**Exhibit A**

**a**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:                                                          Chapter 15

B. Endeavour Shipping Company Limited,                          Case No. 15-10246 (REG)

        Debtor in a Foreign Proceeding.

## ORDER RECOGNIZING FOREIGN MAIN
## PROCEEDING AND GRANTING ADDITIONAL RELIEF

A hearing having been held to consider the Official Form Petition and Verified Petition, filed on February 3, 2015 (the "Verified Petition," and together with the Official Form Petition, the "Petition") by Peter Kubik and Andrew Andronikou of UHY Hacker Young LLP, as the duly authorized Joint Administrators (the "Petitioners") of the above-captioned debtor (the "Debtor") for entry of an order recognizing the administration proceeding pending before the High Court of Justice of England and Wales (the "Foreign Court") and assigned case no. 465/2015 (the "UK Proceeding") as a foreign main proceeding pursuant to section 1517 of title 11 of the United States Code (the "Bankruptcy Code") and granting additional relief pursuant to Bankruptcy Code section 1521; and upon this Court's review and consideration of the Petition, the Declaration of Peter Kubik, filed contemporaneously therewith, and the evidence put on the record at the hearing to consider the Petition (the "Hearing"); and due and proper notice of the Petition having been provided; and no other or further notice being necessary or required; and no objections or other responses having been filed that have not been overruled, withdrawn, or otherwise resolved; and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefore, the Court makes the following findings of fact and conclusions of law:

    A.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

B.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

C.     Venue is proper in this district pursuant to 28 U.S.C. § 1410.

D.     Petitioners are "persons," as such term is defined in 11 U.S.C. § 101(41).

E.     Petitioners are the Debtor's "foreign representative," as such term is defined in 11 U.S.C. § 101(24).

F.     This chapter 15 case was properly commenced pursuant to 11 U.S.C. §§ 1504 and 1515.

G.     Petitioners have satisfied the requirements of 11 U.S.C. § 1515 and Fed. R. Bankr. P. 1007(a)(4).

H.     The UK Proceeding currently pending before the Foreign Court and provisions made thereunder for the protection, administration and distribution of the Debtor's assets, is a "foreign proceeding," as such term is defined in 11 U.S.C. § 101(23).

I.     The UK Proceeding is entitled to recognition by this Court pursuant to 11 U.S.C. § 1517(a).

J.     The UK Proceeding is pending in the country where the Debtor's center of main interests is located, is a "foreign main proceeding," as such term is defined in 11 U.S.C. § 1502(4), and is entitled to recognition as a "foreign main proceeding" pursuant to 11 U.S.C. § 1517(b)(1).

K.     Petitioners are entitled to all the relief provided pursuant to 11 U.S.C. § 1520, without limitation.

L.     The Petitioners are further entitled to all relief expressly set forth in 11 U.S.C. §§ 1521(a)-(b).

M.    The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted under 11 U.S.C. §§ 1517, 1520, and 1521.

Now therefore, it is hereby ORDERED:

1.    The UK Proceeding is granted recognition as a foreign main proceeding pursuant to 11 U.S.C. §§ 1517(a) and 1517(b)(l).

2.    All relief afforded a foreign main proceeding pursuant to 11 U.S.C. § 1520 is granted.

3.    Pursuant to 11 U.S.C. § 1520(a)(1), 11 U.S.C. §§ 361 and 362 apply with respect to the Debtor and the Debtor's property that is currently within or may be brought into the territorial jurisdiction of the United States.

4.    Petitioners are authorized to operate the business of the Debtor that is the subject of the UK Proceeding and exercise the powers of a trustee to the extent provided by 11 U.S.C. § 1520(a)(3).

5.    Pursuant to 11 U.S.C. § 1521(a)(1)-(3), all persons and entities, other than Petitioners and their representatives and agents, are hereby enjoined from:

> a.  execution against any of the Debtor's assets;
>
> b.  the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, arbitral, or other action or proceeding, or to recover a claim, which in either case is in any way related to, or would interfere with, the administration of the Debtor's estate in the UK Proceeding;
>
> c.  taking or continuing any act to create, perfect or enforce a lien or other security interest, set-off or other claim against the Debtor or any of its property;
>
> d.  transferring, relinquishing or disposing of any property of the Debtor to any person or entity other than the Petitioners;

    e.   commencing or continuing an individual action or proceeding concerning the Debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a); and

    f.   declaring or considering the filing of the UK Proceeding or this chapter 15 case a default or event of default under any agreement, contract or arrangement.

6.    Pursuant to 11 U.S.C. § 1521(a)(5), the administration or realization of the Debtor's assets within the territorial jurisdiction of the United States is entrusted to the Petitioners and the Petitioners are hereby established as the exclusive representatives of the Debtor in the United States.

7.    The UK Proceeding and all prior orders of the Foreign Court shall be and hereby are granted comity and given full force and effect in the United States.

8.    No action taken by the Petitioners, the Debtor, or their respective successors, agents, representatives, advisors, or counsel in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the UK Proceeding, this order, this chapter 15 case, or any adversary proceeding herein, or any further proceeding commenced hereunder, shall be deemed to constitute a waiver of the rights or benefits afforded such persons under 11 U.S.C. §§ 306 and 1510.

9.    Notwithstanding anything to the contrary contained herein, this order shall not be construed as (1) enjoining the police or regulatory act of a governmental unit, including a criminal action or proceeding, or (2) staying the exercise of any rights that are not subject to the automatic stay pursuant to 11 U.S.C. §§ 362(b)(6), (7), (17), or (27) or 362(o).

10.    A copy of this order shall be served, within five business days of entry of this order, by fax, e-mail, or regular mail, upon all of the Debtor's known creditors and investors, the Office of the United States Trustee, and such other entities as the Court may direct. Such service shall be good and sufficient service and adequate notice for all purposes.

11.     The Court shall retain jurisdiction with respect to: (1) the enforcement, amendment or modification of this order; (2) any requests for additional relief or any adversary proceeding brought in or through this chapter 15 case; and (3) any request by an entity for relief from the provisions of this order, for cause shown, as to any of the foregoing, and provided the same is properly commenced and within the jurisdiction of this Court.


Dated: New York, New York
        March 10, 2015                    _s/ Robert E. Gerber_____
                                          UNITED STATES BANKRUPTCY JUDGE

**b**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Case No. 20-11207 (SCC) |
| **DIGICEL GROUP ONE LIMITED,** | |
| Debtor in Foreign Proceedings. | Chapter 15 |

## ORDER GRANTING (I) RECOGNITION OF FOREIGN MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVES, (III) RECOGNITION OF SANCTION ORDER AND RELATED SCHEME, AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

Upon the *Motion for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representatives, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief under Chapter 15 of the Bankruptcy Code* (ECF No. 3) (the "**Motion**" and, together with the chapter 15 petition (ECF No. 1), the "**Petition**")[1] of Mike Morrison and Charles Thresh of KPMG Advisory Limited and James Bennett of KPMG LLP, in their capacities as the joint provisional liquidators and authorized foreign representatives (in such respective capacities, the "**JPLs**" or the "**Foreign Representatives**") of Digicel Group One Limited, an exempted company with limited liability incorporated under the laws of Bermuda (the "**Debtor**," the "**Company**" or "**DGL1**") that is subject to (i) a provisional liquidation proceeding under Part XIII of the Companies Act 1981 (the "**Bermuda Companies Act**") entitled *In the Matter of Digicel Group One Limited and In the Matter of the Companies Act 1981*, pending before the Supreme Court of Bermuda (the "**Bermuda Court**"), Companies (Winding Up) Commercial Court, 2020: No. 144 (the "**Provisional Liquidation Proceeding**") and (ii) a reorganization proceeding entitled *In the Matter of Digicel Group One Limited (Provisional Liquidators Appointed for Restructuring Purposes) and In the*

---

[1] Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Motion.

*Matter of Section 99 of the Companies Act 1981* concerning a scheme of arrangement (under section 99 of the Bermuda Companies Act) between DGL1 and the DGL1 Scheme Creditors (the "**Scheme**"), pending before the Bermuda Court, Civil Jurisdiction (Commercial Court), 2020: No. 149 (the "**Scheme Proceeding**," and together with the Provisional Liquidation Proceeding, the "**Bermuda Proceedings**"), pursuant to sections 105(a), 1504, 1507, 1510, 1515, 1517, 1520, and 1521 of title 11 of the United States Code (the "**Bankruptcy Code**"), for entry of an order (this "**Order**"), among other things: (i) recognizing the Bermuda Proceedings as a "foreign main proceeding" or, in the alternative, as a "foreign nonmain proceeding," pursuant to chapter 15 of the Bankruptcy Code; (ii) recognizing each of the Foreign Representatives as a duly appointed "foreign representative," as defined in section 101(24) of the Bankruptcy Code in respect of the Bermuda Proceedings; (iii) recognizing, granting comity to, and giving full force and effect in the United States to the Bermuda Proceedings, the Scheme, and the Bermuda Orders; (iv) enjoining parties from taking any action inconsistent with the Scheme in the United States, including giving effect to the Releases; (v) authorizing The Depository Trust Company ("**DTC**") and the Existing Notes Trustee, and any successor trustee to take any and all actions necessary to give effect to the terms of the proposed restructuring of DGL1 (the "**Restructuring**"); and (vi) granting such other relief as this Court deems just and proper, all as more fully set forth in the Petition; and upon this Court's review and consideration of the Petition, the Thresh Declaration, the Luthi Declaration, the *Supplemental Declaration of C. Christian R. Luthi in Support of the Motion for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representatives, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief under Chapter 15 of the Bankruptcy Code* (ECF No. 19), and the evidence admitted at the hearing ("**Hearing**") to consider the Petition, the *Reply of the Foreign Representatives to the Letter of Don MacAllister and in Further Support of*

2

*the Motion for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representatives, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief under Chapter 15 of the Bankruptcy Code* (ECF No. 20) and the *Declaration of Paul Meagher* (ECF No. 21); and due and proper notice of the Petition having been provided; and no other or further notice being necessary or required; and Don MacAllister having filed correspondence dated May 27, 2020 (ECF No. 18) and June 13, 2020 (ECF No. 23) (together, the "**MacAllister Correspondence**") in respect of the Petition and [no objections or other responses having been filed that have not been overruled, withdrawn, or otherwise resolved;] and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefor,

## THE COURT HEREBY FINDS AND CONCLUDES THAT

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334, section 1501 of the Bankruptcy Code and the *Amended Standing Order of Reference* dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).

C.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P) and this Court may enter a final order consistent with Article III of the United States Constitution.

3

D.    Venue is proper in this district pursuant to 28 U.S.C. § 1410.

E.    The Debtor has intangible property and property rights within this district and, therefore, the Debtor is eligible to be a debtor in a chapter 15 case pursuant to sections 109 and 1501 of the Bankruptcy Code.

F.    This case was properly commenced pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code.

G.    The Petition meets the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rules 1007(a)(4) and 2002.

H.    The Bermuda Proceedings are "foreign proceedings" within the meaning of section 101(23) of the Bankruptcy Code.

I.    The Bermuda Proceedings are located in Bermuda, which is the country where the Debtor's center of main interests is located and, as such, the Bermuda Proceedings are entitled to recognition as "foreign main proceedings" pursuant to sections 1502(4) and 1517(b)(1) of the Bankruptcy Code.

J.    The Bermuda Proceedings are entitled to recognition by this Court pursuant to sections 1515 and 1517(a) of the Bankruptcy Code.

K.    The Foreign Representatives are each a person within the meaning of section 101(41) of the Bankruptcy Code and are the duly appointed foreign representatives of the Debtor within the meaning of section 101(24) of the Bankruptcy Code.

L.    The relief granted hereby pursuant to sections 1507, 1515, 1517, 1520 and 1521 of the Bankruptcy Code is necessary and appropriate to effectuate the purposes of chapter 15, to protect the Debtor and the interests of its creditors and other parties in interest, and is consistent

4

with the laws of the United States, international comity, public policy, and the policies of the Bankruptcy Code.

M.      Each of the injunctions contained in this Order (i) is within this Court's jurisdiction, (ii) is essential to the success of the Bermuda Proceedings and the Scheme, (iii) is an integral element of Bermuda Proceedings and the Scheme or to its effectuation, (iv) confers material benefits on, and is in the best interests of, the Debtor, its creditors and its parties in interest, including, without limitation, the DGL1 Scheme Creditors and the Existing Notes Trustee, and (v) is important to the overall objectives of the Scheme.

N.      Appropriate notice of the filing of, and the hearing on, the Petition was given, which notice was deemed adequate for all purposes, and no further notice need be given.

## NOW THEREFORE, IT IS HEREBY ORDERED THAT

1.      The Petition and requested relief therein is granted.

2.      For the reasons set forth on the record of the Hearing, the objections set forth in the MacAllister Correspondence are overruled in their entirety.  All other objections, if any, to the Petition or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Hearing, or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits.

3.      The Bermuda Proceedings are granted recognition as foreign proceedings as defined in section 101(23) of the Bankruptcy Code and pursuant to section 1517 of the Bankruptcy Code.

4.      The Bermuda Proceedings are collective, court-supervised proceedings governed in accordance with applicable Bermuda law, as it may be amended from time to time, and are granted recognition as foreign main proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code and are entitled to the protections of section 1520(a) of the Bankruptcy Code.

5

5.      The Foreign Representatives are the duly appointed and authorized representatives of the Bermuda Proceedings within the meaning of section 101(24) of the Bankruptcy Code, are authorized to act on behalf of the Debtor in this chapter 15 case and are established as the exclusive representatives of the Debtor in the United States.

6.      The Bermuda Proceedings, the Scheme and the Bermuda Orders, including the Releases contained therein, are recognized, granted comity, and entitled to full force and effect in the United States.

7.      All persons and entities are permanently enjoined and restrained from taking any actions in the United States inconsistent with the Scheme or the Bermuda Orders, or interfering with the enforcement and implementation of the Scheme or the Bermuda Orders, including, without limitation, commencing, continuing or enforcing any action or legal proceeding based on causes of actions released by the Releases.

8.      The administration, realization and distribution of all or part of the assets of the Debtor within the territorial jurisdiction of the United States is entrusted to the Foreign Representatives and the Foreign Representatives are established as the exclusive representatives of the Debtor in the United States pursuant to sections 1521(a) and 1521(b) of the Bankruptcy Code.

9.      The Foreign Representatives, the Debtor and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules or orders of this Court.

10.     No action taken by the Foreign Representatives, the Debtor, or their respective successors, agents, representatives, advisors, or counsel in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the Bermuda Proceedings, this Order, this chapter 15 case, or any adversary proceeding herein, or any further proceeding

6

commenced hereunder, shall be deemed to constitute a waiver of the rights or benefits afforded such persons under 306 and 1510 of the Bankruptcy Code.

11.     This Order shall be served by electronic mail to the extent email addresses are available and otherwise by U.S. mail, first-class postage prepaid or overnight, upon: (i) the Notice Parties (as defined in the *Motion Pursuant to Fed. R. Bankr. P. 2002 and 9007 Requesting Entry of Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice* (ECF No. 7) (the "**Scheduling Motion**") and (ii) those parties requesting notice pursuant to Bankruptcy Rule 2002. Epiq, in its capacity as the Company's information agent, shall make this Order available on the Case Website (as defined in the Scheduling Motion), which may be accessed by the DGL1 Scheme Creditors and other parties in interest. Such service and notice is good and sufficient service and adequate notice for all purposes.

12.     The Foreign Representatives are authorized to take all actions necessary to carry out this Order.

13.     The Existing Notes Trustee and DTC are each hereby authorized to take any actions or execute any documents each believes appropriate in furtherance of or in connection with consummating the transactions contemplated by the Bermuda Orders and the Scheme, including, among other things, the cancellation and discharge of the Existing Notes and the Existing Notes Indenture; and DGL1 is authorized to reimburse the Existing Notes Trustee and DTC for all reasonable fees, costs and expenses, including reasonable fees and expenses of their respective counsel, that each incurs in taking such actions.

14.     Nothing in this Order shall affect the rights of the Existing Notes Trustee under the Existing Notes Indenture, Existing Notes and related documents, including, without limitation, to

7

collect its fees and expenses (including those relating to the Existing Notes Trustee's retained professionals) from DGL1.

15.     The Existing Notes Trustee and DTC shall incur no liability and be exculpated and released from any liability for any action or inaction taken in furtherance of this Order, except for any liability arising from any action or inaction constituting actual fraud, willful misconduct, or gross negligence, in each case as finally determined by this Court.

16.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry, the Foreign Representatives shall not be subject to any stay in the implementation, enforcement or realization of the relief granted in this Order and this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

17.     This Court shall retain jurisdiction to hear and determine all matters arising from or related to interpretation or implementation of this Order.

Dated:  June 17, 2020
       New York, New York

                          /S/ Shelley C. Chapman
                          THE HONORABLE SHELLEY C. CHAPMAN
                          UNITED STATES BANKRUPTCY JUDGE

C

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 15 |
| | ) | |
| Bibby Offshore Services Plc, | ) | Case No. 17-13588 (MG) |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |

## ORDER GRANTING PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND MOTION FOR RELATED RELIEF

Upon consideration of the *Verified Petition for Recognition of Foreign Main Proceeding, Supplementing "Voluntary Petition" [Docket No. 1], and Motion for Related Relief Pursuant to Section 105(a), 1507(a), 1509(b)(2)-(3), 1521(a), and 1525(a) of the Bankruptcy Code Giving Full Force and Effect to UK Scheme of Arrangement* [ECF Doc. # 2] (together with the Form of Voluntary Petition [ECF Doc. # 1], the "Petition"),[1] the Woodcock Declaration, and the Houghton Declaration (together with the Petition and the Woodcock Declaration, the "Chapter 15 Pleadings"), each filed on December 20, 2017 by or on behalf of the Petitioner, Howard Woodcock, in his capacity as the duly-appointed foreign representative of Bibby Offshore Services Plc (the "Debtor"), the debtor in a voluntary Scheme of Arrangement (the "UK Proceeding") concerning the Debtor currently pending before the Chancery Division (Companies Court) of the High Court of Justice of England and Wales (the "English Court"); and the Court having considered and reviewed the Chapter 15 Pleadings and having held a hearing to consider the relief requested in the Petition on January 18, 2018 (the "Hearing"); and it appearing that timely notice of the filing of the Chapter 15 Pleadings and the Hearing has been given; and upon all of the

---

[1]       Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the Petition.

proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND**, that:

1.      This case was properly commenced pursuant to sections 1504 and 1515 of the Bankruptcy Code.

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference, dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

4.      This Court may enter a final order consistent with Article III of the United States Constitution.

5.      The funds held in the Bank Account are property of the Debtor within this district; the Debtor is therefore "eligible" pursuant to 11 U.S.C. § 109(a), and venue is proper in this district pursuant to 28 U.S.C. § 1410(1).

6.      Good, sufficient, appropriate, and timely notice of the filing of the Petition and the Hearing has been given by the Debtor to: (a) the Debtor, (b) counsel to the Debtor, (c) counsel to the Trustee, (d) counsel to the Ad Hoc Group, (e) counsel to the Security Agent, (f) counsel to the RCF Agent and Lender; (g) the Information Agent, (h) the Office of the United States Trustee for the Southern District of New York; and (i) all parties required to be given notice under Bankruptcy Rule 2002(q) of which the Petition is aware; and Noteholders were provided notice of the Petition and the Hearing by the Information Agent; such notice is deemed adequate for all purposes, and no other or further notice need be provided.

7.      The UK Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

8.      The UK Proceeding is pending in England (a constituent member of the political union comprising the United Kingdom), which is the country in which the Debtor has the center of its main interests, and, as such, the UK Proceeding is a "foreign main proceeding" within the meaning of sections 1502(4) and 1517(b)(1) of the Bankruptcy Code and entitled to recognition as the foreign main proceeding in respect of the Debtor.

9.      The Petitioner, Howard Woodcock, is a "person" as defined in section 101(41) of the Bankruptcy Code and has been duly appointed by the Debtor and has been declared by the English Court as authorized to act as the "foreign representative" with respect to the UK Proceeding within the meaning of section 101(24) of the Bankruptcy Code.

10.      The Petition meets all of the requirements set forth in section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).

11.      The UK Proceeding is entitled to recognition by the Court as a foreign main proceeding pursuant to sections 1517(a) and 1517(b) of the Bankruptcy Code.

12.      The Debtor and the Petitioner are entitled to all of the relief set forth in section 1520 of the Bankruptcy Code.

13.      The relief granted hereby is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States, warranted pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1520, 1521(a), and 1525 of the Bankruptcy Code, and will not cause hardship to creditors of the Debtor or other parties in interests that is not outweighed by the benefits of granting that relief.

14.     The relief granted hereby is necessary to effectuate the purposes and objectives of chapter 15 and to protect the Debtor and the interests of its creditors and other parties in interest.

15.     Absent the relief granted hereby, the Debtor and the Released Parties may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative, or regulatory actions or proceedings in connection with the Scheme claims against the Debtor and the Released Parties or their property, thereby interfering with and causing harm to, the Debtor, its creditors, and other parties in interest in the UK Proceeding and, as a result, the Debtor, its creditors, and such other parties in interest would suffer irreparable injury for which there is no adequate remedy at law.

16.     Absent the requested relief, the efforts of the Debtor, the English Court, and the Petitioner in conducting the UK Proceeding and effecting the Restructuring under the Scheme and English law may be thwarted by the actions of certain creditors, a result inimical to the purposes of chapter 15 as reflected in section 1501(a) of the Bankruptcy Code.

17.     Each of the injunctions contained in this Order (i) is within the Court's jurisdiction, (ii) is essential to the success of the Scheme, (iii) is an integral element of the Scheme and/or to its effectuation, (iv) confers material benefits on, and is in the best interests of, the Debtor and its creditors, including without limitation the Noteholders, and (v) is important to the overall objectives of the Restructuring.  For all of the foregoing reasons and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED**, that:

(A)     the Petition and the Relief Requested are granted;

(B)      the UK Proceeding is granted recognition as a foreign main proceeding (as defined in section 1502 of the Bankruptcy Code) pursuant to sections 1517(a) and (b)(1) of the Bankruptcy Code;

(C)      the Petitioner is recognized as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the UK Proceeding;

(D)      the Debtor and the Petitioner are granted all of the relief set forth in section 1520 of the Bankruptcy Code including, without limitation, the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and to the Debtor's property that is within the territorial jurisdiction of the United States;

(E)      the Petitioner is hereby (i) authorized to examine witnesses, take evidence, and deliver information concerning the Debtor and its business and (ii) entrusted with the administration of any and all of the Debtor's assets within the territorial jurisdiction of the United States;

(F)      the Scheme Sanction Order and the Scheme are recognized, granted comity, and entitled to full force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and such terms shall be binding and fully enforceable on all Noteholders and Related Parties, whether or not they actually agreed to be bound by the Scheme or participated in the UK Proceeding;

(G)      subject to paragraph (O) below, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the personal liability of the Debtor or any Released Party with respect to any debt cancelled, discharged, or restructured under the Scheme (including, for the avoidance of doubt, any amount owed in connection with the Notes) and/or as

a result of English law relating to the Restructuring, is unenforceable within the territorial jurisdiction of the United States;

(H)     subject to paragraph (O) below, all Noteholders and Related Parties are permanently enjoined from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit, or other proceeding (including, without limitation, arbitration, mediation, or any judicial, quasi-judicial, or administrative action, proceeding, or process whatever in any judicial, arbitral, administrative, or other forum), employing any process, or performing any act within the territorial jurisdiction of the United States to collect, recover, or offset any debt or claim cancelled, discharged, or restructured under the Scheme (including, for the avoidance of doubt, any amount owed in connection with the Notes) and/or as a result of English law relating to the Restructuring, or seeking discovery related thereto;

(I)     subject to paragraph (O) below, all Noteholders and Related Parties are permanently enjoined from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, arbitration, mediation, or any judicial, quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral, administrative, or other forum), employing any process, or performing any act, to collect, recover, or offset any debt cancelled, discharged, or restructured under the Scheme (including, for the avoidance of doubt, any amount owed in connection with the Notes) and/or as a result of English law relating to the Restructuring, against property of the Debtor or of the Released Parties within the territorial jurisdiction of the United States, including (i) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judicial, quasi-judicial, or administrative judgment, award, determination, decree, assessment,

garnishment, order, or arbitration award against the Debtor or the Released Parties or their respective property, or any direct or indirect transferee of or successor to any property of the Debtor or of the Released Parties, or any property of such transferee or successor, or (ii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any lien or encumbrance of any kind against such property;

(J)      all Noteholders and Related Parties are permanently enjoined from (i) transferring, relinquishing, or disposing of any property of the Debtor or of the Released Parties located within the territorial jurisdiction of the United States, or (ii) taking or continuing any act to obtain possession of, commingle, or exercise control over such property within the territorial jurisdiction of the United States, to the extent any such act under (i) or (ii) is inconsistent with the Scheme or English law relating to the Restructuring;

(K)      all entities (as that term is defined in section 101(15) of the Bankruptcy Code) subject to the Court's jurisdiction are permanently enjoined from taking any action inconsistent with the Scheme, including, without limitation, against the Debtor, the Released Parties, or against any property of the Debtor or the Released Parties within the territorial jurisdiction of the United States;

(L)      all entities (as that term is defined in section 101(15)) are permanently enjoined from commencing or continuing in any manner inconsistent with the Scheme any suit, action, or other proceeding in the territorial jurisdiction of the United States to settle any dispute that arises out of any provision of the Scheme and English law relating to the Restructuring;

(M)      all Noteholders and Related Parties are permanently enjoined within the territorial jurisdiction of the United States from commencing or continuing in any manner inconsistent with the Scheme, directly or indirectly, including by way of counterclaim, any action, suit, or other

proceeding (including, without limitation, arbitration, mediation, or any judicial, quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral, administrative, or other forum), or employing any process, against the Foreign Representative (personally or in such capacity), the Debtor, the Released Parties, or any of their respective successors, assigns, agents, representatives, advisors, or attorneys (collectively, the "Debtor Parties") or any of them in respect of any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken in preparing, negotiating, disseminating, applying for, or implementing the Scheme or the Scheme Sanction Order;

(N)    no action taken by the Petitioner in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the Scheme, this Order, the Chapter 15 Case, any further order for additional relief in this Chapter 15 Case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any protection afforded the Petitioner, as Foreign Representative, including, without limitation, pursuant to section 1510 of the Bankruptcy Code;

(O)    for the avoidance of doubt, nothing in this Order shall impair the rights of any entity expressly granted under the Scheme, and nothing herein shall modify the exclusive right of the Courts of England & Wales to hear and determine any suit, action, or proceeding and to settle any dispute which may arise out of the Explanatory Statement or any provision of the Scheme, or out of any action taken or omitted to be taken under the Scheme or in connection with the administration of the Scheme.

(P)    the Debtor and the Petitioner are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order;

(Q)    the Court shall retain jurisdiction with respect to the effect, enforcement, amendment, or modification of this Order, any request for additional relief and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of the Court; and

(R)    this Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

**IT IS SO ORDERED.**

Dated:  January 18, 2018
          New York, New York

_____/s/ Martin Glenn_____
MARTIN GLENN
United States Bankruptcy Judge

**d**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

|                                         |   |                          |
| In re                                   | ) | Chapter 15               |
|                                         | ) |                          |
| Codere Finance (UK) Limited,            | ) | Case No. 15-13017 (JLG)  |
|                                         | ) |                          |
|     Debtor in a Foreign Proceeding. | ) |                          |

_____

### ORDER GRANTING PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND REQUEST FOR RELATED RELIEF

Upon consideration of the Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief, ECF No. 2 (together with the Form of Voluntary Petition, ECF No. 1, the "Petition"), the Foreign Representative Declaration,[1] and the UK Declaration, (together with the Petition, and the Foreign Representative Declaration, the "Chapter 15 Pleadings"), each filed on November 11, 2015 by or on behalf of the Petitioner, David Jiménez Márquez, in his capacity as the duly-appointed foreign representative of Codere Finance (UK) Limited ("Codere UK", or the "Debtor"), the debtor in a voluntary restructuring proceeding (the "UK Proceeding") concerning the Debtor currently pending before the Chancery Division (Companies Court) of the High Court of Justice of England and Wales (the "UK Court"); and it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. § 1410; and the Court having considered and reviewed the Chapter 15 Pleadings and having held a hearing to consider the relief requested in the Petition on December 22, 2015 (the "Hearing"); and it appearing that timely notice of the filing of the Chapter 15 Pleadings and the Recognition

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the Petition.

Hearing has been given to the Debtor, the Office of the United States Trustee for the Southern District of New York, the Trustee, Counsel to the Ad Hoc Committee, the Information Agent for distribution to the Scheme Creditors and that no other or further notice need be provided; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND**, that:

1.      This case was properly commenced pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code.

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

4.      The Client Trust Account is property of the Debtor within this district and, therefore, the Debtor is eligible to be a debtor in a chapter 15 case pursuant to sections 109 and 1501 of the Bankruptcy Code.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1410.

6.      The UK Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

7.      The UK Proceeding is pending in England (a constituent member of the political union comprising the UK), which is the country in which the Debtor has the center of its main interests and, as such, the UK Proceeding is a "foreign main proceeding" within the meaning of sections 1502(4) and 1517(b)(1) of the Bankruptcy Code and entitled to recognition as the foreign main proceeding in respect of the Debtor.

1

8.      The Petitioner, David Jiménez Márquez, has been duly appointed by the Debtor

and has been declared by the UK Court as authorized to act as the "foreign representative" with

respect to the UK Proceeding within the meaning of section 101(24) of the Bankruptcy Code.

9.      The Petition meets all of the requirements set forth in section 1515 of the

Bankruptcy Code and rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

10.     The UK Proceeding is entitled to recognition by the Court pursuant to section

1517(a) of the Bankruptcy Code.

11.     The Debtor and the Petitioner are entitled to all of the relief set forth in section

1520 of the Bankruptcy Code.

12.     Appropriate notice of the filing of, and the Hearing on, the Petition was given,

which notice is deemed adequate for all purposes, and no other or further notice need be given.

13.     The relief granted hereby is necessary and appropriate, in the interests of the

public and of international comity, not inconsistent with the public policy of the United States,

warranted pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1520, 1521(a) and 1525 of the

Bankruptcy Code, and will not cause hardship to creditors of the Debtors or other parties in

interests that is not outweighed by the benefits of granting that relief.

14.     The relief granted hereby is necessary to effectuate the purposes and objectives of

chapter 15 and to protect the Debtor and the interests of its creditors and other parties in interest.

15.     Absent the relief granted hereby, the Debtor Parties (as defined in paragraph (G)

below) may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative or

regulatory actions or proceedings in connection with the Scheme Claims against themselves or

their property, thereby interfering with and causing harm to, the Debtor, its creditors, and other

parties in interest in the UK Proceeding and, as a result, the Debtor, its creditors and such other

parties in interest would suffer irreparable injury for which there is no adequate remedy at law.

16.     Absent the requested relief, the efforts of the Debtor, the UK Court and the

Petitioner in conducting the UK Proceeding and effecting the Restructuring under the Scheme,

the Restructuring Documents and English law may be thwarted by the actions of certain

creditors, a result counter to the purposes of chapter 15 as reflected in section 1501(a) of the

Bankruptcy Code.

17.     Each of the injunctions contained in this Order (i) is within the Court's

jurisdiction, (ii) is essential to the success of the Scheme, (iii) is an integral element of the

Scheme and/or to its effectuation, (iv) confers material benefits on, and is in the best interests of,

the Debtor and its creditors, including without limitation the Scheme Creditors, and (v) is

important to the overall objectives of the Restructuring.

For all of the foregoing reasons, and after due deliberation and sufficient cause appearing

therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED**, that:

(A)     the Petition and the Relief Requested are granted;

(B)     the UK Proceeding is granted recognition as a foreign main proceeding (as

defined in section 1502 of the Bankruptcy Code) pursuant to sections 1517(a) and (b)(1) of the

Bankruptcy Code;

(C)     the Petitioner is recognized as the "foreign representative" as defined in section

101(24) of the Bankruptcy Code in respect of the UK Proceeding;

(D)     the Debtor and the Petitioner are granted all of the relief set forth in section 1520

of the Bankruptcy Code including, without limitation, the application of the protection afforded

by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and to the Debtor's property that is within the territorial jurisdiction of the United States;

(E)    the Petitioner is hereby entrusted with the administration of any and all of the Debtor's assets within the territorial jurisdiction of the United States;

(F)    as of the Effective Date (as defined in the Scheme), the Scheme Sanction Order, the Scheme and the Restructuring Documents are recognized, granted comity, and entitled to full force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and such terms shall be binding and fully enforceable on all Scheme Creditors, Backstop Parties, the Funding Parties and any of their Nominated Recipients;

(G)    as of the Effective Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the liability of the Debtor or any other person released under the Scheme, including, as applicable, the Protected Parties (as defined in the Explanatory Statement) (collectively, the "Debtor Parties"), with respect to any debt cancelled, discharged or restructured under the Scheme, the Restructuring Documents or as a result of English law relating to the Restructuring is unenforceable in the United States, in each case, to the extent inconsistent with the Scheme, the Restructuring Documents or such law;

(H)    as of the Effective Date, all Scheme Creditors, the Backstop Parties, the Funding Parties, and any of their Nominated Recipients are permanently enjoined from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, any judicial, quasi-judicial or administrative action, proceeding or process whatever in any judicial, administrative or other forum), employing any process, or performing any act to collect, recover or offset any debt

4

cancelled, discharged or restructured under the Scheme or Restructuring Documents and/or as a
result of English law relating to the Restructuring, or seeking any discovery related thereto, in
each case, to the extent inconsistent with the Scheme, the Restructuring Documents or such law;

(I)     as of the Effective Date, Scheme Creditors, the Backstop Parties, the Funding
Parties, and any of their Nominated Recipients are permanently enjoined from (i) transferring,
relinquishing or disposing of any property of the Debtor Parties located within the territorial
jurisdiction of the United States, or (ii) taking or continuing any act to obtain possession of, or
exercise control over, such property, in each case, to the extent inconsistent with the Scheme, the
Restructuring Documents or English law relating to the Restructuring;

(J)     as of the Effective Date, all entities (as that term is defined in section 101(15)) are
permanently enjoined from commencing any suit, action or proceeding in the territorial
jurisdiction of the United States to resolve any dispute arising out of any provision of the
Scheme, the Restructuring Documents or English law relating to the Restructuring;

(K)     as of the Effective Date, all entities (as that term is defined in section 101(15) of
the Bankruptcy Code) subject to the U.S. Bankruptcy Court's jurisdiction are permanently
enjoined from taking any action inconsistent with the Scheme, including, without limitation,
against the Debtor Parties or any property of Debtor Parties within the territorial jurisdiction of
the United States;

(L)     as of the Effective Date, the Scheme Creditors, the Backstop Parties, the Funding
Parties, and any of their Nominated Recipients are permanently enjoined from commencing or
continuing in any manner, directly or indirectly, including by way of counterclaim, any action,
suit or other proceeding (including, without limitation, arbitration, mediation or any judicial,
quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral,

5

administrative or other forum), or employing any process, against the Foreign Representative (personally or in such capacity), the Debtor or the other Debtor Parties in respect of any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken in connection with this chapter 15 case, the Scheme or the Restructuring Documents;

(M)     no action taken by the Petitioner in preparing, disseminating, applying for, implementing or otherwise in connection with the Scheme, the Restructuring Documents, any order entered in respect of this Petition, the chapter 15 case, any further order for additional relief in the chapter 15 case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Petitioner as Foreign Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code;

(N)     the Petitioner is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order;

(O)     the Petitioner, the Debtor, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court;

(P)     this Court shall retain jurisdiction with respect to the effect, enforcement, amendment or modification of this order; and

(Q)     this Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

Dated: December 22, 2015
      New York, New York

*/s/ James L. Garrity, Jr.*
UNITED STATES BANKRUPTCY JUDGE

6

e

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 15 |
|  | ) |  |
| COMPANIA MEXICANA DE AVIACION, S.A. de C.V., | ) | Case No. 10-14182 (MG) |
|  | ) |  |
| Debtor in a Foreign Proceeding. | ) |  |
|  | ) |  |

## ORDER PURSUANT TO
## 11 U.S.C. §§ 1504, 1515, 1517 AND 1520 RECOGNIZING
## FOREIGN REPRESENTATIVE AND FOREIGN MAIN PROCEEDING

Upon the Verified Petition for Recognition and Chapter 15 Relief (the "Petition")[1]

seeking (a) recognition of the Foreign Representative as the "foreign representative" as defined

in section 101(24) of the Bankruptcy Code of the above-captioned debtors (collectively, the

"Debtor"); and (b) recognition of the Debtor's reorganization proceedings under Mexican law

currently pending before the District Court for Civil Matters for The Federal District, Mexico

(the "Mexico Court" and "Concurso Proceeding"), as a foreign main proceeding pursuant to

sections 1515 and 1517 of 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"); and upon the

hearing on the Petition and this Court's review and consideration of the Petition, the Foreign

Representative Declaration [Docket No. 194], the Declaration of Mexican Counsel, Maria

Fernanda Alvarado Villazon [Docket No. 195], and the evidence, testimony and argument

presented at such hearing;

IT IS HEREBY FOUND AND DETERMINED THAT:[2]

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Petition.

[2] The findings and conclusions set forth herein and in the record of the hearing on the Petition constitute this Court's findings of facts and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

1.      This Court has jurisdiction to consider the Petition and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 109 and 1501.

2.      Consideration of the Petition and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

3.      Venue is proper before this Court pursuant to 28 U.S.C. § 1410(3).

4.      Good, sufficient, appropriate and timely notice of the filing of the Petition and the hearing on the Petition has been given by the Foreign Representative.

5.      No objections or other responses were filed that have not been overruled, withdrawn or otherwise resolved.

6.      The Chapter 15 proceeding was properly commenced pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

7.      The Foreign Representative is a "person" pursuant to section 101(41) of the Bankruptcy Code and is the "foreign representative" of the Debtor as such term is defined in section 101(24) of the Bankruptcy Code, and the Foreign Representative has satisfied the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).

8.      The Concurso Proceeding is pending in Mexico, where the Debtor's "center of main interests," as referred to in section 1517(b)(1) of the Bankruptcy Code, is located, and accordingly, the Concurso Proceeding is a "foreign main proceeding" pursuant to section 1502(4) of the Bankruptcy Code, and is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(l) of the Bankruptcy Code.

9.      The Foreign Representative is the duly appointed foreign representative of the Debtor within the meaning of section 101(24) of the Bankruptcy Code.

10.     The Foreign Representative is entitled to all the relief provided pursuant to sections 1520 and 1521(a)(5) of the Bankruptcy Code, subject to certain limited exceptions set forth below, because those protections are necessary to effectuate the purposes of Chapter 15 of the Bankruptcy Code and to protect the assets of the Debtor and the interests of the Debtor's creditors.

BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:

11.     The Petition is granted.

12.     The Concurso Proceeding is recognized as a foreign main proceeding pursuant to section 1517(a) and 1517(b)(l) of the Bankruptcy Code, and all the effects of recognition as set forth in section 1520 of the Bankruptcy Code shall apply, subject to certain limited exceptions as set forth below.

13.     Upon entry of this Order:  pursuant to section 1520 of the Bankruptcy Code, the Concurso Proceeding shall be given its full force and effect; and, among other things (and subject to certain limited exceptions set forth below):

> (i)  the protections of sections 361 and 362 of the Bankruptcy Code apply with respect to the Debtor and the property of the Debtor in the territorial jurisdiction of the United States;
>
> (ii)  all persons and entities are enjoined from seizing, attaching and/or enforcing or executing liens or judgments against the Debtor's property in the United States; and
>
> (iii)   all persons and entities are enjoined from commencing or continuing, including the issuance or employment of process of, any judicial, administrative or any other action or proceeding involving or against the Debtor or its assets that are located in the United States.

14.     The Foreign Representative is hereby established as the representative of the Debtor with full authority to administer the Debtor's assets and affairs in the United States.

15.     Notwithstanding the above (or the terms of any contract between the parties), each of the following providers: Flying Food Catering, Inc.; Integrated Airline Services, Inc.; Allied Aviation Fueling Company of San Antonio, Inc.; Allied Aviation Fueling Company, Inc.; Menzies Aviation (USA), Inc.; Servisair & Shell Fuel Services, LLC; Servisair USA, Inc.; and Servisair, LLC; Aircraft Service International, Inc.; and Aviation Port Services, L.L.C. (collectively, the "Providers", and each individually, a "Provider") may discontinue providing goods and/or services to Mexicana unless Mexicana complies with the following terms with respect to such Provider:

(a)     With respect to insurance coverage, Mexicana maintains its insurance coverage and other practices regarding insurance that Mexicana followed prepetition;

(b)     Mexicana makes payment for all postpetition goods and services rendered by such Provider so that payment is actually received by that Provider no later than seven (7) days after receipt or deemed receipt of an invoice (for postpetition goods and services rendered) that has been delivered to Mexicana after August 18, 2010;

(c)     Invoices shall, in addition to delivery to local representatives of Mexicana (in accordance with normal practice), be sent to each of the individuals identified below by: electronic mail; facsimile transmission; or hand delivery or overnight delivery service addressed to both:

| William Heuer | Maritza Jendro |
|---|---|
| Duane Morris LLP | Mexicana Airlines, Accts Payable manager |
| 1540 Broadway | 9841 Airport Blvd. Ste 400. |
| New York, NY 10036-4086 | Los Angeles CA 90045 |
| wheuer@duanemorris.com | maritza.jendro@mexicana.com.mx |
| Fax: (212) 208-4521 | Fax: (310)646-0465 |

An invoice, if properly addressed, shall be deemed received by Mexicana: (i) on the date sent, if sent before 6:00 p.m. (Pacific) by electronic mail or facsimile transmission, or if sent by hand delivery and actually received by Mexicana before 6:00 p.m. (Pacific); or (ii) on the following business day if sent by overnight delivery service or if delivered in accordance with the preceding romanette but having been received after 6:00 p.m. (Pacific).

(d)     Payments are to be made by Mexicana by wire transfer, or by check for good funds drawn on a bank which is a member of United States Federal Reserve System.  If Mexicana elects to make payment by check to be sent by overnight

delivery, it will be overnight delivery for "first morning" or "earliest next day" delivery, or something similar.

(e)     If Mexicana fails to make any payment within the time specified, a Provider can give Notice of Default to Mexicana. A Notice of Default shall be in writing and shall identify or enclose a copy of any invoice for postpetition goods and/or services for which a timely payment has not been timely received.  A Notice of Default must include wire transfer information for the Provider in order to be effective.

(f)     Notices of Default shall be sent by <u>two</u> of the following methods of delivery: electronic mail; facsimile transmission; or hand delivery or overnight delivery service, addressed to <u>each</u> of the following:

| | |
|---|---|
| William Heuer | Maritza Jendro |
| Duane Morris LLP | Mexicana Airlines, Accts Payable manager |
| 1540 Broadway | 9841 Airport Blvd. Ste 400. |
| New York, NY 10036-4086 | Los Angeles CA 90045 |
| wheuer@duanemorris.com | maritza.jendro@mexicana.com.mx |
| Fax: (212) 208-4521 | Fax: (310)646-0465 |

A Notice of Default, if properly addressed, shall be deemed received by Mexicana: (i) on the date sent, if sent before 6:00 p.m. (Pacific) by electronic mail or facsimile transmission, or if sent by hand delivery and actually received by Mexicana before 6:00 p.m. (Pacific); (ii) on the following business day if sent by overnight delivery service or if delivered in accordance with the preceding romanette but having been received after 6:00 p.m. (Pacific).

(g)     If a payment is still not received by Provider by the second business day after a Notice of Default has been received or deemed received by Mexicana (by way of example if Notice of Default is sent by electronic mail and fax on a Tuesday (such that it is received before 6:00 p.m. (Pacific)) the time to cure the default expires on Thursday), Provider may discontinue providing goods and/or services to Mexicana without any further notice.  If a check is received by the Provider on the second day after a Notice of Default has been received or deemed received by Mexicana, that shall constitute payment sufficient to cure the payment default.  Nothing herein precludes Mexicana or any Provider from seeking other relief from the Court prior to the expiration of the time to cure a default.

(h)     Notwithstanding anything herein to the contrary or the terms of any contract between the parties, if any payment by Mexicana to a Provider is not honored by Mexicana's bank, such Provider may immediately discontinue providing goods and/or services to Mexicana without any further notice or opportunity to cure.

(i)     If the Debtor complies with these requirements, it has provided "sufficient protection" to the parties noted above in accordance with 11 U.S.C. § 1522(a).

16.     Notwithstanding any provision of this Order to the contrary (or the terms of the contract between the parties) Airbus North America Customer Services, Inc. ("Airbus") and

Mexicana agree that Airbus may discontinue providing goods and/or services to Mexicana unless

Mexicana complies with the following terms:

> (a)     All orders placed by Mexicana after the date hereof will be pre-paid until such time as postpetition outstanding amounts owed to Airbus (the "Outstanding Amounts") have been paid in full.  Mexicana and Airbus shall work together, in good faith, to reach agreement regarding the Outstanding Amounts.

> (b)     Once such Outstanding Amounts are paid in full, Mexicana shall make payment for all postpetition goods and services rendered by Airbus in accordance with the terms of the contract between the parties.

> (c)     Notwithstanding anything herein to the contrary or the terms of the contract between the parties, if any payment by Mexicana to Airbus is not honored by Mexicana's bank, Airbus may immediately discontinue providing goods and/or services to Mexicana without any further notice or opportunity to cure.

17.     Nothing herein prohibits Mexicana from remitting fees and taxes, as may be required by government or agency regulations, statutes or rules, that are not property of the estate.  Mexicana recognizes its obligation to comply with such requirements.  Mexicana has confirmed to the Court that Mexicana recognizes and will timely fulfill all of its obligations to comply with all statutes, regulations and rules of the United States and its agencies applicable to Mexicana including, without limitation, its obligations to remit fees and taxes (that are not property of the estate), and specifically including its obligation to segregate and timely remit passenger facility charges to airports within the territorial jurisdiction of the United States and any other funds that are held in trust for the United States and any of its agencies.

18.     Nothing herein shall enjoin or otherwise bar any governmental unit, as defined in 11 U.S.C. § 101(27), from (1) initiating or continuing any criminal, police or regulatory action against Mexicana to the extent permitted under 11 U.S.C. § 362(b).

19.     Mexicana agrees, and the Court hereby orders, that, notwithstanding any provision of this Order to the contrary (or the terms of any contract between the parties) or the terms of a Stipulation submitted by the parties and so-ordered by the Court on November 3, 2010

6

[Docket No. 253] (the "Stipulation"), on consent of the parties to the Stipulation, as of November 10, 2010, to the extent each U.S.-based owner and/or operator of an airport (an "Airport Entity") has not been paid for postpetition rent and other postpetition amounts owed (the "November 10th Payment"), each such Airport Entity (on an individual basis) is granted automatically and without further order of the Court relief:

> (i) from the automatic stay, to the extent recognition as a "foreign main proceeding" is obtained by Mexicana, thereby permitting such Airport Entity to exercise any rights or remedies such Airport Entity may have or obtain respecting Mexicana including, without limitation, any right to terminate a lease or agreement (in accordance with its terms) with Mexicana and to recover any space used by Mexicana at such airport, provided, however, that to the extent the exercise of any such right or remedy requires further judicial relief, such Airport Entity shall seek such relief from this Court unless this Court orders otherwise; and

> (ii) from any injunction issued by this Court and remaining in place at such time, thereby permitting such Airport Entity to exercise any rights or remedies such Airport Entity may have or obtain respecting Mexicana including, without limitation, any right to terminate a lease or agreement (in accordance with its terms) with Mexicana and to recover any space used by Mexicana at such airport , provided, however, that to the extent the exercise of any such right or remedy requires further judicial relief, such Airport Entity shall seek such relief from this Court unless this Court orders otherwise.

***provided, however,*** that no Airport Entity entitled to such relief will waive or be deemed to have waived such relief by any failure to act thereon or by any decision to continue to provide goods or services to Mexicana.

20.     Mexicana further agrees, and the Court hereby orders, that notwithstanding any provision of this Order to the contrary (or the terms of the contract between the parties), each Airport Entity that continues to provide goods or services to Mexicana may submit to Mexicana invoices for postpetition rent and other postpetition amounts no more frequently than once each fourteen (14) days, and such Airport Entity may discontinue providing goods and/or services to Mexicana and is automatically granted without further order of the Court the relief from the stay

and/or injunction provided in subparagraphs 19(i) and 19(ii) hereinabove unless Mexicana complies with the following terms:

(a)     With respect to insurance coverage, Mexicana maintains its insurance coverage and other practices regarding insurance that Mexicana followed prepetition;

(b)     Mexicana maintains all existing security deposits and other obligations inthe nature of security deposits, to the extent such deposits and obligations existed as of August 2, 2010;

(c)     Mexicana complies with all other non-monetary prerequisites and requisites for operation at the airport during all such times Mexicana operates at the airport;

(d)     Mexicana makes payment for all postpetition rent and other postpetition amounts owing to such Airport Entity so that payment is actually received by that Airport Entity no later than seven (7) days after receipt or deemed receipt of an invoice therefor that has been delivered to Mexicana;

(e)     Invoices shall, in addition to delivery to local representatives of Mexicana (in accordance with normal practice), be sent to each of the individuals identified below by: electronic mail; facsimile transmission; or hand delivery or overnight delivery service addressed to both:

| | |
|---|---|
| William Heuer | Maritza Jendro |
| Duane Morris LLP | Mexicana Airlines, Accts Payable manager |
| 1540 Broadway | 9841 Airport Blvd. Ste 400. |
| New York, NY 10036-4086 | Los Angeles CA 90045 |
| wheuer@duanemorris.com | maritza.jendro@mexicana.com.mx |
| Fax: (212) 208-4521 | Fax: (310)646-0465 |

An invoice, if properly addressed, shall be deemed received by Mexicana: (i) on the date sent, if sent before 6:00 p.m. (Pacific) by electronic mail or facsimile transmission, or if sent by hand delivery and actually received by Mexicana before 6:00 p.m. (Pacific); or (ii) on the following business day if sent by overnight delivery service or if delivered in accordance with the preceding romanette but having been received after 6:00 p.m. (Pacific).

(f)     Payments are to be made by Mexicana by wire transfer, or by check for good funds drawn on a bank which is a member of United States Federal Reserve System.  If Mexicana elects to make payment by check to be sent by overnight delivery, it will be overnight delivery for "first morning" or "earliest next day" delivery, or something similar.

(g)     If Mexicana fails to make any payment within the time specified, an Airport Entity can give Notice of Default to Mexicana. A Notice of Default shall be in writing and shall identify or enclose a copy of any invoice for postpetition goods and/or services for which a timely payment has not been timely received.

A Notice of Default must include wire transfer information for the Airport Entity in order to be effective.

(h)     Notices of Default shall be sent by <u>two</u> of the following methods of delivery: electronic mail; facsimile transmission; or hand delivery or overnight delivery service, addressed to <u>each</u> of the following:

William Heuer                          Maritza Jendro
Duane Morris LLP                   Mexicana Airlines, Accts Payable manager
1540 Broadway                       9841 Airport Blvd. Ste 400.
New York, NY 10036-4086     Los Angeles CA 90045
wheuer@duanemorris.com      maritza.jendro@mexicana.com.mx
Fax: (212) 208-4521              Fax: (310)646-0465

A Notice of Default, if properly addressed, shall be deemed received by Mexicana: (i) on the date sent, if sent before 6:00 p.m. (Pacific) by electronic mail or facsimile transmission, or if sent by hand delivery and actually received by Mexicana before 6:00 p.m. (Pacific); (ii) on the following business day if sent by overnight delivery service or if delivered in accordance with the preceding romanette but having been received after 6:00 p.m. (Pacific).

(i)     If a payment is still not received by the Airport Entity by the second business day after a Notice of Default has been received or deemed received by Mexicana (by way of example if Notice of Default is sent by electronic mail and fax on a Tuesday (such that it is received before 6:00 p.m. (Pacific)) the time to cure the default expires on Thursday), the Airport Entity may discontinue providing goods and/or services to Mexicana without any further notice and otherwise is granted automatically and without further order of the Court the relief provided in subparagraphs 19(i) and 19(ii) hereinabove.  If a check is received by the Airport Entity on the second day after a Notice of Default has been received or deemed received by Mexicana, that shall constitute payment sufficient to cure the payment default.  Nothing herein precludes Mexicana or any Airport Entity from seeking other relief from the Court prior to the expiration of the time to cure a default.

(j)     Notwithstanding anything herein to the contrary or the terms of any contract between the parties, if any payment by Mexicana to an Airport Entity is not honored by Mexicana's bank, such Airport Entity may immediately discontinue providing goods and/or services to Mexicana without any further notice or opportunity to cure and shall otherwise obtain automatically and without further order of the Court the relief provided in subparagraphs 19(i) and (19(ii) hereinabove.

21.     The Foreign Representative having confirmed that the Debtor intends to perform the Debtor's obligations under the Debtor's interline agreements, clearinghouse agreements and billing and settlement agreements administered by the International Air Transport Association

("IATA"), the IATA Clearing House, the Airlines Clearing House, Inc. ("ACH") and Universal Air Travel Plan, Inc. (collectively, the "Industry Agreements"), the Debtor and the Foreign Representative, as the case may be, are authorized to perform in accordance with the Industry Agreements, including without limitation (i) to honor and pay outstanding prepetition and postpetition claims arising in the ordinary course of business under the Industry Agreements, and (ii) to process customary payments and transfers and to honor customary transfer requests made by the Debtor and other participants pursuant to the Industry Agreements.

22.    Other than with respect to passenger facility charges and other trust funds collected by Mexicana but which are not property of Mexicana (e.g., certain taxes collected by Mexican for the benefit of the United States of America), this injunction shall not apply to or enjoin Banco Mercantil del Norte, S.A. ("Banorte") from exercising rights and remedies against Mexicana's U.S.-based assets arising under agreements between the parties including, without limitation, (i) that certain Credit Agreement dated April 17, 2008 among Banorte, Mexicana, as an obligor, and certain non-debtor affiliates of Mexicana parties thereto (as amended from time to time, and, together with all documents, papers and instruments related thereto, the "Credit Agreement"), (ii) that certain Deposit Account Security Agreement dated June 16, 2008 among Inter National Bank ("INB"), as collateral agent, Mexicana and Aerovias Caribe, S.A. de C.V., as grantors (as amended from time to time, and, together with all documents, papers and instruments related thereto, the "Security Agreement") and (iii) that certain Collateral Agency Agreement dated June 16, 2008 between Banorte and INB (as amended from time to time, and, together with all documents, papers and instruments related thereto, the "Agency Agreement" and, together with the Credit Agreement and the Security Agreement, the "Banorte Agreements"). Consistent with this paragraph, INB shall remain subject to this Order, except to

the extent acting on instructions given to it by Banorte consistent with the Banorte Agreements. Nothing in this Order is intended to relieve any party's obligation to perform (i) that certain Agreement between U.S. Bank National Association and Mexicana dated June 12, 2002 (as amended from time to time, the "USB Agreement") and (ii) that certain Terms and Conditions for Worldwide Acceptance of the American Express Card By Airlines among Mexicana and Aerovias Caribe, S.A. de C.V., Grupo Mexicana de Aviacion, S.A. de C.V. and American Express Travel Related Services Company Inc. dated May 10, 2006 (as amended from time to time, the "Amex Agreement" and, together with the USB Agreement, the "Credit Card Funding Agreements") in accordance with their terms.

23.     For the avoidance of doubt, the terms of the Stipulation and Order entered into between Banco Mercantil del Norte, S.A., and Compania Mexicana de Aviacion, S.A. de C.V., dated November 8, 2010, are hereby incorporated by reference into this Recognition Order.

24.     Nothing in this Order, the Court's August 2, 2010 Order to Show Cause with Temporary Restraining Order, as amended, the Court's August 18, 2010 Preliminary Injunction Order or in Bankruptcy Code section 362, including, without limitation, any injunctions set forth herein or therein shall enjoin, prevent or limit in any manner whatsoever the parties identified on Schedule A hereto or any other parties related thereto (as relates to the assets identified on Schedule A hereto) from exercising and enforcing any of their rights and remedies with respect to the recovery of the assets identified on Schedule A hereto (hereinafter "Asset Rights and Remedies"). The protections described in paragraph 13 hereof shall apply with respect to claims in any action or proceeding involving or against the Debtor or its assets or proceeds thereof that are located in the United States to the extent that such action or proceeding seeks to determine or liquidate any claims against the Debtor, other than claims related to Asset Rights and Remedies

11

or orders entered by any court related to Asset Rights and Remedies. Without limiting the generality of the foregoing, this paragraph and paragraph 13 apply to the actions commenced by the parties identified in Exhibit A hereto now pending in the United States District Court for the Southern District of New York and the Supreme Court of the State of New York, County of New York, with the effect that such actions are stayed other than with respect to Asset Rights and Remedies or orders entered by any court related to Asset Rights and Remedies.

25. Nothing in this Order, the Court's August 2, 2010 Order to Show Cause with Temporary Restraining Order, as amended, the Court's August 18, 2010 Preliminary Injunction Order or in Bankruptcy Code section 362, including, without limitation, any injunctions set forth herein or therein shall enjoin, prevent or limit in any manner whatsoever C.I.T. Leasing Corporation, CIT Aerospace International and Wilmington Trust SP Services (Dublin) Limited, not in its individual capacity but solely as Trustee, and Wells Fargo Bank Northwest National Association, not in its individual capacity but solely as Owner Trustee (the "CIT Parties"), or any other parties related thereto (as relates to the assets identified on Exhibit B hereto), from exercising any of their rights or remedies with respect to the assets identified on Exhibit B hereto.

26. The Foreign Representative is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

27. The Foreign Representative, the Debtor and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court.

28. The terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

29.     This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, any requests for additional relief or any adversary proceeding brought in and through this Chapter 15 proceeding, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

Dated: New York, New York
            November 8, 2010

_____/s/Martin Glenn_____
MARTIN GLENN
United States Bankruptcy Judge

## SCHEDULE A

| Aircraft Make/Model | Manufacturer's Serial Number | Engine Make/Model and ESN | Lessor |
|---|---|---|---|
| Airbus A319-100 | MSN 1612 | Two CF International CFM 56-5B6/3 Engines<br>ESN 575279 and 575280 | Marco Aircraft Leasing, Ltd.* |
| Airbus A319-100 | MSN 4127 | Two CF International CFM 56-5B6/3 Engines<br>ESN 699684 and 699685 | Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee/ Lessor* |
| Airbus A319-100 | MSN 4204 | Two CF International CFM 56-5B6/3 Engines<br>ESN 699784 and 699787 | Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee/ Lessor* |
| Airbus A319-100 | MSN 4254 | Two CF International CFM 56-5B6/3 Engines<br>ESN 699822 and 699824 | Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee/ Lessor* |
| Airbus A320-200 | MSN 0361 | IAE V2500-A1 Engines<br>ESN V0253 and V0255 | Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee/ Lessor* |
| Airbus A320-200 | MSN 0369 | Two International Aero Engines AG, Model V2500-A1 Engines<br>ESN V0225 and V0226 | Wells Fargo Bank Northwest, National Association, not in its individual capacity, but solely as owner trustee** |

14

| Aircraft Make/Model | Manufacturer's Serial Number | Engine Make/Model and ESN | Lessor |
|---|---|---|---|
| Airbus A320-200 | MSN 0373 | Two International Aero Engines AG, Model V2500-A1 Engines<br><br>ESN V0266 and V0267 | AFT Trust-Sub I** |
| Airbus A318-100 | MSN 2328 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577134 and 577136 | Celestial Aviation Trading 43 Limited** |
| Airbus A318-100 | MSN 2333 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577139 and 577140 | Celestial Aviation Trading 43 Limited** |
| Airbus A318-100 | MSN 2358 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577154 and 577155 | Celestial Aviation Trading 43 Limited** |
| Airbus A318-100 | MSN 2367 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577167 and 577168 | Celestial Aviation Trading 43 Limited** |
| Airbus A318-100 | MSN 2377 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577174 and 577175 | Celestial Aviation Trading 43 Limited** |
| Airbus A318-100 | MSN 2394 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577194 and 577195 | Celestial Aviation Trading 43 Limited** |
| Airbus A318-100 | MSN 2523 | Two CFM International, Model CFM56-5B8/P Engines<br><br>ESN 577314 and 577315 | Celestial Aviation Trading 68 Limited ** |
| Airbus A318-100 | MSN 2544 | Two CFM International, | Celestial Aviation |

| Aircraft Make/Model | Manufacturer's Serial Number | Engine Make/Model and ESN | Lessor |
|---|---|---|---|
| | | Model CFM56-5B8/P Engines | Trading 68 Limited ** |
| | | ESN 577336 and 577338 | |
| Airbus A318-100 | MSN 2552 | Two CFM International, Model CFM56-5B8/P Engines | Celestial Aviation Trading 69 Limited ** |
| | | ESN 577354 and 577355 | |
| Airbus A318-100 | MSN 2575 | Two CFM International, Model CFM56-5B8/P Engines | Celestial Aviation Trading 69 Limited ** |
| | | ESN 577381 and 577382 | |
| Airbus A320-200 | MSN 3123 | Two CF International, Model CFM 56-5B3/P Engines | International Lease Finance Corporation*** |
| | | ESN 697250 and 697251 | |
| Airbus A319-100 | MSN 1866 | Two CFM International, Model CFM 56-5B6/P Engines | International Lease Finance Corporation*** |
| | | ESN 575504 and 575505 | |
| Airbus A319-100 | MSN 1872 | Two CFM International, Model CFM56-5B6/P Engines | International Lease Finance Corporation*** |
| | | ESN 575508 and 575509 | |
| Airbus A319-100 | MSN 1882 | Two CFM International, Model CFM56-5B6/P Engines | International Lease Finance Corporation*** |
| | | ESN 575516 and 575517 | |
| Airbus A319-100 | MSN 1925 | Two CFM International, Model CFM56-5B6/P Engines | International Lease Finance Corporation*** |
| | | ESN 575544 and 575545 | |
| Airbus A319-100 | MSN 2126 | Two CFM International, Model CFM56-5B6/P Engines | Calloipe Limited (Lessor) Sierra Leasing Limited (Owner)*** |

| Aircraft Make/Model | Manufacturer's Serial Number | Engine Make/Model and ESN | Lessor |
|---|---|---|---|
| | | ESN 575741 and 575742 | |
| Airbus A319-100 | MSN 3790 | Two CF International, Model CFM 56-5B6/3 Engines | Whitney Ireland Leasing Limited (Lessor) Wells Fargo Bank Northwest N.A. (Owner)*** |
| | | ESN 699219 and 699220 | |
| Airbus A319-100 | MSN 4275 | Two CF International, Model CFM 56-5B6/3 Engines | Whitney Ireland Leasing Limited (Lessor) Wells Fargo Bank Northwest N.A. (Owner)*** |
| | | ESN 699855 and 699857 | |
| Airbus A320-231 | MSN 347 | Two IAE Model V2500-A1 Engines | EAST Trust – Sub12 (Owner/Lessor)**** |
| | | ESN V0315 and V0240 | |

\*  Subject to Wells Fargo Bank Northwest, National Association Motion.
\*\*  Subject to GE Capital Aviation Services Objection.
\*\*\*  Subject to International Lease Finance Corporation Motion.
\*\*\*\*  Subject to EAST Trust-Sub12 Motion.

## EXHIBIT B

| Aircraft Make/Model | Manufacturer's Serial Number | Engine Make/Model and ESN | Lessor |
|---|---|---|---|
| Airbus A319-112 | MSN 1598 | Two CF International, Model CFM 56-5B6/P Engines<br><br>ESN 575260 and 575261 | Wilmington Trust SP Services (Dublin) Limited, not in its individual capacity but solely as Owner Trustee/Lessor |
| Airbus A319-112 | MSN 1625 | Two CF International, Model CFM 56-5B6/P Engines<br><br>ESN 575295 and 575293 | Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee/Lessor |
| Airbus A319-112 | MSN 2066 | Two CF International, Model CFM 56-5B6/P Engines<br><br>ESN 575676 and 575680 | Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee/Lessor |
| Airbus A319-112 | MSN 2078 | Two CF International, Model CFM 56-5B6/P Engines<br><br>ESN 575691 and 575692 | Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee/Lessor |
| Airbus A319-112 | MSN 2662 | Two CF International, Model CFM 56-5B6/P Engines<br><br>ESN 577471 and 577472 | Wells Fargo Bank Northwest, National Association, not in its individual capacity but solely as Owner Trustee/Lessor |
| Airbus A320-200 | MSN 3304 | Two CF International, Model CFM 56-5B4/P Engines<br><br>ESN 697495 and 697497 | Wilmington Trust SP Services (Dublin) Limited, not in its individual capacity but solely as Owner Trustee/Lessor |

| Aircraft Make/Model | Manufacturer's Serial Number | Engine Make/Model and ESN | Lessor |
|---|---|---|---|
| Airbus A330-200 | MSN 0966 | Two Rolls-Royce Trent 772B Engines<br><br>ESN 41571 and 41572 | CIT Aerospace International |
| Airbus A330-200 | MSN 0971 | Two Rolls-Royce Trent 772B Engines<br><br>ESN 41577 and 41578 | CIT Aerospace International |

f

<u>**Neutral Citation Number: [2010] EWHC 1364 (Ch)**</u>

Claim No: 2325 of 2010

<u>**IN THE HIGH COURT OF JUSTICE**</u>
<u>**CHANCERY DIVISION**</u>

Royal Courts of Justice
Strand
London WC2A 2LL

<u>Wednesday, 26 May 2010</u>

BEFORE:

**MRS JUSTICE PROUDMAN**

-------------------

### RE: LA SEDA DE BARCELONA SA

Applicant Company

-------------------

<u>Mr M Pascoe QC and Mr T Smith</u> (instructed by Freshfields Bruckhaus Deringer LLP)
appeared on behalf of the Applicant Company

<u>Ms C Bryant</u> (instructed by Dickinson Dees) appeared on behalf of a company (not a party)

-------------------

<u>**Approved Judgment**</u>
Crown Copyright ©

-------------------
Digital Transcript of Wordwave International, a Merrill Communications Company
101 Finsbury Pavement London EC2A 1ER
Tel No: 020 7422 6131  Fax No: 020 7422 6134
Web: www.merrillcorp.com/mls     Email: mlstape@merrillcorp.com
(Official Shorthand Writers to the Court)

1.      MRS JUSTICE PROUDMAN:  This is an application by La Seda De Barcelona SA, a company incorporated in Spain, for an order sanctioning a scheme of arrangement pursuant to section 899 of the Companies Act 2006.  On 30 April last, Newey J directed the convening of a single meeting of scheme creditors.  It was duly convened and took place on 21 May and, as recorded in the chairman's report, the scheme was approved in accordance with the statutory majorities.  The percentage of scheme creditors voting in favour exceeded 95 per cent by value.

2.      The company is a parent company of the La Seda group which includes companies incorporated in Spain, the UK and elsewhere.  The group's business is the manufacture of a substance used in food and beverage packing.  The scheme concerns the rights of lenders under a senior facilities agreement which is governed by English law and which is subject to a jurisdiction clause in favour of the courts of England, which provides working capital for the group.  There are four facilities, three term loans and a revolving facility.  All liabilities rank *pari passu.*

3.      The company's obligations under the agreement are secured by charges over shares in several of the subsidiaries.  A number of group companies, including Artenius UK Limited, are guarantors.

4.      Partly as a result of the recession, the group's performance has deteriorated over the past couple of years leading to a severe lack of liquidity and closure of plants.  There has been a series of defaults under the agreement.  Artenius has gone into administration.  The directors believe that without restructuring part or all of the group it will enter into insolvency proceedings in Spain and elsewhere.

5.      Under the proposed restructuring there will be a new equity investment of at least €150 million for new ordinary shares in the company.  Three groups of investors have indicated an intention to invest €100 million and the company is seeking other equity investors.  If successful the new investment will account for €150 million of the proposed €300 million increase in the share capital of the company.  The scheme proposes that the rights of senior lenders under the agreement will be settled and replaced by a combination of debt and equity pro rata to the interests of the scheme creditors under the agreement, consisting of an allotment of new ordinary shares taking up the remaining €150 million, an allocation of unsecured debt under an amended facilities agreement, and an allocation of unsecured debt under a new payment in kind loan facility under the amended facilities agreement.  If the equity investment does not come through and if certain other conditions are not satisfied by a certain date, the scheme will terminate.

6.      The restructuring and the scheme are designed as a means to rectify the currently unsustainable position in the interests of all who have an interest in the group.  The board believes that there is no credible alternative to the scheme which is intended to create a stronger foundation for continuing the company's business.

7.      The scheme has been explained to me in some detail and I note the aspects to which my attention has been drawn.  There are three points with which I need to deal.

**Jurisdiction in relation to an overseas company**

8.      First there is the fact that the company is a company established in Spain.  At the hearing at which he authorised the scheme meeting Newey J considered the question of

jurisdiction under this head.  He held that the court had jurisdiction to sanction the scheme.  I have seen the submissions made to him which led to that conclusion and I see no reason to revisit it.

**Compliance with statutory requirements as to formalities**

9.  Secondly, there is the question of compliance with statutory requirements as to formalities.  The scheme meeting was summoned, convened and conducted in accordance with Newey J's order and the scheme was approved by the requisite majorities in number and value.  Newey J approved the constitution of classes and I do not propose reopen that question either.

10. However, as a result of developments between the provision of documentation and the meeting, certain modifications were made to the scheme and it was appropriate to bring certain further information to the attention of scheme creditors.  Negotiations also continued as to the precise drafting of contractual documents required to implement the scheme.  Three further notices were circulated referring in particular to the guarantors' position, to the subordinated debt position to the extension of key dates and drawing attention to changes to the scheme.  Those notices were posted on the Intralink website.  The company has taken further steps to ensure that the creditors who submitted proxies for the meeting were actually aware of them and of the amendments to the scheme and did not wish to change their vote as a result.

11. I am satisfied that those voting in favour of the scheme were aware of the relevant matters.  The scheme creditors are all sophisticated financial institutions and none sought an adjournment to the scheme meeting or opposes sanction of the scheme today.  In my judgment, the amendments do not substantially alter the provisions of the scheme and I believe I would have jurisdiction to sanction it in any event.

**Release of Artenius, a non-party to the scheme**

12. The third matter arises out of the fact that the scheme provides for the release by scheme creditors of Artenius' liabilities under the agreement.  The terms of Artenius's release within and without the scheme have been negotiated up to and including today.  For the reasons given by Miss Bryant, it seems to me that the amendments so made are not such as would be considered by scheme creditors to be material to their decision whether or not to approve the scheme.

13. However, there is a more fundamental underlying point since I have to decide whether the court has jurisdiction to sanction the scheme which includes amongst its terms the release of Artenius although Artenius is not a party to the scheme.  Any scheme of arrangement made with creditors must be made with them in their capacity as creditors.

14. The releases given by the scheme creditors are given in order that Artenius will release its own claims against companies in the group, estimated, potentially at any rate, at over € 80 million.  Artenius wants to eliminate doubt as to the jurisdiction as it proposes to make a dividend which is dependent on the validity of the scheme.

15. I accept Miss Bryant's submission that the court does have jurisdiction in present circumstances, provided that there is an element of what she describes as give and take.  I have been taken to the decision of David Richards J in T&N Limited (No. 3) [2007] 1 BCLC 563.  I have also been taken to the decision of the Court of Appeal in Lehman

Brothers International (Europe) (in administration) [2009] EWCA Civ 1161 and the reference therein to a number of relevant Australian authorities.

16. Miss Bryant has analysed those authorities also and has satisfied me that the controversy in Australia has now been laid to rest after the appellate decision by the High Court of Australia on 14 April 2010 in City of Swan v Lehman Brothers Australia Limited [2009] FCAFC 130. It appears that there can now be no doubt about the correctness of the decision in T&N Limited.

17. Although T&N Limited was distinguished on the facts of Lehman Brothers in the Court of Appeal, it is evident that the Court of Appeal was satisfied that the decision itself was correct because, in the words of Neuberger LJ at paragraph 83, the scheme claimant's rights:

> "(a) were closely connected with their rights against the company as creditors; (b) were personal, not proprietary, rights; and (c) if exercised and leading to a payment by the insurers, would have resulted in a reduction of the creditors' claims against the company."

18. Patten LJ had said at paragraph 63:

> "It seems to me entirely logical to regard the court's jurisdiction as extending to approving a scheme which varies or releases creditors' claims against the company on terms which require them to bring into account and release rights of action against third parties designed to recover the same loss. The release of such third party claims is merely ancillary to the arrangement between the company and its own creditors."

19. In my judgment, the release in this case does give rise to the requisite element of give and take between the scheme creditors and the company and falls more clearly within the scope of the statute even than the schemes of arrangement in T&N Limited (No. 3). Here the release affects the deal embodied in the settlement agreement whereby (a) Artenius will release the company and its group companies from Artenius's claims, which might otherwise trigger the insolvency of a company which would have escalated group bankruptcy proceedings; and (b) the scheme creditors, together with Deutsche Bank, release Artenius from its liabilities as guarantor under the agreement.

20. The release of Artenius benefits the scheme creditors because Artenius' release of the company and other group companies improves the financial position of the company and the other group companies.

21. Secondly, Artenius is a guarantor of the liabilities of the company and the group companies under the agreement. The scheme creditors' rights of action against Artenius are designed to recover the same loss as arises from the scheme creditors' claims against the company and can fairly be described as ancillary to the arrangement between the company and the scheme creditors.

22. Thirdly, the scheme claimants' rights against Artenius by virtue of Artenius's liability as guarantor (a) are closely connected with the scheme creditors' rights against the company as creditors; (b) are personal and not proprietary rights; and (c) if exercised and leading to a payment by Artenius would have resulted in a reduction of the scheme creditors' claims against the company.

23. I therefore conclude that I do have jurisdiction and I so find.

24. I have considered Mr Pascoe QC's submissions as to the merits of the scheme and I am satisfied that it is one that an intelligent and honest man, a member of the class and acting in respect of his interest, might reasonably approve.  I propose to approve it in the exercise of my discretion.

g

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 15 |
| Lecta Paper UK Limited,[1] | Case No. 19-13990 (MEW) |
| Debtor in a Foreign Proceeding. | |

---

## ORDER RECOGNIZING FOREIGN PROCEEDING AND UNITED KINGDOM SCHEME OF ARRANGEMENT AND GRANTING RELATED RELIEF

Upon the *Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief* [Dkt. No. 2] (together with the Form of Voluntary Petition [Dkt. No. 1], the "Petition")[2] of Andrea Minguzzi, in his capacity as the duly authorized foreign representative (the "Foreign Representative") of Lecta Paper UK Limited (the "Debtor"), which is the subject of proceedings under English law (the "English Proceeding") currently pending before the Business and Property Courts of the High Court of Justice of England and Wales (the "High Court") concerning a scheme of arrangement (the "Scheme") under part 26 of the Companies Act 2006 of the United Kingdom, in support of entry of an order:

    a.    finding that (i) the Debtor is eligible to be a "debtor" under chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), (ii) the English Proceeding is a "foreign main proceeding" within the meaning of section 1502 of the Bankruptcy Code, (iii) the Foreign Representative satisfies the requirements of a "foreign representative" under section 101(24) of the Bankruptcy Code, and (iv) the Petition was properly filed and meets the requirements of section 1515 of the Bankruptcy Code;

---

[1] The last four digits of the Debtor's England and Wales company registration number are 2963. The location of the Debtor's registered office is Unit 4 Shenley Pavilions, Chalkdell Drive, Shenley Wood, Milton Keynes, Buckinghamshire, MK5 6LB, United Kingdom.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Petition.

b.  granting recognition of the English Proceeding as a "foreign main proceeding" under sections 1517 and 1520 of the Bankruptcy Code;

c.  granting all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code;

d.  recognizing, granting comity to, and giving full force and effect within the territorial jurisdiction of the United States to the English Proceeding, the Scheme and the order of the High Court sanctioning the Scheme (the "<u>Sanction Order</u>"), including giving effect to the releases set forth in the Scheme (the "<u>Releases</u>");

e.  permanently enjoining all parties from commencing or continuing any action or proceeding in the United States against the Debtor or its assets located within the territorial jurisdiction of the United States that is inconsistent with the Scheme (the "<u>Injunction</u>");

f.  waiving the 14-day stay of effectiveness of the order; and

g.  granting related relief;

and upon the record of this case and the hearing held on January 29, 2020 (the "<u>Hearing</u>") on the Petition and this Court's review and consideration of the Petition, the Minguzzi Declaration, the Mook Declaration and all other pleadings filed by or on behalf of the Foreign Representative in support of the Petition; and the Court having found and determined that the relief sought in the Petition is consistent with the purposes of chapter 15 of the Bankruptcy Code and is in the best interests of the Debtor and its creditors; and after due deliberation and sufficient cause appearing therefor; and for the reasons stated on the record at the Hearing;

## IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.  This Court has jurisdiction to consider the Petition and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York dated as of January 31, 2012,

---

[3]  The findings and conclusions set forth herein and on the record of the Hearing constitute this Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").  To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 1, 2012) (Preska, C.J.).

B.       The consideration of the Petition and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b), and this Court may enter a final order consistent with Article III of the United States Constitution.

C.       Venue is proper before this Court pursuant to 28 U.S.C. § 1410(1) because the Debtor has U.S. assets that are located within this District.

D.       Good, sufficient, appropriate, and timely notice of the filing of the Petition and the Hearing has been given by the Foreign Representative, pursuant to Bankruptcy Rules 1011(b) and 2002(q) and the *Order Scheduling Hearing on Chapter 15 Petition and Related Relief and Specifying Form and Manner of Service of Notice* [Dkt. No. 6] (the "Scheduling Order") to the Notice Parties (as defined in the Scheduling Order).  In light of the nature of the relief requested and prior orders of this Court, no other or further notice is required.

E.       No objections have been filed to the relief sought in the Petition.

F.       The Debtor has property located in this District, and therefore, the Debtor is "eligible" to be a debtor in this Chapter 15 Case pursuant to sections 109 and 1501 of the Bankruptcy Code.

G.       The English Proceeding is a "foreign proceeding" as such term is defined in section 101(23) of the Bankruptcy Code.

H.       The English Proceeding is pending in England, which is where the Debtor has its "center of main interests" as referred to in section 1517(b)(1) of the Bankruptcy Code.  As such, the English Proceeding is a "foreign main proceeding" pursuant to section 1502(4) of the Bankruptcy Code, is entitled to recognition as a foreign main proceeding pursuant to section

3

1517(b)(1) of the Bankruptcy Code and is entitled to all relief afforded to foreign main proceedings under section 1520 of the Bankruptcy Code.

I.      The Foreign Representative is a "person" as such term is defined in section 101(41) of the Bankruptcy Code and has been duly appointed and designated as the "foreign representative" of the Debtor as such term is defined in section 101(24) of the Bankruptcy Code.

J.      This Chapter 15 Case was properly commenced pursuant to sections 1504 and 1509 of the Bankruptcy Code, and the Petition satisfies the requirements of section 1515 of the Bankruptcy Code.

K.      The Foreign Representative and the Debtor, as applicable, are entitled to the additional assistance and discretionary relief set forth in this Order.

L.      The relief granted herein is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States, warranted pursuant to sections 105(a), 1504, 1507, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code and will not cause hardship to any party in interest.  To the extent that any hardship or inconvenience may result to such parties, it is outweighed by the benefits of the requested relief to the Foreign Representative, the Debtor, its creditors and other parties in interest.

M.      The relief granted herein is necessary to effectuate the purposes and objectives of chapter 15 of the Bankruptcy Code and to protect the Debtor and the interests of its creditors and all parties in interest.

N.      Absent the relief granted herein, the Scheme, the English Proceeding and the Debtor's efforts to consummate the restructuring set forth in the Scheme could be thwarted by the actions of certain creditors, which would be inconsistent with the purpose of chapter 15 of

the Bankruptcy Code as set forth, *inter alia*, in section 1501(a) of the Bankruptcy Code.  Such results could threaten, frustrate, delay, and ultimately jeopardize the implementation of the restructuring set forth in the Scheme.  Absent the Injunction, the Debtor and its assets may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative or regulatory actions or proceedings in connection with claims under the English Proceeding against the Debtor and its assets located within the territorial jurisdiction of the United States, thereby interfering with, and causing harm to, the Debtor, its creditors and other parties in interest, and as a result, the Debtor, its creditors and such other parties in interest would suffer irreparable injury for which there is no adequate remedy at law.

O.    The Injunction contained herein (i) is within the Court's jurisdiction to grant, (ii) is essential to the success and objectives of the Scheme, the English Proceeding and the overall restructuring of which Scheme is a part and (iii) confers material benefits on, and is in the best interests of, the Debtor, its creditors and all other parties in interest.

P.    In accordance with section 1507(b) of the Bankruptcy Code, the relief granted herein will reasonably assure: (i) the just treatment of all holders of claims against or interests in the Debtor's property; (ii) the protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in the English Proceeding; (iii) the prevention of preferential or fraudulent dispositions of property of the Debtor; and (iv) the distribution of proceeds of the Debtor's property substantially in accordance with the order prescribed in the Bankruptcy Code.

Q.    All creditors and other parties in interest, including the Debtor, are sufficiently protected in the grant of the relief ordered hereby in compliance with section 1522(a) of the Bankruptcy Code.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

1.    The Petition and the relief requested therein are granted to the extent set forth in this Order.

2.    The English Proceeding is recognized as a "foreign main proceeding" under sections 1517(a) and 1517(b)(1) of the Bankruptcy Code.

3.    The Foreign Representative is recognized as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the English Proceeding.

4.    All relief and protection afforded to a foreign main proceeding under section 1520 of the Bankruptcy Code is hereby granted to the English Proceeding, the Debtor and the Debtor's assets located in the United States, as applicable, including, without limitation, the application of the automatic stay under section 362 of the Bankruptcy Code to the Debtor and its property located in the territorial jurisdiction of the United States, ***provided***, that nothing herein modifies or limits the exceptions to the automatic stay that are set forth in section 362 or elsewhere in the Bankruptcy Code.

5.    As of the Restructuring Effective Date, the Scheme and the Sanction Order (including the Releases) entered by the High Court in the English Proceeding are hereby recognized, granted comity and given full force and effect in the United States and are binding and fully enforceable in accordance with their terms pursuant to sections 105(a), 1507, 1521 and 1525 of the Bankruptcy Code on all entities (as that term is defined in section 101(15) of the Bankruptcy Code) whose claims or interests are affected by the Scheme and each of their respective heirs, successors, assigns, trustees, subsidiaries, affiliates, officers, directors, agents, employees, representatives, attorneys, beneficiaries, guardians and similar officers, or any persons claiming through or in the right of any such persons or entities (collectively, other than

6

the Debtor and its expressly authorized representatives and agents, the "Affected Entities"),
whether or not the Affected Entity consented to be bound by or participated in the Scheme.

6.        As of the Restructuring Effective Date, except as expressly permitted by the
Scheme, all Affected Entities are hereby permanently enjoined from taking any action within the
territorial jurisdiction of the United States to assert, enforce or seek any relief that is inconsistent
with the Sanction Order and the Scheme.

7.        As of the Restructuring Effective Date, any judgment, wherever and whenever
obtained, to the extent such judgment is a determination of the liability of the Debtor or any other
person released under the Scheme pursuant to the Releases, with respect to any debt cancelled,
discharged or restructured under the Scheme, or as a result of English law relating to the Scheme,
is unenforceable in the United States, in each case, to the extent inconsistent with the Scheme,
the Sanction Order or such law.

8.        The Foreign Representative and the Debtor are authorized and empowered to, and
may in their discretion and without further delay, (i) execute and deliver documents to effectuate
the Scheme (including the Releases) and take any action and perform any act necessary to
implement and effectuate the terms of this Order, the Sanction Order and the Scheme and (ii)
exercise all consent and approval rights provided for in the Scheme in the manner set forth in the
Scheme.

9.        No action taken by the Foreign Representative, the Debtor or their respective
agents, representatives, advisors, or counsel, in preparing, disseminating, applying for,
implementing or otherwise acting in furtherance of the English Proceeding, the documents
contemplated thereunder, this Order, the Chapter 15 Case, any further order for additional relief
in the Chapter 15 Case, or any adversary proceedings in connection therewith, will be deemed to

constitute a waiver of the immunity afforded such persons under sections 306 or 1510 of the Bankruptcy Code.

10.    No party shall incur any liability for following the terms of this Order (whether by acting or refraining from acting), except in the case of the party's own gross negligence or willful misconduct.

11.    Nothing herein shall enjoin, impair, or otherwise supplement or modify in any manner the rights of any party granted under the Scheme, and nothing herein shall modify the exclusive right of the Courts of England and Wales to hear and determine any suit, action, or proceeding and to settle any dispute which may arise out of the Explanatory Statement or any provision of the Scheme or Sanction Order, or out of any action to be taken or omitted to be taken under the Scheme or Sanction Order or in connection with the administration of the Scheme or Sanction Order.

12.    Nothing herein shall enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding.

13.    The administration or realization of all or part of the assets of the Debtor within the territorial jurisdiction of the United States is entrusted to the Foreign Representative, and the Foreign Representative is established as the exclusive representative of the Debtor in the United States.

14.    The Foreign Representative, the Debtor, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court.

15.    The Foreign Representative shall serve this Order by email or first class mail within three business days upon: (i) the United States Trustee for the Southern District of New York; (ii) the Scheme Creditors; (iii) Willkie Farr & Gallagher LLP, counsel to the Committee;

8

(iv) counsel to the Existing SSN Trustee; (v) counsel to the Existing Security Trustee; (vi) counsel to the New SSN Trustee; (vii) counsel to the New Security Trustee; (viii) counsel to the agent under the RCF; (ix) the Information Agent; (x) all parties that have filed a notice of appearance in this Chapter 15 Case; (xi) the Debtor; and (xii) all persons or bodies authorized to administer foreign proceedings of the Debtor. Such service and notice is good, sufficient, appropriate and timely service and notice for all purposes.

16.      Notwithstanding any provision in the Bankruptcy Code or the Bankruptcy Rules to the contrary, including, but not limited to Bankruptcy Rules 1018, 3020(e), 6004(h), 7062 and 9014, (a) this Order shall be effective immediately and enforceable upon its entry, (b) the Foreign Representative is not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order and (c) this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

17.      This Court shall retain jurisdiction with respect to the implementation, enforcement, amendment or modification of this Order.

Dated: February 4, 2020
New York, New York

**s/Michael E. Wiles**
THE HONORABLE MICHAEL E. WILES
UNITED STATES BANKRUPTCY JUDGE

h



<u>Neutral Citation Number: [2009] EWCA Civ 1161</u>

<u>Case No: A2/2009/1994</u>

**<u>IN THE COURT OF APPEAL (CIVIL DIVISION)</u>**
**<u>ON APPEAL FROM THE HIGH COURT OF JUSTICE, CHANCERY DIVISION,</u>**
**<u>COMPANIES COURT</u>**
**<u>BLACKBURNE J</u>**
**<u>CASE NO: 7942 of 2008 and CASE NO: 16389 of 2009</u>**

<u>Royal Courts of Justice</u>
<u>Strand, London, WC2A 2LL</u>

<u>Date: 6th November 2009</u>

**Before :**

**<u>THE MASTER OF THE ROLLS</u>**
**<u>LORD JUSTICE LONGMORE</u>**
**and**
**<u>LORD JUSTICE PATTEN</u>**

**IN THE MATTER OF LEHMAN BROTHERS INTERNATIONAL (EUROPE) (in administration)**

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

**AND IN THE MATTER OF THE COMPANIES ACT 2006**

(Transcript of the Handed Down Judgment of
WordWave International Limited
A Merrill Communications Company
165 Fleet Street, London EC4A 2DY
Tel No:  020 7404 1400, Fax No: 020 7404 1424
Official Shorthand Writers to the Court)

**William Trower QC** and **Daniel Bayfield** (instructed by **Linklaters LLP**) for **the Administrators**
**Richard Snowden QC** and **Andrew Thornton** (instructed by **Freshfields Bruckhaus Deringer LLP**) for the **London Investment Banking Association**
**Anthony Zacaroli QC** (instructed by **Allen & Overy LLP**) for **GLG Partners LP**

Hearing date : 26th October 2009

**Judgment**
**As Approved by the Court**

**Crown copyright©**

**Lord Justice Patten :**

<u>Introduction</u>

1.      Lehman Brothers International (Europe) ("LBIE") entered administration on 15th September 2008.  Until then one of its major business areas was the provision of what are described in the evidence as prime services to various institutional clients.  Most of these were hedge funds.  The services in question included the execution, clearing and settlement of securities and derivative trades and the custody and valuation of the clients' portfolios.

2.      Hedge funds do not have substantial back office functions of their own.  They therefore require a third party to deal with the trades themselves and thereafter to provide custodial and reporting services.  As part of these transactional arrangements, prime brokers such as LBIE lent cash and securities to the hedge funds and provided foreign exchange services.  Any finance was usually secured against the assets of the hedge fund held by or through the prime broker.

3.      These services were provided under a variety of standard form agreements which I will come to in a little more detail later in this judgment.  The principal contracts under consideration in these proceedings are International Prime Brokerage Agreements, Master Custody Agreements, Margin Lending Agreements and what is referred to as the Credit Support Annex to the ISDA Master Agreement.  As the names suggest, LBIE's prime service clients ranged from hedge funds who used the company to provide the full range of services described above to clients who placed securities with LBIE for safe custody.

4.      It is common ground that a key feature of all these transactions was that the counterparty client obtained (or, in the case of pure custody agreements, retained) proprietary interests in the assets held by or on behalf of LBIE.  LBIE held the assets through various depositories, exchanges, clearing systems and sub-custodians depending on the type of asset and the systems through which they were traded.  But none of these arrangements is said to have effected any material change in beneficial ownership.

5.      The administrators have therefore recognised that the contracts described above give many of the counterparties specific claims over the cash and securities transferred to LBIE.  But they are faced with the serious difficulty that, as things stand, they cannot be certain who is entitled to the trust property in their hands.  Therefore any distribution of the assets without the protection of some kind of approval from the court is likely to give rise to claims against LBIE and the administrators for breach of trust by those who claim to be entitled to the property adversely to the counterparties to whom it is in fact distributed.  For the same reasons, the recipients of the assets are also at risk.  Conversely, if no distribution takes place or delays in distributions continue, the administrators are likely to face proceedings for the return of the assets from those who claim to be entitled to them.  In relation to some classes of asset, these may exceed the quantity of the relevant securities which remain available for distribution.

6.      The uncertainties involved in dealing with the trust assets have three primary causes: a lack of response from clients to enquiries made about the transactions in which they were involved; the inability of the administrators to rely on LBIE's books and

records; and the failure of custodians, depositories and affiliates to provide information about the assets held on behalf of LBIE.

7.    These difficulties have been recognised for some time.  On 7th October 2008, at an early stage in the administration, directions were obtained from Blackburne J as the designated judge under which the administrators were to take appropriate steps to identify whether money or securities might be subject to trust or proprietary claims. This order envisaged requests for information being sent to counterparties and for Linklaters (the administrators' solicitors) to devise and set up a programme for identifying the legal issues which needed to be determined before a proposal for the distribution of trust property could be prepared.

8.    The administrators have written to 1,707 account holders who are thought to have potential claims against LBIE for the return of trust property.  The letters ask for details of any such claims, rights or other interests in the assets in question; confirmation of the positions and balances held with LBIE immediately prior to the making of the administration order on 15th September 2008; copies of all relevant documentation; and details of any positions which have been terminated or closed since the making of the administration order.  Similar requests for information have been added to the administrators' website.

9.    As of 29th May 2009, 950 responses have been received, some of which are incomplete.  In the same period the administrators have received some 1,214 claims for the return of trust assets.  A number of these have been identified as priority claims by a Hardship and Prioritisation Committee set up by the administrators in accordance with the prioritisation principles referred to in the order of Blackburne J dated 7th October 2008.

10.   Aside from issues of priority, the administrators have had to expend considerable resources on making requests for information from clients and locating documents within LBIE's records in order to conduct a line-by-line reconciliation of the clients' positions.  Where assets have been distributed, the clients have been required to enter into deeds of undertaking which give the administrators a right to recover the assets or their value where they subsequently turn out to be subject to competing claims.  It goes without saying that these measures add to the cost and uncertainties involved in the distribution process.

11.   In order to produce some finality for the clients and for the process of administration in respect of these claims, permission was sought from Blackburne J that the administrators should be at liberty to propose a scheme of arrangement under Part 26 of the Companies Act 2006 between LBIE and the persons who are its creditors in relation to Trust Property as defined in paragraph 9 of what is referred to as the Pearson Statement.  This is a witness statement made by Mr Steven Pearson, one of the administrators, on 25th February 2009 which explains the steps taken to process the proprietary claims and the reasons for seeking to promote a scheme.  Mr Pearson says in paragraph 9:

> "As set out in my First Statement, made in relation to the application for the Trust Property Order, a redacted version of which has been placed on the Court file and is available on the section of the PwC website dedicated to the administration of

> LBIE, the Administrators wished to adopt a system for dealing
> with all property of, or held in the name of, or otherwise to the
> order of, LBIE which is subject to trust or proprietary claims,
> whether comprising monies under the FSA's Client Money
> Rules ("Client Money") or other monies or assets ("Trust
> Assets") (together with "Trust Property") in an orderly and
> efficient manner and one which balanced the importance of
> dealing with the potential proprietary claims and the
> achievement of the statutory purpose for which we have been
> appointed."

12.   On 16th March 2009 Blackburne J gave the administrators liberty to propose a scheme
of arrangement of the type sought.   Section 899 of the Companies Act 2006
empowers the court to sanction a compromise or arrangement proposed between a
company and its creditors or any class of creditors when it has previously been agreed
to in class meetings by a majority in number representing 75% in value of the
creditors or class of creditors in question.

13.   There is no statutory definition of "creditor", "compromise" or "arrangement" but a
Scheme has been prepared under which (subject to certain exceptions which I will
come to in more detail later) "Scheme Creditors" (as defined) who can establish
proprietary claims to the assets held by LBIE at the time of administration will release
those claims and any associated pecuniary claims for damages or equitable
compensation and will receive, in return, what are described as New Claims.   They
will give to each Scheme Creditor a right to receive, on a pooled basis, securities or
other assets of the type claimed and (when it occurs) will leave the counterparty to
recover as an unsecured creditor the value of any shortfall in its proprietary claim
caused by the shortage of the relevant assets.

14.   Scheme Creditors will therefore be required under the Scheme to release proprietary
rights in assets which are held for their benefit by LBIE as trustee and the
combination of the necessary majorities in suitably constituted class meetings and the
court's sanction of the Scheme will be effective to enforce those provisions against
any dissenting minority of creditors who would be otherwise unwilling to give up
their property rights.   A question arose as to whether a scheme which has this effect
falls within the provisions of Part 26.   The administrators therefore applied, pursuant
to paragraphs 63 and 68(2) of Schedule B1 to the Insolvency Act 1986, for a
determination of this question by the court in advance of any further directions being
given for the preparation of the Scheme and the constitution of the class meetings.
After hearing argument from the administrators and a representative of some hedge
funds (GLG Partners LP) who support the Scheme and from the London Investment
Banking Association ("LIBA"), a trade association for firms in the investment
banking and securities industry, who oppose the Scheme on jurisdictional grounds,
Blackburne J decided that, insofar as the proposed Scheme of Arrangement is
concerned with the distribution by LBIE of property held or controlled by it on trust
for any of its creditors and to the extent that it varies or extinguishes those property
rights, the court has no jurisdiction under Part 26 to sanction the Scheme.   The
administrators now appeal from that decision with the leave of the Judge.

<u>The contractual arrangements</u>

15.    As mentioned earlier, the administrators have identified four principal contracts under
which the counterparties will retain proprietary interests in the cash or securities held
by LBIE.  The issue of jurisdiction raised before the Judge and on this appeal can be
determined as a matter of principle without any detailed consideration of the
provisions of the particular contracts which give rise to the proprietary interests. But
it is useful to have in mind the various types of agreement and some of their key
provisions when considering Mr Trower's submissions about the proper approach to
be applied to commercial arrangements which utilise a trust mechanism in relation to
the assets involved.  I can therefore deal with the individual contracts quite shortly by
commenting on two of the agreements which illustrate the point.

<u>(1) International Prime Brokerage Agreement ("IPBA")</u>

16.    This governed all acquisitions and disposals of securities by LBIE as prime broker
together with the provision of any related advances of cash and securities.  Under the
agreement LBIE acted as the counterparty's agent in settling the transactions and
delivering the securities.  Cash Accounts were opened into which all advances of cash
made to the counterparty were entered as credits.   Securities delivered by the
counterparty to LBIE as prime broker or received by LBIE in settlement of third party
transactions were entered as debits in a Securities Account.

17.    Clause 5.2 of the IPBA provides that:

"5.2 The parties acknowledge and agree that any cash held by
us for you is received by us as collateral with full ownership
under a collateral arrangement and is subject to the security
interest contained in the Agreement.  Accordingly, such cash
will not be client money pursuant to the Rules (or any
successor provisions thereto) and will not be subject to the
protections conferred by the Rules.  Such cash held by the
Prime Broker will not be segregated from the money of the
Prime Broker or any other counterparty of the Prime Broker
and will be held free and clear of all trusts.  The parties further
agree that the Prime Broker will use such cash in the course of
its business and the Counterparty will, therefore, rank as a
general creditor of the Prime Broker in respect of such cash."

18.    This is in contrast to the position in relation to securities.  Clause 17.1 provides that:

"With the exception of any assets transferred to the Prime
Broker pursuant to Clause 11, any securities debited to the
Securities Accounts shall be held by the Prime Broker as
custodian, and the Counterparty hereby appoints the Prime
Broker, and the Prime Broker agrees to act, as its custodian, in
accordance with the terms of Schedule 2."

19.    Paragraph 2 of Schedule 2 requires LBIE to segregate assets by identifying in its
books and records that the securities belong to a particular counterparty and not to
LBIE and requiring any sub-custodians to do the same.  But, subject to this, LBIE is

authorised by paragraph 9 of Schedule 2 to hold securities in fungible accounts with the securities of other customers designated as customer accounts. The reference in clause 17.1 to clause 11 is to the right of use granted by the client to LBIE as prime broker to borrow, lend, charge or dispose of any securities charged to it under the provisions of clause 10 of the agreement. Where this right of use is exercised, the securities become the absolute property of LBIE: see clause 11.2(a). The charge granted by clause 10 in respect of the liabilities of the counterparty to LBIE includes securities debited to the Securities Account subject to a number of specific exceptions including securities where the certificates of title are deposited with a Lehman company and all cash credited to any Cash Account.

20.    These provisions were recently considered in some detail by Briggs J in his judgment in *Re Lehman Brothers International (Europe)* [2009] EWHC 2545 (Ch) where he rejected an argument that the existence of a trustee/beneficiary relationship subsisting between LBIE and the counterparty in respect of securities held by LBIE was inconsistent with the right of use provisions and the permission to hold the counterparty's assets in a fungible account. The Judge also decided that the provisions of clause 5.2 had no application to cash derived from securities and received by LBIE or any of its sub-custodians on or after the making of the administration order on 15th September 2008. These monies would include the proceeds of any redemptions together with receipts in the forms of dividends or coupons. Those monies therefore remain trust assets in the administrators' hands.

21.    Clause 13 of the IPBA entitles a counterparty to terminate the agreement in the event of a failure by LBIE to provide the prime services contracted for. But the exercise of this power has the effect of making any outstanding loans from LBIE immediately repayable and of converting the obligations of the company under clause 7 to deliver the securities in specie to the counterparty on request into an unsecured obligation to pay a net cash balance arrived at by setting off against the value of the securities and any other assets held by LBIE for the client on closure of the client's liabilities to LBIE.

(2) Master Custody Agreement ("MCA")

22.    The MCA covers holdings of both securities and cash on behalf of the client. It was used when only custody services were provided by LBIE and in investment banking transactions where such services were provided to the client as part of a larger transaction.

23.    In earlier versions of the agreement, LBIE is granted a general lien over the property until satisfaction of all liabilities of the client to it or to any other Lehman Brothers entity. But, subject to this, all versions of the agreement contain provisions requiring LBIE to separately identify property of the client in its records and to provide the client with an annual statement of the property held to the client's account. Subject to this, LBIE was entitled, in appropriate cases, to pool the property with that of other clients.

The Scheme

24.    The key provisions of the proposed scheme ("the Scheme") are conveniently summarised in the judgment of Blackburne J as follows:

22.      The scheme is intended to deal with persons who are described as "Scheme Creditors". These are persons who have claims against LBIE at the time it was placed in administration (the "Time of Administration") for or in respect of what are described as "Segregated Assets". The claims must be capable of being satisfied by the delivery, in whole or in part, of the Segregated Assets. Segregated Assets are defined as "any Security which at the Time of Administration was held on a segregated basis" meaning that the asset "was recorded as being held separately from LBIE's own Securities in both the Books and Records of LBIE and also at LBIE's custodian or depository (the Intermediary)…" "Security" is defined as any financial instrument, including any share, instrument creating or acknowledging indebtedness, instrument creating or acknowledging entitlements to investments, warrant and unit in a collective investment scheme…" It excludes money. I was told that there are approximately 28,000 different categories of security to be dealt with.

23.      A Scheme Creditor is expressly described as excluding anyone whose claims "are not proprietary but are only unsecured". Equally, as Mr Trower explained in the course of argument, a Scheme Creditor will not include anyone who has no kind of pecuniary claim, however contingent, against LBIE. Thus, a client with a claim to a particular security but who renounces any pecuniary claim (for example, for damages for late delivery of the security) and confines his claim to its return will not be included. In short, a person is only a Scheme Creditor if that person (1) has a pecuniary claim against LBIE and (2) has a proprietary claim to a security which was held on a segregated basis at the Time of Administration.

24.      The scheme explains, in what is described as "Key Concept 2", that "the subject matter of the Scheme is Trust Property". Trust Property is wider than "Segregated Assets" because it includes assets, referred to as "Derived Assets", which are derived from Segregated Assets, and "Recovered Assets". Recovered Assets are assets received by LBIE from a source which has an obligation to redeliver to LBIE a security which had been delivered by LBIE to that source after the Time of Administration but prior to the date ("the Effective Date") when a copy of the court's order sanctioning the scheme under Part 26 (assuming such an order is made) is delivered to the Registrar of Companies.

25.      The scheme is intended to deal with all of a Scheme Creditor's proprietary claims against LBIE for the return of Trust Property. It extends to property which LBIE should have held even if in fact it does not. This is subject only to the requirement that LBIE must hold some property of the Scheme

Creditor and means therefore that if the claim is confined to an unsecured pecuniary claim against LBIE, the claim will not be dealt with under the scheme.

26.     The key provision of the scheme, set out in Part 2 of Section 4 of the proposal, is that Scheme Creditors release all claims (save for certain "Excluded Claims") against LBIE, the scheme supervisors, the administrators and other Scheme Creditors, including all claims for or in respect of (1) any "Asset Claim" (meaning, put shortly, a claim against LBIE in respect of any Trust Property), (2) any payment for or on account of any asset which is or was at any time the subject of an Asset Claim, (3) damages, indemnity or contribution in respect of any loss, cost or expense in connection with any asset which is or was at any time the subject of an Asset Claim, (4) all liabilities for breach of contract, loss or damage, indemnity or contribution of any nature, (5) all rights to seek or enforce judgment, exercise any remedy or apply any set-off, netting, withholding, combination of accounts or retention or similar rights against LBIE in respect of any claim or liability, and (6) all rights in respect of any financial contract. These are defined as "Released Claims".

27.     In exchange for their Released Claims, Scheme Creditors are given what are described as "New Claims". Broadly stated, these are (1) the right of each creditor to have its net contractual position (as earlier summarised) and what are described as "Allocations and Distributions" determined on the basis set out in the Scheme, (2) the right to have such part of the Trust Property as is available for distribution under the scheme allocated to and then delivered to the creditor, alternatively appropriated by LBIE in or towards discharge of the creditor's liabilities to LBIE (or certain affiliates or other third parties), (3) the right to claim against LBIE in accordance with the scheme for the amount of that creditor's net contractual position (assuming that the position has resulted in an amount owing by LBIE to that creditor) as a new obligation of LBIE and (4) the right to claim in LBIE's winding-up or any other distribution of LBIE's assets for such amount as is determined under the scheme. The New Claims are subject to an overriding proviso that no Scheme Creditor is entitled to recover more than once in respect of the same asset or claim.

28.     The reference to "Allocations" is, shortly stated, to the right of LBIE to allocate Trust Property available for distribution under the scheme to a Scheme Creditor by reference to individual stock lines (for example the quantity of a particular quoted security) held as Trust Property. Paragraph 10.7 of "Key Concept 6" (concerned with "Allocations and shortfalls") provides in terms that "a Scheme Creditor's

entitlement to participate in an Allocation will be based on its Asset Claim". This in turn is to be determined by LBIE based on certain information available to it. The Scheme Creditor has the opportunity to challenge the determination through a dispute resolution mechanism. Paragraph 10.8 requires the Scheme Creditor when receiving anything in respect of its Asset Claim to account for any assets received from an Intermediary (rather than from LBIE direct) and paragraph 10.10 provides, in effect, that if the allocations made to a Scheme Creditor result in a shortfall then the value of that shortfall is to rank as an unsecured claim against LBIE.

29.     The broad effect, although the drafting of the scheme is a little dense at this point, is that, subject to certain exceptions, LBIE will match a Scheme Creditor to a particular stock line where LBIE can be satisfied on the information available to it that the creditor has a proprietary claim (the so-called "Asset Claim") to assets answering the description of that stock line. This is on the basis that the creditor's claim will be satisfied (by means of the "Distribution") out of that stock line so far as is possible having regard (1) to the overall quantity of the stock line available for distribution and (2) to the competing claims of other creditors to the same stock line.

30.     But there is an important qualification to this which is set out in Part 3 of Section 4. This is the provision of a cut-off date (the "Bar Date") for the submission of claims under the scheme. The date envisaged is either 31 December 2009 or, if later, the last business day of the second full calendar month following the Effective Date. Paragraph 21.1 provides that "[a]ny claim submitted after the Bar Date can be disregarded by LBIE". But this is subject to an exception: if by the Bar Date a Scheme Creditor has failed to submit a claim (by completing a pro forma claim form) LBIE will calculate that Scheme Creditor's entitlement under the scheme using "Relevant Information". This is information capable of ascertainment from LBIE's books and records, information contained in the Scheme Creditor's claim form (if one has been submitted) and also, shortly stated, information from various notices delivered under the scheme as well as information made available by intermediaries, affiliates and any relevant exchange. Once the Bar Date has passed LBIE will start allocating, appropriating and distributing on the basis of pre-Bar Date claim forms and other Relevant Information. This means that if a Secured Creditor fails to submit a claim form by the Bar Date and, by that date, LBIE is without any Relevant Information in relation to that Scheme Creditor's claim, the claim may be disregarded.

31.     However, as Mr Trower explained in the course of argument, the imposition of a Bar Date is not intended to have

the consequence that the late claim is altogether barred. If the Scheme Creditor can substantiate its claim, then, notwithstanding that this is after the Bar Date, it may share in the particular stock line, but it may only do so if and to the extent that there is any surplus in that stock line. Thus, if there are no other claimants to a particular stock line (or the claims of those other claimants have been fully satisfied), the late claimant is unaffected by the Bar Date. Conversely, if there is insufficient in the stock line to satisfy the accepted claims of pre-Bar Date claimants, the later claimant will be left to claim as an unsecured creditor. In short, there is no "catch-up" concept for late claimants as regards any distribution: they must await the full satisfaction of the accepted claims of pre-Bar Date established claims.

32.    For present purposes, the scheme may be summarised by saying that a client of LBIE who qualifies as a Scheme Creditor - in that the client has, or potentially has, a pecuniary claim against LBIE and is the owner of a particular asset held or controlled by LBIE (for example a quantity of a particular quoted security) - will have that asset claim satisfied on a pooled basis, ranking alongside (and in competition with) others who can establish ownership claims to the same asset, to the extent that the securities comprising that asset are available to meet the claims. The unrecovered value of the client's Asset Claims and any balance due to the client on computing the client's net contractual position with LBIE resulting from the closing out of all financial contracts between the client and LBIE are to rank as unsecured claims against LBIE. All other pecuniary claims of the client against LBIE are foregone."

25.    As the Judge recognised, there will be cases where the claims of some of those counterparties are sufficiently well documented to establish a clear entitlement to particular securities ahead of any other potential claimants.   In such cases the conversion of a counterparty's existing proprietary claims into New Claims as defined will inevitably involve a loss of priority in cases where the pool of assets of a particular type (e.g. a particular stock line) held by LBIE is insufficient to meet the claims of all clients who are able to establish a right to assets of that kind.   Clients in that position have least to gain from the Scheme but are at risk of having their property rights compulsorily acquired in order to permit a speedy and effective distribution of available assets amongst the entire class of relevant claimants.

26.    Likewise the Scheme Creditor who fails to submit a claim by the Bar Date in circumstances where the administrators have no Relevant Information as defined may find that it effectively forfeits its right over securities it once owned and is limited to recovering from any surplus of assets once the claims to that stock line by the pre-Bar Date claimants have been satisfied.

27.    Blackburne J held that the court has no jurisdiction under Part 26 to sanction a scheme which interferes with the property rights of the clients of LBIE in this way.   Although the potential effect of the Bar Date on some Scheme Creditors is perhaps the most

striking example of the way in which existing property rights could be removed, the issue of principle raised before the Judge and on this appeal does not turn on those particular provisions of the Scheme. LIBA's objection on jurisdictional grounds centres on the identity of the Scheme Creditors and the nature of the rights which the Scheme attempts to deal with. The Judge identified the key question as being whether the Scheme affects clients of LBIE in their capacity as creditors of the company. His view was that it did not insofar as it purported to deal with and discharge their proprietary rights over the securities and other assets held to their account by LBIE. There is, of course, no dispute that in respect of any pecuniary claims which they may have against the company for damages or equitable compensation for breach of trust, they are, to that extent, creditors. But the Judge held that this was insufficient to entitle the court in the exercise of its Part 26 jurisdiction to sanction a scheme insofar as it compromised or removed their rights over trust property.

Jurisdiction

28.   The argument advanced by Mr Snowden on behalf of LIBA which the Judge accepted can be expressed quite shortly. Part 26 of the Companies Act 2006 confers on the court a jurisdiction to sanction compromises or arrangements between the company and its creditors which have been approved by a majority in value of creditors according to the conditions set out in s.899(1). Although the discretion to approve the Scheme is a general one to be exercised judicially having regard to the objects of the Scheme and its general fairness in relation to creditors, the jurisdiction is not an unlimited one. The "arrangement" must have the necessary features of give and take described by Brightman J in *Re NFU Development Trust Ltd* [1972] 1 WLR 1548 and it has to be an arrangement between a company and its creditors or members.

29.   There is no statutory definition of "creditor" or "arrangement" for the purposes of Part 26 and, in relation to "arrangement", the courts have been careful not to attempt to provide one beyond the limited criteria described in *Re NFU Development Trust Ltd*. But Mr Snowden contends that, in order to be a creditor of the company, it is necessary to be owed money either immediately or in the future pursuant to a present obligation or to have a contingent claim for a sum against the company which depends upon the happening of a future event such as the successful outcome of some litigation. Although a creditor for the purposes of Part 26 is not therefore limited to someone with an immediately provable debt in a liquidation, it does require that person to have a pecuniary claim against the company which (once payable) would be satisfied out of the assets as a debt due from the company.

30.   As support for this, we were referred to the decision of the Court of Appeal in *Re Midland Coal, Coke & Iron Company* [1895] 1 Ch 267 in which it was accepted that a person with a contingent claim against the company qualified as a creditor under a scheme of arrangement made under the Joint Stock Companies Arrangement Act 1870. Lindley LJ (at page 277) said that he agreed that:

> "… the word "creditor" is used in the Act of 1870 in the widest sense, and that it includes all persons having any pecuniary claims against the company. Any other construction would render the Act practically useless."

31.   Based on this decision, David Richards J concluded in *Re T&N Ltd* [2005] EWHC 2870 Ch that persons with contingent claims for damages against a company were creditors within what is now Part 26:

> "[40] In my judgment, "creditors" in s 425 is not limited to those persons who would have a provable claim in the winding-up of the company, although it clearly includes all those who would have such a claim. As was submitted by Mr Snowden and other counsel, one of the recognised purposes of s 425 is to encourage arrangements with creditors which avoid liquidation and facilitate the financial rehabilitation of the company: see, for example, *Sea Assets Ltd v PT Garuda Indonesia* [2001] EWCA Civ 1696 at para 2. This suggests that as wide a meaning as possible should be given to "creditors" in the section. Having said that, it is important to bear in mind that s 425 is designed as a mechanism whereby an arrangement may be imposed on dissenting or non-participating members of the class and such a power is not to be construed as extending so as to bind persons who cannot properly be described as "creditors"."

32.   These cases were not, of course, concerned with the status of claimants who were asserting proprietary interests over the assets held by the company. But LIBA fastens on the reference in Lindley LJ's judgment to the widest use of the words being capable of extending to contingent creditors as at least an indication that the concept of a creditor does not extend further to include those whose relationship is not that of a debtor/creditor at all.

33.   The foundation of Mr Snowden's argument is that a beneficiary under a trust is not ipso facto a creditor of the trustee. Although the trust relationship may give rise to unsecured claims against the trustee for breach of trust or even negligence and may sometimes exist in a wider contractual framework, it remains at its core a different legal relationship. Subject to the terms of the trust instrument, the trustee holds the trust property for the benefit of those beneficially entitled to it and has a primary obligation to maintain those particular assets (or any which replace them) to the exclusion of all other claims. The trust property does not form part of the trustee's estate in the event of insolvency so as to be available to meet the claims of general creditors and the beneficiary is entitled to the property in specie free of any such claims.

34.   If authority is needed to make good the distinction between a creditor and a beneficiary then Mr Snowden relies, by way of example, on the decision of Sir John Romilly MR in *Sinclair v Wilson* (1855) 20 Beav. 324 that the restoration of trust property from the estate of a bankrupt to a beneficiary did not amount to a fraudulent preference in favour of a creditor.

35.   He therefore submits that the definition of a Scheme Creditor so as to include only counterparties who have both a proprietary claim and an unsecured pecuniary claim against the company is not sufficient to enable the court to exercise the Part 26 scheme jurisdiction so as to encompass the property rights of those involved. The proposed scheme is, in that respect, not an arrangement between LBIE and the

counterparties in their capacity as creditors.  The court may therefore only sanction it (if at all) so far as it compromises the ancillary money claims.

36.   In response to this argument Mr Trower submits that the Judge focused too much on the removal or variation of existing property rights under the Scheme and failed to apply the correct statutory test which is simply whether the Scheme constitutes an arrangement between the company and its creditors.  The wording of s.895(1) does not impose, he says, a jurisdictional requirement that a scheme of arrangement should be made with creditors only in their capacity as creditors and if the Judge based his decision to that effect on the word "arrangement" then he was wrong to do so.  The courts have steadfastly refused to attach a narrow definition to that term.

37.   Mr Trower submits that once a person qualifies as a creditor in the sense accepted by LIBA, the scheme jurisdiction is engaged and extends to all of his rights against the company and not merely to those which give rise to a claim in debt.  If this is right then the court could only refuse to sanction the Scheme as an exercise of discretion under s.899.

38.   Mr Trower is clearly right to say that the Scheme Creditors are, on any view, creditors of the company, at least insofar as they have monetary claims against LBIE either for the net balance due on their Cash Accounts or because LBIE has committed breaches of contract or trust in connection with the management of the cash and securities it held.  Most of these claims would be provable in a liquidation under the provisions of rule 13.12 of the Insolvency Rules but, as mentioned above, it is accepted that this is not a pre-condition to the claimant being a creditor for the purposes of Part 26.

39.   What is said to follow from this is that the existence of a trust relationship is not inimical to the existence of a debtor/creditor relationship and may be the source of it.  A claim for damages or equitable compensation for breach of trust arises out of the trust relationship.  To that extent, a beneficiary will be a creditor of the trustee.  The duty of the trustee to account to the beneficiary for trust property and to make restitution for any such property which has been lost is carried out in substitution for the trustee's core duty to preserve and disburse the trust fund in accordance with the terms of the trust instrument.  It is artificial, Mr Trower contends, in the context of a Scheme to distinguish between the enforcement of this duty which gives rise to a monetary award in favour of the beneficiary (and thereby makes him a creditor) and the right of a beneficiary to the trust asset itself.  They are simply opposite sides of the same coin.

40.   He also emphasises that the fact that a creditor may have proprietary rights relating to his claim against the relevant company is not in itself a bar to the exercise of the Scheme jurisdiction.  The most obvious examples are debenture-holders and other secured creditors who are undoubtedly creditors of the company but commonly have their security removed or modified under a scheme of arrangement.

41.   So in *Re Empire Mining Company* (1890) 44 Ch D 402 North J sanctioned a scheme under the 1870 Act between the company and its debenture-holders on the basis that they were creditors.  At p. 409 the Judge said that:

     "The Act gives the Court power to bind "creditors," and debenture-holders are creditors. The word "creditor" in the Act

is general. No distinction is made between different kinds of
creditors; there is nothing to except any particular class of
creditors from the jurisdiction of the Court."

42.    In *Re Alabama, New Orleans, Texas and Pacific Junction Railway Company* [1891] 1
Ch 213 the Court of Appeal rejected an argument that a scheme which deprived
debenture-holders of their security fell outside the scope of the 1870 Act.   The
decision of North J that debenture-holders were creditors was affirmed.   In relation to
whether the removal of a security could be included in a scheme, Fry LJ (at p.246)
said this:

> "But again, what kind of compromise or arrangement is the
> most common? Surely the most common kind of compromise
> or arrangement is one in which secured creditors diminish or
> alter the amount of their security. I repeat, that the Legislature
> having used the largest language, such as "any compromise or
> any arrangement between a company and any class of its
> creditors", I think, if we were to exclude from that class of
> creditors the secured creditors, or if we were to exclude from
> the arrangements or compromises to be made an arrangement
> or compromise which affected the security, we should be
> putting a most unwarrantable restriction on the generality of the
> language used in the Act, and therefore I have no hesitation in
> saying that in my judgment the court has jurisdiction in this
> matter."

43.    We were also taken to a number of authorities in which, in other contexts,
beneficiaries under a trust have been treated as creditors of the trustee.  In *Webb v
Stenton* (1883) 11 QBD 518 an application was made to garnishee the money payable
to a judgment debtor by way of income as a life tenant under a trust.  Before the order
could be made the money had in fact been paid to the debtor but Lindley LJ (at p.526)
expressed the view that a liquidated sum payable in equity by the trustee to the life
tenant constituted an "equitable debt" which was capable of being attached.  Similarly
in *Sharp v Jackson* [1899] AC 419 the House of Lords (following earlier decisions in
the Court of Appeal) held that transfers of property to beneficiaries under a trust made
by an insolvent trustee in order to make good previous breaches of trust did not
amount to a fraudulent preference.   The decision was based on there being no
intention to prefer in the circumstances, but Mr Trower referred us to a passage in the
speech of the Earl of Halsbury LC (at p.426) about whether the beneficiary in that
case could be a creditor:

> "It has been suggested that there was a proposition which could
> be maintained, as to which I confess I entertain grave doubts
> whether any decision goes to that extent, namely, that the
> relation between a cestui que trust and a trustee who has
> misappropriated the trust fund is not that of debtor and creditor.
> That it may be something more than that is true, but that it is
> that of debtor and creditor I can entertain no doubt. As that
> question has been mooted and brought before your Lordships'
> House as one question for decision here, I certainly have no
> hesitation in saying that in my opinion no such proposition can

> properly be maintained, and that although there are other and
> peculiar elements in the relation between a cestui que trust and
> a trustee, undoubtedly the relation of debtor and creditor can
> and does exist."

44.     I find these cases of very limited assistance in relation to what we have to decide.  The
interpretation of the rules of court governing the making of garnishee orders is far
removed from the issues which arise in relation to Part 26.  *Sharp v Jackson* is closer
in context but the beneficiary in that case had a claim against the insolvent trustee for
breach of trust which it is common ground would have made him a creditor for the
purposes of a scheme.  The issue in this case is whether the clients of LBIE are to be
treated as creditors in respect of the rights in rem which they enjoy over the property
held by the company.   These are the elements of the trustee/beneficiary relationship
which Lord Halsbury described as "other and peculiar".  If anything, this reference is
helpful to Mr Snowden's argument.  But it certainly does not indicate that the Lord
Chancellor thought that beneficiaries ought to be regarded as creditors in respect of
their proprietary claims.

45.     Mr Trower's principal submission that a scheme of arrangement can legitimately alter
the property rights of creditors begins with the unrestricted meaning to be given to the
word "arrangement" in the context of Part 26.   This is, of course, common ground.
As mentioned earlier, judges have deliberately avoided giving the word a narrow
meaning beyond indicating that it cannot amount simply to a surrender or
confiscation.  Subject to that, however, the judges of the Companies Court frequently
sanction arrangements where the rights of creditors not only against the company but
also inter se are varied or where creditors are required to give up rights against third
parties such as under guarantees.  The use of the scheme jurisdiction in relation to
takeovers makes this almost essential.

46.     A particular illustration of this relied upon by Mr Trower is the scheme of
arrangement considered by David Richards J in *Re T&N Ltd (No 3)* [2006] EWHC
1447 (Ch).  The proposed scheme in that case was between T&N Ltd and various
associate companies and employees and former employees who had claims for
personal injuries arising out of their exposure to asbestos.  The claims included in the
scheme were restricted to those covered by employers' liability insurance.   The
insurers had disputed liability but agreed to pay the sum of £36.74 million to the
administrators of the T&N companies on terms that a binding scheme of arrangement
was put into place and approved by the court under which actual and potential
claimants would agree not to bring claims against the insurers in return for being paid
a dividend out of that fund.

47.     One complication in the scheme was the effect of s.1 of the Third Parties (Rights
Against Insurers) Act 1930.  On entering administration, the rights of T&N and the
other companies under the policies (in respect of liabilities which had by then been
incurred) were transferred to those claimants.  These rights had to be compromised as
a term of the scheme.  One of the arguments addressed to the Judge was that the
scheme did not constitute an "arrangement" under what was then s.425 of the
Companies Act 1985 because it only affected the rights between the employee
claimants and the insurers and was not therefore a compromise or arrangement made
between T&N and its creditors.

48.     David Richards J dismissed this objection on the grounds that the rights which the
        claimants had against the insurers were sufficiently connected with the claimants'
        rights against T&N to bring the proposed arrangement within the scope of s.425:

> "45. The first and obvious point to make is that, whatever the
> precise meaning of a compromise or arrangement, it must be
> proposed with creditors or members of a company. It is implicit
> that it must be made with them in their capacity as creditors or
> members and that it must at least concern their position as
> creditors or members of the company. For the reasons already
> given, even those EL Claimants to whom T&N's rights against
> the EL Insurers have been transferred by operation of the 1930
> Act remain creditors of T&N. The extent to which certain other
> persons with EL Claims are creditors for the purposes of
> section 425 is considered later in this judgment.
>
> …..
>
> 52. The settlement of the litigation is therefore in substance and
> form a tripartite matter, involving T&N, insurers and claimants.
> That is reflected in the proposed scheme, with T&N and the
> claimants as parties and with the EL Insurers appearing before
> the court to consent to the scheme and to undertake to be bound
> by its terms. It is true that the scheme has no effect on the
> present rights of EL Claimants against T&N. The right of
> claimants to assert their claims against T&N, and the right of
> T&N to defend those claims, are unaffected, and claimants are
> not obliged to proceed first against the trust to be established by
> the scheme. However, if a claimant establishes a claim under
> the trust distribution procedures and receives a payment, it will
> diminish the amount which T&N would otherwise be required
> to pay in respect of the claim, if the EL Insurers succeeded in
> avoiding the policies or in limiting the cover. Although not
> immediately affecting rights against T&N, the scheme is likely
> therefore to have an impact on those rights. Mr Chivers
> objected that these effects resulted not from the scheme but
> from the settlement agreement and arrangements constituted by
> the trust deed and trust distribution procedures which took
> effect outside the scheme. In my view, it is not possible to
> divorce the arrangements in this way. The scheme of
> arrangement is an integral part of a single proposal affecting all
> the parties, which includes also the trust and the trust
> distribution procedures to be established pursuant to the
> scheme.
>
> 53. In my judgment it is not a necessary element of an
> arrangement for the purposes of section 425 that it should alter
> the rights existing between the company and the creditors or
> members with whom it is made. No doubt in most cases it will
> alter those rights. But, provided that the context and content of
> the scheme are such as properly to constitute an arrangement

between the company and the members or creditors concerned, it will fall within section 425. It is, as Nourse J observed, neither necessary nor desirable to attempt a definition of arrangement. The legislature has not done so. To insist on an alteration of rights, or a termination of rights as in the case of schemes to effect takeovers or mergers, is to impose a restriction which is neither warranted by the statutory language nor justified by the courts' approach over many years to give the term its widest meaning. Nor is an arrangement necessarily outside the section, because its effect is to alter the rights of creditors against another party or because such alteration could be achieved by a scheme of arrangement with that other party."

49.     Mr Trower relies on the Judge's reasoning as including an acceptance that the Scheme jurisdiction can extend to rights held by the creditors that are connected to the subject matter of their claims against the company but are not rights as creditors against the company. Claims against third party sureties under a guarantee would fall into the same category. If an arrangement under Part 26 can extend this far then there is no reason in principle, he says, why it should not embrace other claims which the creditor does have against the company, although of a proprietary nature. The abandonment of claims against third parties is as much a release of property rights as any variation of the property claims which the counterparties have against LBIE. There is nothing in the language of Part 26 to exclude such claims from an arrangement between the company and its creditors and any objections to their inclusion as a term of the Scheme should be addressed, if at all, on the merits at the sanction hearing.

50.     The question whether the Scheme jurisdiction can be used to require creditors to release rights against third parties has been considered in Australia in two recent decisions of the Federal Court of Australia. In *Re Opes Prime Stockbroking Ltd* [2009] FCAFC 125 a scheme of arrangement under s.411 of the Corporations Act 2001 (which closely resembles the provisions of Part 26) included machinery under which creditors of the scheme companies were required to release claims against third party financiers (ANZ and Merrill Lynch) who had provided the scheme companies with cash and other securities in return for the securities which the scheme companies had received from their own clients. As part of an overall settlement of claims by the creditors against the scheme companies, ANZ and Merrill Lynch, a fund was created for the benefit of creditors into which the two finance companies paid some $226 million in cash and released cash and assets of the scheme companies valued at a further $27 million. It was a term of the scheme of arrangement that, in return for being able to prove against the fund, ANZ and Merrill Lynch would be released from any claims by either the scheme creditors or the scheme companies. The circumstances were therefore very similar to those considered by David Richards J in *Re T&N Ltd (No 3)*.

51.     The Judge at first instance rejected a submission by a creditor that he had no jurisdiction under s.411 to sanction an arrangement which required the release of the creditor's third party claims against ANZ and Merrill Lynch. He approved the scheme. A Full Federal Court dismissed the creditor's appeal.

52.   The submission made to the Federal Court was that a scheme of arrangement could not affect interests other than those of a creditor qua creditor of the company and that s.411 did not authorise the court to approve an arrangement between the company and its creditors which extinguished rights belonging to the creditor in some other capacity: in that case as a creditor of ANZ and Merrill Lynch. The Federal Court rejected that argument for the following reasons:

> "66     Doubtless there are limitations on the extent to which a scheme of arrangement purporting to be between a company and its creditors or a class of its creditors can purport to affect property of the creditor that has no connection with the company or the relationship of creditor and debtor between the creditor and the company. The mere fact that a person or entity is a creditor of a company would not, of itself, justify an arrangement between that person or entity on the one hand and the company on the other whereby property of the person or entity were confiscated without any benefit to the person or entity. Such an arrangement would not be approved by the Court pursuant to s 411(4)(b).

> 67     A purported scheme of arrangement must involve some arrangement in a sense that is to be construed liberally. No narrow interpretation should be given to the expressions "compromise" or "arrangement". An arrangement within the meaning of s 411 connotes some element of give and take. A proposal that conferred no benefit on creditors and constituted the mere confiscation of interests would not be an arrangement within the meaning of s 411. An arrangement must involve some bargain giving benefit to both sides. However, there is no reason to construe the term in s 411 as restricting in any way the nature of the bargain that might be made between company and creditors (*Re Sonodyne International Ltd* (1994) 15 ASCR 494 at 497-8), subject only to the additional requirement that the arrangement must be within the power of the company and not in contravention of the Corporations Act.

> 68     A scheme of arrangement between a company and its creditors or a class of creditors is no more than a proposal to vary or modify the company's obligations in relation to its debts and liabilities owed to the creditors or class of creditors. There is nothing to prevent the company from posing, as part of the arrangement, a term to the effect that, in consideration of what the company has provided under the scheme, the creditors will discharge not only the debts and liabilities of the company, but also the liabilities of, for example, sureties for the same debts and liabilities of the company.

> 69     It is permissible to incorporate in a scheme of arrangement an involvement or participation by an outsider, being a person or entity who is not a party to the scheme as a company or creditor (see *Re Glendale Land Development Ltd*

> *(In liquidation)* (1982) 1 ACLA 540. Such arrangements are
> commonplace in relation to schemes involving takeovers. A
> scheme of arrangement made between a company and its
> creditors under s 411 binds only the company and the creditors.
> Nevertheless, there is no reason why a bargain might not be
> struck between a company and creditors whereby the creditors
> are bound to enter into an arrangement with third parties. So
> long as there is some element of give and take, such that the
> creditors receive something in return for the benefit conferred
> on a third party, there is no reason in principle why that term
> could not be part of a scheme of arrangement as contemplated
> by s 411"

53. This decision is consistent with the reasoning of David Richards J in *Re T&N Ltd (No 3)* but it has not met with universal approval in Australia. In a subsequent decision of the Federal Court in *City of Swan v Lehman Bros Australia Ltd* [2009] FCAFC 130 which was concerned not with the approval of a scheme of arrangement under s.411 but with a deed of company arrangement made pursuant to s.444D(1) of the Corporations Act, another Full Court held that a deed of company arrangement did not have the effect of releasing creditor claims against a third party but only those against the company.

54. The relevant statutory language in s.444D(1) is that:

> "(1) a deed of company arrangement binds all creditors of the
> company, so far as concerns claims arising on or before the day
> specified in the deed under paragraph 444A(4)(i)".

55. The judgments in *City of Swan* distinguish between these provisions and those of s.411 on the grounds that the deed of company arrangement procedure is unsupervised and therefore more restricted in what it is intended to achieve. But, in some of the judgments, the members of the Full Court are careful not to endorse the correctness of the decision in *Opes* and even go so far as to suggest that it is inconsistent with earlier Australian authorities.

<u>Conclusions</u>

56. So that there should be no doubt about it, I accept (as the Judge did) that the proposed Scheme represents a considered attempt to overcome the difficulties faced by the administrators in reconciling the entries in the company's books and records with the claims made against the assets held. I also accept that although the Scheme, if implemented, will undoubtedly remove any existing proprietary rights over the assets in question, it will do so with a view to substituting for them a distribution of the securities amongst the relevant clients which is designed to secure for them the return of their property so far as that is possible consistently with a fair apportionment of available assets. But we are not concerned on this appeal with the fairness or reasonableness of the proposal. Whether the removal of vested and provable rights in this way is fair and reasonable as between the various classes of creditors is a matter to be addressed (if at all) at a sanction hearing. It is not necessary for this court to express any view about that.

57.  The question whether the court's power to sanction a scheme of arrangement under Part 26 can extend to the release of rights over property held by the company under a trust is one of statutory construction.  Considerations of expediency and convenience are only relevant if and so far as they can be assumed to have influenced the legislature when the statutory provisions were formulated.  We have not been asked to treat the Companies Act 2006 as a consolidation measure for the purposes of Part 26 but it is evident that the current provisions have remained essentially unchanged since they first appeared in the 1870 Act and there is nothing to suggest that Parliament has recently intended to give them any different or wider meaning.

58.  Conceptually no statutory power can be unlimited and, in this case, the court's jurisdiction is circumscribed by the requirement that the Scheme should be an arrangement between the company and its creditors.  When the constituent parts of this formula are looked at in isolation there is a considerable measure of agreement as to what they can include.  As mentioned earlier, a "creditor" will consist of anyone who has a monetary claim against the company which, when payable, will constitute a debt.  Contingent claims are included for this purpose.  A claim (e.g.) for damages in tort is still a legal liability of the company which will ultimately result in either an agreed payment or a judgment debt.  The Scheme has been drafted so as to exclude anyone whose only claim against the company will be one in rem.  To be a Scheme Creditor one has to have a current or contingent claim for damages or equitable compensation against the company, either of which is sufficient to render the claimant a creditor at least in that respect.

59.  Mr Snowden, of course, relies upon this as an implicit acceptance by the administrators that a purely proprietary claimant does not qualify as a creditor.  The requirement that all Scheme Creditors should have both an unsecured monetary claim as well as their proprietary claims is criticised as a device to enable, as he put it, the tail to wag the dog.  But the resolution of these issues does not depend on a resort to canine metaphors.  It is obvious that someone with a purely proprietary claim against the company is not its creditor in any conventional sense of that word.  As a matter of ordinary language, a creditor is someone to whom money is owed.  The use of this word with that meaning is a long-established and essential part of English company law.  The Companies Act (and now the Insolvency Act) regime for the administration of insolvent companies and their assets depends upon being able to identify creditors and not to confuse them with those whose property rights do not fall into the insolvent estate: see, for example, *Barclays Bank Ltd v Quistclose Investments Ltd* [1970] AC 567.  Given that "creditor" is not defined in the legislation, it is inconceivable that Parliament should have used the word in the 2006 Act in any but its literal sense.

60.  For these reasons, one gets no real assistance from the cases on secured creditors.  No one can dispute that a creditor with security for what is owed remains a creditor of the company.  Their security exists and is only enforceable to the extent and for so long as the underlying indebtedness continues.  All that *Empire Trading* and *Alabama* establish is that a creditor with security is nonetheless a creditor for the purposes of the Scheme jurisdiction.  That conclusion is hardly surprising given the absence from the legislation of any restriction of what is now Part 26 to unsecured creditors.  Nor is it to the point that under a scheme of arrangement a debenture-holder or other secured creditor may be required to give up the whole or part of his security.  The charges in question will have been granted by the company over its own property.  The interests

granted to secured creditors (which, in the case of real property, amount to a legal estate) are only ever held as security interests subject to the debtor's equity of redemption.  An arrangement under which that indebtedness is re-organised will therefore necessarily impact on any security held in respect of it and may involve the repatriation of the debtor's property free from the charge.  When this occurs the secured creditor is simply returning to the debtor property which the creditor never owned beneficially and was only ever held as security for the debt.  Blackburne J was quite right to regard this as wholly different from the converse case of property which has never formed part of the company's assets but is held by it only as trustee.

61.     What then of an "arrangement"?  As described earlier, the court's approach has been to give this a relatively unrestricted meaning.  Mr Trower relies on this to support his argument that there is nothing in the statutory language to restrict the content of an arrangement to the re-organisation of rights enjoyed by creditors qua creditors.  But the question whether s.895 imposes that restriction has to be determined not by the meaning of "arrangement" alone, but by the use of the word in the phrase "an arrangement between a company and its creditors".  Although "arrangement" is a wide expression, it is given content and meaning by the parties to it.

62.     In terms of authority Mr Trower places some weight on the decisions in *Re T&N Ltd (No 3)* and *Opes* as indicating that the rights which can be released or re-organised under a scheme are not limited to those enjoyed by scheme creditors as creditors of the company.  Both cases indicate that they can include rights against third parties related to and essential for the operation of the scheme.  At first sight these authorities are helpful to the administrators in that they do establish that a scheme can extend beyond monetary claims by the creditors against the scheme company alone.  But what they do not do is to suggest that claims which do lie against the company can be included if they are proprietary rather than contractual or tortious in nature.

63.     Although the decision in *Re T&N Ltd (No 3)* has not been the subject of any judicial criticism in this country, the principle it establishes has proved controversial at least in Australia.   It seems to me entirely logical to regard the court's jurisdiction as extending to approving a scheme which varies or releases creditors' claims against the company on terms which require them to bring into account and release rights of action against third parties designed to recover the same loss.  The release of such third party claims is merely ancillary to the arrangement between the company and its own creditors.  Mr Snowden has not invited us to overrule *T&N Ltd (No 3)* and it would not be appropriate for us to do so without hearing full argument on the point.

64.     But when properly analysed, these cases do not, in my judgment, really assist Mr Trower in his argument.  It seems to me tolerably clear from the judgments in both cases that the courts did not consider that they were changing the basic criteria for the approval of a scheme of arrangement.  David Richards J (in the passage in paragraph 45 of his judgment quoted above) refers expressly to it being implicit in s.425 that the arrangement must be made with creditors in their capacity as creditors and must concern their position as creditors.  In *Opes* (at paragraph 68) the Federal Court describes a scheme of arrangement as no more than a proposal to vary or modify the company's obligations in relation to its debts and liabilities owed to the creditors or class of creditors.

65.     It seems to me that an arrangement between a company and its creditors must mean an arrangement which deals with their rights inter se as debtor and creditor.  That formulation does not prevent the inclusion in the Scheme of the release of contractual rights or rights of action against related third parties necessary in order to give effect to the arrangement proposed for the disposition of the debts and liabilities of the company to its own creditors.  But it does exclude from the jurisdiction rights of creditors over their own property which is held by the company for their benefit as opposed to their rights in the company's own property held by them merely as security.

66.     I do not accept Mr Trower's submission that the reference to a creditor was intended to act as no more than a gateway to the inclusion of that person in the Scheme and that s.895 leaves the court with jurisdiction to sanction the compromise or removal of rights which the creditor does not hold as a creditor.  That would, I think, be inconsistent with the expressed purpose of the legislation which must be to allow the company to re-arrange its contractual or similar liabilities with those who qualify as its creditors.  A person is the creditor of a company only in respect of debts or similar liabilities due to him from the company.  I am not persuaded that Parliament can have intended to allow creditors to be compelled (if necessary) to give up not merely those contractual rights but also their entitlement to their own property held by the company on their behalf.

67.     A proprietary claim to trust property is not a claim in respect of a debt or liability of the company.  The beneficiary is entitled in equity to the property in the company's hands and is asserting his own proprietary rights over it against the trustee.  The failure by a trustee to preserve that property in accordance with the terms of the trust may give rise to a secondary liability to make financial restitution for the loss which results, but that is a consequence of the trust relationship and not a definition of it.

68.     Part of Mr Trower's argument seeks to minimise these legal distinctions by treating agreements such as the IPBA as an overall commercial arrangement which should be looked at in the round for the purposes of Part 26.  The commercial nature of these agreements is not in dispute but the trust mechanism has long been regarded as an important safeguard against insolvency and has been imported into commercial contracts for that very reason.  In the case of pure custody agreements, it is, of course, paramount.  I do not therefore accept that the trust element in these arrangements ought in some way to be merged into the general contractual framework and treated merely as ancillary when considering the limits of the Scheme jurisdiction or (which is more important) that Parliament ever intended to deal with it in that manner.

69.     The language of s.895 ought therefore in my view to be read in the way that Blackburne J construed it.  I would therefore dismiss this appeal.

**Lord Justice Longmore** :

70.     I agree with the judgment of Patten LJ and with the judgment of the Master of the Rolls.

**The Master of the Rolls**:

71.    I agree that this appeal must be dismissed. Despite the undoubted attraction of implementing the proposed scheme of arrangement in this case ("the Scheme"), it seems to me that Blackburne J was right to hold that he had no jurisdiction to approve the Scheme insofar as it was concerned with the distribution of property held or controlled by it on trust for any of its creditors. I entirely agree with the reasons given for this conclusion given by Patten LJ, and indeed by the Judge below. However, as the point is of some importance, I will briefly express my reasons in my own words.

72.    The terms of the Scheme are long and complex, and the detailed provisions of the standard form "International Prime Brokerage Agreement" and "Master Custody Agreement" used by Lehman Brothers International (Europe) ("LBIE") are not simple. However, as Patten LJ has explained, the question thrown up by this appeal is one of principle, albeit that it can be expressed in more than one way. Mr William Trower QC, for the administrators of LBIE ("the administrators"), put it thus: can a scheme of arrangement be approved by the court under section 895 of the Companies Act 2006 if it varies proprietary rights? I prefer to express it rather more specifically, if more wordily: can a scheme be approved under section 895 if it extends to property which is held on trust by the company concerned (a) generally; or alternatively (b) where the persons for whose benefit the property is held on trust are also creditors of the company? The Judge held that the answer to the question was no.

73.    Part 26 of the 2006 Act is concerned with "Arrangements and Reconstructions", and section 895, whose origins go back to section 2 of the Stock Companies Arrangement Act 1870, states, in subsection (1), that it applies "where a compromise or arrangement is proposed between a company and (a) its creditors,…. or (b) its members …".

74.    It has been held that the expression "creditors" in section 895 should be given a wide meaning (see *Re Alabama, New Orleans, Texas, and Pacific Junction Railway Co* [1891] 1 Ch 213, 236-237 and *Re Midland Coal, Coke and Iron Co* [1895] 1 Ch 267, 277), and the same principle seems to apply to the meaning of "arrangement" (*Re Savoy Hotel Ltd* [1981] Ch 351, 359 and 361). Bearing in mind the purpose of section 895, as discussed by David Richards J in *Re T&N Limited (Number 1)* [2006] 1 WLR 1728, paragraphs 32-40, and in *Re T&N Limited (Number 3)* [2007] 1 BCLC 563, paragraphs 43-55, it is plainly right that that is so.

75.    It was argued by Mr Trower that, in the light of the very wide meaning which is to be accorded to the word "creditors" in section 895(1)(a), it is capable of extending to a beneficiary under a trust. However, I find it very hard to see how it could be said that a person ("a beneficiary") who has the beneficial interest in property ("trust property") held on trust by the company is thereby a "creditor" of the company, even bearing the wide meaning that word is to be given in section 895.

76.    As Mr Richard Snowden QC, appearing for the London Investment Banking Association ("LIBA" who oppose the appeal because of what they regard as the unfortunate implications for London as a world financial centre should the administrators succeed on this appeal), says, in relation to such property, the beneficiary is "not a creditor of the [company] but … the owner of certain specific property in the possession of the [company]" – to adapt an observation of Romilly

MR in *Sinclair v Wilson* (1855) 20 Beav 324, 331. The duty of a trustee is thus to account to the beneficiary for trust property. Although a breach of trust by the trustee will normally give rise to a claim which constitutes the beneficiary a creditor, the trustee-beneficiary relationship will not of itself give rise to the beneficiary having any "pecuniary claims" (to quote from the very passage relied on by the administrators in the judgment of Lindley LJ in *Midland Coal* [1895] 1 Ch 267, 277) against the trustee. It would also be surprising if a scheme under what is now section 895 could have been proposed and sanctioned in relation to trust property for over 100 years without anyone, including all the writers of the leading company law and trust law textbooks, apparently being aware of this important feature of the company law legislation. And it seems most unlikely that the legislature would have intended beneficiaries' rights to be capable of being altered by a scheme if the trustee was a company, when there would be no such possibility if the trustee was an individual.

77.   As an alternative, Mr Trower has a more subtle argument. It is that, where a person has the beneficial proprietary interest in property held in the name of a company, a scheme in relation to that property can be validly approved under section 895 provided that the person concerned is also a creditor of the company. In other words, even though (on this alternative argument) such a person is not a creditor of the company qua beneficiary, and therefore a scheme could not extend to the trust property if he was not also a creditor, the argument is that, provided the beneficiary is also a creditor of the company, a scheme could extend to the trust property. So, on the administrators' case, once a person is, to any extent, a creditor of the company, a section 895 scheme in respect of the company can extend to any property or interest of that person.

78.   In the absence of clear and binding authority to support that contention, I consider that this alternative submission should also be rejected. As a matter of ordinary language, section 895 appears quite clearly to be dealing with arrangements between a company and one or both of two groups of people – its members and its creditors. If a person's claim cannot be said to render him a creditor or a member, then it appears to me to follow that the subject matter of the claim could not be covered by the arrangement. The fact that he may, in connection with a different claim, be a creditor, does not justify him being treated as a creditor for the purpose of the first claim.

79.   The practical consequences of the alternative contention would also be startling. Why should the mere fact that a beneficiary happens also to be a creditor of the company entitle the company, or its liquidators or administrators, to include his property in a scheme, when they could not otherwise do so? What commercial sense or logic is there in the notion, which would follow from the contention, that a beneficiary who is also a creditor could take the trust property out of the potential grasp of a scheme by waiving the debt, or by assigning the debt to another person? Equally, what commercial sense or logic is there in the notion that the company could engineer trust property being potentially brought within a scheme by breaching the trust, thereby creating a claim, and thus a debt, in favour of the beneficiary?

80.   However, Mr Trower raised a number of arguments which, he contended, call into question the views I have expressed as to his arguments. First, he relied on the wide meaning of the term "arrangement" in section 895, to which I have already referred. That gets the administrators no further: however generous a meaning is given to the word, there is no getting away from the fact that, in order to be within section 895, an

arrangement must be made with the "creditors" (or members) of the company concerned.

81.     Secondly, it was said that the court always has a discretion to refuse to sanction a scheme even when it satisfies the formal requirements of the section. This point, again, does not address the central problem faced by the administrators, namely that a beneficiary is not a creditor within section 895(1)(a). In any event, the relatively loose rein which the court normally adopts when approving a scheme which has been approved by the requisite majority of the various classes of creditors would scarcely be appropriate when it was sanctioning a scheme which extended to trust property.

82.     Mr Trower's third point was that it has been authoritatively established more than 100 years ago, ever since the Court of Appeal decided *Alabama* [1891] 1 Ch 213, 236-237, that schemes can affect proprietary rights, and in particular creditors' rights in respect of the security they enjoy over the company's assets. In my view, that principle, which I accept unreservedly, does not assist the administrators here. In the case of a secured creditor, the security is an incident of the debt; to put the point another way, it is parasitic on the debt. If there is no longer any debt, there is no security (save that it can survive in some sort of inchoate form to underwrite future debts). Accordingly, as section 895 enables a scheme which varies the debt, then it must follow that the variation must, as it were, be followed through to the security. No such argument can be mounted in relation to trust property held in the name of the company, which also happens to have a debt to the beneficiary, even if the debt arises out of the trustee-beneficiary relationship. Further, as Mr Snowden said, a secured creditor merely has the right to look to his security to enable his debt to be repaid: unlike the beneficiary in relation to the trust property, he does not own the security. So, if the sale of the security realises more than he is owed, the rest of the proceeds of sale are available to other creditors.

83.     Fourthly, Mr Trower relied on the fact that, in *T&N (No 3) Ltd* [2007] 1 BCLC 563, a scheme was held to be capable of extending to, and varying, claims which creditors of the company had against third parties. In *T&N (No 3)* [2007] 1 BCLC 563, paragraph 53, it was held that statutory rights which creditors of the company enjoyed against insurers could be varied as part of an arrangement under section 425 of the 1985 Act (the predecessor of section 895 of the 2006 Act) between those creditors and the company. However, unlike the rights of beneficiaries in respect of trust property, the creditors' rights against the insurers in *T&N (No 3) Ltd* [2007] 1 BCLC 563 (a) were closely connected with their rights against the company as creditors, (b) were personal, not proprietary, rights and (c) if exercised and leading to a payment by the insurers, would have resulted in a reduction of the creditors' claims against the company. Bearing in mind these three factors, it seems to me, as it does to Patten LJ, that the decision of David Richards J was correct, but is of no help to the administrators in this case. Indeed, like the security enjoyed by a secured creditor, the rights of the creditors against the insurers were effectively contingent on the existence of the creditors' claims against the company. It is right to add that, at least as presently advised, I am of the view that the decision in *T&N Ltd (No 3)* [2007] 1 BCLC 563 on this point was near the outer limits of the scope of section 895.

84.     Fifthly, there is the argument (which was put to Mr Trower, rather than raised by him) that there could be said to be some support from the cases for the administrators' contention in the fact that money, such as sums received as dividends or rent paid in

respect of trust property, owed from the trust to the beneficiary, can be characterised as an "equitable debt" due from the trustee to the beneficiary: if money due from the trust is such a debt, then it can be said that it would render the beneficiary, at least to that extent, a creditor, and, on that basis, logic might suggest that he should be treated as a creditor in respect of the trust assets. In my view, however, there is nothing in that point for the purposes of this appeal. As Mr Trower realistically accepted, a beneficiary would not be a creditor of the company for the purpose of section 895, if the trust fund, of which the company was bare trustee, included money, whether or not it was received as income derived from trust property: the money would beneficially be his property just like any asset held in the trust. Cases such as *Webb v Stenton* (1883) 11 QBD 518 may support the proposition that in some contexts (in that case, for the purpose of an attachment order) an equitable debt arises when money is due and payable from a trust fund to a beneficiary (see, in ascending order of force, at (1883) 11 QBD 518, 522, 526-7 and 530). However, even if that is right, it cannot begin to justify the notion that, in the case of a bare trust, income, received by the trustee qua trustee and held in the trust, is a debt to the beneficiary such that he can be to that extent treated as a creditor of the company for the purpose of section 895.

85.   Finally, it is worth noting that, far from there being any authority to support the administrators' contention, such judicial observation as there is on the point tends to support Blackburne J's approach. In *T&N Ltd (No 3) Ltd* [2007] 1 BCLC 563, paragraph 45 David Richards J, who has considerable experience of company law, described it as an "obvious point" and that it was "implicit" in the immediate statutory predecessor to section 895 (namely, as mentioned, section 425 of the Companies Act 1985) that a scheme of arrangement thereunder "must be made with [the creditors or members] in their capacity as creditors or members and that it must at least concern their position as creditors or members of the company".

86.   Like Patten LJ and Blackburne J, I have some sympathy with the administrators' desire to have a scheme under section 895 which extends to trust property, in the light of the difficulties which would otherwise almost certainly arise in connection with seeking to satisfy the rights of beneficiaries in relation to trust property held in the name of LBIE. However, as Blackburne J held, the fact that such a Scheme might well represent a reasonable proposal in this case is plainly not enough to bring it within the ambit of section 895, and, as is evidenced by the opposition to the proposed Scheme mounted by LIBA, it may, viewed in the wider perspective, be positively undesirable that such a Scheme could be approved under section 895. I hope, indeed I would expect, that, if the administrators decide to make an application under the Trustee Acts or pursuant to the court's inherent equitable jurisdiction, in relation to dealing with beneficiaries' rights, the court will provide effective assistance, by arriving at a practical and fair outcome, while ensuring that delay and cost are kept to a minimum.

87.   As it is, however, I, too, would dismiss this appeal.

i

<u>Neutral Citation Number: [2018] EWHC 1980 (Ch)</u>

Case No: 7492 OF 2008/CR-2008-000012 CR-2018-003713

<u>IN THE HIGH COURT OF JUSTICE</u> <u>BUSINESS AND PROPERTY COURTS OF</u>
<u>ENGLAND AND WALES</u> <u>COMPANIES COURT (Ch D)</u>

<u>The Rolls Building 7 Rolls Building Fetter Lane</u> <u>London, EC4A 1NL</u>

Date: 27th July 2018

Before:

# MR JUSTICE HILDYARD

- - - - - - - - - - - - - - - - - - - - -

IN THE MATTER OF LEHMAN BROTHERS
INTERNATIONAL (EUROPE) (IN ADMINISTRATION)
AND IN THE MATTER OF THE COMPANIES ACT 2006

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

MR. WILLIAM TROWER QC, MR. DANIEL BAYFIELD QC and MR. RYAN
PERKINS appeared for the Administrators of Lehman Brothers International (Europe) (In
Administration).
MR. ROBIN DICKER QC, MR. RICHARD FISHER and HENRY PHILLIPS appeared for
the Senior Creditor Group.

MR. DAVID ALLISON QC and MR. ADAM AL-ATTAR appeared for Wentworth.

MR. PETER ARDEN QC and MS. LOUISE HUTTON appeared for LB Holdings Intermediate 2
Limited (In Administration) and its Administrators.

Hearing dates: 13 & 15 & 18 June 2018
- - - - - - - - - - - - - - - - - - - - -

# Judgment Approved

**Mr Justice Hildyard:**

**Part A: the purpose and scope of this judgment, and the broad context of the application**

1. The ultimate question considered in this judgment is whether the Court should sanction a scheme of arrangement between Lehman Brothers International (Europe) (in administration) ("LBIE") and certain of its creditors pursuant to Part 26 of the Companies Act 2006 (the "CA 2006"). The Scheme has been proposed by LBIE's Administrators pursuant to section 896(2)(d) of the CA 2006, which empowers an administrator to propose a scheme of arrangement on behalf of the company.

2. This is my second judgment in this matter. I have already provided, on 15 June 2018, a short ex tempore judgment sanctioning the Scheme. I considered that necessary in order to explain my decision both to the Court of Appeal given the then imminent hearing before it of one of the proceedings compromised by the Scheme, and to the US Bankruptcy Court, given the Administrators' stated intention to apply on 19 June 2018 for recognition of the Scheme as a foreign main proceeding under Chapter 15 of the US Bankruptcy Code. However, as I indicated at the time, and with the encouragement of the parties, I have also thought it right, in the context of an administration which has been in being for nearly a decade and has involved multiple proceedings of very considerable value and complexity, to provide an additional full judgment elaborating my reasoning. I had hoped to provide this before the Scheme became effective; but it proved a more time-consuming task. This judgment should be read with the fact in mind that the Scheme has already come into effect; and any inappropriate use of tenses which abides should impliedly be corrected.

3. Turning to the substance of the matter, the basic purpose of the Scheme is to compromise various complex legal proceedings so as to facilitate the distribution of the surplus in LBIE's estate (and, in due course, to bring the administration to an end). The Administrators present the Scheme as providing the only realistic way of enabling the distribution of the surplus in LBIE's estate without years of further litigation.

4. LBIE, an unlimited company incorporated in England and Wales, was the Lehman Group's main trading company in Europe. It has been in administration since September 2008. Its immediate holding company, LB Holdings Intermediate 2 Ltd ("LBHI2"), which holds all of the ordinary share in its capital, has been in administration since January 2009. The purpose of each administration was to realise the respective assets of these companies to their best advantage, rather than the preservation of the companies as going concerns. Each has become a distributing administration.

5. The collapse of the Lehman Group in September 2008 shook the

financial world. Its effects are still being felt today. It is perhaps ironic that in the result, at least in the case of LBIE, the process of administration has yielded a very substantial surplus; and that the litigation sought to be resolved by the Scheme, and which is delaying the completion of administration, relates not to deficiencies but to the unusual legal issues relating to surplus assets ("the Surplus").

6.    After four dividends to creditors with an aggregate value of 100p in the £ (including distributions to unsecured creditors of approximately £12.6 billion), LBIE's general estate contains liquid assets with a total value of some £6.6 billion. Total estimated future realisations range from approximately £1.2 billion to £1.7 billion. Although not all of these assets will be available (or, in any event, immediately available) for distribution as part of the Surplus, since it is necessary for the Administrators to hold a proportion of the assets in reserve for expenses and any unresolved provable debts, on any view, however, the Surplus is substantial.

7.    There has never, at least in this jurisdiction, been an administration like it. The issues to which it has given rise have been correspondingly novel, with very considerable amounts in dispute. There has at every stage been every likelihood that the issues requiring resolution to establish rankings and priorities as to entitlement to the Surplus (in what has become known as the 'Waterfall proceedings') would eventually proceed to the Court of Appeal and onward to the Supreme Court: see, for example, *Re Lehman Brothers International (Europe) ('Waterfall I')* [2017] UKSC 38 (in the Supreme Court); *Re Lehman Brothers International (Europe) (Nos 6 and 7) ('Waterfall IIB')* [2017] EWCA Civ 1462 (in the Court of Appeal) and *In re Lehman Brothers Europe (No. 9) ('Waterfall IIC')* [2017] EWHC 20131 (Ch), which, at the time of my earlier decision, was imminently due to come before the Court of Appeal at a hearing commencing on 3rd July 2018.

8.    There are a variety of further proceedings, some still in the foothills, others well on their way up the judicial ladder. I shall return later to describe the matters in issue. For the present it suffices to say that prior to the implementation of the Scheme (a) there remained important issues outstanding (in the sense that they have not finally been determined) which could, according to their resolution, have a fundamental effect on the calculation of creditors' entitlements to the Surplus and (b) until such proceedings ("the Relevant Proceedings") were compromised or finally determined (such that all appellate processes have been exhausted), as I understand they now have been by effect of the Scheme, it would have been impossible for the Administrators to make further substantial progress in the distribution of the Surplus.

9.    That is because, if the Administrators were to distribute the Surplus on a basis which was later held to be wrong by the Court of Appeal or the Supreme Court, they would be exposed to the risk of personal liability. That is not a risk that any office-holder can reasonably be expected to bear. Thus, until the Relevant Proceedings are dealt with, the Surplus will remain locked in the estate.

10. Further long delay in the conclusion of the Administration is inherently unsatisfactory. But there is a further reason why delay is damaging to all creditors. Creditors' entitlements to statutory interest (at 8%) ceased once all admitted provable claims had been paid in full (since the underlying debts have been paid), and creditors will not receive any compensation for the period during which the Surplus remains locked in the estate: see *Re Lehman Brothers International (Europe) (Waterfall IIB)* [2018] Bus LR 508 at [43]- [49] (Gloster LJ). In the context of such a substantial Surplus the effect is significant. I can take the following illustrative figures from the Administrators' skeleton argument:

(1) Assume that the total amount of statutory interest is £5bn.

(2) Assume that creditors could earn an average total return of 15% over three years on any distributions made to them (representing a return of 5% per annum, without compounding). On that basis, the "time value" of £5bn over three years is £750m.

(3) If the Surplus is not distributed for three years, creditors would effectively lose £750m (being the assumed "time value" of £5bn), and would not receive any further statutory interest or other compensation for that loss.

(4) The figure of £750m is a conservative estimate. Nearly all LBIE's investors are sophisticated investment funds or banks, which may be able to earn a significantly higher return than 15% over three years.

11. Any further delays will lead inexorably to a continuing loss of the time value of money, increasing with every day that the Surplus is not distributed. In such circumstances, the Administrators have had to consider whether any viable solution is available. They have concluded that (a) the existing judgments in the Waterfall proceedings already provide the Administrators with sufficient guidance to distribute the Surplus; (b) although any further appellate litigation might, of course, lead to a reversal of the existing judgments (to the benefit of some creditors and the detriment of others), such litigation is not necessary to enable the Administrators to distribute the Surplus; and (c) it is plainly desirable, looking at the interests of creditors as a whole, for the Administrators to pursue a compromise of the Relevant Proceedings so as to facilitate the distribution of the Surplus: and that is what the Scheme has been conceived to achieve.

## Part B: structure of this Judgment and representation of creditors at the Hearing

12. After that introduction, I propose, in assessing whether to sanction the Scheme, largely to follow the sequence of the Administrators' full and helpful skeleton argument, as follows:

(1) In Part C, I describe in greater detail both (a) the directions so far given by the Court on the basis of which the Administrators propose to proceed (and which the Scheme thus reflects) and
(b) the Relevant Proceedings;

(2) In Part D, I summarise the relevant terms of the Scheme (largely incorporating for that purpose the summary provided in the Administrators' skeleton argument);

(3) In Part E, I describe the composition of the Scheme Meetings and the voting results at such meetings;

(4) In Part F, I set out the principles which are to be considered by the Court in determining whether to sanction a scheme such as this;

(5) In Part G, I consider an important element in the application of those principles, being what significance the Court should attach to the voting results at the class meetings, and whether there were cross-holdings or other interests such as should reduce or negate reliance on the majority approvals that those votes expressed;

(6) In Part H, I consider the overall fairness of the Scheme, and in that context, objections put forward in respect of it in correspondence;

(7) In Part I, I address questions as to the Court's international jurisdiction in respect of the Scheme and as to recognition internationally of the exercise of jurisdiction.

(8) Part J is my conclusion.

13.    In my consideration of the Scheme I have been greatly assisted by Counsel and their respective teams, as follows (in the order in which they made oral submissions):

(1) Mr William Trower QC, Mr Daniel Bayfield QC and Mr Ryan Perkins appeared for the Administrators;

(2) Mr Robin Dicker QC, Mr Richard Fisher and Mr Henry Phillips appeared for supporting creditors, namely Burlington Loan Management Limited, CVI GVF (Lux) Master S.a.r.l, and Hutchinson Investors LLC (collectively, the "Senior Creditor Group");

(3) Mr David Allison QC and Mr Adam Al-Attar appeared for another group of supporting creditors, namely the Wentworth Group, which comprises investment funds controlled by King Street and Elliott, LBHI, and certain SPVs, including, Wentworth Sons Sub-Debt S.à r.l (the "Subordinated Creditor") and Wentworth Sons Senior Claims S.à r.l.;

(4) Mr Peter Arden QC and Ms Louise Hutton appeared for LBHI2 and its Administrators.

14.    The Wentworth Group and the Senior Creditor Group are the two largest creditors in the estate. The Senior Creditor Group holds approximately 40% of all admitted unsubordinated provable debts. The Wentworth Group includes: (i) the Subordinated Creditor (which holds the Sub-Debt); (ii) Wentworth Sons Senior Claims S.à r.l.; (iii) Lehman Brothers Holdings Inc. ("LBHI"); and (iv) a

number of investment funds controlled by King Street and Elliott. The entities referred to in (ii) to (iv) above hold approximately 38% of all admitted unsubordinated provable debts (the "Wentworth Senior Creditors"). The Subordinated Creditor is a member of the Wentworth Group but is not a Wentworth Senior Creditor, and does not hold any claims apart from the Sub-Debt. The shareholder of LBIE (LBHI2) also has an economic interest in the Wentworth Group.

15.   It is an important factor to be acknowledged at the outset that, by reason of the quantum of their respective claims, both the Wentworth Group and the Senior Creditor Group hold a blocking position. That being so, it has always been essential that any proposed compromise should have the support of both the Wentworth Group and the Senior Creditor Group. This is an inescapable commercial reality.

16.   Contrary to expectations voiced by three opposing creditors at the hearing to determine the composition of the classes to consider and vote upon the Scheme ("the Convening Hearing"), in the event no-one appeared before me at the Sanction Hearing to object to the Scheme. However, one of the creditors who opposed the class composition proposed by the Administrators and directed by the Court at the Convening Hearing, namely Deutsche Bank AG ("Deutsche"), also put forward in correspondence (through Clifford Chance) detailed objections to the sanctioning of the Scheme, though it withdrew its opposition shortly before the Sanction Hearing (by letter dated 11 June 2018). Further, two creditors, namely Goldman Sachs International ("GSI") and SRM Global Master Fund Limited Partnership ("SRM"), raised concerns in correspondence which they asked to be considered and taken into account. SRM's concerns largely mirrored concerns earlier raised by Deutsche. I shall address these concerns later notwithstanding that neither party exercised its right to attend by Counsel at either hearing, and I did not therefore have the benefit of adversarial argument.

## Part C: the directions so far given and the Relevant Proceedings

17.   The Waterfall proceedings have been sponsored (as it were) by the Administrators for the purposes of obtaining directions as to the admissibility of certain categories of claims and as to the rankings or priorities between creditors. The form of the proceedings has been that in the context of an application for directions, parties have been selected to represent competing interests with a view to enabling the Court to resolve the matter after full adversarial contest. The parties so selected have not formally been appointed representative claimants or defendants: but all creditors have been notified of the proceedings and in substance the results are intended to bind them all, given the Administrators' express purpose and intention of acting in accordance with the Court's decisions on those applications.

18.   Amongst the principal concerns and disputes in this context have been:

(1) Whether the Sub-Debt claims ranked ahead or behind statutory interest claims pursuant to rule 2.88(7) of the Insolvency (England and Wales) Rules 2016 (the "IR 2016");

(2) Whether creditors who had suffered a currency loss as a result of the conversion of their debts from foreign currency into sterling as at the date of the commencement of the administration could claim and prove for such losses, and if so whether such a claim would rank ahead of or behind the Sub-Debt claims and/or statutory interest claims;

(3) Whether contractual interest was provable or statutory interest was payable for the period of administration if it was immediately followed by a liquidation.

19. On final appeal in Waterfall I the Supreme Court determined that (1) statutory interest ranks in priority to the Sub-Debt; (2) currency conversion claims do not exist; and that (3) the insolvency regime contains a "lacuna" such that, if LBIE moves from administration into liquidation, any unpaid statutory interest under rule 14.23(7) in respect of the period between the commencement and the termination of the administration would not be payable out of the Surplus or provable in the liquidation.

20. In simplified terms (and ignoring various complications which are not material for present purposes), it now seems clear, since that decision of the Supreme Court in Waterfall I, that the Surplus must be distributed in the following order of priority:

(1) First, the Surplus must be applied towards the payment of statutory interest in accordance with rule 14.23 of the IR 2016. Statutory interest is payable on provable debts at the greater of 8% per annum or the "rate applicable to the debt apart from the administration" (typically a contractual rate): see rule 14.23(7). Some creditors have a contractual discretion to certify the rate of interest applicable to their claims, which could (in principle) enable them to claim statutory interest at a rate greater than the 8% minimum. However, the exercise of any such contractual discretion is capable of giving rise to a number of disputes, and creates significant uncertainty in quantifying the total amount of statutory interest which falls to be paid: see below. Total statutory interest entitlements are likely to exceed £5bn, and are likely to be paid in full out of the Surplus.

(2) Second, after statutory interest and any non-provable liabilities have been paid in full, the Surplus must be applied towards the payment of the subordinated debt (the "Sub-Debt") held by Wentworth Sons Sub-Debt S.à r.l. (the "Subordinated Creditor", as previously defined). As its name indicates, the Subordinated Creditor is part of the Wentworth Group. The ranking of the SubDebt was established by the decision of the Supreme Court in *Re Lehman Brothers International (Europe) (Waterfall I)* [2017] 2 WLR 1497 at [56] (Lord Neuberger). The Sub-Debt has a total value of approximately £1.24bn (excluding interest).

(3) Third, any remaining Surplus falls to be distributed to LBHI2 as the sole shareholder of LBIE. LBHI2 has an economic interest in the Wentworth

Group. A possible mechanism for effecting a distribution to LBHI2 is described in *Re Lehman Brothers Europe Ltd (No. 9)* [2018] Bus LR 439 (Hildyard J) at [22].

21.   There remained, however, a variety of disputes as to (1) the calculation of statutory interest, (2) the extent of entitlements to contractual interest under ISDA Master Agreements and similar contracts and (3) the admission of proofs disputed by other creditors. Thus, although two further applications (known as the Barclays Application and Waterfall III) have been compromised, there remained outstanding the Relevant Proceedings, which can briefly be summarised as follows:

(1)   The Waterfall IIA Application. The Waterfall IIA Application raised a number of questions relating to the calculation of statutory interest, including, most significantly (in financial terms), whether dividends paid in the administration should be treated as notionally having discharged interest before principal. This is known as the Bower v Marris issue, after the case of the same name: see (1841) Cr & Ph 351. In October 2017, the Court of Appeal upheld the judgment of David Richards J at first instance: see [2018] Bus LR 508. As at the date of the Sanction Hearing, there was a pending application by the Senior Creditor Group for permission to appeal to the Supreme Court. The Supreme Court had agreed to postpone its determination of that application to facilitate the implementation of the Scheme. If the Scheme were not to become effective, the Supreme Court would be invited to determine the application. If the Scheme were to become effective, the application would be dismissed by consent.

(2)   The Waterfall IIC Application. The Waterfall IIC Application raised a number of questions relating to the exercise of a contractual discretion to certify a rate of interest under various financial master agreements (including, in particular, ISDA Master Agreements). The hearing of the appeal (brought by the Senior Creditor Group and GSI) against my judgment (reported at [2016] EWHC 2417 (Ch), [2017] Bus LR 1475) was listed to commence before the Court of Appeal on 3 July 2018. If the Scheme were to become effective prior to that date, the appeal would be withdrawn by consent. Otherwise, the appeal would proceed. The Court of Appeal had been informed of the Sanction Hearing for the Scheme, but had declined to re-list the Waterfall IIC appeal for a later date until the outcome of the Sanction Hearing was known.

(3)   The Olivant Application. This was an application by the Subordinated Creditor to challenge the Administrators' decision to admit a proof of debt submitted by another creditor known as Olivant Investments Switzerland S.A. ("Olivant"). The application was made pursuant to rule 14.8(3) of the IR 2016, which provides a procedure whereby one creditor can challenge the admission of another creditor's proof. In December 2017, I gave directions for the trial of various preliminary issues following a lengthy CMC, commenting as follows:

"This is another episode in the saga of the Lehman administrations, reflecting continuing disputes between rival creditors in the multitude of companies still in administration as

> they seek to obtain for themselves a greater share of the
> considerable surpluses which have been collected."

(4) The Lacuna Application. This application arose out of the Supreme Court's
conclusion (in the Waterfall I decision) that, if LBIE moves from
administration into liquidation, any unpaid statutory interest under rule
14.23(7) of the IR 2016 in respect of the period between the
commencement and the termination of the administration would not be
payable out of the Surplus or provable in the liquidation. That conclusion
has come to be known as the "lacuna issue". The Subordinated Creditor has
attempted, in reliance on the lacuna issue, to take steps towards placing
LBIE into liquidation before statutory interest can be paid to creditors. In
response to those attempts, the Administrators applied for directions in
January 2018.

22. The Lacuna Application and the Olivant Application were stayed by consent on
12 January 2018, to facilitate the implementation of the Scheme. If the Scheme
were to become effective, the Olivant Application and the Lacuna Application
would be withdrawn. If the Scheme did not become effective, the stay would be
lifted, and the Olivant Application and the Lacuna Application would proceed
before the High Court.

23. Failing a compromise of all the Relevant Proceedings, the Administrators
estimated (and no one before me suggested any more optimistic view) their
likely continuance until 2020 at the very earliest. Repeated appeals to the
Supreme Court would be entirely foreseeable and perhaps inevitable.
Moreover, it seemed entirely possible that new applications similar to the
Olivant Application (where one creditor challenges the admission of another
creditor's proof) could be brought.
As I put it in *Wentworth Sons Sub-Debt S.à r.l. v Lomas* [2017] EWHC 3158
(Ch) at [18]:

> "… the [Olivant] Application raises inevitably the status and
> effect, not only of the Olivant CDD, but potentially of all Claims
> Determination Deeds entered into by LBIE, of which there have
> been many, in aggregate of very considerable value. To some of
> these Wentworth and/or members of the SCG are party. In such
> circumstances, the Administrators are concerned that this
> Application could merely be the first in a series of similar
> challenges under Rule 14.8(3). The outcome of this Application
> therefore has, at least potentially, broader
> ramifications for the administration of LBIE."

24. The Administrators were satisfied that the Scheme represents the only fair and
realistic way to prevent many more years of continued litigation and to
facilitate the distribution of the Surplus. In the absence of the Scheme, they
reached the conclusion that no other solution would be likely to be available: in
all likelihood, the litigation would simply continue for the foreseeable future.

## Part D: summary of the terms of the Scheme

### (a)    Application of the Scheme

25.    Subject to express exceptions (see below), the Scheme is intended to bind all legal or natural persons who have any "Provable Claim" (as defined in the Scheme) against LBIE, whether paid or unpaid (the "Scheme Creditors"). It is to be noted that for the purposes of the Scheme, the definition of "Scheme Creditor" expressly extends to a person holding Sub-Debt, such extension possibly being necessary (at least for the avoidance of doubt) in light of the view of David Richards J (as he then was), which was approved (in preference to the view of the Court of Appeal) by Lord Neuberger in the Supreme Court in Waterfall I (at [68] to [69]) that no proof can be lodged for the SubDebt until all "Senior Liabilities" have been paid in full.

26.    The claims of a Scheme Creditor in respect of statutory interest entitlements are also within the scope of and intended to be compromised by the Scheme. Indeed, since the vast majority of provable debts have already been discharged in full, creditors' statutory interest entitlements are the primary claims which are compromised by the Scheme.

27.    The following creditors are excluded from the Scheme: (i) Storm Funding Limited ("Storm"); and (ii) any Relevant Employees or Relevant Jurisdiction Clause Creditors (as defined below) who have not lodged a proof of debt in LBIE's administration. As to these creditors:

(1)    Storm has undertaken to be bound by the Scheme. This reflects the fact that Storm has a bespoke arrangement in relation to statutory interest pursuant to a commercial settlement dated 17 March 2014, which provides that any payment made to Storm in respect of statutory interest would be paid in respect of its admitted claim at an effective rate of 8% simple interest per annum, but calculated from a date later than the date of the commencement of LBIE's administration to the date when Storm's admitted claim was paid in full. Storm and the Scheme Creditors are collectively described as the "Scheme Parties". For convenience, in this Judgment I refer simply to the Scheme Creditors, but it should be understood that Storm is also bound.

(2)    The purpose of excluding from the Scheme any Relevant Employees or Relevant Jurisdiction Clause Creditors who have not lodged a proof of debt in LBIE's administration relates to a jurisdictional issue explained below.

(3)    LBHI2 (in its capacity as shareholder of LBIE) is not a Scheme Creditor but has signed a deed of undertaking containing certain obligations in connection with the Scheme given in consideration for third party rights and undertakings granted in LBHI2's favour.

## (b) Termination of Relevant Proceedings

28.  Pursuant to the Scheme, and in accordance and fulfilment of its principal
     objective, the Relevant Proceedings will be brought to an end. This will
     involve: (i) the withdrawal of the application for permission to appeal to the
     Supreme Court in the Waterfall IIA Application (such that the judgment of the
     Court of Appeal is final and binding); (ii) the withdrawal of the appeal to the
     Court of Appeal in the Waterfall IIC Application (such that the judgment at
     first instance is final and binding); and (iii) the withdrawal of the Olivant
     Application and the Lacuna Application. Under the terms of the Scheme the
     Administrators are given authority to provide and file the relevant court
     documentation for these purposes. (c) Waiver of challenge and appeal rights

29.  Further:

     (1) Each Scheme Creditor waives its right to challenge the admission of any
         other creditor's proof of debt (where the relevant proof was admitted prior
         to the Record Date). This will avoid the risk of the Olivant Application
         being repeated for other proofs of debt, which would be likely to lead to
         significant delays and costs.

     (2) Subject to certain exceptions, each Scheme Creditor waives its right to
         appeal any first instance decision (of any court of competent jurisdiction)
         which relates to an exercise of the Administrators' functions after the date
         when the Scheme becomes effective (the "Effective Date"). Thus, by way of
         example, in the unexpected event that a new proof of debt is submitted prior
         to the Effective Date and rejected by the Administrators after the Effective
         Date, any challenge to the Administrators' decision would be resolved by
         the High Court, and there would be no possibility of any appeal to the Court
         of Appeal or the Supreme Court. This provision is intended to avoid the
         substantial delays and costs that would be likely to result from appellate
         proceedings.

## (c) Bar Date

30.  In order to enable the Administrators to distribute the Surplus, it is necessary to
     determine the total quantum of provable claims against LBIE. As matters stand,
     there is nothing to prevent creditors from lodging new proofs (despite the fact
     that the administration has been ongoing for nearly a decade). Any such new
     proofs could affect the size of the Surplus available for distribution to others.

31.  To that end, and conventionally, the Scheme imposes a bar date for the
     submission of claims (the "Bar Date"). Subject to certain exceptions, any
     claims held by a Scheme Creditor which have not been notified prior to the Bar
     Date will be discharged on that date. The Bar Date applies to all types of claims
     held by a Scheme Creditor: that includes provable claims, non-provable claims
     and expense claims (subject to certain exceptions).

32. Less conventionally, the Bar Date is fixed as the date when the Scheme becomes effective (the Effective Date). It would be more conventional to provide a longer period before the bar. The unusually short period is presented as justified in the context of the fact that the administration has been ongoing for a nearly a decade, and that the Administrators first invited creditors to prove their claims in December 2009. Further, creditors were notified of the intention to impose a Bar Date on 22 December 2017, and the Bar Date is clearly signalled in the First Practice Statement Letter (paragraph 6.1.4) dated 18 April 2018 and sent to Scheme Creditors in accordance with the usual practice.

(e)   Statutory Interest Claims and the adjudication process

(i)   The various statutory interest entitlements

33. Central to the Scheme is the mechanism it provides for the

adjudication of creditors' statutory interest entitlements, effectively in substitution for the Relevant Proceedings. I shall return later to assess the fairness of the mechanism: I confine myself now to a statement of its essential features, as described in the Applicants' skeleton argument (which statement I gratefully adopt with only minor alterations).

34. Three groups of creditors must be distinguished in this regard:

(1) 8% Creditors. As noted above, statutory interest is payable on provable debts at the greater of 8% per annum or the "rate applicable to the debt apart from the administration" (typically a contractual rate): see rule 14.23(7). For many creditors, there is no "rate applicable to the debt apart from the administration". Such creditors can only receive interest at the statutory minimum of 8% per annum. These creditors are described as "8% Creditors".

(2) Specified Interest Creditors. One claim arises under a contract which requires LBIE to pay a specific rate of interest in excess of 8% per annum. The sole creditor holding this claim is described as the "Specified Interest Creditor".

(3) Higher Rate Creditors. A number of claims arise under financial master agreements which give the creditor a contractual discretion to determine the rate of interest payable by LBIE. For example, the ISDA Master Agreements require LBIE to pay interest at the "Default Rate", which is defined as the "rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum". The relevant payee has a broad discretion to certify its cost of funding. There are similar provisions in the AFB/FBF French Master Agreements (which empower the payee to certify its "overnight refinancing rate") and the AFTB French Master Agreements (which empower the payee to certify

its "average overnight rate"). A certificate cannot be impugned unless it was made irrationally or in bad faith, or the certificate was founded on a manifest numerical or mathematical error or otherwise than in accordance with the Waterfall IIC judgment: see *Re Lehman Brothers International (Europe) (No. 6) (Waterfall IIC)* [2017] Bus LR 1475 at [207] (Hildyard J). Creditors holding claims arising under an ISDA Master Agreement, AFB/FBF French Master Agreement or AFTB French Master Agreement are described as "Higher Rate Creditors". These creditors <u>may</u> be able to claim more than the statutory minimum of 8%, depending on the outcome of the certification process.

35. The Scheme provides for the statutory interest entitlements of the 8% Creditors and the Specified Interest Creditors to be calculated in accordance with the existing Waterfall judgments. For example, the Administrators will proceed on the basis that the rule in *Bower v Marris* does not apply to the calculation of statutory interest (as David Richards J and the Court of Appeal held in the Waterfall IIA Application), and no further appeal to the Supreme Court in relation to that issue will be possible: see above.

36. Further, the Scheme contains a detailed procedure for determining the statutory interest entitlements of Higher Rate Creditors. The avowed purpose of the procedure is to ensure that the statutory interest entitlements of Higher Rate Creditors can be determined in a manner that is both fair and expeditious, so as to avoid protracted disputes which could delay the distribution of the Surplus. The procedure can be summarised as follows:

    (1) Each Higher Rate Creditor is entitled to elect between two

    alternative options:

        (a) The first option is for the creditor to receive statutory interest at a simple rate of 8% per annum, plus an additional payment equal to 2.5% of the value of the creditor's admitted provable claim (the "Settlement Premium") in full and final satisfaction of the creditor's statutory interest entitlement. The Settlement Premium represents the quid pro quo for waiving the right to certify a rate higher than the statutory minimum of 8%. Alternatively:

        (b) The second option is for the creditor to certify the rate and amount of interest applicable to the creditor's claim in accordance with the underlying contract.
    The certification must be submitted by the Effective Date. Creditors who choose the second option are not entitled to receive the Settlement Premium.

    (2) The stipulated deadline for certification is the Effective Date. The justification advanced for this (which I have accepted) is as follows: (i) the

first progress report which disclosed the possibility of a surplus in the estate was issued in April 2013 (at which point all Higher Rate Creditors should have realised that certification could be necessary); (ii) the Waterfall IIC judgment was handed down in October 2016 (which set out the key legal principles relating to certification); and (iii) creditors have been aware of the proposed certification deadline since 18 April 2018, when the first Practice Statement Letter ("First PSL") was circulated; so that (it is submitted) (iv) Higher Rate Creditors have had sufficient time to assess whether to certify and prepare any such certification. This is borne out by the Chairman's Report: see below.

(3) If a Higher Rate Creditor failed to make an election at the time of voting on the Scheme, the creditor is deemed to have elected to receive the Settlement Premium.

(4) Where a Higher Rate Creditor submits a certification by the Effective Date, LBIE may either: (i) accept the certification; (ii) reject the certification entirely (on the basis that the creditor should not receive more than the statutory minimum of 8%); or (iii) make a counter-offer (higher than the statutory minimum but lower than the certified amount).

(5) If the Higher Rate Creditor is not satisfied with LBIE's decision, the creditor is entitled to require that the dispute be resolved by an independent adjudicator.

(iii)   Key features of adjudication process

37.   The key features of the adjudication process are as follows:

(1) The adjudicator will be either Sir Bernard Rix, Michael Brindle QC or Tim Howe QC (or, if none of them is available, another English law-qualified QC or retired judge).

(2) The adjudicator will act an as expert, not an arbitrator.

(3) The adjudication will be determined on paper, without an oral hearing. The relevant Higher Rate Creditor and LBIE are both entitled to file written submissions and supporting evidence.

(4) In reaching a decision, the adjudicator must have regard to a number of legal principles referred to as the "Relevant Principles". These are set out in the Explanatory Statement prepared by the Company and the Administrators, and dated 31 May 2018.

(5) The Relevant Principles comprise the following: (i) the principles set out in the judgment and order in the Waterfall IIC Application;
(ii) the principles relating to the AFB/FBF French Master Agreements which were agreed to be correct by the parties to the Waterfall IIC Application (but which were not the subject of any formal determination

by the Court); (iii) the principles set out in the judgments and orders of David Richards J and the Court of Appeal in the Waterfall IIA Application; and (iv) a further principle regulating the calculation of the amount of Statutory Interest defined in the Scheme as the Compounding Principle, and further explained subsequently in the Scheme.

(6) Although the adjudicator must "have regard" to the Relevant Principles, it is recognised that these principles do not provide an exhaustive codification of the law. The parties are able to file legal submissions in relation to any issues which may arise, and the adjudicator is entitled to take those submissions into account when reaching his decision.

(7) The adjudicator must uphold the creditor's certification unless the adjudicator is satisfied, on the balance of probabilities, that it was made irrationally, in bad faith, or contrary to the Relevant Principles. The burden of proof falls on LBIE. (There is also a mechanism for addressing and correcting any mathematical or numerical errors which the adjudicator identifies.)

(8) If (and only if) the adjudicator concludes that the certification was made irrationally, in bad faith, or contrary to the Relevant Principles, then the adjudicator must award the creditor the statutory minimum of 8% or (if any counter-offer was made) the amount of LBIE's counter-offer. There is no other option available to the adjudicator. In particular, the adjudicator is not permitted to award some amount falling between the creditor's certification and LBIE's counter-offer.

(9) The timetable for the adjudication is deliberately compressed, as explained in a useful flow chart at Part II, paragraph 10.10 of the Explanatory Statement, which identifies the number of business days between each step in the adjudication process. For example, once the adjudicator receives LBIE's written submissions, the adjudicator is required to use reasonable endeavours to reach a final decision within 20 business days.

(10) The adjudicator will not give reasons for the decision; and that decision is final and binding, and is not capable of being appealed (except in the case of fraud or bias by the adjudicator).

38. The costs of the adjudication follow the event: they must be paid by LBIE or by the creditor, based on the "loser pays" principle.

39. Another important facet of the proposed adjudication system, and one which caused controversy, is the special role accorded to the Wentworth Group. In the course of negotiations leading to the development of the Scheme, the Wentworth Group stated that it would only support the Scheme if the Subordinated Creditor was permitted to have input in respect of the determination of matters which are likely to affect the recovery of the Sub-Debt. The upshot is that the Scheme requires LBIE to engage with the Subordinated Creditor in relation to various matters. For example:

(1) LBIE must consult with the Subordinated Creditor in deciding

whether or not to accept a certification, although LBIE has the sole
discretion as to whether or not to accept any certification.

(2) LBIE must consult with the Subordinated Creditor as to the amount of any
counter-offer, although (once again) LBIE has the sole discretion as to the
amount of any counter-offer. The counteroffer must be made in accordance
with the Relevant Principles. (Under a previous version of the Scheme
(which was placed before the Court at the Convening Hearing), the
Subordinated Creditor had the right to <u>determine</u> the amount of any
counter-offer. Some creditors objected to this provision at the Convening
Hearing. In order to accommodate the concerns that were raised, the
Scheme was amended (prior to the Scheme Meetings) so as to remove the
Subordinated Creditor's right to determine the amount of any counter-offer.
That right is now vested in LBIE, and the Subordinated Creditor merely
has a right of consultation.) Thus, the Subordinated Creditor cannot require
LBIE to make a counteroffer: if LBIE considers that the creditor's
certification should be accepted without any modification, that outcome
cannot be prevented by the Subordinated Creditor. Further, the counter-
offer can be rejected and the matter appealed through the adjudication
procedure.

(3) Where a certification is subject to adjudication, LBIE must use reasonable
endeavours to appoint (in order of priority) Sir Bernard Rix, Michael
Brindle QC or Tim Howe QC as the adjudicator. If such individuals are not
able to accept the appointment, then another suitably qualified candidate
(who must be an English lawqualified QC or former judge[1]) will be
selected in consultation with the Subordinated Creditor. However, the final
decision as to the selection of the adjudicator rests with LBIE and the terms
of appointment are to be agreed by LBIE without regard to the
Subordinated Creditor.

(4) During the "Consultation Period" (where LBIE and a certifying Higher
Rate Creditor are seeking to agree the amount of the certification), the
Subordinated Creditor is entitled to receive information relating to the
negotiations, including confidential information. The Subordinated
Creditor is under an obligation to keep such material confidential, and not
to use such material for a collateral purpose. The information must be
destroyed or returned to the Company once it is no longer reasonably
required for the purposes of the Scheme. These information rights are a
necessary consequence of the Subordinated Creditor's consultation rights
as set out above, since it is impossible to consult without the relevant
information.

40. Having considered the matter carefully, the Administrators are satisfied that it is
appropriate for the Subordinated Creditor to be involved in this way. Where a
Higher Rate Creditor certifies its cost of funding, the Subordinated Creditor has
a significant economic interest in the outcome of the certification and
adjudication process. It is therefore appropriate for the Subordinated Creditor to
play a role in the process. Quite apart from the provisions of the Scheme, the

---

[1] See the Scheme at paragraph 23.1.2 [1/3/45]. This was clarified by way of an amendment to the Scheme (after
the Convening Hearing but prior to the Scheme Meetings).

Administrators would be expected to consult with the Subordinated Creditor on matters affecting its interests, and the Subordinated Creditor would be entitled to intervene in any legal proceedings relating to a disputed certification: see below.

(f) Other matters relating to the Scheme: Lock-Up Agreement and consent fee

41. The Wentworth Group and the Senior Creditor Group have entered into a lock-up agreement dated 22 December 2017 (the "Lock-Up Agreement"), pursuant to which they have agreed to support the Scheme. Further details relating to the Lock-Up Agreement are set out in the First PSL published on 18 April 2018 at paragraphs 5.11 to 5.16.

42. Also pursuant to the Lock-Up Agreement, the Wentworth Group and the Senior Creditor Group have agreed to accept the Settlement Premium in respect of all Higher Rate Claims (rather than seeking to certify their cost of funding).

43. The Lock-Up Agreement does not provide for the payment of any consent fee, however:

(1) Late in the evening on 25 April 2018 (after the First PSL had already been circulated to creditors), the LBIE Administrators received a letter from LBHI2's administrators [CH2/RD2/8] which indicated that Wentworth Sons Senior Claims S.à r.l., the Subordinated Creditor and certain members of the Senior Creditor Group had entered into a separate settlement agreement in parallel with the Lock-Up Agreement (the "Settlement Agreement").

(2) The Settlement Agreement provided that (amongst other things) the Senior Creditor Group would receive from those Wentworth parties the sum of £35m by way of a "consent fee" in the event that the Scheme becomes effective. The Administrators received a copy of the Settlement Agreement on 29 April 2018.

(3) No similar consent fee was offered to other creditors. The Administrators had not previously been aware of these arrangements. As a result of this disclosure, the Administrators sent a second PSL (the "Second PSL", published on 2 May 2018) referring to and explaining the consent fee, and proposing that the Senior Creditor Group should vote in a separate class in order to avoid a dispute about class composition: see below.

(g)    Third party releases

44. The Scheme additionally provides for the release of the following claims by Scheme Creditors against third parties:

(1) Any "Administration Claims (being Claims against the Administrators or the Released Third Parties (who are parties connected to the Administrators, their firm or the Company), where such Claims arise from actions taken by such person on or after the Administration Date but prior to the Effective Date), but only to the extent that the Administrators or

Released Third Parties would have an indemnity or other similar claim against the Company"; and

(2) Subject to certain exceptions, any "Released Scheme Implementation Claims (being Claims against the Company, the Administrators, the Released Third Parties or the Locked-Up Parties) where such Claims arise from or in connection with action taken by any such person on or after 1 November 2017 in relation to the proposal or implementation of the Scheme)".

(3) There are also various releases in favour of LBHI2, e.g. in relation to any Creditor Contributory Claim Rights (as defined).

45. The give and take evident in these provisions is clear. There is no doubt that the Scheme constitutes a "compromise or arrangement" within Part 26 of the CA 2006 (as those words were explained in Re Savoy Hotel Ltd [1981] Ch 351 and Re NFU Development Trust Ltd [1972] 1 WLR 1548). That is, of course, a necessary condition for the application of Part 26 and it is appropriate to record its satisfaction in any event; but I do so in this case also because in correspondence one creditor (Deutsche) at one time suggested that the Scheme was not a "compromise or arrangement", though the suggestion, which was never explained, was (rightly, so it appears to me) not pursued.

46. The questions then are whether the Scheme has been approved by appropriately constituted classes and, if so, whether it is fair and free from 'blot' so that the Court should give it its sanction.


## Part E: composition of classes and the Scheme Meetings


47. The first in the three stages (after development of the proposals themselves of course) which are mandated by Part 26 of the CA 2006 before a scheme may be sanctioned is an application to the Court for an order convening Scheme Meetings to consider and vote on the Scheme.

48. In this case, the Administrators applied (by Part 8 claim form) for such an order on 2 May 2018, and on 18 April 2018 published the First PSL as required by present practice (see Practice Statement [2002] 1 WLR 1345, "the Practice Statement"), followed by a Second PSL (dated 2 May 2018) in circumstances already described.

49. The Convening Hearing (as such hearings are often referred to) took place before me on 9, 10 and 11 May 2018. The Administrators submitted that the Scheme Creditors should vote at four Scheme Meetings, namely:

(1) A meeting of the 8% Creditors and the Specified Interest Creditor, excluding claims legally held by the Senior Creditor Group (the "8% Meeting");

(2) A meeting of the Higher Rate Creditors, excluding claims legally held by the Senior Creditor Group (the "Higher Rate Meeting");

(3) A meeting of all members of the Senior Creditor Group (the "SCG

Meeting"); and

> (4) A meeting of the Subordinated Creditor (the "Subordinated Creditor
> Meeting").

50. At the Convening Hearing, the Administrators' proposals were opposed by three
creditors, namely Deutsche and CRC Credit Fund Limited ("CRC"), both of
which are Higher Rate creditors, and Marble Ridge Special Situations GP LLC
("Marble Ridge") which also is a Higher Rate creditor. These creditors were
represented respectively by Mr Andrew Twigger QC, Mr Andrew de Mestre
and Ms Hilary Stonefrost.

51. After adjourning for a short time to consider the matter, I accepted these
proposals, and made a Convening Order accordingly, for reasons that I sought
to set out fairly summarily in an oral judgment, now I think to be found at
[COUNSEL PLEASE COMPLETE].

52. When I gave that judgment, I anticipated that there would or might be further
evidence adduced, especially as to the claimed identity between all the
Wentworth companies. In the event, however, CRC and Marble Ridge voted in
favour of the Scheme (after its amendment in respect of aspects of the
adjudication process) and (as previously mentioned) Deutsche has withdrawn
its objection stating in its solicitors (Clifford Chance's) letter of 11 June 2018
that it
> "does not…object to the court's sanctioning the proposed scheme,
> should the court see fit to do so."

53. GSI, which did not appear at the Convening Hearing or the Sanction Hearing,
indicated in correspondence (and, in particular, in a letter to the Administrators
dated 5 February 2018) which was before the Court and carefully considered at
the Convening Hearing, its "concerns relating to both the process by which the
Proposed Scheme has been developed, and the substance of the Proposed
Scheme", and I took it to support Deutsche's objections. But GSI never made
clear any other reasoned basis for objection to the class composition; and, as I
say, did not see fit to pursue that before me at either hearing other than in the
somewhat indirect way I have described, save in one instance. The one instance
is this: during the course of the Sanction Hearing its solicitors, Cleary Gottlieb
Steen & Hamilton LLP ("Cleary Gottlieb") requested the Administrators
specifically to draw to my attention two matters by reference to a table in the
Chairman's Report on the meetings, which record the voting results at the four
class meetings. I shall return to these matters in due course; but I shall first
describe the procedure and results at the four meetings. Procedure and voting
results

54. The Chairman's Report on the scheme meetings which took place at the offices of
Linklaters LLP after a short preliminary session dealing with administrative
matters has described carefully the process followed and the outcome of the
voting.

55. Inevitably, the class meetings 3 and 4 were formalistic: the Chairman held
proxies at each on behalf of all Scheme Creditors within the class and cast them

in favour of the Scheme, thus resulting in 100% support in terms of both number and value.

56. The process at those meetings and the more contentious class meetings was entirely regular. I think the only matter I need mention before assessing the actual voting is that nine Higher Rate Creditors (participating in scheme meeting 2) exercised an entitlement pursuant to the Convening Order to submit Increased Voting Rights Requests on the basis that they should be entitled to voting rights greater than those calculated by applying an interest rate of 8% per annum. The Chairman's Report records that in the exercise of his discretion he accepted all the requests and that of the nine, seven voted for the Scheme and two against.

Voting results at the class meetings

57. The voting results at the meetings for (1) 8% Creditors and Specified Interest Creditors ("the 8% Creditor Meeting") and (2) Higher Rate Creditors (excluding the Senior Creditor Group, "the Higher Rate Creditor Meeting") can be summarised as follows:

(1) At the 8% Creditor Meeting, the Scheme was approved by 129 out of the 132 votes cast, representing 97.7% in number and 96.3% in value of those voting. The turnout by reference to claim value at the 8% Creditor Meeting was equal to 96.1% of those entitled to vote.

(2) At the Higher Rate Creditor Meeting, the Scheme was approved by 74 out of the 78 votes cast – representing 94.9% in number and 88.0% in value. The turnout by reference to claim value at the meeting was equal to 94.9% of those entitled to vote.

(3) Only 3 creditors (out of 130) voted against the Scheme at the 8% Creditor Meeting, and only 4 creditors (out of 77) – two of which are members of the same corporate group – voted against the Scheme at the Higher Rate Creditor Meeting.

(4) The Senior Creditor Group voted in a separate class from other 8% Creditors and Higher Rate Creditors. Accordingly, the voting figures for the 8% Meeting and the Higher Rate Meeting do not include claims held by the Senior Creditor Group.

(5) Those statutory majorities would have been obtained even if all of the Increased Voting Rights Requests had been rejected in their entirety or if only the Increased Voting Rights Requests made by the "no" voters were admitted.

(6) If the Wentworth Senior Creditors had been excluded from the 8% Creditor Meeting, the Scheme would still have been approved by 115 creditors, representing 97.5% in number and 93.7% in value.

(7) If the Wentworth Senior Creditors had been excluded from the Higher Rate Meeting, the Scheme would still have been approved by 62 creditors, representing 93.9% in number: but they would have represented only

62.2% in value (thus falling short of the statutory majority required of 75%).

58.    These voting results, and a further analysis of the split between the votes of
Wentworth entities in the two relevant classes and the votes of
others, are summarised in the Table referred to above, as follows:

**Table A – Summary of Votes Cast at Scheme Meetings:**

| Units | Votes FOR | Votes AGAINST | TOTAL | Turnout | | Analysis of Votes FOR[1] | |
|---|---|---|---|---|---|---|---|
| **Scheme Meeting 1: 8% Creditors and Specified Interest Creditors (excluding the SCG)** | | | | | | | |
| | | | | | | WW | Others |
| Number | 129 | 3 | 132 | 130/249[2] | | 14 | 115 |
| % by number | 97.7% | 2.3% | 100.0% | 52.2% | | 10.6% | 87.1% |
| Value (£) | 1,979,607,051 | 76,428,555 | 2,056,035,606 | 2,056,035,606 /2,139,015,278 | | 851,498,338 | 1,128,108,713 |
| % by value | 96.3% | 3.7% | 100.0% | 96.1% | | 41.4% | 54.9% |
| **Scheme Meeting 2: Higher Rate Creditors (excluding the SCG)** | | | | | | WW | Others |
| Number | 74 | 4 | 78 | 77/110[3] | | 12 | 62 |
| % by number | 94.9% | 5.1% | 100% | 70.0% | | 15.4% | 79.5% |
| Value (£) | 1,471,874,244 | 201,170,254 | 1,673,044,498 | 1,673,044,498 /1,763,362,308 | | 1,140,479,940 | 331,394,304 |
| % by value | 88.0% | 12.0% | 100.0% | 94.9% | | 68.2% | 19.8% |
| **Scheme Meeting 3: Members of the SCG** | | | | | | | |
| Number | 55 | 0 | 55 | 55/55 | | | |
| % by number | 100.0% | 0.0% | 100.0% | 100.0%[4] | | | |
| Value (£) | 1,537,022,589 | 0 | 1,537,022,589 | 1,537,022,589 /1,537,087,315 | | | |
| % by value | 100.0% | 0.0% | 100.0% | 100.0% | | | |
| **Scheme Meeting 4: Subordinated Creditor** | | | | | | | |
| Number | 1 | 0 | 1 | 1/1 | | | |
| % by number | 100.0% | 0.0% | 100.0% | 100.0% | | | |
| Value (£) | 1,242,162,410 | 0 | 1,242,162,410 | 1,242,162,410 /1,242,162,410 | | | |

[1] Votes for the Scheme Resolution at Scheme Meeting 1 and Scheme Meeting 2 are split out into votes cast by legal entities which are members of the Wentworth Group ("**WW**") and votes cast by legal entities which are not members of the Wentworth Group ("**Others**").

[2] 130 Scheme Creditors voted at Scheme Meeting 1. As some Scheme Creditors did not control all of their claims and had submitted Split-Holdings Requests, 132 votes were cast in total.

[3] 77 Scheme Creditors voted at Scheme Meeting 2. As some Scheme Creditors did not control all of their claims and had submitted Split-Holdings Requests, 78 votes were cast in total.

[4] One Scheme Creditor voting at Scheme Meeting 3 split its voting rights and abstained from voting in respect of one of its claims. Because the Scheme Creditor concerned voted in favour of the Scheme in respect of the remainder of its claims, however, percentage turnout by number remained 100.0%.

59.  The two points made by Cleary Gottlieb as referred to above at paragraph [53]
can be seen from that Table, being as follows (quoting their e-mail directly):

(1)  "The votes referred to in the "Others" column of the table…includes votes
that are controlled by entities that are part of the Wentworth Group and the
Senior Creditor Group. Our client does not know the extent of the claims
controlled by the Wentworth Group and Senior Creditor Group within the
"Others" column.

(2)  Recognising that the Judge has indicated that he is not minded to revisit
class composition issues, if [the Higher Rate Creditors Meeting] had
proceeded without claims held directly by the Wentworth Group (i.e. of
the Wentworth Group votes are excluded from the votes at [that meeting]),
then the scheme would not have obtained the required statutory majority
<u>by value</u> [at that meeting]. All the more so if claims controlled but not
directly held by the Wentworth Group and the Senior Creditor Group had
been excluded."

60.  These were fair points, neatly made: and though, like other points of objection,
they were not pursued in oral argument (GSI and Cleary Gottlieb having
apparently taken the decision not to appear, though it was of course open to
them to do so), they seem to me to be relevant at every stage of the assessment
of the Scheme, including any review of the class composition issue. That is a
convenient point to turn to the three-stage approach which the Court has
become accustomed to adopting in determining whether to sanction a scheme.

Part F: the Court's jurisdiction and principles as to its exercise

61.  The relevant statutory provision is section 899 of the CA 2006 Act, which
provides as follows:

"(1) If a majority in number representing 75% in value of the creditors or class of
creditors or members or class of members present and voting either in person or by
proxy at the meeting summoned under section 896, agree to any compromise or
arrangement, the court may, on an application under this section, sanction the
compromise or arrangement.

(2) An application under this section may be made by – (a) the company …
(3) A compromise or arrangement sanctioned by the court is binding on – (a)
all creditors or the class of creditors or on the members or a class of members
… and (b) the company …"

62.  The term 'company' in this context means any company liable to be wound up
under the Insolvency Act 1986, including a foreign company which though
unregistered under the Companies Act has a "sufficient connection" with
England or Wales (see *Re Rodenstock GmbH* [2011] EWHC 1104 (Ch), [2012]
BCC 459). LBIE, which was incorporated here, is plainly a qualifying
'company'.

63.   The term 'creditor' for the purposes of a scheme has a broader meaning than it
      has for the purposes of liquidation. For the purposes of the scheme jurisdiction,
      any person who has a monetary claim against the company that, when payable,
      will constitute a debt is a 'creditor'; and it matters not whether that claim is
      actual, prospective or contingent: see *Re Lehman Brothers International
      (Europe) (in administration)* [2009] EWCA Civ 1161, [2010] BCLC 496 at
      [58]; and *Re Midland Coal, Coke & Iron Co* [1895] 1 Ch 267 at 277.

64.   Similarly, the terms 'compromise' and 'arrangement' have been construed widely
      by the Courts: all really that is required is a sequence of steps involving some
      element of give and take, rather than merely surrender or forfeiture.

65.   In *Re Telewest Communications (No. 2) Ltd* [2005] BCC 36, David Richards J
      explained the principles to be considered by the Court when deciding whether
      to sanction a scheme of arrangement (at [20]-[22]):

        "The classic formulation of the principles which guide the court in
        considering whether to sanction a scheme was set out by Plowman J in
        *Re National Bank Ltd* [1966] 1 All ER 1006 at 1012, [1966] 1 WLR
        819 at 829 by reference to a passage in Buckley on the Companies
        Acts (13th edn, 1957) p 409, which has been approved and applied by
        the courts on many subsequent occasions:

        'In exercising its power of sanction the court will see, first, that the
        provisions of the statute have been complied with; secondly, that the
        class was fairly represented by those who attended the meeting and that
        the statutory majority are acting bona fide and are not coercing the
        minority in order to promote interests adverse to those of the class whom
        they purport to represent, and thirdly, that the arrangement is such as an
        intelligent and honest man, a member of the class concerned and acting
        in respect of his interest, might reasonably approve. The court does not
        sit merely to see that the majority are acting bona fide and thereupon to
        register the decision of the meeting; but at the same time the court will
        be slow to differ from the meeting, unless either the class has not been
        properly consulted, or the meeting has not considered the matter with a
        view to the interests of the class which it is empowered to bind, or some
        blot is found in the scheme.'

        This formulation in particular recognises and balances two important
        factors. First, in deciding to sanction a scheme under s 425 [the
        predecessor of section 899], which has the effect of binding members or
        creditors who have voted against the scheme or abstained as well as
        those who voted in its favour, the court must be satisfied that it is a fair
        scheme. It must be a scheme that 'an intelligent and honest man, a
        member of the class concerned and acting in respect of his interest,
        might reasonably approve'. That test also makes clear that the scheme
        proposed need not be the only fair scheme or even, in the court's view,
        the best scheme. Necessarily there may be reasonable differences of
        view on these issues. The second factor recognised by the above-cited
        passage is that in commercial matters members or creditors are much
        better judges of their own interests than the courts.

> Subject to the qualifications set out in the second paragraph, the court 'will
> be slow to differ from the meeting'."

66. The passage from Buckley quoted by David Richards J effectively

involves a three-stage test:

(1) At the first stage, the Court must consider whether the provisions of the
statute have been complied with.

(2) At the second stage, the Court must consider whether the class was fairly
represented by the meeting, and whether the majority are coercing the
minority in order to promote interests adverse to those of the class whom
they purport to represent.

(3) At the third stage, the Court must consider whether the scheme is one which
a creditor might reasonably approve. If the scheme is one which a creditor
could reasonably approve, it is said to be "fair", even though the Court
retains ultimate and unfettered discretion whether to sanction a scheme,
and to withhold sanction if it considers there is nevertheless some
overriding unfairness in the scheme or the manner in which it has been
presented or notified and explained, or in the event that some 'blot' is
found. Indeed, there is no entitlement to have a 'fair' scheme sanctioned:
the exercise of its jurisdiction being discretionary, the Court is not obliged
to sanction a scheme.

67. The breadth of its jurisdiction emphasises the care that must be taken by the Court
in its exercise. In addition to satisfying itself as to the matters above, the Court
must also be satisfied as to the adequacy and accuracy of the explanatory
statement provided in respect of the scheme, and that its recipients have been
afforded adequate time to consider their position and to give vitality to their
right to object.

68. However, the most troublesome of the preconditions for the exercise of
jurisdiction (in the sense of its propensity to give rise to difficult issues) is that
the scheme must have been approved by the statutory majorities in value and
number at class meetings in each case constituted by the Court and comprised
only of

> "those persons whose rights are not so dissimilar as to make it
> impossible for them to consult together with a view to their common
> interest":

see *Sovereign Life Assurance v Dodd* [1892] 2 QB 573 at 583 (Bowen LJ) and *Re
UDL Holdings Ltd* [2002] 1 HKC 172 at [27] (Lord Millett NPJ). The issue is a
fundamental one: for the jurisdiction of the Court to enable a majority to bind the
minority on the terms of a scheme is dependent on the correct identification and
composition of classes, and the passing of resolutions by the statutory majorities at
properly constituted class meetings convened and held in accordance with the
Court's directions: and see *In re Apcoa (No. 2)* at [45].

69. But also fundamental, at least to the modern approach, is to distinguish between the legal rights which the scheme creditors have against the company, and their separate commercial or other interests or motives (whether or not related to the exercise of such rights). As Lord Millett clarified in *UDL* at 184-5:

> "The test is based on similarity or dissimilarity of legal rights against the company, not on similarity or dissimilarity of interests not derived from such legal rights. The fact that individuals may hold divergent views based on their own private interests not derived from their legal rights against the company is not a ground for calling separate meetings … The question is whether the rights which are to be released or varied under the scheme or the new rights which the scheme gives in their place are so different that the scheme must be treated as a compromise or arrangement with more than one class."

70. Even then, a material difference in legal rights does not necessarily preclude their respective holders from being included in a single class: for the second part of the test enables that provided that they are not "so dissimilar as to make it impossible for them to consult together with a view to their common interest". That, unusually and perhaps confusingly, introduces into a jurisdictional issue a subjective assessment, which may account for changing judicial perceptions over the years as to class constitution in the light of the developing and prevailing inclination of judges to recognise the dangers of giving a veto to a minority group by (in Lord Neuberger's words in *Re Anglo American Insurance Co Ltd* [2001] 1 BCLC 755 at 764) being "too picky about different classes" and ending up "with virtually as many classes as there are members of a particular group." Hence my statement in *Re Primacom Holding GmbH* [2013] BCC 201 at [44]-[45]:

> "… The golden thread of these authorities, as I see it, is to emphasise time and again … [that] in determining whether the constituent creditors' rights in relation to the company are so dissimilar as to make it impossible for them to consult together with a view to their common interest the court must focus, and focus exclusively, on rights as distinct from interests. The essential requirement is that the class should be comprised only of persons whose rights in terms of their existing and the rights offered in replacement, in each case against the company, are sufficiently similar to enable them to properly consult and identify their true interests together.
>
> I emphasise this point because it … enables the court to take a far more robust view as to what the classes should be and to determine a far less fragmented structure than if interests were taken into account."

71. In parallel with this development of the Court's approach to this issue of jurisdiction, the Court has also changed its practice and accepted that the identification of proper class composition is one to be addressed at the time of the Convening Hearing. Prior to Re Hawk Insurance Company Ltd [2002] BCC 300 the Court had declined to engage with the issue until the final (sanction) hearing, leaving it to the proponents of the scheme to live with their choices until the potential sudden death of disapproval at the final hurdle.

72. The purpose of the change of practice introduced pursuant to the observations of Chadwick LJ in Re Hawk, and now embodied in the Practice Statement, was and remains to accelerate to the first stage (at the Convening Hearing) consideration by the Court of the issue of class composition. Whilst the Court's decision at that stage is not final, the applicant has a legitimate expectation that, unless circumstances materially alter or fresh considerations are put before it which the Court accepts should be addressed, the Court will not of its own motion change its mind, since (as I put it in *In re APCOA Parking Holdings GmbH (No.2)* "to do so would subvert the purpose of the revised practice": and see also In re Hawk itself at [21] and *Re Global Garden Pructs Italy SpA* [2017] BCC 637, [2016] EWHC 1884 (Ch) at [43].

73. In the present case, there was substantial opposition to the proposals for class composition put forward by the Administrators at the Convening Hearing (which lasted two days). As I have said, three creditors each represented by Counsel put forward arguments why the proposals should be rejected. I sought to describe the arguments then advanced, and my assessment and adjudication of them, in an oral judgment given after time for consideration. As appears from that judgment, the focus at that stage was on (a) whether all the Wentworth entities, including the entity holding the Sub-Debt, should be seen as one, so that the proposal simply to establish a separate class meeting for the Sub-Debt entity did not really or sufficiently address the problem, on the principal basis, as Mr Twigger put it on behalf of Deutsche, of its suggested "failure to recognise that the benefits to be obtained from the Scheme by some of the Wentworth Parties with a view to their being shared among the Wentworth Parties as a whole means that none of the Wentworth Parties can consult with the independent Higher Rate Creditors who do not stand to receive those benefits"; and/or more particularly, (b) whether the right negotiated by the Wentworth Sub-Debt entity to be consulted in respect of the certification and adjudication process was a right shared (at least in economic or commercial terms) by all Wentworth entities so as to place them all in a different class from others; and (c) whether (as Marble Ridge submitted) there was a requirement for a separate class of creditors (like itself) which had acquired rights under a ISDA Master Agreement from a now insolvent entity which in consequence had especial difficulties in certifying its claim to interest, and thus was disadvantaged in and by the adjudication process. For reasons I sought to summarise, I did not consider any of these arguments justified rejection of the proposed class composition.

74. I had envisaged that there might be further evidence or reason adduced at the Sanction Hearing in support of the over-arching proposition that all the Wentworth entities were to be regarded in law as one: but that did not eventuate. As already stated, in point of fact, both CRC and Marble Ridge in

the end supported and voted in favour of the Scheme, and Deutsche withdrew its objection (having all obtained some improvements to the adjudication process).

75.    Thus, the reference in Cleary Gottlieb's letter (to which I have referred in paragraph [53] above, and which was sent to the Administrators but produced to the Court at Cleary Gottlieb's request during the Sanction Hearing), to my indication that I was not minded to revisit class composition issues at the hearing should be viewed in the light of the considerable exploration of the issue at the Convening Hearing, my outline judgment following it, and the fact that no further submissions were sought to be made to me by objectors.

76.    However, I should perhaps make clear that, whilst I did not encourage further submissions on the point from proponents and supporters of the Scheme, I have nevertheless reviewed the issue precisely because it goes to jurisdiction, and also because I accept that in this case the question of class composition has not been straightforward.

77.    I have been concerned especially to re-satisfy myself in respect of five features of the Scheme and its context, even though some were not the subject of objection at any stage: (a) the close association between the Wentworth companies; (b) the entitlement to consultation in some aspects of the adjudication process which the Wentworth Subordinated Creditor has obtained in the process of the Scheme's development; (c) the Lock-Up Agreement; (d) the consent fee payable by Wentworth Group companies to the Senior Creditor Group; and (e) the fact that some provable debts though not legally owned by the Senior Creditor Group are or may be ultimately controlled by it.

78.    As to (a) in paragraph [77] above, it appears to be obvious that the Wentworth Group companies are very closely associated, and likely that in economic terms, unlike other creditors, they have, as a group, legal rights and commercial interests as subordinated creditors which mean that what they lose as Higher Rate Interest creditors they stand to gain in that other capacity. The question I have had to consider is whether that introduces a difference of class rights; and, for example, whether I should take each Wentworth Group entity as having, for the purposes of class composition, cross-holdings and/or the legal rights enjoyed by each other, or another, Wentworth Group entity so as should have been taken to require all such entities to vote in a class separate to other creditors. I remain satisfied that it does not. It might have been different had evidence been advanced such as to persuade me that the Wentworth Group entities were not merely connected but in law each alter egos of the other; but it was not. Further, by analogy, cross-holdings (where a member of one class is also, in respect of another legal right, a member of another class) does not, of itself at least, fracture the class composition: see *Re Telewest, UDL Holdings* and also *Re Primacom*.

79.    Similarly, as to (b) in paragraph [77] above, I also remain of the view that the fact that the Wentworth Group entity holding the Sub-Debt (which itself has no other claims), has (apparently as a condition of its support for the Scheme) negotiated to have various powers under the Scheme in relation to the adjudication process, does not raise a class issue (beyond the fact that it has

been required to vote in a class of its own). In the event, I should note, these powers have been modified since the Convening Hearing to remove aspects of them which have caused especial concern to objectors: in particular, the final form of the Scheme no longer allows the Subordinated Creditor to determine the amount of any counter-offer by LBIE. This was the only real objection that the opposing creditors identified at the Convening Hearing, and it has now been removed. In any event, and as submitted by the Administrators:

>     (1) To the extent that any of the Wentworth Senior Creditors is an 8% Creditor,
>     a Specified Interest Creditor or a Higher Rate Creditor, the rights given to
>     them under the Scheme (in their capacity as such) are precisely the same
>     as the rights given to other creditors.

>     (2) Even if the Wentworth Senior Creditors were motivated to exercise their
>     voting rights as 8% Creditors, Specified Interest Creditors or Higher Rate
>     Creditors in order to enhance the recovery of the Sub-Debt, that is a classic
>     example of a point that may go to fairness, rather than class composition.

>     (3) In the absence of a relevant difference between the legal rights of the
>     Wentworth Senior Creditors (qua 8% Creditors, Specified Interest
>     Creditors or Higher Rate Creditors) and the legal rights of other creditors
>     in those classes, the question of whether those creditors can "consult
>     together with a view to their common interest" does not arise. As
>     explained above, there is no relevant difference in rights.

80.   As to (c) in paragraph [77] above, one aspect of the Lock-Up Agreement, which was advanced (if at all) only tangentially at the Convening Hearing, has since then caused me some further pause for thought. This is whether the fact that the Wentworth Group, as well as the Senior Creditor Group, have agreed not only to support the Scheme but also to accept the Settlement Premium in respect of all Higher Rate Claims (rather than seeking to certify their cost of funding) signifies or entails that their rights as against the company now are different from those of other Higher Rate Creditors, and could be said to make it impossible for them to "consult together with a view to their common interest" (the basic principle as classically stated by Bowen LJ in Sovereign Life Assurance v Dodd [1892] 2 QB 573 at 583) since they no longer can participate in the adjudication process, and thus have no interest in it or in discussing it. I have added to my consideration of this point the potentially linked fact of the agreement between Wentworth Group and the Senior Creditor Group (but not the Administrators or LBIE) for the payment by Wentworth Group companies of a fee of £35 million. I have concluded, however, that these matters do not unsettle the class composition, principally because the Lock-Up Agreement does not, on my analysis, remove the common rights of all the Higher Rate Creditors, but simply commits Wentworth Group as to which of two ways of exercising that right it will choose. In my view, the fact of the agreement in advance as to which of two options offered under the Scheme in respect of the right to select does not signify any material divergence of relevant right, any more than a firm internal and unexpressed election on its part (such as all such Higher Rate Creditors had to make before voting), without binding commitment or agreement, would do so. Furthermore, I do not consider that this precontracted choice is such as to prevent constructive discussion of the

overall Scheme and the balance of benefit that it is intended to bring; and that is so taking into account the arrangements between Wentworth Group and the Senior Creditor Group. Whilst I accept all this is relevant to stages two and three of the three-stage test originally formulated in Buckley on the Companies Acts (13th edn, 1957) and approved by David Richards J (as he then was) in *Re Telewest Communications (No. 2) Ltd* I was satisfied that it does not cast doubt on the composition of the classes convened.

81.    I need add little more to what I have already said about the consent fee (see (d) in paragraph [77] above). In the end, the point was pursued principally in correspondence on behalf of GSI and was presented clearly and sharply as follows in a letter dated 8 June 2018 from Cleary Gottlieb to the Administrators' solicitors (Linklaters LLP), as follows:

> "As you know, our client Goldman Sachs International ("GSI") has raised concerns about the fairness of the Scheme, and for that reason voted against the proposed scheme. GSI continues to consider that the proposed scheme is unfair, in particular because of the arrangements between the SCG and Wentworth, where the SCG is being paid at least £35 million to support the proposed scheme and compromise its appeal rights in the Waterfall IIC appeal. The same incentive is not available to other Higher Rate Creditors including GSI which will be deprived of its appeal rights under the proposed scheme. In effect, the SCG is being paid at least £35 million in consideration of it not pursuing the Waterfall IIC appeal, while GSI is simply being stripped of that right without compensation. Other Higher Rate Creditors who stand to benefit if GSI succeeds in the
> Waterfall IIC appeal are similarly prejudiced."

The objection is expressed as being on grounds of unfairness. I consider it later at the second and third stages of my assessment. It is not presented as an objection to class constitution. Although it is fair to acknowledge that this may be in deference to the decision already made on 11 June 2018, I think that the point does really go to fairness. As it seems to me, these matters are relevant at a subsequent stage in the assessment of the Scheme, and I consider them later accordingly at the second and third stages of my assessment. But for the purposes of this first stage, I remain satisfied that the fact that, after the arrangements (to which the Administrators were not party) were revealed, a separate class for the Senior Creditor Group was conceived to be advisable and probably necessary, has removed that source of concern in the context of class composition.

82.    I have again considered, in relation to (e) in paragraph [77] above, whether the fact that some provable debts are not legally owned by the Senior Creditor Group, but are ultimately controlled by one or more members of the Senior Creditor Group (for example, through a trust structure or a sub-participation arrangement) ought to have required the holders of such claims to vote in a separate class. Again, I remain of the view that this is not the case. For the purposes of class composition, the relevant "rights" are the rights of the legal owner of the relevant claim. The fact that the legal owner of the claim may be required to vote in accordance with the instructions of a third party (e.g. a

beneficial owner or sub-participant) is not relevant to class composition: see *Re Zodiac Pool Solutions SAS* [2014] BCC 569 at [21] (Morgan J) and *Re Abbey National plc* [2004] EWHC 2776 (Ch) at [4] and [13] (Evans-Lombe J). The scheme company's contractual relationship is with its legal creditors, and it would be unworkable to compose classes by reference to the position of third parties who may be able to control the exercise of the legal creditor's voting rights. The involvement of such third parties may be relevant in assessing the fairness of the scheme at the Sanction Hearing, but I do not consider that it is relevant for the purposes of class composition.

83.   In summary, after careful review, I have remained satisfied that the class meetings proposed, and approved, convened and held, were properly constituted.

84.   However, that is the basis of the Court's jurisdiction but it does not conclude the inquiry (see per Street J in *Re Jax Marine Pty Ltd* and Companies Act 1961 [1967] 1 NSWR 145 at 147 (lines 25 to 27)): for conflicting interests  or motives may be highly relevant at the second stage of considering whether, as matter of discretion, to sanction the scheme. That is the stage of assessing whether the class was fairly represented at the meeting, to which I now turn.

Part G: whether each class was fairly represented by those attending

85.   Again, the main focus at this second stage is on the Higher Rate Creditor meeting. Neither the SCG Meeting nor the Subordinated Creditor Meeting, where all those Scheme Creditors entitled to vote did so in favour, nor the 8% Creditor Meeting, where the requisite majorities would have been obtained by a substantial margin even if Wentworth Senior Creditors had been excluded from it, are in issue.

86.   The issue arises in respect of the Higher Rate Creditor Meeting principally because (as the Cleary Gottlieb e-mail referred to in paragraph [53] above emphasised) the votes of the Wentworth Senior Creditors were necessary for the approval of the Scheme by the requisite 75% majority in value at that meeting. (As explained above, if the Wentworth Senior Creditors had been excluded from the Higher Rate Meeting, the Scheme would have been approved by 62 creditors, representing 93.9% in number and 62.2% in value.)

87.   As also mentioned previously, the principal objector at the Convening Meeting, Deutsche, did not pursue its arguments at the Sanction Hearing; and (Cleary Gottlieb having expressly confirmed in their letter of 8 June 2018 that GSI did not propose to be represented at the hearing or to serve any evidence or submissions in relation to it) there was no one who appeared before me to elaborate adversarially the argument that, even if not improperly constituted for the purposes of the first stage of assessment, nevertheless the Higher Rate Creditor class was not fairly represented at the Higher Rate Creditor Meeting. That does not, however, excuse the Court from its task of assessment, even if dialectic argument might have assisted it.

88.    The questions at the heart of the matter at this stage are (a) whether the majority
        creditors had some 'special interest(s)' different from and adverse to the other
        members of the Higher Rate Creditor class by which it is shown (b) they were
        predominantly motivated in voting as they did; if so, (c) whether their votes are
        to be (i) disregarded or (ii) discounted, and (d) what effect that should have in
        terms of whether or not the Court should decline to sanction the Scheme. I shall
        first discuss these tests in general, and then come on to apply them in this case.

89.    I agree with Counsel for the Administrators that the mere fact that the majority
        creditors have a special interest for supporting the scheme does not, without
        more, entail that the class was not "fairly represented". As appears from
        Plowman J's formulation of the guiding principles in Re National Bank Ltd
        (see paragraph [65] above), the concern is whether the relevant creditors have a
        special interest which is adverse to, or clashes with, the interests of the class as
        a whole. A special interest which merely provides an additional reason for
        supporting the scheme (without clashing or conflicting with the interests of the
        class as a whole) does not undermine the representative nature of the vote. This
        is well established in the authorities both before and after National Bank Ltd.
        Thus, for example:

    *(1)* In *Re Alabama, New Orleans, Texas and Pacific Junction Railway Co*
        [1891] 1 Ch 213 at 238-239, Lindley LJ said:

            "... what the court has to do is to see, first of all, that the
            provisions of that statute have been complied with; and,
            secondly, that the majority has been acting bona fide. The
            court also has to see that the minority is not being overridden
            by a majority having interests of its own clashing with those
            of the minority whom they seek to coerce. Further than that,
            the court has to look at the scheme and see whether it is one
            as to which persons acting honestly, and viewing the scheme
            laid before them in the interests of those whom they
            represent, take a view which can be reasonably taken by
            business men. The court must look at the scheme, and see
            whether the Act has been complied with, whether the
            majority are acting bona fide, and whether they are coercing
            the minority in order to promote interests adverse to those of
            the class whom they purport to represent; and then see
            whether the scheme is a reasonable one or whether there is
            any reasonable objection to it, or such an objection to it as
            that any reasonable man might say that he could not approve
            of it."

    (2) In *Re Dee Valley Group plc* [2018] Ch 55, Sir Geoffrey Vos C.

        said this (at [42]):

            "The meeting or meetings are called to establish whether or
            not the court's discretion to sanction a scheme can, as a
            matter of jurisdiction, be invoked. It is, however, most

> important in my judgement to consider what the court is
> doing once it embarks on exercising that discretion. It is then
> deciding, amongst other things, first whether the statutory
> pre-requisites have been fulfilled, and secondly whether the
> class attending the meeting the court called was fairly
> represented by those attending the meeting, whether the
> statutory majority were acting bona fide and not coercing the
> minority in order to promote interests adverse to those of the
> class they purport to represent. It is quite clear from that
> exercise that the court is indeed concerned with those matters
> in sanctioning a scheme. The clue as to what members are
> supposed to be doing in voting at the court's class meeting is
> also, I think, to be found in that second well established
> formulation. The members are supposed to be fairly
> representing their class, and acting bona fide, and not
> coercing a minority in order to promote interests adverse to
> the class they purport to represent ...
>
> The test itself is, as I have said, made clear by the exercise
> that the court undertakes at the sanction stage. That points
> clearly to the need for the class members at the court
> meeting to be voting in the interests of the class and not to
> promote interests adverse to the class they purport to
> represent ..."

(3) I said much the same in *In Re Apcoa* [supra]:

> "... if an allegation is made that a creditor had improper
> regard to interests other than those of the class to which he
> belonged, it is necessary for there to be a 'but for' link
> between the collateral interest and the decision to vote in the
> way that he did. The person challenging the relevant vote
> must therefore show that an intelligent and honest member
> of the class without those collateral interests could not have
> voted in the way that he did. It is not sufficient simply to
> show that the collateral interest is an additional reason for
> voting in the manner in which he would otherwise have
> voted."

(4) The same view has recently been taken by the Grand Court of the Cayman
Islands in *Re Ocean Rig UDW Inc* (18 September 2017, Parker J) with the
benefit of full adversarial argument, including the citation of all relevant
English and Australian authorities.

91. Further, and particularly as to (b) in paragraph [89] above, I agree also with
Counsel for the Administrators that the bare existence of an adverse interest is
not enough to impugn a creditor's vote as being unrepresentative of the class.

There must be a strong and direct causative link between the creditor's decision to support the scheme and the creditor's adverse interest such that it is the adverse interest which drives the creditor's voting decision. In the absence of such a link, there is simply no sufficient reason to treat the creditor's vote any differently from those of the rest of the class.

92.     As Counsel for the Administrators also pointed out, the commercial affairs of sophisticated creditors, particularly where the creditors are hedge funds or global financial institutions, are often so complex and interconnected that any given transaction will throw up a whole host of potential conflicts between them. It would be highly unsatisfactory, and in reality impracticable, if the need to establish the dominant causative reason why a relevant creditor supported the scheme required assessment of that creditor's subjective state of mind. An objective test is required.

93.     In Apcoa, my suggestion was as follows (at [130]):

> "if an allegation is made that a creditor had improper regard to interests other than those of the class to which he belonged, it is necessary for there to be a 'but for' link between the collateral interest and the decision to vote in the way that he did. The person challenging the relevant vote must therefore show that an intelligent and honest member of the class without those collateral interests could not have voted in the way that he did."

94.     Although this 'but for' test was approved and applied by the Grand Court of the Cayman Islands in Ocean Rig at [122], it has elsewhere been doubted, especially (and recently) in *Re Boart Longyear Ltd (No 2)* (2017) 122 ACSR 437 at [134], where it was submitted (incorrectly) that the causal analysis stated in Apcoa was "in the nature of obiter dicta" and, without deciding the point,

Black J said that he was

> "inclined to think that test was put at too high a level, and that it should be sufficient to establish that an interest was likely to have, for example, a real or substantial impact on the vote of a member of a class, to raise a question whether that class member's vote is representative of the class as a whole".

95.     In submissions before me, Counsel for the Administrators supported the 'but for' test; but I think it fair to characterise the submissions of Counsel for the Senior Creditor Group (supported by Counsel for Wentworth Group) as more nuanced in this regard. On behalf of the Senior Creditor Group, Mr Dicker QC in his oral submissions put it this way: "So far as stage 2 is concerned, the phrase used by Plowman J was whether the statutory majority are acting bona fides not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent. In our submission, one needs to have regard to that phrase as a whole. It is a unitary concept, essentially: Were they voting with a view to the interests of the class or not? The reason you asked that

question is that, having at class stage allocated creditors by reference to their legal rights, what weight do you put on their votes when it comes to the sanction hearing, when deciding how to exercise your discretion. In our submission, the answer to that will often depend critically on the facts, including the precise nature of the collateral interest. So, for example, if the interest is adverse, one may say, "Well, actually, I am not going to put much weight on the fact they voted in favour in deciding whether or not to exercise the court's discretion to sanction the scheme." Conversely, if the interests are aligned, again, depending on the facts, one may put a lot of weight, not so much weight on the votes that they have expressed, depending on the nature and extent of the collateral interest. So, in our submission, the result is likely to be in most cases the same as that advocated for by Mr. Trower. However, in our respectful submission, it might be preferable to preserve as it were a little bit of flexibility reflecting the fact that ultimately this is a question of discretion for the court and unlikely to be capable of being reduced to a sort of rigid flow diagram of analysis."

96.   I unhesitatingly agree that the discretion of the Court should not be circumscribed by inflexible rules; and certainly that was not my intention in adopting a 'but for' test in Apcoa. Rather, I intended to illustrate that to show that the vote was the product of a creditor's special adverse interest such as to make the result unrepresentative of the class the creditor's adverse interest must be shown to be what impelled it to vote as it did.

97.   The problem to be addressed is in distinguishing between an adverse interest and an additional one in circumstances where commercial creditors may be expected to have a variety of additional interests which may be in competition, but which are not the dominant causative reason for casting a vote one way or the other.

98.   In that context, it is, to my mind, important that at the second stage what the Court is guarding against is coercion of a class by a self-interested majority within it voting in its perception of its own interests rather than the class interest (see, for example, Alabama at 239); and that the authorities do seem to make clear that at this stage the question is not whether one or more creditors had, in voting, an interest not enjoyed by others and adverse to them which could or even would have had a material bearing on the voting creditor's point of view; it is whether the voting creditor's special interest is adverse to, or even inconsistent with the interests of the class, and in objective reality the factor which caused the creditor to vote as it did.

99.   In Dee Valley, Sir Geoffrey Vos C. went on (after the passage quoted in paragraph [90(2)] above) to say this (at [47]):

   "I have therefore concluded that members voting at a class
   meeting directed by the court must exercise their power to vote
   'for the purpose of benefiting the class as a whole, and not merely
   individual members only': see Viscount Haldane's formulation in
   the British America Nickel case [1927] AC 369,
   371. I am not sure that the gloss suggesting that members at such

> a meeting must not vote for extraneous reasons is helpful. The key
> is that the members of the class must vote in the interests of the
> class as whole and not in their own specific interests if they are
> different from the interests of the class."

100. British American Nickel (in the Privy Council) is also interesting. The question
on appeal concerned the validity of a vote by the majority debenture-holders to
bind a minority under the terms of the debenture. One of the debenture-holders
(Mr John R Booth) was induced to vote in favour of the scheme by a promise of
receiving US$2m in ordinary shares. His vote was necessary to secure the
majority. On the evidence, the judge (Kelly J in the Supreme Court of Ontario)
held

> "the votes neither of Mr Booth nor of the British Government
> would have been given for the scheme had they been influenced
> only by what was most in the interest of the bondholder."

101. As it strikes me, that formulation is similar to the "but for" test in *Apcoa*. The
focus is on whether the special interest in question is the only, or at least the
deciding, factor.

102. In British American Nickel the Privy Council upheld Kelly J's approach.
Viscount Haldane LC stated as follows (at 371):

> "[The votes] must be exercised subject to a general principle, which
> is applicable to all authorities conferred on majorities of classes
> enabling them to bind minorities; namely, that the power given
> must be exercised for the purpose of benefiting the class as a whole,
> and not merely individual members only."
> (emphasis added)

103. In summary, and whilst wary of any exclusive or binary test and not intending to
suggest any mechanistic restriction on the discretion of the Court at each stage,
I continue to think that with suitable caution or nuance in its application, the
'but for' test may be helpful in conveying the extent to which the special
interest must be demonstrated to be an adverse one before the vote of a member
of a class at a duly constituted class meeting is to be discounted or even
disregarded. As it was put in the Administrators' skeleton argument, "the 'but
for' test is a useful heuristic for determining whether the causal link exists."

104. In the application of such a test, or a nuanced version of it, two important and
inter-linked considerations are, and, as it seems to me, usually will be, (a)
whether other creditors without the special interest have, apparently reasonably,
approved the scheme proposed as being in their interests as members of the
class concerned and (b) whether having regard to what would be the position if
there were no scheme there is more to unite the members of the class than
divide them.

105. The first speaks for itself: if creditors in the class without the special interest have, on an informed basis, voted in favour of the proposed scheme that further supports the conclusion that the majority had the interests of the class in mind, and not merely their own.

106. As to the second issue, the 'comparator' is always very important at both the second and the third stage, as was recognised as long ago as the decision in *In re English, Scottish and Australian Chartered Bank* [1893] 3 Ch 385 at 415, though it should not be used as "a solvent for all class differences" even in a context where the alternative is insolvent winding-up or its real likelihood (which will destroy value and negate any real economic value in the competing interest): see *Apcoa (No 2)* at [117].

107. It is important also, I think, to recognise that whilst the class meeting is comprised of those having the same or sufficiently similar legal rights against the company, the interests in play may not be limited to but rather may transcend the class right, and any special advantage as regards a particular class right may need to be weighed against the overall benefits to be obtained under the scheme proposed. Thus, even if perceptions may differ acutely as to the separate class interest, and/or some members of the class enjoy a special interest or an overall advantage relative to others in the class, the broader interests that members of the class have in common may neutralise or displace any suggestion of a coordinated majority having voted in order to obtain the special interest or advantage. The critical question for each Scheme Creditor is whether it is content with the overall "deal" which the Scheme represents. Albeit in rather different circumstances of apparently imminent insolvency, this was the point I sought to make in *Apcoa (No 2)* at [116].

108. The final issue in this context is as to what the effect would be if the Court were to conclude that a creditor's special interest was the dominant causative reason for it having voted in favour of a proposed scheme, and in particular, whether the Court could in its discretion nevertheless sanction the scheme.

109. It is the passing of resolutions by the requisite statutory majorities at properly composed and constituted class meetings duly convened and held which gives the Court jurisdiction on application made to it pursuant to Part 26 of the CA 2006 to sanction a scheme. Unless the 'special interest' is such as to demonstrate some flaw in the class composition, the Court retains that jurisdiction even if it is established that a vote at a class meeting was unrepresentative of the class.

110. In such circumstances, the Court may either (a) discount the weight given to the majority vote and consider the fairness of the scheme without adopting any particular presumption in favour of the majority or (b) altogether disregard the relevant votes of 'special interest' creditors so that the relevant votes are void, and do not count at all towards the statutory majority, in which case if the requisite majorities are not achieved the scheme must fail.

111. The distinction between "discounting" and "disregarding" a vote is apparent from a number of authorities:

(1) One of the earliest relevant decisions, *Re Alabama*, depicts the treatment of an unrepresentative vote as a discretionary matter for the Court. See, for example, the speech of Bowen LJ at 244:

> "[A]lthough in a meeting which is to be held under this section it is perfectly fair for every man to do that which is best for himself, yet the Court, which has to see what is reasonable and just as regards the interests of the whole class, would certainly be very much influenced in its decision, if it turned out that the majority was composed of persons who had not really the interests of that class at stake."

(2) In *Re UDL*, Lord Millett said at 185:

> "The court will decline to sanction a scheme unless it is satisfied, not only that the meetings were properly constituted and that the proposals were approved by the requisite majorities, but that the result of each meeting fairly reflected the views of the creditors concerned. To this end it may discount or disregard altogether the votes of those who, though entitled to vote at a meeting as a member of the class concerned, have such personal or special interests in supporting the proposals that their views cannot be regarded as fairly representative of the class in question."

These remarks draw a clear distinction between discounting and disregarding a vote. The word "may" indicates that the matter is discretionary.

(3) In the course of his analysis, Lord Millett referred to three Australian decisions: *Re Chevron (Sydney) Ltd* [1963] VR 249, Re Jax Marine Pty Ltd [1967] 1 NSWR 145 and *Re Landmark Corp Ltd* [1968] 1 NSWR 759. In *Chevron* at 255-256, Adams J clearly indicated that the treatment of an unrepresentative vote is a matter of discretion:

> "In so far as members of a class have in fact voted for a scheme not because it benefits them as members of the class but because it gives them benefits in some other capacity, their votes would of course, in a sense, not reflect the views of the class as such although they are counted for the purposes of determining whether the statutory majority has been obtained at the meeting of the class.

> Whether that has been the case here or not does not appear from the evidence, and for that reason I have felt that I should be satisfied of the benefits which might reasonably be considered to accrue to the debenture stockholders from the scheme without paying too much regard to the majority obtained at the meeting.

> The true position appears to be that where the members of a class
> have divergent interests because some have and others have not
> interests in a company other than as members of the class the
> Court may treat the result of the voting at the meeting of the class
> as not necessarily representing the views of the class as such, and
> thus should apply with more reserve in such a case the proposition
> that the members of the class are better judges of what is to their
> commercial advantage than the Court can be."

(4)    In *Jax Marine*, Street CJ said at 134:

> "When the petition, if there be a petition, comes before the Court
> there is ample room within the Court's statutory discretion to
> decide the petition in accordance with the requirements of justice
> and equity as those requirements appear to affect the rights of the
> class and its members. Quite frequently it is necessary to discount,
> even to the point of discarding from consideration, the vote of a
> creditor who, although a member of a class, may have such
> personal or special interest as to render his view a self-centered
> view rather than a class-promoting view … This Court is
> accustomed on the hearing of petitions under s. 181 (that is to say
> at the second stage of the proceedings) to recognizing and taking
> appropriately into account any special motives or factors
> affecting particular creditors."

(5)    In the recent Boart sanction judgment (see *Re Boart Longyear Ltd* (No 2)
(2017) 122 ACSR 437), it was expressly held that the treatment of an
unrepresentative vote is a discretionary matter. Black J commented at
[152]:

> "It seems to me that the lesser weight to be given to the votes of
> interested creditors, in the exercise of the Court's discretion
> whether to approve the schemes, in their original or altered forms,
> is not a mathematical exercise".

112. As to the exercise of the Court's discretion in this respect, the Administrators
submitted that since the effect of disregarding the 'special interest' creditor's
vote is effectively its disenfranchisement, and since (they submitted) if the
Court were too ready to disregard a creditor's vote on the grounds of a special
interest, then the test for class composition would be undermined (since a
creditor could be excluded from the class meeting by reason of his interests
rather than his rights), and 'special interest' creditors would always be
disenfranchised, wholly disregarding the vote should be the last and most
unusual resort. I am not persuaded by this line of argument. I would not agree
that there is or should be such a hierarchy of response: but if one were required,
if anything I might reverse the approach. The Court has always been, and
should always be, especially disposed to guard against coercion of a minority
by a self-interested majority. I would prefer to leave it that the discretion is to

be exercised according to all the circumstances of the case, including (often most importantly) the level of support from unconnected creditors and the Court's view of the balance of benefit offered by the scheme.

## Application of these principles in the present case

113. I turn to the application of these principles and guidelines to their application in the present case.

114. To quote the Administrators' skeleton argument for the Sanction

Hearing:

"It is accepted that the Wentworth Senior Creditors have an interest not shared by other members of the classes to which they belong. The special interest arises out of the relationship between the Wentworth Senior Creditors and the Subordinated Creditor. It is understood that the Wentworth Senior Creditors (or those controlling them) are entitled to a proportion of the recoveries of the Subordinated Creditor, pursuant to a joint venture arrangement between the various members of the Wentworth Group. It is understood that the joint venture was established in January 2014, but the Administrators do not know the precise terms of the joint venture. The Administrators have received a term sheet which describes the terms of the Wentworth joint venture (the "WW Term Sheet")... The WW Term Sheet requires members of the Wentworth Group to promote the "Underlying Principle":

"The parties (i) shall act or, to their knowledge, omit to act, in accordance with the underlying principle of enhancing the recoveries for the Recovery Pool and the Preferred Equity and (ii) shall not act in a manner adverse to the economic interests of the LBHI2 Scheduled Creditors (in their capacity as such) ..."

The "Recovery Pool" is defined as: "the recovery pool consisting of all the assets in, or deriving from, the LBHI2 Contribution, the KS Contribution and the Elliott Contribution (as adjusted to include the LBHI Contribution, to the extent required)." The WW Term Sheet contains a complex series of provisions which deal with the parties' obligations to contribute to, and the parties' rights to share in, the Recovery Pool."

115. Nevertheless, the Administrators submitted that none of this creates any impediment to the sanction of the Scheme, and in particular that:

(1) Properly understood, the Wentworth Senior Creditors' interest in the Sub-Debt is not adverse to the interests of the other Higher Rate Creditors in the context of the Scheme, but aligned.

(2) There has been no coercion of the minority, as can been seen from the high level of support obtained from "independent" creditors.

(3) Further, the Wentworth Senior Creditors' interest in the Sub-Debt is not (and cannot rationally be) their dominant causative reason for supporting the Scheme.

(4) Even if that is wrong (such that the Wentworth Senior Creditors are not representative of their respective classes), their votes should be discounted rather than disregarded.

116. More generally, the Administrators sought to emphasise what they presented as being "the fundamental fact" that all of the Scheme Creditors, including all of the 8% Creditors, the Higher Rate Creditors and the Subordinated Creditor, share a collective interest in facilitating the speedy distribution of the Surplus; that is the principal purpose of the Scheme; and that it thus affects all creditors in a similar way.

117. I agree with the Administrators that it is important to have in mind the overall purpose and effect of the Scheme. That is especially so in this case because the context of the debate as to class composition and fair representation of the class tends to focus attention very much on the loss by objecting creditors of their rights of appeal in the Waterfall IIC application, and to obscure in consequence both the exposures to which the holders of such rights are also subject and the overall benefits of early resolution.

118. The Scheme is a multi-faceted commercial compromise of considerable complexity, with 'give and take' on all sides. The exact balance between the parties is probably impossible accurately to establish, just as are the prospects in the various applications described compositely as the Relevant Proceedings. Lehman debt has been actively traded, especially given the high rate of interest it attracts, and the position as to sub-participatory, hedging and cross-holdings is as a practical matter likely to be complex, changing and less than transparent.

119. The essential or overall deal was and remains that in return for giving up the possibility of establishing a greater quantum of interest on appeal, creditors obtain the advantage of a speedy mechanism to return the Surplus, stemming the continuing loss of the time value of money, free of the costs of continued litigation and any benefit or burden in consequence of the Relevant Proceedings.

120. These include the possibility of a successful appeal to the Supreme Court in the Waterfall IIA Application on the applicability of the rule in *Bower v Marris* (which could have a fundamental effect on the calculation of creditors' entitlements to the Surplus), and the uncertainties inherent in the Olivant and Lacuna Applications, as well as the inevitability of delays and thus costs and expense of further delays.

121. There is no reasonable doubt that in the absence of the Scheme, the Administrators would be unable to distribute the Surplus for an indeterminate but almost inevitably lengthy period. As previously explained (and see paragraphs [10] and [11] above especially), material delay is inherently and inevitably prejudicial to all creditors: it would lead to a continuing loss of the

time value of money, a loss which will increase with every day that the Surplus is not distributed, and which will be suffered by all Scheme Creditors equally.

122. Whenever the trade or compromise is between an uncertain right or obligation and actual payment the quantification of the benefit or detriment is largely subjective; and the problem is exacerbated by the fact that the amounts in play in respect of different creditors is both variable and uncertain. It is necessary at this second stage to assess not the balance of advantage but whether there is some factor or reason to suppose that one set of Higher Rate Interest Creditors has an interest adverse to the interests of the others in the class.

123. I consider it fair to focus primarily in this assessment on the way in which the remaining Objectors contend that there is such an adverse interest. I have previously quoted from the letter sent by Cleary Gottlieb on behalf of GSI to the Administrators dated 8 June 2018: see paragraph [81] above. As already noted, the substance of the objection is that the Senior Creditor Group is being paid "at least £35 million"
"in consideration of it not pursuing the Waterfall IIC appeal", whereas GSI is simply being stripped of the right "without compensation". Insofar as this point was intended to suggest adverse interest, the short response is (as will already be apparent) that in light of the emergence of the arrangements for the payment to them, the Senior Creditor Group was not included in the Higher Rate Interest creditor class and was placed in a class of its own.

124. I accept that that may not be a complete answer, given the suggestion floated (by Cleary Gottlieb in its email dated 13 June 2018 provided to the Court during the course of the Sanction Hearing (see paragraphs [53], [59] and [87] above) that the Senior Creditor Group may control some other members of the Higher Rate Creditor class; but it is in my view sufficient given that there was never any demonstration of that floated suggestion.

125. As also previously noted, during the course of the Sanction Hearing Cleary Gottlieb advanced further points that may be thought relevant at this second stage, now concerning the interests of the Wentworth Group entities: see paragraph [53], [59] and [87] above. Although not elaborated on behalf of GSI (or, so far as I am aware, even mentioned by Cleary Gottlieb in its correspondence prior to the Sanction Hearing) this struck me as a stronger point than the one as to the Senior Creditor Group which it primarily advanced, since the interests of Wentworth Senior Creditors as a Higher Rate Creditor are plainly in competition with GSI in relation to the particular issue focused on by GSI, the Waterfall II Application, as simply demonstrated by them being ranged against each other (albeit as quasi-representative parties) in those proceedings. This initially (and intermittently thereafter) caused me some real concern.

126. However, it is important again to return to the question: which is whether the interests of Wentworth Group have been shown to be, or are objectively likely to be, contrary to the interests of the relevant class in which their vote had influence in relation to the question really before the class as such: whether to accept the give and take of the Scheme as a whole.

127. Now as regards that question, as it seems to me, the competition between GSI and Wentworth Group as litigants in the Waterfall IIC Application is substantially beside the point. There is enough Surplus to cater for victory on appeal for GSI without impacting on Wentworth, unless Wentworth Group would garner more from GSI's claims being compromised in some other way. That is why, no doubt, Deutsche, who did always advance this point until they withdrew their objection, focused on the Wentworth Group Sub-Debt interest as the feature giving the Wentworth entities as a whole what was said to be a special interest adverse to the class (since recoveries in respect of the SubDebt would be enhanced by the reduction of Higher Rate interest claims).

128. I would be disposed to accept that this is not only a special interest (as is accepted indeed by the Administrators, as previously noted) but also, if all the Wentworth Group entities are treated economically as one, as being 'adverse' to some in the class, and to the class as a whole in the sense that it is not an interest which is enjoyed by any other members of that class.

129. However, I do not accept that, even on that basis, it is demonstrated or likely that this was the dominant or causative reason for the support given by the Wentworth Group entities to the Scheme. As the Administrators have pointed out, the Wentworth Senior Creditors own some 38% of all provable claims. They have an obvious and very significant interest in ensuring, if that can be done, that statutory interest is distributed quickly and properly, and that any potential for the 'lacuna' identified by the Supreme Court (such that, if LBIE moves from administration into liquidation, any unpaid statutory interest under rule 14.23(7) in respect of the period between the commencement and the termination of the administration would not be payable out of the Surplus or provable in the liquidation) is removed (see paragraph [21(4)] above).

130. Further, subject to the issue raised late as to the control over others in the class that it is suggested that either Wentworth Group or the Senior Creditor Group may have, the conclusion that it is not (or not so much) the 'special interest', but the principal objectives of the Scheme as a whole, which explains why Wentworth Senior Creditors' vote is supported by the voting results. These support the Administrators' short summary that it is not "all about the Sub-Debt".

131. Thus, excluding the Wentworth Senior Creditors, 62 Higher Rate Creditors – representing 93.9% in number and 62.2% in value of the Higher Rate Creditors – have voted in favour of the Scheme. Of those 62, the majority have accepted the Settlement Premium, but a nontrivial minority of creditors (6 in total) have elected to certify their cost of funding. Indeed, two sophisticated Higher Rate Creditors – CRC and Marble Ridge – are in precisely that position, and (though they previously opposed) now support the Scheme. I would accept the submission that it cannot credibly be suggested that the position taken by CRC or Marble Ridge (or any of the other 62 Higher Rate Creditors who support the Scheme) is an irrational one.

132. In all the circumstances, I do not therefore consider that the votes at the class meetings were unrepresentative of the class interest, nor that coercion has been demonstrated.

133. Even if I am wrong and it is thought that the class meetings were unrepresentative, I would also accept that, in all the circumstances of the case, it would not be right to disregard the votes of the Wentworth Senior Creditors as being unrepresentative of their respective classes, and to conclude accordingly that the Scheme must fail for want of sufficient majorities for the purposes of the statutory requirements. It would not be right to treat the vote as the independent view of the regiment such as would ordinarily (in the absence of any 'blot') be the litmus test of a scheme's commercial good sense and fairness of a scheme. But nor would it be right entirely to disenfranchise and negate the views of a majority member of a class which is the largest creditor group in the LBIE estate and which, even ignoring its special interest, has, in common with many others, much to gain from the fulfilment of the central purpose of the Scheme as proposed and perceived by the Administrators.

134. In that context, I consider that the fact of support by a solid majority in number having claims with a value of over 60% of the total is an important factor, distinguishing this case from, for example, one where there is no real indication of general class support either in numerosity or value terms.

135. However, if that is the (as it were) potentially saving grace of the Scheme, the onus on the proponents of the Scheme to persuade the Court of its overall fairness is all the greater.

## Part H: the overall fairness of the Scheme

136. Many, if not most, of the matters to be taken into account in considering, at this third stage of the Court's assessment of the Scheme, whether "the arrangement is such that an intelligent and honest man, a member of the class concerned and acting in respect of his interest might reasonably approve", have already been addressed in the context of the two earlier stages. However, whilst more usually the Court has the guide (and the reassurance) of a regiment of commercial men marching in step, in this case, the differences in view, and the issues as to ulterior purposes objectives, do invite more anxious scrutiny of what appears to be the minority position.

137. A useful checklist for this purpose is provided by the objections put forward by Deutsche in its solicitors' letter of 5 June 2018. Although, in the event, Deutsche did not pursue these objections and confirmed (on 11 June 2018) that it did not intend to be represented at the hearing and, having secured the Administrators' agreement to a contribution to its costs, "does not object to the court's sanctioning of the scheme, should the court see fit to do so", its objections were adopted by another Higher Rate Creditor, namely SRM, as previously explained (see paragraph [16] above). SRM was one of the four Higher Rate Interest Creditors which voted against the Scheme.

138. By letter to the Administrators dated 12 June 2018, SRM especially identified as its "principal reason for its objection to the Scheme" two features of the Certification procedure, being (a) Wentworth's special rights of consultation and (b) the provision for the surrender of SRM's "right to the supervisory control of the Court in respect of Certification". I shall return to these later, in

the course of dealing with Deutsche's seven headline points (which also incorporate them).

139. Deutsche's first objection was as follows:

> "Higher Rate Creditors who control a number of different Claims should be able to take the Certification Option for some of those Claims and the Settlement Option for others. The merits of pursuing the Certification Option for ISDA claims will, absent any other considerations, be entirely fact and circumstance specific to each relevant payee. Creditors should therefore have the freedom to exercise different options in respect of their different claims, and not be subjected to the unfair penalty of being deprived of the 2.5% premium for claims which they would otherwise not certify, simply because a Creditor elects to pursue its legitimate rights of certification in respect of other claims."

140. In short, Deutsche proposed that a creditor holding two claims should be able to receive the Settlement Premium for one claim and pursue the certification route for the other claim.

141. This was, in effect, a suggestion for what was presented as an improvement to the Scheme. Although there is reference to it being an "unfair penalty" to be deprived of the 2.5% premium for claims that they would not certify simply because they are required to make an election across the board of their claims, as if this was a prejudicial defect, that is something of a misplaced forensic flourish. There is no unfair penalty: the Settlement Premium is offered in consideration for the relevant creditor agreeing to spare LBIE the time and expense of dealing with a certification. If a creditor holding two (or more) claims were permitted to "cherry pick" in this way, it is obvious what would happen. Each creditor would choose the Settlement Premium for claims with a comparatively low cost of funding, and would choose the certification route for claims with a comparatively high cost of funding. That would not achieve the cost or time savings that the Settlement Premium is designed to secure. There is no unfair prejudice; and the 'solution' proposed would have destroyed the rationale of the proposal.

142. Deutsche's second objection, which GSI continued to press in Cleary

Gottlieb's letter dated 8 June 2018, was as follows:

> "As it stands, the Scheme provides no form of compensation for the loss of appeal rights against the Waterfall IIC judgment. Whether equivalent to the £35m 'consent fee' payable to the SCG or otherwise, such compensation should fairly be paid to all Higher Rate Creditors."

143. I accept that this was and is a point of substance; however:

(1) It is not likely to be correct to regard the agreed sum of £35 million as being in consideration of not pursuing the Waterfall IIC appeal. Pursuant to the Lock-Up Agreement, the Senior Creditor Group agreed not to certify the cost of funding for any of its claims. This may have involved a significant transfer of value (if some of the Senior Creditor Group's claims had a high cost of funding) from the Senior Creditor Group to the 8% Creditors, the Specified Interest Creditors and the other Higher Rate Creditors (in the event that the Surplus is not sufficient to pay statutory interest in full) or to the Subordinated Creditor or LBHI2 (if the Surplus extends beyond that needed to pay statutory interest in full).

(2) It is simplistic or tunnel-visioned to depict GSI as receiving no consideration. It receives consideration in the form of the benefits which all creditors will obtain from the Scheme, and especially accelerated payment of the Surplus. Other Higher Rate creditors appear to accept the give and take.

(3) These objectives in common seem to me to be ones which any creditor, including a Higher Rate Interest creditor (and, in particular, Wentworth) could well and entirely reasonably be willing to support.

(4) Moreover, the consent fee is not part of the Scheme, but is a private arrangement between the Wentworth Group and the Senior Creditor Group.

(5) The Scheme has been approved by a large majority of creditors who are not entitled to receive any consent fee, and there is no reason for the Court to second-guess their commercial assessment.

144. Deutsche's third objection was as follows:

"Higher Rate Creditors which take the Certification Option should not be effectively subordinated to Specified Interest Creditors, those with 8% Interest Claims and those Higher Rate Creditors which take the Settlement Premium Option through the delay in payment. Higher Rate Creditors which take the Certification Option should be paid the minimum of 8% simple interest at the same time that all other interest is paid by the Company (provided, of course, that the Company has sufficient funds to do so), with only payment of any excess arising from the Certification process deferred."

145. It is true that, where a Higher Rate Creditor elects to certify, that creditor will only receive payment of statutory interest once the certification process is complete. That is because the creditor's statutory interest entitlement will not be determined until the certification process has concluded. The burden of Deutsche's suggestion was that such a creditor should be paid the minimum amount of statutory interest up front (as an interim distribution), with the balance (if any) payable upon the completion of the certification process.

146. Again, this was not so much a point of alleged unfairness, so much as a suggestion for the Scheme's improvement (in Deutsche's perception).

However:

(1) As Mr Russell Downs put it on behalf of the Administrators,

> "…this concern overlooks the fact that Certifying Creditors will still receive their Statutory Interest far sooner than they would but for the Scheme and any delay to receipt of their entitlement will be minor."

(2) The procedure has been designed to be expeditious and streamlined. The timetable for the adjudication is deliberately compressed so as to avoid any substantial delay. For example, once the adjudicator receives LBIE's written submissions, the adjudicator is required to use reasonable endeavours to reach a final decision within 20 business days. A certifying creditor will receive its statutory interest far more quickly than it would but for the Scheme. Pending the adjudicator's determination, LBIE will hold a reserve equal to the certified sum so as to prevent any prejudice to the certifying creditor.

(3) A two-stage process would by contrast be more expensive, less straightforward and likely to be productive of delay.

147. Deutsche's fourth objection was as follows:

> "The Wentworth Group should have no right to be informed of Certification Claims or to be consulted by the Company on those Claims. Certification Claims should be confidential as between the Certifying Creditor and the Company, whose Joint Administrators should approach the Claims in good faith and in a manner consistent with their obligations as officers of the court."

148. This objection did cause me some concern. It is uncomfortable to give any creditor some special status, even if carefully controlled, as regards the proof of another creditor; and the fact that the creditor in question (the Subordinated Creditor) has a considerable interest is no real answer. However, my concern is not such as should in my view upset the Scheme.

149. In particular:

(1) A right to consult is not a right to dictate. The Administrators retain their discretion in its entirety, and are not fettered by the preferences of the Subordinated Creditor. The Administrators are free to deal with a certification in any way they think fit. There is nothing that prevents the Administrators from "acting in good faith and in a manner consistent with their obligations as officers of the court".

(2) As Counsel for the Administrators pointed out, the information and consultation rights afforded to the Subordinated Creditor have parallels outside of the Scheme. For example:

    (a) Creditors are allowed to inspect the proofs lodged by other creditors (see rule 14.6 of the IR 2016), and are empowered to challenge the admission of proofs filed by other creditors (see rule 14.8 of the IR 2016 and paragraph 74 of Schedule B1 to the Insolvency Act 1986).

    (b) In the event of a challenge, the challenging creditor would be entitled to obtain disclosure of all relevant documents (including any relevant confidential materials) and would be fully involved in the proceedings.

    (c) Conversely, if a creditor could demonstrate that it had a financial interest in any legal proceedings between the office-holder and another creditor, it could apply to be joined to the proceedings as a respondent pursuant to CPR 19. In practice, the Subordinated Creditor has frequently been joined to litigation in the LBIE administration for precisely this reason. Consider, for example, the role adopted by the Subordinated Creditor in the Waterfall IIC Application in relation to the German Master Agreement, where the Subordinated Creditor successfully argued against a statutory interest claim by the Senior Creditor Group: see Waterfall IIC (Costs Judgment) [2018] EWHC 924 (Ch).

    (d) In the event of a proposed compromise between a creditor and the estate, any other creditors whose position would be affected by the compromise are entitled to be consulted, and their wishes are relevant to the decision of the office-holder or the Court (as the case may be): see *Re Greenhaven Motors* [1999] BCC 463 at 643.

(3) The Subordinated Creditor is under an obligation to keep the relevant material confidential, and not to use it for a collateral purpose. The information must be destroyed or returned to the Company once it is no longer reasonably required for the purposes of the Scheme.[2] Accordingly, there is no material risk of any prejudice to the certifying creditor.

150. Deutsche's fifth objection was as follows:

"If the Company rejects a Certification Claim, the Company should give reasons why it is doing so. Only then will the Certifying Creditor know what case it has to meet should it wish to take the Claim further and, if so, what additional evidence it should provide to the Adjudicator."

---

[2] See the Scheme at paragraph 27.3 [1/3/53].

151. As to this, in my view:

(1) Fairness does not require the giving of reasons in the context of an expert determination, just as it does not require an oral hearing. Indeed, at least in the context of an expert determination of value,

"the classic rule is that silence is golden and the expert should give no explanation as to how he has come to his decision, leaving it unassailable even if apparently low or high" per Harman J in *Re a Company, ex p Holden* [1991] BCLC 594 at 603d.

(2) See also See *Morgan Sindall plc v Sawston Farms (Cambs)* Ltd [1999] 1 EGLR 90 at 92-93:

"The whole point of instructing a valuer to act as an expert (and not as an arbitrator) is to achieve certainty by a quick and reasonably inexpensive process. Such a valuation is almost invariably a non- speaking valuation, with the expert's reasoning and calculations concealed behind the curtain. The court should give no encouragement to any attempt to infer, from ambiguous shadows and murmurs, what is happening behind the curtain."

(3) That said, and as appears from the actual result in the ex parte Holden case (whereby the applicant was permitted not to accede to the acquisition of his shares at a value struck by an unspeaking expert), that does not conclude the point as to whether it is fair and reasonable to bind a claimant to such a process, especially in circumstances where the process is in substitution for other processes which would involve giving reasons (most obviously, in the case of a claim before the Court).

(4) In this case, the balance is between, on the one hand, expedition and certainty, without the danger of collateral attack and the complication of reasons being required, and, on the other hand, a process more nearly replicating the existing right of access to the Court.

(5) I consider the balance struck to be to be fair and reasonable, and not vitiated by any supervening or over-riding principle of fairness. The overall purpose of the Scheme, supported by the majority, is to facilitate an expeditious return of the Surplus to creditors. If the Administrators were required to give detailed reasons for their decision, that objective might be thwarted.

(6) Further and in any event, the Scheme provides for a Consultation Period during which LBIE may engage in discussions with the certifying creditor regarding their certification. Mr Downs has said he envisages that, where the Consultation Period is engaged,

"the reasons for rejecting a certification will be discussed with a

Certifying Creditor".

(7) In all the circumstances, I do not consider that the process is in this regard flawed or unfair.

152.    Deutsche's sixth objection was as follows:

> "If the Company rejects a Certification Claim and the Certifying Creditor does not accept the Company's decision, the Claim should be referred to one of the Adjudicators identified (acting as an expert). If none of those named is available, a replacement should be agreed between the Certifying Creditor and the Company, without reference to the Wentworth Group. Whilst the Adjudicator should uphold a Certifying Creditor's claim unless made in bad faith or irrationally, the Adjudicator should not be obliged only to choose between, on the one hand, the amount certified and, on the other, the statutory minimum or the Company's counter-offer. If the Adjudicator does not uphold the Certifying Creditor's claim but considers that, on the evidence presented to the Adjudicator (including evidence requested by the Adjudicator), another sum would be appropriate, the Adjudicator should be free to award that other sum. The Adjudicator should also be free to hold an oral hearing if the Adjudicator considers it appropriate, and should give brief reasons for his or her decision."

153.    As Counsel for the Administrators noted in their skeleton argument, this sixth objection amounted to a re-writing of the adjudication process as provided for in the Scheme, as if that was required to rehabilitate the adjudication process. I agree with the Administrators that the adjudication Scheme is not such as to cause the Scheme to fail: some would think what Deutsche proposed an overall improvement, others not; but the Court's function is to determine whether this adjudication process is a blot on the Scheme putting it beyond the pale of fairness.

154.    I accept that there is nothing in the adjudication process which causes the Scheme to fall below this threshold. This seems to me to be broadly confirmed by the voting. Out of the 9 Higher Rate Creditors who have elected to certify their cost of funding (and who could therefore be subject to the adjudication process in the future), 6 voted in favour of the Scheme (2 voted against and 1 abstained). The Administrators confirmed that none of the six is a member of the Wentworth Group or the Senior Creditor Group, and two of them (Marble Ridge and CRC) previously opposed the Scheme at the Convening Hearing.

155.    As to the specific points originally raised by Deutsche:

(1) I do not think a Certifying Creditor could have any reasonable objection to the system for selecting an adjudicator. If none of the named adjudicators is available, a replacement must be appointed. The replacement must be a former judge or a QC. The Subordinated Creditor has a right of consultation, but the Administrators have the final decision as to the identity of the adjudicator (and will make that decision in accordance with

their duties as officers of the Court). The system is calculated to ensure a high calibre of potential appointees, and is further buttressed by the Administrators' duties as officers of the Court. My experience is that reserving to each Certifying Creditor the choice of adjudication in default of the three named would, in that event, be likely to lead to delay, quite unnecessarily.

(2) Borrowing from the explanation given in the Administrators' skeleton argument, the key feature of an adjudication under the Scheme is that the adjudicator must either accept the creditor's certification, accept LBIE's counter-offer (if one has been made), or award the statutory minimum of 8% (if no counter-offer has been made). The purpose of this structure is twofold. On the one hand, it reduces the length and complexity of the adjudication (so as to promote the overall objective of distributing the Surplus expeditiously). On the other hand, the limited options available to the adjudicator are intended to reduce the risk of excessively high certifications. Creditors will understand that the adjudicator is unable to cure a defective certification by re-writing it, and therefore will take care to ensure that certifications are supported by proper evidence. Nevertheless, the adjudication casts the burden of proof in favour of the certifying creditor: the adjudicator must find in favour of the creditor unless LBIE proves that the certification was made in bad faith, irrationally or otherwise than in accordance with the Relevant Principles.

(3) It is acknowledged that, under the general law, it would be possible for the Court to reject both the creditor's certification and LBIE's analysis, and to conclude that the correct figure is somewhere in the middle: see WestLB AG v Nomura Bank International plc [2012] EWCA Civ 495 at [32] and Lehman Brothers Finance SA (in liquidation) v SAL Oppenheim [2014] EWHC 2627 (Ch). This practice, however, should not be elevated into a rule of public policy. There is no reason why an adjudication cannot be structured in the manner proposed in the Scheme for the purpose of furthering the objectives set out above.

(4) At the hearing I did question Counsel whether the introduction of an ability for the adjudicators to call for oral hearings into the adjudication regime might be sensible, and even perhaps requisite given especially the possibility of the adjudicators rejecting a certificate on the ground of bad faith. A finding of bad faith without affording any opportunity for personal attendance felt uncomfortable and even counter-intuitive. I asked for express confirmation that the three chosen adjudicators were happy to proceed without even having that option. The positive confirmation from each of the three has carried considerable weight with me. As further comfort, I note that there is a mechanism by which the adjudicator can request the parties to provide further information, which seems likely to be sufficient to give the adjudicator all the assistance he or she needs: and as I say, none of three primary appointees has conceived any difficulty in any of this.

156. Deutsche's seventh and final objection was as follows:

> "The Certifying Creditor should be able to take the matter to the court if the
> Adjudicator has made a manifest error, has made an error of law or has
> reached a conclusion that no reasonable Adjudicator could have reached."

157. This was a variation on the same theme as its earlier objections; but it chimes also
with SRM's particular concern as to the "surrender" of "its right to the
supervisory control of the Court" (see paragraph [138] above).

158. The concern is natural: and where rights of recourse to the Court are to be
removed or restricted, not by private agreement but by virtue of a scheme
which compels consent at the instance of a statutory majority, it is of
heightened importance that it not be minimised, and that the substitute for legal
recourse in the Courts should be robust, satisfactory and justified. However:

(1) It should be noted first that the Scheme provides that "insofar as the law
allows there will be no right of appeal against the Adjudicator's decision
(whether to a court or otherwise)". Accordingly, the Scheme does not
exclude any mandatory rights of appeal which may exist under the general
law.

(2) The nature of the adjudication required needs to be borne in mind. In effect
it it is simply to choose between the certification and the counter-offer or
(if no counter-offer is made) the statutory minimum of 8%. That is not
likely to give rise to a coherent and cogent claim of manifest error or
Wednesbury unreasonableness. In such circumstances, the prescription of
an appellate process seems more likely to engender more bitterness and
expense, over matters that may well ultimately signify more sound and
fury than prejudice.

(3) The most obvious sort of dispute where instinct prompts against foreclosing
recourse to Court is one involving a point of law. However, it seems
unlikely that the Adjudicators will need to determine any point of law (and
neither Deutsche nor SRM have suggested otherwise). The Relevant
Principles provide the legal framework.

(4) In any event, there is no rule of public policy that prevents parties from
agreeing to the final and conclusive decision of a third party on an issue
involving construction or mixed law and fact: and see per Chadwick LJ in
Brown v GIO Insurance Ltd [1998] EWCA Civ 177 at page 1, adopting as
correct the conclusion of Knox J in Nikko Hotels (UK) Ltd v MEPC plc
[1991] 2 EGLR 103 at 108 where Knox J stated:

> "The result, in my judgment, is that if parties agree to refer to
> the final and conclusive judgment of an expert an issue which
> either consists of a question of construction or necessarily
> involves the solution of a question of construction, the expert's
> decision will be final and conclusive and, therefore, not open to
> review or treatment by the courts as a nullity on the ground that
> the expert's decision on construction was erroneous in law,
> unless it can be shown that the expert has not performed the task
> assigned to him. If he answered the right question in

the wrong way, his decision will be binding. If he has
answered the wrong question, his decision will be a nullity."

159. In the round, I have been persuaded that the certification and adjudication
processes instituted by the Scheme are such as could reasonably be approved
by commercial men acting in their own interest and aware of the potential for
dispute in the areas designated to be subject to those processes; and that, in
particular, though those processes are more "limited" (as SRM put it) than
Court proceedings, they are not unfair, and they are justified by reference to the
fundamental purpose of the Scheme.

160. I should also add that, in my view, the amendments introduced to the Scheme
prior to the Scheme Meetings (see paragraph [39] above), which removed an
earlier feature which conferred on the Subordinated Creditor the right to
determine the amount of any counter-offer, were certainly appropriate and
probably necessary. I had considerable reservations as to the earlier provisions,
and well understood the objections to them.

161. Even the reduced role of the Subordinated Creditor now provided for has given
me some concern: my instincts were against giving any particular role or
platform to the Subordinated Creditor so as to enable it, without colour of
office or being subject to any duties, to intervene in another person's claim
simply with a view to its own interests.

162. However, the position of the Administrators is clear: they consider that
involvement appropriate and would also, even apart from such provisions, have
expected to consult with the Subordinated Creditor on this matter as one
affecting its commercial interests, recognising that it would also have been
entitled to intervene in any legal proceedings relating to a disputed certification.
That view is entitled to weight; and I have taken into account also the fact that
not only has Deutsche withdrawn its objection, but both CRC and Marble
Ridge, who actively opposed the Scheme previously and appeared through
Counsel at the Convening Hearing to object to the class composition proposed,
appear also to have been satisfied by the changes so that they voted in favour of
the Scheme.

163. Although, therefore, I have carefully considered SRM's continued objection on
this score, and its over-arching point that "the Certification Option and the
associated Adjudication process appear to be designed to discourage Higher
Rate Creditors from challenging the Administrators' (and Wentworth's) view
of its entitlement to Statutory Interest" so as to be "particularly unfair for
Higher Rate Interest Creditors in dispute with the Administrators as to their
entitlement to Statutory Interest under the Certification Option", I have
concluded that I should not regard this revised feature or any remaining aspect
of the certification and adjudication processes as such as to cause me to refuse
sanction of the Scheme.

164. Having considered these specific objections, I have also sought to stand back and
consider the matter in the round. In any scheme such as this where the
assessment of the comparator is to a large degree a matter of subjective
judgement, and will inevitably affect different creditors differently, in contrast
to the comparator of imminent, insolvent liquidation where value destruction is
objectively inevitable, the balance to be struck is less straightforward. In the

context of this Scheme, moreover, the cross-holdings and conflicting interests are obvious and substantial.

165. Nevertheless, in my judgment, the benefits overall of the Scheme are also obvious; and they are considerable. The certainty that delay will occasion substantial loss in terms of statutory interest is perhaps the most important fact in the matter.

166. In the round, I have concluded that there is no unfairness such that the Court should decline to give its sanction to the Scheme.

## Part I: international jurisdiction and cross-border recognition

167. This is not a scheme such as that devised for and sanctioned in the case of Apcoa where there is a preliminary question as to whether there are sufficient connections between the scheme company and this jurisdiction to attract the jurisdiction of the Court and warrant its exercise. LBIE being an English company there is no need to demonstrate some other "sufficient connection".

168. Nor is there any concern in this case as to any limitation or restriction on the scheme jurisdiction of this court such as is sometimes argued there may be in the context of a body corporate with its Centre of Main Interests ("COMI") in another EU member state and no establishment here (though it is to be noted that the English court has not considered that an impediment in a number of decided cases): see, for example, *In re Rodenstock GmbH* [2011] EWHC 1104 (Ch), [2011] *Bus LR* 1245; *In re Magyar Telecom BV* [2013] EWHC 3800 (Ch), [2014] BCC 448; and In re Van Gansewinkel Groep BV [2015] EWHC 2151 (Ch),
[2015] Bus LR 1046.

169. However, not all LBIE's creditors are domiciled in the United Kingdom and the effect of the Scheme on them, and the international effectiveness of the Scheme generally, are plainly matters to be considered.

170. Two principal matters need to be addressed: (i) the impact of the Recast Judgments Regulation; and (ii) whether the Scheme will be given and achieve substantial cross-border effect.

## Recast Judgments Regulation

171. Regulation (EU) No. 1215/2012 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters (the "Recast Judgments Regulation") applies in "civil and commercial matters". Chapter II deals with jurisdiction.

172. The basic rule underlying Chapter II is that any person domiciled in an EU Member State must be "sued" in the courts of that Member State: see Article 4(1). It has never been conclusively determined whether Chapter II of the Recast Judgments Regulation applies to some or all schemes of arrangement, although the matter has been considered in a number of cases (including those cited at paragraph [168] above).

173. There are two possibilities: either (a) that the jurisdictional requirements in Chapter II of the Recast Judgments Regulation are simply not applicable to English schemes of arrangement, or (b) that such schemes of arrangement do fall within Chapter II, so that the English Court must be satisfied that it can assume jurisdiction under one or more of the articles in that Chapter II.

174. As to (a) (in paragraph [173] above), there are a variety of arguments against the application of the Recast Judgments Regulation. The principal arguments are that:

    (1) A scheme of arrangement between a company and some or all of its creditors falls within the exclusion in article 1(2)(b) for "bankruptcy, proceedings relating to the winding up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous proceedings". This was the view taken by Lewison J (as he then was) in *In re DAP Holdings NV* [2005] EWHC 2092 (Ch); [2006] BCC 48;

    (2) The main jurisdictional provision in Chapter II, now article 4 of the Recast Judgments Regulation, refers to a person being "sued" in the member state in which he is domiciled, and assumes a 'lis': but no one is sued, nor is there a 'lis' in the conventional sense in a creditors' scheme of arrangement: I expressed this possibility in Re Primacom;

    (3) More generally, and as stated by Snowden J in *In re Van Gansewinkel* at [42], "it must be highly doubtful that the framers of [the Recast Judgment Regulation] had schemes of arrangement in mind at all."

175. Against these arguments, however, and in favour of the applicability of the Recast Judgment Regulation, the principal arguments are that:

    (1) Article 1(1) provides that the Regulation applies to "civil and commercial matters, whatever the nature of the court or tribunal", which is plainly broad enough to encompass schemes of arrangement;

    (2) The exclusion in article 1(2)(b) is intended simply to exclude proceedings which fall within the Insolvency Regulation, so as to dovetail the two Regulations and to avoid both any overlap and any gap between them; in *Re Rodenstock* Briggs J (as he then was) adopted this view in the case of schemes involving solvent companies, but left the matter open in the case of schemes relating to insolvent companies; and in *Re Magyar* David Richards J (as he then was) considered that

> "it logically follows that the exclusion in article 1(2)(b) does not extend to a scheme of arrangement involving an insolvent company, at least unless the company is the subject of an insolvency proceeding falling within the Insolvency Regulation. In other words, an order sanctioning a scheme between an insolvent company and creditors is subject to the Judgment Regulations, at least if the company is not subject to insolvency proceedings to which the Insolvency Regulation applies."

(3) David Richards J went on to mention the case where (as here) a scheme company is subject to an insolvency proceeding, stating that it would not necessarily follow that the exclusion would apply, since a scheme of arrangement is not an insolvency proceeding to which the Insolvency Regulations applies, so that

> "[i]t could still be that an order sanctioning a scheme of arrangement in those circumstances is entitled to recognition under the [the Recast Judgment Regulation]",

But he did not decide the point since it did not arise in the context.

176. As Snowden J noted *In re Van Gansewinkel*, the point is a difficult one. Moreover, there is an added complication in this case in that the Company's administration does not fall within the Insolvency Regulation, because that Regulation does not apply to "investment undertakings which provide services involving the holding of funds or securities for third parties": see Article 1(2). Nor does the Company's administration fall within the Recast Insolvency Regulation, because that Regulation does not apply to insolvency proceedings which commenced prior to 26 June 2017: see Article 84(1). The Company's administration also falls outside the other EU insolvency legislation, namely the Insurance Directive and the Credit Institutions Directive.

177. Rather than decide it, the approach adopted by the Court is to assume (without deciding) that the Recast Judgment Regulation applies and then determine whether jurisdiction could be found within its provisions. Especially having regard to the peculiar additional complications in this case (as above described) that indeed is the course I am invited to adopt now.

178. On that basis, the Administrators pray in aid Article 8 of the Recast Judgment Regulations as providing the necessary jurisdiction. So far as material, Article 8 provides:

> "A person domiciled in a Member State may ... be sued ... (1) where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided the claims are so closely connected that it is expedient to hear and determine them together to avoid the risk of irreconcilable judgments resulting from separate proceedings".

179. If at least one scheme creditor is domiciled in the UK, Article 8(1) has been invoked in many recent cases to establish that the English Court has jurisdiction to sanction a scheme affecting the rights of creditors domiciled elsewhere in the EU. See *Re Nef Telecom BV* [2014] BCC 417 at [43], where Vos J stated:

> "... if the Judgments Regulation applies because some of the creditors are to be regarded as defendants to the applications for sanction [of the scheme] then, where one of those defendants is domiciled in the United Kingdom, that gives the court jurisdiction under Article 6".

180. This principle has been applied in a number of subsequent cases, including *Re Magyar Telecom BV* [2014] BCC 448 at [31] (David Richards J); *Re Zlomrex International Finance SA* [2015] 1 BCLC 369 at [15] (Mann J); *Re Metinvest BV* [2016] I.L.Pr. 19 (Ch) at [32]
(Proudman J); and *Re Hibu Group Ltd* [2016] EWHC 1921 (Ch) at [67] (Warren J).

181. Further, although in some cases, the Court has suggested that it may not be enough to identify a single creditor and should consider whether the "numbers and size of the scheme creditors domiciled in [the UK]" are "sufficiently large": see Re Van Gansewinkel Groep BV [2015] Bus LR 1046 (Ch) at [51] (Snowden J) and Re Global Garden Products Italy SpA [2017] BCC 637 at [25] (Snowden J) that more restrictive view would cause no difficulty in this case. It is understood that approximately 11% by number and 5% by value of the Scheme Creditors with admitted claims are domiciled in England.[3] These figures are broadly comparable to the figures in Van Gansewinkel, and are sufficient (on any view) to bring the Scheme within Article 8.

182. Nevertheless, the Administrators have drawn to my attention that the application of Article 8 is, however, subject to two potential exceptions:

   (1) Some of the Scheme Creditors (representing a very small proportion of the Scheme Creditors by value) are former employees of the Company domiciled outside the UK in other EU Member States (the "Relevant Employees"). Article 22(1)
   provides:

   > "An employer may bring proceedings only in the courts of the Member State in which the employee is domiciled."

   This raises a question as to whether Article 22(1) of the Recast Judgments Regulation prevents the Relevant Employees from being included in the Scheme, given that the Scheme seeks to compromise the Company's liabilities under the relevant contracts of employment. It is arguable, by reference to its effect, that the Scheme should be characterised as a matter relating to employment within Article 22(1), even though the primary purpose of the Scheme is to facilitate the distribution of statutory interest under the English insolvency regime.

   (2) Some of the finance documents governing the scheme liabilities contain exclusive jurisdiction provisions in favour of the courts of another Member State. This raises a question as to whether Article 25(1) of the Recast Judgments Regulation prevents such creditors (the "Relevant Jurisdiction Clause Creditors") from being included in the Scheme, given that the Scheme seeks to compromise the Company's liabilities under the relevant finance documents. Article 25(1) provides:

---

[3] See Downs at paragraph 119.1 [CH1/3/33-34].

"If the parties, regardless of their domicile, have agreed that a court or
the courts of a Member State are to have jurisdiction to settle any
disputes which have arisen or which may arise in connection with a
particular legal relationship, that court or those courts shall have
jurisdiction, unless the agreement is null and void as to its substantive
validity under the law of that Member State. Such jurisdiction shall be
exclusive unless the parties have agreed otherwise."

It may be open to doubt whether the Scheme can properly be treated as falling
within a contractual jurisdiction clause for the purposes of Article 25(1), given
that the primary purpose of the Scheme is to facilitate the distribution of
statutory interest under the English insolvency regime. But the argument is
there; and it must either be adjudicated or some other solution must be
identified.

183. The solution proposed by the Administrators lies in Article 26(1) of the Recast
Judgments Regulation, which provides that "a court of a Member State before
which a defendant enters an appearance shall have jurisdiction". In particular:

(1) Article 26(1) refers to a defendant who "enters an appearance". In
determining whether an appearance has been entered, "it is for the lex fori
to determine what constitutes an appearance": see
Elefanten Schuh GmbH v Pierre Jacqmain [1982] 3 CMLR 1 at 11-12 (per
Sir Gordon Slynn AG). This principle was approved by the Court of Appeal
in Harada Ltd v Turner [2003] EWCA Civ 1695 at [30], where Simon Brown
LJ commented:

"True it is, as Sir Gordon Slynn stated in his opinion as
Advocate- General in Elefanten, that 'in principle … the lex
fori must determine the stage and manner in which any plea
is to be raised', but, as the First Chamber of the ECJ (under
the presidency of Sir Gordon Slynn) said in Kongress
Agentur [1990] ECR 1-1845, whilst 'the Court has
consistently held that, as regards procedural rules, reference
must be made to the national rules applicable by the national
court', 'it should be noted, however, that the application of
national procedural rules may not impair the effectiveness of
the Convention'."

(2) As a matter of English law, any Scheme Creditor who has lodged a proof of
debt in the administration of LBIE has submitted to the jurisdiction of the
English Court for all purposes relating to the administration: Rubin v
Eurofinance SA [2013] 1 AC 236 at [165]-[167] (Lord Collins); *Stitching
Shell Pensionfunds v Krys* [2015] AC 616 at [28]-[32] (Lord Sumption and
Lord Toulson); and *Erste Group Bank AG v JSC 'VMZ Red October'*
[2015] 1 CLC 706 at [30]-[76] (Gloster LJ).

(3) Where a creditor lodges a proof of debt, the creditor's submission to the jurisdiction of the English Court is not limited to the proof itself. Rather, the creditor submits to the entire insolvency process. For example, in Rubin, a defendant to an avoidance action brought by the office-holder submitted to the jurisdiction of the Court (in relation to the avoidance action) by lodging an unconnected proof of debt in the insolvency proceedings. This reflects the policy that, if a creditor seeks to benefit from an insolvency process by lodging a proof and obtaining a rateable distribution from the estate, the creditor cannot "pick and choose": either the creditor must be subject to the entire insolvency process, or the creditor must be subject to none of it.

(4) The Administrators have an express statutory power to propose a scheme of arrangement under section 896(2)(d) of the CA 2006, and Schedule B1 to the Insolvency Act 1986 specifically contemplates that an administrator may propose a scheme of arrangement: see paragraph 49. Thus, the Scheme should be viewed as part of the administration procedure.

(5) It follows that, where a creditor (including any Relevant Employee or Relevant Jurisdiction Clause Creditor) has lodged a proof of debt in LBIE's administration, that creditor has submitted to the jurisdiction of the English Court for the purposes of the Scheme. By the same token, the creditor has "entered an appearance" within Article 26(1) of the Recast Judgments Regulation.

184. I accept this argument, and that pursuant to Article 26(1) the Court has jurisdiction, which it should exercise, to sanction the Scheme vis-à-vis any Relevant Employees or Relevant Jurisdiction Clause Creditors who have lodged a proof of debt in the Company's administration.

185. Any Relevant Employees or Relevant Jurisdiction Clause Creditors who have not lodged a proof of debt in the Company's administration are expressly excluded from the definition of "Scheme Creditor", and are not bound by the Scheme. The Administrators confirmed to me that they consider that it is unlikely that there are any, or any substantial, creditors falling within those categories who have failed to submit a proof of debt in the administration. That is readily understandable in the context of an administration which commenced almost a decade
ago.

186. I need not therefore decide the difficult questions otherwise raised in relation to Relevant Employees and Relevant Jurisdiction Clause Creditors.

Cross-border effect and International recognition

187. Having regard to the general principle that the English court will not act in vain or make an order which has no substantive effect or will not achieve its purpose, and echoing Sompo Japan Insurance Inc v Transfercom Ltd [2007] EWHC 146 (Ch) at [18]-[20] and Rodenstock at paras. 73 to 77, in Re Magyar at [16], David Richards J said:

> "The court will not generally make any order which has no substantial
> effect and, before the court will sanction a scheme, it will need to be
> satisfied that the scheme will achieve its purpose."

188. However, the principle does not require either worldwide

effectiveness, or certainty. Thus, it does not require that the Court must be
satisfied that the scheme will be effective in every jurisdiction worldwide: its
focus is on jurisdictions in which, by reason of the presence there of substantial
assets to or because of which creditors might make claims, it is especially
important that the scheme be effective. Further, and as Snowden J explained in Re
Gansewinkel at
[71],

> "The English court does not need certainty as to the position under foreign
> law – but it ought to have some credible evidence to the effect that it will
> not be acting in vain."

189. Thus, in Sompo, when sanctioning an insurance transfer scheme under the
Financial and Market Act 2000 (which is analogous in the context), David
Richards J said this:

> "[17] My principal concern, when the application was first before me on
> 14th December 2006, was to understand the true impact, if any, of the
> proposed transfer on the business … What, if any, effect will the
> transfer have if proceedings against Sompo were brought in those
> jurisdictions where it did have substantial assets? Would the transfer be
> recognised in those jurisdictions? If not, what purpose would be served
> by the transfer?
>
> [18]    It was relevant, therefore, to have some evidence as to the
> proportion of the transferred policies which were governed by English
> law or other UK law and, particularly if the proportion were small, to
> have some evidence as to the effect of the transfer in Japan and
> perhaps other jurisdictions where Sompo has substantial assets.
>
> [19]    If it appeared that the transfer would have little or no
> significant effect, it raised an issue as to whether in its discretion the
> Court should sanction the transfer. It is established that, on
> comparable applications under the Companies Act 1985, the Court
> will not act in vain …
>
> [26] Overall this evidence leaves me less than convinced that the scheme
> once sanctioned will definitely be effective as regards proceedings in
> foreign jurisdictions to enforce claims under policies which are
> governed by foreign law, although I acknowledge that it provides a
> proper basis for concluding that it may well be so effective in Japan and
> the United States. More importantly, as I have

> mentioned, the evidence establishes that over 27% of the
> policies in number and by reference to reserves are
> governed by English law, and it is reasonable to suppose
> that the transfer will be effective in any relevant
> jurisdictions as regards those policies. The proposed
> scheme will therefore achieve a substantial purpose. The
> fact that the scheme also extends to a larger class of
> business not governed by English law is not, in my
> judgment, a good ground for refusing to sanction the
> scheme. Whether the scheme is recognised as effective
> in Japan or the United States or elsewhere will, if
> necessary, be tested in due course
> in proceedings in those jurisdictions."

190. The Administrators submitted, and I agree, that the present case is
stronger than Sompo: it is difficult to see how creditors could
enforce their statutory interest entitlements in the English
administration of an
English company under English law in any jurisdiction other than
England, and only a small proportion of the Surplus is situated
outside of England.

191. Nevertheless, and as previously mentioned, LBIE has applied to
the US Bankruptcy Court for an order recognising the Scheme
as a foreign main proceeding under Chapter 15 of the US
Bankruptcy Code. The Administrators consider this to be a
prudent course of action, due to the fact that there are a number
of US-domiciled Scheme Creditors with claims under contracts
governed by New York law, and because certain assets
belonging to LBIE are situated in the US. The hearing of the
application was due to take place on 19 June 2018: see Downs
at paragraph 75. I do not know its result. However, in light of
the matters set out above, the effectiveness of the Scheme is not
conditional upon Chapter 15 recognition. Regardless of
whether Chapter 15 recognition is sought or obtained, the
Scheme will plainly achieve a substantial effect.

## Part J: Conclusion

192. I have considered the material sent to those interested in respect
of the Scheme and the court process relating to it. I can see no
'blot' and none has been suggested (subject to the discussion of
objections above).

193. As amended after the Convening Hearing, and with very minor
amendments put forward to me and approved, I have been
satisfied of my jurisdiction to sanction this Scheme, and that in
my discretion I should do so. I made an Order accordingly.

j



Neutral Citation Number: [2018] EWHC 3092 (Ch)

Case No: CR-2018-008453

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMPANIES COURT (ChD)**

Royal Courts of Justice
7 Rolls Building
Fetter Lane, London EC4A 1NL

Date: 14 November 2018

**Before** :

**MR JUSTICE SNOWDEN**
- - - - - - - - - - - - - - - - - - - -

**IN THE MATTER OF NOBLE GROUP LIMITED AND**

**IN THE MATTER OF THE COMPANIES ACT 2006**

- - - - - - - - - - - - - - - - - - - -

**William Trower QC, Henry Phillips and Lottie Pyper**
(instructed by **Kirkland & Ellis International LLP**) for the Company

**David Allison QC** and **Stephen Robins**
(instructed by **Akin Gump LLP**)
for the members of the "Ad Hoc Group" of Scheme Creditors

Hearing date: 12 November 2018
- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

.............................

MR JUSTICE SNOWDEN

## MR JUSTICE SNOWDEN :

1.     This is an application by Noble Group Limited (the "Company") for an order sanctioning a scheme of arrangement (the "Scheme") between the Company and its Scheme Creditors (as defined in the Scheme) pursuant to Part 26 of the Companies Act 2006 (the "CA 2006").

Background

2.     The background to the Scheme is set out in a judgment which I gave on 2 November 2018: [2018] EWHC 2911 (Ch) (the "Convening Judgment"). I shall not repeat it at any length here. In the Convening Judgment I gave my reasons for convening one class meeting of Deutsche Bank ("DB") alone, and a second class meeting of the remainder of the Scheme Creditors. I shall use the same terminology in this judgment as in the Convening Judgment.

3.     Very briefly, the Company is the ultimate holding company of the Noble Group (the "Group"), a major global commodities trader. It is incorporated and has its registered office in Bermuda and is listed in Singapore. The Company has been in financial difficulties for some time, and during the extended period of over a year during which a restructuring has been under negotiation, it has continued to sustain vast losses. The Company now estimates that the Group had a net deficiency of some US$1.1 billion at the end of the third quarter of this year.

4.     The Scheme is part of a broader restructuring of the Group (the "Restructuring"), pursuant to which, in return for the release of the Scheme Creditors' claims, substantially all of the Company's assets will be transferred to newly incorporated subsidiaries of a newly incorporated holding company, Noble Group Holdings Limited ("New Noble" and together the "New Noble Group"), and new debt instruments will be issued to Scheme Creditors by companies in the New Noble Group. New Noble itself will be listed in Singapore in place of the Company, and in addition to receiving debt instruments in the New Noble Group, Scheme Creditors will also receive 70% of the equity in New Noble via an SPV. The existing shareholders of the Company will be issued with 20% of the equity in New Noble, and the existing management will acquire the remaining 10%.

5.     As well as the release of Scheme Claims, a fundamental purpose of the Scheme is to provide the New Noble Group with access to substantial new hedging and trade finance facilities. These facilities will be provided by DB and indirectly provided by those Scheme Creditors who elect to "risk participate" (and thereby become "Participating Creditors"). In exchange for such risk participation in the New Money Debt, Participating Creditors will be issued the structurally senior Priority Debt by the New Noble Group.

6.    It is the contention of the Board that if the Scheme is approved, the New Noble Group will be in a position to compete in annual bids for major commodities contracts in December, that it will be in a position to meet its new liabilities on an ongoing basis, and that value in the existing Group will have been maximised for stakeholders in the Company.   Specifically, the Board believes that a successful implementation of the Scheme is likely to generate a better range of outcomes for all Scheme Creditors than the alternative of an insolvent liquidation of the Company, which it is said would only result in a dividend to unsecured creditors of between about 19 and 30 cents in the US dollar.

7.    The Scheme Creditors comprise substantially all of the Company's creditors, save for,

   i)    ING Bank N.V ("ING") which will enter into bilateral agreements with the Company;

   ii)    the holders of the Company's Perpetual Capital Securities which are subordinated and which the evidence indicates would not receive a return in a liquidation.  These creditors are to be offered the opportunity under the broader Restructuring to exchange their existing Perpetual Capital Securities for a total of $25 million of a new subordinated debt instrument to be issued by New Noble; and

   iii)    the holders of certain other "Excluded Claims" which are defined in the Scheme and which include the claims of DB and various professionals and administrative service providers.

8.    Under the Scheme, the Scheme Creditors' claims against the Company will be released, in return for which, provided they have submitted valid claims before a Bar Date two months after the Scheme becomes effective and their claims have been admitted or adjudicated to be valid, Scheme Creditors will be issued with the Scheme consideration. The claims determination and adjudication procedure culminates in the independent adjudication of disputed claims by a retired Court of Appeal judge or a nominated QC, and has been developed so as to be analogous to the proof of debt process in an insolvent liquidation in the UK.

9.    The amount of Scheme Consideration with which individual Scheme Creditors will be issued will vary depending on the total amount of Accepted Scheme Claims and whether or not that Scheme Creditor elects to risk participate and thereby to become a Participating Creditor (which is an option open to all).

10.    The Explanatory Statement contained a section setting out high, medium and low case scenarios to assist Scheme Creditors in deciding (i) whether or not to support the Scheme and (ii) whether or not to elect to become a Participating Creditor.  In summary, if the Scheme is implemented:

   i)    the returns to Participating Creditors are expected to be between 58.4 and 47.4 cents on the dollar, in return for which they would be required to risk participate the equivalent of between 18.2 and 14.7 cents on the dollar (as a proportion of their Scheme Claim); and

ii)     the returns to Non-Participating Creditors are expected to be between 24.7 and
33.8 cents on the dollar.

## Stakeholder approval for the Restructuring and the Scheme

11.     The transfer of substantially all of the Company's assets to subsidiaries of New Noble
was authorised by an overwhelming majority of shareholders at a special general
meeting on 27 August 2018 (the "Shareholder Resolution").   In waiving the
requirement that the Senior Creditor SPV should make a mandatory bid for the other
shares in New Noble, the Securities Industry Council that regulates takeovers in
Singapore imposed a condition that the Restructuring is completed within three months
from the date of the Shareholder Resolution.

12.     The Scheme Meetings of Scheme Creditors were held on 8 November 2018.   The
Scheme was approved by DB at its meeting, and by 199 out of the 202 Scheme
Creditors who voted at the second meeting.   The total turnout at the second meeting
was high - equal to approximately 89.48% by number of those entitled to vote.
Together, the Scheme Creditors in favour represented approximately 98.51% in number
and 99.98% in value of those voting at the second meeting.

## International matters

13.     In order to facilitate the international effectiveness of the compromises brought about
as part of the Restructuring, the Company is also promulgating an inter-conditional
scheme of arrangement in Bermuda, where it is incorporated and where it has its
registered office. The sanction hearing for the Bermudan scheme is fixed for 14
November 2018.

14.     The Company has, however, never had a substantial presence in Bermuda. Until earlier
this year its centre of main interests ("COMI") was in Hong Kong.   At the time it
announced that it had reached a Restructuring Support Agreement with the members of
the Ad Hoc Group of its main creditors on 14 March 2018, the Company announced
that it intended to move its COMI from Hong Kong to England.   It claims to have
completed that COMI shift in April 2018 and relies upon that change of COMI and a
number of other factors, including the governing law of some of the debt instruments
to be released, to justify this Court exercising its scheme jurisdiction over the Company.

15.     On the basis that its COMI is now in England, the Company also intends to seek
recognition of the Scheme in the US pursuant to principles of comity and/or Chapter 15
of the US Bankruptcy Code. A hearing of the petition is listed before the US Bankruptcy
Court for the Southern District of New York on 15 November 2018.

## The Approach to Sanction

16.     In Re Telewest Communications (No. 2) Ltd [2005] 1 BCLC 772 ("Telewest") at [20]-
[22], David Richards J explained the relevant principles which guide the court in the
exercise of its power to sanction a scheme of arrangement:

> "20.     The classic formulation of the principles which guide
> the court in considering whether to sanction a scheme was set
> out by Plowman J in Re National Bank Ltd [1966] 1 All ER 1006

at 1012, [1966] 1 WLR 819 at 829 by reference to a passage in *Buckley on the Companies Acts* (13th edn, 1957) p 409, which has been approved and applied by the courts on many subsequent occasions:

> 'In exercising its power of sanction the court will see, first, that the provisions of the statute have been complied with; secondly, that the class was fairly represented by those who attended the meeting and that the statutory majority are acting *bona fide* and are not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent, and thirdly, that the arrangement is such as an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve.

> The court does not sit merely to see that the majority are acting *bona fide* and thereupon to register the decision of the meeting; but at the same time the court will be slow to differ from the meeting, unless either the class has not been properly consulted, or the meeting has not considered the matter with a view to the interests of the class which it is empowered to bind, or some blot is found in the scheme.'

21.     This formulation in particular recognises and balances two important factors. First, in deciding to sanction a scheme under section 425, which has the effect of binding members or creditors who have voted against the scheme or abstained as well as those who voted in its favour, the court must be satisfied that it is a fair scheme. It must be a scheme that 'an intelligent and honest man, a member of the class concerned and acting in respect of his interest, might reasonably approve'. That test also makes clear that the scheme proposed need not be the only fair scheme or even, in the court's view, the best scheme. Necessarily there may be reasonable differences of view on these issues.

22.     The second factor recognised by the above-cited passage is that in commercial matters members or creditors are much better judges of their own interests than the courts. Subject to the qualifications set out in the second paragraph, the court 'will be slow to differ from the meeting.'"

17.     There are, accordingly, four stages to be gone through under the *Buckley* test:

i)      At the first stage, the Court must consider whether the provisions of the statute have been complied with. This will include questions of class composition, whether the statutory majorities were obtained, and whether an adequate explanatory statement was distributed to creditors.

ii)    At the second stage, the Court must consider whether the class was fairly represented by the meeting, and whether the majority were coercing the minority in order to promote interests adverse to the class whom they purported to represent.

iii)    At the third stage, the Court must consider whether the scheme is a fair scheme which a creditor could reasonably approve. Importantly it must be appreciated that the Court is not concerned to decide whether the scheme is the only fair scheme or even the "best" scheme.

iv)    At the fourth stage the Court must consider whether there is any "blot" or defect in the scheme that would, for example, make it unlawful or in any other way inoperable.

18.    In an international case, the Court must also be satisfied that it is appropriate, in its discretion, to exercise its scheme jurisdiction on the basis that there is a sufficient connection between the scheme and England, and whether there is a reasonable prospect of the scheme being effective, having regard, in particular, to its prospects for recognition in other relevant jurisdictions. These two questions can be seen to be inter-related: see <u>Magyar Telecom BV</u> [2014] BCC 448 ("<u>Magyar</u>") at [21]-[22].

<u>Stage 1: compliance with the statute</u>

*Class composition*

19.    I decided the relevant classes of Scheme Creditors at the convening hearing and explained my reasons in the Convening Judgment. Although I raised concerns over the position of the Other Scheme Creditors as regards the election to risk participate, and as to the nature and amount of some of the fees which had been paid and which were to be paid to some of the Scheme Creditors under the Scheme, there has been no subsequent challenge to that decision or the factual assumptions upon which it was based.

20.    One issue that I did not consider in the Convening Judgment, but which was brought into focus by an amendment to the Restructuring documentation, was the issue of releases to be granted by Scheme Creditors to a number of third parties in addition to the release of the Scheme Claims under the Scheme.

21.    The Chairman's Letter in the Explanatory Statement stated that the Scheme would effect,

> "the absolute and irrevocable release and discharge of Scheme Claims, and any and all other past, present and future claims that any Scheme Creditor has or may have against (among others) the Company, Management and the Ad Hoc Group and the officers, directors, employees, agents, advisors and representatives of each of the foregoing arising out of relating to or in respect of the Scheme Claims, the preparation, negotiation, sanction or implementation of the Schemes and/or the Restructuring and/or the Restructuring Documents, but excluding (among others) any liability arising directly or indirectly out of, from or in

Noble Group Limited: Scheme Sanction

> connection with, the New Bonds, the New Trade Finance
> Facility, the New Hedging Support Facility, the Increase Trade
> Finance Facility, any new shares in the Group or New Noble
> Group or any other Scheme Consideration or entitlements, and
> in the case of DB, excluding any liability arising directly or
> indirectly out of, from or in connection with, the Existing Trade
> Finance Facilities, or any other facilities provided by DB (except
> the facilities under the Existing RCF Loans)."

22.     To that end, the Deed of Waiver and Release to be executed on behalf of Scheme
        Creditors provided, at clause 2,

> "2. RELEASE
>
> 2.1     As of the Effective Time … each Scheme Creditor shall,
> and shall procure that each of its respective Scheme Creditor
> Parties shall, irrevocably, unconditionally, fully and absolutely:
>
> (a)      release all of its rights, title and interest in the Scheme
>          Claims (to the extent such release has not already been
>          effected pursuant to the Schemes); and
>
> (b)      waive, release and discharge each and every past,
>          present and future claim which it may have against the
>          Company and the Released Parties for any Liability
>          arising out of, relating to or in respect of (i) the Scheme
>          Claims and any of the facts and matters giving rise to
>          the Scheme Claims; (ii) the preparation, negotiation,
>          sanction or implementation for the Schemes and/or the
>          Restructuring Documents; and (iii) the execution of the
>          Restructuring Documents and the carrying out of the
>          steps and transactions contemplated therein in
>          accordance with their terms…
>
> 2.2     Nothing in Clause 2.1(b) shall have effect of waiving,
> releasing or discharging any claim which a Scheme Creditor may
> have against the Released Parties for any Liability arising out of,
> relating to or in respect of fraud."

23.     The definition of "Released Parties" included a long list of persons.  These included
        each member of the Ad Hoc Group and, by a late amendment, their "Related Parties",
        which was a very wide definition.

24.     It is well established that the Court has jurisdiction under Part 26 CA 2006 to sanction
        a scheme which includes a mechanism (usually the execution of a deed of release by an
        attorney appointed under the scheme) under which scheme creditors are required to
        release claims against third parties where such a release is necessary in order to give
        effect to the arrangement between the company and the scheme creditors.  That test is
        most clearly satisfied where the scheme compromises debts which are guaranteed and
        where, absent such a release, pursuit of the guarantor by a scheme creditor would
        undermine the compromise between the creditor and the company: see <u>Re Lehman</u>

Brothers International (Europe) (No 2) [2010] Bus LR 489 at [65] (Patten LJ).  On the facts of the instant case, it seems to me that the releases of any claims "arising out of, relating to or in respect of the Scheme Claims and any of the facts and matters giving rise to the Scheme Claims" must fall into the same category.

25.    The jurisdiction is not, however, limited to guarantees and claims closely connected to scheme claims.  In Far East Capital SA [2017] EWHC 2878 (Ch) at [14], I expressed the view that a release of claims against persons involved in the preparation, negotiation or implementation of a scheme and their legal advisers would also be within the scope of Part 26.  Such clauses can be justified by a need not to allow scheme creditors to undermine the terms of the scheme itself, and have become a regular feature of schemes. I see no difficulty arising from the inclusion of such a clause in the terms of Clause 2.1(b)(ii) and (iii) in the instant case.

26.    Issues might, however, arise where a scheme creditor might have a more tangential claim against a third party.   An example might be a claim by a scheme creditor in negligence against an independent financial adviser who had not cautioned against him buying the investment in the first place, aimed at recouping the difference between the original amount paid for the investment and the consideration provided under the scheme.  As a matter of jurisdiction, the release of such a claim might fall within Part 26 if it was necessary to avoid the main compromise of the creditor's claim against the company being undermined by a "ricochet" claim for contribution or indemnity in respect of the balance by the third-party adviser against the company.  However, issues of class composition could arise on the facts if, for example, some but not all scheme creditors had such a claim against a third-party adviser, or where such a claim could be pursued by some scheme creditors against other scheme creditors who might have been involved in the matters complained of.

27.    In the instant case, however there is no evidence that any such claims exist, might exist, or have even been threatened.  Although there has been litigation in Singapore to which I referred in the Convening Judgment, Mr. Trower QC told me, on instructions, that this essentially concerned allegations by Shareholders against the Company's management.  There was, he told me, no suggestion of a claim against any Scheme Creditors: nor was there any reason to suppose that the facts alleged might give some Scheme Creditors a claim against the Company's management that was not common to all.

28.    Accordingly, I do not think that the inclusion of the releases in the Scheme and associated Restructuring documentation gives rise to any class issue in the instant case.

29.    As an aside, I did observe that the identities of the members of Ad Hoc Group who stand to benefit from the waiver and release could be made clear by spelling out their names in the Scheme and the Deed of Waiver and Release.  Neither draft document did so, and such persons could only be identified by extrinsic reference to the Explanatory Statement.   Both Mr. Trower QC and Mr. Allison QC were content to adopt that suggestion by making a small amendment to the final versions of the documents.

30.    On the basis of this analysis I therefore conclude that the classes were correctly constituted.

*Convening the Scheme Meetings*

31.    In accordance with my order of 16 October 2018 convening the Scheme meetings, the Scheme Documentation was sent to Scheme Creditors on 17 October 2018 accompanied by a covering letter explaining the effect of the Convening Order, the various ways the Scheme Documentation could be accessed, and the various ways for Scheme Creditors to vote at the Scheme Meetings. The letter also provided instructions on how to participate in the New Money Debt and explained the implications of electing not to do so.

32.    On 26 October 2018, the Information Agent, Madison Pacific and Kirkland & Ellis wrote again to the groups of Scheme Creditors they had previously contacted, to remind Scheme Creditors of the ways in which the Scheme Documentation could be accessed. They also reminded them of the impending Record Date (on 2 November 2018), the Voting Instruction Deadline (on 5 November 2018) and the Risk Participation Election Deadline (on 14 November 2018). These communications invited Scheme Creditors to contact the Information Agent with any questions.

33.    On 5 November 2018 (i.e. the day of the Voting Instruction Deadline) a notice was circulated to Scheme Creditors reminding them that they were still able to attend the relevant Scheme Meeting and vote on the Scheme even if they failed to submit valid Notice of Claim or Account Holder Letter by the Voting Instruction Deadline.

34.    The evidence contains an account of various minor practical difficulties encountered in contacting some Scheme Creditors. I am satisfied that there was substantial compliance with the Convening Order, and that the deficiencies in notification were inadvertent and would not have made any difference to the outcome. They do not require the scheme meetings to be reconvened and to the extent I need to, I waive any failure to comply with the Convening order.

35.    Although I indicated in my Convening Judgment that I thought that the time for Scheme Creditors to assimilate the Explanatory Statement and make the necessary decisions on voting and risk participation was very short, there has been no challenge by any Scheme Creditor to the adequacy of the time allowed. Accordingly, I hold that Scheme Creditors had sufficient notice of the meetings and of the timetable for relevant decisions to be made.

*The Explanatory Statement*

36.    There has also been no challenge to the adequacy of the Explanatory Statement, in particular in relation to the issues that I identified in the Convening Judgment as to the identity of the members of the Ad Hoc Group and the nature and amounts of the various fees paid and to be paid in connection with the Scheme and Restructuring.

37.    On 2 November 2018, the Company circulated an Addendum Notice to Scheme Creditors informing them of certain amendments to the Scheme Documentation and reminding Scheme Creditors again of the Record Date, the Voting Instruction Deadline and the Risk Participation Deadline and inviting them to contact the Information Agent with any questions. The Addendum Notice also explained how the Explanatory Statement ought to be read in the light of those changes.

Noble Group Limited: Scheme Sanction

38.  According to a table produced for me by the Company, the vast majority of the changes
were corrections of typographical errors, clarificatory changes or changes to remedy
inconsistencies.    Mr. Trower QC submitted that those changes were obviously
immaterial and permitted under the terms of the draft Scheme that allowed for minor
and inconsequential amendments to be made to the drafts at the sanction hearing.

39.  Mr. Trower QC also very properly took me to the change to the terms of the Deed of
Waiver and Release to include Related Parties to the Ad Hoc Group, which he
acknowledged might be thought to be a more material change.  Though potentially
material, that amendment had, in my judgment, been sufficiently foreshadowed for
anyone who was interested in the paragraph of the Explanatory Statement to which I
have referred, and Mr. Trower QC submitted that there was no factual basis for
believing that any actual claims might be made to which it would apply.

40.  I am readily able to make a judgment as to the nature and effect of many of the minor
typographical and consequential amendments.  However, given the complexity of the
Restructuring documentation, the assessment of the materiality of some of the other
amendments is an issue upon which, as a matter of reality, I am reliant upon the
Company and its advisers to comply with their duties of full and frank disclosure.
Those duties require them not only to identify any specific issues (and to provide what
they contend are the answers), but also to identify for the assistance of the Court how
any rival arguments might be put.  I made a similar point in passing in a different context
in paragraph 152 of the Convening Judgment.

41.  Mr. Trower QC readily accepted that position, and confirmed to me that neither he nor
his team could think of any reason why any of the amendments (save that in relation to
the waivers and releases to which I have referred) might even arguably be regarded as
material.

42.  On these bases I accept that the Explanatory Statement (as amended) was sufficient to
enable Scheme Creditors to make an informed decision on the merits of the Scheme.

*The statutory majorities*

43.  I have already set out that the necessary statutory majorities were comfortably obtained
at the Scheme meetings.  In brief, DB voted in favour, and at the second meeting
excluding DB, 99.98% of Scheme Creditors by value who voted, being 98.51% by
number, approved the Scheme.  The detail of the voting figures is significant for reasons
to which I shall return later.

44.  202 Scheme Creditors voted at the second Scheme meeting.   The total value of such
Scheme  Claims  as  determined  by  the  Chairman  for  voting  purposes  was
US$2,987,430,846.18.   The Chairman admitted all Existing Notes Creditors and
Existing RCF Creditors to vote for the value that they submitted prior to the meeting.
There were two Scheme Creditors with Other Scheme Claims who asserted claims in
aggregate of US$103,491,996.53 and who were admitted by the Chairman for voting
purposes in the combined value of US$102,671,646.18.

45.  All 35 members of the Ad Hoc Group voted in favour of the Scheme, holding Scheme
Claims of US$2,110,650,700.  165 other Finance Creditors holding Scheme Claims of
US$774,108,500 voted at the second meeting.  Of these, 162 voted in favour of the

Scheme and 3 Noteholders holding claims of US$625,000 voted against the Scheme. Both of the Other Scheme Creditors voted in favour of the Scheme.

46.     Mr. Allison QC produced a table which gave a further breakdown of the voting figures based on information provided by Lucid Information Services Limited, which was the scrutineer appointed under the Convening Order. The information in that table was further updated by Mr. Trower QC on instructions at the hearing.

47.     As regards the split between Participating and non-Participating Creditors, I was told that as at the date of the sanction hearing, 74 Scheme Creditors holding claims amounting to US$2.79 billion had elected to risk participate and become Participating Creditors. Of these, 39 Scheme Creditors with claims of US$682.9 million are not members of the Ad Hoc Group. The remaining 128 Scheme Creditors holding US$194.7 million of claims had not made an election: of these, 125 had voted in favour of the Scheme.

48.     In relation to Backstop Fees, of the 199 Scheme Creditors voting in favour of the Scheme, 63 were Backstop Lenders holding claims amounting to US$2.778 billion, and 136 holding claims amounting to US$208.8 million were not Backstop Lenders. As might be expected, the 3 Scheme Creditors who voted against the Scheme were not Backstop Lenders.

<u>Stage 2: Was the majority fairly representative of the class and acting properly?</u>

49.     The second stage of the *Buckley* test requires a determination as to whether,

> "the class was fairly represented by those who attended the meeting and [whether] the statutory majority are acting *bona fide* and are not coercing the minority in order to promote interests adverse to those of the class whom they purport to represent."

50.     As to the first part of that test, as I have indicated, the general meeting was well-attended by Finance Creditors and by two Other Scheme Creditors and there has been no challenge to the Chairman's decisions on voting amounts. The total number of Other Scheme Creditors was always thought to be low, and hence I have no reason to believe that those attending were not fairly representative of the class.

51.     So far as minority protection is concerned, the most recent consideration of the issue was that of Hildyard J in <u>Re Lehman Brothers International (Europe)</u> [2018] EWHC 1980 (Ch) ("<u>Lehman Brothers</u>"). Hildyard J summarised the issues at [88]:

> "The questions at the heart of the matter at this stage are (a) whether the majority creditors had some 'special interest(s)' different from and adverse to the other members of the Higher Rate Creditor class by which it is shown (b) they were predominantly motivated in voting as they did; if so, (c) whether their votes are to be (i) disregarded or (ii) discounted, and (d) what effect that should have in terms of whether or not the Court should decline to sanction the Scheme."

11

Noble Group Limited: Scheme Sanction

52.    Hildyard J continued an extended analysis of the authorities in paragraphs [89]-[112], in the course of which he suggested that before a vote could be disregarded or discounted there had to be a "strong and direct causative link" between the creditor's special interest and his decision to support the scheme. He then discussed at [91]-[102] whether the relevant test should be for the Court to ask whether a particular creditor or group of creditors in the majority would not have voted for the scheme "but for" their special interest; or whether it would be sufficient if the special interest was likely to have had a "real or substantial impact" on the creditor's decision as to how to vote.

53.    Hildyard J concluded, at [103]-[105],

>    "103.    In summary, and whilst wary of any exclusive or binary test and not intending to suggest any mechanistic restriction on the discretion of the Court at each stage, I continue to think that with suitable caution or nuance in its application, the 'but for' test may be helpful in conveying the extent to which the special interest must be demonstrated to be an adverse one before the vote of a member of a class at a duly constituted class meeting is to be discounted or even disregarded. As it was put in the Administrators' skeleton argument, "the 'but for' test is a useful heuristic for determining whether the causal link exists."
>
>    104.    In the application of such a test, or a nuanced version of it, two important and inter-linked considerations are, and, as it seems to me, usually will be, (a) whether other creditors without the special interest have, apparently reasonably, approved the scheme proposed as being in their interests as members of the class concerned and (b) whether having regard to what would be the position if there were no scheme there is more to unite the members of the class than divide them.
>
>    105.    The first speaks for itself: if creditors in the class without the special interest have, on an informed basis, voted in favour of the proposed scheme that further supports the conclusion that the majority had the interests of the class in mind, and not merely their own."

54.    In the instant case, the features of the Restructuring that might be capable of raising a question over the *bona fides* and motivation of the majority are the various fees that have been paid or that will become payable if the Scheme is sanctioned.

55.    I have already observed above that notwithstanding the doubts that I expressed in the Convening Judgment, there has been no challenge from any Scheme Creditor to the nature of those fees as set out in the Explanatory Statement and the evidence. On that basis, and given that the majority of those fees (including in particular the Work Fees and the RCF Waiver Fees) have already been paid, I accept that they cannot have provided any reason for their recipients to have voted in a manner which was adverse to their interests as a member of the class.

56.     The payment of the Backstop Fees <u>is</u> conditional on the sanction of the Scheme.  In
        accordance with the observations of Hildyard J in the <u>Lehman Brothers</u> case, the
        Backstop Fees should only be capable of giving rise to an impermissible collateral
        interest if they create an interest that is adverse to the interests of the class of Scheme
        Creditors as a whole, and if they can be seen to be a sufficiently motivating factor in
        the decision of those who received them to vote in favour of the Scheme.  I do not think
        that the Backstop Fees satisfy either requirement.  On the unchallenged evidence they
        are payable at market rates in respect of further financial accommodation being
        provided to the New Noble Group and, more significantly, applying Hildyard J's
        approach in <u>Lehman Brothers</u>, it is apparent that the great majority by number of
        Scheme Creditors who will not receive Backstop Fees still voted in favour of the
        Scheme.

57.     I therefore conclude that the Scheme Creditors who comprised the majority at the
        meeting were acting *bona fide* and were not voting so as to promote interests adverse
        to the class that they purported to represent.

<u>Stage 3: Fairness</u>

58.     Under the third stage of the *Buckley* test, the Court must consider whether "the
        arrangement is such as an intelligent and honest man, a member of the class concerned
        and acting in respect of his interest, might reasonably approve."   I have already
        observed that the role of the Court in this regard is not to substitute its own assessment
        of what is fair and reasonable for the view of the Scheme Creditors.

59.     The main driver for the Scheme is the risk of insolvency of the Group, and as
        summarised in the Explanatory Statement, the Company believes that the Scheme
        offers the prospect of a better range of outcomes than the likely alternative.  On the
        basis that the Restructuring and the alternatives were adequately explained to Scheme
        Creditors in the Explanatory Statement, as David Richards J explained in <u>Telewest</u>, the
        resounding vote in favour strongly suggests that the Scheme should be regarded as fair
        and reasonable.

60.     The Company has raised a number of specific issues that might be regarded as bearing
        on the fairness of the Scheme.  These are (i) the risk participation provisions and the
        division of the Scheme consideration between Participating and non-Participating
        Creditors, (ii) the payment of fees to some groups of Scheme Creditors, (iii) the third-
        party releases, and (iv) the claims adjudication process.

*Risk participation*

61.     The evidence is that the New Noble Group needs access to trade financing facilities and
        hedging facilities to compete effectively in the market in which it operates.  In order to
        secure those facilities, the Scheme provides all Scheme Creditors with the opportunity
        to risk participate in the New Money Debt and receive the structurally senior Priority
        Debt.  It is not uncommon for schemes to include a right to receive more valuable
        consideration in return for a creditor agreeing to risk participate in new facilities.

62.     In practice, a Scheme Creditor's decision as to whether or not to risk participate in the
        New Money Debt will depend on their individual circumstances, including their risk
        appetite and financial position.  However, the Company has gone to considerable

lengths in order to ensure that all Scheme Creditors who wish to risk participate have the opportunity to do so. The Cash SPV was specifically designed in order to provide as many Scheme Creditors who wish to risk participate with the option to do so, including those who may not want or have the ability to enter into the necessary agreement with an intermediary bank.

63.     In my Convening Judgment I specifically identified the Other Scheme Creditors as a group that might wish to contend that the risk participation provisions of the Scheme were unfair to them. However, of that cohort, two voted in favour of the Scheme and have not elected to risk participate; and none has appeared to argue that they have been unfairly treated.

64.     Since the Risk Participation Election Deadline falls on 14 November 2018, the final numbers of Participating and non-Participating Creditors is not yet known. However, as indicated above, there are a significant majority of the Scheme Creditors who voted in favour of the Scheme but have not yet elected to risk participate. While some may still do so, there are likely to be at least some who do not ultimately become Participating Creditors.

65.     On this basis I do not think that there is any basis upon which I can conclude that the provision of greater consideration under the Scheme to those who elect to risk participate, or the terms upon which risk participation was offered, was unfair or unreasonable.

*Fees*

66.     As I remarked in the Convening Judgment, the total fees of various types which have been paid over the last year and which are to be paid to some (but not all) Scheme Creditors are very significant. It would have been open to any Scheme Creditor to contend, at the sanction hearing, that no reasonable creditor could honestly think that the Scheme was in his interests unless he had also benefitted or stood to benefit from such fees. However, no Scheme Creditor has appeared to make that argument.

67.     Instead, the evidence of the Company is that the fees were a regrettable but commercially necessary price to pay in order to get to a stage in which the Restructuring could be proposed to save the business of the Group. In particular, in addition to the evidence concerning the Work Fees to which I referred in the Convening Judgment, I have had further evidence from Mr. Brough on behalf of the Company explaining the circumstances in which the significantly increased RCF Waiver Fees were agreed to be paid in December 2017 as a condition of the extension of the RCF waivers. The gist of that evidence is that the fees were required by certain RCF Lenders as a condition of their joining the Ad Hoc Group which would be a single point of contact and negotiation for the Company with its Noteholders and RCF Lenders.

68.     Although not in the detail which is now included in the evidence, the fees paid and proposed to be paid were disclosed in the Practice Statement Letter and the Explanatory Statement. Mr. Trower QC also observed that any Scheme Creditor reading the Convening Judgment could have been in no doubt about the concerns which I had at that stage over the nature and amount of the fees.

69.     On the basis that the issue of the fees had thereby been properly disclosed, I accept that by voting in favour of the Scheme and not appearing at the sanction hearing, the Scheme Creditors have in effect rendered their own commercial judgment as to what is in their best interests, and they have confirmed the commercial assessment of the directors of the Company that the fees were necessary to get to a restructuring solution for the Group. The fact that significant numbers of Scheme Creditors who do not stand to receive the same level of fees as the members of the Ad Hoc Group nonetheless voted in favour of the Scheme adds significant weight to that point.

70.     I therefore do not think that I have any basis upon which to conclude that the payment of the fees in this case makes the Scheme one that a Scheme Creditor could not reasonably approve in his own interests.

*Third-party releases*

71.     I have discussed the implications of the waivers and releases granted under the Scheme in relation to the class question above. No Scheme Creditor has raised any objections to the inclusion of such releases in the Scheme, and for much the same reasons as I expressed in relation to the class issue, I do not think that there is any basis upon which the inclusion of the waivers and releases could be regarded as unreasonable or unfair to Scheme Creditors.

*The adjudication process*

72.     In the Convening Judgment I briefly outlined the elaborate process under the Scheme for determination and adjudication by an independent adjudicator of disputed Scheme Claims. I also indicated that such a process was likely to have particular significance for Other Scheme Creditors rather than the Finance Creditors.

73.     An adjudication process has been a central feature of a number of schemes, particularly in the insurance field: see e.g. Hawk Insurance Co Limited [2001] 2 BCLC 480, Re Pan Atlantic Insurance Co Ltd [2003] EWHC 1969, Sovereign Marine and General Insurance [2006] BCC 774, Lehman Brothers and Stronghold Insurance Company Limited [2018] EWHC 2909 (Ch).

74.     In Pan Atlantic Insurance Co Ltd, Lloyd J expressed the view (at [33]) that it may be *"entirely legitimate"* for a scheme to restrict the access of creditors to the courts through the use of an independent adjudicator and, further, that doing so is not inconsistent with Art.6(1) of the European Convention on Human Rights. However, as recognised by Hildyard J in Lehman Brothers at [158],

> "where rights of recourse to the Court are to be removed or restricted, not by private agreement but by virtue of a scheme which compels consent at the instance of a statutory majority, it is of heightened importance that it not be minimised, and that the substitute for legal recourse in the Courts be robust, satisfactory and justified."

75.    In the instant case,

    i)    the adjudication process has been modelled on the statutory procedure for proof of debts in a liquidation;

    ii)    the Scheme provides that the Adjudicator's decision will be final and binding on the Scheme Administrators, the Company and the relevant Scheme Creditor but only "insofar as the law allows". Accordingly, the Scheme does not purport to exclude mandatory rights of appeal which may exist under the general law;

    iii)    the Adjudicators are manifestly highly experienced and impartial; and

    iv)    the adjudication process has been developed by the Company in conjunction with its advisers and both the proposed Scheme Administrators and the Adjudicators themselves with a view to creating a fair and appropriate way of adjudicating on disputed Scheme Claims within a reasonable timeframe. In this regard, a key feature of the adjudication process is the broad latitude given to the Adjudicators to extend timeframes and adopt procedures appropriate to the issues that need to be resolved, including through the introduction of expert evidence and oral hearings.

76.    In these circumstances, I have no doubt that the adjudication process in this case is both consistent with established legal principles, and fair.

Stage 4: defects in the Scheme

77.    At stage 4 the Court considers whether there are any "blots" on the scheme. The term "blot" is generally thought to refer to some technical or legal defect in the scheme, for example, that it does not work according to its own terms, or that it would infringe some mandatory provision of law: see e.g. The Co-operative Bank Plc [2017] EWHC 2269 (Ch) at [22].

78.    In this case, one issue that might be considered under this heading relates to the position of the holders of the Perpetual Capital Securities.

79.    As I indicated in the Convening Judgment, the holders of the Perpetual Capital Securities were not included in the definition of Scheme Creditors whose claims are to be compromised by the Scheme. The reasons were that it is generally for the Company to determine with whom it wishes to propose a compromise or arrangement under Part 26, and it was thought by the Company and its advisers that the subordinated claims of the holders of the Perpetual Capital Securities were sufficiently "out of the money", in the sense that they would manifestly receive no distribution in a liquidation of the Company, that they did not need to be consulted on the Scheme: see Re Tea Corporation [1904] 1 Ch 12; Re Bluebrook Limited [2010] 1 BCLC 338; and My Travel Group plc [2005] 2 BCLC 123.

80.    The consequence is that, at least so far as the Scheme is concerned, the holders of the Perpetual Capital Securities will be left behind as unsatisfied creditors of the Company when the business and assets of the Group are transferred to the New Noble Group.

81.    I apprehend that where, as in the instant case, the scheme includes a transfer of the assets and business of the scheme company in such a way as will leave a non-scheme creditor behind with a claim against a worthless shell, that creditor would be entitled to appear at the sanction hearing to object that the company's assessment of where the value breaks was incorrect.  The creditor's argument would be that sanction of the scheme would legitimise an otherwise unlawful disposal of the company's assets in disregard of his interests as a creditor.

82.    In the instant case, such a complaint was apparently voiced by a lawyer for one of the holders of the Perpetual Capital Securities at the meeting to vote upon the exchange offer (which in the event turned out to be inquorate).  The gist of the complaint appeared to be that the exchange offer made as part of the wider Restructuring to the holders of the Perpetual Capital Securities of US$25 million of similar securities in New Noble undervalued their interests in the Company.

83.    Although no holder of Perpetual Capital Securities has appeared to challenge the Scheme on this basis, Mr. Trower QC drew attention to the point, and I think it right that I should briefly deal with it.

84.    Depending on the facts and figures, there might in some case in the future be a substantial dispute as to the correct approach to valuation which should be adopted when deciding where the value breaks in the scheme company: see the extended discussion by Jennifer Payne in *Schemes of Arrangement* at pages 247-269.  In the instant case, however, there has been no challenge to the Company's assessment that given its very large balance sheet deficiency, the holders of the Perpetual Capital Securities are substantially "out of the money".

85.    The only feature of the Scheme and wider Restructuring that might give rise to any doubt in this regard is the fact that the Shareholders of the Company, who would plainly rank below the holders of the Perpetual Capital Securities in a liquidation, are to receive 20% of the equity in New Noble; and the existing management, who would not, as such, rank in a liquidation at all, are to receive 10% of the equity in New Noble.

86.    The answer to that point was, however, given by Mr. Trower QC.  He submitted, and I accept, that on the evidence, it is clear that the value in the Company and in the business of the Group in essence belongs to the unsecured creditors, i.e. the Scheme Creditors, together with those who have reached bilateral arrangements with the Company or whose debts will be paid in the ordinary course, and who have therefore been excluded from the Scheme.  Mr. Trower QC submitted that it is up to the Scheme Creditors to determine how to divide that value up between them in the Restructuring.  They have done so and have decided that they will, for commercial reasons, share some of the value with the Company's existing Shareholders and management.

87.    The commercial reasons are explained briefly in the evidence.  The proponents of the Scheme have taken the view that since the consent of the Shareholders given by the Shareholder Resolution was necessary in order to permit the disposal by the Company of its business and assets to the New Noble Group, that consent would come at a price.  They also took the view that the members of the Company's existing management understand the Group's business and have key relationships with suppliers and customers, and that it will be necessary for reasons of continuity to retain such experience and relationships when the business is transferred to the New Noble Group.

17

88.   It seems to me that those are credible reasons for the treatment of the Shareholders and existing management, and in the absence of any challenge at the hearing from a holder of Perpetual Capital Securities, I have no basis to conclude that they have any financial interest in the Company, or that the Scheme illegitimately harms their interests.

89.   For completeness, I should record that Mr. Trower QC also drew attention to various communications that have taken place with some of the Other Scheme Creditors, the commercial settlements that have been concluded with a number of them, and the comments of one other person who contacted the Court directly by email to make observations about the Scheme.  There is nothing in any of those materials that leads me to conclude that there is any defect with the Scheme.

## International considerations

90.   The final matters that fall to be considered arise from the international nature of the Scheme.  They are (i) whether the Company has a sufficient connection to England; (ii) whether the Scheme will achieve a substantial effect; and (iii) whether the English Court's jurisdiction to sanction the Scheme is limited by the Recast EU Judgments Regulation.  These issues were raised at the Convening Hearing, but for reasons that I explained in the Convening Judgment, I considered that it was more appropriate for their determination to await this application for sanction.

### *Sufficient connection and substantial effect*

91.   The Company is plainly liable to be wound up as an unregistered company under Part V of the Insolvency Act 1986, and so is a company within the meaning of section 895 CA 2006.   However, as I explained in the Convening Judgment, where a scheme company is incorporated abroad, the court will not exercise its jurisdiction to sanction the scheme unless it has a "sufficient connection" to England and Wales: see e.g. Re Drax Holdings Ltd [2004] 1 WLR 1049 (Ch) at [29].

92.   The "sufficient connection" test is plainly separate and distinct from the issue of where the scheme company has its COMI for the purposes of, say, the recast EU Insolvency Regulation.   That might have been a relevant consideration if, as was once postulated as a possibility, the Company had applied for an administration order in England to facilitate the transfer of its business and assets to the New Noble Group: see e.g. Re Christophorus 3 Limited [2014] EWHC 1162 (Ch).

93.   The "sufficient connection" test is also separate and distinct from any test based on COMI that the US Bankruptcy Court might apply to determine whether to recognise the Scheme under Chapter 15 of the US Bankruptcy Code or as a matter of comity.

94.   Nonetheless, it is obvious that some of the same factors that might have been relevant to establishing that the Company has moved its COMI from Hong Kong to England are also likely to be relevant to demonstrate a "sufficient connection" with this jurisdiction.   That is particularly so given that, as explained in Magyar, the issue of "sufficient connection" is bound up with the question of whether the Scheme is likely to be effective in the sense of being recognised in other relevant jurisdictions, and recognition abroad may depend on the view that the recognising court takes of the location of the Company's COMI.

95.    When considering those factors in the instant case, I accept the propositions that a company is generally free to choose where it carries on its activities and administers its interests; such location is not immutable; and that a company may change its COMI for a self-serving purpose: see e.g. Shierson v Vlieland-Boddy [2005] BCC 949 at [55]. That case also makes clear that where it is suggested that the company has changed its COMI, the Court will have regard in particular to the questions of whether the change has been made in a way which is ascertainable by third parties such as creditors, whether the change is based on substance and is not an illusion, and whether it has the necessary element of permanence. I considered some of those points in my recent judgment in Re Videology Limited [2018] EWHC 2186 (Ch).

96.    In the context of a scheme, whilst the English Court will be astute to detect a COMI-shift performed for illegitimate and abusive reasons, it is possible that a company might legitimately seek the assistance of the Court with the support of, and in order to achieve the best result for, its creditors. In Re Codere Limited [2015] EWHC 3778 (Ch), Newey J indicated, at [18],

> "18.    In a sense, of course, what was done in [AI Scheme Limited [2015] EWHC 1233 (Ch) and [2015] EWHC 2038 (Ch)], and what is sought to be achieved in the present case, is forum shopping. Debtors are seeking to give the English court jurisdiction so that they can take advantage of the scheme jurisdiction available here and which is not widely available, if available at all, elsewhere. Plainly forum shopping can be undesirable. That can potentially be so, for example, where a debtor seeks to move his COMI with a view to taking advantage of a more favourable bankruptcy regime and so escaping his debts. In cases such as the present, however, what is being attempted is to achieve a position where resort can be had to the law of a particular jurisdiction, not in order to evade debts but rather with a view to achieving the best possible outcome for creditors. If in those circumstances it is appropriate to speak of forum shopping at all, it must be on the basis that there can sometimes be good forum shopping."

97.    That statement neatly describes what has happened in the instant case. The Company has, with the support of a large proportion of its creditors, sought to move its COMI to England with the intention of proposing a restructuring taking advantage of the range of procedures available here.

98.    Consistently with the emphasis that the CJEU has placed on the requirement that the factors which go to establish COMI must be ascertainable by third parties, and that a change in COMI should be communicated to third parties, it is also significant that the Company has sought to establish its connections with England in an entirely open manner. In particular, the Company made public announcements and communicated with the SGX to explain the reasons for moving its COMI between February and April this year, and on completion of its move, sent a notice to all its creditors informing them of the change in location of its head office and principal place of business to London. Of course a company cannot create a sufficient connection with England simply by saying that it intends to do so, but the fact that the Company has at all times acted openly and with the consent and support of its creditors is a relevant factor.

19

99.    In the instant case, the Company places particular reliance upon the following factors
       to demonstrate a sufficient connection with England:

   i)    Since 7 April 2018 the head office of the Company has been located at 33
          Cavendish Square in London and all head office functions are carried out in
          London. No managerial activities are conducted in Bermuda and the Company
          no longer conducts substantial activities in Hong Kong.

   ii)   The Company acts as a holding company for the Group and fulfils its role as
          principal debtor under the financing arrangement required to enable its
          subsidiaries to carry on their commodity trading activities.    Seeking a
          restructuring of those debts and of the Group has been the principal focus of the
          Company's activity since late 2017.  In that regard, all of the material meetings
          between the Company and the Ad Hoc Group, particularly those conducted in
          the period immediately prior to, and in the period since, the execution of the
          RSA on 14 March 2018, have been conducted in the United Kingdom. Since
          January 2018, London has also been the main location where face-to-face
          negotiations between the Company and its other creditors and their advisers
          have taken place.

   iii)  Three of the Company's independent non-executive directors are now based in
          the United Kingdom.

   iv)   The majority of Board meetings take place in the Company's London head
          office, and meetings of the Audit Committee, the Risk Committee, and the
          Corporate Governance Committee are also held in London.

   v)    The London office is where the Company's books and records are kept, save for
          the Company's register of members which is required to remain in Bermuda. It
          is also where the Company's officers approve key vendor payments, maintain
          the Company's consolidated cash management system and exercise the
          Company's treasury functions.

   vi)   As of 7 April 2018, the Company has an establishment registered in the United
          Kingdom pursuant to the Overseas Companies Regulations 2009.

   vii)   The Company notified HMRC on 12 July 2018 that it has relocated its head
          office to the UK for corporation tax purposes pursuant to section 55 of the
          Finance Act 2004.

   viii)  Telephone lines are in place for the exclusive use of the Company in London
          with a UK number and those telephone numbers are published on the
          Company's website. The Company's website also makes plain that its head
          office is located at the address at 33 Cavendish Square.

100.   Independently of its move of operations to London, the Company emphasises that the
       majority of the debts which are compromised under the Scheme arise under the 2018
       Notes, the 2022 Notes and the RCF, each of which is governed by English Law.  A
       material proportion (at least 18%) of the Scheme Creditors are also subject to the
       personal jurisdiction of the English Court by virtue of being domiciled in England.  The

relevance of those factors to the "sufficient connection" test was discussed by Briggs J in Re Rodenstock [2011] Bus. L.R. 1245 ("Rodenstock") at [67]-[68].

101.    I am satisfied on the evidence that these factors are not illusory or merely temporary. Taken together with the overwhelming support from Scheme Creditors for the Scheme, and subject to consideration of the effectiveness of the Scheme to which I next turn, in my judgment they establish a sufficient connection with England to justify exercise of the scheme jurisdiction.

102.    As indicated above, in Magyar at [21]-[22], David Richards J said that questions of "sufficient connection" and whether the scheme would have "substantial effect" were closely related. In the latter regard, he said, at [14]:

> "The court will not generally make any order which has no substantial effect and, before the court will sanction a scheme it will need to be satisfied that the scheme will achieve its purpose."

103.    In Van Gansewinkel Groep BV [2016] BCC 172 at [71], after referring to Magyar, Sompo Japan Insurance Inc [2007] EWHC 146 (Ch) and Rodenstock, I commented,

> "In cases such as the present, the issue is normally whether the scheme will be recognised as having compromised creditor rights so as to prevent dissenting creditors from seeking to attach assets of the scheme companies in other countries on the basis of an assertion of their old rights. The English court does not need certainty as to the position under foreign law—but it ought to have some credible evidence to the effect that it will not be acting in vain."

104.    In that regard it is first important to note that the vast majority of Finance Creditors became parties to the RSA, participated in the Scheme process and voted in favour of the Scheme. Having done so, they are unlikely to be able to challenge the Scheme elsewhere. The number and value of potential dissenting creditors who would conceivably be able to take action abroad is therefore relatively small.

105.    Indeed, apart from Iceberg with its relatively small potential claim of around US$320,000, no Scheme Creditors have indicated that they consider themselves not to be bound by the Scheme. Moreover, further evidence was adduced by the Company to the effect that, subject to obtaining permission from the Court in Hong Kong, it intends to pay a suitable sum into court in Hong Kong to secure Iceberg's (disputed) claim.

106.    Secondly, an important feature of the Scheme and the wider Restructuring is that it will result in substantially all of the Company's assets being transferred to New Noble, and the likely winding up and eventual dissolution of the Company. At least as a matter of form, the disappearance of the Company means that the possible existence of creditors in jurisdictions where the compromises are not recognised, or not recognised insofar as they seek to release foreign law-governed debts, may not give rise to the same sort of immediate issues as exist in cases where a scheme is intended to secure the future of the scheme company. That said, there must, however, still be at least a conceptual

21

possibility that dissenting creditors of the existing Group might contend that the compromise of their claims <u>and</u> the transfer of the business and assets to the New Noble Group should not be recognised, and they might seek to attack such business and assets in the hands of the New Noble Group in other jurisdictions.

107.   To that end, thirdly, as a further measure to facilitate that the compromises effected by the Scheme are recognised internationally, an inter-conditional and identical scheme is being promulgated in Bermuda, the Company's place of incorporation.

108.   Fourthly, any claims by a dissentient Finance Creditor would in any event have to be made under the terms of the relevant Notes or the RCF.  In that regard it is significant that the 2018 Notes, the 2022 Notes and the RCF are governed by English law and have (admittedly non-exclusive) English jurisdiction clauses.    This must increase the prospect of the English Scheme being recognised abroad as having discharged the Scheme Claims.

109.   Fifthly, although the 2020 Notes are governed by the laws of New York with a (non-exclusive) New York jurisdiction clause, the Company has sought recognition of the Scheme as a foreign main proceeding under Chapter 15 of the United States Bankruptcy Code and/or principles of comity.  In that regard, as I noted in the Convening Judgment, the Company has obtained expert evidence from The Hon. James Peck, a former judge of the US Bankruptcy Court for the Southern District of New York, expressing the clear view that a US Bankruptcy court would enter an order granting effect to the Scheme in the United States.  I find that evidence entirely persuasive.

110.   Accordingly, I am satisfied that the Scheme, if sanctioned, is likely to be recognised and thereby to have a substantial effect in other significant jurisdictions. Taken together with my view on sufficient connection, I am accordingly satisfied that it is appropriate in the international context to exercise my discretion to sanction the Scheme.

*The Recast Judgments Regulation*

111.   The final international issue concerns the question of whether it is necessary to establish jurisdiction under the Recast Jurisdiction and Judgments Regulation (EU) 1215/2012 (the "Recast Judgments Regulation") .

112.   I outlined the issue in paragraphs [70]-[73] and [81] of the Convening Judgment and noted that rather than decide the difficult legal issue of whether the Recast Judgments Regulation applies to schemes under Part 26 at all, the Courts have generally been prepared to adopt a pragmatic approach of asking whether, on the assumption that the Regulation applies and that the scheme proceeding is to be assimilated to a civil case being brought against the scheme creditors by the scheme company, the jurisdictional requirements of the Regulation would in any event be satisfied.

113.   In that regard, Article 8(1) of the Recast Judgments Regulation provides that,

> "A person domiciled in a Member State may be sued, where he is one of a number of defendants, in the courts for the place where any one of them is domiciled, provided that the claims are so closely connected that it is expedient to hear and determine

> them together to avoid the risk of irreconcilable judgments
> resulting from separate proceedings."

The relevant concept of domicile is defined in Article 63 in terms that a company is domiciled at the place where it has its (a) statutory seat, (b) central administration, or (c) principal place of business.

114.    In a series of decisions, a number of Judges of this Court have decided that given the nature of a scheme, if one scheme creditor is domiciled here, that necessarily means that it will be expedient to hear and determine the "claims" against all other scheme creditors here, so that jurisdiction will automatically be established under Article 8: see e.g. Re Metinvest BV [2016] EWHC 79 (Ch) at [32] and Re DTEK Finance Plc [2016] EWHC 3563 (Ch) in which Norris J concluded, at [25],

> "I therefore take the view that if there is one defendant in England and Wales who is a scheme creditor then the risk of an irreconcilable judgment of itself satisfies the [Article 8] proviso".

115.    I have in the past expressed a different view, indicating that it should not automatically be regarded as "expedient" within the meaning of Article 8 for the English Court to assert jurisdiction over all scheme creditors in other jurisdictions simply because one of their number is domiciled here: see e.g. Re Van Gansewinkel Groep SA [2015] Bus LR 1046 at [50] − [51] and Re Global Garden Products Italy SpA [2017] BCC 637 at [25] to [28]. In what is, ex hypothesi a somewhat artificial exercise (as to which see the doubts expressed by Hildyard J in Re Primacom Holding GmbH [2013] BCC 201 at page 223, paragraph [13]), I have taken the view that if, for example, one scheme creditor owed US$1 was domiciled here, and, say, 200 creditors owed US $100 million were domiciled in Germany, the framers of the Recast Judgments Regulation might not regard it as "expedient" for the purposes of avoiding irreconcilable judgments that the 200 German creditors should be subjected to a scheme in England.

116.    In the instant case I do not, however, need to decide whether to stick to my guns or recant my views, because the evidence adduced by the Company is that 13 Noteholders are domiciled in England, and their claims are likely to amount to between 18.2% and 22.5% of the total Scheme Claims. On any view this is a significant proportion of the Scheme Creditors, and in the same way as Briggs J was reassured in Rodenstock at paragraph [62] by the fact that over 50% by value of the scheme creditors in that case were domiciled in England, I consider that Article 8(1) of the Recast Judgments Regulation would be engaged and satisfied.

Conclusion

117.    For the reasons that I have set out, I consider that the statutory requirements of Part 26 have been satisfied, and that it is appropriate for me to exercise my discretion to sanction the Scheme.

k

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------- x
                                                          :
In re:                                                    :        **Chapter 15**
                                                          :
**NORDIC AVIATION CAPITAL**                               :
**DESIGNATED ACTIVITY COMPANY,**                          :
                                                          :        **Case No. 20-11410 (MEW)**
Debtor in a Foreign Proceeding.[1]                        :
                                                          :
--------------------------------------------------------- x

**ORDER GRANTING (I) RECOGNITION OF FOREIGN MAIN PROCEEDING,**
**(II) RECOGNITION OF FOREIGN REPRESENTATIVE, (III) RECOGNITION OF**
**SANCTION ORDER AND RELATED SCHEME, AND (IV) RELATED RELIEF**
**UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Upon the *Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition of*

*Foreign Representative, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related*

*Relief under Chapter 15 of the Bankruptcy Code* [ECF No. 3] (the "**Motion**" and, together with

the Chapter 15 Petition [ECF No. 1], the "**Petition**")[2] of Søren M. Overgaard, in his capacity as

the duly appointed foreign representative (the "**Foreign Representative**") of the Irish Proceeding

of the above-captioned debtor (the "**Debtor**"), a designated activity company incorporated under

the laws of Ireland, concerning a scheme of arrangement pursuant to Part 9 Chapter 1 of the

Companies Act 2014 to 2018 (the "**Companies Act**"), pursuant to sections 105(a), 1504, 1507,

1510, 1515, 1517, 1520 and 1521 of title 11 of the United States Code (the "**Bankruptcy Code**"),

for entry of an order (this "**Order**"), among other things: (i) recognizing the Irish Proceeding as a

---

[1] Nordic Aviation Capital Designated Activity Company is incorporated and registered under the laws of Ireland with registered number 567526 and with its registered office at Gardens International, Henry Street, Limerick, Ireland V94 4D83.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed in the Motion.

"foreign main proceeding" pursuant to chapter 15 of the Bankruptcy Code; (ii) recognizing the

Foreign Representative as the duly appointed "foreign representative," as defined in section

101(24) of the Bankruptcy Code; (iii) recognizing, granting comity to and giving full force and

effect in the United States to the Irish Proceeding, the Scheme, the Waiver and Deferral Letters

and the Irish Orders; (iv) enjoining parties from taking any action inconsistent with the Scheme or

the Waiver and Deferral Letters in the United States; (v) authorizing and directing each Facility

Agent and Security Trustee, and, in each case, any successor thereto to take any and all actions

necessary to give effect to the terms of the Scheme, including the Waiver and Deferral; and (vi)

granting such other relief as this Court deems just and proper, all as more fully set forth in the

Petition, the Overgaard Declaration, the Murphy Declaration, the *Supplemental Declaration of*

*Michael Murphy in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II)*

*Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme*

*and (IV) Related Relief under Chapter 15 of the Bankruptcy Code* [ECF No. 17] (the

"**Supplemental Murphy Declaration**"), the *Second Supplemental Declaration of Michael*

*Murphy in Support of the Motion for (I) Recognition of Foreign Main Proceeding, (II) Recognition*

*of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme and (IV)*

*Related Relief under Chapter 15 of the Bankruptcy Code* [ECF No. 25], and the *Third*

*Supplemental Declaration of Michael Murphy in Support of the Motion for (I) Recognition of*

*Foreign Main Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of*

*Sanction Order and Related Scheme and (IV) Related Relief under Chapter 15 of the Bankruptcy*

*Code* [ECF No. 26], and the statements of counsel at the hearing before this Court with respect to

the Petition (the "**Hearing**"); and appropriate and timely notice of the filing of the Petition and the

Hearing having been given; and no other or further notice being necessary or required; and no

2

objections or other responses having been filed that have not been overruled, withdrawn or otherwise resolved; and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefor,

**THIS COURT HEREBY FINDS AND CONCLUDES THAT:**

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York dated as of January 31, 2012, Reference M-431, In re Standing Order of Reference Re: Title 11, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).

C.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

D.      Venue for this proceeding is proper before this Court pursuant to 28 U.S.C. § 1410.

E.      The Debtor has tangible and intangible property and property rights within this district and, therefore, the Debtor is eligible to be a debtor in a chapter 15 case pursuant to sections 109 and 1501 of the Bankruptcy Code.

F.      The Petitioner is the duly appointed "foreign representative" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code.

G.      This chapter 15 case was commenced properly pursuant to sections 1504, 1509, and 1515 of the Bankruptcy Code.

H.    The Foreign Representative has satisfied the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rules 1007(a)(4) and 2002(q).

I.    The Irish Proceeding is a "foreign proceeding" pursuant to section 101(23) of the Bankruptcy Code.

J.    The Irish Proceeding is entitled to recognition by this Court pursuant to sections 1515 and 1517 of the Bankruptcy Code.

K.    Ireland is the center of main interests of the Debtor, and, accordingly, the Irish Proceeding is a "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code, and is entitled to recognition as a "foreign main proceeding" pursuant to section 1517(b)(1) of the Bankruptcy Code.

L.    The Foreign Representative and the Debtor, as applicable, are entitled to relief available pursuant to sections 1507, 1520 and 1521 of the Bankruptcy Code to the extent forth herein.

M.    The relief granted herein is necessary and appropriate to effectuate the purposes of chapter 15, to protect the Debtor and the interests of its creditors and other parties in interest, and is consistent with the laws of the United States, international comity, public policy and the policies of the Bankruptcy Code.

N.    Absent the relief granted herein, the Debtor, the Special Purpose Entities and the other Group Companies may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative or regulatory actions or proceedings in connection with the claims against them or their property that are subject to the Facilities, thereby interfering with and causing harm to, the Debtor, its creditors and other parties in interest in the Irish Proceeding and, as a result, the Debtor,

its creditors and such other parties in interest would suffer irreparable injury for which there is no adequate remedy at law, a result contrary to the purposes of chapter 15.

O.     Each of the injunctions contained in this Order (i) is within this Court's jurisdiction, (ii) is essential to the success of the Irish Proceeding and the Amended Scheme (as defined in the Supplemental Murphy Declaration), (iii) is an integral element of Irish Proceeding and the Amended Scheme or to its effectuation, (iv) confers material benefits on, and is in the best interests of, the Debtor, its creditors and other parties in interest in the Irish Proceeding, including, without limitation, the Scheme Creditors, and (v) is important to the overall objectives of the Amended Scheme.

P.     Appropriate notice of the filing of the Petition and the Hearing was given, which notice was deemed adequate for all purposes, and no further notice need be given.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     The Petition and the relief requested therein is granted to the extent set forth herein.

2.     The Irish Proceeding is granted recognition as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code.

3.     The Foreign Representative is the duly appointed foreign representative of the Debtor within the meaning of section 101(24) of the Bankruptcy Code and is authorized to act on behalf of the Debtor in this chapter 15 case.

4.     The Irish Proceeding, the Amended Scheme, the Waiver and Deferral Letters and the Irish Orders, including the Non-Debtor Modifications contained therein, are recognized, granted comity, and entitled to full force and effect in the United States against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and the

Waiver and Deferral Letters shall be binding and fully enforceable on all Scheme Creditors in accordance with their terms.

5.      As of the Scheme Effective Date, except as permitted by the Sanction Order, the Amended Scheme and/or the Waiver and Deferral Letters and to the extent set forth in the Sanction Order, the Amended Scheme and/or the Waiver and Deferral Letters, all entities (as that term is defined in section 101(15) of the Bankruptcy Code) are permanently enjoined from taking any action that is inconsistent with the Amended Scheme or the Irish Orders, or interfering with the enforcement and implementation of the Amended Scheme or the Irish Orders.

6.      Notwithstanding anything to the contrary in this Order, (i) the injunctions provided for herein shall apply only for so long as the Amended Scheme and the Waiver and Deferral Letters remain in effect and (ii) nothing herein shall prevent any entity (as that term is defined in section 101(15) of the Bankruptcy Code) from (a) seeking to enforce any rights or obligations under the Amended Scheme or the Waiver and Deferral Letters, (b) taking any action permitted by the Amended Scheme or the Waiver and Deferral Letters, or (c) seeking relief from the Irish Court or this Court, as applicable, from the injunctions contained herein.

7.      Upon entry of this Order, the relief set forth in section 1520 of the Bankruptcy Code shall apply during the pendency of this case within the territorial jurisdiction of the United States; *provided, however*, that the relief provided under section 362 of the Bankruptcy Code: (a) shall be subject to all of the exceptions set forth in section 362 and in section 1520 of the Bankruptcy Code, and (b) shall not bar or stay any action that is permitted to be taken under the terms of the Sanction Order, the Amended Scheme and/or the Waiver and Deferral Letters.  Without limiting the generality of the foregoing, this Order shall not be construed as enjoining the police or regulatory act of a governmental unit, including a criminal action or proceeding, to the extent not stayed

6

pursuant to section 362 of the Bankruptcy Code, or staying the exercise of any rights that section 362(o) of the Bankruptcy Code does not allow to be stayed.

8.      The administration, realization and distribution of all or part of the assets of the Debtor within the territorial jurisdiction of the United States is entrusted to the Foreign Representative to the extent consistent with the Amended Scheme, and the Foreign Representative is established as the exclusive representative of the Debtor in the United States pursuant to sections 1521(a) and 1521(b) of the Bankruptcy Code.

9.      The Foreign Representative is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

10.     The Foreign Representative and the Debtor and each of their respective successors, agents, representatives, advisors and counsel shall be entitled to the protections contained in sections 306 and 1510 of the Bankruptcy Code, and no action taken by any such party in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of or in connection with the Irish Proceeding, the Amended Scheme, this Order, this chapter 15 case or any adversary proceeding herein, or any further proceeding commenced hereunder, shall be deemed to constitute a waiver of the rights or benefits afforded such parties under 306 and 1510 of the Bankruptcy Code.

11.     Each Facility Agent and Security Trustee and, in each case, any successor thereto are hereby authorized to take any lawful actions or execute any documents that may be necessary to consummate the transactions contemplated by the Irish Orders, the Amended Scheme, and the Waiver and Deferral, including, among other things, the Waiver and Deferral Letters.

12.     Consistent with and  to the extent set forth in Section II, Clause 6.1 of the Amended Scheme, each Facility Agent and Security Trustee shall incur no liability to any person for carrying out any instructions given to any such Facility Agent or Security Trustee under, or contemplated

by Section II, Clause 4.2 the Amended Scheme, and in carrying out any such instructions in accordance with their terms, nothing that any such Facility Agent or Security Trustee does or omits to do in accordance with such instructions will constitute gross negligence or willful misconduct on the part of such Facility Agent or Security Trustee.

13.     The terms and conditions of this Order shall be immediately effective and enforceable upon its entry, the Foreign Representatives shall not be subject to any stay in the implementation, enforcement or realization of the relief granted in this Order, and this Order shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

14.     This Order is without prejudice to the Foreign Representative requesting any additional relief, including seeking recognition and enforcement in the United States of any further orders issued by the Irish Court.

15.     The Foreign Representative shall serve a copy of this Order within three (3) business days of entry of this Order upon all persons or bodies as required under this Court's Order Scheduling Hearing and Specifying the Form and Manner of Service of Notice.  Such service shall be good and sufficient service and adequate notice for all purposes.

16.     This Court shall retain jurisdiction over all matters arising from or related to the enforcement, amendment, modification, implementation and interpretation of this Order.

Dated:   New York, New York
         July 24, 2020

                                             s/Michael E. Wiles
                                             HONORABLE MICHAEL E. WILES
                                             UNITED STATES BANKRUPTCY JUDGE

l

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------- x
In re                                        :
                                             :
OIC RUN-OFF LIMITED and THE LONDON AND       :   In a Case Under Chapter 15
OVERSEAS INSURANCE COMPANY LIMITED           :   of the Bankruptcy Code
                                             :
Debtors in Foreign Proceedings.              :   Case No. 15-13054 (SCC)
------------------------------------------------------------- x
```

### ORDER GRANTING RECOGNITION OF FOREIGN MAIN PROCEEDINGS, PERMANENT INJUNCTION AND RELATED RELIEF

This matter came before the Court upon the verified petition of Dan Yoram Schwarzmann and Paul Anthony Brereton Evans (the "Petitioners"), in their capacity as the duly authorized foreign representatives, as defined in section 101(24) of title 11 of the United States Code (the "Bankruptcy Code"), of OIC Run-Off Limited (subject to a scheme of arrangement) ("Orion") and The London and Overseas Insurance Company Limited (subject to a scheme of arrangement) ("L&O," together with Orion, the "Companies") for entry of an order granting recognition of foreign main proceedings, a permanent injunction and related relief (the "Verified Petition"). The Court has reviewed and considered, among other things: (i) the Verified Petition;[1] (ii) the statement of Dan Yoram Schwarzmann, in his capacity as foreign representative, made pursuant to section 1515 of the Bankruptcy Code; (iii) the Declaration of Joseph Bahlsen Bannister, English counsel to the Companies, dated November 16, 2015; (iv) the Memorandum of Law in support of the Verified Petition; and (v) the arguments presented at the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Verified Petition.

hearing held on January 11, 2016.  Based on the foregoing, the Court finds and concludes as follows:

1.  The Petitioners have demonstrated that:

   (a)    the Companies are subject to foreign proceedings within the meaning of section 101(23) of the Bankruptcy Code;

   (b)    the Companies are subject to foreign main proceedings within the meaning of section 1502(4) of the Bankruptcy Code;

   (c)    the Companies are eligible to be debtors under section 109(a) of the Bankruptcy Code;

   (d)    the Petitioners are the foreign representatives of both Companies within the meaning of section 101(24) of the Bankruptcy Code;

   (e)    the above-referenced Chapter 15 cases were properly commenced pursuant to sections 1504 and 1515 of the Bankruptcy Code; and

   (f)    the requirements of section 1515 of the Bankruptcy Code are satisfied;

2.  The Petitioners have demonstrated that the relief requested, including permanent injunctive relief, is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States and warranted pursuant to section 1521 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 7065;

3.  The Petitioners have demonstrated that permanent injunctive relief would not cause any hardships to Scheme Creditors or other parties-in-interest that would not be outweighed by the benefits of such relief and unless a permanent injunction is issued, it appears to this Court that one or more persons or entities may take action that is inconsistent with or in contravention of the terms of the Amending Scheme, thereby interfering with, and causing harm to, the efforts of the Petitioners and the Companies to administer the Companies' estates, and that as a result, the Companies, and their estates and Scheme Creditors will suffer irreparable injury for which there is no adequate remedy at law;

4.  The interest of the public will be served by this Court's granting the relief requested by the Petitioners;

5.  Service of the Notice of Filing and Hearing on Petitions Seeking Recognition of Foreign Main Proceedings Pursuant to Chapter 15 of the United States Bankruptcy Code in accordance with the Order Limiting Notice, Scheduling Hearing and Specifying the Form and Manner of Service of Notice dated November 19, 2015 is adequate and sufficient notice of the Petitions and the relief requested in the Verified Petition and no further notice of such relief is necessary; and

6.  Venue is proper in this District pursuant to 28 U.S.C. § 1410.

**NOW, THEREFORE, IT IS HEREBY**

**ORDERED**, that the proceedings (the "<u>English Proceedings</u>") in respect of the Amending Scheme under Part 26 of the Companies Act 2006 of the United Kingdom in the High Court of Justice of England and Wales (the "<u>High Court</u>") and the Amending Scheme are granted recognition pursuant to section 1517(a) of the Bankruptcy Code; and it is further

**ORDERED**, that the English Proceedings are granted recognition as foreign main proceedings pursuant to section 1517(b)(1) of the Bankruptcy Code; and it is further

**ORDERED**, that the Companies, the Petitioners and the English Proceedings shall have all relief afforded upon recognition of a foreign main proceeding pursuant to section 1520 of the Bankruptcy Code; and it is further

**ORDERED**, that the Amending Scheme (including any modifications or amendments thereto) shall be given full force and effect in the United States, and shall be binding on and enforceable against any person or entity that is a Scheme Creditor, including,

3

without limitation, against such person or entity in its capacity as a debtor of a Company in the United States; and it is further

ORDERED, that all Scheme Creditors are permanently enjoined from taking any action in contravention of, or inconsistent with, the Amending Scheme; and it is further

ORDERED, that, except as otherwise provided herein or in the Amending Scheme, all Scheme Creditors are permanently enjoined from attaching, seizing, repossessing, transferring, relinquishing or disposing of any property of either Company, or the proceeds thereof, in the United States; and it is further

ORDERED, that, in accordance with the Amending Scheme, all Scheme Creditors are permanently enjoined from: (a) commencing or continuing any Proceedings (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative action, proceeding or process whatsoever), including by way of counterclaim, against a Company or any of its property in the United States, or any proceeds thereof, and seeking discovery of any nature against a Company; (b) enforcing any judicial, quasi-judicial, administrative judgment, assessment or order, or arbitration award and commencing or continuing any Proceedings (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative action, proceeding or process whatsoever) or any counterclaim to create, perfect or enforce any lien, attachment, garnishment, setoff or other claim against a Company or any of its property in the United States, or any proceeds thereof, including, without limitation, rights under reinsurance or retrocession contracts; (c) invoking, enforcing or relying on the benefits of any statute, rule or requirement of federal, state, or local law or regulation requiring a Company to establish or post security in the form of a bond, letter of credit or otherwise as a condition of prosecuting or defending any Proceedings (including, without limitation, arbitration, mediation

4

or any judicial, quasi-judicial, administrative action, proceedings or process whatsoever) and such statute, rule or requirement will be rendered null and void for Proceedings; (d) drawing down any letter of credit established by, on behalf or at the request of, a Company in excess of amounts expressly authorized by the terms of the contract or other agreement pursuant to which such letter of credit has been established; and (e) withdrawing from, setting off against, or otherwise applying property that is the subject of any trust or escrow agreement or similar arrangement in which a Company has an interest in excess of amounts expressly authorized by the terms of the contract and any related trust or other agreement pursuant to which such letter of credit, trust, escrow, or similar arrangement has been established; provided, however, no drawing against any letter of credit shall be made in connection with any commutation unless the amount has been agreed in writing with the Petitioners, the Scheme Administrators, or the Companies, or permitted by the Amending Scheme or further order of the Court; and it is further

ORDERED, that nothing in this Order shall in any respect enjoin any police or regulatory act of a governmental unit, including a criminal action or proceeding; and it is further

ORDERED, that, in accordance with the terms of the Amending Scheme, all persons and entities in possession, custody or control of property of a Company or the proceeds thereof, are required to turn over and account for such property or proceeds thereof to such Company or the Scheme Administrators; and it is further

ORDERED, that all Scheme Creditors that are beneficiaries of letters of credit established by, on behalf or at the request of a Company or parties to any trust, escrow or similar arrangement in which a Company has an interest are required to: (a) provide notice to the Petitioners' United States counsel (Chadbourne & Parke LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Francisco Vazquez) of any drawdown on any letter of credit

5

established by, on behalf or at the request of, a Company or any withdrawal from, setoff against, or other application of property that is the subject of any trust or escrow agreement or similar arrangement in which a Company has an interest, together with information sufficient to permit the Scheme Administrators or such Company to assess the propriety of such drawdown, withdrawal, setoff or other application, including, without limitation, the date and amount of such drawdown, withdrawal, setoff or other application and a copy of any contract, related trust or other agreement pursuant to which any such drawdown, withdrawal, setoff, or other application was made, and provide such notice and other information contemporaneously therewith; and (b) turn over and account to the Scheme Administrators or such Company for all funds resulting from such drawdown, withdrawal, setoff, or other application in excess of amounts expressly authorized by the terms of the contract, any related trust or other agreement pursuant to which such letter of credit, trust, escrow or similar arrangement has been established; and it is further

**ORDERED**, that every Scheme Creditor that is a party to any action or Proceeding (including, without limitation, arbitration or any judicial, quasi-judicial, administrative action, proceeding or process whatsoever) in which a Company is or was named as a party, or as a result of which a Scheme Liability may be established, is required to place such Company, the Scheme Administrators and the Petitioners' United States counsel (Chadbourne & Parke LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Francisco Vazquez) on the master service list of any such action or other legal proceeding, and to take such other steps as may be necessary to ensure that such counsel receives: (a) copies of any and all documents served by the parties to such action or other legal proceeding or issued by the court, arbitrator, administrator, regulator or similar official having jurisdiction over such action or legal proceeding; and (b) any and all

correspondence, or other documents circulated to parties named in the master service list; and it is further

**ORDERED**, that nothing in this Order shall in any respect prevent the commencement or continuation of proceedings against any person or entity or other insurer other than the Companies; <u>provided</u>, <u>however</u>, that if any third party shall reach a settlement with, or obtain a judgment against, any person or entity other than the Companies, such settlement or judgment shall not be binding on or enforceable against any of the Companies; and it is further

**ORDERED**, that, pursuant to Rule 7065 of the Federal Rules of Bankruptcy Procedure, the security provisions of Rule 65(c) of the Federal Rules of Civil Procedure shall be, and the same hereby are, waived; and it is further

**ORDERED**, that this Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, and requests for any additional relief in the Chapter 15 cases and all adversary proceedings in connection therewith properly commenced and within the jurisdiction of this Court; and it is further

**ORDERED**, that except as otherwise provided herein or in the Amending Scheme, all persons are permanently enjoined from commencing or continuing any Proceedings against the Companies, the Petitioners, the Scheme Administrators, or any of their respective directors, officers, agents, employees, representatives, financial advisers or attorneys (the "<u>Scheme Parties</u>"), or any of them with respect to any claim or cause of action, in law or in equity, which may arise out of the construction or interpretation of the Amending Scheme or out of any action taken or omitted to be taken by any of the Scheme Parties in connection with the administration of the Amending Scheme; and it is further

7

ORDERED, that the High Court has exclusive jurisdiction to hear and determine any suit, action, claim or proceeding and to settle any dispute that may arise out of the construction or interpretation of the Amending Scheme, or out of any action taken or omitted to be taken by any of the Scheme Parties in connection with the administration of the Amending Scheme; provided, however, that, in relation to the determination of a Scheme Liability, nothing in this Order affects the validity of provisions determining governing law and jurisdiction, whether contained in any contract between a Company and any of its Scheme Creditors or otherwise; and it is further

ORDERED, that no action taken by the Companies, the Petitioners, the Scheme Administrators, or any of their respective successors, directors, officers, agents, employees, representatives, advisers or attorneys, or any of them, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Amending Scheme, this Order, any further order for additional relief in the ancillary proceedings or cases filed under Chapter 15 of the Bankruptcy Code, or any adversary proceedings in connection therewith as this Court may make, will be deemed to constitute a waiver of the immunity afforded to the Companies, the Petitioners, the Scheme Administrators, or any of their respective successors, directors, officers, agents, employees, representatives, advisers or attorneys, pursuant to section 306 or 1510 of the Bankruptcy Code; and it is further

ORDERED, that, except as otherwise provided herein or in the Amending Scheme, all persons are permanently enjoined from commencing or continuing any Proceeding against the Petitioners, the Companies, the Scheme Administrators, or any of their respective successors, directors, officers, agents, employees, representatives, advisers or attorneys (the "Pre-Scheme Parties"), or any of them with respect to any claim or cause of action, in law or in equity, arising

8

out of or relating to any action taken or omitted to be taken as of the New Effective Date by any of the Pre-Scheme Parties in connection with the Chapter 15 cases or in preparing, disseminating, applying for or implementing the Amending Scheme or this Order; and it is further

  **ORDERED**, that the Companies, the Petitioners, and the Scheme Administrators are authorized to transfer to the foreign proceedings for distribution pursuant to the Amending Scheme any monies or assets of the Companies that the Companies, the Petitioners, or the Scheme Administrators have or may hereafter recover; and it is further

  **ORDERED**, that this Order shall be served as follows:

  (a) by United States mail, first class postage prepaid, on or before January 19, 2016, upon the known parties-in-interest in the United States at the time of such service;

  (b) by publication of notice of entry of this Order, where possible on or before February 29, 2016, in the same publications in which notice was published in accordance the Scheduling Order; and it is further

  **ORDERED**, that service in accordance with this Order shall be deemed good and sufficient service and adequate notice for all purposes.

Dated: New York, New York
   January 11, 2016

      /S/ Shelley C. Chapman
      United States Bankruptcy Judge

m

Case No: A2/2004/2614

**Neutral Citation Number: [2005] EWCA Civ 974**
**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION (IN BANKRUPTCY)**
**MR JUSTICE MANN**
**1948 of 2004**

Royal Courts of Justice
Strand, London, WC2A 2LL

Wednesday, 27 July 2005

Before :

**LORD JUSTICE CHADWICK**
**LORD JUSTICE LONGMORE**
and
**SIR MARTIN NOURSE**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

|  |  |
|---|---|
| **MALCOLM BRIAN SHIERSON** | **Appellant** |
| **(as trustee in bankruptcy of Martin Vlieland-Boddy)** | |
| **- and -** | |
| **CLIVE VLIELAND-BODDY** | **Respondent** |

- - - - - - - - - - - - - - - - - - - - -
(Transcript of the Handed Down Judgment of
Smith Bernal Woredwave Limited, 190 Fleet Street
London EC4A 2AG
Tel No: 020 7421 4040,  Fax No:  020 7831 8838
Official Shorthand Writers to the Court)
- - - - - - - - - - - - - - - - - - - - -

**Mr Gregory Mitchell QC** (instructed by DLA LLP of 101 Barbirolli Square, Manchester M2
3DL) for the Appellant
**Miss Jane Giret QC** and **Mr Stephen Tudway** (instructed by John A White & Co of St John's
House, 84 High Street, Huntington, PE29 3DP) for the Respondent

- - - - - - - - - - - - - - - - - - - - -
# Judgment
# As Approved by the Court

**Crown Copyright ©**

**Lord Justice Chadwick :**

1. On 27 February 2004 a petition was presented to the High Court by Mr Malcolm Shierson, an insolvency practitioner and the trustee in bankruptcy of Mr Martin Vlieland-Boddy, for a bankruptcy order to be made against Mr Clive Vlieland-Boddy. Mr Martin Vlieland-Boddy and Mr Clive Vlieland-Boddy are twin brothers. In this judgment references to "the debtor" are to Mr Clive Vlieland-Boddy.

2. Article 3.1 of Council Regulation (EC) No 1346/2000 on insolvency proceedings provides (so far as material) that:

> "The courts of the Member State within the territory of which the centre of a debtor's main interests is situated shall have jurisdiction to open insolvency proceedings. . . ."

Article 3.2 provides that:

> "Where the centre of a debtor's main interests is situated within the territory of a Member State, the courts of another Member State shall have jurisdiction to open insolvency proceedings against that debtor only if he possesses an establishment within the territory of that other Member State. The effects of those proceedings shall be restricted to the assets of the debtor situated in the latter Member State."

Proceedings opened under article 3.1 are referred to as "main insolvency proceedings". Proceedings opened under article 3.2 are referred to as "territorial insolvency proceedings". The provisions of article 3 are incorporated in the Insolvency Act 1986 by section 265(3) of that Act.

3. This appeal raises the questions (i) whether, on the facts found by the bankruptcy court in this case, the centre of the debtor's main interests was within the territory of the United Kingdom at the relevant date and (ii), if not, whether the debtor possessed an establishment here, so as to found jurisdiction in respect of territorial insolvency proceedings.

*The background*

4. The circumstances which led to the presentation of a bankruptcy petition against the debtor in February 2004 are set out in paragraphs 3 and 4 of the judgment delivered by Mr Registrar Rawson on 13 July 2004:

> "3.     On 3rd October 1997, the Co-operative bank Plc was defrauded of £2 million by Dexter [Dexter Limited, a company of which Mr Shierson is now administrative receiver]. Claims

were pursued by Dexter and the bank against Martin Vlieland-Boddy. In the course of the trial of these claims in November 2002 Martin Vlieland-Boddy decided that he no longer wished to defend and judgment was given against him for £2 million with an interim order for the payment of £300,000 [on account of costs]. In May 2001, the debtor commenced proceedings against the petitioning creditor in his capacity as trustee in bankruptcy of Martin Vlieland-Boddy, claiming the recovery of funds from his estate. In April 2002, on the second day of a three-day trial, the debtor discontinued those proceedings. The costs of Mr Shierson, which were ordered to be paid by the debtor, were assessed at £127,905 odd. A certificate in respect of these costs was issued on 20th January 2004 . . .

4. In February 2002, proceedings were commenced against the debtor claiming that he had assisted in the fraud on the bank, had benefited from part of the proceeds of it and was also liable for repayment of the £2 million. He sought to have these proceedings struck out as an abuse of process. This application was rejected by Lloyd J [on 25th July 2002] and the debtor's appeal against that decision was dismissed by the Court of Appeal [on 24th January 2003] which gave directions for the future conduct of those proceedings. The trial was due to have started in June of this year [2004] but was then postponed until after the determination of this petition."

*The debtor's connection with the United Kingdom*

5. The debtor is a qualified accountant of some twenty five years standing. For many years he practised as such, and as an insolvency practitioner, formerly (until October 1993) from offices at 1 The Centre, Gillingham, Dorset and latterly from offices at Abacus House, Poole, Dorset. He lived with his wife and sons at Milland House, Shaftesbury.

6. On 27 January 2001 the debtor and his wife entered into an  agreement – described as a deed of separation – for the division between them of the "family assets". Those assets, as shown in the agreement, included Milland House and a flat at 8 Ongar Road, Fulham (which were to be taken by Mrs Vlieland-Boddy) and Unit 2A, Sunrise Business Park, Blandford Forum, Dorset (also known as Millennium House) and a share in Abacus House (which were to be taken by the debtor).

7. Notwithstanding that apparent division of family assets, on 22 August 2001 the debtor and his wife took a lease of property known as First Floor Flat, 137 Westminster Bridge Road, London SE1 for a term of 125 years from 1 January 2001. The consideration for the grant of the lease was £185,000. The address of both the debtor and his wife was shown, in that lease, as Milland House.

8. On 4 September 2002 the debtor and his wife charged Unit 2A Sunrise Business Park (Millennium House) to Millennium Investment International Limited, a company incorporated in the British Virgin Islands with an address in Jersey, to secure liabilities under a facility agreement of the same date. The legal charge contained a recital that the debtor was entitled to the entire beneficial interest in the property charged.

9. On 12 October 2002, the debtor and his wife transferred the leasehold interest in the flat at 127 Westminster Bridge Road to Millennium Investment International Limited for no consideration.

*The 2003 insolvency proceedings*

10. On 3 February 2003 the debtor swore an affidavit in support of his application to the High Court for an interim order, pursuant to sections 252 and 253 of the Insolvency Act 1986, pending approval of his proposals to creditors for an individual voluntary arrangement. In that affidavit he gave as his main place of residence an address in Malaga, Spain. In his proposals, a copy of which was exhibited to that affidavit, he stated that he was "currently living in rented accommodation in Malaga where I have recently been able to find employment" The only asset disclosed in the statement of affairs as at 31 January 2003, annexed to the proposals, was Unit 2A Sunrise Business Park, which was shown as subject to a charge in favour of Millennium Investment International Limited to secure £245,000.

11. That application came before Mr Registrar Baister on 13 February 2003, under reference 24-IO-2003. It was adjourned to 27 February 2003 on the debtor's undertaking to make and file a witness statement confirming that his centre of main interests was in the United Kingdom. Although there is no witness statement to that effect in the papers before this Court, the application proceeded on the basis that that undertaking had been met. The chairman's report of a meeting of creditors held on 14 March 2003 records that "The EC Regulation will apply and will be the main proceedings (*sic*)". When, after adjournments on 27 February and 13 March 2003, the application for an interim order came back before Mr Registrar Baister on 20 March 2003, he took the view that no valid meeting of creditors had been held and so made no order.

12. On 3 April 2003 the nominee under the proposals of February 2003 applied to the High Court under section 262 of the Insolvency Act 1986. That application was, I think, for directions under subsection (4)(b) of that section for the summoning of a further meeting. The application was opposed by Mr Shierson, as administrative receiver of Dexter Limited and as trustee in bankruptcy of Mr Martin Vlieland-Boddy. The application was dismissed by the registrar on 1 May 2003 and the order was made final on 18 July 2003.

13. On 6 June 2003 Dexter Limited, acting by Mr Shierson as administrative receiver, presented a bankruptcy petition against the debtor on the basis of the order for costs (£8,500) made in this Court on 24 January 2003. It was alleged in that petition that the debtor's centre of main interests had been in England and Wales and that the bankruptcy proceedings would be main proceedings for the purposes of article 3 of the EC

Regulation. In a witness statement dated 17 July 2003 the debtor took the point – I think for the first time – that his centre of main interests had changed. He said this:

> "Having now settled permanently in Spain, it is now my 'Centre of Interest' in accordance with the provisions of (EC) No 1346/2000
>
> Having no 'Establishment' as defined in (EC) No 1346/2000 – Article 2(h) within the United Kingdom, there are no grounds for Secondary or Territorial proceedings."

It appears (from a witness statement made on 15 April 2004 by a solicitor acting for Mr Shierson in the current proceedings) that that petition was subsequently withdrawn on the debt being satisfied in full by the debtor's wife.

14. Notwithstanding his assertion (in his witness statement of 17 July 2003) that there was no longer jurisdiction to open insolvency proceedings, the debtor appealed from the order of 18 July 2003. Dexter Limited and Mr Shierson served a respondents' notice. It appears that the debtor raised the question whether that notice had been served in time. On 27 August 2003 that question came before Mr Registrar Rawson. He resolved the question in favour of the respondents and ordered the debtor to pay the costs of that hearing, assessed at £1,200.

15. The appeal from the order of 18 July 2003 came before Mr Roger Kaye QC, sitting as a Deputy Judge of the High Court, on 24 October 2003. He dismissed the appeal. He ordered that the debtor pay the costs of the appeal, which he assessed, summarily, at £7,889.10.

16. On 10 November 2003 the debtor wrote to his creditors in these terms, so far as material:

> "Re: My IVA and the creditors meeting of 14th March 2003.
>
> I must firstly apologise for the considerable time that has elapsed since I made my proposals to my creditors back in March of this year. Regretfully, the nominee made several mistakes and these were not able to be rectified by the court even by me making an appeal which was eventually heard some 10 days ago. The position therefore is that I am not in a voluntary arrangement but feel that my creditors who overwhelmingly supported me should not lose out and I do not intend to turn my back on them. However, now living and working in Spain, my 'centre of main interest' is Spain and as such precludes me from making any further application under UK insolvency law.
>
> . . ."

*The 2004 insolvency proceedings*

17. The bankruptcy petition presented to the High Court in February 2004 was based on the debtor's failure to comply with a statutory demand served on 5 January 2004 for the sum of £9,305.45. That was the aggregate of the sums due in respect of costs under the orders of 27 August 2003 and 24 October 2003 – made in the IVA proceedings to which I have referred - and accrued interest. The debtor was described in the petition as having an address at Malaga, in Spain; but as carrying on business as "shareholder, company secretary and director of Sinclair Research Limited whose registered office is at 1 The Centre, The High Street, Gillingham, Kent (*sic*) . . ." and, lately, as "joint proprietor of multi-let business premises at Unit 2A, Sunrise Park, Higher Shaftesbury Road, Blandford Forum". The petition alleged, at paragraph 1, that the debtor had had an establishment at 1 The Centre, Gillingham, and at Unit 2A, Sunrise Park, Blandford Forum; and that the insolvency proceedings would be territorial proceedings as defined in article 3 of the EC Regulation.

18. An application for leave to serve the petition on the debtor out of the jurisdiction was made to Mr Registrar Rawson on 27 February 2004. In granting leave the registrar made a declaration that the EC Regulation applied to the proceedings and that they were territorial proceedings within article 3.

19. On 16 March 2004 the debtor made a witness statement in opposition to the bankruptcy petition. He asserted, as he had done in his witness statement of 17 July 2003 in opposition to the earlier petition, that Spain was his centre of main interests for the purposes of the EC Regulation and that he had no 'establishment' in the United Kingdom. He went on to say this:

> "My wife and I formally separated last year. I moved to live permanently in Spain last summer.
>
> The administrative receiver of Dexter, M B Shierson, who is also the Trustee of the Estate of M R Vlieland-Boddy, in a witness statement to the court in the appeal of IO 24 of 2003, heard in the High Court in October 2003, stated that he accepted that my Centre of Main Interest was Spain and that as such the appeal under s262 Insolvency Act 1986 for the meeting of creditors to be valid should not be allowed as I was no longer entitled to [any] assistance under the UK insolvency laws."

The latter allegation is not accurate. Whatever may or may not have been said to the judge at the hearing of the appeal on 24 October 2003 (as to which the evidence of Mr Shierson's solicitor, in the witness statement of 15 April 2004 to which I have already referred, is that the issue was not raised before the judge), the relevant paragraph of Mr Shierson's witness statement of 7 October 2003 (paragraph 10) was in these terms:

> "I believe the court ought also to be aware that [the debtor] has confirmed in a witness statement dated 17 July 2003 that

having apparently moved to Spain where he suggests he has
now settled permanently, he considers Spain as his centre of
interest for the purpose of relevant insolvency legislation. . . .”

It was plainly appropriate for Mr Shierson to draw to the attention of the court hearing the
appeal from the order of 18 July 2003 that the debtor was contending that his centre of
main interests was no longer within its jurisdiction; but, in doing so, Mr Shierson cannot
be taken to be accepting that contention.

20. The debtor made a further witness statement on 18 April 2004. At paragraph 2 he said
this:

“I live in Spain and have done so for the past 9 months. I have
not lived in the United Kingdom for the past 9 months. I have
separated from my wife. Formal financial settlement was made
with her some 3 years ago and a copy of this was passed to the
petitioner over 15 months ago. This states that we equally
divided our estate with my wife retaining the matrimonial home
(Milland House, Breach Lane, Shaftesbury, Dorset). I therefore
have no interest in it. My wife and I have not gone for formal
divorce proceedings yet, as our two sons are at a very critical
stage of their school careers.”

In a further witness statement, dated 10 May 2004, the debtor said that, since leaving the
United Kingdom in June 2003, he had returned to see his children for a few days at a
time. He went on:

“I have no intention to ever return to live or work in the UK.
My wife and I are separated and we have only held back from
formal divorce proceedings as this is a critical period for both
children’s education.”

Further light was shed on the debtor’s marital position by a witness statement made by
Mrs Vlieland-Boddy on 11 May 2004. She said this:

“As a result of the proceedings brought against Clive by
Malcolm Shierson, our marriage has been put under intolerable
stress to the extent that we no longer live together. Our
marriage has irretrievably broken down and I intend shortly to
bring divorce proceedings. This is something I have agreed
with Clive and which I have explained to the children.

. . .

Insofar as I am aware, Clive has been living abroad for
approximately the last year. Up to Christmas 2003, Clive
periodically returned to Milland House for a few days to see the
children. Since Christmas 2003 he has not been here at all

> except for two nights in April when I asked that he look after
> one of our children . . . whilst I was abroad."

21. The petition came back before the registrar on the first return date (21 April 2004). He
gave permission to amend. Paragraph 2, after amendment, was in these terms:

> "It is considered that the EC Regulation on insolvency
> proceedings will apply and either the centre of main interest is
> in England and these will be main proceedings or alternatively
> that these proceedings will be territorial proceedings as defined
> in Article 3 of the EC Regulation."

*The registrar's decision on jurisdiction*

22. It was in those circumstances that Mr Registrar Rawson had to decide whether the
English court had jurisdiction to open insolvency proceedings, either under article 3.1 or
under article 3.2 of the EC Regulation. In a judgment delivered on 13 July 2004 the
registrar observed, correctly, that the debtor's attempts to set up the voluntary
arrangement were necessarily based upon him having his centre of main interests in
England and Wales. Proceedings to obtain approval of a voluntary arrangement under
Part VIII of the Insolvency Act 1986 are 'insolvency proceedings' for the purposes of the
Regulation – article 2(a) and Annex A. It followed, as he thought, that the debtor could
not be heard to say that his centre of main interests was in another member state at a time
before October 2003 (when the debtor's appeal from the order made by Mr Registrar
Baister on 18 July 2003 was dismissed). As the registrar put it, at paragraph 6 of his
judgment:

> "There can be no doubt at all that until this time, that is until
> October 2003, it was in England and Wales".

The registrar accepted (at paragraph 16) that the time at which the centre of main interests
was to be ascertained was the date of the hearing; but he directed himself that:

> ". . . in order to give effect to the policy of the Convention, the
> court must, in my judgment, have regard to the time at which
> the debt is incurred because that is the time at which the
> creditors need to assess the risks of insolvency."

The reference by the registrar to "the Convention" in that context is, I think, to the
Convention on Insolvency Proceedings signed on 23 November 1995 on which Council
Regulation (EC) No 1346/2000 is based.

23. That approach, when applied to the facts, led the registrar to conclude that he had to
consider "what the debtor's centre of main interests was in the period of approximately 8
months between February and October 2003". On that basis, he concluded that the

debtor's centre of main interests was within England and Wales. As he put it, at paragraph 19 of his judgment:

> ". . . if it had been suggested to his creditors at the time the debts were incurred that his centre of main interests was Spain rather than England, they would have been incredulous. I have no doubt at all that in this case the debtor's centre of main interests is England and Wales and that, accordingly, the bankruptcy court has jurisdiction over all his assets, wherever situated."

24. The registrar made a bankruptcy order on the basis that he was satisfied "that the EC Regulation does apply and that these proceedings are main proceedings as defined in Article 3 of the Regulation". But, notwithstanding his clear view that the jurisdiction had been established under article 3.1 of the Regulation, he went on to consider whether the debtor had an establishment in England for the purposes of article 3.2. He held that that question, also, should be answered in the affirmative. At paragraph 20 of his judgment he said this:

> "Again, I consider that the court must look at the period when the debts were incurred. At this time the debtor retained his directorship of Sinclair Research Ltd and his interest in Sunrise Business Park. I consider that both of these interests constituted establishments for the purposes of Article 3.2 in the sense that they were places where the debtor carried out a non-transitory economic activity with human means and goods."

*The appeal to the High Court*

25. The debtor appealed to a judge of the High Court. In his appellant's notice he took the point that the registrar had erred in holding that the relevant time for determining a debtor's centre of main interest was the time when the petition debt was incurred (rather than at the hearing of the petition); and had erred in holding that the underlying policy of the Regulation required the court to have regard to the perception of an individual creditor when determining a debtor's centre of main interests. He took the timing point in relation, also, to the question whether a debtor had an establishment for the purposes of article 3.2. And he challenged the registrar's conclusion that his continuing directorship of Sinclair Research Limited and his interest in Unit 2A Sunrise Business Park justified an affirmative answer to that question.

26. The appeal came before Mr Justice Mann. He handed down a written judgment on 26 November 2004 ([2004] EWHC 2752 (Ch)). He noted, at paragraph 12 of his judgment, that it had become common ground in the course of the hearing that the relevant date for assessing the centre of main interests and the existence of an establishment – or, more accurately, I think, the date by reference to which those matters are to be assessed – was the date of the hearing of the petition or (perhaps) the date of the presentation of the

petition. But, as he observed, it was not accepted by the petitioner that (on a true analysis of the registrar's judgment) the registrar had assessed the position as at an earlier date.

27. The judge resolved that issue in favour of the debtor. He pointed out that there was an apparent inconsistency between the third sentence of paragraph 16 in the registrar's judgment – "I have to decide now what is his centre of main interests" – and the final sentence of paragraph 17 – "I therefore have to consider what the debtor's centre of main interests was in the period of approximately 8 months between February and October 2003". He concluded that the registrar had "shifted the focus of his enquiry on the date of the hearing before him back to the earlier date referred to [the date or dates on which the debts were incurred]". In that respect the registrar had fallen into error. Accordingly the judge took the view that he had to consider the matter afresh on the material before him.

28. The judge directed himself that the enquiry as to the debtor's centre of main interest is "an overall enquiry which takes into account all relevant facts, giving to each of the facts such weight as is appropriate to the circumstances of the particular case". At paragraphs 28 to 36 of his judgment, he set out the facts of which he was to take account under four heads – work related matters, English residence, Spanish residence and other property interests. At paragraph 37 he summarised "the overall evidential position" in these terms:

> "Mr Vlieland-Boddy has stated that he has moved his home, his work and his life to Spain. He has backed that up with some documentation. He has, however, left some significant suspicion behind him that that is not the actual position, he has retained interests here which he denies having and that his steps to take himself out of the jurisdiction are somehow a deliberate attempt to remove himself. I do not think that a deliberate attempt to remove oneself from the English jurisdiction is necessarily something undesirable or to be guaranteed against – since a centre of main interests can be changed, there is nothing necessarily wrong or sinister in  making a choice to do it. The suspicions, however, remain, and they are strong. Where do they leave the matter?"

He went on, at paragraph 38, to say this:

> "Looking at the matter as Mr Vlieland-Boddy would like to present it as at the present date, without delving into the suspicious matters, would tend to demonstrate that Mr Vlieland-Boddy's main centre of interests has indeed become Spain and is not in England and Wales. He apparently lives there and he works there. He does not work in the UK. Whilst he is the joint registered proprietor of the Milland House [the former matrimonial home], he disclaims any interest in it and says he does not live there. . . . The petitioner challenges this and says that he has not in fact broken the ties in the manner which he claims, and that as a result he should be treated as though his centre of main interests were here. . . . I think that

> underlying the petitioner's case is a suggestion that the move is
> not genuine but has elements of sham about it, and that this is
> the sort of 'convenient' or non-genuine change that the courts
> should be astute to guard against."

29. The judge observed that he could not hold that the move was other than genuine without
disbelieving the debtor's assertions as to his commitment to Spain and his divorce from
ties in the United Kingdom. He pointed out that the petitioner had not sought to test those
assertions by cross-examination. He held that it would not be fair to disbelieve the debtor
without "a proper testing of his evidence". And so he came to the conclusion that the
petitioner had not established the existence of jurisdiction under article 3.1. He said this,
at paragraph 41 of his judgment:

> "The burden is on the petitioner to establish jurisdiction. While
> the petitioner has certainly established an English centre of
> main interests until October 2003, Mr Vlieland-Boddy's
> evidence, if accepted fully, would show a shift to Spain. I am
> not in a position in which I can disbelieve his assertions as to
> what he has done and why he has done it, and in those
> circumstances the petitioner has not discharged the burden on
> him. On the present state of the evidence, Mr Vlieland-Boddy
> seems to be administering his interests from Spain, and I cannot
> conclude that this apparent state of affairs is somehow false or
> temporary. Therefore his centre of main interests appears to be
> in Spain."

30. The judge then went on to consider whether the registrar had been correct to decide (in
the alternative) that territorial jurisdiction arose under article 3.2 of the EC Regulation.
He identified the two factors relied upon as satisfying the requirement that "the debtor
possesses an establishment within the territory": (i) the debtor's interest in Sinclair
Research limited and (ii) his interest in Unit 2A, Sunrise Business Park. The judge
reminded himself that "establishment" was a defined term for the purposes of the EC
Regulation:

> "'establishment' shall mean any place of operations where the
> debtor carries out a non-transitory economic activity with
> human means and goods."

He held that that relevant time for determining whether the debtor was possessed of an
establishment was the date of the hearing before the registrar. The registrar was in error in
looking at the position during the period when the debts were incurred.

31. The judge seems to have accepted that, at the relevant time, the debtor was a director and
the company secretary of Sinclair Research Limited and that he held shares in that
company. But he held that none of those matters "either separately or in combination"
involved the debtor (as distinct from the company) carrying out 'a non-transitory

economic activity with human means and goods' As he put it, at paragraph 44 of his judgment:

> "Holding that sort of office does not seem to me to come within the wording or the concept of 'establishment' within the Regulation."

32. The judge then turned to the property at Blandford Forum – Millennium House, Unit 2A, Sunrise Business Park. He said this:

> "At the date of the hearing before the Registrar this property was not owned by Mr Vlieland-Boddy. It was owned by Millennium. Unless Millennium was a sham and in effect a front or nominee for Mr Vlieland-Boddy, it was that company that was carrying on the activity of letting it and (presumably, though there was no evidence about this) managing it. Even if Mr Vlieland-Boddy is interested in Millennium to the extent of being its beneficial owner, I cannot ignore the corporate structure (in the absence of nomineeship) so Mr Vlieland-Boddy was not carrying on those activities himself. Accordingly he does not fall within the definition in Article 2 and this building is not an establishment of his in this jurisdiction. This conclusion makes it unnecessary for me to consider the extent to which owning and running a building which is fully let would fall within the rest of the wording of the definition, and I make no findings in that respect."

33. Accordingly, the judge allowed the appeal. By his order dated 26 November 2004 he set aside the bankruptcy order of 13 July 2004 and he dismissed the petition presented on 27 February 2004. He ordered Mr Shierson to pay the debtor's costs of the appeal and before the registrar.

*This appeal*

34. The petitioning creditor, Mr Shierson, appeals to this Court. He does so with the permission of this Court granted on 17 December 2004. In granting permission for what is a second appeal Lord Justice Jonathan Parker observed that the grounds of appeal raised questions of general importance as to the approach the courts should adopt to the interpretation and application of article 3 of Council Regulation (EC) No 1346/2000.

35. There are four grounds of appeal set out in the appellant's notice; but, on analysis, they reduce to three, which may be summarised as follows. First, in holding that the registrar had "shifted the focus of his enquiry on the date of the hearing before him back to the earlier date [when the debts were incurred]", the judge misunderstood the registrar's reasoning. He failed to appreciate that the registrar had understood, correctly, that the situation of the centre of the debtor's main interest had to be decided at the date of the hearing; but had held that, in making that decision it was appropriate to look back at all

the circumstances and, in particular, at what the creditors would have believed to be the centre of main interest at the time of giving credit.

36. Second (but set out under grounds 2 and 3), the judge erred in his own construction of the Regulation. Instead of approaching the question 'where is the centre of the debtor's main interest' by considering all of the historical facts relating to the debtor, giving particular importance to the perception of the creditors at the time of giving credit (as the registrar had done), the judge gave too much weight to the debtor's current residence at the time of the hearing and so failed to give proper effect to the policy against 'forum shopping' which (it is said) lies behind the Regulation.

37. Third, the judge's approach to the meaning of 'establishment' was unduly strict. In particular the judge was wrong to hold that a debtor may divest himself of an asset by making a transfer of that asset to a corporate body which he controls.

38. It is convenient to consider the first two of those grounds together. The issue on which each may be said to turn is, I think, the same: what weight should be given to the perception of creditors as to the debtor's centre of main interest at the time that credit is extended. In particular, how ready should the court be to accept that the debtor is free to change his centre of main interest between the time at which credit is extended and the opening of insolvency proceedings.  It is a striking feature of the present case that the petition debt, itself, arises from costs orders made in proceedings in which the debtor was invoking the insolvency jurisdiction of the High Court on the basis that his centre of main interests was in the United Kingdom.

*Centre of main interest*

39. There is not, I think, any doubt as to the date in relation to which the debtor's centre of main interests falls to be determined for the purposes of the Regulation. Jurisdiction to open insolvency proceedings is conferred, under article 3.1, on the courts of the member state "within the territory of which the centre of main interests is situated". The "time of the opening of proceedings" means "the time at which the judgment opening proceedings becomes effective, whether it is a final judgment or not" – article 2(f). "Judgment", in that context, includes the decision of any court empowered to open such proceedings – article 2(e).  The judge was correct to take the view that, before it could assume jurisdiction to open main insolvency proceedings, the court of a member state must be satisfied that, at the time that it did so, the debtor's centre of main interests was situated within the territory of that state. That, too, had been the view of the registrar, as appears from the third sentence of paragraph 16 in his judgment – "I have to decide now what is his centre of main interests".

40. The matter on which the judge differed from the registrar was as to the weight to be given to historical fact; or, as I have already put it, how ready should the court be to accept that the debtor is free to change his centre of main interests between the time at which the debts are incurred and the opening of insolvency proceedings. The judge summarised the contentions advanced on behalf of Mr Shierson at paragraph 18 of his judgment:

"I will deal first with the manner in which [counsel] says I should approach the construction and operation of the Regulation. He points out that Recital 4 in the Regulation confirms that there is a policy behind the regulation to prevent 'forum shopping'. He says it would be 'astonishing' if debtors could forum shop by moving from country to country. In that way they could avoid important safeguards such as the English rights to challenge transactions under sections 339 and 423 of the Insolvency Act 1986 (transactions at an undervalue and transactions intended to defraud creditors). The Regulation should not be applied so as to enable debtors to effect an objectionable transaction and then move to a jurisdiction which makes the recovery of assets subject to such transactions more difficult or even impossible. These sort of considerations should inform the construction and application of Article 3.1, and the key was to take a proper view of the concept of 'the centre of his main interests'. The test must be an objective one. [Counsel] accepted that that centre might in some exceptional circumstances change but it would usually remain 'fixed over time' in the jurisdiction in which a person has his most real and substantial connection. The court must look at the way in which the debtor involved has organised his affairs, where the relevant debts were incurred, where his emotional ties are and so on. Just as a person domiciled in one country cannot easily change his domicile by 'fleeing' to another country, 'so a person cannot change what objectively is the centre of his main interests'. The centre is not fixed by transitory questions such as where that person is currently living, but by the way in which the individual has conducted his life. A court should be slow to decline jurisdiction on the basis that a person has given up his centre of main interests merely on the basis of residence abroad. . . .

At times [counsel's] submissions came close to a submission that the centre of main interests is in essence fixed at the place where it was when his debts were incurred."

41. If counsel had gone so far as to submit that the centre of main interests was fixed at the place where it was when the debts were incurred, the judge was plainly right to reject that submission for the reasons which he gave. To hold that the centre of main interests was fixed by some past event would be inconsistent with the language of article 3.1. The article requires the court to look at the position as it is at the date of the decision to assume (or decline) jurisdiction, not at the position as it was at some earlier date. Further, to fix the centre of main interests at the place where the debts were incurred "would be illogical and unworkable". As the judge put it: "If it is possible to change a centre of main interests, why should it be fixed by reference to certain debts? If it is to be so fixed, by reference to which debts is it to be fixed?"

42. "Centre of main interests" is not included amongst the terms and expressions defined in article 2 of the Regulation. But guidance as to the meaning of the concept is given in recital (13):

> "The 'centre of main interests' should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties."

The judge observed, correctly in my view, that there is nothing in that concept which prevents a debtor's centre of main interests from being changed from time to time. He went on to say this, at paragraph 19 of his judgment:

> ". . . the only question which is going to arise in any particular case is whether or not it has in fact changed. [Counsel] is obviously right in saying that the test to be applied is an objective one, but it does not follow from that that the debtor has no choice in the matter. If a centre of main interests is changed it is obviously because of the subjective choices of the debtor in question; he chooses where he is going to carry on his commercial, domestic and emotional activities, but it is then an objective question as to whether or not the change in those activities has brought about a new centre of main interests."

43. Save that I would question (i) whether a concept based on conduct of "the administration of his interests on a regular basis" really invites an enquiry into the debtor's "emotional activities" – other than to the extent that where he lives and has his home is likely to be relevant to a determination of where he conducts the administration of his interests – and (ii) whether "the only question" which will arise in any particular case is whether or not the debtor's centre of main interests has changed, I would not quarrel with the judge's analysis in that paragraph. He was plainly correct, if I may say so, to appreciate that the place in which a debtor carries on whatever activities fall within the phrase "the administration of his interests" is for the debtor to choose. In that sense, it is a matter of subjective choice. And he was correct to appreciate that, although the debtor may choose where he carries on activities which fall within that phrase, the question "where does he conduct the administration of his interests on a regular basis" remains an objective question. The place where the debtor conducts the administration of his interests on a regular basis must be ascertainable by third parties (recital (13) to the Regulation) and by the court (article 3.1).

44. Further, although the judge may have overstated the position when he said that "the only question which is going to arise in any particular case" is whether the debtor's centre of main interests has in fact changed, that is the question – and, in the context of article 3.1, the only question – which arises in the present case. There is no doubt that, on the facts of the present case, the debtor's centre of main interests was in the United Kingdom until his move to Spain in June 2003. The question for the registrar in July 2004 was whether there had been a change between June 2003 – or, perhaps, October 2003 when the debtor ceased to pursue his proposals for an individual voluntary arrangement - and the date of

the hearing of the bankruptcy petition; that being, I think, the earliest date on which it
could be said that there was a judgment opening main insolvency proceedings.

45.  In addressing that question counsel for the appellant relies, in this Court as he did before
the registrar and before the judge, on recital (4) to the Regulation:

> "It is necessary for the proper functioning of the internal market
> to avoid incentives for the parties to transfer assets or judicial
> proceedings from one Member State to another, seeking to
> obtain a more favourable legal position (forum shopping)."

It is that objective, with others, that justifies "action at Community level" – recital (5).
The objective set out in recital (4) should be read with recitals (8) and (12):

> "(8)      In order to achieve the aim of improving the efficiency
> and effectiveness of insolvency proceedings having cross-
> border effects, it is necessary, and appropriate, that the
> provisions on jurisdiction, recognition and applicable law in
> this area should be contained in a Community law measure
> which is binding and directly applicable in Member States.
>
> . . .
>
> (12)      This Regulation enables the main insolvency
> proceedings to be opened in the Member State where the debtor
> has the centre of his main interests. These proceedings have
> universal scope and aim at encompassing all the debtor's assets.
> To protect the diversity of interests, this regulation permits
> secondary proceedings to be opened to run in parallel with the
> main proceedings. Secondary proceedings may be opened in a
> Member State where the debtor has an establishment. The
> effects of secondary proceedings are limited to the assets
> located in that State. Mandatory rules of coordination with the
> main proceedings satisfy the need for unity in the Community."

46. When seen in context, recital (4) of the Regulation provides little, if any, assistance to the
appellant. The need "to avoid incentives for the parties to transfer assets . . . from one
Member State to another" is met by the Community regime (introduced by the
Regulation) which gives to the main proceedings "universal scope" and the aim of
"encompassing all the debtor's assets". So no advantage is obtained by moving assets
from one territory to another. The need "to avoid incentives to the parties to . . . transfer
judicial proceedings from one Member State to another" – by which, I think, is meant (at
least, primarily) the need to avoid forum shopping by the creditor - is met by restricting
the courts in which insolvency proceedings may be opened. For my part, I do not think
that recital (4) is directed to the question in the present case: whether and in what
circumstances there could be a change in the debtor's centre of main interests. Recital (4)
cannot be read as imposing some restriction on the ability of the debtor to choose where
he carries on the activities which fall within the concept "administration of his interests";

nor to require the court to give some special meaning to the phrase "where the debtor conducts the administration of his interests on a regular basis".  The most that can be said, as it seems to me, is that the court should look critically at the facts which are said to give rise to a change in the centre of a debtor's main interests in circumstances where there are grounds for suspicion that the debtor has sought, deliberately, to change his centre of main interests at a time when he is insolvent in order to alter the insolvency rules which will apply to him in respect of existing debts.

47.  Reliance was placed, also, on the Report on the Convention on Insolvency Proceedings by Professor Virgos and Dr Schmit. As I have said, the Convention, which was opened for signature on 23 November 1995, provides the basis for the Regulation, made on 29 May 2000. The version of the report with which we have been provided is dated 8 July 1996. It is common ground that regard may be had to the report in order to assist in the interpretation of the Regulation. Section III, Part B, Chapter 3 contains a commentary on the general provisions of the Convention, article 3 of which was in the same terms (so far as material) as those later enacted in the Regulation.  Paragraph 75 explains what is meant by the concept of 'centre of main interests':

> "The concept of 'centre of main interests' must be interpreted as the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties.
>
> The rationale of this rule is not difficult to explain. Insolvency is a foreseeable risk. It is therefore important that international jurisdiction (which, as we shall see, entails the application of the insolvency laws of that Contracting State) be based on a place known to the debtor's potential creditors. This enables the legal risks which would have to be assumed in the case of insolvency to be calculated.
>
> By using the term 'interests', the intention was to encompass not only commercial, industrial or professional activities, but also general economic activities, so as to  include the activities of private individuals (eg consumers). The expression 'main' serves as a criterion for the cases where those interests include activities of different types which are run from different centres.
>
> In principle, the centre of main interests will in the case of professionals be the place of their professional domicile and for natural persons in general, the place of their habitual residence.
>
> . . ."

It will be noted that the first sentence of that paragraph has been taken into the Regulation as recital (13).

48. The appellant emphasises what is said in the *Virgos-Schmit Report* to be the rationale of the rule which confers jurisdiction to open main insolvency proceedings on the courts of the member state in which the centre of the debtor's main interests is situated. It is to enable the legal risks to which creditors will be subject in the event of the debtor's insolvency to be evaluated in advance on the basis that the legal system which will govern that insolvency is known. A creditor will know – or will be able to assess with some confidence – what will be the centre of the debtor's main interests on the basis of the facts as they are at the time when he extends credit. But it is reading too much into the commentary to conclude that the centre of main interests will not change – if the underlying facts change – between the time that the creditor extends credit and the time when a court is asked to open insolvency proceedings. That could not have been in the minds of the commentators.

49. The point may be illustrated by an example. Suppose a case in which the debtor incurs debts in the territory of State A and then (while those debts remain unpaid) relocates his home and business to the territory of State B. He then incurs further debts in the territory of State B and becomes insolvent. It is of as much importance to the creditors in State B to know – or to be able to assess – where the debtor's centre of main interests is situated as it is to the creditors in State A. Seen through the eyes of the creditors in State B the debtor is conducting the administration of his interests on a regular basis in State B. Seen through the eyes of the creditors in State A, at the time when the debts to them were incurred, the debtor was conducting the administration of his interests on a regular basis in State A. But it is a necessary feature of the Community regime established by the Regulation that, at the time when a court is asked to open insolvency proceedings, the debtor can have only one centre of main interests within the Community. There is nothing in the *Virgos-Schmit* commentary which suggests that that should situated in State A, rather than in State B. In particular, there is nothing in that commentary to suggest that the centre of main interests, once established in State A, remains in State A – notwithstanding the debtor's relocation to State B – until, say, all his debts in State A have been paid.

50. In my view the commentary does not support any principle of immutability. It does no more than point out the obvious advantages of a scheme under which, *so far as possible*, a creditor will be able to identify the legal system which will govern his debtor's insolvency at the time he advances credit. But unless the debtor is to be prevented from relocating his home and business – which he may wish to do for perfectly proper reasons unconnected with any threat of insolvency – there is a limit to the extent to which those advantages can be guaranteed.

51. We were referred to the decision of His Honour Judge Howarth, sitting as a judge of the High Court, in *Skjevesland v Geveran Trading Company Limited* [2002] EWHC 2898 (Ch). In that case the registrar had decided that the debtor's centre of main interests was situated in Switzerland. On the evidence which was before him it is difficult to see how he could have come to any other conclusion. He summarised that evidence in these terms:

> "I have to consider the question referred to in the Virgos-Schmit report about where his commercial, industrial, professional activities and his general economic activities are carried out. Mr Skjevesland is at pains, without adverting to the European regulation, which he did not know about, to tell me that 90 per cent of his economic activities are carried out in

> Switzerland. He said that was where his business affairs were.
> His pension was there; his family were there. All his money
> went through companies which were involved in Switzerland,
> and bank accounts which he maintained in Switzerland and he
> was a Swiss banker, which was all he had wanted to be, and
> had always wanted to be for the foreseeable future. It is quite
> true that he said he conducted business in Spain. I do not think
> he told me in his evidence in October that he conducted more
> business in Spain than anywhere else, although he tells me that
> now in his fifth witness statement."

The judge agreed. The effect of that decision was that article 3 of Regulation (EC)
1346/2000 did not displace the bankruptcy jurisdiction which (as the registrar found) the
High Court would otherwise have under section 265 of the Insolvency Act 1986. I do not,
for my part, find anything in the *Skjevesland* case which assists the appellant in the
present case.

52. We were taken, also, to the decision of His Honour Judge McGonigal, in the High Court,
in *In re Daisytek-ISA Ltd and others* [2004] BPIR 30. The issue in that case was where
the centre of main interests of French and German subsidiaries of ISA International plc
("International") was situated for the purposes of article 3.1 of the Regulation. After
referring to recital (13) to the Regulation, to the commentary at paragraph 75 of the
*Virgos-Schmit Report* and to the registrar's decision in S*kjevesland v Geveran Trading
Company Limited*, the judge said this (*ibid*, para [16], page 34):

> "In my view the most important 'third parties' referred to in
> recital 13 are the potential creditors. In the case of a trading
> company the most important groups of potential creditors are
> likely to be its financiers and its trade suppliers. The evidence
> in this case is that the financing of the business of the German
> companies by a factoring agreement was organised for them by
> International in Bradford and that 70% of goods supplied to the
> German companies are supplied under contracts made by
> International in Bradford. It appears that a large majority of
> potential creditors by value (which I regard as the relevant
> criterion) know that Bradford is where many important
> functions of the German companies are carried out."

On the basis of that evidence the judge reached the conclusion that Bradford was the
centre of main interests of the German companies. Similar evidence led to the same
conclusion in relation to the French companies. There is nothing surprising or
controversial about that. It was plainly appropriate to ask where potential creditors would
think the debtors were conducting the administration of its interests on a regular basis.
But the judge in *Daisytek* was not faced with the question in the present case: that is to
say, the question which arises when the debtor has made (and sought to carry into effect)
a deliberate choice to move the place at which he conducts the administration of his
affairs on a regular basis from the territory of one member state to the territory of another
member state. The decision is not, I think, of any assistance in the present context.

53. Of more relevance is the decision of His Honour Judge Langan QC in *In re Ci4net.com Inc and another* [2004] EWHC 1941 (Ch) (20 May 2004, unreported). The judge thought that it was necessary to decide whether two companies, Ci4net.com Inc and DBP Holdings Limited, had centres of main interests in London – although it is not clear from the report that there was any other territory within the Community with a real claim. At paragraph 17 of his judgment he addressed the question of timing:

> "There were differences between counsel as to the approach which the court should adopt to a company which . . . had its CoMI in England whilst it was active in the market place, but which has ceased to trade. Mr Clarke [counsel for the companies] would agree with Ms Stonefrost [counsel for the creditor bank] to the extent that the EC Regulation should be applied in a manner which will discountenance attempts by a company to 'forum shop'. It is, both would accept, important that trade creditors should know in what jurisdiction they will be able to pursue the assets of the company if it leaves their debts unpaid. It would, Ms Stonefrost said in her oral submissions, 'be contrary to the policy of the EC Regulation for a company to be able to remove itself from the jurisdiction by ceasing to trade'. This, Mr Clarke said, goes too far. The question of timing is, he said, of importance. Mr Clarke accepts that a more or less cynical removal of the seat of a company's operations from the EU to a non-EU territory a few weeks or months before the business goes to the wall would not be regarded as working an alteration in the CoMI of the company. There is, however a great difference between that and a restructuring of the business which is carried out for sound commercial reasons long before the question of insolvency proceedings becomes live. In the latter situation the policy against forum shopping does not raise a bar to a change in the company's CoMI being effected upon the company's ceasing to trade in the EU."

And, at paragraph 18, the judge went on:

> "The differences between counsel is, I think, one of emphasis rather than of principle. . . . To the limited extent to which I think there is a material controversy here, I prefer Mr Clarke's approach. In my judgment Ms Stonefrost comes too close to saying (although she did not in fact say it) that, once a company has a CoMI within the EU, it is stuck with that CoMI on ceasing to trade, notwithstanding the time at which, or the circumstances in which, that cessation occurs."

Nevertheless, the judge accepted that a centre of main interest must have some element of permanence. The sole director of Ci4net.com Inc had given evidence to the effect that, since 2001, the business of that company had been conducted from wherever he happened

to be at the time, which would be either in Spain or in New York. The judge found that evidence unimpressive. At paragraph 26 of his judgment he said this:

> "The notion of the location of a business shifting as its director moves from one country to another does not sit easily with the policy which underlies the EC Regulation. A business must under the EC Regulation have a CoMI and, in my judgment, a CoMI must have some element of permanence."

He concluded, at paragraph 30:

> "The CoMI of [Ci4net.com Inc] was until at least April 2001 in London, and what has occurred since is not sufficient (even if supported by the presumption in favour of the place of the registered office) to justify a finding that the CoMI is now elsewhere."

54. I should add, for completeness, that we were referred to the decision of the Irish Supreme Court in *In the Matter of Eurofoods IFSC Limited* [2005] I L Pr 2. The Irish Court pointed out that there were two elements to be considered under recital (13) to the Regulation: (i) that the centre of main interests should be where the company has conducted the administration of its interests on a regular basis and (ii) that the centre of main interests must be such as is ascertainable by third parties. But, beyond that, there is nothing which assists on the issues in the present appeal. The Irish Court referred questions to the European Court of Justice for a preliminary ruling; but it has not been suggested that those are questions which arise in the present appeal.

55. I have set out the authorities to which we were referred in deference to the arguments which were addressed to us and in recognition that the point in the present appeal has not previously been before this Court. But, as it seems to me, they provide little assistance in the context of the present appeal. The question raised in this appeal must be determined by construing article 3.1 of the Regulation in the light of the Community purpose which the Regulation was intended to promote. I can summarise my own conclusions as follows:

(1) A debtor's centre of main interests is to be determined at the time that the court is required to decide whether to open insolvency proceedings. In a case where those proceedings are commenced by the presentation of a bankruptcy petition, that time will normally be the hearing of the petition. But, in a case such as the present, where the issue arises in the context of an application for permission to serve the petition out of the jurisdiction, the time at which the centre of the debtor's main interests falls to be determined will be at the hearing of that application. Similar considerations would apply if the court were faced with an application for interim relief in advance of the hearing of the petition.

(2) The centre of main interests is to be determined in the light of the facts as they are at the relevant time for determination. But those facts include historical facts which have led to the position as it is at the time for determination.

(3)     In making its determination the court must have regard to the need for the centre of main interests to be ascertainable by third parties; in particular, creditors and potential creditors. It is important, therefore, to have regard not only to what the debtor is doing but also to what he would be perceived to be doing by an objective observer. And it is important, also, to have regard to the need, if the centre of main interests is to be ascertainable by third parties, for an element of permanence. The court should be slow to accept that an established centre of main interests has been changed by activities which may turn out to be temporary or transitory.

(4)     There is no principle of immutability. A debtor must be free to choose where he carries on those activities which fall within the concept of "administration of his interests". He must be free to relocate his home and his business. And, if he has altered the place at which he conducts the administration of his interests on a regular basis - by choosing to carry on the relevant activities (in a way which is ascertainable by third parties) at another place – the court must recognise and give effect to that.

(5)     It is a necessary incident of the debtor's freedom to choose where he carries on those activities which fall within the concept of "administration of his interests", that he may choose to do so for a self-serving purpose. In particular, he may choose to do so at time when insolvency threatens. In circumstances where there are grounds for suspicion that a debtor has sought, deliberately, to change his centre of main interests at a time when he is insolvent, or threatened with insolvency, in order to alter the insolvency rules which will apply to him in respect of existing debts, the court will need to scrutinise the facts which are said to give rise to a change in the centre of main interests with that in mind. The court will need to be satisfied that the change in the place where the activities which fall within the concept of "administration of his interests" are carried on which is said to have occurred is a change based on substance and not an illusion; and that that change has the necessary element of permanence.

56. Applying those principles to the facts in the present case, I find it impossible to say that the judge was not entitled to reach the conclusion that he did – that the debtor's centre of main interests had moved to Spain. The judge was clearly aware that there were grounds for suspicion that the move was self-serving and might not be genuine. But, unless he were prepared to disbelieve the debtor's evidence as to what he was doing in Spain and why he was living there, the judge was bound to take that evidence into account. He held that it would not be fair to the debtor to disbelieve that evidence in the circumstances that the petitioner had chosen not to test it by cross-examination. He cannot be said to have erred in taking that view. As Mr Justice Rimer observed, in *Long v Farrer & Co and another* [2004] EWHC 1774 (Ch) [57], [2004] BPIR 1218, 1233:

> "It is . . . by now familiar law that, subject to limited exceptions, the court cannot and should not disbelieve the evidence of a witness given on paper in the absence of the cross-examination of that witness."

That is not, of course, to say that the court is bound to accept untested evidence which is plainly incredible (*ibid*, [61]). But the debtor's evidence as to what he was doing in Spain and why he was living there – in contrast to other evidence (for example, his evidence that he had had no connection with Millennium Investment International Limited) – was not of that character.

*Establishment*

57. I turn, therefore, to the remaining issue: whether the judge was wrong to reverse the registrar's decision that the High Court had jurisdiction to open territorial insolvency proceedings under article 3.2 of the Regulation on the ground that the debtor possessed an establishment within the United Kingdom. I should say at once that I do not regard the contention that jurisdiction under article 3.2 can be founded on the unintended failure of the debtor effectively to resign his directorship of Sinclair Research Limited as seriously arguable. The real issue is whether the debtor retained an interest in Millennium House, Unit 2A Sunrise Business Park, Blandford Forum and, if so, whether that interest was sufficient to found jurisdiction under article 3.2.

58. It appears from an official copy of the entries at HM Land Registry under title number DT 190634, issued on 13 April 2004, that the registered proprietors of Unit 2A Sunrise Park were then the debtor and his wife, Mrs Diana Vlieland-Boddy. The property was subject to a charge dated 4 September 2002 in favour of Millennium Investment International Limited ("Millennium"), whose address is shown in the register as Millennium House, Unit 2A, Sunrise Business Park. The charge of 4 September 2002, as I have said, is executed by both the debtor and his wife and contains a recital that the debtor was then entitled to the entire beneficial interest in the property.

59. In a witness statement made on 10 May 2004 the debtor said this (at paragraph 7):

> "Unit 2a Sunrise Business Park was sold to Millennium Investment International Limited in June 2003 for £220,000. Due to a lien on the deeds, this was not actually finalised until January 2004. It has now been registered. Previously Millennium Investment had advanced me monies totalling £220,000 principally for legal fees and to meet costs which the petitioner had ordered against me."

In a witness statement of the same date, 10 May 2004, Mr Robert Freestone, a chartered accountant practising from premises at 1 The Centre, High Street, Gillingham, confirmed that the debtor "did have an investment property at 2a Sunrise Business Park" but went on to say that that "was sold in June 2003". The registrar recorded, at paragraph 9 of his judgment, that on 6 April 2004 the Land Registry received an application to register a transfer of the property to Millennium. The judge accepted (at paragraph 45 of his judgment) that:

> "As at the date of the hearing before the Registrar this property [Unit 2A] was not owned by Mr Vlieland-Boddy. It was owned by Millennium."

He was referring, there, to the hearing of the petition in, I think, May 2004.

60. The judge went on, in a passage which I have set out earlier in this judgment, to say this:

> "Unless Millennium was a sham and in effect a front or nominee for Mr Vlieland-Boddy, it was that company that was carrying on the activity of letting it and (presumably, though there was no evidence about this) managing it. Even if Mr Vlieland-Boddy is interested in Millennium to the extent of being its beneficial owner, I cannot ignore the corporate structure (in the absence of nomineeship) so Mr Vlieland-Boddy was not carrying out those activities himself."

61. The judge did not, as it seems to me, rule out the possibility that Millennium was a front or nominee for the debtor. It is pertinent to keep in mind that, on 12 October 2002, the flat at 127 Westminster Bridge Road, then registered in the joint names of the debtor and his wife, was transferred to Millennium for no consideration. The judge accepted that that transaction had not been satisfactorily explained. At paragraphs 33 and 34 of his judgment he said this:

> ". . . An explanation was offered to the Registrar. It came in the form of a letter from solicitors who acted in the purchase of the lease. It is addressed to the debtor's current solicitor, and it was prepared and sent in the short period between some reply evidence put in by the petitioner and the date of the hearing before the Registrar . . . The letter explains that the solicitor in question (Mr Copeland of Messrs Barfields) was instructed in connection with the conveyancing at the request of the debtor. His initial understanding of the position was that the lease of the flat would be in the name of the debtor and his wife
>
> > 'and I proceeded on that basis. Mr Vlieland-Boddy had become aware of this after I had completed registration of the lease and sent him a copy of the land registry entries. He immediately realised that instead of my registering the property in the name of Millennium Investments International Limited I had in error registered the proprietors as himself and his wife. Directly this error was discovered immediate steps were taken to rectify this situation and Millennium was registered as the proprietors of the property. . . .'
>
> This short explanation comes from the solicitor, not from Mr Vlieland-Boddy himself. Since he only knew part of the circumstances, obviously he can only deal with what he knows. However, the letter does raise other matters which require an explanation. This was a transaction in which a new lease was granted. It is to be inferred that the debtor and his wife were required to execute the lease. It must have been sent to them for

that purpose, and they must have executed it. If the position was that there was some mistake in the communication of instructions, and the lessee should have been Millennium, why was it not spotted at that point? This factor alone causes one to question the explanation. In addition, it is not at all easy to see how instructions can be given by the wrong parties when the wrong parties are a husband and wife who are taking care to divide up properties between them. Furthermore, the company identified (Millennium) is a company which featured several times in Mr Vlieland-Boddy's affairs. He maintained that it is a company in which he is not interested. Why, then was he giving instructions for the property to be transferred to Millennium? More than that, if his case is that he had originally intended that the lease should be put in Millennium's name, why was he acting for Millennium in this transaction if he had nothing to do with this company? In the land registry proprietorship register for the Blandford Forum property the debtor's address is given as this flat, again tending to demonstrate a connection between Mr Vlieland-Boddy and Millennium. The Registrar's suspicions were entirely justified . . ."

62.    Those remarks were made in the context of the flat at 127 Westminster Bridge Road. The judge turned to the position in relation to Unit 2A, Sunrise Business Park, at paragraph 36 of his judgment. After observing that no documents had been produced to support the debtor's assertion that that property had been sold to Millennium in June 2003, the judge said this:

"The entries at HM Land Registry recorded that: "The price stated to have been paid on 30th January 2004 was £220,000" Thus he says there was a sale in some sense in June 2003, and the land registry documents show that the price was not paid until the end of January 2004. Then the purchaser apparently delayed registering its transaction until April 2004 – [counsel for the petitioner] drew my attention to the fact that this was after the petition was finally served on Mr Vlieland-Boddy. As I have said, Mr Vlieland-Boddy has said that Millennium has nothing to do with him. The directors are a Mr Biggs and the Mr Jones referred to above. The true beneficial owners of the property cannot be ascertained from searching out the registry in the BVI. Mr Jones is clearly some sort of associate of Mr Vlieland-Boddy – the first IVA proposals record Mr Jones as helping Mr Vlieland-Boddy with his child's school fees. The circumstances surrounding the flat at Westminster Bridge Road cast very serious doubt on Mr Vlieland-Boddy's evidence that he is not interested in Millennium. If that were the case, why was he giving instructions to purchase a flat for it? If the sale [of Unit 2A] were a genuine arm's length sale to a genuine arm's length purchaser, why did it take the purchaser so long to

> get round to registering the purchase? Once more, a less than
> convincing story has been told by Mr Vlieland-Boddy."

63. One fact, at least, is not open to doubt. The debtor (with his wife) was the legal owner of
Unit 2A at the time when the registrar declared, on 27 February 2004, that there was
jurisdiction to open territorial insolvency proceedings. That fact (amongst others) was
relied upon by the petitioner at the time as a foundation for jurisdiction under article 3.2.
Neither the registrar, nor the judge, were satisfied that the debtor was not then the
beneficial owner of Unit 2A; nor that he ceased to be the beneficial owner when the title
was subsequently transferred to Millennium. It is not necessary to disbelieve the debtor
when he says that he is not the beneficial owner of Millennium. But his assertion that he
had no connection with Millennium at the relevant time is not credible – for the reasons
that the judge gave. He has not provided a credible explanation for the transfer of Unit 2A
– nor for the transfer of 127 Westminster Bridge Road - into the name of Millennium,
although the facts must be within his knowledge. In those circumstances the judge could
not rule out the possibility that Millennium was a front or nominee for the debtor; and he
did not do so. In my view he should have gone on to hold that, on the evidence that was
before him, the balance of probabilities required a conclusion that that was in fact the
position – at least on 27 February 2004 when the registrar assumed jurisdiction to open
territorial insolvency proceedings.

64. In those circumstances the remaining question was whether legal and beneficial
ownership of Unit 2A at the relevant date is sufficient to satisfy the requirement that the
debtor "possesses an establishment" within the territory. The judge made no finding on
that question. As he said, at paragraph 45 of his judgment, he did not find it necessary to
do so.

65. "Establishment", for the purposes of article 3.2 of the Regulation is, of course, a defined
term. It means "any place of operations where the debtor carries out a non-transitory
economic activity with human means and goods" – article 2(h). Virgos and Schmit
observe, at paragraph 70 of their report, that article 3.2 – and the associated definition –
was one of the most debated provisions throughout the negotiations on the Convention.
They comment:

> "Several Contracting States wished to have the possibility of
> basing territorial proceedings not only on the presence of an
> establishment, but also on the mere presence of assets of the
> debtor (assigned to an economic activity) without the debtor
> having an establishment.
>
> For the sake of an overall consensus on the Convention, those
> States agreed to abandon the presence of assets as a basis for
> international competence provided that the concept of
> establishment is interpreted in a broad manner but consistently
> with the text of the Convention. This explains the very open
> definition given in article 2(h).

> In the Convention, the mere presence of assets (eg the existence
> of a bank account) does not enable local territorial proceedings
> to be opened. The presence of an establishment of the debtor
> within the jurisdiction concerned is essential."

66. The commentators go on to say this:

> "For the Convention on insolvency proceedings,
> 'establishment' is understood to mean a place of operations
> through which the debtor carries out an economic activity on a
> non-transitory basis and where he uses human resources and
> goods.
>
> Place of operations means a place from which economic
> activities are exercised on the market (ie externally), whether
> the said activities are commercial, industrial or professional.
>
> The emphasis on an economic activity having to be carried out
> using human resources shows the need for a minimum level of
> organisation. A purely occasional pace of operations cannot be
> classified as an 'establishment'. A certain stability is required.
> The negative formula ('non-transitory') aims to avoid
> minimum time requirements. The decisive factor is how the
> activity appears externally, and not the intention of the debtor.
>
> The rationale behind the rule is that foreign economic operators
> conducting their economic activities through a local
> establishment should be subject to the same rules as national
> economic operators as long as they are both operating in the
> same market. In this way potential creditors concluding a
> contract with a local establishment will not have to worry about
> whether the company is a national or foreign one. Their
> information costs and legal risks in the event of insolvency of
> the debtor will be the same whether they conclude a contract
> with a national undertaking or a foreign undertaking with a
> local presence on that market.
>
> Naturally, the possibility of opening local territorial insolvency
> proceedings makes sense only if the debtor possesses sufficient
> assets within the jurisdiction. Whether or not those assets are
> linked to the economic activity of the establishment is of no
> relevance."

67. The judge was prepared to assume that Millennium was carrying on the activity of letting
and managing Unit 2A, Sunrise Business Park. The unit was described by the registrar as
"a multi-let business premises". It seems to me inevitable that the landlord will need to
manage the property (even if that is done through agents, as to which there is no
evidence). The evidence, such as it is, suggests that Millennium collects the rent itself.

68. In the circumstances that I have set out, and with the guidance provided by the *Virgos-Schmit Report* in mind, I would hold that the owner of Unit 2A, Sunrise Business Park is carrying out a non-transitory economic activity with human means and goods for the purposes of the Regulation. It follows that, if – as I would also hold – the evidence led to the conclusion, on the balance of probabilities, that Millennium was a front or nominee for the debtor at the time the registrar opened territorial insolvency proceedings in February 2004 (if, indeed, there had been a 'sale' by that date), the requirement in article 3.2 of the regulation was satisfied.

*Conclusion*

69. For the reasons which I have set out I would allow the appeal and restore the bankruptcy order made on 13 July 2004. But, because I would uphold the judge's finding that jurisdiction to open main insolvency proceedings had not been established under article 3.1 of the Regulation, I would vary that order so as to recite that the proceedings are territorial insolvency proceedings as defined in article 3 of the Regulation.

**Lord Justice Longmore**:

*Centre of Main Interests*

70. I agree with the judgment of my Lord on the question of the centre of main interests of the debtor but have two caveats. The first caveat relates to the point of time in relation to which, for the purposes of invoking the jurisdiction of the English court, a claimant has to prove that the centre of main interests of the debtor is situated in England. The second caveat relates to the standard of proof that is required.

71. With regard to the time in relation to which the centre of main interests has to be proved to be England, the judge recorded (para. 12) that it was common ground before him that it was the date of the hearing of the petition. Mr Mitchell QC did not seek to resile from this common ground before us and my Lord has held in terms in paragraph 39 that that is the correct date. It seems to me, however, that despite the judge's reference to page 383 of the Fourth Supplement to Dicey and Morris, it is not beyond the realm of argument that the correct date is the date of service of the bankruptcy petition on the debtor rather than the date of the hearing of the petition. On this view the "judgment opening proceedings" is the judgment exercised by the registrar when he gives permission for the petition to be served outside the jurisdiction. That judgment "becomes effective" when it is served, although the defendant debtor has the right to ask the court to set aside that service. So to conclude would have the advantage that the debtor could not rely on acts he might take unilaterally to change his centre of main interests between the date when the petition is served and date when his challenge to the jurisdiction can be heard which might (as in this case) be a period of some months. It would also have the advantage that the phrase "the time at which the judgment opening proceedings becomes effective" in recital (f) to Article 3 would have the same meaning as the time when a court is first seised of a matter for the purpose of the Brussels (now Lugano) Convention, see <u>Dresser v Falcongate</u> [1992] QB 502. On the facts of the present case it makes no difference whether the judgment opening the proceedings was in February or July 2004 and counsel

were quite right not to take time arguing an academic point which should await resolution in a case where it matters on the facts.

72. On the standard of proof, the judge approached the question whether the debtor's centre of main interests was England as a matter of fact which, presumably, was to be decided on the balance of probabilities in the usual way.  We received no argument that the invocation of the court's jurisdiction pursuant to the Regulation should be treated in the same way as the invocation of the court's jurisdiction pursuant to other regulations dealing with service out of the jurisdiction.  It has long been the case that a claimant does not have to prove that the jurisdiction requirements, set out for example in RSC Order 11 (now CPR Part 6) or the Brussels (now Lugano) Convention have been satisfied on a balance of probabilities but has to show merely that there is a "good arguable case" that the jurisdictional requirements exist, see Seaconsar v Bank Markazi [1994] 1 AC 438 and Canada Trust Co v Stolzenberg (No 2) [1998] 1 WLR 547.  This question will also have to be argued on another day and I mention it here only because the judge placed considerable emphasis on the fact that no order had been sought for Mr Clive Vlieland-Boddy to be cross-examined.  No doubt the court has jurisdiction to order cross-examination of a defendant who asserts he is not amenable to the jurisdiction of the court.  But it is, in my view, a discretion which should be exercised extremely sparingly.  In the first place, if the defendant is right that he is not subject to the jurisdiction, it is exorbitant to order his cross-examination at all.  In the second place, those judges of the High Court who deal, perhaps more frequently than bankruptcy registrars, with heavily contested jurisdiction applications will quickly find their lists heavily clogged by enthusiastic applications from claimants to cross-examine foreign defendants on the basis that without such cross-examination their case will be held to fail as Mann J has effectively held here.  To the extent that the judge accepted the approach of the parties that he had to find that the debtor's centre of main interests was, as a matter of fact, in England, his approach cannot, of course, be faulted but there may need to be argument on another occasion that the correct standard to apply is that of a "good arguable case" rather than proof on a balance of probabilities;  cross-examination should not then be necessary.  I should perhaps add that the decision of Rimer J in Long v Farrer [2004] EWHC 1774 Ch, on which junior counsel for the debtor has relied, was not a decision on a jurisdictional application.

*Establishment*

73. I also agree with my Lord on this part of the case but since we are differing from the judge I will express my own view shortly.  Mr Vlieland-Boddy had a lease of premises known as Unit 2A, Sunrise Park, in Blandford Forum in Dorset which he then charged traders for the right to use.  This was thus originally a place where he carried out a non-transitory economic activity with human means and goods within definition (h) of Article 2 as explained in para. 70 of the *Virgos-Schmit Report*.  Mr Vlieland-Boddy then asserts that a British Virgin Islands company, known as Millennium Investments International Ltd, took a charge on the property on 8th November 2002 in the sum of £245,000; he says that he then sold the property to Millennium in June 2003 but that the transfer of property was not completed until January 2004.  Millennium did not register its title until April 2004 after service of the bankruptcy petition on Mr Vlieland-Boddy.  Millennium is also said to be the owner of a flat in Lambeth acquired by Mr and Mrs Vlieland-Boddy in their

joint names on 22nd August 2001.  Millennium appear to have acquired that ownership
on 12th February 2002 but to have paid no consideration.  Mr Vlieland-Boddy has not
told the court who owns the shares in Millennium.  He says that a director is Mr Spencer
Jones who has apparently been helping to pay the school fees for Mr Vlieland-Boddy's
child.  I have every confidence that Mr Vlieland-Boddy could say who owns Millennium
if he wished to do so.  Even on the balance of probabilities, it seems to me that Mr
Vlieland-Boddy was in July 2004 using Millennium to carry on business at Unit 2A and
accordingly has an establishment for the purpose of the territorial insolvency jurisdiction
specified in Article 3.2.  I would therefore join with my Lord in allowing the appeal and
in upholding the Registrar's decision on this aspect of this case.


**Sir Martin Nourse:**


74. I have had the advantage of reading in draft the judgments of Lords Justices Chadwick
    and Longmore.


*Centre of main interests*


75. I agree with the judgment of Lord Justice Chadwick on the question of the centre of main
    interests and with the first of Lord Justice Longmore's caveats.  As to the second caveat, I
    would emphasise that this case has been argued throughout on the footing that the
    standard of proof to be applied is the balance of probabilities and not good arguable case.
    Moreover, it must be doubtful whether an English court could apply the lower standard to
    main insolvency proceedings without obtaining a ruling of the European Court of Justice
    to that effect.


*Establishment*


76. On the question of establishment, I agree with the judgments of Lords Justices Chadwick
    and Longmore.


77. The position here was that the registrar had decided that the debtor had an establishment
    within England and Wales for the purposes of Article 3.2 of the Regulation.  But, as the
    judge held, that decision, having been based on the erroneous view that the court must
    look at the period when the debts were incurred, could not be sustained.  So the judge had
    to consider the question afresh.


78. The judge's decision on this question, in the penultimate paragraph of his judgment, is
    quoted by Lord Justice Chadwick in paragraph 60 above.  I agree with him that the judge
    did not rule out the possibility that Millenium was a sham and in effect a front or nominee
    for the debtor.  What the judge said was:

> "Even if Mr Vlieland-Boddy is interested in Millenium to the
> extent of being its beneficial owner, I cannot ignore the

> corporate structure (in the absence of nomineeship) so Mr
> Vlieland-Boddy was not carrying out those activities himself."

79. I think that that passage shows some inconsistency in the judge's reasoning. If the debtor
was in reality the beneficial owner of Millenium, the corporate structure would simply be
ignored and it would not matter very much whether Millenium was described as a sham
or as a front or nominee for the debtor. But that is not the real point. In my opinion the
only inference which could reasonably have been drawn from the evidence referred to
and considered by the judge earlier in his judgment, in regard not only to Unit 2A,
Sunrise Park but also to the flat at 127 Westminster Bridge Road, was that on 27 February
2004, when the registrar assumed jurisdiction to open territorial insolvency proceedings,
Millenium was a front or nominee for the debtor. On that footing, for the reasons given
by Lord Justice Chadwick, I agree that the debtor possessed an establishment within
England and Wales on that date.

80. In elaboration of the view expressed in the preceding paragraph, I would say that the
judge's conclusion as to the role of Millenium was against the weight of the evidence. In
most cases that would be a strong thing for this court to hold. But it is to be emphasised
that in considering the matter afresh this court is doing no more than what the judge
himself had to do. We are in as good a position as he was to draw the necessary
inferences from the evidence, an exercise in which it is a commonplace that different
minds may take different views.

81. I too would allow the appeal and make the order proposed by Lord Justice Chadwick.

n

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
------------------------------------------------------------ x
In re:                                      :
                                            :              Chapter 15
                                            :
SYNCREON AUTOMOTIVE (UK) LTD.               :              Case No. 19–11702 (BLS)
                                            :
         Debtor in a foreign proceeding.¹   :              Ref. Docket No. 3
                                            :
------------------------------------------------------------ x
```

### ORDER GRANTING RECOGNITION OF
### FOREIGN MAIN PROCEEDING AND CERTAIN RELATED RELIEF

Upon the *Motion for Recognition of Foreign Main Proceeding and Certain Related Relief* (the "**Motion**" and, together with the *Voluntary Chapter 15 Petition*, the "**Verified Petition**")[2] of Carine Van Landschoot, in her capacity as the authorized foreign representative (the "**Foreign Representative**") of the above-captioned debtor (the "**Debtor**") pursuant to sections 105(a), 1145, 1504, 1507, 1510, 1515, 1517, 1520, 1521, and 1522 of title 11 of the United States Code (the "**Bankruptcy Code**"), for entry of an order (i) granting recognition of the English Proceeding as a "foreign main proceeding" or, in the alternative, a foreign non-main proceeding pursuant to chapter 15 of the Bankruptcy Code; (ii) granting recognition of the Foreign Representative as the "foreign representative," as defined in section 101(24) of the Bankruptcy Code in respect of the English Proceeding; (iii) recognizing, granting comity to, and giving full force and effect in the United States to the English Proceeding, the Scheme, and the English

---

[1]  The identifying four digits of the Debtor's U.S. federal tax identification number are 1748. The identifying four digits of the Debtor's local U.K. tax identification number are 2112. The Debtor's (UK) company registration number is 03012604. The location of the Debtor's corporate headquarters and registered office is Unit 5 Logix Road, R D Park, Watling Street, Hinckley, Leicestershire, LE10 3BQ, United Kingdom.

[2]  Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Motion.

Orders, including the Releases; (iv) enjoining parties from taking any action that is otherwise inconsistent with the Scheme and the related orders entered by the English Court; and (v) granting such other relief as the Court deems just and proper, all as more fully set forth in the Verified Petition; and upon the Van Landschoot Declaration, the Wilkinson Declaration, and the *Supplemental Declaration of Carine Van Landschoot in Support of Motion for Recognition of Foreign Main Proceeding and Request for Certain Related Relief* [Docket No. 35], and after due deliberation and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS AND CONCLUDES THAT:**

1.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

3.      This is a core proceeding pursuant to 28 U.S.C. § 157(b) and this Court may enter a final order consistent with Article III of the United States Constitution.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1410.

5.      The Debtor has property in the United States, and the Debtor is eligible to be a debtor in a chapter 15 case pursuant to, as applicable, 11 U.S.C. §§ 109 and 1501.

6.      This case was properly commenced pursuant to 11 U.S.C. §§ 1504, 1509, and 1515.

7.      The Foreign Representative is a duly appointed "foreign representative" of the Debtor as such term is defined in 11 U.S.C. § 101(24).

8.      The Foreign Representative is an individual and, thus, a "person" as such term is defined in 11 U.S.C. § 101(41).

9.      The Foreign Representative has satisfied the requirements of 11 U.S.C. § 1515 and Bankruptcy Rule 1007(a)(4).

10.      The English Proceeding is a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23).

11.      The English Proceeding is pending before the English Court in England, where the Debtor has its "center of its main interests" as referred to in 11 U.S.C. § 1517(b)(1) and, as such, the English Proceeding is entitled to recognition as a "foreign main proceeding" pursuant to 11 U.S.C. § 1502(4) and 1517(b)(1).

12.      The English Proceeding is entitled to recognition by this Court pursuant to 11 U.S.C. §§ 1515 and 1517(a).

13.      The Debtor and the Foreign Representative are entitled to all of the relief set forth in 11 U.S.C. § 1520, without limitation.

14.      The Debtor and the Foreign Representative are entitled to all of the relief set forth herein under 11 U.S.C. §§ 1507 and 1521(a).

15.      The relief granted hereby is necessary and appropriate to effectuate the objectives of chapter 15, to protect the Debtor and the interests of its creditors and other parties in interest, and is consistent with the laws of the United States, international comity, public policy, and the policies of the Bankruptcy Code.

16.     Absent the relief granted hereby, the Released Parties and their respective Connected Persons (each, as defined in the Deed of Release) may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative, or regulatory actions or proceedings by the Scheme Creditors in connection with the claims against them or their property, thereby interfering with and causing harm to, the Debtor, its creditors, and other parties in interest in the English Proceeding and, as a result, the Debtor, its creditors and such other parties in interest would suffer irreparable injury for which there is no adequate remedy at law.

17.     Absent the requested relief, the efforts of the Debtor, the English Court, and the Foreign Representative in conducting the English Proceeding and effectuating the Restructuring and the Scheme and English law may be frustrated by the actions of individual Scheme Creditors, a result contrary to the purposes of chapter 15.

18.     Each of the injunctions contained in this Order (i) is within the Court's jurisdiction, (ii) is essential to the success of the English Proceeding and the Scheme, (iii) is an integral element of the Scheme or to its effectuation, (iv) confers material benefits on, and is in the best interests of, the Debtor, its creditors, and its parties in interest, including, without limitation, the Scheme Creditors, and (v) is important to the overall objectives of the restructuring.

19.     Good, sufficient, appropriate, and timely notice of the filing of, and the hearing on (to the extent necessary), the Verified Petition was given, which notice was deemed adequate for all purposes, and no further notice need be given.

20.     All creditors and other parties in interest, including the Debtor, are sufficiently protected by the grant of relief ordered hereby in accordance with section 1522(a) of the Bankruptcy Code.

21.     The 1145 Securities are being issued "under a plan" (within the meaning of such phrase as it is used in section 1145 of the Bankruptcy Code).

22.     Each of the 1145 Securities are being issued (or deemed to be offered or sold) by an "affiliate participating in a joint plan" within the meaning of the phrase as used in section 1145 of the Bankruptcy Code.

23.     The 1145 Securities offered and sold (or deemed to be offered and sold) pursuant to the Scheme are being offered or sold (or deemed to be offered and sold) in exchange for claims against, among others, the Debtor and the Dutch Borrower.

24.     The 1145 Warrants are being offered and sold (or deemed offered and sold) in the manner specified in 11 U.S.C. § 1145(a)(1).

For all of the foregoing reasons, and after due deliberation and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT:**

1.     The Verified Petition is granted.

2.     The relief requested by the Motion is granted to the extent set forth herein.

3.     The English Proceeding is granted recognition as a foreign main proceeding as defined in 11 U.S.C. § 101(23) pursuant to 11 U.S.C. § 1517(a).

4.     The English Proceeding is a collective, court-supervised proceeding governed in accordance with applicable English law, as it may be amended from time to time, and is granted recognition as a foreign main proceeding pursuant to 11 U.S.C. § 1517(b)(1) and is entitled to the protections of 11 U.S.C. § 1520(a), including, without limitation, the application of the protection afforded by the automatic stay under 11 U.S.C. § 362 to the Debtor and to the Debtor's property that is within the territorial jurisdiction of the United States.

5.     Carine Van Landschoot is the duly appointed foreign representative of the Debtor within the meaning of 11 U.S.C. § 101(24), is authorized to act on behalf of the Debtor in this Chapter 15 Case, and is established as the exclusive representative of the Debtor in the United States.

6.     The English Proceeding, the Scheme, the English Orders, the Deed of Release, and the Restructuring Implementation Deed, including the Releases and all discharges of debt in the foregoing (including any covenants not to sue with respect to the claims and interests related thereto, as set forth in clause 5 of the Deed of Release) and any and all existing and future extensions, amendments, restatements, or supplements authorized by the English Court of the foregoing, are hereby recognized, granted comity, and given full force and effect in the United States, on a final basis, and are binding on and enforceable against all parties subject to the jurisdiction of the United States whether or not they actually voted in favor of the Scheme.

7.     All objections, if any, to the Motion or the relief requested therein that have not been withdrawn, waived, or settled by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits.

8.     In accordance with the Scheme Document, the Restructuring Implementation Deed, and the Deed of Release, the Released Parties and their respective Connected Persons (each as defined in the Deed of Release) are exculpated and released from any liability for any action or inaction taken in furtherance of or in accordance with this Order, this Chapter 15 Case, the English Proceeding, the English Orders, the Scheme Document, the Deed of Release, or the Restructuring Implementation Deed.

9.     All persons and entities subject to the jurisdiction of the United States are permanently enjoined and restrained from taking any actions inconsistent with the Scheme

Document, the Restructuring Implementation Deed, the Deed of Release, or the English Orders,

or interfering with the enforcement and implementation of the Scheme Document, the

Restructuring Implementation Deed, the Deed of Release, the English Orders, or this Order,

including, without limitation, commencing, continuing, or enforcing any action or legal proceeding

against the Released Parties or their respective Connected Persons (each, as defined in the Deed

of Release) based on any claims, liabilities, and/or causes of actions released by the Releases,

including but not limited to:

a. taking or continuing any act to obtain possession of, or exercise control over, including but not limited to, attaching, repossessing, seizing, or disposing of, as applicable, the Debtor or the other Scheme Debt Obligors, or any of their property (including intangible property or any proceeds thereof (collectively, the "**Property**");

b. transferring, encumbering, relinquishing or disposing of any Property other than to the Foreign Representative;

c. commencing, continuing, or enforcing any action or legal proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceedings or process whatsoever), including by way of counterclaim, (each individually, an "**Action**") against the Debtor or the other Scheme Debt Obligors or any of the Property;

d. any judgment, wherever and whenever obtained, to the extent such judgment is a determination of a liability of the Debtor with respect to any debt or liability cancelled, discharged, or restructured under the Scheme Document or the Restructuring Implementation Deed or as a result of English law, is unenforceable in the United States;

e. commencing or continuing any act or Action to create, perfect or enforce any lien, set-off or other claim against the Debtor or the other Scheme Debt Obligors, or the Property, including, without limitation, rights under any contracts with the Debtor or the Scheme Debt Obligors; provided, however, that no Action described in sections 555, 556, 557, 559, 560, 561, 562 and 1519(d) and (f) of the Bankruptcy Code shall be enjoined by such injunction;

f. commencing any suit, action, or proceeding against the Debtor or the other Scheme Debt Obligors, the Foreign Representative, or any of their respective successors, directors, officers, agents, employees, representatives, advisors, or attorneys in respect of any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken in connection with this Chapter 15 Case,

the Scheme Document, the Deed of Release, the Restructuring Implementation Deed, or to resolve any dispute arising out of any provision of the Scheme Document, the Deed of Release, the Restructuring Implementation Deed, or English law relating to the Scheme Document, the Deed of Release, or the Restructuring Implementation Deed, including the Releases contemplated thereby;

g. declaring or considering the filing of the English Proceeding or this Chapter 15 Case a default or event of default under any agreement, contract or arrangement; and taking any action in contravention to or inconsistent with the Scheme, including, without limitation, against the Debtor or the other Scheme Debt Obligors, or any of the Property; provided however, for the avoidance of doubt, this Order shall enjoin parties subject to the jurisdiction of the United States from taking any actions, including but not limited to the actions enumerated in (a) through (g) above, only to the extent such actions are inconsistent with the Scheme Document, the Restructuring Implementation Deed, the Deed of Release, and/or the English Orders or would otherwise interfere with the enforcement or implementation of the Scheme Document, the Restructuring Implementation Deed, the Deed of Release, and/or the English Orders.

10.     As of the Restructuring Effective Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the liability of the Debtor or any of the other Released Parties or their Connected Persons (each, as defined in the Deed of Release) with respect to any cause of action released under the Scheme Document, the Deed of Release, or Restructuring Implementation Deed, including any debt cancelled, discharged or restructured under the Scheme Document, the Deed of Release, the Restructuring Implementation Deed, is unenforceable, in each case, to the extent inconsistent with the Scheme Document, the Deed of Release, the Restructuring Implementation Deed, or the English Orders.

11.     Pursuant to sections 1507, 1521(a)(7), and 1145 of the Bankruptcy Code, (i) the offer and sale (or deemed offer and sale) of the 1145 Securities pursuant to the Scheme Document and the resale of any 1145 Securities by the holders thereof are exempt from any applicable Registration Requirements pursuant to section 1145 of the Bankruptcy Code, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

12.     The administration, realization, and distribution of all or part of the assets of the Debtor within the territorial jurisdiction of the United States is entrusted to the Foreign Representative, and the Foreign Representative is established as the exclusive representative of the Debtor in the United States.

13.     The Foreign Representative, the Debtor, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules or orders of this Court.

14.     No action taken by the Foreign Representative, the Debtor, or their respective successors, agents, representatives, advisors, or counsel in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of or in connection with the English Proceeding, this Order, this Chapter 15 Case, or any adversary proceeding herein, or any further proceeding commenced hereunder, shall be deemed to constitute a waiver of the rights or benefits afforded to such persons under 11 U.S.C. §§ 306 and 1510.

15.     Within three (3) days of its entry or as soon as practicable thereafter, the Foreign Representative shall serve, or cause to be served, this Order on the Notice Parties (as defined in the Scheduling Order) in accordance with the procedures set forth in the *Order (I) Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice and (II) Granting Related Relief* [Docket No. 7] (the "**Scheduling Order**").  The Information Agent shall make this Order available on the Scheme Website (as defined in the Scheduling Motion), which may be accessed by the Scheme Creditors and other parties in interest.  Such service and notice is good and sufficient service and adequate notice for all purposes.

16.     The Foreign Representative is authorized to take all actions necessary to effectuate the relief granted by this Order.

17.     This Order is without prejudice to the Foreign Representative requesting any additional relief in the Chapter 15 Case, including seeking recognition and enforcement by this Court of any further orders issued by the English Court.

18.     The Indenture Trustee is authorized and instructed to take all actions, if any, required by the Scheme Document after it has become effective until the Scheme Document has been terminated or otherwise 20 business days after the Restructuring Effective Date in accordance with the Scheme Document and the Restructuring Implementation Deed.

19.     The Parent Credit Facility Agent is authorized and instructed to take all actions set forth in the Agent Instruction Letter (as defined in the Scheme Document) to give effect to the Restructuring and otherwise to enter into, execute, and deliver (whether as a deed or otherwise) all such other documents that the Scheme Companies or the Parent Credit Facility Agent reasonably consider necessary to give effect to the Restructuring until the Scheme Document has been terminated or otherwise 20 business days after the Restructuring Effective Date in accordance with the Scheme Document and the Restructuring Implementation Deed.

20.     The Debtor is authorized to pay the Indenture Trustee for all reasonable and documented fees and expenses incurred by the Indenture Trustee and its legal advisers prior to the Execution Effective Date (as defined in the Restructuring Implementation Deed) in accordance with the Scheme Document and the Restructuring Implementation Deed.

21.     The Debtor is authorized to pay the Parent Credit Facility Agent for all reasonable and documented fees and expenses incurred by the Parent Credit Facility Agent and its legal advisers prior to the Execution Effective Date (as defined in the Restructuring Implementation Deed) from certain Scheme Debt Obligors in accordance with the Scheme Document and the Restructuring Implementation Deed.

22.      This Court shall retain exclusive jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation, or enforcement of this Order.

23.      Notwithstanding any applicability of any Bankruptcy Rules, the terms and

conditions of this Order shall be immediately effective and enforceable upon its entry and shall

constitute a final order within the meaning of 28 US.C. § 158(a).

**Dated: September 11th, 2019**
**Wilmington, Delaware**

BRENDAN L. SHANNON UNITED STATES BANKRUPTCY
JUDGE

o

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------x
                                                            :
In re                                                       : Chapter 15
                                                            :
Petition of David McGuigan, as foreign                      : Case No. 11-13420 (MG)
representative of                                           :
                                                            :
Tokio Marine Europe Insurance Limited                       :
                                                            :
Debtor in a Foreign Proceeding.                             :
                                                            :
                                                            :
------------------------------------------------------------x
```

### ORDER AND FINAL DECREE GRANTING RECOGNITION OF A FOREIGN PROCEEDING, PERMANENT INJUNCTION AND RELATED RELIEF

David McGuigan (the "Petitioner"), in his capacity as the duly appointed foreign representative, as defined in section 101(24) of title 11 of the United States Code (the "Bankruptcy Code"), of Tokio Marine Europe Insurance Limited (the "Scheme Company" or "Debtor"), which is subject to an adjustment of debt proceeding (the "English Proceeding") and bound by that certain Scheme of Arrangement pursuant to Part 26 of the Companies Act 2006 (the "Scheme") for the Scheme Company sanctioned by the High Court of Justice of England and Wales (the "English Court") on April 15, 2011, filed the Verified Petition Under Chapter 15 For Recognition Of A Foreign Proceeding (the "Chapter 15 Petition") And Motion For Permanent Injunction (the "Verified Petition and Motion"), the Memorandum Of Law In Support Of the Verified Petition Under Chapter 15 For Recognition Of A Foreign Proceeding And Motion For Permanent Injunction (the "Memorandum of Law"), the Declaration of David McGuigan In Support Of Petition Under Chapter 15 For Recognition Of A Foreign Proceeding And Motion For Permanent Injunction And Order (the "McGuigan Declaration"), the Statement of Foreign Representative Identifying All Foreign Proceedings With Respect To Debtor Pursuant To 11 U.S.C. § 1515(c) (the "Section 1515(c) Statement"), and the List Filed Pursuant To Bankruptcy Rule 1007(a)(4) Of Administrators In A Foreign Proceeding, Litigation Parties And Entities Against Whom Provisional Relief Is Being

Sought Under 11 U.S.C. §1519 (the "<u>Bankruptcy Rule 1007(a)(4) List</u>") (collectively, the "<u>Chapter</u> <u>15 Pleadings</u>") on July 18, 2011; and the Petitioner having given notice of the Chapter 15 Petition in accordance with the Scheduling Order, on or before August 1, 2011 and by publication in <u>The Wall</u> <u>Street Journal</u> (US Edition) and <u>Business Insurance</u> magazine on or before August 1, 2011; and upon the record of the hearing before this Court on September 8, 2011, and all prior hearings and status conferences herein; this Court hereby finds and concludes as follows:

1.  The Petitioner has demonstrated that:

    (a)    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York (Ward, Acting C.J.), dated July 10, 1984; and

    (b)    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P); and

    (c)    The Petitioner, acting at the direction of the English Court, is a person duly appointed to act as the foreign representative (the "<u>Foreign</u> <u>Representative</u>") of the Scheme Company within the meaning of section 101(24) of the Bankruptcy Code; and

    (d)    The chapter 15 case (the "<u>Chapter 15 Case</u>") was properly commenced in compliance with and pursuant to 11 U.S.C. §§ 1504 and 1515; and

    (e)    The Verified Petition and Motion satisfies the requirements of 11 U.S.C. § 1515; and

    (f)    The English Proceeding is a "foreign proceeding" pursuant to 11 U.S.C. § 1517(a) and within the meaning of section 101(23) of the Bankruptcy Code; and

    (g)    The English Proceeding is a "foreign main proceeding" pursuant to 11 U.S.C. § 1502(4); and

2. The Scheme Company is entitled to all the relief equivalent to that afforded to a debtor in a foreign main proceeding under 11 U.S.C. § 1520 pursuant to 11 U.S.C. §§ 1521(a) and (b) and that is granted hereby.  The Petitioner has demonstrated that the Scheme Company is entitled to all the relief requested, including that permanent injunctive relief is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States and warranted pursuant to section 1521 of the Bankruptcy Code and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3. The Petitioner has demonstrated that permanent injunctive relief would not cause any hardships to Scheme Creditors[1] of the Scheme Company or other parties-in-interest that would not be outweighed by the benefits of such relief.  Unless a permanent injunction is issued, it appears to this Court that one or more persons or entities may take action  that is inconsistent with or in contravention of the terms of the Scheme Company's Scheme, thereby interfering with, and causing harm to, the efforts of the Scheme Manager to administer the Scheme, and that as a result, the Scheme Company and Scheme Creditors will suffer irreparable injury for which there is no adequate remedy at law;

4. The interest of the public will be served by this Court's granting the relief requested by the Petitioner; and

5. Venue is properly located in this District pursuant to 28 U.S.C. § 1410.

**NOW, THEREFORE, IT IS HEREBY**

ORDERED, that the relief granted in each of the following paragraphs shall affect Scheme Creditors solely with respect to the Scheme and/or Scheme Claims; provided, however, that in no way shall the relief granted herein be construed so as to narrow or limit the terms of the

---

[1]    All capitalized terms not otherwise defined  herein shall have the meaning ascribed to them in the Scheme and/or the Verified Petition and Motion.

Scheme; and it is further

ORDERED, that the Petitioner is recognized as a "foreign representative" pursuant to 11 U.S.C. § 101(24); and it is further

ORDERED, that the English Proceeding is recognized as a "foreign main proceeding" pursuant to 11 U.S.C. § 1502; and it is further

ORDERED, that all relief equivalent to that afforded to a debtor in a foreign main proceeding pursuant to 11 U.S.C. § 1520 is granted; and it is further

ORDERED, that the Scheme (including any amendments or modifications to the Scheme on or before the date of this Order) and the Sanction Order shall be given full force and effect and be binding on and enforceable against all Scheme Creditors, including without limitation, against a Scheme Creditor in its capacity as a debtor of the Scheme Company, in the United States and its territories; and it is further

ORDERED, that all Scheme Creditors and any parties acting on behalf of or deriving title from any Scheme Creditor are hereby permanently enjoined and restrained from:

(a)    taking or continuing any step, or doing or continuing any act by way of Proceedings (as defined in the Scheme) or otherwise, in any jurisdiction whatsoever: (i) against or in respect of the Scheme Company or the Property (as defined in the Scheme) of the Scheme Company, for the purpose of obtaining payment, or establishing the existence or quantum, of any Scheme Claims; or (ii) save as permitted by clause (b) below, against or in respect of any of the Released Parties (as defined in the Scheme) either individually or collectively in connection with their duties and obligations under the Scheme; and

(b)    commencing or continuing any legal or equitable action or proceedings challenging the validity of any act done or omitted to be done by the Released Parties in connection with the Scheme, including in the United States and its territories, and/or (where appropriate) the meetings of Scheme Creditors held on March 8, 2011 and April 7, 2011, and the Released Parties shall not be liable for any loss suffered by any Scheme Creditor or third party, unless such loss is attributable to their fraud or dishonesty;  accordingly, no Scheme Creditor shall bring or institute

any Proceedings, claims or complaints against the Released Parties to the extent prohibited by the Scheme; and

(c)     enforcing any judicial, quasi-judicial, administrative or regulatory judgment, assessment or order or arbitration award and commencing or continuing any act or any other legal or equitable action or proceedings (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceedings or process whatsoever) to create, perfect or enforce any lien or other security interest, set off, attachment, garnishment, or other claim against the Scheme Company in connection with the Scheme or any of its property in the United States, and its territories, or any proceeds thereof, including, without limitation, rights under reinsurance or retrocession contracts; and

(d)     invoking, enforcing or relying on the benefit of any statute, rule or requirement of federal, state or local law or regulation requiring the Scheme Company to establish or post security in the form of a bond, letter of credit or otherwise as a condition of prosecuting or defending any proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever), and such statute, rule or requirement will be rendered null and void for Proceedings, except in compliance with the Scheme; provided, however, that nothing in the Order shall in any respect affect any Security in existence at the Effective Date or the replacements for such Security; and

(e)     withdrawing from, setting-off against, or otherwise applying property which is the subject of any trust or escrow agreement or similar agreement in which the Scheme Company has an interest in excess of amounts expressly authorized by the terms of the trust, escrow, or similar agreement; and

(f)     drawing down any letter of credit established by, on behalf or at the request of, the Scheme Company, in excess of amounts expressly authorized by the terms of the contract or other agreement pursuant to which such letter of credit has been established; and it is further

ORDERED, that a Net Ascertained Claim or Net Debt determined under the Scheme shall be final and binding on the Scheme Company and any person or entity that is a Scheme

Creditor; and it is further

ORDERED, that all Scheme Creditors of the Scheme Company are permanently enjoined from taking any action in contravention of or inconsistent with the Scheme; and it is further

ORDERED, that except as otherwise provided herein or in the Scheme, in the absence of a bona fide dispute raised and conducted in accordance with the Scheme, all persons and entities in possession, custody, or control of property of the Scheme Company in the United States and its territories, or the proceeds thereof, are required to turnover and account for such property or proceeds thereof to the Scheme Company; and it is further

ORDERED, that nothing in this Order prevents the continuance or commencement of proceedings against any person, entity, or other insurer other than the Released Parties; provided, however, that if any third party shall reach a settlement with, or obtain a judgment against, any person or entity other than the Released Parties, such settlement or judgment shall not be binding on or enforceable against the Released Parties or their property, or any proceeds thereof; and it is further

ORDERED, that the security provisions of Rule 65(c) of the Federal Rules of Civil Procedure, pursuant to Bankruptcy Rule 7065, shall be, and the same hereby are, waived with respect to the injunctive relief provided in this Order; and it is further

ORDERED, that no action taken by the Released Parties, in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Scheme, this Order, this Chapter 15 Case, any further order for additional relief in this Chapter 15 Case, or any adversary proceedings in connection therewith will be deemed to constitute a waiver of the immunity afforded pursuant to section 306 or section 1510 of the Bankruptcy Code, the law of the United States or otherwise; and it is further

ORDERED, that all Scheme Creditors that are beneficiaries of letters of credit established by, on behalf or at the request of the Scheme Company or parties to any trust, escrow or similar arrangement in which the Scheme Company has an interest, are required to:

6

(a)      provide notice to the Petitioner's United States counsel of any drawdown on any letter of credit established by, on behalf or at the request of, the Scheme Company, or any withdrawal from, set-off against, or other application of property that is the subject of any trust or escrow agreement or similar arrangement in which the Scheme Company has an interest, together with information sufficient to permit the Scheme Manager to assess the propriety of such drawdown, withdrawal, set-off or other application, including, without limitation, the date and amount of such drawdown, withdrawal, set-off or other application and a copy of any contract, related trust or other agreement pursuant to which any such drawdown, withdrawal, set-off, or other application was made, and provide such notice and other information contemporaneously therewith; provided, however, no drawing against any letter of credit or withdrawal from any escrow, trust or similar arrangement shall be made in connection with any commutation unless the amount of such drawing has been agreed in writing with the Scheme Company and the Scheme Manager; and

(b)      turnover and account to the Scheme Manager for any funds resulting from the drawdown of any letter of credit or the application of funds subject to any trust, escrow or similar arrangement, withdrawal, set-off, or other application in excess of amounts expressly authorized by the terms of the contract, any related trust or other agreement pursuant to which such letter of credit, trust, escrow or similar arrangement has been established; and it is further

ORDERED, that the Scheme Company and the Scheme Manager be authorized to transfer to the foreign proceedings for distribution pursuant to the Scheme any monies or assets of the Scheme Company which the Scheme Company or the Scheme Manager have or may hereafter recover in connection with the Scheme; and it is further

ORDERED, that all persons that have a claim of any nature or source against the Scheme Company in connection with the Scheme and who are parties to any proceedings (including, without limitation, arbitration or any judicial, quasi-judicial, administrative action, proceeding or process whatsoever) in which the Scheme Company is or was named as a party, or as a result of which a liability of the Scheme Company may be established in connection with the Scheme, is required to place the Petitioner's United States counsel (Sidley Austin LLP, 787 Seventh

Avenue, New York, NY 10019, Attn: Lee S. Attanasio, Esq., and Alex R. Rovira, Esq.) on the

master service list of any such action or other legal proceeding, and to take such other steps as may

be necessary to ensure that such counsel receives:

(a)    copies of any and all documents served by the parties to such action or other

legal proceeding or issued by the court, arbitrator, administrator, regulator or similar official having

jurisdiction over such action or legal proceeding; and

(b)    any and all correspondence, or other documents circulated to parties named

in the master service list; and it is further

ORDERED, that the English Court has exclusive jurisdiction to hear and determine

any suit, action, claim or proceeding and to settle any dispute which may arise out of the

construction or interpretation of the Scheme, or out of any action taken or omitted to be taken by

any of the Released Parties in connection with the Scheme; provided, however, that in relation to

the determination of Scheme Claims, nothing in this Order affects the validity of provisions

determining governing law and jurisdiction, whether contained in any contract between the Scheme

Company and any of its Scheme Creditors or otherwise; and it is further

ORDERED, that this Court shall retain jurisdiction with respect to the enforcement,

amendment, or modification of this Order or requests for any additional relief in this Chapter 15

Case and all adversary proceedings in connection therewith properly commenced and within the

jurisdiction of this Court; and it is further

ORDERED, that this Order shall be served:

(a)    by United States mail, first class prepaid, on or before September 26, 2011 as

prescribed by this Court upon all the known Scheme Creditors in the U.S. of whose current address

the Scheme Manager is aware at the date of service;

(b)    by publication on the Scheme website at www.TMEISCHEME.com; and

(c)    by publication of notice of the entry of this order in The Wall Street Journal

(US Edition) and Business Insurance magazine on or before September 26, 2011; and it is further

ORDERED, that such service will be good and sufficient service and adequate notice of this Order for all purposes.

Dated: September 8, 2011
     New York, New York

                **/s/Martin Glenn**
                 MARTIN GLENN
          United States Bankruptcy Judge

p

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

*In re*                                                                                Chapter 15

Towergate Finance plc,                                         Case No. 15-10509 (SMB)

         Debtor in a Foreign Proceeding.

**ORDER RECOGNIZING**
**FOREIGN PROCEEDING AND GRANTING OTHER RELIEF**

       Upon the *Verified Petition Under Chapter 15 for Recognition of a Foreign Main*

*Proceeding and Other Relief* [ECF No. 2] (together with the Form of Voluntary Petition [ECF

No. 1], the "**Petition**")[1] seeking: (a) recognition of the schemes of arrangement under Part 26 of

the Companies Act 2006 (England) (the "**English Proceeding**") currently pending before the

Chancery Division (Companies Court) of the High Court of Justice of England and Wales (the

"**English Court**") of the above-captioned debtor (the "**Debtor**") as a foreign main proceeding;

(b) a finding that the Foreign Representative is a person who meets the definitional requirements

of  section 101(24) of the Bankruptcy Code; (c) a finding that the Petition meets the requirements

of section 1515 of the Bankruptcy Code; and (d) granting additional relief under sections 1507

and 1521 of the Bankruptcy Code; and upon the hearing (the "**Hearing**") on the Petition and this

Court's review and consideration of the Petition, the Egan Declaration [ECF No. 7], the Bell

Declaration [ECF No. 5], the *Declaration of Katerina Papamichael in Connection with Notice of*

*Chapter 15 Documents* [ECF No. 10], the *Declaration of Mia Drennan in Connection with*

*Posting of Chapter 15 Documents* [ECF No. 11] and the *Supplemental Declaration of Bruce Bell*

*in Support of Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding*

*and Other Relief* [ECF No. 14];

---

[1]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Petition.

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

1.      This Court has jurisdiction to consider the Petition and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the "Standing Order of Reference Re: Title 11" of the United States District Court for the Southern District of New York (Preska, C.J.), dated January 31, 2012 (General Order 12-32).

2.      The consideration of the Petition and the relief requested therein is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

3.      The Client Trust Account is property of the Debtor within this District and, therefore, the Debtor is "eligible" to be a debtor in a chapter 15 case pursuant to sections 109 and 1501 of the Bankruptcy Code.

4.      Venue is proper before this Court pursuant to 28 U.S.C. § 1410(1).

5.      Good, sufficient, appropriate, and timely notice of the filing of the Petition and the Hearing on the Petition has been given by the Foreign Representative, pursuant to Bankruptcy Rules 1011(b) and 2002(q), to: (a) the United States Trustee for the Southern District of New York; (b) the Existing SSN Trustee; (c) the Existing FRN Trustee; (d) the Existing SUN Trustee; (e) the RCF Agent; (f) counsel to the Secured Ad Hoc Committee; (g) counsel to the Unsecured Ad Hoc Committee; (h) the Debtor; (i) counsel to the Debtor; (j) the Information Agent; and (k) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Foreign Representative is aware.  The Information Agent has timely provided notice to the Existing SSN Noteholders, the Existing FRN Noteholders and the Existing Senior Unsecured Noteholders and the RCF Agent has timely provided notice to the RCF Lenders, respectively, of

---

[2]     The findings and conclusions set forth herein and in the record of the hearing on the Petition constitute this Court's findings of facts and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Rules 7052 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").  To the extent any of the findings of fact herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law herein constitute findings of fact, they are adopted as such.

the filing of the Petition and the Hearing. In light of the nature of the relief requested and prior orders of this Court, no further notice is required.

6.    No objections or other responses were filed that have not been overruled, withdrawn, or otherwise resolved.

7.    This chapter 15 case was properly commenced pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code.

8.    The Foreign Representative is a "person" as such term is defined in section 101(41) of the Bankruptcy Code and has been duly appointed, made responsible for administering the restructuring of the Debtor and designated as the "foreign representative" of the Debtor as such term is defined in section 101(24) of the Bankruptcy Code.

9.    The Petition satisfies the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4).

10.    The English Proceeding is a "foreign proceeding" as such term is defined in section 101(23) of the Bankruptcy Code.

11.    The English Proceeding is pending in England, which is where the Debtor has its "center of main interests", as referred to in section 1517(b)(1) of the Bankruptcy Code and, as such, the English Proceeding is a "foreign main proceeding" pursuant to section 1502(4) of the Bankruptcy Code, and is entitled to recognition as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code.

12.    Absent the relief granted hereby, the restructuring contemplated by the Schemes and approved by the English Court in the English Proceeding may be frustrated by the actions of individual Scheme Creditors, a result inconsistent with the purposes of chapter 15.

13.     The injunctions contained in this Order (i) are within the Court's jurisdiction, (ii) are essential to the success and objectives of the English Proceeding and the Composite Restructuring (or, as the case may be, the Senior Secured Restructuring), and (iii) confer material benefits on, and is in the best interests of, the Debtor and the Existing Senior Secured Creditors and the Existing Senior Unsecured Noteholders.

14.     The Foreign Representative has demonstrated that the Debtor is entitled to all the relief requested, including that permanent injunctive relief is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States and permitted under sections 1507, 1520 and 1521 of the Bankruptcy Code. Unless a permanent injunction is issued, it appears to this Court that one or more entities (as such term is defined in section 101(15) of the Bankruptcy Code, "**Entities**") may take action that is inconsistent with the terms of the Composite Restructuring (or, as the case may be, the Senior Secured Restructuring), thereby interfering with the restructuring, and that as a result, the Debtor will suffer irreparable harm for which there is no adequate remedy at law.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED THAT:**

A.     The Petition and the relief requested in this Order are granted, and any objections thereto are overruled with prejudice.

B.     The English Proceeding is recognized as a "foreign main proceeding" pursuant to section 1517(a) and 1517(b)(1) of the Bankruptcy Code.

C.     The Foreign Representative is recognized as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the English Proceeding.

D.     The Debtor is entitled to all of the protections under section 1520 of the Bankruptcy Code, including the application of the automatic stay under section 362 of the Bankruptcy Code with respect to the Debtor and the property of the Debtor that is within the territorial jurisdiction of the United States.

E.     As of the Relevant Effective Date, the English Proceeding is recognized and granted comity.  The Senior Secured Scheme and, as the case may be, the Parallel SUN Scheme (in the case of each such Scheme, in the form sanctioned by the English Court) is entitled to full force and effect (including the Scheme Releases set forth therein) against all Entities in accordance with their terms, and such terms shall be binding and fully enforceable on all Existing Senior Secured Creditors (and, as the case may be, Existing Senior Unsecured Noteholders) within the territorial jurisdiction of the United States, whether or not they actually voted in favor of the Senior Secured Scheme (or, as the case may be, the Parallel SUN Scheme) or participated in the English Proceeding.

F.     As of the Relevant Effective Date, all Existing Senior Secured Creditors are permanently enjoined from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), employing any process, or performing any act to collect, recover or offset (except as expressly provided in the Senior Secured Scheme sanctioned by the English Court and Composite Restructuring documents (or, as the case may be, the Senior Secured Restructuring documents)) within the territorial jurisdiction of the United States, any debts or liabilities cancelled, discharged or restructured under the Senior Secured Scheme and Composite Restructuring

documents (or, as the case may be, the Senior Secured Restructuring documents) or as a result of English law relating thereto.

G.       As of the Relevant Effective Date, and provided that the Parallel SUN Scheme becomes effective, all Existing Senior Unsecured Noteholders are permanently enjoined from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), employing any process, or performing any act to collect, recover or offset (except as expressly provided in the Parallel SUN Scheme sanctioned by the English Court and Composite Restructuring documents) within the territorial jurisdiction of the United States, any debts or liabilities cancelled, discharged or restructured under the Parallel SUN Scheme and Composite Restructuring documents or as a result of English law relating thereto.

H.       The Foreign Representative is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

I.        The Foreign Representative, the Debtor, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court.

J.        Notwithstanding Bankruptcy Rule 7062, made applicable to this chapter 15 proceeding by Bankruptcy Rule 1018, this Order shall be immediately effective and enforceable upon its entry, and upon its entry, shall be final and appealable.

K.       This Court shall retain jurisdiction with respect to the enforcement, amendment, or modification of this Order, any requests for additional relief or any adversary proceeding brought

in and through this chapter 15 case, and any request by an entity for relief from the provisions of

this Order that is properly commenced and within the jurisdiction of this Court.

Dated:     March 27<u>th</u>, 2015
             New York, New York

                                 /s/  STUART M. BERNSTEIN

                                 _____

                                 THE HONORABLE STUART M. BERNSTEIN
                                 UNITED STATES BANKRUPTCY JUDGE

q

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re                                :        Chapter 15

                                    :

U.S. STEEL CANADA INC.,         :        Case No. 17-11519 (MG)

                                    :

      Debtor in a foreign proceeding.     :        Re: Docket No. 1, 2, 3, 4, and 9

                                    :

------------------------------------------------------------x

## ORDER GRANTING (I) RECOGNITION OF FOREIGN MAIN PROCEEDING, (II) RECOGNITION OF FOREIGN REPRESENTATIVE, (III) RECOGNITION OF SANCTION ORDER AND RELATED PLAN, AND (IV) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

Upon the Verified Petition (the "**Petition**")[1] of U.S. Steel Canada Inc., the foreign representative (the "**Foreign Representative**") of the above-captioned debtor (the "**Debtor**" or "**USSC**"), under sections 105(a), 1504, 1507, 1510, 1515, 1517, 1520, and 1521 of title 11 of the United States Code (the "**Bankruptcy Code**"), for entry of an order (the "**Order**") (i) recognizing the CCAA Proceedings as a foreign main proceeding under sections 1517 and 1520 of the Bankruptcy Code; (ii) recognizing the Foreign Representative as the "foreign representative," as defined in section 101(24) of the Bankruptcy Code in respect of the CCAA Proceedings; (iii) recognizing the Sanction Order and the Plan; (iv) granting all relief afforded the Debtor in the Sanction Order automatically upon recognition thereof pursuant to section 1520 of the Bankruptcy Code; and (v) granting such other relief as the Court deems just and proper, all as more fully set forth in the Petition; and upon this Court's review and consideration of the Petition (Docket Nos. 1 and 2), the Aziz Declaration (Docket No. 3), the Gage Declaration (Docket No. 4), and the *Supplemental Declaration of William E. Aziz in Support of Recognition of Sanction Order and Related Plan* (Docket No. 9) (the "**Supplemental Aziz Declaration**"), and the evidence admitted

---

[1]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Petition, the Aziz Declaration, or the Supplemental Aziz Declaration (as defined herein).

at the hearing (the "**Hearing**") to consider the Petition; and due and proper notice of the Petition

having been provided; and no other or further notice being necessary or required; and no objections

or other responses having been filed that have not been overruled, withdrawn, or otherwise

resolved; and all interested parties having had an opportunity to be heard at the Hearing; and after

due deliberation and sufficient cause appearing therefor, the Court makes the following findings

of fact and conclusions of law:[2]

a. This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

b. This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

c. Venue is proper in this district pursuant to 28 U.S.C. § 1410.

d. The Foreign Representative is a "person," as such term is defined in 11 U.S.C. § 101(41).

e. The Foreign Representative is the duly appointed "foreign representative" of the Debtor, as such term is defined in 11 U.S.C. § 101(24).

f. This chapter 15 case was properly commenced pursuant to 11 U.S.C. §§ 1504, 1509 and 1515.

g. The Foreign Representative has satisfied the requirements of 11 U.S.C. § 1515 and Fed. R. Bankr. P. 1007(a)(4) and 2002(q).

h. The Debtor has satisfied the eligibility requirements of 11 U.S.C. §§ 109(a) and 1517(a).

i. The CCAA Proceedings currently pending before the Canadian Court and provisions made thereunder for the protection, administration, and distribution of the Debtor's assets, are "foreign proceedings," as such term is defined in 11 U.S.C. § 101(23).

j. The CCAA Proceedings are entitled to recognition by this Court pursuant to 11 U.S.C. § 1517.

k. The CCAA Proceedings are pending in the country where the Debtor's center of main interests is located, are "foreign main proceedings," as such term is defined in 11

---

[2]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, or any of the following conclusions of law constitute findings of fact, they are adopted as such.

U.S.C. § 1502(4), and are entitled to recognition as "foreign main proceedings" pursuant to 11 U.S.C. § 1517(b)(1).

l.  The Foreign Representative is entitled to all the relief provided pursuant to 11 U.S.C. § 1520, without limitation.

m.  The Foreign Representative is further entitled to all relief expressly set forth in 11 U.S.C. §§ 1521(a)-(b).

n.  The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted under 11 U.S.C. §§ 1517, 1520, and 1521.

Now therefore, it is hereby:

ORDERED that the Petition is granted in its entirety; and it is further

ORDERED that the CCAA Proceedings are hereby recognized as a foreign main proceeding pursuant to section 1517(b)(1) of the Bankruptcy Code, and all relief under section 1520 of the Bankruptcy Code shall apply in this case; and it is further

ORDERED that the Sanction Order, the Plan, including the releases contained in sections 7.1, 7.2, and 7.3, and all other related orders and documents are recognized, granted comity, and entitled to full force and effect in the United States pursuant to sections 105, 1507, and 1521 of the Bankruptcy Code; and it is further

ORDERED that the Foreign Representative is authorized to operate the business of the Debtor that is the subject of the CCAA Proceedings and exercise the powers of a trustee to the extent provided by 11 U.S.C. § 1520(a)(3); and it is further

ORDERED that the Foreign Representative, the Debtor, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court; and it is further

ORDERED that no action taken by the Foreign Representative, the Debtor, or their respective successors, agents, representatives, advisors, or counsel in preparing, disseminating,

3

applying for, implementing, or otherwise acting in furtherance of or in connection with the CCAA Proceedings, this Order, this chapter 15 case, or any adversary proceeding herein, or any further proceeding commenced hereunder, shall be deemed to constitute a waiver of the rights or benefits afforded such persons under 11 U.S.C. §§ 306 and 1510; and it is further

ORDERED that the Petition and supporting papers shall be available upon request at the office of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn.: Marcia Goldstein, Esq., Robert J. Lemons, Esq., and Arkady A. Goldinstein, Esq.); and it is further

ORDERED the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that the Foreign Representative is authorized to take all action necessary to carry out this Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

A written opinion further detailing the basis for this ruling will be issued in due course.

**IT IS SO ORDERED.**

Dated: June 29, 2017
      New York, New York

**/s/ Martin Glenn**
_____
MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

r

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | ) Chapter 15 |
| | ) |
| YH Limited, | ) Case No. 16-12262 |
| | ) |
|     Debtor in a Foreign Proceeding. | ) |
| | ) |

## ORDER GRANTING PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND REQUEST FOR RELATED RELIEF

Upon consideration of the Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief, ECF No. 2 (together with the Form of Voluntary Petition, ECF No. 1, the "Petition"), the Foreign Representative Declaration,[1] and the UK Declaration, (together with the Petition, and the Foreign Representative Declaration, the "Chapter 15 Pleadings"), each filed on August 3, 2016 by or on behalf of the Petitioner, Christian Henry Wells, in his capacity as the duly-appointed foreign representative of YH Limited ("YH Limited", or the "Debtor"), the debtor in a voluntary restructuring proceeding (the "UK Proceeding") concerning the Debtor currently pending before the Chancery Division (Companies Court) of the High Court of Justice of England and Wales (the "UK Court"); and it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and it appearing that venue is proper before this Court pursuant to 28 U.S.C. § 1410; and the Court having considered and reviewed the Chapter 15 Pleadings and having held a hearing to consider the relief requested in the Petition on September 7, 2016 (the "Hearing"); and it appearing that timely notice of the filing of the Chapter 15 Pleadings and the Recognition Hearing has been given to the Debtor, the Office of

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to such terms in the Petition.

the United States Trustee for the Southern District of New York, GLAS (for distribution to the Scheme Creditors), and Sullivan & Cromwell (counsel to the Scheme Creditors) and that no other or further notice need be provided; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND**, that:

1.    This case was properly commenced pursuant to sections 1504, 1509 and 1515 of the Bankruptcy Code.

2.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).

3.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).

4.    The Client Trust Account is property of the Debtor within this district and, therefore, the Debtor is eligible to be a debtor in a Chapter 15 case pursuant to sections 109 and 1501 of the Bankruptcy Code.

5.    Venue is proper in this district pursuant to 28 U.S.C. § 1410.

6.    The UK Proceeding is a "foreign proceeding" within the meaning of section 101(23) of the Bankruptcy Code.

7.    The UK Proceeding is pending in England (a constituent member of the political union comprising the UK), which is the country in which the Debtor has the center of its main interests and, as such, the UK Proceeding is a "foreign main proceeding" within the meaning of sections 1502(4) and 1517(b)(1) of the Bankruptcy Code and entitled to recognition as the foreign main proceeding in respect of the Debtor.

8.     The Petitioner, Christian Henry Wells, has been duly appointed by the Debtor and has been declared by the UK Court as authorized to act as the "foreign representative" with respect to the UK Proceeding within the meaning of section 101(24) of the Bankruptcy Code.

9.     The Petition meets all of the requirements set forth in section 1515 of the Bankruptcy Code and rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

10.     The UK Proceeding is entitled to recognition by the Court pursuant to section 1517(a) of the Bankruptcy Code.

11.     The Debtor and the Petitioner are entitled to all of the relief set forth in section 1520 of the Bankruptcy Code.

12.     Appropriate notice of the filing of, and the Hearing on, the Petition was given, which notice is deemed adequate for all purposes, and no other or further notice need be given.

13.     The relief granted hereby is necessary and appropriate, in the interests of the public and of international comity, not inconsistent with the public policy of the United States, warranted pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1520, 1521(a) and 1525 of the Bankruptcy Code, and will not cause hardship to creditors of the Debtors or other parties in interests that is not outweighed by the benefits of granting that relief.

14.     The relief granted hereby is necessary to effectuate the purposes and objectives of Chapter 15 and to protect the Debtor and the interests of its creditors and other parties in interest.

15.     Absent the relief granted hereby, the Debtor Parties (as defined in paragraph (G) below) may be subject to the prosecution of judicial, quasi-judicial, arbitration, administrative or regulatory actions or proceedings in connection with the Scheme Claims against themselves or their property, thereby interfering with and causing harm to, the Debtor, its creditors, and other

parties in interest in the UK Proceeding and, as a result, the Debtor, its creditors and such other parties in interest would suffer irreparable injury for which there is no adequate remedy at law.

16.     Absent the requested relief, the efforts of the Debtor, the UK Court and the Petitioner in conducting the UK Proceeding and effecting the 2016 Refinancing under the Scheme, the Restructuring Documents and English law may be thwarted by the actions of certain creditors, a result counter to the purposes of Chapter 15 as reflected in section 1501(a) of the Bankruptcy Code.

17.     Each of the injunctions contained in this Order (i) is within the Court's jurisdiction, (ii) is essential to the success of the Scheme, (iii) is an integral element of the Scheme and/or to its effectuation, (iv) confers material benefits on, and is in the best interests of, the Debtor and its creditors, including without limitation the Scheme Creditors, and (v) is important to the overall objectives of the 2016 Refinancing.

For all of the foregoing reasons, and after due deliberation and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED AND DECREED**, that:

(A)     the Petition and the Relief Requested are granted;

(B)     the UK Proceeding is granted recognition as a foreign main proceeding (as defined in section 1502 of the Bankruptcy Code) pursuant to sections 1517(a) and (b)(1) of the Bankruptcy Code;

(C)     the Petitioner is recognized as the "foreign representative" as defined in section 101(24) of the Bankruptcy Code in respect of the UK Proceeding;

(D)     the Debtor and the Petitioner are granted all of the relief set forth in section 1520 of the Bankruptcy Code including, without limitation, the application of the protection afforded

by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and to the

Debtor's property that is within the territorial jurisdiction of the United States;

(E)      the Petitioner is hereby entrusted with the administration of any and all of the

Debtor's assets within the territorial jurisdiction of the United States;

(F)      as of the Effective Date (as defined in the Scheme), the Scheme Sanction Order,

the Scheme and the Restructuring Documents are recognized, granted comity, and entitled to full

force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy

Code) in accordance with their terms, and such terms shall be binding and fully enforceable on

all Scheme Creditors and any of their Nominated Recipients;

(G)      as of the Effective Date, any judgment, wherever and whenever obtained, to the

extent such judgment is a determination of the liability of the Debtor or any other person released

under the Scheme, including, as applicable, the Released Persons (as defined in the Explanatory

Statement) (collectively, the "Debtor Parties"), with respect to any debt cancelled, discharged or

restructured under the Scheme, the Restructuring Documents or as a result of English law relat-

ing to the 2016 Refinancing is unenforceable in the United States, in each case, to the extent in-

consistent with the Scheme, the Restructuring Documents or such law;

(H)      as of the Effective Date, all Scheme Creditors and any of their Nominated Recipi-

ents (as defined in the Scheme) are permanently enjoined from commencing or continuing in any

manner, directly or indirectly, including by way of counterclaim, any action, suit or other pro-

ceeding (including, without limitation, any judicial, quasi-judicial, arbitral or administrative ac-

tion, proceeding or process whatever in any judicial, arbitral, administrative or other forum), em-

ploying any process, or performing any act to collect, recover or offset any debt cancelled, dis-

charged or restructured under the Scheme or Restructuring Documents and/or as a result of Eng-

lish law relating to the 2016 Refinancing, or seeking any discovery related thereto, in each case, to the extent inconsistent with the Scheme, the Restructuring Documents or such law;

(I)      as of the Effective Date, Scheme Creditors and any of their Nominated Recipients are permanently enjoined from (i) transferring, relinquishing or disposing of any property of the Debtor Parties located within the territorial jurisdiction of the United States, or (ii) taking or continuing any act to obtain possession of, or exercise control over, such property, in each case, to the extent inconsistent with the Scheme, the Restructuring Documents or English law relating to the 2016 Refinancing;

(J)      as of the Effective Date, all entities (as that term is defined in section 101(15)) are permanently enjoined from commencing any suit, action or proceeding in the territorial jurisdiction of the United States to resolve any dispute arising out of any provision of the Scheme, the Restructuring Documents or English law relating to the 2016 Refinancing;

(K)      as of the Effective Date, all entities (as that term is defined in section 101(15) of the Bankruptcy Code) subject to the U.S. Bankruptcy Court's jurisdiction are permanently enjoined from taking any action inconsistent with the Scheme, including, without limitation, against the Debtor Parties or any property of Debtor Parties within the territorial jurisdiction of the United States;

(L)      as of the Effective Date, the Scheme Creditors and any of their Nominated Recipients are permanently enjoined from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), or employing any process, against the Foreign Representative (personally or in such capacity), the Debtor

or the other Debtor Parties in respect of any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken in connection with this Chapter 15 case, the Scheme or the Restructuring Documents;

(M)     no action taken by the Petitioner in preparing, disseminating, applying for, implementing or otherwise in connection with the Scheme, the Restructuring Documents, any order entered in respect of this Petition, the Chapter 15 case, any further order for additional relief in the Chapter 15 case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Petitioner as Foreign Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code;

(N)     this Court shall retain jurisdiction with respect to the effect, enforcement, amendment or modification of this order;

(O)     the Petitioner, the Debtor, and their respective agents are authorized to serve or provide any notices required under the Bankruptcy Rules or local rules of this Court;

(P)     the Petitioner is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order; and

(Q)     this Order shall be effective and enforceable immediately upon entry and shall constitute a final order within the meaning of 28 U.S.C. § 158(a).

Dated: September 8, 2016
      New York, New York

/S/ Shelley C. Chapman
UNITED STATES BANKRUPTCY JUDGE