# EXHIBIT D

Explanatory Statement

## THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.

THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES. NONE OF THE SECURITIES REFERRED TO IN THIS DOCUMENT MAY BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.

THE SECURITIES MAY NOT BE OFFERED OR SOLD IN THE U.S. UNLESS THEY ARE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE SECURITIES ACT) OR ARE EXEMPT FROM SUCH REGISTRATION. THE SCHEME SECURITIES PROPOSED TO BE ISSUED PURSUANT TO THE SCHEME WILL NOT BE, AND ARE NOT REQUIRED TO BE, REGISTERED WITH THE U.S. SECURITIES AND EXCHANGE COMMISSION (SEC) UNDER THE SECURITIES ACT OR THE SECURITIES LAW OF ANY STATE OR OTHER JURISDICTION, AND ARE BEING OFFERED AND SOLD IN RELIANCE ON CERTAIN EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT. CONSEQUENTLY, NEITHER THESE SECURITIES NOR ANY INTEREST OR PARTICIPATION THEREIN MAY BE OFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE U.S. OR, FOR CERTAIN OF THE SECURITIES TO BE ISSUED, TO U.S. PERSONS (AS DEFINED IN THE SECURITIES ACT) UNLESS THE SECURITIES ARE REGISTERED UNDER THE SECURITIES ACT, OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF THE SECURITIES ACT IS AVAILABLE. THE SCHEME SECURITIES WILL BE ISSUED IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION PROVIDED BY SECTION 4(A)(2) OF THE SECURITIES ACT AND WILL BE OFFERED TO EACH SCHEME CREDITOR THAT IS (A)(X) AN INSTITUTIONAL "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT, OR (Y) A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) OR (Z) A PERSON LOCATED AND RESIDENT OUTSIDE THE U.S. (AND, FOR CERTAIN OF THE SECURITIES TO BE ISSUED, THAT IS NOT A "U.S. PERSON" (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT)) AND (B) IS NOT A RETAIL INVESTOR IN THE EUROPEAN ECONOMIC AREA OR THE UNITED KINGDOM (DEFINED AS A PERSON WHO IS ONE (OR MORE) OF: (X) A RETAIL CLIENT AS DEFINED IN POINT (11) OF ARTICLE 4(1) OF DIRECTIVE 2014/65/EU (AS AMENDED, MIFID II); OR (Y) A CUSTOMER WITHIN THE MEANING OF DIRECTIVE 2016/97/EU (AS AMENDED, THE INSURANCE DISTRIBUTION DIRECTIVE), WHERE THAT CUSTOMER WOULD NOT QUALIFY AS A PROFESSIONAL CLIENT AS DEFINED IN POINT (10) OF ARTICLE 4(1) OF MIFID II; OR (Z) NOT A QUALIFIED INVESTOR.

THE SCHEME CREDITORS MUST RELY ON THEIR OWN EXAMINATION OF THE TERMS OF THE SCHEME, INCLUDING THE MERITS AND RISKS INVOLVED. THIS DOCUMENT WILL NOT BE FILED WITH THE SEC AND THE RESTRUCTURING DOCUMENTS WILL NOT BE REVIEWED BY THE SEC OR ANY STATE SECURITIES AUTHORITY AND NONE OF THEM HAS OR WILL APPROVE, DISAPPROVE, PASS UPON OR ENDORSE THE MERITS OF THE SCHEME OR THE ACCURACY, ADEQUACY OR COMPLETENESS OF THIS DOCUMENT OR THE RESTRUCTURING DOCUMENTS. IT IS UNLAWFUL TO MAKE ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

THIS DOCUMENT COMPRISES AN EXPLANATORY STATEMENT PURSUANT TO SECTION 897 OF THE COMPANIES ACT 2006 (THE EXPLANATORY STATEMENT). IT IS BEING SENT TO PERSONS WHO ARE BELIEVED TO BE SCHEME CREDITORS AS AT THE DATE OF THIS DOCUMENT. IF YOU HAVE ASSIGNED, SOLD OR OTHERWISE TRANSFERRED, OR ASSIGN, SELL OR OTHERWISE TRANSFER, YOUR INTERESTS AS A SCHEME CREDITOR BEFORE THE RELEVANT RECORD TIME, YOU MUST FORWARD THIS DOCUMENT AND THE ACCOMPANYING DOCUMENTS AT ONCE TO THE PERSON OR PERSONS TO WHOM YOU HAVE ASSIGNED, SOLD OR OTHERWISE TRANSFERRED, OR ASSIGN, SELL OR OTHERWISE TRANSFER, YOUR INTERESTS AS A SCHEME CREDITOR.

IF YOU ARE IN ANY DOUBT AS TO THE CONTENTS OF THIS EXPLANATORY STATEMENT OR THE DOCUMENTS THAT ACCOMPANY IT OR WHAT ACTION YOU SHOULD TAKE, YOU ARE RECOMMENDED TO SEEK YOUR OWN INDEPENDENT LEGAL AND FINANCIAL ADVICE IMMEDIATELY FROM YOUR STOCKBROKER, BANK MANAGER, SOLICITOR, ACCOUNTANT OR OTHER INDEPENDENT PROFESSIONAL ADVISER WHO, IF YOU ARE TAKING ADVICE IN THE UNITED KINGDOM, IS AUTHORISED PURSUANT TO THE FINANCIAL SERVICES AND MARKETS ACT 2000 OR BY AN APPROPRIATE REGULATORY BODY, OR FROM ANOTHER APPROPRIATELY AUTHORISED INDEPENDENT PROFESSIONAL ADVISER IF YOU ARE IN A TERRITORY OUTSIDE THE UNITED KINGDOM.

FURTHER COPIES OF THIS EXPLANATORY STATEMENT CAN BE OBTAINED BY CONTACTING THE INFORMATION AGENT VIA EMAIL BY kcadeutag@lucid-is.com OR BY TELEPHONE ON +44 (0) 207 704 0880 OR VIA THE SCHEME WEBSITE www.lucid-is.com/kcadeutag.

THIS DOCUMENT IS ACCOMPANIED BY INSTRUCTIONS FOR SCHEME CREDITORS, INCLUDING VOTING INSTRUCTIONS. IT IS IMPORTANT THAT YOU READ THIS DOCUMENT CAREFULLY FOR INFORMATION ABOUT THE SCHEME AND THAT YOU COMPLETE AND RETURN THE ACCOUNT HOLDER LETTER AND/OR LENDER CLAIM FORM (AS APPLICABLE) WHICH ACCOMPANIES THIS DOCUMENT BY THE VOTING INSTRUCTION DEADLINE.

## EXPLANATORY STATEMENT IN RELATION TO A SCHEME OF ARRANGEMENT

under Part 26 of the Companies Act 2006

between

### KCA Deutag UK Finance plc (the Company)

and

### the Scheme Creditors

(as defined in this Explanatory Statement)

### Date: 15 October 2020

Your attention is drawn to the letter from the directors of the Company in Part 1 (Letter from the Directors of the Company) of this Explanatory Statement, which contains the unanimous recommendation of the Board of the Company that you vote in favour of the Scheme at the Scheme Meeting to be held to consider, and if thought appropriate approve, the Scheme.

A meeting of the Scheme Creditors to consider the Scheme will be held on 30 October 2020 via webinar. The notice convening the Scheme Meeting is set out in Appendix 10 (Notice of Scheme Meeting) to this Explanatory Statement, and validly completed and executed Account Holder Letters and/or Lender Claim Forms (as applicable) should be submitted online via the Scheme Website or emailed by pdf to kcadeutag@lucid-is.com as soon as possible and in any event prior to 5:00 pm (London time) on 28 October 2020 (being the **Voting Instruction Deadline**). The custody instruction deadline for Existing Noteholders that are either (i) Euroclear/Clearstream Account Holders or (ii) are holding their Existing Notes through a Euroclear/Clearstream Account Holder will be **5:00 pm (New York time) on 26 October 2020** (being **the Custody Instruction Deadline).**

More detailed instructions about actions to be taken by the Scheme Creditors preceding the Scheme Meeting are set out in Appendix 7 (Instructions and Guidance for Scheme Creditors) to this Explanatory Statement and summarised on page 30 to this Explanatory Statement. **Whether or not you intend to attend the Scheme Meeting, you are requested to complete, execute and return the Account Holder Letter and/or Lender Claim Form (as applicable) which accompanies this Explanatory Statement in accordance with the instructions stated herein as soon as possible and, in any event, by no later than the Voting Instruction Deadline, being 5:00 pm (London time) on 28 October 2020.**

The statements contained in this Explanatory Statement are made as at the date of this Explanatory Statement, unless another time is specified in relation to them, and delivery of this Explanatory Statement shall not give rise to any implication that there has not been any change in the information set out in this Explanatory Statement since that date.

Nothing contained in this Explanatory Statement shall constitute a warranty or guarantee of any kind, express or implied, and nothing contained in this Explanatory Statement shall constitute any admission of any fact or Liability on the part of the Company or any of its Affiliates with respect to any asset to which it or they may be entitled or any claim against it or them. Without prejudice to the generality of the foregoing, nothing in the Scheme Document, the Restructuring Implementation Deed or this Explanatory Statement or the distribution thereof evidences to any person or constitutes any admission by the Company, that a Liability is owed to any person in respect of any claim or that any person is or may be a Scheme Creditor. The failure to distribute this document to any Scheme Creditor shall not constitute an admission by the Company that such person is not a Scheme Creditor.

No person has been authorised by the Company to make any representations concerning the Scheme which are inconsistent with the statements contained in this Explanatory Statement and, if made, such representations may not be relied upon as having been so authorised. This Explanatory Statement is issued solely in connection with the Scheme.

If the Scheme is approved by the Scheme Creditors, a separate hearing before the Court will be necessary in order to sanction the approved Scheme. All persons who are Scheme Creditors at the Record Time, being (a) in respect of any Liability (other than the Existing Overdraft Liabilities), 5:00 pm (New York time) on 26 October 2020 and (b) in respect of the Existing Overdraft Liabilities, the Existing Overdraft Record Time, are entitled to attend the Sanction Hearing in person or through counsel to support or oppose the sanctioning of the Scheme. It is expected that the Sanction Hearing to consider whether to sanction the Scheme will be held on or around 5 November 2020. Further important information is set out under "Important Notice to Scheme Creditors" on pages 6 to 9.

Unless the context otherwise requires, all terms defined in this Explanatory Statement shall have the meanings set out in Appendix 1 (Definitions and Interpretation) to this Explanatory Statement.

# CONTENTS

**Section**                                                                                                      **Page**

Expected Timetable of Principal Events ...........................................................................4
Important Notice to Scheme Creditors ............................................................................6
Important Securities Law Notice.....................................................................................10
Summary of Actions to be taken by Scheme Creditors ...................................................30


**Parts**

Part 1      Letter from the Directors of the Company .....................................................35
Part 2      Background to the Company, the Group and the Group's Principal Financial
            Indebtedness................................................................................................48
Part 3      Further Background to and Reasons for the Restructuring (including the
            Scheme) .......................................................................................................59
Part 4      Certain Legal Aspects of the Scheme ...........................................................66
Part 5      Summary of the Restructuring (including the Scheme)..................................79
Part 6      Summary of the Key Restructuring Documents ............................................94
Part 7      Estimated Alternative Outcomes for Scheme Creditors ..............................119
Part 8      Risk Factors ...............................................................................................124
Part 9      Tax Considerations For The New Notes .....................................................172


**Appendix**

1.      Definitions and Interpretation..............................................................................176
2.      Scheme Document................................................................................................199
3.      Restructuring Implementation Deed.....................................................................223
4.      Key Restructuring Documents .............................................................................
        Part 1      New Notes Indenture .....................................................................352
        Part 2      New Cash Management Facilities Agreements ...............................541
        Part 3      New LC Facility Agreement ...........................................................711
        Part 4      FAB Run-Off LC Facility Agreement .............................................881
        Part 5      New Intercreditor Agreement .......................................................1041
        Part 6      Jersey Newco Investment Agreement ...........................................1273
        Part 7      Jersey Newco Sale and Purchase Agreement ...............................1344
        Part 8      Deed of Release ...........................................................................1352
        Part 9      Holding Period Trust Agreement ...................................................1407
5.      Jersey Newco Articles of Association ...................................................................1429
6.      Warrant Instruments............................................................................................1481
7.      Instructions and Guidance for Scheme Creditors ...................................................1503
8.      Account Holder Letter ..........................................................................................1516
9.      Lender Claim Form ...............................................................................................1578
10.     Notice of Scheme Meeting ....................................................................................1634
11.     Simplified Group Structure Chart ..........................................................................1637
12.     Simplified Post-Restructured Group Structure Chart...............................................1639
13.     Management Equity Plan – Summary .....................................................................1641

## EXPECTED TIMETABLE OF PRINCIPAL EVENTS[1]

| Event | Expected time and date |
|---|---|
| **Custody Instruction Deadline[2]** | 5:00 pm (New York time) on 26 October 2020 |
| **Record Time[3]** | 5:00 pm (New York time) on 26 October 2020 (in respect of any Liability (other than the Existing Overdraft Liabilities)) (being the Principal Record Time) and the Existing Overdraft Record Time (in respect of the Existing Overdraft Liabilities). |
| **Voting Instruction Deadline[4]** | 5:00 pm on 28 October 2020 |
| Scheme Meeting[5] | 10:30 am on 30 October 2020 |
| Sanction Hearing[6] | 5 November 2020 |
| U.S. Bankruptcy Court hearing with respect to Chapter 15 Recognition in relation to the Scheme | On or shortly after 5 November 2020 |
| Anticipated Scheme Effective Time | 6 November 2020 |
| Anticipated Restructuring Effective Date | On or about 12 November 2020 |
| Long Stop Date | 30 November 2020 |

**Unless otherwise stated, all references to time in this Explanatory Statement are to London time.**

---

1    The dates in this timetable and mentioned throughout this Explanatory Statement assume that neither the Scheme Meeting is adjourned and that no person opposes the Scheme, thereby causing the grant of the Sanction Order to be delayed. It is also possible that the drawing up of the order of the Court sanctioning the Scheme may be delayed if any person appeals the order.

2    The Custody Instruction Deadline is relevant for Existing Noteholders that are either (i) Euroclear/Clearstream Account Holders or (ii) are holding their Existing Notes through a Euroclear/Clearstream Account Holder. This deadline is for such Account Holders to submit an electronic instruction to Euroclear or Clearstream to block their Existing Notes (please see the section titled Summary of Actions to be Taken by Scheme Creditors, below, for more information).

3    All Scheme Claims will be determined at the Record Time.

4    Please see the section entitled Instructions and Guidance for Scheme Creditors at Appendix 7 of this Explanatory Statement. This is the deadline by which Scheme Creditors should submit their Account Holder Letters and/or Lender Claim Forms (as applicable) to the Information Agent. Account Holders are encouraged to obtain whatever information or instructions they may require from Existing Noteholders in sufficient time to enable them to return their valid Account Holder Letters (including, if applicable, Sub-Proxies) to the Information Agent as soon as possible, having considered this Explanatory Statement carefully. Voting instructions will not be taken into account in respect of Account Holder Letters and Lender Claim Forms received after the Voting Instruction Deadline, being 5:00 pm on 28 October 2020. Scheme Creditors (or Account Holders, if different) requiring any assistance in completing Account Holder Letters and/or Lender Claim Forms (as applicable) should contact the Information Agent using the contact details in the Account Holder Letter set out in Appendix 8 to this Explanatory Statement and the Lender Claim Form set out in Appendix 9 to the Explanatory Statement. All relevant documentation for Scheme Creditors can be accessed on the Scheme Website at http://www.lucid-is.com/kcadeutag.

5    The Scheme Meeting will be conducted virtually and will commence at the time stated. Scheme Creditors wishing to attend the Scheme Meeting should produce evidence of corporate authority (in the case of a corporation) (for example, a valid power of attorney and/or board minutes) and evidence of personal identity (a passport or other equivalent identification) to the Information Agent via email by no later than one hour before the scheduled time of the Scheme Meeting.

6    The Court will be requested to sanction the Scheme. The date for that hearing is expected to be on or about 5 November 2020. If this date changes, the dates of all subsequent steps, including the Scheme Effective Time and the Restructuring Effective Date, may be affected. In this event, the date of the hearing will be announced at the Scheme Meeting to the extent then known or will otherwise be notified to the Scheme Creditors.

**Existing Noteholders should observe any deadlines set by any institution or settlement system through which they hold interests in the Existing Notes to ensure that any voting instructions given by them are taken into account at the Scheme Meeting. The Company strongly urges each Existing Noteholder to contact its relevant Account Holder or Intermediary as soon as possible to ensure they are aware of this Explanatory Statement and the process and timetable set out in it.**

The Scheme Meeting will be held virtually on 30 October 2020, via webinar. Please see the section titled Summary of Actions to be taken by Scheme Creditors on page 30, below, for more information.

## IMPORTANT NOTICE TO SCHEME CREDITORS

**1.      Information**

**Unless the context otherwise requires, all terms defined in this Explanatory Statement shall have the meanings set out in Appendix 1 (Definitions and Interpretation) to this Explanatory Statement. The appendices to this Explanatory Statement form an integral part of it and, unless expressly stated otherwise, references to this Explanatory Statement shall be construed as references to this Explanatory Statement including the appendices to it.**

This Explanatory Statement has been prepared in connection with proposals in relation to the scheme of arrangement under Part 26 of the Companies Act between the Company and the Scheme Creditors and has been prepared solely for the purpose of providing information to Scheme Creditors in relation to the Scheme.

Neither the RCF Lenders, the Ad-Hoc Committee nor any other Scheme Creditor has authorised the content of this Explanatory Statement or any part of it, nor do they accept responsibility for the accuracy, completeness or reasonableness of the statements contained within it.

Nothing in this Explanatory Statement or any other document issued with or appended to it should be relied upon by the Scheme Creditors for any purpose other than to make a decision on the Scheme and the Scheme Creditors may not reproduce or distribute this Explanatory Statement, in whole or in part, and may not disclose any of the contents of this Explanatory Statement or use any information herein for any purpose other than considering and/or making a decision in respect of the Scheme.  In particular, and without limitation, nothing in this Explanatory Statement or any other document issued with or appended to it should be relied upon in connection with the purchase of any shares, warrants, bonds, notes or assets in or of any company or person.

The information contained in this Explanatory Statement has been prepared based upon information available to the Company as at the date of this Explanatory Statement. The delivery of this Explanatory Statement does not imply that, unless otherwise stated, the information herein is correct as at any time subsequent to the date of this Explanatory Statement. Save as otherwise agreed, or as required by law, the Company has no obligation whatsoever to update or revise any of the information, forward-looking statements or the conclusions contained herein or to reflect new events or circumstances or to correct any inaccuracies which may become apparent subsequent to the date of this Explanatory Statement. To the best of the Company's knowledge, information and belief, the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.  The Company has taken all reasonable steps to ensure that this document contains the information reasonably necessary to enable the Scheme Creditors to make an informed decision about the effect of the Scheme on them.

In making a decision in respect of the Scheme, each Scheme Creditor must rely on its own examination, analysis and enquiry of the Company and the terms of the Scheme, including the merits and risks involved.  None of the Company's advisers has verified that the information contained in this Explanatory Statement is in accordance with the facts and does not omit anything likely to affect the import of such information, and each of those persons expressly disclaims responsibility for such information.  Each Scheme Creditor, by its receipt of the Scheme Creditor Entitlements (to which it is entitled to pursuant to the Scheme), acknowledges that it has not relied on A&O, Houlihan Lokey, Deloitte or any of the Company's other advisers or the Information Agent in connection with any investigation of the accuracy of any information contained in this Explanatory Statement or its investment decision (including any decision in connection with the Scheme).

This Explanatory Statement has not been reviewed, verified or approved by any rating agency or any regulatory authority.  Other than in the case of fraud or wilful default and without prejudice to the

representations and warranties given by the Company, or any directors or officers of any member of the Group elsewhere, to the fullest extent permitted by law, neither the Company, nor any other member of the Group, nor any directors or officers of the Company or any other member of the Group, will have any tortious, contractual or any other Liability to any person in connection with the use of this Explanatory Statement, and neither the Company nor any other member of the Group accepts any Liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from any use of this Explanatory Statement, its contents or preparation or otherwise in connection with it, even if the Company or such other member of the Group (as applicable) has been advised of the possibility of such damages.

## 2.    Summary only

The summary of the principal provisions of the Scheme Document, the Restructuring Implementation Deed and any other Restructuring Document contained in this Explanatory Statement is qualified in its entirety by reference to the actual Scheme Document, Restructuring Implementation Deed or other Restructuring Document (as applicable). The full text of the Scheme Document is set out in Appendix 2 (Scheme Document) to this Explanatory Statement, and all Key Restructuring Documents are scheduled to the Restructuring Implementation Deed at schedule 2 (Key Restructuring Documents) (and appended to this Explanatory Statement at Appendix 4 (Key Restructuring Documents). Copies of the Other Restructuring Documents will be made available to Scheme Creditors via the Scheme Website.

Each Scheme Creditor is advised to read and consider carefully the text of the Scheme Document, the Restructuring Implementation Deed and all other Restructuring Documents. This Explanatory Statement has been prepared solely to assist the Scheme Creditors to vote on the Scheme.

Scheme Creditors should not construe the contents of this document as legal, tax, financial or other advice, and should consult with their own professional advisers as to the matters described in this document.

**IN THE EVENT OF A CONFLICT BETWEEN THE INFORMATION AND TERMS DESCRIBED IN THIS EXPLANATORY STATEMENT AND THE SCHEME DOCUMENT (INCLUDING THE RESTRUCTURING IMPLEMENTATION DEED SCHEDULED TO THE SCHEME DOCUMENT (AND APPENDED TO THIS EXPLANATORY STATEMENT AT APPENDIX 3)), THE TERMS OF THE SCHEME DOCUMENT (AND THE RESTRUCTURING IMPLEMENTATION DEED) SHALL PREVAIL.**

## 3.    Electronic form

This Explanatory Statement has been sent to you in electronic form. Documents transmitted electronically may be altered or corrupted during the process of transmission. Although the Company and the Information Agent have taken reasonable steps to prevent the alteration or corruption of this Explanatory Statement, none of the Company, the other members of the Group, the Information Agent or their respective directors, officers, Affiliates, employees or agents accepts any liability or responsibility whatsoever in respect of any differences between the Explanatory Statement distributed to you in electronic form and the Explanatory Statement as it may appear on the Scheme Website.

## 4.    Prospectus

This Explanatory Statement is not a prospectus within the meaning of the Prospectus Regulation EU 2017/1129, or a prospectus equivalent document.

**5.      Forward-looking statements**

Nothing contained in this Explanatory Statement shall be deemed to be a forecast, projection or estimate of the Company's or the Group's future financial performance, except where otherwise specifically stated. This Explanatory Statement contains certain statements, statistics and projections that are, or may be, forward-looking. The accuracy and completeness of all such statements, including, without limitation, statements regarding the Group's future financial position, strategy, plans and objectives for the management of future operations, is not warranted or guaranteed.

This Explanatory Statement contains statements, estimates, opinions and projections with respect to the Company and/or the Group. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements often use words such as "anticipate", "target", "expect", "estimate", "intend", "plan", "goal", "believe", "will", "may", "should", "would", "could" or other words of similar import. These statements are based on numerous assumptions and assessments made by the Company and/or any other member of the Group as appropriate in light of their experience and their perception of historical trends, current conditions, expected future developments and other factors which they believe appropriate. Although the Company and/or any other member of the Group, as appropriate, believe that the expectations reflected in such statements are reasonable, no assurance can be given that such expectations will prove to be correct. Forward-looking statements involve significant risks and uncertainties, should not be read as guarantees of future performance or results, and will not necessarily be accurate indications of whether or not such results will be achieved. Such forward-looking statements only speak as at the date of this Explanatory Statement. A number of factors could cause actual results to necessarily differ materially from the results discussed in the forward-looking statements, including, but not limited to, future performance being lower than expected, deterioration in general economic conditions, changes in the regulatory environment, fluctuations in interest and exchange rates, the outcome of litigation, government actions and the other factors set out or referred to in Part 8 (Risk Factors) of this Explanatory Statement. It is up to the recipient of this Explanatory Statement to make its own assessment of the validity of such forward-looking statements and assumptions and no Liability is accepted by the Company or any other member of the Group in respect of the achievement of such forward-looking statements and assumptions. Should one or more of these risks or uncertainties materialise, or should underlying assumptions prove incorrect, actual results may vary materially from those described in this Explanatory Statement.

**6.      Risk factors**

Scheme Creditors' attention is drawn to certain risks associated with the Scheme that are set out or referred to in Part 8 (Risk Factors) of this Explanatory Statement.

**7.      Legal, tax and financial advice**

Scheme Creditors should not construe the contents of this Explanatory Statement as legal, tax or financial advice.

This Explanatory Statement has been prepared without taking into account the objectives, financial situation or needs of any particular recipient of it and, consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purpose for which a recipient might use it. Any such recipients should conduct their own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to its own objectives, financial situations and needs.

**Scheme Creditors are recommended to consult their own professional advisers as to legal, tax, financial or other matters relevant to the action Scheme Creditors should take in relation to the Scheme, or the implications/consequences of those actions.**

**This Explanatory Statement does not discuss the tax consequences for Scheme Creditors, the Company or the Group arising from the implementation of the Scheme.  Save as set out in any Restructuring Document, Scheme Creditors are liable for their own taxes and shall have no recourse to the Company or any other member of the Group or any other entity or person named in this Explanatory Statement with respect to taxes arising in connection with the Scheme. Scheme Creditors who are in any doubt as to the effect of implementation of the Scheme are urged to consult their own professional advisers regarding the possible tax consequences under the laws of the jurisdictions that apply to them.**

## IMPORTANT SECURITIES LAW NOTICE

**THIS EXPLANATORY STATEMENT DOES NOT CONSTITUTE OR FORM PART OF A RECOMMENDATION REGARDING ANY SECURITIES OR AN OFFER TO SELL OR INVITATION TO SELL OR A SOLICITATION OF AN OFFER TO BUY OR SUBSCRIBE FOR OR OTHERWISE ACQUIRE ANY SECURITY. NONE OF THE SECURITIES REFERRED TO IN THIS EXPLANATORY STATEMENT MAY BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW. NEITHER THIS EXPLANATORY STATEMENT NOR ANY COPY THEREOF MAY BE TAKEN OR TRANSMITTED OR DISTRIBUTED, DIRECTLY OR INDIRECTLY, INTO THE U.S., OTHER THAN TO A QIB OR TO AN INSTITUTIONAL "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(A)(1), (2), (3) OR (7) UNDER THE SECURITIES ACT.**

Scheme Creditors are advised that none of the Scheme Consideration has been or will be registered under the Securities Act, the securities laws of any state or any other jurisdiction, and neither Alpha, the Company nor Jersey Newco (as applicable) expects that any of the Scheme Consideration will be subject to the reporting requirements applicable under the Exchange Act, the securities laws of any state of the U.S. or any other jurisdiction. None of the Scheme Consideration may be offered or sold in the U.S. absent registration under the Securities Act or an applicable exemption from registration thereunder.

The distribution of this Explanatory Statement in other jurisdictions may be restricted by law, and persons into whose possession this Explanatory Statement comes should inform themselves about, and observe, any such restriction. Any failure to comply with these restrictions may constitute a violation of the laws of any such other jurisdiction. This Explanatory Statement may not be acted on or relied on by persons who are not eligible to invest in securities offered by the Company or Jersey Newco (as applicable). Any investment or investment activity to which this Explanatory Statement relates is available only to persons eligible to invest in securities offered by the Company or Jersey Newco (as applicable) and will be engaged in only with such persons. A person who is eligible to invest in the Scheme Consideration is an Eligible Person.

The directors of Alpha understand that none of the Scheme Consideration will be listed with the SEC, with any securities regulatory authority of any state or other jurisdiction of the U.S. or on any inter-dealer quotation system in the U.S. None of Alpha, the Company or Jersey Newco (as applicable) intends to take action to facilitate a market in any of the Scheme Consideration in the U.S. Consequently, the Company believes that it is unlikely that an active trading market in the U.S. will develop for any such securities.

Neither the SEC nor any U.S. federal, state or other securities commission or regulatory authority has registered, approved or disapproved any of the Scheme Consideration or passed upon the accuracy or adequacy of this Explanatory Statement. Any representation to the contrary is a criminal offence in the U.S.

Scheme Creditors should consult their own legal, financial and tax advisers with respect to the legal, financial and tax consequences of the Scheme in their particular circumstances.

The issuance of the Jersey Newco Consideration Shares to the Scheme Creditors (as explained in detail in this Explanatory Statement) relates to the issuance of shares in a Jersey company and is proposed to be made by and pursuant to a statutory arrangement under English company law. Accordingly, the Scheme is subject to the disclosure requirements, rules and practices applicable to English schemes of arrangement and the information in this Explanatory Statement is not the same as that which would have been disclosed if this Explanatory Statement had been prepared for the purposes of complying with the registration requirement of the Securities Act or in accordance with the laws or regulations of any other jurisdiction. Any financial information regarding the Company referred to in this Explanatory Statement has been or will have been prepared in accordance with UK accounting standards that may not be comparable to the accounting standards applicable to financial statements of U.S. companies or companies whose financial statements are prepared in accordance with generally accepted accounting principles in the U.S.

It may be difficult for Scheme Creditors in the U.S. to enforce their rights and claims arising out of U.S. federal securities laws against officers and directors of the Company who are residents of countries other than the U.S., and it may not be possible to sue the Company in a non-U.S. court for violations of U.S. securities laws.

1.    **Scheme Consideration**

The Scheme Consideration offered under the Scheme will be offered in reliance upon exemptions from the registration requirements of the Securities Act, including the exemption provided by Section 4(a)(2)(private placement). In order to qualify for the exemption from the registration requirements of the Securities Act provided by Section 4(a)(2)(private placement), the purchasers of the Scheme Consideration must (a) either have enough knowledge and experience in finance and business matters to be "sophisticated investors" or be able to bear the investment's economic risk and (b) have access to the type of information normally provided in a prospectus for a registered securities offering.

Scheme Creditors should be aware that the New Notes will be held in Euroclear and Clearstream only. Scheme Creditors should also note that that the Jersey Newco Shares will not be listed on any recognised stock exchange and will not have an ISIN or CUSIP. As such, the Jersey Newco Shares will not be eligible for clearance in any Clearing System.

In connection with the issue of the Scheme Consideration (which consists of the Jersey Newco Consideration Shares and the New Notes) pursuant to the Scheme, the Account Holder Letter and/or Lender Claim Form will require Scheme Creditors who intend to subscribe for the Jersey Newco Consideration Shares and/or the New Notes to confirm, among other things, that the relevant Scheme Creditor and/or Nominee(s) is an Eligible Person and will require Scheme Creditors and/or Nominee(s) who intend to subscribe for Jersey Newco Consideration Shares and/or New Notes to agree in writing to certain representations, warranties and undertakings, and those written confirmations will form part 6 (Securities Confirmation Deed) of the Account Holder Letter and part 4 (Securities Confirmation Deed) of the Lender Claim Form. If the confirmations required by the Account Holder Letter and/or Lender Claim Form cannot be or are not given, the relevant Scheme Creditor and/or its Nominee(s) will not be eligible to subscribe for the Jersey Newco Consideration Shares and/or the New Notes (as applicable) and will not be treated as an Eligible Person.

The Scheme Consideration delivered under the Scheme will be issued and delivered in reliance upon exemptions from the registration requirements of the Securities Act. The Jersey Newco Consideration Shares and the New Notes will be offered and sold solely to persons within the U.S., in each case where each such person is an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, or a QIB (such Jersey Newco Consideration Shares and New Notes, the **Restricted Jersey Newco Consideration Shares** and the **Restricted New Notes,** respectively). Outside the U.S., the Jersey Newco Consideration Shares and the New Notes will be offered and sold solely in offshore transactions (and, in case of the New Notes, to non-U.S. persons only), in reliance on Regulation S, to persons who are not retail investors in the European Economic Area or in the United Kingdom (defined as persons who are one (or more) of: (x) retail clients as defined in point (11) of Article 4(1) of MiFID II; or (y) customers within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not Qualified Investors) (such Jersey Newco Shares and New Notes, the **Regulation S Jersey Newco Consideration Shares** and the **Regulation S New Notes**, respectively).

Upon issuance, the Jersey Newco Consideration Shares and the New Notes may not be offered, sold, pledged or otherwise transferred other than in compliance with the transfer restrictions described under "U.S. Securities laws considerations" below.

**U.S. Securities laws considerations**

(a)    **Restricted New Notes**

Each Scheme Creditor (or Nominee (if applicable)) that is subscribing for Restricted New Notes who is located in the U.S. or who is (or is acting for the account or benefit of) a U.S. person, prior to accepting delivery of New Notes will be required to represent and warrant to Alpha, the Company and Jersey Newco, on behalf of itself and each other person or account for which it is acting that:

(i)    It understands that the Restricted New Notes are being offered in reliance upon an exemption from, or in a transaction not subject to, registration under the Securities Act and similar provisions under state securities laws for an offer and sale by the Company not involving a public offering in the U.S.

(ii)    Its receipt of the Restricted New Notes is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it.

(iii)    It understands that the Restricted New Notes have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the U.S.

(iv)    As a purchaser of the Restricted New Notes in a private placement not registered under the Securities Act, it is receiving Restricted New Notes for its own account, or for an account as to which it exercises sole investment discretion, for investment purposes and (subject, to the extent necessary, to the disposition of its or such discretionary accounts' property being at all times within its or their control) not with a view to any distribution or resale, directly or indirectly, in the U.S. or otherwise in violation of the securities laws of the U.S.

(v)    It understands that the Restricted New Notes issued in reliance on Section 4(a)(2) of the Securities Act are "restricted securities" (as defined by Rule 144 under the Securities Act), and that for one year after the latest of the original issue date of the Restricted New Notes and the last date on which the issuer or any Affiliate of the issuer was the owner of the Restricted New Notes, the Restricted New Notes are restricted securities, may not be offered, sold, pledged or otherwise transferred except (A) to the issuer, the guarantors or any Subsidiary thereof, (B) pursuant to a registration statement that has been declared effective under the Securities Act, (C) for so long as the Restricted New Notes are eligible for resale pursuant to Rule 144A, to a person that it, and any person acting on its behalf, reasonably believes is a QIB purchasing for its own account or for the account of one or more QIBs to whom notice is given that the transfer is being made in reliance on Rule 144A, (D) in an offshore transaction in accordance with Rule 903 or Rule 904 of Regulation S to a person that is not a U.S. person and that is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (I) a retail client as defined in point (11) of Article 4(1) of MiFID II; or (II) a customer within the meaning of Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or is not a Qualified Investor), or (E) pursuant to an exemption from, or in a transaction not subject to, registration under the Securities Act (if available) in each case in accordance with any applicable securities laws of the U.S. and any state or other jurisdiction of the U.S.

(vi)  It understands that no representation has been made as to the availability of any exemption under the Securities Act or any applicable securities laws of any state or other jurisdiction of the U.S. for the reoffer, resale, pledge or transfer of the Restricted New Notes and that, pursuant to these laws, such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

(vii)  It understands that, if an exemption from registration or qualification under the Securities Act or U.S. federal and state securities laws is available, it may be conditional on various requirements including, but not limited to, the time and manner of sale, the holding period for the Restricted New Notes, and requirements relating to the Company which are outside of its control, and which the Company would not be under any obligation (and may not be able) to satisfy.

(viii)  It understands that the transfer agent for the Restricted New Notes will not be required to accept for registration of transfer any Restricted New Notes acquired by the undersigned or any account of the undersigned, except upon presentation of evidence satisfactory to the Company, as the issuer, and the transfer agent that the foregoing restrictions on transfer have been complied with.  It will give to each person to whom it transfers the Restricted New Notes notice of any restrictions on the transfer of such Restricted New Notes.

(ix)  It understands that the Restricted New Notes will bear a legend in or substantially in the following form:

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE WHICH ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY), ONLY (A) TO THE ISSUER, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (C) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT ("REGULATION S")) THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S, (D) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE U.S.

SECURITIES ACT OR (E) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS WITHIN THE MEANING OF REGULATION S. THE HOLDER AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY SIMILAR TO THE EFFECT OF THIS LEGEND. "

(x)     It will notify any person to whom it subsequently reoffers, resells, pledges, transfers or otherwise disposes of the Restricted New Notes of the foregoing restrictions on transfer and any certificates evidencing such securities shall contain a legend referring to such restrictions on transferability.

(xi)     It acknowledges and agrees that the Restricted New Notes may be issued in a certificated registered form and that each note certificate will bear appropriate legends.

(xii)     It is a "qualified institutional buyer" as defined in Rule 144A or an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) of Regulation D and its receipt of the Restricted New Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act.

(xiii)     It: (A) has conducted its own investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of the Company, Alpha and Jersey Newco and their respective Subsidiaries and the Restricted New Notes and, following such investigation and appraisal and the other due diligence that it deemed necessary and subsequently conducted in connection with the offering of the Restricted New Notes, it has made its own investment decision to acquire the Restricted New Notes; (B) acknowledges that it has had the opportunity to ask and has asked queries regarding an acquisition of the Restricted New Notes, the Company, Alpha and Jersey Newco and their respective Subsidiaries and affairs and the terms of the Restricted New Notes, and has received satisfactory answers from representatives of Alpha, the Company and Jersey Newco; (C) has reviewed all information, including this Explanatory Statement, that it believes is necessary or appropriate in connection with its election to receive the Restricted New Notes; (D) has made its own assessment and has satisfied itself concerning the relevant tax, legal, currency and other economic considerations relevant to its investment in the Restricted New Notes (and has sought such accounting, legal, tax and other advice as it has considered necessary to make an informed decision); (E) possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its prospective investment in the Restricted New Notes; (F) understands that, in the future, the Restricted New Notes may significantly increase or decrease in value; and (G) would be able to afford a complete loss of the value of the Restricted New Notes and would be able to bear the economic risk of holding such securities for an indefinite period.

(xiv)     It acknowledges that neither the Company, as the issuer, nor any of its Subsidiaries, Affiliates or any other person, has made any representation, warranty or undertaking (express or implied) to it with respect to the Company, the guarantors, the Restricted New Notes or the accuracy, completeness or adequacy of any financial or other information concerning the Company, the guarantors, or the Restricted New Notes, other than (in the case of the Company, the guarantors and their Subsidiaries only) any representation, warranty or undertaking of the Company, the guarantors and their Subsidiaries contained in this Explanatory Statement. Further, none of the Company, the guarantors and their Subsidiaries or their Affiliates, directors, officers, employees, agents, representatives or advisers makes any representation as to the future

performance of the Company, the guarantors or any of their Subsidiaries or Affiliates or their respective securities, including the Restricted New Notes.

(xv)     It understands that there may be certain consequences under U.S. and other tax laws resulting from an investment in the Restricted New Notes and it has made such investigation and has consulted its own independent advisers or otherwise has satisfied itself concerning, without limitation, the effects of the U.S. federal, state and local income tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, as amended, the U.S. Investment Company Act of 1940, as amended, and the Securities Act.

(xvi)    It (and each other qualified institutional buyer, if any, for whose account it is receiving the Restricted New Notes), in the normal course of business, invests in or purchases securities similar to the Restricted New Notes, is aware that there are substantial risks incident to the receipt of the Restricted New Notes and has the ability to bear the economic risk of its investment in the Restricted New Notes, has adequate means of providing for its current and contingent needs, has no need for liquidity with respect to its investment in the Restricted New Notes, and is able to sustain a complete loss of its investment in the Restricted New Notes.

(xvii)   It satisfies any and all standards for investors making an investment in the Restricted New Notes imposed by the jurisdiction of its residence or otherwise.

(xviii)  It is empowered, authorised and qualified to receive the Restricted New Notes.

(xix)    It understands that the foregoing representations, warranties and agreements are required in connection with U.S. securities laws and that the Company and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.  It agrees that, if any of the acknowledgements, representations and warranties made in connection with its receipt of the Restricted New Notes are no longer accurate, it will promptly, and in any event prior to the issuance of the Restricted New Notes to it, notify the Company in writing.

(xx)     If it is receiving the Restricted New Notes for the account of another person, it represents that it has full power and authorisation to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

(xxi)    It acknowledges that the Company may request from it and/or any account for which it is acting (if any) such additional information as the Company may deem necessary to evaluate its eligibility or the eligibility of any account for which it is acting to acquire the Restricted New Notes, and may request from time to time such information as the Company may reasonably deem necessary to determine its eligibility or eligibility of any account for which it is acting to hold the Restricted New Notes or to enable the issuer to comply with applicable regulatory requirements or tax law, and it and each account for which it is acting (if any) shall use reasonable efforts to provide such information as may reasonably be requested; provided that in no event shall any purchaser be obliged to disclose the name (or any other identifying information) of its limited partners, members or shareholders.

(b)     **Regulation S New Notes**

Each Scheme Creditor (or Nominee (if applicable)) that is subscribing for Regulation S New Notes who is not required to give the representations and warranties pursuant to paragraph (a) above will be required to represent and warrant to Alpha, the Company and Jersey Newco, on behalf of itself and each other person or account for which it is acting that:

(i)     It is, or at the time Regulation S New Notes issued to such Scheme Creditors (or Nominees (if applicable)) under the Scheme are delivered will be, the beneficial owner of such Regulation S New Notes and (A) it is not a U.S. person and is receiving the Regulation S New Notes in an offshore transaction in accordance with Regulation S and (B) it is not an Affiliate of the Company or a person acting on behalf of such an Affiliate.

(ii)    It represents and warrants that its receipt of the Regulation S New Notes is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it.

(iii)   It understands that such Regulation S New Notes have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the U.S.

(iv)    As a purchaser of the Regulation S New Notes not registered under the Securities Act, it is receiving Regulation S New Notes for its own account, or for an account as to which it exercises sole investment discretion, for investment purposes and (subject, to the extent necessary, to the disposition of its or such discretionary accounts' property being at all times within its or their control) not with a view to any distribution or resale, directly or indirectly, in the U.S. or otherwise in violation of the securities laws of the U.S.

(v)     It understands that for 40 days after the latest of the original issue date of the Regulation S New Notes and the date on which the Regulation S New Notes (or any predecessors thereto) were first offered to persons other than distributors, the Regulation S New Notes may not be offered, sold, pledged or otherwise transferred except: (A) to the issuer, the guarantors or any Subsidiary thereof; (B) pursuant to a registration statement that has been declared effective under the Securities Act; (C) for so long as the Regulation S New Notes are eligible for resale pursuant to Rule 144A, to a person that it, and any person acting on its behalf, reasonably believes is a QIB purchasing for its own account or for the account of one or more QIBs to whom notice is given that the transfer is being made in reliance on Rule 144A; (D) in an offshore transaction in accordance with Rule 903 or Rule 904 of Regulation S to a person that is a non-U.S. person and that is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (I) a retail client as defined in point (11) of Article 4(1) of MiFID II; or (II) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or is not a Qualified Investor); or (E) pursuant to an exemption from, or in a transaction not subject to, registration under the Securities Act (if available) in each case in accordance with any applicable securities laws of the U.S. and any state or other jurisdiction of the U.S.

(vi)    It understands that no representation has been made as to the availability of any exemption under the Securities Act or any applicable securities laws of any state or other jurisdiction of the U.S. for the reoffer, resale, pledge or transfer of the Regulation S New Notes and that, pursuant to these laws, such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

(vii)   It understands that, if an exemption from registration or qualification under the Securities Act or U.S. federal and state securities laws is available, it may be

conditional on various requirements including, but not limited to, the time and manner of sale, the holding period for the Regulation S New Notes, and requirements relating to the Company which are outside of its control, and which the Company would not be under any obligation (and may not be able) to satisfy.

(viii)  It understands that the transfer agent for the Regulation S New Notes will not be required to accept for registration of transfer any Regulation S New Notes acquired by the undersigned or any account of the undersigned, except upon presentation of evidence satisfactory to the Company, as the issuer, and the transfer agent that the foregoing restrictions on transfer have been complied with. It will give to each person to whom it transfers the Regulation S New Notes notice of any restrictions on the transfer of such Regulation S New Notes.

(ix)  It and any account for which it is acting (if any) became aware of the offering of the Regulation S New Notes, and the Regulation S New Notes were offered to it and each account for which it is acting (if any), solely by means of direct contact between it and the Company as the issuer, and not by any other means. It and any account for which it is acting (if any) did not become aware of the offering of the Regulation S New Notes, and the Regulation S New Notes were not offered to it or any account for which it is acting (if any), through any directed selling efforts within the meaning of Regulation S.

(x)  It understands that the Regulation S New Notes will bear a legend in or substantially in the following form:

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE WHICH IS 40 DAYS AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE DATE ON WHICH THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY) WAS FIRST OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN RULE 902 OF REGULATION S) IN RELIANCE ON REGULATION S, ONLY (A) TO THE ISSUER, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A (C) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT ("REGULATION S")) THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S, (D) PURSUANT

TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE U.S. SECURITIES ACT OR (E) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS WITHIN THE MEANING OF REGULATION S. THE HOLDER AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY SIMILAR TO THE EFFECT OF THIS LEGEND."

(xi)    It will notify any person to whom it subsequently reoffers, resells, pledges, transfers or otherwise disposes of the Regulation S New Notes of the foregoing restrictions on transfer and any certificates evidencing such securities shall contain a legend referring to such restrictions on transferability.

(xii)    It acknowledges and agrees that the Regulation S New Notes may be issued in a certificated registered form and that each notes certificate will bear appropriate legends.

(xiii)    It is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (A) a retail client as defined in point (11) of Article 4(1) of MiFID II; or (B) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or is not a Qualified Investor).

(xiv)    It: (A) has conducted its own investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of the Company, Jersey Newco, and Alpha and their respective Subsidiaries and the Regulation S New Notes and, following such investigation and appraisal and the other due diligence that it deemed necessary and subsequently conducted in connection with the offering of the Regulation S New Notes, it has made its own investment decision to acquire the Regulation S New Notes; (B) acknowledges that it has had the opportunity to ask and has asked queries regarding an acquisition of the Regulation S New Notes, Alpha, the Company and Jersey Newco and their respective Subsidiaries and affairs and the terms of the Regulation S New Notes, and has received satisfactory answers from representatives of Alpha, the Company and Jersey Newco; (C) has reviewed all information, including this Explanatory Statement, that it believes is necessary or appropriate in connection with its election to receive the Regulation S New Notes; (D) has made its own assessment and has satisfied itself concerning the relevant tax, legal, currency and other economic considerations relevant to its investment in the Regulation S New Notes (and has sought such accounting, legal, tax and other advice as it has considered necessary to make an informed decision); (E) possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its prospective investment in the Regulation S New Notes; (F) understands that in the future, the Regulation S New Notes may significantly increase or decrease in value; and (G) would be able to afford a complete loss of the value of the Regulation S New Notes and would be able to bear the economic risk of holding such securities for an indefinite period.

(xv)    It acknowledges that neither the Company, as the issuer, nor any of its Subsidiaries, Affiliates or any other person, has made any representation, warranty or undertaking (express or implied) to it with respect to the Company, the guarantors, the Regulation S New Notes or the accuracy, completeness or adequacy of any financial or other information concerning the Company, the guarantors, or the Regulation S New Notes, other than (in the case of the Company, the guarantors and their Subsidiaries only) any representation, warranty or undertaking of the Company, the guarantors and their

Subsidiaries contained in this Explanatory Statement.  Further, none of the Company, the guarantors and their Subsidiaries or their Affiliates, directors, officers, employees, agents, representatives or advisers makes any representation as to the future performance of the Company, the guarantors or any of their Subsidiaries or Affiliates or their respective securities, including the Regulation S New Notes.

(xvi)    It understands that there may be certain consequences under U.S. and other tax laws resulting from an investment in the Regulation S New Notes and it has made such investigation and has consulted its own independent advisers or otherwise has satisfied itself concerning, without limitation, the effects of the U.S. federal, state and local income tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, as amended, the U.S. Investment Company Act of 1940, as amended, and the Securities Act.

(xvii)    It (and each other qualified institutional buyer, if any, for whose account it is receiving the Regulation S New Notes), in the normal course of business, invests in or purchases securities similar to the Regulation S New Notes, is aware that there are substantial risks incident to the receipt of the Regulation S New Notes and has the ability to bear the economic risk of its investment in the Regulation S New Notes, has adequate means of providing for its current and contingent needs, has no need for liquidity with respect to its investment in the Regulation S New Notes, and is able to sustain a complete loss of its investment in the Regulation S New Notes.

(xviii)    It satisfies any and all standards for investors making an investment in the Regulation S New Notes imposed by the jurisdiction of its residence or otherwise.

(xix)    It is empowered, authorised and qualified to receive the Regulation S New Notes.

(xx)    It understands that the foregoing representations, warranties and agreements are required in connection with U.S. securities laws and that the Company and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.  It agrees that, if any of the acknowledgements, representations and warranties made in connection with its receipt of the Regulation S New Notes are no longer accurate, it will promptly, and in any event prior to the issuance of the Regulation S New Notes to it, notify the Company in writing.

(xxi)    If it is receiving the Regulation S New Notes for the account of another person, it represents that it has full power and authorisation to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

(xxii)    It acknowledges that the Company may request from it and/or any account for which it is acting (if any) such additional information as the Company may deem necessary to evaluate its eligibility or the eligibility of any account for which it is acting to acquire the Regulation S New Notes, and may request from time to time such information as the Company may reasonably deem necessary to determine its eligibility or eligibility of any account for which it is acting to hold the Regulation S New Notes or to enable the issuer to comply with applicable regulatory requirements or tax law, and it and each account for which it is acting (if any) shall use reasonable efforts to provide such information as may reasonably be requested; provided that in no event shall any purchaser be obliged to disclose the name (or any other identifying information) of its limited partners, members or shareholders.

(c)    **Restricted Jersey Newco Consideration Shares**

Each Scheme Creditor (or Nominee (if applicable)) that is subscribing for Restricted Jersey Newco Consideration Shares who is located in the U.S. prior to accepting delivery of Restricted Jersey Newco Consideration Shares will be required to represent and warrant to Alpha, the Company and Jersey Newco, on behalf of itself and each other person or account for which it is acting that:

(i)    It understands that the Restricted Jersey Newco Consideration Shares are being offered in reliance upon an exemption from, or in a transaction not subject to, registration under the Securities Act and similar provisions under state securities laws for an offer and sale by Jersey Newco not involving a public offering in the U.S.

(ii)    Its receipt of the Restricted Jersey Newco Consideration Shares is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it.

(iii)    It understands that the Restricted Jersey Newco Consideration Shares have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the U.S.

(iv)    As a subscriber of the Restricted Jersey Newco Consideration Shares in a private placement not registered under the Securities Act, it is receiving Restricted Jersey Newco Consideration Shares for its own account, or for an account as to which it exercises sole investment discretion, for investment purposes and (subject, to the extent necessary, to the disposition of its or such discretionary accounts' property being at all times within its or their control) not with a view to any distribution or resale, directly or indirectly, in the U.S. or otherwise in violation of the securities laws of the U.S. It understands that the Restricted Jersey Newco Consideration Shares issued in reliance on Section 4(a)(2) of the Securities Act are "restricted securities" (as defined by Rule 144 under the Securities Act), and that for one year after the latest of the original issue date of the Restricted Jersey Newco Consideration Shares, and the last date on which the issuer or any Affiliate of the issuer was the owner of the Restricted Jersey Newco Consideration Shares, the Restricted Jersey Newco Consideration Shares are restricted securities, may not be offered, sold, pledged or otherwise transferred except: (A) to the issuer or any Subsidiary thereof; (B) pursuant to a registration statement that has been declared effective under the Securities Act; (C) for so long as the Restricted Jersey Newco Consideration Shares are eligible for resale pursuant to Rule 144A, to a person that it, and any person acting on its behalf, reasonably believes is a QIB purchasing for its own account or for the account of one or more QIBs to whom notice is given that the transfer is being made in reliance on Rule 144A; (D) in an offshore transaction in accordance with Rule 903 or Rule 904 of Regulation S that is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (I) a retail client as defined in point (11) of Article 4(1) of MiFID II; or (II) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or is not a Qualified Investor); or (E) pursuant to an exemption from, or in a transaction not subject to, registration under the Securities Act (if available) in each case in accordance with any applicable securities laws of the U.S. and any state or other jurisdiction of the U.S.

(v)     It understands that no representation has been made as to the availability of any exemption under the Securities Act or any applicable securities laws of any state or other jurisdiction of the U.S. for the reoffer, resale, pledge or transfer of the Restricted Jersey Newco Consideration Shares and that, pursuant to these laws, such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

(vi)    It understands that, if an exemption from registration or qualification under the Securities Act or U.S. federal and state securities laws is available, it may be conditional on various requirements including, but not limited to, the time and manner of sale, the holding period for the Restricted Jersey Newco Consideration Shares, and requirements relating to Jersey Newco which are outside of its control, and which Jersey Newco would not be under any obligation (and may not be able) to satisfy.

(vii)   It understands that Jersey Newco will not be required to accept for registration of transfer any Restricted Jersey Newco Consideration Shares acquired by the undersigned or any account of the undersigned, except upon presentation of evidence satisfactory to Jersey Newco that the foregoing restrictions on transfer have been complied with. It will give to each person to whom it transfers the Restricted Jersey Newco Consideration Shares notice of any restrictions on the transfer of such Restricted Jersey Newco Consideration Shares.

(viii)  It understands that, to the extent the Restricted Jersey Newco Consideration Shares are delivered in certificated form, the certificate (or the shareholder register) will bear a legend in or substantially in the following form:

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE WHICH IS ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY) ONLY (A) TO THE ISSUER, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (C) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT ("REGULATION S"), (D) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE

UNDER THE U.S. SECURITIES ACT OR (E) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS WITHIN THE MEANING OF REGULATION S. THE HOLDER AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY SIMILAR TO THE EFFECT OF THIS LEGEND."

(ix)     It will notify any person to whom it subsequently reoffers, resells, pledges, transfers or otherwise disposes of the Restricted Jersey Newco Consideration Shares of the foregoing restrictions on transfer and any certificates evidencing such securities shall contain a legend referring to such restrictions on transferability.

(x)      It acknowledges and agrees that the Restricted Jersey Newco Consideration Shares may be issued in a certificated registered form and that each share certificate will bear appropriate legends.

(xi)     It is a "qualified institutional buyer" as defined in Rule 144A or an institutional "accredited investor" within the meaning of Rule 501(a) (1), (2), (3) or (7) of Regulation D and its receipt of the Restricted Jersey Newco Consideration Shares is not part of a plan or scheme to evade the registration requirements of the Securities Act.

(xii)    It: (A) has conducted its own investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of Alpha, the Company and Jersey Newco and their respective subsidiaries and the Restricted Jersey Newco Consideration Shares and, following such investigation and appraisal and the other due diligence that it deemed necessary and subsequently conducted in connection with the offering of the Restricted Jersey Newco Consideration Shares, it has made its own investment decision to acquire the Restricted Jersey Newco Consideration Shares; (B) acknowledges that it has had the opportunity to ask and has asked queries regarding an acquisition of the Restricted Jersey Newco Consideration Shares, Alpha, the Company and Jersey Newco and their respective Subsidiaries and affairs and the terms of the Restricted Jersey Newco Consideration Shares, and has received satisfactory answers from representatives of Alpha, the Company and Jersey Newco; (C) has reviewed all information, including this Explanatory Statement, that it believes is necessary or appropriate in connection with its election to receive the Restricted Jersey Newco Consideration Shares; (D) has made its own assessment and has satisfied itself concerning the relevant tax, legal, currency and other economic considerations relevant to its investment in the Restricted Jersey Newco Consideration Shares (and has sought such accounting, legal, tax and other advice as it has considered necessary to make an informed decision); (E) possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its prospective investment in the Restricted Jersey Newco Consideration Shares; (F) understands that, in the future, the Restricted Jersey Newco Consideration Shares may significantly increase or decrease in value; and (G) would be able to afford a complete loss of the value of the Restricted Jersey Newco Consideration Shares and would be able to bear the economic risk of holding such securities for an indefinite period.

(xiii)   It acknowledges that neither Jersey Newco nor any of its Subsidiaries, Affiliates or any other person, has made any representation, warranty or undertaking (express or implied) to it with respect to Jersey Newco, the Restricted Jersey Newco Consideration Shares or the accuracy, completeness or adequacy of any financial or other information concerning Jersey Newco or the Restricted Jersey Newco

Consideration Shares, other than (in the case of Jersey Newco and its Subsidiaries only) any representation, warranty or undertaking of Jersey Newco and its Subsidiaries contained in this Explanatory Statement. Further, none of Jersey Newco and its Subsidiaries or its Affiliates, directors, officers, employees, agents, representatives or advisers makes any representation as to the future performance of Jersey Newco or any of its Subsidiaries or Affiliates or their respective securities, including the Restricted Jersey Newco Consideration Shares.

(xiv)    It understands that there may be certain consequences under U.S. and other tax laws resulting from an investment in the Restricted Jersey Newco Consideration Shares and it has made such investigation and has consulted its own independent advisers or otherwise has satisfied itself concerning, without limitation, the effects of the U.S. federal, state and local income tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, as amended, the U.S. Investment Company Act of 1940, as amended, and the Securities Act.

(xv)    It (and each other qualified institutional buyer, if any, for whose account it is receiving the Restricted Jersey Newco Consideration Shares), in the normal course of business, invests in or purchases securities similar to the Restricted Jersey Newco Consideration Shares, is aware that there are substantial risks incident to the receipt of the Restricted Jersey Newco Consideration Shares and has the ability to bear the economic risk of its investment in the Restricted Jersey Newco Consideration Shares, has adequate means of providing for its current and contingent needs, has no need for liquidity with respect to its investment in the Restricted Jersey Newco Consideration Shares, and is able to sustain a complete loss of its investment in the Restricted Jersey Newco Consideration Shares.

(xvi)    It satisfies any and all standards for investors making an investment in the Restricted Jersey Newco Consideration Shares imposed by the jurisdiction of its residence or otherwise.

(xvii)    It is empowered, authorised and qualified to receive the Restricted Jersey Newco Consideration Shares.

(xviii)    It understands that the foregoing representations, warranties and agreements are required in connection with U.S. securities laws and that Jersey Newco and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements. It agrees that, if any of the acknowledgements, representations and warranties made in connection with its receipt of the Restricted Jersey Newco Consideration Shares are no longer accurate, it will promptly, and in any event prior to the issuance of the Restricted Jersey Newco Consideration Shares to it, notify Jersey Newco and the Company in writing.

(xix)    If it is receiving the Restricted Jersey Newco Consideration Shares for the account of another person, it represents that it has full power and authorisation to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

(xx)    It acknowledges that Jersey Newco may request from it and/or any account for which it is acting (if any) such additional information as Jersey Newco may deem necessary to evaluate its eligibility or the eligibility of any account for which it is acting to acquire the Restricted Jersey Newco Consideration Shares, and may request from time to time such information as Jersey Newco may reasonably deem necessary to determine its eligibility or eligibility of any account for which it is acting to hold the

Restricted Jersey Newco Consideration Shares or to enable Jersey Newco to comply with applicable regulatory requirements or tax law, and it and each account for which it is acting (if any) shall use reasonable efforts to provide such information as may reasonably be requested; provided that in no event shall any purchaser be obliged to disclose the name (or any other identifying information) of its limited partners, members or shareholders.

(d)    **Regulation S Jersey Newco Consideration Shares**

Each Scheme Creditor (or Nominee (if applicable)) that is subscribing for Regulation S Jersey Newco Consideration Shares who is not required to give the representations and warranties pursuant to paragraph (c) above will be required to represent and warrant to Alpha, the Company and Jersey Newco, on behalf of itself and each other person or account for which it is acting that:

(i)    It is, or at the time Regulation S Jersey Newco Consideration Shares issued to such Scheme Creditors are delivered will be, the beneficial owner of such Regulation S Jersey Newco Consideration Shares and (A) it is receiving the Regulation S Jersey Newco Consideration Shares in an offshore transaction in accordance with Regulation S and (B) it is not an Affiliate of Jersey Newco or a person acting on behalf of such an Affiliate.

(ii)    It represents and warrants that its receipt of the Regulation S Jersey Newco Consideration Shares is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it.

(iii)    It understands that such Regulation S Jersey Newco Consideration Shares have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the U.S.

(iv)    As a subscriber of the Regulation S Jersey Newco Consideration Shares not registered under the Securities Act, it is receiving Regulation S Jersey Newco Consideration Shares for its own account, or for an account as to which it exercises sole investment discretion, for investment purposes and (subject, to the extent necessary, to the disposition of its or such discretionary accounts' property being at all times within its or their control) not with a view to any distribution or resale, directly or indirectly, in the U.S. or otherwise in violation of the securities laws of the U.S.

(v)    It understands that no representation has been made as to the availability of any exemption under the Securities Act or any applicable securities laws of any state or other jurisdiction of the U.S. for the reoffer, resale, pledge or transfer of the Regulation S Jersey Newco Consideration Shares and that, pursuant to these laws, such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

(vi)    It understands that, if an exemption from registration or qualification under the Securities Act or U.S. federal and state securities laws is available, it may be conditional on various requirements including, but not limited to, the time and manner of sale, the holding period for the Regulation S Jersey Newco Consideration Shares, and requirements relating to Jersey Newco which are outside of its control, and which Jersey Newco would not be under any obligation (and may not be able) to satisfy.

(vii)    It understands that Jersey Newco will not be required to accept for registration of transfer any Regulation S Jersey Newco Consideration Shares acquired by the

undersigned or any account of the undersigned, except upon presentation of evidence satisfactory to Jersey Newco that the foregoing restrictions on transfer have been complied with. It will give to each person to whom it transfers the Regulation S Jersey Newco Consideration Shares notice of any restrictions on the transfer of such Regulation S Jersey Newco Consideration Shares.

(viii)    It and any account for which it is acting (if any) became aware of the offering of the Regulation S Jersey Newco Consideration Shares, and the Regulation S Jersey Newco Consideration Shares were offered to it and each account for which it is acting (if any), solely by means of direct contact between it and Jersey Newco, and not by any other means. It and any account for which it is acting (if any) did not become aware of the offering of the Regulation S Jersey Newco Consideration Shares, and the Regulation S Jersey Newco Consideration Shares were not offered to it or any account for which it is acting (if any), through any directed selling efforts within the meaning of Regulation S.

(ix)    It understands that, to the extent the Regulation S Jersey Newco Consideration Shares are delivered in certificated form, the certificate will bear a legend in or substantially in the following form:

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS."

(x)    It will notify any person to whom it subsequently reoffers, resells, pledges, transfers or otherwise disposes of the Regulation S Jersey Newco Consideration Shares of the foregoing restrictions on transfer and any certificates evidencing such securities shall contain a legend referring to such restrictions on transferability.

(xi)    It acknowledges and agrees that the Regulation S Jersey Newco Consideration Shares may be issued in a certificated registered form and that each share certificate will bear appropriate legends.

(xii)    It is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (A) a retail client as defined in point (11) of Article 4(1) of MiFID II; or (B) a customer within the meaning of Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or is not a Qualified Investor).

(xiii)    It: (A) has conducted its own investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of Alpha, the Company and Jersey Newco and their respective Subsidiaries and the Regulation S Jersey Newco Consideration Shares and, following such investigation and appraisal and the other due diligence that it deemed necessary and subsequently conducted in connection with the offering of the Regulation S Jersey Newco Consideration Shares, it has made its own investment decision to acquire the Regulation S Jersey Newco Consideration Shares; (B) acknowledges that it has had the opportunity to ask and has asked queries regarding an acquisition of the Regulation S Jersey Newco

Consideration Shares, Alpha, the Company and Jersey Newco and their respective Subsidiaries and affairs and the terms of the Regulation S Jersey Newco Consideration Shares, and has received satisfactory answers from representatives of Alpha, the Company and Jersey Newco; (C) has reviewed all information, including this Explanatory Statement, that it believes is necessary or appropriate in connection with its election to receive the Regulation S Jersey Newco Consideration Shares; (D) has made its own assessment and has satisfied itself concerning the relevant tax, legal, currency and other economic considerations relevant to its investment in the Regulation S Jersey Newco Consideration Shares (and has sought such accounting, legal, tax and other advice as it has considered necessary to make an informed decision); (E) possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its prospective investment in the Regulation S Jersey Newco Consideration Shares; (F) understands that in the future, the Regulation S Jersey Newco Consideration Shares may significantly increase or decrease in value; and (G) would be able to afford a complete loss of the value of the Regulation S Jersey Newco Consideration Shares and would be able to bear the economic risk of holding such securities for an indefinite period.

(xiv)   It acknowledges that neither Jersey Newco, nor any of its Subsidiaries, Affiliates or any other person, has made any representation, warranty or undertaking (express or implied) to it with respect to Jersey Newco, the Regulation S Jersey Newco Consideration Shares or the accuracy, completeness or adequacy of any financial or other information concerning Jersey Newco or the Regulation S New Notes, other than (in the case of Jersey Newco and its Subsidiaries only) any representation, warranty or undertaking of Jersey Newco and its Subsidiaries contained in this Explanatory Statement.  Further, none of Jersey Newco and its Subsidiaries or its Affiliates, directors, officers, employees, agents, representatives or advisers makes any representation as to the future performance of Jersey Newco or any of its Subsidiaries or Affiliates or their respective securities, including the Regulation S Jersey Newco Consideration Shares.

(xv)   It understands that there may be certain consequences under U.S. and other tax laws resulting from an investment in the Regulation S Jersey Newco Consideration Shares and it has made such investigation and has consulted its own independent advisers or otherwise has satisfied itself concerning, without limitation,  the effects of the U.S. federal, state and local income tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, as amended, the U.S. Investment Company Act of 1940, as amended, and the Securities Act.

(xvi)   It (and each other qualified institutional buyer, if any, for whose account it is receiving the Regulation S Jersey Newco Consideration Shares), in the normal course of business, invests in or purchases securities similar to the Regulation S Jersey Newco Consideration Shares, is aware that there are substantial risks incident to the receipt of the Regulation S Jersey Newco Consideration Shares and has the ability to bear the economic risk of its investment in the Regulation S Jersey Newco Consideration Shares, has adequate means of providing for its current and contingent needs, has no need for liquidity with respect to its investment in the Regulation S Jersey Newco Consideration Shares, and is able to sustain a complete loss of its investment in the Regulation S Jersey Newco Consideration Shares.

(xvii)   It satisfies any and all standards for investors making an investment in the Regulation S Jersey Newco Consideration Shares imposed by the jurisdiction of its residence or otherwise.

(xviii)   It is empowered, authorised and qualified to receive the Regulation S Jersey Newco Consideration Shares.

(xix)   It understands that the foregoing representations, warranties and agreements are required in connection with U.S. securities laws and that Jersey Newco and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements. It agrees that, if any of the acknowledgements, representations and warranties made in connection with its receipt of the Regulation S Jersey Newco Consideration Shares are no longer accurate, it will promptly, and in any event prior to the issuance of the Regulation S Jersey Newco Consideration Shares to it, notify Jersey Newco and the Company in writing.

(xx)   If it is receiving the Regulation S Jersey Newco Consideration Shares for the account of another person, it represents that it has full power and authorisation to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

(xxi)   It acknowledges that Jersey Newco may request from it and/or any account for which it is acting (if any) such additional information as Jersey Newco may deem necessary to evaluate its eligibility or the eligibility of any account for which it is acting to acquire the Regulation S Jersey Newco Consideration Shares, and may request from time to time such information as Jersey Newco may reasonably deem necessary to determine its eligibility or eligibility of any account for which it is acting to hold the Regulation S Jersey Newco Consideration Shares or to enable the issuer to comply with applicable regulatory requirements or tax law, and it and each account for which it is acting (if any) shall use reasonable efforts to provide such information as may reasonably be requested; provided that in no event shall any purchaser be obliged to disclose the name (or any other identifying information) of its limited partners, members or shareholders.

(e)   **Other jurisdictions**

Each Scheme Creditor (and/or Nominee (as applicable)) (and any person acting on its behalf) represents and warrants that:

(i)   if it is outside the U.S., it has read the Restructuring Implementation Deed in its entirety;

(ii)   if it is in the United Kingdom, it has complied with its obligations in connection with money laundering and terrorist financing under the Proceeds of Crime Act 2002, the Terrorism Act 2000, the Criminal Justice Act 1993, the Money Laundering Regulations 2007 and, if it is making payment on behalf of a third party, that satisfactory evidence has been obtained and recorded by it to verify the identity of the third party as required by the regulations; and

(iii)   it and any person acting on its behalf falls within Section 86(7) of the Financial Services and Markets Act 2000, as amended, being a Qualified Investor and is otherwise a person whose ordinary activities involve it in acquiring, holding, managing and disposing of investments (as principal or agent) for the purposes of its business and who has professional experience in matters relating to investments and who falls within Article 19(I) of the Order or are persons who fall within Articles 49(2)(a) to (d) ("High net worth companies, unincorporated associations, etc.") of the Order or to whom it may otherwise lawfully be communicated.

**Other securities law considerations**

*European Economic Area and the United Kingdom*

The Restricted Jersey Newco Consideration Shares, the Restricted New Notes, the Regulation S Jersey Newco Consideration Shares and the Regulation S New Notes are not being offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area or in the United Kingdom.  For these purposes, a "retail investor" means a person who is one (or more) of: (a) a "retail client" as defined in point (11) of Article 4(1) of MiFID II; or (b) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or is not a Qualified Investor. Consequently no key information document required by the PRIIPs Regulation for offering or selling the Restricted New Notes and the Regulation S New Notes or otherwise making them available to retail investors in the European Economic Area or in the United Kingdom will be prepared and, therefore, offering or selling the Restricted New Notes and the Regulation S New Notes or otherwise making them available to any retail investor in the European Economic Area or in the United Kingdom may be unlawful under the PRIIPs Regulation.

*United Kingdom only*

This Explanatory Statement is only being distributed to and is only directed at Qualified Investors who are also: (a) persons who are outside the United Kingdom; (b) a person within the definition of "Investment Professional" (as defined in Article 19(5) of the Order); (c) persons falling within Articles 49(2)(a) to (d) of the Order; or (d) persons to whom it may otherwise lawfully be communicated. The Scheme Consideration is only available to Scheme Creditors (in accordance with the terms of the Scheme) and any invitation, offer or agreement to subscribe for, purchase or otherwise acquire such Scheme Consideration will only be engaged in with such persons. Any invitation, offer or agreement to subscribe for, purchase or otherwise acquire such Restricted New Notes and Regulation S New Notes will only be engaged in with such persons. Any invitation, offer or agreement to subscribe for, purchase or otherwise acquire Restricted Jersey Newco Consideration Shares and Regulation S Jersey Newco Consideration Shares will only be engaged in with Relevant Persons. Any person who is not a Relevant Person should not act or rely on this Explanatory Statement or any of its contents.

**General**

The implications of the Scheme for Scheme Creditors who are resident in, have a registered address in or are citizens of and/or are taxable in jurisdictions other than the United Kingdom may be affected by the laws of the relevant jurisdiction.  Such overseas Scheme Creditors should inform themselves about and observe any applicable legal requirements. Any person outside the United Kingdom who is resident in, or who has a registered address in, or is a citizen of and/or is taxable in, an overseas jurisdiction and who is to receive or subscribe for any Scheme Consideration should consult his or her professional advisers and satisfy himself or herself as to the full observance of the laws of the relevant jurisdiction in connection with the Scheme, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

In the absence of bad faith, none of Alpha, the Company, Jersey Newco, the New Trustee, the New Security Agent, the Information Agent or any person appointed to distribute the Scheme Consideration shall have any Liability for any loss or damage arising as a result of the timing or terms of such a sale or as a result of any remittance made pursuant to such distribution.

The Information Agent is the agent of the Company and does not owe any duty to any Scheme Creditor, express or implied.

**Non-Eligible Persons**

**Without limiting the information set out in this "Important Securities Law Notice" section to this Explanatory Statement, the New Notes and the Jersey Newco Consideration Shares will not be issued to a Scheme Creditor (and/or if appointed, its Nominee) pursuant to the Restructuring Implementation Deed on the Restructuring Effective Date where such a Scheme Creditor (and/or its Nominee) is not an Eligible Person.**

**Scheme Creditor Entitlements under the Scheme**

Each Scheme Creditor and/or its Nominee(s) shall be entitled to receive its Scheme Creditor Entitlements on the Restructuring Effective Date in accordance with the provisions of the Restructuring Implementation Deed, save that such Scheme Creditor Entitlements may be withheld from being distributed to a Scheme Creditor (and/or its Nominee(s)) on the Restructuring Effective Date if the Information Agent does not receive a validly completed Account Holder Letter and/or Lender Claim Form from that Scheme Creditor by the Voting Instruction Deadline and all of the information, representations, confirmations and any other documentation required to be provided therein.

**NONE OF THE SECURITIES REFERRED TO IN THIS EXPLANATORY STATEMENT SHALL BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.**

**SUMMARY OF ACTIONS TO BE TAKEN BY SCHEME CREDITORS**

**ALL SCHEME CREDITORS MUST ALSO READ APPENDIX 7 (INSTRUCTIONS AND GUIDANCE FOR SCHEME CREDITORS) TO THIS EXPLANATORY STATEMENT, A SUMMARY OF WHICH IS BELOW.**

1.    **Voting on the Scheme**

Before the Scheme can become effective and binding on the Company and the Scheme Creditors, a resolution to approve it must be passed by the requisite majorities of the Scheme Creditors required by section 899 of the Companies Act. The requisite majorities are a majority in number representing at least 75% in value of the Scheme Creditors who, being so entitled, are present in person, by a duly authorised representative if a corporation, or by proxy, and vote at the Scheme Meeting. The Scheme Meeting has been ordered by the Court and has been summoned to take place by way of video conference on 30 October 2020 at 10:30 am.

Formal notice of the Scheme Meeting is set out in Appendix 10 (Notice of Scheme Meeting) to this Explanatory Statement.

It is important that as many votes as possible are cast at the Scheme Meeting so that the Court may be satisfied that there is a fair and reasonable representation of the opinion of the Scheme Creditors in relation to the Scheme. **You are, therefore, strongly urged to complete, sign and return your Account Holder Letter and/or Lender Claim Form (as applicable) as soon as possible and by the Voting Instruction Deadline, being 5:00 pm on 28 October 2020.**

Instructions and Guidance to Scheme Creditors are set out at Appendix 7 (Instructions and Guidance for Scheme Creditors) to this Explanatory Statement. In addition, the Restructuring Implementation Deed is set out at Appendix 3 to this Explanatory Statement and the other Key Restructuring Documents are set out at Appendix 4 to this Explanatory Statement.

2.    **Completion of Account Holder Letters and/or Lender Claim Forms (as appropriate)**

**Scheme Creditors (and/or their Account Holders) are strongly urged to complete and submit their Account Holder Letters and/or Lender Claim Forms (as applicable) online via the Scheme Website at www.lucid-is.com/kcadeutag or by email in pdf form to kcadeutag@lucid-is.com as soon as possible and in any event so as to be received no later than the Voting Instruction Deadline, being 5:00 pm on 28 October 2020.**

An Account Holder Letter and/or Lender Claim Form (as applicable) is required to be completed and submitted in order for a Scheme Creditor to (a) vote at the Scheme Meeting and (b) receive its Scheme Creditor Entitlements.

- Each Existing Noteholder (and/or its Account Holder) must complete and submit an Account Holder Letter.

- Each Term Loan Lender, each Revolving Loan Lender and the Existing Overdraft Provider must complete and submit a Lender Claim Form. For the avoidance of doubt, in respect of the Term Loan and the Revolving Loans, a Lender Claim Form should only be completed by a lender of record according to the books and records of the relevant Existing Administrative Agent. Creditors with only a beneficial interest in the Term Loan or Revolving Loan (as applicable) may not submit a Lender Claim Form themselves and are therefore recommended to contact their lender of record counterparty.

**A. Account Holder Letter (to be completed by Existing Noteholders (and/or their Account Holders)**

The Existing Custodian holds the Global Notes in DTC. Existing Noteholders either hold their Existing Notes via:

(i)      DTC, either directly (a DTC Participant) or through an intermediary who is a DTC Participant; or

(ii)     Euroclear or Clearstream (through a DTC Participant who is holding the Existing Notes for Euroclear or Clearstream), either directly (a Euroclear/Clearstream Account Holder) or through an intermediary who is a Euroclear/Clearstream Account Holder.

Existing Noteholders, as the beneficial owners of and/or the persons with the ultimate economic interest in the Existing Notes, are Scheme Creditors.

The form of Account Holder Letter is enclosed at Appendix 8 (Account Holder Letter) to this Explanatory Statement.

*Existing Noteholders with an interest in the Existing Notes held via Euroclear or Clearstream only*

In order to vote at the Scheme Meeting, Existing Noteholders with an interest in the Existing Notes held via Euroclear or Clearstream must have blocked their Existing Notes.

Existing Noteholders will receive notice of the elections required by the Account Holder Letter from their Account Holders (if the Existing Noteholder is not itself an Account Holder, and who may be their custodian or prime broker in respect of their holding of Existing Notes). An Existing Noteholder must confirm its consent to this notification, following which the Account Holder must submit an electronic instruction to Euroclear or Clearstream by no later than the Custody Instructions Deadline. The electronic instruction confirmation will generate a Custody Instruction Reference Number which must be included in the Account Holder Letter submission.  Once the electronic instruction is submitted, the relevant notes will be blocked in Euroclear and/or Clearstream.  The block will be lifted:

(a)      if the Scheme is not approved at the Scheme Meeting, at the conclusion of the Scheme Meeting;

(b)      if the Scheme is approved at the Scheme Meeting but not sanctioned at the Sanction Hearing, at the conclusion of the Sanction Hearing;

(c)      if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing, but the Restructuring Effective Date does not occur on or before the Long Stop Date, on the Long Stop Date; or

(d)      if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing and the Restructuring Effective Date occurs on or before the Long Stop Date, on the Restructuring Effective Date (with the Existing Notes being cancelled in accordance with the Restructuring Implementation Deed).

An Account Holder Letter in respect of an Existing Noteholder with an interest in the Existing Notes held via Euroclear or Clearstream will not be complete or valid without the inclusion of a Custody Instruction Reference Number.  Please see Appendix 7 (Instructions and Guidance for Scheme Creditors) to this Explanatory Statement for further information.

*All Existing Noteholders*

Each Existing Noteholder who wishes to vote at the Scheme Meeting must ensure that it, or if it is not an Account Holder, its Account Holder completes and submits to the Information Agent a valid Account Holder Letter in order to vote at the Scheme Meeting. **For the purposes of voting, Account Holder Letters must be delivered to and received by the Information Agent before the Voting Instruction Deadline, being 5:00 pm on 28 October 2020.**

The delivery of an Account Holder Letter to the Information Agent will not prevent the Existing Noteholder who completed it from subsequently attending and voting in person at the Scheme Meeting if it so wishes. Existing Noteholders are encouraged to complete and return an Account Holder Letter whether or not they intend to be present at the Scheme Meeting in case, for any reason, that Existing Noteholder is unable to attend.

An Existing Noteholder who wishes to attend the Scheme Meeting should complete an Account Holder Letter, indicating in it that the Existing Noteholder intends to attend the Scheme Meeting.

Each Scheme Creditor or its proxy who wishes to attend the Scheme Meeting, and has indicated the same in its Account Holder Letter and/or Lender Claim Form, will be required to register its attendance by emailing the Information Agent at least one hour prior to the commencement of the Scheme Meeting.

A proxy need not be a Scheme Creditor. Please see Appendix 7 (Instructions and Guidance for Scheme Creditors) to this Explanatory Statement for more information in this regard.

Proof of personal identity and corporate authority will be required to attend the Scheme Meeting. Please see the Account Holder Letter for details of what is acceptable.

Only those Scheme Creditors who are Scheme Creditors as at the Record Time are entitled to attend and vote, either in person or by proxy, at the Scheme Meeting.

Existing Noteholders are advised to read the Restructuring Implementation Deed, the Holding Period Trust Agreement (which is attached at part 9 (Holding Period Trust Agreement) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to this Explanatory Statement at Part 9 (Holding Period Trust Agreement) of Appendix 4 (Key Restructuring Documents)) and the summary of the Holding Period Trust Agreement in paragraph 5 of Part 6 (Summary of the Key Restructuring Documents) of this Explanatory Statement.

In order to receive its Scheme Creditor Entitlements in accordance with the terms of the Restructuring Implementation Deed each Existing Noteholder must:

(a)     ensure that it (or its Account Holder on its behalf) submits a valid Account Holder Letter to the Information Agent; and

(b)     submit the correct Jersey Newco KYC to the Jersey Registrar (and the Information Agent must have received confirmation from the Jersey Registrar that all Jersey Newco KYC has been completed to its satisfaction no later than five Business Days before the Restructuring Effective Date) in relation to the Jersey Newco Consideration Shares.

A Scheme Creditor must be an Eligible Person to receive Scheme Consideration. If an Existing Noteholder is not an Eligible Person it may, by completing the relevant section in its Account Holder Letter, appoint a Nominee to receive its New Notes and/or a Nominee to receive its Jersey Newco Consideration Shares. Each Nominee so appointed must be an Eligible Person in order to receive the New Notes and/or Jersey Newco Consideration Shares to which the relevant Existing Noteholder is entitled.

**B. Lender Claim Form (to be completed by the Lender Scheme Creditors)**

The form of Lender Claim Form is enclosed at Appendix 9 (Lender Claim Form) to this Explanatory Statement. For the avoidance of doubt, a Lender Claim Form should only be completed by a lenders of record according to the books and records of the relevant Existing Administrative Agent.

Each Lender Scheme Creditor who wishes to vote at the Scheme Meeting must ensure that it completes and submits to the Information Agent a valid Lender Claim Form in order to vote at the Scheme Meeting. **For the purposes of voting, Lender Claim Forms must be delivered to and received by the Information Agent before the Voting Instruction Deadline, being 5:00 pm on 28 October 2020**.

The delivery of a Lender Claim Form will not prevent the Lender Scheme Creditor who completed it from subsequently attending and voting in person at the Scheme Meeting if it so wishes. Lender Scheme Creditors are encouraged to complete and return a Lender Claim Form whether or not they intend to be present at the Scheme Meeting in case, for any reason, that Lender Scheme Creditor is unable to attend.

A Lender Scheme Creditor who wishes to attend the Scheme Meeting in person should complete a Lender Claim Form, indicating in it that the Scheme Creditor intends to attend the Scheme Meeting in person.

Each Lender Scheme Creditor or its proxy who wishes to attend the Scheme Meeting in person, and has indicated the same in its Account Holder Letter and/or Lender Claim Form, will be required to register its attendance by emailing the Information Agent at least one hour prior to the commencement of the Scheme Meeting.

Each Scheme Creditor will be entitled to appoint a proxy to vote on its behalf at the Scheme Meeting. A proxy need not be a Scheme Creditor. Please see Appendix 7 (Instructions and Guidance for Scheme Creditors) to this Explanatory Statement for more information in this regard.

Proof of personal identity and corporate authority will be required to attend the Scheme Meeting. Please see the Lender Claim Form for details of what is acceptable.

Only those Scheme Creditors who are Scheme Creditors as at the Record Time are entitled to attend and vote, either in person or by proxy, at the Scheme Meeting.

Lender Scheme Creditors are advised to read the Restructuring Implementation Deed, the Holding Period Trust Agreement (which is attached at Part 9 (Holding Period Trust Agreement) of Schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to this Explanatory Statement at Part 9 (Holding Period Trust Agreement) of Appendix 4 (Key Restructuring Documents) and the summary of the Holding Period Trust Agreement in paragraph 5 of Part 6 (Summary of Key Restructuring Documents) of this Explanatory Statement.

In order to receive its Scheme Creditor Entitlements in accordance with the terms of the Restructuring Implementation Deed, each Lender Scheme Creditor must:

(a)     ensure that it submits a valid Lender Claim Form to the Information Agent; and

(b)     submit the correct Jersey Newco KYC to the Jersey Registrar (and the Information Agent must have received confirmation from the Jersey Registrar that all Jersey Newco KYC has been completed to its satisfaction five Business Days before the Restructuring Effective Date) in relation to the Jersey Newco Consideration Shares.

A Scheme Creditor must be an Eligible Person to receive Scheme Consideration. If the Lender Scheme Creditor is not an Eligible Person it may, by completing the relevant section in its Lender Claim Form, appoint a Nominee to receive its New Notes and/or a Nominee to receive its Jersey Newco Consideration Shares. Each Nominee so appointed must be an Eligible Person to receive the New Notes and/or Jersey Newco Consideration Shares to which the relevant Lender Scheme Creditor is entitled.

3.    **Chairperson's discretion**

The Chairperson will be entitled, at their sole discretion, to permit a Scheme Creditor in respect of which a completed Account Holder Letter and/or Lender Claim Form has not been delivered prior to the Voting Instruction Deadline to vote at the Scheme Meeting if the Chairperson considers that the relevant Scheme Creditor has produced sufficient proof that it is a Scheme Creditor.

# PART 1

## LETTER FROM THE DIRECTORS OF THE COMPANY



KCA Deutag UK Finance plc
1 Park Row
Leeds, LS1 5AB
United Kingdom

15 October 2020

Dear Scheme Creditor,

## 1.    Introduction

1.1    This letter is part of an Explanatory Statement distributed to you for the reasons set out below. All capitalised terms used in this letter have the meaning given to such terms in Appendix 1 (Definitions and Interpretation) to this Explanatory Statement.

1.2    The Company has proposed the Scheme to the Scheme Creditors as an integral part of implementing the Restructuring, as described in further detail below.

1.3    In considering the Scheme, you should not rely solely on this letter, but you should also consider the more detailed information contained in the remainder of this Explanatory Statement. The Company recommends that you consult your own professional advisers as to legal, tax, financial or other matters relevant to any actions to be taken in relation to the Scheme, or the implications/consequences of those actions.

1.4    The purpose of this letter is to provide a brief explanation of the Scheme and its effect, should it become effective. The Company proposes to seek the sanction of the Court in respect of the Scheme should it first be approved by the requisite majorities of Scheme Creditors at the Scheme Meeting convened for that purpose.

## 2.    Purpose of this Explanatory Statement

2.1    This Explanatory Statement, which is provided pursuant to section 897 of the Companies Act, is distributed for the purpose of providing you with sufficient information to make an informed decision as to whether or not to approve the Scheme. An explanation of the reasons for the proposed Scheme (which is to be voted on at the Scheme Meeting commencing at 10:30 am on 30 October 2020) is included below as part of this letter.

2.2    This document also explains why the Board and the Alpha Boards consider the Scheme, and the Restructuring to be implemented thereby, to be in the best interests of those with an economic interest in the Company and the Group, including the Scheme Creditors.

**3.        What is a scheme of arrangement?**

3.1        A scheme of arrangement is a statutory procedure under English law which allows a company to agree a compromise or arrangement with its creditors (or classes of creditors), and for the terms of that compromise or arrangement to bind any non-consenting or opposing minority creditors.

3.2        If the Court is satisfied at the convening hearing that the proposed scheme of arrangement has a prospect of being approved by creditors, and that the proposed class or classes of scheme creditors for voting purposes have been correctly constituted, the court will order the scheme meeting or meetings for the relevant classes of creditors to be convened.

3.3        In order to become effective, a scheme of arrangement under English law must be:

(a)        approved by a majority in number (above 50%) representing at least 75% in value of each class of creditors present and voting (in person or by proxy) at each relevant scheme meeting;

(b)        sanctioned by the Court; and

(c)        delivered to the Registrar of Companies with a copy of the Sanction Order.

3.4        If a scheme of arrangement becomes effective, it will bind the relevant company and each scheme creditor according to its terms, including those scheme creditors who did not vote on the relevant scheme of arrangement or who voted against it.

3.5        A scheme of arrangement will not be sanctioned by the Court unless the Court is satisfied, among other things, that the scheme of arrangement is fair and reasonable, the scheme of arrangement has been properly explained to creditors, and the class or classes of creditors voting in respect of the scheme of arrangement have been properly constituted by the company.

**4.        Scheme Meeting**

4.1        The Court has granted the Company permission to convene a single meeting of Scheme Creditors to consider and, if thought fit, approve the Scheme.

4.2        We encourage all Scheme Creditors to submit their Account Holder Letter(s) and/or Lender Claim Form(s) to the Information Agent online via the Scheme Website at www.lucid-is.com/kcadeutag or by email in pdf form to kcadeutag@lucid-is.com as soon as possible and in any event so as to be received **no later than the Voting Instruction Deadline**. Details of the actions that Scheme Creditors need to take in order to vote are set out in Appendix 7 (Instructions and Guidance for Scheme Creditors) to this Explanatory Statement.

4.3        Existing Noteholders will receive notice of the elections required by the Account Holder Letter from their Account Holders (if the Existing Noteholder is not itself an Account Holder, and who may be their custodian or prime broker in respect of their holding of Existing Notes). An Existing Noteholder who holds the Existing Notes via Euroclear or Clearstream must confirm its consent to this notification, following which the Account Holder must submit an electronic instruction to Euroclear or Clearstream by no later than the Custody Instruction Deadline. The electronic instruction will generate a Custody Instruction Reference Number. Once the Information Agent receives a Custody Instruction Reference Number, the relevant Existing Notes will be blocked in Euroclear or Clearstream. The block will be lifted on the Restructuring Effective Date (or earlier, if applicable). An Account Holder Letter with respect to Existing Notes held via Euroclear or Clearstream will not be complete or valid without the inclusion of a Custody Instruction Reference Number. Please see Appendix 7 (Instructions and Guidance for Scheme Creditors) to this Explanatory Statement for further information.

**5.    The Scheme**

**Background**

5.1    The Company is a public limited company incorporated and existing in accordance with the laws of England and Wales. The Company was incorporated on 28 April 2014 with registered number 09015065. The Company is an indirect Subsidiary of Alpha.

5.2    The Group is a market-leading international drilling, engineering and technology company serving both onshore and offshore drilling markets. It has a vertically integrated business model, with its engineering and design expertise complementing and enhancing its drilling operations. The Group is one of the largest international land drilling contractors globally, with a highly sophisticated and flexible rig fleet, and is a leader in the design, engineering and manufacturing of premium land rigs and components. In terms of international reach, the Group focusses on geographies characterised by attractive industry dynamics (such as low breakeven oil prices, significant levels of industry consolidation and high return on capital) and operates in more than 15 countries, with a strong presence in Europe (including the North Sea), Russia (including the Caspian Sea), Africa and the Middle East.

5.3    As a result of concerns regarding the level of the Group's financial leverage and certain debt maturities in early 2021, the Group engaged Houlihan Lokey as financial adviser in August 2019 to assist (in conjunction with A&O, the Group's longstanding legal advisers) with conducting a strategic review of its balance sheet (including the indebtedness under the Existing Notes and the Credit Agreement) and finding a comprehensive solution to the Group's capital structure. Between August 2019 and March 2020, the Group, in conjunction with its advisers and ultimate shareholders, continued to explore and progress various strategic options to address its capital structure.

5.4    The range of strategic options available to the Group was severely limited by the Covid-19 Pandemic and the OPEC-related Oil Price Reduction. Examples of the direct and indirect negative impact of the Covid-19 Pandemic and the OPEC-related Oil Price Reduction on the Group's business include:

(a)    requests from the Group's customers for significant price reductions in relation to the services provided by the Group;

(b)    the termination and/or suspension of several of the Group's contracts in connection with its land fleet;

(c)    the resulting reclassification of many of the oil platforms operated by the Group within the UK from operating to stacking mode; and

(d)    severe disruptions to the Group's supply chains and its workforce.

5.5    Despite the measures put in place by the Group to reduce the effect of these external factors on its business (including placing most of its staff on a four-day week for several months and freezing all non-business critical spending), their continuing impact led to a significant deterioration in the Group's financial position (especially in relation to its short-term liquidity). Ultimately, the combined impact of the Covid-19 Pandemic and the OPEC-related Oil Price Reduction on the Group and the wider market meant that many of the strategic options that were previously being considered by the Group in relation to its capital structure were no longer determined to be viable.

5.6    Furthermore, in addition to the significant short-term impact of the Covid-19 Pandemic and the OPEC-related Oil Price Reduction, the Group also determined that, given its considerable exposure to the oil and gas sector, the ongoing impact of the Covid-19 Pandemic combined with a lower demand for oil (and a corresponding drop in the price of oil) was likely to have a medium to long-term impact on its business and financial outlook.

5.7    In light of the situation described above, on 26 March 2020 the Group announced that it: (a) was planning to utilise the applicable grace periods in relation to the April 2020 Interest Payments in order to give it more time to evaluate and assess the impact of the Covid-19 Pandemic and the OPEC-related Oil Price Reduction on its business and operations; and (b) would be formally engaging with its creditors (including the Ad-Hoc Committee and the RCF Lenders and each of their respective advisers).

5.8    **Scheme Creditors can obtain further information on the Group, including financial information, from the Group's investor website at https://kcadeutag.com/investors/.**

**Standstill Agreement**

5.9    Having used the applicable grace periods in respect of the April 2020 Interest Payments to further assess its financial position and potential options and following negotiations with the Ad-Hoc Committee and the RCF Lenders (and each of their respective advisers), the Group announced on 2 May 2020 that, in order to provide stability while it continued to evaluate the impact of the Covid-19 Pandemic and the OPEC-related Oil Price Reduction, it had entered into the Standstill Agreement with the Ad-Hoc Committee and each of the RCF Lenders[7].

5.10   Under the terms of the Standstill Agreement, the members of the Ad-Hoc Committee, the RCF Lenders and the other creditors party thereto agreed to standstill arrangements (including restrictions on enforcement action and forbearances in relation to specified defaults) in respect of the indebtedness under the Existing Notes and the Credit Agreement for the Standstill Period. The Group gave various undertakings under the Standstill Agreement (including in relation to the provision of financial information regarding the Group and the preparation of a proposal for the financial restructuring of the Group's balance sheet) and accepted certain restrictions on the conduct of its business. Pursuant to the terms of the Standstill Agreement, it was also agreed that the Group would not make the April 2020 Interest Payments or (subject to certain limited exceptions) any other interest or amortisation payments due under the Existing Indentures or the Credit Agreement during the Standstill Period.

**Work Fee**

5.11   As a condition precedent to the effectiveness of the Standstill Agreement, Alpha and certain other members of the Group entered into the Work Fee Letters. Pursuant to the Work Fee Letters, Alpha is to pay or to procure the payment to:

(a)    the members of the Ad-Hoc Committee party to the AHC Work Fee Letter of the AHC Work Fees; and

(b)    the RCF Lenders party to the RCF Work Fee Letter of the RCF Work Fees,

which Work Fees have been paid as at the date of this letter and represent the total amount of fees payable under the Work Fee Letters.

5.12   The Group considers the Work Fees to be appropriate in light of the work that:

(a)    has been undertaken by the Ad-Hoc Committee and RCF Lenders in connection with the Standstill Agreement, the Lock-Up Agreement, the negotiation of the terms of the Restructuring and its implementation, including:

(i)    participating in calls and meetings with the advisers to, and representatives of, the Group;

---

7       One RCF Lender acceded to the Standstill Agreement shortly thereafter, following completion of its internal credit approval process.

(ii)     reviewing, assessing and providing feedback on proposals made by the Group in connection with the Standstill Agreement, the Lock-Up Agreement and the Restructuring;

(iii)    reviewing, assessing and providing feedback on draft documentation relating to the Standstill Agreement, the Lock-Up Agreement and the Restructuring;

(iv)     working with fellow creditors and other stakeholders to build a consensus around the terms of the Restructuring; and

(v)      liaising with current and prospective management in relation to the Restructuring; and

(b)    continues to be undertaken by the Ad-Hoc Committee and RCF Lenders to in relation to the implementation of the Restructuring.

**Lock-Up Agreement**

5.13   On 31 July 2020, after a period of further discussions between the Group, the Ad-Hoc Committee, the RCF Lenders and certain other stakeholders (including the Group's ultimate shareholders), the Group announced that the Company and certain other members of the Group had entered into the Lock-Up Agreement setting out the agreed commercial terms of the Restructuring. As the ultimate shareholders of the Group had, after negotiations with the Ad-Hoc Committee, agreed to support the Restructuring, Holdings I (being the ultimate holding company of the Group) and certain other holding companies in the Group structure entered into the Lock-Up Agreement as original parties thereto.

5.14   A redacted copy of the Lock-Up Agreement is available on the Group's website[8] and an unredacted copy is available on the Scheme Website.

5.15   Under the Lock-Up Agreement, the Company and the other parties thereto (other than FAB) have agreed, among other things, that they will:

(a)    promptly take all actions required pursuant to and in accordance with the Lock-Up Agreement and the Restructuring Steps Plan which are necessary to facilitate, implement, consummate or otherwise give effect to all or any part of the Restructuring; and

(b)    not take, encourage, assist or support (or procure that any other person takes, encourages, assists or supports) any action which would, or would reasonably be expected to, breach or be inconsistent with the Lock-Up Agreement, the Restructuring Term Sheets or the Restructuring Steps Plan (taken as a whole) or delay, impede or prevent the implementation or consummation of all or any part of the Restructuring.

5.16   Pursuant to the terms of the Lock-Up Agreement, each Participating Creditor (other than FAB) has acknowledged and submitted to the jurisdiction of the English court in respect of the Scheme and agreed that it shall enter an appearance formally in connection with the Scheme (if required by the Court or, if any creditor that is not a Participating Creditor formally objects to the Scheme, as reasonably requested by Alpha II) or be willing to be joined formally to the Scheme as a defendant (if required by the Court).

5.17   In accordance with the Lock-Up Agreement and in order to help facilitate the Scheme:

(a)    the Company has entered into each of the Supplemental Indentures pursuant to which certain amendments were made to the terms of Existing Indentures (including the amendments referred to in paragraph 5.19 below and the amendments to section 6.01 (Events of Default)

---

8     https://kcadeutag.com/investors/news/Documents/Cleansing%20Announcement%20Lock-up%20Agreement%20FINAL.pdf

of each Existing Indenture to ensure that any step taken, or to be taken, in connection with the Scheme or the Restructuring did not and will not trigger a Default or Event of Default (each as defined in each Existing Indenture));

(b)     Alpha has entered into the Credit and Guaranty Agreement Amendment Agreement, pursuant to which certain amendments were made to the terms of the Credit Agreement and the Guaranty Agreement (including the amendments referred to in paragraph 5.20 below); and

(c)     the Company has entered into the Contribution Deed.

5.18    The Contribution Deed results in the Credit Agreement Borrowers and the Company having rights of contribution against each other, and the members of the Group that are Guarantors (under and as defined in the Guaranty Agreement) and the Company also have rights of contribution against each other pursuant to the Guaranty Agreement. The Company, therefore, cannot effectively seek a release or variation of the Scheme Creditors' rights against it without also seeking to release or vary the Scheme Creditors' rights as against both the Credit Agreement Borrowers and the Guarantors. It will otherwise, in effect, remain liable for the claims of Scheme Creditors to be compromised by Scheme because of its liability under the Contribution Deed.

5.19    Pursuant to the Supplemental Indentures:

(a)     each Existing Indenture, the Existing Notes and the Guarantees (as defined in each Existing Indenture) and all non-contractual obligations arising out of or in connection with them are now governed by, and shall be construed in accordance with, the laws of England and Wales; and

(b)     subject to the terms of each Existing Indenture, the courts of England and Wales now have jurisdiction to settle any disputes that arise out of or in connection with each Existing Indenture, the Existing Notes and the Guarantees, and accordingly any legal action or proceedings arising out of or in connection with each Existing Indenture, the Existing Notes and the Guarantees may be brought in such courts.

5.20    Pursuant to Credit and Guaranty Agreement Amendment Agreement:

(a)     the Credit Agreement and the Guaranty Agreement (and all non-contractual obligations arising out of or in connection with the Credit Agreement or the Guaranty Agreement) are now governed by, and shall be construed in accordance with, the laws of England and Wales; and

(b)     subject to the terms of the Credit Agreement and the Guaranty Agreement (as applicable), the courts of England and Wales now have jurisdiction to settle any disputes that arise out of or in connection with the Credit Agreement or the Guaranty Agreement, and accordingly any legal action or proceedings arising out of or in connection with the Credit Agreement or the Guaranty Agreement may be brought in such courts.

5.21    The Company has obtained an opinion from an independent expert, Judge Robert Smith (retired), a former judge of the US Court of Appeals for the Second Circuit and a respected New York law qualified attorney, that the amendments made pursuant to the Supplemental Indentures and the Credit and Guaranty Agreement Amendment Agreement were validly effected as a matter of New York law.

5.22    The amendments referred to in paragraphs 5.19 and 5.20 above were made to assist with the international recognition of the Scheme in the relevant jurisdictions (including certain of the jurisdictions referred to in paragraph 9 below).

5.23   Following further due diligence and discussions between the respective advisers to the Group, the Ad-Hoc Committee and the RCF Lenders, it was agreed that, in order to facilitate the implementation of the Restructuring within the timescale contemplated by the Lock-Up Agreement, certain amendments were required to be made to the Restructuring Steps Plan. Pursuant to the Restructuring Steps Plan Amendment Letter, the Company requested that the Majority Participating AHC Creditors and the Majority Participating RCF Lenders consent to the Restructuring Steps Plan Amendment. This consent was received and the Restructuring Steps Plan Amendment became effective on 8 October 2020 and a copy of the Restructuring Steps Plan Amendment Letter (including the amended Restructuring Steps Plan) is available to Scheme Creditors on the Scheme Website.

**Lock-Up Fee**

5.24   Pursuant to the terms of the Lock-Up Agreement, on 21 August 2020 (being the date falling 15 Business Days after the Effective Date), Abbot procured payment to each Participating Creditor who had entered into or acceded to the Lock-Up Agreement by 14 August 2020 (being the date falling ten Business Days after the Effective Date) of a Lock-Up Fee in an amount equal to 0.15 % of its Participating Creditor Exposure (as defined in the Lock-Up Agreement).

5.25   The payment of the Lock-Up Fee was (and continues to be) considered by the Group to have been appropriate in order to secure early support for the Restructuring from the Group's diverse and numerous Existing Noteholders, Term Loan Lenders and RCF Lenders in order to provide the Group with a degree of commercial comfort regarding the implementation of the Restructuring. All Existing Noteholders, Term Loan Lenders and RCF Lenders had the opportunity to enter into the Lock-Up Agreement within ten Business Days of the Effective Date and thereby become eligible to receive the Lock-Up Fee.

**Purpose and effect of the Scheme**

5.26   The purpose of the Scheme is to enable the implementation of the Restructuring in the manner described in and contemplated by the Restructuring Steps Plan and the Restructuring Term Sheets which will preserve value for all stakeholders and seek to allow the Existing Noteholders and Lender Scheme Creditors to recover greater amounts in due course than would be recoverable in the likely alternative scenarios if the Restructuring is not implemented, as further detailed in Part 7 (Estimated Alternative Outcomes for Scheme Creditors) of this Explanatory Statement.

5.27   The Scheme will alter the rights of all Scheme Creditors arising out of or in connection with the Existing Indentures and the Credit Agreement, including any accrued but unpaid interest.

5.28   As a result of the Restructuring and the Scheme, it is anticipated that:

(a)   in return for the issuance to the Scheme Creditors of (and as a result of the release of all of the principal, accrued but unpaid interest and any other claims in respect of the Existing Notes, the Term Loan, the Revolving Loans and the Existing Overdraft Facilities):

(i)   the New Notes; and

(ii)   the Jersey Newco Consideration Shares,

the Restructured Group will have a strengthened and de-levered balance sheet, with its total debt being reduced by approximately USD 1.4 billion (meaning it will have a pro forma net leverage of 1.4x[9] (down from its current net leverage of 6.3x[10]));

(b)     the Restructured Group's annual debt servicing costs will be reduced from USD 155 million to USD 49 million;

(c)     the Restructured Group will benefit from a five-year runway to maturity of the New Notes;

(d)     the Restructured Group will have access to:

  (i)     overdraft, cashing pooling and bank account facilities through the New Cash Management Facilities; and

  (ii)    guarantee and letter of credit facilities through the New LC/Undertaking Facilities to be made available by Lloyds and FAB (as applicable); and

(e)     by receiving the Jersey Newco Consideration Shares, Scheme Creditors will be provided with the opportunity to benefit from the potential upside of the implementation of the Restructured Group's turnaround strategy.

5.29     If the Scheme is approved by the requisite majorities of Scheme Creditors and the Restructuring is implemented, the Company anticipates that the Restructured Group will be able to repay the full amounts owing:

(a)     in respect of the New Notes under the New Notes Documents; and

(b)     under the New Bilateral Facilities Agreements.

5.30     Further details of the Restructuring and the Scheme are set out in paragraph 6 below and in Part 5 (Summary of the Restructuring (including the Scheme)) of this Explanatory Statement.

5.31     As at 30 September 2020, the Group had outstanding indebtedness under the Existing Notes and Credit Agreement of an aggregate principal amount of approximately USD 1,989,714,617 (which, for the avoidance of doubt, does not include any accrued but unpaid interest or fees in respect of such indebtedness) with events of default outstanding under both the Credit Agreement and each Existing Indenture. If the Company does not implement the Restructuring by the Long Stop Date and the requisite majorities of the Participating Creditors refuse to extend the Long Stop Date, the Lock-Up Agreement will terminate. In light of the events of default outstanding under both the Credit Agreement and each Existing Indenture, the relevant creditors thereunder would, following the termination of the Lock-Up Agreement, be entitled to accelerate the indebtedness outstanding under the Credit Agreement and the Existing Indentures and instruct the security agent under the Existing Intercreditor Agreement to enforce part or all of the Existing Security. If the indebtedness under the Credit Agreement and the Existing Indentures was accelerated, the Company does not anticipate that the Group would be able to repay the accelerated amounts in full (please see Part 7 (Estimated Alternative Outcomes for Scheme Creditors) of this Explanatory Statement for more information).

5.32     Additionally, the Company considers that, if it is ultimately unable to implement the Restructuring (and no immediate or short term action is taken by the creditors following any termination of the Lock-Up Agreement), the most likely outcome is that there will have to be a distressed, accelerated sale of

---

[9]     Based on LTM June 2020 EBITDA of USD 293 million, pro forma total debt of approximately USD 510 million, and current cash at 30 June 2020 of USD 100 million (which excludes USD 80 million of transaction costs).

[10]    Based on LTM June 2020 EBITDA of USD 293 million, total debt at 20 June 2020 of approximately USD 1.9 billion (including the Existing Notes and facilities under the Credit Agreement) and current cash at 30 June 2020 of USD 100 million (which excludes USD 80 million of transaction costs).

the individual business units within the Group (with any residual part of the Group and its assets entering insolvency or bankruptcy proceedings). If it is not possible to complete one or more of the business unit sales in the time available, the Company considers that it is likely that the relevant part of the Group and its assets will have to enter insolvency or bankruptcy proceedings. If it is not possible to complete any sale in the time available, the Company considers that it is likely that the entire Group and its assets will have to enter insolvency or bankruptcy proceedings.

5.33    The execution of any distressed sale, even on an accelerated basis, will require a sufficient number of the Group's creditors (including the Scheme Creditors) to allow time for such a sale to complete and will be subject to a considerable number of consents, forbearances and waivers. In addition, the current market environment and wider economic climate may present further challenges to achieving a distressed sale of any of the Group's business units, thereby adding to the level of uncertainty and execution risk in this scenario.

5.34    In any of the scenarios referred to in paragraphs 5.31, 5.32 and 5.33 above, the Company considers that the Group would not be able to repay its creditors (including the Scheme Creditors) in full and the quantum and timing of any distributions to those creditors would be very uncertain.

5.35    Furthermore, in any of the scenarios described above or in the event that the relevant creditors under the Credit Agreement and the Existing Indentures initiated an enforcement of the Existing Security following the termination of the Lock-Up Agreement, the Group anticipates that the amounts that would be received by its creditors (including the Scheme Creditors) via insolvency or bankruptcy proceedings (with or without a distressed sale of part of the Group having occurred first) or as a consequence of any enforcement action (as applicable) would be less than the amounts such creditors would ultimately receive if the Restructuring is implemented.

5.36    For further information, please see Part 7 (Estimated Alternative Outcomes for Scheme Creditors) of this Explanatory Statement.

5.37    In light of the factors set out above, while no assurances can be given that, even if the Restructuring is successfully completed, the Group's business will be successful in the future, the Board and the Alpha Boards consider, on the basis of professional advice they have received (including, but not limited to, from Deloitte, for the sole benefit of the Company and certain other members of Group, in relation to the estimated outcomes if the Restructuring is not implemented), that the implementation of the Restructuring is in the best interests of the relevant stakeholders taken as a whole (including the Scheme Creditors).

## 6.    Key Terms of the Restructuring

6.1    The Restructuring will reflect the terms of the Restructuring Term Sheets and the Restructuring Steps Plan.

6.2    A new holding company structure has been established comprising Jersey Newco, which owns English NewCo 1 which in turn owns English NewCo 2.

6.3    Alpha II has acquired all of the shares in Jersey Newco (and, as a result, indirectly acquired English NewCo 1 and English NewCo 2) from Crestbridge Corporate Nominees Limited (being an entity controlled by Crestbridge, the corporate services provider which arranged for Jersey Newco to be incorporated) for nil consideration.

6.4    Following the Scheme Effective Time but prior to the Restructuring Effective Date, Alpha II will transfer all of the shares in Alpha to English NewCo 2 for nil consideration (with the shares in Alpha remaining subject to the relevant Existing Security).

6.5    The key terms of the Restructuring (and the Scheme) provide for the following inter-conditional steps to occur on the Restructuring Effective Date:

(a)    Alpha II shall transfer 100% of the shares in Jersey Newco to certain of the Scheme Creditors (to be selected, subject to certain limitations set out in the Restructuring Implementation Deed, by the Company in its discretion (in consultation with the Ad-Hoc Committee and the Existing Overdraft Provider (or their respective advisers)) for nil consideration;

(b)    on behalf of all Scheme Creditors, the Company (pursuant to the authority granted in the Scheme and pursuant to the steps set out in the Restructuring Implementation Deed) and other relevant parties will affect the release of all of the principal, accrued interest and any other Liabilities in respect of the Scheme Claims and the Existing Security. The Company shall take steps to effect the cancellation of the Existing Notes and will inform the Luxembourg Stock Exchange of such cancellation;

(c)    in consideration for the release described in paragraph (b) above:

   (i)    the Company will issue the New Notes to the Scheme Creditors with each Scheme Creditor being entitled to a pro rata amount of the New Notes reflecting the proportion of its holdings of principal and accrued interest in respect of the Scheme Claims as at the Record Time compared to the total amount of principal and accrued interest in respect of all Scheme Claims as at the Record Time; and

   (ii)    Jersey Newco will issue the Jersey Newco Consideration Shares to the Scheme Creditors with each Scheme Creditor being entitled to a pro rata amount of the Jersey Newco Consideration Shares reflecting the proportion of its holdings of principal and accrued interest in respect of the Scheme Claims as at the Record Time compared to the total amount of principal and accrued interest in respect of all Scheme Claims as at the Record Time (taking into account any shares in Jersey Newco already held by Scheme Creditors as a result of the transfer described in paragraph 6.5(a) above and as calculated before the issuance of any shares in connection with the Management Equity Plan);

(d)    the relevant members of the Group will enter into the New Bilateral Facilities Agreements, in each case, with the relevant New Bilateral Lenders;

(e)    the relevant members of the Group will enter into the New Security Documents with the New Security Agent;

(f)    on behalf of all Scheme Creditors, the Company (pursuant to the authority granted in the Scheme) together with other relevant parties will enter into the New Intercreditor Agreement that will regulate the ranking and priority of the New Bilateral Facilities and the New Notes Documents;

(g)    the relevant parties (including the Scheme Creditors (acting through the Company pursuant to the authority granted in the Scheme) that will be receiving the Jersey Newco Consideration Shares on the Restructuring Effective Date) will enter into the Jersey Newco Investment Agreement to govern the rights as between the shareholders of Jersey Newco in accordance with the terms set out in the Equity Term Sheet (as defined in, and scheduled to, the Lock-Up Agreement); and

(h)    the Deed of Release will be entered into by the relevant parties including the Company (on behalf of itself and all Scheme Creditors pursuant to the authority granted in the Scheme), to effect the releases described in clause 9.2 (Releases on the Completion Date) of the Lock-Up Agreement.

6.6    On the Business Day following the Restructuring Effective Date, subject to the terms of the Restructuring Implementation Deed, Jersey Newco shall issue the Warrants to the Participating Shareholders.

6.7    Scheme Creditors should note that the New Notes will be issued in accordance with the terms of the Restructuring Implementation Deed and subject to applicable securities laws. The New Notes will be held in Euroclear and Clearstream only. **The Company encourages Existing Noteholders holding Existing Notes directly through DTC to transfer their holdings to an account held with Euroclear or Clearstream prior to the Principal Record Time in order to be in a position to receive the New Notes on the Restructuring Effective Date. For the avoidance of doubt, and irrespective of the Clearing System in which the Existing Notes are held, the consideration due to Scheme Creditors in connection with the Scheme will be allocated to or on behalf of all Scheme Creditors rateably in accordance with the terms of the Restructuring Implementation Deed.**

6.8    Scheme Creditors should also note that that the Jersey Newco Shares will not be listed on any recognised stock exchange and will not have an ISIN or CUSIP. As such, they will not be eligible for clearance in any Clearing System.

**Certain Conditions to the Restructuring**

6.9    The Scheme Effective Time will occur upon:

(a)    the approval of the Scheme by a majority in number of Scheme Creditors representing 75% in value of the Scheme Claims present and voting at the Scheme Meeting (in person or by proxy);

(b)    the Court making the Sanction Order, sanctioning the Scheme; and

(c)    a copy of the Sanction Order being delivered to the Registrar of Companies.

6.10    The Restructuring Effective Date will occur upon: (a) the satisfaction or waiver of the Restructuring Conditions Precedent; and (b) the completion of the steps necessary to implement the Restructuring set out in clause 5 (Restructuring Steps) of the Restructuring Implementation Deed in accordance with the terms of the Restructuring Implementation Deed.

**7.    Undertaking Deeds**

7.1    Each of the Undertaking Parties, who are persons involved in the implementation of the Restructuring, some of which are not party to the Lock-Up Agreement, will execute and deliver, prior to the Sanction Hearing, an Undertaking Deed in favour of the Court, the Company and the Scheme Creditors (as applicable), pursuant to which it will agree and undertake to the Court, the Company and the Scheme Creditors (as applicable), on and from the Scheme Effective Time, among other things:

(a)    to be bound by the Scheme and the applicable Restructuring Documents;

(b)    to promptly do all such acts and things necessary for the purpose of giving effect to the Scheme and the applicable Restructuring Documents; and

(c)    to promptly execute and deliver each of the Restructuring Documents (and related documents) to which they are party.

7.2    Having signed the Lock-Up Agreement, FAB has agreed and is expected to execute and deliver a support letter to the Company prior to the Sanction Hearing, pursuant to which FAB will undertake, subject to the terms of the Lock-Up Agreement, to take any and all actions required pursuant to and in accordance with the Lock-Up Agreement and the Restructuring Steps Plan which are necessary to

facilitate, implement, consummate or otherwise give effect to the documentation of the FAB Run-Off LC Facility (including, without limitation, executing and delivering to the Company the Restructuring Implementation Deed) on and from the Scheme Effective Time.

## 8.    Support for the Scheme

Since the date of the Lock-Up Agreement, additional creditors and certain of the ultimate shareholders of the Group have acceded to the Lock-Up Agreement. As at 8 October 2020:

(a)    Existing Noteholders holding 92.76% of the aggregate outstanding principal amount of the 2021 Notes;

(b)    Existing Noteholders holding 99.08% of the aggregate outstanding principal amount of the 2022 Notes;

(c)    Existing Noteholders holding 99.01% of the aggregate outstanding principal amount of the 2023 Notes;

(d)    Term Loan Lenders holding 96.43% of the aggregate outstanding principal amount of the Term Loan;

(e)    Revolving Loan Lenders holding 89.47% of the aggregate outstanding principal amount of the Revolving Loans; and

(f)    the Existing Overdraft Provider, Lloyds and FAB

have executed or acceded to the Lock-Up Agreement, meaning that Scheme Creditors representing 96.86%[11] of the aggregate principal amount of debt under the Existing Notes, the Term Loan, the Revolving Loans and the Existing Overdraft Facilities have entered into the Lock-Up Agreement.

## 9.    Recognition of the Scheme in jurisdictions outside the United Kingdom

9.1    United States

(a)    The Company intends to seek a Chapter 15 Order. The Company considers the seeking of a Chapter 15 Order to be a prudent course of action given that certain of the Scheme Creditors are anticipated to be U.S. persons, one of the Guarantors is incorporated in the U.S. and, additionally, the Existing Notes and the Credit Agreement were originally governed by New York law and subject to the jurisdiction of the New York courts.

(b)    The Company is advised and believes that the Scheme will be recognised in the United States under Chapter 15 of the U.S. Bankruptcy Code and will adduce expert evidence in relation to these matters.

9.2    Russia, Oman, Germany and Norway

No formal steps to obtain recognition of the Scheme are foreseen in Russia, Oman, Germany or Norway; however, the Company has obtained opinions from independent experts (in respect of which privilege is not waived):

(a)    that the Scheme is likely to be recognised and given effect in Russia, Norway and Germany, each being a jurisdiction in which the Group has material operations; and

---

[11]    As the amount under the Existing Overdraft Facilities fluctuates on a daily basis, the overall amount of the commitments in respect of the Existing Overdraft Facilities has been used for the purposes of calculating this percentage.

(b)     that the Scheme may be recognised *de facto* and given effect in Oman (being another jurisdiction in which the Group has material operations) and that in any event it is unlikely that a dissenting Scheme Creditor would be able to improve its position (relative to that of the other Scheme Creditors) before the Omani courts such as to undermine the compromise proposed in the Scheme.

## 10.    Conclusions

10.1    The Board and the Alpha Boards consider the Restructuring and the Scheme to be in the best interests of those parties with an economic interest in the Company and the Group, including the Scheme Creditors. It has arrived at this conclusion on the basis of the reasons given in this letter, in particular:

(a)     the benefits to the Company and to the rest of the Group of the implementation of the Restructuring and the Scheme, which will in turn benefit the Scheme Creditors;

(b)     the high levels of support already received for the Restructuring and the Scheme via the Lock-Up Agreement, as described at paragraph 8; and

(c)     the likely negative alternative outcomes for Scheme Creditors if the Scheme is not approved and/or the Restructuring is not completed.

**Accordingly, the Board unanimously recommends that the Scheme Creditors vote in favour of the Scheme at the Scheme Meeting.**

## 11.    Contact details

The Information Agent has been appointed by the Company to facilitate communications with Scheme Creditors. All relevant documentation, including the Account Holder Letter and Lender Claim Form can be found on the Scheme Website at www.lucid-is.com/kcadeutag. Scheme Creditors may view and download documents relating to the Scheme from the Scheme Website once they have registered on the Scheme Website by submitting their details. An activation link will then be sent to the email address used to register. If you have any questions in relation to this Explanatory Statement, the Restructuring or the Scheme, please contact the Information Agent using the contact details below:

Lucid Issuer Services Limited
Tankerton Works
12 Argyle Walk
London
WC1H 8HA
Email:          kcadeutag@lucid-is.com
Phone:          +44 (0) 207 704 0880
Attention:      Oliver Slyfield / Jacek Kusion


*Yours sincerely,*

*The Board*

<div align="center">

**PART 2**

**BACKGROUND TO THE COMPANY, THE GROUP AND THE GROUP'S PRINCIPAL
FINANCIAL INDEBTEDNESS**

</div>

**1.      Alpha**

1.1      Alpha is a limited liability company incorporated under the laws of England and Wales. Its registered office address is 1 Park Row, Leeds, England, LS1 5AB. Alpha is the "Parent" under the Credit Agreement.

1.2      Alpha was incorporated on 21 November 2007 with registered number 06433748.

1.3      Alpha's immediate shareholder is Alpha II and, as at the date to this Explanatory Statement, the ultimate holding company of Alpha and the Group as a whole is Holdings I. Holdings I's issued and outstanding share capital is owned by funds controlled or managed by Pamplona Capital Management (33.1%), Al Qahtani Investments LLC (21.8%), GoldenTree Asset Management (17.4%), EIG Global Energy Partners (17.2%), Blackrock (6.5%) and various shareholders who in aggregate hold less than 5% of the issued outstanding share capital of Holdings I.

1.4      A simplified structure chart for the Group, prior to the Scheme Effective Time, is set out in Appendix 11 (Simplified Group Structure Chart) to this Explanatory Statement.

1.5      Alpha is a Guarantor.

**2.      The Company**

2.1      The Company is a public limited company incorporated under the laws of England and Wales and a wholly owned indirect Subsidiary of Alpha. Its registered office address is 1 Park Row, Leeds, England, LS1 5AB.

2.2      The Company was incorporated on 28 April 2014 with registered number 09015065.

2.3      The Company is UK tax resident and has its centre of main interests in England.

2.4      As at the date of this Explanatory Statement, the Company's entire issued and outstanding share capital is held by Abbot, a wholly owned indirect Subsidiary of Alpha. Alpha indirectly beneficially owns 100% of the ordinary share capital of the Company.

2.5      The Company is the issuer of the Existing Notes and is a Guarantor.

2.6      The Company has entered into the Contribution Deed. Further detail regarding the Contribution Deed is set out at paragraph 5.18 of Part 1 (Letter from the Directors of the Company) of this Explanatory Statement.

**3.      Overview of business operations of the Group**

**3.1      Overview**

(a)      The Group is a market-leading international drilling, engineering and technology company serving both onshore and offshore drilling markets. It has a vertically integrated business model, with its engineering and design expertise complementing and enhancing its drilling operations. The Group is one of the largest international land-drilling contractors globally, with a highly sophisticated and flexible rig fleet, and a leader in the designing, engineering and manufacturing of premium land rigs and components.

<div align="center">48</div>

(b)      In terms of international reach, the Group focusses on geographies characterised by attractive industry dynamics (such as low breakeven oil prices, significant levels of industry consolidation and high return on capital) and operates in more than 15 countries, with a strong presence in the Middle East, Russia (including the Caspian Sea), Africa and Europe (including the North Sea). These mature hydrocarbon basins have a high concentration of development and production drilling operations (as opposed to higher risk exploration activities) and are characterised by countries with fiscal budgets that are reliant on revenues from commodity exports, resulting in long-term drilling programs which are less susceptible to normal, cyclical change based on oil and gas market conditions.

(c)      The Group's integrated approach to front-end engineering, design and manufacturing helps the Group acquire and maintain highly competitive market positions by establishing long-term relationships with blue chip customers. The Group's highly regarded drilling expertise has resulted in significant long-term customer relationships with the major international oil and gas companies and their affiliated joint ventures, such as BP, Shell, Total, CNR (Canadian Natural Resources), ExxonMobil, and large national oil and gas companies, including Equinor, PDO, Saudi Aramco and Rosneft.

(d)      The Group's operations are divided between two divisions:

        (i)      Integrated Land Drilling; and

        (ii)      Offshore Drilling Services & Design,

which focus on the onshore and offshore markets, respectively.

(e)      The Group's Integrated Land Drilling division comprises the Land Drilling segment and Bentec, the Group's onshore engineering and manufacturing segment.

(f)      The Group's Offshore Drilling Services & Design division comprises the offshore services and RDS segments.

(g)      In 2019, the Group's Integrated Land Drilling division and Offshore Drilling Services & Design division contributed 70.0% and 30.0%, respectively, of the Group's EBITDA before exceptional items (prior to the allocation of central overheads).

## 3.2    Integrated Land Drilling Division

(a)      The Group's Integrated Land Drilling division combines the Group's leading expertise in design and manufacture of high-end land rigs and components with the Group's reputation as a leading international premium drilling contractor. The Group's ability to build customised, high specification rigs and operate them for customers according to a wide range of specifications and in varied geographic conditions, provides the Group with a unique competitive advantage and allows the Group to provide a broad spectrum of services to the client on a land-drilling project. In many instances, the Group's Land Drilling and Bentec segments work together to provide a potential customer with an integrated bid to build and operate customised rigs (or contract existing rigs from our land-drilling fleet).

(b)      For example, in 2015, Bentec and the Group's Land Drilling segments worked together to define the rig specifications, pricing and operations model specifically to meet the requirements of BP's Khazzan project in Oman, resulting in the Group being awarded the integrated contract to build five customised fast moving land rigs. A more recent example of this is the contract for two new build rigs in Kuwait. The Group have been working with their Kuwaiti partner and representative, the Action Group, to supply and operate two new build drilling rigs for an initial term of five years. The rigs will be procured by the Action Group and leased to KCA Deutag. They will be specified to KCA Deutag global standards and contain state of the art components provided by Bentec. The first of these rigs commenced operations in Q3 2020 with the other expected to start up in Q4 2020.

(c)    *Land Drilling*: With 73 owned land-drilling and work-over rigs as of 31 August 2020, and operations
and maintenance contracts on a further four rigs, plus the two leased rigs in Kuwait, the Group is a
leading provider of land-drilling operations by number of rigs in international markets, including
Russia, the Middle East, Africa and Europe. The Group's rigs range in size, with an emphasis on
medium and high-horsepower rigs (1,500-2,000hp) capable of drilling wells up to 25,000 feet in depth.
Of the Group's 73 owned drilling rigs, 28 have been newly built and 30 have undergone significant
refurbishment since 2010. The Group performs drilling operations for a wide range of customers in a
variety of geographic settings and environments, from equatorial deserts at 55ºC to Siberia at -55ºC.
The rigs are predominantly used in development and production drilling with very low exposure to
exploration activities and a track record of repeat business.

(d)    *Bentec*: Bentec is the trade name of the Group's drilling rig and component engineering and
manufacturing segment, which is based in Bad Bentheim, Germany. The Group is a leader in the
design, engineering and manufacturing of premium land and offshore rigs and components for
international markets as well as for use by the Group's Land Drilling segment. The Group produces
premium, custom-built land rigs, including high-specification rigs capable of drilling under harsh and
remote conditions, as well as key rig components, such as top drives (higher technical-specification
equipment which turns the rig drillstring). The Group also performs after-market repair and
maintenance services for land rigs and components. In 2019, 24.1% of the Group's Bentec segment
revenues came from external sales of rigs, 28.1% was attributable to component sales and 45.1% to
after-sale services and 2.7% from non-oilfield services.

## 3.3    Offshore Drilling Services & Design Division

(a)    The Group's Offshore Drilling Services & Design division combines the Group's ability to undertake
offshore rig design and engineering, from concept to commission, rig refurbishment and re-activation
and subsequently to provide customers with the Group's leading expertise in offshore drilling platform
operations and maintenance management, allowing the Group to capitalise on greater proportions of
an offshore drilling project over the full duration of the project life cycle. By working with the Group's
offshore services segment, the Group's RDS segment gains first-hand knowledge of the operations and
maintenance challenges of offshore drilling platforms, thereby providing insight into ways to enhance
usability and longevity of customers' drilling platforms. Furthermore, engineering and design
proposals put forward by RDS can contribute to the Group's offshore services segment winning the
subsequent operations and maintenance services contract, as the offshore services segment has gained
first-hand knowledge of the engineering and design of the platform through working with the Group's
RDS segment and contributing to the engineering and design project.

(b)    *Offshore services*: The Group is one of the three leading platform-drilling providers in the world by
rig count. The Group manages the drilling facilities on 29 platform rigs and two Cat J jack-up rigs,
that are owned by the Group's customers across the UK North Sea, Norway, Azerbaijan, Sakhalin
Island, Canada and Angola. Furthermore, reactivation work continues in the UK. The Group's offshore
services segment is an asset-light, minimal capital expenditure business that features relatively high
levels of cash generation.

(c)    *RDS*: RDS is the trade name for the Group's offshore Rig Design Services segment. The Group is a
leading provider of engineering services for the design and refurbishment of offshore drilling platforms
and mobile offshore drilling units. The Group's greenfield engineering group designs new drilling rigs,
predominantly large rigs that are integrated into topsides (i.e., above sea level), facilities on offshore
platforms located in harsh environments, as well as drilling facilities on new mobile offshore drilling
units. The Group's brownfield engineering group conducts upgrade, refurbishment, modification and
reactivation design and engineering work for existing drilling facilities. The early involvement of RDS
in customers' new projects through engineering and design positions the Group's offshore services
segment to win future management contracts for such platforms. Of the 31 offshore platform-drilling
facilities the Group manages, approximately 65% were designed or refurbished by RDS.

(d)    For example, in 2010, RDS won the engineering and design contract for ExxonMobil's Hebron drilling platform in Canada. Subsequently, the Group's offshore services segment leveraged its co-operative relationship with RDS to win the associated contract for drilling operations and maintenance services, which has a fixed term comprised of a three-year pre-operations phase followed by a nine-year operations and maintenance program, with a customer extension option. Similarly, the combined RDS and offshore services expertise led to the Group winning the construction support and drilling contracts on the two Statoil CJ-70 harsh environment jack-ups. Both rigs were delivered in 2017.

## 3.4    Financial Performance

(a)    This paragraph contains a brief summary of financial information in relation to the Group. For further information relating to the Group, please see Alpha's financial results as of and for the years ended 31 December 2018 and 31 December 2019 and Alpha's interim financial results as at 30 June 2020 as set out in the Incorporated Documents.

(b)    Notwithstanding anything contrary set forth in this Explanatory Statement, unless the context otherwise requires or otherwise provides for, the Incorporated Documents are hereby incorporated by reference except as otherwise modified, supplemented or superseded by this Explanatory Statement or the other documents incorporated herein.

(c)    The following tables present a summary of the financial data of the Group. The financial statement data presented as at and for the years ended 31 December 2018 and 31 December 2019 and Alpha's interim financial results as at 30 June 2020 has been derived from the Group's internal accounting records and, where relevant, aligns to the Group's audited annual financial statements included in the Incorporated Documents, which should be read in conjunction with this Explanatory Statement. The financial data below also includes certain non-GAAP financial measures used to evaluate the economic and financial performance of the Group. It should be noted that the performance indicators that the Group reports herein, such as EBITDA before exceptional items, are not financial measures defined in accordance with UK GAAP or IFRS and, as such, may be calculated by other companies using different methodologies and having different results. Therefore, these performance indicators may not be directly comparable with similar figures and ratios reported by other companies.

(d)    The financial statement data set forth in the following tables should be read in conjunction with the Incorporated Documents.

**Historical Alpha Consolidated Income Sheet**

|  | 2018 $m | 2019 $m | 2020* $m |
|---|---|---|---|
| **Revenue** | 1,262.6 | 1,359.9 | 630.3 |
| **Operating Costs** | (989.7) | (1,060.7) | (494.7) |
| **EBITDA** | 272.9 | 299.2 | 135.6 |
| **Operating profit (pre-exceptional)** | 62.9 | 85.4 | 33.1 |
| **Operating profit (post-exceptional)** | 8.8 | (2.2) | 31.0 |
| **Loss before tax** | (215.9) | (220.4) | (94.1) |
| **Loss after tax** | (242.5) | (239.2) | (105.9) |

*based on the Interim Financial Statement of Alpha for the six months ended 30 June 2020.

**Historical Alpha Consolidated Balance Sheet**

|  | 2018 $m | 2019 $m | 2020* $m |
|---|---|---|---|
| Non-current assets | 1,993.8 | 1,835.9 | 1,770.2 |
| Current assets | 627.5 | 629.6 | 651.2 |
| Total assets | 2,621.3 | 2,465.5 | 2,421.4 |
| Current Liabilities | (546.8) | (579.6) | (626.6) |
| Non-current liabilities | (2,152.4) | (2,220.5) | (2,242.8) |
| Total liabilities | (2,699.2) | (2,800.1) | (2,869.4) |
| Net (liabilities) assets | (77.9) | (334.6) | (448.0) |
| Total Equity | (77.9) | (334.6) | (448.0) |

*based on the Interim Financial Statement of Alpha for the six months ended 30 June 2020.

**Historical Alpha Consolidated Cash Flows**

|  | 2018 $m | 2019 $m | 2020* $m |
|---|---|---|---|
| Net cash inflow from operating activities | 151.7 | 271.0 | 55.7 |
| Net cash outflow from investing activities | (461.2) | (50.4) | (15.6) |
| Net cash in (out) flow from financing activities | 332.6 | (254.1) | (42.5) |
| Effect of foreign exchange rates | (12.6) | (6.7) | (4.9) |
| Net cash in (out) flow | 10.5 | (40.2) | (7.3) |
| Cash and cash equivalents at end of period | 118.8 | 78.6 | 71.3 |

*based on the Interim Financial Statement of Alpha for the six months ended 30 June 2020.

**4.       Summary of Group's principal financial indebtedness**

**4.1      Summary**

(a)    The Group's principal financial indebtedness consists of the Existing Notes and the Existing Senior Facilities.

(b)    As at 30 September 2020, the Group's total indebtedness under the debt instruments described above stood at approximately USD 1.9 billion and is summarised in the table below and described in further detail in paragraphs 4.2 to 4.4 below.

|  | **Total principal outstanding as at 30 September 2020** | **Total accrued but unpaid interest as at 30 September 2020** |
|---|---|---|
| 2021 Notes | USD 375,000,000 | USD 23,900,000 |
| 2022 Notes | USD 535,000,000 | USD 52,800,000 |
| 2023 Notes | USD 400,000,000 | USD 38,500,000 |
| Term Loan | USD 407,314,617 | USD 16,600,000 |
| Revolving Loans | USD 95,000,000 | USD 4,000,000 |
| Existing Overdraft Facilities | USD 111,200,000. The net overdraft limit is USD 115,000,000 which fluctuates on a daily basis. | USD 2,100,000 |
| Existing LC Facility | USD 39,600,000 | USD 1,000,000 |
| Existing Undertaking Facility | USD 21,400,000 | USD 400,000 |

(c)    Under the Existing Intercreditor Agreement, the indebtedness described above ranks *pari passu* as to right of payment and with respect to enforcement proceeds, and ranks ahead of intercompany claims.

(d)    The indebtedness above benefits from a security package which is regulated by the Existing Intercreditor Agreement. The Existing Security includes security over (i) material assets of Alpha and certain other members of the Group, (ii) shares in certain members of the Group, and (iii) certain other assets including bank accounts of, and intercompany loans owing to, certain members of the Group.

**4.2      Existing Notes**

(a)    There are three sets of Existing Notes: the 2021 Notes, the 2022 Notes and the 2023 Notes.

(b)    The Existing Indentures were originally governed by the law of the state of New York and disputes were subject to the courts of the state of New York. Pursuant to the Supplemental Indentures:

(i)     each Existing Indenture, the Existing Notes and the Guarantees (as defined in each Existing Indenture) and all non-contractual obligations arising out of or in connection with them are now governed by, and shall be construed in accordance with, the laws of England and Wales; and

(ii)    subject to the terms of each Existing Indenture, the courts of England and Wales now have jurisdiction to settle any disputes that arise out of or in connection with each Existing Indenture, the Existing Notes and the Guarantees, and accordingly any legal action or proceedings arising out of or in connection with each Existing Indenture, the Existing Notes and the Guarantees may be brought to such court.

(c)    The Existing Notes are guaranteed by all the same guarantors as those in respect of the indebtedness under the Existing Senior Facilities (other than the Company, being the issuer of the Existing Notes) including, among others, Alpha.

(d)    The trustee under each set of Existing Notes is Deutsche Trustee Company Limited and the paying agent, registrar and transfer agent is Deutsche Bank Trust Company Americas.

**2021 Notes**

(e)    On 16 May 2014, the Company issued the 2021 Notes under the 2021 Notes Indenture.

(f)    Proceeds from the issuance of the 2021 Notes were used to prepay the indebtedness under the then existing senior facilities.

(g)    The 2021 Notes are senior obligations of the Company and rank *pari passu* in right of payment with all its existing and future senior indebtedness that is not subordinated to the 2021 Notes.

(h)    Interest on the 2021 Notes is payable in arrear on 15 May and 15 November each year. The 2021 Notes will mature on 15 May 2021.

**2022 Notes**

(i)    On 5 April 2017, the Company issued the 2022 Notes under the 2022 Notes Indenture.

(j)    Proceeds from the issuance of the 2022 Notes were used to redeem the then outstanding notes of the Company due 2018 and prepay the corresponding proceeds loan in full.

(k)    The 2022 Notes are senior obligations of the Company and rank *pari passu* in right of payment with all its existing and future senior indebtedness that is not subordinated to the 2022 Notes.

(l)    Interest on the 2022 Notes is payable in arrear on 1 April and 1 October each year. The 2022 Notes will mature on 1 April 2022.

**2023 Notes**

(m)    On 9 April 2018, the Company issued the 2023 Notes under the 2023 Notes Indenture.

(n)    Proceeds from the issuance of the 2023 Notes Indenture were used to fund the Dalma Acquisition.

(o)    The 2023 Notes are senior obligations of the Company and rank *pari passu* in right of payment with all its existing and future senior indebtedness that is not subordinated to the 2023 Notes.

(p)    Interest on the 2023 Notes is payable in arrear on 1 April and 1 October each year. The 2023 Notes will mature on 1 April 2023.

**Additional information relating to all Existing Notes**

(q)    Each Existing Indenture contains certain customary high yield covenants that restrict the Company's ability to incur more debt, pay dividends and make distributions or certain other restricted payments,

issue, sell or pledge capital stock, enter into transactions with Affiliates, impair the security interests with respect to the collateral securing the relevant Existing Notes, create liens, dispose of assets, enter into sale and leaseback transactions, guarantee additional debt, and consolidate or merge with or into another entity.

(r)    In addition, each Existing Indenture contains customary events of default, including, among others, the non-payment of principal or interest on the relevant Existing Notes, certain failures to perform or observe other obligations under the relevant Existing Indenture, the occurrence of certain defaults under other indebtedness, failure to pay certain indebtedness and insolvency or bankruptcy events (subject, in certain cases, to agreed grace periods, thresholds and other qualifications).

(s)    The Existing Notes are admitted for trading on the Euro MTF and listed on the Official List of the Luxembourg Stock Exchange.

## 4.3   Term Loan and RCF

(a)    The Term Loan and RCF are each facilities made available to the Group under the Credit Agreement.

(b)    The Credit Agreement was originally governed by the law of the state of New York and disputes were subject to the courts of the state of New York. Pursuant to the Credit and Guaranty Agreement Amendment Agreement:

(i)     the Credit Agreement and the Guaranty Agreement (and all non-contractual obligations arising out of or in connection with the Credit Agreement or the Guaranty Agreement) are now governed by, and shall be construed in accordance with, the laws of England and Wales; and

(ii)    subject to the terms of the Credit Agreement and the Guaranty Agreement (as applicable), the courts of England and Wales now have jurisdiction to settle any disputes that arise out of and in connection with the Credit Agreement or the Guaranty Agreement, and accordingly any legal action or proceedings arising out of or in connection with the Credit Agreement or the Guaranty Agreement may be brought in such courts.

(c)    As noted in paragraph 2.6 above, the Company has entered into the Contribution Deed, which is explained in further detail at paragraph 5.18 of Part 1 (Letter from the Directors of the Company) of this Explanatory Statement.

(d)    Pursuant to the Credit Agreement, the Term Loan was borrowed under the Term Loan Facility and the Revolving Loans were borrowed under the RCF.

(e)    The Existing Senior Facilities are guaranteed by, among others, Alpha and the Company pursuant to the terms of the Guaranty Agreement.

(f)    The administrative agent under the Term Loan is Goldman Sachs Lending Partners LLC and the administrative agent under the Revolving Loans is Lloyds in its capacity as Revolving Credit Administrative Agent.

**Term Loan**

(g)    Borrowings under the Term Loan Facility were used to refinance certain existing debts of the Group including, without limitation, the partial refinancing of certain facilities made available under the then existing senior facilities agreement, for working capital purposes and to pay fees and expenses associated with the Existing Senior Facilities.

(h)    KCA Deutag GmbH is the borrower of the Term Loan.

(i)     Interest is payable on each relevant Interest Payment Date (as such term is defined in the Credit Agreement) and the Term Loan Maturity Date, and the Term Loan is repayable in full on the Term Loan Maturity Date.

**RCF**

(j)     Borrowings under the RCF are used for general corporate purposes (including, without limitation, the financing of permitted acquisitions, capital expenditure or working capital purposes of the Group).

(k)     While the Company, Abbot and certain other members of the Group are the borrowers under the RCF, all borrowings under the RCF are currently borrowed by Abbot.

(l)     Interest is payable on each relevant Interest Payment Date (as such term is defined in the Credit Agreement) and the maturity date is the Revolving Maturity Date.

**4.4     Ancillary Facilities**

(a)     Pursuant to the terms of the Credit Agreement, an RCF Lender may make available ancillary facilities (such as overdrafts, guarantees, short-term loan facilities, derivatives, cash-pooling or foreign exchange facilities), subject to the satisfaction of certain conditions precedent, to a borrower in place of all or part of its unutilised commitment under the RCF.

(b)     The Group has entered into three ancillary facilities:

   (i)     the Existing Overdraft Facilities;

   (ii)    the Existing Undertaking Facility; and

   (iii)   the Existing LC Facility.

(c)     The claims under the Existing Overdraft Facilities are being compromised pursuant to the Scheme. However, the Scheme will not compromise the claims under the Existing LC and Undertaking Facilities. The Existing Overdraft Facilities is a funded facility in contrast to the Existing LC and Undertaking Facilities which represent contingent obligations and are not yet funded. The Liabilities under the Existing LC and Undertaking Facilities are not being included in the Scheme Claims because the Liabilities under these facilities are not being compromised and are instead being consensually reinstated pursuant to the Restructuring in the form of the New LC Facility and the FAB Run-Off LC Facility. For further detail, please see Part 6 (Summary of the Key Restructuring Documents) of this Explanatory Statement.

**Existing Overdraft Facilities**

(d)     Pursuant to a facility letter dated 25 September 2018, HSBC issued the Group with an overdraft, guarantee, letters of credit and cash-pooling facility.

(e)     This facility is an ancillary facility under the Credit Agreement.

(f)     The current facility limit is USD 115,000,000 and the maturity date is the Revolving Maturity Date.

(g)     The Existing Overdraft Facilities has been applied towards general corporate purposes of the Group.

**Existing Undertaking Facility**

(h)     Pursuant to a facility letter dated 27 April 2018, FAB issued the Group with a custom bond, letter of credit and bank guarantee facility.

(i)     This facility is an ancillary facility under the Credit Agreement and ranks senior in right and priority of payment with respect to the Existing Intercreditor Agreement. FAB also benefits from the Existing Security.

(j)     The current facility limit is USD 22,183,661 and the maturity date is the earlier of (a) the date falling four years after the Dalma Acquisition Date, and (b) the Revolving Facility Maturity Date (as defined in the Credit Agreement).

(k)     The Existing Undertaking Facility has been used for the general corporate purposes of the Group.

**Existing LC Facility**

(l)     Pursuant to a facility letter dated 16 May 2014 (as amended and restated from time to time, including on 6 September 2018), Lloyds issued the Group with a letter of credit and bank guarantee multicurrency facility.

(m)     This facility is an ancillary facility under the Credit Agreement and ranks senior in right and priority of payment with respect to the Existing Intercreditor Agreement. Lloyds also benefits from the Existing Security.

(n)     The current facility limit is USD 39,600,000 or its equivalent in any other currency and the maturity date is the earlier of (i) the Revolving Maturity Date and (ii) the date on which it is cancelled by the Company.

(o)     The Existing LC Facility has been used for the general corporate purposes of the Group.

**5.      Details of other financing arrangements of the Group**

(a)     In addition to the financing arrangements mentioned above, the Group has also entered into additional financial indebtedness consisting of the Omani Term Loans, the IDTEC Loan and the HSBC Hedging Arrangements.

(b)     The Scheme will not compromise the claims under the Omani Term Loan, the IDTEC Loan or the HSBC Hedging Agreements and they do not form part of the Restructuring.

(c)     The Group also had an uncommitted and unutilised letter of credit facility with Citicorp North America Inc. dated 21 February 2019 which has now been cancelled.

**5.2     Omani Term Loans**

Oman KCA Deutag Drilling Company LLC, and various other members of the Group, entered into an English law-governed facility agreement on 11 February 2016 under which Oman KCA Deutag Drilling Company LLC has borrowed two term loans of which USD 4,000,000 (in aggregate) is currently outstanding and repayable in monthly payment until December 2020.

**5.3     IDTEC Loan**

The Group's joint venture in Oman, IDTEC, has a term loan with a local bank which currently has USD 979,000 outstanding and is repayable in bi-annual payments until August 2021.

**5.4     HSBC Hedging Arrangements**

The Group manages its hedging exposures with HSBC through the placement of FX spot trades and FX Forward trades. There are currently 9 open FX forward trades in place, which all relate to EUR RUB transactions placed by Abbot on behalf of Bentec in November 2019. These are all non-

deliverable forward trades and have maturity dates ranging from 2 October 2020 through to 6 May 2021.

## PART 3

## FURTHER BACKGROUND TO AND REASONS FOR THE RESTRUCTURING (INCLUDING THE SCHEME)

1. **Events leading up to the entry into the Standstill Agreement**

1.1 As a result of concerns regarding the level of the Group's financial leverage and certain debt maturities in early 2021, the Group engaged Houlihan Lokey as financial adviser in August 2019 to assist (in conjunction with A&O, the Group's longstanding legal advisers) with conducting a strategic review of its balance sheet (including the indebtedness under the Existing Notes and the Credit Agreement) and finding a comprehensive solution to the Group's capital structure. Between August 2019 and March 2020, the Group, in conjunction with its advisers and ultimate shareholders, continued to explore and progress various strategic options to address its capital structure.

1.2 The range of strategic options available to the Group was severely limited by the Covid-19 Pandemic and the OPEC-related Oil Price Reduction. Examples of the direct and indirect negative impact of the Covid-19 Pandemic and the OPEC-related Oil Price Reduction on the Group's business include:

(a) requests from the Group's customers for significant price reductions in relation to the services provided by the Group;

(b) the termination and/or suspension of several of the Group's contracts in connection with its land drilling fleet;

(c) the resulting reclassification of several of the oil platforms where the drilling activities are operated by the Group from operating to stacking mode; and

(d) severe disruptions to the Group's supply chains and its workforce.

1.3 In order to try to mitigate and reduce the impact of the Covid-19 Pandemic and the OPEC-related Oil Price Reduction, the Group took a number of steps, including:

(a) introducing a target to reduce its overhead and land opex costs by 10% in FY2020/21 versus previous expectations;

(b) in April 2020, moving most non-rig based staff to a four-day week for a period of three months, providing an immediate USD4 million saving, and this has subsequently been replaced by a 10% salary cut for most personnel across the Group;

(c) freezing the backfilling of any positions and overall recruitment;

(d) stopping all non-business critical spending; and

(e) aligning headcount and overheads across all areas of the Group with activity reductions, identifying additional cost reduction initiatives and monitoring government support opportunities (e.g., the short time working initiative in Germany).

1.4 Despite the measures set out in paragraph 1.3 above, the continuing impact of the Covid-19 Pandemic and the OPEC-related Oil Price Reduction led to a significant deterioration in the Group's financial position (especially in relation to its short-term liquidity).

1.5 Furthermore, in addition to the significant short-term impact of the Covid-19 Pandemic and the OPEC-related Oil Price Reduction, the Group also determined that, given its considerable exposure to the oil and gas sector, the ongoing impact of the Covid-19 Pandemic combined with lower demand for oil

(and a corresponding drop in the price of oil) was likely to have a medium to long-term impact on its business and financial outlook.

1.6    In light of the situation described above, on 26 March 2020 the Group announced that it (a) was planning to utilise the applicable grace periods in relation to the April 2020 Interest Payments in order to give it more time to evaluate and assess the impact of the Covid-19 Pandemic and the OPEC-related Oil Price Reduction on its business and operations; and (b) would be engaging with its creditors (including the Ad-Hoc Committee and the RCF Lenders (including the Revolving Loan Lenders and the Existing Overdraft Provider) and each of their respective advisers).

## 2.    Negotiations with creditors

### *Entry into Standstill Agreement*

2.1    Having used the applicable grace periods in respect of the April 2020 Interest Payments to further assess its financial position and potential options and following negotiations with the Ad-Hoc Committee and the RCF Lenders (and each of their respective advisers), the Group announced on 2 May 2020 that, in order to provide stability while it continued to evaluate the impact of the Covid-19 Pandemic and the OPEC-related Oil Price Reduction, it had entered into the Standstill Agreement[12].

2.2    Under the terms of the Standstill Agreement, the members of the Ad-Hoc Committee, the RCF Lenders and the other creditors party thereto agreed to standstill arrangements (including restrictions on enforcement action and forbearances in relation to specified defaults described in paragraph 2.3 below) in respect of the indebtedness under the Existing Notes and the Credit Agreement for the Standstill Period. The Group gave various undertakings under the Standstill Agreement (including in relation to the provision of financial information regarding the Group and the preparation of a proposal for the financial restructuring of the Group's balance sheet) and accepted certain restrictions on the conduct of its business. Pursuant to the terms of the Standstill Agreement, it was also agreed that the Group would not make the April 2020 Interest Payments or (subject to certain limited exceptions) any other interest or amortisation payments due under the Existing Indentures or the Credit Agreement during the Standstill Period.

2.3    The members of the Ad-Hoc Committee, the RCF Lenders and the other creditors party to the Standstill Agreement agreed (as applicable), for the duration of the Standstill Period (as defined in the Standstill Agreement) to temporarily forbear from exercising any rights or remedies they may have as a result of:

(a)    in relation to the Credit Agreement, any Default or Event of Default (both as defined in the Credit Agreement) which may occur due to the breach of:

(i)    the financial covenant set out in section 6.22 (Financial Covenant) of the Credit Agreement in respect of the Quarter Period (as defined in the Credit Agreement) ending on 31 March 2020 and each Quarter Period ending during the Standstill Period;

(ii)    section 7.01(a) or 7.01(b) of the Credit Agreement as a result of any amount not being paid under the Credit Agreement during the Standstill Period;

(iii)    section 7.01(f) of the Credit Agreement as a result of (x) any amount not being paid under the Existing Financings (as defined in the Standstill Agreement) during the Standstill Period or (y) any other default referred to in paragraph 5 of the Standstill Agreement;

---

[12]    One RCF Lender acceded to the Standstill Agreement shortly thereafter, following completion of its internal credit approval process.

(iv)    section 7.01(g)(v) of the Credit Agreement as a result of any amount not being paid under the Existing Financings (as defined in the Standstill Agreement) during the Standstill Period or the entry into of the Standstill Agreement or any public announcement relating to the same; and

(v)    section 7.01(j) or 7.01(l) of the Credit Agreement solely due to circumstances which, as at the date of the Standstill Agreement, have arisen, or could reasonably be expected to arise, directly or indirectly as a result of the Covid-19 Pandemic or the OPEC-related Oil Price Reduction.

(b)    In relation to the Existing Notes, any Default or Event of Default (as both defined in the relevant Existing Indenture) which may occur due to the breach of:

(i)    section 6.01(a)(1) of each Existing Indenture in respect of which they hold Existing Notes as a result of any amount of interest not being paid under that Existing Indenture during the Standstill Period;

(ii)    section 6.01(a)(5) of each Existing Indenture as a result of (x) any amount not being paid under the Existing Financings (as defined in the Standstill Agreement) during the Standstill Period or (y) any other default referred to in paragraph 5 of the Standstill Agreement; and

(iii)    section 6.01(a)(9)(E) of the 2021 Notes Indenture and the 2022 Notes Indenture and section 6.01(a)(10)(E) of the 2023 Notes Indenture as a result of any amount not being paid under the Existing Financings (as defined in the Standstill Agreement) during the Standstill Period or the entry into of the Standstill Agreement or any public announcement relating to the same.

***Work Fee***

2.4    As a condition precedent to the effectiveness of the Standstill Agreement, Alpha and certain other members of the Group entered into the Work Fee Letters. Pursuant to the Work Fee Letters, Alpha agreed to pay or to procure the payment to:

(a)    the members of the Ad-Hoc Committee party to the AHC Work Fee Letter of the AHC Work Fees; and

(b)    the RCF Lenders (including Lloyds (who is not a Scheme Creditor) and to FAB (who is not a Scheme Creditor in relation to the Existing Undertaking Facility)) party to the RCF Work Fee Letter of the RCF Work Fees,

which Work Fees have been paid as at the date of this letter and represent the total amount of fees payable under the Work Fee Letters.

2.5    The Group considers the Work Fees to be appropriate in light of the work that:

(a)    has been undertaken by the Ad-Hoc Committee and RCF Lenders in connection with the Standstill Agreement, the Lock-Up Agreement, the negotiation of the terms of the Restructuring and its implementation, including:

(i)    participating in calls and meetings with the advisers to, and representatives of, the Group;

(ii)     reviewing, assessing and providing feedback on proposals made by the Group in connection with the Standstill Agreement, the Lock-Up Agreement and the Restructuring;

(iii)    reviewing, assessing and providing feedback on draft documentation relating to the Standstill Agreement, the Lock-Up Agreement and the Restructuring;

(iv)    working with fellow creditors and other stakeholders to build a consensus around the terms of the Restructuring; and

(v)     liaising with current and prospective management in relation to the Restructuring; and

(b)    continues to be undertaken by the Ad-Hoc Committee and RCF Lenders to in relation to the implementation of the Restructuring.

## 3.    Support for the Restructuring

3.1    On 31 July 2020, after a period of further discussions between the Group, the Ad-Hoc Committee, the RCF Lenders and certain other stakeholders (including the Group's ultimate shareholders), the Group announced that the Company and certain other members of the Group had entered into the Lock-Up Agreement setting out the agreed commercial terms of the Restructuring. As the ultimate shareholders of the Group had, after negotiations with the Ad-Hoc Committee, agreed to support the Restructuring, Holdings I (being the ultimate holding company of the Group) and certain other holding companies in the Group structure entered into the Lock-Up Agreement as original parties thereto.

3.2    A copy of the Lock-Up Agreement is available on the Group's website[13] and an unredacted copy is available on the Scheme Website.

3.3    Under the Lock-Up Agreement, the Company and the other parties thereto, other than FAB, have agreed, amongst other things, that they will:

(a)    promptly take all actions required pursuant to and in accordance with the Lock-Up Agreement and the Restructuring Steps Plan which are necessary to facilitate, implement, consummate or otherwise give effect to all or any part of the Restructuring; and

(b)    not take, encourage, assist or support (or procure that any other person takes, encourages, assists or supports) any action which would, or would reasonably be expected to, breach or be inconsistent with the Lock-Up Agreement, the Restructuring Term Sheets or the Restructuring Steps Plan (taken as a whole) or delay, impede or prevent the implementation or consummation of all or any part of the Restructuring.

3.4    Pursuant to the terms of the Lock-Up Agreement, each Participating Creditor (other than FAB) has acknowledged and submitted to the jurisdiction of the English court in respect of the Scheme and agreed that it shall enter an appearance formally in connection with the Scheme (if required by the Court or, if any creditor that is not a Participating Creditor formally objects to the Scheme, as reasonably requested by Alpha II) or be willing to be joined formally to the Scheme as a defendant (if required by the Court).

3.5    FAB is a party to the Lock-Up Agreement. Pursuant (and subject) to the terms of the Lock-Up Agreement, FAB has agreed to take actions which are necessary to facilitate, implement, consummate or otherwise give effect to the FAB Run-Off LC Facility.

---

13    https://www.kcadeutag.com/investors/news/Documents/Cleansing%20Announcement%20Lock-up%20Agreement%20FINAL.pdf

### Effectiveness of the Lock-Up Agreement

3.6    The Lock-Up Agreement was initially signed by, among others, the Obligors, each member of the Ad-Hoc Committee and certain RCF Lenders.

3.7    The Lock-Up Agreement became effective in accordance with its terms on 31 July 2020.

3.8    As at 8 October 2020, the Lock-Up Agreement had been signed or acceded to by:

    (a)    Existing Noteholders holding 92.76% of the aggregate outstanding principal amount of the 2021 Notes;

    (b)    Existing Noteholders holding 99.08% of the aggregate outstanding principal amount of the 2022 Notes;

    (c)    Existing Noteholders holding 99.01% of the aggregate outstanding principal amount of the 2023 Notes;

    (d)    Term Loan Lenders holding 96.43% of the aggregate outstanding principal amount of the Term Loan;

    (e)    Revolving Loan Lenders holding 89.47% of the aggregate outstanding principal amount of the Revolving Loans; and

    (f)    the Existing Overdraft Provider, Lloyds and FAB.

### Amendment to the Lock-Up Agreement

3.9    Following further due diligence and discussions between the Group's advisers and the advisers to the Ad-Hoc Committee and the RCF Lenders, it was agreed that implementing the Restructuring in accordance with steps set out in the Restructuring Steps Plan originally scheduled to the Lock-Up Agreement would require one or more clearances from the FAS to be obtained before the completion of the Restructuring in order to comply with the Russian Strategic Investment Law.

3.10    As the Group was advised by its Russian counsel that it would not be feasible to obtain the requisite clearances from the FAS within the timescale contemplated by the Lock-Up Agreement for the completion of the Restructuring, certain amendments were required to be made to the Restructuring Steps Plan. Accordingly, pursuant to the Restructuring Steps Plan Amendment Letter (which was circulated by the Information Agent to all Participating Creditors on 8 October 2020 and is available to all Scheme Creditors on the Scheme Website), the Company requested that the Majority Participating AHC Creditors and the Majority Participating RCF Lenders consent to the Restructuring Steps Plan Amendment. The consent was received and the Restructuring Steps Plan Amendment became effective on 8 October 2020.

3.11    While the key terms of the Restructuring remain unchanged, as a result of the Restructuring Steps Plan Amendment, the steps that will be taken to implement the Restructuring are now different in certain respects to the steps summarised in paragraph 6 of the Practice Statement Letter. The principal differences are that, in accordance with the Restructuring Steps Plan (as amended by the Restructuring Steps Plan Amendment):

    (a)    Alpha II has acquired all of the shares in Jersey Newco (and, as a result, indirectly acquired English NewCo 1 and English NewCo 2) from Crestbridge Corporate Nominees Limited (being an entity controlled by Crestbridge, the corporate services provider which arranged for Jersey Newco to be incorporated) for nil consideration;

(b)     following the Scheme Effective Time but prior to the Restructuring Effective Date, Alpha II will transfer all of the shares in Alpha to English NewCo 2 for nil consideration (with the shares in Alpha remaining subject to the relevant Existing Security); and

(c)     as part of the Restructuring Steps, Alpha II will transfer 100% of the shares in Jersey Newco to certain of the Scheme Creditors (to be selected, subject to certain limitations set out in the Restructuring Implementation Deed, by the Company in its discretion (in consultation with the Ad-Hoc Committee and the Existing Overdraft Provider (or their respective advisers)) for nil consideration.

3.12    As originally contemplated, at a later Restructuring Step, Jersey Newco will issue the Jersey Newco Consideration Shares to each Scheme Creditor or its Nominee (or the Holding Period Trustee, on behalf of each Unadmitted Scheme Creditor in respect of the Jersey Newco Shares) such that the relevant Scheme Creditor or its Nominee (or the Holding Period Trustee, as applicable) receives Jersey Newco Consideration Shares in an aggregate amount equal to the relevant Scheme Creditor's Jersey Newco Share Entitlement (as adjusted for any Jersey Newco Shares held by a Scheme Creditor prior to this Restructuring Step).

3.13    As noted above, despite the changes to the Restructuring Steps Plan and the differences referred to in paragraph 3.11 above, the economic terms of the Scheme and the Restructuring are unchanged and the Restructuring Steps to occur after the transfer of Jersey Newco to certain of the Scheme Creditors remain materially consistent with the steps summarised in the Practice Statement Letter.

*Lock-Up Fee*

3.14    Each Creditor who became a Participating Creditor within ten Business Days of the Effective Date became entitled to receive the Lock-Up Fee. The Lock-Up Fee was paid to each relevant Participating Creditor on 21 August 2020 (being 15 Business Days after the Effective Date).

3.15    The payment of the Lock-Up Fee was (and continues to be) considered by the Group to have been appropriate in order to secure early support for the Restructuring from the Group's diverse and numerous Creditors in order to provide the Group with a degree of commercial comfort regarding the implementation of the Restructuring. All Existing Noteholders, Term Loan Lenders and RCF Lenders had the opportunity to enter into the Lock-Up Agreement within ten Business Days of its effective date and thereby become eligible to receive the Lock-Up Fee.

## 4.     Third-party support for the Scheme

4.1     In order to successfully implement the Restructuring through the Scheme, participation is required from, *inter alios*, the following third parties (each of which is an Undertaking Party, with the exception of FAB):

(a)     Jersey Newco;

(b)     English NewCo 1;

(c)     English NewCo 2;

(d)     the Holdcos;

(e)     the Obligors (other than the Company);

(f)     FAB (in its capacity as an Existing Ancillary Lender and as a New Bilateral Lender);

(g)     Lloyds (in its capacities as an Existing Ancillary Lender and as a New Bilateral Lender);

(h)     HSBC (in its capacity as a New Bilateral Lender);

(i)     each Existing Trustee;

(j)     each Existing Administrative Agent;

(k)     the Existing Security Agent;

(l)     the Information Agent;

(m)     the Holding Period Trustee;

(n)     the New Security Agent;

(o)     the New Trustee; and

(p)     Lucid Agency Services Limited (in its capacities as Paying Agent, Registrar and Transfer Agent (in each case as defined in the New Notes Indenture)).

4.2     Each of the Undertaking Parties will execute and deliver, prior to the Sanction Hearing, an Undertaking Deed in favour of the Court, the Company and the relevant Scheme Creditors (as applicable pursuant to which it will agree to the Scheme and agree and undertake to the Court, the Company and the Scheme Creditors (as applicable), on and from the Scheme Effective Time, among other things:

(a)     to be bound by the Scheme and the applicable Restructuring Documents;

(b)     to promptly do all such acts and things necessary for the purpose of giving effect to the Scheme and the applicable Restructuring Documents; and

(c)     to promptly execute and deliver each of the Restructuring Documents (and related documents) to which it is party.

4.3     Having executed the Lock-Up Agreement, FAB has agreed and is expected to execute and deliver a support letter to the Company, prior to the Sanction Hearing, pursuant to which, subject to the terms of the Lock-Up Agreement, FAB will undertake to take any and all actions required pursuant to and in accordance with the Lock-Up Agreement and the Restructuring Steps Plan which are necessary to facilitate, implement, consummate or otherwise give effect to the documentation of the FAB Run-Off LC Facility (including, without limitation, executing and delivering to the Company the Restructuring Implementation Deed) on and from the Scheme Effective Time.

# PART 4

## CERTAIN LEGAL ASPECTS OF THE SCHEME

**1.      Scheme of arrangement overview**

1.1      The Scheme is being proposed by the Company under the laws of England and Wales in order to enable the implementation of the Restructuring.

1.2      A scheme of arrangement is a formal procedure under Part 26 of the Companies Act which allows a company to agree a compromise or arrangement with its creditors (or classes of creditors), and for the terms of that compromise or arrangement to bind any non-consenting or opposing minority creditors.

1.3      In order to become effective and legally binding, a scheme of arrangement under English law must be:

(a)      approved by a majority in number (above 50%) representing at least 75% in value of each class of creditors present and voting either in person or by proxy at the relevant scheme meeting convened by the Court to approve the scheme of arrangement;

(b)      sanctioned by the Court; and

(c)      delivered to the Registrar of Companies in England and Wales with a copy of the Sanction Order.

1.4      If a scheme of arrangement is approved by the requisite majorities and sanctioned by the Court and the Sanction Order is delivered to the Registrar of Companies, the scheme of arrangement will become effective in accordance with its terms and bind all the creditors subject to it, including those creditors who voted against it or did not vote at all, together with their successors and assigns.

1.5      A scheme of arrangement cannot be sanctioned by the Court unless the Court is satisfied, among other things, that the relevant provisions of Part 26 of the Companies Act have been complied with and that an intelligent and honest person being a member of the class concerned and acting in respect of his/her own interest, might reasonably approve the scheme of arrangement. However, among other matters, it does not need to be the only fair scheme or the "best scheme" which could reasonably have been agreed to by the Court.

1.6      The actions required of the Scheme Creditors in connection with the Scheme are set out in detail in Appendix 7 (Instructions and Guidance for Scheme Creditors) to this Explanatory Statement, to which Scheme Creditors should refer.

1.7      A summary of the following items is set out below:

(a)      the identity of the Scheme Creditors;

(b)      an explanation of class constitution at the Scheme Meeting;

(c)      the process for and voting at the Scheme Meeting;

(d)      when the Scheme will become effective; and

(e)      recognition of the Scheme in the United States, Russia, Norway, Oman and Germany if approved by Scheme Creditors and sanctioned by the Court.

## 2.    Identity of the Scheme Creditors

2.1    The creditors who are bound by the terms of the Scheme, if it becomes effective, are referred to in the Scheme Document as Scheme Creditors.

2.2    The Scheme Creditors in respect of the Existing Notes are the Existing Noteholders, the Existing Trustee, the Existing Custodian and the Existing Depositary.

2.3    However, the Existing Noteholders, as the beneficial owners of and/or the persons with the ultimate economic interest in the Existing Notes, are the persons with the "real" interest in the Scheme Claims in respect of the Existing Notes and accordingly the Existing Noteholders at the Principal Record Time will be entitled to vote at the Scheme Meeting in respect of the Scheme. Although the Existing Custodian and the Existing Depositary (in accordance with their respective customary practices) and the Existing Trustee (by giving an undertaking not to vote) have agreed that they will not vote at the Scheme Meeting or receive any Scheme Consideration, they remain Scheme Creditors. For the avoidance of doubt, the Account Holders are not Scheme Creditors unless and to the extent that they have a beneficial interest in the Existing Notes.

2.4    The Scheme Creditors in respect of the Term Loan are the Term Loan Lenders, the Scheme Creditors in respect of the Revolving Loans are the Revolving Loan Lenders and the Scheme Creditor in respect of the Existing Overdraft Facilities is the Existing Overdraft Provider.

2.5    The Scheme will not compromise the claims under the Existing LC and Undertaking Facilities. The Liabilities under the Existing LC and Undertaking Facilities are not Scheme Claims because the Liabilities under these facilities will not be compromised and will instead be consensually reinstated:

(a)    in the case of the Liabilities under the Existing LC Facility (other than in respect of any accrued and unpaid interest and fees under the Existing LC Facility), under the New LC Facility, which will be made available to certain members of the Group by Lloyds and which will allow those members of the Group to continue to request new letters of credit, guarantees and other relevant instruments in accordance with the terms of the New Lloyds LC Facility Agreement;

(b)    in the case of the Liabilities under the Existing Undertaking Facility (other than in respect of any accrued and unpaid interest and fees under the Existing Undertaking Facility), under the FAB Run-Off LC Facility, which will be made available to certain members of the Group by FAB and under which the Liabilities under the Existing Undertaking Facility will run-off during the term of the FAB Run-Off LC Facility (which will expire on the original maturity date specified in the Existing Undertaking Facility). For the avoidance of doubt, members of the Group will not be able to request new letters of credit, guarantees or other relevant instruments under the terms of the FAB Run-Off LC Facility; and

(c)    with any accrued and unpaid interest and fees under the Existing LC Facility any accrued and unpaid interest and fees under the Existing Undertaking Facility both being paid at the end of November 2020.

2.6    Lloyds was an original party to the Lock-Up Agreement and will execute an undertaking in favour of, among others, the Court and the Company pursuant to which it will undertake and agree, amongst other matters, to perform those actions which it is required to perform in accordance with the terms of the Scheme (including entering into the Restructuring Implementation Deed) and, where necessary, be bound by the terms of the Scheme as sanctioned by the Court, on and from the Scheme Effective Time.

2.7    FAB has also acceded to the Lock-Up Agreement and will, subject to the terms of the Lock-Up Agreement, take the actions which are necessary to facilitate, implement or otherwise give effect to

the documentation for the FAB Run-Off LC Facility. Furthermore, prior to the Sanction Hearing, FAB has agreed and is expected to execute and deliver a support letter to the Company pursuant to which FAB will undertake, subject to the terms of the Lock-Up Agreement, to take any and all actions required pursuant to and in accordance with the Lock-Up Agreement and the Restructuring Steps Plan which are necessary to facilitate, implement, consummate or otherwise give effect to the documentation of the FAB Run-Off LC Facility (including, without limitation, executing and delivering to the Company the Restructuring Implementation Deed) on and from the Scheme Effective Time.

2.8     If the Scheme becomes effective, each Scheme Creditor's Scheme Creditor Entitlements will be determined based on its Scheme Claim as at the relevant Record Time. The Company shall not be under any obligation to recognise any assignment or transfer of Scheme Claims after the relevant Record Time, provided that, where the Company has received from the relevant parties written notice of such assignment or transfer, the Company may in its absolute discretion, and subject to such evidence as it may reasonably require, agree to recognise such assignment or transfer, subject to the assignee or transferee agreeing to be bound by the terms of the Scheme and to be treated as having been a Scheme Creditor for the purposes of the Scheme.

2.9     In relation to the Existing Overdraft Provider, the amount of the Existing Overdraft Liabilities to be compromised by the Scheme and the Restructuring Implementation Deed (being a Scheme Claim) shall be an amount equal to the Compromised Overdraft Amount, provided that the maximum Compromised Overdraft Amount for the purposes of the Scheme and the Restructuring Implementation Deed shall not exceed USD 115,000,000 plus the aggregate amount of any accrued and unpaid interest and fees under the Existing Overdraft Facilities as at the Existing Overdraft Record Time.

2.10    For the purposes of calculating the Compromised Overdraft Amount, any amounts under the Existing Overdraft Facilities that are denominated in a currency other than dollars shall be converted by the Company into dollars using the HSBC Mid-Market Rate (or if the HSBC Mid-Market Rate is not accessible by the Company at the Existing Overdraft Record Time, the Bank of England Exchange Rate).

## 3.    Scheme Classes

*The existing rights of the Scheme Creditors against the Company*

3.1     The Company considers that the existing rights of the Scheme Creditors against the Company are not so dissimilar as to make it impossible for them to consult together with a view to a common interest, notwithstanding that the Existing Notes, the Term Loan, the Revolving Loans and the Existing Overdraft Facilities have different rates of interest and maturity. This is because:

(a)     under the Existing Intercreditor Agreement, which governs the relationship between, among others, the Scheme Creditors, the Liabilities in respect of the Existing Notes, the Term Loan, the Revolving Loans and the Existing Overdraft Facilities all rank *pari passu* as between themselves;

(b)     the Existing Notes, the Term Loan, the Revolving Loans and the Existing Overdraft Facilities all benefit from the same security and guarantee package;

(c)     the outstanding events of default under each Existing Indenture and the Credit Agreement mean that each series of Existing Notes, the Term Loan, the Revolving Loans and the Existing Overdraft Facilities are all capable of acceleration and the security under the Existing Intercreditor Agreement is capable of enforcement in accordance with the terms of the Existing Intercreditor Agreement, in each case but for the terms of the Lock-Up Agreement;

(d)     if the Company was to enter into an insolvency or bankruptcy proceeding, each Scheme Creditor would be treated the same way when proving in the insolvency or bankruptcy;

(e)     although there are differences between the economic terms and the maturities for the Existing Notes, the Term Loan, the Revolving Loans and the Existing Overdraft Facilities, these differences are not so substantial as to fracture the class in circumstances where the most likely alternative to the Scheme is a distressed, accelerated sale of the individual business units within the Group (with any residual part of the Group and its assets entering insolvency or bankruptcy proceedings) or, if such sales are not achievable in the time available, the entry into formal insolvency or bankruptcy proceedings of the entire Group; and

(f)     in all the circumstances, there is more to unite than divide all of the Scheme Creditors, so as to make any further classes unnecessary.

*The rights of the Scheme Creditors under the Scheme*

3.2     The Company considers that the rights of the Scheme Creditors under the Scheme would not prevent them from consulting together with a view to a common interest because there is no different treatment of the Existing Noteholders, the Term Loan Lenders, the Revolving Loan Lenders and the Existing Overdraft Provider. In particular:

(a)     each Scheme Creditor will be entitled to the same Scheme Consideration on a rateable basis;

(b)     the rights conferred on each shareholder that holds the Jersey Newco Shares are identical, as there is a single class of shares to be allotted as part of the issuance of the Jersey Newco Consideration Shares and the rights within that class are identical. However, certain of those rights are qualified by minimum holdings requirements. In particular, a shareholder that (with its Affiliates) holds at least ten % in aggregate of the Jersey Newco Shares is entitled to nominate directors for approval by a Major Shareholder Majority (as defined in the Jersey Newco Investment Agreement) and to appoint one observer to the board. In addition, shareholders who hold less than five % in aggregate of the Jersey Newco Shares, will not be entitled to vote (save for certain important matters, being Shareholder Super Reserved Matters, such as the alteration of the Jersey Newco Articles of Association), and shareholders who hold at least one % aggregate of the Jersey Newco Shares following the Restructuring Effective Date will have certain information rights as more fully set out in the Jersey Newco Investment Agreement. The Company does not consider that these different thresholds affect the composition of classes for the Scheme Meeting, as all relevant shareholder rights are identical and any difference in the enjoyment of those rights results from the number of shares held by a Scheme Creditor or by its Affiliates; and

(c)     due to the fact that Scheme Creditors may continue to trade their exposures in respect of the Existing Notes, the Term Loan and the Revolving Loans up to the Record Time, the Company was not, as a practical matter at the time at which it was required to formulate the class composition for the Scheme Meeting, in a position to determine definitively which Scheme Creditors hold more than 5% and more than 10% of the Scheme Claims. Therefore, even if it was necessary to convene separate class meetings of Scheme Creditors based on these criteria, the Company could not have confidently proposed which Scheme Creditors should be placed in which class as at the relevant date.

*Impact of Work Fees*

3.3     The Company does not consider that the Work Fees give rise to any separate class issues, particularly as:

(a)  the Work Fees are *de minimis* and not material (looked at in isolation or together with the Lock-up Fee) in the context of both the total amount of the Scheme Claims and the Scheme Creditor Entitlements[14];

(b)  the members of the Ad-Hoc Committee and RCF Lenders have assisted the Company's advisers in connection with the Standstill Agreement, the Lock-Up Agreement, the negotiation of the terms of the Restructuring and its implementation, including:

   (i)   participating in calls and meetings with the advisers to, and representatives of, the Group;

   (ii)  reviewing, assessing and providing feedback on proposals made by the Group in connection with the Standstill Agreement, the Lock-Up Agreement and the Restructuring;

   (iii) reviewing, assessing and providing feedback on draft documentation relating to the Standstill Agreement, the Lock-Up Agreement and the Restructuring;

   (iv)  working with fellow creditors and other stakeholders to build a consensus around the terms of the Restructuring; and

   (v)   liaising with current and prospective management in relation to the Restructuring;

(c)  the Work Fees are not a term of the Scheme nor does the entitlement to the Work Fees arise under or in connection with the Lock-Up Agreement;

(d)  the Work Fees are not intended to induce the relevant members of the Ad-Hoc Committee or the RCF Lenders to vote in favour of the Scheme; and

(e)  all the Work Fees payable pursuant to the Work Fee Letters have already been paid in full and are not therefore an entitlement under or conditional upon the Scheme.

*Impact of Lock-Up Agreement*

3.4  The Company has considered whether the Lock-Up Agreement gives rise to any separate class issues. The Company has concluded that it does not as:

(a)  the existence of the Lock-Up Agreement is information available to all Scheme Creditors; and

(b)  the Lock-Up Agreement is open to all Scheme Creditors should they wish to accede to it.

*Impact of Lock-Up Fee*

3.5  The Company does not consider that the Scheme Creditors who have acceded to the Lock-Up Agreement need to be put into a separate class for the purpose of voting on the Scheme, particularly as:

(a)  all Scheme Creditors were given equal opportunity to accede to the Lock-Up Agreement;

(b)  the Lock-Up Fee has already been paid on 21 August 2020 to each eligible Scheme Creditor;

(c)  the Lock-Up Fee is not a term of, or linked to the outcome of, the Scheme;

---

[14]  Using an estimated aggregate principal amount of Scheme Claims of USD 1,927,314,617, the Work Fees (a total of USD 23,374,288.09, including amounts paid to RCF Lenders that are not Scheme Creditors) represents approximately 1.2% of this total.

(d)     it is unlikely that a Scheme Creditor that considered any substantive aspect of the Scheme to be against its interests would be persuaded to vote in favour by the existence of the Lock-Up Fee;

(e)     the alternative of a distressed, accelerated sale of the individual business units within the Group (with any residual part of the Group and its assets entering insolvency or bankruptcy proceedings) or, if such sales are not achievable in the time available, the entry into formal insolvency or bankruptcy proceedings of the entire Group would result in the Scheme Creditors suffering very significant losses compared to the proposed rights under the Scheme and in that context the Lock-Up Fee is not a material factor; and

(f)     the Company considers that the quantum of the Lock-Up Fee is *de minimis* in the context of the total amount of both the Scheme Claims and the Scheme Consideration.[15]

*Impact of Scheme Creditors who are not Eligible Persons*

3.6     The Company does not consider that Scheme Creditors who are not Eligible Persons should be put in a separate class because:

(a)     if a Scheme Creditor is not an Eligible Person, the Scheme Creditor is nonetheless entitled to nominate a Nominee to hold the Scheme Consideration;

(b)     in any event, if a Scheme Creditor does not claim the Scheme Consideration to which it is entitled (because it is not an Eligible Person or otherwise) that Scheme Consideration will be held on trust in accordance with the Holding Period Trust Agreement for the Holding Period and (if still unclaimed) will thereafter be sold. The proceeds of sale will be available to be claimed by the relevant Scheme Creditor for a further six-month period; and

(c)     although a Scheme Creditor who is not an Eligible Person has different interests as compared to an Eligible Person, the differences do not fracture the class.

*Impact of payment of fees, costs and expenses of the Ad-Hoc Committee's advisors and the advisors to the RCF Lenders*

3.7     The Company does not consider that payment of fees, costs and expenses incurred by the Ad-Hoc Committee's advisors and the advisors to the RCF Lenders represent a net "benefit" to the Ad-Hoc Committee or to the relevant RCF Lenders in the usual sense. All fees, costs and expenses incurred by the Ad-Hoc Committee's advisors and the advisors to the RCF Lenders in connection with the negotiation, preparation and implementation of the Scheme will be covered by the Group in accordance with certain fee arrangement letters entered into by the applicable parties. In this regard, it should be noted that:

(a)     the fees, costs and expenses relate solely to the negotiation of the Restructuring and the implementation thereof and would not have arisen if the Restructuring was not proposed to take place. Accordingly, the payment of the fees, costs and expenses of the Ad-Hoc Committees advisors and the advisors to the RCF Lenders does not represent a net "benefit" to the Ad-Hoc Committee or the RCF Lenders (not all of whom are Scheme Creditors) in the usual sense;

(b)     the Ad-Hoc Committee's advisors and the advisors to the RCF Lenders have assisted the Company's advisors in drafting the documents relating to the Restructuring and devising the

---

[15]     Using an estimated aggregate principal amount of Scheme Claims of USD 1,927,314,617, the Lock-Up Fee received by the relevant Scheme Creditors (a total of USD 2,749,119.23) represents approximately 0.14% of this total.

transaction structure. Accordingly, to that extent, the work carried out by the relevant advisers was for the benefit of all creditors; and

(c)      the Company is not aware of any fees, costs or expenses incurred by any other Scheme Creditor in relation to the Scheme. Had any other Scheme Creditor wished to participate in the development of the Restructuring, the Company would have been willing to pay the reasonable fees, costs and expenses of that Scheme Creditor's advisors. In the event, no other creditor advisory costs have emerged and there is no reason to believe that any other Scheme Creditor will be left out of pocket.

3.8     For the reasons set out in this paragraph 3, the Company considers that the rights of the Scheme Creditors are not so dissimilar as to make it impossible for them to consult together with a view to a common interest. Rather, the Company considers that the Scheme Creditors are able to consult together, irrespective of the fact that some Scheme Creditors may hold Scheme Claims in respect of:

(a)      different series of Existing Notes;

(b)      the Term Loan;

(c)      the Revolving Loans; and/or

(d)      the Existing Overdraft Facilities.

3.9     Accordingly, it is proposed that the Scheme Meeting is convened for the purposes of considering and, if the Scheme Creditors think fit, approving the Scheme.

## 4.    Scheme Meeting

4.1     Before the Scheme can become effective and binding on the Company and the Scheme Creditors, the Scheme must be passed by the requisite majorities (as set out above) at the Scheme Meeting.

4.2     The Court gave directions on 15 October 2020 for the Scheme Meeting to be convened on 30 October 2020 and to commence at 10:30 am.

4.3     A formal notice of the Scheme Meeting is set out in this document at Appendix 10 (Notice of Scheme Meeting) to this Explanatory Statement. In light of the ongoing Covid-19 Pandemic, the Scheme Meeting will take place via webinar using the Zoom communications platform. A Scheme Creditor wishing to attend the Scheme Meeting (via webinar) should first complete the Account Holder Letter and/or Lender Claim Form (as applicable) via the Scheme Website before the Voting Instruction Deadline and, upon validation of such forms by the Information Agent, will be provided with details in order to access the Scheme Meeting if they so wish. Scheme Creditors should note that they will only be provided with access details once the Information Agent and the Company (or its advisers) are satisfied that they (or their representative) have provided evidence of their authority to represent that body corporate at the Scheme Meeting (for example, a valid power of attorney and/or board minutes). Please see Appendix 7 (Instructions and Guidance for Scheme Creditors) to this Explanatory Statement for more information on voting and attending the Scheme Meeting.

4.4     Any person with a Scheme Claim as at the Record Time (being (a) in respect of any Liability (other than the Existing Overdraft Liabilities), 5:00 pm (New York time) on 26 October 2020 and (b) in respect of the Existing Overdraft Liabilities, the Existing Overdraft Record Time) will be entitled to attend and vote at the Scheme Meeting.

4.5     Only the votes of Scheme Creditors voting at the Scheme Meeting via webinar or by proxy can be taken into account for the purpose of establishing whether the requisite approvals for the Scheme have been obtained.

4.6     Scheme Creditors should be aware that they were afforded an opportunity to raise any issues in relation to the constitution of the Scheme Meeting at the Convening Hearing, as stated in the Practice Statement Letter. If Scheme Creditors have not already raised any such issues, the Court will expect any Scheme Creditors doing so at the Sanction Hearing to show good reason why such issues were not raised at the Convening Hearing.

4.7     Scheme Creditors should refer to the detailed instructions in relation to voting at the Scheme Meeting in Appendix 7 (Instructions and Guidance for Scheme Creditors) to this Explanatory Statement.

4.8     The chairman of the Scheme Meeting will be Robert Ellis.

**5.      Effectiveness of the Scheme**

5.1     Before the Scheme can become effective and binding on the Company and its respective Scheme Creditors, the Court must sanction the Scheme at the Sanction Hearing. The Sanction Hearing will take place after the requisite statutory majorities of the Scheme Creditors have approved the Scheme at the Scheme Meeting. The Company expects that the Sanction Hearing will take place on or around 5 November 2020. The Company (through the Information Agent) will give notice to Scheme Creditors of the exact time and date of the Sanction Hearing.

5.2     All Scheme Creditors are entitled to attend in person or through representatives to support or oppose the sanctioning of the Scheme by the Court.

5.3     The Company may, subject to paragraph 5.4 below, at any hearing of the Court to sanction the Scheme consent on behalf of all Scheme Creditors to any modification of, or addition to, the Scheme or to any terms or conditions that the Court may think fit to approve or impose and which are otherwise necessary for the purpose of implementing the Restructuring, and which could not reasonably be expected directly or indirectly to have a material adverse effect on the interests of any Scheme Creditor under the Scheme. However, if such modifications could reasonably be expected directly or indirectly to have a material adverse effect on the interests of a Scheme Creditor, then the Company may not give such consent without the prior written consent of that Scheme Creditor.

5.4     Any modification of, or addition to, the Scheme and/or any of the Implementation Documents may only be made pursuant to clause 9.1 (Modification of the Scheme) of the Scheme Document with the consent of:

        (a)     the Majority Creditors and the New Bilateral Lenders; and

        (b)     any Existing Administrative Party whose interests would be adversely affected by such modification or addition, in each case, with such consent not to be unreasonably withheld or delayed.

5.5     Additionally, certain provisions of the Restructuring Implementation Deed that relate to the Existing Administrative Parties may only be amended with the consent of each Existing Administrative Party.

**6.      Chapter 15 Recognition in the United States**

6.1     The Company intends to apply to the U.S. Bankruptcy Court shortly after the Convening Hearing to seek a Chapter 15 Order. In addition, the making of a Chapter 15 Order permits a U.S. bankruptcy court to provide additional assistance to a foreign representative. In determining whether to provide additional assistance, the U.S. Bankruptcy Code directs the court to do so "consistent with the principles of comity". The Company has appointed Neil Gilchrist (a director of the Company and the chief financial officer of the Group) as its foreign representative for such purpose.

6.2     If a Chapter 15 Order is sought, relevant parties (including the Scheme Creditors) will be notified and the Company will publish notice of the application in the manner prescribed by the U.S. Bankruptcy Court (which may include publication on the Scheme Website).

6.3     The Company at this stage intends to deliver the Sanction Order relating to the Scheme to the Registrar of Companies once the hearing to recognise the Scheme under Chapter 15 has occurred. It is intended that the hearing to recognise the Scheme as a "foreign main proceeding" under Chapter 15 and grant other related relief, including recognition and enforcement of the Scheme and the Sanction Order, will occur on the day following the Sanction Hearing, or shortly thereafter.

## 7.     Recognition of the Scheme elsewhere

7.1     The Company has also obtained:

(a)     opinions from independent experts that the Scheme is likely to be recognised and given effect in Russia, Norway and Germany, each being a jurisdiction in which the Group has material operations; and

(b)     an opinion from independent experts that the Scheme may be recognised *de facto* and given effect in Oman (being another jurisdiction in which the Group has material operations) and that in any event it is unlikely that a dissenting Scheme Creditor would be able to improve its position (relative to that of the other Scheme Creditors) before the Omani courts such as to undermine the compromise proposed in the Scheme.

## 8.     Releases and waivers

As part of the Scheme and pursuant to the Deed of Release, which will be entered into in accordance with the steps set out in the Restructuring Implementation Deed, each Scheme Creditor, Lloyds, FAB and each Obligor will, among other things (with effect from the Scheme Effective Time and subject to the terms of the Deed of Release):

(a)     irrevocably, unconditionally, fully, finally and absolutely waives and releases and forever discharges, to the fullest extent permitted by law, each and every Claim that it ever had, may have or hereafter can, shall or may have against the Released Parties, in each case, in relation to or arising directly or indirectly out of or in connection with:

(i)     the Existing Financings, including the Existing Finance Documents and the Existing Security Documents;

(ii)    the negotiation or preparation of the Restructuring, the Scheme or the Restructuring Documents or the implementation and/or consummation of the Restructuring;

(iii)   the execution of the Restructuring Documents or any other documents required to implement the Restructuring or the taking of any steps or actions necessary or desirable to implement the Restructuring (including, without limitation, the steps set out in the Restructuring Steps Plan); and

(iv)    with respect to the Existing Shareholders or any Relevant Director, any matter arising out of or in connection with any steps, actions or omissions on or prior to the Restructuring Effective Date by or on behalf of such person holding such positions with respect to any Group Company or Holdco (as the case may be); and

(b)     irrevocably and unconditionally undertakes and (in the case of a Scheme Creditor only) shall procure that each of its Nominees (if applicable) undertakes, that it will not assert, threaten, bring, commence, facilitate, participate, provide any information (to the extent that non-

provisions of information is permissible under applicable law or regulation) take or continue, cooperate in any manner or support any person commencing, taking or continuing, or instruct any person to commence, take or continue any proceedings or other judicial, quasi-judicial, administrative or regulatory process in any jurisdiction whatsoever against any Released Party, in each case in relation to or arising out or in connection with:

(i)    the Existing Financings, including the Existing Finance Documents and the Existing Security Documents;

(ii)    the negotiation or preparation of the Restructuring, the Scheme or the Restructuring Documents or the implementation and/or consummation of the Restructuring;

(iii)    the execution of the Restructuring Documents or any other documents required to implement the Restructuring or the taking of any steps or actions necessary or desirable to implement the Restructuring (including, without limitation, the steps set out in the Restructuring Steps Plan); and

(iv)    with respect to the Existing Shareholders or any Relevant Director, any matter arising out of or in connection with any steps, actions or omissions on or prior to the Restructuring Effective Date by or on behalf of such person holding such positions with respect to any Group Company or Holdco (as the case may be),

and the waivers, releases and discharges granted under the Deed of Release shall be treated, for all purposes whatsoever and without limitation, as having been granted irrevocably by deed, provided, however, that nothing in the Deed of Release will:

(A)    affect, impair or prejudice any right of any Creditor arising under the Scheme Document or any Restructuring Document (including as a consequence of non-compliance with the terms of the Scheme Document or any Restructuring Document);

(B)    apply to any claim or liability in respect of fraud, gross negligence or wilful misconduct by any Released Party; or

(C)    extend to any liability of any Adviser (as defined in the Deed of Release) arising under or relating to a duty of care to such Adviser's client or arising under a duty of care to another person which has been expressly accepted in writing by that Adviser.

## 9.    Jurisdiction and exercise of Jurisdiction

9.1    The Company considers that the Court has jurisdiction to sanction the Scheme and that the Company has a sufficient connection to England and Wales for the Court to exercise its discretion to sanction the Scheme because the Company is an English public limited company and is therefore:

(a)    liable to be wound up in England under the Insolvency Act 1986; and

(b)    subject to the jurisdiction of the Court under Part 26 of the Companies Act.

9.2    Furthermore, no rule of trans-national law, including the Brussels (Recast) Regulations, excludes that jurisdiction. Part II of the Brussels (Recast) Regulations requires that a person domiciled in a member state of the European Union be "sued" in the courts of that member state but that general rule is subject to certain exceptions including article 8 (which, broadly, allows persons to be sued in the courts of a member state in which a number of defendants are domiciled, if it is expedient to do so) and article 25 (which, broadly, states that where the parties to an agreement have agreed that a court or the courts of a Member State are to have jurisdiction to settle any disputes which have arisen or which may arise in connection with a particular legal relationship, that court or those courts shall have jurisdiction). The

Company has concluded that, if the Brussels (Recast) Regulations were found to apply in relation to the Scheme, the Company considers that the Court would have jurisdiction in relation to the Scheme under the Brussels (Recast) Regulations because:

(a)      pursuant to article 25 of the Brussels (Recast) Regulations (and, in the case of the Existing Indentures, as a result of the amendments made by the Supplemental Indentures and, in the case of the Credit Agreement and the Guaranty Agreement, as a result of the amendments made by the Credit and Guaranty Agreement Amendment Agreement):

         (i)      each Existing Indenture, the relevant Existing Notes and the Guarantees (as defined in each Existing Indenture) and all non-contractual obligations arising out of or in connection with them are now governed by, and shall be construed in accordance with, the laws of England and Wales;

         (ii)      subject to the terms of each Existing Indenture, the courts of England and Wales now have jurisdiction to settle any disputes that arise out of or in connection with each Existing Indenture, the relevant Existing Notes and the Guarantees, and accordingly any legal action or proceedings arising out of or in connection with each Existing Indenture, the relevant Existing Notes and the Guarantees may be brought in such courts;

         (iii)      the Credit Agreement and the Guaranty Agreement (and all non-contractual obligations arising out of or in connection with them) are now governed by, and shall be construed in accordance with, the laws of England and Wales;

         (iv)      subject to the terms of the Credit Agreement and the Guaranty Agreement (as applicable), the courts of England and Wales now have jurisdiction to settle any disputes that arise out of or in connection with the Credit Agreement and the Guaranty Agreement (as applicable), and accordingly any legal action or proceedings arising out of or in connection with the Credit Agreement and the Guaranty Agreement (as applicable) may be brought in such courts; and

         (v)      each Scheme Creditor who executed the Lock-Up Agreement (other than FAB) has, pursuant to clause 7.5 of the Lock-Up Agreement, expressly submitted to the jurisdiction of the Court for the specific purpose of implementing the Scheme; and

(b)      pursuant to article 8 of the Brussels (Recast) Regulations, a number of the Scheme Creditors are subject to the personal jurisdiction of the Court by virtue of having their registered office, central administration or principal place of business in the jurisdiction of the Court.

(b)      Paragraphs 6 (Chapter 15 Recognition in the United States) and 7 (Recognition of the Scheme elsewhere) of this Part 4 (Certain Legal Aspects of the Scheme) provide details of the international jurisdictional recognition issues in relation to the Scheme.

## 10.    Questions

10.1    Scheme Creditors are entitled to appear at the Sanction Hearing, which is expected to be held on 5 November 2020. The exact time and date of the Sanction Hearing will be notified to Scheme Creditors, once confirmed with the Court, at least one Business Day prior to the Sanction Hearing. Scheme Creditors who wish to ask any questions in advance of the Scheme Meeting or the Sanction Hearing are encouraged to contact Lucid Issuer Services Limited (as Information Agent) via the Scheme Website at www.lucid-is.com/kcadeutag or by email at kcadeutag@lucid-is.com.

10.2    Additionally, Scheme Creditors will have the opportunity at the Scheme Meeting to raise any questions or issues they may have in relation to the Scheme.

## 11.    Directors' interests

11.1    The directors of the Company are:

    (a)    Anthony Byrne;

    (b)    Sean Branston;

    (c)    Neil Gilchrist.

11.2    The directors of Alpha and Alpha II are:

    (a)    Joseph Elkhoury;

    (b)    Robert Ellis;

    (c)    John Ensall; and

    (d)    Neil Gilchrist.

11.3    To the best of the knowledge of the Company, Alpha and Alpha II, none of their respective directors has any interest, direct or indirect, in the Scheme and the Scheme will have no effect on the interests of those directors other than to the extent:

    (a)    they all benefit from the releases granted by the Scheme Creditors described in paragraph 8 above;

    (b)    they will be a recipient of a transaction bonus as described in paragraph 11.4 below; and/or

    (c)    they will participate in the Management Equity Plan (the indicative terms of which are summarised in Appendix 13 (Management Equity Plan – Summary) of this Explanatory Statement.

11.4    Certain directors of the Company, Alpha and Alpha II and certain other members of the senior management team of the Group will be awarded bonus payments (subject to normal payroll deductions and to the relevant individual being on the Group payroll and not under notice on the relevant payment date (other than in the case of Robert Ellis, who will resign as a director of Alpha on or shortly after the Restructuring Effective Date)) if the Restructuring is successfully completed. In particular:

    (a)    Joseph Elkhoury will be awarded a bonus of GBP 375,000, to be paid in equal instalments in November 2020 and April 2021;

    (b)    Robert Ellis will be awarded a bonus of GBP 129,600, to be paid in November 2020;

    (c)    Neil Gilchrist will be awarded a bonus of GBP 84,694, to be paid in November 2020;

    (d)    Sean Branston will be awarded a bonus of GBP 62,043, to be paid in November 2020;

    (e)    Anthony Byrne will be awarded a bonus of GBP 42,500, to be paid in November 2020; and

    (f)    certain other members of the senior management team of the Group will share in an aggregate bonus pool of GBP 104,000.

11.5    John Ensall is also a director of Lemna Limited, which is entitled to a transaction fee of GBP 80,240 (plus VAT) on completion of the Restructuring under the terms of a consultancy agreement dated 6 May 2020 (as amended by a variation dated 8 May 2020).

11.6    Certain members of the senior management team of the Group, most likely including Joseph Elkhoury and Neil Gilchrist, will participate in the Management Equity Plan, the final terms of which are yet to be agreed as at the date of this Explanatory Statement. The indicative terms of the Management Equity Plan are summarised in Appendix 13 (Management Equity Plan – Summary) of this Explanatory Statement.

11.7    To the extent they have not already been appointed prior to the Restructuring Effective Date, Joseph Elkhoury and Neil Gilchrist will be appointed directors of Jersey Newco on the Restructuring Effective Date and Robert Ellis will enter into a consultancy agreement with Jersey Newco to advise the Jersey Newco board of directors. Robert Ellis and John Ensall will resign as directors of Alpha on or shortly after the Restructuring Effective Date and John Ensall's consultancy agreement referred to in paragraph 11.5 above will terminate concurrently.

11.8    As described in paragraph 4.6 of Part 5 (Summary of the Restructuring (including the Scheme)) of this Explanatory Statement, the Alpha Group (as defined in the Lock-Up Agreement) will provide the support set out in clause 11 (Holdco Liquidation) of the Restructuring Implementation Deed to enable an orderly solvent liquidation of each of the Holdcos, and which term includes Alpha II) following the Restructuring Effective Date. The directors of the Company and Alpha are also directors of certain of the Holdcos. In particular:

(a)    as noted above, the directors of Alpha II are the same as those for Alpha;

(b)    Joseph Elkhoury is also a director of KCAD Holdings I Limited and KCAD Holdings II Limited;

(c)    Robert Ellis is also a director of KCAD Holdings I Limited and KCAD Holdings II Limited;

(d)    Neil Gilchrist is also a director of KCA Deutag Finance I Limited, KCA Deutag Finance II Limited, KCA Deutag Midco Limited, Land Rig Ventures I Limited and Land Rig Ventures II Limited; and

(e)    Anthony Byrne is also a director of KCA Deutag Finance II Limited, KCA Deutag Finance I Limited and KCA Deutag Midco Limited and is also company secretary of Alpha, KCAD Holdings I Limited and KCAD Holdings II Limited.

11.9    No other non-pecuniary or other benefits are established in favour of the directors of the Company, Alpha or Alpha II. The directors of the Company, Alpha and Alpha II have the benefit of existing directors' and officers' liability insurance and, in accordance with clause 11 (Holdco Liquidation) of the Restructuring Implementation Deed, the Alpha Group will ensure that the benefit of any directors and officer's insurance currently in place for the Relevant Directors (as defined in the Restructuring Implementation Deed) remains in place for three years following the Restructuring Effective Date.

11.10    Other than as set out in this paragraph 11, none of the directors of the Company, Alpha or Alpha II has or has had any interest in any transaction which is or was unusual in its nature or conditions or significant to the business which was effected by the Group during the current or immediately preceding financial year, or which was effected during an earlier financial year and remains in any respect outstanding or unperformed.

<div align="center">

**PART 5**

**SUMMARY OF THE RESTRUCTURING (INCLUDING THE SCHEME)**

</div>

*This section contains a brief overview of the Restructuring (including the Scheme). The summary information contained herein does not purport to be complete and should be read in conjunction with, and is qualified in its entirety by references to, the more detailed information presented elsewhere in this Explanatory Statement including, without limitation, the Scheme Document set out at Appendix 2 (Scheme Document) to this Explanatory Statement and the Restructuring Implementation Deed (which is appended to the Scheme Document and appended to this Explanatory Statement at Appendix 3 (Restructuring Implementation Deed)).*

1.      **Overview**

1.1      This Part 5 (Summary of the Restructuring (including the Scheme)) is divided into the following sections:

(a)      purpose of the Restructuring;

(b)      key terms of the Scheme;

(c)      summary of the Restructuring Steps; and

(d)      allocation and distribution of Scheme Consideration.

2.      **Purpose of the Restructuring**

2.1      The principal purpose of the Restructuring is to de-lever the Group's balance sheet by implementing an exchange pursuant to which each Scheme Creditor releases its Scheme Claims in return for a proportion of the Scheme Consideration equal to its Scheme Creditor Entitlement.

2.2      As part of the Restructuring, certain members of the Group will also enter into the New Cash Management Documents and agreements in connection with the New LC/Undertaking Facilities, in each case, with HSBC and the Existing LC and Undertaking Facility Lenders (as applicable).

2.3      As a result of the Restructuring, it is anticipated that:

(a)      as a result of the release of all the Scheme Claims in return for the issuance to the Scheme Creditors of:

(i)      the New Notes; and

(ii)      Jersey Newco Consideration Shares,

the Restructured Group will have a strengthened and de-levered balance sheet, with its total debt being reduced by approximately USD 1.4 billion (meaning it will have a pro forma net leverage of 1.4x[16] (down from its current net leverage of 6.3x[17]));

(b)      the Restructured Group's annual debt servicing costs will be reduced from USD 155 million to USD 49 million;

(c)      the Restructured Group will benefit from a five-year runway to maturity of the New Notes;

---

[16]      Based on LTM June 2020 EBITDA of USD 293 million, pro forma total debt of approximately USD 510 million, and current cash at 30 June 2020 of USD 100 million (which excludes USD 80 million of transaction costs).

[17]      Based on LTM June 2020 EBITDA of USD 293 million, total debt at 20 June 2020 of approximately USD 1.9 billion (including the Existing Notes and facilities under the Credit Agreement) and current cash at 30 June 2020 of USD 100 million (which excludes USD 80 million of transaction costs).

(d)    the Restructured Group will have access to:

(i)    overdraft, cash pooling and bank account facilities through the New Cash Management Facilities; and

(ii)    guarantee and letter of credit facilities through the New LC/Undertaking Facilities; and

(e)    by receiving the Jersey Newco Consideration Shares, Scheme Creditors will be provided with the opportunity to benefit from the potential upside of the implementation of the Restructured Group's turnaround strategy.

2.4    If the Scheme is approved by the requisite majority of Scheme Creditors, sanctioned by the Court and the Restructuring is implemented, the Company anticipates that the Restructured Group will be able to repay the full amounts owing:

(a)    in respect of the New Notes under the New Notes Documents; and

(b)    under the New Bilateral Facilities Agreements.

## 3.    Key Terms of the Scheme

*The Company, the Scheme Creditors and the Scheme Claims*

3.1    The Scheme is being proposed by the Company.

3.2    The Scheme Creditors comprise:

(a)    each Existing Noteholder;

(b)    each Term Loan Lender;

(c)    each Revolving Loan Lender;

(d)    the Existing Overdraft Provider; and

(e)    each Non-Voting Scheme Creditor.

3.3    The Non-Voting Scheme Creditors comprise the Existing Custodian, the Existing Depository and the Existing Trustee. In order to avoid double counting, the Existing Custodian and the Existing Depositary will not (in accordance with their respective customary practices) and the Existing Trustee has agreed not to (by giving an undertaking not to) vote at the Scheme Meeting or receive any Scheme Consideration.

3.4    The Scheme Claims (which will be released in exchange for the New Notes and Jersey Newco Consideration Shares), subject to the terms of the Deed of Release, comprise any claim in respect of any Liability of the Company and any other Obligor to a Scheme Creditor arising directly or indirectly out of an interest in the Existing Notes, the Term Loan, the Revolving Loans, and, subject to paragraph 3.5 below, the Existing Overdraft Liabilities arising on or before the relevant Record Time or which may arise after the relevant Record Time as a result of an obligation or Liability of the Company or other Obligor incurred or as a result of an event occurring or an act done on or before the relevant Record Time.

3.5    Under the Scheme, all Scheme Claims will be determined at the Record Time. The Record Time is, however, split so that a different record time (being the Existing Overdraft Record Time) applies to

the Existing Overdraft Liabilities compared to all other Liabilities that are subject to the Scheme. This is for the following reasons:

(a) unlike the Existing Notes, the Term Loan or the Revolving Loans, the Existing Overdraft Liabilities fluctuate during the course of each working day and are comprised of account balances in six different currencies;

(b) the exercise to confirm the amount of the Existing Overdraft Liabilities as at a specific time must be done during UK business hours to reflect the Group's treasury operations (by contrast, the Existing Depositary requires that the record time in respect of the Existing Notes is 5:00 pm (New York time) (and the Term Loan Administrative Agent is also based in the United States)); and

(c) confirming the amount of the Existing Overdraft Liabilities requires accessing account balance information via an online banking platform and it is possible (for reasons outside of the Group's control) that the online banking platform will not be accessible at the specific time required (8:00 am (London time) on 27 October 2020). To allow for this possibility, the Existing Overdraft Record Time includes a degree of flexibility such that if the information required to calculate the Compromised Overdraft Amount is not accessible at the specific time required, the Existing Overdraft Record Time will be the first time after 8:00 am (London time) on 27 October 2020 that the Company is able to access such information.

3.6 In consultation with the Existing Overdraft Provider, the Group has determined that it will be operationally simpler to confirm the amount of the Existing Overdraft Liabilities at the opening of a business day and that using 8:00 am (London time) on 27 October 2020 is the closest time to 5:00 pm (New York time) on 26 October 2020 (being the Record Time in respect of all other Liabilities that are subject to the Scheme) that it can practically use.

3.7 As set out in paragraph 2.9 of Part 4 (Certain Legal Aspects of the Scheme) to this Explanatory Statement, in relation to the Existing Overdraft Provider, the amount of the Existing Overdraft Liabilities to be compromised by the Scheme and the Restructuring Implementation Deed (being a Scheme Claim) shall be an amount equal to the Compromised Overdraft Amount, provided that the maximum Compromised Overdraft Amount for the purposes of the Scheme and the Restructuring Implementation Deed shall not exceed USD 115,000,000 plus the aggregate amount of any accrued and unpaid interest and fees under the Existing Overdraft Facilities as at the Existing Overdraft Record Time.

3.8 For the reasons set out in paragraph 2.5 of Part 4 (Certain Legal Aspects of the Scheme) to this Explanatory Statement, the Scheme will not compromise the claims under the Existing LC and Undertaking Facilities.

3.9 Lloyds was an original party to the Lock-Up Agreement and (in its capacities as an Existing Ancillary Lender and a New Bilateral Lender) will execute an undertaking in favour of, among others, the Court and the Company pursuant to which it will undertake and agree, amongst other matters, to perform those actions which it is required to perform in accordance with the terms of the Scheme (including entering into the Restructuring Implementation Deed) and, where necessary, be bound by the terms of the Scheme as sanctioned by the Court on and from the Scheme Effective Time.

3.10 FAB has also acceded to the Lock-Up Agreement and will, subject to the terms of the Lock-Up Agreement, take the actions which are necessary to facilitate, implement or otherwise give effect to the documentation for the FAB Run-Off LC Facility. Furthermore, prior to the Sanction Hearing, FAB (in its capacities as an Existing Ancillary Lender and a New Bilateral Lender) will execute and deliver a support letter to the Company pursuant to which FAB will, subject to the terms of the Lock-Up Agreement, undertake to take any and all actions required pursuant to and in accordance with the

Lock-Up Agreement and the Restructuring Steps Plan which are necessary to facilitate, implement, consummate or otherwise give effect to the documentation of the FAB Run-Off LC Facility (including, without limitation, executing and delivering to the Company the Restructuring Implementation Deed) on and from the Scheme Effective Time.

3.11    HSBC has also acceded to the Lock-Up Agreement and will (in its capacity as a New Bilateral Lender only) execute an undertaking in favour of, among others, the Court and the Company pursuant to which it will undertake and agree, amongst other matters, to perform those actions which it is required to perform in accordance with the terms of the Scheme (including entering into the Restructuring Implementation Deed) and, where necessary, be bound by the terms of the Scheme as sanctioned by the Court on and from the Scheme Effective Time.

*Purpose of the Scheme*

3.12    The principal purpose of the Scheme is to grant the Company the authority, on behalf of all Scheme Creditors, to enter into the Implementation Documents and do such other acts that may be necessary to implement the Restructuring. The steps for the implementation of the Restructuring are not set out in the Scheme itself but will occur in accordance with the Restructuring Steps (as summarised below and as set out in full in the Restructuring Implementation Deed).

*Effectiveness*

3.13    Assuming the requisite majorities vote in favour of the Scheme at the Scheme Meeting and the Scheme is sanctioned at the Sanction Hearing, the Scheme will become effective on and from the time the Company delivers (or its legal advisers deliver on its behalf) an office copy of the Sanction Order to the Registrar of Companies. The Company shall promptly notify the Scheme Creditors in writing when the Scheme becomes effective.

3.14    The compromise and arrangement effected by the Scheme and the relevant Implementation Documents shall apply to all Scheme Claims and bind all Scheme Creditors, their successors, assigns and, to the extent relevant, any Nominee appointed pursuant to a validly submitted Account Holder Letter and/or Lender Claim Form (as applicable).

*Authorisation to execute and undertaking to be bound by the Implementation Documents*

3.15    Due to the fact that the principal purpose of the Scheme is to authorise the Company to enter into the Implementation Documents and do such acts as are necessary to consummate the Restructuring, under the Scheme, each Scheme Creditor will irrevocably authorise, instruct and empower the Company (represented by an authorised representative):

(a)    to enter into, execute and deliver for and on behalf of such Scheme Creditor as its attorney and agent each of the Implementation Documents;

(b)    in respect of the Implementation Documents, and on behalf of each Scheme Creditor:

(i)    to insert the calculation and completion of any commitments, participations or allocations to any Scheme Creditor or any other party under the Implementation Documents (as determined in accordance with the terms of the Scheme and/or the Restructuring Implementation Deed);

(ii)    to insert information into any blanks (including without limitation, any bank account details, notice provisions or legal entity names), lists of parties and/or signature blocks;

(iii)    to make any mechanical amendments required by the Company;

(iv)      to make any other minor or technical amendments;

(v)      to ensure that they are legal, valid, binding and enforceable upon the parties to them in accordance with the Scheme and the Restructuring Implementation Deed; and/or

(vi)      to make any amendment to take into account any modification of, or addition to, the Scheme and/or the Implementation Documents approved or imposed by the Court in accordance with clause 9 (Modification to the Scheme) of the Scheme Document,

provided that if any such amendment or insertion could reasonably be expected directly or indirectly to have an adverse or disproportionate effect on the interests of a Scheme Creditor, then such amendment will require the prior written consent of that Scheme Creditor; and

(c)      take whatever action is necessary to ensure that the books and records of the Clearing Systems are updated to reflect the terms of the Scheme and the relevant Implementation Documents, including without limitation to:

(i)      instruct the Clearing Systems to debit the Book-Entry Interests relating to the Existing Notes from the custody account of each Scheme Creditor (or its Account Holder, as applicable);

(ii)      authorise the cancellation of the Book-Entry Interests in respect of the Existing Notes; and

(iii)      take or carry out any other step or procedure reasonably required to effect the settlement of the transactions contemplated the Scheme.

3.16    Under the Scheme, each Scheme Creditor and, pursuant to an Account Holder Letter and/or Lender Claim Form (as applicable), each respective Nominee(s) (if applicable), will authorise and instruct each Existing Administrative Party, the Existing Custodian and the Existing Depositary to undertake such steps as it considers necessary or desirable for it to take for the purposes of facilitating the implementation of the Scheme, including (without limitation) entering into and executing in its respective capacity the Implementation Documents to which it is a party and any other document that it reasonably considers necessary or advisable to implement the Scheme.

3.17    Furthermore, under the Scheme, each Scheme Creditor will agree to be bound by and to comply with each of its obligations under the Implementation Documents and irrevocably and unconditionally ratifies and confirms everything which the Company (including its respective authorised signatories) may lawfully do or cause to be done in accordance with any authority conferred by the Scheme.

*Releases*

3.18    Certain releases will be granted as part of the Scheme and will take effect in accordance with clauses 5.3 (Step 2 – release of Scheme Claims and Existing Security) and 5.8 (Step 7 – Releases) of the Restructuring Implementation Deed and the Deed of Release.

*Assignments or Transfers*

3.19    Under the Scheme, the Company shall not be under any obligation to recognise any purported assignment or transfer of any Scheme Claims by a Scheme Creditor following the relevant Record Time for the purposes of the Scheme or the Implementation Documents (including but not limited to determining the applicable allocation of Scheme Consideration). Notwithstanding the foregoing, where the Company has received from the relevant parties written notice of such purported assignment or transfer, the Company may in its absolute discretion, and subject to such evidence as it may reasonably require, agree to recognise such purported assignment or transfer, subject to the assignee

or transferee agreeing to be bound by the terms of the Scheme and to be treated as having been a Scheme Creditor for the purposes of the Scheme.

*Determination of Scheme Consideration*

3.20    Unless expressly provided otherwise in the Scheme, each Scheme Creditor's entitlement to the Scheme Consideration (as allocated in accordance with the terms of the Restructuring Implementation Deed) will be determined based on its Scheme Claims as at the relevant Record Time.

*Modification of the Scheme*

3.21    Subject to paragraph 3.22 below, as part of the Scheme, the Scheme Creditors will agree that the Company may at any Court hearing to sanction the Scheme, consent on behalf of itself and the Scheme Creditors and anyone else concerned to any modification of, or addition to, the Scheme and/or any of the Implementation Documents on any terms or conditions that the Court may think fit to approve or impose which is necessary for the implementation of the Restructuring, and which could not reasonably be expected directly or indirectly to have an adverse effect on the interests of any Scheme Creditor under the Scheme. However, if such modifications could reasonably be expected directly or indirectly to have an adverse effect on the interests of a Scheme Creditor, then the Company may not give such consent without the prior written consent of that Scheme Creditor.

3.22    Any modification of, or addition to, the Scheme and/or any of the Implementation Documents may only be made pursuant to clause 9.1 of the Scheme Document with the consent of:

(a)    the Majority Creditors and the New Bilateral Lenders; and

(b)    any Existing Administrative Party whose interests would be adversely affected by such modification or addition, in each case, with such consent not to be unreasonably withheld or delayed.

3.23    Under the Scheme, if any provision of the Scheme (or any document to be executed pursuant to the authority granted under the Scheme) becomes illegal or unenforceable, such provision will be severed from the Scheme and the rest of the Scheme shall continue in full force and effect as if the severed provision had not been included.

*Termination of the Scheme*

3.24    If the Restructuring Effective Date does not occur on or before the Long Stop Date, the terms of and the obligations on the parties under or pursuant to the Scheme shall lapse and all the compromises and arrangements provided by the Scheme and any releases granted pursuant to the Scheme shall be of no effect and shall be construed as if they had never become effective, and the rights and obligations of the Scheme Creditors (including under the Existing Debt Documents) shall not be affected and shall be reinstated and remain in full force and effect (although certain clauses of the Scheme, as specified in clause 10 (Termination of the Scheme) of the Scheme Document, shall survive termination).

3.25    In addition, the Restructuring Implementation Deed can be terminated at the election of the Super Majority Creditors (as defined in the Restructuring Implementation Deed) and the New Bilateral Lenders by serving a written notice on the Company if the Company or any other Obligor takes any action which is materially inconsistent with or prejudicial to the implementation of the Restructuring; or by unanimous written consent of the parties to the Restructuring Implementation Deed.

*Stay of Proceedings*

3.26    The Scheme will impose a stay on proceedings that restrict the ability of a Scheme Creditor to commence certain proceedings. In particular, under (and subject to the terms of) the Scheme:

    (a)    subject to the terms of the Scheme, which are summarised in the paragraph below, no Scheme Creditor will be allowed to commence, continue, support any person commencing, or instruct any person to commence or take any Prohibited Proceeding against any Scheme Party;

    (b)    a Scheme Creditor (or its Nominee(s)) will be allowed to commence an Allowed Proceeding against any Scheme Party after giving each Scheme Party 21 days' written notice of its intention to do so; and

    (c)    each Scheme Creditor will hold on trust for the benefit of the relevant Scheme Party any recovery made pursuant to any Prohibited Proceeding in breach of the stay and will turn over any such recovery forthwith upon demand being made by the Company without set-off, counterclaim or deduction. To the extent that the asset comprising the recovery cannot be held on trust by the Scheme Creditor, the Scheme Creditor shall pay to the Company an amount equal to that recovery immediately upon demand being made by the Company without set-off, counterclaim or deduction, to be held on trust by the Company for the person(s) entitled to it.

*Costs*

3.27    Under the Scheme, the Company shall pay, or procure the payment of, in full all costs, charges, expenses and disbursements incurred by it in connection with the negotiation, preparation and implementation of the Scheme as and when they arise, including, but not limited to, the costs of holding the Scheme Meeting, the costs of obtaining the sanction of the Court and the costs of placing the notices (if any) required by the Scheme.

*Provision of information by Scheme Creditors*

3.28    Under the Scheme:

    (a)    an Account Holder Letter and/or Lender Claim Form (as applicable) submitted by or on behalf of any Scheme Creditor shall be submitted in accordance with the instructions set out in the relevant Account Holder Letter and/or Lender Claim Form (as applicable) and the Scheme;

    (b)    whether an Account Holder Letter and/or Lender Claim Form (as applicable) has been validly completed shall be determined by the Information Agent at its discretion, provided that, if the Information Agent determines that an Account Holder Letter and/or Lender Claim Form (as applicable) has not been validly completed, it shall promptly prepare a written statement of its reasons for doing so and send that statement by electronic mail to the party that provided such Account Holder Letter and/or Lender Claim Form (as applicable); and

    (c)    the Company may disclose the Account Holder Letter and/or Lender Claim Form (as applicable) and its contents on a confidential basis to such persons as are necessary to facilitate the consummation of the Restructuring.

*Future insolvency*

3.29    In the event that the Company enters into an insolvency proceeding on or before the Restructuring Effective Date, the Company's obligations under the Scheme shall continue to be performed by the Company in an insolvency proceeding to the fullest extent permitted by law or unless otherwise determined by the Court.

3.30    With effect from the Restructuring Effective Date, the Scheme shall continue according to its terms to the fullest extent permitted by law or unless otherwise determined by the Court, notwithstanding any insolvency proceeding in respect of the Company.

*Application to the Court for directions*

3.31    Without prejudice to any rights that the Company or any Scheme Creditor might otherwise have in connection with the Scheme or any aspect of it, the Company shall be entitled to make an application to the Court for directions at any time in connection with any matter arising under or in relation to the Scheme, any Implementation Document or any other aspect of the Restructuring.

*Exercise of discretion*

3.32    Where, under or pursuant to any provision of the Scheme Document or any Implementation Document, a matter is to be determined by the Company, it shall be determined by the board of directors of the Company in their discretion in such manner as they consider fair and reasonable.

*Chapter 15 Filing*

3.33    To the extent it has not already done so prior to the Scheme Effective Time, under the Scheme, the Company shall file a petition for recognition of the Scheme under Chapter 15 of the U.S. Bankruptcy Code and shall use reasonable endeavours to obtain a Chapter 15 Order, unless and until:

(a)    such order is granted or unconditionally denied by the U.S. Bankruptcy Court; or

(b)    otherwise agreed between the Majority Participating AHC Creditors and Majority Participating RCF Lenders and the Company, each acting reasonably and in good faith.

## 4.    Summary of the Restructuring Steps

4.1    The Restructuring Steps are set out in (and will occur in accordance with) the Restructuring Implementation Deed, which will be executed by the Company on behalf of the Scheme Creditors following the Scheme Effective Time in accordance with the authority granted under the Scheme.

4.2    The Restructuring Implementation Deed will become effective and legally binding, as between the signatories thereto, on the date on which it is executed by all the relevant parties, provided that the Effective Date (under and as defined in the Restructuring Implementation Deed) shall not occur before the Scheme Effective Time.

4.3    As referred to in paragraph 3.11 of Part 3 (Further Background to and Reasons for the Restructuring (including the Scheme)) of this Explanatory Statement, while the key terms of the Restructuring remain unchanged, as a result of the Restructuring Steps Plan Amendment the steps that will be taken to implement the Restructuring are now different in certain respects to the steps summarised in paragraph 6 of the Practice Statement Letter. The principal differences are that, in accordance with the Restructuring Steps Plan (as amended by the Restructuring Steps Plan Amendment):

(a)    Alpha II has acquired all of the shares in Jersey Newco (and, as a result, indirectly acquired English NewCo 1 and English NewCo 2) from Crestbridge Corporate Nominees Limited (being an entity controlled by Crestbridge, the corporate services provider which arranged for Jersey Newco to be incorporated) for nil consideration;

(b)    following the Scheme Effective Time but prior to the Restructuring Effective Date, Alpha II will transfer all of the shares in Alpha to English NewCo 2 for nil consideration (with the shares in Alpha remaining subject to the relevant Existing Security); and

(c)     as part of the Restructuring Steps summarised below, Alpha II will transfer 100% of the shares in Jersey Newco to certain of the Scheme Creditors (to be selected, subject to certain limitations set out in the Restructuring Implementation Deed, by the Company in its discretion (in consultation with the Ad-Hoc Committee and the Existing Overdraft Provider (or their respective advisers)) for nil consideration.

4.4     However, as emphasised in paragraph 3.13 of Part 3 (Further Background to and Reasons for the Restructuring (including the Scheme)) of this Explanatory Statement, despite the changes to the Restructuring Steps Plan and the differences referred to in paragraph 4.3 above, the economic terms of the Scheme and the Restructuring are unchanged and the Restructuring Steps to occur after the transfer of Jersey Newco to certain of the Scheme Creditors remain materially consistent with the steps summarised in the Practice Statement Letter.

4.5     The Restructuring Steps are summarised below:

| Step | Description of the Restructuring Step |
| --- | --- |
| 1. | Transfer of Jersey Newco to certain Scheme Creditors |
| 2. | Release of Scheme Claims and Existing Security. |
| 3. | Entry into the New Debt Documents and issue of New Notes. |
| 4. | Issuance of shares in Jersey Newco. |
| 5. | Execution of the Jersey Newco Investment Agreement |
| 6. | Appointment of new directors. |
| 7. | Releases. |
| 8. | Delivery of Restructuring Effective Date Notice. |

4.6     The Restructuring Steps will occur when the Company has delivered to the Notice Parties (as defined in the Restructuring Implementation Deed) in accordance with clause 4.3 (Restructuring Steps Start Time Notice) a notice notifying the Notice Parties that:

(a)     the Company has delivered the Restructuring Documents Notice (as defined in the Restructuring Implementation Deed) to the Notice Parties in accordance with clause 3.1 (Execution of the Restructuring Documents) of the Restructuring Implementation Deed;

(b)     subject to clause 4.2 (Waiver of Restructuring Conditions Precedent) of the Restructuring Implementation Deed, the Company has received all Restructuring Conditions Precedent in form and substance satisfactory to it; and

(c)     all confirmations specified in schedule 7 (Restructuring Conditions Precedent) to the Restructuring Implementation Deed have been provided in writing to the Company.

4.7     The Restructuring Steps will require the assistance and co-operation of various parties (not just the Company and the Scheme Creditors). The Company has therefore obtained or, if not yet obtained will use reasonable endeavours to obtain prior to the Sanction Hearing, undertakings and/or assurances from the Implementation Parties (being those parties who have a role to play in consummating the Restructuring but are not themselves Scheme Creditors and therefore are not bound by the terms of the Scheme).

4.8    The transfer of Alpha to English NewCo 2 referred to in paragraph 4.3(b) above will be made with the consent of the Existing Shareholders and was explicitly approved by Holdings I (being the ultimate holding company of the Group) prior to the execution of the Lock-Up Agreement. The consent of the Existing Shareholders was given on the basis that, pursuant to the terms of the Lock-Up Agreement:

(a)    the Participating Shareholders will be eligible to receive the Warrants;

(b)    the Existing Shareholders, the Holdcos and the Relevant Directors will benefit from the releases set out in the Deed of Release; and

(c)    the Alpha Group (as defined in the Lock-Up Agreement) will provide the support set out in clause 11 (Holdco Liquidation) of the Restructuring Implementation Deed to enable an orderly solvent liquidation of each of the Holdcos following the Restructuring Effective Date.

4.9    Subject to the terms of the Restructuring Implementation Deed, the Restructuring Steps shall occur in the following order:

### Step 1 – Transfer of Jersey Newco to certain Scheme Creditors

The Company shall date and release the Jersey Newco Sale and Purchase Agreement (and any applicable ancillary documents necessary to complete the transactions contemplated by the Jersey Newco Sale and Purchase Agreement).

### Step 2 – Release of Scheme Claims and Existing Security

(a)    Without any requirement for any additional actions or steps to be undertaken by any party to the Restructuring Implementation Deed:

(i)    all of the right, title and interest of the Scheme Creditors in and to the Scheme Claims shall automatically and without further documentation required to be entered into or action or steps required to be taken by any Party be released and treated as satisfied fully and absolutely in each case so as to bind the Scheme Creditors and any person who has acquired or who may acquire any interest in or arising out of a Scheme Claim after the Record Time;

(ii)    all of the right, title and interest of the Existing Depositary, the Existing Custodian and the Existing Trustee to any claims they have or may have under the Existing Debt Documents including the Global Notes or any parallel debt covenant (as applicable) shall automatically and without further documentation required to be entered into or action or steps required to be taken by any Party be released and treated as satisfied fully;

(iii)    subject to clause 10 (Calculation of Overdraft Scheme Claim) of the Restructuring Implementation Deed, all Claims of the Scheme Creditors against any Obligor under or in connection with the Existing Debt Documents shall be released and treated as satisfied fully and absolutely in each case so as to bind the Scheme Creditors and any person who has acquired or acquires any interest in or arising out of such Claims after the Record Time; and

(iv)    without prejudice to the terms of the New LC/Undertaking Facilities Agreements (including with respect to the payment of accrued but unpaid interest and fees under the Existing LC and Undertaking Facilities), all of the Claims of the Existing LC and Undertaking Facility Lenders against the Obligors in respect of the Existing Instruments (as defined in the Restructuring Implementation Deed) or under the Existing LC and Undertaking Facilities shall be released and treated as satisfied fully

and absolutely in each case so as to bind Existing LC and Undertaking Facility Lenders and the Obligors and any person who has acquired or acquires any interest in or arising out of any such Claims after the Record Time.

(b)    The Company shall date, release and deliver each Security and Guarantees Release Document.

(c)    The Company shall deliver all instructions or notices and take such actions necessary or desirable for the cancellation of the Existing Notes (including the relevant Global Notes), including without limitation:

   (i)    instructing DTC to debit the book-entry interests relating to the Existing Notes from the custody account of each Scheme Creditor (or its Account Holder, as applicable);

   (ii)    arranging for the cancellation of the Book-Entry Interests in respect of the Existing Notes; and

   (iii)    issuing a confirmation to DTC to cancel the Existing Notes in accordance with the relevant procedures,

(d)    Immediately following the sub-step set out in paragraph (b) above, the Company shall procure that each Scottish Shareholder Resolution be passed.

(e)    Notwithstanding paragraphs (a) to (c) above, nothing in the Restructuring Implementation Deed shall release, affect, impair or prejudice any right of any party to the Restructuring Implementation Deed:

   (i)    in respect of the Scheme Consideration; and/or

   (ii)    arising under the Scheme Document or any Restructuring Document (including as a consequence of non-compliance with the terms of the Scheme Document or any Restructuring Document).

### Step 3 – Entry into the New Debt Documents and issue of New Notes

(a)    The Company shall:

   (i)    date, (where applicable) complete, release and (where applicable) deliver each New Debt Document (other than each New Security Document and any Relevant New Bilateral Facility Agreement) and the Holding Period Trust Agreement; and

   (ii)    procure that any Relevant New Bilateral Facilities Agreements are entered into in the manner agreed with the HSBC pursuant to clause 3.1(c)(ii)(A) (Execution of the Restructuring Documents) of the Restructuring Implementation Deed; and

   (iii)    deliver requisite (i) instructions for the authentication of the New Notes Global Note and (ii) settlement instructions in respect of the New Notes to the new common depositary and (iii) take any other such steps required to issue the New Notes to:

      (A)    each Scheme Creditor (other than an Unadmitted Scheme Creditor in respect of the New Notes) and/or its Nominee (as applicable) such that the relevant Scheme Creditor and/or its Nominee (as applicable) receives New Notes in an aggregate amount equal to that Scheme Creditor's New Notes Entitlement; and

(B)    the Holding Period Trustee (on behalf of each Unadmitted Scheme Creditor in respect of the New Notes) such that the Holding Period Trustee receives New Notes in an amount equal to the aggregate of each Unadmitted Scheme Creditor's New Notes Entitlement (with the Holding Period Trustee holding such Unadmitted Entitlements on trust for the relevant Unadmitted Scheme Creditors in accordance with the terms of this Deed and the Holding Period Trust Agreement).

(b)    Immediately following the completion of the sub-steps set out in paragraph (b) in Step 2 above and paragraphs (a)(i) and (a)(ii) above, the Company shall date, (where applicable) complete, release and (where applicable) deliver each New Security Document (or, in the case of any New Security Document that is a Notarial Security Document, procure that each such Notarial Security Document is entered into by the relevant parties thereto).

(c)    Immediately following the completion of the sub-step set out in paragraph (b) above:

(i)    the Company shall date each Certificate (as defined in the Restructuring Implementation Deed); and

(ii)    each Legal Opinion (as defined in the Restructuring Implementation Deed) shall be issued.

(d)    This Step shall take place simultaneously with the Step set out in Step 2 – Release of Scheme Claims and Existing Security above.

### Step 4 – Issuance of shares in Jersey Newco

(a)    Jersey Newco shall allot and issue the Jersey Newco Consideration Shares to:

(i)    each Scheme Creditor (other than an Unadmitted Scheme Creditor in respect of the Jersey Newco Shares) and/or its Nominee (as applicable) such that the relevant Scheme Creditor and/or its Nominee (as applicable) receives Jersey Newco Consideration Shares in an aggregate amount equal to that Scheme Creditor's Jersey Newco Share Entitlement; and

(ii)    the Holding Period Trustee (on behalf of each Unadmitted Scheme Creditor in respect of the Jersey Newco Shares) such that the Holding Period Trustee receives Jersey Newco Consideration Shares in an amount equal to the aggregate of each Unadmitted Scheme Creditor's Jersey Newco Share Entitlement (with the Holding Period Trustee holding such Unadmitted Entitlements on trust for the relevant Unadmitted Scheme Creditors in accordance with the terms of this Deed and the Holding Period Trust Agreement),

and any such issuance and allocation shall take into account any Jersey Newco Shares held by a Scheme Creditor prior to this Step to ensure that, as at the Restructuring Effective Date, the number of Jersey Newco Shares held by each Scheme Creditor is consistent with its Jersey Newco Share Entitlement.

(b)    Jersey Newco shall update its register of members and take any other action necessary in connection with the allotment and issuance of the Jersey Newco Consideration Shares.

(c)    This Step shall take place simultaneously with the Step set out in Step 2 – Release of Scheme Claims and Existing Security above.

*Step 5 – Execution of the Jersey Newco Investment Agreement*

(a)     The Company shall date and release the Jersey Newco Investment Agreement.

(b)     Jersey Newco and the relevant shareholders of Jersey Newco shall procure that the Jersey Newco Articles of Association are adopted.

(c)     This Step shall take place simultaneously with the Step set out in Step 2 – Release of Scheme Claims and Existing Security above.

*Step 6 – Appointment of new directors*

(a)     The directors of Jersey Newco shall pass such resolutions as are necessary to:

(i)     appoint Joseph Elkhoury and Neil Gilchrist to the board of directors of Jersey Newco (in each case to the extent not already appointed); and

(ii)     to effect the removal of any other directors from the board of Jersey Newco.

(b)     This Step shall take place simultaneously with the Step set out in Step 2 – Release of Scheme Claims and Existing Security above.

*Step 7 – Releases*

The Company shall date, release and deliver the Deed of Release.

*Step 8 – Delivery of Restructuring Effective Date Notice*

Immediately following the completion of the steps described above, the Company shall deliver the Restructuring Effective Date Notice to the Notice Parties notifying them that Restructuring has been implemented and that the Restructuring Effective Date has occurred.

**5.     Post-Restructuring Effective Date Steps**

Under the Restructuring Implementation Deed (and subject to the occurrence of the Restructuring Effective Date):

(a)     provided that each Participating Shareholder and Holdco has at all times complied with all of its obligations under the Lock-Up Agreement, on the Business Day immediately following the Restructuring Effective Date, Jersey Newco shall, subject to paragraph (b) below, issue the Warrants to the Participating Shareholders pro rata to each such Participating Shareholder's shareholding in Holdings I as at the Restructuring Effective Date (excluding any shareholdings in Holdings I that are held by shareholders of Holdings I that are not Participating Shareholders));

(b)     If the issue of the Warrants in accordance with paragraph (a) above would result in a breach of any limitation on the number of warrant holders contained in the Control of Borrowing (Jersey) Order 1958, the Warrants shall be issued to the Participating Shareholders on an allocation basis to be agreed by Jersey Newco and the Participating Shareholders (each acting in good faith) and Jersey Newco shall be under no obligation to issue the Warrants if an agreement on the allocation of the Warrants has not been reached with the Participating Shareholders; and

(c)      within 60 Business Days of the Restructuring Effective Date, the Company must apply to The International Stock Exchange Authority Limited for the listing and permission to deal in the New Notes on the Official List of the International Stock Exchange.

## 6.     Allocation and Distribution of Scheme Consideration

6.1     Each Scheme Creditor may only receive the Scheme Consideration in accordance with the provisions of clause 7 (Allocation and Distribution of Scheme Consideration) of the Restructuring Implementation Deed.

6.2     A Scheme Creditor (and/or, if relevant, its Nominee) shall only receive the Scheme Consideration on the Restructuring Effective Date if it:

(a)      has duly elected to do so by validly completing and delivering an Account Holder Letter and/or Lender Claim Form (as applicable) to the Information Agent before the Voting Instruction Deadline;

(b)      is an Eligible Person; and

(c)      in the case of Jersey Newco Consideration Shares only, has provided the Jersey Newco KYC in a form satisfactory to the Jersey Registrar.

6.3     Please see Appendix 7 (Instructions and Guidance for Scheme Creditors) to this Explanatory Statement for further information relating to the submission of the Account Holder Letter and/or Lender Claim Form and the eligibility requirements specified above.

6.4     A Scheme Creditor may elect for a Nominee to receive all of its proportion of the New Notes and/or the Jersey Newco Consideration Shares on the Restructuring Effective Date, provided that:

(a)      to make such election, such Scheme Creditor must have validly completed and delivered an Account Holder Letter and/or Lender Claim Form (as applicable) to the Information Agent prior to the Voting Instruction Deadline;

(b)      such Nominee has executed and delivered a Securities Confirmation Deed as a deed;

(c)      such Nominee is an Eligible Person; and

(d)      in the case of the Jersey Newco Consideration shares only (if applicable), such Nominee has provided the Jersey Newco KYC in a form satisfactory to the Jersey Registrar.

6.5     Each Scheme Creditor (and/or its Nominee, as applicable) shall (subject to paragraphs 5 and 6 below) receive a proportion of the Scheme Consideration consistent with its Scheme Creditor Entitlement (without double counting).

6.6     If the number of Jersey Newco Consideration Shares to be issued to a Scheme Creditor and/or its Nominee resulting from any calculation made in accordance with its Scheme Creditor Entitlements is not a whole number, that number shall be rounded down to the nearest whole number of shares.

6.7     If the principal amount of New Notes to be issued to a Scheme Creditor resulting from any calculation made in connection with the calculation of the New Notes Entitlements is not a whole number of dollars, that number shall be rounded down to the nearest U.S. dollar and the relevant Scheme Creditor shall have no entitlement to any fractional amount.

6.8     If a Scheme Creditor does not satisfy the requirements of clause 7 (Allocation and Distribution of Scheme Consideration) of the Restructuring Implementation Deed to be able to receive its Scheme

Creditor Entitlement on the Restructuring Effective Date, such Scheme Creditors' Scheme Creditor Entitlement will be issued on the Restructuring Effective Date to the Holding Period Trustee to hold in accordance with clause 8 (Holding Period Trustee) of the Restructuring Implementation Deed and the Holding Period Trust Agreement (with the same fractional entitlement provisions applying where relevant).

6.9    For more information regarding the terms of the Holding Period Trust Agreement, details of how a Scheme Creditor can claim their Scheme Creditor Entitlement after the Restructuring Effective Date and what will happen to unclaimed Scheme Consideration at the end of the Holding Period, please refer to paragraph 5 (Holding Period Trust Agreement) of Part 6 (Summary of the Key Restructuring Documents) to this Explanatory Statement.

6.10    Under the Restructuring Implementation Deed:

(a)    each Scheme Creditor (or its Nominee, as applicable) and the Holding Period Trustee will waive:

(i)    any entitlement it may have to receive a share certificate for any Jersey Newco Shares issued to it; and

(ii)    any obligation on Jersey Newco to hold annual general meetings; and

(b)    Jersey Newco will not, and no party to the Restructuring Implementation Deed will on behalf of Jersey Newco, be permitted to make any entity classification election under Treasury Regulation section 301.7701-3 for Jersey Newco to be treated as a disregarded entity or a partnership for U.S. federal income tax purposes.

## PART 6

## SUMMARY OF THE KEY RESTRUCTURING DOCUMENTS

*This section contains high level summaries of the Key Restructuring Documents (including the New Debt Documents, Jersey Newco Investment Agreement and Holding Period Trust Agreement). These summaries are not intended to be exhaustive or complete and are qualified in their entirety by reference to the documents themselves. A full copy of the Restructuring Implementation Deed[18] is set out in Appendix 3 (Restructuring Implementation Deed) to this Explanatory Statement and will also be scheduled to the final Scheme Document, a draft of which is set out in Appendix 2 (Scheme Document) to this Explanatory Statement, and the full text of each of the Key Restructuring Documents are set out as schedules to the Restructuring Implementation Deed (and are set out in Appendix 4 (Key Restructuring Documents) to this Explanatory Statement).*

1. **Introduction**

1.1    The Restructuring Documents comprise:

   (a)    the Restructuring Implementation Deed;

   (b)    each Security and Guarantees Release Document;

   (c)    the New Debt Documents;

   (d)    the Jersey Newco Investment Agreement;

   (e)    the Jersey Newco Sale and Purchase Agreement;

   (f)    the Deed of Release;

   (g)    the Holding Period Trust Agreement; and

   (h)    any other document that is:

       (i)    necessary or desirable to give effect to the Restructuring; and

       (ii)    designated as a "Restructuring Document" by the Company, the Majority Creditors (or their advisers) and the New Bilateral Lenders.

1.2    Pursuant to the Scheme, the Company will be authorised to sign any Restructuring Document to which Scheme Creditors will be a party on behalf of the Scheme Creditors. The full text of the Restructuring Implementation Deed is set out in Schedule 1 to the Scheme (and appended to this Explanatory Statement at Appendix 3 (Restructuring Implementation Deed). The full texts of the Key Restructuring Documents are either scheduled to the Restructuring Implementation Deed (and set out at Appendix 4 (Key Restructuring Documents) to this Explanatory Statement), or in the Agreed Form (as defined in the Restructuring Implementation Deed).

2. **The Restructuring Implementation Deed**

2.1    The Restructuring Implementation Deed shall be entered into by, among others, the Company and the Scheme Creditors. The Restructuring Implementation Deed sets out the Restructuring Steps to be taken and the order in which those steps are to be taken to implement the Restructuring. Further details in

---

[18]    Please note that, in order to avoid duplication, any Key Restructuring Documents that will be scheduled to the execution version of the Restructuring Implementation Deed but have also been appended to this Explanatory Statement have not been scheduled to the copy of the Restructuring Implementation Deed set out in Appendix 3 (Restructuring Implementation Deed) to this Explanatory Statement.

relation to the Restructuring Implementation Deed are contained in Part 5 (Summary of the Restructuring (including the Scheme)) to this Explanatory Statement.

2.2    The Restructuring Implementation Deed will become effective and legally binding on the date on which it is executed by all parties to it, provided that it cannot become effective before the Scheme Effective Time.

*The New Debt Documents*

**3.    Key Terms of the New Notes Documents**

3.1    The New Notes Indenture shall be made between the Company in its capacity as borrower, and certain Subsidiaries as guarantors, the Scheme Creditors as noteholders and Lucid Trustee Services Limited as the New Trustee and New Security Agent.

3.2    A copy of the New Notes Indenture is attached at part 1 (New Notes Indenture) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to this Explanatory Statement at Part 1 (New Notes Indenture) of Appendix 4 (Key Restructuring Documents)). Terms capitalised in the table below and not otherwise defined herein have the meaning given to them in the New Notes Indenture or the New Intercreditor Agreement, as the case may be.

3.3    A summary of the terms of the New Notes is set out below.

| Summary of New Notes | |
|---|---|
| **Issuer** | KCA Deutag UK Finance plc. |
| **Principal Amount** | USD 500,000,000. |
| **Issue Date** | Restructuring Effective Date. |
| **Issue Price** | 100%. |
| **Interest Rate** | 9.875% (fixed). |
| **Interest Payment Date** | 1 June and 1 December of each year, commencing on 1 June 2021. |
| **Maturity Date** | Five years from the Issue Date. |
| **New Notes Guarantors** | See paragraph 11 (Post-Restructuring Obligors and the New Security) of this Part 6. |
| **Security** | See paragraph 11 (Post-Restructuring Obligors and the New Security) of this Part 6. |
| **Intercreditor Agreement** | The New Notes will be subject to the New Intercreditor Agreement. See paragraph 10 below for a summary of the New Intercreditor Agreement and Part 5 of Schedule 2 (New Intercreditor Agreement) to the Restructuring Implementation Deed (and appended to this Explanatory Statement at Part 5 of Appendix 4). |
| **Optional Redemption** | Prior to 1 December, 2022, the Issuer will be entitled at its option to redeem all or a portion of the New Notes at a redemption price equal to 100% of the principal amount of the New Notes plus the applicable |

| | |
|---|---|
| | "make-whole" premium (as described in the New Notes Indenture) and accrued and unpaid interest to, but not including, the redemption date, and additional amounts, if any. |
| | On or after 1 December, 2022, the Issuer will be entitled at its option to redeem all or a portion of the New Notes at the redemption prices set forth in the New Notes Indenture plus accrued and unpaid interest to, but not including, the redemption date, and additional amounts, if any. |
| | Prior to 1 December, 2022, the Issuer will be entitled at its option to redeem up to 40% of the aggregate principal amount of the New Notes with the net cash proceeds from certain equity offerings at a redemption price equal to 109.875% of the principal amount of the New Notes redeemed; plus accrued and unpaid interest to but not including, the redemption date, and additional amounts, if any, provided that at least 50% of the aggregate principal amount of the New Notes under the New Notes Indenture remains outstanding immediately after each such redemption. |
| | At any time prior to 1 December, 2022, the Issuer may on any one or more occasions redeem in any calendar year up to 10% of the original principal amount of the New Notes at a redemption price equal to 103% plus accrued and unpaid interest, and additional amounts, if any. |
| **Tender Offer** | In connection with any tender offers for the New Notes, if holders of not less than 90% in aggregate principal amount of the applicable outstanding New Notes validly tender and do not withdraw such New Notes in such tender offer and the Issuer, or any third party making such a tender offer in lieu of the Issuer, purchases all of the New Notes validly tendered and not withdrawn by such holders, the Issuer or such third party will have the right to redeem the New Notes that remain outstanding in whole, but not in part, following such purchase at a price equal to the price offered to each other holder of New Notes. |
| **Ranking of the New Notes** | The New Notes will, among other things:<br><br>• rank *pari passu* in right of payment with all of the Issuer's existing and future Indebtedness that is not subordinated in right of payment of the New Notes, including Indebtedness incurred under the FAB Run-Off LC Facility and New LC Facility, certain hedging obligations and certain other indebtedness permitted to be incurred under the New Notes Indenture; and<br><br>• be secured, subject to the Agreed Security Principles, by the Collateral on a first-ranking basis, along with the obligations under the New LC Facility and FAB Run-Off LC Facility (although any liabilities in respect of obligations under the New LC Facility and the FAB Run-Off LC Facility will, and certain future obligations, including under certain credit facilities and hedging agreements, may, receive priority over the New Notes with respect to any proceeds received upon any |

| | |
|---|---|
| | enforcement action over, or a distressed disposal of, the Collateral). |
| **Ranking of the New Notes Guarantees** | The New Notes Guarantees will, among other things:<br><br>• rank *pari passu* in right of payment with all of the relevant New Notes Guarantor's existing and future Indebtedness that is not subordinated in right of payment of the New Notes Guarantees, including Indebtedness incurred under the FAB Run-Off LC Facility and New LC Facility, certain hedging obligations and certain other indebtedness permitted to be incurred under the New Notes Indenture; and<br><br>• be secured, subject to the Agreed Security Principles, by the Collateral on a first-ranking basis, along with the obligations under the New LC Facility and FAB Run-Off LC Facility (although any liabilities in respect of obligations under the New LC Facility and the FAB Run-Off Facility will, and certain future obligations, including under certain credit facilities and hedging agreements, may, receive priority over the New Notes Guarantees with respect to any proceeds received upon any enforcement action over, or a distressed disposal of, the Collateral). |
| **Change of Control** | Upon the occurrence of a Change of Control, the Issuer may be required to offer to repurchase all outstanding New Notes at a purchase price in cash equal to 101% of the principal amount of the relevant New Notes on the date of purchase, plus accrued and unpaid interest to, but excluding, the date of purchase (see Section 4.15 (Offer to Repurchase Upon Change of Control Triggering Event) of the New Notes Indenture).<br><br>A change of control will not be deemed to have occurred on one or more occasions if, immediately prior to the signing of an arrangement that could result in a Change of Control and, in certain circumstances, for a period of time thereafter, the Notes are rated at or above a specified rating by two of S&P, Fitch and Moody's (as described in the New Notes Indenture). |
| **Covenants** | The New Notes Indenture will limit, among other things, the ability of the Company and its restricted Subsidiaries to:<br><br>• incur or guarantee additional indebtedness and issue certain preferred stock;<br><br>• pay dividends on, redeem or repurchase our capital stock;<br><br>• make certain restricted payments and investments, including dividends or other distributions with regard to the shares of the Issuer or its restricted Subsidiaries;<br><br>• merge or consolidate with other entities, or make certain asset sales; |

|  |  |
|---|---|
|  | • enter into certain transactions with Affiliates;<br><br>• create or incur certain liens;<br><br>• enter into agreements that restrict its restricted Subsidiaries ability to pay dividends; and<br><br>• impair the security interests.<br><br>Each of the covenants is subject to a number of important exceptions and qualifications, as further set forth in Part 1 (New Notes Indenture) of Schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed. |
| **Events of Default** | The New Notes are subject to certain events of default customary for similar instruments. See Article 6 (Defaults and Remedies) of the New Notes Indenture. |
| **Transfer Restrictions** | The New Notes and the New Notes Guarantees have not been, and will not be, registered under the Securities Act or the securities laws of any other jurisdiction. The New Notes and the New Notes Guarantees are subject to restrictions on transfer and may only be offered or sold in transactions that are exempt from or not subject to the registration requirements of the Securities Act. See "Important Securities Law Notice" at page 10 of this Explanatory Statement. |
| **Settlement** | Euroclear and Clearstream. |
| **Listing** | Application will be made to The International Stock Exchange Authority Limited to list the New Notes on the Official List of The International Stock Exchange. |
| **Governing Law** | New York. |

**4.      Key terms of the Jersey Newco Investment Agreement and Jersey Newco Articles of Association**

4.1      Jersey Newco will enter into the Jersey Newco Investment Agreement and adopt the Jersey Newco Articles of Association on the Restructuring Effective Date.

4.2      A copy of each of the Jersey Newco Investment Agreement and Jersey Newco Articles of Association is appended to this Explanatory Statement at Part 6 (Jersey Newco Investment Agreement) of Appendix 4 (Key Restructuring Documents) and Appendix 5 (Jersey Newco Articles of Association). Terms capitalised in the table below and not otherwise defined herein have the meaning given to them in the Jersey Newco Investment Agreement and/or Jersey Newco Articles of Association (as applicable).

4.3      A summary of the terms of the Jersey Newco Investment Agreement and Jersey Newco Articles of Association, in relation to the Jersey Newco Consideration Shares, is as follows:

| **Summary of the Jersey Newco Investment Agreement and Jersey Newco Articles of Association** | |
|---|---|
| **(1) General** | |
| **Governing Documents** | The terms of the New Shareholders' investments in Jersey Newco will be governed by:<br><br>(i)   the Jersey Newco Investment Agreement (which is governed by English law); and<br><br>(ii)   the Jersey Newco Articles of Association. |
| **(2) Capital Structure** | |
| **Share Classes and Share Rights** | A Ordinary shares with customary rights of entitlement to receive dividends, vote (subject to holding thresholds being met), transfer (subject to any applicable transfer restrictions) and participate *pari passu* in returns of capital.<br><br>Separate classes of non-voting shares will be issued to management in connection with the Management Equity Plan. Scheme Creditors will be diluted pro rata by the issue of the Management Equity Plan shares. |
| **Pre-emptive Rights** | All additional issuances of equity/debt by any member of the Group to be first offered to the existing New Shareholders' pro rata to their shareholding/debt holding (as appropriate) before being offered to a third party (subject to customary exclusions for management issuances, acquisition issuances, emergency share issues where there has been or is likely to be an event of default under any finance document (provided a catch up opportunity is available), and issuances between members of the Group). |
| **Funding** | No New Shareholder will have any obligation to provide any further financing to, nor to provide any guarantee in support of, Jersey Newco or the Group. |
| **(3) Governance** | |
| **Board Composition** | •   The board shall comprise: (i) each of the CEO and the CFO from time to time; (ii) the chairperson; and (iii) such number of independent directors as may be appointed as follows:<br><br>•   each (i) New Shareholder together with its Affiliates, or (ii) Major Shareholders acting together and together with their respective Affiliates, in each case holding over 10% in aggregate of the Jersey Newco Shares (a **Substantial Shareholder**), is entitled to nominate a slate of directors for appointment (a **Slate**). Upon receipt of a Slate from a Substantial Shareholder, Jersey Newco will promptly send the Slate to all Major Shareholders for approval; |

|  | |
|---|---|
|  | o   a Major Shareholder may either, if they are a Substantial Shareholder or if acting together such that as a group they constitute a Substantial Shareholder, (i) propose an alternative Slate within ten Business Days of receipt of the Sale, or (ii) waive the ten Business Day period; and<br><br>o   within two Business Days of expiry of the initial ten Business Day period or receipt of waivers from the Major Shareholders, as the case may be, Jersey Newco shall circulate any Slate(s) for approval by Major Shareholder Majority (including the nominating shareholder); and<br><br>o   if the Slate is approved by Major Shareholder Majority, the independent directors named therein shall be appointed and any existing independent Director who is not named on the Slate shall be removed from office.<br><br>•   Only one of the proposed Slates may be approved and directors elected.  If the nomination Slate is rejected, that nominating Substantial Shareholder cannot nominate a further slate of directors for a period of 12 months. If the nominations are accepted, there is no equivalent restriction on proposing further slates for approval. Directors may be removed by a Major Shareholder Majority.<br><br>•   Substantial Shareholders (affiliated holdings may be aggregated for this purpose), have the right to appoint one observer to the board.<br><br>•   The chairperson is to be appointed from amongst the independent directors as proposed by any Major Shareholder and agreed by Major Shareholder Majority.<br><br>•   Audit and Remuneration committees are to be established. The Audit Committee shall comprise the chairperson, the CEO, the CFO and two other Non-Executive Directors. The Remuneration Committee shall comprise the chairperson and two other Non-Executive Directors.<br><br>•   A Major Shareholder shall have the right (but not the obligation) to replicate Jersey Newco board and committee appointments on each board and committee of each member of the Group. |
| **Quorum and Voting** | Quorum to comprise a majority of the board of Jersey Newco. Adjourned meetings to require the same quorum.<br><br>Each director has one vote. Upon a deadlock the chairperson shall have a casting vote. Other than in relation to Board Reserved Matters, all decisions of the board of Jersey Newco will be taken by a simple majority of the directors present and voting. |

| | |
|---|---|
| **Board Meetings** | Board meetings shall take place every other month for a period of 12 months starting on the date of the Jersey Newco Investment Agreement, and following such period shall take place at least once per quarter. |
| **Voting and Major Shareholder Majority** | The Jersey Newco Shares issued to Scheme Creditors shall comprise a single class. Such Jersey Newco Shares shall rank equally as to dividends and other distributions, interest and return of capital.<br><br>Provided that a New Shareholder (affiliated holdings may be aggregated for this purpose) holds 5% or more of the Jersey Newco Shares in issue (each a **Major Shareholder**), each such Jersey Newco Share shall carry one vote. For so long as a New Shareholder holds less than 5% of the Jersey Newco Shares in issue, such Jersey Newco Shares shall be non-voting. Notwithstanding the foregoing, all Jersey Newco Shares shall carry a vote with respect to the below Shareholder Super Reserved Matters.<br><br>**Major Shareholder Majority**: the majority decision (by reference to the number of Shares held) of New Shareholders holding voting Shares.<br><br>If no New Shareholder holds 5% or more of the Jersey Newco Shares then the 5% threshold for Major Shareholders shall be automatically reduced until such point as at least three New Shareholders are Major Shareholders.<br><br>If and for so long as the Major Shareholders hold in aggregate less than 30% of the Jersey Newco Shares in issue, then each Jersey Newco Share shall have one vote and all Major Shareholder Majority matters shall be determined by a simple majority vote of all New Shareholders (by number of Jersey Newco Shares), or where required by law, 66⅔, of the A ordinary shares in issue.<br><br>If a Major Shareholder comprises more than one New Shareholder (through the election to aggregate shareholdings), such group shall nominate one of their number to act, vote, attend meetings and make decisions on their behalf and following such election the non-nominee New Shareholders shall not be entitled to act, vote, attend meetings or make decisions regarding their own shareholdings. |
| **Contingency measures in respect of anti-trust considerations due to control by a single major creditor and capping voting rights** | If:<br><br>a)   a New Shareholder actively stake-builds, then it shall be responsible for determining whether any anti-trust or foreign direct investment (**FDI**) filings need to be made;<br><br>b)   any Major Shareholder sells down such that they cease to be Major Shareholders and as a result a Major Shareholder would gain control of Major Shareholder Majority decisions (i.e. hold more than 25% of the Jersey Newco Shares eligible to vote), the 5% threshold for voting rights on Jersey Newco Shares shall automatically be reduced to such a level that such Major Shareholder does not obtain control until the earlier of that Major Shareholder: (i) provided merger or FDI clearance has been |

|  | obtained, notifying Jersey Newco that it wishes to control Major Shareholder Majority decisions; or (ii) losing control of Major Shareholder Majority decisions if the threshold returned to 5% (i.e. due to other shareholders increasing their shareholding).<br><br>A Major Shareholder may, by notice to Jersey Newco, elect to have the votes attributable to its Jersey Newco Shares capped at a percentage set out in such notice, and the votes of the other Major Shareholders will be adjusted accordingly.<br><br>The Transfer Agent is obliged to notify Jersey Newco and the relevant New Shareholder of any increase or decrease in their Shareholding which would move them (when aggregated with their affiliated holdings) through the thresholds set out in clause 7.11 of the Jersey Newco Investment Agreement. Jersey Newco/the Transfer Agent will be entitled to notify all Major Shareholders of this to ensure appropriate steps are taken regarding voting rights. |
|---|---|
| **Board Reserved Matters** | Customary approval rights in relation to certain approval matters to require the consent of a majority of the Non-Executive Directors on the Board. The full list of matters is set out in Part 2 of Schedule 6 of the Jersey Newco Investment Agreement. |
| **Shareholder Reserved Matters** | The Jersey Newco Investment Agreement lists a number of matters which Jersey Newco may not undertake without approval by Major Shareholder Majority. The matters which these shareholder reserved matters relate to include a variety of matters including but not limited to the sale of Jersey Newco or any listing of Jersey Newco's shares or any merger (except for the purpose of internal reorganisation). The full list of matters is set out in Part 3 of Schedule 6 of the Jersey Newco Investment Agreement.<br><br>1. The following matters require prior approval of holders of 80% of the Shares (whether or not they carry voting rights) (**Shareholder Super Reserved Matters**): amending or modifying the constitutional documents of Jersey Newco or the Jersey Newco Investment Agreement in a manner that would have a materially disproportionate adverse effect on one or more New Shareholders from that on other New Shareholders;<br><br>2. entering into any related party transaction;<br><br>3. any material change in the nature or scope of the business conducted by Jersey Newco or any other member of the Group (excluding the sale of any assets of the Group);<br><br>4. modifying, varying or abrogating any rights attaching to shares in Jersey Newco or any other member of the Group to the extent that would have a materially disproportionate adverse effect on one or more New Shareholders from that on other New Shareholders; and<br><br>5. save in connection with: (a) management issuances; (b) emergency share issues (provided a catch up opportunity is |



| | |
|---|---|
| | available);   (c) issuances between members of the Group; (d) acquisition issuances; and (e) issuances on a fully pre-emptive basis: |
| | i.      issuing any shares (including convertible instruments) in; or |
| | ii.     changing or varying the share capital of Jersey Newco or any Group company (including a reduction of capital or a purchase or redemption of shares or a consolidation, subdivision, conversion or cancellation of any shares), |
| | in each case on a non-pro-rata basis. |
| **Information Rights** | All New Shareholders to receive the same level of information as provided to them in their capacity as bondholders, irrespective of shareholding. |
| | All New Shareholders who together with any Affiliates hold over 1% of the Jersey Newco Shares at Completion may, for the first 18 months post-Completion, elect to receive further information (subject to customary confidentiality obligations) including but not limited to information regarding approaches made for any exit, KPIs, monthly management accounts and anything else they may reasonably (as determined by the board) request.  Provided that such a New Shareholder has made an election to receive non-public information (subject to customary confidentiality obligations) within this 18-month period, it may continue to receive such information for as long as it holds over 1% of the Jersey Newco Shares (in each case affiliated holdings may be aggregated for this purpose). This right does not transfer with the Jersey Newco Shares. |
| | After the expiry of the 18-month period, a New Shareholder who does not hold over 1% of the Jersey Newco Shares shall only be entitled to make an election to receive such further information referred to above if, together with their Affiliates, such New Shareholder is a Major Shareholder. It may only continue to receive such information for as long as it is a Major Shareholder. |
| **4. Exit/Transferability** | |
| **Transfer Restrictions** | • Jersey Newco Shares are freely transferable, save that no transfer may be made except pursuant to the terms of the Jersey Newco Investment Agreement and Jersey Newco Articles of Association and in particular, pursuant to the tag-along and drag-along rights. |
| | • No lock-up period, ROFO or ROFR over Jersey Newco Shares. |
| | • Tag-Along and Drag-Along Rights shall not apply in relation to transfers between affiliated New Shareholders. |

| | |
|---|---|
| **Tag-Along Rights and Squeeze out** | If a New Shareholder or New Shareholders propose to transfer, in one transaction or a series of connected transactions: |

    • more than 50% of the Jersey Newco Shares in issue to any party;

    • more than 20% of the Jersey Newco Shares in issue to any competitor; or

    • such number of the Jersey Newco Shares that results in any party (together with any affiliated shareholders) holding more than 50% of the Jersey Newco Shares in issue, and each subsequent occasion on which that party crosses a 10% threshold (i.e. 60/70/80/90%),

each other New Shareholder shall have the right to sell, and the proposed transferee shall be required to offer to purchase, all of their Jersey Newco Shares to the transferee, in each case on the same terms and conditions. Where the transfer occurs in a series of connected transactions, the price payable to the tagging shareholders shall be the highest price paid by the transferee in the previous 12 months (for which purposes the value of the shares acquired as part of the restructuring shall be ignored).

Tag-along rights do not apply where:

    • a Drag-Along Notice has been served;

    • the transfer of Jersey Newco Shares is a permitted transfer to an Affiliate; or

    • the transfer of Jersey Newco Shares is to a new holding company which is established for the purposes of planning for a reorganisation or an Exit and in which the share capital structure (principally the shareholdings but including all economic rights) of the Company is replicated in all material respects.

**Squeeze-Out Offer**

If a party (affiliated holdings being aggregated for this purpose) obtains 90% or more of the Jersey Newco Shares (a Super Majority Holder) they shall be entitled to require the other New Shareholders (the **Minority Shareholder**) to sell all their Jersey Newco Shares at a price no lower than the highest price the acquiring party paid for Jersey Newco Shares in the preceding 12 months (for which purposes the value of the shares acquired as part of the restructuring shall be ignored) (a **Squeeze-Out Offer**). If a Super Majority Shareholder makes such a Squeeze-Out Offer, the Minority Holders are bound to transfer 100% of their Jersey Newco Shares to the Super Majority Holder on the terms of the Squeeze-Out Offer provided that (i) the consideration for such Jersey Newco Shares must be in either: (a) cash; or (b) marketable securities (which shall not have been suspended from trading due to fraud or deficiencies in quality of corporate governance or financial reporting of their issuer at any time within the 12 months prior to the proposed transfer) listed on

| | an internationally recognised and reputable stock exchange (**Marketable Securities**) (or a combination of (a) and (b)).<br><br>Minority Shareholders are required to make or give the representations and warranties as to title and capacity of the Jersey Newco Shares and a leakage indemnity or covenant.<br><br>If a Minority Shareholder does not execute transfers in respect of its Jersey Newco Shares within the time period set out in the Squeeze-Out Offer, then the Board is entitled to authorise and instruct such person as it thinks fit to execute, complete and deliver the necessary transfer(s) as agent on the Minority Shareholder's behalf on the same terms as those set out in the Squeeze-Out Offer. |
|---|---|
| **Drag-Along Rights** | If New Shareholders wish to transfer more than 50% of the Jersey Newco Shares (the Majority Selling Shareholders) in issue to any bona fide third party in one transaction or a series of connected transactions they can compel the other New Shareholders (the Dragged Shareholder(s)) to sell an equal proportion of their Jersey Newco Shares on the same terms and conditions, provided that:<br><br>(i) the consideration for such Jersey Newco Shares must be in: (a) cash; or (b) Marketable Securities  (or a combination of (a) and (b)); and<br><br>(ii) the Dragged Shareholder(s) shall be required to make or give the same representations, warranties, covenants and indemnities (if any) as to title and capacity of the Jersey Newco Shares, together with a locked box indemnity or covenant in each case as given by the Majority Selling Shareholders.<br><br>If a Dragged Shareholder does not execute transfers in respect of its Jersey Newco Shares within the time period set out in any Drag-Along Notice, then the Board is entitled to authorise and instruct such person as it thinks fit to execute, complete and deliver the necessary transfer(s) as agent on the Dragged Shareholder's behalf on the same terms as those accepted by the Majority Selling Shareholders. |
| **Exit** | Each of the New Shareholders and Jersey Newco agree to consult together (together with Jersey Newco's financial advisers from time to time) with a view to determining a suitable time to effect an Exit. No Exit may take place without the consent of the Major Shareholder Majority. |
| **5. General** | |
| **Amendments** | No amendment, change or addition to the Jersey Newco Investment Agreement is effective or binding unless in writing and executed by all of the parties except that amendments may be made by the written agreement of a Major Shareholder Majority without the involvement or agreement of the other parties provided that such amendment does not have a materially disproportionate adverse effect on one or more New Shareholders from that on other New Shareholders. |

| Governing law | The Jersey Newco Investment Agreement and all matters (including, without limitation, any contractual or non-contractual matters) arising from, or connected with, it are governed by, and will be construed in accordance with English law. |
|---|---|

## 5. Holding Period Trust Agreement

5.1    A copy of the Holding Period Trust Agreement is attached at part 9 (Holding Period Trust Agreement) of schedule 2 (Holding Period Trust Agreement) to the Restructuring Implementation Deed (and appended to this Explanatory Statement at Part 9 (Holding Period Trust Agreement) of Appendix 4 (Key Restructuring Documents)). Terms capitalised in the below and not otherwise defined herein have the meaning given to them in the Holding Period Trust Agreement.

5.2    A Scheme Creditor (and/or, if relevant, its Nominee(s)) shall only receive the New Notes and Jersey Newco Consideration Shares on the Restructuring Effective Date if:

(a)    it (or an Account Holder on its behalf) has duly elected to do so by validly completing and delivering an Account Holder Letter and/or Lender Claim Form to the Information Agent before the Voting Instruction Deadline;

(b)    it is an Eligible Person;

(c)    it is not a Disqualified Person; and

(d)    the Jersey Registrar has confirmed that the Jersey Newco KYC requirements have been satisfied (in relation to the Jersey Newco Consideration Shares only).

5.3    If a Scheme Creditor does not comply with the relevant requirements in paragraph 5.2 above, and is therefore an Unadmitted Scheme Creditor in relation to either the New Notes or the Jersey Newco Consideration Shares, the Scheme Creditor will not be eligible to receive their New Notes and/or Jersey Newco Consideration Shares on the Restructuring Effective Date. As such the Holding Period Trustee will hold the Trust Entitlements, subject to the terms of the Restructuring Implementation Deed and the Holding Period Trust Agreement, until either:

(a)    (i) the Unadmitted Scheme Creditor (or an Account Holder on its behalf) submits a valid Account Holder Letter and/or Lender Claim Form to the Information Agent before the expiry of the Holding Period; (ii) the Unadmitted Scheme Creditor (and/or, if relevant its Nominee(s)) is an Eligible Person; (iii) the Unadmitted Scheme Creditor (and/or, if relevant its Nominee(s)) is not a Disqualified Person; and (iv) the Jersey Registrar has confirmed that the Jersey Newco KYC requirements have been satisfied (in relation to the Jersey Newco Consideration Shares only); or

(b)    the expiry of the Holding Period.

5.4    Any Unadmitted Entitlements shall be issued in trust to the Holding Period Trustee.

5.5    Scheme Creditor Entitlements that remain held by the Holding Period Trustee on the expiry of the Holding Period will be sold by the Holding Period Trustee and the proceeds of such sale (after any taxes, withholding, deductions, fees, costs or any other expenses in connection therewith) will be held on trust by the Holding Period Trustee for the relevant Unadmitted Scheme Creditors for a further period of six months following which they will be paid to Alpha or to any person nominated by Alpha.

**6.**    **Summary of the New LC/Undertaking Facilities Agreements**

6.1    A copy of the New Lloyds LC Facility Agreement is attached at part 3 (New LC Facility Agreement)
of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and
appended to this Explanatory Statement at Part 3 (New LC Facility Agreement) of Appendix 4 (Key
Restructuring Documents)) and a copy of the FAB Run-Off LC Facility Agreement is attached at part
4 (FAB Run-Off LC Facility Agreement) of schedule 2 (Key Restructuring Documents) to the
Restructuring Implementation Deed (and appended to this Explanatory Statement at Part 4 (FAB Run-
Off LC Facility Agreement) of Appendix 4 (Key Restructuring Documents)). Terms capitalised in the
table below and not otherwise defined herein have the meaning given to them in the New Lloyds LC
Facility Agreement or the FAB Run-Off LC Facility Agreement as the context requires.

6.2    The New LC/Undertaking Facilities Agreements contain a number of similar terms and conditions. A
summary of the common terms are set out in the table below:

| | |
|---|---|
| **Material Subsidiary** | A Subsidiary representing 5% of the EBITDA of the Adjusted Group |
| **Change of Control** | As per the New Notes Indenture but without "Portability". |
| | The Borrower shall be required to post cash cover immediately upon the occurrence of a change of control. |
| | Upon a change of control, no Borrower may request, and the Bank shall not be obliged to issue, any Undertaking. |
| **Representations** | Representations as to status(*), binding obligations(*), non-conflict with other obligations(*), power and authority(*), validity and admissibility in evidence(*), governing law and enforcement(*), insolvency, no filing or stamp taxes, deduction of tax, no default, financial statements(*for new statements only), no proceedings, no breach of laws, environmental laws, taxation, anti-corruption law, security and financial indebtedness, ranking, good title to assets(*), legal and beneficial ownership(*), shares, intellectual property, group structure chart, COMI(*) and sanctions.  Items marked with an asterisk(*) are the repeating representations. Various materiality thresholds, qualifications and other exceptions apply. |
| **General undertakings** | Undertakings as to authorisations, compliance with laws, environmental compliance, environmental claims, anti-corruption law, taxation, preservation of assets, pari passu ranking, insurance, pensions, access, intellectual property, financial assistance and further assurance. Various materiality thresholds, qualifications and other exceptions apply. |
| **Incurrence covenants** | Certain of the undertakings contained in the New Notes Indenture will also be incorporated into a schedule to the agreements (the **Covenant Schedule**). |
| **Information undertakings** | Information undertakings to cover quarterly and annual financial reporting together with any other reports required to be delivered under the New Notes documentation (to be delivered at the same time it is delivered to noteholders) and certain miscellaneous information.  No budgets, cashflow forecasts, comparisons provided.  No bank presentation but the Bank shall have a right to attend any noteholder calls (but without any right to speak). |

| | |
|---|---|
| **Events of default** | Non-payment, breach of other obligations, misrepresentation, cross-payment default/acceleration, insolvency, insolvency proceedings, creditors' process, unlawfulness and invalidity, intercreditor agreement, cessation of business, audit qualification, expropriation, repudiation and rescission of agreements and litigation. Various materiality thresholds, qualifications and other exceptions apply.<br><br>Cross-default (other than cross-payment default/acceleration) shall not be an event of default, but upon a cross-default no Borrower may request, and the Bank shall not be obliged to issue, any Undertaking. |
| **Governing Law** | English provided that the Covenant Schedule will be interpreted in accordance with New York law. |
| **Jurisdiction** | Courts of England. |

## 7.    New Lloyds LC Facility Agreement

7.1    Terms capitalised in the table below and not otherwise defined herein have the meaning given to them in the New Lloyds LC Facility Agreement.

7.2    A summary of the terms specific to the New Lloyds LC Facility Agreement are set out in the table below:

| | |
|---|---|
| **Facility Type** | Committed facility (with a base currency in USD) which may be utilised by way of Undertakings issued in the ordinary course of trading and any other instrument agreed between Alpha and the Bank.<br><br>In the event that an Undertaking is to be issued other than in the ordinary course of trading, the Borrower shall be required to post cash cover prior to the issuance of that Undertaking.<br><br>The facility shall not be capable of being drawn or made available in cash. |
| **Facility Limit** | USD 60,000,000 (provided that only USD 50,000,000 may be utilised until the DB Undertaking has been cancelled and returned). In the event that the DB Undertaking has not been cancelled and returned within 6 months after the Restructuring Effective Date, the Facility Limit shall be automatically permanently reduced to USD 50,000,000.<br><br>DCS sub-limit: USD 19,000,000 reducing to USD 12,000,000 after the DB Undertaking has been cancelled and returned.<br><br>Customs Bond sub-limit: USD 15,000,000.<br><br>The available amount of each limit shall be reduced by the aggregate amount of any outstanding Undertaking issued under it. The availability under any limit will not increase as a result of any cash cover.<br><br>The DCS sub-limit and the Customs Bond sub-limit shall not operate to provide for sub-tranches of the Facility that may only be used to issue Direct Credit Substitutes or Custom Bonds (as the case may be). |

| | |
|---|---|
| | The Company shall use reasonable endeavours to ensure that the existing DB Undertaking shall be cancelled and returned to the Bank within 6 months after the Restructuring Effective Date. Failure to return the DB Undertaking shall not be an event of default. |
| **Approved Currencies** | Euros, USD, Sterling, Omani Rial, Kuwaiti Dinar, Saudi Riyal, Mexican peso, Norwegian Krone, Algerian Dinar, Polish Zloty, Russian Rouble, Albanian Lek, United Arab Emirates Dirham and/or any other currency approved by the Bank. |
| **Termination Date** | 5 years from the Restructuring Effective Date less 30 days. |
| **Availability Period** | From the Restructuring Effective Date to the date falling one month prior to the Termination Date. |
| **Expiry Date of Undertakings** | A Borrower (or Alpha or Abbot on its behalf) may request that the Expiry Date of an Undertaking falls after the Termination Date if (other than to the extent the Undertaking is a Customs Bond, a Tax Bond or a Government Bond (but, in the case of a Government Bond, only if it does not have an Expiry Date)) not later than three Months prior to the Termination Date, the relevant Borrower (or Alpha or Abbot on its behalf) provides cash cover in relation to that Undertaking.<br><br>A Borrower (or Alpha or Abbot on its behalf) may request an Undertaking that has no Expiry Date only if that Undertaking is a Customs Bond, a Tax Bond or a Government Bond. |
| **Issuance Fees** | The Company shall pay (or shall procure that a member of the Restricted Group shall pay) to the Bank a fee:<br><br>(i)      in respect of Undertakings issued in euro, in euro;<br><br>(ii)     in respect of Undertakings issued in GBP, in GBP; and<br><br>(iii)    in respect of all other Undertakings, in the Base Currency,<br><br>in each case, computed at the applicable rate specified below as the case may be on the Base Currency Amount of each outstanding Undertaking (less any amount of cash cover provided in connection with that Undertaking).<br><br>In respect of Undertakings which are Direct Credit Substitutes, the Issuance Rate shall be 5.25% per annum.<br><br>In respect of Undertakings which are not Direct Credit Substitutes, the Issuance Rate shall be calculated in accordance with the following table by reference to the Senior Secured Gross Leverage Ratio as set out in the most recently delivered Leverage Calculation Certificate: |

| Senior Secured Gross Leverage Ratio | Custom Bonds (% per annum) | All other Undertakings (% per annum) |
|---|---|---|
| Greater than 4.75:1.00 | 4.75% | 4.25% |

| | | |
|---|---|---|
| Greater than 4.25:1.00 and equal to or less than 4.75:1.00 | 4.50% | 4.00% |
| Greater than 3.75:1.00 and equal to or less than 4.25:1.00 | 4.25% | 3.75% |
| Greater than 3.25:1.00 and equal to or less than 3.75:1.00 | 4.00% | 3.50% |
| Equal to or less than 3.25:1.00 | 3.75% | 3.25% |

The rate at the bottom of the table shall apply from the date of the New Lloyds LC Facility Agreement. Any increase or decrease in the rate for an Undertaking shall take effect at the end of February, May, August or November (as the case may be following) receipt by the Bank of the Leverage Calculation Certificate most recently delivered under this Agreement.

In respect of any Undertaking for which any cash cover has been provided, Alpha shall pay (or shall procure that a member of the Restricted Group shall pay) to the Bank, a fee in the Base Currency computed at a rate of 0.25% per annum of the Base Currency Amount of the relevant Undertaking, provided that this rate shall only apply for the period in respect of which that cash cover is provided.

The accrued issuance fees are payable in arrear on the last day of February May, August and November in each Financial Year after the date of this Agreement and on the Termination Date. The fees payable at the end of November 2020 shall include fees in relation to the Existing Undertakings accrued prior to the Restructuring Effective Date.

| | |
|---|---|
| **Commitment Fees** | The Company shall pay (or shall procure that a member of the Restricted Group shall pay) to the Bank a fee in the Base Currency computed at the rate of 35% of the applicable Base Issuance Rate per annum on the Bank's Available Commitment for the Availability Period. The accrued commitment fee is payable starting from the last day of February 2021, on the last day of February May, August and November in each Financial Year which ends during the Availability Period, on the last day of the Availability Period and, if cancelled in full, on the cancelled amount of the Bank's Commitment at the time the cancellation is effective. |
| **Guarantor coverage test** | The Company shall ensure that, subject to the Agreed Security Principles, the aggregate (without double counting) Group Member EBITDA of the Guarantors exceeds 80% of the Consolidated EBITDA of the Adjusted Group as at the end of each Financial Year when tested by reference to the most recent Leverage Calculation Certificate delivered to the Bank in accordance with this Agreement, provided that (A) any entity with negative Consolidated EBITDA shall be deemed to have Consolidated EBITDA of zero, (B) the Consolidated EBITDA of the Guarantors shall be calculated by reference to each member of the Adjusted Group that has positive Consolidated EBITDA and (C) the Consolidated EBITDA of any member of the Group that is not required to become a Guarantor in accordance with the Agreed Security Principles shall be excluded from the Consolidated EBITDA of the Adjusted Group. |

| | |
|---|---|
| | If any Leverage Calculation Certificate shows that the Guarantor Coverage Test was not satisfied, within 60 days of the date of delivery of that Leverage Calculation Certificate, Alpha shall ensure that, subject to the Agreed Security Principles, such other member(s) of the Restricted Group as may elected by Alpha shall accede as Additional Guarantors to the extent required to ensure that the Guarantor Coverage Test is satisfied (calculated as if such Additional Guarantors had been Guarantors at the end of the relevant Financial Year) and if the Guarantor Coverage Test is satisfied when recalculated within such time period, no Default or other breach of this Agreement shall be deemed to have occurred. |
| **Excess Leverage Event** | If any Leverage Calculation Certificate delivered in accordance with this Agreement shows that the Senior Secured Gross Leverage Ratio for the period to which that Leverage Calculation Certificate relates (the Relevant Period) exceeded 4.5:1, the Bank may request that the Borrower (or Alpha or Abbot on its behalf) provides cash cover in respect of all outstanding Undertakings, such cover to be provided within 10 Business Days of that request. |
| **Equity Cure** | Ability to cure an Excess Leverage Event by including any equity contribution or subordinated debt as EBITDA. No more than four cures may be made and no more than two cures in any financial year and no cap on the amount of the cure. |
| **Additional information undertakings** | Delivery of monthly management accounts (plus commentary on year to date performance) within 30 days after each month end and Leverage Calculation Certificate to be provided with quarterly/annual reporting. |

## 8.    FAB Run-Off LC Facility Agreement

8.1    Terms capitalised in the table below and not otherwise defined herein have the meaning given to them in the FAB Run-Off LC Facility Agreement.

8.2    A summary of the terms specific to the FAB Run-Off LC Facility Agreement are set out in the table below:

| | |
|---|---|
| **Facility Limit** | The facility limit will be set at the outstanding notional amount of the undertakings in issue at the Restructuring Effective Date. |
| **Approved Currencies** | Euros, USD, Sterling, Omani Rial, Kuwaiti Dinar, Saudi Riyal, United Arab Emirates Dirham and/or any other currency approved by the Bank. |
| **Termination Date** | 30 April 2022. |
| **Issuance Fees** | The Company shall pay (or shall procure that a member of the Restricted Group shall pay) to the Bank a fee in US Dollars computed at the rate of 4% per annum on the Base Currency Amount of each Undertaking.<br><br>The accrued issuance fees payable are payable in arrear on the last day of February, May, August and November in each Financial Year after the date of this Agreement and on the Termination Date. The fees payable at the end of November 2020 shall include fees in relation to the Existing Undertakings accrued prior to the Restructuring Effective Date. |

| Guarantor coverage test | None |
|---|---|
| Financial covenant | None |

## 9.    New Cash Management Facilities Agreement

9.1    A copy of the form of the New Cash Management Documents are attached at schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to this Explanatory Statement at Part 2 (New Cash Management Facilities Agreement) of Appendix 4 (Key Restructuring Documents)). Terms capitalised in the table below and not otherwise defined herein have the meaning given to them in the New Cash Management Documents.

9.2    A summary of the terms of the New Cash Management Facilities are set out in the table below:

| Facilities | The New Cash Management Documents provide for overdraft facilities, cash-pooling facilities, BACS facilities, credit card facilities and online banking facilities. |
|---|---|
| Overdraft Facility Limits | Gross limit: USD 200,000,000 on the Restructuring Effective Date. Net limit: zero at all times (aggregated across all overdraft balances and all cash balances in each of the cash pooling services and across all of the Approved Currencies). |
| Approved Currencies | Overdraft currencies: USD, EUR, GBP, NOK, CAD, RUB and any other currency agreed by the Bank. Cash pooling currencies: USD, EUR, GBP, NOK and any other currency agreed by the Bank. |
| Fees and other pricing | As per existing cash management facility documentation. |
| Overdraft Pricing on debit balances | An additional "turn rate" fee of 1% shall apply to any net debit balance of any currency pool. |
| Termination Date | The overdraft, the cash-pooling facilities, BACS facilities and the credit card facilities shall each be uncommitted and may be withdrawn on demand by the Bank at any time. The Bank may cancel, close or withdraw access (as applicable) to all or any part of the bank accounts and/or the online banking platform by giving Alpha at least 6 months prior written notice, subject always to the Bank's ability to cancel, close or withdraw access (as applicable) immediately as a result of the Bank's standard compliance exclusions. |
| Additional information undertaking | Alpha to deliver: |

|  | (a)    the quarterly and annual financial reporting, together with any other reports required to be delivered under the New Notes documentation at the same time it is delivered to noteholders;<br><br>(b)    monthly management accounts (plus commentary on year to date performance) within 30 days after the end of each month; and<br><br>(c)    a calculation of the Senior Secured Gross Leverage Ratio of the Group on a quarterly basis. |
|---|---|
| **Governing Law** | English law. |
| **Jurisdiction** | Courts of England. |

## 10.    Summary of the New Intercreditor Agreement

10.1    A copy of the form of the New Intercreditor Agreement is attached at part 5 (New Intercreditor Agreement) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to this Explanatory Statement at Part 5 (New Intercreditor Agreement) of Appendix 4 (Key Restructuring Documents)). Terms capitalised in the table below and not otherwise defined herein have the meaning given to them in the New Intercreditor Agreement.

10.2    A summary of the New Intercreditor Agreement is set out in the table below:

| **Ranking** | The principal borrowing claims, guarantee claims and security claims shall be ranked in the following order:<br><br>**First**: the New Notes, the New LC/Undertaking Facilities, the New Cash Management Facilities, any future senior secured loan or notes liabilities and any hedging liabilities);<br><br>**Second**: second lien liabilities; and<br><br>**Third**:  any parent debt liabilities. |
|---|---|
| **Payment waterfall** | All amounts received or recovered by the New Security Agent pursuant to the terms of any of the applicable New Debt Documents (excluding any parent debt only security) or in connection with the realisation or enforcement of all or any part of the New Security:<br><br>**First:** in payment or distribution to the New Security Agent and the New Trustee for application towards the discharge of any unpaid fees, costs and expenses payable to them under the relevant New Debt Documents and on a pro rata basis between them.<br><br>**Second:** in discharging all costs and expenses incurred by any Secured Party in connection with any realisation or enforcement of the New Security taken in accordance with the terms of the New Intercreditor Agreement.<br><br>**Third:** pro rata and *pari passu*, in permanent prepayment and reduction of, or to provide full cash collateralisation of, the New LC/Undertaking Facilities, the |

|  | New Cash Management Facilities, any future super senior credit facility liabilities and any super senior hedging liabilities. |
|---|---|
|  | **Fourth**: pro rata and *pari passu* towards unpaid and outstanding liabilities under the New Notes, any future non-super senior secured loan or notes liabilities and any non-super senior hedging liabilities. |
|  | **Fifth**: pro rata and *pari passu* towards unpaid and outstanding liabilities under any second lien liabilities. |
|  | **Sixth**: pro rata and *pari passu* towards unpaid and outstanding liabilities under any parent debt liabilities. |
|  | **Seventh:** in payment of the surplus, if any, to the relevant Post-Restructuring Obligor or any person entitled to it (including for distribution to its shareholder(s)). |
| **New Cash Management Facilities and New LC/Undertaking Facilities** | Nothing shall restrict any right of a cash management provider to net or set-off in relation to the New Cash Management Facility which is a multi-account overdraft to the extent permitted by and in accordance with the terms of the applicable cash management agreement (for any net-nil overdraft). For any non net-nil overdraft customary permissions to reduce to the net amount will be included. |
|  | The New Intercreditor Agreement shall not restrict any right of a lender under the New LC/Undertaking Facilities from requesting cash cover or exercising set-off rights in relation to that cash cover, to the extent permitted by and in accordance with the terms of the applicable New LC/Undertaking Facility Agreements. |
|  | The New Cash Management Facilities will not have any votes in respect of any enforcement of the New Security or as part of "majority" voting but will have customary votes to protect its rights under the New Intercreditor Agreement. |
| **Majority super senior creditors** | 66 2/3% of all super senior credit participations (i.e. those representing the Super Senior Liabilities) but not including any cash management providers. |
| **Majority senior secured creditors** | 50.1% of all senior secured credit participations (excluding super senior credit participations) but not including cash management providers. |
| **Majority senior creditors** | 50.1% of all senior credit participations (including super senior creditors) but not including cash management providers. |
| **Enforcement – consultation period** | If the Majority Super Senior Creditors or the Majority Senior Secured Creditors wish to enforce, they must consult for a period of not more than ten Business Days, except that no consultation shall be required if (a) the New Security has become enforceable as a result of an Enforcement Event or (b) to enter into such consultations and delay the commencement of enforcement of New Security could reasonably be expected to have a Material Adverse Effect on (i) the New Security Agent's ability to enforce any of the New Security or (ii) the realisation proceeds of any enforcement of the New Security. |

| | |
|---|---|
| **Enforcement instructions** | The New Security Agent shall act on the instructions of the Majority Senior Secured Creditors except that: |
| | (a)    if the Majority Senior Secured Creditors have not made a determination as to the method of enforcement they wish to instruct the New Security Agent to pursue (and notified the New Security Agent of that determination in writing) within three months of the date of the initial enforcement notice, then the security agent will act in accordance with enforcement instructions received from the Majority Super Senior Creditors; |
| | (b)    the Super Senior Discharge Date has not occurred within six months of the date of the initial enforcement notice, then the New Security Agent will act in accordance with enforcement instructions received from the Majority Super Senior Creditors; or |
| | (c)    if an Insolvency Event is continuing with respect to a Debtor then the New Security Agent will, to the extent the Majority Super Senior Creditors elect to provide such Enforcement Instructions (and except to the extent that the New Security Agent has already commenced any Enforcement (or any transaction in lieu) or other Enforcement Action at that time with respect to the relevant debtor), act in accordance with enforcement instructions with respect to that debtor received from the Majority Super Senior Creditors. |
| | The restriction on Enforcement Action will be subject to customary exceptions (including actions taken to preserve validity of claims and rights to accelerate / declare amounts due and payable, demand, set-off/receive payment and claim/prove following an Insolvency Event). |
| **Security enforcement principles** | The enforcement objective means maximising, to the extent consistent with a prompt and expeditious realisation of value, the value realised from enforcement. |
| | Any enforcement shall be consistent with the enforcement objective. |
| | Without prejudice to the enforcement objective, the transaction security will be enforced and other action as to enforcement will be taken such that sufficient proceeds from enforcement will be received by the New Security Agent in cash to ensure that, when the proceeds are applied in accordance with the payment waterfall, the Super Senior Discharge Date will occur. |
| **Fairness opinion** | Unless enforcement is pursuant to a Competitive Sales Process, a financial adviser shall be appointed to prepare a fairness opinion that the proceeds received or recovered in connection with that enforcement are fair from a financial point of view taking into account all relevant circumstances. |
| **Chapter 11 provisions** | Certain Chapter 11 protective provisions are included in particular to ensure that the Super Senior Liabilities would be treated as a separate debt class in any U.S. bankruptcy proceeding. |
| **Turnover** | Customary turnover provisions are included and if at any time following a Distress Event or an Insolvency Event but prior to the Super Senior Discharge Date any creditor receives or recovers from any member of the Group or third party security provider any payment or distribution of any amounts (including |

| | by way of set-off), the relevant creditor will turn that amount over to the New Security Agent for application in accordance with the payment waterfall.<br><br>The turnover shall be subject to the customary exclusions, including with respect to rights of netting or set-off relating to a cash management facility which is a multi-account overdraft facility. |
|---|---|
| **Anti-layering** | Customary anti-layering provisions including no liabilities to rank senior to the Super Senior Liabilities. |
| **Amendments** | Customary "majority" or "instructing group" voting for amendments with protections for individual creditors in respect of changes to the payment waterfall, priority and subordination, turnover and enforcement instructions and customary provisions for amendments/releases of transaction security documents |
| **Governing law** | English law |

## 11. Post-Restructuring Obligors and the New Security

11.1 Each of the Post-Restructuring Obligors will be guarantors of the New Notes, the New Lloyds LC Facility, the FAB Run-Off LC Facility, the New Cash Management Facility and any other debt incurred by Alpha and its Subsidiaries that is regulated by the New Intercreditor Agreement.

11.2 Subject to the Agreed Security Principles, the Post-Restructuring Obligors will grant new first ranking (to the extent possible) security over the shares of other Post-Restructuring Obligors owned by it, its material bank accounts and intercompany receivables owed to it by other Post-Restructuring Obligors. A floating charge will also be granted by the Post-Restructuring Obligors incorporated in England and Wales and Scotland.

11.3 English NewCo 2 will also grant third party share security over the shares of Alpha and any shareholders loans made to the Restricted Group (as defined in the New Lloyds LC Facility Agreement and FAB Run-Off LC Facility Agreement) but will not be a guarantor.

## 12. Summary of the Warrants

12.1 The Warrants are not a formal part of the Scheme but are being negotiated and implemented in parallel to the Scheme.

12.2 A copy of the form of the Warrants is attached at schedule 4 (Warrants) to the Restructuring Implementation Deed (and appended to this Explanatory Statement at Appendix 6 (Warrant Instrument). Terms capitalised in the table below and not otherwise defined herein have the meaning given to them in the Warrants.

12.3 A summary of the Warrants is set out below:

| **Summary of the Warrants** | |
|---|---|
| **Issuer** | Jersey Newco. |
| **Issue** | Warrants to subscribe for 1,111,111 shares in Newco (**Warrant Shares**)[19], subject to adjustment as, and on the terms, set out below. |

---

[19]    Based on 10,000,000 issued shares on day 1, so 10% of the fully issued share capital.

| Warrant Holder(s) | The Warrants shall be issued to the Participating Shareholders (or their nominees) (the **Warrant Holders**) on the Restructuring Effective Date. |
|---|---|
| **Amount of proceeds due to Warrant Holders on an Exit** | Profit share above hurdle: 10%<br><br>Based on hurdles linked to the recoveries of creditors as follows:<br><br>_see table below_ |

| Year in which completion of the relevant Exit must occur | Recovery threshold for Warrants (percentage recovery calculated by reference to the principal amount of debt of USD 1,927m) |
|---|---|
| 2021 | USD 2,216,000,000 (being 115% recovery) |
| 2022 | USD 2,312,400,000 (being 120% recovery) |
| 2023 | USD 2,408,800,000 (being 125% recovery) |

| Issue Date | The Warrants will be issued on the on the Business Day immediately following the Restructuring Effective Date to the Warrant Holders. |
|---|---|
| **Exercise Price** | _see table below_ |

| Year in which completion of the relevant Exit must occur | Exercise Price per Warrant Share |
|---|---|
| 2021 | USD 171.61 |
| 2022 | USD 181.24 |
| 2023 | USD 190.88 |

**Exit**: (i) an initial public offering of Jersey Newco (or another entity in which the Original Participating Creditors or their transferees are shareholders at the time, following a pre-sale reorganisation); (ii) a sale of all of the shares in Jersey Newco or all or substantially all of the assets of Jersey Newco (directly or indirectly by way of one or a number of related transactions); (iii) if there is an indirect sale of assets of Jersey Newco (as described in subparagraph (ii)), then the distribution of the proceeds of sale to the New Shareholders; or (iv) liquidation of Jersey Newco.

| Exercise Period | Provided that the Exercise Price for the Warrants is less than the value per share in Jersey Newco post such exercise, the Warrants shall be exercised immediately and automatically prior to an Exit and will lapse on the earlier of: (i) an Exit; and (ii) 31 December 2023. Jersey Newco will work with the Warrant Holders to effect the issuance of the Warrant Shares in a manner such that no physical payment of the Exercise Price will be made by the Warrant Holders to Jersey Newco. |
|---|---|
| **Anti-Dilution** | The number of Warrant Shares issuable will be subject to customary anti-dilution protection in the event of a subdivision of the share capital, reduction of share capital, an issue of shares paid up by way of dividend or by a capitalisation of profits or reserves. |

| **Voting Rights** | None. |
|---|---|
| **Transfer restrictions** | Customary permitted transfers to Affiliates/related funds or other Warrant Holders, but otherwise require consent of Major Shareholder Majority. |
| **Governing law and legal effect** | This term sheet and all matters (including, without limitation, any contractual or non-contractual matters) arising from, or connected with, it are governed by, and will be construed in accordance with English law. |

## PART 7

## ESTIMATED ALTERNATIVE OUTCOMES FOR SCHEME CREDITORS

1.    **Estimated alternative outcomes for Scheme Creditors**

1.1    The Group engaged Deloitte to deliver the Going Concern Valuation and the Scheme Comparator Analysis.

1.2    The Company is able to rely on the work carried out by Deloitte. The information in this Part 7 is being provided to the Scheme Creditors for information purposes only in connection with the Scheme and on a non-reliance basis as regards other purposes, in particular any tortious or other liability. Scheme Creditors should consider their own due diligence and seek independent advice.

1.3    Deloitte prepared the Going Concern Valuation to illustrate an enterprise value range of the Group using a variety of different and widely accepted valuation methodologies as set out below. Deloitte also independently considered the market evidence available and prepared indicative calculations through the application of different methodologies. To prepare the Going Concern Valuation, Deloitte considered:

(a)    an income approach:

(i)    Discounted cash flow analysis based on Group management's forecasts;

(b)    a market approach:

(i)    Comparable / guideline listed company analysis; and

(ii)    Comparable / guideline transaction analysis.

1.4    The Going Concern Valuation was limited in time, scope and the nature of the information provided to Deloitte and assumes that the Group continues as a going concern. The indicative analysis reflects the assumptions that the business is not in any financial distress, is appropriately capitalised to achieve the forecasts provided by Management and the Group could look to maximise value in a normal sales process without the need to undertake any accelerated M&A or other realisation approaches.

1.5    Given the relatively independent operations of the four business units within the Group, Deloitte adopted a sum of the parts approach which involved valuing each of the four business units to imply an enterprise value for the Group.

1.6    For the income approach, the discount rate in relation to Deloitte's discounted cash flow analysis was determined using the weighted average cost of capital formula and the capital asset pricing model. Different discount rates were applied for each of the Group's business units based on market data and by reference to comparable companies. As regards to the market approach, different valuation multiples were applied to the different business units within the Group based on Deloitte's review of the trading multiples for listed companies and the valuation multiples implied from transactions in companies that are broadly comparable to the business units.

1.7    According to the Going Concern Valuation, the estimated enterprise value of the Group on a cash free and debt free basis is in a range from USD 1,200,000,000 to USD 1,500,000,000. Based on the estimated enterprise value in the Going Concern Valuation, the Group has calculated an indicative "day one" post-Restructuring value of the Jersey Newco Consideration Shares by deducting from the estimated enterprise value of the Group, the principal amount of the New Notes to be issued on the Restructuring Effective Date and the amounts of the Omani Term Loans and the IDTEC Loans referred to in paragraph 5 (Details of other financing arrangements of the Group) of Part 2 (Background to the

Company, the Group and the Group's Principal Financial Indebtedness) of this Explanatory Statement. Based on the information provided, Deloitte consider this approach by the Group to be reasonable. This calculation results in a range of USD 695,021,000 to USD 995,021,000 and, for the purposes of the calculations below, the Group have used a mid-point indicative "day one" post-Restructuring value of the Jersey Newco Consideration Shares of USD 845,021,000. This indicative value of the Jersey Newco Consideration Shares does not take account of any cash on the Group's balance sheet and has not been adjusted to take account of the terms of the Management Equity Plan.

1.8    If the Scheme is approved by the requisite majority of Scheme Creditors and sanctioned by the Court and the Restructuring is implemented, the Group estimates that indicative returns to Scheme Creditors based on their allocations of New Notes and Jersey Newco Consideration Shares and on an estimated aggregate principal amount of Scheme Claims of USD 1,927,314,617 and applying the methodology set out in paragraph 1.7 above will be up to 100% (or potentially higher), depending on the future performance of the Restructured Group in line with its business plan, with an indicative estimated 'day one' value of 69.7%, calculated as follows:

    (a)    a pro rata share of USD 500,000,000 in New Notes (representing an indicative recovery on Scheme Claims of 25.9%), accruing interest in accordance with their terms; and

    (b)    a pro rata share of the Jersey Newco Consideration Shares (with the opportunity to benefit from the potential upside of the implementation of the Restructured Group's turnaround strategy, and representing an indicative "day one" recovery on Scheme Claims of 43.8%).

1.9    Deloitte's Scheme Comparator Analysis was prepared using the Group's entity balance sheets and intercompany balances as at 30 June 2020. The Group has confirmed to Deloitte that were no material changes to the information provided to them since 30 June 2020 that alter the Deloitte analysis.

1.10    In the Scheme Comparator Analysis, Deloitte consider two scenarios where the Group is unable to implement the Restructuring (and no immediate or short term action is taken by the creditors following any termination of the Lock-Up Agreement):

    (a)    the scenario in which a sufficient number of the Group's creditors allow time and continued financial support to seek a distressed, accelerated sale of each of the individual business units within the Group; and

    (b)    the scenario in which the entire Group and its assets enter insolvency or bankruptcy proceedings.

1.11    If distressed, accelerated sales of each of the individual business units within the Group are achieved, Deloitte estimate that returns to Scheme Creditors would be in the range of 49% to 59%.

1.12    If the Group and its assets enter insolvency or bankruptcy proceedings, Deloitte estimate that returns to Scheme Creditors would be in the range of 27% to 38%.

1.13    Set out below is a table showing the estimated returns to Scheme Creditors, on the one hand, if the Scheme is approved by the requisite majority of Scheme Creditors and sanctioned by the Court and Restructuring is implemented and, on the other hand, in each of the scenarios described in paragraph 1.10 above (in each case based on the assumptions and subject to the limitations referred to in this Part 7 (Estimated Alternative Outcomes for Scheme Creditors).

| Scheme Creditor | Group's estimated return under the Restructuring implemented pursuant to the Scheme* | Estimated return in distressed, accelerated sale of business units scenario | Estimated return in Group-wide insolvency or bankruptcy proceedings scenario |
|---|---|---|---|
| *2021 Notes* | $261m-$375m ($97m of New Notes and 19.5% of the Jersey Newco Consideration Shares) (up to 100% or higher (69.7% day one)) | $182m-$220m (49%-59%) | $103m-$143m (27%-38%) |
| *2022 Notes* | $373m-$535m ($139m of the New Notes and 27.8% of the Jersey Newco Consideration Shares) (up to 100% or higher (69.7% day one)) | $260m-$314m (49%-59%) | $147m-$204m (27%-38%) |
| *2023 Notes* | $279m-$400m ($104m of the New Notes and 20.8% of the Jersey Newco Consideration Shares) (up to 100% or higher (69.7% day one)) | $195m-$234m (49%-59%) | $110m-$152m (27%-38%) |
| *Term Loan* | $284m-$407m ($106m of the New Notes and 21.1% of the Jersey Newco Consideration Shares) (up to 100% or higher (69.7% day one)) | $202m-$243m (49%-59%) | $112m-$158m (27%-38%) |
| *Revolving Loan* | $66m-$95m ($25m of the New Notes and 4.9% of the Jersey Newco Consideration Shares) (up to 100% or higher (69.7% day one)) | $46m-$56m (49%-59%) | $26m-$36m (27%-38%) |
| *Existing Overdraft Facilities* | $80m-$115m ($30m of the New Notes and 6.0% of the Jersey Newco Consideration Shares) (up to 100% or higher (69.7% day one)) | $52m-$63m (49%-59%) | $29m-$41m (27%-38%) |

\*Calculations based on the Group's estimate of indicative "day one" post-Restructuring value of the Jersey Newco Consideration Shares as set out in paragraph 1.7 above, with the upside depending on the future performance of the Jersey Newco Consideration Shares in line with the Restructured Group's turnaround strategy

1.14    It should be noted that Deloitte's work has been limited both in time, scope and the nature of the information provided to Deloitte, which included unaudited information.

1.15    The key conclusion that can be drawn from the Scheme Comparator Analysis, insofar as it is relevant for Scheme Creditors, is that in the scenario where there is a distressed, accelerated sale of the individual business units within the Group (which the Company considers to be the most likely outcome if it is ultimately unable to implement the Restructuring, with any parts of the Group that cannot be sold in the time available entering insolvency or bankruptcy proceedings) and each of the individual business units is successfully sold, Scheme Creditors are estimated to receive a return representing between 49% and 59% of their claims against the Group.

1.16    As indicated above, if not every individual business unit within the Group can be sold as a going concern in the time available and instead enter insolvency or bankruptcy proceedings, the returns to Scheme Creditors are estimated to be significantly lower. As well as the need for a number of consents, forbearances and waivers from the Group's creditors to allow time for accelerated sales processes to be run, the current market environment and the wider economic climate may present additional challenges to achieving a distressed sale of any of the Group's business units, thereby adding to the level of uncertainty and execution risk in this scenario.

1.17    The ranges presented above are illustrative only, based on certain assumptions made by the Group and therefore the actual recoveries could be greater or less than those percentages. In particular, the low case does not necessarily represent the worst case, as there are many factors which could impact the illustrative ranges presented. Similarly, the high case does not represent the best case.

1.18    A comparison of the Scheme Comparator Analysis with the recoveries that Scheme Creditors might expect to receive based on their Scheme Creditor Entitlements demonstrates that the Scheme (and the Restructuring to be implemented via the Scheme) is likely to result in an outcome that is more favourable for all Scheme Creditors than they would be likely to achieve if the individual business units in the Group were to be sold on a distressed, accelerated basis (with any residual part of the Group and its assets entering insolvency or bankruptcy proceedings) (i.e. the most likely alternative to the Scheme).

1.19    The Group considers the Scheme to be in the best interests of the Scheme Creditors because if the Scheme is not approved and the wider Restructuring is not implemented then their recoveries in a distressed, accelerated sale of the individual business units within the Group (with any residual part of the Group and its assets entering insolvency or bankruptcy proceedings) scenario would, on the basis of the work undertaken by Deloitte, likely be less than their potential recoveries should the Restructuring as presently contemplated (including by the Scheme) be successful and Scheme Creditors receive their Scheme Creditor Entitlements.

# PART 8

# RISK FACTORS

*All statements in this Explanatory Statement are to be read subject to, and are qualified in their entirety by, the matters referred to in this Part 8.*

*The risk factors described below are those that the Group believes are potentially significant, but this should not be regarded as a comprehensive statement of all potential risks and uncertainties relating to the Restructuring or the Scheme. Additional risks and uncertainties not presently known to the Group, or that the Group currently considers to be immaterial, may also have an adverse effect on the Restructuring or the Scheme, the Company and/or the Group, and no assurance can be given that all material risks relating to the Group are set out below. Scheme Creditors should carefully consider these risk factors and the other information set out in this Explanatory Statement.*

*This Explanatory Statement also contains forward-looking statements that include risks and uncertainties. Actual results may differ from those anticipated in these forward-looking statements as a result of various factors, including the risks described below and elsewhere in this Explanatory Statement.*

*If a Scheme Creditor is in any doubt about the action it should take, such Scheme Creditor is advised to consult appropriately authorised independent professional advisers.*

## 1.    Risks relating to the Scheme and Restructuring

### *Effectiveness of the Scheme requires the approval of Scheme Creditors*

1.1    Pursuant to Part 26 of the Companies Act, in order for the Scheme to become legally binding on the Company and the respective Scheme Creditors, a majority in number representing 75% in value of the aggregate Scheme Claims of the Scheme Creditors present and voting (either in person or by proxy) at the single class Scheme Meeting must vote in favour of the Scheme. In order for the Scheme to become effective, the Scheme must then be sanctioned by the Court, and an official copy of the Sanction Order must be delivered to the Registrar of Companies for registration.

1.2    If approved by the requisite majorities, the Scheme is expected to be made effective no later than 30 November 2020 by the delivery of copies of the Sanction Order to the Registrar of Companies. If the Scheme becomes effective, the Scheme Creditors will be bound by its terms from the Scheme Effective Time.

1.3    Pursuant to the Lock-Up Agreement, any Scheme Creditor (other than FAB) that is a party to or has acceded to the Lock-Up Agreement is bound to:

(a)    attend the Scheme Meeting by proxy or in person and exercise and cast all of its votes (or instruct its proxy or other relevant person to vote, to the extent it is legally entitled to instruct that person to vote) in respect of its Scheme Claims in favour of the Scheme and any amendment or modification to the Scheme or adjournment to the Scheme Meeting, provided that the terms of the Scheme or such amendment or modification, do not include any material terms which are likely to (and nor is any such adjournment likely to) adversely affect or conflict with the terms of the Restructuring or its implementation; and

(b)    if (A) any proposal is made to adjourn the Scheme Meeting or (B) the terms of the Scheme or any amendment or modification of the Scheme include any material terms which, in each case is or are likely to adversely affect or conflict with the terms of the Restructuring or its implementation, exercise and cast all of its votes in respect of its debt against any such amendment or modification to the Scheme or proposal to adjourn the Scheme Meeting (as applicable).

1.4    Each party to the Lock-Up Agreement (including any Scheme Creditor party thereto, but excluding FAB) shall also not challenge or object, or encourage or support any challenge or objection, to any terms of, and supporting and voting in favour of, any scheme of arrangement, consent solicitation, arrangement and reconstruction, alternative restructuring or any step proposed to support, facilitate, implement, consummate or otherwise give effect to all or any part of the Restructuring (other than as already provided for in the Lock-Up Agreement).

1.5    Although Scheme Creditors (other than FAB) which are party to the Lock-Up Agreement are expected to vote in favour of the Scheme, in the event that the Lock-Up Agreement was terminated in accordance with its terms, any Scheme Creditor that was party to the Lock-Up Agreement would cease to be bound by its obligation to support the Scheme.

***Even if the Scheme Creditors approve the Scheme, the Scheme may be objected to and the Restructuring may not be completed***

1.6    If the Scheme is approved at the Scheme Meeting, it is possible for a person with an interest in the Scheme (whether a Scheme Creditor or otherwise) to lodge objections to the Scheme with the Court, and, if such objections have been lodged, to attend or be represented at the Sanction Hearing in order to make representations that the Scheme should not be approved and to appeal against the granting of the Sanction Order. Therefore, there can be no assurance that objections will not be made at or before the Sanction Hearing, or that an appeal will not be made against the grant of the Sanction Order and that any such objections or appeal will not delay or possibly prevent the implementation of the Restructuring.

***Effectiveness of the Scheme requires the sanction of the Court***

1.7    In order for the Scheme to become effective, it must receive the sanction of the Court. The Court will not sanction the Scheme unless it is satisfied that the correct procedures have been followed, each class of creditors has been properly constituted, the proposed arrangements are reasonable and, as a matter of discretion, the Court considers it proper to sanction the Scheme that there are no other reasons why the Scheme should not be approved. There can be no assurance that the Court will determine that the Scheme is reasonable or that the Court will not conclude that there are other reasons why the Scheme should not be sanctioned. If the Court does not sanction the Scheme, or sanctions it subject to conditions or amendments which:

(a)    the Group deems unacceptable; or

(b)    would have (directly or indirectly) a material adverse effect on the interests of any Scheme Creditor and such conditions or amendments are not approved by the Scheme Creditors, the Scheme will not become effective and the Restructuring will not be implemented.

***If the conditions to the Restructuring Steps Start Time are not satisfied or waived, the Restructuring may not be completed***

1.8    The Scheme and the transactions contemplated by the Restructuring will not become effective unless (i) the Restructuring Conditions are satisfied or waived in accordance with the terms of the Restructuring Implementation Deed and (ii) the conditions to the transactions contemplated by the Restructuring are satisfied or waived in accordance with the terms of the Restructuring Implementation Deed and/or the Scheme. If this does not occur, it will not be possible to complete the Restructuring. While there is a risk that the relevant parties to the Restructuring Documents may disagree as to when a condition precedent has been satisfied or waived (or will refuse to waive a condition precedent), the Board anticipates that most of the Restructuring Conditions are capable of being satisfied prior to the Scheme Effective Time or will be satisfied by actions to take place on the Scheme Effective Time.

1.9    One of the Restructuring Conditions requires confirmation that each Prospective Major Shareholder has received an official document issued by the FAS acknowledging that the FAS has reviewed and accepted the Russian UBO Disclosure submitted by that Prospective Major Shareholder and, further, that in circumstances where the FAS has notified any Prospective Major Shareholder in writing that a further clearance is required, either (i) that clearance has been received by the relevant Prospective Major Shareholder, or (ii) the relevant Prospective Major Shareholder, all other Prospective Major Shareholders that would be adversely affected by the proposed amendments and the Company have agreed structural amendments to the terms of the Restructuring (and the relevant parties to the Restructuring Implementation Deed have consented to relevant amendments) with the result that such clearance is no longer required.

1.10    The Board understands that each Prospective Major Shareholder has made, or will shortly make, a Russian UBO Disclosure to the FAS in accordance with the relevant Russian foreign direct investment law and that it is unlikely, based on the contemplated Restructuring Steps, that any further clearance will be required by the FAS or other Russian authorities. However, the Russian government has a discretion to require any foreign investor to obtain further clearances for its Russia-related investments. If such a further clearance is required, there can be no assurance that it will be possible to complete the Restructuring because of the time it may take to obtain such a clearance and the possibility that structural amendments to avoid the need for a clearance are either not available or cannot be agreed.

### *Foreign recognition of the Scheme*

1.11    There can be no assurances that a court in another jurisdiction would recognise or give effect to the Scheme. In particular:

(a)    Notwithstanding the foreign expert opinion obtained by the Company, there is a possibility that the U.S. Bankruptcy Court will not recognise the Scheme, whether in whole or in part, under Chapter 15. If the U.S. Bankruptcy Court declines to recognise the Scheme under Chapter 15, the Scheme may not be recognised or enforced in the U.S.

(b)    Similarly, and notwithstanding the common view in the foreign expert opinions obtained by the Company that recognition of the Scheme under the terms of the Brussels (Recast) Regulations, and under the ordinary principles of private international law, is at least possible, and may be likely, in relation to the recognition of the Scheme in Norway, Germany, Oman and Russia, there is a possibility that courts in Norway, Germany, Oman and Russia will not recognise the Scheme under applicable laws in those jurisdictions. If the courts in Norway, Germany, Oman or Russia decline to recognise the Scheme, the Scheme may not be recognised or enforced in Norway, Germany, Oman or Russia.

(c)    Additionally, there is a possibility that the courts in Saudi Arabia will not recognise the Scheme under the laws applicable in Saudi Arabia and the Company has not obtained an opinion as to whether recognition in Saudi Araba is either possible or likely.

(d)    Despite the fact that the Group has obtained expert opinions as to the recognition of the Scheme in the various jurisdictions within Europe where the Group has operations and assets, no assurance can be provided that the Scheme will be recognised in other EU member states. Further, following Brexit on 31 January 2020, the United Kingdom entered into a transition period set to terminate on 31 December 2020 during which it will continue to apply EU law. If the Restructuring is not implemented before the end of the transition period on 31 December 2020, the effects of Brexit on the Group and on recognition of the Scheme in other EU member states will be dependent upon the terms of the UK's withdrawal. Depending on the outcome of the withdrawal negotiations, the impact of Brexit may adversely affect the Group's business,

financial condition or results of operations or the recognition of the Scheme in other EU member states.

1.12    In such circumstances, Creditors would not be prevented from trying to enforce their rights in the applicable foreign courts, as they otherwise would be if the effects of the Scheme are recognised in the applicable jurisdictions.

***Scheme Creditors are responsible for complying with the procedures set out in this Explanatory Statement***

1.13    Scheme Creditors are solely responsible for complying with all of the procedures of the Scheme, including, but not limited to, submitting Account Holder Letters and/or Lender Claim Forms in accordance with the instructions and information provided to Scheme Creditors in this Explanatory Statement, as applicable. Further details on voting at the Scheme Meeting are set out in Appendix 7 (Instructions and Guidance for Scheme Creditors) to this Explanatory Statement.

1.14    Each Scheme Creditor is responsible for independently assessing the merits of the Restructuring and the Scheme. This Explanatory Statement has been prepared without taking into account the objectives, financial situation or needs of any particular recipient of it and, consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purpose for which a recipient might use it. Any such recipients should conduct their own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to their own objectives, financial situations and needs, and making an assessment of how this Explanatory Statement, the Restructuring Implementation Deed and the Scheme will affect them.

***The Scheme and/or the Restructuring may not be implemented in accordance with the timeline envisaged in this Explanatory Statement***

1.15    Factors unknown to the Company at the date of this Explanatory Statement may result in delays to the implementation of the Scheme and/or the Restructuring.

1.16    A long protracted alternative restructuring may be on worse terms and could adversely impact management's ability to manage the Group's operations and may otherwise adversely affect its business.

***The successful implementation of the Scheme and the Restructuring does not guarantee viability of the business***

1.17    While it is anticipated that the Scheme and the Restructuring will ensure the continued viability of the Group's business, there may be other factors which have an impact on its financial performance, business, affairs and continued progress. The successful implementation of the Scheme and the Restructuring cannot be taken as an indication or guarantee of the continued viability of the Group's business.

***Scheme Creditors are responsible for consulting with their advisers***

1.18    Scheme Creditors should consult their own tax, accounting, financial, legal and other advisers regarding the suitability to themselves of the tax, accounting and other consequences of participating or declining to vote in favour of the Scheme. Each Scheme Creditor must determine, based on its own independent review and such professional advice as it deems appropriate under the circumstances, that participation in the Restructuring or the Scheme is fully consistent with its objectives and condition, complies and is fully consistent with all internal policies, guidelines and restrictions applicable to it, and is a fit, proper and suitable action for it. Scheme Creditors are solely liable for any taxes and similar or related payments imposed under the laws of any applicable jurisdiction arising in connection with the Scheme or the Restructuring.

***The Group comprises of entities organised under the laws of several jurisdictions and insolvency, bankruptcy or similar laws applicable to the Group may not be as favourable to creditors as the insolvency, bankruptcy or similar laws of the jurisdiction with which they are familiar***

1.19    The Group comprises of entities organised under the laws of several jurisdictions, including England and Wales, Germany, Norway, Jersey, Russia and Oman. In the event that a member of the Group faces financial difficulty, it is not possible to predict with certainty in which jurisdictions insolvency, bankruptcy or similar Proceedings would be commenced or how these Proceedings would be resolved. Any insolvency, bankruptcy or similar Proceedings commenced in respect of a member of the Group would most likely be based on and governed by the insolvency, bankruptcy or similar laws of the jurisdiction under which it is organised. As a result, creditors will most likely be subject to the insolvency, bankruptcy or similar laws of that member of the Group's jurisdiction of incorporation. There can be no assurance as to how the insolvency, bankruptcy or similar laws of these jurisdictions will be applied in insolvency, bankruptcy or similar Proceedings relating to several jurisdictions.

1.20    To the extent that the laws of such jurisdictions would be applicable to any bankruptcy, insolvency, administrative or other law of any jurisdiction, such provisions could be materially different from, or in conflict with, one another and those in the United States or other jurisdictions which may be more familiar to New Noteholders, including creditors' rights, priority of creditors, the ability to obtain post-petition interest and the duration of the insolvency, bankruptcy or similar Proceeding. The application of these various laws in multiple jurisdictions could trigger disputes over the laws of which jurisdiction should apply and could adversely affect the ability of New Noteholders to enforce their rights and collect payment thereunder.

1.21    Further, one or more members of the Group may in the future take actions, which result in the insolvency laws of a different or additional jurisdiction being applicable to them. In certain circumstances, those laws may conflict, or one or more persons may dispute the applicability of, any such insolvency laws.

1.22    The insolvency and other laws of the jurisdiction in which each member of the Group is organised or operates may be materially different from, or conflict with, both each other and the laws under any creditor's country of incorporation. Some jurisdictions may be less favourable to the interests of certain creditors than others, which may affect, among other things: the ability to obtain post-petition interest; the duration of insolvency, bankruptcy or similar Proceedings; preference periods; and the priority of governmental and other creditors in any insolvency, bankruptcy or similar Proceeding.

1.23    Prospective creditors should seek independent legal advice in each relevant jurisdiction when entering into financing arrangements with any member of the Group, in particular with regard to the impact of local law on their rights as creditors in the event of insolvency or bankruptcy.

## 2.    Risks relating to the Restructured Group

### 2.1    The outbreak of Covid-19 Pandemic and recent events in the energy markets has had, and may continue to have an adverse impact on the Group's financial condition, results of operations and cash flows.

On January 30, 2020, the WHO announced a global health emergency with respect to a new strain of coronavirus known as Covid-19 Pandemic. In March 2020, the WHO classified the Covid-19 Pandemic outbreak as a pandemic based on the rapid increase in global infections. The Covid-19 Pandemic outbreak triggered a sharp sell-off in energy commodities markets during the first half of 2020 due to the sudden drop in worldwide consumption of oil, gas and other energy products as a result of measures taken worldwide to contain the spread of the disease. In addition, a dispute between Russia and Saudi Arabia regarding proposed oil production cuts to counteract decreased demand resulting from the Covid-19 Pandemic outbreak put downward pressure on energy markets.

The recent significant weakness in oil and natural gas prices has resulted in reductions in the exploration and production capital and operating budgets of the Group's customers. Demand for the Group's services and associated product offerings and the rates the Group is able to charge its customers is closely tied to such exploration and production activities and the significant price weakness and associated volatility surrounding recent global events has had, and is reasonably likely to continue to have, an adverse impact on the demand for the Group's services. Certain of the Group's customers have requested discounts in terms of pricing and sharing of cost savings and the Group has experienced several contract terminations and suspensions within the land fleet as well as in terms of our offshore contracts in the UK North Sea and Angola. Offshore, several of the platforms that the Group operates on moved from operating to stacking mode and reactivations have been delayed. The Group's operations have faced supply chain delays and restrictions in moving crews to and from its operations due to the pandemic which is impacting upon its ability to deliver services to its customers. The Group's Bentec and RDS businesses currently anticipate a slow-down of activity and increasing difficulties in the tender pipeline and will likely see delays in large projects and scope reviews, especially in light of the current oil price environment, and which could have a material adverse effect on the Group's business, financial condition and result of operations. The Group expects a drop in international rig counts in the remainder of 2020 and 2021.

While the Group has implemented various measures to limit non-critical business spending and reduce capital and operational expenditures, it remains uncertain when the energy market will recover. Moreover, future increases in commodity prices may not necessarily translate into the resumption of exploration and production activities (and a corresponding increase in demand for the Group's services) because the Group's customers' expectations of future prices may also influence or limit their activity. As a result of these factors, lower industry demand for oil and natural gas field services may persist for a significant period and it could have a material adverse effect on the Group's business, financial condition and results of operations. In addition, the Group's results and financial condition may be adversely affected by federal or state laws, regulations, orders, or other governmental or regulatory actions addressing the current Covid-19 Pandemic, energy market or any other industries related to the Group's business, which, if adopted, could result in direct or indirect restrictions to the Group's business, financial condition, results of operations and cash flow.

Furthermore, the current Covid-19 Pandemic has caused disruption in the financial markets and the businesses of financial institutions. These factors have caused a slowdown in the decision-making of these institutions, which may affect the timing on which the Group may obtain any additional funding. There can be no assurance that the Group will be able to raise additional funds on terms acceptable to the Group, if at all.

The foregoing and other continued disruptions to the Group's business as a result of the Covid-19 Pandemic and events in the energy market could result in a material adverse effect on the Group's business, result of operations, financial condition, cash flows and ability to service the Group's indebtedness and other obligations.

**2.2    Demand for the Group's services is linked to the level of expenditure by the oil and gas industry, which is in turn driven by the prices of oil, gas and refined products. Such prices are volatile and have declined since 2014, which has led to a decrease in the Group's activity levels. A prolonged or further reduction in oil and gas prices could adversely affect the Group's business, financial condition and results of operations.**

The success of the Group's business is dependent upon the level of exploration, development and production of crude oil and gas reserves by the major international and national oil and gas companies that make up the Group's customer base. The oil and gas exploration and production industry historically has been characterised by significant changes in the levels of exploration and development activities. Demand for drilling rigs is driven by expenditure on exploration, development and production of crude oil and gas reserves, which is in turn driven by the prices of oil and gas. The

profitability of operating wells may change as oil and gas prices fall or rise, which will influence the expenditures the Group's customers make and, in turn, affect the Group's results of operations. Thus, capital expenditure on such services as the Group's depends on current and expected short-term and long-term oil and gas prices. If overall levels of exploration, development and production activities of the Group's customers do not align with the Group's expectations, the Group's business, financial condition and results of operations could be materially and adversely affected.

Global oil and gas prices are affected by global supply and demand, particularly in the United States, Europe and Asia (notably China), as well as trading activities by market participants and others either seeking to secure access to oil and gas or to hedge against commercial risks, or as part of investment portfolio activity. Historically, oil and gas prices have been highly positively correlated with global economic activity and levels of GDP and as a result are, and will likely continue to be, subject to substantial and unpredictable volatility. Oversupply and uncertainty about future demand have had a significant adverse effect on global oil and gas prices, and may adversely affect the Group's business, financial condition and results of operations.

Global and regional oil and gas prices are affected by numerous other factors, including:

(b)    demand for energy, which is determined by population growth and general economic and business conditions;

(c)    oil and gas production by non-OPEC countries and competition between them;

(d)    the policies and laws of various governments regarding exploration and development of their oil and gas reserves, energy sources and energy efficiency requirements;

(e)    the implementation or lifting of sanctions on oil-producing countries;

(f)    the cost of exploring for, producing and delivering oil and gas;

(g)    the ability of OPEC to set and maintain production levels for oil;

(h)    capital expenditures by major national and international oil companies, and the types of projects to which these expenditures are allocated;

(i)    political and economic uncertainty and socio-political unrest;

(j)    the level of worldwide oil exploration and production activity;

(k)    the availability of pipeline, storage and refining capacity;

(l)    the availability and prices of alternative energy sources;

(m)    advances in exploration, development and production technology;

(n)    developments in hydraulic fracturing, or "fracking", which has significantly increased the recoverable reserves from certain shale formations, resulting in increased oil and gas production, particularly in the United States;

(o)    technological advances affecting energy consumption; and

(p)    weather conditions.

Oil and gas are globally and regionally traded commodities and, as a result, the Group's clients are unable to control the prices they receive for the oil that the Group or they drill, which is generally sold

with reference to market prices. Historically, crude oil prices have been highly volatile and subject to large fluctuations in response to relatively minor changes in the demand for oil. Most recently, in response to the significant fall in the price of oil since the beginning of 2020, due in part to failed OPEC negotiations and the inability of OPEC and non–OPEC countries, such as Russia, to set and maintain production levels and prices for oil, and to concerns about COVID–19 and its impact on the worldwide economy and global demand for oil, OPEC and certain non-OPEC countries agreed in April 2020 to production cuts. Despite these measures, the oversupply of crude oil and stagnant demand could continue, sustaining current depressed activity levels, or resulting in further declines. The Group's customers also take into account the volatility of energy prices and other risk factors when determining whether to pursue capital projects, and higher perceived risks generally mandate higher required returns. Any further substantial and extended decline, or heightened volatility, in oil or gas prices would be likely to cause a significant decline in the level of expenditure on exploration, development and production. A prolonged period of lower oil and gas prices could also result in future impairment to the Group's long-lived assets. On an annual basis the Group carries out a review of the carrying value of assets in the Group's financial statements for each of the Group's business segments. The fair value of each segment is determined from discounted cash flow calculations and third-party valuations. A prolonged period of lower activity may cause the Group to reassess the future cash flows of the business and hence the carrying value of the Group's assets. Additionally, a sustained reduction in exploration, development and production activity could lead to a decline in the demand for the Group's rigs and services, and therefore either a reduction in the Group's utilization or downward price pressure on day rates, or both, which could adversely affect the Group's business, financial condition and results of operations.

Spending by exploration and production companies may also be impacted by conditions in the capital markets, which have been volatile in recent years. Limitations on the availability of capital or higher costs of capital may cause exploration and production companies to make additional reductions to capital budgets, even if oil and natural gas prices increase from current levels. Any such cuts in spending will curtail drilling programs as well as discretionary spending on well services, which may result in a reduction in the demand for the Group's services, the rates the Group can charge and the utilization of the Group's assets. Moreover, reduced discovery rates of new oil and natural gas reserves or a decrease in the development rate of reserves in the Group's market areas, whether due to increased governmental regulation, limitations on exploration and drilling activity or other factors, could also have a material adverse impact on the Group's business, financial condition and results of operations, even in a stronger oil and natural gas price environment. With respect to national oil company customers, the Group is also subject to risk of policy, regime, currency and budgetary changes, all of which may affect their capital expenditures.

In addition to lower levels of expenditure by the Group's customers, a period of low or declining oil and gas prices may also result in consolidation among the Group's existing and potential customers (resulting from a reduction in the number of independent players focused on activities with higher marginal cost of production and the concentration of larger-scale operators capable of exploiting potential synergies) and among the Group's competitors (in all of engineering, construction and drilling). Some of these trends could result in a more competitive environment. Given the diversity and unpredictability of possible outcomes in a dynamic and discontinuous market such as the one described above, the Group cannot accurately predict the commercial, operational and competitive evolution of the markets in which the Group operates were oil and gas prices to remain at current levels or decline further in the medium- to long-term. Any unfavourable developments in the commercial, operational or competitive landscape resulting from a decline or volatility in oil and gas prices could adversely affect the Group's business, financial condition and results of operation.

**2.3** **The Group's future business performance depends on the Group's ability to win new contracts, and to renew and extend existing contracts.**

The Group's revenue is derived from contracts that are awarded on a tender basis. The Group participates in the tender process to win new contracts and, in certain circumstances, to renew certain existing contracts which may not provide the option to negotiate privately with the customer on the renewal terms. It is generally difficult to predict whether the Group will be awarded such contracts on favourable terms or at all. The tenders are affected by a number of factors beyond the Group's control, such as market conditions, including the intensity of the competition in a particular market, financing arrangements and governmental approvals required of the Group's customers. In preparation for a tender of a new contract, the Group assesses its current capacity in terms of employees, equipment and the availability of third parties, such as sub-contractors and suppliers, and, if the Group is awarded the contract, it determines how to deploy these resources in order to perform the Group's obligations under the contract. Often, the Group must pre-qualify to participate in such tenders by meeting certain thresholds for the performance of the Group's operations including health, safety and environmental requirements, and by demonstrating the Group's ability to provide available equipment and sufficiently comply with local requirements. If the Group is not selected or if the contracts it enters into are delayed and the Group is unable to execute the work it is contracted to perform within the timeframe agreed, the Group's utilisation may drop below currently expected levels, which could adversely affect the Group's business, financial condition and results of operations.

The Group's drilling contracts are normally linked to fixed lengths of time or fixed numbers of wells, and may include extension options that are exercisable at the discretion of the customer. The extension options do not represent guaranteed commitments from the Group's customers. Customer extension options typically require notice several months prior to the end of a contract term. While the Group actively markets its rigs prior to the end of a contract in anticipation of a customer choosing not to exercise its extension option(s), if the customer decides not to exercise the option(s), then the Group will need to secure a new contract for that rig, which could lead to a period during which that rig is off-hire and adversely affect the Group's utilization and contract backlog.

The Group's ability to renew or extend existing contracts or sign new contracts or enter into new markets will largely depend on the prevailing market conditions. If the Group is unable to sign new contracts that start immediately after the end of the Group's current contracts, or if new contracts are entered into are at day rates substantially below the existing day rates, or on terms otherwise less favourable compared to existing contract terms, or which leave the Group with mobilisation or demobilisation costs that cannot be fully recovered, the Group's business, financial condition and results of operations could be adversely affected.

**2.4** **The Group's backlog may not be fully realised.**

The Group's backlog represents its estimate of the amount of the Group's awarded contracts that the Group expects to result in future revenue. Backlog is calculated as an aggregate of such potential future revenue for each of the Group's segments over the relevant contracted period for each contract, which in some cases may be five years or more and is not subject to a present value discount. Backlog does not provide a precise indication of the time period over which the Group is contractually entitled to receive such revenue and there is no assurance that such revenues will be actually received by the Group in the time frames anticipated, or at all. Backlog is computed based on facts known and assumptions deemed appropriate at the computation date. Although under most of the Group's contracts customers have the right to terminate the contract without cause upon written notice of typically 30 to 90 days (sometimes with payment of early termination fees), backlog is based on the full contractual (or optional, as indicated) period, as the Group estimates that, based on the Group's operating history and course of dealing with its customers, these contracts are more likely than not to reach their full term and be continued for the duration of their option periods.

The Group may not be able to realise the full amount of revenue projected in the Group's backlog due to events beyond the Group's control and, if realised, there can be no assurance that any such revenue will result in profit. Because of contract terminations or suspensions and changes in project scope and schedule, including the effect of increased mobilisation times and other factors, including maintenance projects and downtime (in respect of the Group's drilling business), the Group cannot predict with certainty when, or if, the Group's backlog will translate into revenue.

Throughout the regions in which the Group operates, the current depressed market environment has contributed to decreased business confidence and activity and resulted in an increase in the early cancellation, termination or, in some cases, suspension of the Group's existing contracts. In addition, decreased confidence affects the investment policies of the Group's major clients and exposes the Group to potential: (i) delays in the negotiation process and possible cancellation of future projects; (ii) cancellation, termination and suspension of projects in progress (whether lump sum contracts or service contracts); (iii) delays and difficulties in obtaining the payment of contractual penalties owed to the Group for the cancellation and suspension of such contracts; (iv) delays and difficulties in obtaining variation orders for changes in the scope of work requested by clients and executed by the Group; and (v) delays and difficulties in renewing agreements of the Group's drilling fleet on similar economic terms. This economic and business environment may negatively affect the Group's client relationships and, in more serious cases, might also lead to arbitration. Moreover, the Covid-19 Pandemic resulted in several early cancellation, termination or suspension of the Group's existing contracts. Whilst the duration and severity of the Covid-19 Pandemic are not clear, continued depressed business confidence and activities resulting from the Covid-19 Pandemic could further increase the early cancellation, termination or suspension of the Group's existing contracts and adversely affect its business and operations.

There is no assurance that the Group will not receive additional cancellations, especially if the Covid-19 Pandemic is extended, which may continue to depress economic activity. In addition, even where the Group provides services as per the relevant contract, the customer may default and fail to pay amounts owed to the Group. Some of the Group's customers may experience liquidity issues, which could worsen if oil and gas prices declined to lower levels for an extended period of time or their operations are adversely impacted due to the Covid-19 Pandemic. Liquidity issues could encourage the Group's customers who are experiencing financial difficulties to seek to repudiate, cancel or renegotiate agreements with the Group or lead them into bankruptcy, insolvency or similar.

**2.5    The Group's multi-year contracts may be subject to early termination or variance, which could have an adverse effect on the Group's business, financial conditions or results of operations.**

Some of the Group's contracts may be subject to early termination or variation, and if such variation provisions are exercised, the Group's utilisation and backlog levels may decrease, and the levels of revenue received by the Group may be withdrawn or reduced. While certain contracts entered into by the Group is long-term in nature, most provide the customer with an early termination right within notice periods of typically 30 to 90 days. In addition, most provide the customer with an early termination right upon default or non-performance by the Group. In such circumstances, the Group may or may not have the right to receive compensation in respect of such early termination, and the Group may not be able to fully eliminate costs associated with the contract. In addition, some contracts may be suspended, rather than terminated early, for an extended period of time, in some cases without adequate compensation. During 2018 and 2019, the Group experienced downward pricing pressure, in particular during the first half of 2020 due to the outbreak of Covid-19 Pandemic and recent events in the energy market, resulting in renegotiations of pricing and other terms in the Group's contracts with certain customers. The Group's customers' ability to perform their obligations under their contracts, including their ability to pay the Group or fulfil their indemnity obligations to the Group, may also be impacted by an economic or industry downturn or other adverse conditions in the oil and gas industry.

Termination and suspension of drilling contracts results in loss of the day rates for the period of the contract. If the Group's customers default or cancel certain of the Group's significant contracts and the Group is unable to secure new contracts on substantially the same terms, the Group's backlog may be reduced and the Group's business, financial condition and results of operations could be adversely affected.

**2.6    The Group's concentrated customer base in the energy industry exposes the Group to credit and other risks.**

Most of the Group's customers are large national oil companies and international oil companies. National oil companies and international oil companies have substantial bargaining power with respect to price and other commercial terms, which could adversely affect the Group's profit margins. The Group's customer base is concentrated and generates significant amount of revenue from its top three customers. The loss of any of these customers or another significant customer, or a decline in payments under any of the Group's contracts with these customers could adversely affect the Group's business, financial condition and results of operations. The Group's customers are concentrated in the energy industry, which may impact the Group's overall exposure to credit risk as the Group's customers may be similarly affected by prolonged changes in economic and industry conditions. Some of the Group's customers are experiencing extreme financial distress as a result of the prolonged decline in oil and gas prices and may be forced to seek protection under applicable bankruptcy laws. Furthermore, countries that rely heavily upon income from hydrocarbon exports have been negatively and significantly affected by the drop in oil and gas prices, which could affect the Group's ability to collect from the Group's customers in these countries, particularly national oil companies. Laws in some jurisdictions in which the Group operates could make collection difficult or time consuming. The Group performs ongoing credit evaluations of the Group's customers and do not generally require collateral in support of the Group's trade receivables. While the Group maintain reserves for potential credit losses, the Group cannot assure such reserves will be sufficient to meet write-offs of uncollectible receivables or that the Group's losses from such receivables will be consistent with the Group's expectations. Additionally, in the event of a bankruptcy of any of the Group's customers, the Group may be treated as an unsecured creditor and may collect substantially less, or none, of the amounts owed to the Group by such customer.

**2.7    The Group's growth strategy involves selective acquisitions and the Group cannot guarantee that such bolt-on or larger-scale acquisitions will be successful.**

As part of the Group's growth strategy, the Group regularly identifies and evaluates potential acquisition opportunities. Should the Group decide to acquire a business or assets, there can be no assurance that such acquisition will not have material adverse consequences. Any future acquisitions are subject to the risk that they may not be integrated successfully into the Group's operations and may not achieve the Group's desired financial objectives. In addition, any acquisitions of businesses or assets entail numerous operational and financial risks, including:

(a)    higher than expected acquisition costs, including the possibility that the Group could pay more than the acquired company or its assets are worth;

(b)    the possibility that the Group may not identify appropriate acquisition targets, complete future acquisitions on satisfactory terms or realise expected synergies or cost savings within expected timelines;

(c)    unforeseen expenses, delays or conditions may be imposed upon the acquisition, including due to required regulatory approvals or consents;

(d)    exposure to unknown liabilities (including, but not limited to, liabilities in relation to tax and environmental regulations and laws);

(e)    difficulty and cost in integrating the operations and personnel of acquired businesses with the Group's existing operations and personnel;

(f)    diversion of management's attention from the Group's day-to-day business;

(g)    impairment of relationships with key suppliers or customers of acquired businesses due to changes in management and ownership and the restructuring of logistics and information technology systems;

(h)    the inability to retain key employees of acquired businesses;

(i)    difficulty avoiding labour disruptions in connection with any integration, particularly in connection with any headcount reduction; and

(j)    the incurrence of substantial debt, the cost of servicing which may affect the Group's ability to service the Group's existing short- term and long-term liabilities or otherwise negatively impact the Group's cash flows.

The occurrence of any such event in connection with an acquisition could adversely affect the Group's business, financial condition and results of operations.

These acquisitions may be selective and complementary bolt-on acquisitions as part of the Group's ongoing growth strategy. Alternatively, the Group may enter into acquisitions or business combinations of a larger scale, or expand by acquisitions into new business segments or geographic markets. Any such acquisition or business combination could be material in size and transformative to the Group's business. If the Group were to undertake such additional acquisitions or business combinations, the risks associated therewith would be similar in nature to, but of a substantially greater magnitude than, those associated with the Group's more routine acquisitions.

Although the Group analyses each acquisition target, in agreeing to acquire entities the Group's assessments are subject to a number of assumptions and determinations with respect to, among other things, future net sales and earnings, profitability, growth, interest rates and company valuations, based on the Group's investigation of the respective businesses and other information then available. The Group cannot assure you that the Group's assumptions and determinations will prove to be correct or those liabilities, contingencies or other risks previously not known to the Group will not arise. In addition, there can be no assurance that, following the integration into the Group's Group, an acquired business will be able to maintain its customer base consistent with the Group's expectations or generate the expected margins or cash flow. Any such unanticipated risks, liabilities, contingencies, losses or issues, if realised, could adversely affect the Group's business, financial condition and results of operations.

## 2.8    Rig move, upgrade, repair, refurbishment and construction projects are subject to risks, including delays and cost overruns, which could adversely affect the Group's cash flows and results of operations.

The Group often have to incur upgrade and refurbishment expenditures for the Group's rig fleet to comply with contractual requirements, when repairs are required, to comply with the Group's quality management and preventative maintenance system and to comply with periodic certification requirements. Additionally, the Group may make substantial capital expenditures for the construction of additional rigs. Rig upgrade, repair, refurbishment and construction projects often involve complex design and engineering services and are especially vulnerable to the risks of delay and cost overruns, including but not limited to the following:

(a)    shortages of material or skilled labour;

(b)     failure or delay of third-party service providers and labour disputes;

(c)     disputes with suppliers;

(d)     unforeseen design and engineering problems;

(e)     unanticipated change orders;

(f)     work stoppages;

(g)     adverse weather conditions;

(h)     long lead times for manufactured rig components;

(i)     unanticipated cost increases of equipment, labour and raw materials that are not recoverable under the contract;

(j)     the need for greater than expected levels of repair as a result of detailed inspections; and

(k)     delay in or inability to obtain required work permits, visas, customs clearance of routine shipments of equipment, materials and supplies and temporary importation permits, extensions and renewals.

The occurrence of any of the above risks could cause the Group to not realise a contract's full value, which could adversely affect the Group's business, financial condition and results of operations.

The Group also incur costs related to the demobilisation and mobilisation of a rig from one location to another when a contract terminates or a new contract is commenced. Rig moves are vulnerable to risks of delays and cost overruns flowing from the factors set out above, and in particular adverse weather and delays in obtaining customs clearance. While the Group seek to recover the cost of such moves from the Group's customers, the Group typically receive a lump sum payment as compensation for such moves and there can be no guarantee that the sums received will fully cover the Group's costs. Significant shortfall in the sums received from the Group's customers as compared to the Group's actual mobilisation costs could adversely affect the Group's business, financial condition and results of operations.

## 2.9    The Group operates in a highly competitive industry with excess drilling capacity and competition in its business could result in reduced profitability and loss of customers.

Contracts for the Group's services and products are generally awarded on a competitive bid basis. Intense price competition is a significant factor in determining which qualified contractor is awarded a project, as well as rig availability, historical performance, safety philosophy, business management systems and technical capability of service and equipment. In order to remain competitive, the Group must continue to add value for the Group's customers by providing, in comparison to the Group's peers, new and advanced technologies, reliable products and services and competent personnel, as well as superior drilling and health and safety performance. The timing and cost to develop competitive technology and new product introductions can impact the Group's financial results, in particular if one of the Group's competitors were to develop competing technology that accelerates the obsolescence of any of the Group's products or services or results in the Group's inability to compete on commercially acceptable terms. For example, the introduction of new oil production technologies, such as fracking, has resulted in the increased production of shale oil. New technologies have also enabled the profitable extraction and processing of conventional oil. Any one of these factors, including the Group's failure to develop new and advanced technologies in line with the Group's competitors, could materially and adversely affect its ability to compete and win contracts.

In addition, the Group's industry has historically been cyclical and is impacted by oil and gas price levels and volatility. There have been periods of high demand, short rig supply and high day rates, followed by periods of low demand, excess rig supply and low day rates. In addition, changes in oil and energy prices can have a dramatic effect on rig demand in a given region. The current low oil and gas price environment has impacted exploration and production activity and has consequently resulted in significant excess rig capacity in the Group's markets. Periods of excess rig supply intensify the competition in the industry and often result in rigs being idle for long periods of time. In such periods of excess rig supply, the Group may be required to stack idle rigs or enter into contracts at lower day rates until market conditions improve. The industry has been characterised by increasing competition due to the strengthening of international competitors and the volatility of oil and gas prices. It is therefore possible that the entry of new competitors with leading-edge resources and technologies could jeopardize the Group's market positioning. Additional competitive pressure or downturns in the markets in which the Group is engaged could adversely affect the Group's market share. Moreover, a market environment characterised by persistently low or declining oil and gas prices could lead to consolidation of customers and competitors in the Group's markets. The Group may not have the types of skills or the necessary financial resources to enable the Group to compete under such market conditions.

During prior periods of high utilisation and day rates, industry participants increased the supply of rigs by ordering the construction of new rigs or the upgrading of existing rigs. When market conditions change adversely, this has typically resulted in an over-supply of drilling rigs and has caused a subsequent decline in utilisation and day rates, sometimes for extended periods of time. The entry into service of any new or upgraded rigs will increase supply and could lead to a further reduction in utilisation and day rates as these rigs are absorbed into the market.

Lower utilisation and day rates in one or more of the regions in which the Group operates could adversely affect the Group's revenue and profitability. Prolonged periods of low utilisation and day rates could also result in the recognition of further impairment charges on certain classes of the Group's drilling rigs or the Group's goodwill balance, if future cash flow estimates, based upon information available to management at the time, indicate that the carrying value of these rigs, or the goodwill balance, may not be recoverable. During 2020, the Group is experiencing reduced utilisation in most of the countries it operates in and if this level of utilisation continues in the future the Group's revenue and profitability will be adversely affected.

With regard to Bentec, the Group's drilling rig and component engineering and manufacturing segment, competition includes National Oilwell Varco, Drillmec and Uralmash (in Russia) as well as various Chinese rig and component manufacturers. Bentec's main competitors in top drive design and manufacturing are National Oilwell Varco and various Chinese and Russian manufacturers. Bentec has competition in its other components and after sales business from companies such as National Oilwell Varco, which also offer a complete range of components and services. Competition from these, and other industry participants, could impact Bentec's ability to gain orders and maintain margins. Should the prices of oil and gas decline again for a prolonged period, the Group may experience decreases in demand for Bentec's products and services from the Group's customers. During periods of reduced demand, competition could also increase, thus eroding margins.

**2.10    The Group has significant international operations, particularly in the Middle East, North and West Africa, Russia and the Caspian region, which may be susceptible to political, social and economic instability.**

The Group's international operations, particularly those in the Middle East (including Iraq, Kurdistan, Oman and Pakistan), North and West Africa (including Algeria, Angola and Nigeria), Russia and the Caspian region, may be susceptible to political, social and economic instability, civil disturbances or similar events, which may lead to:

(a)     difficulties in collecting accounts receivable and longer collection times than in more developed markets;

(b)     deterioration of customer relationships due to local political pressure as governments seek greater control over their oil and gas industries;

(c)     difficulties complying with changing local legal or regulatory requirements, or their interpretation, in the operation of the Group's business, including environmental rules, contracting or bidding requirements, local content rules, or various other areas of labour, contract or natural resource law;

(d)     expropriation or nationalization of assets by governments;

(e)     difficulty attaining any visas, licenses or relevant regulatory approvals to support continuing operations;

(f)     political pressure to favour local contractors;

(g)     inability to retain or increase market share due to shifts in preferences or policies favouring local or national suppliers;

(h)     disruption to operations, including strikes, civil actions or political interference;

(i)     increasing security threats to the Group's personnel and equipment; or

(j)     the imposition of sanctions by the UK government, EU Commission, U.S. government or other foreign governments.

Any of the above factors could result in disruptions to the Group's business, increased costs and/or reduced future growth. The Group may not be able to obtain insurance policies covering such risks, or such policies may only be available with premiums that are not commercially viable. In addition, there is no certainty that the Group will be able to enforce the Group's legal rights through an independent and objective judiciary in all the territories in which the Group operates. As a result, any political, social and economic instability, civil disturbances or similar events could adversely affect the Group's business, financial condition and results of operations.

There can be no assurance that compliance issues under OFAC and applicable EU regulations, measures or similar laws and regulations will not arise with respect to the Group or its personnel. Non-compliance with OFAC and applicable EU regulations could result in, among other things, debarment from the ability to contract with the U.S. and EU government or their agencies, a significant restriction of the Group's ability to raise funds in global capital markets, limitations on the Group's ability to source certain goods, technology and services from the United States or U.S. suppliers, liability on behalf of the Group or the Group's personnel, imposition of significant fines and negative publicity and reputational damage.

Furthermore, should either OFAC or the Council of the EU or other sanctions be deemed to apply to any of the Group's existing or future clients, a large sector of the Russian economy or otherwise, such an expansion could result in financial difficulties for such persons or the suspension or potential curtailment of business operations between the Group and the designated persons. In addition, the introduction of large scale sanctions on Russian companies or sectors of the Russian economy may negatively affect the Russian economy and investment climate and lead to further deterioration of financial markets. Any of the foregoing could adversely affect the Group's business, financial condition, and results of operations.

The political unrest and resulting sanctions have contributed to significant volatility in Russian financial markets and created uncertainty over foreign investment in Russia and the status of future operations within Russia by foreign companies. The Group has significant operations in Russia, including a Bentec manufacturing and assembly facility in Tyumen, Russia and land rigs located in Russia. In addition, the Group currently operates and maintains platform drilling operations in Sakhalin, Russia. The Group believes that Russia will continue to be an important part of the Group's business. Further deterioration in the political situation or the imposition of further, more restrictive sanctions on Russia or Russian persons or businesses could result in reduced demand for the Group's services or require the Group to suspend certain of the Group's current or planned future activities in Russia.

Beginning in June 2014, militants affiliated with the Islamic State in Iraq and Syria ("**ISIS**") launched attacks on a number of cities and villages across the north and west of Iraq, seizing control over a large swath of territory and advancing towards the national capital of Baghdad. Although the Iraqi government and military have since reasserted control over the areas formerly controlled by ISIS and secured the entire length of the Iraq-Syria border, the threat of violence from members of ISIS and other militant groups remains. As the political and security situation continues to develop, uncertainty remains regarding the future stability and operating climate, particularly in Kurdistan in northern Iraq. The Group believes that Iraq will continue to be an important part of the Group's business. Continuing hostilities in the Middle East may lead to armed conflicts or to further acts of terrorism and civil disturbance, which may contribute to further economic instability and disruption of oil production and distribution, which could result in reduced demand for the Group's services.

In addition to the operational risks inherent to the Group's operations in Iraq, the Group also faces the risk that governmental authorities in Iraq may be unable to carry out mine clearing operations in the areas where it operates, or be unable to provide the necessary degree of peace, order, stability and security for the Group to carry out its services, particularly with regard to infrastructure development, mine safety and protection of the Group's physical property. Foreign companies operating in Iraq may be particular targets for violent criminal or terrorist actions, and such criminal or terrorist actions against the Group or the Group's third-party partners' personnel, facilities or infrastructure could adversely affect the Group's regional business, prospects, and results of operations. In addition, the possible threat of criminal or terrorist actions against the Group could adversely affect the Group's ability to adequately staff its operations or materially increase operating costs in this region. The Group may also face higher operating costs, or a significant shortage of necessary personnel, equipment or supplies, as a result of increased demand from the Group's customers, including international oil companies, as they simultaneously seek to build up and/or maintain their local presence in Iraq.

## 2.11    The Group is subject to the complexity of running a business with global operations.

The Group operates its business in a range of international locations, including Russia, Kazakhstan, Algeria, Angola, Nigeria, Azerbaijan, Iraq, Kurdistan and Pakistan, and it is expected that the Group's business will expand into new locations in the future. As a result, the Group's international operations are subject to the following risks, among others:

(a)    foreign laws and governmental regulation, including those governing tax, worker immigration and customs;

(b)    expropriation, confiscatory taxation and nationalization of the Group's assets located in areas in which the Group operates;

(c)    unfavourable changes in foreign monetary and tax policies, and unfavourable and inconsistent interpretation and application of foreign tax laws;

(d)    foreign currency fluctuations and restrictions on currency repatriation; and

(e)     restrictions in moving expatriate employees to and from the countries where services are being
provided, particularly as a result of the Covid-19 Pandemic.

If the existing body of laws and regulations in the countries in which the Group operates are interpreted
or applied, or relevant discretions exercised, in an inconsistent manner by the courts or applicable
regulatory bodies, this could result in ambiguities, inconsistencies and anomalies in the enforcement
of such laws and regulations, which in turn could hinder the Group's long-term planning efforts and
may create uncertainties in the Group's operating environment.

The Group's international operations are subject to the laws and regulations of a number of countries.
The Group's ability to compete in international drilling markets may be adversely affected by
governmental regulations or other policies that favour the awarding of contracts to contractors in which
nationals of those countries have substantial ownership interests. The Group's international operations
may face governmentally imposed restrictions or taxes from time to time on the transfer of funds to
the Group.

**2.12    General economic conditions may adversely affect the Group's operating performance and
results of operations and its customers' operating performance and results of operations, which
may affect the Group's ability and its customers' ability to raise capital.**

The global financial crisis impacted the Group's business and its customers' business in Europe, the
U.S. and globally. Moreover, the recent Covid-19 Pandemic and decreased demand for oil and gas
caused and is continuing to cause severe disruptions in the European, U.S. and worldwide economies.
Longer term disruptions in the capital and credit markets could adversely affect its customers' and the
Group's ability to access needed liquidity for working capital and growth. Sustained weakness in
general economic conditions and/or financial markets in Europe, the U.S. or globally could adversely
affect the Group's ability and its customers' ability to raise capital on favourable terms or at all, which
could result in project modifications, delays and/or cancellations. The inability to raise capital on
favourable terms, particularly during times of uncertainty in the financial markets, could adversely
impact the Group's ability to sustain the Group's businesses and would likely increase its capital costs.

**2.13    The Group's operating costs will not necessarily fluctuate in proportion to changes in the
Group's operating revenues**

The Group's operating costs will not necessarily fluctuate in proportion to changes in the Group's
operating revenues. Although the Group tries to reduce its operating costs in line with reductions in
operating activity, some costs for operating a rig are fixed or partially variable, and accordingly may
not be reduced in proportion with reductions in operating activity. In addition, the Group will not
always seek to reduce variable operating costs in instances where it is inefficient to do so. For example,
when its rigs incur unplanned downtime while on contract or idle time between drilling contracts, the
Group may seek to keep daily rate staff on those rigs to prepare the rig for its next contract.
Furthermore, during times of reduced activity, reductions in costs may not be immediate as portions
of the crew may be required to idle the rigs, after which time the crew members are assigned to active
rigs or dismissed.

In addition, equipment maintenance costs fluctuate depending upon the type of activity the unit is
performing and the age and condition of the equipment, and these costs could increase for short or
extended periods as a result of regulatory or customer requirements that raise maintenance standards
above historical levels.

As part of a large global business the Group also incurs certain overhead costs to support the provision
of processes and systems as well as the general management of the Group's operations. These costs
do not vary directly with activity and the costs may need to be incurred even where there are substantial
reductions in activity levels.

**2.14    The Group may be affected by the actions of third parties, including sub-contractors, manufacturers and partners.**

The Group relies on third-party equipment manufacturers and sub-contractors in the completion of its projects. In particular, the Group sub-contracts out the survey, upgrade and maintenance work on its rigs, and the mobilisation and demobilisation of certain rigs reliant on warranty services and rig movers, among others. In many of its rigs' locations, there are few or no repair facilities in close proximity that have the facilities and capability to perform the upgrade, repair, refurbishment and contributions that the Group requires. In the event that there are no local facilities, or should a local facility close, the Group would be required to transport the rigs greater distances in order to complete the Group's survey, upgrade and maintenance requirements. This may have a negative impact on the Group's utilisation rate due to the additional transport time required, and would lead to increased costs associated with upgrading and maintaining the Group's fleet and maintaining the Group's certifications.

To the extent that the Group does not engage sub-contractors or acquire equipment or materials according to its plans and budgets, the Group's ability to complete a project in a timely fashion or at a profit may be impaired. In addition, if a sub-contractor or a manufacturer is unable to deliver its services, equipment or materials according to the pre-agreed terms or on time, the Group may be required to purchase such services, equipment or materials from another source at a higher price or, in certain circumstances, the Group may be unable to find a replacement.

The Group's RDS segment staffs a portion of its workforces with contract employees, whose services the Group retain at market rates. Where the Group cannot pass on increases in these market rates to customers, increases have to be absorbed into margin, thus eroding the profitability of this segment. Shortages of engineering staff in the Group's key markets can lead to volatility and rapid changes in the market rates payable to engineering service contractors.

The Group may not be able to recover all of these costs in all circumstances, which may reduce the profit to be realised or result in a loss on the project for which the services, equipment or materials were needed. Moreover, if the Group must purchase services, equipment or materials from a third party that is not the Group's customary provider, there is a risk the Group may fail to deliver at the standard its customers have been accustomed to, which could be detrimental to the Group's reputation. As a result, the failure of a sub-contractor or manufacturer to deliver its services, equipment or materials according to pre-agreed terms or on time could adversely affect the Group's business, financial condition and results of operations.

**2.15    Legal, political and economic uncertainty in the European Union, including the expected exit of the United Kingdom from the European Union and the European sovereign debt crisis, may adversely impact current trading arrangements, be a source of instability in international markets and create significant currency fluctuations, which could have a material adverse effect on the Group's business, results of operations and financial condition**

The results of the United Kingdom's withdrawal from the European Union may have material adverse effect on the Group's business, financial condition and result of operations. Possible negative outcomes resulting from Brexit include: significantly disrupted trade between the United Kingdom and the EU; political and economic instability in other countries of the EU; and instability in the global financial and foreign exchange markets, including volatility in the value of the euro and the pound sterling. Brexit may also result in delays in the movement of goods and products or restrictions on the actual availability of goods and products, in each case which may disrupt the Group's operations, when either sourced directly or through third party providers in the supply chain. Given the lack of comparable precedent, it is unclear what financial, trade and legal implications Brexit will have and whether, and to what extent, the Group's operations might be affected. Therefore, Brexit could have a material adverse effect on the Group's business, financial condition or results of operations.

**2.16    The Group's international operations expose the Group to the risk of fluctuations in currency exchange rates.**

The Group's financial statements are stated in U.S. dollars. However, the functional currencies of the Group's Subsidiaries are denominated in other currencies, primarily krone, roubles, pound sterling and euros. Changes in the value of the krone and pound sterling, on the one hand, and the value of the U.S. dollar, on the other hand, will impact the Group's reported profit and net asset position. It is also possible that currencies under which the Group has entered, or may enter, into under its existing or future contracts, that are currently pegged or effectively pegged to the U.S. dollar, such as Saudi Arabian riyal (SAR) and Omani rial (OMR), might be reset or floated in the future, leading to volatility and/or devaluation of the Group's operations in the respective jurisdictions. The Group does not seek to hedge this translational impact.

In addition, the Group is exposed to transactional foreign exchange risk where individual Subsidiaries enter into contracts or incur costs in currencies other than their functional currency, and the Group may not always be able to match revenue with costs denominated in the same currency. If the currency in which the costs are denominated increases in value relative to the currency in which the revenue is denominated, the Group's operating margins decrease. Moreover, an appreciation of the value of a currency may result in an increased tax liability in certain jurisdictions in which the Group operates. For instance, in the case of a depreciation of the U.S. dollar, the Group's U.S. dollar liabilities incurred in the countries in which the Group operates would be translated and reported as a lower number in local currency relative to the amount stated in U.S. dollars, resulting in taxable gains at the local level. Furthermore, currencies under a significant number of the Group's contracts in relation to its operations in Saudi Arabia is in SAR, which is currently pegged to the U.S. dollar. Moreover, the Group's operations in Oman are subject to contracts that are currently denominated in U.S. dollars, but the Group may renew its existing contracts and/or enter into additional contracts in the future with respect to its Omani operations in OMR instead, which is currently pegged to the U.S. dollar. If SAR, OMR or any other relevant currencies in which the Group operates becomes effectively unpegged with the U.S. dollar in the future, it could result in volatility and/or devaluation of the Group's operations in the respective jurisdictions, which could lead to an adverse impact on the Group's business, financial prospects and results of operations. While the Group attempts to minimize its exposure to such foreign exchange risks through measures such as buying or selling forward currency exposures and through economically matching the currency of the Group's costs and income, there can be no assurance that the Group will be able to successfully hedge its foreign exchange risks.

The results of the United Kingdom's referendum on the UK's continued membership in the EU caused significant volatility in global stock markets and currency exchange rate fluctuations, and resulted in a significant weakening of the pound sterling against the U.S. dollar, the euro and other major currencies. As a result of the referendum and the decision by the UK to trigger Article 50(2) of the Treaty on European Union to begin the exit process from the EU, for the years ended 2018 and 2019, the Group's revenue in pound sterling was, in U.S. dollar terms, significantly lower than in prior years, while the Group's costs in pound sterling were, in U.S. dollar terms, also lower than in prior years. Any future effects of Brexit will depend, in part, on agreements the United Kingdom negotiates during and after the transitional period to retain access to markets in the EU, including current trade and finance agreements. Depending on the outcome, the Group could be required to make additional currency related adjustments. The effects on the UK, European and global economy of the uncertainties arising from Brexit are difficult to predict, but may include economic and financial instability in the UK and Europe, including a continued drop in the value of the pound sterling, or euro, compared to the U.S. dollar and other currencies. In addition to the translational impact on the Group's financial statements, to the extent the Group has unhedged exposure to assets, liabilities, or income statement items in the euro or pound sterling, the change in exchange rate could adversely affect the Group's business, financial prospects and results of operations.

The Group has historically been successful in limiting the risks of currency fluctuation and restrictions on currency repatriation by obtaining contracts providing for payment in U.S. dollars or freely convertible foreign currencies wherever possible. However, certain countries in which the Group may operate could require that all or a portion of its revenue be paid in local currencies that are not freely convertible.

In addition, certain parties with which the Group does business may require that all or a portion of its revenue be paid in local currencies. To the extent possible, the Group limits its exposure to potentially devaluating currencies by matching the acceptance of local currencies to the Group's expense requirements, including taxation in those currencies. Although the Group has done this in the past, it may not be able to obtain such contractual terms or match revenue and expenses in this manner in the future, thereby exposing the Group to foreign currency fluctuations that could adversely affect the Group's business, financial condition and results of operations.

**2.17**    **Downgrades in the Group's credit ratings by various credit rating agencies could impact the Group's access to capital and materially adversely affect the Group's business and financial condition.**

A lowering of the Group's credit ratings could have material adverse consequences on the Group's business and future prospects and could:

(a)    limit the Group's ability to access debt markets, including for the purpose of refinancing the Group's existing debt;

(b)    cause the Group to refinance or issue debt with less favourable terms and conditions, which debt may require collateral and restrict, among other things, the Group's ability to pay distributions or repurchase shares;

(c)    increase certain fees under the Group's credit facilities and negatively impact current and prospective customers' willingness to transact business with the Group;

(d)    impose additional insurance, guarantee and collateral requirements;

(e)    limit the Group's access to bank and third-party guarantees, surety bonds and letters of credit; and

(f)    result in suppliers and financial institutions lowering or eliminating the level of credit provided through payment terms or intraday funding when dealing with the Group, thereby increasing the Group's cash-on-hand requirements, which would decrease the Group's ability to repay debt balances.

Any downgrades to the Group's credit ratings could result in a material adverse impact on the Group's business, financial condition and results of operations.

**2.18**    **The tax laws of the countries in which the Group operates or changes thereto or to the Group's tax profile could result in a higher tax expense or a higher effective tax rate on its worldwide earnings.**

The Group conducts its operations through various Subsidiaries in countries throughout the world. Tax laws, regulations and treaties can be complex and are subject to interpretation. Consequently, the Group is subject to changing tax laws, regulations and treaties in and between the countries in which the Group operates. The Group's income tax expense is based upon the tax laws in effect in various countries at the time that the expense was incurred. A change in these tax laws, regulations or treaties or in the interpretation thereof, or in the valuation of the Group's deferred tax assets, which is beyond the Group's control, could result in a materially higher tax expense or a higher effective tax rate on

the Group's worldwide earnings. The tax implications of Brexit and the outcome of negotiations between the UK and other EU member states are not known as at the date of this document. Additionally, the Group's expansion into new jurisdictions could adversely affect the Group's tax profile and significantly increase the Group's future cash tax payments.

In addition, various national and local taxing authorities periodically examine the Group. Such examinations, including tax audits, may result in an assessment of additional taxes and other costs payable in relation to prior periods. Where challenged, the Group has appealed against these assessments as having no basis under the relevant tax legislation, but there is no assurance the Group will be successful in doing so. Many of the countries in which the Group operates are heavily reliant on the oil and gas sector for their revenues. As a result of the recent and prolonged decline in commodity prices, the tax authorities in some countries have become more active in pursuing tax audits and interpreting tax laws more aggressively.

### 2.19    The Group conducts its business within a strict environmental regime and may be exposed to potential liabilities and increased compliance costs.

The Group's operations are subject to increasingly stringent laws and regulations relating to environmental protection, including laws and regulations governing emissions into the air, discharge into waterways, and the generation, storage, handling treatment and disposal of waste materials. The Group incurs, and expects to continue to incur, capital and operating costs to comply with environmental laws and regulations. The technical requirements of environmental laws and regulations are becoming increasingly expensive, complex and stringent. Although customers continue to take primary responsibility for environmental pollution under the Group's contracts, customers may attempt to pass increasing liability on to contractors such as the Group over time as part of their risk management policies, and there can be no guarantee that the Group will successfully resist such changes. Further, natural or other disasters may result in an increase in environmental regulations and restrictions. These laws may provide for strict liability for damage to natural resources or threats to public health and safety. Strict liability can render a party liable for environmental damage whether or not negligence or fault on the part of that party can be shown and, if imposed by way of fine or penalty, is generally not something for which insurance can be procured. Certain environmental laws provide for joint and several strict liability for remediation of spills and releases of hazardous substances.

In addition, the governments of certain countries have been increasingly active in regulating and controlling the exploration for, and production of, oil and gas and other aspects of the oil and gas industries in their countries. Many governments favour, or effectively require, that drilling contracts be awarded to local contractors. These practices may result in inefficiencies or put the Group at a disadvantage when the Group bid for contracts against local competitors.

### 2.20    Climate change legislation or protests against fossil fuel extraction may have a material adverse effect on our industry.

Continued political attention to issues concerning climate change, the role of human activity in it and potential mitigation through regulation could have a material impact on the Group's business. International agreements, national and regional legislation, and regulatory measures to limit greenhouse emissions are currently in various stages of discussion or implementation. Like other oil and gas companies, given that the Group's operations involve emissions of greenhouse gases, these and other greenhouse gas emissions related laws, policies and regulations may result in substantial capital, compliance, operating and maintenance costs. The level of expenditure required to comply with these laws and regulations is difficult to accurately predict and will vary depending on, among other things, the laws enacted by particular countries. As such, climate change legislation and regulatory initiatives restricting emissions of greenhouse gases may materially adversely affect the Group's operations and increase its cost structure. Such legislation or regulatory initiatives could also

have a material adverse effect by diminishing the demand for oil and gas, increasing the Group's cost structure or causing disruption to its operations by regulators.

In addition, the Group may be subject to activism from groups campaigning against fossil fuel extraction, which could affect its reputation, dissuade investors from investing in its business, persuade shareholders to sell their holdings, dissuade contractors from working with the Group, disrupt our campaigns or programs, induce our employees and/or directors to cease working or acting for the Group or otherwise negatively impact its business.

Additionally,  some scientists have concluded that increasing concentrations of greenhouse gases in the Earth's atmosphere may produce climate changes that have significant physical effects, such as increased frequency and severity of storms, droughts, floods and other climatic events. The Group's offshore operations are at particular risk of severe climatic events and, if any events were to occur in the area where it has operations, they could have an adverse effect on its financial condition and results of operations.

**2.21    A decline in pension asset values may increase the Group's pension liability, which may adversely affect the Group's profitability.**

Certain of the Group's employees participate in defined benefit pension plans. A decline in pension asset values or different actuarial assumptions or the application of purchase accounting may result in an increase in pension liability.  Declines in interest rates, the market values of the securities held by the plans or certain other changes could adversely affect the status of the Group's plans and affect the level and timing of required contributions, thus increasing the Group's pension expense and reducing the Group's profitability.  Any shortfall in the Group's retirement pension benefit scheme funding obligations may require additional funding.

Further, decisions made by the trustees of defined benefits pension schemes can impact on the funding requirements of the schemes.

**2.22    The Group may be unable to attract and retain sufficiently skilled personnel to meet the Group's operational requirements.**

The Group's ability to remain competitive depends on the Group's ability to employ highly skilled personnel. The Group's directors and senior management possess commercial, engineering, project management, legal and financial and administrative skills that are important to the operation of the Group's business. The Group's ability to successfully conduct the Group's business depends on the depth of experience of the Group's senior management and directors and their customer relationships. The Group has established succession planning measures aimed at ensuring the development of the Group's employees to provide successors, over time, for the Group's existing directors and senior managers. However, there can be no assurance that these measures will be successful or that the Group will be able to attract, develop or retain high-calibre directors and senior managers. The loss of or an extended interruption in the services of a substantial number of the Group's directors or senior managers, or the inability to attract or develop a new generation of senior management, could adversely affect the Group's business, financial condition and results of operations.

In addition, demand for engineers and other technical and management personnel is traditionally high and could exceed supply, particularly in the case of skilled and experienced engineers and field service personnel, such as the engineers employed by Bentec. This shortage is exacerbated by the reality of the current skilled workforce aging and not being fully replaced by younger entrants. The Group's recruitment efforts are further challenged by the remoteness of, or perceived dangers of traveling to, the various locations in which the Group operates, the paramount importance of recruiting staff who are capable of rigorously adhering to its high standards of safety, and the need to employ a specified percentage of local workers under nationalization  programs in certain countries, which may be

problematic if there is insufficient interest from local workers or such workers lack the requisite education, qualifications, skills and experience typically required for such positions. To the extent that the demand for drilling services and the size of the worldwide rig fleet increases, shortages of qualified personnel could arise, leading to higher wages and preventing the Group from attracting qualified personnel in a cost-effective manner. All of the Group's offshore platform contracts and certain of its Land Drilling contracts provide for an annual review of key terms and allow the Group to pass on certain costs, such as increases in wages and insurance, to customers. However, there is no assurance that all, or any, of such increases in wages as a result of a labour shortage or wage inflation can be passed on to the Group's customers. If the Group is unable to pass on such costs to its customers, the Group may be unable to retain adequate skilled personnel and the Group's results of operations would be adversely affected.

**2.23    The Group's operations may be adversely affected by natural disasters and climatic conditions, as well as violence and social unrest, hazards inherent to the operation of oil and gas wells and other events outside of the Group's control. The Group could be subject to substantial liability claims, which may potentially exceed the Group's insurance coverage and contractual indemnity provisions.**

Many of the Group's services are carried out in hazardous environments. The Group's operations may be adversely affected and severely disrupted by natural disasters or adverse weather conditions, such as cyclones, excessive rainfall, tropical storms or droughts, that may occur in those geographic areas in which the Group operates. The Group's offshore operations are subject to perils inherent in marine operations, including capsizing, grounding, collision and loss or damage from severe weather. In addition, damage to offshore rigs caused by high winds, turbulent seas or unstable sea bottom conditions could potentially force the Group to suspend operations for significant periods of time until the damage can be repaired.

The Group's international operations in certain countries are also subject to risks of terrorism, war, kidnappings, piracy, sabotage, social unrest, civil disturbances and other political events. The Group's oil facilities, shipyards, vessels, pipelines and oil and natural gas fields could be targets of future terrorist attacks, and the Group's rigs, installations or personnel could be targets of pirates, hijackers or criminal or terrorist actions. International companies and persons, such as the Group and its employees, may be singled out. Any such attacks could lead to, among other things, bodily injury or loss of life, rig, platform or other property damage and increased operational costs, including insurance costs. In addition, the security situation in Iraq remains volatile. Violence could have significant negative effects on the Group's operations by damaging the Group's equipment, shutting down or delaying production, forcing temporary or permanent withdrawal of employees and contractors from facilities or areas, or requiring private security. Any of these risks could result in damage to or destruction of drilling equipment, personal injury and property damage, suspension of operations or environmental damage. If the Group or its employees are the subject of attacks, kidnappings or other security threats, the Group's business, financial condition, results of operations and prospects in the relevant region could be adversely affected.

The Group's operations both on- and offshore are subject to hazards inherent in activities related to the operation of oil and natural gas wells, such as oil spills, blow-outs, reservoir damage, loss of production, loss of well control, punch through, craterings, and fires. An accident or service failure can cause personal injury, loss of life, damage to property, equipment or the environment, consequential losses or the suspension of operations, or possibly the termination of the contract. Furthermore, distance from the Group's principal locations can make it more difficult to implement and impress upon local workforces the Group's policies on matters such as health and safety, and can present challenges in the supervision of the Group's sub-contracted employees. While the Group strive to reduce the Group's accident and injury rates by implementing safety standards at the locations where the Group conduct the Group's operations, there can be no assurance that accidents will not occur in the future.

Furthermore, the Group may be liable for environmental damages, including resulting from the pollution of offshore waters. The Group's insurance and its contractual limitations on liability may not adequately protect the Group in all cases against liability for such events, including events involving pollution, or against direct and consequential losses resulting from business interruption. In addition, indemnities which the Group receives from customers may not be easily enforced and may be of limited value if the relevant customers do not have adequate resources. Moreover, the Group may not be able to maintain insurance at levels that the Group deem adequate or ensure that every contract contains adequate limitations on liabilities. There is no assurance that such insurance or indemnification agreements will adequately protect the Group against liability from all of the consequences of the hazards and risks described above. The occurrence of an event not fully insured or indemnified against, or the failure of a customer or insurer to meet its indemnification or insurance obligations, could result in substantial losses. In addition, there can be no assurance that insurance will be available to cover any or all of these risks, or, even if available, that insurance premiums or other costs will not rise significantly in the future, so as to make the cost of such insurance prohibitive. Any future damage caused by the Group's products or services that are not covered by insurance, are in excess of policy limits, are subject to substantial deductibles, or are not limited by contractual limitations of liability, could adversely affect the Group's business, financial condition and results of operations.

## 2.24    Compliance with labour, health and safety laws and other employment regulations could increase the Group's costs or restrict the Group's operations.

The Group's operations and properties are subject to regulation by various governmental entities and agencies, including in connection with ongoing compliance with existing laws and regulations concerning labour, health and safety, among others (including, most recently, polices relating to the Covid-19 Pandemic). For example, the Group's operations rely on maintaining a sufficient number of workers who are properly registered for work in the relevant geographic location and adequately trained in safety precautions, and therefore any delays in a governmental entity's ability to process visas, work permits, extensions and renewals or certify safety training courses can disrupt the Group's ability to adequately staff the Group's sites. If the Group is not able to obtain visas and work permits for the employees the Group needs for operating its rigs on a timely basis, the Group might not be able to perform the Group's obligations under the Group's drilling contracts, which could allow the Group's customers to cancel their contracts, adversely affecting the Group's financial condition, results of operations or cash flows.

In various countries the Group is also subject to nationalization programs which require the Group to hire a certain percentage of local personnel within a specified time period. In an employment market with a shortage of suitably trained staff, this may be difficult to achieve. The Group may not be able to hire and retain a sufficient number of skilled and experienced workers for wages, pensions and other benefits that the Group believes are commercially reasonable. In addition, a significant portion of the workers the Group employ in the Group's European operations are members of labour unions or otherwise subject to collective bargaining. Although the Group believes the Group presently have good relations with the Group's employees, the Group cannot guarantee that a work slowdown, a work stoppage or a strike will not occur in the future, and the Group cannot estimate the effect of any such work slowdown, work stoppage or strike on its overall performance. In addition, employees may strike for reasons unrelated to the Group's union arrangements. Any future work stoppage could, depending on the operations and the length of the work stoppage, have a material adverse effect on the Group's business, financial position and results of operations.

The technical requirements of employee labour, health and safety laws and regulations are becoming increasingly complex and stringent and it is therefore more difficult to ensure compliance. Legislation and regulations applicable to the Group's industry are evolving continuously, and the Group's ability to maintain satisfactory levels of compliance at all times may be uncertain and may incur significant costs. The level of compliance requirements continues to increase across the broad range of territories

in which the Group operates, including the recent implementation of new legislation around modern slavery. In the near term, data privacy and protection rules are expected to become more onerous with large potential fines and other sanctions for non-compliance. In addition, health and safety laws are often unclear and contradictory, which makes it difficult for the Group to ensure compliance. The incurrence of material expenditures to comply with new and/or existing health and safety laws could restrict the Group's ability to grow and adversely affect the Group's business, financial condition and results of operations. Failure to deliver consistently high standards across all fields of operations could create risks for the Group, including legal action and reputational risks.

Regulatory authorities exercise considerable discretion in monitoring compliance and in interpreting and enforcing applicable laws and regulations. Future inspections by regulatory authorities may conclude that the Group has violated applicable laws or regulations. If the Group is unable to refute these conclusions or to remedy these violations, the regulatory authorities may impose fines, criminal and administrative penalties or severe sanctions, including compelling the Group to cease certain of the Group's business activities. The loss of profits could adversely affect the Group's business, financial condition and results of operations.

**2.25    Complaints or litigation from customers and other third parties could adversely affect the Group's business.**

The Group is currently, and may in the future become, involved in legal complaints or proceedings initiated by the Group's customers, employees and other third parties. These current or potential future proceedings, whether individually or in the aggregate, could involve substantial claims for damages or other payments, and, even if successfully disposed of without direct adverse financial effect, could adversely affect the Group's reputation and divert the Group's financial and management resources from more beneficial uses. If the Group were to be found liable under any such claims, its results of operations could be adversely affected.

Providing project management, engineering and construction services involves the risk of contractual and professional errors, omissions, warranty claims, infringements of third-party intellectual property and other liability claims, as well as negative publicity that may adversely affect the Group's business, financial condition and results of operations. The Group is involved in litigation, claims and disputes incidental to the Group's business, which at times involve claims for significant monetary amounts. The Group may not be able to maintain or obtain adequate insurance coverage at rates the Group consider reasonable or the Group may take the decision not to insure such risks. Even in the event coverage is obtained, claims may exceed such insurance coverage. The Group undertakes all reasonable steps to defend itself in such lawsuits. However, there can be no assurance as to the ultimate outcome of such lawsuits, in which case the Group could suffer material adverse consequences.

**2.26    The Group could be adversely affected by violations of applicable anti-corruption laws.**

The Group is an international business with operations in developing economies and in countries which are high on the Corruption Perceptions Index published by Transparency International. The Group is committed to doing business in accordance with the Group's own codes of ethics and with all applicable laws, including the Bribery Act and FCPA and similar worldwide anti-corruption laws that generally prohibit companies and their intermediaries from making, offering or authorizing improper payments to government officials, private individuals or companies for the purpose of obtaining or retaining business. The Group operates in several countries where compliance with anti-corruption laws may conflict with local customs and practices and are subject to the risk that the Group, the Group's affiliated entities or the Group's or their respective officers, directors, employees and agents may take actions determined to be in violation of such anti-corruption laws. Even though some of the Group's local agents, joint ventures with local operators or strategic partners may not themselves be subject to the Bribery Act, the FCPA or other anti-corruption laws to which the Group is subject, if the Group's agents or partners make improper payments in connection with the Group's work, the

Group could be found liable for violation of such anti-corruption laws and could incur civil and criminal penalties and other sanctions, and such costs could adversely affect the Group's business, financial position, results of operations and cash flows.

Violations of anti-corruption laws (either due to the Group's acts or its omissions) may result in criminal and civil sanctions and could subject the Group to other liabilities in the UK, the U.S. and elsewhere. Even allegations of such violations could disrupt the Group's business and result in a material adverse effect on the Group's business and operations. The Group has policies and procedures designed to assist the Group's compliance with applicable laws and regulations and have trained the Group's employees to comply with such laws and regulations, and to consider the policies, procedures and behaviour of third parties before entering into contracts with them. While the Group has a culture of compliance and have adequate systems of control, the Group seeks to continuously improve its systems of internal controls, to remedy any weaknesses the Group identify through appropriate corrective action depending on the circumstances, including additional training, improvement of internal controls and oversight and deployment of additional resources and to take appropriate action in case of any breach of its rules and procedures, which might include disciplinary measures, suspensions of employees and ultimately termination of such employees. There can be no assurance, however, that the Group's policies and procedures will be followed at all times or effectively detect and prevent violations of the applicable laws by one or more of the Group's employees, consultants, agents or partners and, as a result, the Group could be subject to penalties and adverse consequences on the Group's business, financial condition or results of operations if the Group fail to prevent any such violations. Finally, the Group may be subject to competitive disadvantages to the extent that the Group's competitors are able to secure business, licenses or other preferential treatment by making payments to government officials and others in positions of influence or using other methods that UK, U.S. and foreign laws and regulations and the Group's own policies prohibit the Group from using.

### 2.27    Damage to the Group's reputation and business relationships may adversely affect the Group's business beyond any monetary liability.

The Group's business depends on the Group's customer goodwill, the Group's reputation and on maintaining good relationships with the Group's customers, joint venture partners, employees and regulators. Any circumstances which publicly damage the Group's goodwill, injure the Group's reputation or damage the Group's business relationships may lead to a broader adverse effect on the Group's business and prospects by way of loss of business, goodwill, customers, joint venture partners and employees than solely the monetary liability arising directly from the damaging events.

### 3.    Risk Factors relating to the New Notes

*The following are some of the material risks in respect of the New Notes.*

### 3.1    The Restructured Group may not have enough cash available to service its debt.

The Restructured Group's ability to make scheduled payments on the New Notes and its other indebtedness, or to refinance its debt, depends on its future operating and financial performance, which will be affected by its ability to implement successfully, following the Restructuring, the Restructured Group's business strategy as well as general economic, financial, competitive, regulatory, technical and other factors beyond its control.

If, in the future, the Restructured Group cannot generate sufficient cash to meet its debt service requirements, the Restructured Group may, among other things, need to refinance all or a portion of its debt, including the New Notes, obtain additional financing, delay planned capital expenditures or sell material assets. The Restructured Group's ability to pay and refinance its debt or its ability to fund its working capital and capital expenditures is heavily reliant on the Restructured Group's future operating performance and the Restructured Group's ability to generate a sufficient cash flow. The Restructured

Group may be unable to achieve any refinancing on a timely basis or on satisfactory terms. The Group may also be limited in its ability to pursue refinancing alternatives by the terms and conditions of its existing debt agreements. The Group's inability to refinance its debt obligations on or prior to their maturity on favourable terms or at all could have a material adverse effect on its ability to service and repay the New Notes.

If the Restructured Group is not able to refinance its debt as necessary, obtain additional financing or sell assets on commercially reasonable terms or at all, the Restructured Group may not be able to satisfy its obligations with respect to its debt, including the New Notes. In that event, borrowings under other debt agreements or instruments that contain cross-default or cross-acceleration provisions may become payable on demand, and the Restructured Group may not have sufficient funds to repay all of the Restructured Group's debts, including the New Notes. In addition, any of the members of the Group may, subject to the restrictions in the New Intercreditor Agreement, distribute a significant amount of cash and cash equivalents to its shareholders, use the cash to make acquisitions or enter into transactions that may be adverse to the interests of New Noteholders or otherwise decrease the amount of cash on their balance sheets, which would adversely affect the ability of the Company to repay the interest or principal of the New Notes.

### 3.2   The Restructured Group's indebtedness may make it difficult for it to service the Group's debt and to operate the Group's business.

Although the Restructuring will significantly deleverage the Group's capital structure, substantial indebtedness will continue for the foreseeable future. The Group's substantial indebtedness may have material negative consequences for Scheme Creditors, including:

- making it more difficult for the Group to satisfy its obligations with respect to its debt and other Liabilities;

- requiring that a substantial portion of the cash flow from operations of the Group's operating Subsidiaries be dedicated to debt service obligations, reducing the availability of cash flow to fund internal growth through working capital and capital expenditures and for other general corporate purposes;

- increasing the Group's vulnerability to economic downturns in its industry;

- exposing the Group to interest rate increases;

- placing the Group at a competitive disadvantage compared to its competitors that have less debt in relation to cash flow;

- limiting the Group's flexibility in planning for or reacting to changes in the Group's business and its industry;

- restricting the Group from pursuing strategic acquisitions or exploiting certain business opportunities;

- limiting, among other things, the Group's ability to borrow additional funds or raise equity capital in the future and increasing the costs of such additional financings; and

- limiting the Group's ability to pay dividends.

In the worst case, an actual or impending inability to pay debts as they become due and payable could result in the insolvency of the Group. Certain assets, including certain shares of the members of the Group and material bank accounts, have been pledged to secure the New Notes and the New Bilateral Facilities. On any insolvency, these assets would be subject to foreclosure and liquidation for the

benefit of the secured creditors and the priority in which amounts (if any) may be available for distribution to Scheme Creditors is not certain.

In addition, the New Notes Indenture, the New Bilateral Facilities Agreements and the New Intercreditor Agreement contain restrictions that substantially limit the Group's financial and operational flexibility and that of its Subsidiaries. In particular, these agreements place limits on the ability to incur additional indebtedness, grant security interests to third persons, dispose of material assets, undertake organisational measures such as mergers, changes of corporate form, joint ventures or similar transactions, and enter into transactions with related parties. If an event treated as a change of control, as defined in the New Notes Indenture, the New Bilateral Facilities Agreements and the New Intercreditor Agreement, occurs at any time, the Group may be required to repurchase the New Notes or repay outstanding drawings under the New Bilateral Facilities.

## 3.3 Despite the Restructured Group's current leverage, the Restructured Group may be able to incur more debt in the future, which could further exacerbate the risks of its leverage.

The Restructured Group may need to incur additional debt in the future to complete acquisitions or capital projects or for working capital purposes. Although the agreements governing the New Notes impose limits on the Restructured Group's ability to incur debt, these agreements permit the incurrence of additional debt if the Restructured Group satisfies certain conditions. The Restructured Group may also incur substantial additional debt that could mature prior to the New Notes, and which may be secured by liens on its assets, including the collateral that secures the New Notes. The incremental debt which the Restructured Group may be able to incur under the New Notes may rank *pari passu* or, in certain circumstances, senior to and share security with the New Notes. In particular, the New Notes Indenture will permit the Company to secure debt other than the New Notes with certain assets that will not secure the New Notes. If the Restructured Group and its Subsidiaries incur additional debt, the risks related to being in a highly leveraged group that the Restructured Group now faces, as described elsewhere in this Part 8 (Risk Factors), could intensify.

## 3.4 Certain Indebtedness may be designated as super senior indebtedness and would be entitled to be repaid with the proceeds of the collateral sold in any enforcement sale in priority to the New Notes and the New Noteholders will not control decisions regarding the collateral in certain circumstances.

Pursuant to the terms of the New Intercreditor Agreement, the New Bilateral Facilities will be secured on a super senior basis by the same collateral securing the New Notes and there may also be hedging facilities established that may be secured on a super senior basis. Upon enforcement of any of the New Security, the New Notes will rank behind the New Bilateral Facilities on the proceeds of enforcement. As such, in the event of an enforcement of the collateral, New Noteholders may not be able to recover on the collateral if the aggregate of the then outstanding New Total Super Liabilities is greater than the proceeds realised. Any proceeds from an enforcement sale of the collateral by any creditor will, after all Super Senior Liabilities (as defined in the New Intercreditor Agreement) have been discharged from such recoveries, be applied pro rata in repayment of the New Notes and any other obligations secured by the collateral which are permitted to rank *pari passu* with the New Notes.

In addition, the New Notes Indenture will permit the Restructured Group and its Subsidiaries to incur up to a capped amount of additional indebtedness under credit facilities that are permitted to be Super Senior Liabilities (as defined in the New Intercreditor Agreement) under the New Intercreditor Agreement (such cap exclusive of any hedging Liabilities incurred). For more information, see the form of the New Notes Indenture included in part 1 (New Notes Indenture) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to this Explanatory Statement at Part 1 (New Notes Indenture) of Appendix 4 (Key Restructuring Documents)).

In general, the facility agent under the New Bilateral Facilities Agreements, the New Noteholders and the agents under any permitted future senior secured debt, voting as provided below, will have, subject

to certain restrictions, the ability to provide enforcement instructions to the New Security Agent to enforce the shared Pledged Assets. The New Intercreditor Agreement will provide that, where there is an inconsistency between enforcement instructions by the Majority Super Senior Creditors and the holders of more than 50% of Majority Senior Secured Creditors, the aggregate of the New Notes and all liabilities outstanding under any other indebtedness sharing the Pledged Assets and certain hedging obligations on a first ranking basis, the latter instructions will prevail. However, if and to the extent the obligations under the New Bilateral Facilities Agreements and other Super Senior Liabilities (as defined in the New Intercreditor Agreement) have not been fully discharged within six months of the end of an initial consultation period, or no enforcement action has been taken within three months of such date, or an insolvency event (as defined in the New Intercreditor Agreement) occurs, the enforcement instructions provided by the Majority Super Senior Creditors will prevail. The lenders under the New Bilateral Facilities Agreements and certain hedging counterparties may have interests that are different from the interests of the New Noteholders, and they may, subject to the terms of the New Intercreditor Agreement, elect to pursue their remedies under the New Security Documents at a time when it would be disadvantageous for the New Noteholders to do so.

These arrangements could be disadvantageous to the New Noteholders in a number of other respects. Other creditors not subject to the New Intercreditor Agreement could commence an enforcement action against the Restructured Group during such period, one or more of the Restructured Group members could seek protection under applicable bankruptcy laws, or the value of certain Pledged Assets could otherwise be impaired or reduced.

The New Intercreditor Agreement provides that the New Security Agent, who will serve as the common security agent for the New Notes and the Super Senior Liabilities (as defined in the New Intercreditor Agreement), will act only as provided for in the New Intercreditor Agreement. The New Intercreditor Agreement regulates the ability of the New Trustee or the New Noteholders to instruct the New Security Agent to take enforcement action. The New Security Agent is not required to take enforcement action unless instructed to do so by an Instructing Group (as defined in the New Intercreditor Agreement). Consequently, the rights of the New Noteholders to commence and control any enforcement action is restricted, as provided in the New Intercreditor Agreement.

**3.5    Each of Alpha and its Restricted Subsidiaries is subject to restrictive debt covenants that may limit its ability to finance its future operations and capital needs and to pursue business opportunities and activities.**

The New Notes Indenture and New Bilateral Facilities Agreements contain covenants that limit the ability of the Restructured Group and its Subsidiaries to take certain actions. These restrictions may limit the Restructured Group's ability to operate its businesses and may prohibit or limit its ability to enhance its operations or take advantage of potential business opportunities as they arise. The New Notes Indenture will restrict the Restructured Group's ability to:

- incur or guarantee additional indebtedness and issue certain preferred stock;

- make certain payments, including dividends or other distributions, with respect to the shares of such entity;

- create or incur certain liens;

- prepay or redeem subordinated debt or equity;

- make certain investments;

- sell, lease or transfer certain assets, including stock of the Restricted Subsidiaries;

- create encumbrances or restrictions on the payment of dividends or other distributions, loans or advances to, and on the transfer of, assets to such entity;

- engage in certain transactions with Affiliates;

- enter into arrangements that restrict dividends or other payments to the Restructured Group;

- create Unrestricted Subsidiaries;

- enter into transactions with Affiliates;

- consolidate, merge or transfer all or substantially all of the Group's assets and the assets of the Group's Subsidiaries on a consolidated basis; and

- impair the security interest for the benefit of the New Noteholders.

All of these limitations are subject to exceptions and qualifications. These covenants could limit the Restructured Group's ability to finance its future operations and capital needs and its ability to pursue business opportunities and activities that may be in the Restructured Group's interest.

If the Restructured Group breaches any of these covenants, it may be in default under the New Notes Indenture. A significant portion or all of the Restructured Group's indebtedness may then become immediately due and payable. The Restructured Group may not have, or be able to obtain, sufficient funds to make these accelerated payments. In addition, any default under the New Notes Indenture could lead to an acceleration of debt under other debt instruments that contain cross-acceleration or cross-default provisions under any of the Restructured Group's other agreements governing the Restructured Group's debt. If the debt under the New Notes or other debt instruments is accelerated, the Restructured Group may not have sufficient cash to repay amounts due thereunder.

### 3.6    Certain covenants may be suspended upon the occurrence of a change in ratings.

The New Notes Indenture will provide that, if at any time following the Issue Date, the New Notes receive an Investment Grade Rating by at least two Rating Agencies and no default or event of default has occurred and is continuing, then beginning that day and continuing until such time that the New Notes are no longer assigned an Investment Grade Rating by at least two Rating Agencies, certain covenants will cease to be applicable to the New Notes. If these covenants were to cease to be applicable, the Issuer would be able to incur additional indebtedness or make payments, including dividends or investments, which may conflict with the interests of New Noteholders. There can be no assurance that the New Notes will ever achieve an investment grade rating or that any such rating will be maintained.

### 3.7    Under certain circumstances, following a tender offer or offer to purchase the New Notes, the Issuer may, at its option, redeem the New Notes of non-tendering holders.

If, pursuant to any tender offer or other offer to purchase all of the New Notes, holders of not less than 90% of the aggregate principal amount of the then outstanding New Notes validly tender and do not withdraw such New Notes, the New Notes Indenture will permit the Issuer, at its option, to redeem the remaining outstanding New Notes at a price equal to that paid pursuant to such purchase or tender offer (excluding any early tender premium). As a consequence, the holders may be required to surrender the New Notes against their will at a price equivalent to the lowest price paid to tendering holders, including if such price is below par, and may not receive the return the holders expected to receive on the New Notes.

**3.8**    **The New Notes, the New Notes Guarantees, and the New Security granted to the New Security Agent and any other transactions entered into by the Company and the Post-Restructuring Obligors, the obligations and transactions in connection with the New Intercreditor Agreement and any other obligations or transactions entered into at any time by the Company and any other member of the Restructured Group may be voidable, subordinated or limited in scope under laws governing fraudulent transfers and insolvency.**

The Issuer's obligations under the New Notes are guaranteed by the Post-Restructuring Obligors and each of the New Notes Guarantees may be subject to review under the fraudulent transfer and conveyance laws of the relevant jurisdiction where such guarantors operate.

Under U.S. federal bankruptcy laws and comparable provisions of state fraudulent transfer laws, the issuance of the New Notes Guarantees by the Post-Restructuring Obligors could be voided, or claims in respect of such obligations could be subordinated to all of their other debts and other Liabilities, if, among other things, at the time of entering into the New Notes Guarantees, the Post-Restructuring Obligors had an actual intent to hinder, delay or defraud any present or future creditors, or received less than the reasonably equivalent value for the incurrence of such indebtedness and either:

- was insolvent or rendered insolvent by reason of such incurrence;

- was engaged in a business or transaction for which its remaining assets constituted unreasonably small capital;

- intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature; or

- made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, and not in the ordinary course of business.

In addition, any payment by a guarantor pursuant to the New Notes Guarantees could be voided and required to be returned to the guarantor, or to a fund for the benefit of the creditors of the guarantor.

The Restructured Group and each of its Restricted Subsidiaries, cannot assure Scheme Creditors which standard a court would apply in determining whether a guarantor was "insolvent" as of the date the New Notes Guarantees were issued, or that, regardless of the method of valuation, a court would not determine that a guarantor was insolvent on that date, or that a court would not determine, regardless of whether or not a guarantor was insolvent on the date its guarantee was issued, that payments to New Noteholders constituted fraudulent transfers on other grounds.

Under German insolvency law, guarantees and/or security interests provided by a German guarantor may be subject to avoidance laws in an insolvency proceeding over the assets of the relevant German guarantor. Specific hardening periods range from one month up to ten years in a worst-case scenario and are very fact sensitive. There are potential mitigants, in particular reliance on the exception for "cash-transactions". However, a "cash-transaction" is only possible where "fresh money" has been provided in exchange of a German guarantor granting guarantees and/or security interests of adequate value for such "fresh money" within a period usually not exceeding two weeks up to 30 days, depending on the type of security interest. The provision of guarantees and/or security interests by a German guarantor for existing debt (instead of "fresh money") can significantly increase avoidance risks. An insolvency administrator (*Insolvenzverwalter*) or custodian (*Sachwalter*) or self-administrator (*Eigenverwalter*) could potentially argue that the New Notes are in fact a refinancing of pre-existing debt and thus may not qualify as "fresh-money" in the sense of the exception for "cash-transactions". Guarantees and/or security interests could therefore potentially be treated in hindsight as a gratuitous transaction (*Schenkungsanfechtung*) with an applicable hardening period of four years.

In addition, providing security for shareholder loans or comparable shareholder claims is subject to potential German law avoidance with a ten-year hardening period. The definition of "comparable shareholder claims" is wide and captures various kinds of instruments with a financing character, e.g., the deferral of non-shareholder-loan claims over a period of usually more than three months, or shareholder loans provided by indirect shareholders or other members of the Group controlled by a direct or indirect shareholder. Should such claims also be secured by guarantees and/or security interests provided by a German guarantor without adequate protective measures, the guarantee or security interest as a whole could be infected by such shareholder avoidance risks. In addition, New Noteholders who are also direct or indirect shareholders of a German guarantor holding at least more than 10% of the relevant share capital (unless they are managing shareholders; in such case the 10% exception does not apply) generally qualify as shareholders and thereby infect the relevant guarantees and/or security interests. These risks can be mitigated to a certain extent if the relevant New Noteholders have acquired their shares in a qualifying rescue attempt (*zum Zwecke der Sanierung*). In order to qualify, the acquisition of shares must have been made while Alpha and/or the relevant German guarantor were in a state of (imminent) illiquidity (*(drohende) Zahlungsunfähigkeit*) or over-indebtedness (*Überschuldung*). This privilege automatically ceases once the rescue has been sustained (*bis zur nachhaltigen Sanierung*).

Furthermore, certain German law governed security interests may only be enforced (*verwerted*) in an insolvency proceeding over the assets of such German guarantor by an insolvency administrator or custodian (*Sachwalter*) or self-administrator (*Eigenverwalter*). This refers in particular to Pledged Assets which is in possession of one of the aforementioned persons at the time of the opening of insolvency proceedings.

Under Russian insolvency law, creditors are allowed with "claims of a similar nature", to agree between themselves on the order in which their claims will be discharged, inter alia allowing claims to be satisfied otherwise than on a pro rata basis. A creditor that recovers more than it is entitled to under the terms of an intercreditor agreement must turn over the excess to the other creditors, but the recovering creditor is subrogated to the rights of the creditors with which it shared the excess. The subrogation right applies whether the recovering creditor received the excess amount by breaching the intercreditor agreement itself or the debtor decided to prefer that particular creditor. The law is silent over whether these rules can be contracted out of by agreement between the parties.

Court practice on the enforcement of intercreditor agreements in Russian courts is limited, especially in the context of claims arising under guarantees. Moreover, the concept of contractual subordination or similar intercreditor arrangements is not recognised under Russian bankruptcy legislation. Accordingly, a Russian bankruptcy administrator may not give effect to a subordination agreement entered into by a Russian debtor.

## 3.9    Enforcement of security interest across multiple jurisdictions may be difficult and the New Notes Guarantees will be subject to certain limitations on enforcement and may be limited by applicable laws or subject to certain defences that may limit their validity and enforceability.

The rights of New Noteholders, the New Notes Guarantees and the Pledged Assets may be subject to the insolvency and administrative laws of several jurisdictions, and the holders may not be able to effectively enforce their rights in such complex, multiple bankruptcy or insolvency Proceedings. The New Notes Guarantees provide the New Noteholders with a direct claim against the relevant guarantor. However, the New Notes Indenture will provide that the New Notes Guarantees will be limited to the maximum amount that can be guaranteed by the relevant guarantors without rendering the guarantee voidable or otherwise ineffective under local law, and enforcement of the guarantee would be subject to certain generally available defences. These laws and defences include those that relate to corporate benefit, fraudulent conveyance or transfer, voidable preference, financial assistance, corporate purpose, capital maintenance or similar laws, regulations or defences affecting the rights of creditors generally.

With regards to the German Guarantors the included guarantee and security limitation language may significantly reduce the value of the relevant guarantees and/or security interests which were provided upstream and where the relevant Guarantor is incorporated as a limited liability company (*GmbH*) or partnership with a limited liability company acting as general partner (*GmbH & Co. KG*) and which has suffered a "capital impairment" (*Unterbilanz*). In case of a Group-wide insolvency scenario also affecting the German Guarantors, a "capital impairment" is very likely to occur. In such a scenario, guarantees and/or security interests may no longer be enforced by the New Security Agent. There are various exceptions to the limitation language, e.g., where money has been on-lent or in case of profit and loss pooling agreements that remain in place between the relevant Post-Restructuring Obligor and the Company. However, the value of such exceptions may be questioned by an insolvency officeholder in an insolvency proceeding.

**3.10    The value of the assets securing the New Notes may not be sufficient to satisfy the obligations under the New Notes, and the assets securing the New Notes may be reduced or diluted under certain circumstances.**

The New Notes will be secured by first-priority security interests on all of the Pledged Assets. The Pledged Assets also secure the New Bilateral Facilities but any Liabilities in respect of obligations under the New Notes will rank behind the New Bilateral Facilities with respect to any proceeds received upon any enforcement action over any New Security. The New Security may also secure additional debt to the extent permitted by the terms of the New Notes Indenture. New Noteholders' rights to the New Security would be diluted by any increase in the debt secured by the New Security or a reduction of the New Security securing them.

The value of the New Security and the amount to be received upon a sale of such New Security will depend upon many factors, including, among others, the ability to sell the New Security in an orderly sale, macroeconomic conditions at the time of sale, the availability of buyers and other factors. The book value of the New Security should not be relied on as a measure of realisable value for such assets. Portions of the New Security may be illiquid and may have no readily ascertainable market value. To the extent that holders of other secured debt or third parties enjoy liens (including statutory liens), whether or not permitted by the New Notes Indenture, such holders or third parties may have rights and remedies with respect to the New Security securing the New Notes that, if exercised, could reduce the proceeds available to satisfy the obligations under the New Notes. In the event of a foreclosure, liquidation, bankruptcy, the enforcement of the security or similar Proceeding, there can be no assurance as to whether the proceeds from any sale or liquidation or enforcement of the security will be sufficient to discharge the obligations due under the New Notes Indenture.

For subordination risks relating to shareholder loan or comparable shareholder claims in Germany, see paragraph 3.8 above.

**3.11    It may be difficult to realise the value of the Pledged Assets.**

The Pledged Assets will be subject to exceptions, defects, encumbrances, liens and other imperfections permitted under the Indenture and the terms of the New Bilateral Facilities Agreements, whether on or after the date the New Notes are first issued. The existence of such exceptions, defects, encumbrances, liens and other imperfections could adversely affect the value of the Pledged Assets, as well as the ability of the New Security Agent to realise or foreclose on such Pledged Assets. Furthermore, the ranking of security interests can be affected by a variety of factors, including the timely satisfaction of perfection requirements (including registration requirements), statutory liens or re-characterization under the laws of certain jurisdictions.

The Pledged Assets may be subject to practical problems generally associated with the realization of security interests in Pledged Assets. For example, it may be difficult for the New Security Agent to

sell the Group's assets in an enforcement scenario. The New Security Agent may also need to obtain the consent of a third party to enforce a security interest.

The New Security Agent may not be able to obtain any such consent. In addition, the consents of any third parties may not be given, when required, to facilitate a foreclosure on such assets. In particular, to the extent that any other first priority and pre-existing security interests permitted under the Indenture and the terms of the New Bilateral Facilities Agreements and other rights encumber the Pledged Assets securing the New Notes and the New Notes Guarantees, these parties may have or may exercise rights and remedies with respect to the Pledged Assets. Accordingly, the New Security Agent may not have the ability to foreclose upon those assets, and the value of the Pledged Assets may significantly decrease.

### 3.12  Rights of the New Noteholders in the Pledged Assets may be adversely affected by the failure to perfect security interests in the Pledged Assets.

Applicable law may require that a security interest in certain assets can only be properly perfected and its priority retained through certain actions undertaken by the secured party. The liens on the Pledged Assets securing the New Notes and the New Notes Guarantees may not be perfected with respect to the claims of the New Notes and the New Notes Guarantees if the Company, any other relevant Post-Restructuring Obligor, or the New Security Agent, fail or are unable to take the actions required to perfect any of these liens. Such failure may result in the invalidity of the relevant security interest in the Pledged Assets securing the New Notes or adversely affect the priority of such security interest in favour of the New Notes against third parties, including a trustee in bankruptcy and other creditors who claim a security interest in the same Pledged Assets. In addition, applicable law may require that certain property and rights acquired after the grant of a general security interest can only be perfected at the time such property and rights are acquired and identified. There can be no assurance that the New Security Agent will monitor, or that the Group will inform the New Security Agent of, the future acquisition of property and rights that constitute Pledged Assets, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Pledged Assets. Neither the New Trustee nor the New Security Agent has any obligation to monitor the acquisition of additional property or rights that constitute Pledged Assets or the perfection of any security interest therein. Such failure may result in the loss of the security interest in the Pledged Assets or the priority of the security interest in favour of the New Notes and the New Notes Guarantees against third parties.

Additionally, the New Notes Indenture and the New Security Documents entered into in connection with the New Notes will not require us to take a number of actions that might improve the perfection or priority of the security interests of the New Security Agent in the Pledged Assets. To the extent that the security interests created by the security documents with respect to any Pledged Assets are not perfected, the New Security Agent's rights will be equal to the rights of general unsecured creditors in the event of a liquidation, foreclosure, bankruptcy, reorganisation or similar Proceeding.

### 3.13  The granting of the security interests in the Pledged Assets may create or restart hardening periods.

The granting of security interests to secure the New Notes may create hardening periods for such security interests. The granting of security interests to secure future indebtedness that is permitted to be secured by the Pledged Assets may restart or reopen such hardening periods, in particular as the New Notes Indenture will permit the release and retaking of security granted in favour of the New Notes in certain circumstances, including in connection with the incurrence of other future indebtedness. The applicable hardening period for these new security interests can run from the moment each new security interest has been granted, perfected or recreated. At each time, if the security interest granted, perfected or recreated were to be enforced before the end of the respective hardening period, it may be declared void or ineffective and it may not be possible to enforce it in an insolvency scenario of the relevant security provider. If the grantor of such security interest were to become subject to a

bankruptcy, insolvency or winding-up Proceeding after the Scheme Effective Time, any security interest in the Pledged Assets delivered after the Scheme Effective Time would face a greater risk than security interests in place on the Scheme Effective Time of being avoided by the grantor or by its trustee, receiver, liquidator, administrator or similar authority, or otherwise set aside by a court, as a preference under insolvency law, in each case depending on the relevant length of the applicable hardening period. To the extent that the grant of any security interest is voided, New Noteholders would lose the benefit of the security interest.

**3.14    There are circumstances other than repayment or discharge of the New Notes under which the Pledged Assets and the New Notes Guarantees securing the New Notes may be released automatically.**

Under the New Notes Indenture, the Pledged Assets and New Notes Guarantees may be released automatically under certain circumstances as provided in Section 10.02 "Release of Collateral" and Section 11.07 "Releases" of the New Notes Indenture.

Under applicable law, security may automatically be released upon a transfer or other dealing with the relevant Pledged Assets. In addition, under various circumstances, the New Notes Guarantees may be released.

**3.15    The New Notes will be structurally subordinated to the Liabilities of Non-Guarantor Subsidiaries.**

Some, but not all, of the members of the Restructured Group will guarantee the New Notes. Generally, holders of indebtedness of, and trade creditors of, Non-Guarantor Subsidiaries, including lenders under bank financing agreements, are entitled to payments of their claims from the assets of such Subsidiaries before these assets are made available for distribution to any guarantor, as direct or indirect shareholders.

Accordingly, in the event that any of the Non-Guarantor Subsidiaries becomes insolvent, liquidates or otherwise reorganises:

- the creditors of New Notes Guarantees will have no right to proceed against such Subsidiary's assets; and

- creditors of such Non-Guarantor Subsidiary, including trade creditors, will generally be entitled to payment in full from the sale or other disposal of the assets of such Subsidiary before any guarantor, as direct or indirect shareholder, will be entitled to receive any distributions from such Subsidiary.

As such, the New Notes and each New Notes Guarantee will be structurally subordinated to trade creditors, creditors under certain ancillary facilities and any preferred stockholders of the Non-Guarantor Subsidiaries. As of 31 August 2020, Non-Guarantor Subsidiaries had USD 6.3 million of indebtedness outstanding, which represented approximately 0.36% of total financial indebtedness of the Group.

**3.16    The security interests in the Pledged Assets will be granted to the New Security Agent rather than directly to the New Noteholders. The ability of the New Security Agent to enforce certain of the Pledged Assets may be restricted by local law.**

The security interests in the Pledged Assets that will secure the obligations of the Issuer under the New Notes and the obligations of the Post-Restructuring Obligors under the New Notes Guarantees will not be granted directly to the New Noteholders but will be granted only in favour of the New Security Agent. The New Security Agent will accede to the New Intercreditor Agreement and will be party to the New Intercreditor Agreement with among others, the New Security Agent, and representatives of

the other indebtedness secured by the Pledged Assets (including the New Notes). Other creditors may become parties to the New Intercreditor Agreement in the future. Among other things, the New Intercreditor Agreement governs the enforcement of the New Security Documents, the sharing in any recoveries from such enforcement and the release of the Pledged Assets by the New Security Agent. As a consequence, New Noteholders will not have direct security interests and will not be entitled to take enforcement action in respect of the Pledged Assets securing the New Notes, except through the New Security Agent, who will follow the terms under the New Intercreditor Agreement.

The ability of the New Security Agent to enforce the security interests in the Pledged Assets is subject to mandatory provisions of the laws of Germany and each other jurisdiction in which security over Pledged Assets is taken. In several jurisdictions, including Germany, certain types of security are accessory (*akzessorisch*) to the obligations they secure and, therefore, the security interests may only be constituted for the benefit of the creditors of the secured obligations. In order to grant pledges over the Pledged Assets to the New Security Agent under German law (and any other applicable law with similar requirements), it is necessary that the New Security Agent holds its own so called "Parallel Debt" claim. The New Intercreditor Agreement provides for the creation of such Parallel Debt claim in favour of the New Security Agent mirroring the Principal Obligations. Any payment in respect of the Principal Obligations shall discharge the corresponding Parallel Debt and any payment in respect of the Parallel Debt shall discharge the corresponding Principal Obligations. Although the New Security Agent will have, pursuant to the Parallel Debt, a claim against the Issuer and the Post-Restructuring Obligors for the full principal amount of the New Notes, New Noteholders bear some risks associated with a possible insolvency or bankruptcy of the New Security Agent and the recognition of the English law governed Parallel Debt in particular in Germany.

In addition, there is no assurance that such a structure will be effective before courts in the governing law jurisdictions of the New Security Documents as there are no published court decisions or other guidance as to its efficacy, and therefore the ability of the New Security Agent to enforce the Pledged Assets may be restricted. To the extent that the security interests in the Pledged Assets created under the Parallel Debt construct are successfully challenged by other parties, the New Noteholders will not receive any proceeds from an enforcement of such security interests.

### 3.17    The Notes Guarantees and the security interests over the Pledged Assets, including future security interests permitted by the New Notes Indenture and actually granted, will be subject to certain limitations on enforcement and may be limited by applicable laws or subject to certain defences that may limit their validity and enforceability.

The Issuer and the Post-Restructuring Obligors are incorporated or organised, as applicable, under the laws of England and Wales, Germany, Norway, Scotland, the Netherlands, Russia, Oman and Saudi Arabia. Although laws differ among these jurisdictions, in general, applicable fraudulent transfer and conveyance laws, equitable principles and insolvency laws and limitations on the enforceability of judgments obtained in courts in such jurisdictions could limit the enforceability of the New Notes Guarantees and the Pledged Assets against a Post-Restructuring Obligor.

Enforcement of any of the New Notes Guarantees against any Post-Restructuring Obligor will be subject to certain defences available to Post-Restructuring Obligors in the relevant jurisdiction. Although laws differ among these jurisdictions, these laws and defences generally include those that relate to corporate purpose or benefit, fraudulent conveyance or transfer, voidable preference, insolvency or bankruptcy challenges, financial assistance, preservation of share capital, thin capitalisation, capital maintenance or similar laws, regulations or defences affecting the rights of creditors generally. If one or more of these laws and defences are applicable, a Post-Restructuring Obligor may have no liability or decreased liability under its New Notes Guarantee depending on the amounts of its other obligations and applicable law. Limitations on the enforceability of judgments obtained in New York courts in such jurisdictions could limit the enforceability of any New Notes Guarantee against any Post-Restructuring Obligor.

Although laws differ in various jurisdictions, in general, under fraudulent conveyance and other laws, a court could subordinate, reduce or void the New Notes Guarantees or the security interests in the Pledged Assets and, if payment had already been made under a Guarantee or the relevant security interests, require that the recipient return the payment to the relevant Post-Restructuring Obligor or the relevant security provider, if the court found that:

- the relevant New Notes Guarantee was incurred or security interest was created with actual intent to hinder, delay or defraud current or future creditors or shareholders of the Post-Restructuring Obligors or the relevant security providers with a desire to prefer some creditors over others or the relevant obligor was insolvent when creating the security interest or, in certain jurisdictions, if the recipient was aware that the relevant obligor was insolvent when it granted the relevant New Notes Guarantee or created the relevant security interest;

- the Post-Restructuring Obligor or the relevant security provider did not receive fair consideration or reasonably equivalent value for the relevant New Notes Guarantee or the creation of the relevant security interest and the Post-Restructuring Obligor or the relevant security provider was: (i) insolvent or rendered insolvent because of the relevant New Notes Guarantee or the creation of the security interest or subsequently became insolvent for other reasons; (ii) undercapitalised or became undercapitalised because of the relevant New Notes Guarantee or the relevant security interests; or (iii) intended to incur, or believed that it would incur, indebtedness beyond its ability to pay at maturity or create an imbalance between the other financial burdens assumed by the Post-Restructuring Obligors or the relevant security provider;

- the relevant New Notes Guarantees or the relevant security interests were held to exceed the corporate objects of such obligor or the credit lines which effectively benefit such obligor or were held not to be in the best interests or for the corporate benefit of the relevant obligor;

- the amount paid or payable under the relevant New Notes Guarantee was in excess of the maximum amount permitted under applicable law;

- the relevant security interest securing a third party's debt was not approved by the relevant corporate body; or

- a German guarantor incorporated as a limited liability company (GmbH) or partnership with a limited liability company acting as general partner (GmbH & Co. KG) and which has suffered a "capital impairment" (*Unterbilanz*).

The measures of insolvency for purposes of fraudulent transfer laws vary depending upon applicable governing law. Generally, an entity would be considered insolvent if, at the time it incurred indebtedness:

- the sum of its debts, including contingent liabilities, is greater than the fair value of all its assets;

- the present fair saleable value of its assets is less than the amount required to pay the probable liability on its existing debts and liabilities, including contingent and prospective liabilities, as they become due; or

- it cannot pay its debts as they become due.

The Restructured Group cannot assure the holders which standard a court would apply in determining whether a Post-Restructuring Obligor was "insolvent" at the relevant time or that, regardless of the method of valuation, a court would not determine that a Post-Restructuring Obligor was insolvent on

that date, or that a court would not determine, regardless of whether or not a Post-Restructuring Obligor was insolvent on the date its New Notes Guarantee was issued, that payments to New Noteholders constituted preferences, fraudulent transfers or conveyances on other grounds.

The liability of each Post-Restructuring Obligor under its New Notes Guarantee will be limited to the amount that will result in such New Notes Guarantee not constituting a preference, fraudulent conveyance or improper corporate distribution or otherwise being set aside.

However, there can be no assurance as to what standard a court will apply in making a determination of the maximum liability of each Post-Restructuring Obligor. There is a possibility that the entire New Notes Guarantee may be set aside, in which case the entire liability may be extinguished.

If a court decided that a New Notes Guarantee was a preference, fraudulent transfer or conveyance and voided such New Notes Guarantee, or held it unenforceable for any other reason, the holders may cease to have any claim in respect of the relevant Post-Restructuring Obligor and would be a creditor solely of the Issuer and, if applicable, of any other Post-Restructuring Obligor under the relevant New Notes Guarantee which has not been declared void. In the event that any New Notes Guarantee is invalid or unenforceable, in whole or in part, or to the extent the agreed limitation of the New Notes Guarantee obligations apply, the New Notes would be effectively subordinated to all liabilities of the applicable Post-Restructuring Obligor, and if the Restructured Group cannot satisfy its obligations under the New Notes, or any New Notes Guarantee is found to be a preference, fraudulent transfer or conveyance or is otherwise set aside, the Restructured Group cannot assure the holders that it can ever repay in full any amounts outstanding under the New Notes, or that in turn, the Issuer can ever repay in full any amounts outstanding under the New Notes.

In many jurisdictions those limitation languages have not been tested in court and it is uncertain whether, in the event of violation of capital maintenance or similar rules, a security interest or a New Notes Guarantee will be null and void altogether or only in part (i.e., to the extent it is not compliant with capital maintenance or similar rules). Irrespective thereof, the application of such limitation language may result in a security interest or a New Notes Guarantee having a value of zero because of insufficient profits or assets of the respective Post-Restructuring Obligor.

If a court were to find that the issuance of a New Notes Guarantee or the granting of security interests over the Pledged Assets was a fraudulent conveyance or held it unenforceable for any other reason, the court could hold that the payment obligations under the New Notes or such New Notes Guarantee are ineffective, or require New Noteholders to repay any amounts received with respect to the New Notes funded by any payments on the New Notes that are guaranteed by such New Notes Guarantee or secured by such Pledged Assets.

In the event of a finding that a fraudulent conveyance occurred in respect of the New Notes Guarantee or the Pledged Assets, New Noteholders may cease to have any indirect claim in respect of the relevant Post-Restructuring Obligor and would be a creditor solely of the Issuer and indirectly, if applicable, of the other Post-Restructuring Obligors under any New Notes Guarantees which have not been declared void.

Additionally, any future granting of security over the Pledged Assets in favour of the New Security Agent, including pursuant to security documents delivered after the date of the New Notes Indenture, might be voidable by the pledgor (as debtor-in-possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of granting of security, the security interest permits' New Noteholders to receive, directly or indirectly, a greater recovery than if the security interest had not been given and a bankruptcy proceeding in respect of the security grantor is commenced within certain number of days (as required under applicable law of the respective jurisdictions) following the grant of the relevant security interest, or in certain circumstances, a longer period.

In addition, under the terms of the New Notes Indenture, the Restructured Group will be permitted in the future to incur additional indebtedness and other obligations that may share in the security interest under the Pledged Assets securing the New Notes. The granting of new security interests may require the releasing and retaking of security or otherwise create new hardening periods in certain jurisdictions. The applicable hardening period for these new security interests will run from the moment each new security interest has been granted or perfected. At each time, if the security interest granted or recreated were to be enforced before the end of the respective hardening period applicable in such jurisdiction, it may be declared void or ineffective and/or it may not be possible to enforce it.

Under Russian law, judgments rendered by a court in any jurisdiction outside the Russian Federation will be generally recognised by courts in the Russian Federation if an international treaty providing for the recognition and enforcement of judgments in civil cases exists between the Russian Federation and the country where the judgment is rendered and/or a federal law is adopted in the Russian Federation that provides for the recognition and enforcement of foreign court judgments.

No such treaty for the reciprocal enforcement of foreign court judgments in civil and commercial matters exists between the Russian Federation and certain jurisdictions (including the United States and the United Kingdom), and no relevant federal law on enforcement of foreign court judgments has been adopted in the Russian Federation.

As a result, new proceedings may have to be brought in the Russian Federation in respect of a judgment already obtained in any such jurisdiction against the Russian Guarantor or its respective officers or directors. These limitations, as well as the general procedural grounds set out in Russian legislation for the refusal to recognise and enforce foreign court judgments in the Russian Federation, may significantly delay the enforcement of such judgments or deprive the Company, the Post-Restructuring Obligors or the New Noteholders of effective legal recourse for claims related to the investment in the New Notes.

In the absence of an applicable treaty, enforcement of a final judgment rendered by a foreign court may still be recognised by a Russian court on the basis of reciprocity, if courts of the country where the foreign judgment is rendered have previously enforced judgments issued by Russian courts. While Russian courts have recognised and enforced English court judgments on these grounds, the existence of reciprocity must be established at the time the recognition and enforcement of a foreign judgment is sought, and it is not possible to predict whether a Russian court will in the future recognise and enforce on the basis of reciprocity a judgment issued by a foreign court, including an English court. Even if an applicable international treaty is in effect or a foreign judgment might otherwise be recognised and enforced on the basis of reciprocity, the recognition and enforcement of a foreign judgment will in all events be subject to exceptions and limitations provided for in Russian law. For example, a Russian court may refuse to recognise or enforce a foreign judgment if its recognition or enforcement would contradict Russian public policy.

The New Notes Guarantee provided by the Russian Guarantors will provide for disputes, controversies and causes of action brought by any party thereto to be settled by arbitration in accordance with the rules of the LCIA. The place of such arbitration shall be London, England. The Russian Federation and the United Kingdom are parties to the New York Convention. Consequently, Russian courts should generally recognise and enforce in the Russian Federation an arbitral award from an arbitral tribunal in the United Kingdom on the basis of the rules of the New York Convention (subject to qualifications provided for in the New York Convention and compliance with Russian procedural regulations and other procedures and requirements established by Russian legislation).

While Russian courts have, in many instances, recognised such awards, nevertheless, as a practical matter, their enforcement in Russia may be difficult or impossible. The enforcement of judgments and/or arbitral awards in the Russian Federation may be limited by statutes of limitation, lapse of time, and by laws relating to bankruptcy, insolvency, liquidation, administration, arrangement, moratorium,

reorganisation, or other laws relating to or affecting generally the enforcement of the rights of creditors, and claims may be or become subject to set-off or counterclaim.

The Arbitrazh Procedural Code of the Russian Federation, which sets out the procedure for the recognition and enforcement of foreign arbitral awards by Russian courts, and other Russian procedural legislation could change, and other grounds for Russian courts to refuse the recognition and enforcement of foreign courts' judgments and foreign arbitral awards could arise in the future. In practice, reliance upon international treaties may meet with resistance or a lack of understanding on the part of a Russian court or other officials, thereby introducing delay and unpredictability into the process of enforcing any foreign judgment or any foreign arbitral award in the Russian Federation. Furthermore, any arbitral award pursuant to arbitration proceedings in accordance with the LCIA Rules and the application of New York law to the relevant documents and any non-contractual obligations arising out of or in connection with them may be limited by the mandatory provisions of Russian laws relating to the exclusive jurisdiction of Russian courts and the application of Russian laws with respect to bankruptcy, winding up or liquidation of Russian companies.

There can be no assurance that both a New York Court and an arbitral body would come to the same decision even if presented with the same facts and arguments or that the damages awarded from such decision would be similar. Further, procedural or evidentiary rules may differ, which could also affect the outcome of any such litigation. Finally, there can be no assurance that courts in Russia would treat such awards as final.

### 3.18    The value of the Pledged Assets may decrease because of obsolescence, impairment or certain casualty events.

The value of certain properties and assets serving as Pledged Assets may be adversely affected by depreciation and normal wear and tear or because of certain events that may cause damage to these properties. Although the New Notes Indenture, the New Bilateral Facilities Agreements and the New Security Documents contain certain covenants in relation to the maintenance and preservation of assets and the Existing Indenture contains and the New Notes Indenture will contain, a covenant restricting impairment of security interests, the Issuer and the Post-Restructuring Obligors will not be required to improve the Pledged Assets. Any insurance policies carried by the Issuer or the Post-Restructuring Obligors are unlikely to cover all the events that may conceivably result in damage to the Pledged Assets.

### 3.19    The Pledged Assets is subject to casualty risks.

The Restructured Group intends to continue to maintain insurance or otherwise insure against hazards. There are, however, certain losses that may be either uninsurable or not economically insurable, in whole or in part. Insurance proceeds may not compensate us fully for the Restructured Group's losses. If there is a complete or partial loss of any of the Pledged Assets, the insurance proceeds may not be sufficient to satisfy all of the secured obligations, including the New Notes and the New Bilateral Facilities. In addition, even if there is sufficient insurance coverage, if there is a total or partial loss of certain Pledged Assets, there may be significant delays in obtaining replacement Pledged Assets.

### 3.20    The New Notes will be secured only to the extent of the value of the Pledged Assets that has been granted as security for the New Notes and other secured indebtedness may be secured by assets that do not secure the Notes.

The New Notes and the New Notes Guarantees will be secured by the Pledged Assets, which will secure the New Bilateral Facilities (and any guarantees thereof), and may also secure certain hedging obligations and certain additional indebtedness with "super senior" status on a first-priority basis. The Pledged Assets may also secure additional debt to the extent permitted by the New Notes Indenture and the New Intercreditor Agreement. Any holders' of the New Notes rights to the Pledged Assets

may be diluted by the incurrence of any additional debt which is secured by the Pledged Assets or a reduction of the Pledged Assets securing the New Notes.

Not all of our assets secure the New Notes, and the New Notes Indenture allows the Restructured Group to secure certain future indebtedness permitted to be incurred with certain property and assets that do not secure the New Notes. If an event of default occurs and the obligations under the New Notes are accelerated, the New Notes and the New Notes Guarantees will not benefit from the assets securing such secured debt and will rank equally with the holders of other unsecured indebtedness of Alpha and its Restricted Subsidiaries with respect to any property or assets excluded from the Pledged Assets securing the New Notes.

No appraisals of any of the Pledged Assets have been prepared by the Group or on the Group's behalf in connection with the Scheme, and the value of the Pledged Assets and the amount to be received upon an enforcement of such Pledged Assets will depend upon many factors, including, among others, the ability to sell the Pledged Assets in an orderly sale, economic conditions where operations are located and the availability of buyers. The book value of the Pledged Assets should not be relied on as a measure of realizable value for such assets. All or a portion of the Pledged Assets may be illiquid and may have no readily ascertainable market value. Similarly, the Group cannot assure you that there will be a market for the sale of the Pledged Assets, or, if such market exists, that there will not be a substantial delay in its liquidation. In addition, the share pledges of an entity may be of no value if that entity is subject to an insolvency or bankruptcy proceeding. If the proceeds of any sale of Pledged Assets are not sufficient to repay all amounts due on the New Notes and the New Notes Guarantees, the Scheme Creditors (to the extent not repaid from the proceeds of the sale of the Pledged Assets) would have only an unsecured claim against the remaining assets of the relevant members of the Group.

While the New Notes Indenture creates certain obligations to provide additional New Notes Guarantees and grant additional security over assets, or a particular class of assets, whether as a result of granting liens in favour of other indebtedness or the acquisition or creation of future assets or Subsidiaries or otherwise, such obligations are subject to certain exceptions and qualifications pursuant to the Agreed Security Principles. The Agreed Security Principles set forth in the Intercreditor Agreement set out a number of limitations on the rights of the holders of the New Notes to be granted security or New Notes Guarantees in certain circumstances.

The operation of such Agreed Security Principles may result in, among other things, the amount recoverable under any Pledged Assets provided being limited or security not being granted over a particular type or class of assets. Accordingly, such Agreed Security Principles may affect the value of the security or New Notes Guarantees provided by the Issuer and any Guarantors of the New Notes.

## 3.21 The value of the Pledged Assets securing the New Notes may not be sufficient to secure post-petition interest in the United States.

In the event of a bankruptcy, liquidation, dissolution, reorganisation or similar proceeding against us in the United States, New Noteholders will only be entitled to post-petition interest under the U.S. Bankruptcy Code to the extent that the value of their security interest in the Pledged Assets is greater than their pre-bankruptcy claim. New Noteholders that have a security interest in Pledged Assets with a value equal or less than their pre-bankruptcy claim will not be entitled to post-petition interest under the U.S. Bankruptcy Code. No appraisal of the fair market value of the Pledged Assets has been prepared in connection with this offering and therefore the value of the interest of New Noteholders in the Pledged Assets may not equal or exceed the principal amount of the New Notes.

**3.22    The relevant New Notes Guarantees by certain Subsidiaries based in Norway and the security interests granted by such Subsidiaries are subject to challenge under Norwegian law.**

Section 8-10 of the Acts restricts a Norwegian private or public limited liability company from providing financial assistance (including placing funds at disposal, granting loans or providing security or guarantees) in connection with the acquisition of its shares or the shares in its (direct or indirect) parent companies, unless the value of such financial assistance is within the company's distributable reserves and then, further, provided that satisfactory security for repayment has been established, the financial assistance is provided on ordinary business terms and principles and for fully paid shares. The practical restriction in respect of financial assistance referred to above applies irrespective of whether such parent company is a Norwegian or a foreign company, and there are no general exemptions available except for special cases of real property financing and employee share purchase programs. Before such financial assistance is provided, the board of directors of the company shall ensure that a credit check of the party or parties that receive assistance is carried out. Further, the board of directors' resolution to provide such assistance must be approved by the general meeting by the same majority as required for amendments to the company's articles of association.

In addition to the above general financial assistance restriction, section 8-7 of the Acts restricts a Norwegian limited liability company on a broader basis from granting credit to, or providing guarantees and security interests for the obligations of, its shareholders or closely related entities of a shareholder beyond its distributable reserves (free equity) and then, further, provided that satisfactory security for repayment (or for the payment of any recourse claim) has been established in favour of the relevant Norwegian limited liability company. However, section 8-7 of the Acts permits a Norwegian limited liability company to provide upstream loans, guarantees or security in favour of a legal entity which has decisive influence over such Norwegian Guarantor, as set out in section 1–3 of the Acts, or a Subsidiary of such legal entity, provided that the granting of any such loan, guarantee and/or security, as applicable, is made for the purpose of serving the Restructured Group's financial interests (*foretaksgruppens økonomiske interesser*). Therefore, the guarantees and security interests provided by a Norwegian limited liability company may not be valid and binding under Norwegian law if such guarantees or security interests are deemed to not serve the financial interests of the Restructured Group.

Due to the restriction under section 8-10 of the Acts, there is a risk that the New Notes Guarantees and security interests granted by the Group's Subsidiaries based in Norway will be ineffective to the extent these cover refinanced acquisition debt.

**3.23    The insolvency laws of England and Wales, Germany, Norway, Scotland, the Netherlands, Russia, Oman and Saudi Arabia and other local insolvency laws may not be as favourable to the holders as the U.S. bankruptcy laws and may preclude New Noteholders from recovering payments due on the New Notes.**

The Issuer is established under the laws of England and Wales, and certain of the Post-Restructuring Obligors are established under the laws of England and Wales, Germany, Norway, Scotland, the Netherlands, Russia, Oman and Saudi Arabia. Consequently, in the event of a bankruptcy or insolvency of the Issuer or any of the Post-Restructuring Obligors, insolvency proceedings with respect to the Issuer or the Post-Restructuring Obligors would most likely be based on and governed by the insolvency laws of the jurisdiction under which the relevant entity is established. The insolvency laws of England and Wales, Germany, Norway, Scotland, the Netherlands, Russia, Oman and Saudi Arabia may be less favourable to the holders' interests as creditors than the bankruptcy laws of the United States or another jurisdiction with which the holders may be familiar, in particular with respect to priority of creditors, ability to obtain post-petition interest and the duration of the insolvency proceedings.

The application of these laws, and any conflict between them, may limit the holders' ability to recover payments due on the New Notes to an extent exceeding the limitations arising under other insolvency laws.

### 3.24 New Noteholders may be unable to enforce judgments obtained in U.S. courts against the Issuer and Post-Restructuring Obligors.

The Issuer and the Post-Restructuring Obligors are companies incorporated outside the United States. Most of the Issuer's directors and executive officers and the directors and executive officers of the Post-Restructuring Obligors are not residents of the United States. Although the Issuer and the Post-Restructuring Obligors have submitted to the jurisdiction of certain New York courts in connection with any action under U.S. securities laws, the holders may be unable to effect service of process within the United States on the Issuer's directors and executive officers or the directors or executive officers of the Post-Restructuring Obligors. In addition, as most of the Issuer's and each Post-Restructuring Obligor's assets and those of their respective directors and executive officers are located outside of the United States, the holders may be unable to enforce against them judgments obtained in the U.S. courts predicated upon civil liability provisions of the federal securities laws of the United States.

### 3.25 The Issuer is a finance company with no revenue-generating operations of its own and will depend on cash from other members of the Restructured Group to be able to make payments on the New Notes.

The Issuer is a finance Subsidiary of the Restructured Group and was formed in order to offer and issue debt securities.

The Issuer does not conduct any business operations and, therefore, it has a limited ability to generate revenue. Further, the Issuer has limited assets and no Subsidiaries. Upon completion of the Restructuring, only significant assets of the Issuer will be its right to receive payments made to it under the proceeds to Abbot in connection with the New Notes. The Issuer's material liabilities will include the New Notes, the New Bilateral Facilities and any additional debt it may incur in the future. As such, the Issuer will be dependent upon payments from the relevant members of the Restructured Group to make any payments due on the New Notes. If one or more relevant members of the Restructured Group fails to make scheduled payments on the proceeds loans, it is not expected that the Issuer will have any other sources of funds that would allow it to make payments on its indebtedness.

The ability of the Restructured Group's Subsidiaries to make payments to Abbot to fund payments on the proceeds loans will depend upon their cash flows and earnings which, in turn, will be affected by all of the factors discussed in these. The payment of dividends and the making, or repayment, of loans and advances to the Company by its Subsidiaries are subject to various restrictions, including restrictions on certain intragroup payments (other than payments under proceeds loans) pursuant to the New Intercreditor Agreement, existing and future debt, including the Omani Term Loan, of certain of these Subsidiaries may prohibit the payment of dividends or the making, or repayment, of loans or advances to the Company or its parent entities. For example, certain Omani companies have a statutory reserve requirement, making them withhold 10% of their net profits until such reserves reach at least one third of the capital of the company. This requirement has the potential to reduce the amount of dividends payable to its shareholders. In addition, the ability of any of the Company's direct or indirect Subsidiaries to make certain distributions may be limited by the laws of the relevant jurisdiction in which the Subsidiaries are organised or located, including financial assistance rules, corporate benefit laws and other legal restrictions which, if violated, might require the recipient to refund unlawful payments.

The inability to transfer cash among the Subsidiaries of the Restructured Group may mean that even though the entities, in aggregate, may have sufficient resources to meet their obligations, they may not

be permitted to make the necessary transfers from one entity in their restricted group to another entity in their restricted group in order to make payments to the entity owing the obligations. In addition, the Subsidiaries of the Company that do not guarantee the New Notes have no obligation to make payments with respect to the New Notes or otherwise make funds available for that purpose.

**3.26    The Issuer may not be able to obtain the funds required to repurchase the New Notes upon a change of control.**

The New Notes Indenture will contain provisions relating to certain events constituting a "Change of Control". Upon the occurrence of certain "Change of Control" events (as detailed in the New Notes Indenture), the Issuer may be required to offer to repurchase all outstanding New Notes at a price equal to 101% of their aggregate principal amount, plus accrued and unpaid interest and additional amounts, if any, to the date of repurchase. If a change of control were to occur under the New Notes Indenture, no assurance can be given that the Company would have sufficient funds available at such time to pay the purchase price of the New Notes, or that the restrictions in the New Notes Indenture, New Bilateral Facilities Agreements, the New Intercreditor Agreement or the then-existing contractual obligations would allow the Company to make such required repurchases. A change of control may result in an event of default, or acceleration of, or an obligation to mandatorily prepay the New Bilateral Facilities Agreements and other indebtedness. The repurchase of the New Notes pursuant to such an offer could cause a default under such indebtedness, even if the change of control itself does not. The ability of the Company to receive cash from its Subsidiaries to allow it to pay cash to the New Noteholders, following the occurrence of a change of control, may be limited by the Restructured Group's then existing financial resources.

**3.27    The change of control provision contained in the New Notes Indenture may not necessarily afford the New Noteholders protection in certain circumstances.**

The change of control provision contained in the New Notes Indenture may not necessarily afford you protection in the event of certain important corporate events, including a reorganisation, restructuring, merger or other similar transaction involving us that may adversely affect you, because such corporate events may not involve a shift in voting power or beneficial ownership or, even if they do, may not constitute a "Change of Control" as defined in the New Notes Indenture.

In the event the Company is sold to a new investor, whether or not such sale does constitute a change of control under the New Notes Indenture, no assurance can be given that any such investor will continue to implement the Restructured Group's current business and financial strategy.

**3.28    Holders of the New Notes may face foreign exchange risks**

The New Notes will be denominated and payable in U.S. dollars. If holders of the New Notes measure their investment returns by reference to a currency other than the U.S. dollars, an investment in the New Notes will entail foreign exchange-related risks due to, among other factors, possible significant changes in the value of the U.S. dollars relative to the currency by reference to which the holder of the New Notes measures the return on his or her investments because of economic, political and other factors over which the Group has no control. Depreciation of the U.S. dollars against the currency by reference to which a holder of the New Notes measures the return on his or her investments could cause a decrease in the effective yield of the New Notes below their stated coupon rates and could result in a loss to holders of the New Notes when the return on the New Notes is translated into the currency by reference to which the holder of the New Notes measures the return on his or her investments. Receipt of the New Notes by holders may also have important tax consequences as a result of foreign exchange gains or losses, if any.

**3.29    Credit ratings may not reflect all risks, are not recommendations to buy or hold securities and may be subject to revision, suspension or withdrawal at any time.**

Following the issuance of the New Notes, one or more independent credit rating agencies may assign credit ratings to the New Notes. The ratings may not reflect the potential impact of all risks related to the structure, market, additional risk factors discussed herein and other factors that may affect the value of the New Notes. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal by the rating agency at any time. No assurance can be given that a credit rating will remain constant for any given period of time or that a credit rating will not be lowered or withdrawn entirely by the credit rating agency if, in its judgement, circumstances in the future so warrant. A suspension, reduction or withdrawal at any time of the credit rating assigned to the New Notes by one or more of the credit rating agencies may adversely affect the cost and terms and conditions of financing and could adversely affect the value and trading of the New Notes.

**3.30    Transfer of the New Notes will be restricted, which may adversely affect the value of the New Notes.**

Because the New Notes will not have been, and are not required to be, registered under the Securities Act or the securities laws of any other jurisdiction, they may not be offered or sold in the United States except (A) (i) to a person whom the beneficial owner and/or any person acting on its behalf reasonably believes is a QIB purchasing for its own account or for the account of a QIB in a transaction meeting the requirements of Rule 144A under the Securities Act, (ii) through a private placement in accordance with Section 4(a)(2) of the Securities Act, (iii) in an "offshore transaction" complying with Rule 903 or Rule 904 of Regulation S, (iv) pursuant to an exemption from, or a transaction not subject to, the registration requirements under the Securities Act provided by Rule 144 thereunder (if available) or (v) pursuant to an available exemption from the registration requirements of the Securities Act, and (B) in accordance with all applicable securities laws of the states of the United States and any other jurisdiction. These restrictions may limit the ability of New Noteholders to resell the New Notes. It is the obligation of New Noteholders to ensure that all offers and sales of the New Notes in the United States and other countries comply with applicable securities laws. For further information, see "*Important Securities Law Notice*" above.

**3.31    The New Notes will initially be held in book-entry form, and holders of the New Note must rely on the procedures of Euroclear and/or Clearstream to exercise any rights and remedies.**

Unless and until the New Notes are in definitive registered form, or definitive registered notes, are issued in exchange for book-entry interests (which may occur only in very limited circumstances), owners of book-entry interests will not be considered owners or New Noteholders. The common depositary (or its nominee) for Euroclear and Clearstream will be the sole registered holder of the applicable global notes. Payments of principal, interest and other amounts owing on or in respect of the relevant global notes will be made to Lucid Issuer Services Limited, as Paying Agent, which will make payments to Euroclear and Clearstream. Thereafter, these payments will be credited to participants' accounts that hold book-entry interests in the global notes representing the New Notes and credited by such participants to indirect participants. After payment to the Paying Agent, no responsibility or Liability of the Restructured Group exists for the payment of interest, principal or other amounts to the owners of book-entry interests. Accordingly, if book-entry interest in the New Notes is owned, procedures of Euroclear and Clearstream must be relied upon.

Unlike the New Noteholders themselves, owners of book-entry interests will not have any direct rights to act upon any solicitations for consents, requests for waivers or other actions from New Noteholders. Instead, if book-entry interest is owned, New Noteholders will be permitted to act only to the extent they have received appropriate proxies to do so from Euroclear or Clearstream, as applicable, or, if applicable, from a participant. There can be no assurance that procedures implemented for the granting

of such proxies will be sufficient to enable New Noteholders to vote on any matters or on a timely basis.

Similarly, upon the occurrence of an event of default under the New Notes Indenture, unless and until the relevant definitive registered New Notes are issued in respect of all book-entry interests, if a book-entry interest is owned, New Noteholders will be restricted to acting through Euroclear or Clearstream. There can be no assurance that the procedures to be implemented through Euroclear or Clearstream, as applicable, will be adequate to ensure the timely exercise of rights under the New Notes.

**3.32    There may not be an active trading market for the New Notes, in which case the holders' ability to sell the New Notes may be limited.**

The Restructured Group cannot assure the holders as to:

- the liquidity of any market in the New Notes;

- the holders' ability to sell its New Notes; or

- the prices at which the holders would be able to sell its New Notes.

Future trading prices for the New Notes will depend on many factors, including, among other things, prevailing interest rates, the Restructured Group's operating results and the market for similar securities. Historically, the market for non-investment grade securities has been subject to disruptions that have caused substantial volatility in the prices of securities similar to the New Notes. The liquidity of a trading market for the New Notes may be adversely affected by a general decline in the market for similar securities and is subject to disruptions that may cause volatility in prices. The trading market for the New Notes may attract different investors and this may affect the extent to which the New Notes may trade. It is possible that the market for the New Notes will be subject to disruptions. Any such disruption may have a negative effect on the holders, as a holder of New Notes, regardless of the Restructured Group's prospects and financial performance. As a result, there is no assurance that there will be an active trading market for the New Notes. If no active trading market develops, the holders may not be able to resell their holding of the New Notes at a fair value, if at all. Although an application will be made for the New Notes to be listed on the Official List of the International Stock Exchange, the Restructured Group cannot assure the holders that the New Notes will be or remain listed.

Although no assurance is made as to the liquidity of the New Notes as a result of the admission to trading on the Official List of the International Stock Exchange, failure to be approved for listing or the delisting (whether or not for an alternative admission to listing on another stock exchange) of the New Notes, as applicable, from the Official List of the International Stock Exchange may have a material effect on the ability of a holder of New Notes to resell the New Notes, as applicable, in the secondary market.

**4.    Risk Factors relating to the Jersey Newco Shares**

*The following are some of the material risks in respect of the Jersey Newco Shares.*

**4.1    There is no established trading market for the Jersey Newco Shares and active trading market for Jersey Newco Shares may fail to develop and holders may be unable to sell their Jersey Newco Shares.**

The Jersey Newco Shares issued and delivered pursuant to the Scheme will be in uncertificated form and will not be listed on any stock exchange. A written instrument of transfer form is required to transfer their legal ownership (although share certificates will not be issued). The Restructured Group does not expect any active trading market for the Jersey Newco Shares to develop. If a market for the Jersey Newco Shares were to develop, the Jersey Newco Shares could trade at prices that may be volatile

and lower than the initial values at which such shares have been valued for purposes of the Scheme depending on a number of factors, including the liquidity of the Jersey Newco Shares, prevailing interest rates, transfer restrictions, the markets for similar securities, the future performance of the Restructured Group and technological, market, economic, legislative, political, regulatory and other factors.

**4.2    Issuance of additional Jersey Newco Shares may dilute ownership and voting interest of holders of Jersey Newco Shares and have an adverse effect on their price.**

An additional issue of ordinary shares by Jersey Newco could dilute the proportionate ownership and voting interest of shareholders and could have an adverse effect on the price of Jersey Newco Shares. This will particularly be the case if and to the extent that such an issue of Jersey Newco Shares is not effected on a pre-emptive basis (including, but not limited to, any issue of ordinary shares in relation to the Management Equity Plan and/or exercise of Warrants) or shareholders do not take up their rights to subscribe for further Jersey Newco Shares structured as a pre-emptive offer or as an emergency securities issuance.

**4.3    There can be no assurance as to the amount, if any, of future distributions with respect to Jersey Newco Shares.**

The declaration, payment and amount of any future distributions of Jersey Newco are subject to the discretion of its board of directors and will depend on, among other things, the Restructured Group's earnings, financial position, cash requirements and availability of profits, as well as provisions of relevant laws or generally accepted accounting principles from time to time.

Jersey Newco is a holding company with no business operations other than the direct and indirect equity interests it holds in its Subsidiaries, including the Company, English NewCo 1 and English NewCo 2. Jersey Newco will be dependent upon the cash flow from certain members of the Restructured Group in the form of dividends or other distributions for payments to the holders of Jersey Newco Shares. The amounts of dividends and distributions available to Jersey Newco will depend on the profitability and cash flows of its Subsidiaries and the ability of those Subsidiaries to pay dividends or make upstream loans under applicable law. Members of the Restructured Group, however, may not be able to, or may not be permitted under applicable law to, make distributions or advance upstream loans to Jersey Newco to make dividend distributions on the Jersey Newco Shares. In addition, certain Subsidiaries of Jersey Newco, including the Company, English NewCo 1 and English NewCo 2, as applicable, are subject to restrictive covenants pursuant to the New Notes Indenture that may limit the ability of such Subsidiaries to make upstream distributions, in particular if an event of default has occurred and is continuing.

**4.4    Drag-along provisions of the Jersey Newco Investment Agreement applicable to Jersey Newco may mandate a holder to sell its Jersey Newco Shares and the price that such holder will be able to recover for its Jersey Newco Shares may be lower than the initial value at which such Jersey Newco Shares have been valued for purposes of the Scheme or that could be recovered otherwise.**

If (in each case as defined under the Jersey Newco Investment Agreement unless otherwise defined herein) any transferor or group of transferors intend(s) to transfer more than 50% of the Jersey Newco Shares to any bona fide third party in one transaction or a series of transactions the transferor may elect to deem such transfer a "Drag-Along Sale" and require each Dragged Shareholder(s) (as defined in the Jersey Newco Investment Agreement) to transfer an equal portion of their Jersey Newco Shares to such person on the same terms as agreed by the transferor.

Any consideration to be paid in connection with a Proposed Drag-Along Sale (as defined in the Jersey Newco Investment Agreement) shall be paid in cash or marketable securities listed on an internationally recognised and reputable stock exchange, or a combination of cash and marketable

securities. If the Dragged Shareholder is a ring-fenced body pursuant to Financial Services (Banking Reform) Act 2013, that Dragged Shareholder shall have the option to elect that such marketable securities are sold on its behalf so as to receive its consideration in cash only, even in circumstances where all or part of the proposed consideration for the Jersey Newco Shares is to be in marketable securities.

If a Dragged Shareholder does not execute transfers in respect of its Jersey Newco Shares within the time frame given in any Drag-Along Notice, then the Board is entitled to authorise and execute the necessary transfers as agent on the Dragged Shareholder's behalf on the same terms as those accepted by the transferor.

Additionally, if the Dragged Shareholder fails to comply with the Drag-Along Sale, any Jersey Newco Shares held by a Dragged Shareholder on the date of a Drag-Along Notice (and any Jersey Newco Shares acquired by the Dragged Shareholder thereafter) shall automatically cease to confer the right to receive notice of or to attend or vote at any general meeting of Jersey Newco, and will not be counted in determining quorum for said meetings, or for the purpose of any written resolution or other form of consent required under the articles of association of Jersey Newco. These rights are restored immediately upon transfer of said Jersey Newco Shares.

4.5    **The Jersey Newco Shares will not be freely transferrable in the United States.**

Any Jersey Newco Shares offered and sold to investors located in the United States will be "restricted securities" (as defined in Rule 144 under the Securities Act), and such Jersey Newco Shares may be reoffered, resold, pledged or otherwise transferred only (A) (i) to a person whom the beneficial owner and/or any person acting on its behalf reasonably believes is a QIB purchasing for its own account or for the account of a QIB in a transaction meeting the requirements of Rule 144A under the Securities Act, (ii) through a private placement in accordance with Section 4(a)(2) of the Securities Act, (iii) in an "offshore transaction" complying with Rule 903 or Rule 904 of Regulation S under the Securities Act, (iv) pursuant to an exemption from, or a transaction not subject to, the registration requirements under the Securities Act provided by Rule 144 thereunder (if available), or (v) pursuant to an available exemption from the registration requirements of the Securities Act, and (B) in accordance with all applicable securities laws of the states of the United States and any other jurisdiction. These restrictions may limit the ability of holders of the Jersey Newco Shares to resell the Jersey Newco Shares. It is the obligation of holders of the Jersey Newco Shares to ensure that all offers and sales of the Jersey Newco Shares in the United States and other countries comply with applicable securities laws. For further information, see "*Important Securities Law Notice*" above.

4.6    **Certain extra rights attach to the Jersey Newco Shares once a New Shareholder holds (aggregated with affiliated holdings for this purpose) Jersey Newco Shares up to certain threshold amounts**

The Jersey Newco Shares shall comprise a single class. All Jersey Newco Shares shall rank equally as to dividends and other distributions, interest and return of capital. Provided that a New Shareholder (affiliated holdings may be aggregated for this purpose) holds 5% or more of the Jersey Newco Shares in issue (each a **Major Shareholder**), each such Jersey Newco Share shall carry one vote. For so long as a New Shareholder holds fewer than 5% of the Jersey Newco Shares in issue, such Jersey Newco Shares shall be non-voting.

Notwithstanding the foregoing, all Jersey Newco Shares shall carry a vote with respect to the certain Shareholder Super Reserved Matters (as defined in the Jersey Newco Investment Agreement).

If no New Shareholder holds 5% or more of the Jersey Newco Shares then the 5% threshold for Major Shareholders shall be automatically reduced until such point as at least three New Shareholders are Major Shareholders.

If and for so long as the Major Shareholders hold in aggregate less than 30% of the Jersey Newco Shares, then each Jersey Newco Share shall have one vote and all Major Shareholder Majority (being the majority decision by reference to the number of Jersey Newco Shares held by Shareholders holding voting Jersey Newco Shares) matters shall be determined by a simple majority vote of all New Shareholders (by number of Jersey Newco Shares), or where required by law, 66⅔, of the ordinary shares in issue.

# TAX CONSIDERATIONS FOR THE NEW NOTES

## 1.    U.S. federal income tax considerations

1.1    The following is a summary of certain U.S. federal income tax considerations relevant to U.S. Holders and Non-U.S. Holders acquiring, holding and disposing of New Notes. This summary addresses only the U.S. federal income tax considerations for recipients of the New Notes at their original issuance that will hold the New Notes as capital assets (generally, property held for investment). This summary does not address any other tax consequences of the Restructuring, including in respect of the release of the Existing Notes. This summary is based on the Code, final, temporary and proposed U.S. Treasury regulations and administrative and judicial interpretations, all of which are subject to change, possibly with retroactive effect. This summary does not discuss all aspects of U.S. federal income taxation that may be relevant to investors in light of their particular circumstances, such as investors subject to special tax rules (including, without limitation: (i) financial institutions; (ii) insurance companies; (iii) dealers or traders in stocks, securities, or currencies or notional principal contracts; (iv) regulated investment companies; (v) real estate investment trusts; (vi) tax-exempt organizations; (vii) partnerships or other pass-through entities, or persons that hold New Notes through pass-through entities; (viii) investors that hold New Notes as part of a straddle, hedge, conversion, constructive sale or other integrated transaction for U.S. federal income tax purposes; (ix) U.S. Holders that have a functional currency other than the U.S. dollar and (xi) U.S. expatriates and former long-term residents of the United States), all of whom may be subject to tax rules that differ significantly from those summarized below. This summary does not address U.S. federal estate, gift, Medicare contribution or alternative minimum tax considerations, special tax accounting rules applicable as a result of any item of gross income with respect to the New Notes being taken into account on an applicable financial statement, or non-U.S., state or local tax considerations.

If an entity or arrangement treated as a partnership holds New Notes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partnership. Holders of New Notes that are partners, and the partners therein, are urged to consult their own tax advisors regarding the specific tax consequences of the purchase, ownership and disposition of the New Notes.

### 1.2    U.S. Holder

### Interest

(a)    Payments of stated interest on a New Note (without reduction for any amounts withheld and including payments of any Additional Amounts (as defined in the New Notes Indenture)) will be treated as qualified stated interest and includible in the gross income of a U.S. Holder as ordinary interest income at the time the interest is received or accrued, in accordance with the U.S. Holder's method of accounting for U.S. federal income tax purposes.

(b)    If the New Notes are issued with OID, U.S. Holders of the New Notes must include OID in income as ordinary income calculated on a constant yield method before the receipt of cash attributable to the income, regardless of the U.S. Holder's method of accounting, and will generally have to include in income increasingly greater amounts of OID over the life of the New Notes. An obligation generally will be treated as issued with OID if the excess of such New Notes' stated redemption price at maturity over their issue price is at least a de minimis amount (0.25% of such New Notes' stated redemption price at maturity multiplied by the number of complete years to their maturity). If a substantial amount of New Notes are traded on an established securities market on their issue date, the issue price of the New Notes should be their fair market value on such date. If the New Notes are not traded in substantial amounts after their issue date but the Existing Notes were traded in substantial amounts prior to the Restructuring, the issue price of the New Notes should be the fair market of the Existing Notes exchanged for the New Notes on the issue date of the New Notes. Otherwise, the issue price of the

New Notes should be their stated principal amount. The "stated redemption price at maturity" of the New Notes is the total of all payments provided by such New Notes that are not payments of "qualified stated interest". A "qualified stated interest" payment is generally any one of a series of stated interest payments on the New Notes that is unconditionally payable at least annually at a single fixed rate or a qualified floating rate.

(c)     The amount of OID includible in income by a U.S. Holder is the sum of the daily portions of OID with respect to the New Note for each day during the taxable year or portion of the taxable year in which the U.S. Holder holds the New Note. The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. Accrual periods with respect to a New Note may be of any length selected by the U.S. Holder and may vary in length over the term of the New Note as long as (i) no accrual period is longer than one year and (ii) each scheduled payment of interest or principal on the New Note occurs on either the final or first day of an accrual period. The amount of OID allocable to an accrual period equals the excess of (a) the product of the New Note's adjusted issue price at the beginning of the accrual period and the New Note's yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period) over (b) the sum of the payments of qualified stated interest on the New Note allocable to the accrual period. The adjusted issue price of a New Note at the beginning of any accrual period is the issue price of the New Note increased by (x) the amount of accrued OID for each prior accrual period and decreased by (y) the amount of any payments previously made on the New Note that were not qualified stated interest payments. The OID rules are complex and each U.S. Holder should consult with its own tax advisor regarding the acquisition, ownership, and disposition of a New Note issued with OID.

(d)     Interest received and any OID earned on the New Notes by a U.S. Holder will generally be treated as foreign source "passive income" for U.S. foreign tax credit purposes, or, in certain cases, "general category income". The rules governing the U.S. foreign tax credit are complex and each U.S. Holder is urged to consult with its own tax advisor regarding the availability of the U.S. foreign tax credit with respect to non-U.S. taxes paid with respect to interest received on, or proceeds from the disposition of, the New Notes.

**Sale, exchange or other taxable disposition**

(e)     Upon the sale, exchange or other taxable disposition of a New Note, a U.S. Holder generally will recognize gain or loss in an amount equal to the difference between the amount realized (other than amounts attributable to accrued and unpaid interest, which will generally be taxable to the extent not previously included in income as described above under "— *Interest*") and the U.S. Holder's adjusted tax basis in the New Note. A U.S. Holder's adjusted tax basis in a New Note generally will equal the issue price of the New Note increased by the amount of any OID previously included in the U.S. Holder's income with respect to the New Note, and reduced by the amount of any payments made with respect to the New Note that are not qualified stated interest payments. A U.S. Holder's adjusted tax basis in a New Note may be affected by the U.S. federal income tax characterization of the Restructuring. Such characterization is complex and each U.S. Holder should consult with its own tax advisor regarding such U.S. Holder's adjusted tax basis in the New Notes.

(f)     Any gain or loss recognized by a U.S. Holder on the sale, exchange or other taxable disposition of a New Note will generally be U.S. source capital gain or loss and will be long-term capital gain or loss if the U.S. Holder has held the New Note for more than one year at the time of the sale, exchange or other taxable disposition. Net long-term capital gain recognized by a non-corporate U.S. Holder generally is eligible for reduced U.S. federal income tax rates. The deductibility of capital losses is subject to significant limitations.

### 1.3    Non-U.S. Holders

(a)    A Non-U.S. Holder generally should not be subject to U.S. federal income or withholding tax on any payments on the New Notes and gain from the sale, redemption or other disposition of the New Notes unless: (i) that payment and/or gain is effectively connected with the conduct by that Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty requires, such items are attributable to the conduct of a trade or business through a permanent establishment or fixed base in the United States) or (ii) in the case of any gain realized on the sale, redemption or other disposition of a New Note by an individual Non-U.S. Holder, that holder is present in the United States for 183 days or more in the taxable year of the sale, redemption or other disposition and certain other conditions are met.

### 1.4    U.S. information reporting, backup withholding and certain tax return disclosure requirements

(a)    Payments of principal and interest on, and the proceeds of a sale, exchange or other taxable disposition of, the New Notes payable to a U.S. Holder by a U.S. paying agent or other U.S. intermediary will be reported to the IRS and to the U.S. Holder as may be required under applicable regulations. Backup withholding will apply to these payments if the U.S. Holder fails to provide an accurate taxpayer identification number or certification of exempt status or otherwise fails to comply with the applicable backup withholding requirements. Certain U.S. Holders (including, among others, corporations) are not subject to backup withholding.

(b)    In general, payments of principal and interest and the proceeds of a sale, redemption or other disposition of, the New Notes, payable to a Non-U.S. Holder by a U.S. paying agent or other U.S. intermediary will not be subject to backup withholding tax and information reporting requirements if an appropriate certification (IRS Form W-8BEN or W-8BEN- E or other appropriate form) is provided by the Non-U.S. Holder to the payor and the payor does not have actual knowledge that the certification is false.

(c)    Backup withholding is not an additional tax. Amounts withheld as backup withholding may be credited against a U.S. Holder's U.S. federal income tax liability.  A holder of New Notes may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing the appropriate claim for refund with the IRS and furnishing any required information.

(d)    Certain U.S. Holders that own "specified foreign financial assets" with an aggregate value in excess of certain thresholds generally are required to file an information report (on IRS Form 8938) with respect to such assets with their tax returns. The New Notes generally will constitute specified foreign financial assets subject to these reporting requirements, unless the New Notes are held in an account at certain financial institutions. U.S. Holders are urged to consult their tax advisors regarding the application of these disclosure requirements to their ownership and disposition of the New Notes. U.S. Holders that fail to comply with these disclosure requirements could be subject to substantial penalties.

### 1.5    United Kingdom tax considerations

*The following applies only to persons who are the beneficial owners of New Notes and is a summary of the Issuer's understanding of current United Kingdom law and published HMRC practice relating only to certain aspects of the United Kingdom tax treatment of New Notes and the New Notes Guarantees. References to "interest" refer to interest as that term is understood for United Kingdom tax purposes.  The following is not exhaustive and does not deal with any United Kingdom taxation implications of acquiring, holding or disposing of the New Notes other than as expressly set out herein. The United Kingdom tax treatment of prospective holders of New Notes depends on their individual circumstances and may be subject to change in the future. Prospective holders of New Notes who may be subject to tax in a jurisdiction other than the United Kingdom or who may be unsure as to their tax*

*position should seek their own professional advice.*

**Payment of interest on the New Notes**

(a)    Payments of interest on the New Notes may be made without deduction of or withholding on account of United Kingdom income tax provided that the New Notes carry a right to interest and the New Notes are and continue to be listed on a "recognised stock exchange" within the meaning of section 1005 of the Income Tax Act 2007 (and, for the avoidance of doubt, the New Notes will need to be listed prior to interest being paid in order for the interest to be paid without deduction of or withholding). The International Stock Exchange is a recognised stock exchange. The New Notes will satisfy this requirement if they are officially listed in Guernsey in accordance with provisions corresponding to those generally applicable in European Economic Area states and are admitted to trading on the International Stock Exchange. Provided, therefore, that the New Notes are and remain so listed, interest on the New Notes will be payable without withholding or deduction on account of United Kingdom income tax.

(b)    In other cases, an amount must generally be withheld from payments of interest on the New Notes that has a United Kingdom source on account of United Kingdom income tax at the basic rate (currently 20%), subject to any other available exemptions and reliefs. However, where an applicable double tax treaty provides for a lower rate of withholding tax (or for no tax to be withheld) in relation to a holder of New Notes, HMRC can issue a notice to the Issuer to pay interest to the holder of such New Notes without deduction of tax (or for interest to be paid with tax deducted at the rate provided for in the relevant double tax treaty).

**Payments by a Guarantor**

(c)    The United Kingdom withholding tax treatment of payments by the Post-Restructuring Obligors under the terms of the New Notes Guarantees which have a United Kingdom source is uncertain. In particular, such payments by the Post-Restructuring Obligors may not be eligible for the exemptions described above in relation to payments of interest. Accordingly, if the Post-Restructuring Obligors make any such payments, these may be subject to United Kingdom withholding tax at the basic rate.

**Stamp duty and stamp duty reserve tax**

(d)    No United Kingdom stamp duty or stamp duty reserve tax is payable on the issue of the New Notes or, assuming that (i) the interest on the New Notes does not exceed a reasonable commercial return on the nominal amount of the capital and (ii) any right on repayment of the New Notes to an amount which exceeds the nominal amount of the New Notes is reasonably comparable with what is generally repayable (in respect of a similar nominal amount of capital) under the terms of issue of loan capital listed in the Official List of the London Stock Exchange, on a transfer of the New Notes.

# APPENDIX 1

## DEFINITIONS AND INTERPRETATION

In this Explanatory Statement, unless inconsistent with the subject or context, the following expressions shall have the following meanings:

| | |
|---|---|
| **2021 Notes** | means the $375 million 7.25% senior secured notes due 2021 (ISIN Codes: US48244LAA61 / USG5222MAA39; CUSIPs: 48244LAA6 / G5222MAA3) governed by the 2021 Notes Indenture. |
| **2021 Notes Indenture** | means the indenture dated 16 May 2014 between, among others, the Company and Deutsche Trustee Company Limited as trustee (as amended and supplemented from time to time). |
| **2022 Notes** | means the $535 million 9.875% senior secured notes due 2022 (ISIN Codes: US48244LAC28 / USG5222MAB12; CUSIPs: 48244LAC2 / G5222MAB1) governed by the 2022 Notes Indenture. |
| **2022 Notes Indenture** | means the indenture dated 5 April 2017 between, among others, the Company and Deutsche Trustee Company Limited as trustee (as amended and supplemented from time to time). |
| **2023 Notes** | means the $400 million 9.625% senior secured notes due 2023 (ISIN Codes: US48244LAE83 / USG5222MAC94; CUSIPs: 48244LAE8 / G5222MAC9) governed by the 2023 Notes Indenture. |
| **2023 Notes Indenture** | means the indenture dated 9 April 2018 between, among others, the Company and Deutsche Trustee Company Limited as trustee (as amended and supplemented from time to time). |
| **A&O** | means Allen & Overy LLP as legal advisers to the Group. |
| **Abbot** | means Abbot Group Limited. |
| **Account Holder Letter** | means the account holder letter substantially in the form set out in Appendix 8 to the Explanatory Statement. |
| **Account Holders** | means: |
| | (a)    a DTC Participant; and/or |
| | (b)    a Euroclear/Clearstream Account Holder. |
| **Acts** | means the Norwegian Private Limited Companies Act 1997 and the Norwegian Public Limited Companies Act 1997. |
| **Ad-Hoc Committee** | means the ad hoc group of Existing Noteholders and Term Loan Lenders listed in the definition of "Ad-Hoc Committee" in the Lock-Up Agreement. |
| **Affiliates** | means in relation to a person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company. |

| | |
|---|---|
| **AHC Work Fee Letter** | means the work fee letter dated 2 May 2020 between Alpha, certain other members of the Group and the Ad-Hoc Committee. |
| **AHC Work Fees** | means the work fees of $18,608,038 (being an amount equal to 1.75% of the face value amount of the Participating Creditor Exposure (as defined in the Standstill Agreement) held by the relevant members of the Ad-Hoc Committee as of 30 April 2020. |
| **Allowed Proceeding** | has the meaning given to that term in the Scheme Document. |
| **Alpha** | means KCA Deutag Alpha Limited. |
| **Alpha Boards** | means the board of directors of Alpha and the board of directors of Alpha II. |
| **Alpha II** | means KCA Deutag Alpha II Limited. |
| **April 2020 Interest Payments** | means the interest payments due on 1 April 2020 in respect of the 2022 Notes and the 2023 Notes. |
| **Bank of England Exchange Rate** | means in relation to a currency, the most recent spot rate of exchange for that currency against U.S. Dollars published by the Bank of England on its website at https://www.bankofengland.co.uk/boeapps/database/Rates.asp?Travel=NIxAZx&into=USD. |
| **Board** | means the board of directors of the Company. |
| **Book-Entry Interest** | means, in relation to the Existing Notes, a beneficial interest in a Global Note held through or shown on, and transferred only through, records maintained in book-entry form by DTC and their respective nominees and successors acting through themselves or the Existing Depository. |
| **Brexit** | means the withdrawal of the United Kingdom from the EU. |
| **Bribery Act** | means the Bribery Act 2010. |
| **Brussels (Recast) Regulations** | means Regulation (EU) No 1215/2012 on Jurisdiction and Recognition and Enforcement of Judgments in Civil and Commercial Matters. |
| **Business Day** | means a day on which banks are open for business in London, Jersey, New York and Luxembourg (excluding, for the avoidance of doubt, Saturdays, Sundays and public holidays). |
| **Chairperson** | means the chair of the Scheme Meeting. |
| **Chapter 15** | means Chapter 15 of the U.S. Bankruptcy Code. |
| **Chapter 15 Order** | means an order of the U.S. Bankruptcy Court which, among other things, recognises this Scheme as a "foreign main proceeding" under Chapter 15 of the U.S. Bankruptcy Code, enforces the court order granted in connection with the Scheme within the territorial jurisdiction of the United States and grants related relief. |
| **Claim** | has the same meaning given to such term in the Deed of Release. |
| **Clearing System** | means DTC, Clearstream and Euroclear (as applicable). |

| | |
|---|---|
| **Clearstream** | means Clearstream Banking S.A. |
| **Code** | means the U.S. Internal Revenue Code of 1986. |
| **Companies Act** | means the Companies Act 2006 (as amended). |
| **Company** | means KCA Deutag UK Finance plc. |
| **Compromised Overdraft Amount** | has the meaning given to it in the Restructuring Implementation Deed. |
| **Contribution Deed** | means the deed dated 10 September 2020 entered into by the Company pursuant to which it has undertaken in favour of the Credit Agreement Borrowers to contribute to any amounts that are paid by the Credit Agreement Borrowers towards their obligations in respect of such term Loan, the Revolving Loans and the Existing Overdraft Facility respectively. |
| **Convening Hearing** | means the hearing (which was conducted virtually) held on 15 October 2020 in the Companies Court, Royal Courts of Justice, 7 Rolls Building, Fetter Lane, London, EC4A 7NL for an order granting certain directions in relation to the Scheme. |
| **Court** | means the High Court of Justice of England and Wales (or another court of England and Wales) under section 899 of the Companies Act. |
| **Covid-19 Pandemic** | means the outbreak of coronavirus disease (also known as 'COVID-19' and assessed to be a pandemic by the World Health Organisation on 11 March 2020) and the reactions of government authorities to this outbreak. |
| **Credit Agreement** | means the credit agreement dated 16 May 2014 (as amended and restated from time to time) between, among others, Alpha and the Existing Administrative Agents. |
| **Credit Agreement Borrowers** | means KCAD Germany in relation to such term Loan, Abbot in relation to the Revolving Loans and each member of the Group that has utilised the Existing Overdraft Facility. |
| **Credit and Guaranty Agreement Amendment Agreement** | means the amendment agreement dated 21 August 2020 in relation to the Credit Agreement between Alpha and the Existing Administrative Agents. |
| **Creditor** | means the Scheme Creditors and the Non-Scheme Creditors. |
| **Custody Instruction Deadline** | means 5:00 pm (New York time) on 26 October 2020. |
| **Custody Instruction Reference Number** | means the number generated by the SWIFT confirmation submitted by an Account Holder. |
| **Custody Instructions** | means the relevant instructions sent by the Account Holder to the relevant Clearing System in order to block certain of the Existing Notes. |
| **Dalma Acquisition** | means the acquisition by the Company and certain Subsidiaries pursuant to a sale and acquisition agreement dated 4 March 2018 with Gulfcap Energy LLC and Al Qahtani Investments LLC. |

**Dalma Acquisition Date** means the closing date of the Dalma Acquisition.

**Deed of Release** means the deed of release substantially in the form set out in part 8 (Deed of Release) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to the Explanatory Statement at Part 8 (Deed of Release) of Appendix 4 (Key Restructuring Documents)) between, among others, the Company and the Scheme Creditors.

**Deloitte** means Deloitte LLP.

**Disqualified Person** means a person who is a citizen of, or domiciled or resident in, or subject to the laws of, any jurisdiction where the offer to issue to or subscribe by, such person of any Scheme Creditor Entitlements is prohibited by law or would, or would be likely to, result in the Company being required to comply with any filing, registration, disclosure or other onerous (as may be decided by the Company in its sole discretion acting reasonably) requirement in such jurisdiction.

**Drag-Along Notice** has the same meaning given to such term in the Jersey Newco Investment Agreement.

**Drag-Along Sale** has the same meaning given to such term in the Jersey Newco Investment Agreement.

**Dragged Shareholder** has the same meaning given to such term in the Jersey Newco Investment Agreement.

**DTC** means The Depositary Trust Company.

**DTC Book-Entry Interests** means, in relation to the Existing Notes, a beneficial interest in a Global Note held through or shown on, and transferred only through, records maintained in book-entry form by DTC and their respective nominees and successors acting through themselves or the Existing Depository.

**DTC Participant** means a person recorded directly in the records of Cede & Co. and DTC as holding an interest in any Existing Notes in an account held with DTC.

**Effective Date** has the meaning given to such term in the Lock-Up Agreement.

**Eligible Institution** means a recognised participant in the Securities Transfer Agents Medallion Program, the New York Stock Exchange Medallion Signature Program or the Stock Exchanges Medallion Program.

**Eligible Person** means a person who is:

(a)    (i) either (x) an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, or (y) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act or (z) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, that is located and resident outside the United States and (ii) not a retail investor in the European Economic Area (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; or (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II); and

(b)      not a Disqualified Person.

**English NewCo 1**          means Kelly Holdco 1 Limited, a private limited company incorporated in England and Wales with registered number 12922288 and registered office at 1 Park Row, Leeds, England, LS1 5AB.

**English NewCo 2**          means Kelly Holdco 2 Limited, a private limited company incorporated in England and Wales with registered number 12922637 and registered office at 1 Park Row, Leeds, England, LS1 5AB.

**EU**          means the European Union.

**Euroclear**          means Euroclear Bank S.A./N.V. as operator of the Euroclear clearing system.

**Euroclear/Clearstream Account Holders**          means a holder of a Euroclear/Clearstream Book-Entry Interest.

**Euroclear/Clearstream Book-Entry Interest**          means, in relation to the Existing Notes, a beneficial interest in a Global Note held through or shown on, and transferred only through, records maintained in book-entry form by Euroclear or Clearstream and their respective nominees and successors acting through themselves or the Existing Depository.

**European Economic Area**          means the internal market situated in Europe governed by the rules of the European Union.

**Exchange Act**          means the Securities Exchange Act of 1934, as amended.

**Existing Administrative Agents**          means such term Loan Administrative Agent and the Revolving Credit Administrative Agent.

**Existing Administrative Party**          means:

(a)      each Existing Administrative Agent;

(b)      the Existing Security Agent; and

(c)      the Existing Trustee.

**Existing Ancillary Lender**          means each of:

(a)      the Existing LC and Undertaking Facility Lenders; and

(b)      the Existing Overdraft Provider.

**Existing Custodian**          means Cede & Co as nominee for DTC.

**Existing Debt Documents**          means the Debt Documents (under and as defined in the Existing Intercreditor Agreement).

**Existing Depositary**          means DTC.

**Existing Financings**          means each of the Existing Notes and the facilities made available under the Credit Agreement (including, for the avoidance of doubt, any "Ancillary Facility" under and as defined in the Credit Agreement).

**Existing Finance Documents** means the Finance Documents (under and as defined in the Existing Intercreditor Agreement).

**Existing Indentures** means the 2021 Notes Indenture, the 2022 Notes Indenture and the 2023 Notes Indenture.

**Existing Intercreditor Agreement** means the intercreditor agreement dated 15 March 2008 (as amended and restated from time to time) between, among others, the Company, Alpha as parent and the Existing Administrative Agents.

**Existing LC and Undertaking Facility** means each of:

    (a)    the Existing LC Facility; and

    (b)    the Existing Undertaking Facility.

**Existing LC and Undertaking Facility Lenders** means FAB and Lloyds in their respective capacities as lenders under the Existing LC and Undertaking Facilities.

**Existing LC Facility** means the standby letter of credit and lender guarantee facility made available to Alpha and certain other members of the Group by Lloyds pursuant to an agreement originally dated 16 May 2014, as amended and/or amended and restated from time to time, being an Ancillary Facility under (and as defined in) the Credit Agreement.

**Existing Noteholders** means the holder of the beneficial interest in the Existing Notes (including, for the avoidance of doubt, an Account Holder that has a beneficial interest in the Existing Notes).

**Existing Notes** means the 2021 Notes, the 2022 Notes and the 2023 Notes.

**Existing Overdraft Facilities** means the facilities made available to Alpha and certain other members of the Group by the Existing Overdraft Provider pursuant to an agreement originally dated 25 September 2018 (as amended and/or amended and restated from time to time), being an Ancillary Facility under (and as defined in) the Credit Agreement.

**Existing Overdraft Liabilities** means the Liabilities under the Existing Overdraft Facilities.

**Existing Overdraft Provider** means HSBC UK Bank plc in its capacity as provider of the Existing Overdraft Facilities.

**Existing Overdraft Record Time** means 8:00 am (London time) on 27 October 2020 (or, if the information required to calculate the Compromised Overdraft Amount is not accessible by the Company at such time, the first time following such time that the Company is able to access the information required to calculate the Compromised Overdraft Amount).

**Existing Security** means the Security constituted by the Existing Security Documents.

**Existing Security Agent** means Lloyds in its capacity as Security Agent under, and as defined in, the Existing Intercreditor Agreement.

**Existing Security Documents** means the Transaction Security Documents under (and as defined in) the Existing Intercreditor Agreement.

**Existing Senior Facilities**  means the Term Loan, Revolving Loan, the Existing LC and Undertaking Facilities and the Existing Overdraft Facility.

**Existing Shareholders**  means the shareholders of Holdings I (being the current ultimate parent company of the KCA Deutag group) as at the Restructuring Effective Date.

**Existing Trustee**  means Deutsche Trustee Company Limited in its capacity as trustee in respect of each of the Existing Notes.

**Existing Undertaking Facility**  means the custom bonds, standby letters of credit and bank guarantee facility made available to Alpha and certain other members of the Group by FAB pursuant to an agreement dated 26 March 2018, being an Ancillary Facility under (and as defined in) the Credit Agreement.

**Explanatory Statement**  means this explanatory statement in relation to the Scheme required to be provided to the Scheme Creditors pursuant to section 897 of the Companies Act.

**FAB**  means First Abu Dhabi Bank PJSC.

**FAB Run-Off LC Facility**  means the super senior facility to be provided under the FAB Run-Off LC Facility Agreement.

**FAB Run-Off LC Facility Agreement**  means the super senior facility agreement substantially in the form set out in part 4 (FAB Run-Off LC Facility Agreement) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to the Explanatory Statement at Part 4 (FAB Run-Off LC Facility Agreement) of Appendix 4 (Key Restructuring Documents)) between, among others, Alpha and the Run-Off LC Lender.

**FAS**  means the Federal Antimonopoly Service of the Russian Federation.

**FCPA**  means U.S. Foreign Corrupt Practices Act.

**GDP**  means gross domestic product.

**German Guarantor**  means a Post-Restructuring Obligor that is incorporated in Germany.

**Global Notes**  means, individually and collectively, the global notes deposited with or on behalf of and registered in the name of the Existing Custodian, in the form of:

(a) Exhibit A to the 2021 Notes Indenture (in respect of the 2021 Notes);

(b) Exhibit A to the 2022 Notes Indenture (in respect of the 2022 Notes); and

(c) Exhibit A to the 2023 Notes Indenture (in respect of the 2023 Notes).

**Going Concern Valuation**  means a high-level limited scope going concern valuation of Alpha II's business as at 30 June 2020, undertaken by Deloitte.

**Group**  means Alpha II and its Subsidiaries.

**Group Company**  has the meaning given to such term in the Scheme.

| | |
|---|---|
| **Guarantors** | means the guarantors under the Guaranty Agreement. |
| **Guaranty Agreement** | means the guaranty agreement dated 16 May 2016 between, among others, Alpha and each Existing Administrative Agent (as amended and restated from time to time). |
| **Holdco** | has the meaning given to such term in the Restructuring Implementation Deed. |
| **Holding Company** | means, in relation to a person, any other person in respect of which it is a Subsidiary. |
| **Holding Period** | means the period of 12 months following the Restructuring Effective Date. |
| **Holding Period Trust Agreement** | means the trust deed substantially in the form set out in part 9 (Holding Period Trust Agreement) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to the Explanatory Statement at Part 9 (Holding Period Trust Agreement) of Appendix 4 (Key Restructuring Documents)) to be entered into by, among others, the Company and the Holding Period Trustee, for the purpose of creating the trust in accordance with clause 8 (Holding Period Trustee) of the Restructuring Implementation Deed. |
| **Holding Period Trustee** | means Lucid Issuer Services Limited in its capacity as holding period trustee under the Holding Period Trust Agreement. |
| **Holdings I** | means KCAD Holdings I Limited. |
| **Houlihan Lokey** | means Houlihan Lokey EMEA, LLP. |
| **HMRC** | means the UK's HM Revenue and Customs. |
| **HSBC** | means HSBC UK Bank plc. |
| **HSBC Hedging Arrangements** | means the Group's hedging exposures with HSBC as described in paragraph 5.4 of Part 2 (Background to the Company, the Group and the Group's Principal Financial Indebtedness) of this Explanatory Statement. |
| **HSBC Mid-Market Rate** | means, in relation to a currency, the exchange rate for that currency on HSBC's "Liquidity Management Portal Dashboard" as at the Existing Overdraft Record Time. |
| **IDTEC** | means International Drilling Technology LLC. |
| **IDTEC Loan** | means the term loan borrowed by IDTEC with a local bank, repayable in bi-annual payments until August 2021. |
| **Implementation Documents** | has the meaning given to it in clause 3.1(a) (Authorisation to execute and undertaking to be bound by the Implementation Documents) of the Scheme Document. |
| **Implementation Party** | means each Undertaking Party and FAB. |
| **Incorporated Documents** | means Alpha's financial results as of and for the years ended 31 December 2018 and 31 December 2019 and Alpha's interim financial results as at 30 June 2020 (which can be found at https://www.kcadeutag.com/investors and (in relation to |

|  | Alpha's interim financial results as at 30 June 2020) https://www.kcadeutag.com/investors/Pages/Results-Centre.aspx?year=2020). |
|---|---|
| **Information Agent** | means Lucid Issuer Services Limited as information agent in relation to the Scheme. |
| **Insurance Distribution Directive** | means Directive 2016/97/EU, as amended. |
| **Intermediary** | means a person who holds an interest in Existing Notes on behalf of another person or other persons. |
| **Investment Grade Rating** | has the meaning given to such term in the New Notes Indenture. |
| **IRS** | means the U.S. Internal Revenue Service. |
| **Issue Date** | means the date on which the New Notes are issued, which Alpha expects to be the Restructuring Effective Date. |
| **Issuer** | means the Company as issuer of the New Notes. |
| **Jersey Newco** | means Kelly Topco Limited, a private limited company incorporated in Jersey with registered number 132385 and registered office at 47 Esplanade, St Helier, Jersey, JE1 0BD, which owns the entire issued share capital of English NewCo 1. |
| **Jersey Newco Articles of Association** | means the proposed articles of association of Jersey Newco in substantially the form attached at schedule 3 (Jersey Newco Articles of Association) to the Restructuring Implementation Deed (and appended to the Explanatory Statement at Appendix 5 (Jersey Newco Articles of Association)). |
| **Jersey Newco Consideration Shares** | means the Jersey Newco Shares that will be allotted and issued pursuant to the Restructuring Implementation Deed. |
| **Jersey Newco Investment Agreement** | means the shareholders' agreement substantially in the form set out in part 6 (Jersey Newco Investment Agreement) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to the Explanatory Statement at Part 6 (Jersey Newco Investment Agreement) of Appendix 4 (Key Restructuring Documents)) between, among others, Jersey Newco, the Scheme Creditors (other than any Unadmitted Scheme Creditors) and the Holding Period Trustee. |
| **Jersey Newco KYC** | means the "know your customer" requirements by the Jersey Registrar in relation to the Jersey Newco Consideration Shares, as set out in the Schedule to the Account Holder Letter and Lender Claim Form (and, if a Scheme Creditor will, or is likely to, beneficially hold more than 10% of the Jersey Newco Shares, such extra information as the Jersey Registrar requests upon email inquiry (email: projectkelly@crestbridge.com) by the Scheme Creditor). |
| **Jersey Newco Sale and Purchase Agreement** | means the sale and purchase agreement substantially in the form set out in part 7 (Jersey Newco Sale and Purchase Agreement) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to the Explanatory Statement at Part 7 (Jersey Newco Sale and Purchase Agreement) of Appendix 4 (Key Restructuring Documents)) between Alpha II as seller and certain of the Scheme Creditors (to be determined by the Company in its discretion (in consultation with the Ad-Hoc Committee and the Existing Overdraft Provider (or |

their respective advisers)) as purchasers with respect to the sale of the Transferred Assets.

| | |
|---|---|
| **Jersey Newco Share Entitlement** | has the meaning given to such term in the Restructuring Implementation Deed. |
| **Jersey Newco Shares** | means all of the A ordinary shares in Jersey Newco in such number to be determined by Jersey Newco (in consultation with the Company and the Ad-Hoc Committee (or their respective Advisers)) prior to the Scheme Effective Time and a **Jersey Newco Share** shall mean an A ordinary share in Jersey Newco. |
| **Jersey Registrar** | means Crestbridge as registrar for Jersey Newco. |
| **KCAD Germany** | means KCA Deutag GmbH. |
| **Key Restructuring Documents** | means: |

    (a)    the New Notes Indenture;

    (b)    the New Cash Management Facilities Agreement;

    (c)    the New Lloyds LC Facility Agreement;

    (d)    the FAB Run-Off LC Facility Agreement;

    (e)    the New Intercreditor Agreement;

    (f)    the Jersey Newco Investment Agreement;

    (g)    the Jersey Newco Sale and Purchase Agreement;

    (h)    the Deed of Release; and

    (i)    the Holding Period Trust Agreement.

| | |
|---|---|
| **LCIA** | means the London Court of International Arbitration. |
| **LCIA Rules** | means the rules of the LCIA. |
| **Lender Claim Form** | means the lender claim form substantially in the form set out in Appendix 9 (Lender Claim Form) to the Explanatory Statement. |
| **Lender Scheme Creditor** | means each Term Loan Lender, each Revolving Loan Lender and the Existing Overdraft Provider. |
| **Liability** | means any debt, liability or obligation of a person whether it is present, future, prospective or contingent, whether it is fixed or undetermined, whether or not it involves the payment of money or performance of an act or obligation and whether it arises at common law, in equity or by statute, in England and Wales or any other jurisdiction, or in any manner whatsoever. |
| **Lloyds** | means Lloyds Bank plc. |

**Lock-Up Agreement**    means the lock-up agreement dated 31 July 2020 (as amended by the Restructuring Steps Plan Amendment Letter) between, among others, the Company and certain of its creditors.

**Lock-Up Fee**    means the lock up fee in relation to the Lock-Up Agreement in an amount equal to 0.15% of each eligible Participating Creditor's Participating Creditor Exposure (as defined in the Lock-Up Agreement) as at the date falling ten Business Days after the Effective Date (as defined in the Lock-Up Agreement).

**Long Stop Date**    has the meaning given to such term in the Restructuring Implementation Deed.

**Majority Creditors**    has the meaning given to such term in the Restructuring Implementation Deed.

**Major Shareholder**    means a Shareholder (affiliated holdings may be aggregated for this purpose) which holds 5% or more of the Jersey Newco Shares in issue.

**Major Shareholder Majority**    means the majority decision (by reference to the number of Shares held) of Shareholders holding voting shares.

**Majority Participating AHC Creditors**    has the meaning given to such term in the Lock-Up Agreement.

**Majority Participating RCF Lenders**    has the meaning given to such term in the Lock-Up Agreement.

**Majority Senior Secured Creditors**    has the meaning given to such term in the New Intercreditor Agreement.

**Majority Super Senior Creditors**    has the meaning given to such term in the New Intercreditor Agreement.

**Management Equity Plan**    means the plan under which certain members of the management of the Restructured Group will be issued with shares in Jersey Newco (indicative terms of which are summarised in Appendix 13 (Management Equity Plan – Summary).

**MiFID II**    means Directive 2014/65/EU (as amended).

**New Bilateral Facilities**    means the facilities to be provided under the New Bilateral Facilities Agreements.

**New Bilateral Facilities Agreement**    means each of:

    (a)    the New Cash Management Facilities Documents;

    (b)    the New Lloyds LC Facility Agreement; and

    (c)    the FAB Run-Off LC Facility Agreement.

**New Bilateral Lender**    means each of:

    (a)    HSBC;

    (b)    Lloyds; and

    (c)    FAB.

| | |
|---|---|
| **New Cash Management Documents** | means the New Cash Management Facilities Agreements and related ancillary documentation. |
| **New Cash Management Facilities** | means the new facilities that will be entered into by HSBC upon the completion of the Restructuring pursuant to the New Cash Management Facility Documents. |
| **New Cash Management Facilities Agreements** | means the super senior cash management facilities agreements to be attached to the Umbrella Agreement substantially in the form set out in part 2 (New Cash Management Facilities Agreement) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to the Explanatory Statement at Part 2 (New Cash Management Facilities Agreement) of Appendix 4 (Key Restructuring Documents)) (with any amendments that may be agreed by Alpha and the New Cash Management Lender (provided that such amendments are not adverse to the Scheme Creditors)) between, among others, Alpha and HSBC to be entered into in accordance with such terms of the Restructuring Implementation Deed. |

| | |
|---|---|
| **New Debt Documents** | means: |

(a)      the New Bilateral Facility Agreements;

(b)      the New Intercreditor Agreement;

(c)      the New Notes Documents; and

(d)      the New Security Documents.

| | |
|---|---|
| **New Guarantee** | means the new guarantees granted by the Post-Restructuring Obligors under the New Debt Documents. |
| **New Intercreditor Agreement** | means the intercreditor agreement substantially in the form attached at part 5 (New Intercreditor Agreement) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to the Explanatory Statement at Part 5 (New Intercreditor Agreement) of Appendix 4 (Key Restructuring Documents)), between, among others, the Company and the New Security Agent to be entered into in accordance with such terms of the Restructuring Implementation Deed. |
| **NewCo** | means each of Jersey Newco, English NewCo 1 and English NewCo 2. |
| **New LC Facility** | means the new, extended super senior facility to be provided under the New Lloyds LC Facility Agreement. |
| **New LC/Undertaking Facilities** | means the facilities under the New LC/Undertaking Facilities Agreements. |
| **New LC/Undertaking Facilities Agreements** | means: |

(a)      the New Lloyds LC Facility Agreement; and

(b)      the FAB Run-Off LC Facility Agreement.

| | |
|---|---|
| **New Lloyds LC Facility Agreement** | means the super senior facility agreement substantially in the form set out in part 3 (New LC Facility Agreement) of schedule 2 (Key Restructuring Documents) to the |

Restructuring Implementation Deed (and appended to the Explanatory Statement at Part 3 (New LC Facility Agreement) of Appendix 4 (Key Restructuring Documents)) between, among others, Alpha and Lloyds to be entered into in accordance with such terms of the Restructuring Implementation Deed.

**New Noteholder**  means a holder of the New Notes.

**New Notes**  means the $500,000,000 9.875% senior secured notes due 2025 to be issued by the Company on the Issue Date  to the Scheme Creditors pursuant to the New Notes Indenture.

**New Notes Documents**  means:

(a)  the New Notes Indenture; and

(b)  the New Notes Global Notes.

**New Notes Entitlement**  has the meaning given to such term in the Restructuring Implementation Deed.

**New Notes Global Notes**  means the Global Notes (as defined in the New Notes Indenture).

**New Notes Guarantees**  means the guarantees to be granted by the Post-Restructuring Obligors under the New Notes Indenture.

**New Notes Indenture**  means the indenture substantially in the form set out in part 1 (New Notes Indenture) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to the Explanatory Statement at Part 1 (New Notes Indenture) of Appendix 4 (Key Restructuring Documents)) between, among others, the Company and the New Trustee to be entered into in accordance with such terms of the Restructuring Implementation Deed.

**New Security**  means transaction security to be granted under the New Security Documents.

**New Security Agent**  means Lucid Trustee Services Limited as security agent under the New Intercreditor Agreement.

**New Security Documents**  has the meaning given to such term in the Restructuring Implementation Deed.

**New Shareholder**  means the shareholders in Jersey Newco from time to time.

**New Total Super Liabilities**  means all debt secured pursuant to the terms of the New Intercreditor Agreement.

**New Trustee**  means Lucid Trustee Services Limited as trustee under the New Notes.

**New York Convention**  means the United Nations (New York) Convention on the Recognition and Enforcement of Foreign Arbitral Awards.

**Nominee**  means, in respect of a Scheme Creditor, a person (or persons) nominated by a Scheme Creditor in its Account Holder Letter and/or Lender Claim Form (as applicable) to receive on its behalf its proportion of the New Notes and/or Jersey Newco Consideration Shares to which it is entitled pursuant to such terms of the Restructuring Implementation Deed.

| | |
|---|---|
| **Non-Guarantor Subsidiaries** | means members of the Restructured Group that are not Post-Restructuring Obligors. |
| **Non-Scheme Creditor** | has the meaning given to such term in the Deed of Release. |
| **Non-U.S. Holder** | means a beneficial owner of New Notes that is neither a U.S. Holder nor a partnership for U.S. federal income tax purposes. |
| **Non-Voting Scheme Creditor** | means each of: |

    (a)    the Existing Trustee;

    (b)    the Existing Custodian; and

    (c)    the Existing Depositary,

in each case solely in respect of its capacity as the beneficiary of the covenant to repay principal and pay interest on the Existing Notes pursuant to such terms of the Existing Indentures and/or the Global Notes.

| | |
|---|---|
| **Norwegian Guarantor** | means a Post-Restructuring Obligor incorporated in Norway. |
| **Notarial Security Document** | has the meaning given to it in the Restructuring Implementation Deed. |
| **Notice of Scheme Meeting** | means the notice set out in Appendix 10 (Notice of Scheme Meeting) of the Explanatory Statement. |
| **Notice Parties** | has the meaning given to it in the Restructuring Implementation Deed. |
| **Obligor** | means the Company, Alpha II and each Other Obligor. |
| **OFAC** | means the U.S. Office of Foreign Assets Control. |
| **OID** | means an original issue discount. |
| **Omani Term Loans** | means the loans borrowed under the English law-governed facility agreement on 11 February 2016 between Oman KCA Deutag Drilling Company LLC, and various other members of the Group. |
| **Omnibus Proxy** | means the proxy by which Cede & Co. appoints the DTC Participants through whom Existing Notes are held through DTC as its proxies. |
| **OPEC** | means the Organization of Petroleum Exporting Countries. |
| **OPEC-Plus** | means the Organization of the Petroleum Exporting Countries plus additional countries. |
| **OPEC-related Oil Price Reduction** | means the reduction in the price of crude oil arising (both directly and indirectly) from actions taken in March 2020 by OPEC-Plus in connection with the pricing and level of production of crude oil. |
| **Order** | means the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005. |

| | |
|---|---|
| **Other Obligor** | has the meaning given to such term in the Restructuring Implementation Deed. |
| **Other Restructuring Documents** | means the Restructuring Documents other than the Key Restructuring Documents. |
| **Participating Creditor** | has the meaning given to such term in the Lock-Up Agreement. |
| **Participating Shareholder** | has the meaning given to such term in the Lock-Up Agreement. |
| **Paying Agent** | means Lucid Agency Services Limited. |
| **Pledged Assets** | means the assets pledged or otherwise subject to security (including, for the avoidance of doubt, by way of assignment or transfer) pursuant to the New Security Documents. |

**Post-Restructuring Obligors**  means each of:

(a)    Abbot Group Limited;

(b)    Abbot Holdings Limited;

(c)    KCA Deutag (Land Rig) Limited;

(d)    KCA Deutag Alpha Limited;

(e)    KCA Deutag Drilling Group Limited;

(f)    KCA Deutag UK Finance Plc;

(g)    KCA European Holdings Limited;

(h)    Set Drilling Company Limited;

(i)    KCA Deutag Caspian Limited;

(j)    Abbot Verwaltungsgesellshaft MbH;

(k)    Bentec GmbH Drilling And Oilfield Systems;

(l)    KCA Deutag Drilling GmbH;

(m)    KCA Deutag GmbH;

(n)    KCA Deutag Tiefbohrgesellschaft MbH;

(o)    KCA Deutag Europe B.V.;

(p)    KCA Deutag Nederland B.V.;

(q)    Abbot Holdings Norge AS;

(r)    KCA Deutag Drilling Norge AS;

(s)    KCA Deutag Drilling Offshore Services AS;

|  |  |  |
|---|---|---|
| (t) | KCA Deutag Holdings Norge AS; | |
| (u) | KCA Deutag Modu Operations AS; | |
| (v) | KCA Deutag Offshore AS; | |
| (w) | KCA Deutag Energy International LLC; | |
| (x) | KCA Deutag Energy LLC; | |
| (y) | KCA Deutag Drilling LLC; | |
| (z) | KCA Deutag Russia LLC; | |
| (aa) | KCA Deutag Gulf Drilling Limited Company; | |
| (bb) | KCA Deutag Drilling Limited; and | |
| (cc) | KCA Deutag Technical Support Limited. | |

**Practice Statement Letter**    means the letter dated 11 September 2020 issued by the Company in accordance with the Practice Statement (Companies: Schemes of Arrangement under Part 26 and Part 26A of the Companies Act 2006) issued on 26 June 2020 by the Court in relation to the practice to be followed in respect of a scheme of arrangement proposed between a company and its creditors.

**PRIIPs Regulation**    means Regulation (EU) No 1286/2014, as amended.

**Principal Obligations**    means the obligations of the Issuer and the Post-Restructuring Obligors under the New Notes Indenture, the New Notes and the New Notes Guarantees.

**Principal Record Time**    means 5:00 pm (New York time) on 26 October 2020.

**Proceedings**    means any process, action or other legal proceedings (including, without limitation, any demand arbitration, alternative dispute resolution, judicial review, adjudication, execution, seizure, distraint, forfeiture re-entry, lien, enforcement of judgment or enforcement of any security), whether arising in connection with the Scheme or otherwise.

**Prohibited Proceedings**    has the meaning given to such term in the Scheme.

**Prospective Major Shareholder**    means each Scheme Creditor who, together with its Affiliates (as defined in the Jersey Newco Investment Agreement), holds five per cent. or more of the Scheme Claims.

**Prospectus Regulation**    means Regulation (EU) 2017/1129.

**QIB**    means a "qualified institutional buyer" as defined under Rule 144A.

**Qualified Investor**    means any person within the meaning of Article (2)(e) of the Prospectus Regulation.

**Rating Agency**    has the meaning given to such term in the New Notes Indenture.

**RCF**    means the revolving credit facility made available under the Credit Agreement.

| | |
|---|---|
| **RCF Lenders** | means any "Lender" with "Revolving Commitments" (each as defined in the Credit Agreement). |
| **RCF Work Fee Letter** | means the work fee letter dated 4 May 2020 with Alpha, certain other members of the Group and certain RCF Lenders. |
| **RCF Work Fees** | means the work fees of $4,766,250.09 (being an amount equal to 1.75% of the face value amount of the Participating Creditor Exposure held by the relevant members of the relevant RCF Lenders as of 30 April 2020). |
| **RDS** | means the Rig Design Services. |
| **Record Time** | means: (a) in respect of any Liability (other than the Existing Overdraft Liabilities), 5:00 pm (New York time) on 26 October 2020 (the **Principal Record Time**) and (b) in respect of the Existing Overdraft Liabilities, the Existing Overdraft Record Time. |
| **Registrar of Companies** | means the registrar of companies in England and Wales. |
| **Regulation D** | means Regulation D under the Securities Act. |
| **Regulation S** | means Regulation S under the Securities Act. |
| **Regulation S Jersey NewCo Consideration Shares** | means the Jersey Newco Shares to be offered and sold solely in offshore transaction in reliance on Regulation S. |
| **Regulation S New Notes** | means the New Notes to be offered and sold solely to non-U.S. persons in an offshore transaction in reliance on Regulation S. |
| **Released Parties** | means the persons listed at Part 1 of Appendix 2 to the Deed of Release. |
| **Relevant Director** | has the same meaning given to such term in the Lock-Up Agreement. |
| **Relevant Persons** | means qualified investors as defined in the Prospectus Regulation who are also (i) persons who are outside the United Kingdom; (ii) a person within the definition of "Investment Professional" (as defined in Article 19(5) of the Order); (iii) persons falling within Article 49(2)(a) to (d) of the Order; or (iv) persons to whom it may otherwise lawfully be communicated. |
| **Relevant New Bilateral Facility Agreement** | has the meaning given to such term in the Restructuring Implementation Deed. |
| **Restricted Jersey Newco Consideration Shares** | means the Jersey Newco Shares to be offered sold solely to persons within the United States where each such person is an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, that is an institution, or a qualified institutional buyer. |
| **Restricted New Notes** | means the New Notes to be offered and sold solely to persons to U.S. persons where each such person is an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, or a qualified institutional buyer. |
| **Restricted Subsidiaries** | has the meaning given to such term in the New Notes Indenture. |

| | |
|---|---|
| **Restructured Group** | means Jersey Newco and each of its direct and indirect Subsidiaries (whether directly or indirectly owned, and whether wholly or partly owned) on and from the Restructuring Effective Date. |
| **Restructuring** | means the proposed restructuring of the financial indebtedness and capital structure of the Group to be implemented in accordance with the Scheme, the Restructuring Steps and the Explanatory Statement and any and all connected compromises, arrangements and/or agreements with persons that are not party to the Scheme. |
| **Restructuring Conditions** | means the conditions to the Restructuring Steps Start Time. |
| **Restructuring Conditions Precedent** | means the documents and other evidence listed in schedule 7 (Restructuring Conditions Precedent) to the Restructuring Implementation Deed. |

**Restructuring Documents**    means the following:

(a)     the Restructuring Implementation Deed;

(b)     each Security and Guarantees Release Document;

(c)     the New Debt Documents;

(d)     the Jersey Newco Investment Agreement;

(e)     the Sale and Purchase Agreement;

(f)     the Deed of Release;

(g)     the Holding Period Trust Agreement; and

(h)     any other documents that is:

(i)     necessary or desirable to give effect to the Restructuring; and

(ii)     designated as a "Restructuring Document" by the Company, the Majority Creditors (or their advisers) and the New Bilateral Lenders.

| | |
|---|---|
| **Restructuring Effective Date** | means the date on which the Restructuring Effective Date Notice is issued. |
| **Restructuring Effective Date Notice** | means a notice to be delivered by the Company to certain parties in accordance with clause 5.9 (Step 8 – delivery of Restructuring Effective Date Notice) of the Restructuring Implementation Deed. |
| **Restructuring Implementation Deed** | means the restructuring implementation deed substantially in the form set out in Schedule 1 (Restructuring Implementation Deed) to the Scheme Document (and appended to the Explanatory Statement at Appendix 3 (Restructuring Implementation Deed)). |
| **Restructuring Steps** | has the meaning given to such term in the Restructuring Implementation Deed. |
| **Restructuring Steps Plan** | means the restructuring steps plan scheduled to (and as defined in) the Lock-Up Agreement (as amended by the Restructuring Steps Plan Amendment Letter). |

| | |
|---|---|
| **Restructuring Steps Plan Amendment** | means the amendment to the Restructuring Steps Plan made pursuant to the Restructuring Steps Plan Amendment Letter. |
| **Restructuring Steps Plan Amendment Letter** | means the letter dated 8 October 2020 from the Company to the Participating Creditors requesting that they consent to the Restructuring Steps Plan Amendment. |
| **Restructuring Steps Start Time** | has the meaning given to such term in the Restructuring Implementation Deed. |
| **Restructuring Term Sheets** | means the restructuring term sheets scheduled to (and each as defined in) the Lock-Up Agreement. |
| **Revolving Credit Administrative Agent** | means Lloyds in its capacity as Revolving Credit Administrative Agent under and as defined in the Credit Agreement. |
| **Revolving Loan Lender** | means an RCF Lender that is a lender of record in respect of the Revolving Loans but excluding FAB and Lloyds in their capacities as Existing LC and Undertaking Facility Lenders and HSBC solely in its capacity as the Existing Overdraft Provider. |
| **Revolving Loans** | means $95 million of revolving cash loans originally borrowed by Abbot and made under the Credit Agreement. |
| **Revolving Maturity Date** | has the meaning given to such term in the Credit Agreement. |
| **Rule 144A** | means Rule 144A under the Securities Act. |
| **Run-Off Facility** | means the new super senior run-off facility provided under the FAB Run-Off LC Facility Agreement. |
| **Run-Off LC Lender** | means FAB as lender under the FAB Run-Off LC Facility Agreement. |
| **Russian Guarantors** | the Post-Restructuring Obligors incorporated in the Russian Federation. |
| **Russian Strategic Investment Law** | the Strategic Investment Law (*Federal Law of the Russian Federation No. 57-FZ dated 29 April 2008 "On Foreign Investments into Entities of Strategic Significance for the Defence of the Country and Security of the State"* (as amended)). |
| **Russian UBO Disclosure** | has the meaning given to such term in the Restructuring Implementation Deed. |
| **S&P** | means Standard and Poor's. |
| **Sanction Hearing** | means the hearing of the Court for the purpose of obtaining the Sanction Order. |
| **Sanction Order** | means if the Scheme is sanctioned by the Court, the order to be made by the Court sanctioning the Scheme under section 899 of the Companies Act. |
| **Scheme** | means the scheme of arrangement, proposed to be made under Part 26 of the Companies Act between the Company and the Scheme Creditors as set out in the Scheme Document. |
| **Scheme Claim** | means any claim in respect of any Liability of the Company and any other Obligor to a Scheme Creditor arising directly or indirectly out of an interest in the Existing |

Notes, the Term Loan, the Revolving Loans, and, subject to Clause 10 (Calculation of Overdraft Scheme Claim) of the Restructuring Implementation Deed, the Existing Overdraft Liabilities arising on or before the Record Time or which may arise after the Record Time as a result of an obligation or Liability of the Company or other Obligor incurred or as a result of an event occurring or an act done on or before the Record Time (including, for the avoidance of doubt, any interest accruing on, or accretions arising in respect of, such claims before, on or after the Record Time and, provided that, for the purposes of calculating the amount of any Scheme Claims as at the Record Time, any interest accruing on the date the Record Time occurs shall be included in the amount of such Scheme Claims), excluding, in relation to the Existing Notes, any Liability of the Company or other Obligor to the Existing Trustee under the Existing Indentures other than in respect of the covenants to repay principal and interest on the Existing Notes pursuant to the Existing Indentures.

| | |
|---|---|
| **Scheme Comparator Analysis** | means an indicative outcome analysis in order to, among other things, provide an estimate of potential recoveries for Scheme Creditors if (i) the Restructuring is successfully implemented; (ii) if the Restructuring is not successful and there is a distressed, accelerated sale of the individual business units within the Group (with any residual part of the Group and its assets entering insolvency or bankruptcy proceedings); and (iii) if the Restructuring is not successful and the entities in the Alpha Group are subject to various local law insolvency procedures, undertaken by Deloitte. |
| **Scheme Consideration** | means the New Notes and the Jersey Newco Consideration Shares. |
| **Scheme Creditor** | means: |

(a)    each Existing Noteholder;

(b)    each Non-Voting Scheme Creditor;

(c)    each Term Loan Lender;

(d)    each Revolving Loan Lender and

(e)    the Existing Overdraft Provider.

| | |
|---|---|
| **Scheme Creditor Entitlements** | means, in relation to a Scheme Creditor, if the Restructuring Effective Date occurs, its: |

(a)    New Notes Entitlement; and

(b)    Jersey Newco Share Entitlement.

| | |
|---|---|
| **Scheme Document** | means the document setting out such terms of the Company's proposed scheme of arrangement to implement the Restructuring with the Scheme Creditors in the form set out in Appendix 2 (Scheme Document) to the Explanatory Statement, with or subject to any modification, addition or condition that the Court may think fit to approve or impose, as appropriate, in accordance with such terms of such scheme. |
| **Scheme Effective Time** | means the time the Company or A&O delivers the office copy of the Sanction Order to the Registrar of Companies. |

| | |
|---|---|
| **Scheme Meeting** | means the meeting of the Scheme Creditors convened in accordance with the permission of the Court pursuant to section 896 of the Companies Act to consider and, if thought fit, approve the Scheme, including any adjournment thereof. |
| **Scheme Party** | has the meaning given to such term in the Scheme. |
| **Scheme Website** | means the website set up by the Information Agent at www.lucid-is.com/kcadeutag. |
| **Scottish      Shareholder Resolution** | has the meaning given to such term in the Restructuring Implementation Deed. |
| **Section   4(a)(2)(private placement)** | means the exemption from the registration requirements of the Securities Act provided by section 4(a)(2) thereunder. |
| **Securities Act** | means the U.S. Securities Act of 1933, as amended. |
| **Securities Confirmation Deed** | means Part 4 of the Lender Claim Form and Part 6 of the Account Holder Letter. |
| **Security** | means any mortgage, charge, assignation, pledge, lien, standard security or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect. |
| **Security            and Guarantees      Release Document** | has the meaning given to such term in the Restructuring Implementation Deed. |
| **Shareholder    Reserved Matters** | means the matters set out in paragraph 4 (Key terms of the Jersey Newco Investment Agreement and Jersey Newco Articles of Association) of Part 6 (Summary of the Key Restructuring Documents) of the Explanatory Statement. |
| **Shareholder         Super Reserved Matters** | means the matters set out in paragraph 4 (Key terms of the Jersey Newco Investment Agreement and Jersey Newco Articles of Association) of Part 6 (Summary of the Key Restructuring Documents) of the Explanatory Statement. |
| **Slate** | means a slate of directors for appointment to Jersey Newco. |
| **Standstill Agreement** | means the standstill agreement dated 2 May 2020 between, among others, Alpha II and certain Creditors. |
| **Standstill Period** | means the period from 2 May 2020 to 31 July 2020 during which the members of the Ad-Hoc Committee, the RCF Lenders and the other creditors party to the Standstill Agreement agreed to the standstill arrangements in respect of the indebtedness under the Existing Notes and the Credit Agreement. |
| **Sub-Proxy** | means Part 4 of the Account Holder Letter. |
| **Subsidiary** | has the same meaning given such term in section 1159 of the Companies Act. |
| **Substantial Shareholder** | means Shareholders' acting together and together with their respective Affiliates, in each case holding over 10% in aggregate of the Jersey Newco Shares. |
| **Super Senior Liabilities** | means the super senior liabilities under the New Intercreditor Agreement. |

| | |
|---|---|
| **Supplemental Indentures** | means the respective supplemental indentures relating to the 2021 Notes Indenture, the 2022 Notes Indenture and the 2023 Notes Indenture attached to the Lock-Up Agreement and each entered into on 17 August 2020 by, among others, the Company, the Existing Trustee and the Existing Security Agent. |
| **Term Loan** | means a $407,314,617 term loan borrowed by KCA Deutag GmbH and made under the Credit Agreement. |
| **Term Loan Administrative Agent** | means Goldman Sachs Lending Partners LLC in its capacity as Term Loan Administrative Agent under and as defined in the Credit Agreement. |
| **Term Loan Facility** | means the facility under the Credit Agreement pursuant to which the Term Loan was issued. |
| **Term Loan Lenders** | means the lenders of record under the Term Loan. |
| **Term Loan Maturity Date** | has the meaning given to such term in the Credit Agreement. |
| **Transferred Assets** | has the meaning given to such term in the Restructuring Implementation Deed. |
| **Trust Entitlements** | means Unadmitted Entitlements held on trust for the relevant Unadmitted Scheme Creditor following being issued and delivered to the Holding Period Trustee on the Restructuring Effective Date. |
| **Umbrella Agreement** | means the umbrella agreement substantially in the form set out in part 2 (New Cash Management Facilities Agreement) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed (and appended to the Explanatory Statement at Part 2 (New Cash Management Facilities Agreement) of Appendix 4 (Key Restructuring Documents)) (with any amendments that may be agreed by Alpha and the New Cash Management Lender (provided that such amendments are not adverse to the Scheme Creditors)) between, among others, Alpha and HSBC to be entered into in accordance with such terms of the Restructuring Implementation Deed. |
| **Unadmitted Entitlements** | means Scheme Creditor Entitlements that are not issued to an Unadmitted Scheme Creditor on the Restructuring Effective Date. |
| **Unadmitted Scheme Creditor** | means a Scheme Creditor who is not issued with its Scheme Creditor Entitlements on the Restructuring Effective Date. |
| **Undertaking Deed** | means the deeds of undertaking issued, or to be issued, in favour of the Court, the Company and the Scheme Creditors (as the case may be) to support the Scheme and the Restructuring. |
| **Undertaking Parties** | means the parties giving undertakings pursuant to and in accordance with each of those parties' applicable Undertaking Deeds as set out in schedule 2 (Scheme Undertaking Parties) of the Scheme Document. |
| **Unrestricted Subsidiaries** | has the meaning given to such term in the New Notes Indenture. |
| **U.S.** | means the United States of America. |

**U.S. Bankruptcy Code**    means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended.

**U.S. Bankruptcy Court**    means the United States Bankruptcy Court for the Southern District of New York or other court of competent jurisdiction presiding over any case filed under Chapter 15 of the U.S. Bankruptcy Code seeking, among other things, recognition of the Scheme as a foreign main proceeding and enforcement of the Sanction Order in the United States.

**U.S. Holder**    means a beneficial owner of New Notes that is for U.S. federal income tax purposes (i) an individual who is a citizen or resident of the United States, (ii) a corporation created in, or organized under the laws of, the United States or any state thereof, including the District of Columbia, (iii) an estate the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source or (iv) a trust (A) the administration of which is subject to the primary supervision of a U.S. court and which has one or more United States persons who have the authority to control all substantial decisions of the trust, or (B) if a valid election is in place to treat the trust as a United States person.

**U.S. person**    means a U.S. person as defined in Regulation S.

**Voting Instruction Deadline**    means 5:00pm (London time) on 28 October 2020.

**Warrant Holders**    means, in relation to a Warrant, the person whose name appears in the register kept by the Jersey Registrar as the holder of the Warrant.

**Warrant Instrument**    means the warrant instrument entered into between Jersey Newco and the Warrant Holders on the Business Day immediately following the Restructuring Effective Date

**Warrant Shares**    means up to 1,111,111 ordinary shares in the share capital of Jersey Newco issued pursuant to the Warrants (subject to adjustment in accordance with the Warrant Instrument).

**Warrants**    means the warrants constituted by the document substantially in the form set out in schedule 4 (Warrants) to the Restructuring Implementation Deed (and appended to the Explanatory Statement at Appendix 6 (Warrant Instrument)) to be issued by Jersey Newco to the Participating Shareholders subject to such terms of the Restructuring Implementation Deed.

**WHO**    means the World Health Organisation.

**Work Fee Letters**    means the AHC Work Fee Letter and the RCF Work Fee Letter.

**Work Fees**    means the AHC Work Fees and the RCF Work Fees.

**APPENDIX 2**

**SCHEME DOCUMENT**

**199**

CLAIM NUMBER: CR-2020-003944

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**INSOLVENCY AND COMPANIES LIST (CHD)**

**IN THE MATTER OF KCA DEUTAG UK FINANCE PLC**

**AND**

**IN THE MATTER OF THE COMPANIES ACT 2006**

**SCHEME OF ARRANGEMENT**
**(under Part 26 of the Companies Act 2006)**

**between**

**KCA DEUTAG UK FINANCE PLC**

**and**

**THE SCHEME CREDITORS**
**(as defined herein)**

# CONTENTS

**Clause**                                                                                                    **Page**

1.    Definitions ........................................................................................................................4
2.    Scheme Effectiveness ....................................................................................................11
3.    Authorisation to execute and undertaking to be bound by the Implementation Documents ..............12
4.    Scheme Steps ..................................................................................................................14
5.    Releases ..........................................................................................................................14
6.    Calculation of Overdraft Scheme Claim ......................................................................14
7.    Assignments and Transfers ............................................................................................15
8.    Determination of Scheme Consideration .......................................................................15
9.    Modification to the Scheme ...........................................................................................15
10.    Termination of the Scheme ............................................................................................16
11.    Stay of Proceedings .......................................................................................................16
12.    Costs ...............................................................................................................................16
13.    Provision of information by Scheme Creditors ............................................................16
14.    Future insolvency ..........................................................................................................17
15.    Application to the Court for directions ..........................................................................17
16.    Exercise of discretion ....................................................................................................17
17.    Notices ...........................................................................................................................17
18.    Chapter 15 Filing ...........................................................................................................18
19.    Governing Law and Jurisdiction....................................................................................18

**Schedule**

1.    Restructuring Implementation Deed................................................................................20
2.    Scheme Undertaking Parties...........................................................................................21

**BETWEEN:**

(1) **KCA DEUTAG UK FINANCE PLC** (the **Company**); and

(2) **THE SCHEME CREDITORS** (as defined below).

**RECITALS**

**The Company**

(A) The Company was incorporated and registered in England and Wales as a public limited company on 28 April 2014.

(B) The Company is registered in England and Wales with company number 09015065 and has its registered office is 1 Park Row, Leeds, LS1 5AB, United Kingdom.

(C) As at 28 April 2020, the date of the Company's last confirmation statement filed at Companies House, the issued share capital of the Company was £50,000 divided into 50,000 ordinary shares with a nominal value of £1 each.

(D) The Company is wholly owned by Abbot Group Limited (**Abbot**).

**Background to the Scheme**

(E) On 31 July 2020, KCA Deutag Alpha II Limited, the Company and certain of its creditors (including the Ad-Hoc Committee (as defined in the Lock-up Agreement)) entered into the Lock-up Agreement with a view to implementing the Restructuring.

(F) Pursuant to the terms of the Lock-up Agreement, the Existing Noteholders party thereto (comprising more than a majority in outstanding principal amount of each of the Existing Notes), expressly for the purpose of facilitating the Scheme, instructed the Existing Trustee to enter into, and on 17 August 2020 the Existing Trustee and the Company did enter into, supplemental indentures pursuant to each Existing Indenture in order to, among other things, provide for the governing law of each Existing Indenture to be changed such that each Existing Indenture is now governed by the laws of England and Wales.

(G) Pursuant to the terms of the Lock-up Agreement, the Lenders party thereto (comprising a majority of the aggregate amount of unpaid principal then outstanding under the Credit Agreement), expressly for the purpose of facilitating the Scheme, instructed the Term Loan Administrative Agent and the Revolving Credit Administrative Agent to enter into, and on 21 August 2020 the Term Loan Administrative Agent, the Revolving Credit Administrative Agent and the Company did enter into, an amendment agreement in respect of the Credit Agreement in order to, amongst other things: (i) incorporate a mechanism to permit the accession of the Company as co-borrower under the Credit Agreement and (ii) provide for the governing law of the Credit Agreement and the Guaranty Agreement to be changed such that the Credit Agreement and the Guaranty Agreement are now governed by the laws of England and Wales.

(H) Furthermore, in order to help facilitate this Scheme, on 10 September 2020, the Company entered into a deed pursuant to which the Company has undertaken in favour of (i) KCAD Germany in relation to the Term Loan, (ii) Abbot in relation to the Revolving Loans and (iii) each member of the Group that had utilised the Existing Overdraft Facility (together with KCAD Germany and Abbot, the **Credit Agreement Borrowers**), to contribute on a joint and several basis to any amounts that are paid by the Credit Agreement Borrowers towards their obligations in respect of the Term Loan, the Revolving Loans and the Existing Overdraft Facility respectively.

**Purpose of the Scheme**

(I)     The purpose of this Scheme is to effect an arrangement between the Company and the Scheme Creditors.

(J)     The Scheme, if approved by the requisite majority of Scheme Creditors and sanctioned by the Court will effect a release of the Scheme Creditors' Existing Debt in consideration for pro rata allocations of the New Notes and the Jersey NewCo Consideration Shares (the **Scheme Consideration**) and is being proposed as part of the broader Restructuring of the Group's capital structure in accordance with the terms of the Lock-up Agreement. Accordingly, the Scheme will affect the rights of all Scheme Creditors.

(K)     It is proposed that the release of Existing Debt, the allocation of the Scheme Consideration, and the associated transactions, will be implemented under and in accordance with the Restructuring Implementation Deed.

(L)     In addition, the Restructuring Implementation Deed will implement further steps in order to implement the broader Restructuring of the Group's capital structure.

**Scheme Undertaking Parties**

(M)     Each Scheme Undertaking Party, upon the sanction of the Scheme by the Court, has agreed to be bound by and comply with the obligations expressed to apply to it under this Scheme and the Implementation Documents to which it is a party pursuant to the provisions of the applicable undertaking deed(s).

**Agreement not to vote**

(N)     The Existing Trustee has agreed not to vote in relation to the Scheme and the other Non-Voting Scheme Creditors will not vote in relation to the Scheme in accordance with their respective customary practices.

1.     **DEFINITIONS**

1.1     In this Scheme, the following terms shall, unless the context otherwise requires, have the following meanings:

**2021 Notes** means the $375 million 7.25% senior secured notes due 2021 (ISIN Codes: US48244LAA61 / USG5222MAA39; CUSIPs: 48244LAA6 / G5222MAA3) governed by the 2021 Notes Indenture.

**2021 Notes Indenture** means the indenture dated 16 May 2014 between, among others, the Company and Deutsche Trustee Company Limited as trustee (as amended and supplemented from time to time).

**2022 Notes** means the $535 million 9.875% senior secured notes due 2022 (ISIN Codes: US48244LAC28 / USG5222MAB12; CUSIPs: 48244LAC2 / G5222MAB1) governed by the 2022 Notes Indenture.

**2022 Notes Indenture** means the indenture dated 5 April 2017 between, among others, the Company and Deutsche Trustee Company Limited as trustee (as amended and supplemented from time to time).

**2023 Notes** means the $400 million 9.625% senior secured notes due 2023 (ISIN Codes: US48244LAE83 / USG5222MAC94; CUSIPs: 48244LAE8 / G5222MAC9) governed by the 2023 Notes Indenture.

**2023 Notes Indenture** means the indenture dated 9 April 2018 between, among others, the Company and Deutsche Trustee Company Limited as trustee (as amended and supplemented from time to time).

**Abbot** has the meaning given to that term in Recital (D).

**Account Holder** means a holder of a Book-Entry Interest (including, for the avoidance of doubt, a DTC Participant).

**Account Holder Letter** means an account holder letter substantially in the form set out in Appendix 8 to the Explanatory Statement.

**Act** means the Companies Act 2006 (as amended).

**Ad-Hoc Committee** has the meaning given to that term in the Lock-up Agreement.

**Adviser** has the meaning given to it in the Restructuring Implementation Deed.

**Affiliate** means in respect of any person or entity:

(a)     a Subsidiary of that person or entity or a Holding Company of that person or entity or any other Subsidiary of such a Holding Company; and

(b)     any Affiliated Entities of any of the persons or entities referred to in paragraph (a) above.

**Affiliated Entity** means (a) in relation to a fund (the **first fund**), (i) a fund which is managed or advised by the same investment manager or investment adviser as the first fund or (ii) if it is managed by a different investment manager or investment adviser, a fund whose investment manager or investment adviser is an Affiliate of the investment manager or investment adviser of the first fund or which is a co-investment vehicle under common control with the first fund; and (b) in relation to any other person, a fund which is managed or advised by such person or any of its Affiliate.

**Allowed Proceeding** means any Proceeding by a Scheme Creditor (or its Nominee(s)):

(a)     to enforce its rights under this Scheme, the Lock-up Agreement, an Implementation Document or a document ancillary to or in connection with an Implementation Document that is entered into or executed pursuant to Clause 3 of this Scheme (each a **Relevant Document**) where the Company or any of its Affiliates or any Scheme Party or another Scheme Creditor (or its Nominee(s)) fails to perform its obligations under this Scheme, the Lock-up Agreement, or an Implementation Document or fails to effect the Restructuring; or

(b)     in respect of any Liability of the Company or any of its Affiliates, any Scheme Party or another Scheme Creditor (or its Nominees(s)) in relation to a Relevant Document arising from fraud, gross negligence or wilful misconduct.

**Applicable Procedures** means, with respect to any transfer, release, waiver and/or cancellation of beneficial interests in any Global Note, the rules and procedures of the relevant Clearing System that apply to such transfer, release, waiver and/or cancellation.

**Bank of England Exchange Rate** means, in relation to a currency, the most recent spot rate of exchange for that currency against Dollars published by the Bank of England on its website at https://www.bankofengland.co.uk/boeapps/database/Rates.asp?Travel=NIxAZx&into=USD.

**Book-Entry Interest** means, in relation to the Existing Notes, a beneficial interest in a Global Note held through or shown on, and transferred only through, records maintained in book-entry form by the

Clearing Systems and their respective nominees and successors acting through themselves or the Existing Depository.

**Business Day** means a day on which banks are open for business in London, Jersey, New York and Luxembourg (excluding, for the avoidance of doubt, Saturdays, Sundays and public holidays).

**Chapter 15 Order** means an order of the U.S. Bankruptcy Court which, among other things, recognises this Scheme as a "foreign main proceeding" under Chapter 15 of the U.S. Bankruptcy Code, enforces the court order granted in connection with the Scheme within the territorial jurisdiction of the United States and grants related relief.

**Clearing System** means DTC, Clearstream and Euroclear (as applicable).

**Clearstream** means Clearstream Banking S.A.

**Court** means the High Court of Justice of England and Wales (or another court of England and Wales) under section 899 of the Companies Act.

**Credit Agreement** means the credit agreement dated 16 May 2014 (as amended or amended and restated from time to time) between, among others, KCA Deutag Alpha Limited as parent, the Term Loan Administrative Agent and the Revolving Credit Administrative Agent.

**Deed of Release** has the meaning given to it in the Restructuring Implementation Deed.

**DTC** means The Depository Trust Company.

**DTC Participant** means a person recorded directly in the records of Cede & Co. and DTC as holding an interest in any Existing Notes in an account held with DTC.

**Euroclear** means Euroclear Bank S.A./N.V. as operator of the Euroclear clearing system.

**Existing Administrative Party** means each of:

(a)      the Revolving Credit Administrative Agent;

(b)      the Term Loan Administrative Agent;

(c)      the Existing Trustee; and

(d)      the Existing Security Agent.

**Existing Ancillary Lender** has the meaning given to it in the Restructuring Implementation Deed.

**Existing Custodian** means Cede & Co as nominee for DTC.

**Existing Debt** means the amount owed to each Scheme Creditor under the Existing Debt Documents.

**Existing Debt Document** means the Debt Documents (under and as defined in the Existing Intercreditor Agreement).

**Existing Depositary** means DTC.

**Existing Indenture** means each of:

(a)      the 2021 Notes Indenture;

(b)      the 2022 Notes Indenture; and

(c)      the 2023 Notes Indenture.

**Existing Noteholder** means a holder of a beneficial interest in the Existing Notes (including, for the avoidance of doubt, an Account Holder that has a beneficial interest in the Existing Notes).

**Existing Notes** means each of:

(a)      the 2021 Notes;

(b)      the 2022 Notes; and

(c)      the 2023 Notes.

**Existing Overdraft Facility** means the $115,000,000 net overdraft facility made available by the Existing Overdraft Provider as an ancillary facility under the Credit Agreement to certain members of the Group pursuant to an agreement dated 25 September 2018.

**Existing Overdraft Liabilities** means the Liabilities under the Existing Overdraft Facilities.

**Existing Overdraft Provider** means HSBC UK Bank plc it is capacity as overdraft provider under the Existing Overdraft Facility.

**Existing Overdraft Record Time** means 8:00 am (London time) on 27 October 2020 (or, if the information required to calculate the Compromised Overdraft Amount is not accessible by the Company at such time, the first time following such time that the Company is able to access the information required to calculate the Compromised Overdraft Amount).

**Existing Security Agent** means Lloyds Bank plc (in its capacity as security agent under and in respect of the Existing Notes and the Intercreditor Agreement).

**Existing Trustee** means Deutsche Trustee Company Limited in its capacity as trustee in respect of the Existing Notes.

**Explanatory Statement** means the explanatory statement in relation to this Scheme provided to the Scheme Creditors pursuant to section 897 of the Act.

**Global Notes** means, individually and collectively, the global notes deposited with or on behalf of and registered in the name of the Existing Custodian, in the form of:

(a)      Exhibit A to the 2021 Notes Indenture (in respect of the 2021 Notes);

(b)      Exhibit A to the 2022 Notes Indenture (in respect of the 2022 Notes); and

(c)      Exhibit A to the 2023 Notes Indenture (in respect of the 2023 Notes).

**Group** means KCA Deutag Alpha II Limited and its Subsidiaries from time to time.

**Guaranty Agreement** means the guaranty agreement dated 16 May 2014 between, among others, KCA Deutag Alpha Limited, the Revolving Credit Administrative Agent and the Term Loan Administrative Agent.

**Holding Company** means, in relation to a person or entity, any other person or entity in respect of which it is a Subsidiary.

**HSBC Mid-Market Rate** means, in relation to a currency, the exchange rate for that currency on HSBC UK Bank plc's "Liquidity Management Portal Dashboard" as at the Existing Overdraft Record Time.

**Implementation Documents** has the meaning given to that term in Clause 3.1(a) of this Scheme.

**Information Agent** means Lucid Issuer Services Limited (acting in its capacity as information agent under and in connection with this Scheme).

**Intercreditor Agreement** means the intercreditor agreement originally dated 15 March 2008 (as amended and restated from time to time) between, among others, the Company, the Term Loan Administrative Agent and the Revolving Credit Administrative Agent.

**Jersey Newco** means Kelly Topco Limited.

**Jersey Newco Consideration Shares** means the Jersey Newco Shares that will be allotted and issued pursuant to the terms of the Restructuring Implementation Deed.[1]

**Jersey NewCo Shares Allocation** means, in respect of each Scheme Creditor, its allocation of Jersey NewCo Consideration Shares pursuant to the terms of the Restructuring Implementation Deed.

**Jersey Newco Shares** means all of the A ordinary shares in Jersey Newco in such number to be determined by Jersey Newco (in consultation with the Company and the Ad-Hoc Committee (or their respective Advisers) prior to the Scheme Effective Time and a **Jersey Newco Share** shall mean an A ordinary share in Jersey Newco.

**KCAD Germany** means KCA Deutag GmbH.

**Lender Claim Form** means the lender claim form substantially in the form set out in Appendix 9 to the Explanatory Statement.

**Lenders** means the Term Loan Lenders and the Revolving Lenders.

**Liability** means any debt, liability or obligation of a person whether it is present, future, prospective or contingent, whether it is fixed or undetermined, whether or not it involves the payment of money or performance of an act or obligation and whether it arises at common law, in equity or by statute, in England and Wales or any other jurisdiction, or in any manner whatsoever.

**Lock-up Agreement** means the lock-up agreement dated 31 July 2020 between, among others, the Company and certain of its creditors.

**Long Stop Date** has the meaning given to that term in the Restructuring Implementation Deed.

**New Notes** means the $500,000,000 9.875% senior secured notes due 2025 to be issued in accordance with the Restructuring Implementation Deed by the Company on or around the Restructuring Effective Date to the Scheme Creditors.

**New Notes Allocation** means, in respect of each Scheme Creditor, its allocation of New Notes pursuant to the terms of the Restructuring Implementation Deed.

**Nominee** means, in respect of a Scheme Creditor, a person (or persons) nominated by that Scheme Creditor in its Account Holder Letter and/or Lender Claim Form (as applicable) to receive on its behalf

---

[1]    The Jersey Newco Consideration Shares will be issued pro rata to the amount of the Scheme Claims as at the Record Time, with, subject to clause 5.5(a) of the Restructuring Implementation Deed, one Jersey Newco Consideration Share to be issued for approximately each $207 of Scheme Claims, save that fractional entitlements to Jersey Newco Consideration Shares will not be issued.

its proportion of the New Notes and/or Jersey Newco Consideration Shares to which it is entitled pursuant to the terms of this Scheme.

**Non-Voting Scheme Creditor** means each of:

(a)        the Existing Trustee;

(b)        the Existing Custodian; and

(c)        the Existing Depositary,

in each case solely in respect of its capacity as the beneficiary of the covenant to repay principal and pay interest on the Existing Notes pursuant to the terms of the Existing Indentures and/or the Global Notes.

**Obligor** has the meaning given to that term in the Restructuring Implementation Deed.

**Overdraft Accounts** has the meaning given to that term in the Restructuring Implementation Deed.

**Proceeding** means any process, suit, action, legal or other proceeding, including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, execution, distraint, restraint, forfeiture, re-entry, seizure, lien, enforcement of judgment or enforcement of any security in any jurisdiction whatsoever.

**Prohibited Proceeding** means any Proceeding (other than an Allowed Proceeding) with respect to the Liabilities that are to be released pursuant to the Restructuring Implementation Deed or the Deed of Release.

**Record Time** means:

(a)        in respect of any Liability (other than the Existing Overdraft Liabilities), 5:00 pm (New York time) on 26 October 2020; and

(b)        in respect of the Existing Overdraft Liabilities, the Existing Overdraft Record Time.

**Registrar of Companies** means the Registrar of Companies in England and Wales.

**Restructuring** has the meaning given to that term in the Restructuring Implementation Deed.

**Restructuring Document** has the meaning given to that term in the Restructuring Implementation Deed.

**Restructuring Effective Date** has the meaning given to that term in the Restructuring Implementation Deed.

**Restructuring Implementation Deed** means the restructuring implementation deed substantially in the form scheduled hereto at Schedule 1 (*Restructuring Implementation Deed*).

**Revolving Credit Administrative Agent** means Lloyds Bank plc (in its capacity as revolving credit administrative agent under the Credit Agreement).

**Revolving Lender** has the meaning given to that term in the Credit Agreement.

**Revolving Loan Lender** means a Revolving Lender that is a lender in respect of the Revolving Loans, excluding, for the avoidance of doubt, any Ancillary Lender (as defined in the Credit Agreement) in its capacity as such.

**Revolving Loans** means the £95,000,000 of drawn revolving loans originally borrowed by Abbot and made under the Credit Agreement.

**Sanction Order** means the order of the Court sanctioning this Scheme under section 899 of the Act.

**Scheme** means this scheme of arrangement in respect of the Company under Part 26 of the Act in its present form or with or subject to any modifications, additions or conditions approved or imposed by the Court or approved in accordance with the terms of this scheme.

**Scheme Claims** means any claim in respect of any Liability of the Company and/or any other Obligor to a Scheme Creditor arising directly or indirectly out of an interest in the Existing Notes, the Term Loan, the Revolving Loans, and/or, subject to Clause 6 (Calculation of Overdraft Scheme Claim), the Existing Overdraft Liabilities arising on or before the Record Time or which may arise after the Record Time as a result of an obligation or Liability of the Company or other Obligor incurred or as a result of an event occurring or an act done on or before the Record Time (including, for the avoidance of doubt, any interest accruing on, or accretions arising in respect of, such claims before, on or after the Record Time and, provided that, for the purposes of calculating the amount of any Scheme Claims as at the Record Time, any interest accruing on the date the Record Time occurs shall be included in the amount of such Scheme Claims), excluding, in relation to the Existing Notes, any Liability of the Company or other Obligor to the Existing Trustee under the Existing Indentures other than in respect of the covenants to repay principal and interest on the Existing Notes pursuant to the Existing Indentures.

**Scheme Creditor** means:

(a)     each Existing Noteholder;

(b)     each Non-Voting Scheme Creditor;

(c)     each Term Loan Lender;

(d)     each Revolving Loan Lender and

(e)     the Existing Overdraft Provider.

**Scheme Effective Time** means the time the Company or its advisers delivers an office copy of the Sanction Order to the Registrar of Companies.

**Scheme Meeting** means the meeting of the Scheme Creditors to vote on this Scheme convened pursuant to an order of the Court (and any meeting called following an adjournment).

**Scheme Party** means each of the Company, any Scheme Creditor (or its Nominee(s)) and any person that is party to an undertaking deed granted in connection with the Scheme.

**Scheme Undertaking Party** means each entity listed in Schedule 2 (*Scheme Undertaking Parties*) whom has signed a deed of undertaking in favour of the Court in connection with this Scheme.

**Scheme Website** means https://www.lucid-is.com/kcadeutag.

**Security and Guarantees Release Document** has the meaning given to that term in the Restructuring Implementation Deed.

**Subsidiary** has the same meaning as in section 1159 of the Act.

**Term Loan** has the meaning given to that term in the Credit Agreement.

**Term Loan Administrative Agent** means Goldman Sachs Lending Partners LLC (in its capacity as term loan administrative agent under the Credit Agreement).

**Term Loan Lender** has the meaning given to that term in the Credit Agreement.

**U.S. Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York or other court of competent jurisdiction presiding over any case filed under Chapter 15 of the U.S. Bankruptcy Code seeking, among other things, recognition of the Scheme as a foreign main proceeding and enforcement of the court order granted in connection with the Scheme in the United States.

1.2    In this Scheme, unless the context otherwise requires or otherwise expressly provides:

(a)    references to this Scheme shall include Schedules to this Scheme;

(b)    references to a person include a reference to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency and shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

(c)    references to a statute, statutory provision or regulatory rule or guidance include references to the same as subsequently modified, amended or re-enacted from time to time;

(d)    references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

(e)    the singular includes the plural and vice versa and words importing one gender shall include all genders;

(f)    references to "including" shall be construed as references to "including without limitation" and "include", "includes" and "included" shall be construed accordingly;

(g)    references to Clauses, Subclauses and Schedules are references to recitals, clauses, subclauses and schedules of this Scheme;

(h)    headings to Clauses, Subclauses and Schedules are for ease of reference only and shall not affect the interpretation of this Scheme;

(i)    references to "$", "dollar", or to "U.S.$" are references to the lawful currency from time to time of the United States of America; and

(j)    references to time shall, unless otherwise stated, be to London time (Greenwich Mean Time or British Summer Time, as appropriate).

## 2.    SCHEME EFFECTIVENESS

2.1    The compromise and arrangement effected by this Scheme and the relevant Implementation Documents shall apply to all Scheme Claims and bind all Scheme Creditors, their successors, assigns, and the Company.

2.2    Unless otherwise stated, the provisions of this Scheme shall take effect on and from the Scheme Effective Time.

2.3    The Company shall promptly notify the Scheme Creditors in writing that the Scheme Effective Time has occurred.

## 3.    AUTHORISATION TO EXECUTE AND UNDERTAKING TO BE BOUND BY THE IMPLEMENTATION DOCUMENTS

3.1    With effect on and from the Scheme Effective Time, in consideration of the rights provided to the Scheme Creditors under this Scheme and notwithstanding any term of any relevant document, each Scheme Creditor hereby appoints, and shall for all purposes be treated as having appointed, the Company as its attorney and agent and irrevocably authorises, directs, instructs and empowers the Company (represented by any authorised representative):

(a)    to enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of such Scheme Creditor:

(i)    the Restructuring Implementation Deed;

(ii)    each other Restructuring Document to which the Scheme Creditors, or any of them, are named as a party; and

(iii)    any other document referred to, contemplated by or ancillary to any of the foregoing and that is required to give effect to the Restructuring,

the documents referred to in this Clause 3.1(a) being the **Implementation Documents** and each an **Implementation Document**;

(b)    in respect of the Implementation Documents, and on behalf of each Scheme Creditor:

(i)    to insert the calculation and completion of any commitments, participations or allocations to any Scheme Creditor or any other party under the Implementation Documents (as determined in accordance with the terms of this Scheme and/or the Restructuring Implementation Deed);

(ii)    to insert information into any blanks (including without limitation, any bank account details, notice provisions or legal entity names), lists of parties and/or signature blocks;

(iii)    to make any mechanical amendments required by the Company;

(iv)    to make any other minor or technical amendments;

(v)    to ensure that they are legal, valid, binding and enforceable upon the parties to them in accordance with this Scheme and the Restructuring Implementation Deed; and/or

(vi)    to make any amendment to take into account any modification of, or addition to, this Scheme and/or the Implementation Documents approved or imposed by the Court in accordance with Clause 9 (Modification to the Scheme),

provided that if any such amendment or insertion could reasonably be expected directly or indirectly to have an adverse or disproportionate effect on the interests of a Scheme Creditor, then such amendment will require the prior written consent of that Scheme Creditor; and

(c)     take whatever action is necessary to ensure that the books and records of the Clearing Systems are updated to reflect the terms of this Scheme and the relevant Implementation Documents, including without limitation to:

(i)     instruct the Clearing Systems to debit the Book-Entry Interests relating to the Existing Notes from the custody account of each Scheme Creditor (or its Account Holder, as applicable);

(ii)     authorise the cancellation of the Book-Entry Interests in respect of the Existing Notes; and

(iii)     take or carry out any other step or procedure reasonably required to effect the settlement of the transactions contemplated this Scheme.

3.2     The authority and power granted and conferred on the Company under Clause 3.1 shall be treated, for all purposes whatsoever and without limitation, as having been granted and conferred by deed and the Company shall be entitled to delegate the authority granted and conferred by Clause 3.1 to any duly authorised officer or agent of the Company as necessary.

3.3     Each Scheme Creditor and, pursuant to an Account Holder Letter and/or Lender Claim Form (as applicable), each respective Nominee(s) (if applicable), hereby authorises and instructs each Existing Administrative Party, the Existing Custodian and the Existing Depositary to undertake such steps as it considers necessary or desirable for it to take for the purposes of facilitating the implementation of this Scheme, including (without limitation) entering into and executing in its respective capacity the Implementations Documents to which it is a party (including, for the avoidance of doubt, in respect of the Existing Security Agent, each Security and Guarantees Release Document) and any other document that it reasonably considers necessary or advisable to implement this Scheme.

3.4     The Company and Scheme Creditors hereby agree that each Existing Administrative Party shall be entitled to enforce, enjoy the benefit of and rely upon the provisions of this Clause 3.

3.5     Each Scheme Creditor hereby consents to the transfer by KCA Deutag Alpha II Limited of the shares in KCA Deutag Alpha Limited to Kelly Holdco 2 Limited prior to the Restructuring Effective Date (and subject to the relevant Existing Security (as defined in the Restructuring Implementation Deed)).

3.6     Notwithstanding any other provision of this Scheme, each Scheme Creditor hereby confirms that it agrees to, shall be bound by and shall comply with, and shall for all purposes be treated as having agreed to and be bound by, each Implementation Document after it has been executed by the Company on its behalf in accordance with this Clause 3. Furthermore, each Scheme Creditor hereby irrevocably and unconditionally ratifies and confirms everything which the Company (including its respective authorised signatories) may lawfully do or cause to be done in accordance with any authority conferred by this Scheme.

3.7     On and from the Scheme Effective Time, each person or entity that has been nominated by a Scheme Creditor to act as a Nominee pursuant to the applicable Account Holder Letter and/or Lender Claim Form (as applicable), agrees that the authority and power conferred on the Company by this Clause 3 shall extend to any Implementation Documents to which such Nominee is named as a party.

3.8     Once an Implementation Document has been fully executed, dated, released and (if applicable, delivered), the authority granted by each Scheme Creditor to the Company under this Clause 3 shall expire automatically in respect of that Implementation Document at that time and, thereafter, that Implementation Document may only be amended in accordance with its terms. Any remaining authorities granted by the Scheme Creditors to the Company under this Clause 3 shall terminate two Business Days following the occurrence of the Restructuring Effective Date.

## 4.     SCHEME STEPS

4.1     On and from the Scheme Effective Time and in the order set out in this Clause 4, the following steps (the **Scheme Steps**) shall be taken in accordance with this Scheme:

(a)     the Company shall execute but not date nor deliver the Restructuring Implementation Deed on its own behalf and on behalf of each Scheme Creditor;

(b)     each of the Scheme Undertaking Parties that is party to the Restructuring Implementation Deed shall execute but not date the Restructuring Implementation Deed on its own behalf and deliver a copy of such executed document to the Company or its legal advisers;

(c)     promptly following receipt of all signatures to the Restructuring Implementation Deed, the Company or its legal advisers shall, and are hereby irrevocably authorised to, date, complete, release and deliver the Restructuring Implementation Deed (without the consent of or any further notice to any party thereto); and

(d)     the Company and each Scheme Undertaking Party (to the extent any action is required by it in connection with the satisfaction of any condition precedent to any step specified in the Restructuring Implementation Deed) shall use reasonable endeavours to procure that any condition precedent to any step specified in the Restructuring Implementation Deed (including, for the avoidance of doubt, the execution or delivery of any Implementation Document or any other conditions precedent to the effectiveness of any Implementation Documents) shall be satisfied (unless waived in accordance with the terms of the Restructuring Implementation Deed).

4.2     Following the completion of the Scheme Steps:

(a)     the remaining Implementation Documents will be executed, dated and released in accordance with clauses 3 (Scheme Steps) to 5 (Restructuring Steps) of the Restructuring Implementation Deed; and

(b)     any other steps to be taken in connection with the implementation of the Restructuring will be taken in the manner prescribed in the Restructuring Implementation Deed.

## 5.     RELEASES

Certain releases will be granted as part of the Scheme and will take effect in accordance with clauses 5.3 (Step 2 – release of Scheme Claims and Existing Security) and 5.8 (Step 7 – Releases) of the Restructuring Implementation Deed and the Deed of Release.

## 6.     CALCULATION OF OVERDRAFT SCHEME CLAIM

(a)     In relation to the Existing Overdraft Provider, the amount of the Existing Overdraft Liabilities to be compromised by the Scheme and the Restructuring Implementation Deed (being a Scheme Claim) shall be an amount equal to the aggregate net balance on the Overdraft Accounts and any accrued and unpaid interest and fees under the Existing Overdraft Facilities, in each case, as calculated by the Company with reference to the balances of the Overdraft Accounts at the Existing Overdraft Record Time (the **Compromised Overdraft Amount**), provided that the maximum Compromised Overdraft Amount for the purposes of the Scheme shall not exceed $115,000,000 plus the aggregate amount of any accrued and unpaid interest and fees under the Existing Overdraft Facilities as at the Existing Overdraft Record Time.

(b)     For the purposes of calculating the Compromised Overdraft Amount, any amounts under the Existing Overdraft Facilities that are denominated in a currency other than dollars shall be converted into dollars

by the Company using the HSBC Mid-Market Rate (or if the HSBC Mid-Market Rate is not accessible by the Company at the Existing Overdraft Record Time, the Bank of England Exchange Rate).

(c)    The Existing Overdraft Liabilities shall be released in accordance with the terms of the Restructuring Implementation Deed in an amount equal to the Compromised Overdraft Amount and, for the purposes of the Scheme, such amount shall be represented by the debit balances in the following bank accounts held with the Existing Overdraft Provider and in the following order:

(i)    the bank account in the name of Abbot Group Limited with account number 60230006 and sort code 401276; and

(ii)    to the extent necessary, such other bank account operated as part of the Existing Overdraft Facilities as the Company may notify the Existing Overdraft Provider in writing on the Restructuring Effective Date.

(d)    For the avoidance of doubt, the remaining credit and debit balances in the bank accounts operated as part of the Existing Overdraft Facilities following the release of the relevant Scheme Claim pursuant to paragraph (c) above shall be deemed to be the opening credit and debit balances for the purposes of the overdraft arrangements provided for in the New Cash Management Facilities Agreement (as defined in the Restructuring Implementation Deed).

## 7.    ASSIGNMENTS AND TRANSFERS

The Company shall not be under any obligation to recognise any purported assignment or transfer of any Scheme Claims by a Scheme Creditor following the Record Time for the purposes of this Scheme or the Implementation Documents (including but not limited to determining the applicable allocation of Scheme Consideration). Notwithstanding the foregoing, where the Company has received from the relevant parties written notice of such purported assignment or transfer, the Company may in its absolute discretion, and subject to such evidence as it may reasonably require, agree to recognise such purported assignment or transfer, subject to the assignee or transferee agreeing to be bound by the terms of this Scheme and to be treated as having been a Scheme Creditor for the purposes of this Scheme.

## 8.    DETERMINATION OF SCHEME CONSIDERATION

8.1    Unless expressly provided otherwise herein, each Scheme Creditor's entitlement to the Scheme Consideration (as allocated in accordance with the terms of the Restructuring Implementation Deed) will be determined based on its Scheme Claims as at the Record Time.

## 9.    MODIFICATION TO THE SCHEME

9.1    Subject to Clause 9.2, the Scheme Creditors hereby agree that the Company may at any Court hearing to sanction this Scheme, consent on behalf of itself and the Scheme Creditors and anyone else concerned to any modification of, or addition to, this Scheme and/or any of the Implementation Documents on any terms or conditions that the Court may think fit to approve or impose which is necessary for the implementation of the Restructuring, and which could not reasonably be expected directly or indirectly to have an adverse effect on the interests of any Scheme Creditor under this Scheme. However, if such modifications could reasonably be expected directly or indirectly to have an adverse effect on the interests of a Scheme Creditor, then the Company may not give such consent without the prior written consent of that Scheme Creditor.

9.2    Any modification of, or addition to, this Scheme and/or any of the Implementation Documents may only be made pursuant to Clause 9.1 with the consent of:

(a)      the Majority Creditors and the New Bilateral Lenders (each as defined in the Restructuring
Implementation Deed); and

(b)      any Existing Administrative Party whose interests would be adversely affected by such
modification or addition (as determined by the relevant Existing Administrative Party in its
sole discretion),

in each case, with such consent not to be unreasonably withheld or delayed.

9.3      If any provision of this Scheme (or any document to be executed pursuant to the authority granted
under this Scheme) is illegal or unenforceable, such provision shall be severed from this Scheme and
the rest of this Scheme shall continue in full force and effect as if the severed provision had not been
included.

## 10.    TERMINATION OF THE SCHEME

10.1     If the Restructuring Effective Date does not occur on or before the Long Stop Date, the terms of and
the obligations on the parties under or pursuant to this Scheme shall lapse and all the compromises
and arrangements provided by this Scheme and any releases granted pursuant to this Scheme shall be
of no effect and shall be construed as if it had never become effective, and the rights and obligations
of the Scheme Creditors (including under the Existing Debt Documents) shall not be affected and shall
be reinstated and remain in full force and effect.

10.2     Clauses 10, 12, 17 and 19 shall survive any termination of this Scheme.

## 11.    STAY OF PROCEEDINGS

11.1     Subject to Clause 11.2 below, no Scheme Creditor may commence, continue, support any person
commencing, or instruct any person to commence or take any Prohibited Proceeding against any
Scheme Party.

11.2     A Scheme Creditor (or its Nominee(s)) may commence an Allowed Proceeding against any Scheme
Party after giving each Scheme Party 21 days' written notice of its intention to do so.

11.3     Each Scheme Creditor will hold on trust for the benefit of the relevant Scheme Party any recovery
made pursuant to any Prohibited Proceeding in breach of this Clause 11 and will turn over any such
recovery forthwith upon demand being made by the Company without set-off, counterclaim or
deduction. To the extent that the asset comprising the recovery cannot be held on trust by the Scheme
Creditor, the Scheme Creditor shall pay to the Company an amount equal to that recovery immediately
upon demand being made by the Company without set-off, counterclaim or deduction, to be held on
trust by the Company for the person(s) entitled to it.

## 12.    COSTS

The Company shall pay, or procure the payment of, in full all costs, charges, expenses and
disbursements incurred by it in connection with the negotiation, preparation and implementation of
this Scheme as and when they arise, including, but not limited to, the costs of holding the Scheme
Meeting, the costs of obtaining the sanction of the Court and the costs of placing the notices (if any)
required by this Scheme.

## 13.    PROVISION OF INFORMATION BY SCHEME CREDITORS

13.1     An Account Holder Letter and/or Lender Claim Form (as applicable) submitted by or on behalf of any
Scheme Creditor shall be submitted in accordance with the instructions set out in the relevant Account
Holder Letter and/or Lender Claim Form (as applicable) and this Scheme.

13.2    Whether an Account Holder Letter and/or Lender Claim Form (as applicable) has been validly completed shall be determined by the Information Agent at its discretion, provided that, if the Information Agent determines that an Account Holder Letter and/or Lender Claim Form (as applicable) has not been validly completed, it shall promptly prepare a written statement of its reasons for doing so and send that statement by electronic mail to the party that provided such Account Holder Letter and/or Lender Claim Form (as applicable).

13.3    The Company may disclose the Account Holder Letter and/or Lender Claim Form (as applicable) and its contents on a confidential basis to such persons as are necessary to facilitate the consummation of the Restructuring.

## 14.    FUTURE INSOLVENCY

14.1    In the event that the Company enters into an insolvency proceeding on or before the Restructuring Effective Date, the Company's obligations under this Scheme shall continue to be performed by the Company in an insolvency proceeding to the fullest extent permitted by law or unless otherwise determined by the Court.

14.2    With effect from the Restructuring Effective Date, this Scheme shall continue according to its terms to the fullest extent permitted by law or unless otherwise determined by the Court, notwithstanding any insolvency proceeding in respect of the Company.

## 15.    APPLICATION TO THE COURT FOR DIRECTIONS

Without prejudice to any rights that the Company or any Scheme Creditor might otherwise have in connection with this Scheme or any aspect of it, the Company shall be entitled to make an application to the Court for directions at any time in connection with any matter arising under or in relation to this Scheme, any Implementation Document or any other aspect of the Restructuring.

## 16.    EXERCISE OF DISCRETION

Where, under or pursuant to any provision of this Scheme or any Implementation Document, a matter is to be determined by the Company, it shall be determined by the board of directors of the Company, in their discretion in such manner as they consider fair and reasonable.

## 17.    NOTICES

17.1    Any notice or other written communication to be given under or in relation to this Scheme must be given in the English language by email to the email address as set out below

17.2    The addresses for notices are as follows:

    (a)    in the case of the Company:

        Email:    Neil.Gilchrist@kcadeutag.com and Tony.Byrne@kcadeutag.com

        Attention:    the CFO and General Counsel

        with a copy to A&O at:

        Email:    Kelly_A&O_Core_Finance_Team@AllenOvery.com

        Attention:    Ian Field / James Graham

    (b)    in the case of notices to all Scheme Creditors, via the Information Agent at:

<div style="margin-left:2em">

Email:     kcadeutag@lucid-is.com

Attention:    Oliver Slyfield

</div>

(c)    in the case of any other person, any address set forth for that person in any agreement entered into in connection with this Scheme.

17.3    Any notice or other written communication to be given under this Scheme shall be deemed to have been served:

    (a)    in the case of any person other than a Scheme Creditor, at the time of transmission if sent by email; and

    (b)    in the case of Scheme Creditors only, when such notice or other written communication is published on the Scheme Website,

provided, in each case, such notice or other written communication is in legible form.

17.4    The accidental omission to send any notice, written communication or other document in accordance with paragraphs 17.1 to 17.3 above, or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of this Scheme.

17.5    All communications under this Scheme to or from an Obligor (other than the Company) must be sent through the Company.

17.6    Any communication given to the Company in connection with this Scheme will be deemed to have also been given to the other Obligors.

## 18.    CHAPTER 15 FILING

18.1    To the extent it has not already done so prior to the Scheme Effective Time, the Company shall file a petition for recognition of this Scheme under Chapter 15 of the U.S. Bankruptcy Code and shall use reasonable endeavours to obtain a Chapter 15 Order, unless and until:

    (a)    such order is granted or unconditionally denied by the U.S. Bankruptcy Court; or

    (b)    otherwise agreed between the Majority Participating AHC Creditors and Majority Participating RCF Lenders (each as defined in the Lock-up Agreement) and the Company, each acting reasonably and in good faith.

## 19.    GOVERNING LAW AND JURISDICTION

19.1    Subject to Clause 19.2, the operative terms of this Scheme and any non-contractual obligations arising out of or in connection with this Scheme shall be governed by and construed in accordance with the laws of England and Wales. The Scheme Creditors and the Company hereby agree that the Court shall have exclusive jurisdiction to hear and determine any suit, action or Proceeding and to settle any dispute which arises out of or in connection with the terms of this Scheme or its implementation or out of any action taken or omitted to be taken under this Scheme or in connection with the administration of this Scheme, and for such purposes the Scheme Creditors and the Company irrevocably submit to the jurisdiction of the Court, provided, however, that nothing in this Clause 19 shall affect the validity of other provisions determining governing law and jurisdiction as between the Company and any of the Scheme Creditors, whether contained in contract or otherwise. A Scheme Creditor may take action

in any other court of competent jurisdiction in order to enforce a judgment made in its favour in relation to Allowed Proceedings.

19.2    The U.S. Bankruptcy Court shall have exclusive jurisdiction to hear and determine any dispute, suit, action or Proceeding (including any settlement thereof) which may arise out of or in connection with any Chapter 15 Order relating to the Company or its assets located within the territorial jurisdiction of the United States.

19.3    The terms of this Scheme and the obligations imposed on the Company and the Scheme Creditors (and, for the avoidance of doubt, those terms and obligations which may be construed as being imposed on any Scheme Undertaking Party) hereunder shall take effect subject to any prohibition or condition imposed by applicable law.

## SCHEDULE 1

### RESTRUCTURING IMPLEMENTATION DEED

[*to be inserted*]

## SCHEDULE 2

## SCHEME UNDERTAKING PARTIES

1.     Kelly Topco Limited

2.     Kelly Holdco 1 Limited

3.     Kelly Holdco 2 Limited

4.     KCA Deutag Alpha II Limited

5.     KCA Deutag Alpha Limited

6.     KCA Deutag US Finance LLC

7.     Abbot Group Limited

8.     Abbot Holdings Limited

9.     Abbot Investments (North Africa) Limited

10.    KCA Deutag (Land Rig) Limited

11.    KCA Deutag Caspian Limited

12.    KCA Deutag Drilling Group Limited

13.    KCA European Holdings Limited

14.    Abbot Verwaltungsgesellschaft mbH

15.    Bentec GmbH Drilling & Oilfield Systems

16.    KCA Deutag Drilling GmbH

17.    KCA Deutag GmbH

18.    KCA Deutag Tiefbohrgesellschaft mbH

19.    KCA Deutag Europe BV

20.    KCA Deutag Nederland BV

21.    Abbot Holdings Norge AS

22.    KCA Deutag Drilling Norge AS

23.    KCA Deutag Drilling Offshore Services AS

24.    KCA Deutag Holdings Norge AS

25.    KCA Deutag MODU Operations AS

26.    KCA Deutag Offshore AS

27.    KCA Deutag Energy Global LLC

28.    KCA Deutag Energy International LLC

29.    KCA Deutag Energy LLC

30.    KCA Deutag Energy National LLC

31.    KCA Deutag Drilling LLC

32.    KCA Deutag Russia LLC

33.    KCA Deutag Gulf Drilling Limited Company

34.    KCA Deutag Drilling Limited

35.    KCA Deutag Technical Support Limited

36.    KCA Deutag Rig Design Services Limited

37.    SET Drilling Company Limited

38.    KCA Deutag Pte Ltd

39.    KCAD Holdings I Limited

40.    KCAD Holdings II Limited

41.    KCA Deutag Finance I Limited

42.    KCA Deutag Finance II Limited

43.    KCA Deutag Midco Limited

44.    Land Rig Ventures I Limited

45.    Land Rig Ventures II Limited

46.    KCA Deutag Drilling Rigs I Limited

47.    Lloyds Bank plc (in its capacities as an Existing Ancillary Lender and as a New Bilateral Lender (in each case as defined in the Restructuring Implementation Deed))

48.    HSBC UK Bank plc (in its capacities as an Existing Ancillary Lender and as a New Bilateral Lender (in each case as defined in the Restructuring Implementation Deed))

49.    The Existing Trustee

50.    The Term Loan Administrative Agent

51.    The Revolving Credit Administrative Agent

52.    The Existing Security Agent

53.    Lucid Issuer Services Limited (in its capacities as Information Agent and Holding Period Trustee (as defined in the Restructuring Implementation Deed))

54.  Lucid Trustee Services Limited (in its capacities as New Trustee and New Security Agent (in each case as defined in the Restructuring Implementation Deed))

55.  Lucid Agency Services Limited (in its capacities as Paying Agent, Registrar and Transfer Agent (in each case as defined in the New Notes Indenture (as defined in the Restructuring Implementation Deed))

**APPENDIX 3**

**RESTRUCTURING IMPLEMENTATION DEED**

# RESTRUCTURING IMPLEMENTATION DEED

**[●] 2020**

**BETWEEN, AMONG OTHERS**

**KCA DEUTAG UK FINANCE PLC**

**AND**

**THE SCHEME CREDITORS**
**(as defined herein)**

**relating to the restructuring of certain financial indebtedness of the**
**KCA Deutag group**

# ALLEN & OVERY

**Allen & Overy LLP**

0101521-0000029 UKO3: 2000910902.11

**224**

# CONTENTS

**Clause**                                                                                                               **Page**

1.    Interpretation ......................................................................................................................2
2.    Effectiveness ....................................................................................................................16
3.    Scheme Steps ...................................................................................................................16
4.    Restructuring Steps Start Time ........................................................................................17
5.    Restructuring Steps .........................................................................................................18
6.    Post-Restructuring Effective Date Steps ..........................................................................22
7.    Allocation and Distribution of Scheme Consideration .....................................................23
8.    Holding Period Trustee ....................................................................................................24
9.    Acknowledgements, Instructions and Ratifications ..........................................................25
10.   Calculation of Overdraft Scheme Claim ..........................................................................26
11.   Holdco Liquidation ..........................................................................................................27
12.   Termination ......................................................................................................................27
13.   Survival ............................................................................................................................28
14.   Representations and warranties ........................................................................................28
15.   Amendments and Further Assurance .................................................................................29
16.   Notices .............................................................................................................................30
17.   Third party rights .............................................................................................................31
18.   Specific performance ........................................................................................................31
19.   Reservation of rights .........................................................................................................31
20.   Severability .......................................................................................................................31
21.   Miscellaneous ...................................................................................................................31
22.   Parties' rights and obligations ..........................................................................................31
23.   Counterparts .....................................................................................................................31
24.   Governing law ..................................................................................................................32
25.   Enforcement .....................................................................................................................32

**Schedule**

1.    Parties ..............................................................................................................................33
      Part 1    The Other Obligors .............................................................................................33
      Part 2    Additional Holdcos .............................................................................................35
      Part 3    The Existing LC and Undertaking Lenders ..........................................................36
2.    Key Restructuring Documents .........................................................................................37
      Part 1    New Notes Indenture ...........................................................................................37
      Part 2    New Cash Management Facilities Agreement .......................................................38
      Part 3    New LC Facility Agreement .................................................................................39
      Part 4    FAB Run-Off LC Facility Agreement ..................................................................40
      Part 5    New Intercreditor Agreement ...............................................................................41
      Part 6    Jersey Newco Investment Agreement ...................................................................42
      Part 7    Jersey Newco Sale and Purchase Agreement .......................................................43
      Part 8    Deed of Release ...................................................................................................44
      Part 9    Holding Period Trust Agreement ..........................................................................45
3.    Jersey Newco Articles of Association ...............................................................................46
4.    Warrants ...........................................................................................................................47
5.    New Security Documents ..................................................................................................48
6.    Existing Security Release Instruction ...............................................................................52
7.    Restructuring Conditions Precedent .................................................................................59
8.    Adviser Email List ...........................................................................................................66
9.    Post-Restructuring Obligors .............................................................................................67
10.   Overdraft Accounts ..........................................................................................................69

Signatories ................................................................................................................................................72

**THIS DEED** is dated [●] 2020

**BETWEEN**:

(1)     **KCA DEUTAG UK FINANCE PLC** (company number 09015065) (the **Company**);

(2)     **KCAD DEUTAG ALPHA II LIMITED** (company number 06511474) (**Alpha II**);

(3)     **KELLY TOPCO LIMITED** (registered number 132385) (**Jersey Newco**);

(4)     **KELLY HOLDCO 1 LIMITED** (company number 12922288) (**English Newco 1**);

(5)     **KELLY HOLDCO 2 LIMITED** (company number 12922637) (**English Newco 2**);

(6)     **EACH COMPANY** listed in Part 1 of Schedule 1 (the **Other Obligors**);

(7)     **EACH COMPANY** listed in Part 2 of Schedule 1 (the **Additional Holdcos**);

(8)     **THE FINANCIAL INSTITUTIONS** listed in Part 3 of Schedule 1 as lenders under the Existing LC and Undertaking Facilities (the **Existing LC and Undertaking Lenders**);

(9)     **LLOYDS BANK PLC** as lender under the New LC Facility Agreement (the **New LC Lender**);

(10)    **FIRST ABU DHABI BANK PJSC** as lender under the FAB Run-Off LC Facility Agreement (the **Run-Off LC Lender**);

(11)    **HSBC UK BANK PLC** as lender under the New Cash Management Facilities (the **New Cash Management Lender**);

(12)    **LUCID ISSUER SERVICES LIMITED** as Holding Period Trustee (as defined below); and

(13)    **EACH PERSON** that is a Scheme Creditor (under and as defined in the Scheme Document).

**WHEREAS**:

(A)     Certain of the Group's financial creditors and other stakeholders have agreed the terms of the Restructuring and have agreed, pursuant to the terms of the Lock-up Agreement, to support and facilitate the implementation of the Restructuring.

(B)     As part of the Restructuring, the Company has proposed the Scheme pursuant to Part 26 of the Companies Act to the Scheme Creditors.

(C)     The parties to this Deed have entered into it in order to formalise the terms on which the Restructuring and the Scheme will be implemented and to document the consents, instructions, directions, waivers, conditions precedent, steps and sequencing required to implement the Restructuring.

(D)     The Restructuring Steps constitute a series of steps, which shall be implemented in the order set out in, and in accordance with the terms of, this Deed.

(E)     It is intended that this document takes effect as a deed notwithstanding the fact that a party may only execute this document under hand.

**IT IS AGREED**, in consideration of the promises and the mutual covenants and agreements contained herein, the sufficiency of which is hereby acknowledged, as follows:

1.     **INTERPRETATION**

1.1    **Definitions**

(a)    In this Deed:

**2021 Notes** means the $375 million 7.25% senior secured notes due 2021 (ISIN Codes: US48244LAA61 / USG5222MAA39; CUSIPs: 48244LAA6 / G5222MAA3) governed by the 2021 Notes Indenture.

**2021 Notes Indenture** means the indenture dated 16 May 2014 between, among others, the Company and Deutsche Trustee Company Limited as trustee (as amended and supplemented from time to time).

**2022 Notes** means the $535 million 9.875% senior secured notes due 2022 (ISIN Codes: US48244LAC28 / USG5222MAB12; CUSIPs: 48244LAC2 / G5222MAB1) governed by the 2022 Notes Indenture.

**2022 Notes Indenture** means the indenture dated 5 April 2017 between, among others, the Company and Deutsche Trustee Company Limited as trustee (as amended and supplemented from time to time).

**2023 Notes** means the $400 million 9.625% senior secured notes due 2023 (ISIN Codes: US48244LAE83 / USG5222MAC94; CUSIPs: 48244LAE8 / G5222MAC9) governed by the 2023 Notes Indenture.

**2023 Notes Indenture** means the indenture dated 9 April 2018 between, among others, the Company and Deutsche Trustee Company Limited as trustee (as amended and supplemented from time to time).

**A&O** means Allen & Overy LLP as legal advisers to the Group.

**Account Holder** means a holder of a Book-Entry Interest (including, for the avoidance of doubt, a DTC Participant).

**Account Holder Letter** the account holder letter substantially in the form set out in Appendix 8 to the Explanatory Statement.

**Ad-Hoc Committee** has the meaning given to that term in the Lock-up Agreement.

**Administrative Parties** means the Existing Administrative Parties and the New Administrative Parties.

**Adviser Email Address** means, in respect of an Adviser, the email address or email addresses set out next to the name of that Adviser in Schedule 8 (Adviser Email List).

**Advisers** means:

(a)    A&O;

(b)    Weil, Gotshal & Manges (London) LLP as legal adviser to the Ad-Hoc Committee;

(c)    Linklaters LLP as legal adviser to the Existing Ancillary Lenders and New Bilateral Lenders; and

(d)      McDermott Will & Emery UK LLP as legal adviser to the New Administrative Parties.

**Affiliates** means in relation to a person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

**Agreed Form** has the meaning given to it in Schedule 7 (Restructuring Conditions Precedent).

**Alpha** means KCA Deutag Alpha Limited.

**Alpha Group** means Alpha and its Subsidiaries.

**Applicable Procedures** means, with respect to any transfer, release, waiver and/or cancellation of beneficial interests in any Global Note, the rules and procedures of DTC that apply to such transfer, release, waiver and/or cancellation.

**Authorisation** means an authorisation, consent, approval, waiver, resolution, licence, exemption, filing, notarisation or registration.

**Bank of England Exchange Rate** means, in relation to a currency, the most recent spot rate of exchange for that currency against Dollars published by the Bank of England on its website at https://www.bankofengland.co.uk/boeapps/database/Rates.asp?Travel=NIxAZx&into=USD.

**Book-Entry Interest** means, in relation to the Existing Notes, a beneficial interest in a Global Note held through or shown on, and transferred only through, records maintained in book-entry form by DTC and their respective nominees and successors acting through themselves or the Existing Depository.

**Business Day** means a day on which banks are open for business in London, Jersey, New York and Luxembourg (excluding, for the avoidance of doubt, Saturdays, Sundays and public holidays).

**Certificates** means the certificates listed in paragraphs 1, 2(a), 2(b) and 2(d) of Schedule 7 (Restructuring Conditions Precedent), in each case, in the Agreed Form.

**Claim** means any claim, counterclaim, right, remedy, indebtedness, right of action, cause of action, indemnity, contribution, right of set-off, demand, damages and other sums (in each case of whatever kind or nature, whether in law, equity, regulation, statute, contract or otherwise, whether known or unknown, whether suspected or unsuspected, whether present, future or otherwise, whether actual, prospective, contingent, potential, alleged or other and however and whether it is held for itself or as agent or trustee for any other person and whenever arising and in whatever jurisdiction) and all rights, title and interests in each of the foregoing, including for or by reason of or arising in connection with any undertaking, obligation, liability, occurrence, act, omission, circumstance, event, transaction, payment (in cash or in kind), matter or thing, whether actual or contingent and whether or not attributable to one cause or event but in each case, excluding those arising under or in connection with the Restructuring Documents.

**Clearing System** means DTC, Clearstream and Euroclear (as applicable).

**Clearstream** means Clearstream Banking S.A.

**Companies Act** means the Companies Act 2006 (as amended from time to time).

**Court** means the High Court of Justice of England and Wales (or another court of England and Wales) under section 899 of the Companies Act.

**Credit Agreement** means the credit agreement dated 16 May 2014 (as amended and restated from time to time) between, among others, Alpha as parent and each Existing Administrative Agent.

**Deed of Release** means the deed of release substantially in the form set out in Part 8 of Schedule 2 (Key Restructuring Documents) to this Deed between, among others, the Company and the Scheme Creditors.

**Disqualified Person** means a person who is a citizen of, or domiciled or resident in, or subject to the laws of, any jurisdiction where the offer to issue to or subscribe by, such person of any Scheme Creditor Entitlements is prohibited by law or would, or would be likely to, result in the Company being required to comply with any filing, registration, disclosure or other onerous (as may be decided by the Company in its sole discretion acting reasonably) requirement in such jurisdiction.

**DTC** means The Depository Trust Company.

**DTC Participant** means a person recorded directly in the records of Cede & Co. and DTC as holding an interest in any Existing Notes in an account held with DTC.

**Effective Date** has the meaning given to that term in Clause 2 (Effectiveness).

**Eligible Person** means a person who is:

(a)     (i) either (x) an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act, or (y) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act or (z) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act, that is located and resident outside the United States and (ii) not a retail investor in the European Economic Area (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; or (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II); and

(b)     not a Disqualified Person.

**End Date** means the earlier of the Termination Date and the Restructuring Effective Date.

**Euroclear** means Euroclear Bank S.A./N.V. as operator of the Euroclear clearing system.

**Existing Administrative Agents** means:

(a)     the Term Loan Administrative Agent; and

(b)     the Revolving Credit Administrative Agent.

**Existing Administrative Parties** means:

(a)     the Existing Administrative Agents;

(b)     the Existing Security Agent; and

(c)     the Existing Trustee.

**Existing Ancillary Lender** means each of:

(a)     the Existing LC and Undertaking Facility Lenders; and

(b)      the Existing Overdraft Provider.

**Existing Custodian** means Cede & Co as nominee for DTC.

**Existing Debt Documents** means the Debt Documents (under and as defined in the Existing Intercreditor Agreement).

**Existing Depository** means DTC.

**Existing Indentures** means:

(a)      the 2021 Notes Indenture;

(b)      the 2022 Notes Indenture; and

(c)       the 2023 Notes Indenture.

**Existing Intercreditor Agreement** means intercreditor agreement originally dated 15 March 2008 (as amended and restated from time to time) between, among others, Alpha as parent and the Existing Administrative Agents.

**Existing Instrument** means any letter of credit, undertaking, guarantee or other instrument that has been issued by an Existing LC and Undertaking Facility Lender under an Existing LC and Undertaking Facility to the extent that it remains outstanding in whole or in part.

**Existing LC Facility** means the standby letter of credit and lender guarantee facility made available to Alpha and certain other members of the Group by Lloyds Bank plc pursuant to the Existing LC Facility Agreement, being an Ancillary Facility under (and as defined in) the Credit Agreement.

**Existing LC Facility Agreement** means the agreement originally dated 16 May 2014 (as amended and/or amended and restated from time to time) between, among others, Alpha and Lloyds Bank plc.

**Existing LC and Undertaking Facility** means each of:

(a)      the Existing LC Facility; and

(b)      the Existing Undertaking Facility.

**Existing Notes** means:

(a)      the 2021 Notes;

(b)      the 2022 Notes; and

(c)      the 2023 Notes.

**Existing Overdraft Facilities** means the facilities made available to Alpha and certain other members of the Group by the Existing Overdraft Provider pursuant to an agreement originally dated 25 September 2018, (as amended and/or amended and restated from time to time), being an Ancillary Facility under (and as defined in) the Credit Agreement.

**Existing Overdraft Liabilities** means the Liabilities under the Existing Overdraft Facilities.

**Existing Overdraft Provider** means HSBC UK Bank plc in its capacity as lender under the Existing Overdraft Facilities.

**Existing Overdraft Record Time** means 8:00 am (London time) on 27 October 2020 (or, if the information required to calculate the Compromised Overdraft Amount is not accessible by the Company at such time, the first time following such time that the Company is able to access the information required to calculate the Compromised Overdraft Amount).

**Existing Security** means the Security constituted by the Existing Security Documents.

**Existing Security Agent** means Lloyds Bank plc in its capacity as Security Agent under and as defined in the Existing Intercreditor Agreement.

**Existing Security Agent Instruction** means the instruction (substantially in the form set out in Annex 1 to the Existing Security Release Instruction Letter) to be sent by the Term Loan Administrative Agent (in its capacity as Administrative Agent (under and as defined in the Existing Intercreditor Agreement) and the Existing Trustee (in its capacity as Senior Secured Notes Trustee and Pari Passu Debt Representative (each under and as defined in the Existing Intercreditor Agreement)) to the Existing Security Agent.

**Existing Security Release Instruction** means the existing security release instruction substantially in the form set out in Schedule 6 (Existing Security Release Instruction) to be sent by the Company (on behalf of each Senior Secured Facilities Lender, Senior Secured Noteholder and Pari Passu Creditor (each under and as defined in the Existing Intercreditor Agreement)) to the Term Loan Administrative Agent (in its capacity as Administrative Agent (under and as defined in the Existing Intercreditor Agreement)) and the Existing Trustee (in its capacity as Senior Secured Notes Trustee and Pari Passu Debt Representative (each under and as defined in the Existing Intercreditor Agreement)).

**Existing Security Documents** means the Transaction Security Documents under (and as defined in) the Existing Intercreditor Agreement.

**Existing Shareholders** means the shareholders of Holdings I as at the Restructuring Effective Date.

**Existing Trustee** means Deutsche Trustee Company Limited in its capacity as trustee in respect of the Existing Notes.

**Existing Undertaking Facility** means the custom bonds, standby letters of credit and bank guarantee facility made available to Alpha and certain other members of the Group by First Abu Dhabi Bank PJSC pursuant to an agreement dated 26 March 2018, being an Ancillary Facility under (and as defined in) the Credit Agreement.

**Explanatory Statement** means the explanatory statement in relation to the Scheme provided to the Scheme Creditors pursuant to section 897 of the Companies Act.

**FAB Run-Off LC Facility Agreement** means the super senior facility agreement substantially in the form set out in Part 4 of Schedule 2 (Key Restructuring Documents) between, among others, Alpha and the Run-Off LC Lender to be entered into in accordance with the terms of this Deed.

**FAS** means the Federal Antimonopoly Service of the Russian Federation.

**Global Deed of Release** means the global deed of release to be entered into by, among others, Alpha, the Existing Administrative Agents and the Existing Security Agent.

**Global Notes** means, individually and collectively, the global notes deposited with or on behalf of and registered in the name of the Existing Custodian, in the form of:

(a)    Exhibit A to the 2021 Notes Indenture (in respect of the 2021 Notes);

(b)  Exhibit A to the 2022 Notes Indenture (in respect of the 2022 Notes); and

(c)  Exhibit A to the 2023 Notes Indenture (in respect of the 2023 Notes).

**Group** means Alpha II and its Subsidiaries.

**Holdcos** means:

(a)  Alpha II; and

(b)  the Additional Holdcos,

and **Holdco** means any of them.

**Holding Company** means, in relation to a person, any other person in respect of which it is a Subsidiary.

**Holding Period** means the period of 12 months following the Restructuring Effective Date.

**Holding Period Trust Agreement** means the trust deed substantially in the form set out in Part 9 of Schedule 2 (Key Restructuring Documents) to be entered into by, among others, the Company and the Holding Period Trustee, for the purpose of creating the trust in accordance with Clause 8(a) (Holding Period Trustee).

**Holding Period Trustee** means Lucid Issuer Services Limited, or any additional or replacement trustee over the Trust Entitlements or the Trusts Entitlements Consideration at any time that is appointed in accordance with Clause 8(h) (Holding Period Trustee), in its capacity as holding period trustee and in accordance with the Holding Period Trust Agreement.

**Holdings I** means KCAD Holdings I Limited.

**HSBC Mid-Market Rate** means, in relation to a currency, the exchange rate for that currency on HSBC UK Bank plc's "Liquidity Management Portal Dashboard" as at the Existing Overdraft Record Time.

**Information Agent** means Lucid Issuer Services Limited as information agent in relation to the Scheme.

**Intercompany Balance Parties** means:

(a)  Holdings I;

(b)  KCAD Holdings II Limited;

(c)  KCA Deutag Drilling Canada Inc; and

(d)  KCA Deutag Finance I Limited.

**Intercompany Balance Reorganisation Deed** means the intercompany balance reorganisation deed dated 2 October 2020 and entered into by certain of the Obligors and the Intercompany Balance Parties to implement the rationalisation of certain intercompany balances in a manner consistent with 'Phase 3' of the transaction steps set out in the Tax Structure Paper.

**Investors' Shareholders Agreement** means the investors' shareholders agreement originally dated 11 July 2012 (as amended and restated from time to time including on 30 April 2018) entered into between Holdings I, PHM Holdco 14 S.à r.l. and the A Shareholders (as defined therein);

**Jersey Newco Articles of Association** means the proposed articles of association of Jersey Newco substantially in the form set out in Schedule 3 (Jersey Newco Articles of Association).

**Jersey Newco Consideration Shares** means the Jersey Newco Shares that will be allotted and issued pursuant to this Deed.[1]

**Jersey Newco Investment Agreement** means the investment agreement substantially in the form set out in Part 6 of Schedule 2 (Key Restructuring Documents) to be entered into by, among others, Jersey Newco, the Scheme Creditors (other than any Unadmitted Scheme Creditors) and the Holding Period Trustee.

**Jersey Newco KYC** has the meaning given to it in Clause 7(b)(iii) (Allocation and Distribution of Scheme Consideration).

**Jersey Newco Sale and Purchase Agreement** means the sale and purchase agreement substantially in the form set out in Part 7 of Schedule 2 (Key Restructuring Documents) to be entered into between Alpha II as seller and certain of the Scheme Creditors (to be determined by the Company in its discretion (in consultation with the Ad-Hoc Committee and the Existing Overdraft Provider (or their respective Advisers)) as purchasers with respect to the sale of the Transferred Assets.

**Jersey Newco Shares** means all of the A ordinary shares in Jersey Newco in such number to be determined by Jersey Newco (in consultation with the Company and the Ad-Hoc Committee (or their respective Advisers) prior to the Scheme Effective Date and a **Jersey Newco Share** shall mean an A ordinary share in Jersey Newco.

**Jersey Newco Share Entitlement** means, in respect of a Scheme Creditor, the total number of Jersey Newco Consideration Shares multiplied by that Scheme Creditor's Pro Rata Proportion.

**Legal Opinions** means the legal opinions listed in paragraphs 5 and 6 of Schedule 7 (Restructuring Conditions Precedent), in each case, in the Agreed Form.

**Lender Claim Form** means the lender claim form substantially in the form set out in Appendix 9 to the Explanatory Statement.

**Liability** means any debt, liability or obligation of a person whether it is present, future, prospective or contingent, whether it is fixed or undetermined, whether or not it involves the payment of money or performance of an act or obligation and whether it arises at common law, in equity or by statute, in England and Wales or any other jurisdiction, or in any manner whatsoever.

**Lock-up Agreement** means the lock-up agreement (including each of the schedules thereto) dated 31 July 2020 between, among others, the Company and the Participating Creditors (as defined therein).

**Locked-up Creditors** means the Scheme Creditors that have signed the Lock-up Agreement and the Existing LC and Undertaking Facility Lenders.

**Long Stop Date** means 5:00 pm London time on 30 November 2020 or such later date as may be agreed in writing (whether pursuant to a single extension or multiple extensions) between the Company, the Majority Creditors and the New Bilateral Lenders.

---

[1]    The Jersey Newco Consideration Shares will be issued pro rata to the amount of the Scheme Claims as at the Record Time, with, subject to Clause 5.5(a), one Jersey Newco Consideration Share to be issued for approximately each $207 of Scheme Claims, save that fractional entitlements to Jersey Newco Consideration Shares will not be issued.

**Majority Creditors** means Scheme Creditors holding at least 50 per cent. in value of the Scheme Claims.

**MiFID II** means Directive 2014/65/EU (as amended).

**New Administrative Parties** means each of:

(a)     the New Security Agent; and

(b)     the New Trustee.

**New Bilateral Facility Agreement** means each of:

(a)     the New Cash Management Facilities Agreements;

(b)     the Umbrella Agreement;

(c)     the New LC Facility Agreement; and

(d)     the FAB Run-Off LC Facility Agreement.

**New Bilateral Lender** means each of:

(a)     the New Cash Management Lender;

(b)     the New LC Lender; and

(c)     the Run-Off LC Lender.

**New Cash Management Facilities Agreements** means the super senior cash management facilities agreements to be attached to the Umbrella Agreement substantially in the form set out in Part 2 of Schedule 2 (Key Restructuring Documents) between, among others, Alpha and the New Cash Management Lender to be entered into in accordance with the terms of this Deed with any amendments that may be agreed by Alpha and the New Cash Management Lender (provided that such amendments are not adverse to the Scheme Creditors).

**Newco** means each of:

(a)     Jersey Newco;

(b)     English Newco 1; and

(c)     English Newco 2.

**New Common Depositary** means a depositary common to Euroclear and Clearstream which shall include each person who is then a Common Depositary under (and as defined in) the New Notes Indenture.

**New Debt Documents** means:

(a)     the New Bilateral Facility Agreements;

(b)     the New Intercreditor Agreement;

(c)     the New Notes Documents; and

(d)      the New Security Documents.

**New Intercreditor Agreement** means the intercreditor agreement substantially in the form set out in Part 5 of Schedule 2 (Key Restructuring Documents) between, among others, the Company and the New Security Agent to be entered into in accordance with the terms of this Deed.

**New LC Facility Agreement** means the super senior facility agreement substantially in the form set out in Part 3 of Schedule 2 (Key Restructuring Documents) between, among others, Alpha and the New LC Lender to be entered into in accordance with the terms of this Deed.

**New LC/Undertaking Facilities Agreements** means:

(a)      the New LC Facility Agreement; and

(b)      the FAB LC Run-Off Facility Agreement.

**New Notes** means the $500,000,000 9.875% senior secured notes due 2025 to be issued by the Company on or around the Restructuring Effective Date to the Scheme Creditors pursuant to the New Notes Indenture.

**New Notes Documents** means:

(a)      the New Notes Indenture; and

(b)      the New Notes Global Notes.

**New Notes Entitlement** means, in respect of a Scheme Creditor, $500,000,000 multiplied by that Scheme Creditor's Pro Rata Proportion.

**New Notes Global Notes** means the Global Notes (as defined in the New Notes Indenture).

**New Notes Indenture** means the indenture substantially in the form set out in Part 1 of Schedule 2 (Key Restructuring Documents) between, among others, the Company and the New Trustee to be entered into in accordance with the terms of this Deed.

**New Security Agent** means Lucid Trustee Services Limited.

**New Security Documents** means each security document listed in Schedule 5 (New Security Documents), in each case in the Agreed Form.

**New Trustee** means Lucid Trustee Services Limited.

**Nominee** means, in respect of a Scheme Creditor, a person (or persons) nominated by a Scheme Creditor in its Account Holder Letter and/or Lender Claim Form (as applicable) to receive on its behalf its proportion of the New Notes and/or Jersey Newco Consideration Shares to which it is entitled pursuant to the terms of this Deed.

**Notarial Security Documents** means:

(a)      the Dutch law share pledge agreement referred to in paragraph 3 of Schedule 5 (New Security Documents); and

(b)      the German law share pledge agreement referred to in paragraph 5 of Schedule 5 (New Security Documents),

in each case, in the Agreed Form.

**Notice Parties** means:

(a)        the Existing Ancillary Lenders;

(b)        the Scheme Creditors; and

(c)        the New Administrative Parties,

or, in the case of the Existing Ancillary Lenders and the New Administrative Parties, their respective Advisers or, in the case of the Scheme Creditors, the Information Agent.

**Obligor** means the Company, Alpha II and each Other Obligor.

**Overdraft Accounts** means each account listed in Schedule 10 (Overdraft Accounts).

**Parties** mean the parties who have signed this Deed and **Party** means each of them.

**Participating Shareholder** has the meaning given to it in the Lock-up Agreement.

**Prospective Major Shareholder** means each Scheme Creditor who, together with its Affiliates (as defined in the Jersey Newco Investment Agreement), holds five per cent. or more of the Scheme Claims.

**Post-Restructuring Obligor** means each company listed in Schedule 9 (Post-Restructuring Obligors).

**Pro Rata Proportion** means, in respect of a Scheme Creditor, the proportion (a) the aggregate amount of its Scheme Claims bears to (b) the aggregate amount of all Scheme Claims in each case, as at the Record Time, expressed as a percentage.

**Record Time** means:

(a)        in respect of any Liability (other than the Existing Overdraft Liabilities), 5:00 pm (New York time) on 26 October 2020; and

(b)        in respect of the Existing Overdraft Liabilities, the Existing Overdraft Record Time.

**Registrar of Companies** means the registrar of companies in England and Wales.

**Related Rights** means

(a)        any dividend or interest paid or payable in respect of any Unadmitted Entitlement;

(b)        any stock shares, rights, money or property accruing or offered in respect of any Unadmitted Entitlement; and

(c)        any dividend or interest paid or payable in respect of any asset listed at paragraph (b) above.

**Relevant Director** means:

(a)        each Shareholder Director; and

(b)        any director (current or previous) of any Holdco that is not a Shareholder Director;

**Relevant New Bilateral Facility Agreement** has the meaning given to it in Clause 3.1(c) (Execution of the Restructuring Documents).

**Restructuring** means the proposed restructuring of the financial indebtedness and capital structure of the Group to be implemented in accordance with the terms of the Lock-up Agreement, the Scheme, the Restructuring Steps and the Explanatory Statement and any and all connected compromises, arrangements and/or agreements with persons that are not party to the Scheme.

**Restructuring Conditions Precedent** means the documents and other evidence listed in Schedule 7 (Restructuring Conditions Precedent).

**Restructuring Documents** means the following:

(a)     this Deed;

(b)     each Security and Guarantees Release Document;

(c)     the New Debt Documents;

(d)     the Jersey Newco Investment Agreement;

(e)     the Jersey Newco Sale and Purchase Agreement;

(f)     the Deed of Release;

(g)     the Holding Period Trust Agreement; and

(h)     any other document that is:

  (i)     necessary or desirable to give effect to the Restructuring; and

  (ii)    designated as a "Restructuring Document" by the Company, the Majority Creditors (or their advisers) and the New Bilateral Lenders.

**Restructuring Documents Notice** means a notice to be delivered by the Company to the Notice Parties in accordance with Clause 3.1(b) (Execution of the Restructuring Documents).

**Restructuring Effective Date** means the date on which the Restructuring Effective Date Notice is issued.

**Restructuring Effective Date Notice** means a notice to be delivered by the Company to the Notice Parties in accordance with Clause 5.9 (Step 8 – delivery of Restructuring Effective Date Notice).

**Restructuring Steps** means each of the steps, conditions and actions set out in Clause 5 (Restructuring Steps).

**Restructuring Steps Start Time** means the time when each of the steps, conditions or actions (as applicable) set out in Clause 4.1 (Restructuring Steps Start Time) has occurred.

**Restructuring Steps Start Time Notice** means the notice to be delivered by the Company to the Notice Parties in accordance with Clause 4.3 (Restructuring Steps Start Time Notice).

**Revolving Credit Administrative Agent** means Lloyds Bank plc in its capacity as Revolving Credit Administrative Agent under and as defined in the Credit Agreement.

**Revolving Loans** means the £95,000,000 of drawn revolving loans borrowed by Abbot Group Limited and made under the Credit Agreement.

**Russian FDI-Related Amendment** means any amendment(s) to the terms of this Deed that is required to be made as a result of any structural amendments to the terms of the Restructuring agreed between the Company and each relevant Prospective Major Shareholder pursuant to paragraphs 13(a)(ii) or 13(b)(ii) of Schedule 7 (Restructuring Conditions Precedent).

**Russian UBO Disclosure** means, in respect of a person, a disclosure submitted to the FAS by such person in respect of its controlling persons, ultimate beneficial owners and beneficiaries (in Russian: предоставление иностранными юридическими лицами, иностранными организациями, не являющимися юридическими лицами, и находящимися под их контролем организациями информации своих выгодоприобретателях, бенефициарных владельцах и контролирующих лицах в ФАС России") in accordance with the "Rules for Provision of Information by Foreign Legal Entities, Foreign Organisations Which Are Not Legal Entites, and Entities Under Their Control Regarding Their Beneficiaries, Beneficial Owners and Controlling Persons to the Executive Authority Responsible for Control over Foreign Investments in the Russian Federation" adopted by the Decree of the Government of the Russian Federation No. 1456 dated 1 December 2018.

**Sanction Hearing** means the hearing at which the Court sanctions the Scheme.

**Sanction Order** means the order of the Court sanctioning the Scheme under section 899 of the Companies Act.

**Scheme** means the scheme of arrangement in relation to the Company under Part 26 of the Companies Act as set out in the Scheme Document.

**Scheme Claim** means any claim in respect of any Liability of the Company and any other Obligor to a Scheme Creditor arising directly or indirectly out of an interest in the Existing Notes, the Term Loan, the Revolving Loans, and, subject to Clause 10 (Calculation of Overdraft Scheme Claim), the Existing Overdraft Liabilities arising on or before the Record Time or which may arise after the Record Time as a result of an obligation or Liability of the Company or other Obligor incurred or as a result of an event occurring or an act done on or before the Record Time (including, for the avoidance of doubt, any interest accruing on, or accretions arising in respect of, such claims before, on or after the Record Time and, provided that, for the purposes of calculating the amount of any Scheme Claims as at the Record Time, any interest accruing on the date the Record Time occurs shall be included in the amount of such Scheme Claims), excluding, in relation to the Existing Notes, any Liability of the Company or other Obligor to the Existing Trustee under the Existing Indentures other than in respect of the covenants to repay principal and interest on the Existing Notes pursuant to the Existing Indentures.

**Scheme Consideration** means the New Notes and the Jersey Newco Consideration Shares.

**Scheme Creditor Entitlement** means, in relation to a Scheme Creditor, if the Restructuring Effective Date occurs, its:

(a)     New Notes Entitlement; and

(b)     Jersey Newco Share Entitlement.

**Scheme Document** means the document setting out the terms of the Company's proposed scheme of arrangement with Scheme Creditors in its present form as at the date of this Deed, or subject to any modification, addition or condition that the Court may think fit to approve or impose, as appropriate, in accordance with the terms of such scheme.

**Scheme Effective Time** means the time the Company or A&O delivers the office copy of the Sanction Order to the Registrar of Companies.

**Scheme Website** means the website set up by the Information Agent at www.lucid-is.com/kcadeutag.

**Scottish Shareholder Resolution** has the meaning given to it in paragraph 3 of Schedule 7 (Restructuring Conditions Precedent).

**Securities Act** means the U.S. Securities Act of 1933 (as amended).

**Securities Confirmation Deed** means a securities confirmation deed substantially in the form set out in part 6 of the Account Holder Letter or part 4 of the Lender Claim Form (as applicable).

**Security** means any mortgage, charge, assignation, pledge, lien, standard security or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

**Security and Guarantees Release Document** means:

(a)    the Global Deed of Release; and

(b)    the deed of release to be entered into by, among others, Alpha and Lloyds Bank plc in relation to "cash cover" provided to Lloyds Bank plc under the Existing LC Facility Agreement,

in each case, in the Agreed Form.

**Selling Agent** means such person as the Holding Period Trustee may (in its sole discretion) appoint for the purposes of selling or otherwise disposing of the remaining Trust Entitlements in accordance with Clause 8(d) (Holding Period Trustee), which person shall be a reputable institution with relevant experience.

**Shareholder Director** means any director (current or previous) of any member of the Group or any Holdco, appointed by an Existing Shareholder pursuant to the terms of the Investors' Shareholders Agreement;

**Step** means any one of the Restructuring Steps.

**Subsidiary** has the meaning given to it in section 1159 of the Companies Act.

**Super Majority Creditors** means Scheme Creditors holding at least 75 per cent. of the Scheme Claims.

**Tax Structure Paper** means the tax structure paper dated [●] 2020 prepared by Deloitte LLP in connection with the Proposed Restructuring;

**Term Loan** has the meaning given to it in the Credit Agreement.

**Term Loan Administrative Agent** means Goldman Sachs Lending Partners LLC in its capacity as Term Loan Administrative Agent under and as defined in the Credit Agreement.

**Termination Date** means the date on which this Deed is terminated in accordance with Clause 12 (Termination) of this Deed.

**Transferred Assets** means such right, title, and interest which Alpha II has to or in the Jersey Newco Shares.

**Trust Entitlements** has the meaning given to it in Clause 8(d) (Holding Period Trustee).

**Trust Entitlements Consideration** has the meaning given to it in Clause 8(d) (Holding Period Trustee).

**Trust Entitlements Consideration Holding Period** has the meaning given to it in Clause 8(d) (Holding Period Trustee).

**Umbrella Agreement** means the umbrella agreement substantially in the form set out in Part 2 of Schedule 2 (Key Restructuring Documents) between, among others, Alpha and HSBC UK Bank plc.

**Unadmitted Entitlement** has the meaning given to it in Clause 8(a)(Holding Period Trustee).

**Unadmitted Scheme Creditor** has the meaning given to it in Clause 8(a) (Holding Period Trustee).

**Voting Instruction Deadline** means 5:00 pm (London time) on 28 October 2020.

**Warrants** means the warrants constituted by the document substantially in the form set out in Schedule 4 (Warrants) to be issued by Jersey Newco to the Participating Shareholders subject to the terms of this Deed.

## 1.2    Interpretation

(a)    Unless a contrary indication appears any reference in this Deed to:

    (i)    "this Deed" shall include the Schedules to this Deed;

    (ii)    any person shall be construed so as to include its successors in title, permitted assigns and permitted transferees;

    (iii)    any agreement or instrument is a reference to that agreement or instrument as amended, supplemented or novated;

    (iv)    "indebtedness" includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

    (v)    a "person" includes any person, firm, company, corporation, government, state or agency of a state or any joint venture, association, trust or partnership (whether or not having separate legal personality) of two or more of the foregoing;

    (vi)    a provision of law is a reference to that provision as amended or re-enacted;

    (vii)    "$" or to "dollar" are references to the lawful currency from time to time of the United States of America;

    (viii)    a time of day is a reference to London time;

    (ix)    "includes", "included" or "including" shall be construed without limitation;

    (x)    words importing the singular shall include the plural equivalent and vice versa; and

    (xi)    Clause and Schedule headings are for ease of reference only (and, in each case, to Clauses and Schedules in this Deed).

(b)     If there is any conflict between the terms of this Deed and the terms of any Restructuring Document, the terms of this Deed will prevail.

(c)     Where this Deed provides for a notice or other communication or confirmation to be given "in writing", it is sufficient for that notice or other communication to be given by email.

(d)     Unless specified to the contrary, in this Deed, any reference to a determination, certification, specification or similar act to be made or done by any person shall, in the absence of manifest error, be deemed to be conclusive and shall be construed and take effect as that person making or doing that determination, certification, specification or similar act, acting in its sole discretion.

(e)     A reference to a document being "completed" or an authority granted to "complete" a document will include the insertion in manuscript or otherwise of all missing dates, figures and information required for the relevant document to be completed.

## 2.     EFFECTIVENESS

This Deed will become effective and legally binding, as between the signatories hereto, on the date (the **Effective Date**) on which it is executed by all the Parties hereto, provided that the Effective Date shall not occur before the Scheme Effective Time.

## 3.     SCHEME STEPS

### 3.1     Execution of the Restructuring Documents

(a)     Promptly following the Effective Date and subject to paragraphs (b) and (c) below:

  (i)     the Company shall, to the extent it has not already done so, sign but leave undated (and, where applicable, undelivered) each Restructuring Document to which it is a party;

  (ii)    the Company shall, to the extent it has not already done so, sign but leave undated (and, where applicable, undelivered) each Restructuring Document on behalf of the Scheme Creditors who are parties to them (acting as their attorney and agent pursuant to the terms of the Scheme);

  (iii)   each other Party to this Deed shall, to the extent it has not already done so, sign and leave undated (and, where applicable, undelivered each Restructuring Document to which it is a party; and

  (iv)    each Party (other than a Party which is a Scheme Creditor) shall deliver all of its signature pages to each relevant Restructuring Document (and, where applicable, full execution versions in accordance with any reasonably required execution formalities) to A&O, who shall hold all such signature pages to order in accordance with Clause 3.2(a) (Dating and delivery of the Restructuring Documents) below, to be released only in accordance with the Restructuring Steps.

(b)     Paragraph (a) above shall not apply to any Notarial Security Document.

(c)     If the Company and the New Cash Management Lender agree that any New Bilateral Facility Agreement to which the New Cash Management Lender is a party will be entered into in a manner that does not involve such New Bilateral Facility Agreement being signed by the parties thereto (a **Relevant New Bilateral Facility Agreement**):

  (i)     paragraph (a) above shall not apply to such Relevant New Bilateral Facility Agreement; and

(ii)     prior to the Restructuring Steps Start Time, the Company and the New Cash Management Lender shall:

(A)     agree the manner in which such Relevant New Bilateral Facility Agreement will be entered into at the sub-step set out in Clause 5.4(a)(ii) (Step 3 – entry into New Debt Documents and issue of New Notes); and

(B)     take any steps necessary to ensure that such Relevant New Bilateral Facility Agreement can be entered into at the same time that the other New Debt Documents are dated, (where applicable) completed, released and (where applicable) delivered in accordance with Clause 5.4(a)(i) (Step 3 – entry into New Debt Documents and issue of New Notes).

(d)     The delivery by (or on behalf of) a Party of all of its signature pages to each relevant Restructuring Document (and, where applicable, full execution versions in accordance with any reasonably required execution formalities) to A&O in accordance with Clause 3.1(a)(iv) (Execution of the Restructuring Documents) shall constitute that Party's irrevocable instruction and authorisation to A&O to date each relevant Restructuring Document and to release all such signature pages in accordance with the Restructuring Steps. For the avoidance of doubt, the instruction and authorisation referred to above shall apply equally to the delivery by the Company of signature pages to Restructuring Documents it has signed on behalf of the Scheme Creditors (acting as their attorney and agent pursuant to the terms of the Scheme).

(e)     When the Company has received confirmation from A&O that A&O is holding all Parties' signature pages (and full execution versions, as applicable) for each Restructuring Document (other than the Notarial Security Documents) in escrow, the Company shall deliver a notice to the Notice Parties notifying them that the Company has received such a confirmation from A&O.

## 3.2     Dating and delivery of the Restructuring Documents

(a)     In relation to the dating and delivery of each Restructuring Document, each Party authorises A&O to date, complete, release and, if applicable, deliver the Restructuring Documents to which that Party is a party, without being required to obtain any further consents or Authorisations from any Party or from any other person or entity. Where this Deed refers to the Company dating, completing, releasing and, if applicable, delivering a Restructuring Document, such obligation shall be satisfied by A&O dating, completing, releasing and delivering that Restructuring Document on the Company's behalf.

(b)     Each Party acknowledges and agrees that until the Termination Date, the instructions and authorisations given by each Party in accordance with this Clause 3 (Scheme Steps) cannot be revoked, that any attempt to revoke such instructions shall be of no effect and that the provisions of this Deed shall continue to apply to any action the subject of such instructions and authorisations notwithstanding such purported revocation.

(c)     Where a Step refers to a document, notice or confirmation being delivered to a Party or the Parties, each Party agrees that it will be sufficient (if applicable) for the relevant document, notice or confirmation to be sent by way of email to the Adviser to such Party or Parties at the Adviser Email Address for that Adviser.

## 4.     RESTRUCTURING STEPS START TIME

## 4.1     Restructuring Steps Start Time

The Restructuring Steps Start Time will occur when:

(a)    the Company has delivered the Restructuring Documents Notice to the Notice Parties in accordance with Clause 3.1 (Execution of the Restructuring Documents); and

(b)    subject to Clause 4.2 (Waiver of Restructuring Conditions Precedent) below, the Company has received all Restructuring Conditions Precedent in form and substance satisfactory to it; and

(c)    all confirmations specified in Schedule 7 (Restructuring Conditions Precedent) have been provided in writing to the Company.

**4.2    Waiver of Restructuring Conditions Precedent**

(a)    Any Restructuring Condition Precedent (other than the Restructuring Condition Precedent in paragraph 14 of Schedule 7 (Restructuring Conditions Precedent)) may be waived with the written consent of the Company, the Majority Creditors (or their advisers on their behalf) and each New Bilateral Lender, and the Company shall give notice of any such waiver to the Notice Parties.

(b)    The Restructuring Condition Precedent in paragraph 14 of Schedule 7 (Restructuring Conditions Precedent) may be waived with the written consent of the Company, the Majority Creditors (or their advisers on their behalf), each New Bilateral Lender and each Existing Administrative Party, and the Company shall give notice of any such waiver to the Notice Parties. Each Existing Administrative Party shall be entitled to rely on this paragraph (b) as an express third party beneficiary thereof.

**4.3    Restructuring Steps Start Time Notice**

Upon the occurrence of the Restructuring Steps Start Time, the Company (if applicable, through A&O) shall deliver to each of the Notice Parties a notice confirming that the Restructuring Steps Start Time has occurred.

**5.    RESTRUCTURING STEPS**

**5.1    Sequencing of Restructuring Steps**

Following delivery of the Restructuring Steps Start Time Notice by the Company (or A&O, if applicable) in accordance with Clause 4.3 (Restructuring Steps Start Time Notice), the Restructuring Steps shall occur in the order described in this Clause 5 (Restructuring Steps), provided that:

(a)    none of the Steps shall take place unless all transactions contemplated by such Steps are capable of being completed in full;

(b)    unless a Step is expressed to take place simultaneously with a prior Step, no Step shall take place unless the prior Step has been completed in full;

(c)    each transaction or sub-step in a Step shall, unless stated otherwise, be deemed to occur simultaneously;

(d)    each Step shall be completed as soon as reasonably practicable following the completion of the previous Step;

(e)    the Company shall exercise its discretion to determine which Scheme Creditors shall be party to the Jersey Newco Sale and Purchase Agreement to be dated and released in accordance with the Step set out in Clause 5.2 (Step 1 – transfer of Jersey Newco to certain Scheme Creditors) in such a way as to ensure that, following the completion of such Step and prior to the issuance of shares in Jersey Newco to be effected in accordance with Clause 5.5 (Step 4 – issuance of shares in Jersey Newco):

(i)      no Scheme Creditor will (together with its Affiliates) hold five per cent. or more of the shares in Jersey Newco unless it has confirmed to the Company that it has made a Russian UBO Disclosure and received an official document issued by the FAS acknowledging that the FAS has reviewed and accepted the relevant Russian UBO Disclosure; and

(ii)     no Jersey Newco Shares will be held by any Scheme Creditor that has (either directly or through its adviser) notified the Company (or its Adviser) in writing prior to the Effective Date that, for regulatory reasons, such Scheme Creditor is prohibited from accepting the transfer of any Jersey Newco Shares pursuant to such Step;

(f)     in the event that any Step (a **Relevant Step**) is not completed on the Business Day on which the Restructuring Steps are commenced:

(i)      the process of the closing of the Restructuring shall be paused until the date on which the Relevant Step and all remaining Steps can be completed (on which date all such Steps shall be completed);

(ii)     to the fullest extent permitted by law, any Step completed before the Relevant Step shall be deemed to have occurred on the Restructuring Effective Date;

(iii)    no Party shall be permitted to raise any objection for the purposes of the Scheme in connection with the fact that a Step has not been completed on the Restructuring Effective Date by reason of the operation of the provisions of this sub-paragraph 5.1(e);

(iv)    in the event that any Step completed before the Relevant Step cannot be treated as having occurred on a subsequent date under the provisions of this sub-paragraph 5.1(e), then the fact of its occurrence on a date prior to the Restructuring Effective Date shall not prevent it from being regarded for the purposes of the Scheme as having occurred on the Restructuring Effective Date; and

(v)     each Scheme Creditor agrees and acknowledges that it shall not transfer any Scheme Consideration until the Restructuring Effective Date; and

(g)    the provisions of Clause 12 (Termination) shall apply to the extent that this Deed is terminated in accordance with its terms and some but not all of the Steps have been completed in full or in part.

## 5.2    Step 1 – transfer of Jersey Newco to certain Scheme Creditors

The Company shall date and release the Jersey Newco Sale and Purchase Agreement (and any applicable ancillary documents necessary to complete the transactions contemplated by the Jersey Newco Sale and Purchase Agreement).

## 5.3    Step 2 – release of Scheme Claims and Existing Security

(a)    Without any requirement for any additional actions or steps to be undertaken by any Party:

(i)      all of the right, title and interest of the Scheme Creditors in and to the Scheme Claims shall hereby automatically and without further documentation required to be entered into or action or steps required to be taken by any Party be released and treated as satisfied fully and absolutely in each case so as to bind the Scheme Creditors and any person who has acquired or who may acquire any interest in or arising out of a Scheme Claim after the Record Time;

(ii)    all of the right, title and interest of the Existing Depositary, the Existing Custodian and the Existing Trustee to any claims they have or may have under the Existing Debt Documents including the Global Notes or any parallel debt covenant (as applicable) shall hereby automatically and without further documentation required to be entered into or action or steps required to be taken by any Party be released and treated as satisfied fully;

(iii)    subject to Clause 10 (Calculation of Overdraft Scheme Claim), all Claims of the Scheme Creditors against any Obligor under or in connection with the Existing Debt Documents shall hereby be released and treated as satisfied fully and absolutely in each case so as to bind the Scheme Creditors and any person who has acquired or acquires any interest in or arising out of such Claims after the Record Time; and

(iv)    without prejudice to the terms of the New LC/Undertaking Facilities Agreements (including with respect to the payment of accrued but unpaid interest and fees under the Existing LC and Undertaking Facilities), all of the Claims of the Existing LC and Undertaking Lenders against the Obligors in respect of the Existing Instruments or under the Existing LC and Undertaking Facilities shall hereby be released and treated as satisfied fully and absolutely in each case so as to bind Existing LC and Undertaking Lenders and the Obligors and any person who has acquired or acquires any interest in or arising out of any such Claims after the Record Time.

(b)    The Company shall date, release and deliver each Security and Guarantees Release Document.

(c)    The Company shall deliver all instructions or notices and take such actions necessary or desirable for the cancellation of the Existing Notes (including the relevant Global Notes), including without limitation:

(i)    instructing DTC to debit the Book-Entry Interests relating to the Existing Notes from the custody account of each Scheme Creditor (or its Account Holder, as applicable);

(ii)    arranging for the cancellation of the Book-Entry Interests in respect of the Existing Notes; and

(iii)    issuing a confirmation to DTC to cancel the Existing Notes in accordance with the Applicable Procedures,

(d)    Immediately following the sub-step set out in paragraph (b) above, the Company shall procure that each Scottish Shareholder Resolution be passed.

(e)    Notwithstanding the sub-steps set out in paragraphs (a) to (c) above, nothing in this Deed shall release, affect, impair or prejudice any right of any Party:

(A)    in respect of the Scheme Consideration; and/or

(B)    arising under the Scheme Document or any Restructuring Document (including as a consequence of non-compliance with the terms of the Scheme Document or any Restructuring Document).

**5.4    Step 3 – entry into New Debt Documents and issue of New Notes**

(a)    The Company shall:

(i)    date, (where applicable) complete, release and (where applicable) deliver each New Debt Document (other than each New Security Document and any Relevant New Bilateral Facility Agreements) and the Holding Period Trust Agreement;

(ii)    procure that any Relevant New Bilateral Facility Agreements are entered into in the manner agreed with the New Cash Management Lender pursuant to Clause 3.1(c)(ii)(A) (Execution of the Restructuring Documents); and

(iii)   deliver requisite (i) instructions for the authentication of the New Notes Global Note and (ii) settlement instructions in respect of the New Notes to the New Common Depositary and (iii) take any other such steps required to issue the New Notes to:

(A)    each Scheme Creditor (other than an Unadmitted Scheme Creditor in respect of the New Notes) or its Nominee (as applicable) such that the relevant Scheme Creditor or its Nominee (as applicable) receives New Notes in an aggregate amount equal to that Scheme Creditor's New Notes Entitlement; and

(B)    the Holding Period Trustee (on behalf of each Unadmitted Scheme Creditor in respect of the New Notes) such that the Holding Period Trustee receives New Notes in an amount equal to the aggregate of each Unadmitted Scheme Creditor's New Notes Entitlement (with the Holding Period Trustee holding such Unadmitted Entitlements on trust for the relevant Unadmitted Scheme Creditors in accordance with the terms of this Deed and the Holding Period Trust Agreement.

(b)    Immediately following the completion of the sub-steps set out in Clause 5.3(b) and paragraphs (a)(i) and (a)(ii) above, the Company shall date, (where applicable) complete, release and (where applicable) deliver each New Security Document (or, in the case of any New Security Document that is a Notarial Security Document, procure that each such Notarial Security Document is entered into by the relevant parties thereto).

(c)    Immediately following the completion of the sub-step set out in paragraph (b) above:

(i)    the Company shall date each Certificate; and

(ii)   each Legal Opinion shall be issued.

(d)    This Step shall take place simultaneously with the Step set out in Clause 5.3 (Step 2 – release of Scheme Claims and Existing Security).

**5.5    Step 4 – issuance of shares in Jersey Newco**

(a)    Jersey Newco shall allot and issue the Jersey Newco Consideration Shares to:

(i)    each Scheme Creditor (other than an Unadmitted Scheme Creditor in respect of the Jersey Newco Shares) or its Nominee (as applicable) such that the relevant Scheme Creditor or its Nominee (as applicable) receives Jersey Consideration Newco Shares in an aggregate amount equal to that Scheme Creditor's Jersey Newco Share Entitlement; and

(ii)   the Holding Period Trustee (on behalf of each Unadmitted Scheme Creditor in respect of the Jersey Newco Shares) such that the Holding Period Trustee receives Jersey Newco Consideration Shares in an amount equal to the aggregate of each Unadmitted Scheme Creditor's Jersey Newco Share Entitlement (with the Holding Period Trustee holding such Unadmitted Entitlements on trust for the relevant Unadmitted Scheme Creditors in accordance with the terms of this Deed and the Holding Period Trust Agreement),

and any such issuance and allocation shall take into account any Jersey Newco Shares held by a Scheme Creditor prior to this Step to ensure that, as at the Restructuring Effective Date, the number of Jersey Newco Shares held by each Scheme Creditor is consistent with its Jersey Newco Share Entitlement.

(b)    Jersey Newco shall update its register of members and take any other action necessary in connection with the allotment and issuance of the Jersey Newco Consideration Shares.

(c)    This Step shall take place simultaneously with the Step set out in Clause 5.3 (Step 2 – release of Scheme Claims and Existing Security).

**5.6    Step 5 – execution of Jersey Newco Investment Agreement**

(a)    The Company shall date and release the Jersey Newco Investment Agreement.

(b)    Jersey Newco and the relevant shareholders of Jersey Newco shall procure that the Jersey Newco Articles of Association are adopted.

(c)    This Step shall take place simultaneously with the Step set out in Clause 5.3 (Step 2 – release of Scheme Claims and Existing Security).

**5.7    Step 6 – appointment of new directors**

(a)    The directors of Jersey Newco shall pass such resolutions as are necessary to:

(i)    appoint [●] to the boards of directors of Jersey Newco (in each case to the extent not already appointed); and

(ii)    to effect the removal of any other directors from the board of Jersey Newco.

(b)    This Step shall take place simultaneously with the Step set out in Clause 5.3 (Step 2 – release of Scheme Claims and Existing Security).

**5.8    Step 7 – Releases**

The Company shall date, release and deliver the Deed of Release.

**5.9    Step 8 – delivery of Restructuring Effective Date Notice**

Immediately following the completion of the Steps described in Clauses 5.2 (Step 1 – transfer of Jersey Newco to certain Scheme Creditors) to 5.8 (Step 7 – Releases), the Company shall deliver the Restructuring Effective Date Notice to the Notice Parties notifying them that Restructuring has been implemented and that the Restructuring Effective Date has occurred.

**6.    POST-RESTRUCTURING EFFECTIVE DATE STEPS**

(a)    Provided that each Participating Shareholder and Holdco has at all times complied with all of its obligations under the Lock-up Agreement, on the Business Day immediately following the Restructuring Effective Date, Jersey Newco shall, subject to paragraph (b) below, issue the Warrants to the Participating Shareholders pro rata to each such Participating Shareholder's shareholding in Holdings I as at the Restructuring Effective Date (excluding any shareholdings in Holdings I that are held by shareholders of Holdings I that are not Participating Shareholders).

(b)    If the issue of the Warrants in accordance with paragraph (a) above would result in a breach of any limitation on the number of warrant holders contained in the Control of Borrowing (Jersey) Order 1958, the Warrants shall be issued to the Participating Shareholders on an allocation basis to be agreed by Jersey Newco and the Participating Shareholders (each acting in good faith) and Jersey Newco shall be under no obligation to issue the Warrants if an agreement on the allocation of the Warrants has not been reached with the Participating Shareholders.

(c)     Within 60 Business Days of the Restructuring Effective Date, the Company must apply to The International Stock Exchange Authority Limited for the listing and permission to deal in the New Notes on the Official List of the International Stock Exchange.

## 7.     ALLOCATION AND DISTRIBUTION OF SCHEME CONSIDERATION

(a)     Subject to the other provisions of this Deed, each Scheme Creditor may only receive the Scheme Consideration in accordance with the provisions of this Clause 7 (Allocation and Distribution of Scheme Consideration).

(b)     A Scheme Creditor (and/or, if relevant, its Nominee) shall only receive the Scheme Consideration on the Restructuring Effective Date if it:

(i)     has duly elected to do so by validly completing and delivering an Account Holder Letter and/or Lender Claim Form (as applicable) to the Information Agent before the Voting Instruction Deadline;

(ii)    is an Eligible Person; and

(iii)   in the case of the Jersey Newco Consideration Shares only, has provided the know-your-customer information (the **Jersey Newco KYC**) set out in the Schedule (Jersey Newco KYC Requirements) to the Account Holder Letter or Schedule 1 (Jersey Newco KYC Requirements) to the Lender Claim Form (as applicable) in a form satisfactory to the Jersey registrar of Jersey Newco.

(c)     A Scheme Creditor may elect for a Nominee to receive all of its proportion of the New Notes and/or the Jersey Newco Consideration Shares on the Restructuring Effective Date, provided that:

(i)     to make such election, such Scheme Creditor must have validly completed and delivered an Account Holder Letter and/or Lender Claim Form (as applicable) to the Information Agent prior to the Voting Instruction Deadline;

(ii)    such Nominee has executed and delivered a Securities Confirmation Deed as a deed;

(iii)   such Nominee must be an Eligible Person.

(d)     Each Scheme Creditor (and/or its Nominee, as applicable) shall, subject to paragraphs (e) and (f) below, receive a proportion of the Scheme Consideration equal to its Scheme Creditor Entitlement (without double counting).

(e)     If the number of Jersey Newco Consideration Shares to be issued to a Scheme Creditor and/or its Nominee resulting from any calculation made in accordance with its Scheme Creditor Entitlements is not a whole number, that number shall be rounded down to the nearest whole number of shares.

(f)     If the principal amount of New Notes to be issued to a Scheme Creditor resulting from any calculation made in connection with the calculation of the New Notes Entitlements is not a whole number of dollars, that number shall be rounded down to the nearest dollar and the relevant Scheme Creditor shall have no entitlement to any fractional amount.

(g)     Each Scheme Creditor (or its Nominee, as applicable) and the Holding Period Trustee waives:

(i)     any entitlement it may have to receive a share certificate for any Jersey Newco Shares issued to it; and

(ii)    any obligation on Jersey Newco to hold annual general meetings.

(h)    Jersey NewCo shall not, and no Party shall on behalf of Jersey NewCo, make any entity classification election under Treasury Regulation section 301.7701-3 for Jersey NewCo to be treated as a disregarded entity or a partnership for US federal income tax purposes.

(i)    If a Scheme Creditor does not satisfy the requirements of this Clause 7 (Allocation and Distribution of Scheme Consideration) to be able to receive the Scheme Consideration on the Restructuring Effective Date, such Scheme Creditors' Scheme Consideration will be issued on the Restructuring Effective Date to the Holding Period Trustee to hold on in accordance with Clause 8 (Holding Period Trustee) and the Holding Period Trust Agreement and the provisions of paragraphs (e) and (f) above shall apply when calculating that Scheme Creditor's Scheme Consideration.

## 8.    HOLDING PERIOD TRUSTEE

(a)    If a Scheme Creditor (or its Nominee, as applicable) is not issued with its proportion of the New Notes and/or the Jersey Newco Shares in accordance with Clauses 5 (Restructuring Steps) and 7 (Allocation and Distribution of Scheme Consideration) (such Scheme Creditors, being the **Unadmitted Scheme Creditors** and each an **Unadmitted Scheme Creditor**) such Unadmitted Scheme Creditors' proportion of the New Notes and/or Jersey Newco Consideration Shares (the **Unadmitted Entitlements**) shall instead be issued and delivered to the Holding Period Trustee on the Restructuring Effective Date who will hold such Unadmitted Entitlements (and any Related Rights) on trust for the relevant Unadmitted Scheme Creditor (the **Trust Entitlements**), subject to the terms of the Holding Period Trust Agreement, until the expiry of the Holding Period.

(b)    Any Unadmitted Entitlements shall be issued to the Holding Period Trustee pursuant to Regulation S under the Securities Act.

(c)    An Unadmitted Scheme Creditor whose Unadmitted Entitlements have been issued to the Holding Period Trustee pursuant to paragraph (a) above may, prior to the expiry of the Holding Period, request the Holding Period Trustee in writing to transfer (and the Holding Period Trustee shall transfer) the relevant Trust Entitlements to it (or its Nominee), provided that it:

(i)    has validly completed and delivered an Account Holder Letter and/or Lender Claim Form (as applicable) to the Information Agent, together with any such information, confirmation, representations or undertakings that the Information Agent may request;

(ii)    (or its Nominee) is an Eligible Person;

(iii)    (or its Nominee) agrees to adhere to the Jersey Newco Investment Agreement; and

(iv)    only in the case of any Trust Entitlements that are Jersey Newco Consideration Shares, has provided the Jersey Newco KYC in a form satisfactory to the Jersey registrar of Jersey Newco.

(d)    At the end of the Holding Period, the Holding Period Trustee will, as soon as reasonably practicable, use reasonable endeavours, including by the appointment of a Selling Agent or otherwise, to sell or otherwise dispose of the remaining Trust Entitlements for such cash consideration as it is able to obtain (after any taxes, withholding, deductions, fees, costs or any other expenses in connection therewith) (such consideration being the **Trust Entitlements Consideration**). The Holding Period Trustee shall, for a period of six months (the **Trust Entitlements Consideration Holding Period**), hold the Trust Entitlements Consideration on trust for each remaining Unadmitted Scheme Creditor pro rata to the Trust Entitlements Consideration raised from the sale of the relevant Unadmitted Scheme Creditor's Trust Entitlements. A Scheme Creditor whose Trust Entitlements have been sold or otherwise disposed of by the Holding Period Trustee pursuant to this paragraph (d) may at any time prior to the expiry of the Trust Entitlements Consideration Holding Period request the Holding Period Trustee in writing to transfer (and the Holding Period Trustee shall transfer) the relevant Trust Entitlements Consideration to it (or its Nominee) (after deducting any taxes, withholding, deductions, fees, costs, or any other

expenses in connection with such Trust Entitlements or Trust Entitlements Consideration), provided that it provides an executed Account Holder Letter and/or Lender Claim Form (as applicable), completed as appropriate, together with any relevant information, confirmation, representations or undertakings that the Holding Period Trustee may reasonably request.

(e)    Subject to paragraph (f) below, neither the Holding Period Trustee nor any person other than the relevant Unadmitted Scheme Creditor shall at any time whatsoever, either present or future, have any beneficial interest in the Trust Entitlements or the Trust Entitlements Consideration, until the expiry of the Holding Period or the Trust Entitlements Consideration Holding Period (as applicable).

(f)    Notwithstanding paragraph (e) above, at the end of the Trust Entitlements Consideration Holding Period, the Holding Period Trustee will pay or deliver the beneficial interest in any remaining Trust Entitlements or Trust Entitlements Consideration held by the Holding Period Trustee to Alpha or to any person nominated by Alpha.

(g)    Any interest, dividends, distributions, repayments or prepayments (or any other rights or benefits) paid to the Holding Period Trustee from time to time in respect of the Trust Entitlements or the Trust Entitlements Consideration shall form part of the Trust Entitlements or the Trust Entitlements Consideration and be dealt with in accordance with the terms of the Holding Period Trust Agreement.

(h)    Each Party acknowledges and agrees that the Holding Period Trustee has the power to appoint an additional or replacement trustee over the Trust Entitlements or the Trust Entitlements Consideration at any time, subject to any additional or replacement trustee agreeing to be bound by the terms of this Deed and the Holding Period Trust Agreement.

## 9.    ACKNOWLEDGEMENTS, INSTRUCTIONS AND RATIFICATIONS

(a)    Each Existing LC and Undertaking Facility Lender acknowledges and agrees that the Restructuring Steps and the implementation of the Restructuring will not affect, amend, vary or waive the rights of any beneficiary under any Existing Instrument.

(b)    The Obligors and the Locked-up Creditors agree and acknowledge that:

(i)    save to the extent of any inconsistency between the terms of the Lock-up Agreement and the terms of the Scheme (including the transactions contemplated by this Deed) the Lock-up Agreement shall, until terminated in accordance with its terms, remain in full force and effect; and

(ii)    the Long Stop Date (as defined in the Lock-up Agreement) shall be automatically extended if (and on each occasion) the Long Stop Date is extended in accordance with the terms of this Deed such that the Long Stop Date (as defined in the Lock-up Agreement) and the Long Stop Date shall at all times be the same date.

(c)    Each Scheme Creditor and each Existing LC and Undertaking Facility Lender:

(i)    irrevocably instructs:

(A)    the Company to execute and deliver the Existing Security Release Instruction to the Term Loan Administrative Agent (in its capacity as Administrative Agent (under and as defined in the Existing Intercreditor Agreement)) and the Existing Trustee (in its capacity as Senior Secured Notes Trustee and Pari Passu Debt Representative (each under and as defined in the Existing Intercreditor Agreement)); and

(B)    upon receipt of the executed Existing Security Release Instruction, the Term Loan Administrative Agent (in its capacity as Administrative Agent (under and as defined

in the Existing Intercreditor Agreement)) and the Existing Trustee (in its capacity as Senior Secured Notes Trustee and Pari Passu Debt Representative (each under and as defined in the Existing Intercreditor Agreement)) to execute and deliver the Existing Security Agent Instruction to the Existing Security Agent;

(ii)    irrevocably instructs the Existing Administrative Agents to execute and deliver to A&O as if it was a Party to this Deed each Security and Guarantees Release Document to which it is expressed to be a party and ratifies any steps taken by the Existing Administrative Agents pursuant to this Deed or any Security and Guarantees Release Document whether before, on or after the Effective Date;

(iii)    acknowledges, confirms and irrevocably ratifies all actions taken by each Existing Administrative Party pursuant to the Restructuring, the Scheme and this Deed including (without limitation):

(A)    each Existing Administrative Party having executed and delivered a deed of undertaking in favour of the Court in connection with the Scheme;

(B)    the Existing Trustee having agreed not to vote in relation to the Scheme; and

(C)    any steps taken or to be taken by the Existing Trustee to effect the cancellation of the Existing Notes in accordance with the Restructuring Steps.

(d)    The Existing Security Agent and the Existing Administrative Agents shall be entitled to rely on this paragraph (d) and paragraphs (c)(i) and (c)(ii) above and each Existing Administrative Party shall be entitled to rely on this paragraph (d) and paragraph(c)(iii), in each case as an express third party beneficiary thereof.

## 10.    CALCULATION OF OVERDRAFT SCHEME CLAIM

(a)    In relation to the Existing Overdraft Provider, the amount of the Existing Overdraft Liabilities to be compromised by the Scheme and this Deed (being a Scheme Claim) shall be an amount equal to the aggregate net balance on the Overdraft Accounts and any accrued and unpaid interest and fees under the Existing Overdraft Facilities, in each case, as calculated by the Company with reference to the balances of the Overdraft Accounts at the Existing Overdraft Record Time (the **Compromised Overdraft Amount**), provided that the maximum Compromised Overdraft Amount for the purposes of the Scheme and this Deed shall not exceed $115,000,000 plus the aggregate amount of any accrued and unpaid interest and fees under the Existing Overdraft Facilities as at the Existing Overdraft Record Time.

(b)    For the purposes of calculating the Compromised Overdraft Amount, any amounts under the Existing Overdraft Facilities that are denominated in a currency other than dollars shall be converted into dollars by the Company using the HSBC Mid-Market Rate (or if the HSBC Mid-Market Rate is not accessible by the Company at the Existing Overdraft Record Time, the Bank of England Exchange Rate).

(c)    The Existing Overdraft Liabilities shall be released in accordance with Clause 5.3 (Step 2 – release of Scheme Claims and Existing Security) in an amount equal to the Compromised Overdraft Amount and, for the purposes of the Scheme, such amount shall be represented by the debit balances in the following bank accounts held with the Existing Overdraft Provider and in the following order:

(i)    the bank account in the name of Abbot Group Limited with account number 60230006 and sort code 401276; and

(ii)  to the extent necessary, such other bank account operated as part of the Existing Overdraft Facilities as the Company may notify the Existing Overdraft Provider in writing on, or as soon as practicable following, the Restructuring Effective Date.

(d)  For the avoidance of doubt, the remaining credit and debit balances in the bank accounts operated as part of the Existing Overdraft Facilities following the release of the relevant Scheme Claim pursuant to paragraph (c) above shall be deemed to be the opening credit and debit balances for the purposes of the overdraft arrangements provided for in the New Cash Management Facilities Agreement.

## 11.    HOLDCO LIQUIDATION

(a)  Subject to paragraph (b) below, the Parties agree that the Alpha Group shall:

(i)  fund the costs and expenses of an orderly liquidation of each of the Holdcos following the Restructuring Effective Date in full;

(ii)  ensure that the benefit of any directors and officer's insurance policy and any other indemnity (including any run-off coverage related thereto) in place with respect to the applicable Relevant Directors remains in full force and effect following the Restructuring Effective Date for a period of 3 years;

(iii)  administer and coordinate the orderly solvent liquidation of each of the Holdcos following the Completion Date;

(iv)  make its employees and officers available (where reasonably necessary) to support and help to facilitate the transactions referred to in sub-paragraph (a)(iii); and

(v)  fund the legal fees of each of the Holdcos, the Existing Shareholders and (from the Restructuring Effective Date) Alpha II in connection with this Deed and the transactions referred to in sub-paragraph (a)(iii) above.

(b)  The funding by the Alpha Group referred to in paragraph (a) (above shall be limited to:

(i)  the items specified in schedule 16 (Liquidation and Related Costs) to the Lock-up Agreement and capped at the respective amounts specified therein;

(ii)  any accrued and irrecoverable VAT payments that may be payable by any of the Holdcos in respect of those items; and

(iii)  any other item that may be otherwise reasonably requested to be funded by a Holdco in connection with its solvent liquidation in the good faith opinion of its directors as confirmed to and approved by the directors of Alpha, such approval not to be unreasonably withheld or delayed.

## 12.    TERMINATION

(a)  Subject to Clause 13 (Survival), this Deed will terminate automatically and without the need for any further action by or on behalf of any person or Party on the earlier of:

(i)  if the Restructuring Steps have not been completed in accordance with the terms of this Deed and the Scheme on or before the Long Stop Date, the Long Stop Date; and

(ii)  the date on which the Holding Period ends.

(b)  This Deed may be terminated:

(i)     at the election of the Super Majority Creditors and the New Bilateral Lenders by serving a written notice on the Company if the Company or any other Obligor takes any action which is materially inconsistent with or prejudicial to the implementation of the Restructuring; or

(ii)    by unanimous written consent of the Parties.

(c)    In the event of the termination of this Deed under this Clause 12 (Termination), the Parties reserve any and all rights and remedies they may have against any of the other Parties which have accrued or arisen prior to the Termination Date and agree that after the Termination Date, they may enforce those rights and remedies to their full extent notwithstanding the termination of this Deed or any term to the contrary contained herein.

(d)    If this Deed is terminated or terminates in accordance with its terms prior to the occurrence of the Restructuring Effective Date then the Parties agree:

(i)     that any of the Restructuring Steps completed or actions taken under this Deed prior to termination will be deemed not to have been completed or taken and shall have no legal or binding effect (in law or otherwise) and will be deemed to be null and void and to have never occurred pursuant to the Scheme or this Deed;

(ii)    following termination, to the extent permitted by law, and subject to paragraph (iii) below, to take such steps necessary or desirable to reverse any steps already taken in contemplation of the implementation of the Restructuring such that each relevant Party, to the extent legally and practically possible, shall be put back into the position it was in prior to such step, with any such reasonable costs or expenses incurred by a Party arising therefrom to be borne by the Company (provided that the Company has agreed in writing to meet such costs and expenses); and

(iii)   to the extent that the Company does not agree to pay the costs and expenses set out in paragraph (ii) above, no Party shall be required to take steps necessary or desirable to reverse any steps already taken in contemplation of the implementation of the Restructuring if those steps would necessitate the incurrence of material out-of-pocket expenses by that Party.

## 13.   SURVIVAL

The rights (and obligations) of the Parties under this Deed, under this Clause 13 Survival, , Clause 16 (Notices), Clause 17 (Third party rights), Clause 18 (Specific performance), Clause 19 (Reservation of rights), Clause 21 (Miscellaneous), Clause 22 (Parties' rights and obligations), Clause 23 (Counterparts), Clause 24 (Governing law) and Clause 25 (Enforcement), and the rights and obligations of the Parties in respect of breaches of this Deed which have accrued prior to the Termination Date shall, in each case, continue notwithstanding the occurrence of the Termination Date.

## 14.   REPRESENTATIONS AND WARRANTIES

Each Obligor, Holdco and Newco represents and warrants to each of the other Parties as to itself, as at the Effective Date and on the Restructuring Effective Date that:

(a)    it, and if applicable, the duly authorised attorney acting on its behalf, has all requisite power, authority and legal capacity to execute, deliver and perform its obligations under this Deed, and to consummate the transactions contemplated by the Restructuring;

(b)    the execution, delivery and performance by it of this Deed has been duly authorised by all necessary corporate or other organisational action on its behalf;

(c)    this Deed has been duly and validly executed and delivered by it and is a binding obligation enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganisation, moratorium, procedural and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity); and

(d)    it is duly incorporated and validly existing under the laws of the jurisdiction of its incorporation or formation.

## 15.   AMENDMENTS AND FURTHER ASSURANCE

(a)    Subject to paragraphs (b) to (d) below, or unless expressly permitted under the terms of this Deed, this Deed may be amended or waived only with the consent of:

    (i)    the Company;

    (ii)    the Super Majority Creditors; and

    (iii)    the New Bilateral Lenders.

(b)    An amendment or waiver which, in each case, is of a minor or technical nature may be made with the consent of the Company provided that the amendment or waiver:

    (i)    is necessary or desirable for the implementation of the Restructuring; and

    (ii)    would not have a materially adverse effect on the interests of the Company, a Scheme Creditor, an Administrative Party or the New Bilateral Lenders.

(c)    Subject to paragraph (d) below and provided that it would not adversely affect any other Party, any Russian FDI-Related Amendment may be made with the consent of the Company and each Prospective Major Shareholder.

(d)    The definitions of "Existing Security Release Instruction" and "Existing Security Agent Instruction", Clause 4.2 (Waiver of Restructuring Conditions Precedent), paragraphs (c) and (d) of Clause 9 (Acknowledgements, Instructions and Ratifications), Schedule 6 (Existing Security Release Instruction) and paragraph 14 of Schedule 7 (Restructuring Conditions Precedent) may only be amended with the consent of each Existing Administrative Party. Each Existing Administrative Party shall be entitled to rely on this paragraph (c) as an express third party beneficiary thereof.

(e)    Each Scheme Creditor shall, within two Business Days of written request from the Information Agent, provide the Information Agent with a list of its Affiliates (as that terms is defined in the Jersey Newco Investment Agreement) that are also Scheme Creditors.

(f)    If any Scheme Creditor fails to accept or refuse a request for a consent, waiver, amendment of or in relation to any of the terms of this Deed or other vote of Scheme Creditors under the terms of this Deed within 10 Business Days (unless the Company agrees to a longer time period in relation to any request) of that request being received by the Information Agent and notified to the Scheme Creditors, its Scheme Claims shall not be included for the purpose of calculating the value of the Scheme Claims when ascertaining whether any relevant percentage (including, for the avoidance of doubt, unanimity) in value of the Scheme Claims has been obtained to approve that request.

(g)    Each Party shall promptly, at the request of any other Party, execute and deliver such other documents, notices or instructions and take such actions reasonably necessary or desirable to implement the transactions contemplated by the Scheme, this Deed or any other Restructuring Document provided

that no Party shall be required to incur any material out-of-pocket costs or expenses unless the Company has agreed in writing to meet those costs or expenses.

**16.    NOTICES**

(a)    Any communication made or received or any notice or confirmation to be provided under or in connection with this Deed may be made or received by a Party's Adviser on behalf of that Party, and, if so made or received, shall be deemed to be made or received by such Party.

(b)    Any notice or other written communication to be given under or in relation to this Deed must be given in the English language by email to the email address as set out below (or in the case of any communication or notice given to an Adviser on behalf of a Party in accordance with paragraph (a) above, the relevant Adviser Email Address).

(c)    The addresses for notices are as follows:

    (i)    in the case of the Company:

        Email:        Neil.Gilchrist@kcadeutag.com and Tony.Byrne@kcadeutag.com

        Attention:     the CFO and General Counsel

        with a copy to A&O at:

        Email:        Kelly_A&O_Core_Finance_Team@AllenOvery.com

        Attention:     Ian Field / James Graham

    (ii)    in the case of notices to all Scheme Creditors, via the Information Agent at:

        Email:        kcadeutag@lucid-is.com

        Attention:     Oliver Slyfield

    (iii)    in the case of any other person, any email address set forth for that person on their signature page to this Deed or in any agreement entered into in connection with this Deed.

(d)    Any notice or other written communication to be given under this Deed shall be deemed to have been served:

    (i)    in the case of any Party other than a Scheme Creditor, at the time of transmission if sent by email; and

    (ii)    in the case of Scheme Creditors only, when such notice or other written communication is published on the Scheme Website,

provided, in each case, such notice or other written communication is in legible form.

(e)    The accidental omission to send any notice, written communication or other document in accordance with paragraphs (a) to (d) above, or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of this Deed.

(f)    All communications under this Deed to or from an Obligor (other than the Company) must be sent through the Company.

(g)     Any communication given to the Company in connection with this Deed will be deemed to have also been given to the other Obligors.

## 17.    THIRD PARTY RIGHTS

Unless otherwise provided in this Deed, a person who is not a Party to this Deed may not enforce any of its terms under the Contracts (Rights of Third Parties) Act 1999 and, notwithstanding any term of this Deed, no consent of any third party is required for any amendment, waiver, release, compromise or termination of this Deed.

## 18.    SPECIFIC PERFORMANCE

The Parties agree that monetary damages would not be a sufficient remedy for the breach by any Party of any term of this Deed.  Any non-breaching Party may seek specific performance and injunctive or other equitable relief as a remedy for any such breach.  Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies which any Party may have under this Deed or otherwise.

## 19.    RESERVATION OF RIGHTS

If the transactions contemplated by this Deed are not consummated in full or this Deed is terminated for any reason, the Scheme Creditors and the Existing Ancillary Lenders fully reserve all of their rights and remedies under or in connection with the Existing Debt Documents.

## 20.    SEVERABILITY

If a term of this Deed is or becomes illegal, invalid or unenforceable in any jurisdiction, that will not affect:

(a)     the legality, validity or enforceability of any other term of this Deed; or

(b)     the legality, validity or enforceability in other jurisdictions of that term or any other term of this Deed.

## 21.    MISCELLANEOUS

### 21.1    Performance of obligations on dates other than a Business Day

If any obligation is to be performed under the terms of this Deed on a date other than a Business Day and is not capable of being performed on such date, the relevant obligation shall be performed on the next Business Day.

## 22.    PARTIES' RIGHTS AND OBLIGATIONS

(a)     The obligations of each Party under this Deed are several.  Failure by a Party to perform its obligations under this Deed does not affect the obligations of the other Parties under this Deed.

(b)     The rights of each Party under or in connection with this Deed are separate and independent rights.  A Party may separately enforce its rights under this Deed.

## 23.    COUNTERPARTS

(a)     This Deed may be signed by the Parties in any number of counterparts.  This has the same effect as if the signatures on the counterparts were on a single copy of this Deed.

(b)    Unless otherwise provided for in the execution pages, it is acknowledged that a Party signing in one capacity in the execution pages to this Deed will not be deemed to have signed this Deed in any other capacity.

## 24.    GOVERNING LAW

This Deed (including any non-contractual obligations arising out of or in connection with this Deed) shall be governed by English law.

## 25.    ENFORCEMENT

(a)    Each Party agrees that the courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Deed or any non-contractual obligations arising out of or in connection with it.

(b)    Each Party agrees that the courts of England are the most appropriate and convenient courts to settle any such disputes and accordingly no Party will argue to the contrary.

(c)    References in this Clause 25 (Enforcement) to a dispute in connection with this Deed include any dispute as to the existence, validity or termination of this Deed.

**THIS DEED** has been entered into and delivered on the date stated at the beginning of this Deed.

## SCHEDULE 1

## PARTIES

## PART 1

## THE OTHER OBLIGORS

| Obligor name | Jurisdiction of incorporation |
|---|---|
| KCA Deutag US Finance LLC | Delaware |
| Abbot Group Limited | England |
| Abbot Holdings Limited | England |
| Abbot Investments (North Africa) Limited | England |
| KCA Deutag (Land Rig) Limited | England |
| KCA Deutag Alpha Limited | England |
| KCA Deutag Caspian Limited | England |
| KCA Deutag Drilling Group Limited | England |
| KCA European Holdings Limited | England |
| Abbot Verwaltungsgesellschaft mbH | Germany |
| Bentec GmbH Drilling & Oilfield Systems | Germany |
| KCA Deutag Drilling GmbH | Germany |
| KCA Deutag GmbH | Germany |
| KCA Deutag Tiefbohrgesellschaft mbH | Germany |
| KCA Deutag Europe BV | Netherlands |
| KCA Deutag Nederland BV | Netherlands |
| Abbot Holdings Norge AS | Norway |
| KCA Deutag Drilling Norge AS | Norway |
| KCA Deutag Drilling Offshore Services AS | Norway |
| KCA Deutag Holdings Norge AS | Norway |
| KCA Deutag MODU Operations AS | Norway |
| KCA Deutag Offshore AS | Norway |

**259**

| | |
|---|---|
| KCA Deutag Energy Global LLC | Oman |
| KCA Deutag Energy International LLC | Oman |
| KCA Deutag Energy LLC | Oman |
| KCA Deutag Energy National LLC | Oman |
| KCA Deutag Drilling LLC | Russia |
| KCA Deutag Russia LLC | Russia |
| KCA Deutag Gulf Drilling Limited Company | Saudi Arabia |
| KCA Deutag Drilling Limited | Scotland |
| KCA Deutag Technical Support Limited | Scotland |
| KCA Deutag Rig Design Services Limited | Scotland |
| SET Drilling Company Limited | Scotland |
| KCA Deutag Pte Ltd | Singapore |

## PART 2

## ADDITIONAL HOLDCOS

1.      KCAD Holdings I Limited

2.      KCAD Holdings II Limited

3.      KCA Deutag Finance I Limited

4.      KCA Deutag Finance II Limited

5.      KCA Deutag Midco Limited

6.      Land Rig Ventures I Limited

7.      Land Rig Ventures II Limited

8.      KCA Deutag Drilling Rigs I Limited

**261**

## PART 3

### THE EXISTING LC AND UNDERTAKING LENDERS

1.      Lloyds Bank plc in its capacity as lender under the Existing LC Facility

2.      First Abu Dhabi Bank PJSC in its capacity as lender under the Existing Undertaking Facility

**SCHEDULE 2**

**KEY RESTRUCTURING DOCUMENTS**

**PART 1**

**NEW NOTES INDENTURE**

**PART 2**

**NEW CASH MANAGEMENT FACILITIES AGREEMENT**

## PART 3

## NEW LC FACILITY AGREEMENT

**PART 4**

**FAB RUN-OFF LC FACILITY AGREEMENT**

## PART 5

### NEW INTERCREDITOR AGREEMENT

# PART 6

## JERSEY NEWCO INVESTMENT AGREEMENT

# PART 7

## JERSEY NEWCO SALE AND PURCHASE AGREEMENT

## PART 8

### DEED OF RELEASE

## PART 9

## HOLDING PERIOD TRUST AGREEMENT

# SCHEDULE 3

## JERSEY NEWCO ARTICLES OF ASSOCIATION

**SCHEDULE 4**

**WARRANTS**

## SCHEDULE 5

## NEW SECURITY DOCUMENTS

| # | New Security Document | KCAD Deutag Parties[2] | Other Parties[3] |
|---|---|---|---|
| English law | | | |
| 1. | English debenture | English Newco 2<br><br>Abbot Group Limited<br><br>Abbot Holdings Limited<br><br>KCA Deutag (Land Rig) Limited<br><br>KCA Deutag Alpha Limited<br><br>KCA Deutag Caspian Limited<br><br>KCA Deutag Drilling Group Limited<br><br>KCA European Holdings Limited<br><br>KCA Deutag UK Finance PLC | Lucid    Trustee Services Limited |
| 2. | English law Receivables Security Agreement | KCA Deutag Energy International LLC<br><br>KCA Deutag Energy LLC | As above |
| Dutch law | | | |
| 3. | Dutch share pledge agreement<br><br>*[Notarised]* | KCA European Holdings Limited *(E&W)*<br><br>KCA Deutag Europe B.V.<br><br>KCA Deutag Nederland B.V. | As above |
| 4. | Dutch Omnibus Security Agreement | KCA Deutag Europe B.V.<br><br>KCA Deutag Nederland B.V. | As above |
| German law | | | |
| 5. | German share pledge agreement<br><br>*[Notarised]* | KCA Deutag Drilling Group Ltd *(E&W)*<br><br>KCA Deutag GmbH<br><br>Abbot Verwaltungsgesellschaft mbH | As above |

---

[2] Please note that Parties signing in more than one capacity are only listed once.
[3] Please note that Parties signing in more than one capacity are only listed once.

| # | New Security Document | KCAD Deutag Parties[2] | Other Parties[3] |
|---|---|---|---|
| | | KCA Deutag Europe B.V. *(the Netherlands)* | |
| | | KCA Deutag Nederland B.V. *(the Netherlands)* | |
| | | Bentec GmbH Drilling & Oilfield Systems | |
| | | KCA Deutag Drilling GmbH | |
| | | KCA Deutag Tiefbohrgesellschaft mbH | |
| 6. | German Account Pledge Agreement | Abbot Verwaltungsgesellschaft mbH | As above |
| | | Bentec GmbH Drilling & Oilfield Systems | |
| | | KCA Deutag Drilling GmbH | |
| | | KCA Deutag GmbH | |
| | | KCA Deutag Tiefbohrgesellschaft mbH | |
| 7. | German Receivables Assignment Agreement | Abbot Verwaltungsgesellschaft mbH | As above |
| | | Bentec GmbH Drilling & Oilfield Systems | |
| | | KCA Deutag Drilling GmbH | |
| | | KCA Deutag GmbH | |
| | | KCA Deutag Tiefbohrgesellschaft mbH | |
| Norwegian law | | | |
| 8. | Norwegian share pledge agreement | KCA Deutag Holdings Norge AS | As above |
| 9. | Norwegian share pledge agreement | KCA Deutag Holdings Norge AS | As above |
| 10. | Norwegian share pledge agreement | KCA Deutag Offshore AS | As above |
| 11. | Norwegian share pledge agreement | KCA Deutag Drilling Limited *(Scotland)* | As above |

| # | New Security Document | KCAD Deutag Parties[2] | Other Parties[3] |
|---|---|---|---|
| 12. | Norwegian share pledge agreement | KCA Deutag Drilling Norge AS | As above |
| 13. | Norwegian share pledge agreement | Abbot Holdings Norge AS | As above |
| 14. | Norwegian Security Agreement | Abbot Holdings Norge AS | As above |
| 15. | Norwegian Security Agreement | KCA Deutag Drilling Norge AS | As above |
| 16. | Norwegian Security Agreement | KCA Deutag Drilling Offshore Services AS | As above |
| 17. | Norwegian Security Agreement | KCA Deutag Holdings Norge AS | As above |
| 18. | Norwegian Security Agreement | KCA Deutag MODU Operations AS | As above |
| 19. | Norwegian Security Agreement | KCA Deutag Offshore AS | As above |
| Omani law | | | |
| 20. | Omani Account Pledge Agreement | KCA Deutag Energy International LLC KCA Deutag Energy LLC | As above |
| KSA law | | | |
| 21. | KSA Account Pledge Agreement | KCA Deutag Gulf Drilling Limited | As above |
| 22. | KSA Receivables Pledge Agreement | KCA Deutag Gulf Drilling Limited | As above |
| 23. | Share Pledge Agreement | KCA Deutag (Land Rig) Limited | As above |
| Scottish law | | | |
| 24. | Scottish Bond and Floating Charge | KCA Deutag Drilling Limited | As above |
| 25. | Scottish Bond and Floating Charge | KCA Deutag Technical Support Limited | As above |
| 26. | Scottish Bond and Floating Charge | SET Drilling Company Limited | As above |
| 27. | Scottish Deed of Pledge of Shares | KCA Deutag Drilling Group Limited *(E&W)* | As above |
| 28. | Scottish Deed of Pledge of Shares | KCA Deutag Drilling Group Limited *(E&W)* | As above |

| # | New Security Document | KCAD Deutag Parties[2] | Other Parties[3] |
|---|---|---|---|
| 29. | Scottish Deed of Pledge of Shares | KCA Deutag GmbH *(Germany)*<br><br>KCA Deutag Drilling Group Ltd *(E&W)* | As above |

## SCHEDULE 6

## EXISTING SECURITY RELEASE INSTRUCTION

To: **GOLDMAN SACHS LENDING PARTNERS LLC** in its capacity as Administrative Agent (as defined in the Existing Intercreditor Agreement (as defined below))

**DEUTSCHE TRUSTEE COMPANY LIMITED** in its capacity as Senior Secured Notes Trustee and Pari Passu Debt Representative (in each case as defined in the Existing Intercreditor Agreement).

Dated: _____ 2020

**Existing Security Release Instruction**

## 1.    BACKGROUND

1.1    We refer to the restructuring implementation deed entered into by KCA Deutag UK Finance PLC dated on or around the date of this letter (the **Restructuring Implementation Deed**). Terms defined in the Restructuring Implementation Deed have the same meaning in this letter unless given a different meaning in this letter.

1.2    We also refer to the:

(a)    the Credit Agreement;

(b)    each Existing Indenture; and

(c)    the Existing Intercreditor Agreement.

1.3    The provisions of clause 1.2 (Construction) of the Restructuring Implementation Deed apply to this letter as though they were set out in full in this letter except that references to this Deed are to be construed as references to this letter.

1.4    This letter is sent pursuant to and in connection with the Restructuring Implementation Deed.

## 2.    AUTHORITY TO INSTRUCT

2.1    Pursuant to and in accordance with the terms of the Credit Agreement, the Administrative Agent shall act in accordance with valid instructions its receives from the requisite majority of the Senior Secured Facilities Lenders.

2.2    Pursuant to and in accordance with the terms of the 2021 Notes Indenture, the Senior Secured Notes Trustee shall act in accordance with valid instructions its receives from the requisite majority of the Senior Secured Noteholders.

2.3    Pursuant to and in accordance with the terms of the 2022 Notes Indenture and the 2023 Notes Indenture, the Pari Passu Debt Representative shall act in accordance with valid instructions given by the requisite majority of the Pari Passu Creditors.

2.4    This letter is sent to you by the Company on behalf of all the:

(a)    the Senior Secured Facilities Lenders;

(b)      the Senior Secured Noteholders; and

(c)      the Pari Passu Creditors,

in each case pursuant to the express authority granted by each Senior Secured Facilities Lender, Senior Secured Noteholder and Pari Passu Creditor pursuant to clause 9(c)(i) (Acknowledgements, Instructions and Ratifications) of the Restructuring Implementation Deed.

## 3.    SECURITY RELEASE CONFIRMATION AND INSTRUCTIONS TO THE EXISTING SECURITY AGENT

3.1    We hereby confirm that each Senior Secured Facilities Lender, Senior Secured Noteholder and Pari Passu Creditor:

(a)      approves the release of the Transaction Security (as defined in the Existing Intercreditor Agreement) in the manner set out in the Restructuring Implementation Deed; and

(b)      requests that the Existing Security Agent executes and delivers to the Company each Security and Guarantees Release Document and takes all other steps necessary to affect the release of the Transaction Security in the manner set out in the Restructuring Implementation Deed.

3.2    In order to facilitate the release of the Transaction Security by the Existing Security Agent in the manner contemplated in the Restructuring Implementation Deed, we hereby irrevocably authorise, instruct and direct you on behalf of each Senior Secured Facilities Lender, Senior Secured Noteholder and Pari Passu Creditor, to send the letter attached at Annex 1 (Instruction to the Security Agent) to this letter to the Existing Security Agent without delay.

## 4.    MISCELLANEOUS

4.1    This notice and any non-contractual obligations arising out of or in connection with it are governed by English law.

**279**

**KCA DEUTAG UK FINANCE PLC**

on behalf of each Senior Secured Facilities Lender,
Senior Secured Noteholder and Pari Passu Creditor


By:                    _____

Name:                    _____

Title:                    _____

## ANNEX 1

## INSTRUCTION TO THE SECURITY AGENT

To:    **LLOYDS BANK PLC** in its capacity as Security Agent (as defined in the Intercreditor Agreement (as defined below))

Dated: _____ 2020

**Security Release Instruction**

## 1.    BACKGROUND

1.1    We refer to the intercreditor agreement originally dated 15 March 2008 as amended and restated on 27 March 2008 by an amendment and restatement agreement, an amendment and restatement agreement dated 28 March 2011 and an amendment and restatement agreement dated 16 May 2014 (the **Intercreditor Agreement**).

1.2    We also refer to the restructuring implementation deed entered into by KCA Deutag UK Finance PLC (the **Scheme Company**) dated on or around the date of this letter (the **Restructuring Implementation Deed**).

1.3    Terms defined in the Intercreditor Agreement have the same meaning in this letter unless given a different meaning in this letter.

1.4    The provisions of clause 1.2 (Construction) of the Intercreditor Agreement apply to this letter as though they were set out in full in this letter except that references to the Intercreditor Agreement are to be construed as references to this letter.

1.5    In accordance with clause 9(c)(i) (Acknowledgements, Instructions and Ratifications) of the Restructuring Implementation Deed and pursuant to the existing security release instruction sent to us from the Scheme Company on or around the date of this letter, we are instructed by each Senior Secured Facilities Lender, Senior Secured Noteholder and Pari Passu Creditor to send you this letter.

## 2.    SECURITY RELEASE CONFIRMATION AND INSTRUCTIONS

2.1    We hereby confirm that each Senior Secured Facilities Lender, Senior Secured Noteholder and Pari Passu Creditor:

(a)    approves the release of the Transaction Security in the manner set out in the Restructuring Implementation Deed; and

(b)    requests that the Security Agent executes and delivers to the Scheme Company each Security and Guarantees Release Document and takes all other steps necessary to affect the release of the Transaction Security in the manner set out in the Restructuring Implementation Deed.

2.2    Accordingly, based on the instructions received from each Senior Secured Facilities Lender, Senior Secured Noteholder and Pari Passu Creditor, we, in our capacity as Administrative Agent, Senior Secured Notes Trustee and Pari Passu Debt Representative (as applicable) hereby irrevocably authorise, instruct and direct you to execute and deliver to the Scheme Company each Security and Guarantees Release Document (as defined in the Restructuring Implementation Deed) and to take all other steps necessary to affect the release of the Transaction Security in the manner set out in the Restructuring Implementation Deed.

**3.      MISCELLANEOUS**

3.1      This letter may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this letter.

3.2      This notice and any non-contractual obligations arising out of or in connection with it are governed by English law.

**SIGNATORIES**

**GOLDMAN SACHS LENDING PARTNERS
LLC**

in its capacity as Administrative Agent

By:                    _____

Name:                _____

Title:                 _____

**DEUTSCHE TRUSTEE COMPANY LIMITED**

in its capacity as Senior Secured Notes Trustee and
Pari Passu Debt Representative

By: _____

Name: _____

Title: _____

## SCHEDULE 7

## RESTRUCTURING CONDITIONS PRECEDENT

**Agreed Form** means, in respect of a document, the form agreed by the Company, the Ad-Hoc Committee, the New Bilateral Lenders, the Existing Administrative Agents, the Existing Security Agent and/or the New Security Agent (each an **Agreement Party**) (or their respective advisers on their behalf) as the context requires and any reference to an Agreement Party (or its adviser on its behalf) providing written confirmation that a document is **in Agreed Form** means such Agreement Party providing written confirmation that they agree with the form of such document.

**Data Room** means the electronic data room titled "Project Kelly" made available by Datasite in connection with the Restructuring.

**Jersey Newco**

1.    Written confirmation from the Ad-Hoc Committee (or its Advisers on its behalf) that it has received an undated certificate in the Agreed Form of an authorised signatory of Jersey Newco attaching:

(a)    a copy of its constitutional documents;

(b)    a specimen signature of each person authorised on behalf of each party to execute each of the Restructuring Documents to which it is a party;

(c)    a copy of resolutions or extracts of resolutions or minutes of the decision of the board of its directors (or other relevant body) and a shareholders' resolution in respect of the Restructuring and:

(i)    approving the terms of and the transactions contemplated by and authorising it to enter into each of the Restructuring Documents to which it is a party;

(ii)    authorising a specified person or persons to execute the Restructuring Documents to which it is a party on their behalf; and

(iii)    authorising a specified person or persons to sign and/or despatch all documents and notices (including, if relevant, any utilisation request and selection notice) to be signed and/or despatched by it under or in connection with the Restructuring Documents to which it is a party.

**Post-Restructuring Obligors, English Newco 1 and English Newco 2**

2.    Written confirmation from the Ad-Hoc Committee and the New Bilateral Lenders (or their respective Advisers on their behalf) that they have received:

(a)    an undated certificate in the Agreed Form of an authorised signatory of each Post-Restructuring Obligor, English Newco 1 and English Newco 2 confirming that the copy of its constitutional documents contained in the Data Room remains in force as at the Scheme Effective Time or attaching the updated or in the case of English Newco 2 a copy of its new constitutional documents;

(b)    an undated certificate in the Agreed Form of an authorised signatory of each Post-Restructuring Obligor, English Newco 1 and English Newco 2 attaching in each case:

(i)    (other than for each Post-Restructuring Obligor incorporated in Germany, Oman or Russia) copies of resolutions or extracts of resolutions or minutes of the decision of the board of its directors (or other relevant body) in respect of the Restructuring and:

(A)    approving the terms of and the transactions contemplated by and authorising it to enter into each of the Restructuring Documents to which it is a party;

(B)    authorising a specified person or persons to execute the Restructuring Documents to which it is a party on their behalf;

(C)    authorising a specified person or persons to sign and/or despatch all documents and notices (including, if relevant, any utilisation request and selection notice) to be signed and/or despatched by it under or in connection with the Restructuring Documents to which it is a party; and

(D)    in the case of a Post-Restructuring Obligor not incorporated in England and Wales (other than KCA Deutag Alpha Limited) authorising KCA Deutag Alpha Limited to act as its agent in connection with the New Debt Documents to which it is a party;

(ii)    in respect of each Post-Restructuring Obligor incorporated in England and Wales, Germany, the Netherlands, Oman, the Kingdom of Saudi Arabia, a copy of resolutions signed by all the holders of the issued shares in such Post-Restructuring Obligor, approving the terms of, and the transactions contemplated by, the Restructuring Documents to which such Post-Restructuring Obligor is a party;

(iii)    in respect of each Post-Restructuring Obligor incorporated in Scotland, copies of the unsigned and undated Scottish Shareholder Resolution (in the Agreed Form) of that Post-Restructuring Obligor (which will be replaced with signed copies of the relevant Scottish Shareholder Resolutions before the relevant certificate of that Post-Restructuring Obligor is dated on the Restructuring Effective Date in accordance with the Restructuring Steps);

(iv)    a specimen signature of each person authorised on behalf of each party to execute each of the Restructuring Documents to which it is a party;

(v)    in respect of each Post-Restructuring Obligor incorporated in Germany, a copy of the constitutional documents (*Satzung* or *Gesellschaftsvertrag* as applicable) or an up-to-date copy of the partnership agreement, an up-to-date commercial register extract (*Handelsregisterauszug*) dated no less than ten Business Days prior to the Scheme Effective Time and its list of shareholders (*Gesellschafterliste*);

(vi)    in respect of each Post-Restructuring Obligor incorporated in the Netherlands, a copy of an up-to-date extract of registration of the Trade Register of the Dutch Chamber of Commerce dated no less than ten Business Days prior to the Scheme Effective Time;

(vii)    in respect of each Post-Restructuring Obligor incorporated in Oman, a copy of its commercial registration certificate and Oman Chamber of Commerce and Industry certificate dated no less than ten Business Days prior to the Scheme Effective Time;

(viii)    in respect of each Post-Restructuring Obligor incorporated in the Kingdom of Saudi Arabia, a copy of the commercial registration and foreign investment licence; and

(ix)    in respect of each Post-Restructuring Obligor incorporated in Russia:

(A)     a copy of the certificate of registration of such Post-restructuring Obligor and, where applicable, a copy of certificates or lists of entry to the Unified State Register of Legal Entities confirming registration of the constitutional documents and any amendments to them;

(B)     an electronic copy of an extract from the Unified State Register of Legal Entities in relation to such Post-Restructuring Obligor issued by a competent tax authority and dated no less than ten Business Days prior to the Scheme Effective Time;

(C)     a copy of the certificate of registration of such Post-Restructuring Obligor as a taxpayer with the Russian tax authorities;

(D)     a copy of a corporate resolution of such Post-Restructuring Obligor on an alternative method of confirming the adoption of decisions by its participants together with a copy of a notarial certificate confirming the adoption of such corporate resolution (if required by law or the constitutional documents of such Post-Restructuring Obligor) ;

(E)     evidence of the authority of its relevant signatories to execute the Restructuring Documents to which it is party and any related documents ; and

(F)     written confirmation in relation to certain matters (including those set out in paragraph (d) below), executed by the authorised signatory;

(c)     in respect of each Post-Restructuring Obligor incorporated in England and Wales or Scotland, whose shares are the subject of the New Security Documents (a **Charged Company**), either:

(i)     a certificate of an authorised signatory of Alpha attaching a copy of the "PSC register" (within the meaning of section 790C(10) of the Companies Act 2006) of that Charged Company; or

(ii)     a certificate of an authorised signatory of Alpha certifying that such Charged Company is not required to comply with Part 21A of the Companies Act 2006;

(d)     an undated certificate in the Agreed Form of an authorised signatory of each Post-Restructuring Obligor and English Newco 2:

(i)     certifying that each copy document relating to it specified in this paragraph 2 of Schedule 6 is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of the Scheme Effective Time;

(ii)     (in the case of a Post-Restructuring Obligor not incorporated in Germany) confirming that borrowing or guaranteeing or securing, as appropriate, the commitments under the New Debt Documents would not cause any borrowing, guarantee, security or similar limit, as the case may be, binding on such Post-Restructuring Obligor or English Newco 2.

3.     In respect of each Post-Restructuring Obligor incorporated in Scotland, written confirmation from the Ad-Hoc Committee and the New Bilateral Lenders (or their respective Advisers on their behalf) that the resolutions (each a **Scottish Shareholder Resolution**):

(a)     to be signed on the Restructuring Effective Date in accordance with the Restructuring Steps by all the holders of the issued shares in such Post-Restructuring Obligor; and

(b)    approving the terms of, and the transactions contemplated by, the Restructuring Documents to which such Post-Restructuring Obligor is a party,

are in the Agreed Form.

4.    Written confirmation from the Company, the Ad-Hoc Committee, the New Bilateral Lenders, the Existing Security Agent (in respect of the Security and Guarantees Release Documents only), the Existing Administrative Agents (in respect of the Global Deed of Release only) and the New Security Agent (in respect of the New Security Documents only) (or, in each case, their respective advisers on their behalf) that:

(a)    each Security and Guarantees Release Document; and

(b)    each New Security Document,

is in Agreed Form.

**Legal opinions**

5.    Written confirmation from each New Bilateral Lender (or their respective Advisers on their behalf) that each of the following legal opinions is in Agreed Form in relation to the New Bilateral Facility Agreements, the New Security Documents and the Intercreditor Agreement, each addressed to each New Bilateral Lender and the New Security Agent:

(a)    a legal opinion from Linklaters LLP as English law counsel to the New Bilateral Lenders;

(b)    a legal opinion from Linklaters LLP as Dutch law counsel to the New Bilateral Lenders;

(c)    a legal opinion from Linklaters LLP as German law counsel to the New Bilateral Lenders;

(d)    a legal opinion from Wiersholm as Norwegian law counsel to the New Bilateral Lenders;

(e)    a legal opinion from Al Busaidy, Mansoor Jamal & Co as Omani law counsel to the New Bilateral Lenders;

(f)    a legal opinion from Linklaters CIS as Russian law counsel to the New Bilateral Lenders;

(i)    a legal opinion from Al Fahad & Partners as Saudi Arabian law counsel to the Group in relation to capacity;

(g)    a legal opinion from Zamakhchary & Co. as Saudi Arabian law counsel to the New Bilateral Lenders in relation to enforceability; and

(h)    a legal opinion from Brodies LLP as Scottish law counsel to the New Bilateral Lenders.

6.    Written confirmation from the Ad-Hoc Committee (or its Advisers on its behalf) that each of the following legal opinions is in Agreed Form in relation to the New Notes Documents and the Intercreditor Agreement, each addressed to the New Trustee:

(a)    a legal opinion from A&O as English law counsel to the Group;

(b)    a legal opinion from A&O as Dutch law counsel to the Group;

(c)    a legal opinion from A&O as German law counsel to the Group;

**288**

(d)    a legal opinion from CMS Cameron McKenna Nabarro Olswang LLP as Omani law counsel to the Group;

(e)    a legal opinion from Allen & Overy Legal Services as Russian law counsel to the Group;

(f)    a legal opinion from Al Fahad & Partners as Saudi Arabian law counsel to the Group; and

(g)    a legal opinion from Burness Paull LLP as Scottish law counsel to the Group.

**General restructuring evidence documents**

7.    Written confirmation from the Ad-Hoc Committee and the New Bilateral Lenders (or their respective Advisers on their behalf) that they have received:

(a)    a copy of the Intercompany Balance Reorganisation Deed, executed by the relevant parties thereto; and

(b)    (in respect of their respective Advisers (as defined in the Lock-up Agreement)), evidence of payment of all fees, costs and expenses of such Advisers due as at the Scheme Effective Time, in accordance with the terms of the Advisor Fee Letters (as defined in the Lock-up Agreement).

8.    Written confirmation from:

(a)    the Information Agent (on its behalf and with the prior approval and sign off of the Company) that the Scheme Creditor Entitlements of all Scheme Creditors are consistent with each Scheme Creditor's Pro Rata Proportion and calculated in accordance with the terms of this Deed; and

(b)    the financial advisers to the Ad-Hoc Committee, the Existing Overdraft Provider and the Existing Undertaking Lender that the respective Scheme Creditor Entitlements of the Ad-Hoc Committee, the Existing Overdraft Provider and the Existing Undertaking Lender are consistent with their Pro Rata Proportion and calculated in accordance with the terms of this Deed.

9.    Written confirmation from the New Cash Management Lender that it has received evidence that any process agent (if applicable, under the New Cash Management Facilities Agreement) has accepted its appointment.

10.    Evidence that the Company has obtained, and filed with Companies House, a confirmation letter from HMRC stating that UK stamp duty is not payable or that the Sanction Order does not attract UK stamp duty.

11.    Provided that it has been completed on or before date on which each other condition precedent in this Schedule 7 (Restructuring Conditions Precedent) has been satisfied or waived, a copy of an independent business review prepared by Deloitte GmbH Wirtschaftsprüfungsgesellschaft as restructuring expert in relation to Abbot Verwaltungsgesellshaft GmbH, Bentec GmbH Drilling and Oilfield Systems, KCA Deutag Drilling GmbH, KCA Deutag GmbH and KCA Deutag Tiefbohrgesellschaft GmbH (together, the **German Obligors**) which covers in all material respects the items listed in schedule 13 (Scope of Deloitte IBR) to the Lock-up Agreement and, as at the date of its issuance:

(a)    complies with the principles established by the German Federal Court of Justice for expert reports relating to restructuring concepts;

(b)    confirms that, subject to the restructuring steps and measures examined in such report being implemented, the German Obligors are capable of being successfully restructured (*sanierungsfähig*); and

(c)    is in form and substance satisfactory to each member of the Ad-Hoc Committee and each New Bilateral Lender (to be confirmed in writing by the Ad-Hoc Committee and each New Bilateral Lender (or their respective Advisers on their behalf) and capable of being relied upon by each Scheme Creditor and each New Bilateral Lender (but only to the extent that each such Scheme Creditor or New Bilateral Lender has agreed the terms of such reliance with Deloitte GmbH Wirtschaftsprüfungsgesellschaft on or before date on which each other condition precedent in this Schedule 7 (Restructuring Conditions Precedent) has been satisfied or waived).

12.    A copy of the final Tax Structure Paper in a form and substance acceptable to Advisers to the Ad-Hoc Committee and the New Bilateral Lenders (acting reasonably) and capable of being relied upon by each Scheme Creditor and each New Bilateral Lender (but only to the extent that each such Scheme Creditor or New Bilateral Lender has agreed the terms of such reliance with Deloitte LLP and, if such terms have not been agreed by a Scheme Creditor or New Bilateral Lender, on a non-reliance basis).

13.    In respect of each Prospective Major Shareholder:

(a)    written confirmation from that Prospective Major Shareholder that it has received an official document issued by the FAS acknowledging that the FAS has reviewed and accepted the Russian UBO Disclosure submitted by that Prospective Major Shareholder, unless:

(i)    the Strategic Investment Clearance (as defined below) has been received by the relevant Prospective Major Shareholder(s); or

(ii)    the relevant Prospective Major Shareholder, all other Prospective Major Shareholders that would be adversely affected by the proposed amendments and the Company have agreed any structural amendments to the terms of the Restructuring with the result that the relevant transaction steps no longer require a Russian UBO Disclosure (and each relevant Party has consented to any amendments to this Deed that may be required to effect such structural amendments); and

(b)    if the FAS has informed any Prospective Major Shareholder(s) in writing prior to the time at which all other Restructuring Conditions Precedent have been satisfied or waived that clearance under the Strategic Investment Law (Federal Law of the Russian Federation No. 57-FZ dated 29 April 2008 "On Foreign Investments into Entities of Strategic Significance for the Defence of the Country and Security of the State" (as amended)) (a **Strategic Investment Clearance**) is required, either:

(i)    such Strategic Investment Clearance has been received by the relevant Prospective Major Shareholder(s); or

(ii)    the relevant Prospective Major Shareholder, all other Prospective Major Shareholders that would be adversely affected by the proposed amendments and the Company have agreed any structural amendments to the terms of the Restructuring with the result that the relevant transaction step no longer requires a Strategic Investment Clearance (and each relevant Party has consented to any amendments to this Deed that may be required to effect such structural amendments).

14.    Evidence of payment of all fees, costs and expenses of the Existing Administrative Parties payable pursuant to the terms of the Existing Debt Documents and due as at the Scheme Effective Time.

15.   Evidence of payment of all fees, costs and expenses of Lucid Issuer Services Limited (**Lucid**) payable pursuant to the terms of:

(a)   the engagement letter dated 22 July 2020 (as amended by a deed of novation dated 25 August 2020) originally between Lucid and Alpha II; and

(b)   the engagement letter dated 19 August 2020 between Lucid and the Company,

and, in each case, due as at the Scheme Effective Time.

16.   Written confirmation from each New Bilateral Lender (or the Advisers to the New Bilateral Lenders) that it has received each document required by it in order for it to carry out, and be satisfied with, the results of all necessary "know your customer" checks to be carried out by it in relation to the Alpha Group under any applicable laws and/or regulations and/or that New Bilateral Lender's internal compliance requirements pursuant to the transactions contemplated in the Restructuring Documents.

17.   A group structure chart certified by the Group's general counsel and showing the structure of Jersey NewCo and its Subsidiaries assuming the Restructuring Effective Date has occurred.

**291**

## SCHEDULE 8

## ADVISER EMAIL LIST

| Name of Adviser | Adviser Email Address |
|---|---|
| Allen & Overy LLP as legal adviser to the Group | Kelly_A&O_Core_Finance_Team@AllenOvery.com |
| Weil, Gotshal & Manges (London) LLP as legal adviser to the Ad-Hoc Committee | Kelly.Weil.LO@weil.com |
| Linklaters LLP as legal adviser to the Existing Ancillary Lenders and New Bilateral Lenders | LinklatersKCAD@linklaters.com |
| McDermott Will & Emery UK LLP as legal adviser to the New Administrative Parties | Ptaneja@mwe.com<br><br>Rbasu@mwe.com<br><br>Mwrobel@mwe.com |

## SCHEDULE 9

## POST-RESTRUCTURING OBLIGORS

| Obligor name | Jurisdiction of incorporation |
|---|---|
| Abbot Group Limited | England |
| Abbot Holdings Limited | England |
| KCA Deutag (Land Rig) Limited | England |
| KCA Deutag Alpha Limited | England |
| KCA Deutag Drilling Group Limited; | England |
| KCA Deutag UK Finance plc | England |
| KCA European Holdings Limited; | England |
| Set Drilling Company Limited | Scotland |
| KCA Deutag Caspian Limited | England |
| Abbot Verwaltungsgesellshaft MbH | Germany |
| Bentec GmbH Drilling And Oilfield Systems | Germany |
| KCA Deutag Drilling GmbH | Germany |
| KCA Deutag GmbH | Germany |
| KCA Deutag Tiefbohrgesellschaft MbH | Germany |
| KCA Deutag Europe B.V. | Netherlands |
| KCA Deutag Nederland B.V. | Netherlands |
| Abbot Holdings Norge AS; | Norway |
| KCA Deutag Drilling Norge AS | Norway |
| KCA Deutag Drilling Offshore Services AS | Norway |
| KCA Deutag Holdings Norge AS | Norway |
| KCA Deutag Modu Operations AS | Norway |
| KCA Deutag Offshore AS | Norway |
| KCA Deutag Energy International LLC | Oman |
| KCA Deutag Energy LLC | Oman |

| | |
|---|---|
| KCA Deutag Drilling LLC | Russia |
| KCA Deutag Russia LLC | Russia |
| KCA Deutag Gulf Drilling Limited Company | Saudi Arabia |
| KCA Deutag Drilling Limited | Scotland |
| KCA Deutag Technical Support Limited | Scotland |

## SCHEDULE 10

## OVERDRAFT ACCOUNTS

| Account Holder | Currency | Account Provider | Sort Code/Account Number |
|---|---|---|---|
| KCA Deutag Alpha Limited | EUR | HSBC UK BANK PLC | 401276/77022461 |
| KCA Deutag Alpha Limited | GBP | HSBC UK BANK PLC | 400125/21492063 |
| KCA Deutag Alpha Limited | USD | HSBC UK BANK PLC | 401276/77022453 |
| Abbot Group Limited | GBP | HSBC UK BANK PLC | 400125/81348353 |
| Abbot Group Limited | USD | HSBC UK BANK PLC | 401276/73147231 |
| Abbot Group Limited | CAD | HSBC UK BANK PLC | 401276/73147290 |
| Abbot Group Limited | EUR | HSBC UK BANK PLC | 401276/67641976 |
| Abbot Group Limited | GBP | HSBC UK BANK PLC | 400125/11145010 |
| Abbot Group Limited | NOK | HSBC UK BANK PLC | 401276/67640073 |
| Abbot Group Limited | RUB | HSBC UK BANK PLC | 401276/73147317 |
| Abbot Group Limited | MXN | HSBC UK BANK PLC | 401276/73147309 |
| Abbot Group Limited | SGD | HSBC UK BANK PLC | 401276/73147282 |
| Abbot Group Limited | USD | HSBC UK BANK PLC | 401276/60230006 |
| Abbot Group Limited | SAR | HSBC UK BANK PLC | 401276/84172146 |
| Abbot Holdings Limited | GBP | HSBC UK BANK PLC | 400125/31348388 |
| KCA Deutag Drilling Group Limited | GBP | HSBC UK BANK PLC | 400125/31348396 |

| | | | |
|---|---|---|---|
| KCA Deutag Drilling Group Limited | USD | HSBC UK BANK PLC | 401276/73147325 |
| KCA Deutag Drilling Limited | EUR | HSBC UK BANK PLC | 401276/73147384 |
| KCA Deutag Drilling Limited | GBP | HSBC UK BANK PLC | 400125/01348426 |
| KCA Deutag Drilling Limited | NOK | HSBC UK BANK PLC | 401276/73147392 |
| KCA Deutag Drilling Limited | USD | HSBC UK BANK PLC | 401276/73147376 |
| KCA Deutag Caspian Limited | GBP | HSBC UK BANK PLC | 400125/01348442 |
| KCA Deutag Caspian Limited | EUR | HSBC UK BANK PLC | 401276/73147443 |
| KCA Deutag Caspian Limited | NOK | HSBC UK BANK PLC | 401276/73147451 |
| KCA Deutag Caspian Limited | USD | HSBC UK BANK PLC | 401276/73147435 |
| KCA Deutag Technical Support Limited | EUR | HSBC UK BANK PLC | 401276/73147341 |
| KCA Deutag Technical Support Limited | GBP | HSBC UK BANK PLC | 400125/01348418 |
| KCA Deutag Technical Support Limited | NOK | HSBC UK BANK PLC | 401276/73147368 |
| KCA Deutag Technical Support Limited | USD | HSBC UK BANK PLC | 401276/73147333 |
| KCA European Holdings Limited | GBP | HSBC UK BANK PLC | 400125/41348477 |
| KCA European Holdings Limited | USD | HSBC UK BANK PLC | 401276/77376684 |
| Abbot Investments (North Africa) Limited | USD | HSBC UK BANK PLC | 401276/73147478 |
| KCA Deutag Holdings Norge AS | NOK | HSBC UK BANK PLC | 401276/73147553 |
| KCA Deutag Holdings Norge AS | USD | HSBC UK BANK PLC | 401276/73147545 |

| | | | |
|---|---|---|---|
| KCA Deutag Drilling Norge AS | EUR | HSBC UK BANK PLC | 401276/73147510 |
| KCA Deutag Drilling Norge AS | GBP | HSBC UK BANK PLC | 400125/91348450 |
| KCA Deutag Drilling Norge AS | NOK | HSBC UK BANK PLC | 401276/73147529 |
| KCA Deutag Drilling Norge AS | NOK | HSBC UK BANK PLC | 401276/73147537 |
| KCA Deutag Drilling Norge AS | USD | HSBC UK BANK PLC | 401276/73147502 |
| KCA Deutag Offshore AS | USD | HSBC UK BANK PLC | 401276/73147561 |
| Abbot Holdings Norge AS | NOK | HSBC UK BANK PLC | 401276/76096894 |
| Abbot Holdings Norge AS | USD | HSBC UK BANK PLC | 401276/73147486 |
| KCA Deutag Drilling Offshore Services AS | USD | HSBC UK BANK PLC | 401276/73147588 |
| KCA Deutag Drilling Offshore Services AS | EUR | HSBC UK BANK PLC | 401276/77452908 |
| KCA Deutag Drilling Offshore Services AS | USD | HSBC UK BANK PLC | 401276/74202468 |
| KCA Deutag Drilling Offshore Services AS | GBP | HSBC UK BANK PLC | 400125/51409565 |
| KCA Deutag Drilling Offshore Services AS | GBP | HSBC UK BANK PLC | 400125/41348469 |

**SIGNATORIES**

| | |
|---|---|
| **EXECUTED** as a **DEED** by | ) |
| **KCA DEUTAG UK FINANCE PLC** | ) |
| | ) |
| Acting by: | ) |

_____        _____

Name:                                                                     Name:

Title:                                                                       Title:

**298**

**EXECUTED** as a **DEED** by           )
**KCAD DEUTAG ALPHA II LIMITED**    )
                                         )
Acting by:                           )

_____

Name:                                             Name:

Title:                                             Title:

**EXECUTED** as a **DEED** by                )

**KELLY TOPCO LIMITED**                )

                )

Acting by:                )


_____                _____

Name:                                          Name:

Title:                                         Title:

**EXECUTED** as a **DEED** by        )

**KELLY HOLDCO 1 LIMITED**      )

                                            )

Acting by:                           )

_____        _____

Name:                                        Name:

Title:                                         Title:

**EXECUTED** as a **DEED** by )

**KELLY HOLDCO 2 LIMITED** )

)

Acting by: )

_____    _____

Name:    Name:

Title:    Title:

**EXECUTED** as a **DEED** by                    )
**KCA DEUTAG US FINANCE LLC**                    )
                                                 )
Acting by:                                       )


_____          _____

Name:                                     Name:

Title:                                    Title:

**EXECUTED** as a **DEED** by                    )
**ABBOT GROUP LIMITED**                          )
                                                 )
Acting by:                                       )


_____        _____

Name:                                   Name:

Title:                                  Title:

**EXECUTED** as a **DEED** by                    )
**ABBOT HOLDINGS LIMITED**                    )
                                              )
Acting by:                                    )


_____        _____

Name:                                          Name:

Title:                                         Title:

**EXECUTED** as a **DEED** by                    )

**ABBOT INVESTMENTS (NORTH AFRICA)**    )
**LIMITED**                    )
                              )
Acting by:                    )


_____        _____

Name:                          Name:

Title:                         Title:

**EXECUTED** as a **DEED** by                    )
**KCA DEUTAG (LAND RIG) LIMITED**                )
                                                 )
Acting by:                                       )


_____          _____

Name:                                            Name:

Title:                                           Title:

**EXECUTED** as a **DEED** by                    )
**KCA DEUTAG ALPHA LIMITED**                    )
                                                )
Acting by:                                      )


_____          _____

Name:                                        Name:

Title:                                       Title:

**EXECUTED** as a **DEED** by       )

**KCA DEUTAG CASPIAN LIMITED**    )

                                               )

Acting by:                             )

_____      _____

Name:                                        Name:

Title:                                          Title:

**EXECUTED** as a **DEED** by                    )
**KCA DEUTAG DRILLING GROUP LIMITED**    )
                                                  )
Acting by:                                        )


_____         _____

Name:                                   Name:

Title:                                  Title:

**EXECUTED** as a **DEED** by                    )
**KCA EUROPEAN HOLDINGS LIMITED**    )
                                                                    )
Acting by:                                                    )


_____        _____


Name:                                                    Name:

Title:                                                      Title:

**EXECUTED** as a **DEED** by                    )

**ABBOT VERWALTUNGSGESELLSCHAFT**   )
**MBH**                                            )
                                                   )
Acting by:                                        )


_____          _____


Name:                                    Name:

Title:                                   Title:

**EXECUTED** as a **DEED** by )

**BENTEC GMBH DRILLING & OILFIELD** )
**SYSTEMS** )
)
Acting by: )

_____    _____

Name:                                       Name:

Title:                                        Title:

**313**

**EXECUTED** as a **DEED** by                    )
**KCA DEUTAG DRILLING GMBH**                     )
                                                 )
Acting by:                                       )


_____          _____

Name:                                            Name:

Title:                                           Title:

**EXECUTED** as a **DEED** by                    )

**KCA DEUTAG GMBH**                              )

                                                )

Acting by:                                      )


_____             _____

Name:                                           Name:

Title:                                          Title:

**EXECUTED** as a **DEED** by                    )

**KCA DEUTAG TIEFBOHRGESELLSCHAFT**    )

**MBH**                                 )

                                        )

Acting by:                              )


_____        _____

Name:                                   Name:

Title:                                  Title:

**EXECUTED** as a **DEED** by )

**KCA DEUTAG EUROPE B.V.** )

)

Acting by: )


_____          _____


Name:                                                      Name:

Title:                                                     Title:

**EXECUTED** as a **DEED** by                    )

**KCA DEUTAG NEDERLAND B.V.**                    )

                                                 )

Acting by:                                       )


Director                              _____

In the presence of:                   _____

                                      Name: ....................................................

                                      Address:................................................

                                      ..............................................................

                                      ..............................................................

                                      ..............................................................

                                      ..............................................................

**EXECUTED** as a **DEED** by                     )
**ABBOT HOLDINGS NORGE AS**                 )
                                                                  )
Acting by:                                                  )


_____        _____

Name:                                                      Name:

Title:                                                        Title:

**EXECUTED** as a **DEED** by                    )
**KCA DEUTAG DRILLING NORGE AS**                 )
                                                  )
Acting by:                                        )


_____          _____

Name:                                            Name:

Title:                                           Title:

**EXECUTED** as a **DEED** by                    )

**KCA DEUTAG DRILLING OFFSHORE**          )
**SERVICES AS**                                   )
                                                  )
Acting by:                                        )


_____          _____

Name:                                      Name:

Title:                                     Title:

**EXECUTED** as a **DEED** by                          )
**KCA DEUTAG HOLDINGS NORGE AS**                        )
                                                        )
Acting by:                                              )


_____          _____

Name:                               Name:

Title:                              Title:

**322**

**EXECUTED** as a **DEED** by                    )
**KCA DEUTAG MODU OPERATIONS AS**                )
                                                 )
Acting by:                                       )


_____          _____


Name:                              Name:

Title:                             Title:

**EXECUTED** as a **DEED** by )
**KCA DEUTAG OFFSHORE AS** )
)
Acting by: )

_____  _____

Name:  Name:

Title:  Title:

**EXECUTED** as a **DEED** by                    )
**KCA DEUTAG ENERGY GLOBAL LLC**                 )
                                                  )
Acting by:                                        )


_____        _____


Name:                                   Name:

Title:                                  Title:

**EXECUTED** as a **DEED** by ）

**KCA DEUTAG ENERGY INTERNATIONAL** ）

**LLC** ）

）

Acting by: ）


_____    _____

Name:    Name:

Title:    Title:

**EXECUTED** as a **DEED** by                    )
**KCA DEUTAG ENERGY LLC**                    )
                                             )
Acting by:                                    )


_____          _____

Name:                                        Name:

Title:                                       Title:

**EXECUTED** as a **DEED** by                    )
**KCA DEUTAG ENERGY NATIONAL LLC**    )
                                                      )
Acting by:                                        )


_____        _____

Name:                                              Name:

Title:                                               Title:

**328**

**EXECUTED** as a **DEED** by                              )
**KCA DEUTAG DRILLING LLC**                    )
                                                                     )
Acting by:                                                        )


_____          _____

Name:                                                    Name:

Title:                                                      Title:

**EXECUTED** as a **DEED** by                    )
**KCA DEUTAG RUSSIA LLC**                    )
                                                                         )
Acting by:                                                 )


_____          _____


Name:                                                      Name:

Title:                                                        Title:

**EXECUTED** as a **DEED** by                )

**KCA DEUTAG GULF DRILLING LIMITED**        )
**COMPANY**                                 )
                                            )
Acting by:                                  )


_____        _____

Name:                                       Name:

Title:                                      Title:

**EXECUTED** as a **DEED** by                    )
**KCA DEUTAG DRILLING LIMITED**         )
                                        )
Acting by:                              )


_____          _____

Name:                                   Name:

Title:                                  Title:

| | |
|---|---|
| **EXECUTED** as a **DEED** by | ) |
| **KCA DEUTAG TECHNICAL SUPPORT LIMITED** | ) |
| | ) |
| | ) |
| Acting by: | ) |

_____         _____

Name:                                             Name:

Title:                                              Title:

**333**

**EXECUTED** as a **DEED** by                              )

**KCA DEUTAG RIG DESIGN SERVICES**          )
**LIMITED**                                               )
                                                          )
Acting by:                                               )


_____            _____

Name:                                                 Name:

Title:                                                Title:

**EXECUTED** as a **DEED** by                )

**SET DRILLING COMPANY LIMITED**            )

                                            )

Acting by:                                  )


_____        _____

Name:                                        Name:

Title:                                       Title:

**EXECUTED** as a **DEED** by        )

**KCA DEUTAG PTE. LTD.**        )

                              )

Acting by:                   )

_____        _____

Name:                                         Name:

Title:                                        Title:

**EXECUTED** as a **DEED** by                    )
**KCAD HOLDINGS 1 LIMITED**            )
                                                        )
Acting by:                                            )


_____              _____

Name:                                                Name:

Title:                                               Title:

**EXECUTED** as a **DEED** by )
**KCAD HOLDINGS 1I LIMITED** )
)
Acting by: )


_____         _____

Name:                                              Name:

Title:                                             Title:

**EXECUTED** as a **DEED** by                          )
**KCA DEUTAG FINANCE 1 LIMITED**        )
                                                                    )
Acting by:                                                      )


_____            _____

Name:                                                        Name:

Title:                                                          Title:

**EXECUTED** as a **DEED** by                         )
**KCA DEUTAG FINANCE I1 LIMITED**     )
                                                                  )
Acting by:                                                    )


_____          _____

Name:                                                           Name:

Title:                                                              Title:

**EXECUTED** as a **DEED** by         )

**KCA DEUTAG MIDCO LIMITED**     )

                                     )

Acting by:                         )

_____       _____

Name:                                     Name:

Title:                                     Title:

**EXECUTED** as a **DEED** by                    )
**LAND RIG VENTURES 1 LIMITED**                  )
                                                 )
Acting by:                                       )


_____          _____


Name:                                       Name:


Title:                                      Title:

**342**

**EXECUTED** as a **DEED** by                    )
**LAND RIG VENTURES 1I LIMITED**          )
                                                                  )
Acting by:                                               )


_____          _____

Name:                                                   Name:

Title:                                                    Title:

**343**

**EXECUTED** as a **DEED** by                     )
**KCA DEUTAG DRILLING RIGS 1 LIMITED**     )
                                                   )
Acting by:                                         )


_____          _____


Name:                                      Name:

Title:                                     Title:

**EXECUTED** as a **DEED** by                                    )

**LLOYDS BANK PLC**                                             )
in its capacity as lender under the Existing LC
Facility

                                                                )
Acting by:                                                       )


_____          _____

Name:                                              Name:

Title:                                             Title:

**EXECUTED** as a **DEED** by          )

**FIRST ABU DHABI BANK PJSC**     )

in its capacity as lender under the Existing
Undertaking Facility

                                     )

Acting by:                      )

_____

Name:                                       Name:

Title:                                        Title:

**EXECUTED** as a **DEED** by                    )

**LLOYDS BANK PLC**                              )
as lender under the New LC Facility Agreement
                                                )
Acting by:                                      )


_____          _____

Name:                                           Name:

Title:                                          Title:

**347**

**RUN-OFF LC LENDER**

| | |
|---|---|
| **EXECUTED** as a **DEED** by | ) |
| **FIRST ABU DHABI BANK PJSC**<br>as lender under the FAB Run-Off Facility<br>Agreement | ) |
| | ) |
| Acting by: | ) |

_____          _____

Name:                                                     Name:

Title:                                                        Title:

**NEW CASH MANAGEMENT LENDER**

| | |
|---|---|
| **EXECUTED** as a **DEED** by | ) |
| **HSBC UK BANK PLC** | ) |
| as lender under the New Cash Management Facilities | |
| | ) |
| Acting by: | ) |

_____          _____

Name:                                               Name:

Title:                                              Title:

**EXECUTED** as a **DEED** by )

**LUCID ISSUER SERVICES LIMITED** )
as Holding Period Trustee

)

Acting by: )


_____        _____

Name:                                    Name:

Title:                                   Title:

| | |
|---|---|
| **EXECUTED** as a **DEED** by | ) |
| **THE SCHEME CREDITORS** | ) |
| | ) |
| Acting by | ) |
| **KCA DEUTAG UK FINANCE PLC** | |
| pursuant to the authority conferred upon the | |
| Company by the Scheme Creditors under the | |
| Scheme | |

_____          _____

Name:                                               Name:

Title:                                              Title:

**APPENDIX 4**

**KEY RESTRUCTURING DOCUMENTS**

**PART 1**

**NEW NOTES INDENTURE**

KCA DEUTAG UK FINANCE PLC

as the Issuer

LUCID TRUSTEE SERVICES LIMITED

as Trustee

LUCID AGENCY SERVICES LIMITED

as Paying Agent, Registrar and Transfer Agent

LUCID TRUSTEE SERVICES LIMITED

as Security Agent

———————————

INDENTURE

Dated as of [●], 2020

———————————

9.875% Senior Secured Notes due 2025
———————

## ARTICLE 1
## DEFINITIONS

Section 1.01    Definitions.................................................................................5
Section 1.02    Other Definitions .......................................................................40
Section 1.03    Rules of Construction .................................................................41
Section 1.04    "all or substantially all" .............................................................41

## ARTICLE 2
## THE NOTES

Section 2.01    Form and Dating ........................................................................41
Section 2.02    Execution and Authentication....................................................43
Section 2.03    Registrar, Transfer Agent and Paying Agent..............................43
Section 2.04    Paying Agent to Hold Money .....................................................44
Section 2.05    Holder Lists................................................................................44
Section 2.06    Transfer and Exchange ...............................................................44
Section 2.07    Replacement Notes .....................................................................54
Section 2.08    Outstanding Notes.......................................................................55
Section 2.09    Treasury Notes ...........................................................................55
Section 2.10    Temporary Notes ........................................................................55
Section 2.11    Cancellation ...............................................................................55
Section 2.12    Defaulted Interest.......................................................................56
Section 2.13    Common Code or ISIN Number ..................................................56
Section 2.14    Deposit of Moneys .....................................................................56
Section 2.15    Agents ........................................................................................56

## ARTICLE 3
## REDEMPTION AND PREPAYMENT

Section 3.01    Notices to Trustee ......................................................................58
Section 3.02    Selection of Notes to Be Redeemed or Purchased........................58
Section 3.03    Notice of Redemption .................................................................58
Section 3.04    Effect of Notice of Redemption...................................................60
Section 3.05    Deposit of Redemption or Purchase Price ....................................60
Section 3.06    Notes Redeemed or Purchased in Part..........................................61
Section 3.07    Optional Redemption ..................................................................61
Section 3.08    Redemption for Changes in Taxes................................................62
Section 3.09    Offer to Purchase by Application of Excess Proceeds and Notes Offer..........63
Section 3.10    Mandatory Redemption ...............................................................65

## ARTICLE 4
## COVENANTS

Section 4.01    Payments of Notes ......................................................................66
Section 4.02    Maintenance of Office or Agency.................................................66
Section 4.03    Reports .......................................................................................66
Section 4.04    Compliance Certificate ...............................................................69
Section 4.05    [Reserved]..................................................................................70
Section 4.06    [Reserved]..................................................................................70

i

**354**

Section 4.07    Restricted Payments..................................................................70
Section 4.08    Dividend and Other Payment Restrictions Affecting Subsidiaries.................75
Section 4.09    Incurrence of Indebtedness and Issuance of Preferred Stock ..........................78
Section 4.10    Asset Sales .............................................................................83
Section 4.11    Transactions with Affiliates................................................................87
Section 4.12    Liens......................................................................................89
Section 4.13    Limitation on Issuer Activities..........................................................89
Section 4.14    [Reserved].............................................................................90
Section 4.15    Offer to Repurchase Upon Change of Control Triggering Event...................90
Section 4.16    Limitation on Issuances of Guarantees of Indebtedness..............................92
Section 4.17    [Reserved].............................................................................93
Section 4.18    Designation of Restricted and Unrestricted Subsidiaries................................93
Section 4.19    Maintenance of Listing .................................................................94
Section 4.20    No Impairment of Security Interest ....................................................94
Section 4.21    Additional Amounts....................................................................95
Section 4.22    Suspension of Covenants on Achievement of Investment Grade Status .........98
Section 4.23    Additional Intercreditor Agreements ..................................................99
Section 4.24    Limitation on Holding Company Activities ...........................................100
Section 4.25    Further Assurances......................................................................101
Section 4.26    Business Activities......................................................................101
Section 4.27    Financial Calculations..................................................................101

ARTICLE 5
SUCCESSORS

Section 5.01    Merger, Consolidation or Sale of Assets .........................................104
Section 5.02    Successor Corporation Substituted ................................................107

ARTICLE 6
DEFAULTS AND REMEDIES

Section 6.01    Events of Default ......................................................................107
Section 6.02    Remedies under this Indenture......................................................110
Section 6.03    Acceleration............................................................................110
Section 6.04    Other Remedies.......................................................................110
Section 6.05    Waiver of Past Defaults ..............................................................110
Section 6.06    Control by Majority ...................................................................111
Section 6.07    Limitation on Suits....................................................................111
Section 6.08    Rights of Holders to Receive Payment ...........................................111
Section 6.09    Collection Suit by Trustee ...........................................................112
Section 6.10    Trustee May File Proofs of Claim .................................................112
Section 6.11    Priorities................................................................................112
Section 6.12    Undertaking for Costs................................................................113
Section 6.13    Restoration of Rights and Remedies................................................113
Section 6.14    Rights and Remedies Cumulative.................................................113
Section 6.15    Delay or Omission Not Waiver.....................................................113

ARTICLE 7
TRUSTEE

Section 7.01    Duties of Trustee......................................................................114

Section 7.02   Rights of Trustee ...................................................................................115
Section 7.03   Individual Rights of Trustee ...................................................................118
Section 7.04   Trustee's Disclaimer ..............................................................................118
Section 7.05   Notice of Defaults ..................................................................................119
Section 7.06   [Reserved] ..............................................................................................119
Section 7.07   Compensation and Indemnity ................................................................119
Section 7.08   Replacement of Trustee ..........................................................................120
Section 7.09   Successor Trustee by Merger, etc ..........................................................121
Section 7.10   Eligibility; Disqualification ...................................................................121

## ARTICLE 8
## LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01   Option to Effect Legal Defeasance or Covenant Defeasance .......................121
Section 8.02   Legal Defeasance and Discharge ...........................................................122
Section 8.03   Covenant Defeasance .............................................................................122
Section 8.04   Conditions to Legal or Covenant Defeasance ........................................123
Section 8.05   Deposited Money and Government Obligations  to be Held in Trust; Other
               Miscellaneous Provisions .......................................................................124
Section 8.06   Repayment to Issuer ...............................................................................124
Section 8.07   Reinstatement .........................................................................................125

## ARTICLE 9
## AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01   Without Consent of Holders ...................................................................125
Section 9.02   With Consent of Holders ........................................................................126
Section 9.03   Revocation and Effect of Consents ........................................................128
Section 9.04   Notation on or Exchange of Notes .........................................................128
Section 9.05   Trustee to Sign Amendments, etc ..........................................................129

## ARTICLE 10
## SECURITY

Section 10.01  Collateral Documents .............................................................................129
Section 10.02  Release of Collateral ..............................................................................130
Section 10.03  Authorization of Actions to Be Taken by the Trustee ...................................131
Section 10.04  Authorization of Receipt of Funds by the Trustee ........................................131
Section 10.05  Termination of Security Interest in Collateral ........................................131

## ARTICLE 11
## GUARANTEES

Section 11.01  [Reserved] ...............................................................................................133
Section 11.02  Guarantee ................................................................................................133
Section 11.04  Limitation and Effectiveness of Guarantees ..........................................134
Section 11.05  Notation Not Required ...........................................................................141
Section 11.06  [Reserved] ...............................................................................................141
Section 11.07  Releases ...................................................................................................141

ARTICLE 12
RESERVED

ARTICLE 13
SATISFACTION AND DISCHARGE

Section 13.01  Satisfaction and Discharge............................................................................143
Section 13.02  Application of Trust Money...........................................................................144

ARTICLE 14
MISCELLANEOUS

Section 14.01  Notices ...........................................................................................................144
Section 14.02  Communications ............................................................................................146
Section 14.03  Certificate and Opinion as to Conditions Precedent .....................................146
Section 14.04  Statements Required in Certificate or Opinion .............................................147
Section 14.05  Rules by Trustee and Agents ........................................................................147
Section 14.06  Agent for Service; Submission to Jurisdiction; Waiver of Immunities .........147
Section 14.07  No Personal Liability of Directors, Officers, Employees and Stockholders .148
Section 14.08  Governing Law ..............................................................................................148
Section 14.09  No Adverse Interpretation of Other Agreements...........................................148
Section 14.10  Successors .....................................................................................................148
Section 14.11  Severability ....................................................................................................148
Section 14.12  Counterpart Originals.....................................................................................149
Section 14.13  Table of Contents, Headings, etc ..................................................................149
Section 14.14  Judgment Currency ........................................................................................149
Section 14.15  Prescription ....................................................................................................149
Section 14.16  Additional Information ...................................................................................149
Section 14.17  Scheme and Structure Memorandum.............................................................150

EXHIBITS

Exhibit A      FORM OF NOTE
Exhibit B      FORM OF CERTIFICATE OF TRANSFER
Exhibit C      FORM OF CERTIFICATE OF EXCHANGE
Exhibit D      FORM OF SUPPLEMENTAL INDENTURE TO BE DELIVERED BY
               SUBSEQUENT GUARANTORS
Exhibit E      COLLATERAL DOCUMENTS

INDENTURE dated as of [●], 2020 ("*Indenture*") among KCA DEUTAG UK Finance plc ("*Issuer*"), a public limited company incorporated under the laws of England and Wales, KCA DEUTAG Alpha Limited, a limited liability company incorporated under the laws of England and Wales (the "*Company*"), the initial guarantors named herein (together with the Company, the "*Initial Guarantors*"), Lucid Trustee Services Limited, as Trustee, Lucid Agency Services Limited, as Paying Agent, Registrar and Transfer Agent and Lucid Trustee Services Limited, as Security Agent.

The Issuer and the Trustee agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined) of the Issuer's U.S. dollar-denominated 9.875% Senior Secured Notes due 2025 (the "*Notes*").

ARTICLE 1
DEFINITIONS

Section 1.01    *Definitions*.

"*144A Definitive Registered Note*" means a Definitive Registered Note resold in reliance on Rule 144A.

"*144A Global Note*" means a Global Note bearing the Global Note Legend and the Private Placement Legend and deposited with and registered in the name of, the Common Depositary or its nominee, substantially in the form of Exhibit A hereto and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Article 2.

"*Acquired Debt*" means, with respect to any specified Person:

(1)    Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Restricted Subsidiary of such specified Person, whether or not such Indebtedness is Incurred in connection with, or in contemplation of, such other Person merging with or into, or becoming a Restricted Subsidiary of, such specified Person; and

(2)    Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"*Additional Notes*" means additional Notes (other than the Initial Notes) issued from time to time under this Indenture in accordance with Section 2.02 and Section 4.09, as part of the same series as the Notes.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For purposes of this definition, "*control*", as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise. For purposes of this definition, the terms "*controlling*", "*controlled by*" and "*under common control with*" have correlative meanings.

"*Agent*" means any Registrar, co-registrar, Transfer Agent, Authenticating Agent or Paying Agent.

"*Agreed Security Principles*" means the agreed security principles appended to the Intercreditor Agreement as applied *mutatis mutandis* with respect to the Notes in good faith by the Company.

"*Applicable Premium*" means, on any redemption date, the greater of:

(1)     1.0% of the principal amount of the Notes; and

(2)     the excess of (to the extent positive):

(a)     the present value at the redemption date of (i) the redemption price of the Notes at December 1, 2022 (such redemption price being set forth in the table appearing Section 3.07) plus (ii) all required interest payments due on the Notes through December 1, 2022 (excluding accrued but unpaid interest to the redemption date), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points; over

(b)     the outstanding principal amount of the Notes.

For the avoidance of doubt, calculation of the Applicable Premium shall be the responsibility of the Issuer and shall not be a duty or obligation of the Trustee, the Registrar or the Paying Agent.

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rules and procedures of Euroclear and Clearstream that apply to such transfer or exchange.

"*Asset Sale*" means:

(1)     the sale, lease, conveyance or other disposition of any assets or rights; *provided* that the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries taken as a whole will be governed by Section 4.15 and/or Section 5.01 and not by Section 4.10; and

(2)     the issuance or sale of Equity Interests in any of the Company's Restricted Subsidiaries (other than directors' qualifying shares or shares that are required by applicable law to be held by third parties).

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(1)     any single transaction or series of related transactions that involves assets of or Equity Interests in any Restricted Subsidiary having a Fair Market Value of less than the greater of $25.0 million and 10.0% of Consolidated EBITDA;

(2)     a transfer of assets or Equity Interests between the Company and any of its Restricted Subsidiaries or among any Restricted Subsidiaries;

(3)     an issuance or sale of Equity Interests by a Restricted Subsidiary of the Company to the Company or to another Restricted Subsidiary of the Company;

(4)     the sale, lease, sub-lease, assignment or other transfer of inventory, products, raw materials, receivables, services or other assets (including any real or personal property) in the ordinary course of business;

(5)     the sale or discounting of accounts receivable in the ordinary course of business and the disposition of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings of any customers or vendors of the Company or any of its Restricted Subsidiaries;

(6)     any sale or other disposition of damaged, worn-out, obsolete or no longer useful assets or properties in the ordinary course of business (including the abandonment or other disposition of intellectual property that is, in the reasonable judgment of the Company, no longer economically practicable to maintain or useful in the conduct of the business of Company and its Restricted Subsidiaries taken as whole);

(7)     any sale of assets received by the Company or any of its Restricted Subsidiaries upon the foreclosure on a Lien;

(8)     the sale or other disposition of cash, Cash Equivalents or Government Guaranteed Securities;

(9)     a Restricted Payment that does not violate Section 4.07, or a Permitted Investment or any transaction specifically excluded from the definition of Restricted Payment or, solely for purposes of Section 4.10(c), asset sales, the proceeds of which are used to make such Restricted Payments, Permitted Investments or transactions specifically excluded from the definition of Restricted Payment;

(10)    any sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(11)    the granting of Liens not otherwise prohibited by this Indenture;

(12)    the foreclosure, condemnation or any similar action with respect to any property or other assets or the surrender, or waiver of contract rights or settlement, release or surrender of contract, tort or other claims;

(13)    any sale, transfer or other disposition of Receivables and related assets in connection with any Qualified Receivables Financing;

(14)    licenses and sublicenses granted by the Company or any of its Restricted Subsidiaries of software or intellectual property in the ordinary course of business;

(15)    the disposition of assets to a Person who is providing services (the provision of which have been or are to be outsourced by the Company or any Restricted Subsidiary to such Person) related to such assets;

(16)    any disposition with respect to property built, owned or otherwise acquired by the Company or any Restricted Subsidiary pursuant to customary sale and leaseback transactions, asset securitizations and other similar financings permitted by this Indenture; and

7

**360**

(17)    any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Company or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and, in each case, comprising all or a portion of the consideration in respect of such sale or acquisition.

"*Bankruptcy Law*" means Title 11 of the United States Bankruptcy Code of 1978, or any similar United States federal or state law or relevant law in any jurisdiction or organization or similar foreign law (including, without limitation, laws of Germany, the Netherlands, Norway, Scotland, Singapore and the United Kingdom relating to moratorium, bankruptcy, insolvency, receivership, winding up, liquidation, reorganization or relief of debtors) other than any scheme of arrangement under Part 26 of the Companies Act 2006 (and any related petition filed under Chapter 15 of the United States Bankruptcy Code of 1978) or any amendment to, succession to or change in any such law.

"*Beneficial Owner*" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the U.S. Exchange Act, except that in calculating the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the U.S. Exchange Act), such "person" shall be deemed to have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time.  The terms "*Beneficially Owns*" and "*Beneficially Owned*" have a corresponding meaning.

"*Board of Directors*" means:

(1)    with respect to a corporation, the board of directors or other governing body of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)    with respect to a partnership, the board of directors or other governing body of the general partner of the partnership;

(3)    with respect to a limited liability company, the board of directors or other governing body, and in the absence of the same, the manager or board of managers or the managing member or members or any controlling committee thereof; and

(4)    with respect to any other Person, the board or committee of such Person serving a similar function.

"*Book-Entry Interest*" means a beneficial interest in a Global Note held by or through a Participant.

"*Business Day*" means a day (other than a Saturday or Sunday) on which banks are open for general business in London and New York and (in relation to any date for the payment or purchase of a currency other than U.S. Dollars) the principal financial center of the country of that currency.

"*Capital Stock*" means:

(1)    in the case of a corporation, corporate stock;

<div align="center">8</div>

<div align="right">**361**</div>

(2)     in the case of an association or business entity that is not a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)     in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)     any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

"*Cash Equivalents*" means:

(1)     securities issued or directly and fully guaranteed or insured by any country or government, or any agency or instrumentality thereof (*provided* that the full faith and credit of the relevant country or government is pledged in support of those securities) or any supranational institution, in each case, *provided* that it has a rating of at least Aa3 (or the equivalent) by Moody's, AA- (or the equivalent) from S&P, or the equivalent credit rating from any other Rating Agency, having maturities of not more than one year from the date of acquisition.

(2)     certificates of deposit, money market deposits, time deposits and U.S. Dollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case, with a bank or trust company which is organized under, or authorized to operate as a bank or trust company under, the laws of a member state of the European Union, or of the United States of America or any state thereof, the United Kingdom, Switzerland, Canada, Norway, Japan or Australia, or any other jurisdiction in which the Company or any Restricted Subsidiaries are engaged in business, having capital and surplus in excess of $500.0 million (or the foreign currency equivalent thereof) and an Investment Grade rating by S&P, Moody's or another Rating Agency;

(3)     repurchase obligations for underlying securities of the types described in clauses (1) and (2) of this definition entered into with any financial institution meeting the qualifications specified in clause (2) of this definition;

(4)     commercial paper having an Investment Grade rating by S&P, Moody's or another Rating Agency and, in each case, maturing within one year after the date of acquisition;

(5)     money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (1) through (4) of this definition;

(6)     with respect to a jurisdiction in which (a) the Company or a Restricted Subsidiary conducts its business or is organized and (b) it is not commercially practicable to make investments in clauses (1), (2) or (3) of this definition, demand or time deposit accounts, certificates of deposit, overnight or call deposits and money market deposits with any bank, trust company or similar entity, which would rank, in terms of combined capital and surplus and undivided profits or the ratings on its long-term dent, among the top five banks in such jurisdiction, in an amount not to exceed cash generated in or reasonably required for operation in such jurisdiction; and

9

(7)     other short-term investments utilized by Restricted Subsidiaries in accordance with normal investment practices for cash management; *provided* that such deposits do not exceed $30.0 million (or its equivalent in other currencies) in the aggregate at any date of determination thereafter.

"*Cash Management Facilities*" means any cash management agreement or arrangement including, without limitation, any treasury, cash pooling and/or other cash management services, treasury deposits, depository services, overdraft or other current account facilities, foreign exchange facilities, credit or debit card facilities, other automated payment facilities, electronic funds transfer, the collection of cheques and direct debits.

"*Change of Control*" means the occurrence of any of the following:

(1)     the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Company and its Restricted Subsidiaries, in each case, taken as a whole, to any "person" (as that term is used in Section 13(d)(3) of the U.S. Exchange Act), other than the Permitted Holders; or

(2)     the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the U.S. Exchange Act), other than the Permitted Holders, becomes the Beneficial Owner, directly or indirectly, of more than 50% of the voting power of the Voting Stock of the Company, *provided* that for the purposes of this clause, (x) no Change of Control shall be deemed to occur by reason of the Company becoming a Subsidiary of a Successor Parent and (y) any Voting Stock of which any Permitted Holder is the "beneficial owner" (as so defined) shall not be included in any Voting Stock of which any such person or group is the "beneficial owner" (as so defined), unless that person or group is not an affiliate of a Permitted Holder and has greater voting power with respect to that Voting Stock, *provided, further*, that prior to an Initial Public Offering, no person or group shall be deemed to acquire beneficial ownership of Voting Stock held by any other person or group solely by virtue of an agreement among all (but not some) holders of Voting Stock of the Company providing for (i) drag-along rights, tag-along rights, pre-emption rights, rights of first offer, rights of first refusal or other similar rights or (ii) an agreement among all (but not some) of such holders to vote in favor of a nominee for the Board of Directors of the Company proposed by one or more holders of such Voting Stock.

"*Change of Control Triggering Event*" means:

(1)     if the Notes are rated by two of S&P, Fitch and Moody's at or above "BB+", in case of S&P or Fitch, or "Ba1", in case of Moody's (or the equivalent of such ratings), immediately prior to the signing of an arrangement that could result in a Change of Control, there is no Change of Control Triggering Event; or

(2)     the occurrence of a Change of Control and, if the Notes are rated by two of S&P, Fitch and Moody's in the range of "B+" to "BB", in case of S&P or Fitch, or "B1" to "Ba2", in case of Moody's (or the equivalent of such ratings), immediately prior to the signing of the arrangement that resulted in such Change of Control, at least two of such Rating Agencies have not affirmed the rating of "BB" or "Ba2" or higher (or the equivalent of such ratings) prior to the 60th day following the occurrence of such Change of Control

10

**363**

(which 60 day period shall be extended so long as at least two of such Rating Agencies have not yet affirmed the rating of the Notes and the Notes are under publicly announced consideration by any of such Rating Agencies), or

(3)     the occurrence of a Change of Control if the Notes are rated by two of S&P, Fitch or Moody's at or lower than "B", in case of S&P or Fitch, or "B2", in case of Moody's (or the equivalent of such ratings) immediately prior to the signing of the arrangement that resulted in such Change of Control, regardless of any rating after the occurrence of such Change of Control.

"*Clearstream*" means Clearstream Banking S.A., and its successors.

"*Collateral*" means those assets subject from time to time to a Lien in favor of the Security Agent on behalf of the Holders under the Collateral Documents.

"*Collateral Documents*" means the initial documents listed in Exhibit E hereto and any other security agreements, the pledge agreements, the collateral assignments and other instruments and documents evidencing or creating a Lien over any Collateral for or on behalf of the Security Agent for the benefit of the Holders or in the Security Agent's capacity as a parallel debt creditor (as applicable), in each case as amended or supplemented from time to time.

"*Common Depositary*" means Deutsche Bank AG, London Branch, as common depository for Euroclear and Clearstream until a successor replaces it and thereafter means the successor serving hereunder.

"*Company*" means KCA DEUTAG Alpha Limited and any and all successors or assigns.

"*Consolidated EBITDA*" means, with respect to any specified Person for any period, the consolidated operating profit of such Person and its Restricted Subsidiaries (the "*Reporting Group*") for such period before exceptional items, adjusted as follows without double counting:

(1)     *plus* (to the extent otherwise deducted) any deduction for or on account of corporation tax or other taxes on income or gains;

(2)     *plus* (to the extent otherwise deducted) any deduction for Fixed Charges or any other debt or equity finance related fee or cost or post-retirement benefit scheme costs charged to finance costs in accordance with IFRS;

(3)     *less* (to the extent otherwise included) any gain over book value arising in favor of a member of the Reporting Group on the disposal of any business or asset (other than inventory disposed of in the normal course of business) during such period and any gain arising on any revaluation of any business or asset during such period;

(4)     *plus* (to the extent otherwise deducted) any loss against book value incurred by a member of the Reporting Group on the disposal of any business or asset (other than inventory disposed of in the normal course of business) during such period and any loss on revaluation of any business or asset during such period;

(5)     *plus* (to the extent otherwise deducted) amortization of any goodwill or any intangible assets, including amortization of costs related to the incurrence of Indebtedness or the

11

**364**

making of any acquisition or joint venture investment, in each case to the extent that acquisition or joint venture investment (as applicable) is permitted under this Indenture;

(6)     *plus* (to the extent otherwise deducted) any depreciation on, or impairment of, or write-down of, fixed assets, during such period;

(7)     *excluding* profits or losses on discontinued operations;

(8)     *excluding* unusual or non-recurring items and non-cash charges;

(9)     *taking into account* any exchange gains or losses, including any arising on translation of currency debt, and any hedging gains or losses relating to finance costs and any gains or losses on any financial instrument (other than any derivative instrument which is accounted for on a hedge accounting basis);

(10)    *plus* (to the extent otherwise deducted) any monitoring, consulting or advisory fees accrued or paid to or on behalf of the Equity Investors;

(11)    *plus* (to the extent otherwise deducted) all fees (including notarial fees), commissions, costs and expenses, stamp, registration and other Taxes incurred by such Person or any of its Restricted Subsidiary in connection with the Restructuring, the Scheme Documents, this Indenture, any Senior Facilities Agreements (whether before or after the Issue Date) and any equivalent amounts in connection with any acquisition, joint venture or disposal, incurrence of Indebtedness and Initial Public Offerings to the extent that such acquisition, joint venture or disposal, incurrence of indebtedness or Initial Public Offering (as applicable) is not prohibited under this Indenture;

(12)    *plus* (to the extent not otherwise included) the consolidated earnings from ordinary activities of any unconsolidated entities received as dividends or distributions by any member of the Reporting Group during such period;

(13)    *plus* (to the extent not otherwise included) the proceeds of any business interruption insurance;

(14)    *excluding* any gain arising from the direct or indirect acquisition of any debt instrument at a discount to par;

(15)    *taking no account of* any income or charge attributable to a post-employment benefit scheme other than the current service costs attributable to the scheme;

(16)    *taking no account of* any expense referable to equity settled share based compensation of employees or management; and

(17)    *taking into account* any adjustments made in accordance with Section 4.27.

Unless stated otherwise, the Consolidated EBITDA referred in this Indenture and the Notes refers to the Consolidated EBITDA of the Company.

"*Consolidated Net Income*" means, with respect to any specified Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with IFRS; *provided* that:

(1)     any extraordinary, unusual or nonrecurring gain, loss or charge (including, without limitation, pension expense, casualty losses, severance expenses, redundancy expenses, integration expenses, relocation expenses, other restructuring expenses and fees, expenses or charges related to any offering of Equity Interests of such Person, any recapitalization, any refinancing, any Investment, acquisition or Indebtedness permitted to be Incurred hereunder (in each case, whether or not successful) or any asset impairment charges or the financial impacts of natural disasters (including fire, flood and storm and related events)) shall be excluded;

(2)     any income or loss from discontinued operations and any net after-tax gain or loss on disposal of discontinued operations shall be excluded;

(3)     any gains or losses (*minus* all fees and expenses or transaction costs relating thereto) attributable to business dispositions or asset dispositions of the Company or any of its Restricted Subsidiaries (including pursuant to any sale leaseback transaction) other than in the ordinary course of business (as determined in good faith by the Board of Directors or senior management of the Company) shall be excluded;

(4)     any income or loss (*minus* all fees and expenses or transaction costs relating thereto) attributable to the early extinguishment of indebtedness and Hedging Obligations shall be excluded;

(5)     (A) the Net Income for such period of any Person that is not a Restricted Subsidiary, or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of dividends or distributions or other payments in respect of equity that are actually paid in cash or Cash Equivalents or Government Guaranteed Securities (or to the extent converted into cash or Cash Equivalents or Government Guaranteed Securities) by the referent Person to the Company or a Restricted Subsidiary thereof in respect of such period, (B) the Net Income for such period shall include any dividend, distribution or other payments in respect of equity paid in cash or Cash Equivalents or Government Guaranteed Securities (or to the extent converted into cash or Cash Equivalents or Government Guaranteed Securities) by such Person to the Company or a Restricted Subsidiary thereof in excess of the amount included in clauses (A) and (C) the net loss of any Person that is not a Restricted Subsidiary will be included only to the extent that such loss has been funded with cash by the specified Person or a Restricted Subsidiary of such Person;

(6)     any long-term incentive plan accruals that are not settled in cash and any non-cash compensation charge or expense realized from grants of stock appreciation or similar rights, stock options or other similar rights to officers, directors and employees of such Person or any of its Restricted Subsidiaries shall be excluded;

(7)     solely for the purpose of determining the amount available for Restricted Payments under Section 4.07(a)(3), the Net Income of any Restricted Subsidiary (other than any Guarantor) will be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders or members (other than (a) restrictions that have been waived or otherwise released or (b) restrictions

13

permitted by Section 4.08; *provided* that Consolidated Net Income of such Person shall be included in Consolidated Net Income up to the aggregate amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents or Government Guaranteed Securities (or to the extent converted into cash or Cash Equivalents or Government Guaranteed Securities) by such Person to the Company or another Restricted Subsidiary thereof in respect of such period, to the extent not already included therein;

(8)     the cumulative effect of a change in accounting principles shall be excluded;

(9)     any exchange gains or losses, including any arising on translation of currency debt, and any hedging gains or losses relating to finance costs and any gains or losses on any financial instrument (other than any derivative instrument which is accounted for on a hedge accounting basis), shall be excluded;

(10)    goodwill or other intangible asset impairment charge will be excluded;

(11)    any one time non-cash charges or any amortization or depreciation resulting from purchase accounting, in each case, in relation to any acquisition of another Person or business or resulting from any reorganization or restructuring involving the Company or its Subsidiaries will be excluded; and

(12)    the impact of capitalized, accrued or accreting or pay-in-kind interest or accreting principal on Subordinated Shareholder Debt shall be excluded.

"*Consolidated Net Leverage*" means, with respect to any specified Person as of any date of determination, the total amount of Indebtedness of such Person and its Restricted Subsidiaries (excluding any Indebtedness Incurred under clauses (1)(A), (6)(A) (unless it is secured by a Lien on the Collateral that ranks *pari passu* to the Notes and the Guarantees, but still excluding any Indebtedness secured by a Lien described under clause (1)(b) of the definition of "Permitted Collateral Liens"), (6)(B), (8), (9), (10), (11), (12), (13), (16), (18) and (19) of Section 4.09(b)) *less* cash and Cash Equivalents of such Person and its Restricted Subsidiaries on a consolidated basis.

"*Consolidated Net Leverage Ratio*" means, with respect to any specified Person as of any date of determination, the ratio of (a) the Consolidated Net Leverage of such Person on such date to (b) the Consolidated EBITDA of such Person, in each case with any adjustments made in accordance with Section 4.27.

"*Consolidated Senior Secured Net Leverage*" means, with respect to any specified Person as of any date of determination, the sum without duplication of the total amount of Senior Secured Indebtedness of such Person and its Restricted Subsidiaries *less* cash and Cash Equivalents of such Person and its Restricted Subsidiaries on a consolidated basis.

"*Consolidated Senior Secured Net Leverage Ratio*" means, with respect to any specified Person as of any date of determination, the ratio of (a) the Consolidated Senior Secured Net Leverage of such Person on such date to (b) the Consolidated EBITDA of such Person in each case with any adjustments made in accordance with Section 4.27.

"*Contingent Obligations*" means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute

14

Indebtedness ("*primary obligations*") of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1)    to purchase any such primary obligation or any property constituting direct or indirect security thereof;

(2)    to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)    to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

"*Credit Facilities*" means one or more debt facilities, instruments or arrangements or any revolving credit facility or commercial paper facilities, bankers' acceptances, overdraft facilities, indentures or trust deeds, in each case with banks or other institutional lenders or investors providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables), LC and Bank Guarantees, bonds, notes, debentures or other corporate debt instruments, Cash Management Facilities or other Indebtedness, in each case, as amended, restated, modified, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time in one or more agreements or indentures (in each case with the same or new lenders or institutional investors or investors), including any agreement or indenture extending the maturity thereof or otherwise restructuring all or any portion of the indebtedness thereunder, increasing the amount loaned or issued thereunder, altering the maturity thereof, adding Subsidiaries of the Company as additional borrowers, issuers or guarantors thereunder or otherwise altering the terms and conditions thereof, and in each case including all agreements, instruments and documents executed and delivered pursuant to or in connection with the foregoing.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Definitive Registered Note*" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.06, substantially in the form of Exhibit A hereto except that such Note shall not bear the Global Note Legend and shall not have the "Schedule of Exchanges of Interests in the Global Note" attached thereto.

"*Designated Non-cash Consideration*" means the Fair Market Value of non-cash consideration received by the Company or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as "*Designated Non-cash Consideration*" pursuant to an Officer's Certificate, setting forth the basis of such valuation, *less* the amount of cash or Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

"*Designated Preference Shares*" means, with respect to the Company or any Parent, preferred stock (other than Disqualified Stock) (1) that is issued for cash (other than to the Company or a Subsidiary of the Company or an employee stock ownership plan or trust

15

**368**

established by the Company or any such Subsidiary for the benefit of their employees to the extent funded by the Company or such Subsidiary) and (2) that is designated as "*Designated Preference Shares*" pursuant to an Officer's Certificate of the Company at or prior to the issuance thereof, the net cash proceeds of which are excluded from the calculation set forth in Section 4.07(a)(C)(ii).

"*Disqualified Stock*" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the date on which the Notes mature; *provided* that if such Capital Stock is issued pursuant to any plan for the benefit of employees of the Company or any Restricted Subsidiary of the Company, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company or any such Restricted Subsidiary in order to satisfy applicable statutory or regulatory obligations.  Notwithstanding the preceding sentence, any Capital Stock will not constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Company or any Restricted Subsidiary to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale.  The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Indenture will be the maximum amount that the Company and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends.  The term "*Disqualified Stock*" shall also include any options, warrants or other rights that are convertible into Disqualified Stock or that are redeemable at the option of the holder or required to be redeemed, prior to the date that is 91 days after the date on which the Notes mature.

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

"*Equity Investors*" means any equity holder holding more than 10.0% of the voting power of the Voting Stock of the Company on the Issue Date plus any affiliates and related parties.

"*Equity Offering*" means an offering of Capital Stock (other than an offering to the Company or any of its Restricted Subsidiaries) (a) of the Company (other than Disqualified Stock of the Company), other than an offering pursuant to a registration statement on Form S-8 or otherwise relating to equity securities issuable under any employee benefit plan of the Company, or (b) the net proceeds of which are contributed to the equity capital of the Company or any Restricted Subsidiary (other than through the issuance of Disqualified Stock) or as Subordinated Shareholder Debt.

"*Euroclear*" means Euroclear Bank, SA/NV and its successors.

"*European Union*" means the European Union as of January 1, 2004, including the countries of Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, Sweden and the United Kingdom, but not including any country which becomes a member of the European Union after January 1, 2004.

"*Exchange*" means The International Stock Exchange Authority Limited.

16

**369**

"*Excluded Contributions*" means the aggregated net cash proceeds and the Fair Market Value of property, assets and marketable securities received by the Company after the date of this Indenture from:

(1)    contributions to its common equity capital,

(2)    the sale or issuance (other than to a Subsidiary of the Company) of Capital Stock (other than Disqualified Stock) of the Company, and

(3)    Subordinated Shareholder Debt;

in each case designated as "*Excluded Contributions*" pursuant to an Officer's Certificate of the Company (which shall be designated no later than the date on which such Excluded Contribution has been received by the Company), the net cash proceeds of which are excluded from the calculation set forth in Section 4.07(a)(C)(ii).

"*Fair Market Value*" means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by the Company's chief executive officer, chief financial officer, head of treasury, head of corporate development, head of group accounting or a responsible accounting or financial officer of the Company (unless otherwise provided in this Indenture).

"*Fitch*" means Fitch Ratings, Ltd, and its successors.

"*Fixed Charges*" means, with respect to any specified Person for any period, the sum, without duplication, of:

(1)    the consolidated interest expense (net of interest income) of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, excluding amortization of debt issuance costs and the expensing of any bridge or other financing fees, expenses and commissions, but including original issue discount, non-cash interest payments (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments), the interest component of any deferred payment obligations (classified as Indebtedness under this Indenture), the interest component of all payments associated with Lease Obligations and net of the effect of all payments made or received pursuant to Hedging Obligations in respect of interest rates; *plus*

(2)    the consolidated interest expense of such Person and its Restricted Subsidiaries that was capitalized during such period; *plus*

(3)    all cash dividend payments or other cash distributions on any series of preferred stock of such Person and all other dividend payments or other distributions on the Disqualified Stock of such Person (other than dividends or distributions payable to the Company or any Restricted Subsidiary),

in each case, on a consolidated basis and in accordance with IFRS, but not, in each case, including any non-cash interest expense relating to Subordinated Shareholder Debt and any interest paid or payable on Indebtedness between the Company and any of its Restricted Subsidiaries or between any Restricted Subsidiary and any other Restricted Subsidiary.

"*Fixed Charge Coverage Ratio*" means, with respect to any specified Person for any period, the ratio of (a) Consolidated EBITDA of such Person for such period to (b) the Fixed Charges of such Person for such period in each case with any adjustments made in accordance with Section 4.27.

"*Global Note Legend*" means the legend set forth in Section 2.06 which is required to be placed on all Global Notes issued under this Indenture.

"*Global Notes*" means, individually and collectively, each of the 144A Global Notes, the IAI Global Notes and the Regulation S Global Notes.

"*Government Guaranteed Securities*" means:

(1)   securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents) and in each case with maturities not exceeding two years from the date of acquisition;

(2)   corresponding instruments by any member state of the European Union (*provided* that such member state has one of the two highest ratings obtainable from Moody's or S&P) or Switzerland or Norway or Japan or the United Kingdom, or any agency or instrumentality of any member state of the European Union (*provided* that such member state has one of the two highest ratings obtainable from Moody's or S&P) or Switzerland or Norway or Japan or the United Kingdom and in each case with maturities not exceeding two years from the date of acquisition; and

(3)   investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) of this definition which fund may also hold immaterial amounts of cash pending investment and/or distribution.

"*Government Obligations*" mean direct obligations (or certificates representing an ownership interest in such obligations) of the U.S. government or any agency or instrumentality thereof, or any member state of the European Union (*provided* that such member state has one of the two highest ratings obtainable from Moody's or S&P) or Switzerland or Norway or Japan, or the United Kingdom or any agency or instrumentality of any member state of the European Union (*provided* that such member state has one of the two highest ratings obtainable from Moody's or S&P) or Switzerland or Norway or Japan or the United Kingdom for the payment of which the full faith and credit of such government is pledged.

"*Guarantee*" means the guarantee by each Guarantor of the Issuer's obligations under this Indenture and the Notes executed pursuant to the provisions of this Indenture.

"*guarantee*" means a guarantee other than by endorsement of negotiable instruments for collection or deposit in the ordinary course of business of all or any part of any Indebtedness (whether arising by agreements to keep-well, to take or pay or to maintain financial statement conditions, pledges of assets or otherwise).

"*Guarantors*" means each of:

(1)   the Company, Abbot Group Limited, Abbot Holdings Limited, KCA Deutag (Land Rig) Limited, KCA Deutag Caspian Limited, KCA Deutag Drilling Group Limited, KCA European Holdings Limited, Abbot Verwaltungsgesellschaft mbH, Bentec GmbH

18

**371**

Drilling & Oilfield Systems, KCA Deutag Drilling GmbH, KCA Deutag GmbH, KCA Deutag Tiefbohrgesellschaft mbH, KCA Deutag Europe B.V., KCA Deutag Nederland B.V., Abbot Holdings Norge AS, KCA Deutag Drilling Norge AS, KCA Deutag Drilling Offshore Services AS, KCA Deutag Holdings Norge AS, KCA Deutag MODU Operations AS, KCA Deutag Offshore AS, KCA Deutag Energy Global LLC, KCA Deutag Energy International LLC, KCA Deutag Energy LLC, KCA Deutag Drilling LLC, KCA Deutag Russia LLC, KCA Deutag Gulf Drilling Limited Company, KCA Deutag Drilling Limited, KCA Deutag Technical Support Limited, SET Drilling Company Limited; and

(2)    any other Person that becomes a Guarantor in accordance with this Indenture, and their respective successors and assigns,

in each case, until the Guarantee of such Person has been released in accordance with this Indenture.

"*Hedging Obligations*" means, with respect to any specified Person, the obligations of such Person under:

(1)    interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements;

(2)    other agreements or arrangements designed to manage interest rates or interest rate risk; and

(3)    other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

"*Holdco Liquidation Payment*" means a payment to fund the liquidation costs of KCAD Deutag Alpha II Limited, KCAD Holdings I Limited, KCAD Holdings II Limited, KCA Deutag Finance I Limited, KCA Deutag Finance II Limited, KCA Deutag Midco Limited, Land Rig Ventures I Limited, Land Rig Ventures II Limited and KCA Deutag Drilling Rigs I Limited, in accordance with the Scheme Documents.

"*Holder*" means a Person in whose name a Note is registered.

"*Holding Period Trustee*" has the meaning given to that term in the Scheme.

"*IAI Global Note*" means a Global Note bearing the Global Note Legend and the Private Placement Legend and deposited with and registered in the name of, the Common Depositary or its nominee, that will be issued in an initial amount equal to the principal amount of the Notes initially sold to institutional "accredited investors" ("*IAIs*") within the meaning of Rule 501(a)(1), (2), (3) or (7) under Regulation D of the U.S. Securities Act ("Regulation D") that are not also QIBs, substantially in the form of Exhibit A hereto and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Article 2.

"*IFRS*" means the international accounting standards promulgated by the International Accounting Standards Board and its successors, as adopted by the European Union or the United Kingdom, as in effect from time to time, unless otherwise stated; *provided* that at any date after the Issue Date, the Company may make an irrevocable election to establish that

19

**372**

"IFRS" shall mean, except as otherwise specified herein, IFRS as in effect on a date that is on or prior to the date of such election.

"*Incur*" means create, incur, issue, assume, guarantee or otherwise become liable with respect to; and the terms "*Incurs*", "*Incurred*" and "*Incurrence*" have meanings correlative to the foregoing; *provided,* however, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Restricted Subsidiary, whether by merger, consolidation, acquisition or otherwise, will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary and any Indebtedness pursuant to any revolving credit or similar facility shall only be Incurred at the time any funds are borrowed thereunder).

"*Indebtedness*" means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables):

(1)     in respect of borrowed money;

(2)     evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof); *provided* that any counter-indemnity or reimbursement obligation under a letter of credit shall be considered Indebtedness only to the extent that the underlying obligation in respect of which the letter of credit has been issued would also be Indebtedness;

(3)     in respect of banker's acceptances;

(4)     representing Lease Obligations;

(5)     representing the balance deferred and unpaid of the purchase price of any property or services due more than one year after such property is acquired or such services are completed, unless being disputed in good faith;

(6)     representing any Hedging Obligations (*provided* that the amount of Indebtedness under Hedging Obligations of a Person will be calculated by reference to the net liability of such Person thereunder (as determined in accordance with IFRS as of the date of the most recent financial statements available at the date of determination)); or

(7)     the principal amount of any Disqualified Stock of the Company or any preferred stock of any Restricted Subsidiary,

if and to the extent any of the preceding items (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the notes thereto) of the specified Person prepared in accordance with IFRS.  In addition, the term "*Indebtedness*" includes (i) all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person); *provided, however,* that the amount of such Indebtedness shall be the lesser of (x) the Fair Market Value of such asset as of such date of determination and (y) the amount of such Indebtedness of such other Person; and (ii) to the extent not otherwise included, the guarantee by the specified Person of any Indebtedness of any other Person to the extent guaranteed by such Person.

Notwithstanding the foregoing, "*Indebtedness*" shall not include any

20

**373**

(A)    Subordinated Shareholder Debt,

(B)    Contingent Obligations Incurred in the ordinary course of business,

(C)    in connection with the purchase by the Company or any Restricted Subsidiary of any business, any post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing; *provided, however*, that, at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid within 30 days thereafter,

(D)    for the avoidance of doubt, any contingent obligations in respect of workers' compensation claims, early retirement or termination obligations, pension fund obligations or contributions or similar claims, obligations or contributions or social security or wage Taxes,

(E)    Qualified Receivables Financing; or

(F)    deferred or prepaid revenues, including prepayments or deposits received from clients or customers, in each case, in the ordinary course of business.

"*Indenture*" means this indenture in respect of the Notes (including any Additional Notes issued hereunder) as amended or supplemented from time to time.

"*Indirect Participant*" means a Person who holds a Book-Entry Interest in a Global Note through a Participant.

"*Initial Notes*" means the $500,000,000 aggregate principal amount of Notes issued under this Indenture on the Issue Date.

"*Initial Public Offering*" means an Equity Offering of common stock or other common equity interests of the Company or any Parent or any successor of the Company or any Parent (the "*IPO Entity*") following which there is a Public Market and, as a result of which, the shares of common stock or other common equity interests of the IPO Entity in such offering are listed on an internationally recognized exchange or traded on an internationally recognized market.

"*Intercreditor Agreement*" means the intercreditor agreement dated on or prior to the Issue Date, by and among, *inter alios*, the Company, the Issuer, the Security Agent and the Trustee, as amended from time to time.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's, BBB- (or the equivalent) by S&P or the equivalent investment grade credit rating from any other Rating Agency.

"*Investments*" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including guarantees or other obligations), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers or suppliers and commission, travel and similar advances to

21

**374**

officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person, together with any investments that are required under IFRS to be classified as investments on a balance sheet (excluding the notes thereto) of such Person in the same manner as other investments included in this definition and to the extent such transactions involve the transfer of cash or other property. If the Company or any Subsidiary of the Company sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary of the Company such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of the Company, the Company will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Company's Investments in such Restricted Subsidiary that were not sold or disposed of. Except as otherwise provided in this Indenture, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"*IPO Entity*" has the meaning assigned to it in the definition of "*Initial Public Offering*".

"*IPO Market Capitalization*" means an amount equal to (1) the total number of issued and outstanding shares of common stock or common equity interests of the IPO Entity at the time of closing of the Initial Public Offering multiplied by (2) the price per share at which such shares of common stock or common equity interests are sold in such Initial Public Offering.

"*LC and Bank Guarantee*" means any letters of credit, bank guarantee, completion or performance bond, bid/tender bond, custom bond, advance payment guarantee, tax bond, surety bonds, appeal bonds, rent guarantee bonds or any similar obligation used by the Company or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice, including issuance of any back to back letters of credit, guarantees or similar instruments in favor of an issuer of any such instrument.

"*Issue Date*" means [●], 2020.

"*Issuer*" means KCA Deutag UK Finance plc, and any and all successors or assigns thereto.

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof.

"*Lease Obligation*" means an obligation that is required to be classified and accounted for as a lease for financial reporting purposes on the basis of IFRS. The amount of Indebtedness will be, at the time any determination is to be made, the amount of such obligation required to appear on a balance sheet (excluding any notes thereto) prepared in accordance with IFRS, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

"*Management*" means any members of management of any Parent, the Company or any Restricted Subsidiary of the Company (for this purpose including any person who was a member of management when acquiring an interest) or any former member of management and/or any other person directly or indirectly holding any interest pursuant to a MIP.

22

**375**

"*Management Advances*" means, loans or advances made to, or guarantees with respect to loans or advances made to, Management, directors, current or former officers, employees or consultants of any Parent, the Company or any Restricted Subsidiary of the Company (or to any trust or other entity holding shares or other investments in connection with any MIP):

(1)    in respect of travel, entertainment or moving related expenses Incurred in the ordinary course of business;

(2)    in respect of moving related expenses Incurred in connection with any closing or consolidation of any facility or office; or

(3)    (in the case of this clause (3)) in the ordinary course of business or consistent with past practice not to exceed the greater of $5.0 million and 2.0% of Consolidated EBITDA in the aggregate at any one time outstanding, subject to the approval of the Board of Directors of the Company.

"*Market Capitalization*" means an amount equal to (i) the total number of issued and outstanding shares of common stock or common equity interests of the IPO Entity on the date of the declaration of the relevant dividend multiplied by (ii) the arithmetic mean of the closing prices per share of such common stock or common equity interests for the 30 consecutive trading days immediately preceding the date of declaration of such dividend.

"*Maturity Date*" means December 1, 2025.

"*MIP*" means any management equity plan, employee benefit scheme, incentive scheme or other similar or equivalent arrangement.

"*MIP Payment*" means any payment or transaction which is, or which is to be made, entered into or used directly or indirectly (or to facilitate any such step or payment):

(1)    to make payment to a member of any MIP (including payments to members leaving any MIP) or any trust or other person in respect of any MIP or pay any costs and expenses properly incurred in the establishing and maintaining of any MIP (provided that, for the avoidance of doubt, nothing in this Indenture shall prohibit any payments to, or the acquisition of shares or other interests or investments of, employees or Management); and/or

(2)    for repayment or refinancing of amounts outstanding under any loan made in connection with an MIP or capitalisation of such loans.

"*Moody's*" means Moody's Investors Service, Inc. and its successors and assigns.

"*Net Income*" means, with respect to any Person for any period, the net income (loss) of such Person for such period, determined in accordance with IFRS and before any reduction in respect of dividends on preferred stock.

"*Net Proceeds*" means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but

23

**376**

excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any non-cash form), net of the direct costs relating to such Asset Sale and the sale of such Designated Non-cash Consideration, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses Incurred as a result of the Asset Sale or Taxes paid or payable as a result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, and amounts required to be applied to the repayment of Indebtedness, other than Indebtedness under a Credit Facility, secured by a Lien on the asset or assets that were the subject of such Asset Sale and any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with IFRS, including without limitation, pension and post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

"*Notes*" has the meaning assigned to it in the preamble to this Indenture. The Initial Notes and any Additional Notes shall be treated as a single class for all purposes under this Indenture, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additional Notes.

"*Notes Documents*" means the Notes, the Guarantees, this Indenture, the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement.

"*Obligations*" means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

"*Officer*" means, with respect to any Person, the chairman of the Board of Directors, the chief executive officer, the president, the chief operating officer, the chief financial officer, the head of treasury, the treasurer, any assistant treasurer, the head of corporate development, the head of group accounting, the controller, the secretary, any senior vice president, any vice president or any assistant vice president of such Person or any other Person that the Board of Directors of such Person shall designate for such purpose.

"*Officer's Certificate*" means a certificate signed on behalf of the Company by an Officer of the Company that meets the requirements of this Indenture.

"*Opinion of Counsel*" means a written opinion from legal counsel reasonably satisfactory to the Trustee.

"*Ordinary Course Lease Obligations*" means any Lease Obligation relating to property or assets in which a significant portion of the risks and rewards of ownership are not transferred to the Company or any Restricted Subsidiary as lessee and are Incurred in the ordinary course of business (in the good faith determination of the Company).

"*Parent*" means any direct or indirect parent company or entity of the Company and where specified any direct or indirect parent company or entity of the specified entity.

"*Pari Passu Indebtedness*" means (1) any Indebtedness of the Issuer that is *pari passu* in right of payment to the Notes and (2) any Indebtedness of a Guarantor that is *pari passu* in right of payment to such Guarantor's Guarantees.

24

**377**

"*Participant*" means, with respect to the Common Depositary, a Person who has an account with the Common Depositary.

"*Permitted Business*" means the businesses, services or activities of the Company and its Subsidiaries and joint ventures engaged in on the date of this Indenture and any other businesses, services or activities that are similar, incidental, complementary, ancillary or reasonably related to, or a reasonable extension, expansion or development of, such businesses.

"*Permitted Collateral Liens*" means:

(1)    (a) Liens on the Collateral that are described in one or more of clauses (4), (8), (12), (13), (15), (17), (18), (20), (22), (23), (24), (26), (27), (29), (30), (31) and (32) of the definition of Permitted Liens and that, in each case, would not materially interfere with the ability of the Security Agent to enforce any Lien over the Collateral and (b) Liens on assets that only constitute part of the Collateral because such assets are subject to a floating charge for the benefit of (or to secure) the Notes or the Guarantees that are described in one or more clauses of the definition of "Permitted Liens";

(2)    Liens on the Collateral to secure Indebtedness:

   (a)    pursuant to the Notes (or the Guarantees) (excluding any Additional Notes (or any guarantee of Additional Notes)) and Permitted Refinancing Indebtedness in respect thereof (and Permitted Refinancing Indebtedness in respect of such Permitted Refinancing Indebtedness;

   (b)    pursuant to Section 4.09(b)(1), which Indebtedness (up to an aggregate amount not exceeding the greater of (x) $225.0 million and (y) 100% of Consolidated EBITDA at any time and with any Indebtedness under any Cash Management Facilities to be calculated on a net basis to the extent permitted under the relevant Cash Management Facility) may have super senior priority status in respect of the proceeds from the enforcement of the Collateral;

   (c)    pursuant to Section 4.09(b)(1)(B), Section 4.09(b)(17) and Section 4.09(b)(22) and Permitted Refinancing Indebtedness in respect of any of such Indebtedness (and Permitted Refinancing Indebtedness in respect of such Permitted Refinancing Indebtedness);

   (d)    pursuant to Sections 4.09(b)(6) (but with respect to Lease Obligations covering only the assets acquired, improved, constructed, leased with or financed by such Indebtedness, the shares of entities that own such assets, and receivables and bank accounts therefrom);

   (e)    pursuant to Section 4.09(b)(10) and Hedging Obligations in connection with any Senior Notes; which may have super senior priority status in respect of the proceeds from the enforcement of the Collateral;

   (f)    pursuant to Section 4.09(b)(11) (to the extent such guarantee is in respect of Indebtedness otherwise permitted to be secured and is specified in this definition of Permitted Collateral Liens);

(g)        pursuant to Section 4.09(b)(14) and Section 4.09(b)(15) and Permitted Refinancing Indebtedness in respect of any of such Indebtedness (and Permitted Refinancing Indebtedness in respect of such Permitted Refinancing Indebtedness);

(h)        pursuant to Section 4.09(b)(12)(A) and Section 4.09(b)(19);

(i)        on a basis junior to the Liens on such Collateral securing the Notes and the Guarantees and Permitted Refinancing Indebtedness in respect thereof (and Permitted Refinancing Indebtedness in respect of such Permitted Refinancing Indebtedness); and

(j)        solely with respect to Collateral securing any Senior Notes or guarantees in respect thereof, Indebtedness issued or borrowed by any issuer of Senior Notes and the guarantees in respect thereof; *provided* that such Liens rank junior to the Liens on the same Collateral securing the Notes and the Guarantees;

*provided,* that with respect to this clause (2) each of the secured parties to any such Indebtedness (acting directly or through its respective creditor representative) will have entered into the Intercreditor Agreement or an Additional Intercreditor Agreement; *provided, further* that subject to the Agreed Security Principles all property and assets (including, without limitation, the Collateral) of the Company or any Restricted Subsidiary securing such Indebtedness (including any guarantees thereof) or Permitted Refinancing Indebtedness secure the Notes and related Guarantees and the Indenture on a senior or *pari passu* basis, except to the extent provided in clauses (b) and (e) above.

For purposes of determining compliance with this definition, (w) a Lien need not be Incurred solely by reference to one category of Permitted Collateral Liens described in this definition, but may be Incurred under any combination of such categories (including in part under one such category and in part under any other such category), (x) in the event that a Lien (or any portion thereof) meets the criteria of one or more of such categories of Permitted Collateral Liens, the Company shall, in its sole discretion, classify or reclassify such Lien (or any portion thereof) in any manner that complies with this definition, (y) the principal amount of Indebtedness secured by a Lien outstanding under any category of Permitted Collateral Liens shall be determined after giving effect to the application of proceeds of any such Indebtedness to refinance any such other Indebtedness, and (z) any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the Incurrence of such Indebtedness shall also be permitted to secure any increase in the amount of such Indebtedness in connection with the accrual of interest, the accretion of accreted value, the payment of interest in the form of additional Indebtedness and the payment of dividends on Capital Stock constituting Indebtedness in the form of additional shares of the same class of Capital Stock.

"*Permitted Holders*" means each of (a) the Equity Investors and Related Parties (other than the Company and any of its Restricted Subsidiaries), (b) any person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made in accordance with the requirements of this Indenture, together with its Affiliates, (c) any "group" (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act as in effect on the Issue Date) of which any of the foregoing are members, *provided* that in the case of such "group" and without giving effect to the existence of such "group" or any other "group," the persons referred to in clauses (a) and (b) above,

26

**379**

collectively, have beneficial ownership, directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Company or any of its direct or indirect parent entities held by such "group," and (d) any person acting as an underwriter in connection with any public or private offering of the common stock or other common equity interests of the Company or any of its direct or indirect parent entities.

"*Permitted Investments*" means:

(1)    any Investment in the Company or in a Restricted Subsidiary of the Company;

(2)    any Investment in cash, Cash Equivalents or Government Guaranteed Securities;

(3)    any Investment by the Company or any Restricted Subsidiary of the Company in a Person, if as a result of such Investment:

  (a)    such Person becomes a Restricted Subsidiary of the Company; or

  (b)    such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company, and, in each of cases (a) and (b), any Investment then held by such Person; *provided* that any such Investment was not made by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Restricted Subsidiary of the Company or such merger, consolidation, amalgamation, transfer, conveyance or liquidation;

(4)    any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 4.10 or any acquisition or other Investment made in accordance with Section 4.10(c);

(5)    any Investment the payment for which consists of Equity Interests (other than Disqualified Stock) of the Company or any Parent (which Investment, in the case of any Parent, is contributed to the common equity capital of the Company; *provided* that any such contribution shall be excluded from Section 4.07(a)(C)(ii);

(6)    any Investments received (i) in compromise or resolution of (A) obligations of trade creditors or customers that were Incurred in the ordinary course of business of the Company or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes; or (ii) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)    Investments represented by Hedging Obligations;

(8)    [*Reserved*];

(9)    guarantees issued in accordance with Section 4.09;

**380**

(10)    any Investment existing, or made pursuant to binding commitments existing, on the Issue Date and any Investment that replaces, refinances or refunds such Investment; *provided* that the new investment is in an amount that does not exceed the amount replaced, refinanced or refunded, and is made in the same Person as the Investment replaced, refinanced or refunded;

(11)    Investments consisting of purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of intellectual property, in each case in the ordinary course of business;

(12)    additional Investments by the Company or any Restricted Subsidiary having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), taken together with all other Investments made pursuant to this clause (12) that are at the time outstanding not to exceed the greater of $80.0 million and 35.0% of Consolidated EBITDA; *provided*, *however*, that if any Investment pursuant to this clause (12) is made in a Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) of this definition and shall cease to have been made pursuant to this clause (12);

(13)    Investments in joint ventures or in any Unrestricted Subsidiary of the Company or any of its Restricted Subsidiaries having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), taken together with all other Investments made pursuant to this clause (13) that are at the time outstanding not to exceed the greater of $80.0 million and 35.0% of Consolidated EBITDA; provided, however, that if an Investment is made pursuant to this clause (13) in a Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) of this definition and shall cease to have been made pursuant to this clause (13);

(14)    any Investments made in connection with a Qualified Receivables Financing, including Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related indebtedness;

(15)    Investments in the Notes, any Additional Notes and any other Indebtedness of the Company or any of its Restricted Subsidiaries; and

(16)    Investments contemplated by the Restructuring.

    "*Permitted Liens*" means:

(1)    Liens in favor of the Company or any Restricted Subsidiary;

(2)    Liens on property (including Capital Stock) of a Person existing at the time such Person becomes a Restricted Subsidiary or is merged with or into or consolidated with the Company or any Restricted Subsidiary of the Company; *provided* that such Liens were in existence prior to, and not Incurred in contemplation of, such Person becoming a Restricted Subsidiary or such merger or consolidation, and do not extend to any assets

28

**381**

other than those of the Person that becomes a Restricted Subsidiary or is merged into or consolidated with the Company or the Restricted Subsidiary;

(3)     Liens on property (including Capital Stock) existing at the time of acquisition of the property by the Company or any Subsidiary of the Company; *provided* that such Liens were in existence prior to, such acquisition, and not Incurred in contemplation of, such acquisition and do not extend to any property other than the property so acquired by the Company or such Restricted Subsidiary;

(4)     Liens to secure Indebtedness permitted by Section 4.09(b)(12) and Liens or deposits to secure the performance of tenders, trade contracts, insurance, guarantees, leases, bids, statutory or regulatory obligations, or surety, appeal, indemnity or performance bonds, warranty, contractual, netting or set-off requirements or other obligations of a like nature Incurred in the ordinary course of business or consistent with past practice;

(5)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other assets relating to such letters of credit and products and proceeds thereof;

(6)     Liens to secure Lease Obligations permitted to be Incurred pursuant to Section 4.09 covering only the assets acquired with or financed by such Lease Obligation;

(7)     Liens existing on the Issue Date;

(8)     Liens for Taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings; *provided* that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(9)     Liens created for the benefit of (or to secure) the Notes or the Guarantees;

(10)    (a) Liens (other than on rigs owned by any Guarantor) securing Indebtedness or other obligations of the Company or any of its Restricted Subsidiaries at any time outstanding that do not exceed the greater of $90.0 million and 37.5% of Consolidated EBITDA and (b) Liens securing Indebtedness permitted by Section 4.09(b)(22);

(11)    Liens arising under licenses of intellectual property in the ordinary course of business;

(12)    Liens to secure any Cash Management Facilities including in respect of any netting or setting off arrangements;

(13)    Liens arising under retention of title, extended retention of title (including, without limitation, *verlängerter Eigentumsvorbehalt*), or conditional sale arrangements in the ordinary course of trading and on arm's length terms;

(14)    Liens on equipment of the Company or any Restricted Subsidiary granted in the ordinary course of business to clients upon whose property or premises such equipment is located;

(15)    Liens imposed by law (including, without limitation, Liens in favor of customers for equipment under order or in respect of advances paid in connection therewith), such as

29

**382**

carriers', warehousemen's, landlord's, lessor's, suppliers, banks, repairmen's and mechanics' Liens, and Liens of landlords securing obligations to pay lease payments that are not yet due and payable or in default, including, without limitation, any security in favor of landlords or warehouse operators (*Pfandrecht des Vermieters oder Lagerhalters*) arising solely by operation of law in favor of the relevant third party landlord or warehouse operator under a lease or warehousing agreement, in each case, Incurred in the ordinary course of business;

(16)    Liens on property or assets (including Equity Interests) at the time the Company or a Restricted Subsidiary acquired such property or assets, including any acquisition by means of a merger or consolidation with or into the Company or any Restricted Subsidiary; *provided, however*, that such Liens are not created or Incurred in connection with, or in contemplation of, such acquisition; *provided, further*, that the Liens may not extend to any other property owned by the Company or any Restricted Subsidiary;

(17)    Liens Incurred or deposits made in the ordinary course of business to secure payment of workers' compensation or to participate in any fund in connection with workmen's compensation, unemployment insurance, pensions or other social security programs including, without limitation, section 8a of the German Act on Partial Retirement (*Altersteilzeitgesetz*) or section 7e of the German Social Security Code, Part IV (*Sozialgesetzbuch IV*);

(18)    easements, rights of way, zoning and similar restrictions, reservations (including severances, leases or reservations of oil, gas, coal, minerals or water rights), restrictions or encumbrances in respect of real property or title defects that were not Incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties (as such properties are used by the Company or its Subsidiaries) or materially impair their use in the operation of the business of the Company and its Subsidiaries;

(19)    Liens to secure any Permitted Refinancing Indebtedness permitted to be Incurred under this Indenture; *provided*, *however*, that:

(a)    the new Lien shall be limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the original Lien (plus improvements and accessions to such property or proceeds or distributions thereof); and

(b)    the Indebtedness secured by the new Lien is not increased to any amount greater than the sum of (x) the original principal amount, or, if greater, committed amount, of the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged with such Permitted Refinancing Indebtedness and (y) an amount necessary to pay any fees and expenses, including premiums, related to such renewal, refunding, refinancing, replacement, defeasance or discharge;

(20)    Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(21)    Liens on Capital Stock of an Unrestricted Subsidiary that secure Indebtedness or other obligations of such Unrestricted Subsidiary;

(22)    Liens securing insurance premium financing arrangements; *provided* that such Lien is limited to the applicable insurance contracts;

(23)    Liens arising by way of set-off or pledge (in favor of the account holding bank) arising by operation of law or under standard banking terms and conditions *provided* that the relevant bank account has not been set up nor has the relevant credit balance arisen in order to implement a secured financing;

(24)    Liens on escrowed proceeds for the benefit of related holders of debt securities or other Indebtedness (or the underwriter or arrangers thereof) or on cash set aside at the time of the Incurrence of any Indebtedness or government securities purchased with such cash;

(25)    Liens securing Hedging Obligations permitted pursuant to Section 4.09(b)(10);

(26)    Liens on property or assets under construction (and related rights) in favor of a contractor or developer or arising from progress or partial payments by a third party relating to such property or assets;

(27)    Liens on specific items of inventory or other goods (and the proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances issued or created in the ordinary course of business for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(28)    [*Reserved*];

(29)    Leases (other than Lease Obligations), licenses, subleases and sublicenses of assets in the ordinary course of business;

(30)    Liens on Receivables and related assets Incurred in connection with a Qualified Receivables Financing (including Liens encumbering cash deposits in bank accounts established in connection with a Qualified Receivables Financing and Liens encumbering cash and Cash Equivalents collected from Receivables that are part of or subject to a Qualified Receivables Financing);

(31)    bankers' Liens, rights of set-off or similar rights and remedies as to deposit accounts (including any Lien created or subsisting over any asset held in any securities depository or any clearing house pursuant to the standard terms and procedures of the relevant securities depository or clearing house applicable in the normal course of trading), Liens arising out of judgments or awards not constituting an Event of Default and notices of *lis pendens* and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(32)    Liens on cash, Cash Equivalents or other property arising in connection with the defeasance, discharge or redemption of Indebtedness;

(33)    limited recourse Liens in respect of the ownership interests in, or assets owned by, any joint ventures which are not Restricted Subsidiaries securing obligations of such joint ventures;

(34)    Liens on any proceeds loan made by the Issuer or any Restricted Subsidiary in connection with any future Incurrence of Indebtedness permitted under this Indenture and securing that Indebtedness;

(35)    any interest or title of a lessor under any operating lease;

(36)    Liens on assets or property of a Restricted Subsidiary of the Company (other than a Guarantor) securing Indebtedness of such Restricted Subsidiary or another Restricted Subsidiary (other than a Guarantor);

(37)    Liens over cash paid into an escrow account pursuant to any purchase price retention arrangement as part of any permitted disposal by the Company or a Restricted Subsidiary on condition that the cash paid into such escrow account in relation to a disposal does not represent more than 15% of the net proceeds of such disposal; and

(38)    Liens securing Indebtedness under Section 4.09(b)(1) to the extent such Lien is not able or required to be granted to secure the Notes pursuant to the Agreed Security Principles.

"*Permitted Payments to Parent*" means, without duplication as to amounts:

(1)    customary indemnification obligations of any Parent owing to directors, officers, employees or other Persons under its charter or by-laws or pursuant to written agreement with any such Person to the extent relating to the Company and its Subsidiaries;

(2)    payments to any Parent to pay fees and expenses (including franchise or similar Taxes and fees and expenses properly Incurred in the ordinary course of business to auditors and legal advisors) required to maintain its corporate existence, customary salary, bonus and other benefits payable to officers and employees of any Parent of the Company and general corporate overhead expenses of any Parent of the Company, director's and officer's insurance to the extent such fees and expenses are attributable to the ownership or operation of the Company and its Subsidiaries not to exceed the greater of $5.0 million and 2.0% of Consolidated EBITDA in any 12 month period;

(3)    for so long as the Company is a member of a group filing a consolidated or combined tax return with any Parent, payments to any Parent in respect of an allocable portion of the tax liabilities of such group that is attributable to the Company and its Subsidiaries ("*Tax Payments*").  The Tax Payments shall not exceed the lesser of (i) the amount of the relevant Tax (including any penalties and interest) that the Company would owe if the Company were filing a separate tax return (or a separate consolidated or combined return with its Subsidiaries that are members of the consolidated or combined group), taking into account any carryovers and carrybacks of tax attributes (such as net operating losses) of the Company and such Subsidiaries from other taxable years and (ii) the net amount of the relevant Tax that such Parent actually owes to the appropriate Tax authority.  Any Tax Payments received from the Company shall be paid over to the appropriate taxing authority within 30 days of any Parent's receipt of such Tax Payments or refunded to the Company;

32

**385**

(4)     costs (including all professional fees and expenses) Incurred by any Parent in connection with reporting obligations under or otherwise Incurred in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, this Indenture or any other agreement or instrument relating to Indebtedness of the Company or any Restricted Subsidiaries, including in respect of any reports filed with respect to the U.S. Securities Act, U.S. Exchange Act or the respective rules and regulations promulgated thereunder;

(5)     fees and expenses of any Parent Incurred in relation to any public offering or other sale of Capital Stock or Indebtedness (whether or not completed) (a) where the net proceeds of such offering or sale are intended to be received by or contributed to the Company or any Restricted Subsidiaries; (b) in a prorated amount of such expenses in proportion to the amount of such net proceeds intended to be so received or contributed; or (c) otherwise on an interim basis prior to completion of such offering so long as any Parent will cause the amount of such expenses to be repaid to the Company or the relevant Restricted Subsidiary out of the proceeds of such offering promptly if completed and there is a reasonable expectation of completion; and

(6)     fees and expenses (including the fees and expenses of legal counsel) of any Parent Incurred in connection with the issuance of the Initial Notes, any refinancing thereof and the Restructuring, including to fund any Holdco Liquidation Payment, and any other amount payable under the Scheme Documents.

"*Permitted Refinancing Indebtedness*" means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, renew, refund, refinance, replace, defease or discharge other Indebtedness of the Company or any of its Restricted Subsidiaries (other than intercompany Indebtedness); *provided* that:

(1)     the principal amount (or accreted value, if applicable, or if issued with original issue discount, aggregate issue price) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness extended, renewed, refunded, refinanced, replaced, defeased or discharged (plus any accrued interest and any premium required to be paid on the Indebtedness being so renewed, refunded, replaced, defeased or discharged, plus the amount of all fees, commissions and expenses Incurred in connection therewith); and

(2)     such Permitted Refinancing Indebtedness has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity (disregarding any nominal amortization at the Company's option) equal to or greater than the remaining Weighted Average Life to Maturity of, the Indebtedness being extended, renewed, refunded, refinanced, replaced, defeased or discharged; and

(3)     if the Indebtedness being extended, renewed, refunded, refinanced, replaced, defeased or discharged is expressly contractually subordinated in right of payment to the Notes or the Guarantees, such Permitted Refinancing Indebtedness is subordinated in right of payment to, the Notes or the Guarantees, as applicable, on terms at least as favorable to the Holders as those contained in the documentation governing the Indebtedness being extended, renewed, refunded, refinanced, replaced, defeased or discharged.

Permitted Refinancing Indebtedness in respect of any Credit Facility or any other Indebtedness may be Incurred from time to time after the termination, discharge, or repayment of any such Credit Facility or other Indebtedness.

"*Permitted Reorganization*" means any amalgamation, demerger, merger, voluntary liquidation, consolidation, reorganization, redomiciliation, winding up, arrangement, corporate reconstruction or other similar or equivalent transaction involving the Company or any Restricted Subsidiary (other than any transaction which involves the Company ceasing to be the surviving entity) and the assignment, transfer or assumption of intragroup receivables and payables among the Company or any Restricted Subsidiaries in connection therewith (a Reorganization) that is made on a solvent basis; provided that after giving effect to such Reorganization:  (a) all of the business and assets of the Company and its Restricted Subsidiaries remain owned by the Company and its Restricted Subsidiaries, (b) any payments or assets distributed in connection with such Reorganization remain within the Company and its Restricted Subsidiaries and (c) if the assets of a Restricted Subsidiary party to the Reorganization form part of the Collateral, substantially equivalent Liens (excluding for this purpose any hardening periods or the limitations anticipated by the Agreed Security Principles) must be granted over any shares that were held by that Restricted Subsidiary and over any other such assets that are distributed to a Guarantor.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

"*Private Placement Legend*" means the legend set forth Section 2.06(f)(1) to be placed on all Notes issued under this Indenture except where otherwise permitted by this Indenture.

"*Public Debt*" means any Indebtedness consisting of bonds, debentures, notes or other similar debt securities issued in (1) a public offering registered under the U.S. Securities Act or (2) a private placement to institutional investors that is underwritten for resale in accordance with Rule 144A or Regulation S under the U.S. Securities  Act, whether or not it includes registration rights entitling the holders of such debt securities to registration thereof with the SEC for public resale.

"*Public Market*" means any time after:

(1)    an Equity Offering has been consummated; and

(2)    shares of common stock or other common equity interests of the IPO Entity having a market value in excess of $100.0 million on the date of such Equity Offering have been distributed pursuant to such Equity Offering.

"*QIB*" means a "qualified institutional buyer" as defined in Rule 144A.

"*Qualified Receivables Financing*" means any financing (including, at the company's election, any factoring) pursuant to which the Company or any of its Restricted Subsidiaries may sell, convey or otherwise transfer to any other Person or grant a security interest in, any Receivables (and related assets); *provided* that (a) the covenants, events of default and other provisions applicable to such financing shall be on market terms (as determined in good faith by the Company's Board of Directors or senior management) at the time such financing is entered into, (b) the interest rate applicable to such financing shall be a market interest rate (as

34

**387**

determined in good faith by the Company's Board of Directors or senior management) at the time such financing is entered into and (c) such financing shall be non-recourse to the Company or any of its Restricted Subsidiaries except in relation to a Receivables Repurchase Obligation or to the extent customary for such transactions (as determined in good faith by the Company's Board of Directors or senior management).

"*Rating Agency*" means each of S&P, Moody's, Fitch or any other internationally recognized statistical rating organization or organizations identified by the U.S. Securities and Exchange Commission, or in each case its affiliated rating agencies outside of the United States.

"*Receivable*" means any accounts receivable, inventory, royalty, licenses, contracts or revenue streams subject to a Qualified Receivables Financing.

"*Receivables Fees*" means distributions or payments made directly or by means of discounts with respect to any participation interest issued or sold in connection with, and other fees paid to a Person that is not the Company or any of its Restricted Subsidiaries in connection with any Qualified Receivables Financing.

"*Receivables Repurchase Obligation*" means any obligation of a seller of Receivables in a Qualified Receivables Financing to repurchase Receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a Receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

"*Registrar*" means Lucid Agency Services Limited until a successor replaces it and thereafter means the successor serving hereunder.

"*Regulation S*" means Regulation S promulgated under the U.S. Securities Act.

"*Regulation S Global Note*" means a Global Note bearing the Global Note Legend and Private Placement Legend and deposited with or on behalf of and registered in the name of the Common Depositary or its nominee that will be issued in an initial amount equal to the principal amount of the Notes initially sold in reliance on Regulation S, substantially in the form of Exhibit A hereto and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Article 2.

"*Related Party*" means:

(1)     any controlling stockholder, partner or member, or any 50% (or more) owned Subsidiary, or immediate family member (in the case of an individual), of any Equity Investor; or

(2)     any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons beneficially holding a 50% or more controlling interest of which consist of any one or more Equity Investors and/or such other Persons referred to in the immediately preceding clause.

"*Responsible Officer*," when used with respect to the Trustee, means any officer within the corporate trust and agency department of the Trustee (or any successor group of the Trustee)

or any other officer of the Trustee customarily performing functions similar to those performed by any of the designated officers of this definition and also means, with respect to a particular corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular subject.

"*Restricted Global Note*" means a 144A Global Note or an IAI Global Note.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Subsidiary*" of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

"*Restructuring*" means the restructuring of the Company and its Subsidiaries described in the Scheme Documents.

"*Restructuring Implementation Deed*" has the meaning given to that term in the Scheme.

"*Rule 144A*" means Rule 144A promulgated under the U.S. Securities Act.

"*Rule 903*" means Rule 903 promulgated under the U.S. Securities Act.

"*Rule 904*" means Rule 904 promulgated under the U.S. Securities Act.

"*S&P*" means Standard & Poor's Ratings Services and its successors and assigns.

"*Scheme*" means the scheme of arrangement in relation to the Issuer under Part 26 of the Companies Act 2006, which was sanctioned by the High Court of Justice of England and Wales on [●] 2020.

"*Scheme Documents*" means the Structure Memorandum, the Restructuring Implementation Deed and any other documents related to the Scheme, including any documents ancillary thereto.

"*SEC*" means the Securities and Exchange Commission.

"*Security Agent*" means Lucid Trustee Services Limited, until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor thereof.

"*Senior Facilities Agreement*" means:

(1)   the super senior letter of credit facility dated the Issue Date between among others the Company and Lloyds Bank plc;

(2)   the super senior letter of credit facility dated the Issue Date between among others the Company and First Abu Dhabi Bank PJSC; or

(3)   any other facilities agreement entered into by the Company and/or any Restricted Subsidiary after the Issue Date evidencing the terms of any loan or LC or Bank Guarantee facility,

in each case, as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including any agreement extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or any successor or replacement agreement or agreements or increasing the amount made available thereunder (subject to compliance with Section 4.09) or altering the maturity thereof.

"*Senior Notes*" means any Indebtedness of a Parent or any Subsidiary of a Parent designated as a "Parent Debt Facility" or "Parent Debt Notes" under the Intercreditor Agreement or any Additional Intercreditor Agreement.

"*Senior Secured Indebtedness*" means, as of any date of determination, the principal amount of any Indebtedness that is secured by a Lien on the Collateral that ranks or is intended to rank *pari passu* with the Liens on the Collateral securing the Notes and the Guarantees, excluding any Indebtedness incurred under (1)(A), (6)(A) (unless it is secured by a Lien on the Collateral that ranks *pari passu* to the Notes and the Guarantees, but still excluding any Indebtedness secured by a Lien described under clause (1)(b) of the definition of "Permitted Collateral Liens"), (6)(B), (8), (9), (10), (11), (12), (13), (16), (18), (19), (20) and (21) of Section 4.09(b)).

"*Significant Subsidiary*" means any Subsidiary whose proportionate share of Consolidated EBITDA (on an unconsolidated basis) exceeds 10.0% of the Consolidated EBITDA of the Company.

"*Stated Maturity*" means, with respect to any installment of principal on any series of Indebtedness, the date on which the final payment of principal was scheduled to be paid in the documentation governing such Indebtedness as of the Issue Date or the date of Incurrence, and will not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

"*Structure Memorandum*" means the tax structure paper dated [●] 2020 prepared by Deloitte LLP in connection with the Restructuring.

"*Subordinated Shareholder Debt*" means, collectively, any funds provided to the Company by a Parent or any Permitted Holder in exchange for or pursuant to any security, instrument or agreement other than Capital Stock, together with any such security, instrument or agreement and any other security or instrument other than Capital Stock issued in payment of any obligation under any Subordinated Shareholder Debt; *provided, however,* that such Subordinated Shareholder Debt:

(1)    does not (including upon the happening of any event) mature or require any amortization, redemption or other repayment of principal or any sinking fund payment prior to the first anniversary of the Stated Maturity of the Notes (other than through conversion or exchange of such funding into Capital Stock (other than Disqualified Stock) of the Company or any funding meeting the requirements of this definition);

(2)    does not (including upon the happening of any event) require, prior to the first anniversary of the Stated Maturity of the Notes, payment of cash interest, cash withholding amounts or other cash gross-ups, or any similar cash amounts;

(3)     contains no change of control or similar provisions and does not (including upon the happening of any event) accelerate and has no right (including upon the happening of any event) to declare a default or event of default or take any enforcement action or otherwise require any cash payment, in each case, prior to the first anniversary of the Stated Maturity of the Notes;

(4)     does not provide for or require any security interest or encumbrance over any asset of the Company or any of its Subsidiaries and is not guaranteed by any Subsidiary of the Company;

(5)     is subordinated in right of payment to the prior payment in full in cash of the Notes and the Guarantees at least to the same extent as the "Subordinated Liabilities" (as defined in the Intercreditor Agreement) are subordinated to the Notes and the Guarantees under the Intercreditor Agreement;

(6)     does not (including upon the happening of any event) restrict the payment of amounts due in respect of the Notes or compliance by Company with its obligations under the Notes and this Indenture;

(7)     does not (including upon the happening of an event) constitute Voting Stock; and

(8)     is not (including upon the happening of any event) mandatorily convertible or exchangeable, or convertible or exchangeable at the option of the holder thereof; in whole or in part, prior to the date on which the Notes mature, other than into or for Capital Stock (other than Disqualified Stock) of the Company; *provided* that the proceeds of any Senior Notes made available to the Company or any of its Restricted Subsidiaries shall not constitute Subordinated Shareholder Debt.

"*Subsidiary*" means, with respect to any specified Person:

(1)     any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person (or a combination thereof); and

(2)     any partnership or limited liability company of which (i) more than 50% of the capital accounts, distribution rights, total equity and voting interests or general and limited partnership interests, as applicable, are owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of that Person or a combination thereof, whether in the form of membership, general, special or limited partnership interests or otherwise, and (ii) such Person or any Subsidiary of such Person is a controlling general partner or otherwise controls such entity.

"*Subsidiary Guarantor*" means each Guarantor that is a Subsidiary of the Company.

"*Successor Parent*" with respect to any Person means any other Person with more than 50% of the total voting power of the Voting Stock of which is, at the time the first Person becomes a Subsidiary of such other Person, "beneficially owned" (as defined below) by one or

more Persons that "beneficially owned" (as defined below) more than 50% of the total voting power of the Voting Stock of the first Person immediately prior to the first Person becoming a Subsidiary of such other Person. For purposes hereof, "beneficially own" has the meaning correlative to the term "beneficial owner," as such term is defined in Rules 13d-3 and 13d-5 under the U.S. Exchange Act (as in effect on the Issue Date).

"*Tax*" means any tax, duty, levy, impost, assessment or other governmental charge (including penalties and interest related thereto (and "*Taxes*" and "*Taxation*" shall be construed to have corresponding meanings)).

"*Transfer Agent*" means Lucid Agency Services Limited, until a successor replaces it and thereafter means the successor serving hereunder.

"*Treasury Rate*" means, as of any redemption date, the yield to maturity as of such redemption date of United States Treasury securities (subject to a 0% floor) with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to the date of a notice of redemption (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from the redemption date to December 1, 2022; *provided*, *however*, that if the period from the redemption date to December 1, 2022, is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

"*Trust Office of the Trustee*" will be at the address of the Trustee specified in Section 14.01 or such other address as to which the Trustee may give notice to the Company.

"*Trustee*" means Lucid Trustee Services Limited, until a successor replaces it in accordance with the applicable provisions of this Indenture and thereafter means the successor thereof.

"*Unrestricted Subsidiary*" means:

(1)    any Subsidiary of the Company that at the time of determination is designated an Unrestricted Subsidiary by the Board of Directors of the Company in the manner provided in Section 4.18; and

(2)    any Subsidiary of an Unrestricted Subsidiary.

"*U.S. Dollar*" or "*$*" means the lawful currency of the United States of America.

"*U.S. Exchange Act*" means the U.S. Securities Exchange Act of 1934, as amended.

"*U.S. Government Obligations*" means direct obligations of, or obligations guaranteed by, the United States of America, and the payment for which the United States pledges its full faith and credit.

"*U.S. Securities Act*" means the U.S. Securities Act of 1933, as amended.

"*Voting Stock*" of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

39

**392**

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1)    the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Indebtedness, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; *by*

(2)    the then outstanding principal amount of such Indebtedness.

Section 1.02    *Other Definitions.*

| Term | Defined in Section |
|------|------|
| "*Additional Amounts*" | 4.21 |
| "*Additional Intercreditor Agreement*" | 4.23 |
| "*Affiliate Transaction*" | 4.11 |
| "*Asset Sale Offer*" | 4.10 |
| "*Authenticating Agent*" | 2.02 |
| "*Authentication Order*" | 2.02 |
| "*Authorized Agent*" | 14.06 |
| "*Change of Control Offer*" | 4.15 |
| "*Change of Control Payment*" | 4.15 |
| "*Change of Control Payment Date*" | 4.15 |
| "*Covenant Defeasance*" | 8.03 |
| "*Covenant Suspension Event*" | 4.22 |
| "*Event of Default*" | 6.01 |
| "*Excess Proceeds*" | 4.10 |
| "*Judgment Currency*" | 14.14 |
| "*Legal Defeasance*" | 8.02 |
| "*Notes Offer*" | 4.10 |
| "*Offer Amount*" | 3.09 |
| "*Offer Period*" | 3.09 |
| "*Paying Agent*" | 2.03 |
| "*Payment Default*" | 6.01 |
| "*Permitted Debt*" | 4.09 |
| "*Purchase Date*" | 3.09 |
| "*Registrar*" | 2.03 |
| "*Required Currency*" | 14.14 |
| "*Restricted Payments*" | 4.07 |
| "*Reversion Date*" | 4.22 |
| "*Suspended Covenants*" | 4.22 |
| "*Suspension Date*" | 4.22 |
| "*Suspension Period*" | 4.22 |
| "*Tax Jurisdiction*" | 4.21 |
| "*Tax Redemption Date*" | 3.08 |

| Term | Defined in Section |
|------|--------------------|
| *"Transfer Agent"* ................................................................................. | 2.03 |

Section 1.03   *Rules of Construction.*

Unless the context otherwise requires:

(1)     a term has the meaning assigned to it;

(2)     an accounting term not otherwise defined has the meaning assigned to it in accordance with IFRS;

(3)     "or" is not exclusive;

(4)     words in the singular include the plural, and in the plural include the singular;

(5)     "will" shall be interpreted to express a command;

(6)     provisions apply to successive events and transactions; and

(7)     references to sections of or rules under the U.S. Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time.

Section 1.04   *"all or substantially all"*

Notwithstanding anything to the contrary in this Indenture, a sale, assignment, transfer, lease, conveyance or other disposition of properties or assets of the Company or any of its Restricted Subsidiaries shall not constitute a sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Company and its Restricted Subsidiaries if any such sale, assignment, transfer, lease, conveyance or other disposition results in the sale or other disposition of assets of less than 50% of either (1) the total consolidated assets of the Company and its Restricted Subsidiaries, as shown on the most recent balance sheet of such Company for which internal financial statements are available calculated on a consolidated basis in accordance with IFRS or (2) the Consolidated EBITDA of the Company.

ARTICLE 2
THE NOTES

Section 2.01   *Form and Dating.*

(a)     *General.*   The Notes and the Trustee's or the Authenticating Agent's certificate of authentication will be substantially in the form of Exhibit A hereto.  The Notes may have notations, legends or endorsements required by law, stock exchange rule or usage.  Each Note will be dated the date of its authentication.  The terms and provisions contained in the Notes

41

**394**

will constitute, and are hereby expressly made, a part of this Indenture and the Issuer and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to be bound thereby. However, to the extent any provision of any Note conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(b)    *Global Notes*.  Notes issued in global form will be substantially in the form of Exhibit A hereto (including the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto).  Each Global Note will represent such of the outstanding Notes as will be specified therein and each shall provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregate principal amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exchanges and redemptions.  Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of outstanding Notes represented thereby will be made by the Registrar or the Paying Agent, in accordance with instructions given by the Holder thereof as required by Section 2.06.

(c)    *144A Global Notes, IAI Global Notes and Regulation S Global Notes*.  Notes sold within the United States to QIBs pursuant to Rule 144A under the U.S. Securities Act shall be issued initially in the form of a 144A Global Note, which shall be deposited with and registered in the name of a nominee of the Common Depositary for the accounts of Euroclear and Clearstream, duly executed by the Issuer and authenticated by the Trustee, or the Authenticating Agent, as hereinafter provided.  The aggregate principal amount of the 144A Global Note may from time to time be increased or decreased by adjustments made on Schedule A to each such Global Note, as hereinafter provided.

Notes sold within the United States to IAIs pursuant to an exemption from the registration requirements of the U.S. Securities Act shall be issued initially in the form of an IAI Global Note, which shall be deposited with and registered in the name of a nominee of the Common Depositary for the accounts of Euroclear and Clearstream, duly executed by the Issuer and authenticated by the Trustee, or the Authenticating Agent, as hereinafter provided. The aggregate principal amount of the IAI Global Note may from time to time be increased or decreased by adjustments made on Schedule A to each such Global Note, as hereinafter provided.

Notes offered and sold in reliance on Regulation S shall be issued initially in the form of a Regulation S Global Note, which shall be deposited with and registered in the name of a nominee of the Common Depositary for the accounts of Euroclear and Clearstream, duly executed by the Issuer and authenticated by the Trustee, or the Authenticating Agent, as hereinafter provided.  The aggregate principal amount of the Regulation S Global Note may from time to time be increased or decreased by adjustments made on Schedule A to each such Global Note, as hereinafter provided.

(d)    *Definitive Registered Notes*.  Definitive Registered Notes issued upon transfer of a Book-Entry Interest or a Definitive Registered Note, or in exchange for a Book-Entry Interest or a Definitive Registered Note, shall be issued in accordance with this Indenture.

Notes issued in definitive registered form will be substantially in the form of Exhibit A hereto (excluding the Global Note Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" in the form of Schedule A attached thereto).

42

**395**

(e)      *Book-Entry Provisions*.   The Applicable Procedures shall be applicable to Book-Entry Interests in the Global Notes that are held by Participants through the Common Depositary.

(f)      *Denomination*.   The Notes shall be in denominations of $1,000 and integral multiples of $1 above $1,000.

Section 2.02    *Execution and Authentication*.

At least one Officer must sign the Notes for the Issuer by manual or facsimile signature.

If an Officer whose signature is on a Note no longer holds that office at the time a Note is authenticated, the Note will nevertheless be valid.

A Note will not be valid until authenticated by the manual signature of the Trustee or Authenticating Agent.   The signature will be conclusive evidence that the Note has been authenticated under this Indenture.

The Trustee or Authenticating Agent will, upon receipt of a written order of the Issuer signed by an authorized representative (an "*Authentication Order*"), authenticate or cause an Authenticating Agent to authenticate Notes for original issue that may be validly issued under this Indenture, including any Additional Notes; *provided*, *however*, that Additional Notes that are not fungible with the Notes for U.S. federal income tax purposes shall have a separate ISIN or other identifying number from the Notes. The aggregate principal amount of Notes outstanding at any time may not exceed the aggregate principal amount of Notes authorized for issuance by the Issuer pursuant to one or more Authentication Orders, except as provided in Section 1.01(h)(7).

The Trustee may appoint one or more authenticating agents acceptable to the Issuer to authenticate Notes.  An authenticating agent may authenticate Notes whenever the Trustee may do so.  Each reference in this Indenture to authentication by the Trustee includes authentication by such agent.  An authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Issuer.  The Trustee hereby appoints Lucid Agency Services Limited as the Authenticating Agent for the Notes (the "*Authenticating Agent*"). Lucid Agency Services Limited hereby accepts such appointment and the Issuer hereby confirms that such appointment is acceptable to it.

Section 2.03    *Registrar, Transfer Agent and Paying Agent*.

The Issuer will maintain one or more paying agents (each, a "*Paying Agent*") for the Notes. The initial Paying Agent will be Lucid Agency Services Limited. Lucid Agency Services Limited hereby accepts such appointment.

The Issuer will also maintain a registrar (the "*Registrar*") for the registration of the Notes and of their transfer or exchange.  The Issuer will also maintain a transfer agent (the "*Transfer Agent*").  The Issuer hereby appoints Lucid Agency Services Limited as the initial Registrar and Lucid Agency Services Limited hereby accepts such appointment.  The Issuer hereby appoints Lucid Agency Services Limited as the initial Transfer Agent and Lucid Agency Services Limited hereby accepts such appointment. The Registrar, each Paying Agent and the Transfer Agent, as applicable, will maintain a register reflecting ownership of

43

Definitive Registered Notes outstanding from time to time, make payments on and facilitate transfers of Definitive Registered Notes on behalf of the Issuer.

The Issuer may change the Paying Agent, the Registrar or the Transfer Agent without prior notice to the Holders.  For so long as the Notes are listed on the Official List of The International Stock Exchange (the "*Exchange*") and the rules of the Exchange so require, the Issuer will notify the Exchange of any change of Registrar, Paying Agent or Transfer Agent.

Section 2.04   *Paying Agent to Hold Money*.

The Issuer will require each Paying Agent (other than the Trustee or an Affiliate of the Trustee) to agree in writing that the Paying Agent will hold for the benefit of Holders or the Trustee all money held by the Paying Agent for the payment of principal of, premium or Additional Amounts, if any, or interest on, the Notes, and will notify the Trustee of any default by the Issuer in making any such payment.  While any such default continues, the Trustee may require a Paying Agent to pay all money held by it to the Trustee.  The Issuer at any time may require a Paying Agent to pay all money held by it to the Trustee.  Upon payment over to the Trustee, or such entity designated by the Trustee, the Paying Agent (if other than the Company or a Subsidiary) will have no further liability for the money. Money held by a Paying Agent (if other than the Company or a Subsidiary) need not be segregated, except as required by law, and in no event shall any Paying Agent be liable for interest on any money received by it hereunder.  If the Company or a Subsidiary acts as Paying Agent, it will segregate and hold in a separate trust fund for the benefit of the Holders all money held by it as Paying Agent.  Upon any insolvency, bankruptcy or reorganization proceedings relating to the Issuer (including, without limitation, its bankruptcy, voluntary or judicial liquidation, composition with creditors, reprieve from payment, controlled management, fraudulent conveyance, general settlement with creditors, reorganization or similar laws affecting the rights of creditors generally), the Trustee (or an entity appointed by the Trustee) will serve as Paying Agent for the Notes. For the avoidance of doubt, the Paying Agent and the Trustee shall be held harmless and have no liability with respect to payments or disbursements to be made by the Paying Agent and Trustee (i) for which payment instructions are not made or that are not otherwise deposited by the respective times set forth in this Indenture; and (ii) until they have confirmed receipt of funds sufficient to make the relevant payment.

Section 2.05   *Holder Lists*.

The Registrar will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addresses of all Holders.  If the Trustee or the Paying Agent is not the Registrar, the Issuer will furnish to the Trustee and each Paying Agent at least two Business Days before each interest payment date and at such other times as the Trustee or the Paying Agent may request in writing, a list of the names and addresses of the Holders in such form and as of such date as the Trustee or the Paying Agent may reasonably require.

Section 2.06   *Transfer and Exchange*.

(a)      *Transfer and Exchange of Global Notes*.

A Global Note may not be transferred except as a whole by Euroclear or Clearstream to a Common Depositary or a nominee of such Common Depositary, by a Common Depositary or a nominee of Euroclear or Clearstream to Euroclear or Clearstream or to another nominee

44

**397**

or Common Depositary of Euroclear or Clearstream, or by such Common Depositary or Euroclear or Clearstream or any such nominee to a successor of Euroclear or Clearstream or Common Depositary or a nominee thereof.

All Global Notes will be exchanged by the Issuer for Definitive Registered Notes:

> (1)    if Euroclear or Clearstream notifies the Issuer that they are unwilling or unable to continue to act as depositary and a successor depositary is not appointed by the Issuer within 120 days; or

> (2)    if any holder of a Book-Entry Interest requests such exchange in writing through Euroclear or Clearstream following an Event of Default under this Indenture and enforcement action is being taken in respect thereof under this Indenture.

Upon the occurrence of either of the preceding events in clauses (a)(1) or (2) of this Section 2.06, the Issuer shall issue or cause to be issued Definitive Registered Notes in such names as Euroclear or Clearstream shall instruct the Registrar or Transfer Agent.

Global Notes also may be exchanged or replaced, in whole or in part, as provided in Section 2.07 and Section 2.10.  A Global Note may not be exchanged for another Note other than as provided in this clause (a).  Book-Entry Interests in a Global Note may be transferred and exchanged as provided in clause (b) or (c) of this Section 2.06.

(b)    *General Provisions Applicable to Transfer and Exchange of Book-Entry Interests in the Global Notes*.

The transfer and exchange of Book-Entry Interests shall be effected through Euroclear or Clearstream, in accordance with the provisions of this Indenture and the Applicable Procedures.

In connection with all transfers and exchanges of Book-Entry Interests (other than transfers of Book-Entry Interests in connection with which the transferor takes delivery thereof in the form of a Book-Entry Interest in the same Global Note), the Transfer Agent (copied to the Trustee and Registrar) must receive:

> > (i)    a written order from a Participant or an Indirect Participant given to the Common Depositary in accordance with the Applicable Procedures directing the Common Depositary to debit from the transferor a Book-Entry Interest in an amount equal to the Book-Entry Interest to be transferred or exchanged;

> > (ii)    a written order from a Participant or an Indirect Participant given to the Common Depositary in accordance with the Applicable Procedures directing the Common Depositary to credit or cause to be credited a Book-Entry Interest in another Global Note in an amount equal to the Book-Entry Interest to be transferred or exchanged; and

> > (iii)    instructions given in accordance with the Applicable Procedures containing information regarding the Participant account to be credited or debited with such increase or decrease, if applicable.

In connection with a transfer or exchange of a Book-Entry Interest for a Definitive Registered Note, the Transfer Agent (copied to the Trustee and the Registrar) must receive:

> (i)    a written order from a Participant or an Indirect Participant given to the Common Depositary in accordance with the Applicable Procedures directing the Common Depositary to debit from the transferor a Book-Entry Interest in an amount equal to the Book-Entry Interest to be transferred or exchanged;

> (ii)    a written order from a Participant directing the Registrar to cause to be issued a Definitive Registered Note in an amount equal to the Book-Entry Interest to be transferred or exchanged; and

> (iii)    instructions containing information regarding the Person in whose name such Definitive Registered Note shall be registered to effect the transfer or exchange referred to in this Section 2.06.

In connection with any transfer or exchange of Definitive Registered Notes, the Holder of such Notes shall present or surrender to the Transfer Agent or Registrar the Definitive Registered Notes duly endorsed or accompanied by a written instruction of transfer in a form satisfactory to such Transfer Agent or Registrar duly executed by such Holder or by its attorney, duly authorized in writing.  In addition, in connection with a transfer or exchange of a Definitive Registered Note for a Book-Entry Interest, the Transfer Agent (copied to the Registrar) must receive a written order directing the Common Depositary to credit the account of the transferee in an amount equal to the Book-Entry Interest to be transferred or exchanged.

Upon satisfaction of all of the requirements for transfer or exchange of Book-Entry Interests in Global Notes contained in this Indenture, the Transfer Agent (copied to the Trustee and the Registrar), as specified in this Section 2.06, shall endorse the relevant Global Note(s) with any increase or decrease and instruct the Common Depositary to reflect such increase or decrease in its systems.

Transfers of Book-Entry Interests shall be subject to restrictions on transfer comparable to those set forth herein to the extent required by the U.S. Securities Act.  Transfers and exchanges of Book-Entry Interests for Book-Entry Interests also shall require compliance with either clause (b)(1) or (b)(2) of this Section 2.06 as applicable, as well as clause (b)(3) of this Section 2.06, if applicable:

> (1)    *Transfer of Beneficial Interests in the Same Global Note*.  Book-Entry Interests in any Restricted Global Note may be transferred to Persons who take delivery thereof in the form of a Book-Entry Interest in the same Restricted Global Note in accordance with the transfer restrictions set forth in the Private Placement Legend. Book-Entry Interests in any Regulation S Global Note may be transferred to Persons who take delivery thereof in the form of a Book-Entry Interest in the same Regulation S Global Note.  No written orders or instructions shall be required to be delivered to the Trustee to effect the transfers described in this clause (1).

> (2)    *All Other Transfers and Exchanges of Beneficial Interests in Global Notes*.  A Holder may transfer or exchange a Book-Entry Interest in Global Notes in a transaction not subject to clause (b)(1) of this Section 2.06 only if the Transfer Agent (copied to the Trustee and the Registrar) receives either:

(A)     both:

(i)     a written order from a Participant or an Indirect Participant given to the Common Depositary in accordance with the Applicable Procedures directing the Common Depositary to credit or cause to be credited a Book-Entry Interest in another Global Note in an amount equal to the Book-Entry Interest to be transferred or exchanged; and

(ii)     instructions given by the Common Depositary in accordance with the Applicable Procedures containing information regarding the Participant account to be credited with such increase; or

(B)     both:

(i)     a written order from a Participant or an Indirect Participant given to the Common Depositary in accordance with the Applicable Procedures directing the Common Depositary to cause to be issued a Definitive Registered Note in an amount equal to the Book-Entry Interest to be transferred or exchanged; and

(ii)     instructions given by the Common Depositary to the Registrar containing information specifying the identity of the Person in whose name such Definitive Registered Note shall be registered to effect the transfer or exchange referred to in clause (b)(1) of this Section 2.06, the principal amount of such securities and the ISIN or other similar number identifying the Notes, *provided* that any such transfer or exchange is made in accordance with the transfer restrictions set forth in the Private Placement Legend.

(3)     *Transfer of Book-Entry Interests in a Restricted Global Note to Another Global Note.*  A Book-Entry Interest in a *Restricted* Global Note may be transferred to a Person who takes delivery thereof in the form of a Book-Entry Interest in another Global Note if the transfer complies with the requirements of clause (b)(2) of this Section 2.06 and the Registrar or Transfer Agent or Trustee receives the following:

(A)     if the transferee will take delivery in the form of a Book-Entry Interest in a the Restricted Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(B)     if the transferee will take delivery in the form of a Book-Entry Interest in a Regulation S Global Note then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof.

(4)     *Transfer of Book-Entry Interests in a Regulation S Global Note to Another Global Note.*  A Book-Entry Interest in a Regulation S Global Note may be transferred to a Person who takes delivery thereof in the form of a Book-Entry Interest in another Global Note if the transfer complies with the requirements of clause (b)(2) of this Section 2.06.

47

**400**

(c)     *Transfer or Exchange of Beneficial Interests for Definitive Registered Notes*.  If any holder of a Book-Entry Interest in a Global Note proposes to exchange such Book-Entry Interest for a Definitive Registered Note or to transfer such Book-Entry Interest to a Person who takes delivery thereof in the form of a Definitive Registered Note, then, upon receipt by the Trustee, the Transfer Agent and the Registrar of the following documentation:

(1)     in the case of a transfer by a holder of a Book-Entry Interest in a Regulation S Global Note, the transfer complies with clause (b) of this Section 2.06;

(2)     in the case of a transfer by a holder of a Book-Entry Interest in a Restricted Global Note to a QIB in reliance on Rule 144A, the Trustee, the Transfer Agent and the Registrar shall have received a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(3)     in the case of a transfer by a holder of a Book-Entry Interest in a Restricted Global Note in reliance on Regulation S, the Trustee, the Transfer Agent and the Registrar shall have received a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof; or

(4)     in the case of a transfer by a holder of a Book-Entry Interest in a Restricted Global Note in reliance on Rule 144, the Trustee, the Transfer Agent and the Registrar shall have received a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3) thereof,

the Trustee or the Paying Agent shall cause the aggregate principal amount of the applicable Global Note to be reduced accordingly pursuant to Section 2.06(h), and the Issuer shall execute and the Trustee or the Authenticating Agent shall authenticate and deliver to the Person designated in the instructions a Definitive Registered Note in the appropriate principal amount.  Any Definitive Registered Note issued in exchange for a Book-Entry Interest in a Global Note pursuant to this clause (c) shall be registered in such name or names and in such authorized denomination or denominations as the holder of such Book-Entry Interest shall instruct the Registrar through instructions from the Common Depositary and the Participant or Indirect Participant.  The Registrar or a Paying Agent shall deliver such Definitive Registered Notes to the Persons in whose names such Notes are so registered.  Any Definitive Registered Note issued in exchange for a Book-Entry Interest in a Restricted Global Note pursuant to this clause (c) shall bear the Private Placement Legend and shall be subject to all restrictions on transfer contained therein.

(d)     *Transfer and Exchange of Definitive Registered Notes for Book-Entry Interests in the Global Notes*.  If any Holder of a Definitive Registered Note proposes to exchange such Note for a Book-Entry Interest in a Global Note or to transfer such Definitive Registered Notes to a Person who takes delivery thereof in the form of a Book-Entry Interest in a Global Note, then, upon receipt by the Trustee, the Transfer Agent and the Registrar of the following documentation:

(1)     if the Holder of such Definitive Registered Note proposes to exchange such Note for a Book-Entry Interest in a Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (2) thereof;

48

(2)     if such Definitive Registered Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (1) thereof;

(3)     if such Definitive Registered Note is a Restricted Definitive Registered Note that is being transferred in an offshore transaction in accordance with Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof, as applicable;

(4)     if such Definitive Registered Note is being transferred to the Company or any of its Subsidiaries, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3) thereof; and

the Trustee or Paying Agent will cancel the Definitive Registered Note, and the Paying Agent will increase or cause to be increased the aggregate principal amount of, in the case of clause (d)(1) of this Section 2.06, the Global Note, in the case of clause (d)(2) of this Section 2.06, the 144A Global Note, in the case of clause (d)(3) of this Section 2.06, the Regulation S Global Note, and in the case of clause (d)(4) of this Section 2.06, the 144A Global Note.

(e)     *Transfer and Exchange of Definitive Registered Notes for Definitive Registered Notes*. Upon request by a Holder of Definitive Registered Notes and such Holder's compliance with the provisions of this Section 2.06(e), the Transfer Agent or the Registrar will register the transfer or exchange of Definitive Registered Notes of which registration the Issuer will be informed of by such Transfer Agent or such Registrar (as the case may be). Prior to such registration of transfer or exchange, the requesting Holder must present or surrender to the Transfer Agent or the Registrar the Definitive Registered Notes duly endorsed and accompanied by a written instruction of transfer in a form satisfactory to the Transfer Agent or the Registrar duly executed by such Holder or its attorney, duly authorized to execute the same in writing. In the event that the Holder of such Definitive Registered Notes does not transfer the entire principal amount of Notes represented by any such Definitive Registered Note, the Transfer Agent or the Registrar will cancel or cause to be canceled such Definitive Registered Note and the Issuer (who has been informed of such cancellation) shall execute and the Trustee or an authentication agent shall authenticate and deliver to the requesting Holder and any transferee Definitive Registered Notes in the appropriate principal amounts. In addition, the requesting Holder shall provide any additional certifications, documents and information, as applicable, required pursuant to the following provisions of this Section 2.06(e).

Any Definitive Registered Note may be transferred to and registered in the name of Persons who take delivery thereof in the form of a Definitive Registered Note if the Registrar receives the following:

(A)     if the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof; and

(B)     if the transfer of a Restricted Definitive Registered Note will be made in reliance on Regulation S, then the transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications in item (2) thereof.

(f)     *Legends*.  The following legends will appear on the face of all Global Notes and Definitive Registered Notes issued under this Indenture unless specifically stated otherwise in the applicable provisions of this Indenture.

(1)     *Private Placement Legend*.  Each Global Note and each Definitive Registered Note (and all Notes issued in exchange therefor or in substitution thereof) shall bear the legend in substantially the following form:

THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**U.S. SECURITIES ACT**"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE WHICH IS [IN THE CASE OF RULE 144A NOTES OR IAI NOTES: ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY)] [IN THE CASE OF REGULATION S NOTES: 40 DAYS AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE DATE ON WHICH THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY) WAS FIRST OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN RULE 902 OF REGULATION S) IN RELIANCE ON REGULATION S], ONLY (A) TO THE ISSUER, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("**RULE 144A**"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A (C) PURSUANT TO OFFERS AND SALES TO NON U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT ("**REGULATION S**")) THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S, (D) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE U.S. SECURITIES ACT OR (E) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS WITHIN THE MEANING OF REGULATION S. THE HOLDER AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY SIMILAR TO THE EFFECT OF THIS LEGEND. IN THE CASE OF REGULATION S NOTES: BY ITS ACQUISITION HEREOF, THE HOLDER HEREOF REPRESENTS THAT IT IS NOT A U.S. PERSON NOR IS IT PURCHASING FOR THE ACCOUNT OF A U.S. PERSON AND IS ACQUIRING

50

THIS SECURITY IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT.

BY ITS ACQUISITION OF THIS SECURITY OR AN INTEREST HEREIN, THE HOLDER HEREOF WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED THAT EITHER (1) IT IS NOT AN "EMPLOYEE BENEFIT PLAN" (AS DEFINED IN SECTION 3(3) OF THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**")) SUBJECT TO TITLE I OF ERISA OR A PLAN SUBJECT TO SECTION 4975 OF THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), SUCH AS AN INDIVIDUAL RETIREMENT ACCOUNT, OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE, OR ARE DEEMED FOR PURPOSES OF ERISA OR THE CODE TO INCLUDE "PLAN ASSETS" (WITHIN THE MEANING OF 29 C.F.R. SECTION 2510.3-101 (AS MODIFIED BY SECTION 3(42) OF ERISA)) BY REASON OF ANY SUCH EMPLOYEE BENEFIT PLAN OR PLAN'S INVESTMENT IN THE ENTITY (COLLECTIVELY, "**PLANS**" OR "**BENEFIT PLAN INVESTORS**"), IT IS NOT ACTING ON BEHALF OF A PLAN AND NO ASSETS OF A PLAN OR NON U.S. PLAN, "GOVERNMENTAL PLAN" (AS DEFINED IN SECTION 3(32) OF ERISA) OR "CHURCH PLAN" (AS DEFINED IN SECTION 3(33) OF ERISA, THAT HAS NOT MADE ELECTIONS UNDER SECTION 410(D) OF THE CODE) HAVE BEEN USED TO ACQUIRE THIS SECURITY OR AN INTEREST HEREIN, OR (2) THE ACQUISITION, HOLDING AND DISPOSITION OF THIS SECURITY OR AN INTEREST HEREIN BY THE HOLDER WILL NOT CONSTITUTE OR RESULT IN A NON EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR A VIOLATION OF STATE, LOCAL, OTHER FEDERAL OR NON U.S. LAWS OR REGULATIONS THAT ARE SUBSTANTIALLY SIMILAR TO THE FOREGOING PROVISIONS OF ERISA OR THE CODE, AND (3) THE HOLDER WILL NOT SELL OR OTHERWISE TRANSFER THIS SECURITY OR AN INTEREST HEREIN, UNLESS SUCH SUBSEQUENT TRANSFEREE HAS MADE THE REPRESENTATIONS AND WARRANTEES IN (1) OR (2) ABOVE. THE HOLDER HEREOF WILL ALSO BE DEEMED TO ACKNOWLEDGE THAT THE FOREGOING RESTRICTIONS APPLY TO HOLDERS OF BENEFICIAL INTERESTS IN THESE NOTES AS WELL AS TO HOLDERS OF THESE NOTES.

EACH PURCHASER AND TRANSFEREE OF THIS SECURITY OR INTEREST HEREIN THAT IS A BENEFIT PLAN INVESTOR SHALL BE REQUIRED OR DEEMED TO REPRESENT AND WARRANT TO THE ISSUER, ON EACH DAY FROM THE DATE ON WHICH SUCH BENEFICIAL OWNER ACQUIRES THIS SECURITY OR INTEREST HEREIN THROUGH AND INCLUDING THE DATE ON WHICH IT DISPOSES OF THIS SECURITY OR INTEREST HEREIN, THAT (A) THE FIDUCIARY MAKING THE DECISION TO INVEST IN THIS SECURITY ON ITS BEHALF (THE "**INDEPENDENT FIDUCIARY**") IS A BANK, (AS DEFINED IN SECTION 202 OF THE U.S. INVESTMENT ADVISORS ACT OF 1940, AS AMENDED (THE "**ADVISORS ACT**")) OR A SIMILAR INSTITUTION THAT IS REGULATED AND SUPERVISED AND SUBJECT TO PERIODIC EXAMINATION BY A STATE OR FEDERAL AGENCY, AN INSURANCE CARRIER THAT IS QUALIFIED UNDER THE LAWS OF MORE THAN ONE STATE TO PERFORM THE SERVICES OF MANAGING, ACQUIRING OR

DISPOSING OF THE ASSETS OF A BENEFIT PLAN INVESTOR, AN INVESTMENT ADVISOR REGISTERED UNDER THE ADVISORS ACT, OR IF NOT REGISTERED AS AN INVESTMENT ADVISOR UNDER THE ADVISORS ACT BY REASON OF PARAGRAPH (1) OF SECTION 203A OF THE ADVISORS ACT, IS REGISTERED AS AN INVESTMENT ADVISOR UNDER THE LAWS OF THE STATE IN WHICH IT MAINTAINS ITS PRINCIPAL OFFICE AND PLACE OF BUSINESS, A BROKER-DEALER REGISTERED UNDER THE U.S. SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, OR HAS, AND AT ALL TIMES THAT THE BENEFIT PLAN INVESTOR IS INVESTED IN THIS SECURITY WILL HAVE, TOTAL ASSETS OF AT LEAST U.S. $50,000,000 UNDER ITS MANAGEMENT OR CONTROL (PROVIDED THAT THIS CLAUSE SHALL NOT BE SATISFIED IF THE INDEPENDENT FIDUCIARY IS EITHER (1) THE OWNER OR A RELATIVE OF THE OWNER OF AN INVESTING INDIVIDUAL RETIREMENT ACCOUNT OR (2) A PARTICIPANT OR BENEFICIARY OF THE BENEFIT PLAN INVESTOR INVESTING IN THIS SECURITY IN SUCH CAPACITY); (B) THE INDEPENDENT FIDUCIARY IS AN INDEPENDENT PLAN FIDUCIARY WITHIN THE MEANING OF SECTION 3(21) OF ERISA, SECTION 4975 OF THE CODE, OR BOTH, AND IS RESPONSIBLE FOR EXERCISING INDEPENDENT JUDGEMENT IN EVALUATING THE BENEFIT PLAN INVESTOR'S ACQUISITION OF THIS SECURITY; (C) THE INDEPENDENT FIDUCIARY IS CAPABLE OF EVALUATING INVESTMENT RISKS INDEPENDENTLY, BOTH IN GENERAL AND WITH REGARD TO PARTICULAR TRANSACTIONS AND INVESTMENT STRATEGIES INCLUDING, WITHOUT LIMITATION, THE ACQUISITION BY THE BENEFIT PLAN INVESTOR OF THIS SECURITY; (D) THE INDEPENDENT FIDUCIARY IS RESPONSIBLE FOR EXERCISING INDEPENDENT JUDGMENT IN EVALUATING THE ACQUISITION, HOLDING AND DISPOSITION OF THIS SECURITY; (E) NONE OF THE ISSUER, THE GUARANTORS, OR THE INITIAL PURCHASERS HAS EXERCISED ANY AUTHORITY TO CAUSE THE BENEFIT PLAN INVESTOR TO INVEST IN THIS SECURITY OR TO NEGOTIATE THE TERMS OF THE BENEFIT PLAN INVESTOR'S INVESTMENT IN THIS SECURITY; AND (F) NEITHER THE BENEFIT PLAN INVESTOR NOR THE INDEPENDENT FIDUCIARY IS PAYING OR HAS PAID ANY FEE OR OTHER COMPENSATION TO ANY OF THE ISSUER, THE GUARANTORS OR THE INITIAL PURCHASERS FOR INVESTMENT ADVICE (AS OPPOSED TO OTHER SERVICES) IN CONNECTION WITH ITS ACQUISITION OR HOLDING OF THIS SECURITY. IN ADDITION, EACH SUCH PURCHASER OR TRANSFEREE WILL BE REQUIRED OR DEEMED TO ACKNOWLEDGE AND AGREE THAT THE INDEPENDENT FIDUCIARY HAS BEEN FAIRLY INFORMED: (X) THAT NONE OF THE ISSUER, THE GUARANTORS, THE INITIAL PURCHASERS, OR OTHER PERSONS THAT PROVIDE MARKETING SERVICES, NOR ANY OF THEIR AFFILIATES, HAS PROVIDED, AND NONE OF THEM WILL PROVIDE, IMPARTIAL INVESTMENT ADVICE OR ADVICE IN A FIDUCIARY CAPACITY AND THEY ARE NOT GIVING, NOR HAVE THEY GIVEN, ANY INVESTMENT ADVICE OR OTHERWISE MADE A RECOMMENDATION, IN CONNECTION WITH THE PURCHASER OR TRANSFEREE'S ACQUISITION OR HOLDING OF THIS SECURITY AND (Y) OF THE EXISTENCE OF, AND HAS RECEIVED AND UNDERSTANDS THE DISCLOSURE AND NATURE OF, THE ISSUER, THE GUARANTORS, AND THE INITIAL PURCHASERS' FINANCIAL INTERESTS IN THE BENEFIT PLAN INVESTOR'S ACQUISITION OF THIS SECURITY.

52

**405**

(2)     *Global Note Legend*.   Each Global Note shall bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE COMMON DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE BUT NOT IN PART PURSUANT TO CLAUSE (A) OF SECTION 2.06 OF THE INDENTURE, AND (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE."

(g)     *Cancellation and/or Adjustment of Global Notes*.   At such time as all Book-Entry Interests in a particular Global Note have been exchanged for Definitive Registered Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global Note will be returned to or retained and canceled by the Trustee in accordance with Section 2.11.  At any time prior to such cancellation, if any Book-Entry Interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a Book-Entry Interest in another Global Note or for Definitive Registered Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly and an endorsement will be made on such Global Note by the Trustee or the Paying Agent or the Common Depositary at the direction of the Trustee to reflect such reduction; and if the Book-Entry Interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a Book-Entry Interest in another Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Trustee or the Paying Agent or the Common Depositary at the direction of the Trustee to reflect such increase.

(h)     *General Provisions Relating to Transfers and Exchanges*.

(1)     To permit registrations of transfers and exchanges, the Issuer will execute and the Trustee or the Authenticating Agent will authenticate Global Notes and Definitive Registered Notes upon receipt of an Authentication Order in accordance with Section 2.02 or at the Registrar's request.

(2)     No service charge will be made by the Issuer or the Registrar to a Holder of a Book-Entry Interest in a Global Note, a Holder of a Global Note or a Holder of a Definitive Registered Note for any registration of transfer or exchange, but the Issuer may require payment of a sum sufficient to cover any stamp duty, stamp duty reserve, documentary or other similar tax or governmental charge that may be imposed in connection therewith (other than any such transfer taxes or similar governmental charge payable upon exchange or transfer pursuant to Section 2.10, Section 3.06, Section 4.10 and Section 4.15).

(3)     No Transfer Agent or Registrar will be required to register the transfer of or exchange of any Note selected for redemption in whole or in part, except the unredeemed portion of any Note being redeemed in part.

(4)    All Global Notes and Definitive Registered Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Registered Notes will be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Global Notes or Definitive Registered Notes surrendered upon such registration of transfer or exchange.

(5)    The Issuer and the Registrar shall not be required to register the transfer into its register kept at its registered office of any Definitive Registered Notes:

(A)    for a period of 15 calendar days prior to any date fixed for the redemption of the Notes under Section 3.02;

(B)    for a period of 15 calendar days immediately prior to the date fixed for selection of Notes to be redeemed in part;

(C)    for a period of 15 calendar days prior to the record date with respect to any interest payment date; or

(D)    which the Holder has tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer or an Asset Sale Offer.

Any such transfer will be made without charge to the Holder, other than any taxes, duties and governmental charges payable in connection with such transfer.

(6)    The Trustee, any Agent and the Issuer may deem and treat the Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of principal of and interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuer shall be affected by notice to the contrary.

(7)    All certifications, certificates and Opinions of Counsel required to be submitted to the Issuer, the Trustee or the Registrar pursuant to this Section 2.06 to effect a registration of transfer or exchange may be submitted by facsimile with originals to be delivered as soon as practicable thereafter to the Trustee.

Section 2.07    *Replacement Notes*.

If any mutilated Note is surrendered to the Registrar and the Registrar receives evidence to its satisfaction of the destruction, loss or theft of any Note, the Issuer will issue and the Trustee, upon receipt of an Authentication Order, will authenticate, or cause the Authenticating Agent to authenticate, a replacement Note if the Registrar's requirements are met.  If required by the Registrar or the Issuer, an indemnity bond must be supplied by the Holder that is sufficient in the judgment of the Registrar and the Issuer to protect the Issuer, the Trustee, the Registrar, any Agent and any Authenticating Agent from any loss that any of them may suffer if a Note is replaced.  The Issuer and the Registrar may charge for its expenses in replacing a Note.

Every replacement Note is an additional obligation of the Issuer and will be entitled to all of the benefits of this Indenture equally and proportionately with all other Notes duly issued hereunder.

Section 2.08    *Outstanding Notes*.

The Notes outstanding at any time are all the Notes authenticated by the Trustee or the Authenticating Agent except for those canceled by it or the Registrar, those delivered to it or the Registrar for cancellation, those reductions in the interest in a Global Note effected by the Trustee or the Registrar in accordance with the provisions hereof, and those described in this Section 2.08 as not outstanding.  Except as set forth in Section 2.09, a Note does not cease to be outstanding because the Company or an Affiliate of the Company holds the Note; however, Notes held by the Company or a Subsidiary of the Company shall not be deemed to be outstanding for purposes of clause (a) of Section 3.07.

If a Note is replaced pursuant to Section 1.01(h)(7), it ceases to be outstanding unless the Trustee and the Registrar receive proof satisfactory to them that the replaced Note is held by a protected purchaser.

If the principal amount of any Note is considered paid under Section 4.01, it ceases to be outstanding and interest on it ceases to accrue.

If a Paying Agent (other than the Issuer, the Company, a Subsidiary or an Affiliate of any thereof) holds, on a redemption date or maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes will be deemed to be no longer outstanding and will cease to accrue interest.

Section 2.09    *Treasury Notes*.

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consent, Notes owned by the Issuer, any Guarantor or by any Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Issuer or any Guarantor (other than any persons that have beneficial ownership of the Notes on the Issue Date) or held by the Holding Period Trustee will be considered as though not outstanding, except that for the purposes of determining whether the Trustee and the Registrar will be protected in relying on any such direction, waiver or consent, only Notes that the Trustee and the Registrar know are so owned will be so disregarded.

Section 2.10    *Temporary Notes*.

Until certificates representing Notes are ready for delivery, the Issuer may prepare and the Trustee, upon receipt of an Authentication Order, will authenticate, or cause its Authenticating Agent to authenticate, temporary Notes.  Temporary Notes will be substantially in the form of certificated Notes but may have variations that the Issuer considers appropriate for temporary Notes and as may be reasonably acceptable to the Trustee.  Without unreasonable delay, the Issuer will prepare and the Trustee or Authenticating Agent will authenticate permanent Notes in exchange for temporary Notes.

Holders of temporary Notes will be entitled to all of the benefits of this Indenture.

Section 2.11    *Cancellation*.

The Issuer at any time may deliver Notes to the Registrar for cancellation.  Each Paying Agent and any Transfer Agent will forward to the Registrar any Notes surrendered to them for registration of transfer, exchange or payment.  The Registrar or Paying Agent (other than the

Issuer or a subsidiary or an Affiliate of any thereof) and no one else will cancel all Notes surrendered for registration of transfer, exchange, payment, replacement or cancellation and will destroy canceled Notes (subject to the record retention requirement of the U.S. Exchange Act). Certification of the destruction of all canceled Notes will be delivered to the Issuer upon written request. The Issuer may not issue new Notes to replace Notes that it has paid or that have been delivered to the Registrar for cancellation.

Section 2.12    *Defaulted Interest*.

If the Issuer defaults in a payment of interest on the Notes, it will pay the defaulted interest in any lawful manner plus, to the extent lawful, interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate provided in the Notes and in Section 4.01. The Issuer will notify the Trustee and the Paying Agent in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment. The Issuer will fix or cause to be fixed each such special record date and payment date; *provided* that no such special record date may be less than 10 days prior to the related payment date for such defaulted interest. At least 15 days before the special record date, the Issuer (or, upon the written request of the Issuer, the Trustee in the name and at the expense of the Issuer) will mail or cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be paid.

Section 2.13    *Common Code or ISIN Number*.

The Issuer, in issuing the Notes, may use a common code or "ISIN" number and, if so, such common code or ISIN number shall be included in notices of redemption or exchange as a convenience to Holders; *provided*, *however*, that any such notice may state that no representation is made as to the correctness or accuracy of the common code or ISIN number printed in the notice or on the Notes, and that reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption or exchange shall not be affected by any defect in or omission of such numbers.

The Issuer will promptly notify the Trustee and the Agents of any change in the common code or ISIN number.

Section 2.14    *Deposit of Moneys*.

(a)    Prior to 10:00 a.m., London time, one Business Day prior to each interest payment date, the Stated Maturity date of the Notes and each payment date relating to a Change of Control Offer, and on the Business Day immediately following any acceleration of the Notes pursuant to Section 6.02, the Issuer shall deposit with the Paying Agent in immediately available funds money sufficient to make cash payments, if any, due on such day or date, as the case may be, in a timely manner which permits the Trustee or relevant Paying Agent to remit payment to the Holders on such day or date, as the case may be. Subject to actual receipt of such funds as provided by this Section 2.14 by the designated Paying Agent, such Paying Agent shall make payments on the Notes in accordance with the provisions of this Indenture. The Issuer shall promptly notify the Trustee and the Paying Agent of its failure to so act.

Section 2.15    *Agents*.

(a)    *Actions of Agents*. The rights, powers, duties and obligations and actions of each Agent under this Indenture are several and not joint or joint and several.

56

**409**

(b)      *Agents of Trustee*.  The Issuer and the Agents acknowledge and agree that in the event of a Default or Event of Default, the Trustee may, by notice in writing to the Issuer and the Agents, require that the Agents act as agents of, and take instructions exclusively from, the Trustee. Without prejudice to Section 2.04, until they have received such written notice from the Trustee, the Agents shall act solely as agents of the Issuer.

(c)      *Publication of Notices*. Any obligation the Agents may have to publish a notice to Holders of Global Notes on behalf of the Issuer will have been met upon delivery of the notice to the Common Depositary.

(d)      *Authorized Signatories*. The Issuer shall provide the Agents with a certified list of authorized signatories within a reasonable time following a request for such list by an Agent.

(e)      *Resignation of Agents.* Any Agent may resign and be discharged from its duties under this Indenture at any time by giving thirty (30) days' prior written notice of such resignation to the Trustee and Issuer; *provided* that in the case of the resignation of a Paying Agent, no such resignation shall take effect until a new Paying Agent has been appointed by the Issuer to exercise the powers and undertake the duties hereby conferred and imposed upon the Paying Agent. The Trustee or the Issuer may remove any Agent at any time by giving thirty (30) days' prior written notice to any Agent. Upon such notice, the Issuer shall promptly appoint a successor Agent, who shall provide written notice of such to the Trustee. Such successor Agent shall become the Agent hereunder upon the resignation or removal date specified in such notice. If the Issuer is unable to replace the resigning Agent within thirty (30) days after such notice, the Agent shall deliver any funds then held hereunder in its possession to the Trustee or may apply to a court of competent jurisdiction for the appointment of a successor Agent or for other appropriate relief. The costs and expenses (including its counsels' fees and expenses) incurred by the Agent in connection with such proceeding shall be paid by the Issuer. Upon receipt of the identity of the successor Agent, the Agent shall deliver any funds then held hereunder to the successor Agent, *less* the Agent's fees, costs and expenses or other obligations owed to the Agent. Upon its resignation and delivery of any funds, the Agent shall be discharged of and from any and all further obligations arising in connection with this Indenture, but shall continue to enjoy the benefit of Section 7.06.

(f)      *Mechanical Nature*. The roles, duties and functions of the Agents are of a mechanical nature and each Agent shall only perform those acts and duties as specifically set out in this Indenture and no other acts, covenants, obligations or duties shall be implied or read into this Indenture against any of the Agents.

(g)      *Instructions*. In the event that instructions given to any Agent are not reasonably clear, then such Agent shall be entitled to seek reasonable clarification from the Issuer or other party entitled to give the Agents instructions under this Indenture by written request immediately and in any event on the same Business Day of receipt by such Agent of such instructions. If an Agent has sought clarification in accordance with this Section 2.15, then such Agent shall be entitled to take no action until such clarification is provided, and shall not incur any liability for not taking any action pending receipt of such clarification.

(h)      *No Duty*. Except as otherwise set forth herein, no Agent shall be under any duty or other obligation towards, or have any relationship of agency or trust for or with, any person other than the Issuer.

## ARTICLE 3
## REDEMPTION AND PREPAYMENT

Section 3.01   *Notices to Trustee.*

If the Issuer elects to redeem Notes pursuant to the optional redemption provisions of Section 3.07, it must furnish to the Trustee (with a copy to the Paying Agent and Registrar), at least five Business Days (or such shorter time frame that may be otherwise agreed) prior to issuing a notice of redemption pursuant to Section 3.03, an Officer's Certificate setting forth:

    (1)    the clause of this Indenture pursuant to which the redemption shall occur;

    (2)    the redemption date and the record date;

    (3)    the principal amount of Notes to be redeemed;

    (4)    the redemption price; and

    (5)    the common codes or ISIN numbers.

Section 3.02   *Selection of Notes to Be Redeemed or Purchased.*

If less than all of the Notes are to be redeemed or purchased in an offer to purchase at any time, the Trustee or the Registrar, as applicable, will select Notes for redemption or purchase on a *pro rata* basis (or, in the case of Global Notes, based on a method that most nearly approximates *pro rata* selection in accordance with the procedures of the relevant clearing system, unless otherwise required by law or applicable stock exchange or depository requirements.  The Trustee and the Registrar shall not be liable for selections made in accordance with this Section 3.02. Notes in excess of $1,000 in aggregate principal amount can be redeemed in part in integral multiples of $1.

No Notes of $1,000 in aggregate principal amount or less will be purchased or redeemed in part.

Notices of redemption will be given to each Holder pursuant to Section 3.03 and Section 14.01.

In relation to Definitive Registered Notes, a new Note in principal amount equal to the unpurchased or unredeemed portion of any Note purchased or redeemed in part will be issued in the name of the Holder thereof upon cancellation of the original Note.  In the case of a Global Note, an appropriate notation will be made on such Note to decrease the principal amount thereof to an amount equal to the unredeemed portion thereof.  Notes called for redemption become due on the date fixed for redemption.  On and after any purchase or redemption date, unless the Issuer defaults in payment of the purchase or redemption price, interest shall cease to accrue on Notes or portions thereof tendered for purchase or called for redemption.

Section 3.03   *Notice of Redemption.*

At least 10 days but not more than 60 days before a redemption date, the Issuer will mail or cause to be mailed (with a copy to the Trustee and Paying Agent), by first class mail or electronically, a notice of redemption to each Holder whose Notes are to be redeemed at its

58

**411**

registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of this Indenture pursuant to Article 8 or Article 13.  In addition, for so long as the Notes are listed on the Official List of the Exchange and the rules of the Exchange so require, the Issuer shall publish any notice of redemption in accordance with the prevailing rules of the Exchange.

The notice will identify the Notes to be redeemed and will state:

(1)     the redemption date and the record date;

(2)     the redemption price and the amount of accrued interest, if any, and Additional Amounts, if any, to be paid;

(3)     if any Global Note is being redeemed in part, the portion of the principal amount of such Global Note to be redeemed and that, after the redemption date upon surrender of such Global Note, the principal amount thereof will be decreased by the portion thereof redeemed pursuant thereto;

(4)     if any Definitive Registered Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed, and that, after the redemption date, upon surrender of such Note, a new Definitive Registered Note or Definitive Registered Notes in principal amount equal to the unredeemed portion thereof will be issued in the name of the Holder thereof upon cancellation of the original Definitive Registered Note;

(5)     the name and address of the Paying Agent(s) to which the Notes are to be surrendered for redemption;

(6)     that Notes called for redemption must be surrendered to the relevant Paying Agent to collect the redemption price, plus accrued and unpaid interest, if any, and Additional Amounts, if any;

(7)     that, unless the Issuer defaults in making such redemption payment, interest, and Additional Amounts, if any, on Notes called for redemption ceases to accrue on and after the redemption date;

(8)     the paragraph of the Notes and/or Section of this Indenture pursuant to which the Notes called for redemption are being redeemed; and

(9)     that no representation is made as to the correctness or accuracy of the common codes or ISIN numbers listed in such notice or printed on the Notes.

If the Issuer elects to redeem the Notes or portions thereof and requests the Trustee to distribute to the Holders any amounts deposited in trust (which, for the avoidance of doubt, will include accrued and unpaid interest to the date fixed for redemption) prior to the date fixed for redemption in accordance with the provisions set forth in Section 13.01 and in accordance with the Applicable Procedures, the applicable notice of redemption will state that Holders will receive such amounts deposited in trust prior to the date fixed for redemption and mention the payment date.

At the Issuer's request, the Trustee will give the notice of redemption in the Issuer's name and at its expense; *provided*, *however*, that the Issuer has delivered to the Trustee, at least five Business Days prior to the publication of the notice of redemption (or such shorter time frame that may be otherwise agreed), an Officer's Certificate requesting that the Trustee give such notice and setting forth the information to be stated in such notice as provided in Section 3.01.

The Trustee will not be liable for selection made by it as contemplated in this Section 3.03. For Notes that are represented by Global Notes held on behalf of the Common Depositary, notices may be given by delivery of the relevant notices to the Common Depositary for communication to entitled account holders in substitution for the aforesaid mailing.

Section 3.04   *Effect of Notice of Redemption*.

(a)   A redemption and notice may, at the Issuer's discretion, be subject to the satisfaction of one or more conditions precedent, including (without limitation) that the Issuer has received or any Paying Agent has received from the Issuer or a Person on behalf of the Issuer sufficient funds to pay the full redemption price payable to the Holders of the Notes on or before the relevant redemption date. Notice of any redemption upon any Equity Offering may be given prior to the completion thereof, and any such redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related Equity Offering. If such redemption is subject to satisfaction of one or more conditions precedent, the notice of such redemption shall state that, in the Issuer's discretion, the redemption date may be delayed until such time as any or all such conditions shall be satisfied, or such redemption may not occur and such notice may be rescinded in the event that any or all such conditions shall not have been satisfied by the redemption date, or by the redemption date so delayed. In addition, the Issuer may provide in such notice that payment of the redemption price and performance of the Issuer's obligations with respect to such redemption may be performed by another Person.

Section 3.05   *Deposit of Redemption or Purchase Price*.

(a)   On or prior to 10:00 a.m. London time on the date of such redemption or purchase, the Issuer will deposit with the Trustee (or such entity designated by the Trustee for this purpose) or with the Paying Agent money sufficient to pay the redemption or purchase price of, accrued interest and Additional Amounts, if any, on all Notes to be redeemed or purchased on that date. The Trustee or the Paying Agent will promptly return to the Issuer any money deposited with the Trustee or the Paying Agent by the Issuer in excess of the amounts necessary to pay the redemption or purchase price of, accrued interest and Additional Amounts, if any, on all Notes to be redeemed or purchased.

(b)   If the Issuer complies with clause (a) of this Section 3.05, on and after the redemption or purchase date, interest will cease to accrue on the Notes or the portions of Notes called for redemption or purchase. If a Note is redeemed or purchased on or after an interest record date but on or prior to the related interest payment date, then any accrued and unpaid interest shall be paid to the Person in whose name such Note was registered at the close of business on such record date. If any Note called for redemption or purchase is not so paid upon surrender for redemption or purchase because of the failure of the Issuer to comply with the preceding paragraph, interest shall be paid on the unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on such unpaid principal, in each case at the rate provided in the Notes and in Section 4.01.

60

**413**

Section 3.06    *Notes Redeemed or Purchased in Part.*

In the case of Definitive Registered Notes, upon surrender of a Note that is redeemed or purchased in part, the Issuer will issue and, upon receipt of an Authentication Order, the Trustee or the Authenticating Agent will authenticate for the Holder at the expense of the Issuer a new Note equal in principal amount to the unredeemed or unpurchased portion of the Note surrendered, *provided* that any Note shall be in a principal amount of $1,000 or an integral multiple of $1 above $1,000.

Section 3.07    *Optional Redemption.*

(a)    At any time prior to December 1, 2022, the Issuer may on any one or more occasions redeem up to 40% of the aggregate principal amount of the Notes upon giving not less than 10 nor more than 60 days' prior written notice to the Holders, at a price equal to 109.875% of the principal amount of the Notes redeemed, plus accrued and unpaid interest and Additional Amounts, if any, to, but not including, the date set for the redemption of the Notes (subject to the right of Holders on the relevant record date to receive interest on the relevant interest payment date), with the net cash proceeds of one or more Equity Offerings; *provided* that:

(1)    at least 50% of the aggregate principal amount of the Notes under this Indenture remains outstanding immediately after the occurrence of such redemption; and

(2)    the redemption occurs within 180 days of the date of the closing of such Equity Offering.

(b)    Except pursuant to clause (a) and (e) of this Section 3.07 and except pursuant to Section 3.08, the Notes may not be redeemed, in whole or in part, at the option of the Issuer prior to December 1, 2022; *provided*, however, that the Issuer, the Company or any Restricted Subsidiary may acquire the Notes by means other than a redemption, whether by open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws so long as (A) such acquisition does not otherwise violate the terms of this Indenture and (B) such acquired Notes will not be deemed to be outstanding and the Company and its Restricted Subsidiaries and affiliates shall not be entitled to any of the voting rights provided to Holders under this Indenture.

(c)    On or after December 1, 2022, the Issuer may on any one or more occasions redeem, in whole or in part, the Notes upon giving not less than 10 nor more than 60 days' prior written notice to the Holders, at the prices (expressed as percentages of the outstanding principal amount on the redemption date) set forth below, plus accrued and unpaid interest and Additional Amounts, if any, on the Notes redeemed, to, but not including, the applicable redemption date if repaid during the period beginning on the dates indicated below (subject to the right of Holders on the relevant record date to receive interest on the relevant interest payment date):

| Year | |
|---|---|
| December 1, 2022 | 104.938% |
| December 1, 2023 | 102.469% |
| December 1, 2024 and thereafter | 100.000% |

(d)    At any time prior to December 1, 2022, the Issuer may on any one or more occasions redeem, in whole or in part, the Notes, upon giving not less than 10 nor more than 60 days' prior written notice to the Holders, at a redemption price equal to 100% of the principal amount of Notes to be redeemed, plus the Applicable Premium (as calculated by the Issuer) as of, and accrued and unpaid interest and Additional Amounts, if any, on the Notes being redeemed to, but not including, the redemption date (subject to the rights of Holders on the relevant record date to receive interest on the relevant interest payment date).

(e)    In addition, at any time prior to December 1, 2022, upon not less than 10 nor more than 60 days' notice, the Issuer may redeem, during each twelve-month period commencing on the Issue Date, up to 10% of the original principal amount of the Notes (including the original principal amount of any Additional Notes of the same series) at a redemption price equal to 103% of the principal amount redeemed, plus accrued and unpaid interest and Additional Amounts, if any, to, but not including, the applicable redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

(h)    Notwithstanding the foregoing, in connection with any tender offer for the Notes, if Holders of not less than 90% in aggregate principal amount of the outstanding Notes validly tender and do not withdraw such Notes in such tender offer and the Issuer, or any third party making such a tender offer in lieu of the Issuer, purchases all of the Notes validly tendered and not withdrawn by such Holders, the Issuer or such third party will have the right upon not less than 10 nor more than 60 days' prior notice to the Holders of the Notes, given not more than 30 days following such purchase date, to redeem all Notes that remain outstanding following such purchase at a price equal to the price paid to each other Holder in such tender offer (other than any incentive payment for early tenders), plus, to the extent not included in the tender offer payment, accrued and unpaid interest and Additional Amounts, if any, thereon, to, but not including, the redemption date. In determining whether the Holders of at least 90% of the aggregate principal amount of the then outstanding Notes have validly tendered and not withdrawn Notes in a tender offer or other offer to purchase for all of the Notes, as applicable, Notes owned by an Affiliate of the Issuer or by funds controlled or managed by any Affiliate of the Issuer, or any successor thereof, shall be deemed to be outstanding for the purposes of such tender offer or other offer, as applicable.

(i)    Unless the Issuer defaults in the payment of the redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable redemption date.

(j)    Any redemption or notice may, in the Issuer's discretion, be subject to the satisfaction of one or more conditions precedent.

Section 3.08    *Redemption for Changes in Taxes*.

The Issuer may redeem the Notes, in whole but not in part, at its discretion at any time upon giving not less than 10 nor more than 60 days' prior notice to the Holders (which notice will be irrevocable and given in accordance with the procedures described in Section 3.02), at a redemption price equal to 100% of the aggregate principal amount thereof, together with accrued and unpaid interest, if any, to the date fixed by the Issuer for redemption (a "*Tax Redemption Date*") and all Additional Amounts (if any) then due and which will become due on the Tax Redemption Date as a result of the redemption or otherwise (and subject to the right of Holders on the relevant record date to receive interest due on the relevant interest payment

62

**415**

date and Additional Amounts (if any) in respect thereof), if the Issuer or a Guarantor, as the case may be, on the next date on which any amount would be payable in respect of the Notes or any Guarantee, is or would be required to pay Additional Amounts, and the Issuer or the relevant Guarantor (but, in the case of a Guarantor, only if the payment giving rise to such requirement cannot be made by the Issuer or another Guarantor, who can make such payment without the obligation to pay Additional Amounts) cannot avoid any such payment obligation by taking reasonable measures available (including making payment through a Paying Agent located in another jurisdiction), as a result of:

>    (1)     any change in, or amendment to, the laws (or any regulations or rulings promulgated thereunder) of the relevant Tax Jurisdiction affecting taxation which change or amendment has not been publicly announced before the date of this Indenture and becomes effective on or after the date of this Indenture (or, if a Tax Jurisdiction has been added since the date of this Indenture, the date on which that Tax Jurisdiction became a Tax Jurisdiction under this Indenture); or

>    (2)     any change in, or amendment to, the existing official written position regarding the application, administration or interpretation of such laws, regulations or rulings (including a holding, judgment or order by a court of competent jurisdiction or a change in published practice), which change, amendment, application or interpretation has not been publicly announced before the date of this Indenture and becomes effective on or after the date of this Indenture (or, if a Tax Jurisdiction has been added since the date of this Indenture, the date on which that Tax Jurisdiction became a Tax Jurisdiction under this Indenture).

The Issuer will not give any such notice of redemption earlier than 60 days prior to the earliest date on which the Issuer, or Guarantor, as the case may be, would be obligated to make such payment or withholding if a payment in respect of the Notes or any Guarantee were then due.  Prior to the publication or, where relevant, mailing of any notice of redemption of the Notes pursuant to the foregoing, the Issuer will deliver to the Trustee an Opinion of Counsel, the choice of such counsel to be subject to the prior written approval of the Trustee (such approval not to be unreasonably withheld), to the effect that there has been such change or amendment which would obligate the Issuer or a Guarantor to make such payment or withholding and an Officer's Certificate to the effect that the Issuer or Guarantor, as the case may be, cannot avoid such payment or withholding by taking reasonable measures available to it.  For the avoidance of doubt, reasonable measures shall not include anything which has any material impact on the business of the Issuer or Guarantor, or which would cause the Issuer or Guarantor to Incur any material costs.  The Trustee shall be entitled to rely on such Opinion of Counsel and Officer's Certificate as sufficient evidence of the conditions as described in this Section 3.08, in which event it will be conclusive and binding on all Holders.

Any redemption and notice described in this Section 3.08 will be subject to the receipt by the Issuer or any Paying Agent of sufficient funds from the Issuer to pay the full redemption price payable to the Holders on or before the Tax Redemption Date.

Section 3.09    *Offer to Purchase by Application of Excess Proceeds and Notes Offer.*

In the event that, pursuant to Section 4.10, the Issuer is required to commence an Asset Sale Offer (as defined in Section 4.10) or a Notes Offer, it will follow the procedures specified in this Section 3.09.

Each Asset Sale Offer and Notes Offer shall be made to all Holders and, to the extent applicable, with respect to an Asset Sale Offer, to all holders of other Indebtedness that is *pari passu* with the Notes or any Guarantee with respect to an Asset Sale Offer. Each Asset Sale Offer and Notes Offer will remain open for a period of at least 10 Business Days following its commencement and not more than 30 Business Days, except to the extent that a longer period is required by applicable law (the "*Offer Period*"). No later than three Business Days after the termination of the Offer Period (the "*Purchase Date*"), the Issuer will apply all Excess Proceeds, in the case of an Asset Sale Offer, or the applicable Net Proceeds, in the case of a Notes Offer, (the "*Offer Amount*") to the purchase of Notes and, if applicable, such other Pari Passu Indebtedness (on a *pro rata* basis based on the principal amount of Notes and such other Pari Passu Indebtedness surrendered, if applicable) or, if less than the Offer Amount has been tendered, all Notes and, if applicable, other Indebtedness tendered in response to the Asset Sale Offer or Notes Offer, as the case may be. Payment for any Notes so purchased will be made in the same manner as interest payments are made.

If the Purchase Date is on or after an interest record date and on or before the related interest payment date, any accrued and unpaid interest, if any, will be paid to the Person in whose name a Note is registered at the close of business on such record date, and no additional interest will be payable to Holders who tender Notes pursuant to the Asset Sale Offer or Notes Offer, as the case may be.

Upon the commencement of an Asset Sale Offer or a Notes Offer, the Issuer will send, by first class mail or electronically, a notice to the Trustee, the Paying Agent and each of the Holders. The notice will contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Asset Sale Offer or the Notes Offer, as applicable. The notice, which will govern the terms of the Asset Sale Offer or the Notes Offer, as applicable, will state:

(1)    that the Asset Sale Offer or Notes Offer, as applicable, is being made pursuant to this Section 3.09 and Section 4.10 and the length of time the Asset Sale Offer will remain open;

(2)    the Offer Amount, the purchase price and the Purchase Date;

(3)    that any Note not tendered or accepted for payment will continue to accrue interest;

(4)    that, unless the Issuer defaults in making such payment, any Note accepted for payment pursuant to the Asset Sale Offer or Notes Offer, as applicable, will cease to accrue interest after the Purchase Date;

(5)    that Holders electing to have a Note purchased pursuant to an Asset Sale Offer may elect to have Notes purchased in integral multiples of $1 only (*provided* that Notes of $1,000 or less may only be redeemed in whole and not in part);

(6)    that Holders electing to have Notes purchased pursuant to any Asset Sale Offer or Notes Offer, as applicable, will be required to surrender the Note, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Issuer, a Common Depositary, if appointed by the Issuer, or a Paying Agent at the address specified in the notice at least three days before the Purchase Date;

(7)      that Holders will be entitled to withdraw their election if the Issuer or the Paying Agent, as the case may be, receives, not later than the expiration of the Offer Period, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of the Note the Holder delivered for purchase and a statement that such Holder is withdrawing his election to have such Note purchased;

(8)      that, if the aggregate principal amount of Notes and, in the case of an Asset Sale Offer, other Pari Passu Indebtedness tendered into (or to be prepaid or redeemed in connection with) such Asset Sale Offer or Notes Offer, as applicable, exceeds the amount of Excess Proceeds or if the aggregate amount of Notes tendered pursuant to a Notes Offer exceeds the amount of Net Proceeds so applied, the Issuer will select the Notes and, in the case of an Asset Sale Offer, such other Pari Passu Indebtedness to be purchased on a *pro rata* (or in the manner described in Section 3.02) basis based on the principal amount of Notes and, in the case of an Asset Sale Offer, such other Pari Passu Indebtedness tendered or required to be prepaid or redeemed (with such adjustments as may be deemed appropriate by the Issuer so that only Notes in denominations of $1, or integral multiples thereof, will be purchased (*provided* that Notes of $1,000 or less may only be redeemed in whole and not in part)); and

(9)      that Holders whose Definitive Registered Notes were purchased only in part will be issued new Definitive Registered Notes equal in principal amount to the unpurchased portion of the Notes surrendered (or transferred by book-entry transfer).

On or before the Purchase Date, the Issuer will, to the extent lawful, accept for payment, on a *pro rata* basis to the extent necessary, the Offer Amount of Notes or portions thereof tendered pursuant to the Asset Sale Offer or Notes Offer, as applicable, or if less than the Offer Amount has been tendered, all Notes tendered, and will deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officer's Certificate stating that such Notes or portions thereof were accepted for payment by the Issuer in accordance with the terms of this Section 3.09. The Issuer, the Common Depositary or the Paying Agent, as the case may be, will promptly (but in any case not later than five days after the Purchase Date) mail or deliver to, or procure the mailing or delivery to, each tendering Holder an amount equal to the purchase price of the Notes tendered by such Holder and accepted by the Issuer for purchase. In connection with any partial purchase of Definitive Registered Notes, the Issuer will promptly issue a new Definitive Registered Note, and the Trustee, upon written request from the Issuer, will procure the authentication of and mail or deliver such new Definitive Registered Note to the tendering Holder, in a principal amount equal to any unpurchased portion of the Definitive Registered Note surrendered.  Any Note tendered but not accepted shall be promptly mailed or delivered by the Issuer to the Holder thereof.  The Issuer will publicly announce and inform the Exchange (for as long as the Notes are listed on the Official List of the Exchange) of the results of the Asset Sale Offer or Notes Offer, as applicable, on the Purchase Date.

Other than as specifically provided in this Section 3.09, any purchase pursuant to this Section 3.09 shall be made pursuant to Section 3.01 through to Section 3.06.

Section 3.10    *Mandatory Redemption*.

The Issuer is not required to make mandatory redemption payments or sinking fund payments with respect to the Notes.

ARTICLE 4
COVENANTS

Section 4.01    *Payments of Notes*.

The Issuer will pay or cause to be paid the principal of, premium on, if any, interest and Additional Amounts, if any, on, the Notes on the dates and in the manner provided in the Notes and this Indenture.  Principal, premium, if any, interest and Additional Amounts, if any, will be considered paid on the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds as of 10:00 a.m. (London time) on the due date money deposited by the Issuer in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and interest and Additional Amounts, if any, then due.  If the Company or any of its Subsidiaries acts as Paying Agent, principal, premium, if any, interest and Additional Amounts, if any, shall be considered paid on the due date if the entity acting as Paying Agent complies with Section 2.04.

If the due date for any payment in respect of any Notes (including any interest payment date) is not a Business Day, the Holder thereof will not be entitled to payment of the amount due until the next succeeding Business Day, and will not be entitled to any further interest or other payment as a result of any such delay.

The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal at a rate that is 1% higher than the then applicable interest rate on the Notes to the extent lawful.  The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Amounts, if any (without regard to any applicable grace period), at the same rate to the extent lawful.

Section 4.02    *Maintenance of Office or Agency*.

The Issuer will maintain the offices and agencies specified in Section 2.03.  The Issuer shall give prompt written notice to the Trustee of the location, and any change in the location, of such office or agency.  If at any time the Issuer fails to maintain any such required office or agency or fails to furnish the Trustee with the address thereof, such presentations, surrenders, notices and demands may be made or served at the Trust Office of the Trustee.

The Issuer may also from time to time designate one or more other offices or agencies where the Notes may be presented or surrendered for any or all such purposes and may from time to time rescind such designations.  The Issuer will give prompt written notice to the Trustee of any such designation or rescission and of any change in the location of any such other office or agency.

The Issuer hereby designates the Trust Office of the Trustee (the address of which is specified in Section 14.01) as one such office or agency of the Issuer in accordance with Section 2.03.

Section 4.03    *Reports*.

(a)    For so long as any Notes are outstanding, the Company will provide to the Trustee the following reports:

66

**419**

(1)      within 120 days after the end of the Company's fiscal year beginning with the first fiscal year ending after the Issue Date, annual reports containing, to the extent applicable, and in a level of detail that is consistent with past practice:

(A)      audited consolidated balance sheets of the Company as of the end of the two most recent fiscal years and audited consolidated income statements and statements of cash flow of the Company for the two most recent fiscal years, including complete footnotes to such financial statements and the report of the independent auditors on the financial statements;

(B)      unaudited *pro forma* income statement information and balance sheet information of the Company (which, for the avoidance of doubt, shall not include the provision of a full income statement or balance sheet to the extent not reasonably available), together with explanatory footnotes, for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the most recently completed fiscal year as to which such annual report relates, in each case unless *pro forma* information has been provided in a previous report pursuant to Section 4.03(a)(2) or Section 4.03(a)(3);

(C)      an operating and financial review of the audited financial statements, including a discussion of the results of operations, financial condition, and liquidity and capital resources of the Company, and a discussion of material commitments and contingencies and critical accounting policies in a level of detail that is consistent with past practice;

(D)      description of the business, management and shareholders of the Company, all material affiliate transactions and a description of all material contractual arrangements, including material debt instruments; and

(E)      a description of material risk factors;

*provided* that the information described in clauses (D) and (E) above may be provided in the footnotes to the audited financial statements; and

(2)      within 60 days following the end of the first three fiscal quarters in each fiscal year of the Company beginning with the quarter ending March 2021, all quarterly reports of the Company containing the following information:

(A)      an unaudited condensed consolidated balance sheet as of the end of such quarter and unaudited condensed statements of income and cash flow for the most recent quarter year-to-date periods ending on the unaudited condensed balance sheet date, and the comparable prior year period, together with condensed footnote disclosure;

(B)      unaudited *pro forma* income statement information and balance sheet information of the Company (which, for the avoidance of doubt, shall not include the provision of a full income statement or balance sheet to the extent not reasonably available), together with explanatory footnotes, for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the relevant quarter unless *pro forma* information has been

provided in a previous report pursuant to clause (1), (2) or (3) of this Section 4.03(a); and

(C)    an operating and financial review of the unaudited financial statements, including a discussion of the results of operations, financial condition, EBITDA and material changes in liquidity and capital resources of the Company, and a discussion of material changes not in the ordinary course of business in commitments and contingencies since the most recent report in a level of detail that is consistent with past practice; and

(D)    any material changes to the risk factors disclosed in the most recent annual report;

*provided* that the information described in clause (D) above may be provided in the footnotes to the unaudited financial statements; and

(3)    promptly after the occurrence of any material acquisition, disposition or restructuring or any senior executive officer changes at the Company or change in auditors of the Company or any other material event that the Company or any of its Restricted Subsidiaries announces publicly, a report containing a description of such event.

(b)    Following an Initial Public Offering of the Capital Stock of an IPO Entity and/or the listing of such Capital Stock on a recognized European, United Kingdom or United States stock exchange, the requirements of Section 4.03(a)(1), Section 4.03(a)(2) and Section 4.03(a)(3) shall be considered to have been fulfilled if the IPO Entity complies with the reporting requirements of such stock exchange; *provided* that (x) the IPO Entity shall provide financial statements consistent with the requirements set forth in Section 4.03(a)(2)(A) above for the first three quarterly periods in each fiscal year after the Issue Date pursuant to Section 4.03(a)(2) and (y) to the extent such IPO Entity relies on such stock exchange reporting requirements to fulfill the requirements of Section 4.03(a)(1), Section 4.03(a)(2) and Section 4.03(a)(3), a reasonably detailed description of such material differences between the financial statements of such IPO Entity and the financial statements of the Company shall be included for any period after the Issue Date.

(c)    All financial statement and *pro forma* financial information shall be prepared in accordance with IFRS as in effect on the date of such report or financial statement (or otherwise on the basis of IFRS as then in effect) and on a consistent basis for the periods presented; *provided, however,* that the reports set forth in clauses (1), (2) and (3) of Section 4.03(a) may, in the event of a change in applicable IFRS, present earlier periods on a basis that applied to such periods.  No report needs to include separate financial statements for any Subsidiaries of the Company.  In addition, the reports set forth above will not be required to contain any reconciliation to U.S. generally accepted accounting principles.

(d)    At any time that any of the Company's subsidiaries are Unrestricted Subsidiaries and any such Unrestricted Subsidiary or a group of Unrestricted Subsidiaries, taken as a whole, constitutes a Significant Subsidiary of the Company, then the quarterly and annual financial information required by Section 4.03(a) will include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, of the financial condition and results of operations of the Company and its Restricted Subsidiaries

68

separate from the financial condition and results of operations of the Unrestricted Subsidiaries of the Company.

(e)    The Company shall also post a copy of the reports furnished to the Trustee on the Company's website and if and so long as the Notes are listed on the Official List of the Exchange and to the extent that the rules and regulations of the Exchange so require, copies of such reports furnished to the Trustee will also be made available at the specified office of the listing agent in Jersey.

(f)    The Company will, either:

(1)    within ten Business Days after the delivery of each report discussed in clauses (1) and (2) of Section 4.03(a), conduct a conference call to discuss such report and answer questions about such report, which conference call will be open to all Holders, or (2) provide Holders with access to and the opportunity to participate in any public conference call, investor presentation, webcast or other event, the primary purpose of which is to discuss results of operations or any material event referenced in clause (3) of Section 4.03(a) with investors in the Capital Stock of the Company.

(2)    Details of such conference calls will either (x) be delivered with each report or (y) posted on an electronic website that is used by the Company to communicate to its investors or the equity holders generally for which the Holders have been, prior to the posting of such notice, informed of the website address and relevant password specifications, which notice shall constitute reasonable notice of such public calls for the purpose of this Section 4.03(f).

(g)    In addition, so long as the Notes remain outstanding and during any period during which the Company is not subject to Section 13 or 15(d) of the U.S. Exchange Act nor exempt therefrom pursuant to Rule 12g3-2(b), the Company shall furnish to the Holders and, upon their request, prospective purchasers of the Notes, the information required to be delivered pursuant to Rule 144A(d)(4).

Section 4.04    *Compliance Certificate*.

(a)    The Company shall deliver to the Trustee, within 120 days after the end of each fiscal year, an Officer's Certificate stating that a review of the activities of the Company and its Subsidiaries during the preceding fiscal year has been made under the supervision of the signing Officer with a view to determining whether the Company and its Subsidiaries have kept, observed, performed and fulfilled their respective obligations under this Indenture and the Collateral Documents, and further stating, as to each such Officer signing such certificate, that to the best of his or her knowledge the Company and its Subsidiaries have kept, observed, performed and fulfilled each and every covenant contained in this Indenture and the Collateral Documents and each is not in default in the performance or observance of any of the terms, provisions and conditions of such agreement (or, if a Default or Event of Default has occurred and is continuing, describing all such Defaults or Events of Default of which he or she may have knowledge and what action the Company is taking or proposes to take with respect thereto) and that to the best of his or her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of, premium on, if any, interest or Additional Amounts, if any, on, the Notes is prohibited or if such event has occurred, a description of the event and what action the Company is taking or proposes to take with respect thereto.

(b)    So long as any of the Notes are outstanding, the Company will deliver to the Trustee, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officer's Certificate specifying such Default or Event of Default and what action the Company is taking or proposes to take with respect thereto.

Section 4.05    *[Reserved]* .

Section 4.06    *[Reserved]*.

Section 4.07    *Restricted Payments*.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(1)    declare or pay any dividend or make any other payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Company's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Company or payable in the form of Subordinated Shareholder Debt and other than dividends or distributions payable to the Company or a Restricted Subsidiary of the Company);

(2)    purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) any Equity Interests of the Company or any Parent held by Persons other than the Company or any of its Restricted Subsidiaries (other than in exchange for Equity Interests (other than Disqualified Stock) of the Company or Subordinated Shareholder Debt);

(3)    make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value, any Indebtedness of the Issuer or any Guarantor that is contractually subordinated in right of payment to the Notes or to any Guarantee (excluding any intercompany Indebtedness between the Company and any of its Restricted Subsidiaries or among any Restricted Subsidiaries), except (i) a payment of interest or principal at or after the Stated Maturity thereof or (ii) the purchase, repurchase, or other acquisition of Indebtedness that is contractually subordinated to the Notes or to any Guarantee, as the case may be, purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase or acquisition;

(4)    make any payment (other than in the form of Equity Interests (other than Disqualified Stock) of the Company or Subordinated Shareholder Debt) on or with respect to, or purchase, redeem, defease or otherwise acquire for value any Subordinated Shareholder Debt; or

(5)    make any Restricted Investment,

(all such payments and other actions set forth in clauses (1) through (5) of this Section 4.07(a) being collectively referred to as "*Restricted Payments*") unless, at the time of and after giving effect to such Restricted Payment:

       (A)    no Default or Event of Default has occurred and is continuing or would occur as a consequence of such Restricted Payment;

       (B)    the Company would, after giving *pro forma* effect to such Restricted Payment as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.09(a); and

       (C)    such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries since the Issue Date (excluding Restricted Payments permitted by clauses (2), (3), (4), (5), (6), (7), (8), (9), (11), (12), (14), (15), (16), (17), (18), (19), (20) and (21) of the next succeeding paragraph), is less than the sum, without duplication, of:

       (i)    50% of the Consolidated Net Income of the Company for the period (taken as one accounting period) starting from the beginning of the fiscal quarter commencing immediately after the Issue Date to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, if such Consolidated Net Income for such period is a deficit, less 100% of such deficit, *provided that* if Consolidated Net Income is a deficit, such deficit shall in no event reduce amounts available pursuant to sub-paragraph (vi) below); *plus*

       (ii)    100% of the aggregate net cash proceeds and the Fair Market Value of property, assets or marketable securities received by the Company since the Issue Date (x) as a contribution to its common equity capital or (y) from the issue or sale of Equity Interests of the Company or any Parent (other than Disqualified Stock or Excluded Contributions or Designated Preference Shares) or from Subordinated Shareholder Debt or from the issue or sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or Designated Preference Shares or debt securities) sold to a Restricted Subsidiary of the Company); *plus*

       (iii)    to the extent that any Restricted Investment that was (i) made after the Issue Date is sold, disposed of or otherwise cancelled, liquidated or repaid, 100% of the aggregate amount received in cash and the Fair Market Value of property, assets or marketable securities received by the Company or any Restricted Subsidiary or (ii) made in an entity that subsequently becomes a Restricted Subsidiary, 100% of the Fair Market Value of the Restricted Investment of the Company and

its Restricted Subsidiaries as of the date such entity becomes a Restricted Subsidiary; *plus*

(iv)    to the extent that any Unrestricted Subsidiary of the Company designated as such is redesignated as a Restricted Subsidiary after the Issue Date or has been merged into, consolidated or amalgamated with or into, or transfers or conveys its assets to, the Company or a Restricted Subsidiary of the Company, 100% of the Fair Market Value of the Company's Investment in such Subsidiary as of the date of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable) after deducting the amount of any Investment in such Unrestricted Subsidiary that constituted a Permitted Investment made pursuant to clause (12) of the definition of Permitted Investment; *plus*

(v)    100% of any dividends or distributions received by the Company or a Restricted Subsidiary of the Company after the Issue Date from an Unrestricted Subsidiary of the Company, to the extent that such dividends or distributions were not otherwise included in the Consolidated Net Income of the Company for such period; *plus*

(vi)    $25.0 million.

(b)    The provisions of Section 4.07(a) will not prohibit:

(1)    the payment of any dividend or distribution or the consummation of any redemption within 60 days after the date of declaration of the dividend or distribution or giving of the redemption notice, as the case may be, if, at the date of declaration or notice, the dividend, distribution or redemption payment would have complied with the provisions of this Indenture;

(2)    the making of any Restricted Payment in exchange for, or out of or with the net cash proceeds received by the Company of the substantially concurrent sale or issuance (other than to a Subsidiary of the Company) of, Equity Interests of the Company or any Parent (other than Disqualified Stock) or Subordinated Shareholder Debt or from the substantially concurrent contribution of such proceeds to the capital of the Company; *provided* that the amount of any such net cash proceeds and the Fair Market Value of property other than cash that are utilized for any such Restricted Payment will be excluded from the calculation of amounts under Section 4.07(a)(C)(ii) and shall not constitute Excluded Contributions;

(3)    the repurchase, redemption, defeasance or other acquisition or retirement for value of Indebtedness of the Company or any of its Restricted Subsidiaries that is contractually subordinated to the Notes or to any Guarantee with the net cash proceeds from a substantially concurrent Incurrence of Permitted Refinancing Indebtedness;

(4)    the payment of any dividend (or, in the case of any partnership or limited liability company, any similar distribution) by a Restricted Subsidiary of the Company to the holders of its Equity Interests on a *pro rata* basis;

72

**425**

(5)    the repurchase, redemption or other acquisition or retirement (or dividends or distributions to any Parent to finance any such repurchase, redemption or other acquisition or retirement) for value of any Equity Interests of the Company, any Parent or any Restricted Subsidiary of the Company held by any current or former officer, director, consultant or employee of the Company, any Parent or any Restricted Subsidiary of the Company or any trust or other person in respect of any MIP pursuant to any equity subscription agreement, stock option agreement, MIP, shareholders' or members' agreement or similar agreement, plan or arrangement; *provided* that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests may not exceed the greater of $7.0 million and 3.0% of Consolidated EBITDA (and following the Initial Public Offering, the greater of $10.0 million and 5.0% of Consolidated EBITDA) in any calendar year with unused amounts being carried over into succeeding years, subject to the approval of the Board of Directors of the Company; *provided, further*, that such amount in any calendar year may be increased by an amount not to exceed (i) the cash proceeds received by the Company, any Parent or a Restricted Subsidiary during such calendar year from the sale of Equity Interests of the Company or a Restricted Subsidiary in each case to members of management, officers, directors, consultants or employees of the Company, any Restricted Subsidiary or any Parent and (ii) the cash proceeds of keyman life insurance policies, in each case, to the extent the cash proceeds have not otherwise been applied to the making of Restricted Payments pursuant to Section 4.07(a)(C)(ii) or Section 4.07(b)(2);

(6)    the repurchase of Equity Interests deemed to occur upon the exercise of stock options or warrants to the extent such Equity Interests represent a portion of the exercise price of those stock options or warrants;

(7)    the declaration and payment of regularly scheduled or accrued dividends or distributions to holders of any class or series of Disqualified Stock of the Company or any preferred stock of any Restricted Subsidiary issued on or after the Issue Date in accordance with Section 4.09;

(8)    Permitted Payments to Parent;

(9)    Restricted Payments in aggregate amount outstanding at any time not to exceed the aggregated net cash proceeds and the Fair Market Value of property, assets or marketable securities of Excluded Contributions or Investments in exchange for or using as consideration Investments previously made under this Section 4.07(b)(9);

(10)    other Restricted Payments in an aggregate amount not to exceed the greater of $45.0 million and 20.0% of Consolidated EBITDA since the Issue Date;

(11)    any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Indebtedness of the Company or any of its Restricted Subsidiaries pursuant to the provisions similar to those described under (i) Section 4.15 at a purchase price not greater than 101% of the principal amount of such Indebtedness and (ii) Section 4.10 at a purchase price not greater than 100% of the principal amount of such Indebtedness, *provided* that the Company has complied with its obligations under Section 4.10 and Section 4.15 as applicable, and all Notes validly tendered by Holders in connection with a Change of Control Offer or Asset Sale Offer, as applicable, have been repurchased, redeemed or acquired for value;

(12) cash dividends or other distributions on the Company's Capital Stock used to, or the making of loans to any Parent to, fund the payment of fees and expenses owed by the Company or its Restricted Subsidiaries to Affiliates, to the extent permitted under Section 4.11(b)(4);

(13) following an Initial Public Offering of the Capital Stock of the Company or a Parent, the declaration and payment of loans, advances, dividends, or distributions on the Capital Stock of the Company in an amount per annum not to exceed the greater of (A) 6.0% of the net cash proceeds received from such Initial Public Offering or any subsequent Equity Offering by the Company or contributed in cash to the Company's equity (other than through the issuance of Disqualified Stock) and (B) an amount equal to the greater of (1) the greater of (i) 7.0% of the Market Capitalization and (ii) 7.0% of the IPO Market Capitalization; *provided* that, after giving *pro forma* effect to the payment of any such dividend or making of any such distribution, the Consolidated Net Leverage Ratio of the Company would not exceed 1.75 to 1.0 and (2) the greater of (i) 5.0% of the Market Capitalization and (ii) 5.0% of the IPO Market Capitalization, *provided* that, after giving *pro forma* effect to the payment of any such dividend or making of any such distribution, the Consolidated Net Leverage Ratio of the Company would not exceed 2.25 to 1.0; *provided*, that if such Initial Public Offering or any subsequent Equity Offering was of Capital Stock of a Parent, the net proceeds of any such loans, advances, dividends or distributions are used to fund a corresponding loan, advance, dividend or distribution in equal or greater amount on the Capital Stock of such Parent;

(14) any payments to minority shareholders as required by law or regulation pursuant to or in contemplation of a merger or consolidation involving the Company or any of its Restricted Subsidiaries that does not violate Article 5;

(15) the distribution, as a dividend, or otherwise, of Equity Interests in, or Indebtedness or other securities of an Unrestricted Subsidiary of the Company;

(16) payments of cash, dividends, distributions, advances or other Restricted Payments by the Company or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon (x) the exercise of options or warrants or (y) the conversion or exchange of Capital Stock of any such Person;

(17) the payment of any Receivables Fees and purchases of Receivables and related assets pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing;

(18) any Restricted Payment; *provided* that the Consolidated Net Leverage Ratio of the Company on a *pro forma* basis after giving effect to any such Restricted Payment does not exceed 1.25 to 1.0;

(19) dividends, loans, advances, payments or other distributions in amounts required for any Parent of the Company to pay interest, premium, catch-up payments, make-whole amounts and break costs in respect of Senior Notes, the net cash proceeds of which have been contributed to the Company or any of its Restricted Subsidiaries and that has been guaranteed by, or is otherwise considered Indebtedness of, the Company or any of its Restricted Subsidiaries incurred in accordance of Section 4.09;

(20)    Management Advances and MIP Payments; and

(21)    any Restricted Payment in connection with the Restructuring;

*provided*, *however*, that at the time of, and after giving effect to, any Restricted Payment permitted under clause (10), (13) or (18) of this Section 4.07(b), no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof.

(c)    The amount of all Restricted Payments (other than cash**)** will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Company or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.

(d)    For purposes of determining compliance with this Section 4.07, in the event that a Restricted Payment (or portion thereof) meets the criteria of more than one of the categories of permitted payments described in Sections 4.07(b)(1) through (20) above, or is permitted pursuant to Section 4.07(a) or one or more of the clauses contained in the definition of "Permitted Investment", the Company, in its sole discretion, may classify such Restricted Payment or Investment (or portion thereof) in any manner that complies with this Section 4.07, including as an Investment pursuant to one or more clauses contained in the definition of "Permitted Investment". Unsecured Indebtedness shall not be deemed to be subordinated or junior to secured Indebtedness by virtue of its nature as unsecured Indebtedness. No Indebtedness will be deemed to be subordinated or junior to any other Indebtedness which is secured by a Permitted Collateral Lien on a super senior basis and no "second lien" Indebtedness (but excluding any Senior Notes) shall be deemed to be subordinated or junior to the Facility, in either case, solely as a result of any applicable enforcement proceeds waterfall in the Intercreditor Agreement or any Additional Intercreditor Agreement.

Section 4.08    *Dividend and Other Payment Restrictions Affecting Subsidiaries*.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or cause to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1)    pay dividends or make any other distributions on its Capital Stock to the Company or any of its Restricted Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness owed to the Company or any of its Restricted Subsidiaries;

(2)    make loans or advances to the Company or any of its Restricted Subsidiaries; or

(3)    sell, lease or transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries,

*provided* that (x) the priority of any preferred stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill period to) loans or advances made to the Company or any Restricted Subsidiary to other Indebtedness Incurred by the Company or any Restricted Subsidiary, in each case, shall not be deemed to constitute such an encumbrance or restriction.

75

**428**

(b)    The restrictions in Section 4.08(a) will not apply to encumbrances or restrictions existing under or by reason of:

(1)    agreements governing Indebtedness outstanding on the Issue Date (including any Senior Facilities Agreement), and any other agreements of the Company or its Restricted Subsidiaries, in each case as in effect on the Issue Date and taking into account any additional security contemplated by their terms and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of such agreements; *provided* that such amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not, in the good faith judgment of the Company's Board of Directors or senior management, materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in such agreements on the Issue Date or comparable financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Notes or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Notes;

(2)    this Indenture, the Notes and the Guarantees, the Intercreditor Agreement, the Collateral Documents and any Additional Intercreditor Agreement;

(3)    applicable law, rule, regulation, order, approval, license, permit, authorization, concession or similar restriction;

(4)    any instrument or agreement governing Indebtedness or Capital Stock of a Person acquired by the Company or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was Incurred or issued in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets or Capital Stock of the Person, so acquired; *provided* that, in the case of Indebtedness, such Indebtedness was permitted by the terms of this Indenture to be Incurred;

(5)    non-assignment provisions, subletting restrictions or similar restrictions in contracts, leases and licenses entered into in the ordinary course of business;

(6)    purchase money obligations for property (including Capital Stock) acquired in the ordinary course of business and Lease Obligations that impose restrictions on the property purchased or leased of the nature described in Section 4.08(a)(3);

(7)    any agreement for the sale or other disposition of the Capital Stock or assets of a Restricted Subsidiary that restricts distributions by that Restricted Subsidiary pending closing of the sale or other disposition;

(8)    Permitted Refinancing Indebtedness; *provided* that any such encumbrances or restrictions contained in the agreements governing such Permitted Refinancing Indebtedness taken as a whole are not, in the good faith judgment of the Company's Board of Directors or senior management, materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness

76

**429**

being refinanced or comparable financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Notes or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Notes;

(9)   Liens permitted to be Incurred as set forth under Section 4.12 that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(10)   provisions limiting the disposition or distribution of assets or property or transfer of Capital Stock in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements, limited liability company organizational documents, and other similar agreements entered into (A) in the ordinary course of business, consistent with past practice or (B) with the approval of the Company's Board of Directors or senior management, which limitation is applicable only to the assets, property or Capital Stock that are the subject of such agreements;

(11)   Hedging Obligations entered into from time to time for *bona fide* purposes of the Company and the Restricted Subsidiaries;

(12)   restrictions on cash, Cash Equivalents, Government Guaranteed Securities or other deposits or net worth imposed by customers, suppliers, or lessors or required by insurance, surety or bonding companies under contracts or leases entered into in the ordinary course of business;

(13)   other Indebtedness of the Company and its Restricted Subsidiaries permitted to be Incurred after the Issue Date under Section 4.09; *provided* that in the good faith judgment of the Company's Board of Directors or senior management such encumbrances or restrictions taken as a whole are not materially less favorable to the Holders with respect to such dividend and other payment restrictions, taken as a whole, than those contained in Indenture, the Notes, the Guarantees, any Senior Facilities Agreement and the Collateral Documents on the Issue Date or customary in comparable financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Notes or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Notes;

(14)   encumbrances on property that exist at the time the property was acquired by the Company or a Restricted Subsidiary of the Company;

(15)   contractual encumbrances or restrictions in effect on the Issue Date, and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements; *provided* that such amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not, in the good faith judgment of the Company's Board of Directors or senior management, materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in such agreements on the Issue Date or comparable financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Notes

or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Notes;

(16)     any mortgage financing or mortgage refinancing that imposes restrictions on the real property securing such Indebtedness;

(17)     any Qualified Receivables Financing; or

(18)     any encumbrances or restrictions imposed by any agreement that amends, renews, refinances, extends, refunds, replaces, defeases or discharges any of the contracts, instruments or obligations referred to in clauses (1) through (17) of this Section 4.08(b); *provided* that the encumbrances and restrictions contained in such agreement are not, in the good faith judgment of the Company's Board of Directors or senior management, materially more restrictive, taken as a whole, than such encumbrances and restrictions prior to such amendment or refinancing or than those contained in any comparable agreements or financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Notes or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Notes.

Section 4.09     *Incurrence of Indebtedness and Issuance of Preferred Stock.*

(a)     The Company will not, and will not permit any of its Restricted Subsidiaries to, Incur any Indebtedness (including Acquired Debt) and the Company will not permit any of its Restricted Subsidiaries to issue any preferred stock; *provided, however* that the Company may Incur Indebtedness (including Acquired Debt) and the Restricted Subsidiaries of the Company may Incur Indebtedness (including Acquired Debt) or issue preferred stock, if the Fixed Charge Coverage Ratio of the Company for the period of the most recent four consecutive fiscal quarters for which internal financial statements of the Company are available immediately preceding the date on which such additional Indebtedness is Incurred or such preferred stock is issued, as the case may be, would have been at least 2.0 to 1.0, determined on a *pro forma* basis (including the *pro forma* application of the proceeds therefrom), as if the additional Indebtedness had been Incurred or the preferred stock had been issued, as the case may be, at the beginning of such four-quarter period.

(b)     Section 4.09(a) will not prohibit the Incurrence of any of the following items of Indebtedness or preferred stock (collectively, "*Permitted Debt*"):

(1)     the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness under Credit Facilities in an aggregate principal amount at any one time outstanding under this clause (1) (with LC and Bank Guarantees being deemed (solely for the purpose of Incurring Indebtedness under this clause (1)) to have a principal amount equal to the maximum potential liability of the Company and any of its Restricted Subsidiaries thereunder and any Indebtedness under any Cash Management Facilities to be calculated on a net basis to the extent permitted under the relevant Cash Management Facility) not to exceed:

(A)     the greater of (x) $225.0 million and (y) 100% of Consolidated EBITDA; *plus*

78

**431**

(B)     the maximum amount of Senior Secured Indebtedness such that, on the date of determination, after giving pro forma effect to such Incurrence (including pro forma application of the proceeds thereof), the Consolidated Senior Secured Net Leverage Ratio of the Company does not exceed 2.5 to 1.0,

*provided* that any Indebtedness or preferred stock Incurred pursuant to this clause (1) may be refinanced (including, for the avoidance of doubt, an extension, renewal, refund, replacement, defeasance, or discharge) at any time if such refinancing Indebtedness or preferred stock does not exceed the greater of (I) the aggregate principal amount of Indebtedness or preferred stock permitted to be Incurred pursuant to this clause (1) on the date of determination for such refinancing and (II) the aggregate principal amount of the Indebtedness or preferred stock being refinanced at such time  (together with an amount necessary to pay fees, commissions, premiums, discounts, costs and expenses (including underwriting commissions paid as discounts) Incurred in connection with such refinancing);

(2)     [*Reserved*]

(3)     [*Reserved*]

(4)     the Incurrence by the Issuer of Indebtedness represented by the Notes (other than Additional Notes) and the Incurrence by the Guarantors (including any future Guarantors) of the Guarantees (other than Guarantees of Additional Notes);

(5)     Indebtedness of the Company or any of its Restricted Subsidiaries (other than Indebtedness described in clauses (1) or (4) of this Section 4.09(b)) outstanding on the Issue Date after giving *pro forma* effect to the Restructuring;

(6)     the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness represented by:

(A)     Lease Obligations, mortgage financings, industrial revenue bonds or purchase money obligations or other Indebtedness or preferred stock, in each case, Incurred for the purpose of financing or refinancing all or any part of the purchase price or cost of design, development, construction, lease, rental, installation or improvement of property (real or personal and including Capital Stock), plant or equipment used or useful in the business of the Company or any of its Restricted Subsidiaries (whether through the direct purchase of such assets or the Equity Interests of any Person owning such assets) and any Indebtedness which refinances, replaces or refunds such Indebtedness, in an aggregate principal amount at any one time outstanding not to exceed the greater of (x) $70.0 million and (y) 30.0% of Consolidated EBITDA; and

(B)     Ordinary Course Lease Obligations;

(7)     the Incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge any Indebtedness (other than intercompany Indebtedness) that was permitted by this Indenture to be Incurred under Section 4.09(a) and clauses (4), (5), (7) and (14) of this Section 4.09(b);

(8)   the Incurrence by the Company or any of its Restricted Subsidiaries of intercompany Indebtedness between the Company and any of its Restricted Subsidiaries or among any Restricted Subsidiaries; *provided*, *however*, that:

(A)   to the extent required by the Intercreditor Agreement, if the Issuer or any Guarantor is the obligor on such Indebtedness and the payee is not the Issuer or a Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full in cash of all Obligations then due with respect to the Notes, in the case of the Issuer, or the relevant Guarantee, in the case of a Guarantor; and

(B)   (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Restricted Subsidiary of the Company, and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Restricted Subsidiary of the Company, shall be deemed, in each case, to constitute an Incurrence of such Indebtedness by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this Section 4.09(b)(8);

(9)   the issuance by any of the Company's Restricted Subsidiaries to the Company or to another Restricted Subsidiary of preferred stock; *provided*, *however*, that:

(A)   any subsequent issuance or transfer of Equity Interests that results in any such preferred stock being held by a Person other than the Company or a Restricted Subsidiary of the Company, and

(B)   any sale or other transfer of any such preferred stock to a Person that is neither the Company nor a Restricted Subsidiary of the Company,

will be deemed, in each case, to constitute an issuance of such preferred stock by such Restricted Subsidiary that was not permitted by this Section 4.09(b)(9);

(10)   the Incurrence by the Company or any of its Restricted Subsidiaries of Hedging Obligations (other than commodity hedging) other than for speculative purposes as determined in good faith by the Company;

(11)   the guarantee by the Company or any Restricted Subsidiary of Indebtedness of the Company or any Restricted Subsidiary that was permitted to be Incurred by another provision of this Section 4.09 (including Section 4.09(a)); *provided* that, if the Indebtedness being guaranteed is subordinated to or *pari passu* with the Notes or the Guarantees, then the guarantee thereof shall be subordinated or *pari passu* as applicable, to the same extent as the Indebtedness so guaranteed;

(12)   the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness in respect of (A) any LC and Bank Guarantee or (B) workers' compensation claims, payment obligations in connection with health or other types of social security benefits, unemployment or other insurance or self-insurance obligations, statutory obligations, bankers' acceptance, equipment leases, rent payment obligations or other similar obligations in the ordinary course of business or consistent with past

practice or (C) any letter of support given to any of its Subsidiaries in connection with the audit of that Subsidiary;

(13)   the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds; *provided* that such Indebtedness is extinguished within five Business Days of its Incurrence;

(14)   Indebtedness or preferred stock of Persons (i) that are acquired by the Company or any of its Restricted Subsidiaries or merged (amalgamated or otherwise combined) into a Restricted Subsidiary (including pursuant to any acquisition of assets and assumption of related liabilities) in accordance with the terms of this Indenture or (ii) Incurred to provide all or a portion of the funds utilized to consummate the transaction or series of related transactions pursuant to which any Person became a Restricted Subsidiary or was otherwise acquired by the Company or a Restricted Subsidiary; *provided* that, for any such Indebtedness or preferred stock Incurred under this Section 4.09(b)(14) on the date of such acquisition or other transaction, after giving *pro forma* effect to such acquisition or other transaction and the Incurrence or issuance of such Indebtedness or preferred stock, (A) either (x) the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to Section 4.09(a) or (y) the Fixed Charge Coverage Ratio of the Company would not be less than it was immediately prior to giving effect to such acquisition or other transaction and to the related Incurrence of Indebtedness or preferred stock; or (B) to the extent that Indebtedness Incurred pursuant to Section 4.09(b)(14) constitutes Senior Secured Indebtedness, either (x) the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to Section 4.09(b)(1)(B); or (y) the Consolidated Senior Secured Net Leverage Ratio of the Company would not be greater than it was immediately prior to giving effect to such acquisition or other transaction and to the related Incurrence of Indebtedness or preferred stock;

(15)   Indebtedness of the Company or any Restricted Subsidiary in an aggregate outstanding principal amount that, when taken together with any Permitted Refinancing Indebtedness in respect thereof and the principal amount of all other Indebtedness Incurred pursuant to this Section 4.09(b) (15) and then outstanding, will not exceed 100% of the net cash proceeds received by the Company since the Issue Date (x) as a contribution to its common equity capital or (y) from the issue or sale of Equity Interests of the Company or any Parent (other than Disqualified Stock) or from Subordinated Shareholder Debt or from the issue and sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold to a Restricted Subsidiary of the Company); *provided, however,* that (i) any net cash proceeds that are so received or contributed shall be excluded for purposes of making Restricted Payments under Section 4.07(a) and clauses (2), (9) and (13) of Section 4.07(b) to the extent the Issuer or any Guarantor Incur Indebtedness in reliance thereon and (ii) any net cash proceeds that are so received or contributed shall be excluded for purposes of Incurring Indebtedness pursuant to this Section 4.09(b)(15) to the extent the Company or any of its Restricted Subsidiaries makes a Restricted Payment under Section 4.07(a) and clauses (2), (9) and (13) of Section 4.07(b) in reliance thereon;

(16)    the Incurrence of Indebtedness arising from agreements of the Company or a Restricted Subsidiary providing for indemnification, adjustment of purchase price, earn outs, guarantees, or similar obligations, in each case, Incurred or assumed in connection with the disposition or acquisition of any business, assets or a Subsidiary in accordance with the terms of this Indenture, other than guarantees of financial Indebtedness Incurred or assumed by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

(17)    the Incurrence by the Company or any of its Restricted Subsidiaries of additional Indebtedness or the issuance of preferred stock in an aggregate principal amount (or accreted value, as applicable) or having an aggregate liquidation preference at any time outstanding, including all Permitted Refinancing Indebtedness Incurred to extend, renew, refund, refinance, replace, defease or discharge any Indebtedness Incurred pursuant to this clause (17), not to exceed the greater of (x) $80.0 million and (y) 35.0% of Consolidated EBITDA;

(18)    the Incurrence by the Company or any of its Restricted Subsidiaries of additional Indebtedness arising out of advances on exports, advances on imports, customer prepayments and similar transactions in the ordinary course of business or consistent with past practice or advances on trade receivables or factoring of receivables;

(19)    any Cash Management Facilities including in respect of any netting or setting off arrangements;

(20)    Indebtedness of the Company or any Restricted Subsidiary in respect of Management Advances and MIP Payments;

(21)    guarantees of Indebtedness in connection with Investments in joint ventures not exceeding the greater of $20.0 million and 8.0% of Consolidated EBITDA in the aggregate at any one time outstanding; and

(22)    Indebtedness outstanding under local lines of credit or local facilities (including local bilateral facilities, working capital facilities or overdraft facilities) in an aggregate principal amount at any one time outstanding not to exceed the greater of $25.0 million and 10.0% of Consolidated EBITDA;

*provided*, *however*, that no more than the greater of $115.0 million and 50.0% of Consolidated EBITDA of Indebtedness at any time outstanding may be Incurred by a Restricted Subsidiary which is not a Guarantor pursuant to Sections 4.09(a) or clauses (14)(ii)(A), (15) or (17) of this Section 4.09(b).

(c)    For purposes of determining compliance with this Section 4.09:

(1)    in the event that an item of Indebtedness or preferred stock meets the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (22) of Section 4.09(b) or is entitled to be Incurred pursuant to Section 4.09(a), the Company will be permitted to classify such item of Indebtedness or preferred stock on the date of its Incurrence and will only be required to include the amount and type of such Indebtedness or preferred stock in one of such clauses, although the Company may divide and classify an item of Indebtedness or preferred stock in one or more of

82

**435**

the types of Indebtedness or preferred stock and may later reclassify all or a portion of such item of Indebtedness or preferred stock, in any manner that complies with this Section 4.09;

(2)    notwithstanding Section 4.09(c)(1), all Indebtedness Incurred under each Senior Facilities Agreement entered into on the Issue Date will be deemed to have been Incurred under Section 4.09(b)(1)(A) and may not be reclassified;

(3)    guarantees of, or obligations in respect of letters of credit, bankers' acceptances or other similar instruments relating to, or Liens securing, Indebtedness that is otherwise included in the determination of a particular amount of Indebtedness shall not be included; and

(4)    if obligations in respect of LC and Bank Guarantees, bankers' acceptances or other similar instruments are Incurred pursuant to any Credit Facility and are being treated as Incurred pursuant to Section 4.09(a) or clauses (1), (6), (12), (15), (17) and (22) of Section 4.09(b) and the LC and Bank Guarantees, bankers' acceptances or other similar instruments relate to other Indebtedness, then such other Indebtedness shall not be included

(d)    The accrual of interest or dividends, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness, the reclassification of preferred stock as Indebtedness due to a change in accounting principles, and the payment of dividends on Disqualified Stock or preferred stock in the form of additional shares of the same class of Disqualified Stock or preferred stock will not be deemed to be an Incurrence of Indebtedness or an issuance of preferred stock for purposes of this Section 4.09.  Notwithstanding any other provision of this Section 4.09 (including pursuant to any Permitted Refinancing Indebtedness permitted pursuant to this Section 4.09), the maximum amount of Indebtedness that the Company or any Restricted Subsidiary may Incur pursuant to this Section 4.09 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

(e)    The amount of any Indebtedness outstanding as of any date will be:  (a) the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount; (b) the principal amount of the Indebtedness, in the case of any other Indebtedness; and (c) in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:  (x) the Fair Market Value of such assets at the date of determination; and (y) the amount of the Indebtedness of the other Person.

(f)    Neither the Issuer nor any Guarantor will Incur any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Issuer or such Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Notes and the applicable Guarantee on substantially identical terms; *provided, however*, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Issuer or any Guarantor solely by virtue of being unsecured or by virtue of being secured with different collateral or by virtue of being secured on a junior priority basis or by virtue of the application of waterfall or other payment ordering provisions affecting different tranches of Indebtedness.

Section 4.10   *Asset Sales*.

(a)    The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1)    the Company (or the Restricted Subsidiary, as the case may be) receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests subject to such Asset Sale; and

(2)    at least 75% of the consideration received in the Asset Sale by the Company or such Restricted Subsidiary is in the form of cash, Cash Equivalents or Government Guaranteed Securities.

(b)    The amount of (i) any liabilities, as recorded on the most recent balance sheet, of the Company or any Restricted Subsidiary of the Company (other than contingent liabilities and liabilities that are subordinated in right of payment to the Notes or any Guarantee) that are assumed by the transferee of any such assets and as a result of which, the Company or such Restricted Subsidiary of the Company are released from any further liability in connection therewith or are indemnified against further liabilities, (ii) any securities, notes, other obligations or assets received by the Company or any such Restricted Subsidiary from such transferee that are converted by the Company or such Restricted Subsidiary into cash or Cash Equivalents within 180 days of the receipt thereof, to the extent of the cash or Cash Equivalents received in that conversion (iii) any Designated Non-cash Consideration received by the Company or any of its Restricted Subsidiaries in such Asset Sale having aggregate Fair Market Value taken together with all other Designated Non-cash Consideration received pursuant to this clause (iii), that is at that time outstanding not to exceed the greater of $35.0 million and 15.0% of Consolidated EBITDA (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value), (iv) Indebtedness of any Restricted Subsidiary of the Company that is no longer a Restricted Subsidiary as a result of such Asset Sale, to the extent that the Company and each other Restricted Subsidiary are released from any guarantee of such Indebtedness in connection with such Asset Sale, (v) the Fair Market Value of any Capital Stock or assets of the kind referred to in clause (B) or (D) of Section 4.10(c)(1) and (vi) the Fair Market Value of any consideration consisting of Indebtedness of the Company, the Issuer or any Guarantor of the kind referred to in Section 4.10(c)(1)(A), *provided* the such Indebtedness shall thereafter be canceled, shall be deemed to be cash for purposes of Section 4.10(a)(2) and for no other purpose.

(c)    Within 365 days after the receipt of any Net Proceeds from an Asset Sale, the Company (or any Restricted Subsidiary of the Company, as the case may be) may:

(1)    apply such Net Proceeds, at its option:

(A)    to repay or redeem (v) Indebtedness outstanding under Section 4.09(b)(1)(A), (w) Pari Passu Indebtedness Incurred under a Credit Facility that is secured by a Lien on the Collateral and that is not subordinated in right of payment to the Notes or any Guarantee, (x) Senior Secured Indebtedness that is Pari Passu Indebtedness at a purchase price of no more than 100% of the principal amount of such Pari Passu Indebtedness, so long as the Issuer (or the Company or applicable Restricted Subsidiary, as the case may be) makes an offer on a *pro rata* basis to all Holders at a purchase price in cash equal to at least 100% of the principal amount of the Notes *plus* accrued and unpaid interest, if any, in accordance with the provisions set forth under Section

84

**437**

4.10(d)-(j), (y) any Indebtedness that was secured by any assets not constituting Collateral sold in such Asset Sale, or any other Indebtedness secured only by assets not constituting Collateral, (z) Indebtedness of a Restricted Subsidiary that is not a Guarantor (other than Indebtedness owed to the Company or any of its Restricted Subsidiaries), (aa) the Notes pursuant to an offer to all Holders at a purchase price equal to at least 100% of the principal amount, *plus* accrued and unpaid interest and Additional Amounts, if any, to the date of purchase (a "*Notes Offer*"), or (bb) (in full or in part) the Notes pursuant to the redemption provisions set forth in Section 3.07;

(B)      to acquire all or substantially all of the assets of, or any Capital Stock of, another Permitted Business; *provided* that in the case of any such acquisition of Capital Stock, the Permitted Business is or becomes a Restricted Subsidiary of the Company;

(C)      to make a capital expenditure or other Investment in any person engaged in a Permitted Business;

(D)      to acquire other assets that are not classified as current assets under IFRS and that are used or useful in a Permitted Business, or

(2)      enter into a binding commitment to apply the Net Proceeds pursuant to clause (B), (C) or (D) of Section 4.10(c)(1), *provided* that such binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment until the earlier of (x) the date on which such acquisition or expenditure is consummated, and (y) the 180th day following the expiration of the aforementioned 365 day period; or

(3)      any combination of Section 4.10(c)(1) and Section 4.10(c)(2),

*provided* that if the assets sold or transferred in such Asset Sale constituted Collateral (other than assets that only constitute part of the Collateral because such assets are subject to a floating charge or equivalent Lien), the Company shall pledge or shall cause the applicable Restricted Subsidiary to pledge any assets (including without limitation any acquired Capital Stock) acquired (which for the avoidance of doubt shall not include capital expenditure under Section 4.10(c)(1)(C)) with the Net Proceeds of such Asset Sale to secure (to the extent required by the Agreed Security Principles) the Notes on a first-priority basis.

(d)      Any Net Proceeds from Asset Sales that are not applied, invested or subject to a Notes Offer as provided in Section 4.10(c) will constitute "*Excess Proceeds*". When the aggregate amount of Excess Proceeds exceeds the greater of $45.0 million and 20.0% of Consolidated EBITDA, within 10 Business Days thereof, or at any earlier time at the Issuer's election, the Issuer will make an offer to all Holders (an "*Asset Sale Offer*") and (at the Issuer's election) all holders of other Indebtedness that is *pari passu* with the Notes or any Guarantee to purchase, prepay or redeem with the proceeds of sales of assets the maximum principal amount of Notes and such other Pari Passu Indebtedness (plus all accrued interest on the Indebtedness and the amount of all fees and expenses, including premiums, Incurred in connection therewith) that may be purchased, prepaid or redeemed out of the Excess Proceeds. The offer price in any Asset Sale Offer will be equal to (solely in the case of the Notes) 100% of the principal amount of the Notes and (solely in the case of Pari Passu Indebtedness) no

85

**438**

greater than 100% of the principal amount (or accreted value, as applicable) of such Pari Passu Indebtedness, *plus*, in each case, accrued and unpaid interest to, but excluding, the date of repayment and will be payable in cash. If any Excess Proceeds remain after consummation of an Asset Sale Offer or any Net Proceeds subject to a Notes Offer remain after consummation of a Notes Offer, the Company and its Restricted Subsidiaries may use those Excess Proceeds or Net Proceeds for any purpose not otherwise prohibited by this Indenture. If the aggregate principal amount of Notes and other Pari Passu Indebtedness tendered into (or to be prepaid or redeemed in connection with) such Asset Sale Offer exceeds the amount of Excess Proceeds or if the aggregate principal amount of Notes tendered pursuant to a Notes Offer exceeds the amount of the Net Proceeds so applied, the Notes and such other Pari Passu Indebtedness to be prepaid or redeemed shall be prepaid or redeemed on a *pro rata* basis based on the principal amount of Notes and such other Pari Passu Indebtedness presented for purchase. The Notes to be prepaid or redeemed will be selected, if applicable, in the manner described in Section 3.02. Upon completion of each Asset Sale Offer, the amount of Excess Proceeds will be reset at zero. For the avoidance of doubt, the Issuer may make an Asset Sale Offer prior to the expiration of the 365-day period referred to in Section 4.10(c).

(e)     To the extent that any portion of Net Proceeds payable in respect of the Notes is denominated in a currency other than dollars, as the case may be, the amount thereof payable in respect of such Notes shall not exceed the net amount of funds in U.S. Dollars that is actually received by the Issuer upon converting such portion of the Net Proceeds into U.S. Dollars.

(f)     Pending the final application of any Net Proceeds, the Company (or the applicable Restricted Subsidiary) may temporarily reduce revolving credit borrowings or otherwise invest the Net Proceeds in any manner that is not prohibited by this Indenture.

(g)     Not later than the date upon which written notice of an Asset Sale Offer is delivered to the Trustee, the Issuer shall deliver to the Trustee an Officer's Certificate as to (i) the amount of the Excess Proceeds, (ii) the allocation of the Net Proceeds from the Asset Sales pursuant to which such Asset Sale Offer is being made and (iii) the compliance of such allocation with the provisions of this Section 4.10 and this Indenture. Upon the expiration of the Offer Period, the Issuer shall deliver to the Paying Agent for cancellation the Notes or portions thereof that have been properly presented for purchase to and are to be accepted by the Issuer. Upon receipt from the Issuer of the repurchase price for the Notes accepted for payment, the Paying Agent shall promptly (but in any case not later than 10 Business Days after the Paying Agent receives such amounts) cause to be repaid to each selling Holder an amount equal to the repurchase price of the Notes presented for purchase by such Holder and accepted by the Issuer for repayment. In the event that the Excess Proceeds delivered by the Issuer to the Paying Agent is greater than the repurchase price of the Notes presented for purchase, the Paying Agent shall deliver the excess to the Issuer without undue delay after the expiration of the Offer Period for application in accordance with this Section 4.10.

(h)     Notices of an Asset Sale Offer shall be mailed by first class mail, postage prepaid, or electronically, at least 30 but not more than 60 days before the repayment date to each Holder at such Holder's registered address. If any Note is to be purchased in part only, any notice of purchase that relates to such Note shall state the portion of the principal amount thereof that is to be purchased. For Notes which are represented by global certificates held on behalf of the Common Depositary, notices may be given by delivery of the relevant notices to the Common Depositary for communication to entitled account holders in substitution for the aforesaid mailing.

(i)      On and after the repurchase date, unless the Issuer defaults in payment of the purchase price, interest shall cease to accrue on Notes or portions thereof purchased.

(j)      The Asset Sale Offer and Notes Offer will comply with the requirements of any securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the purchase of the Notes as a result of an Asset Sale Offer or a Notes Offer.  To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Indenture by virtue of such compliance.

Section 4.11    *Transactions with Affiliates*.

(a)      The Company will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each, an "*Affiliate Transaction*"), involving aggregate consideration in excess of the greater of $10.0 million and 5.0% of Consolidated EBITDA, unless:

(1)      the Affiliate Transaction is on terms that are not materially less favorable to the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with a Person who is not an Affiliate; and

(2)      the Company delivers to the Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of the greater of $30.0 million and 12.5% of Consolidated EBITDA, an Officer's Certificate and a resolution of the Board of Directors of the Company certifying that such Affiliate Transaction complies with this Section 4.11.

(b)      The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to Section 4.11(a):

(1)      any employment or consultancy agreement, collective bargaining agreement, employee benefit plan, officer or director indemnification agreement, including any stock option, stock appreciation rights, stock incentive, MIP or similar plans or any similar arrangement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice and payments pursuant thereto (including severance, termination and other similar payments to former or departing employees, consultants, officers or directors);

(2)      transactions (including a merger) between the Company and any of its Restricted Subsidiaries or among any Restricted Subsidiaries;

(3)      transactions with a Person (other than an Unrestricted Subsidiary of the Company) that is an Affiliate of the Company solely because the Company owns, directly or through a Restricted Subsidiary, an Equity Interest in, or controls, such Person;

(4)    payment of reasonable fees to, reimbursements of expenses and indemnity provided on behalf of, officers, directors, employees or consultants of the Company or any of its Restricted Subsidiaries or of any Parent;

(5)    any issuance of Equity Interests (other than Disqualified Stock) of the Company, receipt of any capital contributions in exchange for Equity Interests of the Company (other than Disqualified Stock) or the Incurrence of Subordinated Shareholder Debt;

(6)    Restricted Payments and Permitted Investments (other than Permitted Investments described in clauses (3) and (9) (to the extent such guarantee is in respect of Indebtedness of a Person that is not the Company or a Restricted Subsidiary) of the definition thereof in Section 1.01 ) that do not violate Section 4.07;

(7)    Management Advances and MIP Payments;

(8)    transactions with customers, clients, suppliers, joint venture partners or purchasers or sellers of goods or services, or lessors or lessees of property or providers of employees or other labor in compliance with the terms of this Indenture which are, in the aggregate (taking into account all the costs and benefits associated with such transactions), in the good faith judgment of the Company's Board of Directors, materially no less favorable to the Company or its Restricted Subsidiaries than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with a Person who is not an Affiliate;

(9)    Liens on Equity Interests of Unrestricted Subsidiaries of the Company for the benefit of lenders of Unrestricted Subsidiaries of the Company;

(10)    if such Affiliate Transaction, following an Initial Public Offering, is with a Person in its capacity as a holder of Capital Stock of the Company or any Restricted Subsidiary where such Person is treated no more favorably than the holders of Capital Stock of the Company or any Restricted Subsidiary;

(11)    transactions effected pursuant to agreements in effect on the Issue Date and any amendment, modification or replacement of such agreement (so long as such amendment or replacement is not, in the good faith judgment of the Company's Board of Directors, materially more disadvantageous to the Holders, taken as a whole, than the original agreement as in effect on the Issue Date);

(12)    Permitted Payments to Parent;

(13)    execution, delivery and performance of any consolidated group arrangements for tax or accounting purposes, *provided* that any payments to be made pursuant to such arrangements are made in compliance with Section 4.07;

(14)    (A) issuances or sales of Capital Stock (other than Disqualified Stock or Designated Preference Shares) of the Company or options, warrants or other rights to acquire such Capital Stock or Subordinated Shareholder Debt and entering into any proceeds loan in respect of the proceeds of any issuance of Senior Notes; *provided* that the interest rate and other financial terms of such Subordinated Shareholder Debt or proceeds loans are approved by a majority of the members of the Board of Directors of

the Company in their reasonable determination and (B) any amendment, waiver or other transaction, including satisfying payment obligations, with respect to any Subordinated Shareholder Debt or proceeds loan in compliance with the other provisions of the Indenture, the Intercreditor Agreement or any Additional Intercreditor Agreement, as applicable;

(15)   any transaction effected as part of a Qualified Receivables Financing; and

(16)   any transaction effected in connection with the Restructuring.

Section 4.12   *Liens*.

(a)   The Company will not, and will not permit any of its Restricted Subsidiaries to, create, Incur, assume or otherwise cause to exist or become effective any Lien of any kind securing Indebtedness upon any of their property or assets, now owned or hereafter acquired, except:

(1)   in the case of any property or asset that does not constitute Collateral, (A) Permitted Liens or (B) if such Lien is not a Permitted Lien, to the extent that all payments due under this Indenture, the Notes and the Guarantees are secured on an equal and ratable *pari passu* basis with the obligations so secured (or if such obligations so secured are subordinated in right of payment to either the Notes or any Guarantee, prior or senior thereto, with the same relative priority as the Notes or such Guarantee, as applicable, shall have with respect to such subordinated Indebtedness), until such time as such obligations are no longer secured by a Lien; and

(2)   in the case of any property or asset that constitutes Collateral, Permitted Collateral Liens.

(b)   The conditions for the release of any such Lien created in favor of the Notes or any such Guarantee pursuant to Section 4.12(a)(1)(B) is set forth Section 10.02.

Section 4.13   *Limitation on Issuer Activities*

(a)   The Issuer will not engage in any business activity or undertake any other activity, except:

(1)   any activity reasonably relating to the offering, sale, issuance, Incurrence and servicing, purchase, redemption, refinancing or retirement of the Notes, or other Indebtedness permitted by the terms of this Indenture, the granting of Liens permitted under Section 4.12 and distributing, lending or otherwise advancing funds to the Company or any of its Restricted Subsidiaries;

(2)   any activity undertaken with the purpose of fulfilling any other obligations under the Notes, other Indebtedness permitted by the terms of this Indenture, the Intercreditor Agreement (or any Additional Intercreditor Agreement entered into pursuant to the terms of the Intercreditor Agreement or this Indenture) or any Collateral Document to which it is a party;

89

**442**

(3)     Permitted Investments constituting Investments in the Company or another Restricted Subsidiary, Investments in the form of cash and Cash Equivalents and repurchases of the Notes or other Indebtedness permitted by the terms of this Indenture;

(4)     Permitted Reorganization;

(5)     any activity undertaken in connection with the Restructuring;

(6)     any activity directly related to the establishment and/or maintenance of the Issuer's corporate existence or otherwise complying with applicable law; and

(7)     other activities not specifically enumerated above that are *de minimis* in nature.

(b)     The Issuer will not create, Incur, assume or suffer to exist any Lien over any of its property or assets, or any proceeds therefrom, to secure Indebtedness, except for Liens to secure the Notes or other Indebtedness permitted to be Incurred under this Indenture to the extent Liens securing such Indebtedness are permitted to be Incurred under this Indenture.

(c)     The Issuer will at all times remain a wholly owned Restricted Subsidiary of the Company. Except in accordance with Article 5 the Issuer will not merge, consolidate, amalgamate or otherwise combine with or into another Person (whether or not the Issuer is the surviving corporation) or, other than in connection with the Incurrence of a Permitted Lien or Permitted Collateral Lien, sell, assign, transfer, lease, convey or otherwise dispose of any material property or assets to any Person in one or more related transactions.

(d)     For so long as any Notes are outstanding, none of the Company nor any of its Restricted Subsidiaries will commence or take any action or facilitate a winding-up, liquidation or other analogous proceeding in respect of the Issuer.

Section 4.14    *[Reserved]*

Section 4.15    *Offer to Repurchase Upon Change of Control Triggering Event.*

(a)     Upon the occurrence of a Change of Control Triggering Event, the Issuer will make an offer (a "*Change of Control Offer*") to each Holder to repurchase all or any part (in integral multiples of $1; *provided* that Notes of $1,000 in aggregate principal amount or less may only be redeemed in whole and not in part) of that Holder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount of the Notes repurchased plus accrued and unpaid interest and Additional Amounts, if any, on the Notes repurchased to, but not including, the date of purchase (the "*Change of Control Payment*") (subject to the rights of Holders on the relevant Record Date to receive interest on the relevant Interest Payment Date); *provided, however*, that the Issuer shall not be obliged to repay Notes as described under this provision, in the event and to the extent that it has unconditionally exercised its right to redeem all of the Notes in accordance with this Indenture, or all conditions to such redemption have been satisfied or waived.

(b)     Unless the Issuer has unconditionally exercised its right to redeem all the Notes in accordance with this Indenture or all conditions to such redemption have been satisfied or waived, no later than the date that is 60 days after any Change of Control Triggering Event, the

Issuer will give notice to each Holder, stating that a Change of Control Offer is being made and offering to purchase Notes on the date specified in the notice, which shall be no earlier than 30 days and no later than 60 days from the date such notice is made (the "*Change of Control Payment Date*"), pursuant to the procedures required by this Indenture and described in such notice, stating:

> (1)    that the Change of Control Offer is being made pursuant to this Section 4.15 and that all Notes tendered will be accepted for payment; and

> (2)    the purchase price and the purchase date or delivered;

> (3)    that any Note not tendered will continue to accrue interest;

> (4)    that, unless the Issuer defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursuant to the Change of Control Offer will cease to accrue interest after the Change of Control Payment Date;

> (5)    that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender the Notes, with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the Paying Agent at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Control Payment Date;

> (6)    that Holders will be entitled to withdraw their election if the Paying Agent receives, not later than the close of business on the second Business Day preceding the Change of Control Payment Date, a facsimile transmission or letter setting forth the name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is withdrawing his election to have the Notes purchased; and

> (7)    that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpurchased portion of the Notes surrendered, which unpurchased portion must be equal to $1,000 in principal amount or an integral multiple of $1 thereof.

(c)    The Change of Control Offer will comply with the requirements of any securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change of Control Offer.  To the extent that the provisions of any applicable securities laws or regulations conflict with the Change of Control Triggering Event provisions of this Indenture, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Indenture by virtue of such compliance.

(d)    On the Change of Control Payment Date, if a Change of Control Triggering Event has occurred, the Issuer will, to the extent lawful:

> (1)    accept for payment all Notes or portions of Notes properly tendered pursuant to the Change of Control Offer;

> (2)    deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes properly tendered; and

(3)      deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Issuer pursuant to the Change of Control Offer.

(e)      The relevant Paying Agent will promptly mail or cause to be delivered to each Holder which has properly tendered and so accepted the Change of Control Payment for such Notes, and the Trustee (or Authenticating Agent) will promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unpurchased portion of the Notes surrendered, if any; *provided* that each new Note will be in a principal amount of $1,000 and integral multiples of $1 in excess thereof.  Any Note so accepted for payment will cease to accrue interest on and after the Change of Control Payment Date.  The Issuer will publicly announce the results of the Change of Control Offer on or as soon as reasonably practicable after the Change of Control Payment Date.

(f)      If a Change of Control Triggering Event has not occurred at the time of the Change of Control Payment Date, but a Change of Control Triggering Event subsequently occurs, the Issuer will be required to extend a new Change of Control Offer in compliance with the terms of this Section 4.15.  The Issuer will not be required to make a Change of Control Offer upon a Change of Control Triggering Event if (x) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth in this Section 4.15 and purchases all Notes properly tendered for purchase and not withdrawn under the Change of Control Offer, or (y) notice of redemption has been given pursuant to Section 3.07 and all conditions thereto have been satisfied or waived, unless and until there is a default in payment of the applicable redemption price.  Notwithstanding anything to the contrary contained herein, a Change of Control Offer may be made in advance of a Change of Control Triggering Event, conditioned upon the consummation of such Change of Control Triggering Event, if a definitive agreement is in place for the Change of Control Triggering Event at the time the Change of Control Offer is made.

(g)      The provisions of this Indenture relating to the Issuer's obligation to make an offer to repurchase the Notes following a Change of Control Triggering Event may be waived or modified with the prior written consent of the Holders of a majority in principal amount of the Notes prior to the occurrence of a Change of Control Triggering Event.

Section 4.16    *Limitation on Issuances of Guarantees of Indebtedness.*

(a)      The Company will not cause or permit any of its Restricted Subsidiaries that are not Guarantors or the Issuer, directly or indirectly, to guarantee, assume or in any manner become liable with respect to any Indebtedness with an outstanding principal amount in excess of $20.0 million under any Senior Facilities Agreement, any syndicated Credit Facility or any Public Debt, in each case, of the Issuer or a Guarantor unless such Restricted Subsidiary simultaneously executes and delivers a supplemental indenture providing for the Guarantee of the payment of the Notes by such Restricted Subsidiary, which Guarantee will be senior to or *pari passu* with such Restricted Subsidiary's guarantee of such other Indebtedness; provided, however, that such Restricted Subsidiary shall not be obligated to execute such supplemental indenture or provide such Guarantee to the extent and for so long as the incurrence of such Guarantee is contrary to the Agreed Security Principles.

(b)      Each additional Guarantee provided pursuant to Section 4.16(a) will be limited as necessary to recognize certain defenses generally available to guarantors (including those

92

**445**

that relate to fraudulent conveyance or transfer, voidable preference, financial assistance, corporate purpose, corporate benefit, capital maintenance or similar laws, regulations or defenses affecting the rights of creditors generally) or other considerations under applicable law.

(c)     Notwithstanding Section 4.16(a) and Section 4.16(b), the Company shall not be obligated to cause such Restricted Subsidiary to guarantee the Notes to the extent that such Guarantee by such Restricted Subsidiary would reasonably be expected to give rise to or result in a violation of applicable law, which, in any case, cannot be prevented or otherwise avoided through measures reasonably available to the Company or the Restricted Subsidiary or any liability for the officers, directors or shareholders of such Restricted Subsidiary.  Section 4.16(a) will not be applicable to any guarantees of any Restricted Subsidiary outstanding on the Issue Date, or any guarantee given to a bank or trust company having combined capital and surplus and undivided profits of not less than $250 million, whose debt has an Investment Grade Rating by at least two Rating Agencies at the time such guarantee was given, in connection with the operation of cash management programs established for the benefit of the Company or any of its Restricted Subsidiaries.

(d)     Any additional Guarantee will automatically and unconditionally be released and discharged in accordance with Section 11.06.

Section 4.17   *[Reserved]*.

Section 4.18   *Designation of Restricted and Unrestricted Subsidiaries*.

The Board of Directors of the Company may designate any Restricted Subsidiary (including any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary if that designation would not cause a Default.  If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Company and its Restricted Subsidiaries in the Subsidiary designated as Unrestricted shall be deemed to be an Investment made as of the time of the designation and will reduce the amount available for Restricted Payments under Section 4.07 or under one or more clauses of such definition of Permitted Investments, as determined by the Company.  That designation will only be permitted if such Investment would be permitted at that time.

Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the Trustee by filing promptly with the Trustee a certified copy of a resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the preceding conditions and was permitted under Section 4.07 or under one or more clauses of such definition of Permitted Investments, as determined by the Company.  If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedness of such Subsidiary will be deemed to be Incurred by a Restricted Subsidiary of the Company as of such date and, if such Indebtedness is not permitted to be Incurred as of such date under Section 4.09, the Company will be in Default under Section 4.09.

The Board of Directors of the Company may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Company; *provided* that such designation will be deemed to be an Incurrence of Indebtedness by a Restricted Subsidiary of the Company of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation will only

be permitted if (1) such Indebtedness is permitted under Section 4.09, calculated on a *pro forma* basis taking into account such designation as if such designation had occurred at the beginning of the applicable reference period; and (2) no Default or Event of Default would be in existence following such designation.

Section 4.19    *Maintenance of Listing*.

The Issuer will use its commercially reasonable efforts to obtain and maintain the listing of the Notes on the Official List of the Exchange or for so long as such Notes are outstanding on another "*recognised stock exchange*" as defined in Section 1005 of the Income Tax Act of 2007 of the United Kingdom.

Section 4.20    *No Impairment of Security Interest*.

(a)    The Company will not, and will not cause or permit any Restricted Subsidiary to, take or knowingly or negligently omit to take, any action which action or omission would or could reasonably be expected to have the result of materially impairing the security interest with respect to the Collateral (it being understood that the Incurrence of Liens on the Collateral permitted by the definition of Permitted Collateral Liens shall under no circumstances be deemed to materially impair the security interest with respect to the Collateral) for the benefit of the Trustee and the Holders, and the Company will not, and will not cause or permit any Restricted Subsidiary to, grant to any Person other than the Security Agent, for the benefit of the Trustee and the Holders and the other beneficiaries described in the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement, any interest whatsoever in any of the Collateral; *provided* that (i) nothing in this Section 4.20 shall restrict the discharge or release of the Collateral in accordance with this Indenture, the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement; (ii) the Company and the Restricted Subsidiaries may Incur Permitted Collateral Liens; (iii) the applicable Collateral Documents may be amended from time to time to cure any ambiguity, mistake, omission, defect, manifest error or inconsistency therein; (iv) the Company and its Restricted Subsidiaries may discharge and release security interests with respect to the Collateral in connection with the implementation of a Permitted Reorganization, (v) the applicable Collateral Documents may be amended in any manner that does not adversely affect the rights of the Security Agent, the Trustee or the Holders of Notes in any material respects; and (vi) the security interests and the related Collateral Documents may be amended, extended, renewed, restated, supplemented or otherwise modified or released (followed by an immediate retaking of a Lien of at least equivalent ranking over the same assets); *provided*, *however*, that in the case of clause (vi) of this Section 4.20(a), the Collateral Documents may not be amended, extended, renewed, restated, supplemented, released or otherwise modified or replaced, unless contemporaneously with such amendment, extension, replacement, restatement, supplement, modification, renewal or release (followed by an immediate retaking of a Lien of at least equivalent ranking over the same assets), the Company delivers to the Trustee either:

(1)    a solvency opinion from an internationally recognized investment bank or accounting firm, in form and substance reasonably satisfactory to the Trustee confirming the solvency of the Company and its Subsidiaries, taken as a whole, after giving effect to any transactions related to such amendment, extension, renewal, restatement, supplement, modification, replacement or release and retaking;

(2)    a certificate from the Board of Directors or chief financial officer of the relevant Person or the chief financial officer of the Company, which certificate confirms

94

the solvency of the Person granting such security interest after giving effect to any transactions related to such amendment, extension, renewal, restatement, supplement, modification, replacement or release and retaking; or

(3)    an Opinion of Counsel, in form and substance reasonably satisfactory to the Trustee (subject to customary exceptions and qualifications), confirming that, after giving effect to any transactions related to such amendment, extension, renewal, restatement, supplement, modification, replacement or release and retaking, the Lien or Liens securing the Notes created under the Collateral Documents so amended, extended, renewed, restated, supplemented, modified, replaced or release and retaking are valid and perfected Liens not otherwise subject to any limitation imperfection, in equity or at law, that such Lien or Liens were not otherwise subject to immediately prior to such amendment, extension, renewal, restatement, supplement, modification, replacement or release and retaking (other than as a result of the effect of the Agreed Security Principles or any new hardening period).

(b)    At the direction of the Company and without the consent of the Holders, the Security Agent may from time to time enter into one or more amendments to the Collateral Documents or enter into additional or supplemental Collateral Documents to:  (i) cure any ambiguity, omission, defect or inconsistency therein or (ii) (but subject to compliance with Section 4.20(a)) (x) provide for Permitted Collateral Liens, (y) add to the Collateral or (z) make any other change thereto that does not adversely affect the rights of the Holders in any material respect.

(c)    In the event that the Company complies with this Section 4.20, the Trustee and the Security Agent shall (subject to customary protections and indemnifications) consent to such amendment, extension, renewal, restatement, supplement, modification, replacement or release with no need for instructions from Holders.

Section 4.21    *Additional Amounts*.

(a)    All payments made by or on behalf of the Issuer under or with respect to the Notes (whether or not in the form of Definitive Registered Notes) or any of the Guarantors on its Guarantee (including in each case any Successor Person) will be made without withholding or deduction for, or on account of, any present or future Taxes unless the withholding or deduction of such Taxes is then required by law.  If any deduction or withholding for, or on account of, any Taxes imposed or levied by or on behalf of any jurisdiction in which the Issuer or any Guarantor (including in each case any Successor Person) is incorporated, organized, carrying on a business through a branch, agency or permanent establishment or resident for tax purposes or any political subdivision thereof or therein or any jurisdiction by or through which payment is made by or on behalf of the Issuer or any Guarantor under or with respect to the Notes or the Guarantees or any political subdivision thereof or therein (each, a "*Tax Jurisdiction*"), will at any time be required to be made from any payments made by or on behalf of the Issuer under or with respect to the Notes or any of the Guarantors with respect to any Guarantee, including payments of principal, redemption price, purchase price, interest or premium, the Issuer or the relevant Guarantor, as applicable, will pay such additional amounts (the "*Additional Amounts*") as may be necessary in order that the net amounts received in respect of such payments after such withholding or deduction (including any such deduction or withholding from such Additional Amounts) will equal the respective amounts that would

**448**

have been received in respect of such payments in the absence of such withholding or deduction; *provided, however*, that no Additional Amounts will be payable with respect to:

(1)     any Taxes to the extent such taxes would not have been imposed but for the Holder or the beneficial owner of the Notes (or a fiduciary, settlor, beneficiary, partner of, member or shareholder of, or possessor of a power over, the relevant Holder, if the relevant Holder is an estate, trust, nominee, partnership, limited liability company or corporation) being or having been a citizen or resident or national of, incorporated, present, or engaged in a trade or business in, or having or having had a permanent establishment in, the relevant Tax Jurisdiction in which such Taxes are imposed or having any other present or former connection with the relevant Tax Jurisdiction other than by the mere acquisition or holding of, exercise or enforcement of rights under, or the receipt of payments in respect of, the Notes, this Indenture or any Guarantee;

(2)     any Taxes to the extent such Taxes are imposed or withheld as a result of the failure of the Holder or beneficial owner of the Notes to comply with any reasonable written request, made at least 30 days before any such withholding or deduction would be payable, by the Issuer or any of the Guarantors to provide timely and accurate information concerning the nationality, residence or identity of such Holder or beneficial owner or to make any valid or timely declaration or similar claim or satisfy any certification, information or other reporting requirement, which is required or imposed by a statute, treaty, regulation or administrative practice of the relevant Tax Jurisdiction as a precondition to exemption from all or part of, or reduction in the rate of deduction or withholding of, such Taxes (in each case, to the extent such Holder or beneficial owner is legally entitled to do so);

(3)     any Taxes imposed or withheld as a result of the presentation of any Note for payment (where Notes are in the form of Definitive Registered Notes and presentation is required) more than 30 days after the relevant payment is first made available for payment to the Holder (except to the extent that the Holder would have been entitled to Additional Amounts had the Note been presented on the last day of such 30-day period);

(4)     any estate, inheritance, gift, sale, transfer, personal property or similar tax, assessment or excise taxes imposed on the transfer of Notes;

(5)     any Taxes withheld, deducted or imposed on a payment to an individual and which are required to be made pursuant to Luxembourg Relibi law of December 23, 2005, as amended;

(6)     any Taxes payable otherwise than by deduction or withholding on or in respect of any Note or Guarantee;

(7)     any Taxes that were imposed with respect to any payment on a Note to any Holder who is a fiduciary or partnership or person other than the sole beneficial owner of such payment to the extent that no Additional Amounts would have been payable had the beneficial owner of the applicable Note been the Holder of such Note;

(8)     any Taxes that are imposed or withheld pursuant to Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), as of the Issue Date (or any amended or successor version of such sections), any

96

regulations promulgated thereunder, any official interpretations thereof, any similar law or regulation adopted pursuant to an intergovernmental agreement between a non-U.S. jurisdiction and the United States with respect to the foregoing or any agreements entered into pursuant to Section 1471(b)(1) of the Code; or

(9)     any combination of the items in clauses (1) through (8) of this Section 4.21(a).

(b)     In addition to the foregoing, the Issuer and the Guarantors will also pay and indemnify each Holder and beneficial owner for any present or future stamp, issue, registration, transfer, court or documentary Taxes, or any other excise or property Taxes, charges or similar levies or Taxes which are levied by any Tax Jurisdiction on the execution, delivery, issuance or registration of, or by any Tax Jurisdiction on the enforcement of, any of the Notes, this Indenture, any Guarantee, or any other document or instrument referred to therein (other than a transfer of the Notes that is not part of the initial resale by the initial purchasers), or the receipt of any payments with respect to the Notes or the Guarantees (limited, solely in the case of Taxes attributable to the receipt of any payments, to any such Taxes imposed in a Tax Jurisdiction that are not excluded under clauses (1) though (5), (7) or (8) of Section 4.21(a) or any combination thereof).

(c)     The Issuer and the Guarantors will not pay and indemnify any Holder or beneficial owner for any Luxembourg registration duties (*droits d'enregistrement*) payable in the case of registration by any Holder or beneficial owner of the Notes, this Indenture, any Guarantee, or any other document or instrument referred to therein in Luxembourg when such registration is not required to enforce the rights of a Holder or a beneficial owner under such documents.

(d)     If the Issuer or any Guarantor, as the case may be, becomes aware that it will be obligated to pay Additional Amounts with respect to any payment under or with respect to the Notes or any Guarantee, the Issuer or the relevant Guarantor, as the case may be, will deliver to the Trustee and the Paying Agent on a date that is at least 30 days prior to the date of that payment (unless the obligation to pay Additional Amounts arises after the 45th day prior to that payment date, in which case the Issuer or the relevant Guarantor shall notify the Trustee and the Paying Agent promptly thereafter) an Officer's Certificate stating the fact that Additional Amounts will be payable and the amount estimated to be so payable. The Officer's Certificate must also set forth any other information reasonably necessary to enable the Paying Agent to pay Additional Amounts on the relevant payment date. The Trustee and the Paying Agent shall be entitled to rely absolutely and solely on such Officer's Certificate as conclusive proof that such payments are necessary.

(e)     The Issuer or the relevant Guarantor will make or cause to be made all withholdings and deductions as required by law and will remit or cause to be remitted the full amount deducted or withheld to the relevant Tax authority in accordance with applicable law. The Issuer or the relevant Guarantor will use its reasonable efforts to obtain Tax receipts from each Tax authority evidencing the payment of any Taxes so deducted or withheld. The Issuer or the relevant Guarantor will furnish to the Trustee, within a reasonable time after the date the payment of any Taxes so deducted or withheld is made, certified copies of Tax receipts evidencing payment by the Issuer or a Guarantor, as the case may be, or if, notwithstanding such entity's efforts to obtain receipts, receipts are not obtained, other evidence of payment (reasonably satisfactory to the Trustee) by such entity.

(f)    Whenever in this Indenture there is mentioned, in any context, the payment of amounts based upon the principal amount of the Notes or of principal, interest or of any other amount payable under, or with respect to, any of the Notes or Guarantees, such mention shall be deemed to include mention of the payment of Additional Amounts to the extent that, in such context, Additional Amounts are, were or would be payable in respect thereof.

(g)    The obligations in this Section 4.21 will survive any termination, defeasance or discharge of this Indenture, any transfer by a Holder or beneficial owner of its Notes and will apply, mutatis mutandis, to any jurisdiction in which any successor Person to the Issuer or any Guarantor is incorporated, organized, engaged in business or otherwise resident for tax purposes or any jurisdiction from or through which any payments made by or on behalf of the Issuer or any Guarantors under or with respect to the Notes or any Guarantee is made and any department or political subdivision thereof or therein.

Section 4.22    *Suspension of Covenants on Achievement of Investment Grade Status.*

(a)    If on any date following the Issue Date:

(1)    the Notes are assigned an Investment Grade Rating by at least two Rating Agencies; and

(2)    no Default or Event of Default shall have occurred and be continuing, (the occurrence of the events described in Section 4.22(a)(1) and this Section 4.22(a)(2) being collectively referred to as a "*Covenant Suspension Event*" and the date thereof being referred to as the "*Suspension Date*"),

then the Issuer shall provide written notice to such effect to the Trustee and, beginning on the Suspension Date, the provisions of this Indenture under Section 4.07, Section 4.08, Section 4.09, Section 4.10, Section 4.11, Section 4.16, Section 4.18, Section 4.26, Section 5.01(a)(5) and Section 5.01(b)(4) will not apply to the Notes or the Company and its Restricted Subsidiaries (collectively, the "*Suspended Covenants*").

(b)    [*Reserved*].

(c)    In the event that the Company and the Restricted Subsidiaries are not subject to the Suspended Covenants under this Indenture for any period of time as a result of the foregoing, and on any subsequent date (the "*Reversion Date*") one or more Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Notes below an Investment Grade Rating so that the Notes are no longer assigned an Investment Grade Rating by at least two Rating Agencies, then the Company and the Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants under this Indenture with respect to future events unless and until the Notes subsequently again attain an Investment Grade Rating from at least two Rating Agencies. Upon any such Reversion Date, the Company shall promptly notify the Trustee, however, the Trustee shall not be obliged to notify the Holders of such an event. The period of time between the Suspension Date and the Reversion Date is referred to in this Indenture as the "*Suspension Period*". Upon the occurrence of a Covenant Suspension Event, the amount of Excess Proceeds from Net Proceeds shall be reset to zero.

(d)    Notwithstanding the foregoing, in the event of any such reinstatement, no action taken or omitted to be taken by the Company or any Restricted Subsidiary prior to such reinstatement will give rise to a Default or Event of Default under this Indenture with respect

98

**451**

to the Notes; *provided* that (i) with respect to Restricted Payments made after such reinstatement, the amount available to be made as Restricted Payments will be calculated as though Section 4.07 had been in effect prior to, but not during, the Suspension Period; (ii) all Indebtedness Incurred, or Disqualified Stock or preferred stock issued, during the Suspension Period will be classified to have been Incurred or issued pursuant to Section 4.09(b)(5); (iii) any transactions with Affiliates entered into after such reinstatement pursuant to an agreement entered into during any Suspension Period shall be deemed to be permitted pursuant to Section 4.11(b)(11); and (iv) any encumbrance or restriction on the ability of any Restricted Subsidiary that is not a Guarantor to take any action described in clauses (1) through (3) of Section 4.08(a) that becomes effective during any Suspension Period shall be deemed to be permitted pursuant to Section 4.08(b)(1); and (v) no Restricted Subsidiary shall be required to comply with Section 4.16 after such reinstatement with respect to any guarantee entered into by such Restricted Subsidiary during any Suspension Period.  In addition, in the event of any such reinstatement, the Company and the Restricted Subsidiaries will be permitted, without causing a Default or an Event of Default, to honor any contractual commitment or take any actions, as long as the contractual commitments were entered into during the Suspension Period and not in anticipation of the occurrence of a Reversion Date.

Section 4.23   *Additional Intercreditor Agreements*.

(a)   At the request of the Company and upon delivery of an Officer's Certificate and an Opinion of Counsel to the Trustee, without the consent of the Holders, and at the time of, or prior to, the Incurrence by the Issuer or a Guarantor of Indebtedness permitted under Section 4.09, the Issuer or the relevant Guarantor and the Trustee and Security Agent shall enter into with the holders of such Indebtedness (or their duly authorized representatives) an amendment to the Intercreditor Agreement or an additional intercreditor agreement (an "*Additional Intercreditor Agreement*") on substantially the same terms as the Intercreditor Agreement (or more favorable to the Holders), including terms with respect to the limitation on enforcement and release of guarantees and priority as set forth in the Intercreditor Agreement (or on terms more favorable to the Holders); *provided* that such amendment to the Intercreditor Agreement or Additional Intercreditor Agreement will not impose any personal obligations on the Trustee or adversely affect the rights, duties, liabilities or immunities of the Trustee under this Indenture or the Intercreditor Agreement or any Additional Intercreditor Agreement.

(b)   At the request of the Company, without the consent of Holders, the Issuer or the relevant Guarantor and the Trustee and the Security Agent shall enter into one or more amendments to the Intercreditor Agreement or any Additional Intercreditor Agreement to: (1) cure any defects, ambiguities, omissions or inconsistencies or reflect changes, in each case, of a minor, technical or administrative nature, (2) increase the amount or types of Indebtedness covered by any Intercreditor Agreement or Additional Intercreditor Agreement that may be Incurred by the Issuer or a Guarantor that is subject to any Intercreditor Agreement or Additional Intercreditor Agreement (including the addition of provisions relating to new Indebtedness ranking junior or *pari passu* in right of payment with the Notes); *provided* that such Indebtedness is Incurred in compliance with this Indenture, (3) add new Guarantors to the Intercreditor Agreement or an Additional Intercreditor Agreement, (4) further secure the Notes, (5) make provision for the security securing Additional Notes to rank *pari passu* with the Collateral or (6) make any other change to any such Intercreditor Agreement or an Additional Intercreditor Agreement that does not adversely affect the rights of Holders in any material respect.

(c)    The Company shall not otherwise direct the Trustee to enter into any amendment to the Intercreditor Agreement or any Additional Intercreditor Agreement without the consent of the holders of the majority in aggregate principal amount of the Notes then outstanding, except as otherwise permitted by Article 9 and the Company may only direct the Trustee to enter into any amendment to the extent such amendment does not impose any personal obligations on the Trustee or adversely affect the rights, duties, liabilities or immunities of the Trustee under this Indenture, the Intercreditor Agreement or such Additional Intercreditor Agreement in any material respect.

(d)    In relation to the Intercreditor Agreement or, to the extent applicable, an Additional Intercreditor Agreement, the Trustee shall be deemed to have consented on behalf of the Holders to any payment, repayment, purchase, repurchase, defeasance, acquisition, retirement or redemption of any obligations subordinated to the Notes thereby; *provided* that such transaction would comply with Section 4.07.

(e)    Each Holder, by accepting such Note, will be deemed to have agreed to and accepted the terms and conditions of each of the Intercreditor Agreement and Additional Intercreditor Agreement and any amendment referred to in this Section 4.23 and none of the Company, the Trustee or the Security Agent will be required to seek the consent of any Holders to perform its obligations under and in accordance with this Section 4.23.

Section 4.24    *Limitation on Holding Company Activities*.

(a)    The Company may not carry on any business or own any assets other than:

(1)    the ownership of shares in its Subsidiaries and any other assets that are *de minimis* in nature; *provided* that the Company may from time to time receive in a transaction otherwise permitted under this Indenture and the Collateral Documents, properties and assets (including cash, Cash Equivalents, Government Guaranteed Securities and/or Indebtedness and other obligations) for the purpose of transferring such properties and assets to any Parent, any Subsidiary or any other Person, so long as in any case such further transfer is made promptly by the Company and, after giving effect thereto, the Company is again in compliance with this clause;

(2)    the provision of administrative services. treasury service, legal, accounting and management services to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries and the ownership of assets necessary to provide such services;

(3)    Incurring Indebtedness (or other items that are specifically excluded from the definition of Indebtedness) permitted under this Indenture (including activities reasonably incidental thereto, including performance of the terms and conditions of such Indebtedness (or other items that are specifically excluded from the definition of Indebtedness), to the extent such activities are otherwise permissible under this Indenture) and the granting of Liens permitted under Section 4.12.

(4)    activities undertaken with the purpose of, and directly related to, fulfilling its obligations or exercising its rights under this Indenture, the Guarantees, the Intercreditor Agreement (or any Additional Intercreditor Agreement), the Collateral Documents, the Existing Notes Documents, any Senior Facilities Agreement, other

100

**453**

Indebtedness (or any item specifically excluded from the definition of Indebtedness) permitted by the terms of this Indenture, or any other document relating to the Notes;

(5)     making Investments in the Notes, the Existing Notes or Indebtedness permitted under this Indenture;

(6)     directly related or reasonably incidental to the establishment and/or maintenance of its or its Subsidiaries corporate existence;

(7)     any activity reasonably relating to the servicing, purchase, redemption, amendment, exchange, refinancing or retirement of the Notes, the Existing Notes or other Indebtedness (or other items that are specifically excluded from the definition of Indebtedness) permitted under this Indenture;

(8)     any activity undertaken in connection with the Transactions; or

(9)     other activities not specifically enumerated above that are *de minimis* in nature.

Section 4.25   *Further Assurances*.

The Company shall, and shall procure that each of its Restricted Subsidiaries shall, at its own expense, execute and do all such acts and things and provide such assurances as the Security Agent may reasonably require (i) for registering any Collateral Documents in any required register and for perfecting or protecting the security intended to be afforded by such Collateral Documents; and (ii) if such Collateral Documents have become enforceable, for facilitating the realization of all or any part of the assets which are subject to such Collateral Documents and for facilitating the exercise of all powers, authorities and discretions vested in the Security Agent or in any receiver of all or any part of those assets. The Company shall, and shall procure that each of its Restricted Subsidiaries shall, execute all transfers, conveyances, assignments and releases of that property whether to the Security Agent or to its nominees and give all notices, orders and directions which the Security Agent may reasonably request.

Section 4.26   *Business Activities*.

The Company will not, and will not permit any of its Restricted Subsidiaries to, engage in any business other than Permitted Businesses, except to such extent as would not be material to the Company and its Restricted Subsidiaries taken as a whole.

Each of the Issuer and the Guarantors will maintain its centre of main interest (as that term is used in Article 3(1) of The Council of the European Union Regulation No. 1346/2000 on Insolvency Proceedings) in its respective jurisdiction of incorporation or formation or in England and Wales or Scotland.

Section 4.27   *Financial Calculations*.

(a)     For the purposes of determining "Consolidated EBITDA" for any basket or ratio under this Indenture on any date of determination, Consolidated EBITDA shall be calculated for the period of the most recent four consecutive fiscal quarters for which internal financial

statements of the Company are available immediately preceding such date of determination and pro forma effect shall be given to Consolidated EBITDA as set out in this Section 4.27.

(b)   In the event that the specified Person or any of its Subsidiaries that are Restricted Subsidiaries Incurs, assumes, guarantees, repays, repurchases, redeems, defeases or otherwise discharges any Indebtedness (other than ordinary working capital borrowings) or issues, repurchases or redeems preferred stock subsequent to the commencement of the period for which a financial ratio is being calculated and on or prior to the date on which the event for which the calculation of that financial ratio is made (for the purposes of this definition, the "*Calculation Date*"), then that financial ratio will be calculated giving *pro forma* effect (as determined in good faith by the Company's chief executive officer, chief financial officer, head of treasury, head of corporate development, head of group accounting or any person performing a similarly senior accounting role), including in respect of any cost savings, expense reductions, operating improvements and synergies that are reasonably expected to occur within 24 months, to such Incurrence, assumption, guarantee, repayment, repurchase, redemption, defeasance or other discharge of Indebtedness, or such issuance, repurchase or redemption of preferred stock, and the use of the proceeds therefrom, as if the same had occurred at the beginning of the applicable four-quarter reference period; *provided, however,* that (except with respect to Section 4.07(b)(18)) the *pro forma* calculation of that financial ratio shall not give effect to (i) any Indebtedness Incurred on the Calculation Date pursuant to Section 4.09(b) (other than 4.09(b)(1)(B) or 4.09(b)(14)(ii)) or (ii) the discharge on the Calculation Date of any Indebtedness to the extent that such discharge results from the proceeds of Indebtedness Incurred on the Calculation Date pursuant to Section 4.09(b) (other than 4.09(b)(1)(B) or 4.09(b)(14)(ii)).

(c)   For purposes of calculating any financial ratio under this Indenture:

(1)   any acquisition, Investment, joint venture, disposition, cost saving program or initiative or other similar transaction that have been made by the specified Person or any of its Restricted Subsidiaries, including through mergers or consolidations or leases, or any Person or any Restricted Subsidiary acquired by the specified Person or any of its Restricted Subsidiaries, and including all related financing transactions and including increases in ownership of Restricted Subsidiaries (including any Unrestricted Subsidiary that has been redesignated as a Restricted Subsidiary) (a "*Transaction*"), during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date, or that are to be made on the Calculation Date, will be given *pro forma* effect (as determined in good faith by the Company's chief executive officer, chief financial officer, head of treasury, head of corporate development, head of group accounting or any person performing a similarly senior accounting role), including in respect of any cost savings, expense reductions, operating improvements and synergies that are reasonably expected to occur within 24 months, as if they had occurred on the first day of the four-quarter reference period, *provided* that, if definitive documentation has been entered into with respect to that Transaction, at the option of the Company, Consolidated EBITDA for such period will be calculated after giving pro forma effect to such Transaction (including anticipated cost savings, expense reductions, operating improvements and synergies reasonably expected to occur within 24 months) as if that Transaction had occurred on the first day of such period, even if the Transaction has not yet been consummated as of the date of determination;

102

**455**

(2)    Consolidated EBITDA and Fixed Charges attributable to discontinued operations, as determined in accordance with IFRS, and operations or businesses (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded;

(3)    any Person that is a Restricted Subsidiary on the Calculation Date (including any Unrestricted Subsidiary that has been redesignated as a Restricted Subsidiary) will be deemed to have been a Restricted Subsidiary at all times during such four-quarter period;

(4)    any Person that is not a Restricted Subsidiary on the Calculation Date will be deemed not to have been a Restricted Subsidiary at any time during such four-quarter period;

(5)    if any Indebtedness bears a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any interest rate agreement applicable to such Indebtedness), and if any Indebtedness is not denominated in the Company's functional currency, that Indebtedness for purposes of the calculation of that financial ratio shall be treated in accordance with IFRS;

(6)    interest on a Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible accounting or financial officer of the Company to be the rate of interest implicit in such Lease Obligation in accordance with IFRS; and

(7)    the full run-rate effect of cost savings, expense reductions, operating improvements and  synergies (as determined in good faith by an a responsible accounting or financial officer of the Company) that have occurred during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date or that are reasonably expected to occur within 24 months shall be included as though such cost savings, expense reductions, operating improvements and synergies had been achieved on the first day of the relevant period,

*provided* that at any time the aggregate amount of anticipated cost savings, expense reductions, operating improvements and synergies calculated pursuant to clauses (1) and (7) hereof shall only represent with respect to any four quarter period in the aggregate 20.0% of Consolidated EBITDA (including as a result of such cost savings, expense reductions, operating improvements and synergies).

(d)        When calculating the availability under any basket or ratio under this Indenture, in each case in connection with any Transaction or Restricted Payment where there is a time difference between commitment and closing or Incurrence, the date of determination of such basket or ratio and of any Default or Event of Default shall, at the option of the Company, be the date the definitive agreements for such Transaction or Restricted Payment are entered into and such baskets or ratios shall be calculated on a pro forma basis after giving effect to such Transaction or Restricted Payment (including any Incurrence of Indebtedness and the use of proceeds thereof and anticipated cost savings, expense reductions, operating improvements and synergies reasonably expected to occur within 24 months) as if they occurred at the beginning of the applicable reference period for purposes of determining the ability to consummate any such Transaction or Restricted Payment (and not for purposes of any subsequent availability of any basket or ratio). For the avoidance of doubt, (x) if any of such baskets or ratios are

exceeded as a result of fluctuations in such basket or ratio (including due to fluctuations in Consolidated EBITDA of the Company or the target company) subsequent to such date of determination and at or prior to the consummation of the relevant Transaction or Restricted Payment, such baskets or ratios will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Transaction or Restricted Payment is permitted hereunder and (y) such baskets or ratios shall not be tested at the time of consummation of such Transaction or Restricted Payment; provided, further, that if the Company elects to have such determinations occur at the time of entry into such definitive agreement, any such Transaction or Restricted Payment (including any Incurrence of Indebtedness and the use of proceeds thereof) shall be deemed to have occurred on the date the definitive agreements are entered and outstanding thereafter for purposes of calculating any baskets or ratios under this Indenture after the date of such agreement and before the consummation of such Transaction or Restricted Payment.

<div align="center">

ARTICLE 5
SUCCESSORS

</div>

Section 5.01   *Merger, Consolidation or Sale of Assets*.

(a)      The Issuer will not, directly or indirectly, in one or more related transactions (x) consolidate or merge with or into another Person or (y) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the Issuer's properties or assets to another Person (whether or not the Issuer is the surviving Person), unless:

(1)      either:  (a) the Issuer is the surviving entity; or (b) the Person formed by or surviving any such consolidation or merger (if other than the Issuer) or to which such sale, assignment, transfer, conveyance, lease or other disposition has been made complies with prior to and after such transaction.

(2)      the Person formed by or surviving any such consolidation or merger (if other than the Issuer) or to which such sale, assignment, transfer, conveyance or other disposition has been made is an entity organized or existing under the laws of the European Union or any member state thereof, the United States, any state of the United States or the District of Columbia, Canada, Norway, Switzerland or Japan;

(3)      the Person formed by or surviving any such consolidation or merger (if other than Issuer) or the Person to which such sale, assignment, transfer, conveyance or other disposition has been made assumes all the obligations of the Issuer under the Notes and this Indenture, the Intercreditor Agreement, any Additional Intercreditor Agreements and the Collateral Documents, in each case, pursuant to agreements reasonably satisfactory to the Trustee (and the Guarantees will be confirmed as applying to such surviving entity's obligations); and the Notes, this Indenture, the Guarantee, the Intercreditor Agreement, any Additional Intercreditor Agreements and the Collateral Documents will remain in full force and effect as so amended or supplemented;

(4)      immediately after such transaction, no Default or Event of Default exists and the Collateral Documents and the Liens created on the Collateral shall remain in full force and effect, or subject to the satisfaction of the Trustee, shall have been transferred to such surviving entity and shall have been perfected and be in full force and effect or otherwise released in accordance with the terms of this Indenture;

<div align="center">104</div>

(5)    (a) the Issuer or the Person formed by or surviving any such consolidation or merger (if other than the Issuer), or to which such sale, assignment, transfer, conveyance or other disposition has been made would, on the date of such transaction after giving *pro forma* effect thereto and to any related financing transactions as if the same had occurred at the beginning of the applicable four-quarter period be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4.09(a), or (b) the Fixed Charge Coverage Ratio of the Company, on the date of and after giving *pro forma* effect to such acquisition and such Incurrence or issuance, would not be less than such ratio for the Company and its Restricted Subsidiaries immediately prior to such transaction; and

(6)    the Issuer shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel (each, in a form reasonably satisfactory to the Trustee), each stating that such consolidation, merger or transfer and such supplemental indenture (if any) comply with this Indenture and that the supplemental indenture, this Indenture, the Notes and any Collateral Documents to which the Issuer was party will be the legal, valid and binding obligations of the surviving Person or Issuer, enforceable in accordance with their terms.

In the event of any transaction (other than a lease) described in and complying with the conditions listed in the immediately preceding paragraph in which the Issuer is not the continuing corporation, the successor Person formed or remaining or to which such transfer is made will succeed to, and be substituted for, and may exercise every right and power of the Issuer and the Issuer will be discharged from all obligations and covenants under this Indenture, the Notes and the Collateral Documents to which the Issuer is a party.

(b)    The Company will not, directly or indirectly, in one or more related transactions (x) consolidate or merge with or into another Person or (y) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the Company's and its Restricted Subsidiaries' properties or assets to another Person (whether or not the Company is the surviving Person), unless:

(1)    either:  (a) the Company is the surviving entity; or (b) the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition has been made is a corporation, partnership or limited liability company organized or existing under the laws of the European Union or any member state thereof, the United States, any state of the United States or the District of Columbia, Canada, Norway, Switzerland or Japan;

(2)    the Person formed by or surviving any such consolidation or merger (if other than the Company) or the Person to which such sale, assignment, transfer, conveyance or other disposition has been made assumes all the obligations of the Company under the Notes and this Indenture, the Guarantee, the Intercreditor Agreement, any Additional Intercreditor Agreements and the Collateral Documents (to the extent the Company is a party thereto), in each case pursuant to agreements reasonably satisfactory to the Trustee; and the Notes, this Indenture, the Guarantee, the Intercreditor Agreement, any Additional Intercreditor Agreements and Collateral Documents will remain in full force and effect as so amended or supplemented;

105

**458**

(3)     immediately after such transaction, no Default or Event of Default exists and the Collateral Documents and the Liens created on the Collateral shall remain in full force and effect, or subject to the satisfaction of the Trustee, shall have been transferred to such surviving entity and shall have been perfected and be in full force and effect or otherwise released in accordance with the terms of this Indenture;

(4)     (a) the Company, the Issuer or the Person formed by or surviving any such consolidation or merger (if other than the Company), or to which such sale, assignment, transfer, conveyance or other disposition has been made would, on the date of such transaction after giving *pro forma* effect thereto and to any related financing transactions as if the same had occurred at the beginning of the applicable four-quarter period be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth Section 4.09(a), or (b) the Fixed Charge Coverage Ratio of the Company or the successor Person, on the date of and after giving *pro forma* effect to such acquisition and such Incurrence or issuance, would not be less than such ratio for the Company  and its Restricted Subsidiaries immediately prior to such transaction; and

(5)     the Company shall have delivered to the Trustee an Officer's Certificate and an Opinion of Counsel (each, in a form reasonably satisfactory to the Trustee), each stating that such consolidation, merger or transfer and such supplemental Indenture (if any) comply with this Indenture and that the supplemental indenture this Indenture (including the Guarantee therein) and any Collateral Documents to which the Company was party will be the legal, valid and binding obligations of the surviving Person or Company, enforceable in accordance with their terms.

(c)     A Subsidiary Guarantor may not sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such Subsidiary Guarantor is the surviving Person) another Person, in each case, other than the Issuer, the Company or another Subsidiary Guarantor, unless either:

(1)     the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger assumes all the obligations of that Subsidiary Guarantor under its Guarantee, this Indenture, the Intercreditor Agreement, any Additional Intercreditor Agreements and the Collateral Documents to which such Subsidiary Guarantor is a party pursuant to agreements reasonably satisfactory to the Trustee and immediately after giving effect to that transaction, no Default or Event of Default exists; or

(2)     the Net Proceeds of such sale or other disposition are applied in accordance with the applicable provisions of this Indenture.

(d)     In addition, neither the Issuer nor the Company may, directly or indirectly, lease all or substantially all of the properties and assets (in the case of the Company, determined on a consolidated basis for the Company and its Restricted Subsidiaries), in one or more related transactions, to any other Person.

(e)     This Section 5.01 will not apply to (i) any consolidation or merger of any Restricted Subsidiary that is not a Guarantor into the Issuer or a Guarantor, (ii) any consolidation or merger among Guarantors, (iii) any consolidation or merger among the Issuer

106

and any Guarantor, *provided* that, if the Issuer is not the surviving entity of such merger or consolidation, the relevant Guarantor is an entity organized or existing under the laws of any member state of the European Union, Switzerland, the United States, any state of the United States or the District of Columbia, Canada, Norway, Switzerland or Japan and Section 5.01(a)(3) and Section 5.01(a)(6)  will be complied with or (d) any sale, assignment, transfer, conveyance, lease or other disposition of assets by a Guarantor or a Restricted Subsidiary that is not a Guarantor to the Issuer or a Guarantor.  Section 5.01(a)(4), Section 5.01(a)(5), Section 5.01(b)(3) and Section 5.01(b)(4) will not apply to any merger or consolidation of the Issuer , the Company or any Guarantors with or into, or any sale, assignment, transfer, conveyance, lease or other disposition of assets by the Issuer, the Company or any Guarantor to, an Affiliate solely for the purpose of reincorporating the Issuer, the Company or such Guarantor for tax reasons.

(f)     Notwithstanding anything to the contrary set forth herein, the Company and its Restricted Subsidiaries may implement a Permitted Reorganization.

Section 5.02   *Successor Corporation Substituted*.

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Issuer or the Company in a transaction that is subject to, and that complies with the provisions of, Section 5.01, the Successor Person formed by such consolidation or into or with which the Issuer or the Company is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, the provisions of this Indenture referring to the "Issuer" or the "Company" shall refer instead to the Successor Person and not to the Issuer or the Company), and may exercise every right and power of the Issuer or the Company under this Indenture with the same effect as if such Successor Person had been named as the Issuer herein.

## ARTICLE 6
## DEFAULTS AND REMEDIES

Section 6.01   *Events of Default*.

(a)     Each of the following is an "*Event of Default*":

(1)     default for 30 days in the payment when due of interest or Additional Amounts, if any, on the Notes;

(2)     default in the payment when due (at maturity, upon redemption or otherwise) of the principal of, or premium, if any, on the Notes;

(3)     failure by the Company or any of its Restricted Subsidiaries to comply with Article 5;

(4)     failure by the Company or any of its Restricted Subsidiaries for 60 days after notice to the Company by the Trustee or the Holders of at least 30% in aggregate principal amount of the Notes then outstanding voting as a single class to comply with any of the other agreements in this Indenture (other than a default in performance, or breach, or a covenant or agreement which is specifically dealt with in clauses (1), (2) or

107

**460**

(3) of this Section 6.01), the Notes, the Guarantees, any Collateral Document or the Intercreditor Agreement (or any Additional Intercreditor Agreement entered into pursuant to the terms of the Intercreditor Agreement or this Indenture);

(5)    default under any mortgage, indenture or instrument under which there may be issued or by which there may be secured or evidenced any Indebtedness for money borrowed by the Company or any of its Restricted Subsidiaries (or the payment of which is guaranteed by the Company or any of its Restricted Subsidiaries), whether such Indebtedness or guarantee now exists, or is created after the date of this Indenture (but excluding Indebtedness owing to the Company or a Restricted Subsidiary), if that default:

(A)    is caused by a failure to pay principal of such Indebtedness after the expiration of the grace period provided in such Indebtedness upon the Stated Maturity of such Indebtedness (a "*Payment Default*") or results in the acceleration of such Indebtedness prior to its Stated Maturity, and, in each case, the principal amount of any such Indebtedness that is due and has not been paid or which has been accelerated, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates the greater of $45.0 million and 20.0% of Consolidated EBITDA or more; or

(B)    results in the enforcement of Collateral with a fair market value in excess of the greater of $45.0 million and 20.0% of Consolidated EBITDA; or

(6)    failure by the Company or any of its Significant Subsidiaries or group of Restricted Subsidiaries that taken as a whole would constitute a Significant Subsidiary to pay final and non-appealable judgments entered by a court or courts of competent jurisdiction aggregating in excess of the greater of $45.0 million and 20.0% of Consolidated EBITDA (net of any amounts which are covered by insurance or bonded), which judgments are not paid, waived, satisfied, discharged or stayed for a period of 60 days;

(7)    except as permitted by this Indenture, any Guarantee of any Significant Subsidiary or group of Restricted Subsidiaries that taken as a whole would constitute a Significant Subsidiary is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect (other than in accordance with the terms of such Guarantee and this Indenture), or any Guarantor, or any Person acting on behalf of any Guarantor, denies or disaffirms its obligations under its Guarantee and such Default continues for 10 days;

(8)    any security interest under the Collateral Documents with respect to Collateral having a Fair Market Value in excess of the greater of $25.0 million and 10.0% of Consolidated EBITDA shall, at any time, cease to be in full force and effect and constitute a valid and perfected Lien with the priority required for the applicable Collateral Document and Intercreditor Agreement (other than in accordance with the terms of the relevant Collateral Documents, the Intercreditor Agreement, any Additional Intercreditor Agreement and this Indenture) for any reason other than the satisfaction in full of all Obligations under this Indenture or the release of any such security interest in accordance with the terms of this Indenture, the Intercreditor

108

Agreement, any Additional Intercreditor Agreement or the Collateral Documents or any such security interest created thereunder shall be declared invalid or unenforceable or the Company shall assert in writing that any such security interest is invalid or unenforceable and any such Default continues for 10 days;

(9)     the Company, the Issuer or any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together (as of the latest audited consolidated financial statements for the Company and its Restricted Subsidiaries), would constitute a Significant Subsidiary pursuant to or within the meaning of Bankruptcy Law; and

(A)     commences a voluntary case,

(B)     consents to the entry of an order for relief against it in an involuntary case,

(C)     consents to the appointment of a custodian of it or for all or substantially all of its property, or

(D)     makes a general assignment for the benefit of its creditors;

(10)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A)     is for relief against the Issuer, the Company or any Restricted Subsidiary of the Company (that is a Significant Subsidiary) or any group of Restricted Subsidiaries of the Company, taken together (as of the latest audited consolidated financial statements for the Company and its Restricted Subsidiaries), would constitute a Significant Subsidiary in an involuntary case;

(B)     appoints a custodian of the Issuer, the Company or any Restricted Subsidiary of the Company (that is a Significant Subsidiary) or any group of Restricted Subsidiaries of the Company that, taken together (as of the latest audited consolidated financial statements for the Issuer, the Company and its Restricted Subsidiaries), would constitute a Significant Subsidiary or for all or substantially all of the property of the Company or any Restricted Subsidiary of the Company (that is a Significant Subsidiary) or any group of Restricted Subsidiaries of the Company that, taken together (as of the latest audited consolidated financial statements for the Company and its Restricted Subsidiaries), would constitute a Significant Subsidiary; or

(C)     orders the liquidation of the Issuer, the Company or any Restricted Subsidiary of the Company or any group of Restricted Subsidiaries of the Company that, taken together (as of the latest audited consolidated financial statements for the Company and its Restricted Subsidiaries), would constitute a Significant Subsidiary, and the order or decree remains unstayed and in effect for 60 consecutive days.

(b)     A default under clause (4), (5) or (6) of this Section 6.01 will not constitute an Event of Default until the Trustee or the Holders of 30% in aggregate principal amount of the outstanding Notes notify the Issuer of the default and, with respect to clause (4) or (6), the

Issuer does not cure such default within the time specified in clause (4) or (6), as applicable, after receipt of such notice.

Section 6.02   *Remedies under this Indenture*.

(a)   Holders of the Notes may not enforce this Indenture or the Notes except as provided in this Indenture and may not enforce the Collateral Documents except as provided in such Collateral Documents and the Intercreditor Agreement or any Additional Intercreditor Agreement.

(b)   Notwithstanding anything to the contrary herein, (i) if a Default occurs for a failure to deliver a required certificate in connection with another default (an "Initial Default"), then at the time such Initial Default is cured, such Default for a failure to report or deliver a required certificate in connection with the Initial Default will also be cured without any further action and (ii) any Default or Event of Default for the failure to comply with the time periods prescribed in Section 4.09, or otherwise to deliver any notice or certificate pursuant to any other provision of this Indenture shall be deemed to be cured upon the delivery of any such report required by such covenant or notice or certificate, as applicable, even though such delivery is not within the prescribed period specified in this Indenture.

Section 6.03   *Acceleration*

In the case of an Event of Default specified in Section 6.01(a)(9) and Section 6.01(a)(10), all outstanding Notes (including accrued interest, if any) will become due and payable immediately without further action or notice. If any other Event of Default occurs and is continuing, the Trustee may, or the Holders of at least 30% in aggregate principal amount of the then outstanding Notes may and the Trustee shall, if so directed by Holders of at least 30% in aggregate principal amount of the then outstanding Notes, declare all the Notes to be due and payable immediately. Upon any such declaration, the Notes shall become due and payable immediately.

Section 6.04   *Other Remedies*.

If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal of, premium on, if any, interest or Additional Amounts, if any, on, the Notes or to enforce the performance of any provision of the Notes or this Indenture.

The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proceeding. A delay or omission by the Trustee or any Holder in exercising any right or remedy accruing upon an Event of Default shall not impair the right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by law.

Section 6.05   *Waiver of Past Defaults*.

Holders of not less than a majority in aggregate principal amount of the then outstanding Notes by notice to the Trustee may on behalf of the Holders of all of the Notes rescind an acceleration or waive an existing Default or Event of Default and its consequences hereunder, except a continuing Default or Event of Default in the payment of the principal of, premium, if any, or interest or Additional Amounts, if any, on the Notes (including in

110

**463**

connection with an offer to purchase) (which may only be waived in accordance with clause (4) of Section 9.02); *provided, however*, that the Holders of a majority in aggregate principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration.  Upon any such rescission or waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 6.06    *Control by Majority*.

Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it.  However, the Trustee may refuse to follow any direction that conflicts with law or this Indenture and that the Trustee determines may be unduly prejudicial to the rights of other Holders or that may involve the Trustee in personal liability.

Section 6.07    *Limitation on Suits*.

(a)    Subject to the provisions of this Indenture relating to the duties of the Trustee, in case an Event of Default occurs and is continuing, the Trustee will be under no obligation to exercise any of the rights or powers under this Indenture at the request or direction of any Holders unless such Holders have offered to the Trustee, and the Trustee has received, indemnity and/or security (including by way of prefunding) satisfactory to it against any loss, liability or expense.  Except (subject to Article 9) to enforce the right to receive payment of principal, premium, if any, or interest or Additional Amounts when due, no Holder may pursue any remedy with respect to this Indenture or the Notes unless:

(1)    such Holder has given the Trustee written notice that an Event of Default is continuing;

(2)    Holders of at least 30% in aggregate principal amount of the then outstanding Notes make a written request to the Trustee to pursue the remedy;

(3)    such Holder or Holders offer and, if requested, provide to the Trustee security and/or indemnity satisfactory to the Trustee against any loss, liability or expense;

(4)    the Trustee does not comply with the request within 60 days after receipt of the request and the offer of such security and/or indemnity including by way of prefunding; and

(5)    during such 60-day period, Holders of a majority in aggregate principal amount of the then outstanding Notes do not give the Trustee a direction inconsistent with such request.

(b)    A Holder may not use this Indenture to prejudice the rights of another Holder or to obtain a preference or priority over another Holder.

Section 6.08    *Rights of Holders to Receive Payment*.

111

**464**

Except as set forth in Article 9 of this Indenture, the right of any Holder to receive payment of principal of, premium on, if any, interest or Additional Amounts, if any, on, the Note, on or after the respective due dates expressed in the Note (including in connection with an offer to purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Holder; *provided* that a Holder shall not have the right to institute any such suit for the enforcement of payment if and to the extent that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment, waiver or loss of the Lien of this Indenture upon any property subject to such Lien.

Section 6.09    *Collection Suit by Trustee*.

If an Event of Default specified in clause (1) or (2) of Section 6.01 occurs and is continuing, the Trustee is authorized to recover judgment in its own name and as trustee of an express trust against the Issuer for the whole amount of principal of, premium on, if any, interest and Additional Amounts, if any, remaining unpaid on, the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel.

Section 6.10    *Trustee May File Proofs of Claim*.

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel) and the Holders allowed in any judicial proceedings relative to the Issuer (or any other obligor upon the Notes), its creditors or its property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or deliverable on any such claims and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee, and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount due to it for the compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.06. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts due the Trustee under Section 7.06 out of the estate in any such proceeding, shall be denied for any reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, securities and other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorganization or arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.11    *Priorities*.

(a)    Subject to the Intercreditor Agreement or any Additional Intercreditor Agreement, to the extent applicable, if the Trustee or the Security Agent collects any money pursuant to this Article 6 or from the enforcement of any Collateral Document, it shall pay out (or in the case of the Security Agent, it shall pay to the Trustee to pay out) the money in the following order:

112

**465**

First:        to the Trustee, the Security Agent and their agents (including the Agents) and attorneys for amounts due under Section 7.06, including payment of all compensation, expenses and liabilities Incurred, and all advances made, by the Trustee and the Security Agent and the costs and expenses of collection;

Second:        to Holders for amounts due and unpaid on the Notes for principal, premium, if any, interest and Additional Amounts, if any, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, premium, if any, interest and Additional Amounts, if any, respectively; and

Third:        to the Issuer or to such party as a court of competent jurisdiction shall direct.

The Trustee may fix a record date and payment date for any payment to Holders pursuant to this Section 6.11.

Section 6.12    *Undertaking for Costs*.

In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee or the Security Agent for any action taken or omitted by it as a Trustee or Security Agent, as applicable, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and the court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 6.12 does not apply to a suit by the Trustee, a suit by a Holder pursuant to Section 6.08, or a suit by Holders of more than 10% in aggregate principal amount of the then outstanding Notes.

Section 6.13    *Restoration of Rights and Remedies*.

If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceeding, the Issuer, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

Section 6.14    *Rights and Remedies Cumulative*.

Except as otherwise provided with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes in Section 1.01(h)(7), no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 6.15    *Delay or Omission Not Waiver*.

No delay or omission of the Trustee or any Holder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article 6 or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

Section 6.16    *Indemnification of Trustee.*

Prior to taking any action under this Article 6, the Trustee shall be entitled to indemnification or other security satisfactory to it in its sole discretion against all losses, liabilities and expenses caused by taking or not taking such action.

ARTICLE 7
TRUSTEE

Section 7.01    *Duties of Trustee.*

(a)    If an Event of Default has occurred and is continuing of which a Responsible Officer of the Trustee has received a written notice, the Trustee will exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default of which the Trustee has received written notice:

(1)    the duties of the Trustee and the Agents will be determined solely by the express provisions of this Indenture and the Trustee and the Agents need perform only those duties that are specifically set forth in this Indenture and no others, and no implied covenants or obligations shall be read into this Indenture against the Trustee and the Agents; and

(2)    in the absence of gross negligence, willful misconduct or fraud on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture.  However, with respect to certificates or opinions specifically required to be furnished to it hereunder, the Trustee will examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture (but need not confirm or investigate the accuracy of mathematical calculations or other facts stated therein).

(c)    The Trustee may not be relieved from liabilities for its own grossly negligent action, its own grossly negligent failure to act, or its own willful misconduct, except that:

(1)    this paragraph does not limit the effect of paragraph (b) of this Section 7.01;

(2)    the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is proved that the Trustee was negligent in ascertaining the pertinent facts; and

114

**467**

(3)    the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 6.02, Section 6.05 or Section 6.06.

(d)    Whether or not therein expressly so provided, every provision of this Indenture or the Collateral Documents that in any way relates to the Trustee or the Security Agent is subject to paragraphs (a), (b), and (c) of this Section 7.01.

(e)    No provision of this Indenture will require the Trustee or the Security Agent to expend or risk its own funds or incur any expense or liability.  The Trustee and the Security Agent will be under no obligation to exercise any of its rights and powers under this Indenture or the Collateral Documents at the request of any Holders, unless such Holder has offered to the Trustee and/or the Security Agent, and the Trustee and/or the Security Agent has received, security and/or indemnity (including by way of prefunding) satisfactory to it against any loss, liability or expense.

(f)    The Trustee will not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuer.  Money held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

(g)    The Trustee shall not be deemed to have notice or any knowledge of any matter (including without limitation Defaults or Events of Default) unless a Responsible Officer assigned to and working in the Trustee's trust and agency department has actual knowledge thereof or unless written notice or information thereof is received by the Trustee in accordance with this Indenture and such notice clearly references the Notes, the Issuer or this Indenture.

Section 7.02    *Rights of Trustee*.

(a)    The Trustee may conclusively rely upon any document (whether in its original, electronic or facsimile form) believed by it to be genuine and to have been signed or presented by the proper Person.  The Trustee need not investigate any fact or matter stated in the document.

(b)    Before the Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel or both.  The Trustee will not be liable for any action it takes or omits to take in good faith in reliance on such Officer's Certificate or Opinion of Counsel.  The Trustee, at the expense of the Issuer, may consult with counsel or other professional advisors and the written advice of such counsel, professional advisor or any Opinion of Counsel will be full and complete authorization and protection from liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c)    The Trustee may act through its attorneys and agents and will not be responsible for the willful misconduct or negligence of any attorney or agent appointed with due care.

(d)    The Trustee will not be liable for any action its takes or omits to take in good faith that it believes to be authorized or within the rights or powers conferred upon it by this Indenture or the Collateral Documents.

(e)    Unless otherwise specifically provided in this Indenture, any demand, request, direction or notice from the Issuer will be sufficient if signed by an Officer of the Issuer.

115

**468**

(f)    The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture or the Collateral Documents at the request or direction of any of the Holders unless such Holders have offered to the Trustee indemnity and/or security (including by way of prefunding) satisfactory to it against the losses, liabilities and expenses that might be incurred by it in compliance with such request or direction.

(g)    The Trustee shall have no duty to inquire as to the performance of the covenants of the Issuer and/or its Restricted Subsidiaries.  In addition, the Trustee shall not be deemed to have knowledge of any Default or Event of Default except:

(A)    any Event of Default occurring pursuant to clause (1) or (2) of Section 6.01 (provided it is acting as Paying Agent); and

(B)    any Default or Event of Default of which a Responsible Officer shall have received written notification.  Delivery of reports, information and documents to the Trustee under Section 4.03 is for informational purposes only and the Trustee's receipt of the foregoing shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with this Section 7.02 (as to which the Trustee is entitled to rely exclusively on Officer's Certificates).

(h)    The Trustee shall not have any obligation or duty to monitor, determine or inquire as to compliance, and shall not be responsible or liable for compliance with restrictions on transfer, exchange, redemption, purchase or repurchase, as applicable, of minimum denominations imposed under this Indenture or under applicable law or regulation with respect to any transfer, exchange, redemption, purchase or repurchase, as applicable, of any interest in any Notes.

(i)    The rights, privileges, indemnities, protections, immunities and benefits given to the Trustee, including its right to be indemnified and/or secured to its satisfaction, are extended to, and shall be enforceable by the Trustee in each of its capacities hereunder and by each agent (including the Agents) and the Security Agent, custodian and other person employed to act hereunder (including the Collateral Documents).  Absent willful misconduct or gross negligence, each Agent shall not be liable for acting in good faith on instructions believed by it to be genuine and from the proper party.

(j)    In the event the Trustee receives inconsistent or conflicting requests and indemnity from two or more groups of Holders, each representing less than a majority in aggregate principal amount of the Notes then outstanding, pursuant to the provisions of this Indenture, the Trustee, in its sole discretion, may determine what action, if any, will be taken and shall not incur any liability for its failure to act until such inconsistency or conflict is, in its reasonable opinion, resolved.

(k)    In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by acts of war or terrorism involving the United States, the United Kingdom or any member state of the European Monetary Union or any other national or international calamity or emergency (including, but not limited to, natural disasters, or acts of God, any act of war, civil unrest, local or national disturbance or disaster, any act of terrorism, or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility), it being understood that the Trustee

116

**469**

shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(l)     The Trustee is not required to give any bond or surety with respect to the performance of its duties or the exercise of its powers under this Indenture, the Collateral Documents or the Notes.

(m)     The permissive right of the Trustee to take the actions permitted by this Indenture shall not be construed as an obligation or duty to do so.

(n)     The Trustee will not be liable to any person if prevented or delayed in performing any of its obligations or discretionary functions under this Indenture or the Collateral Documents by reason of any present or future law applicable to it, by any governmental or regulatory authority or by any circumstances beyond its control.

(o)     The Trustee shall not under any circumstances be liable for any consequential loss (including without limitation loss of business, goodwill, opportunity or profit of any kind) or punitive damages of the Issuer, any Restricted Subsidiary or any other Person (or, in each case, any successor thereto), even if advised of it in advance and even if foreseeable.

(p)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer personally or by agent or attorney.

(q)     The Trustee may request that the Issuer deliver an Officer's Certificate setting forth the names of the individuals and/or titles of officers, directors, managers, and Authorized Signatories authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any person authorized to sign an Officer's Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(r)     No provision of this Indenture shall require the Trustee to do anything which, in its opinion, may be illegal or contrary to applicable law or regulation.

(s)     The Trustee may refrain from taking any action in any jurisdiction if the taking of such action in that jurisdiction would, in its opinion, based upon legal advice in the relevant jurisdiction, be contrary to any law of that jurisdiction or, to the extent applicable, the State of New York.

(t)     The Trustee may retain professional advisors to assist it in performing its duties under this Indenture.  The Trustee may consult with such professional advisors or with counsel, and the advice or opinion of such professional advisors or counsel with respect to legal or other matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect of any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

(u)     At any time that the security granted pursuant to the Collateral Documents has become enforceable and the Holders have given a direction to the Trustee to enforce such Collateral, the Trustee is not required to give any direction to the Security Agent with respect thereto unless it has been indemnified and/or secured in accordance with clause (e) of Section 7.01.  In any event, in connection with any enforcement of such security, the Trustee is not responsible for:

>   (1)     any failure of the Security Agent to enforce such security within a reasonable time or at all;

>   (2)     any failure of the Security Agent to pay over the proceeds of enforcement of the Collateral;

>   (3)     any failure of the Security Agent to realize such security for the best price obtainable;

>   (4)     monitoring the activities of the Security Agent in relation to such enforcement;

>   (5)     taking any enforcement action itself in relation to such security;

>   (6)     agreeing to any proposed course of action by the Security Agent which could result in the Trustee incurring any liability for its own account; or

>   (7)     paying any fees, costs or expenses of the Security Agent.

(v)     The Trustee may assume without inquiry in the absence of actual knowledge and written notification or information that the Issuer is duly complying with its obligations contained in this Indenture required to be performed and observed by it, and that no Default or Event of Default or other event which would require repayment of the Notes has occurred.

(w)     The duties and obligations of the Trustee shall be subject to the provision of the Intercreditor Agreement, to the extent applicable.

Section 7.03   *Individual Rights of Trustee*.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Affiliate of the Issuer with the same rights it would have if it were not Trustee.  However, in the event that the Trustee acquires any conflicting interest in its capacity as Trustee it must eliminate such conflict within 90 days or resign.  Any Agent and the Security Agent  may do the same with like rights and duties.  The Trustee is also subject to Section 7.10.

Section 7.04   *Trustee's Disclaimer*.

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture, the Notes, the Guarantees, the Intercreditor Agreement or any Additional Intercreditor Agreement, it shall not be accountable for the Issuer's use of the proceeds from the Notes or any money paid to the Issuer or upon the Issuer's direction under any provision of this Indenture, it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, and it will not be responsible for

any statement or recital herein or any statement in the Notes or any other document in connection with the sale of the Notes or pursuant to this Indenture other than its certificate of authentication.

Section 7.05   *Notice of Defaults*.

If a Default or Event of Default occurs and is continuing and if the Trustee is informed in writing of such occurrence by the Issuer, the Trustee will transmit to Holders or the Common Depositary a notice of the Default or Event of Default within 90 days after it occurs.  Except in the case of a Default or Event of Default in payment of principal of, premium on, if any, interest or Additional Amounts, if any, on, any Note, the Trustee may withhold the notice if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of the Holders.

Section 7.06   [*Reserved*].

Section 7.07   *Compensation and Indemnity*.

(a)     The Issuer, failing which the Company, will pay to the Trustee and the Agents from time to time compensation for their acceptance of this Indenture and services hereunder as shall be agreed from time to time between them.  The Trustee's and the Agents' compensation will not be limited by any law on compensation of a trustee of an express trust. The Issuer, failing which the Company, will reimburse the Trustee and the Agents promptly upon request for all disbursements, advances and expenses properly incurred or made by it in addition to the compensation for its services.  Such expenses will include the properly incurred compensation, disbursements and expenses of the Trustee's and the Agents' agents and counsel. In the event of the occurrence of an Event of Default, where the Trustee reasonably considers it necessary or is being requested by the Issuer to undertake duties which the Trustee and the Issuer reasonably believe to be of an exceptional nature or otherwise outside the scope of the normal duties of the Trustee, the Issuer, failing which the Company, shall pay to the Trustee additional remuneration for such duties; *provided* that any such additional remuneration is agreed between the Issuer and the Trustee in writing (if reasonably practicable).

(b)     The Issuer, failing which the Company, will indemnify the Trustee and the Agents and their officers, directors, employees and agents against any and all losses, liabilities or expenses incurred by them arising out of or in connection with the acceptance or administration of their duties under this Indenture, including, without limitation (i) the costs and expenses of enforcing this Indenture against the Issuer (including this Section 7.07) and (ii) defending itself against any claim (whether asserted by the Issuer, any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its gross negligence, willful misconduct or fraud; *provided* that in the case of clause (b)(ii), of this Section 7.07, if the Trustee controls such defense, the Issuer shall have the right to participate in such defense, except where the interests of the Issuer, on the one hand, and the Trustee, on the other hand, may be adverse.  The Trustee and the Agents will notify the Issuer promptly of any claim for which they may seek indemnity.  Failure by the Trustee or the Agents to so notify the Issuer will not relieve the Issuer or the Company, as applicable, of its obligations hereunder. The Trustee may have separate counsel and the Issuer, failing which the Company, will pay the properly incurred fees and expenses of such counsel.  The Issuer need not pay for any settlement made without its consent, which consent will not be unreasonably withheld.

119

(c)      The obligations of the Issuer under this Section 7.07 will survive the satisfaction and discharge of this Indenture or the resignation or removal of the Trustee, the Security Agent or the Agents.

(d)      To secure the Issuer's payment obligations in this Section 7.07, the Trustee will have a Lien prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal of, premium on, if any, interest or Additional Amounts, if any, on, particular Notes.  Such Lien will survive the satisfaction and discharge of this Indenture.

(e)      When the Trustee incurs expenses or renders services after an Event of Default specified in clause (9) of Section 6.01 occurs, the expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute expenses of administration under any Bankruptcy Law.

(f)      The indemnity contained in this Section 7.07 shall survive the discharge or termination of this Indenture and shall continue for the benefit of the Trustee, the Security Agent or any Agent notwithstanding its resignation or retirement.

Section 7.08   *Replacement of Trustee*.

(a)      A resignation or removal of the Trustee and appointment of a successor Trustee will become effective only upon the successor Trustee's acceptance of appointment as provided in this Section 7.08.

(b)      The Trustee may resign in writing at any time and be discharged from the trust hereby created by so notifying the Issuer.  The Holders of a majority in aggregate principal amount of the then outstanding Notes may remove the Trustee by so notifying the Trustee and the Issuer in writing.  The Issuer may remove the Trustee if:

(1)      the Trustee fails to comply with Section 7.10;

(2)      the Trustee is adjudged a bankrupt or an insolvent or an order for relief is entered with respect to the Trustee under any Bankruptcy Law;

(3)      a custodian or public officer takes charge of the Trustee or its property; or

(4)      the Trustee becomes incapable of acting.

(c)      If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Issuer will promptly appoint a successor Trustee.  Within one year after the successor Trustee takes office, the Holders of a majority in aggregate principal amount of the then outstanding Notes may appoint a successor Trustee to replace the successor Trustee appointed by the Issuer.

(d)      If a successor Trustee does not take office within 60 days after the retiring Trustee resigns or is removed, (i) the retiring Trustee, at the expense of the Issuer, the Issuer, or the Holders of at least 10% in aggregate principal amount of the then outstanding Notes may petition any court of competent jurisdiction for the appointment of a successor Trustee or

(ii) the retiring Trustee may appoint a successor Trustee at any time prior to the date on which a successor Trustee takes office.

(e)      If the Trustee, after written request by any Holder who has been a Holder for at least six months, fails to comply with Section 7.10, such Holder may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(f)      A successor Trustee will deliver a written acceptance of its appointment to the retiring Trustee and to the Issuer.  Thereupon, the resignation or removal of the retiring Trustee will become effective, and the successor Trustee will have all the rights, powers and duties of the Trustee under this Indenture.  The successor Trustee will mail a notice of its succession to Holders.  The retiring Trustee will promptly transfer all property held by it as Trustee to the successor Trustee; provided all sums owing to the Trustee hereunder have been paid and subject to the Lien provided for in Section 7.06.  Notwithstanding replacement of the Trustee pursuant to this Section 7.08, the Issuer's obligations under Section 7.06 will continue for the benefit of the retiring Trustee.

(g)      For the purposes of Section 7.08, the Issuer hereby expressly accepts and confirms, for the purposes of Article 1278 and/or Article 1281 of the Luxembourg Civil Code (to the extent applicable), notwithstanding any assignment, amendment, transfer and/or novation of any kind permitted under, and made in accordance with the provisions of this Indenture or any agreement referred to therein to which the Issuer and/or the Manager is party (including the Collateral Documents) any security interest created under such agreement or in relation to such agreement shall be preserved and continue in full force and effect to the benefit of each new successor.

Section 7.09   *Successor Trustee by Merger, etc*.

If the Trustee consolidates, merges or converts into, or transfers all or substantially all of its corporate trust business to, another corporation, the successor corporation without any further act will be the successor Trustee.

Section 7.10   *Eligibility; Disqualification*.

There will at all times be a Trustee hereunder that is a corporation organized and doing business under the laws of England and Wales, or the United States of America or of any state thereof that is authorized under such laws to exercise corporate trustee power, and which is generally recognized as a corporation which customarily performs such corporate trustee roles and provides such corporate trustee services in transactions similar in nature to the offering of the Notes.

ARTICLE 8
LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01   *Option to Effect Legal Defeasance or Covenant Defeasance*.

The Issuer may at any time, at the option of its Board of Directors evidenced by a resolution set forth in an Officer's Certificate, elect to have either Section 8.02 or Section 8.03 be applied to have all of its obligations discharged with respect to the outstanding Notes and

all obligations of the Guarantors discharged with respect to their Guarantees upon compliance with the conditions set forth in this Article 8.

Section 8.02    *Legal Defeasance and Discharge.*

(a)    Upon the Issuer's exercise under Section 8.01 of the option applicable to this Section 8.02, the Issuer and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04, be deemed to have been discharged from their obligations with respect to all outstanding Notes on the date the conditions set forth below are satisfied (hereinafter, "*Legal Defeasance*").    For this purpose, Legal Defeasance means that the Issuer and each of the Guarantors will be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes, which will thereafter be deemed to be "outstanding" only for the purposes of Section 8.05 and the other Sections of this Indenture referred to in Section 8.02(a)(1) and Section 8.02(a)(2), and to have satisfied all their other obligations under such Notes and this Indenture (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging the same), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(1)    the rights of Holders of the outstanding Notes to receive payments in respect of the principal of, or interest or premium, if any, and Additional Amounts, if any, on such Notes when such payments are due from the trust referred to in Section 8.04;

(2)    the Issuer's obligations with respect to the Notes under Article 2 and 4.02;

(3)    the rights, powers, trusts, duties and immunities of the Trustee and the Agents hereunder and the Issuer's and the Guarantors' obligations in connection therewith; and

(4)    this Article 8.

(b)    Subject to compliance with this Article 8, the Company may exercise its option under this Section 8.02 notwithstanding the prior exercise of its option under Section 8.03.

Section 8.03    *Covenant Defeasance.*

(a)    Upon the Issuer's exercise under Section 8.01 of the option applicable to this Section 8.03, the Issuer and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04, be released from each of their obligations under the Section 3.09, 4.05, 4.06, 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.13, 4.15, 4.16, 4.18, 4.19, 4.20, 4.23, 4.24 and 4.26 and Section 5.01 with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 are satisfied (hereinafter, "*Covenant Defeasance*"), and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such covenants, but will continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such Notes will not be deemed outstanding for accounting purposes).    For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes, the Issuer and each of the Guarantors may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such covenant, whether directly or indirectly, by reason of any reference elsewhere herein to any such covenant or by reason of

122

**475**

any reference in any such covenant to any other provision herein or in any other document and such omission to comply will not constitute a Default or an Event of Default under Section 6.01, but, except as specified in this Section 8.03, the remainder of this Indenture and such Notes and Guarantees will be unaffected thereby. In addition, upon the Issuer's exercise under Section 8.01 of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04, clauses (3), (4), (5), (6), (7) and (8) of Section 6.01 will not constitute Events of Default and clauses (9) and (10) of Section 6.01 shall constitute Events of Default solely with respect to the Issuer.

(b)    In addition, in the event Covenant Defeasance occurs, certain events (not including non-payment, bankruptcy, receivership, rehabilitation and insolvency events) described under clauses (9) and (10) of Section 6.01 will no longer constitute an Event of Default with respect to the Notes.

Section 8.04    *Conditions to Legal or Covenant Defeasance*.

In order to exercise either Legal Defeasance or Covenant Defeasance under either Section 8.02 or Section 8.03:

(1)    the Issuer must irrevocably deposit with the Trustee or such other entity designated by the Trustee for this purpose, in trust, for the benefit of the Holders, cash in U.S. Dollars, non-callable Government Obligations, or a combination of cash in U.S. Dollars and non-callable Government Obligations (with such cash and government securities denominated in U.S. Dollars), in amounts as will be sufficient to pay the principal of, or interest and premium and Additional Amounts, if any, on, the outstanding Notes on the stated date for payment thereof or on the applicable redemption date, as the case may be, and the Issuer must specify whether the Notes are being defeased to such stated date for payment or to a particular redemption date;

(2)    in the case of an election under Section 8.02, the Issuer must deliver to the Trustee (i) an Opinion of Counsel reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) confirming that: (a) the Issuer has received from, or there has been published by, the U.S. Internal Revenue Service a ruling; or (b) since the date of this Indenture, there has been a change in the applicable U.S. federal income tax law, in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that, the Holders and the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred; and (ii) an Opinion of Counsel in the jurisdiction of organization of the Issuer and reasonably acceptable to the Trustee to the effect that the Holders and the beneficial owners of the Notes will not recognize income, gain or loss for income tax purposes of such jurisdiction as a result of such Legal Defeasance and will be subject to income tax in such jurisdiction in the same amounts and in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(3)    in the case of an election under Section 8.03, the Issuer must deliver to the Trustee (i) an Opinion of Counsel reasonably acceptable to the Trustee (subject to customary exceptions and exclusions) confirming that: the Holders and the beneficial owners of the Notes will not recognize income, gain or loss for U.S. federal income tax

123

**476**

purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred and (ii) an Opinion of Counsel in the jurisdiction of organization of the Issuer and reasonably acceptable to the Trustee to the effect that the Holders and the beneficial owners of the Notes will not recognize income, gain or loss for income tax purposes of such jurisdiction as a result of such Covenant Defeasance and will be subject to income tax in such jurisdiction in the same amounts and in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(4)     the Issuer must deliver to the Trustee an Officer's Certificate stating that the deposit was not made by the Issuer with the intent of preferring the Holders over the other creditors of the Issuer with the intent of defeating, hindering, delaying or defrauding any creditors of the Issuer or Guarantors; and

(5)     the Issuer must deliver to the Trustee an Officer's Certificate and an Opinion of Counsel reasonably acceptable to the Trustee, each stating that all conditions precedent relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

Section 8.05   *Deposited Money and Government Obligations to be Held in Trust; Other Miscellaneous Provisions*.

Subject to Section 8.06, all money, non-callable Government Obligations (including the proceeds thereof) deposited with the Trustee (or such other entity designated by the Trustee for this purpose or other qualifying trustee, collectively for purposes of this Section 8.05, the "*Trustee*") pursuant to Section 8.04 in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as Paying Agent) as the Trustee may determine, to the Holders of such Notes of all sums due and to become due thereon in respect of principal, premium, if any, interest and Additional Amounts, if any, but such money need not be segregated from other funds except to the extent required by law.

The Issuer will pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the cash, non-callable Government Obligations deposited pursuant to Section 8.04 or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

Notwithstanding anything in this Article 8 to the contrary, the Trustee will deliver or pay to the Issuer from time to time upon the request of the Issuer any money, non-callable Government Obligations held by it as provided in Section 8.04 which, in the opinion of a nationally recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the opinion delivered under clause (1) of Section 8.04), are in excess of the amount thereof that would then be required to be deposited to effect an equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06   *Repayment to Issuer*.

124

**477**

Any money deposited with the Trustee or any Paying Agent, or then held by the Issuer, in trust for the payment of the principal of, premium on, if any, interest or Additional Amounts, if any, on any Note and remaining unclaimed for two years after such principal, premium, if any, interest or Additional Amounts, if any, has become due and payable shall be paid to the Issuer on its request or (if then held by the Issuer) will be discharged from such trust; and the Holder of such Note will thereafter be permitted to look only to the Issuer for payment thereof, and all liability of the Trustee or such Paying Agent with respect to such trust money, and all liability of the Issuer as trustee thereof, will thereupon cease.

Section 8.07   *Reinstatement*.

If the Trustee or Paying Agent is unable to apply any U.S. dollars or non-callable Government Obligations in accordance with Section 8.02 or Section 8.03, as the case may be, by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, then the Issuer's obligations under this Indenture and the Notes will be revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or Section 8.03 until such time as the Trustee or Paying Agent is permitted to apply all such money in accordance with Section 8.02 or Section 8.03, as the case may be; *provided*, *however*, that, if the Issuer makes any payment of principal of, premium on, if any, interest or Additional Amounts, if any, on, any Note following the reinstatement of its obligations, the Issuer will be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying Agent.

## ARTICLE 9
## AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01   *Without Consent of Holders*.

Notwithstanding Section 9.02, without the consent of any Holder, the Issuer, the Company, the Trustee and the Security Agent (as applicable and to the extent each is a party to the relevant document) may amend or supplement any of the Notes Documents:

(1)     to cure any ambiguity, defect or inconsistency;

(2)     to provide for uncertificated Notes in addition to or in place of certificated Notes, provided that such uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code;

(3)     to provide for the assumption of the Issuer or a Guarantor's obligations under the Notes Documents by a successor to the Issuer or Guarantor in the case of a merger or consolidation or sale of all or substantially all of the Issuer's or such Guarantor's assets in accordance with the terms of this Indenture, as applicable;

(4)     to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the legal rights hereunder of any Holder in any material respect;

(5)     to allow any Restricted Subsidiary to become a Guarantor in accordance with this Indenture, to add Guarantees with respect to the Notes, to add security to or for the benefit of the Notes, or to effect, confirm and evidence the release, termination or discharge of any Guarantee or Lien (including the Collateral and the Collateral

Documents) with respect to or securing the Notes in accordance with the terms of this Indenture;

(6)    to enter into additional or supplemental Collateral Documents;

(7)    to allow any Guarantor to execute a supplemental indenture and/or a Guarantee with respect to the Notes;

(8)    to release any Collateral or Guarantee in accordance with the terms set forth in this Indenture;

(9)    to provide for the issuance of Additional Notes in accordance with the limitations set forth in this Indenture;

(10)    to provide for a successor Trustee or Security Agent in accordance with the terms of this Indenture or to otherwise comply with any requirement of this Indenture;

(11)    [*Reserved*];

(12)    in the case of a Collateral Document, the Intercreditor Agreement and to the extent applicable any Additional Intercreditor Agreement, to Incur Indebtedness or to grant a Lien for the benefit of any Person, in each case with the ranking and priority appropriate thereto; *provided* that the Incurrence of such Indebtedness or the granting of Lien is permitted by this Indenture and Section 4.20 and Section 4.23 are complied with; and

(13)    to add additional parties to the Intercreditor Agreement or any Collateral Document to the extent permitted hereunder or thereunder.

The Trustee shall be entitled to request, receive and rely absolutely on such evidence as it deems appropriate, including Opinions of Counsel and Officer's Certificates, on which the Trustee may solely rely.

Upon the request of the Issuer and upon receipt by the Trustee of the documents described in Section 7.02, the Trustee will join with the Issuer in the execution of any amended or supplemental indenture authorized or permitted by the terms of this Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee will not be obligated to enter into such amended or supplemental indenture that affects its own rights, duties or immunities under this Indenture or otherwise.

Section 9.02    *With Consent of Holders.*

Except as provided in this Section 9.02, the Issuer, the Company, the Security Agent and the Trustee (as applicable and to the extent each is a party to the relevant document) may amend, supplement or waive any of the terms of this Indenture (including, without limitation, Section 3.09, Section 4.10 and Section 4.15) and any other Notes Documents with the consent of the Issuer and the Holders of at least a majority in aggregate principal amount of the then outstanding Notes voting as a single class (including, without limitation, consents obtained in connection with a tender offer, exchange offer or purchase of the Notes), and, subject to Section 6.05 and Section 6.08, any existing Default or Event of Default (other than a Default or Event

126

of Default in the payment of the principal of, premium on, if any, interest or Additional Amounts, if any, on, the Notes, except a payment default resulting from an acceleration that has been rescinded) or compliance with any provision of the Notes Documents may be waived with the consent of the Issuer and Holders of a majority in aggregate principal amount of the then outstanding Notes voting as a single class (including, without limitation, consents obtained in connection with a tender offer, exchange offer or purchase of the Notes).

Upon the request of the Issuer and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders as aforesaid, and upon receipt by the Trustee of the documents described in Section 7.02, the Trustee will join with the Issuer in the execution of such amended or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's own rights, duties or immunities under this Indenture or otherwise, in which case the Trustee may in its discretion, but will not be obligated to, enter into such amended or supplemental Indenture.

It is not necessary for the consent of the Holders under this Section 9.02 to approve the particular form of any proposed amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof.

After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuer will deliver or cause to be delivered to the Holders affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Issuer to deliver or cause to be delivered such notice, or any defect therein, will not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver. Subject to Section 6.05 and Section 6.08 the Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class may waive compliance in a particular instance by the Issuer with any provision of this Indenture, the Notes, the Guarantees, the Collateral Documents, the Intercreditor Agreement or any Additional Intercreditor Agreement. However, unless (i) consented to by the Holders of at least 90% of the aggregate principal amount of the then outstanding Notes or (ii) consented to by each Holder adversely affected thereby (in each of (i) and (ii) above including, without limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), an amendment, supplement or waiver under this Section 9.02 may not:

      (1)    reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

      (2)    reduce the principal of or change the fixed maturity of any Note or alter the provisions with respect to the redemption of the Notes (except as provided above with respect to Section 4.10 and Section 4.15);

      (3)    reduce the rate of or change the time for payment of interest, including default interest, on any Note;

      (4)    waive a Default or Event of Default in the payment of principal of, or premium or Additional Amounts, if any, or interest on, the Notes (except a rescission of acceleration of the Notes by the Holders of at least a majority in aggregate principal amount of the then outstanding Notes and a waiver of the Payment Default that resulted from such acceleration);

(5)     make any Note payable in money other than that stated in the applicable Note;

(6)     make any change in the provisions of this Indenture relating to waivers of past Defaults;

(7)     waive a redemption payment with respect to any Note (other than a payment required by Section 4.10 and Section 4.15);

(8)     make any changes in the provision of this Indenture described under Section 4.21 that adversely affects the rights of any Holder in any material respect or amends the terms of such Notes in a way that would result in a loss of an exemption from any obligation to withhold or deduct Taxes so described thereunder unless the Issuer and/or Guarantor agrees to pay Additional Amounts, if any, in respect thereof;

(9)     release all or substantially all of the Guarantors from any of their obligations under its Guarantee or this Indenture, except in accordance with the terms of this Indenture, the Intercreditor Agreement or any Additional Intercreditor Agreement;

(10)     release all or substantially all of the Collateral granted for the benefit of the Holders, except in accordance with the terms of this Indenture, the Collateral Documents, the Intercreditor Agreement and to the extent applicable, any Additional Intercreditor Agreement;

(11)     impair the right to institute suit for the enforcement of any payment on or with respect to the Notes or any Guarantees; or

(12)     make any change in the preceding amendment and waiver provisions.

Section 9.03     *Revocation and Effect of Consents*.

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder is a continuing consent by the Holder and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if notation of the consent is not made on any Note. However, any such Holder or subsequent Holder may revoke the consent as to its Note if the Trustee receives written notice of revocation before the date the amendment, supplement or waiver becomes effective. An amendment, supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

Section 9.04     *Notation on or Exchange of Notes*.

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. The Issuer in exchange for all Notes may issue and the Trustee or the Authenticating Agent, as the case may be, shall, upon receipt of an Authentication Order, authenticate new Notes that reflect the amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or waiver.

Section 9.05    *Trustee to Sign Amendments, etc.*

The Trustee and the Security Agent will sign, only in their respective capacities as Trustee and Security Agent, any amended or supplemental indenture authorized pursuant to this Article 9 if the amendment or supplement does not adversely affect the rights, duties, liabilities or immunities of the Trustee and the Security Agent.  The Issuer may not sign an amended or supplemental indenture until the Board of Directors of the Company approves it. In executing any amended or supplemental indenture, the Trustee and the Security Agent will be entitled to receive and (subject to Section 7.01) will be fully protected in relying upon, in addition to the documents required by Section 14.04, an Officer's Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted by this Indenture and that such amendment is the legal, valid and binding obligation of the Issuer (and any guarantor) enforceable against them in accordance with its terms, subject to customary exceptions, and complies with the provisions of this Indenture.

<div align="center">

ARTICLE 10
SECURITY

</div>

Section 10.01  *Collateral Documents.*

(a)    The payment obligations of the Issuer and the Guarantors under the Notes, the Guarantees and this Indenture will, subject to the Agreed Security Principles, benefit from, (i) on the Issue Date, the security granted by the Collateral Documents and (ii) property and assets that thereafter secure the obligations under this Indenture, the Notes and the Guarantees pursuant to any Collateral Documents.

(b)    The due and punctual payment of the principal of, and premium, interest and Additional Amounts, if any, on the Notes and any Guarantee when and as the same shall be due and payable, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest on the overdue principal of and interest and Additional Amounts (to the extent permitted by law), if any, on the Notes and any Guarantee and performance of all other obligations of the Issuer and any Guarantor to Holders or the Trustee under this Indenture, the Notes and any Guarantee according to the terms hereunder or thereunder, are secured as provided in the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement.  Each Holder, by accepting a Note, consents and agrees to the terms of the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement (including, without limitation, the provisions providing for foreclosure and release of Collateral and authorizing the Security Agent to enter into any Collateral Document on its behalf) as the same may be in effect or may be amended from time to time in accordance with its terms and authorizes and directs the Security Agent to enter into the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement and to perform its obligations and exercise its rights thereunder in accordance therewith. The Issuer will deliver to the Trustee copies of all documents delivered to the Security Agent pursuant to the Collateral Documents, and the Issuer will and the Company will cause each of the Restricted Subsidiaries to do or cause to be done all such acts and things as may be necessary or proper, or as may be required by the provisions of the Collateral Documents, or which the Security Agent from time to time may reasonably request, to assure and confirm to the Trustee that the Security Agent holds, for the benefit of the Holders and the Trustee, duly created, enforceable and perfected Liens as contemplated hereby and by the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor

<div align="center">129</div>

Agreement, so as to render the same available for the security and benefit of this Indenture and of the Notes and any Guarantee secured thereby, according to the intent and purposes herein expressed.  The Issuer and any Guarantor will take, and the Guarantors will cause their respective subsidiaries to take, upon request of the Trustee, subject to the Agreed Security Principles, any and all actions reasonably required to cause the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement to create and maintain, as security for the Obligations of the Issuer and any Guarantors and, in respect of the Collateral, valid and enforceable perfected Liens in and on such Collateral.

(c)    To the extent required, the Security Agent agrees that it will hold the security interests in Collateral created under the Collateral Documents to which it is a party as contemplated by this Indenture in accordance with the Intercreditor Agreement and any Additional Intercreditor Agreement, and any and all proceeds thereof, for the benefit of, among others, the Trustee and the Holders, to act in preservation of the security interest in the Collateral in accordance with the Intercreditor Agreement and any Additional Intercreditor Agreement. The Security Agent will (subject to being indemnified and/or secured to its satisfaction) take action or refrain from taking action with respect to the Notes in connection therewith only as directed by the Trustee, subject to the terms of this Indenture.

(d)    Each Holder, by accepting a Note, shall be deemed (i) to have authorized the Security Agent to enter into the Collateral Documents and (ii) to have agreed to be bound thereby. The Trustee hereby acknowledges that the Security Agent is authorized to act under the Collateral Documents on behalf of the Trustee, with the full authority and powers of the Trustee thereunder. The Security Agent is hereby authorized to exercise such rights, powers and discretions as are specifically delegated to it by the terms of the Collateral Documents, including the power to enter into the Collateral Documents, as trustee on behalf of the Holders and the Trustee, together with all rights, powers and discretions as are reasonably incidental thereto or necessary to give effect to the trusts created thereunder. The Security Agent shall however at all times be entitled to seek directions from the Trustee with respect to the Notes and shall, subject to the Security Agent being indemnified and/or secured to its satisfaction, be obligated to follow those directions if given (but the Trustee shall not be obligated to give such directions unless directed in accordance with this Indenture). The Security Agent hereby accepts its appointment as the agent of the Holders and the Trustee under the Collateral Documents, and its authorization to so act on such Holders' and the Trustee's behalf in accordance with the terms of this Indenture, the Intercreditor Agreement and any Additional Intercreditor Agreement.

(e)    Notwithstanding any other provision of this Indenture, neither the Trustee nor the Security Agent shall have any responsibility for the validity, perfection, sufficiency, adequacy, priority or enforceability of any Lien, Security or Collateral Document or other security interest, and shall have no obligation to take any action to procure or maintain such validity, perfection, sufficiency, adequacy, priority or enforceability.

Section 10.02  *Release of Collateral*.

(a)    Collateral shall be released with respect to the Notes from the Liens and security interests created by the Collateral Documents in accordance with Section 10.05 and the Collateral may be released from the Liens and security interests created by the Collateral Documents at any time or from time to time in accordance with the provisions of the Collateral Document, the Intercreditor Agreement, any Additional Intercreditor Agreement and this

130

**483**

Indenture.  The Collateral may be released from the Liens and security interests created by the Collateral Documents at any time or from time to time in accordance with the provisions of the Collateral Documents, the Intercreditor Agreement and this Indenture.  Notwithstanding anything to the contrary in the Collateral Documents, upon receipt by the Security Agent of a request from the Issuer or any Guarantor that complies with Section 10.05, the Security Agent shall release the Collateral.  Upon receipt of such request the Security Agent shall execute, deliver or acknowledge any necessary or proper instruments of termination, satisfaction or release to evidence the release of any Collateral permitted to be released pursuant to this Indenture and the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement.

Section 10.03  *Authorization of Actions to Be Taken by the Trustee.*

Subject to Section 7.01 and 7.02 and the terms of the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement (including any consent of the Holders required thereunder), the Trustee may, in its sole discretion, direct, on behalf of the Holders, the Security Agent to take all actions it deems necessary or appropriate in order to:

(1)    enforce any of the terms of the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement; and

(2)    collect and receive any and all amounts payable in respect of the Obligations of the Issuer and any Guarantor hereunder.

The Trustee will have power to, or to direct the Security Agent to, institute and maintain such suits and proceedings as it may deem expedient to prevent any impairment of the Collateral by any acts that may be unlawful or in violation of the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement or this Indenture, and such suits and proceedings as the Trustee may deem expedient to preserve or protect its interests and the interests of the Holders in the Collateral (including power to institute and maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or order that may be otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair the security interest hereunder or be prejudicial to the interests of the Holders or of the Trustee).

Section 10.04  *Authorization of Receipt of Funds by the Trustee.*

The Trustee is authorized to receive any funds for the benefit of the Holders distributed under the Collateral Documents, the Intercreditor Agreement, any Additional Intercreditor Agreement and this Indenture, and to make further distributions of such funds to the Holders according to the provisions of this Indenture.

Section 10.05  *Termination of Security Interest in Collateral.*

Liens created by the relevant Collateral Documents shall be automatically and unconditionally released (and, upon request of the Issuer or any Guarantor, the Security Agent shall (without notice to, or vote or consent of, any Holder but with notice to the Trustee) take such actions as shall be required to release such Liens) under any one or more of the following circumstances and as follows:

(1)      in the case of a Guarantor (other than the Company) that is released from its Guarantee in accordance with the terms of this Indenture, the release of Liens on the property and assets, and share capital, of such Guarantor;

(2)      if the Company designates any of its Restricted Subsidiaries (other than the Issuer) to be an Unrestricted Subsidiary in accordance with the applicable provisions of this Indenture, the release of Liens on the property, assets and share capital of such Restricted Subsidiary;

(3)      in connection with any sale, transfer or other disposition of Capital Stock of a Guarantor or any holding company of such Guarantor (in each case, other than the Company) to a Person that is not (either before or after giving effect to such transaction) the Company or any of its Restricted Subsidiaries, if the sale or other disposition does not violate Section 4.10;

(4)      in connection with any sale, assignment, transfer, conveyance or other disposition of property or assets constituting Collateral (including Capital Stock of Subsidiaries) to a Person that is not (either before or after giving effect to such transaction) the Company or any of its Restricted Subsidiaries if the sale, transfer or other disposition does not violate Section 4.10;

(5)      any release provided for in the Intercreditor Agreement or any Additional Intercreditor Agreement;

(6)      upon Legal Defeasance, Covenant Defeasance or satisfaction and discharge of this Indenture as provided in Article 8 and Article 13;

(7)      in accordance with Section 4.20;

(8)      in connection with certain enforcement actions taken by the creditors under certain of our secured Indebtedness in accordance with the Intercreditor Agreement and, to the extent applicable, any Additional Intercreditor Agreement, the release of the property and assets subject to such enforcement sale;

(9)      upon repayment in full of the Notes;

(10)     in accordance with Article 9;

(11)     as a result of a transaction permitted by Article 5;

(12)     in connection with the implementation of a Permitted Reorganization;

(13)     substantially concurrently with or following the release, discharge or other termination (other than as a result of an enforcement action) of any and all Liens over the relevant Collateral securing Indebtedness of the Issuer or any Guarantor outstanding under any Indebtedness outstanding under any Senior Facilities Agreement, so long as no Event of Default exists at such time or would arise as a result of such release;

132

(14)    in connection with the granting of Liens on such property or assets, which may include Collateral, or the sale or transfer of such property or assets, which may include Collateral, in each case pursuant to a Qualified Receivables Financing;

(15)    any release of any asset from any floating charge created under any Collateral Document to the extent not prohibited by the terms of this Indenture or such Collateral Document; and

(16)    upon a release of the Lien that resulted in the creation of the Lien under Section 4.12 hereof.

The Security Agent and, if necessary, the Trustee shall take all reasonably necessary actions to effectuate or evidence any release of security interests over the Collateral in accordance with the provisions of this Indenture, the Intercreditor Agreement, any Additional Intercreditor Agreement and any relevant Collateral Documents, subject to customary protections and indemnifications. Each of the releases set forth in this Section 10.05 shall be affected by the Security Agent without the consent of the Holders or any action on the part of the Trustee, and each Holder, by accepting a Note, will be deemed to have consented to such actions by the Security Agent.

## ARTICLE 11
## GUARANTEES

Section 11.01  [*Reserved*].

Section 11.02  *Guarantee*.

(a)    Subject to this Article 11, each of the Guarantors, jointly and severally, absolutely, unconditionally and irrevocably guarantees to each Holder and to the Trustee and its successors and assigns, irrespective of the validity and enforceability of this Indenture, the Notes or the obligations of the Company hereunder or thereunder, that:

(1)    the principal of, premium on, if any, interest and Additional Amounts, if any, on, the Notes and all other monetary obligations of the Issuer due under the Indenture will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal of, premium on, if any, interest and Additional Amounts, if any, on, the Notes, if lawful, and all other obligations of the Issuer to the Holders or the Trustee hereunder or thereunder will be promptly and completely paid in full or performed, all in accordance with the terms hereof and thereof; and

(2)    in case of any extension of time of payment or performance or renewal of any Notes or any of such other obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of such extension or renewal, whether at stated maturity, by acceleration or otherwise.

Failing payment when due of any amount so guaranteed or any performance so guaranteed for whatever reason, the Guarantors will be jointly and severally obligated to pay the same immediately.  Each Guarantor agrees that this is a guarantee of payment and performance and not a guarantee of collection.

(b)     Subject to this Article 11, the Guarantors agree that their obligations are unconditional, irrespective of the validity, regularity or enforceability of the Notes or this Indenture, the validity, perfection, non-perfection, lapse in perfection or priority of any security interest securing any of the obligations guaranteed by the Guarantee, the absence of any action to enforce any of the foregoing, any amendment, modification, waiver or consent by any Holder with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same, any change in the corporate structure of existence of the Issuer or any other Guarantor, or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor. Without limiting the generality of the foregoing, each Guarantor's liability under its Guarantee shall extend to all obligations under the Notes and this Indenture (including, without limitation, interest, fees, costs and expenses) that would be owed but for the fact that they are unenforceable or not allowable due to any proceeding under Bankruptcy Law involving the Issuer or any Guarantor.

(c)     Each Guarantor waives diligence, presentment, demand of payment, marshaling, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever and covenant that this Guarantee will not be discharged except by complete payment and performance of the obligations contained in the Notes and this Indenture and the obligations of each Guarantor under this Guarantee shall not be subject to any reduction, limitation, impairment, set-off, defense, counterclaim, discharge or termination for any reason other than the complete payment and performance of the obligations contained in the Notes and this Indenture, it being understood that in relation to a Guarantor incorporated in Germany this provision shall apply only to the extent the respective waiver does not amount to a breach of such Guarantor's management's capital maintenance obligations.

(d)     If any Holder or the Trustee is required by any court or otherwise to return to the Issuer, the Guarantors or any custodian, trustee, liquidator or other similar official acting in relation to either the Issuer or the Guarantors, any amount paid by either the Trustee or such Holder, this Guarantee, to the extent theretofore discharged, will be reinstated in full force and effect.

(e)     Each Guarantor agrees that it will not be entitled to any right of subrogation in relation to the Holders in respect of any obligations guaranteed hereby or any collateral securing any such obligations until payment and performance in full of all obligations guaranteed, it being understood that this provision shall not be construed as a waiver of any such rights in relation to a German Guarantor to the extent the respective waiver does not amount to a breach of such Guarantor's management's capital maintenance obligations.  Each Guarantor further agrees that, as between the Guarantors, on the one hand, and the Holders and the Trustee, on the other hand, (1) the maturity of the obligations guaranteed by may be accelerated as provided in Article 6 for the purposes of this Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed, and (2) in the event of any declaration of acceleration of such obligations as provided in Article 6, such obligations (whether or not due and payable) will forthwith become due and payable by the Guarantors for the purpose of this Guarantee.  The Guarantors will have the right to seek contribution from any non-paying Guarantor so long as the exercise of such right does not impair the rights of the Holders under the Guarantee.

Section 11.04 *Limitation and Effectiveness of Guarantees*.

134

(a)    *General*

Without limiting any specific exemptions set out below, each Guarantee and any other Guarantee, indemnity or assurance against loss in this Indenture does not apply to any liability to the extent it would constitute unlawful financial assistance within the meaning of sections 678 or 679 of the Companies Act 2006 or any equivalent and applicable provisions under the laws of the jurisdiction of incorporation of the relevant Guarantor.

(b)    *Germany*

(1)    In this Section 11.04(b):

"*German Guarantor*" means:

(A)    any Guarantor incorporated in Germany as a limited liability company (*Gesellschaft mit beschränkter Haftung*) (a "*German GmbH Guarantor*"); or

(B)    a limited partnership (*Kommanditgesellschaft*) in relation to which any general partner (*persönlich haftender Gesellschafter*) is a limited liability company (any such general partner is hereinafter referred to as a "*German GP Company*") (such limited partnership is hereinafter referred to as a "*German KG Guarantor*").

"*Guarantee*" means any guarantee and/or indemnity obligation of any German Guarantor created under this Indenture.

"*Net Assets*" means the amount of the German GmbH Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's relevant assets (the calculation of which shall include all items set forth in Section 266(2) A, B, C, D and E of the German Commercial Code (*Handelsgesetzbuch*, "HGB")) *less*:

(A)    the German GmbH Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's liabilities, the calculation of which shall include all items set forth in Section 266(3) B, C, D and E of the HGB including any costs for any Auditor's Determination but such liabilities shall exclude:

(i)    the liabilities under or relating to the Guarantee; and

(ii)    any obligations (*Verbindlichkeiten*) of the German GmbH Guarantor (and, in case of a GmbH & Co. KG, of its German GP Company):

(x)    owing to any member of the group or any other affiliated company which are subordinated by law or by contract to any Indebtedness outstanding under this Indenture (including for the avoidance of doubt, obligations that would in an insolvency be subordinated pursuant to Section 39 para 1 no 5 or Section 39 para 2 of the German

135

**488**

Insolvency Code (*Insolvenzordnung*)) and including obligations under guarantees for obligations which are so subordinated, unless a waiver of the loan provided to the relevant German GmbH Guarantor or, in the case of a GmbH & Co. KG, of its German GP Company, would result in that member of the group breaching its obligations under section 30 of the German Limited Liability Companies Act (*GmbH-Gesetz*, "*GmbHG*") or any similar provision of any other jurisdiction applicable to it; and

    (y)    incurred by the German GmbH Guarantor (and, in the case of a GmbH & Co.KG, of its German GP Company) in willful violation of any of the provisions of this Indenture; and

(B)    any amounts which are subject to legal dividend payment constraints (*Ausschüttungssperre*) pursuant to Section 253(6), Section 268(8) or Section 272(5) HGB, in each case calculated in accordance with HGB (taking into account applicable case law on the calculation of net assets pursuant to Section 30 GmbHG) and accounting principles consistent with those applied in the preparation of the latest annual unconsolidated financial statements for that German GmbH Guarantor (or, where the German Guarantor is a German KG Guarantor, its German GP Company.

For the purpose of such calculation, the following balance sheet items shall be adjusted as follows:

(i)    if the registered share capital of the German Guarantor, or where the German Guarantor is a German KG Guarantor, of its German GP Company, is increased out of retained earnings (*Kapitalerhöhung aus Gesellschaftsmitteln*) after the date of this Indenture, such increase shall not be taken into account unless (i) such increase has been effected with the prior written consent of the Trustee or is otherwise permitted under this Indenture and (ii) only to the extent it is fully paid up (*voll eingezahlt*);

(ii)    the amount of any increase after the date of this Indenture of the German Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's registered share capital which has been effected out of retained earnings (*Kapitalerhöhung aus Gesellschaftsmitteln*) without the prior written consent of the Trustee shall be deducted from the registered share capital;

(iii)    any accrual (*Rückstellung*) in respect of a potential enforcement of the Guarantee or any Security shall be disregarded; and

(iv)    liabilities in relation to loans granted to, and other contractual liabilities incurred by, the German Guarantor or as the case may be by its German GP Company, in willful (*vorsätzlich*) or grossly negligent (*grob fahrlässig*) violation of this Indenture shall be disregarded.

136

**489**

(2)     In the case of a German Guarantor the enforcement of the Guarantee against such German Guarantor shall be limited if and to the extent that:

(i)     such Guarantee secures the obligations or liabilities of:

(A)     the German Guarantor's, or in case of a German KG Guarantor, any of its relevant German GP Company's, direct or indirect shareholder (upstream), or

(B)     a direct or indirect subsidiary of a shareholder pursuant to paragraph (i) (but excluding any direct or indirect subsidiary of the German Guarantor (and, in the case of a German KG Guarantor, any direct or indirect subsidiary of its German GP Company)) (cross-stream); and

(ii)     the enforcement of the Guarantee (x) would cause the Net Assets to be less than the respective share capital (*Stammkapital*) (*Begründung einer Unterbilanz*) or (y) (if the German GmbH Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's Net Assets are already less than its respective registered share capital) would cause such deficit to be further increased (*Vertiefung einer Unterbilanz*).

(3)     In addition, the German Guarantor and, where the German Guarantor is a German KG Guarantor, also its relevant German GP Company shall, if so requested by the Trustee (acting on behalf of and for the account of the Holders), realise, to the extent legally permitted, in a situation where after enforcement of the Guarantee the German Guarantor, or, where the German Guarantor is a German KG Guarantor, its relevant German GP Company would not have Net Assets in excess of its respective registered share capital, any and all of its assets that are shown in the balance sheet with a book value (*Buchwert*) that is significantly lower than the market value of the asset if such asset is not necessary for the German Guarantor's or as the case may be its relevant German GP Company's operational business (*operativ nicht betriebsnotwendig*).

(4)     The enforcement of the Guarantee shall initially be excluded if no later than fifteen (15) Business Days following a demand by the Trustee (acting on behalf of and for the account of the Holders) to make a payment under the Guarantee, the managing directors on behalf of the German Guarantor or, as the case may be, its German GP Company, have confirmed in writing to the Trustee:

(iii)     to what extent the Guarantee granted hereunder has an upstream or cross-stream effect as described above; and

(iv)     to which extent the Guarantee securing cross-stream and/or upstream obligations or liabilities as described above cannot be enforced as it would cause the Net Assets of the German Guarantor, or, where the German Guarantor is a German KG Guarantor, its German GP Company to be less than its respective registered share capital (taking into account the above set out adjustments and realization duties),

137

**490**

(the "*Management Determination*") and such confirmation is supported by a reasonably satisfactory calculation provided that the Trustee (acting on behalf of and for the account of the Holders) shall in any event be entitled to enforce the Guarantee for any amounts where such enforcement would, in accordance with the Management Determination, not cause the German Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's Net Assets to be less than (or to fall further below) the amount of its respective registered share capital (in each case as calculated and adjusted as set out above).

(5)    Following the Trustee's receipt of Management Determination, any further enforcement of the Guarantee (i.e. any enforcement to which the Trustee is not already entitled to) shall be excluded for a period of no more than thirty (30) Business Days only. If the Trustee receives within such thirty (30) Business Days period: (i) an up-to date balance sheet together with (ii) a determination in each case prepared by auditors of international standard and reputation appointed by the relevant German Guarantor either confirming the Management Determination or setting out deviations from the Management Determination (the "*Auditor's Determination*"), the further enforcement of the Guarantee shall be limited, if and to the extent such enforcement would, in accordance with the Auditor's Determination cause the German Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's Net Assets to be less than (or to fall further below) the amount of its respective registered share capital in each case as calculated and adjusted as set out above. If the German Guarantor fails to deliver an Auditor's Determination within thirty (30) Business Days after receipt of the Management Determination, the Trustee shall be entitled to enforce the Guarantee without any limitation or restriction.

(6)    If and to the extent (A) the net assets as determined by the Auditors' Determination are lower than the amount enforced in accordance with the Management Determination or (B) the Guarantee has been enforced without regard to the limitations set out above because (x) the Management Determination was not delivered within the relevant time frame or (y) the Auditors' Determination was not delivered within the relevant time frame but has been delivered within ten (10) Business Days following the due date for the delivery of the Auditors' Determination, the Trustee shall without undue delay repay to the relevant German Guarantor upon written demand of the relevant German Guarantor any amount (if and to the extent already paid to the Trustee (or any of them)) in the case of (A) equal to the difference between the amount paid and the amount payable resulting from the Auditor's Determination, and in the case of (B), which the Trustee would not have been entitled to enforce had the Management Determination and the Auditors' Determination been delivered in time provided such demand for repayment is made to the Trustee within six months from the date the Guarantee is enforced. The Trustee (acting on instructions from the Holders), may withhold any amount received pursuant to an enforcement of the Guarantee until final determination of the amount of the net assets pursuant to the Auditor's Determination.

(7)    The limitations set out in this Section 11.04(b) shall not apply (or, as the case may be, shall cease to apply):

138

**491**

(i)    if and to the extent any amounts borrowed under this Indenture are lent or on-lent to such German Guarantor and/or, in case of a German KG Guarantor, its relevant German GP Company or any of its respective subsidiaries from time to time if, in addition by virtue of the enforcement of the Guarantee the German Guarantor, or as the case may be, its relevant German GP Company, has a recourse, indemnification, sharing of losses or other compensation claim against such lending affiliated company (*verbundenes Unternehmen*) within the meaning of Section 16, 17 or 18 of the German Stock Act (*Aktiengesetz*, "*AktG*") or the lending direct or indirect shareholder of the German Guarantor which could be set-off against such loan receivable or otherwise be used to settle or discharge such loan obligation and provided that the Trustee (acting on instructions from the Holders) has waived with binding effect on the Trustee the restrictions of any provision under this Indenture restricting the right to set off claims against, or otherwise make use of the recourse, indemnification, sharing of losses or other compensation claim against such lending affiliated company (*verbundenes Unternehmen*) within the meaning of Section 16, 17 or 18 of the AktG or the lending direct or indirect shareholder of the German Guarantor in order to settle or discharge such loan obligation vis-à-vis, such lending member of the lending affiliated company (*verbundenes Unternehmen*) within the meaning of Section 16, 17 or 18 of the AktG or the lending direct or indirect shareholder of the German Guarantor; or

(ii)    if and when a domination agreement (*Beherrschungsvertrag*) and/or profit absorption agreement (*Gewinnabführungsvertrag*) (either directly or through a chain of domination and/or profit absorption agreements) is or becomes effective between the relevant German Guarantor (or, in case of a German KG Guarantor, its German GP Company) as dependent entity (*abhängiges Unternehmen*) and:

(A)    in case of the German Guarantor (or, in case of a German KG Guarantor, its German GP Company) is a subsidiary of the relevant obligor whose obligations are guaranteed under the Guarantee, that obligor; or

(B)    in case the German Guarantor (or, in case of a German KG Guarantor, its German GP Company) is a sister company of the relevant obligor whose obligations are guaranteed under the Guarantee, any joint (direct or indirect) parent company of the German Guarantor (or, in case of a German KG Guarantor, its German GP Company) and that obligor,

as dominating entity (*beherrschendes Unternehmen*)) other than where and to the extent the existence of such domination agreement (*Beherrschungsvertrag*) and/or profit absorption agreement (*Gewinnabführungsvertrag*) does not result in the inapplicability of

139

**492**

sentence 1 of paragraph 1 of Section 30 GmbHG (as stipulated by sentence 2 of such paragraph) with respect to the relevant payments under the Guarantee (including in respect of intermediate entities through which the relevant obligor whose obligations are guaranteed under the Guarantee is an indirect shareholder of the German Guarantor, or as the case may be, its German GP Company);

(iii)    if and to the extent the German Guarantor holds on the date of the enforcement of the Guarantee a fully valuable and recoverable indemnity or claim for refund (*vollwertiger Gegenleistungs-oder Rückgewähranspruch*) against any of its direct or indirect shareholders or Subsidiaries of such shareholders (other than Subsidiaries of the German Guarantor) with respect to the relevant payments under the Guarantee; or

(iv)    if and to the extent for any other reason (including, without limitation, as a result of a change in the relevant rules of law) the deficit (*Unterbilanz*) referred to in paragraph (b) above does not constitute a breach of the German Guarantor's obligations to maintain its registered share capital pursuant to §§ 30 et seq. GmbHG or does not result in a personal liability of the managing directors of the German Guarantor pursuant to § 43 GmbHG.

(b)    *Kingdom of Saudi Arabia law*

(1)    The obligations of a Guarantor incorporated in the Kingdom of Saudi Arabia (a "*KSA Guarantor*") under this Indenture shall be limited to exclude any obligation to the extent that it would constitute an unlawful distribution to the partners or shareholders of that KSA Guarantor or an otherwise unlawful use of proceeds or assets of that KSA Guarantor, whether pursuant to article 10 of the Saudi Arabian companies regulations or any other applicable law (each being a "*Breach of Law*").  The Parties irrevocably agree that the obligations of a KSA Guarantor under this Indenture are limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of that KSA Guarantor, result in the obligations of that KSA Guarantor under this Indenture not constituting a Breach of Law.

(2)    Unless otherwise agreed by the Company and each KSA Guarantor (without any need to amend this Indenture), the liability of a KSA Guarantor under this Indenture shall be limited to US$1,000,000,000 plus any unpaid amount of interest, fees, liability, costs and expenses under this Indenture and the amount of any interest, default interest, costs and expenses related to the liabilities of the KSA Guarantor.

(c)    *Norway*

(1)    The obligations of each Guarantor incorporated in Norway (a "*Norwegian Guarantor*") under this Indenture shall be limited by any mandatory provisions of law applicable to such Norwegian Guarantor and be deemed to have been given only to the extent it does not violate Sections 8-7 and 8-10 of the Norwegian Private Limited Liability Companies Act 1997 No. 44 (the

140

"*Norwegian Companies Act*") regulating unlawful financial assistance and other restricted loans, guarantees and joint and several liability as well as providing of security, and the liability of each Norwegian Guarantor only applies to the extent permitted by such provisions of the Norwegian Companies Act. Any Norwegian Guarantor's obligations under this Indenture shall, however, be interpreted so as to make it liable to the fullest extent permitted by the Norwegian Companies Act from time to time.

(2)    Unless otherwise agreed in writing by the Company and each Norwegian Guarantor (and following any such agreement this Indenture shall be deemed to be amended accordingly), the liability of a Norwegian Guarantor under this Indenture shall be limited to US$1,000,000,000 plus any unpaid amount of interest, fees, liability, costs and expenses under this Indenture and the amount of any interest, default interest, costs and expenses related to the liabilities of the Norwegian Guarantor.

(d)    *Security*

The limitations set out above shall apply mutatis mutandis to any security provided by any Guarantor under the Collateral Documents and to any guarantee, undertaking, obligation, indemnity and payment, including but not limited to, distributions, credits, loans and set-offs, pursuant to or permitted by this Indenture in relation to a Guarantor.

(e)    *Additional Guarantors*

The Guarantee of, and any security granted by, any additional Guarantor is subject to any other limitations relating to that additional Guarantor set out in the relevant supplemental indenture applicable to such additional Guarantor.

Section 11.05  *Notation Not Required*.

Neither the Issuer nor any Guarantor shall be required to make a notation on the Notes to reflect any Guarantee or any release, termination or discharge thereof.

Each Guarantor agrees that its Guarantee set forth in Section 11.02 will remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Guarantee.

Section 11.06  *[Reserved]*.

Section 11.07  *Releases*.

A Guarantee of a Subsidiary Guarantor will be automatically released:

(1)    in connection with the sale, disposition or transfer of all or substantially all of the assets of the applicable Guarantor (including by way of merger, consolidation, amalgamation or combination) to a Person that is not (either before or after giving effect to such transaction), the Company or a Restricted Subsidiary of the Company, if such sale, disposition or transfer does not violate Section 4.10;

141

**494**

(2)    in connection with the sale, disposition or transfer of the Capital Stock of the applicable Guarantor or any holding company of such Guarantor to a Person that is not (either before or after giving effect to such transaction) the Company or a Restricted Subsidiary of the Company, if (i) after giving effect to such sale, disposition or transfer, such Guarantor is no longer a Subsidiary of the Company and (ii) the sale, disposition or transfer does not violate Section 4.10;

(3)    upon the defeasance or discharge of the Notes, the Guarantees and this Indenture as provided in Article 8 or Article 13, in each case, in accordance with the terms of this Indenture;

(4)    if the Company designates the applicable Guarantor as an Unrestricted Subsidiary and such designation complies with the other applicable provisions of this Indenture;

(5)    in accordance with the Intercreditor Agreement and to the extent applicable any Additional Intercreditor Agreement;

(6)    as described under Article 9;

(7)    as a result of a transaction permitted under Article 5;

(8)    in connection with the implementation of a Permitted Reorganization;

(9)    upon repayment in full of the Notes; or

(10)    in the case of any Restricted Subsidiary of the Company that after the Issue Date is required to guarantee the Notes pursuant to Section 4.16, upon the release or discharge of the Guarantee of Indebtedness by such Restricted Subsidiary which resulted in the obligation to Guarantee the Notes so long as no Event of Default would result and *provided* that such Restricted Subsidiary does not Guarantee any other Indebtedness of the Issuer or any Guarantor,

*provided* that, in each case, the Company or the applicable Guarantor has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent provided for in this Indenture relating to such release have been complied with.

In addition, the Guarantee of the Company will be released in the circumstances described in clauses (3), (6), (7), (8) and (9) of this Section 11.06.

Upon the occurrence giving rise to a release as specified in this Section 11.06, the Trustee shall take all reasonably necessary actions, including the granting of releases or waivers under the Intercreditor Agreement and to the extent applicable any Additional Intercreditor Agreement, to effectuate or evidence any release in accordance with this Article 11, subject to customary protections and indemnifications. Neither the Issuer, the Trustee nor any Guarantor will be required to make a notation on the Notes to reflect any such release, termination or discharge. Each Holder, by accepting a Note, will be deemed to have consented to such actions by the Trustee.

ARTICLE 12
RESERVED

ARTICLE 13
SATISFACTION AND DISCHARGE

Section 13.01 *Satisfaction and Discharge*.

This Indenture, the Notes, the Guarantees and the Collateral and any related defaults will be discharged and will cease to be of further effect, when:

(1)    either:

(A)    all Notes that have been authenticated and delivered, except lost, stolen or destroyed Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust and thereafter repaid to the Issuer, have been delivered to the Paying Agent or Trustee for cancellation; or

(B)    all Notes that have not been delivered to the Paying Agent or Trustee for cancellation have become due and payable by reason of the making of a notice of redemption or otherwise or will become due and payable by reason of the making of a notice of redemption or otherwise within one year and the Issuer or a Guarantor has irrevocably deposited or caused to be deposited with the Trustee, or such other entity designated by the Trustee for this purpose, as trust funds in trust solely for the benefit of the Holders, cash in U.S. Dollars, non-callable U.S. Dollar-denominated Government Obligations or a combination of cash in U.S. Dollars or non-callable U.S. Dollar-denominated Government Obligations, in amounts as will be sufficient without consideration of reinvestment, to pay and discharge the entire Indebtedness on the Notes not delivered to the Trustee for cancellation for principal, premium and Additional Amounts, if any, and accrued interest to the date of maturity or redemption;

(2)    the Issuer or any Guarantor has paid or caused to be paid all sums payable by it under this Indenture; and

(3)    the Issuer has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes issued hereunder at maturity or on the redemption date, as the case may be; *provided* that, if requested by the Issuer, the Trustee may distribute any amounts deposited in trust to the Holders prior to the maturity or the redemption date, as the case may be, *provided, however*, that the Holders shall have received at least five Business Days' notice from the Issuer of such earlier payment date (which may be included in a notice of redemption); *provided, further* that, for the avoidance of doubt, the Trustee shall not distribute such amounts deposited in the trust to Holders prior to the fifth Business Day following the date of publication of any such redemption notice, to the extent applicable.  The Trustee shall not be liable to any Person (including, without limitation, any Holders) for making any payments at the request of the Issuer and the indemnities from the Issuer and/or Guarantors contained in this Indenture shall extend to any actions of the Trustee taken, and any losses and liabilities Incurred by the Trustee (including, without limitation, any claim that may be brought by Holders), in connection with such request.

143

**496**

In addition, the Issuer must deliver an Officer's Certificate and an Opinion of Counsel to the Trustee stating that all conditions precedent to satisfaction and discharge have been satisfied; *provided* that any such counsel may rely on any Officer's Certificate as to matters of fact (including as to compliance with clauses (1), (2) and (3)) of this Section 13.01.

Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to Section 13.01(1)(B), Section 13.02 and Section 8.06 will survive. In addition, nothing in this Section 13.01 will be deemed to discharge those provisions of Section 7.06, that, by their terms, survive the satisfaction and discharge of this Indenture.

Section 13.02    *Application of Trust Money*.

Subject to Section 8.06, all money deposited with the Trustee pursuant to Section 13.01 shall be held in trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through any Paying Agent (including the Issuer acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the principal of, premium on, if any, interest and Additional Amounts, if any, for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

If the Trustee or Paying Agent is unable to apply any money or Government Obligations, as applicable, in accordance with Section 13.01 by reason of any legal proceeding or by reason of any order or judgment of any court or governmental authority enjoining, restraining or otherwise prohibiting such application, the Issuer's and the Guarantors' obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 13.01; *provided* that if the Issuer has made any payment of principal of, premium on, if any, interest and Additional Amounts, if any, on, the Notes because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Obligations, as applicable, held by the Trustee or Paying Agent.

ARTICLE 14
MISCELLANEOUS

Section 14.01    *Notices*.

Any notice or communication by the Issuer, the Trustee, the Security Agent, the Paying Agent or the Transfer Agent to the others is duly given if in writing and delivered in Person or by first class mail (registered or certified, return receipt requested), facsimile transmission, electronic mail or overnight air courier guaranteeing next day delivery, to the others' address:

If to the Issuer:

> **KCA DEUTAG UK Finance plc**
> c/o KCA DEUTAG Alpha Limited
> Bankhead Drive
> City South Office Park
> Portlethen

144

Aberdeenshire AB12 4XX
United Kingdom
Attention: Jan Hetherington, Head of Corporate Development and Treasury

With a copy to:

**Allen & Overy LLP**
Address: One Bishops Square, London E1 6AD, United Kingdom
Facsimile:  +44 20 3088 2536
Attention:  Kevin Muzilla

If to the Trustee:

**Lucid Trustee Services Limited**
Address: 6th Floor, No 1 Building 1-5 London Wall Buildings, London Wall,
London, United Kingdom, EC2M 5PG
Facsimile: + 44 2030024691 / + 44 844 507 0945
Attention: Lucid Agency and Trustee Services Limited (deals@lucid-ats.com)

If to the Security Agent:

**Lucid Trustee Services Limited**
Address: 6th Floor, No 1 Building 1-5 London Wall Buildings, London Wall,
London, United Kingdom, EC2M 5PG
Facsimile: + 44 2030024691 / + 44 844 507 0945
Attention: Lucid Agency and Trustee Services Limited (deals@lucid-ats.com)

If to the Paying Agent, Registrar or Transfer Agent:

**Lucid Agency Services Limited**
Address: 6th Floor, No 1 Building 1-5 London Wall Buildings, London Wall,
London, United Kingdom, EC2M 5PG
Facsimile: + 44 2030024691 / + 44 844 507 0945
Attention: Lucid Agency and Trustee Services Limited (deals@lucid-ats.com)

The Issuer, the Trustee, the Security Agent, the Paying Agent or the Transfer Agent, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

All notices and communications shall be in the English language.

All notices and communications (other than those sent to Holders) will be deemed to have been duly given:  at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if transmitted by electronic mail or facsimile; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

All notices to the Holders (while any Notes are represented by one or more Global Notes) shall be delivered to the Common Depositary for communication to entitled account holders.  So long as the Notes are listed on the Official List of Exchange and the rules of the Exchange so require, all notices to Holders will also be published to the extent and in the

145

**498**

manner permitted by such rules.  If publication as provided above is not practicable, notice will be given in such other manner, and shall be deemed to have been given on such date, as the Trustee may approve.  In the case of Definitive Registered Notes, notices will be mailed to Holders by first-class mail at their respective addresses as they appear on the records of the Registrar, unless stated otherwise in the register kept by, and at the registered office of the Issuer.

Notices given by publication will be deemed given on the first date on which publication is made.  Notices delivered to the Common Depositary will be deemed given on the date when delivered.  Notices given by first class mail, postage paid, will be deemed given five calendar days after mailing whether or not the addressee receives it.

If a notice or communication is mailed or published in the manner provided above within the time prescribed, it is duly given, whether or not the addressee receives it.

If the Issuer mails a notice or communication to Holders, it will mail a copy to the Trustee and each Agent at the same time.

Section 14.02  *Communications*

(a)    Communications by Holders with Other Holders.

Holders may communicate pursuant to TIA §312(b), as if this Indenture were required to be qualified under the TIA, with other Holders with respect to their rights under this Indenture or the Notes.

(b)    Communications with the Trustee.

In no event shall the Trustee or the Agents be liable for any Losses arising from the Trustee or the Agent receiving or transmitting any data from the Issuer or the Company, any Authorized Person or Officer or any party to the transaction via any non-secure method of transmission or communication, such as, but without limitation, by facsimile or email.

The parties hereto accept that some methods of communication are not secure and the Trustee or the Agent shall incur no liability for receiving instructions via any such non-secure method.  The Trustee or the Agent is authorized to comply with and rely upon any such notice, instructions or other communications believed by it to have been sent or given by an Authorized Person or Officer or an appropriate party to the transaction (or authorized representative thereof).  The Issuer, the Company or authorized officer of the Issuer or the Company shall use all reasonable endeavors to ensure that instructions transmitted to the Trustee or an Agent pursuant to this Indenture are complete and correct.  Any instructions shall be conclusively deemed to be valid instructions from the Issuer, the Company or authorized officer of the Issuer or the Company to the Trustee or such Agent for the purposes of this Indenture.

Section 14.03  *Certificate and Opinion as to Conditions Precedent*.

Upon any request or application by the Issuer to the Trustee to take any action under this Indenture, the Issuer shall furnish to the Trustee:

(1)    an Officer's Certificate in form and substance reasonably satisfactory to the Trustee (which must include the statements set forth in Section 14.04) stating that,

146

**499**

in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

(2)     an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which must include the statements set forth in Section 14.04) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

Section 14.04   *Statements Required in Certificate or Opinion*.

Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(1)     a statement that the Person making such certificate or opinion has read such covenant or condition;

(2)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)     a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to enable him or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(4)     a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

Section 14.05   *Rules by Trustee and Agents*.

The Trustee may make reasonable rules for action by or at a meeting of Holders.  The Registrar or Paying Agent may make reasonable rules and set reasonable requirements for its functions.

Section 14.06   *Agent for Service; Submission to Jurisdiction; Waiver of Immunities*.

The Issuer and each of the Guarantors irrevocably and unconditionally:

(1)     submits itself and its property in any legal action or proceeding relating to this Indenture to which it is a party, or for recognition and enforcement of any judgment in respect hereof, to the general jurisdiction of the Courts of the State of New York, sitting in the Borough of Manhattan, The City of New York, the courts of the United States of America for the Southern District of New York, appellate courts from any thereof and courts of its own corporate domicile, with respect to actions brought against it as defendant;

(2)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same and waives any right to trial by jury;

147

**500**

(3)     appoints Cogency Global, Inc., 10 East 40th Street, 10th Floor, New York, New York 10016, USA, as its agent to receive on its behalf service of all process ("*Authorized Agent*") in any such action or proceeding, such service being hereby acknowledged by the Issuer to be effective and binding in every respect. Such appointment shall be irrevocable unless and until replaced by an agent reasonably acceptable to the Trustee.

The Issuer and each of the Guarantors represents and warrants that the Authorized Agent has agreed to act as said agent for service of process, and the Issuer agrees to take any and all action, including the filing of any and all documents and instruments, that may be necessary to continue such appointment in full force and effect as aforesaid.  Service of process upon the Authorized Agent and written notice of such service to the Issuer shall be deemed, in every respect, effective service of process upon the Issuer and the Guarantors.

Section 14.07 *No Personal Liability of Directors, Officers, Employees and Stockholders*.

No director, officer, employee, incorporator or stockholder of the Issuer, the Company or any other Guarantor, as such, will have any liability for any obligations of the Issuer, the Company or any other Guarantor under the Notes, this Indenture, the Guarantees, the Intercreditor Agreement or the Collateral Documents or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws of the United States.

Section 14.08  *Governing Law*.

THE INTERNAL LAW OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS INDENTURE AND THE NOTES AND THE GUARANTEES WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

Section 14.09 *No Adverse Interpretation of Other Agreements*.

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of any other Person.  Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

Section 14.10  *Successors*.

All agreements of the Issuer in this Indenture and the Notes will bind its successors.  All agreements of the Company in this Indenture and the Notes will bind its successors.  All agreements of the Trustee in this Indenture will bind its successors.  All agreements of each Guarantor in this Indenture will bind its successors, except as otherwise provided in Section 11.07.

Section 14.11  *Severability*.

In case any provision in this Indenture or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired thereby.

Section 14.12  *Counterpart Originals*.

The parties may sign any number of copies of this Indenture.  Each signed copy will be an original, but all of them together represent the same agreement.

Section 14.13  *Table of Contents, Headings, etc*.

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been inserted for convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or provisions hereof.

Section 14.14  *Judgment Currency*.

Any payment on account of an amount that is payable in U.S. Dollars (the "*Required Currency*"), which is made to or for the account of any Holder or the Trustee in lawful currency of any other jurisdiction (the "*Judgment Currency*"), whether as a result of any judgment or order or the enforcement thereof or the liquidation of the Issuer or a Guarantor, shall constitute a discharge of the Issuer's or the Guarantor's obligations under this Indenture and the Notes or the Guarantees, as the case may be, only to the extent of the amount of the Required Currency which such Holder or the Trustee, as the case may be, could purchase in the London foreign exchange markets with the amount of the Judgment Currency in accordance with normal banking procedures at the rate of exchange prevailing on the first Business Day following receipt of the payment in the Judgment Currency.  If the amount of the Required Currency that could be so purchased is less than the amount of the Required Currency originally due to such Holder or the Trustee, as the case may be, the Issuer shall indemnify and hold harmless the Holder or the Trustee, as the case may be, from and against all loss or damage arising out of, or as a result of, such deficiency.  This indemnity shall constitute an obligation separate and independent from the other obligations contained in this Indenture or the Notes, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by any Holder or the Trustee from time to time and shall continue in full force and effect notwithstanding any judgment or order for a liquidated sum in respect of an amount due hereunder or under any judgment or order.

Section 14.15  *Prescription*.

Claims against the Issuer or any Guarantor for the payment of principal, premium or Additional Amounts, if any, on the Notes will be prescribed ten years after the applicable due date for payment thereof.  Claims against the Issuer or any Guarantor for the payment of interest on the Notes will be prescribed five years after the applicable due date for the payment of interest.

Section 14.16  *Additional Information*.

Any Holder or beneficial owner of the Notes may obtain a copy of this Indenture, the form of Note, the Guarantees, the Collateral Documents, the Intercreditor Agreement and any

149

**502**

Additional Intercreditor Agreement without charge by writing to the Issuer and/or the Company at the addresses below:

> KCA DEUTAG UK Finance plc
> 1 Park Row
> Leeds LS1 5AB
> United Kingdom
>
> KCA DEUTAG Alpha Limited
> Bankhead Drive
> City South Office Park
> Portlethen, Aberdeenshire AB12 4XX
> United Kingdom

Section 14.17 *Scheme and Structure Memorandum*

None of the steps or actions set out in, or reorganizations expressly contemplated by, the Structure Memorandum (or the steps or actions necessary to implement any of them) and none of the steps or actions taken or to be taken with respect to the Scheme (including any proceedings commenced with respect to the recognition of the judgment of the High Court of England and Wales in any jurisdiction) and/or the Restructuring Implementation Deed (including any document ancillary thereto) shall constitute a breach of any representation, warranty or undertaking in this Indenture, the Notes, the Intercreditor Agreement, any Additional Intercreditor Agreement or any Collateral Document or result in the occurrence of a Default or an Event of Default and any intermediate steps in any such reorganization which are not specified in the Structure Memorandum, but which are necessary to achieve the steps, actions or reorganizations expressly contemplated, shall not be prohibited by any of this Indenture, the Notes, the Intercreditor Agreement, any Additional Intercreditor Agreement or any Collateral Document.

*[Signatures on following page]*

## SIGNATURES

Dated as of the date first written above.

KCA DEUTAG UK FINANCE PLC
as the Issuer

By:    _____
Name:
Title:

KCA DEUTAG ALPHA LIMITED
as the Company

By:    _____
Name:
Title:

ABBOT GROUP LIMITED
as the Guarantor

By:    _____
Name:
Title:

ABBOT HOLDINGS LIMITED
as the Guarantor

By:    _____
Name:
Title:

KCA DEUTAG (LAND RIG) LIMITED
as the Guarantor

By:    _____
Name:
Title:

KCA DEUTAG CASPIAN LIMITED
as the Guarantor

By:    _____
Name:
Title:

KCA DEUTAG DRILLING GROUP LIMITED
as the Guarantor

*(Signature Page to Indenture)*

**504**

By: _____
Name:
Title:

KCA EUROPEAN HOLDINGS LIMITED
as the Guarantor

By: _____
Name:
Title:

ABBOT VERWALTUNGSGESELLSCHAFT
MBH
as the Guarantor

By: _____
Name:
Title:
BENTEC GMBH DRILLING & OILFIELD
SYSTEMS
as the Guarantor

By: _____
Name:
Title:

KCA DEUTAG DRILLING GMBH
as the Guarantor

By: _____
Name:
Title:

KCA DEUTAG GMBH
as the Guarantor

By: _____
Name:
Title:

KCA DEUTAG TIEFBOHRGESELLSCHAFT
MBH
as the Guarantor

By: _____
Name:
Title:

KCA DEUTAG EUROPE B.V.

*(Signature Page to Indenture)*

**505**

as the Guarantor

By:   _____
Name:
Title:

KCA DEUTAG NEDERLAND B.V.
as the Guarantor

By:   _____
Name:
Title:

ABBOT HOLDINGS NORGE AS
as the Guarantor

By:   _____
Name:
Title:

KCA DEUTAG DRILLING NORGE AS
as the Guarantor

By:   _____
Name:
Title:

KCA DEUTAG DRILLING OFFSHORE
SERVICES AS
as the Guarantor

By:   _____
Name:
Title:

KCA DEUTAG HOLDINGS NORGE AS
as the Guarantor

By:   _____
Name:
Title:

KCA DEUTAG MODU OPERATIONS AS
as the Guarantor

By:   _____
Name:
Title:

KCA DEUTAG OFFSHORE AS

*(Signature Page to Indenture)*

**506**

as the Guarantor

By:   _____
Name:
Title:

KCA DEUTAG ENERGY GLOBAL LLC
as the Guarantor

By:   _____
Name:
Title:

KCA DEUTAG ENERGY INTERNATIONAL
LLC
as the Guarantor

By:   _____
Name:
Title:

KCA DEUTAG ENERGY LLC
as the Guarantor

By:   _____
Name:
Title:

KCA DEUTAG DRILLING LLC
as the Guarantor

By:   _____
Name:
Title:

KCA DEUTAG RUSSIA LLC
as the Guarantor

By:   _____
Name:
Title:

KCA DEUTAG GULF DRILLING LIMITED
COMPANY
as the Guarantor

By:   _____
Name:
Title:

*(Signature Page to Indenture)*

**507**

KCA DEUTAG DRILLING LIMITED
as the Guarantor

By:      _____
Name:
Title:

KCA DEUTAG TECHNICAL SUPPORT
LIMITED
as the Guarantor

By:      _____
Name:
Title:

SET DRILLING COMPANY LIMITED
as the Guarantor

By:      _____
Name:
Title:

*(Signature Page to Indenture)*

LUCID TRUSTEE SERVICES LIMITED
as Trustee

By:_____

    Name:

    Title:

LUCID AGENCY SERVICES LIMITED
as Paying Agent, Registrar and Transfer Agent

By:_____

    Name:

    Title:

*(Signature Page to Indenture)*

**510**

LUCID TRUSTEE SERVICES LIMITED
as Security Agent

By:_____

    Name:
    Title:

*(Signature Page to Indenture)*

**511**

## EXHIBIT A

### FORM OF NOTE

### KCA DEUTAG UK FINANCE PLC

9.875% Senior Secured Notes due 2025

No. ___

ISIN: _____
Common Code: _____

$ _____

Issue Date: _____

KCA DEUTAG UK FINANCE PLC, organized and established as a public limited company under the laws of England and Wales, having its registered office at 1 Park Row, Leeds, LS1 5AB, United Kingdom, for value received promises to pay to _____, or registered assigns, upon surrender hereof, the principal sum of $_____, subject to any adjustments listed on the Schedule of Exchanges of Interests in the Global Note attached hereto, on December 1, 2025.

Interest Payment Dates: June 1 and December 1, commencing June 1, 2021.

Record Dates:  One Clearing System Business Day immediately preceding the relevant Interest Payment Date.

Reference is hereby made to the further provisions of this Note set forth herein and the provisions of the Indenture, which further provisions shall for all purposes have the same effect as if set forth at this place.

*[Insert the Original Issue Discount Legend, if applicable]*.

**512**

**IN WITNESS WHEREOF**, the parties hereto have caused this Note to be signed manually or by facsimile by the duly authorized officers referred to below.

**KCA DEUTAG UK FINANCE PLC**

By: _____
      Name:
      Title:

This is one of the Notes referred to in the within-mentioned Indenture.

**LUCID AGENCY SERVICES LIMITED,** not in its personal capacity but in its capacity as authenticating agent with respect to the Notes appointed by the Trustee, LUCID TRUSTEE SERVICES LIMITED.


By:     _____
                Name:
                Title:

## KCA DEUTAG UK FINANCE PLC

9.875% SENIOR SECURED NOTES DUE 2025

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]*

Capitalized terms used herein shall have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

*(1) INTEREST.* KCA DEUTAG UK FINANCE PLC, organized and established as a public limited company under the laws of England and Wales, having its registered office at 1 Park Row, Leeds, LS1 5AB, United Kingdom, promises to pay interest on the principal amount of this Note at 9.875% per annum from [●], 2020 until maturity. The Issuer will pay interest semi-annually in arrears on June 1 and December 1 of each year, or if any such day is not a Business Day, on the next succeeding Business Day (each an "*Interest Payment Date*"). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; *provided* that if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeeding Interest Payment Date, interest shall accrue from such next succeeding Interest Payment Date; *provided, further*, that the first Interest Payment Date shall be June 1, 2021. The Issuer will, to the extent lawful, pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principal and premium, if any, from time to time on demand at a rate that is 1% per annum in excess of the rate then in effect; it shall pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Amounts (without regard to any applicable grace periods) from time to time on demand at the same rate to the extent lawful. Interest will be computed on the basis of a 360-day year of twelve 30-day months.

*(2) METHOD OF PAYMENT.* The Issuer will pay interest on the Notes (except defaulted interest) to the Persons who are registered Holders at the close of business on the Clearing System Business Day preceding the next Interest Payment Date, even if such Notes are cancelled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Indenture with respect to defaulted interest. The Notes will be payable as to principal, interest, premium and Additional Amounts, if any, through the Paying Agent as provided in the Indenture. Such payment shall be in U.S. dollars.

*(3) PAYING AGENT AND REGISTRAR.* Initially, Lucid Agency Services Limited will act as Paying Agent. Lucid Agency Services Limited will act as Registrar and Ogier Corporate Finance Limited will act as the Listing Agent for so long as the Notes are listed on the Official List of the Exchange and the rules and regulations of the Exchange so require. Upon notice to the Trustee, the Issuer may change the Paying Agent, the Registrar or the Transfer Agent without prior notice to the Holders.

*(4) INDENTURE.* The Issuer issued the Notes under an Indenture dated as of [●], 2020, (the "*Indenture*") among the Issuer, the Guarantors, the Trustee, the Security Agent, the Paying Agent, Registrar and the Transfer Agent. The terms of the Notes include those stated in the

**515**

Indenture. The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of such terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shall govern and be controlling.

*(5) OPTIONAL REDEMPTION.*

(a)  Prior to December 1, 2022, the Issuer may on any one or more occasions redeem up to 40% of the aggregate principal amount of Notes issued under the Indenture upon giving not less than 10 nor more than 60 days' notice, at a redemption price equal to 109.875% of the principal amount of the Notes redeemed, plus accrued and unpaid interest and Additional Amounts, if any, to, but not including, the date of redemption of the Notes (subject to the rights of Holders on the relevant record date to receive interest on the relevant interest payment date), with the net cash proceeds of one or more Equity Offerings, *provided* that:

(1)  at least 50% of the aggregate principal amount of the Notes under the Indenture remains outstanding immediately after the occurrence of such redemption; and

(2)  the redemption occurs within 180 days of the date of the closing of such Equity Offering.

(b)  At any time prior to December 1, 2022, the Issuer may on any one or more occasions redeem, in whole or in part, the Notes, upon giving not less than 10 nor more than 60 days' prior written notice to the Holders, at a redemption price equal to 100% of the principal amount of Notes to be redeemed, plus the Applicable Premium (as calculated by the Issuer) as of, and accrued and unpaid interest and Additional Amounts, if any, on the Notes being redeemed to, but not including, the redemption date (subject to the rights of Holders on the relevant record date to receive interest on the relevant Interest Payment Date).

(c)  Except pursuant to clause (a) and (b) in this Paragraph 5 and except as pursuant to Paragraph 6 or Paragraph 7, the Notes may not be redeemed, in whole or in part, at the option of the Issuer prior to December 1, 2022; *provided*, *however*, that the Issuer, the Company or any Restricted Subsidiary may acquire the Notes by means other than a redemption, whether by open market purchases, negotiated transactions or otherwise, in accordance with applicable securities laws so long as (A) such acquisition does not otherwise violate the terms of the Indenture and (B) such acquired Notes will not be deemed to be outstanding and the Company and its Restricted Subsidiaries and affiliates shall not be entitled to any of the voting rights provided to Holders under the Indenture.

(d)  On or after December 1, 2022, the Issuer may on any one or more occasions redeem, in whole or in part, the Notes upon giving not less than 10 nor more than 60 days' prior written notice to the Holders, at the prices (expressed as percentages of the outstanding principal amount on the redemption date) set forth below, plus accrued and unpaid interest and Additional Amounts, if any, on the Notes redeemed, to, but not including, the applicable redemption date if repaid during the period beginning on the dates indicated below (subject to the right of Holders on the relevant record date to receive interest on the relevant Interest Payment Date):

<u>Year</u>

| | |
|---|---|
| December 1, 2022 ............................................................................. | 104.938% |
| December 1, 2023 ............................................................................. | 102.469% |
| December 1, 2024 and thereafter ..................................................... | 100.000% |

(e) In addition, at any time prior to December 1, 2022, upon not less than 10 nor more than 60 days' notice, the Issuer may redeem, during each twelve-month period commencing on the Issue Date, up to 10% of the original principal amount of the Notes (including the original principal amount of any Additional Notes of the same series) at a redemption price equal to 103% of the principal amount redeemed, plus accrued and unpaid interest and Additional Amounts, if any, to, but not including, the applicable redemption date (subject to the right of Holders of record on the relevant record date to receive interest due on the relevant interest payment date).

(f) In connection with any tender offer for, or other offer to purchase, the Notes, if holders of not less than 90% in aggregate principal amount of the outstanding Notes validly tender and do not withdraw such Notes in such tender offer and the Issuer, or any third party making such a tender offer in lieu of the Issuer, purchases all of the Notes validly tendered and not withdrawn by such holders, the Issuer or such third party will have the right upon not less than 10 nor more than 60 days' prior notice to the holders of the Notes, given not more than 30 days following such purchase date, to redeem all Notes that remain outstanding following such purchase at a price equal to the price paid to each other holder in such tender offer (other than any incentive payment for early tenders), plus, to the extent not included in the tender offer payment, accrued and unpaid interest and Additional Amounts, if any, thereon, to, but not including, the redemption date. In determining whether the holders of at least 90% of the aggregate principal amount of the then outstanding Notes have validly tendered and not withdrawn Notes in a tender offer or other offer to purchase for all of the Notes, as applicable, Notes owned by an Affiliate of the Issuer or by funds controlled or managed by any Affiliate of the Issuer, or any successor thereof, shall be deemed to be outstanding for the purposes of such tender offer or other offer, as applicable.

(g) Unless the Issuer defaults in the payment of the redemption price, interest will cease to accrue on the Notes or portions thereof called for redemption on the applicable redemption date.

(i)    Any redemption or notice may, in the Issuer's discretion, be subject to the satisfaction of one or more conditions precedent.

*(6) REDEMPTION FOR CHANGES IN TAXES.*

The Issuer may redeem the Notes, in whole but not in part, at its discretion at any time upon giving not less than 10 nor more than 60 days' prior notice to Holders (which notice will be irrevocable and given in accordance with Section 3.02 of the Indenture), at a redemption price equal to 100% of the aggregate principal amount thereof, together with accrued and unpaid interest, if any, to the date fixed by the Issuer for redemption (a "*Tax Redemption Date*") and all Additional Amounts (if any) then due and which will become due on the Tax Redemption Date as a result of the redemption or otherwise (and subject to the right of Holders

**517**

on the relevant record date to receive interest due on the relevant interest payment date and Additional Amounts (if any) in respect thereof), if the Issuer or a Guarantor, as the case may be, on the next date on which any amount would be payable in respect of the Notes or any Guarantee, is or would be required to pay Additional Amounts, and the Issuer or the relevant Guarantor (but, in the case of a Guarantor, only if the payment giving rise to such requirement cannot be made by the Issuer or another Guarantor, who can make such payment without the obligation to pay Additional Amounts) cannot avoid any such payment obligation by taking reasonable measures available (including making payment through a Paying Agent located in another jurisdiction), as a result of:

> (i)   any change in, or amendment to, the laws (or any regulations or rulings promulgated thereunder) of the relevant Tax Jurisdiction affecting taxation which change or amendment has not been publicly announced before the Issue Date and becomes effective on or after the Issue Date (or, if a Tax Jurisdiction has been added since the Issue Date the date on which that Tax Jurisdiction became a Tax Jurisdiction under the Indenture); or

> (ii)   any change in, or amendment to, the existing official written position regarding the application, administration or interpretation of such laws, regulations or rulings (including a holding, judgment or order by a court of competent jurisdiction or a change in published practice), which change, amendment, application or interpretation has not been publicly announced before the Issue Date and becomes effective on or after the Issue Date (or, if a Tax Jurisdiction has been added since the Issue Date, the date on which that Tax Jurisdiction became a Tax Jurisdiction under the Indenture).

The Issuer will not give any such notice of redemption earlier than 60 days prior to the earliest date on which the Issuer, or Guarantor, as the case may be, would be obligated to make such payment or withholding if a payment in respect of the Notes or any Guarantee were then due. Prior to the publication or, where relevant, mailing of any notice of redemption of the Notes pursuant to the foregoing, the Issuer will deliver to the Trustee an Opinion of Counsel, the choice of such counsel to be subject to the prior written approval of the Trustee (such approval not to be unreasonably withheld), to the effect that there has been such change or amendment which would obligate the Issuer or a Guarantor to make such payment or withholding and an Officer's Certificate to the effect that the Issuer or Guarantor, as the case may be, cannot avoid such payment or withholding by taking reasonable measures available to it. For the avoidance of doubt, reasonable measures shall not include anything which has any material impact on the business of the Issuer or Guarantor, or which would cause the Issuer or Guarantor to Incur any material costs. The Trustee shall be entitled to rely on such Opinion of Counsel and Officer's Certificate as sufficient evidence of the conditions as described in this Paragraph 6, in which event it will be conclusive and binding on all Holders.

Any redemption and notice described in this Paragraph 6 will be subject to the receipt by the Issuer or any Paying Agent of sufficient funds from the Issuer to pay the full redemption price payable to the Holders on or before the Tax Redemption Date.

*(7) [RESERVED]*

*(8) MANDATORY REDEMPTION.* The Issuer is not required to make mandatory redemption payments or sinking fund payments with respect to the Notes.

**518**

*(9)  REPURCHASE AT OPTION OF HOLDER.*

(a)  Upon the occurrence of a Change of Control Triggering Event, the Issuer will make an offer (a "*Change of Control Offer*") to each Holder to repurchase all or any part (in integral multiples of $1; *provided* that Notes of $1,000 in aggregate principal amount or less may only be redeemed in whole and not in part) of that Holder's Notes at a purchase price in cash equal to 101% of the aggregate principal amount of the Notes repurchased plus accrued and unpaid interest and Additional Amounts, if any, on the Notes repurchased to, but not including, the date of purchase (the "*Change of Control Payment*") (subject to the rights of Holders on the relevant record date to receive interest on the relevant interest payment date); *provided, however*, that the Issuer shall not be obliged to repay Notes as described under this provision, in the event and to the extent that it has unconditionally exercised its right to redeem all of the Notes in accordance with the Indenture, or all conditions to such redemption have been satisfied or waived.

(b)  Any Net Proceeds from Asset Sales that are not applied, invested or subject to a Notes Offer as provided in the Indenture will constitute "*Excess Proceeds*". When the aggregate amount of Excess Proceeds exceeds the greater of $45.0 million and 20.0% of Consolidated EBITDA, within ten Business Days thereof or at any earlier time at the Issuer's election, the Issuer will make an offer to all Holders (an "*Asset Sale Offer*"), and (at the Issuer's election) all holders of other Indebtedness that is *pari passu* with the Notes or any Guarantees to purchase, prepay or redeem with the proceeds of sales of assets the maximum principal amount of Notes and such other Pari Passu Indebtedness (plus all accrued interest on the Indebtedness and the amount of all fees and expenses, including premiums, Incurred in connection therewith) that may be purchased, prepaid or redeemed out of the Excess Proceeds. The offer price in any Asset Sale Offer will be equal to (solely in the case of the Notes) 100% of the principal amount of the Notes and (solely in the case of Pari Passu Indebtedness) no greater than 100% of the principal amount (or accreted value, as applicable) of such Pari Passu Indebtedness, *plus*, in each case, accrued and unpaid interest to, but excluding, the date of repayment and will be payable in cash. If any Excess Proceeds remain after consummation of an Asset Sale Offer or any Net Proceeds subject to a Notes Offer remain after consummation of a Notes Offer, the Company and its Restricted Subsidiaries may use those Excess Proceeds or Net Proceeds for any purpose not otherwise prohibited by the Indenture. If the aggregate principal amount of Notes and other Pari Passu Indebtedness tendered into (or to be prepaid or redeemed in connection with) such Asset Sale Offer exceeds the amount of Excess Proceeds or if the aggregate principal amount of Notes tendered pursuant to a Notes Offer exceeds the amount of the Net Proceeds so applied, the Notes and such other Pari Passu Indebtedness to be prepaid or redeemed shall be prepaid or redeemed on a *pro rata* basis based on the principal amount of Notes and such other Pari Passu Indebtedness presented for purchase. The Notes to be prepaid or redeemed will be selected, if applicable, in the manner described under Section 3.02 of the Indenture. Upon completion of each Asset Sale Offer, the amount of Excess Proceeds will be reset at zero. For the avoidance of doubt, the Issuer may make an Asset Sale Offer prior to the expiration of the 365-day period referred to above.

To the extent that any portion of Net Proceeds payable in respect of the Notes is denominated in a currency other than U.S. Dollars, the amount thereof payable in respect of such Notes shall not exceed the net amount of funds in U.S. Dollars that is actually received by the Issuer upon converting such portion of the Net Proceeds into U.S. Dollars.

*(10) NOTICE OF REDEMPTION.*

At least 10 days but not more than 60 days before a redemption date, the Issuer will mail or cause to be mailed (with a copy to the Trustee and Paying Agent), by first class mail or electronically, a notice of redemption to each Holder whose Notes are to be redeemed at its registered address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance of the Notes or a satisfaction and discharge of the Indenture. If the Notes are at such time listed on the Exchange, the Issuer shall inform the Exchange of the principal amount of the Notes that have not been redeemed in connection with any optional redemption.

*(11) DENOMINATIONS, TRANSFER, EXCHANGE.*

(a) [The Global Notes are in global registered form without coupons attached. The Global Notes will represent the aggregate principal amount of all the Notes issued and not yet cancelled other than Definitive Registered Notes. A Holder may transfer or exchange Global Notes in accordance with the Indenture.][1]

(b) [The Definitive Registered Notes are in registered form without coupons attached in denominations of $1,000 and integral multiples of $1 above $1,000. A Holder may transfer or exchange Definitive Registered Notes in accordance with the Indenture. The Indenture requires a Holder, among other things, to furnish appropriate endorsements and transfer documents. The Issuer shall not be required to register the transfer into its register kept at its registered office of any Definitive Registered Notes: (A) for a period of 15 calendar days prior to any date fixed for the redemption of the Notes under Section 3.02 of the Indenture; (B) for a period of 15 calendar days immediately prior to the date fixed for selection of Notes to be redeemed in part; (C) for a period of 15 calendar days prior to the record date with respect to any interest payment date; or (D) which the Holder has tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer or an Asset Sale Offer. Any such transfer will be made without charge to the Holder, other than any taxes, duties and governmental charges payable in connection with such transfer.][2]

*(12) PERSONS DEEMED OWNERS.* The registered Holder of a Note may be treated as its owner for all purposes.

*(13) AMENDMENT, SUPPLEMENT AND WAIVER.* Except as provided in Section 9.02 of the Indenture, the Issuer, the Guarantors, the Trustee and the Security Agent may amend or supplement the Notes Documents (including, without limitation, Section 3.09, Section 4.10 and Section 4.15 of the Indenture) or waive any of the terms of any of the Notes Documents with the consent of the Issuer and Holders of at least a majority in aggregate principal amount of the then outstanding Notes voting as a single class (including, without limitation, consents obtained in connection with a tender offer, exchange offer or purchase of the Notes), and, subject to Section 6.05 and Section 6.08 of the Indenture, any existing Default or Event of Default or compliance with any provision of the Notes Documents may be waived with the consent of the Issuer and Holders of a majority in aggregate principal amount of the then outstanding Notes (including, without limitation, consents obtained in connection with a tender offer, exchange offer or purchase of the Notes). Notwithstanding Section 9.02 of the Indenture, without the consent of any Holder, the Issuer, the Guarantors, the Trustee and the Security

---

[1] Include in any Global Note.

[2] Include in any Definitive Registered Note.

**520**

Agent (as applicable and to the extent each is a party to the relevant document) may amend or supplement the Notes Documents: to cure any ambiguity, defect or inconsistency; to provide for uncertificated Notes in addition to or in place of certificated Notes, provided that such uncertificated Notes are issued in registered form for purposes of Section 163(f) of the Code; to release any Collateral or Guarantee in accordance with the terms set forth in the Indenture; to provide for the assumption of the Issuer or a Guarantor's obligations under the Notes Documents by a successor to the Issuer or Guarantor in the case of a merger or consolidation or sale of all or substantially all of the Issuer's or such the Guarantor's assets in accordance with the terms of the Indenture, as applicable; to make any change that would provide any additional rights or benefits to the Holders or that does not adversely affect the legal rights hereunder of any Holder in any material respect; to allow any Restricted Subsidiary to become a Guarantor in accordance with the Indenture, to add Guarantees with respect to the Notes, to add security to or for the benefit of the Notes, or to effect, confirm and evidence the release, termination or discharge of any Guarantee or Lien (including the Collateral and the Collateral Documents) with respect to or securing the Notes in accordance with the terms of the Indenture; to allow any Guarantor to execute a supplemental indenture and/or a Guarantee with respect to the notes; to enter into additional or supplemental Collateral Documents; to provide for the issuance of Additional Notes in accordance with the limitations set forth in the Indenture; to provide for a successor Trustee or Security Agent in accordance with the terms of the Indenture or to otherwise comply with any requirement of the Indenture; in the case of a Collateral Document, the Intercreditor Agreement and to the extent applicable any Additional Intercreditor Agreement, to Incur Indebtedness or to grant a Lien for the benefit of any Person, in each case with the ranking and priority appropriate thereto, *provided* that the Incurrence of such Indebtedness or the granting of Lien is permitted by the Indenture and Section 4.20 and Section 4.23 thereof are complied with; and to add additional parties to the Intercreditor Agreement or any Collateral Document to the extent permitted hereunder or thereunder. In formulating its opinion on such matters, the Trustee will be entitled to request, receive and rely absolutely on such evidence as it deems appropriate, including Opinions of Counsel and Officer's Certificates, on which the Trustee may solely rely. Upon the request of the Issuer and upon receipt by the Trustee of the documents described in Section 7.02 of the Indenture, the Trustee will join with the Issuer in the execution of any amended or supplemental indenture authorized or permitted by the terms of the Indenture and to make any further appropriate agreements and stipulations that may be therein contained, but the Trustee will not be obligated to enter into such amended or supplemental indenture unless such amended or supplemental indenture directly affects the Trustee's own rights, duties or immunities under the Indenture or otherwise.

*(14)  DEFAULTS AND REMEDIES.* Each of the following is an "*Event of Default*": (1) default for 30 days in the payment when due of interest or Additional Amounts, if any, on the Notes; (2) default in the payment when due (at maturity, upon redemption or otherwise) of the principal of, or premium, if any, on, the Notes; (3) failure by the Company or any of its Restricted Subsidiaries to comply with Section 5.01 of the Indenture; (4) failure by the Company or any of its restricted subsidiaries for 60 days after notice to the Company by the Trustee or the Holders of at least 30% in aggregate principal amount of the Notes then outstanding voting as a single class to comply with any of the other agreements in the Indenture (other than a default in performance, or breach, or a covenant or agreement which is specifically dealt with in clauses (1), (2) or (3) of Section 6.01 of the Indenture) the Notes, the Guarantees, any Collateral Document or the Intercreditor Agreement (or any Additional Intercreditor Agreement entered into pursuant to the terms of the Intercreditor Agreement or the Indenture); (5) default under any mortgage, indenture or instrument under which there may be issued or by which there may

**521**

be secured or evidenced any Indebtedness for money borrowed by the Company or any of its Restricted Subsidiaries (or the payment of which is guaranteed by the Company or any of its Restricted Subsidiaries), whether such Indebtedness or guarantee now exists, or is created after the Issue Date (but excluding Indebtedness owing to the Company or a Restricted Subsidiary), if that default: (A) is caused by a failure to pay principal of such Indebtedness after the expiration of the grace period provided in such Indebtedness upon the Stated Maturity of such Indebtedness (a "*Payment Default*") or results in the acceleration of such Indebtedness prior to its Stated Maturity, and, in each case, the principal amount of any such Indebtedness that is due and has not been paid or which has been accelerated, together with the principal amount of any other such Indebtedness under which there has been a Payment Default or the maturity of which has been so accelerated, aggregates the greater of $45.0 million and 20.0% of Consolidated EBITDA or more; or  (B) results in the enforcement of Collateral with a fair market value in excess of the greater of $45.0 million and 20.0% of Consolidated EBITDA; (6) failure by the Company or any of its Significant Subsidiaries or group of Restricted Subsidiaries that taken as a whole would constitute a Significant Subsidiary to pay final and non-appealable judgments entered by a court or courts of competent jurisdiction aggregating in excess of the greater of $45.0 million and 20.0% of Consolidated EBITDA (net of any amounts which are covered by insurance or bonded), which judgments are not paid, waived, satisfied, discharged or stayed for a period of 60 days; (7) except as permitted by the Indenture, any Guarantee of any Significant Subsidiary or group of Restricted Subsidiaries that taken as a whole would constitute a Significant Subsidiary is held in any judicial proceeding to be unenforceable or invalid or ceases for any reason to be in full force and effect (other than in accordance with the terms of such Guarantee and the Indenture), or any Guarantor, or any Person acting on behalf of any Guarantor, denies or disaffirms its obligations under its Guarantee and such Default continues for 10 days; (8) any security interest under the Collateral Documents with respect to Collateral having a Fair Market Value in excess of the greater of $25.0 million and 10.0% of Consolidated EBITDA shall, at any time, cease to be in full force and effect and constitute a valid and perfected Lien with the priority required for the applicable Collateral Document and the Intercreditor Agreement (other than in accordance with the terms of the relevant Collateral Documents, the Intercreditor Agreement, any Additional Intercreditor Agreement and the Indenture) for any reason other than the satisfaction in full of all Obligations under the Indenture or the release of any such security interest in accordance with the terms of the Indenture, the Intercreditor Agreement, any Additional Intercreditor Agreement or the Collateral Documents or any such security interest created thereunder shall be declared invalid or unenforceable or the Company shall assert in writing that any such security interest is invalid or unenforceable and any such Default continues for 10 days; (9) the Company or any Restricted Subsidiary of the Company that is a Significant Subsidiary or any group of Restricted Subsidiaries that, taken together (as of the latest audited consolidated financial statements for the Company and its Restricted Subsidiaries), would constitute a Significant Subsidiary pursuant to or within the meaning of Bankruptcy Law: (A) commences a voluntary case, (B) consents to the entry of an order for relief against it in an involuntary case, (C) consents to the appointment of a custodian of it or for all or substantially all of its property, (D) makes a general assignment for the benefit of its creditors, or (E) admits in writing its inability to pay its debts generally as they become due; or (10) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: (A) is for relief against the Company or any Restricted Subsidiary of the Company (that is a Significant Subsidiary) or any group of Restricted Subsidiaries of the Company, taken together (as of the latest audited consolidated financial statements for the Company and its Restricted Subsidiaries), would constitute a Significant Subsidiary in an involuntary case; (B) appoints a custodian of the Company or any Restricted Subsidiary of the Company (that is a Significant Subsidiary) or any group of

Restricted Subsidiaries of the Company that, taken together (as of the latest audited consolidated financial statements for the Company and its Restricted Subsidiaries), would constitute a Significant Subsidiary or for all or substantially all of the property of the Company or any Restricted Subsidiary of the Company (that is a Significant Subsidiary) or any group of Restricted Subsidiaries of the Company that, taken together (as of the latest audited consolidated financial statements for the Company and its Restricted Subsidiaries), would constitute a Significant Subsidiary; or (C) orders the liquidation of the Issuer, the Company, any Guarantor or any Restricted Subsidiary of the Company or any group of Restricted Subsidiaries of the Company that, taken together (as of the latest audited consolidated financial statements for Company and its Restricted Subsidiaries), would constitute a Significant Subsidiary, and the order or decree remains unstayed and in effect for 60 consecutive days. In the case of an Event of Default specified in clauses (9) and (10) of Section 6.01 of the Indenture, all outstanding Notes (including accrued interest, if any) will become due and payable immediately without further action or notice.  If any other Event of Default occurs and is continuing, the Trustee may, or the Holders of at least 30% in aggregate principal amount of the then outstanding Notes may and the Trustee shall, if so directed by Holders of at least 30% in aggregate principal amount of the then outstanding Notes, declare all the Notes to be due and payable immediately. Upon any such declaration, the Notes shall become due and payable immediately. The Holders of not less than a majority in aggregate principal amount of the then outstanding Notes by notice to the Trustee may on behalf of the Holders of all of the Notes rescind an acceleration or waive an existing Default or Event of Default and its consequences hereunder, except a continuing Default or Event of Default in the payment of the principal of, premium, if any, interest or Additional Amounts, if any, on the Notes (including in connection with an offer to purchase) (which may only be waived in accordance with clause (5) of Section 9.02 of the Indenture); *provided, however,* that the Holders of a majority in aggregate principal amount of the then outstanding Notes may rescind an acceleration and its consequences, including any related payment default that resulted from such acceleration.  Upon any rescission and any Event of Default arising therefrom shall be deemed to have been cured for every purpose of the Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon. Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it.  However, the Trustee may refuse to follow any direction that conflicts with law or the Indenture and that the Trustee determines may be unduly prejudicial to the rights of other Holders or that may involve the Trustee in personal liability.

*(15) TRUSTEE DEALINGS WITH ISSUER*.  The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer or any Affiliate of the Issuer with the same rights it would have if it were not Trustee.  However, in the event that the Trustee acquires any conflicting interest it must eliminate such conflict within 90 days or resign.  Any Agent and the Security Agent may do the same with like rights and duties.  The Trustee is also subject to Section 7.10 of the Indenture.

*(16)   NO RECOURSE AGAINST OTHERS*. No director, officer, employee, incorporator or stockholder of the Issuer, the Company, or any Guarantor, as such, will have any liability for any obligations of the Company, any Guarantor or the Issuer under the Notes, the Indenture, the Guarantees, the Intercreditor Agreement or the Collateral Documents, or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a Note waives and releases all such liability. The waiver and release are part of the

**523**

consideration for issuance of the Notes. The waiver may not be effective to waive liabilities under the federal securities laws of the United States.

*(17) AUTHENTICATION.*  A Note will not be valid until authenticated by the manual signature of the Trustee or an Authenticating Agent appointed by the Trustee in accordance with the Indenture.  The signature will be conclusive evidence that the Note has been authenticated under the Indenture.

*(18) ABBREVIATIONS.*  Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= tenants in common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common), CUST (= Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

*(19) COMMON CODE OR ISIN NUMBERS.*  Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedures, the Company has caused ISIN numbers to be printed on the Notes and the Trustee may use ISIN numbers in notices of redemption as a convenience to Holders.  The Company may cause a common code to be printed on the Notes and the Trustee may use the common code in notices of redemption as a convenience to Holders. No representation is made as to the accuracy of any such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

*(20) GOVERNING LAW*

THE INTERNAL LAW OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THE INDENTURE AND THIS NOTE WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

*(21) ADDITIONAL INFORMATION*

Any Holder or beneficial owner of the Notes may obtain a copy of the Indenture, the form of Note, the Collateral Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement without charge by writing to the Issuer and/or the Company at the addresses below:

KCA DEUTAG UK Finance plc
1 Park Row
Leeds, LS1 5AB
United Kingdom

KCA DEUTAG Alpha Limited
Bankhead Drive
City South Office Park
Portlethen, Aberdeenshire AB12 4XX
United Kingdom

## Assignment Form

***To assign this Note, fill in the form below:***

(I)      or (we) assign and transfer this Note to:  _____

(Insert assignee's legal name)

_____

(Insert assignee's soc. sec. or tax I.D. no.)

_____

_____

_____

_____

(Print or type assignee's name and address)

and irrevocably appoint _____

to transfer this Note on the books of the Issuer.  The agent may substitute another to act for him.

Date: _____

Your Signature:  _____
(Sign exactly as your name appears on the face
 of this Note)

Signature Guarantee*:

*  Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuer pursuant to Section 4.10 or Section 4.15 of the Indenture, check the appropriate box below:

☐ Section 4.10      ☐ Section 4.15

If you want to elect to have only part of the Note purchased by the Issuer pursuant to Section 4.10 or Section 4.15 of the Indenture, state the amount you elect to have purchased: Notes of $1,000 or less may only be redeemed in whole and not in part.

$_____

Date:

Your Signature: _____
(Sign exactly as your name appears on the face of this Note)

Tax Identification No.: _____

Signature Guarantee*:

*  Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee).

## SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Registered Note, or exchanges of a part of another Global Note or Definitive Registered Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee, Paying Agent, or Common Depositary |
| --- | --- | --- | --- | --- |

**527**

## EXHIBIT B

## FORM OF CERTIFICATE OF TRANSFER

[*Company address*]

[[●]
c/o [●]]

Re: U.S. dollar-denominated 9.875% Senior Secured Notes due 2025 of KCA DEUTAG UK Finance plc

Reference is hereby made to the Indenture, dated as of [●], 2020 (the "*Indenture*"), between, *inter alios*, KCA DEUTAG UK Finance plc, organized and established as a public limited company under the laws of England and Wales, having its registered office at 1 Park Row, Leeds, LS1 5AB, United Kingdom, Lucid Trustee Services Limited as Trustee, and Lucid Trustee Services Limited as Security Agent, in respect of the Issuer's 9.875% Senior Secured Notes due 2025. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "*Transferor*") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "*Transfer*"), to _____ (the "*Transferee*"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1. **Check if Transferee will take delivery of a Book-Entry Interest in the 144A Global Note or a Definitive Registered Note Pursuant to Rule 144A.** The Transfer is being effected pursuant to and in accordance with Rule 144A under the United States Securities Act of 1933, as amended (the "*U.S. Securities Act*"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or the Book-Entry Interest or Definitive Registered Note is being transferred to a Person that the Transferor reasonably believed and believes is purchasing the beneficial interest or the Book-Entry Interest or Definitive Registered Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A under the U.S. Securities Act in a transaction meeting the requirements of Rule 144A under the U.S. Securities Act and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or the Book-Entry Interest or Definitive Registered Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Global Note and/or the Definitive Registered Note and in the Indenture and the U.S. Securities Act.

2. **Check if Transferee will take delivery of a Book-Entry Interest in the Regulation S Global Note or a Definitive Registered Note pursuant to Regulation S**. The Transfer is

**528**

being effected pursuant to and in accordance with Rule 903 or Rule 904 under the U.S. Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is not being made to a person in the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States or (y) the transaction was executed in, on or through the facilities of a designated offshore securities market, (ii) such Transferor does not know that the transaction was prearranged with a buyer in the United States, (iii) no directed selling efforts have been made in connection with the Transfer in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the U.S. Securities Act, (iv) the transaction is not part of a plan or scheme to evade the registration requirements of the U.S. Securities Act and (v) if the proposed transfer is being effected prior to the expiration of a Restricted Period, the transferee is not a U.S. Person, as such term is defined pursuant to Regulation S of the U.S. Securities Act, and will take delivery only as a Book-Entry Interest so transferred through Euroclear or Clearstream. Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred Book-Entry Interest or Definitive Registered Note will be subject to the restrictions on Transfer enumerated in the Private Placement Legend printed on the Regulation S Global Note and/or the Definitive Registered Note and in the Indenture and the U.S. Securities Act.

3. **Check if Transferee will take delivery of a Book-Entry Interest in a Global Note or a Definitive Registered Note Pursuant to Rule 144.** (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and all applicable securities laws of any other applicable jurisdiction; (ii) the Transferor is not (and during the three months preceding the Transfer was not) an Affiliate of the Issuer or any Guarantor, and (iii) at least one year has elapsed since such Transferor (or any previous transferor of such Book-Entry Interest or Definitive Registered Note that was not an Affiliate of the Issuer or any Guarantor) acquired such Book-Entry Interest or Definitive Registered Note from the Issuer or any Guarantor or an Affiliate of the Issuer or any Guarantor. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred Book-Entry Interest or 144A Definitive Registered Note will no longer be subject to the restrictions on transfer enumerated in the Restricted Notes Legend set forth in the Indenture printed on the Global Note and/or the applicable Definitive Registered Notes and in the Indenture.

4. **Check if Transferee will take delivery of a Book-Entry Interest in a Global Note or a Definitive Registered Note Pursuant to Rule 506.** The Transfer is being effected pursuant to and in accordance with Rule 506 ("Rule 506") under Regulation D of the Securities Act, Section 4(a)(2) under the Securities Act or another exemption under the Securities Act and, accordingly, the Transferor hereby further certifies that the Book-Entry Interest or Definitive Registered Note is being transferred to a Person that the Transferor reasonably believes is purchasing the Book-Entry Interest or Definitive Registered Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is an institutional "accredited investor" ("IAI") within the meaning of Rule 501(A)(1), (2), (3) or (7) under the Securities Act in a transaction meeting the requirements of Rule 506 or such other applicable exemption and such Transfer is in compliance with all applicable securities laws of any other jurisdiction. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred Book-Entry Interest or Definitive Registered Note will be subject to the restrictions on transfer enumerated in the Restricted Notes Legend printed on the IAI Global Note and/or the IAI Definitive Registered Note and in the Indenture and the Securities Act.

**529**

5. **Check and complete if Transferee will take delivery of a Book-Entry Interest in a Global Note or a Definitive Registered Note pursuant to any other provision of the U.S. Securities Act**.  The Transfer is being effected in compliance with the transfer restrictions applicable to Book-Entry Interests in Global Notes and Definitive Registered Notes and pursuant to and in accordance with the U.S. Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby further certifies that such Transfer is being effected to the Issuer.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

                       _____

                       [Insert Name of Transferor]

                       By:_____

                         Name:

                         Title:

Dated: _____

**530**

## ANNEX A TO CERTIFICATE OF TRANSFER

1.  The Transferor owns and proposes to transfer the following:

[CHECK ONE]

(a) Book-Entry Interest in the:

(i)  144A Global Note ([ISIN][Common Code]_____),

(ii)  IAI Global Note ([ISIN][Common Code]_____), or

(iii)  Regulation S Global Note ([ISIN][Common Code]_____).

2.  After the Transfer the Transferee will hold:

[CHECK ONE]

(a) a Book-Entry Interest in the:

(i)  144A Global Note ([ISIN] [Common Code]_____),

(ii)  IAI Global Note ([ISIN][Common Code]_____), or

(iii)  Regulation S Global Note ([ISIN] [Common Code] _____).

in accordance with the terms of the Indenture.

**531**

<u>**EXHIBIT C**</u>

**FORM OF CERTIFICATE OF EXCHANGE**

[*Company address*]

[●]

      Re: <u>U.S. dollar-denominated 9.875%  Senior Secured Notes due 2025 of KCA DEUTAG UK Finance plc</u>

(ISIN_____)

Reference is hereby made to the Indenture, dated as of [●], 2020  (the "*Indenture*"), between, *inter alios*, KCA DEUTAG UK Finance plc, organized and established as a public limited company under the laws of England and Wales, having its registered office at 1 Park Row, Leeds, LS1 5AB, United Kingdom, Lucid Trustee Services Limited as Trustee, and Lucid Trustee Services Limited as Security Agent, in respect of the Issuer's 9.875% Senior Secured Notes due 2025.  Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "*Owner*") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "*Exchange*").  In connection with the Exchange, the Owner hereby certifies that:

1.  **Check if Exchange is from Book-Entry Interest in a Global Note for Definitive Registered Notes.**  In connection with the Exchange of the Owner's Book-Entry Interest in a Global Note for Definitive Registered Notes in an equal amount, the Owner hereby certifies that such Definitive Registered Notes are being acquired for the Owner's own account without transfer.  The Definitive Registered Notes issued pursuant to the Exchange will bear the Private Placement Legend and will be subject to restrictions on transfer enumerated therein and in the Indenture and the U.S. Securities Act.

2.  **Check if Exchange is from Definitive Registered Notes for Book-Entry Interest in a Global Note.**  In connection with the Exchange of the Owner's Definitive Registered Notes for Book-Entry Interest in a Global Note in an equal amount, the Owner hereby certifies that such Book-Entry Interest in a Global Note are being acquired for the Owner's own account without transfer.  The Book-Entry Interests transferred in exchange will be subject to restrictions on transfer enumerated in the Private Placement Legend and in the Indenture and the U.S. Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuer.

**532**

_____
[Insert Name of Transferor]

By:_____

  Name:

  Title:

  Dated: _____

**533**

ANNEX A TO CERTIFICATE OF EXCHANGE

1.  The Owner owns and proposes to exchange the following:

[CHECK ONE OF (a) OR (b)]

(a) Book-Entry Interest held through Euroclear/Clearstream Account No. _____ in the:

(i) 144A Global Note ([ISIN] [Common Code]_____),

(ii)  IAI Global Note ([ISIN][Common Code]_____), or

(iii) Regulation S Global Note ([ISIN][Common Code _____), or

(b) a Definitive Registered Note.

2.  After the Exchange the Owner will hold:

[CHECK ONE]

(a)   a   Book-Entry   Interest   held   through   Euroclear/Clearstream   Account   No. _____   in the:

(i) 144A Global Note ([ISIN] [Common Code]_____),

(ii)  IAI Global Note ([ISIN][Common Code]_____), or

(iii) Regulation S Global Note ([ISIN][Common Code _____), or

(b) a Definitive Registered Note.

in accordance with the terms of the Indenture.

**534**

## EXHIBIT D

**FORM OF SUPPLEMENTAL INDENTURE
TO BE DELIVERED BY SUBSEQUENT GUARANTORS**

Supplemental Indenture (this "*Supplemental Indenture*"), dated as of _____, among _____, a company organized and existing under the laws of _____ (the "*Subsequent Guarantor*"), a subsidiary of the Company (as such term is defined in the indenture referred to below) (or its permitted successor), KCA Deutag UK Finance plc, organized and established as a public limited company under the laws of England and Wales, having its registered office at 1 Park Row, Leeds, LS1 5AB, United Kingdom, KCA Deutag Alpha Limited, organized and established as a limited liability company under the laws of England and Wales, having its registered office at Bankhead Drive, City South Office Park, Portlethen, Aberdeenshire AB12 4XX, United Kingdom, and Lucid Trustee Services Limited as Trustee.

W I T N E S S E T H

WHEREAS, the Issuer and the Company have heretofore executed and delivered to the Trustee an indenture (the "*Indenture*"), dated as of [●], 2020, providing for the issuance of U.S. Dollar-denominated 9.875% Senior Secured Notes due 2025 (the "*Notes*");

WHEREAS, the Indenture provides that under certain circumstances the Subsequent Guarantor shall execute and deliver to the Trustee a supplemental indenture pursuant to which the Subsequent Guarantor shall unconditionally guarantee all of the Issuer's Obligations under the Notes and the Indenture on the terms and conditions set forth herein (the "*Guarantee*"); and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Issuer, the Company and the Trustee are authorized to execute and deliver this Supplemental Indenture.

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Subsequent Guarantor and the Trustee mutually covenant and agree for the equal and ratable benefit of the Holders as follows:

1.    CAPITALIZED TERMS.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture.

2.    AGREEMENT TO GUARANTEE.  The Subsequent Guarantor hereby agrees as follows:

(a)    To jointly and severally Guarantee to each Holder of a Note, authenticated and delivered by the Trustee, and to the Trustee and its successors and assigns, regardless of the validity and enforceability of the Indenture, the Notes or the obligations of the Issuer under the Indenture or the Notes, that:

(i)    the principal of, interest on, premium, and Additional Amounts, if any, on the Notes will be promptly paid in full when due, whether at maturity, by acceleration, redemption or otherwise, and interest on the overdue principal and premium, if any, and if lawful, interest and Additional Amounts of the Issuer to the Holders or the Trustee under the Indenture or the Notes or thereunder will be promptly paid in full or performed, all in accordance with the terms hereof and thereof; and

**535**

(ii)    in case of any extension of time of payment or renewal of any Notes, that same will be promptly paid in full when due in accordance with the terms of such extension or renewal, whether at stated maturity, by acceleration or otherwise.  Failing payment when due of any amount so guaranteed for whatever reason, the Subsequent Guarantor shall be jointly and severally obligated to pay the same immediately.

(b)    The obligations of the Subsequent Guarantor hereunder shall be unconditional, irrespective of the validity, regularity or enforceability of the Notes or the Indenture, the absence of any action to enforce the same, any waiver or consent by any Holder with respect to any provisions hereof or thereof, the recovery of any judgment against the Issuer, any action to enforce the same or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Guarantor.

(c)    The following is hereby waived:  diligence, presentment, demand of payment, filing of claims with a court in the event of insolvency or bankruptcy of the Issuer, any right to require a proceeding first against the Issuer, protest, notice and all demands whatsoever.

(d)    Except as set forth in Section 5, this Guarantee shall not be discharged except by complete performance of the obligations contained in the Notes and the Indenture, and the Subsequent Guarantor accepts all obligations of a Guarantor provided for under the terms of the Indenture.

(e)    The Subsequent Guarantor waives and will not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation or any other rights against the Issuer, the Company or any other Restricted Subsidiary as a result of any payment by such Subsequent Guarantor under its Guarantee.

(f)    As between the Subsequent Guarantor, on the one hand, and the Holders and the Trustee, on the other hand, (x) the maturity of the obligations guaranteed hereby may be accelerated as provided in Article 6 of the Indenture for the purposes of this Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the obligations guaranteed hereby, and (y) in the event of any declaration of acceleration of such obligations as provided in Article 6 of the Indenture, such obligations (whether or not due and payable) shall forthwith become due and payable by the Subsequent Guarantor for the purpose of this Guarantee.

(g)    The Subsequent Guarantor hereby confirms that it is its intention that the Guarantee of the Subsequent Guarantor does not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to the Guarantee.  To effectuate the foregoing intention, the Trustee and the Subsequent Guarantor hereby irrevocably agree that after giving effect to such maximum amount and all other contingent and fixed liabilities of the Subsequent Guarantor that are relevant under such laws, and after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Subsequent Guarantor in respect of the obligations of such other Subsequent Guarantor, the obligations of the Subsequent Guarantor will be limited to the obligations of the

**536**

Subsequent Guarantor under its Guarantee not constituting a fraudulent transfer or conveyance.

(h)    [*Applicable limitation wording to be added*]

3.    EXECUTION AND DELIVERY.

(a)    To evidence its Guarantee, the Subsequent Guarantor hereby agrees that this Supplemental Indenture shall be executed on behalf of the Subsequent Guarantor by one of its Directors or Officers.

(b)    The Subsequent Guarantor hereby agrees that its Guarantee shall remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Guarantee.

(c)    If an Officer whose signature is on this Supplemental Indenture no longer holds that office at a later time, the Guarantee shall be valid nevertheless.

(d)    Upon execution of this Supplemental Indenture, the delivery of any Note by the Trustee, after the authentication thereof hereunder, shall constitute due delivery of the Guarantee set forth in this Supplemental Indenture on behalf of the Subsequent Guarantor.

4.    [RESERVED].

5.    RELEASES.    Each Guarantee shall be automatically and unconditionally released and discharged in accordance with Section 11.06 of the Indenture.

6.    NO RECOURSE AGAINST OTHERS.    No director, officer, employee, Authorized Signatory, incorporator or stockholder of any Subsequent Guarantor, as such, will have any liability for any obligations of the Company or any Subsequent Guarantor under the Notes, the Indenture, the Guarantees or this Supplemental Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation.  Each Holder, by accepting a Note, waives and releases all such liability.  The waiver and release are part of the consideration for issuance of the Notes.  The waiver may not be effective to waive liabilities under applicable securities laws.

7.    THE INTERNAL LAW OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS SUPPLEMENTAL INDENTURE, THIS NOTE AND THE GUARANTEES WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

8.    JURISDICTION AND SERVICE OF PROCESS.    The Subsequent Guarantor irrevocably and unconditionally:

(1)    submits itself and its property in any legal action or proceeding relating to this Indenture to which it is a party, or for recognition and enforcement of any judgment in respect hereof, to the general jurisdiction of the Courts of the State of New York, sitting in the Borough of Manhattan, The City of New York, the courts of the United States of America for the Southern District of New York, appellate courts from

any thereof and courts of its own corporate domicile, with respect to actions brought against it as defendant;

(2)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(3)    appoints Cogency Global, Inc., 10 East 40th Street, 10th Floor, New York, New York 10016, USA, as its agent to receive on its behalf service of all process ("*Authorized Agent*") in any such action or proceeding, such service being hereby acknowledged by the Subsequent Guarantor to be effective and binding in every respect. Such appointment shall be irrevocable unless and until replaced by an agent reasonably acceptable to the Trustee.

The Subsequent Guarantor represents and warrants that the Authorized Agent has agreed to act as said agent for service of process, and the Subsequent Guarantor agrees to take any and all action, including the filing of any and all documents and instruments, that may be necessary to continue such appointment in full force and effect as aforesaid.  Service of process upon the Authorized Agent and written notice of such service to the Subsequent Guarantor shall be deemed, in every respect, effective service of process upon the Subsequent Guarantor.

9.    COUNTERPARTS.    The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

10.    EFFECT OF HEADINGS.  The Section headings herein are for convenience only and shall not affect the construction hereof.

11.    THE TRUSTEE.  The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency of this Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by each Subsequent Guarantor, the Issuer and the Company.

**538**

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the date first above written.

Dated: _____, \_\_\_\_\_        [SUBSEQUENT GUARANTOR]

By: _____
    Name:
    Title:


KCA DEUTAG UK Finance plc


By:_____
Name:
Title:


KCA DEUTAG Alpha Limited


By:_____
Name:
Title:


[TRUSTEE]


By:_____
Authorized Signatory

**539**

## EXHIBIT E

### Collateral Documents

[●]

# PART 2

## NEW CASH MANAGEMENT FACILITIES AGREEMENTS

**Umbrella Agreement with respect to Cash Management Facilities**

To:

(1)   The companies listed in Schedule 1 of this letter (each a "**Company**" and together the "**Companies**")

KCA Deutag Alpha Limited ("**Alpha**")

From:

(2)   HSBC UK Bank plc ("**HSBC**")

_____ 2020

**Terms and Conditions of Corporate Banking Facilities**

1    HSBC is the provider of certain cash-pooling, net overdraft, BACS facilities, corporate credit card facilities, commercial bank account services and online banking services to the Companies (the **Corporate Banking Services**).

2    On and from the date of this letter, HSBC and certain of the Companies are party to an intercreditor agreement with, among others, Lucid Trustee Services Limited as security agent (the **Intercreditor Agreement**).

3    Alpha (on behalf of each of the Companies) and HSBC agree that on and from the date of this letter, the Corporate Banking Services shall continue to be provided by HSBC to the relevant Companies on the following terms:

   3.1   in the case of the net overdraft, the "Net Overdraft Facility Terms and Conditions" set out in Schedule 3 (the **Net Overdraft Terms**);

   3.2   in the case of the cash-pooling facility, terms substantially similar to the "GLS Service Terms and Conditions – Abbot Group Limited" set out in Schedule 4 (the **Cash Pooling Terms**);

   3.3   in the case of the commercial bank account services (the **Commercial Bank Account Services**), the "Business Banking Terms and Conditions for HSBC UK Bank plc business current and savings accounts and services as of 1 September 2019" set out in Schedule 5 (the **Commercial Bank Account Terms**);

   3.4   in the case of the online banking platform services (the **Online Banking Services**), the "HSBCnet Terms and Conditions" set out in Schedule 6 (the **Online Banking Terms**);

   3.5   in the case of the corporate credit card facilities, the "Corporate Payment Card Customer Agreement Terms and Conditions" set out in Schedule 7 (the **Corporate Credit Card Terms**); and

   3.6   in the case of the BACS facilities, the "BACSTEL-IP Service Terms and Conditions" set out in Schedule 8 (the **BACS Facility Terms**).

   (where the above facilities shall be collectively referred to as the "**Corporate Banking Facilities**").

4    The Corporate Banking Facilities (as amended by clauses 7, 8 and 9 of this letter) shall supersede the terms and conditions applicable to the Corporate Banking Facilities prior to the date of this letter.

1

5   Alpha (on behalf of each of the Companies) and HSBC agree that the rights and obligations under this letter and the Corporate Banking Facilities after the date of this letter shall be subject to the terms of the Intercreditor Agreement.

**Designation as Cash Management Facilities**

6   Alpha (on behalf of each of the Companies) and HSBC agree that each of the Corporate Banking Facilities shall be Cash Management Facilities for the purposes of the Intercreditor Agreement. No other facility provided by HSBC to any member of the Group shall constitute a Cash Management Facility for the purposes of the Intercreditor Agreement unless designated as such by Alpha and HSBC in accordance with the Intercreditor Agreement.

**Amendment to termination rights**

7   With respect to HSBC's right to terminate the Commercial Bank Account Services under section 29 (By giving you notice) of the Commercial Bank Account Terms, the Commercial Bank Account Terms shall be amended so that HSBC shall not terminate the Commercial Bank Account Services provided to the Companies without providing at least six months' notice.

8   With respect to HSBC's right to terminate the Online Banking Services under clause 10.1.1 (Termination) of the Online Banking Terms, the Online Banking Terms shall be amended so that HSBC shall not terminate the Online Banking Services provided to the Companies without providing at least six months' notice.

9   Notwithstanding Clauses 7 and 8 above, and in addition to any termination rights that HSBC is entitled to exercise under the terms of the Corporate Banking Facilities, HSBC may terminate the Commercial Bank Account Services and Online Banking Services immediately and without notice upon the occurrence of any of the circumstances specified in Schedule 2 of this letter.

**Set-off**

10   Alpha (on behalf of each of the Companies) acknowledges and agrees that HSBC may (at its absolute discretion and without consent or demand of any Company) at any time set off, apply or combine, or exercise any netting rights in relation to, all or any amounts due from HSBC to any Company under the Corporate Banking Facilities (including in respect of any credit balance on any Account (as defined in the Net Overdraft Facility) of that Company), regardless of the place of payment, booking branch or currency of either obligation in or towards the repayment or discharge of any amount due to HSBC from a Company under the Corporate Banking Facilities (or any rights of HSBC under the Intercreditor Agreement with respect to the Corporate Banking Facilities). If the obligations are in different currencies, HSBC may convert either obligation at its then prevailing spot selling rate of exchange in its usual course of business for the purpose of the set-off. This right of set-off shall not apply to any rights of HSBC against any member of the Customer Group with respect to any agreement (including any Primary Debt Document (as defined in the Intercreditor Agreement)) other than the Corporate Banking Facilities.

11   HSBC's set-off rights in Clause 10 are additional to and without prejudice to any other rights of set-off or combination of accounts that HSBC may have, including (without limitation) any rights under the Net Overdraft Facility, the Cash Pooling Terms or the Intercreditor Agreement.

**Consent to Transaction Security**

2

**543**

**12**    Notwithstanding the provisions of the Cash Pooling Terms, HSBC acknowledges the Transaction Security (as defined in the Intercreditor Agreement) created over the Accounts (as defined in the Cash Pooling Terms) on or around the date of this letter.

**13**    HSBC acknowledges that the Transaction Security described in Clause 12 of this letter shall not breach the obligations of any Company under Clause 4 (Beneficial Ownership of Pooling Accounts) of the "Pooling Services Schedule" in the Cash Pooling Terms or Clause 7 (Security Interest) of the "Master Services Agreement" in the Cash Pooling Terms or any similar provision of any other Corporate Banking Facility.

**Miscellaneous provisions**

**14**    If, at any time, any provision of this letter is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

**15**    No failure to exercise, nor delay in exercising, on the part of any party of any right or remedy under this letter shall operate as a waiver, nor shall any single or partial exercise of any right or remedy prevent any further or other exercise or exercise of any other right or remedy. The rights and remedies provided in this letter are cumulative and not exclusive of any rights or remedies provided by law.

**16**    A person who is not party to this letter has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this letter, except for any Company that is not a party to this letter.

**17**    This letter and any non-contractual obligations arising out of, or in connection with it, shall be governed by and construed in accordance with the laws of England and Wales. The courts of England and Wales have exclusive jurisdiction to settle any dispute arising out of, or connected with, this letter (including a dispute regarding the existence, validity or termination of this letter or the consequences of its nullity).

## SCHEDULE 1

### The Companies

| Corporate Banking Facility | Company |
|---|---|
| Commercial Bank Account Services and Online Banking Services | Abbot Group Limited, Abbot Holdings Limited, Abbot Holdings Norge AS, Abbot Investments North Africa Limited, KCA Deutag Alpha Limited, KCA Deutag Caspian Limited, KCA Deutag Drilling Offshore Services AS, KCA Deutag Drilling Canada Inc, KCA Deutag Drilling Group Limited, KCA Deutag Drilling Limited, KCA Deutag Drilling Norge AS, KCA Deutag Enterprises Limited, KCA Deutag Europe BV, KCA Deutag GmbH, KCA Deutag Holding Norge AS, KCA Deutag Holdings Limited, KCA Deutag Land Rig Limited, KCA Deutag Investments Limited, KCA Deutag LLC, KCA Deutag Limited, KCA Deutag Modu Operations AS, KCA Deutag Offshore AS, KCA Deutag Operations Services DMCC, KCA Deutag PTE Limited, KCA Deutag Rig Co Limited, KCA Deutag Rig Design Limited, KCA Deutag Tech Support Limited, KCA Deutag Tiefbohr MBH, KCA Deutag Tender Barges (Offshore) PTE, KCA Deutag UK Finance plc, KCA Drilling Limited Group (Life Assurance), KCA European Holdings Limited, Prorig Limited and RDS Energy Solutions Limited |
| Cash pooling facility | Abbot Group Limited, Abbot Holdings Limited, Abbot Holdings Norge AS, Abbot Investments (North Africa) Limited, KCA Deutag Alpha Limited, KCA Deutag Caspian Limited, KCA Deutag Drilling Group Limited, KCA Deutag Drilling Limited, KCA Deutag Drilling Norge AS, KCA Deutag Drilling Offshore AS, KCA Deutag Holding Norge AS, KCA Deutag Offshore AS, KCA Deutag Technical Support Limited and KCA European Holdings Limited |
| Net Overdraft facility | Abbot Group Limited, Abbot Holdings Limited, KCA Deutag Alpha Limited, KCA Deutag Caspian Limited, KCA Deutag Drilling Group Limited, KCA European Holdings Limited, Abbot Holdings Norge AS, KCA Deutag Drilling Norge AS, KCA Deutag Drilling Offshore Services AS, KCA Deutag Holdings Norge AS, KCA Deutag Offshore AS, KCA Deutag Drilling Limited, KCA Deutag Technical Support Limited |
| Corporate credit card facility | KCA Deutag Technical Support Limited |
| BACS Facility | KCA Deutag Drilling Limited, KCA Deutag Operations Services DMCC, Prorig Limited and KCA Deutag Technical Support Limited |

4

## SCHEDULE 2

### Additional Termination Events

**1**    Any Company becomes insolvent;

**2**    If a Company is, or HSBC reasonably suspects that any Company may be, using or obtaining, or allowing someone else to use or obtain, an account, service or money illegally or fraudulently;

**3**    Any Company's (or its employees', representatives', or advisers') behaviour is improper, for example the Company (or its employees, representatives, or advisers) act in a threatening or violent manner towards HSBC staff;

**4**    Any Company was not entitled to open its account or to the service, or is no longer entitled to have the account or the service;

**5**    HSBC discovers, or reasonably suspects, that any Company is using its account for a purpose not covered by the Commercial Bank Account Terms or Online Banking Terms;

**6**    Any Company has not provided HSBC with adequate information that HSBC requested in relation to the Company's liability for tax;

**7**    HSBC reasonably considers that any Company has placed HSBC in a position where HSBC might break a law, regulation, code, court order or other duty, requirement or obligation (including compliance with any internal financial crime risk management activity) or HSBC, or another HSBC Group company, may be exposed to action or censure from any government, regulator or law enforcement agency;

**8**    There has been, or HSBC suspect, a breach of security or misuse of any Company's account, security details or a payment device;

**9**    Any Company provides HSBC with any false information; or

**10**    Any Company is involved, or HSBC reasonably believe that any Company is involved, in criminal activity of any kind whether or not linked to the Company's account or the Company's relationship with HSBC.

**SCHEDULE 3**

**Net Overdraft Facility Terms and Conditions**

**SCHEDULE 4**

**GLS Service Terms and Conditions – Abbot Group Limited**

**SCHEDULE 5**

**Business Banking Terms and Conditions for HSBC UK Bank plc business current and savings
accounts and services as of 1 September 2019**

**SCHEDULE 6**

**HSBCnet Terms and Conditions**

## SCHEDULE 7

**Corporate Payment Card Customer Agreement Terms and Conditions**

**SCHEDULE 8**

**BACSTEL-IP Service Terms and Conditions**

# Net Overdraft Facility
# Terms and conditions

# ▶ Net Overdraft Facility – Application Form

## 1. General

1.1 This is an application for a net overdraft facility, to be provided by the Bank on the terms set out in this Application Form as supported by the following documents:

(i) Master Terms;

(ii) Multiparty Supplementary Terms;

(iii) Non-GLS Accounts Supplementary Terms (together with (i) to (iii) above, "the **NOD Terms**"); and

(iv) Intercreditor Agreement.

1.2 The Facility is uncommitted and repayable on demand. The Bank may make demand or withdraw the Facility at any time.

1.3 Unless otherwise defined in this Application Form, terms defined in the Master Terms shall have the same meaning in this Application Form.

## 2. Effective Date

Subject to Clauses 2 and 3 of the Master Terms, the NOD Terms shall commence from the date that this Application Form is dated and released in accordance with the applicable Restructuring Step (as defined under the Restructuring Implementation Deed).

## 3. Key Terms

**Bank:** HSBC UK Bank plc (registered number: 09928412) whose registered office is 1 Centenary Square, Birmingham, B1 1HQ.

**NOD Agent:** KCA Deutag Alpha Limited (registered number: 06433748) whose registered office is at 1 Park Row, Leeds, England, LS1 5AB

**Principal contact:** Jan Hetherington

**Email address:** Jan.Hetherington@kcadeutag.com

**Telephone number:** +44 (0) 1224 987695

| Borrowers: | Registered Name: | Company Number: | Jurisdiction of Incorporation: |
|---|---|---|---|
| | Abbot Group Limited | 00623285 | England & Wales |
| | Abbot Holdings Limited | 02682916 | England & Wales |
| | KCA Deutag Alpha Limited | 06433748 | England & Wales |
| | KCA Deutag Caspian Limited | 01877963 | England & Wales |
| | KCA Deutag Drilling Group Limited | 01059871 | England & Wales |
| | KCA European Holdings Limited | 04286946 | England & Wales |
| | Abbot Holdings Norge AS | 989 528 270 | Norway |
| | KCA Deutag Drilling Norge AS | 918 357 688 | Norway |
| | KCA Deutag Drilling Offshore Services AS | 990 397 082 | Norway |
| | KCA Deutag Holdings Norge AS | 987 558 74 | Norway |

| | | |
|---|---|---|
| KCA Deutag Offshore AS | 986 709 770 | Norway |
| KCA Deutag Drilling Limited | SC426092 | Scotland |
| KCA Deutag Technical Support Limited | SC219425 | Scotland |

**GLS Accounts:** As appearing in the GLS Terms.

**Non-GLS Accounts:**

| Borrower Name: | Sort Code: | Account Number: | Currency: |
|---|---|---|---|
| Abbot Group Limited | 401276 | 73147317 | RUB |
| Abbot Group Limited | 401276 | 84172146 | SAR |

**Limit:** USD 100

**Gross Debit Balance Cap:** USD 200,000,000

**Sub-limits:** N/A

**Interest on GLS Accounts:** At the rate specified in the GLS Terms.

**Interest on Non-GLS Accounts:** 1% per annum over Base Rate.

**Base Currency:** USD

**Review Date:** 30 November 2021 and at least annually thereafter.

**Renewal Fees:** $0 on acceptance of the NOD Terms.  A renewal fee may also be payable following each review.

**Specified Security Documents:** Transaction Security Documents

**Special Conditions:** Without affecting any other method of service, the Customer (other than a Customer incorporated in England and Wales) irrevocably appoints the NOD Agent  as its agent for service of process relating to any proceedings before the English courts in connection with the NOD Terms and the Security and agrees that failure by a process agent to notify the relevant Customer of the process will not invalidate the proceedings concerned.

RESTRICTED

**555**

►      Signature Pages [*Borrower signature blocks to be inserted*]

Before signing this Application Form, you must ensure that you have read and understood all documents comprising the NOD Terms.

The Customer agrees to the net overdraft facility terms and conditions comprising the NOD Terms each as attached to this Application Form and that the provision of the Facility shall be subject to such terms and conditions.

**NOD Agent**

| | |
|---|---|
| Name | **[INSERT name]** |

Full Name of Authorised Signatory

Title of Authorised Signatory

**Signature**

Dated

Full Name of Authorised Signatory

Title of Authorised Signatory

**Signature**

Dated

**Borrower**

| | |
|---|---|
| Name | **[INSERT name] (NOD Agent again here as 1st Borrower)** |

Full Name of Authorised Signatory

Title of Authorised Signatory

**Signature**

Dated

Full Name of Authorised Signatory

Title of Authorised Signatory

**Signature**

Dated

RESTRICTED

**556**

**Borrower**

Name

[INSERT name]

Full Name of Authorised
Signatory

**Signature**

Title of Authorised Signatory

Dated

Full Name of Authorised
Signatory

**Signature**

Title of Authorised Signatory

Dated

**Borrower**

Name

[INSERT name]

Full Name of Authorised
Signatory

**Signature**

Title of Authorised Signatory

Dated

Full Name of Authorised
Signatory

**Signature**

Title of Authorised Signatory

Dated

RESTRICTED

**557**

**Bank**
Accepted and agreed

| | |
|---|---|
| Name | **HSBC UK Bank plc** |

Signature

Full Name of Authorised
Signatory

Title of Authorised Signatory

Dated

RESTRICTED

**558**

## ▶  Net Overdraft Facility – Master Terms

**1.  Introduction**

1.1  The Facility is governed by the terms and conditions set out in this document (the "**Master Terms**") together with the other NOD Terms set out in Clause 1.2 and the Intercreditor Agreement.

1.2  In the event of any conflict between the NOD Terms, the following order of priority shall apply:

(a)  the Application Form;

(b)  the applicable Supplementary Terms; and

(c)  these Master Terms.

1.3  Each party acknowledges that the Application Form, these Master Terms, and (as applicable) the Supplementary Terms must be read together and shall constitute a single agreement between the Customer and the Bank.

1.4  Each party acknowledges that the rights and obligations under the Facility are subject to the terms of the Intercreditor Agreement.

1.5  Subject to Clause 1.6, these NOD Terms supersede and replace any previous facility or agreement with respect to overdrafts in relation to any of the Accounts, including any previous NOD Terms (the "**Existing Terms**").  This takes effect from the effective date specified in Clause 2 of the Application Form (the "**Effective Date**").

1.6  Any authority given by a Customer under any Existing Terms for another Customer to act as its agent will continue to apply in full force and effect in respect of these NOD Terms.

1.7  This Facility is designated as a Cash Management Facility for the purposes of the Intercreditor Agreement.

1.8  Definitions

In these Master Terms:

"**Accession Notice**" has the meaning given to the term in the Multiparty Supplementary Terms.

"**Account**" means each of the GLS Accounts and each of the Non-GLS Accounts listed in this Application Form.

"**Accounting Principles**" means:

(a)  in relation to the consolidated financial statements of the NOD Agent, generally accepted accounting
    principles in England and Wales from time to time, including IFRS; and

(b) in relation to any other member of the Customer Group, generally accepted accounting principles
    and generally accepted financial reporting standards and practices in the jurisdiction of incorporation
    of the relevant member of the Customer Group from time to time.

"**Additional Borrower**" means any entity which becomes a party to the NOD Terms as a Borrower pursuant to an Accession Notice.

"**Annual Business Plan**" has the meaning given to the term in the Investment Agreement Schedule

"**Affiliate**" means, in relation to a person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

"**Application Form**" means an application form (in form and substance satisfactory to the Bank) signed by the Customer confirming acceptance of the NOD Terms and detailing the Facility.

RESTRICTED

**559**

"**Bank**" means the bank appearing in the Application Form and its successors, transferees and assigns.

"**Base Currency**" means the currency specified as such in this Application Form.

"**Base Rate**" means, in relation to USD, the Mid-Point of FED Target Range as published from time to time, and, in relation to any other currency, the Bank's COR for such currency from time to time.

"**Borrower**" means each party identified as such in the Application Form and each Additional Borrower.

"**Business Day**" means a day and a time on which the relevant banking offices, exchanges and markets are open for business, both in London and in any relevant financial centre for the currency and transaction involved.

"**Cash Equivalents**" has the meaning given to it in the New Notes Indenture or the equivalent term in the document governing any instrument which refinances the notes issued under the New Notes Indenture.

"**Cash Management Facility**" has the meaning given to it in the Intercreditor Agreement.

"**Consolidated Senior Secured Net Leverage Ratio**" has the meaning given to it in the New Notes Indenture or the equivalent term in the document governing any instrument which refinances the notes issued under the New Notes Indenture.

"**COR**" means the Bank's relevant currency overdraft rate from time to time.

"**Cleared/Value Dated Balance**" means, in respect of each Account, the debit or credit balance (as the case may be) that the Bank has recorded in that Account as at the end of a relevant day, after having taken into consideration all the transactions for which value has been received for and up to that day and "**Cleared/Value Dated Debit Balance**" and "**Cleared/Value Dated Credit Balance**" shall be construed accordingly.

"**Corporate Banking Facility**" has the meaning given in the Umbrella Designation Letter.

"**Customer**" means, unless the context otherwise requires, the NOD Agent and each Borrower and any reference to "the Customer" shall be read as a reference to each of them.

"**Customer Group**" means the NOD Agent and all subsidiaries of the NOD Agent and "member of the Customer Group" shall be construed accordingly.

"**Debt Documents**" has the meaning given to it in the Intercreditor Agreement.

"**Euro**" means the single currency unit of the Participating Member States.

"**Event of Default**" means a breach of any obligation under this agreement or any event or circumstance specified as such in a Primary Financing Document, a Hedging Agreement or a Cash Management Agreement (each term as defined under the Intercreditor Agreement).

"**Facility**" means the net overdraft facility to be provided by the Bank to the Customer pursuant to the NOD Terms.

"**Financial Quarter**" means each quarterly accounting period of the NOD Agent.

"**Financial Year**" means the annual accounting period of the NOD Agent.

"**GLS Account**" means as described in the Application Form.

"**GLS Terms**" means the terms and conditions with the Bank for the provision of cash pooling and other liquidity solutions in respect of the Accounts.

"**Gross Debit Balance**" means the aggregate of the Cleared/Value Debit Balances of the Accounts at the relevant time, calculated in accordance with Clause 4.2

"**Gross Debit Balance Cap**" means the gross debit balance cap as specified in the Application Form.

"**Holding Company**" means, in relation to a person, any other person in respect of which it is a Subsidiary.

RESTRICTED

"**HSBC Group**" means HSBC Holdings plc, its affiliates and subsidiaries, associated entities and any of their branches and offices (together or individually) and "member of the HSBC Group" shall be construed accordingly.

 "**Indenture**" means any indenture entered into by any member of the Customer Group with respect to the issuance of any public debt by a member of the Customer Group.

"**Intercreditor Agreement**" means the intercreditor agreement dated on or around the same date as this Facility and made between, among others, the NOD Agent, the Security Agent and the Bank.

"**Investment Agreement Schedule**" means the form of shareholder agreement included as a schedule to the Restructuring Implementation Deed, as at the date of the Restructuring Implementation Deed.

"**Limit**" means the limit and any sub-limits specified in the Application Form.

"**Leverage Calculation Certificate**" means a certificate substantially in the form set out in Schedule 2 (Form of Leverage Calculation Certificate)

"**Master Terms**" means this document.

"**Monthly Reporting Pack**" means a reporting pack consisting of the following items (each defined term shall have the meaning prescribed to it in the Investment Agreement Schedule):

(a)  Executive Summary: a report from the CEO commenting on the performance in the month and containing a business commentary against the Annual Business Plan;

(b)  Group Performance Summary: a summary of the Reporting Group's revenue and EBITDA for the month and year to date compared to the Annual Business Plan, together with monthly and year to date commentary;

(c)  Summary Financials by Business Unit: a summary of revenue and EBITDA by business unit, including waterfalls and variance analysis by month and year to date including commentary by division;

(d)  Capex and Working Capital: a working capital summary, daily sales outstandings by area and region and capex against budgets and capital commitments; and

(e)  the monthly operations performance report including certain KPIs in accordance with the Reporting Group's past practice

"**Net Overdraft Balance**" means the consolidated Cleared/Value Dated Balances of the Accounts and calculated in accordance with Clause 4.1

"**New Notes Indenture**" means the indenture (which may be amended from time to time) in respect of the New Notes (as defined under the Restructuring Implementation Deed).

"**NOD Agent**" means the party listed as the NOD Agent in the Application Form.

"**NOD Terms**" means as defined in Clause 1.1 of the Application Form.

"**Non-GLS Accounts**" means each of the accounts not subject to the GLS Terms listed in the Application Form as Non-GLS Accounts.

"**Non-GLS Interest Rate**" means the rate specified in the Application Form.

"**Noteholders**" means the holders of any notes issued pursuant to any Indenture.

 "**Participant**" has the meaning given to such term in the GLS Terms.

"**Participating Member State**" means any member state of the European Union that adopts or has adopted the Euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

RESTRICTED

"**Restricted Subsidiary**" has the meaning given to it in the New Notes Indenture or the equivalent term in the document governing any instrument which refinances the notes issued under the New Notes Indenture.

"**Restructuring Implementation Deed**" has the meaning given to that term in the Scheme.

"**Scheme**" means the scheme of arrangement in relation to KCA Deutag UK Finance plc under Part 26 of the Companies Act 2006, which was sanctioned by the High Court of England and Wales on [ ] 2020.

'**Security**" means:

(a) in respect of the GLS Accounts only, the guarantee and undertakings of the Customer contained in the GLS Terms;

(b) any guarantee or security created or evidenced in favour of the Security Agent on behalf of the Bank pursuant to the Specified Security Documents; and

(c) all existing security (if any) and any future security held by the Bank to secure the Customer's obligations to the Bank from time to time, or any guarantee of those obligations.

"**Security Agent**" means the Security Agent under the Intercreditor Agreement.

"**Security Provider**" means a person providing Security.

"**Senior Secured Gross Leverage Ratio** has the meaning given to Consolidated Senior Secured Net Leverage Ratio but calculated such that the Consolidated Senior Secured Net Leverage is adjusted by:

(a) including in the calculation of the total amount of Senior Secured Indebtedness of the NOD Agent and the Restricted Subsidiaries, any Indebtedness drawn in cash outstanding on the date of determination which was incurred under Section 4.09(b)(1) of the New Notes Indenture; and

(b) adding back the amount of any cash and Cash Equivalents of the NOD Agent and its Restricted Subsidiaries on a consolidated basis deducted in calculating the Consolidated Senior Secured Net Leverage.

"**Senior Secured Indebtedness**" has the meaning given to it in the New Notes Indenture or the equivalent term in the document governing any instrument which refinances the notes issued under the New Notes Indenture.

"**Specified Security Documents**" means any documents listed as such in the Application Form, in the Bank's preferred form.

"**Subsidiary**" has the meaning given to it in section 1159 of the Companies Act 2006 (as amended from time to time).

"**Supplementary Terms**" means any terms and conditions supplementary to the Master Terms relating to the Facility and referenced in Clause 1.1 of the Application Form.

"**Transaction Security Documents**" has the meaning given to it in the Intercreditor Agreement.

"**Umbrella Designation Letter**" means a letter entered into on or around the date of this agreement by the Bank and certain members of the Customer Group relating to the provision of certain cash management facilities by the Bank to certain members of the Customer Group.

1.9 Unless otherwise defined in the Supplementary Terms and/or Application Form, terms defined in the Master Terms have the same meaning in the Supplementary Terms, and/or Application Form.

1.10 Unless the contrary intention appears, a reference to:

(a) the NOD Terms, the Master Terms, the Supplementary Terms or other document is a reference to such terms and conditions or other document as amended from time to time;

(b) an "amendment" includes a supplement, novation or re-enactment and "amended" is to be construed accordingly; and

(c)    a "Clause" in the Master Terms or any Supplementary Terms is a reference to a clause respectively in the Master Terms or such Supplementary Terms.

**2.    Availability, drawings**

2.1    Notwithstanding any other provision of the NOD Terms, the Bank may at any time withdraw the Facility and/or demand repayment of all sums owing to it.

2.2    The Facility shall be available subject always to the Bank's current practices from time to time (explained on request).

2.3    The Facility may be utilised through drawings by the Customer exclusively on the Accounts and in the currency of the Accounts.

2.4    The Bank may review the Facility on the review date specified in the Application Form and at least annually thereafter.

**3.    Pre-drawdown conditions**

3.1    The Facility will become available on the Effective Date.

**4.    Calculation of overdraft, limit compliance**

4.1    The Net Overdraft Balance shall be calculated by deducting the aggregate Cleared/Value Dated Debit Balances of the Accounts from the aggregate Cleared/Value Dated Credit Balance of the Accounts.

4.2    The Gross Debit Balance shall be calculated by aggregating the Cleared/Value Debit Balances of the Accounts at the relevant time.

4.3    Where balances on the Accounts are denominated in different currencies, the Net Overdraft Balance and Gross Debit Balance shall be calculated by the Bank notionally converting the Cleared/Value Dated Balance of such Accounts denominated in a currency other than the Base Currency into the Base Currency by reference to the Bank's then prevailing spot selling rate of exchange for the relevant currency into the Base Currency.

4.4    The Net Overdraft Balance shall not at any time exceed the Limit.

4.5    The Bank may at any time refuse payment of any cheque or other order for payment, any drawing or any other disposal on any of the Accounts which would result in the Net Overdraft Balance exceeding the Limit.

4.6    The Bank may, at its sole discretion, make payments from the Accounts against uncleared credits.

4.7    When a credit is uncleared, it may still be included in the balance shown on an Account. In such cases, the uncleared credit may be treated by the Bank (in its sole discretion) as deducted from the balance shown on the relevant Account for the purposes of determining the amount available for withdrawal by the Customer.

4.8    The Gross Debit Balance shall not at any time exceed the Gross Debit Balance Cap. To the extent the Gross Debit Balance exceeds the Gross Debit Balance Cap, this shall be considered an unauthorised overdraft and will be immediately due and payable and, without prejudice to any other rights of set-off or combination of accounts that the Bank may have, the Bank may at any time apply its right of set-off in accordance with the GLS Terms, on any of the Accounts, if the Gross Debit Balance exceeds the Gross Debit Balance Cap.

4.9    The sub-limits set out in the Application Form shall operate solely for the benefit of the Bank and the Bank shall have no obligation to the Customer to ensure the compliance by the Customer with the sub-limit allocated to the relevant Customer.  The Bank may, at its absolute discretion and without notice to any other party, accede to any request by the Customer to borrow on its Account(s) in excess of its sub-limit and it shall be a matter exclusively for the Customer to establish procedures itself to govern and monitor the appropriate collective utilisation by the Customer of the Facility.

RESTRICTED

5.    **Security**

The Customer's obligations to the Bank under the NOD Terms will be secured by the Security. The Bank acknowledges the security created over the Accounts pursuant to the Specified Security Documents in accordance with the terms required by the relevant Specified Security Documents.

6.    **Undertakings and representations**

6.1   Without affecting the Bank's right at any time to withdraw the Facility and/or demand repayment of all sums owing to it, the Customer:

(a)   gives the undertakings (the "**Undertakings**") set out below to the Bank which will remain in force until the Facility has been repaid in full;

(b)   makes the representations and warranties (the "**Representations**") set out below to the Bank; and

(c)   acknowledges that the willingness of the Bank to continue to make available the Facility is likely to be strongly influenced by the Representations and the observance of the Undertakings and the Bank will have particular regard to the matters set out in this Clause 6.

6.2   **Undertakings**

(a)   **Information**. The NOD Agent will provide to the Bank:

(i)    at the same time they are delivered to any group of Noteholders or lenders under any instrument which refinances any notes held by Noteholders, but in any event on or before the deadline for delivery of such financial statements in any Indenture or the document governing any instrument which refinances any notes issued under any Indenture:

(aa)   the audited consolidated financial statements of the NOD Agent for each Financial Year (the "**Annual Financial Statements**"); and

(bb)   the consolidated financial statements of the NOD Agent for each Financial Quarter (other than in respect of the fourth Financial Quarter) (the "**Quarterly Financial Statements**").

(ii)   as soon as they are available, but in any event within 30 days after the end of each month, its management accounts on a consolidated basis for that month (the "**Monthly Management Accounts**").

(iii)  Within 30 days following the end of each month, commencing with the first calendar month ending after the Effective Date, the Monthly Reporting Pack.

(iv)   Within 60 days after the start of each Financial Year a copy of the Annual Business Plan

(b)   **Provision and contents of Leverage Calculation Certificate**.

(i)    The NOD Agent shall supply a Leverage Calculation Certificate to the Bank with each set of its Annual Financial Statements and each set of its Quarterly Financial Statements, but in any event no later than 60 days after the end of each Financial Quarter (other than in respect of the fourth Financial Quarter) or 120 days after the end of each Financial Year.

(ii)   Furthermore, each Leverage Calculation Certificate shall be signed by any director of the Customer or the chief executive officer, chief financial officer, head of treasury, head of corporate development or head of group accounting of the Customer.

(iii)  For the avoidance of doubt, the Leverage Calculation Certificate will continue to be provided in the event a document is entered into by any member of the Customer Group that governs an instrument which refinances the notes issued under the New Notes Indenture (regardless of whether such document provides for the provision of a Leverage Calculation Certificate).

(c)   **Requirements as to financial statements**

RESTRICTED

**564**

(i)   The NOD Agent shall procure that each set of Annual Financial Statements, Quarterly Financial Statements and Monthly Financial Statements includes a balance sheet, profit and loss account and cashflow statement.

(ii)   Each set of financial statements delivered pursuant to Clause 6.2(a) shall be prepared in accordance with the Accounting Principles.

(d)   **Information: miscellaneous**

(i)   The NOD Agent shall supply to the Bank, at the same time as they are dispatched to such persons, copies of all documents dispatched by the NOD Agent or any of its Subsidiaries to its creditors generally (or any class of them) including any report delivered to any group of Noteholders under any Indenture or the document governing any instrument which refinances any notes issued under any Indenture; and

(ii)   if the Bank so requests, the NOD Agent shall promptly provide such information as the Security Agent may reasonably require about the Security and compliance of the NOD Agent and/or its Subsidiaries with the terms of the Specified Security Documents;

(iii)   The NOD Agent shall supply to the Bank a notification of any Event of Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence;

(iv)   The NOD Agent shall promptly supply to the Bank any financial or other information that the Bank may reasonably request for the purposes of understanding that Customer's financial position and its ability to meet its obligations under the NOD Terms.

(e)   **Negative pledge**. The Customer will not create or allow any mortgage, charge, pledge, lien or other encumbrance over all or any part of its assets without the Bank's written consent, other than:

(i)   any disposal, indebtedness, guarantee, indemnity, mortgage, charge, pledge, lien or other encumbrance or other transaction (1) arising under the Specified Security Documents or (2) otherwise not prohibited by the terms of any of the Debt Documents;

(ii)   a lien arising by operation of law and in the ordinary course of trading;

(iii)   any netting or set-off arrangement entered into solely by that Customer in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances;

(iv)   anything arising under any retention of title, hire purchase or conditional sale arrangement or arrangements having similar effect in respect of goods supplied to any Customer in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by the Customer; and

(v)   any mortgage, charge, pledge, lien or other encumbrance granted in favour of the Bank.

(f)   **No security interest over accounts**. Notwithstanding sub-clause (e), and other than the circumstances described in sub-clause (e)(i), no security interest may be granted over or in respect of any Account and the rights of the Customer in connection with any Account may not be transferred or assigned and any purported creation of security, assignment, transfer or other disposal shall be void and of no effect.

(g)   **Anti-bribery and corruption**. The proceeds of the Facility will not be used, directly or indirectly, for any payments that could constitute a violation of any applicable anti-bribery law.

(h)   **Sanctions**. The Customer and its subsidiaries will not, directly or indirectly, use the proceeds of the Facility, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other Person (as defined below), (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions (as defined below), or (ii) in any other manner that would result in a violation of Sanctions by any Person (including any Person participating in the Facility).

(i)   **Representations.** The Customer will promptly inform the Bank should any representation or warranty under Clause 7 (Representations) cease to be true.

RESTRICTED

## 7.    Representations

The Customer makes the representations and warranties set out in this Clause 7 (other than paragraph (a)) to the Bank daily until the Facility has been repaid in full, by reference to the facts and circumstances existing at that date.  The Customer makes the representations and warranties set out in Clause 7(a)(i) on the date of this agreement and the representations and warranties set out in this Clause 7(a)(ii) on the date on which the relevant financial statements or any other information are delivered under this agreement.

(a)    **No misleading information.**

(i)    The information provided in the online data room hosted by Merrill Datasite with the designated project name "Kelly" containing documents and information relating to the Customer Group and all other written information provided to the Bank by any member of the Customer Group in connection with the negotiation, consideration and implementation of this agreement as at the date such information was provided was true and accurate in all material respects and that information taken as a whole was not misleading in any material respect and the financial projections or forecasts provided were prepared on the basis of accurate historical information and on the basis of reasonable assumptions at the time (provided that it is acknowledged that financial projections or forecasts are subject to uncertainties including those arising as a result of Covid-19 Pandemic and the OPEC-related Oil Price Reduction and there can be no assurance that any such financial projections or forecasts will be realised); and

(ii)    All information provided to the Bank pursuant to the terms of this agreement (including (but not limited to) the information provided under Clause 6.2(a), (b) and (d)) is true, complete and accurate in all material respects as at the date it was provided and has not become misleading or incorrect.

(b)    **Accounts**. It is the sole and beneficial owner of each Account in its name and that, except (1) arising under the Specified Security Documents or (2) otherwise not prohibited by the terms of any of the Debt Documents, no trust arrangement, security interest, agency arrangement or other beneficial interest exists in relation to any such Account and for the avoidance of doubt, it is the sole beneficial owner of the Cleared/Value Dated Balance on each Account in its name, notwithstanding the designation of the Accounts as "re:" another customer and the Accounts are so designated purely for administrative purposes in order to record the identity of the customer from which any monies forming part of the Cleared Value/ Dated Balance are transferred or paid.

(c)    **Anti-bribery and corruption**. The Customer is not aware of, has not taken nor to its knowledge is any director, officer, agent, employee, affiliate or other person acting on behalf of the Customer or any of their subsidiaries aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of any applicable anti-bribery law, including but not limited to, the United Kingdom Bribery Act 2010 (the "**UK Bribery Act**") and the U.S. Foreign Corrupt Practices Act of 1977 (the "**FCPA**"). Furthermore, the Customer Group and, to the knowledge of the Customer Group, each of its affiliates have conducted their businesses in compliance with the UK Bribery Act, the FCPA and similar laws, rules or regulations and have instituted and maintain policies and procedures designed to ensure, and which are reasonably expected to continue to ensure, continued compliance therewith.

(d)    **Sanctions**. None of the Customer, nor any subsidiary, director, officer, employee, agent, or affiliate of the Customer Group, is an individual or entity (a "**Person**") that is, or is owned or controlled by Persons that are (i) the subject of any sanctions administered or enforced by the US Department of the Treasury's Office of Foreign Assets Control, the US Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or the Hong Kong Monetary Authority (collectively, "**Sanctions**"), or (ii) located, organised or resident in a country or territory that is, or whose government is, the subject of Sanctions.

## 8.    Fees, costs and expenses

8.1    The Customer agrees to indemnify the Bank within 5 Business Days of demand against any and all claims, losses, costs and expenses arising out of or in connection with:

RESTRICTED

**566**

(a)   the enforcement of or the preservation of any rights under the NOD Terms and/or any Security and any proceedings instituted by or against the Bank as a consequence of taking or holding the Security or enforcing these rights;

(b)   a breach by the Customer of these NOD Terms, including, without limitation. a failure by the Customer to pay any amount due hereunder on its due date;

(c)   any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same) payable in respect of the NOD Terms; and

(d)   any currency conversion made by the Bank in connection with these NOD Terms, including, without limitation, in connection with the enforcement of its rights hereunder.

8.2   It is not necessary for the Bank to incur expense or make payment before enforcing a right of indemnity under the NOD Terms.  The indemnities in Clause 8.1 are continuing obligations of the Customer, separate and independent from the other obligations of the Customer and survive the termination of the NOD Terms.

8.3   The Bank may require the Customer to pay a renewal fee if, and each time, the Bank notifies the Customer that it will continue to provide the Facility after a periodic review.  The Bank will inform the customer of the amount of any renewal fees before debiting that amount in accordance with clause 8.4.

8.4   All fees, costs and expenses payable to the Bank under the NOD Terms may be debited from any Account in the name of the Customer.  The Customer authorises the Bank for this purpose.

## 9.   Miscellaneous provisions relating to facilities available in currencies other than sterling

9.1   If, in the opinion of the Bank, deposits in a currency are not available to the Bank to finance any drawing on the relevant currency account such drawing may, at the Bank's discretion following consultation with the Customer, be re-denominated in another currency by reference to the Bank's then prevailing spot selling rate of exchange for the outstanding currency against the currency of re-denomination.

9.2   In the event that a member state that at the date of this Application Form:

(i)   is a Participating Member State; and

(ii)   is (A) the jurisdiction of incorporation of a Borrower, or (B) the jurisdiction of the centre of main interest of a Borrower, or (C) a jurisdiction where a substantial portion of a Borrower's assets are located or its revenues are generated;

and such member state ceases or, in the reasonable opinion of the Bank, will cease to be a Participating Member State, the Bank may at any time thereafter redenominate any sum due to it in Euro under this Application Form to Sterling at the Bank's then prevailing spot selling rate of exchange or, at the Bank's prevailing spot selling rate of exchange immediately prior to such member state ceasing to be a Participating Member State.

## 10.   Tax and payments

10.1   All payments by the Customer will be made in cleared funds in the currency in which the payment is due on a Business Day on the due date for payment or, if that day is not a Business Day, on the next succeeding Business Day.

10.2   All payments will be made without any deduction or withholding (whether in respect of set-off, counterclaim, duties, taxes, charges or otherwise).

10.3   If the Customer is required by law to make any deduction or withholding from a payment, it will promptly pay to the Bank such additional sums as will make the net sum received by the Bank equal to the full sum payable had there been no deduction or withholding.

RESTRICTED

10.4    If a payment due from the Customer under the NOD Terms is received or recovered by the Bank in a currency other than the currency which is due (the "**Due Currency**") the Bank may convert the amount received by it into the Due Currency at any time at the Bank's then prevailing spot selling rate of exchange.

## 11.    Interest

11.1    In relation to each GLS Account, interest on the Facility will be payable on the debit balances on the Accounts at the interest rate specified in the GLS Terms.

11.2    In relation to each Non-GLS Account:

(a)    interest on the Facility will be payable at the Non-GLS Interest Rate on the debit balances on each of the Customer's Non-GLS Accounts;

(b)    interest will be debited in arrears on the Borrowers' agreed charging dates or upon termination of the relevant Facility to the accounts on which such interest has accrued; and

(c)    interest will be calculated on a daily basis and will be calculated on the actual number of days elapsed against a year of 360 or 365 days as the Bank shall determine is the market convention for the relevant currency.

11.3    In relation to any sum which is not paid on its due date, interest shall be charged at a rate of 2% per annum above the rate otherwise applicable to such amount, or if no such rate is applicable, at a rate of 2% per annum over Base Rate.

## 12.    Set Off

12.1    The Bank may (at its absolute discretion and without consent or demand of any Customer) at any time set off, apply or combine, or exercise any netting rights in relation to, all or any amounts due from the Bank to a Customer (including in respect of any credit balance on any Account of that Customer), regardless of the place of payment, booking branch or currency of either obligation in or towards the repayment or discharge of any amount due to the Bank from a member of the Customer Group under any Corporate Banking Facility provided by the Bank to any member of the Customer Group (or any rights of HSBC under the Intercreditor Agreement with respect to the Corporate Banking Facilities). If the obligations are in different currencies, the Bank may convert either obligation at its then prevailing spot selling rate of exchange in its usual course of business for the purpose of the set-off.

12.2    The Bank's set-off rights in this Clause 12 are additional to and without prejudice to any other rights of set-off or combination of accounts that the Bank may have, including (without limitation) any rights under the NOD Terms, Umbrella Designation Letter or Intercreditor Agreement

## 13.    Demand and notice

13.1    Any demand or notice given on behalf of the Bank under the NOD Terms may be:

(a)    by letter addressed to the Customer or any officer of the Customer sent by first class post to or left at the Customer's address last known to the Bank or at the Customer's registered office; or

(b)    by fax or other electronic means to the Customer's last known fax number or electronic mail address.

13.2    If sent by post, the demand or notice will be taken to have been made or given at noon the second day following the day the letter was posted.  If sent by fax or other electronic means, the demand or notice will be taken to have been made or given at the time of transmission.

13.3    Unless otherwise advised by the Bank any notices given on behalf of the Customer to the Bank under the NOD Terms will be delivered to the office of the Bank from which the NOD Terms have been sent for the attention of the division named in the Bank's signature block to the Net Overdraft Facility - Application Form.

RESTRICTED

**568**

**14.    Information management**

14.1    The Bank may disclose any confidential information relating to the NOD Terms and/or the Customer to:

(a)    any member of the HSBC Group and any of its or their officers, directors, employees, professional advisers and agents and as required or requested by law, rule, regulation or any court or regulatory authority or similar body; and

(b)    any potential transferee or assignee who has entered into a confidentiality undertaking in respect of such confidential information.

**15.    Assignment and transfer**

The Customer may not assign or transfer any of its rights, benefits or obligations under the NOD Terms without the prior written consent of the Bank. The Bank may assign the NOD Terms and its rights, benefits and/or obligations hereunder to any other person.

**16.    Miscellaneous**

16.1    No failure by the Bank to exercise nor delay in exercising any right or remedy under the NOD Terms shall operate as a waiver or release of that right or remedy.  The Bank is entitled to exercise all of its rights and remedies unless it has expressly waived them in writing.

16.2    If, at any time, any provision of the NOD Terms is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

16.3    The NOD Terms may be executed in any number of counterparts.  All counterparts together will be taken to constitute one instrument.

16.4    Any certification or determination by the Bank of a rate or amount or sum due from the Customer under the NOD Terms is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**17.    Law and jurisdiction**

17.1    The NOD Terms and any non-contractual obligations arising out of or in connection with them shall be governed by and construed in accordance with the laws of England.

17.2    The parties submit to the exclusive jurisdiction of the courts of England to settle any dispute or proceedings in connection with the NOD Terms or any non-contractual obligation arising out of or in connection with the NOD Terms provided that this Clause shall be for the benefit of the Bank alone and the Bank shall not be prevented from taking proceedings in relation to any dispute in any other courts                                        with                                        jurisdiction.

RESTRICTED

# ▶General matters applicable to the relationship between the Bank and the Customer

## Material Interests

The Bank, divisions or transaction teams within the Bank, other members of the HSBC Group or any company with whom the Bank has an association, may from time to time have interests or duties which conflict with its clients' interests or duties owed to its clients, including, potentially, the Customer. The Bank has established procedures which are designed to identify and manage such conflicts. These include organisational and administrative arrangements to safeguard the interests of clients. The Bank also has rules and procedures which control disclosure of information between the HSBC Group's various legal entities, between different divisions within these legal entities and also between the transaction teams within those entities.

The Customer acknowledges that the Bank's agreement to provide services to the Customer does not require any other member of the HSBC Group or any of the Bank's other divisions or transaction teams to restrict their activities in any way or to provide the Customer, the Bank or the division or team advising the Customer any information whatsoever about, or derived from, those activities nor, in most cases, does it create any obligation to advise the Customer of any conflict of interest which exists or may arise.

In financing the Customer, the Bank will not be required to disclose to the Customer, nor to make use for the Customer's benefit, of, any information known to the Bank or any individual acting on the Bank's behalf which: (a) belongs to or is confidential to another client, or (b) belongs to or is confidential to the Bank, some other part of the Bank's business, its associates, or one of the HSBC Group's various legal entities.

In some cases, the Bank's procedures and controls may not of themselves be sufficient to ensure that a potential conflict of interest does not damage a client's interests.  In these circumstances, the Bank may consider it appropriate to disclose the potential conflict to the client and may seek the client's consent to proceed.  Alternatively, the Bank may decline to act or cease to act in any circumstance where there is residual risk of damage to the interests of any client.

## Compliance Activity

The Bank and members of the HSBC Group, are required, and may take any action they consider appropriate in their sole discretion, acting reasonably, to meet Compliance Obligations in connection with the detection, investigation and prevention of Financial Crime ("**Financial Crime Risk Management Activity**").  To the extent permissible by law, neither the Bank nor any other member of the HSBC Group shall be liable to the Customer or any third party in respect of any Loss, whether incurred by the Customer or a third party, caused in whole or in part in connection with the undertaking of Financial Crime Risk Management Activity.

"**Compliance Obligations**" means obligations of the HSBC Group to comply with: (a) Laws, or international guidance and internal policies or procedures, (b) any demand and/or requests from authorities or reporting, disclosure or other obligations under Laws, and (c) Laws requiring members of the HSBC Group to verify the identity of its customers.

"**Financial Crime**" means money laundering, terrorist financing, bribery, corruption, tax evasion, fraud, evasion of economic or trade sanctions, and/or violations, or acts or attempts to circumvent or violate, any Laws relating to these matters.

"**Laws**" means any applicable local or foreign statute, law, regulation, ordinance, rule, judgment, decree, voluntary code, directive, sanctions regime, court order, agreement between any member of the HSBC Group and an authority, or agreement or treaty between authorities and applicable to the Bank or a member of the HSBC Group.

"**Loss**" means any claim, charge, cost (including, but not limited to, any legal or other professional cost), damages, debt, expense, tax, liability, obligation, allegation, suit, action, demand, cause of action, proceeding or judgment, however calculated or caused, and whether direct or indirect, consequential, punitive or incidental.

RESTRICTED

# ▶  NOD Supplementary Terms – Multiple Parties

**1.    INTRODUCTION**

These terms and conditions (the **"Multiparty Supplementary Terms"**) apply to and govern the use of the Facility by the Customer and shall at all times and for all purposes form part of the NOD Terms.

**2.    Definitions**

Unless otherwise defined herein, terms defined in the Master Terms shall have the same meaning in these Multiparty Supplementary Terms. In addition, in these Multiparty Supplementary Terms:

**"Accession Notice"** means an accession request duly signed by the relevant entity (in a form as provided by the Bank on request) for the purpose of adding an Additional Borrower in accordance with Clause 6.

**"Account Notice"** means a notice to the Bank (in a form as provided by the Bank on request) duly signed by a Borrower and/or the NOD Agent requesting that the Facility is to apply (or cease to apply) to certain Accounts specified in that notice.

"**Departing Borrower**" means a Borrower who duly executes and delivers a Withdrawal Notice such that they are no longer a Borrower in accordance with Clause 6.4,

 "**Withdrawal Notice**" means a notice (in a form as provided by the Bank on request) duly signed by a Borrower and/or the NOD Agent for the purpose of withdrawing a Borrower from the NOD Terms in accordance with Clause 6.2.

**3.    NOD Agent Appointment**

Each Borrower authorises the NOD Agent to negotiate, agree or change the Facility or any amendment to the NOD Terms, including any replacement or renewal of the NOD Terms, any increase or decrease in the Limit, and to execute any document setting out such agreement for itself and on behalf of each Borrower.

**4.    Representations, Warranties and undertakings**

4.1    Each Borrower represents and warrants to the Bank that:

(a)    the NOD Agent is authorised by each Borrower to negotiate, agree or change the Facility or any amendment to the NOD Terms, including any replacement or renewal of the NOD Terms, any increase or decrease in the Limit, and to execute any document setting out such agreement for itself and on behalf of each Borrower, including without limitation the documents referred to in Clause 5; and

(b)    it has the power to authorise the NOD Agent to carry out the acts set out in Clause 4.1(a) above.

4.2    Each Borrower repeats the representations and warranties in these Multiparty Supplementary Terms continually during the term of the NOD Terms.

**5.    Group Relationship**

5.1    Each Borrower represents and warrants to the Bank that it is a member of the same Customer Group as each other Borrower. Each Borrower undertakes to give to the Bank (with copies to the other Borrowers) not less than 14 (fourteen) calendar days prior written notice that such Borrower is to cease to be a member of the same Customer Group as each other Borrower, and each such notice shall take effect as a notice by the relevant Borrower of its intention to cease to be a Borrower.

5.2    A Borrower who ceases to be a member of the same Customer Group as each other Borrower and fails to give prior written notice to the Bank in accordance with Clause 5.1 becomes a Departing Borrower on the date the Bank so notifies the Borrower in writing.

**6.      Accession and Withdrawal of Borrowers**

6.1    **Accession**.

(a)    An entity that is a member of the same Customer Group as the existing Borrowers but is not a party to the NOD Terms  may submit an Accession Notice to the Bank confirming that:

(i)     it wishes to become a Borrower; and, if applicable,
(ii)    it has become or will become a Participant under the GLS Terms,

(b)    Subject to Clause 6.3, the Bank will confirm its agreement by countersigning and returning the Accession Notice whereupon the entity will become a Borrower on the later of: (i) the date specified by the Bank in the Accession Notice; and (ii) the date that entity becomes a Debtor under the Intercreditor Agreement.

6.2    **Withdrawal.**

(a)    If a Borrower:

(i)     wishes to resign from the NOD Terms; and/or
(ii)    intends to cease to be a Participant under the GLS Terms (a "**Former Participant**");

that Borrower and/or the NOD Agent shall submit to the Bank a Withdrawal Notice.

(b)    If the Bank is satisfied that the relevant Borrower has no actual or contingent liabilities outstanding under the Facility, it will release that Borrower from its rights and obligations under the NOD Terms by countersigning and returning the Withdrawal Notice, whereupon such Borrower becomes a Departing Borrower.

(c)    Instead of withdrawing from the Facility, a Borrower may, before becoming a Former Participant, request that the Facility is available on its Non-GLS Accounts upon it becoming a Former Participant by submitting an Account Notice confirming:

(i)     the fact that and the date on which it will cease to be a Participant under the GLS Terms;
(ii)    that it wishes the Facility to continue to apply to certain of its Non-GLS Accounts; and
(iii)   which Non-GLS Accounts the Facility is to continue to apply to.

(d)    Subject to Clause 6.3, the Bank will confirm its agreement by countersigning and returning the Account Notice whereupon the Facility will be available only on the relevant Non-GLS Accounts of the Borrower from the date on which it becomes a Former Participant.

(e)    A Former Participant who fails to give prior written notice to the Bank in accordance with Clause 6.2 (a) (ii) or (b) becomes a Departing Borrower on the date on which it becomes a Former Participant.

6.3    **Bank Discretion.** The Bank may, in its absolute discretion, decide to consent to any request in a Accession Notice, Withdrawal Notice and/or Account Notice it has received and it may make its consent subject to such conditions it considers necessary and/or desirable, including (without limitation) any amendment to the NOD Terms.

6.4    **Departing Borrower. If a Borrower becomes a Departing Borrower:**

(a)    it immediately ceases to be a Borrower;

(b)    the Facility shall immediately be deemed to have been withdrawn from it and no further borrowings may be made by it under the NOD Terms;

(c)    unless otherwise directed by the Bank in writing, all sums owed by it to the Bank under the NOD Terms (if any) become immediately payable to the Bank;

(d)    no credit balance standing to the credit of any of its Accounts shall be taken into account for the purposes of calculating the amount of the Net Overdraft Balance;

(e)    the remaining Borrowers shall forthwith elect to make such repayments in respect of their borrowings as will ensure compliance with the Limit or, in default of such election by the Borrowers, shall make such repayments as the Bank direct; and

(f)    for the avoidance of doubt and without prejudice to the preceding paragraphs of this Clause 6.4:

    (i)    a Departing Borrower shall remain liable to the Bank under the NOD terms until such time at which the Bank notifies the Departing Borrower in writing that it is satisfied that it has received payment of all sums outstanding from that Departing Borrower in connection with the NOD Terms; and

    (ii)    nothing in this clause 6.4 shall prevent the exercise by the Bank at any time of any other right in and towards satisfaction of any indebtedness owed to it by a Departing Borrower.

## 6.5   Documentation

(a)    Any document submitted and any amendment to the NOD Terms requested by the Bank pursuant to this Clause 6 shall be signed by the NOD Agent (acting for itself and as agent for each of the Borrowers).

(b)    The NOD Agent undertakes to send a copy of any countersigned documents received from the Bank to all Borrowers.

(c)    The rights, duties and obligations of the Borrowers and/or the Bank under to the NOD Terms shall not be affected by any failure by the NOD Agent to notify any Borrowers of any matter relating to the Facility or the NOD Terms.

## 7.   Disclosure

The Bank may disclose to the NOD Agent any information concerning any Borrower and any Account, and execution of the Application Form or an Accession Notice by the Borrower, as applicable, shall constitute the Borrower's consent to such disclosure.

## 8.   Notices

8.1    Any notice sent by the Bank to the NOD Agent shall constitute notice to all Borrowers.

8.2    Notwithstanding Clause 8.1, the Bank may at its sole discretion address any notices or demands for payment direct to any Borrower and such notice shall be effective as if sent to the NOD Agent.

## 9.   Liability

9.1    Any liability of the NOD Agent or any Borrower under the NOD Terms shall be a joint and several liability of such NOD Agent or the relevant Borrower;

9.2    If any part of the NOD Terms is or becomes unenforceable against any Borrower it shall remain enforceable against the others;

9.3    Each Borrower agrees it is bound by NOD Terms even if not all of the other Borrowers have executed the NOD Terms, or there was some deficiency or invalidity in another Borrower being bound by the NOD Terms;

9.4    The Bank's rights against any Borrower shall not be impaired, discharged or otherwise affected by any time, indulgence, consent or waiver granted to any other Borrower or by any liability of any other Borrower, or any Security relating to any such liability being varied or released or by any failure to take or perfect any such Security or by any other act, event or omission which would but for this provision impair, discharge or otherwise affect any of the Bank's rights; and

9.5    None of the Borrowers shall be entitled, without the Bank's written consent, to exercise any right, or make any claim against any other Borrower (including any right of subrogation or right to prove in a liquidation) arising by virtue of any payment made in accordance with the NOD Terms or otherwise arising in connection to it.

RESTRICTED

# NOD Supplementary Terms – Non-GLS Accounts

**1.    INTRODUCTION**

1.1    These terms and conditions (the "**Non-GLS Accounts Supplementary Terms**") apply to and govern the use of the Facility by the Customer and shall at all times and for all purposes form part of the NOD Terms.

**2.    Definitions**

Terms defined in the Master Terms shall have the same meaning in these Non-GLS Accounts Supplementary Terms.

**3.    SET OFF**

3.1    Each Customer irrevocably and unconditionally:

(a)    authorises the Bank (at its absolute discretion and without notice to or consent or demand of any Borrower) from time to time to set off, apply or combine, or exercise any netting rights in relation to, all or any amounts for the time being due from the Bank to the Borrower in respect of any credit balance on any Account of that Borrower in or towards the repayment or discharge of any amount for the time being due to the Bank from the Borrower under any Corporate Banking Facility (as defined in the Umbrella Designation Letter) provided by the Bank to that Borrower (or any rights of HSBC under the Intercreditor Agreement with respect to the Corporate Banking Facilities).

3.2    Each Borrower:

(a)    acknowledges that neither its above-described liability nor the rights, powers and remedies conferred on the Bank by these Non-GLS Accounts Supplementary Terms or by law shall be discharged, impaired or otherwise affected by any act, event or omission which would otherwise operate to discharge, impair or otherwise affect such liability or such rights, powers or remedies; and

(b)    acknowledges that so long as it is under the above-described liability, it shall not exercise any rights or remedies which it may at any time have to be indemnified by or claim any contribution from any other Borrower in connection with these Non-GLS Accounts Supplementary Terms.

3.3    The Bank's set-off rights in Clause 3.1 are additional to and without prejudice to any other rights of set-off or combination of accounts that the Bank may have, including (without limitation) any rights under the NOD Terms, the Umbrella Designation Letter or the Intercreditor Agreement.

3.4    Each Borrower agrees that its obligations under this Clause 3 shall not be affected or discharged as a result of:

(a)    the making of any changes to the Facility or any variation to the NOD Terms; or

(b)    the variation, exchange, release or failure to enforce any other security or guarantee held or to be held by the Bank with respect to the Facility (or any part thereof) or the NOD Terms; or

(c)    the enforcement against any Borrower under this Clause 3 without having enforced or sought to enforce any rights or remedies which the Bank may have against any other Borrower or any other person; or

the taking of, or the omission to take, any action which but for this provision would discharge any Borrower from its liability under this Clause 3.

RESTRICTED

**574**

## SCHEDULE 1

### FORM OF LEVERAGE CALCULATION CERTIFICATE

To:      [        ] as Bank

From:   [Company]

Dated:

**KCA Deutag Alpha Limited – Net Overdraft Facility
dated [          ] (the Overdraft Agreement)**

1.      We refer to the Overdraft Agreement.  This is a Leverage Calculation Certificate.  Terms defined in the Overdraft Agreement have the same meaning when used in this Leverage Calculation Certificate unless given a different meaning in this Leverage Calculation Certificate.

2.      We confirm that in respect of the 12 month period ending on [      ],   the   Senior   Secured   Gross Leverage Ratio was [    ]:

Signed for and on behalf of

……………………………
[Authorised Signatory]
[Company]

RESTRICTED

RESTRICTED

# HSBC Global Documentation Output Pack — Explanatory Statement

Welcome to your Global Documentation Output Pack. There are two phases to generating your Output Pack ready for execution. These will allow you to review all the documentation before you finalise it and it can no longer be edited.

The Output Pack is initially marked with a Draft watermark when you have selected "Generate Draft Documentation". This represents all the documentation, including Terms and Conditions, based upon the services you have requested and the data entered so far. Please thoroughly review and ensure that all known data in the application forms is entered. This will improve your product set up. If any information is missing please go back to the Customer Detail Tab and/or Product Requests Tab and make any changes/additions. You can generate your draft document again and recheck all data entered.

After your final review of the watermarked version you can select the Finalise Document button which will generate the Output Pack again but without the watermark, ready to be signed. Once the Finalise Document is selected you will not be able to make any further amendments. You would need to start your case again. You are required to make a confirmation before selecting the Finalise Button.

If you have any questions please contact your HSBC representative dealing with your case.

Le damos la bienvenida a su paquete inicial de Global Documentation.  La generación de un paquete inicial listo para ejecutarse consta de dos fases.  Estas le permitirán revisar toda la documentación antes de finalizarla y de que ya no pueda editarse.

El paquete inicial incluye al principio la marca de agua Borrador si selecciona la opción "Generar borrador de documentación".  Esto representa toda la documentación, incluidos los términos y condiciones, en función de los servicios solicitados y los datos introducidos hasta ese momento.  Realice una revisión exhaustiva para asegurarse de se hayan introducido todos los datos conocidos en los formularios de solicitud.  Esto facilitará la configuración del producto.  Si falta información, vuelva a las pestañas Detalles del cliente o Solicitudes de producto y realice los cambios o las adiciones pertinentes.  Puede generar su borrador de documentación otra vez y volver a comprobar todos los datos introducidos.

Tras la revisión final de la versión con marca de agua, puede seleccionar el botón Finalizar documentación, que generará el paquete inicial de nuevo sin la marca de agua, listo para firmarse.  Una vez seleccionado el botón Finalizar documentación, no podrá realizar modificaciones.  Deberá volver a empezar el caso.  Debe confirmar antes de seleccionar el botón Finalizar.

Si tiene cualquier pregunta, póngase en contacto con el representante de HSBC encargado del caso.

Selamat datang di Global Documentation Output Pack.  Ada dua fase untuk membuat Output Pack Anda siap dijalankan.  Hal ini akan memungkinkan Anda memeriksa semua dokumen sebelum Anda memfinalisasi dokumen tersebut dan tidak dapat diedit lagi.

Output Pack ini awalnya diberi tanda dengan watermark Draf saat Anda memilih "Buat Draf Dokumentasi".  Hal ini mewakili semua dokumentasi, termasuk Syarat dan Ketentuan, berdasarkan layanan yang Anda minta dan data yang dimasukkan sejauh ini.  Periksalah secara menyeluruh dan pastikan semua data yang diketahui dalam formulir aplikasi sudah dimasukkan.  Hal ini akan membantu meningkatkan pengaturan produk Anda. Jika ada informasi yang belum lengkap, kembalilah ke Tab Detail Nasabah dan/atau Permintaan Produk dan lakukan perubahan/penambahan yang diperlukan.  Anda dapat membuat draf dokumen lagi Anda dan memeriksa kembali semua data yang telah dimasukkan.

Setelah pemeriksaan final terhadap versi dokumen ber-watermark, Anda dapat menekan tombol Finalisasi Dokumen yang akan menghasilkan Output Pack lagi tetapi tanpa watermark, dan siap untuk ditandatangani.  Jika Anda sudah menekan tombol Finalisasi Dokumen, Anda tidak dapat melakukan perubahan lagi.  Anda harus memulai kasus Anda lagi.  Anda diminta melakukan konfirmasi sebelum menekan Tombol Finalisasi.

Jika ada pertanyaan, hubungi perwakilan HSBC Anda yang menangani kasus ini.



## Table of Contents

Abbot Group Limited
 United Kingdom - HSBC UK
  English ......................................................................................................... 2
   Relationship Acceptance Form .......................................................... 2  [ ]
   Global Application Form - United Kingdom - HSBC UK ....................... 6  [ ]
    Pooling Form .................................................................................. 6  [ ]
   E-Channel Reporting .......................................................................... 12  [ ]
    E-Channel Account Details Form - HSBCnet .................................. 12  [ ]
    E-Channels Letter of Authority ....................................................... 22  [ ]
    E-Channels Letter of Authority ....................................................... 24  [ ]
    E-Channels Letter of Authority ....................................................... 26  [ ]
    E-Channels Letter of Authority ....................................................... 28  [ ]
    E-Channels Letter of Authority ....................................................... 30  [ ]
    E-Channels Letter of Authority ....................................................... 32  [ ]
    E-Channels Letter of Authority ....................................................... 34  [ ]
    E-Channels Letter of Authority ....................................................... 36  [ ]
    E-Channels Letter of Authority ....................................................... 38  [ ]
    E-Channels Letter of Authority ....................................................... 40  [ ]
    E-Channels Letter of Authority ....................................................... 42  [ ]
    E-Channels Letter of Authority ....................................................... 44  [ ]
    E-Channels Letter of Authority ....................................................... 46  [ ]
  Relationship Checklist ........................................................................ 48  [ ]
  Terms and Conditions ......................................................................... 50  [ ]

DRAFT

**578**

# Relationship Acceptance Form

| For Bank Use Only | Original Document Stored | | GRID | |
|---|---|---|---|---|

## Customer Details

| Registered/Customer Name | Abbot Group Limited |
|---|---|
| Country/Territory of Formation / Incorporation | United Kingdom |

| Country/Territory Of Registration (if different from Formation/Incorporation) | |
|---|---|

| Registration/Formation/ Incorporation Number(if applicable) | | Tax Number | |
|---|---|---|---|

| Date of Formation/Incorporation or Registration | | Corporate Status | |
|---|---|---|---|

"Formation" means, in relation to a non-corporate entity, the execution of legal documents or completion of such other legal steps (including obtaining required approvals) as may be required to form such entity. The customer whose Registered/Customer Name is set out above shall be referred to as "Customer" for the purposes of the Relationship Documents. Terms used in this Relationship Acceptance Form shall have the same meaning as in other relevant Relationship Documents, unless otherwise defined.

## Customer Address Details

**Registered/Customer Address**

| Address Line 1 | |
|---|---|
| Address Line 2 | |
| Address Line 3 | |

| City | | State/Province/County | |
|---|---|---|---|

| Postal/Zip Code | | Country/Territory | United Kingdom |
|---|---|---|---|

**Business Address**  ☒ Same as Registered/Customer Address   ☐ Other

**Correspondence Address**  ☒ Same as Registered/Customer Address   ☐ Same as Business Address   ☐ Other

DRAFT

Customer Pack Number: 28092020-00041
Document Number: GF-1000-200228-EN. HSBC Group © All rights reserved.

579   HSBC

Version   09/10/2020 13:37:17

**Relationship Acceptance Form (Continued)**

## Customer Contact

Please provide details of the primary business contact(s).

| | | | |
|---|---|---|---|
| First Name(s) | | Last Name | |
| Title (e.g. Mr, Mrs) | | Job Title | |
| Telephone Number | | Fax Number | |
| Email Address | | | |

## Requested Services

Please find listed below the Services requested by the Customer and the corresponding list of Relationship Documents containing the applicable terms and conditions.

This Application Form refers to the Master Services Agreement and other Relationship Documents agreed between the Customer and the HSBC Entity/ies whose registered name(s) is/are set out below. Each such HSBC Entity shall be referred to as "Bank" for the purposes of the applicable Relationship Documents.  Where the Customer takes additional Services from members of the HSBC Group in the future, the Bank may provide the Customer with additional Relationship Documents which apply in addition to those set out below. The Bank will not provide the Customer with those set out below again unless the Customer requests another copy of these from the Bank. The Parties will enter into additional terms and conditions using a Service Amendment Form.

| Service | Country/ Territory | HSBC Entity | Relationship Documents | |
|---|---|---|---|---|
| | | | Applicable Application Forms | Other Applicable Relationship Documents |
| Notional Pooling | United Kingdom - HSBC UK | HSBC UK Bank plc | Relationship Acceptance Form, Notional Pooling Form, E-Channel Account Details Form - HSBCnet | Master Services Agreement, Confidentiality and Regulatory Annex, Pooling Service Schedule, Participant Country Condition, E-Channel Letter of Authority, United Kingdom - HSBC UK Country Conditions, Relationship Checklist |

3 / 69

## Customer Declaration

By executing this Relationship Acceptance Form, the Customer acknowledges the receipt of and agree to all of the terms and conditions contained

within the Relationship Documents in Customer Pack Number  28092020-00041  which apply to the provision of each Service by each HSBC

Entity (and no other member of the Group) as described in the Requested Services section above. The Customer further agrees that the provisions of the Confidentiality and Regulatory Annex shall apply to the Customer's entire banking relationship with each HSBC Entity, and supplements those in any other agreement between the Customer and such HSBC Entity. Any consents, authorisations or waivers requested by such HSBC Entity, and permissions that already exist from the Customer in relation to Customer Information shall continue to apply in full force and effect, to the extent permissible by applicable law.

The Customer certifies that:
- it has taken all necessary action to authorise the entry into and performance of the Relationship Documents;
- the signatories named below have the necessary capacity and authority to enter into the applicable Relationship Documents with the HSBC Entity/ies named at the Requested Services section above on the Customer's behalf;
- the Authorised Persons who have completed a Signature Book have been duly authorised by the Customer in accordance with the Customer's constitutional documents and as set out in any relevant Application Form; and
- all information and documentation provided in the applicable Relationship Documents, and/or in connection therewith to the HSBC Entity/ies named above is complete, true and correct.

The Customer furthermore warrants and undertakes to take all steps necessary to ensure that this Customer Declaration shall remain valid and effective in all respects until such time as the Customer or the Bank terminates the Relationship Documents in accordance with their terms.

| | | | |
|---|---|---|---|
| Signature on behalf of the Customer: | | Signature on behalf of the Customer: | |
| First Name(s): | | First Name(s): | |
| Last Name: | | Last Name: | |
| Job Title: | | Job Title: | |
| Date: | | Date: | |

DRAFT

## Bank Confirmation

Each HSBC Entity (and no other member of the Group) named at the Requested Services section above agrees with the Customer that the terms and conditions contained within the applicable Relationship Documents shall apply by providing each of the Services described in the Requested Services section above.

Customer Pack Number: 28092020-00041
Document Number: GF-1000-200228-EN. HSBC Group © All rights reserved.

**581**  HSBC

Version   09/10/2020 13:37:17

Page left intentionally blank

**582**

# Pooling Form

This Pooling Form shall form part of the Relationship Documents agreed by each Participant listed below.

Pooling Reference No. | IOF-Abbot Group Limited-001 | Pooling Form Version No. | 00001

## Pooling Agent

| Registered / Customer Name | Customer Pack Number(s) |
|---|---|
| Abbot Group Limited | 28092020-00041 |

## Participants

| Registered /Customer Name | Jurisdiction of Formation / Incorporation | Customer Pack Number(s) |
|---|---|---|
| Abbot Holdings Limited | United Kingdom | 28092020-00040 |
| KCA Deutag Drilling Norge AS | Norway | 28092020-00033 |
| KCA European Holdings Limited | United Kingdom | 28092020-00028 |
| KCA Deutag Alpha Ltd | United Kingdom | 28092020-00037 |
| KCA Deutag Drilling Limited | United Kingdom | 28092020-00034 |
| KCA Deutag Drilling Offshore Services AS | Norway | 28092020-00032 |
| Abbot Investment (North Africa) Limited | United Kingdom | 28092020-00038 |
| KCA Deutag Caspian Limited | United Kingdom | 28092020-00036 |
| KCA Deutag Holdings Norge AS | Norway | 28092020-00031 |
| KCA Deutag Technical Support Limited | United Kingdom | 28092020-00029 |
| KCA Deutag Drilling Group Limited | United Kingdom | 28092020-00035 |
| Abbot Group Limited | United Kingdom | 28092020-00041 |
| Abbot Holdings Norge AS | Norway | 28092020-00039 |
| KCA Deutag Offshore AS | Norway | 28092020-00030 |

Customer Pack Number: 28092020-00041
Document Number: CF-TW01-110830-EN. HSBC Group © All rights reserved.



# Pooling Form continued

## Pooling Service

| Notional Pool | | Pool Name / Pool ID Bank use only | IOF-Abbot Group Limited-001 |
|---|---|---|---|
| Base Currency | USD | Location of the Notional pool | United Kingdom - HSBC UK |
| Interest Period | Monthly | Settlement Date | Last day of the month |

**Pooling Accounts**

| Account Number or Pool Name/ID | Currency |
|---|---|
| SCP 001 | GBP |
| SCP 002 | EUR |
| SCP 003 | NOK |
| SCP 004 | USD |
| 40127673147290 | CAD |
| 40127673147282 | SGD |
| 40127673147309 | MXN |



Customer Pack Number: 28092020-00041
Document Number: CF-TW01-110830-EN. HSBC Group © All rights reserved.

584 HSBC

# Pooling Form continued

## Advantage Allocation

**Advantage Allocation** 1    Pool Name/Pool ID    SCP 001

Allocation Method    ☒ Absolute Balance Allocation    ☐ Fair Share Allocation

Default Settlement Account    40012511145010

### Interest on Net Balance

Base Rate for Net Credit Balance    See IOF    Spread for Net Credit Balance

Base Rate for Net Debit Balance    See IOF    Spread for Net Debit Balance

### Interest on Pooling Accounts

| Pooling Account Number | Base Rate for Credit Balance | Spread for Credit Balance | Base Rate for Debit Balance | Spread for Debit Balance | Nominated Pooling Account |
|---|---|---|---|---|---|
| 40012511145010 | N/A | N/A | N/A | N/A | ☐ |
| 40012531348396 | N/A | N/A | N/A | N/A | ☐ |
| 40012501348418 | N/A | N/A | N/A | N/A | ☐ |
| 40012501348426 | N/A | N/A | N/A | N/A | ☐ |
| 40012501348442 | N/A | N/A | N/A | N/A | ☐ |
| 40012591348450 | N/A | N/A | N/A | N/A | ☐ |
| 40012541348469 | N/A | N/A | N/A | N/A | ☐ |
| 40012541348477 | N/A | N/A | N/A | N/A | ☐ |
| 40012531348388 | N/A | N/A | N/A | N/A | ☐ |
| 40012581348353 | N/A | N/A | N/A | N/A | ☐ |
| 40012551409565 | N/A | N/A | N/A | N/A | ☐ |
| 40012521492063 | N/A | N/A | N/A | N/A | ☐ |

**Advantage Allocation** 2    Pool Name/Pool ID    SCP 002

Allocation Method    ☒ Absolute Balance Allocation    ☐ Fair Share Allocation

Default Settlement Account    40127667641976

### Interest on Net Balance

Base Rate for Net Credit Balance    See IOF    Spread for Net Credit Balance

Base Rate for Net Debit Balance    See IOF    Spread for Net Debit Balance

### Interest on Pooling Accounts

Customer Pack Number: 28092020-00041
Document Number: CF-TW01-110830-EN. HSBC Group © All rights reserved.

585

 HSBC

**Pooling Form continued**

| Pooling Account Number | Base Rate for Credit Balance | Spread for Credit Balance | Base Rate for Debit Balance | Spread for Debit Balance | Nominated Pooling Account |
|---|---|---|---|---|---|
| 40127673147510 | N/A | N/A | N/A | N/A | ☐ |
| 40127667641976 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147443 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147341 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147384 | N/A | N/A | N/A | N/A | ☐ |
| 40127677022461 | N/A | N/A | N/A | N/A | ☐ |

**Advantage Allocation** 3     Pool Name/Pool ID     SCP 003

Allocation Method     ☒ Absolute Balance Allocation     ☐ Fair Share Allocation

Default Settlement Account     40127667640073

**Interest on Net Balance**

Base Rate for Net Credit Balance     See IOF     Spread for Net Credit Balance

Base Rate for Net Debit Balance     See IOF     Spread for Net Debit Balance

**Interest on Pooling Accounts**

| Pooling Account Number | Base Rate for Credit Balance | Spread for Credit Balance | Base Rate for Debit Balance | Spread for Debit Balance | Nominated Pooling Account |
|---|---|---|---|---|---|
| 40127673147553 | N/A | N/A | N/A | N/A | ☐ |
| 40127667640073 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147368 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147392 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147451 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147529 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147537 | N/A | N/A | N/A | N/A | ☐ |
| 40127676096894 | N/A | N/A | N/A | N/A | ☐ |

**Advantage Allocation** 4     Pool Name/Pool ID     SCP 004

Allocation Method     ☒ Absolute Balance Allocation     ☐ Fair Share Allocation

Default Settlement Account     40127673147231

**Interest on Net Balance**

Base Rate for Net Credit Balance     See IOF     Spread for Net Credit Balance

Base Rate for Net Debit Balance     See IOF     Spread for Net Debit Balance

Customer Pack Number: 28092020-00041
Document Number: CF-TW01-110830-EN. HSBC Group © All rights reserved.


586

**Interest on Pooling Accounts**

| Pooling Account Number | Base Rate for Credit Balance | Spread for Credit Balance | Base Rate for Debit Balance | Spread for Debit Balance | Nominated Pooling Account |
|---|---|---|---|---|---|
| 40127673147231 | N/A | N/A | N/A | N/A | ☐ |
| 40127660230006 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147325 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147333 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147376 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147435 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147478 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147486 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147502 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147545 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147561 | N/A | N/A | N/A | N/A | ☐ |
| 40127673147588 | N/A | N/A | N/A | N/A | ☐ |
| 40127674202468 | N/A | N/A | N/A | N/A | ☐ |
| 40127677022453 | N/A | N/A | N/A | N/A | ☐ |
| 40127677376684 | N/A | N/A | N/A | N/A | ☐ |

DRAFT

10 / 69



587

# Pooling Form continued

## Interest Optimisation

| | Pool Name/Pool ID | IOF-Abbot Group Limited-001 |
|---|---|---|

**Interest on Pooling Accounts**

| Pooling Account Number / Pool ID | Covered Credit Balance | | Covered Debit Balance | | Residual Credit Balance | | Residual Debit Balance | |
|---|---|---|---|---|---|---|---|---|
| | Base Rate | Spread | Base Rate | Spread | Base Rate | Spread | Base Rate | Spread |
| SCP 001 | Bank of England Base Rate | -0.40 | Bank of England Base Rate | +1.00 | Bank of England Base Rate | -0.40 | Bank of England Base Rate | +1.0 |
| SCP 002 | ECB Deposit Rate' | +0.15 | ECB Main Refinancing Rate | +1.0 | ECB Deposit Rate | +0.15 | ECB Main Refinancing Rate | +1.0 |
| SCP 003 | HSBC overnight offer rate | -0.40 | HSBC overnight offer rate | +1.0 | HSBC overnight offer rate | -0.40 | HSBC overnight offer rate | +1.0 |
| SCP 004 | US Federal RES Federal Funds Target Rate Mid-point | -0.40 | US Federal RES Federal Funds Target Rate Mid-point | +1.0 | US Federal RES Federal Funds Target Rate Mid-point | -0.40 | US Federal RES Federal Funds Target Rate Mid-point | +1.00 |
| 40127673147290 | HSBC overnight offer rate | -0.40 | HSBC overnight offer rate | +1.0 | HSBC overnight offer rate | -0.40 | HSBC overnight offer rate | +1.0 |
| 40127673147282 | HSBC overnight offer rate | -0.40 | HSBC overnight offer rate | +1.0 | HSBC overnight offer rate | -0.40 | HSBC overnight offer rate | +1.0 |
| 40127673147309 | HSBC overnight offer rate | -0.40 | HSBC overnight offer rate | +1.0 | HSBC overnight offer rate | -0.40 | HSBC overnight offer rate | +1.0 |

Customer Pack Number: 28092020-00041
Document Number: CF-TW01-110830-EN. HSBC Group © All rights reserved.

 589  HSBC

# E-Channel Account Details Form: HSBC UK

The E-Channel Account Details Form refers to the agreement which the E-Channel owner named below (the "Profile Owner") has entered into with a member of the HSBC Group (the "Profile Bank") pursuant to which the Profile Owner may use the Profile Bank's electronic banking systems ("E-Channels"). The Account Holder authorises the loading of the accounts set out below to the Profile Owner's E-Channel for those purposes.

| Profile Owner: | Abbot Group Limited |
|---|---|

| E-Channel ID: | GB1089338287 | Profile Bank | HSBC UK Bank plc |
|---|---|---|---|

Where you are not the Profile Owner, or you are not the Account Holder of any accounts listed in this form, you must promptly notify the Profile Owner or Account Holder (as appropriate) of this notification and provide them with any relevant information. You must further ensure that all appropriate Account Holder authorisation documentation is completed in the form required by HSBC.

☒ The Account Holder hereby authorises the Profile Bank to fill in account numbers and to otherwise complete the E-Channel Account Details Form on its behalf and to correct any patent errors herein.

## Account Details

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Group Limited | 40127673147282 | SGD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other |
|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Group Limited | 40012581348353 | GBP | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other |
|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Group Limited | 40127667641976 | EUR | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other |
|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboad | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Norge AS | 40127673147502 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other |
|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

Customer Pack Number: 28092020-00041
Document Number: EF-0001-080917-EN. HSBC Group © All rights reserved.

589



# E-Channel Account Details for HSBC – Continued

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Alpha Ltd | 40127677022453 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA European Holdings Limited | 40012541348477 | GBP | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Group Limited | 40127673147290 | CAD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Norge AS | 40127673147529 | NOK | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Offshore AS | 40127673147561 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

DRAFT

Customer Pack Number: 28092020-00041
Document Number: EF-0001-080917-EN. HSBC Group © All rights reserved.

590 HSBC

# E-Channel Account Details for HSBC – continued

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Limited | 40127673147384 | EUR | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboad |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Holdings Norge AS | 40127673147486 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Alpha Ltd | 40012521492063 | GBP | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Group Limited | 40127660230006 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Group Limited | 40127667640073 | NOK | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |

Customer Pack Number: 28092020-00041
Document Number: EF-0001-080917-EN. HSBC Group © All rights reserved.

591



| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Group Limited | 40012511145010 | GBP | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Offshore Services AS | 40012551409565 | GBP | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Limited | 40012501348426 | GBP | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Caspian Limited | 40127673147451 | NOK | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Group Limited | 40127673147325 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |



# E-Channel Account Details for HSBC – Continued

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Alpha Ltd | 40127677022461 | EUR | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboad | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Holdings Norge AS | 40127676096894 | NOK | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Technical Support Limited | 40127673147333 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboad | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Norge AS | 40127673147510 | EUR | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboad | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Group Limited | 40127673147309 | MXN | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

DRAFT

Customer Pack Number: 28092020-00041
Document Number: EF-0001-080917-EN. HSBC Group © All rights reserved.

593

 HSBC

# E-Channel Account Details for HSBC - Continued

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Holdings Norge AS | 40127673147553 | NOK | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Caspian Limited | 40127673147435 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Caspian Limited | 40012501348442 | GBP | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA European Holdings Limited | 40127677376684 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Technical Support Limited | 40012501348418 | GBP | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |



# E-Channel Account Details for HSBCnet continued

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Group Limited | 40127673147231 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Offshore Services AS | 40127674202468 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Technical Support Limited | 40127673147368 | NOK | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Investment (North Africa) Limited | 40127673147478 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Offshore Services AS | 40127673147588 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard | |

Customer Pack Number: 28092020-00041
Document Number: EF-0001-080917-EN. HSBC Group © All rights reserved.



# E-Channel Account Details for HSBC - Continued

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Norge AS | 40012591348450 | GBP | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Offshore Services AS | 40012541348469 | GBP | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Norge AS | 40127673147537 | NOK | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Technical Support Limited | 40127673147341 | EUR | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboad |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Limited | 40127673147376 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | LMP Dashboard |

DRAFT

Customer Pack Number: 28092020-00041
Document Number: EF-0001-080917-EN. HSBC Group © All rights reserved.

596



# E-Channel Account Details for HSBC ... Continued

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Group Limited | 40012531348396 | GBP | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | Abbot Holdings Limited | 40012531348388 | GBP | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Drilling Limited | 40127673147392 | NOK | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Caspian Limited | 40127673147443 | EUR | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboad |

| Bank Name / Country / Territory | Branch Code / Name / BIC | Account Owner Entity | Account Number | Currency | Account Name |
|---|---|---|---|---|---|
| HSBC UK Bank plc, United Kingdom - HSBC UK | HSBC BANK UK | KCA Deutag Holdings Norge AS | 40127673147545 | USD | |

| HSBC Account Reference | ACH CR | ACH DR | AI | FLU | PP | TRF | Other | |
|---|---|---|---|---|---|---|---|---|
| | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | | LMP Dashboard |

Customer Pack Number: 28092020-00041
Document Number: EF-0001-080917-EN. HSBC Group © All rights reserved.

597



# E-Channel Account Details Form - HSBC Group continued

**• Products:**

| | | | |
|---|---|---|---|
| ACH - Automated Clearing House Payments | AI - Account Information | CBRT- CTLA Bond Report | CUS AS - Custody Asset Servicing |
| CUS Enq - Custody Enquiry | CUS Inst- Custody Instruction | FLU - File Upload | FLU – TA Enq - Transfer Agency Enquiry |
| FS Enq - Fund Services Enquiry | MT 101 - Single Customer Credit Transfer (SCORE Only) | MT 103 - Single Customer Credit Transfer | MT 940/950 – Statement Message |
| MT 942 – Interim Transaction Report | MT900 – Confirmation of Debit | MT910 - Confirmation of Credit | MIP - Market Information Product |
| PP – Priority Payments | PERF – Performance | RPT - Reporting | TA Inst - Transfer Agency Instruction |
| TPB - Titres et Placements - BOURSE | TPC -Titres et Placements - Comptes | TPO - Titres et Placements - OPCVM | TRF – Inter-account Transfers |

**• Other** - (Please insert the service code as applicable. e.g INS, BEN)

| | | | |
|---|---|---|---|
| AAR - Auto Account Registration | BEN – Beneficiary | BP – Bill Payment | CLS – Continuous Linked Settlement |
| COS - Cheque Outsourcing Service | eSec - eSecurity | EZ – SEPA Payments | GLS - Gloabl Liquidity System |
| GTE – Guarantees | HPE – Historic Payment Enquiry | INS – Instruction | ITS - Internet Trade Services |
| LBX – Lockbox Service | LMD - Liquidity Management Dashboard | MT202 - Bank to Bank Transfers | MT798 - SWIFT for Corporates for Trade |
| PBEN – Partial Beneficiary | PINS – Partial Instruction | RDC – Remote Deposit Capture | RF - Receivables Finance |
| RMS - Receivables Management System | SCS-AI - Buyer | SCS-AI - Supplier | SCSB - Supply Chain Solutions Buyer |
| SCSS - Supply Chain Solutions Supplier | SEC – Securities | STP - Straight Through Processing Reporting | TAX - Tax and Social Security Payments |
| TD – Time Deposit | | | |

By completing this E-Channel Account Details Form, the Account Holder authorises the relevant HSBC Entity/ies to load any accounts listed to the selected Profile Owner's E-Channel. Please note that the Account Holder's use of products may be subject to separate terms and conditions.





598

# E-Channels Letter of Authority

| | | |
|---|---|---|
| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |
| | E-Channel ID :  GB1089338287 | |
| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
| From : | Abbot Holdings Norge AS | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

(a)   We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

(b)   We acknowledge and agree that:

(1)   by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

(2)   all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

(3)   we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

(4)   whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.



**599**

Page left intentionally blank

**600**

# E-Channels Letter of Authority

| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
|---|---|---|
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |
| | E-Channel ID : GB1089338287 | |
| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
| From : | Abbot Investment (North Africa) Limited | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

(a) We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

(b) We acknowledge and agree that:

    (1) by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

    (2) all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

    (3) we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

    (4) whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.



Page left intentionally blank

# E-Channels Letter of Authority

| | | |
|---|---|---|
| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |
| | E-Channel ID : GB1089338287 | |
| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
| From : | KCA Deutag Drilling Norge AS | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

(a) We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

(b) We acknowledge and agree that:

(1) by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

(2) all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

(3) we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

(4) whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.



**603**

Page left intentionally blank

# E-Channels Letter of Authority

| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
|---|---|---|
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |
| | E-Channel ID : GB1089338287 | |
| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
| From : | KCA European Holdings Limited | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

(a)  We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

(b)  We acknowledge and agree that:

(1)  by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

(2)  all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

(3)  we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

(4)  whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.



**605**

Page left intentionally blank

# E-Channels Letter of Authority

| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
|------|------------------|--------------------------|
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |

|  | E-Channel ID : | GB1089338287 |

| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
|--------|------------------|--------------------------|
| From : | KCA Deutag Offshore AS | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

(a)   We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

(b)   We acknowledge and agree that:

(1)   by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

(2)   all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

(3)   we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

(4)   whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.



**607**

Page left intentionally blank

# E-Channels Letter of Authority

| | | |
|---|---|---|
| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |
| | E-Channel ID : GB1089338287 | |
| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
| From : | KCA Deutag Alpha Ltd | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

(a) We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

(b) We acknowledge and agree that:

(1) by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

(2) all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

(3) we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

(4) whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.



Page left intentionally blank

# E-Channels Letter of Authority

| | | |
|---|---|---|
| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |
| | E-Channel ID :  GB1089338287 | |
| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
| From : | KCA Deutag Holdings Norge AS | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

   (a)   We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

   (b)   We acknowledge and agree that:

      (1)   by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

      (2)   all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

      (3)   we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

      (4)   whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.

Customer Pack Number: 28092020-00041
Document Number: GF-4000-170305-EN. HSBC Group © All rights reserved.



611

Page left intentionally blank

**612**

# E-Channels Letter of Authority

| | | |
|---|---|---|
| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |
| | E-Channel ID : GB1089338287 | |
| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
| From : | KCA Deutag Drilling Offshore Services AS | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

(a) We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

(b) We acknowledge and agree that:

(1) by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

(2) all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

(3) we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

(4) whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.

Customer Pack Number: 28092020-00041
Document Number: GF-4000-170305-EN. HSBC Group © All rights reserved.



613

Page left intentionally blank

**614**

# E-Channels Letter of Authority

| | | |
|---|---|---|
| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |
| | E-Channel ID : GB1089338287 | |
| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
| From : | KCA Deutag Drilling Limited | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

(a)    We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

(b)    We acknowledge and agree that:

(1)    by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

(2)    all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

(3)    we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

(4)    whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.

Customer Pack Number: 28092020-00041
Document Number: GF-4000-170305-EN. HSBC Group © All rights reserved.

**HSBC**

**615**

Page left intentionally blank

# E-Channels Letter of Authority

| | | |
|---|---|---|
| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |
| | E-Channel ID : GB1089338287 | |
| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
| From : | KCA Deutag Caspian Limited | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

(a)    We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

(b)    We acknowledge and agree that:

(1)    by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

(2)    all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

(3)    we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

(4)    whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.

DRAFT

Document Number: GF-4000-170305-EN. HSBC Group © All rights reserved.

HSBC

**617**

Page left intentionally blank

# E-Channels Letter of Authority

| | | |
|---|---|---|
| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |
| | E-Channel ID : GB1089338287 | |
| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
| From : | Abbot Holdings Limited | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

(a) We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

(b) We acknowledge and agree that:

    (1) by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

    (2) all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

    (3) we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

    (4) whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.

Customer Pack Number: 28092020-00041
Document Number: GF-4000-170305-EN. HSBC Group © All rights reserved.



**619**

Page left intentionally blank

# E-Channels Letter of Authority

| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
|---|---|---|
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |

| | E-Channel ID : | GB1089338287 |
|---|---|---|

| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
|---|---|---|
| From : | KCA Deutag Drilling Group Limited | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

(a) We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

(b) We acknowledge and agree that:

(1) by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

(2) all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

(3) we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

(4) whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.

Customer Pack Number: 28092020-00041
Document Number: GF-4000-170305-EN. HSBC Group © All rights reserved.

HSBC

**621**

Page left intentionally blank

# E-Channels Letter of Authority

| | | |
|---|---|---|
| To : | HSBC UK Bank plc | (the "**Profile Bank**") |
| Copy : | Abbot Group Limited | (the "**Profile Owner**") |
| | E-Channel ID : GB1089338287 | |
| Copy : | HSBC UK Bank plc | (the "**Account Bank**") |
| From : | KCA Deutag Technical Support Limited | (the "**Account Holder**") |

This letter refers to the agreement (the "**E-Channel Agreement**") entered into by the Profile Owner and the Profile Bank, under which the Profile Owner may use the Profile Bank's electronic banking systems ("**E-Channel**"). We authorise the Profile Bank to include the accounts and services listed in the attached E-Channel Account Detail Form or such other accounts as may be notified to the Profile Bank by us or the Profile Owner (the "**Accounts**") on the Profile Owner's E-Channel.

In consideration of the mutual promises contained in this letter:

(a)    We hereby represent and warrant that the persons who execute this letter have been duly authorised to do so;

(b)    We acknowledge and agree that:

(1)    by adding our Accounts to the Profile Owner's E-Channel the Profile Owner will be able to access, transact and use any other services via the relevant E-Channel in relation to the Accounts;

(2)    all contractual rights and obligations arising under the E-Channel Agreement in respect of the Accounts or otherwise and any terms agreed by the Profile Owner relating to an E-Channel shall be rights and obligations arising between the Profile Bank and the Profile Owner (and not the Account Holder);

(3)    we shall be bound by all actions of the Profile Owner taken in respect of the Accounts; and

(4)    whenever we instruct the Profile Bank to provide the Profile Owner with access to an Account, the Profile Bank is under no obligation to inform the Profile Owner of the instruction and the relevant account details.

We hereby consent to the Account Bank disclosing any information relating to our Accounts to the Profile Owner and the Profile Bank.

We hereby indemnify the Profile Bank against all loss, damages, liability, costs, claims, demands and expenses incurred by the Profile Bank of any kind whether or not foreseeable when acting in accordance with instructions from the Profile Owner in relation to our Accounts.

We agree that the Profile Bank shall confirm the Profile Bank's acceptance of the terms of this letter by including the Accounts on the Profile Owner's E-Channel.

This letter is governed by and will be construed in accordance with the law of the jurisdiction which governs the E-Channel Agreement. The parties irrevocably submit to the exclusive jurisdiction of the courts of that jurisdiction, unless otherwise mutually agreed, in respect of any proceedings which may be initiated in connection with this letter.

Customer Pack Number: 28092020-00041
Document Number: GF-4000-170305-EN. HSBC Group © All rights reserved.



**623**

Page left intentionally blank

Registered/Customer Name | Abbot Group Limited

The documents set out below shall be Supporting Documents for the purposes of the Relationship Documents. Unless stated otherwise, the Customer must ensure that any documents to be signed are signed by a person who is authorised to represent and bind the Customer.

## Supporting Service Documents - Documents provided to the Customer

| Document | Service | Country/Territory | Explanatory Notes |
|---|---|---|---|
| None | | | |

## Supporting Service Documents - Documents required from the Customer

| Document | Service | Country/Territory | Explanatory Notes |
|---|---|---|---|
| Certificate of Legal Validity | Notional Pooling | United Kingdom - HSBC UK | If the Customer is not formed / incorporated in England and Wales, the Customer must submit this Certificate, which provides evidence from an internal or external lawyer qualified to practice in the Customer's country of formation / incorporation that the Customer is correctly formed / incorporated, and has the power to agree the Terms. |

### Authorisations (please note - documents listed are based on the Country/Territory of Formation/Incorporation of the Customer)

| Document | Service | Country/Territory | Explanatory Notes |
|---|---|---|---|
| N/A | Pooling | United Kingdom | Please discuss the customer authorisations that the Bank requires with your HSBC representative. |

### Identification Requirements[1]

| Document | Service | Country/Territory | Explanatory Notes |
|---|---|---|---|
| None | | | |

### Supplementary Identification Requirements

| Document | Service | Country/Territory | Explanatory Notes |
|---|---|---|---|
| None | | | |

Customer Pack Number: 28092020-00041
Document Number: GF-7000-200313-EN. HSBC Group © All rights reserved.

625  HSBC

## Certification Requirements

| United Kingdom - HSBC UK | Supporting Service Documents - Documents required from the Customer, if applicable<br>Certificate of Legal Validity - Original required.<br><br>Identification Requirements<br>Resident, Non-resident and Proof of Address - Confirmation is required of the validity of a copy of an existing document as a true likeness of the original.  Certification as a true copy can be undertaken by an HSBC staff member; a lawyer, solicitor, attorney or Notary Public; a chartered or certified accountant; an embassy, consulate or high commission of the country of origin; or a commissioner of oaths.  The certification should clearly include: words to the effect of "I confirm this to be a true copy / likeness of the original"; the status of the issuing body or signatory; the date the certification was made; and the signature and details of the certifying officer - any certification stamp and/or signature should be clear and details should include the name and address of the provider/registration number/details where appropriate. |
|---|---|
| United Kingdom - HSBC UK | Supporting Service Documents - Documents required from the Customer<br><br>Authorisations<br>Customer Authorisation-  If an original not available a confirmation is required of the validity of a copy of an existing document as a true likeness of the original. Certification as a true copy can be undertaken by an HSBC staff member; a lawyer, solicitor, attorney or Notary Public; a chartered or certified accountant; an embassy, consulate or high commission of the country of origin; or a commissioner of oaths. The certification should clearly include: words to the effect of "I confirm this to be a true copy / likeness of the original"; the status of the issuing body or signatory; the date the certification was made; and the signature and details of the certifying officer - any certification stamp and/or signature should be clear and details should include the name and address of the provider/registration number/details where appropriate.<br><br>Identification Requirements<br>Resident, Non-resident and Proof of Address -  Confirmation is required of the validity of a copy of an existing document as a true likeness of the original. Certification as a true copy can be undertaken by an HSBC staff member; a lawyer, solicitor, attorney or Notary Public; a chartered or certified accountant; an embassy, consulate or high commission of the country of origin; or a commissioner of oaths. The certification should clearly include: words to the effect of "I confirm this to be a true copy / likeness of the original"; the status of the issuing body or signatory; the date the certification was made; and the signature and details of the certifying officer - any certification stamp and/or signature should be clear and details should include the name and address of the provider/registration number/details where appropriate. |

[1] Resident means a person with residential status and associated identity documents in the country/territory where the service is being provided.
  Non Resident means any person not with residential status and associated identity documents in the country/territory where the service is being provided.

Customer Pack Number: 28092020-00041
Document Number: GF-7000-200313-EN. HSBC Group © All rights reserved.

626  HSBC

**Master Services Agreement**

## 1 Relationship Documents

1.1 The Relationship Documents govern the provision of the Services. In the event of any conflict among the Relationship Documents, the following order of priority shall apply:

(a) the applicable Country Conditions;

(b) the applicable Supporting Documents;

(c) any relevant Appendix;

(d) any relevant Annex;

(e) any relevant Services Schedule; and

(f) the Terms.

1.2 In the event of any conflict between any of the terms of the Relationship Documents that rank equal in order of priority in accordance with Clause 1.1, the term which applies to a specific Service shall prevail in relation to the provision of that Service by the Bank to the Customer.

1.3 The Relationship Documents contain the whole agreement between the Parties relating to the transactions contemplated by the Relationship Documents and replace all previous agreements between the Parties relating to the Services and each Party confirms that in agreeing the terms of the Relationship Documents it has not relied on any express or implied warranties, representations, collateral contracts or other assistance made by or on behalf of the other Party unless set out in the Relationship Documents. Each Party waives all rights and remedies which, but for this Clause 1.3, might otherwise be available to it in respect of any such express or implied representation, warranty, collateral contract or other assurance. Nothing in this Clause 1.3 limits or excludes any liability for fraud.

1.4 In the Relationship Documents, references to the singular include the plural and vice versa. Clause headings are included for convenience only and do not affect interpretation. Unless otherwise defined in a Relationship Document, any capitalised term in the Relationship Documents shall have the meaning given to it in the Terms. Each reference to a document or agreement (whether online or in hard copy) is a reference to that document or agreement as amended or restated from time to time.

## 2 Authority

2.1 The Customer or any party duly authorised by the Customer to act on its behalf shall provide to the Bank documents identifying the Authorised Persons. The Bank is authorised to rely upon any such documents provided by any means, including electronically, and accepted by the Bank.

2.2 Subject to any written restriction received and accepted by the Bank, the Customer confirms that each Authorised Person shall be authorised to:

(a) perform all lawful acts on behalf of the Customer in connection with any Account or Service, including, but not limited to, opening, closing and operating Accounts, signing any agreements (including facility agreements), declarations or other documents relating to any Accounts or Services and execution of any guarantees, indemnities or other undertakings to the Bank; and

(b) delegate their authority to perform such acts to any person indicated in any document provided to the Bank by any means, including electronically, and accepted by the Bank.

2.3 The Customer confirms that each Authorised Person is authorised to act as described in Clauses 2.2(a) and 2.2(b) until the Bank has received written notice, in form and substance acceptable to the Bank, of any change to an Authorised Person, or to a person to whom authority has been delegated in accordance with this Clause, and the Bank has had a reasonable opportunity to act on it.

## 3 Communications, Instructions and Security Procedures

3.1 The Parties will comply with the Security Procedures. The Customer shall follow the Security Procedures upon accessing communication channels provided by the Bank and issuing Instructions or Communications via such channels. The Bank shall follow the Security Procedures upon receipt of such Instructions or Communications to establish their validity.

3.2 The Bank is not obliged to do anything outside of the Security Procedures to establish and rely upon the authority or identity of any person sending an Instruction or Communication on behalf of the Customer. The Bank is not responsible for errors or omissions made by the Customer or the duplication of any Instruction by the Customer and may act on any Instruction by reference to a bank identification or account number only, even if a bank or account name is provided. An authenticated SWIFT message issued to the Bank in the name of the Customer (or of an entity authorised by the Customer to issue SWIFT messages on its behalf) may be relied on by the Bank as having been issued by an Authorised Person.

3.3 If the Bank doubts the legality, origination or authorisation of an Instruction, it shall take such steps as it considers appropriate to investigate the matter. If such investigation results or, in the opinion of the Bank, is likely to result in the Instruction being declined or executed outside the applicable value date or other agreed time period, the Bank will notify the Customer as soon as practicable, provided it is not prohibited from doing so by any law, regulation, order or Authority.

3.4 The Bank will use its reasonable efforts to comply with any request made by the Customer to vary or cancel an Instruction and, subject to the Bank using such efforts, the Customer shall be responsible for any Losses related to such an Instruction.

3.5 The Customer is responsible for the accuracy, completeness and correct transmission of its Instructions and for ensuring they will achieve the Customer's intended purpose, including when the Customer requests the Bank to forward information to a third party. The Bank will not be liable to the Customer where the Bank chooses to comply with such a request and the Customer must take reasonable steps to ensure that its request will not give rise to any claim against the Bank. If the Bank accepts a manually initiated Instruction (being an Instruction which is not submitted through electronic communication channels provided by the Bank, but, for example, by telephone, fax or physical delivery), then, provided the Bank acts in accordance with the applicable Security Procedures, the Customer is responsible for any Losses related thereto.

3.6 Without prejudice and subject to the foregoing provisions of Clause 3, if the Bank acts on an Instruction which the Customer claims was unauthorised, the Bank shall only be responsible for acting on such Instruction if:

(a) the Bank cannot demonstrate that it acted in accordance with the Security Procedures; or

(b) the Bank demonstrates that it acted in accordance with the Security Procedures, but the Customer can demonstrate that the unauthorised Instruction was not caused by a person (i) entrusted at any time to act for the Customer with respect to Instructions or the applicable Security Procedures, or (ii) who obtained access to the Customer's premises, equipment, systems or transmitting facilities or (iii) who obtained from a source controlled by the Customer, information (such as keys and passwords) which facilitated breach of the Security Procedures.

Unless one of the conditions set out in paragraphs (a) and (b) of this clause is satisfied, the Bank shall be entitled to enforce or retain payment from the Customer with respect to such an Instruction.

Customer Pack Number: 28092020-00041
Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.

**627**   HSBC

# Master Services Agreement – Schedule

3.7    In some circumstances, Communications (including electronic mail, voicemail, SMS, telephone calls and website usage) as well as paper correspondence received by either Party such as envelopes or packages may be monitored, recorded or inspected (as appropriate) using monitoring devices or other technical or physical means. Such monitoring may take place where necessary insofar as required or allowed by and for purposes permitted by any applicable law, regulation, order or Authority from time to time, including, without limitation, to record evidence of business transactions and so as to ensure compliance with the Parties' respective policies and procedures. Subject to any applicable laws and regulations, all telephone conversations may be recorded by or for either Party without warning. Such records or recordings are and shall remain the sole property of the Party that made them and either Party may produce them as evidence in any proceedings brought in connection with the Relationship Documents.

3.8    Communication channels provided by the Bank may be suspended by the Bank for maintenance or for any other reason where it reasonably considers it necessary to do so. The Bank will provide the Customer with reasonable prior notice of the suspension where it is practical to do so.

## 4    Credits and Debits

4.1    If an Account is credited in error or in anticipation of receiving funds, where those funds are not received or the underlying funds transfer is reversed, the Bank may reverse all or part of such credit including any interest accrued thereon, make the appropriate entry to the Account, and, except in case of the Bank's error, debit or demand immediate repayment of any Losses incurred by the Bank in connection therewith, as appropriate.

4.2    The Bank is not obliged to carry out an Instruction which would result in a debit to an Account where this causes the Account to be overdrawn without the Bank's approval or to exceed any agreed or advised overdraft facility, or where the Account is subject to a right of a third party that has been enforced, such as a freezing order in favour of a creditor.

4.3    If the Customer gives Instructions which would result in multiple debits on an Account which would in aggregate cause the Account to be overdrawn or an agreed or advised facility to be exceeded, the Bank may decide the order in which to make those debits and whether to make any of them in whole or in part.

4.4    If an Account is overdrawn without the Bank's approval or if an overdraft limit is exceeded due to (i) any debit or (ii) such limit being withdrawn or varied by the Bank in accordance with applicable terms, the Customer shall immediately upon demand, or otherwise becoming aware thereof, transfer sufficient cleared funds to bring such Account into credit or within the overdraft limit. For the avoidance of doubt, the Bank is not hereby offering the Customer, or agreeing an increase to, any overdraft facility and, unless otherwise provided in an agreement executed by the Bank and the Customer, any extension of credit can be cancelled by the Bank at any time.

## 5    Statements

The Customer shall notify the Bank, as soon as practicable and in any case within 30 days of delivery of a statement of account or report of transactions, of any errors (including any errors arising as a result of fraudulent or unauthorised transactions) in that statement or report. If notice is received by the Bank after this time period, the Bank shall not be responsible for any Loss resulting from the delay by the Customer in providing such notice.

## 6    Interest

Any interest will accrue or, if applicable, be charged on the applicable credit balance of an Account on the days and at the applicable rate for those days as set out in any relevant guide or as the Bank may agree with the Customer from time to time. Unless agreed otherwise by the Parties, the Bank may change such rates and the Bank shall notify the Customer or otherwise make available such changes. The Customer acknowledges that, as applicable:

(a)    interest payments made by the Bank may be made net of taxes and subject to deduction or withholding; and

(b)    the Bank may debit from an Account any interest to be charged to such Account as and when due and such payment will be free of any deduction or withholding of tax or other charges so the Bank receives the full amount of such interest.

## 7    Security Interest

The Customer shall not grant any security interest over or transfer or assign its rights in connection with any Account without prior written consent from the Bank, such consent not to be unreasonably withheld or delayed.

## 8    Set-Off

The Bank may set off any of the Customer's obligations owed to the Bank that are due and payable against any obligations of the Bank owed to the Customer.

## 9    Representations, Warranties and Undertakings

9.1    Each Party represents and warrants, solely as to itself, that:

(a)    it is duly incorporated or, if the Party is not a body corporate, is otherwise validly constituted and existing under the laws of the jurisdiction of its incorporation or constitution (as the case may be);

(b)    it has all necessary corporate or equivalent power and legal capacity to execute (where applicable) and deliver, and to perform its obligations under, the Relationship Documents; and

(c)    the execution and performance of the Relationship Documents by it will not violate its constitutional documents, organisational documents or bylaws, the terms of any material contract or other instrument (including, for the avoidance of doubt, any  trust instrument) to which it is a party or by which it is bound or any duty, obligation, limitation or prohibition imposed on it by any law or regulation applicable to it; and

(d)    the terms of the Relationship Documents constitute legal, valid and binding obligations, enforceable against it.

9.2    Each Party furthermore warrants and undertakes to take all reasonable steps to ensure that its warranties and representations in Clause 9.1 shall remain valid and effective in all respects until such time as all Relationship Documents are terminated or expire in accordance with their terms.

9.3    A breach of Clause 9.1 or 9.2 shall constitute a material breach of the Relationship Documents. If a Party becomes aware that it is in breach of Clause 9.1 or 9.2 it shall notify the other Party as soon as reasonably practicable.

Customer Pack Number:  28092020-00041
Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.

**628**



**Master Services Agreement – Fund**

9.4 The Customer undertakes to:

(a) comply with all reasonable requests of the Bank necessary to provide the Customer with the Services, including but not limited to, promptly providing to the Bank all documents and other information reasonably requested by it from time to time in relation to any Account or Service; the Bank may rely on the documents and information provided until the Customer notifies the Bank in writing of any changes and the Bank has had a reasonable opportunity to act thereon; and

(b) notify the Bank as soon as possible if it becomes aware of any theft, fraud, illegal activity, loss, damage or other misuse in relation to the Services or in relation to any associated documentation, Instruction, Communication or payment instrument.

9.5 Where multiple Customer Parties acting pursuant to an arrangement without separate legal capacity (such as participants in an unincorporated joint venture) are identified on an Application Form as joint holders of an Account and/or joint recipients of the Services, each Customer Party undertakes and agrees that:

(a) it shall be jointly and severally liable with each Customer Party for any obligation owed by the Customer to the Bank or any other member of the Group under the Relationship Documents;

(b) any demand, notice, agreement, Instruction or Communication given by the Bank to one or more Customer Parties, or received by the Bank from one or more Customer Parties, in connection with the Relationship Documents will be deemed to be a demand, notice, agreement, Instruction or Communication (as the case may be) given to or received from all Customer Parties;

(c) if the Bank becomes aware of or reasonably suspects a dispute between any of the Customer Parties, the Bank may decline to act on any Instruction until all Customer Parties have confirmed the Bank's authority to act on it in form and substance satisfactory to the Bank; and

(d) to the extent any Customer Party ceases to exist for any reason, the Relationship Documents shall continue to bind the remaining Customer Parties.

9.6 The Bank undertakes to maintain a business continuity plan setting out contingency arrangements for the continuing performance of the Bank's services, including the Services, in the event of a Force Majeure Event. The Bank shall test and review such business continuity plan at least once in each calendar year.

## 10 Confidentiality and Data Protection

10.1 The Parties agree that Confidential Information shall be kept confidential, except as disclosed in accordance with the Confidentiality and Regulatory Annex.

10.2 The Parties will process and transfer Customer Information in accordance with the Confidentiality and Regulatory Annex.

## 11 Performance and Liability

11.1 The Bank will perform its obligations under the Relationship Documents using such level of skill and care as would be considered commercially reasonable by reference to the standards and practices of the banking industry.

11.2 Neither Party shall be liable for any:

(a) consequential, incidental or indirect Loss including, without limitation, fines, penalties or punitive damages; or

(b) any direct or indirect loss of (i) profit (actual or anticipated), (ii) goodwill or (iii) business opportunity,

whether or not foreseeable, even if one Party advised the other of the possibility of such loss or damage.

11.3 Any obligation of the Bank with respect to an Account shall be enforceable only at the Bank or, where the Account is held at a branch of the Bank, such branch, which in each case, is the sole place of payment, and not at or against another branch or member of the Group.

11.4 The Bank is only required to perform its obligations in the currency in which those obligations are denominated. Unless otherwise agreed in writing, the Bank, or any intermediary reasonably selected by the Bank, may make any currency conversion in connection with the exercise of its rights and obligations pursuant to the Relationship Documents, using exchange rates that are reasonable in the relevant market at the time and for the size and type of foreign exchange transaction.

11.5 The Parties shall not be liable for any Loss caused by a Force Majeure Event. If either Party is prevented or delayed in the performance of any of its obligations under the Relationship Documents by a Force Majeure Event, such Party shall as soon as reasonably practicable notify the other of the existence of the Force Majeure Event. The Bank's duty or the duty of any member of the Group to act upon any Instruction or Communication, or perform any obligation, shall be suspended to the extent that and for as long as the Bank and/or any member of the Group is prevented or restricted from doing so by a Force Majeure Event.

11.6 In providing the Services, the Bank may use certain Infrastructure Providers and the Services are therefore subject to the rules and regulations of those Infrastructure Providers as well as the guidelines and procedures of relevant regulatory or industry bodies. Neither the Bank nor any other member of the Group shall be liable for any Loss suffered as a result of the acts or omissions of an Infrastructure Provider, but will provide commercially reasonable assistance to the Customer in the recovery of any such Loss.

11.7 The Customer shall indemnify the Bank and any other member of the Group in full against any Loss arising from or in connection with a third party making a claim or demand against the Bank or other member of the Group as a result of the Bank or any other member of the Group processing an Instruction or otherwise performing its obligations hereunder in accordance with the Relationship Documents.

11.8 Neither the Bank nor any member of the Group is obliged to perform any of the Services or any other obligation under the Relationship Documents, including without limitation any obligation to give notice or provide information to the Customer, if to do so would result in the Bank or any member of the Group being in breach of any Law.

## 12 Fees and charges

12.1 The Customer shall pay to the Bank fees, costs, charges, interest and expenses in connection with the Services. These will be the Bank's standard fees and charges unless the Bank separately agrees different fees and charges with the Customer. Unless otherwise stated, all amounts payable pursuant to this Clause are exclusive of value added, sales, use, goods and services, business, stamp or any similar taxes or duties that may be applicable. All such taxes or duties will be applied in accordance with applicable legislation and the Bank will issue valid invoices or other documents as appropriate. The Bank may change the fees and charges either with reasonable notice to the Customer or immediately with the Customer's agreement. Payment of all amounts due pursuant to this Clause will be clear and free of any deduction or withholding for or on account of tax, set-off, counterclaim or other charges so the Bank receives such amounts in full. If a deduction or withholding for or on account of tax is required to be made by law, the payment shall be

Customer Pack Number: 28092020-00041
Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.

**HSBC**

Master Services Agreement – contd

increased to an amount which after making any deduction or withholding leaves an amount equal to the payment which would have been made if no deduction had been required. The Customer shall make any payment required in connection with such tax deduction or withholding within the time allowed by law.

12.2 The Bank may debit fees, costs, charges, interest and expenses owed by the Customer to the Bank from any account advised by the Customer for such purposes. However, in the event of the Customer's breach of the Relationship Documents, the Customer's insolvency (which includes, where the Customer acts as a trustee, the insolvency of the trust and which may also include the Customer's bankruptcy in certain jurisdictions), or where acting in accordance with the Customer's advice is not possible, the Bank may debit fees, costs, charges, interest and expenses owed by the Customer to the Bank from any account the Customer has with the Bank. If the Customer fails to pay any amount due under the Relationship Documents, the Customer shall, to the extent permitted under applicable law, pay to the Bank interest and charges on the overdue amount at the rate the Bank determines, unless otherwise agreed, acting reasonably and in good faith.

## 13    Amendments and Assignment

13.1 If at any time the Bank makes amendments to terms governing the provision of services which include any of the Services to its customers generally or to customers belonging to the same market segment as the Customer, the Bank may, by written notice to the Customer, make the same (or substantially the same) amendments to the Relationship Documents. Such amendments will become effective on the expiry of no less than 45 days after delivery of such notice.

13.2 Notwithstanding the provisions of Clause 13.1, the Bank may, by written notice to the Customer, make amendments to the Relationship Documents at any time in order to comply with any law or regulation, which will become effective in accordance with the terms of such notice. The Bank will use reasonable efforts to give the Customer as much advance notice as possible in such circumstances.

13.3 Neither Party may assign its rights or transfer its obligations under these Relationship Documents without the written consent of the other, such consent not to be unreasonably withheld or delayed. However, the Bank may, without the Customer's consent, assign the Bank's rights and/or transfer the Bank's obligations to:

(a)    any member of the Group; or

(b)    to the Bank's successor following a merger, consolidation or disposal of all or substantially all of the Bank's shares, capital, assets or the business to which the Relationship Documents relate,

provided that such assignment does not adversely affect the provision of the Services to the Customer.

## 14    Termination

14.1 Either Party can terminate any or all Relationship Documents and/or, in the case of the Bank, withdraw any or all of the Services or close any Account by giving 30 days prior written notice to the other. Any liabilities owing to the Bank thereunder will become immediately due and payable on termination of the terms of the relevant Relationship Document.

14.2 Subject to any applicable legal or regulatory restriction, either Party can terminate any or all Relationship Documents and/or, in the case of the Bank, withdraw any or all of the Services or close any Account immediately if:

(a)    the other Party commits a material breach of the Relationship Documents which is incapable of remedy or not remedied within a reasonable time period;

(b)    any step is taken by or in respect of the other Party for a moratorium, composition, compromise or arrangement with creditors, administration, bankruptcy, liquidation, dissolution (other than for the purposes of amalgamation or reconstruction), receivership, distress or execution, debt relief orders,  interim orders or the other Party becomes insolvent (including, where a Party acts as a trustee, the insolvency of the trust and which may also include the Customer's bankruptcy in certain jurisdictions) or is deemed unable to pay its debts as they fall due, or anything analogous to the foregoing occurs in any applicable jurisdiction;

(c)    it is or may become unlawful for that Party to perform its obligations under any of the Relationship Documents or if to do so would result in that Party or, in the case of the Bank, any member of the Group, being in breach of any regulation or requirement or request of any governmental or other authority; or

(d)    the Customer has provided false or misleading information, or failed to provide Customer Information reasonably requested by the Bank, in connection with any know-your-customer or financial due diligence performed by the Bank or if otherwise required, in the Bank's reasonable opinion, in connection with any Compliance Activity.

14.3 Termination of the Terms by either Party shall have the immediate effect of terminating each of the Relationship Documents.

14.4 Termination shall not affect any accrued rights or liabilities of either Party nor shall it affect the coming into force or continuation in force of any other Clauses and provisions of the Relationship Documents which are expressly or by implication intended to come into force or continue in force on or after termination or expiry of the Relationship Documents including, without limitation Clauses 1, 3.5, 9.5, 10, 11, 13.3, 14.1, 14.4, 15-21 inclusive, and the Confidentiality and Regulatory Annex.

## 15    Waiver

In the event that any Party fails or delays to exercise a right under the Relationship Documents, that Party may still exercise that right later. Any waiver of any right shall be in writing and limited to the specific circumstances.

## 16    Severability

Each provision of the Relationship Documents is severable and if any provision is or becomes illegal, invalid or unenforceable in any jurisdiction or in relation to any particular Service, then that provision is severed only in that particular jurisdiction or in relation to that particular Service. All other provisions shall continue to have effect.

## 17    Third Party Rights

Any law, statute or regulation which may bestow upon a person who is not a Party the right to enforce any of the terms of the Relationship Documents shall be disapplied to the fullest extent permitted.

Customer Pack Number:  28092020-00041
Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.

630



**Master Services Agreement — Cloud**

## 18 Notices

Notices in writing from the Bank shall be effective if delivered to an address specified by the Customer on an Application Form or to such other address as the Customer may specify in writing from time to time as effective for delivery of notices pursuant to the Relationship Documents, including an address for notices to be sent electronically. Notices in writing from the Customer shall be effective if delivered to the Bank's address specified on the most recent statement for the relevant Account or to such other address as the Bank may specify in writing from time to time as effective for delivery of notices pursuant to the Relationship Documents, including an address for notices to be sent electronically.

## 19 Governing Law and Jurisdiction

19.1 The Relationship Documents and any non-contractual obligations arising out of or in connection with them shall be governed by and construed in accordance with the law of the jurisdiction in which the relevant Account is maintained or the relevant Service is provided unless specified otherwise in any applicable Relationship Document.

19.2 Unless otherwise mutually agreed by the Parties, they submit to the non-exclusive jurisdiction of the courts of the jurisdiction whose governing law applies.

## 20 Counterparts

The Relationship Documents may be entered into by the execution of any number of copies of the relevant Application Form, all of which taken together shall form one document.

## 21 Definitions

- **Account** means any account which is to be opened or which has been opened by the Customer with the Bank under the Relationship Documents.

- **Annex** means an annex to a Services Schedule or the Terms which sets out additional terms in relation to the particular Services being provided.

- **Appendix** means an appendix to an Annex which sets out additional terms in relation to the particular Services being provided.

- **Application Form** means any form that must be completed to apply for the provision of a Service including without limitation the Relationship Acceptance Form and the Service Amendment Form.

- **Authorised Person** means any person identified to the Bank and authorised to act on behalf of the Customer in accordance with Clause 2.

- **Authority** means any judicial, administrative or regulatory body, any government, or public or government agency, instrumentality or authority, any Tax Authority, securities or futures exchange, court, central bank or law enforcement body, or any agents thereof, having jurisdiction over the relevant Party or a member of its group.

- **Bank** means the member of the Group that is or becomes a Party to the Relationship Documents and that provides the Customer with Services as specified in an Application Form.

- **Clause**, whenever used in a Relationship Document and not defined or identified otherwise therein, means a clause of that Relationship Document.

- **Communication** means communication (in any form) between Customer and Bank, but which shall not include Instructions.

- **Compliance Activity** means any activity performed by the Bank or any other member of the Group considered appropriate, acting reasonably, to meet Compliance Obligations relating to or in connection with the detection, investigation and prevention of Financial Crime, international and national guidance, relevant Group procedures and/or the direction of any public, regulatory or industry body relevant to any member of the Group.

- **Compliance Obligations** means obligations of any member of the Group to comply with: (a) Laws, or international guidance and the Bank's mandatory policies or procedures, (b) any demand from Authorities or reporting, regulatory trade reporting, disclosure or other obligations under Laws or (c) any Laws requiring the Bank to verify the identity of its Customers.

- **Confidential Information** means any information, about or relating to either Party or members of its group, received or accessed by the other Party in the course of the relationship established by them pursuant to the Relationship Documents, including without limitation, the business, operations, Personal Data or customers of the disclosing Party or members of its group and the provisions of the Relationship Documents.

- **Confidentiality and Regulatory Annex** means the Annex to the Terms which sets out each Party's obligations in relation to Confidential Information, Customer Information and tax compliance.

- **Connected Person** means a person or entity whose information (including Personal Data or Tax Information) is provided by, or on behalf of, the Customer to any member of the Group or otherwise received by any member of the Group in connection with the provision of the Services and any owner, controlling person, substantial owner or beneficial owner of the Customer in relation to whom the Bank considers, acting reasonably, Tax Information is required to be provided to any Tax Authority to comply with any Group member's Compliance Obligations.

- **Country Conditions** means, for each relevant jurisdiction, the specific terms which supplement and/or amend any Relationship Document.

- **Customer** means the Customer Party and, where there is more than one Customer Party, refers to the Customer Parties jointly and severally.

- **Customer Information** means Personal Data, Confidential Information, and/or Tax Information of or in relation to either the Customer or a Connected Person.

- **Customer Party** means an entity or person receiving the Services identified as a customer on an Application Form.

- **Data Protection Legislation** means all data protection, privacy and other laws to the same or similar purpose in all relevant jurisdictions applicable to a Party.

- **Financial Crime** means money laundering, terrorist financing, bribery, corruption, tax evasion, fraud, evasion of economic or trade sanctions, and/or violations, or attempts to circumvent or violate any laws or regulations relating to these matters.

- **Force Majeure Event** means any event beyond the reasonable control of a Party affecting that Party's ability to comply with the Relationship Documents, such as:

    (a) any natural event such as flood, storm or earthquake,

    (b) war, civil disturbance or act of terrorism,

    (c) industrial action,

    (d) Act of God,

Customer Pack Number: 28092020-00041
Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.

**632**

**HSBC**

(e) action of a government or governmental agency,

(f) change of law or regulation (or change in the interpretation of law or regulation),

(g) power or equipment failure or interruption, or

(h) interruption, failure or delay in receiving or acting on any Communication or Instruction caused by an Infrastructure Provider,

PROVIDED ALWAYS that any non-compliance with the Relationship Documents resulting from such an event could not be avoided by the exercise of commercially reasonable skill and care by the affected Party which, in the case of the Bank, may include invocation of the business continuity plan referred to in Clause 9.6.

- **Group** means HSBC Holdings plc, its subsidiaries, related bodies corporate, associated entities and undertakings and any of their branches.

- **Infrastructure Provider** means any third party providing shared market infrastructure necessary for a Party to perform its obligations under the Relationship Documents including any communications, clearing, settlement or payment system, or intermediary or correspondent bank.

- **Instruction** means any communication which is received by the Bank in relation to a Service which:

  (a) contains the necessary information for the Bank to carry out the payment or other act on the Customer's behalf; and

  (b) has or, in the reasonable opinion of the Bank, appears to have been provided by an Authorised Person.

- **Law** means any applicable local or foreign statute, law, regulation, ordinance, rule, judgment, decree, voluntary code, directive, sanctions regime, court order, agreement between any member of the Group and an Authority, or agreement or treaty between Authorities and applicable to the Bank or a member of the Group.

- **Loss** means any loss, damages, liability, costs, claims, demands and expenses of any kind whether or not foreseeable.

- **Party** means the Customer or the Bank, and **Parties** means the Customer and the Bank.

- **Personal Data** means any data relating to an individual and allowing the identification of that individual, and such other data which is protected by local Data Protection Legislation.

- **Purposes** means the circumstances in connection with which Customer Information will be processed, transferred and disclosed by the Bank and/or members of the Group, as set out in Clause 2.2 of the Confidentiality and Regulatory Annex.

- **Relationship Acceptance Form** means the Application Form in which the Customer agrees to the provision of the Services by the Bank.

- **Relationship Documents** means, separately and together, as the case may be:

  (a) the Terms,

  (b) any Services Schedules,

  (c) any Annexes,

  (d) any Appendices,

  (e) each of the applicable Country Conditions, and

  (f) the applicable Supporting Documents,

  as amended or supplemented from time to time.

- **Security Procedures** means security measures or protocols governing the Customer's access to the communication channels made available to the Customer by the Bank from time to time and used to verify the origination of Instructions or Communications between them transmitted via such channels. A Security Procedure may include, but is not limited to, one or more of the following measures: encryption algorithms or other codes, user entitlements, identifying words and numbers, and similar security devices.

- **Service Amendment Form** means the Application Form in which the Customer agrees to the provision of any additional Services by the Bank at any time after the Relationship Acceptance Form has been executed.

- **Services** means the services provided by the Bank and members of the Group under the Relationship Documents and requested in an Application Form.

- **Services Schedule** means a schedule to the Terms or a separate agreement between the Parties that expressly incorporates the Terms and relates to a specific Service.

- **Supporting Documents** means any document, agreement or Application Form which the Bank requires the Customer to enter into in connection with the receipt or maintenance of any Services in a particular jurisdiction, other than Country Conditions, Appendices, Annexes, Service Schedules or the Terms.

- **Tax Authorities** means domestic or foreign tax, revenue, fiscal or monetary authorities.

- **Tax Information** means any documentation or information relating, directly or indirectly, to a Customer and any owner, controlling person, substantial owner or beneficial owner of the Customer, that the Bank considers, acting reasonably, is needed to comply with any Group member's obligations to any Tax Authority.

- **Terms** means this Master Services Agreement.

Customer Pack Number: 28092020-00041
Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.

**632**



**Confidentiality and Regulatory Annex**

## 1 Disclosure of Confidential Information

1.1 Subject to Clauses 1, 2 and 6 of this Annex, the Parties agree that any Confidential Information shall be kept confidential. The Customer may disclose the Bank's Confidential Information as set out in Clause 1.2 of this Annex. The Bank may disclose the Customer's Confidential Information as set out in Clause 2 of this Annex.

1.2 The Customer may disclose the Bank's Confidential Information to:

(a) members of its group and service providers, sub-contractors, agents, and any Infrastructure Provider provided always that the Customer may only make such disclosure on a confidential basis, and in connection with receipt of the Services under the Relationship Documents;

(b) Authorities, auditors, professional advisers or as otherwise required or reasonably necessary under law, regulation, order of a court, or binding request from an Authority; and

(c) any other person with the Bank's written consent.

1.3 Restrictions on the disclosure of Confidential Information by either Party shall not apply to information that:

(a) is in or enters into the public domain other than in breach of the Relationship Documents;

(b) is lawfully obtained by the recipient party from a third party or is already known by the recipient party, in each case without notice or duty to maintain it as confidential; or

(c) was independently developed by the recipient party without reference to the disclosing party's Confidential Information.

## 2 Collection and Use of Customer Information (including Confidential Information)

2.1 Collection

Members of the Group may collect, use and share Customer Information, which may be requested from a person acting on the Customer's behalf. Customer Information may also be collected by or on behalf of members of the Group from other sources, and generated or combined with other information available to members of the Group.

2.2 Processing and Sharing

Customer Information will be processed, transferred and disclosed by the Bank and/or members of the Group in connection with the following Purposes:

(a) the provision of services and as necessary for the Bank to approve, manage, administer or effect any transactions requested or authorised by the Customer,

(b) meeting Compliance Obligations,

(c) conducting Compliance Activity,

(d) the collection of any amounts due and outstanding from the Customer,

(e) conducting credit checks and obtaining or providing credit references,

(f) to enforce or defend the Bank's, or a member of the Group's, rights,

(g) for internal operational requirements of the Bank or the Group (including, without limitation, credit and risk management, system or product development and planning, insurance, audit and administrative purposes) and

(h) the maintenance of the Bank's overall relationship with the Customer.

By using the Services, the Customer agrees that the Bank may also, as necessary and appropriate for the Purposes, transfer and disclose any Customer Information to the following recipients globally (who may also process, transfer and disclose such Customer Information for the Purposes):

(a) any member of the Group,

(b) any sub-contractors, agents, service providers, or associates of the Group (including their employees, directors and officers),

(c) in response to any requests from any Authorities,

(d) persons acting on behalf of the Customer, Infrastructure Providers, payment recipients, beneficiaries, account nominees, intermediary, correspondent and agent banks, clearing houses, clearing or settlement systems, market counterparties, upstream withholding agents, swap or trade repositories, stock exchanges, and companies in which the Customer has an interest in securities (where such securities are held by the Bank for the Customer),

(e) any party to a transaction acquiring interest in or assuming risk in or in connection with the Services, and

(f) other financial institutions, credit reference agencies or credit bureaus, for the purposes of obtaining or providing credit references,

wherever located, including in jurisdictions which do not have data protection laws that provide the same level of protection as the jurisdiction in which the Services are supplied.

2.3 Protection of Customer Information

Whether it is processed in a home jurisdiction or overseas, in accordance with Data Protection Legislation, Customer Information will be protected by a strict code of secrecy and security which all members of the Group, their staff and third parties are subject to. Customer Information will be treated with the same degree of care that the Group exercises to protect its own Confidential Information of a similar nature.

2.4 Under relevant Data Protection Legislation, an individual has the right to request copies of certain categories of Personal Data which may be held and to request that any errors in such data are corrected.

## 3 Customer Obligations

3.1 The Customer confirms, warrants and has responsibility for ensuring that every person whose information (including Personal Data or Tax Information) they have provided to a member of the Group has (or will at the relevant time have) been notified of and agreed to the processing, disclosure and transfer of their information as set out in the Relationship Documents. The Customer shall advise such persons that they may have rights of access to, and correction of, their Personal Data.

3.2 The failure of a Customer to supply its, or its Connected Person's, Tax Information and accompanying statements, waivers and consents, as may be requested, may result in the Bank making its own decision with respect to the status of the Customer and/or its Connected Persons, including whether such Customer and/or its Connected Persons is reportable to a Tax Authority. Such failure may require the Bank or other persons to withhold amounts as may be legally required by any Tax Authority and paying such amounts to the appropriate Tax Authority.

Customer Pack Number: 28092020-00041
Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.

HSBC

**Confidentiality and Regulatory Annex – continued**

## 4   Tax Compliance

The Customer acknowledges that it is solely responsible for understanding and complying with its tax obligations in all jurisdictions in which those obligations arise, and relating to the opening and use of accounts and/or services provided by the Bank and/or members of the Group. Except to the extent required otherwise by applicable law, the Customer shall be responsible for the deduction or withholding on account of any tax with respect to any amount paid, transferred or held by the Bank pursuant to any Service and shall be responsible for the payment and proper reporting of any such tax. The Customer confirms that, whenever required by applicable law and regulation, it has reported and will continue to report the assets deposited at the Bank and/or members of the Group as well as the income generated by those assets to the competent tax authorities.

## 5   Bearer Shares

5.1   Except to the extent that the Customer has either provided such confirmation to the Bank or received written confirmation from the Bank that it is on notice to the contrary, the Customer confirms on behalf of itself and any shareholder and affiliates (the "**Associated Entities**") that none of its shares or shares of Associated Entities have been issued in, or are held in a form that assigns or entitles ownership to whomever has possession of the physical share certificates, warrants or equivalent instruments ("**Bearer Shares**").

5.2   If the Customer or any of the Associated Entities issues, or converts existing shares to, Bearer Shares, the Customer undertakes to:

(a)   notify the Bank immediately and include the name of the beneficial owners of such Bearer Shares; and

(b)   comply with the Bank's requirements regarding issued Bearer Shares.

## 6   Compliance Activity

The provision of Services by the Bank and members of the Group may be affected by Compliance Activity and any impact on the performance of the Bank's obligations due to Compliance Activity or any actions taken by the Bank as a result thereof shall not constitute a breach of the Bank's agreements with the Customer.

## 7   Regulatory Disclosures

Where the Bank provides the Accounts and/or Services in the following jurisdictions, the Bank is required to provide the Customer with the following information:

### Algeria

HSBC Bank Middle East Limited (Algeria Branch), Business District Algiers, Complèxe Immobilier Oriental Business Park, Bab Ezzouar, 16024, Algiers, is regulated by the Central Bank of Algeria and lead regulated by the Dubai Financial Services Authority.

### Bahrain

HSBC Bank Middle East Limited (Bahrain Branch), P.O. Box 57, Manama, Kingdom of Bahrain, is licensed and regulated by the Central Bank of Bahrain as a Conventional Retail Bank and lead regulated by the Dubai Financial Services Authority.

### Egypt

HSBC Bank Egypt S.A.E., PO Box 124, Maadi, Cairo, Egypt, is regulated by the Central Bank of Egypt.

### Kuwait

HSBC Bank Middle East Limited, (Kuwait Branch), P.O. Box 1683 Safat 13017, is regulated by the Central Bank of Kuwait,the Capital Markets Authority for licensed Securities Activities and lead regulated by the Dubai Financial Services Authority.

### Oman

HSBC Bank Oman S.A.O.G., P.O. Box 1727, Postal Code 111, Seeb, Sultanate of Oman is regulated by the Central Bank of Oman and Capital Market Authority, Oman.

### Qatar

HSBC Bank Middle East Limited (Qatar Branch), P.O. Box 57, Doha, Qatar, is regulated by Qatar Central Bank and lead regulated by the Dubai Financial Services Authority.

### UAE

HSBC Bank Middle East Limited (U.A.E. Branch), P.O. Box 66, Dubai, U.A.E., is regulated by the Central Bank of the U.A.E and lead regulated by the Dubai Financial Services Authority.

### United Kingdom

HSBC Bank plc is a company registered and established in England and Wales under registration number 14259. The Bank's registered office is at 8 Canada Square, London E14 5HQ. The Bank's VAT registration number is GB 365684514. HSBC Bank plc is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority (the Bank's firm reference number is 114216).

Customer Pack Number:  28092020-00041
Document Number: GC-1000-200330-EN. HSBC Group © All rights reserved.

**634**



# Pooling Services Schedule

## 1  Relationship Documents

1.1  This Services Schedule is a schedule to and incorporates the terms of the Master Services Agreement.

1.2  This Services Schedule sets out the specific terms that apply to the Pooling Services.

1.3  Capitalised terms used but not defined in this Services Schedule are as defined in the Master Services Agreement.

## 2  Pooling Services

In respect of each Currency, the Bank shall notionally pool all Pooling Accounts into separate Notional Pools denominated in that Currency provided that, for any MCP Account denominated in a Currency other than the Base Currency for the specified Notional Pool, the Bank shall notionally convert the Cleared/Value Dated Balance of such MCP Account on a daily basis into the designated Base Currency at the Conversion Rate for that Notional Pool.

## 3  Guarantee, Indemnity and Set Off

3.1  The Customer irrevocably and unconditionally:

(a)  guarantees, as a primary obligation, to the Bank due and punctual payment to the Bank by each Participant participating in the same Notional Pool of any debit balance (howsoever arising) for the time being on any Pooling Account of such Participant, and will pay to the Bank from time to time on demand any and every sum of money which such Participant shall at any time be liable to pay to the Bank in respect of any such debit balance;

(b)  undertakes as a primary obligation to indemnify the Bank from time to time on demand from and against any Loss incurred by the Bank as a result of any obligation of any Participant participating in that Notional Pool to pay to the Bank any debit balance (howsoever arising) for the time being on any Pooling Account of such Participant being or becoming void, voidable, unenforceable or ineffective as against such Participant, for any reason (whether or not known to the Bank), the amount of such Loss being the amount which the Bank would otherwise have been entitled to recover from such Participant; and

(c)  authorises the Bank (at its absolute discretion and without notice to or consent or demand of the Customer) from time to time to set off, apply or combine all or any amounts for the time being due from the Bank to the Customer in respect of any credit balance on any of its Pooling Accounts in or towards the repayment or discharge of any amount for the time being due to the Bank from the Customer pursuant to the above,

provided that the Customer's liability under or pursuant to the above shall be limited to and be satisfied wholly out of all or any amounts for the time being due from the Bank to the Customer in respect of any credit balance on any of its Pooling Accounts.

3.2  The Customer acknowledges that:

(a)  neither its above-described liability nor the rights, powers and remedies conferred on the Bank by this Clause 3 or by law shall be discharged, impaired or otherwise affected by any act, event or omission which would otherwise operate to discharge, impair or otherwise affect such liability or such rights, powers or remedies;

(b)  so long as it is under the above-described liability, it shall not exercise any rights or remedies which the Customer may at any time have to be indemnified by or claim any contribution from any Participant in connection with this Clause 3; and

(c)  if the credit balance on any of its Pooling Accounts is in a different currency to any amount for the time being due to the Bank from the Customer pursuant to Clause 3.1, the Bank may convert either such credit balance or such amount due into the relevant Currency at a rate of exchange conclusively determined by the Bank according to its prevailing practice for the relevant Currency for the purpose of exercising its right under Clause 3.1(c).

3.3  The Customer agrees that its obligations under this Clause 3 shall not be affected or discharged as a result of:

(a)  the making of any changes to the Pooling Services (including, without limitation, pursuant to Clause 5.2) or any variation to the Relationship Documents; or

(b)  the variation, exchange, release or failure to enforce any other security or guarantee held or to be held by the Bank with respect to the Pooling Services or the Pooling Terms; or

(c)  the enforcement against the Customer or any other Participant under this Clause 3 without having enforced or sought to enforce any rights or remedies which the Bank may have against any other Participant or any other person; or

(d)  the taking of, or the omission to take, any action which but for this provision would discharge the Customer or any other Participant from liability under this Clause 3.

## 4  Beneficial Ownership of Pooling Accounts

The Customer represents and warrants on entering into this Services Schedule and continually while the Pooling Services are provided that the Customer is the sole and beneficial owner of each Pooling Account in its name and that no trust arrangement, security interest, agency arrangement or other beneficial interest exists in relation to any such Pooling Account.

## 5  Pooling Agent

5.1  The Customer represents and warrants on entering into this Services Schedule and continually while the Pooling Services are provided that the Pooling Agent is authorised by the Customer to:

(a)  negotiate and agree any Relationship Document,

(b)  negotiate and agree any amendment to the Pooling Terms,

(c)  execute any document setting out such agreement for the Customer on the Customer's behalf,

(d)  agree any change in the Pooling Services, including changes made through the GLS Portal,

(e)  sub-delegate authority to the Profile Owner to access Pooling Accounts and make changes to the Pooling Services.

5.2  If the Customer wishes to:

(a)  amend the details of the parameters set out in the Pooling Form,

(b)  cease to receive the Pooling Services, or

(c)  add, withdraw or suspend a Pooling Account to or from the Pooling Services,

the Pooling Agent must:

(A)  complete and deliver to the Bank an Application Form together with such other information and documents as the Bank may require (each in form and substance satisfactory to the Bank), or

(B)  if available, make such changes through the GLS Portal.


HSBC

5.3 The Customer agrees that:

(a) the Pooling Agent shall notify all other Participants of any of the events in Clause 5.2 above;

(b) any notice served under the Pooling Terms may be served on the Pooling Agent and the Pooling Agent shall forward any such notices to the Customer,

and any failure of the Pooling Agent to do so will not affect either of the Party's rights, duties and obligations pursuant to the Pooling Terms.

5.4 The Bank may disclose to the Pooling Agent and/or Profile Owner any Confidential Information concerning the Customer and any Pooling Account.

**6    Group Relationship of Participants**

6.1 The Customer represents and warrants to the Bank that it is a member of the same group as each other Participant. The Customer (or the Pooling Agent on its behalf) will inform the Bank immediately should the Pooling Agent or any Participant cease to be part of the Customer's group.

6.2 The Bank shall have the right to terminate the Pooling Terms and all Services provided under them as they apply to the Customer immediately upon the Bank's becoming aware that the Customer ceases to be a member of the same group as the other Participants or Pooling Agent.

**7    Representation and Warranties**

7.1 The Customer warrants and undertakes to take all reasonable steps to ensure that its warranties and representations in Clauses 4, 5.1 and 6.1 shall remain valid and effective in all respects until such time as all Pooling Terms are terminated or expire in accordance with their terms.

7.2 A breach of Clauses 4, 5.1 and 6.1 shall constitute a material breach of the Relationship Documents. If the Customer becomes aware that it is in breach of Clauses 4, 5.1 and 6.1 it shall notify the Bank as soon as reasonably practicable.

**8    HSBCnet**

8.1 The GLS Portal can only be accessed via HSBCnet.  If access to the Pooling Services via HSBCnet is terminated or revoked, access to the GLS Portal shall also be terminated or revoked.

8.2 Where the Pooling Agent is not the Profile Owner of HSBCnet, the Pooling Agent acknowledges and agrees that:

(a) the Pooling Agent must provide to the Profile Bank a GLS E-Channels Letter of Authority;

(b) whenever the Pooling Agent instructs the Bank to provide the Profile Owner with access to the Pooling Accounts or to the Pooling Services through the GLS Portal, the Pooling Agent must promptly notify the Profile Owner of such instructions; and

(c) it is the responsibility of the Pooling Agent and not the Profile Owner to instruct the Bank to set entitlements to access the GLS Portal.  Nonetheless, should the Profile Owner instruct the Bank with respect to such entitlements, the Bank is authorised to act on such Instruction and neither the Bank nor the Profile Bank shall be responsible for or under any obligation to review whether such an Instruction conflicts with any Instruction of the Pooling Agent.  In the event of a conflict, Instructions received via the Profile Owner shall prevail.

**8    Definitions**

• **Base Currency** means the currency specified as such for each Notional Pool in the relevant Pooling Form.

• **Business Day** means, with respect to the Pooling Services, a day on which commercial banks in the jurisdiction where the Pooling Services are being provided are open for transacting business in the relevant Currencies and settling payments.

• **Cleared/Value Dated Balance** means the balance that the Bank has recorded in that Pooling Account as at the end of a Business Day, after having taken into consideration all the transactions for which value has been received for and up to that day and "Cleared/Value Dated Credit Balance" and "Cleared/Value Dated Debit Balance" shall be construed accordingly.

• **Conversion Rate** means, in respect of each MCP Account, the conversion rate as determined by the Bank or as otherwise agreed by the Customer and the Bank.

• **Currency** means each of the currency/ies listed in the relevant Pooling Form.

• **GLS E-Channels Letter of Authority** means the letter from the Pooling Agent to the Profile Bank confirming that the Profile Owner is authorised to perform certain duties on behalf of the Pooling Agent in respect of the Pooling Services.

• **GLS Portal** means the Global Liquidity Solutions Portal accessed via HSBC**net**, through which the Profile Owner may view and/or amend certain parameters of the Pooling Services.  The Bank shall make available to the Profile Owner, details of the parameters that can be amended on the GLS Portal from time to time.

• **HSBC**net means the Group's internet banking platform accessed via the portal at www.hsbcnet.com or such other access point or means as may be notified by the Profile Bank to the Pooling Agent from time to time.

• **Master Services Agreement** means the master services agreement that forms part of the Relationship Documents contained in the Customer Pack referred to in the Relationship Acceptance Form or the Service Amendment Form (as applicable) issued together with this Services Schedule.

• **MCP Account** means a Pooling Account or a Net Balance included in an MCP Pool, as set out in the Pooling Form.

• **MCP Pool** means a pool of Pooling Accounts denominated in different Currencies.

• **Net Balance** means the consolidated Cleared/Value Dated Balances of any SCP Pool.

• **Notional Pool** means each pool of Pooling Accounts specified as such in the relevant Pooling Form and notionally pooled pursuant to Clause 2 and which shall, for the purposes of Clause 3, include all SCP Accounts used to calculate the Net Balance included in an MCP Pool.

• **Participant** means each party listed as such in the relevant Pooling Form.

• **Pooling Account** means either an SCP Account or an MCP Account.

• **Pooling Agent** means the party listed as such in the relevant Pooling Form.



HSBC Group © All rights reserved.

# Pooling Services Schedule continued

- **Pooling Form** means the form relating to any Pooling Services as may be amended from time to time in accordance with Clause 5.

- **Pooling Services** means the pooling services described in this Services Schedule.

- **Pooling Terms** means:
  (a) this Services Schedule;
  (b) any relevant Annex(es);
  (c) any applicable Country Conditions; and
  (d) the applicable Supporting Documents.

- **Profile Bank** means the member of the Group that provides HSBC**net** to the Profile Owner.

- **Profile Owner** means the company that the Pooling Agent has authorised to access the Pooling Accounts and Pooling Services, including the GLS Portal, through HSBC**net**.

- **SCP Account** means a Pooling Account included in an SCP Pool, as set out in the relevant Pooling Form.

- **SCP Pool** means a pool of Pooling Accounts denominated in the same Currency.



Customer Pack Number: 28092020-00041
Document Number: GC-7000-181207-EN. HSBC Group © All rights reserved.



**637**

Page left intentionally blank

**638**

# United Kingdom Country Conditions

The following are the terms which amend and/or supplement the Relationship Documents which shall apply to the provision of Services by the Bank to the Customer in the United Kingdom only ("**United Kingdom Country Conditions**").

**1    Interpretation**

**Business Day** means any day other than a Saturday, Sunday or a public holiday in the United Kingdom, when the Bank is open for business.

**2    The Single Euro Payments Area**

2.1    This Clause 2.1 shall only apply where the Customer enters into SEPA direct debit mandates in respect of its Accounts.

(a)    The Single Euro Payments Area ("**SEPA**") Direct Debit Scheme allows direct debit arrangements to be entered into across the SEPA. The Customer may enter into SEPA direct debit mandates in respect of any of the Accounts which are denominated in euro.

(b)    The Customer may inform the Bank at any time that no SEPA direct debits are to be made from its Accounts. The Customer must comply with the terms of its mandates and resolve any dispute regarding any payment directly with the party to the relevant mandate.

(c)    Terms agreed in the Customer's mandates shall not affect the Bank's obligations under the SEPA Direct Debit Scheme.

2.2    This Clause 2.2 shall only apply where the Bank has agreed to make the relevant service available to the Customer. With regards to all SEPA payments, information on the payment operation governed by the SEPA schemes (SCT, SCT Inst, SDD Core and SDD B2B) and the Customer's rights under such schemes is available from the following website: **www.hsbcnet.com/sepa**. The contractual relationship governing the aforementioned products and/or services is supplemented by the information on **www.hsbcnet.com/sepa**. Further the contractual relationship governing the SEPA Direct Debit (Creditor) product is also supplemented by the SEPA Direct Debit Core Scheme Rulebook and the SEPA Direct Debit B2B Scheme Rulebook.

**3    The Payment Services Conditions**

3.1    The following Clauses 3.2 - 3.10 will amend and/or supplement each relevant Relationship Document when the Payment Services Regulations 2017 (as amended, restated or re-enacted from time to time) (the "**Regulations**") apply to the Services being provided under such Relationship Document.

3.2    The Regulations are a set of rules in the United Kingdom which shall apply to certain payment services provided by the Bank to the Customer. Certain provisions of the Regulations do not apply where:

(a)    one of the payment service providers of either the payer or the payee is located outside the European Economic Area ("**EEA**"); and

(b)    the payment services are carried out in a currency other than in euro or a currency of an EEA state that has not adopted the euro as its currency.

In both circumstances referred to in (a) and (b) above the Regulations only apply to those parts of the payment service carried out within the EEA. In addition where the payment service falls within 3.2(a) and (b) Clause 3.4 will not apply.

3.3    In order for an Instruction to be properly executed, the Customer shall provide the Bank with the payee's bank sort code and account number or, where applicable, the bank identification code (BIC), or other relevant identification of the payee's bank and the payee's international bank account number (IBAN), or other relevant account number, and/or such information (if any) as the Bank may advise the Customer from time to time.

3.4    The Bank shall make a payment on the Customer's behalf to the relevant payee by the end of the Business Day following receipt of the Customer's complete Instruction. Where the payment to be made relates to a paper payment order, the Bank shall make the payment on the Customer's behalf to the relevant payee by the end of the second Business Day following the time of receipt of the Customer's complete Instruction.

3.5    If the Customer's Instruction is received after the deadline specified in any reference material provided or made available to the Customer by the Bank or on a non-Business Day, the Bank shall assume the Customer's Instruction has been received on the Business Day following the receipt of the Customer's Instruction.

3.6    The Bank shall have the right to stop the use of a payment instrument on reasonable grounds relating to:

(a)    the security of the payment instrument;

(b)    the suspected unauthorised or fraudulent use of the payment instrument; or

(c)    the Customer's ability to repay any credit advanced to the Customer.

3.7    If the Customer receives a payment, the Bank may deduct the Bank's reasonable charges, before crediting the Customer's account with the remaining sum of money. The Bank shall provide the Customer with the details of the original sum of money received by the Customer and the Bank's deducted charges in the Customer's bank statement (or by other means agreed with the Customer).

3.8    In this Clause "Third Party Provider" and "TPP" means a payment initiation service provider or account information service provider which is authorised by or registered with the FCA or another EEA regulator or otherwise permitted by law to access information on accounts and/or give the Bank the Customer's Instructions to make payments from those accounts which are accessible online and which are subject to this Clause 3.

Customer Pack Number:28092020-00041
Document Number: CC-01GB-200417-EN. HSBC Group © All rights reserved.

**639**



# United Kingdom Country Conditions *continued*

(a) Notwithstanding anything else to the contrary in the Relationship Documents, the Customer may instruct a Third Party Provider to access information on the Customer's accounts and/or give the Bank Instructions to make transfers from its accounts, without the need for a written agreement between the Bank and the Third Party Provider, provided that in either case the Third Party Provider has identified themselves to the Bank and acted in accordance with the requirements of the Regulations. Before entering into an agreement with a TPP the Customer must check it is authorised. If the Customer instructs an unauthorised third party, the Bank will assume it is the Customer that is authorising the Bank to give access to information about the Customer's accounts and the Customer will be responsible for any payments made as a result. If the Bank is aware that an unauthorised third party is trying to access the Customer's accounts, the Bank will block access to the accounts.

(b) Any Instructions from a Third Party Provider shall be deemed to be valid instructions from the Customer to the Bank for the purposes of the Relationship Documents and shall be treated in the same way under the Relationship Documents as an Instruction given by an Authorised Person. This includes the right to refuse an instruction for the reasons set out in the Relationship Documents.

(c) The Bank may deny a Third Party Provider access to an account where there are justified and evidenced reasons relating to unauthorised use or fraudulent activities by that Third Party Provider. Before doing so, the Bank will inform the Customer that it intends to deny access and will give reasons for doing so, unless it is not reasonably practicable to do so, in which case the Bank will inform the Customer immediately afterwards.  In either case, the Bank will inform the Customer in the manner in which the Bank considers most appropriate in the circumstances and will not be obliged to inform the Customer, where doing so would compromise the Bank's reasonable security measures or otherwise be unlawful. In the event the Bank denies access to a Third Party Provider the Bank will also notify the FCA.

3.9 The provisions of the Regulations which are permitted to be disapplied by law do not apply to the Relationship Documents.

3.10 The provisions which shall not apply to these terms, as provided in the clause immediately above, shall include the whole of Part 6 of the Regulations and Regulations 66(1), 67(3) and (4), 75, 77, 79, 80, 83, 91, 92 and 94 of Part 7 of the 2017 Regulations.  In addition, a different time period shall apply for the purposes of Regulation 74(1) (notification of unauthorised payments).  Notwithstanding any provision to the contrary in the Relationship Documents, this period will be 60 days from the date of your statement.

## 4    The General Data Protection Regulation Conditions

4.1 The following capitalised terms shall have the following meanings when used in this Clause 4.

**Customer Personal Data** means Personal Data in respect of which Customer is primarily responsible and/or accountable under Data Protection Legislation.

**Data Protection Legislation** has the meaning set out in Clause 21 of the Terms, which, for the avoidance of doubt, includes national legislation in the Customer's jurisdiction of incorporation or establishment implementing the Data Protection Directive (Directive 95/46/EC) and the Directive on Privacy and Electronic Communications (Directive 2002/58/EC), the GDPR, and any other laws and regulations implementing, derogating from or made under them, in each case as amended or re-enacted and in force from time to time.

**GDPR** means the Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC and the terms "**Data Subject**" and "**processing**" (and any derivatives thereof) have the meaning given to them in the GDPR.

**Personal Data Breach** means the accidental or unlawful destruction, loss, alteration, corruption, unauthorised disclosure of, or access to, Customer Personal Data transmitted, stored or otherwise processed by or on behalf of the Bank.

4.2 By reference to the Purposes set out in Clause 2.2 of the Confidentiality and Regulatory Annex, in circumstances where the Bank is using, collecting, processing and/or sharing any Customer Personal Data for the provision of Services requested by the Customer, it may act either as a data processor or a data controller, as determined under the relevant Data Protection Legislation. In particular, in circumstances where the Bank determines the purposes for which and the manner in which any Customer Personal Data are to be processed (for instance, in connection with any of the Purposes set out in clauses 2.2 (b) - (h) of the Confidentiality and Regulatory Annex) the Bank shall act as a data controller.

4.3 To the extent Customer Information constitutes Customer Personal Data, and the Bank acts as a data processor in relation to such Customer Personal Data, pursuant to or in connection with the Relationship Documents, the Bank shall, to the extent required by Data Protection Legislation:

(a) on behalf of the Customer, carry out Customer Personal Data processing activities necessary for the Purposes and in processing Customer Personal Data comply with all written instructions of the Customer in relation to any such Customer Personal Data, such written instructions to include the Purposes. In the event that a legal requirement prevents the Bank from complying with such instructions or if, in the Bank's opinion, the Customer's written instructions infringe the Data Protection Legislation (a "**Processing Conflict**"), the Bank shall not be obliged to carry out the data processing affected by the Processing Conflict and shall, unless such legal requirement prohibits it from doing so, inform the Customer of the relevant legal requirement before carrying out further processing activities in respect of the affected Customer Personal Data;

(b) ensure that any of the Bank's personnel that have access to the Customer Personal Data, have been informed by the Bank of the confidential nature of the Customer Personal Data and such personnel have agreed in writing to be bound by a duty of confidentiality in respect of the Customer Personal Data;



**United Kingdom Counter Credit Service** *...continued*

(c) at the Customer's request and cost, provide reasonable co-operation and assistance (taking into account the nature of the processing undertaken by the Bank and the information available to the Bank) to the Customer in taking such steps as are necessary to ensure its compliance with the obligations of Articles 32 - 36 of the GDPR and its obligations to respond to the exercise of data subject rights under the Data Protection Legislation;

(d) take all reasonable and appropriate technical and organisational measures to safeguard Customer Personal Data against unauthorised, accidental or unlawful access, processing, loss, damage or destruction in accordance with the relevant Data Protection Legislation (including such measures as are required by Article 32 of the GDPR as amended, extended, re-enacted or replaced from time to time), and the Bank's IT security standards and policies as the same may be implemented by the Bank from time to time;

(e) without undue delay on becoming aware of a Personal Data Breach or any complaint made to the Bank relating to Customer Personal Data, notify the Customer of such Personal Data Breach or complaint and provide the Customer with such reasonable co-operation and assistance (taking into account the nature of the processing undertaken by the Bank and the information available to the Bank) as agreed by the Parties in making any mandatory notifications to Authorities and/or affected individuals in connection with the Personal Data Breach or complaint; and

(f) subject to the Customer providing prior written notice and agreeing to confidentiality obligations reasonably satisfactory to the Bank and any member of the Group or subcontractor involved in processing Customer Personal Data, make information available to the Customer to the extent that it is reasonably necessary in order to evidence compliance with its obligations under this Clause 4.

4.4 The Customer agrees that, where the Bank is acting as a data processor, the Bank shall be entitled to appoint third parties to sub-process the Customer Personal Data, provided that:

(a) the Bank shall ensure that the third party is bound to comply with data protection obligations which are substantially the same as those set out in this Clause 4 as if the third party was the Bank; and

(b) the Bank shall remain liable to the Customer for that third party's compliance with this Clause 4.

4.5 On expiry or termination of the Relationship Documents or any part of them, the Bank will (where the Bank is acting as a data processor and at the Bank's option) return to Customer or securely and permanently destroy all Customer Personal Data and all copies thereof (except to the extent that the Bank retains copies of the Customer Personal Data in accordance with law, regulation or the Bank's internal retention policies, in which case it shall continue to treat any such Customer Personal Data as Confidential Information).

4.6 In addition to the warranty provided in Clause 3.1 of the Confidentiality and Regulatory Annex, the Customer warrants and represents that the Bank (acting both as a data processor and data controller as set out in Clause 4.2) is entitled to process Customer Personal Data as set out in the Relationship Documents, that the Customer has taken, and will take from time to time, all steps required by Data Protection Legislation to permit the on-going processing of Customer Personal Data by the Bank, and that, as far as the Customer is aware, the Bank's processing of Customer Personal Data for the purposes of the Relationship Documents will not cause the Bank to breach any Data Protection Legislation, and that any Customer Personal Data is accurate and up-to-date.

4.7 The Bank shall be entitled to transfer, or otherwise permit access to, the Customer Personal Data outside the European Economic Area provided that the transfer satisfies the requirements of Data Protection Legislation and is subject to appropriate safeguards.

**HSBC UK Bank plc**

HSBC UK Bank plc is a company registered and established in England and Wales under registration number 9928412. The Bank's registered office is at 1 Centenary Square, Birmingham, B1 1HQ. The Bank's VAT registration number is GB 365684514. HSBC UK Bank plc is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority (the Bank's firm reference number is 765112).

Customer Pack Number: 28092020-00041
Document Number: CC-01GB-200417-EN. HSBC Group © All rights reserved.

641



Page left intentionally blank

# Participant Country Conditions

## Pooling Services Country Conditions

The following are specific terms which amend and/or supplement the Pooling Services Schedule in respect of the Services provided thereunder, where the jurisdiction of the Customer's incorporation (or constitution, as applicable) is England ("**Pooling Participant England Country Conditions**").

### 1    England

If the Customer is incorporated or established in England, it represents and warrants on entering into the Pooling Services Schedule and continually while the Pooling Services are provided to it that the Customer's granting of the guarantee or indemnity under clause 3 of the Pooling Services Schedule does not result in a reduction in its net assets as properly recorded in its books in accordance with generally accepted accounting principles or, to the extent that the granting of the guarantee or indemnity does result in a reduction in its net assets, that it has sufficient distributable reserves to cover the reduction.

### 2    England Partnerships

2.1    This Clause 2 only applies if the Customer has entered into the Relationship Documents in its capacity as a partnership and is established in England.

2.2    **Definitions**

In this Clause 2:

- **Customer Group** means the Customer, any company in respect of which the Customer or any of its partners hold the majority voting rights and any of the subsidiaries of such companies, any company holding majority voting rights in the Customer, its ultimate holding company and all of its subsidiaries.

- **Change in Partnership Composition** means any change of the Customer's Relevant Partners from time to time, whether arising by operation of law otherwise.

- **Relevant Partner** means any person who is liable in respect of any obligation owed by the Customer to the Bank as a member of the Customer's partnership or of a Relevant Transparent Partnership.

- **Relevant Transparent Partnership** means any Transparent Partnership which is a member of the Customer's partnership or of a Relevant Transparent Partnership.

- **Transparent Partnership** means a partnership or other association (whether formed under English law or otherwise) which does not have legal personality separate from that of its members.

- **Customer** shall mean the partnership or any member(s) of the partnership from time to time who are the recipients of the Pooling Services.

2.3    **General**

(a)    The Customer represents and warrants continually while the Pooling Services are provided that:

    (i)    its partnership is validly constituted as a partnership  under the Partnership Act 1890 and existing under the laws of England;

    (ii)    it has all the necessary power, capacity and authority to enter into, execute (where applicable) and deliver, and to perform the Relationship

Documents on behalf of its partnership and all Relevant Partners from time to time;

    (iii)    the terms of the Relationship Documents constitute legal, valid and binding obligations, enforceable against it and all Relevant Partners from time to time; and

    (iv)    the Pooling Services are not used or accessed in a personal capacity by any Relevant Partner.

(b)    The Customer undertakes that it will upon the Bank's request, promptly provide to the Bank information (in form and substance satisfactory to the Bank) as to the identity of the Relevant Partners, their respective capacities and the Customer's authority as warranted in Clause 2.3(a)(ii).

(c)    The Bank may release or discharge any Relevant Partner from any liability under the Relationship Documents or make any other arrangements with any Relevant Partner without discharging any other Relevant Partner or otherwise prejudicing the Bank's rights against any other Relevant Partner.

(d)    All references in the Relationship Documents to the Customer's authority shall be read as referring to the Customer's authority as Relevant Partners of a partnership and all references to the Customer's group shall be read as referring to the Customer collectively as Relevant Partners of a partnership.

(e)    Any demand, notice or Instruction given by the Customer to any one or more members of the Customer's partnership, or received by the Bank from any one or more members of the Customer's partnership, shall be deemed to be a demand, notice or Instruction given to or received by all Relevant Partners (as the case may be).

2.4    **Change of partners**

(a)    The Customer undertakes that it will give at least 30 days advance written notice of any Change in Partnership Composition.

(b)    If there is any Change in Partnership Composition, the Customer agrees that the Relationship Documents shall apply to the Relevant Partners after the change and such Relevant Partners shall be liable for the performance of all existing and subsequent obligations thereunder. The Bank may, in its discretion, require separate documentation, in form and substance specified by the Bank, to be executed by the Relevant Partners after the Change in Partnership Composition.

(c)    Irrespective of any Change in Partnership Composition, the Bank shall at all times be entitled to act on Instructions from (or on behalf of) and account to the partnership for the time being and exercise the Bank's rights under the Relationship Documents as if there had been no Change in Partnership Composition.

(d)    Clause 13.3 of the Master Services Agreement shall not apply to a Change in Partnership Composition.

(e)    In determining who is a Relevant Partner:

    (i)    a person who is a member of a Transparent Partnership is to be taken as a person who is liable for obligations of that Transparent Partnership. Where the members of a Transparent Partnership include another Transparent Partnership, this Clause applies also in respect of the members of

Customer Pack Number: 28092020-00041
Document Number: CC-1GLS-200616-EN. HSBC Group © All rights reserved.

**643**



**Participant Country Conditions** — HSBC CONFIDENTIAL

that other Transparent Partnership; and

   (ii)   no account shall be taken of any limitation, under the law under which a Transparent Partnership is formed, on the liability of any member of the Transparent Partnership to discharge obligations of or contribute to the assets of the Transparent Partnership.

### 3   England Limited Partnership

**3.1**   This Clause 2 only applies if the Customer has entered into the Relationship Documents in its capacity as a limited partnership and is established in England.

**3.2**   **Definitions**

In this Clause 2:

- **Change in Partnership Composition** means any change of the Customer's Relevant Partners from time to time or their respective capacities, whether arising by operation of law other otherwise.

- **Relevant Partner** means any person who is liable in respect of any obligation owed by the Customer to the Bank as a member of the Customer's partnership or of a Relevant Transparent Partnership.

- **Relevant Transparent Partnership** means any Transparent Partnership which is a member of the Customer's partnership or of another Relevant Transparent Partnership.

- **Transparent Partnership** means a partnership or other association (whether formed under English law or otherwise) which does not have legal personality separate from that of its members.

- **Customer** shall mean the limited partnership and any general partner(s) of the limited partnership from time to time who are the recipients of the Pooling Services.

**3.3**   **General**

(a)   The Customer represents and warrants continually while the Pooling Services are provided that:

   (i)   it is validly constituted under the Limited Partnerships Act 1907 and existing under the laws of England;

   (ii)   it has all the necessary power, capacity and authority to enter into, execute (where applicable), deliver and perform its obligations under, the Relationship Documents on behalf of the Customer's partnership and the Relevant Partners from time to time;

   (iii)   the terms of the Relationship Documents constitute legal, valid and binding obligations, enforceable against the Customer and all Relevant Partners from time to time; and

   (iv)   the Services are not used or accessed in a personal capacity by any Relevant Partner.

(b)   The Customer undertakes that it will upon the Bank's request, promptly provide to the Bank information (in form and substance satisfactory to the Bank) as to the identity of the Relevant Partners, their respective capacities and the Customer's authority as warranted in Clause 2.3(a)(ii).

(c)   The Bank may release or discharge any Relevant Partner from any liability under the Relationship Documents or make any other arrangements with any Relevant Partner without discharging any other Relevant Partner or otherwise prejudicing the Bank's rights against any other Relevant Partner.

(d)   All references in the Relationship Documents to the Customer's authority shall be read as referring to the Customer's authority as Relevant Partners of a limited partnership and all references to the Customer's group shall be read as referring to the Customer collectively as Relevant Partners of a partnership.

(e)   Any demand, notice or Instruction given by the Bank to any one or more general partners of the Customer's partnership, or received by the Bank from any one or more general partners of the Customer's partnership, will be deemed to be a demand, notice or Instruction given to or received by all Relevant Partners (as the case may be).

**3.4**   **Change of partners**

(a)   The Customer undertakes that it will give at least 30 days advance written notice of any Change in Partnership Composition.

(b)   If there is any Change in Partnership Composition, the Customer agrees that the Relationship Documents shall apply to the Relevant Partners after the change and such Relevant Partners shall be liable, in their respective capacities, for the performance of all existing and subsequent obligations thereunder. The Bank may, in its discretion, require separate documentation, in form and substance specified by the Bank, to be executed by the Relevant Partners after the Change in Partnership Composition.

(c)   Irrespective of any Change in Partnership Composition, the Bank shall at all times be entitled to act on Instructions from (or on behalf of) and account to the partnership for the time being and exercise the Bank's rights under the Relationship Documents as if there had been no Change in Partnership Composition.

(d)   Clause 13.3 of the Master Services Agreement shall not apply to a Change in Partnership Composition.

(e)   In determining who is a Relevant Partner:

   (i)   a person who is a member of a Transparent Partnership is to be taken as a person who is liable for obligations of that Transparent Partnership. Where the members of a Transparent Partnership include another Transparent Partnership, this Clause applies also in respect of the members of that other Transparent Partnership; and

   (ii)   no account shall be taken of any limitation, under the law under which a Transparent Partnership is formed, on the liability of any member of the Transparent Partnership to discharge obligations of or contribute to the assets of the Transparent Partnership.

Customer Pack Number: 28092020-00041
Document Number: CC-1GLS-200616-EN. HSBC Group © All rights reserved.

**644**


HSBC

## Pooling Services Country Conditions

The following are specific terms which amend and/or supplement the Pooling Services Schedule in respect of the Services provided thereunder, where the jurisdiction of the Customer's incorporation (or constitution, as applicable) is in the European Union ("**Pooling Participant European Union Country Conditions**").

### 1  European Union

If the Customer is incorporated or established in the European Union, the Customer represents and warrants on entering into the Pooling Services Schedule and continually while the Pooling Services are provided to the Customer that its centre of main interests (as that term is defined in Council Regulation (EC) No 1346/2000 of 29 May 2000 on insolvency proceedings) is located in the jurisdiction of the place of the Customer's registered office and its registered office is located in the Customer's place of incorporation.



Customer Pack Number: 28092020-00041
Document Number: CC-1GLS-200616-EN. HSBC Group © All rights reserved.



**645**

Page left intentionally blank

# Business Banking

## Terms and Conditions

**For HSBC UK Bank plc business current and savings accounts and services as of 1 September 2019.**



# Contents

| | Page | | | Page |
|---|---|---|---|---|
| **About this Agreement** | **3** | | 22. What happens if there are incorrect or unauthorised payments on an account or you've been tricked into sending money to a fraudster? | 23 |
| 1. How do we contact each other? | 3 | | | |
| 2. What does this agreement cover? | 4 | | 23. Refunds | 27 |
| 3. What forms our agreement? | 4 | | **About overdrafts, charges and how we pay and charge interest** | **28** |
| 4. How this agreement applies to different types of customer | 5 | | 24. Overdrafts | 28 |
| **About using your account** | **6** | | 25. Interest rates and charges | 29 |
| 5. How do we make sure we're dealing with you | 6 | | **Our relationship with you** | **31** |
| 6. Business Telephone Banking | 6 | | 26. Changes we can make which require notice | 31 |
| 7. Keeping up security | 9 | | 27. Changes we can make without telling you in advance | 32 |
| 8. Using a TPP | 10 | | 28. How you can close your account or end this agreement | 32 |
| 9. Statements and other information we'll give you | 11 | | 29. How we can end this agreement, withdraw services and close accounts | 33 |
| 10. Text message banking | 11 | | 30. How we can transfer accounts | 34 |
| 11. Information we need from you and when we can disclose information about you | 12 | | 31. Transferring this agreement | 34 |
| 12. Tax compliance | 12 | | 32. When aren't we responsible for things that go wrong? | 34 |
| 13. What happens if you stop using your account? | 12 | | 33. Set-off | 35 |
| **Payments** | **13** | | 34. If you're a company or a partnership | 35 |
| 14. Payments into your account (other than by cheque) | 13 | | 35. What country's courts and laws apply to this agreement and our dealings before you opened your account? | 36 |
| 15. Payments into your account by cheque | 14 | | **Information to help manage your account** | **37** |
| 16. Payments into your account by mistake or fraud | 16 | | Privacy | 37 |
| 17. When we can refuse to accept payments into your account | 17 | | How to make a complaint | 37 |
| 18. How we decide whether to make a payment from your account | 17 | | How your money is protected | 37 |
| 19. Blocking payments and services | 18 | | Unclaimed assets scheme | 38 |
| 20. Payments from your account | 18 | | Authorisation details | 38 |
| 21. Cancelling or changing payments (other than cheques) | 22 | | | |

# About this Agreement

This agreement is between us, HSBC UK Bank plc, and you, the organisation we've opened one or more accounts for. Depending on where it's used, 'you' can mean the organisation or any individual authorised by the organisation.

You'll be bound by anything done by any person you've authorised to access or use an account for you, even if they do something that's outside the scope of the authority you gave them.

You can ask us for a copy of these terms at any time.

If you'd like this document in another format such as large print, Braille or audio, please contact us.

### 1. How do we contact each other?

#### How will we contact you?

To contact you, we'll use the most recent postal or email address and telephone numbers you've given us. To warn you about any actual or suspected fraud or security threats we'll use the fastest and most secure way of contacting you (e.g. we might text you rather than calling you).

If you've chosen to access notices electronically, including through Business Internet Banking or HSBCnet, we may provide statements and other account information to you in this way. Where statements are available in Business Internet Banking we won't change them and you'll be able to download and print them.

**Note**

You must tell us as soon as possible if the contact details for you or any authorised person change. If you don't, you might not get information or notices from us - we won't be responsible for this.

You must make sure that anyone authorised to access or use your accounts is aware of any notices and information we send you.

We may record:

◆ and monitor telephone calls so we can improve our services and for security reasons

◆ telephone numbers you call us from and may use them if we need to contact you urgently.

We'll always use English to communicate with you.

**How to reach us**

| By telephone | From UK (including Channel Islands and Isle of Man) | From anywhere else |
|---|---|---|
| Lost or stolen cards and PINs | **0800 032 7075**<br>Textphone: **0800 028 35 16** | **+44 1442 422 929** |
| Other queries | **03457 60 60 60** (8am to 10pm every day) | **+44 1226 26 08 78** |
| Textphone | **03457 125 563** | |
| Website | **www.business.hsbc.uk** | |
| By post | **PO Box 6201, Coventry CV3 9HW.** | |

**649**

**2. What does this agreement cover?**

| UK Accounts | | Services | |
|---|---|---|---|
| Sterling Business current accounts | ✓ | Mobile and Business Internet Banking | ✓ |
| Sterling Business savings accounts | ✓ | Text message banking | ✓ |
| International/Foreign currency current accounts | ✓ | Business Telephone Banking | ✓ |
| International/Foreign currency savings accounts | ✓ | Unarranged overdrafts | ✓ |
| Personal accounts | ✗ | | |

**3. What forms our agreement?**

When we refer to "this agreement", "the agreement" or "our agreement", we mean this document, any mandate for your account and all other terms set out in the table below.

| Terms | Where you will find them |
|---|---|
| General terms that apply to all accounts where relevant | In this document. |
| Interest rates and charges | Unless we've agreed individual rates and charges with you, you can find information on our:<br><br>♦ interest rates on our website, in our branches or by calling us; and<br>♦ charges in the HSBC UK Business Price List. |
| Exchange rates | You can find information on our exchange rates on Business Internet Banking or HSBCnet (if relevant to you), in our branches or by calling us. |
| Additional Conditions for some products (e.g. savings accounts) and services (e.g. Business Internet Banking) | In the Additional Conditions for that product or service. |

If there is a conflict between the provisions in this document and those in the Additional Conditions, the Additional Conditions will apply in respect of the product or service to which they relate.

For other products or services (e.g. overdrafts or HSBCnet), the terms we give you when you request the product or service will also apply.

**650**

## 4. How this agreement applies to different types of customer

The Payment Services Regulations 2017 and other rules require us to treat Small Business and Small Charity Customers in the same way as our personal banking customers. However, we don't have to do this for our Larger Corporate Business Customers provided we've agreed that different terms may apply. Where relevant, we make clear whether a particular term applies to Larger Corporate Business Customers in place of the term that applies to Small Business and Small Charity Customers, and vice versa.

### Small Business Customer

A business customer which had, on the date it agreed to the Business Banking Terms and Conditions, fewer than 10 employees and an annual turnover and/or balance sheet total of £2million or less (or, if it's part of a group, the group has an annual turnover and/or balance sheet total of £2million or less).

### Small Charity Customer

A UK charity whose annual income was, on the date it agreed to the Business Banking Terms and Conditions, less than £1million.

### Larger Corporate Business Customer

Any business customer whose accounts are held with us which isn't a Small Business or Small Charity Customer.

If you're a Larger Corporate Business Customer, you agree that the following provisions of the Payment Services Regulations 2017 won't apply to your agreement with us:

- ◆ Part 6 – Information Requirements for Payment Services.
- ◆ Regulation 66(1) – Charges.
- ◆ Regulation 67(3) and (4) – Consent and withdrawal of consent.
- ◆ Regulation 75 – Evidence on authentication and execution of payment transactions.
- ◆ Regulation 77 – Payer or payee's liability for unauthorised payment transactions.
- ◆ Regulation 79 – Refunds for payment transactions initiated by or through a payee.
- ◆ Regulation 80 – Requests for refunds for payment transactions initiated by or through a payee.
- ◆ Regulation 83 – Revocation of a payment order.
- ◆ Regulation 91 – Non-execution or defective or late execution of payment transactions initiated by the payer.
- ◆ Regulation 92 – Non-execution or defective or late execution of payment transactions initiated by the payee.
- ◆ Regulation 94 – Liability of payment service provider for charges and interest.

---

**Note**

You must tell us as soon as you become aware that you meet or stop meeting the criteria to be a Small Business or Small Charity Customer.

**651**

# About using your account

**5. How do we make sure we're dealing with you?**

Before we do certain things (e.g. provide information about your account or make payments) we need to check your identity and make sure that you've authorised the action we're taking.

◆ If we get a document, for example, we can check that a signature on it matches our records. If you're in a branch, we may also ask for photo ID (e.g. a driver's licence).

◆ In all other cases or if your security details are used with Mobile or Business Internet Banking, Business Telephone Banking (or another service we provide for accessing your accounts e.g. HSBCnet) or with a payment device we'll assume we're dealing with you and that we're authorised to take action. We may add other ways of checking your identity in the future.

| What's a 'payment device'? | What are 'security details'? |
|---|---|
| A card, e-wallet or another device that you can use (usually with security details) to make payments, give us instructions or access information about your account. | Passwords, PINs, telephone security number, security codes, memorable data, biometric data or any other information or details that you've set up with us for use with Mobile or Business Internet Banking, Business Telephone Banking, HSBCnet or a payment device. |

**6. Business Telephone Banking**

Our Business Telephone Banking service, which includes an automated service, allows your nominated users to manage and transact on your accounts by phone.

Most of the features within our Business Telephone Banking service are available to both Primary and Additional users. However, if an Additional User isn't a signatory then that user's access to your account will be restricted.

| What's an 'automated service'? | Who's a 'user'? | What's an 'instruction'? | Who's a signatory? |
|---|---|---|---|
| An automated voice which lets users use parts of Business Telephone Banking from a touchtone phone. | Any person registered to use some or all of Business Telephone Banking on your behalf.<br><br>A user may or may not be a signatory on your mandate. | Any phone instruction, request or other communication given, or appearing to have been given, to us by a user. | Any user who's a signatory to the mandate on your account. |

**Registering for Business Telephone Banking**

If you're a sole trader, you can register for Business Telephone Banking by calling one of our advisers on **03457 60 60 60** (Textphone **03457 125 563**), or **+44 1226 26 08 78** if you're calling from overseas. Lines are open from 8 am to 10 pm (UK time) every day.

For all other business structures, you must complete an application form, sign it in accordance with your mandate and return it to us for processing and approval. Registration can also be completed through the Business Internet Banking service.

**Availability of Business Telephone Banking**

Our Business Telephone Banking advisers are available between 8am and 10pm every day on the numbers set out above, or users can access our automated service 24/7. Either way, users will need their bank account details, date of birth and telephone security number to hand. Once registered, a user can register their Voice ID to access the service.

If we can't identify a user, we might not be able to help them, other than to discuss very limited information about the account or provide assistance if they suspect the account has been compromised.

**If there are two or more signatories on the account**

If there are two or more signatories on the account, we'll act on instructions from any signatory so long as they're also a registered user of Business Telephone Banking and are trying to do something they're allowed to do.

**What can be done using Business Telephone Banking?**

The table below sets out in more detail what each type of user can do. However, you should note that we reserve the right to add or remove certain services from time to time.

All registered users of Business Telephone Banking must have a telephone security number or Voice ID in order to access the service. Failure to pass the necessary security checks will restrict or suspend a user's access to the service.

| | **Primary User** | **Additional User who's a signatory** | **Additional User who's not a signatory** |
|---|---|---|---|
| **What's a Primary/ Additional User?** | The Primary User is the person appointed by you and has:<br><br>◆ full access and authority over your account;<br>◆ authority to appoint Additional Users;<br>◆ no restrictions on what they can do using Business Telephone Banking.<br><br>They must be a signatory. | A person appointed by the Primary User and is a signatory. | A person appointed by the Primary User and who's not a signatory. They will have reduced access and authority over the account. |

**653**

|  | **Primary User** | **Additional User who's a signatory** | **Additional User who's not a signatory** |
|---|---|---|---|
| **Nominating a user** | When you register for Business Telephone Banking, you'll have to nominate someone to be the Primary User.<br><br>Registration and nomination of a Primary User can be completed online or by printing and posting the registration form. | The Primary User must follow the instructions on the registration forms if nominating an Additional User.<br><br>This can be completed online or by printing and posting the registration form. | |

| **What can this user do?** | **Primary User** | **Additional User who's a signatory** | **Additional User who's not a signatory** |
|---|---|---|---|
| Find out balances | ✓ | ✓ | ✓ |
| Transfer money between your linked sterling accounts | ✓ | ✓ | ✓ |
| Get transaction information | ✓ | ✓ | ✓ |
| Send messages to your Relationship Manager | ✓ | ✓ | ✓ |
| Get foreign exchange and interest rate information | ✓ | ✓ | ✓ |
| Cancel standing orders and direct debits | ✓ | ✓ | ✓ |
| Get information on business banking products | ✓ | ✓ | ✓ |
| Apply for products or services including seeking credit | ✓ | ✓ | ✗ |
| Make payments to third parties | ✓ | ✓ | ✗ |
| Set up/amend standing orders | ✓ | ✓ | ✗ |
| Reinstate direct debits | ✓ | ✓ | ✗ |
| Remove registered users (including the Primary User) | ✓ | ✓ | ✗ |
| Appoint an Additional User | ✓ | ✗ | ✗ |
| Change statement frequency | ✓ | ✓ | ✗ |
| Change date of a statement | ✓ | ✓ | ✗ |

**654**

**Misuse of Business Telephone Banking**

If you think the Primary User or an Additional User is misusing Business Telephone Banking, including operating beyond their authority, you must let us know immediately and take steps to revoke their access. You must also replace the Primary User where their access has been revoked.

**Limits on payments**

We may set limits on how much a user can instruct us to pay out of an account. We may also limit the number of payments a user can make on one call. We'll only do this if they have a large number of multiple payments to make. A user can pay any one recipient up to £10,000 a day using Business Telephone Banking although we might let them exceed this limit in exceptional circumstances.

**Unregistered individuals**

If an individual who isn't registered for Business Telephone Banking contacts us and wishes to discuss your account, we won't provide any information to them until they pass our security checks. We won't authorise any payments via Business Telephone Banking by any person, including a signatory, who isn't registered to use the service. An individual may be able to start the process of applying for a product or service but completing such application may be restricted by the mandate or our procedures.

**Becoming a signatory**

If an Additional User who isn't a signatory becomes one, we'll allow them full powers over the accounts. This will happen automatically, which means we won't tell you or the Primary User this has happened.

**If someone's no longer a user or a signatory**

You must tell us immediately if someone ceases to be a signatory or needs to be removed from the Business Telephone Banking service. This might happen when a person resigns from their job, leaves the business or goes on gardening leave, for example.

If a person ceases to be a Primary User then you must nominate a replacement. You must also tell us if any Additional Users become or cease to be a mandate signatory.

If you don't inform us of changes to the people who are signatories or are nominated to use Business Telephone Banking, then we'll continue to process instructions we receive from them (subject to security checks being passed).

**7. Keeping up security**

We'll do all we reasonably can to prevent unauthorised access to your account. You must also act reasonably to prevent misuse of your account by keeping your payment devices and security details safe, and by not sharing your security details with anyone else (other than a TPP that you've authorised). If you don't, we may block access to your account to protect you and us from unauthorised use. If you ask, we'll tell you when the block will end if we can.

**655**

Tips for preventing misuse of your accounts:

**Don't:**

- allow anyone (other than a TPP, if necessary) to use any payment device or tell them your security details;
- choose security details that anyone else can easily guess;
- log in, or stay logged in, to a device if you're not in full control of it or it's not in your possession; or
- use a device to access online banking services if another person has registered their biometric data on it.

Before you transfer possession of a payment device to someone else (e.g. if you sell it or give it to someone for repair), please ensure that you **delete**:

- cards stored on it or in any e-wallets; and
- any biometric access (such as fingerprint, face or Voice ID) including access from any linked device.

You'll find additional security tips on our website and in the Business Banking Made Easy brochure. Please check for any updates we may make from time to time.

You must contact us as soon as possible if:

- someone else tries to access, or has accessed, your account or payment device (with or without security details), or has made a payment from your account using a cheque; or
- your cheque(s), payment device or security details have been lost or stolen.

We'll ask for information or other help and we may assist and ask you to assist with any police investigation.

You mustn't use a payment device or cheque after you've reported it lost or stolen or you think someone has used or tried to use it. You must destroy it and return it to us if we ask.

### 8. Using a TPP

**What's a 'TPP'?**

A TPP is a third party service provider that's authorised by or registered with the FCA or another EEA regulator or otherwise permitted by law to access information and make payments on online payment accounts operated by other providers (such as banks, building societies and credit card issuers) and has your permission to do this.

An EEA regulator is a regulator in a member state of the European Union, Iceland, Liechtenstein or Norway.

If you use a TPP, the terms of this agreement will still apply. We'll give the TPP access to account information and you'll be able to make the same payments through the TPP that you'd be able to make if you were dealing with us online. Account information will include details about who you make payments to and receive payments from. This might contain some sensitive personal information.

Although you mustn't, generally, give your security details to anyone else, you may give them to a TPP if it's necessary for them to provide their services to you. We may refuse to allow a TPP to access your account if we're concerned that the TPP is unauthorised or acting fraudulently. We'll tell you if we do this (unless it'd be unlawful or we'd compromise our reasonable security measures). **656**

You must check from the information the TPP has to give you that they're authorised. If you think a payment made through a TPP was unauthorised or incorrect you must call us as soon as you can.

If you give your security details to an unauthorised third party, we'll assume it's you that's authorising us to give access to information about your accounts and you'll be responsible for any payments made as a result. If we're aware that an unauthorised third party is using your security details, we'll block access to your accounts.

### 9. Statements and other information we'll give you

Whenever we make a payment into or out of your account, take our charges or charge or pay interest we'll give you details by updating the information we provide through Business Internet Banking, HSBCnet or sending a separate confirmation. This information will also be available if you ask for it using Business Telephone Banking, cash machines or in our branches.

If you're a Small Business or Small Charity Customer, we may also ask you to choose between receiving monthly statements or having the information made available as set out above. If you choose not to receive monthly statements, we may still send you statements at a different frequency (we'll explain this if we offer you the choice). If you don't tell us what you want, we'll provide statements monthly. If you have an overdraft on your account, you'll be provided with a monthly statement.

We'll send statements by post or, if you're registered for Business Internet Banking, provide them online unless you've asked us for paper statements. You can also access online statements via HSBCnet. We'll also send statements by post if they aren't available online. We'll only send or provide a statement if there's been a payment out of your account since the last statement we gave you.

If you're a Larger Corporate Business Customer, we'll agree with you how we'll provide statements. You can ask us for a copy of your statements at any time.

You must let us know as soon as possible if you think there are any unusual or incorrect transactions on your accounts. For most transactions, if you don't do so within 13 months of the date of the transaction, you won't have a right to a refund. However, if you're a Small Business Customer or a Small Charity Customer and you've been tricked into sending money to a fraudster, there's no time limit for reporting this to us.

**Pre-notification of account charges**
We'll send you pre-notifications of fees or overdraft interest rates that are to be deducted from your account at least 14 days before we deduct them. We may do this by post, email, Business Internet Banking or HSBCnet.

### 10. Text message banking

We can change, suspend or withdraw the text message banking service at any time.

We're not liable for any losses you suffer if:

◆ you don't receive a text message that we can show we sent to you (or if you only receive part of it); or
◆ someone steals or sees your confidential information because you haven't followed our instructions or kept your phone and security details secure.

We'll deduct our service fees from your nominated account in arrears for each calendar month you're registered for the service.

**11. Information we need from you and when we can disclose information about you**

Before you (or anyone on your behalf) provides information on connected persons to us or a member of the HSBC Group you must ensure that you have a legitimate interest, lawful purpose or the agreement of the relevant person. You must also ensure they've been provided with our Privacy Notice, which explains the way in which their information will be processed and their rights in relation to their information.

---

**What's a 'connected person'?**

A 'connected person' is a person or legal entity whose information (including personal data or tax information) you provide, or which is provided on your behalf, to any member of the HSBC Group or which is otherwise received by any member of the HSBC Group in connection with this agreement.

A connected person could be any guarantor, a director, officer or employee of a company, partners or members of a partnership, any substantial owner, controlling person, or beneficial owner, trustee, settlor or protector of a trust, account holder of a designated account, recipient of a designated payment, your attorney or representative (e.g. authorised signatories), agent or nominee, or any other persons or entities with whom you have a relationship that's relevant to your relationship with the HSBC Group.

---

If we make a reasonable request for information, you must give it to us as soon as possible. If you don't, or we suspect fraudulent or criminal activity of any kind:

◆ we might try to get it from another source;
◆ we could block or close your account(s) or suspend your access to services; or
◆ you might not be able to carry on doing some or all of your banking with us.

You must make sure the information you give us is accurate and up to date and tell us within 30 days if anything changes.

We'll use your information as explained in our Privacy Notice (available at **www.business.hsbc.uk/legal**). We'll also give it to others if required by law, a public duty (e.g. if we believe you may have tax obligations in other countries, we may have to disclose that information directly to tax authorities) or it's in our interests to disclose it to protect our interests or reputation (e.g. in any legal proceedings) or if we have your specific agreement.

**12. Tax compliance**

It's up to you to meet your tax responsibilities in the UK and elsewhere. This relates to opening and using accounts and services provided by members of the HSBC Group. Some countries' tax laws may apply to you even if you don't have a business there. Connected persons are responsible for their own tax obligations. As you're responsible for your own tax obligations (and connected persons for theirs), no HSBC Group member is responsible for this or provides tax advice. It's your choice whether to seek independent legal and tax advice.

**13. What happens if you stop using your account?**

If you haven't used your current account for 12 months, we may restrict payments in or out of it to protect against fraud, but we'll let you know first.

If you're not using a savings account but you're using other accounts with us, we won't suspend the savings account unless you haven't used it for two years.

**658**

# Payments

This section is about payments in and out of accounts. Some accounts have different or additional terms which are set out in the Additional Conditions for that product. We don't accept or make payments in all currencies (please ask us if you want to know which currencies we cover). All payments and decisions about payments are made on working days, and how we manage payments can depend on whether the payment is made within the European Economic Area (EEA) and if it's in an EEA currency.

### What's an 'electronic payment'?

Electronic payments include internal transfers and standing orders and Direct Debits from other people or businesses to you. We can accept payments from mobile payment systems (e.g. Paym).

### What's the 'EEA'?

The EEA is all member states of the European Union and Iceland, Liechtenstein and Norway.

### What's 'SEPA'?

SEPA stands for the Single Euro Payments Area. Euro payments can be made through SEPA across multiple jurisdictions including the EEA, plus Monaco, San Marino, Switzerland, the Channel Islands and Isle of Man.

### What's the 'HSBC Exchange Rate'?

This is the rate we use to convert payments to and from currencies other than the currency of your account. It's based on the foreign currency market for each currency we offer so changes constantly.

The rate you get will depend on the size of the payment and whether we're buying currency (because you're receiving a payment) or selling currency (because you're making a payment).

### What's a 'working day'?
A working day is Monday to Friday (excluding public holidays). Branch opening hours will be the working day for payments at a branch, but for payments made by Faster Payments our working day is 24/7.

### 14. Payments into your account (other than by cheque)
Payments can be paid into your accounts in different ways and available to you at different times.

| Payment in | When you can use the funds and when it counts for working out interest |
|---|---|
| **Cash** | |
| Branch counters.* | Immediately. |
| Using your deposit or debit card at UK Post Office® branches – sterling only. | Immediately. |
| At our self-service machines that accept payments in. | Immediately if the machine says that it automatically counts your cash. |
| | Otherwise, it'll be the same working day (or the next working day if you pay in after the cut-off time displayed on the machine ). |

**659**

| Payment in | When you can use the funds and when it counts for working out interest |
|---|---|
| At other banks if they allow you to do so – they may charge for this and we'll pass on that charge. | Immediately after we receive your cash from the other bank. |

If you pay cash into your account which isn't in the same currency as your account, we'll convert it into the currency of your account using the HSBC Exchange Rate at the time we receive the cash.

*There may be a limit on the amount you can pay in. For example, at Post Office® branches, you can't deposit more than £20,000 in notes or £250 in coins in any one deposit. Each Post Office® will tell you what its actual limit is when you're making the deposit.

**Electronic payments**

| | |
|---|---|
| All payments in the currency of the account. | Immediately after we receive it. |
| All payments in a different currency than the account. | Immediately after we've converted it into the currency of the account using the HSBC Exchange Rate at the time we receive the payment. |

### 15. Payment into your account by cheque

**Paying sterling and euro cheques from a UK bank into your account**

We have to collect payments made by cheque from the paying bank. The time it takes before you can use it depends on whether it's a paper or imaged cheque.

| Paper cheques paid into HSBC UK Branches: | Working days after the working day that the cheque is paid in |
|---|---|
| ◆ You'll start earning interest | 2 |
| ◆ You'll be able to use the funds | 3 |
| ◆ The paying bank can't recall the funds and we can't take it out of your account (unless we reasonably suspect fraud or you agree) | 7 |

**Note**

We'll start to process a cheque the day you pay it into your account as long as it's before the branch cut-off time. Otherwise, we'll process it on the next working day. The branch cut-off time will be as displayed in branch.

If you want to use the funds before the paper cheque has 'cleared' (i.e. before it's certain that the paying bank can't recall the funds - on the seventh working day after the working day you've paid the cheque in) and want to know for certain whether the payment won't be recalled, you can ask us for 'special presentation'. This means we'll send a sterling cheque by post to the bank it came from for payment – and they'll let us know as soon as they receive it whether they'll pay it or not.

| Imaged cheques paid into HSBC UK Branches: | Working days after the working day that the cheque is paid in |
|---|---|
| ◆ You'll start earning interest | 1 |
| ◆ You'll be able to use the funds | 1 (as soon as the payment is shown in your account – this could be at any time that day) |
| ◆ The paying bank can't recall the funds and we can't take it out of your account (unless we reasonably suspect fraud or you agree) | 1 |

**Note**
An imaged cheque is a scanned digital image of a paper cheque that can be processed for clearing and payment through the Image Clearing System.

If there's an issue with the cheque which means we're unable to scan it, it may take longer to clear.

**Example**

| Cheque paid in before the branch cut-off time on a Monday: | Paper cheque | Imaged cheque |
|---|---|---|
| ◆ You'll start earning interest. | On Wednesday. | On Tuesday. |
| ◆ You'll be able to use the funds. | After the funds appear in your account on Thursday (this could be at any time that day). | After the funds appear in your account on Tuesday (this could be at any time that day). |
| ◆ The paying bank can recall the cheque. | Until the end of the second Tuesday after you pay it in.<br><br>We'll take the funds out of your account if this happens. | Until the funds appear in your account. |

**Note**
If you pay a cheque in at a Post Office®, these timings will begin when we receive it, normally on the next working day.

If a cheque paid into your account is returned unpaid we'll tell you and take the payment from your account. We may ask for payment again from the paying bank. If deducting the full amount from your account would make you go overdrawn or make you go over your overdraft limit, we'll treat it as a request for a new or a larger unarranged overdraft. If that happens, you may have to pay charges and overdraft interest.

**Paying other cheques into your account**
If we process a foreign currency cheque for you, you'll be responsible for our charges and costs and the charges of any foreign bank or agent we use to collect the payment. We'll take these from the account you told us to pay the cheque into. We can't always process a foreign currency cheque (including a sterling or euro cheque where the paying bank is not in the UK, Channel Islands or the Isle of Man), e.g. if exchange controls apply.

**661**

To pay a foreign cheque into your account we either have to negotiate or collect it. In each case, we'll convert the cheque amount into the currency of the account using the HSBC Exchange Rate.

| Negotiate | Collect |
|-----------|---------|
| We'll assume the cheque will clear and will pay the cheque amount into your account on the working day after we receive it. | We'll send the cheque to the paying bank and pay the payment into your account when we receive it. |
| | The time this takes depends on the paying bank and/or its country. You can ask us for details. We may use an agent to collect payment. |

If the foreign bank returns the cheque or asks for the money to be returned, we'll take enough money from your account to cover the payment in the foreign currency using the HSBC Exchange Rate applicable at the time of the deduction. This is unlikely to be the same as the amount we paid into your account because exchange rates may have changed. We'll do this even if you've already spent the money or if it will put you into an unarranged overdraft.

### 16. Payments into your account by mistake or fraud

We'll take back any money we pay into your account by mistake or due to an HSBC systems error.

If we're told that a payment from within the EEA wasn't meant for you (e.g. if the payer used the wrong account number) we'll contact you. If you tell us the payment wasn't a mistake, we're legally required to share all relevant information with the paying bank (if it asks us), including your name, address and transaction information, so that the payer can contact you directly.

In all other cases, the steps we'll take will depend on how the payment was made and where it came from.

**For UK payments (other than payments made by CHAPS)**

| How long has the payment been in your account? | What will we do? |
|-----------------------------------------------|------------------|
| Two months or less | We'll limit access to the money for 15 working days and tell you we've done this, so that you have time to show us that it was meant for you before we return it to the paying bank. |
| More than two months | We'll contact you before limiting access to the money or returning it to the paying bank. |

◆ If the payment was made into a closed or suspended account, we'll return it to the paying bank.

**For CHAPS, international and non-sterling payments**

◆ We won't take the payment out of your account and return it to the paying bank unless you agree.

If we suspect any payment into your account was the result of fraud, we can remove it without asking you.

If you don't have enough money in your account when we take a payment out of it for any of these reasons, this will result in an unarranged overdraft.

**662**

**17. When we can refuse to accept payments into your account**

We can refuse to accept a payment into your account if we're acting reasonably, e.g. if we reasonably believe that:

- accepting it might cause us to breach a legal requirement or might expose us to action from any government, regulator or law enforcement agency; or
- there is fraudulent or criminal activity on or in connection with the account.

**18. How we decide whether to make a payment from your account**

We'll make a payment from your account if you instruct us to unless:

- you don't have enough money in your account (including any arranged or unarranged overdraft);
- you haven't given us the account or reference details or we know they're incorrect;
- you've asked us to send the payment in a particular way (e.g. by Faster Payments) and the recipient's bank doesn't accept that method;
- you've not provided any extra identification or information about the payment that we've reasonably asked for;
- the payment exceeds a limit that we tell you, or that you've set (where applicable) when you make the payment;

or we reasonably believe:

- there has been a breach of security or misuse of your account, security details or a payment device;
- there has been fraudulent or criminal activity of any kind whether or not linked to your account or your relationship with us and it's reasonable for us not to make a payment as a result;
- it would cause us to breach a law, regulation, code, court order or other duty, requirement or obligation or expose us to action or censure from any government, regulator or law enforcement agency;
- we're prevented from doing so due to us or any member of the HSBC Group carrying out financial crime risk management activity; or
- someone else may have a claim over the money.

---

**Note**

In this section, 'we' and 'us' includes any HSBC Group Company worldwide.

---

If you ask us to make payments on a particular day, unless you've asked us to make a BACS payment we'll check you have enough money in your account to make them at the start of that day (excluding automatic transfers into the account) and, unless it's a weekend or a public holiday, we'll check again at:

- **1.30pm** for cheque payments; and
- **3.30pm** for all other payments.

If we're able to make some but not all of the payments we'll pay cheques first, and then Direct Debits, and standing orders and, if there's more than one, we'll start with the smallest payment.

Even if you don't have enough money or arranged overdraft, we might make the payment by allowing an unarranged overdraft on your account. Any payments that we can't make will be returned unpaid.

**663**

You'll know we've refused to make a payment if:

◆ you're making it online or using Mobile or Business Telephone Banking; or

◆ you're using a payment device (such as a debit card).

For other types of payment, e.g. standing orders, we'll try and tell you as soon as possible. You can always call us immediately to find out why we've refused a payment and what you need to do to correct any errors that made us refuse it and we'll tell you unless we're prevented by law or any regulation or for fraud prevention or security reasons. You can also get transaction information through Business Telephone Banking, Business Internet Banking and Mobile Banking.

### 19. Blocking payments and services

We can block any payment device (and your access to related services such as Business Telephone Banking, Mobile, Business Internet Banking and HSBCnet) if we reasonably believe it's necessary because of:

◆ a significantly increased risk that you may be unable to pay any money you owe us on the relevant account;

◆ suspected fraudulent or criminal use of the payment device; or

◆ security concerns (e.g. if we know or suspect your payment device and/or security details have been misused).

If we do this, we'll usually let you know why immediately afterwards, unless we're prevented by law or any regulation or for security reasons. We'll unblock the payment device as soon as the reason for blocking it ends.

**Payment limits**

We may set limits on the number or value of payments you can make for different types of payments (e.g. like your debit card or payment devices). We'll tell you what it is when we send you it and you can also ask at any time.

### 20. Payments from your account

**Cash withdrawals**

You can withdraw cash:

◆ at any of our branches or Post Office® branches, where available; or,

◆ by using a cash machine,

up to a daily limit we tell you when we send your debit card. You can ask us to consider changing your daily limit.

**Payments (other than by card or cheque)**

To make a payment from your account in the ways set out in the table opposite, you'll need to give us details of the account you want to make the payment to and any other details we ask for. This usually includes the sort code and account number (or equivalent for payments outside the UK) or, where available, a number that's linked to these, such as a mobile phone number. However, we're planning to change this in future and may start asking you for the name of the account holder so we can check it matches the account you're paying. It's up to you to check the details are correct before asking us to make a payment as we'll make it using only these details.

**664**

The table below shows the cut-off time for giving us payment instructions and how long payments take to reach the payee's bank after we've received your instruction to make the payment and taken it from your account.

### Cut-off time

This is the latest time on any day that we can process instructions or add payments to an account. You can ask us for the relevant cut-off time when you give us a payment instruction.

If we don't receive a payment request before the cut-off time on a working day, we'll treat your request as received on the next working day. The timings set out in the box below will begin then.

| Payment type | Cut-off time* | When the payment will reach the recipient's bank |
|---|---|---|
| **Payments in the UK in sterling** | | |
| Internal (including automatic) transfers between accounts held by us | No cut-off. You can make payments at any time (Business Internet Banking, Express Bank Machine or cash machine)<br><br>10.00 pm (Business Telephone Banking) | Immediately |
| To accounts at other banks | **Bill Payments**<br>(by Faster Payment)<br>◆ 11.45 pm (Business Internet Banking)<br>◆ 10.00 pm (Business Telephone Banking) | Usually within two hours |
| | **CHAPS**<br>◆ 5.10 pm (Business Internet Banking)<br>◆ 4.45 pm (Business Telephone Banking and in branch) | Same working day |
| | **BACS**<br>◆ 6.45 pm (Business Internet Banking)<br>Two working days before the payment is due to be made (for example, if you want to make a payment on Wednesday, you'll need to tell us by 6.45 pm on Monday) | On the requested day |

| Payment type | Cut-off time* | When the payment will reach the recipient's bank |
|---|---|---|
| Standing orders | ◆ 11.45 pm (Business Internet Banking)<br>◆ 10.00 pm (Business Telephone Banking)<br>Three working days before the first payment is due to be made | On the requested day |

**International payments in sterling and payments in other currencies**

You can give us instructions to make international payments at any time via Business Internet Banking.

Payment instructions given before the cut-off times below will be actioned on the same working day and any instructions given afterwards will be actioned on the next working day:

| | | |
|---|---|---|
| To accounts in the EEA in euro and sterling | ◆ 3.30pm (Business Internet Banking and Business Telephone Banking)<br>◆ 2.00 pm (in branch) | Next working day |
| SEPA credit transfer | ◆ 9.30 am (Business Internet Banking) | Same working day |
| All other payments | ◆ 6.00 pm for US Dollars<br>For other foreign currencies, please check. We can't make payments in some currencies. | Usually up to four working days (but may take longer depending on the country the money is being sent to) |

*When we don't give you a specific branch closing time, the cut-off time for in-branch payments will be when the branch closes for the day. The cut-off time for all payments by post is 12.00 pm. HSBCnet cut-off times are not included in this table. For further information about HSBCnet cut-off times, please refer to the specific information you have been given for HSBCnet. You can also contact the HSBCnet Helpdesk for any queries.

---

**Note**

If you instruct us to make a payment on a future date, we'll make it on that date, unless it's a non-working day, in which case we'll make it on the next working day (except for bill payments, which are made using the Faster Payments System and can be made on any day).

If you want to make a regular payment (such as a standing order) you must set it up with us at least three working days in advance.

You can instruct us to make payments on a future date for the following:

◆ Bill payments;
◆ BACS; and
◆ International and SEPA payments in the same currency as your account.

**666**

If you're a Small Business or Small Charity Customer and a payment you make to an account in the EEA doesn't arrive when it should (normally the working day after we send it), you can ask us to contact the receiving bank to ask them to treat the payment as if it had been made on time.

**Currency payments**

If you want to make a payment in a different currency to your account, you can ask us to convert the amount into that currency and we'll tell you the HSBC Exchange Rate that we'll use. We won't change the rate if the payment goes ahead immediately. If the payment isn't made immediately, or we don't agree a rate with you and you tell us to go ahead with the payment anyway, we'll apply the HSBC Exchange Rate that applies at the time we make the payment.

In future, once we've advised you that it applies to your account, we'll confirm the exchange rate that will apply to the payment at the time you instruct it using Business Internet Banking or HSBCnet and this rate will apply even if (because of the cut-off times listed) it doesn't go ahead until the next working day. Otherwise, we'll use the HSBC Exchange Rate that applies when the payment is made.

If the payment is returned to us or we can't make it for any reason, we'll reverse it using the HSBC Exchange Rate at that time. If it's changed, the amount we pay back when we reverse the payment will be different to the amount we originally took from your account.

If we can't convert the money before we send it, or you don't want us to, it will be converted by the recipient's bank unless:

◆ you're a Larger Corporate Business Customer; or
◆ the payment is not processed entirely within the EEA.

In both these cases any intermediary we route the payment through may carry out the currency conversion. If it does, it'll convert the payment at the current market rate it uses at that time. If you ask us, we'll tell you the exchange rate used.

Instead of deducting our charges from the payment, you can ask us to deduct them from your account. If the payment is to a recipient outside the EEA, any intermediary we route it through and the recipient's bank may deduct their charges from your payment too.

The intermediary we use for international payments may be a member of the HSBC Group.

**Cheque payments in sterling**

To make a cheque payment, you need to write on it the name of the recipient, the amount (in numbers and words) and the date that you're signing it (we'll usually pay cheques even if you've used a date in the future). If you want to cancel a cheque you must tell us the same details and your account and cheque number before we pay it or begin the imaging process. We can't cancel it after that point.

If we receive a cheque for payment more than six months after you write it we may pay it but don't have to.

**Payments by card**

If you use your debit card for a cash withdrawal or payment, we'll take the money from your account after we receive confirmed details from the relevant payment scheme, such as Visa or MasterCard. This may be on a working or a non-working day.

**667**

If you use your debit card for a transaction or cash withdrawal in a foreign currency, it will be converted into sterling on the day Visa or Mastercard processes it using the Visa scheme exchange rate (available at **www.visaeurope.com**) or the Mastercard scheme exchange rate (available at **www.mastercard. com**) We also apply charges to these transactions. You can find our charges in our Business Price List.

We may replace your card with a different type of card available under this agreement after reviewing your personal circumstances.

### 21. Cancelling or changing payments (other than cheques)

You can't cancel or change a payment that you've asked us to make immediately. This includes card payments.

Other payments can be cancelled or changed if you contact us by the deadline on the working day before the payment is due to be made (except for standing orders and Direct Debits using Business Internet Banking and BACS, where the deadline is three and four working days before respectively).

Details of cancelling or changing payments made using HSBCnet profiles (and applicable cut-off times) are not included in this table. For further information on this, please refer to the specific information you've been given for HSBCnet. You can also contact the HSBCnet Helpdesk for any queries.

| Payment type | Ways to contact us | Deadline |
|---|---|---|
| Bill payments (by Faster Payment) and internal transfers | Business Internet Banking | 11.59 pm |
|  | Business Telephone Banking | 10.00 pm |
|  | In branch | The end of the working day |
| Regular card payments | Business Telephone Banking | 4.00 pm |
| Standing orders and Direct Debits | Business Internet Banking | 11.59 pm, three working days before the payment is due |
|  | Business Telephone Banking | 10.00 pm |
| SEPA credit transfers | Business Internet Banking | 3.00 pm |
| SEPA core Direct Debits | Business Telephone Banking | 4.00 pm |
| International Payments | Business Internet Banking | 11.59 pm |
| BACS | Business Internet Banking | 11.59 pm, four working days before the payment is due |

If you cancel or change a Direct Debit or regular card payment, you should also tell the organisation that collects the payment so that they can cancel or change it (and any future payments) too. If you haven't used a Direct Debit or standing order for 13 months, we'll cancel it. If payments you've cancelled are still collected (e.g. by the organisation), we'll treat the payment as unauthorised and give you an immediate refund.

**668**

**22. What happens if there are incorrect or unauthorised payments on your account or you've been tricked into sending money to a fraudster?**

This clause doesn't apply to cheques. If you notice a cheque payment has been made from your account that is incorrect or you didn't sign, please contact us as soon as possible and we'll look into this.

| What's an 'incorrect payment'? | What's an 'unauthorised payment'? | What do we mean by "tricked into sending money to a fraudster"? |
|---|---|---|
| A payment that hasn't been sent to the person or account you specified when you instructed us to make the payment. | A payment from your account which wasn't authorised by you or someone you've authorised to make payments from your account.<br><br>If you give someone your payment device or security details and they use them to make a payment, we may treat the payment as if you'd authorised it depending on what happened. This is why you mustn't tell anyone your security details or allow anyone access to your payment device unless they're a TPP and it's necessary for you to do so. | ◆ You intended to send money to someone but you were tricked into sending it to someone else; or<br>◆ You sent money to someone for what you thought was a genuine purpose but which was actually fraudulent.<br><br>When we say "send money" here, we mean where you've asked us to transfer money from your account to another account in the UK. |

**General position on refunds**

**Payments by Small Business and Small Charity Customers**

| Question | Answer |
|---|---|
| What if you notice an incorrect or unauthorised payment, or that you've been tricked into sending money to a fraudster on, or after, 28 May 2019? | You must call us as soon as you can. |
| What will we do when you tell us that you've been tricked into sending money to a fraudster on, or after, 28 May 2019? | Applying industry standards, we'll look into this and let you know whether or not you're entitled to a full or partial refund. This will usually be no later than 15 working days after the day you told us, but may take longer in exceptional circumstances. If you're entitled to a refund, we'll then give you this without delay.<br><br>You won't get a refund if, taking into account the circumstances when the payment was made, we find you should have known that you were sending money to a fraudster. |

**669**

**Payments by Small Business and Small Charity Customers**

| Question | Answer |
| --- | --- |
| What will we do when you tell us about:<br><br>◆ an incorrect payment made to another bank; or<br>◆ an unauthorised payment? | We'll refund the amount of the payment before the end of the working day after you tell us, or sooner if we can. |
| Will we always make a refund? | No. We won't make a refund for:<br><br>◆ an incorrect payment if we can prove that the recipient's bank received the payment or that we made the payment using the details you gave us;<br>◆ an unauthorised payment if we know you've been grossly negligent (acted with a very significant degree of carelessness) or we reasonably suspect fraud on your part; or<br>◆ an incorrect or unauthorised payment if you don't tell us within 13 months after it was made. (This doesn't apply to unauthorised payments made using an overdraft or if you've been tricked into sending money to fraudster on or after 28 May 2019.) |
| Can we take back a refund we've made? | Yes. We can take back refunds (after giving you reasonable notice) in these cases:<br><br>For incorrect payments:<br><br>◆ we can show that the payment was received by the recipient's bank.<br><br>For unauthorised payments:<br><br>◆ you acted fraudulently; or<br>◆ it was made because you intentionally or with gross negligence failed to keep your payment device safe (e.g. you knowingly gave your card and PIN number to someone else). |
| **Unauthorised payments** | |
| What happens if we can prove you acted fraudulently? | You're responsible for all payments from your account. |
| What happens if we can prove you've been grossly negligent? | You're responsible for all payments from your account until you've told us that your payment device or security details have been lost, stolen or that you suspect misuse. |

**670**

**Payments by Small Business and Small Charity Customers**

| Question | Answer |
|---|---|
| Are there any other cases where we're responsible for unauthorised payments or fraud on your account? | We're responsible (unless you've acted fraudulently): <br> ◆ if someone else uses your card before you receive it; <br> ◆ after you've told us that your card or security details have been lost or stolen or misused; <br> ◆ if we haven't provided a number for you to tell us that your card or security details have been lost or stolen; or <br> ◆ if we haven't applied procedures that we're legally required to use to check that a payment has been authorised by you. |

**Incorrect payments**

| | |
|---|---|
| What happens if you: <br> ◆ tell us about an incorrect payment more than 13 months after it was made; or <br> ◆ gave us the wrong payment details? | We won't give a refund but, if you ask us, we'll contact the bank that received your payment to try to recover the money. We may charge our reasonable costs for doing this but we'll tell you the maximum amount you'll pay first. <br><br> If the payment was to another bank in the EEA and we're unable to recover your money, you can ask us in writing to give you all the information we've been given by the bank that received the funds so you can try to recover them yourself. |

**Payments by Larger Corporate Business Customers**

| Question | Answer |
|---|---|
| What if you notice an incorrect or unauthorised payment? | You must call us as soon as you can. |
| What will we do when you tell us about: <br> ◆ an incorrect payment made to another bank; or <br> ◆ an unauthorised payment? | For incorrect payments: <br> ◆ we'll do what we can to trace an incorrect payment and tell you what happened (for a charge). <br><br> For unauthorised payments: <br> ◆ we'll refund the amount of an unauthorised payment before the end of the working day after you tell us, or sooner if we can. |

**671**

**Payments by Larger Corporate Business Customers**

| Question | Answer |
|---|---|
| Will we always make a refund? | No. We won't make a refund for:<br><br>◆ an incorrect payment if we can prove that the recipient's bank received the payment or that we made the payment using the details you gave us;<br>◆ an unauthorised payment if the security details and device were lost or stolen or you failed to keep them safe or to take reasonable steps to prevent misuse or we reasonably suspect fraud on your part; or<br>◆ an incorrect or unauthorised payment if you don't tell us within 13 months after it was made. |
| Can we take back a refund we've made? | Yes. We can take back refunds (after giving you reasonable notice) in these cases:<br><br>For incorrect payments:<br><br>◆ we can show that the payment was received by the recipient's bank.<br><br>For unauthorised payments:<br><br>◆ you acted fraudulently; or<br>◆ it was made because you failed to keep your payment device safe or to take reasonable steps to prevent misuse. |
| **Unauthorised payments** | |
| What happens if we can prove you acted fraudulently? | You're responsible for all payments from your account. |
| Are there any other cases where we're responsible for unauthorised payments or fraud on your account? | We'll be responsible (unless you've acted fraudulently):<br><br>◆ if someone else uses your card before you receive it; or<br>◆ after you've told us that your card or Security Details have been lost or stolen. |
| **Incorrect payments** | |
| What happens if you:<br><br>◆ tell us about an incorrect payment more than 13 months after it was made or an incorrect payment sent outside the EEA; or<br>◆ gave us the wrong payment details? | We won't give a refund but, if you ask us, we'll try to recover the payment for you. We may charge our reasonable costs for doing this but we'll tell you the maximum amount you'll pay first.<br><br>If the payment was to another bank in the EEA and we can't recover your money, you can ask us in writing to give you all the information we've been given by the bank that received the funds so you can try to recover them yourself. |

**672**

### 23. Refunds

**For some card payments in the EEA**
If you're a Small Business or Small Charity Customer and you've made a card payment, you can ask us to refund it if:

◆ the payment was made in the EEA;
◆ you didn't agree the actual payment amount;
◆ the amount charged to your account was higher than you reasonably expected, taking into account previous spending patterns and the particular facts of the case; and
◆ you make the refund request within eight weeks of the date when the payment was charged to your account.

We'll investigate your claim and may ask for information which we reasonably need.

Within 10 working days of your request (or receiving information we've asked for), we'll either refund the payment or tell you why we're not.

You aren't entitled to a refund if you gave consent for the payment directly to us and, at least four weeks before the payment was made, you were given information about the transaction by (or it was available from) us or the retailer.

**For BACS Direct Debit or SEPA Direct Debit payments**
The terms of the BACS Direct Debit Guarantee or SEPA Direct Debit Scheme will apply to refunds for any Direct Debit errors.

**How much will we refund and can we reverse a refund?**
If you're a Small Business or Small Charity Customer and we give a refund for any reason, we'll refund the payment and any interest we charged (or pay any interest that we'd have paid) so you're in the position you would've been in if the payment hadn't been made.

If you're a Larger Corporate Business Customer and we give you a refund for an incorrect payment, we'll refund the amount of the payment but won't refund any interest you didn't receive or charges you incurred due to the incorrect payment.

If we give a refund but later find you weren't entitled to it, we'll reverse it so you're in the position you would've been in if we hadn't refunded you.

**673**

# About overdrafts, charges and how we pay and charge interest

### 24. Overdrafts

We may agree to give you an overdraft on an account if we think you can afford it. Overdrafts are only for short-term borrowing and aren't available on some accounts.

The types of overdraft are explained below but all overdrafts are repayable 'on demand'. This means we can ask for immediate repayment although we'll usually give you advance notice.

#### Types of overdraft

**Arranged** (previously "formal")

You ask us for, and we agree to give you, an overdraft before you make any transactions that take your account overdrawn, or over your previously arranged overdraft limit.

**Unarranged** (previously "informal")

You've made a payment or we've taken an amount from your account and you don't have enough money in the account (or under an arranged overdraft).

If we permit an unarranged overdraft, it will stay in place until:

◆ we agree an arranged overdraft; or
◆ you pay enough into your account to bring it back into credit or within your arranged overdraft limit.

Business Savings Accounts and International Business Savings Accounts are not designed to provide unarranged overdrafts. However, if operational reasons mean we're unable to prevent a charge or transaction which would cause you to go overdrawn, we'll treat this as an unarranged overdraft and you'll have to repay the overdrawn amount immediately on demand. Please speak to your usual point of contact about overdraft rates on these accounts. Rates are shown on your regular statement and set out in the Business Price List.

You'll find details of our overdraft text alerting service in our Business Banking Made Easy brochure.

**Who is responsible for the money you borrow?**
If you're a sole trader, you're personally responsible for any money your business borrows.

For partnerships, personal representatives or trusts, each partner, personal representative or trustee is jointly and individually responsible for money borrowed when they were in that position (even if they aren't any more). The only exception is if we've agreed something else in writing. We may demand repayment of money borrowed by an organisation from any or all of these individuals.

For companies, limited liability partnerships or other incorporated bodies, and clubs, societies, associations, charities and other unincorporated bodies (except partnerships, personal representatives and trustees), individuals aren't normally responsible for money their organisation has borrowed unless they've given personal guarantees.

**674**

**Contingent liabilities**

In each case, you're also responsible for contingent liabilities. This is money that you might owe us in the future because of a legal obligation you have to us now.

For example, you might ask us to give a guarantee in your favour to someone else. If we have to make a payment as your guarantor, you agree you'll pay us what we've paid them. Because it may never happen, that obligation to repay us is a contingent liability.

Where you have contingent liabilities:

◆ we may take money from your account to meet any amount you owe us due to a contingent liability no longer being contingent (e.g. becoming an actual liability);

◆ we may take money from your account and hold it, to cover the amount of any contingent liabilities you have to us (e.g. we might only agree to give a guarantee for you if you give us money upfront to cover the amount we may need to pay out as guarantor); and

◆ we can hold money to pay for contingent liabilities without telling you in advance, if we have good reasons to think you might otherwise not be able to pay.

If we decide to do any of the above, we'll work out how much we need to cover your contingent liabilities in good faith based on current market rates. We'll also tell you what we've done, and when and why we did it.

### 25. Interest rates and charges

In the Additional Conditions you'll find the terms which apply to certain types of account.

In the Business Price List you'll find:

◆ our overdraft charges;

◆ all our other standard charges e.g. for certain types of account, making payments and providing services. These will apply unless we agree different charges with you;

◆ details of the Currency Standard Debit Interest Rate; and

◆ where to find the Business Standard Debit Interest Rate.

**How we'll work out your interest**

We'll provide details of your interest rate when you open the account and you can contact us to find out your current rate at any time.

We'll pay and charge interest at a fixed or variable rate.

You can also find our standard interest rates on our website, in our branches or by calling us.

| What's a 'fixed' rate? | What's a 'variable rate'? |
|---|---|
| Fixed rates are rates that we've told you won't change for an agreed period. | Variable rates are rates that might go up and down. This includes:<br><br>◆ rates which track a 'reference rate' set by another institution which we don't control (e.g. the Bank of England base rate); or<br>◆ rates we set internally. |

**675**

For sterling accounts we work out interest each day on the amount you owe us or, where we pay interest, on the amount we're holding for you in that account. For foreign currency accounts we work out interest on the basis of a 360 day year.

We'll take interest from, or pay it into, your account on the day in the month you originally opened your account (unless we've made a different arrangement with you) or, if that's not a working day, the next working day. If you have a non-sterling account and the credit interest rate on your account goes below zero, we may charge you interest on the money you hold with us.

**Your account charges**
We'll charge you the fees set out in the Business Price List (unless we've agreed different charges with you) and may charge you other fees and expenses, e.g. for putting in place security or for dealing with your overdraft.

We may also charge for services which aren't set out in the Business Price List, but we'll always tell you how much they'll be and check you're happy to pay them before we provide the service. We may also charge an administration fee, up to the maximum permitted by law, if we have to do anything to comply with a court order on your account(s).

We can take charges from your account either when we provide the service, or at the end of your charging period. We'll give you at least 14 days' notice before taking any interest, fees or charges from your account.

Please note that taxes or costs may apply to you that aren't charged by us and/or won't be paid through us. If you're sending money outside the UK but within the EEA, you'll only pay our charges. You can't pay charges for the recipient.

**Charges for using other banks**
If we need to use an agent, correspondent or intermediary bank to make a payment, you may have to pay their charges too (except for currency conversions carried out by intermediaries).

**676**

# Our relationship with you

### 26. Changes we can make which require notice

Our agreement has no fixed end date so it's likely we'll need to keep our terms up to date so they cover changes we're making to our business and changes we don't control. We'll only make changes for these reasons if it's reasonable for us to pass on the impact of them, but we'll never change any terms that we've said are fixed (e.g. fixed interest rates on some accounts) before the fixed period ends.

| Change | Notice before change | | Notice after change |
|---|---|---|---|
| | At least two months | At least 30 days | Within 30 days or three working days* |
| **Variable interest rates other than reference interest rates and our currency base rates (including changing the margin we charge above or below a reference rate or switching from a reference rate)** | | | |
| Increasing interest rates we pay you or reducing interest rates you pay us – Small Business and Charity Customers | ✗ | ✗ | ✓ |
| Reducing interest rates we pay you – Small Business and Charity Customers | ✓ | ✗ | ✗ |
| Changing overdraft interest rates – Small Business and Charity Customers | ✗ | ✓ | ✗ |
| Changing interest rates – Larger Corporate Business Customers | ✗ | ✗ | ✓ |
| **All other changes (including charges)** | | | |
| Changing charges for standard account and additional payment services | ✓ | ✗ | ✗ |
| Increasing charges for non-standard account services | ✗ | ✓ | ✗ |
| Reducing charges for other account services | ✗ | ✗ | ✓ |
| Changing charges for non-standard business services | ✗ | ✗ | ✓ |
| Changing overdraft charges | ✗ | ✓ | ✗ |
| Changing any other terms | ✓ | ✗ | ✗ |

\* Notice within three working days will be given online, in newspapers or in branch. Personal notice will be given within 30 days.

**Note**

The timeframes in this table don't apply to reference interest rates and our currency base rates. These are dealt with in section 27 below. Different notice periods may apply to some of the Additional Conditions.

**677**

**Your rights when we tell you about a change**

If we give advance notice that we're going to make a change to this agreement and you don't tell us you want to close your account before that change takes place, or within the next 60 days (if longer), then we'll assume you've accepted the change and it will apply automatically at the end of the notice period.

If you tell us you don't want to accept the change you can close your account without charge.

### 27. Changes we can make without telling you in advance

| Interest and exchange rates | When we apply changes |
|---|---|
| **Reference interest rates** | |
| Some accounts have interest rates that are based on 'reference rates' which we don't control (e.g. the Bank of England base rate). | The new rate will apply within one working day of any change to the reference rate and will be shown on your statement and available from our website. |
| **Exchange rates** | |
| HSBC Exchange Rate. | We can change these immediately and without giving advance notice. |
| **Currency base rates** | |
| Our currency base rates for Larger Corporate Business Customers are variable interest rates which we set. They aren't available to Small Business or Small Charity Customers. You'll need to contact us or visit our website (for rates you pay us) to find out the current rate. | Our currency base rates can change daily. The applicable rate will be shown on your statement or will be available on our website. |

### 28. How you can close your account or end this agreement

**You can end this agreement or close any account at any time by writing to tell us (unless you're switching to a new bank, in which case they can tell us to close it for you).**

We'll close your account as long as the closure instruction from you or your new bank has been signed by the authorised signatories on your mandate.

You won't have to pay any charges once your account has closed but you'll have to pay any charges for using the account before it's closed (e.g. any card payments that have been authorised but not yet charged to the account).

Any account benefits will end when the account is closed.

We won't close your account until you've paid everything you owe us.

The Additional Conditions will set out any other consequences (e.g. if you have a fixed term product you may lose interest if you close early).

**678**

**29. How we can end this agreement, withdraw services and close your accounts**

### When?

#### Immediately and without notice

We can do this if you:

- have seriously or persistently broken this agreement;
- become insolvent;
- acted abusively, offensively or violently towards staff;
- weren't entitled to open your account or use the service, or are no longer entitled to have the account or service;
- haven't given us adequate information that we've requested about your liability for tax; or
- provided us with any false information;

or if it's reasonable for us to believe that:

- you have or are using or obtaining, or allowing someone else to use or obtain, an account, service or money illegally or fraudulently;
- you're using the account for a purpose not covered by this agreement;
- by continuing the agreement, we (or another HSBC Group Company) may be exposed to action from any government, regulator or law enforcement agency;
- by continuing the agreement, we (or another HSBC Group Company) may break a law, regulation, code, court order or other duty, requirement or obligation, including compliance with any internal financial crime risk management activity;
- there's been a breach of security or misuse of your account, security details or a payment device; or
- you're involved in criminal activity whether or not linked to your account or your relationship with us.

#### By giving you notice

We may close an account or withdraw any service by giving you at least two months' notice. We may give you less than two months' notice if you opened an account online and we didn't receive specimen signatures from each of the authorised signatories on your mandate within 60 days of your account opening.

We may also transfer you to a different account or tariff by giving you at least two months' notice if you stop meeting the eligibility criteria for your account. If you're not happy with this, you can close your account without charge before the transfer takes place.

#### What happens next?

We'll take any card payments that have been authorised but not yet charged to the account and apply any charges and interest which haven't yet been applied to your account before we pay what's left to you or to your account with another provider in the currency of your account, although in certain circumstances this may be paid in sterling regardless of the currency of the account. In these circumstances, funds will be converted to sterling at the HSBC Exchange Rate on the day of closure.

You mustn't write any more cheques, make any more payments or use any payment devices.

You'll need to pay us for any cheques we pay after your account is closed.

You're responsible for cancelling payments into and out of your account.

You must destroy any unused cheques and your card.

**679**

**30. How we can transfer accounts**

If:

- ◆ you no longer meet the conditions for an account; or
- ◆ we're withdrawing a type of account,

we'll give you at least two months' notice that we're going to transfer you to another account provided by us and that we think is appropriate for you. You can close your existing account during the notice period if you don't want us to make the transfer.

**31. Transferring this agreement**

| Can we transfer this agreement? | Can you transfer this agreement? |
|---|---|
| Yes. | No. |
| ◆ We can transfer all of our rights under this agreement and in relation to your account to someone else. | ◆ You can't transfer any of your rights and obligations in relation to the agreement, your account, or your account itself, to any other person. |
| ◆ We can also transfer all of our obligations under this agreement and in relation to your account, but only to someone we reasonably consider capable of performing them as well as us and who is authorised or recognised by our regulator as being able to accept deposits. | |
| This won't reduce any of your rights in relation to your account. | |

**32. When aren't we responsible for things that go wrong?**

We won't be liable for any losses you may suffer if we cannot perform our obligations under this agreement due to:

- ◆ any legal or regulatory requirements;
- ◆ abnormal or unforeseeable circumstances which are outside our (or our agents' and/or subcontractors') control and which we couldn't have avoided despite all efforts to the contrary, such as industrial action or mechanical failure; or
- ◆ any member of the HSBC Group carrying out financial crime risk management activity.

In any other circumstance, we might be liable to you, but this will depend on the type of loss and the type of customer you are.

**680**

The table below sets out when we'll be liable to you for losses you may suffer.

| Customer | Are we liable to you for the loss? | | |
|---|---|---|---|
| | **Direct loss of profit** | **Other direct losses (such as costs)** | **Indirect or consequential loss (including lost business, data, profits or losses resulting from third party claims) even if it was foreseeable** |
| Small Business Customer | ✓ | ✓ | ✗ |
| Small Charity Customer | ✓ | ✓ | ✗ |
| Larger Corporate Business Customer | ✗ | ✓ | ✗ |

### 33. Set-off

If you have money in one of your accounts (except for trust, client or joint accounts), we may set it off against any amount you owe us which is due for payment on other accounts (including money you owe on a joint account) so it reduces or repays the amount you owe us. We'll only do this with accounts in your name.

In exercising our right, we may use any amounts you have in a fixed term deposit account and, where those deposits are not in the same currency as the amount owed, we may convert those amounts to the currency of the amount owed using our HSBC Exchange Rate. We may also adjust the amount of interest we pay you.

---

**Note**

Amounts owed to us and due for payment include, for example, amounts owed under a loan, credit card, charge card, mortgage or overdraft.

---

### 34. If you're a company or a partnership

**If you're a company**

You confirm, and confirm on behalf of any shareholders and associated companies who hold or are entitled to 10% or more of your share capital (whether legally or beneficially, directly or indirectly), that:

◆ neither you nor they have issued any bearer shares;

◆ you'll tell us immediately if you or they issue bearer shares or convert existing shares to bearer shares in the future, in which case you'll comply with our requirements on bearer shares; and

◆ the issuance of, or conversion of shares to, bearer shares and any failure to comply with this section would be a serious breach of these terms and you acknowledge that it may result in us ending every aspect of our relationship with you.

**If you're in a partnership**

These terms and the Additional Conditions will remain in force until you give us notice that you're closing the account or stopping the relevant service – even if you change the name of the partnership, new partners join or current partners leave.

**681**

**35. What country's courts and laws apply to this agreement and our dealings before you opened your account?**

| Where you opened your account | Laws | Courts |
| --- | --- | --- |
| UK (except Scotland) | England and Wales | The country where your account is held or the country where your business or organisation is based. |
| Scotland | Scotland | |

# Information to help manage your account

**Privacy**

Your privacy is important to us.

You explicitly consent to us accessing, processing and retaining any information you provide to us for the purposes of providing payment services to you. This doesn't affect any rights and obligations you or we have under data protection legislation. You may withdraw this consent by closing your account. If you do this, we'll stop using your data for this purpose, but may continue to process your data for other purposes.

Our Privacy Notice explains how we collect, use, disclose, transfer and store your information and sets out your rights to your information. We've provided our Privacy Notice to you separately and will tell you if we make changes to it. You can also find it at **www.business.hsbc.uk** or you can ask for a copy in branch.

**How to make a complaint**

If you have a complaint, please contact us using the details at the front of this booklet. We'll send you a written acknowledgement within five working days and keep you informed of our progress until your complaint has been resolved. We'll do everything we can to sort out the problem.

If you still remain dissatisfied you may be entitled to refer your complaint to the ombudsman service using the contact details set out below. If you're not eligible to use the ombudsman service, please note we don't use any alternative dispute resolution services.

| Ombudsman | Contact details |
|---|---|
| Financial Ombudsman Service | **Exchange Tower, London E14 9SR** |
| | **0800 023 4567** or **0300 123 9123** |
| | **complaint.info@financial-ombudsman.org.uk** |
| | **www.financial-ombudsman.org.uk** |

**How your money is protected**

We're covered by the Financial Services Compensation Scheme (FSCS). The FSCS can pay compensation to depositors if a bank is unable to meet its financial obligations. Most depositors are covered by the scheme. In respect of deposits, an eligible depositor is entitled to claim up to the current FSCS limit for deposits. For joint accounts each account holder is treated as having a claim in respect of their share so, for a joint account held by two eligible depositors, each depositor would have a claim up to the FSCS deposit limit and so the maximum amount that could be claimed in total would be twice the current FSCS limit. The FSCS deposit limit relates to the combined amount in all the eligible depositor's accounts with the bank, including their share of any joint account, and not to each separate account. For further information about the scheme (including the current limits, amounts covered and eligibility to claim) please contact us, visit the FSCS website **www.fscs.org.uk** or call the FSCS on **020 7741 4100** or **0800 678 1100**. Please note only compensation related queries should be directed to the FSCS.

**683**

**Unclaimed assets scheme**

We participate in the unclaimed assets scheme. If you've an account with us (including an account that we've closed in accordance with these terms but we haven't been able to repay your money to you) and there has been no activity from you on your account for at least the last 15 years we may transfer any money in your account to the unclaimed assets scheme at Reclaim Fund Limited.

This scheme doesn't apply to international business accounts, foreign currency accounts, currency client accounts or business money market accounts.

If you have a dormant business account (including closed accounts) and we haven't been able to repay the money in it to you, we may transfer the money to our unclaimed balances account. We'll only do this if your account has been dormant for at least 12 months.

We'll tell you at least 30 days before we do this. If we haven't already done so, we may then close your account. You'll still have the right to your money – you should ask us for information about how to get your money back. The transfer of money to the unclaimed assets scheme won't affect any entitlement you may have to compensation under the Financial Services Compensation Scheme.

If we transfer your money in either of these situations, you can reclaim it by contacting us.

Further information to help you find lost accounts can be found at **www.mylostaccount.org.uk**.

**Authorisation details**

HSBC UK Bank plc is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority.

Our Financial Services Register number is 765112. You can check these details by visiting the Financial Conduct Authority's website **www.fca.org.uk** or contacting them on **0800 111 6768**.

**684**

# Accessibility

To find out more about our accessible services please visit
**www.hsbc.co.uk/accessibility** or ask at any of our branches.

**If you'd like this in another format such as large print, Braille or audio, please contact us.** A textphone service is also available for customers with hearing and/or speech impairments.

If you use your own textphone you can call us on **03457 125 563** (**+44 207 088 2077** from overseas).

**hsbc.co.uk**

**HSBC UK Bank plc**
Registered in England & Wales with number 09928412.
Registered Office: 1 Centenary Square, Birmingham, B1 1HQ, United Kingdom. Authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority. Our Financial Services Register number is 765112.

**Customer Information:** PO Box 6201, Coventry CV3 9HW

RFB1820 MCP53555 ©HSBC Group 2019. All Rights Reserved. **685**



# BACSTEL-IP Service

## Terms and conditions
## About us

HSBC Bank plc. Registered Office and Group Head Office, 8 Canada Square, London, E14 5HQ. VAT Registration Number GB 365684514. HSBC Bank Plc is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority (Registration Number 114216) and is registered with the Jersey Financial Services Commission, the Guernsey Financial Services Commission and the Isle of Man Financial Supervision Commission for banking and investment business. You can contact us with queries about the BACSTEL-IP Service by contacting our HSBC BACS Helpdesk. Details about the Helpdesk are available in our Customer Guides.

**HSBC Bank plc**

Registered Office: 8 Canada Square, London E14 5HQ. Registered in England Number 14259.

HSBC Bank plc, 8 Canada Square, London, E14 5HQ is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority and the Prudential Regulation Authority

Printed by Communisis, Leeds © HSBC Bank 2009. All rights reserved.

## BACSTEL-IP Service Agreement

### 1. INTRODUCTION

1.1 The Customer and the Bank agree that if requested by the Customer the HSBC PKI Service and/or ASM (as defined below) shall be supplied by the Bank to the Customer subject to the terms and conditions contained or referred to in this Agreement. By signing the application form relating to the BACSTEL-IP service and returning it to the Bank the Customer agrees to be bound by the provisions of this Agreement.

1.2 Even if the Customer is not supplied with either the HSBC PKI Service or ASM, certain important provisions of this Agreement (including without limitation Clauses 4, 5, 6, 10, 11, 12, 17, 18, 21 and 24) will still be relevant and binding upon the parties hereto.

1.3 In these terms and conditions:

| | |
|---|---|
| **Additional Contact** | means a Contact appointed by you or any Bureau or a Primary Security Contact. |
| **Agreement** | means this agreement as modified from time to time including any supplementary terms for the provision of the HSBC PKI Service or ASM issued by us from time to time and any other HSBC PKI Service and ASM documents (including all Customer Guides) issued by us and mentioned in this agreement. |
| **Applicable Requirements** | means any law, statute, regulation, order, rule, guidance, voluntary code or standard applicable to the Customer (including, without limitation, all import and export controls and requirements). |
| **ASM (also Alternative Security Method)** | means a non-public key infrastructure based access method, supplied by the Bank through the BACS System, and using a contact ID and password to provide secure access to low-risk functions on the BACS payments service web channel (e.g. access reports and maintaining non-sensitive reference data on the Reference Database). |
| **BACS Approved Software** | means any software which is at the relevant time approved under the BACS approved software service. |
| **BACS Confidential Information** | means all information of the Supplier, the System Operator, the BACS System, the Bank and any other Member, which is disclosed or made available to the Customer in connection with or for the purposes of BACSTEL-IP and/or the BACS System and which is by its nature confidential, or is designated as confidential by the party who discloses it or to whom it relates. |
| **BACS Services** | means services relating to the BACS System provided by the Bank. |
| **BACS System** | means the system relating to the automated clearing and settlement of payments between each entity that has been admitted to participate in such system, administered and operated by the Supplier and the System Operator and/or such other entities as may be obliged, with the agreement of the Members, from time to time to perform such functions. |
| **BACSTEL-IP** | means the mechanism and processes adopted by the BACS System whereby the HSBC PKI Service and other PKI Service(s) (and ASM but only in the case of (c) below) will be used in connection with the BACS System:<br>(a) to authenticate and sign payment messages submitted to the BACS System;<br>(b) to authenticate and sign certain other instructions, messages, files and other communications transmitted to the BACS System, including (without limitation) any such communication which allows access to, or changes to be made to, the Reference Database; and<br>(c) to provide secure access to low-risk functions such as accessing reports and maintaining non-sensitive reference data on the Reference Database. |
| **BACSTEL-IP Materials** | means all documents, information and other materials provided or made available to the Customer, its employees, contractors or agents at any time by or on behalf of the Bank or the BACS System in connection with the implementation and operation of BACSTEL-IP, including (without limitation) the Service User Guide – BACSTEL-IP. |
| **BACSTEL-IP Transmission** | means an instruction, message, file or other communication which is transmitted (or purports to be transmitted) in electronic form by the Customer (or by any Bureau on behalf of the Customer) to the BACS System, or by the BACS System to the Customer (or any such Bureau), using a PKI Service or ASM as part of BACSTEL-IP, including (without limitation) any such communication which allows access to, or changes to be made to, the Reference Database. |
| **Bank (also we, us, our)** | means HSBC Bank plc. |
| **Bureau** | means any party other than the Bank (but including without limitation any bureau or Group Company) which you notify us of and in respect of which the Bank at your request and in its discretion accepts as being authorised by you to transmit and receive BACSTEL-IP Transmissions on your behalf and to which the Bank and/or any other Member has issued (a) Digital Certificate(s) in connection with the HSBC PKI Service or the PKI Service of such Member to enable authentication and encryption of BACSTEL-IP Transmissions as described in Clause 2.1 and/or (b) ASM. |
| **Charity** | has the meaning given to the word "charity" in the Regulations the current meaning being a body whose annual income is less than £1 million and is a charity as specified in the Regulations. |
| **Contact** | means a person who is authorised to access and use the BACS System via BACSTEL-IP (either using a PKI Service or ASM) on behalf of a Member (including for the avoidance of doubt the Bank), the Customer, any Bureau or the Supplier. |

**687**

| | |
|---|---|
| **Customer (also you, your, yours)** | means the customer named on the application form mentioned above. |
| **Customer Guides** | means our customer guide and all other guides, manuals, help text or similar documents (whether in hard copy or in electronic form) issued by the Bank at any time in any format for use with the HSBC PKI Service and/or ASM. |
| **Digital Certificate** | means an electronic attestation which links a public key to the party for whom the corresponding Private Key was generated and confirms the identity of that person. |
| **Digital Signature** | means data in electronic form which are attached to or logically associated with other electronic data (including, without limitation, a BACSTEL-IP Transmission) and which serve as a method of authentication. |
| **DPA** | means the Data Protection Act 1998 (as the same may be amended from time to time). |
| **Good Response** | means a response that indicates that the Digital Certificate in question:<br>(a) was issued by or on behalf of the Bank or some other Member or on its behalf; and<br>(b) has not expired, or been revoked, and is not unknown. |
| **Group Company** | means, in relation to a company, any Holding Company or any Subsidiary of that company or any Subsidiary of any such Holding Company. |
| **Holding Company** | has the meaning given to it in the Companies Act 1985 (as amended from time to time). |
| **HSBC Group** | means HSBC Holdings plc and its subsidiary and associate undertakings or any of their branches. |
| **HSBC PKI Service** | means any PKI Service provided by or on behalf of the Bank to the Customer or any Bureau. |
| **Intellectual Property Rights** | means all intellectual property rights of any kind in any part of the world and shall include (without limitation): patents, registered and unregistered trade marks, registered designs, unregistered rights in designs, copyrights, and database rights. |
| **Member** | means any party participating as a member in the BACS System. |
| **Micro-enterprise** | has the meaning given to the word "micro-enterprise" in the Regulations the current meaning being an enterprise which employs fewer than 10 persons and whose annual turnover and/or annual balance sheet does not exceed 2 million Euros. |
| **Password** | means any confidential password, phrase, code or number, memorable data, personal identification number or any other identification whether issued to the Customer, any Bureau or any Contact by the Bank, any Member, the BACS System, the Supplier or the System Operator or adopted by the Customer, any Bureau or any Contact which may be used in connection with a PKI Service and/or ASM. |
| **Payment Transaction** | has the meaning given to the words 'payment transaction' in the Regulations. |
| **PKI Service** | means a public key infrastructure service (consisting of a certification authority, registration authority and certificate validation authority that in combination are able to issue, manage and certify Digital Certificates to enable the authentication and encryption of digital communications) provided to the Customer or any Bureau by or on behalf of the Bank or another Member (as the case may be) which service has been and remains accepted by the BACS System. |
| **Primary Security Contact** | means a Contact entrusted with the Customer's or any Bureau's ongoing use of a PKI Service and/or ASM as described in our Customer Guides and the Service User Guide – BACSTEL-IP. |
| **Private Key** | means the key within any asymmetric key pair (the other key being the public key) generated for use in connection with a PKI Service for a party which is normally known only by that party. |
| **Reference Database** | means the database held by the BACS System which records details inputted by the BACS System, the Bank, any Bureau and the Customer, as the case may be, about the Customer and any Bureau, including (without limitation) the levels of authorisation and permission in relation to BACSTEL-IP Transmissions submitted to the BACS System by the Customer and any Bureau as part of BACSTEL-IP. |
| **Regulations** | means The Payment Services Regulations 2009 as amended, restated and re-enacted from time to time. |
| **Regulated Payment Transaction** | means a Payment Transaction which is subject to the Regulations. |
| **Sign** | means the use of a party's Private Key and associated Digital Certificate to create a Digital Signature on or for a BACSTEL-IP Transmission, and "Signed" and "Signing" shall be construed accordingly. |
| **Service User Guide - BACSTEL-IP** | means the document issued by the Supplier entitled "Service User Guide –BACSTEL- IP" as amended from time to time. |
| **Subsidiary** | has the meaning given to it in the Companies Act 1985 (as amended from time to time). |
| **Supplier** | means Vocalink Limited and any other such supplier(s) from time to time and any successor entity or entities. |
| **System Operator** | means BACS Payment Schemes Limited and any other such system operator(s) from time to time and any successor entity or entities. |
| **Viruses** | means viruses, worms and other disruptive or destructive mechanisms or components of any kind. |

**688**

2. **THE HSBC PKI SERVICE**

2.1 The HSBC PKI Service involves the issue of Digital Certificates by us to the Customer or its Contacts to enable the authentication and encryption of BACSTEL-IP Transmissions and such authentication involves the BACS System requesting us to validate such Digital Certificate used to sign each such BACSTEL-IP Transmission. Such validation is signified by us responding to the BACS System with a Good Response. For further details of the HSBC PKI Service, please refer to our Customer Guides and the Service User Guide – BACSTEL-IP.

2.2 The Customer shall use the HSBC PKI Service or ASM in connection with the BACS System and for:

2.2.1 submitting BACSTEL-IP Transmissions directly to the BACS System or for collecting reports from the BACS System via BACSTEL-IP for its own account or on behalf of any Group Company of the Customer which either:

(a) specifies an account maintained by the Customer or such Group Company with the Bank and/or, with the prior consent of the Bank, with another Member(s) as the account to be debited or, as the case may be, credited; or

(b) (with the prior consent of the Bank) specifies an account maintained by the Customer or such Group Company with the Bank in respect of which a contra-instruction exists which substitutes for that account an account held by the Office of Her Majesty's Paymaster General with the Bank of England as the account to be debited or, as the case may be, credited; or

(c) makes changes to the details held on the Reference Database regarding or associated with any such account held with the Bank or any other Member(s) or provides access to any other information held by the BACS System relating to that account (including, without limitation, any information relating to the processing of payments made or to be made to or from that account).

2.2.2 signing BACSTEL-IP Transmissions which are sent to a Bureau for onward submission by the Bureau (unread and unaltered by the Bureau) to the BACS System or for collecting reports from the BACS System via BACSTEL-IP for its own account or on behalf of any Group Company of the Customer which either:

(a) specifies an account maintained by the Customer or such Group Company with the Bank and/or, with the prior consent of the Bank, with another Member(s) as the account to be debited or, as the case may be, credited; or

(b) makes changes to the details held on the Reference Database regarding or associated with any such account or provides access to any other information held by the BACS System relating to that account (including, without limitation, any information relating to the processing of payments made or to be made to or from that account).

3. **REGISTRATION PROCEDURE**

3.1 When registering for a PKI Service and/or ASM you are required to nominate at least two Primary Security Contacts. You understand that by doing this such Primary Security Contacts will have full control of the PKI Service and/or ASM (as the case may be) and will be able, among other things, (in the case of the PKI Service) to submit BACSTEL-IP Transmissions (which can involve payments) and further will have authority to delegate various access rights to Additional Contacts. For details of the powers and privileges given to Primary Security Contacts and Additional Contacts, please refer to our Customer Guides and the Service User Guide – BACSTEL-IP.

4. **DEBITING YOUR ACCOUNTS**

4.1 You hereby authorise and request that we accept debits to the account/s specified by you or on your behalf from time to time in respect of the total value of all payments contained in each and every BACSTEL-IP Transmission Signed or purporting to be Signed using a Private Key and Digital Certificate issued for use in connection with a PKI Service to you or one of your Contacts, or (subject to Clause 4.2) to a Bureau or one of their Contacts acting or purporting to act on your behalf, and made to the BACS System and processed by the BACS System provided that:-

(a) the Digital Certificate used to Sign such BACSTEL-IP Transmission has not expired, has not been revoked, is not unknown and we have not failed to revoke such Digital Certificate in accordance with our obligations under Clause 7.7 when requested by you or any Bureau (as the case may be) to do so; and

(b) such BACSTEL-IP Transmission does not contravene the levels of authorisation and permission set out in the Reference Database in relation to the holder of the Digital Certificate used, or purporting to be used, to Sign such BACSTEL-IP Transmission.

4.2 Where a BACSTEL-IP Transmission is submitted and Signed (or purports to have been Signed) as a whole by a Bureau using the HSBC PKI Service or any other PKI Service and, in addition to it being so Signed, it has been Signed (or purports to have been Signed) by you or on your behalf using the HSBC PKI Service or any other PKI Service, then you agree that we shall have no liability of any kind whatsoever to you or any other party and shall remain entitled in accordance with Clause 4.1 to accept and maintain any relevant debits to the account/s specified by you or on your behalf in respect of any payments contained in such BACSTEL-IP Transmission in the event that we or any other PKI Service provider, whether or not in breach of its obligations to you under this Agreement or any other agreement, incorrectly gives a Good Response, if and when requested to authenticate through BACSTEL-IP the above-mentioned Signing by the Bureau of such BACSTEL-IP Transmission.

4.3 We may act in accordance with Clause 4.1, even if to do so would conflict with the terms of any other mandates given by you or any Bureau at any time concerning your or such Bureau's accounts or affairs. Subject to the matters referred to in Clause 4.1, we shall not be under any other obligation to check the authenticity of BACSTEL-IP Transmissions or the authority of the party or parties purporting to send them.

**689**

4.4    All BACSTEL-IP Transmissions must be made in accordance with our Customer Guides and the Service User Guide-BACSTEL-IP. We shall not be liable for any loss or delay where the contents or format of any BACSTEL-IP Transmission are not in accordance with such Guides or are inaccurate or incomplete.

4.5    In order for a BACSTEL-IP Transmission involving a Payment Transaction to be properly executed the Customer must provide the Bank with the payee's bank sort code and account number or, where applicable, the bank identification code (BIC) or other relevant identification of the payee's bank and the payee's international bank account number (IBAN) or other relevant account number; and/or such other information if any as the Bank may advise the Customer of from time to time.

4.6    For details of cut-off times in respect of BACSTEL-IP Transmissions, please refer to the Service User Guide – BACSTEL-IP if you are a direct submitter to the BACS System. If you are submitting to the BACS Systems via a Bureau please refer to the Bureau for details of cut-off times in respect of BACSTEL-IP Transmissions.

4.7    For details of maximum execution times in respect of Regulated Payment Transactions please refer to the Service User Guide-BACSTEL-IP.

5.    **LEGAL EFFECTIVENESS AND ADMISSIBILITY OF ELECTRONIC SIGNATURES AND CERTIFICATES**

5.1    All BACSTEL-IP Transmissions Signed or purporting to be Signed by or on behalf of the Customer or any Bureau acting or purporting to act on behalf of the Customer (as the case may be) using a Private Key and Digital Certificate issued for use in connection with a PKI Service to the Customer, such Bureau or any of their respective Contacts shall have the same legal effect, validity and enforceability as if such BACSTEL-IP Transmission had been in writing signed by or on behalf of the Customer or any Bureau, provided that:

(a)    the Digital Certificate has not expired; and

(b)    the recipient requests a validation of such Digital Certificate and the response received to such validation request is a Good Response.

5.2    All BACSTEL-IP Transmissions submitted using ASM shall have the same legal effect, validity and enforceability as if such BACSTEL-IP Transmissions had been in written rather than in electronic form provided that each party wishing to rely on such BACSTEL-IP Transmissions has complied with the procedures relating to the use of ASM in the Service User Guide-BACSTEL-IP.

5.3    The Customer shall not challenge the legal effect, validity or enforceability of any BACSTEL-IP Transmission on the basis that:

(a)    such BACSTEL-IP Transmission is in electronic rather than written form; or

(b)    the Customer, the Bureau or the holder of the Digital Certificate did not see, check or review the contents of the BACSTEL-IP Transmission before or when Signing it; or

(c)    the holder of the Digital Certificate exceeded his/her authority to act on behalf of the Customer or the Bureau (as the case may be) or was not authorised at all in relation to the content of the BACSTEL-IP Transmission; or

(d)    the holder of the Digital Certificate did not Sign the BACSTEL-IP Transmission; or the BACSTEL-IP Transmission, whilst appearing to be Signed using the Digital Certificate, was not in fact Signed using the Digital Certificate that was actually issued to the Customer or the Bureau (as the case may be); or

(e)    the BACSTEL-IP Transmission was Signed automatically or without direct human instigation or intervention (whether by a hardware security module or otherwise); or

(f)    the BACSTEL-IP Transmission, or the Signing, transmission and processing of the BACSTEL-IP Transmission, constitutes a breach by the Customer of this Agreement or, in the case of a Bureau, any agreement between us (or any other Member) and such Bureau, or of the provisions or terms of use of any relevant third party provider or third party trust scheme.

5.4    The Bank, the Supplier and the System Operator shall be entitled to rely on, and the Customer shall accept full liability for, any BACSTEL-IP Transmission Signed or purporting to be Signed using a Private Key and Digital Certificate issued for use in connection with a PKI Service to the Customer or any of its Contacts, or to a Bureau or any of its Contacts acting or purporting to act on behalf of the Customer, provided that the provisos specified in Clause 4.1(a) and (b) are satisfied.

6.    **SERVICE INTERRUPTION/SUSPENSION/WITHDRAWAL**

6.1    We may suspend some or all of the BACSTEL-IP related services and/or the HSBC PKI Service and/or ASM without notice and with immediate effect where we consider it necessary or advisable to do so, for example to protect you when there is a suspected breach of security or to carry out routine, non-routine or emergency maintenance or for other reasons.

6.2    In addition, the Bank may suspend or terminate, or withdraw or cease to provide (without notice and with immediate effect) some or all of the BACSTEL-IP related services and/or the HSBC PKI Service and/or ASM to the Customer or any Bureau or to one or more Contacts with immediate effect in any of the following circumstances:

(i)    if the Supplier or the System Operator has suspended or withdrawn its authorisation for the HSBC PKI Service and/or ASM to be used in connection with BACSTEL-IP; or

(ii)    where the Bank considers it appropriate to do so in order to protect the security, integrity or reputation of BACSTEL-IP; or

(iii)    where, in the opinion of the Bank, the Customer is in breach of any provision of this Agreement or any Bureau is in breach of any agreement between it and the Bank relating to any HSBC PKI Service or between it and any other Member relating to any relevant PKI Service.

6.3    Upon any suspension, termination or withdrawal in accordance with this Clause 6, the Customer shall not (and shall ensure that its employees, contractors, agents including any Bureaux shall not) Sign or submit any BACSTEL-IP Transmissions using the HSBC PKI Service or ASM after such suspension or withdrawal unless and until, in the case of a suspension, such suspension is lifted by the Bank giving notice in writing or by telephone, e-mail or fax to that effect to the Customer or the Bureau (as the case may be).

**690**

6.4    Where not unlawful to do so we shall where possible give you notice of any suspension, termination or withdrawal in accordance with this Clause 6 before doing so or if not possible immediately afterwards. Any such notification shall be made in writing or by telephone, e-mail or fax.

7.    **SECURITY PROVISIONS**

7.1    You agree to, and agree to ensure that all Contacts will, comply with the terms of this Agreement and any other reasonable instructions or recommendations which we, the Supplier or the System Operator issue to you regarding HSBC PKI Service and PKI Service security and security relating to ASM including, without limitation, the security instructions and recommendations contained in our Customer Guides and the Service User Guide – BACSTEL-IP. You agree that it is your sole responsibility to set-up, maintain and regularly review security arrangements concerning access to, and use of, the HSBC PKI Service (and any other relevant PKI Service provided to you) and ASM, and information stored on your computing and communications systems, and in particular your and any of your Contacts' control of Passwords and Digital Certificates and access to the HSBC PKI Service (and any other relevant PKI Service provided to you) and ASM.

7.2    You must (and you must ensure that your Contacts) keep your/their Password secure and secret at all times and take steps to prevent unauthorised use of your/their Password and any Digital Certificate provided to you/them. Our Customer Guides and/or the Service User Guide – BACSTEL-IP set out various instructions and recommendations relating to Password security. Among other things, you must (and you must ensure that Contacts):

7.2.1    never write or otherwise record any Password in a way that can be understood by someone else except where it is required by the Bank for the registration of a Contact or for any other reason as set out in our Customer Guides or the Service User Guide – BACSTEL-IP;

7.2.2    avoid any Password which is easy to guess and never reveal your/their Password to anyone else including your/their business colleagues and staff, and change your/their Passwords regularly; and

7.2.3    keep secure at all times all smartcards issued in connection with the HSBC PKI Service and destroy all expired and replaced smartcards.

7.3    You must not access and agree to ensure that your Contacts will not access the BACS System, the HSBC PKI Service (or any other relevant PKI Service provided to you) or ASM from any computer connected to a local area network (LAN) or any public internet access device or access point without first making sure that no-one else will be able to observe or copy your/their access or get access to the BACS System, the HSBC PKI Service or any other relevant PKI Service provided to you or ASM pretending to be you or a Contact.

7.4    You must notify us immediately of the following:

7.4.1    any unauthorised access to the BACS System, the HSBC PKI Service or ASM, or any unauthorised transaction or instruction in connection with the BACS System which you or any of your Contacts knows of or suspects;

7.4.2    if you suspect someone else knows the Password of you or one or more of your Contacts or has access to your/their Digital Certificate. In the event of any such breach or suspected breach of security you must ensure that you and all your Contacts change their Passwords immediately to one which you/they have not used before; or

7.4.3    if you become aware of or suspect any breach by you or any of your Contacts of, or any non-compliance with, this Agreement; or any fraud in or affecting, or any material instances of compromise or suggested compromise in relation to, the BACS Services, BACSTEL-IP, the BACS System, the HSBC PKI Service or any other relevant PKI Service provided to you or any Bureau or ASM, or your use of them.

Any notification required to be made by a Customer under sub-clauses 7.4.1/2/3 shall be made initially by telephone in accordance with Clause 24.11, such notification to be confirmed immediately in writing. Further, you hereby agree to comply immediately with all reasonable requests for assistance from us and/or the police in trying to recover any losses or identify actual or potential breaches of security.

7.5    If you suspect any impropriety on the part of any Additional Contact in connection with the BACS Services, the BACS System, BACSTEL-IP, ASM or the HSBC PKI Service, or any Additional Contact leaves your business, you must ensure that a Primary Security Contact immediately removes him/her from BACSTEL-IP and further (in the case of the HSBC PKI Service) you or a Primary Security Contact must immediately request us to revoke his/her Digital Certificate.

7.6    If you suspect any impropriety on the part of any Primary Security Contact in connection with the BACS Services, the BACS System, BACSTEL-IP, ASM or the HSBC PKI Service, or any Primary Security Contact leaves your business, you must immediately take steps to replace such Primary Security Contact and (in the case of the HSBC PKI Service) to request us to revoke his/her Digital Certificate.

7.7    If you or any Bureau request us to revoke any Digital Certificate issued by us, we will make all reasonable efforts to comply with such request. Revocation requests can only be processed if received by us in accordance with the procedures referred to in Clause 24.11. You acknowledge that, in the circumstances referred to in Clauses 7.5 and 7.6, you must take all relevant steps to delete and procure that such Bureau deletes the details of the relevant Contacts from BACSTEL-IP. We are not liable for any failure to revoke a Digital Certificate issued by us or take any other relevant step if such a request is received at a time or under circumstances that render us unable to comply immediately (or at all) with your request.

7.8    We shall not be liable to you or to third parties for any loss whatsoever arising from the unauthorised copying and/or unauthorised use of any Digital Certificates. Further, neither you nor any Contact must use any Digital Certificate other than for the purposes of identifying yourselves to the BACS System and must not transmit or otherwise send the Digital Certificate to any party other than the BACS System.

7.9    You agree that you are solely responsible for the performance and protection of any browser and computer used in connection with the HSBC PKI Service (and any other relevant PKI Service provided to you) and ASM including the prompt adoption by you of all security patches and other security measures issued or recommended from time to time by the

**691**

suppliers of such browsers and computers' operating systems, and we shall not be liable for any damage to or reduction in the performance of your computer system or any part of it by the installation of any software required to use the HSBC PKI Service (or any other relevant PKI Service provided to you) or ASM. You agree to use a browser version and operating system that is supported by the HSBC PKI Service and ASM.

7.10  All notifications under this Clause 7 in respect of BACSTEL-IP Transmissions involving Payment Transactions must be given by you to us without undue delay and in any event no later than 13 months after the debit date, on becoming aware of any unauthorised or incorrectly executed Payment Transaction.

## 8.  DIGITAL CERTIFICATES

8.1  We grant you a non-exclusive, non-transferable licence to install and use Digital Certificates stored on the smartcards issued to your Contacts or on any hard security module which you may use. Title to and rights in the Digital Certificates belong to us or our licensors and, except for the specific rights granted to you by this licence, neither you nor any Contacts will acquire any rights whatsoever to the Digital Certificates, which will remain the property of the Bank or its licensors.

8.2  We will make all reasonable efforts to ensure that any Digital Certificate that we provide to you will perform as necessary to permit access to the BACS System as and when required. You will notify us immediately if any Digital Certificate fails to function correctly.

8.3  We shall have no liability for breach of any implied term as to satisfactory quality, merchantability or fitness for purpose of any Digital Certificate or associated software.

## 9.  FEES AND CHANGES TO THE AGREEMENT

9.1  You agree to pay our scale of charges for providing the HSBC PKI Service and/or ASM as we advise you from time to time. We may introduce charges and/or vary our charges and (where relevant) the frequency and dates of payment. In case of an introduction and/or change of charges we will provide you with not less than two months' prior notice and Clause 9.2 below shall apply to such notice. These charges are in addition to any charges for BACS Services. Please let us know if you wish to receive details of our charges for BACS Services. You are liable for any telephone charges and any charges made by your internet service provider as a result of the use by you of the HSBC PKI Service and ASM. You authorise us to debit any of your accounts with any charges for the HSBC PKI Service and/or ASM.

9.2  We may change the terms of this Agreement (including the matters in Clause 9.1) by giving you not less than two months' prior notice to you for any such changes. If you object to any such change, you may terminate this Agreement with immediate effect by giving written notice to us at any time up to two months from the date of our notice to you, and such termination will not involve you in paying any extra charges for doing this.

## 10.  OUR LIABILITY TO YOU

10.1  Neither we nor any member of the HSBC Group shall be liable for any loss, damage or delay other than such losses which arise as a direct result of our negligence, wilful misconduct or fraud. Notwithstanding anything in this Clause 10, we do not purport to exclude liability for personal injury or death.

10.2  Our total liability to you due to, under and/or arising out of or in connection with this Agreement in aggregate

10.2.1  in respect of any claim, or series of connected claims arising out of the same cause, shall not exceed £500,000

10.2.2  in respect of all claims which arise in any calendar year, shall not exceed £1,000,000 (and for the purposes of this sub-Clause 'calendar year' shall mean the period of twelve months starting upon the date of this Agreement and any anniversary thereof).

10.3  We will not be liable to you for any loss or damage due to, under and/or arising out of or in connection with this Agreement, to the extent that such loss or damage is:

10.3.1  indirect, consequential or special; or

10.3.2  a loss of business or profit; or

10.3.3  a loss of data;

whether or not we have been advised of the possibility of such loss or damage.

10.4  You are responsible for obtaining, if you consider it appropriate, insurance cover at your cost for any loss exceeding the limits set out in Clause 10.2 or for any loss for which we are not liable to you.

10.5  For the avoidance of doubt, you agree that neither we nor any other company in the HSBC Group shall have any liability of any kind (whether of the types referred to above or otherwise) in respect of:

10.5.1  the supply to you by any third party suppliers of services (including services provided by any Bureau, the Supplier, the System Operator or any other Member), or of BACS Approved Software or of any other software, hard security modules, readers or any other equipment or materials; or

10.5.2  any messages or transmissions Signed or purporting to be Signed by or on behalf of the Customer, any Bureau, the Supplier, the System Operator or any other party using a Private Key and Digital Certificate issued by a PKI Service to such Signing party, if such message or transmission is not a BACSTEL-IP Transmission.

10.6  You will indemnify and hold the HSBC Group harmless from all losses and liabilities incurred by any member of the HSBC Group as a result of:

10.6.1  any breach by you of your obligations under this Agreement; or

10.6.2  any fraudulent act on your behalf.

**692**

11. **LIABILITY WHERE REGULATIONS APPLY**

11.1    The provisions of this Clause 11 shall apply only where the Customer has not effectively agreed with the Bank under Clause 21 that Regulation 62 of the Regulations shall not apply.

11.2    Where Clause 11.1 applies to the Customer in the event of any conflict between the provisions of this Clause 11 and any other provisions of this Agreement then the provisions of this Clause 11 shall prevail but only to the extent necessary to resolve such conflict.

11.3    Subject to Clauses 11.1, 11.2, 11.4 and 11.5, the Customer shall be liable up to a maximum of £50 for any losses incurred in respect of any unauthorised BACSTEL-IP Transmission involving a Regulated Payment Transaction arising –

   a)    from the use of a lost or stolen Private Key or Digital Certificate provided to or adopted by the Customer, any of its Contacts or any Bureau or other agent acting on its behalf or any Password used in connection with such Private Key or Digital Certificate; or

   b)    where the Customer, any of its Contacts or any Bureau or other agent acting on its behalf has failed to keep the personalised security features of any Private Key or Digital Certificate provided to or adopted by the Customer or any of its Contacts or any Bureau or other agent acting on its behalf or any Password used in connection with such Private Key or Digital Certificate safe, from the misappropriation of any such Private Key, Digital Certificate or Password.

11.4    The Customer shall be liable for all losses incurred in respect of any unauthorised BACSTEL-IP Transmission involving a Regulated Payment Transaction where the Customer, any of its Contacts or any Bureau or other agent acting on its behalf -

   a)    has acted fraudulently; or

   b)    has with intent or gross negligence failed to comply with its or their obligations under this Agreement relating to:

   • the issue and use of Passwords, Digital Certificates and Private Keys and procedures relating to such matters and the keeping of such matters safe or

   • the notification by the Customer in accordance with Clause 7 and without undue delay on becoming aware of the breach of, loss, theft, misappropriation or unauthorised use of any Password, Digital Certificate, Private Key or the procedures relating to such matters.

11.5    Subject to Clauses 11.1 to 11.4, where a BACSTEL-IP Transmission involving a Regulated Payment Transaction is not authorised by the Customer the Bank will refund the amount of the unauthorised Regulated Payment Transaction and where applicable will restore the account debited with the Regulated Payment Transaction to the state it would have been in had the unauthorised Regulated Payment Transaction not taken place.

12. **LIABILITY OF CUSTOMER AND BANK FOR BUREAUX AND OTHER MEMBERS**

12.1    You will be bound by, responsible for and liable in respect of all actions or omissions (including without limitation BACSTEL-IP Transmissions) carried out or made (or purporting to be carried out or made) by any Bureau on your behalf and for any breach(es) by such Bureau of any agreement in place from time to time between the Bank (or any other Member) and such Bureau which is connected with any such actions or omissions.

12.2    You will be bound by, responsible for and liable as described in Clause 12.1 regardless of whether such actions or omissions reflect fully or at all your instructions to the Bureau.

12.3    The Bank shall have no liability or responsibility to you in respect of any actions or omissions of any other Member or any Bureau, whether in connection with any authorisation or sponsorship by the Bank of such Bureau or other Member or otherwise.

13. **USE OF BACS APPROVED SOFTWARE**

13.1    When submitting a BACSTEL-IP Transmission to the BACS System using the HSBC PKI Service or any other relevant PKI Service provided to you or a Bureau, the Customer or the Bureau (as the case may be) shall (a) only use software which at the relevant time is BACS Approved Software; (b) act in accordance with any instructions, guidance or procedures provided to it by the Bank; and (c) comply with the provisions of the Service User Guide - BACSTEL-IP.

14. **APPLICABLE REQUIREMENTS**

14.1    The Customer shall comply at all times with all Applicable Requirements; and obtain and maintain at all times all licences, consents, permissions and authorisations necessary to Sign, submit or receive BACSTEL-IP Transmissions (including, without limitation, those relating to the import or export of any equipment, software or technology, whether used for encryption or other purposes).

15. **VIRUSES**

15.1    It is your duty to make sure that any computer or other device which you use to access the BACS System and the services which the BACS System provides is free from and adequately protected against acquiring Viruses. We will not be responsible for any loss of or damage to your data, software, computer, computer networks, telecommunications or other equipment caused by you using the HSBC PKI Service or ASM unless such loss or damage is directly and solely caused by our gross negligence or wilful misconduct.

15.2    The Customer shall use all reasonable care (including, without limitation, the use of up to date Virus checking software) to prevent the introduction of any Viruses into, or any Virus contamination (including cross-contamination) of any BACSTEL-IP Transmissions; the HSBC PKI Service; ASM; any public key infrastructure service used by any other participant in BACSTEL-IP; any BACSTEL-IP related hardware or software; or the BACS System.

**693**

### 16. CONFIDENTIALITY AND OUR USE OF YOUR INFORMATION

16.1 The Customer shall keep any BACS Confidential Information which it receives confidential at all times.

16.2 You agree that we may exchange information about you and your affairs ('Your Information') with members of the HSBC Group and others (including any agent or sub-contractor appointed in pursuance of Clause 24.3) to provide you with the HSBC PKI Service and/or ASM. You also agree that we may use other members of the HSBC Group and/or third parties (in jurisdictions inside or outside the European Economic Area where there may be less stringent data protection laws) to process Your Information on our behalf. Wherever Your Information is processed, it will be protected by a strict code of secrecy and security which all members of the HSBC Group, their staff and any third parties are subject to, and will only be used in accordance with our instructions.

### 17. TERMINATION

17.1 The Customer may terminate this Agreement on not less than one month's prior notice to the Bank and the Bank may terminate this Agreement on not less than two months' prior notice to the Customer.

17.2 Either party may also terminate this Agreement with immediate effect by notice to the other, if the other party commits a material breach of this Agreement or becomes insolvent under the laws of any applicable jurisdiction.

17.3 Termination will not affect the rights and remedies of either party accrued to the date of termination nor will it affect any provision of this Agreement (including, without limitation, Clauses 4, 5, 7, 10, 12, 16 and 19) which is intended to apply after termination.

17.4 Upon termination of this Agreement for any reason, the Digital Certificate licence referred in Clause 8.1 terminates, as does any licence(s) referred to in Clause 19 and any other licence relating to any associated software.

### 18. FORCE MAJEURE

18.1 Neither party will be liable for delay in performing or failure to perform any of its obligations under this Agreement which is caused by circumstances beyond its reasonable control, including, but not limited to, the failure, malfunction or unavailability of telecommunications, data communications and computer systems and services, war, acts of terrorism, civil unrest, government action, strikes, lock-outs or other industrial action or trade disputes (whether involving either party's employees or those of a third party). Any delay or failure of this kind will not be deemed to be a breach of this Agreement and the time for performance of the affected obligation will be extended by a period which is reasonable in the circumstances.

### 19. INTELLECTUAL PROPERTY RIGHTS

19.1 All right, title, interest and Intellectual Property Rights in the BACSTEL-IP Materials shall vest in the Bank or the Bank's licensors and, except to the extent set out in Clause 19.2, the Customer shall obtain no right, title or interest in any BACSTEL-IP Materials or in any Intellectual Property Rights therein.

19.2 The Bank hereby grants the Customer a licence to use and copy (but not to sub-license) the BACSTEL-IP Materials (other than any documents, information and other materials relating to the BACS Approved Software service), but only to the extent necessary to enable the Customer to Sign, submit and receive BACSTEL-IP Transmissions or to access the BACS System via ASM.

19.3 The licence set out in this Clause 19 shall terminate automatically on the earlier of:

(a)    any termination or interruption, suspension or withdrawal under Clauses 6 or 17;

(b)    the Bank ceasing to participate in BACSTEL-IP;

(c)    the Customer ceasing to maintain an account with the Bank.

19.4 On such termination, the Customer is required to return to the Bank or destroy (at the Bank's option) all copies of the BACSTEL-IP Materials provided to the Customer or which are otherwise in the Customer's or any Contact's possession, custody or power.

### 20. CONTRACTS (RIGHTS OF THIRD PARTIES) ACT 1999

20.1 Subject to Clause 24.3 no person other than the Bank, other members of the HSBC Group and the Customer shall have any rights under the Contracts (Rights of Third Parties) Act 1999 (as amended from time to time) to enforce any term (express or implied) of this Agreement, but this is without prejudice to any right or remedy of a third party which may exist or be available apart from that Act.

### 21. THE PAYMENT SERVICES REGULATIONS 2009 (THE REGULATIONS)

21.1 To the fullest extent that is permitted by law the Customer agrees that the provisions of the Regulations including without limitation, those currently numbered as specified in Clause 21.2 shall not apply to the Customer, any of its Contacts or any Bureau or other agent acting on its behalf.

21.2 The relevant provisions of the Regulations referred to in Clause 21.1 include, without limitation, the whole of Part 5 of the Regulations (Regulations 33 to 50 inclusive including Schedule 4) and the whole of Regulations 54(1), 55(3), 60, 62, 63, 64, 67, 75, 76 and 77.

21.3 If at the date of this Agreement it is not permitted by law for the Customer to agree the matters referred to in Clauses 21.1 and 21.2 but subsequently such agreement does become permitted by law (whether because the Customer has ceased to be a Micro-enterprise or a Charity or otherwise), then the Customer agrees that the agreement of the Customer to the matters referred to in Clauses 21.1 and 21.2 shall take effect from such subsequent date.

**694**

22.  **COMMUNICATIONS AND ELECTRONIC RECORDS**

22.1  The Supplier, the System Operator, the BACS System and the Bank may record communications with the Customer, its agents, employees and contractors (including, but not limited to, BACSTEL-IP Transmissions) for any purpose connected with BACSTEL-IP (including, but not limited to, the HSBC PKI Service and ASM) which any of the Supplier, the System Operator, the BACS System or the Bank (as the case may be) consider appropriate.

22.2  Records and audit logs maintained by the Bank, any other Member, the Supplier, the System Operator or the BACS System in relation to the HSBC PKI Service, any other relevant PKI Service, ASM, any BACSTEL-IP Transmission or BACSTEL-IP shall be deemed to be accurate until the contrary is proved and the burden of proof that they are inaccurate shall lie with the Customer.

23.  **USE OF ASM**

23.1  Subject to and in accordance with this Agreement, the Customer shall use ASM (in accordance with the relevant provisions of the Service User Guide – BACSTEL-IP) to access and collect reports from the BACS System if the Customer has been authorised by the Bank to use ASM for accessing the BACS System.

23.2  The Customer shall not be permitted to use ASM to access and collect reports from the BACS System except via a Contact who is authorised to use ASM.

24.  **MISCELLANEOUS**

24.1  This Agreement is the entire agreement between the parties concerning the use of the HSBC PKI Service and ASM and supersedes all previous agreements, communications, representations or discussions between you and us relating to such matters.  Any other agreements between us and you and/or mandates relating to the conduct of your accounts shall remain unaffected. In the event of any conflict between any such agreement and/or mandates and this Agreement the provisions of this Agreement shall prevail but only to the extent necessary to resolve any such conflict.

24.2  Save as otherwise provided in this Agreement, any notice to be given under this Agreement must be communicated by post and such notice will be taken to have been received 5 days after posting by one party to the postal address most recently notified by the receiving party.

24.3  We may use any party or parties as our agent or sub-contractor to provide all or any part of the HSBC PKI Service and ASM and to perform all or any of our obligations under this Agreement.  You agree that such parties shall have the benefit of any provisions of this Agreement which limit our liability.

24.4.1 The Bank and the Customer shall at all times comply with the DPA and any regulations or other legislation made under the DPA (and other laws to the same or similar purpose), and in particular with the data protection principles set out in the DPA.

24.4.2 Where personal data is provided or disclosed to the Bank, the Supplier, the System Operator, any Bureau or the BACS System by the Customer, the Customer shall ensure that all necessary consents have been obtained from the relevant data subjects to allow the Bank and its data processors (including the Supplier, the System Operator, any Bureau and the BACS System) to receive such personal data and to use and process it in order to provide the HSBC PKI Service (or any other relevant PKI Service) and ASM to the Customer; and validate and process BACSTEL-IP Transmissions submitted by or on behalf of the Customer.

24.4.3 For the purposes of this Clause 24.4, the terms "personal data", "data subjects" and "data processors" shall have the meaning given to them by the DPA.

24.5  Each of the terms of this Agreement, including for the avoidance of doubt the exclusions of liability in Clauses 10.2.1 and 10.2.2 and in Clauses 10.3.1, 10.3.2 and 10.3.3, is severable from the others and if one or more of them becomes void, illegal or unenforceable, the remainder will not be affected in any way.

24.6  Subject to the applicable laws of evidence, each party agrees not to object to the admission of the records (including computer records) of the other as evidence in legal proceedings.

24.7  To help us comply with the laws, rules and regulations in place relating to money laundering issues, you agree to comply with such procedures as may be specified by us from time to time ('Procedures'). You also agree that, each time an Additional Contact is appointed with authority to make payments or otherwise authorise transactions on your behalf, you will provide the new Additional Contact's name and address together with a specimen signature in accordance with the Procedures. In addition, you agree that as part of the process of appointing any Primary Security Contact, you will provide a specimen signature of such Primary Security Contact and that it may be necessary for us to take steps to identify such Primary Security Contact in accordance with the Procedures.

24.8  You may not assign any right or benefit under any provision of this Agreement without our prior written consent.

24.9  The Customer shall not do (or permit to be done) by itself or on its behalf anything in connection with the BACS System via BACSTEL-IP outside of the United Kingdom, the Channel Islands or the Isle of Man which would or is reasonably likely to result in the BACS System, the Supplier, the System Operator or the Bank being in breach of any applicable laws or regulations outside of the United Kingdom, the Channel Islands or the Isle of Man.

24.10  Each of the terms of this Agreement is severable from the others and if one or more of them becomes void, illegal or unenforceable, the remainder will not be affected in any way.  References in this Agreement to clauses are references to clauses of this Agreement unless expressly stated otherwise.

24.11  If you wish to withdraw your consent to any BACSTEL-IP Transmission you must notify us by telephoning our HSBC BACS

**695**

Help Desk on 0845 6040 000 (or such other number/s as we may inform you of from time to time), such notification to be confirmed immediately in writing. We will make reasonable efforts to comply with your notification. However, we are not liable for any failure to cancel or modify any BACSTEL-IP Transmission if such notification is received at a time or under circumstances that render us unable to comply with your notification.  We will make a charge for dealing with such withdrawals of your consent to BACSTEL-IP Transmissions.

24.12  The Customer and the Bank may agree financial limit(s) upon the amount(s) which can be the subject of BACSTEL-IP Transmissions.

24.13.1    If the HSBC PKI Service fails to give a Good Response in respect of the submission of any BACSTEL-IP Transmission the Customer will be informed of this in accordance with the procedures relating to the HSBC PKI Service and the BACS System as described in the Service User Guide-BACSTEL-IP.

24.13.2    If the BACS System declines to process any BACSTEL-IP Transmission the Customer will be informed of this in accordance with procedures relating to the BACS System as described in the Service User Guide-BACSTEL-IP.

24.14  All notifications and communications under this Agreement (which Agreement shall be in English and shall continue until terminated in accordance with its terms) shall be made in the manner and as described in this Agreement; and if not so described shall be given by notice as described in Clause 24.2.

25.15  Information relevant to this Agreement under the Regulations will be provided as and when changes are made.  Certain information concerning BACSTEL-IP Transmissions will be provided by accessing the BACS System as referred to in Clauses 2.2.1(c) and 23 and the Service User Guide – BACSTEL-IP.  Save as provided otherwise in this Agreement, all other such information shall be made available as described in Clause 24.2.  If you want a copy of this Agreement, our Customer Guides or the Service User Guide – BACSTEL-IP, these can be obtained by contacting your Relationship Manager or our HSBC BACS Help Desk.

## 25.    LAW AND PROCEEDINGS

25.1  This Agreement and any dispute, claim or issue arising out of or in connection with it (whether of a contractual or non-contractual nature, such as claims in tort, for breach of statute or regulation or otherwise) shall be governed by and are to be interpreted in accordance with the laws of England and Wales. Both parties irrevocably submit to the non-exclusive jurisdiction of the courts of England and Wales.

**HSBC Bank plc**

Registered Office: 8 Canada Square, London E14 5HQ. Registered in England Number 14259.

HSBC Bank plc, 8 Canada Square, London, E14 5HQ is authorised by the Prudential Regulation Authority and regulated by the Financial Conduct Authority

and the Prudential Regulation Authority

Printed by Communisis, Leeds © HSBC Bank 2009. All rights reserved.

## Corporate Payment Card Customer Agreement Terms and Conditions

These Terms and Conditions are applicable for the Bank's Corporate Payment Card Customer Agreement.

## 1. Products issued under this Agreement

1.1. The Bank agrees to issue to the Customer any combination of the following products under this Agreement:

1.1.1. Corporate Cards;

1.1.2. Purchasing Cards;

1.1.3. Lodge Cards;

1.1.4. Fuel Cards;

1.1.5. Virtual Cards;

1.2. The product selection section in this Agreement sets out which combination of Cards the Customer requires the Bank to issue it with. Following the initial product selection, the Bank may agree to subsequently issue other products as detailed in the product selection section, as requested by the Customer, whilst this Agreement remains in force.

1.3. This Agreement states where particular terms do or do not apply to a particular Card.

## 2. Card and card account issue and renewal

2.1. The Bank will issue Cards and renew and replace them unless cancelled and, if requested and appropriate for the relevant Card type, issue a PIN to each Cardholder, unless the Bank otherwise objects or refuses, which it may do in its absolute discretion. Issuance of Cards is subject to:

2.1.1. the Customer authorising the proposed Cardholder to receive and use a Card;

2.1.2. compliance with the Bank's account opening procedures in effect from time to time for the relevant product.

2.2. The Customer shall be bound by, and agrees to ensure acceptance and compliance by Cardholders with any relevant Conditions of Use issued with the product(s).

2.3. The Bank shall be under no responsibility to the Customer to:

2.3.1. ensure that Cardholders and Card Administrators comply with this Agreement, any relevant Conditions of Use, or any variation of or supplement to them;

2.3.2. take any legal action or proceedings against a Cardholder or Card Administrator;

2.3.3. ensure that a Card is used for the purposes of the Customer's business; or

2.3.4. review, monitor or investigate the use of a Card.

## 3. Accounting and billing

3.1. The Bank will open Cards for use under this Agreement, each having a Card Limit not exceeding the Customer Limit for the relevant Card. When a Card is issued to a Cardholder, the Customer must ensure that the Cardholder is notified of any Card Limit.

3.2. The aggregate of balances outstanding on all Cards shall not exceed the Customer Limit. The Bank may make changes to the Customer Limit and Card Limit from time to time and shall give the Customer written notice as soon as practicable, and as permitted by applicable law, of such changes and, where changes lead to an outstanding balance being in excess of the revised Customer Limit or Card Limit, the written notice will include the period within which the Customer is required to make a payment to the Bank to reduce such balance so that it is equal to or less than the revised Customer Limit or Card Limit.

3.3. If any Customer Limit or Card Limit is exceeded without the Bank's approval, the Customer shall immediately repay the excess upon demand.

3.4. The Bank is authorised to debit each Card with the value of all transactions made by use of the Card (whether with or without use of a PIN or other identifier) or transacted via a Card whether or not properly authorised by the Cardholder or the Customer, including (without limitation) all transactions for which a merchant does not require express authorisation from the Bank and any transactions which may exceed the Card Limit or the relevant Customer Limit.

3.5. When asked to authorise a transaction, the Bank will take into account any other transactions already debited to the relevant Card or for which authorisation has been given, whether that transaction has been completed or not. This may lead to the transaction being declined. The Bank may refuse to authorise use of a Card if the Bank considers that the Card has been or is likely to be misused or where the Bank cannot authorise a transaction due to regulatory or legal restrictions. As part of the Bank's decision making process and in an effort to minimise the misuse of Cards, the Bank may refer an authorisation request back to the retailer or supplier for further information. This may result in the Cardholder being asked to produce further means of identification or other information.

3.6. A payment made by use of a Card or transacted on a Card cannot be stopped. If a retailer or supplier agrees to make a refund, the Bank will credit the relevant account only upon receipt of a written instruction in a form acceptable to the Bank from the retailer or supplier. The Bank cannot be held responsible for any delay in the receipt of such instructions.

## 4. Performance

4.1. The Bank may use sub-contractors, agents or third parties to perform and/or in connection with the performance of any of its activities in terms of its obligations under this Agreement.

4.2. The Bank may take, and may instruct members of its group to take any action which the Bank in its sole discretion considers appropriate to prevent or investigate crime or the potential breach of sanctions regimes or to act in accordance with relevant laws, regulations, sanctions regimes, international and national guidance, relevant group procedures and/or the direction of any public, regulatory or industry body relevant to any member of the group. This includes the interception and investigation of any payment, communication or instruction, and the making of further enquiries as to whether a person or entity is subject to any sanctions regime.

## 5. Payment

5.1. The Bank will make a Statement available to the Customer, and where applicable Cardholders, at the last known contact details provided by the Customer.

5.2. The Customer promises to pay to the order of the Bank, in immediately available funds in the currency in which the Card is denominated:

a) a payment(s) equal to the entire balance of each Card; and
b) all applicable interest, fees and charges which apply for the relevant Card(s), in accordance with this Agreement or on such basis as agreed between the Bank and the Customer in writing from time to time as specified on the Statement by the Payment Date. This may include (without limitation) charges payable if the Bank does not receive a payment in full by the Payment Date or if an outstanding balance exceeds an applicable Customer Limit or Card Limit.

5.3. If full payment of the amount shown on any Statement is not received by the Bank, in cleared funds, by the Payment Date, fees as detailed in the product selection section of the Agreement will apply being:

a) interest which will be debited by reference to the outstanding items on each account which will be calculated on the daily outstanding balance from the date the transactions fees and charges are debited to each account, and compounded monthly, until full payment is received, and

b) a late payment charge.

5.4. The Customer shall be liable for all transactions on the Cards and agrees to pay the Bank according to the Statements and the terms of this Agreement.

5.5 The Bank, in its sole discretion, has the right to apply payments to the Cards in such order as the Bank may determine.

5.6. Where the Customer has selected the Corporate Card individual bill corporate pay product on the product selection section, the following clauses shall apply:

5.6.1. The Customer agrees that it (and not the Cardholder) will pay each individual Cardholder statement balance in full by the agreed Payment Date as shown on the Statement. The Customer agrees that it will do this by making a separate payment(s) per Statement directly to the Bank or as otherwise agreed between the Customer and the Bank.

5.6.2. The Customer agrees that it will not instruct or permit its Cardholders to make any payments whatsoever to the Bank.

5.6.3. If the Bank becomes aware that any Cardholder has made a payment(s) directly to the Bank in settlement of all or part of their individual Statement, the Bank may terminate the Agreement with immediate effect notwithstanding the Agreement Term.

## 6. Liability for transactions

6.1. Subject to Clause 6.3, the Customer irrevocably and unconditionally indemnifies the Bank from and against all actions, proceedings, damages, costs, (including legal costs on a full indemnity basis) claims, demands, expenses and losses that the Bank may suffer or sustain in connection with the issue of any Cards by the Bank or the use of them, whether within the terms of any Conditions of Use and whether authorised or not, including but not limited to the value of all Card transactions and any losses or liabilities suffered or incurred by the Bank after a Cardholder ceases to be an officer of or employed/contracted by the Customer or any subsidiary company of the Customer.

6.2. Subject to Clause 6.3, the Customer shall be solely liable to the Bank for payment of the value of all transactions made by use of the Card whether or not that transaction has been made for the purposes of the Customer business or with the authority of the Cardholder or Customer, together with any charges, fees and interest payable under the Agreement. This will include (without limitation) any transactions made after the cancellation of a Card subject to the Bank's failure to comply with Clause 12.

6.3. Subject to Clause 6.4, the Customer shall have no liability for any transactions not authorised by the Customer or a Cardholder using a Card after it has been reported to the Bank (in accordance with any Conditions of Use) that the Card has been lost or stolen or that the Card details may be known by a third party or that unauthorised or fraudulent use is suspected. The amount of any such transactions that may have been debited in these circumstances will be provisionally credited to the relevant Card, including (without limitation) any related interest or charges. The Bank shall have no further liability to the Customer whatsoever. The Bank may require written notification that an item on the Customer's Statement is not a recognised transaction of the Card before the Bank can process any refund to which the Customer may be entitled.

6.4. Upon a report being made under Clause 6.3, the Bank will follow its usual procedures to cancel or block use of the Card, but if any loss, theft, fraudulent or unauthorised use of a Card or the disclosure of the Card details is attributable to the fraud or negligence of a Cardholder or the Customer (or the negligence of any agent, contractor, representative, employee or officer of the Customer) the Customer shall remain liable for any transactions made by use of the Card. For the purpose of this sub-Clause, "negligence" shall include (without limitation) any relevant failure by the Cardholder or Customer to observe any Conditions of Use.

6.5. The Bank may require the Customer to cooperate with it and relevant authorities in the Bank's efforts to recover any Card or funds. The Bank may also disclose to third parties any information about the Customer, any Cardholder and any Card account if it thinks it will help to avoid or recover loss.

6.6. In no event shall a Cardholder be liable to the Bank for Card transactions, and any credit made available is extended solely to the Customer.

# 7. Set-off

The Bank shall be entitled without notice to use any credit balances on any account held by the Customer with the Bank to reduce or repay any liability of the Customer outstanding under the Agreement. If the Bank takes such action it will advise the Customer. Where the credit balance is denominated in a currency other than the currency of the outstanding liability, the Bank will convert the credit balances to the currency of the outstanding liability at the Bank's exchange rate applicable on the day of conversion.

# 8. Tax

All fees and charges payable under the Agreement are exempt from UK and EU Value Added Tax but in the event that any law or regulation is introduced or there is a change in interpretation of any law or regulation which renders fees and/or charges liable to payment of Value Added Tax or other tax, or whether any tax currently exists in a jurisdiction that the Customer resides in, then such tax shall become payable by the Customer.

# 9. Disputed transactions

9.1. The Customer must continue to pay the Bank any money outstanding under the Agreement without any deduction, set-off or withholding and the Customer shall remain liable to make payments required under the Agreement even if the Customer is in dispute with or has a claim against a retailer, supplier or bank over a transaction made under this Agreement.

9.2. The Customer shall notify the Bank in writing of any transactions which the Customer disputes within 60 days of the date of the Statement showing the transaction. The Bank will take such steps as are available under the relevant payment system to resolve the dispute. If taking such steps does not resolve the dispute it will be a matter between the Customer and the retailer, supplier or bank. This Clause will continue to apply after any termination of the Agreement, how ever caused.

9.3 If the Bank suspects a payment into the Card account was the result of fraud, the Bank will remove it. If the Bank makes a payment into the Card account by mistake or as a result of an error, the Bank will debit the amount from the Card account. If the Bank is told that a payment from within the European Economic Area (EEA) was made into the Card account by someone else's mistake (for example if the payer gave the wrong account number), but, when the Bank contacts the Customer, the Customer informs the Bank that the payment was correctly made, the Bank is legally required to share all relevant information including the Customer's name and address and transaction information with the payment institution the payment came from if it asks for it so that the payer may use the contact details to make direct contact with the Customer to recover the payment. In all other cases the Bank will tell the Customer about it and, depending on how long ago the payment was made into the Card account, the Bank will either give the Customer time to provide evidence that the payment was correctly made before the payment is returned or the Bank will return the payment with the Customer's consent. During this time the Bank will restrict access to the payment (the Bank might do this by debiting the Card account or by limiting access to the amount on the Card account).

# 10. Terminating the Agreement

10.1. Notwithstanding the Agreement Term:

10.1.1. Either party may terminate this Agreement with immediate effect by written notice to the other upon or at any time after the occurrence of any of the following events:

a) If the other party commits any such breach of its obligations under this Agreement and if remediable shall fail to remedy such breach within 30 days of notice of requiring it to do so;

b) If the other party enters into a deed of arrangement or compounds with its creditors, or if a receiving order is made against it, or if an order is made or a resolution is passed for the winding up of the other party, or an order is made for the appointment of an administrator to manage the other party's affairs, business or property, or if a receiver is appointed to control any of the other party's assets or undertakings, or if the other party is dissolved, or if circumstances arise which entitle a court or a creditor to appoint a receiver or manager, or which entitle a court to make a winding up order, or if the other party suffers any similar or analogous action in consequence of debt;

c) If it becomes apparent to either party that any statement, representation or warranty made by the other party during the negotiations leading to this Agreement, in this Agreement itself, or in the performance of this Agreement, was untrue in any material respect when made.

10.1.2. The Bank may terminate this Agreement with immediate effect by written notice to the Customer upon or at any time after either of the following:

a) the occurrence of any change in the financial condition of the Customer, which in the reasonable opinion of the Bank is adverse and material;

b) following an internal credit and risk review which the Bank is obliged to undertake from time to time.

10.2. Upon termination, the Bank:

10.2.1. will take its usual procedures to cancel all Cards and stop access to accounts; and

10.2.2. may make demand or demands for immediate repayment of all sums outstanding under the Agreement, whether incurred before or after termination.

10.3. Interest on any sums demanded under the Agreement shall accrue from the date of demand until the date of payment at the interest rate stated in the product selection section in the Agreement, both before and after any judgment, which will be calculated on the daily outstanding balance and compounded monthly until full payment is received.

10.4. After termination, the provisions of the Agreement shall continue to apply in relation to all sums due from either party to the other until they have been paid in full.

# 11. Limitation of liability

11.1. Any failure or omission by either party to carry out or observe any of the terms or conditions of the Agreement shall not give rise to any claim against the other party or be deemed a breach of the Agreement or limit the liability of the Customer to the Bank if such failure or omission arises from any cause reasonably beyond the control of that party.

11.2. Neither party shall be liable to the other for any consequential, special, secondary or indirect loss, injury or damage or any loss of, or damage to, goodwill, opportunity, profits or anticipated savings howsoever caused.

11.3. The Bank shall have no liability if any retailer, supplier, cash machine, terminal or bank refuses to or cannot accept a transaction for any reason, except, subject to Clause 11.2, where their inability to accept a transaction is solely the result of the transaction not being processed because of the Bank's negligence, or for the way in which such refusal is communicated.

## 12. Cancellation and surrender of Cards

12.1. Cards remain the property of the Bank and the Bank, upon reasonable grounds relating to security, suspected misuse or credit control, may suspend or cancel a Card at any time. The Bank will use best endeavours to notify the Customer prior to such suspension or cancellation, but in any event shall inform the Customer of such suspension or cancellation as soon as practicable.

12.2. The Bank will cancel a Card upon receipt of a request from the Customer.

12.3. Upon a request by the Customer to cancel a Card or on notice that the Bank has cancelled a Card or on termination of the Agreement, the Customer shall return to the Bank the relevant Card(s) cut in half vertically, or destroy such Cards and give written c o n f i r m a t i o n to the Bank that this has occurred.

12.4. If the Customer is unable to return a Card, the Bank will take its usual procedures to recover possession of it at the time of its attempted use but shall not be under any obligation to take any special procedures to recover possession, unless a specific arrangement has been agreed in writing between the Bank and the Customer.

12.5. In cancelling a Card, the Bank will take its usual procedures to block use of the Card (whether or not returned to the Bank) but if transactions are made by use of a Card after cancellation, the Bank shall continue to apply in relation to that Card and transactions made under it until the receipt by the Bank of all sums outstanding in respect of the Card.

## 13. Information

### 13.1. Confidentiality

13.1.1 Subject to Clauses 13.1.2, 13.1.3 and 13.3, the parties agree that Confidential Information shall be kept confidential.

13.1.2 The Bank may disclose such Confidential Information to:

(a) members of the Bank's group on a confidential basis;

(b) sub-contractors, agents and third parties used by the Bank for providing the services in relation to the products, on a confidential basis;

(c) regulators, auditors or as otherwise permitted, required or reasonably necessary under law, regulation or an order of a court; and/or

(d) any other person with the Customer's consent.

13.1.3 The Customer may disclose Confidential Information to its employees or agents on a confidential basis to the extent strictly necessary for the receipt of the services under this Agreement.

### 13.2. Data protection and Customer Data

13.2.1 The Customer acknowledges that Personal Information may be stored, disclosed, processed and transferred by the Bank and members of its Group, or its group's sub-contractors, agents or third parties on a worldwide basis to perform and/or in connection with the performance of any of its activities under this Agreement in accordance with data protection legislation. The Customer consents, and shall take such steps as are required for the purposes of any applicable data protection legislation, to permit the Bank to store, disclose, process and transfer all Personal Information about relevant individuals in the manner described above.

13.2.2 The Customer explicitly consents to the Bank accessing, processing, and retaining any information the Customer provides to the Bank, for the purposes of providing payment services to the Customer. This does not affect any rights and obligations under data protection legislation. The Customer may withdraw this consent by terminating this Agreement. If the Customer does this, the Bank will stop using the data for this purpose, but may continue to process the data for other purposes.

13.3. The Bank shall not be restricted from making any disclosures under this Clause 13 where the Bank undertakes financial crime management and compliance activity under its regulatory obligations.

## 14. Variation

14.1. The Bank may, at its discretion from time to time, amend, vary or supplement the terms of the Agreement or Conditions of Use upon giving at least 60 days' notice in writing to the Customer. The Customer shall inform every applicable Cardholder of any amendments to the Conditions of Use promptly after notice of the same from the Bank.

14.2. Notwithstanding the provisions of Clause 14.1, the Bank may, by written notice to the Customer, make amendments to the Agreement at any time in order to comply with any law or regulation, which will become effective in accordance with the terms of such notice. The Bank will use reasonable efforts to give the Customer as much advance notice as possible in such circumstances.

## 15. General

15.1. The failure of a party to exercise or enforce any right conferred upon it by the Agreement shall not be deemed to be a waiver of any such right or operate so as to bar the exercise or enforcement of it any time or times after the failure.

15.2. If any provision of the Agreement is or proves to be or becomes illegal, invalid or unenforceable, in whole or in part, under any enactment or rule of law, such provision or part shall to that extent be deemed deleted from the Agreement and the legality, validity and enforceability of the remaining provisions of the Agreement shall not be in any way affected.

15.3. The Bank may transfer any of its rights, liabilities or obligations under the Agreement or any part of it and the Customer shall release the Bank from all such liabilities and obligations in the event of any such transfer. Following any transfer, references to the Bank in the Agreement shall read as references to the transferee to the extent of the transfer.

15.4. The Bank may disclose information about the Customer, any Cardholder and the Agreement in relation to an actual or a proposed contract for the transfer of the Bank's rights, liabilities and obligations under the Agreement provided that the Bank shall impose an obligation on the recipient to keep such information confidential, subject to any restrictions imposed by national laws of the country in which the Customer is situated.

15.5. For certain products where the Bank's nominated third party provides part of the service, the Bank may require the Customer to enter into a separate Agreement directly with the third party for the provision of the product.

15.6. Part 6 of the Payment Services Regulations 2017 (the "PSR") and those regulations noted in Regulation 63(5) of the PSR are appropriate to agreements with consumers, micro-enterprises and charities and will not apply to this Agreement. The Customer represents that it is not a microenterprise (as defined in Commission Recommendation 2003/361/EC, as amended from time to time), or if it is a microenterprise then the Customer is a part of a group undertaking (as defined in the Companies Act 2006 as amended from time to time) that is not a microenterprise.

15.7 Using a third party provider ("TPP")

15.7.1 A TPP is a third party service provider that is authorised by or registered with the Financial Conduct Authority or another EEA regulator or otherwise permitted by law to access information and make payments on online payment accounts operated by other providers (such as banks, building societies and credit card issuers) and has permission from an accountholder to do this.

15.7.2 If the Customer uses a TPP, the terms of this agreement will still apply. The Bank will give the TPP access to account information and the Customer will be able to make the same payments through the TPP that the Customer is able to make if the Customer was dealing with the Bank online.

15.7.3 Although the Customer and any Cardholder must not, generally, give any security details to anyone else, the Customer may give them to a TPP if it is necessary to allow a TPP to provide its services to the Customer. The Bank may refuse to allow a TPP to access the Card account if the Bank is concerned that the TPP is acting on an unauthorised or fraudulent basis. If the Bank does this, it will inform the Customer (unless doing so would compromise the Bank's reasonable security measures or otherwise be unlawful).

15.7.4 The Customer must check from the information provided to it by the TPP, that the TPP is authorised. If the Customer or a Cardholder gives security details to an unauthorised third party, the Bank will assume it is the Customer or the Cardholder that is authorising the Bank to give access to information about the Card account and the Customer will be responsible for any payments made as a result. If the Bank is aware that an unauthorised third party is using the security details, the Bank will block access to the Card account.

15.8. The Customer confirms, and confirms on behalf of any shareholders who hold 10% or more of its share capital (whether legally or beneficially, directly or indirectly), that it is compliant with UK law regarding Bearer Shares and that none of its shareholders have issued Bearer Shares. The Customer agrees to tell the Bank immediately if it or any of its shareholders has issued Bearer Shares. The Customer also confirms that there are no laws or regulations preventing it from giving the confirmations required by this clause.

## 16. Notices and demands

16.1. Where the Bank gives any notice to or makes any demand on the Customer such notice or demand shall be deemed properly served if served upon the Customer at the address of the Customer last notified to the Bank.

16.2 If the Bank needs to contact the Customer about any actual or suspected fraud or security threats, the Bank will do this using the fastest and most secure way (for example, the Bank may try to send a text message rather than telephone).

16.3. The Customer shall indemnify the Bank and any other member of its group against any loss arising from or in connection with the Bank or other member of its group processing an instruction or otherwise performing its obligations hereunder where the Bank or any other member of its group has done so in accordance with this Agreement.

## 17. Liability Waiver

17.1. The Bank will, upon written request, waive the Customer's liability for transactions under this Agreement (except for the circumstances in 17.4, 17.5 and 17.6) under the following conditions:

17.1.1. a Card transaction(s) was authorised by a Cardholder and this occurred after the date that the Customer notified the Bank that the Cardholder was no longer employed by the Customer and, consequently, was no longer authorised by the Customer to use a Card; or

a transaction(s) authorised by a Cardholder was an act of dishonesty or fraud on the part of the Cardholder and the Customer did not instruct nor give permission to the Cardholder to authorise the transaction(s); and

17.1.2. the Customer did not benefit in any way from the transaction(s), i.e. where the transaction(s) purchased goods or services which were not for the purposes of the Customer's business; and

17.1.3. the Customer has paid the Bank for, or is being asked by the Bank for payment of, the transaction(s) but has been unable to obtain recompense for the transaction(s) from the Cardholder or any other person; and

17.1.4. the Customer must give written notice to the Bank as soon as possible after the transaction(s), but in any event no later than 60 days following the date the transaction(s) is included on any Statement made available to the Customer. The notice should indicate that a request is being made to waive amount(s) due or paid for the transaction(s). The Customer must disclose sufficient detail to enable the Bank to identify the Card, the Cardholder and the transaction(s) for which a waiver is requested and an explanation of the circumstances under which the request is made. The Bank may require the Customer to provide further information before a waiver is granted. Where necessary, any information provided may be passed to the police or any other relevant authority.

17.2. Application for a waiver under this Clause 17 shall not affect the Customer's duty to make payments due under the Agreement.

17.3. A transaction(s) waived under this Clause 17 will be treated for interest and charging purposes as if it had not been applied to the account.

17.4. A waiver will not be granted if it would cause the total value of all waivers under this Clause in any 12 month period to exceed £15,000 or the billing currency equivalent for the relevant Cardholder or £1,000,000 or the billing currency equivalent for the Customer with the further restriction that any waiver of cash advance transactions will not exceed £200 or the billing currency equivalent per Cardholder per day and £700 or the billing currency equivalent per Cardholder in any 12 month period.

17.5. A waiver will not be granted, or if granted will be reversed, if it becomes apparent to the Bank that the Customer instructed, approved, authorised or in any way colluded in the authorisation of the transaction(s) for which a waiver was requested or that the Customer has obtained recompense for the transaction from any other person or that the customer has obtained or will obtain benefit from the goods or services purchased.

17.6. Waivers will not apply to transaction(s) where only a single Cardholder is employed by the Customer at the date the transaction(s) was undertaken.

## 18. Governing law

This Agreement is governed by the laws of England and Wales and the parties submit to the exclusive jurisdiction of the English courts. This Agreement and any communications in relation to it will be in English.

## 19. Definitions

**Bearer Shares** means shares issued in a form which assigns ownership to whomever holds the physical share certificate.

**Card** means any card issued by the Bank in physical or electronic form.

**Card Administrator** means any person identified to the Bank and authorised by the Customer to act as a Card Administrator who can provide instructions to the Bank regarding the issue, renewal and replacement of Cards and PINs and any amendments to Card accounts under this Agreement.

**Card Limit** means a credit limit applicable to a Card as determined by the Customer.

**Cardholder** means any person to whom the Bank has agreed to issue a Card under the Agreement following 1) receipt from the Customer of a duly completed nomination form using the MiVision portal (or in writing, in circumstances where the MiVision portal is unavailable), 2) the Customer authorising a user to access the Bank's Virtual Card portal.

**Conditions of Use** means any terms or conditions issued by the Bank from time to time for a relevant Card, to be provided by the Customer to each Cardholder to whom a Card of that type has been issued, and governing the use by the Cardholder of the Card.

**Confidential Information** means any material non-public information, about or relating to either party or members of its group, shared between each party in the course of their relationship.

**Corporate Cards** means Cards used as a method of payment for travel, subsistence and entertainment related transactions.

**Customer Limit** means the maximum allowable outstanding balance on all Cards at any time as notified by the Bank to the Customer in writing from time to time.

**Fuel Cards** means Cards used as a method of payment that only allows purchases from fuel retailers, as long as the entity processing card payments for those fuel retailers have identified them as such on their systems..

**Lodge Cards** means Cards used as a method payment for travel related transactions where the Card is lodged with the Customer's travel management company.

**Payment Date** means the date specified in the Statement which payment of the balance is to be received by the Bank.

**PIN** means personal identification number.

**Personal Information** means any information concerning an individual and allowing the identification of that individual.

**Purchasing Cards** means Cards used as a method of payment for goods and services in relation to business transactions.

**Statement** means the periodic statement made available by the Bank which sets out details of the transactions and account balance including any interest, fees and charges.

**Virtual Cards** means Cards used as a method of payment for goods and services and travel bookings either by using the Virtual Card portal provided by the Bank to the Customer or by using a central travel booking process provided by the Customer's travel management company or hotel booking agency.

## Complaints procedure

If the Bank does not deliver the standard of service the Customer expects, or if the Customer thinks The Bank has made a mistake, please let the Bank know. The Bank will then investigate the situation and, if necessary, set about putting matters right as quickly as possible. In addition, the Bank will take steps, where appropriate, to prevent a recurrence. Please allow the Branch Manager, Relationship Manager, or the Manager of the department concerned the first opportunity to answer any concerns and put matters right. However, if the Customer remains dissatisfied and would like further information about the Bank's process for resolving complaints, please visit our website www.hsbc.co.uk for further details.

## The Direct Debit Guarantee

• This Guarantee is offered by all banks and building societies that accept instructions to pay Direct Debits.

• If there are any changes to the amount, date or frequency of the Customer's Direct Debit, the Bank will notify the Customer five working days in advance of the Customer's account being debited or as otherwise agreed. If the Customer requests the Bank to collect a payment, confirmation of the amount and date will be given to the Customer at the time of the request.

• If an error is made in the payment of the Customer's Direct Debit, by the Bank or the Customer's bank or building society, The Customer is entitled to a full and immediate refund of the amount paid from the Customer's bank or building society.

• If the Customer receives a refund the Customer is not entitled to, the Customer must pay it back when the Bank asks the Customer to.

• The Customer can cancel a Direct Debit at any time by simply contacting the Customer's bank or building society. Written confirmation may be required. Please also notify the Bank.

For Bank Use Only: CIN

## 1. INTRODUCTION

1.1  The Customer wishes to use and receive HSBC*net* Services provided by the Bank and the Bank is willing to make those Services available to the Customer.

1.2  The Customer and the Bank agree that such Services shall be supplied to and used by the Customer subject to the terms and conditions contained in this Agreement.

1.3  In this Agreement, the following terms and expressions shall have the meanings ascribed to them as stated below:

| | |
|---|---|
| **Access Control Procedures** | The facilities and procedures used to control the operation of the System and other directions for the secure use of the System and the Services from time to time issued or made available by us via the System and on request. |
| **Agreement** | This agreement, the Terms and Conditions, the schedules, any supplementary terms for the provision of the Services provided to you in writing and the Access Control Procedures, as may be modified from time to time in accordance with the provisions of this Agreement. |
| **Bank (also we, us, our)** | The bank named in this Agreement in the section entitled 'Principal Bank and Governing Law'. |
| **Customer (also, you, your, yours)** | The customer named in the section of this Agreement entitled 'Customer Details'. |
| **Customer Associate** | (a) The associate companies of the Customer named in a Customer Associate agreement or as set out in this section of this Agreement entitled 'Customer Associate Schedule'; or (b) the individual named in a 'Customer Associate Letter of Authority (Individual)'. |
| **Customer Instruction** | Any advice, request, instruction or communication which is received by the Bank through the System. |
| **HSBC Group** | HSBC Holdings plc and its subsidiaries and associate undertakings and any of their branches. |
| **Institution** | (a) Any member of the HSBC Group (other than the Bank); and (b) any third party financial institution which the Customer has notified to the Bank should be treated as an Institution for the purposes of this Agreement. |
| **Materials** | Any content, tools or other materials (other than software) made available to you. |
| **Services** | Any electronic banking or related services supplied via the System and ancillary services that we provide, procure or make available to you from time to time, as may be further described in this Agreement. |
| **Software** | Any software supplied by us for use in conjunction with the System. |
| **System** | HSBC Group's HSBC*net* system (including any Software accessed via the portal at www.hsbcnet.com or such other access points as we may notify you from time to time. |
| **System Administrator** | Your employee or agent empowered by you with either single or joint authority to appoint Users as set out in this Agreement. |
| **User (s)** | Any of your employees, agents and any other individual(s) authorised by the Customer, whom from time to time are appointed to use the System pursuant to this Agreement. |
| **User Terms** | The terms and conditions relating to a User's use of the System from time to time issued or made available by us via the System and on request. |

1.4  In this Agreement, references to the singular include the plural and vice versa and clause headings are included for convenience only and do not affect its interpretation.

## 2. SERVICES

2.1  Subject to your compliance with the instructions and procedures set out in this Agreement we will use reasonable efforts to make the Services available to you. Such Services will be subject to any notifications of any restrictions received by us relating to any such Users from time to time.

2.2  You shall communicate with us via your Users. You shall ensure your Users only use the System and the Services in accordance with all terms of this Agreement and agree to be bound by and observe the terms of this Agreement.

2.3  From time to time, we may make available to you enhancements, improvements and upgrades to the existing Services, which shall be governed by the provisions of this Agreement.

2.4  From time to time you may require or we may offer to you new services. We will provide to you in writing any terms applicable to those new services prior to making them available to you, which will form part of this Agreement. If you consent to receiving such new services, then your (or any of your Users') access to or use of any such new services shall be deemed to constitute your acceptance of any such terms.

## 3. CUSTOMER INSTRUCTIONS

3.1  We may treat all apparently valid Customer Instructions received by the Bank through the System as instructions properly authorised by you, even if made fraudulently and even if they conflict with the terms of any other instructions or mandates given by you at any time concerning your accounts or affairs. We shall be under no obligation to check the authenticity of Customer Instructions or the authority of the person or persons giving them.

3.2  Where we have reason to believe that a Customer Instruction purporting to come from you has not been properly authorised by you or that any other breach of security has occurred in relation to your use of the System, we reserve the right not to act, or to delay acting upon the Customer Instruction and we will inform you as soon as is reasonably possible.

3.3  You are responsible for the accuracy and completeness of Customer Instructions (including the appropriate application of the Access Control Procedures) and for ensuring that they will achieve your intended purpose.

3.4  You are responsible for ensuring that Customer Instructions are transmitted correctly. Without prejudice to this obligation, we will use reasonable efforts to dispatch an acknowledgement within a reasonable period of receipt by us of a Customer Instruction.

3.5  In the event that you request us to cancel or modify any Customer Instruction for whatever reason, we will make all reasonable efforts to comply with your request. However, we are not liable for any failure to cancel or modify the Customer Instruction if such a request is received at a time or under circumstances that render us unable to comply with your request.

3.6  Where permitted, we are entitled to debit your accounts, wherever they are situated and whenever they are opened, with any amounts that we have paid or incurred in accordance with a Customer Instruction.

3.7  As part of certain of the Services, you may issue a Customer Instruction requesting us to forward certain information to third parties on your behalf. If we agree to act on such request, we will use reasonable efforts to forward any such information to the recipient and address specified in the relevant Customer Instruction within a reasonable time of receipt of such Customer Instruction. You must ensure that the information you ask us to forward is complete, accurate and will not give rise to any claim against us (including without limitation any claim in defamation, in relation to privacy or data protection or for infringement of any other third party rights).

## 4. DEALINGS WITH INSTITUTIONS

4.1  You appoint us as your agent on your behalf to request any Institution to supply the System with information about you and your accounts and to use the System to instruct an Institution to give effect to a Customer Instruction.

4.2  We may appoint an agent or third party to provide some or all of the Services under this Agreement. Other than in relation to an Institution selected by you, where we use an agent or any third party in performance of any Service, we shall use reasonable care in any such selection. In any event neither we nor any other member of the HSBC Group shall be liable for any loss (including loss of profit), damage, delay or failure to perform occasioned by the acts or omissions of any such third party or agent whether selected by us or you.

4.3  In order that an Institution may give effect to a Customer Instruction, you agree that we may, as your agent, agree with any Institution that where applicable the terms of this Agreement apply between you and that Institution.

## 5. CONFIDENTIALITY

5.1  We may need to share, store or transmit information about you, your Users or accounts within the HSBC Group or with any Institution or agent or third party used by us for the purpose of providing the Services. Subject to Clause 11.2, any such sharing, storage or transmission of such information will be done on a confidential basis and we will endeavour to maintain the strict confidentiality of such information within the HSBC Group unless: (a) otherwise required by any applicable law, regulation or request of any public or regulatory authority; or (b) where disclosure is required for the purposes of preventing crime; or (c) we deem disclosure necessary to give effect to a Customer Instruction. In addition, in any situation where the Customer provides confidential information to any member of the HSBC Group on a restricted basis (eg price-sensitive information), that HSBC Group member has procedures to ensure such restrictions are observed. Nothing in this Clause 5.1 shall apply when the Bank discloses confidential information to a third party as a result of the Bank exercising its rights pursuant to Clause 11.2.

5.2  You must keep confidential all information about the System and the Services contained in this Agreement and all information concerning your access to and use of the System and Services. You may only disclose such information to your Users or other employees or agents and then only to the extent strictly necessary for the proper use of the System and Services.

5.3  All parties agree to comply with all applicable data protection and other laws to the same or similar purpose in all relevant jurisdictions. We will set out in the User terms details of the use we may make of information relating to your Users, agents and customers. You hereby authorise us to process any such information in the manner described in this Agreement. Where appropriate, you will ensure that your Users and other relevant individuals consent to such processing.

## 6. SECURITY PROVISIONS

6.1  You agree to comply with the Access Control Procedures and any other reasonable instructions we may issue to you regarding the System's security. You agree it is your responsibility to set-up, maintain and regularly review security arrangements concerning your access to and use of the System and information stored on your computing and communications systems.

6.2  You confirm that you have assessed the security arrangements set out in this Agreement, and have determined that they are adequate to protect your interests.

6.3  You must notify us as soon as reasonably possible upon becoming aware of any actual or attempted unauthorised access to the System or any unauthorised transaction or attempt to execute an unauthorised transaction pursuant to this Agreement.

6.4  You must ensure that neither you, your Users nor your employees do anything during or after the term of this Agreement which may result in the security of the System, or the systems or security of any other HSBC Group customers, being compromised.

## 7. LIMITED WARRANTIES

7.1  We will use all reasonable efforts to ensure that the System will perform in substantial conformity to the description in this Agreement To the extent permitted by law, this is the only performance warranty made by the Bank in respect to the System or the Services. We shall have no liability for breach of any implied term including, without limitation, those as to satisfactory quality, merchantability or fitness for any particular purpose of the System or the Services.

7.2  We warrant that your use in accordance with this Agreement of the Software or Materials will not infringe the intellectual property rights of any third party.

7.3  We will ensure that the information supplied to you through the System reflects the information in our computer systems or information received from a third party, including an Institution. We do not warrant that the information is accurate, sufficient or error-free, nor that the information on our computer systems is current and up-to-date at the time it is accessed via the System.

7.4  In the case of a breach of the warranty in Clause 7.1 above, we will take all reasonable steps to correct the defective software and/or retransmit or reprocess any Customer Instruction, at no additional cost to you.

## 8. SOFTWARE AND MATERIALS

8.1  Subject to Clause 8.2, we grant you a non-exclusive, non-transferable licence to use the Software and the Materials in conjunction with the System for the intended business purpose contemplated by this Agreement. Title to and all rights in the Software and the Materials belong to us or our licensors and, except for the specific rights granted to you by this Agreement, you will acquire no rights whatsoever in relation thereto.

8.2  Your use of certain Software and Materials may be subject to additional restrictions. These will be notified to you upon the supply of the Software or Materials from time to time. You shall be deemed to have accepted any such additional terms upon any User using any such Software or Materials.

8.3  You undertake not to alter, reverse engineer, copy (other than to the extent necessary for the permitted use), publish or impart to any third party any Software or Materials.

UK HSBCnet Agreement T&Cs - Non - Micro Enterprise - 07-August-2015
Schedule ID: eCKMCAHT&CEU15July2015
Document ID:

**705**

For Office Use Only: CIN

**9.   OUR LIABILITY TO YOU**

9.1   Subject to Clauses 9.2 to 9.5 (inclusive), the Bank and/or any other member of the HSBC Group shall only be liable for any loss, damage or delay which you suffer or incur as a direct result of the Bank's or the other HSBC Group Member's gross negligence or wilful misconduct and shall not be liable for any other loss or damage of any kind.

9.2   Neither the Bank nor any other member of the HSBC Group shall in any event be liable to you for any loss of business or profits or data, or indirect, consequential or special loss or damage arising out of your use of, or in connection with, the System or the Services, whether or not the Bank or that other member of the HSBC Group has been advised of the possibility of such loss or damage and whether or not arising out of negligence, breach of this Agreement or otherwise.

9.3   Neither party nor any other member of the HSBC Group purports to exclude or limit liability in relation to fraud, personal injury or death.

9.4   Subject to Clause 9.5, the liability of the Bank and each other member of the HSBC Group to you for, to, under and/or arising out of or in connection with  this Agreement shall, in aggregate in any calendar year, not exceed USD1 million.

9.5   Notwithstanding the limit set out in Clause 9.4 above, to the extent a successful claim against the Bank or any other member of the HSBC Group (ie for direct loss arising as a result of its gross negligence or wilful misconduct only) relates to all or part of the principal amount payable under a Customer Instruction (such amount, the 'Lost Principal'), the Bank shall be liable for:

9.5.1   The Lost Principal; and

9.5.2   Any interest which might reasonably have been earned in relation to the Lost Principal, provided that any interest payment shall be reduced accordingly if (a) any interest or other charges which would have been payable by you were not charged as a result of the loss; or (b) any interest was earned by you which would not otherwise have been earned.

9.6   You will indemnify and hold the Bank and any other member of the HSBC Group harmless from all losses and liabilities incurred by the Bank or any member of the HSBC Group as a result of:

9.6.1   Any breach by you of your obligations under this Agreement; or

9.6.2   The Bank or any other member of the HSBC Group acting on any Customer Instruction or other communication relating to the Services, whether or not such Customer Instruction or communication was: (a) authorised by you, or (b) in an agreed form.

**10.   TERMINATION**

10.1   Either party may terminate this Agreement in whole or in relation to any Service:

10.1.1   On not less than 30 days' written notice to the other party; or

10.1.2   With immediate effect by written notice to the other if the other party: (a) commits a material breach of this Agreement (or, if termination is in relation to the Services only, commits in relation to that part of the Services, a material breach of this Agreement) which is not remedied within 14 days of a written notice requiring remedy; or (b) becomes insolvent under the laws of any applicable jurisdiction

10.2   Upon termination for any reason of any part of this Agreement for which Software or Materials were supplied, any such Software or Materials licence terminates.

10.3   Termination will not affect the rights and remedies of either party accrued to the date of termination nor will it affect any provision of this Agreement (including, without limitation, Clauses 5, 6, 9, 11.2 and 12) which is intended to apply after termination.

10.4   From time to time we may suspend some or all of the System or Services for routine, non-routine or emergency maintenance or for any other reason where we reasonably consider it necessary to do so. In the event of such a suspension, we will where reasonably practicable provide you with a reasonable period of notice prior to the suspension.

**11.   FORCE MAJEURE AND OTHER RIGHTS**

11.1   Neither party nor any member of the HSBC Group will be liable for any loss (including loss of profit), damage, delay or failure in performing any of its duties relating to this Agreement caused in whole or in part by the action of any government or governmental agency, natural occurrence, law or regulation (or any change in the interpretation thereof), injunction, currency restriction, sanction, exchange control, industrial action (whether involving its staff or not), war, terrorist action, equipment failure, or interruption to power supplies or anything else beyond its reasonable control. The affected party will attempt to notify the other party as soon as is reasonably practicable of the existence of such circumstances.

11.2   The Bank and other members of the HSBC Group are required to act in accordance with the laws and regulations operating in various jurisdictions which relate to the prevention of money laundering, terrorist financing and the provision of financial and other services to any persons or entities which may be subject to sanctions. The Bank may take, and may instruct other members of the HSBC Group to take, any action which it, in its sole and absolute discretion, considers appropriate to act in accordance with such laws and regulations. Such action may include but is not limited to: the interception and investigation of any payment messages and other information or Customer Instructions sent to or by the Customer or on its behalf via the Bank's systems or the System or any other member of the HSBC Group's systems; and making further enquiries as to whether a name which might refer to a sanctioned person or entity actually refers to that person or entity. Notwithstanding any provision of this Agreement, neither the Bank nor any member of the HSBC Group will be liable for loss (whether direct, consequential or loss of profit, data or interest) or damage suffered by any party arising out of:

11.2.1   Any delay or failure by the Bank or any member of the HSBC Group in performing any of its duties under this Agreement or other obligations caused in whole or in part by any steps which the Bank, in its sole and absolute discretion, considers appropriate to act in accordance with all such laws and regulations; or

11.2.2   The exercise of any of the Bank's rights under this clause.

In certain circumstances, the action which the Bank may take may prevent or cause a delay in the processing of certain information. Therefore, neither the Bank nor any member of the HSBC Group warrants that any information on the Bank's systems relating to any payment messages and Customer Instructions which are the subject of any action taken pursuant to this clause is accurate, current or up to date at the time it is accessed, whilst such action is being taken. Subject to the overriding requirements of any applicable laws and regulations, the Bank will endeavour to notify the Customer of the existence of such circumstances as soon as is reasonably practicable.

**12.   MISCELLANEOUS**

12.1   This Agreement forms the entire agreement between the parties concerning the supply and use of the System and Services. It supersedes any pre-existing agreements, communications, representations and discussions between you and us relating to the System and Services, which are hereby terminated. Neither party will have a right of action against the other arising from any previous agreement, communication, representation and discussion in respect of the System and Services, except in the case of fraud. Any other agreements between us and you, terms of business and/or mandates relating to the conduct of your accounts or our provision of related services shall remain unaffected, save that if any conflict between such terms and the terms of this Agreement arises, this Agreement shall prevail in so far as the conflict relates to the subject matter of this Agreement.

12.2   Any notice to be given under this Agreement must be communicated by post or facsimile to the address most recently notified by the receiving party. Proof of posting or transmission of any notice to the Customer shall be deemed to be proof of receipt of the notice by the Customer at the time when the notice would in the ordinary course be delivered or transmitted.

12.3   If we agree that you may communicate with us or we agree to communicate with you (or any third party) via e-mail, the internet, or any other method (other than via the relevant System), you acknowledge the risks that any such communications may be intercepted, monitored, amended or otherwise interfered with by third parties. We are not responsible or liable to you or any third party in the event of any such occurrence in relation to any communication between us and you (or which appears to have been made on your behalf), or any communication you ask us to enter into with any third party.

12.4   You agree to pay our fees and other tariffs (where applicable) for providing the System or Services as we advise you from time to time, and we are entitled to debit your accounts wherever they are situated and wherever they are opened, with the amount of any such fees and/or tariffs. We may vary our fees and/or tariffs and the frequency and dates of payment on giving you not less than 30 days' notice.

12.5   Each party shall take all reasonable precautions to ensure that communications through the System are not affected by computer viruses, Trojan Horse programs (such as key loggers) and other harmful programs or components.

12.6   Each of the terms of this Agreement (including for the avoidance of doubt the exclusions of liability in Clause 9) is severable from the others and if one or more of them becomes void, illegal or unenforceable, the remainder will not be affected in any way.

12.7   The rights of the Bank under this Agreement (a) may be exercised as often as necessary; (b) are cumulative and not exclusive of its rights under any applicable law; and (c) may be waived only in writing and specifically. Any delay in the exercise or non-exercise of any such right is not a waiver of that right.

12.8   You may not assign any right or benefit under any provision of this Agreement without our prior written consent.

12.9   We may make modifications to this Agreement which are required due to changes in any laws and/or regulations by giving you not less than 30 days' notice or, exceptionally, such shorter period as is required for the effective operation of the Services.

12.10   No addition to or modification of any provision of this Agreement (other than as set out in Clauses 2.4, 8.2 and 12.9 above) shall be binding upon us unless made by a written instrument signed by the Bank's duly authorised representative.

12.11   Certain jurisdictions may have particular legal or regulatory requirements which require you to agree supplementary terms. Where such supplementary terms are necessary, we will provide those terms in writing together with this Agreement and other relevant documentation, and such supplementary terms shall form part of the Agreement.

12.12   Members of the HSBC Group may enforce the terms of this Agreement where such terms are applicable to them and they have been referenced in such terms, subject to and in accordance with the provisions of the Contract (Rights of Third Parties) Act 1999. Except as provided in this clause, a person who is not a party to this Agreement has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Agreement but this does not affect any right or remedy of a third party which exists or is available apart from that Act.

12.13   In the event of any conflict between these Terms and Conditions and any of its schedules (other than express variations of these Terms and Conditions set out in any schedule), these Terms and Conditions shall prevail to the extent of the inconsistency.

12.14   Where the Customer comprises one or more individuals (whether acting in a personal capacity or as a trustee(s), partners or otherwise) any notice in this Agreement (but not, for the avoidance of doubt, instructions given by Users appointed in accordance with this Agreement) may be given by the individual who is the Customer or, where the Customer comprises more than one individual,by any of such individuals.

12.15   Where the Customer is a partnership, this Agreement will continue in force unless revoked by notice given by any one partner, notwithstanding any change of name of the partnership, admission of a new partner(s) or any partner ceasing to be a member of the partnership by reason of death or otherwise.

**13.   AUTHORISATION BY CUSTOMER**

13.1   You authorise and instruct us to supply the Services in respect of the accounts as set out in the Accounts and Services Schedule, and in respect of and for the purposes of the Trade Services Service, any import and/or export account(s) opened by you and/or any Customer Associate with us and/or any member of the HSBC Group for the purposes of any facilities granted to you and/or any Customer Associates by us and/or any member of the HSBC Group.

13.2   You may subsequently request and authorise us to provide or withdraw Services in respect of accounts opened at any time with us or an Institution in writing signed by a duly authorised person or person(s). The terms of this Agreement shall apply to all Services provided in relation to any accounts.

13.3   Certain Services may only be accessed by specified Users. The person(s) nominated in the section of this Agreement entitled 'Initial System Administrators' is appointed as the Initial System Administrator(s) and may appoint Users and further System Administrators from time to time.

13.4   If you access or use the System or the Services actually or purportedly on behalf of a Customer  Associate, or otherwise act in any way on behalf of such Customer Associate, you shall ensure that you have appropriate authorisation from the Customer Associate to act on its behalf and you agree on behalf of the Customer Associate that the terms of this Agreement shall apply between us and the Customer Associate (as if it were the Customer) in relation to such access, use or other action.

**14   LAW AND PROCEEDINGS**

14.1   This Agreement is governed by and will be construed in accordance with the laws of the jurisdiction named within the section of this Agreement entitled 'Principal Bank and Governing Law'. Both parties irrevocably submit to the non exclusive jurisdiction of the courts of that named jurisdiction in respect of any proceedings which may be initiated in connection with this Agreement.

14.2   You agree that any of the Services provided by us to you shall be deemed to be provided in the jurisdiction named pursuant to Clause 14.1,irrespective of where a User accesses the System or uses the Services (if such access or use is in a different jurisdiction).

**706**

UK HSBCnet Agreement T&Cs - Non - Micro Enterprise - 07-August-2015
Schedule ID: eCKMCAHT&CEU15July2015

Document ID:

▶ **Relationship Manager Sign Off - For Bank Use Only**

For Bank Use Only: CIN [                    ]

Customer Name [                                        ]

Customer Type

| | | | | |
|---|---|---|---|---|
| ☐ GBFI | ☐ GBCO | ☐ GBMN | ☐ GBPS | ☐ GBMS |
| ☐ CMBB | ☐ CMBM | ☐ CMCB | ☐ CMCM | ☐ CMCS |
| ☐ CMMS | | | | |

Sales Manager [                                        ]

**Limits**

Approved daily BACS limit  £ [                        ]

Approved daily Priority Payments/
Currency Transfer/Daylight  £ [                        ]
Overdraft limit
                                        *if left blank, will revert to pay/no-pay*

STC limit  £ [                        ]

Max £ 315,000.00 - only applicable for STC clients

Currency Limits MUST be expressed in all currencies where the customer has an account and has requested payment functionality. Each currency net debit limit may be equal to but not more than the Approved daily Priority Payments/Currency Transfer/Daylight overdraft limit. Use the bank's current notional rates.

| Currency Code | | | Net Debit Limit |
|---|---|---|---|
| G | B | P | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Get Rate Supplementary Details**

New customer to HSBC ?              Yes ☐        No ☐

Number of foreign exchange payments per annum [                ]

Average size of foreign exchange payment  £ [                ]

**Authorisation:** I confirm that :

- The agreement and any/all Customer Associate Letters of Authority have been signed in accordance with the customers' respective bank mandates and HSBC*net* signing rules
- All required KYC Checks have been completed
- The limits stated in this section have been approved/sanctioned and are to be placed on HSBC*net*

☐ GTE/SDC Omnibus Counter Indemnity and associated Facility Letter is in place (tick if applicable).

RM Signature [                                        ]

Print Name [                                        ]

Date [                                        ]

RM Location/Sort Code [                                        ]

RM Telephone Number [                                        ]

| | | |
|---|---|---|
| ☐ On-site Training Visit | ☐ Free WebEx Training | |
| ☐ SBT (PCM Direct) | ☐ E-GTE/SDC Fee | £ [            ] |
| ☐ Standard Tariff | ☐ E-trade Monthly Fee | £ [            ] |
| ☐ Restricted Tariff | ☐ Set-up Fee | £ [            ] |

**N.B. (Please complete the invoicing form if default prices are not applicable, in the absence of information, default pricing will apply)**

Billing Address: As per page 1

RM Code [                ]        Sales ManagerCode [                ]

UK HSBCnet Agreement T&Cs – Non – Micro Enterprise - 07-August-2015

Schedule ID: eCKMCARM/SIGNOFFEU15July2015

Document ID:

**707**

Section 6

20-12433-scc    Doc 8-4    Filed 10/15/20    Entered 10/15/20 13:00:32    Exhibit D Visible Only: CIN
(Explanatory Statement)    Pg 709 of 1648

‣ **HSBC*net* Supplementary Terms and Conditions - Eurozone SEPA Credit Transfer Service**

## 1.    INTRODUCTION

1.1    These Supplementary Terms and Conditions (the 'EZ Terms') apply to and govern the use of the EZ Service (as defined below) by the Customer using HSBC*net* and shall form part of the HSBC*net* Customer Agreement entered into between the Customer and the Principal Bank (the 'Agreement'). The EZ Terms apply to the provision of the EZ Service by the HSBC entity which maintains the account from which the Customer makes payments using the EZ Service (the 'Bank').

1.2    Expressions defined in the Agreement shall have the same meanings when used in these EZ Terms unless otherwise stated.

1.3    These EZ Terms are supplementary to and shall not prejudice any party's rights and obligations under the Agreement, provided always that in the event of any conflict between these EZ Terms and the provisions of the Agreement, these EZ Terms shall prevail insofar as the EZ Service is concerned.

1.4    Certain jurisdictions may have particular legal, regulatory, business or service requirements that must be incorporated into these EZ Terms where applied to accounts in those jurisdictions; where appropriate, these requirements will be dealt with in separate country-specific conditions. Where such country-specific conditions are necessary they will be set out in a schedule to these EZ Terms or otherwise provided to the Customer by the Bank. Without prejudice to the foregoing, the provision of the EZ Service is subject to the requirements of all applicable laws.

1.5    In these EZ Terms, the following words shall have the following meanings:

| | |
|---|---|
| **Business Day** | means any day on which the Bank or the Beneficiary Bank involved in the execution of the Payment is open for business as required for the execution of the Payment. |
| **Beneficiary** | means the recipient of a Payment. |
| **Beneficiary Bank** | means the financial institution with whom the Beneficiary's specified account is located. |
| **BIC** | means the Bank Identifier Code, an 8 or 11 character code used to identify a financial institution. |
| **Eurozone** | means the SEPA countries as referred to in the Fact sheet. |
| **EZ Service** | means the service provided by the Bank to the Customer in relation to the making of Payments by the Customer from accounts located in the Eurozone to a Beneficiary's account also located in the Eurozone and under the terms of the SEPA Scheme. |
| **Fact sheet** | means the HSBC SEPA Credit Transfer fact sheet available at www.hsbcnet.com/sepa. |
| **IBAN** | means the International Bank Account Number, a number which is used to uniquely identify an account at a financial institution. |
| **Originator Bank** | means the Bank at which the Customer's account from which a Payment is sent is held. |
| **Payment** | means a credit transfer whereby funds are debited from a Customer's account within the Eurozone, and subsequently credited to a Beneficiary's account within the Eurozone. |
| **SEPA Rulebook** | means the document entitled 'SEPA Credit Transfer Scheme Rulebook, currently version 8.0 and dated 25 November 2014 (as the same may be amended or replaced from time to time), which sets out the rules to which all financial institutions wishing to participate in the SEPA Scheme must adhere. |
| **SEPA Scheme** | means the SEPA Credit Transfer Scheme as designed by the European Payments Council and more particularly described in the SEPA Rulebook. |

## 2.    EZ SERVICE

2.1    Payments made using the EZ Service will be made in Euro and so where the account from which the Customer makes the Payment is not denominated in Euro, a currency conversion will be carried out at the then current rate offered by the Bank in relation to that Customer account or otherwise agreed between the Bank and the Customer.

2.2    The Bank may from time to time expand, reduce, vary, suspend, withdraw or cancel any part(s) of the EZ Service in any of the jurisdictions concerned and will, to the extent practicable, give reasonable notice of the same to the Customer.

2.3    Payments made using the EZ Service will be executed within one (1) Business Day following the date on which the Bank receives the Customer Instruction. Where the Bank receives a Customer Instruction for execution on a non- Business Day, the Bank will execute the Customer Instruction on the next Business Day.

2.4    Any Customer Instruction received by the Bank on or after the specified cut-off time on any Business Day will be treated as having been received by the Bank on the next Business Day.

2.5    Further details of the EZ Service (including the cut-off times) are set out in the Fact sheet.

## 3.    MAKING A PAYMENT USING THE EZ SERVICE: DATA REQUIREMENTS

3.1    To make a Payment using the EZ Service, the Customer Instruction must include all data and information required to be included in the Fact Sheet, under the SEPA Rulebook or requested by the Bank from time to time (including, without limitation, the IBAN of the account of the Beneficiary to which the Payment is to be made).

3.2    The Customer must ensure that any and all data included in its Customer Instruction and supplied to the Bank is accurate, consistent and complete.

## 4.    WHERE WE CANNOT ACCEPT A PAYMENT UNDER THE EZ SERVICE

4.1    The Bank may decline to process any Customer Instruction and will (unless to do so would place the Bank in contravention of any applicable laws and regulations) notify the Customer as soon as reasonably practicable giving its reasons for doing so, in the event that:

4.1.1    the Customer has failed to include all of the data or information required under Clause 3;

4.1.2    the Beneficiary Bank does not fully comply with the SEPA Rulebook in respect of making and receiving payments;

4.1.3    the Beneficiary's account is unable to receive Payments in Euro;

4.1.4    the Customer has insufficient funds in the relevant account to make the Payment or to make the Payment would exceed any limits that the Bank has set in respect of the Customer or the relevant account;

4.1.5    the Bank reasonably believes that a Customer Instruction is not authentic or valid (including, without limitation, where the Bank has concerns as to the plausibility of the IBAN of the Beneficiary and the validity of the BIC of the Beneficiary Bank; or

4.1.6    processing the Customer Instruction would be in contravention of any applicable laws and regulations.

4.2    Returns, Rejects and Recalls (as those terms are defined in the SEPA Rulebook) will be processed in accordance with the Bank's exceptions processing procedures, the relevant provisions of the SEPA Rulebook and applicable laws and regulations.

## 5.    RECEIVING PAYMENTS UNDER THE EZ SERVICE

5.1    The Bank shall deliver to the Customer in full and without alteration any remittance data received by us from the Originator Bank. For the avoidance of doubt, the Customer hereby acknowledges and agrees that the Bank is only able to deliver to the Customer such remittance data in the form the Bank receives it from the Originator Bank and that the Bank is under no obligation to vet, alter or confirm such data.

## 6.    MISCELLANEOUS

6.1    The provisions of these EZ Terms shall continue for the benefit of the successors and permitted assignees of the Bank and the Customer.

6.2    These EZ Terms are governed by and will be construed in accordance with the laws of the jurisdiction in which the Bank maintains the Customer's account from which Payments are made.

UK HSBC*net* Agreement T&Cs – Non – Micro Enterprise - 07-August-2015
Schedule ID: eCKMH5TACEZSEPACRTRFSCHEU07August2015
Document ID:

**708**

Exhibit D For Use Only: CIN

# 1    INTRODUCTION

1.1    You, the Customer, have agreed with us, the Bank, terms and conditions relating to certain electronic banking services by signing or adhering to one or more of the following customer agreements (the '**Terms and Conditions**'): (i) Hexagon; (ii) HSBC*net*; (iii) HSBC Connect; (iv) E-Channels Master Customer Agreement with one or more schedules; and/or (v) customer agreement(s) similar to one or more of the above.

1.2    These UK Country Conditions supplement the Terms and Conditions and govern the relationship between the Customer and the Bank in relation to the account/s in the United Kingdom. However, these UK Country Conditions only apply in circumstances:

1.2.1    where the payment services providers of both the payer and the payee are located within the European Economic Area (the '**EEA**'); and

1.2.2    the payment services are carried out in either euro or in the currency of an EEA State that has not adopted the euro as its currency.

1.3    Capitalised expressions used in these UK Country Conditions unless defined herein shall have the meanings given to such expressions in the Terms and Conditions.

1.4    In the event of any conflict between the Terms and Conditions and the UK Country Conditions, these UK Country Conditions shall prevail.

# 2.    CUSTOMER INSTRUCTIONS

2.1    In order for a Customer Instruction to be properly executed, we must be provided with the payee's bank sort code and account number or, where applicable, the bank identification code (BIC) or other relevant identification of the payee's bank and the payee's international bank account number (IBAN) or other relevant account number, and/or such information if any as we may advise you of from time to time.

2.2    We must receive a Customer Instruction before the cut-off time specified in any reference material provided to you or made available by us or we will deem the instruction to have been received on the next business day. Notwithstanding this, a Customer Instruction given to us after the cut-off time specified in any reference material provided to you or made available by us and on a business day for us may be processed by us on that day but we shall not be obliged to do so. Customer Instructions received on days which are not business days for us will also be deemed to have been received on the next business day. For the avoidance of doubt, a business day for us means any day other than a Saturday, Sunday or a public holiday in the UK, where we are open for business.

2.3    Where we receive a Customer Instruction from you for execution on a specific day, you agree that the time of receipt is deemed to be that specific day we are to execute that Customer Instruction.

2.4    Payment transactions will be executed in the currency agreed between the parties. The parties may also agree financial limit(s) upon the amounts which can be subject to Customer Instructions. Maximum execution times will be as advised to you whether in any reference material provided to you or otherwise made available by us.

2.5    Without prejudice to any provisions in the Terms and Conditions related to matters similar to these referred to below in this paragraph 2.5, we shall have the right to stop the use of a payment instrument (including the use of a password or token to access the relevant electronic channel and Services) on reasonable grounds relating to:

(a)    the security of the payment instrument;

(b)    the suspected unauthorised or fraudulent use of the payment instrument; or

(c)    your ability to repay any credit advanced to you.

Document ID:

UK HSBCnet Agreement T&Cs - Non - Micro Enterprise - 07-August-2015

Schedule ID: eCKMCCGBRNM15July2015

Exhibit D Use Only: CIN

## 3   MISCELLANEOUS

3.1   To the fullest extent that is permitted by law, the Customer agrees that provisions of the Payment Services Regulations 2009 (as from time to time amended, restated or re-enacted) (the '**Regulations**') shall not apply to the Terms and Conditions and these UK Country Conditions.

3.2   The provisions which shall not apply as provided in paragraph 3.1 above shall include the whole of Part 5 of the Regulations and Regulations 54(1), 55(3), 60, 62, 63, 64, 67, 75, 76 and 77 (as from time to time amended, restated or re-enacted).

3.3   No person other than the Bank, other members of the HSBC Group, the Customer and the Customer Associate(s) shall have any rights under the Contracts (Rights of Third Parties) Act 1999 (as amended from time to time) to enforce any term (express or implied) of these UK Country Conditions but this is without prejudice to any right or remedy of a third party which may exist or be available apart from that Act.

3.4   As of the date of these UK Country Conditions, you agree that each Customer Associate is not a microenterprise (as defined in Commission Recommendation 2003/361/EC, as amended from time to time) (a **Micro-enterprise**') or if any Customer Associate is a Micro-enterprise, then that Customer Associate is a group undertaking (as defined in the Companies Act 2006, as amended from time to time) (a '**Group Undertaking**') of yours. If at any time after these UK Country Conditions take effect, there is: (i) a Customer Associate that is a Micro-enterprise but is not a Group Undertaking of yours; or (ii) a Customer Associate that becomes a Micro-enterprise but is not a Group Undertaking of yours, then you shall inform us in writing as other terms and conditions will apply to them and their accounts instead of these UK Country Conditions.

3.5   Subject to these UK Country Conditions, where permitted, we are entitled to debit your accounts, wherever they are situated and whenever they are opened, with any amounts that we have paid or incurred in accordance with a Customer Instruction even if this may conflict with any terms and conditions relating to your accounts.

## 4   INFORMATION MANAGEMENT TERMS

4.1   You may also have received one or more of the following documents from us setting out our information management terms (the "**Information Management Terms**"):

(i)      our Terms of Business;
(ii)     our Tax Reporting Obligations Terms; and/or
(iii)    our Business Banking Terms and Conditions on or after 1 November 2014.

4.2   In the event of conflict between (a) the provisions of the Agreement which relate to our management of information and (b) the Information Management Terms you have received (if any), the Information Management Terms will prevail.

4.3   Where you have not received any Information Management Terms from us, the terms of the Agreement shall apply in full until such time as you may receive any Information Management Terms.

## 5   GOVERNING LAW AND JURISDICTION

5.1   These UK Country Conditions and any dispute, claim or issue arising out of or in connection with them (whether of a contractual or non-contractual nature, such as claims in tort, for breach of statute or regulation or otherwise) shall be governed by the laws of England and Wales. Both parties irrevocably submit to the non-exclusive jurisdiction of the courts of England and Wales.

Document ID:

UK HSBCnet Agreement T&Cs - Non - Micro Enterprise - 07-August-2015

Schedule ID: eCKMCCGBRNM15July2015

Page 6 of 6

## PART 3

## NEW LC FACILITY AGREEMENT

**VERSION ATTACHED TO RID**

# US$60,000,000
# SUPER SENIOR FACILITY AGREEMENT

**[●] 2020**

**For**

**KCA DEUTAG ALPHA LIMITED**
**as the Company**

**with**

**LLOYDS BANK PLC**
**acting as the Bank**

**and**

**LUCID TRUSTEE SERVICES LIMITED**
**acting as Security Agent**

## ALLEN & OVERY

**Allen & Overy LLP**

0101521-0000029 UKO3: 2000896815.22

# CONTENTS

**Clause**                                                                      **Page**

1.   Definitions and interpretation ................................................................. 1
2.   The Facility ............................................................................................ 18
3.   Purpose .................................................................................................. 19
4.   Utilisation .............................................................................................. 19
5.   Bank specific conditions ....................................................................... 22
6.   Undertakings ......................................................................................... 26
7.   Repayment ............................................................................................. 27
8.   Illegality, voluntary prepayment and cancellation ............................... 27
9.   Mandatory prepayment - Change of Control ........................................ 28
10.  Restrictions............................................................................................ 28
11.  Default Interest ..................................................................................... 29
12.  Fees........................................................................................................ 29
13.  Tax gross up and indemnities ............................................................... 30
14.  Increased Costs ..................................................................................... 38
15.  Other indemnities ................................................................................. 39
16.  Mitigation by the Bank ......................................................................... 40
17.  Costs and expenses ............................................................................... 41
18.  Guarantee and indemnity ...................................................................... 41
19.  Representations ...................................................................................... 49
20.  Information undertakings....................................................................... 54
21.  General undertakings............................................................................. 57
22.  Events of Default ................................................................................... 61
23.  Changes to the Bank ............................................................................. 65
24.  Changes to the Obligors ........................................................................ 69
25.  Conduct of business by the Finance Parties .......................................... 71
26.  Payment mechanics ............................................................................... 72
27.  Set-off.................................................................................................... 74
28.  Notices................................................................................................... 74
29.  Calculations and certificates ................................................................. 75
30.  Partial invalidity.................................................................................... 76
31.  Remedies and waivers ........................................................................... 76
32.  Amendments and waivers ...................................................................... 76
33.  Confidential Information........................................................................ 77
34.  Counterparts........................................................................................... 79
35.  Contractual recognition of bail-in.......................................................... 79
36.  Governing law ....................................................................................... 81
37.  Enforcement .......................................................................................... 81

**Schedule**

| | | |
|---|---|---|
| 1. | The Original Obligors | 82 |
| | Part 1     The Original Borrowers | 82 |
| | Part 2     The Original Guarantors | 83 |
| 2. | Conditions precedent required to be delivered by an Additional Obligor | 84 |
| 3. | Utilisation Request | 86 |
| 4. | Form of Transfer Certificate | 88 |
| 5. | Form of Assignment Agreement | 91 |
| 6. | Form of Accession Deed | 94 |
| 7. | Form of Resignation Letter | 97 |
| 8. | Form of Leverage Calculation Certificate | 98 |
| 9. | Existing Undertakings | 99 |
| 10. | Restrictive Covenants | 101 |

Signatories .................................................................................................................................. 150

**THIS AGREEMENT** is dated [●] 2020 and made

**BETWEEN**:

(1)     **KCA DEUTAG ALPHA LIMITED** as parent (the **Company**);

(2)     **THE PERSONS** listed in Part 1 of Schedule 1 (The Original Obligors) as original borrowers (the **Original Borrowers**);

(3)     **THE PERSONS** listed in Part 2 of Schedule 1 (The Original Obligors) as original guarantors (together with the Company, the **Original Guarantors**);

(4)     **LLOYDS BANK PLC** (the **Original Bank**);

(5)     **LUCID TRUSTEE SERVICES LIMITED** as security trustee and security agent for the Secured Parties (the **Security Agent**).

**IT IS AGREED** as follows:

1.      **DEFINITIONS AND INTERPRETATION**

1.1     **Definitions**

In this Agreement, capitalised terms have the meanings given to them in Schedule 10 (Restrictive Covenants) and:

**Abbot Group** means Abbot Group Limited.

**Acceleration Event** means an Event of Default in respect of which any notice has been served by the Bank demanding payment or repayment of any amount under the Facility in accordance with Clause 22.15 (Acceleration).

**Accession Deed** means a document substantially in the form set out in Schedule 6 (Form of Accession Deed).

**Accounting Principles** means:

(a)     in relation to the consolidated financial statements of the Company, generally accepted accounting principles in England and Wales from time to time, including IFRS; and

(b)     in relation to any other member of the Restricted Group, generally accepted accounting principles and generally accepted financial reporting standards and practices in the jurisdiction of incorporation of the relevant member of the Restricted Group from time to time.

**Additional Borrower** means a person which becomes an Additional Borrower in accordance with Clause 24 (Changes to the Obligors).

**Additional Guarantor** means a person which becomes an Additional Guarantor in accordance with Clause 24 (Changes to the Obligors).

**Additional Obligor** means an Additional Borrower or an Additional Guarantor.

**Adjusted Group** means the Company and the wholly-owned members of the Restricted Group.

**Affiliate** means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

**Agreed Security Principles** means the principles set out in schedule 8 (Agreed Security Principles) of the Intercreditor Agreement.

**Annual Financial Statements** has the meaning given to that term in Clause 20 (Information undertakings).

**Anti-Corruption Laws** means all laws, rules, and regulations of any jurisdiction applicable to members of the Group, from time to time, concerning or relating to bribery or corruption, including, but not limited to, the Foreign Corrupt Practices Act of 1977, the Bribery Act 2010 of the United Kingdom, the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

**Approved Currency** means euro, USD, Sterling, Omani Rial, Kuwaiti Dinar, Saudi Riyal, Mexican peso, Norwegian Krone, Algerian Dinar, Polish Zloty, Russian Rouble, Albanian Lek, United Arab Emirates Dirham and/or any other currency approved by the Bank.

**Assignment Agreement** means an agreement substantially in the form set out in Schedule 5 (Form of Assignment Agreement) or any other form agreed between the relevant assignor and assignee provided that if that other form does not contain the undertaking set out in the form set out in Schedule 5 (Form of Assignment Agreement) it shall not be a Creditor/Creditor Representative Accession Undertaking as defined in, and for the purposes of, the Intercreditor Agreement.

**Authorisation** means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

**Authorised Person** means any director of the Company or the chief executive officer, chief financial officer, head of treasury, head of corporate development or head of group accounting of the Group.

**Availability Period** means the period from and including the date of this Agreement to and including the date which falls one month prior to the Termination Date.

**Available Commitment** means, subject to Clause 5.2 (Available Commitment), the Bank's Commitment minus (subject as set out below):

(a)      the Base Currency Amount of its participation in any outstanding Utilisations; and

(b)      in relation to any proposed Utilisation, the Base Currency Amount of its participation in any other Utilisations that are due to be made on or before the proposed Utilisation Date.

For the purposes of calculating the Bank's Available Commitment in relation to any proposed Utilisation, an amount equal to the Bank's participation in any Utilisations that are due to be renewed or replaced on or before the proposed Utilisation Date shall not be deducted from the Bank's Commitment.

**Available Facility** means the aggregate for the time being of the Bank's Available Commitment.

**Bank** means:

(a)      the Original Bank; and

(b)     any bank, financial institution, trust, fund or other entity which has become a Party as the "Bank" in accordance with Clause 23 (Changes to the Bank),

which in each case has not ceased to be a Party as such in accordance with the terms of this Agreement.

**Bank Levy** means:

(a)     any tax levied by reference to the balance sheet or capital base of any person or its liabilities or minimum regulatory capital or any combination thereof (including, without limitation, the UK bank levy as set out in the Finance Act 2011 (as amended), the German bank levy as set out in the German Restructuring Fund Act 2010 (*Restrukturierungsfondsgesetz*) (as amended);

(b)     any financial activities taxes (or other taxes) of a kind contemplated in the European Commission consultation paper on financial sector taxation dated 22 February 2011 or the Single Resolution Mechanism established by EU Regulation n°806/2014 of July 15, 2014)

(c)     any bank surcharge or banking corporation tax surcharge as enacted by section 17 of, and Schedule 3 to, the Finance (No. 2) Act 2015 (as amended); and

(d)     any other surcharge or tax levied on a similar basis or for a similar purpose implemented in any other jurisdiction.

**Bank's Spot Rate of Exchange** means:

(a)     the Bank's spot rate of exchange; or

(b)     (if the Bank does not have an available spot rate of exchange) any other publicly available spot rate of exchange selected by the Bank (acting reasonably),

for the purchase of the relevant currency with the Base Currency in the London foreign exchange market at or about 7.30 a.m. London time on a particular day.

**Base Currency** means US Dollars.

**Base Currency Amount** means in relation to:

(a)     each Existing Undertaking, the amount specified in Schedule 9 (Existing Undertakings); and

(b)     any other Utilisation, the amount specified in the Utilisation Request delivered by a Borrower for that Utilisation (or, if the amount requested is not denominated in the Base Currency, that amount converted into the Base Currency at the Bank's Spot Rate of Exchange on the date which is three Business Days before the Utilisation Date or, if later, on the date the Bank receives the Utilisation Request in accordance with the terms of this Agreement),

in each case, as adjusted under Clause 4.7 (Revaluation of Undertakings) or Clause 5.8(c) (Cash cover), and to reflect any repayment, prepayment, consolidation or division of a Utilisation.

**Billing Cycle Date** means the last day of February, May, August and November in each calendar year.

**Borrower** means an Original Borrower or an Additional Borrower unless it has ceased to be a Borrower in accordance with Clause 24 (Changes to the Obligors).

**Business Day** means a day (other than a Saturday or Sunday) on which banks are open for general business in London, and

(a)     (in relation to any date for payment or purchase of a currency other than euro) the principal financial centre of the country of that currency; or

(b)     (in relation to any date for payment or purchase of euro) any TARGET Day.

**Charged Property** means all of the assets of the Obligors and the Third Party Security Providers which from time to time are, or are expressed to be, the subject of the Transaction Security.

**Code** means the US Internal Revenue Code of 1986.

**Commitment** means:

(a)     in relation to the Original Bank, US$60,000,000; and

(b)     in relation to any other Bank, the amount in the Base Currency of any Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement.

**Confidential Information** means all information relating to the Company, any Obligor, the Group, the Third Party Security Providers, the Finance Documents or the Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or the Facility from either:

(a)     any member of the Group or any of its advisers; or

(b)     another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any member of the Group or any of its advisers,

in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(A)     is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of Clause 33 (Confidential Information);

(B)     is identified in writing at the time of delivery as non-confidential by any member of the Group or any of its advisers; or

(C)     is known by that Finance Party before the date the information is disclosed to it in accordance with paragraphs (a) or (b) above or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with the Group and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

**Confidentiality Undertaking** means a confidentiality undertaking substantially in a recommended form of the LMA or in any other form agreed between the Company and the Bank.

**CTA** means the Corporation Tax Act 2009.

**Default** means an Event of Default or any event or circumstance specified in Clause 22 (Events of Default) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

**Defaulting Bank** means the Bank if it:

(a)    has rescinded or repudiated a Finance Document;

(b)    has failed to issue an Undertaking (or has notified the Company that it will not issue an Undertaking) in accordance with Clause 4.5 (Issue of Undertakings) or which has failed to pay a claim (or has notified the Company that it will not pay a claim) in accordance with (and as defined in) Clause 6.2 (Claims under an Undertaking); or

(c)    is the subject of an Insolvency Event which has occurred and is continuing,

unless:

(i)    its failure to pay, or to issue an Undertaking, is caused by:

(A)    administrative or technical error; or

(B)    a Disruption Event,

and payment is made within five Business Days of its due date; or

(ii)    the Bank is disputing in good faith whether it is contractually obliged to make the payment in question.

**Delegate** means any delegate, agent, attorney, co-trustee or co-security agent appointed by the Security Agent.

**Disruption Event** means either or both of:

(a)    a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Facility (or otherwise in order for the transactions contemplated by the Finance Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

(b)    the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

(i)    from performing its payment obligations under the Finance Documents; or

(ii)    from communicating with other Parties in accordance with the terms of the Finance Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

**Environment** means humans, animals, plants and all other living organisms including the ecological systems of which they form part and the following media:

(a)    air (including, without limitation, air within natural or man-made structures, whether above or below ground);

(b)    water (including, without limitation, territorial, coastal and inland waters, water under or within land and water in drains and sewers); and

(c)    land (including, without limitation, land under water).

**Environmental Claim** means any claim, proceeding, formal notice or investigation by any person in respect of any Environmental Law.

**Environmental Law** means any applicable law or regulation which relates to:

(a)    the pollution or protection of the Environment;

(b)    the conditions of the workplace; or

(c)    the generation, handling, storage, use, release or spillage of any substance which, alone or in combination with any other, is capable of causing harm to the Environment, including, without limitation, any waste.

**Environmental Permits** means any permit and other Authorisation and the filing of any notification, report or assessment required under any Environmental Law for the operation of the business of any member of the Restricted Group conducted on or from the properties owned or used by any member of the Restricted Group.

**Event of Default** means any event or circumstance specified as such in Clause 22 (Events of Default).

**Existing Undertakings** means each of the Undertakings listed in Schedule 9 (Existing Undertakings) and includes all outstanding Undertakings, as at the date of this Agreement, issued under the ancillary facility agreement dated 16 May 2014 (as amended and/or restated from time to time) and made between, amongst others, the Company and the Bank.

**Expiry Date** means, for an Undertaking, the last day of its Term.

**Facility** means the credit facility made available under this Agreement as described in Clause 2.1 (The Facility).

**Facility Office** means:

(a)    in respect of the Bank, the office or offices notified by the Bank to the Company in writing on or before the date it becomes the Bank (or, following that date, by not less than five Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement; or

(b)    in respect of any other Finance Party, the office in the jurisdiction in which it is resident for tax purposes.

**FATCA** means:

(a)    sections 1471 to 1474 of the Code or any associated regulations;

(b)    any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)    any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

**FATCA Application Date** means:

(a)    in relation to a "withholdable payment" described in section 1473(1)(A)(i) of the Code (which relates to payments of interest and certain other payments from sources within the US), 1 July 2014; or

(b)    in relation to a "passthru payment" described in section 1471(d)(7) of the Code not falling within paragraph (a) above, the first date from which such payment may become subject to a deduction or withholding required by FATCA.

**FATCA Deduction** means a deduction or withholding from a payment under a Finance Document required by FATCA.

**FATCA Exempt Party** means a Party that is entitled to receive payments free from any FATCA Deduction.

**Fee Letter** means any agreement setting out fees payable to a Finance Party under a Finance Document.

**Finance Document** means this Agreement, any Accession Deed, any Fee Letter, any Leverage Calculation Certificate, the Intercreditor Agreement, any Resignation Letter, any Transaction Security Document, any Utilisation Request and any other document designated as a "Finance Document" by the Bank and the Company.

**Finance Party** means the Security Agent or the Bank.

**Financial Quarter** means each quarterly accounting period of the Company.

**Financial Year** means the annual accounting period of the Company.

**Group** means the Company and each of its Subsidiaries for the time being.

**Group Member EBITDA** means, for any period for any member of the Adjusted Group, the aggregate (without double counting) earnings before interest, tax, depreciation and amortisation attributable to such member of the Adjusted Group for such period, calculated on a last twelve months basis on the same basis as Consolidated EBITDA, on an unconsolidated basis and excluding all intra-group items and investments in its Subsidiaries, provided that any member of the Adjusted Group with negative Consolidated EBITDA shall be deemed to have Consolidated EBITDA of zero.

**Group Structure Chart** means the group structure chart delivered to the Bank prior to the date of this Agreement.

**Guarantor** means an Original Guarantor or an Additional Guarantor, unless it has ceased to be a Guarantor in accordance with Clause 24 (Changes to the Obligors).

**Guarantor Coverage Test** has the meaning given to that term in Clause 21.15 (Guarantors).

**Holding Company** means, in relation to a person, any other person in respect of which it is a Subsidiary.

**Indenture** means any indenture entered into by any member of the Restricted Group with respect to the issuance of any Public Debt by a member of the Restricted Group.

**Insolvency Event** in relation to an entity means that the entity:

(a)     is dissolved (other than pursuant to a consolidation, amalgamation or merger);

(b)     becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

(c)     makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(d)     institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official;

(e)     has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition is instituted or presented by a person or entity not described in paragraph (d) above and:

(i)     results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation; or

(ii)     is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof;

(f)     has exercised in respect of it one or more of the stabilisation powers pursuant to Part 1 of the Banking Act 2009 and/or has instituted against it a bank insolvency proceeding pursuant to Part 2 of the Banking Act 2009 or a bank administration proceeding pursuant to Part 3 of the Banking Act 2009;

(g)     has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(h)     seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets (other than, for so long as it is required by law or regulation not to be publicly disclosed, any such appointment which is to be made, or is made, by a person or entity described in paragraph (d) above);

(i)     has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter;

(j)     causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in paragraphs (a) to (i) above; or

(k)     takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

**Intellectual Property** means:

(a)     any patents, trade marks, service marks, designs, business names, copyrights, database rights, design rights, domain names, moral rights, inventions, confidential information, knowhow and other intellectual property rights and interests (which may now or in the future subsist), whether registered or unregistered; and

(b)     the benefit of all applications and rights to use such assets of each member of the Restricted Group (which may now or in the future subsist).

**Intercreditor Agreement** means the intercreditor agreement dated the same date as this Agreement and made between, among others, the Company, the Security Agent and the Bank.

**Issuance Rate** has the meaning given in Clause 12.1 (Issuance fees).

**ITA** means the Income Tax Act 2007.

**Legal Opinion** means any legal opinion delivered to the Bank under or in connection with the Finance Documents.

**Legal Reservations** means:

(a)     the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)     the time barring of claims under the Limitation Acts, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c)     similar principles, rights and defences under the laws of any Relevant Jurisdiction; and

(d)     any other matters which are set out as qualifications or reservations as to matters of law of general application in the Legal Opinions or customarily included in legal opinions for facilities of this type.

**Leverage Calculation Certificate** means a certificate substantially in the form set out in Schedule 8 (Form of Leverage Calculation Certificate).

**Limitation Acts** means the Limitation Act 1980 and the Foreign Limitation Periods Act 1984.

**Material Adverse Effect** means, taking into account any indemnity, insurance or other reimbursement right or claim which any member of the Restricted Group has in connection with the relevant event or circumstance), a material adverse effect on:

(a)     the business, assets or financial condition of the Restricted Group taken as a whole; or

(b)     the ability of the Restricted Group taken as a whole to perform its payment obligations under the Finance Documents; or

(c)     subject to the Legal Reservations and the Perfection Requirements, the validity or enforceability of the Transaction Security Documents taken as a whole to the extent it is materially adverse to the interests of the Secured Parties under the Finance Documents.

**Material Company** means, at any time:

(a)     an Obligor; or

(b)     a wholly-owned member of the Restricted Group that holds shares in an Obligor; or

(c)     a Restricted Subsidiary of the Company that is a member of the Adjusted Group and has Group Member EBITDA representing 5 % or more of Consolidated EBITDA.

Compliance with the conditions set out in paragraph (c) above shall be determined by reference to the most recent Leverage Calculation Certificate supplied by the Company with the latest Annual Financial Statements. A report by the Company's auditors that a Restricted Subsidiary is or is not a Material Company shall, in the absence of manifest error, be conclusive and binding on all Parties.

**Month** means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a)     if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day; and

(b)     if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month.

These rules will only apply to the last Month of any period.

**New Bank** has the meaning given to that term in Clause 23 (Changes to the Bank).

**Noteholders** means the holders of any notes issued pursuant to any Indenture.

**Obligor** means a Borrower or a Guarantor.

**Obligors' Agent** means the Company appointed to act on behalf of each Obligor in relation to the Finance Documents pursuant to Clause 2.3 (Obligors' Agent).

**Original Financial Statements** means the consolidated audited financial statements of the Company for the Financial Year ended 31 December 2019.

**Original Obligor** means an Original Borrower or an Original Guarantor.

**Participating Member State** means any member state of the European Union that has the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

**Party** means a party to this Agreement.

**Perfection Requirements** means the making or the procuring of appropriate registration, filings, recordings, enrolments, registrations, notarisations, notifications, endorsements and stampings and

payments in any jurisdiction in order to perfect any Transaction Security created by the Transaction Security Documents in order to achieve the relevant priority for such Transaction Security.

**Permitted Transaction** means:

(a)    any disposal required, Indebtedness incurred, guarantee, indemnity or Security given, or other transaction arising, under the Finance Documents;

(b)    a Permitted Reorganisation;

(c)    transactions not otherwise prohibited by the terms of this Agreement; or

(d)    any Transaction Step.

**Qualifying Bank** has the meaning given to that term in Clause 13 (Tax gross up and indemnities).

**Receiver** means a receiver or receiver and manager or administrative receiver of the whole or any part of the Charged Property.

**Relevant Jurisdiction** means, in relation to an Obligor:

(a)    its jurisdiction of incorporation; and

(b)    the jurisdiction whose laws govern the Transaction Security Documents entered into by it.

**Renewal Request** means a written notice delivered to the Bank in accordance with Clause 4.6 (Renewal of an Undertaking).

**Repeating Representations** means each of the representations set out in Clause 19.2 (Status), Clause 19.3 (Binding obligations), Clause 19.4 (Non-conflict with other obligations), Clause 19.5 (Power and authority), Clause 19.6 (Validity and admissibility in evidence), Clause 19.7 (Governing law and enforcement), Clause 19.20 (Good title to assets), Clause 19.21 (Legal and beneficial ownership) and Clause 19.25 (Centre of main interests).

**Representative** means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian.

**Resignation Letter** means a letter substantially in the form set out in Schedule 7 (Form of Resignation Letter).

**Restricted Group** means the Group excluding the Unrestricted Subsidiaries.

**Restructuring** means the restructuring of the Company and its Subsidiaries pursuant to the Restructuring Implementation Deed.

**Restructuring Implementation Deed** has the meaning given to that term in the Scheme.

**Sanctioned Country** means, at any time, a country or territory which is the subject of any country-wide or territory-wide Sanctions (being, as at the date of this Agreement, Cuba, Iran, North Korea, Syria, Sudan and the territory of Crimea).

**Sanctioned Person** means, at any time:

(a)    any person specifically listed in any Sanctions List (and, solely for the purposes of Clause 5.6 (Additional conditions to issuance of an Undertaking) and Clause  21.6 (Anti-

corruption law and Sanctions) including clause (c) of this definition as it relates to such Clause) with respect to any person that is not a Group member or an Affiliate thereof, in that person's individual capacity unless otherwise specified in the relevant Sanctions List);

(b)      any person located, organised or ordinarily resident in a Sanctioned Country; or

(c)      any person controlled by any person referred to in paragraph (a) or (b) above.

**Sanctions** means the economic or financial sanctions laws, regulations and restrictive measures administered, enacted, imposed or enforced, in each case from time to time, by any Sanctions Authority.

**Sanctions Authority** means the United States, the United Kingdom, the United Nations Security Council, the European Union (and its member states), the Kingdom of Norway and the respective governmental institutions of any of the foregoing including, without limitation, Her Majesty's Treasury, OFAC, the U.S. Department of State, and any other agency of the U.S. government.

**Sanctions List** means any list of persons specifically designated as being subject to Sanctions as maintained by any Sanctions Authority.

**Scheme** means the scheme of arrangement in relation to KCA Deutag UK Finance plc under Part 26 of the Companies Act 2006, which was sanctioned by the High Court of England and Wales on [●] 2020.

**Secured Parties** means each Finance Party from time to time party to this Agreement and any Receiver or Delegate.

**Security** means a mortgage, charge, pledge, lien, standard security, assignation in security or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

**Senior Secured Gross Leverage Ratio** has the meaning given to Consolidated Senior Secured Net Leverage Ratio but calculated such that the Consolidated Senior Secured Net Leverage is adjusted by:

(a)      including in the calculation of the total amount of Senior Secured Indebtedness of the Company and the Restricted Subsidiaries, any Indebtedness drawn in cash outstanding on the date of determination which was Incurred under Section 4(b)(1) of Schedule 10 (Restrictive Covenants); and

(b)      adding back the amount of any cash and Cash Equivalents of the Company and its Restricted Subsidiaries on a consolidated basis deducted in calculating the Consolidated Senior Secured Net Leverage.

**Structure Memorandum** means the structure paper prepared by Deloitte and entitled "KCA Deutag Group – Tax Structure Paper" dated [●] 2020.

**Subsidiary** means an entity of which a person has direct or indirect control or owns directly or indirectly more than 50 % of the voting capital or similar right of ownership and **control** for this purpose means the power to direct the management and policies of the entity whether through the ownership of voting capital, by contract or otherwise.

**TARGET2** means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilises a single shared platform and which was launched on 19 November 2007.

**726**

**TARGET Day** means any day on which TARGET2 is open for the settlement of payments in euro.

**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

**Term** means each period determined under this Agreement for which the Bank is under a liability under an Undertaking.

**Termination Date** means the date falling 30 days prior to the fifth anniversary of this Agreement.

**Third Party Security Provider** means a person (other than an Obligor) who has entered into a Transaction Security Document pursuant to which it creates or expresses to create Security over any of its assets.

**Total Commitments** means the aggregate of the Commitments, being US$60,000,000 at the date of this Agreement.

**Transaction Security** means the Security created or expressed to be created in favour of the Security Agent or any other Secured Party pursuant to the Transaction Security Documents.

**Transaction Security Documents** means:

(a)     each of the security documents delivered to the Security Agent on or prior to the date of this Agreement; and

(b)     any other document entered into by any Obligor or any Third Party Security Provider creating or expressed to create any Security over all or any part of its assets in respect of the obligations of any of the Obligors under any of the Finance Documents.

**Transaction Step** has the meaning given in Clause 1.6 (Scheme and Structure Memorandum).

**Transfer Certificate** means a certificate substantially in the form set out in Schedule 4 (Form of Transfer Certificate) or any other form agreed between the Bank and the Company.

**Transfer Date** means, in relation to an assignment or a transfer, the later of:

(a)     the proposed Transfer Date specified in the relevant Assignment Agreement or Transfer Certificate; and

(b)     the date on which the Bank executes the relevant Assignment Agreement or Transfer Certificate.

**Treaty Bank** has the meaning given to that term in Clause 13 (Tax gross up and indemnities).

**Undertaking** means any letter of credit, bank guarantee, completion or performance bond, bid/tender bond, custom bond, advance payment guarantee, tax bond or any other instrument agreed between the Company and the Bank from time to time.

**Unpaid Sum** means any sum due and payable but unpaid by an Obligor under the Finance Documents.

**US** means the United States of America.

**US Tax Obligor** means:

(a)    a Borrower which is resident for tax purposes in the US; or

(b)    an Obligor some or all of whose payments under the Finance Documents are from sources within the US for US federal income tax purposes.

**Utilisation** means an Undertaking.

**Utilisation Date** means the date of a Utilisation, being the date on which the relevant Undertaking is to be issued.

**Utilisation Request** means a notice substantially in the form set out in Schedule 3 (Utilisation Request) or any other form of request permitted pursuant to Clause 5.3 (Alternative forms of Utilisation Request).

**VAT** means:

(a)    any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)    any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

**White List** means any of the following: Barclays, BNP Paribas, Citi, Commerzbank, Deutsche, FAB, HSBC, ING, JPMorgan, Mizuho, MUFJ, Standard Chartered, Sumitomo, UniCredit, DNB, Natwest, Natwest Markets, Goldman Sachs, Morgan Stanley, Bank of America, Santander, Nomura, Pimco Europe, UBS, and any other clearing bank with the ability to issue Undertakings.

## 1.2    Construction

(a)    Unless a contrary indication appears, a reference in this Agreement to:

(i)    any **Finance Party**, the Bank, any **Obligor**, any **Party**, any **Secured Party**, the **Security Agent**, a **Third Party Security Provider** or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Finance Documents and, in the case of the Security Agent, any person for the time being appointed as Security Agent or Security Agents in accordance with the Finance Documents;

(ii)    a document in **agreed form** is a document which is previously agreed in writing by or on behalf of the Company and the Bank;

(iii)    an **amendment** includes a supplement, novation, extension (whether of maturity or otherwise), restatement, re-enactment or replacement (in each case, however fundamental and whether or not more onerous or involving any change in or addition to the parties to any agreement or document and including any change in the purpose of, any extension of or any increase in the amount of a facility or any additional facility) and **amended** shall be construed accordingly;

(iv)    **assets** includes present and future properties, revenues and rights of every description;

(v)    a **Finance Document** or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, novated, supplemented, extended or restated;

(vi)   **guarantee** means (other than in Clause 18 (Guarantee and indemnity)) any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(vii)   **indebtedness** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(viii)   the Bank's **participation** in relation to an Undertaking, shall be construed as a reference to the relevant amount that is or may be payable by the Bank in relation to that Undertaking;

(ix)   any matter being **permitted** under one or more of the Finance Documents shall include references to such matter not being prohibited or otherwise approved under those Finance Documents and a reference to any matter being **not prohibited** under one or more of the Finance Documents shall include references to such matter being permitted or otherwise approved under those Finance Documents;

(x)   a **person** includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality);

(xi)   a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(xii)   **shares** includes shares, stock or equivalent ownership interests of any entity including limited partnership interests, share capital (including partnership capital) as well as options, warrants or any other instruments convertible into any such ownership interests;

(xiii)   **sub-participation** means any sub-participation or sub-contract or any other agreement or arrangement having a substantially similar economic effect (whether written or oral) by the Bank of any of its rights or obligations under the Finance Documents (including any voting sub-participation) provided that (i) the Bank remains liable under the Finance Documents for any such obligation; (ii) the relationship between the Bank and the proposed sub-participant or sub-contractor is that of a contractual debtor and creditor (including in the bankruptcy or similar event of the Bank or an Obligor); (iii) the proposed sub-participant or sub-contractor will have no proprietary interest in the benefit of this Agreement or in any monies received by the Bank under or in relation to this Agreement (in its capacity as sub-participant or sub-contractor under that arrangement); and (iv) the proposed sub-participant or sub-contractor will under no circumstances: (A) be subrogated to, or be substituted in respect of, the Bank's claims under this Agreement, or (B) otherwise have any contractual relationship with, or rights against the Obligors under or in relation to this Agreement (in its capacity as sub-participant or sub-contractor under that arrangement) and a **voting sub-participation** means any sub-participation made by the Bank in respect of any of its rights or obligations under the Finance Documents which results in a person other than the Bank having sole control over all rights and obligations in relation to the relevant participations and Commitments that are the subject of the relevant arrangement including all voting rights;

(xiv)   a member of the Restricted Group is **wholly-owned** only if all of its shares are owned by one other member of the Restricted Group;

(xv)   a Utilisation made or to be made to a Borrower includes an Undertaking issued on its behalf;

(xvi) a provision of law is a reference to that provision as amended or re-enacted from time to time; and

(xvii) a time of day is a reference to London time.

(b) The provisions of clauses 1.2 (Construction) and 1.3 (Local law terms and provisions) and schedule 9 (Local Law Provisions) of the Intercreditor Agreement apply to this Agreement as though they were set out in full in this Agreement except that references to the Intercreditor Agreement will be construed as references to this Agreement.

(c) Clause and Schedule headings are for ease of reference only.

(d) Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(e) A Borrower providing **cash cover** for an Undertaking means:

    (i) a Borrower paying an amount in the currency of the Undertaking (or in any other currency permitted or required under this Agreement) to a non-interest-bearing account and the following conditions being met:

        (A) either:

            I. the account is in the name of the Borrower and is with the Bank for which that cash cover is to be provided and, until no amount is or may be outstanding under that Undertaking, withdrawals from the account may only be made to pay the relevant Finance Party amounts due and payable to it under this Agreement in respect of that Undertaking; or

            II. the account is in the name of the Bank for which that cash cover is to be provided; and

        (B) the Borrower has executed documentation in form and substance satisfactory to the Finance Party for which that cash cover is to be provided, creating a first ranking security interest, or other collateral arrangement, in respect of the amount of that cash cover; or

    (ii) a Borrower procuring Indemnity Cover in respect of an Undertaking.

(f) **Indemnity Cover** in respect of any Undertaking means any guarantee, letter of credit, bond, indemnity or other assurance against loss issued in favour of the Bank in respect of amounts due under such Undertaking, in form and substance, and on terms, acceptable to the Bank (acting in its sole discretion noting that specific internal approvals of the Bank will be required to be obtained).

(g) A Default or an Event of Default is **continuing** if it has not been remedied or waived.

(h) A Borrower **repaying** or **prepaying** an Undertaking means:

    (i) that Borrower providing cash cover for that Undertaking;

    (ii) the maximum amount payable under the Undertaking being reduced or cancelled in accordance with its terms; or

    (iii) the Bank being satisfied that it has no further liability under that Undertaking,

and the amount by which an Undertaking is repaid or prepaid under paragraphs (i) and (ii) above is the amount of the relevant cash cover, reduction or cancellation.

(i)     Amounts outstanding under this Agreement include amounts outstanding under or in respect of any Undertaking.

(j)     An outstanding amount of an Undertaking at any time is the maximum amount that is or may be payable by the relevant Borrower in respect of that Undertaking at that time.

(k)     A Borrower's obligation on Utilisations becoming "due and payable" includes the Borrower repaying any Undertaking in accordance with paragraph (h) above.

### 1.3     Currency symbols and definitions

(a)     **US$**, **USD** and **US Dollars** denote the lawful currency of the United States of America.

(b)     **£**, **GBP** and **sterling** denote the lawful currency of the United Kingdom.

(c)     **€**, **EUR** and **euro** denote the single currency of the Participating Member States.

### 1.4     Third party rights

(a)     Unless expressly provided to the contrary in a Finance Document a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the **Third Parties Act**) to enforce or enjoy the benefit of any term of this Agreement.

(b)     Subject to Clause 32.3 (Exceptions) but otherwise notwithstanding any term of any Finance Document, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

### 1.5     No personal liability

No personal liability shall attach to any director, officer, authorised signatory or employee of any member of the Group for any representation or statement made by that member of the Group in a certificate signed by a director, officer, authorised signatory or employee save in the case of fraud in which case liability (if any) will be determined in accordance with applicable law and each such individual may rely on this Clause subject to Clause 1.4 (Third party rights) and the provisions of the Third Parties Act.

### 1.6     Scheme and Structure Memorandum

None of the steps or actions set out in, or reorganisations expressly contemplated by, the Structure Memorandum (or the steps or actions necessary to implement any of them) and none of the steps or actions taken or to be taken with respect to the Scheme (including any proceedings commenced with respect to the recognition of the judgment of the High Court of England and Wales in any jurisdiction) and/or the Restructuring Implementation Deed (including any document ancillary thereto) shall constitute a breach of any representation, warranty or undertaking in the Finance Documents or result in the occurrence of a Default or an Event of Default and any intermediate steps in any such reorganisation which are not specified in the Structure Memorandum (including the steps to effect the intra-group reorganization shown in Appendix A9 "Indicative group structure post reorganization" of the Structure Memorandum), but which are necessary to achieve the steps, actions or reorganisations expressly contemplated, shall not be prohibited by any of the Finance Documents (each such step, reorganisation or action being a **Transaction Step**).

## 1.7    Anti-boycott laws

(a)    Nothing in any Finance Document (including Clauses 19.17 (Anti-corruption law and Sanctions) and 21.6 (Anti-corruption law and Sanctions)) shall create or establish an obligation or right for any person to the extent that by agreeing to it, complying with it, exercising it, having such obligation or right or otherwise (including the giving of any boycott declaration), it would be placed in violation of any law applicable to it, including EU Regulation (EC) 2271/96 (including any law or regulation implementing such Regulation in any member state of the European Union or the United Kingdom), any law relating to foreign trade or any similar anti-boycott law or regulation (an **Anti-Boycott Law**).

(b)    No representation or undertaking given under any Finance Document (including Clauses 19.17 (Anti-corruption law and Sanctions) and 21.6 (Anti-corruption law and Sanctions)) shall be made or given for the benefit of any person to the extent that it would result in a violation of or conflict with or liability under any Anti-Boycott Law for that person.

## 2.    THE FACILITY

## 2.1    The Facility

(a)    Subject to the terms of this Agreement, the Bank makes available a multicurrency credit facility in an aggregate amount the Base Currency Amount of which is equal to the Total Commitments.

(b)    The Facility will be available to all the Borrowers.

## 2.2    Finance Parties' rights and obligations

(a)    The obligations of each Finance Party under the Finance Documents are several.  Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents.  No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

(b)    The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from an Obligor is a separate and independent debt in respect of which a Finance Party shall be entitled to enforce its rights in accordance with paragraph (c) below. The rights of each Finance Party include any debt owing to that Finance Party under the Finance Documents and, for the avoidance of doubt, any part of an Undertaking or any other amount owed by an Obligor which relates to a Finance Party's participation in the Facility or its role under a Finance Document (including any such amount payable to the Bank on its behalf) is a debt owing to that Finance Party by that Obligor.

(c)    A Finance Party may, except as specifically provided in the Finance Documents, separately enforce its rights under or in connection with the Finance Documents.

## 2.3    Obligors' Agent

(a)    Each Obligor (other than the Company) by its execution of this Agreement or an Accession Deed irrevocably appoints the Company (acting through one or more authorised signatories) to act on its behalf as its agent in relation to the Finance Documents and irrevocably authorises:

   (i)    the Company on its behalf to supply all information concerning itself contemplated by this Agreement to the Finance Parties and to give all notices and instructions (including, in the case of a Borrower, Utilisation Requests), to make such agreements and to effect the relevant amendments, supplements and variations capable of being given, made or effected by any

Obligor notwithstanding that they may affect the Obligor, without further reference to or the consent of that Obligor; and

(ii)     each Finance Party to give any notice, demand or other communication to that Obligor pursuant to the Finance Documents to the Company,

and in each case the Obligor shall be bound as though the Obligor itself had given the notices and instructions (including, without limitation, any Utilisation Requests) or executed or made the agreements or effected the amendments, supplements or variations, or received the relevant notice, demand or other communication.

(b)     Every act, omission, agreement, undertaking, settlement, waiver, amendment, supplement, variation, notice or other communication given or made by the Obligors' Agent or given to the Obligors' Agent under any Finance Document on behalf of another Obligor or in connection with any Finance Document (whether or not known to any other Obligor and whether occurring before or after such other Obligor became an Obligor under any Finance Document) shall be binding for all purposes on that Obligor as if that Obligor had expressly made, given or concurred with it.  In the event of any conflict between any notices or other communications of the Obligors' Agent and any other Obligor, those of the Obligors' Agent shall prevail.

## 3.     PURPOSE

### 3.1     Purpose

Each Borrower shall only utilise the Facility to issue Undertakings in the ordinary course of trading of the Group (or to issue Undertakings not in the ordinary course of trading of the Group if the relevant Borrower provides cash cover in respect of the full notional amount of that Undertaking on or prior to it being issued).

### 3.2     Monitoring

No Finance Party is bound to monitor or verify the application of any Undertaking utilised pursuant to this Agreement.

## 4.     UTILISATION

### 4.1     The Facility

(a)     The Facility may only be utilised by way of Undertakings. The Facility shall not be available for being drawn or utilised in cash.

(b)     In determining the amount of the Available Facility for the purposes of this Agreement, the Available Commitment of the Bank will be calculated ignoring any cash cover provided for outstanding Undertakings.

### 4.2     Delivery of a Utilisation Request for Undertakings

A Borrower (or the Company or Abbot Group on its behalf) may request an Undertaking to be issued by delivery to the Bank of a duly completed Utilisation Request at any time.

### 4.3     Completion of a Utilisation Request for Undertakings

Each Utilisation Request for an Undertaking is irrevocable and will not be regarded as having been duly completed unless:

(a)    it identifies the Borrower of the Undertaking;

(b)    the proposed Utilisation Date is a Business Day within the Availability Period and is not less than three Business Days after the date of the Utilisation Request;

(c)    the currency and amount of the Undertaking comply with Clause 4.4 (Currency and amount) and the limits set out in Clause 5 (Bank specific conditions);

(d)    the form of Undertaking is attached and is in a form agreed between the Bank and the relevant Borrower (or the Company or Abbot Group on its behalf) (each acting reasonably) and includes the applicable goods description and delivery instruction where applicable;

(e)    subject to Clause 5.7 (Expiry Date of Undertakings), the Expiry Date of the Undertaking falls on or before the Termination Date;

(f)    the delivery instructions for the Undertaking are specified; and

(g)    the additional conditions specified in Clause 5.6 (Additional conditions to issuance of an Undertaking) have been satisfied or waived.

**4.4    Currency and amount**

(a)    The currency specified in a Utilisation Request must be an Approved Currency.

(b)    The amount of the proposed Undertaking must be an amount whose Base Currency Amount is not more than the Available Facility.

**4.5    Issue of Undertakings**

(a)    If the conditions set out in this Agreement have been met, the Bank shall issue the Undertaking on the Utilisation Date.

(b)    The Bank will only be obliged to comply with paragraph (a) above if on the date of the Utilisation Request or Renewal Request and on the proposed Utilisation Date:

(i)    no Default is continuing or would result from the proposed Utilisation;

(ii)    except to the extent the Borrower has provided cash cover in respect of all outstanding Undertakings (including the Undertaking under the relevant Utilisation Request) in accordance with Clause 5.9 (Excess Leverage Event), no Excess Leverage Event is continuing (as defined in Clause 5.9 (Excess Leverage Event));

(iii)    no creditor (or group of creditors) of any Obligor is entitled to declare any Indebtedness of that Obligor (other than any Indebtedness specified in Clause 22.4(c) (Cross-payment default/acceleration)) due and payable prior to its specified maturity as a result of an event of default (however described) which has not been remedied or waived in accordance with the terms of that Indebtedness; and

(iv)    the Repeating Representations to be made by each Obligor are true in all material respects.

(c)    The Bank shall determine the Base Currency Amount of each Undertaking which is to be issued in an Approved Currency.

(d)    The Bank may issue an Undertaking in the form of a SWIFT message or other form of communication customary in the relevant market but has no obligation to do so.

**4.6    Renewal of an Undertaking**

(a)    A Borrower (or the Company or Abbot Group on its behalf) may request that any Undertaking issued on behalf of that Borrower be renewed by delivery to the Bank of a Renewal Request in substantially similar form to a Utilisation Request for an Undertaking.

(b)    The Bank shall treat any Renewal Request in the same way as a Utilisation Request for an Undertaking except that the condition set out in paragraph (d) of Clause 4.3 (Completion of a Utilisation Request for Undertakings) shall not apply.

(c)    The terms of each renewed Undertaking shall be the same as those of the relevant Undertaking immediately prior to its renewal, except that:

    (i)    its amount may be less than the amount of the Undertaking immediately prior to its renewal; and

    (ii)    its Term shall start on the date which was the Expiry Date of the Undertaking immediately prior to its renewal, and shall end on the proposed Expiry Date specified in the Renewal Request.

(d)    Subject to paragraph (e) below, if the conditions set out in this Agreement have been met, the Bank shall amend and re-issue any Undertaking pursuant to a Renewal Request.

(e)    Where a new Undertaking is to be issued to replace by way of renewal an existing Undertaking, the Bank is not required to issue that new Undertaking until the Undertaking being replaced has been either (i) cancelled or (ii) returned (or to be returned) to the Bank and the Bank is satisfied that no liability can arise under it.

**4.7    Revaluation of Undertakings**

(a)    If any Undertakings are denominated in an Approved Currency (other than the Base Currency), the Bank shall on each Billing Cycle Date, recalculate the Base Currency Amount of each Undertaking by notionally converting into the Base Currency the outstanding amount of that Undertaking on the basis of the Bank's Spot Rate of Exchange on the date of calculation. The Bank shall notify the Company of the new Base Currency Amount of each Undertaking within 10 Business Day of request by the Company.

(b)    The Company shall, if requested by the Bank, ensure that within 30 days sufficient Utilisations are repaid to prevent the Base Currency Amount of the Utilisations exceeding the Total Commitments following any adjustment to a Base Currency Amount under paragraph (a) above.

**4.8    Affiliates of the Bank**

(a)    Subject to the terms of this Agreement, the Bank may require that one of its Affiliates issues an Undertaking.

(b)    If the Bank requires that its Affiliate issues an Undertaking, the Bank shall ensure that its Affiliate shall, within two Business Days after the date of the relevant Utilisation Request, accede to the Intercreditor Agreement as a Super Senior Facility Lender in accordance with clause 26.16 (*Creditor/Creditor Representative Accession Undertaking*) of the Intercreditor Agreement.

(c)    If the Bank assigns all of its rights and benefits or transfers all of its rights and obligations to a New Lender, its Affiliate shall cease to have any obligations under this Agreement and the Intercreditor Agreement.

(d)     The Bank and its Affiliate shall be treated as a single entity for the purpose of the Finance Documents and the Bank shall ensure that any of its Affiliates that issues an Undertaking pursuant to this Clause performs its obligations under any Finance Document to which it is not a party.

## 5.     BANK SPECIFIC CONDITIONS

### 5.1     Bank Specific Defined Terms

**Approved Cash Cover Currency** means Canadian Dollars, euro, USD, Sterling, Omani Rial, Kuwaiti Dinar, Saudi Riyal, Norwegian Krone, Polish Zloty, United Arab Emirates Dirham, Singapore Dollars and/or any other currency approved by the Bank.

**Customs Bond** means any Undertaking issued to guarantee the payment of import duties and taxes to custom authorities or equivalent.

**Customs Bond Limit** means US$15,000,000.

**DB Undertaking** means the Existing Undertaking with reference number GTYA080022273.

**Direct Credit Substitute** means any Undertaking which serves as a financial guarantee where the Bank has an irrevocable obligation to pay a third party beneficiary if a member of the Restricted Group fails to repay an outstanding commitment (but excluding any Undertaking issued in favour of a financial institution that explicitly backs any instrument referred to in the definition of "Undertaking" issued by that financial institution or any Custom Bond).

**Direct Credit Substitutes Limit** means:

(a)     from the date of this Agreement until the date on which the DB Undertaking is cancelled and returned to the Bank, US$19,000,000; and

(b)     from the date on which the DB Undertaking is cancelled and returned to the Bank, US$12,000,000.

**Government Bond** means an Undertaking issued in favour of any Governmental Authority.

**Governmental Authority** includes any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of, or pertaining to, government, but for the avoidance of doubt shall not include any nationalised or state-owned company.

**Tax Bond** means any Undertaking issued in favour of any tax authority or equivalent (other than a Customs Bond).

### 5.2     Available Commitment

(a)     Until the date on which the DB Undertaking is cancelled and returned to the Bank, for the purposes of the definition of Available Commitment, the Bank's Commitment shall be deemed to be US$50,000,000.

(b)     The Company shall, (or shall procure that another member of the Restricted Group will), use its reasonable endeavours to ensure that the DB Undertaking is cancelled and returned by no later than the date falling 6 months after the date of this Agreement.

(c)    In the event that the DB Undertaking has not been cancelled and returned to the Bank on or before the date falling 6 months after the date of this Agreement, the Total Commitments shall be automatically permanently reduced to US$50,000,000.

(d)    No Default or Event of Default shall occur as a result of any failure to cancel or return the DB Undertaking.

**5.3    Alternative forms of Utilisation Request**

As an alternative to requesting an Undertaking by delivering a Utilisation Request in the form set out in Schedule 3 (Utilisation Request), a Borrower (or the Company or Abbot Group on its behalf) may request the issue of an Undertaking using the Bank's "LOTS" system (or any replacement system in use from time to time) or pursuant to any other procedure as the Company and the Bank may agree from time to time, provided that the Company and the Bank agree that the Bank's "LOTS" system shall be the primary procedure for requesting Undertakings.

**5.4    Existing Undertakings**

(a)    The Bank confirms that from the date of this Agreement each Existing Undertaking is deemed to be an Undertaking under this Agreement.

(b)    The Bank also confirms that any cash cover in place prior to the date of this Agreement with respect to any Existing Undertakings is released with effect from the date of this Agreement.  The Bank shall pay the cash held pursuant to such cash cover to the Company (or to such other member of the Restricted Group designated by the Company) within five Business Days after the date of this Agreement.

**5.5    Direct Credit Substitutes and Custom Bonds**

(a)    A Borrower (or the Company or Abbot Group on its behalf) may not submit a Utilisation Request for any Undertaking that is:

(i)    a Direct Credit Substitute if as a result of that Undertaking, the aggregate Base Currency Amount of all outstanding Undertakings that are Direct Credit Substitutes and the DB Undertaking (for as long as it remains outstanding) would exceed the Direct Credit Substitutes Limit; or

(ii)    a Customs Bond if as a result of that Undertaking, the aggregate Base Currency Amount of all outstanding Undertakings that are Customs Bonds would exceed the Customs Bond Limit.

The Direct Credit Substitutes Limit and the Customs Bond Limit do not operate to provide for sub-tranches of the Facility that may only be used to issue Direct Credit Substitutes or Custom Bonds (as the case may be).  In determining the amount of the Facility available to be utilised under the Customs Bond Limit and the Direct Credit Substitute Limit, that amount shall be calculated ignoring any cash cover provided for any outstanding Undertakings issued under the Customs Bond Limit or the Direct Credit Substitute Limit (as the case may be).

(b)    The Bank must promptly notify the Company (and in any event before the Utilisation Date of the relevant Undertaking) if any Undertaking is to be treated as a Direct Credit Substitute.  The Bank shall also promptly notify the Company if any Undertaking that has been designated as Direct Credit Substitute subsequently ceases to be a Direct Credit Substitute. If any Undertaking is issued and the Bank does not designate it as a Direct Credit Substitute that Undertaking cannot subsequently be re-classified as a Direct Credit Substitute without the consent of the Company.

(c)     In each Utilisation Request (but only to the extent possible under the Bank's "LOTS" system), the Company shall specify whether it considers the proposed Undertaking is a Direct Credit Substitute or not.

**5.6     Additional conditions to issuance of an Undertaking**

The additional conditions to the issuance of an Undertaking referred to in Clause 4.3(g) (Completion of a Utilisation Request for Undertakings) are:

(a)     confirmation from the Bank (acting reasonably) that issuing the requested Undertaking is not contrary to the Bank's internal policies as applicable to the Bank's customers generally from time to time and, in particular, that the beneficiary is not a Sanctioned Person and issuing the requested Undertaking to the relevant beneficiary is not restricted by any applicable law binding on the Bank; and

(b)     the Borrower (or the Company or Abbot Group on its behalf) has provided any information reasonably requested by the Bank (including, without limitation, any information required for "know your customer" checks or similar procedures required by law or regulation binding on the Bank, to the satisfaction of the Bank) in relation to the proposed beneficiary of the Undertaking.

**5.7     Expiry Date of Undertakings**

(a)     A Borrower (or the Company or Abbot Group on its behalf) may request that the Expiry Date of an Undertaking falls after the Termination Date if (other than to the extent the Undertaking is a Customs Bond, a Tax Bond or a Government Bond (but, in the case of a Government Bond, only if it does not have an Expiry Date)) not later than three Months prior to the Termination Date, the relevant Borrower (or the Company or Abbot Group on its behalf) provides cash cover in relation to that Undertaking.

(b)     A Borrower (or the Company or Abbot Group on its behalf) may request an Undertaking that has no Expiry Date only if that Undertaking is a Customs Bond, a Tax Bond or a Government Bond.

**5.8     Cash cover - general**

(a)     Subject to Clause 5.9(b) (Excess Leverage Event), if cash cover is required to be provided in accordance with this Agreement in relation to an Undertaking that is denominated in an Approved Cash Cover Currency and the relevant Borrower (or the Company or Abbot Group on its behalf) elects to provide cash cover in that Approved Cash Cover Currency, the relevant Borrower (or the Company or Abbot Group on its behalf) shall provide that cash cover in the Approved Cash Cover Currency in an amount equal to 100% of the outstanding notional amount of the relevant Undertaking.

(b)     Subject to Clause 5.9(b) (Excess Leverage Event), if cash cover is required to be provided in accordance with this Agreement and either (i) that cash cover is required to be provided for an Undertaking which is not denominated in an Approved Cash Cover Currency or (ii) the relevant Borrower (or the Company or Abbot Group on its behalf) elects to provide cash cover in a currency which is not the same currency as that of the relevant Undertaking, the relevant Borrower (or the Company or Abbot Group on its behalf) shall provide that cash cover in US Dollars in an amount equal to 115% of the Base Currency Amount of the relevant Undertaking (or 110% of the Base Currency Amount of the relevant Undertaking if the currency of the Undertaking is Sterling or euro).

(c)     If any cash cover is provided in accordance with paragraph (b) above, on each Billing Cycle Date, in which that cash cover is provided, the Bank shall recalculate the Base Currency Amount of the relevant Undertaking by notionally converting into the Base Currency the outstanding amount of that

**738**

Undertaking on the basis of the Bank's Spot Rate of Exchange on the date of calculation, and if the amount of that cash cover is:

(i)     less than 100% of the recalculated Base Currency Amount of the relevant Undertaking, the relevant Borrower (or the Company or Abbot Group on its behalf) shall within five Business Days provide additional cash cover in US Dollars; or

(ii)    greater than 125% of the recalculated Base Currency Amount of the relevant Undertaking, the Bank shall within five Business Days pay or return (as applicable) an amount in US Dollars to the relevant Borrower (or such other member of the Restricted Group designated by the Company),

such that, after that payment, the aggregate amount of cash cover provided in relation to that Undertaking is an amount equal 115% of the recalculated Base Currency Amount of that Undertaking.

**5.9     Excess Leverage Event**

(a)     Subject to the terms of this Clause 5.9, if any Leverage Calculation Certificate delivered in accordance with this Agreement shows that the Senior Secured Gross Leverage Ratio for the period to which that Leverage Calculation Certificate relates (the **Relevant Period**) exceeded 4.5:1 (an **Excess Leverage Event**), the Bank may request that the Borrower (or the Company or Abbot Group on its behalf) provides cash cover in respect of all outstanding Undertakings, such cover to be provided within ten Business Days of that request.

(b)     If cash cover is required to be provided pursuant to paragraph (a) above, the relevant Borrower (or the Company or Abbot Group on its behalf) shall provide that cash cover in US Dollars in an amount equal to 100% of the aggregate Base Currency Amount of all outstanding Undertakings (as calculated on the date the Bank requests that cash cover).

(c)     No Default or Event of Default shall occur as a result of any Excess Leverage Event but, for the avoidance of doubt, if the relevant Borrower (or the Company or Abbot Group on its behalf) has failed to provide cash cover at the end of the relevant grace period following any request by the Bank pursuant to paragraph (a) above, this shall constitute an Event of Default.

(d)     An Excess Leverage Event will be continuing for the purposes of this Agreement until:

(i)     it is cured in accordance with paragraph (f) below, provided that the relevant Borrower may request that new Undertakings be issued whilst an Excess Leverage Event is continuing if the relevant Borrower posts cash cover in respect of all outstanding Undertakings and the requested new Undertaking(s);

(ii)    any subsequent Leverage Calculation Certificate delivered in accordance with this Agreement shows that the Senior Secured Gross Leverage Ratio is less than or equal to 4.5:1; or

(iii)   it has been waived by the Bank (in its sole discretion).

(e)     If any cash cover is provided pursuant to paragraph (a) above and an Excess Leverage Event is no longer continuing, the Bank shall within five Business Days repay or return (as applicable) the aggregate amount of that cash cover in US Dollars to the relevant Borrower (or such other member of the Restricted Group designated by the Company).

(f)     If, at any time on or after the first day of any Relevant Period until the date that is 20 Business Days after the date on which the Leverage Calculation Certificate is required to be delivered for such

Relevant Period, the Company receives the proceeds of any issuance of Capital Stock or Subordinated Shareholder Debt (a **Specified Equity Contribution**), the Company may recalculate the Senior Secured Gross Leverage Ratio solely for the purposes of paragraph (a) above (and not for the purposes of the calculation of the Issuance Rate) (the **Cure Right**) such that Consolidated EBITDA shall be increased (notwithstanding the absence of a related add-back in the definition of "Consolidated EBITDA") as of the end of such Relevant Period and applicable subsequent periods that include all or part of that Relevant Period, by an amount equal to that Specified Equity Contribution. If, after giving effect to the recalculation, the Senior Secured Gross Leverage Ratio is less than or equal to 4.5:1, no Excess Leverage Event shall be deemed to have occurred for any purpose under this Agreement. For this purpose:

(i)      the Cure Right shall not be exercised more than twice in any Financial Year;

(ii)     during the term of this Agreement, the Cure Right shall not be exercised more than four times;

(iii)    there shall be no limit on the amount of any Specified Equity Contribution that may be utilised by way of the Cure Right; and

(iv)     if the Company notifies the Bank that it intends to exercise the Cure Right, then until the 20th Business Day following the date on which the Leverage Calculation Certificate is required to be delivered for such Relevant Period, the Bank shall not exercise any right under this Agreement to demand cash cover or to refuse to issue any Undertakings.

## 6.      UNDERTAKINGS

### 6.1     Payments on demand

If an Undertaking or any amount outstanding under an Undertaking is expressed to be immediately payable (other than pursuant to Clause 22.15 (Acceleration)), the Borrower that requested (or on behalf of which the Company or Abbot Group requested) the issue of that Undertaking shall repay or prepay that amount within five Business Days of demand.

### 6.2     Claims under an Undertaking

(a)     Each Borrower irrevocably and unconditionally authorises the Bank to pay any claim made or purported to be made under an Undertaking requested by it (or requested by the Company or Abbot Group on its behalf) and which appears on its face to be in order (a **claim**).

(b)     Each Borrower shall within five Business Days of demand pay to the Bank an amount equal to the amount of any claim.

(c)     Each Borrower acknowledges that the Bank:

(i)      is not obliged to carry out any investigation or seek any confirmation from any other person before paying a claim; and

(ii)     deals in documents only and will not be concerned with the legality of a claim or any underlying transaction or any available set-off, counterclaim or other defence of any person.

(d)     The obligations of a Borrower under this Clause 6 will not be affected by:

(i)      the sufficiency, accuracy or genuineness of any claim or any other document; or

(ii)    any incapacity of, or limitation on the powers of, any person signing a claim or other document.

**6.3    Indemnities**

(a)    Each Borrower shall immediately on demand indemnify the Bank against any cost, loss or liability incurred by the Bank (otherwise than by reason of the Bank's gross negligence or wilful misconduct) in acting as the Bank under any Undertaking requested by (or on behalf of) that Borrower.

(b)    The obligations of each Borrower under this Clause 6.3 are continuing obligations and will extend to the ultimate balance of sums payable by that Borrower in respect of any Undertaking, regardless of any intermediate payment or discharge in whole or in part.

(c)    The obligations of any Borrower under this Clause 6.3 will not be affected by any act, omission, matter or thing which, but for this Clause 6.3, would reduce, release or prejudice any of its obligations under this Clause 6.3 (without limitation and whether or not known to it or any other person) including:

(i)    any time, waiver or consent granted to, or composition with, any Obligor, any beneficiary under an Undertaking or any other person;

(ii)    the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor or any member of the Restricted Group;

(iii)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor, any beneficiary under an Undertaking or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(iv)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor, any beneficiary under an Undertaking or any other person;

(v)    any amendment (however fundamental) or replacement of a Finance Document, any Undertaking or any other document or security;

(vi)    any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document, any Undertaking or any other document or security; or

(vii)    any insolvency or similar proceedings.

**7.    REPAYMENT**

Each Borrower shall repay each outstanding Undertaking and the outstanding amount of any claim on the Termination Date.

**8.    ILLEGALITY, VOLUNTARY PREPAYMENT AND CANCELLATION**

**8.1    Illegality**

If, in any applicable jurisdiction, it becomes unlawful for the Bank to perform any of its obligations as contemplated by this Agreement or for the Bank to issue or leave outstanding any Undertaking or it becomes unlawful for any Affiliate of the Bank for the Bank to do so then:

(a)    the Bank shall promptly notify the Company upon becoming aware of that event;

(b)    upon the Bank notifying the Company, the Bank shall not be obliged to issue any Undertaking;

(c)    the Company shall procure that each relevant Borrower shall use its best endeavours to procure the release of each Undertaking issued by the Bank and outstanding at such time on or before the date specified by the Bank in the notice delivered to the Bank (being no earlier than the last day of any applicable grace period permitted by law); and

(d)    the Facility shall cease to be available for the issue of Undertakings.

## 8.2    Voluntary cancellation

The Company may, if it gives the Bank not less than three Business Days' (or such shorter period as the Bank may agree) prior notice, cancel the whole or any part (being a minimum amount of US$500,000) of the Available Facility.

## 8.3    Voluntary prepayment of Utilisations

A Borrower to which a Utilisation has been made may, if it or the Company gives the Bank not less than three Business Days' (or such shorter period as the Bank may agree) prior notice, prepay the whole or any part of a Utilisation (but if in part, being an amount that reduces the Base Currency Amount of the Utilisation by a minimum amount of US$500,000).

## 9.    MANDATORY PREPAYMENT - CHANGE OF CONTROL

Upon the occurrence of a Change of Control, the Facility will, unless otherwise agreed by the Bank, be immediately cancelled and shall immediately cease to be available for further utilisation and all Utilisations, accrued fees and other amounts under the Finance Documents, shall become immediately due and payable and the Company shall (or shall ensure that a Borrower shall) immediately repay or prepay all outstanding Undertakings.

## 10.    RESTRICTIONS

### 10.1    Notices of cancellation or prepayment

Any notice of cancellation, prepayment, authorisation or other election given by any Party under Clause 8 (Illegality, voluntary prepayment and cancellation) shall (subject to the terms of those Clauses) be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

### 10.2    Reutilisation of Facility

Unless a contrary indication appears in this Agreement, any part of the Facility which is prepaid or repaid may be reutilised in accordance with the terms of this Agreement.

### 10.3    Prepayment in accordance with Agreement

No Borrower shall repay or prepay all or any part of the Utilisations or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

### 10.4    No reinstatement of Commitments

No amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

### 10.5    Effect of repayment and prepayment on Commitments

If all or part of the Bank's participation in a Utilisation is repaid or prepaid and is not available for redrawing (other than by operation of Clause 4.5(b) (Issue of Undertakings)), an amount of the Bank's Commitment (equal to the Base Currency Amount of the amount of the participation which is repaid or prepaid) will be deemed to be cancelled on the date of repayment or prepayment.

## 11.    DEFAULT INTEREST

If an Obligor fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which is 1% per annum higher than the applicable Base Issuance Rate (as defined in Clause 12.1 (Issuance fees)).  Any interest accruing under this Clause 11 shall be payable by the Obligor within five Business Days of demand by the Bank.

## 12.    FEES

### 12.1    Issuance fees

(a)    Subject to paragraph (d) below, the Company shall pay (or shall procure that a member of the Restricted Group shall pay) to the Bank a fee:

(i)    in respect of Undertakings issued in euro, in euro;

(ii)    in respect of Undertakings issued in GBP, in GBP; and

(iii)    in respect of all other Undertakings, in the Base Currency,

in each case, computed at the applicable rate specified in paragraph (b) or (c) below (the **Issuance Rate**) as the case may be on the Base Currency Amount of each outstanding Undertaking (less any amount of cash cover provided in connection with that Undertaking). Notwithstanding the foregoing, the Company and the Bank may agree on an alternative currency for the payment of fees from time to time.

(b)    In respect of Undertakings which are Direct Credit Substitutes, the Issuance Rate shall be 5.25% per annum.

(c)    In respect of Undertakings which are not Direct Credit Substitutes, the Issuance Rate shall be calculated in accordance with the following table by reference to the Senior Secured Gross Leverage Ratio as set out in the Leverage Calculation Certificate delivered in respect of the most recent Relevant Period (the rate applicable to "All other Undertakings" from time to time being the **Base Issuance Rate**):

| Senior Secured Gross Leverage Ratio | Custom Bonds (% per annum) | All other Undertakings (% per annum) |
|---|---|---|
| Greater than 4.75:1.00 | 4.75% | 4.25% |
| Greater than 4.25:1.00 and equal to or less than 4.75:1.00 | 4.50% | 4.00% |

| Senior Secured Gross Leverage Ratio | Custom Bonds (% per annum) | All other Undertakings (% per annum) |
|---|---|---|
| Greater than 3.75:1.00 and equal to or less than 4.25:1.00 | 4.25% | 3.75% |
| Greater than 3.25:1.00 and equal to or less than 3.75:1.00 | 4.00% | 3.50% |
| Equal to or less than 3.25:1.00 | 3.75% | 3.25% |

From the date of this Agreement until the first Billing Cycle Date to occur after the date of delivery of the first Leverage Calculation Certificate, the Base Issuance Rate shall be 3.25% and the Issuance Rate for Customs Bonds shall be 3.75%. Any increase or decrease in the Issuance Rate for an Undertaking shall take effect on the first Billing Cycle Date to occur after the date of the relevant Leverage Calculation Certificate.

(d)      In respect of any Undertaking for which any cash cover has been provided, the Company shall pay (or shall procure that a member of the Restricted Group shall pay) to the Bank, a fee in the Base Currency computed at a rate of 0.25% per annum of the Base Currency Amount of the relevant Undertaking, provided that this rate shall only apply for the period in respect of which that cash cover is provided.

(e)      The accrued issuance fees payable pursuant to this Clause 12.1 are payable in arrear on each Billing Cycle Date after the date of this Agreement and on the Termination Date. The fees payable at the end of November 2020 shall include fees in relation to the Existing Undertakings accrued and unpaid under the ancillary facility agreement originally dated 16 May 2014 (as amended and/or restated from time to time) prior to the date of this Agreement.

**12.2    Commitment fee**

(a)      The Company shall pay (or shall procure that a member of the Restricted Group shall pay) to the Bank a fee in the Base Currency computed at the rate of 35% of the applicable Base Issuance Rate per annum on the Bank's Available Commitment for the Availability Period.

(b)      The accrued commitment fee is payable on each Billing Cycle Date after the date of this Agreement which ends during the Availability Period, on the last day of the Availability Period and, if cancelled in full, on the cancelled amount of the Bank's Commitment at the time the cancellation is effective.

(c)      No commitment fee is payable to the Bank on the Available Commitment of the Bank for any day on which the Bank is a Defaulting Bank.

**12.3    Security Agent fee**

The Company shall pay to the Security Agent (for its own account) a security agent fee in the amount and at the times agreed in a Fee Letter.

**13.     TAX GROSS UP AND INDEMNITIES**

**13.1    Definitions**

In this Agreement:

**Borrower DTTP Filing** means an HM Revenue & Customs' Form DTTP2 duly completed and filed by the relevant Borrower, which:

(a)  where it relates to a Treaty Bank that is the Original Bank, contains the scheme reference number and jurisdiction of tax residence provided to the Company by the Bank pursuant to Clause 13.2(i) (Tax gross-up), and

(i)  where the Borrower is an Original Borrower, is filed with HM Revenue & Customs within 60 days of the date of this Agreement; or

(ii)  where the Borrower is an Additional Borrower, is filed with HM Revenue & Customs within 60 days of the date on which that Borrower becomes an Additional Borrower; or

(b)  where it relates to a Treaty Bank that is not the Original Bank, contains the scheme reference number and jurisdiction of tax residence stated in respect of the Bank in the documentation which it executes on becoming a Party as the Bank; and

(i)  where the Borrower is a Borrower as at the date on which that Treaty Bank becomes a Party as the Bank, is filed with HM Revenue & Customs within 60 days of that date; or

(ii)  where the Borrower is not a Borrower as at the date on which that Treaty Bank becomes a Party as the Bank, is filed with HM Revenue & Customs within 60 days of the date on which that Borrower becomes an Additional Borrower.

**Domestic Bank** means, in relation to any Borrower, the Bank if it is lending through a Facility Office in, and is resident for tax purposes in, that Borrower's Relevant Tax Jurisdiction on the date on which it became the Bank, provided that payments received through such Facility Office are included within the taxable profits of that Facility Office for the purpose of calculating the Bank's taxable income in such jurisdiction.

**Protected Party** means a Finance Party which is or will be subject to any liability or required to make any payment for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

**Qualifying Bank** means the Bank if:

(a)  it is a Domestic Bank and to which, lending through its Facility Office in the Relevant Tax Jurisdiction, any payment in respect of the Facility can be made without a Tax Deduction being imposed; or

(b)  it is a Treaty Bank; or

(c)  payments in respect of the Facility can be made to it without a Tax Deduction being imposed.

**Relevant Tax Jurisdiction** means, in relation to each Borrower, the jurisdiction in which that Borrower is incorporated or resident for tax purposes.

**Tax Confirmation** means any confirmation by the Bank as to its tax residence in accordance with this Agreement or any confirmation given pursuant to Clause 13.5 (Bank status confirmation).

**Tax Credit** means a credit against, relief or remission for, or repayment of, any Tax.

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under a Finance Document, other than a FATCA Deduction.

**Tax Payment** means either the increase in a payment made by a Borrower to a Finance Party under Clause 13.2 (Tax gross-up) or a payment under Clause 13.3 (Tax indemnity).

**Treaty Bank** means the Bank if it:

(a)     is treated as a resident of a Treaty State for the purposes of the Treaty;

(b)     does not carry on a business in the relevant Borrower's Relevant Tax Jurisdiction through a permanent establishment with which the Bank's participation in the Undertaking is effectively connected; and

(c)     meets all other conditions which must be fulfilled (assuming completion of all procedural formalities) in the relevant Treaty to obtain full exemption from tax imposed by the Borrower's jurisdiction of tax residence on any payment to it under a Finance Document.

**Treaty State** means a jurisdiction having a double taxation agreement (a **Treaty**) with the relevant Borrower's Relevant Tax Jurisdiction which makes provision for full exemption from tax imposed by the jurisdiction in relation to which the relevant Borrower is treated as being tax resident on any payment under a Finance Document.

Unless a contrary indication appears, in this Clause 13 a reference to **determines** or **determined** means a determination made in the absolute discretion of the person making the determination.

## 13.2    Tax gross-up

(a)     Each Obligor shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

(b)     The Company shall promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Bank accordingly. The Bank shall promptly notify the Company on becoming so aware in respect of a payment payable to the Bank.

(c)     If a Tax Deduction is required by law to be made by a Borrower, the amount of the payment due from that Borrower shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)     A payment shall not be increased under paragraph (c) above by reason of a Tax Deduction on account of Tax imposed by the relevant Borrower's jurisdiction of tax residence, if on the date on which the payment falls due:

(i)     the payment could have been made to the Bank without a Tax Deduction if the Bank had been a Qualifying Bank with respect to that Borrower, but on that date the Bank is not or has ceased to be a Qualifying Bank with respect to that Borrower other than as a result of any change after the date it became the Bank under this Agreement in (or in the interpretation, administration, or application of) any law or Treaty or any published practice or published concession of any relevant taxing authority;

(ii)     the Bank has not given a Tax Confirmation to the Company with respect to that Borrower and payment could have been made to the Bank without any Tax Deduction if the Bank had given a Tax Confirmation to the Borrower;

(iii)     the Borrower making the payment is able to demonstrate that the payment could have been made to the Bank without the Tax Deduction had the Bank complied with its obligations under paragraph (h), (j), (m) and/or (n) below (as applicable) below; or

(iv)    an officer of H.M. Revenue & Customs has given (and not revoked) a direction (a **Direction**) under section 931 of the ITA which relates to the payment and the Bank has received from the relevant Borrower or from the Company a certified copy of that Direction and the payment could have been made to the Bank without any Tax Deduction if that Direction had not been made.

(e)    A Guarantor will not be obliged to make a payment or increased payment pursuant to this Clause 13.2 with respect to a payment by it of a liability due for payment by a Borrower to the extent that, had the payment been made by that Borrower, that Borrower would not have been obliged to make a payment or increased payment pursuant to this Clause 13.2.

(f)    If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(g)    Within 30 days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Bank for the Finance Party entitled to the payment evidence reasonably satisfactory to that Finance Party that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

(h)    Subject to paragraph (i) below, a Treaty Bank and each Obligor which makes a payment to which that Treaty Bank is entitled shall co-operate in completing any procedural formalities necessary for that Obligor to obtain authorisation to make that payment without a Tax Deduction.

(i)    If the Bank is a Treaty Bank that holds a passport under the HMRC DT Treaty Passport scheme, and which wishes that scheme to apply to this Agreement, it shall confirm its scheme reference number and its jurisdiction of tax residence to the Company within five Business Days after the date of this Agreement or in the documentation which it executes on becoming a Party as the Bank and shall promptly notify the Company of any change to that information and, having done so, the Bank shall be under no obligation pursuant to paragraph (h) above.

(j)    If, with respect to any Borrower whose Relevant Tax Jurisdiction is the United Kingdom, the Bank has confirmed its scheme reference number and its jurisdiction of tax residence in accordance with paragraph (i) above and:

(i)    a Borrower making a payment to the Bank has not made a Borrower DTTP Filing in respect of the Bank; or

(ii)    a Borrower making a payment to the Bank has made a Borrower DTTP Filing in respect of the Bank but:

(A)    that Borrower DTTP Filing has been rejected by HM Revenue & Customs;

(B)    HM Revenue & Customs has not given the Borrower authority to make payments to the Bank without a Tax Deduction within 60 days of the date of the Borrower DTTP Filing; or

(C)    HM Revenue & Customs has given the Borrower authority to make payments to the Bank without a Tax Deduction but such authority has subsequently been revoked or expired,

and in each case, the Borrower has notified the Bank in writing, the Bank and the Borrower shall co-operate in completing any additional procedural formalities necessary for that Borrower to obtain authorisation to make that payment without a Tax Deduction.

**747**

(k)     If the Bank has not confirmed its scheme reference number and jurisdiction of tax residence in accordance with paragraph (i) above, no Obligor shall make a Borrower DTTP Filing or file any other form relating to the HMRC DT Treaty Passport scheme in respect of the Bank's Commitment or its participation in any Utilisation unless the Bank otherwise agrees.

(l)     A Borrower shall, promptly on making a Borrower DTTP Filing, deliver a copy of that Borrower DTTP Filing to the Bank.

(m)     The Bank shall ensure that it satisfies all applicable legal and regulatory requirements for providing the Facility to the Borrowers other than as a result of a change in law or regulation occurring after the date on which it becomes the Bank under this Agreement.

(n)     If the Bank will only become a Qualifying Bank on completion of certain procedural requirements, the Bank shall notify the Company promptly on completion of all such formalities.

**13.3    Tax indemnity**

(a)     The Company shall, or shall procure that another member of the Restricted Group shall, (within five Business Days of demand by the Bank) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document.

(b)     Paragraph (a) above shall not apply:

    (i)     with respect to any Tax assessed on a Finance Party:

        (A)     under the law of the jurisdiction in which that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party is treated as resident for tax purposes; or

        (B)     under the law of the jurisdiction in which that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

    if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by that Finance Party; or

    (ii)     to the extent a loss, liability or cost:

        (A)     is compensated for by an increased payment under Clause 13.2 (Tax gross-up);

        (B)     would have been compensated for by an increased payment under Clause 13.2 (Tax gross-up) but was not so compensated solely because one of the exclusions in paragraph (d) of Clause 13.2 (Tax gross-up) applied;

        (C)     is attributable to the Bank Levy (or any payment attributable to, or liability arising as a consequence of, the Bank Levy); or

        (D)     relates to a FATCA Deduction required to be made by a Party.

(c)     A Protected Party making, or intending to make a claim under paragraph (a) above shall promptly notify the Company of the event which will give, or has given, rise to the claim.

### 13.4    Tax Credit

If an Obligor makes a Tax Payment and the relevant Finance Party determines that acting reasonably and in good faith:

(a)    a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

(b)    that Finance Party has obtained and it (or any of its affiliated entities) has utilised that Tax Credit,

the Finance Party shall pay an amount to the Obligor which that Finance Party determines acting reasonably and in good faith will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Obligor.

### 13.5    Bank status confirmation

(a)    If the Bank is not the Original Bank it shall indicate, in the documentation which it executes on becoming a Party as the Bank, and without liability to any Obligor, which of the following categories it falls in:

(i)    not a Qualifying Bank;

(ii)    a Qualifying Bank (other than a Treaty Bank); or

(iii)    a Treaty Bank.

(b)    If the Bank fails to indicate its status in accordance with this Clause 13.5 then the Bank shall be treated for the purposes of this Agreement (including by each Obligor) as if it is not a Qualifying Bank until such time as it notifies the Bank which category applies (and the Bank, upon receipt of such notification, shall inform the Company).  For the avoidance of doubt, the documentation which the Bank executes on becoming a Party as the Bank shall not be invalidated by any failure of the Bank to comply with this Clause 13.5.

### 13.6    Stamp taxes

The Company shall pay and, within five Business Days of demand, indemnify each Secured Party against any cost, loss or liability that Secured Party incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Finance Document provided that this Clause 13.6 shall not apply to any stamp duty, registration or other similar Taxes payable in respect of any assignment, assignation, sub-participation or transfer by a Secured Party of any of its rights and/or obligations under a Finance Document.

### 13.7    VAT

(a)    All amounts expressed to be payable under a Finance Document by any Party to a Finance Party which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, subject to paragraph (b) below, if VAT is or becomes chargeable on any supply made by any Finance Party to any Party under a Finance Document and such Finance Party is required to account to the relevant tax authority for the VAT, that Party must pay to such Finance Party (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of the VAT (and such Finance Party must promptly provide an appropriate VAT invoice to that Party).

(b)     If VAT is or becomes chargeable on any supply made by any Finance Party (the **Supplier**) to any other Finance Party (the **Recipient**) under a Finance Document, and any Party other than the Recipient (the **Relevant Party**) is required by the terms of any Finance Document to pay an amount equal to the consideration for that supply to the Supplier (rather than being required to reimburse or indemnify the Recipient in respect of that consideration):

(i)     (where the Supplier is the person required to account to the relevant tax authority for the VAT) the Relevant Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT.  The Recipient must (where this paragraph (i) applies) promptly pay to the Relevant Party an amount equal to any credit or repayment the Recipient receives from the relevant tax authority which the Recipient reasonably determines relates to the VAT chargeable on that supply; and

(ii)     (where the Recipient is the person required to account to the relevant tax authority for the VAT) the Relevant Party must promptly, following demand from the Recipient, pay to the Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the Recipient reasonably determines that it is not entitled to credit or repayment from the relevant tax authority in respect of that VAT.

(c)     Where a Finance Document requires any Party to reimburse or indemnify a Finance Party for any cost or expense, that Party shall reimburse or indemnify (as the case may be) such Finance Party for the full amount of such cost or expense, including such part thereof as represents VAT, save to the extent that such Finance Party reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

(d)     Any reference in this Clause 13.7 to any Party shall, at any time when such Party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term **representative member** to have the same meaning as in the Value Added Tax Act 1994) or a reference to the person who is treated at that time as making the supply, or (as appropriate) receiving the supply, under the grouping rules (provided for in article 11 of Council Directive 2006/112/EC as amended (or as implemented by any relevant member state of the European Union) so that a reference to a Party shall be construed as a reference to that Party or the relevant group or unity (or fiscal unity) of which that Party is a member for VAT purposes at the relevant time or the relevant representative member (or representative or head) of that group or unity at the relevant time (as the case may be).

(e)     In relation to any supply made by a Finance Party to any Party under a Finance Document, if reasonably requested by such Finance Party, that Party must promptly provide such Finance Party with details of that Party's VAT registration and such other information as is reasonably requested in connection with such Finance Party's VAT reporting requirements in relation to such supply.

**13.8    FATCA information**

(a)     Subject to paragraph (c) below, each Party shall, within ten Business Days of a reasonable request by another Party:

(i)     confirm to that other Party whether it is:

(A)     a FATCA Exempt Party; or

(B)     not a FATCA Exempt Party;

(ii)     supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA; and

(iii)    supply to that other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime.

(b)    If a Party confirms to another Party pursuant to paragraph (a)(i) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c)    Paragraph (a) above shall not oblige any Finance Party to do anything, and paragraph (a)(iii) above shall not oblige any other Party to do anything, which would or might in its reasonable opinion constitute a breach of:

(i)     any law or regulation;

(ii)    any fiduciary duty; or

(iii)    any duty of confidentiality.

(d)    If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with paragraph (a)(i) or (a)(ii) above (including, for the avoidance of doubt, where paragraph (c) above applies), then such Party shall be treated for the purposes of the Finance Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

(e)    If a Borrower is a US Tax Obligor or the Bank reasonably believes that its obligations under FATCA or any other applicable law or regulation require it, the Bank shall, within ten Business Days of:

(i)     where an Original Borrower is a US Tax Obligor and the Bank is the Original Bank, the date of this Agreement;

(ii)    where a Borrower is a US Tax Obligor on a date on which any other person becomes a Party as the Bank, that date;

(iii)    the date a new US Tax Obligor accedes as a Borrower; or

(iv)    where a Borrower is not a US Tax Obligor, the date of a request from the Bank,

supply to the Company:

(A)    a withholding certificate on Form W-8, Form W-9 or any other relevant form; or

(B)    any withholding statement or other document, authorisation or waiver as the Company may require to certify or establish the status of the Bank under FATCA or that other law or regulation.

(f)    If any withholding certificate, withholding statement, document, authorisation or waiver provided to the Company by the Bank pursuant to paragraph (e) above is or becomes materially inaccurate or incomplete, the Bank shall promptly update it and provide such updated withholding certificate, withholding statement, document, authorisation or waiver to the Company unless it is unlawful for the Bank to do so (in which case the Bank shall promptly notify the Company).

(g)     The Company and each US Tax Obligor may rely on any withholding certificate, withholding statement, document, authorisation or waiver it receives from the Bank pursuant to paragraph (e) above without further verification.

**13.9    FATCA Deduction**

(a)     Each Party may make any FATCA Deduction it is required to make by FATCA, and any payment required in connection with that FATCA Deduction, and no Party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.

(b)     Each Party shall promptly, upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of such FATCA Deduction), notify the Party to whom it is making the payment and, in addition, shall notify the Company.

**14.     INCREASED COSTS**

**14.1    Increased Costs**

(a)     Subject to Clause 14.3 (Exceptions) the Company shall, within five Business Days of a demand by the Bank, pay for the account of a Finance Party the amount of any Increased Costs incurred by that Finance Party or any of its Affiliates as a result of:

(i)     the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation; or

(ii)     compliance with any law or regulation made after the date of this Agreement.

(b)     In this Agreement **Increased Costs** means:

(i)     a reduction in the rate of return from the Facility or on a Finance Party's (or its Affiliate's) overall capital;

(ii)     an additional or increased cost; or

(iii)     a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to that Finance Party having entered into its Commitment or funding or performing its obligations under any Finance Document or Undertaking.

**14.2    Increased cost claims**

(a)     A Finance Party intending to make a claim pursuant to Clause 14.1 (Increased Costs) shall promptly notify the Company.

(b)     Each Finance Party shall, as soon as practicable after a demand by the Bank, provide a certificate confirming the amount of its Increased Costs.

**14.3    Exceptions**

(a)     Clause 14.1 (Increased Costs) does not apply to the extent any Increased Cost is:

(i)     attributable to a Tax Deduction required by law to be made by an Obligor;

(ii)    attributable to a FATCA Deduction required to be made by a Party;

(iii)    compensated for by Clause 13.3 (Tax indemnity) (or would have been compensated for under Clause 13.3 (Tax indemnity) but was not so compensated solely because any of the exclusions in paragraph (b) of 13.3 (Tax indemnity) applied);

(iv)    attributable to any Bank Levy (or any payment attributable to, or liability arising as a consequence of, any Bank Levy);

(v)    attributable to the wilful breach by the relevant Finance Party or its Affiliates of any law or regulation;

(vi)    attributable to the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement (**Basel II**) or any other law or regulation which implements Basel II (whether such implementation, application or compliance is by a government, regulator, Finance Party or any of its Affiliates);

(vii)    attributable to the implementation or application of or compliance with (x) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated, (y) the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated or (z) any further guidance or standards published by the Basel Committee on Banking Supervision relating to Basel III;

(viii)    attributable to the implementation or application of or compliance with (x) Regulation (EU) No 575/2013 of the European Parliament and of the Counsel of 26 June 2013 on prudential requirements for credit institutions and investment firms or (y) Directive 2013/36/EU of the European Parliament and of the Counsel of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC;

(ix)    attributable to the implementation or application of or compliance with the U.S. Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or in connection therewith; or

(x)    not notified in writing to the Company within six months of the Bank becoming aware of such change.

(b)    In this Clause 14.3 reference to a **Tax Deduction** has the same meaning given to the term in Clause 13.1 (Definitions).

## 15.    OTHER INDEMNITIES

### 15.1    Currency indemnity

(a)    If any sum due from an Obligor under the Finance Documents (a **Sum**), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the **First**

**Currency**) in which that Sum is payable into another currency (the **Second Currency**) for the purpose of:

(i)     making or filing a claim or proof against that Obligor; or

(ii)    obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall as an independent obligation, within five Business Days of demand, indemnify each Secured Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b)     Each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

**15.2    Other indemnities**

The Company shall (or shall procure that an Obligor will), within five Business Days of demand, indemnify the Bank against any cost, loss or liability incurred by it as a result of:

(a)     the occurrence of any Event of Default;

(b)     a failure by an Obligor to pay any amount due under a Finance Document on its due date;

(c)     funding, or making arrangements to fund, its participation in a Utilisation requested by a Borrower in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by the Bank alone);

(d)     issuing or making arrangements to issue an Undertaking requested by the Company or a Borrower in a Utilisation Request but not issued by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by the Bank alone); or

(e)     a Utilisation (or part of a Utilisation) not being prepaid in accordance with a notice of prepayment given by a Borrower or the Company.

**16.    MITIGATION BY THE BANK**

**16.1    Mitigation**

(a)     Each Finance Party shall, in consultation with the Company, take all reasonable steps to mitigate any circumstances which arise and which would result in the Facility ceasing to be available or any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Clause 8.1 (Illegality), Clause 13 (Tax gross up and indemnities) or Clause 14 (Increased Costs) including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate or Facility Office.

(b)     Paragraph (a) above does not in any way limit the obligations of any Obligor under the Finance Documents.

**16.2    Limitation of liability**

(a)    The Company shall promptly indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under Clause 16.1 (Mitigation).

(b)    A Finance Party is not obliged to take any steps under Clause 16.1 (Mitigation) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

**17.    COSTS AND EXPENSES**

**17.1    Transaction expenses**

The Company shall, within five Business Days of demand, pay the Bank the amount of all costs and expenses (including legal fees) reasonably incurred by any of them in connection with the negotiation, preparation, printing, execution and perfection of:

(a)    this Agreement and any other documents referred to in this Agreement and the Transaction Security; and

(b)    any other Finance Documents executed after the date of this Agreement.

**17.2    Amendment costs**

If:

(a)    an Obligor requests an amendment, waiver or consent; or

(b)    an amendment is required pursuant to Clause 26.7 (Change of currency),

the Company shall, within five Business Days of demand, reimburse each of the Bank and the Security Agent for the amount of all costs and expenses (including legal fees) reasonably incurred by the Bank and the Security Agent (and, in the case of the Security Agent, by any Receiver or Delegate) in responding to, evaluating, negotiating or complying with that request or requirement.

**17.3    Enforcement and preservation costs**

The Company shall, within five Business Days of demand, pay to each Secured Party (other than the Security Agent) the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of or the preservation of any rights under any Finance Document and the Transaction Security and any proceedings instituted by or against the Security Agent as a consequence of taking or holding the Transaction Security or enforcing these rights.

**18.    GUARANTEE AND INDEMNITY**

**18.1    Guarantee and indemnity**

Each Guarantor irrevocably and unconditionally jointly and severally:

(a)    guarantees to each Finance Party punctual performance by each other Obligor of all that Obligor's obligations under the Finance Documents;

(b)    undertakes with each Finance Party that whenever another Obligor does not pay any amount when due under or in connection with any Finance Document, that Guarantor shall immediately on demand pay that amount as if it was the principal obligor; and

(c)     agrees with each Finance Party that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify that Finance Party immediately on demand against any cost, loss or liability it incurs as a result of an Obligor not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Finance Document on the date when it would have been due. The amount payable by a Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 18 if the amount claimed had been recoverable on the basis of a guarantee.

## 18.2    Continuing guarantee

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

## 18.3    Reinstatement

If any discharge, release or arrangement (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made by a Finance Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration or otherwise, without limitation, then the liability of each Guarantor under this Clause 18 will continue or be reinstated as if the discharge, release or arrangement had not occurred.

## 18.4    Waiver of defences

The obligations of each Guarantor under this Clause 18 will not be affected by an act, omission, matter or thing which, but for this Clause 18, would reduce, release or prejudice any of its obligations under this Clause 18 (without limitation and whether or not known to it or any Finance Party) including:

(a)     any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b)     the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(c)     the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d)     any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

(e)     any amendment, novation, supplement, extension restatement (however fundamental and whether or not more onerous) or replacement of a Finance Document or any other document or security including, without limitation, any change in the purpose of, any extension of or increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(f)     any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g)     any insolvency or similar proceedings.

**18.5    Guarantor intent**

Without prejudice to the generality of Clause 18.4 (Waiver of defences), each Guarantor expressly confirms that it intends that this guarantee shall extend from time to time to any (however fundamental) variation, increase, extension or addition of or to any of the Finance Documents and/or any facility or amount made available under any of the Finance Documents for the purposes of or in connection with any of the following:  business acquisitions of any nature; increasing working capital; enabling investor distributions to be made; carrying out restructurings; refinancing existing facilities; refinancing any other indebtedness; making facilities available to new borrowers; any other variation or extension of the purposes for which any such facility or amount might be made available from time to time; and any fees, costs and/or expenses associated with any of the foregoing.

**18.6    Immediate recourse**

Each Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this Clause 18.  This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

**18.7    Appropriations**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on its behalf) may:

(a)    refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Guarantor shall be entitled to the benefit of the same; and

(b)    hold in an interest-bearing suspense account any moneys received from any Guarantor or on account of any Guarantor's liability under this Clause 18.

**18.8    Deferral of Guarantors' rights**

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Bank otherwise directs, no Guarantor will exercise any rights which it may have by reason of performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this Clause 18:

(a)    to be indemnified by an Obligor;

(b)    to claim any contribution from any other guarantor of any Obligor's obligations under the Finance Documents;

(c)    to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party;

(d)    to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which any Guarantor has given a guarantee, undertaking or indemnity under Clause 18.1 (Guarantee and indemnity);

(e)      to exercise any right of set-off against any Obligor; and/or

(f)      to claim or prove as a creditor of any Obligor in competition with any Finance Party.

If a Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Finance Parties by the Obligors under or in connection with the Finance Documents to be repaid in full on trust for (or otherwise for the benefit of) the Finance Parties and shall promptly pay or transfer the same to the Bank or as the Bank may direct for application in accordance with Clause 26 (Payment mechanics).

### 18.9    Release of Guarantors' right of contribution

If any Guarantor (a **Retiring Guarantor**) ceases to be a Guarantor in accordance with the terms of the Finance Documents for the purpose of any sale or other disposal of that Retiring Guarantor then on the date such Retiring Guarantor ceases to be a Guarantor:

(a)      that Retiring Guarantor is released by each other Guarantor from any liability (whether past, present or future and whether actual or contingent) to make a contribution to any other Guarantor arising by reason of the performance by any other Guarantor of its obligations under the Finance Documents; and

(b)      each other Guarantor waives any rights it may have by reason of the performance of its obligations under the Finance Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under any Finance Document or of any other security taken pursuant to, or in connection with, any Finance Document where such rights or security are granted by or in relation to the assets of the Retiring Guarantor.

### 18.10    Additional security

This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by any Finance Party.

### 18.11    General limitations

Without limiting any specific exemptions set out below, this guarantee and any other guarantee, indemnity or assurance against loss in any Finance Document (including any Transaction Security) does not apply to any liability to the extent it would constitute unlawful financial assistance within the meaning of sections 678 or 679 of the Companies Act 2006 or any equivalent and applicable provisions under the laws of the jurisdiction of incorporation of the relevant Guarantor.

### 18.12    Germany

(a)      In this Clause 18.12:

**German Guarantor** means:

(a)      any Guarantor incorporated in Germany as a limited liability company (*Gesellschaft mit beschränkter Haftung*) (a **German GmbH Guarantor**); or

(b)      a limited partnership (*Kommanditgesellschaft*) in relation to which any general partner (*persönlich haftender Gesellschafter*) is a limited liability company (any such general partner is hereinafter referred to as a **German GP Company**) (such limited partnership is hereinafter referred to as a **German KG Guarantor**).

**Guarantee** means any guarantee and/or indemnity obligation of any German Guarantor created under this Agreement or any other Finance Document.

**Net Assets** means the amount of the German GmbH Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's relevant assets (the calculation of which shall include all items set forth in Section 266(2) A, B, C, D and E of the German Commercial Code (*Handelsgesetzbuch*, **HGB**)) less:

(a)     the German GmbH Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's liabilities, the calculation of which shall include all items set forth in Section 266(3) B, C, D and E of the HGB including any costs for any Auditor's Determination but such liabilities shall exclude:

     (i)     the liabilities under or relating to the Guarantee; and

     (ii)    any obligations (*Verbindlichkeiten*) of the German GmbH Guarantor (and, in case of a GmbH & Co. KG, of its German GP Company):

          (A)     owing to any member of the group or any other affiliated company which are subordinated by law or by contract to any Indebtedness outstanding under this Agreement (including for the avoidance of doubt, obligations that would in an insolvency be subordinated pursuant to Section 39 para 1 no 5 or Section 39 para 2 of the German Insolvency Code (*Insolvenzordnung*)) and including obligations under guarantees for obligations which are so subordinated, unless a waiver of the loan provided to the relevant German GmbH Guarantor or, in the case of a GmbH & Co. KG, of its German GP Company, would result in that member of the group breaching its obligations under section 30 of the German Limited Liability Companies Act (*GmbH-Gesetz*, **GmbHG**) or any similar provision of any other jurisdiction applicable to it; and

          (B)     incurred by the German GmbH Guarantor (and, in the case of a GmbH & Co.KG, of its German GP Company) in willful violation of any of the provisions of the Finance Documents; and

(b)     any amounts which are subject to legal dividend payment constraints (*Ausschüttungssperre*) pursuant to Section 253(6), Section 268(8) or Section 272(5) HGB, in each case calculated in accordance with HGB (taking into account applicable case law on the calculation of net assets pursuant to Section 30 GmbHG) and accounting principles consistent with those applied in the preparation of the latest annual unconsolidated financial statements for that German GmbH Guarantor (or, where the German Guarantor is a German KG Guarantor, its German GP Company.

For the purpose of such calculation, the following balance sheet items shall be adjusted as follows:

(i)     if the registered share capital of the German Guarantor, or where the German Guarantor is a German KG Guarantor, of its German GP Company, is increased out of retained earnings (*Kapitalerhöhung aus Gesellschaftsmitteln*) after the date of this Agreement, such increase shall not be taken into account unless (i) such increase has been effected with the prior written consent of the Bank or is otherwise permitted under this Agreement or any other Finance Document and (ii) only to the extent it is fully paid up (*voll eingezahlt*);

(ii)    the amount of any increase after the date of this Agreement of the German Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's registered share capital which has been effected out of retained earnings (*Kapitalerhöhung*

*aus Gesellschaftsmitteln*) without the prior written consent of the Bank shall be deducted from the registered share capital;

(iii)    any accrual (*Rückstellung*) in respect of a potential enforcement of the Guarantee or any Security shall be disregarded; and

(iv)    liabilities in relation to loans granted to, and other contractual liabilities incurred by, the German Guarantor or as the case may be by its German GP Company, in willful (*vorsätzlich*) or grossly negligent (*grob fahrlässig*) violation of any Finance Document shall be disregarded.

(b)    In the case of a German Guarantor the enforcement of the Guarantee against such German Guarantor shall be limited if and to the extent that:

    (i)    such Guarantee secures the obligations or liabilities of:

        (A)    the German Guarantor's, or in case of a German KG Guarantor, any of its relevant German GP Company's, direct or indirect shareholder (upstream), or

        (B)    a direct or indirect subsidiary of a shareholder pursuant to paragraph (i) (but excluding any direct or indirect subsidiary of the German Guarantor (and, in the case of a German KG Guarantor, any direct or indirect subsidiary of its German GP Company)) (cross-stream); and

    (ii)    the enforcement of the Guarantee (x) would cause the Net Assets to be less than the respective share capital (*Stammkapital*) (*Begründung einer Unterbilanz*) or (y) (if the German GmbH Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's Net Assets are already less than its respective registered share capital) would cause such deficit to be further increased (*Vertiefung einer Unterbilanz*).

(c)    In addition, the German Guarantor and, where the German Guarantor is a German KG Guarantor, also its relevant German GP Company shall, if so requested by the Bank, realise, to the extent legally permitted, in a situation where after enforcement of the Guarantee the German Guarantor, or, where the German Guarantor is a German KG Guarantor, its relevant German GP Company would not have Net Assets in excess of its respective registered share capital, any and all of its assets that are shown in the balance sheet with a book value (*Buchwert*) that is significantly lower than the market value of the asset if such asset is not necessary for the German Guarantor's or as the case may be its relevant German GP Company's operational business (*operativ nicht betriebsnotwendig*).

(d)    The enforcement of the Guarantee shall initially be excluded if no later than fifteen (15) Business Days following a demand by the Bank to make a payment under the Guarantee, the managing directors on behalf of the German Guarantor or, as the case may be, its German GP Company, have confirmed in writing to the Bank:

    (i)    to what extent the Guarantee granted hereunder has an upstream or cross-stream effect as described above; and

    (ii)    to which extent the Guarantee securing cross-stream and/or upstream obligations or liabilities as described above cannot be enforced as it would cause the Net Assets of the German Guarantor, or, where the German Guarantor is a German KG Guarantor, its German GP Company to be less than its respective registered share capital (taking into account the above set out adjustments and realization duties),

(the **Management Determination**) and such confirmation is supported by a reasonably satisfactory calculation provided that the Bank shall in any event be entitled to enforce the Guarantee for any

amounts where such enforcement would, in accordance with the Management Determination, not cause the German Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's Net Assets to be less than (or to fall further below) the amount of its respective registered share capital (in each case as calculated and adjusted as set out above).

(e)    Following the Bank's receipt of Management Determination, any further enforcement of the Guarantee (i.e. any enforcement to which the Bank is not already entitled to) shall be excluded for a period of no more than thirty (30) Business Days only. If the Bank receives within such thirty (30) Business Days period: (i) an up-to date balance sheet together with (ii) a determination in each case prepared by auditors of international standard and reputation appointed by the relevant German Guarantor either confirming the Management Determination or setting out deviations from the Management Determination (the **Auditor's Determination**), the further enforcement of the Guarantee shall be limited, if and to the extent such enforcement would, in accordance with the Auditor's Determination cause the German Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's Net Assets to be less than (or to fall further below) the amount of its respective registered share capital in each case as calculated and adjusted as set out above. If the German Guarantor fails to deliver an Auditor's Determination within thirty (30) Business Days after receipt of the Management Determination, the Bank shall be entitled to enforce the Guarantee without any limitation or restriction.

(f)    If and to the extent (A) the net assets as determined by the Auditors' Determination are lower than the amount enforced in accordance with the Management Determination or (B) the Guarantee has been enforced without regard to the limitations set out above because (x) the Management Determination was not delivered within the relevant time frame or (y) the Auditors' Determination was not delivered within the relevant time frame but has been delivered within ten (10) Business Days following the due date for the delivery of the Auditors' Determination, the Bank shall without undue delay repay to the relevant German Guarantor upon written demand of the relevant German Guarantor any amount (if and to the extent already paid to the Finance Party (or any of them)) in the case of (A) equal to the difference between the amount paid and the amount payable resulting from the Auditor's Determination, and in the case of (B), which the Bank would not have been entitled to enforce had the Management Determination and the Auditors' Determination been delivered in time provided such demand for repayment is made to the Bank within six months from the date the Guarantee is enforced. The Bank may withhold any amount received pursuant to an enforcement of the Guarantee until final determination of the amount of the net assets pursuant to the Auditor's Determination.

(g)    The limitations set out in this Clause 18.12 shall not apply (or, as the case may be, shall cease to apply):

(i)    if and to the extent any amounts borrowed under this Agreement are lent or on-lent to such German Guarantor and/or, in case of a German KG Guarantor, its relevant German GP Company or any of its respective subsidiaries from time to time if, in addition by virtue of the enforcement of the Guarantee the German Guarantor, or as the case may be, its relevant German GP Company, has a recourse, indemnification, sharing of losses or other compensation claim against such lending affiliated company (*verbundenes Unternehmen*) within the meaning of Section 16, 17 or 18 of the German Stock Act (*Aktiengesetz*, **AktG**) or the lending direct or indirect shareholder of the German Guarantor which could be set-off against such loan receivable or otherwise be used to settle or discharge such loan obligation and provided that the Bank has waived with binding effect on any Finance Party the restrictions of any provision under any Finance Document restricting the right to set off claims against, or otherwise make use of the recourse, indemnification, sharing of losses or other compensation claim against such lending affiliated company (*verbundenes Unternehmen*) within the meaning of Section 16, 17 or 18 of the AktG or the lending direct or indirect shareholder of the German Guarantor in order to settle or discharge such loan

obligation vis-à-vis, such lending member of the lending affiliated company (*verbundenes Unternehmen*) within the meaning of Section 16, 17 or 18 of the AktG or the lending direct or indirect shareholder of the German Guarantor; or

(ii)     if and when a domination agreement (*Beherrschungsvertrag*) and/or profit absorption agreement (*Gewinnabführungsvertrag*) (either directly or through a chain of domination and/or profit absorption agreements) is or becomes effective between the relevant German Guarantor (or, in case of a German KG Guarantor, its German GP Company) as dependent entity (*abhängiges Unternehmen*) and:

(A)     in case of the German Guarantor (or, in case of a German KG Guarantor, its German GP Company) is a subsidiary of the relevant obligor whose obligations are guaranteed under the Guarantee, that obligor; or

(B)     in case the German Guarantor (or, in case of a German KG Guarantor, its German GP Company) is a sister company of the relevant obligor whose obligations are guaranteed under the Guarantee, any joint (direct or indirect) parent company of the German Guarantor (or, in case of a German KG Guarantor, its German GP Company) and that obligor,

as dominating entity (*beherrschendes Unternehmen*)) other than where and to the extent the existence of such domination agreement (*Beherrschungsvertrag*) and/or profit absorption agreement (*Gewinnabführungsvertrag*) does not result in the inapplicability of sentence 1 of paragraph 1 of Section 30 GmbHG (as stipulated by sentence 2 of such paragraph) with respect to the relevant payments under the Guarantee (including in respect of intermediate entities through which the relevant obligor whose obligations are guaranteed under the Guarantee is an indirect shareholder of the German Guarantor, or as the case may be, its German GP Company);

(iii)     if and to the extent the German Guarantor holds on the date of the enforcement of the Guarantee a fully valuable and recoverable indemnity or claim for refund (*vollwertiger Gegenleistungs-oder Rückgewähranspruch*) against any of its direct or indirect shareholders or Subsidiaries of such shareholders (other than Subsidiaries of the German Guarantor) with respect to the relevant payments under the Guarantee; or

(iv)     if and to the extent for any other reason (including, without limitation, as a result of a change in the relevant rules of law) the deficit (*Unterbilanz*) referred to in paragraph (b) above does not constitute a breach of the German Guarantor's obligations to maintain its registered share capital pursuant to §§ 30 et seq. GmbHG or does not result in a personal liability of the managing directors of the German Guarantor pursuant to §§ 43, 31 GmbHG.

## 18.13    Kingdom of Saudi Arabia law

(a)     The obligations of a Guarantor incorporated in the Kingdom of Saudi Arabia (a **KSA Guarantor**) under the Finance Documents shall be limited to exclude any obligation to the extent that it would constitute an unlawful distribution to the partners or shareholders of that KSA Guarantor or an otherwise unlawful use of proceeds or assets of that KSA Guarantor, whether pursuant to article 10 of the Saudi Arabian companies regulations or any other applicable law (each being a **Breach of Law**).  The Parties irrevocably agree that the obligations of a KSA Guarantor under the Finance Documents are limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of that KSA Guarantor, result in the obligations of that KSA Guarantor under the Finance Documents not constituting a Breach of Law.

(b)     Unless otherwise agreed by the Company and each KSA Guarantor (without any need to amend this Agreement), the liability of a KSA Guarantor under the Finance Documents shall be limited to

**762**

US$1,000,000,000 plus any unpaid amount of interest, fees, liability, costs and expenses under the Finance Documents and the amount of any interest, default interest, costs and expenses related to the liabilities of the KSA Guarantor

### 18.14    Norway

(a)    The obligations of each Guarantor incorporated in Norway (a **Norwegian Guarantor**) under the Finance Documents shall be limited by any mandatory provisions of law applicable to such Norwegian Guarantor and be deemed to have been given only to the extent it does not violate Sections 8-7 and 8-10 of the Norwegian Private Limited Liability Companies Act 1997 No. 44 (the **Norwegian Companies Act**) regulating unlawful financial assistance and other restricted loans, guarantees and joint and several liability as well as providing of security, and the liability of each Norwegian Guarantor only applies to the extent permitted by such provisions of the Norwegian Companies Act. Any Norwegian Guarantor's obligations under the Finance Documents shall, however, be interpreted so as to make it liable to the fullest extent permitted by the Norwegian Companies Act from time to time.

(b)    Unless otherwise agreed by the Company and each Norwegian Guarantor (and following any such agreement this Agreement shall be deemed to be amended accordingly), the liability of a Norwegian Guarantor under the Finance Documents shall be limited to US$1,000,000,000 plus any unpaid amount of interest, fees, liability, costs and expenses under the Finance Documents and the amount of any interest, default interest, costs and expenses related to the liabilities of the Norwegian Guarantor.

### 18.15    Security

The limitations set out above shall apply mutatis mutandis to any Security provided by any Guarantor under the Security Documents and to any guarantee, undertaking, obligation, indemnity and payment, including but not limited to, distributions, credits, loans and set-offs, pursuant to or permitted by the Finance Documents in relation to a Guarantor.

### 18.16    Additional Guarantors

The guarantee of, and any Security granted by, any Additional Guarantor is subject to any other limitations relating to that Additional Guarantor set out in the Accession Deed applicable to such Additional Guarantor.

## 19.    REPRESENTATIONS

### 19.1    General

Each Obligor makes the representations and warranties set out in this Clause 19 to each Finance Party.

### 19.2    Status

(a)    It is a limited liability corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation.

(b)    Except where failure to do so does not have, or would not be likely to have, a Material Adverse Effect, it and each of its Restricted Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

### 19.3    Binding obligations

Subject to the Legal Reservations and the Perfection Requirements:

(a)    the obligations expressed to be assumed by it in each Finance Document to which it is a party are legal, valid, binding and enforceable obligations; and

(b)    (without limiting the generality of paragraph (a) above), each Transaction Security Document to which it is a party creates the security interests which that Transaction Security Document purports to create and those security interests are valid and effective.

### 19.4    Non-conflict with other obligations

Subject to the Legal Reservations, the entry into and performance by it of, and the transactions contemplated by, the Finance Documents and the granting of the Transaction Security pursuant to the Agreed Security Principles do not and will not conflict with:

(a)    any law or regulation applicable to it;

(b)    the constitutional documents of any member of the Restricted Group; or

(c)    any agreement or instrument binding upon it or any member of the Restricted Group or any of its or any member of the Restricted Group's assets or constitute a default or termination event (however described) under any such agreement or instrument,

in each case to an extent which has had, or would be likely to have, a Material Adverse Effect.

### 19.5    Power and authority

(a)    It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Finance Documents to which it is or will be a party and the transactions contemplated by those Finance Documents.

(b)    No limit on its powers will be exceeded as a result of the borrowing, grant of security or giving of guarantees or indemnities contemplated by the Finance Documents to which it is a party.

### 19.6    Validity and admissibility in evidence

(a)    Subject to the Legal Reservations and Perfection Requirements, all Authorisations required:

(i)    to enable it lawfully to enter into, exercise its rights and comply with its material obligations in the Finance Documents to which it is a party; and

(ii)    to make the Finance Documents to which it is a party admissible in evidence in its Relevant Jurisdictions,

have been obtained or effected and are in full force and effect.

(b)    All Authorisations necessary for the conduct of its business, trade and ordinary activities have been obtained or effected and are in full force and effect if failure to obtain or effect those Authorisations has or would be likely to have a Material Adverse Effect.

### 19.7    Governing law and enforcement

Subject to the Legal Reservations and the Perfection Requirements:

(a)   the choice of governing law of the Finance Documents will be recognised and enforced in its Relevant Jurisdictions; and

(b)   any judgment obtained in relation to a Finance Document in the jurisdiction of the governing law of that Finance Document will be recognised and enforced in its Relevant Jurisdictions.

**19.8   Insolvency**

No:

(a)   corporate action, legal proceeding or other procedure or step described in paragraph (a) of Clause 22.6 (Insolvency proceedings); or

(b)   creditors' process described in Clause 22.7 (Creditors' process),

has been taken in relation to any Material Company (subject in each case to the exceptions set out in Clause 22.6 (Insolvency proceedings) or Clause 22.7 (Creditors' process) as the case may be); and none of the circumstances described in Clause 22.5 (Insolvency) applies to any Material Company.

**19.9   No filing or stamp taxes**

Subject to the Legal Reservations and the Perfection Requirements, under the laws of its Relevant Jurisdiction it is not necessary that the Finance Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents.

**19.10   Deduction of Tax**

It is not required to make any deduction for or on account of Tax from any payment it may make under any Finance Document to the Bank except in accordance with this Agreement.

**19.11   No default**

(a)   No Event of Default is continuing.

(b)   No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on it or any of its Restricted Subsidiaries or to which its (or any of its Restricted Subsidiaries') assets are subject which has or would be likely to have a Material Adverse Effect.

**19.12   Financial Statements**

(a)   Its Original Financial Statements were prepared in accordance with the Accounting Principles consistently applied.

(b)   Its most recent Annual Financial Statements or Quarterly Financial Statements delivered pursuant to Clause 20.2 (Financial statements):

(i)   have been prepared in accordance with the Accounting Principles (to the extent applicable to Quarterly Financial Statements) unless otherwise referred to in such financial statements (or the notes); and

(ii)    fairly present in all material respects its consolidated financial condition as at the end of, and its consolidated results of operations for, the period to which they relate.

## 19.13    No proceedings

(a)    No litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency which is likely to be determined adversely to any Obligor and, if adversely determined, would be likely to have a Material Adverse Effect have (to the best of its knowledge and belief (having made due and careful enquiry)) been started against it or any of its Restricted Subsidiaries.

(b)    No judgment or order of a court, arbitral body or agency which has or would be likely to have a Material Adverse Effect has (to the best of its knowledge and belief (having made due and careful enquiry)) been made against it or any of its Restricted Subsidiaries.

## 19.14    No breach of laws

(a)    It has not (and none of its Restricted Subsidiaries has) breached any law or regulation applicable to it which breach has or would be likely to have a Material Adverse Effect.

(b)    No labour disputes are current against any member of the Restricted Group which would be likely to have a Material Adverse Effect.

## 19.15    Environmental laws

(a)    Each Obligor is in compliance with applicable Environmental Law where failure to do so or would be likely to have a Material Adverse Effect.

(b)    No Environmental Claim has been commenced or against any member of the Restricted Group where that claim has or would be likely, if determined against that member of the Group, to have a Material Adverse Effect.

## 19.16    Taxation

(a)    It is not (and none of its Restricted Subsidiaries is) materially overdue in the filing of any Tax returns and it is not (and none of its Restricted Subsidiaries is) overdue in the payment of any amount in respect of Tax (taking into account any extension or grace period) in each case which has or would be likely to have a Material Adverse Effect.

(b)    No claims or investigations are being, or are reasonably likely to be, made or conducted against it (or any of its Restricted Subsidiaries) with respect to Taxes which have or would be likely to have a Material Adverse Effect.

(c)    Except for KCA Deutag Drilling Offshore Services AS and KCA Deutag Europe B.V. which are tax resident in the United Kingdom, it is resident for Tax purposes only in its jurisdiction of incorporation.

## 19.17    Anti-corruption law and Sanctions

(a)    Each member of the Group has conducted its businesses in compliance with applicable Anti-Corruption Laws in all material respects and has instituted and maintained policies and procedures reasonably designed to promote and achieve compliance with such laws in all material respects.

(b)    No member of the Group and, to its knowledge, none of their respective directors, officers, employees, agents, or representatives, is a Sanctioned Person, nor is any member of the Group

**766**

located, organised or ordinarily resident in a Sanctioned Country or otherwise the target of any applicable Sanctions (save, in all cases, in respect of KCA DEUTAG Iran Kish Drilling Company PJSC which is established in Iran and is a Sanctioned Person solely by virtue of the definition of limb (b) of the definition of Sanctioned Person).

(c)    Each member of the Group has conducted its businesses in compliance with applicable Sanctions and has instituted and maintained policies and procedures reasonably designed to promote and achieve compliance with such laws.

(d)    No member of the Group is (and none of their assets are) the subject of any claim, proceeding, formal notice or investigation with respect to a breach or alleged breach of any applicable Sanctions.

(e)    No member of the Group has, or is, engaged in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to breach, directly or indirectly, any applicable Sanctions. No asset the subject of the Transaction Security is currently the target of any applicable Sanctions.

## 19.18    Security and Indebtedness

(a)    No Security exists over all or any of the present or future assets of any member of the Restricted Group other than as permitted by this Agreement.

(b)    No member of the Restricted Group has any Indebtedness outstanding other than as permitted by this Agreement.

## 19.19    Ranking

Subject to the Legal Reservations and the Perfection Requirements, the Transaction Security has or will have the ranking in priority which it is expressed to have in the Transaction Security Documents.

## 19.20    Good title to assets

It has a good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently conducted in each case to the extent failure to do so has or would be likely to have a Material Adverse Effect.

## 19.21    Legal and beneficial ownership

It is the sole legal and beneficial owner of the respective assets over which it purports to grant Security.

## 19.22    Shares

(a)    The shares of any member of the Restricted Group which are subject to the Transaction Security are fully paid and not subject to any option to purchase or similar rights.

(b)    The constitutional documents of any member of the Restricted Group whose shares are subject to the Transaction Security do not and could not restrict or inhibit any transfer of those shares on creation or enforcement of the Transaction Security.

## 19.23    Intellectual Property

It:

(a)     is the sole legal and beneficial owner of or has licensed to it on normal commercial terms all the Intellectual Property which is material in the context of its business and which is required by it in order to carry on its business as it is being conducted where failure to do so has or would be likely to have a Material Adverse Effect;

(b)     does not, in carrying on its businesses, infringe any Intellectual Property of any third party in any respect which has or would be likely to have a Material Adverse Effect; and

(c)     has taken all formal or procedural actions (including payment of fees) required to maintain any material Intellectual Property owned by it where failure to do so has, or would be likely to have, a Material Adverse Effect.

**19.24   Group Structure Chart**

On the date of this Agreement, the Group Structure Chart is true, complete and accurate in all material respects.

**19.25   Centre of main interests**

For the purposes of Regulation (EU) 2015/848 of 20 May 2015 on insolvency proceedings (recast) (the **Regulation**), the centre of main interest (as that term is used in Article 3(1) of the Regulation) of each Obligor incorporated in the European Union is situated in its jurisdiction of incorporation, England and Wales or Scotland.

**19.26   Times when representations made**

(a)     All the representations and warranties in this Clause 19 are made by each Original Obligor on the date of this Agreement.

(b)     The Repeating Representations are deemed to be made by each Obligor on each Utilisation Date.

(c)     The representations and warranties contained in paragraph (b) of Clause 19.12 (Financial Statements) will be deemed to be made by each Obligor on the date on which the relevant financial statements are delivered under this Agreement.

(d)     The Repeating Representations are deemed to be made by each Additional Obligor on the day on which it becomes (or it is proposed that it becomes) an Additional Obligor.

(e)     Each representation or warranty deemed to be made after the date of this Agreement shall be deemed to be made by reference to the facts and circumstances existing at the date the representation or warranty is deemed to be made.

**20.   INFORMATION UNDERTAKINGS**

(a)     The undertakings in this Clause 20 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

(b)     In this Clause 20:

**Annual Financial Statements** means the financial statements for a Financial Year delivered pursuant to paragraph (a)(i) of Clause 20.2 (Financial statements).

**Monthly Financial Statements** means the financial statements delivered pursuant to paragraph (b) of Clause 20.2 (Financial statements).

**Quarterly Financial Statements** means the financial statements delivered pursuant to paragraph (a)(ii) of Clause 20.2 (Financial statements).

**20.2    Financial statements**

The Company shall supply to the Bank:

(a)    at the same time they are delivered to any group of Noteholders, but in any event on or before the deadline for delivery of such financial statements in any Indenture:

    (i)    the audited consolidated financial statements of the Company for each Financial Year; and

    (ii)    the consolidated financial statements of the Company for each Financial Quarter (other than in respect of the fourth Financial Quarter); and

(b)    as soon as they are available, but in any event within 30 days after the end of each month its management accounts on a consolidated basis for that month.

**20.3    Provision and contents of Leverage Calculation Certificate**

(a)    The Company shall supply a Leverage Calculation Certificate to the Bank with each set of its Annual Financial Statements and each set of its Quarterly Financial Statements, but in any event no later than 60 days after the end of each Financial Quarter (other than in respect of the fourth Financial Quarter) or 120 days after the end of each Financial Year.

(b)    The Leverage Calculation Certificate shall set out the calculation of the Senior Secured Gross Leverage Ratio and, in the case of a Leverage Calculation Certificate required to be delivered with the Annual Financial Statements, computations as to compliance with the Guarantor Coverage Test, in each case, as at the date at which the financial statements to which the Leverage Calculation Certificate relates were drawn up.

(c)    If the aggregate amount of adjustments to EBITDA with respect to cost savings, expense reductions, operating improvements and synergies made pursuant to Section 11(c) of Schedule 10 (Restrictive Covenants) for the purposes of calculating the Senior Secured Gross Leverage Ratio exceed $5,000,000 with respect to any acquisition, the relevant Leverage Calculation Certificate shall also include a confirmation of those adjustments by the Authorised Person.

(d)    Each Leverage Calculation Certificate shall be signed by one Authorised Person.

**20.4    Requirements as to financial statements**

(a)    The Company shall procure that each set of Annual Financial Statements, Quarterly Financial Statements and Monthly Financial Statements includes a balance sheet, profit and loss account and cashflow statement.

(b)    The Company shall procure that each set of Monthly Financial Statements is accompanied by a commentary on the performance of the Restricted Group for that month and the Financial Year to the month to which the financial statements relate in accordance with its past practice (but without any comparison to budget).

(c)    Each set of financial statements delivered pursuant to Clause 20.2 (Financial statements) shall be prepared in accordance with the Accounting Principles.

## 20.5    Presentations – noteholder calls

The Company shall invite the Bank to any public call held for Noteholders and give the Bank reasonable notice of such calls provided that no representative of the Bank may speak during such calls other than to register their attendance.

## 20.6    Information: miscellaneous

The Company shall supply to the Bank (if the Bank so requests):

(a)    at the same time as they are dispatched, copies of all documents dispatched by the Company or any Obligors to its creditors generally (or any class of them) including any report delivered to any group of Noteholders under any Indenture;

(b)    promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current or pending against any member of the Restricted Group, and which, if adversely determined, would be likely to have a Material Adverse Effect;

(c)    promptly, such information as the Security Agent may reasonably require about the Charged Property and compliance of the Obligors or any Third Party Security Provider with the terms of any Transaction Security Documents; and

(d)    promptly on request, such further information regarding the financial condition, assets and operations of the Restricted Group as the Bank may reasonably request.

## 20.7    Notification of Default

(a)    Each Obligor shall notify the Bank of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence (unless that Obligor is aware that a notification has already been provided by another Obligor).

(b)    Promptly upon a request by the Bank, the Company shall supply to the Bank a certificate signed by one Authorised Person on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

## 20.8    "Know your customer" checks

(a)    If:

(i)    the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

(ii)    any change in the status of an Obligor (or of a Holding Company of an Obligor) or the composition of the shareholders of an Obligor (or of a Holding Company of an Obligor) after the date of this Agreement; or

(iii)    a proposed assignment or transfer by the Bank of any of its rights and/or obligations under this Agreement to a party that is not the Bank prior to such assignment or transfer,

obliges the Bank (or, in the case of paragraph (iii) above, any prospective new Bank) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Obligor shall promptly upon the request of the Bank supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Bank (for itself or, in the case of the event described in paragraph (iii) above, on behalf of any

prospective new Bank) in order for the Bank or, in the case of the event described in paragraph (iii) above, any prospective new Bank to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(b)    Each Obligor shall, upon request from the Bank (acting reasonably), provide such additional information as the Bank reasonably requires to satisfy its own internal "know your customer" requirements. The relevant Obligor shall not be obliged to provide any additional information requested by the Bank pursuant to this paragraph (b), where such information is already available to the Bank and the Obligor shall only be required to provide such additional information where the information requested is in its possession on or prior to the date it is requested by the Bank.

(c)    The Company shall, by not less than three Business Days' prior written notice to the Bank, notify the Bank of its intention to request that one of its Restricted Subsidiaries becomes an Additional Obligor pursuant to Clause 24 (Changes to the Obligors).

(d)    Following the giving of any notice pursuant to paragraph (c) above, if the accession of such Additional Obligor obliges the Bank to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Company shall promptly upon the request of the Bank supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Bank (for itself or on behalf of any prospective new Bank) in order for the Bank or any prospective new Bank to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the accession of such Restricted Subsidiary to this Agreement as an Additional Obligor.

## 21.    GENERAL UNDERTAKINGS

The undertakings in this Clause 21 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

### 21.1    Restrictive covenants

Each Obligor shall comply with the covenants set out in Schedule 10 (Restrictive Covenants).

### 21.2    Authorisations

Subject to the Legal Reservations and the Perfection Requirements, each Obligor shall promptly:

(a)    obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b)    and if requested, supply certified copies to the Bank of:

any Authorisation required under any law or regulation of a Relevant Jurisdiction to:

(i)    enable it to perform its obligations under the Finance Documents; and

(ii)    carry on its business where failure to do so has or would be likely to have a Material Adverse Effect.

### 21.3    Compliance with laws

Each Obligor shall (and the Company shall ensure that each member of the Restricted Group will) comply in all respects with all laws to which it may be subject, if failure so to comply has or would be likely to have a Material Adverse Effect.

**21.4    Environmental compliance**

Each Obligor shall (and the Company shall ensure that each member of the Restricted Group will):

(a)    comply with all Environmental Law;

(b)    obtain, maintain and ensure compliance with all requisite Environmental Permits;

(c)    implement procedures to monitor compliance with and to prevent liability under any Environmental Law,

where failure to do so has or would be likely to have a Material Adverse Effect.

**21.5    Environmental Claims**

Each Obligor shall (through the Company), promptly upon becoming aware of the same, inform the Bank in writing of any Environmental Claim against any member of the Group which is current where the claim, if determined against that member of the Group, has or would be likely to have a Material Adverse Effect.

**21.6    Anti-corruption law and Sanctions**

(a)    No Obligor shall (and the Company shall ensure that no other member of the Restricted Group will) directly or indirectly use the Facility for any purpose which would breach any applicable Anti-Corruption Laws or any applicable Sanctions.

(b)    No Obligor shall (and the Company shall ensure that no other member of the Restricted Group will) directly or indirectly use the Facility to fund any activities of, or business with, any Sanctioned Person in breach of applicable Sanctions, or in any Sanctioned Country, or in any other manner that would result in a violation by any Party of any applicable Sanctions to the extent they are applicable to such Party.

(c)    Each Obligor shall (and the Company shall ensure that each other member of the Restricted Group will):

(i)    conduct its businesses in compliance with applicable Anti-Corruption Laws and Sanctions; and

(ii)    maintain policies and procedures reasonably designed to promote and achieve compliance with applicable Anti-Corruption Laws and Sanctions.

(d)    No Obligor shall (and the Company shall ensure that no other member of the Restricted Group will) own, operate, possess, use, lease, dispose of or otherwise deal with, or procure or allow the ownership, operation, possession, use, leasing or disposal of, or any other dealing with, the assets subject to the Transaction Security or part thereof for any purpose which would violate, or cause any Finance Party or the Company or other member of the Restricted Group to violate, any applicable Sanctions.

**21.7    Taxation**

Each Obligor shall (and the Company shall ensure that each member of the Restricted Group will) pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring penalties unless and only to the extent that failure to pay those Taxes does not have or would not be likely to have a Material Adverse Effect.

**21.8    Preservation of assets**

Each Obligor shall (and the Company shall ensure that each other member of the Restricted Group will) maintain in good working order and condition (ordinary wear and tear excepted) all of its assets necessary in the conduct of its business, except where failure to do so does not have or would not be likely to have a Material Adverse Effect.

**21.9    Pari passu ranking**

Each Obligor shall ensure that at all times any unsecured and unsubordinated claims of a Finance Party against it under the Finance Documents rank at least pari passu with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

**21.10   Insurance**

(a)    The Company shall on behalf of the Obligors (or shall ensure that each Obligor shall) maintain insurances on and in relation to its business and assets against those risks and to the extent as is usual for companies carrying on the same or substantially similar business, except where failure to do so does not have or would not be likely to have a Material Adverse Effect.

(b)    All insurances must be with reputable independent insurance companies or underwriters.

(c)    No Obligor shall be required to maintain any key-man policy or to ensure that any insurance arrangements include any loss payee endorsements or arrangements in favour of the Secured Parties.

**21.11   Pensions**

The Company shall ensure that all pension schemes operated by or maintained for the benefit of members of the Restricted Group and/or their employees are funded in all material respects to the extent required by law, except where failure to do so does not have or would not be likely to have a Material Adverse Effect.

**21.12   Access**

If an Event of Default is continuing, the Company shall, and the Company shall ensure that each Obligor will, permit the Bank and/or the Security Agent and/or accountants or other professional advisers and contractors of the Bank (after consultation with the Company as to the scope of the investigation) at all reasonable times and on reasonable notice at the risk and cost of the Company:

(a)    free access (in the presence of the Company) to the books, accounts and records of each Obligor; and

(b)    to meet and discuss with senior management of the Company at the offices of the Company,

provided that all information obtained as a result of such access shall be subject to the confidentiality restrictions set out in this Agreement.

**21.13   Intellectual Property**

Each Obligor shall:

(a)    preserve and maintain the subsistence and validity of the Intellectual Property necessary for its business;

(b)    use reasonable endeavours to prevent any infringement in any material respect of its Intellectual Property;

(c)    make registrations and pay all registration fees and taxes necessary to maintain its Intellectual Property in full force and effect and record its interest in that Intellectual Property;

(d)    not use or permit its Intellectual Property to be used in a way or take any step or omit to take any step in respect of that Intellectual Property which may materially and adversely affect the existence or value of the Intellectual Property or imperil the right of any member of the Restricted Group to use such property; and

(e)    not discontinue the use of its Intellectual Property,

where failure to do so, in the case of paragraphs (a) to (c) above or, in the case of paragraphs (d) and (e) above, such use, permission to use, omission or discontinuation, would be likely to have a Material Adverse Effect

**21.14    Financial assistance**

Each Obligor shall comply in all respects with sections 678 and 679 of the Companies Act 2006 and any equivalent legislation in other jurisdictions including in relation to the execution of the Transaction Security Documents and payment of amounts due under this Agreement.

**21.15    Guarantors**

(a)    The Company shall ensure that, subject to the Agreed Security Principles:

(i)    each member of the Restricted Group incorporated in an Agreed Security Jurisdiction (other than Oman, Saudi Arabia or Russia) which is or becomes a Material Company shall as soon as reasonably practicable (and in any event within 60 days of the date on which it is determined that it is a Material Company), become an Additional Guarantor; and

(ii)    subject to and paragraph (b) below, the aggregate (without double counting) Group Member EBITDA of the Guarantors exceeds 80% of the Consolidated EBITDA of the Adjusted Group as at the end of each Financial Year when tested by reference to the most recent Leverage Calculation Certificate delivered to the Bank in accordance with this Agreement, provided that (A) any entity with negative Consolidated EBITDA shall be deemed to have Consolidated EBITDA of zero, (B) the Consolidated EBITDA of the Guarantors shall be calculated by reference to each member of the Adjusted Group that has positive Consolidated EBITDA and (C) the Consolidated EBITDA of any member of the Group that is not required to become a Guarantor in accordance with the Agreed Security Principles shall be excluded from the Consolidated EBITDA of the Adjusted Group (the **Guarantor Coverage Test**).

(b)    If any Leverage Calculation Certificate shows that the Guarantor Coverage Test was not satisfied, within 60 days of the date of delivery of that Leverage Calculation Certificate, the Company shall ensure that, subject to the Agreed Security Principles, such other member(s) of the Restricted Group as may elected by the Company shall accede as Additional Guarantors to the extent required to ensure that the Guarantor Coverage Test is satisfied (calculated as if such Additional Guarantors had been Guarantors at the end of the relevant Financial Year) and if the Guarantor Coverage Test is satisfied when recalculated within such time period, no Default or other breach of this Agreement shall be deemed to have occurred.

### 21.16    Further assurance

(a)    Subject to the Agreed Security Principles, each Obligor shall (and the Company shall procure that each other member of the Restricted Group and each Third Party Security Provider will) promptly do all such acts or execute all such documents (including assignments, assignations, transfers, mortgages, charges, standard securities, notices and instructions) as the Security Agent may reasonably specify (and in such form as the Security Agent may reasonably require in favour of the Security Agent or its nominee(s)):

(i)    to perfect the Security created or intended to be created under or evidenced by the Transaction Security Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Transaction Security) or for the exercise of any rights, powers and remedies of the Security Agent or the Finance Parties provided by or pursuant to the Finance Documents or by law;

(ii)    to confer on the Security Agent or confer on the Finance Parties Security over any property and assets of that Obligor or that Third Party Security Provider located in any jurisdiction equivalent or similar to the Security intended to be conferred by or pursuant to the Transaction Security Documents; and/or

(iii)    to facilitate the realisation of the assets which are, or are intended to be, the subject of the Transaction Security.

(b)    Each Obligor shall (and the Company shall procure that each other member of the Restricted Group and each Third Party Security Provider will) take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Security Agent or the Finance Parties by or pursuant to the Finance Documents.

### 22.    EVENTS OF DEFAULT

Each of the events or circumstances set out in this Clause 22 is an Event of Default (save for Clause 22.15 (Acceleration)).

### 22.1    Non-payment

An Obligor does not pay on the due date any amount payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless payment is made within five Business Days of its due date.

### 22.2    Other obligations

(a)    An Obligor or a Third Party Security Provider does not comply with any provision of the Finance Documents (other than those referred to in Clause 22.1 (Non-payment)).

(b)    No Event of Default under paragraph (a) above will occur if the failure to comply is capable of remedy and is remedied within 20 Business Days of the earlier of (i) the Bank giving notice to the Company or relevant Obligor or Third Party Security Provider and (ii) an Obligor or a Third Party Security Provider becoming aware of the failure to comply.

### 22.3    Misrepresentation

(a)    Any representation or statement made or deemed to be made by an Obligor or a Third Party Security Provider in the Finance Documents or any other document delivered by or on behalf of any Obligor

or Third Party Security Provider under or in connection with any Finance Document is or proves to have been incorrect or misleading when made or deemed to be made.

(b)    No Event of Default under paragraph (a) above will occur if the circumstances giving rise to the misrepresentation or misstatement are capable of remedy and are remedied within 20 Business Days of the earlier of (i) the Bank giving notice to the Company or relevant Obligor or Third Party Security Provider and (ii) an Obligor or a Third Party Security Provider becoming aware of the misrepresentation, breach of warranty or misstatement.

## 22.4    Cross-payment default/acceleration

(a)    Any Indebtedness of any Material Company is not paid when due nor within any originally applicable grace period.

(b)    Any Indebtedness of any Material Company is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (howsoever described).

(c)    No Event of Default will occur under this Clause 22.4 if:

    (i)    the aggregate amount of Indebtedness or commitment for Indebtedness falling within paragraphs (a) or (b) above is less than US$35,000,000 (or its equivalent); or

    (ii)    the Indebtedness falling within paragraphs (a) or (b) above:

        (A)    is covered by a letter of credit;

        (B)    is owed by one member of the Restricted Group to another member of the Restricted Group;

        (C)    is Subordinated Shareholder Debt; or

        (D)    has ceased to be due and payable in accordance with the terms of that Indebtedness.

## 22.5    Insolvency

(a)    Any Material Company or a Third Party Security Provider:

    (i)    is unable or admits inability to pay its debts as they fall due (other than solely as a result of its liabilities exceeding its assets);

    (ii)    is deemed to, or is declared to, be unable to pay its debts under applicable law;

    (iii)    suspends or publicly announces an intention to suspend making payments on any of its debts; or

    (iv)    by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors (excluding any Finance Party in its capacity as such) with a view to rescheduling any of its Indebtedness.

(b)    A moratorium is declared in respect of any Indebtedness of a Material Company or a Third Party Security Provider.

## 22.6    Insolvency proceedings

(a)    Any formal corporate action, legal proceedings or other procedure or step is taken in relation to:

(i)     the suspension of payments, a moratorium of any Indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any Material Company or a Third Party Security Provider;

(ii)    a composition, compromise, assignment or arrangement with the financial creditors of any Material Company or a Third Party Security Provider; or

(iii)   the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of any Material Company or a Third Party Security Provider or any of their assets,

or any analogous procedure or step is taken in any jurisdiction.

(b)    Paragraph (a) above shall not apply to:

(i)     any action, proceedings or other procedure or step which is frivolous or vexatious and is discharged, stayed or dismissed within 60 days of commencement; or

(ii)    any step or procedure or other matter contemplated by, or arises in connection with, a Permitted Transaction.

## 22.7    Creditors' process

Any attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a Material Company or a Third Party Security Provider is not discharged within 60 days and such event has or would be likely to have a Material Adverse Effect.

## 22.8    Unlawfulness and invalidity

(a)    Subject to the Legal Reservations and Perfection Requirements and paragraph (b) below:

(i)     it is or becomes unlawful for an Obligor or a Third Party Security Provider to perform any of its material obligations under the Finance Documents or any Transaction Security created or expressed to be created or evidenced by the Transaction Security Documents ceases to be effective or any subordination created under the Intercreditor Agreement is or becomes unlawful;

(ii)    any obligation or obligations of any Obligor or Third Party Security Provider under any Finance Documents  are not or cease to be legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the Bank under the Finance Documents; or

(iii)   any Finance Document ceases to be in full force and effect or any Transaction Security or any subordination created under the Intercreditor Agreement ceases to be legal, valid, binding, enforceable or effective or is alleged to be ineffective by an Obligor, a Third Party Security Provider or any Holding Company of the Company party to it.

(b)    No Event of Default under paragraph (a) above will occur if the failure to comply is capable of remedy and is remedied within 20 Business Days of the earlier of (i) the Bank giving notice to the Company or relevant Obligor or Third Party Security Provider and (ii) an Obligor or a Third Party Security Provider becoming aware of the failure to comply.

**22.9** **Intercreditor Agreement**

(a) Any Holding Company of the Company party to the Intercreditor Agreement fails to comply with the provisions of, or does not perform its material obligations under, the Intercreditor Agreement; or

(b) a representation or warranty given by that party in the Intercreditor Agreement is incorrect in any material respect,

and, if the non-compliance or circumstances giving rise to the misrepresentation are capable of remedy, it is not remedied within 20 Business Days of the earlier of the Bank giving notice to that party or that party becoming aware of the non-compliance or misrepresentation.

**22.10** **Cessation of business**

The Restricted Group (taken as a whole) suspends or ceases to carry on all or a material part of its business except as a result of a Permitted Transaction.

**22.11** **Audit qualification**

The Company's auditors qualify the Annual Financial Statements of the Company in respect of the Restricted Group as a going concern or by reason of failure to disclose information, and such qualification is or would be materially adverse to the interests of the Bank under the Finance Documents.

**22.12** **Expropriation**

The authority or ability of the Restricted Group (taken as a whole) to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any governmental, regulatory or other similar authority in relation to any member of the Restricted Group or any of its assets and such event has or would be likely to have a Material Adverse Effect.

**22.13** **Repudiation and rescission of agreements**

An Obligor or a Third Party Security Provider or any Holding Company of the Company party to it rescinds or purports to rescind or repudiates or purports to repudiate a Finance Document or any of the Transaction Security or evidences an intention to rescind or repudiate a Finance Document or any Transaction Security and this has or is likely to be materially adverse effect on the interests of the Bank under the Finance Documents.

**22.14** **Litigation**

Any litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency are started, or any judgment or order of a court, arbitral body or agency is made, in relation to the Finance Documents or the transactions contemplated in the Finance Documents or against any member of the Restricted Group or its assets which has, or would be likely to have, a Material Adverse Effect.

**22.15** **Acceleration**

Subject to the Intercreditor Agreement, on and at any time after the occurrence of an Event of Default which is continuing the Bank may:

(a) by notice to the Company:

(i) cancel the Available Commitment of the Bank at which time each such Available Commitment shall immediately be cancelled and the Facility shall immediately cease to be available for further utilisation;

(ii) declare that all or part of the Utilisations, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, at which time they shall become immediately due and payable;

(iii) declare that all or part of the Utilisations be payable on demand, at which time they shall immediately become payable on demand by the Bank;

(iv) declare that cash cover in respect of each Undertaking is immediately due and payable at which time it shall become immediately due and payable; and/or

(v) declare that cash cover in respect of each Undertaking is payable on demand at which time it shall immediately become due and payable on demand by the Bank; and/or

(b) exercise or direct the Security Agent to exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

## 23. CHANGES TO THE BANK

### 23.1 Assignments and transfers by the Bank

Subject to this Clause 23, the Bank (the **Existing Bank**) may:

(a) assign all (but not part) of its rights;

(b) transfer by novation all (but not part) of its rights and obligations; or

(c) enter into a sub-participation,

under any Finance Documents to another bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (the **New Bank**).

### 23.2 Company consent

(a) The consent of the Company is required for an assignment, transfer or a voting sub-participation by an Existing Bank, unless, subject to paragraph (b) below, the assignment, transfer or voting sub-participation is:

(i) to any entity identified on the White List;

(ii) to an Affiliate of the Bank;

(iii) made at a time when an Event of Default is continuing under Clause 22.1 (Non-payment) or 22.5 (Insolvency) or 22.6 (Insolvency proceedings).

(b) Notwithstanding paragraph (a) above, the consent of the Company shall always be required for an assignment, transfer or a voting sub-participation by an Existing Bank if the New Bank:

(i) is not a bank with a long term corporate credit rating of BBB+/Baa1 or better according to at least two of Moody's, Standard & Poor's and Fitch; or

**779**

(ii) is, or is acting on behalf of or is fronting for, a Loan to Own/Distressed Investor or an Industry Competitor.

(c) For the purposes of paragraph (b) above:

**Industry Competitor** means any person or entity (or any of its Affiliates or any person acting on its behalf) which is a competitor of a member of the Group or whose business is similar or related to a member of the Group or is a supplier or sub-contractor of a member of the Group and, in each case, any controlling shareholder of such persons, provided that this shall not include any person or entity (or any of its Affiliates) which is a bank, financial institution or trust, fund or other entity which is independently controlled and managed and whose principal business or a material activity of whom is arranging, underwriting or investing in debt.

**Loan to Own/Distressed Investor** means any person or entity (or any of its Affiliates or any person acting on its behalf including any department or "desk" of any such person or entity) whose principal business or material activity is:

(a) investing in distressed debt or the purchase of loans or other debt securities with the intention of (or view to) owning the equity or gaining control of a business (directly or indirectly);

(b) investing in equity and/or acquiring control of, or an equity stake in, a business (directly or indirectly); and/or

(c) exploiting holdout or blocking positions,

but excluding:

(i) any Affiliate of any such person or entity which is a deposit taking financial institution authorised by a financial services regulator to carry out the business of banking which holds a minimum rating equal to or better than BBB+/Baa1 according to at least two of Moody's, Standard & Poor's and Fitch which are managed and controlled independently to any such person or entity and provided that any information made available under the Finance Documents shall not be disclosed or made available to such person or entity or its other Affiliates; and

(ii) the Original Bank.

### 23.3 Other conditions of assignment or transfer

(a) An assignment will only be effective on:

(i) receipt by the Bank (whether in the Assignment Agreement or otherwise) of written confirmation from the New Bank (in form and substance satisfactory to the Bank) that the New Bank will assume the same obligations to the other Finance Parties and the other Secured Parties as it would have been under if it had been the Original Bank;

(ii) the New Bank entering into the documentation required for it to accede as a party to the Intercreditor Agreement; and

(iii) performance by the Bank of all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to such assignment to a New Bank, the completion of which the Bank shall promptly notify to the Existing Bank and the New Bank.

(b)    A transfer will only be effective if the New Bank enters into the documentation required for it to accede as a party to the Intercreditor Agreement and if the procedure set out in Clause 23.5 (Procedure for transfer) is complied with.

(c)    If:

    (i)    the Bank assigns or transfers any of its rights or obligations under the Finance Documents or changes its Facility Office; and

    (ii)    as a result of circumstances existing at the date the assignment, transfer or change occurs, an Obligor would be obliged to make a payment to the New Bank acting through its new Facility Office under Clause 13 (Tax gross up and indemnities) or Clause 14 (Increased Costs),

then the New Bank acting through its new Facility Office is only entitled to receive payment under those Clauses to the same extent as the Existing Bank acting through its previous Facility Office would have been if the assignment, transfer or change had not occurred.

**23.4    Limitation of responsibility of Existing Bank**

(a)    Unless expressly agreed to the contrary, an Existing Bank makes no representation or warranty and assumes no responsibility to a New Bank for:

    (i)    the legality, validity, effectiveness, adequacy or enforceability of the Finance Documents, the Transaction Security or any other documents;

    (ii)    the financial condition of any Obligor;

    (iii)    the performance and observance by any Obligor or any other member of the Restricted Group of its obligations under the Finance Documents or any other documents; or

    (iv)    the accuracy of any statements (whether written or oral) made in or in connection with any Finance Document or any other document,

and any representations or warranties implied by law are excluded.

(b)    Each New Bank confirms to the Existing Bank, the other Finance Parties and the Secured Parties that it:

    (i)    has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of each Obligor and its related entities in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Bank or any other Finance Party in connection with any Finance Document or the Transaction Security; and

    (ii)    will continue to make its own independent appraisal of the creditworthiness of each Obligor and its related entities whilst any amount is or may be outstanding under the Finance Documents or any Commitment is in force.

(c)    Nothing in any Finance Document obliges an Existing Bank to:

    (i)    accept a re-transfer or re-assignment from a New Bank of any of the rights and obligations assigned or transferred under this Clause 23; or

(ii)    support any losses directly or indirectly incurred by the New Bank by reason of the non-performance by any Obligor of its obligations under the Finance Documents or otherwise.

**23.5    Procedure for transfer**

(a)    Subject to the conditions set out in Clause 23.2 (Company consent) and Clause 23.3 (Other conditions of assignment or transfer) a transfer is effected in accordance with paragraph (b) below when a duly completed Transfer Certificate is executed by the Existing Bank and the New Bank.

(b)    On the Transfer Date:

(i)    to the extent that in the Transfer Certificate the Existing Bank seeks to transfer by novation its rights and obligations under the Finance Documents and in respect of the Transaction Security each of the Obligors and the Existing Bank shall be released from further obligations towards one another under the Finance Documents and in respect of the Transaction Security and their respective rights against one another under the Finance Documents and in respect of the Transaction Security shall be cancelled (being the **Discharged Rights and Obligations**);

(ii)    each of the Obligors and the New Bank shall assume obligations towards one another and/or acquire rights against one another which differ from the Discharged Rights and Obligations only insofar as that Obligor or other member of the Restricted Group and the New Bank have assumed and/or acquired the same in place of that Obligor and the Existing Bank;

(iii)    the Security Agent and the New Bank shall acquire the same rights and assume the same obligations between themselves and in respect of the Transaction Security as they would have acquired and assumed had the New Bank been the Original Bank with the rights, and/or obligations acquired or assumed by it as a result of the transfer and to that extent the Security Agent and the Existing Bank shall each be released from further obligations to each other under the Finance Documents; and

(iv)    the New Bank shall become a Party as the "Bank".

**23.6    Procedure for assignment**

(a)    Subject to the conditions set out in Clause 23.2 (Company consent) and Clause 23.3 (Other conditions of assignment or transfer) an assignment may be effected in accordance with paragraph (b) below when a duly completed Assignment Agreement is executed by the Existing Bank and the New Bank.

(b)    On the Transfer Date:

(i)    the Existing Bank will assign absolutely to the New Bank its rights under the Finance Documents and in respect of the Transaction Security expressed to be the subject of the assignment in the Assignment Agreement;

(ii)    the Existing Bank will be released from the obligations (the **Relevant Obligations**) expressed to be the subject of the release in the Assignment Agreement (and any corresponding obligations by which it is bound in respect of the Transaction Security); and

(iii)    the New Bank shall become a Party as the "Bank" and will be bound by obligations equivalent to the Relevant Obligations.

(c)    The Bank may utilise procedures other than those set out in this Clause 23.6 to assign its rights under the Finance Documents (but not, without the consent of the relevant Obligor or unless in accordance

with Clause 23.5 (Procedure for transfer), to obtain a release by that Obligor from the obligations owed to that Obligor by the Bank nor the assumption of equivalent obligations by a New Bank) provided that they comply with the conditions set out in Clause 23.2 (Company consent) and Clause 23.3 (Other conditions of assignment or transfer).

**23.7    Copy of Transfer Certificate or Assignment Agreement to Company**

The Bank shall, as soon as reasonably practicable after it has executed a Transfer Certificate, an Assignment Agreement, send to the Company a copy of that Transfer Certificate or Assignment Agreement.

**23.8    Security over rights**

In addition to the other rights provided to the Bank under this Clause 23, the Bank may without consulting with or obtaining consent from any Obligor, at any time charge, assign or otherwise create Security in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of the Bank including, without limitation:

(a)    any charge, assignment or other Security to secure obligations to a federal reserve or central bank; and

(b)    any charge, assignment or other Security granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by the Bank as security for those obligations or securities,

except that no such charge, assignment or Security shall:

(i)    release the Bank from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or Security for the Bank as a party to any of the Finance Documents; or

(ii)    require any payments to be made by an Obligor other than or in excess of, or grant to any person any more extensive rights than, those required to be made or granted to the Bank under the Finance Documents.

**24.    CHANGES TO THE OBLIGORS**

**24.1    Assignment and transfers by Obligors**

No Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

**24.2    Additional Borrowers**

(a)    Subject to compliance with the provisions of paragraphs (c) and (d) of Clause 20.8 ("Know your customer" checks), the Company may request that any of its wholly-owned Restricted Subsidiaries becomes a Borrower.  That Restricted Subsidiary shall become a Borrower if:

(i)    it is incorporated in the same jurisdiction as an existing Borrower or otherwise if the Bank approves the addition of that Restricted Subsidiary;

(ii)    the Company and that Restricted Subsidiary deliver to the Bank a duly completed and executed Accession Deed;

(iii)    the Restricted Subsidiary is (or becomes) a Guarantor prior to becoming a Borrower;

(iv)    no Event of Default is continuing or would occur as a result of that Restricted Subsidiary becoming a Borrower; and

(v)    the Bank has received all of the documents and other evidence listed in Schedule 2 (Conditions precedent) in relation to that Additional Borrower, each in form and substance satisfactory to the Bank (acting reasonably).

(b)    The Bank shall notify the Company promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Schedule 2 (Conditions precedent).

## 24.3    Resignation of a Borrower

(a)    The Company may request that a Borrower ceases to be a Borrower by delivering to the Bank a Resignation Letter.

(b)    The Bank shall accept a Resignation Letter and notify the Company and the other Finance Parties of its acceptance if:

(i)    the Borrower is under no actual or contingent obligations as a Borrower under any Finance Documents; and

(ii)    the member of the Restricted Group continues as a Guarantor (unless its resignation has been accepted in accordance with Clause 24.5 (Resignation of a Guarantor)).

(c)    Upon notification by the Bank to the Company of its acceptance of the resignation of a Borrower, that company shall cease to be a Borrower and shall have no further rights or obligations under the Finance Documents as a Borrower.

## 24.4    Additional Guarantors

(a)    Subject to compliance with the provisions of paragraphs (c) and (d) of Clause 20.8 ("Know your customer" checks), the Company may request that any of its Restricted Subsidiaries become a Guarantor.

(b)    A member of the Restricted Group shall become an Additional Guarantor if:

(i)    the Company and the proposed Additional Guarantor deliver to the Bank a duly completed and executed Accession Deed; and

(ii)    the Bank has received all of the documents and other evidence listed in Schedule 2 (Conditions precedent) in relation to that Additional Guarantor, each in form and substance satisfactory to the Bank (acting reasonably).

(c)    The Bank shall notify the Company promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Schedule 2 (Conditions precedent).

## 24.5    Resignation of a Guarantor

(a)    The Company may request that a Guarantor (other than the Company) ceases to be a Guarantor by delivering to the Bank a Resignation Letter if:

(i)    the Company has confirmed to the Bank that the Guarantor Cover Test will continue to be complied with following the resignation of that Guarantor;

(ii)    that Guarantor or any member of the Group which is its Holding Company is the subject of a Permitted Transaction pursuant to which that Guarantor will cease to be a member of the Group;

(iii)    that Guarantor is the subject of a Permitted Transaction pursuant to which it is to be liquidated, wound up or dissolved (or pursuant to which it will otherwise cease to exist);

(iv)    the resignation is required to give effect to a Structure Memorandum Step;

(v)    that Guarantor (or a Holding Company of that Guarantor) is designated as an Unrestricted Subsidiary; or

(vi)    the resignation is required to give effect to clause 17.5 (Other transactions) of the Intercreditor Agreement,

provided that the Company may not request that any of Abbot Group Limited, Bentec GmbH Drilling and Oilfield Systems, KCA Deutag Drilling GmbH, KCA Deutag Tiefbohrgesellschaft mbH, KCA Deutag Energy LLC or KCA Deutag (Land Rig) Limited resigns voluntarily pursuant to sub-paragraph (i) above.

(b)    The Bank shall accept a Resignation Letter and notify the Company and the Bank of its acceptance if:

(i)    the Company has confirmed that no Event of Default is continuing or would result from the acceptance of the Resignation Letter;

(ii)    no payment is due from the Guarantor under Clause 18.1 (Guarantee and indemnity); and

(iii)    where the Guarantor is also a Borrower, it has resigned and ceased to be a Borrower under Clause 24.3 (Resignation of a Borrower).

(c)    Upon notification by the Bank to the Company of its acceptance of the resignation of that Guarantor, that company shall cease to be a Guarantor and shall have no further rights or obligations under the Finance Documents as a Guarantor.

**24.6    Resignation and release of security on disposal**

If a Borrower or Guarantor is or is proposed to be the subject of a disposal to a person which is not a member of the Restricted Group that is not prohibited by this Agreement, any resignation of that Borrower or Guarantor and related release of Transaction Security required in accordance with the Intercreditor Agreement shall become effective only on the making of that disposal.

**25.    CONDUCT OF BUSINESS BY THE FINANCE PARTIES**

No provision of this Agreement will:

(a)    interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)    oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c)    oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

## 26.    PAYMENT MECHANICS

### 26.1    Payments to the Bank

(a)    On each date on which an Obligor is required to make a payment under a Finance Document that Obligor shall make the same available to the Bank (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Bank as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b)    Payment shall be made to such account in London as specified by the Bank.

### 26.2    Distributions to an Obligor

The Bank may (with the consent of the Obligor or in accordance with Clause 27 (Set-off)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

### 26.3    Partial payments

(a)    Subject to the terms of the Intercreditor Agreement, if the Bank receives a payment for application against amounts due in respect of any Finance Documents that is insufficient to discharge all the amounts then due and payable by an Obligor under those Finance Documents, the Bank shall apply that payment towards the obligations of that Obligor under the Finance Documents in the following order:

(i)    **first**, in or towards payment pro rata of any accrued interest, fee or commission due but unpaid under those Finance Documents;

(ii)    **secondly**, in or towards payment pro rata of any principal due but unpaid under those Finance Documents and any amount due but unpaid under Clause 6.2 (Claims under an Undertaking) and Clause 6.3 (Indemnities); and

(iii)    **thirdly**, in or towards payment pro rata of any other sum due but unpaid under the Finance Documents.

(b)    Paragraph (a) above will override any appropriation made by an Obligor.

### 26.4    Set-off by Obligors

All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

### 26.5    Business Days

(a)    Any payment under the Finance Documents which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b)    During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

**26.6    Currency of account**

(a)    Subject to paragraphs (b) to (e) below, the Base Currency is the currency of account and payment for any sum due from an Obligor under any Finance Document.

(b)    A repayment of a Utilisation or Unpaid Sum or a part of a Utilisation or Unpaid Sum shall be made in the currency in which that Utilisation or Unpaid Sum is denominated, pursuant to this Agreement, on its due date.

(c)    Each payment of interest shall be made in the currency in which the sum in respect of which the interest is payable was denominated, pursuant to this Agreement, when that interest accrued.

(d)    Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(e)    Any amount expressed to be payable in a currency other than the Base Currency shall be paid in that other currency.

**26.7    Change of currency**

(a)    Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(i)    any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Bank (after consultation with the Company); and

(ii)    any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Bank (acting reasonably).

(b)    If a change in any currency of a country occurs, this Agreement will, to the extent the Bank (acting reasonably and after consultation with the Company) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the relevant market and otherwise to reflect the change in currency.

**26.8    Disruption to payment systems etc.**

If either the Bank determines (in its discretion) that a Disruption Event has occurred or the Bank is notified by the Company that a Disruption Event has occurred:

(a)    the Bank may, and shall if requested to do so by the Company, consult with the Company with a view to agreeing with the Company such changes to the operation or administration of the Facility as the Bank may deem necessary in the circumstances;

(b)    the Bank shall not be obliged to consult with the Company in relation to any changes mentioned in paragraph (a) above if, in its opinion, it is not practicable to do so in the circumstances and, in any event, shall have no obligation to agree to such changes;

(c)    the Bank may consult with the Finance Parties in relation to any changes mentioned in paragraph (a) above but shall not be obliged to do so if, in its opinion, it is not practicable to do so in the circumstances;

(d)     any such changes agreed upon by the Bank and the Company shall (whether or not it is finally determined that a Disruption Event has occurred) be binding upon the Parties as an amendment to (or, as the case may be, waiver of) the terms of the Finance Documents notwithstanding the provisions of Clause 32 (Amendments and waivers);

(e)     the Bank shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever (including, without limitation for negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Bank) arising as a result of its taking, or failing to take, any actions pursuant to or in connection with this Clause 26.8; and

(f)     the Bank shall notify the Finance Parties of all changes agreed pursuant to paragraph (d) above.

## 27.   SET-OFF

If an Event of Default is continuing, the Bank may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by the Bank) against any matured obligation owed by the Bank to that Obligor, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Bank may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

## 28.   NOTICES

### 28.1  Communications in writing

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by email or letter.

### 28.2  Addresses

The address and email address (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is that identified with its signature below or any substitute address, email address or department or officer as the Party may notify to the Bank (or the Bank may notify to the other Parties, if a change is made by the Bank) by not less than five Business Days' notice.

### 28.3  Delivery

(a)     Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

    (i)     if by way of email, when received in legible form; or

    (ii)    if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 28.2 (Addresses), if addressed to that department or officer.

(b)     Any communication or document to be made or delivered to the Bank or the Security Agent will be effective only when actually received by the Bank or Security Agent and then only if it is expressly marked for the attention of the department or officer identified with the Bank's or Security Agent's

signature below (or any substitute department or officer as the Bank or Security Agent shall specify for this purpose).

(c)     Any communication or document made or delivered to the Company in accordance with this Clause 28.3 will be deemed to have been made or delivered to each of the Obligors.

(d)     Any communication or document which becomes effective, in accordance with paragraphs (a) to (c) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

## 28.4    Notification of address and email address

Promptly upon changing its address or email address, the Bank shall notify the other Parties.

## 28.5    Electronic communication

(a)     Any communication or document to be made or delivered by one Party to another under or in connection with the Finance Documents may be made or delivered by electronic mail or other electronic means (including, without limitation, by way of posting to a secure website).

(b)     Any such electronic communication or document as specified in paragraph (a) above made or delivered by one Party to another will be effective only when actually received (or made available) in readable form.

(c)     Any electronic communication or document which becomes effective, in accordance with paragraph (b) above, after 5.00 p.m. in the place in which the Party to whom the relevant communication or document is sent or made available has its address for the purpose of this Agreement shall be deemed only to become effective on the following day.

(d)     Any reference in a Finance Document to a communication being sent or received or a document being delivered shall be construed to include that communication or document being made available in accordance with this Clause 28.5.

## 28.6    English language

(a)     Any notice given under or in connection with any Finance Document must be in English.

(b)     All other documents provided under or in connection with any Finance Document must be:

(i)     in English; or

(ii)     if not in English, and if so required by the Bank, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

## 29.    CALCULATIONS AND CERTIFICATES

## 29.1    Accounts

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

**29.2    Certificates and determinations**

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

**29.3    Day count convention**

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or, in any case where the practice in the relevant market differs, in accordance with that market practice.

**30.    PARTIAL INVALIDITY**

If, at any time, any provision of a Finance Document is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

**31.    REMEDIES AND WAIVERS**

No failure to exercise, nor any delay in exercising, on the part of any Finance Party or Secured Party, any right or remedy under a Finance Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any Finance Document. No election to affirm any Finance Document on the part of any Finance Party or Secured Party shall be effective unless it is in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy. The rights and remedies provided in each Finance Document are cumulative and not exclusive of any rights or remedies provided by law.

**32.    AMENDMENTS AND WAIVERS**

**32.1    Intercreditor Agreement**

This Clause 32 is subject to the terms of the Intercreditor Agreement.

**32.2    Required consents**

(a)    Subject to Clause 32.3 (Exceptions), any term of this Agreement may be amended or waived only with the consent of the Bank and the Company and any such amendment or waiver will be binding on all Parties.

(b)    The Bank may effect, on behalf of any Finance Party, any amendment or waiver permitted by this Clause 32.

(c)    Each Obligor agrees to any such amendment or waiver permitted by this Clause 32 which is agreed to by the Company. This includes any amendment or waiver which would, but for this paragraph (c), require the consent of all of the Guarantors.

**32.3    Exceptions**

An amendment or waiver which relates to the rights or obligations of the Security Agent may not be effected without the consent of the Security Agent.

## 33.    CONFIDENTIAL INFORMATION

### 33.1    Confidentiality

Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by Clause 33.2 (Disclosure of Confidential Information), and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

### 33.2    Disclosure of Confidential Information

Any Finance Party may disclose:

(a)    to any of its Affiliates and any of its or their officers, directors, employees, professional advisers, auditors, partners and Representatives such Confidential Information as that Finance Party shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this paragraph (a) is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

(b)    to any person:

(i)    to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Finance Documents or which succeeds (or which may potentially succeed) it as Security Agent and, in each case, to any of that person's Affiliates, Representatives and professional advisers;

(ii)    with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or one or more Obligors and to any of that person's Affiliates, Representatives and professional advisers;

(iii)    appointed by any Finance Party or by a person to whom paragraph (b)(i) or (b)(ii) above applies to receive communications, notices, information or documents delivered pursuant to the Finance Documents on its behalf;

(iv)    who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in paragraph (b)(i) or (b)(ii) above;

(v)    to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(vi)    to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes;

(vii)    to whom or for whose benefit that Finance Party charges, assigns or otherwise creates Security (or may do so) pursuant to Clause 23.8 (Security over rights);

(viii)   who is a Party; or

(ix)   with the consent of the Company,

in each case, such Confidential Information as that Finance Party shall consider appropriate if:

(A)   in relation to paragraphs (b)(i), (b)(ii) and (b)(iii) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information;

(B)   in relation to paragraph (b)(iv) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential Information they receive and is informed that some or all of such Confidential Information may be price-sensitive information;

(C)   in relation to paragraphs (b)(v), (b)(vi) and (b)(vii) above, the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of that Finance Party, it is not practicable so to do in the circumstances;

(c)   to any person appointed by that Finance Party or by a person to whom paragraph (b)(i) or (b)(ii) above applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this paragraph (c) if the service provider to whom the Confidential Information is to be given has entered into a confidentiality agreement substantially in the form of the LMA Master Confidentiality Undertaking for Use With Administration/Settlement Service Providers or such other form of confidentiality undertaking agreed between the Company and the relevant Finance Party; and

(d)   to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Obligors if the rating agency to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information.

**33.3    Entire agreement**

This Clause 33 constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

**33.4    Inside information**

Each of the Finance Parties acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each of the Finance Parties undertakes not to use any Confidential Information for any unlawful purpose.

**33.5    Notification of disclosure**

Each of the Finance Parties agrees (to the extent permitted by law and regulation) to inform the Company:

(a)    of the circumstances of any disclosure of Confidential Information made pursuant to paragraph (b)(v) of Clause 33.2 (Disclosure of Confidential Information) except where such disclosure is made to any of the persons referred to in that paragraph during the ordinary course of its supervisory or regulatory function; and

(b)    upon becoming aware that Confidential Information has been disclosed in breach of this Clause 33.

**33.6    Continuing obligations**

The obligations in this Clause 33 are continuing and, in particular, shall survive and remain binding on each Finance Party for a period of 12 months from the earlier of:

(a)    the date on which all amounts payable by the Obligors under or in connection with the Finance Documents have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

(b)    the date on which such Finance Party otherwise ceases to be a Finance Party.

**34.    COUNTERPARTS**

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

**35.    CONTRACTUAL RECOGNITION OF BAIL-IN**

(a)    Notwithstanding any other term of any Finance Document or any other agreement, arrangement or understanding between the Parties, each Party acknowledges and accepts that any liability of any Party to any other Party under or in connection with the Finance Documents may be subject to Bail-In Action by the relevant Resolution Authority and acknowledges and accepts to be bound by the effect of:

(i)    any Bail-In Action in relation to any such liability, including (without limitation):

(A)    a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

(B)    a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it; and

(C)    a cancellation of any such liability; and

(ii)    a variation of any term of any Finance Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

(b)    In this Agreement:

**Article 55 BRRD** means Article 55 of Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms;

**Bail-In Action** means the exercise of any Write-down and Conversion Powers;

**Bail-In Legislation** means:

(i)        in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 BRRD, the relevant implementing law or regulation as described in the EU Bail-In Legislation Schedule from time to time; and

(ii)       in relation to any state other than such an EEA Member Country or (to the extent that the United Kingdom is not such an EEA Member Country) the United Kingdom, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation;

**EEA Member Country** means any member state of the European Union, Iceland, Liechtenstein and Norway;

**EU Bail-In Legislation Schedule** means the document described as such and published by the Loan Market Association (or any successor person) from time to time;

**Resolution Authority** means any body which has authority to exercise any Write-down and Conversion Powers;

**UK Bail-In Legislation** means (to the extent that the United Kingdom is not an EEA Member Country which has implemented, or implements, Article 55 BRRD) Part I of the United Kingdom Banking Act 2009 and any other law or regulation applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (otherwise than through liquidation, administration or other insolvency proceedings); and

**Write-down and Conversion Powers** means:

(i)        in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule;

(ii)       in relation to any other applicable Bail-In Legislation:

(A)       any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and

(B)       any similar or analogous powers under that Bail-In Legislation; and

(iii)      in relation to any UK Bail-In Legislation:

(A)       any powers under that UK Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into

shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that UK Bail-In Legislation that are related to or ancillary to any of those powers; and

(B)     any similar or analogous powers under that UK Bail-In Legislation.

## 36.   GOVERNING LAW

(a)     This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

(b)     Without prejudice to paragraph (a) above, Schedule 10 (Restrictive Covenants) of this Agreement will be interpreted in accordance with the laws of the State of New York.

## 37.   ENFORCEMENT

### 37.1   Jurisdiction of English courts

(a)     The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a **Dispute**).

(b)     The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c)     Notwithstanding paragraphs (a) and (b) above, no Finance Party or Secured Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction.  To the extent allowed by law, the Finance Parties and Secured Parties may take concurrent proceedings in any number of jurisdictions.

### 37.2   Service of process

(a)     Without prejudice to any other mode of service allowed under any relevant law, each Obligor (other than an Obligor incorporated in England and Wales):

(i)     irrevocably appoints the Company as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document (and the Company by its execution of this Agreement, accepts that appointment); and

(ii)    agrees that failure by an agent for service of process to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

(b)     If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Company (on behalf of all the Obligors) must immediately (and in any event within ten Business Days of such event taking place) appoint another agent on terms acceptable to the Bank.  Failing this, the Bank may appoint another agent for this purpose.

**THIS AGREEMENT** has been entered into on the date stated at the beginning of this Agreement.

**795**

## SCHEDULE 1

## THE ORIGINAL OBLIGORS

## PART 1

## THE ORIGINAL BORROWERS

| Name of Original Borrower | Jurisdiction of incorporation | Registration number (or equivalent, if any) |
|---|---|---|
| Abbot Group Limited | England & Wales | 0623285 |
| Abbot Holdings Limited | England & Wales | 02682916 |
| KCA Deutag Alpha Limited | England & Wales | 06433748 |
| KCA Deutag Caspian Limited | England & Wales | 01877963 |
| KCA Deutag Drilling Group Limited | England & Wales | 01059871 |
| KCA European Holdings Limited | England & Wales | 04286946 |
| Bentec GmbH Drilling and Oilfield Systems | Germany | HRB130192 |
| KCA Deutag Drilling GmbH | Germany | HRB131828 |
| KCA Deutag GmbH | Germany | HRB 131828 |
| Abbot Holdings Norge AS | Norway | 989 528 270 |
| KCA Deutag Drilling Norge AS | Norway | 918 357 688 |
| KCA Deutag Drilling Offshore Services AS | Norway | 990 397 082 |
| KCA Deutag Holdings Norge AS | Norway | 987 558 741 |
| KCA Deutag Offshore AS | Norway | 986 709 770 |
| KCA Deutag Drilling Limited | Scotland | SC031961 |
| KCA Deutag Technical Support Limited | Scotland | SC219425 |
| SET Drilling Company Limited | Scotland | SC167498 |

## PART 2

### THE ORIGINAL GUARANTORS

| Name of Original Guarantor | Jurisdiction of incorporation | Registration number (or equivalent, if any) |
|---|---|---|
| Abbot Group Limited | England & Wales | 00623285 |
| Abbot Holdings Limited | England & Wales | 02682916 |
| KCA Deutag (Land Rig) Limited | England & Wales | 05659113 |
| KCA Deutag Alpha Limited | England & Wales | 06433748 |
| KCA Deutag Caspian Limited | England & Wales | 01877963 |
| KCA Deutag Drilling Group Limited | England & Wales | 01059871 |
| KCA Deutag UK Finance plc | England & Wales | 09015065 |
| KCA European Holdings Limited | England & Wales | 04286946 |
| Abbot Verwaltungsgesellschaft mbH | Germany | HRB 131347 |
| Bentec GmbH Drilling and Oilfield Systems | Germany | HRB 130192 |
| KCA Deutag Drilling GmbH | Germany | HRB 130813 |
| KCA Deutag GmbH | Germany | HRB 131828 |
| KCA Deutag Tiefbohrgesellschaft mbH | Germany | HRB 131390 |
| KCA Deutag Europe B.V. | Netherlands | 34162210 |
| KCA Deutag Nederland B.V. | Netherlands | 34162211 |
| Abbot Holdings Norge AS | Norway | 989 528 270 |
| KCA Deutag Drilling Norge AS | Norway | 918 357 688 |
| KCA Deutag Drilling Offshore Services AS | Norway | 990 397 082 |
| KCA Deutag Holdings Norge AS | Norway | 987 558 74 |
| KCA Deutag MODU Operations AS | Norway | 979 392 710 |
| KCA Deutag Offshore AS | Norway | 986 709 770 |
| KCA Deutag Energy International LLC | Oman | 1183594 |
| KCA Deutag Energy LLC | Oman | 1707728 |
| KCA Deutag Drilling LLC | Russia | 1036500623884 |
| KCA Deutag Russia LLC | Russia | 1036500621410 |
| KCA Deutag Gulf Drilling Limited Company | Saudi Arabia | 2052101330 |
| KCA Deutag Drilling Limited | Scotland | SC426092 |
| KCA Deutag Technical Support Limited | Scotland | SC219425 |
| SET Drilling Company Limited | Scotland | SC167498 |

## SCHEDULE 2

## CONDITIONS PRECEDENT REQUIRED TO BE DELIVERED BY AN ADDITIONAL OBLIGOR

1.    **Additional Obligor**

(a)    A copy of the constitutional documents of the Additional Obligor and, if that Additional Obligor is incorporated in:

   (i)    Germany: (i) a copy of the constitutional documents (*Satzung* or *Gesellschaftsvertrag* as applicable) or an up to date copy of the partnership agreement and up to date copies of any by-laws as well (as applicable), (ii) an extract from the Commercial Register (*Handelsregister*) not older than fourteen days as the date of the certificate delivered pursuant to paragraph (f) below) and (iii) a copy of a list of shareholders (*Gesellschafterliste*) as filed with the competent commercial register (*Handelsregister*) (as applicable);

   (ii)    The Netherlands, an up-to-date extract from the Dutch trade register (*Handelsregister*) relating to it dated not earlier than five Business Days prior to the date on which the relevant Accession Deed becomes effective.

(b)    A copy of a resolution of the board or, if applicable, a committee of the board of directors of the Additional Obligor (other than an Additional Obligor incorporated or established in Germany):

   (i)    approving the terms of, and the transactions contemplated by, the Accession Deed and the Finance Documents and resolving that it execute, deliver and perform the Accession Deed and any other Finance Document to which it is party;

   (ii)    authorising a specified person or persons to execute the Accession Deed and other Finance Documents on its behalf;

   (iii)    authorising a specified person or persons, on its behalf, to sign and/or despatch all other documents and notices (including, in relation to an Additional Borrower, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party; and

   (iv)    authorising the Company to act as its agent in connection with the Finance Documents.

(c)    In relation to an Additional Obligor incorporated or established in Germany:

   (i)    a copy of a resolution signed by all the holders of the issued shares (*Gesellschafterbeschluss*) of such Original Obligor and/or if applicable, a copy of a resolution of the supervisory board (*Aufsichtsrat*) and/or advisory board (*Beirat*) of such Original Obligor:

      (A)    approving the terms of, and the transactions contemplated by the Finance Documents to which it is a party; and

      (B)    instructing the managing director(s) of each Original Obligor to execute the Finance Documents to which it is a party;

   (ii)    and each such other resolution which might be required by such German Obligor's Articles of Association (*Satzung* or *Gesellschaftsvertrag* as applicable)).

(d)    If applicable, a copy of a resolution of the board of directors of the Additional Obligor, establishing the committee referred to in paragraph (b) above.

(e)    A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above.

(f)    If applicable, a copy of a resolution signed by all the holders of the issued shares of the Additional Obligor, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Additional Obligor is a party.

(g)    A certificate of the Additional Obligor (signed by a director) confirming that utilising or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on it to be exceeded.

(h)    A certificate of an authorised signatory of the Additional Obligor certifying that each copy document listed in this Schedule 2 is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of the Accession Deed.

## 2.    Finance Documents

(a)    An Accession Deed executed by the Additional Obligor and the Company.

(b)    Any Transaction Security Documents which are required to be executed by the proposed Additional Obligor in accordance with the Agreed Security Principles.

(c)    Any notices or documents required to be given or executed under the terms of those Transaction Security Documents.

## 3.    Legal opinions

The following legal opinions, each addressed to the Bank and the Security Agent:

(a)    a legal opinion of the legal advisers to the Bank in England, as to English law in the form distributed to the Bank prior to signing the Accession Deed; and

(b)    if the Additional Obligor is incorporated in a jurisdiction other than England and Wales or is executing a Finance Document which is governed by a law other than English law, a legal opinion of the legal advisers to the Bank in the jurisdiction of its incorporation and in the form distributed to the Bank prior to signing the Accession Deed.

## 4.    Other documents and evidence

(a)    If the proposed Additional Obligor is incorporated in a jurisdiction other than England and Wales, evidence that the process agent specified in Clause 37.2 (Service of process), if not an Obligor, has accepted its appointment in relation to the proposed Additional Obligor.

(b)    Evidence required by the Finance Parties for the purpose of any "know your customer" requirements.

(c)    A copy of any other Authorisation or other document, opinion or assurance which the Bank considers to be necessary or desirable in connection with the entry into and performance of the transactions contemplated by the Accession Deed or for the validity and enforceability of any Finance Document.

## SCHEDULE 3

## UTILISATION REQUEST

From:      [Borrower]/[Company/Abbot Group]¹
To:        Lloyds Bank plc
Dated:

### KCA Deutag Alpha Limited – US$60,000,000 Super Senior Facility Agreement
### dated [          ] (the Facility Agreement)

1.    We refer to the Facility Agreement.  This is a Utilisation Request.  Terms defined in the Facility Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2.    We wish to arrange for an Undertaking to be issued by the Bank specified below (which has agreed to do so) on the following terms:

        (a)    Borrower:              [        ];

        (b)    Proposed    Utilisation[        ] (or, if that is not a Business Day, the next Business Day);
                   Date:

        (c)    Currency    of
                    Undertaking:          [        ];

        (d)    Amount:               [        ] or, if less, the Available Facility;

        (e)    Beneficiary:          [        ]; and

        (f)    Term:                 [        ].

3.    We confirm that each condition specified in paragraph (b) of Clause 4.5 (Issue of Undertakings) of the Facility Agreement is satisfied on the date of this Utilisation Request.

4.    We attach a copy of the proposed Undertaking.

5.    The purpose of this proposed Undertaking is [            ].

6.    The Company considers that the proposed Undertaking [is/is not] a Direct Credit Substitute.

7.    This Utilisation Request is irrevocable.

8.    [*Specify delivery instructions*].

Yours faithfully

.......................................................
authorised signatory for
[Company/Abbot Group] on behalf of [*insert name of relevant Borrower*]]/[*insert name of relevant Borrower*]¹

NOTES:

1.        Amend as appropriate.  The Utilisation Request can be given by the Borrower or by the Company or Abbot Group.

**800**

## SCHEDULE 4

## FORM OF TRANSFER CERTIFICATE

To:    [        ] as Bank and [        ] as Security Agent

From:   [*The Existing Bank*] (the **Existing Bank**) and [*The New Bank*] (the **New Bank**)

Dated:

### KCA Deutag Alpha Limited – US$60,000,000 Super Senior Facility Agreement
### dated [          ] (the Facility Agreement)

1.    We refer to the Facility Agreement and to the Intercreditor Agreement (as defined in the Facility Agreement). This agreement (the **Agreement**) shall take effect as a Transfer Certificate for the purposes of the Facility Agreement and as a Creditor/Creditor Representative Accession Undertaking for the purposes of the Intercreditor Agreement (and as defined in the Intercreditor Agreement). Terms defined in the Facility Agreement have the same meaning in this Agreement unless given a different meaning in this Agreement.

2.    We refer to Clause 23.5 (Procedure for transfer) of the Facility Agreement.

(a)    The Existing Bank and the New Bank agree to the Existing Bank transferring to the New Bank by novation and in accordance with Clause 23.5 (Procedure for transfer) of the Facility Agreement all of the Existing Bank's rights and obligations under the Facility Agreement, the other Finance Documents and in respect of the Transaction Security which relate to that portion of the Existing Bank's Commitment and participations in Utilisations under the Facility Agreement as specified in the Schedule.

(b)    The proposed Transfer Date is [        ].

(c)    The Facility Office and address, email address and attention details for notices of the New Bank for the purposes of Clause 28.2 (Addresses) of the Facility Agreement are set out in the Schedule.

3.    The New Bank expressly acknowledges the limitations on the Existing Bank's obligations set out in paragraph (c) of Clause 23.4 (Limitation of responsibility of Existing Bank) of the Facility Agreement.

4.    The New Bank confirms, for the benefit of the Bank and without liability to any Obligor, that it is:

(a)    [a Qualifying Bank;]

(b)    [a Qualifying Bank (other than a Treaty Bank);]

(c)    [a Treaty Bank.][1]

5.    [The New Bank confirms that it holds a passport under the HMRC DT Treaty Passport scheme (reference number [ ]) and is tax resident in [  ][2], so that interest payable to it by Borrowers is generally subject to full exemption from UK withholding tax and requests that the Company notifies:

(a)    each Borrower which is a Party as a Borrower as at the Transfer Date; and

---

[1]    Delete as applicable. Each New Bank is required to confirm which of these three categories it falls within.
[2]    Insert jurisdiction of tax residence.

(b)    each Additional Borrower which becomes an Additional Borrower after the Transfer Date,

that it wishes that scheme to apply to the Facility Agreement.][3]

6.    We refer to clause 26.3 (Change of Lender) of the Intercreditor Agreement. In consideration of the New Bank being accepted as a Super Senior Facility Lender for the purposes of the Intercreditor Agreement (and as defined therein), the New Bank confirms that, as from the Transfer Date, it intends to be party to the Intercreditor Agreement as a Super Senior Facility Lender, and undertakes to perform all the obligations expressed in the Intercreditor Agreement to be assumed by a Super Senior Facility Lender and agrees that it shall be bound by all the provisions of the Intercreditor Agreement, as if it had been an original party to the Intercreditor Agreement.

7.    This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

8.    This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

9.    This Agreement has been entered into on the date stated at the beginning of this Agreement.

**Note: The execution of this Transfer Certificate may not transfer a proportionate share of the Existing Bank's interest in the Transaction Security in all jurisdictions.  It is the responsibility of the New Bank to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Bank's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

**WARNING: Please seek Dutch legal advice (i) until the interpretation of the term "public" (as referred to in Article 4.1(1) of the Capital Requirements Regulation (EU/575/2013)) has been published by the competent authority, if the share of a Lender in any utilisation requested by a Dutch borrower is less than EUR 100,000 (or the foreign currency equivalent thereof) and (ii) as soon as the interpretation of the term "public" has been published by the competent authority, if the Lender is considered to be part of the public on the basis of such interpretation.**

---

[3]    Include if the New Bank holds a passport under the HMRC DT Treaty Passport scheme and wishes that scheme to apply to the Facility Agreement.

## THE SCHEDULE

### Commitment/rights and obligations to be transferred

[*insert relevant details*]

[*Facility Office address, email address and attention details for notices and account details for payments*]


[Existing Bank]                    [New Bank]

By:                                By:

This Agreement is accepted as a Creditor/Creditor Representative Accession Undertaking for the purposes of the Intercreditor Agreement by the Security Agent, and the Transfer Date is confirmed as [      ].


[Security Agent]

By:

## SCHEDULE 5

## FORM OF ASSIGNMENT AGREEMENT

To:     [      ] as Bank, [        ] as Security Agent and [         ] as the Company, for and on behalf of each Obligor

From:   [*The Existing Bank*] (the **Existing Bank**) and [*The Existing Bank*] (the **New Bank**)

Dated:

### KCA Deutag Alpha Limited – US$60,000,000 Super Senior Facility Agreement
### dated [          ] (the Facility Agreement)

1.    We refer to the Facility Agreement and to the Intercreditor Agreement (as defined in the Facility Agreement).  This is an Assignment Agreement.  This agreement (the **Agreement**) shall take effect as an Assignment Agreement for the purposes of the Facility Agreement and as a Creditor/Creditor Representative Accession Undertaking for the purposes of the Intercreditor Agreement (and as defined in the Intercreditor Agreement).  Terms defined in the Facility Agreement have the same meaning in this Agreement unless given a different meaning in this Agreement.

2.    We refer to Clause 23.6 (Procedure for assignment) of the Facility Agreement.

(a)    The Existing Bank assigns absolutely to the New Bank all the rights of the Existing Bank under the Facility Agreement, the other Finance Documents and in respect of the Transaction Security which correspond to that portion of the Existing Bank's Commitment and participations in Utilisations under the Facility Agreement as specified in the Schedule.

(b)    The Existing Bank is released from all the obligations of the Existing Bank which correspond to that portion of the Existing Bank's Commitment and participations in Utilisations under the Facility Agreement specified in the Schedule.

(c)    The New Bank becomes a Party as the Bank and is bound by obligations equivalent to those from which the Existing Bank is released under paragraph (b) above.

3.    The proposed Transfer Date is [        ].

4.    On the Transfer Date the New Bank becomes:

(a)    party to the relevant Finance Documents (other than the Intercreditor Agreement) as the Bank; and

(b)    party to the Intercreditor Agreement as a Super Senior Facility Lender (as defined in the Intercreditor Agreement).

5.    The Facility Office and address, email address and attention details for notices of the New Bank for the purposes of Clause 28.2 (Addresses) of the Facility Agreement are set out in the Schedule.

6.    The New Bank expressly acknowledges the limitations on the Existing Bank's obligations set out in paragraph (c) of Clause 23.4 (Limitation of responsibility of Existing Bank) of the Facility Agreement.

7.    The New Bank confirms, for the benefit of the Bank and without liability to any Obligor, that it is:

(a)      [not a Qualifying Bank;]

(b)      [a Qualifying Bank (other than a Treaty Bank);]

(c)      [not a Treaty Bank].[4]

8.    [The New Bank confirms that it holds a passport under the HMRC DT Treaty Passport scheme (reference number [ ]) and is tax resident in [ ][5], so that interest payable to it by Borrowers is generally subject to full exemption from UK withholding tax and requests that the Company notifies:

(a)      each Borrower which is a Party as a Borrower as at the Transfer Date; and

(b)      each Additional Borrower which becomes an Additional Borrower after the Transfer Date,

that it wishes that scheme to apply to the Facility Agreement.][6]

9.    We refer to clause 26.3 (Change of Lender) of the Intercreditor Agreement. In consideration of the New Bank being accepted as a Super Senior Facility Lender for the purposes of the Intercreditor Agreement (and as defined therein), the New Bank confirms that, as from the Transfer Date, it intends to be party to the Intercreditor Agreement as a Super Senior Facility Lender, and undertakes to perform all the obligations expressed in the Intercreditor Agreement to be assumed by a Super Senior Facility Lender and agrees that it shall be bound by all the provisions of the Intercreditor Agreement, as if it had been an original party to the Intercreditor Agreement.

10.   This Agreement acts as notice to the Bank (on behalf of each Finance Party) and, upon delivery in accordance with Clause 23.7 (Copy of Transfer Certificate or Assignment Agreement to Company) of the Facility Agreement, to the Company (on behalf of each Obligor) of the assignment referred to in this Agreement.

11.   This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

12.   This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

13.   This Agreement has been entered into on the date stated at the beginning of this Agreement.

**Note: The execution of this Assignment Agreement may not transfer a proportionate share of the Existing Bank's interest in the Transaction Security in all jurisdictions.  It is the responsibility of the New Bank to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Bank's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

**WARNING: Please seek Dutch legal advice (i) until the interpretation of the term "public" (as referred to in Article 4.1(1) of the Capital Requirements Regulation (EU/575/2013)) has been published by the competent authority, if the share of a Lender in any utilisation requested by a Dutch borrower is less than EUR 100,000 (or the foreign currency equivalent thereof) and (ii) as soon as the interpretation of the term "public" has been published by the competent authority, if the Lender is considered to be part of the public on the basis of such interpretation.**

---

[4]      Delete as applicable. Each New Bank is required to confirm which of these three categories it falls within.
[5]      Insert jurisdiction of tax residence.
[6]      Include if the New Bank holds a passport under the HMRC DT Treaty Passport scheme and wishes that scheme to apply to the Facility Agreement.

## THE SCHEDULE

**Commitment/rights and obligations to be transferred by assignment, release and accession**

[*insert relevant details*]

[*Facility Office address, email address and attention details for notices and account details for payments*]


[Existing Bank]                    [New Bank]

By:                                By:

This Agreement is accepted as a Creditor/Creditor Representative Accession Undertaking for the purposes of the Intercreditor Agreement by the Security Agent, and the Transfer Date is confirmed as [     ].


[Security Agent]

By:

## SCHEDULE 6

## FORM OF ACCESSION DEED

To:       [       ] as Bank and [       ] as Security Agent for itself and each of the other parties to the Intercreditor Agreement referred to below

From:   [*Restricted Subsidiary*] and [Company]

Dated:

### KCA Deutag Alpha Limited – US$60,000,000 Super Senior Facility Agreement dated [       ] (the Facility Agreement)

1.       We refer to the Facility Agreement and to the Intercreditor Agreement.  This deed (the **Accession Deed**) shall take effect as an Accession Deed for the purposes of the Facility Agreement and as a Debtor Accession Deed for the purposes of the Intercreditor Agreement (and as defined in the Intercreditor Agreement).   Terms defined in the Facility Agreement have the same meaning in paragraphs 1 to 4 of this Accession Deed unless given a different meaning in this Accession Deed.

2.       [*Restricted Subsidiary*] agrees to become an Additional [Borrower]/[Guarantor] and to be bound by the terms of the Facility Agreement and the other Finance Documents (other than the Intercreditor Agreement) as an Additional [Borrower]/[Guarantor] pursuant to Clause [24.2 (Additional Borrowers)]/[Clause 24.4 (Additional Guarantors)] of the Facility Agreement.   [*Restricted Subsidiary*] is a company duly incorporated under the laws of [*name of relevant jurisdiction*] and is a [limited liability] company with registered number [                ].

3.       [The Company confirms that no Event of Default is continuing or would occur as a result of [*Restricted Subsidiary*] becoming an Additional Borrower].[7]

4.       [*Restricted Subsidiary's*] administrative details for the purposes of the Facility Agreement and the Intercreditor Agreement are as follows:

   Address:
   Email:
   Attention:

5.       [*Restricted Subsidiary*] (for the purposes of this paragraph 5, the **Acceding Debtor**) intends to incur Liabilities and to give a guarantee, indemnity or other assurance against loss in respect of Liabilities under any Debt Document to which it is or will become a party (the **Relevant Documents**).

   **IT IS AGREED** as follows:

   (a)       Terms defined in the Intercreditor Agreement shall, unless otherwise defined in this Accession Deed, bear the same meaning when used in this paragraph 5.

   (b)       The Acceding Debtor and the Security Agent agree that the Security Agent shall hold:

   (i)       any Security in respect of Liabilities or any Security Agent Claim created or expressed to be created pursuant to the Relevant Documents;

   (ii)      all proceeds of that Security; and

---

[7]       Include in the case of an Additional Borrower.

(iii)    all obligations expressed to be undertaken by the Acceding Debtor to pay amounts in respect of the Liabilities to the Security Agent as trustee or security agent for the Secured Parties (in the Relevant Documents or otherwise and including any Security Agent Claim) and secured by the Transaction Security together with all representations and warranties expressed to be given by the Acceding Debtor (in the Relevant Documents or otherwise) in favour of the Security Agent as trustee or security agent for the Secured Parties,

on trust or as security agent for the Secured Parties on the terms and conditions contained in the Intercreditor Agreement.

(c)    The Acceding Debtor confirms that it intends to be party to the Intercreditor Agreement as a Debtor, undertakes to perform all the obligations expressed to be assumed by a Debtor under the Intercreditor Agreement and agrees that it shall be bound by all the provisions of the Intercreditor Agreement as if it had been an original party to the Intercreditor Agreement.

(d)    [In consideration of the Acceding Debtor being accepted as an Intra-Group Lender for the purposes of the Intercreditor Agreement, the Acceding Debtor also confirms that it intends to be party to the Intercreditor Agreement as an Intra-Group Lender, and undertakes to perform all the obligations expressed in the Intercreditor Agreement to be assumed by an Intra-Group Lender and agrees that it shall be bound by all the provisions of the Intercreditor Agreement, as if it had been an original party to the Intercreditor Agreement].[8]

6.    This Accession Deed and any non-contractual obligations arising out of or in connection with it are governed by English law.

**THIS ACCESSION DEED** has been signed on behalf of the Security Agent (for the purposes of paragraph 5 above only), signed on behalf of the Company and executed as a deed by [*Restricted Subsidiary*] and is delivered on the date stated above.

**Restricted Subsidiary**

EXECUTED as a deed by
[*Restricted Subsidiary*]
acting by

………………….
Director

and

………………….
Director/Secretary

---

[8]    Include this paragraph in this Accession Deed if the Subsidiary is also to accede as an Intra-Group Lender to the Intercreditor Agreement.

**Company**

[Company]

By:

**Security Agent**

[*Full name of current Security Agent*]

By:

Date:

## SCHEDULE 7

### FORM OF RESIGNATION LETTER

To:      [        ] as Bank

From:   [*resigning Obligor*] and [Company]

Dated:

### KCA Deutag Alpha Limited – US$60,000,000 Super Senior Facility Agreement
### dated [         ] (the Facility Agreement)

1.      We refer to the Facility Agreement.  This is a Resignation Letter.  Terms defined in the Facility Agreement have the same meaning in this Resignation Letter unless given a different meaning in this Resignation Letter.

2.      Pursuant to [Clause 24.3 (Resignation of a Borrower)]/[Clause 24.5 (Resignation of a Guarantor)] of the Facility Agreement, we request that [*resigning Obligor*] be released from its obligations as a [Borrower]/[Guarantor] under the Facility Agreement and the Finance Documents (other than the Intercreditor Agreement).

3.      We confirm that the conditions referred to in Clause 24.5 (Resignation of a Guarantor) have been complied with.

4.      This Resignation Letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

[Company]                                              [*resigning Obligor*]

By:                                                    By:

## SCHEDULE 8

## FORM OF LEVERAGE CALCULATION CERTIFICATE

To:    [        ] as Bank

From:   [KCA Deutag Alpha Limited]

Dated:

**KCA Deutag Alpha Limited – US$60,000,000 Super Senior Facility Agreement
dated [            ] (the Facility Agreement)**

1.      We refer to the Facility Agreement.  This is a Leverage Calculation Certificate.  Terms defined in the Facility Agreement have the same meaning when used in this Leverage Calculation Certificate unless given a different meaning in this Leverage Calculation Certificate.

2.      We confirm that in respect of the 12 month period ending on [     ],  the  Senior  Secured  Gross Leverage Ratio was [     ]:1.

3.      We confirm that accordingly the Issuance Rate for the purpose of paragraph (c) of Clause 12.1 (Issuance fees) will be:

(a)      Customs Bonds: [●]% per annum.

(b)      Other Undertakings: [●]% per annum.

4.      [We confirm that the following companies constitute Material Companies for the purposes of the Facility Agreement: [●]][9]

5.      [We confirm that the aggregate (without double counting) Group Member EBITDA of the Guarantors was equal to [          ]% of the Consolidated EBITDA of the Adjusted Group as at the end of the Financial Year ending [        ].  We therefore confirm that the Guarantor Coverage Test is satisfied or will be satisfied by further members of the Group acceding as Additional Guarantors in accordance with Clause 21.15.][10]

Signed for and on behalf of


………………………………
Authorised Person
[KCA Deutag Alpha Limited]

---

[9]       Include in the certificate delivered with the Annual Financial Statements
[10]      Include in the certificate delivered with the Annual Financial Statements

**812**

# SCHEDULE 9[11]

# EXISTING UNDERTAKINGS

| REFERENCE NUMBER | DATE ISSUED | BENEFICIARY | CCY | CURRENCY AMOUNT OUTSTANDING | STERLING AMOUNT OUTSTANDING | EXPIRY | CI CODE | EXOTIC CURRENCY | SYNDICATION AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| GTYA080022273 | 31/03/2008 | DEUTSCHE BANK A.G. | EUR | 9,000,000.00 | 8,192,990.44 | 31/03/2021 | CO | | |
| GTSD500004240 | 10/09/2019 | Hauptzollamt Osnabruck | EUR | 155,400.00 | 141,465.63 | | IN | | |
| GTYA121003024 | 20/01/2012 | BANQUE EXTERIEURE D'ALGERIE | GBP | 499,383.11 | 499,383.11 | | | DZD | |
| GTYA151019514 | 22/07/2015 | DIRECTEUR GENERAL DOUANES | USD | 0.01 | 0.01 | | CO | | |
| GTYA151019670 | 03/08/2015 | DIRECTEUR GENERAL DOUANES ALGERIENN | DZD | 65,000,000.00 | 388,711.34 | | CO | | |
| GTSD500001483 | 15/08/2018 | Sharjah National Oil Corporation | USD | 266,525.00 | 206,664.60 | 10/02/2021 | IN | | |
| GTSD500002316 | 29/11/2018 | Schneider Electric GmbH | EUR | 4,227.00 | 3,847.97 | 30/11/2020 | IN | | |
| GTSD500002339 | 11/12/2018 | E.NA. For Zone Industrielle BP 211 | EUR | 62,636.33 | 57,019.87 | 20/08/2020 | IN | | |
| GTSD500003446 | 23/04/2019 | Kuwait Oil Company | KWD | 1,947,486.00 | 4,927,849.19 | 31/07/2025 | IN | | |
| GTSD500003447 | 23/04/2019 | Kuwait Oil Company | KWD | 1,947,486.00 | 4,927,849.19 | 28/03/2021 | IN | | |
| GTSD500003485 | 02/05/2019 | MOL PAKISTAN OIL and GAS CO. B.V. | USD | 400,000.00 | 310,161.67 | 31/12/2020 | IN | | |
| GTSD500003888 | 04/07/2019 | ENTREPRISE NATIONALE DES TRAVAUX | EUR | 135,027.12 | 122,919.54 | 31/12/2020 | IN | | |
| GTSD500003941 | 17/09/2019 | Qarat Al Milh Petroleum LLC | USD | 1,000,000.00 | 775,404.18 | 24/12/2020 | IN | | |
| GTSD500004465 | 26/09/2019 | The Public Authority for Manpower | KWD | 36,750.00 | 92,990.89 | 30/06/2025 | CO | | |
| GTSD500004466 | 26/09/2019 | The Public Authority for Manpower | KWD | 36,750.00 | 92,990.89 | 30/06/2025 | IN | | |
| GTSD500004660 | 08/11/2019 | Groupement TouatGaz | USD | 1,049,556.00 | 813,830.11 | 01/10/2020 | IN | | |
| GTSD500004862 | 29/11/2019 | Administracao Geral Tributaria Prim | GBP | 332,769.53 | 332,769.53 | 28/02/2021 | IN | 268,987,597.00 | |
| GTSD500005435 | 17/03/2020 | E.NA. For Zone Industrielle BP 211 | EUR | 45,036.72 | 40,998.38 | 30/03/2021 | IN | | |
| GTSD500005598 | 16/04/2020 | E.NA. For Zone | EUR | 25,079.35 | 22,830.54 | 31/03/2021 | IN | | |

---

[11] This schedule lists the Existing Undertakings as at 8 October 2020- to be updated prior to signing as agreed between the Bank and the Company.

| REFERENCE NUMBER | DATE ISSUED | BENEFICIARY | CCY | CURRENCY AMOUNT OUT STANDING | STERLING AMOUNT OUT STANDING | EXPIRY | CI CODE | EXOTIC CURRENCY | SYNDICATION AMOUNT |
|---|---|---|---|---|---|---|---|---|---|
| | | Industrielle BP 211 | | | | | | | |
| GTSD500006033 | 18/08/2020 | Entreprise nationale de forage | EUR | 5,853.86 | 5,328.96 | 31/03/2021 | IN | | |
| GTYA151019187 | 22/06/2015 | E.NA.FOR | EUR | 1,812,031.00 | 1,649,550.30 | 31/12/2018 | CO | | |
| GTYA161023599 | 10/08/2016 | UNDRAWN FACILITY | USD | 3,503,531.51 | 2,716,652.98 | 16/05/2021 | CO | | |
| GTYB121006724 | 26/07/2012 | ENTREPRISE NATIONALE DES TRAVAUX AU | USD | 1,111,175.10 | 861,609.82 | 31/12/2020 | CO | | |
| GTSD500005796 | 12/06/2020 | E.NA.FOR | EUR | 750.00 | 682.75 | 31/12/2020 | IN | | |
| GTSD500005436 | 25/03/2020 | RITTAL GmbH & Co. KG | EUR | 100,000.00 | 91,033.23 | 31/10/2020 | IN | | |
| GTYA161020076 | 13/01/2016 | BERGEN KEMNERKONTOR | NOK | 55,000,000.00 | 4,569,092.99 | | CO | | |
| GTYA171028178 | 23/11/2017 | General Tax Directorate | USD | 1,922,034.90 | 1,490,353.89 | 27/11/2020 | IN | LEK205, | |

Total liabiities outstanding as at 07-Oct-2020 -
Group 93M
Total for KCA Deutag Alpha Limited            33,334,982.01
Customers Liability to Lloyds Bank             33,334,982.01

## SCHEDULE 10

## RESTRICTIVE COVENANTS

**1.    GENERAL**

(a)    A reference in this Agreement to a "Section" is a reference to a section of this Schedule.

(b)    A reference in this Schedule to a "Clause" (capitalised) is a reference to a clause in the main body of this Agreement.

(c)    Unless the context otherwise requires:

    (i)    a term has the meaning assigned to it;

    (ii)    an accounting term not otherwise defined has the meaning assigned to it in accordance with IFRS;

    (iii)    "or" is not exclusive;

    (iv)    words in the singular include the plural, and in the plural include the singular;

    (v)    "will" shall be interpreted to express a command;

    (vi)    provisions apply to successive events and transactions; and

    (vii)    references to sections of or rules under the U.S. Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time.

(d)    Notwithstanding anything to the contrary in this Agreement, for the purposes of this Schedule, a sale, assignment, transfer, lease, conveyance or other disposition of properties or assets of the Company or any of its Restricted Subsidiaries shall not constitute a sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Company and its Restricted Subsidiaries if any such sale, assignment, transfer, lease, conveyance or other disposition results in the sale or other disposition of assets of less than 50% of either (1) the total consolidated assets of the Company and its Restricted Subsidiaries, as shown on the most recent balance sheet of such Company for which internal financial statements are available calculated on a consolidated basis in accordance with IFRS or (2) the Consolidated EBITDA of the Company.

**2.    RESTRICTED PAYMENTS**.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

    (i)    declare or pay any dividend or make any other payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Company's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Company or payable in the form of Subordinated Shareholder Debt and other than dividends or distributions payable to the Company or a Restricted Subsidiary of the Company);

(ii)    purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) any Equity Interests of the Company or any Parent held by Persons other than the Company or any of its Restricted Subsidiaries (other than in exchange for Equity Interests (other than Disqualified Stock) of the Company or Subordinated Shareholder Debt);

(iii)    make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value, any Indebtedness of the Company or any Guarantor that is contractually subordinated in right of payment to the Facility (excluding any intercompany Indebtedness between the Company and any of its Restricted Subsidiaries or among any Restricted Subsidiaries), except (i) a payment of interest or principal at or after the Stated Maturity thereof or (ii) the purchase, repurchase, or other acquisition of Indebtedness that is contractually subordinated to the Facility, purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase or acquisition;

(iv)    make any payment (other than in the form of Equity Interests (other than Disqualified Stock) of the Company or Subordinated Shareholder Debt) on or with respect to, or purchase, redeem, defease or otherwise acquire for value any Subordinated Shareholder Debt; or

(v)    make any Restricted Investment,

(all such payments and other actions set forth in clauses (i) through (v) of this Section 2(a) being collectively referred to as **Restricted Payments**) unless, at the time of and after giving effect to such Restricted Payment:

(i)    no Default or Event of Default has occurred and is continuing or would occur as a consequence of such Restricted Payment;

(ii)    the Company would, after giving pro forma effect to such Restricted Payment as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4(a); and

(iii)    such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries since the date of this Agreement (excluding Restricted Payments permitted by clauses (2), (3), (4), (5), (6), (7), (8), (9), (11), (12), (14), (15), (16), (17), (18), (19), (20) and (21) of the next succeeding paragraph), is less than the sum, without duplication, of:

(i)    50% of the Consolidated Net Income of the Company for the period (taken as one accounting period) starting from the beginning of the fiscal quarter commencing immediately after the date of this Agreement to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, if such Consolidated Net Income for such period is a deficit, less 100% of such deficit, provided that if Consolidated Net Income is a deficit, such deficit shall in no event reduce amounts available pursuant to sub-paragraph (vi) below); plus

(ii)    100% of the aggregate net cash proceeds and the Fair Market Value of property, assets or marketable securities received by the Company since the date of this Agreement (x) as a contribution to its common equity capital or

(y) from the issue or sale of Equity Interests of the Company or any Parent (other than Disqualified Stock or Excluded Contributions or Designated Preference Shares) or from Subordinated Shareholder Debt or from the issue or sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or Designated Preference Shares or debt securities) sold to a Restricted Subsidiary of the Company); plus

(iii)    to the extent that any Restricted Investment that was (i) made after the date of this Agreement is sold, disposed of or otherwise cancelled, liquidated or repaid, 100% of the aggregate amount received in cash and the Fair Market Value of property, assets or marketable securities received by the Company or any Restricted Subsidiary or (ii) made in an entity that subsequently becomes a Restricted Subsidiary, 100% of the Fair Market Value of the Restricted Investment of the Company and its Restricted Subsidiaries as of the date such entity becomes a Restricted Subsidiary; plus

(iv)    to the extent that any Unrestricted Subsidiary of the Company designated as such is redesignated as a Restricted Subsidiary after the date of this Agreement or has been merged into, consolidated or amalgamated with or into, or transfers or conveys its assets to, the Company or a Restricted Subsidiary of the Company, 100% of the Fair Market Value of the Company's Investment in such Subsidiary as of the date of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable) after deducting the amount of any Investment in such Unrestricted Subsidiary that constituted a Permitted Investment made pursuant to clause (12) of the definition of Permitted Investment; plus

(v)    100% of any dividends or distributions received by the Company or a Restricted Subsidiary of the Company after the date of this Agreement from an Unrestricted Subsidiary of the Company, to the extent that such dividends or distributions were not otherwise included in the Consolidated Net Income of the Company for such period; plus

(vi)    $25.0 million.

(b)    The provisions of Section 2(a) will not prohibit:

(i)    the payment of any dividend or distribution or the consummation of any redemption within 60 days after the date of declaration of the dividend or distribution or giving of the redemption notice, as the case may be, if, at the date of declaration or notice, the dividend, distribution or redemption payment would have complied with the provisions of this Agreement;

(ii)    the making of any Restricted Payment in exchange for, or out of or with the net cash proceeds received by the Company of the substantially concurrent sale or issuance (other than to a Subsidiary of the Company) of, Equity Interests of the Company or any Parent (other than Disqualified Stock) or Subordinated Shareholder Debt or from the substantially concurrent contribution of such proceeds to the capital of the Company; provided that the amount of any such net cash proceeds and the Fair Market Value of property other than cash that are utilized for any such Restricted Payment will be excluded from the calculation of amounts under Section 2(a)(C)(ii) and shall not constitute Excluded Contributions;

(iii)    the repurchase, redemption, defeasance or other acquisition or retirement for value of Indebtedness of the Company or any of its Restricted Subsidiaries that is contractually subordinated to the Facility with the net cash proceeds from a substantially concurrent Incurrence of Permitted Refinancing Indebtedness;

(iv)    the payment of any dividend (or, in the case of any partnership or limited liability company, any similar distribution) by a Restricted Subsidiary of the Company to the holders of its Equity Interests on a pro rata basis;

(v)    the repurchase, redemption or other acquisition or retirement (or dividends or distributions to any Parent to finance any such repurchase, redemption or other acquisition or retirement) for value of any Equity Interests of the Company, any Parent or any Restricted Subsidiary of the Company held by any current or former officer, director, consultant or employee of the Company, any Parent or any Restricted Subsidiary of the Company or any trust or other person in respect of any MIP pursuant to any equity subscription agreement, stock option agreement, MIP, shareholders' or members' agreement or similar agreement, plan or arrangement; provided that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests may not exceed the greater of $7.0 million and 3.0% of Consolidated EBITDA (and following the Initial Public Offering, the greater of $10.0 million and 5.0% of Consolidated EBITDA) in any calendar year with unused amounts being carried over into succeeding years, subject to the approval of the Board of Directors of the Company; provided, further, that such amount in any calendar year may be increased by an amount not to exceed (i) the cash proceeds received by the Company, any Parent or a Restricted Subsidiary during such calendar year from the sale of Equity Interests of the Company or a Restricted Subsidiary in each case to members of management, officers, directors, consultants or employees of the Company, any Restricted Subsidiary or any Parent and (ii) the cash proceeds of keyman life insurance policies, in each case, to the extent the cash proceeds have not otherwise been applied to the making of Restricted Payments pursuant to Section 2(a)(C)(ii) or Section 2(b)(ii);

(vi)    the repurchase of Equity Interests deemed to occur upon the exercise of stock options or warrants to the extent such Equity Interests represent a portion of the exercise price of those stock options or warrants;

(vii)    the declaration and payment of regularly scheduled or accrued dividends or distributions to holders of any class or series of Disqualified Stock of the Company or any preferred stock of any Restricted Subsidiary issued on or after the date of this Agreement in accordance with Section 4;

(viii)   Permitted Payments to Parent;

(ix)    Restricted Payments in aggregate amount outstanding at any time not to exceed the aggregated net cash proceeds and the Fair Market Value of property, assets or marketable securities of Excluded Contributions or Investments in exchange for or using as consideration Investments previously made under this Section 2(b)(9);

(x)    other Restricted Payments in an aggregate amount not to exceed the greater of $45.0 million and 20.0% of Consolidated EBITDA since the date of this Agreement;

(xi)    any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Indebtedness of the Company or any of its Restricted Subsidiaries pursuant to the provisions similar to those described under (i) section 4.15 of the 2025 Indenture at a purchase price not greater than 101% of the principal amount of such Indebtedness and

(ii) Section 5 at a purchase price not greater than 100% of the principal amount of such Indebtedness, provided that the Company has complied with its obligations under Section 5;

(xii)    cash dividends or other distributions on the Company's Capital Stock used to, or the making of loans to any Parent to, fund the payment of fees and expenses owed by the Company or its Restricted Subsidiaries to Affiliates, to the extent permitted under Section 6(b)(4);

(xiii)    following an Initial Public Offering of the Capital Stock of the Company or a Parent, the declaration and payment of loans, advances, dividends, or distributions on the Capital Stock of the Company in an amount per annum not to exceed the greater of (A) 6.0% of the net cash proceeds received from such Initial Public Offering or any subsequent Equity Offering by the Company or contributed in cash to the Company's equity (other than through the issuance of Disqualified Stock) and (B) an amount equal to the greater of (1) the greater of (i) 7.0% of the Market Capitalization and (ii) 7.0% of the IPO Market Capitalization; provided that, after giving pro forma effect to the payment of any such dividend or making of any such distribution, the Consolidated Net Leverage Ratio of the Company would not exceed 1.75 to 1.0 and (2) the greater of (i) 5.0% of the Market Capitalization and (ii) 5.0% of the IPO Market Capitalization, provided that, after giving pro forma effect to the payment of any such dividend or making of any such distribution, the Consolidated Net Leverage Ratio of the Company would not exceed 2.25 to 1.0; provided, that if such Initial Public Offering or any subsequent Equity Offering was of Capital Stock of a Parent, the net proceeds of any such loans, advances, dividends or distributions are used to fund a corresponding loan, advance, dividend or distribution in equal or greater amount on the Capital Stock of such Parent;

(xiv)    any payments to minority shareholders as required by law or regulation pursuant to or in contemplation of a merger or consolidation involving the Company or any of its Restricted Subsidiaries that does not otherwise violate this Agreement;

(xv)    the distribution, as a dividend, or otherwise, of Equity Interests in, or Indebtedness or other securities of an Unrestricted Subsidiary of the Company;

(xvi)    payments of cash, dividends, distributions, advances or other Restricted Payments by the Company or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon (x) the exercise of options or warrants or (y) the conversion or exchange of Capital Stock of any such Person;

(xvii)    the payment of any Receivables Fees and purchases of Receivables and related assets pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing;

(xviii)    any Restricted Payment; provided that the Consolidated Net Leverage Ratio of the Company on a pro forma basis after giving effect to any such Restricted Payment does not exceed 1.25 to 1.0;

(xix)    dividends, loans, advances, payments or other distributions in amounts required for any Parent of the Company to pay interest, premium, catch-up payments, make-whole amounts and break costs in respect of Senior Notes, the net cash proceeds of which have been contributed to the Company or any of its Restricted Subsidiaries and that has been guaranteed by, or is otherwise considered Indebtedness of, the Company or any of its Restricted Subsidiaries incurred in accordance of Section 4;

(xx)    Management Advances and MIP Payments; and

(xxi)    any Restricted Payment in connection with the Restructuring;

provided, however, that at the time of, and after giving effect to, any Restricted Payment permitted under clause (x), (xiii) or (18) of this Section 2(b), no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof.

(c)    The amount of all Restricted Payments (other than cash**)** will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Company or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.

(d)    For purposes of determining compliance with this Section 2, in the event that a Restricted Payment (or portion thereof) meets the criteria of more than one of the categories of permitted payments described in Sections 2(b)(1) through (20) above, or is permitted pursuant to Section 2(a) or one or more of the clauses contained in the definition of Permitted Investment, the Company, in its sole discretion, may classify such Restricted Payment or Investment (or portion thereof) in any manner that complies with this Section 2, including as an Investment pursuant to one or more clauses contained in the definition of Permitted Investment. Unsecured Indebtedness shall not be deemed to be subordinated or junior to secured Indebtedness by virtue of its nature as unsecured Indebtedness. No Indebtedness will be deemed to be subordinated or junior to any other Indebtedness which is secured by a Permitted Collateral Lien on a super senior basis and no "second lien" Indebtedness (but excluding any Senior Notes) shall be deemed to be subordinated or junior to the Facility, in either case, solely as a result of any applicable enforcement proceeds waterfall in the Intercreditor Agreement or any Additional Intercreditor Agreement.

3.    **DIVIDEND AND OTHER PAYMENT RESTRICTIONS AFFECTING SUBSIDIARIES**.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or cause to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(i)    pay dividends or make any other distributions on its Capital Stock to the Company or any of its Restricted Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness owed to the Company or any of its Restricted Subsidiaries;

(ii)    make loans or advances to the Company or any of its Restricted Subsidiaries; or

(iii)    sell, lease or transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries,

provided that (x) the priority of any preferred stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill period to) loans or advances made to the Company or any Restricted Subsidiary to other Indebtedness Incurred by the Company or any Restricted Subsidiary, in each case, shall not be deemed to constitute such an encumbrance or restriction.

(b)    The restrictions in Section 3(a) will not apply to encumbrances or restrictions existing under or by reason of:

(i)    agreements governing Indebtedness outstanding on the date of this Agreement (including any Senior Facilities Agreement), and any other agreements of the Company or its Restricted Subsidiaries, in each case as in effect on the date of this Agreement and taking into account any additional security contemplated by their terms and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of such agreements; provided that such amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not, in the good faith judgment of

the Company's Board of Directors or senior management, materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in such agreements on the date of this Agreement or comparable financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Facility or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Facility;

(ii)    the 2025 Indenture, the 2025 Notes, the 2025 Notes Guarantees, the Intercreditor Agreement, the Transaction Security Documents and any Additional Intercreditor Agreement;

(iii)    applicable law, rule, regulation, order, approval, license, permit, authorization, concession or similar restriction;

(iv)    any instrument or agreement governing Indebtedness or Capital Stock of a Person acquired by the Company or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was Incurred or issued in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets or Capital Stock of the Person, so acquired; provided that, in the case of Indebtedness, such Indebtedness was permitted by the terms of this Agreement to be Incurred;

(v)    non-assignment provisions, subletting restrictions or similar restrictions in contracts, leases and licenses entered into in the ordinary course of business;

(vi)    purchase money obligations for property (including Capital Stock) acquired in the ordinary course of business and Lease Obligations that impose restrictions on the property purchased or leased of the nature described in Section 3(a)(iii);

(vii)    any agreement for the sale or other disposition of the Capital Stock or assets of a Restricted Subsidiary that restricts distributions by that Restricted Subsidiary pending closing of the sale or other disposition;

(viii)    Permitted Refinancing Indebtedness; provided that any such encumbrances or restrictions contained in the agreements governing such Permitted Refinancing Indebtedness taken as a whole are not, in the good faith judgment of the Company's Board of Directors or senior management, materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced or comparable financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Facility or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Facility;

(ix)    Liens permitted to be Incurred as set forth under Section 7 that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(x)    provisions limiting the disposition or distribution of assets or property or transfer of Capital Stock in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements, limited liability company organizational documents, and other similar agreements entered into (A) in the ordinary course of business, consistent with past practice or (B) with the approval of the Company's Board of Directors or senior management, which limitation is applicable only to the assets, property or Capital Stock that are the subject of such agreements;

(xi)    Hedging Obligations entered into from time to time for bona fide purposes of the Company and the Restricted Subsidiaries;

(xii)    restrictions on cash, Cash Equivalents, Government Guaranteed Securities or other deposits or net worth imposed by customers, suppliers, or lessors or required by insurance, surety or bonding companies under contracts or leases entered into in the ordinary course of business;

(xiii)    other Indebtedness of the Company and its Restricted Subsidiaries permitted to be Incurred after the date of this Agreement under Section 4; provided that in the good faith judgment of the Company's Board of Directors or senior management such encumbrances or restrictions taken as a whole are not materially less favorable to the Bank with respect to such dividend and other payment restrictions, taken as a whole, than those contained in the 2025 Indenture, the 2025 Notes, the 2025 Notes Guarantees, any Senior Facilities Agreement and the Transaction Security Documents on the date of this Agreement or customary in comparable financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Facility or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Facility;

(xiv)    encumbrances on property that exist at the time the property was acquired by the Company or a Restricted Subsidiary of the Company;

(xv)    contractual encumbrances or restrictions in effect on the date of this Agreement, and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements; provided that such amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not, in the good faith judgment of the Company's Board of Directors or senior management, materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in such agreements on the date of this Agreement or comparable financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Facility or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Facility;

(xvi)    any mortgage financing or mortgage refinancing that imposes restrictions on the real property securing such Indebtedness;

(xvii)    any Qualified Receivables Financing; or

(xviii)    any encumbrances or restrictions imposed by any agreement that amends, renews, refinances, extends, refunds, replaces, defeases or discharges any of the contracts, instruments or obligations referred to in clauses (i) through (xvii) of this Section 3(b); provided that the encumbrances and restrictions contained in such agreement are not, in the good faith judgment of the Company's Board of Directors or senior management, materially more restrictive, taken as a whole, than such encumbrances and restrictions prior to such amendment or refinancing or than those contained in any comparable agreements or financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Facility or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Facility.

**4.    INCURRENCE OF INDEBTEDNESS AND ISSUANCE OF PREFERRED STOCK**.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, Incur any Indebtedness (including Acquired Debt) and the Company will not permit any of its Restricted

Subsidiaries to issue any preferred stock; provided, however that the Company may Incur Indebtedness (including Acquired Debt) and the Restricted Subsidiaries of the Company may Incur Indebtedness (including Acquired Debt) or issue preferred stock, if the Fixed Charge Coverage Ratio of the Company for the period of the most recent four consecutive fiscal quarters for which internal financial statements of the Company are available immediately preceding the date on which such additional Indebtedness is Incurred or such preferred stock is issued, as the case may be, would have been at least 2.0 to 1.0, determined on a pro forma basis (including the pro forma application of the proceeds therefrom), as if the additional Indebtedness had been Incurred or the preferred stock had been issued, as the case may be, at the beginning of such four-quarter period.

(b)     Section 4(a) will not prohibit the Incurrence of any of the following items of Indebtedness or preferred stock (collectively, **Permitted Debt**):

   (i)      the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness under Credit Facilities in an aggregate principal amount at any one time outstanding under this clause (i) (with LC and Bank Guarantees being deemed (solely for the purpose of Incurring Indebtedness under this clause (i)) to have a principal amount equal to the maximum potential liability of the Company and any of its Restricted Subsidiaries thereunder and any Indebtedness under any Cash Management Facilities to be calculated on a net basis to the extent permitted under the relevant Cash Management Facility) not to exceed:

      (i)      the greater of (x) $225.0 million and (y) 100% of Consolidated EBITDA; plus

      (ii)     the maximum amount of Senior Secured Indebtedness such that, on the date of determination, after giving pro forma effect to such Incurrence (including pro forma application of the proceeds thereof), the Consolidated Senior Secured Net Leverage Ratio of the Company does not exceed 2.5 to 1.0,

      provided that any Indebtedness or preferred stock Incurred pursuant to this clause (1) may be refinanced (including, for the avoidance of doubt, an extension, renewal, refund, replacement, defeasance, or discharge) at any time if such refinancing Indebtedness or preferred stock does not exceed the greater of (I) the aggregate principal amount of Indebtedness or preferred stock permitted to be Incurred pursuant to this clause (1) on the date of determination for such refinancing and (II) the aggregate principal amount of the Indebtedness or preferred stock being refinanced at such time (together with an amount necessary to pay fees, commissions, premiums, discounts, costs and expenses (including underwriting commissions paid as discounts) Incurred in connection with such refinancing);

   (ii)     [reserved]

   (iii)    [reserved]

   (iv)     the Incurrence of Indebtedness represented by the 2025 Notes (other than Additional 2025 Notes) and the Incurrence by the Guarantors (including any future Guarantors) of the 2025 Notes Guarantees (other than guarantees of Additional 2025 Notes);

   (v)      Indebtedness of the Company or any of its Restricted Subsidiaries (other than Indebtedness described in clauses (1) or (4) of this Section 4(b)) outstanding on the date of this Agreement after giving pro forma effect to the Restructuring;

   (vi)     the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness represented by:

      (i)      Lease Obligations, mortgage financings, industrial revenue bonds or purchase money obligations or other Indebtedness or preferred stock, in each case, Incurred

for the purpose of financing or refinancing all or any part of the purchase price or cost of design, development, construction, lease, rental, installation or improvement of property (real or personal and including Capital Stock), plant or equipment used or useful in the business of the Company or any of its Restricted Subsidiaries (whether through the direct purchase of such assets or the Equity Interests of any Person owning such assets) and any Indebtedness which refinances, replaces or refunds such Indebtedness, in an aggregate principal amount at any one time outstanding not to exceed the greater of (x) $70.0 million and (y) 30.0% of Consolidated EBITDA; and

 (ii) Ordinary Course Lease Obligations;

(vii) the Incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge any Indebtedness (other than intercompany Indebtedness) that was permitted by this Agreement to be Incurred under Section 4(a) and clauses (4), (v), (vii) and (14) of this Section 4(b);

(viii) the Incurrence by the Company or any of its Restricted Subsidiaries of intercompany Indebtedness between the Company and any of its Restricted Subsidiaries or among any Restricted Subsidiaries; provided, however, that:

 (i) to the extent required by the Intercreditor Agreement, if the Company or any Guarantor is the obligor on such Indebtedness and the payee is not the Company or a Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full in cash of all Obligations then due with respect to the Facility; and

 (ii) (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Restricted Subsidiary of the Company, and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Restricted Subsidiary of the Company, shall be deemed, in each case, to constitute an Incurrence of such Indebtedness by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this Section 4(b)(viii);

(ix) the issuance by any of the Company's Restricted Subsidiaries to the Company or to another Restricted Subsidiary of preferred stock; provided, however, that:

 (i) any subsequent issuance or transfer of Equity Interests that results in any such preferred stock being held by a Person other than the Company or a Restricted Subsidiary of the Company, and

 (ii) any sale or other transfer of any such preferred stock to a Person that is neither the Company nor a Restricted Subsidiary of the Company,

will be deemed, in each case, to constitute an issuance of such preferred stock by such Restricted Subsidiary that was not permitted by this Section 4(b)(ix);

(x) the Incurrence by the Company or any of its Restricted Subsidiaries of Hedging Obligations (other than commodity hedging) other than for speculative purposes as determined in good faith by the Company;

(xi) the guarantee by the Company or any Restricted Subsidiary of Indebtedness of the Company or any Restricted Subsidiary that was permitted to be Incurred by another provision of this Section 4 (including Section 4(a)); provided that, if the Indebtedness being guaranteed is

subordinated to or pari passu with the Facility, then the guarantee thereof shall be subordinated or pari passu as applicable, to the same extent as the Indebtedness so guaranteed;

(xii)    the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness in respect of (A) any LC and Bank Guarantee or (B) workers' compensation claims, payment obligations in connection with health or other types of social security benefits, unemployment or other insurance or self-insurance obligations, statutory obligations, bankers' acceptance, equipment leases, rent payment obligations or other similar obligations in the ordinary course of business or consistent with past practice or (C) any letter of support given to any of its Subsidiaries in connection with the audit of that Subsidiary;

(xiii)    the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds; provided that such Indebtedness is extinguished within five Business Days of its Incurrence;

(xiv)    Indebtedness or preferred stock of Persons (i) that are acquired by the Company or any of its Restricted Subsidiaries or merged (amalgamated or otherwise combined) into a Restricted Subsidiary (including pursuant to any acquisition of assets and assumption of related liabilities) in accordance with the terms of this Agreement or (ii) Incurred to provide all or a portion of the funds utilized to consummate the transaction or series of related transactions pursuant to which any Person became a Restricted Subsidiary or was otherwise acquired by the Company or a Restricted Subsidiary; provided that, for any such Indebtedness or preferred stock Incurred under this Section 4(b)(14) on the date of such acquisition or other transaction, after giving pro forma effect to such acquisition or other transaction and the Incurrence or issuance of such Indebtedness or preferred stock, (A) either (x) the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to Section 4(a) or (y) the Fixed Charge Coverage Ratio of the Company would not be less than it was immediately prior to giving effect to such acquisition or other transaction and to the related Incurrence of Indebtedness or preferred stock; or (B) to the extent that Indebtedness Incurred pursuant to Section 4(b)(14) constitutes Senior Secured Indebtedness, either (x) the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to Section 4(b)(1)(B); or (y) the Consolidated Senior Secured Net Leverage Ratio of the Company would not be greater than it was immediately prior to giving effect to such acquisition or other transaction and to the related Incurrence of Indebtedness or preferred stock;

(xv)    Indebtedness of the Company or any Restricted Subsidiary in an aggregate outstanding principal amount that, when taken together with any Permitted Refinancing Indebtedness in respect thereof and the principal amount of all other Indebtedness Incurred pursuant to this clause (xv) and then outstanding, will not exceed 100% of the net cash proceeds received by the Company since the date of this Agreement (x) as a contribution to its common equity capital or (y) from the issue or sale of Equity Interests of the Company or any Parent (other than Disqualified Stock) or from Subordinated Shareholder Debt or from the issue and sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold to a Restricted Subsidiary of the Company); provided, however, that (i) any net cash proceeds that are so received or contributed shall be excluded for purposes of making Restricted Payments under Section 2(a) and clauses (ii), (ix) and (xiii) of Section 2(b) to the extent the Company or any Guarantor Incur Indebtedness in reliance thereon and (ii) any net cash proceeds that are so received or contributed shall be excluded for purposes of Incurring Indebtedness pursuant to this clause (xv) to the extent the Company or any of its Restricted Subsidiaries makes a

Restricted Payment under Section 2(a) and clauses (ii), (ix) and (xiii) of Section 2(b) in reliance thereon;

(xvi)    the Incurrence of Indebtedness arising from agreements of the Company or a Restricted Subsidiary providing for indemnification, adjustment of purchase price, earn outs, guarantees, or similar obligations, in each case, Incurred or assumed in connection with the disposition or acquisition of any business, assets or a Subsidiary in accordance with the terms of this Agreement, other than guarantees of financial Indebtedness Incurred or assumed by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

(xvii)    the Incurrence by the Company or any of its Restricted Subsidiaries of additional Indebtedness or the issuance of preferred stock in an aggregate principal amount (or accreted value, as applicable) or having an aggregate liquidation preference at any time outstanding, including all Permitted Refinancing Indebtedness Incurred to extend, renew, refund, refinance, replace, defease or discharge any Indebtedness Incurred pursuant to this clause (xvii), not to exceed the greater of (x) $80.0 million and (y) 35.0% of Consolidated EBITDA;

(xviii)    the Incurrence by the Company or any of its Restricted Subsidiaries of additional Indebtedness arising out of advances on exports, advances on imports, customer prepayments and similar transactions in the ordinary course of business or consistent with past practice or advances on trade receivables or factoring of receivables;

(xix)    any Cash Management Facilities including in respect of any netting or setting off arrangements;

(xx)    Indebtedness of the Company or any Restricted Subsidiary in respect of Management Advances and MIP Payments;

(xxi)    guarantees of Indebtedness in connection with Investments in joint ventures not exceeding the greater of $20.0 million and 8.0% of Consolidated EBITDA in the aggregate at any one time outstanding; and

(xxii)    Indebtedness outstanding under local lines of credit or local facilities (including local bilateral facilities, working capital facilities or overdraft facilities) in an aggregate principal amount at any one time outstanding not to exceed the greater of $25.0 million and 10.0% of Consolidated EBITDA;

provided, however, that no more than the greater of $115.0 million and 50.0% of Consolidated EBITDA of Indebtedness at any time outstanding may be Incurred by a Restricted Subsidiary which is not a Guarantor pursuant to Sections 4(a) or clauses (14)(ii)(A), (15) or (17) of this Section 4(b).

(c)    For purposes of determining compliance with this Section 4:

(i)    in the event that an item of Indebtedness or preferred stock meets the criteria of more than one of the categories of Permitted Debt described in clauses (i) through (22) of Section 4(b) or is entitled to be Incurred pursuant to Section 4(a), the Company will be permitted to classify such item of Indebtedness or preferred stock on the date of its Incurrence and will only be required to include the amount and type of such Indebtedness or preferred stock in one of such clauses, although the Company may divide and classify an item of Indebtedness or preferred stock in one or more of the types of Indebtedness or preferred stock and may later reclassify all or a portion of such item of Indebtedness or preferred stock, in any manner that complies with this Section 4;

(ii)     notwithstanding Section 4(c)(1), all Indebtedness Incurred under each Senior Facilities Agreement entered into on the date of this Agreement will be deemed to have been Incurred under Section 4(b)(i)(A) and may not be reclassified;

(iii)    guarantees of, or obligations in respect of letters of credit, bankers' acceptances or other similar instruments relating to, or Liens securing, Indebtedness that is otherwise included in the determination of a particular amount of Indebtedness shall not be included; and

(iv)    if obligations in respect of LC and Bank Guarantees, bankers' acceptances or other similar instruments are Incurred pursuant to any Credit Facility and are being treated as Incurred pursuant to Section 4(a) or clauses (1), (6), (12), (15), (17) and (22) of Section 4(b) and the LC and Bank Guarantees, bankers' acceptances or other similar instruments relate to other Indebtedness, then such other Indebtedness shall not be included

(d)    The accrual of interest or dividends, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness, the reclassification of preferred stock as Indebtedness due to a change in accounting principles, and the payment of dividends on Disqualified Stock or preferred stock in the form of additional shares of the same class of Disqualified Stock or preferred stock will not be deemed to be an Incurrence of Indebtedness or an issuance of preferred stock for purposes of this Section 4. Notwithstanding any other provision of this Section 4 (including pursuant to any Permitted Refinancing Indebtedness permitted pursuant to this Section 4), the maximum amount of Indebtedness that the Company or any Restricted Subsidiary may Incur pursuant to this Section 4 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

(e)    The amount of any Indebtedness outstanding as of any date will be:  (a) the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount; (b) the principal amount of the Indebtedness, in the case of any other Indebtedness; and (c) in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:  (x) the Fair Market Value of such assets at the date of determination; and (y) the amount of the Indebtedness of the other Person.

(f)    Neither the Company nor any Guarantor will Incur any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Company or such Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Facility on substantially identical terms; provided, however, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Company or any Guarantor solely by virtue of being unsecured or by virtue of being secured with different collateral or by virtue of being secured on a junior priority basis or by virtue of the application of waterfall or other payment ordering provisions affecting different tranches of Indebtedness.

**5.    ASSET SALES**.

(a)    The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(i)     the Company (or the Restricted Subsidiary, as the case may be) receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests subject to such Asset Sale; and

(ii)    at least 75% of the consideration received in the Asset Sale by the Company or such Restricted Subsidiary is in the form of cash, Cash Equivalents or Government Guaranteed Securities.

(b)    The amount of (i) any liabilities, as recorded on the most recent balance sheet, of the Company or any Restricted Subsidiary of the Company (other than contingent liabilities and liabilities that are subordinated in right of payment to the Facility) that are assumed by the transferee of any such assets and as a result of which, the Company or such Restricted Subsidiary of the Company are released from any further liability in connection therewith or are indemnified against further liabilities, (ii) any securities, notes, other obligations or assets received by the Company or any such Restricted Subsidiary from such transferee that are converted by the Company or such Restricted Subsidiary into cash or Cash Equivalents within 180 days of the receipt thereof, to the extent of the cash or Cash Equivalents received in that conversion (iii) any Designated Non-cash Consideration received by the Company or any of its Restricted Subsidiaries in such Asset Sale having aggregate Fair Market Value taken together with all other Designated Non-cash Consideration received pursuant to this clause (iii), that is at that time outstanding not to exceed the greater of $35.0 million and 15.0% of Consolidated EBITDA (with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received and without giving effect to subsequent changes in value), (iv) Indebtedness of any Restricted Subsidiary of the Company that is no longer a Restricted Subsidiary as a result of such Asset Sale, to the extent that the Company and each other Restricted Subsidiary are released from any guarantee of such Indebtedness in connection with such Asset Sale, (v) the Fair Market Value of any Capital Stock or assets of the kind referred to in clause (B) or (D) of Section 5(c)(1) and (vi) the Fair Market Value of any consideration consisting of Indebtedness of the Company or any Guarantor of the kind referred to in Section 5(c)(1)(A), provided the such Indebtedness shall thereafter be cancelled, shall be deemed to be cash for purposes of Section 5(a)(ii) and for no other purpose.

(c)    Within 365 days after the receipt of any Net Proceeds from an Asset Sale, the Company (or any Restricted Subsidiary of the Company, as the case may be) may:

    (i)    apply such Net Proceeds, at its option:

        (i)    to repay or redeem (v) Indebtedness outstanding under Section 4(b)(1)(A), (w) Pari Passu Indebtedness Incurred under a Credit Facility that is secured by a Lien on the Collateral and that is not subordinated in right of payment to the Facility, (x) Senior Secured Indebtedness that is Pari Passu Indebtedness at a purchase price of no more than 100% of the principal amount of such Pari Passu Indebtedness, (y) any Indebtedness that was secured by any assets not constituting Collateral sold in such Asset Sale, or any other Indebtedness secured only by assets not constituting Collateral, (z) Indebtedness of a Restricted Subsidiary that is not a Guarantor (other than Indebtedness owed to the Company or any of its Restricted Subsidiaries) or (aa) any Indebtedness pursuant to a Notes Offer;

        (ii)    to acquire all or substantially all of the assets of, or any Capital Stock of, another Permitted Business; provided that in the case of any such acquisition of Capital Stock, the Permitted Business is or becomes a Restricted Subsidiary of the Company;

        (iii)    to make a capital expenditure or other Investment in any person engaged in a Permitted Business;

        (iv)    to acquire other assets that are not classified as current assets under IFRS and that are used or useful in a Permitted Business, or

    (ii)    enter into a binding commitment to apply the Net Proceeds pursuant to clause (ii), (iii) or (iv) of Section 5(c)(i), provided that such binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment

**828**

until the earlier of (x) the date on which such acquisition or expenditure is consummated, and (y) the 180th day following the expiration of the aforementioned 365 day period; or

    (iii)    any combination of Section 5(c)(i) and Section 5(c)(ii).

(d)    Pending the final application of any Net Proceeds, the Company (or the applicable Restricted Subsidiary) may temporarily reduce revolving credit borrowings or otherwise invest the Net Proceeds in any manner that is not prohibited by this Agreement.

## 6. TRANSACTIONS WITH AFFILIATES.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each, an **Affiliate Transaction**), involving aggregate consideration in excess of the greater of $10.0 million and 5.0% of Consolidated EBITDA, unless:

    (i)    the Affiliate Transaction is on terms that are not materially less favorable to the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with a Person who is not an Affiliate; and

    (ii)    the Company delivers to the Bank with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of the greater of $30.0 million and 12.5% of Consolidated EBITDA, an Officer's Certificate and a resolution of the Board of Directors of the Company certifying that such Affiliate Transaction complies with this Section 6.

(b)    The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to Section 6(a):

    (i)    any employment or consultancy agreement, collective bargaining agreement, employee benefit plan, officer or director indemnification agreement, including any stock option, stock appreciation rights, stock incentive, MIP or similar plans or any similar arrangement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice and payments pursuant thereto (including severance, termination and other similar payments to former or departing employees, consultants, officers or directors);

    (ii)    transactions (including a merger) between the Company and any of its Restricted Subsidiaries or among any Restricted Subsidiaries;

    (iii)    transactions with a Person (other than an Unrestricted Subsidiary of the Company) that is an Affiliate of the Company solely because the Company owns, directly or through a Restricted Subsidiary, an Equity Interest in, or controls, such Person;

    (iv)    payment of reasonable fees to, reimbursements of expenses and indemnity provided on behalf of, officers, directors, employees or consultants of the Company or any of its Restricted Subsidiaries or of any Parent;

    (v)    any issuance of Equity Interests (other than Disqualified Stock) of the Company, receipt of any capital contributions in exchange for Equity Interests of the Company (other than Disqualified Stock) or the Incurrence of Subordinated Shareholder Debt;

(vi)  Restricted Payments and Permitted Investments (other than Permitted Investments described in clauses (3) and (9) (to the extent such guarantee is in respect of Indebtedness of a Person that is not the Company or a Restricted Subsidiary) of the definition thereof in Section 15 that do not violate Section 2;

(vii)  Management Advances and MIP Payments;

(viii)  transactions with customers, clients, suppliers, joint venture partners or purchasers or sellers of goods or services, or lessors or lessees of property or providers of employees or other labor in compliance with the terms of this Agreement which are, in the aggregate (taking into account all the costs and benefits associated with such transactions), in the good faith judgment of the Company's Board of Directors, materially no less favorable to the Company or its Restricted Subsidiaries than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with a Person who is not an Affiliate;

(ix)  Liens on Equity Interests of Unrestricted Subsidiaries of the Company for the benefit of lenders of Unrestricted Subsidiaries of the Company;

(x)  if such Affiliate Transaction, following an Initial Public Offering, is with a Person in its capacity as a holder of Capital Stock of the Company or any Restricted Subsidiary where such Person is treated no more favorably than the holders of Capital Stock of the Company or any Restricted Subsidiary;

(xi)  transactions effected pursuant to agreements in effect on the date of this Agreement and any amendment, modification or replacement of such agreement (so long as such amendment or replacement is not, in the good faith judgment of the Company's Board of Directors, materially more disadvantageous to the Bank, taken as a whole, than the original agreement as in effect on the date of this Agreement);

(xii)  Permitted Payments to Parent;

(xiii)  execution, delivery and performance of any consolidated group arrangements for tax or accounting purposes, provided that any payments to be made pursuant to such arrangements are made in compliance with Section 2;

(xiv)  (A) issuances or sales of Capital Stock (other than Disqualified Stock or Designated Preference Shares) of the Company or options, warrants or other rights to acquire such Capital Stock or Subordinated Shareholder Debt and entering into any proceeds loan in respect of the proceeds of any issuance of Senior Notes; provided that the interest rate and other financial terms of such Subordinated Shareholder Debt or proceeds loans are approved by a majority of the members of the Board of Directors of the Company in their reasonable determination and (B) any amendment, waiver or other transaction, including satisfying payment obligations, with respect to any Subordinated Shareholder Debt or proceeds loan in compliance with the other provisions of this Agreement, the Intercreditor Agreement or any Additional Intercreditor Agreement, as applicable;

(xv)  any transaction effected as part of a Qualified Receivables Financing; and

(xvi)  any transaction effected in connection with the Restructuring.

7.     **LIENS**.

(a)     The Company will not, and will not permit any of its Restricted Subsidiaries to, create, Incur, assume or otherwise cause to exist or become effective any Lien of any kind securing Indebtedness upon any of their property or assets, now owned or hereafter acquired, except:

      (i)     in the case of any property or asset that does not constitute Collateral, (A) Permitted Liens or (B) if such Lien is not a Permitted Lien, to the extent that all payments due under this Agreement are secured on an equal and ratable pari passu basis with the obligations so secured (or if such obligations so secured are subordinated in right of payment to either the Facility, prior or senior thereto, with the same relative priority as the Facility shall have with respect to such subordinated Indebtedness), until such time as such obligations are no longer secured by a Lien; and

      (ii)     in the case of any property or asset that constitutes Collateral, Permitted Collateral Liens.

8.     **DESIGNATION OF RESTRICTED AND UNRESTRICTED SUBSIDIARIES**.

The Board of Directors of the Company may designate any Restricted Subsidiary (including any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary if that designation would not cause a Default. If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Company and its Restricted Subsidiaries in the Subsidiary designated as Unrestricted shall be deemed to be an Investment made as of the time of the designation and will reduce the amount available for Restricted Payments under Section 2 or under one or more clauses of such definition of Permitted Investments, as determined by the Company. That designation will only be permitted if such Investment would be permitted at that time.

Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the Bank by filing promptly with the Bank a certified copy of a resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the preceding conditions and was permitted under Section 2 or under one or more clauses of such definition of Permitted Investments, as determined by the Company. If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Agreement and any Indebtedness of such Subsidiary will be deemed to be Incurred by a Restricted Subsidiary of the Company as of such date and, if such Indebtedness is not permitted to be Incurred as of such date under Section 4, the Company will be in Default under Section 4.

The Board of Directors of the Company may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Company; provided that such designation will be deemed to be an Incurrence of Indebtedness by a Restricted Subsidiary of the Company of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation will only be permitted if (1) such Indebtedness is permitted under Section 4, calculated on a pro forma basis taking into account such designation as if such designation had occurred at the beginning of the applicable reference period; and (2) no Default or Event of Default would be in existence following such designation.

9.     **NO IMPAIRMENT OF SECURITY INTEREST**.

(a)     The Company will not, and will not cause or permit any Restricted Subsidiary to, take or knowingly or negligently omit to take, any action which action or omission would or could reasonably be expected to have the result of materially impairing the security interest with respect to the Collateral (it being understood that the Incurrence of Liens on the Collateral permitted by the definition of Permitted Collateral Liens shall under no circumstances be deemed to materially impair the security interest with respect to the Collateral) for the benefit of the Bank, and the Company will not, and

will not cause or permit any Restricted Subsidiary to, grant to any Person other than the Security Agent, for the benefit of the Bank and the other beneficiaries described in the Transaction Security Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement, any interest whatsoever in any of the Collateral; provided that (i) nothing in this Section 9 shall restrict the discharge or release of the Collateral in accordance with this Agreement, the Transaction Security Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement; (ii) the Company and the Restricted Subsidiaries may Incur Permitted Collateral Liens; (iii) the applicable Transaction Security Documents may be amended from time to time to cure any ambiguity, mistake, omission, defect, manifest error or inconsistency therein; (iv) the Company and its Restricted Subsidiaries may discharge and release security interests with respect to the Collateral in connection with the implementation of a Permitted Reorganization, (v) the applicable Transaction Security Documents may be amended in any manner that does not adversely affect the rights of the Security Agent or the Bank in any material respects; and (vi) the security interests and the related Transaction Security Documents may be amended, extended, renewed, restated, supplemented or otherwise modified or released (followed by an immediate retaking of a Lien of at least equivalent ranking over the same assets); provided, however, that in the case of clause (vi) of this Section 9(a), the Transaction Security Documents may not be amended, extended, renewed, restated, supplemented, released or otherwise modified or replaced, unless contemporaneously with such amendment, extension, replacement, restatement, supplement, modification, renewal or release (followed by an immediate retaking of a Lien of at least equivalent ranking over the same assets), the Company delivers to the Bank either:

(i)     a solvency opinion from an internationally recognized investment bank or accounting firm, in form and substance reasonably satisfactory to the Bank confirming the solvency of the Company and its Subsidiaries, taken as a whole, after giving effect to any transactions related to such amendment, extension, renewal, restatement, supplement, modification, replacement or release and retaking;

(ii)    a certificate from the Board of Directors or chief financial officer of the relevant Person or the chief financial officer of the Company, which certificate confirms the solvency of the Person granting such security interest after giving effect to any transactions related to such amendment, extension, renewal, restatement, supplement, modification, replacement or release and retaking; or

(iii)   an Opinion of Counsel, in form and substance reasonably satisfactory to the Bank (subject to customary exceptions and qualifications), confirming that, after giving effect to any transactions related to such amendment, extension, renewal, restatement, supplement, modification, replacement or release and retaking, the Lien or Liens securing the Facility created under the Transaction Security Documents so amended, extended, renewed, restated, supplemented, modified, replaced or release and retaking are valid and perfected Liens not otherwise subject to any limitation imperfection, in equity or at law, that such Lien or Liens were not otherwise subject to immediately prior to such amendment, extension, renewal, restatement, supplement, modification, replacement or release and retaking (other than as a result of the effect of the Agreed Security Principles or any new hardening period).

(b)     At the direction of the Company and without the consent of the Bank, the Security Agent may from time to time enter into one or more amendments to the Transaction Security Documents or enter into additional or supplemental Transaction Security Documents to:  (i) cure any ambiguity, omission, defect or inconsistency therein or (ii) (but subject to compliance with Section 9(a)) (x) provide for Permitted Collateral Liens, (y) add to the Collateral or (z) make any other change thereto that does not adversely affect the rights of the Bank in any material respect.

(c)     In the event that the Company complies with this Section 9, the Security Agent shall (subject to customary protections and indemnifications) consent to such amendment, extension, renewal,

restatement, supplement, modification, replacement or release with no need for instructions from the Bank.

**10.    SUSPENSION OF COVENANTS ON ACHIEVEMENT OF INVESTMENT GRADE STATUS**.

(a)    If on any date following the date of this Agreement:

    (i)    the 2025 Notes (or any Permitted Refinancing Indebtedness of the 2025 Notes) (the **Relevant Debt**) assigned an Investment Grade Rating by at least two Rating Agencies; and

    (ii)    no Default or Event of Default shall have occurred and be continuing, (the occurrence of the events described in Section 10(a)(i) and this Section 10(a)(ii) being collectively referred to as a **Covenant Suspension Event** and the date thereof being referred to as the **Suspension Date**),

then the Company shall provide written notice to such effect to the Bank and, beginning on the Suspension Date, the provisions of this Agreement under Section 2, Section 3, Section 4, Section 5, Section 6, Section 8, Section 11 and Section 13(a)(4) will not apply to the Facility or the Company and its Restricted Subsidiaries (collectively, the **Suspended Covenants**).

(b)    [Reserved].

(c)    In the event that the Company and the Restricted Subsidiaries are not subject to the Suspended Covenants under this Agreement for any period of time as a result of the foregoing, and on any subsequent date (the **Reversion Date**) one or more Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Relevant Debt below an Investment Grade Rating so that the Relevant Debt is no longer assigned an Investment Grade Rating by at least two Rating Agencies, then the Company and the Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants under this Agreement with respect to future events unless and until the Relevant Debt subsequently again attains an Investment Grade Rating from at least two Rating Agencies. Upon any such Reversion Date, the Company shall promptly notify the Bank. The period of time between the Suspension Date and the Reversion Date is referred to in this Agreement as the **Suspension Period**. Upon the occurrence of a Covenant Suspension Event, the amount of Excess Proceeds from Net Proceeds shall be reset to zero.

(d)    Notwithstanding the foregoing, in the event of any such reinstatement, no action taken or omitted to be taken by the Company or any Restricted Subsidiary prior to such reinstatement will give rise to a Default or Event of Default under this Agreement; provided that (i) with respect to Restricted Payments made after such reinstatement, the amount available to be made as Restricted Payments will be calculated as though Section 2 had been in effect prior to, but not during, the Suspension Period; (ii) all Indebtedness Incurred, or Disqualified Stock or preferred stock issued, during the Suspension Period will be classified to have been Incurred or issued pursuant to Section 4(b)(v); (iii) any transactions with Affiliates entered into after such reinstatement pursuant to an agreement entered into during any Suspension Period shall be deemed to be permitted pursuant to Section 6(b)(11); and (iv) any encumbrance or restriction on the ability of any Restricted Subsidiary that is not a Guarantor to take any action described in clauses (i) through (iii) of Section 3(a) that becomes effective during any Suspension Period shall be deemed to be permitted pursuant to Section 3(b)(i). In addition, in the event of any such reinstatement, the Company and the Restricted Subsidiaries will be permitted, without causing a Default or an Event of Default, to honor any contractual commitment or take any actions, as long as the contractual commitments were entered into during the Suspension Period and not in anticipation of the occurrence of a Reversion Date.

## 11.    BUSINESS ACTIVITIES

The Company will not, and will not permit any of its Restricted Subsidiaries to, engage in any business other than Permitted Businesses, except to such extent as would not be material to the Company and its Restricted Subsidiaries taken as a whole.

## 12.    FINANCIAL CALCULATIONS.

(a)    For the purposes of determining Consolidated EBITDA for any basket or ratio under this Agreement on any date of determination, Consolidated EBITDA shall be calculated for the period of the most recent four consecutive fiscal quarters for which internal financial statements of the Company are available immediately preceding such date of determination and pro forma effect shall be given to Consolidated EBITDA as set out in this Section 12.

(b)    In the event that the specified Person or any of its Subsidiaries that are Restricted Subsidiaries Incurs, assumes, guarantees, repays, repurchases, redeems, defeases or otherwise discharges any Indebtedness (other than ordinary working capital borrowings) or issues, repurchases or redeems preferred stock subsequent to the commencement of the period for which a financial ratio is being calculated and on or prior to the date on which the event for which the calculation of that financial ratio is made (for the purposes of this definition, the **Calculation Date**), then that financial ratio will be calculated giving pro forma effect (as determined in good faith by an Authorised Person), including in respect of any cost savings, expense reductions, operating improvements and synergies that are reasonably expected to occur within 24 months, to such Incurrence, assumption, guarantee, repayment, repurchase, redemption, defeasance or other discharge of Indebtedness, or such issuance, repurchase or redemption of preferred stock, and the use of the proceeds therefrom, as if the same had occurred at the beginning of the applicable four-quarter reference period; provided, however, that (except with respect to Section 2(b)(18)) the pro forma calculation of that financial ratio shall not give effect to (i) any Indebtedness Incurred on the Calculation Date pursuant to Section 4(b) (other than 4(b)(1)(B) or 4(b)(14)(ii)) or (ii) the discharge on the Calculation Date of any Indebtedness to the extent that such discharge results from the proceeds of Indebtedness Incurred on the Calculation Date pursuant to Section 4(b) (other than 4(b)(1)(B) or 4(b)(14)(ii)).

(c)    For purposes of calculating any financial ratio under this Agreement:

(i)    any acquisition, Investment, joint venture, disposition, cost saving program or initiative or other similar transaction that have been made by the specified Person or any of its Restricted Subsidiaries, including through mergers or consolidations or leases, or any Person or any Restricted Subsidiary acquired by the specified Person or any of its Restricted Subsidiaries, and including all related financing transactions and including increases in ownership of Restricted Subsidiaries (including any Unrestricted Subsidiary that has been redesignated as a Restricted Subsidiary) (a **Transaction**), during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date, or that are to be made on the Calculation Date, will be given pro forma effect (as determined in good faith by an Authorised Person), including in respect of any cost savings, expense reductions, operating improvements and synergies that are reasonably expected to occur within 24 months, as if they had occurred on the first day of the four-quarter reference period, provided that, if definitive documentation has been entered into with respect to that Transaction, at the option of the Company, Consolidated EBITDA for such period will be calculated after giving pro forma effect to such Transaction (including anticipated cost savings, expense reductions, operating improvements and synergies reasonably expected to occur within 24 months) as if that Transaction had occurred on the first day of such period, even if the Transaction has not yet been consummated as of the date of determination;

**834**

(ii)   Consolidated EBITDA and Fixed Charges attributable to discontinued operations, as determined in accordance with IFRS, and operations or businesses or any asset or group of assets constituting a business or operating unit (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded;

(iii)  any Person that is a Restricted Subsidiary on the Calculation Date (including any Unrestricted Subsidiary that has been redesignated as a Restricted Subsidiary) will be deemed to have been a Restricted Subsidiary at all times during such four-quarter period;

(iv)   any Person that is not a Restricted Subsidiary on the Calculation Date will be deemed not to have been a Restricted Subsidiary at any time during such four-quarter period;

(v)    if any Indebtedness bears a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any interest rate agreement applicable to such Indebtedness), and if any Indebtedness is not denominated in the Company's functional currency, that Indebtedness for purposes of the calculation of that financial ratio shall be treated in accordance with IFRS;

(vi)   interest on a Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible accounting or financial officer of the Company to be the rate of interest implicit in such Lease Obligation in accordance with IFRS; and

(vii)  the full run-rate effect of cost savings, expense reductions, operating improvements and synergies (as determined in good faith by an a responsible accounting or financial officer of the Company) that have occurred during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date or that are reasonably expected to occur within 24 months shall be included as though such cost savings, expense reductions, operating improvements and synergies had been achieved on the first day of the relevant period,

provided that, subject to paragraph (e) below, at any time the aggregate amount of anticipated cost savings, expense reductions, operating improvements and synergies calculated pursuant to clauses (1) and (7) hereof shall only represent with respect to any four quarter period in the aggregate 20.0% of Consolidated EBITDA (including as a result of such cost savings, expense reductions, operating improvements and synergies).

(d)    When calculating the availability under any basket or ratio under this Agreement, in each case in connection with any Transaction or Restricted Payment where there is a time difference between commitment and closing or Incurrence, the date of determination of such basket or ratio and of any Default or Event of Default shall, at the option of the Company, be the date the definitive agreements for such Transaction or Restricted Payment are entered into and such baskets or ratios shall be calculated on a pro forma basis after giving effect to such Transaction or Restricted Payment (including any Incurrence of Indebtedness and the use of proceeds thereof and anticipated cost savings, expense reductions, operating improvements and synergies reasonably expected to occur within 24 months) as if they occurred at the beginning of the applicable reference period for purposes of determining the ability to consummate any such Transaction or Restricted Payment (and not for purposes of any subsequent availability of any basket or ratio). For the avoidance of doubt, (x) if any of such baskets or ratios are exceeded as a result of fluctuations in such basket or ratio (including due to fluctuations in Consolidated EBITDA of the Company or the target company) subsequent to such date of determination and at or prior to the consummation of the relevant Transaction or Restricted Payment, such baskets or ratios will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Transaction or Restricted Payment is permitted hereunder and (y) such baskets or ratios shall not be tested at the

time of consummation of such Transaction or Restricted Payment; provided, further, that if the Company elects to have such determinations occur at the time of entry into such definitive agreement, any such Transaction or Restricted Payment (including any Incurrence of Indebtedness and the use of proceeds thereof) shall be deemed to have occurred on the date the definitive agreements are entered and outstanding thereafter for purposes of calculating any baskets or ratios under this Agreement after the date of such agreement and before the consummation of such Transaction or Restricted Payment.

(e)     For the purposes of calculating the Senior Secured Gross Leverage Ratio only:

    (i)      any adjustments to Consolidated EBITDA may only be made pursuant to paragraph (c) above;

    (ii)     Consolidated EBITDA shall be calculated after deducting (to the extent otherwise included) the amount of interest received by members of the Restricted Group during the relevant period;

    (iii)    at any time the aggregate amount of anticipated cost savings, expense reductions, operating improvements and synergies calculated pursuant to clauses (1) and (7) of paragraph (c) above shall only represent with respect to any four quarter period in the aggregate 10.0% of Consolidated EBITDA (including as a result of such cost savings, expense reductions, operating improvements and synergies) in any 12 month period;

    (iv)     the Company shall only be entitled to include cost savings, expense reductions, operating improvements and synergies with respect to an acquisition that has completed (and not any other Transaction) and that are reasonably expected to occur within 12 months (and not 24 months).

## 13.     MERGER, CONSOLIDATION OR SALE OF ASSETS

(a)     The Company will not, directly or indirectly, in one or more related transactions (x) consolidate or merge with or into another Person or (y) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the Company's and its Restricted Subsidiaries' properties or assets to another Person (whether or not the Company is the surviving Person), unless:

    (i)      either: (a) the Company is the surviving entity; or (b) the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition has been made is a corporation, partnership or limited liability company organized or existing under the laws of the European Union or any member state thereof, the United States, any state of the United States or the District of Columbia, Canada, Norway, Switzerland or Japan;

    (ii)     the Person formed by or surviving any such consolidation or merger (if other than the Company) or the Person to which such sale, assignment, transfer, conveyance or other disposition has been made assumes all the obligations of the Company under this Agreement, the Intercreditor Agreement, any Additional Intercreditor Agreements and the Transaction Security Documents (to the extent the Company is a party thereto), in each case pursuant to agreements reasonably satisfactory to the Bank; and this Agreement, the Intercreditor Agreement, any Additional Intercreditor Agreements and Transaction Security Documents will remain in full force and effect as so amended or supplemented;

    (iii)    immediately after such transaction, no Default or Event of Default exists and the Transaction Security Documents and the Liens created on the Collateral shall remain in full force and effect, or subject to the satisfaction of the Bank, shall have been transferred to such

surviving entity and shall have been perfected and be in full force and effect or otherwise released in accordance with the terms of this Agreement;

(iv)     (a) the Company or the Person formed by or surviving any such consolidation or merger (if other than the Company), or to which such sale, assignment, transfer, conveyance or other disposition has been made would, on the date of such transaction after giving *pro forma* effect thereto and to any related financing transactions as if the same had occurred at the beginning of the applicable four-quarter period be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4(a), or (b) the Fixed Charge Coverage Ratio of the Company or the successor Person, on the date of and after giving *pro forma* effect to such acquisition and such Incurrence or issuance, would not be less than such ratio for the Company and its Restricted Subsidiaries immediately prior to such transaction; and

(v)     the Company shall have delivered to the Bank an Officer's Certificate and an Opinion of Counsel (each, in a form reasonably satisfactory to the Bank), each stating that such consolidation, merger or transfer complies with this Agreement and any Transaction Security Documents to which the Company was party will be the legal, valid and binding obligations of the surviving Person or Company, enforceable in accordance with their terms.

(b)     Save for the Company, a Guarantor may not sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such Guarantor is the surviving Person) another Person, in each case, other than the Company or another Guarantor, unless either:

(i)     the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger assumes all the obligations of that Guarantor under this Agreement, the Intercreditor Agreement, any Additional Intercreditor Agreements and the Transaction Security Documents to which such Guarantor is a party pursuant to agreements reasonably satisfactory to the Bank and immediately after giving effect to that transaction, no Default or Event of Default exists; or

(ii)     the Net Proceeds of such sale or other disposition are applied in accordance with the applicable provisions of this Agreement.

(c)     In addition, the Company may not, directly or indirectly, lease all or substantially all of the properties and assets (determined on a consolidated basis for the Company and its Restricted Subsidiaries), in one or more related transactions, to any other Person.

(d)     This Section 13 will not apply to (i) any consolidation or merger of any Restricted Subsidiary that is not a Guarantor into the Company or a Guarantor, (ii) any consolidation or merger among Guarantors, (iii) any consolidation or merger among the Company and any Guarantor, *provided* that, if the Company is not the surviving entity of such merger or consolidation, the relevant Guarantor is an entity organized or existing under the laws of any member state of the European Union, Switzerland, the United States, any state of the United States or the District of Columbia, Canada, Norway, Switzerland or Japan and Section 13(a)(3) and Section 13(a)(6) will be complied with or (d) any sale, assignment, transfer, conveyance, lease or other disposition of assets by a Guarantor or a Restricted Subsidiary that is not a Guarantor to the Company or a Guarantor. Section 13(a)(4), Section 13(a)(5), Section 13(b)(3) and Section 13(b)(4) will not apply to any merger or consolidation of the Company or any Guarantors with or into, or any sale, assignment, transfer, conveyance, lease or other disposition of assets by the Company or any Guarantor to, an Affiliate solely for the purpose of reincorporating the Company or such Guarantor for tax reasons.

(e)     Notwithstanding anything to the contrary set forth herein, the Company and its Restricted Subsidiaries may implement a Permitted Reorganization.

**14.    SUCCESSOR CORPORATION SUBSTITUTED**

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Company in a transaction that is subject to, and that complies with the provisions of, Section 13, the Successor Person formed by such consolidation or into or with which the Company is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Company" shall refer instead to the Successor Person and not to the Company), and may exercise every right and power of the Company under this Agreement with the same effect as if such Successor Person had been named as the Company herein.

**15.    LIMITATION ON HOLDING COMPANY ACTIVITIES**

The Company may not carry on any business or own any assets other than:

(i)    the ownership of shares in its Subsidiaries and any other assets that are *de minimis* in nature; *provided* that the Company may from time to time receive in a transaction otherwise permitted under this Agreement and the Transaction Security Documents, properties and assets (including cash, Cash Equivalents, Government Guaranteed Securities and/or Indebtedness and other obligations) for the purpose of transferring such properties and assets to any Parent, any Subsidiary or any other Person, so long as in any case such further transfer is made promptly by the Company and, after giving effect thereto, the Company is again in compliance with this clause;

(ii)    the provision of administrative services. treasury service, legal, accounting and management services to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries and the ownership of assets necessary to provide such services;

(iii)    Incurring Indebtedness (or other items that are specifically excluded from the definition of Indebtedness) permitted under this Indenture (including activities reasonably incidental thereto, including performance of the terms and conditions of such Indebtedness (or other items that are specifically excluded from the definition of Indebtedness), to the extent such activities are otherwise permissible under this Indenture) and the granting of Liens permitted under Section 7.

(iv)    activities undertaken with the purpose of, and directly related to, fulfilling its obligations or exercising its rights under this Agreement, the Intercreditor Agreement (or any Additional Intercreditor Agreement), the Transaction Documents, any Senior Facilities Agreement, other Indebtedness (or any item specifically excluded from the definition of Indebtedness) permitted by the terms of this Agreement;

(v)    directly related or reasonably incidental to the establishment and/or maintenance of its or its Subsidiaries corporate existence;

(vi)    any activity undertaken in connection with the Transactions; or

(vii)    other activities not specifically enumerated above that are *de minimis* in nature.

**16.    DEFINITIONS**

**2025 Indenture** means this indenture in respect of the 2025 Notes (including any Additional 2025 Notes) as amended or supplemented from time to time.

**2025 Notes** means the $500,000,000 aggregate principal amount of notes issued under the 2025 Indenture on the date of this Agreement.

**2025 Notes Guarantee** means the guarantee by each Guarantor of the obligations under the 2025 Indenture and the 2025 Notes.

**Acquired Debt** means, with respect to any specified Person:

(1) Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Restricted Subsidiary of such specified Person, whether or not such Indebtedness is Incurred in connection with, or in contemplation of, such other Person merging with or into, or becoming a Restricted Subsidiary of, such specified Person; and

(2) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

**Additional 2025 Notes** means additional 2025 Notes (other than the initial 2025 Notes) issued from time to time under the 2025 Indenture, as part of the same series as the 2025 Notes.

**Affiliate Transaction** has the meaning given in Section 6.

**Asset Sale** means:

(1) the sale, lease, conveyance or other disposition of any assets or rights; provided that the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries taken as a whole will be governed by Clause 9 (Mandatory prepayment - Change of Control) and not by Section 5; and

(2) the issuance or sale of Equity Interests in any of the Company's Restricted Subsidiaries (other than directors' qualifying shares or shares that are required by applicable law to be held by third parties).

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(1) any single transaction or series of related transactions that involves assets of or Equity Interests in any Restricted Subsidiary having a Fair Market Value of less than the greater of $25.0 million and 10.0% of Consolidated EBITDA;

(2) a transfer of assets or Equity Interests between the Company and any of its Restricted Subsidiaries or among any Restricted Subsidiaries;

(3) an issuance or sale of Equity Interests by a Restricted Subsidiary of the Company to the Company or to another Restricted Subsidiary of the Company;

(4) the sale, lease, sub-lease, assignment or other transfer of inventory, products, raw materials, receivables, services or other assets (including any real or personal property) in the ordinary course of business;

(5) the sale or discounting of accounts receivable in the ordinary course of business and the disposition of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings of any customers or vendors of the Company or any of its Restricted Subsidiaries;

(6) any sale or other disposition of damaged, worn-out, obsolete or no longer useful assets or properties in the ordinary course of business (including the abandonment or other disposition of intellectual property that is, in the reasonable judgment of the Company, no longer economically practicable to maintain or useful in the conduct of the business of Company and its Restricted Subsidiaries taken as whole);

(7)     any sale of assets received by the Company or any of its Restricted Subsidiaries upon the foreclosure on a Lien;

(8)     the sale or other disposition of cash, Cash Equivalents or Government Guaranteed Securities;

(9)     a Restricted Payment that does not violate Section 2, or a Permitted Investment or any transaction specifically excluded from the definition of Restricted Payment or, solely for purposes of Section 5(c), asset sales, the proceeds of which are used to make such Restricted Payments, Permitted Investments or transactions specifically excluded from the definition of Restricted Payment;

(10)    any sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(11)    the granting of Liens not otherwise prohibited by this Agreement;

(12)    the foreclosure, condemnation or any similar action with respect to any property or other assets or the surrender, or waiver of contract rights or settlement, release or surrender of contract, tort or other claims;

(13)    any sale, transfer or other disposition of Receivables and related assets in connection with any Qualified Receivables Financing;

(14)    licenses and sublicenses granted by the Company or any of its Restricted Subsidiaries of software or intellectual property in the ordinary course of business;

(15)    the disposition of assets to a Person who is providing services (the provision of which have been or are to be outsourced by the Company or any Restricted Subsidiary to such Person) related to such assets;

(16)    any disposition with respect to property built, owned or otherwise acquired by the Company or any Restricted Subsidiary pursuant to customary sale and leaseback transactions, asset securitizations and other similar financings permitted by this Agreement; and

(17)    any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Company or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and, in each case, comprising all or a portion of the consideration in respect of such sale or acquisition.

**Beneficial Owner** has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the U.S. Exchange Act, except that in calculating the beneficial ownership of any particular person (as that term is used in Section 13(d)(3) of the U.S. Exchange Act), such person shall be deemed to have beneficial ownership of all securities that such person has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time.  The terms **Beneficially Owns** and **Beneficially Owned** have a corresponding meaning.

**Board of Directors** means:

(1)     with respect to a corporation, the board of directors or other governing body of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)     with respect to a partnership, the board of directors or other governing body of the general partner of the partnership;

(3)    with respect to a limited liability company, the board of directors or other governing body, and in the absence of the same, the manager or board of managers or the managing member or members or any controlling committee thereof; and

(4)    with respect to any other Person, the board or committee of such Person serving a similar function.

**Capital Stock** means:

(1)    in the case of a corporation, corporate stock;

(2)    in the case of an association or business entity that is not a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)    in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)    any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

**Cash Equivalents** means:

(1)    securities issued or directly and fully guaranteed or insured by any country or government, or any agency or instrumentality thereof (provided that the full faith and credit of the relevant country or government is pledged in support of those securities) or any supranational institution, in each case, provided that it has a rating of at least Aa3 (or the equivalent) by Moody's, AA- (or the equivalent) from S&P, or the equivalent credit rating from any other Rating Agency, having maturities of not more than one year from the date of acquisition.

(2)    certificates of deposit, money market deposits, time deposits and U.S. Dollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case, with a bank or trust company which is organized under, or authorized to operate as a bank or trust company under, the laws of a member state of the European Union, or of the United States of America or any state thereof, the United Kingdom, Switzerland, Canada, Norway, Japan or Australia, or any other jurisdiction in which the Company or any Restricted Subsidiaries are engaged in business, having capital and surplus in excess of $500.0 million (or the foreign currency equivalent thereof) and an Investment Grade rating by S&P, Moody's or another Rating Agency;

(3)    repurchase obligations for underlying securities of the types described in clauses (1) and (2) of this definition entered into with any financial institution meeting the qualifications specified in clause (2) of this definition;

(4)    commercial paper having an Investment Grade rating by S&P, Moody's or another Rating Agency and, in each case, maturing within one year after the date of acquisition;

(5)    money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (1) through (4) of this definition;

(6)    with respect to a jurisdiction in which (a) the Company or a Restricted Subsidiary conducts its business or is organized and (b) it is not commercially practicable to make investments in clauses (1), (2) or (3) of this definition, demand or time deposit accounts, certificates of deposit, overnight or call deposits and money market deposits with any bank, trust company or similar entity, which would rank, in terms of combined capital and surplus and undivided profits or the ratings on its long-

**841**

term dent, among the top five banks in such jurisdiction, in an amount not to exceed cash generated in or reasonably required for operation in such jurisdiction; and

(7)    other short-term investments utilized by Restricted Subsidiaries in accordance with normal investment practices for cash management; provided that such deposits do not exceed $30.0 million (or its equivalent in other currencies) in the aggregate at any date of determination thereafter.

**Cash Management Facilities** means any cash management agreement or arrangement including, without limitation, any treasury, cash pooling and/or other cash management services, treasury deposits, depository services, overdraft or other current account facilities, foreign exchange facilities, credit or debit card facilities, other automated payment facilities, electronic funds transfer, the collection of cheques and direct debits.

**Change of Control** means the occurrence of any of the following:

(1)    the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Company and its Restricted Subsidiaries, in each case, taken as a whole, to any person (as that term is used in Section 13(d)(3) of the U.S. Exchange Act), other than the Permitted Holders; or

(2)    the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any person or group (as such terms are used in Sections 13(d) and 14(d) of the U.S. Exchange Act), other than the Permitted Holders, becomes the Beneficial Owner, directly or indirectly, of more than 50% of the voting power of the Voting Stock of the Company, provided that for the purposes of this clause, (x) no Change of Control shall be deemed to occur by reason of the Company becoming a Subsidiary of a Successor Parent and (y) any Voting Stock of which any Permitted Holder is the beneficial owner (as so defined) shall not be included in any Voting Stock of which any such person or group is the beneficial owner (as so defined), unless that person or group is not an affiliate of a Permitted Holder and has greater voting power with respect to that Voting Stock, provided, further, that prior to an Initial Public Offering, no person or group shall be deemed to acquire beneficial ownership of Voting Stock held by any other person or group solely by virtue of an agreement among all (but not some) holders of Voting Stock of the Company providing for (i) drag-along rights, tag-along rights, pre-emption rights, rights of first offer, rights of first refusal or other similar rights or (ii) an agreement among all (but not some) of such holders to vote in favor of a nominee for the Board of Directors of the Company proposed by one or more holders of such Voting Stock.

**Collateral** means those assets subject from time to time to a Lien in favor of the Security Agent under the Transaction Security Documents.

**Consolidated EBITDA** means, with respect to any specified Person for any period, the consolidated operating profit of such Person and its Restricted Subsidiaries (the **Reporting Group**) for such period before exceptional items, adjusted as follows without double counting:

(1)    plus (to the extent otherwise deducted) any deduction for or on account of corporation tax or other taxes on income or gains;

(2)    plus (to the extent otherwise deducted) any deduction for Fixed Charges or any other debt or equity finance related fee or cost or post-retirement benefit scheme costs charged to finance costs in accordance with IFRS;

(3)    less (to the extent otherwise included) any gain over book value arising in favor of a member of the Reporting Group on the disposal of any business or asset (other than inventory disposed of in the normal course of business) during such period and any gain arising on any revaluation of any business or asset during such period;

(4)    plus (to the extent otherwise deducted) any loss against book value incurred by a member of the Reporting Group on the disposal of any business or asset (other than inventory disposed of in the normal course of business) during such period and any loss on revaluation of any business or asset during such period;

(5)    plus (to the extent otherwise deducted) amortization of any goodwill or any intangible assets, including amortization of costs related to the incurrence of Indebtedness or the making of any acquisition or joint venture investment, in each case to the extent that acquisition or joint venture investment (as applicable) is permitted under this Agreement;

(6)    plus (to the extent otherwise deducted) any depreciation on, or impairment of, or write-down of, fixed assets, during such period;

(7)    excluding profits or losses on discontinued operations;

(8)    excluding unusual or non-recurring items and non-cash charges;

(9)    taking into account any exchange gains or losses, including any arising on translation of currency debt, and any hedging gains or losses relating to finance costs and any gains or losses on any financial instrument (other than any derivative instrument which is accounted for on a hedge accounting basis);

(10)    plus (to the extent otherwise deducted) any monitoring, consulting or advisory fees accrued or paid to or on behalf of the Equity Investors;

(11)    plus (to the extent otherwise deducted) all fees (including notarial fees), commissions, costs and expenses, stamp, registration and other Taxes incurred by such Person or any of its Restricted Subsidiary in connection with the Restructuring, the Scheme Documents, the 2025 Indenture, any Senior Facilities Agreements (whether before or after the date of this Agreement) and any equivalent amounts in connection with any acquisition, joint venture or disposal, incurrence of Indebtedness and Initial Public Offerings to the extent that such acquisition, joint venture or disposal, incurrence of indebtedness or Initial Public Offering (as applicable) is not prohibited under this Agreement;

(12)    plus (to the extent not otherwise included) the consolidated earnings from ordinary activities of any unconsolidated entities received as dividends or distributions by any member of the Reporting Group during such period;

(13)    plus (to the extent not otherwise included) the proceeds of any business interruption insurance;

(14)    excluding any gain arising from the direct or indirect acquisition of any debt instrument at a discount to par;

(15)    taking no account of any income or charge attributable to a post-employment benefit scheme other than the current service costs attributable to the scheme;

(16)    taking no account of any expense referable to equity settled share based compensation of employees or management; and

(17)    taking into account any adjustments made in accordance with Section 12.

Unless stated otherwise, the Consolidated EBITDA referred in this Agreement refers to the Consolidated EBITDA of the Company.

**Consolidated Net Income** means, with respect to any specified Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with IFRS; provided that:

(1)     any extraordinary, unusual or nonrecurring gain, loss or charge (including, without limitation, pension expense, casualty losses, severance expenses, redundancy expenses, integration expenses, relocation expenses, other restructuring expenses and fees, expenses or charges related to any offering of Equity Interests of such Person, any recapitalization, any refinancing, any Investment, acquisition or Indebtedness permitted to be Incurred hereunder (in each case, whether or not successful) or any asset impairment charges or the financial impacts of natural disasters (including fire, flood and storm and related events)) shall be excluded;

(2)     any income or loss from discontinued operations and any net after-tax gain or loss on disposal of discontinued operations shall be excluded;

(3)     any gains or losses (**minus** all fees and expenses or transaction costs relating thereto) attributable to business dispositions or asset dispositions of the Company or any of its Restricted Subsidiaries (including pursuant to any sale leaseback transaction) other than in the ordinary course of business (as determined in good faith by the Board of Directors or senior management of the Company) shall be excluded;

(4)     any income or loss (**minus** all fees and expenses or transaction costs relating thereto) attributable to the early extinguishment of indebtedness and Hedging Obligations shall be excluded;

(5)     (A) the Net Income for such period of any Person that is not a Restricted Subsidiary, or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of dividends or distributions or other payments in respect of equity that are actually paid in cash or Cash Equivalents or Government Guaranteed Securities (or to the extent converted into cash or Cash Equivalents or Government Guaranteed Securities) by the referent Person to the Company or a Restricted Subsidiary thereof in respect of such period, (B) the Net Income for such period shall include any dividend, distribution or other payments in respect of equity paid in cash or Cash Equivalents or Government Guaranteed Securities (or to the extent converted into cash or Cash Equivalents or Government Guaranteed Securities) by such Person to the Company or a Restricted Subsidiary thereof in excess of the amount included in clauses (A) and (C) the net loss of any Person that is not a Restricted Subsidiary will be included only to the extent that such loss has been funded with cash by the specified Person or a Restricted Subsidiary of such Person;

(6)     any long-term incentive plan accruals that are not settled in cash and any non-cash compensation charge or expense realized from grants of stock appreciation or similar rights, stock options or other similar rights to officers, directors and employees of such Person or any of its Restricted Subsidiaries shall be excluded;

(7)     solely for the purpose of determining the amount available for Restricted Payments under Section 2(a)(iii), the Net Income of any Restricted Subsidiary (other than any Guarantor) will be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders or members (other than (a) restrictions that have been waived or otherwise released or (b) restrictions permitted by Section 3; provided that Consolidated Net Income of such Person shall be included in Consolidated Net Income up to the aggregate amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents or Government Guaranteed Securities (or to the extent converted into cash or Cash Equivalents or Government Guaranteed Securities) by such Person to the Company or another Restricted Subsidiary thereof in respect of such period, to the extent not already included therein;

(8)     the cumulative effect of a change in accounting principles shall be excluded;

(9)     any exchange gains or losses, including any arising on translation of currency debt, and any hedging gains or losses relating to finance costs and any gains or losses on any financial instrument (other than any derivative instrument which is accounted for on a hedge accounting basis), shall be excluded;

(10)    goodwill or other intangible asset impairment charge will be excluded;

(11)    any one time non-cash charges or any amortization or depreciation resulting from purchase accounting, in each case, in relation to any acquisition of another Person or business or resulting from any reorganization or restructuring involving the Company or its Subsidiaries will be excluded; and

(12)    the impact of capitalized, accrued or accreting or pay-in-kind interest or accreting principal on Subordinated Shareholder Debt shall be excluded.

**Consolidated Net Leverage** means, with respect to any specified Person as of any date of determination, the total amount of Indebtedness of such Person and its Restricted Subsidiaries (excluding any Indebtedness Incurred under clauses (1)(A), (6)(A) (unless it is secured by a Lien on the Collateral that ranks pari passu to the Facility, but still excluding any Indebtedness secured by a Lien described under clause (1)(b) of the definition of Permitted Collateral Liens), (6)(B), (8), (9), (10), (11), (12), (13), (16), (18) and (19) of Section 4(b)) less cash and Cash Equivalents of such Person and its Restricted Subsidiaries on a consolidated basis.

**Consolidated Net Leverage Ratio** means, with respect to any specified Person as of any date of determination, the ratio of (a) the Consolidated Net Leverage of such Person on such date to (b) the Consolidated EBITDA of such Person, in each case with any adjustments made in accordance with Section 12.

**Consolidated Senior Secured Net Leverage** means, with respect to any specified Person as of any date of determination, the sum without duplication of the total amount of Senior Secured Indebtedness of such Person and its Restricted Subsidiaries **less** cash and Cash Equivalents of such Person and its Restricted Subsidiaries on a consolidated basis.

**Consolidated Senior Secured Net Leverage Ratio** means, with respect to any specified Person as of any date of determination, the ratio of (a) the Consolidated Senior Secured Net Leverage of such Person on such date to (b) the Consolidated EBITDA of such Person in each case with any adjustments made in accordance with Section 12.

**Contingent Obligations** means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness (**primary obligations**) of any other Person (the **primary obligor**) in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1)     to purchase any such primary obligation or any property constituting direct or indirect security thereof;

(2)     to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

**Covenant Suspension Event** has the meaning given in Section 10.

**Credit Facilities** means one or more debt facilities, instruments or arrangements or any revolving credit facility or commercial paper facilities, bankers' acceptances, overdraft facilities, indentures or trust deeds, in each case with banks or other institutional lenders or investors providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables), LC and Bank Guarantees, bonds, notes, debentures or other corporate debt instruments, **Cash Management Facilities** or other Indebtedness, in each case, as amended, restated, modified, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time in one or more agreements or indentures (in each case with the same or new lenders or institutional investors or investors), including any agreement or indenture extending the maturity thereof or otherwise restructuring all or any portion of the indebtedness thereunder, increasing the amount loaned or issued thereunder, altering the maturity thereof, adding Subsidiaries of the Company as additional borrowers, issuers or guarantors thereunder or otherwise altering the terms and conditions thereof, and in each case including all agreements, instruments and documents executed and delivered pursuant to or in connection with the foregoing.

**Designated Non-cash Consideration** means the Fair Market Value of non-cash consideration received by the Company or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as **Designated Non-cash Consideration** pursuant to an Officer's Certificate, setting forth the basis of such valuation, **less** the amount of cash or Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

**Designated Preference Shares** means, with respect to the Company or any Parent, preferred stock (other than Disqualified Stock) (1) that is issued for cash (other than to the Company or a Subsidiary of the Company or an employee stock ownership plan or trust established by the Company or any such Subsidiary for the benefit of their employees to the extent funded by the Company or such Subsidiary) and (2) that is designated as "Designated Preference Shares" pursuant to an Officer's Certificate of the Company at or prior to the issuance thereof, the net cash proceeds of which are excluded from the calculation set forth in Section 2(a)(C)(ii).

**Disqualified Stock** means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the date on which the Facility matures; provided that if such Capital Stock is issued pursuant to any plan for the benefit of employees of the Company or any Restricted Subsidiary of the Company, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company or any such Restricted Subsidiary in order to satisfy applicable statutory or regulatory obligations. Notwithstanding the preceding sentence, any Capital Stock will not constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Company or any Restricted Subsidiary to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Company and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends. The term **Disqualified Stock** shall also include any options, warrants or other rights that are convertible into Disqualified Stock or that are redeemable at the option of the holder or required to be redeemed, prior to the date that is 91 days after the date on which the Facility matures.

**Equity Interests** means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

**Equity Investors** means any equity holder holding more than 10.0% of the voting power of the Voting Stock of the Company on the date of this Agreement plus any affiliates and related parties.

**Equity Offering** means an offering of Capital Stock (other than an offering to the Company or any of its Restricted Subsidiaries) (a) of the Company (other than Disqualified Stock of the Company), other than an offering pursuant to a registration statement on Form S-8 or otherwise relating to equity securities issuable under any employee benefit plan of the Company, or (b) the net proceeds of which are contributed to the equity capital of the Company or any Restricted Subsidiary (other than through the issuance of Disqualified Stock) or as Subordinated Shareholder Debt.

**European Union** means the European Union as of January 1, 2004, including the countries of Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, Sweden and the United Kingdom, but not including any country which becomes a member of the European Union after January 1, 2004.

**Excluded Contributions** means the aggregated net cash proceeds and the Fair Market Value of property, assets and marketable securities received by the Company after the date of this Agreement from:

(1)     contributions to its common equity capital,

(2)     the sale or issuance (other than to a Subsidiary of the Company) of Capital Stock (other than Disqualified Stock) of the Company, and

(3)     Subordinated Shareholder Debt;

in each case designated as **Excluded Contributions** pursuant to an Officer's Certificate of the Company (which shall be designated no later than the date on which such Excluded Contribution has been received by the Company), the net cash proceeds of which are excluded from the calculation set forth in Section 2(a)(C)(ii).

**Fair Market Value** means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by an Authorised Person (unless otherwise provided in this Agreement).

**Fitch** means Fitch Ratings, Ltd, and its successors.

**Fixed Charges** means, with respect to any specified Person for any period, the sum, without duplication, of:

(1)     the consolidated interest expense (net of interest income) of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, excluding amortization of debt issuance costs and the expensing of any bridge or other financing fees, expenses and commissions, but including original issue discount, non-cash interest payments (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments), the interest component of any deferred payment obligations (classified as Indebtedness under this Agreement), the interest component of all payments associated with Lease Obligations and net of the effect of all payments made or received pursuant to Hedging Obligations in respect of interest rates; **plus**

(2)     the consolidated interest expense of such Person and its Restricted Subsidiaries that was capitalized during such period; **plus**

(3)     all cash dividend payments or other cash distributions on any series of preferred stock of such Person and all other dividend payments or other distributions on the Disqualified Stock of such Person (other than dividends or distributions payable to the Company or any Restricted Subsidiary),

in each case, on a consolidated basis and in accordance with IFRS, but not, in each case, including any non-cash interest expense relating to Subordinated Shareholder Debt and any interest paid or payable on Indebtedness between the Company and any of its Restricted Subsidiaries or between any Restricted Subsidiary and any other Restricted Subsidiary.

**Fixed Charge Coverage Ratio** means, with respect to any specified Person for any period, the ratio of (a) Consolidated EBITDA of such Person for such period to (b) the Fixed Charges of such Person for such period in each case with any adjustments made in accordance with Section 12.

**Government Guaranteed Securities** means:

(1)     securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents) and in each case with maturities not exceeding two years from the date of acquisition;

(2)     corresponding instruments by any member state of the European Union (provided that such member state has one of the two highest ratings obtainable from Moody's or S&P) or Switzerland or Norway or Japan or the United Kingdom, or any agency or instrumentality of any member state of the European Union (provided that such member state has one of the two highest ratings obtainable from Moody's or S&P) or Switzerland or Norway or Japan or the United Kingdom and in each case with maturities not exceeding two years from the date of acquisition; and

(3)     investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) of this definition which fund may also hold immaterial amounts of cash pending investment and/or distribution.

**guarantee** means a guarantee other than by endorsement of negotiable instruments for collection or deposit in the ordinary course of business of all or any part of any Indebtedness (whether arising by agreements to keep-well, to take or pay or to maintain financial statement conditions, pledges of assets or otherwise).

**Hedging Obligations** means, with respect to any specified Person, the obligations of such Person under:

(1)     interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements;

(2)     other agreements or arrangements designed to manage interest rates or interest rate risk; and

(3)     other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

**Holdco Liquidation Payment** means a payment to fund the liquidation costs of KCA Deutag Alpha II Limited, KCAD Holdings I Limited, KCAD Holdings II Limited, KCA Deutag Finance I Limited, KCA Deutag Finance II Limited, KCA Deutag Midco Limited, Land Rig Ventures I Limited, Land Rig Ventures II Limited and KCA Deutag Drilling Rigs I Limited in accordance with the Scheme Documents.

**IFRS** means the international accounting standards promulgated by the International Accounting Standards Board and its successors, as adopted by the European Union or the United Kingdom, as in effect from time to time, unless otherwise stated; provided that at any date after the date of this Agreement, the Company may make an irrevocable election to establish that IFRS shall mean, except as otherwise specified herein, IFRS as in effect on a date that is on or prior to the date of such election.

**Incur** means create, incur, issue, assume, guarantee or otherwise become liable with respect to; and the terms **Incurs**, **Incurred** and **Incurrence** have meanings correlative to the foregoing; **provided,** however, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Restricted Subsidiary, whether by merger, consolidation, acquisition or otherwise, will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary and any Indebtedness pursuant to any revolving credit or similar facility shall only be Incurred at the time any funds are borrowed thereunder).

**Indebtedness** means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables):

(1)     in respect of borrowed money;

(2)     evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof); provided that any counter-indemnity or reimbursement obligation under a letter of credit shall be considered Indebtedness only to the extent that the underlying obligation in respect of which the letter of credit has been issued would also be Indebtedness;

(3)     in respect of banker's acceptances;

(4)     representing Lease Obligations;

(5)     representing the balance deferred and unpaid of the purchase price of any property or services due more than one year after such property is acquired or such services are completed, unless being disputed in good faith;

(6)     representing any Hedging Obligations (provided that the amount of Indebtedness under Hedging Obligations of a Person will be calculated by reference to the net liability of such Person thereunder (as determined in accordance with IFRS as of the date of the most recent financial statements available at the date of determination)); or

(7)     the principal amount of any Disqualified Stock of the Company or any preferred stock of any Restricted Subsidiary,

if and to the extent any of the preceding items (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the notes thereto) of the specified Person prepared in accordance with IFRS.  In addition, the term **Indebtedness** includes (i) all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person); **provided, however**, that the amount of such Indebtedness shall be the lesser of (x) the Fair Market Value of such asset as of such date of determination and (y) the amount of such Indebtedness of such other Person; and (ii) to the extent not otherwise included, the guarantee by the specified Person of any Indebtedness of any other Person to the extent guaranteed by such Person.

Notwithstanding the foregoing, **Indebtedness** shall not include any

(A)     Subordinated Shareholder Debt,

(B)     Contingent Obligations Incurred in the ordinary course of business,

(C)     in connection with the purchase by the Company or any Restricted Subsidiary of any business, any post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing; **provided, however**, that, at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid within 30 days thereafter,

(D)     for the avoidance of doubt, any contingent obligations in respect of workers' compensation claims, early retirement or termination obligations, pension fund obligations or contributions or similar claims, obligations or contributions or social security or wage Taxes,

(E)     Qualified Receivables Financing; or

(F)     deferred or prepaid revenues, including prepayments or deposits received from clients or customers, in each case, in the ordinary course of business.

**Initial Public Offering** means an Equity Offering of common stock or other common equity interests of the Company or any Parent or any successor of the Company or any Parent (the **IPO Entity**) following which there is a Public Market and, as a result of which, the shares of common stock or other common equity interests of the IPO Entity in such offering are listed on an internationally recognized exchange or traded on an internationally recognized market.

**Investment Grade Rating** means a rating equal to or higher than Baa3 (or the equivalent) by Moody's, BBB- (or the equivalent) by S&P or the equivalent investment grade credit rating from any other Rating Agency.

**Investments** means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including guarantees or other obligations), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers or suppliers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person, together with any investments that are required under IFRS to be classified as investments on a balance sheet (excluding the notes thereto) of such Person in the same manner as other investments included in this definition and to the extent such transactions involve the transfer of cash or other property. If the Company or any Subsidiary of the Company sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary of the Company such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of the Company, the Company will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Company's Investments in such Restricted Subsidiary that were not sold or disposed of. Except as otherwise provided in this Agreement, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

**IPO Entity** has the meaning assigned to it in the definition of **Initial Public Offering**.

**IPO Market Capitalization** means an amount equal to (1) the total number of issued and outstanding shares of common stock or common equity interests of the IPO Entity at the time of closing of the Initial Public Offering multiplied by (2) the price per share at which such shares of common stock or common equity interests are sold in such Initial Public Offering.

**LC and Bank Guarantee** means any letters of credit, bank guarantee, completion or performance bond, bid/tender bond, custom bond, advance payment guarantee, tax bond, surety bonds, appeal bonds, rent guarantee bonds or any similar obligation used by the Company or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice, including issuance of any back to back letters of credit, guarantees or similar instruments in favor of an issuer of any such instrument.

**Lien** means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof.

**Lease Obligation** means an obligation that is required to be classified and accounted for as a lease for financial reporting purposes on the basis of IFRS. The amount of Indebtedness will be, at the time any determination is to be made, the amount of such obligation required to appear on a balance sheet (excluding any notes thereto) prepared in accordance with IFRS, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

**Management** means any members of management of any Parent, the Company or any Restricted Subsidiary of the Company (for this purpose including any person who was a member of management when acquiring an interest) or any former member of management and/or any other person directly or indirectly holding any interest pursuant to a MIP.

**Management Advances** means, loans or advances made to, or guarantees with respect to loans or advances made to, Management, directors, current or former officers, employees or consultants of any Parent, the Company or any Restricted Subsidiary of the Company (or to any trust or other entity holding shares or other investments in connection with any MIP):

(1)      in respect of travel, entertainment or moving related expenses Incurred in the ordinary course of business;

(2)      in respect of moving related expenses Incurred in connection with any closing or consolidation of any facility or office; or

(3)      (in the case of this clause (3)) in the ordinary course of business or consistent with past practice not to exceed the greater of $5.0 million and 2.0% of Consolidated EBITDA in the aggregate at any one time outstanding, subject to the approval of the Board of Directors of the Company.

**Market Capitalization** means an amount equal to (i) the total number of issued and outstanding shares of common stock or common equity interests of the IPO Entity on the date of the declaration of the relevant dividend multiplied by (ii) the arithmetic mean of the closing prices per share of such common stock or common equity interests for the 30 consecutive trading days immediately preceding the date of declaration of such dividend.

**MIP** means any management equity plan, employee benefit scheme, incentive scheme or other similar or equivalent arrangement.

**MIP Payment** means any payment or transaction which is, or which is to be made, entered into or used directly or indirectly (or to facilitate any such step or payment):

(1)      to make payment to a member of any MIP (including payments to members leaving any MIP) or any trust or other person in respect of any MIP or pay any costs and expenses properly incurred in the establishing and maintaining of any MIP (provided that, for the avoidance of doubt, nothing in this Agreement shall prohibit any payments to, or the acquisition of shares or other interests or investments of, employees or Management); and/or

(2)      for repayment or refinancing of amounts outstanding under any loan made in connection with an MIP or capitalisation of such loans.

**Moody's** means Moody's Investors Service, Inc. and its successors and assigns.

**Net Income** means, with respect to any Person for any period, the net income (loss) of such Person for such period, determined in accordance with IFRS and before any reduction in respect of dividends on preferred stock.

**Net Proceeds** means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any non-cash form), net of the direct costs relating to such Asset Sale and the sale of such Designated Non-cash Consideration, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses Incurred as a result of the Asset Sale or Taxes paid or payable as a result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, and amounts required to be applied to the repayment of Indebtedness, other than Indebtedness under a Credit Facility, secured by a Lien on the asset or assets that were the subject of such Asset Sale and any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with IFRS, including

without limitation, pension and post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

**Notes Offer** means an offer to the redeem any Public Debt that is Pari Passu Indebtedness pursuant to the terms of any Indenture.

**Obligations** means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

**Officer** means, with respect to any Person, the chairman of the Board of Directors, the chief executive officer, the president, the chief operating officer, the chief financial officer, the head of treasury, the treasurer, any assistant treasurer, the head of corporate development, the head of group accounting, the controller, the secretary, any senior vice president, any vice president or any assistant vice president of such Person or any other Person that the Board of Directors of such Person shall designate for such purpose.

**Officer's Certificate** means a certificate signed on behalf of the Company by an Officer of the Company that meets the requirements of this Agreement.

**Opinion of Counsel** means a written opinion from legal counsel reasonably satisfactory to the Bank.

**Ordinary Course Lease Obligations** means any Lease Obligation relating to property or assets in which a significant portion of the risks and rewards of ownership are not transferred to the Company or any Restricted Subsidiary as lessee and are Incurred in the ordinary course of business (in the good faith determination of the Company).

**Parent** means any direct or indirect parent company or entity of the Company and where specified any direct or indirect parent company or entity of the specified entity.

**Pari Passu Indebtedness** means any Indebtedness of the Company or any Guarantor that is pari passu in right of payment to the Facility.

**Permitted Business** means the businesses, services or activities of the Company and its Subsidiaries and joint ventures engaged in on the date of this Agreement and any other businesses, services or activities that are similar, incidental, complementary, ancillary or reasonably related to, or a reasonable extension, expansion or development of, such businesses.

**Permitted Collateral Liens** means:

(1)     (a) Liens on the Collateral that are described in one or more of clauses (4), (8), (12), (13), (15), (17), (18), (20), (22), (23), (24), (26), (27), (29), (30), (31) and (32) of the definition of Permitted Liens and that, in each case, would not materially interfere with the ability of the Security Agent to enforce any Lien over the Collateral and (b) Liens on assets that only constitute part of the Collateral because such assets are subject to a floating charge for the benefit of (or to secure) the Facility that are described in one or more clauses of the definition of Permitted Liens;

(2)     Liens on the Collateral to secure Indebtedness:

(a)     pursuant to the 2025 Notes (or the 2025 Notes Guarantees) (excluding any Additional 2025 Notes (or any guarantee of Additional 2025 Notes)) and Permitted Refinancing Indebtedness in respect thereof (and Permitted Refinancing Indebtedness in respect of such Permitted Refinancing Indebtedness;

(b)    pursuant to Section 4(b)(1), which Indebtedness (up to an aggregate amount not exceeding the greater of (x) $225.0 million and (y) 100% of Consolidated EBITDA at any time and with any Indebtedness under any Cash Management Facilities to be calculated on a net basis to the extent permitted under the relevant Cash Management Facility) may have super senior priority status in respect of the proceeds from the enforcement of the Collateral;

(c)    pursuant to Section 4(b)(1)(B), Section 4(b)(17) and Section 4(b)(22) and Permitted Refinancing Indebtedness in respect of any of such Indebtedness (and Permitted Refinancing Indebtedness in respect of such Permitted Refinancing Indebtedness);

(d)    pursuant to Sections 4(b)(6) (but with respect to Lease Obligations covering only the assets acquired, improved, constructed, leased with or financed by such Indebtedness, the shares of entities that own such assets, and receivables and bank accounts therefrom);

(e)    pursuant to Section 4(b)(10) and Hedging Obligations in connection with any Senior Notes; which may have super senior priority status in respect of the proceeds from the enforcement of the Collateral;

(f)    pursuant to Section 4(b)(11) (to the extent such guarantee is in respect of Indebtedness otherwise permitted to be secured and is specified in this definition of Permitted Collateral Liens);

(g)    pursuant to Section 4(b)(14) and Section 4(b)(15) and Permitted Refinancing Indebtedness in respect of any of such Indebtedness (and Permitted Refinancing Indebtedness in respect of such Permitted Refinancing Indebtedness);

(h)    pursuant to Section 4(b)(12)(A) and Section 4(b)(19);

(i)    on a basis junior to the Liens on such Collateral securing the Facility and Permitted Refinancing Indebtedness in respect thereof (and Permitted Refinancing Indebtedness in respect of such Permitted Refinancing Indebtedness); and

(j)    solely with respect to Collateral securing any Senior Notes or guarantees in respect thereof, Indebtedness issued or borrowed by any issuer of Senior Notes and the guarantees in respect thereof; provided that such Liens rank junior to the Liens on the same Collateral securing the Facility;

provided, that with respect to this clause (2) each of the secured parties to any such Indebtedness (acting directly or through its respective creditor representative) will have entered into the Intercreditor Agreement or an Additional Intercreditor Agreement; provided, further that subject to the Agreed Security Principles all property and assets (including, without limitation, the Collateral) of the Company or any Restricted Subsidiary securing such Indebtedness (including any guarantees thereof) or Permitted Refinancing Indebtedness secure the Facility on a senior or pari passu basis, except to the extent provided in clauses (b) and (e) above.

For purposes of determining compliance with this definition, (w) a Lien need not be Incurred solely by reference to one category of Permitted Collateral Liens described in this definition, but may be Incurred under any combination of such categories (including in part under one such category and in part under any other such category), (x) in the event that a Lien (or any portion thereof) meets the criteria of one or more of such categories of Permitted Collateral Liens, the Company shall, in its sole discretion, classify or reclassify such Lien (or any portion thereof) in any manner that complies with this definition, (y) the principal amount of Indebtedness secured by a Lien outstanding under any category of Permitted Collateral Liens shall be determined after giving effect to the application of proceeds of any such Indebtedness to refinance any such other Indebtedness, and (z) any Lien securing Indebtedness that was permitted to secure such Indebtedness at

the time of the Incurrence of such Indebtedness shall also be permitted to secure any increase in the amount of such Indebtedness in connection with the accrual of interest, the accretion of accreted value, the payment of interest in the form of additional Indebtedness and the payment of dividends on Capital Stock constituting Indebtedness in the form of additional shares of the same class of Capital Stock.

**Permitted Debt** has the meaning given in Section 4.

**Permitted Holders** means each of (a) the Equity Investors and Related Parties (other than the Company and any of its Restricted Subsidiaries), (b) any person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which the Bank has not required a prepayment and cancellation pursuant to Clause 9 (Mandatory prepayment - Change of Control), together with its Affiliates, (c) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act as in effect on the date of this Agreement) of which any of the foregoing are members, provided that in the case of such group and without giving effect to the existence of such group or any other group, the persons referred to in clauses (a) and (b) above, collectively, have beneficial ownership, directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Company or any of its direct or indirect parent entities held by such group, and (d) any person acting as an underwriter in connection with any public or private offering of the common stock or other common equity interests of the Company or any of its direct or indirect parent entities.

**Permitted Investments** means:

(1)     any Investment in the Company or in a Restricted Subsidiary of the Company;

(2)     any Investment in cash, Cash Equivalents or Government Guaranteed Securities;

(3)     any Investment by the Company or any Restricted Subsidiary of the Company in a Person, if as a result of such Investment:

    (a)     such Person becomes a Restricted Subsidiary of the Company; or

    (b)     such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company, and, in each of cases (a) and (b), any Investment then held by such Person; provided that any such Investment was not made by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Restricted Subsidiary of the Company or such merger, consolidation, amalgamation, transfer, conveyance or liquidation;

(4)     any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 5 or any acquisition or other Investment made in accordance with Section 5(c);

(5)     any Investment the payment for which consists of Equity Interests (other than Disqualified Stock) of the Company or any Parent (which Investment, in the case of any Parent, is contributed to the common equity capital of the Company; provided that any such contribution shall be excluded from Section 2(a)(C)(ii);

(6)     any Investments received (i) in compromise or resolution of (A) obligations of trade creditors or customers that were Incurred in the ordinary course of business of the Company or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes; or (ii) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)    Investments represented by Hedging Obligations;

(8)    [Reserved];

(9)    guarantees issued in accordance with Section 4;

(10)    any Investment existing, or made pursuant to binding commitments existing, on the date of this Agreement and any Investment that replaces, refinances or refunds such Investment; provided that the new investment is in an amount that does not exceed the amount replaced, refinanced or refunded, and is made in the same Person as the Investment replaced, refinanced or refunded;

(11)    Investments consisting of purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of intellectual property, in each case in the ordinary course of business;

(12)    additional Investments by the Company or any Restricted Subsidiary having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), taken together with all other Investments made pursuant to this clause (12) that are at the time outstanding not to exceed the greater of $80.0 million and 35.0% of Consolidated EBITDA; **provided**, **however**, that if any Investment pursuant to this clause (12) is made in a Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) of this definition and shall cease to have been made pursuant to this clause (12);

(13)    Investments in joint ventures or in any Unrestricted Subsidiary of the Company or any of its Restricted Subsidiaries having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), taken together with all other Investments made pursuant to this clause (13) that are at the time outstanding not to exceed the greater of $80.0 million and 35.0% of Consolidated EBITDA; provided, however, that if an Investment is made pursuant to this clause (13) in a Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) of this definition and shall cease to have been made pursuant to this clause (13);

(14)    any Investments made in connection with a Qualified Receivables Financing, including Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related indebtedness;

(15)    Investments in the 2025 Notes, any Additional 2025 Notes and any other Indebtedness of the Company or any of its Restricted Subsidiaries; and

(16)    Investments contemplated by the Restructuring.

**Permitted Liens** means:

(1)    Liens in favor of the Company or any Restricted Subsidiary;

(2)    Liens on property (including Capital Stock) of a Person existing at the time such Person becomes a Restricted Subsidiary or is merged with or into or consolidated with the Company or any Restricted Subsidiary of the Company; provided that such Liens were in existence prior to, and not Incurred in contemplation of, such Person becoming a Restricted Subsidiary or such merger or consolidation, and do not extend to any assets other than those of the Person that becomes a Restricted Subsidiary or is merged into or consolidated with the Company or the Restricted Subsidiary;

(3)     Liens on property (including Capital Stock) existing at the time of acquisition of the property by the Company or any Subsidiary of the Company; provided that such Liens were in existence prior to, such acquisition, and not Incurred in contemplation of, such acquisition and do not extend to any property other than the property so acquired by the Company or such Restricted Subsidiary;

(4)     Liens to secure Indebtedness permitted by Section 4(b)(12) and Liens or deposits to secure the performance of tenders, trade contracts, insurance, guarantees, leases, bids, statutory or regulatory obligations, or surety, appeal, indemnity or performance bonds, warranty, contractual, netting or set-off requirements or other obligations of a like nature Incurred in the ordinary course of business or consistent with past practice;

(5)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other assets relating to such letters of credit and products and proceeds thereof;

(6)     Liens to secure Lease Obligations permitted to be Incurred pursuant to Section 4 covering only the assets acquired with or financed by such Lease Obligation;

(7)     Liens existing on the date of this Agreement;

(8)     Liens for Taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings; provided that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(9)     Liens created for the benefit of (or to secure) the Facility;

(10)    (a) Liens (other than on rigs owned by any Guarantor) securing Indebtedness or other obligations of the Company or any of its Restricted Subsidiaries at any time outstanding that do not exceed the greater of $90.0 million and 37.5% of Consolidated EBITDA and (b) Liens securing Indebtedness permitted by Section 4(b)(22);

(11)    Liens arising under licenses of intellectual property in the ordinary course of business;

(12)    Liens to secure any Cash Management Facilities including in respect of any netting or setting off arrangements;

(13)    Liens arising under retention of title, extended retention of title (including, without limitation, verlängerter Eigentumsvorbehalt), or conditional sale arrangements in the ordinary course of trading and on arm's length terms;

(14)    Liens on equipment of the Company or any Restricted Subsidiary granted in the ordinary course of business to clients upon whose property or premises such equipment is located;

(15)    Liens imposed by law (including, without limitation, Liens in favor of customers for equipment under order or in respect of advances paid in connection therewith), such as carriers', warehousemen's, landlord's, lessor's, suppliers, banks, repairmen's and mechanics' Liens, and Liens of landlords securing obligations to pay lease payments that are not yet due and payable or in default, including, without limitation, any security in favor of landlords or warehouse operators (Pfandrecht des Vermieters oder Lagerhalters) arising solely by operation of law in favor of the relevant third party landlord or warehouse operator under a lease or warehousing agreement, in each case, Incurred in the ordinary course of business;

(16)    Liens on property or assets (including Equity Interests) at the time the Company or a Restricted Subsidiary acquired such property or assets, including any acquisition by means of a merger or consolidation with or into the Company or any Restricted Subsidiary; provided, however, that such Liens are not created or Incurred in connection with, or in contemplation of, such acquisition;

**856**

provided, further, that the Liens may not extend to any other property owned by the Company or any Restricted Subsidiary;

(17)   Liens Incurred or deposits made in the ordinary course of business to secure payment of workers' compensation or to participate in any fund in connection with workmen's compensation, unemployment insurance, pensions or other social security programs including, without limitation, section 8a of the German Act on Partial Retirement (Altersteilzeitgesetz) or section 7e of the German Social Security Code, Part IV (Sozialgesetzbuch IV);

(18)   easements, rights of way, zoning and similar restrictions, reservations (including severances, leases or reservations of oil, gas, coal, minerals or water rights), restrictions or encumbrances in respect of real property or title defects that were not Incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties (as such properties are used by the Company or its Subsidiaries) or materially impair their use in the operation of the business of the Company and its Subsidiaries;

(19)   Liens to secure any Permitted Refinancing Indebtedness permitted to be Incurred under this Agreement; provided, however, that:

   (a)   the new Lien shall be limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the original Lien (plus improvements and accessions to such property or proceeds or distributions thereof); and

   (b)   the Indebtedness secured by the new Lien is not increased to any amount greater than the sum of (x) the original principal amount, or, if greater, committed amount, of the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged with such Permitted Refinancing Indebtedness and (y) an amount necessary to pay any fees and expenses, including premiums, related to such renewal, refunding, refinancing, replacement, defeasance or discharge;

(20)   Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(21)   Liens on Capital Stock of an Unrestricted Subsidiary that secure Indebtedness or other obligations of such Unrestricted Subsidiary;

(22)   Liens securing insurance premium financing arrangements; provided that such Lien is limited to the applicable insurance contracts;

(23)   Liens arising by way of set-off or pledge (in favor of the account holding bank) arising by operation of law or under standard banking terms and conditions provided that the relevant bank account has not been set up nor has the relevant credit balance arisen in order to implement a secured financing;

(24)   Liens on escrowed proceeds for the benefit of related holders of debt securities or other Indebtedness (or the underwriter or arrangers thereof) or on cash set aside at the time of the Incurrence of any Indebtedness or government securities purchased with such cash;

(25)   Liens securing Hedging Obligations permitted pursuant to Section 4(b)(10);

(26)   Liens on property or assets under construction (and related rights) in favor of a contractor or developer or arising from progress or partial payments by a third party relating to such property or assets;

(27)   Liens on specific items of inventory or other goods (and the proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances issued or created in the

**857**

ordinary course of business for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(28)   [Reserved];

(29)   Leases (other than Lease Obligations), licenses, subleases and sublicenses of assets in the ordinary course of business;

(30)   Liens on Receivables and related assets Incurred in connection with a Qualified Receivables Financing (including Liens encumbering cash deposits in bank accounts established in connection with a Qualified Receivables Financing and Liens encumbering cash and Cash Equivalents collected from Receivables that are part of or subject to a Qualified Receivables Financing);

(31)   bankers' Liens, rights of set-off or similar rights and remedies as to deposit accounts (including any Lien created or subsisting over any asset held in any securities depository or any clearing house pursuant to the standard terms and procedures of the relevant securities depository or clearing house applicable in the normal course of trading), Liens arising out of judgments or awards not constituting an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(32)   Liens on cash, Cash Equivalents or other property arising in connection with the defeasance, discharge or redemption of Indebtedness;

(33)   limited recourse Liens in respect of the ownership interests in, or assets owned by, any joint ventures which are not Restricted Subsidiaries securing obligations of such joint ventures;

(34)   Liens on any proceeds loan made by the Company or any Restricted Subsidiary in connection with any future Incurrence of Indebtedness permitted under this Agreement and securing that Indebtedness;

(35)   any interest or title of a lessor under any operating lease;

(36)   Liens on assets or property of a Restricted Subsidiary of the Company (other than a Guarantor) securing Indebtedness of such Restricted Subsidiary or another Restricted Subsidiary (other than a Guarantor);

(37)   Liens over cash paid into an escrow account pursuant to any purchase price retention arrangement as part of any permitted disposal by the Company or a Restricted Subsidiary on condition that the cash paid into such escrow account in relation to a disposal does not represent more than 15% of the net proceeds of such disposal; and

(38)   Liens securing Indebtedness under Section 4(b)(1) to the extent such Lien is not able or required to be granted to secure the Facility pursuant to the Agreed Security Principles.

**Permitted Payments to Parent** means, without duplication as to amounts:

(1)   customary indemnification obligations of any Parent owing to directors, officers, employees or other Persons under its charter or by-laws or pursuant to written agreement with any such Person to the extent relating to the Company and its Subsidiaries;

(2)   payments to any Parent to pay fees and expenses (including franchise or similar Taxes and fees and expenses properly Incurred in the ordinary course of business to auditors and legal advisors) required to maintain its corporate existence, customary salary, bonus and other benefits payable to officers and employees of any Parent of the Company and general corporate overhead expenses of any Parent

of the Company, director's and officer's insurance to the extent such fees and expenses are attributable to the ownership or operation of the Company and its Subsidiaries not to exceed the greater of $5.0 million and 2.0% of Consolidated EBITDA in any 12 month period;

(3)     for so long as the Company is a member of a group filing a consolidated or combined tax return with any Parent, payments to any Parent in respect of an allocable portion of the tax liabilities of such group that is attributable to the Company and its Subsidiaries (**Tax Payments**).  The Tax Payments shall not exceed the lesser of (i) the amount of the relevant Tax (including any penalties and interest) that the Company would owe if the Company were filing a separate tax return (or a separate consolidated or combined return with its Subsidiaries that are members of the consolidated or combined group), taking into account any carryovers and carrybacks of tax attributes (such as net operating losses) of the Company and such Subsidiaries from other taxable years and (ii) the net amount of the relevant Tax that such Parent actually owes to the appropriate Tax authority.  Any Tax Payments received from the Company shall be paid over to the appropriate taxing authority within 30 days of any Parent's receipt of such Tax Payments or refunded to the Company;

(4)     costs (including all professional fees and expenses) Incurred by any Parent in connection with reporting obligations under or otherwise Incurred in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, this Agreement or any other agreement or instrument relating to Indebtedness of the Company or any Restricted Subsidiaries, including in respect of any reports filed with respect to the U.S. Securities Act, U.S. Exchange Act or the respective rules and regulations promulgated thereunder;

(5)     fees and expenses of any Parent Incurred in relation to any public offering or other sale of Capital Stock or Indebtedness (whether or not completed) (a) where the net proceeds of such offering or sale are intended to be received by or contributed to the Company or any Restricted Subsidiaries; (b) in a prorated amount of such expenses in proportion to the amount of such net proceeds intended to be so received or contributed; or (c) otherwise on an interim basis prior to completion of such offering so long as any Parent will cause the amount of such expenses to be repaid to the Company or the relevant Restricted Subsidiary out of the proceeds of such offering promptly if completed and there is a reasonable expectation of completion; and

(6)     fees and expenses (including the fees and expenses of legal counsel) of any Parent Incurred in connection with the issuance of the 2025 Notes, any refinancing thereof and the Restructuring, including to fund any Holdco Liquidation Payment, and any other amount payable under the Scheme Documents.

**Permitted Refinancing Indebtedness** means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, renew, refund, refinance, replace, defease or discharge other Indebtedness of the Company or any of its Restricted Subsidiaries (other than intercompany Indebtedness); provided that:

(1)     the principal amount (or accreted value, if applicable, or if issued with original issue discount, aggregate issue price) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness extended, renewed, refunded, refinanced, replaced, defeased or discharged (plus any accrued interest and any premium required to be paid on the Indebtedness being so renewed, refunded, replaced, defeased or discharged, plus the amount of all fees, commissions and expenses Incurred in connection therewith); and

(2)     such Permitted Refinancing Indebtedness has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity (disregarding any nominal amortization at the Company's option) equal to or greater than the remaining Weighted Average Life to Maturity of, the Indebtedness being extended, renewed, refunded, refinanced, replaced, defeased or discharged; and

(3)    if the Indebtedness being extended, renewed, refunded, refinanced, replaced, defeased or discharged is expressly contractually subordinated in right of payment to the Facility, such Permitted Refinancing Indebtedness is subordinated in right of payment to, the Facility on terms at least as favorable to the Bank as those contained in the documentation governing the Indebtedness being extended, renewed, refunded, refinanced, replaced, defeased or discharged.

Permitted Refinancing Indebtedness in respect of any Credit Facility or any other Indebtedness may be Incurred from time to time after the termination, discharge, or repayment of any such Credit Facility or other Indebtedness.

**Permitted Reorganization** means any amalgamation, demerger, merger, voluntary liquidation, consolidation, reorganization, redomiciliation, winding up, arrangement, corporate reconstruction or other similar or equivalent transaction involving the Company or any Restricted Subsidiary (other than any transaction which involves the Company ceasing to be the surviving entity) and the assignment, transfer or assumption of intragroup receivables and payables among the Company or any Restricted Subsidiaries in connection therewith (a **Reorganization**) that is made on a solvent basis; provided that after giving effect to such Reorganization:  (a) all of the business and assets of the Company and its Restricted Subsidiaries remain owned by the Company and its Restricted Subsidiaries, (b) any payments or assets distributed in connection with such Reorganization remain within the Company and its Restricted Subsidiaries and (c) if the assets of a Restricted Subsidiary party to the Reorganization form part of the Collateral, substantially equivalent Liens (excluding for this purpose any hardening periods or the limitations anticipated by the Agreed Security Principles) must be granted over any shares that were held by that Restricted Subsidiary and over any other such assets that are distributed to a Guarantor.

**Person** means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

**Public Debt** means any Indebtedness consisting of bonds, debentures, notes or other similar debt securities issued in (1) a public offering registered under the U.S. Securities Act or (2) a private placement to institutional investors that is underwritten for resale in accordance with Rule 144A or Regulation S under the U.S. Securities Act, whether or not it includes registration rights entitling the holders of such debt securities to registration thereof with the SEC for public resale.

**Public Market** means any time after:

(1)    an Equity Offering has been consummated; and

(2)    shares of common stock or other common equity interests of the IPO Entity having a market value in excess of $100.0 million on the date of such Equity Offering have been distributed pursuant to such Equity Offering.

**Qualified Receivables Financing** means any financing (including, at the company's election, any factoring) pursuant to which the Company or any of its Restricted Subsidiaries may sell, convey or otherwise transfer to any other Person or grant a security interest in, any Receivables (and related assets); provided that (a) the covenants, events of default and other provisions applicable to such financing shall be on market terms (as determined in good faith by the Company's Board of Directors or senior management) at the time such financing is entered into, (b) the interest rate applicable to such financing shall be a market interest rate (as determined in good faith by the Company's Board of Directors or senior management) at the time such financing is entered into and (c) such financing shall be non-recourse to the Company or any of its Restricted Subsidiaries except in relation to a Receivables Repurchase Obligation or to the extent customary for such transactions (as determined in good faith by the Company's Board of Directors or senior management).

**Rating Agency** means each of S&P, Moody's, Fitch or any other internationally recognized statistical rating organization or organizations identified by the U.S. Securities and Exchange Commission, or in each case its affiliated rating agencies outside of the United States.

**Receivable** means any accounts receivable, inventory, royalty, licenses, contracts or revenue streams subject to a Qualified Receivables Financing.

**Receivables Fees** means distributions or payments made directly or by means of discounts with respect to any participation interest issued or sold in connection with, and other fees paid to a Person that is not the Company or any of its Restricted Subsidiaries in connection with any Qualified Receivables Financing.

**Receivables Repurchase Obligation** means any obligation of a seller of Receivables in a Qualified Receivables Financing to repurchase Receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a Receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

**Related Party** means:

(1)     any controlling stockholder, partner or member, or any 50% (or more) owned Subsidiary, or immediate family member (in the case of an individual), of any Equity Investor; or

(2)     any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons beneficially holding a 50% or more controlling interest of which consist of any one or more Equity Investors and/or such other Persons referred to in the immediately preceding clause.

**Restricted Investment** means an Investment other than a Permitted Investment.

**Restricted Payments** has the meaning given in Section 2.

**Restricted Subsidiary** of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

**Reversion Date** has the meaning given in Section 10.

**Rule 144A** means Rule 144A promulgated under the U.S. Securities Act.

**S&P** means Standard & Poor's Ratings Services and its successors and assigns.

**Senior Facilities Agreement** means:

(1)     this Agreement;

(2)     the letter of credit facility dated the date of this Agreement between among others the Company and First Abu Dhabi Bank PJSC; or

(3)     any other facilities agreement entered into by the Company and/or any Restricted Subsidiary after the date of this Agreement evidencing the terms of any loan or LC or Bank Guarantee facility, in each case, as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including any agreement extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or any successor or replacement agreement or agreements or increasing the amount made available thereunder (subject to compliance with Section 4) or altering the maturity thereof.

**Senior Notes** means any Indebtedness of a Parent or any Subsidiary of a Parent designated as a "Parent Debt Facility" or "Parent Debt Notes" under the Intercreditor Agreement or any Additional Intercreditor Agreement.

**Senior Secured Indebtedness** means, as of any date of determination, the principal amount of any Indebtedness that is secured by a Lien on the Collateral that ranks or is intended to rank pari passu with the Liens on the Collateral securing the Facility, excluding any Indebtedness incurred under (1)(A), (6)(A) (unless it is secured by a Lien on the Collateral that ranks pari passu to the Facility, but still excluding any Indebtedness secured by a Lien described under clause (1)(b) of the definition of Permitted Collateral Liens), (6)(B), (8), (9), (10), (11), (12), (13), (16), (18), (19), (20) and (21) of Section 4(b)).

**Stated Maturity** means, with respect to any installment of principal on any series of Indebtedness, the date on which the final payment of principal was scheduled to be paid in the documentation governing such Indebtedness as of the date of this Agreement or the date of Incurrence, and will not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

**Subordinated Shareholder Debt** means, collectively, any funds provided to the Company by a Parent or any Permitted Holder in exchange for or pursuant to any security, instrument or agreement other than Capital Stock, together with any such security, instrument or agreement and any other security or instrument other than Capital Stock issued in payment of any obligation under any Subordinated Shareholder Debt; provided, however, that such Subordinated Shareholder Debt:

(1)     does not (including upon the happening of any event) mature or require any amortization, redemption or other repayment of principal or any sinking fund payment prior to the first anniversary of the Stated Maturity of the Facility (other than through conversion or exchange of such funding into Capital Stock (other than Disqualified Stock) of the Company or any funding meeting the requirements of this definition);

(2)     does not (including upon the happening of any event) require, prior to the first anniversary of the Stated Maturity of the Facility, payment of cash interest, cash withholding amounts or other cash gross-ups, or any similar cash amounts;

(3)     contains no change of control or similar provisions and does not (including upon the happening of any event) accelerate and has no right (including upon the happening of any event) to declare a default or event of default or take any enforcement action or otherwise require any cash payment, in each case, prior to the first anniversary of the Stated Maturity of the Facility;

(4)     does not provide for or require any security interest or encumbrance over any asset of the Company or any of its Subsidiaries and is not guaranteed by any Subsidiary of the Company;

(5)     is subordinated in right of payment to the prior payment in full in cash of the Facility at least to the same extent as the Subordinated Liabilities (as defined in the Intercreditor Agreement) are subordinated to the Facility under the Intercreditor Agreement;

(6)     does not (including upon the happening of any event) restrict the payment of amounts due in respect of the Facility or compliance by Company with its obligations under the Facility and this Agreement;

(7)     does not (including upon the happening of an event) constitute Voting Stock; and

(8)     is not (including upon the happening of any event) mandatorily convertible or exchangeable, or convertible or exchangeable at the option of the holder thereof; in whole or in part, prior to the date on which the Facility matures, other than into or for Capital Stock (other than Disqualified Stock) of the Company; provided that the proceeds of any Senior Notes made available to the Company or any of its Restricted Subsidiaries shall not constitute Subordinated Shareholder Debt.

**Successor Parent** with respect to any Person means any other Person with more than 50% of the total voting power of the Voting Stock of which is, at the time the first Person becomes a Subsidiary of such other

**862**

Person, beneficially owned (as defined below) by one or more Persons that beneficially owned (as defined below) more than 50% of the total voting power of the Voting Stock of the first Person immediately prior to the first Person becoming a Subsidiary of such other Person. For purposes hereof, beneficially own has the meaning correlative to the term beneficial owner, as such term is defined in Rules 13d-3 and 13d-5 under the U.S. Exchange Act (as in effect on the date of this Agreement).

**Suspended Covenants** has the meaning given in Section 10.

**Suspension Date** has the meaning given in Section 10.

**Suspension Period** has the meaning given in Section 10.

**Unrestricted Subsidiary** means:

(1)      any Subsidiary of the Company that at the time of determination is designated an Unrestricted Subsidiary by the Board of Directors of the Company in the manner provided in Section 8; and

(2)      any Subsidiary of an Unrestricted Subsidiary.

**U.S. Exchange Act** means the U.S. Securities Exchange Act of 1934, as amended.

**Voting Stock** of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

**Weighted Average Life to Maturity** means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1)      the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Indebtedness, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; **by**

(2)      the then outstanding principal amount of such Indebtedness.

## SIGNATORIES

**COMPANY**

**KCA DEUTAG ALPHA LIMITED**

By:

…………………………………

Address:
Email:
Attention:

**Original Borrowers**

**ABBOT GROUP LIMITED**

By:

…………………………………

Address:
Email:
Attention:

**ABBOT HOLDINGS LIMITED**

By:

…………………………………

Address:
Email:
Attention:

**KCA DEUTAG ALPHA LIMITED**

By:

…………………………………

Address:
Email:
Attention:

**KCA DEUTAG CASPIAN LIMITED**

By:

…………………………………

Address:
Email:
Attention:

**KCA DEUTAG DRILLING GROUP LIMITED**

By:

…………………………………

Address:
Email:
Attention:


**KCA EUROPEAN HOLDINGS LIMITED**

By:

…………………………………

Address:
Email:
Attention:


**BENTEC GMBH DRILLING AND OILFIELD SYSTEMS**

By:

…………………………………

Address:
Email:
Attention:


**KCA DEUTAG DRILLING GMBH**

By:

…………………………………

Address:
Email:
Attention:

**KCA DEUTAG GMBH**

By:

…………………………………

Address:
Email:
Attention:


**ABBOT HOLDINGS NORGE AS**

By:

…………………………………

Address:
Email:
Attention:


**KCA DEUTAG DRILLING OFFSHORE SERVICES AS**

By:

…………………………………

Address:
Email:
Attention:


**KCA DEUTAG HOLDINGS NORGE AS**

By:

…………………………………

Address:
Email:
Attention:

**KCA DEUTAG OFFSHORE AS**

By:

…………………………………

Address:
Email:
Attention:

**KCA DEUTAG DRILLING LIMITED**

By:

…………………………………

Address:
Email:
Attention:

**KCA DEUTAG TECHNICAL SUPPORT LIMITED**

By:

…………………………………

Address:
Email:
Attention:

**SET DRILLING COMPANY LIMITED**

By:

…………………………………

Address:
Email:
Attention:

**Original Guarantors**

**ABBOT GROUP LIMITED**

By:


...............................................

Address:

Email:

Attention:


**ABBOT HOLDINGS LIMITED**

By:


...............................................

Address:

Email:

Attention:


**KCA DEUTAG (LAND RIG) LIMITED**

By:


...............................................

Address:

Email:

Attention:

**KCA DEUTAG ALPHA LIMITED**

By:


.................................................

Address:

Email:

Attention:


**KCA DEUTAG CASPIAN LIMITED**

By:


.................................................

Address:

Email:

Attention:


**KCA DEUTAG DRILLING GROUP LIMITED**

By:


.................................................

Address:

Email:

Attention:

**KCA DEUTAG UK FINANCE PLC**

By:


...............................................

Address:

Email:

Attention:


**KCA EUROPEAN HOLDINGS LIMITED**

By:


...............................................

Address:

Email:

Attention:


**ABBOT VERWALTUNGSGESELLSCHAFT MBH**

By:


...............................................

Address:

Email:

Attention:

**BENTEC GMBH DRILLING AND OILFIELD SYSTEMS**

By:


...............................................

Address:

Email:

Attention:


**KCA DEUTAG DRILLING GMBH**

By:


...............................................

Address:

Email:

Attention:


**KCA DEUTAG GMBH**

By:


...............................................

Address:

Email:

Attention:

**KCA DEUTAG TIEFBOHRGESELLSCHAFT MBH**

By:


...............................................

Address:

Email:

Attention:


**KCA DEUTAG EUROPE B.V.**

By:


...............................................

Address:

Email:

Attention:


**KCA DEUTAG NEDERLAND B.V.**

By:


...............................................

Address:

Email:

Attention:

**ABBOT HOLDINGS NORGE AS**

By:

.................................................

Address:

Email:

Attention:

**KCA DEUTAG DRILLING NORGE AS**

By:

.................................................

Address:

Email:

Attention:

**KCA DEUTAG DRILLING OFFSHORE SERVICES AS**

By:

.................................................

Address:

Email:

Attention:

**KCA DEUTAG HOLDINGS NORGE AS**

By:

.................................................

Address:

Email:

Attention:

**KCA DEUTAG MODU OPERATIONS AS**

By:

.................................................

Address:

Email:

Attention:

**KCA DEUTAG OFFSHORE AS**

By:

.................................................

Address:

Email:

Attention:

**KCA DEUTAG ENERGY INTERNATIONAL LLC**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG ENERGY LLC**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG DRILLING LLC**

By:


................................................

Address:

Email:

Attention:

**KCA DEUTAG RUSSIA LLC**

By:


...............................................

Address:

Email:

Attention:


**KCA DEUTAG GULF DRILLING LIMITED COMPANY**

By:


...............................................

Address:

Email:

Attention:


**KCA DEUTAG DRILLING LIMITED**

By:


...............................................

Address:

Email:

Attention:

**KCA DEUTAG TECHNICAL SUPPORT LIMITED**

By:


.................................................

Address:

Email:

Attention:


**SET DRILLING COMPANY LIMITED**

By:


.................................................

Address:

Email:

Attention:

**SECURITY AGENT**

**LUCID TRUSTEE SERVICES LIMITED**

By:


Address:
Email:
Attention:

**ORIGINAL BANK**

**LLOYDS BANK PLC**

By:


Address:
Email:
Attention:

**PART 4**

**FAB RUN-OFF LC FACILITY AGREEMENT**

**VERSION ATTACHED TO RID**

# US$[ ]<sup>1</sup>
# SUPER SENIOR FACILITY AGREEMENT

**[●] 2020**

For

**KCA DEUTAG ALPHA LIMITED**
as the Company

with

**FIRST ABU DHABI BANK PJSC**
acting as the Bank

and

**LUCID TRUSTEE SERVICES LIMITED**

acting as Security Agent

---

[1]  Amount to be inserted on the Restructuring Effective Date – being the USD equivalent on that date of the outstanding Undertakings

## ALLEN & OVERY

**Allen & Overy LLP**

0101521-0000029 UKO3: 2001142340.10

# CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | Definitions and interpretation | 4 |
| 2. | The Facility | 20 |
| 3. | Purpose | 21 |
| 4. | Utilisation | 21 |
| 5. | Undertakings | 23 |
| 6. | Repayment | 25 |
| 7. | Illegality, voluntary prepayment and cancellation | 25 |
| 8. | Mandatory prepayment - Change of Control | 25 |
| 9. | Restrictions | 26 |
| 10. | Default Interest | 26 |
| 11. | Fees | 26 |
| 12. | Tax gross up and indemnities | 27 |
| 13. | Increased Costs | 34 |
| 14. | Other indemnities | 36 |
| 15. | Mitigation by the Bank | 37 |
| 16. | Costs and expenses | 37 |
| 17. | Guarantee and indemnity | 38 |
| 18. | Representations | 45 |
| 19. | Information undertakings | 50 |
| 20. | General undertakings | 52 |
| 21. | Events of Default | 56 |
| 22. | Changes to the Bank | 60 |
| 23. | Changes to the Obligors | 64 |
| 24. | Conduct of business by the Finance Parties | 66 |
| 25. | Payment mechanics | 67 |
| 26. | Set-off | 69 |
| 27. | Notices | 69 |
| 28. | Calculations and certificates | 70 |
| 29. | Partial invalidity | 71 |
| 30. | Remedies and waivers | 71 |
| 31. | Amendments and waivers | 71 |
| 32. | Confidential Information | 72 |
| 33. | Counterparts | 74 |
| 34. | Contractual recognition of bail-in | 74 |
| 35. | Governing law | 76 |
| 36. | Enforcement | 76 |

**Schedule**

1.       The Original Obligors.................................................................................................77
         Part 1        The Original Borrowers ...............................................................77
         Part 2        The Original Guarantors .............................................................78
2.       Conditions precedent required to be delivered by an Additional Obligor .........................79
3.       Utilisation Request .....................................................................................................81
4.       Form of Transfer Certificate.........................................................................................82
5.       Form of Assignment Agreement ...................................................................................85
6.       Form of Accession Deed ..............................................................................................88
7.       Form of Resignation Letter ..........................................................................................91
8.       Existing Undertakings .................................................................................................92
9.       Restrictive Covenants ..................................................................................................93


Signatories ....................................................................................................................141

**THIS AGREEMENT** is dated [●] 2020 and made

**BETWEEN**:

(1)     **KCA DEUTAG ALPHA LIMITED** as parent (the **Company**);

(2)     **THE PERSONS** listed in Part 1 of Schedule 1 (The Original Obligors) as original borrowers (the **Original Borrowers**);

(3)     **THE PERSONS** listed in Part 2 of Schedule 1 (The Original Obligors) as original guarantors (together with the Company, the **Original Guarantors**);

(4)     **FIRST ABU DHABI BANK PJSC** (the **Original Bank**);

(5)     **LUCID TRUSTEE SERVICES LIMITED** as security trustee and security agent for the Secured Parties (the **Security Agent**).

**IT IS AGREED** as follows:

1.      **DEFINITIONS AND INTERPRETATION**

1.1     **Definitions**

In this Agreement, capitalised terms have the meanings given to them in Schedule 9 (Restrictive Covenants) and:

**Abbot Group** means Abbot Group Limited.

**Acceleration Event** means an Event of Default in respect of which any notice has been served by the Bank demanding payment or repayment of any amount under the Facility in accordance with Clause 21.15 (Acceleration).

**Accession Deed** means a document substantially in the form set out in Schedule 6 (Form of Accession Deed).

**Accounting Principles** means:

(a)     in relation to the consolidated financial statements of the Company, generally accepted accounting principles in England and Wales from time to time, including IFRS; and

(b)     in relation to any other member of the Restricted Group, generally accepted accounting principles and generally accepted financial reporting standards and practices in the jurisdiction of incorporation of the relevant member of the Restricted Group from time to time.

**Additional Borrower** means a person which becomes an Additional Borrower in accordance with Clause 23 (Changes to the Obligors).

**Additional Guarantor** means a person which becomes an Additional Guarantor in accordance with Clause 23 (Changes to the Obligors).

**Additional Obligor** means an Additional Borrower or an Additional Guarantor.

**Adjusted Group** means the Company and the wholly-owned members of the Restricted Group.

**Affiliate** means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

**Agreed Security Principles** means the principles set out in schedule 8 (Agreed Security Principles) of the Intercreditor Agreement.

**Annual Financial Statements** has the meaning given to that term in Clause 19 (Information undertakings).

**Anti-Corruption Laws** means all laws, rules, and regulations of any jurisdiction applicable to members of the Group, from time to time, concerning or relating to bribery or corruption, including, but not limited to, the Foreign Corrupt Practices Act of 1977, the Bribery Act 2010 of the United Kingdom, the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions.

**Approved Currency** means euro, USD, Sterling, Omani Rial, Kuwaiti Dinar, Saudi Riyal, United Arab Emirates Dirham and/or any other currency approved by the Bank.

**Assignment Agreement** means an agreement substantially in the form set out in Schedule 5 (Form of Assignment Agreement) or any other form agreed between the relevant assignor and assignee provided that if that other form does not contain the undertaking set out in the form set out in Schedule 5 (Form of Assignment Agreement) it shall not be a Creditor/Creditor Representative Accession Undertaking as defined in, and for the purposes of, the Intercreditor Agreement.

**Authorisation** means an authorisation, consent, approval, resolution, licence, exemption, filing, notarisation or registration.

**Authorised Person** means any director of the Company or the chief executive officer, chief financial officer, head of treasury, head of corporate development or head of group accounting of the Group.

**Availability Period** means the period from and including the date of this Agreement to and including the date which falls one month prior to the Termination Date.

**Available Commitment** means zero.

**Available Facility** means the aggregate for the time being of the Bank's Available Commitment.

**Bank** means:

(a)     the Original Bank; and

(b)     any bank, financial institution, trust, fund or other entity which has become a Party as the "Bank" in accordance with Clause 22 (Changes to the Bank),

which in each case has not ceased to be a Party as such in accordance with the terms of this Agreement.

**Bank Levy** means:

(a)     any tax levied by reference to the balance sheet or capital base of any person or its liabilities or minimum regulatory capital or any combination thereof (including, without limitation, the UK bank levy as set out in the Finance Act 2011 (as amended), the German bank levy as set out in the German Restructuring Fund Act 2010 (*Restrukturierungsfondsgesetz*) (as amended);

(b)      any financial activities taxes (or other taxes) of a kind contemplated in the European Commission consultation paper on financial sector taxation dated 22 February 2011 or the Single Resolution Mechanism established by EU Regulation n°806/2014 of July 15, 2014)

(c)      any bank surcharge or banking corporation tax surcharge as enacted by section 17 of, and Schedule 3 to, the Finance (No. 2) Act 2015 (as amended); and

(d)      any other surcharge or tax levied on a similar basis or for a similar purpose implemented in any other jurisdiction.

**Bank's Spot Rate of Exchange** means:

(a)      the Bank's spot rate of exchange; or

(b)      (if the Bank does not have an available spot rate of exchange) any other publicly available spot rate of exchange selected by the Bank (acting reasonably),

for the purchase of the relevant currency with the Base Currency in the London foreign exchange market at or about 10.00 a.m. London time on a particular day.

**Base Currency** means US Dollars.

**Base Currency Amount** means in relation to:

(a)      each Existing Undertaking, the amount specified in Schedule 8 (Existing Undertakings); and

(b)      any other Utilisation, the amount specified in the Utilisation Request delivered by a Borrower for that Utilisation (or, if the amount requested is not denominated in the Base Currency, that amount converted into the Base Currency at the Bank's Spot Rate of Exchange on the date which is three Business Days before the Utilisation Date or, if later, on the date the Bank receives the Utilisation Request in accordance with the terms of this Agreement),

in each case, as adjusted to reflect any repayment, prepayment, consolidation or division of a Utilisation.

**Borrower** means an Original Borrower or an Additional Borrower unless it has ceased to be a Borrower in accordance with Clause 23 (Changes to the Obligors).

**Business Day** means a day (other than a Saturday or Sunday) on which banks are open for general business in London, and

(a)      (in relation to any date for payment or purchase of a currency other than euro) the principal financial centre of the country of that currency; or

(b)      (in relation to any date for payment or purchase of euro) any TARGET Day.

**Charged Property** means all of the assets of the Obligors and the Third Party Security Providers which from time to time are, or are expressed to be, the subject of the Transaction Security.

**Code** means the US Internal Revenue Code of 1986.

**Commitment** means:

(a)      in relation to the Original Bank, US$[●]; and

(b)       in relation to any other Bank, the amount in the Base Currency of any Commitment transferred to it under this Agreement,

to the extent not cancelled, reduced or transferred by it under this Agreement.

**Confidential Information** means all information relating to the Company, any Obligor, the Group, the Third Party Security Providers, the Finance Documents or the Facility of which a Finance Party becomes aware in its capacity as, or for the purpose of becoming, a Finance Party or which is received by a Finance Party in relation to, or for the purpose of becoming a Finance Party under, the Finance Documents or the Facility from either:

(a)       any member of the Group or any of its advisers; or

(b)       another Finance Party, if the information was obtained by that Finance Party directly or indirectly from any member of the Group or any of its advisers,

in whatever form, and includes information given orally and any document, electronic file or any other way of representing or recording information which contains or is derived or copied from such information but excludes information that:

(A)       is or becomes public information other than as a direct or indirect result of any breach by that Finance Party of Clause 32 (Confidential Information);

(B)       is identified in writing at the time of delivery as non-confidential by any member of the Group or any of its advisers; or

(C)       is known by that Finance Party before the date the information is disclosed to it in accordance with paragraphs (a) or (b) above or is lawfully obtained by that Finance Party after that date, from a source which is, as far as that Finance Party is aware, unconnected with the Group and which, in either case, as far as that Finance Party is aware, has not been obtained in breach of, and is not otherwise subject to, any obligation of confidentiality.

**Confidentiality Undertaking** means a confidentiality undertaking substantially in a recommended form of the LMA or in any other form agreed between the Company and the Bank.

**CTA** means the Corporation Tax Act 2009.

**Default** means an Event of Default or any event or circumstance specified in Clause 21 (Events of Default) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

**Defaulting Bank** means the Bank if it:

(a)       has rescinded or repudiated a Finance Document;

(b)       has failed to issue an Undertaking (or has notified the Company that it will not issue an Undertaking) in accordance with Clause 4.5 (Issue of Undertakings) or which has failed to pay a claim (or has notified the Company that it will not pay a claim) in accordance with (and as defined in) Clause 5.2 (Claims under an Undertaking); or

(c)       is the subject of an Insolvency Event which has occurred and is continuing,

unless:

(i)      its failure to pay, or to issue an Undertaking, is caused by:

      (A)      administrative or technical error; or

      (B)      a Disruption Event,

      and payment is made within five Business Days of its due date; or

(ii)      the Bank is disputing in good faith whether it is contractually obliged to make the payment in question.

**Delegate** means any delegate, agent, attorney, co-trustee or co-security agent appointed by the Security Agent.

**Disruption Event** means either or both of:

(a)      a material disruption to those payment or communications systems or to those financial markets which are, in each case, required to operate in order for payments to be made in connection with the Facility (or otherwise in order for the transactions contemplated by the Finance Documents to be carried out) which disruption is not caused by, and is beyond the control of, any of the Parties; or

(b)      the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a Party preventing that, or any other Party:

      (i)      from performing its payment obligations under the Finance Documents; or

      (ii)      from communicating with other Parties in accordance with the terms of the Finance Documents,

and which (in either such case) is not caused by, and is beyond the control of, the Party whose operations are disrupted.

**Environment** means humans, animals, plants and all other living organisms including the ecological systems of which they form part and the following media:

(a)      air (including, without limitation, air within natural or man-made structures, whether above or below ground);

(b)      water (including, without limitation, territorial, coastal and inland waters, water under or within land and water in drains and sewers); and

(c)      land (including, without limitation, land under water).

**Environmental Claim** means any claim, proceeding, formal notice or investigation by any person in respect of any Environmental Law.

**Environmental Law** means any applicable law or regulation which relates to:

(a)      the pollution or protection of the Environment;

(b)      the conditions of the workplace; or

(c)     the generation, handling, storage, use, release or spillage of any substance which, alone or in combination with any other, is capable of causing harm to the Environment, including, without limitation, any waste.

**Environmental Permits** means any permit and other Authorisation and the filing of any notification, report or assessment required under any Environmental Law for the operation of the business of any member of the Restricted Group conducted on or from the properties owned or used by any member of the Restricted Group.

**Event of Default** means any event or circumstance specified as such in Clause 21 (Events of Default).

**Existing Undertakings** means each of the Undertakings listed in Schedule 8 (Existing Undertakings).

**Expiry Date** means, for an Undertaking, the last day of its Term.

**Facility** means the credit facility made available under this Agreement as described in Clause 2.1 (The Facility).

**Facility Office** means:

(a)     in respect of the Bank, the office or offices notified by the Bank to the Company in writing on or before the date it becomes the Bank (or, following that date, by not less than five Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement; or

(b)     in respect of any other Finance Party, the office in the jurisdiction in which it is resident for tax purposes.

**FATCA** means:

(a)     sections 1471 to 1474 of the Code or any associated regulations;

(b)     any treaty, law or regulation of any other jurisdiction, or relating to an intergovernmental agreement between the US and any other jurisdiction, which (in either case) facilitates the implementation of any law or regulation referred to in paragraph (a) above; or

(c)     any agreement pursuant to the implementation of any treaty, law or regulation referred to in paragraphs (a) or (b) above with the US Internal Revenue Service, the US government or any governmental or taxation authority in any other jurisdiction.

**FATCA Application Date** means:

(a)     in relation to a "withholdable payment" described in section 1473(1)(A)(i) of the Code (which relates to payments of interest and certain other payments from sources within the US), 1 July 2014; or

(b)     in relation to a "passthru payment" described in section 1471(d)(7) of the Code not falling within paragraph (a) above, the first date from which such payment may become subject to a deduction or withholding required by FATCA.

**FATCA Deduction** means a deduction or withholding from a payment under a Finance Document required by FATCA.

**FATCA Exempt Party** means a Party that is entitled to receive payments free from any FATCA Deduction.

**Fee Letter** means any agreement setting out fees payable to a Finance Party under a Finance Document.

**Finance Document** means this Agreement, any Accession Deed, any Fee Letter, the Intercreditor Agreement, any Resignation Letter, any Transaction Security Document, any Utilisation Request and any other document designated as a "Finance Document" by the Bank and the Company.

**Finance Party** means the Security Agent or the Bank.

**Financial Quarter** means each quarterly accounting period of the Company.

**Financial Year** means the annual accounting period of the Company.

**Group** means the Company and each of its Subsidiaries for the time being.

**Group Member EBITDA** means, for any period for any member of the Adjusted Group, the aggregate (without double counting) earnings before interest, tax, depreciation and amortisation attributable to such member of the Adjusted Group for such period, calculated on a last twelve months basis on the same basis as Consolidated EBITDA, on an unconsolidated basis and excluding all intra-group items and investments in its Subsidiaries, provided that any member of the Adjusted Group with negative Consolidated EBITDA shall be deemed to have Consolidated EBITDA of zero.

**Group Structure Chart** means the group structure chart delivered to the Bank prior to the date of this Agreement.

**Guarantor** means an Original Guarantor or an Additional Guarantor, unless it has ceased to be a Guarantor in accordance with Clause 23 (Changes to the Obligors).

**Holding Company** means, in relation to a person, any other person in respect of which it is a Subsidiary.

**Indenture** means any indenture entered into by any member of the Restricted Group with respect to the issuance of any Public Debt by a member of the Restricted Group.

**Insolvency Event** in relation to an entity means that the entity:

(a)    is dissolved (other than pursuant to a consolidation, amalgamation or merger);

(b)    becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

(c)    makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(d)    institutes or has instituted against it, by a regulator, supervisor or any similar official with primary insolvency, rehabilitative or regulatory jurisdiction over it in the jurisdiction of its incorporation or organisation or the jurisdiction of its head or home office, a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation by it or such regulator, supervisor or similar official;

(e)    has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such

proceeding or petition instituted or presented against it, such proceeding or petition is instituted or presented by a person or entity not described in paragraph (d) above and:

(i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation; or

(ii) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof;

(f) has exercised in respect of it one or more of the stabilisation powers pursuant to Part 1 of the Banking Act 2009 and/or has instituted against it a bank insolvency proceeding pursuant to Part 2 of the Banking Act 2009 or a bank administration proceeding pursuant to Part 3 of the Banking Act 2009;

(g) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(h) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets (other than, for so long as it is required by law or regulation not to be publicly disclosed, any such appointment which is to be made, or is made, by a person or entity described in paragraph (d) above);

(i) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter;

(j) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in paragraphs (a) to (i) above; or

(k) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.

**Intellectual Property** means:

(a) any patents, trade marks, service marks, designs, business names, copyrights, database rights, design rights, domain names, moral rights, inventions, confidential information, knowhow and other intellectual property rights and interests (which may now or in the future subsist), whether registered or unregistered; and

(b) the benefit of all applications and rights to use such assets of each member of the Restricted Group (which may now or in the future subsist).

**Intercreditor Agreement** means the intercreditor agreement dated the same date as this Agreement and made between, among others, the Company, the Security Agent and the Bank.

**ITA** means the Income Tax Act 2007.

**Legal Opinion** means any legal opinion delivered to the Bank under or in connection with the Finance Documents.

**Legal Reservations** means:

(a)    the principle that equitable remedies may be granted or refused at the discretion of a court and the limitation of enforcement by laws relating to insolvency, reorganisation and other laws generally affecting the rights of creditors;

(b)    the time barring of claims under the Limitation Acts, the possibility that an undertaking to assume liability for or indemnify a person against non-payment of UK stamp duty may be void and defences of set-off or counterclaim;

(c)    similar principles, rights and defences under the laws of any Relevant Jurisdiction; and

(d)    any other matters which are set out as qualifications or reservations as to matters of law of general application in the Legal Opinions or customarily included in legal opinions for facilities of this type.

**Limitation Acts** means the Limitation Act 1980 and the Foreign Limitation Periods Act 1984.

**Material Adverse Effect** means, taking into account any indemnity, insurance or other reimbursement right or claim which any member of the Restricted Group has in connection with the relevant event or circumstance), a material adverse effect on:

(a)    the business, assets or financial condition of the Restricted Group taken as a whole; or

(b)    the ability of the Restricted Group taken as a whole to perform its payment obligations under the Finance Documents; or

(c)    subject to the Legal Reservations and the Perfection Requirements, the validity or enforceability of the Transaction Security Documents taken as a whole to the extent it is materially adverse to the interests of the Secured Parties under the Finance Documents.

**Material Company** means, at any time:

(a)    an Obligor; or

(b)    a wholly-owned member of the Restricted Group that holds shares in an Obligor; or

(c)    a Restricted Subsidiary of the Company that is a member of the Adjusted Group and has Group Member EBITDA representing 5 % or more of Consolidated EBITDA as determined by reference to the latest Annual Financial Statements.

**Month** means a period starting on one day in a calendar month and ending on the numerically corresponding day in the next calendar month, except that:

(a)    if the numerically corresponding day is not a Business Day, that period shall end on the next Business Day in that calendar month in which that period is to end if there is one, or if there is not, on the immediately preceding Business Day; and

(b)    if there is no numerically corresponding day in the calendar month in which that period is to end, that period shall end on the last Business Day in that calendar month.

These rules will only apply to the last Month of any period.

**New Bank** has the meaning given to that term in Clause 22 (Changes to the Bank).

**Noteholders** means the holders of any notes issued pursuant to any Indenture.

**Obligor** means a Borrower or a Guarantor.

**Obligors' Agent** means the Company appointed to act on behalf of each Obligor in relation to the Finance Documents pursuant to Clause 2.3 (Obligors' Agent).

**Original Financial Statements** means the consolidated audited financial statements of the Company for the Financial Year ended 31 December 2019.

**Original Obligor** means an Original Borrower or an Original Guarantor.

**Participating Member State** means any member state of the European Union that has the euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

**Party** means a party to this Agreement.

**Perfection Requirements** means the making or the procuring of appropriate registration, filings, recordings, enrolments, registrations, notarisations, notifications, endorsements and stampings and payments in any jurisdiction in order to perfect any Transaction Security created by the Transaction Security Documents in order to achieve the relevant priority for such Transaction Security.

**Permitted Transaction** means:

(a)    any disposal required, Indebtedness incurred, guarantee, indemnity or Security given, or other transaction arising, under the Finance Documents;

(b)    a Permitted Reorganisation;

(c)    transactions not otherwise prohibited by the terms of this Agreement; or

(d)    any Transaction Step.

**Qualifying Bank** has the meaning given to that term in Clause 12 (Tax gross up and indemnities).

**Receiver** means a receiver or receiver and manager or administrative receiver of the whole or any part of the Charged Property.

**Relevant Jurisdiction** means, in relation to an Obligor:

(a)    its jurisdiction of incorporation; and

(b)    the jurisdiction whose laws govern the Transaction Security Documents entered into by it.

**Renewal Request** means a written notice delivered to the Bank in accordance with Clause 4.6 (Renewal of an Undertaking).

**Repeating Representations** means each of the representations set out in Clause 18.2 (Status), Clause 18.3 (Binding obligations), Clause 18.4 (Non-conflict with other obligations), Clause 18.5 (Power and authority), Clause 18.6 (Validity and admissibility in evidence), Clause 18.7 (Governing law and enforcement), Clause 18.20 (Good title to assets), Clause 18.21 (Legal and beneficial ownership) and Clause 18.25 (Centre of main interests).

**Representative** means any delegate, agent, manager, administrator, nominee, attorney, trustee or custodian.

**Resignation Letter** means a letter substantially in the form set out in Schedule 7 (Form of Resignation Letter).

**Restricted Group** means the Group excluding the Unrestricted Subsidiaries.

**Restructuring** means the restructuring of the Company and its Subsidiaries pursuant to the Restructuring Implementation Deed.

**Restructuring Implementation Deed** has the meaning given to that term in the Scheme.

**Sanctioned Country** means, at any time, a country or territory which is the subject of any country-wide or territory-wide Sanctions (being, as at the date of this Agreement, Cuba, Iran, North Korea, Syria, the territory of Crimea and Sudan).

**Sanctioned Person** means, at any time:

(a)    any person specifically listed in any Sanctions List (and, solely for the purposes of Clause 20.6 (Anti-corruption law and Sanctions) including clause (c) of this definition as it relates to such Clause) with respect to any person that is not a Group member or an Affiliate thereof, in that person's individual capacity unless otherwise specified in the relevant Sanctions List);

(b)    any person located, organised or ordinarily resident in a Sanctioned Country; or

(c)    any person controlled by any person referred to in paragraph (a) or (b) above.

**Sanctions** means the economic or financial sanctions laws, regulations and restrictive measures administered, enacted, imposed or enforced, in each case from time to time, by any Sanctions Authority.

**Sanctions Authority** means the United States, the United Kingdom, the United Nations Security Council, the European Union (and its member states), the Kingdom of Norway and the respective governmental institutions of any of the foregoing including, without limitation, Her Majesty's Treasury, OFAC, the U.S. Department of State, and any other agency of the U.S. government.

**Sanctions List** means any list of persons specifically designated as being subject to Sanctions as maintained by any Sanctions Authority.

**Scheme** means the scheme of arrangement in relation to KCA Deutag UK Finance plc under Part 26 of the Companies Act 2006, which was sanctioned by the High Court of England and Wales on [●] 2020.

**Secured Parties** means each Finance Party from time to time party to this Agreement and any Receiver or Delegate.

**Security** means a mortgage, charge, pledge, lien, standard security, assignation in security or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

**Senior Secured Gross Leverage Ratio** has the meaning given to Consolidated Senior Secured Net Leverage Ratio but calculated such that the Consolidated Senior Secured Net Leverage is adjusted by:

(a)    including in the calculation of the total amount of Senior Secured Indebtedness of the Company and the Restricted Subsidiaries, any Indebtedness drawn in cash outstanding on the date of determination which was Incurred under Section 4(b)(1) of Schedule 9 (Restrictive Covenants); and

(b)     adding back the amount of any cash and Cash Equivalents of the Company and its Restricted Subsidiaries on a consolidated basis deducted in calculating the Consolidated Senior Secured Net Leverage.

**Structure Memorandum** means the structure paper prepared by Deloitte and entitled "KCA Deutag Group – Tax Structure Paper" dated [●] 2020.

**Subsidiary** means an entity of which a person has direct or indirect control or owns directly or indirectly more than 50 % of the voting capital or similar right of ownership and **control** for this purpose means the power to direct the management and policies of the entity whether through the ownership of voting capital, by contract or otherwise.

**TARGET2** means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilises a single shared platform and which was launched on 19 November 2007.

**TARGET Day** means any day on which TARGET2 is open for the settlement of payments in euro.

**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

**Term** means each period determined under this Agreement for which the Bank is under a liability under an Undertaking.

**Termination Date** means 30 April 2022.

**Third Party Security Provider** means a person (other than an Obligor) who has entered into a Transaction Security Document pursuant to which it creates or expresses to create Security over any of its assets.

**Total Commitments** means the aggregate of the Commitments, being US$[●] at the date of this Agreement.

**Transaction Security** means the Security created or expressed to be created in favour of the Security Agent or any other Secured Party pursuant to the Transaction Security Documents.

**Transaction Security Documents** means:

(a)     each of the security documents delivered to the Security Agent on or prior to the date of this Agreement; and

(b)     any other document entered into by any Obligor or any Third Party Security Provider creating or expressed to create any Security over all or any part of its assets in respect of the obligations of any of the Obligors under any of the Finance Documents.

**Transaction Step** has the meaning given in Clause 1.6 (Scheme and Structure Memorandum).

**Transfer Certificate** means a certificate substantially in the form set out in Schedule 4 (Form of Transfer Certificate) or any other form agreed between the Bank and the Company.

**Transfer Date** means, in relation to an assignment or a transfer, the later of:

(a)     the proposed Transfer Date specified in the relevant Assignment Agreement or Transfer Certificate; and

(b)    the date on which the Bank executes the relevant Assignment Agreement or Transfer Certificate.

**Treaty Bank** has the meaning given to that term in Clause 12 (Tax gross up and indemnities).

**Undertaking** means any letter of credit, bank guarantee, completion or performance bond, bid/tender bond, custom bond, advance payment guarantee, tax bond or any other instrument agreed between the Company and the Bank from time to time.

**Unpaid Sum** means any sum due and payable but unpaid by an Obligor under the Finance Documents.

**US** means the United States of America.

**US Tax Obligor** means:

(a)    a Borrower which is resident for tax purposes in the US; or

(b)    an Obligor some or all of whose payments under the Finance Documents are from sources within the US for US federal income tax purposes.

**Utilisation** means an Undertaking.

**Utilisation Date** means the date of a Utilisation, being the date on which the relevant Undertaking is to be issued.

**Utilisation Request** means a notice substantially in the form set out in Schedule 3 (Utilisation Request) or any other form of request agreed between the Company and the Bank.

**VAT** means:

(a)    any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)    any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

**White List** means any of the following: Barclays, BNP Paribas, Citi, Commerzbank, Deutsche, FAB, HSBC, ING, JPMorgan, Mizuho, MUFJ, Standard Chartered, Sumitomo, UniCredit, DNB, Natwest, Natwest Markets, Goldman Sachs, Morgan Stanley, Bank of America, Santander, Nomura, Pimco Europe, UBS, and any other clearing bank with the ability to issue Undertakings.

## 1.2    Construction

(a)    Unless a contrary indication appears, a reference in this Agreement to:

(i)    any **Finance Party**, the Bank, any **Obligor**, any **Party**, any **Secured Party**, the **Security Agent**, a **Third Party Security Provider** or any other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Finance Documents and, in the case of the Security Agent, any person for the time being appointed as Security Agent or Security Agents in accordance with the Finance Documents;

(ii)    a document in **agreed form** is a document which is previously agreed in writing by or on behalf of the Company and the Bank;

(iii)    an **amendment** includes a supplement, novation, extension (whether of maturity or otherwise), restatement, re-enactment or replacement (in each case, however fundamental and whether or not more onerous or involving any change in or addition to the parties to any agreement or document and including any change in the purpose of, any extension of or any increase in the amount of a facility or any additional facility) and **amended** shall be construed accordingly;

(iv)    **assets** includes present and future properties, revenues and rights of every description;

(v)    a **Finance Document** or any other agreement or instrument is a reference to that Finance Document or other agreement or instrument as amended, novated, supplemented, extended or restated;

(vi)    **guarantee** means (other than in Clause 17 (Guarantee and indemnity)) any guarantee, letter of credit, bond, indemnity or similar assurance against loss, or any obligation, direct or indirect, actual or contingent, to purchase or assume any indebtedness of any person or to make an investment in or loan to any person or to purchase assets of any person where, in each case, such obligation is assumed in order to maintain or assist the ability of such person to meet its indebtedness;

(vii)    **indebtedness** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(viii)    the Bank's **participation** in relation to an Undertaking, shall be construed as a reference to the relevant amount that is or may be payable by the Bank in relation to that Undertaking;

(ix)    any matter being **permitted** under one or more of the Finance Documents shall include references to such matter not being prohibited or otherwise approved under those Finance Documents and a reference to any matter being **not prohibited** under one or more of the Finance Documents shall include references to such matter being permitted or otherwise approved under those Finance Documents;

(x)    a **person** includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality);

(xi)    a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(xii)    **shares** includes shares, stock or equivalent ownership interests of any entity including limited partnership interests, share capital (including partnership capital) as well as options, warrants or any other instruments convertible into any such ownership interests;

(xiii)    **sub-participation** means any sub-participation or sub-contract or any other agreement or arrangement having a substantially similar economic effect (whether written or oral) by the Bank of any of its rights or obligations under the Finance Documents (including any voting sub-participation) provided that (i) the Bank remains liable under the Finance Documents for any such obligation; (ii) the relationship between the Bank and the proposed sub-participant or sub-contractor is that of a contractual debtor and creditor (including in the bankruptcy or similar event of the Bank or an Obligor); (iii) the proposed sub-participant or sub-contractor will have no proprietary interest in the benefit of this Agreement or in any monies received by the Bank under or in relation to this Agreement (in its capacity as sub-participant or sub-contractor under that arrangement); and (iv) the proposed sub-participant or sub-contractor will under no circumstances: (A) be subrogated to, or be substituted in respect of, the Bank's

claims under this Agreement, or (B) otherwise have any contractual relationship with, or rights against the Obligors under or in relation to this Agreement (in its capacity as sub-participant or sub-contractor under that arrangement) and a **voting sub-participation** means any sub-participation made by the Bank in respect of any of its rights or obligations under the Finance Documents which results in a person other than the Bank having sole control over all rights and obligations in relation to the relevant participations and Commitments that are the subject of the relevant arrangement including all voting rights;

(xiv) a member of the Restricted Group is **wholly-owned** only if all of its shares are owned by one other member of the Restricted Group;

(xv) a Utilisation made or to be made to a Borrower includes an Undertaking issued on its behalf;

(xvi) a provision of law is a reference to that provision as amended or re-enacted from time to time; and

(xvii) a time of day is a reference to London time.

(b) The provisions of clauses 1.2 (Construction) and 1.3 (Local law terms and provisions) and schedule 9 (Local Law Provisions) of the Intercreditor Agreement apply to this Agreement as though they were set out in full in this Agreement except that references to the Intercreditor Agreement will be construed as references to this Agreement.

(c) Clause and Schedule headings are for ease of reference only.

(d) Unless a contrary indication appears, a term used in any other Finance Document or in any notice given under or in connection with any Finance Document has the same meaning in that Finance Document or notice as in this Agreement.

(e) A Borrower providing **cash cover** for an Undertaking means:

(i) a Borrower paying an amount in the currency of the Undertaking (or in any other currency permitted or required under this Agreement) to a non-interest-bearing account and the following conditions being met:

(A) either:

I. the account is in the name of the Borrower and is with the Bank for which that cash cover is to be provided and, until no amount is or may be outstanding under that Undertaking, withdrawals from the account may only be made to pay the relevant Finance Party amounts due and payable to it under this Agreement in respect of that Undertaking; or

II. the account is in the name of the Bank for which that cash cover is to be provided; and

(B) the Borrower has executed documentation in form and substance satisfactory to the Finance Party for which that cash cover is to be provided, creating a first ranking security interest, or other collateral arrangement, in respect of the amount of that cash cover; or

(ii) a Borrower procuring Indemnity Cover in respect of an Undertaking.

(f) **Indemnity Cover** in respect of any Undertaking means any guarantee, letter of credit, bond, indemnity or other assurance against loss issued in favour of the Bank in respect of amounts due under such

Undertaking, in form and substance, and on terms, acceptable to the Bank (acting in its sole discretion noting that specific internal approvals of the Bank will be required to be obtained).

(g)    A Default or an Event of Default is **continuing** if it has not been remedied or waived.

(h)    A Borrower **repaying** or **prepaying** an Undertaking means:

    (i)    that Borrower providing cash cover for that Undertaking;

    (ii)    the maximum amount payable under the Undertaking being reduced or cancelled in accordance with its terms; or

    (iii)    the Bank being satisfied that it has no further liability under that Undertaking,

and the amount by which an Undertaking is repaid or prepaid under paragraphs (i) and (ii) above is the amount of the relevant cash cover, reduction or cancellation.

(i)    Amounts outstanding under this Agreement include amounts outstanding under or in respect of any Undertaking.

(j)    An outstanding amount of an Undertaking at any time is the maximum amount that is or may be payable by the relevant Borrower in respect of that Undertaking at that time.

(k)    A Borrower's obligation on Utilisations becoming "due and payable" includes the Borrower repaying any Undertaking in accordance with paragraph (h) above.

## 1.3    Currency symbols and definitions

(a)    **US$**, **USD** and **US Dollars** denote the lawful currency of the United States of America.

(b)    **£**, **GBP** and **sterling** denote the lawful currency of the United Kingdom.

(c)    **€**, **EUR** and **euro** denote the single currency of the Participating Member States.

## 1.4    Third party rights

(a)    Unless expressly provided to the contrary in a Finance Document a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the **Third Parties Act**) to enforce or enjoy the benefit of any term of this Agreement.

(b)    Subject to Clause 31.3 (Exceptions) but otherwise notwithstanding any term of any Finance Document, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

## 1.5    No personal liability

No personal liability shall attach to any director, officer, authorised signatory or employee of any member of the Group for any representation or statement made by that member of the Group in a certificate signed by a director, officer, authorised signatory or employee save in the case of fraud in which case liability (if any) will be determined in accordance with applicable law and each such individual may rely on this Clause subject to Clause 1.4 (Third party rights) and the provisions of the Third Parties Act.

**900**

### 1.6    Scheme and Structure Memorandum

None of the steps or actions set out in, or reorganisations expressly contemplated by, the Structure Memorandum (or the steps or actions necessary to implement any of them) and none of the steps or actions taken or to be taken with respect to the Scheme (including any proceedings commenced with respect to the recognition of the judgment of the High Court of England and Wales in any jurisdiction) and/or the Restructuring Implementation Deed (including any document ancillary thereto) shall constitute a breach of any representation, warranty or undertaking in the Finance Documents or result in the occurrence of a Default or an Event of Default and any intermediate steps in any such reorganisation which are not specified in the Structure Memorandum (including the steps to effect the intra-group reorganization shown in Appendix A9 "Indicative group structure post reorganization" of the Structure Memorandum), but which are necessary to achieve the steps, actions or reorganisations expressly contemplated, shall not be prohibited by any of the Finance Documents (each such step, reorganisation or action being a **Transaction Step**).

### 1.7    Anti-boycott laws

(a)    Nothing in any Finance Document (including Clauses 18.17 (Anti-corruption law and Sanctions) and 20.6 (Anti-corruption law and Sanctions)) shall create or establish an obligation or right for any person to the extent that by agreeing to it, complying with it, exercising it, having such obligation or right or otherwise (including the giving of any boycott declaration), it would be placed in violation of any law applicable to it, including EU Regulation (EC) 2271/96 (including any law or regulation implementing such Regulation in any member state of the European Union or the United Kingdom), any law relating to foreign trade or any similar anti-boycott law or regulation (an **Anti-Boycott Law**).

(b)    No representation or undertaking given under any Finance Document (including Clauses 18.17 (Anti-corruption law and Sanctions) and 20.6 (Anti-corruption law and Sanctions)) shall be made or given for the benefit of any person to the extent that it would result in a violation of or conflict with or liability under any Anti-Boycott Law for that person.

## 2.    THE FACILITY

### 2.1    The Facility

(a)    Subject to the terms of this Agreement, the Bank makes available a multicurrency credit facility in an aggregate amount the Base Currency Amount of which is equal to the Total Commitments.

(b)    The Facility will be available to all the Borrowers.

### 2.2    Finance Parties' rights and obligations

(a)    The obligations of each Finance Party under the Finance Documents are several.  Failure by a Finance Party to perform its obligations under the Finance Documents does not affect the obligations of any other Party under the Finance Documents.  No Finance Party is responsible for the obligations of any other Finance Party under the Finance Documents.

(b)    The rights of each Finance Party under or in connection with the Finance Documents are separate and independent rights and any debt arising under the Finance Documents to a Finance Party from an Obligor is a separate and independent debt in respect of which a Finance Party shall be entitled to enforce its rights in accordance with paragraph (c) below. The rights of each Finance Party include any debt owing to that Finance Party under the Finance Documents and, for the avoidance of doubt, any part of an Undertaking or any other amount owed by an Obligor which relates to a Finance Party's participation in the Facility or its role under a Finance Document (including any such amount payable to the Bank on its behalf) is a debt owing to that Finance Party by that Obligor.

(c)     A Finance Party may, except as specifically provided in the Finance Documents, separately enforce its rights under or in connection with the Finance Documents.

## 2.3    Obligors' Agent

(a)     Each Obligor (other than the Company) by its execution of this Agreement or an Accession Deed irrevocably appoints the Company (acting through one or more authorised signatories) to act on its behalf as its agent in relation to the Finance Documents and irrevocably authorises:

(i)     the Company on its behalf to supply all information concerning itself contemplated by this Agreement to the Finance Parties and to give all notices and instructions (including, in the case of a Borrower, Utilisation Requests), to make such agreements and to effect the relevant amendments, supplements and variations capable of being given, made or effected by any Obligor notwithstanding that they may affect the Obligor, without further reference to or the consent of that Obligor; and

(ii)     each Finance Party to give any notice, demand or other communication to that Obligor pursuant to the Finance Documents to the Company,

and in each case the Obligor shall be bound as though the Obligor itself had given the notices and instructions (including, without limitation, any Utilisation Requests) or executed or made the agreements or effected the amendments, supplements or variations, or received the relevant notice, demand or other communication.

(b)     Every act, omission, agreement, undertaking, settlement, waiver, amendment, supplement, variation, notice or other communication given or made by the Obligors' Agent or given to the Obligors' Agent under any Finance Document or given to another Obligor or in connection with any Finance Document (whether or not known to any other Obligor and whether occurring before or after such other Obligor became an Obligor under any Finance Document) shall be binding for all purposes on that Obligor as if that Obligor had expressly made, given or concurred with it.  In the event of any conflict between any notices or other communications of the Obligors' Agent and any other Obligor, those of the Obligors' Agent shall prevail.

## 3.    PURPOSE

## 3.1    Purpose

Each Borrower shall only utilise the Facility to issue Undertakings in the ordinary course of trading of the Group (or to issue Undertakings not in the ordinary course of trading of the Group if the relevant Borrower provides cash cover in respect of the full notional amount of that Undertaking on or prior to it being issued).

## 3.2    Monitoring

No Finance Party is bound to monitor or verify the application of any Undertaking utilised pursuant to this Agreement.

## 4.    UTILISATION

## 4.1    The Facility

(a)     The Facility may only be utilised by way of Undertakings. The Facility shall not be available for being drawn or utilised in cash.

(b)    In determining the amount of the Available Facility for the purposes of this Agreement, the Available Commitment of the Bank will be calculated ignoring any cash cover provided for outstanding Undertakings.

(c)    No new Undertaking shall be issued under this Agreement without the consent of the Bank.

**4.2    Delivery of a Utilisation Request for Undertakings**

A Borrower (or the Company or Abbot Group on its behalf) may request an Undertaking to be issued by delivery to the Bank of a duly completed Utilisation Request at any time.

**4.3    Completion of a Utilisation Request for Undertakings**

Each Utilisation Request for an Undertaking is irrevocable and will not be regarded as having been duly completed unless:

(a)    it identifies the Borrower of the Undertaking;

(b)    the proposed Utilisation Date is a Business Day within the Availability Period and is not less than three Business Days after the date of the Utilisation Request;

(c)    the currency and amount of the Undertaking comply with Clause 4.4 (Currency and amount);

(d)    the form of Undertaking is attached and is in a form agreed between the Bank and the relevant Borrower (or the Company or Abbot Group on its behalf) (each acting reasonably); and

(e)    the delivery instructions for the Undertaking are specified.

**4.4    Currency and amount**

(a)    The currency specified in a Utilisation Request must be an Approved Currency.

(b)    The amount of the proposed Undertaking must be an amount whose Base Currency Amount is not more than the Available Facility.

**4.5    Issue of Undertakings**

(a)    If the conditions set out in this Agreement have been met, the Bank shall issue the Undertaking on the Utilisation Date.

(b)    The Bank will only be obliged to comply with paragraph (a) above if on the date of the Utilisation Request or Renewal Request and on the proposed Utilisation Date:

(i)    no Default is continuing or would result from the proposed Utilisation;

(ii)    no creditor (or group of creditors) of any Obligor is entitled to declare any Indebtedness of that Obligor (other than any Indebtedness specified in Clause 21.4(c) (Cross-payment default/acceleration)) due and payable prior to its specified maturity as a result of an event of default (however described) which has not been remedied or waived in accordance with the terms of that Indebtedness; and

(iii)    the Repeating Representations to be made by each Obligor are true in all material respects.

(c)    The Bank shall determine the Base Currency Amount of each Undertaking which is to be issued in an Approved Currency.

**903**

(d)   The Bank may issue an Undertaking in the form of a SWIFT message or other form of communication customary in the relevant market but has no obligation to do so.

**4.6   Renewal of an Undertaking**

(a)   A Borrower (or the Company or Abbot Group on its behalf) may request that any Undertaking issued on behalf of that Borrower be renewed by delivery to the Bank of a Renewal Request in substantially similar form to a Utilisation Request for an Undertaking.

(b)   The Bank shall treat any Renewal Request in the same way as a Utilisation Request for an Undertaking except that the condition set out in paragraph (d) of Clause 4.3 (Completion of a Utilisation Request for Undertakings) shall not apply.

(c)   The terms of each renewed Undertaking shall be the same as those of the relevant Undertaking immediately prior to its renewal, except that:

   (i)    its amount may be less than the amount of the Undertaking immediately prior to its renewal; and

   (ii)   its Term shall start on the date which was the Expiry Date of the Undertaking immediately prior to its renewal, and shall end on the proposed Expiry Date specified in the Renewal Request.

(d)   Subject to paragraphs (e) and (f) below, if the conditions set out in this Agreement have been met, the Bank shall amend and re-issue any Undertaking pursuant to a Renewal Request.

(e)   Where a new Undertaking is to be issued to replace by way of renewal an existing Undertaking, the Bank is not required to issue that new Undertaking until the Undertaking being replaced has been returned to the Bank or the Bank is satisfied either that it will be returned to it or otherwise that no liability can arise under it.

(f)   No Undertaking shall be renewed pursuant to this Clause without the consent of the Bank. If the Bank does not consent to the renewal of an Undertaking, on the date on which that Undertaking is returned to the Bank and cancelled, or if earlier, on the Expiry Date of that Undertaking, an amount of the Commitments will be cancelled corresponding to the Base Currency Amount of the notional amount of that Undertaking.

**4.7   Existing Undertakings**

The Bank confirms that from the date of this Agreement each Existing Undertaking is deemed to be an Undertaking under this Agreement.

**5.    UNDERTAKINGS**

**5.1   Payments on demand**

If an Undertaking or any amount outstanding under an Undertaking is expressed to be immediately payable (other than pursuant to Clause 21.15 (Acceleration)), the Borrower that requested (or on behalf of which the Company or Abbot Group requested) the issue of that Undertaking shall repay or prepay that amount within five Business Days of demand.

## 5.2    Claims under an Undertaking

(a)    Each Borrower irrevocably and unconditionally authorises the Bank to pay any claim made or purported to be made under an Undertaking requested by it (or requested by the Company or Abbot Group on its behalf) and which appears on its face to be in order (a **claim**).

(b)    Each Borrower shall within five Business Days of demand pay to the Bank an amount equal to the amount of any claim.

(c)    Each Borrower acknowledges that the Bank:

(i)    is not obliged to carry out any investigation or seek any confirmation from any other person before paying a claim; and

(ii)    deals in documents only and will not be concerned with the legality of a claim or any underlying transaction or any available set-off, counterclaim or other defence of any person.

(d)    The obligations of a Borrower under this Clause 5.2 will not be affected by:

(i)    the sufficiency, accuracy or genuineness of any claim or any other document; or

(ii)    any incapacity of, or limitation on the powers of, any person signing a claim or other document.

## 5.3    Indemnities

(a)    Each Borrower shall immediately on demand indemnify the Bank against any cost, loss or liability incurred by the Bank (otherwise than by reason of the Bank's gross negligence or wilful misconduct) in acting as the Bank under any Undertaking requested by (or on behalf of) that Borrower.

(b)    The obligations of each Borrower under this Clause 5.3 are continuing obligations and will extend to the ultimate balance of sums payable by that Borrower in respect of any Undertaking, regardless of any intermediate payment or discharge in whole or in part.

(c)    The obligations of any Borrower under this Clause 5.3 will not be affected by any act, omission, matter or thing which, but for this Clause 5.3, would reduce, release or prejudice any of its obligations under this Clause 5.3 (without limitation and whether or not known to it or any other person) including:

(i)    any time, waiver or consent granted to, or composition with, any Obligor, any beneficiary under an Undertaking or any other person;

(ii)    the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor or any member of the Restricted Group;

(iii)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor, any beneficiary under an Undertaking or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(iv)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor, any beneficiary under an Undertaking or any other person;

(v)     any amendment (however fundamental) or replacement of a Finance Document, any Undertaking or any other document or security;

(vi)    any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document, any Undertaking or any other document or security; or

(vii)   any insolvency or similar proceedings.

## 6.    REPAYMENT

Each Borrower shall repay each outstanding Undertaking and the outstanding amount of any claim on the Termination Date.

## 7.    ILLEGALITY, VOLUNTARY PREPAYMENT AND CANCELLATION

### 7.1    Illegality

If, in any applicable jurisdiction, it becomes unlawful for the Bank to perform any of its obligations as contemplated by this Agreement or for the Bank to issue or leave outstanding any Undertaking or it becomes unlawful for any Affiliate of the Bank for the Bank to do so then:

(a)     the Bank shall promptly notify the Company upon becoming aware of that event;

(b)     upon the Bank notifying the Company, the Bank shall not be obliged to issue any Undertaking;

(c)     the Company shall procure that each relevant Borrower shall use its best endeavours to procure the release of each Undertaking issued by the Bank and outstanding at such time on or before the date specified by the Bank in the notice delivered to the Bank (being no earlier than the last day of any applicable grace period permitted by law); and

(d)     the Facility shall cease to be available for the issue of Undertakings.

### 7.2    Voluntary cancellation

The Company may, if it gives the Bank not less than three Business Days' (or such shorter period as the Bank may agree) prior notice, cancel the whole or any part (being a minimum amount of US$500,000) of the Available Facility.

### 7.3    Voluntary prepayment of Utilisations

A Borrower to which a Utilisation has been made may, if it or the Company gives the Bank not less than three Business Days' (or such shorter period as the Bank may agree) prior notice, prepay the whole or any part of a Utilisation (but if in part, being an amount that reduces the Base Currency Amount of the Utilisation by a minimum amount of US$500,000).

## 8.    MANDATORY PREPAYMENT - CHANGE OF CONTROL

Upon the occurrence of a Change of Control, the Facility will, unless otherwise agreed by the Bank, be immediately cancelled and shall immediately cease to be available for further utilisation and all Utilisations, accrued fees and other amounts under the Finance Documents, shall become immediately due and payable and the Company shall (or shall ensure that a Borrower shall) immediately repay or prepay all outstanding Undertakings.

## 9.    RESTRICTIONS

### 9.1    Notices of cancellation or prepayment

Any notice of cancellation, prepayment, authorisation or other election given by any Party under Clause 7 (Illegality, voluntary prepayment and cancellation) shall (subject to the terms of those Clauses) be irrevocable and, unless a contrary indication appears in this Agreement, shall specify the date or dates upon which the relevant cancellation or prepayment is to be made and the amount of that cancellation or prepayment.

### 9.2    Reutilisation of Facility

No part of the Facility which is prepaid or repaid may be reutilised in accordance with the terms of this Agreement without the prior consent of the Bank.

### 9.3    Prepayment in accordance with Agreement

No Borrower shall repay or prepay all or any part of the Utilisations or cancel all or any part of the Commitments except at the times and in the manner expressly provided for in this Agreement.

### 9.4    No reinstatement of Commitments

No amount of the Total Commitments cancelled under this Agreement may be subsequently reinstated.

### 9.5    Effect of repayment and prepayment on Commitments

If all or part of the Bank's participation in a Utilisation is repaid or prepaid and is not available for redrawing (other than by operation of Clause 4.5(b) (Issue of Undertakings)), an amount of the Bank's Commitment (equal to the Base Currency Amount of the amount of the participation which is repaid or prepaid) will be deemed to be cancelled on the date of repayment or prepayment.

## 10.    DEFAULT INTEREST

If an Obligor fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which is 1% per annum higher than the rate payable in respect of an Undertaking pursuant to Clause 11.1 (Issuance fees).  Any interest accruing under this Clause 10 shall be payable by the Obligor within five Business Days of demand by the Bank.

## 11.    FEES

### 11.1    Issuance fees

(a)    The Company shall pay (or shall procure that a member of the Restricted Group shall pay) to the Bank a fee in US Dollars computed at the rate of 4% per annum on the Base Currency Amount of each Undertaking.

(b)    The accrued issuance fees payable pursuant to this Clause 11.1 are payable in arrear on the last day of February, May, August and November in each Financial Year after the date of this Agreement and on the Termination Date. The fees payable at the end of November 2020 shall include fees in relation to the Existing Undertakings accrued and unpaid under the ancillary facility agreement originally dated 16 May 2014 (as amended and/or restated from time to time) prior to the date of this Agreement.

**11.2    Security Agent fee**

The Company shall pay to the Security Agent (for its own account) a security agent fee in the amount and at the times agreed in a Fee Letter.

**12.    TAX GROSS UP AND INDEMNITIES**

**12.1    Definitions**

In this Agreement:

**Borrower DTTP Filing** means an HM Revenue & Customs' Form DTTP2 duly completed and filed by the relevant Borrower, which:

(a)    where it relates to a Treaty Bank that is the Original Bank, contains the scheme reference number and jurisdiction of tax residence provided to the Company by the Bank pursuant to Clause 12.2(i) (Tax gross-up), and

    (i)    where the Borrower is an Original Borrower, is filed with HM Revenue & Customs within 60 days of the date of this Agreement; or

    (ii)    where the Borrower is an Additional Borrower, is filed with HM Revenue & Customs within 60 days of the date on which that Borrower becomes an Additional Borrower; or

(b)    where it relates to a Treaty Bank that is not the Original Bank, contains the scheme reference number and jurisdiction of tax residence stated in respect of the Bank in the documentation which it executes on becoming a Party as the Bank; and

    (i)    where the Borrower is a Borrower as at the date on which that Treaty Bank becomes a Party as the Bank, is filed with HM Revenue & Customs within 60 days of that date; or

    (ii)    where the Borrower is not a Borrower as at the date on which that Treaty Bank becomes a Party as the Bank, is filed with HM Revenue & Customs within 60 days of the date on which that Borrower becomes an Additional Borrower.

**Domestic Bank** means, in relation to any Borrower, the Bank if it is lending through a Facility Office in, and is resident for tax purposes in, that Borrower's Relevant Tax Jurisdiction on the date on which it became the Bank, provided that payments received through such Facility Office are included within the taxable profits of that Facility Office for the purpose of calculating the Bank's taxable income in such jurisdiction.

**Protected Party** means a Finance Party which is or will be subject to any liability or required to make any payment for or on account of Tax in relation to a sum received or receivable (or any sum deemed for the purposes of Tax to be received or receivable) under a Finance Document.

**Qualifying Bank** means the Bank if:

(a)    it is a Domestic Bank and to which, lending through its Facility Office in the Relevant Tax Jurisdiction, any payment in respect of the Facility can be made without a Tax Deduction being imposed; or

(b)    it is a Treaty Bank; or

(c)      payments in respect of the Facility can be made to it without a Tax Deduction being imposed.

**Relevant Tax Jurisdiction** means, in relation to each Borrower, the jurisdiction in which that Borrower is incorporated or resident for tax purposes.

**Tax Confirmation** means any confirmation by the Bank as to its tax residence in accordance with this Agreement or any confirmation given pursuant to Clause 12.5 (Bank status confirmation).

**Tax Credit** means a credit against, relief or remission for, or repayment of, any Tax.

**Tax Deduction** means a deduction or withholding for or on account of Tax from a payment under a Finance Document, other than a FATCA Deduction.

**Tax Payment** means either the increase in a payment made by a Borrower to a Finance Party under Clause 12.2 (Tax gross-up) or a payment under Clause 12.3 (Tax indemnity).

**Treaty Bank** means the Bank if it:

(a)      is treated as a resident of a Treaty State for the purposes of the Treaty;

(b)      does not carry on a business in the relevant Borrower's Relevant Tax Jurisdiction through a permanent establishment with which the Bank's participation in the Undertaking is effectively connected; and

(c)      meets all other conditions which must be fulfilled (assuming completion of all procedural formalities) in the relevant Treaty to obtain full exemption from tax imposed by the Borrower's jurisdiction of tax residence on any payment to it under a Finance Document.

**Treaty State** means a jurisdiction having a double taxation agreement (a **Treaty**) with the relevant Borrower's Relevant Tax Jurisdiction which makes provision for full exemption from tax imposed by the jurisdiction in relation to which the relevant Borrower is treated as being tax resident on any payment under a Finance Document.

Unless a contrary indication appears, in this Clause 12 a reference to **determines** or **determined** means a determination made in the absolute discretion of the person making the determination.

**12.2    Tax gross-up**

(a)      Each Obligor shall make all payments to be made by it without any Tax Deduction, unless a Tax Deduction is required by law.

(b)      The Company shall promptly upon becoming aware that an Obligor must make a Tax Deduction (or that there is any change in the rate or the basis of a Tax Deduction) notify the Bank accordingly.  The Bank shall promptly notify the Company on becoming so aware in respect of a payment payable to the Bank.

(c)      If a Tax Deduction is required by law to be made by a Borrower, the amount of the payment due from that Borrower shall be increased to an amount which (after making any Tax Deduction) leaves an amount equal to the payment which would have been due if no Tax Deduction had been required.

(d)      A payment shall not be increased under paragraph (c) above by reason of a Tax Deduction on account of Tax imposed by the relevant Borrower's jurisdiction of tax residence, if on the date on which the payment falls due:

(i)    the payment could have been made to the Bank without a Tax Deduction if the Bank had been a Qualifying Bank with respect to that Borrower, but on that date the Bank is not or has ceased to be a Qualifying Bank with respect to that Borrower other than as a result of any change after the date it became the Bank under this Agreement in (or in the interpretation, administration, or application of) any law or Treaty or any published practice or published concession of any relevant taxing authority;

(ii)    the Bank has not given a Tax Confirmation to the Company with respect to that Borrower and payment could have been made to the Bank without any Tax Deduction if the Bank had given a Tax Confirmation to the Borrower;

(iii)    the Borrower making the payment is able to demonstrate that the payment could have been made to the Bank without the Tax Deduction had the Bank complied with its obligations under paragraph (h), (j), (m) and/or (n) below (as applicable) below; or

(iv)    an officer of H.M. Revenue & Customs has given (and not revoked) a direction (a **Direction**) under section 931 of the ITA which relates to the payment and the Bank has received from the relevant Borrower or from the Company a certified copy of that Direction and the payment could have been made to the Bank without any Tax Deduction if that Direction had not been made.

(e)    A Guarantor will not be obliged to make a payment or increased payment pursuant to this Clause 12.2 with respect to a payment by it of a liability due for payment by a Borrower to the extent that, had the payment been made by that Borrower, that Borrower would not have been obliged to make a payment or increased payment pursuant to this Clause 12.2.

(f)    If an Obligor is required to make a Tax Deduction, that Obligor shall make that Tax Deduction and any payment required in connection with that Tax Deduction within the time allowed and in the minimum amount required by law.

(g)    Within 30 days of making either a Tax Deduction or any payment required in connection with that Tax Deduction, the Obligor making that Tax Deduction shall deliver to the Bank for the Finance Party entitled to the payment evidence reasonably satisfactory to that Finance Party that the Tax Deduction has been made or (as applicable) any appropriate payment paid to the relevant taxing authority.

(h)    Subject to paragraph (i) below, a Treaty Bank and each Obligor which makes a payment to which that Treaty Bank is entitled shall co-operate in completing any procedural formalities necessary for that Obligor to obtain authorisation to make that payment without a Tax Deduction.

(i)    If the Bank is a Treaty Bank that holds a passport under the HMRC DT Treaty Passport scheme, and which wishes that scheme to apply to this Agreement, it shall confirm its scheme reference number and its jurisdiction of tax residence to the Company within five Business Days after the date of this Agreement or in the documentation which it executes on becoming a Party as the Bank and shall promptly notify the Company of any change to that information and, having done so, the Bank shall be under no obligation pursuant to paragraph (h) above.

(j)    If, with respect to any Borrower whose Relevant Tax Jurisdiction is the United Kingdom, the Bank has confirmed its scheme reference number and its jurisdiction of tax residence in accordance with paragraph (i) above and:

(i)    a Borrower making a payment to the Bank has not made a Borrower DTTP Filing in respect of the Bank; or

(ii)    a Borrower making a payment to the Bank has made a Borrower DTTP Filing in respect of the Bank but:

(A)    that Borrower DTTP Filing has been rejected by HM Revenue & Customs;

(B)    HM Revenue & Customs has not given the Borrower authority to make payments to the Bank without a Tax Deduction within 60 days of the date of the Borrower DTTP Filing; or

(C)    HM Revenue & Customs has given the Borrower authority to make payments to the Bank without a Tax Deduction but such authority has subsequently been revoked or expired,

and in each case, the Borrower has notified the Bank in writing, the Bank and the Borrower shall co-operate in completing any additional procedural formalities necessary for that Borrower to obtain authorisation to make that payment without a Tax Deduction.

(k)    If the Bank has not confirmed its scheme reference number and jurisdiction of tax residence in accordance with paragraph (i) above, no Obligor shall make a Borrower DTTP Filing or file any other form relating to the HMRC DT Treaty Passport scheme in respect of the Bank's Commitment or its participation in any Utilisation unless the Bank otherwise agrees.

(l)    A Borrower shall, promptly on making a Borrower DTTP Filing, deliver a copy of that Borrower DTTP Filing to the Bank.

(m)    The Bank shall ensure that it satisfies all applicable legal and regulatory requirements for providing the Facility to the Borrowers other than as a result of a change in law or regulation occurring after the date on which it becomes the Bank under this Agreement.

(n)    If the Bank will only become a Qualifying Bank on completion of certain procedural requirements, the Bank shall notify the Company promptly on completion of all such formalities.

**12.3**    **Tax indemnity**

(a)    The Company shall, or shall procure that another member of the Restricted Group shall, (within five Business Days of demand by the Bank) pay to a Protected Party an amount equal to the loss, liability or cost which that Protected Party determines will be or has been (directly or indirectly) suffered for or on account of Tax by that Protected Party in respect of a Finance Document.

(b)    Paragraph (a) above shall not apply:

(i)    with respect to any Tax assessed on a Finance Party:

(A)    under the law of the jurisdiction in which that Finance Party is incorporated or, if different, the jurisdiction (or jurisdictions) in which that Finance Party is treated as resident for tax purposes; or

(B)    under the law of the jurisdiction in which that Finance Party's Facility Office is located in respect of amounts received or receivable in that jurisdiction,

if that Tax is imposed on or calculated by reference to the net income received or receivable (but not any sum deemed to be received or receivable) by that Finance Party; or

(ii)    to the extent a loss, liability or cost:

(A)    is compensated for by an increased payment under Clause 12.2 (Tax gross-up);

(B)     would have been compensated for by an increased payment under Clause 12.2 (Tax gross-up) but was not so compensated solely because one of the exclusions in paragraph (d) of Clause 12.2 (Tax gross-up) applied;

(C)     is attributable to the Bank Levy (or any payment attributable to, or liability arising as a consequence of, the Bank Levy); or

(D)     relates to a FATCA Deduction required to be made by a Party.

(c)     A Protected Party making, or intending to make a claim under paragraph (a) above shall promptly notify the Company of the event which will give, or has given, rise to the claim.

## 12.4    Tax Credit

If an Obligor makes a Tax Payment and the relevant Finance Party determines that acting reasonably and in good faith:

(a)     a Tax Credit is attributable to an increased payment of which that Tax Payment forms part, to that Tax Payment or to a Tax Deduction in consequence of which that Tax Payment was required; and

(b)     that Finance Party has obtained and it (or any of its affiliated entities) has utilised that Tax Credit,

the Finance Party shall pay an amount to the Obligor which that Finance Party determines acting reasonably and in good faith will leave it (after that payment) in the same after-Tax position as it would have been in had the Tax Payment not been required to be made by the Obligor.

## 12.5    Bank status confirmation

(a)     If the Bank is not the Original Bank it shall indicate, in the documentation which it executes on becoming a Party as the Bank, and without liability to any Obligor, which of the following categories it falls in:

(i)     not a Qualifying Bank;

(ii)    a Qualifying Bank (other than a Treaty Bank); or

(iii)   a Treaty Bank.

(b)     If the Bank fails to indicate its status in accordance with this Clause 12.5 then the Bank shall be treated for the purposes of this Agreement (including by each Obligor) as if it is not a Qualifying Bank until such time as it notifies the Bank which category applies (and the Bank, upon receipt of such notification, shall inform the Company).  For the avoidance of doubt, the documentation which the Bank executes on becoming a Party as the Bank shall not be invalidated by any failure of the Bank to comply with this Clause 12.5.

## 12.6    Stamp taxes

The Company shall pay and, within five Business Days of demand, indemnify each Secured Party against any cost, loss or liability that Secured Party incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Finance Document provided that this Clause 12.6 shall not apply to any stamp duty, registration or other similar Taxes payable in respect of any assignment, assignation, sub-participation or transfer by a Secured Party of any of its rights and/or obligations under a Finance Document.

## 12.7    VAT

(a)    All amounts expressed to be payable under a Finance Document by any Party to a Finance Party which (in whole or in part) constitute the consideration for any supply for VAT purposes are deemed to be exclusive of any VAT which is chargeable on that supply, and accordingly, subject to paragraph (b) below, if VAT is or becomes chargeable on any supply made by any Finance Party to any Party under a Finance Document and such Finance Party is required to account to the relevant tax authority for the VAT, that Party must pay to such Finance Party (in addition to and at the same time as paying any other consideration for such supply) an amount equal to the amount of the VAT (and such Finance Party must promptly provide an appropriate VAT invoice to that Party).

(b)    If VAT is or becomes chargeable on any supply made by any Finance Party (the **Supplier**) to any other Finance Party (the **Recipient**) under a Finance Document, and any Party other than the Recipient (the **Relevant Party**) is required by the terms of any Finance Document to pay an amount equal to the consideration for that supply to the Supplier (rather than being required to reimburse or indemnify the Recipient in respect of that consideration):

(i)    (where the Supplier is the person required to account to the relevant tax authority for the VAT) the Relevant Party must also pay to the Supplier (at the same time as paying that amount) an additional amount equal to the amount of the VAT.  The Recipient must (where this paragraph (i) applies) promptly pay to the Relevant Party an amount equal to any credit or repayment the Recipient receives from the relevant tax authority which the Recipient reasonably determines relates to the VAT chargeable on that supply; and

(ii)    (where the Recipient is the person required to account to the relevant tax authority for the VAT) the Relevant Party must promptly, following demand from the Recipient, pay to the Recipient an amount equal to the VAT chargeable on that supply but only to the extent that the Recipient reasonably determines that it is not entitled to credit or repayment from the relevant tax authority in respect of that VAT.

(c)    Where a Finance Document requires any Party to reimburse or indemnify a Finance Party for any cost or expense, that Party shall reimburse or indemnify (as the case may be) such Finance Party for the full amount of such cost or expense, including such part thereof as represents VAT, save to the extent that such Finance Party reasonably determines that it is entitled to credit or repayment in respect of such VAT from the relevant tax authority.

(d)    Any reference in this Clause 12.7 to any Party shall, at any time when such Party is treated as a member of a group for VAT purposes, include (where appropriate and unless the context otherwise requires) a reference to the representative member of such group at such time (the term **representative member** to have the same meaning as in the Value Added Tax Act 1994) or a reference to the person who is treated at that time as making the supply, or (as appropriate) receiving the supply, under the grouping rules (provided for in article 11 of Council Directive 2006/112/EC as amended (or as implemented by any relevant member state of the European Union) so that a reference to a Party shall be construed as a reference to that Party or the relevant group or unity (or fiscal unity) of which that Party is a member for VAT purposes at the relevant time or the relevant representative member (or representative or head) of that group or unity at the relevant time (as the case may be).

(e)    In relation to any supply made by a Finance Party to any Party under a Finance Document, if reasonably requested by such Finance Party, that Party must promptly provide such Finance Party with details of that Party's VAT registration and such other information as is reasonably requested in connection with such Finance Party's VAT reporting requirements in relation to such supply.

**12.8    FATCA information**

(a)    Subject to paragraph (c) below, each Party shall, within ten Business Days of a reasonable request by another Party:

    (i)    confirm to that other Party whether it is:

        (A)    a FATCA Exempt Party; or

        (B)    not a FATCA Exempt Party;

    (ii)    supply to that other Party such forms, documentation and other information relating to its status under FATCA as that other Party reasonably requests for the purposes of that other Party's compliance with FATCA; and

    (iii)    supply to that other Party such forms, documentation and other information relating to its status as that other Party reasonably requests for the purposes of that other Party's compliance with any other law, regulation, or exchange of information regime.

(b)    If a Party confirms to another Party pursuant to paragraph (a)(i) above that it is a FATCA Exempt Party and it subsequently becomes aware that it is not or has ceased to be a FATCA Exempt Party, that Party shall notify that other Party reasonably promptly.

(c)    Paragraph (a) above shall not oblige any Finance Party to do anything, and paragraph (a)(iii) above shall not oblige any other Party to do anything, which would or might in its reasonable opinion constitute a breach of:

    (i)    any law or regulation;

    (ii)    any fiduciary duty; or

    (iii)    any duty of confidentiality.

(d)    If a Party fails to confirm whether or not it is a FATCA Exempt Party or to supply forms, documentation or other information requested in accordance with paragraph (a)(i) or (a)(ii) above (including, for the avoidance of doubt, where paragraph (c) above applies), then such Party shall be treated for the purposes of the Finance Documents (and payments under them) as if it is not a FATCA Exempt Party until such time as the Party in question provides the requested confirmation, forms, documentation or other information.

(e)    If a Borrower is a US Tax Obligor or the Bank reasonably believes that its obligations under FATCA or any other applicable law or regulation require it, the Bank shall, within ten Business Days of:

    (i)    where an Original Borrower is a US Tax Obligor and the Bank is the Original Bank, the date of this Agreement;

    (ii)    where a Borrower is a US Tax Obligor on a date on which any other person becomes a Party as the Bank, that date;

    (iii)    the date a new US Tax Obligor accedes as a Borrower; or

    (iv)    where a Borrower is not a US Tax Obligor, the date of a request from the Bank,

supply to the Company:

**914**

(A)    a withholding certificate on Form W-8, Form W-9 or any other relevant form; or

(B)    any withholding statement or other document, authorisation or waiver as the Company may require to certify or establish the status of the Bank under FATCA or that other law or regulation.

(f)    If any withholding certificate, withholding statement, document, authorisation or waiver provided to the Company by the Bank pursuant to paragraph (e) above is or becomes materially inaccurate or incomplete, the Bank shall promptly update it and provide such updated withholding certificate, withholding statement, document, authorisation or waiver to the Company unless it is unlawful for the Bank to do so (in which case the Bank shall promptly notify the Company).

(g)    The Company and each US Tax Obligor may rely on any withholding certificate, withholding statement, document, authorisation or waiver it receives from the Bank pursuant to paragraph (e) above without further verification.

## 12.9    FATCA Deduction

(a)    Each Party may make any FATCA Deduction it is required to make by FATCA, and any payment required in connection with that FATCA Deduction, and no Party shall be required to increase any payment in respect of which it makes such a FATCA Deduction or otherwise compensate the recipient of the payment for that FATCA Deduction.

(b)    Each Party shall promptly, upon becoming aware that it must make a FATCA Deduction (or that there is any change in the rate or the basis of such FATCA Deduction), notify the Party to whom it is making the payment and, in addition, shall notify the Company.

## 13.    INCREASED COSTS

## 13.1    Increased Costs

(a)    Subject to Clause 13.3 (Exceptions) the Company shall, within five Business Days of a demand by the Bank, pay for the account of a Finance Party the amount of any Increased Costs incurred by that Finance Party or any of its Affiliates as a result of:

(i)    the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation; or

(ii)    compliance with any law or regulation made after the date of this Agreement.

(b)    In this Agreement **Increased Costs** means:

(i)    a reduction in the rate of return from the Facility or on a Finance Party's (or its Affiliate's) overall capital;

(ii)    an additional or increased cost; or

(iii)    a reduction of any amount due and payable under any Finance Document,

which is incurred or suffered by a Finance Party or any of its Affiliates to the extent that it is attributable to that Finance Party having entered into its Commitment or funding or performing its obligations under any Finance Document or Undertaking.

**13.2    Increased cost claims**

(a)    A Finance Party intending to make a claim pursuant to Clause 13.1 (Increased Costs) shall promptly notify the Company.

(b)    Each Finance Party shall, as soon as practicable after a demand by the Bank, provide a certificate confirming the amount of its Increased Costs.

**13.3    Exceptions**

(a)    Clause 13.1 (Increased Costs) does not apply to the extent any Increased Cost is:

(i)    attributable to a Tax Deduction required by law to be made by an Obligor;

(ii)    attributable to a FATCA Deduction required to be made by a Party;

(iii)    compensated for by Clause 12.3 (Tax indemnity) (or would have been compensated for under Clause 12.3 (Tax indemnity) but was not so compensated solely because any of the exclusions in paragraph (b) of 12.3 (Tax indemnity) applied);

(iv)    attributable to any Bank Levy (or any payment attributable to, or liability arising as a consequence of, any Bank Levy);

(v)    attributable to the wilful breach by the relevant Finance Party or its Affiliates of any law or regulation;

(vi)    attributable to the implementation or application of or compliance with the "International Convergence of Capital Measurement and Capital Standards, a Revised Framework" published by the Basel Committee on Banking Supervision in June 2004 in the form existing on the date of this Agreement (**Basel II**) or any other law or regulation which implements Basel II (whether such implementation, application or compliance is by a government, regulator, Finance Party or any of its Affiliates);

(vii)    attributable to the implementation or application of or compliance with (x) the agreements on capital requirements, a leverage ratio and liquidity standards contained in "Basel III: A global regulatory framework for more resilient banks and banking systems", "Basel III: International framework for liquidity risk measurement, standards and monitoring" and "Guidance for national authorities operating the countercyclical capital buffer" published by the Basel Committee on Banking Supervision in December 2010, each as amended, supplemented or restated, (y) the rules for global systemically important banks contained in "Global systemically important banks: assessment methodology and the additional loss absorbency requirement – Rules text" published by the Basel Committee on Banking Supervision in November 2011, as amended, supplemented or restated or (z) any further guidance or standards published by the Basel Committee on Banking Supervision relating to Basel III;

(viii)    attributable to the implementation or application of or compliance with (x) Regulation (EU) No 575/2013 of the European Parliament and of the Counsel of 26 June 2013 on prudential requirements for credit institutions and investment firms or (y) Directive 2013/36/EU of the European Parliament and of the Counsel of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directives 2006/48/EC and 2006/49/EC;

(ix)    attributable to the implementation or application of or compliance with the U.S. Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or in connection therewith; or

(x)     not notified in writing to the Company within six months of the Bank becoming aware of such change.

(b)     In this Clause 13.3 reference to a **Tax Deduction** has the same meaning given to the term in Clause 12.1 (Definitions).

## 14.     OTHER INDEMNITIES

### 14.1     Currency indemnity

(a)     If any sum due from an Obligor under the Finance Documents (a **Sum**), or any order, judgment or award given or made in relation to a Sum, has to be converted from the currency (the **First Currency**) in which that Sum is payable into another currency (the **Second Currency**) for the purpose of:

    (i)     making or filing a claim or proof against that Obligor; or

    (ii)     obtaining or enforcing an order, judgment or award in relation to any litigation or arbitration proceedings,

that Obligor shall as an independent obligation, within five Business Days of demand, indemnify each Secured Party to whom that Sum is due against any cost, loss or liability arising out of or as a result of the conversion including any discrepancy between (A) the rate of exchange used to convert that Sum from the First Currency into the Second Currency and (B) the rate or rates of exchange available to that person at the time of its receipt of that Sum.

(b)     Each Obligor waives any right it may have in any jurisdiction to pay any amount under the Finance Documents in a currency or currency unit other than that in which it is expressed to be payable.

### 14.2     Other indemnities

The Company shall (or shall procure that an Obligor will), within five Business Days of demand, indemnify the Bank against any cost, loss or liability incurred by it as a result of:

(a)     the occurrence of any Event of Default;

(b)     a failure by an Obligor to pay any amount due under a Finance Document on its due date;

(c)     funding, or making arrangements to fund, its participation in a Utilisation requested by a Borrower in a Utilisation Request but not made by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by the Bank alone);

(d)     issuing or making arrangements to issue an Undertaking requested by the Company or a Borrower in a Utilisation Request but not issued by reason of the operation of any one or more of the provisions of this Agreement (other than by reason of default or negligence by the Bank alone); or

(e)     a Utilisation (or part of a Utilisation) not being prepaid in accordance with a notice of prepayment given by a Borrower or the Company.

### 15. MITIGATION BY THE BANK

#### 15.1 Mitigation

(a)    Each Finance Party shall, in consultation with the Company, take all reasonable steps to mitigate any circumstances which arise and which would result in the Facility ceasing to be available or any amount becoming payable under or pursuant to, or cancelled pursuant to, any of Clause 7.1 (Illegality), Clause 12 (Tax gross up and indemnities) or Clause 13 (Increased Costs) including (but not limited to) transferring its rights and obligations under the Finance Documents to another Affiliate or Facility Office.

(b)    Paragraph (a) above does not in any way limit the obligations of any Obligor under the Finance Documents.

#### 15.2 Limitation of liability

(a)    The Company shall promptly indemnify each Finance Party for all costs and expenses reasonably incurred by that Finance Party as a result of steps taken by it under Clause 15.1 (Mitigation).

(b)    A Finance Party is not obliged to take any steps under Clause 15.1 (Mitigation) if, in the opinion of that Finance Party (acting reasonably), to do so might be prejudicial to it.

### 16. COSTS AND EXPENSES

#### 16.1 Transaction expenses

The Company shall, within five Business Days of demand, pay the Bank the amount of all costs and expenses (including legal fees) reasonably incurred by any of them in connection with the negotiation, preparation, printing, execution and perfection of:

(a)    this Agreement and any other documents referred to in this Agreement and the Transaction Security; and

(b)    any other Finance Documents executed after the date of this Agreement.

#### 16.2 Amendment costs

If:

(a)    an Obligor requests an amendment, waiver or consent; or

(b)    an amendment is required pursuant to Clause 25.7 (Change of currency),

the Company shall, within five Business Days of demand, reimburse each of the Bank and the Security Agent for the amount of all costs and expenses (including legal fees) reasonably incurred by the Bank and the Security Agent (and, in the case of the Security Agent, by any Receiver or Delegate) in responding to, evaluating, negotiating or complying with that request or requirement.

#### 16.3 Enforcement and preservation costs

The Company shall, within five Business Days of demand, pay to each Secured Party (other than the Security Agent) the amount of all costs and expenses (including legal fees) incurred by it in connection with the enforcement of or the preservation of any rights under any Finance Document and the Transaction Security and any proceedings instituted by or against the Security Agent as a consequence of taking or holding the Transaction Security or enforcing these rights.

## 17. GUARANTEE AND INDEMNITY

### 17.1 Guarantee and indemnity

Each Guarantor irrevocably and unconditionally jointly and severally:

(a) guarantees to each Finance Party punctual performance by each other Obligor of all that Obligor's obligations under the Finance Documents;

(b) undertakes with each Finance Party that whenever another Obligor does not pay any amount when due under or in connection with any Finance Document, that Guarantor shall immediately on demand pay that amount as if it was the principal obligor; and

(c) agrees with each Finance Party that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify that Finance Party immediately on demand against any cost, loss or liability it incurs as a result of an Obligor not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under any Finance Document on the date when it would have been due. The amount payable by a Guarantor under this indemnity will not exceed the amount it would have had to pay under this Clause 17 if the amount claimed had been recoverable on the basis of a guarantee.

### 17.2 Continuing guarantee

This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Obligor under the Finance Documents, regardless of any intermediate payment or discharge in whole or in part.

### 17.3 Reinstatement

If any discharge, release or arrangement (whether in respect of the obligations of any Obligor or any security for those obligations or otherwise) is made by a Finance Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration or otherwise, without limitation, then the liability of each Guarantor under this Clause 17 will continue or be reinstated as if the discharge, release or arrangement had not occurred.

### 17.4 Waiver of defences

The obligations of each Guarantor under this Clause 17 will not be affected by an act, omission, matter or thing which, but for this Clause 17, would reduce, release or prejudice any of its obligations under this Clause 17 (without limitation and whether or not known to it or any Finance Party) including:

(a) any time, waiver or consent granted to, or composition with, any Obligor or other person;

(b) the release of any other Obligor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(c) the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Obligor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d) any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of an Obligor or any other person;

**919**

(e)     any amendment, novation, supplement, extension restatement (however fundamental and whether or not more onerous) or replacement of a Finance Document or any other document or security including, without limitation, any change in the purpose of, any extension of or increase in any facility or the addition of any new facility under any Finance Document or other document or security;

(f)     any unenforceability, illegality or invalidity of any obligation of any person under any Finance Document or any other document or security; or

(g)     any insolvency or similar proceedings.

### 17.5    Guarantor intent

Without prejudice to the generality of Clause 17.4 (Waiver of defences), each Guarantor expressly confirms that it intends that this guarantee shall extend from time to time to any (however fundamental) variation, increase, extension or addition of or to any of the Finance Documents and/or any facility or amount made available under any of the Finance Documents for the purposes of or in connection with any of the following:  business acquisitions of any nature; increasing working capital; enabling investor distributions to be made; carrying out restructurings; refinancing existing facilities; refinancing any other indebtedness; making facilities available to new borrowers; any other variation or extension of the purposes for which any such facility or amount might be made available from time to time; and any fees, costs and/or expenses associated with any of the foregoing.

### 17.6    Immediate recourse

Each Guarantor waives any right it may have of first requiring any Finance Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Guarantor under this Clause 17.  This waiver applies irrespective of any law or any provision of a Finance Document to the contrary.

### 17.7    Appropriations

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full, each Finance Party (or any trustee or agent on its behalf) may:

(a)     refrain from applying or enforcing any other moneys, security or rights held or received by that Finance Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Guarantor shall be entitled to the benefit of the same; and

(b)     hold in an interest-bearing suspense account any moneys received from any Guarantor or on account of any Guarantor's liability under this Clause 17.

### 17.8    Deferral of Guarantors' rights

Until all amounts which may be or become payable by the Obligors under or in connection with the Finance Documents have been irrevocably paid in full and unless the Bank otherwise directs, no Guarantor will exercise any rights which it may have by reason of performance by it of its obligations under the Finance Documents or by reason of any amount being payable, or liability arising, under this Clause 17:

(a)     to be indemnified by an Obligor;

**920**

(b)     to claim any contribution from any other guarantor of any Obligor's obligations under the Finance Documents;

(c)     to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under the Finance Documents or of any other guarantee or security taken pursuant to, or in connection with, the Finance Documents by any Finance Party;

(d)     to bring legal or other proceedings for an order requiring any Obligor to make any payment, or perform any obligation, in respect of which any Guarantor has given a guarantee, undertaking or indemnity under Clause 17.1 (Guarantee and indemnity);

(e)     to exercise any right of set-off against any Obligor; and/or

(f)     to claim or prove as a creditor of any Obligor in competition with any Finance Party.

If a Guarantor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to the Finance Parties by the Obligors under or in connection with the Finance Documents to be repaid in full on trust for (or otherwise for the benefit of) the Finance Parties and shall promptly pay or transfer the same to the Bank or as the Bank may direct for application in accordance with Clause 25 (Payment mechanics).

**17.9    Release of Guarantors' right of contribution**

If any Guarantor (a **Retiring Guarantor**) ceases to be a Guarantor in accordance with the terms of the Finance Documents for the purpose of any sale or other disposal of that Retiring Guarantor then on the date such Retiring Guarantor ceases to be a Guarantor:

(a)     that Retiring Guarantor is released by each other Guarantor from any liability (whether past, present or future and whether actual or contingent) to make a contribution to any other Guarantor arising by reason of the performance by any other Guarantor of its obligations under the Finance Documents; and

(b)     each other Guarantor waives any rights it may have by reason of the performance of its obligations under the Finance Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Finance Parties under any Finance Document or of any other security taken pursuant to, or in connection with, any Finance Document where such rights or security are granted by or in relation to the assets of the Retiring Guarantor.

**17.10    Additional security**

This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by any Finance Party.

**17.11    General limitations**

Without limiting any specific exemptions set out below, this guarantee and any other guarantee, indemnity or assurance against loss in any Finance Document (including any Transaction Security) does not apply to any liability to the extent it would constitute unlawful financial assistance within the meaning of sections 678 or 679 of the Companies Act 2006 or any equivalent and applicable provisions under the laws of the jurisdiction of incorporation of the relevant Guarantor.

**921**

**17.12   Germany**

(a)      In this Clause 17.12:

**German Guarantor** means:

(a)      any Guarantor incorporated in Germany as a limited liability company (*Gesellschaft mit beschränkter Haftung*) (a **German GmbH Guarantor**); or

(b)      a limited partnership (*Kommanditgesellschaft*) in relation to which any general partner (*persönlich haftender Gesellschafter*) is a limited liability company (any such general partner is hereinafter referred to as a **German GP Company**) (such limited partnership is hereinafter referred to as a **German KG Guarantor**).

**Guarantee** means any guarantee and/or indemnity obligation of any German Guarantor created under this Agreement or any other Finance Document.

**Net Assets** means the amount of the German GmbH Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's relevant assets (the calculation of which shall include all items set forth in Section 266(2) A, B, C, D and E of the German Commercial Code (*Handelsgesetzbuch*, **HGB**)) less:

(a)      the German GmbH Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's liabilities, the calculation of which shall include all items set forth in Section 266(3) B, C, D and E of the HGB including any costs for any Auditor's Determination but such liabilities shall exclude:

(i)      the liabilities under or relating to the Guarantee; and

(ii)      any obligations (*Verbindlichkeiten*) of the German GmbH Guarantor (and, in case of a GmbH & Co. KG, of its German GP Company):

(A)      owing to any member of the group or any other affiliated company which are subordinated by law or by contract to any Indebtedness outstanding under this Agreement (including for the avoidance of doubt, obligations that would in an insolvency be subordinated pursuant to Section 39 para 1 no 5 or Section 39 para 2 of the German Insolvency Code (*Insolvenzordnung*)) and including obligations under guarantees for obligations which are so subordinated, unless a waiver of the loan provided to the relevant German GmbH Guarantor or, in the case of a GmbH & Co. KG, of its German GP Company, would result in that member of the group breaching its obligations under section 30 of the German Limited Liability Companies Act (*GmbH-Gesetz*, **GmbHG**) or any similar provision of any other jurisdiction applicable to it; and

(B)      incurred by the German GmbH Guarantor (and, in the case of a GmbH & Co.KG, of its German GP Company) in wilful violation of any of the provisions of the Finance Documents; and

(b)      any amounts which are subject to legal dividend payment constraints (*Ausschüttungssperre*) pursuant to Section 253(6), Section 268(8) or Section 272(5) HGB, in each case calculated in accordance with HGB (taking into account applicable case law on the calculation of net assets pursuant to Section 30 GmbHG) and accounting principles consistent with those applied in the preparation of the latest annual unconsolidated financial statements for that German GmbH Guarantor (or, where the German Guarantor is a German KG Guarantor, its German GP Company.

**922**

For the purpose of such calculation, the following balance sheet items shall be adjusted as follows:

(i)    if the registered share capital of the German Guarantor, or where the German Guarantor is a German KG Guarantor, of its German GP Company, is increased out of retained earnings (*Kapitalerhöhung aus Gesellschaftsmitteln*) after the date of this Agreement, such increase shall not be taken into account unless (i) such increase has been effected with the prior written consent of the Bank or is otherwise permitted under this Agreement or any other Finance Document and (ii) only to the extent it is fully paid up (*voll eingezahlt*);

(ii)    the amount of any increase after the date of this Agreement of the German Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's registered share capital which has been effected out of retained earnings (*Kapitalerhöhung aus Gesellschaftsmitteln*) without the prior written consent of the Bank shall be deducted from the registered share capital;

(iii)    any accrual (*Rückstellung*) in respect of a potential enforcement of the Guarantee or any Security shall be disregarded; and

(iv)    liabilities in relation to loans granted to, and other contractual liabilities incurred by, the German Guarantor or as the case may be by its German GP Company, in wilful (*vorsätzlich*) or grossly negligent (*grob fahrlässig*) violation of any Finance Document shall be disregarded.

(b)    In the case of a German Guarantor the enforcement of the Guarantee against such German Guarantor shall be limited if to the extent that:

(i)    such Guarantee secures the obligations or liabilities of:

(A)    the German Guarantor's, or in case of a German KG Guarantor, any of its relevant German GP Company's, direct or indirect shareholder (upstream), or

(B)    a direct or indirect subsidiary of a shareholder pursuant to paragraph (i) (but excluding any direct or indirect subsidiary of the German Guarantor (and, in the case of a German KG Guarantor, any direct or indirect subsidiary of its German GP Company)) (cross-stream); and

(ii)    the enforcement of the Guarantee (x) would cause the Net Assets to be less than the respective share capital (*Stammkapital*) (*Begründung einer Unterbilanz*) or (y) (if the German GmbH Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's Net Assets are already less than its respective registered share capital) would cause such deficit to be further increased (*Vertiefung einer Unterbilanz*).

(c)    In addition, the German Guarantor and, where the German Guarantor is a German KG Guarantor, also its relevant German GP Company shall, if so requested by the Bank realise, to the extent legally permitted, in a situation where after enforcement of the Guarantee the German Guarantor, or, where the German Guarantor is a German KG Guarantor, its relevant German GP Company would not have Net Assets in excess of its respective registered share capital, any and all of its assets that are shown in the balance sheet with a book value (*Buchwert*) that is significantly lower than the market value of the asset if such asset is not necessary for the German Guarantor's or as the case may be its relevant German GP Company's operational business (*operativ nicht betriebsnotwendig*).

(d)    The enforcement of the Guarantee shall initially be excluded if no later than fifteen (15) Business Days following a demand by the Bank to make a payment under the Guarantee, the managing directors on behalf of the German Guarantor or, as the case may be, its German GP Company, have confirmed in writing to the Bank:

**923**

(i)     to what extent the Guarantee granted hereunder has an upstream or cross-stream effect as described above; and

(ii)    to which extent the Guarantee securing cross-stream and/or upstream obligations or liabilities as described above cannot be enforced as it would cause the Net Assets of the German Guarantor, or, where the German Guarantor is a German KG Guarantor, its German GP Company to be less than its respective registered share capital (taking into account the above set out adjustments and realization duties),

(the **Management Determination**) and such confirmation is supported by a reasonably satisfactory calculation provided that the Bank shall in any event be entitled to enforce the Guarantee for any amounts where such enforcement would, in accordance with the Management Determination, not cause the German Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's Net Assets to be less than (or to fall further below) the amount of its respective registered share capital (in each case as calculated and adjusted as set out above).

(e)     Following the Bank's receipt of Management Determination, any further enforcement of the Guarantee (i.e. any enforcement to which the Bank is not already entitled to) shall be excluded for a period of no more than thirty (30) Business Days only. If the Bank receives within such thirty (30) Business Days period: (i) an up-to date balance sheet together with (ii) a determination in each case prepared by auditors of international standard and reputation appointed by the relevant German Guarantor either confirming the Management Determination or setting out deviations from the Management Determination (the **Auditor's Determination**), the further enforcement of the Guarantee shall be limited, if and to the extent such enforcement would, in accordance with the Auditor's Determination cause the German Guarantor's, or, where the German Guarantor is a German KG Guarantor, its German GP Company's Net Assets to be less than (or to fall further below) the amount of its respective registered share capital in each case as calculated and adjusted as set out above. If the German Guarantor fails to deliver an Auditor's Determination within thirty (30) Business Days after receipt of the Management Determination, the Bank shall be entitled to enforce the Guarantee without any limitation or restriction.

(f)     If and to the extent (A) the net assets as determined by the Auditors' Determination are lower than the amount enforced in accordance with the Management Determination or (B) the Guarantee has been enforced without regard to the limitations set out above because (x) the Management Determination was not delivered within the relevant time frame or (y) the Auditors' Determination was not delivered within the relevant time frame but has been delivered within ten (10) Business Days following the due date for the delivery of the Auditors' Determination, the Bank shall without undue delay repay to the relevant German Guarantor upon written demand of the relevant German Guarantor any amount (if and to the extent already paid to the Finance Party (or any of them)) in the case of (A) equal to the difference between the amount paid and the amount payable resulting from the Auditor's Determination, and in the case of (B), which the Bank would not have been entitled to enforce had the Management Determination and the Auditors' Determination been delivered in time provided such demand for repayment is made to the Bank within six months from the date the Guarantee is enforced. The Bank may withhold any amount received pursuant to an enforcement of the Guarantee until final determination of the amount of the net assets pursuant to the Auditor's Determination.

(g)     The limitations set out in this Clause 17.12 shall not apply (or, as the case may be, shall cease to apply):

(i)     if and to the extent any amounts borrowed under this Agreement are lent or on-lent to such German Guarantor and/or, in case of a German KG Guarantor, its relevant German GP Company or any of its respective subsidiaries from time to time if, in addition by virtue of the enforcement of the Guarantee the German Guarantor, or as the case may be, its relevant German GP Company, has a recourse, indemnification, sharing of losses or other compensation claim against such lending affiliated company (*verbundenes Unternehmen*)

within the meaning of Section 16, 17 or 18 of the German Stock Act (*Aktiengesetz*, **AktG**) or the lending direct or indirect shareholder of the German Guarantor which could be set-off against such loan receivable or otherwise be used to settle or discharge such loan obligation and provided that the Bank has waived with binding effect on any Finance Party the restrictions of any provision under any Finance Document restricting the right to set off claims against, or otherwise make use of the recourse, indemnification, sharing of losses or other compensation claim against such lending affiliated company (*verbundenes Unternehmen*) within the meaning of Section 16, 17 or 18 of the AktG or the lending direct or indirect shareholder of the German Guarantor in order to settle or discharge such loan obligation vis-à-vis, such lending member of the lending affiliated company (*verbundenes Unternehmen*) within the meaning of Section 16, 17 or 18 of the AktG or the lending direct or indirect shareholder of the German Guarantor; or

(ii)    if and when a domination agreement (*Beherrschungsvertrag*) and/or profit absorption agreement (*Gewinnabführungsvertrag*) (either directly or through a chain of domination and/or profit absorption agreements) is or becomes effective between the relevant German Guarantor (or, in case of a German KG Guarantor, its German GP Company) as dependent entity (*abhängiges Unternehmen*) and:

(A)    in case of the German Guarantor (or, in case of a German KG Guarantor, its German GP Company) is a subsidiary of the relevant obligor whose obligations are guaranteed under the Guarantee, that obligor; or

(B)    in case the German Guarantor (or, in case of a German KG Guarantor, its German GP Company) is a sister company of the relevant obligor whose obligations are guaranteed under the Guarantee, any joint (direct or indirect) parent company of the German Guarantor (or, in case of a German KG Guarantor, its German GP Company) and that obligor,

as dominating entity (*beherrschendes Unternehmen*)) other than where and to the extent the existence of such domination agreement (*Beherrschungsvertrag*) and/or profit absorption agreement (*Gewinnabführungsvertrag*) does not result in the inapplicability of sentence 1 of paragraph 1 of Section 30 GmbHG (as stipulated by sentence 2 of such paragraph) with respect to the relevant payments under the Guarantee (including in respect of intermediate entities through which the relevant obligor whose obligations are guaranteed under the Guarantee is an indirect shareholder of the German Guarantor, or as the case may be, its German GP Company);

(iii)    if and to the extent the German Guarantor holds on the date of the enforcement of the Guarantee a fully valuable and recoverable indemnity or claim for refund (*vollwertiger Gegenleistungs-oder Rückgewähranspruch*) against any of its direct or indirect shareholders or Subsidiaries of such shareholders (other than Subsidiaries of the German Guarantor) with respect to the relevant payments under the Guarantee; or

(iv)    if and to the extent for any other reason (including, without limitation, as a result of a change in the relevant rules of law) the deficit (*Unterbilanz*) referred to in paragraph (b) above does not constitute a breach of the German Guarantor's obligations to maintain its registered share capital pursuant to §§ 30 et seq. GmbHG or does not result in a personal liability of the managing directors of the German Guarantor pursuant to §§ 43, 31 GmbHG.

## 17.13    Kingdom of Saudi Arabia law

(a)    The obligations of a Guarantor incorporated in the Kingdom of Saudi Arabia (a **KSA Guarantor**) under the Finance Documents shall be limited to exclude any obligation to the extent that it would

constitute an unlawful distribution to the partners or shareholders of that KSA Guarantor or an otherwise unlawful use of proceeds or assets of that KSA Guarantor, whether pursuant to article 10 of the Saudi Arabian companies regulations or any other applicable law (each being a **Breach of Law**). The Parties irrevocably agree that the obligations of a KSA Guarantor under the Finance Documents are limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of that KSA Guarantor, result in the obligations of that KSA Guarantor under the Finance Documents not constituting a Breach of Law.

(b)     Unless otherwise agreed by the Company and each KSA Guarantor (without any need to amend this Agreement), the liability of a KSA Guarantor under the Finance Documents shall be limited to US$1,000,000,000 plus any unpaid amount of interest, fees, liability, costs and expenses under the Finance Documents and the amount of any interest, default interest, costs and expenses related to the liabilities of the KSA Guarantor

**17.14    Norway**

(a)     The obligations of each Guarantor incorporated in Norway (a **Norwegian Guarantor**) under the Finance Documents shall be limited by any mandatory provisions of law applicable to such Norwegian Guarantor and be deemed to have been given only to the extent it does not violate Sections 8-7 and 8-10 of the Norwegian Private Limited Liability Companies Act 1997 No. 44 (the **Norwegian Companies Act**) regulating unlawful financial assistance and other restricted loans, guarantees and joint and several liability as well as providing of security, and the liability of each Norwegian Guarantor only applies to the extent permitted by such provisions of the Norwegian Companies Act. Any Norwegian Guarantor's obligations under the Finance Documents shall, however, be interpreted so as to make it liable to the fullest extent permitted by the Norwegian Companies Act from time to time.

(b)     Unless otherwise agreed by the Company and each Norwegian Guarantor (and following any such agreement this Agreement shall be deemed to be amended accordingly), the liability of a Norwegian Guarantor under the Finance Documents shall be limited to US$1,000,000,000 plus any unpaid amount of interest, fees, liability, costs and expenses under the Finance Documents and the amount of any interest, default interest, costs and expenses related to the liabilities of the Norwegian Guarantor.

**17.15    Security**

The limitations set out above shall apply mutatis mutandis to any Security provided by any Guarantor under the Security Documents and to any guarantee, undertaking, obligation, indemnity and payment, including but not limited to, distributions, credits, loans and set-offs, pursuant to or permitted by the Finance Documents in relation to a Guarantor.

**17.16    Additional Guarantors**

The guarantee of, and any Security granted by, any Additional Guarantor is subject to any other limitations relating to that Additional Guarantor set out in the Accession Deed applicable to such Additional Guarantor.

**18.     REPRESENTATIONS**

**18.1    General**

Each Obligor makes the representations and warranties set out in this Clause 18 to each Finance Party.

**18.2    Status**

(a)    It is a limited liability corporation, duly incorporated and validly existing under the law of its jurisdiction of incorporation.

(b)    Except where failure to do so does not have, or would not be likely to have, a Material Adverse Effect, it and each of its Restricted Subsidiaries has the power to own its assets and carry on its business as it is being conducted.

**18.3    Binding obligations**

Subject to the Legal Reservations and the Perfection Requirements:

(a)    the obligations expressed to be assumed by it in each Finance Document to which it is a party are legal, valid, binding and enforceable obligations; and

(b)    (without limiting the generality of paragraph (a) above), each Transaction Security Document to which it is a party creates the security interests which that Transaction Security Document purports to create and those security interests are valid and effective.

**18.4    Non-conflict with other obligations**

Subject to the Legal Reservations, the entry into and performance by it of, and the transactions contemplated by, the Finance Documents and the granting of the Transaction Security pursuant to the Agreed Security Principles do not and will not conflict with:

(a)    any law or regulation applicable to it;

(b)    the constitutional documents of any member of the Restricted Group; or

(c)    any agreement or instrument binding upon it or any member of the Restricted Group or any of its or any member of the Restricted Group's assets or constitute a default or termination event (however described) under any such agreement or instrument,

in each case to an extent which has had, or would be likely to have, a Material Adverse Effect.

**18.5    Power and authority**

(a)    It has the power to enter into, perform and deliver, and has taken all necessary action to authorise its entry into, performance and delivery of, the Finance Documents to which it is or will be a party and the transactions contemplated by those Finance Documents.

(b)    No limit on its powers will be exceeded as a result of the borrowing, grant of security or giving of guarantees or indemnities contemplated by the Finance Documents to which it is a party.

**18.6    Validity and admissibility in evidence**

(a)    Subject to the Legal Reservations and Perfection Requirements, all Authorisations required:

(i)    to enable it lawfully to enter into, exercise its rights and comply with its material obligations in the Finance Documents to which it is a party; and

(ii)    to make the Finance Documents to which it is a party admissible in evidence in its Relevant Jurisdictions,

have been obtained or effected and are in full force and effect.

(b)   All Authorisations necessary for the conduct of its business, trade and ordinary activities have been obtained or effected and are in full force and effect if failure to obtain or effect those Authorisations has or would be likely to have a Material Adverse Effect.

### 18.7   Governing law and enforcement

Subject to the Legal Reservations and the Perfection Requirements:

(a)   the choice of governing law of the Finance Documents will be recognised and enforced in its Relevant Jurisdictions; and

(b)   any judgment obtained in relation to a Finance Document in the jurisdiction of the governing law of that Finance Document will be recognised and enforced in its Relevant Jurisdictions.

### 18.8   Insolvency

No:

(a)   corporate action, legal proceeding or other procedure or step described in paragraph (a) of Clause 21.6 (Insolvency proceedings); or

(b)   creditors' process described in Clause 21.7 (Creditors' process),

has been taken in relation to any Material Company (subject in each case to the exceptions set out in Clause 21.6 (Insolvency proceedings) or Clause 21.7 (Creditors' process) as the case may be); and none of the circumstances described in Clause 21.5 (Insolvency) applies to any Material Company.

### 18.9   No filing or stamp taxes

Subject to the Legal Reservations and the Perfection Requirements, under the laws of its Relevant Jurisdiction it is not necessary that the Finance Documents be filed, recorded or enrolled with any court or other authority in that jurisdiction or that any stamp, registration, notarial or similar Taxes or fees be paid on or in relation to the Finance Documents or the transactions contemplated by the Finance Documents.

### 18.10   Deduction of Tax

It is not required to make any deduction for or on account of Tax from any payment it may make under any Finance Document to the Bank except in accordance with this Agreement.

### 18.11   No default

(a)   No Event of Default is continuing.

(b)   No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing, would constitute) a default or termination event (however described) under any other agreement or instrument which is binding on it or any of its Restricted Subsidiaries or to which its (or any of its Restricted Subsidiaries') assets are subject which has or would be likely to have a Material Adverse Effect.

**18.12    Financial Statements**

(a)    Its Original Financial Statements were prepared in accordance with the Accounting Principles consistently applied.

(b)    Its most recent Annual Financial Statements or Quarterly Financial Statements delivered pursuant to Clause 19.2 (Financial statements):

(i)    have been prepared in accordance with the Accounting Principles (to the extent applicable to Quarterly Financial Statements) unless otherwise referred to in such financial statements (or the notes); and

(ii)    fairly present in all material respects its consolidated financial condition as at the end of, and its consolidated results of operations for, the period to which they relate.

**18.13    No proceedings**

(a)    No litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency which is likely to be determined adversely to any Obligor and, if adversely determined, would be likely to have a Material Adverse Effect have (to the best of its knowledge and belief (having made due and careful enquiry)) been started against it or any of its Restricted Subsidiaries.

(b)    No judgment or order of a court, arbitral body or agency which has or would be likely to have a Material Adverse Effect has (to the best of its knowledge and belief (having made due and careful enquiry)) been made against it or any of its Restricted Subsidiaries.

**18.14    No breach of laws**

(a)    It has not (and none of its Restricted Subsidiaries has) breached any law or regulation applicable to it which breach has or would be likely to have a Material Adverse Effect.

(b)    No labour disputes are current against any member of the Restricted Group which would be likely to have a Material Adverse Effect.

**18.15    Environmental laws**

(a)    Each Obligor is in compliance with applicable Environmental Law where failure to do so or would be likely to have a Material Adverse Effect.

(b)    No Environmental Claim has been commenced or against any member of the Restricted Group where that claim has or would be likely, if determined against that member of the Group, to have a Material Adverse Effect.

**18.16    Taxation**

(a)    It is not (and none of its Restricted Subsidiaries is) materially overdue in the filing of any Tax returns and it is not (and none of its Restricted Subsidiaries is) overdue in the payment of any amount in respect of Tax (taking into account any extension or grace period) in each case which has or would be likely to have a Material Adverse Effect.

(b)    No claims or investigations are being, or are reasonably likely to be, made or conducted against it (or any of its Restricted Subsidiaries) with respect to Taxes which have or would be likely to have a Material Adverse Effect.

(c)   Except for KCA Deutag Drilling Offshore Services AS and KCA Deutag Europe B.V. which are tax resident in the United Kingdom, it is resident for Tax purposes only in its jurisdiction of incorporation.

**18.17   Anti-corruption law and Sanctions**

(a)   Each member of the Group has conducted its businesses in compliance with applicable Anti-Corruption Laws in all material respects and has instituted and maintained policies and procedures reasonably designed to promote and achieve compliance with such laws in all material respects.

(b)   No member of the Group and, to its knowledge, none of their respective directors, officers, employees, agents, or representatives, is a Sanctioned Person, nor is any member of the Group located, organised or ordinarily resident in a Sanctioned Country or otherwise the target of any applicable Sanctions (save, in all cases, in respect of KCA DEUTAG Iran Kish Drilling Company PJSC which is established in Iran and is a Sanctioned Person solely by virtue of the definition of limb (b) of the definition of Sanctioned Person).

(c)   Each member of the Group has conducted its businesses in compliance with applicable Sanctions and has instituted and maintained policies and procedures reasonably designed to promote and achieve compliance with such laws.

(d)   No member of the Group is (and none of their assets are) the subject of any claim, proceeding, formal notice or investigation with respect to a breach or alleged breach of any applicable Sanctions.

(e)   No member of the Group has, or is, engaged in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to breach, directly or indirectly, any applicable Sanctions.  No asset the subject of the Transaction Security is currently the target of any applicable Sanctions.

**18.18   Security and Indebtedness**

(a)   No Security exists over all or any of the present or future assets of any member of the Restricted Group other than as permitted by this Agreement.

(b)   No member of the Restricted Group has any Indebtedness outstanding other than as permitted by this Agreement.

**18.19   Ranking**

Subject to the Legal Reservations and the Perfection Requirements, the Transaction Security has or will have the ranking in priority which it is expressed to have in the Transaction Security Documents.

**18.20   Good title to assets**

It has a good, valid and marketable title to, or valid leases or licences of, and all appropriate Authorisations to use, the assets necessary to carry on its business as presently conducted in each case to the extent failure to do so has or would be likely to have a Material Adverse Effect.

**18.21   Legal and beneficial ownership**

It is the sole legal and beneficial owner of the respective assets over which it purports to grant Security.

**18.22   Shares**

(a)   The shares of any member of the Restricted Group which are subject to the Transaction Security are fully paid and not subject to any option to purchase or similar rights.

(b)     The constitutional documents of any member of the Restricted Group whose shares are subject to the Transaction Security do not and could not restrict or inhibit any transfer of those shares on creation or enforcement of the Transaction Security.

### 18.23    Intellectual Property

It:

(a)     is the sole legal and beneficial owner of or has licensed to it on normal commercial terms all the Intellectual Property which is material in the context of its business and which is required by it in order to carry on its business as it is being conducted where failure to do so has or would be likely to have a Material Adverse Effect;

(b)     does not, in carrying on its businesses, infringe any Intellectual Property of any third party in any respect which has or would be likely to have a Material Adverse Effect; and

(c)     has taken all formal or procedural actions (including payment of fees) required to maintain any material Intellectual Property owned by it where failure to do so has, or would be likely to have, a Material Adverse Effect.

### 18.24    Group Structure Chart

On the date of this Agreement, the Group Structure Chart is true, complete and accurate in all material respects.

### 18.25    Centre of main interests

For the purposes of Regulation (EU) 2015/848 of 20 May 2015 on insolvency proceedings (recast) (the **Regulation**), the centre of main interest (as that term is used in Article 3(1) of the Regulation) of each Obligor incorporated in the European Union is situated in its jurisdiction of incorporation, England and Wales or Scotland.

### 18.26    Times when representations made

(a)     All the representations and warranties in this Clause 18 are made by each Original Obligor on the date of this Agreement.

(b)     The Repeating Representations are deemed to be made by each Obligor on each Utilisation Date.

(c)     The representations and warranties contained in paragraph (b) of Clause 18.12 (Financial Statements) will be deemed to be made by each Obligor on the date on which the relevant financial statements are delivered under this Agreement.

(d)     The Repeating Representations are deemed to be made by each Additional Obligor on the day on which it becomes (or it is proposed that it becomes) an Additional Obligor.

(e)     Each representation or warranty deemed to be made after the date of this Agreement shall be deemed to be made by reference to the facts and circumstances existing at the date the representation or warranty is deemed to be made.

### 19.    INFORMATION UNDERTAKINGS

(a)     The undertakings in this Clause 19 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

(b)    In this Clause 19:

**Annual Financial Statements** means the financial statements for a Financial Year delivered pursuant to paragraph (a) of Clause 19.2 (Financial statements).

**Quarterly Financial Statements** means the financial statements delivered pursuant to paragraph (b) of Clause 19.2 (Financial statements).

## 19.2    Financial statements

The Company shall supply to the Bank at the same time they are delivered to any group of Noteholders, but in any event on or before the deadline for delivery of such financial statements in any Indenture:

(a)    the audited consolidated financial statements of the Company for each Financial Year; and

(b)    the consolidated financial statements of the Company for each Financial Quarter (other than in respect of the fourth Financial Quarter).

## 19.3    Requirements as to financial statements

(a)    The Company shall procure that each set of Annual Financial Statements and Quarterly Financial Statements includes a balance sheet, profit and loss account and cashflow statement.

(b)    Each set of financial statements delivered pursuant to Clause 19.2 (Financial statements) shall be prepared in accordance with the Accounting Principles.

## 19.4    Presentations – noteholder calls

The Company shall invite the Bank to any public call held for Noteholders and give the Bank reasonable notice of such calls provided that no representative of the Bank may speak during such calls other than to register their attendance.

## 19.5    Information: miscellaneous

The Company shall supply to the Bank (if the Bank so requests):

(a)    at the same time as they are dispatched, copies of all documents dispatched by the Company or any Obligors to its creditors generally (or any class of them) including any report delivered to any group of Noteholders under any Indenture;

(b)    promptly upon becoming aware of them, the details of any litigation, arbitration or administrative proceedings which are current or pending against any member of the Restricted Group, and which, if adversely determined, would be likely to have a Material Adverse Effect;

(c)    promptly, such information as the Security Agent may reasonably require about the Charged Property and compliance of the Obligors or any Third Party Security Provider with the terms of any Transaction Security Documents; and

(d)    promptly on request, such further information regarding the financial condition, assets and operations of the Restricted Group as the Bank may reasonably request.

### 19.6    Notification of Default

(a)    Each Obligor shall notify the Bank of any Default (and the steps, if any, being taken to remedy it) promptly upon becoming aware of its occurrence (unless that Obligor is aware that a notification has already been provided by another Obligor).

(b)    Promptly upon a request by the Bank, the Company shall supply to the Bank a certificate signed by one Authorised Person on its behalf certifying that no Default is continuing (or if a Default is continuing, specifying the Default and the steps, if any, being taken to remedy it).

### 19.7    "Know your customer" checks

(a)    If:

    (i)    the introduction of or any change in (or in the interpretation, administration or application of) any law or regulation made after the date of this Agreement;

    (ii)    any change in the status of an Obligor (or of a Holding Company of an Obligor) or the composition of the shareholders of an Obligor (or of a Holding Company of an Obligor) after the date of this Agreement; or

    (iii)    a proposed assignment or transfer by the Bank of any of its rights and/or obligations under this Agreement to a party that is not the Bank prior to such assignment or transfer,

obliges the Bank (or, in the case of paragraph (iii) above, any prospective new Bank) to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, each Obligor shall promptly upon the request of the Bank supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Bank (for itself or, in the case of the event described in paragraph (iii) above, on behalf of any prospective new Bank) in order for the Bank or, in the case of the event described in paragraph (iii) above, any prospective new Bank to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the transactions contemplated in the Finance Documents.

(b)    The Company shall, by not less than three Business Days' prior written notice to the Bank, notify the Bank of its intention to request that one of its Restricted Subsidiaries becomes an Additional Obligor pursuant to Clause 23 (Changes to the Obligors).

(c)    Following the giving of any notice pursuant to paragraph (b) above, if the accession of such Additional Obligor obliges the Bank to comply with "know your customer" or similar identification procedures in circumstances where the necessary information is not already available to it, the Company shall promptly upon the request of the Bank supply, or procure the supply of, such documentation and other evidence as is reasonably requested by the Bank (for itself or on behalf of any prospective new Bank) in order for the Bank or any prospective new Bank to carry out and be satisfied it has complied with all necessary "know your customer" or other similar checks under all applicable laws and regulations pursuant to the accession of such Restricted Subsidiary to this Agreement as an Additional Obligor.

## 20.    GENERAL UNDERTAKINGS

The undertakings in this Clause 20 remain in force from the date of this Agreement for so long as any amount is outstanding under the Finance Documents or any Commitment is in force.

### 20.1    Restrictive covenants

Each Obligor shall comply with the covenants set out in Schedule 9 (Restrictive Covenants).

**20.2    Authorisations**

Subject to the Legal Reservations and the Perfection Requirements, each Obligor shall promptly:

(a)    obtain, comply with and do all that is necessary to maintain in full force and effect; and

(b)    and if requested, supply certified copies to the Bank of:

any Authorisation required under any law or regulation of a Relevant Jurisdiction to:

(i)    enable it to perform its obligations under the Finance Documents; and

(ii)    carry on its business where failure to do so has or would be likely to have a Material Adverse Effect.

**20.3    Compliance with laws**

Each Obligor shall (and the Company shall ensure that each member of the Restricted Group will) comply in all respects with all laws to which it may be subject, if failure so to comply has or would be likely to have a Material Adverse Effect.

**20.4    Environmental compliance**

Each Obligor shall (and the Company shall ensure that each member of the Restricted Group will):

(a)    comply with all Environmental Law;

(b)    obtain, maintain and ensure compliance with all requisite Environmental Permits;

(c)    implement procedures to monitor compliance with and to prevent liability under any Environmental Law,

where failure to do so has or would be likely to have a Material Adverse Effect.

**20.5    Environmental Claims**

Each Obligor shall (through the Company), promptly upon becoming aware of the same, inform the Bank in writing of any Environmental Claim against any member of the Group which is current where the claim, if determined against that member of the Group, has or would be likely to have a Material Adverse Effect.

**20.6    Anti-corruption law and Sanctions**

(a)    No Obligor shall (and the Company shall ensure that no other member of the Restricted Group will) directly or indirectly use the Facility for any purpose which would breach any applicable Anti-Corruption Laws or any applicable Sanctions.

(b)    No Obligor shall (and the Company shall ensure that no other member of the Restricted Group will) directly or indirectly use the Facility to fund any activities of, or business with, any Sanctioned Person in breach of applicable Sanctions, or in any Sanctioned Country, or in any other manner that would result in a violation by any Party of any applicable Sanctions to the extent they are applicable to such Party.

(c)    Each Obligor shall (and the Company shall ensure that each other member of the Restricted Group will):

(i)     conduct its businesses in compliance with applicable Anti-Corruption Laws and Sanctions; and

(ii)    maintain policies and procedures reasonably designed to promote and achieve compliance with applicable Anti-Corruption Laws and Sanctions.

(d)    No Obligor shall (and the Company shall ensure that no other member of the Restricted Group will) own, operate, possess, use, lease, dispose of or otherwise deal with, or procure or allow the ownership, operation, possession, use, leasing or disposal of, or any other dealing with, the assets subject to the Transaction Security or part thereof for any purpose which would violate, or cause any Finance Party or the Company or other member of the Restricted Group to violate, any applicable Sanctions.

## 20.7    Taxation

Each Obligor shall (and the Company shall ensure that each member of the Restricted Group will) pay and discharge all Taxes imposed upon it or its assets within the time period allowed without incurring penalties unless and only to the extent that failure to pay those Taxes does not have or would not be likely to have a Material Adverse Effect.

## 20.8    Preservation of assets

Each Obligor shall (and the Company shall ensure that each other member of the Restricted Group will) maintain in good working order and condition (ordinary wear and tear excepted) all of its assets necessary in the conduct of its business, except where failure to do so does not have or would not be likely to have a Material Adverse Effect.

## 20.9    Pari passu ranking

Each Obligor shall ensure that at all times any unsecured and unsubordinated claims of a Finance Party against it under the Finance Documents rank at least pari passu with the claims of all its other unsecured and unsubordinated creditors except those creditors whose claims are mandatorily preferred by laws of general application to companies.

## 20.10   Insurance

(a)    The Company shall on behalf of the Obligors (or shall ensure that each Obligor shall) maintain insurances on and in relation to its business and assets against those risks and to the extent as is usual for companies carrying on the same or substantially similar business, except where failure to do so does not have or would not be likely to have a Material Adverse Effect.

(b)    All insurances must be with reputable independent insurance companies or underwriters.

(c)    No Obligor shall be required to maintain any key-man policy or to ensure that any insurance arrangements include any loss payee endorsements or arrangements in favour of the Secured Parties.

## 20.11   Pensions

The Company shall ensure that all pension schemes operated by or maintained for the benefit of members of the Restricted Group and/or their employees are funded in all material respects to the extent required by law, except where failure to do so does not have or would not be likely to have a Material Adverse Effect.

**20.12    Access**

If an Event of Default is continuing, the Company shall, and the Company shall ensure that each Obligor will, permit the Bank and/or the Security Agent and/or accountants or other professional advisers and contractors of the Bank (after consultation with the Company as to the scope of the investigation) at all reasonable times and on reasonable notice at the risk and cost of the Company:

(a)    free access (in the presence of the Company) to the books, accounts and records of each Obligor; and

(b)    to meet and discuss with senior management of the Company at the offices of the Company,

provided that all information obtained as a result of such access shall be subject to the confidentiality restrictions set out in this Agreement.

**20.13    Intellectual Property**

Each Obligor shall:

(a)    preserve and maintain the subsistence and validity of the Intellectual Property necessary for its business;

(b)    use reasonable endeavours to prevent any infringement in any material respect of its Intellectual Property;

(c)    make registrations and pay all registration fees and taxes necessary to maintain its Intellectual Property in full force and effect and record its interest in that Intellectual Property;

(d)    not use or permit its Intellectual Property to be used in a way or take any step or omit to take any step in respect of that Intellectual Property which may materially and adversely affect the existence or value of the Intellectual Property or imperil the right of any member of the Restricted Group to use such property; and

(e)    not discontinue the use of its Intellectual Property,

where failure to do so, in the case of paragraphs (a) to (c) above or, in the case of paragraphs (d) and (e) above, such use, permission to use, omission or discontinuation, would be likely to have a Material Adverse Effect.

**20.14    Financial assistance**

Each Obligor shall comply in all respects with sections 678 and 679 of the Companies Act 2006 and any equivalent legislation in other jurisdictions including in relation to the execution of the Transaction Security Documents and payment of amounts due under this Agreement.

**20.15    Material Companies**

The Company shall ensure that, subject to the Agreed Security Principles, each member of the Restricted Group incorporated in an Agreed Security Jurisdiction (other than Oman, Saudi Arabia or Russia) which is or becomes a Material Company shall as soon as reasonably practicable (and in any event within 60 days of the date on which it is determined that it is a Material Company), become an Additional Guarantor.

**20.16    Further assurance**

(a)    Subject to the Agreed Security Principles, each Obligor shall (and the Company shall procure that each other member of the Restricted Group and each Third Party Security Provider will) promptly do all such acts or execute all such documents (including assignments, assignations, transfers, mortgages, charges, standard securities, notices and instructions) as the Security Agent may reasonably specify (and in such form as the Security Agent may reasonably require in favour of the Security Agent or its nominee(s)):

   (i)    to perfect the Security created or intended to be created under or evidenced by the Transaction Security Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Transaction Security) or for the exercise of any rights, powers and remedies of the Security Agent or the Finance Parties provided by or pursuant to the Finance Documents or by law;

   (ii)    to confer on the Security Agent or confer on the Finance Parties Security over any property and assets of that Obligor or that Third Party Security Provider located in any jurisdiction equivalent or similar to the Security intended to be conferred by or pursuant to the Transaction Security Documents; and/or

   (iii)    to facilitate the realisation of the assets which are, or are intended to be, the subject of the Transaction Security.

(b)    Each Obligor shall (and the Company shall procure that each other member of the Restricted Group and each Third Party Security Provider will) take all such action as is available to it (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Security Agent or the Finance Parties by or pursuant to the Finance Documents.

**21.    EVENTS OF DEFAULT**

   Each of the events or circumstances set out in this Clause 21 is an Event of Default (save for Clause 21.15 (Acceleration)).

**21.1    Non-payment**

   An Obligor does not pay on the due date any amount payable pursuant to a Finance Document at the place at and in the currency in which it is expressed to be payable unless (other than in respect of any payment due on the Termination Date) payment is made within five Business Days of its due date.

**21.2    Other obligations**

(a)    An Obligor or a Third Party Security Provider does not comply with any provision of the Finance Documents (other than those referred to in Clause 21.1 (Non-payment)).

(b)    No Event of Default under paragraph (a) above will occur if the failure to comply is capable of remedy and is remedied within 20 Business Days of the earlier of (i) the Bank giving notice to the Company or relevant Obligor or Third Party Security Provider and (ii) an Obligor or a Third Party Security Provider becoming aware of the failure to comply.

**21.3    Misrepresentation**

(a)    Any representation or statement made or deemed to be made by an Obligor or a Third Party Security Provider in the Finance Documents or any other document delivered by or on behalf of any Obligor

or Third Party Security Provider under or in connection with any Finance Document is or proves to have been incorrect or misleading when made or deemed to be made.

(b)    No Event of Default under paragraph (a) above will occur if the circumstances giving rise to the misrepresentation or misstatement are capable of remedy and are remedied within 20 Business Days of the earlier of (i) the Bank giving notice to the Company or relevant Obligor or Third Party Security Provider and (ii) an Obligor or a Third Party Security Provider becoming aware of the misrepresentation, breach of warranty or misstatement.

### 21.4    Cross-payment default/acceleration

(a)    Any Indebtedness of any Material Company is not paid when due nor within any originally applicable grace period.

(b)    Any Indebtedness of any Material Company is declared to be or otherwise becomes due and payable prior to its specified maturity as a result of an event of default (howsoever described).

(c)    No Event of Default will occur under this Clause 21.4 if:

    (i)    the aggregate amount of Indebtedness or commitment for Indebtedness falling within paragraphs (a) or (b) above is less than US$35,000,000 (or its equivalent); or

    (ii)    the Indebtedness falling within paragraphs (a) or (b) above:

        (A)    is covered by a letter of credit;

        (B)    is owed by one member of the Restricted Group to another member of the Restricted Group;

        (C)    is Subordinated Shareholder Debt; or

        (D)    has ceased to be due and payable in accordance with the terms of that Indebtedness.

### 21.5    Insolvency

(a)    Any Material Company or a Third Party Security Provider:

    (i)    is unable or admits inability to pay its debts as they fall due (other than solely as a result of its liabilities exceeding its assets);

    (ii)    is deemed to, or is declared to, be unable to pay its debts under applicable law;

    (iii)    suspends or publicly announces an intention to suspend making payments on any of its debts; or

    (iv)    by reason of actual or anticipated financial difficulties, commences negotiations with one or more of its creditors (excluding any Finance Party in its capacity as such) with a view to rescheduling any of its Indebtedness.

(b)    A moratorium is declared in respect of any Indebtedness of a Material Company or a Third Party Security Provider.

### 21.6    Insolvency proceedings

(a)    Any formal corporate action, legal proceedings or other procedure or step is taken in relation to:

**938**

(i)      the suspension of payments, a moratorium of any Indebtedness, winding-up, dissolution, administration or reorganisation (by way of voluntary arrangement, scheme of arrangement or otherwise) of any Material Company or a Third Party Security Provider;

(ii)     a composition, compromise, assignment or arrangement with the financial creditors of any Material Company or a Third Party Security Provider; or

(iii)    the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of any Material Company or a Third Party Security Provider or any of their assets,

or any analogous procedure or step is taken in any jurisdiction.

(b)     Paragraph (a) above shall not apply to:

    (i)      any action, proceedings or other procedure or step which is frivolous or vexatious and is discharged, stayed or dismissed within 60 days of commencement; or

    (ii)     any step or procedure or other matter contemplated by, or arises in connection with, a Permitted Transaction.

### 21.7    Creditors' process

Any attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of a Material Company or a Third Party Security Provider is not discharged within 60 days and such event has or would be likely to have a Material Adverse Effect.

### 21.8    Unlawfulness and invalidity

(a)     Subject to the Legal Reservations and Perfection Requirements and paragraph (b) below:

    (i)      it is or becomes unlawful for an Obligor or a Third Party Security Provider to perform any of its material obligations under the Finance Documents or any Transaction Security created or expressed to be created or evidenced by the Transaction Security Documents ceases to be effective or any subordination created under the Intercreditor Agreement is or becomes unlawful;

    (ii)     any obligation or obligations of any Obligor or Third Party Security Provider under any Finance Documents are not or cease to be legal, valid, binding or enforceable and the cessation individually or cumulatively materially and adversely affects the interests of the Bank under the Finance Documents; or

    (iii)    any Finance Document ceases to be in full force and effect or any Transaction Security or any subordination created under the Intercreditor Agreement ceases to be legal, valid, binding, enforceable or effective or is alleged to be ineffective by an Obligor, a Third Party Security Provider or any Holding Company of the Company party to it.

(b)     No Event of Default under paragraph (a) above will occur if the failure to comply is capable of remedy and is remedied within 20 Business Days of the earlier of (i) the Bank giving notice to the Company or relevant Obligor or Third Party Security Provider and (ii) an Obligor or a Third Party Security Provider becoming aware of the failure to comply.

**21.9    Intercreditor Agreement**

(a)    Any Holding Company of the Company party to the Intercreditor Agreement fails to comply with the provisions of, or does not perform its material obligations under, the Intercreditor Agreement; or

(b)    a representation or warranty given by that party in the Intercreditor Agreement is incorrect in any material respect,

and, if the non-compliance or circumstances giving rise to the misrepresentation are capable of remedy, it is not remedied within 20 Business Days of the earlier of the Bank giving notice to that party or that party becoming aware of the non-compliance or misrepresentation.

**21.10    Cessation of business**

The Restricted Group (taken as a whole) suspends or ceases to carry on all or a material part of its business except as a result of a Permitted Transaction.

**21.11    Audit qualification**

The Company's auditors qualify the Annual Financial Statements of the Company in respect of the Restricted Group as a going concern or by reason of failure to disclose information, and such qualification is or would be materially adverse to the interests of the Bank under the Finance Documents.

**21.12    Expropriation**

The authority or ability of the Restricted Group (taken as a whole) to conduct its business is limited or wholly or substantially curtailed by any seizure, expropriation, nationalisation, intervention, restriction or other action by or on behalf of any governmental, regulatory or other similar authority in relation to any member of the Restricted Group or any of its assets and such event has or would be likely to have a Material Adverse Effect.

**21.13    Repudiation and rescission of agreements**

An Obligor or a Third Party Security Provider or any Holding Company of the Company party to it rescinds or purports to rescind or repudiates or purports to repudiate a Finance Document or any of the Transaction Security or evidences an intention to rescind or repudiate a Finance Document or any Transaction Security and this has or is likely to be materially adverse effect on the interests of the Bank under the Finance Documents.

**21.14    Litigation**

Any litigation, arbitration or administrative proceedings or investigations of, or before, any court, arbitral body or agency are started, or any judgment or order of a court, arbitral body or agency is made, in relation to the Finance Documents or the transactions contemplated in the Finance Documents or against any member of the Restricted Group or its assets which has, or would be likely to have, a Material Adverse Effect.

**21.15    Acceleration**

Subject to the Intercreditor Agreement, on and at any time after the occurrence of an Event of Default which is continuing the Bank may:

(a)    by notice to the Company:

(i)     cancel the Available Commitment of the Bank at which time each such Available Commitment shall immediately be cancelled and the Facility shall immediately cease to be available for further utilisation;

(ii)    declare that all or part of the Utilisations, together with accrued interest, and all other amounts accrued or outstanding under the Finance Documents be immediately due and payable, at which time they shall become immediately due and payable;

(iii)   declare that all or part of the Utilisations be payable on demand, at which time they shall immediately become payable on demand by the Bank;

(iv)    declare that cash cover in respect of each Undertaking is immediately due and payable at which time it shall become immediately due and payable; and/or

(v)     declare that cash cover in respect of each Undertaking is payable on demand at which time it shall immediately become due and payable on demand by the Bank; and/or

(b)    exercise or direct the Security Agent to exercise any or all of its rights, remedies, powers or discretions under the Finance Documents.

## 22.    CHANGES TO THE BANK

### 22.1   Assignments and transfers by the Bank

Subject to this Clause 22, the Bank (the **Existing Bank**) may:

(a)    assign all (but not part) of its rights;

(b)    transfer by novation all (but not part) of its rights and obligations; or

(c)    enter into a sub-participation,

under any Finance Documents to another bank or financial institution or to a trust, fund or other entity which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets (the **New Bank**).

### 22.2   Company consent

(a)    The consent of the Company is required for an assignment, transfer or a voting sub-participation by an Existing Bank, unless, subject to paragraph (b) below, the assignment, transfer or voting sub-participation is:

(i)     to any entity identified on the White List;

(ii)    to an Affiliate of the Bank;

(iii)   made at a time when an Event of Default is continuing under Clause 21.1 (Non-payment) or 21.5 (Insolvency) or 21.6 (Insolvency proceedings).

(b)    Notwithstanding paragraph (a) above, the consent of the Company shall always be required for an assignment, transfer or a voting sub-participation by an Existing Bank if the New Bank:

(i)     is not a bank with a long term corporate credit rating of BBB+/Baa1 or better according to at least two of Moody's, Standard & Poor's and Fitch; or

(ii)     is, or is acting on behalf of or is fronting for, a Loan to Own/Distressed Investor or an Industry Competitor.

(c)     For the purposes of paragraph (b) above:

**Industry Competitor** means any person or entity (or any of its Affiliates or any person acting on its behalf) which is a competitor of a member of the Group or whose business is similar or related to a member of the Group or is a supplier or sub-contractor of a member of the Group and, in each case, any controlling shareholder of such persons, provided that this shall not include any person or entity (or any of its Affiliates) which is a bank, financial institution or trust, fund or other entity which is independently controlled and managed and whose principal business or a material activity of whom is arranging, underwriting or investing in debt.

**Loan to Own/Distressed Investor** means any person or entity (or any of its Affiliates or any person acting on its behalf including any department or "desk" of any such person or entity) whose principal business or material activity is:

(a)     investing in distressed debt or the purchase of loans or other debt securities with the intention of (or view to) owning the equity or gaining control of a business (directly or indirectly);

(b)     investing in equity and/or acquiring control of, or an equity stake in, a business (directly or indirectly); and/or

(c)     exploiting holdout or blocking positions,

but excluding:

(i)     any Affiliate of any such person or entity which is a deposit taking financial institution authorised by a financial services regulator to carry out the business of banking which holds a minimum rating equal to or better than BBB+/Baa1 according to at least two of Moody's, Standard & Poor's and Fitch which are managed and controlled independently to any such person or entity and provided that any information made available under the Finance Documents shall not be disclosed or made available to such person or entity or its other Affiliates; and

(ii)     the Original Bank.

**22.3    Other conditions of assignment or transfer**

(a)     An assignment will only be effective on:

(i)     receipt by the Bank (whether in the Assignment Agreement or otherwise) of written confirmation from the New Bank (in form and substance satisfactory to the Bank) that the New Bank will assume the same obligations to the other Finance Parties and the other Secured Parties as it would have been under if it had been the Original Bank;

(ii)     the New Bank entering into the documentation required for it to accede as a party to the Intercreditor Agreement; and

(iii)     performance by the Bank of all necessary "know your customer" or other similar checks under all applicable laws and regulations in relation to such assignment to a New Bank, the completion of which the Bank shall promptly notify to the Existing Bank and the New Bank.

(b)    A transfer will only be effective if the New Bank enters into the documentation required for it to accede as a party to the Intercreditor Agreement and if the procedure set out in Clause 22.5 (Procedure for transfer) is complied with.

(c)    If:

(i)    the Bank assigns or transfers any of its rights or obligations under the Finance Documents or changes its Facility Office; and

(ii)    as a result of circumstances existing at the date the assignment, transfer or change occurs, an Obligor would be obliged to make a payment to the New Bank acting through its new Facility Office under Clause 12 (Tax gross up and indemnities) or Clause 13 (Increased Costs),

then the New Bank acting through its new Facility Office is only entitled to receive payment under those Clauses to the same extent as the Existing Bank acting through its previous Facility Office would have been if the assignment, transfer or change had not occurred.

**22.4    Limitation of responsibility of Existing Bank**

(a)    Unless expressly agreed to the contrary, an Existing Bank makes no representation or warranty and assumes no responsibility to a New Bank for:

(i)    the legality, validity, effectiveness, adequacy or enforceability of the Finance Documents, the Transaction Security or any other documents;

(ii)    the financial condition of any Obligor;

(iii)    the performance and observance by any Obligor or any other member of the Restricted Group of its obligations under the Finance Documents or any other documents; or

(iv)    the accuracy of any statements (whether written or oral) made in or in connection with any Finance Document or any other document,

and any representations or warranties implied by law are excluded.

(b)    Each New Bank confirms to the Existing Bank, the other Finance Parties and the Secured Parties that it:

(i)    has made (and shall continue to make) its own independent investigation and assessment of the financial condition and affairs of each Obligor and its related entities in connection with its participation in this Agreement and has not relied exclusively on any information provided to it by the Existing Bank or any other Finance Party in connection with any Finance Document or the Transaction Security; and

(ii)    will continue to make its own independent appraisal of the creditworthiness of each Obligor and its related entities whilst any amount is or may be outstanding under the Finance Documents or any Commitment is in force.

(c)    Nothing in any Finance Document obliges an Existing Bank to:

(i)    accept a re-transfer or re-assignment from a New Bank of any of the rights and obligations assigned or transferred under this Clause 22; or

(ii)    support any losses directly or indirectly incurred by the New Bank by reason of the non-performance by any Obligor of its obligations under the Finance Documents or otherwise.

**943**

**22.5    Procedure for transfer**

(a)    Subject to the conditions set out in Clause 22.2 (Company consent) and Clause 22.3 (Other conditions of assignment or transfer) a transfer is effected in accordance with paragraph (b) below when a duly completed Transfer Certificate is executed by the Existing Bank and the New Bank.

(b)    On the Transfer Date:

(i)    to the extent that in the Transfer Certificate the Existing Bank seeks to transfer by novation its rights and obligations under the Finance Documents and in respect of the Transaction Security each of the Obligors and the Existing Bank shall be released from further obligations towards one another under the Finance Documents and in respect of the Transaction Security and their respective rights against one another under the Finance Documents and in respect of the Transaction Security shall be cancelled (being the **Discharged Rights and Obligations**);

(ii)    each of the Obligors and the New Bank shall assume obligations towards one another and/or acquire rights against one another which differ from the Discharged Rights and Obligations only insofar as that Obligor or other member of the Restricted Group and the New Bank have assumed and/or acquired the same in place of that Obligor and the Existing Bank;

(iii)    the Security Agent and the New Bank shall acquire the same rights and assume the same obligations between themselves and in respect of the Transaction Security as they would have acquired and assumed had the New Bank been the Original Bank with the rights, and/or obligations acquired or assumed by it as a result of the transfer and to that extent the Security Agent and the Existing Bank shall each be released from further obligations to each other under the Finance Documents; and

(iv)    the New Bank shall become a Party as the "Bank".

**22.6    Procedure for assignment**

(a)    Subject to the conditions set out in Clause 22.2 (Company consent) and Clause 22.3 (Other conditions of assignment or transfer) an assignment may be effected in accordance with paragraph (b) below when a duly completed Assignment Agreement is executed by the Existing Bank and the New Bank.

(b)    On the Transfer Date:

(i)    the Existing Bank will assign absolutely to the New Bank its rights under the Finance Documents and in respect of the Transaction Security expressed to be the subject of the assignment in the Assignment Agreement;

(ii)    the Existing Bank will be released from the obligations (the **Relevant Obligations**) expressed to be the subject of the release in the Assignment Agreement (and any corresponding obligations by which it is bound in respect of the Transaction Security); and

(iii)    the New Bank shall become a Party as the "Bank" and will be bound by obligations equivalent to the Relevant Obligations.

(c)    The Bank may utilise procedures other than those set out in this Clause 22.6 to assign its rights under the Finance Documents (but not, without the consent of the relevant Obligor or unless in accordance with Clause 22.5 (Procedure for transfer), to obtain a release by that Obligor from the obligations owed to that Obligor by the Bank nor the assumption of equivalent obligations by a New Bank) provided that they comply with the conditions set out in Clause 22.2 (Company consent) and Clause 22.3 (Other conditions of assignment or transfer).

**22.7    Copy of Transfer Certificate or Assignment Agreement to Company**

The Bank shall, as soon as reasonably practicable after it has executed a Transfer Certificate, an Assignment Agreement, send to the Company a copy of that Transfer Certificate or Assignment Agreement.

**22.8    Security over rights**

In addition to the other rights provided to the Bank under this Clause 22, the Bank may without consulting with or obtaining consent from any Obligor, at any time charge, assign or otherwise create Security in or over (whether by way of collateral or otherwise) all or any of its rights under any Finance Document to secure obligations of the Bank including, without limitation:

(a)    any charge, assignment or other Security to secure obligations to a federal reserve or central bank; and

(b)    any charge, assignment or other Security granted to any holders (or trustee or representatives of holders) of obligations owed, or securities issued, by the Bank as security for those obligations or securities,

except that no such charge, assignment or Security shall:

(i)    release the Bank from any of its obligations under the Finance Documents or substitute the beneficiary of the relevant charge, assignment or Security for the Bank as a party to any of the Finance Documents; or

(ii)    require any payments to be made by an Obligor other than or in excess of, or grant to any person any more extensive rights than, those required to be made or granted to the Bank under the Finance Documents.

**23.    CHANGES TO THE OBLIGORS**

**23.1    Assignment and transfers by Obligors**

No Obligor may assign any of its rights or transfer any of its rights or obligations under the Finance Documents.

**23.2    Additional Borrowers**

(a)    Subject to compliance with the provisions of paragraphs (b) and (c) of Clause 19.7 ("Know your customer" checks), the Company may request that any of its wholly-owned Restricted Subsidiaries becomes a Borrower. That Restricted Subsidiary shall become a Borrower if:

(i)    it is incorporated in the same jurisdiction as an existing Borrower or otherwise if the Bank approves the addition of that Restricted Subsidiary;

(ii)    the Company and that Restricted Subsidiary deliver to the Bank a duly completed and executed Accession Deed;

(iii)    the Restricted Subsidiary is (or becomes) a Guarantor prior to becoming a Borrower;

(iv)    no Event of Default is continuing or would occur as a result of that Restricted Subsidiary becoming a Borrower; and

(v)    the Bank has received all of the documents and other evidence listed in Schedule 2 (Conditions precedent) in relation to that Additional Borrower, each in form and substance satisfactory to the Bank (acting reasonably).

(b)    The Bank shall notify the Company promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Schedule 2 (Conditions precedent).

**23.3    Resignation of a Borrower**

(a)    The Company may request that a Borrower ceases to be a Borrower by delivering to the Bank a Resignation Letter.

(b)    The Bank shall accept a Resignation Letter and notify the Company and the other Finance Parties of its acceptance if:

(i)    the Borrower is under no actual or contingent obligations as a Borrower under any Finance Documents; and

(ii)    the member of the Restricted Group continues as a Guarantor (unless its resignation has been accepted in accordance with Clause 23.5 (Resignation of a Guarantor)).

(c)    Upon notification by the Bank to the Company of its acceptance of the resignation of a Borrower, that company shall cease to be a Borrower and shall have no further rights or obligations under the Finance Documents as a Borrower.

**23.4    Additional Guarantors**

(a)    Subject to compliance with the provisions of paragraphs (b) and (c) of Clause 19.7 ("Know your customer" checks), the Company may request that any of its Restricted Subsidiaries become a Guarantor.

(b)    A member of the Restricted Group shall become an Additional Guarantor if:

(i)    the Company and the proposed Additional Guarantor deliver to the Bank a duly completed and executed Accession Deed; and

(ii)    the Bank has received all of the documents and other evidence listed in Schedule 2 (Conditions precedent) in relation to that Additional Guarantor, each in form and substance satisfactory to the Bank (acting reasonably).

(c)    The Bank shall notify the Company promptly upon being satisfied that it has received (in form and substance satisfactory to it) all the documents and other evidence listed in Schedule 2 (Conditions precedent).

**23.5    Resignation of a Guarantor**

(a)    The Company may request that a Guarantor (other than the Company) ceases to be a Guarantor by delivering to the Bank a Resignation Letter if:

(i)    the Company has confirmed to the Bank that the Guarantor Cover Test will continue to be complied with following the resignation of that Guarantor;

(ii)      that Guarantor or any member of the Group which is its Holding Company is the subject of a Permitted Transaction pursuant to which that Guarantor will cease to be a member of the Group;

(iii)      that Guarantor is the subject of a Permitted Transaction pursuant to which it is to be liquidated, wound up or dissolved (or pursuant to which it will otherwise cease to exist);

(iv)      the resignation is required to give effect to a Structure Memorandum Step;

(v)      that Guarantor (or a Holding Company of that Guarantor) is designated as an Unrestricted Subsidiary; or

(vi)      the resignation is required to give effect to clause 17.5 (Other transactions) of the Intercreditor Agreement,

provided that the Company may not request that any of Abbot Group Limited, Bentec GmbH Drilling and Oilfield Systems, KCA Deutag Drilling GmbH, KCA Deutag Tiefbohrgesellschaft mbH, KCA Deutag Energy LLC or KCA Deutag (Land Rig) Limited resigns voluntarily pursuant to sub-paragraph (i) above.

(b)      The Bank shall accept a Resignation Letter and notify the Company and the Bank of its acceptance if:

(i)      the Company has confirmed that no Event of Default is continuing or would result from the acceptance of the Resignation Letter;

(ii)      no payment is due from the Guarantor under Clause 17.1 (Guarantee and indemnity); and

(iii)      where the Guarantor is also a Borrower, it has resigned and ceased to be a Borrower under Clause 23.3 (Resignation of a Borrower).

(c)      Upon notification by the Bank to the Company of its acceptance of the resignation of that Guarantor, that company shall cease to be a Guarantor and shall have no further rights or obligations under the Finance Documents as a Guarantor.

### 23.6      Resignation and release of security on disposal

If a Borrower or Guarantor is or is proposed to be the subject of a disposal to a person which is not a member of the Restricted Group that is not prohibited by this Agreement, any resignation of that Borrower or Guarantor and related release of Transaction Security required in accordance with the Intercreditor Agreement shall become effective only on the making of that disposal.

### 24.      CONDUCT OF BUSINESS BY THE FINANCE PARTIES

No provision of this Agreement will:

(a)      interfere with the right of any Finance Party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit;

(b)      oblige any Finance Party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim; or

(c)      oblige any Finance Party to disclose any information relating to its affairs (tax or otherwise) or any computations in respect of Tax.

## 25.    PAYMENT MECHANICS

### 25.1    Payments to the Bank

(a)    On each date on which an Obligor is required to make a payment under a Finance Document that Obligor shall make the same available to the Bank (unless a contrary indication appears in a Finance Document) for value on the due date at the time and in such funds specified by the Bank as being customary at the time for settlement of transactions in the relevant currency in the place of payment.

(b)    Payment shall be made to such account in London as specified by the Bank.

### 25.2    Distributions to an Obligor

The Bank may (with the consent of the Obligor or in accordance with Clause 26 (Set-off)) apply any amount received by it for that Obligor in or towards payment (on the date and in the currency and funds of receipt) of any amount due from that Obligor under the Finance Documents or in or towards purchase of any amount of any currency to be so applied.

### 25.3    Partial payments

(a)    Subject to the terms of the Intercreditor Agreement, if the Bank receives a payment for application against amounts due in respect of any Finance Documents that is insufficient to discharge all the amounts then due and payable by an Obligor under those Finance Documents, the Bank shall apply that payment towards the obligations of that Obligor under the Finance Documents in the following order:

(i)     **first**, in or towards payment pro rata of any accrued interest, fee or commission due but unpaid under those Finance Documents;

(ii)    **secondly**, in or towards payment pro rata of any principal due but unpaid under those Finance Documents and any amount due but unpaid under Clause 5.2 (Claims under an Undertaking) and Clause 5.3 (Indemnities); and

(iii)   **thirdly**, in or towards payment pro rata of any other sum due but unpaid under the Finance Documents.

(b)    Paragraph (a) above will override any appropriation made by an Obligor.

### 25.4    Set-off by Obligors

All payments to be made by an Obligor under the Finance Documents shall be calculated and be made without (and free and clear of any deduction for) set-off or counterclaim.

### 25.5    Business Days

(a)    Any payment under the Finance Documents which is due to be made on a day that is not a Business Day shall be made on the next Business Day in the same calendar month (if there is one) or the preceding Business Day (if there is not).

(b)    During any extension of the due date for payment of any principal or Unpaid Sum under this Agreement interest is payable on the principal or Unpaid Sum at the rate payable on the original due date.

**25.6    Currency of account**

(a)    Subject to paragraphs (b) to (e) below, the Base Currency is the currency of account and payment for any sum due from an Obligor under any Finance Document.

(b)    A repayment of a Utilisation or Unpaid Sum or a part of a Utilisation or Unpaid Sum shall be made in the currency in which that Utilisation or Unpaid Sum is denominated, pursuant to this Agreement, on its due date.

(c)    Each payment of interest shall be made in the currency in which the sum in respect of which the interest is payable was denominated, pursuant to this Agreement, when that interest accrued.

(d)    Each payment in respect of costs, expenses or Taxes shall be made in the currency in which the costs, expenses or Taxes are incurred.

(e)    Any amount expressed to be payable in a currency other than the Base Currency shall be paid in that other currency.

**25.7    Change of currency**

(a)    Unless otherwise prohibited by law, if more than one currency or currency unit are at the same time recognised by the central bank of any country as the lawful currency of that country, then:

(i)    any reference in the Finance Documents to, and any obligations arising under the Finance Documents in, the currency of that country shall be translated into, or paid in, the currency or currency unit of that country designated by the Bank (after consultation with the Company); and

(ii)    any translation from one currency or currency unit to another shall be at the official rate of exchange recognised by the central bank for the conversion of that currency or currency unit into the other, rounded up or down by the Bank (acting reasonably).

(b)    If a change in any currency of a country occurs, this Agreement will, to the extent the Bank (acting reasonably and after consultation with the Company) specifies to be necessary, be amended to comply with any generally accepted conventions and market practice in the relevant market and otherwise to reflect the change in currency.

**25.8    Disruption to payment systems etc.**

If either the Bank determines (in its discretion) that a Disruption Event has occurred or the Bank is notified by the Company that a Disruption Event has occurred:

(a)    the Bank may, and shall if requested to do so by the Company, consult with the Company with a view to agreeing with the Company such changes to the operation or administration of the Facility as the Bank may deem necessary in the circumstances;

(b)    the Bank shall not be obliged to consult with the Company in relation to any changes mentioned in paragraph (a) above if, in its opinion, it is not practicable to do so in the circumstances and, in any event, shall have no obligation to agree to such changes;

(c)    the Bank may consult with the Finance Parties in relation to any changes mentioned in paragraph (a) above but shall not be obliged to do so if, in its opinion, it is not practicable to do so in the circumstances;

(d)     any such changes agreed upon by the Bank and the Company shall (whether or not it is finally determined that a Disruption Event has occurred) be binding upon the Parties as an amendment to (or, as the case may be, waiver of) the terms of the Finance Documents notwithstanding the provisions of Clause 31 (Amendments and waivers);

(e)     the Bank shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever (including, without limitation for negligence, gross negligence or any other category of liability whatsoever but not including any claim based on the fraud of the Bank) arising as a result of its taking, or failing to take, any actions pursuant to or in connection with this Clause 25.8; and

(f)     the Bank shall notify the Finance Parties of all changes agreed pursuant to paragraph (d) above.

## 26.    SET-OFF

If an Event of Default is continuing, the Bank may set off any matured obligation due from an Obligor under the Finance Documents (to the extent beneficially owned by the Bank) against any matured obligation owed by the Bank to that Obligor, regardless of the place of payment, booking branch or currency of either obligation. If the obligations are in different currencies, the Bank may convert either obligation at a market rate of exchange in its usual course of business for the purpose of the set-off.

## 27.    NOTICES

### 27.1    Communications in writing

Any communication to be made under or in connection with the Finance Documents shall be made in writing and, unless otherwise stated, may be made by email or letter.

### 27.2    Addresses

The address and email address (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with the Finance Documents is that identified with its signature below or any substitute address, email address or department or officer as the Party may notify to the Bank (or the Bank may notify to the other Parties, if a change is made by the Bank) by not less than five Business Days' notice.

### 27.3    Delivery

(a)     Any communication or document made or delivered by one person to another under or in connection with the Finance Documents will only be effective:

(i)     if by way of email, when received in legible form; or

(ii)     if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 27.2 (Addresses), if addressed to that department or officer.

(b)     Any communication or document to be made or delivered to the Bank or the Security Agent will be effective only when actually received by the Bank or Security Agent and then only if it is expressly marked for the attention of the department or officer identified with the Bank's or Security Agent's

signature below (or any substitute department or officer as the Bank or Security Agent shall specify for this purpose).

(c)     Any communication or document made or delivered to the Company in accordance with this Clause 27.3 will be deemed to have been made or delivered to each of the Obligors.

(d)     Any communication or document which becomes effective, in accordance with paragraphs (a) to (c) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

**27.4**     **Notification of address and email address**

Promptly upon changing its address or email address, the Bank shall notify the other Parties.

**27.5**     **Electronic communication**

(a)     Any communication or document to be made or delivered by one Party to another under or in connection with the Finance Documents may be made or delivered by electronic mail or other electronic means (including, without limitation, by way of posting to a secure website).

(b)     Any such electronic communication or document as specified in paragraph (a) above made or delivered by one Party to another will be effective only when actually received (or made available) in readable form.

(c)     Any electronic communication or document which becomes effective, in accordance with paragraph (b) above, after 5.00 p.m. in the place in which the Party to whom the relevant communication or document is sent or made available has its address for the purpose of this Agreement shall be deemed only to become effective on the following day.

(d)     Any reference in a Finance Document to a communication being sent or received or a document being delivered shall be construed to include that communication or document being made available in accordance with this Clause 27.5.

**27.6**     **English language**

(a)     Any notice given under or in connection with any Finance Document must be in English.

(b)     All other documents provided under or in connection with any Finance Document must be:

     (i)     in English; or

     (ii)     if not in English, and if so required by the Bank, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

**28.**     **CALCULATIONS AND CERTIFICATES**

**28.1**     **Accounts**

In any litigation or arbitration proceedings arising out of or in connection with a Finance Document, the entries made in the accounts maintained by a Finance Party are *prima facie* evidence of the matters to which they relate.

### 28.2    Certificates and determinations

Any certification or determination by a Finance Party of a rate or amount under any Finance Document is, in the absence of manifest error, conclusive evidence of the matters to which it relates.

### 28.3    Day count convention

Any interest, commission or fee accruing under a Finance Document will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days or, in any case where the practice in the relevant market differs, in accordance with that market practice.

## 29.    PARTIAL INVALIDITY

If, at any time, any provision of a Finance Document is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of such provision under the law of any other jurisdiction will in any way be affected or impaired.

## 30.    REMEDIES AND WAIVERS

No failure to exercise, nor any delay in exercising, on the part of any Finance Party or Secured Party, any right or remedy under a Finance Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any Finance Document.  No election to affirm any Finance Document on the part of any Finance Party or Secured Party shall be effective unless it is in writing. No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy.  The rights and remedies provided in each Finance Document are cumulative and not exclusive of any rights or remedies provided by law.

## 31.    AMENDMENTS AND WAIVERS

### 31.1    Intercreditor Agreement

This Clause 31 is subject to the terms of the Intercreditor Agreement.

### 31.2    Required consents

(a)    Subject to Clause 31.3 (Exceptions), any term of this Agreement may be amended or waived only with the consent of the Bank and the Company and any such amendment or waiver will be binding on all Parties.

(b)    The Bank may effect, on behalf of any Finance Party, any amendment or waiver permitted by this Clause 31.

(c)    Each Obligor agrees to any such amendment or waiver permitted by this Clause 31 which is agreed to by the Company. This includes any amendment or waiver which would, but for this paragraph (c), require the consent of all of the Guarantors.

### 31.3    Exceptions

An amendment or waiver which relates to the rights or obligations of the Security Agent may not be effected without the consent of the Security Agent.

## 32. CONFIDENTIAL INFORMATION

### 32.1 Confidentiality

Each Finance Party agrees to keep all Confidential Information confidential and not to disclose it to anyone, save to the extent permitted by Clause 32.2 (Disclosure of Confidential Information), and to ensure that all Confidential Information is protected with security measures and a degree of care that would apply to its own confidential information.

### 32.2 Disclosure of Confidential Information

Any Finance Party may disclose:

(a)     to any of its Affiliates and any of its or their officers, directors, employees, professional advisers, auditors, partners and Representatives such Confidential Information as that Finance Party shall consider appropriate if any person to whom the Confidential Information is to be given pursuant to this paragraph (a) is informed in writing of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no such requirement to so inform if the recipient is subject to professional obligations to maintain the confidentiality of the information or is otherwise bound by requirements of confidentiality in relation to the Confidential Information;

(b)     to any person:

(i)     to (or through) whom it assigns or transfers (or may potentially assign or transfer) all or any of its rights and/or obligations under one or more Finance Documents or which succeeds (or which may potentially succeed) it as Security Agent and, in each case, to any of that person's Affiliates, Representatives and professional advisers;

(ii)     with (or through) whom it enters into (or may potentially enter into), whether directly or indirectly, any sub-participation in relation to, or any other transaction under which payments are to be made or may be made by reference to, one or more Finance Documents and/or one or more Obligors and to any of that person's Affiliates, Representatives and professional advisers;

(iii)     appointed by any Finance Party or by a person to whom paragraph (b)(i) or (b)(ii) above applies to receive communications, notices, information or documents delivered pursuant to the Finance Documents on its behalf;

(iv)     who invests in or otherwise finances (or may potentially invest in or otherwise finance), directly or indirectly, any transaction referred to in paragraph (b)(i) or (b)(ii) above;

(v)     to whom information is required or requested to be disclosed by any court of competent jurisdiction or any governmental, banking, taxation or other regulatory authority or similar body, the rules of any relevant stock exchange or pursuant to any applicable law or regulation;

(vi)     to whom information is required to be disclosed in connection with, and for the purposes of, any litigation, arbitration, administrative or other investigations, proceedings or disputes;

(vii)     to whom or for whose benefit that Finance Party charges, assigns or otherwise creates Security (or may do so) pursuant to Clause 22.8 (Security over rights);

**953**

(viii)    who is a Party; or

(ix)    with the consent of the Company,

in each case, such Confidential Information as that Finance Party shall consider appropriate if:

(A)    in relation to paragraphs (b)(i), (b)(ii) and (b)(iii) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking except that there shall be no requirement for a Confidentiality Undertaking if the recipient is a professional adviser and is subject to professional obligations to maintain the confidentiality of the Confidential Information;

(B)    in relation to paragraph (b)(iv) above, the person to whom the Confidential Information is to be given has entered into a Confidentiality Undertaking or is otherwise bound by requirements of confidentiality in relation to the Confidential Information they receive and is informed that some or all of such Confidential Information may be price-sensitive information;

(C)    in relation to paragraphs (b)(v), (b)(vi) and (b)(vii) above, the person to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information except that there shall be no requirement to so inform if, in the opinion of that Finance Party, it is not practicable so to do in the circumstances;

(c)    to any person appointed by that Finance Party or by a person to whom paragraph (b)(i) or (b)(ii) above applies to provide administration or settlement services in respect of one or more of the Finance Documents including without limitation, in relation to the trading of participations in respect of the Finance Documents, such Confidential Information as may be required to be disclosed to enable such service provider to provide any of the services referred to in this paragraph (c) if the service provider to whom the Confidential Information is to be given has entered into a confidentiality agreement substantially in the form of the LMA Master Confidentiality Undertaking for Use With Administration/Settlement Service Providers or such other form of confidentiality undertaking agreed between the Company and the relevant Finance Party; and

(d)    to any rating agency (including its professional advisers) such Confidential Information as may be required to be disclosed to enable such rating agency to carry out its normal rating activities in relation to the Finance Documents and/or the Obligors if the rating agency to whom the Confidential Information is to be given is informed of its confidential nature and that some or all of such Confidential Information may be price-sensitive information.

## 32.3    Entire agreement

This Clause 32 constitutes the entire agreement between the Parties in relation to the obligations of the Finance Parties under the Finance Documents regarding Confidential Information and supersedes any previous agreement, whether express or implied, regarding Confidential Information.

## 32.4    Inside information

Each of the Finance Parties acknowledges that some or all of the Confidential Information is or may be price-sensitive information and that the use of such information may be regulated or prohibited by applicable legislation including securities law relating to insider dealing and market abuse and each of the Finance Parties undertakes not to use any Confidential Information for any unlawful purpose.

### 32.5    Notification of disclosure

Each of the Finance Parties agrees (to the extent permitted by law and regulation) to inform the Company:

(a)    of the circumstances of any disclosure of Confidential Information made pursuant to paragraph (b)(v) of Clause 32.2 (Disclosure of Confidential Information) except where such disclosure is made to any of the persons referred to in that paragraph during the ordinary course of its supervisory or regulatory function; and

(b)    upon becoming aware that Confidential Information has been disclosed in breach of this Clause 32.

### 32.6    Continuing obligations

The obligations in this Clause 32 are continuing and, in particular, shall survive and remain binding on each Finance Party for a period of 12 months from the earlier of:

(a)    the date on which all amounts payable by the Obligors under or in connection with the Finance Documents have been paid in full and all Commitments have been cancelled or otherwise cease to be available; and

(b)    the date on which such Finance Party otherwise ceases to be a Finance Party.

## 33.    COUNTERPARTS

Each Finance Document may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of the Finance Document.

## 34.    CONTRACTUAL RECOGNITION OF BAIL-IN

(a)    Notwithstanding any other term of any Finance Document or any other agreement, arrangement or understanding between the Parties, each Party acknowledges and accepts that any liability of any Party to any other Party under or in connection with the Finance Documents may be subject to Bail-In Action by the relevant Resolution Authority and acknowledges and accepts to be bound by the effect of:

(i)    any Bail-In Action in relation to any such liability, including (without limitation):

(A)    a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

(B)    a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it; and

(C)    a cancellation of any such liability; and

(ii)    a variation of any term of any Finance Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

(b)    In this Agreement:

**Article 55 BRRD** means Article 55 of Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms;

**Bail-In Action** means the exercise of any Write-down and Conversion Powers;

**Bail-In Legislation** means:

(i)    in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 BRRD, the relevant implementing law or regulation as described in the EU Bail-In Legislation Schedule from time to time; and

(ii)    in relation to any state other than such an EEA Member Country or (to the extent that the United Kingdom is not such an EEA Member Country) the United Kingdom, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation;

**EEA Member Country** means any member state of the European Union, Iceland, Liechtenstein and Norway;

**EU Bail-In Legislation Schedule** means the document described as such and published by the Loan Market Association (or any successor person) from time to time;

**Resolution Authority** means any body which has authority to exercise any Write-down and Conversion Powers;

**UK Bail-In Legislation** means (to the extent that the United Kingdom is not an EEA Member Country which has implemented, or implements, Article 55 BRRD) Part I of the United Kingdom Banking Act 2009 and any other law or regulation applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (otherwise than through liquidation, administration or other insolvency proceedings); and

**Write-down and Conversion Powers** means:

(i)    in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule;

(ii)    in relation to any other applicable Bail-In Legislation:

(A)    any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and

(B)    any similar or analogous powers under that Bail-In Legislation; and

(iii)    in relation to any UK Bail-In Legislation:

(A)    any powers under that UK Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to

suspend any obligation in respect of that liability or any of the powers under that UK Bail-In Legislation that are related to or ancillary to any of those powers; and

(B)    any similar or analogous powers under that UK Bail-In Legislation.

## 35.    GOVERNING LAW

(a)    This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

(b)    Without prejudice to paragraph (a) above, Schedule 9 (Restrictive Covenants) of this Agreement will be interpreted in accordance with the laws of the State of New York.

## 36.    ENFORCEMENT

### 36.1    Jurisdiction of English courts

(a)    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a **Dispute**).

(b)    The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c)    Notwithstanding paragraphs (a) and (b) above, no Finance Party or Secured Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction. To the extent allowed by law, the Finance Parties and Secured Parties may take concurrent proceedings in any number of jurisdictions.

### 36.2    Service of process

(a)    Without prejudice to any other mode of service allowed under any relevant law, each Obligor (other than an Obligor incorporated in England and Wales):

(i)    irrevocably appoints the Company as its agent for service of process in relation to any proceedings before the English courts in connection with any Finance Document (and the Company by its execution of this Agreement, accepts that appointment); and

(ii)    agrees that failure by an agent for service of process to notify the relevant Obligor of the process will not invalidate the proceedings concerned.

(b)    If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Company (on behalf of all the Obligors) must immediately (and in any event within ten Business Days of such event taking place) appoint another agent on terms acceptable to the Bank. Failing this, the Bank may appoint another agent for this purpose.

**THIS AGREEMENT** has been entered into on the date stated at the beginning of this Agreement.

# SCHEDULE 1

## THE ORIGINAL OBLIGORS

### PART 1

### THE ORIGINAL BORROWERS

| Name of Original Borrower | Jurisdiction of incorporation | Registration number (or equivalent, if any) |
|---|---|---|
| Abbot Group Limited | England & Wales | 0623285 |
| Abbot Holdings Limited | England & Wales | 02682916 |
| KCA Deutag Alpha Limited | England & Wales | 06433748 |
| KCA Deutag Caspian Limited | England & Wales | 01877963 |
| KCA Deutag Drilling Group Limited | England & Wales | 01059871 |
| KCA European Holdings Limited | England & Wales | 04286946 |
| KCA Deutag UK Finance plc | England & Wales | 09015065 |
| Bentec GmbH Drilling and Oilfield Systems | Germany | HRB130192 |
| KCA Deutag Drilling GmbH | Germany | HRB131828 |
| KCA Deutag GmbH | Germany | HRB 131828 |
| Abbot Holdings Norge AS | Norway | 989 528 270 |
| KCA Deutag Drilling Norge AS | Norway | 918 357 688 |
| KCA Deutag Drilling Offshore Services AS | Norway | 990 397 082 |
| KCA Deutag Holdings Norge AS | Norway | 987 558 741 |
| KCA Deutag Offshore AS | Norway | 986 709 770 |
| KCA Deutag MODU Operations AS | Norway | 979 392 710 |
| KCA Deutag Drilling Limited | Scotland | SC031961 |
| KCA Deutag Technical Support Limited | Scotland | SC219425 |
| SET Drilling Company Limited | Scotland | SC167498 |

## PART 2

## THE ORIGINAL GUARANTORS

| Name of Original Guarantor | Jurisdiction of incorporation | Registration number (or equivalent, if any) |
|---|---|---|
| Abbot Group Limited | England & Wales | 00623285 |
| Abbot Holdings Limited | England & Wales | 02682916 |
| KCA Deutag (Land Rig) Limited | England & Wales | 05659113 |
| KCA Deutag Alpha Limited | England & Wales | 06433748 |
| KCA Deutag Caspian Limited | England & Wales | 01877963 |
| KCA Deutag Drilling Group Limited | England & Wales | 01059871 |
| KCA Deutag UK Finance plc | England & Wales | 09015065 |
| KCA European Holdings Limited | England & Wales | 04286946 |
| Abbot Verwaltungsgesellschaft mbH | Germany | HRB 131347 |
| Bentec GmbH Drilling and Oilfield Systems | Germany | HRB 130192 |
| KCA Deutag Drilling GmbH | Germany | HRB 130813 |
| KCA Deutag GmbH | Germany | HRB 131828 |
| KCA Deutag Tiefbohrgesellschaft mbH | Germany | HRB 131390 |
| KCA Deutag Europe B.V. | Netherlands | 34162210 |
| KCA Deutag Nederland B.V. | Netherlands | 34162211 |
| Abbot Holdings Norge AS | Norway | 989 528 270 |
| KCA Deutag Drilling Norge AS | Norway | 918 357 688 |
| KCA Deutag Drilling Offshore Services AS | Norway | 990 397 082 |
| KCA Deutag Holdings Norge AS | Norway | 987 558 74 |
| KCA Deutag MODU Operations AS | Norway | 979 392 710 |
| KCA Deutag Offshore AS | Norway | 986 709 770 |
| KCA Deutag Energy International LLC | Oman | 1183594 |
| KCA Deutag Energy LLC | Oman | 1707728 |
| KCA Deutag Drilling LLC | Russia | 1036500623884 |
| KCA Deutag Russia LLC | Russia | 1036500621410 |
| KCA Deutag Gulf Drilling Limited Company | Saudi Arabia | 2052101330 |
| KCA Deutag Drilling Limited | Scotland | SC426092 |
| KCA Deutag Technical Support Limited | Scotland | SC219425 |
| SET Drilling Company Limited | Scotland | SC167498 |

## SCHEDULE 2

## CONDITIONS PRECEDENT REQUIRED TO BE DELIVERED BY AN ADDITIONAL OBLIGOR

1.    **Additional Obligor**

(a)    A copy of the constitutional documents of the Additional Obligor and, if that Additional Obligor is incorporated in:

(i)    Germany: (i) a copy of the constitutional documents (*Satzung* or *Gesellschaftsvertrag* as applicable) or an up to date copy of the partnership agreement and up to date copies of any by-laws as well (as applicable), (ii) an extract from the Commercial Register (*Handelsregister*) not older than fourteen days as the date of the certificate delivered pursuant to paragraph (f) below) and (iii) a copy of a list of shareholders (*Gesellschafterliste*) as filed with the competent commercial register (*Handelsregister*) (as applicable);

(ii)    The Netherlands, an up-to-date extract from the Dutch trade register (*Handelsregister*) relating to it dated not earlier than five Business Days prior to the date on which the relevant Accession Deed becomes effective.

(b)    A copy of a resolution of the board or, if applicable, a committee of the board of directors of the Additional Obligor (other than an Additional Obligor incorporated or established in Germany):

(i)    approving the terms of, and the transactions contemplated by, the Accession Deed and the Finance Documents and resolving that it execute, deliver and perform the Accession Deed and any other Finance Document to which it is party;

(ii)    authorising a specified person or persons to execute the Accession Deed and other Finance Documents on its behalf;

(iii)    authorising a specified person or persons, on its behalf, to sign and/or despatch all other documents and notices (including, in relation to an Additional Borrower, any Utilisation Request) to be signed and/or despatched by it under or in connection with the Finance Documents to which it is a party; and

(iv)    authorising the Company to act as its agent in connection with the Finance Documents.

(c)    In relation to an Additional Obligor incorporated or established in Germany:

(i)    a copy of a resolution signed by all the holders of the issued shares (*Gesellschafterbeschluss*) of such Original Obligor and/or if applicable, a copy of a resolution of the supervisory board (*Aufsichtsrat*) and/or advisory board (*Beirat*) of such Original Obligor:

(A)    approving the terms of, and the transactions contemplated by the Finance Documents to which it is a party; and

(B)    instructing the managing director(s) of each Original Obligor to execute the Finance Documents to which it is a party;

(ii)    and each such other resolution which might be required by such German Obligor's Articles of Association (*Satzung* or *Gesellschaftsvertrag* as applicable)).

(d)    If applicable, a copy of a resolution of the board of directors of the Additional Obligor, establishing the committee referred to in paragraph (b) above.

(e)     A specimen of the signature of each person authorised by the resolution referred to in paragraph (b) above.

(f)     If applicable, a copy of a resolution signed by all the holders of the issued shares of the Additional Obligor, approving the terms of, and the transactions contemplated by, the Finance Documents to which the Additional Obligor is a party.

(g)     A certificate of the Additional Obligor (signed by a director) confirming that utilising or guaranteeing or securing, as appropriate, the Total Commitments would not cause any borrowing, guarantee, security or similar limit binding on it to be exceeded.

(h)     A certificate of an authorised signatory of the Additional Obligor certifying that each copy document listed in this Schedule 2 is correct, complete and in full force and effect and has not been amended or superseded as at a date no earlier than the date of the Accession Deed.

**2.      Finance Documents**

(a)     An Accession Deed executed by the Additional Obligor and the Company.

(b)     Any Transaction Security Documents which are required to be executed by the proposed Additional Obligor in accordance with the Agreed Security Principles.

(c)     Any notices or documents required to be given or executed under the terms of those Transaction Security Documents.

**3.      Legal opinions**

The following legal opinions, each addressed to the Bank and the Security Agent.

(a)     a legal opinion of the legal advisers to the Bank in England, as to English law in the form distributed to the Bank prior to signing the Accession Deed; and

(b)     if the Additional Obligor is incorporated in a jurisdiction other than England and Wales or is executing a Finance Document which is governed by a law other than English law, a legal opinion of the legal advisers to the Bank in the jurisdiction of its incorporation and in the form distributed to the Bank prior to signing the Accession Deed.

**4.      Other documents and evidence**

(a)     If the proposed Additional Obligor is incorporated in a jurisdiction other than England and Wales, evidence that the process agent specified in Clause 36.2 (Service of process), if not an Obligor, has accepted its appointment in relation to the proposed Additional Obligor.

(b)     Evidence required by the Finance Parties for the purpose of any "know your customer" requirements.

(c)     A copy of any other Authorisation or other document, opinion or assurance which the Bank considers to be necessary or desirable in connection with the entry into and performance of the transactions contemplated by the Accession Deed or for the validity and enforceability of any Finance Document.

## SCHEDULE 3

## UTILISATION REQUEST

From:        [Borrower]/[Company/Abbot Group][1]
To:          First Abu Dhabi Bank PJSC
Dated:

### KCA Deutag Alpha Limited – US$[    ] Super Senior Facility Agreement
### dated [        ] (the Facility Agreement)

1.    We refer to the Facility Agreement.  This is a Utilisation Request.  Terms defined in the Facility Agreement have the same meaning in this Utilisation Request unless given a different meaning in this Utilisation Request.

2.    We wish to arrange for an Undertaking to be issued by the Bank specified below (which has agreed to do so) on the following terms:

   (a)    Borrower:              [        ];

   (b)    Proposed    Utilisation [        ] (or, if that is not a Business Day, the next Business Day);
          Date:

   (c)    Currency    of
          Undertaking:          [        ];

   (d)    Amount:               [        ] or, if less, the Available Facility;

   (e)    Beneficiary:          [        ]; and

   (f)    Term:                 [        ].

3.    We confirm that each condition specified in paragraph (b) of Clause 4.5 (Issue of Undertakings) of the Facility Agreement is satisfied on the date of this Utilisation Request.

4.    We attach a copy of the proposed Undertaking.

5.    The purpose of this proposed Undertaking is [            ].

6.    This Utilisation Request is irrevocable.

7.    [*Specify delivery instructions*].

Yours faithfully

....................................................
authorised signatory for
[Company/Abbot Group] on behalf of [*insert name of relevant Borrower*]]/[*insert name of relevant Borrower*][1]

NOTES:

1.        Amend as appropriate.  The Utilisation Request can be given by the Borrower or by the Company or Abbot Group.

## SCHEDULE 4

## FORM OF TRANSFER CERTIFICATE

To:      [        ] as Bank and [         ] as Security Agent

From:   [*The Existing Bank*] (the **Existing Bank**) and [*The New Bank*] (the **New Bank**)

Dated:

### KCA Deutag Alpha Limited – US$[      ] Super Senior Facility Agreement dated [        ] (the Facility Agreement)

1.      We refer to the Facility Agreement and to the Intercreditor Agreement (as defined in the Facility Agreement).  This agreement (the **Agreement**) shall take effect as a Transfer Certificate for the purposes of the Facility Agreement and as a Creditor/Creditor Representative Accession Undertaking for the purposes of the Intercreditor Agreement (and as defined in the Intercreditor Agreement).  Terms defined in the Facility Agreement have the same meaning in this Agreement unless given a different meaning in this Agreement.

2.      We refer to Clause 22.5 (Procedure for transfer) of the Facility Agreement.

(a)      The Existing Bank and the New Bank agree to the Existing Bank transferring to the New Bank by novation and in accordance with Clause 22.5 (Procedure for transfer) of the Facility Agreement all of the Existing Bank's rights and obligations under the Facility Agreement, the other Finance Documents and in respect of the Transaction Security which relate to that portion of the Existing Bank's Commitment and participations in Utilisations under the Facility Agreement as specified in the Schedule.

(b)      The proposed Transfer Date is [         ].

(c)      The Facility Office and address, email address and attention details for notices of the New Bank for the purposes of Clause 27.2 (Addresses) of the Facility Agreement are set out in the Schedule.

3.      The New Bank expressly acknowledges the limitations on the Existing Bank's obligations set out in paragraph (c) of Clause 22.4 (Limitation of responsibility of Existing Bank) of the Facility Agreement.

4.      The New Bank confirms, for the benefit of the Bank and without liability to any Obligor, that it is:

(a)      [a Qualifying Bank;]

(b)      [a Qualifying Bank (other than a Treaty Bank);]

(c)      [a Treaty Bank.][2]

5.      [The New Bank confirms that it holds a passport under the HMRC DT Treaty Passport scheme (reference number [ ]) and is tax resident in [   ][3], so that interest payable to it by Borrowers is generally subject to full exemption from UK withholding tax and requests that the Company notifies:

(a)      each Borrower which is a Party as a Borrower as at the Transfer Date; and

(b)      each Additional Borrower which becomes an Additional Borrower after the Transfer Date,

---

[2]        Delete as applicable. Each New Bank is required to confirm which of these three categories it falls within.
[3]        Insert jurisdiction of tax residence.

that it wishes that scheme to apply to the Facility Agreement.][4]

6.     We refer to clause 22.5 (Change of Lender) of the Intercreditor Agreement. In consideration of the New Bank being accepted as a Super Senior Facility Lender for the purposes of the Intercreditor Agreement (and as defined therein), the New Bank confirms that, as from the Transfer Date, it intends to be party to the Intercreditor Agreement as a Super Senior Facility Lender, and undertakes to perform all the obligations expressed in the Intercreditor Agreement to be assumed by a Super Senior Facility Lender and agrees that it shall be bound by all the provisions of the Intercreditor Agreement, as if it had been an original party to the Intercreditor Agreement.

7.     This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

8.     This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

9.     This Agreement has been entered into on the date stated at the beginning of this Agreement.

**Note: The execution of this Transfer Certificate may not transfer a proportionate share of the Existing Bank's interest in the Transaction Security in all jurisdictions.  It is the responsibility of the New Bank to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Bank's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

**WARNING: Please seek Dutch legal advice (i) until the interpretation of the term "public" (as referred to in Article 4.1(1) of the Capital Requirements Regulation (EU/575/2013)) has been published by the competent authority, if the share of a Lender in any utilisation requested by a Dutch borrower is less than EUR 100,000 (or the foreign currency equivalent thereof) and (ii) as soon as the interpretation of the term "public" has been published by the competent authority, if the Lender is considered to be part of the public on the basis of such interpretation.**

---

[4]     Include if the New Bank holds a passport under the HMRC DT Treaty Passport scheme and wishes that scheme to apply to the Facility Agreement.

## THE SCHEDULE

**Commitment/rights and obligations to be transferred**

[*insert relevant details*]

[*Facility Office address, email address and attention details for notices and account details for payments*]


[Existing Bank]                                    [New Bank]

By:                                                By:

This Agreement is accepted as a Creditor/Creditor Representative Accession Undertaking for the purposes of the Intercreditor Agreement by the Security Agent, and the Transfer Date is confirmed as [     ].


[Security Agent]


By:

## SCHEDULE 5

## FORM OF ASSIGNMENT AGREEMENT

To:     [        ] as Bank, [        ] as Security Agent and [        ] as the Company, for and on behalf of each
        Obligor

From:   [*The Existing Bank*] (the **Existing Bank**) and [*The Existing Bank*] (the **New Bank**)

Dated:

### KCA Deutag Alpha Limited – US$60,000,000 Super Senior Facility Agreement
### dated [        ] (the Facility Agreement)

1.      We refer to the Facility Agreement and to the Intercreditor Agreement (as defined in the Facility
        Agreement).  This is an Assignment Agreement.  This agreement (the **Agreement**) shall take effect as
        an Assignment Agreement for the purposes of the Facility Agreement and as a Creditor/Creditor
        Representative Accession Undertaking for the purposes of the Intercreditor Agreement (and as defined
        in the Intercreditor Agreement).  Terms defined in the Facility Agreement have the same meaning in
        this Agreement unless given a different meaning in this Agreement.

2.      We refer to Clause 22.6 (Procedure for assignment) of the Facility Agreement.

        (a)     The Existing Bank assigns absolutely to the New Bank all the rights of the Existing Bank
                under the Facility Agreement, the other Finance Documents and in respect of the Transaction
                Security which correspond to that portion of the Existing Bank's Commitment and
                participations in Utilisations under the Facility Agreement as specified in the Schedule.

        (b)     The Existing Bank is released from all the obligations of the Existing Bank which correspond
                to that portion of the Existing Bank's Commitment and participations in Utilisations under the
                Facility Agreement specified in the Schedule.

        (c)     The New Bank becomes a Party as the Bank and is bound by obligations equivalent to those
                from which the Existing Bank is released under paragraph (b) above.

3.      The proposed Transfer Date is [        ].

4.      On the Transfer Date the New Bank becomes:

        (a)     party to the relevant Finance Documents (other than the Intercreditor Agreement) as the Bank;
                and

        (b)     party to the Intercreditor Agreement as a Super Senior Facility Lender (as defined in the
                Intercreditor Agreement).

5.      The Facility Office and address, email address and attention details for notices of the New Bank for
        the purposes of Clause 27.2 (Addresses) of the Facility Agreement are set out in the Schedule.

6.      The New Bank expressly acknowledges the limitations on the Existing Bank's obligations set out in
        paragraph (c) of Clause 22.4 (Limitation of responsibility of Existing Bank) of the Facility Agreement.

7.      The New Bank confirms, for the benefit of the Bank and without liability to any Obligor, that it is:

        (a)     [not a Qualifying Bank;]

(b)    [a Qualifying Bank (other than a Treaty Bank);]

(c)    [not a Treaty Bank].[5]

8.    [The New Bank confirms that it holds a passport under the HMRC DT Treaty Passport scheme (reference number [ ]) and is tax resident in [ ][6], so that interest payable to it by Borrowers is generally subject to full exemption from UK withholding tax and requests that the Company notifies:

(a)    each Borrower which is a Party as a Borrower as at the Transfer Date; and

(b)    each Additional Borrower which becomes an Additional Borrower after the Transfer Date,

that it wishes that scheme to apply to the Facility Agreement.][7]

9.    We refer to clause 22.5 (Change of Lender) of the Intercreditor Agreement. In consideration of the New Bank being accepted as a Super Senior Facility Lender for the purposes of the Intercreditor Agreement (and as defined therein), the New Bank confirms that, as from the Transfer Date, it intends to be party to the Intercreditor Agreement as a Super Senior Facility Lender, and undertakes to perform all the obligations expressed in the Intercreditor Agreement to be assumed by a Super Senior Facility Lender and agrees that it shall be bound by all the provisions of the Intercreditor Agreement, as if it had been an original party to the Intercreditor Agreement.

10.    This Agreement acts as notice to the Bank (on behalf of each Finance Party) and, upon delivery in accordance with Clause 22.7 (Copy of Transfer Certificate or Assignment Agreement to Company) of the Facility Agreement, to the Company (on behalf of each Obligor) of the assignment referred to in this Agreement.

11.    This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

12.    This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

13.    This Agreement has been entered into on the date stated at the beginning of this Agreement.

**Note: The execution of this Assignment Agreement may not transfer a proportionate share of the Existing Bank's interest in the Transaction Security in all jurisdictions.  It is the responsibility of the New Bank to ascertain whether any other documents or other formalities are required to perfect a transfer of such a share in the Existing Bank's Transaction Security in any jurisdiction and, if so, to arrange for execution of those documents and completion of those formalities.**

**WARNING: Please seek Dutch legal advice (i) until the interpretation of the term "public" (as referred to in Article 4.1(1) of the Capital Requirements Regulation (EU/575/2013)) has been published by the competent authority, if the share of a Lender in any utilisation requested by a Dutch borrower is less than EUR 100,000 (or the foreign currency equivalent thereof) and (ii) as soon as the interpretation of the term "public" has been published by the competent authority, if the Lender is considered to be part of the public on the basis of such interpretation.**

---

[5]    Delete as applicable. Each New Bank is required to confirm which of these three categories it falls within.
[6]    Insert jurisdiction of tax residence.
[7]    Include if the New Bank holds a passport under the HMRC DT Treaty Passport scheme and wishes that scheme to apply to the Facility Agreement.

## THE SCHEDULE

**Commitment/rights and obligations to be transferred by assignment, release and accession**

[*insert relevant details*]

[*Facility Office address, email address and attention details for notices and account details for payments*]

[Existing Bank]                              [New Bank]

By:                                          By:

This Agreement is accepted as a Creditor/Creditor Representative Accession Undertaking for the purposes of the Intercreditor Agreement by the Security Agent, and the Transfer Date is confirmed as [      ].

[Security Agent]

By:

## SCHEDULE 6

## FORM OF ACCESSION DEED

To:     [       ] as Bank and [       ] as Security Agent for itself and each of the other parties to the Intercreditor Agreement referred to below

From:   [*Restricted Subsidiary*] and [Company]

Dated:

### KCA Deutag Alpha Limited – US$[     ] Super Senior Facility Agreement
### dated [       ] (the Facility Agreement)

1.    We refer to the Facility Agreement and to the Intercreditor Agreement.  This deed (the **Accession Deed**) shall take effect as an Accession Deed for the purposes of the Facility Agreement and as a Debtor Accession Deed for the purposes of the Intercreditor Agreement (and as defined in the Intercreditor Agreement).  Terms defined in the Facility Agreement have the same meaning in paragraphs 1 to 4 of this Accession Deed unless given a different meaning in this Accession Deed.

2.    [*Restricted Subsidiary*] agrees to become an Additional [Borrower]/[Guarantor] and to be bound by the terms of the Facility Agreement and the other Finance Documents (other than the Intercreditor Agreement) as an Additional [Borrower]/[Guarantor] pursuant to Clause [23.2 (Additional Borrowers))]/[Clause 23.4 (Additional Guarantors)] of the Facility Agreement. [*Restricted Subsidiary*] is a company duly incorporated under the laws of [*name of relevant jurisdiction*] and is a [limited liability] company with registered number [            ].

3.    [The Company confirms that no Event of Default is continuing or would occur as a result of [*Restricted Subsidiary*] becoming an Additional Borrower].[8]

4.    [*Restricted Subsidiary's*] administrative details for the purposes of the Facility Agreement and the Intercreditor Agreement are as follows:

Address:
Email:
Attention:

5.    [*Restricted Subsidiary*] (for the purposes of this paragraph 5, the **Acceding Debtor**) intends to incur Liabilities and to give a guarantee, indemnity or other assurance against loss in respect of Liabilities under any Debt Document to which it is or will become a party (the **Relevant Documents**).

**IT IS AGREED** as follows:

(a)    Terms defined in the Intercreditor Agreement shall, unless otherwise defined in this Accession Deed, bear the same meaning when used in this paragraph 5.

(b)    The Acceding Debtor and the Security Agent agree that the Security Agent shall hold:

(i)    any Security in respect of Liabilities or any Security Agent Claim created or expressed to be created pursuant to the Relevant Documents;

(ii)    all proceeds of that Security; and

---

[8]    Include in the case of an Additional Borrower.

(iii)    all obligations expressed to be undertaken by the Acceding Debtor to pay amounts in respect of the Liabilities to the Security Agent as trustee or security agent for the Secured Parties (in the Relevant Documents or otherwise and including any Security Agent Claim) and secured by the Transaction Security together with all representations and warranties expressed to be given by the Acceding Debtor (in the Relevant Documents or otherwise) in favour of the Security Agent as trustee or security agent for the Secured Parties,

on trust or as security agent for the Secured Parties on the terms and conditions contained in the Intercreditor Agreement.

(c)    The Acceding Debtor confirms that it intends to be party to the Intercreditor Agreement as a Debtor, undertakes to perform all the obligations expressed to be assumed by a Debtor under the Intercreditor Agreement and agrees that it shall be bound by all the provisions of the Intercreditor Agreement as if it had been an original party to the Intercreditor Agreement.

(d)    [In consideration of the Acceding Debtor being accepted as an Intra-Group Lender for the purposes of the Intercreditor Agreement, the Acceding Debtor also confirms that it intends to be party to the Intercreditor Agreement as an Intra-Group Lender, and undertakes to perform all the obligations expressed in the Intercreditor Agreement to be assumed by an Intra Group Lender and agrees that it shall be bound by all the provisions of the Intercreditor Agreement, as if it had been an original party to the Intercreditor Agreement].[9]

6.    This Accession Deed and any non-contractual obligations arising out of or in connection with it are governed by English law.

**THIS ACCESSION DEED** has been signed on behalf of the Security Agent (for the purposes of paragraph 5 above only), signed on behalf of the Company and executed as a deed by [*Restricted Subsidiary*] and is delivered on the date stated above.

**Restricted Subsidiary**

EXECUTED as a deed by
[*Restricted Subsidiary*]
acting by

………………….
Director

and

………………….
Director/Secretary

---

[9]    Include this paragraph in this Accession Deed if the Subsidiary is also to accede as an Intra-Group Lender to the Intercreditor Agreement.

**Company**

[Company]


By:



**Security Agent**

[*Full name of current Security Agent*]


By:

Date:

## SCHEDULE 7

## FORM OF RESIGNATION LETTER

To:      [          ] as Bank

From:  [*resigning Obligor*] and [Company]

Dated:

**KCA Deutag Alpha Limited – US$[      ] Super Senior Facility Agreement
dated [            ] (the Facility Agreement)**

1.      We refer to the Facility Agreement.  This is a Resignation Letter.  Terms defined in the Facility Agreement have the same meaning in this Resignation Letter unless given a different meaning in this Resignation Letter.

2.      Pursuant to [Clause 23.3 (Resignation of a Borrower)]/[Clause 23.5 (Resignation of a Guarantor)] of the Facility Agreement, we request that [*resigning Obligor*] be released from its obligations as a [Borrower]/[Guarantor] under the Facility Agreement and the Finance Documents (other than the Intercreditor Agreement).

3.      We confirm that the conditions referred to in Clause 23.5 (Resignation of a Guarantor) have been complied with.

4.      This Resignation Letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

[Company]                                    [*resigning Obligor*]

By:                                                By:

## SCHEDULE 8

## EXISTING UNDERTAKINGS

| Reference Number | Borrower | Beneficiary | Country | Currency | Value | Date of Issue | Current Expiry Date | Utilised Value |
|---|---|---|---|---|---|---|---|---|
| ACLG1903294 | KCA Deutag Alpha | HSBC Corporate Trustee Company (UK) Limited | UK | USD | 8,000,000 | 29-Jul-19 | 31-Dec-2020 | 8,000,000 |
| ACLG1800930 | KCA Deutag Alpha | Bank Sohar | Saudi | SAR | 7,500,000 | 30-Apr-18 | 15-Jul-2021 | 1,999,680 |
| ACLG1800929 | KCA Deutag Alpha | Bank Sohar | Saudi | SAR | 5,600,000 | 30-Apr-18 | 15-Jul-2021 | 1,493,094 |
| 14LG003152 | KCA Deutag Alpha | Bank of Muscat | Oman | USD | 9,879,449 | 30-Apr-18 | Open Ended | 9,879,449 |

**973**

## SCHEDULE 9

## RESTRICTIVE COVENANTS

**1.    GENERAL**

(a)    A reference in this Agreement to a "Section" is a reference to a section of this Schedule.

(b)    A reference in this Schedule to a "Clause" (capitalised) is a reference to a clause in the main body of this Agreement.

(c)    Unless the context otherwise requires:

(i)    a term has the meaning assigned to it;

(ii)    an accounting term not otherwise defined has the meaning assigned to it in accordance with IFRS;

(iii)    "or" is not exclusive;

(iv)    words in the singular include the plural, and in the plural include the singular;

(v)    "will" shall be interpreted to express a command;

(vi)    provisions apply to successive events and transactions; and

(vii)    references to sections of or rules under the U.S. Securities Act will be deemed to include substitute, replacement of successor sections or rules adopted by the SEC from time to time.

(d)    Notwithstanding anything to the contrary in this Agreement, for the purposes of this Schedule, a sale, assignment, transfer, lease, conveyance or other disposition of properties or assets of the Company or any of its Restricted Subsidiaries shall not constitute a sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Company and its Restricted Subsidiaries if any such sale, assignment, transfer, lease, conveyance or other disposition results in the sale or other disposition of assets of less than 50% of either (1) the total consolidated assets of the Company and its Restricted Subsidiaries, as shown on the most recent balance sheet of such Company for which internal financial statements are available calculated on a consolidated basis in accordance with IFRS or (2) the Consolidated EBITDA of the Company.

**2.    RESTRICTED PAYMENTS**.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(i)    declare or pay any dividend or make any other payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Company's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Company or payable in the form of Subordinated Shareholder Debt and other than dividends or distributions payable to the Company or a Restricted Subsidiary of the Company);

(ii)    purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) any Equity Interests of the Company or any Parent held by Persons other than the Company or any of its Restricted Subsidiaries (other than in exchange for Equity Interests (other than Disqualified Stock) of the Company or Subordinated Shareholder Debt);

(iii)    make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value, any Indebtedness of the Company or any Guarantor that is contractually subordinated in right of payment to the Facility (excluding any intercompany Indebtedness between the Company and any of its Restricted Subsidiaries or among any Restricted Subsidiaries), except (i) a payment of interest or principal at or after the Stated Maturity thereof or (ii) the purchase, repurchase, or other acquisition of Indebtedness that is contractually subordinated to the Facility, purchased in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case due within one year of the date of purchase, repurchase or acquisition;

(iv)    make any payment (other than in the form of Equity Interests (other than Disqualified Stock) of the Company or Subordinated Shareholder Debt) on or with respect to, or purchase, redeem, defease or otherwise acquire for value any Subordinated Shareholder Debt; or

(v)    make any Restricted Investment,

(all such payments and other actions set forth in clauses (i) through (v) of this Section 2(a) being collectively referred to as **Restricted Payments**) unless, at the time of and after giving effect to such Restricted Payment:

(i)    no Default or Event of Default has occurred and is continuing or would occur as a consequence of such Restricted Payment;

(ii)    the Company would, after giving pro forma effect to such Restricted Payment as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4(a); and

(iii)    such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries since the date of this Agreement (excluding Restricted Payments permitted by clauses (2), (3), (4), (5), (6), (7), (8), (9), (11), (12), (14), (15), (16), (17), (18), (19), (20) and (21) of the next succeeding paragraph), is less than the sum, without duplication, of:

(i)    50% of the Consolidated Net Income of the Company for the period (taken as one accounting period) starting from the beginning of the fiscal quarter commencing immediately after the date of this Agreement to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, if such Consolidated Net Income for such period is a deficit, less 100% of such deficit, provided that if Consolidated Net Income is a deficit, such deficit shall in no event reduce amounts available pursuant to sub-paragraph (vi) below); plus

(ii)    100% of the aggregate net cash proceeds and the Fair Market Value of property, assets or marketable securities received by the Company since the date of this Agreement (x) as a contribution to its common equity capital or (y) from the issue or sale of Equity Interests of the Company or any Parent

(other than Disqualified Stock or Excluded Contributions or Designated Preference Shares) or from Subordinated Shareholder Debt or from the issue or sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or Designated Preference Shares or debt securities) sold to a Restricted Subsidiary of the Company); plus

(iii)    to the extent that any Restricted Investment that was (i) made after the date of this Agreement is sold, disposed of or otherwise cancelled, liquidated or repaid, 100% of the aggregate amount received in cash and the Fair Market Value of property, assets or marketable securities received by the Company or any Restricted Subsidiary or (ii) made in an entity that subsequently becomes a Restricted Subsidiary, 100% of the Fair Market Value of the Restricted Investment of the Company and its Restricted Subsidiaries as of the date such entity becomes a Restricted Subsidiary; plus

(iv)    to the extent that any Unrestricted Subsidiary of the Company designated as such is redesignated as a Restricted Subsidiary after the date of this Agreement or has been merged into, consolidated or amalgamated with or into, or transfers or conveys its assets to, the Company or a Restricted Subsidiary of the Company, 100% of the Fair Market Value of the Company's Investment in such Subsidiary as of the date of such redesignation, combination or transfer (or of the assets transferred or conveyed, as applicable) after deducting the amount of any Investment in such Unrestricted Subsidiary that constituted a Permitted Investment made pursuant to clause (12) of the definition of Permitted Investment; plus

(v)    100% of any dividends or distributions received by the Company or a Restricted Subsidiary of the Company after the date of this Agreement from an Unrestricted Subsidiary of the Company, to the extent that such dividends or distributions were not otherwise included in the Consolidated Net Income of the Company for such period; plus

(vi)    $25.0 million.

(b)    The provisions of Section 2(a) will not prohibit:

(i)    the payment of any dividend or distribution or the consummation of any redemption within 60 days after the date of declaration of the dividend or distribution or giving of the redemption notice, as the case may be, if, at the date of declaration or notice, the dividend, distribution or redemption payment would have complied with the provisions of this Agreement;

(ii)    the making of any Restricted Payment in exchange for, or out of or with the net cash proceeds received by the Company of the substantially concurrent sale or issuance (other than to a Subsidiary of the Company) of, Equity Interests of the Company or any Parent (other than Disqualified Stock) or Subordinated Shareholder Debt or from the substantially concurrent contribution of such proceeds to the capital of the Company; provided that the amount of any such net cash proceeds and the Fair Market Value of property other than cash that are utilized for any such Restricted Payment will be excluded from the calculation of amounts under Section 2(a)(C)(ii) and shall not constitute Excluded Contributions;

(iii)    the repurchase, redemption, defeasance or other acquisition or retirement for value of Indebtedness of the Company or any of its Restricted Subsidiaries that is contractually

subordinated to the Facility with the net cash proceeds from a substantially concurrent Incurrence of Permitted Refinancing Indebtedness;

(iv)    the payment of any dividend (or, in the case of any partnership or limited liability company, any similar distribution) by a Restricted Subsidiary of the Company to the holders of its Equity Interests on a pro rata basis;

(v)    the repurchase, redemption or other acquisition or retirement (or dividends or distributions to any Parent to finance any such repurchase, redemption or other acquisition or retirement) for value of any Equity Interests of the Company, any Parent or any Restricted Subsidiary of the Company held by any current or former officer, director, consultant or employee of the Company, any Parent or any Restricted Subsidiary of the Company or any trust or other person in respect of any MIP pursuant to any equity subscription agreement, stock option agreement, MIP, shareholders' or members' agreement or similar agreement, plan or arrangement; provided that the aggregate price paid for all such repurchased, redeemed, acquired or retired Equity Interests may not exceed the greater of $7.0 million and 3.0% of Consolidated EBITDA (and following the Initial Public Offering, the greater of $10.0 million and 5.0% of Consolidated EBITDA) in any calendar year with unused amounts being carried over into succeeding years, subject to the approval of the Board of Directors of the Company; provided, further, that such amount in any calendar year may be increased by an amount not to exceed (i) the cash proceeds received by the Company, any Parent or a Restricted Subsidiary during such calendar year from the sale of Equity Interests of the Company or a Restricted Subsidiary in each case to members of management, officers, directors, consultants or employees of the Company, any Restricted Subsidiary or any Parent and (ii) the cash proceeds of keyman life insurance policies, in each case, to the extent the cash proceeds have not otherwise been applied to the making of Restricted Payments pursuant to Section 2(a)(C)(ii) or Section 2(b)(ii);

(vi)    the repurchase of Equity Interests deemed to occur upon the exercise of stock options or warrants to the extent such Equity Interests represent a portion of the exercise price of those stock options or warrants;

(vii)    the declaration and payment of regularly scheduled or accrued dividends or distributions to holders of any class or series of Disqualified Stock of the Company or any preferred stock of any Restricted Subsidiary issued on or after the date of this Agreement in accordance with Section 4;

(viii)    Permitted Payments to Parent;

(ix)    Restricted Payments in aggregate amount outstanding at any time not to exceed the aggregated net cash proceeds and the Fair Market Value of property, assets or marketable securities of Excluded Contributions or Investments in exchange for or using as consideration Investments previously made under this Section 2(b)(9);

(x)    other Restricted Payments in an aggregate amount not to exceed the greater of $45.0 million and 20.0% of Consolidated EBITDA since the date of this Agreement;

(xi)    any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Indebtedness of the Company or any of its Restricted Subsidiaries pursuant to the provisions similar to those described under (i) section 4.15 of the 2025 Indenture at a purchase price not greater than 101% of the principal amount of such Indebtedness and (ii) Section 5 at a purchase price not greater than 100% of the principal amount of such Indebtedness, provided that the Company has complied with its obligations under Section 5;

(xii)    cash dividends or other distributions on the Company's Capital Stock used to, or the making of loans to any Parent to, fund the payment of fees and expenses owed by the Company or its Restricted Subsidiaries to Affiliates, to the extent permitted under Section 6(b)(4);

(xiii)   following an Initial Public Offering of the Capital Stock of the Company or a Parent, the declaration and payment of loans, advances, dividends, or distributions on the Capital Stock of the Company in an amount per annum not to exceed the greater of (A) 6.0% of the net cash proceeds received from such Initial Public Offering or any subsequent Equity Offering by the Company or contributed in cash to the Company's equity (other than through the issuance of Disqualified Stock) and (B) an amount equal to the greater of (1) the greater of (i) 7.0% of the Market Capitalization and (ii) 7.0% of the IPO Market Capitalization; provided that, after giving pro forma effect to the payment of any such dividend or making of any such distribution, the Consolidated Net Leverage Ratio of the Company would not exceed 1.75 to 1.0 and (2) the greater of (i) 5.0% of the Market Capitalization and (ii) 5.0% of the IPO Market Capitalization, provided that, after giving pro forma effect to the payment of any such dividend or making of any such distribution, the Consolidated Net Leverage Ratio of the Company would not exceed 2.25 to 1.0; provided, that if such Initial Public Offering or any subsequent Equity Offering was of Capital Stock of a Parent, the net proceeds of any such loans, advances, dividends or distributions are used to fund a corresponding loan, advance, dividend or distribution in equal or greater amount on the Capital Stock of such Parent;

(xiv)    any payments to minority shareholders as required by law or regulation pursuant to or in contemplation of a merger or consolidation involving the Company or any of its Restricted Subsidiaries that does not otherwise violate this Agreement;

(xv)     the distribution, as a dividend, or otherwise, of Equity Interests in, or Indebtedness or other securities of an Unrestricted Subsidiary of the Company;

(xvi)    payments of cash, dividends, distributions, advances or other Restricted Payments by the Company or any Restricted Subsidiary to allow the payment of cash in lieu of the issuance of fractional shares upon (x) the exercise of options or warrants or (y) the conversion or exchange of Capital Stock of any such Person;

(xvii)   the payment of any Receivables Fees and purchases of Receivables and related assets pursuant to a Receivables Repurchase Obligation in connection with a Qualified Receivables Financing;

(xviii)  any Restricted Payment; provided that the Consolidated Net Leverage Ratio of the Company on a pro forma basis after giving effect to any such Restricted Payment does not exceed 1.25 to 1.0;

(xix)    dividends, loans, advances, payments or other distributions in amounts required for any Parent of the Company to pay interest, premium, catch-up payments, make-whole amounts and break costs in respect of Senior Notes, the net cash proceeds of which have been contributed to the Company or any of its Restricted Subsidiaries and that has been guaranteed by, or is otherwise considered Indebtedness of, the Company or any of its Restricted Subsidiaries incurred in accordance of Section 4;

(xx)     Management Advances and MIP Payments; and

(xxi)    any Restricted Payment in connection with the Restructuring;

provided, however, that at the time of, and after giving effect to, any Restricted Payment permitted under clause (x), (xiii) or (18) of this Section 2(b), no Default or Event of Default shall have occurred and be continuing or would occur as a consequence thereof.

(c)     The amount of all Restricted Payments (other than cash) will be the Fair Market Value on the date of the Restricted Payment of the asset(s) or securities proposed to be transferred or issued by the Company or such Restricted Subsidiary, as the case may be, pursuant to the Restricted Payment.

(d)     For purposes of determining compliance with this Section 2, in the event that a Restricted Payment (or portion thereof) meets the criteria of more than one of the categories of permitted payments described in Sections 2(b)(1) through (20) above, or is permitted pursuant to Section 2(a) or one or more of the clauses contained in the definition of Permitted Investment, the Company, in its sole discretion, may classify such Restricted Payment or Investment (or portion thereof) in any manner that complies with this Section 2, including as an Investment pursuant to one or more clauses contained in the definition of Permitted Investment. Unsecured Indebtedness shall not be deemed to be subordinated or junior to secured Indebtedness by virtue of its nature as unsecured Indebtedness. No Indebtedness will be deemed to be subordinated or junior to any other Indebtedness which is secured by a Permitted Collateral Lien on a super senior basis and no "second lien" Indebtedness (but excluding any Senior Notes) shall be deemed to be subordinated or junior to the Facility, in either case, solely as a result of any applicable enforcement proceeds waterfall in the Intercreditor Agreement or any Additional Intercreditor Agreement.

## 3.     DIVIDEND AND OTHER PAYMENT RESTRICTIONS AFFECTING SUBSIDIARIES.

(a)     The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or cause to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(i)     pay dividends or make any other distributions on its Capital Stock to the Company or any of its Restricted Subsidiaries, or with respect to any other interest or participation in, or measured by, its profits, or pay any Indebtedness owed to the Company or any of its Restricted Subsidiaries;

(ii)     make loans or advances to the Company or any of its Restricted Subsidiaries; or

(iii)     sell, lease or transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries,

provided that (x) the priority of any preferred stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock and (y) the subordination of (including the application of any standstill period to) loans or advances made to the Company or any Restricted Subsidiary to other Indebtedness Incurred by the Company or any Restricted Subsidiary, in each case, shall not be deemed to constitute such an encumbrance or restriction.

(b)     The restrictions in Section 3(a) will not apply to encumbrances or restrictions existing under or by reason of:

(i)     agreements governing Indebtedness outstanding on the date of this Agreement (including any Senior Facilities Agreement), and any other agreements of the Company or its Restricted Subsidiaries, in each case as in effect on the date of this Agreement and taking into account any additional security contemplated by their terms and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of such agreements; provided that such amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not, in the good faith judgment of the Company's Board of Directors or senior management, materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in such agreements on the date of this Agreement or comparable financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in

respect of the Facility or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Facility;

(ii)    the 2025 Indenture, the 2025 Notes, the 2025 Notes Guarantees, the Intercreditor Agreement, the Transaction Security Documents and any Additional Intercreditor Agreement;

(iii)    applicable law, rule, regulation, order, approval, license, permit, authorization, concession or similar restriction;

(iv)    any instrument or agreement governing Indebtedness or Capital Stock of a Person acquired by the Company or any of its Restricted Subsidiaries as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was Incurred or issued in connection with or in contemplation of such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person, or the property or assets or Capital Stock of the Person, so acquired; provided that, in the case of Indebtedness, such Indebtedness was permitted by the terms of this Agreement to be Incurred;

(v)    non-assignment provisions, subletting restrictions or similar restrictions in contracts, leases and licenses entered into in the ordinary course of business;

(vi)    purchase money obligations for property (including Capital Stock) acquired in the ordinary course of business and Lease Obligations that impose restrictions on the property purchased or leased of the nature described in Section 3(a)(iii);

(vii)    any agreement for the sale or other disposition of the Capital Stock or assets of a Restricted Subsidiary that restricts distributions by that Restricted Subsidiary pending closing of the sale or other disposition;

(viii)    Permitted Refinancing Indebtedness; provided that any such encumbrances or restrictions contained in the agreements governing such Permitted Refinancing Indebtedness taken as a whole are not, in the good faith judgment of the Company's Board of Directors or senior management, materially more restrictive, taken as a whole, than those contained in the agreements governing the Indebtedness being refinanced or comparable financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Facility or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Facility;

(ix)    Liens permitted to be Incurred as set forth under Section 7 that limit the right of the debtor to dispose of the assets securing such Indebtedness;

(x)    provisions limiting the disposition or distribution of assets or property or transfer of Capital Stock in joint venture agreements, asset sale agreements, sale-leaseback agreements, stock sale agreements, limited liability company organizational documents, and other similar agreements entered into (A) in the ordinary course of business, consistent with past practice or (B) with the approval of the Company's Board of Directors or senior management, which limitation is applicable only to the assets, property or Capital Stock that are the subject of such agreements;

(xi)    Hedging Obligations entered into from time to time for bona fide purposes of the Company and the Restricted Subsidiaries;

(xii)    restrictions on cash, Cash Equivalents, Government Guaranteed Securities or other deposits or net worth imposed by customers, suppliers, or lessors or required by insurance, surety or bonding companies under contracts or leases entered into in the ordinary course of business;

(xiii)    other Indebtedness of the Company and its Restricted Subsidiaries permitted to be Incurred after the date of this Agreement under Section 4; provided that in the good faith judgment of the Company's Board of Directors or senior management such encumbrances or restrictions taken as a whole are not materially less favorable to the Bank with respect to such dividend and other payment restrictions, taken as a whole, than those contained in the 2025 Indenture, the 2025 Notes, the 2025 Notes Guarantees, any Senior Facilities Agreement and the Transaction Security Documents on the date of this Agreement or customary in comparable financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Facility or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Facility;

(xiv)    encumbrances on property that exist at the time the property was acquired by the Company or a Restricted Subsidiary of the Company;

(xv)    contractual encumbrances or restrictions in effect on the date of this Agreement, and any amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings of those agreements; provided that such amendments, restatements, modifications, renewals, supplements, refundings, replacements or refinancings are not, in the good faith judgment of the Company's Board of Directors or senior management, materially more restrictive, taken as a whole, with respect to such dividend and other payment restrictions than those contained in such agreements on the date of this Agreement or comparable financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Facility or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Facility;

(xvi)    any mortgage financing or mortgage refinancing that imposes restrictions on the real property securing such Indebtedness;

(xvii)    any Qualified Receivables Financing; or

(xviii)    any encumbrances or restrictions imposed by any agreement that amends, renews, refinances, extends, refunds, replaces, defeases or discharges any of the contracts, instruments or obligations referred to in clauses (i) through (xvii) of this Section 3(b); provided that the encumbrances and restrictions contained in such agreement are not, in the good faith judgment of the Company's Board of Directors or senior management, materially more restrictive, taken as a whole, than such encumbrances and restrictions prior to such amendment or refinancing or than those contained in any comparable agreements or financings at the time of determination or would not, in the good faith judgment of the Company's Board of Directors or senior management, materially impair the ability to make payments of amounts due in respect of the Facility or comply with the respective obligations of the Company and its Restricted Subsidiaries under the Facility.

## 4.    INCURRENCE OF INDEBTEDNESS AND ISSUANCE OF PREFERRED STOCK.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, Incur any Indebtedness (including Acquired Debt) and the Company will not permit any of its Restricted Subsidiaries to issue any preferred stock; provided, however that the Company may Incur Indebtedness (including Acquired Debt) and the Restricted Subsidiaries of the Company may Incur Indebtedness (including Acquired Debt) or issue preferred stock, if the Fixed Charge Coverage Ratio of the Company for the period of the most recent four consecutive fiscal quarters for which internal financial statements of the Company are available immediately preceding the date on which such additional Indebtedness is Incurred or such preferred stock is issued, as the case may be, would have been at least 2.0 to 1.0, determined on

a pro forma basis (including the pro forma application of the proceeds therefrom), as if the additional Indebtedness had been Incurred or the preferred stock had been issued, as the case may be, at the beginning of such four-quarter period.

(b)      Section 4(a) will not prohibit the Incurrence of any of the following items of Indebtedness or preferred stock (collectively, **Permitted Debt**):

(i)      the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness under Credit Facilities in an aggregate principal amount at any one time outstanding under this clause (i) (with LC and Bank Guarantees being deemed (solely for the purpose of Incurring Indebtedness under this clause (i)) to have a principal amount equal to the maximum potential liability of the Company and any of its Restricted Subsidiaries thereunder and any Indebtedness under any Cash Management Facilities to be calculated on a net basis to the extent permitted under the relevant Cash Management Facility) not to exceed:

    (i)      the greater of (x) $225.0 million and (y) 100% of Consolidated EBITDA; plus

    (ii)      the maximum amount of Senior Secured Indebtedness such that, on the date of determination, after giving pro forma effect to such Incurrence (including pro forma application of the proceeds thereof), the Consolidated Senior Secured Net Leverage Ratio of the Company does not exceed 2.5 to 1.0,

    provided that any Indebtedness or preferred stock Incurred pursuant to this clause (1) may be refinanced (including, for the avoidance of doubt, an extension, renewal, refund, replacement, defeasance, or discharge) at any time if such refinancing Indebtedness or preferred stock does not exceed the greater of (I) the aggregate principal amount of Indebtedness or preferred stock permitted to be Incurred pursuant to this clause (1) on the date of determination for such refinancing and (II) the aggregate principal amount of the Indebtedness or preferred stock being refinanced at such time (together with an amount necessary to pay fees, commissions, premiums, discounts, costs and expenses (including underwriting commissions paid as discounts) Incurred in connection with such refinancing);

(ii)      [reserved]

(iii)      [reserved]

(iv)      the Incurrence of Indebtedness represented by the 2025 Notes (other than Additional 2025 Notes) and the Incurrence by the Guarantors (including any future Guarantors) of the 2025 Notes Guarantees (other than guarantees of Additional 2025 Notes);

(v)      Indebtedness of the Company or any of its Restricted Subsidiaries (other than Indebtedness described in clauses (1) or (4) of this Section 4(b)) outstanding on the date of this Agreement after giving pro forma effect to the Restructuring;

(vi)      the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness represented by:

    (i)      Lease Obligations, mortgage financings, industrial revenue bonds or purchase money obligations or other Indebtedness or preferred stock, in each case, Incurred for the purpose of financing or refinancing all or any part of the purchase price or cost of design, development, construction, lease, rental, installation or improvement of property (real or personal and including Capital Stock), plant or equipment used or useful in the business of the Company or any of its Restricted Subsidiaries (whether through the direct purchase of such assets or the Equity Interests of any Person owning such assets) and any Indebtedness which refinances, replaces or refunds such

**982**

Indebtedness, in an aggregate principal amount at any one time outstanding not to exceed the greater of (x) $70.0 million and (y) 30.0% of Consolidated EBITDA; and

(ii)    Ordinary Course Lease Obligations;

(vii)    the Incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange for, or the net proceeds of which are used to renew, refund, refinance, replace, defease or discharge any Indebtedness (other than intercompany Indebtedness) that was permitted by this Agreement to be Incurred under Section 4(a) and clauses (4), (v), (vii) and (14) of this Section 4(b);

(viii)    the Incurrence by the Company or any of its Restricted Subsidiaries of intercompany Indebtedness between the Company and any of its Restricted Subsidiaries or among any Restricted Subsidiaries; provided, however, that:

(i)    to the extent required by the Intercreditor Agreement, if the Company or any Guarantor is the obligor on such Indebtedness and the payee is not the Company or a Guarantor, such Indebtedness must be expressly subordinated to the prior payment in full in cash of all Obligations then due with respect to the Facility; and

(ii)    (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Person other than the Company or a Restricted Subsidiary of the Company, and (ii) any sale or other transfer of any such Indebtedness to a Person that is not either the Company or a Restricted Subsidiary of the Company, shall be deemed, in each case, to constitute an Incurrence of such Indebtedness by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this Section 4(b)(viii);

(ix)    the issuance by any of the Company's Restricted Subsidiaries to the Company or to another Restricted Subsidiary of preferred stock; provided, however, that:

(i)    any subsequent issuance or transfer of Equity Interests that results in any such preferred stock being held by a Person other than the Company or a Restricted Subsidiary of the Company, and

(ii)    any sale or other transfer of any such preferred stock to a Person that is neither the Company nor a Restricted Subsidiary of the Company,

will be deemed, in each case, to constitute an issuance of such preferred stock by such Restricted Subsidiary that was not permitted by this Section 4(b)(ix);

(x)    the Incurrence by the Company or any of its Restricted Subsidiaries of Hedging Obligations (other than commodity hedging) other than for speculative purposes as determined in good faith by the Company;

(xi)    the guarantee by the Company or any Restricted Subsidiary of Indebtedness of the Company or any Restricted Subsidiary that was permitted to be Incurred by another provision of this Section 4 (including Section 4(a)); provided that, if the Indebtedness being guaranteed is subordinated to or pari passu with the Facility, then the guarantee thereof shall be subordinated or pari passu as applicable, to the same extent as the Indebtedness so guaranteed;

(xii)    the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness in respect of (A) any LC and Bank Guarantee or (B) workers' compensation claims, payment obligations in connection with health or other types of social security benefits, unemployment or other insurance or self-insurance obligations, statutory obligations, bankers' acceptance, equipment

leases, rent payment obligations or other similar obligations in the ordinary course of business or consistent with past practice or (C) any letter of support given to any of its Subsidiaries in connection with the audit of that Subsidiary;

(xiii)    the Incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn against insufficient funds; provided that such Indebtedness is extinguished within five Business Days of its Incurrence;

(xiv)    Indebtedness or preferred stock of Persons (i) that are acquired by the Company or any of its Restricted Subsidiaries or merged (amalgamated or otherwise combined) into a Restricted Subsidiary (including pursuant to any acquisition of assets and assumption of related liabilities) in accordance with the terms of this Agreement or (ii) Incurred to provide all or a portion of the funds utilized to consummate the transaction or series of related transactions pursuant to which any Person became a Restricted Subsidiary or was otherwise acquired by the Company or a Restricted Subsidiary; provided that, for any such Indebtedness or preferred stock Incurred under this Section 4(b)(14) on the date of such acquisition or other transaction, after giving pro forma effect to such acquisition or other transaction and the Incurrence or issuance of such Indebtedness or preferred stock, (A) either (x) the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to Section 4(a) or (y) the Fixed Charge Coverage Ratio of the Company would not be less than it was immediately prior to giving effect to such acquisition or other transaction and to the related Incurrence of Indebtedness or preferred stock; or (B) to the extent that Indebtedness Incurred pursuant to Section 4(b)(14) constitutes Senior Secured Indebtedness, either (x) the Company would be permitted to Incur at least $1.00 of additional Indebtedness pursuant to Section 4(b)(1)(B); or (y) the Consolidated Senior Secured Net Leverage Ratio of the Company would not be greater than it was immediately prior to giving effect to such acquisition or other transaction and to the related Incurrence of Indebtedness or preferred stock;

(xv)    Indebtedness of the Company or any Restricted Subsidiary in an aggregate outstanding principal amount that, when taken together with any Permitted Refinancing Indebtedness in respect thereof and the principal amount of all other Indebtedness Incurred pursuant to this clause (xv) and then outstanding, will not exceed 100% of the net cash proceeds received by the Company since the date of this Agreement (x) as a contribution to its common equity capital or (y) from the issue or sale of Equity Interests of the Company or any Parent (other than Disqualified Stock) or from Subordinated Shareholder Debt or from the issue and sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold to a Restricted Subsidiary of the Company);    provided, however, that (i) any net cash proceeds that are so received or contributed shall be excluded for purposes of making Restricted Payments under Section 2(a) and clauses (ii), (ix) and (xiii) of Section 2(b) to the extent the Company or any Guarantor Incur Indebtedness in reliance thereon and (ii) any net cash proceeds that are so received or contributed shall be excluded for purposes of Incurring Indebtedness pursuant to this clause (xv) to the extent the Company or any of its Restricted Subsidiaries makes a Restricted Payment under Section 2(a) and clauses (ii), (ix) and (xiii) of Section 2(b) in reliance thereon;

(xvi)    the Incurrence of Indebtedness arising from agreements of the Company or a Restricted Subsidiary providing for indemnification, adjustment of purchase price, earn outs, guarantees, or similar obligations, in each case, Incurred or assumed in connection with the disposition or acquisition of any business, assets or a Subsidiary in accordance with the terms of this Agreement, other than guarantees of financial Indebtedness Incurred or assumed by any Person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

**984**

(xvii)   the Incurrence by the Company or any of its Restricted Subsidiaries of additional Indebtedness or the issuance of preferred stock in an aggregate principal amount (or accreted value, as applicable) or having an aggregate liquidation preference at any time outstanding, including all Permitted Refinancing Indebtedness Incurred to extend, renew, refund, refinance, replace, defease or discharge any Indebtedness Incurred pursuant to this clause (xvii), not to exceed the greater of (x) $80.0 million and (y) 35.0% of Consolidated EBITDA;

(xviii)  the Incurrence by the Company or any of its Restricted Subsidiaries of additional Indebtedness arising out of advances on exports, advances on imports, customer prepayments and similar transactions in the ordinary course of business or consistent with past practice or advances on trade receivables or factoring of receivables;

(xix)    any Cash Management Facilities including in respect of any netting or setting off arrangements;

(xx)     Indebtedness of the Company or any Restricted Subsidiary in respect of Management Advances and MIP Payments;

(xxi)    guarantees of Indebtedness in connection with Investments in joint ventures not exceeding the greater of $20.0 million and 8.0% of Consolidated EBITDA in the aggregate at any one time outstanding; and

(xxii)   Indebtedness outstanding under local lines of credit or local facilities (including local bilateral facilities, working capital facilities or overdraft facilities) in an aggregate principal amount at any one time outstanding not to exceed the greater of $25.0 million and 10.0% of Consolidated EBITDA;

provided, however, that no more than the greater of $115.0 million and 50.0% of Consolidated EBITDA of Indebtedness at any time outstanding may be Incurred by a Restricted Subsidiary which is not a Guarantor pursuant to Sections 4(a) or clauses (14)(ii)(A), (15) or (17) of this Section 4(b).

(c)      For purposes of determining compliance with this Section 4:

(i)      in the event that an item of Indebtedness or preferred stock meets the criteria of more than one of the categories of Permitted Debt described in clauses (i) through (22) of Section 4(b) or is entitled to be Incurred pursuant to Section 4(a), the Company will be permitted to classify such item of Indebtedness or preferred stock on the date of its Incurrence and will only be required to include the amount and type of such Indebtedness or preferred stock in one of such clauses, although the Company may divide and classify an item of Indebtedness or preferred stock in one or more of the types of Indebtedness or preferred stock and may later reclassify all or a portion of such item of Indebtedness or preferred stock, in any manner that complies with this Section 4;

(ii)     notwithstanding Section 4(c)(1), all Indebtedness Incurred under each Senior Facilities Agreement entered into on the date of this Agreement will be deemed to have been Incurred under Section 4(b)(i)(A) and may not be reclassified;

(iii)    guarantees of, or obligations in respect of letters of credit, bankers' acceptances or other similar instruments relating to, or Liens securing, Indebtedness that is otherwise included in the determination of a particular amount of Indebtedness shall not be included; and

(iv)     if obligations in respect of LC and Bank Guarantees, bankers' acceptances or other similar instruments are Incurred pursuant to any Credit Facility and are being treated as Incurred pursuant to Section 4(a) or clauses (1), (6), (12), (15), (17) and (22) of Section 4(b) and the

LC and Bank Guarantees, bankers' acceptances or other similar instruments relate to other Indebtedness, then such other Indebtedness shall not be included

(d)      The accrual of interest or dividends, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of additional Indebtedness, the reclassification of preferred stock as Indebtedness due to a change in accounting principles, and the payment of dividends on Disqualified Stock or preferred stock in the form of additional shares of the same class of Disqualified Stock or preferred stock will not be deemed to be an Incurrence of Indebtedness or an issuance of preferred stock for purposes of this Section 4.  Notwithstanding any other provision of this Section 4 (including pursuant to any Permitted Refinancing Indebtedness permitted pursuant to this Section 4), the maximum amount of Indebtedness that the Company or any Restricted Subsidiary may Incur pursuant to this Section 4 shall not be deemed to be exceeded solely as a result of fluctuations in exchange rates or currency values.

(e)      The amount of any Indebtedness outstanding as of any date will be:  (a) the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount; (b) the principal amount of the Indebtedness, in the case of any other Indebtedness; and (c) in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of:  (x) the Fair Market Value of such assets at the date of determination; and (y) the amount of the Indebtedness of the other Person.

(f)      Neither the Company nor any Guarantor will Incur any Indebtedness (including Permitted Debt) that is contractually subordinated in right of payment to any other Indebtedness of the Company or such Guarantor unless such Indebtedness is also contractually subordinated in right of payment to the Facility on substantially identical terms; provided, however, that no Indebtedness will be deemed to be contractually subordinated in right of payment to any other Indebtedness of the Company or any Guarantor solely by virtue of being unsecured or by virtue of being secured with different collateral or by virtue of being secured on a junior priority basis or by virtue of the application of waterfall or other payment ordering provisions affecting different tranches of Indebtedness.

## 5.      ASSET SALES.

(a)      The Company will not, and will not cause or permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(i)      the Company (or the Restricted Subsidiary, as the case may be) receives consideration at the time of the Asset Sale at least equal to the Fair Market Value of the assets or Equity Interests subject to such Asset Sale; and

(ii)      at least 75% of the consideration received in the Asset Sale by the Company or such Restricted Subsidiary is in the form of cash, Cash Equivalents or Government Guaranteed Securities.

(b)      The amount of (i) any liabilities, as recorded on the most recent balance sheet, of the Company or any Restricted Subsidiary of the Company (other than contingent liabilities and liabilities that are subordinated in right of payment to the Facility) that are assumed by the transferee of any such assets and as a result of which, the Company or such Restricted Subsidiary of the Company are released from any further liability in connection therewith or are indemnified against further liabilities, (ii) any securities, notes, other obligations or assets received by the Company or any such Restricted Subsidiary from such transferee that are converted by the Company or such Restricted Subsidiary into cash or Cash Equivalents within 180 days of the receipt thereof, to the extent of the cash or Cash Equivalents received in that conversion (iii) any Designated Non-cash Consideration received by the Company or any of its Restricted Subsidiaries in such Asset Sale having aggregate Fair Market Value taken together with all other Designated Non-cash Consideration received pursuant to this clause (iii), that is at that time outstanding not to exceed the greater of $35.0 million and 15.0% of Consolidated EBITDA (with the Fair Market Value of each item of Designated Non-cash Consideration being

**986**

measured at the time received and without giving effect to subsequent changes in value), (iv) Indebtedness of any Restricted Subsidiary of the Company that is no longer a Restricted Subsidiary as a result of such Asset Sale, to the extent that the Company and each other Restricted Subsidiary are released from any guarantee of such Indebtedness in connection with such Asset Sale, (v) the Fair Market Value of any Capital Stock or assets of the kind referred to in clause (B) or (D) of Section 5(c)(1) and (vi) the Fair Market Value of any consideration consisting of Indebtedness of the Company or any Guarantor of the kind referred to in Section 5(c)(1)(A), provided the such Indebtedness shall thereafter be cancelled, shall be deemed to be cash for purposes of Section 5(a)(ii) and for no other purpose.

(c)    Within 365 days after the receipt of any Net Proceeds from an Asset Sale, the Company (or any Restricted Subsidiary of the Company, as the case may be) may:

    (i)    apply such Net Proceeds, at its option:

        (i)    to repay or redeem (v) Indebtedness outstanding under Section 4(b)(1)(A), (w) Pari Passu Indebtedness Incurred under a Credit Facility that is secured by a Lien on the Collateral and that is not subordinated in right of payment to the Facility, (x) Senior Secured Indebtedness that is Pari Passu Indebtedness at a purchase price of no more than 100% of the principal amount of such Pari Passu Indebtedness, (y) any Indebtedness that was secured by any assets not constituting Collateral sold in such Asset Sale, or any other Indebtedness secured only by assets not constituting Collateral, (z) Indebtedness of a Restricted Subsidiary that is not a Guarantor (other than Indebtedness owed to the Company or any of its Restricted Subsidiaries) or (aa) any Indebtedness pursuant to a Notes Offer;

        (ii)    to acquire all or substantially all of the assets of, or any Capital Stock of, another Permitted Business; provided that in the case of any such acquisition of Capital Stock, the Permitted Business is or becomes a Restricted Subsidiary of the Company;

        (iii)    to make a capital expenditure or other Investment in any person engaged in a Permitted Business;

        (iv)    to acquire other assets that are not classified as current assets under IFRS and that are used or useful in a Permitted Business, or

    (ii)    enter into a binding commitment to apply the Net Proceeds pursuant to clause (ii), (iii) or (iv) of Section 5(c)(i), provided that such binding commitment shall be treated as a permitted application of the Net Proceeds from the date of such commitment until the earlier of (x) the date on which such acquisition or expenditure is consummated, and (y) the 180th day following the expiration of the aforementioned 365 day period; or

    (iii)    any combination of Section 5(c)(i) and Section 5(c)(ii).

(d)    Pending the final application of any Net Proceeds, the Company (or the applicable Restricted Subsidiary) may temporarily reduce revolving credit borrowings or otherwise invest the Net Proceeds in any manner that is not prohibited by this Agreement.

## 6.    TRANSACTIONS WITH AFFILIATES.

(a)    The Company will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each, an **Affiliate**

**Transaction**), involving aggregate consideration in excess of the greater of $10.0 million and 5.0% of Consolidated EBITDA, unless:

(i)     the Affiliate Transaction is on terms that are not materially less favorable to the Company or the relevant Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with a Person who is not an Affiliate; and

(ii)     the Company delivers to the Bank with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of the greater of $30.0 million and 12.5% of Consolidated EBITDA, an Officer's Certificate and a resolution of the Board of Directors of the Company certifying that such Affiliate Transaction complies with this Section 6.

(b)     The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to Section 6(a):

(i)     any employment or consultancy agreement, collective bargaining agreement, employee benefit plan, officer or director indemnification agreement, including any stock option, stock appreciation rights, stock incentive, MIP or similar plans or any similar arrangement entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice and payments pursuant thereto (including severance, termination and other similar payments to former or departing employees, consultants, officers or directors);

(ii)     transactions (including a merger) between the Company and any of its Restricted Subsidiaries or among any Restricted Subsidiaries;

(iii)     transactions with a Person (other than an Unrestricted Subsidiary of the Company) that is an Affiliate of the Company solely because the Company owns, directly or through a Restricted Subsidiary, an Equity Interest in, or controls, such Person;

(iv)     payment of reasonable fees to, reimbursements of expenses and indemnity provided on behalf of, officers, directors, employees or consultants of the Company or any of its Restricted Subsidiaries or of any Parent;

(v)     any issuance of Equity Interests (other than Disqualified Stock) of the Company, receipt of any capital contributions in exchange for Equity Interests of the Company (other than Disqualified Stock) or the Incurrence of Subordinated Shareholder Debt;

(vi)     Restricted Payments and Permitted Investments (other than Permitted Investments described in clauses (3) and (9) (to the extent such guarantee is in respect of Indebtedness of a Person that is not the Company or a Restricted Subsidiary) of the definition thereof in Section 15 that do not violate Section 2;

(vii)     Management Advances and MIP Payments;

(viii)     transactions with customers, clients, suppliers, joint venture partners or purchasers or sellers of goods or services, or lessors or lessees of property or providers of employees or other labor in compliance with the terms of this Agreement which are, in the aggregate (taking into account all the costs and benefits associated with such transactions), in the good faith judgment of the Company's Board of Directors, materially no less favorable to the Company or its Restricted Subsidiaries than those that would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with a Person who is not an Affiliate;

(ix)     Liens on Equity Interests of Unrestricted Subsidiaries of the Company for the benefit of lenders of Unrestricted Subsidiaries of the Company;

(x)     if such Affiliate Transaction, following an Initial Public Offering, is with a Person in its capacity as a holder of Capital Stock of the Company or any Restricted Subsidiary where such Person is treated no more favorably than the holders of Capital Stock of the Company or any Restricted Subsidiary;

(xi)     transactions effected pursuant to agreements in effect on the date of this Agreement and any amendment, modification or replacement of such agreement (so long as such amendment or replacement is not, in the good faith judgment of the Company's Board of Directors, materially more disadvantageous to the Bank, taken as a whole, than the original agreement as in effect on the date of this Agreement);

(xii)     Permitted Payments to Parent;

(xiii)     execution, delivery and performance of any consolidated group arrangements for tax or accounting purposes, provided that any payments to be made pursuant to such arrangements are made in compliance with Section 2;

(xiv)     (A) issuances or sales of Capital Stock (other than Disqualified Stock or Designated Preference Shares) of the Company or options, warrants or other rights to acquire such Capital Stock or Subordinated Shareholder Debt and entering into any proceeds loan in respect of the proceeds of any issuance of Senior Notes; provided that the interest rate and other financial terms of such Subordinated Shareholder Debt or proceeds loans are approved by a majority of the members of the Board of Directors of the Company in their reasonable determination and (B) any amendment, waiver or other transaction, including satisfying payment obligations, with respect to any Subordinated Shareholder Debt or proceeds loan in compliance with the other provisions of this Agreement, the Intercreditor Agreement or any Additional Intercreditor Agreement, as applicable;

(xv)     any transaction effected as part of a Qualified Receivables Financing; and

(xvi)     any transaction effected in connection with the Restructuring.

## 7.     LIENS.

(a)     The Company will not, and will not permit any of its Restricted Subsidiaries to, create, Incur, assume or otherwise cause to exist or become effective any Lien of any kind securing Indebtedness upon any of their property or assets, now owned or hereafter acquired, except:

(i)     in the case of any property or asset that does not constitute Collateral, (A) Permitted Liens or (B) if such Lien is not a Permitted Lien, to the extent that all payments due under this Agreement are secured on an equal and ratable pari passu basis with the obligations so secured (or if such obligations so secured are subordinated in right of payment to either the Facility, prior or senior thereto, with the same relative priority as the Facility shall have with respect to such subordinated Indebtedness), until such time as such obligations are no longer secured by a Lien; and

(ii)     in the case of any property or asset that constitutes Collateral, Permitted Collateral Liens.

## 8.     DESIGNATION OF RESTRICTED AND UNRESTRICTED SUBSIDIARIES.

The Board of Directors of the Company may designate any Restricted Subsidiary (including any newly acquired or newly formed Subsidiary) to be an Unrestricted Subsidiary if that designation would not

cause a Default.  If a Restricted Subsidiary is designated as an Unrestricted Subsidiary, the aggregate Fair Market Value of all outstanding Investments owned by the Company and its Restricted Subsidiaries in the Subsidiary designated as Unrestricted shall be deemed to be an Investment made as of the time of the designation and will reduce the amount available for Restricted Payments under Section 2 or under one or more clauses of such definition of Permitted Investments, as determined by the Company.  That designation will only be permitted if such Investment would be permitted at that time.

Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the Bank by filing promptly with the Bank a certified copy of a resolution of the Board of Directors of the Company giving effect to such designation and an Officer's Certificate certifying that such designation complied with the preceding conditions and was permitted under Section 2 or under one or more clauses of such definition of Permitted Investments, as determined by the Company.  If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requirements as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Agreement and any Indebtedness of such Subsidiary will be deemed to be Incurred by a Restricted Subsidiary of the Company as of such date and, if such Indebtedness is not permitted to be Incurred as of such date under Section 4, the Company will be in Default under Section 4.

The Board of Directors of the Company may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidiary of the Company; provided that such designation will be deemed no be an Incurrence of Indebtedness by a Restricted Subsidiary of the Company of any outstanding Indebtedness of such Unrestricted Subsidiary, and such designation will only be permitted if (1) such Indebtedness is permitted under Section 4, calculated on a pro forma basis taking into account such designation as if such designation had occurred at the beginning of the applicable reference period; and (2) no Default or Event of Default would be in existence following such designation.

## 9.    NO IMPAIRMENT OF SECURITY INTEREST.

(a)    The Company will not, and will not cause or permit any Restricted Subsidiary to, take or knowingly or negligently omit to take, any action which action or omission would or could reasonably be expected to have the result of materially impairing the security interest with respect to the Collateral (it being understood that the Incurrence of Liens on the Collateral permitted by the definition of Permitted Collateral Liens shall under no circumstances be deemed to materially impair the security interest with respect to the Collateral) for the benefit of the Bank, and the Company will not, and will not cause or permit any Restricted Subsidiary to, grant to any Person other than the Security Agent, for the benefit of the Bank and the other beneficiaries described in the Transaction Security Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement, any interest whatsoever in any of the Collateral; provided that (i) nothing in this Section 9 shall restrict the discharge or release of the Collateral in accordance with this Agreement, the Transaction Security Documents, the Intercreditor Agreement and any Additional Intercreditor Agreement; (ii) the Company and the Restricted Subsidiaries may Incur Permitted Collateral Liens; (iii) the applicable Transaction Security Documents may be amended from time to time to cure any ambiguity, mistake, omission, defect, manifest error or inconsistency therein; (iv) the Company and its Restricted Subsidiaries may discharge and release security interests with respect to the Collateral in connection with the implementation of a Permitted Reorganization, (v) the applicable Transaction Security Documents may be amended in any manner that does not adversely affect the rights of the Security Agent or the Bank in any material respects; and (vi) the security interests and the related Transaction Security Documents may be amended, extended, renewed, restated, supplemented or otherwise modified or released (followed by an immediate retaking of a Lien of at least equivalent ranking over the same assets); provided, however, that in the case of clause (vi) of this Section 9(a), the Transaction Security Documents may not be amended, extended, renewed, restated, supplemented, released or otherwise modified or replaced, unless contemporaneously with such amendment, extension, replacement,

restatement, supplement, modification, renewal or release (followed by an immediate retaking of a Lien of at least equivalent ranking over the same assets), the Company delivers to the Bank either:

(i)     a solvency opinion from an internationally recognized investment bank or accounting firm, in form and substance reasonably satisfactory to the Bank confirming the solvency of the Company and its Subsidiaries, taken as a whole, after giving effect to any transactions related to such amendment, extension, renewal, restatement, supplement, modification, replacement or release and retaking;

(ii)    a certificate from the Board of Directors or chief financial officer of the relevant Person or the chief financial officer of the Company, which certificate confirms the solvency of the Person granting such security interest after giving effect to any transactions related to such amendment, extension, renewal, restatement, supplement, modification, replacement or release and retaking; or

(iii)   an Opinion of Counsel, in form and substance reasonably satisfactory to the Bank (subject to customary exceptions and qualifications), confirming that, after giving effect to any transactions related to such amendment, extension, renewal, restatement, supplement, modification, replacement or release and retaking, the Lien or Liens securing the Facility created under the Transaction Security Documents so amended, extended, renewed, restated, supplemented, modified, replaced or release and retaking are valid and perfected Liens not otherwise subject to any limitation imperfection, in equity or at law, that such Lien or Liens were not otherwise subject to immediately prior to such amendment, extension, renewal, restatement, supplement, modification, replacement or release and retaking (other than as a result of the effect of the Agreed Security Principles or any new hardening period).

(b)     At the direction of the Company and without the consent of the Bank, the Security Agent may from time to time enter into one or more amendments to the Transaction Security Documents or enter into additional or supplemental Transaction Security Documents to:  (i) cure any ambiguity, omission, defect or inconsistency therein or (ii) (but subject to compliance with Section 9(a)) (x) provide for Permitted Collateral Liens, (y) add to the Collateral or (z) make any other change thereto that does not adversely affect the rights of the Bank in any material respect.

(c)     In the event that the Company complies with this Section 9, the Security Agent shall (subject to customary protections and indemnifications) consent to such amendment, extension, renewal, restatement, supplement, modification, replacement or release with no need for instructions from the Bank.

## 10.   SUSPENSION OF COVENANTS ON ACHIEVEMENT OF INVESTMENT GRADE STATUS.

(a)     If on any date following the date of this Agreement:

(i)     the 2025 Notes (or any Permitted Refinancing Indebtedness of the 2025 Notes) (the **Relevant Debt**) assigned an Investment Grade Rating by at least two Rating Agencies; and

(ii)    no Default or Event of Default shall have occurred and be continuing, (the occurrence of the events described in Section 10(a)(i) and this Section 10(a)(ii) being collectively referred to as a **Covenant Suspension Event** and the date thereof being referred to as the **Suspension Date**),

then the Company shall provide written notice to such effect to the Bank and, beginning on the Suspension Date, the provisions of this Agreement under Section 2, Section 3, Section 4, Section 5, Section 6, Section 8, Section 11 and Section 13(a)(4) will not apply to the Facility or the Company and its Restricted Subsidiaries (collectively, the **Suspended Covenants**).

(b)     [Reserved].

(c)    In the event that the Company and the Restricted Subsidiaries are not subject to the Suspended Covenants under this Agreement for any period of time as a result of the foregoing, and on any subsequent date (the **Reversion Date**) one or more Rating Agencies withdraw their Investment Grade Rating or downgrade the rating assigned to the Relevant Debt below an Investment Grade Rating so that the Relevant Debt is no longer assigned an Investment Grade Rating by at least two Rating Agencies, then the Company and the Restricted Subsidiaries will thereafter again be subject to the Suspended Covenants under this Agreement with respect to future events unless and until the Relevant Debt subsequently again attains an Investment Grade Rating from at least two Rating Agencies. Upon any such Reversion Date, the Company shall promptly notify the Bank. The period of time between the Suspension Date and the Reversion Date is referred to in this Agreement as the **Suspension Period**. Upon the occurrence of a Covenant Suspension Event, the amount of Excess Proceeds from Net Proceeds shall be reset to zero.

(d)    Notwithstanding the foregoing, in the event of any such reinstatement, no action taken or omitted to be taken by the Company or any Restricted Subsidiary prior to such reinstatement will give rise to a Default or Event of Default under this Agreement; provided that (i) with respect to Restricted Payments made after such reinstatement, the amount available to be made as Restricted Payments will be calculated as though Section 2 had been in effect prior to, but not during, the Suspension Period; (ii) all Indebtedness Incurred, or Disqualified Stock or preferred stock issued, during the Suspension Period will be classified to have been Incurred or issued pursuant to Section 4(b)(v); (iii) any transactions with Affiliates entered into after such reinstatement pursuant to an agreement entered into during any Suspension Period shall be deemed to be permitted pursuant to Section 6(b)(11); and (iv) any encumbrance or restriction on the ability of any Restricted Subsidiary that is not a Guarantor to take any action described in clauses (i) through (iii) of Section 3(a) that becomes effective during any Suspension Period shall be deemed to be permitted pursuant to Section 3(b)(i). In addition, in the event of any such reinstatement, the Company and the Restricted Subsidiaries will be permitted, without causing a Default or an Event of Default, to honor any contractual commitment or take any actions, as long as the contractual commitments were entered into during the Suspension Period and not in anticipation of the occurrence of a Reversion Date.

## 11.    BUSINESS ACTIVITIES

The Company will not, and will not permit any of its Restricted Subsidiaries to, engage in any business other than Permitted Businesses, except to such extent as would not be material to the Company and its Restricted Subsidiaries taken as a whole.

## 12.    FINANCIAL CALCULATIONS.

(a)    For the purposes of determining Consolidated EBITDA for any basket or ratio under this Agreement on any date of determination, Consolidated EBITDA shall be calculated for the period of the most recent four consecutive fiscal quarters for which internal financial statements of the Company are available immediately preceding such date of determination and pro forma effect shall be given to Consolidated EBITDA as set out in this Section 12.

(b)    In the event that the specified Person or any of its Subsidiaries that are Restricted Subsidiaries Incurs, assumes, guarantees, repays, repurchases, redeems, defeases or otherwise discharges any Indebtedness (other than ordinary working capital borrowings) or issues, repurchases or redeems preferred stock subsequent to the commencement of the period for which a financial ratio is being calculated and on or prior to the date on which the event for which the calculation of that financial ratio is made (for the purposes of this definition, the **Calculation Date**), then that financial ratio will be calculated giving pro forma effect (as determined in good faith by an Authorised Person), including in respect of any cost savings, expense reductions, operating improvements and synergies that are reasonably expected to occur within 24 months, to such Incurrence, assumption, guarantee, repayment, repurchase, redemption, defeasance or other discharge of Indebtedness, or such issuance, repurchase or redemption

of preferred stock, and the use of the proceeds therefrom, as if the same had occurred at the beginning of the applicable four-quarter reference period; provided, however, that (except with respect to Section 2(b)(18)) the pro forma calculation of that financial ratio shall not give effect to (i) any Indebtedness Incurred on the Calculation Date pursuant to Section 4(b) (other than 4(b)(1)(B) or 4(b)(14)(ii)) or (ii) the discharge on the Calculation Date of any Indebtedness to the extent that such discharge results from the proceeds of Indebtedness Incurred on the Calculation Date pursuant to Section 4(b) (other than 4(b)(1)(B) or 4(b)(14)(ii)).

(c)     For purposes of calculating any financial ratio under this Agreement:

(i)     any acquisition, Investment, joint venture, disposition, cost saving program or initiative or other similar transaction that have been made by the specified Person or any of its Restricted Subsidiaries, including through mergers or consolidations or leases, or any Person or any Restricted Subsidiary acquired by the specified Person or any of its Restricted Subsidiaries, and including all related financing transactions and including increases in ownership of Restricted Subsidiaries (including any Unrestricted Subsidiary that has been redesignated as a Restricted Subsidiary) (a **Transaction**), during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date, or that are to be made on the Calculation Date, will be given pro forma effect (as determined in good faith by an Authorised Person), including in respect of any cost savings, expense reductions, operating improvements and synergies that are reasonably expected to occur within 24 months, as if they had occurred on the first day of the four-quarter reference period, provided that, if definitive documentation has been entered into with respect to that Transaction, at the option of the Company, Consolidated EBITDA for such period will be calculated after giving pro forma effect to such Transaction (including anticipated cost savings, expense reductions, operating improvements and synergies reasonably expected to occur within 24 months) as if that Transaction had occurred on the first day of such period, even if the Transaction has not yet been consummated as of the date of determination;

(ii)     Consolidated EBITDA and Fixed Charges attributable to discontinued operations, as determined in accordance with IFRS, and operations or businesses or any asset or group of assets constituting a business or operating unit (and ownership interests therein) disposed of prior to the Calculation Date, will be excluded;

(iii)     any Person that is a Restricted Subsidiary on the Calculation Date (including any Unrestricted Subsidiary that has been redesignated as a Restricted Subsidiary) will be deemed to have been a Restricted Subsidiary at all times during such four-quarter period;

(iv)     any Person that is not a Restricted Subsidiary on the Calculation Date will be deemed not to have been a Restricted Subsidiary at any time during such four-quarter period;

(v)     if any Indebtedness bears a floating rate of interest, the interest expense on such Indebtedness will be calculated as if the rate in effect on the Calculation Date had been the applicable rate for the entire period (taking into account any interest rate agreement applicable to such Indebtedness), and if any Indebtedness is not denominated in the Company's functional currency, that Indebtedness for purposes of the calculation of that financial ratio shall be treated in accordance with IFRS;

(vi)     interest on a Lease Obligation shall be deemed to accrue at an interest rate reasonably determined by a responsible accounting or financial officer of the Company to be the rate of interest implicit in such Lease Obligation in accordance with IFRS; and

(vii)     the full run-rate effect of cost savings, expense reductions, operating improvements and synergies (as determined in good faith by an a responsible accounting or financial officer of

the Company) that have occurred during the four-quarter reference period or subsequent to such reference period and on or prior to the Calculation Date or that are reasonably expected to occur within 24 months shall be included as though such cost savings, expense reductions, operating improvements and synergies had been achieved on the first day of the relevant period,

provided that, subject to paragraph (e) below, at any time the aggregate amount of anticipated cost savings, expense reductions, operating improvements and synergies calculated pursuant to clauses (1) and (7) hereof shall only represent with respect to any four quarter period in the aggregate 20.0% of Consolidated EBITDA (including as a result of such cost savings, expense reductions, operating improvements and synergies).

(d)     When calculating the availability under any basket or ratio under this Agreement, in each case in connection with any Transaction or Restricted Payment where there is a time difference between commitment and closing or Incurrence, the date of determination of such basket or ratio and of any Default or Event of Default shall, at the option of the Company, be the date the definitive agreements for such Transaction or Restricted Payment are entered into and such baskets or ratios shall be calculated on a pro forma basis after giving effect to such Transaction or Restricted Payment (including any Incurrence of Indebtedness and the use of proceeds thereof and anticipated cost savings, expense reductions, operating improvements and synergies reasonably expected to occur within 24 months) as if they occurred at the beginning of the applicable reference period for purposes of determining the ability to consummate any such Transaction or Restricted Payment (and not for purposes of any subsequent availability of any basket or ratio). For the avoidance of doubt, (x) if any of such baskets or ratios are exceeded as a result of fluctuations in such basket or ratio (including due to fluctuations in Consolidated EBITDA of the Company or the target company) subsequent to such date of determination and at or prior to the consummation of the relevant Transaction or Restricted Payment, such baskets or ratios will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the Transaction or Restricted Payment is permitted hereunder and (y) such baskets or ratios shall not be tested at the time of consummation of such Transaction or Restricted Payment; provided, further, that if the Company elects to have such determinations occur at the time of entry into such definitive agreement, any such Transaction or Restricted Payment (including any Incurrence of Indebtedness and the use of proceeds thereof) shall be deemed to have occurred on the date the definitive agreements are entered and outstanding thereafter for purposes of calculating any baskets or ratios under this Agreement after the date of such agreement and before the consummation of such Transaction or Restricted Payment.

## 13.    MERGER, CONSOLIDATION OR SALE OF ASSETS

(a)     The Company will not, directly or indirectly, in one or more related transactions (x) consolidate or merge with or into another Person or (y) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the Company's and its Restricted Subsidiaries' properties or assets to another Person (whether or not the Company is the surviving Person), unless:

(i)      either: (a) the Company is the surviving entity; or (b) the Person formed by or surviving any such consolidation or merger (if other than the Company) or to which such sale, assignment, transfer, conveyance or other disposition has been made is a corporation, partnership or limited liability company organized or existing under the laws of the European Union or any member state thereof, the United States, any state of the United States or the District of Columbia, Canada, Norway, Switzerland or Japan;

(ii)     the Person formed by or surviving any such consolidation or merger (if other than the Company) or the Person to which such sale, assignment, transfer, conveyance or other disposition has been made assumes all the obligations of the Company under this Agreement, the Intercreditor Agreement, any Additional Intercreditor Agreements and the Transaction

Security Documents (to the extent the Company is a party thereto), in each case pursuant to agreements reasonably satisfactory to the Bank; and this Agreement, the Intercreditor Agreement, any Additional Intercreditor Agreements and Transaction Security Documents will remain in full force and effect as so amended or supplemented;

(iii)    immediately after such transaction, no Default or Event of Default exists and the Transaction Security Documents and the Liens created on the Collateral shall remain in full force and effect, or subject to the satisfaction of the Bank, shall have been transferred to such surviving entity and shall have been perfected and be in full force and effect or otherwise released in accordance with the terms of this Agreement;

(iv)    (a) the Company or the Person formed by or surviving any such consolidation or merger (if other than the Company), or to which such sale, assignment, transfer, conveyance or other disposition has been made would, on the date of such transaction after giving *pro forma* effect thereto and to any related financing transactions as if the same had occurred at the beginning of the applicable four-quarter period be permitted to Incur at least $1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test set forth in Section 4(a), or (b) the Fixed Charge Coverage Ratio of the Company or the successor Person, on the date of and after giving *pro forma* effect to such acquisition and such Incurrence or issuance, would not be less than such ratio for the Company and its Restricted Subsidiaries immediately prior to such transaction; and

(v)    the Company shall have delivered to the Bank an Officer's Certificate and an Opinion of Counsel (each, in a form reasonably satisfactory to the Bank), each stating that such consolidation, merger or transfer complies with this Agreement and any Transaction Security Documents to which the Company was party will be the legal, valid and binding obligations of the surviving Person or Company, enforceable in accordance with their terms.

(b)    Save for the Company, a Guarantor may not sell or otherwise dispose of all or substantially all of its assets to, or consolidate with or merge with or into (whether or not such Guarantor is the surviving Person) another Person, in each case, other than the Company or another Guarantor, unless either:

(i)    the Person acquiring the property in any such sale or disposition or the Person formed by or surviving any such consolidation or merger assumes all the obligations of that Guarantor under this Agreement, the Intercreditor Agreement, any Additional Intercreditor Agreements and the Transaction Security Documents to which such Guarantor is a party pursuant to agreements reasonably satisfactory to the Bank and immediately after giving effect to that transaction, no Default or Event of Default exists; or

(ii)    the Net Proceeds of such sale or other disposition are applied in accordance with the applicable provisions of this Agreement.

(c)    In addition, the Company may not, directly or indirectly, lease all or substantially all of the properties and assets (determined on a consolidated basis for the Company and its Restricted Subsidiaries), in one or more related transactions, to any other Person.

(d)    This Section 13 will not apply to (i) any consolidation or merger of any Restricted Subsidiary that is not the Company into the Company or a Guarantor, (ii) any consolidation or merger among Guarantors, (iii) any consolidation or merger among the Company and any Guarantor, *provided* that, if the Company is not the surviving entity of such merger or consolidation, the relevant Guarantor is an entity organized or existing under the laws of any member state of the European Union, Switzerland, the United States, any state of the United States or the District of Columbia, Canada, Norway, Switzerland or Japan and Section 13(a)(3) and Section 13(a)(6) will be complied with or (d) any sale, assignment, transfer, conveyance, lease or other disposition of assets by a Guarantor or a Restricted

Subsidiary that is not a Guarantor to the Company or a Guarantor.  Section 13(a)(4), Section 13(a)(5), Section 13(b)(3) and Section 13(b)(4) will not apply to any merger or consolidation of the Company or any Guarantors with or into, or any sale, assignment, transfer, conveyance, lease or other disposition of assets by the Company or any Guarantor to, an Affiliate solely for the purpose of reincorporating the Company or such Guarantor for tax reasons.

(e)    Notwithstanding anything to the contrary set forth herein, the Company and its Restricted Subsidiaries may implement a Permitted Reorganization.

## 14.    SUCCESSOR CORPORATION SUBSTITUTED

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of the Company in a transaction that is subject to, and that complies with the provisions of, Section 13, the Successor Person formed by such consolidation or into or with which the Company is merged or to which such sale, assignment, transfer, lease, conveyance or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, assignment, transfer, lease, conveyance or other disposition, the provisions of this Agreement referring to the "Company" shall refer instead to the Successor Person and not to the Company), and may exercise every right and power of the Company under this Agreement with the same effect as if such Successor Person had been named as the Company herein.

## 15.    LIMITATION ON HOLDING COMPANY ACTIVITIES

The Company may not carry on any business or own any assets other than:

(i)    the ownership of shares in its Subsidiaries and any other assets that are *de minimis* in nature; *provided* that the Company may from time to time receive in a transaction otherwise permitted under this Agreement and the Transaction Security Documents, properties and assets (including cash, Cash Equivalents, Government Guaranteed Securities and/or Indebtedness and other obligations) for the purpose of transferring such properties and assets to any Parent, any Subsidiary or any other Person, so long as in any case such further transfer is made promptly by the Company and, after giving effect thereto, the Company is again in compliance with this clause;

(ii)    the provision of administrative services. treasury service, legal, accounting and management services to its Subsidiaries of a type customarily provided by a holding company to its Subsidiaries and the ownership of assets necessary to provide such services;

(iii)    Incurring Indebtedness (or other items that are specifically excluded from the definition of Indebtedness) permitted under this Indenture (including activities reasonably incidental thereto, including performance of the terms and conditions of such Indebtedness (or other items that are specifically excluded from the definition of Indebtedness), to the extent such activities are otherwise permissible under this Indenture) and the granting of Liens permitted under Section 7.

(iv)    activities undertaken with the purpose of, and directly related to, fulfilling its obligations or exercising its rights under this Agreement, the Intercreditor Agreement (or any Additional Intercreditor Agreement), the Transaction Documents, any Senior Facilities Agreement, other Indebtedness (or any item specifically excluded from the definition of Indebtedness) permitted by the terms of this Agreement;

(v)    directly related or reasonably incidental to the establishment and/or maintenance of its or its Subsidiaries corporate existence;

(vi)     any activity undertaken in connection with the Transactions; or

(vii)    other activities not specifically enumerated above that are *de minimis* in nature.

## 16.   DEFINITIONS

**2025 Indenture** means this indenture in respect of the 2025 Notes (including any Additional 2025 Notes) as amended or supplemented from time to time.

**2025 Notes** means the $500,000,000 aggregate principal amount of notes issued under the 2025 Indenture on the date of this Agreement.

**2025 Notes Guarantee** means the guarantee by each Guarantor of the obligations under the 2025 Indenture and the 2025 Notes.

**Acquired Debt** means, with respect to any specified Person:

(1)     Indebtedness of any other Person existing at the time such other Person is merged with or into or became a Restricted Subsidiary of such specified Person, whether or not such Indebtedness is Incurred in connection with, or in contemplation of, such other Person merging with or into, or becoming a Restricted Subsidiary of, such specified Person; and

(2)     Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

**Additional 2025 Notes** means additional 2025 Notes (other than the initial 2025 Notes) issued from time to time under the 2025 Indenture, as part of the same series as the 2025 Notes.

**Affiliate Transaction** has the meaning given in Section 6.

**Asset Sale** means:

(1)     the sale, lease, conveyance or other disposition of any assets or rights; provided that the sale, lease, conveyance or other disposition of all or substantially all of the assets of the Company and its Restricted Subsidiaries taken as a whole will be governed by Clause 8 (Mandatory prepayment - Change of Control) and not by Section 5; and

(2)     the issuance or sale of Equity Interests in any of the Company's Restricted Subsidiaries (other than directors' qualifying shares or shares that are required by applicable law to be held by third parties).

Notwithstanding the preceding, none of the following items will be deemed to be an Asset Sale:

(1)     any single transaction or series of related transactions that involves assets of or Equity Interests in any Restricted Subsidiary having a Fair Market Value of less than the greater of $25.0 million and 10.0% of Consolidated EBITDA;

(2)     a transfer of assets or Equity Interests between the Company and any of its Restricted Subsidiaries or among any Restricted Subsidiaries;

(3)     an issuance or sale of Equity Interests by a Restricted Subsidiary of the Company to the Company or to another Restricted Subsidiary of the Company;

(4)     the sale, lease, sub-lease, assignment or other transfer of inventory, products, raw materials, receivables, services or other assets (including any real or personal property) in the ordinary course of business;

(5)     the sale or discounting of accounts receivable in the ordinary course of business and the disposition of receivables in connection with the compromise, settlement or collection thereof in the ordinary course of business or in bankruptcy or similar proceedings of any customers or vendors of the Company or any of its Restricted Subsidiaries;

(6)     any sale or other disposition of damaged, worn-out, obsolete or no longer useful assets or properties in the ordinary course of business (including the abandonment or other disposition of intellectual property that is, in the reasonable judgment of the Company, no longer economically practicable to maintain or useful in the conduct of the business of Company and its Restricted Subsidiaries taken as whole);

(7)     any sale of assets received by the Company or any of its Restricted Subsidiaries upon the foreclosure on a Lien;

(8)     the sale or other disposition of cash, Cash Equivalents or Government Guaranteed Securities;

(9)     a Restricted Payment that does not violate Section 2, or a Permitted Investment or any transaction specifically excluded from the definition of Restricted Payment or, solely for purposes of Section 5(c), asset sales, the proceeds of which are used to make such Restricted Payments, Permitted Investments or transactions specifically excluded from the definition of Restricted Payment;

(10)    any sale of Equity Interests in, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(11)    the granting of Liens not otherwise prohibited by this Agreement;

(12)    the foreclosure, condemnation or any similar action with respect to any property or other assets or the surrender, or waiver of contract rights or settlement, release or surrender of contract, tort or other claims;

(13)    any sale, transfer or other disposition of Receivables and related assets in connection with any Qualified Receivables Financing;

(14)    licenses and sublicenses granted by the Company or any of its Restricted Subsidiaries of software or intellectual property in the ordinary course of business;

(15)    the disposition of assets to a Person who is providing services (the provision of which have been or are to be outsourced by the Company or any Restricted Subsidiary to such Person) related to such assets;

(16)    any disposition with respect to property built, owned or otherwise acquired by the Company or any Restricted Subsidiary pursuant to customary sale and leaseback transactions, asset securitizations and other similar financings permitted by this Agreement; and

(17)    any disposition of Capital Stock of a Restricted Subsidiary pursuant to an agreement or other obligation with or to a Person (other than the Company or a Restricted Subsidiary) from whom such Restricted Subsidiary was acquired or from whom such Restricted Subsidiary acquired its business and assets (having been newly formed in connection with such acquisition), made as part of such acquisition and, in each case, comprising all or a portion of the consideration in respect of such sale or acquisition.

**Beneficial Owner** has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the U.S. Exchange Act, except that in calculating the beneficial ownership of any particular person (as that term is used in Section 13(d)(3) of the U.S. Exchange Act), such person shall be deemed to have beneficial ownership of all securities that such person has the right to acquire by conversion or exercise of other securities, whether such right is currently exercisable or is exercisable only after the passage of time.  The terms **Beneficially Owns** and **Beneficially Owned** have a corresponding meaning.

**Board of Directors** means:

(1)    with respect to a corporation, the board of directors or other governing body of the corporation or any committee thereof duly authorized to act on behalf of such board;

(2)    with respect to a partnership, the board of directors or other governing body of the general partner of the partnership;

(3)    with respect to a limited liability company, the board of directors or other governing body, and in the absence of the same, the manager or board of managers or the managing member or members or any controlling committee thereof; and

(4)    with respect to any other Person, the board or committee of such Person serving a similar function.

**Capital Stock** means:

(1)    in the case of a corporation, corporate stock;

(2)    in the case of an association or business entity that is not a corporation, any and all shares, interests, participations, rights or other equivalents (however designated) of corporate stock;

(3)    in the case of a partnership or limited liability company, partnership interests (whether general or limited) or membership interests; and

(4)    any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distributions of assets of, the issuing Person, but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any right of participation with Capital Stock.

**Cash Equivalents** means:

(1)    securities issued or directly and fully guaranteed or insured by any country or government, or any agency or instrumentality thereof (provided that the full faith and credit of the relevant country or government is pledged in support of those securities) or any supranational institution, in each case, provided that it has a rating of at least Aa3 (or the equivalent) by Moody's, AA- (or the equivalent) from S&P, or the equivalent credit rating from any other Rating Agency, having maturities of not more than one year from the date of acquisition;

(2)    certificates of deposit, money market deposits, time deposits and U.S. Dollar time deposits with maturities of one year or less from the date of acquisition, bankers' acceptances with maturities not exceeding one year and overnight bank deposits, in each case, with a bank or trust company which is organized under, or authorized to operate as a bank or trust company under, the laws of a member state of the European Union, or of the United States of America or any state thereof, the United Kingdom, Switzerland, Canada, Norway, Japan or Australia, or any other jurisdiction in which the Company or any Restricted Subsidiaries are engaged in business, having capital and surplus in excess of $500.0 million (or the foreign currency equivalent thereof) and an Investment Grade rating by S&P, Moody's or another Rating Agency;

(3)    repurchase obligations for underlying securities of the types described in clauses (1) and (2) of this definition entered into with any financial institution meeting the qualifications specified in clause (2) of this definition;

(4)    commercial paper having an Investment Grade rating by S&P, Moody's or another Rating Agency and, in each case, maturing within one year after the date of acquisition;

(5)      money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (1) through (4) of this definition;

(6)      with respect to a jurisdiction in which (a) the Company or a Restricted Subsidiary conducts its business or is organized and (b) it is not commercially practicable to make investments in clauses (1), (2) or (3) of this definition, demand or time deposit accounts, certificates of deposit, overnight or call deposits and money market deposits with any bank, trust company or similar entity, which would rank, in terms of combined capital and surplus and undivided profits or the ratings on its long-term dent, among the top five banks in such jurisdiction, in an amount not to exceed cash generated in or reasonably required for operation in such jurisdiction; and

(7)      other short-term investments utilized by Restricted Subsidiaries in accordance with normal investment practices for cash management; provided that such deposits do not exceed $30.0 million (or its equivalent in other currencies) in the aggregate at any date of determination thereafter.

**Cash Management Facilities** means any cash management agreement or arrangement including, without limitation, any treasury, cash pooling and/or other cash management services, treasury deposits, depository services, overdraft or other current account facilities, foreign exchange facilities, credit or debit card facilities, other automated payment facilities, electronic funds transfer, the collection of cheques and direct debits.

**Change of Control** means the occurrence of any of the following:

(1)      the direct or indirect sale, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the properties or assets of the Company and its Restricted Subsidiaries, in each case, taken as a whole, to any person (as that term is used in Section 13(d)(3) of the U.S. Exchange Act), other than the Permitted Holders; or

(2)      the consummation of any transaction (including, without limitation, any merger or consolidation), the result of which is that any person or group (as such terms are used in Sections 13(d) and 14(d) of the U.S. Exchange Act), other than the Permitted Holders, becomes the Beneficial Owner, directly or indirectly, of more than 50% of the voting power of the Voting Stock of the Company, provided that for the purposes of this clause, (x) no Change of Control shall be deemed to occur by reason of the Company becoming a Subsidiary of a Successor Parent and (y) any Voting Stock of which any Permitted Holder is the beneficial owner (as so defined) shall not be included in any Voting Stock of which any such person or group is the beneficial owner (as so defined), unless that person or group is not an affiliate of a Permitted Holder and has greater voting power with respect to that Voting Stock, provided, further, that prior to an Initial Public Offering, no person or group shall be deemed to acquire beneficial ownership of Voting Stock held by any other person or group solely by virtue of an agreement among all (but not some) holders of Voting Stock of the Company providing for (i) drag-along rights, tag-along rights, pre-emption rights, rights of first offer, rights of first refusal or other similar rights or (ii) an agreement among all (but not some) of such holders to vote in favor of a nominee for the Board of Directors of the Company proposed by one or more holders of such Voting Stock.

**Collateral** means those assets subject from time to time to a Lien in favor of the Security Agent under the Transaction Security Documents.

**Consolidated EBITDA** means, with respect to any specified Person for any period, the consolidated operating profit of such Person and its Restricted Subsidiaries (the **Reporting Group**) for such period before exceptional items, adjusted as follows without double counting:

(1)      plus (to the extent otherwise deducted) any deduction for or on account of corporation tax or other taxes on income or gains;

(2)     plus (to the extent otherwise deducted) any deduction for Fixed Charges or any other debt or equity finance related fee or cost or post-retirement benefit scheme costs charged to finance costs in accordance with IFRS;

(3)     less (to the extent otherwise included) any gain over book value arising in favor of a member of the Reporting Group on the disposal of any business or asset (other than inventory disposed of in the normal course of business) during such period and any gain arising on any revaluation of any business or asset during such period;

(4)     plus (to the extent otherwise deducted) any loss against book value incurred by a member of the Reporting Group on the disposal of any business or asset (other than inventory disposed of in the normal course of business) during such period and any loss on revaluation of any business or asset during such period;

(5)     plus (to the extent otherwise deducted) amortization of any goodwill or any intangible assets, including amortization of costs related to the incurrence of Indebtedness or the making of any acquisition or joint venture investment, in each case to the extent that acquisition or joint venture investment (as applicable) is permitted under this Agreement;

(6)     plus (to the extent otherwise deducted) any depreciation on, or impairment of, or write-down of, fixed assets, during such period;

(7)     excluding profits or losses on discontinued operations;

(8)     excluding unusual or non-recurring items and non-cash charges;

(9)     taking into account any exchange gains or losses, including any arising on translation of currency debt, and any hedging gains or losses relating to finance costs and any gains or losses on any financial instrument (other than any derivative instrument which is accounted for on a hedge accounting basis);

(10)    plus (to the extent otherwise deducted) any monitoring, consulting or advisory fees accrued or paid to or on behalf of the Equity Investors;

(11)    plus (to the extent otherwise deducted) all fees (including notarial fees), commissions, costs and expenses, stamp, registration and other Taxes incurred by such Person or any of its Restricted Subsidiary in connection with the Restructuring, the Scheme Documents, the 2025 Indenture, any Senior Facilities Agreements (whether before or after the date of this Agreement) and any equivalent amounts in connection with any acquisition, joint venture or disposal, incurrence of Indebtedness and Initial Public Offerings to the extent that such acquisition, joint venture or disposal, incurrence of indebtedness or Initial Public Offering (as applicable) is not prohibited under this Agreement;

(12)    plus (to the extent not otherwise included) the consolidated earnings from ordinary activities of any unconsolidated entities received as dividends or distributions by any member of the Reporting Group during such period;

(13)    plus (to the extent not otherwise included) the proceeds of any business interruption insurance;

(14)    excluding any gain arising from the direct or indirect acquisition of any debt instrument at a discount to par;

(15)    taking no account of any income or charge attributable to a post-employment benefit scheme other than the current service costs attributable to the scheme;

(16)    taking no account of any expense referable to equity settled share based compensation of employees or management; and

(17)    taking into account any adjustments made in accordance with Section 12.

Unless stated otherwise, the Consolidated EBITDA referred in this Agreement refers to the Consolidated EBITDA of the Company.

**Consolidated Net Income** means, with respect to any specified Person for any period, the aggregate of the Net Income of such Person and its Restricted Subsidiaries for such period, on a consolidated basis, determined in accordance with IFRS; provided that:

(1)    any extraordinary, unusual or nonrecurring gain, loss or charge (including, without limitation, pension expense, casualty losses, severance expenses, redundancy expenses, integration expenses, relocation expenses, other restructuring expenses and fees, expenses or charges related to any offering of Equity Interests of such Person, any recapitalization, any refinancing, any Investment, acquisition or Indebtedness permitted to be Incurred hereunder (in each case, whether or not successful) or any asset impairment charges or the financial impacts of natural disasters (including fire, flood and storm and related events)) shall be excluded;

(2)    any income or loss from discontinued operations and any net after-tax gain or loss on disposal of discontinued operations shall be excluded;

(3)    any gains or losses (**minus** all fees and expenses or transaction costs relating thereto) attributable to business dispositions or asset dispositions of the Company or any of its Restricted Subsidiaries (including pursuant to any sale leaseback transaction) other than in the ordinary course of business (as determined in good faith by the Board of Directors or senior management of the Company) shall be excluded;

(4)    any income or loss (**minus** all fees and expenses or transaction costs relating thereto) attributable to the early extinguishment of indebtedness and Hedging Obligations shall be excluded;

(5)    (A) the Net Income for such period of any Person that is not a Restricted Subsidiary, or that is accounted for by the equity method of accounting, shall be included only to the extent of the amount of dividends or distributions or other payments in respect of equity that are actually paid in cash or Cash Equivalents or Government Guaranteed Securities (or to the extent converted into cash or Cash Equivalents or Government Guaranteed Securities) by the referent Person to the Company or a Restricted Subsidiary thereof in respect of such period, (B) the Net Income for such period shall include any dividend, distribution or other payments in respect of equity paid in cash or Cash Equivalents or Government Guaranteed Securities (or to the extent converted into cash or Cash Equivalents or Government Guaranteed Securities) by such Person to the Company or a Restricted Subsidiary thereof in excess of the amount included in clauses (A) and (C) the net loss of any Person that is not a Restricted Subsidiary will be included only to the extent that such loss has been funded with cash by the specified Person or a Restricted Subsidiary of such Person;

(6)    any long-term incentive plan accruals that are not settled in cash and any non-cash compensation charge or expense realized from grants of stock appreciation or similar rights, stock options or other similar rights to officers, directors and employees of such Person or any of its Restricted Subsidiaries shall be excluded;

(7)    solely for the purpose of determining the amount available for Restricted Payments under Section 2(a)(iii), the Net Income of any Restricted Subsidiary (other than any Guarantor) will be excluded to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of that Net Income is not at the date of determination permitted without any prior governmental approval (that has not been obtained) or, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Restricted Subsidiary or its stockholders or members (other than (a) restrictions that have been waived or otherwise released or (b) restrictions permitted by Section 3; provided that Consolidated Net Income of such Person shall be included in Consolidated Net Income

**1002**

up to the aggregate amount of dividends or distributions or other payments that are actually paid in cash or Cash Equivalents or Government Guaranteed Securities (or to the extent converted into cash or Cash Equivalents or Government Guaranteed Securities) by such Person to the Company or another Restricted Subsidiary thereof in respect of such period, to the extent not already included therein;

(8)     the cumulative effect of a change in accounting principles shall be excluded;

(9)     any exchange gains or losses, including any arising on translation of currency debt, and any hedging gains or losses relating to finance costs and any gains or losses on any financial instrument (other than any derivative instrument which is accounted for on a hedge accounting basis), shall be excluded;

(10)    goodwill or other intangible asset impairment charge will be excluded;

(11)    any one time non-cash charges or any amortization or depreciation resulting from purchase accounting, in each case, in relation to any acquisition of another Person or business or resulting from any reorganization or restructuring involving the Company or its Subsidiaries will be excluded; and

(12)    the impact of capitalized, accrued or accreting or pay-in-kind interest or accreting principal on Subordinated Shareholder Debt shall be excluded.

**Consolidated Net Leverage** means, with respect to any specified Person as of any date of determination, the total amount of Indebtedness of such Person and its Restricted Subsidiaries (excluding any Indebtedness Incurred under clauses (1)(A), (6)(A) (unless it is secured by a Lien on the Collateral that ranks pari passu to the Facility, but still excluding any Indebtedness secured by a Lien described under clause (1)(b) of the definition of Permitted Collateral Liens), (6)(B), (8), (9), (10), (11), (12), (13), (16), (18) and (19) of Section 4(b)) less cash and Cash Equivalents of such Person and its Restricted Subsidiaries on a consolidated basis.

**Consolidated Net Leverage Ratio** means, with respect to any specified Person as of any date of determination, the ratio of (a) the Consolidated Net Leverage of such Person on such date to (b) the Consolidated EBITDA of such Person, in each case with any adjustments made in accordance with Section 12.

**Consolidated Senior Secured Net Leverage** means, with respect to any specified Person as of any date of determination, the sum without duplication of the total amount of Senior Secured Indebtedness of such Person and its Restricted Subsidiaries **less** cash and Cash Equivalents of such Person and its Restricted Subsidiaries on a consolidated basis.

**Consolidated Senior Secured Net Leverage Ratio** means, with respect to any specified Person as of any date of determination, the ratio of (a) the Consolidated Senior Secured Net Leverage of such Person on such date to (b) the Consolidated EBITDA of such Person in each case with any adjustments made in accordance with Section 12.

**Contingent Obligations** means, with respect to any Person, any obligation of such Person guaranteeing any leases, dividends or other obligations that do not constitute Indebtedness (**primary obligations**) of any other Person (the **primary obligor**) in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent:

(1)     to purchase any such primary obligation or any property constituting direct or indirect security thereof;

(2)     to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; or

(3)     to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation against loss in respect thereof.

**Covenant Suspension Event** has the meaning given in Section 10.

**Credit Facilities** means one or more debt facilities, instruments or arrangements or any revolving credit facility or commercial paper facilities, bankers' acceptances, overdraft facilities, indentures or trust deeds, in each case with banks or other institutional lenders or investors providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpose entities formed to borrow from such lenders against such receivables), LC and Bank Guarantees, bonds, notes, debentures or other corporate debt instruments, **Cash Management Facilities** or other Indebtedness, in each case, as amended, restated, modified, renewed, refunded, replaced (whether upon or after termination or otherwise) or refinanced (including by means of sales of debt securities to institutional investors) in whole or in part from time to time in one or more agreements or indentures (in each case with the same or new lenders or institutional investors or investors), including any agreement or indenture extending the maturity thereof or otherwise restructuring all or any portion of the indebtedness thereunder, increasing the amount loaned or issued thereunder, altering the maturity thereof, adding Subsidiaries of the Company as additional borrowers, issuers or guarantors thereunder or otherwise altering the terms and conditions thereof, and in each case including all agreements, instruments and documents executed and delivered pursuant to or in connection with the foregoing.

**Designated Non-cash Consideration** means the Fair Market Value of non-cash consideration received by the Company or one of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as **Designated Non-cash Consideration** pursuant to an Officer's Certificate, setting forth the basis of such valuation, **less** the amount of cash or Cash Equivalents received in connection with a subsequent sale of such Designated Non-cash Consideration.

**Designated Preference Shares** means, with respect to the Company or any Parent, preferred stock (other than Disqualified Stock) (1) that is issued for cash (other than to the Company or a Subsidiary of the Company or an employee stock ownership plan or trust established by the Company or any such Subsidiary for the benefit of their employees to the extent funded by the Company or such Subsidiary) and (2) that is designated as "Designated Preference Shares" pursuant to an Officer's Certificate of the Company at or prior to the issuance thereof, the net cash proceeds of which are excluded from the calculation set forth in Section 2(a)(C)(ii).

**Disqualified Stock** means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for which it is exchangeable, in each case, at the option of the holder of the Capital Stock), or upon the happening of any event, matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the holder of the Capital Stock, in whole or in part, on or prior to the date that is 91 days after the date on which the Facility matures; provided that if such Capital Stock is issued pursuant to any plan for the benefit of employees of the Company or any Restricted Subsidiary of the Company, such Capital Stock shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Company or any such Restricted Subsidiary in order to satisfy applicable statutory or regulatory obligations. Notwithstanding the preceding sentence, any Capital Stock will not constitute Disqualified Stock solely because the holders of the Capital Stock have the right to require the Company or any Restricted Subsidiary to repurchase such Capital Stock upon the occurrence of a change of control or an asset sale. The amount of Disqualified Stock deemed to be outstanding at any time for purposes of this Agreement will be the maximum amount that the Company and its Restricted Subsidiaries may become obligated to pay upon the maturity of, or pursuant to any mandatory redemption provisions of, such Disqualified Stock, exclusive of accrued dividends. The term **Disqualified Stock** shall also include any options, warrants or other rights that are convertible into Disqualified Stock or that are redeemable at the option of the holder or required to be redeemed, prior to the date that is 91 days after the date on which the Facility matures.

**Equity Interests** means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt security that is convertible into, or exchangeable for, Capital Stock).

**Equity Investors** means any equity holder holding more than 10.0% of the voting power of the Voting Stock of the Company on the date of this Agreement plus any affiliates and related parties.

**Equity Offering** means an offering of Capital Stock (other than an offering to the Company or any of its Restricted Subsidiaries) (a) of the Company (other than Disqualified Stock of the Company), other than an offering pursuant to a registration statement on Form S-8 or otherwise relating to equity securities issuable under any employee benefit plan of the Company, or (b) the net proceeds of which are contributed to the equity capital of the Company or any Restricted Subsidiary (other than through the issuance of Disqualified Stock) or as Subordinated Shareholder Debt.

**European Union** means the European Union as of January 1, 2004, including the countries of Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, Sweden and the United Kingdom, but not including any country which becomes a member of the European Union after January 1, 2004.

**Excluded Contributions** means the aggregated net cash proceeds and the Fair Market Value of property, assets and marketable securities received by the Company after the date of this Agreement from:

(1)     contributions to its common equity capital,

(2)     the sale or issuance (other than to a Subsidiary of the Company) of Capital Stock (other than Disqualified Stock) of the Company, and

(3)     Subordinated Shareholder Debt;

in each case designated as **Excluded Contributions** pursuant to an Officer's Certificate of the Company (which shall be designated no later than the date on which such Excluded Contribution has been received by the Company), the net cash proceeds of which are excluded from the calculation set forth in Section 2(a)(C)(ii).

**Fair Market Value** means the value that would be paid by a willing buyer to an unaffiliated willing seller in a transaction not involving distress or necessity of either party, determined in good faith by an Authorised Person (unless otherwise provided in this Agreement).

**Fitch** means Fitch Ratings, Ltd, and its successors.

**Fixed Charges** means, with respect to any specified Person for any period, the sum, without duplication, of:

(1)     the consolidated interest expense (net of interest income) of such Person and its Restricted Subsidiaries for such period, whether paid or accrued, excluding amortization of debt issuance costs and the expensing of any bridge or other financing fees, expenses and commissions, but including original issue discount, non-cash interest payments (but excluding any non-cash interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments), the interest component of any deferred payment obligations (classified as Indebtedness under this Agreement), the interest component of all payments associated with Lease Obligations and net of the effect of all payments made or received pursuant to Hedging Obligations in respect of interest rates; **plus**

(2)     the consolidated interest expense of such Person and its Restricted Subsidiaries that was capitalized during such period; **plus**

(3)     all cash dividend payments or other cash distributions on any series of preferred stock of such Person and all other dividend payments or other distributions on the Disqualified Stock of such Person (other than dividends or distributions payable to the Company or any Restricted Subsidiary),

in each case, on a consolidated basis and in accordance with IFRS, but not, in each case, including any non-cash interest expense relating to Subordinated Shareholder Debt and any interest paid or payable on Indebtedness between the Company and any of its Restricted Subsidiaries or between any Restricted Subsidiary and any other Restricted Subsidiary.

**Fixed Charge Coverage Ratio** means, with respect to any specified Person for any period, the ratio of (a) Consolidated EBITDA of such Person for such period to (b) the Fixed Charges of such Person for such period in each case with any adjustments made in accordance with Section 12.

**Government Guaranteed Securities** means:

(1)     securities issued or directly and fully guaranteed or insured by the U.S. government or any agency or instrumentality thereof (other than Cash Equivalents) and in each case with maturities not exceeding two years from the date of acquisition;

(2)     corresponding instruments by any member state of the European Union (provided that such member state has one of the two highest ratings obtainable from Moody's or S&P) or Switzerland or Norway or Japan or the United Kingdom, or any agency or instrumentality of any member state of the European Union (provided that such member state has one of the two highest ratings obtainable from Moody's or S&P) or Switzerland or Norway or Japan or the United Kingdom and in each case with maturities not exceeding two years from the date of acquisition; and

(3)     investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) of this definition which fund may also hold immaterial amounts of cash pending investment and/or distribution.

**guarantee** means a guarantee other than by endorsement of negotiable instruments for collection or deposit in the ordinary course of business of all or any part of any Indebtedness (whether arising by agreements to keep-well, to take or pay or to maintain financial statement conditions, pledges of assets or otherwise).

**Hedging Obligations** means, with respect to any specified Person, the obligations of such Person under:

(1)     interest rate swap agreements (whether from fixed to floating or from floating to fixed), interest rate cap agreements and interest rate collar agreements;

(2)     other agreements or arrangements designed to manage interest rates or interest rate risk; and

(3)     other agreements or arrangements designed to protect such Person against fluctuations in currency exchange rates or commodity prices.

**Holdco Liquidation Payment** means a payment to fund the liquidation costs of KCA Deutag Alpha II Limited, KCAD Holdings I Limited, KCAD Holdings II Limited, KCA Deutag Finance I Limited, KCA Deutag Finance II Limited, KCA Deutag Midco Limited, Land Rig Ventures I Limited, Land Rig Ventures II Limited and KCA Deutag Drilling Rigs I Limited in accordance with the Scheme Documents.

**IFRS** means the international accounting standards promulgated by the International Accounting Standards Board and its successors, as adopted by the European Union or the United Kingdom, as in effect from time to time, unless otherwise stated; provided that at any date after the date of this Agreement, the Company may make an irrevocable election to establish that IFRS shall mean, except as otherwise specified herein, IFRS as in effect on a date that is on or prior to the date of such election.

**Incur** means create, incur, issue, assume, guarantee or otherwise become liable with respect to; and the terms **Incurs**, **Incurred** and **Incurrence** have meanings correlative to the foregoing; **provided,** however, that any Indebtedness or Capital Stock of a Person existing at the time such Person becomes a Restricted Subsidiary, whether by merger, consolidation, acquisition or otherwise, will be deemed to be Incurred by such Restricted Subsidiary at the time it becomes a Restricted Subsidiary and any Indebtedness pursuant to any revolving credit or similar facility shall only be Incurred at the time any funds are borrowed thereunder).

**Indebtedness** means, with respect to any specified Person, any indebtedness of such Person (excluding accrued expenses and trade payables):

(1)      in respect of borrowed money;

(2)      evidenced by bonds, notes, debentures or similar instruments or letters of credit (or reimbursement agreements in respect thereof); provided that any counter-indemnity or reimbursement obligation under a letter of credit shall be considered Indebtedness only to the extent that the underlying obligation in respect of which the letter of credit has been issued would also be Indebtedness;

(3)      in respect of banker's acceptances;

(4)      representing Lease Obligations;

(5)      representing the balance deferred and unpaid of the purchase price of any property or services due more than one year after such property is acquired or such services are completed, unless being disputed in good faith;

(6)      representing any Hedging Obligations (provided that the amount of Indebtedness under Hedging Obligations of a Person will be calculated by reference to the net liability of such Person thereunder (as determined in accordance with IFRS as of the date of the most recent financial statements available at the date of determination)); or

(7)      the principal amount of any Disqualified Stock of the Company or any preferred stock of any Restricted Subsidiary,

if and to the extent any of the preceding items (other than letters of credit and Hedging Obligations) would appear as a liability upon a balance sheet (excluding the notes thereto) of the specified Person prepared in accordance with IFRS.  In addition, the term **Indebtedness** includes (i) all Indebtedness of others secured by a Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person); **provided, however**, that the amount of such Indebtedness shall be the lesser of (x) the Fair Market Value of such asset as of such date of determination and (y) the amount of such Indebtedness of such other Person; and (ii) to the extent not otherwise included, the guarantee by the specified Person of any Indebtedness of any other Person to the extent guaranteed by such Person.

Notwithstanding the foregoing, **Indebtedness** shall not include any

(A)      Subordinated Shareholder Debt,

(B)      Contingent Obligations Incurred in the ordinary course of business,

(C)      in connection with the purchase by the Company or any Restricted Subsidiary of any business, any post-closing payment adjustments to which the seller may become entitled to the extent such payment is determined by a final closing balance sheet or such payment depends on the performance of such business after the closing; **provided, however**, that, at the time of closing, the amount of any such payment is not determinable and, to the extent such payment thereafter becomes fixed and determined, the amount is paid within 30 days thereafter,

(D)      for the avoidance of doubt, any contingent obligations in respect of workers' compensation claims, early retirement or termination obligations, pension fund obligations or contributions or similar claims, obligations or contributions or social security or wage Taxes,

(E)      Qualified Receivables Financing; or

(F)    deferred or prepaid revenues, including prepayments or deposits received from clients or customers, in each case, in the ordinary course of business.

**Initial Public Offering** means an Equity Offering of common stock or other common equity interests of the Company or any Parent or any successor of the Company or any Parent (the **IPO Entity**) following which there is a Public Market and, as a result of which, the shares of common stock or other common equity interests of the IPO Entity in such offering are listed on an internationally recognized exchange or traded on an internationally recognized market.

**Investment Grade Rating** means a rating equal to or higher than Baa3 (or the equivalent) by Moody's, BBB- (or the equivalent) by S&P or the equivalent investment grade credit rating from any other Rating Agency.

**Investments** means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affiliates) in the forms of loans (including guarantees or other obligations), advances or capital contributions (excluding accounts receivable, trade credit and advances to customers or suppliers and commission, travel and similar advances to officers, employees and consultants made in the ordinary course of business), purchases or other acquisitions for consideration of Indebtedness, Equity Interests or other securities issued by any other Person, together with any investments that are required under IFRS to be classified as investments on a balance sheet (excluding the notes thereto) of such Person in the same manner as other investments included in this definition and to the extent such transactions involve the transfer of cash or other property.  If the Company or any Subsidiary of the Company sells or otherwise disposes of any Equity Interests of any direct or indirect Restricted Subsidiary of the Company such that, after giving effect to any such sale or disposition, such Person is no longer a Restricted Subsidiary of the Company, the Company will be deemed to have made an Investment on the date of any such sale or disposition equal to the Fair Market Value of the Company's Investments in such Restricted Subsidiary that were not sold or disposed of.  Except as otherwise provided in this Agreement, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

**IPO Entity** has the meaning assigned to it in the definition of **Initial Public Offering**.

**IPO Market Capitalization** means an amount equal to (1) the total number of issued and outstanding shares of common stock or common equity interests of the IPO Entity at the time of closing of the Initial Public Offering multiplied by (2) the price per share at which such shares of common stock or common equity interests are sold in such Initial Public Offering.

**LC and Bank Guarantee** means any letters of credit, bank guarantee, completion or performance bond, bid/tender bond, custom bond, advance payment guarantee, tax bond, surety bonds, appeal bonds, rent guarantee bonds or any similar obligation used by the Company or any of its Restricted Subsidiaries in the ordinary course of business or consistent with past practice, including issuance of any back to back letters of credit, guarantees or similar instruments in favor of an issuer of any such instrument.

**Lien** means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respect of such asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention agreement, any lease in the nature thereof.

**Lease Obligation** means an obligation that is required to be classified and accounted for as a lease for financial reporting purposes on the basis of IFRS. The amount of Indebtedness will be, at the time any determination is to be made, the amount of such obligation required to appear on a balance sheet (excluding any notes thereto) prepared in accordance with IFRS, and the Stated Maturity thereof will be the date of the last payment of rent or any other amount due under such lease prior to the first date such lease may be terminated without penalty.

**Management** means any members of management of any Parent, the Company or any Restricted Subsidiary of the Company (for this purpose including any person who was a member of management when acquiring an interest) or any former member of management and/or any other person directly or indirectly holding any interest pursuant to a MIP.

**1008**

**Management Advances** means, loans or advances made to, or guarantees with respect to loans or advances made to, Management, directors, current or former officers, employees or consultants of any Parent, the Company or any Restricted Subsidiary of the Company (or to any trust or other entity holding shares or other investments in connection with any MIP):

(1)     in respect of travel, entertainment or moving related expenses Incurred in the ordinary course of business;

(2)     in respect of moving related expenses Incurred in connection with any closing or consolidation of any facility or office; or

(3)     (in the case of this clause (3)) in the ordinary course of business or consistent with past practice not to exceed the greater of $5.0 million and 2.0% of Consolidated EBITDA in the aggregate at any one time outstanding, subject to the approval of the Board of Directors of the Company.

**Market Capitalization** means an amount equal to (i) the total number of issued and outstanding shares of common stock or common equity interests of the IPO Entity on the date of the declaration of the relevant dividend multiplied by (ii) the arithmetic mean of the closing prices per share of such common stock or common equity interests for the 30 consecutive trading days immediately preceding the date of declaration of such dividend.

**MIP** means any management equity plan, employee benefit scheme, incentive scheme or other similar or equivalent arrangement.

**MIP Payment** means any payment or transaction which is, or which is to be made, entered into or used directly or indirectly (or to facilitate any such step or payment):

(1)     to make payment to a member of any MIP (including payments to members leaving any MIP) or any trust or other person in respect of any MIP or pay any costs and expenses properly incurred in the establishing and maintaining of any MIP (provided that, for the avoidance of doubt, nothing in this Agreement shall prohibit any payments to, or the acquisition of shares or other interests or investments of, employees or Management); and/or

(2)     for repayment or refinancing of amounts outstanding under any loan made in connection with an MIP or capitalisation of such loans.

**Moody's** means Moody's Investors Service, Inc. and its successors and assigns.

**Net Income** means, with respect to any Person for any period, the net income (loss) of such Person for such period, determined in accordance with IFRS and before any reduction in respect of dividends on preferred stock.

**Net Proceeds** means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of any Asset Sale (including, without limitation, any cash received upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding the assumption by the acquiring Person of Indebtedness relating to the disposed assets or other consideration received in any non-cash form), net of the direct costs relating to such Asset Sale and the sale of such Designated Non-cash Consideration, including, without limitation, legal, accounting and investment banking fees, and sales commissions, and any relocation expenses Incurred as a result of the Asset Sale or Taxes paid or payable as a result of the Asset Sale, in each case, after taking into account any available tax credits or deductions and any tax sharing arrangements, and amounts required to be applied to the repayment of Indebtedness, other than Indebtedness under a Credit Facility, secured by a Lien on the asset or assets that were the subject of such Asset Sale and any reserve for adjustment in respect of the sale price of such asset or assets established in accordance with IFRS, including without limitation, pension

**1009**

and post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction.

**Notes Offer** means an offer to the redeem any Public Debt that is Pari Passu Indebtedness pursuant to the terms of any Indenture.

**Obligations** means any principal, interest, penalties, fees, indemnifications, reimbursements, damages and other liabilities payable under the documentation governing any Indebtedness.

**Officer** means, with respect to any Person, the chairman of the Board of Directors, the chief executive officer, the president, the chief operating officer, the chief financial officer, the head of treasury, the treasurer, any assistant treasurer, the head of corporate development, the head of group accounting, the controller, the secretary, any senior vice president, any vice president or any assistant vice president of such Person or any other Person that the Board of Directors of such Person shall designate for such purpose.

**Officer's Certificate** means a certificate signed on behalf of the Company by an Officer of the Company that meets the requirements of this Agreement.

**Opinion of Counsel** means a written opinion from legal counsel reasonably satisfactory to the Bank.

**Ordinary Course Lease Obligations** means any Lease Obligation relating to property or assets in which a significant portion of the risks and rewards of ownership are not transferred to the Company or any Restricted Subsidiary as lessee and are Incurred in the ordinary course of business (in the good faith determination of the Company).

**Parent** means any direct or indirect parent company or entity of the Company and where specified any direct or indirect parent company or entity of the specified entity.

**Pari Passu Indebtedness** means any Indebtedness of the Company or any Guarantor that is pari passu in right of payment to the Facility.

**Permitted Business** means the businesses, services or activities of the Company and its Subsidiaries and joint ventures engaged in on the date of this Agreement and any other businesses, services or activities that are similar, incidental, complementary, ancillary or reasonably related to, or a reasonable extension, expansion or development of, such businesses.

**Permitted Collateral Liens** means:

(1)     (a) Liens on the Collateral that are described in one or more clauses (4), (8), (12), (13), (15), (17), (18), (20), (22), (23), (24), (26), (27), (29), (30), (31) and (32) of the definition of Permitted Liens and that, in each case, would not materially interfere with the ability of the Security Agent to enforce any Lien over the Collateral and (b) Liens on assets that only constitute part of the Collateral because such assets are subject to a floating charge for the benefit of (or to secure) the Facility that are described in one or more clauses of the definition of Permitted Liens;

(2)     Liens on the Collateral to secure Indebtedness:

(a)     pursuant to the 2025 Notes (or the 2025 Notes Guarantees) (excluding any Additional 2025 Notes (or any guarantee of Additional 2025 Notes)) and Permitted Refinancing Indebtedness in respect thereof (and Permitted Refinancing Indebtedness in respect of such Permitted Refinancing Indebtedness;

(b)     pursuant to Section 4(b)(1), which Indebtedness (up to an aggregate amount not exceeding the greater of (x) $225.0 million and (y) 100% of Consolidated EBITDA at any time and with any Indebtedness under any Cash Management Facilities to be calculated on a net basis to the extent permitted under the relevant Cash Management Facility) may have

super senior priority status in respect of the proceeds from the enforcement of the Collateral;

(c)    pursuant to Section 4(b)(1)(B), Section 4(b)(17) and Section 4(b)(22) and Permitted Refinancing Indebtedness in respect of any of such Indebtedness (and Permitted Refinancing Indebtedness in respect of such Permitted Refinancing Indebtedness);

(d)    pursuant to Sections 4(b)(6) (but with respect to Lease Obligations covering only the assets acquired, improved, constructed, leased with or financed by such Indebtedness, the shares of entities that own such assets, and receivables and bank accounts therefrom);

(e)    pursuant to Section 4(b)(10) and Hedging Obligations in connection with any Senior Notes; which may have super senior priority status in respect of the proceeds from the enforcement of the Collateral;

(f)    pursuant to Section 4(b)(11) (to the extent such guarantee is in respect of Indebtedness otherwise permitted to be secured and is specified in this definition of Permitted Collateral Liens);

(g)    pursuant to Section 4(b)(14) and Section 4(b)(15) and Permitted Refinancing Indebtedness in respect of any of such Indebtedness (and Permitted Refinancing Indebtedness in respect of such Permitted Refinancing Indebtedness);

(h)    pursuant to Section 4(b)(12)(A) and Section 4(b)(19);

(i)    on a basis junior to the Liens on such Collateral securing the Facility and Permitted Refinancing Indebtedness in respect thereof (and Permitted Refinancing Indebtedness in respect of such Permitted Refinancing Indebtedness); and

(j)    solely with respect to Collateral securing any Senior Notes or guarantees in respect thereof, Indebtedness issued or borrowed by any issuer of Senior Notes and the guarantees in respect thereof; provided that such Liens rank junior to the Liens on the same Collateral securing the Facility;

provided, that with respect to this clause (2) each of the secured parties to any such Indebtedness (acting directly or through its respective creditor representative) will have entered into the Intercreditor Agreement or an Additional Intercreditor Agreement; provided, further that subject to the Agreed Security Principles all property and assets (including, without limitation, the Collateral) of the Company or any Restricted Subsidiary securing such Indebtedness (including any guarantees thereof) or Permitted Refinancing Indebtedness secure the Facility on a senior or pari passu basis, except to the extent provided in clauses (b) and (e) above.

For purposes of determining compliance with this definition, (w) a Lien need not be Incurred solely by reference to one category of Permitted Collateral Liens described in this definition, but may be Incurred under any combination of such categories (including in part under one such category and in part under any other such category), (x) in the event that a Lien (or any portion thereof) meets the criteria of one or more of such categories of Permitted Collateral Liens, the Company shall, in its sole discretion, classify or reclassify such Lien (or any portion thereof) in any manner that complies with this definition, (y) the principal amount of Indebtedness secured by a Lien outstanding under any category of Permitted Collateral Liens shall be determined after giving effect to the application of proceeds of any such Indebtedness to refinance any such other Indebtedness, and (z) any Lien securing Indebtedness that was permitted to secure such Indebtedness at the time of the Incurrence of such Indebtedness shall also be permitted to secure any increase in the amount of such Indebtedness in connection with the accrual of interest, the accretion of accreted value, the payment of interest in the form of additional Indebtedness and the payment of dividends on Capital Stock constituting Indebtedness in the form of additional shares of the same class of Capital Stock.

**Permitted Debt** has the meaning given in Section 4.

**Permitted Holders** means each of (a) the Equity Investors and Related Parties (other than the Company and any of its Restricted Subsidiaries), (b) any person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which the Bank has not required a prepayment and cancellation pursuant to Clause 8 (Mandatory prepayment - Change of Control), together with its Affiliates, (c) any group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act as in effect on the date of this Agreement) of which any of the foregoing are members, provided that in the case of such group and without giving effect to the existence of such group or any other group, the persons referred to in clauses (a) and (b) above, collectively, have beneficial ownership, directly or indirectly, of more than 50% of the total voting power of the Voting Stock of the Company or any of its direct or indirect parent entities held by such group, and (d) any person acting as an underwriter in connection with any public or private offering of the common stock or other common equity interests of the Company or any of its direct or indirect parent entities.

**Permitted Investments** means:

(1)     any Investment in the Company or in a Restricted Subsidiary of the Company;

(2)     any Investment in cash, Cash Equivalents or Government Guaranteed Securities;

(3)     any Investment by the Company or any Restricted Subsidiary of the Company in a Person, if as a result of such Investment:

    (a)     such Person becomes a Restricted Subsidiary of the Company; or

    (b)     such Person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company, and, in each of cases (a) and (b), any Investment then held by such Person; provided that any such Investment was not made by such Person in connection with, or in anticipation or contemplation of, such Person becoming a Restricted Subsidiary of the Company or such merger, consolidation, amalgamation, transfer, conveyance or liquidation;

(4)     any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant to and in compliance with Section 5 or any acquisition or other Investment made in accordance with Section 5(c);

(5)     any Investment the payment for which consists of Equity Interests (other than Disqualified Stock) of the Company or any Parent (which Investment, in the case of any Parent, is contributed to the common equity capital of the Company; provided that any such contribution shall be excluded from Section 2(a)(C)(ii);

(6)     any Investments received (i) in compromise or resolution of (A) obligations of trade creditors or customers that were Incurred in the ordinary course of business of the Company or any of its Restricted Subsidiaries, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade creditor or customer; or (B) litigation, arbitration or other disputes; or (ii) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(7)     Investments represented by Hedging Obligations;

(8)     [Reserved];

(9)     guarantees issued in accordance with Section 4;

**1012**

(10)    any Investment existing, or made pursuant to binding commitments existing, on the date of this Agreement and any Investment that replaces, refinances or refunds such Investment; provided that the new Investment is in an amount that does not exceed the amount replaced, refinanced or refunded, and is made in the same Person as the Investment replaced, refinanced or refunded;

(11)    Investments consisting of purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of intellectual property, in each case in the ordinary course of business;

(12)    additional Investments by the Company or any Restricted Subsidiary having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), taken together with all other Investments made pursuant to this clause (12) that are at the time outstanding not to exceed the greater of $80.0 million and 35.0% of Consolidated EBITDA; **provided**, **however**, that if any Investment pursuant to this clause (12) is made in a Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) of this definition and shall cease to have been made pursuant to this clause (12);

(13)    Investments in joint ventures or in any Unrestricted Subsidiary of the Company or any of its Restricted Subsidiaries having an aggregate Fair Market Value (measured on the date each such Investment was made and without giving effect to subsequent changes in value), taken together with all other Investments made pursuant to this clause (13) that are at the time outstanding not to exceed the greater of $80.0 million and 35.0% of Consolidated EBITDA; provided, however, that if an Investment is made pursuant to this clause (13) in a Person that is not a Restricted Subsidiary of the Company at the date of the making of such Investment and such Person becomes a Restricted Subsidiary of the Company after such date, such Investment shall thereafter be deemed to have been made pursuant to clause (1) of this definition and shall cease to have been made pursuant to this clause (13);

(14)    any Investments made in connection with a Qualified Receivables Financing, including Investments of funds held in accounts permitted or required by the arrangements governing such Qualified Receivables Financing or any related indebtedness;

(15)    Investments in the 2025 Notes, any Additional 2025 Notes and any other Indebtedness of the Company or any of its Restricted Subsidiaries; and

(16)    Investments contemplated by the Restructuring.

**Permitted Liens** means:

(1)    Liens in favor of the Company or any Restricted Subsidiary;

(2)    Liens on property (including Capital Stock) of a Person existing at the time such Person becomes a Restricted Subsidiary or is merged with or into or consolidated with the Company or any Restricted Subsidiary of the Company; provided that such Liens were in existence prior to, and not Incurred in contemplation of, such Person becoming a Restricted Subsidiary or such merger or consolidation, and do not extend to any assets other than those of the Person that becomes a Restricted Subsidiary or is merged into or consolidated with the Company or the Restricted Subsidiary;

(3)    Liens on property (including Capital Stock) existing at the time of acquisition of the property by the Company or any Subsidiary of the Company; provided that such Liens were in existence prior to, such acquisition, and not Incurred in contemplation of, such acquisition and do not extend to any property other than the property so acquired by the Company or such Restricted Subsidiary;

(4)    Liens to secure Indebtedness permitted by Section 4(b)(12) and Liens or deposits to secure the performance of tenders, trade contracts, insurance, guarantees, leases, bids, statutory or regulatory

**1013**

obligations, or surety, appeal, indemnity or performance bonds, warranty, contractual, netting or set-off requirements or other obligations of a like nature Incurred in the ordinary course of business or consistent with past practice;

(5)     Liens securing reimbursement obligations with respect to commercial letters of credit which encumber documents and other assets relating to such letters of credit and products and proceeds thereof;

(6)     Liens to secure Lease Obligations permitted to be Incurred pursuant to Section 4 covering only the assets acquired with or financed by such Lease Obligation;

(7)     Liens existing on the date of this Agreement;

(8)     Liens for Taxes, assessments or governmental charges or claims that are not yet delinquent or that are being contested in good faith by appropriate proceedings; provided that any reserve or other appropriate provision as is required in conformity with IFRS has been made therefor;

(9)     Liens created for the benefit of (or to secure) the Facility;

(10)    (a) Liens (other than on rigs owned by any Guarantor) securing Indebtedness or other obligations of the Company or any of its Restricted Subsidiaries at any time outstanding that do not exceed the greater of $90.0 million and 37.5% of Consolidated EBITDA and (b) Liens securing Indebtedness permitted by Section 4(b)(22);

(11)    Liens arising under licenses of intellectual property in the ordinary course of business;

(12)    Liens to secure any Cash Management Facilities including in respect of any netting or setting off arrangements;

(13)    Liens arising under retention of title, extended retention of title (including, without limitation, verlängerter Eigentumsvorbehalt), or conditional sale arrangements in the ordinary course of trading and on arm's length terms;

(14)    Liens on equipment of the Company or any Restricted Subsidiary granted in the ordinary course of business to clients upon whose property or premises such equipment is located;

(15)    Liens imposed by law (including, without limitation, Liens in favor of customers for equipment under order or in respect of advances paid in connection therewith), such as carriers', warehousemen's, landlord's, lessor's, suppliers, banks, repairmen's and mechanics' Liens, and Liens of landlords securing obligations to pay lease payments that are not yet due and payable or in default, including, without limitation, any security in favor of landlords or warehouse operators (Pfandrecht des Vermieters oder Lagerhalters) arising solely by operation of law in favor of the relevant third party landlord or warehouse operator under a lease or warehousing agreement, in each case, Incurred in the ordinary course of business;

(16)    Liens on property or assets (including Equity Interests) at the time the Company or a Restricted Subsidiary acquired such property or assets, including any acquisition by means of a merger or consolidation with or into the Company or any Restricted Subsidiary; provided, however, that such Liens are not created or Incurred in connection with, or in contemplation of, such acquisition; provided, further, that the Liens may not extend to any other property owned by the Company or any Restricted Subsidiary;

(17)    Liens Incurred or deposits made in the ordinary course of business to secure payment of workers' compensation or to participate in any fund in connection with workmen's compensation, unemployment insurance, pensions or other social security programs including, without limitation, section 8a of the German Act on Partial Retirement (Altersteilzeitgesetz) or section 7e of the German Social Security Code, Part IV (Sozialgesetzbuch IV);

(18)     easements, rights of way, zoning and similar restrictions, reservations (including severances, leases or reservations of oil, gas, coal, minerals or water rights), restrictions or encumbrances in respect of real property or title defects that were not Incurred in connection with Indebtedness and that do not in the aggregate materially adversely affect the value of said properties (as such properties are used by the Company or its Subsidiaries) or materially impair their use in the operation of the business of the Company and its Subsidiaries;

(19)     Liens to secure any Permitted Refinancing Indebtedness permitted to be Incurred under this Agreement; provided, however, that:

(a)     the new Lien shall be limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the original Lien arose, could secure the original Lien (plus improvements and accessions to such property or proceeds or distributions thereof); and

(b)     the Indebtedness secured by the new Lien is not increased to any amount greater than the sum of (x) the original principal amount, or, if greater, committed amount, of the Indebtedness being renewed, refunded, refinanced, replaced, defeased or discharged with such Permitted Refinancing Indebtedness and (y) an amount necessary to pay any fees and expenses, including premiums, related to such renewal, refunding, refinancing, replacement, defeasance or discharge;

(20)     Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(21)     Liens on Capital Stock of an Unrestricted Subsidiary that secure Indebtedness or other obligations of such Unrestricted Subsidiary;

(22)     Liens securing insurance premium financing arrangements; provided that such Lien is limited to the applicable insurance contracts;

(23)     Liens arising by way of set-off or pledge (in favor of the account holding bank) arising by operation of law or under standard banking terms and conditions provided that the relevant bank account has not been set up nor has the relevant credit balance arisen in order to implement a secured financing;

(24)     Liens on escrowed proceeds for the benefit of related holders of debt securities or other Indebtedness (or the underwriter or arrangers thereof) or on cash set aside at the time of the Incurrence of any Indebtedness or government securities purchased with such cash;

(25)     Liens securing Hedging Obligations permitted pursuant to Section 4(b)(10);

(26)     Liens on property or assets under construction (and related rights) in favor of a contractor or developer or arising from progress or partial payments by a third party relating to such property or assets;

(27)     Liens on specific items of inventory or other goods (and the proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances issued or created in the ordinary course of business for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(28)     [Reserved];

(29)     Leases (other than Lease Obligations), licenses, subleases and sublicenses of assets in the ordinary course of business;

(30)     Liens on Receivables and related assets Incurred in connection with a Qualified Receivables Financing (including Liens encumbering cash deposits in bank accounts established in connection with a

**1015**

Qualified Receivables Financing and Liens encumbering cash and Cash Equivalents collected from Receivables that are part of or subject to a Qualified Receivables Financing);

(31) bankers' Liens, rights of set-off or similar rights and remedies as to deposit accounts (including any Lien created or subsisting over any asset held in any securities depository or any clearing house pursuant to the standard terms and procedures of the relevant securities depository or clearing house applicable in the normal course of trading), Liens arising out of judgments or awards not constituting an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made;

(32) Liens on cash, Cash Equivalents or other property arising in connection with the defeasance, discharge or redemption of Indebtedness;

(33) limited recourse Liens in respect of the ownership interests in, or assets owned by, any joint ventures which are not Restricted Subsidiaries securing obligations of such joint ventures;

(34) Liens on any proceeds loan made by the Company or any Restricted Subsidiary in connection with any future Incurrence of Indebtedness permitted under this Agreement and securing that Indebtedness;

(35) any interest or title of a lessor under any operating lease;

(36) Liens on assets or property of a Restricted Subsidiary of the Company (other than a Guarantor) securing Indebtedness of such Restricted Subsidiary or another Restricted Subsidiary (other than a Guarantor);

(37) Liens over cash paid into an escrow account pursuant to any purchase price retention arrangement as part of any permitted disposal by the Company or a Restricted Subsidiary on condition that the cash paid into such escrow account in relation to a disposal does not represent more than 15% of the net proceeds of such disposal; and

(38) Liens securing Indebtedness under Section 4(b)(1) to the extent such Lien is not able or required to be granted to secure the Facility pursuant to the Agreed Security Principles.

**Permitted Payments to Parent** means, without duplication as to amounts:

(1) customary indemnification obligations of any Parent owing to directors, officers, employees or other Persons under its charter or by-laws or pursuant to written agreement with any such Person to the extent relating to the Company and its Subsidiaries;

(2) payments to any Parent to pay fees and expenses (including franchise or similar Taxes and fees and expenses properly Incurred in the ordinary course of business to auditors and legal advisors) required to maintain its corporate existence, customary salary, bonus and other benefits payable to officers and employees of any Parent of the Company and general corporate overhead expenses of any Parent of the Company, director's and officer's insurance to the extent such fees and expenses are attributable to the ownership or operation of the Company and its Subsidiaries not to exceed the greater of $5.0 million and 2.0% of Consolidated EBITDA in any 12 month period;

(3) for so long as the Company is a member of a group filing a consolidated or combined tax return with any Parent, payments to any Parent in respect of an allocable portion of the tax liabilities of such group that is attributable to the Company and its Subsidiaries (**Tax Payments**). The Tax Payments shall not exceed the lesser of (i) the amount of the relevant Tax (including any penalties and interest) that the Company would owe if the Company were filing a separate tax return (or a separate consolidated or combined return with its Subsidiaries that are members of the consolidated or combined group), taking into account any carryovers and carrybacks of tax attributes (such as net operating losses) of the Company and such Subsidiaries from other taxable years and (ii) the net amount of the relevant Tax that such Parent actually owes to the appropriate Tax authority. Any Tax Payments received from the

Company shall be paid over to the appropriate taxing authority within 30 days of any Parent's receipt of such Tax Payments or refunded to the Company;

(4)     costs (including all professional fees and expenses) Incurred by any Parent in connection with reporting obligations under or otherwise Incurred in connection with compliance with applicable laws, rules or regulations of any governmental, regulatory or self-regulatory body or stock exchange, this Agreement or any other agreement or instrument relating to Indebtedness of the Company or any Restricted Subsidiaries, including in respect of any reports filed with respect to the U.S. Securities Act, U.S. Exchange Act or the respective rules and regulations promulgated thereunder;

(5)     fees and expenses of any Parent Incurred in relation to any public offering or other sale of Capital Stock or Indebtedness (whether or not completed) (a) where the net proceeds of such offering or sale are intended to be received by or contributed to the Company or any Restricted Subsidiaries; (b) in a prorated amount of such expenses in proportion to the amount of such net proceeds intended to be so received or contributed; or (c) otherwise on an interim basis prior to completion of such offering so long as any Parent will cause the amount of such expenses to be repaid to the Company or the relevant Restricted Subsidiary out of the proceeds of such offering promptly if completed and there is a reasonable expectation of completion; and

(6)     fees and expenses (including the fees and expenses of legal counsel) of any Parent Incurred in connection with the issuance of the 2025 Notes, any refinancing thereof and the Restructuring, including to fund any Holdco Liquidation Payment, and any other amount payable under the Scheme Documents.

**Permitted Refinancing Indebtedness** means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchange for, or the net proceeds of which are used to extend, renew, refund, refinance, replace, defease or discharge other Indebtedness of the Company or any of its Restricted Subsidiaries (other than intercompany Indebtedness); provided that:

(1)     the principal amount (or accreted value, if applicable, or if issued with original issue discount, aggregate issue price) of such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness extended, renewed, refunded, refinanced, replaced, defeased or discharged (plus any accrued interest and any premium required to be paid on the Indebtedness being so renewed, refunded, replaced, defeased or discharged, plus the amount of all fees, commissions and expenses Incurred in connection therewith); and

(2)     such Permitted Refinancing Indebtedness has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity (disregarding any nominal amortization at the Company's option) equal to or greater than the remaining Weighted Average Life to Maturity of, the Indebtedness being extended, renewed, refunded, refinanced, replaced, defeased or discharged; and

(3)     if the Indebtedness being extended, renewed, refunded, refinanced, replaced, defeased or discharged is expressly contractually subordinated in right of payment to the Facility, such Permitted Refinancing Indebtedness is subordinated in right of payment to, the Facility on terms at least as favorable to the Bank as those contained in the documentation governing the Indebtedness being extended, renewed, refunded, refinanced, replaced, defeased or discharged.

Permitted Refinancing Indebtedness in respect of any Credit Facility or any other Indebtedness may be Incurred from time to time after the termination, discharge, or repayment of any such Credit Facility or other Indebtedness.

**Permitted Reorganization** means any amalgamation, demerger, merger, voluntary liquidation, consolidation, reorganization, redomiciliation, winding up, arrangement, corporate reconstruction or other similar or equivalent transaction involving the Company or any Restricted Subsidiary (other than any transaction which involves the Company ceasing to be the surviving entity) and the assignment, transfer or assumption of

intragroup receivables and payables among the Company or any Restricted Subsidiaries in connection therewith (a **Reorganization**) that is made on a solvent basis; provided that after giving effect to such Reorganization: (a) all of the business and assets of the Company and its Restricted Subsidiaries remain owned by the Company and its Restricted Subsidiaries, (b) any payments or assets distributed in connection with such Reorganization remain within the Company and its Restricted Subsidiaries and (c) if the assets of a Restricted Subsidiary party to the Reorganization form part of the Collateral, substantially equivalent Liens (excluding for this purpose any hardening periods or the limitations anticipated by the Agreed Security Principles) must be granted over any shares that were held by that Restricted Subsidiary and over any other such assets that are distributed to a Guarantor.

**Person** means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company or government or other entity.

**Public Debt** means any Indebtedness consisting of bonds, debentures, notes or other similar debt securities issued in (1) a public offering registered under the U.S. Securities Act or (2) a private placement to institutional investors that is underwritten for resale in accordance with Rule 144A or Regulation S under the U.S. Securities Act, whether or not it includes registration rights entitling the holders of such debt securities to registration thereof with the SEC for public resale.

**Public Market** means any time after:

(1)     an Equity Offering has been consummated; and

(2)     shares of common stock or other common equity interests of the IPO Entity having a market value in excess of $100.0 million on the date of such Equity Offering have been distributed pursuant to such Equity Offering.

**Qualified Receivables Financing** means any financing (including, at the company's election, any factoring) pursuant to which the Company or any of its Restricted Subsidiaries may sell, convey or otherwise transfer to any other Person or grant a security interest in, any Receivables (and related assets); provided that (a) the covenants, events of default and other provisions applicable to such financing shall be on market terms (as determined in good faith by the Company's Board of Directors or senior management) at the time such financing is entered into, (b) the interest rate applicable to such financing shall be a market interest rate (as determined in good faith by the Company's Board of Directors or senior management) at the time such financing is entered into and (c) such financing shall be non-recourse to the Company or any of its Restricted Subsidiaries except in relation to a Receivables Repurchase Obligation or to the extent customary for such transactions (as determined in good faith by the Company's Board of Directors or senior management).

**Rating Agency** means each of S&P, Moody's, Fitch or any other internationally recognized statistical rating organization or organizations identified by the U.S. Securities and Exchange Commission, or in each case its affiliated rating agencies outside of the United States.

**Receivable** means any accounts receivable, inventory, royalty, licenses, contracts or revenue streams subject to a Qualified Receivables Financing.

**Receivables Fees** means distributions or payments made directly or by means of discounts with respect to any participation interest issued or sold in connection with, and other fees paid to a Person that is not the Company or any of its Restricted Subsidiaries in connection with any Qualified Receivables Financing.

**Receivables Repurchase Obligation** means any obligation of a seller of Receivables in a Qualified Receivables Financing to repurchase Receivables arising as a result of a breach of a representation, warranty or covenant or otherwise, including as a result of a Receivable or portion thereof becoming subject to any asserted defense, dispute, off-set or counterclaim of any kind as a result of any action taken by, any failure to take action by or any other event relating to the seller.

**Related Party** means:

(1)      any controlling stockholder, partner or member, or any 50% (or more) owned Subsidiary, or immediate family member (in the case of an individual), of any Equity Investor; or

(2)      any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons beneficially holding a 50% or more controlling interest of which consist of any one or more Equity Investors and/or such other Persons referred to in the immediately preceding clause.

**Restricted Investment** means an Investment other than a Permitted Investment.

**Restricted Payments** has the meaning given in Section 2.

**Restricted Subsidiary** of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

**Reversion Date** has the meaning given in Section 10.

**Rule 144A** means Rule 144A promulgated under the U.S. Securities Act.

**S&P** means Standard & Poor's Ratings Services and its successors and assigns.

**Senior Facilities Agreement** means:

(1)      this Agreement;

(2)      the letter of credit facility dated the date of this Agreement between among others the Company and First Abu Dhabi Bank PJSC; or

(3)      any other facilities agreement entered into by the Company and/or any Restricted Subsidiary after the date of this Agreement evidencing the terms of any loan or LC or Bank Guarantee facility, in each case, as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, repaid, refunded, refinanced or otherwise modified from time to time, including any agreement extending the maturity thereof, refinancing, replacing or otherwise restructuring all or any portion of the Indebtedness under such agreement or any successor or replacement agreement or agreements or increasing the amount made available thereunder (subject to compliance with Section 4) or altering the maturity thereof.

**Senior Notes** means any Indebtedness of a Parent or any Subsidiary of a Parent designated as a "Parent Debt Facility" or "Parent Debt Notes" under the Intercreditor Agreement or any Additional Intercreditor Agreement.

**Senior Secured Indebtedness** means, as of any date of determination, the principal amount of any Indebtedness that is secured by a Lien on the Collateral that ranks or is intended to rank pari passu with the Liens on the Collateral securing the Facility, excluding any Indebtedness incurred under (1)(A), (6)(A) (unless it is secured by a Lien on the Collateral that ranks pari passu to the Facility, but still excluding any Indebtedness secured by a Lien described under clause (1)(b) of the definition of Permitted Collateral Liens), (6)(B), (8), (9), (10), (11), (12), (13), (16), (18), (19), (20) and (21) of Section 4(b)).

**Stated Maturity** means, with respect to any installment of principal on any series of Indebtedness, the date on which the final payment of principal was scheduled to be paid in the documentation governing such Indebtedness as of the date of this Agreement or the date of Incurrence, and will not include any contingent obligations to repay, redeem or repurchase any such principal prior to the date originally scheduled for the payment thereof.

**Subordinated Shareholder Debt** means, collectively, any funds provided to the Company by a Parent or any Permitted Holder in exchange for or pursuant to any security, instrument or agreement other than Capital Stock, together with any such security, instrument or agreement and any other security or instrument other than Capital Stock issued in payment of any obligation under any Subordinated Shareholder Debt; provided, however, that such Subordinated Shareholder Debt:

(1)    does not (including upon the happening of any event) mature or require any amortization, redemption or other repayment of principal or any sinking fund payment prior to the first anniversary of the Stated Maturity of the Facility (other than through conversion or exchange of such funding into Capital Stock (other than Disqualified Stock) of the Company or any funding meeting the requirements of this definition);

(2)    does not (including upon the happening of any event) require, prior to the first anniversary of the Stated Maturity of the Facility, payment of cash interest, cash withholding amounts or other cash gross-ups, or any similar cash amounts;

(3)    contains no change of control or similar provisions and does not (including upon the happening of any event) accelerate and has no right (including upon the happening of any event) to declare a default or event of default or take any enforcement action or otherwise require any cash payment, in each case, prior to the first anniversary of the Stated Maturity of the Facility;

(4)    does not provide for or require any security interest or encumbrance over any asset of the Company or any of its Subsidiaries and is not guaranteed by any Subsidiary of the Company;

(5)    is subordinated in right of payment to the prior payment in full in cash of the Facility at least to the same extent as the Subordinated Liabilities (as defined in the Intercreditor Agreement) are subordinated to the Facility under the Intercreditor Agreement;

(6)    does not (including upon the happening of any event) restrict the payment of amounts due in respect of the Facility or compliance by Company with its obligations under the Facility and this Agreement;

(7)    does not (including upon the happening of an event) constitute Voting Stock; and

(8)    is not (including upon the happening of any event) mandatorily convertible or exchangeable, or convertible or exchangeable at the option of the holder thereof; in whole or in part, prior to the date on which the Facility matures, other than into or for Capital Stock (other than Disqualified Stock) of the Company; provided that the proceeds of any Senior Notes made available to the Company or any of its Restricted Subsidiaries shall not constitute Subordinated Shareholder Debt.

**Successor Parent** with respect to any Person means any other Person with more than 50% of the total voting power of the Voting Stock of which is, at the time the first Person becomes a Subsidiary of such other Person, beneficially owned (as defined below) by one or more Persons that beneficially owned (as defined below) more than 50% of the total voting power of the Voting Stock of the first Person immediately prior to the first Person becoming a Subsidiary of such other Person. For purposes hereof, beneficially own has the meaning correlative to the term beneficial owner, as such term is defined in Rules 13d-3 and 13d-5 under the U.S. Exchange Act (as in effect on the date of this Agreement).

**Suspended Covenants** has the meaning given in Section 10.

**Suspension Date** has the meaning given in Section 10.

**Suspension Period** has the meaning given in Section 10.

**Unrestricted Subsidiary** means:

(1)     any Subsidiary of the Company that at the time of determination is designated an Unrestricted Subsidiary by the Board of Directors of the Company in the manner provided in Section 8; and

(2)     any Subsidiary of an Unrestricted Subsidiary.

**U.S. Exchange Act** means the U.S. Securities Exchange Act of 1934, as amended.

**Voting Stock** of any specified Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the Board of Directors of such Person.

**Weighted Average Life to Maturity** means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1)     the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect of the Indebtedness, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; **by**

(2)     the then outstanding principal amount of such Indebtedness.

**SIGNATORIES**

**Company**

**KCA DEUTAG ALPHA LIMITED**

By:


.............................................

Address:

Email:

Attention:


**Original Borrowers**
**ABBOT GROUP LIMITED**

By:


.............................................

Address:

Email:

Attention:


**ABBOT HOLDINGS LIMITED**

By:


.............................................

Address:

Email:

Attention:

**KCA DEUTAG ALPHA LIMITED**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG CASPIAN LIMITED**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG DRILLING GROUP LIMITED**

By:


................................................

Address:

Email:

Attention:

**KCA EUROPEAN HOLDINGS LIMITED**

By:


.................................................

Address:

Email:

Attention:


**KCA DEUTAG UK FINANCE PLC**

By:


.................................................

Address:

Email:

Attention:


**BENTEC GMBH DRILLING AND OILFIELD SYSTEMS**

By:


.................................................

Address:

Email:

Attention:

**KCA DEUTAG DRILLING GMBH**

By:


...............................................

Address:

Email:

Attention:


**KCA DEUTAG GMBH**

By:


...............................................

Address:

Email:

Attention:


**ABBOT HOLDINGS NORGE AS**

By:


...............................................

Address:

Email:

Attention:

**KCA DEUTAG DRILLING NORGE AS**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG DRILLING OFFSHORE SERVICES AS**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG HOLDINGS NORGE AS**

By:


................................................

Address:

Email:

Attention:

**KCA DEUTAG OFFSHORE AS**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG MODU OPERATIONS AS**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG DRILLING LIMITED**

By:


................................................

Address:

Email:

Attention:

**KCA DEUTAG TECHNICAL SUPPORT LIMITED**

By:


................................................

Address:

Email:

Attention:


**SET DRILLING COMPANY LIMITED**

By:


................................................

Address:

Email:

Attention:

**Original Guarantors**

**ABBOT GROUP LIMITED**

By:


................................................

Address:

Email:

Attention:


**ABBOT HOLDINGS LIMITED**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG (LAND RIG) LIMITED**

By:


................................................

Address:

Email:

Attention:

**KCA DEUTAG ALPHA LIMITED**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG CASPIAN LIMITED**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG DRILLING GROUP LIMITED**

By:


................................................

Address:

Email:

Attention:

**KCA DEUTAG UK FINANCE PLC**

By:


.............................................

Address:

Email:

Attention:


**KCA EUROPEAN HOLDINGS LIMITED**

By:


.............................................

Address:

Email:

Attention:


**ABBOT VERWALTUNGSGESELLSCHAFT MBH**

By:


.............................................

Address:

Email:

Attention:

**BENTEC GMBH DRILLING AND OILFIELD SYSTEMS**

By:


...............................................

Address:

Email:

Attention:


**KCA DEUTAG DRILLING GMBH**

By:


...............................................

Address:

Email:

Attention:


**KCA DEUTAG GMBH**

By:


...............................................

Address:

Email:

Attention:

**KCA DEUTAG TIEFBOHRGESELLSCHAFT MBH**

By:


................................................
Address:

Email:

Attention:


**KCA DEUTAG EUROPE B.V.**

By:


................................................
Address:

Email:

Attention:


**KCA DEUTAG NEDERLAND B.V.**

By:


................................................
Address:

Email:

Attention:

**ABBOT HOLDINGS NORGE AS**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG DRILLING NORGE AS**

By:


................................................

Address:

Email:

Attention:


**KCA DEUTAG DRILLING OFFSHORE SERVICES AS**

By:


................................................

Address:

Email:

Attention:

**KCA DEUTAG HOLDINGS NORGE AS**

By:


.................................................

Address:

Email:

Attention:


**KCA DEUTAG MODU OPERATIONS AS**

By:


.................................................

Address:

Email:

Attention:


**KCA DEUTAG OFFSHORE AS**

By:


.................................................

Address:

Email:

Attention:

**KCA DEUTAG ENERGY INTERNATIONAL LLC**

By:


................................................
Address:

Email:

Attention:


**KCA DEUTAG ENERGY LLC**

By:


................................................
Address:

Email:

Attention:


**KCA DEUTAG DRILLING LLC**

By:


................................................
Address:

Email:

Attention:

**KCA DEUTAG RUSSIA LLC**

By:


.................................................

Address:

Email:

Attention:


**KCA DEUTAG GULF DRILLING LIMITED COMPANY**

By:


.................................................

Address:

Email:

Attention:


**KCA DEUTAG DRILLING LIMITED**

By:


.................................................

Address:

Email:

Attention:

**KCA DEUTAG TECHNICAL SUPPORT LIMITED**

By:


................................................

Address:

Email:

Attention:


**SET DRILLING COMPANY LIMITED**

By:


................................................

Address:

Email:

Attention:

**Security Agent**

**LUCID TRUSTEE SERVICES LIMITED**

By:


...............................................

Address:

Email:

Attention:

**Original Bank**

**FIRST ABU DHABI BANK PJSC**

By:


................................................

Address:

Email:

Attention:

## PART 5

## NEW INTERCREDITOR AGREEMENT

**VERSION ATTACHED TO RID**


# INTERCREDITOR AGREEMENT


**DATED [●] 2020**


**Between**


**KCA DEUTAG ALPHA LIMITED**
as Company


**LUCID TRUSTEE SERVICES LIMITED**
acting as Security Agent


**and others**


# ALLEN & OVERY

**Allen & Overy LLP**

0101521-0000029 UKO3: 2000745137.14

# CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | Definitions and Interpretation | 1 |
| 2. | Ranking and Priority | 48 |
| 3. | First Lien Creditors and First Lien Liabilities | 51 |
| 4. | Cash Management Providers and Cash Management Liabilities | 55 |
| 5. | Hedge Counterparties and Hedging Liabilities | 57 |
| 6. | Option to Purchase and Hedge Transfer | 65 |
| 7. | Second Lien Creditors and Second Lien Liabilities | 72 |
| 8. | Parent Debt Creditors and Parent Debt Liabilities | 80 |
| 9. | Intra-Group Lenders and Intra-Group Liabilities | 88 |
| 10. | Subordinated Creditors and Subordinated Liabilities | 90 |
| 11. | Effect of Insolvency Event | 93 |
| 12. | Turnover of Receipts | 95 |
| 13. | Redistribution | 99 |
| 14. | Chapter 11 Provisions | 100 |
| 15. | Enforcement of Transaction Security | 103 |
| 16. | Enforcement of Parent Debt Only Security | 110 |
| 17. | Non-Distressed Disposals | 110 |
| 18. | Distressed Disposals | 113 |
| 19. | Mandatory prepayments | 119 |
| 20. | Further Assurance – Disposals and Releases | 120 |
| 21. | Application of Proceeds | 121 |
| 22. | Equalisation | 127 |
| 23. | Additional Regulated Debt | 130 |
| 24. | The Security Agent | 133 |
| 25. | Notes Trustee Protections | 148 |
| 26. | Changes to the Parties | 152 |
| 27. | Costs and Expenses | 159 |
| 28. | Other Indemnities | 160 |
| 29. | Information | 161 |
| 30. | Notices | 162 |
| 31. | Preservation | 164 |
| 32. | Consents, Amendments and Override | 166 |
| 33. | Counterparts | 171 |
| 34. | Contractual recognition of bail-in | 171 |
| 35. | U.S. OFC Contractual Stay Requirement | 173 |
| 36. | Governing Law | 174 |
| 37. | Enforcement | 174 |

**Schedule**

1.  Initial Debt ........................................................................................................................ 176
2.  Form of Debtor Accession Deed .......................................................................................... 177
3.  Form of Creditor/Creditor Representative Accession Undertaking ..................................... 180
4.  Form of Debtor Resignation Request ................................................................................... 182
5.  Form of Super Senior Hedging Certificate .......................................................................... 183
6.  Guarantee and Indemnity ..................................................................................................... 185
7.  Guarantee Limitations .......................................................................................................... 189
8.  Agreed Security Principles .................................................................................................... 195
9.  Local Law Provisions ........................................................................................................... 201

Signatories ................................................................................................................................... 205

**THIS AGREEMENT** is dated [●] 2020 and made

**BETWEEN**:

(1)    **KCA DEUTAG ALPHA LIMITED** (the **Company**);

(2)    **THE ENTITIES** named on the signing pages as original Super Senior Facility Lenders;

(3)    **THE ENTITY** named on the signing pages as original Cash Management Provider (the **Initial Cash Management Provider**);

(4)    **LUCID TRUSTEE SERVICES LIMITED** as an original Senior Secured Notes Trustee;

(5)    **THE ENTITIES** named on the signing pages as original Subordinated Creditors;

(6)    **THE ENTITIES** named on the signing pages as original Intra-Group Lenders;

(7)    **THE ENTITIES** named on the signing pages as original Debtors (the **Original Debtors**);

(8)    **THE ENTITIES** named on the signing pages as original Third Party Security Providers; and

(9)    **LUCID TRUSTEE SERVICES LIMITED** as security trustee and security agent for the Secured Parties (the **Security Agent**).

**IT IS AGREED** as follows:

**1.     DEFINITIONS AND INTERPRETATION**

**1.1     Definitions**

In this Agreement:

**1992 ISDA Master Agreement** means the Master Agreement (Multicurrency - Cross Border) as published by the International Swaps and Derivatives Association, Inc.

**2002 ISDA Master Agreement** means the 2002 Master Agreement as published by the International Swaps and Derivatives Association, Inc.

**Acceleration Event** means a First Lien Acceleration Event, a Second Lien Acceleration Event or a Parent Debt Acceleration Event.

**Acceleration Rights** means the rights under any provisions of a Primary Financing Document to accelerate amounts outstanding under that Primary Financing Document or any acceleration provisions being automatically invoked under that Primary Financing Document as a result of an Event of Default, in each case, such that a principal amount outstanding under that Primary Financing Document becomes immediately due and payable prior to its scheduled maturity.

**Additional Regulated Debt** has the meaning given in Clause 23.1 (Additional Regulated Debt).

**Affiliate** means, in relation to any person, a Subsidiary of that person or a Holding Company of that person or any other Subsidiary of that Holding Company.

●

**Agreed Security Principles** means the principles set out in Schedule 8 (Agreed Security Principles).

**Ancillary Document** means each document relating to or evidencing the terms of an Ancillary Facility.

**Ancillary Facility** means any ancillary facility made available under and in accordance with any First Lien Facility Agreement.

**Ancillary Lender** means any Lender (or Affiliate of a Lender) which makes available an Ancillary Facility.

**Arranger** means a Super Senior Facility Arranger, a Senior Secured Facility Arranger, a Second Lien Facility Arranger or a Parent Debt Facility Arranger, as the case may be.

**Arranger Liabilities** means the First Lien Arranger Liabilities, the Second Lien Arranger Liabilities and the Parent Debt Arranger Liabilities.

**Available Commitment**, in relation to any Lender, has the meaning given to the term "Available Commitment" (or any substantially equivalent term) in the relevant Facility Agreement to which that Lender is a party.

**Bilateral Creditor** means each Bilateral Lender, Cash Management Provider and Hedge Counterparty.

**Bilateral Lender** means any Lender under any Facility Agreement in respect of which no agent, trustee or other creditor representative has been appointed.

**Borrowing Liabilities** means, in relation to a Parent Debt Issuer or a member of the Group, the liabilities and obligations (not being Guarantee Liabilities) it may have as a principal debtor to a Creditor (other than to an Arranger, a Creditor Representative or the Security Agent in its capacity as such) or a Debtor in respect of Liabilities arising under the Debt Documents (whether incurred solely or jointly and including, without limitation, liabilities and obligations as a borrower or an issuer under the Primary Financing Documents).

**Business Day** means a day (other than a Saturday or Sunday) on which banks are open for general business in London and New York and:

(a)     (in relation to any date for payment or purchase of a currency other than euro) the principal financial centre of the country of that currency; and

(b)     (in relation to any date for payment or purchase of euro) any TARGET Day.

**Cash Cover** means "cash cover" (or any substantially equivalent term) under and as defined in any First Lien Facility Agreement or any Cash Management Agreement.

**Cash Cover Document** means, in relation to any Cash Cover, any First Lien Facility Document or Cash Management Agreement which creates or evidences, or is expressed to create or evidence, the Security required to be provided over that Cash Cover by the relevant First Lien Facility Agreement or Cash Management Agreement.

•

**Cash Management Agreement** means each document relating to or evidencing the terms of a Cash Management Facility.

**Cash Management Facilities** means any cash management agreement or arrangement including, without limitation, any treasury, cash pooling and/or other cash management services, treasury deposits, depository services, overdraft or other current account facilities, foreign exchange facilities, credit or debit card facilities, other automated payment facilities, electronic funds transfer, the collection of cheques and direct debits including any Initial Debt which is designated as a "Cash Management Facility".

**Cash Management Facility Discharge Date** means the first date on which all Cash Management Liabilities have been fully and finally discharged to the satisfaction of the relevant Cash Management Providers, whether or not as the result of an Enforcement, and the Cash Management Providers are under no further obligation to provide financial accommodation to any of the Debtors under the Cash Management Agreements.

**Cash Management Facility Outstandings** means, in relation to a Cash Management Provider and a Cash Management Facility, the aggregate in the Common Currency of:

(a)     the principal amount outstanding under any overdraft facility or other loan facility under that Cash Management Facility;

(b)     the notional amount of any Letter of Credit issued under that Cash Management Facility; and

(c)     the amount fairly representing the aggregate exposure or equivalent outstanding (excluding interest and similar charges) of that Cash Management Provider under each other type of accommodation provided under that Cash Management Facility, provided that any amount outstanding under any BACS facility or other intra-day exposure facilities under that Cash Management Facility shall be excluded (unless otherwise agreed between the Company and the relevant Cash Management Provider),

in each case, net of any credit balances (including any Cash Cover) which that Cash Management Provider is entitled to net or set-off against liabilities owed under that Cash Management Facility under the terms of the relevant Cash Management Agreement.

**Cash Management Liabilities** means the Liabilities owed by any Debtor to the Cash Management Providers under or in connection with the Cash Management Agreements.

**Cash Management Provider** means:

(a)     any person which is named on the signing pages as a Cash Management Provider; and

(b)     any person which becomes a Party as a Cash Management Provider pursuant to Clause 26 (Changes to the Parties).

**Charged Property** means the Common Charged Property and the Priority Creditor Charged Property.

**Close-Out Netting** means:

•

(a)     in respect of a Hedging Agreement or a Hedging Ancillary Document based on a 1992 ISDA Master Agreement, any step involved in determining the amount payable in respect of an Early Termination Date (as defined in the 1992 ISDA Master Agreement) under section 6(e) (Payments on Early Termination) of the 1992 ISDA Master Agreement before the application of any subsequent Set-off (as defined in the 1992 ISDA Master Agreement);

(b)     in respect of a Hedging Agreement or a Hedging Ancillary Document based on a 2002 ISDA Master Agreement, any step involved in determining an Early Termination Amount (as defined in the 2002 ISDA Master Agreement) under section 6(e) (Payments on Early Termination) of the 2002 ISDA Master Agreement; and

(c)     in respect of a Hedging Agreement or a Hedging Ancillary Document not based on an ISDA Master Agreement, any step involved on a termination of the hedging transactions under that Hedging Agreement or Hedging Ancillary Document pursuant to any provision of that Hedging Agreement or Hedging Ancillary Document which has a similar effect to either provision referenced in paragraph (a) and paragraph (b) above.

**Commitment** means a Super Senior Facility Commitment, a Senior Secured Facility Commitment, a Second Lien Facility Commitment or a Parent Debt Facility Commitment.

**Common Assurance** means any guarantee, indemnity or other assurance against loss in respect of any of the Liabilities, the benefit of which (however conferred) is, to the extent legally possible and subject to any Agreed Security Principles, given to all the Priority Secured Parties in respect of their Liabilities.

**Common Charged Property** means all of the assets which from time to time are, or are expressed to be, the subject of the Common Transaction Security.

**Common Currency** means US Dollar.

**Common Currency Amount** means, in relation to an amount, that amount converted (to the extent not already denominated in the Common Currency) into the Common Currency at the Security Agent's Spot Rate of Exchange on the Business Day prior to the relevant calculation.

**Common Recoveries** has the meaning given to that term in Clause 21.1 (Order of application: Common Recoveries).

**Common Secured Obligations** means all the Primary Creditor Liabilities and all other present and future liabilities and obligations at any time due, owing or incurred by any member of the Group and by each Debtor to any Secured Party under the Debt Documents (including to the Security Agent under Clause 24.3 (Parallel debt)), both actual and contingent and whether incurred solely or jointly and as principal or surety or in any other capacity.

**Common Security Property** means:

(a)     the Common Transaction Security and all proceeds of that Common Transaction Security;

(b)     all obligations expressed to be undertaken by a Debtor or a Third Party Security Provider to pay amounts in respect of the Liabilities to the Security Agent as security agent or trustee for the Secured Parties (including under Clause 24.3 (Parallel debt)) and secured by the Common Transaction Security together with all representations and warranties expressed to

•

be given by a Debtor or a Third Party Security Provider in favour of the Security Agent as security agent or trustee for the Secured Parties;

(c)     the Security Agent's interest in any trust fund in any amounts to be applied for the benefit only of the Secured Parties created pursuant Clause 12.3 (Turnover by the First Lien Creditors); and

(d)     any other amounts or property, whether rights, entitlements, choses in action or otherwise, actual or contingent, which the Security Agent is required by the terms of the Debt Documents to hold as trustee on trust or as security agent for (or otherwise for the benefit of) the Secured Parties,

but not including the Priority Creditor Security Property or the Parent Debt Only Security Property.

**Common Transaction Security** means any Security from any member of the Group or Third Party Security Provider which to the extent legally possible and subject to any Agreed Security Principles:

(a)     is created in favour of the Security Agent as agent or trustee for the other Secured Parties in respect of the Common Secured Obligations; or

(b)     in the case of any jurisdiction in which effective Security cannot be granted in favour of the Security Agent as security agent or trustee for the Secured Parties is created in favour of:

(i)     all the Secured Parties in respect of the Common Secured Obligations; or

(ii)    the Security Agent under a parallel debt structure, joint and several creditor structure or agency structure for the benefit of all the Secured Parties,

and which (subject to the terms of this Agreement) ranks in the order of priority contemplated in Clause 2.2 (Transaction Security) but not including the Priority Creditor Transaction Security or the Parent Debt Only Security.

**Common Transaction Security Documents** means:

(a)     any document creating any Security in favour of any of the Secured Parties over any of the following:

(i)     the shares in the Company held by any direct shareholder of the Company; and

(ii)    all receivables owed by the Company to a Subordinated Creditor or other Holding Company or shareholder of the Company (or any of their Subsidiaries) (including any Proceeds Loan from a Parent Debt Issuer);

(b)     any other document entered into at any time by any of the Debtors or Third Party Security Providers creating any Security in favour of any of the Secured Parties as security for any of the Common Secured Obligations; and

(c)     any Security granted under any covenant for further assurance in any of the documents referred to in paragraphs (a) and (b) above,

•

in each case designated as a Common Transaction Security Document by the Company (in its discretion) by written notice to the Security Agent, but not including the Priority Creditor Transaction Security Documents or the Parent Debt Only Security Documents.

**Competitive Sales Process** means any public auction or other competitive sale process in which more than one bidder participates or is invited to participate (including, for the avoidance of doubt, any person invited that is a Primary Creditor), which may or may not be conducted through a court or other legal proceeding, and which is conducted with the advice of a Financial Adviser selected by the Security Agent. Any Primary Creditor shall have a right to participate in any Competitive Sales Process.

For the purposes of this definition a **right to participate** shall be interpreted to mean:

(a)     that any offer, or indication of a potential offer, that a Creditor makes shall be considered by those running the Competitive Sales Process against the same criteria as any offer, or indication of a potential offer, by any other bidder or potential bidder; and

(b)     that a Creditor that is considering making an offer in any Competitive Sales Process is provided with the same information, including any due diligence reports, and access to management that is being provided to any other bidder at the same stage of the process.

If after having applied these criteria, the offer or indication of a potential offer made by a Creditor is not considered by those running the Competitive Sales Process to be sufficient to continue in the Competitive Sales Process (such consideration being assessed against the same criteria as any offer, or indication of a potential offer, by any other bidder or potential bidder (and where continuation may include being invited to review additional information or being invited to have an opportunity to make a subsequent or revised offer, whether in another round of bidding or otherwise)) then the right to participate of that Creditor under this Agreement shall be deemed to be satisfied.

**Consent** means any consent, approval, release or waiver or agreement to any amendment.

**Consultation Period** has the meaning given in Clause 15.3 (Consultation period).

**Credit Participation** means a Super Senior Credit Participation, Senior Secured Credit Participation, Second Lien Credit Participation, a Parent Debt Credit Participation, a Super Senior Hedge Credit Participation, a Senior Secured Hedge Credit Participation or a Hedge Credit Participation, as the context requires.

**Credit Related Close-Out** means any Permitted Hedge Close-Out which is not a Non-Credit Related Close-Out.

**Creditor Class** means each of the following as separate classes of Primary Creditor:

(a)     the Super Senior Creditors;

(b)     the Senior Secured Creditors;

(c)     the Second Lien Creditors; and

(d)     the Parent Debt Creditors.

•

**1050**

**Creditor Conflict** means, at any time prior to the Priority Discharge Date, a conflict between:

(a)      the interests of any Creditor (or group of Creditors) of one Creditor Class; and

(b)      the interests of any Creditor (or group of Creditors) of another Creditor Class.

**Creditor/Creditor Representative Accession Undertaking** means:

(a)      an undertaking substantially in the form set out in Schedule 3 (Form of Creditor/Creditor Representative Accession Undertaking); or

(b)      a Transfer Certificate, Assignment Agreement or Increase Confirmation (each as defined in the relevant Facility Agreement) provided that it contains an accession to this Agreement which is substantially in the form set out in Schedule 3 (Form of Creditor/Creditor Representative Accession Undertaking),

as the context may require, or

(c)      in the case of an acceding Debtor which is expressed to accede as an Intra-Group Lender in the relevant Debtor Accession Deed, that Debtor Accession Deed.

**Creditor Representative** means a Super Senior Facility Agent, a Senior Secured Debt Creditor Representative, a Second Lien Creditor Representative or a Parent Debt Creditor Representative, as the context requires.

**Creditor Representative Amounts** means fees, costs and expenses of a Creditor Representative payable to a Creditor Representative for its own account pursuant to the relevant Debt Documents or any engagement letter between a Creditor Representative and a Debtor (including any amount payable to a Creditor Representative by way of indemnity, remuneration or reimbursement for expenses incurred), and the costs incurred by a Creditor Representative in connection with any actual or attempted Enforcement Action which is permitted by this Agreement which are recoverable pursuant to the terms of the Debt Documents including, in relation to a Notes Trustee, Notes Trustee Amounts.

**Creditor Representative Liabilities** means all present and future liabilities and obligations, whether actual or contingent and whether incurred solely or jointly, of each Debtor and Third Party Security Provider to any Creditor Representative under the Debt Documents, including (without double-counting), any Creditor Representative Amounts.

**Creditors** means the Primary Creditors, the Arrangers, the Creditor Representatives, the Security Agent, the Intra-Group Lenders and the Subordinated Creditors.

**Debt Disposal** means any disposal of any Liabilities or Debtors' Intra-Group Receivables pursuant to paragraphs (d) or (e) of Clause 18.1 (Facilitation of Distressed Disposals).

**Debt Document** means each of this Agreement, the Hedging Agreements, the Cash Management Agreements, the Super Senior Facility Documents, the Senior Secured Debt Documents, the Second Lien Debt Documents, the Parent Debt Documents, the Security Documents, any agreement evidencing the terms of the Intra-Group Liabilities or the Subordinated Liabilities and any other document designated as such by the Security Agent and the Company.

•

**Debtor** means each Original Debtor and any person which becomes a Party as a Debtor in accordance with the terms of Clause 26 (Changes to the Parties), but not including any Parent Debt Only Obligor.

**Debtor Accession Deed** means:

(a)    a deed substantially in the form set out in Schedule 2 (Form of Debtor Accession Deed); or

(b)    (only in the case of person which is acceding as a borrower, issuer or guarantor under a Primary Financing Document) an accession document in the form required by the relevant Primary Financing Document (provided that it contains an accession to this Agreement which is substantially in the form set out in Schedule 2 (Form of Debtor Accession Deed)).

**Debtor Resignation Request** means a notice substantially in the form set out in Schedule 4 (Form of Debtor Resignation Request).

**Debtors' Intra-Group Receivables** means, in relation to a member of the Group, any liabilities and obligations owed to any Debtor (whether actual or contingent and whether incurred solely or jointly) by that member of the Group.

**Default** means an Event of Default or any event or circumstance which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Debt Documents or any combination of any of the foregoing) be an Event of Default.

**Defaulting Lender** means a Lender which is a "Defaulting Lender" (or any substantially equivalent term) under, and as defined in, the relevant Facility Agreement to which it is a party.

**Delegate** means any delegate, agent, attorney or co-trustee or co-security agent appointed by the Security Agent.

**Designated Gross Amount** means, in relation to a Multi-account Overdraft, the maximum aggregate gross debit balance of overdrafts that may, at any time, be outstanding under that Multi-account Overdraft.

**Designated Net Amount** means, in relation to a Multi-account Overdraft, the maximum aggregate net amount that may, at any time, be outstanding under that Multi-account Overdraft.

**Discharge Date** means:

(a)    a Super Senior Facility Discharge Date or a Cash Management Facility Discharge Date;

(b)    a Senior Secured Facility Discharge Date or a Senior Secured Notes Discharge Date;

(c)    a Second Lien Facility Discharge Date or a Second Lien Notes Discharge Date;

(d)    a Parent Debt Facility Discharge Date or a Parent Debt Notes Discharge Date; or

(e)    a Super Senior Hedging Discharge Date or a Senior Secured Hedging Discharge Date.

**Distress Event** means any of:

•

**1052**

(a)      an Acceleration Event which has occurred and is continuing; or

(b)      the enforcement of any Transaction Security which has occurred and is continuing.

**Distressed Disposal** means a disposal of any Charged Property or any other asset of a member of the Group which is:

(a)      being effected at the request of the relevant Instructing Group in circumstances where the Transaction Security has become enforceable;

(b)      being effected by enforcement of the Transaction Security; or

(c)      being effected, after the occurrence of a Distress Event, by a Debtor or a Third Party Security Provider to a person or persons which is, or are, not a member, or members, of the Group.

**Enforcement** means the enforcement or disposal of any Transaction Security or as the case may be the Parent Debt Only Security, the requesting of a Distressed Disposal and/or the release or disposal of claims and/or Transaction Security on a Distressed Disposal under Clause 18 (Distressed Disposals), the giving of instructions as to actions with respect to the Transaction Security or as the case may be the Parent Debt Only Security, and/or the Charged Property or as the case may be the Parent Debt Only Charged Property following an Insolvency Event under Clause 11.7 (Security Agent instructions) and the taking of any other actions consequential on (or necessary to effect) any of those actions (but excluding the delivery of an Initial Enforcement Notice).

**Enforcement Action** means:

(a)      in relation to any Liabilities:

(i)      the acceleration of any Liabilities or the making of any declaration that any Liabilities are prematurely due and payable (other than as a result of it becoming unlawful for a Primary Creditor to perform its obligations under, or of any voluntary or mandatory prepayment arising under, the Debt Documents);

(ii)      the making of any declaration that any Liabilities are payable on demand;

(iii)      the making of a demand for payment in relation to a Liability that is payable on demand (other than a demand made by an Intra-Group Lender in relation to any Intra-Group Liabilities which are on-demand Liabilities to the extent (A) that the demand is made in the ordinary course of dealings between the relevant Debtor and Intra-Group Lender and (B) that any resulting Payment would be a Permitted Intra-Group Payment);

(iv)      the making of any demand for payment against a Parent Debt Issuer or any member of the Group in relation to any Guarantee Liabilities of that Parent Debt Issuer or member of the Group;

(v)      the exercise of any right to require a Parent Debt Issuer or any member of the Group to acquire any Liability (including exercising any put or call option against a Parent Debt Issuer or any member of the Group for the redemption or purchase of any Liability other than in connection with an asset sale offer or a change of control

•

offer or escrow mandatory redemption (however defined) as set out in the Primary Financing Documents and excluding any such right which arises as a result of any debt buy-back which is not prohibited under any Facility Agreement or any open market purchases of, or any voluntary tender offer or exchange offer for, any Notes at a time at which no Default is continuing);

(vi) the exercise of any right of set-off, account combination or payment netting against a Parent Debt Issuer or any member of the Group or any Third Party Security Provider in respect of any Liabilities other than the exercise of any such right:

(A) as Close-Out Netting by a Hedge Counterparty or by a Hedging Ancillary Lender;

(B) as Payment Netting by a Hedge Counterparty or by a Hedging Ancillary Lender;

(C) as Inter-Hedging Agreement Netting by a Hedge Counterparty;

(D) as Inter-Hedging Ancillary Document Netting by a Hedging Ancillary Lender; or

(E) which is otherwise expressly permitted under the Primary Financing Documents to the extent that the exercise of that right gives effect to a Permitted Payment; and

(vii) the suing for, commencing or joining of any legal or arbitration proceedings against a Parent Debt Issuer or any member of the Group or any Third Party Security Provider to recover any Liabilities;

(b) the premature termination or close-out of any hedging transaction under any Hedging Agreement (except to the extent expressly permitted under this Agreement);

(c) the taking of any steps to enforce or require the enforcement of any Transaction Security, as the case may be, (including the crystallisation of any floating charge forming part of the Transaction Security, as the case may be);

(d) the entering into of any composition, compromise, assignment or arrangement with a Parent Debt Issuer or any member of the Group or any Third Party Security Provider which owes any Liabilities, or has given any Security, guarantee or indemnity or other assurance against loss in respect of the Liabilities (other than any action permitted under Clause 26 (Changes to the Parties), any debt buy-back which is not prohibited under any Facility Agreement or any open market purchases of, or voluntary tender offer or exchange offer for, any Notes at a time at which no Default is continuing); or

(e) the petitioning, applying or voting for, or the taking of any steps (including the appointment of any liquidator, receiver, administrator or similar officer) in relation to, the winding up, dissolution, administration or reorganisation of a Parent Debt Issuer or any member of the Group or any Third Party Security Provider which owes any Liabilities, or has given any Security, guarantee, indemnity or other assurance against loss in respect of any of the Liabilities, or any of such Parent Debt Issuer's, member of the Group's or Third Party Security Provider's assets or any suspension of payments or moratorium of any indebtedness

•

of any such Parent Debt Issuer, member of the Group or Third Party Security Provider, or any analogous procedure or step in any jurisdiction,

except that the following shall not constitute Enforcement Action:

(i)     the taking of any action falling within paragraphs (a)(ii), (iii), (iv) and (vii) or (e) above which is necessary (but only to the extent necessary) to preserve the validity, existence or priority of claims in respect of Liabilities, including the registration of such claims before any court or governmental authority and the bringing, supporting or joining of proceedings to prevent any loss of the right to bring, support or join proceedings by reason of applicable limitation periods; and

(ii)    a Primary Creditor or Creditor Representative bringing legal proceedings against any person solely for the purpose of:

(A)     obtaining injunctive relief (or any analogous remedy outside England and Wales) to restrain any actual or putative breach of any Debt Document to which it is party;

(B)     obtaining specific performance (other than specific performance of an obligation to make a payment) with no claim for damages; or

(C)     requesting judicial interpretation of any provision of any Debt Document to which it is party with no claim for damages; or

(iii)   bringing legal proceedings against any person in connection with any fraud, securities violation or securities or listing regulations; or

(iv)    allegations of material misstatements or omissions made in connection with the offering materials relating to any Note or in reports furnished to the Noteholders or any exchange on which the Notes are listed by a Parent Debt Issuer or a member of the Group pursuant to the information and reporting requirements under the Primary Financing Documents; or

(v)     to the extent entitled by law, the taking of action against any Creditor (or any agent, trustee or receiver acting on behalf of such Creditor) to challenge the basis on which any sale or disposal is to take place pursuant to powers granted to such persons under any security documentation; or

(vi)    the delivery of an Initial Enforcement Notice or any discussions or consultations between, or proposals made by, any group of Primary Creditors or any Creditor Representative with respect to instructions to enforce any Transaction Security in accordance with this Agreement; or

(vii)   the taking of any action by a Parent Debt Issuer, any member of the Group, any Subordinated Creditor or any Third Party Security Provider in relation to the Parent Debt Liabilities, the Intra-Group Liabilities or the Subordinated Liabilities in each case to the extent any resulting payment is not prohibited by the Debt Documents.

**Enforcement Instructions** means instructions as to Enforcement (including the manner and  timing of Enforcement) given to the Security Agent in accordance with Clause 15 (Enforcement of Transaction Security) provided that instructions not to undertake Enforcement or an absence of instructions as to Enforcement shall not constitute "Enforcement Instructions".

•

**1055**

**Enforcement Objective** has the meaning given to that term in Clause 15.6 (Enforcement principles prior to Super Senior Discharge Date).

**Enforcement Proceeds** means any amount paid to or otherwise realised by a Secured Party under or in connection with any Enforcement and, following the occurrence of a Distress Event, any other proceeds of, or arising from, any of the Charged Property.

**Event of Default** means any event or circumstance specified as such in a Primary Financing Document, a Hedging Agreement or a Cash Management Agreement.

**Exposure** has the meaning given to that term in Clause 22.1 (Equalisation Definitions).

**Facility Agreement** means a Super Senior Facility Agreement, a Senior Secured Facility Agreement, a Second Lien Facility Agreement or a Parent Debt Facility Agreement.

**Fairness Opinion** means, in respect of any Enforcement, an opinion from a Financial Adviser which is regularly engaged in issuing such opinions that the proceeds received or recovered in connection with that Enforcement are fair from a financial point of view taking into account all relevant circumstances.

**Final Discharge Date** means the later to occur of the Priority Discharge Date and the Parent Debt Discharge Date.

**Financial Adviser** means any:

(a)     independent internationally recognised investment bank;

(b)     independent internationally recognised accountancy firm; or

(c)     if it is not practicable for the Security Agent to appoint any such bank or accountancy firm on commercially reasonable terms (including for reasons of conflicts of interest), other independent internationally recognised professional services firm which is regularly engaged in providing valuations of businesses or assets similar or comparable to those subject to the relevant Transaction Security or, where applicable, advising on Competitive Sales Processes.

**First Lien Acceleration Event** means a Super Senior Facility Acceleration Event, a Senior Secured Facility Acceleration Event or a Senior Secured Notes Acceleration Event.

**First Lien Arranger Liabilities** means all Liabilities owed by the Debtors to a Super Senior Facility Arranger or a Senior Secured Facility Arranger.

**First Lien Creditor Representative** means a Super Senior Facility Agent or a Senior Secured Creditor Representative.

**First Lien Creditors** means the Super Senior Creditors and the Senior Secured Creditors.

**First Lien Debt Discharge Date** means the later to occur of the Super Senior Facility Discharge Date, the Cash Management Facility Discharge Date and the Senior Secured Debt Discharge Date.

•

**First Lien Debt Documents** means the Super Senior Facility Documents, the Senior Secured Debt Documents and, except for the purposes of Clause 3 (First Lien Creditors and First Lien Liabilities), the Cash Management Agreements.

**First Lien Discharge Date** means the later to occur of the Super Senior Discharge Date and the Senior Secured Creditor Discharge Date.

**First Lien Facility Agreement** means a Super Senior Facility Agreement or a Senior Secured Facility Agreement.

**First Lien Facility Document** means a Super Senior Facility Document or a Senior Secured Facility Document.

**First Lien Liabilities** means the Super Senior Liabilities and the Senior Secured Creditor Liabilities.

**Group** means the Company and each of its Restricted Subsidiaries for the time being.

**Guarantee Liabilities** means, in relation to a Parent Debt Issuer or any member of the Group, the liabilities and obligations under the Debt Documents (present or future, actual or contingent and whether incurred solely or jointly) it may have to a Creditor (other than to an Arranger, a Creditor Representative or the Security Agent in its capacity as such) or Debtor as or as a result of its being a guarantor or surety (including, without limitation, liabilities and obligations arising by way of guarantee, indemnity, contribution or subrogation and in particular any guarantee or indemnity arising under or in respect of the Primary Financing Documents).

**Guarantee Limitations** means, in relation to any person, the limitations and restrictions set out in Schedule 7 (Guarantee Limitations) or otherwise within this Agreement and any substantially equivalent provisions in any other Primary Debt Document, in each case, as applied to that person.

**Hedge Counterparty** means:

(a)    any person which is named on the signing pages as a Hedge Counterparty; and

(b)    any person which becomes a Party as a Hedge Counterparty pursuant to Clause 26 (Changes to the Parties).

**Hedge Counterparty Obligations** means the liabilities and obligations owed by any Hedge Counterparty to the Debtors under or in connection with the Hedging Agreements.

**Hedge Credit Participation** means, in relation to a Hedge Counterparty, the aggregate of:

(a)    in respect of any hedging transaction of that Hedge Counterparty under any Hedging Agreement that has, as of the date the calculation is made, been terminated or closed out in accordance with the terms of this Agreement, the amount, if any, payable to it under any Hedging Agreement in respect of that termination or close-out as of the date of termination or close-out (and before taking into account any interest accrued on that amount since the date of termination or close-out) to the extent that amount is unpaid (that amount to be certified by the relevant Hedge Counterparty and as calculated in accordance with the relevant Hedging Agreement) and to the extent it is a Hedging Liability; and

•

(b)     after the Super Senior Facility Discharge Date (with respect to any Super Senior Hedging Liability only) or the Senior Secured Debt Discharge Date (with respect to any Senior Secured Hedging Liability only), in respect of any hedging transaction of that Hedge Counterparty under any Hedging Agreement to the extent it constitutes a Hedging Liability that has, as of the date the calculation is made, not been terminated or closed out:

   (i)     if the relevant Hedging Agreement is based on an ISDA Master Agreement the amount, if any, which would be payable to it under that Hedging Agreement in respect of that hedging transaction, if the date on which the calculation is made was deemed to be an Early Termination Date (as defined in the relevant ISDA Master Agreement) for which the relevant Debtor is the Defaulting Party (as defined in the relevant ISDA Master Agreement); or

   (ii)    if the relevant Hedging Agreement is not based on an ISDA Master Agreement, the amount, if any, which would be payable to it under that Hedging Agreement in respect of that hedging transaction, if the date on which the calculation is made was deemed to be the date on which an event similar in meaning and effect (under that Hedging Agreement) to an Early Termination Date (as defined in any ISDA Master Agreement) occurred under that Hedging Agreement for which the relevant Debtor is in a position similar in meaning and effect (under that Hedging Agreement) to that of a Defaulting Party (under and as defined in the same ISDA Master Agreement),

that amount, in each case, to be certified by the relevant Hedge Counterparty and as calculated in accordance with the relevant Hedging Agreement.

**Hedge Transfer** means a transfer to the Relevant Purchasing Creditors (as defined in Clause 6.4 (Hedge Transfer)) (or to their respective nominee or nominees) of (subject to paragraph (b) of Clause 6.4 (Hedge Transfer) (as applicable)), each relevant Hedging Agreement together with:

(a)     all the rights in respect of the Hedging Liabilities or the Senior Secured Hedging Liabilities (as the case may be) owed by the Debtors to each Hedge Counterparty; and

(b)     all the Hedge Counterparty Obligations owed by each Hedge Counterparty to the Debtors,

in accordance with Clause 26.6 (Change of Hedge Counterparty).

**Hedging Agreement** means any master agreement, confirmation, schedule or other agreement entered into or to be entered into by a Debtor (or any member of the Group that is to become a Debtor) and a Hedge Counterparty in relation to any derivative or hedging arrangement which is not prohibited by any Primary Financing Document to share in the Transaction Security.

**Hedging Ancillary Document** means an Ancillary Document which relates to or evidences the terms of a Hedging Ancillary Facility.

**Hedging Ancillary Facility** means an Ancillary Facility which is made available by way of a hedging facility.

**Hedging Ancillary Lender** means an Ancillary Lender to the extent that that Ancillary Lender makes available a Hedging Ancillary Facility.

**Hedging Force Majeure** means:

•

(a)   in relation to a Hedging Agreement which is based on the 1992 ISDA Master Agreement:

    (i)   an Illegality or Tax Event or Tax Event Upon Merger (each as defined in the 1992 ISDA Master Agreement); or

    (ii)   an event similar in meaning and effect to a "Force Majeure Event" (as referred to in paragraph (b) below);

(b)   in relation to a Hedging Agreement which is based on the 2002 ISDA Master Agreement, an Illegality or Tax Event, Tax Event Upon Merger or a Force Majeure Event (each as defined in the 2002 ISDA Master Agreement); or

(c)   in relation to a Hedging Agreement which is not based on an ISDA Master Agreement, any event similar in meaning and effect to an event described in paragraphs (a) or (b) above.

**Hedging Liabilities** means the Liabilities owed by any Debtor to the Hedge Counterparties under or in connection with the Hedging Agreements.

**Hedging Purchase Amount** means:

(a)   in respect of a hedging transaction under a Hedging Agreement that has, as of the relevant time, not been terminated or closed out, the amount that would be payable to (expressed as a positive number) or by (expressed as a negative number) the relevant Hedge Counterparty on the relevant date if:

    (i)   in the case of a Hedging Agreement which is based on an ISDA Master Agreement:

        (A)   that date was an Early Termination Date (as defined in the relevant ISDA Master Agreement); and

        (B)   the relevant Debtor was the Defaulting Party (under and as defined in the relevant ISDA Master Agreement); or

    (ii)   in the case of a Hedging Agreement which is not based on an ISDA Master Agreement:

        (A)   that date was the date on which an event similar in meaning and effect (under that Hedging Agreement) to an Early Termination Date (as defined in any ISDA Master Agreement) occurred under that Hedging Agreement; and

        (B)   the relevant Debtor was in a position which is similar in meaning and effect to that of a Defaulting Party (under and as defined in the same ISDA Master Agreement),

in each case as certified by the relevant Hedge Counterparty and as calculated in accordance with the relevant Hedging Agreement; and

(b)   in respect of a hedging transaction that has, as of the relevant time, been terminated or closed out in accordance with the terms of this Agreement, the amount that is payable to (expressed as a positive number) or by (expressed as a negative number) the relevant Hedge

•

Counterparty under any Hedging Agreement in respect of that termination or close-out to the extent that amount is unpaid.

**Holding Company** means, in relation to a person, any other person in respect of which it is a Subsidiary.

**Initial Debt** means the Liabilities described in Schedule 1 (Initial Debt).

**Initial Enforcement Notice** has the meaning given to such term in Clause 15.3 (Consultation period).

**Insolvency Event** means, in relation to a Debtor or a Third Party Security Provider:

(a)     any resolution is passed or order made for the winding up, dissolution, administration or reorganisation of that Debtor or Third Party Security Provider, a moratorium is declared in relation to any indebtedness of that Debtor or Third Party Security Provider or an administrator is appointed to that Debtor or Third Party Security Provider;

(b)     any composition, compromise, assignment or arrangement is made with any of its creditors;

(c)     the appointment of any liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of that Debtor or Third Party Security Provider or any of its assets; or

(d)     any analogous procedure or step is taken in any jurisdiction,

in each case, only to the extent that such event, procedure or step constitutes an Event of Default which is continuing under any Primary Financing Document.

**Instructing Group** means:

(a)     prior to the Super Senior Discharge Date:

(i)      subject to paragraph (ii) below, the Majority Super Senior Creditors and the Majority Senior Secured Creditors; and

(ii)     in relation to instructions as to Enforcement with respect to the Transaction Security, the group of Primary Creditors entitled to give instructions as to Enforcement under Clause 15.5 (Enforcement prior to Super Senior Discharge Date);

(b)     on or after the Super Senior Discharge Date but before the First Lien Discharge Date, the Majority Senior Secured Creditors;

(c)     on or after the First Lien Discharge Date but before the Priority Discharge Date, the Majority Second Lien Creditors; and

(d)     on or after the Priority Discharge Date but before the Parent Debt Discharge Date, the Majority Parent Debt Creditors.

**Intercreditor Amendment** means any amendment or waiver which is subject to Clause 32 (Consents, Amendments and Override).

•

**Inter-Hedging Agreement Netting** means the exercise of any right of set-off, account combination, close-out netting or payment netting (whether arising out of a cross agreement netting agreement or otherwise) by a Hedge Counterparty against liabilities owed to a Debtor by that Hedge Counterparty under a Hedging Agreement in respect of Hedging Liabilities owed to that Hedge Counterparty by that Debtor under another Hedging Agreement.

**Inter-Hedging Ancillary Document Netting** means the exercise of any right of set-off, account combination, close-out netting or payment netting (whether arising out of a cross agreement netting agreement or otherwise) by a Hedging Ancillary Lender against liabilities owed to a Debtor by that Hedging Ancillary Lender under a Hedging Ancillary Document in respect of Liabilities owed to that Hedging Ancillary Lender by that Debtor under another Hedging Ancillary Document.

**Intra-Group Lenders** means each member of the Group which has made a loan available to, granted credit to or made any other financial arrangement having similar effect with another member of the Group and which is named on the signing pages as an Intra-Group Lender or which becomes a Party as an Intra-Group Lender in accordance with the terms of Clause 26 (Changes to the Parties).

**Intra-Group Lending** means the loans, credit or other financial arrangements made available by any Intra-Group Lender to a Debtor.

**Intra-Group Liabilities** means the Liabilities owed by any Debtor to any of the Intra-Group Lenders in its capacity as such and excluding any Liabilities which are Primary Creditor Liabilities.

**ISDA Master Agreement** means a 1992 ISDA Master Agreement or a 2002 ISDA Master Agreement.

**Issuing Bank** means any "Issuing Bank" (or any substantially equivalent term) under and as defined in any First Lien Facility Agreement.

**Legal Reservations and Perfection Requirements** means the "Legal Reservations" and the "Perfection Requirements" (or any substantially equivalent terms) under and as defined in any First Lien Facility Agreement.

**Lender** means a Super Senior Facility Lender, a Senior Secured Facility Lender, a Second Lien Facility Lender or a Parent Debt Facility Lender.

**Lender Cash Collateral** means any cash collateral provided by a Lender to an Issuing Bank pursuant to the terms of the relevant Facility Agreement.

**Letter of Credit** means any "Letter of Credit" or any "Undertaking" (or any substantially equivalent term) under and as defined in any First Lien Facility Agreement.

**Liabilities** means all present and future liabilities and obligations at any time of any Parent Debt Issuer, any Third Party Security Provider, any Debtor or any other member of the Group to any Creditor under the Debt Documents or under any other Intra-Group Lending, both actual and contingent and whether incurred solely or jointly or as principal or surety or in any other capacity together with any of the following matters relating to or arising in respect of those liabilities and obligations:

(a)      any refinancing, novation, deferral or extension;

•

**1061**

(b)     any claim for breach of representation, warranty or undertaking or on an event of default or under any indemnity given under or in connection with any document or agreement evidencing or constituting any other liability or obligation falling within this definition;

(c)     any claim for damages or restitution; and

(d)     any claim as a result of any recovery by any Parent Debt Issuer, any Third Party Security Provider, any Debtor or other member of the Group of a Payment on the grounds of preference or otherwise,

and any amounts which would be included in any of the above but for any discharge, non-provability, unenforceability or non-allowance of those amounts in any insolvency or other proceedings.

**Liabilities Acquisition** means, in relation to a person and to any Liabilities, a transaction where that person:

(a)     purchases by way of assignment or transfer;

(b)     enters into any sub-participation in respect of; or

(c)     enters into any other agreement or arrangement having an economic effect substantially similar to a sub-participation in respect of,

the rights in respect of those Liabilities.

**Liabilities Sale** means a Debt Disposal pursuant to paragraph (e) of Clause 18.1 (Facilitation of Distressed Disposals).

**Liabilities Transfer** means a transfer of the relevant class of Primary Creditor Liabilities described in Clause 6.1 (Option to purchase: Senior Secured Debt Creditors), Clause 6.2 (Option to purchase: Second Lien Creditors) or Clause 6.3 (Option to purchase: Parent Debt Creditors).

**Lower Ranking Creditors** means in relation to Consent given by any Creditor Representative or Bilateral Creditor for the purposes of Clause 32.8 (Deemed consent):

(a)     under a First Lien Debt Document, the Second Lien Creditors and the Parent Debt Creditors; and

(b)     under a Second Lien Debt Document, the Parent Debt Creditors.

**Lower Ranking Debt Documents** means in relation to Consent given by any Creditor Representative or Bilateral Creditor for the purposes of Clause 32.8 (Deemed consent):

(a)     under a First Lien Debt Document, the Second Lien Debt Documents and the Parent Debt Documents; and

(b)     under a Second Lien Debt Document, the Parent Debt Documents.

•

**Lower Ranking Security** means any Transaction Security which, as required under the applicable law of such Transaction Security, is expressed to be lower ranking than any other Transaction Security granted over the same assets.

**Majority Facility Lenders** means, in relation to any Facility Agreement, the Lenders under that Facility Agreement whose Credit Participations in respect of that Facility Agreement at that time aggregate more than 50% of the total Credit Participations of all Lenders under and in respect of that Facility Agreement at that time.

**Majority Parent Debt Creditors** means, at any time, those Parent Debt Creditors whose Parent Debt Credit Participations at that time aggregate more than 50% of the total Parent Debt Credit Participations at that time.

**Majority Second Lien Creditors** means, at any time, those Second Lien Creditors whose Second Lien Credit Participations at that time aggregate more than 50% of the total Second Lien Credit Participations at that time.

**Majority Senior Secured Creditors** means, at any time, those Senior Secured Facility Lenders, Senior Secured Noteholders and Senior Secured Hedge Counterparties whose Senior Secured Credit Participations at that time aggregate more than 50% of the total Senior Secured Credit Participations at that time.

**Majority Super Senior Creditors** means, at any time, those Super Senior Creditors (other than the Cash Management Providers) whose Super Senior Credit Participations at that time aggregate more than 66.67% of the total Super Senior Credit Participations of all Super Senior Creditors (other than the Cash Management Providers) at that time.

**Multi-account Overdraft** means an Ancillary Facility or Cash Management Facility which is an overdraft facility comprising more than one account.

**Multi-account Overdraft Liabilities** means the Liabilities arising under any Multi-account Overdraft.

**Non-Credit Related Close-Out** means a Permitted Hedge Close-Out described in any of paragraphs (i), (ii), (iii) or (vi) of Clause 5.9(a) (Permitted Enforcement: Hedge Counterparties).

**Non-Distressed Disposal** has the meaning given to that term in Clause 17 (Non-Distressed Disposals).

**Noteholders** means:

(a)     in relation to any Senior Secured Notes, the relevant Senior Secured Noteholders;

(b)     in relation to any Second Lien Notes, the relevant Second Lien Noteholders; and

(c)     in relation to any Parent Debt Notes, the relevant Parent Debt Noteholders.

**Notes** means:

(a)     any Senior Secured Notes;

•

(b)    any Second Lien Notes; and/or

(c)    any Parent Debt Notes.

**Notes Indenture** means:

(a)    in relation to any Senior Secured Notes, the relevant Senior Secured Notes Indenture;

(b)    in relation to any Second Lien Notes, the relevant Second Lien Notes Indenture; and

(c)    in relation to any Parent Debt Notes, the relevant Parent Debt Notes Indenture.

**Notes Issuer** means the issuer of any Notes.

**Notes Trustee** means:

(a)    in relation to any Senior Secured Noteholders, the relevant Senior Secured Note Trustee; and

(b)    in relation to any Second Lien Noteholders, the relevant Second Lien Notes Trustee; and

(c)    in relation to any Parent Debt Noteholders, the relevant Parent Debt Notes Trustee.

**Notes Trustee Amounts** means, in relation to a Notes Trustee, any amounts payable to that Notes Trustee or any adviser, receiver, delegate, attorney, agent or appointee of that Notes Trustee (a **Notes Trustee Appointee**) under the Debt Documents, any provisions (including indemnity provisions) for fees, costs and expenses in favour of that Notes Trustee or any Notes Trustee Appointee, all compensation for services provided by that Notes Trustee or any Notes Trustee Appointee which is payable to that Notes Trustee or any Notes Trustee Appointee pursuant to the terms of the Debt Documents and all out-of-pocket costs and expenses (including VAT where applicable) properly incurred (including reimbursement for expenses incurred) by that Notes Trustee or any Notes Trustee Appointee in carrying out its duties or performing any service pursuant to the terms of the Debt Documents, including compensation for the costs and expenses of the collection by that Notes Trustee of any amount payable to that Notes Trustee for the benefit of the relevant Noteholders, but excluding:

(a)    any payment in relation to any unpaid costs and expenses incurred in respect of any litigation initiated by that Notes Trustee or any Notes Trustee Appointee on behalf of that Notes Trustee against any: (i) in the case of a Senior Secured Notes Trustee, any other First Lien Creditor, (ii) in the case of a Second Lien Notes Trustee, any First Lien Creditor or any other Second Lien Creditor or (iii) in the case of a Parent Debt Notes Trustee, any Priority Creditor or any other Parent Debt Creditor; and

(b)    any payment made directly or indirectly on or in respect of any amounts owing under the Notes in respect of which it is the Notes Trustee (including principal, interest, premium or any other amounts to any of the relevant Noteholders) including VAT where applicable.

**Other Liabilities** means, in relation to a Parent Debt Issuer, a Third Party Security Provider, a Debtor or any other member of the Group, any trading and other liabilities and obligations (not being Borrowing Liabilities or Guarantee Liabilities) it may have to a Subordinated Creditor, Intra-Group Lender, Third Party Security Provider or Debtor.

•

**Parent Debt Acceleration Event** means a Parent Debt Facility Acceleration Event or a Parent Debt Notes Acceleration Event.

**Parent Debt Arranger Liabilities** means all Liabilities owed by the Debtors to a Parent Debt Facility Arranger.

**Parent Debt Automatic Block Event** means the occurrence under a Priority Debt Document of an Event of Default, in each case relating to the non-payment of:

(a)    an amount constituting principal or interest; or

(b)    any other amount in excess of US$500,000 (or its equivalent).

**Parent Debt Credit Participation** means in relation to a Parent Debt Noteholder or a Parent Debt Facility Lender, the aggregate of:

(a)    its aggregate Parent Debt Facility Commitments, if any;

(b)    the aggregate outstanding principal amount of the Parent Debt Notes held by it, if any; and

(c)    to the extent not falling within paragraphs (a) or (b) above, the aggregate outstanding principal amount of any Parent Debt Liabilities in respect of which it is the creditor, if any.

**Parent Debt Creditor Representative** means a Parent Debt Facility Agent or a Parent Debt Notes Trustee, as the context requires.

**Parent Debt Creditors** means the Parent Debt Facility Lenders and the Parent Debt Noteholders.

**Parent Debt Discharge Date** means the first date on which both of the Parent Debt Facility Discharge Date and the Parent Debt Notes Discharge Date have occurred.

**Parent Debt Documents** means the Parent Debt Facility Documents and the Parent Debt Notes Documents.

**Parent Debt Enforcement Notice** has the meaning given to that term in Clause 8.9 (Permitted Enforcement: Parent Debt Creditors).

**Parent Debt Event of Default** means an Event of Default under a Parent Debt Facility Agreement or Parent Debt Notes Indenture.

**Parent Debt Facility** means:

(a)    any Initial Debt which is designated as a "Parent Debt Facility"; and/or

(b)    any other loan, letter of credit, guarantee or other credit facility made available to a Parent Debt Issuer where any:

(i)    agent, trustee or other creditor representative in respect of that facility has become a Party as a Parent Debt Facility Agent;

(ii)    arranger of that facility has become a Party as a Parent Debt Facility Arranger; and

•

(iii)    lender or other provider in respect of that facility has become a Party as a Parent Debt Facility Lender,

in respect of that facility pursuant to Clause 26 (Changes to the Parties).

**Parent Debt Facility Acceleration Event** means the Creditor Representative in relation to any Parent Debt Facility exercising any of its Acceleration Rights with respect to that Parent Debt Facility in accordance with the relevant Parent Debt Facility Agreement.

**Parent Debt Facility Agent** means, in relation to a Parent Debt Facility, the person which is an initial Party, or which has acceded to this Agreement, as the agent, trustee or other creditor representative of the relevant Parent Debt Facility Lenders pursuant to Clause 26 (Changes to the Parties).

**Parent Debt Facility Agreement** means, in relation to a Parent Debt Facility, the facility agreement documenting that Parent Debt Facility.

**Parent Debt Facility Arranger** means, in relation to a Parent Debt Facility, any arranger of that Parent Debt Facility which is named on the signing pages as a Parent Debt Facility Arranger or which becomes a Party as a Parent Debt Facility Arranger in respect of that Parent Debt Facility pursuant to Clause 26 (Changes to the Parties).

**Parent Debt Facility Commitment** means a "Commitment" (or substantially equivalent term) under and as defined in a Parent Debt Facility Agreement.

**Parent Debt Facility Discharge Date** means the first date on which all Parent Debt Facility Liabilities have been fully and finally discharged to the satisfaction of the relevant Creditor Representative(s) or Bilateral Lender (as the case may be), whether or not as the result of an Enforcement, and the Parent Debt Facility Lenders are under no further obligation to provide financial accommodation to any of the Debtors under the Parent Debt Facility Documents.

**Parent Debt Facility Documents** means, in relation to a Parent Debt Facility, the relevant Parent Debt Facility Agreement and any "Finance Document" (or any substantially equivalent term) in that Parent Debt Facility Agreement.

**Parent Debt Facility Lender** means, in relation to a Parent Debt Facility:

(a)    each "Lender" or "Bank" under and as defined in the relevant Parent Debt Facility Agreement and each Issuing Bank and Ancillary Lender under the relevant Parent Debt Facility Agreement; and/or

(b)    any other lender, holder or other creditor of that Parent Debt Facility.

**Parent Debt Facility Liabilities** means the Liabilities owed by any Debtor to the Parent Debt Facility Lenders under or in connection with the Parent Debt Facility Documents.

**Parent Debt Financing Document** means a Parent Debt Facility Agreement or a Parent Debt Notes Indenture.

**Parent Debt Group Guarantee** means any guarantee by a member of the Group in respect of any Parent Debt Notes (whether contained in a Parent Debt Notes Indenture, as a notation of guarantee

•

attached to the Parent Debt Notes or otherwise) or any Parent Debt Facility (whether contained in a Parent Debt Facility Agreement or otherwise).

**Parent Debt Group Guarantor** means any member of the Group which has given any Parent Debt Group Guarantee.

**Parent Debt Issuer** means:

(a)    any Holding Company of the Company; or

(b)    any Subsidiary of any Holding Company of the Company (other than a member of the Group),

which is (or becomes) the issuer of any Parent Debt Notes or the borrower under any Parent Debt Facility.

**Parent Debt Liabilities** means the Parent Debt Facility Liabilities and the Parent Debt Notes Liabilities.

**Parent Debt Noteholders** means any registered holder from time to time of any Parent Debt Notes.

**Parent Debt Notes** means:

(a)    any Initial Debt which is designated as "Parent Debt Notes"; and/or

(b)    any high yield notes, exchange notes or other debt securities issued or to be issued by any Parent Debt Issuer which are designated as such by the Company (in its discretion) by written notice to the Security Agent from time to time where the trustee in respect of that issuance has become a Party as a Parent Debt Notes Trustee in respect of that issuance pursuant to Clause 26 (Changes to the Parties).

**Parent Debt Notes Acceleration Event** means the Creditor Representative in relation to any Parent Debt Notes exercising any of its Acceleration Rights with respect to those Parent Debt Notes in accordance with the relevant Parent Debt Notes Indenture.

**Parent Debt Notes Discharge Date** means the first date on which all Parent Debt Notes Liabilities have been fully and finally discharged to the satisfaction of the relevant Creditor Representative(s), whether or not as the result of an Enforcement, and the Parent Debt Noteholders are under no further obligation to provide financial accommodation to any of the Debtors under the Parent Debt Notes Documents.

**Parent Debt Notes Documents** mean each Parent Debt Notes Indenture, the Parent Debt Notes, the Common Transaction Security Documents (if expressed to secure the Parent Debt Notes Liabilities), any Parent Debt Only Security Documents, the Parent Debt Group Guarantees in respect of the Parent Debt Notes, this Agreement and any other document designated as such by the Company and the Security Agent.

**Parent Debt Notes Indenture** means, in relation to any Parent Debt Notes, the indenture pursuant to which those Parent Debt Notes are issued.

•

**Parent Debt Notes Liabilities** means the Liabilities owed by any Debtor to the Parent Debt Noteholders under or in connection with the Parent Debt Notes Documents.

**Parent Debt Notes Trustee** means, in relation to any Parent Debt Notes, the person which is an initial Party, or which has acceded to this Agreement, as the notes trustee of the relevant Parent Debt Noteholders pursuant to Clause 26 (Changes to the Parties).

**Parent Debt Only Charged Property** means all of the assets which from time to time are, or are expressed to be, the subject of the Parent Debt Only Security.

**Parent Debt Only Obligor** means any person that is not a member of the Group or a Third Party Security Provider that becomes a Party to this Agreement in accordance with Clause 26.18 (New Parent Debt Only Obligor)

**Parent Debt Only Secured Obligations** means all the Parent Debt Liabilities and all other present and future liabilities and obligations at any time due, owing or incurred by any Parent Debt Only Obligor to any Parent Debt Secured Party under the Debt Documents (including to the Security Agent under Clause 24.3 (Parallel debt)), both actual and contingent and whether incurred solely or jointly and as principal or surety or in any other capacity, but not including the Common Secured Obligations or the Priority Creditor Secured Obligations.

**Parent Debt Only Security** means any Security from any Parent Debt Only Obligor which to the extent legally possible and subject to the Agreed Security Principles (or any substantially equivalent principles included in any Parent Debt Document):

(a)      is created in favour of the Security Agent as agent or trustee for the other Parent Debt Secured Parties in respect of the Parent Debt Only Secured Obligations; or

(b)      in the case of any jurisdiction in which effective Security cannot be granted in favour of the Security Agent as agent or trustee for the Parent Debt Secured Parties is created in favour of:

(i)      all the Parent Debt Secured Parties in respect of the Parent Debt Only Secured Obligations; or

(ii)      the Security Agent under a parallel debt structure, joint and several creditor structure or agency structure for the benefit of all the Parent Debt Secured Parties,

but not including the Transaction Security.

**Parent Debt Only Security Documents** means:

(a)      any document entered into by any Parent Debt Only Obligor creating or expressed to create any Parent Debt Only Security;

(b)      any other document entered into at any time by any Parent Debt Only Obligor creating any Security in favour of any of the Parent Debt Secured Parties as security for any of the Parent Debt Only Secured Obligations; and

(c)      any Security granted under any covenant for further assurance in any of the documents referred to in paragraphs (a) and (b) above,

•

but not including the Transaction Security Documents.

**Parent Debt Only Security Property** means:

(a)     the Parent Debt Only Security and all proceeds of that Parent Debt Only Security;

(b)     all obligations expressed to be undertaken by a Parent Debt Only Obligor to pay amounts in respect of the Liabilities to the Security Agent as agent or trustee for the Parent Debt Secured Parties (including under Clause 24.3 (Parallel debt)) and secured by the Parent Debt Only Security together with all representations and warranties expressed to be given by a Parent Debt Only Obligor in favour of the Security Agent as agent or trustee for the Parent Debt Secured Parties; and

(c)     any other amounts or property, whether rights, entitlements, choses in action or otherwise, actual or contingent, which the Security Agent is required by the terms of the Debt Documents to hold as trustee on trust or as security agent for (or otherwise for the benefit of) the Parent Debt Secured Parties,

but not including the Transaction Security Property.

**Parent Debt Payment Stop Event** means an Event of Default having occurred under a Priority Debt Document (other than an Event of Default constituting a Parent Debt Automatic Block Event).

**Parent Debt Payment Stop Notice** has the meaning given to such term in Clause 8.4 (Issue of Parent Debt Payment Stop Notice).

**Parent Debt Secured Parties** means the Security Agent, any Receiver or Delegate appointed in respect of the Parent Debt Only Security, each Parent Debt Creditor Representative, each Parent Debt Facility Arranger and each of the Parent Debt Creditors from time to time.

**Parent Debt Standstill Period** means, in relation to a relevant Parent Debt Event of Default, the period beginning on the date (the **Parent Debt Standstill Start Date**) the relevant Parent Debt Creditor Representative serves a Parent Debt Enforcement Notice on the Security Agent in respect of such relevant Parent Debt Event of Default and ending on the earlier to occur of:

(a)     the date falling 179 days after the Parent Debt Standstill Start Date;

(b)     the date the Security Agent takes any Enforcement Action against any Parent Debt Group Guarantor provided that if a Parent Debt Standstill Period ends pursuant to this paragraph (b), the Parent Debt Creditors may only take the same Enforcement Action in relation to the relevant Parent Debt Liabilities (and only against the same entity) as the Enforcement Action taken by the Security Agent and may not take any other Enforcement Action against any other member of the Group;

(c)     the date of an Insolvency Event (other than an Insolvency Event directly caused by any action taken by or at the request or direction of a Parent Debt Creditor) in relation to the relevant Parent Debt Issuer or a particular Parent Debt Group Guarantor against whom Enforcement Action is to be taken provided that if a Parent Debt Standstill Period ends pursuant to this paragraph (c), the Parent Debt Creditors may only take Enforcement Action against that Debtor;

•

(d)    the expiry of any other Parent Debt Standstill Period outstanding at the date such first mentioned Parent Debt Standstill Period commenced (unless that expiry occurs as a result of a cure, waiver or other permitted remedy); and

(e)    the date on which the Majority Super Senior Creditors, the Majority Senior Secured Creditors and the Majority Second Lien Creditors give their consent to an early termination of the Parent Debt Standstill Period.

**Party** means a party to this Agreement.

**Payment** means, in respect of any Liabilities (or any other liabilities or obligations), a payment, prepayment, repayment, redemption, defeasance or discharge of those Liabilities (or other liabilities or obligations).

**Payment Netting** means:

(a)    in respect of a Hedging Agreement or a Hedging Ancillary Document based on an ISDA Master Agreement, netting under section 2(c) of the relevant ISDA Master Agreement; and

(b)    in respect of a Hedging Agreement or a Hedging Ancillary Document not based on an ISDA Master Agreement, netting pursuant to any provision of that Hedging Agreement or a Hedging Ancillary Document which has a similar effect to the provision referenced in paragraph (a) above.

**Permitted Cash Management Payment** means the Payments permitted by Clause 4.1 (Payment of Cash Management Liabilities).

**Permitted First Lien Debt Payments** means the Payments permitted by Clause 3.1 (Payment of First Lien Liabilities).

**Permitted Gross Outstandings** means, in relation to a Multi-account Overdraft, any amount, not exceeding its Designated Gross Amount, which is the aggregate amount of the gross debit balance of overdrafts comprised in that Multi-account Overdraft.

**Permitted Hedge Close-Out** means, in relation to a hedging transaction under a Hedging Agreement, a termination or close-out of that hedging transaction which is permitted pursuant to Clause 5.9 (Permitted Enforcement: Hedge Counterparties).

**Permitted Hedge Payments** means the Payments permitted by Clause 5.3 (Permitted Payments: Hedging Liabilities).

**Permitted Intra-Group Payments** means the Payments permitted by Clause 9.2 (Permitted Payments: Intra-Group Liabilities).

**Permitted Multi-account Overdraft Discharge** means any discharge (including by way of netting or set-off) by an Ancillary Lender or a Cash Management Provider of any Multi-account Overdraft Liabilities:

(a)    in the case of any Multi-account Overdraft which has a Designated Net Amount which is greater than (being a positive amount) or equal to zero, to the extent permitted under the relevant First Lien Debt Document or Ancillary Document (as the case may be); or

•

(b)      in the case of any other Multi-account Overdraft, to the extent that the relevant discharge represents a reduction of the Permitted Gross Outstandings of that Multi-account Overdraft to or towards an amount equal to its Designated Net Amount.

**Permitted Parent Debt Payments** means the Payments permitted by Clause 8.2 (Permitted Payments: Parent Debt Liabilities).

**Permitted Payment** means a Permitted Primary Creditor Payment, a Permitted Intra-Group Payment or a Permitted Subordinated Payment.

**Permitted Primary Creditor Payments** means a Permitted Hedge Payment, a Permitted Cash Management Payment, a Permitted First Lien Debt Payment, a Permitted Second Lien Debt Payment or a Permitted Parent Debt Payment.

**Permitted Second Lien Debt Payments** means the Payments permitted by Clause 7.2 (Permitted Payments: Second Lien Liabilities).

**Permitted Subordinated Payment** means the Payments permitted by Clause 10.2 (Permitted Payments: Subordinated Liabilities).

**Primary Creditor Liabilities** means the First Lien Liabilities, the Second Lien Liabilities and the Parent Debt Liabilities.

**Primary Creditors** means the First Lien Creditors, the Second Lien Creditors and the Parent Debt Creditors.

**Primary Debt Documents** means the Hedging Agreements, the Cash Management Agreements, the First Lien Debt Documents, the Second Lien Debt Documents and the Parent Debt Documents.

**Primary Financing Document** means a Facility Agreement or a Notes Indenture.

**Primary Liabilities** means the Primary Creditor Liabilities, the Arranger Liabilities, the Creditor Representative Liabilities and the Security Agent Liabilities.

**Prior Ranking Creditors** means:

(a)      when used in relation to the Second Lien Liabilities, the First Lien Creditors; and

(b)      when used in relation to the Parent Debt Liabilities, the First Lien Creditors and the Second Lien Creditors.

**Prior Ranking Default** means:

(a)      when used in relation to the Second Lien Liabilities, an Event of Default under a First Lien Facility Agreement or a Senior Secured Notes Indenture; and

(b)      when used in relation to the Parent Debt Liabilities, an Event of Default under a First Lien Facility Agreement, a Senior Secured Notes Indenture, a Second Lien Facility Agreement or a Second Lien Notes Indenture.

**Prior Ranking Financing Documents** means:

•

(a)     when used in relation to the Second Lien Liabilities, each First Lien Facility Agreement and each Senior Secured Notes Indenture; and

(b)     when used in relation to the Parent Debt Liabilities, each First Lien Facility Agreement, each Senior Secured Notes Indenture, each Second Lien Facility Agreement and each Second Lien Notes Indenture.

**Prior Ranking Liabilities** means:

(a)     when used in relation to the Second Lien Liabilities, the First Lien Liabilities; and

(b)     when used in relation to the Parent Debt Liabilities, the First Lien Liabilities and the Second Lien Liabilities.

**Priority Creditor Charged Property** means all of the assets which from time to time are, or are expressed to be, the subject of the Priority Creditor Transaction Security.

**Priority Creditor Facility Arranger** means a Super Senior Facility Arranger, a Senior Secured Facility Arranger or a Second Lien Facility Arranger.

**Priority Creditor Liabilities** means the Primary Creditor Liabilities other than the Parent Debt Liabilities.

**Priority Creditor Representative** means a Super Senior Facility Agent, a Senior Secured Creditor Representative or a Second Lien Creditor Representative.

**Priority Creditor Secured Obligations** means all the Priority Creditor Liabilities and all other present and future liabilities and obligations at any time due, owing or incurred by any member of the Group and by each Debtor to any Priority Secured Party under the Priority Debt Documents (including to the Security Agent under Clause 24.3 (Parallel debt)), both actual and contingent and whether incurred solely or jointly and as principal or surety or in any other capacity.

**Priority Creditor Security Property** means:

(a)     the Priority Creditor Transaction Security and all proceeds of that Priority Creditor Transaction Security;

(b)     all obligations expressed to be undertaken by a Debtor or a Third Party Security Provider to pay amounts in respect of the Liabilities to the Security Agent as security agent or trustee for the Priority Secured Parties (including under Clause 24.3 (Parallel debt)) and secured by the Priority Creditor Transaction Security together with all representations and warranties expressed to be given by a Debtor or a Third Party Security Provider in favour of the Security Agent as security agent or trustee for the Priority Secured Parties;

(c)     the Security Agent's interest in any trust fund in any amounts to be applied for the benefit only of the Priority Secured Parties created pursuant Clause 12 (Turnover of Receipts); and

(d)     any other amounts or property, whether rights, entitlements, choses in action or otherwise, actual or contingent, which the Security Agent is required by the terms of the Debt Documents to hold as trustee on trust or as security agent for (or otherwise for the benefit of) the Priority Secured Parties.

•

**1072**

**Priority Creditor Transaction Security** means any Security from any member of the Group or Third Party Security Provider which to the extent legally possible and subject to any Agreed Security Principles:

(a)    is created in favour of the Security Agent as agent or trustee for the other Priority Secured Parties in respect of the Priority Creditor Secured Obligations; or

(b)    in the case of any jurisdiction in which effective Security cannot be granted in favour of the Security Agent as agent or trustee for the Priority Secured Parties is created in favour of:

(i)    all the Priority Secured Parties in respect of the Priority Creditor Secured Obligations; or

(ii)    the Security Agent under a parallel debt structure, joint and several creditor structure or agency structure for the benefit of all the Priority Secured Parties,

and which (subject to the terms of this Agreement) ranks in the order of priority contemplated in Clause 2.2 (Transaction Security).

**Priority Creditor Transaction Security Documents** means:

(a)    any document entered into by any member of the Group or Third Party Security Provider creating or expressed to create any Priority Creditor Transaction Security;

(b)    any other document entered into at any time by any of the Debtors or any Third Party Security Provider creating any guarantee, indemnity, Security or other assurance against financial loss in favour of any of the Priority Secured Parties as security for any of the Priority Creditor Secured Obligations; and

(c)    any Security granted under any covenant for further assurance in any of the documents referred to in paragraphs (a) and (b) above.

**Priority Creditors** means the Primary Creditors other than the Parent Debt Creditors.

**Priority Debt Document** means each of this Agreement, the Hedging Agreements, the Super Senior Facility Documents, the Cash Management Agreements, the Senior Secured Debt Documents, the Second Lien Debt Documents, the Transaction Security Documents and any other document designated as such by the Security Agent and the Company.

**Priority Discharge Date** means the latest to occur of the Super Senior Discharge Date, the Senior Secured Creditor Discharge Date and the Second Lien Discharge Date.

**Priority Secured Parties** means the Security Agent, any Receiver or Delegate appointed in respect of the Priority Creditor Transaction Security, each Priority Creditor Representative, each Priority Creditor Facility Arranger and each of the Priority Creditors from time to time.

**Proceeds Loan** means each loan, bond or other debt instrument pursuant which the proceeds of any issue of Parent Debt Notes or any Parent Debt Facility are lent by the issuer of those Parent Debt Notes or the borrower of that Parent Debt Facility to a member of the Group.

**Property** of a member of the Group or of a Debtor means:

•

(a)    any asset of that member of the Group or of that Debtor;

(b)    any Subsidiary of that member of the Group or of that Debtor; and

(c)    any asset of any such Subsidiary.

**Receiver** means a receiver or receiver and manager or administrative receiver of the whole or any part of the Charged Property or the Parent Debt Only Charged Property.

**Recoveries** means the Common Recoveries and the Parent Debt Recoveries (each as defined in Clause 21.1 (Order of application: Common Recoveries) and Clause 21.3 (Order of application: Parent Debt Recoveries) respectively).

**Relevant Ancillary Lender** means, in respect of any Cash Cover, the Ancillary Lender (if any) for which that Cash Cover is provided.

**Relevant Cash Management Provider** means, in respect of any Cash Cover, the Cash Management Provider (if any) for which that Cash Cover is provided.

**Relevant Issuing Bank** means, in respect of any Cash Cover, the Issuing Bank (if any) for which that Cash Cover is provided.

**Relevant Liabilities** means:

(a)    in the case of a Creditor:

(i)    the Liabilities owed to Creditors ranking (in accordance with the terms of this Agreement) *pari passu* with or in priority to that Creditor (as the case may be) together with all Creditor Representative Liabilities owed to the Creditor Representative(s) of those Creditors and any Arranger Liabilities owed to any Arranger of those Liabilities; and

(ii)    all present and future liabilities and obligations, actual and contingent, of the Debtors to the Security Agent; and

(b)    in the case of a Debtor, the Liabilities owed to the Creditors, the Creditor Representative Liabilities owed to the Creditor Representatives of those Creditors together with all present and future liabilities and obligations, actual and contingent, of the Debtors to the Security Agent and any Arranger Liabilities owed to any Arranger of those Liabilities.

**Required Creditor Consent** means a Required Super Senior Creditor Consent, a Required Senior Secured Creditor Consent, a Required Second Lien Creditor Consent, and/or a Required Parent Debt Creditor Consent, as the context requires.

**Required Parent Debt Creditor Consent** means, if any proposed matter, step or action taken prior to the Parent Debt Discharge Date is prohibited by the terms of:

(a)    any Parent Debt Facility Document, the prior consent of the Majority Facility Lenders under the relevant Parent Debt Facility Agreement; or

•

(b)      any Parent Debt Notes Document, the prior consent of the relevant Parent Debt Notes Trustee acting on behalf of the requisite Parent Debt Noteholders.

**Required Prior Ranking Creditor Consent** means:

(a)      when used in relation to the Senior Secured Creditor Liabilities, a Required Super Senior Creditor Consent;

(b)      when used in relation to the Second Lien Liabilities, a Required Super Senior Creditor Consent and a Required Senior Secured Creditor Consent; and

(c)      when used in relation to the Parent Debt Liabilities, a Required Super Senior Creditor Consent, a Required Senior Secured Creditor Consent, a Required Second Lien Creditor Consent.

**Required Second Lien Creditor Consent** means, if any proposed matter, step or action taken prior to the Second Lien Discharge Date is prohibited by the terms of:

(a)      any Second Lien Facility Document, the prior consent of the Majority Facility Lenders under the relevant Second Lien Facility Agreement; or

(b)      any Second Lien Notes Document, the prior consent of the relevant Second Lien Notes Trustee acting on behalf of the requisite Second Lien Noteholders.

**Required Senior Secured Creditor Consent** means, if any proposed matter, step or action taken prior to the Senior Secured Debt Discharge Date is prohibited by the terms of:

(a)      any Senior Secured Facility Document, the prior consent of the Majority Facility Lenders under the relevant Senior Secured Facility Agreement; or

(b)      any Senior Secured Notes Document, the prior consent of the relevant Senior Secured Notes Trustee acting on behalf of the requisite Senior Secured Noteholders.

**Required Super Senior Creditor Consent** means, if any proposed matter, step or action taken prior to the Super Senior Discharge Date is prohibited by the terms of a Super Senior Facility Agreement, the prior consent of the Majority Facility Lenders under that Super Senior Facility Agreement.

**Restricted Subsidiary** means a Subsidiary of the Company other than an Unrestricted Subsidiary.

**Second Lien Acceleration Event** means a Second Lien Facility Acceleration Event or a Second Lien Notes Acceleration Event.

**Second Lien Arranger Liabilities** means all Liabilities owed by the Debtors to a Second Lien Facility Arranger.

**Second Lien Automatic Block Event** means the occurrence under a First Lien Debt Document of an Event of Default, in each case relating to the non-payment of:

(a)      an amount constituting principal or interest; or

(b)      any other amount in excess of US$500,000 (or its equivalent).

•

**Second Lien Credit Participation** means in relation to a Second Lien Noteholder or a Second Lien Facility Lender, the aggregate of:

(a)      its aggregate Second Lien Facility Commitments, if any;

(b)      the aggregate outstanding principal amount of the Second Lien Notes held by it, if any; and

(c)      to the extent not falling within paragraphs (a) or (b) above, the aggregate outstanding principal amount of any Second Lien Liabilities in respect of which it is the creditor, if any.

**Second Lien Creditor Representative** means a Second Lien Facility Agent or a Second Lien Notes Trustee, as the context requires.

**Second Lien Creditors** means the Second Lien Facility Lenders and the Second Lien Noteholders.

**Second Lien Debt Documents** means the Second Lien Facility Documents and the Second Lien Notes Documents.

**Second Lien Debt Issuer** means the issuer of any Second Lien Notes or a borrower under any Second Lien Facility.

**Second Lien Discharge Date** means the first date on which both of the Second Lien Facility Discharge Date and the Second Lien Notes Discharge Date have occurred.

**Second Lien Enforcement Notice** has the meaning given to that term in Clause 7.9 (Permitted Enforcement: Second Lien Creditors).

**Second Lien Event of Default** means an Event of Default under a Second Lien Facility Agreement or Second Lien Notes Indenture.

**Second Lien Facility** means:

(a)      any Initial Debt which is designated as a "Second Lien Facility"; and/or

(b)      any other loan, letter of credit, guarantee or other credit facility made available to a member of the Group where any:

　　(i)      agent, trustee or other creditor representative in respect of that facility has become a Party as a Second Lien Facility Agent;

　　(ii)      arranger of that facility has become a Party as a Second Lien Facility Arranger; and

　　(iii)      lender or other provider in respect of that facility has become a Party as a Second Lien Facility Lender,

in respect of that facility pursuant to Clause 26 (Changes to the Parties).

**Second Lien Facility Acceleration Event** means the Creditor Representative in relation to any Second Lien Facility exercising any of its Acceleration Rights with respect to that Second Lien Facility in accordance with the relevant Second Lien Facility Agreement.

•

**Second Lien Facility Agent** means, in relation to a Second Lien Facility, the person which is an initial Party, or which has acceded to this Agreement, as the agent, trustee or other creditor representative of the relevant Second Lien Facility Lenders pursuant to Clause 26 (Changes to the Parties).

**Second Lien Facility Agreement** means, in relation to a Second Lien Facility, the facility agreement documenting that Second Lien Facility.

**Second Lien Facility Arranger** means, in relation to a Second Lien Facility, any arranger of that Second Lien Facility which is named on the signing pages as a Second Lien Facility Arranger or which becomes a Party as a Second Lien Facility Arranger in respect of that Second Lien Facility pursuant to Clause 26 (Changes to the Parties).

**Second Lien Facility Commitment** means a "Commitment" (or substantially equivalent term) under and as defined in a Second Lien Facility Agreement.

**Second Lien Facility Discharge Date** means the first date on which all Second Lien Facility Liabilities have been fully and finally discharged to the satisfaction of the relevant Creditor Representative(s) or Bilateral Lender (as the case may be), whether or not as the result of an Enforcement, and the Second Lien Facility Lenders are under no further obligation to provide financial accommodation to any of the Debtors under the Second Lien Facility Documents.

**Second Lien Facility Documents** means, in relation to a Second Lien Facility, the relevant Second Lien Facility Agreement and any "Finance Document" (or any substantially equivalent term) in that Second Lien Facility Agreement.

**Second Lien Facility Lender** means, in relation to a Second Lien Facility:

(a)     each "Lender" or "Bank" under and as defined in the relevant Second Lien Facility Agreement and each Issuing Bank and Ancillary Lender under the relevant Second Lien Facility Agreement; and/or

(b)     any other lender, holder or other creditor of that Second Lien Facility.

**Second Lien Facility Liabilities** means the Liabilities owed by any Debtor to the Second Lien Facility Lenders under or in connection with the Second Lien Facility Documents.

**Second Lien Financing Document** means a Second Lien Facility Agreement or a Second Lien Notes Indenture.

**Second Lien Group Guarantee** means any guarantee by a member of the Group in respect of any Second Lien Notes (whether contained in a Second Lien Notes Indenture, as a notation of guarantee attached to the Second Lien Notes or otherwise) or any Second Lien Facility (whether contained in a Second Lien Facility Agreement or otherwise).

**Second Lien Group Guarantor** means any member of the Group which has given any Second Lien Group Guarantee.

**Second Lien Liabilities** means the Second Lien Facility Liabilities and the Second Lien Notes Liabilities.

•

**Second Lien Noteholders** means any registered holder from time to time of any Second Lien Notes.

**Second Lien Notes** means:

(a)    any Initial Debt which is designated as "Second Lien Notes"; and/or

(b)    any high yield notes, exchange notes or other debt securities issued or to be issued by any member of the Group which are designated as such by the Company (in its discretion) by written notice to the Security Agent from time to time where the trustee in respect of that issuance has become a Party as a Second Lien Notes Trustee in respect of that issuance pursuant to Clause 26 (Changes to the Parties).

**Second Lien Notes Acceleration Event** means the Creditor Representative in relation to any Second Lien Notes exercising any of its Acceleration Rights with respect to those Second Lien Notes in accordance with the relevant Second Lien Notes Indenture.

**Second Lien Notes Discharge Date** means the first date on which all Second Lien Notes Liabilities have been fully and finally discharged to the satisfaction of the relevant Creditor Representative(s), whether or not as the result of an Enforcement, and the Second Lien Noteholders are under no further obligation to provide financial accommodation to any of the Debtors under the Second Lien Notes Documents.

**Second Lien Notes Documents** mean each Second Lien Notes Indenture, the Second Lien Notes, the Transaction Security Documents, the Second Lien Group Guarantees, this Agreement and any other document designated as such by the Company and the Security Agent.

**Second Lien Notes Indenture** means, in relation to any Second Lien Notes, the indenture pursuant to which those Second Lien Notes are issued.

**Second Lien Notes Liabilities** means the Liabilities owed by any Debtor to the Second Lien Noteholders under or in connection with the Second Lien Notes Documents.

**Second Lien Notes Trustee** means, in relation to any Second Lien Notes, the person which is an initial Party, or which has acceded to this Agreement, as the notes trustee of the relevant Second Lien Noteholders pursuant to Clause 26 (Changes to the Parties).

**Second Lien Payment Stop Event** means:

(a)    any Second Lien Automatic Block Event;

(b)    an Event of Default which is continuing under any First Lien Debt Document with respect to "insolvency" or "insolvency proceedings" (or any substantially equivalent provision) including any Insolvency Event;

(c)    an Event of Default which is continuing under any First Lien Debt Document as a result of a breach of any financial covenant;

(d)    an Event of Default which is continuing under any First Lien Debt Document which has or is reasonably likely to have a Material Adverse Effect (as defined in the relevant First Lien Debt Document); or

•

(e)    any First Lien Acceleration Event.

**Second Lien Payment Stop Notice** has the meaning given to such term in Clause 7.4 (*Issue of Second Lien Payment Stop Notice*).

**Second Lien Standstill Period** means, in relation to a relevant Second Lien Event of Default, the period beginning on the date (the **Second Lien Standstill Start Date**) the relevant Second Lien Creditor Representative serves a Second Lien Enforcement Notice on the Security Agent in respect of such relevant Second Lien Event of Default and ending on the earlier to occur of:

(a)    the date falling 120 days after the Second Lien Standstill Start Date;

(b)    the date the Security Agent takes any Enforcement Action against any Second Lien Group Guarantor provided that if a Second Lien Standstill Period ends pursuant to this paragraph (b), the Second Lien Creditors may only take the same Enforcement Action in relation to the relevant Second Lien Liabilities (and only against the same entity) as the Enforcement Action taken by the Security Agent and may not take any other Enforcement Action against any other Debtor or member of the Group;

(c)    the date of an Insolvency Event (other than an Insolvency Event directly caused by any action taken by or at the request or direction of a Second Lien Creditor) in relation to the relevant Second Lien Debt Issuer or a particular Second Lien Group Guarantor against whom Enforcement Action is to be taken provided that if a Second Lien Standstill Period ends pursuant to this paragraph (c), the Second Lien Creditors may only take Enforcement Action against that Debtor;

(d)    the expiry of any other Second Lien Standstill Period outstanding at the date such first mentioned Second Lien Standstill Period commenced (unless that expiry occurs as a result of a cure, waiver or other permitted remedy); and

(e)    the date on which the Majority Super Senior Creditors and the Majority Senior Secured Creditors give their consent to an early termination of the Second Lien Standstill Period.

**Secured Parties** means the Security Agent, any Receiver or Delegate, each Creditor Representative, each Arranger and each of the Primary Creditors from time to time.

**Security** means a mortgage, charge, pledge, lien or other security interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

**Security Agent Amounts** means fees, costs and expenses of the Security Agent payable to the Security Agent for its own account pursuant to the relevant Debt Documents or any engagement letter between the Security Agent and a Debtor (including any amount payable to the Security Agent by way of indemnity, remuneration or reimbursement for expenses incurred), and the costs incurred by the Security Agent in connection with any actual or attempted Enforcement Action which is permitted by this Agreement which are recoverable pursuant to the terms of the Debt Documents (other than pursuant to Clause 24.3 (*Parallel debt*)).

**Security Agent Claim** has the meaning given to that term in Clause 24.3 (*Parallel debt*).

**Security Agent Liabilities** means all Liabilities owed by the Debtors to the Security Agent including Security Agent Amounts (other than pursuant to Clause 24.3 (*Parallel debt*)).

•

**1079**

**Security Agent's Spot Rate of Exchange** means, in respect of the conversion of one currency (the **First Currency**) into another currency (the **Second Currency**):

(a)      the Security Agent's spot rate of exchange; or

(b)      (if the Security Agent does not have an available spot rate of exchange) any other publicly available spot rate of exchange selected by the Security Agent (acting reasonably),

for the purchase of the Second Currency with the First Currency in the London foreign exchange market at or about 11.00 a.m. (London time) on a particular day, which shall, in either case, be notified by the Security Agent in accordance with paragraph (e) of Clause 24.6 (Duties of the Security Agent).

**Security Documents** means the Transaction Security Documents and the Parent Debt Only Security Documents.

**Senior Secured Credit Participation** means:

(a)      in relation to a Senior Secured Hedge Counterparty, its aggregate Senior Secured Hedge Credit Participation; and

(b)      in relation to a Senior Secured Noteholder or a Senior Secured Facility Lender, the aggregate of:

(i)        its aggregate Senior Secured Facility Commitments, if any;

(ii)       the aggregate outstanding principal amount of the Senior Secured Notes held by it, if any; and

(iii)      to the extent not falling within paragraphs (i) or (ii) above, the aggregate outstanding principal amount of any Senior Secured Debt Liabilities in respect of which it is the creditor, if any.

**Senior Secured Creditor Discharge Date** means the first date on which both of the Senior Secured Debt Discharge Date and the Senior Secured Hedging Discharge Date have occurred.

**Senior Secured Creditor Liabilities** means the Senior Secured Debt Liabilities and the Senior Secured Hedging Liabilities.

**Senior Secured Creditors** means the Senior Secured Debt Creditors and the Senior Secured Hedge Counterparties.

**Senior Secured Debt Creditor Representative** means a Senior Secured Facility Agent or a Senior Secured Notes Trustee, as the context requires.

**Senior Secured Debt Creditors** means the Senior Secured Facility Lenders and the Senior Secured Noteholders.

**Senior Secured Debt Discharge Date** means the first date on which both of the Senior Secured Facility Discharge Date and the Senior Secured Notes Discharge Date have occurred.

•

**1080**

**Senior Secured Debt Documents** means the Senior Secured Facility Documents and the Senior Secured Notes Documents.

**Senior Secured Debt Liabilities** means the Senior Secured Facility Liabilities and the Senior Secured Notes Liabilities.

**Senior Secured Facility** means:

(a)     any Initial Debt which is designated as a "Senior Secured Facility"; and/or

(b)     any other loan, letter of credit, guarantee or other credit facility made available to a member of the Group where any:

      (i)     agent, trustee or other creditor representative in respect of that facility has become a Party as a Senior Secured Facility Agent;

      (ii)     arranger of that facility has become a Party as a Senior Secured Facility Arranger; and

      (iii)     lender or other provider in respect of that facility has become a Party as a Senior Secured Facility Lender,

in respect of that facility pursuant to Clause 26 (Changes to the Parties).

**Senior Secured Facility Acceleration Event** means the Creditor Representative in relation to any Senior Secured Facility exercising any of its Acceleration Rights with respect to that Senior Secured Facility in accordance with the relevant Senior Secured Facility Agreement.

**Senior Secured Facility Agent** means, in relation to a Senior Secured Facility, the person which is an initial Party, or which has acceded to this Agreement, as the agent, trustee or other creditor representative of the relevant Senior Secured Facility Lenders pursuant to Clause 26 (Changes to the Parties).

**Senior Secured Facility Agreement** means, in relation to a Senior Secured Facility, the facility agreement documenting that Senior Secured Facility.

**Senior Secured Facility Arranger** means, in relation to a Senior Secured Facility, any arranger of that Senior Secured Facility which is named on the signing pages as a Senior Secured Facility Arranger or which becomes a Party as a Senior Secured Facility Arranger in respect of that Senior Secured Facility pursuant to Clause 26 (Changes to the Parties).

**Senior Secured Facility Commitment** means a "Commitment" (or any substantially equivalent term) under and as defined in a Senior Secured Facility Agreement.

**Senior Secured Facility Discharge Date** means the first date on which all Senior Secured Facility Liabilities have been fully and finally discharged to the satisfaction of the relevant Creditor Representative(s) or Bilateral Lender (as the case may be), whether or not as the result of an Enforcement, and the Senior Secured Facility Lenders are under no further obligation to provide financial accommodation to any of the Debtors under the Senior Secured Facility Documents.

•

**1081**

**Senior Secured Facility Documents** means, in relation to a Senior Secured Facility, the relevant Senior Secured Facility Agreement and any "Finance Document" (or any substantially equivalent term) in that Senior Secured Facility Agreement.

**Senior Secured Facility Lender** means, in relation to a Senior Secured Facility:

(a)     each "Lender" or "Bank" under and as defined in the relevant Senior Secured Facility Agreement and each Issuing Bank and Ancillary Lender under the relevant Senior Secured Facility Agreement; and/or

(b)     any other lender, holder or other creditor of that Senior Secured Facility.

**Senior Secured Facility Liabilities** means the Liabilities owed by any Debtor to the Senior Secured Facility Lenders under or in connection with the Senior Secured Facility Documents.

**Senior Secured Financing Document** means a Senior Secured Facility Agreement or a Senior Secured Notes Indenture.

**Senior Secured Group Guarantee** means any guarantee by a member of the Group in respect of any Senior Secured Notes (whether contained in a Senior Secured Notes Indenture, as a notation of guarantee attached to the Senior Secured Notes or otherwise) or any Senior Secured Facility (whether contained in a Senior Secured Facility Agreement or otherwise).

**Senior Secured Hedge Counterparty** means each Hedge Counterparty to the extent it is owed Senior Secured Hedging Liabilities.

**Senior Secured Hedge Credit Participation** means, in relation to a Senior Secured Hedge Counterparty, the aggregate of its Hedge Credit Participations in respect of any hedging transaction of that Senior Secured Hedge Counterparty that is a Senior Secured Hedging Liability.

**Senior Secured Hedging Discharge Date** means the first date on which all Senior Secured Hedging Liabilities have been fully and finally discharged to the satisfaction of the relevant Senior Secured Hedge Counterparties (in the case of its Senior Secured Hedging Liabilities only), whether or not as the result of an Enforcement, and the Senior Secured Hedge Counterparties are under no further obligation to provide financial accommodation to any of the Debtors under the relevant Hedging Agreements.

**Senior Secured Hedging Liabilities** means the Hedging Liabilities to the extent they are not Super Senior Hedging Liabilities.

**Senior Secured Noteholders** means any registered holder from time to time of any Senior Secured Notes.

**Senior Secured Notes** means:

(a)     any Initial Debt which is designated as "Senior Secured Notes"; and/or

(b)     any high yield notes, exchange notes or other debt securities issued or to be issued by any member of the Group which are designated as such by the Company (in its discretion) by written notice to the Security Agent from time to time where the trustee in respect of that

•

issuance has become a Party as a Senior Secured Notes Trustee in respect of that issuance pursuant to Clause 26 (Changes to the Parties).

**Senior Secured Notes Acceleration Event** means the Creditor Representative in relation to any Senior Secured Notes exercising any of its Acceleration Rights with respect to those Senior Secured Notes in accordance with the relevant Senior Secured Notes Indenture.

**Senior Secured Notes Discharge Date** means the first date on which all Senior Secured Notes Liabilities have been fully and finally discharged to the satisfaction of the relevant Creditor Representative(s), whether or not as the result of an Enforcement, and the Senior Secured Noteholders are under no further obligation to provide financial accommodation to any of the Debtors under the Senior Secured Notes Documents.

**Senior Secured Notes Documents** mean each Senior Secured Notes Indenture, the Senior Secured Notes, the Transaction Security Documents, the Senior Secured Group Guarantees, this Agreement and any other document designated as such by the Company and the Security Agent.

**Senior Secured Notes Indenture** means, in relation to any Senior Secured Notes, the indenture pursuant to which those Senior Secured Notes are issued.

**Senior Secured Notes Liabilities** means the Liabilities owed by any Debtor to the Senior Secured Noteholders under or in connection with the Senior Secured Notes Documents.

**Senior Secured Notes Trustee** means, in relation to any Senior Secured Notes, the person which is an initial Party, or which has acceded to this Agreement, as the notes trustee of the relevant Senior Secured Noteholders pursuant to Clause 26 (Changes to the Parties).

**Subordinated Creditors** means any person which has made a loan available to, granted credit to or made any other financial arrangement having similar effect with a Parent Debt Issuer or the Company and which is named on the signing pages as a Subordinated Creditor or which becomes a Party as a Subordinated Creditor in accordance with the terms of Clause 26 (Changes to the Parties).

**Subordinated Liabilities** means the Liabilities owed to the Subordinated Creditors by a Parent Debt Issuer or the Company excluding any Liabilities which are Primary Creditor Liabilities.

**Subsidiary** means a person of which another person has direct or indirect control or owns directly or indirectly more than 50 % of the voting capital or similar right of ownership and **control** for this purpose means the power to direct the management and policies of the person whether through the ownership of voting capital, by contract or otherwise.

**Super Senior Credit Participation** means:

(a)     in relation to a Cash Management Provider, the aggregate of its aggregate Cash Management Facility Outstandings, if any;

(b)     in relation to a Super Senior Hedge Counterparty, its aggregate Super Senior Hedge Credit Participation; and

(c)     in relation to a Super Senior Facility Lender, the aggregate of its aggregate Super Senior Facility Commitments, if any.

**Super Senior Creditors** means the Super Senior Facility Lenders, the Cash Management Providers and the Super Senior Hedge Counterparties.

**Super Senior Discharge Date** means the first date on which each of the Super Senior Facility Discharge Date, the Cash Management Facility Discharge Date and the Super Senior Hedging Discharge Date have occurred.

**Super Senior Facility** means (other than a Cash Management Facility):

(a)      any Initial Debt which is designated as a "Super Senior Facility"; and/or

(b)      any other loan, letter of credit, guarantee or other credit facility made available to a member of the Group where any:

(i)      agent, trustee or other creditor representative in respect of that facility has become a Party as a Super Senior Facility Agent;

(ii)      arranger of that facility has become a Party as a Super Senior Facility Arranger; and

(iii)      lender or other provider in respect of that facility has become a Party as a Super Senior Facility Lender,

in respect of that facility pursuant to Clause 26 (Changes to the Parties).

**Super Senior Facility Acceleration Event** means the Creditor Representative or, as the case may be, Bilateral Lender, in relation to any Super Senior Facility exercising any of its Acceleration Rights with respect to that Super Senior Facility in accordance with the relevant Super Senior Facility Agreement.

**Super Senior Facility Agent** means, in relation to a Super Senior Facility, the person which is an initial Party, or which has acceded to this Agreement, as the agent, trustee or other creditor representative of the relevant Super Senior Facility Lenders pursuant to Clause 26 (Changes to the Parties).

**Super Senior Facility Agreement** means, in relation to a Super Senior Facility, the facility agreement (or any other document) documenting that Super Senior Facility.

**Super Senior Facility Arranger** means, in relation to a Super Senior Facility, any arranger of that Super Senior Facility which is named on the signing pages as a Super Senior Facility Arranger or which becomes a Party as a Super Senior Facility Arranger in respect of that Super Senior Facility pursuant to Clause 26 (Changes to the Parties).

**Super Senior Facility Commitment** means a "Commitment" (or any substantially equivalent term) under and as defined in a Super Senior Facility Agreement.

**Super Senior Facility Discharge Date** means the first date on which all Super Senior Facility Liabilities have been fully and finally discharged to the satisfaction of the relevant Creditor Representative(s) or Bilateral Lender (as the case may be), whether or not as the result of an Enforcement, and the Super Senior Facility Lenders are under no further obligation to provide financial accommodation to any of the Debtors under the Super Senior Facility Documents.

•

**Super Senior Facility Documents** means, in relation to a Super Senior Facility, the relevant Super Senior Facility Agreement and any "Finance Document" (or any substantially equivalent term) in that Super Senior Facility Agreement.

**Super Senior Facility Lender** means, in relation to a Super Senior Facility:

(a)     each "Lender" or "Bank" under and as defined in the relevant Super Senior Facility Agreement and each Issuing Bank and Ancillary Lender under the relevant Super Senior Facility Agreement; and/or

(b)     any other lender, holder or other creditor of that Super Senior Facility.

**Super Senior Facility Liabilities** means the Liabilities owed by any Debtor to the Super Senior Facility Lenders under or in connection with the Super Senior Facility Documents.

**Super Senior Hedge Counterparty** means each Hedge Counterparty to the extent it is owed Super Senior Hedging Liabilities.

**Super Senior Hedge Credit Participation** means, in relation to a Super Senior Hedge Counterparty, the aggregate of its Hedge Credit Participations in respect of any hedging transaction of that Super Senior Hedge Counterparty that is a Super Senior Hedging Liability.

**Super Senior Hedging Certificate** means a certificate substantially in the form set out in Schedule 5 (Form of Super Senior Hedging Certificate).

**Super Senior Hedging Discharge Date** means the first date on which all Super Senior Hedging Liabilities have been fully and finally discharged to the satisfaction of the relevant Super Senior Hedge Counterparties (in the case of its Super Senior Hedging Liabilities only), whether or not as the result of an Enforcement, and the Super Senior Hedge Counterparties are under no further obligation to provide financial accommodation to any of the Debtors under the relevant Hedging Agreements.

**Super Senior Hedging Liabilities** means Hedging Liabilities owed to any Hedge Counterparty to the extent designated or redesignated as such in accordance with Clause 5.13 (Designation of Super Senior Hedging Liabilities).

**Super Senior Liabilities** means the Super Senior Facility Liabilities, the Cash Management Liabilities and the Super Senior Hedging Liabilities.

**Super Senior Reset Date** means the earliest of:

(a)     the date on which the relevant Discharge Date occurs with respect to each Initial Debt which is designated as a "Super Senior Facility" or a "Cash Management Facility" (each an **Initial Facility**); and

(b)     any other date agreed between the Company and each Bilateral Lender under each Initial Facility.

**TARGET2** means the Trans-European Automated Real-Time Gross Settlement Express Transfer payment system which utilities a single shared platform and which was launched on 19 November 2007.

•

**TARGET Day** means any day on which TARGET2 is open for the settlement of payment in euro.

**Tax** means any tax, levy, impost, duty or other charge or withholding of a similar nature (including any penalty or interest payable in connection with any failure to pay or any delay in paying any of the same).

**Third Party Security Provider** means:

(a)    any person which is named on the signing pages as a Third Party Security Provider; or

(b)    any person that has provided Transaction Security over any or all of its assets in respect of any of the Liabilities but that is not a Debtor in respect of those Liabilities,

in each case which has not ceased to be a Third Party Security Provider in accordance with the terms of this Agreement.

**Transaction Security** means the Priority Creditor Transaction Security and the Common Transaction Security.

**Transaction Security Documents** means the Priority Creditor Transaction Security Documents and the Common Transaction Security Documents.

**Transaction Security Property** means the Priority Creditor Security Property and the Common Security Property.

**Unrestricted Subsidiary** means a Subsidiary of the Company which has been designated an "Unrestricted Subsidiary" for the purpose of (and in accordance with) all of the Priority Debt Documents.

**VAT** means:

(a)    any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)    any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

## 1.2    Construction

(a)    Unless a contrary indication appears, a reference in this Agreement to:

(i)    any "Ancillary Lender", "Arranger", "Bilateral Creditor", "Bilateral Lender", "Cash Management Provider", "Creditor", "Creditor Representative", "Debtor", "First Lien Creditor", "Hedge Counterparty", "Intra-Group Lender", "Issuing Bank", "Lender", "Noteholder", "Notes Issuer", "Notes Trustee", "Parent Debt Creditor", "Parent Debt Creditor Representative", "Parent Debt Facility Agent", "Parent Debt Facility Arranger", "Parent Debt Facility Lender", "Parent Debt Group Guarantor", "Parent Debt Issuer", "Parent Debt Noteholder", "Parent Debt Notes Trustee", "Parent Debt Only Obligor", "Party", "Primary Creditor", "Priority Creditor", "Second Lien Creditor Representative", "Second Lien Creditor", "Second Lien Debt Issuer", "Second Lien Facility Agent", "Second

•

Lien Facility Arranger", "Second Lien Facility Lender", "Second Lien Group Guarantor", "Second Lien Noteholder", "Second Lien Notes Trustee", "Senior Secured Creditor", "Senior Secured Creditor Representative", "Senior Secured Debt Creditor", "Senior Secured Facility Agent", "Senior Secured Facility Arranger", "Senior Secured Facility Lender", "Senior Secured Noteholder", "Senior Secured Notes Trustee", "Senior Secured Hedge Counterparty", "Security Agent", "Subordinated Creditor" "Super Senior Creditor", "Super Senior Facility Agent", "Super Senior Facility Arranger", "Super Senior Facility Lender", "Super Senior Hedge Counterparty" or "Third Party Security Provider" shall be construed to be a reference to it in its capacity as such and not in any other capacity;

(ii)     any Party or other person shall be construed so as to include its successors in title, permitted assigns and permitted transferees to, or of, its rights and/or obligations under the Debt Documents and, in the case of the Security Agent, any person for the time being appointed as the Security Agent in accordance with this Agreement;

(iii)    **assets** includes present and future properties, revenues and rights of every description;

(iv)    a **Debt Document** or any other agreement or instrument is (other than a reference to a **Debt Document** or any other agreement or instrument in **original form**) a reference to that Debt Document, or other agreement or instrument, as amended, novated, supplemented, extended or restated as permitted by this Agreement;

(v)     **enforcing** (or any derivation) the Transaction Security or the Parent Debt Only Security includes:

    (A)    the appointment of an administrator (or any analogous officer in any jurisdiction) of a Debtor, a Third Party Security Provider or a Parent Debt Only Obligor by the Security Agent; and

    (B)    the making of a demand under Clause 24.3 (Parallel debt) by the Security Agent;

(vi)    a **group of Creditors** includes all the Creditors and a **group of Primary Creditors** includes all the Primary Creditors;

(vii)   **indebtedness** includes any obligation (whether incurred as principal or as surety) for the payment or repayment of money, whether present or future, actual or contingent;

(viii)  the **original form** of a **Debt Document** or any other agreement or instrument is a reference to that Debt Document, agreement or instrument as originally entered into;

(ix)    a **person** includes any individual, firm, company, corporation, government, state or agency of a state or any association, trust, joint venture, consortium, partnership or other entity (whether or not having separate legal personality);

(x)     **proceeds** of a Distressed Disposal or of a Debt Disposal includes proceeds in cash;

(xi)    any matter being **permitted** under one or more of the Debt Documents shall include references to such matter not being prohibited or otherwise approved under those Debt Documents and a reference to any matter being **not prohibited** under one or more of the Debt Documents shall include references to such matter being permitted or otherwise approved under those Debt Documents;

•

(xii)    a **regulation** includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organisation;

(xiii)    a member of the Restricted Group is **wholly-owned** only if all of its shares are owned by one other member of the Restricted Group; and

(xiv)    a provision of law is a reference to that provision as amended or re-enacted from time to time.

(b)    Section, Clause and Schedule headings are for ease of reference only.

(c)    A Default, an Event of Default, a Second Lien Automatic Block Event, a Second Lien Payment Stop Event, a Parent Debt Automatic Block Event or a Parent Debt Payment Stop Event is **continuing** if it has not been remedied or waived (or, in the case of a Second Lien Payment Stop Event due to a First Lien Acceleration Event, if that First Lien Acceleration Event has not been revoked or otherwise ceases to be continuing in accordance with the terms of the relevant Debt Document).

(d)    An Acceleration Event is **continuing** if it has not been revoked or otherwise ceases to be continuing in accordance with the terms of the relevant Debt Document

(e)    The determination that a Second Lien Payment Stop Notice or a Parent Debt Payment Stop Notice is **outstanding** is to be made by reference to the provisions of Clause 7.4 (Issue of Second Lien Payment Stop Notice) or Clause 8.4 (Issue of Parent Debt Payment Stop Notice) as the case may be.

(f)    A Primary Creditor providing **cash cover** for a Letter of Credit means that Primary Creditor paying an amount in the currency of the Letter of Credit to an interest-bearing account and the following conditions being met:

(i)    the account is either:

(A)    in the name of the Primary Creditor and is with the Issuing Bank for which that cash cover is to be provided and until no amount is or may be outstanding under that Letter of Credit, withdrawals from the account may only be made to pay an Issuing Bank amounts due and payable to it under the relevant Facility Agreement in respect of which that Letter of Credit is issued; or

(B)    the account is in the name of the Issuing Bank for which that cash cover is to be provided; and

(ii)    the Primary Creditor has executed documentation in form and substance satisfactory to the Issuing Bank for which that cash cover is to be provided, creating a first ranking security interest, or other collateral arrangement, in respect of the amount of that cash cover.

(g)    To the extent that any Super Senior Creditor is holding any Cash Cover, for the purpose of this Agreement, the Credit Participation of that Super Senior Creditor shall be reduced by the amount of that Cash Cover. For the purpose of determining whether any Discharge Date has occurred, Liabilities will be deemed to have been fully and finally discharged if Cash Cover has been provided in respect of all of those Liabilities.

(h)    To the extent that any Debt Document refers to or incorporates by reference the provisions of this Clause 1.2, where the context requires, that shall also include a reference to (or incorporate by reference) Clauses 1.3 (Local law terms and provisions) to 1.6 (Creditor Representatives acting on behalf of Creditors).

**1.3    Local law terms and provisions**

The provisions set out in Schedule 9 (Local Law Provisions) shall apply to this Agreement.

**1.4    Self-dealing and multi-representation**

(a)    Each Debtor and Third Party Security Provider (other than the Company) releases, for all purposes under the Debt Documents, the Company from the restrictions of (to the extent that such restrictions would otherwise apply) on self-dealing and multi-representation and any similar restrictions under any other applicable law, in each case, to the fullest extent legally possible.

(b)    Each Debtor, Third Party Security Provider, Intra-Group Lender, Subordinated Creditor and Parent Debt Only Obligor releases, for all purposes under the Debt Documents, the Security Agent and each Creditor Representative from the restrictions of (to the extent that such restrictions would otherwise apply) on self-dealing and multi-representation and any similar restrictions under any other applicable law, in each case, to the fullest extent legally possible.

(c)    If and to the extent that a Party sub-delegates (by power of attorney or otherwise) any powers granted to it pursuant to the Debt Documents (or any of them), paragraphs (a) and (b) above shall extend to include such sub-delegation from the restrictions on self-dealing and multi-representation.

(d)    If a Secured Party is prohibited by its constitutional documents, by-laws or otherwise from validly granting an exemption on self-dealing or multi-representation, it shall either act in accordance with the terms of and as required pursuant to this Agreement and/or any Primary Debt Document or grant a special power of attorney to a party acting on its behalf in a manner that is not otherwise prohibited by its constitutional documents, by-laws or law.

**1.5    Consents and other actions**

If any provision of this Agreement refers to or otherwise contemplates any Consent, notification or other step or action (an **Action**) which may be required from or by any person:

(a)    which is not a Party at such time (with a Primary Creditor being deemed to be Party for the purposes of this paragraph if the Creditor Representative acting on its behalf is a Party);

(b)    in respect of any agreement which is not in existence at such time;

(c)    in respect of any indebtedness which has not been committed or incurred (or an agreement in relation thereto) at such time; or

(d)    in respect of Liabilities or Creditors (or other persons) for which the relevant Discharge Date has occurred at or prior to such time or concurrently with any Action coming into effect,

unless otherwise agreed or specified by the Company, that Action shall not be required (or be required from any such person that is a party thereto) and no such provision shall, or shall be construed so as to, in any way prohibit or restrict the rights or actions of any member of the Group.

•

**1.6     Creditor Representatives acting on behalf of Creditors**

(a)     References to a Creditor Representative acting on behalf of the Super Senior Facility Lenders of which it is the Creditor Representative means such Creditor Representative acting on behalf of the Super Senior Facility Lenders of which it is the Creditor Representative with the consent of the proportion of such Super Senior Facility Lenders required under and in accordance with the applicable Super Senior Facility Agreement (provided that if the relevant Super Senior Facility Agreement does not specify a voting threshold for a particular matter, the threshold will be a simple majority of the outstanding principal amount under the Super Senior Facility Agreement (excluding any Super Senior Facility Liabilities owned by a member of the Group)).  A Creditor Representative will be entitled to seek instructions from the Super Senior Facility Lenders of which it is the Creditor Representative to the extent required by the applicable Super Senior Facility Agreement, as the case may be, as to any action to be taken by it under this Agreement.

(b)     References to a Creditor Representative acting on behalf of the Senior Secured Debt Creditors of which it is the Creditor Representative means such Creditor Representative acting on behalf of the Senior Secured Debt Creditors of which it is the Creditor Representative with the consent of the proportion of such Senior Secured Debt Creditors required under and in accordance with the applicable Senior Secured Financing Document (provided that if the relevant Senior Secured Financing Document does not specify a voting threshold for a particular matter, the threshold will be a simple majority of the outstanding principal amount under the applicable Senior Secured Financing Document (excluding any Senior Secured Creditor Liabilities owned by a member of the Group)).  A Creditor Representative will be entitled to seek instructions from the Senior Secured Debt Creditors of which it is the Creditor Representative to the extent required by the applicable Senior Secured Financing Document, as the case may be, as to any action to be taken by it under this Agreement.

(c)     References to a Creditor Representative acting on behalf of the Second Lien Creditors of which it is the Creditor Representative means such Creditor Representative acting on behalf of the Second Lien Creditors of which it is the Creditor Representative with the consent of the proportion of such Second Lien Creditors required under and in accordance with the applicable Second Lien Financing Document (provided that if the relevant Second Lien Financing Document does not specify a voting threshold for a particular matter, the threshold will be a simple majority of the outstanding principal amount under the applicable Second Lien Financing Document (excluding any Second Lien Liabilities owned by a member of the Group)).  A Creditor Representative will be entitled to seek instructions from the Second Lien Creditors of which it is the Creditor Representative to the extent required by the applicable Second Lien Financing Document, as the case may be, as to any action to be taken by it under this Agreement.

(d)     References to a Creditor Representative acting on behalf of the Parent Debt Creditors of which it is the Creditor Representative means such Creditor Representative acting on behalf of the Parent Debt Creditors of which it is the Creditor Representative with the consent of the proportion of such Parent Debt Creditors required under and in accordance with the applicable Parent Debt Financing Document (provided that if the relevant Parent Debt Financing Document does not specify a voting threshold for a particular matter, the threshold will be a simple majority of the outstanding principal amount under the applicable Parent Debt Financing Document (excluding any Parent Debt Liabilities owned by a member of the Group)).  A Creditor Representative will be entitled to seek instructions from the Parent Debt Creditors of which it is the Creditor Representative to the extent required by the applicable Parent Debt Financing Document, as the case may be, as to any action to be taken by it under this Agreement.

•

## 1.7    Third party rights

(a)    Unless expressly provided to the contrary in this Agreement, a person who is not a Party has no right under the Contracts (Rights of Third Parties) Act 1999 (the **Third Parties Act**) to enforce or to enjoy the benefit of any term of this Agreement.

(b)    Notwithstanding any term of this Agreement, the consent of any person who is not a Party is not required to rescind or vary this Agreement at any time.

(c)    Any Receiver, Delegate or any other person described in paragraph (b) of Clause 24.13 (Exclusion of liability) may, subject to this Clause 1.7 and the Third Parties Act, rely on any Clause of this Agreement which expressly confers rights on it.

(d)    The Third Parties Act shall apply to this Agreement in respect of any Noteholder.  For the purposes of paragraph (b) above and this paragraph (d), upon any person becoming a Noteholder, such person shall be deemed to be a Party to this Agreement and shall be bound by the provisions of this Agreement and be deemed to receive the benefits of this Agreement, and be subject to the terms and conditions hereof, as if such person were a Party hereto.

## 1.8    Guarantee Limitations

Any guarantee or indemnity or hold harmless obligation or subordination or any other obligation or liability (including under Schedule 6 (Guarantee and Indemnity)) by a Debtor, Third Party Security Provider, Parent Debt Only Obligor or Intra-Group Lender under this Agreement shall be subject to the Guarantee Limitations and any other matters set out in the Agreed Security Principles to the extent applicable and any such obligation of any such person shall be deemed to be limited accordingly.

## 1.9    Excluded Swap Obligations

(a)    Notwithstanding anything to the contrary in any Debt Document unless otherwise agreed by the Company, the Hedging Liabilities and the Cash Management Liabilities shall not include any Excluded Swap Obligation and no Security, guarantee, indemnity or other assurance against loss (including under Schedule 6 (Guarantee and Indemnity)) shall be granted by any Parent Debt Issuer, by any member of the Group or by any Third Party Security Provider in respect of any Excluded Swap Obligation of any Hedge Counterparty or any Cash Management Provider.

(b)    In this Clause 1.9:

**Commodity Exchange Act** means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

**Excluded Swap Obligation** means, with respect to any person, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of that person that relates to such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the US Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of that person's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee given by that person becomes effective with respect to such Swap. If a Swap Obligation arises under a master agreement governing more than one Swap, such

•

exclusion shall apply only to the portion of such Swap Obligation that is attributable to Swaps for which such guarantee or security interest is or becomes illegal.

**Swap** means any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

**Swap Obligation** means, with respect to any person, any obligation to pay or perform under any Swap.

### 1.10    Notice to counterparties under Security Documents

For the purposes of any relevant Security Document governed by any law:

(a)    each Debtor and each Third Party Security Provider notifies (including by way of advance notice) each other member of the Group which is a Party that it has granted Security over any Intra-Group Liabilities and Subordinated Liabilities (as the case may be) owed to it by that member of the Group and that member of the Group acknowledges that notice; and

(b)    each Debtor also authorises the Company to notify each other member of the Group which is not a Party that it has granted Security over any Intra-Group Liabilities owed to it by that member of the Group.

### 1.11    No personal liability

No personal liability shall attach to any director, officer, authorised signatory or employee of any member of the Group for any representation or statement made by that member of the Group in a certificate signed by a director, officer, authorised signatory or employee save in the case of fraud in which case liability (if any) will be determined in accordance with applicable law and each such individual may rely on this Clause subject to Clause 1.7 (Third party rights) and the provisions of the Third Parties Act.

### 1.12    Anti-boycott laws

(a)    Nothing in any Debt Document shall create or establish an obligation or right for any person to the extent that by agreeing to it, complying with it, exercising it, having such obligation or right or otherwise (including the giving of any boycott declaration), it would be placed in violation of any law applicable to it, including EU Regulation (EC) 2271/96 (and any law or regulation implementing such Regulation in any member state of the European Union or the United Kingdom), any law relating to foreign trade or any similar anti-boycott law or regulation (an **Anti-Boycott Law**).

(b)    No representation or undertaking given under any Debt Document shall be made or given for the benefit of any person to the extent that it would result in a violation of or conflict with or liability under any Anti-Boycott Law for that person.

### 1.13    Termination

Unless otherwise notified to the Security Agent by the Company in writing on or prior to the Final Discharge Date, this Agreement shall terminate in full and cease to have any further effect on the Final Discharge Date.

•

**1.14    Company as agent**

(a)    Each Debtor and Third Party Security Provider (other than the Company) by its execution of this Agreement or a Debtor Accession Deed irrevocably appoints the Company (acting through one or more authorised signatories) to act on its behalf as its agent in relation to the Debt Documents and irrevocably authorises:

(i)    the Company on its behalf to supply all information concerning itself contemplated by this Agreement to the Secured Parties and to give all notices and instructions, to make such agreements and to effect the relevant amendments, supplements and variations capable of being given, made or effected by any Debtor or Third Party Security Provider notwithstanding that they may affect the Debtor or Third Party Security Provider, without further reference to or the consent of that Debtor or Third Party Security Provider; and

(ii)    each Secured Party to give any notice, demand or other communication to that Debtor or Third Party Security Provider pursuant to the Debt Documents to the Company,

and in each case the Debtor or Third Party Security Provider shall be bound as though the Debtor or Third Party Security Provider itself had given the notices and instructions or executed or made the agreements or effected the amendments, supplements or variations, or received the relevant notice, demand or other communication.

(b)    Every act, omission, agreement, undertaking, settlement, waiver, amendment, supplement, variation, notice or other communication given or made by the Company or given to the Company under any Debt Document on behalf of another Debtor or Third Party Security Provider or in connection with any Debt Document (whether or not known to any other Debtor or Third Party Security Provider and whether occurring before or after such other Debtor or Third Party Security Provider became an Debtor or Third Party Security Provider under any Debt Document) shall be binding for all purposes on that Debtor or Third Party Security Provider as if that Debtor or Third Party Security Provider had expressly made, given or concurred with it.  In the event of any conflict between any notices or other communications of the Company and any other Debtor or Third Party Security Provider, those of the Company shall prevail.

**1.15    Scheme and Structure Memorandum**

(a)    None of the steps or actions set out in, or reorganisations expressly contemplated by, the Structure Memorandum (or the steps or actions necessary to implement any of them) and none of the steps or actions taken or to be taken with respect to the Scheme (including any proceedings commenced with respect to the recognition of the judgment of the High Court of England and Wales in any jurisdiction) and/or the Restructuring Implementation Deed (including any document ancillary thereto) shall constitute a breach of any representation, warranty or undertaking in the Debt Documents or result in the occurrence of a Default or an Event of Default and any intermediate steps in any such reorganisation which are not specified in the Structure Memorandum (including the steps to effect the intra-group reorganization shown in Appendix A9 "Indicative group structure post reorganization" of the Structure Memorandum), but which are necessary to achieve the steps, actions or reorganisations expressly contemplated, shall not be prohibited by any of the Debt Documents.

(b)    For the purposes of paragraph (a) above:

**Restructuring Implementation Deed** has the meaning given to that term in the Scheme.

**Scheme** means the scheme of arrangement in relation to KCA Deutag UK Finance plc under Part 26 of the Companies Act 2006, which was sanctioned by the High Court of England and Wales on [●] 2020.

**Structure Memorandum** means the structure paper prepared by Deloitte and entitled "KCA Deutag Group – Tax Structure Paper" dated [●] 2020.

## 2. RANKING AND PRIORITY

### 2.1 Primary Liabilities

Each of the Parties agrees that, unless expressly provided to the contrary in this Agreement, the Primary Liabilities owed by:

(a)    the Debtors (other than a Parent Debt Issuer to the extent relating to Parent Debt Liabilities) to the Creditors shall rank in right and priority of payment in the following order and are postponed and subordinated to any prior ranking Liabilities as follows:

        (i)    **first**, the Priority Creditor Liabilities, the Arranger Liabilities (other than the Parent Debt Arranger Liabilities), the Creditor Representative Liabilities and the Security Agent Liabilities *pari passu* and without any preference between them; and

        (ii)    **second**, the Parent Debt Liabilities and the Parent Debt Arranger Liabilities *pari passu* and without any preference between them; and

(b)    the Parent Debt Issuers (if any and in their capacity as such) to the Creditors shall rank *pari passu* and without any preference between them.

### 2.2 Transaction Security

Subject to Clause 21 (Application of Proceeds) and without prejudice to Clause 22 (Equalisation), each of the Parties agrees that the Transaction Security shall rank and secure the following Liabilities (but only to the extent such Transaction Security is expressed to secure those Liabilities) in the following order:

(a)    **first**, the First Lien Liabilities, the First Lien Arranger Liabilities, the Creditor Representative Liabilities and the Security Agent Liabilities *pari passu* and without any preference between them;

(b)    **second**, the Second Lien Liabilities and the Second Lien Arranger Liabilities pari passu and without any preference between them; and

(c)    **third,** in respect of the Common Transaction Security only, the Parent Debt Liabilities and the Parent Debt Arranger Liabilities *pari passu* and without any preference between them.

The above shall apply irrespective of whether the Transaction Security Documents are expressed to be first ranking or of any Lower Ranking Security.

•

### 2.3    Parent Debt Liabilities and Parent Debt Only Security

(a)    The Parties acknowledge that the Parent Debt Liabilities owed by a Parent Debt Issuer (if any) are senior obligations of that Parent Debt Issuer.

(b)    Notwithstanding paragraph (a) above, the Parent Debt Creditors agree that any Enforcement in relation to the assets of a Parent Debt Issuer subject to the Common Transaction Security Documents may only be taken as expressly permitted by this Agreement.

(c)    Subject to Clause 21 (Application of Proceeds) and without prejudice to Clause 22 (Equalisation), each of the Parties agrees that the Parent Debt Only Security shall rank and secure the applicable Parent Debt Liabilities *pari passu* and without any preference between them (but only to the extent such Parent Debt Only Security is expressed to secure those Liabilities).

### 2.4    Subordinated and Intra-Group Liabilities

(a)    Each of the Parties agrees that the Subordinated Liabilities and the Intra-Group Liabilities are postponed and subordinated to the Liabilities owed by the Debtors and the Third Party Security Providers to the Primary Creditors.

(b)    This Agreement does not purport to rank any of the Subordinated Liabilities or the Intra-Group Liabilities as between themselves.

### 2.5    Creditor Representative Amounts and Security Agent Amounts

Subject to Clause 21 (Application of Proceeds) where applicable, nothing in this Agreement will prevent payment by any Debtor or Third Party Security Provider of the Creditor Representative Amounts or Security Agent Amounts or the receipt and retention of such Creditor Representative Amounts or Security Agent Amounts by the relevant Creditor Representative(s) and the Security Agent.

### 2.6    Proceeds Loans

(a)    Nothing in this Agreement (including Clause 9.1 (Restriction on Payment: Intra-Group Liabilities) and Clause 10.1 (Restriction on Payment: Subordinated Liabilities)) shall prohibit any Payment of any Proceeds Loan to the extent that such Payment is made to facilitate a Payment of the Primary Creditor Liabilities owed by the Creditor of that Proceeds Loan which is not prohibited by this Agreement or any of the Primary Debt Documents.

(b)    No Creditor in respect of any Proceeds Loan shall take or require the taking of any Enforcement Action with respect to that Proceeds Loan unless that action is taken in connection with any other Enforcement Action which is permitted by this Agreement at that time to facilitate a Payment of the Primary Creditor Liabilities owed by the Creditor of that Proceeds Loan which is not prohibited by this Agreement or any of the Primary Debt Documents.

### 2.7    Additional indebtedness

The Creditors acknowledge and agree that the Debtors (or any of them) shall, at any time, be permitted, subject to Clause 2.8 (Anti-layering) and Clause 23 (Additional Regulated Debt), to:

•

(a)    incur or have incurred Borrowing Liabilities and/or Guarantee Liabilities in respect of any indebtedness or any facility; and/or

(b)    refinance, replace or otherwise restructure (in whole or in part) Borrowing Liabilities and/or Guarantee Liabilities (or any other liabilities and obligations subject to the terms of this Agreement from time to time) with the proceeds of Additional Regulated Debt,

provided in each case that the incurrence of the relevant Borrowing Liabilities and/or Guarantee Liabilities, and the ranking thereof, is not prohibited by the Primary Debt Documents.

## 2.8    Anti-layering

(a)    Notwithstanding anything to the contrary in any Debt Document:

(i)    until the Super Senior Discharge Date, no Debtor shall issue or allow to remain outstanding any Liabilities that:

(A)    are secured or expressed to be secured by Transaction Security on a basis senior to the Super Senior Liabilities;

(B)    are expressed to rank or rank so that they are senior to the Super Senior Liabilities; or

(C)    are contractually senior in right of payment to the Super Senior Liabilities;

(ii)    until the First Lien Discharge Date, without the approval of the Majority Senior Secured Creditors, the Majority Second Lien Creditors and the Majority Parent Debt Creditors and any other approvals required under any Primary Financing Document, no Debtor shall issue or allow to remain outstanding any Liabilities that:

(A)    are secured or expressed to be secured by Transaction Security on a basis (A) junior to any of the Super Senior Liabilities but (B) senior to the Senior Secured Creditor Liabilities;

(B)    are expressed to rank or rank so that they are subordinated to any of the Super Senior Liabilities but are senior to the Senior Secured Creditor Liabilities; or

(C)    are contractually subordinated in right of payment to any of the Super Senior Liabilities and senior in right of payment to the Senior Secured Creditor Liabilities;

(iii)    until the Second Lien Discharge Date, without the approval of the Majority Second Lien Creditors and the Majority Parent Debt Creditors and any approvals required under any Primary Financing Document, no Debtor shall issue or allow to remain outstanding any Liabilities that:

(A)    are secured or expressed to be secured by Transaction Security on a basis (A) junior to any of the First Lien Liabilities but (B) senior to the Second Lien Liabilities;

(B)    are expressed to rank or rank so that they are subordinated to any of the First Lien Liabilities but are senior to the Second Lien Liabilities; or

•

(C)    are contractually subordinated in right of payment to any of the First Lien Liabilities and senior in right of payment to the Second Lien Liabilities; and

(iv)    until the Parent Debt Discharge Date, without the approval of the Majority Parent Debt Creditors and any other approvals required under any Primary Financing Document, no Debtor shall issue or allow to remain outstanding any Liabilities that:

(A)    are secured or expressed to be secured by Transaction Security on a basis (A) junior to any of the Second Lien Liabilities but (B) senior to the Parent Debt Liabilities;

(B)    are expressed to rank or rank so that they are subordinated to any of the Second Lien Liabilities but are senior to the Parent Debt Liabilities; or

(C)    are contractually subordinated in right of payment to any of the Second Lien Liabilities and senior in right of payment to the Parent Debt Liabilities.

(b)    Paragraph (a) above shall not prevent:

(i)    any subordination arising by operation of law;

(ii)    the entry into of any Lower Ranking Security which (subject to the terms of this Agreement) ranks in the order of priority contemplated in Clause 2.2 (Transaction Security); or

(iii)    any indebtedness to benefit from any Cash Cover in accordance with the terms of this Agreement.

## 3.    FIRST LIEN CREDITORS AND FIRST LIEN LIABILITIES

### 3.1    Payment of First Lien Liabilities

(a)    Subject to paragraph (b) below, any Parent Debt Issuer, any Debtor, any member of the Group and the Third Party Security Providers may make Payments of the First Lien Liabilities at any time in accordance with, and subject to the provisions of, the relevant First Lien Debt Documents.

(b)    Following the occurrence of a First Lien Acceleration Event or an Insolvency Event in relation to any Debtor (other than in its capacity as a Parent Debt Issuer) or Third Party Security Provider but, subject to paragraph (b) of Clause 3.7 (Permitted Enforcement: Ancillary Lenders and Issuing Banks), Clause 3.9 (Bilateral Lenders: Cash Cover), paragraph (b) of Clause 11.3 (Set-Off) and Clause 21.5 (Treatment of Cash Cover and Lender Cash Collateral), (until the occurrence of the Super Senior Discharge Date), no Parent Debt Issuer, member of the Group or Third Party Security Provider may make Payments of the First Lien Liabilities except from Common Recoveries distributed in accordance with Clause 21 (Application of Proceeds), provided that:

(i)    this paragraph (b) shall not prevent any distribution or dividend out of any Debtor's unsecured assets (pro rata to each unsecured creditor's claim) made by a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer appointed in respect of any Debtor or any of its assets;

(ii)    any Payment prohibited by this paragraph (b) will remain owing by the relevant Debtor(s); and

•

(iii)    any failure to make a Payment as a result of this paragraph (b) shall not prevent the occurrence of an Event of Default under the relevant First Lien Debt Document as a consequence of that failure to make a Payment.

### 3.2    Amendments and Waivers: First Lien Debt Documents

Subject to Clause 5.6 (Amendments and Waivers: Hedging Agreements), the Debtors and the Third Party Security Providers may amend or waive the terms of any of the First Lien Debt Documents from time to time in accordance with their terms (and subject only to any consent required under them).

### 3.3    Security: First Lien Creditors

Other than as set out in Clause 3.4 (Security: Ancillary Lenders and Issuing Banks), Clause 3.9 (Bilateral Lenders: Cash Cover) and Clause 4 (Cash Management Providers and Cash Management Liabilities) the First Lien Creditors may take, accept or receive the benefit of:

(a)    any Security in respect of the First Lien Liabilities from any Debtor, any member of the Group or any Third Party Security Provider in addition to the Transaction Security which (except for any Security permitted under Clause 3.4 (Security: Ancillary Lenders and Issuing Banks) or Clause 3.9 (Bilateral Lenders: Cash Cover)) to the extent legally possible and subject to any Agreed Security Principles (except to the extent they already benefit from such Security) is, at the same time, also offered either:

    (i)    to the Security Agent as security agent or trustee for the other Priority Secured Parties (and, if such Transaction Security relates to the Common Charged Property, the Parent Debt Secured Parties) in respect of their Liabilities; or

    (ii)    in the case of any jurisdiction in which effective Security cannot be granted in favour of the Security Agent as security agent or trustee for the Priority Secured Parties (and, if applicable, the Parent Debt Secured Parties):

        (A)    to the other Priority Secured Parties (and, if such Transaction Security relates to the Common Charged Property, the Parent Debt Secured Parties) in respect of their Liabilities; or

        (B)    to the Security Agent under a parallel debt structure, joint and several creditor structure or agency structure for the benefit of the other Priority Secured Parties (and, if such Transaction Security relates to the Common Charged Property, the Parent Debt Secured Parties),

    and ranks in the same order of priority as that contemplated in Clause 2.2 (Transaction Security);

(b)    any guarantee, indemnity or other assurance against loss in respect of the First Lien Liabilities from any Debtor, any member of the Group or any Third Party Security Provider in addition to those in:

    (i)    the Senior Secured Group Guarantees and any Super Senior Facility Agreement;

    (ii)    this Agreement;

•

      (iii)    any mandate letter or fee letter entered into in connection with any First Lien Facility Agreement; or

      (iv)    any Common Assurance,

      (except for any guarantee, indemnity or other assurance against loss permitted under Clause 3.4 (Security: Ancillary Lenders and Issuing Banks) or to the extent they already benefit from such guarantee, indemnity or other assurance against loss), if and to the extent legally possible and subject to any Agreed Security Principles, at the same time, it is also offered to the other Priority Secured Parties (and, if such Security relates to the Common Charged Property, the Parent Debt Secured Parties) in respect of their Liabilities and ranks in the same order of priority as that contemplated in Clause 2 (Ranking and Priority); and

(c)    any Security, guarantee, indemnity or other assurance against loss from any Debtor, any member of the Group or a Third Party Security Provider:

      (i)    in connection with any escrow or similar or equivalent arrangements entered into in respect of the proceeds of any indebtedness which, upon release of those amounts to a member of the Group, will become First Lien Liabilities; or

      (ii)    in connection with any actual or proposed defeasance, redemption, prepayment, repayment, purchase or other discharge of any First Lien Liabilities (in each case provided that such defeasance, redemption, prepayment, repayment, purchase or other discharge is not prohibited by the terms of this Agreement).

**3.4**    **Security: Ancillary Lenders and Issuing Banks**

No Ancillary Lender or Issuing Bank will, unless the consent of the Instructing Group is obtained, take, accept or receive from any Parent Debt Issuer, member of the Group or Third Party Security Provider the benefit of any Security, guarantee, indemnity or other assurance against loss in respect of any of the Liabilities owed to it other than:

(a)    the Transaction Security;

(b)    each guarantee, indemnity or other assurance against loss contained in:

      (i)    any First Lien Facility Agreement;

      (ii)    this Agreement; or

      (iii)    any Common Assurance;

(c)    indemnities and assurances against loss contained in the Ancillary Documents no greater in extent than any of those referred to in paragraph (b) above;

(d)    any Cash Cover permitted under the First Lien Debt Documents relating to any Ancillary Facility or for any Letter of Credit issued by an Issuing Bank;

(e)    the indemnities contained in an ISDA Master Agreement (in the case of a Hedging Ancillary Document which is based on an ISDA Master Agreement) or any indemnities which are

      •

similar in meaning and effect to those indemnities (in the case of a Hedging Ancillary Document which is not based on an ISDA Master Agreement);

(f)    any Security, guarantee, indemnity or other assurance against loss giving effect to, or arising as a result of the effect of, any netting or set-off arrangement relating to the Ancillary Facilities for the purpose of netting debit and credit balances arising under the Ancillary Facilities; or

(g)    any Security, guarantee, indemnity or other assurance against loss permitted under Clause 3.3 (Security: First Lien Creditors).

## 3.5    Restriction on Enforcement: First Lien Creditors

No First Lien Creditor may take any Enforcement Action under paragraph (c) of that definition without the prior written consent of an Instructing Group.

## 3.6    Restriction on Enforcement: Ancillary Lenders and Issuing Banks

Subject to Clause 3.7 (Permitted Enforcement: Ancillary Lenders and Issuing Banks), so long as any of the First Lien Liabilities (other than any Liabilities owed to the Ancillary Lenders or Issuing Banks) are or may be outstanding, none of the Ancillary Lenders nor the Issuing Banks shall be entitled to take any Enforcement Action in respect of any of the Liabilities owed to it.

## 3.7    Permitted Enforcement: Ancillary Lenders and Issuing Banks

(a)    Each Ancillary Lender and Issuing Bank may take Enforcement Action which would be available to it but for Clause 3.6 (Restriction on Enforcement: Ancillary Lenders and Issuing Banks) if:

(i)    at the same time as, or prior to, that action, Enforcement Action has been taken in respect of the First Lien Liabilities (excluding the Liabilities owing to Ancillary Lenders and the Issuing Banks), in which case the Ancillary Lenders and the Issuing Banks may take the same Enforcement Action as has been taken in respect of those First Lien Liabilities;

(ii)    that action is contemplated by the relevant First Lien Facility Agreement or Clause 3.4 (Security: Ancillary Lenders and Issuing Banks) provided that an Ancillary Lender may only net or set off in relation to any Multi-Account Overdraft in each case to the extent that the demand is required to effect, or the netting or set-off represents, a Permitted Multi-account Overdraft Discharge;

(iii)    that Enforcement Action is taken in respect of Cash Cover which has been provided in accordance with any First Lien Facility Agreement;

(iv)    at the same time as or prior to, that action, the consent of the Instructing Group is obtained; or

(v)    an Insolvency Event has occurred in relation to any Debtor (other than in its capacity as a Parent Debt Issuer) or Third Party Security Provider, in which case after the occurrence of that Insolvency Event, each Ancillary Lender and each Issuing Bank shall be entitled (if it has not already done so) to exercise any right it may otherwise have in respect of that Debtor or Third Party Security Provider to:

•

**1100**

(A)    accelerate any of that Debtor's or Third Party Security Provider's First Lien Liabilities or declare them prematurely due and payable on demand;

(B)    make a demand under any guarantee, indemnity or other assurance against loss given by that Debtor or Third Party Security Provider in respect of any First Lien Liabilities;

(C)    exercise any right of set-off or take or receive any Payment in respect of any First Lien Liabilities of that Debtor or Third Party Security Provider; or

(D)    claim and prove in any insolvency process of that Debtor or Third Party Security Provider for the First Lien Liabilities owing to it.

(b)    Clause 3.6 (Restriction on Enforcement: Ancillary Lenders and Issuing Banks) shall not restrict any right of an Ancillary Lender:

(i)    to demand repayment or prepayment of any of the Liabilities owed to it prior to the expiry date of the relevant Ancillary Facility; or

(ii)    to net or set off in relation to a Multi-account Overdraft,

in accordance with the terms of the relevant First Lien Facility Agreement and to the extent that the demand is required to effect, or the netting or set-off represents, a Permitted Multi-account Overdraft Discharge.

### 3.8    Hedge Counterparties and Cash Management Liabilities

This Clause 3 shall not apply to any Hedge Counterparty or any Hedging Liabilities or any Cash Management Provider or any Cash Management Liabilities.

### 3.9    Bilateral Lenders: Cash Cover

Nothing in this Agreement shall prevent any Bilateral Lender from requesting, taking, accepting or receiving any Cash Cover in relation to any Letter of Credit issued by that Bilateral Lender or taking any Enforcement Action in respect of that Cash Cover, in each case, in accordance with the terms of the relevant Facility Agreement.

## 4.    CASH MANAGEMENT PROVIDERS AND CASH MANAGEMENT LIABILITIES

### 4.1    Payment of Cash Management Liabilities

(a)    Subject to paragraph (b) below, any Debtor, any member of the Group and the Third Party Security Providers may make Payments of the Cash Management Liabilities at any time in accordance with, and subject to the provisions of, the relevant Cash Management Agreement.

(b)    Following the occurrence of a First Lien Acceleration Event or an Insolvency Event in relation to any Debtor (other than in its capacity as a Parent Debt Issuer) or Third Party Security Provider but, subject to Clause 3.9 (Bilateral Lenders: Cash Cover), paragraph (b) of Clause 4.5 (Permitted Enforcement: Cash Management Providers), paragraph (b) of Clause 11.3 (Set-Off) and Clause 21.5 (Treatment of Cash Cover and Lender Cash Collateral), (until the occurrence of the Super Senior Discharge Date), no member of the Group or Third Party Security Provider may make Payments of

•

the Cash Management Liabilities except from Common Recoveries distributed in accordance with Clause 21 (Application of Proceeds), provided that:

(i)     this paragraph (b) shall not prevent any distribution or dividend out of any Debtor's unsecured assets (pro rata to each unsecured creditor's claim) made by a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer appointed in respect of any Debtor or any of its assets;

(ii)    any Payment prohibited by this paragraph (b) will remain owing by the relevant Debtor(s); and

(iii)   any failure to make a Payment as a result of this paragraph (b) shall not prevent the occurrence of an event of default under the relevant Cash Management Agreement as a consequence of that failure to make a Payment.

**4.2     Amendments and Waivers: Cash Management Agreements**

The Debtors and the Third Party Security Providers may amend or waive the terms of any of the Cash Management Agreement from time to time in accordance with their terms (and subject only to any consent required under them).

**4.3     Security: Cash Management Providers**

No Cash Management Provider will, unless the prior consent of the Instructing Group is obtained, take, accept or receive from any Parent Debt Issuer, member of the Group or Third Party Security Provider the benefit of any Security, guarantee, indemnity or other assurance against loss in respect of any of the Cash Management Liabilities owed to it other than:

(a)     the Transaction Security;

(b)     each guarantee, indemnity or other assurance against loss contained in:

(i)     this Agreement; or

(ii)    any Common Assurance;

(c)     indemnities and assurances against loss contained in any Cash Management Agreement;

(d)     any Cash Cover permitted under any Cash Management Agreement;

(e)     any Security, guarantee, indemnity or other assurance against loss giving effect to, or arising as a result of the effect of, any netting or set-off arrangement relating to the Cash Management Facilities for the purpose of netting debit and credit balances arising under the Cash Management Facilities;

(f)     account pledges created under the relevant Cash Management Provider's general terms and conditions in the ordinary course of business; and

(g)     any Security, guarantee, indemnity or other assurance against loss permitted under Clause 3.3 (Security: First Lien Creditors).

•

**4.4    Restriction on Enforcement: Cash Management Providers**

Subject to Clause 4.5 (Permitted Enforcement: Cash Management Providers), so long as any of the First Lien Liabilities (other than any Liabilities owed to the Cash Management Providers) are or may be outstanding, none of the Cash Management Providers shall be entitled to take any Enforcement Action in respect of any of the Cash Management Liabilities owed to it.

**4.5    Permitted Enforcement: Cash Management Providers**

(a)    Each Cash Management Provider may take Enforcement Action with respect to its Cash Management Liabilities which would be available to it but for Clause 4.4 (Restriction on Enforcement: Cash Management Providers) if that action would be permitted to be taken under paragraph (a) of Clause 3.7 (Permitted Enforcement: Ancillary Lenders and Issuing Banks) as if the Cash Management Provider was an Ancillary Lender and any reference to a First Lien Facility Agreement is a reference to the relevant Cash Management Agreement.

(b)    Clause 4.4 (Restriction on Enforcement: Cash Management Providers) shall not restrict any right of a Cash Management Provider:

(i)    to demand repayment or prepayment of any of the Liabilities owed to it prior to the expiry date of the relevant Cash Management Agreement; or

(ii)    to net or set off in relation to a Multi-account Overdraft,

in accordance with the terms of the relevant Cash Management Agreement and, in the case of a Multi-account Overdraft, to the extent that the demand is required to effect, or the netting or set-off represents, a Permitted Multi-account Overdraft Discharge.

(c)    Notwithstanding anything else to contrary in this Agreement or the terms of any other Debt Document, including any Security Document and including Clause 4.4 (Restriction on Enforcement: Cash Management Providers), nothing shall restrict any right of the Initial Cash Management Provider to exercise all or any of the rights it may have under the Cash Management Agreements to which it is a party (including, but not limited to, any such rights that relate to demanding repayment, cancelling commitments or availability or exercising any right of set-off or netting or otherwise to apply cash held by it against any Liabilities owed to it), provided that the Initial Cash Management Provider shall not be entitled to exercise any rights it may have under its Cash Management Agreements to set-off, net or otherwise to apply any cash held by it against any Liabilities owed to it in respect of (i) any Notes, (ii) any Facility Agreement which is not provided on a bilateral basis or (iii) any other Facility Agreement which the Initial Cash Management Provider was not the original lender of record.

(d)    The Company shall not, and shall ensure that no other member of the Group or any other Debtor or Third Party Security Provider shall:

(i)    enter into any Hedging Agreement, bilateral Facility Agreement or Cash Management Facility with the Initial Cash Management Provider after the date of this Agreement; or

(ii)    amend the Designated Net Amount of the Multi-account Overdraft provided by the Initial Cash Management Provider pursuant to the Cash Management Agreements to which it is a party as at the date of this Agreement to be less than minus USD100,

•

**1103**

(each being an **Additional Bilateral Facility**) unless either (A) paragraph (c) above is disapplied with respect to that Additional Bilateral Facility or (B) the consent of the Instructing Group has been obtained.

(e)    If any Debt Document is entered into in breach of paragraph (d) above, that shall constitute an Event of Default for the purposes of each Senior Secured Financing Document (subject to the requirements of section 6.01(a)(4) of the Senior Secured Notes Indenture entered into on the date of this Agreement).

**4.6    Guarantee of Cash Management Liabilities**

Each Debtor (other than in its capacity as a Parent Debt Issuer) agrees that it will be bound by the obligations set out in Schedule 6 (Guarantee and Indemnity).

**5.    HEDGE COUNTERPARTIES AND HEDGING LIABILITIES**

**5.1    Identity of Hedge Counterparties**

(a)    Subject to paragraph (b) below, no person providing hedging arrangements to any Debtor shall be entitled to share in any of the Transaction Security or in the benefit of any guarantee or indemnity from any Debtor, any member of the Group or Third Party Security Provider in respect of any of the liabilities and obligations arising in relation to those hedging arrangements, nor shall those liabilities and obligations be treated as Hedging Liabilities unless that person is or becomes a party to this Agreement as a Hedge Counterparty.

(b)    Paragraph (a) above shall not apply to a Hedging Ancillary Lender.

**5.2    Restriction on Payments: Hedging Liabilities**

Prior to the First Lien Debt Discharge Date, neither the Debtors nor the Third Party Security Providers shall, and each shall procure that no other member of the Group will, make any Payment of the Hedging Liabilities at any time unless:

(a)    that Payment is permitted under Clause 5.3 (Permitted Payments: Hedging Liabilities); or

(b)    the taking or receipt of that Payment is permitted under paragraph (c) of Clause 5.9 (Permitted Enforcement: Hedge Counterparties),

provided that, following the occurrence of a First Lien Acceleration Event or an Insolvency Event in relation to any Debtor (other than a Debtor that is solely a Parent Debt Issuer) or Third Party Security Provider, (until the occurrence of the Super Senior Discharge Date), no Debtor or Third Party Security Provider may make Payments of the Hedging Liabilities except from Common Recoveries distributed in accordance with Clause 21 (Application of Proceeds), and provided further that:

(i)    this Clause 5.2 shall not prevent any distribution or dividend out of any Debtor's unsecured assets (pro rata to each unsecured creditor's claim) made by a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer appointed in respect of any Debtor or any of its assets;

(ii)    any Payment prohibited by this Clause 5.2 will remain owing by the relevant Debtor(s); and

•

(iii) any failure to make a Payment as a result of this Clause 5.2 shall not prevent the occurrence of an event of default under the relevant Hedging Agreement as a consequence of that failure to make a Payment.

**5.3    Permitted Payments: Hedging Liabilities**

(a) Subject to paragraph (b) below, the Debtors and the Third Party Security Providers may make Payments to any Hedge Counterparty in respect of the Hedging Liabilities then due to that Hedge Counterparty under any Hedging Agreement in accordance with the terms of that Hedging Agreement:

   (i) if the Payment is a scheduled Payment arising under the relevant Hedging Agreement (or any other ordinary course payment under a Hedging Agreement, including any payment in relation to fees, costs and expenses);

   (ii) to the extent that the relevant Debtor's obligation to make the Payment arises as a result of the operation of:

      (A) any of sections 2(d) (Deduction or Withholding for Tax), 2(e) (Default Interest; Other Amounts), 8(a) (Payment in the Contractual Currency), 8(b) (Judgments) and 11 (Expenses) of the 1992 ISDA Master Agreement (if the Hedging Agreement is based on a 1992 ISDA Master Agreement);

      (B) any of sections 2(d) (Deduction or Withholding for Tax), 8(a) (Payment in the Contractual Currency), 8(b) (Judgments), 9(h)(i) (Prior to Early Termination) and 11 (Expenses) of the 2002 ISDA Master Agreement (if the Hedging Agreement is based on a 2002 ISDA Master Agreement); or

      (C) any provision of a Hedging Agreement which is similar in meaning and effect to any provision listed in paragraphs (A) or (B) above (if the Hedging Agreement is not based on an ISDA Master Agreement);

   (iii) to the extent that the relevant Debtor's obligation to make the Payment arises from a Non-Credit Related Close-Out;

   (iv) to the extent that:

      (A) the relevant Debtor's obligation to make the Payment arises from a Credit Related Close-Out in relation to that Hedging Agreement; and

      (B) no Event of Default (other than a Parent Debt Event of Default) is continuing at the time of that Payment or would result from that Payment;

   (v) if the Payment is a Payment pursuant to Clause 21.1 (Order of application: Common Recoveries);

   (vi) if, at any time prior to a Distress Event, the Payment arises directly or indirectly as a result of any close-out, termination or other similar or equivalent action under a Hedging Agreement by a member of the Group provided that, if applicable, the Company has certified to the relevant Hedge Counterparty that the termination or close-out would not

**1105**

result in a breach of any minimum hedging requirements under any Primary Financing Document; or

(vii)    if the Majority Super Senior Creditors and the Majority Senior Secured Creditors give prior consent to the Payment being made.

(b)    No Payment may be made to a Hedge Counterparty under paragraph (a) above if any scheduled Payment due from that Hedge Counterparty to a Debtor under a Hedging Agreement to which they are both party is due and unpaid unless the prior consent of the Majority Super Senior Creditors and the Majority Senior Secured Creditors is obtained.

(c)    Failure by a Debtor or a Third Party Security Provider to make a Payment to a Hedge Counterparty which results solely from the operation of paragraph (b) above shall, without prejudice to Clause 5.4 (Payment obligations continue), not result in a default (however described) in respect of that Debtor or Third Party Security Provider under that Hedging Agreement or any other Primary Financing Document.

(d)    Nothing in this Agreement obliges a Hedge Counterparty to make a payment to a Debtor under a Hedging Agreement to which they are both party if any scheduled Payment due from that Debtor to that Hedge Counterparty under that Hedging Agreement is due and unpaid. For the avoidance of doubt, this provision shall not affect any Payment which is due from a Hedge Counterparty to a Debtor as a result of a Hedging Agreement to which they are both a party being terminated or closed-out.

**5.4    Payment obligations continue**

No Debtor or Third Party Security Provider shall be released from the liability to make any Payment (including of default interest, which shall continue to accrue) under any Debt Document by the operation of Clauses 5.2 (Restriction on Payments: Hedging Liabilities) and 5.3 (Permitted Payments: Hedging Liabilities) even if its obligation to make that Payment is restricted at any time by the terms of any of those Clauses.

**5.5    No acquisition of Hedging Liabilities**

The Debtors shall not, and shall procure that no other member of the Group will:

(a)    enter into any Liabilities Acquisition; or

(b)    beneficially own all or any part of the share capital of a company that is party to a Liabilities Acquisition,

in respect of any of the Hedging Liabilities unless, the prior consent of the Majority Super Senior Creditors and the Majority Senior Secured Creditors is obtained or the relevant Liabilities Acquisition relates to Hedging Liabilities (or rights, benefits and/or obligations in relation thereto) in respect of which a Payment could be made under Clause 5.3 (Permitted Payments: Hedging Liabilities).

**5.6    Amendments and Waivers: Hedging Agreements**

(a)    Subject to paragraph (b) below, the Hedge Counterparties may not, at any time, amend or waive any term of the Hedging Agreements.

•

(b)     A Hedge Counterparty may amend or waive any term of a Hedging Agreement in accordance with the terms of that Hedging Agreement if the amendment or waiver would not result in a breach of another term of this Agreement and would not result in a breach of any minimum hedging requirements under any Primary Financing Document by any member of the Group.

**5.7     Security: Hedge Counterparties**

The Hedge Counterparties may not take, accept or receive the benefit of any Security, guarantee, indemnity or other assurance against loss from any Parent Debt Issuer, any member of the Group or any Third Party Security Provider in respect of the Hedging Liabilities other than:

(a)     the Transaction Security;

(b)     any guarantee, indemnity or other assurance against loss contained in:

(i)      any First Lien Facility Agreement;

(ii)     this Agreement;

(iii)    any Common Assurance; or

(iv)     the relevant Hedging Agreement provided that any such guarantee, indemnity or other assurance against loss is no greater in extent than any of those referred to in paragraphs (i) to (iii) above (ignoring for this purpose the effect of any Guarantee Limitation);

(c)     as otherwise contemplated by Clause 3.3 (Security: First Lien Creditors); and

(d)     the indemnities contained in the ISDA Master Agreements (in the case of a Hedging Agreement which is based on an ISDA Master Agreement) or any indemnities which are similar in meaning and effect to those indemnities (in the case of a Hedging Agreement which is not based on an ISDA Master Agreement).

**5.8     Restriction on Enforcement: Hedge Counterparties**

Subject to Clause 5.9 (Permitted Enforcement: Hedge Counterparties) and Clause 5.10 (Required Enforcement: Hedge Counterparties) and without prejudice to each Hedge Counterparty's rights under Clauses 15.2 (Instructions to enforce – Transaction Security) and 15.4 (Manner of enforcement – Transaction Security), the Hedge Counterparties shall not take any Enforcement Action in respect of any of the Hedging Liabilities or any of the hedging transactions under any of the Hedging Agreements at any time.

**5.9     Permitted Enforcement: Hedge Counterparties**

(a)     To the extent it is able to do so under the relevant Hedging Agreement, a Hedge Counterparty may terminate or close-out in whole or in part any hedging transaction under that Hedging Agreement prior to its stated maturity:

(i)      if, prior to a Distress Event, the Company has certified to that Hedge Counterparty that that termination or close-out would not result in a breach of any minimum hedging requirements under any Primary Financing Document;

•

        (ii)       if a Hedging Force Majeure has occurred in respect of that Hedging Agreement;

        (iii)     to the extent necessary to ensure that the aggregate outstanding notional amount of all hedging entered into by the Group with one or more Hedge Counterparties in respect of any specific indebtedness or exposure does not exceed the maximum aggregate amount of that indebtedness or other exposure from time to time (in each case to the extent agreed by the member of the Group party to that Hedging Agreement either in that Hedging Agreement or otherwise);

        (iv)     if a Distress Event has occurred;

        (v)      if an Insolvency Event has occurred in relation to a Debtor which is party to that Hedging Agreement; and

        (vi)     if the Majority Super Senior Creditors and the Majority Senior Secured Creditors give prior consent to that termination or close-out being made.

(b)     If a Debtor has defaulted on any Payment due under a Hedging Agreement (after allowing any applicable notice or grace periods) and the default has continued unwaived for more than five Business Days after notice of that default has been given to the Security Agent pursuant to paragraph (e) of Clause 29.3 (Notification of prescribed events), the relevant Hedge Counterparty:

        (i)      may, to the extent it is able to do so under the relevant Hedging Agreement, terminate or close-out in whole or in part any hedging transaction under that Hedging Agreement; and

        (ii)     until such time as the Security Agent has given notice to that Hedge Counterparty that the Transaction Security is being enforced (or that any formal steps are being taken to enforce the Transaction Security), shall be entitled to exercise any right it might otherwise have to sue for, commence or join legal or arbitration proceedings against any Debtor to recover any Hedging Liabilities due under that Hedging Agreement.

(c)     After the occurrence of an Insolvency Event in relation to any Debtor (other than in its capacity as a Parent Debt Issuer) or Third Party Security Provider, each Hedge Counterparty shall be entitled to exercise any right it may otherwise have in respect of that Debtor or Third Party Security Provider to:

        (i)      prematurely close-out or terminate any Hedging Liabilities of that Debtor or Third Party Security Provider;

        (ii)     make a demand under any guarantee, indemnity or other assurance against loss given by that Debtor or Third Party Security Provider in respect of any Hedging Liabilities;

        (iii)     exercise any right of set-off or take or receive any Payment in respect of any Hedging Liabilities of that Debtor or Third Party Security Provider; or

        (iv)     claim and prove in any insolvency process of that Debtor or Third Party Security Provider for the Hedging Liabilities owing to it.

•

**5.10    Required Enforcement: Hedge Counterparties**

(a)    Subject to paragraph (b) below, a Hedge Counterparty shall promptly terminate or close-out in full any hedging transaction under all or any of the Hedging Agreements to which it is party prior to their stated maturity, following:

    (i)    the occurrence of a First Lien Acceleration Event and delivery to it of a notice from the Security Agent that that First Lien Acceleration Event has occurred; and

    (ii)    delivery to it of a subsequent notice from the Security Agent (acting on the instructions of the Instructing Group) instructing it to do so.

(b)    Paragraph (a) above shall not apply to the extent that that First Lien Acceleration Event occurred as a result of an arrangement made between any Debtor or, as the case may be, Third Party Security Provider and any Primary Creditor or Creditor Representative with the purpose of bringing about that First Lien Acceleration Event.

(c)    If a Hedge Counterparty is entitled to terminate or close-out any hedging transaction under paragraph (b) of Clause 5.9 (Permitted Enforcement: Hedge Counterparties) (or would have been able to if that Hedge Counterparty had given the notice referred to in that paragraph) but has not terminated or closed out each such hedging transaction, that Hedge Counterparty shall promptly terminate or close-out in full each such hedging transaction following a request to do so by the Security Agent (acting on the instructions of the Instructing Group).

**5.11    Treatment of Payments due to Debtors on termination of hedging transactions**

(a)    If, on termination of any hedging transaction under any Hedging Agreement occurring after a Distress Event, a settlement amount or other amount (following the application of any Close-Out Netting, Payment Netting or Inter-Hedging Agreement Netting in respect of that Hedging Agreement) falls due from a Hedge Counterparty to the relevant Debtor then that amount shall be paid by that Hedge Counterparty to the Security Agent, treated as the proceeds of enforcement of the Transaction Security and applied in accordance with the terms of this Agreement.

(b)    The payment of that amount by the Hedge Counterparty to the Security Agent in accordance with paragraph (a) above shall discharge the Hedge Counterparty's obligation to pay that amount to that Debtor.

**5.12    Terms of Hedging Agreements**

(a)    The Hedge Counterparties (to the extent party to the Hedging Agreement in question) and the Debtors party to the Hedging Agreements shall ensure that, at all times:

    (i)    each Hedging Agreement is based either:

        (A)    on an ISDA Master Agreement; or

        (B)    on another framework agreement which is similar in effect to an ISDA Master Agreement;

    (ii)    in the event of a termination of the hedging transaction entered into under a Hedging Agreement, whether as a result of:

•

(A)    a Termination Event or an Event of Default, each as defined in the relevant Hedging Agreement (in the case of a Hedging Agreement which is based on an ISDA Master Agreement); or

(B)    an event similar in meaning and effect to either of those described in paragraph (A) above (in the case of a Hedging Agreement which is not based on an ISDA Master Agreement),

that Hedging Agreement will:

I.    if it is based on a 1992 ISDA Master Agreement, provide for payments under the "Second Method" and will make no material amendment to section 6(e) (Payments on Early Termination) of the ISDA Master Agreement;

II.    if it is based on a 2002 ISDA Master Agreement, make no material amendment to section 6(e) (Payments on Early Termination) of the ISDA Master Agreement; or

III.    if it is not based on an ISDA Master Agreement, provide for any other method the effect of which is that the party to which that event is referable will be entitled to receive payment under the relevant termination provisions if the net replacement value of all terminated transactions entered into under that Hedging Agreement is in its favour;

(iii)    each Hedging Agreement will provide that the relevant Hedge Counterparty will be entitled to designate an Early Termination Date or otherwise be able to terminate each transaction under such Hedging Agreement if so required pursuant to Clause 5.10 (Required Enforcement: Hedge Counterparties).

(iv)    each Hedging Agreement shall include only standard ISDA representations and undertakings (and not, for the avoidance of doubt, any additional representations and undertakings contained in any Primary Financing Document), in each case amended as necessary so as to be no more onerous on any member of the Group than the equivalent provisions of the Primary Financing Documents;

(v)    no Hedging Agreement shall contain any events of default (however described) other than:

(A)    failure by the member of the Group party to that Hedging Agreement to pay on the due date any amount payable by it under that Hedging Agreement (subject to any applicable grace period);

(B)    the occurrence of a First Lien Acceleration Event which is continuing; and

(C)    the occurrence of an Insolvency Event in relation to the Debtor which is party to that Hedging Agreement.

(b)    Unless otherwise agreed by the Company from time to time, notwithstanding anything to the contrary in any Hedging Agreement, no Hedging Agreement shall prohibit or restrict any action by any member of the Group not prohibited or restricted under the other Primary Debt Documents.

•

(c)    To the extent that the terms of a Hedging Agreement are inconsistent with the terms of this Agreement, the terms of this Agreement shall prevail.

**5.13    Designation of Super Senior Hedging Liabilities**

(a)    The Company may from time to time designate (or redesignate or effect the release of any previous designation of) any Hedging Liabilities in whole or in part as Super Senior Hedging Liabilities subject to this Clause 5.13.

(b)    Any designation or redesignation or release of any previous designation of Hedging Liabilities (whether in whole or in part) by the Company shall only take effect on receipt by the Security Agent (which receipt shall be acknowledged promptly) of a Super Senior Hedging Certificate which complies with the conditions set out in this Clause 5.13.

(c)    The Security Agent shall only be required to recognise and give effect to any designation, redesignation or release of any Super Senior Hedging Liabilities requested by the Company pursuant to any Super Senior Hedging Certificate to the extent such Super Senior Hedging Certificate:

    (i)    has been duly executed by:

        (A)    the Company;

        (B)    the Hedge Counterparty to whom any Super Senior Hedging Liabilities is to be designated or redesignated; and

        (C)    if applicable, any Hedge Counterparty who is to release any portion of any Hedging Liabilities previously designated to it in accordance with this Clause 5.13; and

    (ii)    identifies the relevant Hedging Agreement pursuant to which the relevant Hedging Liabilities arise.

(d)    No Hedging Liabilities may be redesignated or released without the prior written consent of the relevant Hedge Counterparty.

(e)    The Security Agent shall maintain a register for the recording of the names of the Hedge Counterparties whose Hedging Liabilities are designated as Super Senior Hedging Liabilities (the **Register**).  The entries in the Register shall be conclusive absent manifest error, and the Company, the Security Agent and the Hedge Counterparties shall treat each person whose name is recorded in the Register as a Super Senior Hedge Counterparty for the purposes of this Agreement to the extent of its Super Senior Hedging Liabilities.  The Register shall be available for inspection by the Company and any Hedge Counterparty, at all reasonable times and on reasonable notice to the Security Agent.

**5.14    Hedge Counterparties' Guarantee and Indemnity**

Each Debtor (other than in its capacity as a Parent Debt Issuer) agrees that it will be bound by the obligations set out in Schedule 6 (Guarantee and Indemnity).

•

## 6.    OPTION TO PURCHASE AND HEDGE TRANSFER

### 6.1    Option to purchase: Senior Secured Debt Creditors

(a)    For the purpose of this Clause 6.1 only, a reference to:

    (i)    a Super Senior Facility shall be construed to include a Cash Management Facility;

    (ii)    the Super Senior Facility Liabilities shall be construed to include the Cash Management Liabilities;

    (iii)    a Super Senior Facility Agreement or a Super Senior Facility Document shall be construed to include a Cash Management Agreement; and

    (iv)    a Super Senior Facility Lender and a Bilateral Lender shall be construed to include a Cash Management Provider.

(b)    Subject to paragraph (c) below and to Clause 6.2 (Option to purchase: Second Lien Creditors) and Clause 6.3 (Option to purchase: Parent Debt Creditors), some or all of the Senior Secured Noteholders and Senior Secured Facility Lenders (the **Purchasing Senior Secured Creditors**) may after a Distress Event, after having given all Senior Secured Noteholders and Senior Secured Facility Lenders the opportunity to participate in such purchase, by giving not less than ten days' notice to the Security Agent, require the transfer to the Purchasing Senior Secured Creditors (or to a nominee or nominees), in accordance with Clause 26.3 (Change of Lender), of all, but not part, of the rights, benefits and obligations in respect of the Super Senior Facility Liabilities if:

    (i)    that transfer is lawful and subject to paragraph (ii) below, otherwise permitted by the terms of each Super Senior Facility Agreement;

    (ii)    any conditions relating to such a transfer contained in each Super Senior Facility Agreement are complied with, other than:

        (A)    any requirement to obtain the consent of, or consult with, any Debtor, Third Party Security Provider or other member of the Group relating to such transfer, which consent or consultation shall not be required; and

        (B)    to the extent to which the Purchasing Senior Secured Creditors provide cash cover for any Letter of Credit, the consent of the relevant Issuing Bank or Bilateral Creditor relating to such transfer shall not be required;

    (iii)    the relevant Creditor Representative(s) on behalf of the Super Senior Facility Lenders and each relevant Bilateral Creditor are each paid an amount by the Purchasing Senior Secured Creditors equal to the aggregate of:

        (A)    any amounts provided as cash cover by the Purchasing Senior Secured Creditors for any Letter of Credit (as envisaged in paragraph (ii)(B) above);

        (B)    all of the Super Senior Facility Liabilities at that time (whether or not due), including all amounts that would have been payable under the Super Senior Facility Documents if the Super Senior Facility Liabilities were being prepaid by the

•

**1112**

relevant Debtors on the date of that payment (including Creditor Representative Amounts); and

(C)    all costs and expenses (including legal fees) incurred by the Super Senior Agents and/or the Super Senior Facility Lenders as a consequence of giving effect to that transfer;

(iv)    as a result of that transfer the Super Senior Facility Lenders have no further actual or contingent liability to any Debtor under the relevant Debt Documents;

(v)    an indemnity is provided from the Purchasing Senior Secured Creditors (or from another third party acceptable to all the Super Senior Facility Lenders) in a form satisfactory to each Super Senior Facility Lender in respect of all losses which may be sustained or incurred by any Super Senior Facility Lender in consequence of any sum received or recovered by any Super Senior Facility Lender from any person being required (or it being alleged that it is required) to be paid back by or clawed back from any Super Senior Facility Lender for any reason (provided that no Creditor Representative shall be required to give any such indemnity); and

(vi)    the transfer is made without recourse to, or representation or warranty from, the Super Senior Facility Lenders, except that each Super Senior Facility Lender shall be deemed to have represented and warranted on the date of that transfer that it has the corporate power to effect that transfer and it has taken all necessary action to authorise the making by it of that transfer.

(c)    Subject to paragraph (b) of Clause 6.4 (Hedge Transfer), the Purchasing Senior Secured Creditors may only require a Liabilities Transfer under this Clause 6.1 if, at the same time, they require a Hedge Transfer in relation to the Super Senior Hedging Liabilities in accordance with Clause 6.4 (Hedge Transfer) and if, for any reason, a Hedge Transfer in relation to the Super Senior Hedging Liabilities cannot be made in accordance with Clause 6.4 (Hedge Transfer), that Liabilities Transfer may not be required to be made.

(d)    Each Creditor Representative and each Bilateral Creditor in respect of the Super Senior Facilities shall, at the request of the Purchasing Senior Secured Creditors notify the Purchasing Senior Secured Creditors of:

(i)    the sum of the amounts described in paragraphs (b)(iii)(B) and (C) above; and

(ii)    the amount of each Letter of Credit for which cash cover is to be provided by the Purchasing Senior Secured Creditors.

(e)    If more than one Purchasing Senior Secured Creditor wishes to exercise the option to purchase the Super Senior Facility Liabilities in accordance with paragraph (b) above, each such Purchasing Senior Secured Creditor shall:

(i)    acquire the Super Senior Facility Liabilities *pro rata*, in the proportion that its Senior Secured Credit Participation bears to the aggregate Senior Secured Credit Participations of all the Purchasing Senior Secured Creditors; and

(ii)    inform each relevant Creditor Representative(s) or Bilateral Lender(s) in accordance with the terms of the relevant Senior Secured Debt Documents, who will determine (consulting

•

with each other as required) the appropriate share of the Super Senior Facility Liabilities to be acquired by each such Purchasing Senior Secured Creditor and who shall inform each such Purchasing Senior Secured Creditor accordingly,

and the relevant Creditor Representative(s) and Bilateral Lender(s) under the relevant Senior Secured Debt Documents (as applicable) shall promptly inform the relevant Creditor Representatives and Bilateral Creditors in respect of the Super Senior Facility Liabilities and the Super Senior Hedge Counterparties of the Purchasing Senior Secured Creditors' intention to exercise the option to purchase the Super Senior Facility Liabilities.

**6.2    Option to purchase: Second Lien Creditors**

(a)    Subject to paragraph (b) below, some or all of the Second Lien Creditors (the **Purchasing Second Lien Creditors**) may after a Distress Event, after having given all Second Lien Creditors the opportunity to participate in such purchase, by giving not less than ten days' notice to the Security Agent, require the transfer to the Purchasing Second Lien Creditors (or to a nominee or nominees), in accordance with Clause 26.3 (Change of Lender) and Clause 26.4 (Change of Noteholder), of all, but not part, of the rights, benefits and obligations in respect of the First Lien Liabilities (other than the Hedging Liabilities) if:

(i)    that transfer is lawful and, subject to paragraph (ii) below, otherwise permitted by the terms of the relevant First Lien Debt Documents;

(ii)    any conditions relating to such a transfer contained in the relevant First Lien Debt Documents are complied with, other than:

(A)    any requirement to obtain the consent of, or consult with, any Debtor, Third Party Security Provider or other member of the Group relating to such transfer, which consent or consultation shall not be required; and

(B)    to the extent that the Purchasing Second Lien Creditors provide cash cover for any Letter of Credit, the consent of the relevant Issuing Bank or Bilateral Creditor relating to such transfer shall not be required;

(iii)    the relevant Creditor Representatives on behalf of each group of First Lien Creditors and each relevant Bilateral Creditor are each paid an amount by the Purchasing Second Lien Creditors equal to the aggregate of:

(A)    any amounts provided as cash cover by the Purchasing Second Lien Creditors for any Letter of Credit;

(B)    all of the First Lien Liabilities (other than the Hedging Liabilities) at that time (whether or not due), including all amounts that would have been payable under the First Lien Debt Documents if the First Lien Liabilities (other than the Hedging Liabilities) were being prepaid by the relevant Debtors on the date of that payment (including Creditor Representative Amounts); and

(C)    all costs and expenses (including legal fees) incurred by the relevant Creditor Representatives and/or the other First Lien Creditors as a consequence of giving effect to that transfer;

•

(iv)    as a result of that transfer the First Lien Creditors have no further actual or contingent liability to any Debtor under the relevant Debt Documents;

(v)    an indemnity is provided from the Purchasing Second Lien Creditors (or from another third party acceptable to all the First Lien Creditors) in a form satisfactory to each First Lien Creditor in respect of all losses which may be sustained or incurred by any First Lien Creditor in consequence of any sum received or recovered by any First Lien Creditor from any person being required (or it being alleged that it is required) to be paid back by or clawed back from any First Lien Creditor for any reason (provided that no Creditor Representative shall be required to give any such indemnity); and

(vi)    the transfer is made without recourse to, or representation or warranty from, the First Lien Creditors, except that each First Lien Creditor shall be deemed to have represented and warranted on the date of that transfer that it has the corporate power to effect that transfer and it has taken all necessary action to authorise the making by it of that transfer.

(b)    Subject to paragraph (b) of Clause 6.4 (Hedge Transfer), all the Purchasing Second Lien Creditors may only require a Liabilities Transfer under this Clause 6.3 if, at the same time, they require a Hedge Transfer in relation to the Hedging Liabilities in accordance with Clause 6.4 (Hedge Transfer) and if, for any reason, a Hedge Transfer in relation to the Hedging Liabilities cannot be made in accordance with Clause 6.4 (Hedge Transfer), that Liabilities Transfer may not be required to be made.

(c)    Each Creditor Representative and each Bilateral Creditor in respect of the First Lien Liabilities shall, at the request of the Purchasing Second Lien Creditors, notify the Purchasing Second Lien Creditors of:

(i)    the sum of the amounts described in paragraphs (a)(iii)(B) and (C) below; and

(ii)    the amount of each Letter of Credit for which cash cover is to be provided by the Purchasing Second Lien Creditors.

(d)    If more than one Purchasing Second Lien Creditor wishes to exercise the option to purchase the First Lien Liabilities in accordance with paragraph (a) below, each such Purchasing Second Lien Creditor shall:

(i)    acquire the First Lien Liabilities *pro rata*, in the proportion that its Second Lien Credit Participation bears to the aggregate Second Lien Credit Participations of all the Purchasing Second Lien Creditors; and

(ii)    inform each relevant Creditor Representative(s) or Bilateral Lender(s) in accordance with the terms of the relevant Second Lien Debt Documents, who will determine (consulting with each other as required) the appropriate share of the First Lien Liabilities to be acquired by each such Purchasing Second Lien Creditor and who shall inform each such Purchasing Second Lien Creditor accordingly,

and the relevant Second Lien Creditor Representative(s) or Bilateral Lender(s) shall promptly inform the relevant Creditor Representatives and Bilateral Creditors in respect of the First Lien Liabilities, and the Hedge Counterparties of the Purchasing Second Lien Creditors' intention to exercise the option to purchase the First Lien Liabilities.

•

**6.3    Option to purchase: Parent Debt Creditors**

(a)    Subject to paragraph (b) below, some or all of the Parent Debt Creditors (the **Purchasing Parent Debt Creditors**) may after a Distress Event, after having given all Parent Debt Creditors the opportunity to participate in such purchase, by giving not less than ten days' notice to the Security Agent, require the transfer to the Purchasing Parent Debt Creditors (or to a nominee or nominees), in accordance with Clause 26.3 (Change of Lender) and Clause 26.4 (Change of Noteholder), of all, but not part, of the rights, benefits and obligations in respect of the Priority Creditor Liabilities (other than the Hedging Liabilities) if:

(i)    that transfer is lawful and, subject to paragraph (ii) below, otherwise permitted by the terms of the relevant Priority Debt Documents;

(ii)    any conditions relating to such a transfer contained in the relevant Priority Debt Documents are complied with, other than:

(A)    any requirement to obtain the consent of, or consult with, any Debtor, Third Party Security Provider or other member of the Group relating to such transfer, which consent or consultation shall not be required; and

(B)    to the extent that the Purchasing Parent Debt Creditors provide cash cover for any Letter of Credit, the consent of the relevant Issuing Bank or Bilateral Creditor relating to such transfer shall not be required;

(iii)    the relevant Creditor Representatives on behalf of each group of Priority Creditors and each relevant Bilateral Creditor are each paid an amount by the Purchasing Parent Debt Creditors equal to the aggregate of:

(A)    any amounts provided as cash cover by the Purchasing Parent Debt Creditors for any Letter of Credit;

(B)    all of the Priority Creditor Liabilities (other than Hedging Liabilities) at that time (whether or not due), including all amounts that would have been payable under the Priority Debt Documents if the Priority Creditor Liabilities (other than Hedging Liabilities) were being prepaid by the relevant Debtors on the date of that payment (including Creditor Representative Amounts); and

(C)    all costs and expenses (including legal fees) incurred by the relevant Creditor Representatives and/or the other Priority Creditors as a consequence of giving effect to that transfer;

(iv)    as a result of that transfer the Priority Creditors have no further actual or contingent liability to any Debtor under the relevant Debt Documents;

(v)    an indemnity is provided from the Purchasing Parent Debt Creditors (or from another third party acceptable to all the Priority Creditors) in a form satisfactory to each Priority Creditor in respect of all losses which may be sustained or incurred by any Priority Creditor in consequence of any sum received or recovered by any Priority Creditor from any person being required (or it being alleged that it is required) to be paid back by or clawed back from any Priority Creditor for any reason (provided that no Creditor Representative shall be required to give any such indemnity); and

**1116**

(vi)    the transfer is made without recourse to, or representation or warranty from, the Priority Creditors, except that each Priority Creditor shall be deemed to have represented and warranted on the date of that transfer that it has the corporate power to effect that transfer and it has taken all necessary action to authorise the making by it of that transfer.

(b)    Subject to paragraph (b) of Clause 6.4 (Hedge Transfer), all the Purchasing Parent Debt Creditors may only require a Liabilities Transfer under this Clause 6.3 if, at the same time, they require a Hedge Transfer in relation to the Hedging Liabilities in accordance with Clause 6.4 (Hedge Transfer) and if, for any reason, a Hedge Transfer in relation to the Hedging Liabilities cannot be made in accordance with Clause 6.4 (Hedge Transfer), that Liabilities Transfer may not be required to be made.

(c)    Each Creditor Representative and each Bilateral Creditor in respect of the Priority Creditor Liabilities shall, at the request of the Purchasing Parent Debt Creditors, notify the Purchasing Parent Debt Creditors of:

(i)    the sum of the amounts described in paragraphs (a)(iii)(B) and (C) above; and

(ii)    the amount of each Letter of Credit for which cash cover is to be provided by the Purchasing Parent Debt Creditors.

(d)    If more than one Purchasing Parent Debt Creditor wishes to exercise the option to purchase the Priority Creditor Liabilities in accordance with paragraph (a) above, each such Purchasing Parent Debt Creditor shall:

(i)    acquire the Priority Creditor Liabilities *pro rata*, in the proportion that its Parent Debt Credit Participation bears to the aggregate Parent Debt Credit Participations of all the Purchasing Parent Debt Creditors; and

(ii)    inform each relevant Creditor Representative(s) or Bilateral Lender(s) in accordance with the terms of the relevant Parent Debt Documents, who will determine (consulting with each other as required) the appropriate share of the Priority Creditor Liabilities to be acquired by each such Purchasing Parent Debt Creditor and who shall inform each such Purchasing Parent Debt Creditor accordingly,

and the relevant Parent Debt Creditor Representative(s) or Bilateral Lender(s) shall promptly inform the relevant Creditor Representatives and Bilateral Creditors in respect of the Priority Creditor Liabilities, and the Hedge Counterparties of the Purchasing Parent Debt Creditors' intention to exercise the option to purchase the Priority Creditor Liabilities.

**6.4    Hedge Transfer**

(a)    The Purchasing Senior Secured Creditors, the Purchasing Second Lien Creditors or the Purchasing Parent Debt Creditors, as the case may be (the **Relevant Purchasing Creditors**) may, by giving not less than ten days' notice to the Security Agent, require a Hedge Transfer of all, but not part of, the rights, benefits and obligations in respect of the Super Senior Hedging Liabilities (in the case of the Purchasing Senior Secured Creditors) or all the Hedging Liabilities (in the case of any other Relevant Purchasing Creditors):

(i)    if either:

•

     (A)     the Relevant Purchasing Creditors require, at the same time, a Liabilities Transfer; or

     (B)     the Relevant Purchasing Creditors require that Hedge Transfer at any time on or after:

          I.     in the case of Purchasing Senior Secured Creditors, the first date on which both of the Super Senior Facility Discharge Date and the Cash Management Facility Discharge Date have occurred;

          II.     in the case of Purchasing Second Lien Creditors, the First Lien Debt Discharge Date; or

          III.     in the case of Purchasing Parent Debt Creditors, the first date on which both of the First Lien Debt Discharge Date and the Second Lien Discharge Date have occurred; and

(ii)     if:

     (A)     that transfer is lawful and otherwise permitted by the terms of the relevant Hedging Agreements in which case no Debtor, Third Party Security Provider or other member of the Group shall be entitled to withhold its consent to that transfer;

     (B)     any conditions (other than the consent of, or any consultation with, any Debtor, Third Party Security Provider or other member of the Group) relating to that transfer contained in the relevant Hedging Agreements are complied with;

     (C)     each Hedge Counterparty is paid (in the case of a positive number) or pays (in the case of a negative number) an amount equal to the aggregate of (I) the Hedging Purchase Amount in respect of the hedging transactions under the relevant Hedging Agreement at that time and (II) all costs and expenses (including legal fees) incurred as a consequence of giving effect to that transfer;

     (D)     as a result of that transfer, the Hedge Counterparties have no further actual or contingent liability to any Debtor under the relevant Hedging Agreements;

     (E)     an indemnity is provided from each Relevant Purchasing Creditor exercising its rights pursuant to this Clause 6.4 which is receiving (or for which a nominee is receiving) that transfer (or from another third party acceptable to the relevant Hedge Counterparty) in a form satisfactory to the relevant Hedge Counterparty in respect of all losses which may be sustained or incurred by that Hedge Counterparty in consequence of any sum received or recovered by that Hedge Counterparty being required (or it being alleged that it is required) to be paid back by or clawed back from the Hedge Counterparty for any reason; and

     (F)     that transfer is made without recourse to, or representation or warranty from, the relevant Hedge Counterparty, except that the relevant Hedge Counterparty shall be deemed to have represented and warranted on the date of that transfer that it has the corporate power to effect that transfer and it has taken all necessary action to authorise the making by it of that transfer.

•

(b)    The Relevant Purchasing Creditors and any Hedge Counterparty may agree (in respect of the Hedging Agreements (or one or more of them) to which that Hedge Counterparty is a party) that a Hedge Transfer required by the Relevant Purchasing Creditors pursuant to paragraph (a) above shall not apply to that Hedging Agreement(s) or to the Hedging Liabilities and Hedge Counterparty Obligations under that Hedging Agreement(s).

## 7.    SECOND LIEN CREDITORS AND SECOND LIEN LIABILITIES

### 7.1    Restriction on Payment: Second Lien Liabilities

(a)    Until the First Lien Discharge Date, no Debtor or Third Party Security Provider shall, and the Company shall procure that no other member of the Group will:

(i)    make any Payments in respect of any principal, interest or other amount on or in respect of, or make any distribution or Liabilities Acquisition in respect of, any Second Lien Liabilities in cash or in kind or apply any such money or property in or towards discharge of any Second Lien Liabilities except as expressly permitted by Clause 7.2 (Permitted Payments: Second Lien Liabilities), Clause 7.9 (Permitted Enforcement: Second Lien Creditors), Clause 11.5 (Filing of claims) or, in relation to a refinancing in full of such Second Lien Liabilities, Clause 23 (Additional Regulated Debt); or

(ii)    exercise any set-off against any Second Lien Liabilities except as expressly permitted by Clause 7.2 (Permitted Payments: Second Lien Liabilities), Clause 7.9 (Permitted Enforcement: Second Lien Creditors) or Clause 11.5 (Filing of claims),

and, in each case, to the extent not restricted by Clause 7.4 (Issue of Second Lien Payment Stop Notice) and Clause 7.5 (Effect of Second Lien Payment Stop Event or Second Lien Automatic Block Event).

(b)    Notwithstanding Clause 7.2 (Permitted Payments: Second Lien Liabilities), following the occurrence of a First Lien Acceleration Event or an Insolvency Event in relation to any Debtor (other than in its capacity as a Parent Debt Issuer) or Third Party Security Provider, (until the occurrence of the Super Senior Discharge Date), no Parent Debt Issuer, member of the Group or Third Party Security Provider may make Payments of the Second Lien Liabilities except from Common Recoveries distributed in accordance with Clause 21 (Application of Proceeds), provided that:

(i)    this paragraph (b) above shall not prevent any distribution or dividend out of any Debtor's unsecured assets (pro rata to each unsecured creditor's claim) made by a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer appointed in respect of any Debtor or any of its assets;

(ii)    any Payment prohibited by this paragraph (b) will remain owing by the relevant Debtor(s); and

(iii)    any failure to make a Payment as a result of this paragraph (b) shall not prevent the occurrence of an Event of Default under the relevant Second Lien Debt Document as a consequence of that failure to make a Payment.

### 7.2    Permitted Payments: Second Lien Liabilities

Any Debtor or member of the Group may:

•

(a)    prior to the First Lien Discharge Date, make Payments to the Second Lien Creditors in respect of the Second Lien Liabilities in accordance with the Second Lien Debt Documents:

   (i)    if:

      (A)    the Payment is of:

         I.    any amount of principal or capitalised interest in respect of the Second Lien Liabilities which is not prohibited from being paid by the Prior Ranking Financing Documents; or

         II.    any other amount which is not an amount of principal or capitalised interest (such other amounts including all scheduled interest payments (including, if applicable, special interest (or liquidated damages)) and default interest on the Second Lien Liabilities accrued and payable in cash in accordance with the terms of the relevant Second Lien Debt Document (as at the date of issue of the same or as amended in accordance with the terms of this Agreement and the other Debt Documents), additional amounts payable as a result of the tax gross-up provisions relating to the Second Lien Liabilities and amounts in respect of currency indemnities in any Second Lien Financing Document;

      (B)    no Second Lien Payment Stop Notice is outstanding; and

      (C)    no Second Lien Automatic Block Event has occurred and is continuing;

   (ii)    if the Instructing Group consents to that Payment being made;

   (iii)    if the Payments are of costs, commissions, taxes and expenses incurred in respect of (or reasonably incidental to) the Second Lien Debt Documents (including in relation to any reporting or listing requirements under the relevant Second Lien Debt Documents or any other reasonable and ordinary course administrative and maintenance costs and expenses of a Second Lien Debt Issuer) or the Payment is of amounts due under the original form of any fee letter relating to upfront fees or if the Payment is of any amendment, consent and/or waiver fees reasonably incurred;

   (iv)    if the Payments are of costs, commissions, taxes, fees and expenses incurred in respect of (or reasonably incidental to) any refinancing of any of the Second Lien Liabilities in compliance with this Agreement and the Prior Ranking Financing Documents;

   (v)    if the Payments are of Creditor Representative Amounts or Security Agent Amounts due and payable to the Second Lien Creditor Representative or the Security Agent (as the case may be);

   (vi)    if the Payment is by a Second Lien Debt Issuer of any of its obligations under a Second Lien Financing Document and such Payment is not directly or indirectly financed by any member of the Group except to the extent such Payment would, if it had been a Payment by a Debtor (other than the relevant Second Lien Debt Issuer)

•

or member of the Group to a Second Lien Creditor, otherwise have been permitted under this Agreement;

(vii)   if the Payment is funded directly or indirectly with the proceeds of any other Second Lien Liabilities incurred under or pursuant to any Second Lien Debt Documents or the proceeds of any issuance of any shares by the Company or any Subordinated Liabilities;

(viii)  if a Prior Ranking Default is continuing or would occur as a result of making such Payment and the Payment is of any Second Lien Liabilities which would have been payable but for the issue of a Second Lien Payment Stop Notice (which has since expired and no new Second Lien Payment Stop Event is continuing) which has been capitalised and added to the principal amount of the Second Lien Liabilities or where that amount is outstanding as a result of the accrual of cash interest payable in respect of the Second Lien Liabilities during a period when a Second Lien Payment Stop Notice was outstanding or any other amount referred to in sub-paragraph (i)(A)II above;

(ix)    if an Event of Default is continuing and the Payment is of all or part of the Second Lien Liabilities by way of a release or otherwise discharge solely in consideration for the issues of shares in any Holding Company of the Company (each a **Debt for Equity Swap**) provided that:

(A)     no cash or cash equivalent Payment is made in respect of the Second Lien Liabilities;

(B)     it does not result in a "change of control" under any Primary Financing Document;

(C)     any Liabilities owed by a member of the Group to another member of the Group, a Subordinated Creditor or any other Holding Company of the Company that arise as a result of such Debt for Equity Swap are subordinated to the Prior Ranking Liabilities pursuant to this Agreement and the Prior Ranking Creditors are granted Transaction Security in respect of any of those Liabilities;

(D)     at the time that any Debt for Equity Swap becomes effective, no Distressed Disposal is due to occur at such time which is reasonably likely to be adversely impeded by the occurrence of such Debt for Equity Swap; and

(E)     no member of the Group shall become liable for, or incur, any tax liability as a result of such Debt for Equity Swap which is materially adverse to the interests of the First Lien Creditors taking into account the circumstances of such Debt for Equity Swap and (subject to receipt of any required countersigned release or reliance letters and for information purposes only) a tax report from a reputable independent firm of accountants is provided to the Security Agent (on which the Security Agent and the First Lien Creditors can rely), confirming what tax liability (if any) should have arisen or should arise as a result of such Debt for Equity Swap;

•

       (x)      if the Payment is of non-cash interest made by way of the capitalisation of interest or by the issuance of a non-cash pay financial instrument evidencing the same which is subordinated to the First Lien Liabilities on the same terms as the Second Lien Liabilities; or

       (xi)     if the Payment is of work fees and professional fees, costs or expenses for restructuring advice and valuations (including legal advice and the advice of other appropriate financial and/or restructuring advisors) of the Second Lien Creditor Representative and the Security Agent in an aggregate amount not exceeding US$5,000,000 (or its equivalent in other currencies) since the date of this Agreement, but excluding any fees, costs or expenses incurred in connection with any current, threatened or pending litigation against any First Lien Creditor or any Affiliate of any First Lien Creditor; and

(b)      on or after the First Lien Discharge Date, make Payments to the Second Lien Creditors in respect of the Second Lien Liabilities in accordance with the relevant Second Lien Debt Documents.

A reference in this Clause 7.2 to a Payment shall be construed to include any direct or indirect step, matter, action or dealing in relation to any Second Lien Liabilities which are otherwise prohibited under Clause 7.1 (Restriction on Payment: Second Lien Liabilities).

**7.3**     **Security and Guarantees: Second Lien Liabilities**

At any time prior to the First Lien Discharge Date, except with the consent of the Instructing Group, the Second Lien Creditors may not take, accept or receive the benefit of any Security, guarantee, indemnity or other assurance against loss from any Debtor, any member of the Group or any Third Party Security Provider other than:

(a)      any Security in respect of the Second Lien Liabilities from any member of the Group or any Third Party Security Provider in addition to the Transaction Security which to the extent legally possible and subject to any Agreed Security Principles (except to the extent they already benefit from such Security) is, at the same time, also offered either:

       (i)      to the Security Agent as agent or trustee for the other Priority Secured Parties (and, if such Transaction Security relates to the Common Charged Property, the Parent Debt Secured Parties) in respect of their Liabilities; or

       (ii)     in the case of any jurisdiction in which effective Security cannot be granted in favour of the Security Agent as agent or trustee for the Priority Secured Parties (and, if applicable, the Parent Debt Secured Parties):

            (A)     to the other Priority Secured Parties (and, if such Transaction Security relates to the Common Charged Property, the Parent Debt Secured Parties) in respect of their Liabilities; or

            (B)     to the Security Agent under a parallel debt structure, joint and several creditor structure or agency structure for the benefit of the other Priority Secured Parties (and, if such Transaction Security relates to the Common Charged Property, the Parent Debt Secured Parties),

•

and ranks in the same order of priority as that contemplated in Clause 2.2 (Transaction Security) and all amounts received or recovered by any Second Lien Creditor are immediately paid to the Security Agent and held and applied in accordance with Clause 21 (Application of Proceeds);

(b)    any guarantee, indemnity or other assurance against loss in respect of the Second Lien Liabilities from any member of the Group or a Third Party Security Provider in addition to those in:

    (i)    the Second Lien Group Guarantees;

    (ii)    this Agreement;

    (iii)    any mandate letter entered into in connection with any Second Lien Facility Agreement; or

    (iv)    any Common Assurance,

(except to the extent they already benefit from such guarantee, indemnity or other assurance against loss) if and to the extent legally possible and subject to any Agreed Security Principles, at the same time, it is also offered to the other Priority Secured Parties in respect of their Liabilities and ranks in the same order of priority as that contemplated in Clause 2 (Ranking and Priority) and all amounts received or recovered by any Second Lien Creditor are immediately paid to the Security Agent and held and applied in accordance with Clause 21 (Application of Proceeds);

(c)    any Security, guarantee, indemnity or other assurance against loss from any Debtor, any member of the Group or a Third Party Security Provider:

    (i)    in connection with any escrow or similar or equivalent arrangements entered into in respect of the proceeds of any indebtedness which, upon release of those amounts to a member of the Group, will become Second Lien Liabilities; or

    (ii)    in connection with any actual or proposed defeasance, redemption, prepayment, repayment, purchase or other discharge of any Second Lien Liabilities (in each case provided that such defeasance, redemption, prepayment, repayment, purchase or other discharge is not prohibited by the terms of this Agreement); and

(d)    as otherwise contemplated by Clause 3.3 (Security: First Lien Creditors).

**7.4    Issue of Second Lien Payment Stop Notice**

(a)    At any time prior to the First Lien Discharge Date, if a Second Lien Payment Stop Event has occurred and is continuing, except with Required Prior Ranking Creditor Consent and subject to Clause 11 (Effect of Insolvency Event), no Debtor or Third Party Security Provider shall (and the Company shall procure that no member of the Group shall) make, and no Second Lien Creditor may receive from any Debtor, Third Party Security Provider or member of the Group, any Payment in respect of the Second Lien Liabilities (other than a payment falling within paragraphs (a)(ii) to (xi) of Clause 7.2 (Permitted Payments: Second Lien Liabilities) (other than any Payment pursuant to paragraph (a)(iii) of Clause 7.2 (Permitted Payments: Second Lien Liabilities) "of amounts due under the original form of any fee letter relating to upfront fees") provided in each case that no First

•

Lien Acceleration Event or Insolvency Event has occurred and is continuing) from the date on which the relevant Creditor Representative or Bilateral Lender delivers a notice (a **Second Lien Payment Stop Notice**) to the Company, the Security Agent and each Second Lien Creditor Representative and each Bilateral Lender under any Second Lien Facility Agreement specifying the events or circumstances relating to that Second Lien Payment Stop Event until the earliest of:

(i)    the date falling 120 days after delivery of that Second Lien Payment Stop Notice;

(ii)    in relation to payments of the Second Lien Liabilities, if a Second Lien Standstill Period is in effect at any time after delivery of that Second Lien Payment Stop Notice, the date on which that Second Lien Standstill Period expires;

(iii)    the date on which the relevant Second Lien Payment Stop Event is no longer continuing and, if the relevant Priority Creditor Liabilities have been accelerated, such acceleration has been rescinded, revoked or waived provided that at such time no other Event of Default is continuing under any Priority Debt Document;

(iv)    the date on which the Creditor Representative or Bilateral Lender which issued the Second Lien Payment Stop Notice delivers a notice to the Company, the Security Agent and the Second Lien Creditor Representatives cancelling the Second Lien Payment Stop Notice; and

(v)    the date on which the Second Lien Creditors or the Second Lien Creditor Representative(s) or the Security Agent takes any Enforcement Action that it is permitted to take under Clause 7.9 (Permitted Enforcement: Second Lien Creditors) and Clause 7.10 (Subsequent Second Lien Defaults) against a member of the Group or any Third Party Security Provider,

such period being the period for which the relevant Second Lien Payment Stop Notice is **outstanding**.

(b)    Unless each Second Lien Creditor Representative waives this requirement:

(i)    a new Second Lien Payment Stop Notice may not be delivered unless and until 360 days have elapsed since the delivery of the immediately prior Second Lien Payment Stop Notice; and

(ii)    no Second Lien Payment Stop Notice may be delivered in reliance on a Second Lien Payment Stop Event more than 90 days after the date on which each relevant Creditor Representative has received notice of that Second Lien Payment Stop Event.

(c)    A Creditor Representative or Bilateral Lender may serve only one Second Lien Payment Stop Notice each with respect to the same event or set of circumstances. Subject to paragraph (b) above, this shall not affect the right of that or any other Creditor Representative or Bilateral Lender to issue a Second Lien Payment Stop Notice in respect of any other event or set of circumstances.

(d)    No Second Lien Payment Stop Notice may be served by a Creditor Representative or Bilateral Lender in respect of a Second Lien Payment Stop Event which had been notified to each of them at the time at which an earlier Second Lien Payment Stop Notice was issued.

•

**1124**

**7.5    Effect of Second Lien Payment Stop Event or Second Lien Automatic Block Event**

Any failure to make a Payment due under the Second Lien Debt Documents as a result of the issue of a Second Lien Payment Stop Notice or the occurrence of a Second Lien Automatic Block Event or the operation of Clause 7.2 (Permitted Payments: Second Lien Liabilities) or Clause 7.4 (Issue of Second Lien Payment Stop Notice):

(a)    shall not prevent the occurrence of an Event of Default as a consequence of that failure to make a Payment in relation to the Second Lien Debt Documents;

(b)    shall not prevent the issue of a Second Lien Enforcement Notice on behalf of the Second Lien Creditors;

(c)    acts as a suspension of payment and not as a waiver of the right to receive payment on the date such payments are due;

(d)    shall not release any Debtor from the liability to make any Payment under any Second Lien Debt Document and will not prevent the accrual or capitalisation of interest (including default interest) in accordance with the relevant Second Lien Debt Documents;

(e)    will not prevent the payment of audit fees, directors' fees, taxes and other proper and incidental expenses required to maintain existence;

(f)    will not prevent the payment of Creditor Representative Amounts or Security Agent Amounts due and payable to the Second Lien Creditor Representatives or the Security Agent (as the case may be); and

(g)    will not prevent the payment of any other amounts funded directly or indirectly with amounts which have been received by the relevant Second Lien Debt Issuer from a person that is not a member of the Group.

**7.6    Cure of Payment Stop: Second Lien Creditors**

If:

(a)    at any time following the issue of a Second Lien Payment Stop Notice or the occurrence of a Second Lien Automatic Block Event, that Second Lien Payment Stop Notice ceases to be outstanding and/or (as the case may be) the Second Lien Automatic Block Event ceases to be continuing; and

(b)    the relevant Debtor then promptly pays to the Second Lien Creditors an amount equal to any Payments which had accrued under the Second Lien Debt Documents and which would have been Permitted Second Lien Debt Payments but for that Second Lien Payment Stop Notice or that Second Lien Automatic Block Event,

then any Event of Default which may have occurred as a result of that suspension of Payments shall be waived and any Second Lien Enforcement Notice which may have been issued as a result of that Event of Default shall be waived, in each case without any further action being required on the part of the Second Lien Creditors.

•

**1125**

**7.7    Amendments and Waivers: Second Lien Creditors**

(a)    Subject to paragraph (b) below, the Second Lien Creditors may amend or waive the terms of the Second Lien Debt Documents (other than this Agreement or any Security Document) in accordance with their terms at any time.

(b)    Prior to the First Lien Discharge Date, the Second Lien Creditors may not amend or waive the terms of the Second Lien Debt Documents if the amendment or waiver would result in any Second Lien Debt Document not complying with the provisions of this Agreement, without Required Prior Ranking Creditor Consent.

**7.8    Restrictions on Enforcement: Second Lien Creditors**

At any time prior to the First Lien Discharge Date, except as permitted by Clause 7.9 (Permitted Enforcement: Second Lien Creditors), no Second Lien Creditor shall be entitled to take or direct the Security Agent to take any Enforcement Action:

(a)    against any of the Debtors or any Third Party Security Provider in respect of any of the Second Lien Liabilities including, without limitation, under the Second Lien Group Guarantees; or

(b)    in respect of any of the Transaction Security,

except with the prior consent of or at the request of an Instructing Group.

**7.9    Permitted Enforcement: Second Lien Creditors**

(a)    Subject to the provisions of Clause 7.11 (Enforcement on behalf of Second Lien Creditors), the restrictions in Clause 7.8 (Restrictions on Enforcement: Second Lien Creditors) will not apply in respect of the Second Lien Liabilities or the Transaction Security if:

(i)    a Second Lien Event of Default has occurred and is continuing (the **Relevant Second Lien Event of Default**);

(ii)    each other Creditor Representative and Bilateral Creditor has received a notice of the Relevant Second Lien Event of Default specifying the event or circumstance in relation to the Relevant Second Lien Event of Default from the relevant Second Lien Creditor Representative (a **Second Lien Enforcement Notice**);

(iii)    the relevant Second Lien Standstill Period has elapsed or otherwise terminated; and

(iv)    the Relevant Second Lien Event of Default is continuing at the end of the relevant Second Lien Standstill Period.

(b)    A Second Lien Creditor may take any of the actions described in paragraph (i) of the proviso to the definition of Enforcement Action where it is otherwise entitled to do so.

**7.10    Subsequent Second Lien Defaults**

The Second Lien Creditors may take Enforcement Action under Clause 7.9 (Permitted Enforcement: Second Lien Creditors) in relation to a Relevant Second Lien Event of Default to the extent entitled

•

to under the relevant Second Lien Debt Documents even if, at the end of any relevant Second Lien Standstill Period or at any later time, a further Second Lien Standstill Period has begun as a result of any other Second Lien Event of Default.

**7.11    Enforcement on behalf of Second Lien Creditors**

If the Security Agent has notified the Second Lien Creditor Representative(s) that it is taking or has been instructed by an Instructing Group to take any Enforcement Action against any Debtor or Third Party Security Provider, no Second Lien Creditor may take any action referred to in Clause 7.9 (Permitted Enforcement: Second Lien Creditors) against that Debtor or Third Party Security Provider or any Subsidiary of that Debtor or Third Party Security Provider while the Security Agent is taking steps to enforce that Transaction Security in accordance with the instructions of the Instructing Group where such action might be reasonably likely to adversely affect such enforcement or Enforcement Action or the amount of proceeds to be derived therefrom.

**8.    PARENT DEBT CREDITORS AND PARENT DEBT LIABILITIES**

**8.1    Restriction on Payment: Parent Debt Liabilities**

(a)    Until the Priority Discharge Date, no Debtor or Third Party Security Provider shall, and the Company shall procure that no other member of the Group will:

    (i)    make any Payments in respect of any principal, interest or other amount on or in respect of, or make any distribution or Liabilities Acquisition in respect of, any Parent Debt Liabilities in cash or in kind or apply any such money or property in or towards discharge of any Parent Debt Liabilities except as expressly permitted by Clause 8.2 (Permitted Payments: Parent Debt Liabilities), Clause 8.9 (Permitted Enforcement: Parent Debt Creditors), Clause 11.5 (Filing of claims) or, in relation to a refinancing in full of such Parent Debt Liabilities, 23 (Additional Regulated Debt); or

    (ii)    exercise any set-off against any Parent Debt Liabilities except as expressly permitted by Clause 8.2 (Permitted Payments: Parent Debt Liabilities), Clause 8.9 (Permitted Enforcement: Parent Debt Creditors) or Clause 11.5 (Filing of claims),

and, in each case, to the extent not restricted by Clause 8.4 (Issue of Parent Debt Payment Stop Notice) and Clause 8.5 (Effect of Parent Debt Payment Stop Event or Parent Debt Automatic Block Event) below.

(b)    Notwithstanding Clause 8.2 (Permitted Payments: Parent Debt Liabilities), following the occurrence of a First Lien Acceleration Event or an Insolvency Event in relation to any Debtor (other than in its capacity as a Parent Debt Issuer) or Third Party Security Provider, (until the occurrence of the Super Senior Discharge Date), no member of the Group or Third Party Security Provider may make Payments of the Parent Debt Liabilities except from Common Recoveries distributed in accordance with Clause 21 (Application of Proceeds), provided that:

    (i)    this paragraph (b) above shall not prevent any distribution or dividend out of any Debtor's unsecured assets (pro rata to each unsecured creditor's claim) made by a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer appointed in respect of any Debtor or any of its assets;

•

(ii)     any Payment prohibited by this paragraph (b) will remain owing by the relevant Debtor(s); and

(iii)     any failure to make a Payment as a result of this paragraph (b) shall not prevent the occurrence of an Event of Default under the relevant Parent Debt Document as a consequence of that failure to make a Payment.

**8.2    Permitted Payments: Parent Debt Liabilities**

Any Debtor or member of the Group may:

(a)    prior to the Priority Discharge Date, make Payments to the Parent Debt Creditors in respect of the Parent Debt Liabilities in accordance with the Parent Debt Documents:

    (i)    if:

        (A)    the Payment is of:

            I.    any amount of principal or capitalised interest in respect of the Parent Debt Liabilities which is not prohibited from being paid by the Prior Ranking Financing Documents; or

            II.    any other amount which is not an amount of principal or capitalised interest (such other amounts including all scheduled interest payments (including, if applicable, special interest (or liquidated damages)) and default interest on the Parent Debt Liabilities accrued and payable in cash in accordance with the terms of the relevant Parent Debt Document (as at the date of issue of the same or as amended in accordance with the terms of this Agreement and the other Debt Documents), additional amounts payable as a result of the tax gross-up provisions relating to the Parent Debt Liabilities and amounts in respect of currency indemnities in any Parent Debt Financing Document;

        (B)    no Parent Debt Payment Stop Notice is outstanding; and

        (C)    no Parent Debt Automatic Block Event has occurred and is continuing;

    (ii)    if the consent of the Majority Super Senior Creditors, the Majority Senior Secured Creditors and the Majority Second Lien Creditors consent to that Payment being made is obtained;

    (iii)    if the Payments are of costs, commissions, taxes and expenses incurred in respect of (or reasonably incidental to) the Parent Debt Documents (including in relation to any reporting or listing requirements under the relevant Parent Debt Documents or any other reasonable and ordinary course administrative and maintenance costs and expenses of a Parent Debt Issuer) or the Payment is of amounts due under the original form of any fee letter relating to upfront fees or if the Payment is of any amendment, consent and/or waiver fees reasonably incurred;

        •

(iv)    if the Payments are of costs, commissions, taxes, fees and expenses incurred in respect of (or reasonably incidental to) any refinancing of any of the Parent Debt Liabilities in compliance with this Agreement and the Prior Ranking Financing Documents;

(v)    if the Payments are of Creditor Representative Amounts or Security Agent Amounts due and payable to the Parent Debt Creditor Representative or Security Agent (as the case may be);

(vi)    if no Parent Debt Automatic Block Event has occurred and is continuing and the Payment is a payment of principal, interest or any other amounts made on or after the final maturity date of the relevant Parent Debt Liabilities (provided that such maturity date is no earlier than that contained in the Parent Debt Documents as of the first date of issuance or borrowing of the applicable Parent Debt Liabilities);

(vii)    if the Payment is by a Parent Debt Issuer of any of its obligations under a Parent Debt Financing Document and such Payment is not directly or indirectly financed by any member of the Group except to the extent such Payment would, if it had been a Payment by a Debtor (other than the relevant Parent Debt Issuer) or member of the Group to a Parent Debt Creditor, otherwise have been permitted under this Agreement;

(viii)    if the Payment is funded directly or indirectly with the proceeds of any other Parent Debt Liabilities incurred under or pursuant to any Parent Debt Documents or the proceeds of any issuance of any shares by the Company or any Subordinated Liabilities;

(ix)    if a Prior Ranking Default is continuing or would occur as a result of making such Payment and the Payment is of any Parent Debt Liabilities which would have been payable but for the issue of a Parent Debt Payment Stop Notice (which has since expired and no new Parent Debt Payment Stop Notice is outstanding) which has been capitalised and added to the principal amount of the Parent Debt Liabilities or where that amount is outstanding as a result of the accrual of cash interest payable in respect of the Parent Debt Liabilities during a period when a Parent Debt Payment Stop Notice was outstanding or any other amount referred to in sub-paragraph (i)(A)II above;

(x)    if an Event of Default is continuing and the Payment is of all or part of the Parent Debt Liabilities by way of a release or otherwise discharge solely in consideration for the issues of shares in any Holding Company of the Company (each a **Debt for Equity Swap**) provided that:

    (A)    no cash or cash equivalent Payment is made in respect of the Parent Debt Liabilities;

    (B)    it does not result in a "change of control" under any Primary Financing Document;

    (C)    any Liabilities owed by a member of the Group to another member of the Group, a Subordinated Creditor or any other Holding Company of the Company that arise as a result of such Debt for Equity Swap are

•

subordinated to the Prior Ranking Liabilities pursuant to this Agreement and the Prior Ranking Creditors are granted Transaction Security in respect of any of those Liabilities;

(D)    at the time that any Debt for Equity Swap becomes effective, no Distressed Disposal is due to occur at such time which is reasonably likely to be adversely impeded by the occurrence of such Debt for Equity Swap; and

(E)    no member of the Group shall become liable for, or incur, any tax liability as a result of such Debt for Equity Swap which is materially adverse to the interests of the First Lien Creditors taking into account the circumstances of such Debt for Equity Swap and (subject to receipt of any required countersigned release or reliance letters and for information purposes only) a tax report from a reputable independent firm of accountants is provided to the Security Agent (on which the Security Agent and the First Lien Creditors can rely), confirming what tax liability (if any) should have arisen or should arise as a result of such Debt for Equity Swap;

(xi)    if the Payment is of non-cash interest made by way of the capitalisation of interest or by the issuance of a non-cash pay financial instrument evidencing the same which is subordinated to the Priority Creditor Liabilities on the same terms as the Parent Debt Liabilities; or

(xii)    if the Payment is of work fees and professional fees, costs or expenses for restructuring advice and valuations (including legal advice and the advice of other appropriate financial and/or restructuring advisors) of the Parent Debt Creditor Representative and the Security Agent in an aggregate amount not exceeding US$5,000,000 (or its equivalent in other currencies) since the date of this Agreement, but excluding any fees, costs or expenses incurred in connection with any current, threatened or pending litigation against any Parent Debt Creditor or any Affiliate of any Parent Debt Creditor; and

(b)    on or after the Priority Discharge Date, make Payments to the Parent Debt Creditors in respect of the Parent Debt Liabilities in accordance with the relevant Parent Debt Documents.

A reference in this Clause 8.2 to a Payment shall be construed to include any direct or indirect step, matter, action or dealing in relation to any Parent Debt Liabilities which are otherwise prohibited under Clause 8.1 (Restriction on Payment: Parent Debt Liabilities).

**8.3    Security and Guarantees: Parent Debt Liabilities**

At any time prior to the Priority Discharge Date, except with the consent of the Majority Super Senior Creditors, the Majority Senior Secured Creditors and the Majority Second Lien Creditors, the Parent Debt Creditors may not take, accept or receive the benefit of any Security, guarantee, indemnity or other assurance against loss from any Debtor, any member of the Group or any Third Party Security Provider other than:

(a)    at the option of the Company, all or any part of the Common Transaction Security if and to the extent legally possible and subject to any Agreed Security Principles (except to the extent they already benefit from such Security), at the same time, it is also offered either:

•

(i)    to the Security Agent as agent or trustee for the Priority Secured Parties in respect of their Liabilities; or

(ii)    in the case of any jurisdiction in which effective Security cannot be granted in favour of the Security Agent as agent or trustee for the Priority Secured Parties:

(A)    to the Priority Secured Parties in respect of their Liabilities; or

(B)    to the Security Agent under a parallel debt structure, joint and several creditor structure or agency structure for the benefit of the Priority Secured Parties,

and ranks in the same order of priority as that contemplated in Clause 2.2 (Transaction Security) and all amounts received or recovered by any Parent Debt Creditor are immediately paid to the Security Agent and held and applied in accordance with Clause 21 (Application of Proceeds);

(b)    any guarantee, indemnity or other assurance against loss in respect of the Parent Debt Liabilities from any member of the Group in addition to those in:

(i)    the Parent Debt Group Guarantees;

(ii)    this Agreement; or

(iii)    any mandate letter entered into in connection with any Parent Debt Facility Agreement,

(except to the extent they already benefit from such guarantee, indemnity or other assurance against loss) if and to the extent legally possible and subject to any Agreed Security Principles, at the same time, it is also offered to the other Priority Secured Parties in respect of their Liabilities and ranks in the same order of priority as that contemplated in Clause 2 (Ranking and Priority) and all amounts received or recovered by any Parent Debt Creditor are immediately paid to the Security Agent and held and applied in accordance with Clause 21 (Application of Proceeds); and

(c)    any Security, guarantee, indemnity or other assurance against loss from any Debtor, any member of the Group or a Third Party Security Provider:

(i)    in connection with any escrow or similar or equivalent arrangements entered into in respect of the proceeds of any indebtedness which, upon release of those amounts to a member of the Group, will become Parent Debt Liabilities; or

(ii)    in connection with any actual or proposed defeasance, redemption, prepayment, repayment, purchase or other discharge of any Parent Debt Liabilities (in each case provided that such defeasance, redemption, prepayment, repayment, purchase or other discharge is not prohibited by the terms of this Agreement).

## 8.4    Issue of Parent Debt Payment Stop Notice

(a)    At any time prior to the Priority Discharge Date, if a Parent Debt Payment Stop Event has occurred and is continuing, except with Required Prior Ranking Creditor Consent and subject to Clause 11

(Effect of Insolvency Event), no Debtor or Third Party Security Provider shall (and the Company shall procure that member of the Group shall) make, and no Parent Debt Creditor may receive from any Debtor, Third Party Security Provider or member of the Group, any Payment in respect of the Parent Debt Liabilities (other than a payment falling within paragraphs (a)(ii) to (xii) of Clause 8.2 (Permitted Payments: Parent Debt Liabilities)) provided in each case that no First Lien Acceleration Event or Insolvency Event has occurred and is continuing) from the date on which the relevant Creditor Representative or Bilateral Lender delivers a notice (a **Parent Debt Payment Stop Notice**) to the Company, the Security Agent and each Parent Debt Creditor Representative and each Bilateral Lender under any Parent Debt Facility Agreement specifying the events or circumstances relating to that Parent Debt Payment Stop Event until the earliest of:

(i)     the date falling 179 days after delivery of that Parent Debt Payment Stop Notice;

(ii)    in relation to payments of the Parent Debt Liabilities, if a Parent Debt Standstill Period is in effect at any time after delivery of that Parent Debt Payment Stop Notice, the date on which that Parent Debt Standstill Period expires;

(iii)   the date on which the relevant Parent Debt Payment Stop Event is no longer continuing and, if the relevant Priority Creditor Liabilities have been accelerated, such acceleration has been rescinded, revoked or waived provided that at such time no other Event of Default is continuing under any Priority Debt Document;

(iv)    the date on which the Creditor Representative or Bilateral Lender which issued the Parent Debt Payment Stop Notice delivers a notice to the Company, the Security Agent and the Parent Debt Creditor Representatives cancelling the Parent Debt Payment Stop Notice; and

(v)     the date on which the Parent Debt Creditors or the Parent Debt Creditor Representative(s) or the Security Agent takes any Enforcement Action that it is permitted to take under Clause 8.9 (Permitted Enforcement: Parent Debt Creditors) and Clause 8.10 (Subsequent Parent Debt Defaults) against a member of the Group or any Third Party Security Provider,

such period being the period for which the relevant Parent Debt Payment Stop Notice is **outstanding**.

(b)     Unless each Parent Debt Creditor Representative waives this requirement:

(i)     a new Parent Debt Payment Stop Notice may not be delivered unless and until 360 days have elapsed since the delivery of the immediately prior Parent Debt Payment Stop Notice; and

(ii)    no Parent Debt Payment Stop Notice may be delivered in reliance on a Parent Debt Payment Stop Event more than 90 days after the date on which each relevant Creditor Representative has received notice of that Parent Debt Payment Stop Event.

(c)     A Creditor Representative or Bilateral Lender may serve only one Parent Debt Payment Stop Notice each with respect to the same event or set of circumstances.  Subject to paragraph (b) above, this shall not affect the right of that or any other Creditor Representative or Bilateral Lender to issue a Parent Debt Payment Stop Notice in respect of any other event or set of circumstances.

(d)    No Parent Debt Payment Stop Notice may be served by a Creditor Representative or Bilateral Lender in respect of a Parent Debt Payment Stop Event which had been notified to each of them at the time at which an earlier Parent Debt Payment Stop Notice was issued.

**8.5    Effect of Parent Debt Payment Stop Event or Parent Debt Automatic Block Event**

Any failure to make a Payment due under the Parent Debt Documents as a result of the issue of a Parent Debt Payment Stop Notice or the occurrence of a Parent Debt Automatic Block Event or the operation of Clause 8.2 (Permitted Payments: Parent Debt Liabilities) or Clause 8.4 (Issue of Parent Debt Payment Stop Notice):

(a)    shall not prevent the occurrence of an Event of Default as a consequence of that failure to make a Payment in relation to the Parent Debt Documents;

(b)    shall not prevent the issue of a Parent Debt Enforcement Notice on behalf of the Parent Debt Creditors;

(c)    acts as a suspension of payment and not as a waiver of the right to receive payment on the date such payments are due;

(d)    shall not release any Debtor from the liability to make any Payment under any Parent Debt Document and will not prevent the accrual or capitalisation of interest (including default interest) in accordance with the relevant Parent Debt Documents;

(e)    will not prevent the payment of audit fees, directors' fees, taxes and other proper and incidental expenses required to maintain existence;

(f)    will not prevent the payment of Creditor Representative Amounts or Security Agent Amounts due and payable to the Parent Debt Creditor Representatives or the Security Agent (as the case may be); and

(g)    will not prevent the payment of any other amounts funded directly or indirectly with amounts which have been received by the relevant Parent Debt Issuer from a person that is not a member of the Group.

**8.6    Cure of Payment Stop: Parent Debt Creditors**

If:

(a)    at any time following the issue of a Parent Debt Payment Stop Notice or the occurrence of a Parent Debt Automatic Block Event, that Parent Debt Payment Stop Notice ceases to be outstanding and/or (as the case may be) the Parent Debt Automatic Block Event ceases to be continuing; and

(b)    the relevant Debtor then promptly pays to the Parent Debt Creditors an amount equal to any Payments which had accrued under the Parent Debt Documents and which would have been Permitted Parent Debt Payments but for that Parent Debt Payment Stop Notice or that Parent Debt Automatic Block Event,

then any Event of Default which may have occurred as a result of that suspension of Payments shall be waived and any Parent Debt Enforcement Notice which may have been issued as a result of that

•

Event of Default shall be waived, in each case without any further action being required on the part of the Parent Debt Creditors.

### 8.7    Amendments and Waivers: Parent Debt Creditors

(a)    Subject to paragraph (b) below, the Parent Debt Creditors may amend or waive the terms of the Parent Debt Documents (other than this Agreement or any Security Document) in accordance with their terms at any time.

(b)    Prior to the Priority Discharge Date, the Parent Debt Creditors may not amend or waive the terms of the Parent Debt Documents if the amendment or waiver would result in any Parent Debt Document not complying with the provisions of this Agreement, without Required Prior Ranking Creditor Consent.

### 8.8    Restrictions on Enforcement: Parent Debt Creditors

At any time prior to the Priority Discharge Date, except as permitted by Clause 8.9 (Permitted Enforcement: Parent Debt Creditors), no Parent Debt Creditor shall be entitled to take or direct the Security Agent to take any Enforcement Action:

(a)    against any of the Debtors (other than the Parent Debt Issuer solely in its capacity as the issuer or borrower of the Parent Debt Liabilities) or any Third Party Security Provider in respect of any of the Parent Debt Liabilities including, without limitation, under the Parent Debt Group Guarantees; or

(b)    in respect of any of the Transaction Security,

except with the prior consent of or at the request of an Instructing Group.

### 8.9    Permitted Enforcement: Parent Debt Creditors

(a)    Subject to the provisions of Clause 8.11 (Enforcement on behalf of Parent Debt Creditors), the restrictions in Clause 8.8 (Restrictions on Enforcement: Parent Debt Creditors) will not apply in respect of the Parent Debt Liabilities or the Transaction Security if:

(i)    a Parent Debt Event of Default has occurred and is continuing (the **Relevant Parent Debt Event of Default**);

(ii)    each other Creditor Representative and Bilateral Creditor has received a notice of the Relevant Parent Debt Event of Default specifying the event or circumstance in relation to the Relevant Parent Debt Event of Default from the relevant Parent Debt Creditor Representative (a **Parent Debt Enforcement Notice**);

(iii)    the relevant Parent Debt Standstill Period has elapsed or otherwise terminated; and

(iv)    the Relevant Parent Debt Event of Default is continuing at the end of the relevant Parent Debt Standstill Period.

(b)    A Parent Debt Creditor may take any of the actions described in paragraph (i) of the proviso to the definition of Enforcement Action where it is otherwise entitled to do so.

•

**1134**

**8.10    Subsequent Parent Debt Defaults**

The Parent Debt Creditors may take Enforcement Action under Clause 8.9 (Permitted Enforcement: Parent Debt Creditors) in relation to a Relevant Parent Debt Event of Default to the extent entitled to under the relevant Parent Debt Documents even if, at the end of any relevant Parent Debt Standstill Period or at any later time, a further Parent Debt Standstill Period has begun as a result of any other Parent Debt Event of Default.

**8.11    Enforcement on behalf of Parent Debt Creditors**

If the Security Agent has notified the Parent Debt Creditor Representative(s) that it is taking or has been instructed by an Instructing Group to take any Enforcement Action against any Debtor or Third Party Security Provider, no Parent Debt Creditor may take any action referred to in Clause 8.9 (Permitted Enforcement: Parent Debt Creditors) against that Debtor or Third Party Security Provider or any Subsidiary of that Debtor or Third Party Security Provider while the Security Agent is taking steps to enforce that Transaction Security in accordance with the instructions of the Instructing Group where such action might be reasonably likely to adversely affect such enforcement or Enforcement Action or the amount of proceeds to be derived therefrom.

**8.12    Parent Debt Only Obligors**

(a)    This Agreement shall not prohibit any Security or any guarantee, indemnity or other assurance against loss from being given by any person that is not a member of the Group or a Third Party Security Provider in respect of any Parent Debt Liabilities, provided that any such person becomes a Party as a Parent Debt Only Obligor in accordance with Clause 26.18 (New Parent Debt Only Obligor).

(b)    This Agreement does not rank or restrict the payment by any Parent Debt Only Obligor in respect of any liabilities of any Parent Debt Issuer.

(c)    Except to the extent restricted by Clause 8.8 (Restrictions on Enforcement: Parent Debt Creditors), the Parent Debt Creditors shall be entitled to take or direct the Security Agent to take any enforcement action available with respect to any Parent Debt Only Security or any guarantee or other assurance against loss given by a Parent Debt Only Obligor in accordance with the terms of the Parent Debt Documents and Clause 16 (Enforcement of Parent Debt Only Security).

**9.    INTRA-GROUP LENDERS AND INTRA-GROUP LIABILITIES**

**9.1    Restriction on Payment: Intra-Group Liabilities**

Prior to the Final Discharge Date, the Debtors shall not, and the Company shall procure that no other member of the Group will, make any Payments of the Intra-Group Liabilities at any time unless:

(a)    that Payment is permitted under Clause 9.2 (Permitted Payments: Intra-Group Liabilities); or

(b)    the taking or receipt of that Payment is permitted under Clause 9.7 (Permitted Enforcement: Intra-Group Lenders).

•

**9.2    Permitted Payments: Intra-Group Liabilities**

(a)    Subject to paragraph (b) below, any member of the Group may make Payments in respect of the Intra-Group Liabilities (whether of principal, interest or otherwise) from time to time when due.

(b)    Payments in respect of the Intra-Group Liabilities may not be made pursuant to paragraph (a) above if, at the time of the Payment, an Acceleration Event has occurred unless:

(i)    an Instructing Group consents to that Payment being made; or

(ii)    that Payment is made to facilitate the making of a Permitted Primary Creditor Payment.

**9.3    Payment obligations continue**

No Debtor shall be released from the liability to make any Payment (including of default interest, which shall continue to accrue) in respect of any Intra-Group Liabilities by the operation of Clauses 9.1 (Restriction on Payment: Intra-Group Liabilities) and 9.2 (Permitted Payments: Intra-Group Liabilities) even if its obligation to make that Payment is restricted at any time by the terms of any of those Clauses.

**9.4    Acquisition of Intra-Group Liabilities**

(a)    Subject to paragraph (b) below, each Debtor may, and may permit any other member of the Group to:

(i)    enter into any Liabilities Acquisition; or

(ii)    beneficially own all or any part of the share capital of a company that is party to a Liabilities Acquisition,

in respect of any Intra-Group Liabilities at any time.

(b)    Subject to paragraph (c) below, no action described in paragraph (a) above may take place in respect of any Intra-Group Liabilities if:

(i)    that action would result in a breach of a Primary Financing Document; or

(ii)    at the time of that action, an Acceleration Event has occurred.

(c)    The restrictions in paragraph (b) above shall not apply if:

(i)    an Instructing Group consents to that action; or

(ii)    that action is taken to facilitate the making of a Permitted Primary Creditor Payment.

**9.5    Security: Intra-Group Lenders**

Prior to the Final Discharge Date, the Intra-Group Lenders may not take, accept or receive the benefit of any Security, guarantee, indemnity or other assurance against loss in respect of the Intra-Group Liabilities.

•

**1136**

### 9.6    Restriction on enforcement: Intra-Group Lenders

Subject to Clause 9.7 (Permitted Enforcement: Intra-Group Lenders) and Clause 9.8 (Intra-Group Liabilities: Exceptions), none of the Intra-Group Lenders shall be entitled to take any Enforcement Action in respect of any of the Intra-Group Liabilities at any time prior to the Final Discharge Date.

### 9.7    Permitted Enforcement: Intra-Group Lenders

After the occurrence of an Insolvency Event in relation to any Debtor, each Intra-Group Lender may (unless otherwise directed by the Security Agent or unless the Security Agent has taken, or has given notice that it intends to take, action on behalf of that Intra-Group Lender in accordance with Clause 11.5 (Filing of claims)), exercise any right it may otherwise have against that member of the Group to:

(a)    accelerate any of that Debtor's Intra-Group Liabilities or declare them prematurely due and payable or payable on demand;

(b)    make a demand under any guarantee, indemnity or other assurance against loss given by that Debtor in respect of any Intra-Group Liabilities;

(c)    exercise any right of set-off or take or receive any Payment in respect of any Intra-Group Liabilities of that Debtor; or

(d)    claim and prove in any insolvency process of that Debtor for the Intra-Group Liabilities owing to it.

### 9.8    Intra-Group Liabilities: Exceptions

Notwithstanding anything to the contrary in this Agreement or any other Debt Document, nothing in this Agreement or any other Debt Document shall prohibit or restrict any set-off, capitalisation, forgiveness, write-off, waiver, release, transfer or other discharge of any Intra-Group Liabilities or any other amount due, payable or owing by one member of the Group to another member of the Group unless an Acceleration Event has occurred and is continuing and provided that if any Intra-Group Liabilities are capitalised and the shares of such Debtor are subject to Transaction Security prior to such issue, then shares issued pursuant to such capitalisation are subject to Transaction Security.

### 9.9    Representations: Intra-Group Lenders

Each Intra-Group Lender which is not a Debtor represents and warrants to the Primary Creditors and the Security Agent that:

(a)    it is a corporation, duly incorporated or formed and validly existing under the laws of its jurisdiction of incorporation or formation;

(b)    the obligations expressed to be assumed by it in this Agreement are, subject to any general principles of law limiting its obligations which are applicable to creditors generally, legal, valid, binding and enforceable obligations; and

(c)    the entry into and performance by it of this Agreement does not and will not:

•

     (i)     conflict with any law or regulation applicable to it, its constitutional documents or any agreement or instrument binding upon it or any of its assets; or

     (ii)     constitute a default or termination event (however described) under any agreement or instrument binding on it or any of its assets,

in each case, to an extent which would have a material adverse effect on the interests of the Primary Creditors under the Primary Financing Documents.

## 10.    SUBORDINATED CREDITORS AND SUBORDINATED LIABILITIES

### 10.1    Restriction on Payment: Subordinated Liabilities

Prior to the Final Discharge Date, no Debtor shall, and the Company shall procure that no other member of the Group will, make any Payment of the Subordinated Liabilities at any time unless:

(a)     that Payment is permitted under Clause 10.2 (Permitted Payments: Subordinated Liabilities); or

(b)     the taking or receipt of that Payment is permitted under Clause 10.7 (Permitted Enforcement: Subordinated Creditors).

### 10.2    Permitted Payments: Subordinated Liabilities

Any member of the Group or any Debtor may make Payments in respect of the Subordinated Liabilities then due if:

(a)     the Payment is not prohibited by the Primary Financing Documents; or

(b)     Required Creditor Consent for that Payment is obtained.

### 10.3    Payment obligations continue

No Debtor shall be released from the liability to make any Payment (including of default interest, which shall continue to accrue) in respect of any Subordinated Liability by the operation of Clauses 10.1 (Restriction on Payment: Subordinated Liabilities) and 10.2 (Permitted Payments: Subordinated Liabilities) even if its obligation to make that Payment is restricted at any time by the terms of any of those Clauses.

### 10.4    No acquisition of Subordinated Liabilities

Prior to the Final Discharge Date, the Debtors shall not, and shall procure that no other member of the Group will:

(a)     enter into any Liabilities Acquisition; or

(b)     beneficially own all or any part of the share capital of a company that is party to a Liabilities Acquisition,

in respect of any of the Subordinated Liabilities, unless:

(i)     that action is not prohibited by the Primary Financing Documents;

•

(ii) the relevant Liabilities Acquisition relates to Subordinated Liabilities in respect of which a Payment could be made under Clause 10.2 (Permitted Payments: Subordinated Liabilities); or

(iii) Required Creditor Consent for that action is obtained.

**10.5   Security: Subordinated Creditors**

The Subordinated Creditors may not take, accept or receive the benefit of any Security, guarantee, indemnity or other assurance against loss from any Debtor or member of the Group in respect of any of the Subordinated Liabilities prior to the Final Discharge Date unless:

(a) that Security, guarantee, indemnity or other assurance against loss is not prohibited by the Primary Financing Documents; or

(b) Required Creditor Consent for that action is obtained.

**10.6   Restriction on Enforcement: Subordinated Creditors**

Subject to Clause 10.7 (Permitted Enforcement: Subordinated Creditors) and Clause 10.8 (Subordinated Liabilities: Exceptions), no Subordinated Creditor shall be entitled to take any Enforcement Action in respect of any of the Subordinated Liabilities at any time prior to the Final Discharge Date.

**10.7   Permitted Enforcement: Subordinated Creditors**

After the occurrence of an Insolvency Event in relation to any Debtor, the Subordinated Creditors may (unless otherwise directed by the Security Agent or unless the Security Agent has taken, or has given notice that it intends to take, action on behalf of that Subordinated Creditor in accordance with Clause 11.5 (Filing of claims)) exercise any right it may otherwise have in respect of that Debtor to:

(a) accelerate any of that Debtor's Subordinated Liabilities or declare them prematurely due and payable or payable on demand;

(b) make a demand under any guarantee, indemnity or other assurance against loss given by that Debtor in respect of any Subordinated Liabilities;

(c) exercise any right of set-off or take or receive any Payment in respect of any Subordinated Liabilities of that Debtor; or

(d) claim and prove in any insolvency process of that Debtor for the Subordinated Liabilities owing to it.

**10.8   Subordinated Liabilities: Exceptions**

Notwithstanding anything to the contrary, nothing in this Agreement or any other Debt Document shall prohibit or restrict:

(a) any Payment or other return made by way of a roll-up or capitalisation of any amount, an issue of shares, an incurrence of indebtedness constituting Subordinated Liabilities

•

(including the issue of payment-in-kind instruments) or any other similar or equivalent step, action or arrangement;

(b)    any forgiveness or write-off of Subordinated Liabilities (or any other similar or equivalent step or action);

(c)    any payment made (whether cash or in kind) or other step or action taken to facilitate any Payment (or other matter) in respect of any Subordinated Liabilities (in each case to the extent that such Payment or other matter is not prohibited by this Clause 10); and

(d)    any Subordinated Creditor from granting any Security over or in relation to the Subordinated Liabilities or any related rights provided that the rights of the holder of such Security upon any enforcement are subject to this Agreement.

## 10.9    Representations: Subordinated Creditors

Each Subordinated Creditor represents and warrants to the Primary Creditors, each Creditor Representative and the Security Agent on the date of this Agreement (or, if it becomes a Party after such date, the date of its Creditor/Creditor Representative Accession Undertaking) that:

(a)    it is a corporation, duly incorporated or formed and validly existing under the laws of its jurisdiction of incorporation or formation;

(b)    subject to the Legal Reservations and Perfection Requirements, the obligations expressed to be assumed by it in this Agreement are legal, valid, binding and enforceable obligations; and

(c)    the entry into and performance by it of this Agreement does not and will not:

(i)    conflict with any law or regulation applicable to it, its constitutional documents or any agreement or instrument binding upon it or any of its assets; or

(ii)    constitute a default or termination event (however described) under any agreement or instrument binding on it or any of its assets,

in each case, to an extent which would have a material adverse effect on the interests of the Primary Creditors under the Primary Financing Documents.

## 10.10    Representations: Third Party Security Providers

Each Third Party Security Provider represents and warrants to the Primary Creditors, each Creditor Representative and the Security Agent on the date of this Agreement (or, if it becomes a Party after such date, the date on which it becomes a Party to this Agreement) that:

(a)    it is a corporation, duly incorporated or formed and validly existing under the laws of its jurisdiction of incorporation or formation;

(b)    subject to the Legal Reservations and Perfection Requirements, the obligations expressed to be assumed by it in this Agreement and the Security Documents to which it is a party are legal, valid, binding and enforceable obligations;

•

(c)     the entry into and performance by it of this Agreement and the Security Documents to which it is a party does not and will not:

    (i)     conflict with any law or regulation applicable to it, its constitutional documents or any agreement or instrument binding upon it or any of its assets; or

    (ii)    constitute a default or termination event (however described) under any agreement or instrument binding on it or any of its assets,

in each case, to an extent which would have a material adverse effect on the interests of the Primary Creditors under the Primary Financing Documents;

(d)     subject to the Legal Reservations and the Perfection Requirements, the Security has or will have the ranking in priority which it is expressed to have in the Security Documents to which it is a party; and

(e)     it is the sole legal and beneficial owner of the respective assets over which it purports to grant Security.

## 11.    EFFECT OF INSOLVENCY EVENT

### 11.1    Cash Cover and Notes Trustees

This Clause 11 is subject to Clause 3.9 (Bilateral Lenders: Cash Cover), Clause 21.5 (Treatment of Cash Cover and Lender Cash Collateral) and, in the case of each Notes Trustee, Clause 25.5 (Turnover obligations).

### 11.2    Distributions

(a)     Without limitation to Clause 12 (Turnover of Receipts) and Clause 21 (Application of Proceeds), after the occurrence of an Insolvency Event in relation to any Debtor or Third Party Security Provider, any Party entitled to receive a Payment or distribution out of the assets of, or a distribution out of the Charged Property of, that person (in the case of a receipt by (i) a Parent Debt Creditor of a Payment or distribution of assets of a Parent Debt Issuer, only to the extent subject to the Common Transaction Security or otherwise forming part of the Common Charged Property; and (ii) a First Lien Creditor of that Payment or distribution of assets, only to the extent that such amount constitutes Enforcement Proceeds) in respect of Liabilities owed to that Party shall, to the extent it is able to do so, direct the person responsible for the distribution of the assets of that person to make that distribution to the Security Agent (or to such other person as the Security Agent shall direct) until the Liabilities owing to the Secured Parties have been paid in full.

(b)     The Security Agent shall apply distributions made to it under paragraph (a) above in accordance with Clause 21 (Application of Proceeds).

### 11.3    Set-Off

(a)     Subject to paragraph (b) below, to the extent that a Parent Debt Issuer's (to the extent relating to the Common Transaction Security or the Common Charged Property) or any Debtor's Liabilities are discharged by way of set-off (mandatory or otherwise) after the occurrence of an Insolvency Event in relation to that Parent Debt Issuer or that Debtor, any Creditor which benefited from that set-off shall (in the case of a First Lien Creditor, only to the extent that such amount constitutes

•

Enforcement Proceeds) pay an amount equal to the amount of the Liabilities owed to it which are discharged by that set-off to the Security Agent for application in accordance with Clause 21 (Application of Proceeds).

(b)      Paragraph (a) above shall not apply to:

(i)      any Permitted Multi-account Overdraft Discharge;

(ii)     any Close-Out Netting by a Hedge Counterparty or a Hedging Ancillary Lender;

(iii)    any Payment Netting by a Hedge Counterparty or a Hedging Ancillary Lender;

(iv)    any Inter-Hedging Agreement Netting by a Hedge Counterparty;

(v)     any Inter-Hedging Ancillary Document Netting by a Hedging Ancillary Lender; and

(vi)    any set-off by any person which gives effect to a Permitted Payment (or another payment or distribution not prohibited by the terms of this Agreement) which is otherwise permitted to be made under this Agreement notwithstanding the occurrence of the Insolvency Event.

**11.4     Non-cash distributions**

Subject to Clause 21.1 (Order of application: Common Recoveries), if the Security Agent or any other Secured Party receives a distribution in a form other than cash in respect of any of the Liabilities, the Liabilities will not be reduced by that distribution until and except to the extent that the realisation proceeds are actually applied towards the Liabilities.

**11.5     Filing of claims**

Without prejudice to any right of netting or set-off relating to a Multi-account Overdraft (to the extent that the netting or set-off represents a Permitted Multi-account Overdraft Discharge), after the occurrence of an Insolvency Event in relation to any Debtor or Third Party Security Provider, each Creditor irrevocably authorises the Security Agent on its behalf, to:

(a)      take any Enforcement Action (in accordance with the terms of this Agreement) against that Debtor or Third Party Security Provider;

(b)      demand, sue, prove and give receipt for any or all of that Debtor's or Third Party Security Provider's Liabilities;

(c)      collect and receive all distributions on, or on account of, any or all of that Debtor's or Third Party Security Provider's Liabilities; and

(d)      file claims, take proceedings and do all other things the Security Agent considers reasonably necessary to recover that Debtor's or Third Party Security Provider's Liabilities.

**11.6     Further assurance – Insolvency Event**

Each Creditor will:

(a)      do all things that the Security Agent requests in order to give effect to this Clause 11; and

•

(b)    if the Security Agent is not entitled to take any of the actions contemplated by this Clause 11 or if the Security Agent requests that a Creditor take that action, undertake that action itself in accordance with the instructions of the Security Agent or grant a power of attorney to the Security Agent (on such terms as the Security Agent may reasonably require, provided that no Creditor Representative shall be under any obligation to grant any power of attorney) to enable the Security Agent to take such action.

### 11.7    Security Agent instructions

For the purposes of Clause 11.2 (Distributions), Clause 11.5 (Filing of claims) and Clause 11.6 (Further assurance – Insolvency Event) the Security Agent shall act:

(a)    on the instructions of the group of Primary Creditors entitled at that time to give instructions under Clauses 15.2 (Instructions to enforce – Transaction Security) or 15.4 (Manner of enforcement – Transaction Security) or Clauses 16.1 (Instructions to enforce – Parent Debt Only Security) or 16.2 (Manner of enforcement – Parent Debt Only Security), as the case may be; or

(b)    in the absence of any such instructions, as the Security Agent sees fit (which may include taking no action).

## 12.    TURNOVER OF RECEIPTS

### 12.1    Cash Cover and Notes Trustees

This Clause 12 is subject to Clause 3.9 (Bilateral Lenders: Cash Cover), Clause 21.5 (Treatment of Cash Cover and Lender Cash Collateral) and, in the case of each Notes Trustee, Clause 25.5 (Turnover obligations).

### 12.2    Override provision

Notwithstanding anything to the contrary in this Clause 12:

(a)    until the Super Senior Reset Date, Clause 12.3 (Turnover by the First Lien Creditors) shall not apply and the reference in Clause 12.4 (Turnover by Creditors other than the First Lien Creditors) to "any Creditor other than a First Lien Creditor" shall be construed to mean "any Creditor"; and

(b)    on and from the Super Senior Reset Date, Clauses 12.3 (Turnover by the First Lien Creditors) and 12.4 (Turnover by Creditors other than the First Lien Creditors) shall apply in full.

### 12.3    Turnover by the First Lien Creditors

Subject to Clause 12.5 (Exclusions) and to Clause 12.6 (Permitted assurance and receipts), if at any time prior to the Final Discharge Date any First Lien Creditor (or Creditor Representative on their behalf) receives or recovers from any member of the Group or Third Party Security Provider any Enforcement Proceeds or any other amounts which should otherwise be received or recovered by the Security Agent for application under Clause 21 (Application of Proceeds) (in either case whether before or after an Insolvency Event) except in accordance with Clause 21 (Application of Proceeds), the relevant Priority Creditor will:

•

**1143**

(a)     in relation to receipts and recoveries not received or recovered by way of set-off:

    (i)     hold an amount of that receipt or recovery equal to the Relevant Liabilities (or if less, the amount received or recovered) on trust for the Security Agent and promptly pay or distribute that amount to the Security Agent for application in accordance with the terms of this Agreement; and

    (ii)     promptly pay or distribute an amount equal to the amount (if any) by which the receipt or recovery exceeds the Relevant Liabilities to the Security Agent for application in accordance with the terms of this Agreement; and

(b)     in relation to receipts and recoveries received or recovered by way of set-off, promptly pay an amount equal to that recovery to the Security Agent for application in accordance with the terms of this Agreement.

## 12.4    Turnover by Creditors other than the First Lien Creditors

Subject to Clause 23 (Additional Regulated Debt), Clause 12.3 (Turnover by the First Lien Creditors), Clause 12.5 (Exclusions) and to Clause 12.6 (Permitted assurance and receipts), if at any time prior to the Final Discharge Date, any Creditor other than a First Lien Creditor receives or recovers from any member of the Group, a Parent Debt Issuer or a Third Party Security Provider:

(a)     any Payment or distribution of, or on account of or in relation to, any of the Liabilities which is neither:

    (i)     not prohibited by the terms of this Agreement; nor

    (ii)     made in accordance with Clause 21 (Application of Proceeds);

(b)     other than where paragraphs (a) or (b) of Clause 11.3 (Set-Off) applies, any amount by way of set-off in respect of any of the Liabilities owed to it which does not give effect to a Permitted Payment;

(c)     notwithstanding paragraphs (a) and (b) above, and other than where paragraphs (a) or (b) of Clause 11.3 (Set-Off) applies, any amount:

    (i)     on account of, or in relation to, any of the Liabilities:

        (A)     after the occurrence of a Distress Event; or

        (B)     as a result of any other litigation or proceedings against a Parent Debt Issuer a member of the Group or a Third Party Security Provider (other than after the occurrence of an Insolvency Event in respect of that Parent Debt Issuer, member of the Group or Third Party Security Provider); or

    (ii)     by way of set-off in respect of any of the Liabilities owed to it after the occurrence of a Distress Event,

other than, in each case, any amount received or recovered in accordance with Clause 21 (Application of Proceeds);

•

**1144**

(d)    the proceeds of any enforcement of any Transaction Security or Parent Debt Only Security except in accordance with Clause 21 (Application of Proceeds); or

(e)    other than where paragraph (a) of Clause 11.3 (Set-Off) applies, any distribution or Payment of, or on account of or in relation to, any of the Liabilities owed by a Parent Debt Issuer, a member of the Group or a Third Party Security Provider which is not in accordance with Clause 21 (Application of Proceeds) and which is made as a result of, or after, the occurrence of an Insolvency Event in respect of that Parent Debt Issuer, member of the Group or Third Party Security Provider,

that Creditor will:

(i)    in relation to receipts and recoveries not received or recovered by way of set-off:

(A)    hold an amount of that receipt or recovery equal to the Relevant Liabilities (or if less, the amount received or recovered) on trust for the Security Agent and promptly pay or distribute that amount to the Security Agent for application in accordance with the terms of this Agreement; and

(B)    promptly pay or distribute an amount equal to the amount (if any) by which the receipt or recovery exceeds the Relevant Liabilities to the Security Agent for application in accordance with the terms of this Agreement; and

(ii)    in relation to receipts and recoveries received or recovered by way of set-off, promptly pay an amount equal to that recovery to the Security Agent for application in accordance with the terms of this Agreement.

## 12.5    Exclusions

Clause 12.3 (Turnover by the First Lien Creditors) and Clause 12.4 (Turnover by Creditors other than the First Lien Creditors) shall not apply to any receipt or recovery:

(a)    by way of:

(i)    Close-Out Netting by a Hedge Counterparty or a Hedging Ancillary Lender;

(ii)    Payment Netting by a Hedge Counterparty or a Hedging Ancillary Lender;

(iii)    Inter-Hedging Agreement Netting by a Hedge Counterparty; or

(iv)    Inter-Hedging Ancillary Document Netting by a Hedging Ancillary Lender; or

(b)    by way of a Permitted Multi-account Overdraft Discharge; or

(c)    made in accordance with Clause 22 (Equalisation);

(d)    to the extent that such receipt or recovery was funded directly or indirectly from the proceeds of any indebtedness incurred in accordance with Clause 23 (Additional Regulated Debt);

(e)    in respect of funds received by the Security Agent for its own account; or

•

(f)    that has been distributed by a Notes Trustee in accordance with the applicable Notes Indenture unless that Notes Trustee had received at least two Business Days' prior notice that an Acceleration Event or an Insolvency Event has occurred or that the receipt or recovery falls within Clause 12.3 (Turnover by the First Lien Creditors) or Clause 12.4 (Turnover by Creditors other than the First Lien Creditors) in each case prior to distribution of the relevant amount.

## 12.6    Permitted assurance and receipts

Nothing in this Agreement shall restrict the ability of any Primary Creditor or Party that is not a member of the Group (other than a Parent Debt Issuer or a Third Party Security Provider) to:

(a)    arrange with any person which is not a Parent Debt Issuer, a member of the Group or a Third Party Security Provider any assurance against loss in respect of, or reduction of its credit exposure to, a Debtor (including assurance by way of credit based derivative or sub-participation); or

(b)    make any assignment or transfer permitted by Clause 26 (Changes to the Parties),

which:

(i)    is not prohibited by any Primary Financing Document; and

(ii)    is not in breach of:

(A)    Clause 5.5 (No acquisition of Hedging Liabilities); or

(B)    Clause 10.4 (No acquisition of Subordinated Liabilities),

and that Primary Creditor or Party that is not a member of the Group (other than a Parent Debt Issuer or a Third Party Security Provider) shall not be obliged to account to any other Party for any sum received by it as a result of that action.

## 12.7    Amounts received

If any of the Debtors or Third Party Security Providers receives or recovers any amount which, under the terms of any of the Debt Documents, should have been paid to the Security Agent, it will:

(a)    hold an amount of that receipt or recovery equal to the Relevant Liabilities (or if less, the amount received or recovered) on trust for the Security Agent and promptly pay that amount to the Security Agent for application in accordance with the terms of this Agreement; and

(b)    promptly pay an amount equal to the amount (if any) by which the receipt or recovery exceeds the Relevant Liabilities to the Security Agent for application in accordance with the terms of this Agreement.

## 12.8    Saving provision

If, for any reason, any of the trusts expressed to be created in this Clause 12 should fail or be unenforceable or not be recognised by any applicable law, the affected Creditor, Debtor or Third Party Security Provider will hold the amount of any receipt or recovery on behalf and for the account

of the Security Agent and promptly pay or distribute an amount equal to that receipt or recovery to the Security Agent to be held on trust by the Security Agent for application in accordance with the terms of this Agreement.

## 13.    REDISTRIBUTION

### 13.1    Recovering Creditor's rights

(a)    Any amount paid or distributed by a Creditor (a **Recovering Creditor**) to the Security Agent under Clause 11 (Effect of Insolvency Event) or Clause 12 (Turnover of Receipts) shall be treated as having been paid or distributed by the relevant Debtor or Third Party Security Provider and shall be applied by the Security Agent in accordance with Clause 21 (Application of Proceeds).

(b)    On an application by the Security Agent pursuant to Clause 21 (Application of Proceeds) of a Payment or distribution received by a Recovering Creditor from a Debtor or Third Party Security Provider, as between the relevant Debtor or Third Party Security Provider and the Recovering Creditor an amount equal to the amount received or recovered by the Recovering Creditor and paid or distributed to the Security Agent by the Recovering Creditor (the **Shared Amount**) will be treated as not having been paid or distributed by that Debtor or Third Party Security Provider.

### 13.2    Reversal of redistribution

(a)    If any part of the Shared Amount received or recovered by a Recovering Creditor becomes repayable or returnable to a Debtor or Third Party Security Provider and is repaid or returned by that Recovering Creditor to that Debtor or Third Party Security Provider, then:

(i)    each Party that received any part of that Shared Amount pursuant to an application by the Security Agent of that Shared Amount under Clause 13.1 (Recovering Creditor's rights) (a **Sharing Party**) shall (subject, in the case of each Notes Trustee, to Clause 25 (Notes Trustee Protections)), upon request of the Security Agent, pay or distribute to the Security Agent for the account of that Recovering Creditor an amount equal to the appropriate part of its share of the Shared Amount (together with an amount as is necessary to reimburse that Recovering Creditor for its proportion of any interest on the Shared Amount which that Recovering Creditor is required to pay) (the **Redistributed Amount**); and

(ii)    as between the relevant Debtor or Third Party Security Provider and each relevant Sharing Party, an amount equal to the relevant Redistributed Amount will be treated as not having been paid or distributed by that Debtor or Third Party Security Provider.

(b)    The Security Agent shall not be obliged to pay or distribute any Redistributed Amount to a Recovering Creditor under paragraph (a)(i) above until it has been able to establish to its satisfaction that it has actually received that Redistributed Amount from the relevant Sharing Party.

### 13.3    Deferral of subrogation

(a)    Subject to paragraph (c) below, if any Priority Creditor Liabilities are wholly or partly paid out of any proceeds received in respect of or on account of the Parent Debt Liabilities owing to one or more Parent Debt Creditors, those Parent Debt Creditors will to that extent be subrogated to the Priority Creditor Liabilities so paid (and all securities and guarantees for those Priority Creditor Liabilities).

•

(b)      Subject to paragraph (c) below, to the extent that a Parent Debt Creditor (a **Subrogated Creditor**) is entitled to exercise rights of subrogation, each other Creditor (subject in each case to it being indemnified to its reasonable satisfaction against any resulting costs, expenses and liabilities) will give such assistance to enable such rights so to be exercised as such Subrogated Creditor may reasonably request.

(c)      No Creditor, Debtor or Third Party Security Provider will exercise any rights which it may have by reason of the performance by it of its obligations under the Debt Documents to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights under the Debt Documents of any Creditor which ranks ahead of it in accordance with the priorities set out in Clause 2 (Ranking and Priority) or the order of application in Clause 21 (Application of Proceeds) until such time as all of the Liabilities owing to each prior ranking Creditor (or, in the case of any Debtor or Third Party Security Provider, owing to each Creditor) have been irrevocably discharged in full.

(d)      No Subordinated Creditor will exercise any rights which it may have to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights under the Debt Documents of any Creditor until such time as all of the Liabilities owing to each Creditor (other than a Subordinated Creditor) have been irrevocably discharged in full.

## 14.    CHAPTER 11 PROVISIONS

### 14.1    Override provision

Notwithstanding anything to the contrary, Clauses 14.2 (Definitions) to 14.6 (Reorganisation securities) shall only apply until the Super Senior Reset Date.

### 14.2    Definitions

**Pay-Over Amount** has the meaning given in Clause 14.5(c).

**Post-Petition Interest** means interest, fees, expenses and other charges that, pursuant to the Super Secured Financing Documents, Parent Debt Financing Documents, Primary Financing Documents, or Second Lien Financing Documents, as applicable, continue to accrue after the commencement of any US Insolvency or Liquidation Proceeding, whether or not such interest, fees, expenses and other charges are allowed or allowable under US Bankruptcy Laws or in any such US Insolvency or Liquidation Proceeding.

**Primary Creditor Adequate Protection Payments** has the meaning given in Clause 14.5(c).

**UCC** means the Uniform Commercial Code as from time to time in effect in the State of New York.

**United States** means the United States of America.

**US Bankruptcy Code** means Title 11 of the United States Code, as amended.

**US Bankruptcy Laws** means the US Bankruptcy Code and any other laws of the United States or any State (within the meaning of Section 9-102(a)(76) of the UCC) relating to the liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, administration, rearrangement, judicial management, receivership, insolvency, reorganisation, or similar of any person.

•

**1148**

**US DIP Financing** has the meaning given in Clause 14.4 (Financing and sale issues).

**US Insolvency or Liquidation Proceeding** means:

(a)    any case or proceeding commenced by or against any Debtor under the US Bankruptcy Laws or any similar case or proceeding relative to any Debtor in the United States;

(b)    any liquidation, dissolution, judicial management, marshalling of assets or liabilities or other winding up of or relating to any Debtor, in each case whether or not voluntary and whether or not involving bankruptcy or insolvency; or

(c)    any other proceeding in the United States of any type or nature in which substantially all claims of creditors of any Debtor are determined and any payment or distribution is or may be made on account of such claims.

**14.3    Separate classification of debt**

Each Primary Creditor acknowledges and agrees that the Super Senior Liabilities are fundamentally different from the other First Lien Liabilities and the other Primary Liabilities and must be separately classified in any plan of reorganisation, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed, confirmed, or adopted in a US Insolvency or Liquidation Proceeding.  The Primary Creditors will not seek in a US Insolvency or Liquidation Proceeding to be treated as part of the same class of creditors as the Super Senior Creditors and will not object to, oppose or contest any pleading by the Super Senior Creditors seeking separate classification of their claims.

**14.4    Financing and sale issues**

If any Debtor is subject to any US Insolvency or Liquidation Proceeding and any Super Senior Creditor shall desire to consent (or not object) to the sale, use or lease of cash or other collateral or to consent (or not object) to any Debtor obtaining financing under Section 363 or Section 364 of the US Bankruptcy Code (a **US DIP Financing**)), then each Primary Creditor agrees that it:

(a)    will not raise any objection to, will not support any objection to or otherwise contest, and will be deemed to have consented to, such sale, use or lease of such cash or other collateral or such US DIP Financing and will not request adequate protection or any other relief in connection therewith, except to the extent permitted by Clause 14.5  (Adequate protection); and

(b)    to the extent the Security securing any Super Senior Liabilities are subordinated to or have the same priority as any Security securing a US DIP Financing will subordinate (and will be deemed to have subordinated) its Security securing the Primary Liabilities and any other security or collateral securing the Primary Liabilities to such US DIP Financing (and all obligations relating thereto) in the manner set out in Clause 2 (Ranking and Priority) and the order of application in Clause 21.1 (Order of application: Common Recoveries) to any adequate protection granted to the Super Senior Creditors.

**14.5    Adequate protection**

(a)    Each Primary Creditor agrees not to object to, contest or support any other person objecting to or contesting, and will be deemed to have consented to:

•

(i)    any request by any Super Senior Creditor for adequate protection under any US Bankruptcy Law; or

(ii)    any objection by any Super Senior Creditor to any motion, relief, action or proceeding based on any Super Senior Creditor claiming a lack of adequate protection,

in the event of any US Insolvency or Liquidation Proceeding.

(b)    Notwithstanding paragraph (a) above, if, in any US Insolvency or Liquidation Proceeding:

(i)    the Super Senior Creditors are granted adequate protection in the form of additional Security on additional or replacement assets and super-priority claims in connection with any US DIP Financing or use of cash collateral under Section 363 or 364 of the US Bankruptcy Code, then each other Primary Creditor may seek or request adequate protection in the form of additional Security on such additional or replacement assets or a super-priority claim (as applicable); or

(ii)    any Primary Creditor (other than a Super Senior Creditor), seeks or requests adequate protection and such adequate protection is granted in the form of additional Security on additional or replacement assets or a super-priority claim, then such Primary Creditor agrees that each Super Senior Creditor shall also be granted additional Security on such additional or replacement assets as security and adequate protection for the Super Senior Liabilities and any such US DIP Financing and a super-priority claim (as applicable),

provided that any Security or super-priority claim granted to a Primary Creditor (other than a Super Senior Creditor) in accordance with this paragraph (b) is subordinated to the Security securing, and claims with respect to, the Super Senior Liabilities, any such US DIP Financing and any other Security or claims granted to the Super Senior Creditors as adequate protection in the manner set out in Clause 2 (Ranking and Priority) and the order of application in Clause 21.1 (Order of application: Common Recoveries).

(c)    If any Primary Creditor (other than a Super Senior Creditor) receives Post-Petition Interest or adequate protection payments in a US Insolvency or Liquidation Proceeding (**Primary Creditor Adequate Protection Payments**) before the Super Senior Discharge Date, then each Primary Creditor shall pay over to the Super Senior Creditor(s) an amount (the **Pay-Over Amount**) equal to the lesser of (i) the Primary Creditor Adequate Protection Payments received by such Primary Creditor and (ii) the amount necessary to pay in full in cash the Super Senior Liabilities (subject, in the case of each Notes Trustee, to Clause 25.5 (Turnover obligations) be turned-over to the Security Agent for application in accordance with Clause 21.1 (Order of application: Common Recoveries). Notwithstanding anything herein to the contrary, the Super Senior Creditors shall not be deemed to have consented to, and expressly retain their rights to object to, the grant of adequate protection in the form of cash payments and the payment of Post-Petition Interest to the Primary Creditors made pursuant to this paragraph (c).

### 14.6    Reorganisation securities

If, in any US Insolvency or Liquidation Proceeding, debt obligations or other debt securities of the reorganised Debtor secured by Security upon any property of the reorganised Debtor are distributed, pursuant to a plan of reorganisation, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed, confirmed, or adopted in that US Insolvency or Liquidation Proceeding, to more than one Creditor Class, then, to the extent that such debt obligations distributed

•

are secured by Security upon the same assets or property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Security securing such debt obligations.

**14.7    Post-Petition Interest**

(a)    None of the Senior Secured Facility Agent, Parent Debt Facility Agent, Second Lien Facility Agent or Primary Creditors shall oppose or seek to challenge any claim by any Super Senior Facility Agent or Super Senior Creditor for allowance in any US Insolvency or Liquidation Proceeding of Super Senior Liabilities consisting of Post-Petition Interest under section 506(b) of the US Bankruptcy Code or otherwise.

(b)    None of the Super Senior Facility Agent or Super Senior Creditors shall oppose or seek to challenge any claim by any Senior Secured Facility Agent, Parent Debt Facility Agent, Second Lien Facility Agent or Primary Creditor for allowance in any US Insolvency or Liquidation proceeding of Primary Creditor Liabilities consisting of Post-Petition Interest under section 506(b) of the US Bankruptcy Code or otherwise (after taking into account the amount of the Super Senior Liabilities).

**15.    ENFORCEMENT OF TRANSACTION SECURITY**

**15.1    Cash Cover**

This Clause 15 is subject to Clause 3.9 (Bilateral Lenders: Cash Cover) and Clause 21.5 (Treatment of Cash Cover and Lender Cash Collateral).

**15.2    Instructions to enforce – Transaction Security**

(a)    This Clause 15.2 is subject to Clause 15.3 (Consultation period) and, on or prior to the Super Senior Discharge Date, Clause 15.5 (Enforcement prior to Super Senior Discharge Date).

(b)    Subject to paragraphs (d) and (e) below, the Security Agent may refrain from enforcing the Transaction Security or taking any other action as to Enforcement unless instructed otherwise by:

(i)    an Instructing Group (if prior to the Super Senior Discharge Date only, in accordance with Clause 15.5 (Enforcement prior to Super Senior Discharge Date));

(ii)    if required under paragraph (d) below, the Creditor Representative(s) for the Second Lien Creditors (acting on the instructions of the Majority Second Lien Creditors); or

(iii)    if required under paragraph (e) below, the Creditor Representative(s) for the Parent Debt Creditors (acting on the instructions of the Majority Parent Debt Creditors).

(c)    Subject to the Transaction Security having become enforceable in accordance with its terms:

(i)    an Instructing Group may give or refrain from giving instructions to the Security Agent to take action as to Enforcement (if prior to the Super Senior Discharge Date only, in accordance with Clause 15.5 (Enforcement prior to Super Senior Discharge Date));

(ii)    to the extent permitted or required under Clause 7.9 (Permitted Enforcement: Second Lien Creditors), prior to the First Lien Discharge Date, the Creditor Representative(s) for the Second Lien Creditors (acting on the instructions of the Majority Second Lien Creditors)

•

may give or refrain from giving instructions to the Security Agent to enforce the Transaction Security; or

(iii)     to the extent permitted or required under Clause 8.9 (Permitted Enforcement: Parent Debt Creditors), prior to the Priority Discharge Date, the Creditor Representative(s) for the Parent Debt Creditors (acting on the instructions of the Majority Parent Debt Creditors), may give or refrain from giving instructions to the Security Agent to enforce the Transaction Security.

(d)     Prior to the First Lien Discharge Date:

(i)     if an Instructing Group has (or, if prior to the Super Senior Discharge Date, both the Majority Super Senior Creditors and the Majority Senior Secured Creditors have) instructed the Security Agent to cease or not to proceed with Enforcement; or

(ii)     in the absence of instructions as to Enforcement from an Instructing Group (or, if prior to the Super Senior Discharge Date, the absence of instructions from both the Majority Super Senior Creditors and the Majority Senior Secured Creditors),

and if, in each case, an Instructing Group has not (or, if prior to the Super Senior Discharge Date, neither the Majority Super Senior Creditors nor the Majority Senior Secured Creditors have) required any Debtor or Third Party Security Provider to make a Distressed Disposal, the Security Agent shall give effect to any instructions to enforce the Transaction Security which the Creditor Representative(s) for the Second Lien Creditors (acting on the instructions of the Majority Second Lien Creditors) are then entitled to give to the Security Agent under Clause 7.9 (Permitted Enforcement: Second Lien Creditors).

(e)     Prior to the Priority Discharge Date:

(i)     if an Instructing Group has (or, if prior to the Super Senior Discharge Date, both the Majority Super Senior Creditors and the Majority Senior Secured Creditors have) instructed the Security Agent to cease or not to proceed with Enforcement; or

(ii)     in the absence of instructions as to Enforcement from an Instructing Group (or, if prior to the Super Senior Discharge Date, the absence of instructions from both the Majority Super Senior Creditors and the Majority Senior Secured Creditors),

and if, in each case, an Instructing Group has not (or, if prior to the Super Senior Discharge Date, neither the Majority Super Senior Creditors nor the Majority Senior Secured Creditors have) required any Debtor or Third Party Security Provider to make a Distressed Disposal, the Security Agent shall give effect to any instructions to enforce the Transaction Security which the Creditor Representative(s) for the Parent Debt Creditors (acting on the instructions of the Majority Parent Debt Creditors) are then entitled to give to the Security Agent under Clause 8.9 (Permitted Enforcement: Parent Debt Creditors).

(f)     Notwithstanding paragraphs (c)(ii), (c)(iii), (d) and (e) above, if at any time the Creditor Representative(s) for the Second Lien Creditors or the Parent Debt Creditors are then entitled to give the Security Agent instructions as to enforcement of the Transaction Security pursuant to paragraph (d) or (e) above and the Creditor Representative(s) do not give such instruction and do not indicate any intention to give such instruction, then the Majority Senior Secured Creditors (or, if entitled to give instructions as to Enforcement under Clause 15.5 (Enforcement prior to Super Senior Discharge Date), the Majority Super Senior Creditors) may give instructions to the Security Agent as

•

to Enforcement in lieu of any instructions to enforce given by the Creditor Representative for the Second Lien Creditors or the Parent Debt Creditors under Clause 7.9 (Permitted Enforcement: Second Lien Creditors) or 8.9 (Permitted Enforcement: Parent Debt Creditors) and the Security Agent shall act on the first such instructions received.

(g)     The Security Agent is entitled to rely on and comply with instructions given or deemed to be given in accordance with this Clause 15.2.

**15.3     Consultation period**

(a)     Subject to the Transaction Security having become enforceable in accordance with its terms, if any group of Creditors entitled to give instructions to enforce the Transaction Security or to take any other action as to Enforcement in accordance with Clause 15.2 (Instructions to enforce – Transaction Security) wishes to issue Enforcement Instructions, the Creditor Representative representing the Creditors (together with any Bilateral Lender(s) as the case may be) comprising that group of Creditors shall deliver a copy of those proposed Enforcement Instructions (an **Initial Enforcement Notice**) to the Security Agent and to each other Creditor Representative and each Bilateral Creditor.

(b)     Subject to paragraph (c) below, as soon as reasonably practicable after receipt of an Initial Enforcement Notice, each of the Creditor Representatives and each Bilateral Lender will consult in good faith with each other and the Security Agent for a period of not less than ten Business Days (or such shorter period as each Creditor Representative, each Bilateral Lender and the Security Agent shall agree) from the date such Initial Enforcement Notice is received by such persons (or such shorter period as the relevant parties may agree) (the **Consultation Period**) with a view to co-ordinating the Enforcement Instructions, provided that a Parent Debt Creditor Representative shall only be required to be consulted if the proposed Enforcement Instructions relate to Common Transaction Security.

(c)     No Consultation Period shall be required if:

(i)     the Transaction Security has become enforceable as a result of an Insolvency Event in relation to a Debtor or Third Party Security Provider; or

(ii)    an Instructing Group or the Creditor Representative representing the Creditors comprising an Instructing Group determines in good faith (and notifies the other Creditor Representatives, each Bilateral Creditor and the Security Agent) that to enter into such consultations and delay the commencement of Enforcement could reasonably be expected to have a material adverse effect on (A) the Security Agent's ability to enforce any of the Transaction Security or (B) the expected realisation proceeds of any Enforcement.

(d)     Following the expiry of a Consultation Period or if no Consultation Period is required pursuant to paragraph (c) above, the Security Agent shall be entitled to act on any Enforcement Instructions given to it by the group of Creditors entitled to give instructions to enforce the Transaction Security or to take any other action as to Enforcement in accordance with Clauses 15.2 (Instructions to enforce – Transaction Security) and 15.4 (Manner of enforcement – Transaction Security).

**15.4     Manner of enforcement – Transaction Security**

If the Transaction Security is being enforced or other action as to Enforcement is being taken pursuant to Clause 15.2 (Instructions to enforce – Transaction Security), the Security Agent shall enforce the Transaction Security or take other action as to Enforcement in such manner (including,

•

without limitation, the selection of any administrator (or any analogous officer in any jurisdiction) of any Debtor or Third Party Security Provider to be appointed by the Security Agent) as:

(a)    the Instructing Group shall instruct;

(b)    if, prior to the First Lien Discharge Date:

    (i)    the Security Agent has, pursuant to paragraph (d) of Clause 15.2 (Instructions to enforce – Transaction Security), received instructions given by the Majority Second Lien Creditors to enforce the Transaction Security; and

    (ii)    the Instructing Group (or any other group of First Lien Creditors pursuant to paragraph (f) of Clause 15.2 (Instructions to enforce – Transaction Security)) has not given instructions as to Enforcement,

the Majority Second Lien Creditors shall instruct; or

(c)    if, prior to the Priority Discharge Date:

    (i)    the Security Agent has, pursuant to paragraph (e) of Clause 15.2 (Instructions to enforce – Transaction Security), received instructions given by the Majority Parent Debt Creditors to enforce the Transaction Security; and

    (ii)    the Instructing Group (or any other group of Priority Creditors pursuant to paragraph (f) of Clause 15.2 (Instructions to enforce – Transaction Security)) has not given instructions as to Enforcement,

the Majority Parent Debt Creditors shall instruct,

provided that (in the case of paragraph (a) above and prior to the Super Senior Discharge Date only) such instructions are consistent with Clause 15.6 (Enforcement principles prior to Super Senior Discharge Date) or, in the absence of any such instructions, as the Security Agent considers in its discretion to be appropriate and consistent with Clause 15.6 (Enforcement principles prior to Super Senior Discharge Date).

## 15.5    Enforcement prior to Super Senior Discharge Date

(a)    This Clause 15.5 shall only apply on or prior to the Super Senior Discharge Date.

(b)    If, following any Consultation Period, the Majority Super Senior Creditors and the Majority Senior Secured Creditors have both agreed the Enforcement Instructions, the Security Agent will act in accordance with those joint Enforcement Instructions.

(c)    If, following any Consultation Period, the Majority Senior Secured Creditors have given Enforcement Instructions and paragraph (b) above does not apply, subject to paragraphs (d) and (e) below, the Security Agent will act in accordance with the Enforcement Instructions received from the Majority Senior Secured Creditors.

(d)    If:

•

(i)     the Majority Senior Secured Creditors have not made a determination as to the method of Enforcement they wish to instruct the Security Agent to pursue (and notified the Security Agent of that determination in writing) within three months of the date of the Initial Enforcement Notice (or, if later, the end of the Consultation Period); or

(ii)    the Super Senior Discharge Date has not occurred within six months of the date of the Initial Enforcement Notice (or, if later, the end of the Consultation Period),

then the Security Agent will act in accordance with Enforcement Instructions received from the Majority Super Senior Creditors until the Super Senior Discharge Date has occurred.

(e)    If an Insolvency Event (other than an Insolvency Event directly caused by any Enforcement Action taken by or at the request or direction of a Super Senior Creditor or group of Super Senior Creditors) is continuing with respect to a Debtor or a Third Party Security Provider then the Security Agent will, to the extent the Majority Super Senior Creditors elect to provide such Enforcement Instructions (and except to the extent that the Security Agent has already commenced any Enforcement (or any transaction in lieu) or other Enforcement Action at that time with respect to the relevant Debtor or Third Party Security Provider), act in accordance with Enforcement Instructions received from the Majority Super Senior Creditors until the Super Senior Discharge Date has occurred.

**15.6    Enforcement principles prior to Super Senior Discharge Date**

(a)    This Clause 15.6 shall only apply on or prior to the Super Senior Discharge Date.

(b)    Any Enforcement shall be consistent with maximising, to the extent consistent with a prompt and expeditious realisation of value, the value realised from Enforcement (the **Enforcement Objective**).

(c)    Without prejudice to the Enforcement Objective, the Transaction Security shall be enforced and other action as to Enforcement shall be taken such that sufficient proceeds from Enforcement will be received by the Security Agent in cash to ensure that, when the proceeds are applied in accordance with Clause 21 (Application of Proceeds), the Super Senior Discharge Date will occur.

(d)    On:

(i)     a proposed Enforcement in relation to assets comprising Charged Property other than shares in a member of the Group over which Transaction Security exists, where the aggregate book value of such assets exceeds US$10,000,000 (or its equivalent in any other currency or currencies); or

(ii)    a proposed Enforcement in relation to Charged Property comprising some or all of the shares in a member of the Group over which Transaction Security exists,

which, in either case, is not being effected through a Competitive Sales Process, the Security Agent shall, if requested by the Majority Super Senior Creditors or the Majority Senior Secured Creditors, appoint a Financial Adviser to provide a Fairness Opinion in relation to that Enforcement, provided that the Security Agent shall not be required to appoint a Financial Adviser nor obtain a Fairness Opinion if a proposed Enforcement:

•

(A)    would result in the receipt of sufficient Enforcement Proceeds in cash by the Security Agent to ensure that, after application in accordance with Clause 21 (Application of Proceeds):

I.    in the case of an Enforcement requested by the Majority Super Senior Creditors, the Senior Secured Creditor Discharge Date would occur; or

II.    in the case of an Enforcement requested by the Majority Senior Secured Creditors, the Super Senior Discharge Date would occur;

(B)    is in accordance with any applicable law; and

(C)    complies with Clause 18 (Distressed Disposals).

(e)    A Fairness Opinion will be conclusive evidence that the Enforcement Objective has been met.

(f)    This Clause 15.6 is for the benefit of the Super Senior Creditors, the Senior Secured Creditors and the Security Agent only.

**15.7    Exercise of voting rights**

(a)    Subject to paragraphs (b) and (d) below, each Creditor (other than each Creditor Representative, the Security Agent and each Arranger) will cast its vote in any proposal put to the vote by or under the supervision of any judicial or supervisory authority in respect of any insolvency, pre-insolvency or rehabilitation or similar proceedings relating to a Parent Debt Issuer (insofar as it relates to the enforcement, protection or preservation of the Common Transaction Security) or any member of the Group as instructed by the Security Agent.

(b)    Each Creditor (other than a Primary Creditor and each Creditor Representative, the Security Agent and each Arranger) will cast its vote in any proposal put to the vote by or under the supervision of any judicial or supervisory authority in respect of any insolvency, pre-insolvency or rehabilitation or similar proceedings relating to a Parent Debt Issuer (insofar as it does not relate to the enforcement, protection or preservation of the Common Transaction Security) as instructed by the Majority Parent Debt Creditors.

(c)    Subject to paragraph (d) below, the Security Agent shall give instructions for the purposes of paragraph (a) above in accordance with any instructions given to it by the Instructing Group, provided that any such instructions have been given in accordance with Clause 15.2 (Instructions to enforce – Transaction Security).

(d)    Nothing in this Clause 15.7 entitles any party to exercise or require any other Creditor to exercise such power of voting or representation to waive, reduce, discharge, extend the due date for (or change the basis for accrual of any) payment of or reschedule any of the Liabilities owed to that Creditor.

**15.8    Waiver of rights**

To the extent permitted under applicable law and subject to Clause 15.2 (Instructions to enforce – Transaction Security), Clause 15.4 (Manner of enforcement – Transaction Security), Clause 18.4 (Fair value) and Clause 21 (Application of Proceeds), each of the Secured Parties, the Third Party Security Providers and the Debtors waives all rights it may otherwise have to require that the

•

Transaction Security be enforced in any particular order or manner or at any particular time or that any amount received or recovered from any person, or by virtue of the enforcement of any of the Transaction Security or of any other security interest, which is capable of being applied in or towards discharge of any of the Common Secured Obligations or the Priority Creditor Secured Obligations is so applied.

**15.9    Duties owed**

(a)    Each of the Secured Parties, the Third Party Security Providers and the Debtors acknowledges that, in the event that the Security Agent enforces or is instructed to enforce any part of the Transaction Security:

   (i)    prior to the First Lien Discharge Date, the duties of the Security Agent and of any Receiver or Delegate owed to the Second Lien Creditors and the Parent Debt Creditors; or

   (ii)    after the First Lien Discharge Date but prior to the Priority Discharge Date, the duties of the Security Agent and of any Receiver or Delegate owed to the Parent Debt Creditors,

in either case, in respect of the method, type and timing of that enforcement or of the exploitation, management or realisation of any of that Transaction Security shall, subject to Clause 18.4 (Fair value) and 18.6 (Restriction on Distressed Disposals – Second Lien / Parent Debt Creditor protections) (where applicable), be no different to or greater than the duty that is owed by the Security Agent, Receiver or Delegate to the Debtors under general law.

(b)    The duty of care owed (whether under this Agreement or under general law) by the Security Agent to the Second Lien Creditors and the Parent Debt Creditors shall be the same whether or not the Second Lien Creditors and the Parent Debt Creditors are creditors at the relevant entity at which enforcement is being conducted or are beneficiaries of the Security that is being enforced. The Security Agent shall promptly upon receiving notice provide the Second Lien Creditors (through their respective Second Lien Creditor Representatives) and the Parent Debt Creditors (through their respective Parent Debt Creditor Representatives) notification of the scheduling of any court or administrative hearings relating to any Enforcement Action with respect to the Transaction Security.

**15.10    Enforcement through Security Agent only**

The Secured Parties shall not have any independent power to enforce, or have recourse to, any of the Transaction Security or to exercise any right, power, authority or discretion arising under the Transaction Security Documents except through the Security Agent.

**15.11    Alternative Enforcement Actions**

(a)    After the Security Agent has commenced Enforcement, it shall not accept any subsequent instructions as to Enforcement save for:

   (i)    instructions as to Enforcement where paragraphs (d) or (e) of Clause 15.5 (Enforcement prior to Super Senior Discharge Date) apply;

   (ii)    instructions as to Enforcement that the Second Lien Creditors are entitled to give under Clause 7.9 (Permitted Enforcement: Second Lien Creditors); or

•

**1157**

(iii)    instructions as to Enforcement that the Parent Debt Creditors are entitled to give under Clause 8.9 (Permitted Enforcement: Parent Debt Creditors); or

(iv)    instructions as to Enforcement from the Majority Super Senior Creditors or the Majority Senior Secured Creditors that they are entitled to give pursuant to paragraph (f) of Clause 15.2 (Instructions to enforce – Transaction Security),

from anyone other than the Instructing Group that instructed it to commence such Enforcement regarding any other Enforcement of the Transaction Security over or relating to shares or assets directly or indirectly the subject of the Enforcement which has been commenced (and, for the avoidance of doubt, during any enforcement of the Transaction Security, only paragraph (a)(ii) of the definition of Instructing Group shall be applicable in relation to any instructions given to the Security Agent by the Instructing Group under this Agreement).

(b)    Paragraph (a) above shall not restrict the right of any other Instructing Group to instruct the Security Agent as to Enforcement of the Transaction Security over or relating to shares or assets which are not directly or indirectly the subject of the Enforcement which has been commenced, subject to compliance with the requirements of this Agreement.

**15.12    Transaction Security held by other Creditors**

If any Transaction Security is held by a Creditor other than the Security Agent, then that Creditor may only enforce that Transaction Security in accordance with instructions given by an Instructing Group in accordance with this Clause 15 (and for this purpose references to the Security Agent shall be construed as references to that Creditor).

**16.    ENFORCEMENT OF PARENT DEBT ONLY SECURITY**

**16.1    Instructions to enforce – Parent Debt Only Security**

(a)    The Security Agent may refrain from enforcing the Parent Debt Only Security unless instructed otherwise by the Majority Parent Debt Creditors.

(b)    Subject to the Parent Debt Only Security having become enforceable in accordance with its terms, the Majority Parent Debt Creditors may give or refrain from giving instructions to the Security Agent to enforce the Parent Debt Only Security.

(c)    The Security Agent is entitled to rely on and comply with instructions given or deemed to be given in accordance with this Clause 16.1.

**16.2    Manner of enforcement – Parent Debt Only Security**

If the Parent Debt Only Security is being enforced pursuant to Clause 16.1 (Instructions to enforce – Parent Debt Only Security), the Security Agent shall enforce the Parent Debt Only Security in such manner (including, without limitation, the selection of any administrator (or any analogous officer in any jurisdiction) of any Parent Debt Only Obligor to be appointed by the Security Agent) as the Majority Parent Debt Creditors shall instruct.

•

**16.3    Waiver of rights**

To the extent permitted under applicable law and subject to Clause 16.1 (Instructions to enforce – Parent Debt Only Security), Clause 16.2 (Manner of enforcement – Parent Debt Only Security), Clause 18.4 (Fair value) and Clause 21 (Application of Proceeds), each of the Parent Debt Secured Parties and each Parent Debt Only Obligor waives all rights it may otherwise have to require that the Parent Debt Only Security be enforced in any particular order or manner or at any particular time or that any amount received or recovered from any person, or by virtue of the enforcement of any of the Parent Debt Only Security or of any other security interest, which is capable of being applied in or towards discharge of any of the Parent Debt Only Secured Obligations is so applied.

**16.4    Enforcement through Security Agent only**

The Parent Debt Secured Parties shall not have any independent power to enforce, or have recourse to, any of the Parent Debt Only Security or to exercise any right, power, authority or discretion arising under the Parent Debt Only Security Documents except through the Security Agent.

**16.5    Parent Debt Only Security held by other Creditors**

If any Parent Debt Only Security is held by a Creditor other than the Security Agent, then that Creditor may only enforce that Parent Debt Only Security in accordance with instructions given by the Majority Parent Debt Creditors in accordance with this Clause 15 (and for this purpose references to the Security Agent shall be construed as references to that Creditor).

**17.    NON-DISTRESSED DISPOSALS**

**17.1    Definitions**

In this Clause 17:

**Disposal Proceeds** means the proceeds of a Non-Distressed Disposal.

**Non-Distressed Disposal** means a disposal of:

(a)    an asset of a member of the Group; or

(b)    an asset which is subject to the Transaction Security or Parent Debt Only Security,

to any person (including to a member of the Group, but without prejudice to any obligation of any member of the Group in a Debt Document to provide replacement Security) where:

(i)     the Company certifies for the benefit of the Security Agent that the disposal and, if the disposal is of Charged Property or Parent Debt Only Charged Property, the release of Transaction Security or Parent Debt Only Security (as applicable) is not prohibited under the Primary Debt Documents or Required Creditor Consent has been obtained to authorise the release; and

(ii)    that disposal is not a Distressed Disposal.

•

**17.2    Facilitation of Non-Distressed Disposals**

(a)    If a disposal of an asset is a Non-Distressed Disposal, the Security Agent is irrevocably authorised (at the cost of the Company and without any consent, sanction, authority or further confirmation from any Creditor, other Secured Party or Debtor or Third Party Security Provider) but subject to paragraph (b) below:

   (i)    to release (or procure that any other relevant person releases) the Transaction Security and/or Parent Debt Only Security (as applicable) or any other claim (relating to a Debt Document) over that asset;

   (ii)    where that asset consists of shares in the capital of a member of the Group, to release (or procure that any other relevant person releases) the Transaction Security or Parent Debt Only Security (as applicable) or any other claim (relating to a Debt Document) over that member of the Group's Property and any Guarantee Liabilities of that member of the Group; and

   (iii)    to execute and deliver or enter into (or procure that any other relevant person executes, delivers and enters into) any release of the Transaction Security or Parent Debt Only Security (as applicable) or any claim described in paragraphs (i) and (ii) above and issue any certificates of non-crystallisation of any floating charge or any consent to dealing that may, in the discretion of the Security Agent, be considered necessary or desirable.

(b)    Each release of Transaction Security or Parent Debt Only Security or any claim described in paragraph (a) above shall become effective only on the making of the relevant Non-Distressed Disposal.

**17.3    Disposal Proceeds**

If any Disposal Proceeds are required to be applied in mandatory prepayment of the Primary Creditor Liabilities then those Disposal Proceeds shall, subject to any restrictions on the making of Payments set out in this Agreement, be applied in accordance with the Debt Documents and the consent of any other Party shall not be required for that application.

**17.4    Release of Unrestricted Subsidiaries**

If a member of the Group is designated as an Unrestricted Subsidiary in accordance with the terms of the Primary Debt Documents, the Security Agent is irrevocably authorised and obliged (at the cost of the relevant Debtor or the Company and without any consent, sanction, authority or further confirmation from any Creditor or Debtor):

(a)    to release the Transaction Security or Parent Debt Only Security or any other claim (relating to a Debt Document) over that member of the Group's assets; and

(b)    to execute and deliver or enter into any release of the Transaction Security or Parent Debt Only Security or any claim described in paragraph (a) above and issue any certificates of non-crystallisation of any floating charge or any consent to dealing that may, in the discretion of the Security Agent, be considered necessary or desirable or as requested by the Company.

•

**17.5    Other transactions**

(a)    Without prejudice to Clauses 17.2 (Facilitation of Non-Distressed Disposals) and 17.4 (Release of Unrestricted Subsidiaries), the Security Agent is irrevocably authorised (at the cost of the Company and without any consent, sanction, authority or further confirmation from any Creditor, other Secured Party or Debtor or Third Party Security Provider) to execute (or procure that any relevant person executes) promptly any guarantee, security or other release and/or any amendment, supplement or other documentation relating to any Transaction Security or Parent Debt Only Security requested by the Company in connection with any other transaction or action that is not expressly prohibited by any of the other Primary Debt Documents.

(b)    Notwithstanding anything to the contrary in any Debt Document, nothing in any Security Document shall operate or be construed so as to prevent any transaction, matter or other step not prohibited by the terms of this Agreement or the Primary Debt Documents (a **Permitted Action**). The Security Agent is irrevocably authorised (at the cost of the Company and without any consent, sanction, authority or further confirmation from any Creditor, other Secured Party or Debtor or Third Party Security Provider) to execute (or procure that any relevant person executes) promptly any release or other document and/or take such other action or step under or in relation to any Debt Document (or any asset subject or expressed to be subject to any Transaction Security or Parent Debt Only Security) as is requested by the Company in order to complete, implement or facilitate a Permitted Action.

(c)    In the event that the Company makes any request pursuant to paragraph (a) or (b) above, the Company shall confirm in writing to the Security Agent that the requested action is not expressly prohibited by any of the other Debt Documents or that the relevant transaction, matter or other step is a Permitted Action and the Security Agent shall be entitled to rely on that confirmation for all purposes under the Primary Debt Documents.

**17.6    Further assurance**

The Security Agent shall promptly enter into (or procure that any relevant person enters into) and deliver such documentation and/or take such other action as the Company shall require to give effect to, or to evidence, any release (including in any official register) or other matter contemplated by or in connection with this Clause 17.

**18.    DISTRESSED DISPOSALS**

**18.1    Facilitation of Distressed Disposals**

Subject to Clause 18.2 (Election to transfer Liabilities to a Holding Company), Clause 18.5 (Restriction on Distressed Disposals – First Lien Creditor protections) and Clause 18.6 (Restriction on Distressed Disposals – Second Lien / Parent Debt Creditor protections), if a Distressed Disposal is being effected, the Security Agent is irrevocably authorised (at the cost of the relevant Debtor, Third Party Security Provider or the Company and without any consent, sanction, authority or further confirmation from any Creditor, other Secured Party, Third Party Security Provider or Debtor):

(a)    *release of Transaction Security/non-crystallisation certificates*: to release the Transaction Security or any other claim over the asset subject to the Distressed Disposal and execute and deliver or enter into any release of that Transaction Security or claim and issue any letters of

•

non-crystallisation of any floating charge or any consent to dealing that may, in the discretion of the Security Agent, be considered necessary or desirable;

(b)     ***release of liabilities and Transaction Security on a share sale (Debtor)***: if the asset subject to the Distressed Disposal consists of shares in the capital of a Debtor, to release:

    (i)     that Debtor and any Subsidiary of that Debtor from all or any part of:

        (A)     its Borrowing Liabilities;

        (B)     its Guarantee Liabilities; and

        (C)     its Other Liabilities;

    (ii)     any Transaction Security granted by that Debtor or any Subsidiary of that Debtor over any of its assets; and

    (iii)     any other claim of a Subordinated Creditor, an Intra-Group Lender, Third Party Security Provider or another Debtor over that Debtor's assets or over the assets of any Subsidiary of that Debtor,

on behalf of the relevant Creditors, Third Party Security Providers and Debtors;

(c)     ***release of liabilities and Transaction Security on a share sale (Holding Company)***: if the asset subject to the Distressed Disposal consists of shares in the capital of any Holding Company of a Debtor, to release:

    (i)     that Holding Company and any Subsidiary of that Holding Company from all or any part of:

        (A)     its Borrowing Liabilities;

        (B)     its Guarantee Liabilities; and

        (C)     its Other Liabilities;

    (ii)     any Transaction Security granted by that Holding Company and any Subsidiary of that Holding Company over any of its assets; and

    (iii)     any other claim of a Subordinated Creditor, an Intra-Group Lender, Third Party Security Provider or another Debtor over the assets of that Holding Company and any Subsidiary of that Holding Company,

on behalf of the relevant Creditors, Third Party Security Providers and Debtors;

(d)     ***facilitative disposal of liabilities on a share sale***: if the asset subject to the Distressed Disposal consists of shares in the capital of a Debtor or the Holding Company of a Debtor and the Security Agent decides to dispose of all or any part of:

    (i)     the Liabilities (other than any Creditor Representative Liabilities, Security Agent Liabilities or Arranger Liabilities); or

•

(ii)    the Debtors' Intra-Group Receivables,

owed by that Debtor or Holding Company or any Subsidiary of that Debtor or Holding Company on the basis that any transferee of those Liabilities or Debtors' Intra-Group Receivables (the **Transferee**) will not be treated as a Primary Creditor or a Secured Party for the purposes of this Agreement, to execute and deliver or enter into any agreement to dispose of all or part of those Liabilities or Debtors' Intra-Group Receivables on behalf of the relevant Creditors and Debtors provided that notwithstanding any other provision of any Debt Document the Transferee shall not be treated as a Primary Creditor or a Secured Party for the purposes of this Agreement;

(e)    *sale of liabilities on a share sale*: if the asset subject to the Distressed Disposal consists of shares in the capital of a Debtor or the Holding Company of a Debtor and the Security Agent decides to dispose of all or any part of:

(i)    the Liabilities (other than any Creditor Representative Liabilities, Security Agent Liabilities or Arranger Liabilities); or

(ii)    the Debtors' Intra-Group Receivables,

owed by that Debtor or Holding Company or any Subsidiary of that Debtor or Holding Company on the basis that any transferee of those Liabilities or Debtors' Intra-Group Receivables will be treated as a Primary Creditor or a Secured Party for the purposes of this Agreement, to execute and deliver or enter into any agreement to dispose of:

(A)    all (and not part only) of the Liabilities owed to the Primary Creditors; and

(B)    all or part of any other Liabilities (other than any Creditor Representative Liabilities, Security Agent Liabilities or Arranger Liabilities) and the Debtors' Intra-Group Receivables,

on behalf of, in each case, the relevant Creditors, Third Party Security Providers and Debtors;

(f)    *transfer of obligations in respect of liabilities on a share sale*: if the asset subject to the Distressed Disposal consists of shares in the capital of a Debtor or the Holding Company of a Debtor (the **Disposed Entity**) and the Security Agent decides to transfer to another Debtor (the **Receiving Entity**) all or any part of the Disposed Entity's obligations or any obligations of any Subsidiary of that Disposed Entity in respect of:

(i)    the Intra-Group Liabilities; or

(ii)    the Debtors' Intra-Group Receivables,

to execute and deliver or enter into any agreement to:

(A)    agree to the transfer of all or part of the obligations in respect of those Intra-Group Liabilities or Debtors' Intra-Group Receivables on behalf of the relevant Intra-Group Lenders and Debtors to which those obligations are owed and on behalf of the Debtors which owe those obligations; and

•

(B)    accept the transfer of all or part of the obligations in respect of those Intra-Group Liabilities or Debtors' Intra-Group Receivables on behalf of the Receiving Entity or Receiving Entities to which the obligations in respect of those Intra-Group Liabilities or Debtors' Intra-Group Receivables are to be transferred.

## 18.2    Election to transfer Liabilities to a Holding Company

Where Borrowing Liabilities, Guarantee Liabilities and/or Other Liabilities would otherwise be released pursuant to Clause 18.1 (Facilitation of Distressed Disposals), the Creditor concerned may elect to have those Borrowing Liabilities, Guarantee Liabilities and/or Other Liabilities transferred to a Holding Company of the Company specified by such Creditor, in which case, to the extent legally possible the Security Agent is irrevocably authorised (at the cost of the relevant Debtor or the Company and without any consent, sanction, authority or further confirmation from any Creditor or Debtor) to execute such documents as are required to so transfer those Borrowing Liabilities, Guarantee Liabilities and/or Other Liabilities.

## 18.3    Proceeds of Distressed Disposals and Debt Disposals

The net proceeds of each Distressed Disposal and each Debt Disposal shall be paid, or distributed, to the Security Agent for application in accordance with Clause 21 (Application of Proceeds) and, to the extent that any Liabilities Sale has occurred as if that Liabilities Sale had not occurred.

## 18.4    Fair value

(a)    Without prejudice to Clause 15.6 (Enforcement principles prior to Super Senior Discharge Date), in the case of a Distressed Disposal or a Liabilities Sale, effected by, or at the request of, the Security Agent, the Security Agent shall take reasonable care to obtain a fair market price having regard to the prevailing market conditions (though the Security Agent shall have no obligation to postpone (or request the postponement of) any Distressed Disposal or Liabilities Sale in order to achieve a higher price).

(b)    The requirement in paragraph (a) above shall be satisfied (and as between the Creditors and the Debtors shall be conclusively presumed to be satisfied) and the Security Agent will be taken to have discharged all its obligations in this respect under this Agreement, the other Debt Documents and generally at law if that Distressed Disposal or Liabilities Sale is made in accordance with Clauses 18.5 (Restriction on Distressed Disposals – First Lien Creditor protections) and 18.6 (Restriction on Distressed Disposals – Second Lien / Parent Debt Creditor protections).

## 18.5    Restriction on Distressed Disposals – First Lien Creditor protections

(a)    The Security Agent is not authorised to release any Debtor, Subsidiary or Holding Company from any Borrowing Liabilities or Guarantee Liabilities owed to any Priority Creditor except in accordance with this Clause 18 (Distressed Disposals);

(b)    Without prejudice to Clause 15.6 (Enforcement principles prior to Super Senior Discharge Date), if a Distressed Disposal or Liabilities Sale is being effected, unless the consent of each First Lien Creditor Representative and each First Lien Creditor that is a Bilateral Lender is otherwise obtained, it is a condition to any release, transfer or disposal under Clause 18.1 (Facilitation of Distressed Disposals) that:

•

**1164**

(i)     the proceeds of such sale or disposal are in cash (or substantially in cash) and/or other marketable securities or, if the proceeds of such sale or disposal are not in cash (or substantially in cash) and/or other marketable securities, the requirements of paragraph (iii)(C) below are satisfied;

(ii)    the proceeds of such sale or disposal are applied in accordance with Clause 21.1 (Order of application: Common Recoveries); and

(iii)   such sale or disposal (including any sale or disposal of any claim) is made:

    (A)     by way of Competitive Sales Process; or

    (B)     pursuant to any process or proceedings approved or supervised by or on behalf of any court of law which has jurisdiction and where there is a determination of value by or on behalf of such court; or

    (C)     where a Financial Adviser, as selected by the Security Agent, has delivered a Fairness Opinion.

(c)     If a Distressed Disposal is being effected at a time when the Majority Second Lien Creditors are entitled to give, and have given, instructions under Clause 15.2 (Instructions to enforce – Transaction Security) or Clause 15.4 (Manner of enforcement – Transaction Security), the Security Agent is not authorised to release any Debtor, Subsidiary or Holding Company from any Borrowing Liabilities or Guarantee Liabilities or Other Liabilities owed to any First Lien Creditor unless those Borrowing Liabilities or Guarantee Liabilities or Other Liabilities and any other First Lien Liabilities will be paid (or repaid) in full (or, in the case of any contingent Liability relating to a Letter of Credit or an Ancillary Facility or a Cash Management Facility, made the subject of cash collateral arrangements acceptable to the relevant First Lien Creditor) upon that release.

(d)     If a Distressed Disposal is being effected at a time when the Majority Parent Debt Creditors are entitled to give, and have given, instructions under Clause 15.2 (Instructions to enforce – Transaction Security) or Clause 15.4 (Manner of enforcement – Transaction Security), the Security Agent is not authorised to release any Debtor, Subsidiary or Holding Company from any Borrowing Liabilities or Guarantee Liabilities or Other Liabilities owed to any Priority Creditor unless those Borrowing Liabilities or Guarantee Liabilities or Other Liabilities and any other Priority Creditor Liabilities will be paid (or repaid) in full (or, in the case of any contingent Liability relating to a Letter of Credit or an Ancillary Facility or a Cash Management Facility, made the subject of cash collateral arrangements acceptable to the relevant Priority Creditor) upon that release.

**18.6    Restriction on Distressed Disposals – Second Lien / Parent Debt Creditor protections**

(a)     Without prejudice to Clause 15.6 (Enforcement principles prior to Super Senior Discharge Date), if before the Second Lien Discharge Date or the Parent Debt Discharge Date (as the case may be), a Distressed Disposal or a Liabilities Sale is being effected such that the Second Lien Liabilities or Parent Debt Liabilities or Transaction Security or assets of a Second Lien Debt Issuer or a Second Lien Group Guarantor or a Parent Debt Issuer or a Parent Debt Group Guarantor will be released, transferred or disposed under Clause 18.1 (Facilitation of Distressed Disposals), it is a condition to that release, transfer or disposal that either:

(i)     each Second Lien Creditor Representative and each Parent Debt Creditor Representative (as the case may be) has approved the release, transfer or disposal; or

•

(ii)     where shares or assets of a Second Lien Debt Issuer or a Second Lien Group Guarantor or a Parent Debt Issuer or a Parent Debt Group Guarantor are sold or disposed of, each of the following conditions are satisfied:

(A)     the proceeds of such sale or disposal are in cash (or substantially in cash) and/or other marketable securities or, if the proceeds of such sale or disposal are not in cash (or substantially in cash) and/or other marketable securities, the requirements of paragraph (C)III below are satisfied;

(B)     the proceeds of such sale or disposal are applied in accordance with Clause 21.1 (Order of application: Common Recoveries);

(C)     such sale or disposal is made:

I.     by way of Competitive Sales Process;

II.     pursuant to any process or proceedings approved or supervised by or on behalf of any court of law which has jurisdiction and where there is a determination of value by or on behalf of such court; or

III.     where a Financial Adviser, as selected by the Security Agent, has delivered a Fairness Opinion; and

(D)     at the time of completion of such sale or disposal, the Borrowing Liabilities, Guarantee Liabilities and/or Other Liabilities owing to each of the Primary Creditors by the Debtors and their respective Subsidiaries being sold or disposed of (the **Relevant Claim**) are (to the same extent) unconditionally released and discharged or sold or disposed of concurrently with such sale or disposal (and not assumed by the purchaser or one of its Affiliates), and all Security under the Transaction Security Documents or the Parent Debt Only Security Documents (as the case may be) in respect of the assets of such Debtors and their respective Subsidiaries is simultaneously and unconditionally released and discharged concurrently with such sale or disposal, provided that if each Relevant Creditor Representative:

I.     (acting reasonably and in good faith) determines that the Relevant Primary Creditors will recover a greater cash amount if the Relevant Claim is sold or otherwise transferred to the purchaser or one of its Affiliates and not released or discharged and provided such amount is less than the aggregate amount of the outstanding Relevant Secured Liabilities (which shall be deemed to be the case if there are no bidders or if each Relevant Creditor Representative (acting reasonably and in good faith) determines that there are no bona fide and fully committed bids in cash or substantially all in cash in excess of the outstanding amount of the Relevant Secured Liabilities); and

II.     serves a written notice on the Security Agent confirming the same,

then the Security Agent shall be entitled immediately to sell and transfer such Relevant Claim to the purchaser or one of its Affiliates.

(b)     For the purpose of sub-paragraph (a)(ii)(D) above:

•

**Relevant Creditor Representative** means:

(a)    before the Second Lien Discharge Date, each First Lien Creditor Representative and each First Lien Creditor that is a Bilateral Lender; or

(b)    before the Parent Debt Discharge Date, each First Lien Creditor Representative, each First Lien Creditor that is a Bilateral Lender and each Second Lien Creditor Representative.

**Relevant Primary Creditors** means:

(a)    before the Second Lien Discharge Date, the First Lien Creditors; or

(b)    before the Parent Debt Discharge Date, the Priority Creditors.

**Relevant Secured Liabilities** means:

(a)    before the Second Lien Discharge Date, the First Lien Liabilities; or

(b)    before the Parent Debt Discharge Date, the Priority Creditor Liabilities.

**18.7    Appointment of Financial Adviser**

(a)    Without prejudice to Clause 24.10 (Rights and discretions), the Security Agent may engage, or approve the engagement of, pay for and rely on the services of a Financial Adviser in accordance with Clause 15.6 (Enforcement principles prior to Super Senior Discharge Date), 18.5 (Restriction on Distressed Disposals – First Lien Creditor protections) and/or Clause 18.6 (Restriction on Distressed Disposals – Second Lien / Parent Debt Creditor protections) provided that the Security Agent may agree that the liability of such Financial Adviser may be limited to the amount of its fees in respect of its engagement.

(b)    The Security Agent shall be under no obligation to appoint a Financial Adviser or to seek the advice of a Financial Adviser under this Agreement unless it has been indemnified and/or secured and/or prefunded to its satisfaction.

**18.8    Security Agent's actions**

For the purposes of Clause 18.1 (Facilitation of Distressed Disposals) the Security Agent shall act:

(a)    on the instructions of the group of Primary Creditors entitled at that time to give instructions under Clause 15.2 (Instructions to enforce – Transaction Security), Clause 15.4 (Manner of enforcement – Transaction Security), Clause 15.5 (Enforcement prior to Super Senior Discharge Date) or Clause 15.6 (Enforcement principles prior to Super Senior Discharge Date); or

(b)    in the absence of any such instructions, as the Security Agent sees fit.

**18.9    Cash Cover**

If any Transaction Security proposed to be released under this Clause 18 includes Cash Cover, the Security created or evidenced, or expressed to be created or evidenced, under or pursuant to the relevant document in relation to such Cash Cover shall not be released without the consent of the

•

Security Agent and the Issuing Bank, Ancillary Lender, Bilateral Lender or Cash Management Provider with which that Cash Cover is held (provided that the Security Agent shall not, and no Issuing Bank, Ancillary Lender, Bilateral Lender or Cash Management Provider shall, have any right to consent to, or prevent, any release of any other Transaction Security).

## 19.    MANDATORY PREPAYMENTS

### 19.1    Facilitation of claims

(a)    So long as the requirements of Clause 19.2 (Mandatory prepayment of proceeds) are met (or the Company has confirmed that if and when applicable they will be met), if any contractual, insurance or other claim is to be made, or is made, by a member of the Group prior to a Distress Event and that claim (or the proceeds of any such claim (the **Claim Proceeds**)) is or are expressed to be subject to the Transaction Security, the Security Agent is irrevocably authorised (without any consent, agreement, sanction, authority, instruction, direction, confirmation, payment, certification or other document, request or information from any Creditor, other Secured Party, Third Party Security Provider or Debtor) to:

(i)    give a consent under or release the Transaction Security, or any other claim, over any relevant document, policy or other asset to the extent necessary to allow that member of the Group to make that claim (and to allow each member of the Group to comply with any obligations in respect of that claim and those proceeds under the Primary Financing Documents); and

(ii)    execute and deliver or enter into any such consent under or release of that Transaction Security, or claim, that may, in the discretion of the Company, be necessary or desirable.

### 19.2    Mandatory prepayment of proceeds

Subject to Clause 19.3 (Adjustment of mandatory prepayments), if any Claim Proceeds or any other amounts or proceeds are required to be applied in mandatory prepayment, repurchase or redemption (including any requirement to make an offer to repurchase) or other payment (a **Mandatory Prepayment**) of any Primary Creditor Liabilities or other application of amounts or proceeds is required to be made pursuant to the terms of the Debt Documents, those proceeds or amounts (the **Relevant Proceeds**) shall be applied as required by the terms of the Primary Financing Documents, provided that if:

(a)    those Relevant Proceeds are required to be applied in Mandatory Prepayment of more than one class of Creditors under the Primary Financing Documents and the amount of such Relevant Proceeds is not sufficient to satisfy all such Mandatory Prepayment requirements; or

(b)    there is any conflict between the terms of the Primary Financing Documents with respect to the application of those Relevant Proceeds; or

(c)    compliance with the provisions governing Mandatory Prepayment of Relevant Proceeds in any Primary Financing Document would result in a Default or Event of Default arising under any other Debt Document,

the relevant Debtor may pay those Relevant Proceeds to the relevant Creditors in the order set out in Clause 21.1 (Order of application: Common Recoveries) as though such Relevant Proceeds were

•

Common Recoveries (subject to any right of any Creditor in a Primary Financing Document to decline to receive such Relevant Proceeds) or otherwise in accordance with the terms of any Primary Financing Document and such payment or application shall be deemed to satisfy all obligations of each member of the Group and each Parent Debt Issuer in respect of such Relevant Proceeds under each Primary Financing Document, no consent of any other Party or Creditor shall be required for that application and no Default or Event of Default shall arise under any Debt Document to the extent that such Relevant Proceeds are so applied.

19.3    **Adjustment of mandatory prepayments**

If the making of any Mandatory Prepayment (an **Original Mandatory Prepayment**) would directly or indirectly result in the notional amount of any outstanding Hedging Liabilities exceeding the outstanding principal amount (following such Original Mandatory Prepayment) under any Debt Document to which the Company determines such Hedging Liabilities relate (the **Relevant Debt**), the Company (or the relevant Debtor) may (upon written notice to each relevant Creditor Representative and Bilateral Creditor) reduce the amount of such Mandatory Prepayment so that the aggregate of:

(a)    the reduced Mandatory Prepayment; and

(b)    the amount required to be applied in close-out or termination of the relevant Hedging Liabilities to reduce the notional amount to the outstanding principal amount of the Relevant Debt,

is equal to the amount of the Original Mandatory Prepayment and no Default or Event of Default shall arise under any Debt Document to the extent that any mandatory prepayment is adjusted in accordance with this Clause 19.3.

20.    **FURTHER ASSURANCE – DISPOSALS AND RELEASES**

Each Creditor, Debtor and Third Party Security Provider will:

(a)    do all things that the Security Agent requests in order to give effect to Clause 17 (Non-Distressed Disposals) and Clause 18 (Distressed Disposals) (which shall include, without limitation, the execution of any assignments, transfers, releases or other documents that the Security Agent may consider to be necessary to give effect to the releases or disposals contemplated by those Clauses); and

(b)    if the Security Agent is not entitled to take any of the actions contemplated by those Clauses or if the Security Agent requests that any Creditor, Third Party Security Provider or Debtor take any such action, take that action itself in accordance with the instructions of the Security Agent,

provided that the proceeds of those disposals are applied in accordance with Clause 17 (Non-Distressed Disposals) or Clause 18 (Distressed Disposals) as the case may be.

•

## 21.   APPLICATION OF PROCEEDS

### 21.1   Order of application: Common Recoveries

Subject to Clause 3.9 (Bilateral Lenders: Cash Cover), Clause 21.2 (Liabilities of a Parent Debt Issuer), Clause 21.4 (Prospective liabilities) and Clause 21.5 (Treatment of Cash Cover and Lender Cash Collateral), all amounts from time to time received or recovered by the Security Agent pursuant to the terms of any Debt Document (other than any amount to which Clause 21.3 (Order of application: Parent Debt Recoveries) applies) or in connection with the realisation or enforcement of all or any part of the Transaction Security (for the purposes of this Clause 21, the **Common Recoveries**) shall be held by the Security Agent on trust to apply them at any time as the Security Agent (in its discretion) sees fit, to the extent permitted by applicable law (and subject to the provisions of this Clause 21), in the following order of priority:

(a)   in discharging any sums owing to the Security Agent (other than pursuant to Clause 24.3 (Parallel debt)), any Receiver or any Delegate and in payment to the Creditor Representatives of the relevant Creditor Representative Liabilities;

(b)   in discharging all costs and expenses incurred by any Primary Creditor in connection with any realisation or enforcement of the Transaction Security taken in accordance with the terms of this Agreement or any action taken at the request of the Security Agent under Clause 11.6 (Further assurance – Insolvency Event);

(c)   in payment or distribution to:

    (i)   each Creditor Representative in respect of a Super Senior Facility on its own behalf and on behalf of the Super Senior Facility Lenders for which it is the Creditor Representative and each Bilateral Lender in respect of a Super Senior Facility;

    (ii)   the Cash Management Providers; and

    (iii)   the Super Senior Hedge Counterparties,

for application towards the discharge of (including by way of Cash Cover):

    (A)   the Super Senior Facility Liabilities and the related Arranger Liabilities (in accordance with the terms of the Super Senior Facility Agreements) and if there is more than one Super Senior Facility Agreement on a pro rata basis between the Super Senior Facility Liabilities under each Super Senior Facility Agreement;

    (B)   the Cash Management Liabilities (on a *pro rata* basis between the Cash Management Liabilities of each Cash Management Provider); and

    (C)   the Super Senior Hedging Liabilities (on a *pro rata* basis between the Super Senior Hedging Liabilities of each Super Senior Hedge Counterparty),

on a *pro rata* basis between paragraphs (A), (B) and (C) above;

(d)   in payment or distribution to:

•

**1170**

    (i)      the Creditor Representatives in respect of any Senior Secured Debt Liabilities on its own behalf and on behalf of the Senior Secured Debt Creditors for which it is the Creditor Representative and each Bilateral Lender in respect of a Senior Secured Facility; and

    (ii)     the Senior Secured Hedge Counterparties,

for application towards the discharge of (including by way of Cash Cover):

    (A)    the Senior Secured Facility Liabilities and the related Arranger Liabilities (in accordance with the terms of the relevant Senior Secured Facility Agreements) and if there is more than one Senior Secured Facility Agreement on a pro rata basis between the Senior Secured Facility Liabilities under each Senior Secured Facility Agreement;

    (B)    the Senior Secured Notes Liabilities (in accordance with the terms of the relevant Senior Secured Notes Indentures) and if there is more than one Senior Secured Notes Indenture on a pro rata basis between the Senior Secured Notes Liabilities under each Senior Secured Notes Indenture; and

    (C)    the Senior Secured Hedging Liabilities (on a *pro rata* basis between the Senior Secured Hedging Liabilities of each Senior Secured Hedge Counterparty),

on a *pro rata* basis between paragraphs (A), (B) and (C) above;

(e)    in payment or distribution to the Creditor Representatives in respect of any Second Lien Liabilities on its own behalf and on behalf of the Second Lien Creditors for which it is the Creditor Representative and each Bilateral Lender in respect of a Second Lien Facility, for application towards the discharge of:

    (A)    the Second Lien Facility Liabilities the related Arranger Liabilities (in accordance with the terms of the relevant Second Lien Facility Agreements) and if there is more than one Second Lien Facility Agreement on a pro rata basis between the Second Lien Facility Liabilities under each Second Lien Facility Agreement; and

    (B)    the Second Lien Notes Liabilities (in accordance with the terms of the relevant Second Lien Notes Indentures) and if there is more than one Second Lien Notes Indenture on a pro rata basis between the Second Lien Notes Liabilities under each Second Lien Notes Indenture,

on a *pro rata* basis between paragraphs (A) and (B) above;

(f)    to the extent secured by the Common Transaction Security only, in payment or distribution to the Creditor Representatives in respect of any Parent Debt Liabilities on its own behalf and on behalf of the Parent Debt Creditors for which it is the Creditor Representative and each Bilateral Lender in respect of a Parent Debt Facility, for application towards the discharge of:

    (A)    the Parent Debt Facility Liabilities the related Arranger Liabilities (in accordance with the terms of the relevant Parent Debt Facility Agreements) and if there is more

•

than one Parent Debt Facility Agreement on a pro rata basis between the Parent Debt
Facility Liabilities under each Parent Debt Facility Agreement; and

(B)      the Parent Debt Notes Liabilities (in accordance with the terms of the relevant
Parent Debt Notes Indentures) and if there is more than one Parent Debt Notes
Indenture on a pro rata basis between the Parent Debt Notes Liabilities under each
Parent Debt Notes Indenture,

on a *pro rata* basis between paragraphs (A) and (B) above;

(g)      if none of the Debtors or Third Party Security Providers is under any further actual or
contingent liability under any Primary Debt Document, in payment or distribution to any
person to whom the Security Agent is obliged to pay or distribute in priority to any Debtor
or Third Party Security Provider; and

(h)      the balance, if any, in payment or distribution to the relevant Debtor or Third Party Security
Provider.

## 21.2    Liabilities of a Parent Debt Issuer

Subject to Clause 21.4 (Prospective liabilities), all amounts from time to time received or recovered
by the Security Agent from or in respect of a Parent Debt Issuer pursuant to the terms of any Debt
Document (other than in connection with the realisation or enforcement of all or any part of the
Common Transaction Security or Parent Debt Only Security) shall be held by the Security Agent on
trust to apply them at any time as the Security Agent (in its discretion) sees fits, to the extent
permitted by applicable law (and subject to the provisions of this Clause 21), in the following order
of priority:

(a)      in accordance with paragraph (a) of Clause 21.1 (Order of application: Common
Recoveries);

(b)      in accordance with paragraph (b) of Clause 21.1 (Order of application: Common
Recoveries);

(c)      in accordance with paragraphs (c) to (f) of Clause 21.1 (Order of application: Common
Recoveries) (in each case, only to the extent there are Liabilities due from the relevant
Parent Debt Issuer to such Creditors), provided that payments will be made on a *pro rata*
basis across all Liabilities subject to such paragraphs;

(d)      if none of the Debtors or Third Party Security Providers are under any further actual or
contingent liability under any Primary Debt Document, in payment to any person to whom
the Security Agent is obliged to pay in priority to any Debtor or Third Party Security
Provider; and

(e)      the balance, if any, in payment to the relevant Debtor or Third Party Security Provider.

## 21.3    Order of application: Parent Debt Recoveries

Subject to Clause 21.4 (Prospective liabilities), all amounts from time to time received or recovered
by the Security Agent pursuant to the terms of any Parent Debt Document in connection with any
guarantees provided by a Parent Debt Only Obligor or in connection with the realisation or

•

enforcement of all or any part of the Parent Debt Only Security (for the purposes of this Clause 21, the **Parent Debt Recoveries**) shall be held by the Security Agent on trust to apply them at any time as the Security Agent (in its discretion) sees fit, to the extent permitted by applicable law (and subject to the provisions of this Clause 21), in the following order of priority:

(a)    in discharging any sums owing to the Security Agent (other than pursuant to Clause 24.3 (Parallel debt)), any Receiver or any Delegate and in payment to the Parent Debt Creditor Representatives of the relevant Creditor Representative Liabilities (to the extent they relate to Parent Debt Recoveries);

(b)    in discharging all costs and expenses incurred by any Parent Debt Creditor in connection with any realisation or enforcement of the Parent Debt Only Security taken in accordance with the terms of this Agreement or any action taken at the request of the Security Agent under Clause 11.6 (Further assurance – Insolvency Event);

(c)    in payment or distribution to the Creditor Representatives in respect of any Parent Debt Liabilities on its own behalf and on behalf of the Parent Debt Creditors for which it is the Creditor Representative and each Bilateral Lender in respect of a Parent Debt Facility, for application towards the discharge of:

(A)    the Parent Debt Facility Liabilities the related Arranger Liabilities (in accordance with the terms of the relevant Parent Debt Facility Agreements) and if there is more than one Parent Debt Facility Agreement on a pro rata basis between the Parent Debt Facility Liabilities under each Parent Debt Facility Agreement; and

(B)    the Parent Debt Notes Liabilities (in accordance with the terms of the relevant Parent Debt Notes Indentures) and if there is more than one Parent Debt Notes Indenture on a pro rata basis between the Parent Debt Notes Liabilities under each Parent Debt Notes Indenture,

on a *pro rata* basis between paragraphs (A) and (B) above;

(d)    if none of the Debtors, Third Party Security Providers or Parent Debt Only Obligors is under any further actual or contingent liability under any Parent Debt Document, in payment or distribution to any person to whom the Security Agent is obliged to pay or distribute in priority to any Debtor, Third Party Security Providers or Parent Debt Only Obligor; and

(e)    the balance, if any, in payment or distribution to the relevant Debtor, Third Party Security Providers or Parent Debt Only Obligors.

**21.4    Prospective liabilities**

Following a Distress Event or any enforcement of the Parent Debt Only Security, the Security Agent may, in its discretion, hold any amount of the Recoveries in one or more interest bearing suspense or impersonal accounts in the name of the Security Agent with such financial institution (including itself) as the Security Agent shall think fit (the interest being credited to the relevant account), for so long as the Security Agent shall think fit (or until otherwise directed by an Instructing Group (or the Majority Parent Debt Creditors in the case of Parent Debt Only Security)) for later application under Clause 21.1 (Order of application: Common Recoveries) or Clause 21.3 (Order of application: Parent Debt Recoveries) (as the case may be) in respect of:

•

**1173**

(a)      any sum to the Security Agent, any Receiver or any Delegate; and

(b)      any part of the Liabilities,

that the Security Agent reasonably considers, in each case, might become due or owing at any time in the future.

## 21.5   Treatment of Cash Cover and Lender Cash Collateral

(a)      Nothing in this Agreement shall prevent any Issuing Bank or Ancillary Lender or Cash Management Provider taking any Enforcement Action in respect of any Cash Cover which has been provided for it in accordance with the relevant Facility Agreement or Cash Management Agreement.

(b)      To the extent that any Cash Cover is not held with the Relevant Issuing Bank or Relevant Ancillary Lender or Relevant Cash Management Provider, all amounts from time to time received or recovered in connection with the realisation or enforcement of that Cash Cover shall be paid to the Security Agent and shall be held by the Security Agent on trust to apply them at any time as the Security Agent (in its discretion) sees fit, to the extent permitted by applicable law, in the following order of priority:

(i)      to the Relevant Issuing Bank or Relevant Ancillary Lender or Relevant Cash Management Provider towards the discharge of the Liabilities for which that Cash Cover was provided; and

(ii)     the balance, if any, in accordance with Clause 21.1 (Order of application: Common Recoveries).

(c)      To the extent that any Cash Cover is held with the Relevant Issuing Bank or Relevant Ancillary Lender or Relevant Cash Management Provider, nothing in this Agreement shall prevent that Relevant Issuing Bank or Relevant Ancillary Lender or Relevant Cash Management Provider receiving and retaining any amount in respect of that Cash Cover.

(d)      Nothing in this Agreement shall prevent any Issuing Bank receiving and retaining any amount in respect of any Lender Cash Collateral provided for it in accordance with the relevant Facility Agreement.

## 21.6   Investment of cash proceeds

Prior to the application of the proceeds of the Transaction Security Property or Parent Debt Only Security Property in accordance with Clause 21.1 (Order of application: Common Recoveries) or Clause 21.3 (Order of application: Parent Debt Recoveries) (as the case may be), until otherwise directed by an Instructing Group (or the Majority Parent Debt Creditors in the case of Parent Debt Only Security), the Security Agent may, in its discretion, hold all or part of any cash proceeds in one or more interest bearing suspense or impersonal accounts in the name of the Security Agent with such financial institution (including itself) and for so long as the Security Agent shall think fit (the interest being credited to the relevant account) or until otherwise directed by an Instructing Group (or the Majority Parent Debt Creditors in the case of Parent Debt Only Security) pending the application from time to time of those monies in the Security Agent's discretion in accordance with the provisions of this Clause 21.

•

**21.7    Currency conversion**

(a)    For the purpose of, or pending the discharge of, any of the Common Secured Obligations, the Priority Creditor Secured Obligations or the Parent Debt Only Secured Obligations the Security Agent may:

(i)    convert any moneys received or recovered by the Security Agent (including, without limitation, any cash proceeds) from one currency to another, at the Security Agent's Spot Rate of Exchange; and

(ii)    notionally convert the valuation provided in any opinion or valuation from one currency to another, at the Security Agent's Spot Rate of Exchange.

(b)    The obligations of any Debtor or Third Party Security Provider to pay in the due currency shall only be satisfied:

(i)    in the case of paragraph (a)(i) above, to the extent of the amount of the due currency purchased after deducting the costs of conversion; and

(ii)    in the case of paragraph (a)(ii) above, to the extent of the amount of the due currency which results from the notional conversion referred to in that paragraph.

**21.8    Permitted Deductions**

The Security Agent shall be entitled, in its discretion, (a) to set aside by way of reserve amounts required to meet and (b) to make and pay, any deductions and withholdings (on account of Taxes or otherwise) which it is or may be required by any applicable law or regulation to make from any distribution or payment made by it under this Agreement, and to pay all Taxes which may be assessed against it in respect of any of the Charged Property or the Parent Debt Only Charged Property, or as a consequence of performing its duties or exercising its rights, powers, authorities and discretions, or by virtue of its capacity as the Security Agent under any of the Debt Documents or otherwise (other than in connection with its remuneration for performing its duties under this Agreement).

**21.9    Good Discharge**

(a)    Any distribution or payment to be made in respect of the Common Secured Obligations, the Priority Creditor Secured Obligations or the Parent Debt Only Secured Obligations by the Security Agent:

(i)    may be made to the relevant Creditor Representative on behalf of its Primary Creditors;

(ii)    may be made to the Relevant Issuing Bank or Relevant Ancillary Lender or Relevant Cash Management Provider in accordance with paragraph (b)(i) of Clause 21.5 (Treatment of Cash Cover and Lender Cash Collateral); or

(iii)    shall be made directly to the Bilateral Creditors.

(b)    Any distribution or payment made as described in paragraph (a) above shall be a good discharge, to the extent of that payment or distribution, by the Security Agent.

•

(c)    The Security Agent is under no obligation to make the payments to any person under paragraph (a) above in the same currency as that in which the Liabilities owing to the relevant Primary Creditor are denominated pursuant to the relevant Debt Document.

**21.10    Calculation of Amounts**

For the purpose of calculating any person's share of any amount payable to or by it, the Security Agent shall be entitled to:

(a)    notionally convert the Liabilities owed to any person into a common base currency (decided in its discretion by the Security Agent), that notional conversion to be made at the spot rate at which the Security Agent is able to purchase the notional base currency with the actual currency of the Liabilities owed to that person at the time at which that calculation is to be made; and

(b)    assume that all amounts received or recovered as a result of the enforcement or realisation of any Transaction Security Property or Parent Debt Only Security Property are applied in discharge of the Liabilities in accordance with the terms of the Debt Documents under which those Liabilities have arisen.

**22.    EQUALISATION**

**22.1    Equalisation Definitions**

**Enforcement Date** means the first date (if any) on which a Primary Creditor takes enforcement action of the type described in paragraphs (a)(i), (a)(iii), (a)(iv) or (c) of the definition of **Enforcement Action** in accordance with the terms of this Agreement.

**Exposure** means:

(a)    in relation to a Lender under a particular Primary Financing Document, the aggregate amount of its participation (if any, and without double counting) in all Utilisations outstanding under that Primary Financing Document at the Enforcement Date (assuming all contingent liabilities which have become actual liabilities since the Enforcement Date to have been actual liabilities at the Enforcement Date (but not including, for these purposes only, any interest that would have accrued from the Enforcement Date to the date of actual maturity in respect of those liabilities) and assuming any transfer of claims between Lenders pursuant to any loss-sharing arrangement in that Primary Financing Document which has taken place since the Enforcement Date to have taken place at the Enforcement Date) together with the aggregate amount of all accrued interest, fees and commission owed to it under that Primary Financing Document and amounts owed to it by a Debtor in respect of any Ancillary Facility under that Primary Financing Document and all other Primary Creditor Liabilities owed by the Debtors to that Lender under that Primary Financing Document to the extent not already taken into account in this paragraph, but excluding:

(i)    any amount owed to it by a Debtor in respect of any Ancillary Facility under that Primary Financing Document to the extent that that amount would not be outstanding but for a breach by that Lender of any provision of that Primary Financing Document relating to that Ancillary Facility;

•

(ii)     any amount owed to it by a Debtor in respect of any Ancillary Facility under that Primary Financing Document to the extent (and in the amount) that Cash Cover has been provided by a Debtor in respect of that amount and is available to that Lender pursuant to the relevant Cash Cover Document; and

(iii)    any amount outstanding in respect of a Letter of Credit to the extent (and in the amount) that Cash Cover has been provided by a Debtor in respect of that amount and is available to the party it has been provided for pursuant to the relevant Cash Cover Document;

(b)     in relation to a Cash Management Provider, its Cash Management Facility Outstandings;

(c)     in relation to a Noteholder, the Liabilities under the relevant Notes Indenture owed by the Debtors or, as the case may be, Third Party Security Provider to that Noteholder; and

(d)     in relation to a Hedge Counterparty:

(i)     if that Hedge Counterparty has terminated or closed out any hedging transaction under any Hedging Agreement in accordance with the terms of this Agreement on or prior to the Enforcement Date, the amount, if any, payable to it under that Hedging Agreement in respect of that termination or close-out as of the date of termination or close-out (taking into account any interest accrued on that amount) to the extent that amount is unpaid at the Enforcement Date; and

(ii)    if that Hedge Counterparty has not terminated or closed out any hedging transaction under any Hedging Agreement on or prior to the Enforcement Date:

(A)     if the relevant Hedging Agreement is based on an ISDA Master Agreement the amount, if any, which would be payable to it under that Hedging Agreement in respect of that hedging transaction if the Enforcement Date was deemed to be an Early Termination Date (as defined in the relevant ISDA Master Agreement) for which the relevant Debtor is the Defaulting Party (as defined in the relevant ISDA Master Agreement); or

(B)     if the relevant Hedging Agreement is not based on an ISDA Master Agreement, the amount, if any, which would be payable to it under that Hedging Agreement in respect of that hedging transaction if the Enforcement Date was deemed to be the date on which an event similar in meaning and effect (under that Hedging Agreement) to an Early Termination Date (as defined in any ISDA Master Agreement) occurred under that Hedging Agreement for which the relevant Debtor is in a position similar in meaning and effect (under that Hedging Agreement) to that of a Defaulting Party (under and as defined in the same ISDA Master Agreement),

that amount, in each case, to be certified by the relevant Hedge Counterparty and as calculated in accordance with the relevant Hedging Agreement.

**Utilisation** means a "Utilisation" or "Undertaking" (or substantially equivalent term) under and as defined in the relevant Primary Financing Document.

•

## 22.2    Implementation of equalisation

(a)    The provisions of this Clause 22 shall be applied at such time or times after the Enforcement Date as the Security Agent shall consider appropriate.

(b)    Without prejudice to the generality of paragraph (a) above, if the provisions of this Clause 22 have been applied before all the Liabilities have matured and/or been finally quantified, the Security Agent may elect to re-apply those provisions on the basis of revised Exposures and the relevant Creditors in the same Creditor Class shall make appropriate adjustment payments amongst themselves.

## 22.3    Equalisation

If, for any reason, any Liabilities of any Creditor Class remain unpaid after the Enforcement Date and the resulting losses are not borne by the Primary Creditors in that Creditor Class in the proportions which their respective Exposures at the Enforcement Date bore to the aggregate Exposures of all the Primary Creditors in that Creditor Class at the Enforcement Date, the Primary Creditors in that Creditor Class will make such payments amongst themselves as the Security Agent shall require to put the Primary Creditors in that Creditor Class in such a position that (after taking into account such payments) those losses are borne in those proportions.

## 22.4    Turnover of enforcement proceeds

If:

(a)    the Security Agent or a Creditor Representative is not entitled, for reasons of applicable law, to pay or distribute amounts received pursuant to the making of a demand under any guarantee, indemnity or other assurance against loss or the enforcement of the Transaction Security (or in the case of the Parent Debt Creditors only, the Parent Debt Only Security) to the relevant Primary Creditors but is entitled to pay or distribute those amounts to Creditors (such Creditors, the **Receiving Creditors**) who, in accordance with the terms of this Agreement, are subordinated in right and priority of payment to the relevant Primary Creditors; and

(b)    the applicable Discharge Date in respect of the Liabilities of the relevant Primary Creditors to whom the Security Agent did not make that payment or distribution has not yet occurred (nor would occur after taking into account such payments),

then the Receiving Creditors shall make such payments or distributions to the relevant Primary Creditors as the Security Agent shall require to place the relevant Primary Creditors in the position they would have been in had such amounts been available for application against the relevant Primary Creditor Liabilities, provided that this Clause 22.4 shall not apply to any receipt or recovery that has been distributed by a Notes Trustee in accordance with the applicable Notes Indenture unless that Notes Trustee had received at least two Business Days' prior notice that an Enforcement Date, an Acceleration Event or an Insolvency Event in relation to a Debtor or a Third Party Security Provider has occurred or that the receipt or recovery falls within Clause 12.3 (Turnover by the First Lien Creditors) or Clause 12.4 (Turnover by Creditors other than the First Lien Creditors) in each case prior to distribution of the relevant amount.

**22.5    Notification of Exposure**

Before each occasion on which it intends to implement the provisions of this Clause 22, the Security Agent shall send a notice to each Bilateral Creditor and Creditor Representative requesting that it notify the Security Agent of, respectively, its Exposure and the Exposure of each Creditor represented by it (if any).

**22.6    Default in payment**

If a Creditor fails to make a payment due from it under this Clause 22, the Security Agent shall be entitled (but not obliged) to take action on behalf of the Creditor(s) to whom such payment was to be redistributed (subject to being indemnified to its satisfaction by such Creditor(s) in respect of costs) but shall have no liability or obligation towards such Creditor(s), or any other Primary Creditor as regards such default in payment and any loss suffered as a result of such default shall lie where it falls.

**23.    ADDITIONAL REGULATED DEBT**

**23.1    Additional Regulated Debt**

(a)    Notwithstanding anything to the contrary in this Agreement or a Security Document, each Party irrevocably agrees that any indebtedness or facility (including any indebtedness or facility entered into before the date of this Agreement or already subject to this Agreement) of any member of the Group or any Parent Debt Issuer which is not otherwise prohibited by the terms of the Primary Financing Documents may:

(i)    be treated and designated as any class of Primary Creditor Liabilities or, subject to Clause 2.8 (Anti-layering), otherwise rank pari passu or junior to any other Primary Creditor Liabilities;

(ii)    subject to Clause 23.2 (Security: Additional Regulated Debt), be secured by any Transaction Security and/or Parent Debt Only Security as applicable; and

(iii)    be treated and rank as such for the purposes of this Agreement,

(any such indebtedness being **Additional Regulated Debt**).

(b)    On the date on which each Creditor and each Creditor Representative in respect of any Additional Regulated Debt (and any other required person) accedes to this Agreement in the required capacity and the Company designates that Additional Regulated Debt as the relevant class of Primary Creditor Liabilities, in each case, in accordance with Clause 26 (Changes to the Parties) (or such later date as agreed between the Company and the Security Agent), the Liabilities in respect of that Additional Regulated Debt shall become subject to the terms of this Agreement as so designated.

**23.2    Security: Additional Regulated Debt**

Notwithstanding anything to the contrary in any other Debt Document, the Parties agree that, in order to facilitate any Additional Regulated Debt, each Creditor Representative and the Security Agent (and any other Creditor party to a Transaction Security Document or a Parent Debt Only Security Document (as the case may be)) are authorised and instructed by all Creditors (and in each case are obliged at the request and cost of the Company) to enter into any new Security Document

•

(including any Lower Ranking Security), amend or waive any terms of an existing Security Document and/or release any asset from any Transaction Security or Parent Debt Only Security and/or to effect the ranking and priority of the guarantees and Security of the Additional Regulated Debt provided that:

(a)     any new Transaction Security or Parent Debt Only Security in relation to such Additional Regulated Debt is not prohibited by the terms of the Primary Financing Documents and is granted otherwise in accordance with this Agreement and the Primary Financing Documents; and

(b)     any release of Transaction Security or Parent Debt Only Security shall only be undertaken:

   (i)     (x) if required by the terms or conditions of the Additional Regulated Debt, or (y) to the extent necessary under applicable law to give effect to the ranking set out in Clause 2 (Ranking and Priority), or (z) where the Company has confirmed in writing to the Security Agent that it has determined in good faith (taking into account any applicable legal limitations and other relevant considerations in relation to the Additional Regulated Debt) that it is either not possible or not commercially feasible to implement the Additional Regulated Debt on terms satisfactory to the Company by instead granting additional Transaction Security or Parent Debt Only Security (as the case may be) and/or amending the terms of the existing Transaction Security Document or Parent Debt Only Security Document (as the case may be); and

   (ii)     if, promptly upon giving effect to that release, replacement Transaction Security or Parent Debt Only Security (as the case may be) is, subject to applicable law, the Debt Documents, the Agreed Security Principles, Guarantee Limitations and other terms of this Agreement, granted over the released assets on substantially the same terms as the Transaction Security or Parent Debt Only Security released (except that it shall also secure the Additional Regulated Debt).

(c)     Each of the Secured Parties agrees:

   (i)     not to take any action to challenge the validity or enforceability of the additional Transaction Security or Parent Debt Only Security by reason of it being Lower Ranking Security;

   (ii)     that additional Transaction Security may be granted by any Debtor in order to secure all or any part of any Hedging Liabilities and/or any Additional Regulated Debt; and

   (iii)     that additional Parent Debt Only Security may be granted by any Parent Debt Only Obligor in order to secure all or part of any Additional Regulated Debt that is designated as Parent Debt Liabilities.

**23.3     Further assurance**

(a)     The Creditors (or a Creditor Representative on their behalf) will (at the cost of the Company) enter into any documentation required by the Company to ensure that any obligations and liabilities incurred by the Debtors in respect of such Additional Regulated Debt will share in the relevant Transaction Security or Parent Debt Only Security and/or have the ranking permitted to be conferred upon it in accordance with the relevant Primary Debt Documents (including, without limitation, executing any amendment to this Agreement, entering into any additional or replacement

**1180**

intercreditor agreement and any other Primary Debt Documents to reflect, enable and/or facilitate any such Additional Regulated Debt to be incurred).

(b)    Each Primary Creditor authorise its Creditor Representative (if applicable) to enter into any release document in connection with a full repayment, prepayment or refinancing of that Creditor's Primary Creditor Liabilities.

**23.4**    **Debtor and Third Party Security Provider confirmations**

(a)    For the purpose of this Clause 23.4, **Relevant Secured Liabilities** means, in relation to any Security Document, the relevant Liabilities secured by that Security Document and, in relation to any Primary Debt Document, the relevant Liabilities guaranteed by that Primary Debt Document.

(b)    Each Debtor, Third Party Security Provider and Parent Debt Only Obligor confirms its intention that:

    (i)    any amendment to a Primary Debt Document which is not prohibited by this Agreement or otherwise made in accordance with this Agreement is within the scope of the Relevant Secured Liabilities; and

    (ii)    the Relevant Secured Liabilities extend to any amount payable by it under or in connection with the relevant Primary Debt Document as amended.

(c)    Each Debtor, Third Party Security Provider and Parent Debt Only Obligor agrees that the confirmations in paragraph (b) above apply regardless of:

    (i)    why or how a Primary Debt Document is amended (including the extent of the amendment and any change in or addition to the parties);

    (ii)    whether any amount payable by a Debtor under or in connection with the amended Primary Debt Document in any way relates to any amount that would or may have been payable had the amendment not taken place;

    (iii)    the extent to which its liability under any Primary Debt Document (whether present or future, actual or contingent), or any right it may have as a result of entering into or performing its obligations under any Primary Debt Document, changes or may change as a result of the amendment; and

    (iv)    whether it was aware of or consented to the amendment.

(d)    Each Debtor, Third Party Security Provider and Parent Debt Only Obligor further acknowledges and agrees that (to the extent permitted by the terms of the Primary Debt Documents):

    (i)    the Relevant Secured Liabilities are intended to cover all obligations of the relevant class(es) owing to the relevant Secured Parties under the relevant Primary Debt Document from time to time (including any Additional Regulated Debt); and

    (ii)    the Security created under the relevant Security Document is intended as security for the payment and discharge of all of the Relevant Secured Liabilities without the need for any amendment to the relevant Security Document or for any supplemental, confirmatory or subsequent ranking security document.

•

(e)    Each Debtor, Third Party Security Provider and Parent Debt Only Obligor further acknowledges and agrees that paragraphs (b) to (d) above shall apply (to the extent permitted by the terms of the Primary Debt Documents) whether or not:

(i)    any of the Relevant Secured Liabilities or Primary Debt Documents exist on the date of the relevant Security Document (or, as the case may be, the date on which it became a party to the relevant Security Document);

(ii)    the amount of the Relevant Secured Liabilities is increased or the terms of any of the Primary Debt Documents are more onerous (including in relation to the interest rate and other pricing terms);

(iii)    any additional obligations are added to the Relevant Secured Liabilities by way of designating a document as a Primary Debt Document or any person as a Secured Party, and whether or not that document or person is designated directly, or indirectly as a result of that document or person being of a type or class which falls within the then current definition of Primary Debt Documents or Secured Party;

(iv)    that Debtor, Third Party Security Provider and Parent Debt Only Obligor or any person incurring the Relevant Secured Liabilities is a party to the Primary Debt Documents on the date of the relevant Security Document (or, as the case may be, the date on which it became a party to the relevant Security Document);

(v)    any of the Secured Parties changes (including a change to all or substantially all of the Secured Parties) or any amendment is made to the definition of Secured Party (or any defined term in any Primary Debt Document that is referred to in the definition of Secured Party to include an additional person as a Secured Party); or

(vi)    any change increases the likelihood that any Security will be enforced.

(f)    Notwithstanding paragraphs (b) to (e) above, none of the Relevant Secured Liabilities shall extend to any Primary Liabilities (including any Additional Regulated Debt) which are not originally contemplated by the relevant Security Document or Primary Debt Document without the consent of the Company and any extension of the Relevant Secured Liabilities contemplated by paragraphs (b) to (e) above shall be subject to the applicable Guarantee Limitations and the Agreed Security Principles.

(g)    Each Debtor, Third Party Security Provider and Parent Debt Only Obligor irrevocably authorises the Company to give effect to the terms of or facilitate the implementation, assumption or establishment of any Additional Regulated Debt entered into or assumed in compliance with this Agreement.

## 24.    THE SECURITY AGENT

### 24.1    Appointment by Secured Parties

Each Secured Party (other than the Security Agent) irrevocably appoints the Security Agent to act as its security agent, trustee, joint and several creditor and/or beneficiary of a parallel debt under Clause 24.3 (Parallel debt) (as the case may be) under this Agreement and with respect to the applicable Primary Debt Documents, and irrevocably authorises the Security Agent to:

•

(a)     execute each Primary Debt Document expressed to be executed by the Security Agent on its behalf and execute any releases and any other documents, instruments or notices to be executed by the Security Agent as contemplated by the terms of this Agreement or any applicable Primary Debt Document; and

(b)     to perform such duties, obligations and responsibilities and to exercise such rights, powers, authorities and discretions under this Agreement and the applicable Primary Debt Documents as are specifically delegated to the Security Agent by the terms of this Agreement and the other Primary Debt Documents, together with such rights, powers, authorities and discretions as are reasonably incidental thereto

## 24.2    Security Agent as trustee

(a)     The Security Agent declares that it holds the Priority Creditor Security Property on trust for the Priority Secured Parties, the Common Security Property on trust for the Priority Secured Parties and the Parent Debt Secured Parties and the Parent Debt Only Security Property on trust for the Parent Debt Secured Parties, in each case, on the terms contained in this Agreement.

(b)     Paragraph (a) above shall not apply in respect of any Excluded Security Document (as defined in Clause 24.3 (Parallel debt)).

## 24.3    Parallel debt

(a)     In this Clause 24.3:

**Excluded Security Documents** means:

(a)     any Transaction Security Document or Parent Debt Only Security Document which is governed by German law or Russian law; and

(b)     any other Transaction Security Document or Parent Debt Only Security Document governed by any other law agreed by the Company and the Security Agent for this purpose from time to time.

**Secured Party Claim** means, in relation to a Debtor or a Parent Debt Only Obligor, any amount which that Debtor or a Parent Debt Only Obligor owes to a Secured Party under or in connection with the Primary Debt Documents (other than any Security Agent Claim).

**Security Agent Claim** means, in relation to a Debtor or a Parent Debt Only Obligor, the amounts which that Debtor or Parent Debt Only Obligor owes to the Security Agent under paragraph (b) below.

(b)     Subject to the Guarantee Limitations, each Debtor and each Parent Debt Only Obligor shall pay to the Security Agent, as an independent and separate creditor, an amount equal to, and in the currency of, the amount of that Debtor's or that Parent Debt Only Obligor's Secured Party Claim as and when those amounts are due.

(c)     Unless expressly provided to the contrary in any Debt Document and without prejudice to Clause 24.2 (Security Agent as trustee), the Security Agent holds:

(i)     any Security created by an Excluded Security Document;

•

(ii)    the benefit of any Security Agent Claims; and

(iii)    all proceeds of the Transaction Security and the Parent Debt Only Security,

for the benefit, and as the property, of the Secured Parties (on the terms contained in this Agreement) and so that they are not available to the personal creditors of the Security Agent.

(d)    For the purposes of this Clause 24.3, the Security Agent acts in its own name and not as an agent, representative or a trustee, and its claims in respect of the Security Agent Claim shall not be held on trust. The Transaction Security and the Parent Debt Only Security granted to the Security Agent to secure the Security Agent Claim is granted to the Security Agent in its capacity as creditor of the Security Agent Claim and shall not be held on trust.

(e)    The Security Agent may enforce performance of any Security Agent Claim in its own name as an independent and separate right.  This includes, without limitation, any filing, suit, execution, enforcement of security or any Transaction Security Document or Parent Debt Only Security Document, recovery of guarantees and applications for and voting in respect of any kind of insolvency proceeding.

(f)    Each Secured Party shall, at the request of the Security Agent:

(i)    do anything required in connection with the enforcement of any Security Agent Claim (including, without limitation, joining in any proceedings with the Security Agent); and

(ii)    enforce its Secured Party Claim,

in each case, only to the extent that that enforcement is in accordance with the terms of this Agreement.

(g)    Each Debtor and Parent Debt Only Obligor irrevocably and unconditionally waives any right it may have to require a Secured Party to join in any proceedings with the Security Agent in respect of any Security Agent Claim.

(h)    The Security Agent Claim owed by each Debtor and each Parent Debt Only Obligor shall be decreased and discharged automatically in the same amount to the extent that the corresponding Secured Party Claim owed by it is irrevocably paid or otherwise discharged.

(i)    The Secured Party Claim owed by each Debtor and each Parent Debt Only Obligor shall be decreased and discharged automatically in the same amount to the extent that the corresponding Security Agent Claim owed by it is irrevocably paid or otherwise discharged.

(j)    The aggregate amount of the Security Agent Claims will never exceed the aggregate amount of Secured Party Claims.

(k)    A defect affecting a Security Agent Claim against a Debtor or a Parent Debt Only Obligor will not affect any Secured Party Claim and a defect affecting a Secured Party Claim against a Debtor or a Parent Debt Only Obligor will not affect any Security Agent Claim.

(l)    If the Security Agent returns to any Debtor or Parent Debt Only Obligor, whether in any kind of insolvency proceedings or otherwise, any recovery in respect of which it has made a payment to a Secured Party, that Secured Party shall pay an amount equal to that recovery to the Security Agent.

•

(m)   Without limiting or affecting the Security Agent's rights against the Debtors and the Parent Debt Only Obligors under the Debt Documents, each Debtor and Parent Debt Only Obligor acknowledges that:

   (i)    nothing in this Clause 24.3 shall impose any obligation on the Security Agent to advance any amount to any Debtor or Parent Debt Only Obligor or otherwise under any Debt Document, except, if applicable, in its capacity as a Primary Creditor; and

   (ii)    for the purpose of any vote taken under any Debt Document, the Security Agent shall not be regarded as having any participation or commitment other than, if applicable, those which it has in its capacity as a Primary Creditor.

(n)   All amounts received or recovered by the Security Agent pursuant to this Clause 24.3 and all amounts received or recovered by the Security Agent from or by the enforcement of any Transaction Security or Parent Debt Only Security granted to secure the Security Agent Claims shall be applied in accordance with Clause 21.1 (Order of application: Common Recoveries) or 21.3 (Order of application: Parent Debt Recoveries) as the case may be.

(o)   Unless a Security Document explicitly states that it is intended to be a Common Transaction Security Document or a Parent Debt Only Security Document, that Security Document shall only secure Secured Party Claims owed by a Debtor to a Priority Secured Party.

## 24.4    German Transaction Security

(a)   The Security Agent shall:

   (i)    hold and administer any Security governed by German law which is security assigned (*Sicherungseigentum/Sicherungsabtretung*) or otherwise transferred under a non-accessory security right (*nicht-akzessorische Sicherheit*) to it as trustee for the benefit of the Secured Parties; and

   (ii)    administer any Security governed by German law which is pledged (*Verpfändung*) or otherwise transferred to any Secured Party under an accessory security right (*akzessorische Sicherheit*) as agent.

(b)   Each Secured Party (other than the Security Agent) hereby authorises the Security Agent (whether or not by or through employees or agents) and grants power of attorney (*Vollmacht*) to the Security Agent:

   (i)    to exercise such rights, remedies, powers and discretions as are specifically delegated to or conferred upon the Security Agent under the Security Documents governed by German law together with such powers and discretions as are reasonably incidental thereto including, without limitation, to realise and enforce the relevant Security in accordance with the relevant provisions of this Agreement and the Transaction Security Documents governed by German law; and

   (ii)    to take such action on its behalf as may from time to time be authorised under or in accordance with the Security Documents governed by German law, including, without limitation, the release, cancellation or termination of any collateral under the Security Documents governed by German law.

•

(c)     For the avoidance of doubt, none of the above functions of a trustee holding and/or administering Security governed by German law shall be qualified as an English law "trust" but as a German law governed "Treuhand".

**24.5    Instructions**

(a)     The Security Agent shall:

    (i)     subject to paragraphs (d) and (e) below, exercise or refrain from exercising any right, power, authority or discretion vested in it as Security Agent, or as holder of a Security Agent Claim, in accordance with any instructions given to it by the Instructing Group (or, if this Agreement stipulates the matter is a decision for any other Creditor or group of Creditors, from that Creditor or group of Creditors); and

    (ii)     not be liable for any act (or omission) if it acts (or refrains from acting) in accordance with paragraph (i) above (or, if this Agreement stipulates the matter is a decision for any other Creditor or group of Creditors, in accordance with instructions given to it by that Creditor or group of Creditors).

(b)     The Security Agent shall be entitled to request instructions, or clarification of any instruction, from the Instructing Group (or, if this Agreement stipulates the matter is a decision for any other Creditor or group of Creditors, from that Creditor or group of Creditors) as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Security Agent may refrain from acting unless and until it receives those instructions or that clarification.

(c)     Save in the case of decisions stipulated to be a matter for any other Creditor or group of Creditors under this Agreement and unless a contrary intention appears in this Agreement, any instructions given to the Security Agent by the Instructing Group (or, if this Agreement stipulates the matter is a decision for any other Creditor or group of Creditors, from that Creditor or group of Creditors) shall override any conflicting instructions given by any other Parties and will be binding on all Secured Parties.

(d)     Paragraph (a) above shall not apply:

    (i)     where a contrary indication appears in this Agreement;

    (ii)     where this Agreement requires the Security Agent to act in a specified manner or to take a specified action;

    (iii)     in respect of any provision which protects the Security Agent's own position in its personal capacity as opposed to its role of Security Agent for the Secured Parties including, without limitation, Clauses 24.8 (No duty to account) to Clause 24.13 (Exclusion of liability), Clause 24.16 (Confidentiality) to Clause 24.23 (Custodians and nominees) and Clause 24.26 (Acceptance of title) to Clause 24.29 (Disapplication of Trustee Acts);

    (iv)     in respect of the exercise of the Security Agent's discretion to exercise a right, power or authority under any of:

        (A)     Clause 17 (Non-Distressed Disposals);

        (B)     Clause 21.1 (Order of application: Common Recoveries);

(C)     Clause 21.4 (Prospective liabilities);

(D)     Clause 21.5 (Treatment of Cash Cover and Lender Cash Collateral); and

(E)     Clause 21.8 (Permitted Deductions).

(e)     If giving effect to instructions given by the Instructing Group (or, if this Agreement stipulates the matter is a decision for any other Creditor or group of Creditors, from that Creditor or group of Creditors) would (in the Security Agent's opinion) have an effect equivalent to an Intercreditor Amendment, the Security Agent shall not act in accordance with those instructions unless consent to it so acting is obtained from each Party (other than the Security Agent) whose consent would have been required in respect of that Intercreditor Amendment.

(f)     In exercising any discretion to exercise a right, power or authority under the Debt Documents where either:

(i)     it has not received any instructions as to the exercise of that discretion; or

(ii)    the exercise of that discretion is subject to paragraph (d)(iv) above,

the Security Agent shall:

(A)     other than where paragraph (B) below applies, do so having regard to the interests of all the relevant Secured Parties; and

(B)     if (in its opinion) there is a Creditor Conflict in relation to the matter in respect of which the discretion is to be exercised, do so having regard only to the interests of all the Priority Secured Parties.

(g)     The Security Agent may refrain from acting in accordance with any instructions of any Creditor or group of Creditors until it has received any indemnification and/or security that it may in its discretion require (which may be greater in extent than that contained in the Debt Documents and which may include payment in advance) for any cost, loss or liability (together with any applicable VAT) which it may incur in complying with those instructions.

(h)     Without prejudice to the provisions of Clause 15 (Enforcement of Transaction Security), Clause 16 (Enforcement of Parent Debt Only Security) and the remainder of this Clause 24.5, in the absence of instructions, the Security Agent may (but shall not be obliged to) act (or refrain from acting) as it considers in its discretion to be appropriate.

**24.6    Duties of the Security Agent**

(a)     The Security Agent's duties under the Debt Documents are solely mechanical and administrative in nature.

(b)     The Security Agent shall promptly:

(i)     forward to each Creditor Representative and to each Bilateral Creditor a copy of any document received by the Security Agent from any Debtor under any Debt Document; and

(ii)     forward to a Party the original or a copy of any document which is delivered to the Security Agent for that Party by any other Party.

(c)    Except where a Debt Document specifically provides otherwise, the Security Agent is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(d)    Without prejudice to Clause 29.3 (Notification of prescribed events), if the Security Agent receives notice from a Party referring to any Debt Document, describing a Default and stating that the circumstance described is a Default, it shall promptly notify each Creditor Representative and each Bilateral Creditor.

(e)    To the extent that a Party (other than the Security Agent) is required to calculate a Common Currency Amount, the Security Agent shall upon a request by that Party, promptly notify that Party of the Security Agent's Spot Rate of Exchange.

(f)    The Security Agent shall have only those duties, obligations and responsibilities expressly specified in the Debt Documents to which it is expressed to be a party (and no others shall be implied).

**24.7    No fiduciary duties**

Nothing in this Agreement constitutes the Security Agent as an agent, trustee or fiduciary of any Debtor, Third Party Security Provider, Parent Debt Only Obligor or any Subordinated Creditor.

**24.8    No duty to account**

The Security Agent shall not be bound to account to any other Secured Party for any sum or the profit element of any sum received by it for its own account.

**24.9    Business with the Company and the Group**

The Security Agent may accept deposits from, lend money to and generally engage in any kind of banking or other business with any member of the Group, Third Party Security Provider or Parent Debt Only Obligor.

**24.10   Rights and discretions**

(a)    The Security Agent may:

(i)     rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorised;

(ii)    assume that:

(A)    any instructions received by it from the Instructing Group, any Creditors or any group of Creditors are duly given in accordance with the terms of the Debt Documents;

(B)    unless it has received notice of revocation, that those instructions have not been revoked and no revocation of any such instructions shall affect any actions taken by

the Security Agent in reliance on such instructions prior to actual receipt of a written notice of revocation; and

    (C)    if it receives any instructions to act in relation to the Transaction Security or the Parent Debt Only Security, that all applicable conditions under the Debt Documents for so acting have been satisfied; and

(iii)    rely on a certificate from any person:

    (A)    as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

    (B)    to the effect that such person approves of any particular dealing, transaction, step, action or thing,

as sufficient evidence that that is the case and, in the case of paragraph (A) above, may assume the truth and accuracy of that certificate.

(b)    The Security Agent may assume (unless it has received notice to the contrary in its capacity as security trustee or security agent for the relevant Secured Parties) that:

(i)    no Default, Event of Default, termination event (however described) or Acceleration Event has occurred and no Debtor or other person is in breach of a default under its obligations under any of the Debt Documents;

(ii)    any right, power, authority or discretion vested in any Party or any group of Creditors has not been exercised; and

(iii)    any notice made by the Company is made on behalf of and with the consent and knowledge of all the Debtors, the Third Party Security Providers and the Parent Debt Only Obligors.

(c)    The Security Agent may engage and pay for the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts.

(d)    Without prejudice to the generality of paragraph (c) above or paragraph (e) below, the Security Agent may at any time engage and pay for the services of any lawyers to act as independent counsel to the Security Agent (and so separate from any lawyers instructed by any Primary Creditor) if the Security Agent in its reasonable opinion deems this to be desirable.

(e)    The Security Agent may rely on the advice or services of any lawyers, accountants, tax advisers, surveyors or other professional advisers or experts (whether obtained by the Security Agent or by any other Party) and shall not be liable for any damages, costs or losses to any person, any diminution in value or any liability whatsoever arising as a result of its so relying.

(f)    The Security Agent, any Receiver and any Delegate may act in relation to the Debt Documents and the Transaction Security Property and the Parent Debt Only Security Property through its officers, employees and agents and shall not:

(i)    be liable for any error of judgment made by any such person; or

&bull;

(ii)   be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part of any such person,

unless such error or such loss was directly caused by the Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct.

(g)   Unless this Agreement expressly specifies otherwise, the Security Agent may disclose to any other Party any information it reasonably believes it has received as security trustee or security agent under this Agreement.

(h)   Notwithstanding any other provision of any Debt Document to the contrary, the Security Agent is not obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

(i)   Notwithstanding any provision of any Debt Document to the contrary, the Security Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

**24.11   Responsibility for documentation**

None of the Security Agent, any Receiver nor any Delegate is responsible or liable for:

(a)   the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Security Agent, a Debtor or any other person in or in connection with any Debt Document or the transactions contemplated in the Debt Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Debt Document;

(b)   the legality, validity, effectiveness, adequacy or enforceability of any Debt Document, the Transaction Security Property or the Parent Debt Only Security Property or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Debt Document or the Transaction Security Property or the Parent Debt Only Security Property; or

(c)   any determination as to whether any information provided or to be provided to any Secured Party is non-public information the use of which may be regulated or prohibited by applicable law or regulation relating to insider dealing or otherwise.

**24.12   No duty to monitor**

The Security Agent shall not be bound to enquire:

(a)   whether or not any Default has occurred;

(b)   as to the performance, default or any breach by any Party of its obligations under any Debt Document; or

(c)   whether any other event specified in any Debt Document has occurred.

•

### 24.13   Exclusion of liability

(a)   Without limiting paragraph (b) below (and without prejudice to any other provision of any Debt Document excluding or limiting the liability of the Security Agent, any Receiver or Delegate), none of the Security Agent, any Receiver nor any Delegate will be liable for:

    (i)   any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Debt Document or the Transaction Security Property or the Parent Debt Only Security Property unless directly caused by its gross negligence or wilful misconduct;

    (ii)   exercising or not exercising any right, power, authority or discretion given to it by, or in connection with, any Debt Document, the Transaction Security Property or the Parent Debt Only Security Property or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Debt Document or the Transaction Security Property or the Parent Debt Only Security Property;

    (iii)   any shortfall which arises on the enforcement or realisation of the Transaction Security Property or the Parent Debt Only Security Property; or

    (iv)   without prejudice to the generality of paragraphs (i) to (iii) above, any damages, costs, losses, any diminution in value or any liability whatsoever arising as a result of:

        (A)   any act, event or circumstance not reasonably within its control; or

        (B)   the general risks of investment in, or the holding of assets in, any jurisdiction,

        including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets; breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

(b)   No Party (other than the Security Agent, that Receiver or that Delegate (as applicable)) may take any proceedings against any officer, employee or agent of the Security Agent, a Receiver or a Delegate in respect of any claim it might have against the Security Agent, a Receiver or a Delegate or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Debt Document or any Transaction Security Property or the Parent Debt Only Security Property and any officer, employee or agent of the Security Agent, a Receiver or a Delegate may rely on this paragraph (b) subject to Clause 1.7 (Third party rights) and the provisions of the Third Parties Act.

(c)   Nothing in this Agreement shall oblige the Security Agent to carry out:

    (i)   any "know your customer" or other checks in relation to any person; or

    (ii)   any check on the extent to which any transaction contemplated by this Agreement might be unlawful for any Primary Creditor,

•

on behalf of any Primary Creditor and each Primary Creditor confirms to the Security Agent that it is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Security Agent.

(d)    Without prejudice to any provision of any Debt Document excluding or limiting the liability of the Security Agent, any Receiver or Delegate, any liability of the Security Agent, any Receiver or Delegate arising under or in connection with any Debt Document or the Transaction Security Property or the Parent Debt Only Security Property shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered (as determined by reference to the date of default of the Security Agent, Receiver or Delegate (as the case may be) or, if later, the date on which the loss arises as a result of such default) but without reference to any special conditions or circumstances known to the Security Agent, Receiver or Delegate (as the case may be) at any time which increase the amount of that loss.  In no event shall the Security Agent, any Receiver or Delegate be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Security Agent, Receiver or Delegate (as the case may be) has been advised of the possibility of such loss or damages.

### 24.14    Primary Creditors' indemnity to the Security Agent

(a)    Each Primary Creditor shall (in the proportion that the Liabilities due to it bear to the aggregate of the Liabilities due to all the Primary Creditors for the time being (or, if the Liabilities due to the Primary Creditors are zero, immediately prior to their being reduced to zero)), indemnify the Security Agent and every Receiver and every Delegate, within five Business Days of demand, against any cost, loss or liability incurred by any of them (otherwise than by reason of the Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct) in acting as Security Agent, Receiver or Delegate under, or exercising any authority conferred under, the Debt Documents (unless the Security Agent, Receiver or Delegate has been reimbursed by a Debtor pursuant to a Debt Document).

(b)    For the purposes only of paragraph (a) above, to the extent that any hedging transaction under a Hedging Agreement has not been terminated or closed-out, the Hedging Liabilities due to any Hedge Counterparty in respect of that hedging transaction will be deemed to be:

(i)    if the relevant Hedging Agreement is based on an ISDA Master Agreement, the amount, if any, which would be payable to it under that Hedging Agreement in respect of those hedging transactions, if the date on which the calculation is made was deemed to be an Early Termination Date (as defined in the relevant ISDA Master Agreement) for which the relevant Debtor is the Defaulting Party (as defined in the relevant ISDA Master Agreement); or

(ii)    if the relevant Hedging Agreement is not based on an ISDA Master Agreement, the amount, if any, which would be payable to it under that Hedging Agreement in respect of that hedging transaction, if the date on which the calculation is made was deemed to be the date on which an event similar in meaning and effect (under that Hedging Agreement) to an Early Termination Date (as defined in any ISDA Master Agreement) occurred under that Hedging Agreement for which the relevant Debtor is in a position similar in meaning and effect (under that Hedging Agreement) to that of a Defaulting Party (under and as defined in the same ISDA Master Agreement),

that amount, in each case as calculated in accordance with the relevant Hedging Agreement.

•

(c)    Subject to paragraph (d) below, the Company shall immediately on demand reimburse any Primary Creditor for any payment that Primary Creditor makes to the Security Agent pursuant to paragraph (a) above.

(d)    Paragraph (c) above shall not apply to the extent that the indemnity payment in respect of which the Primary Creditor claims reimbursement relates to a liability of the Security Agent to a Debtor.

## 24.15    Resignation of the Security Agent

(a)    The Security Agent may resign and appoint one of its Affiliates as successor by giving notice to the Primary Creditors and the Company.

(b)    Alternatively the Security Agent may resign by giving 30 days' notice to the Primary Creditors and the Company, in which case the Instructing Group may appoint a successor Security Agent.

(c)    If the Instructing Group has not appointed a successor Security Agent in accordance with paragraph (b) above within 20 days after notice of resignation was given, the relevant retiring Security Agent (after consultation with the Creditor Representatives and each Bilateral Creditor (other than any Cash Management Provider)) may appoint a successor Security Agent.

(d)    The retiring Security Agent shall, at its own cost (or at the cost of the Company if it is resigning as a result of the non-payment of any fees payable to the Security Agent under any fee letter), make available to the successor Security Agent such documents and records and provide such assistance as the successor Security Agent may reasonably request for the purposes of performing its functions as Security Agent under the Debt Documents.

(e)    The Security Agent's resignation notice shall only take effect upon:

(i)    the appointment of a successor; and

(ii)    the transfer of all the Transaction Security Property and the Parent Debt Only Security Property to that successor.

(f)    Upon the appointment of a successor, the retiring Security Agent shall be discharged from any further obligation in respect of the Debt Documents (other than its obligations under paragraph (b) of Clause 24.27 (Winding up of trust) and paragraph (d) above) but shall remain entitled to the benefit of this Clause 24.15 and Clause 28.1 (Indemnity to the Security Agent) (and any Security Agent fees for the account of the retiring Security Agent shall cease to accrue from (and shall be payable on) that date). Any successor and each of the other Parties shall have the same rights and obligations amongst themselves as they would have had if that successor had been an original Party.

(g)    The Instructing Group may, by notice to the Security Agent, require it to resign in accordance with paragraph (b) above. In this event, the Security Agent shall resign in accordance with paragraph (b) above but the cost referred to in paragraph (d) above shall be for the account of the Company.

## 24.16    Confidentiality

(a)    In acting as trustee, or security agent for the Secured Parties, the Security Agent shall be regarded as acting through its trustee or agency division (as applicable) which shall be treated as a separate entity from any other of its divisions or departments.

•

(b)    If information is received by another division or department of the Security Agent, it may be treated as confidential to that division or department and the Security Agent shall not be deemed to have notice of it.

(c)    Notwithstanding any other provision of any Debt Document to the contrary, the Security Agent is not obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty.

**24.17    Information from the Creditors**

Each Creditor (through its Creditor Representative if applicable) shall supply the Security Agent with any information that the Security Agent may reasonably specify as being necessary or desirable to enable the Security Agent to perform its functions as Security Agent.

**24.18    Credit appraisal by the Secured Parties**

Without affecting the responsibility of any Debtor, Third Party Security Provider or Parent Debt Only Obligor for information supplied by it or on its behalf in connection with any Debt Document, each Secured Party confirms to the Security Agent that it has been, and will continue to be, solely responsible for making its own independent appraisal and investigation of all risks arising under or in connection with any Debt Document including but not limited to:

(a)    the financial condition, status and nature of the Company and each member of the Group, Third Party Security Provider and Parent Debt Only Obligor;

(b)    the legality, validity, effectiveness, adequacy or enforceability of any Debt Document, the Transaction Security Property or the Parent Debt Only Security Property and any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Debt Document or the Transaction Security Property or the Parent Debt Only Security Property;

(c)    whether that Secured Party has recourse, and the nature and extent of that recourse, against any Party or any of its respective assets under or in connection with any Debt Document, the Transaction Security Property or the Parent Debt Only Security Property, the transactions contemplated by the Debt Documents or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Debt Document or the Transaction Security Property or the Parent Debt Only Security Property;

(d)    the adequacy, accuracy or completeness of any information provided by the Security Agent, any Party or by any other person under or in connection with any Debt Document, the transactions contemplated by any Debt Document or any other agreement, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Debt Document; and

(e)    the right or title of any person in or to, or the value or sufficiency of any part of the Charged Property or the Parent Debt Only Charged Property, the priority of any of the Transaction Security or the Parent Debt Only Security or the existence of any Security affecting the Charged Property or the Parent Debt Only Charged Property.

•

**24.19    Security Agent's additional remuneration**

(a)    In the event of:

    (i)    an Event of Default;

    (ii)    the Security Agent being requested by a Debtor or the Instructing Group or any other group of creditors then entitled to give instructions to the Security Agent under the Debt Documents to undertake duties which the Security Agent and the Company agree to be of an exceptional nature or outside the scope of the normal duties of the Security Agent under the Debt Documents; or

    (iii)    the Security Agent and the Company agreeing that it is otherwise appropriate in the circumstances;

the Company shall (or the Company shall ensure that another Debtor shall) pay to the Security Agent any additional remuneration (together with any applicable VAT) that may be agreed between them or determined pursuant to paragraph (b) below.

(b)    If the Security Agent and the Company fail to agree upon the nature of the duties or upon the additional remuneration referred to in paragraph (a) above or whether additional remuneration is appropriate in the circumstances, any dispute shall be determined by an investment bank (acting as an expert and not as an arbitrator) selected by the Security Agent and approved by the Company or, failing approval, nominated (on the application of the Security Agent) by the President for the time being of the Law Society of England and Wales (the costs of the nomination and of the investment bank being payable by the Company) and the determination of any investment bank shall be final and binding upon the Parties.

**24.20    Reliance and engagement letters**

(a)    The Security Agent may obtain and rely on any certificate or report from any Debtor's auditor and may enter into any reliance letter or engagement letter relating to that certificate or report on such terms as it may consider appropriate (including, without limitation, restrictions on the auditor's liability and the extent to which that certificate or report may be relied on or disclosed).

(b)    Each Secured Party confirms that the Security Agent has authority to accept on its behalf (and ratifies the acceptance on its behalf of any letters or reports already accepted by the Security Agent) the terms of any reliance letter or engagement letters relating to the Structure Memorandum and any other reports or letters provided by accountants or other due diligence providers in connection with the Primary Debt Documents or the transactions contemplated in the Primary Debt Documents and to bind it in respect of those reports or letters and to sign such letters on its behalf and further confirms that it accepts the terms and qualifications set out in such letters.

**24.21    No responsibility to perfect Security**

The Security Agent shall not be liable for any failure to:

(a)    require the deposit with it of any deed or document certifying, representing or constituting the title of any Debtor, Third Party Security Provider or Parent Debt Only Obligor to any of the Charged Property or the Parent Debt Only Charged Property;

•

**1195**

(b)     obtain any licence, consent or other authority for the execution, delivery, legality, validity, enforceability or admissibility in evidence of any Debt Document or the Transaction Security or the Parent Debt Only Security;

(c)     register, file or record or otherwise protect any of the Transaction Security or the Parent Debt Only Security (or the priority of any of the Transaction Security or the Parent Debt Only Security) under any law or regulation or to give notice to any person of the execution of any Debt Document or of the Transaction Security or the Parent Debt Only Security;

(d)     take, or to require any Debtor to take, any step to perfect its title to any of the Charged Property or the Parent Debt Only Charged Property or to render the Transaction Security or the Parent Debt Only Security effective or to secure the creation of any ancillary Security under any law or regulation; or

(e)     require any further assurance in relation to any Security Document.

## 24.22    Insurance by Security Agent

(a)     The Security Agent shall not be obliged:

(i)     to insure any of the Charged Property or the Parent Debt Only Charged Property;

(ii)     to require any other person to maintain any insurance; or

(iii)     to verify any obligation to arrange or maintain insurance contained in any Debt Document,

and the Security Agent shall not be liable for any damages, costs or losses to any person as a result of the lack of, or inadequacy of, any such insurance.

(b)     Where the Security Agent is named on any insurance policy as an insured party, it shall not be liable for any damages, costs or losses to any person as a result of its failure to notify the insurers of any material fact relating to the risk assumed by such insurers or any other information of any kind, unless the Instructing Group requests it to do so in writing and the Security Agent fails to do so within 14 days after receipt of that request.

## 24.23    Custodians and nominees

The Security Agent may appoint and pay any person to act as a custodian or nominee on any terms in relation to any asset held on trust by the Security Agent under this Agreement and the Security Documents as the Security Agent may determine, including for the purpose of depositing with a custodian this Agreement or any document relating to any such assets and the Security Agent shall not be responsible for any loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, omission or default on the part of any person appointed by it under this Agreement or be bound to supervise the proceedings or acts of any person.

## 24.24    Delegation by the Security Agent

(a)     Each of the Security Agent, any Receiver and any Delegate may, at any time, delegate by power of attorney or otherwise to any person for any period, all or any right, power, authority or discretion vested in it in its capacity as such.

•

(b) That delegation may be made upon any terms and conditions (including the power to sub-delegate) and subject to any restrictions that the Security Agent, that Receiver or that Delegate (as the case may be) may, in its discretion, think fit in the interests of the Secured Parties.

(c) No Security Agent, Receiver or Delegate shall be bound to supervise, or be in any way responsible for any damages, costs or losses incurred by reason of any act, misconduct, omission or default on the part of, any such delegate or sub-delegate.

### 24.25 Additional Security Agent

(a) The Security Agent may at any time appoint (and subsequently remove) any person to act as a separate trustee, or security agent or as a co-trustee or co-security agent jointly with it:

(i) if it considers that appointment to be in the interests of the Secured Parties;

(ii) for the purposes of conforming to any legal requirement, restriction or condition which the Security Agent deems to be relevant; or

(iii) for obtaining or enforcing any judgment in any jurisdiction,

and the Security Agent shall give prior notice to the Company and each Creditor Representative and each Bilateral Creditor of that appointment.

(b) Any person so appointed shall have the rights, powers, authorities and discretions (not exceeding those given to the Security Agent under or in connection with the Debt Documents) and the duties, obligations and responsibilities that are given or imposed by the instrument of appointment.

(c) The remuneration that the Security Agent may pay to that person, and any costs and expenses (together with any applicable VAT) incurred by that person in performing its functions pursuant to that appointment shall, for the purposes of this Agreement, be treated as costs and expenses incurred by the Security Agent.

### 24.26 Acceptance of title

The Security Agent shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that any Debtor may have to any of the Charged Property or the Parent Debt Only Charged Property and shall not be liable for, or bound to require any Debtor to remedy, any defect in its right or title.

### 24.27 Winding up of trust

If the Security Agent, with the approval of each Creditor Representative and each Bilateral Creditor, determines that:

(a) all of the Common Secured Obligations, Priority Creditor Secured Obligations and Parent Debt Only Secured Obligations and all other obligations secured by the Security Documents have been fully and finally discharged; and

(b) no Secured Party is under any commitment, obligation or liability (actual or contingent) to make advances or provide other financial accommodation to any Debtor pursuant to the Debt Documents,

•

then:

(i)     the trusts set out in this Agreement shall be wound up and the Security Agent shall release, without recourse or warranty, all of the Transaction Security, the Parent Debt Only Security and the rights of the Security Agent under each of the Security Documents; and

(ii)    any Security Agent which has resigned pursuant to Clause 24.15 (Resignation of the Security Agent) shall release, without recourse or warranty, all of its rights under each Security Document.

## 24.28   Powers supplemental to Trustee Acts

The rights, powers, authorities and discretions given to the Security Agent under or in connection with the Debt Documents shall be supplemental to the Trustee Act 1925 and the Trustee Act 2000 and in addition to any which may be vested in the Security Agent by law or regulation or otherwise.

## 24.29   Disapplication of Trustee Acts

Section 1 of the Trustee Act 2000 shall not apply to the duties of the Security Agent in relation to the trusts constituted by this Agreement.  Where there are any inconsistencies between the Trustee Act 1925 or the Trustee Act 2000 and the provisions of this Agreement, the provisions of this Agreement shall, to the extent permitted by law and regulation, prevail and, in the case of any inconsistency with the Trustee Act 2000, the provisions of this Agreement shall constitute a restriction or exclusion for the purposes of that Act.

## 24.30   Power of Attorney

Each Intra-Group Lender, Debtor, Third Party Security Provider and Parent Debt Only Obligor by way of security for its obligations under this Agreement irrevocably appoints the Security Agent to be its attorney to do anything which that Intra-Group Lender, Debtor, Third Party Security Provider or Parent Debt Only Obligor has authorised the Security Agent or any other Party to do under this Agreement or is itself required to do under this Agreement but has failed to do (and the Security Agent may delegate that power on such terms as it sees fit).

## 25.    NOTES TRUSTEE PROTECTIONS

## 25.1   Limitation of Notes Trustee Liability

(a)     It is expressly understood and agreed by the Parties that this Agreement is executed and delivered by each Notes Trustee not individually or personally but solely in its capacity as a trustee in the exercise of the powers and authority conferred and vested in it under the relevant Debt Documents for and on behalf of the Noteholders only for which the Notes Trustee acts as trustee and it shall have no liability for acting for itself or in any capacity other than as trustee and nothing in this Agreement shall impose on it any obligation to pay any amount out of its personal assets.

(b)     It is further understood by the Parties that in no case shall a Notes Trustee be (i) personally responsible or accountable in damages or otherwise to any other Party for any loss, damage or claim incurred by reason of any act or omission performed or omitted by it in good faith in accordance with this Agreement and the relevant Debt Documents and in a manner that the relevant Notes Trustee believed to be within the scope of the authority conferred on the Notes Trustee by this Agreement and the relevant Debt Documents or by law, or (ii) personally liable for or on account of

•

**1198**

any of the statements, representations, warranties, covenants or obligations stated to be those of any other Party, all such liability, if any, being expressly waived by the Parties and any person claiming by, through or under such Party, provided however, that a Notes Trustee shall be personally liable under this Agreement for its own gross negligence or wilful misconduct.  It is also acknowledged that a Notes Trustee shall not have any responsibility for the actions of any individual Noteholder.

(c)    In no event shall a Notes Trustee be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not that Notes Trustee has been advised of the possibility of such loss or damages.

(d)    Notwithstanding anything contained in this Agreement, no provision of this Agreement shall alter or otherwise affect the rights and obligations of a Notes Issuer or any Debtor to make payments in respect of Notes Trustee Amounts as and when the same are due and payable pursuant to the applicable Debt Documents or the receipt and retention by a Notes Trustee of the same or the taking of any step or action by a Notes Trustee in respect of its rights under the Debt Documents to the same.

**25.2    Notes Trustee not fiduciary for other Creditors**

A Notes Trustee shall not be deemed to owe any fiduciary duty to any of the Creditors (other than the Noteholders for which it is the Creditor Representative), any of the Subordinated Creditors, any Parent Debt Issuer, any Parent Debt Only Obligor, any member of the Group and shall not be personally liable to any Creditor (other than the Noteholders for which it is the Creditor Representative), any Subordinated Creditor, any Parent Debt Issuer, any Parent Debt Only Obligor or any member of the Group if a Notes Trustee shall in good faith mistakenly pay over or distribute to the Noteholders for which it the Creditor Representative or to any other person cash, property or securities to which any Creditor (other than the Noteholders for which it is the Creditor Representative) shall be entitled by virtue of this Agreement or otherwise.  With respect to the Creditors (other than the Noteholders for which it is the Creditor Representative) and any Subordinated Creditor, each Notes Trustee undertakes to perform or to observe only such of its covenants or obligations as are specifically set forth in the relevant Debt Documents (including this Agreement) and no implied covenants or obligations with respect to Creditors (other than the Noteholders for which it is the Creditor Representative) and any Subordinated Creditor shall be read into this Agreement against a Notes Trustee.

**25.3    Reliance on certificates**

A Notes Trustee may rely without enquiry on any notice, consent or certificate of the Security Agent, any other Creditor Representative or any Bilateral Creditor as to the matters certified therein.

**25.4    Instructions to Notes Trustee**

(a)    In acting under and in accordance with this Agreement a Notes Trustee shall act in accordance with the relevant Notes Indenture and shall be entitled to seek any necessary instruction from the relevant Noteholders, to the extent provided for, and in accordance with, the relevant Notes Indenture, and where it so acts on the instructions of the relevant Noteholders, a Notes Trustee shall not incur any liability to any person for so acting other than in accordance with the Notes Indenture.  Furthermore, prior to taking any action under this Agreement or the relevant Debt Documents as the case may be the relevant Notes Trustee may reasonably request and rely upon an opinion of counsel or opinion of another qualified expert, at the Company's expense, as applicable; provided, however, that any such

•

opinions shall be at the expense of the relevant Noteholders, if such actions are on the instructions of the relevant Noteholders.

(b)    The Notes Trustee is not liable to any person for any loss suffered as a result of any delay caused as a result of it seeking instructions from the Noteholders for which it acts as trustee.

## 25.5    Turnover obligations

Notwithstanding any provision in this Agreement to the contrary, a Notes Trustee shall only have an obligation to turn over or repay amounts received or recovered under this Agreement by it (a) if it had actual knowledge that the receipt or recovery is an amount received in breach of a provision of this Agreement (a **Turnover Receipt**), and (b) to the extent that, prior to receiving that actual knowledge, it has not distributed the amount of the Turnover Receipt to the Noteholders for which it is the Creditor Representative in accordance with the provisions of the relevant Notes Indenture.  For the purpose of this Clause 25.5, (i) **actual knowledge** of the Notes Trustee shall be construed to mean the Notes Trustee shall not be charged with knowledge (actual or otherwise) of the existence of facts that would impose an obligation on it to make any payment or prohibit it from making any payment unless a responsible officer of such Notes Trustee has received, not less than two Business Days' prior to the date of such payment, a written notice that such payments are required or prohibited by this Agreement, and (ii) **responsible officer** when used in relation to the Notes Trustee means any person who is an officer within the corporate trust and agency department of the relevant Notes Trustee, including any director, associate director, vice president, assistance vice president, senior associate, assistant treasurer, trust officer, or any other officer of the relevant Notes Trustee who customarily performs functions similar to those performed by such officers, or to whom any corporate trust matter is referred because of such individual's knowledge of and familiarity with the particular subject and who shall have direct responsibility for the administration of this Agreement.

## 25.6    Creditors and the Notes Trustees

In acting pursuant to this Agreement and the relevant Notes Indenture, a Notes Trustee is not required to have any regard to the interests of the Creditors (other than the Noteholders for which it is the Creditor Representative) or any Subordinated Creditor.

## 25.7    Notes Trustee; reliance and information

(a)    A Notes Trustee may rely and shall be fully protected in acting or refraining from acting upon any notice, certificate or other document reasonably believed by it to be genuine and correct and to have been signed by, or with the authority of, the proper person.

(b)    Without affecting the responsibility of any Debtor for information supplied by it or on its behalf in connection with any Debt Document, each Primary Creditor (other than the Noteholders for which it is the Creditor Representative) confirms that it has not relied exclusively on any information provided to it by a Notes Trustee in connection with any Debt Document.  A Notes Trustee is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another party.

(c)    Each Secured Party gives each of the confirmations referred to in Clause 24.18 (Credit appraisal by the Secured Parties) to each Notes Trustee.

(d)    A Notes Trustee is entitled to assume that:

•

**1200**

(i)     any payment or other distribution made in respect of the Liabilities, respectively, has been made in accordance with the provisions of this Agreement;

(ii)    any Security granted in respect of the relevant Liabilities is in accordance with this Agreement;

(iii)   no Default, Event of Default, termination event (however described) or Acceleration Event has occurred; and

(iv)    no Discharge Date has occurred,

unless it has actual notice to the contrary.

(e)     A Notes Trustee is not obliged to monitor performance by the Debtors, the Security Agent or any other Party to this Agreement or the Noteholders of their respective obligations under, or compliance by them with, the terms of this Agreement or to enquire whether any Default, Event of Default, termination event (however described) or Acceleration Event has occurred.

**25.8    No action**

(a)     A Notes Trustee shall not have any obligation to take any action under this Agreement unless it is indemnified or secured to its satisfaction (whether by way of payment in advance or otherwise) by the Debtors or the Noteholders for which it is the Creditor Representative, as applicable, in accordance with the terms of the relevant Notes Indenture.  A Notes Trustee is not required to indemnify any other person, whether or not a Party in respect of the transactions contemplated by this Agreement.

(b)     In no event shall the permissive rights of a Notes Trustee to take action under this Agreement be construed as an obligation to do so.

**25.9    Departmentalisation**

In acting as a Notes Trustee, a Notes Trustee shall be treated as acting through its agency division which shall be treated as a separate entity from its other divisions and departments.  Any information received or acquired by a Notes Trustee which, in its opinion, is received or acquired by some other division or department or otherwise than in its capacity as a Notes Trustee may be treated as confidential by that Notes Trustee and will not be treated as information possessed by that Notes Trustee in its capacity as such.

**25.10    Other parties not affected**

This Clause 25 is intended to afford protection to each Notes Trustee only and no provision of this Clause 25 shall alter or change the rights and obligations as between the other parties in respect of each other.

**25.11    Security Agent and the Notes Trustees**

(a)     A Notes Trustee is not responsible for the appointment or for monitoring the performance of the Security Agent.

•

**1201**

(b)     A Notes Trustee shall be under no obligation to instruct or direct the Security Agent to take any Security enforcement action unless it shall have been instructed to do so by the Noteholders for which it is the Creditor Representative and indemnified and/or secured to its satisfaction.

(c)     The Security Agent acknowledges and agrees that it has no claims for any fees, costs or expenses from, or indemnification against, a Notes Trustee.

## 25.12    Provision of information

A Notes Trustee is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.  A Notes Trustee is not responsible for:

(a)     providing any Creditor with any credit or other information concerning the risks arising under or in connection with the Transaction Security Documents, Parent Debt Only Security Documents or Debt Documents (including any information relating to the financial condition or affairs of any Debtor or their related entities or the nature or extent of recourse against any Party or its assets) whether coming into its possession before, on or after the date of this Agreement; or

(b)     obtaining any certificate or other document from any Creditor.

## 25.13    Disclosure of information

Each Debtor irrevocably authorises each Notes Trustee to disclose to any other Debtor any information that is received by that Notes Trustee in its capacity as Notes Trustee.

## 25.14    Illegality

A Notes Trustee may refrain from doing anything (including disclosing any information) which might, in its opinion, constitute a breach of any law or regulation and may do anything which, in its opinion, is necessary or desirable to comply with any law or regulation. A Notes Trustee may also refrain from taking such action if it would otherwise render it liable to any person in that jurisdiction or if, in its opinion based upon such legal advice, it would not have the power to do the relevant thing in that jurisdiction by virtue of any applicable law in that jurisdiction or if it is determined by any court or other competent authority in that jurisdiction that it does not have such power.

## 25.15    Resignation of Notes Trustee

A Notes Trustee may resign or be removed in accordance with the terms of the relevant Notes Indenture, provided that a replacement of such Notes Trustee agrees with the Parties to become the replacement trustee under this Agreement by the execution of a Creditor/Creditor Representative Accession Undertaking.

## 25.16    Agents

A Notes Trustee may act through its attorneys and agents and shall not be responsible for the misconduct or negligence of any attorney or agent appointed with reasonable care by it hereunder.

•

**25.17    No Requirement for Bond or Security**

A Notes Trustee shall not be required to give any bond or surety with respect to the performance of its duties or the exercise of its powers under this Agreement.

**25.18    Provisions Survive Termination**

The provisions of this Clause 25 shall survive any termination of discharge of this Agreement.

**26.    CHANGES TO THE PARTIES**

**26.1    Assignments and transfers**

No Party may:

(i)        assign any of its rights; or

(ii)       transfer any of its rights and obligations,

in respect of any Debt Documents or the Liabilities except as permitted by this Clause 26.

**26.2    Change of Subordinated Creditor**

Subject to Clause 10.4 (No acquisition of Subordinated Liabilities), a Subordinated Creditor may:

(a)        assign any of its rights; or

(b)        transfer any of its rights and obligations,

in respect of the Subordinated Liabilities owed to it if any assignee or transferee has (if not already party to this Agreement as a Subordinated Creditor) acceded to this Agreement, as a Subordinated Creditor, pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking).

**26.3    Change of Lender**

(a)        A Lender may:

(i)        assign any of its rights; or

(ii)       transfer by novation any of its rights and obligations,

in respect of any Debt Documents or the Liabilities if:

(A)       that assignment or transfer is in accordance with the terms of the relevant Facility Agreement to which it is a party; and

(B)       subject to paragraph (b) below, any assignee or transferee has (if not already a Party as a Lender of the relevant class) acceded to this Agreement, as a Lender of the relevant class, pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking).

(b)        Paragraph (a)(B) above shall not apply in respect of:

•

(i)    any debt buy-back permitted to be undertaken by a Debtor under the relevant Facility Agreement; or

(ii)    any Liabilities Acquisition of the relevant Liabilities owed to that Lender by a member of the Group permitted under the relevant Facility Agreement and pursuant to which the relevant Liabilities are discharged,

which is effected in accordance with the terms of the Debt Documents.

## 26.4    Change of Noteholder

Any Noteholder may assign, transfer or novate any of its rights and obligations to any person without the need for such person to execute and deliver to the Security Agent a Creditor/Creditor Representative Accession Undertaking, provided that that assignment or transfer is in accordance with the terms of the relevant Notes Indenture.

## 26.5    Change of Cash Management Provider

A Cash Management Provider may:

(a)    assign any of its rights; or

(b)    transfer by novation any of its rights and obligations,

in respect of any Debt Documents or the Liabilities if:

(i)    that assignment or transfer is in accordance with the terms of the relevant Cash Management Agreement to which it is a party; and

(ii)    any assignee or transferee has (if not already a Party as a Cash Management Provider) acceded to this Agreement, as a Cash Management Provider, pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking).

## 26.6    Change of Hedge Counterparty

A Hedge Counterparty may (in accordance with the terms of the relevant Hedging Agreement and subject to any consent required under that Hedging Agreement) transfer any of its rights or obligations in respect of the Hedging Agreements to which it is a party if any transferee has (if not already a Party as a Hedge Counterparty) acceded to this Agreement pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking) as a Hedge Counterparty.

## 26.7    Change of Creditor Representative

(a)    No person shall become a Creditor Representative unless, at the same time, it accedes to this Agreement as a Creditor Representative pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking).

(b)    The Security Agent is authorised and instructed by each other Party to make changes to the terms of this Agreement relating to the rights and duties of any new Creditor Representative under this Agreement as may be required by the new Creditor Representative without the consent of any other

•

Party, provided that such changes would not be materially prejudicial to the interests of the other Parties.

**26.8   Change of Intra-Group Lender**

Subject to Clause 9.4 (Acquisition of Intra-Group Liabilities) and to the terms of the other Debt Documents, any Intra-Group Lender may:

(a)      assign any of its rights; or

(b)      transfer any of its rights and obligations,

in respect of the Intra-Group Liabilities to another member of the Group if that member of the Group has (if not already a Party as an Intra-Group Lender) acceded to this Agreement as an Intra-Group Lender, pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking), provided that such member of the Group will not be required to accede to this Agreement as an Intra-Group Lender under this Clause 26.8 if it would otherwise not have been required to do so under the terms of Clause 26.9 (New Intra-Group Lender) if it had been the original creditor of such Intra-Group Liability.

**26.9   New Intra-Group Lender**

If any Intra-Group Lender or any Debtor makes any loan to or grants any credit to or makes any other financial arrangement having similar effect with any Debtor or (if the aggregate principal amount of the loans (excluding any intra-group trade credit incurred in the ordinary course of trading) owed by that member of the Group to that person exceeds US$10,000,000 and provided that the member of the Group is in an "Agreed Security Jurisdiction" as defined in the Agreed Security Principles) any other member of the Group, it shall (if not already a Party as an Intra-Group Lender and is otherwise required to do so by the Debt Documents) accede to this Agreement as an Intra-Group Lender, pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking).

**26.10   Accessions in respect of new credit facilities**

In order for any indebtedness under any loan, letter of credit, guarantee or other credit facility to constitute Primary Creditor Liabilities for the purposes of this Agreement:

(a)      the Company shall designate that indebtedness as the relevant class of Primary Creditor Liabilities in writing to the Security Agent and confirm in writing to each Creditor Representative and each Bilateral Lender that such indebtedness complies with the provisions of Clause 23 (Additional Regulated Debt);

(b)      each creditor in respect of that facility shall accede to this Agreement in the relevant "Creditor" capacity;

(c)      each arranger (if any) in respect of that facility shall accede to this Agreement as an the relevant "Arranger" capacity; and

(d)      the agent, trustee or other creditor representative (if any) in respect of that facility shall accede to this Agreement as the Creditor Representative in relation to that facility pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking).

•

**1205**

**26.11   Accessions in respect of new Notes issuances**

In order for indebtedness in respect of any issuance of high yield notes, exchange notes or other debt securities to constitute Primary Creditor Liabilities for the purposes of this Agreement:

(a)   the Company shall designate that indebtedness as the relevant class of Primary Creditor Liabilities in writing to the Security Agent; and

(b)   the trustee in respect of those notes or debt securities shall accede to this Agreement as the Creditor Representative in relation to those notes or debt securities pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking).

**26.12   New Ancillary Lender**

If any Affiliate of a Lender becomes an Ancillary Lender in accordance with any Facility Agreement, it shall not be entitled to share in any of the Transaction Security or in the benefit of any guarantee or indemnity in respect of any of the liabilities arising in relation to its Ancillary Facilities unless it has (if not already a Party as a Lender of the relevant class) acceded to this Agreement in the relevant "Lender" capacity (which must be of the same class of "Lender" as its Affiliate) pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking) and, to the extent required by the relevant Facility Agreement, to the relevant Facility Agreement as an Ancillary Lender.

**26.13   New Hedge Counterparty**

In order for any person to constitute a Hedge Counterparty for the purposes of this Agreement:

(a)   that person shall (if not already a Party as a Hedge Counterparty) accede to this Agreement as a Hedge Counterparty pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking); and

(b)   upon accession, the Hedging Liabilities of that Hedge Counterparty shall constitute Senior Secured Hedging Liabilities unless the Company has designated those Hedging Liabilities as Super Senior Hedging Liabilities pursuant to Clause 5.13 (Designation of Super Senior Hedging Liabilities).

**26.14   New Cash Management Provider**

In order for any person to constitute a Cash Management Provider for the purposes of this Agreement that person shall (if not already a Party as a Cash Management Provider) accede to this Agreement as a Cash Management Provider pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking).

**26.15   New Subordinated Creditor**

If any person that is not a member of the Group makes any loan to or grants any credit to or makes any other financial arrangement having similar effect to the Company (including any Proceeds Loan from a Parent Debt Issuer) or to any Parent Debt Issuer, that person (if not already a Party as a Subordinated Creditor) must (if such Liabilities are intended to be Subordinated Liabilities) accede to this Agreement as a Subordinated Creditor, pursuant to Clause 26.16 (Creditor/Creditor Representative Accession Undertaking).

•

**26.16    Creditor/Creditor Representative Accession Undertaking**

With effect from the date of acceptance by the Security Agent of a Creditor/Creditor Representative Accession Undertaking duly executed and delivered to the Security Agent by the relevant acceding party or, if later, the date specified in that Creditor/Creditor Representative Accession Undertaking:

(a)    any Party ceasing entirely to be a Creditor shall be discharged from further obligations towards the Security Agent and other Parties under this Agreement and their respective rights against one another shall be cancelled (except in each case for those rights which arose prior to that date);

(b)    the replacement or new Creditor shall assume the same obligations and become entitled to the same rights, as if it had been an original Party in the capacity specified in the Creditor/Creditor Representative Accession Undertaking; and

(c)    to the extent envisaged by the relevant Facility Agreement, any new Ancillary Lender (which is an Affiliate of a Lender) shall also become party to the relevant Facility Agreement as an "Ancillary Lender" and shall assume the same obligations and become entitled to the same rights as if it had been an original party to the Facility Agreement as an Ancillary Lender.

**26.17    New Debtor / Third Party Security Provider**

(a)    If any member of the Group or any other person (other than any person that is or becomes a Party as a Parent Debt Only Obligor):

(i)    incurs any Primary Creditor Liabilities; or

(ii)    gives any Security, guarantee, indemnity or other assurance against loss in respect of any of the Primary Creditor Liabilities,

the Debtors will procure that the person incurring those Liabilities or giving that assurance accedes to this Agreement as a Debtor or a Third Party Security Provider (as the case may be), in accordance with paragraph (c) below, no later than contemporaneously with the incurrence by it of those Liabilities or the giving by it of that assurance.

(b)    Paragraph (a) above shall not apply to any member of the Group or other person which becomes a borrower or guarantor of an Ancillary Facility or Cash Management Facility but is not otherwise an "Obligor" (or substantially equivalent term) under the relevant Facility Agreement or Cash Management Agreement.

(c)    With effect from the date of acceptance by the Security Agent of a Debtor Accession Deed duly executed and delivered to the Security Agent by the new Debtor or, if later, the date specified in the Debtor Accession Deed, the new Debtor shall assume the same obligations and become entitled to the same rights as if it had been an original Party as a Debtor.

(d)    Notwithstanding anything to the contrary, a person shall only be required to accede to this Agreement as a Debtor or a Third Party Security Provider (as the case may be) to the extent that the relevant person would not breach any applicable law or any fiduciary or statutory duties.

•

**26.18    New Parent Debt Only Obligor**

Any person in its discretion may accede to this Agreement in the capacity of a Parent Debt Only Obligor if such person has executed and delivered to the Security Agent a deed substantially in the form of a Debtor Accession Deed agreeing to be bound by all the terms of this Agreement in the capacity of a Parent Debt Only Obligor.

**26.19    Additional parties**

(a)    Each of the Parties appoints the Security Agent to receive on its behalf each Debtor Accession Deed and Creditor/Creditor Representative Accession Undertaking delivered to the Security Agent and the Security Agent shall, as soon as reasonably practicable after receipt by it, sign and accept the same if it appears on its face to have been completed, executed and, where applicable, delivered in the form contemplated by this Agreement or, where applicable, by the relevant Debt Document.

(b)    In the case of a Creditor/Creditor Representative Accession Undertaking delivered to the Security Agent by any new Ancillary Lender (which is an Affiliate of a Lender):

(i)    the Security Agent shall, as soon as practicable after signing and accepting that Creditor/Creditor Representative Accession Undertaking in accordance with paragraph (a) above, deliver that Creditor/Creditor Representative Accession Undertaking to the relevant Creditor Representative; and

(ii)    the relevant Creditor Representative shall, as soon as practicable after receipt by it, sign and accept that Creditor/Creditor Representative Accession Undertaking if it appears on its face to have been completed, executed and delivered in the form contemplated by this Agreement.

**26.20    Resignation of Hedge Counterparty or Cash Management Provider**

(a)    In the event that a person which is a Party to this Agreement as a Hedge Counterparty is no longer providing any hedging to any of the Debtors under a Hedging Agreement, that person may resign (and will resign if required by the Company) as a Hedge Counterparty by giving notice to the Security Agent and the Company.

(b)    In the event that a person which is a Party to this Agreement as a Cash Management Provider is no longer providing any Cash Management Facility to any of the Debtors under a Cash Management Agreement, that person may resign (and will resign if required by the Company) as a Cash Management Provider by giving notice to the Security Agent and the Company.

(c)    From the date of receipt by the Security Agent and the Company of any such notice of resignation that person shall cease to be a Party to this Agreement, and shall have no further rights or obligations under this Agreement, as a Hedge Counterparty or Cash Management Provider, as the case may be.

**26.21    Resignation of a Debtor**

(a)    A Debtor shall cease to be a Debtor for the purpose of this Agreement immediately and automatically if it ceases to be a member of the Group pursuant to a transaction that is not prohibited by the Debt Documents or if that Debtor is designated as an Unrestricted Subsidiary in accordance with the Debt Documents or as otherwise contemplated by Clause 17 (Non-Distressed Disposals).

•

**1208**

(b)     The Company may request that a Debtor ceases to be a Debtor by delivering to the Security Agent a Debtor Resignation Request.

(c)     The Security Agent shall accept a Debtor Resignation Request and notify the Company and each other Party of its acceptance if the Company certifies for the benefit of the Security Agent that:

(i)     no Event of Default is continuing or would result from the acceptance of the Debtor Resignation Request;

(ii)    that Debtor is not, or has ceased to be, a borrower, issuer or a guarantor of any of the Primary Creditor Liabilities; and

(iii)   that Debtor is under no actual or contingent obligations in respect of any Intra-Group Liabilities or Subordinated Liabilities.

(d)     Upon notification by the Security Agent to the Company of its acceptance of the resignation of a Debtor, that member of the Group shall cease to be a Debtor and shall have no further rights or obligations under this Agreement as a Debtor.

**26.22    Resignation of a Third Party Security Provider or Parent Debt Only Obligor**

Following the release of all Transaction Security granted by a Third Party Security Provider or, as the case may be, the release of all Parent Debt Only Security granted by a Parent Debt Only Obligor) in accordance with the terms of the relevant Debt Documents and this Agreement, that Third Party Security Provider or Parent Debt Only Obligor shall cease to be, and shall have no further rights or obligations under this Agreement as, a Third Party Security Provider or a Parent Debt Only Obligor, as the case may be.

**26.23    Resignation of a Subordinated Creditor**

(a)     In the event that a person which is a Party to this Agreement as a Subordinated Creditor is no longer a creditor in respect of any Subordinated Liabilities, that person may resign (and will resign if required by the Company) as a Subordinated Creditor by giving notice to the Security Agent and the Company.

(b)     From the date of receipt by the Security Agent and the Company of any such notice of resignation that person shall cease to be a Party to this Agreement as Subordinated Creditor and shall have no further rights or obligations under this Agreement as a Subordinated Creditor.

**27.     COSTS AND EXPENSES**

**27.1    Transaction expenses**

The Company shall (or the Company shall ensure that another Debtor shall), within five Business Days of demand, pay the Security Agent the amount of all reasonable costs and expenses (including legal fees (subject to any cap agreed with the Company) and any notarial, registration and administrative costs and expenses) (together with any applicable VAT) properly incurred by the Security Agent and by any Receiver or Delegate in connection with the negotiation, preparation, printing, execution, syndication, notarisation and perfection of:

•

(a)     this Agreement and any other documents referred to in this Agreement and the Transaction Security; and

(b)     any other Debt Documents executed after the date of this Agreement.

**27.2    Amendment costs**

If a Debtor requests an amendment, waiver or consent, the Company shall (or the Company shall ensure that another Debtor shall), within five Business Days of demand, reimburse the Security Agent for the amount of all reasonable costs and expenses (including legal fees, subject to any cap agreed with the Company) (together with any applicable VAT) reasonably incurred by the Security Agent (and by any Receiver or Delegate) in responding to, evaluating, negotiating or complying with that request or requirement.

**27.3    Enforcement and preservation costs**

The Company shall (or the Company shall ensure that another Debtor shall), within five Business Days of demand, pay to the Security Agent the amount of all costs and expenses (including legal fees and any notarial, registration and administrative costs and expenses and together with any applicable VAT) incurred by it in connection with the enforcement of or the preservation of any rights under any Debt Document, the Transaction Security or the Parent Debt Only Security and any proceedings instituted by or against the Security Agent as a consequence of taking or holding the Transaction Security or the Parent Debt Only Security or enforcing these rights (but excluding any costs and expenses arising as a result of the Security Agent's gross negligence or wilful default).

**27.4    Stamp taxes**

The Company shall (or the Company shall ensure that another Debtor shall) pay and, within five Business Days of demand, indemnify the Security Agent against any cost, loss or liability the Security Agent incurs in relation to all stamp duty, registration and other similar Taxes payable in respect of any Debt Document other than any stamp duty, registration and other similar Taxes payable in respect of any assignment, sub-participation or transfer by a Secured Party of any of its rights and/or obligations under a Debt Document.

**27.5    Interest on demand**

If any Creditor or Debtor fails to pay any amount payable by it under this Agreement on its due date, interest shall accrue on the overdue amount (and be compounded with it) from the due date up to the date of actual payment (both before and after judgment and to the extent interest at a default rate is not otherwise being paid on that sum) at the rate which is 1% per annum over the rate at which the Security Agent would be able to obtain by placing on deposit with a leading bank an amount comparable to the unpaid amounts in the currencies of those amounts for any period(s) that the Security Agent may from time to time select provided that if any such rate is below zero, that rate will be deemed to be zero.

•

## 28.    OTHER INDEMNITIES

### 28.1    Indemnity to the Security Agent

(a)    Each Debtor jointly and severally shall promptly indemnify the Security Agent and every Receiver and Delegate against any cost, loss or liability (together with any applicable VAT) incurred by any of them as a result of:

    (i)    any failure by the Company to comply with its obligations under Clause 27 (Costs and Expenses);

    (ii)    acting or relying on any notice, request or instruction which it reasonably believes to be genuine, correct and appropriately authorised;

    (iii)    the taking, holding, protection or enforcement of the Transaction Security or the Parent Debt Only Security;

    (iv)    the exercise of any of the rights, powers, discretions, authorities and remedies vested in the Security Agent, each Receiver and each Delegate by the Debt Documents or by law;

    (v)    any default by any Debtor or Third Party Security Provider or Parent Debt Only Obligor in the performance of any of the obligations expressed to be assumed by it in the Debt Documents;

    (vi)    instructing lawyers, accountants, tax advisers, surveyors, a Financial Adviser or other professional advisers or experts as permitted under this Agreement; or

    (vii)    acting as the Security Agent, Receiver or Delegate under the Debt Documents or which otherwise relates to any of the Transaction Security Property or the Parent Debt Only Security Property,

(otherwise, in each case, as a direct result of the Security Agent's, Receiver's or Delegate's gross negligence or wilful misconduct).

(b)    Each Debtor expressly acknowledges and agrees that the continuation of its indemnity obligations under this Clause 28.1 will not be prejudiced by any release or disposal under Clause 18 (Distressed Disposals) taking into account the operation of that Clause 18.

(c)    The Security Agent and every Receiver and Delegate may, in priority to any payment to the Secured Parties, indemnify itself out of the Charged Property or the Parent Debt Only Charged Property in respect of, and pay and retain, all sums necessary to give effect to the indemnity in this Clause 28.1 and shall have a lien on the Transaction Security and the Parent Debt Only Security and the proceeds of the enforcement of the Transaction Security and the Parent Debt Only Security for all moneys payable to it, in each case in accordance with Clause 21.1 (Order of application: Common Recoveries).

### 28.2    Company's indemnity to Primary Creditors

The Company shall promptly and as principal obligor indemnify each Primary Creditor against any cost, loss or liability (together with any applicable VAT), whether or not reasonably foreseeable,

•

incurred by any of them in relation to or arising out of the operation of Clause 18 (Distressed Disposals).

**28.3    Continuing obligation**

Each indemnity given by a Primary Creditor, a Debtor or the Company under this Clause 28 or Clause 24.14 (Primary Creditors' indemnity to the Security Agent) is a continuing obligation, independent of the party's other obligations under or in connection with that or any other Debt Document.  It is not necessary for a party to pay any amount or incur any expense before enforcing an indemnity under this Clause 28 or Clause 24.14 (Primary Creditors' indemnity to the Security Agent).

**29.    INFORMATION**

**29.1    Dealings with Security Agent and Creditor Representatives**

(a)    Subject to any provision of any other Primary Financing Document in relation to "Communication when Agent is Impaired Agent", each Primary Creditor (other than a Bilateral Creditor) shall deal with the Security Agent exclusively through its Creditor Representative and each Bilateral Creditor shall deal directly with the Security Agent.

(b)    No Creditor Representative shall be under any obligation to act as agent or otherwise on behalf of any Bilateral Creditor except as expressly provided for in, and for the purposes of, this Agreement.

**29.2    Disclosure between Primary Creditors and Security Agent**

Notwithstanding any agreement to the contrary, each of the Debtors, the Third Party Security Providers and the Subordinated Creditors consents, until the Final Discharge Date, to the disclosure by any Primary Creditor and the Security Agent to each other (whether or not through a Creditor Representative or the Security Agent) of such information concerning the Debtors, the Third Party Security Providers and the Subordinated Creditors as any Primary Creditor or the Security Agent shall see fit to the extent that the disclosure of such information:

(a)    does not breach any applicable law; and

(b)    prior to the taking of any Enforcement Action, would not result in any Noteholder or any "public side" Lender receiving any material non-public information.

**29.3    Notification of prescribed events**

(a)    If an Event of Default under a Primary Financing Document either occurs or ceases to be continuing the relevant Creditor Representative or Bilateral Creditor shall, upon becoming aware of that occurrence or cessation, notify the Security Agent and the Security Agent shall, upon receiving that notification, notify each other Creditor Representative and Bilateral Creditor.

(b)    If an Acceleration Event occurs the relevant Creditor Representative or Bilateral Creditor shall notify the Security Agent and the Security Agent shall, upon receiving that notification, notify each other Party.

•

**1212**

(c)    If a Second Lien Standstill Period or a Parent Debt Standstill Period commences or ceases to be continuing the Security Agent shall, upon receiving that notification, notify each Creditor Representative and Bilateral Creditor.

(d)    If the Security Agent receives a Second Lien Enforcement Notice under Clause 7.9 (Permitted Enforcement: Second Lien Creditors) or a Parent Debt Enforcement Notice under Clause 8.9 (Permitted Enforcement: Parent Debt Creditors) it shall, upon receiving that notification, notify each Creditor Representative and Bilateral Creditor.

(e)    If the Security Agent enforces, or takes formal steps to enforce, any of the Transaction Security or Parent Debt Only Security it shall notify each Party of that action.

(f)    If any Primary Creditor exercises any right it may have to enforce, or to take formal steps to enforce, any of the Transaction Security or Parent Debt Only Security it shall notify the Security Agent and the Security Agent shall, upon receiving that notification, notify each Party of that action.

(g)    If a Debtor defaults on any Payment due under a Hedging Agreement, the Hedge Counterparty which is party to that Hedging Agreement shall, upon becoming aware of that default, notify the Security Agent and the Security Agent shall, upon receiving that notification, notify the Creditor Representatives, each Bilateral Creditor and each other Hedge Counterparty.

(h)    If a Hedge Counterparty terminates or closes-out, in whole or in part, any hedging transaction under any Hedging Agreement under Clause 5.9 (Permitted Enforcement: Hedge Counterparties) it shall notify the Security Agent and the Security Agent shall, upon receiving that notification, notify each Creditor Representative and each other Bilateral Creditor.

(i)    If the Security Agent receives a notice under Clause 6.1 (Option to purchase: Senior Secured Debt Creditors), 6.2 (Option to purchase: Second Lien Creditors) or 6.3 (Option to purchase: Parent Debt Creditors) it shall upon receiving that notice, notify, and send a copy of that notice to, each Creditor Representative and Bilateral Creditor.

(j)    If the Security Agent receives a notice under Clause 6.4 (Hedge Transfer) it shall upon receiving that notice, notify, and send a copy of that notice to, each relevant Hedge Counterparty.

## 30.    NOTICES

### 30.1    Communications in writing

Any communication to be made under or in connection with this Agreement shall be made in writing and, unless otherwise stated, may be made by email or letter.

### 30.2    Security Agent' communications with Primary Creditors

The Security Agent shall be entitled to carry out all dealings:

(a)    with the Primary Creditors (other than a Bilateral Creditor) through their respective Creditor Representatives and may give to the Creditor Representatives, as applicable, any notice, document or other communication required to be given by the Security Agent to a Primary Creditor; and

(b)    with each Bilateral Creditor directly with that Bilateral Creditor.

•

**30.3    Addresses**

The address and email address (and the department or officer, if any, for whose attention the communication is to be made) of each Party for any communication or document to be made or delivered under or in connection with this Agreement is:

(a)    in the case of any person that is a Party on the date of this Agreement, that identified with its signature below; and

(b)    in the case of each other Party, that notified in writing to the Security Agent on or prior to the date on which it becomes a Party,

or any substitute address, email address or department or officer which that Party may notify to the Security Agent (or the Security Agent may notify to the other Parties, if a change is made by the Security Agent) by not less than five Business Days' notice.

**30.4    Delivery**

(a)    Any communication or document made or delivered by one person to another under or in connection with this Agreement will only be effective:

(i)    if by way of email, when received in legible form; or

(ii)    if by way of letter, when it has been left at the relevant address or five Business Days after being deposited in the post postage prepaid in an envelope addressed to it at that address,

and, if a particular department or officer is specified as part of its address details provided under Clause 30.3 (Addresses), if addressed to that department or officer.

(b)    Any communication or document to be made or delivered to the Security Agent will be effective only when actually received by the Security Agent and then only if it is expressly marked for the attention of the department or officer identified with the Security Agent's signature below (or any substitute department or officer as the Security Agent shall specify for this purpose).

(c)    Any communication or document made or delivered to the Company in accordance with this Clause 30.4 will be deemed to have been made or delivered to each of the Debtors and Third Party Security Providers.

(d)    Any communication or document which becomes effective, in accordance with paragraphs (a) to (c) above, after 5.00 p.m. in the place of receipt shall be deemed only to become effective on the following day.

**30.5    Notification of address and email address**

Promptly upon receipt of notification of an address and email address or change of address or email address pursuant to Clause 30.3 (Addresses) or changing its own address or email address, the Security Agent shall notify the other Parties.

•

**1214**

### 30.6   Electronic communication

(a)   Unless a Party notifies another Party to the contrary, each Party agrees that any communication or document to be made or delivered by one Party to another under or in connection with this Agreement may be delivered or made by electronic mail or other electronic means (including, without limitation, by way of posting to a secure website) provided that Parties agree to:

    (i)   notify each other in writing of their electronic mail address and/or any other information required to enable the transmission of information by that means; and

    (ii)   notify each other of any change to their address or any other such information supplied by them by not less than five Business Days' notice.

(b)   Any such electronic communication or document as specified in paragraph (a) above made or delivered by one Party to another will be effective only when actually received (or made available) in readable form and in the case of any electronic communication or document made or delivered by a Party to the Security Agent only if it is addressed in such a manner as the Security Agent shall specify for this purpose.

(c)   Any electronic communication or document which becomes effective, in accordance with paragraph (b) above, after 5.00 p.m. in the place in which the Party to whom the relevant communication or document is sent or made available has its address for the purpose of this Agreement shall be deemed only to become effective on the following day.

(d)   Any reference in this Agreement to a communication being sent or received or a document being delivered shall be construed to include that communication or document being made available in accordance with this Clause 30.6.

### 30.7   English language

(a)   Any notice given under or in connection with this Agreement must be in English.

(b)   All other documents provided under or in connection with this Agreement must be:

    (i)   in English; or

    (ii)   if not in English, and if so required by the Security Agent, accompanied by a certified English translation and, in this case, the English translation will prevail unless the document is a constitutional, statutory or other official document.

### 31.   PRESERVATION

### 31.1   Partial invalidity

If, at any time, any provision of a Debt Document is or becomes illegal, invalid or unenforceable in any respect under any law of any jurisdiction, neither the legality, validity or enforceability of the remaining provisions nor the legality, validity or enforceability of that provision under the law of any other jurisdiction will in any way be affected or impaired.

•

**31.2   No impairment**

If, at any time after its date, any provision of a Debt Document (including this Agreement) is not binding on or enforceable in accordance with its terms against a person expressed to be a party to that Debt Document, neither the binding nature nor the enforceability of that provision or any other provision of that Debt Document will be impaired as against the other party(ies) to that Debt Document.

**31.3   Remedies and waivers**

No failure to exercise, nor any delay in exercising, on the part of any Party, any right or remedy under a Debt Document shall operate as a waiver of any such right or remedy or constitute an election to affirm any Debt Document.  No election to affirm any Debt Document on the part of a Secured Party shall be effective unless it is in writing.  No single or partial exercise of any right or remedy shall prevent any further or other exercise or the exercise of any other right or remedy.  The rights and remedies provided in each Debt Document are cumulative and not exclusive of any rights or remedies provided by law.

**31.4   Waiver of defences**

The provisions of this Agreement or any Transaction Security or Parent Debt Only Security will not be affected by an act, omission, matter or thing which, but for this Clause 31.4, would reduce, release or prejudice the subordination and priorities expressed to be created by this Agreement including (without limitation and whether or not known to any Party):

(a)    any time, waiver or consent granted to, or composition with, any Debtor or other person;

(b)    the release of any Debtor or any other person under the terms of any composition or arrangement with any creditor of any Debtor or member of the Group;

(c)    the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Debtor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any Security;

(d)    any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of any Debtor or other person;

(e)    any amendment, novation, supplement, extension (whether of maturity or otherwise) or restatement (in each case, however fundamental and of whatsoever nature, and whether or not more onerous) or replacement of a Debt Document or any other document or security;

(f)    any unenforceability, illegality or invalidity of any obligation of any person under any Debt Document or any other document or security;

(g)    any intermediate Payment of any of the Liabilities owing to the Primary Creditors in whole or in part; or

(h)    any insolvency or similar proceedings.

•

### 31.5    Priorities not affected

Except as otherwise provided in this Agreement the priorities referred to in Clause 2 (Ranking and Priority) will:

(a)    not be affected by any reduction or increase in the principal amount secured by the Transaction Security or the Parent Debt Only Security in respect of the Liabilities owing to the Primary Creditors or by any intermediate reduction or increase in, amendment or variation to any of the Debt Documents, or by any variation or satisfaction of, any of the Liabilities or any other circumstances;

(b)    apply regardless of the order in which or dates upon which this Agreement and the other Debt Documents are executed or registered or notice of them is given to any person; and

(c)    secure the Liabilities owing to the Primary Creditors in the order specified, regardless of the date upon which any of the Liabilities arise or of any fluctuations in the amount of any of the Liabilities outstanding.

## 32.    CONSENTS, AMENDMENTS AND OVERRIDE

### 32.1    Required consents

(a)    Subject the other provisions of this Clause 32 and Clause 23 (Additional Regulated Debt), this Agreement may be amended or waived only with the consent of the Company, the Majority Super Senior Creditors and each Creditor Representative (acting on behalf of the relevant class of Primary Creditors).

(b)    Subject to the other provisions of this Clause 32, an amendment or waiver that has the effect of changing or which relates to:

(i)    Clause 2.1 (Primary Liabilities), Clause 2.2 (Transaction Security), Clause 2.8 (Anti-layering), Clause 12 (Turnover of Receipts), Clause 13 (Redistribution), Clause 14 (Chapter 11 Provisions), Clause 15 (Enforcement of Transaction Security), Clause 16 (Enforcement of Parent Debt Only Security), Clause 18 (Distressed Disposals), Clause 21 (Application of Proceeds) or this Clause 32 (Consents, Amendments and Override);

(ii)    paragraphs (d)(iii), (e) and (f) of Clause 24.5 (Instructions);

(iii)    the order of priority or subordination under this Agreement,

shall not be made without the consent of:

(A)    each Creditor Representative (acting on behalf of the relevant class of Primary Creditors);

(B)    each Bilateral Lender;

(C)    each Cash Management Provider (to the extent that the amendment or waiver would adversely affect the rights and obligations of that Cash Management Provider under this Agreement in its capacity as such but would not adversely affect the rights and obligations of any other Creditor or class of Creditors);

•

(D)    each Hedge Counterparty (to the extent that the amendment or waiver would adversely affect the rights and obligations of that Hedge Counterparty under this Agreement in its capacity as such but would not adversely affect the rights and obligations of any other Creditor or class of Creditors); and

(E)    the Company.

## 32.2    Amendments and Waivers: Security Documents

(a)    Subject to paragraphs (b) and (c) below and to Clause 32.4 (Exceptions) and unless the provisions of any Debt Document expressly provide otherwise, the Security Agent may, if authorised by an Instructing Group (or the Majority Parent Debt Creditors in relation to the Parent Debt Only Security Documents only), and if the Company consents, amend the terms of, waive any of the requirements of or grant consents under, any of the Transaction Security Documents or the Parent Debt Only Security Documents or amend the terms of or waive any of the requirements of the Agreed Security Principles which shall be binding on each Party.

(b)    Subject to paragraph (c) of Clause 32.4 (Exceptions), any amendment or waiver of, or consent under, any Priority Creditor Transaction Security Document which adversely affects:

(i)    the nature or scope of the Charged Property; or

(ii)    the manner in which the proceeds of enforcement of the Priority Creditor Transaction Security are distributed,

shall not be made without the prior consent of the Company and each Priority Creditor Representative (acting on behalf of the relevant class of Priority Creditors) and each Bilateral Lender.

(c)    Subject to paragraph (c) of Clause 32.4 (Exceptions), any amendment or waiver of, or consent under, any Common Transaction Security Document or any Parent Debt Only Security Document which adversely affects:

(i)    the nature or scope of the Common Charged Property or the Parent Debt Only Charged Property; or

(ii)    the manner in which the proceeds of enforcement of the Common Transaction Security or the Parent Debt Only Security are distributed,

shall not be made without the prior consent of the Company and each Creditor Representative (acting on behalf of the relevant class of Primary Creditors) and each Bilateral Lender.

## 32.3    Effectiveness

(a)    Any amendment, waiver or consent given in accordance with this Clause 32 will be binding on all Parties and the Security Agent may effect, on behalf of any Primary Creditor, any amendment, waiver or consent permitted by this Clause 32.

(b)    Without prejudice to the generality of Clause 24.10 (Rights and discretions) the Security Agent may engage, pay for and rely on the services of lawyers in determining the consent level required for and effecting any amendment, waiver or consent under this Agreement.

•

**1218**

### 32.4    Exceptions

(a)    Subject to paragraphs (c) to (g) below, if the amendment, waiver or consent may impose new or additional obligations on or withdraw or reduce the rights of any Party other than:

    (i)    in the case of a Primary Creditor, in a way which affects or would affect Primary Creditors of that Party's class generally; or

    (ii)    in the case of a Debtor, to the extent consented to by the Company under paragraph (a) of Clause 32.2 (Amendments and Waivers: Security Documents),

the consent of that Party (or the relevant Creditor Representative) is required.

(b)    Subject to paragraphs (c) to (g) below, an amendment, waiver or consent which relates to the rights or obligations of a Creditor Representative, an Arranger or the Security Agent in its capacity as such (including, without limitation, any ability of the Security Agent to act in its discretion under this Agreement) may not be effected without the consent of that Creditor Representative or, as the case may be, that Arranger or the Security Agent.

(c)    Neither paragraph (a) nor (b) above, nor Clauses 32.1 (Required consents) or 32.2 (Amendments and Waivers: Security Documents) shall apply:

    (i)    to any release of Transaction Security or Parent Debt Only Security, claim or Liabilities; or

    (ii)    to any consent,

which, in each case, the Security Agent gives in accordance with Clause 2.7 (Additional indebtedness), Clause 17 (Non-Distressed Disposals), Clause 18 (Distressed Disposals) or Clause 23 (Additional Regulated Debt) or as contemplated by the terms of any Debt Document and each Party agrees that any such release, amendment, waiver or consent can be effected solely by the Company and the Security Agent acting in accordance with the provisions of such Clauses or the applicable Security Document to give effect to the same.

(d)    To the extent that an amendment, waiver or consent requested under this Clause 32 only affects one class of Creditors, and such amendment, waiver or consent could not reasonably be expected materially and adversely to affect the interests of the other classes of Creditors, only the written agreement from the relevant Creditor Representative acting on behalf of the affected class (or in the case of Bilateral Creditors, each affected Bilateral Creditor) shall be required.

(e)    This Agreement may be amended by the Company and the Security Agent without the consent of or instruction from any other Party:

    (i)    to cure defects, omissions or manifest errors or resolve ambiguities or inconsistencies; or

    (ii)    to effect any amendment that is for the benefit of all of the Secured Parties.

(f)    Notwithstanding anything to the contrary in the Debt Documents, a Creditor may unilaterally waive, relinquish or otherwise irrevocably give up all or any of its rights under any Debt Document with the consent of the Company.

(g)    Paragraphs (a) and (b) above shall apply to an Arranger only to the extent that Liabilities are then owed to that Arranger.

**32.5    Snooze/lose**

If in relation to:

(a)    a request for a Consent in relation to any of the terms of this Agreement;

(b)    a request to participate in any other vote of any group of Primary Creditors under the terms of this Agreement;

(c)    a request to approve any other action under this Agreement;

(d)    a request to provide any confirmation or notification under this Agreement; or

(e)    a request to provide details of an Exposure,

any Primary Creditor:

(i)    fails to respond to that request within ten Business Days (or such longer period specified by the Company) of that request being made; or

(ii)    (in the case of paragraphs (a) to (c) above), fails to provide details of its Credit Participation to the Security Agent within the timescale specified by the Security Agent,

then:

(A)    in the case of subparagraphs (a) to (c) above, that Primary Creditor's Credit Participation shall be deemed to be zero for the purpose of calculating the relevant Credit Participations when ascertaining whether any relevant percentage (including, for the avoidance of doubt, unanimity) of Credit Participations of any group of Primary Creditors has been obtained to give that Consent, carry that vote or approve that action;

(B)    in the case of subparagraphs (a) to (c) above, that Primary Creditor's status as a Primary Creditor shall be disregarded for the purposes of ascertaining whether the agreement of any specified group of Primary Creditors has been obtained to give that Consent, carry that vote or approve that action;

(C)    in the case of paragraph (d) above, that confirmation or notification shall be deemed to have been given; and

(D)    in the case of paragraph (e) above, that Super Senior Creditor's Exposure shall be deemed to be zero,

provided that this Clause 32.5 shall not apply to any Noteholder in respect of any request where such Noteholder is not given the option to respond to such request in the negative but shall otherwise apply to all Noteholders.

•

**1220**

**32.6    Disenfranchisement of Defaulting Lenders**

(a)    For so long as a Defaulting Lender has any Available Commitment, in ascertaining whether:

    (i)    any relevant percentage (including, for the avoidance of doubt, unanimity) of Credit Participations; or

    (ii)    the agreement of any specified group of Primary Creditors,

has been obtained to approve any request for a Consent or to carry any other vote or approve any action under this Agreement, that Defaulting Lender's Commitments will be reduced by the amount of its Available Commitments and, to the extent that that reduction results in that Defaulting Lender's Commitments being zero, that Defaulting Lender shall be deemed not to be a Primary Creditor.

(b)    For the purposes of this Clause 32.6, the relevant Creditor Representative and/or the Security Agent may assume that the following Primary Creditors are Defaulting Lenders:

    (i)    any Primary Creditor which has notified the Security Agent that it has become a Defaulting Lender;

    (ii)    any Primary Creditor to the extent that the relevant Creditor Representative has notified the Security Agent that that Primary Creditor is a Defaulting Lender; and

    (iii)    any Primary Creditor in relation to which it is aware that any of the events or circumstances referred to the definition of "Defaulting Lender" in any Facility Agreement has occurred,

unless it has received notice to the contrary from the Primary Creditor concerned (together with any supporting evidence reasonably requested by the relevant Creditor Representative and/or the Security Agent) or the relevant Creditor Representative and/or the Security Agent is otherwise aware that the Primary Creditor has ceased to be a Defaulting Lender.

**32.7    Calculation of Credit Participations**

(a)    For the purpose of ascertaining whether any relevant percentage of Credit Participations has been obtained under this Agreement, the Security Agent may notionally convert the Credit Participations into their Common Currency Amounts.

(b)    Each Creditor Representative and Bilateral Creditor will, upon the request of the Security Agent, promptly provide the Security Agent with the details of its Credit Participations or the Credit Participations of the Creditors whom it represents (which shall be calculated as at the time stipulated by the Security Agent or the relevant Creditor Representative (as applicable) in such request) and (if applicable) details of the extent to which such Credit Participations have been voted for or against any request.

**32.8    Deemed consents**

(a)    If, at any time prior to the Final Discharge Date and following a request from a member of the Group, any Creditor Representative or Bilateral Creditor gives a Consent in respect of the Debt Documents to which it is a party then, if that action was permitted by the terms of this Agreement, the Intra-Group Lenders, the Company and the Subordinated Creditors will (or will be deemed to):

    •

(i)     give a corresponding Consent in equivalent terms in relation to each of the Debt Documents to which they are a party; and

(ii)    do anything (including executing any document) that the relevant group of Primary Creditors may reasonably require to give effect to this Clause 32.8.

(b)    If, at any time, any Creditor Representative or Bilateral Creditor gives a Consent in respect of the respective Debt Documents to which it is a party of a minor technical or administrative nature which does not adversely affect the interests of the Cash Management Providers or the Lower Ranking Creditors or change the commercial terms contained in the Cash Management Agreements or the Lower Ranking Debt Documents, then, if that action was permitted by the terms of this Agreement, the Cash Management Providers and the Lower Ranking Creditors will (or will be deemed to):

(i)     give a corresponding Consent in equivalent terms in relation to each of the Debt Documents to which they are a party; and

(ii)    do anything (including executing any document) that the relevant Creditor Representative or Bilateral Creditor may reasonably require to give effect to this Clause 32.8.

**32.9    Excluded consents**

Clause 32.8 (Deemed consent) does not apply to any Consent which has the effect of:

(a)    increasing or decreasing the Liabilities;

(b)    changing the basis upon which any Permitted Payments are calculated (including the timing, currency or amount of such Payments); or

(c)    changing the terms of this Agreement or of any Security Document.

**32.10    No liability**

None of the Primary Creditors will be liable to any other Creditor, or Debtor for any Consent given or deemed to be given under this Clause 32.

**32.11    Agreement to override**

(a)    Subject to paragraph (b) below, unless expressly stated otherwise in this Agreement, this Agreement overrides anything in the Debt Documents to the contrary.

(b)    Notwithstanding anything to the contrary in this Agreement, paragraph (a) above will not cure, postpone, waive or negate in any manner any default or event of default (however described) under any Debt Document as between any Creditor and any Debtor that are party to that Debt Document.

**33.    COUNTERPARTS**

This Agreement may be executed in any number of counterparts, and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

•

34.     **CONTRACTUAL RECOGNITION OF BAIL-IN**

(a)     Notwithstanding any other term of any Debt Document or any other agreement, arrangement or understanding between the Parties, each Party acknowledges and accepts that any liability of any Party to any other Party under or in connection with the Primary Debt Documents may be subject to Bail-In Action by the relevant Resolution Authority and acknowledges and accepts to be bound by the effect of:

   (i)     any Bail-In Action in relation to any such liability, including (without limitation):

      (A)     a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability;

      (B)     a conversion of all, or part of, any such liability into shares or other instruments of ownership that may be issued to, or conferred on, it; and

      (C)     a cancellation of any such liability; and

   (ii)     a variation of any term of any Primary Debt Document to the extent necessary to give effect to any Bail-In Action in relation to any such liability.

(b)     In this Agreement:

**Article 55 BRRD** means Article 55 of Directive 2014/59/EU establishing a framework for the recovery and resolution of credit institutions and investment firms;

**Bail-In Action** means the exercise of any Write-down and Conversion Powers;

**Bail-In Legislation** means:

   (i)     in relation to an EEA Member Country which has implemented, or which at any time implements, Article 55 BRRD, the relevant implementing law or regulation as described in the EU Bail-In Legislation Schedule from time to time; and

   (ii)     in relation to any state other than such an EEA Member Country or (to the extent that the United Kingdom is not such an EEA Member Country) the United Kingdom, any analogous law or regulation from time to time which requires contractual recognition of any Write-down and Conversion Powers contained in that law or regulation;

**EEA Member Country** means any member state of the European Union, Iceland, Liechtenstein and Norway;

**EU Bail-In Legislation Schedule** means the document described as such and published by the Loan Market Association (or any successor person) from time to time;

**Resolution Authority** means any body which has authority to exercise any Write-down and Conversion Powers;

**UK Bail-In Legislation** means (to the extent that the United Kingdom is not an EEA Member Country which has implemented, or implements, Article 55 BRRD) Part I of the United Kingdom Banking Act 2009 and any other law or regulation applicable in the United Kingdom relating to the

•

resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (otherwise than through liquidation, administration or other insolvency proceedings); and

**Write-down and Conversion Powers** means:

(i)    in relation to any Bail-In Legislation described in the EU Bail-In Legislation Schedule from time to time, the powers described as such in relation to that Bail-In Legislation in the EU Bail-In Legislation Schedule;

(ii)    in relation to any other applicable Bail-In Legislation:

(A)    any powers under that Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers; and

(B)    any similar or analogous powers under that Bail-In Legislation; and

(iii)    in relation to any UK Bail-In Legislation:

(A)    any powers under that UK Bail-In Legislation to cancel, transfer or dilute shares issued by a person that is a bank or investment firm or other financial institution or affiliate of a bank, investment firm or other financial institution, to cancel, reduce, modify or change the form of a liability of such a person or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that UK Bail-In Legislation that are related to or ancillary to any of those powers; and

(B)    any similar or analogous powers under that UK Bail-In Legislation.

## 35.    **U.S. QFC CONTRACTUAL STAY REQUIREMENT**

(a)    To the extent that the Primary Debt Documents provide support, through a guarantee or otherwise, for any hedging agreements or any other agreement or instrument that is a QFC (such support, **QFC Credit Support**, and each such QFC a **Supported QFC**), the Parties acknowledge and agree as follows with respect to the U.S. Special Resolution Regimes in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that any Primary Debt Document or Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

(i)    in the event that a Covered Entity that is party to a Supported QFC (each, a **Covered Party**) becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and

•

obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States; and

(ii)     in the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Primary Debt Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Primary Debt Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(b)     In this Clause 35:

**BHC Act Affiliate** of a Party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such Party.

**Covered Entity** means any of the following:

(a)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(b)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(c)     a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

**Default Right** has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

**QFC** has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

**U.S. Special Resolution Regimes** means each of (i) the Federal Deposit Insurance Act and the regulations promulgated thereunder and (ii) Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act and the regulations promulgated thereunder.

## 36.     GOVERNING LAW

This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

## 37.    ENFORCEMENT

### 37.1    Jurisdiction

(a)    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a **Dispute**).

(b)    The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

(c)    Notwithstanding paragraph (a) above, no Secured Party shall be prevented from taking proceedings relating to a Dispute in any other courts with jurisdiction.  To the extent allowed by law, the Secured Parties may take concurrent proceedings in any number of jurisdictions.

### 37.2    Service of process

(a)    Without prejudice to any other mode of service allowed under any relevant law, each Debtor, Third Party Security Provider and Subordinated Creditor (unless incorporated in England and Wales):

    (i)    irrevocably appoints the Company as its agent for service of process in relation to any proceedings before the English courts in connection with this Agreement and the Company, by its execution of this Agreement, accepts that appointment; and

    (ii)    agrees that failure by a process agent to notify the relevant Debtor or Third Party Security Provider or Subordinated Creditor of the process will not invalidate the proceedings concerned;

(b)    If any person appointed as an agent for service of process is unable for any reason to act as agent for service of process, the Company must immediately (and in any event within ten Business Days of such event taking place) appoint another agent on terms acceptable to the Security Agent.  Failing this, the relevant Security Agent may appoint another agent for this purpose.

**THIS AGREEMENT** has been entered into on the date stated at the beginning of this Agreement and executed as a deed by the Company, the Intra-Group Lenders, the Debtors, the Subordinated Creditors and the Third Party Security Providers and is intended to be and is delivered by them as a deed on the date specified above and shall take effect as a deed notwithstanding the fact that the other Parties have executed this Agreement under hand.

## SCHEDULE 1

## INITIAL DEBT

| Category | Description |
|---|---|
| Super Senior Facility | US$[●] letter of credit facility between among others the Company and First Abu Dhabi Bank PJSC

US$60,000,000, letter of credit facility between among others the Company and Lloyds Bank plc |
| Cash Management Facility | The various cash management facilities made available and appended to an "umbrella agreement" between the Company and HSBC UK Bank plc |
| Senior Secured Facility | None |
| Senior Secured Notes | US$500 million senior secured notes due 2025 |
| Second Lien Facility | None |
| Second Lien Notes | None |
| Parent Debt Facility | None |
| Parent Debt Notes | None |

•

## SCHEDULE 2

## FORM OF DEBTOR ACCESSION DEED

**THIS AGREEMENT** is made on [        ] and made

**BETWEEN**:

(1)       [*Insert Full Name of New Debtor*] (the **Acceding Debtor**); and

(2)       Lucid Trustee Services Limited (the **Security Agent**), for itself and each of the other parties to the intercreditor agreement referred to below.

This agreement is made on [date] by the Acceding Debtor in relation to an intercreditor agreement (the **Intercreditor Agreement**) dated [        ] between, amongst others, KCA Deutag Alpha Limited as Company and Lucid Trustee Services Limited as Security Agent, the other Creditors and the other Debtors (each as defined in the Intercreditor Agreement).

The Acceding Debtor intends to [incur Liabilities under the following documents]/[give a guarantee, indemnity or other assurance against loss in respect of Liabilities under the following documents]:

[*Insert details (date, parties and description) of relevant documents*]

the **Relevant Documents**.

**IT IS AGREED** as follows:

1.       Terms defined in the Intercreditor Agreement shall, unless otherwise defined in this Agreement, bear the same meaning when used in this Agreement.

2.       The Acceding Debtor and the Security Agent agree that the Security Agent shall hold:

(a)       [any Security in respect of Liabilities or any Security Agent Claim created or expressed to be created pursuant to the Relevant Documents;

(b)       all proceeds of that Security; and]*

(c)       all obligations expressed to be undertaken by the Acceding Debtor to pay amounts in respect of the Liabilities to the Security Agent as trustee or security agent for the Secured Parties (in the Relevant Documents or otherwise and including any Security Agent Claim) and secured by the Transaction Security together with all representations and warranties expressed to be given by the Acceding Debtor (in the Relevant Documents or otherwise) in favour of the Security Agent as trustee or Security Agent for the Secured Parties,

as trustee or as security agent for the Secured Parties on the terms and conditions contained in the Intercreditor Agreement.

---

*       Include to the extent that the Security created in the Relevant Documents is expressed to be granted to the Security Agent as trustee for the Secured Parties.

•

3.      The Acceding Debtor confirms that it intends to be party to the Intercreditor Agreement as a Debtor, undertakes to perform all the obligations expressed to be assumed by a Debtor under the Intercreditor Agreement and agrees that it shall be bound by all the provisions of the Intercreditor Agreement as if it had been an original party to the Intercreditor Agreement.

4.      In consideration of the Acceding Debtor being accepted as an Intra-Group Lender for the purposes of the Intercreditor Agreement, the Acceding Debtor also confirms that it intends to be party to the Intercreditor Agreement as an Intra-Group Lender, and undertakes to perform all the obligations expressed in the Intercreditor Agreement to be assumed by an Intra-Group Lender and agrees that it shall be bound by all the provisions of the Intercreditor Agreement, as if it had been an original party to the Intercreditor Agreement.

5.      The Acceding Debtor is notified (including by way of advance notice) that other Debtors or Subordinated Creditors have granted Security over Intra-Group Liabilities or Subordinated Liabilities (as the case may be) that are or may be owed to it and the Acceding Debtor acknowledges that notice.

6.      This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

**THIS AGREEMENT** has been signed on behalf of the Security Agent and executed as a deed by the Acceding Debtor and is delivered on the date stated above.

**The Acceding Debtor**

EXECUTED AS A DEED by
[*Full Name of Acceding Debtor*]
acting by

........................................
Director

........................................
Director/Secretary

**[OR**

EXECUTED AS A DEED by
[*Full Name of Acceding Debtor*]
acting by

•

**1229**

………………………..
Director

In the presence of:

Witness's signature:    …………………………..

Name:    …………………………..

Address:    …………………………..]

Address for notices:

Address:

Fax:

**The Security Agent**

**LUCID TRUSTEE SERVICES LIMITED**

By:

Date:

•

**1230**

## SCHEDULE 3

## FORM OF CREDITOR/CREDITOR REPRESENTATIVE ACCESSION UNDERTAKING

To:     [Lucid Trustee Services Limited] for itself and each of the other parties to the Intercreditor Agreement referred to below (the **Security Agent**).

From:   [Acceding Creditor] (the **Acceding Creditor**)

**THIS UNDERTAKING** is made on [date] by the Acceding Creditor in relation to the intercreditor agreement (the **Intercreditor Agreement**) dated [    ] between, among others, KCA Deutag Alpha Limited as Company, the Security Agent, the other Creditors and the other Debtors (each as defined in the Intercreditor Agreement). Terms defined in the Intercreditor Agreement shall, unless otherwise defined in this Undertaking, bear the same meanings when used in this Undertaking.

In consideration of the Acceding Creditor being accepted as a [*insert title of the role in which the Acceding Creditor will become a party*] (the **Acceding Capacity**) for the purposes of the Intercreditor Agreement, the Acceding Creditor confirms that, as from [date], it intends to be party to the Intercreditor Agreement in the Acceding Capacity and undertakes to perform all the obligations expressed in the Intercreditor Agreement to be assumed in the Acceding Capacity and agrees that it shall be bound by all the provisions of the Intercreditor Agreement, as if it had been an original party to the Intercreditor Agreement.

[The Acceding Creditor is an Affiliate of a Lender and has become a provider of an Ancillary Facility. In consideration of the Acceding Creditor being accepted as an Ancillary Lender for the purposes of [*specify the relevant facility agreement*] (the **Relevant Facility Agreement**), the Acceding Creditor confirms, for the benefit of the parties to the Relevant Facility Agreement, that, as from [date], it intends to be party to the Relevant Facility Agreement as an Ancillary Lender, and undertakes to perform all the obligations expressed in the Relevant Facility Agreement to be assumed by a [Finance Party] (as defined in the Relevant Facility Agreement) and agrees that it shall be bound by all the provisions of the Relevant Facility Agreement, as if it had been an original party to the Relevant Facility Agreement as an Ancillary Lender.][*]

This Undertaking and any non-contractual obligations arising out of or in connection with it are governed by English law.

**THIS UNDERTAKING** has been entered into on the date stated above [and is executed as a deed by the Acceding Creditor, if it is acceding as an Intra-Group Lender [or an Subordinated Creditor] and is delivered on the date stated above].

**Acceding Creditor**

[**EXECUTED** as a **DEED**]

[*insert full name of Acceding Creditor*]

By:

---

[*]    Include only in the case of an Ancillary Lender which is an Affiliate of a Credit Facility Lender which is using this undertaking to accede to the relevant Credit Facility Agreement in accordance with paragraph (c) of Clause 26.16 (Creditor/Creditor Representative Accession Undertaking).

•

Address:

Fax:

Accepted by the Security Agent                    [Accepted by the relevant Super Senior Facility Agent]


_____            _____

for and on behalf of                              for and on behalf of

[*Insert full name of Security Agent*]              [*Insert full name of relevant Super Senior Facility Agent*]

Date:                                             Date:][***]

---

[***]    Include only in the case of an Ancillary Lender which is an Affiliate of a Lender which is using this undertaking to accede to the relevant Facility Agreement.

•

**1232**

## SCHEDULE 4

## FORM OF DEBTOR RESIGNATION REQUEST

To:       Lucid Trustee Services Limited as Security Agent

From:    [Company]

Dated: [    ]

Dear Sirs

**[Parent] – [    ] Intercreditor Agreement
dated [    ] (the Intercreditor Agreement)**

1.       We refer to the Intercreditor Agreement.  This is a Debtor Resignation Request.  Terms defined in the Intercreditor Agreement have the same meaning in this Debtor Resignation Request unless given a different meaning in this Debtor Resignation Request.

2.       Pursuant to Clause 26.21 (Resignation of a Debtor) of the Intercreditor Agreement we request that [*resigning Debtor*] (the **Resigning Debtor**) be released from its obligations as a Debtor under the Intercreditor Agreement.

3.       We confirm that:

(a)       no Event of Default is continuing or would result from the acceptance of the Debtor Resignation Request;

(b)       the Resigning Debtor is not, or has ceased to be, a borrower, issuer or a guarantor of any of the Primary Creditor Liabilities; and

(c)       the Resigning Debtor is under no actual or contingent obligations in respect of any Intra-Group Liabilities or Subordinated Liabilities.

4.       This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

Yours faithfully



…………………
For and on behalf of

[Company]

•

## SCHEDULE 5

## FORM OF SUPER SENIOR HEDGING CERTIFICATE

To:      Lucid Trustee Services Limited as Security Agent

From:   [*new Super Senior Hedge Counterparty*]/[*existing Super Senior Hedge Counterparty*] and [*Company*]

Dated: [   ]

Dear Sirs

**[Parent] – [   ] Intercreditor Agreement
dated [   ] (the Intercreditor Agreement)**

5.       We refer to the Intercreditor Agreement.  This is a Super Senior Hedging Certificate.  Terms defined in the Intercreditor Agreement have the same meaning in this Super Senior Hedging Certificate.

6.       Pursuant to Clause 5.13 (Designation of Super Senior Hedging Liabilities) of the Intercreditor Agreement we request that with effect from the date of your acknowledgement of this Super Senior Hedging Certificate:

   (a)      [the Hedging Liabilities owed to [name of new Super Senior Hedge Counterparty] under [details of Hedging Agreement and/or trade confirmation or other equivalent documentation to be inserted] shall be designated and treated as Super Senior Hedging Liabilities][.][; and/or

   (b)      the Hedging Liabilities owed to [name of existing Super Senior Hedge Counterparty] under [details of Hedging Agreement and/or trade confirmation or other equivalent documentation to be inserted] shall no longer be designated as Super Senior Hedging Liabilities] shall be released and be available for designation towards other Hedging Liabilities as Super Senior Hedging Liabilities under the Intercreditor Agreement.]

7.       This letter and any non-contractual obligations arising out of or in connection with it are governed by English law.

[*Company*]

By:

[*existing Super Senior Hedge Counterparty*]

By:

[*new Super Senior Hedge Counterparty*]

By:

•

Acknowledged and accepted on [*insert date*]:

[*Security Agent*]

By:

•

**1235**

## SCHEDULE 6

## GUARANTEE AND INDEMNITY

1. **Definitions**

   **Guaranteed Party** means each Hedge Counterparty and each Cash Management Provider.

   **Guaranteed Document** means, in relation to a Guaranteed Party, each Hedging Agreement or Cash Management Agreement to which it is a party.

2. **Guarantee**

   Each Debtor (other than any in its capacity as a Parent Debt Issuer) irrevocably and unconditionally jointly and severally:

   (a)    guarantees to each Guaranteed Party punctual performance by each other Debtor of all that Debtor's obligations under its Guaranteed Document;

   (b)    undertakes with each Guaranteed Party that whenever another Debtor does not pay any amount when due under or in connection with its Guaranteed Document, that Debtor shall immediately on demand pay that amount as if it was the principal Debtor; and

   (c)    agrees with each Guaranteed Party that if any obligation guaranteed by it is or becomes unenforceable, invalid or illegal, it will, as an independent and primary obligation, indemnify that Guaranteed Party immediately on demand against any cost, loss or liability it incurs as a result of a Debtor not paying any amount which would, but for such unenforceability, invalidity or illegality, have been payable by it under its Guaranteed Document on the date when it would have been due. The amount payable by a Debtor under this indemnity will not exceed the amount it would have had to pay under this Schedule 6 if the amount claimed had been recoverable on the basis of a guarantee.

3. **Continuing guarantee**

   This guarantee is a continuing guarantee and will extend to the ultimate balance of sums payable by any Debtor under the Guaranteed Documents, regardless of any intermediate payment or discharge in whole or in part.

4. **Reinstatement**

   If any discharge, release or arrangement (whether in respect of the obligations of any Debtor or any security for those obligations or otherwise) is made by a Guaranteed Party in whole or in part on the basis of any payment, security or other disposition which is avoided or must be restored in insolvency, liquidation, administration or otherwise, without limitation, then the liability of each Debtor under this Schedule 6 will continue or be reinstated as if the discharge, release or arrangement had not occurred.

•

**5.      Waiver of defences**

The obligations of each Debtor under this Schedule 6 will not be affected by an act, omission, matter or thing which, but for this Schedule 6, would reduce, release or prejudice any of its obligations under this Schedule 6 (without limitation and whether or not known to it or any Guaranteed Party) including:

(a)      any time, waiver or consent granted to, or composition with, any Debtor or other person;

(b)      the release of any other Debtor or any other person under the terms of any composition or arrangement with any creditor of any member of the Group;

(c)      the taking, variation, compromise, exchange, renewal or release of, or refusal or neglect to perfect, take up or enforce, any rights against, or security over assets of, any Debtor or other person or any non-presentation or non-observance of any formality or other requirement in respect of any instrument or any failure to realise the full value of any security;

(d)      any incapacity or lack of power, authority or legal personality of or dissolution or change in the members or status of a Debtor or any other person;

(e)      any amendment, novation, supplement, extension restatement (however fundamental and whether or not more onerous) or replacement of a Guaranteed Document or any other document or security including, without limitation, any change in the purpose of, any extension of or increase in any indebtedness or hedging arrangements or the addition of any new hedging arrangements under any Guaranteed Document or other document or security;

(f)      any unenforceability, illegality or invalidity of any obligation of any person under any Guaranteed Document or any other document or security; or

(g)      any insolvency or similar proceedings.

**6.      Debtor intent**

Without prejudice to the generality of paragraph 5 (Waiver of defences), each Debtor expressly confirms that it intends that this guarantee shall extend from time to time to any (however fundamental) variation, increase, extension or addition of or to any of the Guaranteed Documents and/or any indebtedness or hedging made available for the purposes of or in connection with any of the following: business acquisitions of any nature; increasing working capital; enabling investor distributions to be made; carrying out restructurings; refinancing existing facilities; refinancing any other indebtedness; making facilities available to new borrowers; any other variation or extension of the purposes for which any such facility or amount might be made available from time to time; and any fees, costs and/or expenses associated with any of the foregoing.

**7.      Immediate recourse**

Each Debtor waives any right it may have of first requiring any Guaranteed Party (or any trustee or agent on its behalf) to proceed against or enforce any other rights or security or claim payment from any person before claiming from that Debtor under this Schedule 6.  This waiver applies irrespective of any law or any provision of its Guaranteed Documents to the contrary.

•

8. **Appropriations**

Until all amounts which may be or become payable by the Debtors under or in connection with the its Guaranteed Documents have been irrevocably paid in full, each Guaranteed Party (or any trustee or agent on its behalf) may:

(a)     refrain from applying or enforcing any other moneys, security or rights held or received by that Guaranteed Party (or any trustee or agent on its behalf) in respect of those amounts, or apply and enforce the same in such manner and order as it sees fit (whether against those amounts or otherwise) and no Debtor shall be entitled to the benefit of the same; and

(b)     hold in an interest-bearing suspense account any moneys received from any Debtor or on account of any Debtor's liability under this Schedule 6.

9. **Deferral of Debtors' rights**

Until all amounts which may be or become payable by the Debtors under or in connection with a Guaranteed Document have been irrevocably paid in full, no Debtor will exercise any rights which it may have by reason of performance by it of its obligations under that Guaranteed Document or by reason of any amount being payable, or liability arising, under this Schedule 6:

(a)     to be indemnified by a Debtor;

(b)     to claim any contribution from any other guarantor of any Debtor's obligations under that Guaranteed Document;

(c)     to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of the Guaranteed Party under that Guaranteed Document or of any other guarantee or security taken pursuant to, or in connection with, that Guaranteed Document by the relevant Guaranteed Party;

(d)     to bring legal or other proceedings for an order requiring any Debtor to make any payment, or perform any obligation, in respect of which any Debtor has given a guarantee, undertaking or indemnity under paragraph 2 (Guarantee);

(e)     to exercise any right of set-off against any Debtor; and/or

(f)     to claim or prove as a creditor of any Debtor in competition with the relevant Guaranteed Party.

If a Debtor receives any benefit, payment or distribution in relation to such rights it shall hold that benefit, payment or distribution to the extent necessary to enable all amounts which may be or become payable to a Guaranteed Party by the Debtors under or in connection with its Guaranteed Documents to be repaid in full on trust for that Guaranteed Party and shall promptly pay or transfer the same to the that Guaranteed Party.

10. **Release of Debtors' right of contribution**

If any Debtor (a **Retiring Debtor**) ceases to be a Debtor then on the date such Retiring Debtor ceases to be a Debtor:

•

**1238**

(a)  that Retiring Debtor is released by each other Debtor from any liability (whether past, present or future and whether actual or contingent) to make a contribution to any other Debtor arising by reason of the performance by any other Debtor of its obligations under each Guaranteed Document; and

(b)  each other Debtor waives any rights it may have by reason of the performance of its obligations under each Guaranteed Document to take the benefit (in whole or in part and whether by way of subrogation or otherwise) of any rights of a Guaranteed Party under that Guaranteed Document or of any other security taken pursuant to, or in connection with, that Guaranteed Document where such rights or security are granted by or in relation to the assets of the Retiring Debtor.

## 11.    Additional security

This guarantee is in addition to and is not in any way prejudiced by any other guarantee or security now or subsequently held by any Guaranteed Party.

## 12.    Guarantee Limitations

This Schedule 6 is subject to the Guarantee Limitations.

•

**1239**

## SCHEDULE 7

## GUARANTEE LIMITATIONS

1.    **Interpretation**

In this Schedule, a reference to a Debtor includes a Third Party Security Provider.

2.    **General limitations**

Without limiting any specific exemptions set out below, this guarantee and any other guarantee, indemnity or assurance against loss in any Primary Debt Documents (including any Transaction Security) does not apply to any liability to the extent it would constitute unlawful financial assistance within the meaning of sections 678 or 679 of the Companies Act 2006 or any equivalent and applicable provisions under the laws of the jurisdiction of incorporation of the relevant Debtor.

3.    **Germany**

(a)    In this Clause 3:

**German Debtor** means:

(a)    any Debtor incorporated in Germany as a limited liability company (*Gesellschaft mit beschränkter Haftung*) (a **German GmbH Debtor**); or

(b)    a limited partnership (*Kommanditgesellschaft*) in relation to which any general partner (*persönlich haftender Gesellschafter*) is a limited liability company (any such general partner is hereinafter referred to as a **German GP Company**) (such limited partnership is hereinafter referred to as a **German KG Debtor**).

**Guarantee** means any guarantee and/or indemnity obligation of any German Debtor created under this Agreement or any other Primary Debt Documents.

**Net Assets** means the amount of the German GmbH Debtor's, or, where the German Debtor is a German KG Debtor, its German GP Company's relevant assets (the calculation of which shall include all items set forth in Section 266(2) A, B, C, D and E of the German Commercial Code (*Handelsgesetzbuch*, **HGB**)) less:

(a)    the German GmbH Debtor's, or, where the German Debtor is a German KG Debtor, its German GP Company's liabilities, the calculation of which shall include all items set forth in Section 266(3) B, C, D and E of the HGB including any costs for any Auditor's Determination but such liabilities shall exclude:

(i)    the liabilities under or relating to the Guarantee; and

(ii)    any obligations (*Verbindlichkeiten*) of the German GmbH Debtor (and, in case of a GmbH & Co. KG, of its German GP Company):

(A)    owing to any member of the group or any other affiliated company which are subordinated by law or by contract to any Indebtedness outstanding under this

•

Agreement (including for the avoidance of doubt, obligations that would in an insolvency be subordinated pursuant to Section 39 para 1 no 5 or Section 39 para 2 of the German Insolvency Code (*Insolvenzordnung*)) and including obligations under guarantees for obligations which are so subordinated, unless a waiver of the loan provided to the relevant German GmbH Debtor or, in the case of a GmbH & Co. KG, of its German GP Company, would result in that member of the group breaching its obligations under section 30 of the German Limited Liability Companies Act (*GmbH-Gesetz*, **GmbHG**) or any similar provision of any other jurisdiction applicable to it; and

(B)    incurred by the German GmbH Debtor (and, in the case of a GmbH & Co.KG, of its German GP Company) in wilful violation of any of the provisions of the Primary Debt Documents; and

(b)    any amounts which are subject to legal dividend payment constraints (*Ausschüttungssperre*) pursuant to Section 253(6), Section 268(8) or Section 272(5) HGB, in each case calculated in accordance with HGB (taking into account applicable case law on the calculation of net assets pursuant to Section 30 GmbHG) and accounting principles consistent with those applied in the preparation of the latest annual unconsolidated financial statements for that German GmbH Debtor (or, where the German Debtor is a German KG Debtor, its German GP Company.

For the purpose of such calculation, the following balance sheet items shall be adjusted as follows:

(i)    if the registered share capital of the German Debtor, or where the German Debtor is a German KG Debtor, of its German GP Company, is increased out of retained earnings (*Kapitalerhöhung aus Gesellschaftsmitteln*) after the date of this Agreement, such increase shall not be taken into account unless (i) such increase has been effected with the prior written consent of the Security Agent or is otherwise permitted under this Agreement or any other Primary Debt Documents and (ii) only to the extent it is fully paid up (*voll eingezahlt*);

(ii)    the amount of any increase after the date of this Agreement of the German Debtor's, or, where the German Debtor is a German KG Debtor, its German GP Company's registered share capital which has been effected out of retained earnings (*Kapitalerhöhung aus Gesellschaftsmitteln*) without the prior written consent of the Security Agent shall be deducted from the registered share capital;

(iii)    any accrual (*Rückstellung*) in respect of a potential enforcement of the Guarantee or any Security shall be disregarded; and

(iv)    liabilities in relation to loans granted to, and other contractual liabilities incurred by, the German Debtor or as the case may be by its German GP Company, in willful (*vorsätzlich*) or grossly negligent (*grob fahrlässig*) violation of any Primary Debt Documents shall be disregarded.

(b)    In the case of a German Debtor the enforcement of the Guarantee against such German Debtor shall be limited if and to the extent that:

(i)    such Guarantee secures the obligations or liabilities of:

•

(A)    the German Debtor's, or in case of a German KG Debtor, any of its relevant German GP Company's, direct or indirect shareholder (upstream), or

(B)    a direct or indirect subsidiary of a shareholder pursuant to paragraph (i) (but excluding any direct or indirect subsidiary of the German Debtor (and, in the case of a German KG Debtor, any direct or indirect subsidiary of its German GP Company)) (cross-stream); and

(ii)    the enforcement of the Guarantee (x) would cause the Net Assets to be less than the respective share capital (*Stammkapital*) (*Begründung einer Unterbilanz*) or (y) (if the German GmbH Debtor's, or, where the German Debtor is a German KG Debtor, its German GP Company's Net Assets are already less than its respective registered share capital) would cause such deficit to be further increased (*Vertiefung einer Unterbilanz*).

(c)    In addition, the German Debtor and, where the German Debtor is a German KG Debtor, also its relevant German GP Company shall, if so requested by the Security Agent, realise, to the extent legally permitted, in a situation where after enforcement of the Guarantee the German Debtor, or, where the German Debtor is a German KG Debtor, its relevant German GP Company would not have Net Assets in excess of its respective registered share capital, any and all of its assets that are shown in the balance sheet with a book value (*Buchwert*) that is significantly lower than the market value of the asset if such asset is not necessary for the German Debtor's or as the case may be its relevant German GP Company's operational business (*operativ nicht betriebsnotwendig*).

(d)    The enforcement of the Guarantee shall initially be excluded if no later than fifteen (15) Business Days following a demand by the Security Agent to make a payment under the Guarantee, the managing directors on behalf of the German Debtor or, as the case may be, its German GP Company, have confirmed in writing to the Security Agent:

(i)    to what extent the Guarantee granted hereunder has an upstream or cross-stream effect as described above; and

(ii)    to which extent the Guarantee securing cross-stream and/or upstream obligations or liabilities as described above cannot be enforced as it would cause the Net Assets of the German Debtor, or, where the German Debtor is a German KG Debtor, its German GP Company to be less than its respective registered share capital (taking into account the above set out adjustments and realization duties),

(the **Management Determination**) and such confirmation is supported by a reasonably satisfactory calculation provided the Security Agent shall in any event be entitled to enforce the Guarantee for any amounts where such enforcement would, in accordance with the Management Determination, not cause the German Debtor's, or, where the German Debtor is a German KG Debtor, its German GP Company's Net Assets to be less than (or to fall further below) the amount of its respective registered share capital (in each case as calculated and adjusted as set out above).

(e)    Following the Security Agent's receipt of Management Determination, any further enforcement of the Guarantee (i.e. any enforcement to which the Security Agent is not already entitled to) shall be excluded for a period of no more than thirty (30) Business Days only. If the Security Agent receives within such thirty (30) Business Days period: (i) an up-to date balance sheet together with (ii) a determination in each case prepared by auditors of international standard and reputation appointed by the relevant German Debtor either confirming the Management Determination or setting out deviations from the Management Determination (the **Auditor's Determination**), the further

•

enforcement of the Guarantee shall be limited, if and to the extent such enforcement would, in accordance with the Auditor's Determination cause the German Debtor's, or, where the German Debtor is a German KG Debtor, its German GP Company's Net Assets to be less than (or to fall further below) the amount of its respective registered share capital in each case as calculated and adjusted as set out above. If the German Debtor fails to deliver an Auditor's Determination within thirty (30) Business Days after receipt of the Management Determination, the Security Agent shall be entitled to enforce the Guarantee without any limitation or restriction.

(f)    If and to the extent (A) the net assets as determined by the Auditors' Determination are lower than the amount enforced in accordance with the Management Determination or (B) the Guarantee has been enforced without regard to the limitations set out above because (x) the Management Determination was not delivered within the relevant time frame or (y) the Auditors' Determination was not delivered within the relevant time frame but has been delivered within ten (10) Business Days following the due date for the delivery of the Auditors' Determination, the Security Agent shall without undue delay repay to the relevant German Debtor upon written demand of the relevant German Debtor any amount (if and to the extent already paid to the Creditors (or any of them)) in the case of (A) equal to the difference between the amount paid and the amount payable resulting from the Auditor's Determination, and in the case of (B), which the Security Agent would not have been entitled to enforce had the Management Determination and the Auditors' Determination been delivered in time provided such demand for repayment is made to the Security Agent within six months from the date the Guarantee is enforced. The Security Agent may withhold any amount received pursuant to an enforcement of the Guarantee until final determination of the amount of the net assets pursuant to the Auditor's Determination.

(g)    The limitations set out in this Clause 3 shall not apply (or, as the case may be, shall cease to apply):

    (i)    if and to the extent any amounts borrowed under this Agreement are lent or on-lent to such German Debtor and/or, in case of a German KG Debtor, its relevant German GP Company or any of its respective subsidiaries from time to time if, in addition by virtue of the enforcement of the Guarantee the German Debtor, or as the case may be, its relevant German GP Company, has a recourse, indemnification, sharing of losses or other compensation claim against such lending affiliated company (*verbundenes Unternehmen*) within the meaning of Section 16, 17 or 18 of the German Stock Act (*Aktiengesetz*, **AktG**) or the lending direct or indirect shareholder of the German Debtor which could be set-off against such loan receivable or otherwise be used to settle or discharge such loan obligation and provided that the Security Agent has waived with binding effect on any Creditor the restrictions of any provision under any Primary Debt Documents restricting the right to set off claims against, or otherwise make use of the recourse, indemnification, sharing of losses or other compensation claim against such lending affiliated company (*verbundenes Unternehmen*) within the meaning of Section 16, 17 or 18 of the AktG or the lending direct or indirect shareholder of the German Debtor in order to settle or discharge such loan obligation vis-à-vis, such lending member of the lending affiliated company (*verbundenes Unternehmen*) within the meaning of Section 16, 17 or 18 of the AktG or the lending direct or indirect shareholder of the German Debtor; or

    (ii)    if and when a domination agreement (*Beherrschungsvertrag*) and/or profit absorption agreement (*Gewinnabführungsvertrag*) (either directly or through a chain of domination and/or profit absorption agreements) is or becomes effective between the relevant German Debtor (or, in case of a German KG Debtor, its German GP Company) as dependent entity (*abhängiges Unternehmen*) and:

•

(A)   in case of the German Debtor (or, in case of a German KG Debtor, its German GP Company) is a subsidiary of the relevant obligor whose obligations are guaranteed under the Guarantee, that obligor; or

(B)   in case the German Debtor (or, in case of a German KG Debtor, its German GP Company) is a sister company of the relevant obligor whose obligations are guaranteed under the Guarantee, any joint (direct or indirect) parent company of the German Debtor (or, in case of a German KG Debtor, its German GP Company) and that obligor,

as dominating entity (*beherrschendes Unternehmen*)) other than where and to the extent the existence of such domination agreement (*Beherrschungsvertrag*) and/or profit absorption agreement (*Gewinnabführungsvertrag*) does not result in the inapplicability of sentence 1 of paragraph 1 of Section 30 GmbHG (as stipulated by sentence 2 of such paragraph) with respect to the relevant payments under the Guarantee (including in respect of intermediate entities through which the relevant obligor whose obligations are guaranteed under the Guarantee is an indirect shareholder of the German Debtor, or as the case may be, its German GP Company);

(iii)   if and to the extent the German Debtor holds on the date of the enforcement of the Guarantee a fully valuable and recoverable indemnity or claim for refund (*vollwertiger Gegenleistungs-oder Rückgewähranspruch*) against any of its direct or indirect shareholders or Subsidiaries of such shareholders (other than Subsidiaries of the German Debtor) with respect to the relevant payments under the Guarantee; or

(iv)   if and to the extent for any other reason (including, without limitation, as a result of a change in the relevant rules of law) the deficit (*Unterbilanz*) referred to in paragraph (b) above does not constitute a breach of the German Debtor's obligations to maintain its registered share capital pursuant to §§ 30 et seq. GmbHG or does not result in a personal liability of the managing directors of the German Debtor pursuant to §§ 43, 31 GmbHG.

## 4.   Kingdom of Saudi Arabia law

(a)   The obligations of a Debtor incorporated in the Kingdom of Saudi Arabia (a **KSA Debtor**) under the Primary Debt Documents shall be limited to exclude any obligation to the extent that it would constitute an unlawful distribution to the partners or shareholders of that KSA Debtor or an otherwise unlawful use of proceeds or assets of that KSA Debtor, whether pursuant to article 10 of the Saudi Arabian companies regulations or any other applicable law (each being a **Breach of Law**). The Parties irrevocably agree that the obligations of a KSA Debtor under the Primary Debt Documents are limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of that KSA Debtor, result in the obligations of that KSA Debtor under the Parent Debt Documents not constituting a Breach of Law.

(b)   Unless otherwise agreed by the Company and each KSA Debtor (without any need to amend this Agreement), the liability of a KSA Debtor under the Primary Debt Documents shall be limited to US$1,000,000,000 plus any unpaid amount of interest, fees, liability, costs and expenses under the Primary Debt Documents and the amount of any interest, default interest, costs and expenses related to the liabilities of the KSA Debtor.

•

5.      **Norway**

(a)     The obligations of each Debtor incorporated in Norway (a **Norwegian Debtor**) under the Primary Debt Documents shall be limited by any mandatory provisions of law applicable to such Norwegian Debtor and be deemed to have been given only to the extent it does not violate Sections 8-7 and 8-10 of the Norwegian Private Limited Liability Companies Act 1997 No. 44 (the **Norwegian Companies Act**) regulating unlawful financial assistance and other restricted loans, guarantees and joint and several liability as well as providing of security, and the liability of each Norwegian Debtor only applies to the extent permitted by such provisions of the Norwegian Companies Act. Any Norwegian Debtor's obligations under the Primary Debt Documents shall, however, be interpreted so as to make it liable to the fullest extent permitted by the Norwegian Companies Act from time to time.

(b)     Unless otherwise agreed by the Company and each Norwegian Debtor (and following any such agreement this Agreement shall be deemed to be amended accordingly), the liability of a Norwegian Debtor under the Primary Debt Documents shall be limited to US$1,000,000,000 plus any unpaid amount of interest, fees, liability, costs and expenses under the Primary Debt Documents and the amount of any interest, default interest, costs and expenses related to the liabilities of the Norwegian Debtor.

6.      **Security**

The limitations set out above shall apply mutatis mutandis to any Security provided by any Debtor under the Security Documents and to any guarantee, undertaking, obligation, indemnity and payment, including but not limited to, distributions, credits, loans and set-offs, pursuant to or permitted by the Primary Debt Documents in relation to a Debtor.

7.      **Additional Debtors**

The guarantee of, and any Security granted by, any Debtor which becomes a party to this Agreement pursuant to Clause 26 (Changes to the Parties) is subject to any other limitations relating to that Debtor set out in the Accession Deed applicable to such Debtor.

•

## SCHEDULE 8

## AGREED SECURITY PRINCIPLES

This Schedule contains the principles that apply to all Primary Debt Documents including all Transaction Security Documents.  To the extent there is any inconsistency between the terms of any Primary Debt Document and the terms set out in this Schedule, this Schedule shall prevail.

## 1.    GENERAL PRINCIPLES

(a)    The guarantees and Security to be provided will be given in accordance with certain Security principles (the **Agreed Security Principles**).  This Schedule addresses the manner in which these Agreed Security Principles will affect the guarantees and Security proposed to be taken in relation to this transaction.

(b)    A reference to an Obligor in these Agreed Security Principles is a reference to the borrower or issuer of the applicable debt and each guarantor of that debt, and shall also be construed as a reference to a Third Party Security Provider where applicable.

(c)    These Agreed Security Principles embody a recognition by all parties that there may be certain legal and practical difficulties in obtaining effective guarantees and Security from the Company or any Restricted Subsidiary in jurisdictions in which it has been agreed guarantees and Security will be granted.  In particular:

(i)    general statutory limitations, financial assistance, corporate benefit, fraudulent preference, "earnings stripping", "thin capitalisation" rules, tax restrictions, retention of title claims or other similar laws or regulations (or analogous restrictions) of any applicable jurisdiction may limit the ability of the Company or any Restricted Subsidiary to provide a guarantee or Security or may require that the guarantee or Security be limited by an amount or otherwise. If any such limit applies, the guarantees and Security provided will be limited to the maximum amount which the Company or any Restricted Subsidiary, as applicable, may provide having regard to applicable law (including any jurisprudence) and subject to fiduciary duties of management (a security interest will not be required if taking such Security would expose the directors of the relevant company to a material risk of personal liability);

(ii)    certain supervisory board, works council or another external body's consent may be required to enable the Company or any Restricted Subsidiary to provide a guarantee or Security. Such guarantee and/or Security shall not be required unless such consent has been received provided that all reasonable endeavours have been used by the Company or Restricted Subsidiary, as applicable, to obtain the relevant consent;

(iii)    a key factor in determining whether or not a guarantee or Security shall be taken is the applicable cost (including but not limited to adverse effects on interest deductibility and stamp duty, notarisation and registration fees) which shall not be disproportionate to the benefit to the creditors of obtaining such guarantee or Security;

(iv)    the maximum guaranteed or secured amount may be limited to minimise stamp duty, notarisation, registration or other applicable fees, taxes and duties where the benefit of

•

increasing the guaranteed or secured amount is disproportionate to the level of such fee, taxes and duties;

(v)  where there is material incremental cost involved in creating Security over all assets owned by any Obligor in a particular category the principle stated in sub-paragraph (iii) above shall apply and, subject to these Agreed Security Principles, only the material assets in that category shall be subject to Security;

(vi)  guarantees and Security will not be granted or the perfection of the Security granted will not be required if it would restrict the ability of the Company or any Restricted Subsidiary to conduct its operations and business in the ordinary course;

(vii)  it is acknowledged that in certain jurisdictions it may be either impossible or impractical to create Security over certain categories of assets in which event Security will not be taken over such assets;

(viii)  any assets subject to third party arrangements which are permitted by the finance documents and which prevent those assets from being secured will be excluded from any relevant security document;

(ix)  the Company and its Restricted Subsidiaries will not be required to give guarantees or enter into security documents if it would be likely to result in any risk that the directors and officers of the relevant grantor of collateral or guarantees could be held to be (i) in breach of their fiduciary duties and/or (ii), company or criminal law provided that the Company and each Restricted Subsidiary, as applicable, shall use reasonable endeavours to overcome any such obstacle;

(x)  to the extent possible, all Security shall be given in favour of the Security Agent as one set of Security and not the secured creditors individually unless second or third ranking Security is required by local law.  "Parallel debt"/"Joint and several creditorship" (as applicable) provisions will be used where necessary and such provisions will be contained in this Agreement and not the individual security documents unless required under local laws;

(xi)  to the extent possible, there should be no action required to be taken by any Obligor in relation to the guarantees or Security when any creditor assigns or transfers any of its participation in the Liabilities to a new creditor;

(xii)  no perfection action will be required in any jurisdiction other than the jurisdictions of incorporation of the Obligors;

(xiii)  other than in relation to the relevant security document itself or as otherwise set out in these Agreed Security Principles, no perfection action will be required in relation to any assets the subject of a floating charge;

(xiv)  no title investigations or title insurance will be required;

(xv)  unless granted under a global security document governed by the law of the jurisdiction of an Obligor or under English law, New York law or Scottish law, all Security (other than share Security over its subsidiaries that are also Obligors) shall be governed by the law of, and shall secure assets located in the jurisdiction of, incorporation of that Obligor; and

•

**1247**

(xvi)    no Security will be required over investments/shares in joint ventures (or non-wholly-owned Restricted Subsidiaries) or the assets of joint ventures (or non-wholly-owned Restricted Subsidiaries) and no joint venture (or non-wholly-owned Restricted Subsidiary) will be required to provide a guarantee.

(d)    Subject to these Agreed Security Principles, an Obligor shall only be required to grant Security over shares, intercompany receivables owed by any member of the Group and material bank accounts. Obligors incorporated in England and Wales and Scotland shall also be required to grant floating charges.

(e)    No guarantee or Security will be required from a Restricted Subsidiary incorporated in a jurisdiction other than England, Scotland, Germany, Netherlands, Norway, Oman, Saudi Arabia and Russia or any other jurisdiction notified to the creditors (or representative on their behalf) in writing by the Company (an **Agreed Security Jurisdiction**), provided that no Security shall be granted by (or over the shares of) any original Obligor incorporated in Russia.

(f)    For the avoidance of doubt, in these Agreed Security Principles, "cost" includes registration taxes payable on the creation or for the continuance of any Security, stamp duties, taxes, out-of-pocket expenses, and other fees and expenses incurred by the relevant grantor of Security or any of its direct or indirect owners, subsidiaries or affiliates.

(g)    Any request for an Obligor to use its reasonable endeavours under these Agreed Security Principles shall only require that Obligor to use its reasonable endeavours for a period of 20 Business Days after which such obligation shall lapse.

## 2.    TERMS OF SECURITY DOCUMENTS

### 2.1    General

The following principles will be reflected in the terms of any Security taken as part of this transaction:

(a)    the Security will be first ranking to the extent possible;

(b)    Security will not be enforceable until an Acceleration Event has occurred;

(c)    any rights of set off will not be exercisable until an Acceleration Event has occurred;

(d)    notification of pledges/charges over bank accounts will only be given to the bank holding the account to the extent it is necessary for the creation or perfection of the Security and doesn't restrict or prohibit the cash pooling arrangements to be implemented among the Company and its Restricted Subsidiaries or otherwise prevent it from retaining control over and the ability to operate such accounts freely; notices to account banks shall include a request for an acknowledgement by the account bank and the Company shall use its reasonable endeavours to obtain an acknowledgement from the relevant account bank to the extent that it is necessary for the creation or perfection of the security and doesn't restrict or prohibit the cash pooling arrangements to be implemented by the Company and its Restricted Subsidiaries or otherwise prevent it from retaining control over the ability to operate such accounts freely;

•

(e)    notices to account banks shall not request the account bank to amend or waive the standard terms and conditions of the account bank and any acknowledgement provided by an account bank shall be permitted to include a permission for any prior security interests in favour of the account bank created or arising by operation of law or in its standard terms and conditions (including, as applicable, for the netting of credit and debit balances pursuant to current account netting arrangements) or in any cash pooling arrangement to remain in place;

(f)    notification of receivables Security to debtors will only be given if an Acceleration Event has occurred (other than in respect of intra-group receivables owed by Debtors (as defined in the Intercreditor Agreement) to whom notice will be deemed to have been given pursuant to the Intercreditor Agreement);

(g)    unless a security document specifies a later date, notices and other perfection steps are to be completed within ten Business Days after the date of the security document (or the date on which any security provider becomes a party to that security document);

(h)    in relation to any asset which a security provider does not own on the date of a security document (or the date on which the security provider becomes a party to that security document) including the opening of a new material bank account, any notices or other perfection steps shall only be required to be given if the Company determines that (in the case of new bank accounts only) that such account is a material account or such asset is otherwise required to be secured under the security documents (other than under any floating charge), provided that the Company shall only be obliged to make such determination once in any calendar year);   if the asset is Shares, the Company shall ensure that any notice, document, certificate or other requirement required to be sent, deposited or completed in respect of that asset in accordance with the terms of the relevant security document is sent, deposited or completed as soon as reasonably practicable after those Shares are acquired by the relevant Security Provider;

(i)    the security documents should only operate to create Security rather than to impose new commercial obligations. Accordingly, they will not contain any representations or undertakings (such as in respect of title, insurance, information or the payment of costs) or provisions for default or penalty interest, tax gross-up or any indemnities unless these are representations or covenants required for the creation or perfection of the Security and if there is an equivalent representation or undertaking in any underlying facility agreement, the provisions included in the relevant security document shall be no more onerous;

(j)    until an Acceleration Event has occurred, the Obligors shall be permitted to retain and to exercise voting rights to any shares secured by them in a manner which does not adversely affect the validity or enforceability of the Security or cause an Event of Default to occur and the Obligors shall be permitted to receive and retain dividends on secured shares/pay dividends upstream on secured shares;

(k)    the Secured Parties shall only be able to exercise any power of attorney granted to them under the security documents following an Acceleration Event has occurred of any secured debt or failure to comply with a written request to fulfil a further assurance or perfection obligation within 20 business days of request;

(l)    the security documents will permit disposals of assets (including pursuant to a merger, consolidation, reorganisation, winding up, securitisation or sale and leaseback) where such

•

disposal is permitted under the finance documents and will include an automatic release of the Security in respect of the assets the subject of such disposal and assurances for the Security Agent to do all things reasonably requested (at the cost of the Obligors) to effect any release of Security the subject of such a disposal;

(m)     the security documents will not contain any provisions for default or penalty interest, tax gross-up or indemnity or any indemnification for costs, damages or liabilities that are more onerous or extensive than the equivalent provisions in the finance documents;

(n)     to the extent any notice or other perfection documentation is required to be delivered under the security documents, the security documents will state that such notice or documentation will be delivered as soon as practicable and will only include a specified number of days for delivery of a notice or other perfection documentation if required in order for the relevant Security to be perfected in a relevant jurisdiction within an applicable time period established as a matter of law;

(o)     if not otherwise required by law, upon complete and irrevocable satisfaction of the secured obligations and provided there are no actual or contingent liabilities to advance further monies, the Security Agent shall promptly thereafter, at the request and the cost and expense of the relevant grantor, release the secured asset;

(p)     the security documents will not accrue interest on any amount in respect of which interest is accruing under the finance documents; and

(q)     intercompany debt (other than proceeds loans) over which Security is granted will be freely transferable among the Company and its Restricted Subsidiaries (subject to limitations in the finance documents) and permitted to be capitalised up until the point of any Acceleration Event provided that, to the extent any debt is capitalised in a company the shares of which are subject to Security, the relevant Obligor will grant equivalent Security over the new shares following that capitalisation.

## 2.2     Specific terms to be included

(a)     Except to the extent a security document only creates Security over specific assets (and provided that paragraphs (i) to (ix) below shall not apply to the Company), each security document shall include an "excluded assets" clause (or other provisions having similar effect) so that the following assets are excluded from the Security (including any floating charge) and from the operation of any further assurance provisions:

(i)     any asset in respect of which an Obligor is prohibited from creating a security interest by reason of any contract, licence, lease, instrument, regulatory constraint or other arrangement with a third party (including any asset in respect of which an Obligor is prohibited from creating a security interest without the prior consent of a third party), in each case, to the extent of that prohibition and only for so long as that prohibition is in existence or until consent has been received from the third party;

(ii)     any asset which, if it becomes the subject of the Security would give a third party the right to terminate or otherwise amend any rights, benefits or obligations of an Obligor in respect of that asset or require an Obligor to take any action materially adverse to the interests of any member of the group, in each case, to the extent of that right and only for so long as that

•

right is in existence or until a waiver of the relevant term has been received from the third party.

(iii)    any shares or investment in any Unrestricted Subsidiary;

(iv)    any asset subject to (or which becomes subject to) any security interest in favour of a third party which is not prohibited by the terms of the secured debt documents (other than solely as a result of the standard terms and conditions of any account bank);

(v)    any cash constituting regulatory capital or customer cash or other restricted cash;

(vi)    any bank account which is part of any cash-pooling arrangement (other than the cash-pooling arrangement in place with HSBC on the date of this Agreement);

(vii)    any hedging agreement;

(viii)    any asset (including shares in a Restricted Subsidiary) of a member of the group that is a "controlled foreign corporation" as defined in section 957(a) of the US Internal Revenue Code or any asset (including shares) of a subsidiary of a "controlled foreign corporation", to the extent that the asset would otherwise constitute a security asset in respect of any secured liability owed by any member of the group that is a United States person, as that term is used in section 956(d) of the US Internal Revenue Code; and

(ix)    any asset representing more than 65 per cent. of the total combined voting power of all classes of shares entitled to vote of (A) any "controlled foreign corporation" that is directly owned for US federal income tax purposes by a US person (a **First Tier CFC Subsidiary**) or (B) any US or non-US entity through which that First Tier CFC Subsidiary is owned, if that entity is treated as a disregarded entity for US federal tax purposes.

(b)    Each security document shall include a clause confirming that, until the Security becomes enforceable, to the extent that any transaction or other matter is permitted or not prohibited by the terms of the secured debt documents, the security document shall not prohibit that transaction or other matter (and that transaction or other matter shall not constitute a breach of the security document) and no consent shall be required from the Security Agent under the security document in connection with that transaction or other matter. In particular, before the Security becomes enforceable, to the extent that the transaction or other matter is permitted by the terms of the other secured debt documents, each Obligor shall have the right to:

(i)    deal with any security asset and all contractual counterparties; and

(ii)    amend, waive, terminate or allow to lapse any right, benefit or obligation in respect of any security asset (including agreeing to surrender or terminate any contract or to the closure of any bank account).

(c)    If the Security Agent so requests (acting reasonably), an Obligor shall use reasonable endeavours to obtain any consent necessary to enable any material asset excluded under paragraph (a)(i) or (a)(ii) above to be the subject of the relevant Security unless:

(i)    it could reasonably be expected to materially adversely affect its commercial reputation or interests or its ability to conduct its operations and business in the ordinary course as otherwise permitted by the relevant security document;

(ii)     to do so could reasonably be expected to place its commercial relationships with third parties in jeopardy; or

(iii)    it would be required to pay any fees, costs or expenses which are disproportionate to the value of the relevant asset.

•

**1252**

## SCHEDULE 9

## LOCAL LAW PROVISIONS

1.    **DUTCH LAW TERMS**

1.1    **Interpretation**

In this Agreement, where it relates to a Dutch person or the context so requires, a reference to:

(a)    **The Netherlands** means the European part of the Kingdom of the Netherlands and **Dutch** means in or of The Netherlands;

(b)    **Dutch Civil Code** means the Burgerlijk Wetboek of The Netherlands;

(c)    **works council** means each works council (*ondernemingsraad*) or central or group works council (*centrale of groeps ondernemingsraad*) having jurisdiction over that person;

(d)    a **necessary action to authorise** includes any action required to comply with the Works Councils Act of The Netherlands (*Wet op de ondernemingsraden*), followed by an unconditional, neutral or positive advice (*advies*) from the works council of that person which, if conditional, contains conditions which can reasonably be complied with and would not cause and are not reasonably likely to cause a breach of any term of any Transaction Document;

(e)    **constitutional documents** means the articles of association (*statuten*) and deed of incorporation (*akte van oprichting*) and an up-to-date extract of registration of the Trade Register of the Dutch Chamber of Commerce;

(f)    a **security interest** or **security** includes any mortgage (*hypotheek*), pledge (*pandrecht*), retention of title arrangement (*eigendomsvoorbehoud*), right of retention (*recht van retentie*), right to reclaim goods (*recht van reclame*) and any right *in rem* (*beperkt recht*) created for the purpose of granting security (*goederenrechtelijke zekerheid*);

(g)    a **winding-up**, **administration** or **dissolution** includes declared bankrupt (*failliet verklaard*) or dissolved (*ontbonden*);

(h)    a **moratorium** includes *surseance van betaling* and **a moratorium is declared** includes *surseance verleend*;

(i)    any **procedure or step** taken in connection with insolvency proceedings includes that person having filed a notice under Section 36 of the Tax Collection Act of The Netherlands (*Invorderingswet 1990*);

(j)    a **liquidator** includes a *curator* or a *beoogd curator*;

(k)    an **administrator** includes a *bewindvoerder* or a *beoogd bewindvoerder;*

(l)    an **attachment** includes a *beslag*; and

•

**1253**

(m)    a director means a managing director (*bestuurder*) and board means its managing board (*bestuur*).

## 1.2    Other provisions

Each Party acknowledges any third party stipulation included in any Security Document governed by Dutch law.

## 2.    GERMAN LAW TERMS

## 2.1    Interpretation

In this Agreement, where it relates to a person incorporated in Germany or the context so requires, a reference to:

(a)    the **German Civil Code** means the *Bürgerliches Gesetzbuch*;

(b)    the **German Insolvency Code** means the *Insolvenzordnung*;

(c)    the **German Limited Liabilities Companies Act** means the *Gesetz betreffend die Gesellschaften mit beschränkter Haftung*;

(d)    a **winding-up**, **administration** or **dissolution** (and each of these terms) includes any action taken by a competent court set out in section 21 of the German Insolvency Code or where a competent court institutes or rejects (for reason of insufficiency of its funds to implement such proceedings (*Abweisung mangels Masse*)) insolvency proceedings against it (*Eröffnung des Insolvenzverfahrens*);

(e)    a person being **insolvent** or **bankrupt** includes that person being in the state of Zahlungsunfähigkeit pursuant to section 17 of the German Insolvency Code or in the state of *Überschuldung* pursuant to section 19 of the German Insolvency Code, to the extent this would require such person to file for insolvency;

(f)    a person being **unable to pay its debts** includes that person being in a state of *Zahlungsunfähigkeit* pursuant to section 17 of the German Insolvency Code;

(g)    a **receiver**, **liquidator**, **administrator**, **administrative receiver** includes an Insolvenzverwalter, a preliminary insolvency administrator (*Vorläufiger Insolvenz-verwalter*), a Zwangsverwalter, a custodian or creditor's trustee (*Sachwalter*) or a preliminary custodian or creditor's trustee (*vorläufiger Sachwalter*);

(h)    **director** includes any statutory legal representative(s) (*organschaftlicher Vertreter*), a managing director (*Geschäftsführer*) or member of the board of directors (*Vorstand*);

(i)    a **disposal** includes (A) a Verfügung, (B) the entry into an agreement upon a priority notice (*Auflassungsvormerkung*), (C) an agreement on the transfer of title to a property (*Auflassung*) in whole or part and (D) the partition of an ownership in a property (*Grundstücksteilung*);

(j)    **gross negligence** means *grobe Fahrlässigkeit* and **wilful misconduct** means *Vorsatz*;

•

(k)    **insolvency proceedings** includes any insolvency proceedings (*Insolvenzverfahren*) pursuant to the German Insolvency Code; and

(l)    **merger** includes any corporate measure contemplated by the German Transformation Act (*Umwandlungsgesetz*) as well as any other corporate act by which several entities are consolidated with the result of one entity becoming the universal legal successor (*Gesamtrechtsnachfolger*) of the other; and

(m)    **self-dealing** and **multi-representation** means *Insichgeschäfte* and *Mehrfachvertretung* pursuant to section 181 of the German Civil Code.

## 2.2    Other provisions

(a)    If any release or discharge (or prohibition on any discharge) or any restriction on exercising any rights under this Agreement (including, without limitation, any restriction under Clause 9 of this Agreement) would cause any current or former director of any member of the Group incorporated in Germany (or in case of a member of the Group established in Germany as a limited partnership with a limited liability company incorporated under German law as its sole general partner (*GmbH & Co KG*), the directors of its general partner) to incur personal criminal or civil liability (including without limitation according to sections 30 and/or section 43 of the German Limited Liability Companies Act), that release, discharge (or prohibition on any discharge) or restriction shall not apply.

(b)    To the extent that any Primary Liabilities of a Debtor incorporated in Germany (a **German Debtor**) would, in an insolvency of that German Debtor, be subordinated pursuant to Section 39 para. 1 no. 5, Section 39 para. 2 or Section 135 of the German Insolvency Code or prejudice the validity or enforceability of any Transaction Security or guarantee and/or indemnity provided to any Creditor pursuant to the Debt Documents in any way, the relevant Creditor of those Primary Liabilities shall be deemed not to be a Primary Creditor and/or a Secured Party under any Transaction Security Document and it shall not benefit from the guarantee or indemnity or from any turnover and/or equalisation provisions applicable between Primary Creditors.

## 3.    RUSSIAN LAW TERMS

## 3.1    Interpretation

In this Agreement, where it relates to a person incorporated in the Russian Federation or the context so requires, a reference to:

(a)    **Russian Bankruptcy Law** means the Federal Law of the Russian Federation No. 127-FZ "On Insolvency (Bankruptcy)" dated 26 October 2002;

(b)    **any amalgamation, demerger, merger or corporate reconstruction** or similar terms will be deemed to include merger (*sliyaniye*), accession (*prisoedinyeniye*), division (*razdelyeniye*), separation (*vydelyeniye*), transformation (*preobrazovaniye*) or any other company reorganisation (*reorganizatsiya obschestva*), as these terms are construed under Russian law;

(c)    **an analogous procedure or step** taken in the Russian Federation in relation to an Obligor incorporated in the Russian Federation includes any of the following events as each is defined in and understood by the Russian Bankruptcy Law:

•

(i)      the implementation of rehabilitation (*sanatsiya*);

(ii)      the appointment of a liquidation commission (*likvidatsionnaya komissiya*) or a liquidator or a similar officer;

(iii)      adopting a resolution by its board of directors or its shareholders or participants to file a bankruptcy petition or a petition for its liquidation with a court or arbitrazh court;

(iv)      filing of a petition for bankruptcy or liquidation by an Obligor incorporated in the Russian Federation or by a third party with any court or any arbitrazh court (or before any agency authorised to accept and consider the same);

(v)      the institution of supervision (*nablyudeniye*), external management (*vneshneye upravleniye*), financial rehabilitation (*finansovoye ozdorovleniye*) or bankruptcy management (*konkursnoye proizvodstvo*);

(vi)      the appointment of any administrative manager (*administrativniy upravlayushiy*) including a temporary manager (*vremenniy upravlayushiy*), external manager (*vneshniy upravlayushiy*), bankruptcy manager (*konkursniy upravlayushiy*) or a similar officer;

(vii)      the convening or announcement of an intention to convene a meeting of creditors for the purposes of considering an amicable settlement (*mirovoye soglasheniye*) or the entry into any other voluntary arrangement with creditors;

(viii)      the institution of any other insolvency proceedings recognised by Russian law; or

(ix)      the taking of any decision on liquidation or actual liquidation by any court or any extra-judicial liquidation or analogous act in respect of it by any governmental, regulatory or supervisory body of the Russian Federation; and

(d)      in relation to a person incorporated in the Russian Federation, to any share, shares or common stock includes any participation interest(s) (*dol(ya)(i) uchastiya*).

## 3.2    Other provisions

The Debtors, the Third Party Security Providers and the Security Agent hereby agree that Articles 364 to 367 of the Civil Code of the Russian Federation shall not apply to the relations between them.

•

**1256**

## SIGNATORIES

[*FORM OF SIGNATURE BLOCKS TO BE DETERMINED*]

**The Company**

EXECUTED AS A DEED by
[                                    ]
acting by


.......................................
Director


.......................................
Director/Secretary


[**OR**

EXECUTED AS A DEED by
[                                    ]
acting by


………………………..
Director

In the presence of:

Witness's signature:    …………………………..

Name:                        …………………………..

Address:                    …………………………..]

**Original Debtors and Intra-Group Lenders**

**EXECUTED AS A DEED by**
**ABBOT GROUP LIMITED**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


................................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**ABBOT HOLDINGS LIMITED**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


................................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG (LAND RIG) LIMITED**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


................................................

Address:

Email:

Attention:

•

0101521-0000029 UKO3: 2000745137.14                    214

**EXECUTED AS A DEED by**
**KCA DEUTAG ALPHA LIMITED**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG CASPIAN LIMITED**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG DRILLING GROUP LIMITED**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


•

**1259**

**EXECUTED AS A DEED by**
**KCA DEUTAG UK FINANCE PLC**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA EUROPEAN HOLDINGS LIMITED**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**ABBOT VERWALTUNGSGESELLSCHAFT MBH**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:

•

**EXECUTED AS A DEED by**
**BENTEC GMBH DRILLING AND OILFIELD SYSTEMS**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG DRILLING GMBH**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG GMBH**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:

•

**EXECUTED AS A DEED by**
**KCA DEUTAG TIEFBOHRGESELLSCHAFT MBH**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG EUROPE B.V.**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG NEDERLAND B.V.**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


•

**1262**

**EXECUTED AS A DEED by**
**ABBOT HOLDINGS NORGE AS**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


..............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG DRILLING NORGE AS**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


..............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG DRILLING OFFSHORE SERVICES AS**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


..............................................

Address:

Email:

Attention:


•

**EXECUTED AS A DEED by**
**KCA DEUTAG HOLDINGS NORGE AS**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG MODU OPERATIONS AS**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG OFFSHORE AS**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:

•

**EXECUTED AS A DEED by**
**KCA DEUTAG ENERGY INTERNATIONAL LLC**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG ENERGY LLC**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG DRILLING LLC**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


•

**EXECUTED AS A DEED by**
**KCA DEUTAG RUSSIA LLC**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG GULF DRILLING LIMITED COMPANY**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**KCA DEUTAG DRILLING LIMITED**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:

•

**EXECUTED AS A DEED by**
**KCA DEUTAG TECHNICAL SUPPORT LIMITED**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


................................................

Address:

Email:

Attention:


**EXECUTED AS A DEED by**
**SET DRILLING COMPANY LIMITED**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


................................................

Address:

Email:

Attention:

•

**Original Third Party Security Provider and Subordinated Creditor**

**EXECUTED AS A DEED by**
**[ENGLISH NEWCO 2]**
acting by
[SIGNATURE BLOCK TO BE CONFIRMED]


...............................................

Address:

Email:

Attention:

•

**The Security Agent**

**LUCID TRUSTEE SERVICES LIMITED**


................................................
Authorised Signatory

Address: 6th Floor, No 1 Building 1-5 London Wall Buildings, London Wall, London, United Kingdom, EC2M 5PG

Fax: + 44 2030024691 / + 44 844 507 0945

Attention: Lucid Agency and Trustee Services Limited (Email: deals@lucid-ats.com)

•

**The Senior Secured Notes Trustee**

**LUCID TRUSTEE SERVICES LIMITED**


................................................
Authorised Signatory

Address: 6th Floor, No 1 Building 1-5 London Wall Buildings, London Wall, London, United Kingdom, EC2M 5PG

Fax: + 44 2030024691 / + 44 844 507 0945

Attention: Lucid Agency and Trustee Services Limited (Email: deals@lucid-ats.com)

•

**1270**

**Original Super Senior Facility Lenders**

**FIRST ABU DHABI BANK PJSC**

By:


................................................

Address:

Email:

Attention:


**LLOYDS BANK PLC**

By:


................................................

Address:

Email:

Attention:


•

**Initial Cash Management Provider**

**HSBC UK BANK PLC**

By:


.................................................

Address:

Email:

Attention:

•

**1272**

**PART 6**

**JERSEY NEWCO INVESTMENT AGREEMENT**

**Weil, Gotshal & Manges**
110 Fetter Lane
London EC4A 1AY
+44 20 7903 1000 main tel
+44 20 7903 0990 main fax
weil.com

**Weil**

● **2020**

**DEED OF INVESTMENT**

**relating to**

**KELLY TOPCO LIMITED**

## TABLE OF CONTENTS

Page

1        INTERPRETATION ................................................................................................ 1

2        AGREEMENT TO SUBSCRIBE ............................................................................ 1

3        COMPLETION ........................................................................................................ 2

4        WARRANTIES ........................................................................................................ 3

5        INVESTMENT APPRAISAL .................................................................................. 3

6        CORPORATE GOVERNANCE .............................................................................. 4

7        RIGHTS AND RESTRICTIONS ATTACHING TO SHARES ............................ 7

8        PROVISION OF INFORMATION ......................................................................... 10

9        CONDUCT OF THE GROUP ................................................................................ 12

10       NON-EXECUTIVE DIRECTORS AND CHAIRPERSON AND FORM OF APPROVAL......... 17

11       EXIT........................................................................................................................ 18

12       SHARE TRANSFERS ............................................................................................ 19

13       DRAG-ALONG........................................................................................................ 20

14       TAG-ALONG............................................................................................................ 22

15       SQUEEZE-OUT ...................................................................................................... 23

16       LISTING RULES .................................................................................................... 25

17       COMPLIANCE COVENANTS .............................................................................. 25

18       DEED OF ADHERENCE......................................................................................... 26

19       FEES AND COSTS ................................................................................................. 26

20       CONFIDENTIALITY ............................................................................................. 26

21       PUBLICITY ............................................................................................................ 27

22       NOTICES ................................................................................................................ 27

23       TRANSFER OF RIGHTS AND OBLIGATIONS ................................................ 28

24       ENTIRE AGREEMENT, AMENDMENT AND TERMINATION .................... 28

25       MISCELLANEOUS ............................................................................................... 29

26       THIRD PARTY RIGHTS ....................................................................................... 31

27       GOVERNING LAW AND JURISDICTION ......................................................... 32

SCHEDULE 1 THE SHAREHOLDERS ........................................................................... 33

SCHEDULE 2 THE COMPANY, MIDCO AND BIDCO ................................................ 35

         Part 1 THE COMPANY ........................................................................................... 35

         Part 2 MIDCO........................................................................................................... 36

         Part 3 BIDCO............................................................................................................ 37

i

**1275**

# TABLE OF CONTENTS

## (continued)

Page

SCHEDULE 3 COMPLETION MATTERS .............................................................................. 38

SCHEDULE 4 AUDIT COMMITTEE AND REMUNERATION COMMITTEE TERMS OF REFERENCE ........................................................................................................ 39

    Part 1 AUDIT COMMITTEE TERMS OF REFERENCE ............................................ 39

    Part 2 REMUNERATION COMMITTEE TERMS OF REFERENCE ........................... 40

SCHEDULE 5 PROVISION OF INFORMATION ................................................................... 41

    Part 1 ALL SHAREHOLDERS ................................................................................ 41

    Part 2 1% HOLDERS & MAJOR SHAREHOLDERS ................................................ 44

SCHEDULE 6 CONDUCT OF THE GROUP ......................................................................... 46

    Part 1 POSITIVE OBLIGATIONS ........................................................................... 46

    Part 2 BOARD RESERVED MATTERS .................................................................... 48

    Part 3 SHAREHOLDER RESERVED MATTERS ...................................................... 50

    Part 4 SHAREHOLDER SUPER RESERVED MATTERS .......................................... 52

SCHEDULE 7 DEED OF ADHERENCE .............................................................................. 53

SCHEDULE 8 DEFINITIONS AND INTERPRETATION ...................................................... 55

ii

Agreed Form documents:

Articles
Initial Business Plan

**THIS AGREEMENT** has been **EXECUTED AND DELIVERED AS A DEED** on                    2020
between the following parties

(1)     **Kelly Topco Limited,** a private company limited by shares incorporated in Jersey (registered
        number 132385) whose registered office is at 47 Esplanade, St Helier, Jersey JE1 0BD, Channel
        Islands ("**Company**");

(2)     **Kelly Holdco 1 Limited,** a private company limited by shares incorporated in England
        (registered number 12922288) whose registered office is at 1 Park Row, Leeds, England,
        England, LS1 5AB ("**Midco**");

(3)     **Kelly Holdco 2 Limited,** a private company limited by shares incorporated in England
        (registered number 12922637) whose registered office is at 1 Park Row, Leeds, England,
        England, LS1 5AB ("**Bidco**");

(4)     **The Persons** whose names, addresses and authorised e-mail addresses are set out in Schedule 1
        (together with the Holding Period Trustee the "**Shareholders**" or individually a
        "**Shareholder**"); and

(5)     **Lucid Issuer Services Limited**, a company incorporated in England (registered number
        05098454) whose registered office is at Tankerton Works, 12 Argyle Walk, London, England,
        WC1H 8HA ("**Holding Period Trustee**").

        **WHEREAS**

(A)     Bidco will acquire the entire issued share capital of Alpha following completion of the Scheme.

(B)     The Shareholders have agreed to release, pursuant to the terms of the Scheme, a proportion of the
        debt owed to them by Reporting Group members for the issue of A Ordinary Shares in the
        Company, which will result in a number of intercompany balances being created between those
        Reporting Group members who issued the debt to the Shareholders, which will be owed
        ultimately to the Company (the "**Release**").

(C)     This Deed contains the terms of matters concerning the Company and the operation of the Group
        in the future.

**IT IS AGREED** as follows:

**1        INTERPRETATION**

        In this Deed, unless the context requires otherwise, the expressions set out in Schedule 8 have the
        meanings set out in that Schedule.

**2        AGREEMENT TO SUBSCRIBE**

**Subscription**

**2.1**    The subscription for the A Ordinary Shares must be made by way of the Release.

**Registration**

**2.2**    Upon the Release referred to in clause 2.1, the Company will, subject to receipt of KYC and a
        valid instruction from the proposed Shareholder, immediately register each Shareholder as the
        fully paid holder of the A Ordinary Shares subscribed for by, or transferred to it (as the case may
        be) under clause 2.1. If, prior to the Effective Date, any person does not (a) comply with the KYC
        requirements of the Company's Jersey registrar to the satisfaction of the Company's Jersey

1

registrar; or (b) complete an account holder letter or lender claim form (as applicable) together with a Deed of Adherence (if such Shareholder has not already executed this Deed) in each case to the satisfaction of the Holding Period Trustee (acting in that capacity or in its capacity as information agent, as applicable), such person's A Ordinary Shares shall be issued or transferred to, and held by the Holding Period Trustee until such time as the above requirements are satisfied, whereupon the Holding Period Trustee agrees to transfer such A Ordinary Shares promptly to such person. The Company shall pay the fees of the Holding Period Trustee in connection with such transfers.

## 3   COMPLETION

**Place and time of Completion**

3.1   Subject to the provisions of this Deed, Completion will occur on the signing of this Deed in London or at any other place in the United Kingdom or on such other date as approved in writing by Major Shareholder Majority.

**Completion matters**

3.2   On Completion the acts described in Schedule 3 (if not already effected to the reasonable satisfaction of the Board) will be done, and each Major Shareholder undertakes to exercise its voting rights and use any and all other lawful powers vested in it as a shareholder of the Company as may be required to approve the matters (which are subject to shareholder approval) set out in Schedule 3.

**Management Incentive Plan**

3.3   Subject to consent first having been obtained in accordance with clause 9.3 and Part 2 of Schedule 6:

(a)   each party agrees to approve any resolution and sign any documentation in connection with implementing a new management incentive plan which has been approved by the Board pursuant to clause 9.3 and paragraph 8 of Part 2 of Schedule 6 (the "**Management Incentive Plan**"), including but not limited to authorising the new issuance of up to [●] A Ordinary Shares, [●] B Ordinary Shares and [●] C Ordinary Shares pursuant to the Management Incentive Plan and procuring that any amendments to this Deed and/ or the Articles required to implement the Management Incentive Plan or the changes to the Management Incentive Plan are given effect;

(b)   any and all reasonable fees, costs and expenses associated with implementing or making any material changes to the Management Incentive Plan shall be borne by the Company; and

(c)   each party hereby appoints the Company (acting by any Director) to act as its true and lawful attorney, or failing that its agent, and in its name or otherwise and on its behalf with full power to exercise all its rights and do such acts on its behalf which, in the absolute discretion of the Company acting reasonably and at the direction of the Board, are required in order to implement the Management Incentive Plan or the changes to the Management Incentive Plan, or any matter set out in clause 3.2, including but not limited to:

(i)   receiving notice of, attending and voting at any general meeting of the shareholders of the Company, including any meeting of the members of any particular class of shareholder of the Company, and all or any adjournment of such meetings;

(ii)   signing any resolution as a registered holder of Shares;

2

**1279**

(iii)    completing and returning proxy cards, consents to short notice and any other documents required to be signed by the registered holder of Shares; and

(iv)    otherwise executing, delivering and doing all deeds, instruments and acts in its name insofar as may be done in its capacity as a registered holder of Shares.

**3.4**    The power of attorney or agency in Clause 3.3(c) is granted by way of security for each party's rights and obligations pursuant to Clause 3.3(a) and shall be irrevocable save to the extent agreed in writing by a Major Shareholder Majority.

## 4    WARRANTIES

**Reliance on Warranties**

**4.1**    In consideration of the Shareholders agreeing to subscribe for A Ordinary Shares under this Deed, each of the Shareholders in respect of itself only severally warrants to each other Shareholder and the Company (for itself and for its successors in title), as at the Signing Date and as at Completion, that:

(a)    it is validly incorporated or organised (as applicable), in existence and duly registered under the laws of its country of incorporation or organisation;

(b)    it has taken all necessary action and has all requisite power and authority to enter into and perform this Deed and the other Transaction Documents to which it is or will be a party in accordance with their respective terms;

(c)    this Deed and each other Transaction Document to which it is or will be a party constitutes (or will, when executed, constitute) valid, legal and binding obligations of it in accordance with its terms;

(d)    it is not insolvent or unable to pay its debts within the meaning of any laws relating to insolvency binding upon the Shareholder, nor has it filed an application for bankruptcy or liquidation, nor has the Shareholder received notice that a third party has filed any such application for bankruptcy or liquidation against or with respect to it; and

(e)    the execution and delivery of this Deed and each other Transaction Document to which it is or will be a party by it and the performance of and compliance with their terms and provisions will not conflict with or result in a breach of, or constitute a default under, its constitutional documents, any agreement or instrument to which it is a party or by which it is bound or any law, regulation or court order that applies to it or its property.

## 5    INVESTMENT APPRAISAL

**Independent assessment and, in each case, no duty of care**

**5.1**    Each Shareholder agrees with each other Shareholder that:

(a)    it has not relied, and is not relying, on any appraisal, recommendation, advice or information in relation to the Group or the directors of a Group member given by, carried out or effected by, or on behalf of, the Shareholders or any Affiliate of a Shareholder in connection with its decision to enter into this Deed and the transactions contemplated by this Deed;

(b)    it has made its or his own investigations and appraisals into and assessment of the Group and none of the Shareholders nor any Affiliate of a Shareholder has any liability to the other party in connection with its decision to enter into this Deed and the transactions contemplated by this Deed other than as expressly set out in this Deed; and

3

**1280**

(c)    it is owed no duty of care or other obligation by the Shareholders or any Affiliate of a Shareholder in connection with its decision to enter into this Deed and the transactions contemplated by this Deed.

**Not a client of the Shareholders**

5.2    Each of the Company, Midco and Bidco acknowledges and confirms that:

(a)    it is not being treated as a client of any Shareholder (or an Affiliate of any Shareholder); and

(b)    neither any Shareholder nor any Affiliate of any Shareholder is responsible to it for providing the protections afforded to such person's clients or advising it in relation to this Deed and the transactions contemplated by this Deed.

**No regulated activity**

5.3    Each of the Company, Midco and Bidco agrees that neither the appointment of an Non-Executive Director, Chairperson or other director nor the giving of advice by any such person in his capacity as a director of a Group member is to be taken as constituting the regulated activity of providing investment advice either by such person or by the appointing Shareholders (or a person connected with such Shareholders), nor is the appointment or the giving of such advice to be treated as causing a Group member to be a client of the appointing Shareholders (or an Affiliate of any Shareholder).

**6    CORPORATE GOVERNANCE**

**Quorum and Voting**

6.1    The quorum for meetings, including any adjourned meetings of the Directors shall be a majority of the Directors. If a meeting of the Board is not quorate, it shall be adjourned to the same time on the date which is no less than two but no greater than ten Business Days following the date of the original meeting.

6.2    Each director shall have one vote. In the event of a deadlock the Chairperson shall have the casting vote. Save in respect of any Board Reserved Matter, decisions of the Board shall be taken by a simple majority of those Directors present and voting at the meeting.

**Non-Executive Directors**

6.3    In addition to all other rights the Substantial Shareholders may have as Shareholders, each Substantial Shareholder is entitled by written notice to the Company, to request that new directors are appointed to the Board, by proposing a list of independent directors for appointment to the board (a "**Slate**"). Upon receipt of a Slate from a Substantial Shareholder, the Company will promptly send the Slate to all Major Shareholders, who may either, if they are a Substantial Shareholder or are acting together such that as a group they constitute a Substantial Shareholder, (i) propose an alternative Slate within 10 Business Days of receipt, or (ii) waive the 10 Business Day period. Within two Business Days of expiry of the initial 10 Business Day period or receipt of waivers from the Major Shareholders, as the case may be, the Company (or failing which the Major Shareholders) shall circulate any Slate(s) to the Major Shareholders for approval by Major Shareholder Majority. Once approved the appointment shall be automatic, subject only to receipt by the Jersey registrar of KYC. A maximum of one Slate may be approved at any one time, and the nominating Substantial Shareholder(s) shall be entitled to vote on the proposed Slate(s), including the Slate which that Substantial Shareholder has itself proposed. If a Slate is not approved or is rejected in favour of a differing Slate, the Substantial Shareholder who proposed such Slate may not nominate a further Slate for a period of 12 months. If a Slate is accepted, the independent directors named therein shall be appointed and any existing independent director who

4

is not named on the Slate shall be removed from office. For the avoidance of doubt, a Substantial Shareholder who has a Slate approved shall not be prohibited from proposing future Slate(s) unless and until any such Slate(s) are rejected. Each director appointed in accordance with this clause 6.3 will be a "**Non-Executive Director**".

6.4    Notwithstanding the provisions of clause 6.3, if the Slate proposed is accompanied by, or takes the form of, a resolution already passed by a Major Shareholder Majority, such appointments (and any resignations) shall become effective automatically upon delivery of the resolution to the Company.

**Chairperson**

6.5    In addition to all other rights the Major Shareholders may have as Shareholders, any Major Shareholder is entitled by written notice to the Company from time to time to propose the appointment of any Non-Executive Director as the Chairperson. The Company shall, within four Business Days of receipt of such notice, circulate a resolution to the Major Shareholders to approve or reject the appointment of such Chairperson by Major Shareholder Majority.

6.6    The Company must pay or procure the payment by another Group member) to the Non-Executive Directors and Chairperson each year market-standard fees for each such Director as are proposed by the Remuneration Committee and approved by the Major Shareholder Majority, together with any reasonable, documented expenses properly incurred by the Non-Executive Directors and Chairperson in proper fulfilment of their duties and in accordance with the Company's expenses policy.

6.7    Any Director may be removed from office at any time by a decision of the Major Shareholder Majority, provided that this clause 6.7 shall be without prejudice to the terms and conditions of their employment with any Group member.

**Observer**

6.8    Any Substantial Shareholder may from time to time appoint an observer (the "**Observer**") to attend meetings of the Board (and its committees). The Observer must be given (at the same time as the relevant directors) notice of all meetings of the directors and all agendas, minutes and other papers relating to those meetings. The Observer may speak at meetings and require business to be added to the agenda but may not in any circumstances vote on any matter. The Company must reimburse all reasonable, documented expenses properly incurred by the Observer in in proper fulfilment of their duties and in accordance with the Company's expenses policy.

**CEO and CFO**

6.9    The Parties confirm that the Group's CEO and CFO from time to time shall both be appointed as directors of the Company and, subject at all times to applicable law and regulation, each subsidiary which, in the reasonable opinion of the Board is material to the Group from time to time.

**Audit Committee**

6.10   The Shareholders agree to procure that the Company procures that there is a committee of the Board called the audit committee (the "**Audit Committee**") which will comprise the Chairperson, the CEO, the CFO and two other Non-Executive Directors and whose terms of reference (and powers and authorities) will be those set out in Part 1 of Schedule 4 (or otherwise as may be varied by the Board with the prior written approval of the Major Shareholder Majority). The Board shall have discretion to appoint and remove any Non-Executive Director member of the Audit Committee. The quorum necessary for the transaction of business by the Audit Committee is a majority of its Non-Executive members.

**Remuneration Committee**

**6.11**   The Shareholders agree to procure that the Company procures that there is a committee of the Board called the remuneration committee (the "**Remuneration Committee**") which will comprise the Chairperson and two other Non-Executive Directors. The terms of reference (and powers and authorities) of the Remuneration Committee will be those set out in Part 2 of Schedule 4 (or otherwise as may be varied by the Board with the prior written approval of the Major Shareholder Majority). The Board shall have discretion to appoint and remove any member of the Remuneration Committee. The quorum necessary for the transaction of business by the Remuneration Committee is a majority of its members. A Non-Executive Director shall not participate in any discussions or decision of the Remuneration Committee in respect of his own salary, remuneration or other benefits and for such purposes the quorum shall be two Non-Executive Directors. The CEO and CFO will be invited to attend meetings of the Remuneration Committee save where the matter being discussed relates to his own salary, remuneration or other benefits.

**Board meetings and notice of Board meetings**

**6.12**   Board meetings shall be held at least six times during the period of 12 months starting on the date of this Deed, with no longer than three months between each Board meeting, and following such period Board meetings shall take place at least once per quarter. All Board meetings shall be held in the United Kingdom. The Company shall send each Director, including each Executive Director and Non-Executive Director:

(a)   so far as is reasonably practicable to do so and save to the extent waived by both at least half of the appointed Non-Executive Directors, not less than 10 Business Days' advance notice of each meeting of the Board or of a committee of the Board (including the Audit Committee and the Remuneration Committee) and not less than three Business Days before such meeting an agenda of the business to be transacted at such meeting (together with all papers to be circulated or presented to the same and no other business shall be transacted at such meeting without the consent of a majority of the Non-Executive Directors then present; and

(b)   as soon as practicable after each such meeting, a copy of the minutes,

provided however, no Executive Director who ceases to be an employee of any Group member or who is suspended from employment shall be notified or entitled to participate in Board meetings or any meeting of any committee of the Board or receive a copy of Board papers or minutes of Board meetings or of meetings of any committee of the Board.

**Appointment to subsidiary undertaking boards and committees**

**6.13**   If a resolution is passed by a Major Shareholder Majority, each Shareholder shall direct that the Board and the Company, to the extent permitted by applicable law procure that some or all of the Non-Executive Directors are appointed to the board of directors (or equivalent body) of any Group member other than the Company and to any committee (or equivalent body) of a Group member (including the Audit Committee and the Remuneration Committee), but, for the avoidance of doubt, no additional remuneration shall be payable to such appointed Non-Executive Directors.

**Tax residence**

**6.14**    The Parties intend that each of the Company, Midco and Bidco are and will be solely resident for Tax purposes in the United Kingdom. The Parties further agree that the Company, Midco and Bidco will be governed in a manner to ensure each of those companies' residence for Tax purposes remains solely in the United Kingdom.

**7        RIGHTS AND RESTRICTIONS ATTACHING TO SHARES**

**7.1**    The rights and restrictions attaching to the A Ordinary Shares are as set out in this clause 7.

**Income**

**7.2**    The monies which are available for distribution by the Company shall be distributed in accordance with the Law by way of distribution in accordance with Article [15.2].

**Capital**

**7.3**    Upon a winding-up of the Company, or any other return of capital, the assets of the Company remaining after payment of its debts and liabilities and of the costs, charges and expenses of such winding-up or return of capital shall be divided in accordance with Article [15.3].

**Sale or Listing**

**7.4**    On a Sale or Listing, including any Proposed Drag-Along Sale or Proposed Tag-Along Transfer the proceeds of Sale or Listing of the issued share capital must be applied in the same manner as for capital set out in clause 7.3.

**Voting – aggregation of shareholdings**

**7.5**    If a Shareholder together with its Affiliates would constitute a Major Shareholder, and such Shareholders have elected to aggregate their holdings, such group shall nominate one of their number (the "**Major Shareholder Nominee**") to act as nominee on behalf of that Shareholder and its Affiliates, and (except to the extent already provided pursuant to Schedule 3) within three Business Days of such nomination provide the Transfer Agent with the name of that Major Shareholder Nominee, confirmation of the Shareholders in respect of which the Major Shareholder Nominee has been nominated to act as nominee and the contact details of the Major Shareholder Nominee, in each case, for the Major Shareholder Nominee to act, vote, attend meetings and make decisions on their behalf; and following such election the non-nominee Shareholders shall not be entitled to act, vote, attend meetings or make decisions regarding their own Shareholdings. Once aggregated, holdings may not be disaggregated unless transferred to non-Affiliates or the Shareholders notify the Transfer Agent that they are no longer affiliated.

**Determination of voting thresholds**

**7.6**    If the Major Shareholder(s) hold in aggregate 30% or more of the A Ordinary Shares in issue, then:

    **(a)**    each Major Shareholder Nominee and Major Shareholder, if no election has been made:

        **(i)**    is entitled to receive notice of, and to attend and vote at, general meetings of the Company; and

        **(ii)**    who is an individual (present in person or by proxy) or a corporate entity (present by a duly authorised representative or by proxy) or, if not present as aforesaid, whose beneficiary is present in person, by authorised representative or proxy, has:

         **(A)**    on a show of hands, one vote; or

         **(B)**    on a poll, one vote for each Ordinary Share of which that person (taken together with their Affiliates if a Major Shareholder Nominee) is the holder;

    **(b)**    holders of A Ordinary Shares who hold less than 5% of the A Ordinary Shares in issue shall not be entitled to receive notice of, attend or vote at general meetings of the Company.

**7.7**    If there are no Major Shareholders, then the 5% threshold for qualification as a Major Shareholder shall be reduced to such percentage as would deliver no fewer than three Major Shareholders.

**7.8**    If the Major Shareholder(s) in aggregate hold less than 30% of the A Ordinary Shares in issue, then each holder of A Ordinary Shares:

    **(a)**    is entitled to receive notice of, and to attend and vote at, general meetings of the Company; and

    **(b)**    who is an individual (present in person or by proxy) or a corporate entity (present by a duly authorised representative or by proxy) or, if not present as aforesaid, whose beneficiary is present in person, by authorised representative or proxy, has:

         **(i)**    on a show of hands, one vote; or

         **(ii)**    on a poll, one vote for each Ordinary Share of which that person (taken together with their Affiliates if a Major Shareholder Nominee) is the holder,

and each matter expressed herein or in the Articles as requiring Major Shareholder Majority approval shall be determined by the passing of a resolution by a majority, or where required by the Law, 66⅔, of the A Ordinary Shares in issue.

**7.9**    Notwithstanding the provisions of clauses 7.5 to 7.8 all holders of A Ordinary Shares shall be entitled to vote in respect of the Shareholder Super Reserved Matters and on a resolution of the Company pursuant to clause 9.2.

**Prevention of unintentional control**

**7.10**    Each person who actively acquires (through transfer or subscription) further A Ordinary Shares after Completion shall be responsible for: (i) determining whether any anti-trust or foreign direct investment filings need to be made in respect of such acquisition(s); and (ii) obtaining all required consents, approvals and acknowledgements before proceeding with any such acquisition(s).

**7.11**    Neither the Company nor its Transfer Agent shall be required to register any transfer of Shares or proceed with any issue of Shares (as applicable) in clause 7.10 above unless and until all such required consents, approvals and acknowledgements (as applicable) have been obtained.

**7.12**    If:

    **(a)**    a Major Shareholder at any time makes an election pursuant to clause 7.13;

    **(b)**    any Major Shareholder(s) sells such number of A Ordinary Shares after Completion; or

    **(c)**    any person would be transferred or issued A Ordinary Shares on Completion,

and which would, in the case of any of (a), (b) and (c) lead to one or more Major Shareholders gaining control of 25% or more of the A Ordinary Shares eligible to vote (each such Major

8

Shareholder being a "**Controlling Shareholder**"), then immediately prior to any such election, sell down, issue or acquisition the 5% threshold (subject to any adjustment that may have previously been made pursuant to this clause 7.12) for voting rights on A Ordinary Shares shall automatically be deemed to have been reduced to such a level that: (i) the potentially Controlling Shareholder does not become a Controlling Shareholder; (ii) any Shareholder holding less than 5% of the voting rights on A Ordinary Shares does not, by way of operation of this clause 7.12, hold 5% or more of the voting rights on A Ordinary Shares; and (iii) any Shareholder holding 5% or more but less than 25% of the voting rights on A Ordinary Shares does not, by way of operation of this clause 7.12, vary its percentage of voting rights on Ordinary Shares unless it has previously consented to the same, until the earlier of:

(d)    provided the relevant merger clearance or foreign direct investment approval or acknowledgement has been obtained, that potentially Controlling Shareholder notifying the Company that it wishes to be a Controlling Shareholder; or

(e)    other Shareholders increasing their shareholding such that the potentially Controlling Shareholder ceases to be a potentially Controlling Shareholder,

whereupon, in the case of each of (a) and (b), the 5% threshold for voting rights shall be automatically reinstated (subject to any adjustment that may have previously been made pursuant to this clause 7.12 which shall be retained).

**Voluntary capping of voting rights**

7.13    Major Shareholders, at any time by notice to the Company, elect to have the votes attributable to its A Ordinary Shares capped at a percentage set out in such notice, and the votes of the other Major Shareholders will be increased accordingly.

**Notification of shareholdings**

7.14    Each Shareholder shall, at Completion and promptly following any change thereafter, notify the Transfer Agent of the identity of its Affiliates who are also Shareholders.

7.15    If as a result of any change in the shareholding of any Shareholder which, when taken with the A Ordinary Shares held by its Affiliates, would alter its status such that it (together with its Affiliates) would become, or cease to be, any of the following: (i) a Major Shareholder; (ii) a 5% Shareholder; (iii) a Substantial Shareholder; (iv) a Controlling Shareholder; (v) a Super Majority Holder; (vi) a holder of either 50%, 60%, 70% or 80% of A Ordinary Shares in the Company; or (vii) a 1% Holder, the Company shall procure that the Transfer Agent, notifies the Major Shareholders and the Company within three Business Days to ensure appropriate steps are taken regarding voting rights.

7.16    The Company shall procure that the Transfer Agent notifies each Shareholder whose voting rights have been adjusted of their adjusted voting right percentage in accordance with clauses 7.12 and to 7.13 as soon as reasonably practicable, and in any event within four Business Days of such adjustment.

**Class Rights**

7.17    If there is more than one class of Shares in issue at any time, any amendment to the rights of any class may be passed by Ordinary Resolution.

## 8    PROVISION OF INFORMATION

**Specific information to be provided**

8.1    Subject to clauses 8.2 and 8.3, Company agrees to provide to the Shareholders (and to procure that each other Group member provides) the information set out in Part 1 of Schedule 5.

8.2    Each Shareholder who together with its Affiliates holds over 1% of the A Ordinary Shares at Completion (a "**1% Holder**"), may elect to receive the information set out in Part 2 of Schedule 5 for a period of 18 months following Completion. The Company shall provide this information provided that each such electing shareholder has first entered into a confidentiality agreement, including any applicable standstill provisions, on terms which are satisfactory to the Board (a "**Confidentiality Agreement**"). Each 1% Holder may continue to receive such information, for so long as it is a 1% Holder, if during the initial 18 month period it makes a further election to receive non-public information and either extends the term of its existing, or enters into a further, Confidentiality Agreement. For the avoidance of doubt, the rights of 1% Holders pursuant to this clause 8.2 are personal and are not rights attaching to the A Ordinary Shares.

8.3    A Shareholder who is not a 1% Holder shall only be entitled to make an election to receive the information set out in Part 2 of Schedule 5, if together with their Affiliates, such Shareholder is a Major Shareholder. The Company shall provide this information provided that each such electing shareholder has entered into a Confidentiality Agreement and for so long as such Shareholder is a Major Shareholder.

**Right to appoint investigating accountants**

8.4    If: (i) the Company at any time fails in any material respect to perform any of its obligations under clause 8.1; or (ii) the Major Shareholders have reasonable grounds to suspect the affairs of any Group member have been conducted in an improper way or that the books and records of any Group member have not been maintained properly, in the case of each of (i) and (ii) a Major Shareholder Majority (without prejudice to any remedies or rights which the Shareholders may have in respect of any such non-performance) is entitled to appoint an independent accountant of their own choosing to investigate the affairs of the Group or of one or more Group members with a view to obtaining the information which was not supplied. If such accountant is appointed:

(a)    the Company agrees to provide (and to procure that each relevant Group member, and (so far as it is able to do so) any other person, provides), to the Major Shareholders and to the accountant, such assistance and co-operation (including full and unrestricted access to the accounting books and records of the Group) as the accountant and/or Major Shareholder Majority from time to time request; and

(b)    the reasonable costs of and incidental to any such appointment, and value added tax on them, must be paid by the Company within 10 Business Days of the presentation of the relevant invoice.

**Disclosure of information by Shareholders**

8.5    Each of the Shareholders may disclose on a confidential basis any information relating to a Group member, except for material, non-public information ("**MNPI**")(which such information the Company shall mark as MNPI on its face and notify the Shareholders of the same at the time of disclosure), whether such information is received from a Group member, Non-Executive Director or Observer to:

(a)    an Affiliate of that Shareholder;

(b)    any general partner, limited partner, manager, trustee or nominee of, or investor or prospective investor in, that Shareholder;

10

**1287**

(c)    a body corporate or other person, partnership or fund (including any unit trust) and/or any investor or prospective investor therein:

   (i)    which is advised, or the assets of which are managed (whether solely or jointly with others), from time to time by that Shareholder or by an Affiliate of that Shareholder or by the general partner, trustee, nominee, manager of or adviser to that Shareholder; or

   (ii)    in respect of which that Shareholder or any of its Affiliates is a general partner;

(d)    a Co-Investment Scheme or a person holding or entitled to the benefit of A Ordinary Shares under a Co-Investment Scheme;

(e)    any director, employee, officer or agent of the Shareholders or any person falling within this clause 8.5, who is reasonably required to receive such information in the performance of their role;

(f)    any sponsor, underwriter or broker for the purposes of facilitating an Exit (subject to such person first having executed a confidentiality undertaking in favour of the Company (on behalf of itself and as trustee for each Group member) in a form reasonably acceptable to the Board);

(g)    provided that such disclosure has first been approved by Major Shareholder Majority:

   (i)    any of the Group's current or proposed bankers or financiers from time to time (subject to such person first having executed a confidentiality undertaking in favour of the Company (on behalf of itself and as trustee for each Group member) in a form reasonably acceptable to the Board);

   (ii)    a potential purchaser of shares or other securities in a Group member (except for A Ordinary Shares and/or Debt Instruments, for this purpose including the Reinstated Bonds) or of assets (or the whole or part of the undertaking) of a Group member (subject to such person first having executed a confidentiality undertaking in favour of the Company (on behalf of itself and as trustee for each Group member) in a form reasonably acceptable to the Board);

(h)    a potential purchaser of A Ordinary Shares and/or Debt Instruments (for this purpose including the Reinstated Bonds) in accordance with the transfer provisions of clause 12 (subject to such person first having executed a confidentiality undertaking in favour of the Company (on behalf of itself and as trustee for each Group member) in a form reasonably acceptable to the Board);

(i)    provided that such person has either: (i) entered into a confidentiality agreement on substantially similar terms to the confidentiality undertakings set out herein; or (ii) is subject to professional rules of confidentiality, a professional adviser to a person falling within this clause 8.5;

(j)    a person to whom it is required to pass the information (i) by law or (ii) by any rule of, or by, any regulatory body or authority or any Tax Authority or (iii) in connection with an audit function; and

(k)    any Tax Authority to the extent reasonably required to be disclosed for the purposes of that Shareholder's Tax affairs.

**1288**

**Information to be included in prospectus**

8.6    Each party consents to the disclosure of information, to the extent required by applicable law, rule or regulation (including the rules of an applicable investment exchange) concerning the Group and its assets in any document which must be published to effect an Exit and in any other document which a Major Shareholder Majority approves.

8.7    The Shareholders consent to the disclosure of information to the extent required by applicable law, including for know-your-customer information required in connection with bond issuances or future financings of the Group.

## 9    CONDUCT OF THE GROUP

**Positive undertakings**

9.1    The day to day management of the business of each Group member will be carried out by the Board and the Company agrees with the Shareholders (to the extent it is legally able to do so) that it will act, and will procure (save as otherwise provided in this Deed) that each Group member acts, in accordance with Part 1 of Schedule 6.

9.2    The Company shall procure (to the extent it is legally able to do so) that no Group member takes or fails to take any action that is reasonably likely to (in the reasonable opinion of the Company's legal counsel, in consultation with the Company's accountants, auditors and/or actuary, to the extent necessary) give rise to the exercise of the Pensions Regulator's powers under section 38 of the Pensions Act 2004, without the prior consent of the Shareholders by way of a special resolution of the Company (where all Shareholders vote on such resolution).

**Negative undertakings**

9.3    The Company agrees with the Shareholders (for itself only) that, except as provided in this Deed, it will not and, to the extent it is legally able to do so, will procure that no Group member will do, or agree to do, any of the acts set out in Parts 2, 3 or 4 of Schedule 6 without the consent specified in that Schedule.

9.4    Where a matter set out in Part 3 of Schedule 6 has been approved by the requisite consent specified therein, all other Shareholders having voting rights undertake to vote in favour of any resolution to give effect to the matter for which consent has been given.

**Pre-Emption Rights**

9.5    Subject to clause 9.3, if a Group Member proposes to or a Major Shareholder Majority requires a Group Company to issue any new Group Shares or Debt Instruments (the "**New Group Shares or New Debt Instruments**") no such New Group Shares or New Debt Instruments shall be so issued unless such issuance is made in accordance with clauses 9.5 to 9.10 (inclusive), save where clause 9.11 applies, and the Shareholders and the Company shall procure that:

(a)    the New Group Shares or New Debt Instruments shall be offered for subscription in cash at the same time and on the same terms to each Shareholder, each Shareholder being offered such percentage of each class of New Group Shares or New Debt Instruments as is equal to its pro rata proportion of A Ordinary Shares and/or debt securities (as applicable in relation to the Group Shares or Debt Instruments being offered) immediately prior to such offer (or as nearly as may be) ("**Share or Debt Instrument Proportion**") on the basis that each Shareholder may take up all or none of the New Group Shares or New Debt Instruments offered to it;

(b)     subject to the New Issue Subscription Price having been determined in accordance with clause 9.10 below, each offer shall be made by notice from the relevant Group Member (the "**Issue Notice**") specifying:

    (i)     the number of New Group Shares or New Debt Instruments to which the relevant Shareholder is entitled (pursuant to clause 9.5(a));

    (ii)     the New Issue Subscription price per New Share or New Debt Instrument (established in accordance with clause 9.10 below); and

    (iii)     the time (being not less than 15 Business Days from the date of the Issue Notice) within which the offer (if not irrevocably accepted in writing) will be deemed to have been declined (the "**Pre-emption Period**").

9.6     By no later than the expiry of the Pre-emption Period, each Shareholder may by notice in writing to the Company (the "**Acceptance Notice**") exercise the right to subscribe for all of the New Group Shares or New Debt Instruments on the terms set out in the Issue Notice. Once given, an Acceptance Notice shall be irrevocable and binding. Each Shareholder who irrevocably accepts the offer in accordance with this clause 9.6 shall, in addition to such acceptance, confirm either:

(a)     that it would irrevocably accept, on the same terms, New Group Shares or New Debt Instruments (specifying a maximum number) that are not accepted by other Shareholders ("**Excess New Group Shares or New Debt Instruments**"); or

(b)     that it would not accept any Excess New Group Shares or New Debt Instruments,

(and, if a Shareholder who accepts the offer fails to give a confirmation in the terms of (a) or (b), it shall be deemed to have made a confirmation in the terms of (b));

9.7     Any Shareholder who does not accept the offer in accordance with clause 9.6 within the Pre-emption Period shall be deemed to have irrevocably declined the offer in full.

9.8     Promptly following, and no later than the date that is five Business Days after, the expiry of the Pre-emption Period, the Company shall:

(a)     determine the allocation of New Group Shares or New Debt Instruments as follows:

    (i)     Excess New Group Shares or New Debt Instruments (if any) shall be allocated to each Shareholder who has indicated that it shall accept Excess New Group Shares or New Debt Instruments, pro rata to the Share or Debt Instrument Proportions of all those Shareholders who have indicated that they would accept Excess New Group Shares or New Debt Instruments (discounting those Shareholders which did not apply for Excess New Group Shares or New Debt Instruments and provided that no Shareholder shall be allocated more than the maximum number of Excess New Group Shares or New Debt Instruments that it has indicated it is willing to accept);

    (ii)     if, after the first allocation of Excess New Group Shares or New Debt Instruments, there remain Excess New Group Shares or New Debt Instruments which have not been allocated (the "**Remaining Excess New Group Shares or New Debt Instruments**") and one or more Shareholders have indicated in their response to the Issue Notice that they shall accept more Excess New Group Shares or New Debt Instruments than they have been allocated (the "**Remaining Shareholders**"), the Remaining Excess New Group Shares or New Debt Instruments shall be allocated to the Remaining Shareholders pro rata to the Share or Debt Instrument Proportions (or as nearly as may be) of the Remaining Shareholders (discounting each Shareholder that is not a Remaining Shareholder

13

**1290**

and Remaining Excess New Group Shares or New Debt Instruments shall continue to be allocated on this basis until either: (i) all Remaining Excess New Group Shares or New Debt Instruments are allocated; or (ii) all requests for Remaining Excess New Group Shares or New Debt Instruments have been satisfied (provided, in each case, that no Shareholder shall be allocated more than the maximum number of Remaining Excess New Group Shares or New Debt Instruments that it has indicated it is willing to accept);

(iii)    if, after the allocation of the Remaining Excess New Group Shares or New Debt Instruments there remains Remaining Excess New Group Shares or New Debt Instruments which have not been allocated, those unallocated Remaining Excess New Group Shares or New Debt Instruments may be allocated by the Board to third parties; and

(iv)    where any allocation of New Group Shares or New Debt Instruments pursuant to this clause 9.8 would result in a fractional allotment of New Group Shares or New Debt Instruments, the board of the relevant Group Member may, in its absolute discretion, round up or down such fractional allotments so that the offers or allotments of New Group Shares or New Debt Instruments by the relevant Group Member are of whole numbers of New Group Shares or New Debt Instruments;

(b)    shall give notice in writing to each Shareholder of:

(i)    its allocation of New Group Shares or New Debt Instruments in accordance with this clause 9.8;

(ii)    the aggregate amount payable by each such Shareholder calculated by reference to the New Issue Subscription Price per New Share or Debt Instrument (the "**Aggregate Subscription Price**"); and

(iii)    the date on which the Aggregate Subscription Price is to be provided to the Company, provided that date is not less than 15 Business Days after the expiry of the Pre-emption Period (the "**Issue Completion Date**").

9.9    On the Issue Completion Date, upon receipt of the Aggregate Subscription Price for the New Group Shares or New Debt Instruments (and Excess New Group Shares or New Debt Instruments, as applicable), allot and issue (credited as fully paid) the New Group Shares or New Debt Instruments (and Excess New Group Shares or New Debt Instruments, as applicable), enter the relevant allottees in the relevant register and complete and despatch to the relevant allottee(s) certificates (if any) for the New Group Shares or New Debt Instruments (and Excess New Group Shares or New Debt Instruments, in each case as applicable).

9.10    The "**New Issue Subscription Price**" in respect of any allocation of Group Shares or Debt Instruments pursuant to this clauses shall be:

(a)    in the case of an Emergency Funding Issue, such price per New Share or Debt Instrument as the Board shall agree with Major Shareholder Majority consent based on advice received by an appropriately qualified independent financial adviser; or

(b)    in the case of an issue of Group Shares or Debt Instruments in accordance with clause 9.5, such other price per New Share or Debt Instrument as shall be approved by the Board based on advice received by an appropriately qualified independent financial adviser.

9.11    The pre-emption rights provided in the provisions of clauses 9.5 through 9.10 (inclusive) shall not apply:

14

**1291**

(a)  to issuances to members of management and/or directors of the Group up to [●] A Ordinary Shares, [●] B Ordinary Shares and [●] C Ordinary Shares or to further issuances to members of management as may be approved in writing by a Major Shareholder Majority from time to time;

(b)  any issuance of A Ordinary Shares or Warrants pursuant to the terms of the Warrant Instrument;

(c)  any issuance of Group Shares or Debt Instruments to another Group member;

(d)  any issuance of Group Shares or Debt Instruments which is carried out as part of a Listing or secondary offering or any restructuring of any Group Member prior to and as part of a Listing or recapitalisation of such Group Member in each case where each Shareholder holds the same proportionate economic entitlement of such other Shareholder before and after such restructuring;

(e)  to the re-designation of any class of Group Shares or Debt Instruments into any other class of Share or Debt Instrument;

(f)  to any issuance of Group Shares or Debt Instruments to a third party as consideration, in whole or in part, for a bona fide acquisition of shares or assets by any Group member in accordance with the terms of this Deed; or

(g)  pursuant to an Emergency Funding Requirement, subject to the applicable catch-up rights in this Deed.

**Emergency Funding Requirement**

9.12  The Company, acting in good faith and subject to clause 9.3, subject to first having considered all reasonable alternatives, may issue New Group Shares or New Debt Instruments:

(a)  in order to remedy cash or liquidity requirements, including to cure an actual or potential event of default under any of the Finance Documents or (a "**Finance Event of Default**"), where such Finance Event of Default is continuing and has not been unconditionally waived by the relevant agent and, in the reasonable opinion of the Company further financing is required in connection with curing such Finance Event of Default; or

(b)  if in the reasonable opinion of the Company further financing is required to avoid within 60 days either:

(i)  the occurrence of a Finance Event of Default; or

(ii)  circumstances that would reasonably be expected to amount to, or give rise to the occurrence of, a Finance Event of Default,

each event an "**Emergency Funding Requirement**".

9.13  If the Company determines, acting in good faith that an event is an Emergency Funding Requirement pursuant to the above:

(a)  the Company may authorise the issue of only such number of Group Shares or Debt Instruments (the "**Emergency Group Shares or Debt Instruments**") as would, in its reasonable opinion cure or avoid the relevant Finance Event of Default (the "**Emergency Funding Issue**");

(b)  the Company may only issue Emergency Group Shares or Debt Instruments to third parties if the then existing Shareholders subscribe for an insufficient amount of

Emergency Group Shares or Debt Instruments (with the Company having first offered the opportunity to all Shareholders);

**(c)**    the nature of the Emergency Group Shares or Debt Instruments issued shall be determined by the Company on an arm's length basis such that they are priced in the most cost effective and appropriate way given the nature of the Finance Event of Default, and for the purposes of minimising the impact on prevailing governance arrangements;

**(d)**    the pricing of an Emergency Funding Issue shall be agreed by the Company pursuant to clause 9.10(a) based on advice received by an appropriately qualified independent financial adviser, except for any issue under a Catch-Up Option which shall carry additional payment for carrying cost (the "**Catch-Up Payment**").

9.14    If any Shareholders do not have the opportunity to participate in an Emergency Funding Issue then, within 30 days from such Emergency Funding Issue, such Shareholder(s) may elect (but shall not be obliged) to:

**(a)**    purchase such number of Emergency Group Shares or Debt Instruments from Shareholders who subscribed for Emergency Group Shares or Debt Instruments pursuant to the Emergency Funding Issue, which would result in, following such acquisition, such Shareholder holding such percentage of the Emergency Group Shares or Debt Instruments as equates to its Equity Proportion immediately prior to the Emergency Funding Issue Shareholders; or

**(b)**    have the Company to approve the additional issuance of New Group Shares or New Debt Instruments in the same class of the Emergency Group Shares or Debt Instruments ("**Catch-Up Group Shares or Debt Instruments**") (without regard to any pre-emption rights on issue, including (without limitation) as set out in this Deed or the Articles) which would result in, following such subscription, such Shareholder holding such percentage of the total number of the Emergency Group Shares or Debt Instruments and Catch-Up Group Shares or Debt Instruments (taken together) as equates to its Share or Debt Instrument Proportion immediately prior to the Emergency Funding Issue,

together, the "**Catch-Up Option**".

9.15    If a Shareholder elects to exercise a Catch-Up Option pursuant to clause 9.14 the Shareholders and (if applicable) the Company shall complete the purchase of Emergency Group Shares or Debt Instruments or additional issuance of the Catch-Up Group Shares or Debt Instruments which are subject to the Catch-Up Option, in consideration for the payment of the Catch-Up Option Price by such electing Shareholder, as soon as reasonably practicable following such election and, in any event, by no later than 90 days from the relevant Emergency Funding Issue, in default of which, the Catch-Up Option shall lapse. For the purposes of this clause 9.15, the price payable in respect of the Catch-Up Option shall be the aggregate of:

**(a)**    the price paid in respect of the Emergency Funding Issue by those Shareholders who participated in the Emergency Funding Issue (as determined in accordance with clause 9.10(a)); and

**(b)**    the Catch-Up Payment, where there has been a carrying cost incurred.

(the "**Catch-Up Option Price**").

9.16    The Catch-Up Payment shall be determined by the Company but shall be subject to unanimous approval of those Shareholders who subscribed for Emergency Group Shares or Debt Instruments in the relevant Emergency Funding Issue, in each case acting reasonably. If the Shareholders are unable to agree the Catch-Up Payment within 14 days, the Catch-Up Payment shall be calculated

at a daily simple rate of 10% per annum on the issue price of Emergency Group Shares or Debt Instruments issued for the relevant Emergency Funding Issue.

**9.17** Each Shareholder shall exercise its rights as a holder of Group Shares or Debt Instruments so as to ensure that any resolutions of the Company, or Major Shareholder Majority consents, which are necessary to facilitate an Emergency Funding Issue and a Catch-Up Option are passed or provided, as applicable, promptly.

**Maintenance of authority to allot share capital**

**9.18** Each Shareholder agrees to exercise its rights and powers as a Shareholder to maintain sufficient authority to enable the Company and its Directors fully to perform its, or their, obligations under this clause 9.

**Sanctioned Countries**

**9.19** Nothing in this Deed shall require the Shareholders (which for this purpose includes any person who is a partner of, or participant in, either a Shareholder or any partnership or other person which itself is a partner or participant in a Shareholder) or any Director to take any action which would be a prohibited, or otherwise illegal activity, under any economic, financial, anti-bribery, anti-corruption and anti-money laundering or trade sanctions laws, regulations or embargoes imposed, administered, or enforced from time to time by the US government (including OFAC, the US State Department, the US Department of Justice or the US Department of Treasury), the Security Council of the United Nations, Her Majesty's Treasury of the United Kingdom, the European Union, government institutions of any of the foregoing or any other relevant sanctions authority (of any jurisdiction), whether implemented under the Trading with the Enemy Act, the International Emergency Economic Powers Act, any presidential or executive order or otherwise.

**10    NON-EXECUTIVE DIRECTORS AND CHAIRPERSON AND FORM OF APPROVAL**

**No claim against Directors and Shareholders**

**10.1** Each party, including the Shareholders, except in the case of fraud or deliberate or wilful default or (in respect of any Director) breach of their fiduciary duties, waives any claim it may have now or in the future against:

    **(a)**    the Chairperson and each Director relating to or otherwise connected with any act or exercise of any right or discretion by the Chairperson or that Director under a provision of this Deed; and

    **(b)**    the Shareholders arising out of the valid exercise of any right or discretion by the Shareholders under a provision of this Deed.

**Approvals, consents and directions**

**10.2** The consent, approval or direction of the Shareholders, Major Shareholder Majority, Chairperson or Director(s) may only be validly given (whether under this Deed, the Articles or otherwise) if that person:

    **(a)**    gives that consent, approval or direction in writing to the Board or other recipient; or

    **(b)**    (in the case of a consent or approval, as opposed to a direction, required from a Chairperson or Director(s)) signs a written resolution of the Board or signs the minutes of the Board meeting approving the relevant transaction or matter or votes in favour of the relevant transaction or matter at a Board meeting.

## 11    EXIT

**Intention to achieve an Exit**

11.1    The parties confirm their intention and commitment to work to achieve an Exit at an appropriate date in the future. Each of the Shareholders and the Company, agree to consult together (together with the Company's financial advisers from time to time) with a view to determining a suitable time to effect an Exit. No Exit may take place without the consent of the Major Shareholder Majority and the parties agree that:

(a)    the Major Shareholder Majority may appoint advisers (including, without limitation, financial, accounting and legal advisers) to act on behalf of all the Shareholders in connection with an Exit;

(b)    the Major Shareholder Majority can in their absolute discretion negotiate and agree the terms of appointment of any such advisers on behalf of all Shareholders; and

(c)    such advisers' fees will be borne by the Company (where legal) and/or the Shareholders in proportion to their shareholdings on Exit, save that where underwriting commission(s) are incurred:

(i)    on a primary issue in connection with or following a Listing the Company shall bear such underwriting commission; and

(ii)    in relation to a sale of A Ordinary Shares in a secondary transaction on or following a Listing, such fees will be borne by the Shareholders in the proportion that the A Ordinary Shares they sell bear to the total number of A Ordinary Shares being sold in the secondary.

**No Shareholders warranties**

11.2    On an Exit, no Shareholder will be required to give any representations, warranties, indemnities or similar assurances in connection with the sale of its A Ordinary Shares, other than: (i) on a Sale giving warranties concerning title to its A Ordinary Shares, capacity to sell and any locked box indemnity or covenant; or (ii) on a Listing, giving such representations, warranties and undertakings typically given to underwriters by selling shareholders on a Listing, provided that all Shareholders who are financial investors will only be required to give the same warranties and indemnities as those given by the other Shareholders who are financial investors.

**Listing**

11.3    If, on a Listing, it is necessary to take any actions to restructure one or more Group members prior to an Exit, including, without limitation, converting the A Ordinary Shares into a different class of shares or exchanging the A Ordinary Shares for shares in another entity, then each Shareholder hereby irrevocably undertakes to execute, complete and deliver all documents and pass all resolutions necessary to effect such actions and achieve a Listing and appoints the Company (acting through the Board) to be his attorney. In addition, each party agrees to enter into an agreement for the orderly transition of the Group onto the public markets, including customary terms relating to share transfers (an "**IPO Shareholders' Agreement**") provided that such agreements to be entered into by any Shareholder who is a financial investor shall be no more onerous than those given by any other Shareholder who is a financial investor.

11.4    If it is intended by the Company that there is a Listing of a holding company of the Company (or a successor thereto) then each holder of A Ordinary Shares in the Company, if required to do so by the Company or a Major Shareholder Majority by notice in writing to each Shareholder, is obliged to exchange the A Ordinary Shares it holds in the Company for shares in that holding company in the same proportion and with the same economic rights as the A Ordinary Shares held by it in the

Company (or such successor) and the provisions contained in this Deed shall apply to such holding company (or any successor) shares as if they were set out in this Deed.

## 12    SHARE TRANSFERS

**Permitted Transfers**

12.1    A Ordinary Shares shall be freely transferable, save that no transfer of any A Ordinary Shares, or any interest in any A Ordinary Shares, may be made except (i) where an equivalent proportion of Debt Instruments are also transferred; and (ii) pursuant to this Deed and the Articles, including but not limited to clauses 14 and 18 hereof. For this purpose, an interest in any A Ordinary Shares is deemed to be transferred if a Shareholder enters into an agreement (other than this Deed) with any person in respect of the exercise of votes attached to such A Ordinary Shares. Notwithstanding the foregoing, Shareholders may transfer their A Ordinary Shares and Debt Instruments to any of their Affiliates, and in such case the provisions of clause 14 shall not apply to such transfer.

**Indirect transfers**

12.2    Subject to clause 12.1, there shall be no transfer of any direct, indirect or beneficial interest in any A Ordinary Shares by any Person unless such transfer would be permitted under clause 12.1, if it was a transfer by the Shareholder.

12.3    If: (i) the Company; or (ii) a Shareholder, becomes aware of any breach of clause 12.2, then (A) in the case of (i) the Company shall promptly; and (B) in the case of (ii) promptly following notification to the Company of such breach by the relevant Shareholder, the Company shall serve a notice on the Shareholder in respect of which an indirect interest has been transferred (the "**Forfeiting Shareholder**") who shall have five Business Days after receipt of the notice served by the Company in accordance with this clause 12.3 to cure the breach (the "**Cure Period**"). If the Forfeiting Shareholder fails to cure the breach within the Cure Period, it may be required to transfer all or a portion of their A Ordinary Shares and/or Debt Instruments (collectively "**Forfeited Instruments**") in accordance with clauses 12.3 to 12.5 inclusive. The Company or relevant Shareholder shall promptly deliver a written notice (a "**Mandatory Transfer Offer Notice**") to each other Shareholder ("**Non-Forfeiting Shareholder**") that such Shareholder is entitled to acquire a proportion of the Forfeited Instruments equal to such Non-Forfeiting Shareholder's Percentage Interest at that time as a proportion of the aggregate Percentage Interests of all Non-Forfeiting Shareholders (the "**Mandatory Transfer Relevant Amount**"), at a price per Share or Debt Instrument equal to 50% of fair market value of the Forfeited Instruments at the date of the Mandatory Transfer Offer Notice (as determined by the Board acting reasonably) (the "**Mandatory Offer Price**").    The Mandatory Transfer Offer Notice shall invite each Non-Forfeiting Shareholder to apply to purchase: (i) all or any portion of their Mandatory Transfer Relevant Amount; and (ii) (if they become available as a result of any Non-Forfeiting Shareholders not wishing to purchase all of their Mandatory Transfer Relevant Amount) any Forfeited Instruments in excess of their Mandatory Transfer Relevant Amount, in each case, within twenty (20) Business Days of the following the date of the Mandatory Transfer Offer Notice (the "**Mandatory Transfer Offer Period**").    The Company shall allocate the relevant proportion of Forfeited Instruments to each Non-Forfeiting Shareholder which submits an application to the Company within the Mandatory Transfer Offer Period stating the proportion of the Mandatory Transfer Relevant Amount which the Non-Forfeiting Shareholder wishes to acquire and providing payment in full for such amount of Forfeited Instruments.    If any Non-Forfeiting Shareholder fails to submit an application to the Company within the Mandatory Transfer Offer Period, it shall be deemed to have declined the invitation to purchase any Forfeited Instruments. If and to the extent that any Non-Forfeiting Shareholder has submitted an application for less than their Mandatory Transfer Relevant Amount or has or is deemed to have declined the invitation to purchase any Forfeited Instruments (together, such unallocated Forfeited Instruments, being referred to as the "**Excess Forfeited Instruments**"):

19

**1296**

(a) such Excess Forfeited Instruments shall be allocated to each Non-Forfeiting Shareholder wishing to purchase Forfeited Instruments in excess of their Mandatory Transfer Relevant Amount, in proportion to such Non-Forfeiting Shareholder's Percentage Interest for the time being as a proportion of the aggregate Percentage Interests of those Non-Forfeiting Shareholders who have submitted an application to purchase any part of such Excess Forfeited Instruments (provided that any allocation made under this clause shall be made so as not to result in any Non-Forfeiting Shareholder being allocated more Forfeited Instruments than it wishes to purchase); and

(b) any remaining Excess Forfeited Instruments shall continue to be allocated on this basis until either all the Forfeited Instruments have been allocated or all requests for extra Forfeited Instruments have been satisfied.

12.4 Following the expiry of the Mandatory Transfer Offer Period (or, as the case may be, following election and payment (if applicable) by any Non-Forfeiting Shareholder for any Excess Forfeited Instruments pursuant to clause 12.3), the Forfeiting Shareholder shall sell the amount of Forfeited Instruments which the Non-Forfeiting Shareholders applied for in accordance with clause 12.3 at the Mandatory Offer Price to the relevant Non-Forfeiting Shareholders. Each member of the Board is individually authorised to execute, complete and deliver as agent for and on behalf of the Forfeiting Shareholder such documents as are required to transfer such Forfeited Instruments to the relevant Non-Forfeiting Shareholder (provided that any Director(s) appointed by the Forfeiting Shareholder (s) shall be excluded from such authority), and following such transfer shall update the register of A Ordinary Shares accordingly.

12.5 Immediately on the occurrence of any breach of clause 12.2, any and all specific rights of the Forfeiting Shareholder attaching to their holding of A Ordinary Shares pursuant to this Deed (including, without limitation, rights to vote, appoint directors and/or observers and any and all rights of consent in relation to any matter) shall cease to apply in respect of such Forfeiting Shareholder.

## 13    DRAG-ALONG

**Drag-Along Mechanism**

13.1 If the Majority Selling Shareholders agree terms for a Proposed Drag-Along Sale with a Purchaser then, on receipt of a Drag-Along Notice from the Purchaser, all the Dragged Shareholders are bound to transfer the same proportion of their Shares to the Purchaser on the same terms as agreed by the Majority Selling Shareholders (save as provided in clause 13.5).

**Representations, Warranties and Costs**

13.2 Dragged Shareholders must make or give the same representations, warranties, covenants and indemnities (if any) as to title and capacity of the Shares, together with a locked box indemnity or covenant (subject to customary permitted leakage exceptions, including transactions with any Shareholder (and or its Affiliates) in the ordinary and usual course of trading and on arms-length terms) in each case as given by the Majority Selling Shareholders. Each Dragged Shareholder is responsible for its proportionate share of the costs of the Proposed Drag-Along Sale to the extent not paid or reimbursed by the Purchaser based on the proportion his or its number of Shares held bears to the proportion of the total number of Shares in issue and such costs will be deducted from the proceeds.

**Drag-Along Notice**

13.3 The Drag-Along Notice must set out the number of Shares proposed to be transferred, the name and address of the proposed Purchaser, the proposed amount, if any, and form of consideration and any other terms and conditions of payment offered for the Shares. Consideration for the Shares must be in either:

20

**1297**

(a)     cash; or

(b)     marketable securities listed on a Recognised Investment Exchange (which shall not have been suspended from trading due to fraud or deficiencies in quality of corporate governance or financial reporting of their issuer at any time within the 12 month period prior to the proposed Drag-Along Sale ("**Marketable Securities**"); or

(c)     a combination of cash and Marketable Securities;

**PROVIDED THAT** where a Dragged Shareholder is a Ring-Fenced Body, that Dragged Shareholder (on behalf of itself only and not in respect of any Shares which it holds as market-maker or broker) shall have the option to elect, within fifteen Business Days of the date of the Drag-Along Notice, to receive its consideration in cash only, even in circumstances where all or part of the proposed consideration for the Shares is to be in Marketable Securities.  In such circumstances, the Company shall appoint a broker (whose appointment has been agreed with the Ring-Fenced Body making the election, acting reasonably) to sell that proportion of the proposed consideration due to the Ring-Fenced Body that constitutes Marketable Securities either by way of a sale of the entire block or in one or more transfers within 30 days of the issue of the Marketable Securities. The proceeds of such sale (with the reasonable broker fees relating to the sale of the proportion of the Marketable Securities attributable to the shares issued to the Ring-Fenced Body as part of the Scheme being borne by the Company) shall be paid to such Ring-Fenced Body within two Business Days of receipt of the cash by the Company in full and final satisfaction of the Marketable Securities consideration otherwise due to that Ring-Fenced Body.

13.4    The Drag-Along Notice must specify a date, time and place for the Dragged Shareholders to execute transfers in respect of their Shares, being a date which is not less than eight Business Days after the date of the Drag-Along Notice (and not earlier than the transfers by the Majority Selling Shareholders).  The Drag-Along Notice may be expressed to be conditional upon completion of the sale by the Majority Selling Shareholders.  A Drag-Along Notice shall be valid for: (i) 90 days; or (ii) if completion is subject to conditions, 60 days from the earlier of: (a) satisfaction of such conditions; and (b) the long stop date in the relevant SPA.

**Execution of Transfers**

13.5    If a Dragged Shareholder does not, within five Business Days of the date of the Drag-Along Notice (or on the date specified in the Drag-Along Notice if later than five Business Days after the date of the Drag-Along Notice) execute transfers in respect of its Shares, then any Director shall be deemed to be irrevocably appointed as the Minority Holder's attorney, entitled to authorise and instruct such person as it thinks fit to execute, complete and deliver the necessary transfer(s) as agent on the Dragged Shareholder's behalf on the same terms as those accepted by the Majority Selling Shareholders and, against receipt by the Company (on trust for the member) of the consideration payable for the Shares, deliver the transfer(s) to the Purchaser (or its nominee) and register the Purchaser (or its nominee) as the holder of those Shares.  After the Purchaser or its nominee has been registered as the holder the validity of such proceedings may not be questioned by any person.  The Company will deliver the consideration payable for each Dragged Shareholder's Shares held on trust in accordance with this clause for a member to that member as soon as practicable following the delivery to the Company by that member of his original share certificate (if any) in respect of such Shares or an indemnity for a lost share certificate in a form reasonably acceptable to the Chairperson.

13.6    The Shareholders acknowledge and agree that the authority conferred under clause 13.5 is necessary as security for the performance by the Dragged Shareholders of their obligations under this Deed.

**1298**

**13.7**    Subject to clause 13.8 , unless the Board otherwise agrees in writing, any Shares held by a Dragged Shareholder on the date of a Drag-Along Notice (and any Shares acquired by a Dragged Shareholder from time to time thereafter, whether by virtue of the exercise of any right or option granted or arising by virtue of the holding of Shares by the Dragged Shareholder, or otherwise) shall immediately on failure by the holder of such Shares to comply with this clause 13.7:

    **(a)**    (automatically cease to confer the right to receive notice of or to attend or vote (either in person or by proxy and whether on a poll or on a show of hands) at any general meeting of the Company or (subject to the Law) at any meeting of the holders of any class of Shares in the capital of the Company with effect from the date of the Drag-Along Notice (or the date of acquisition of such Shares, if later); and

    **(b)**    not be counted in determining the total number of votes which may be cast at any such meeting, or required for the purposes of a written resolution of any member or any class of members, or for the purposes of any other consent required under these Articles.

**13.8**    The rights referred to in clause 13.7 shall be restored immediately upon the transfer of the Shares in accordance with the Drag-Along Notice.

**13.9**    Following the issue of a Drag-Along Notice, if any person becomes a New Member, a Drag-Along Notice is deemed to have been served upon the New Member on the same terms as the previous Drag-Along Notice. The New Member will be bound to sell and transfer all such Shares acquired by him or it to the Purchaser or as the Purchaser may direct and the provisions of this clause 13 shall apply (with necessary modifications) to the New Member save that completion of the sale of such  Shares shall take place immediately following the registration of the New Member as a Shareholder.

## 14    TAG-ALONG

**Tag-Along Mechanism**

**14.1**    No Proposed Tag-along Transfer may be made by any Selling Shareholder(s) unless the Acquirer has first made a written offer in accordance with this clause 14 to the Non-Selling Shareholders to purchase the Non-Selling Shareholders' Shares at the Notified Price (whether the consideration is cash or newly issued shares in the Acquirer's share capital) and on no less preferential terms and conditions (including time of payment, form of consideration, representations, warranties, covenants and indemnities (if any) and limitations of liability) (provided they are given on a several basis) as to be paid and given to and by the Selling Shareholder(s).

**Costs**

**14.2**    A Tagging Shareholder is responsible for his or its proportionate share of the costs of the Proposed Tag-along Transfer to the extent not paid or reimbursed by the Acquirer or the Company based on the proportion his or its number of Shares held bears to the proportion of the total number of Shares, being sold pursuant to the Proposed Tag-along Transfer.

**Terms of Tag-Along Offer**

**14.3**    The Selling Shareholder(s) must give written notice to each Non-Selling Shareholder of each Proposed Tag-along Transfer at least five Business Days prior to signing a definitive agreement relating to the Proposed Tag-along Transfer providing details of the Acquirer and its proposed price and, to the extent it is able, the other terms and conditions.

**14.4**    Where the Proposed Tag-Along Transfer occurs in a series of connected transactions, the price which is payable to the Tagging Shareholders shall be the highest price paid by the Acquirer in the 12 month period prior to the date of the notice of the Proposed Tag-Along Transfer delivered

22

**1299**

pursuant to clause 14.3, and for these purposes the value attributed to the Shares pursuant to the Scheme shall be disregarded (such price being the "**12 Month High**").

**14.5** The written offer required to be given by the Acquirer under clause 14.1 must be given at least than five Business Days before the signing of the definitive agreement relating to the Proposed Tag-along Transfer and must be open for acceptance for at least twenty Business Days after the date of the written offer ("**Tag Acceptance Period**"). The Selling Shareholder(s) must deliver or cause to be delivered to the Non-Selling Shareholders copies of all material transaction documents relating to the Proposed Tag-along Transfer promptly as the same become available.

**Acceptance of Tag-Along Offer**

**14.6** If a Non-Selling Shareholder wishes to accept the Acquirer's offer under clause 14.1 it must do so by means of a written notice to the Selling Shareholder(s) indicating its acceptance of the offer in respect of all of the number of its Shares specified in the written offer. If the Tag-Along Notice is accepted the Proposed Tag-along Transfer shall be conditional upon the Selling Shareholders' sale and shall be completed at the same time as that sale.

**Effect of No Acceptances of Tag-Along Offer**

**14.7** If some or all of the Non-Selling Shareholders do not accept such offer within the period that is open for acceptance pursuant to clause 14.5, signing of the Proposed Tag-along Transfer is permitted to be made:

(a) within 10 Business Days after signing the definitive agreement, provided that the offer shall remain open to any Tagging Shareholder to accept within the Tag Acceptance Period and the purchaser shall be bound to purchase any such shares;

(b) so long as it takes place on terms and conditions no more favourable in any respect to the Selling Shareholder(s) than those stated in the original written offer under clause 14.1; and

(c) on the basis that all of the Shares proposed to be sold under the Proposed Tag-along Transfer are transferred.

**Exclusions**

**14.8** The provisions of clause 14.1 will not apply to any transfers of Shares:

(a) in respect of which a Drag-Along Notice has been served;

(b) a transfer to Affiliates in accordance with clause 12.1; or

(c) to a new holding company of the Company which is established for the purposes of planning for a reorganization or an Exit and in which the share capital structure (principally the shareholdings but including all economic rights) of the Company is replicated in all material respects.

**15    SQUEEZE-OUT**

**15.1** If a person, together with its Affiliates, acquires 90% or more of the Shares in issue at any time (a "**Super Majority Holder**"), then such Super Majority Holder shall be entitled to make a written offer to the remaining Shareholders (the "**Minority Holders**") to acquire the Shares held by the Minority Holders at a price which is no lower than the 12 Month High (a "**Squeeze-Out Offer**"). If the Super Majority Holder makes such a Squeeze-Out Offer, the Minority Holders are bound to transfer 100% of their Shares to the Super Majority Holder on the terms of the Squeeze-Out Offer.

23

**1300**

15.2    Minority Holders are required to make or give the representations and warranties as to title and capacity of the Shares and a leakage indemnity or covenant. The Super Majority Holder is responsible for the costs of the Squeeze-Out Offer.

15.3    The Squeeze-Out Offer must set out the number of Shares to be transferred by each Minority Holder, the name and address of the Super Majority Holder, the proposed amount, if any, and form of consideration and any other terms and conditions of payment offered for the Shares. Consideration for the Shares must be in cash.

15.4    The Squeeze-Out Offer must specify a date, time and place for the Minority Holders to execute transfers in respect of their Shares, being a date which is not less than eight Business Days after the date of the Squeeze-Out Offer. The Squeeze-Out Offer shall be valid for (i) 90 days; or (ii) if completion is subject to conditions, 60 days from the earlier of: (a) satisfaction of such conditions; and (b) the long stop date in the relevant SPA.

15.5    If a Minority Holder does not, within five Business Days of the date of the Squeeze-Out Offer (or on the date specified in the Squeeze-Out Offer if later than five Business Days after the date of the Squeeze-Out Offer) execute transfers in respect of its Shares, then any Director shall be deemed to be irrevocably appointed as the Minority Holder's attorney, entitled to authorise and instruct such person as it thinks fit to execute, complete and deliver the necessary transfer(s) as agent on the Minority Holder's behalf on the same terms as those set out in the Squeeze-Out Offer and, against receipt by the Company (on trust for the member) of the consideration payable for the Shares, deliver the transfer(s) to the Super Majority Holder (or its nominee) and register the Super Majority Holder (or its nominee) as the holder of those Shares. After the Super Majority Holder or its nominee has been registered as the holder of such proceedings may not be questioned by any person. The Company will deliver the consideration payable for each Minority Holder's Shares held on trust in accordance with this clause for a member to that member as soon as practicable following the delivery to the Company by that member of his original share certificate (if any) in respect of such Shares or an indemnity for a lost share certificate in a form reasonably acceptable to the Chairperson.

15.6    The Shareholders acknowledge and agree that the authority conferred under clause 15.5 is necessary as security for the performance by the Minority Holders of their obligations under this Deed.

15.7    Subject to clause 15.8, unless the Chairperson otherwise agrees in writing, any Shares held by a Minority Holder on the date of a Squeeze-Out Offer (and any Shares acquired by a Minority Holder from time to time thereafter, whether by virtue of the exercise of any right or option granted or arising by virtue of the holding of Shares by the Minority Holder, or otherwise) shall immediately on failure by the holder of such Shares to comply with this clause 15:

   (a)    (automatically cease to confer the right to receive notice of or to attend or vote (either in person or by proxy and whether on a poll or on a show of hands) at any general meeting of the Company or (subject to the Law) at any meeting of the holders of any class of Shares in the capital of the Company with effect from the date of the Squeeze-Out Offer (or the date of acquisition of such Shares, if later); and

   (b)    not be counted in determining the total number of votes which may be cast at any such meeting, or required for the purposes of a written resolution of any member or any class of members, or for the purposes of any other consent required under these Articles.

15.8    The rights referred to in clause 15.7 shall be restored immediately upon the transfer of the Shares in accordance with the Squeeze-Out Offer.

15.9    Following the issue of a Squeeze-Out Offer, if any person becomes a New Member, a Squeeze-Out Offer is deemed to have been served upon the New Member on the same terms as the previous Squeeze-Out Offer. The New Member will be bound to sell and transfer all such Shares

24

acquired by him or it to the Super Majority Holder or as the Super Majority Holder may direct and the provisions of this clause 15 shall apply (with necessary modifications) to the New Member save that completion of the sale of such Shares shall take place immediately following the registration of the New Member as a Shareholder.

## 16    LISTING RULES

16.1    For so long as Barclays Bank PLC or any of its Affiliates has a premium listing on the London Stock Exchange, and does not have sole discretion over whether or not there is to be a transfer of its Shares pursuant to clauses 13, 14 and 15, the maximum consideration payable to it for any such transfer shall, notwithstanding any provisions to the contrary in the Agreement, be limited to the minimum amount that would constitute a Class 2 transaction in accordance with the Listing Rules of the London Stock Exchange, less $1. The provisions of the foregoing sentence are for the benefit of Barclays Bank PLC alone and may, within three (3) Business Days of receipt of notice of any Proposed Tag-Along Offer, Drag-Along Notice or Squeeze-Out Offer (as the case may be), be waived by Barclays Bank plc in its sole discretion (whether entirely or subject to a higher cap determined by it).

16.2    For so long as HSBC Holdings plc or any of its Affiliates has a premium listing on the London Stock Exchange or a listing on the Main Board of the Hong Kong Stock Exchange, and does not have sole discretion over whether or not there is to be a transfer of its Shares pursuant to clauses 13, 14 and 15, the maximum consideration payable to it for any such transfer shall, notwithstanding any provisions to the contrary in the Agreement, be limited to the minimum amount that would constitute (i) a Class 2 transaction in accordance with the Listing Rules issued by the UK Financial Conduct Authority or (ii) a "discloseable transaction" under Chapter 14 of the Main Board Listing Rules issued by the Hong Kong Stock Exchange (as applicable), less $1. The provisions of the foregoing sentence are for the benefit of HSBC Holdings plc alone and may, within three (3) Business Days of receipt of notice of any Proposed Tag-Along Offer, Drag-Along Notice or Squeeze-Out Offer (as the case may be), be waived by HSBC Holdings plc in its sole discretion (whether entirely or subject to a higher cap determined by it).

16.3    To the extent that Barclays Bank PLC or HSBC Holdings plc (as appropriate) do not waive such a cap on proceeds, any amount of the excess which would otherwise have been due to them shall be shared between the other Shareholders in accordance with the terms of clause 7.3.

## 17    COMPLIANCE COVENANTS

17.1    The Company and each Shareholder agrees to observe and comply fully and promptly with the provisions of the Articles to the intent and effect that each and every provision thereof shall be enforceable by the parties to this Deed between themselves and in whatever capacity notwithstanding that any such provision might not have been so enforceable in the absence of this clause.

## 18    DEED OF ADHERENCE

**No allotment or transfer without a Deed of Adherence and KYC**

18.1    A person (who is not already a party) acquiring any A Ordinary Shares or Debt Instruments (whether by allotment, issue, transfer or transmission) must not be registered as the holder of those A Ordinary Shares unless and until that person has (i) provided due diligence, know-your-customer information in a form satisfactory to the Company's Jersey registrar including (if such person is not resident in England) confirmation of the details of an agent for service of process in England ("**KYC**"); and (ii) entered into and delivered to the Board a Deed of Adherence in a legally binding manner; and a party transferring any A Ordinary Shares shall procure that the transferee (if not already a party), by the time of transfer, enters into and delivers a Deed of Adherence and provides such KYC.

**Benefit and burden of Agreement**

18.2    A person who has entered into a Deed of Adherence pursuant to this Deed has the benefit of, and is subject to the burden of, all the provisions of this Deed as if that person is a party to this Deed in the capacity designated in the Deed of Adherence, and this Deed shall be interpreted accordingly.

18.3    Without limiting the general nature of clause 18.2, a person designated as a Shareholder in a Deed of Adherence is entitled to the benefit of all representations, warranties and undertakings given to the Shareholders in or pursuant to this Deed provided that nothing in this clause 18.3 is construed as requiring a party to perform again an obligation or discharge again a liability already performed or discharged or entitling a party to receive again a benefit already enjoyed.

## 19    FEES AND COSTS

**Own costs**

19.1    Subject to the other provisions of this Deed, the Reporting Group will bear the costs and expenses in connection with the negotiation and preparation of Agreement. No Shareholder shall be entitled to receive any monitoring, transaction or other fees in connection with its investment in the Company.

**Other Costs**

19.2    The Company must, to the extent lawful, procure that all stamp duty or stamp duty reserve tax and any other Taxes or similar duties or fees arising out of the Scheme are paid by Bidco.

19.3    The Company must, to the extent lawful, pay on demand all reasonable expenses (including, without limitation, legal, accounting and other professional fees) together with value added tax on them, incurred by any Shareholder in connection with the registration, preservation or enforcement of any of that Shareholder's rights under this Deed or the Articles in circumstances where the Company has, or is alleged to have, breached the provisions of this Deed except, for the avoidance of doubt, where such registration, preservation or enforcement is being taken by one Shareholder in relation to another Shareholder, in which case such Shareholders shall bear their own costs.

## 20    CONFIDENTIALITY

20.1    For as long as a party is a Shareholder each party will, and will procure that each of its Affiliates will, for a period of three years following the date it ceases to be a Shareholder only use any information relating to another party or to a Group member which was acquired by that party as a Shareholder in connection with the transaction and its investment, and will cause all information so obtained by it or its Affiliates which is not publicly available to be treated as confidential, provided that nothing in this clause 20 will prevent a Major Shareholder Majority disclosing such

information in such manner as the Shareholders may determine is appropriate in connection with an Exit or a proposed Exit, so long as the recipient of any such information is subjected to such confidentiality obligations which the Shareholders acting reasonably may require.

20.2    The obligations of confidentiality in clause 20.1 do not apply to information which, after the Signing Date:

(a)    is or becomes generally available to the public;

(b)    is required to be disclosed to a competent tribunal or government agency or other regulatory body (including pursuant to a subpoena, civil investigative demand or similar process);

(c)    is required to be disclosed pursuant to an order, statute, rule or other legal requirement promulgated or imposed by a court or by a judicial, regulatory, self-regulatory or legislative body, organisation, agency or committee;

(d)    is required to be otherwise disclosed in connection with any judicial, arbitral or administrative proceeding (including, in response to oral questions, interrogatories or requests for information or other documents);

(e)    is required to be disclosed pursuant to any law or regulation including applicable insider trading and market abuse laws in accordance with which a party is required to act;

(f)    is required to be disclosed to a Tax Authority in connection with that party's Tax affairs; or

(g)    disclosed pursuant to clause 8 of this Deed.

## 21    PUBLICITY

A press release or other external media communication to be made by a party relating to the investment in the Company by the Shareholders, may only be made with the prior written approval of a Major Shareholder Majority, provided that no reference may be made to a specific Shareholder without that Shareholder's consent.

## 22    NOTICES

22.1    A notice or other communication given under this Deed must be in writing in English, and signed by or on behalf of the person giving it and marked for the attention of the addressee's authorised recipient and is deemed to have been duly served on, given to or made in relation to a party if it is left at the authorised address or address for service of process of that party, posted by first class post (to a United Kingdom or Jersey address) or by recognised international courier (to a non-United Kingdom or Jersey address) to the authorised address or address for service of process of that party, or sent by e-mail to the authorised e-mail address of that party and if:

(a)    personally delivered, it is deemed to have been received at the time of delivery;

(b)    posted to a United Kingdom or Jersey address, it is deemed to have been received on the second Business Day after the date of posting;

(c)    posted to a non-United Kingdom or Jersey address, it is deemed to have been received on the fifth Business Day after the date of posting; or

(d)    sent by e-mail, it is deemed to have been received upon receipt by the sender on the same Business Day as the day of transmission,

**1304**

provided that where, in the case of delivery by hand or e-mail transmission, delivery occurs or transmission completes after 6.00 pm on a Business Day or at any time on a day which is not a Business Day, receipt shall be deemed to occur at 9.00 am on the next following Business Day.

22.2    For the purpose of clause 22.1 the authorised address, authorised e-mail address and authorised recipient of each party is the address and e-mail address set out Schedule 1 or the recitals or in the Deed of Adherence (as the case may be) or such other address and/or e-mail address as that party may notify to the others in writing (in accordance with the requirements of clause 22.1) from time to time.

## 23    TRANSFER OF RIGHTS AND OBLIGATIONS

23.1    Except as otherwise provided in this Deed, no party may assign or in any other way dispose of any of its rights or obligations under this Deed without the prior written consent of all the other parties to this Deed. Notwithstanding the foregoing, any Shareholder may charge and/or assign the benefit of the whole or any part of this Deed to any bank or financial institution or other person by way of security.

## 24    ENTIRE AGREEMENT, AMENDMENT AND TERMINATION

**Entire agreement**

24.1    This Deed and the Scheme constitute the entire agreement between the parties in respect of the subject matter of this Deed.

24.2    Subject to clause 25.3:

(a)    this Deed supersedes and extinguishes any representations and/or warranties previously given or made (other than those given in the Scheme);

(b)    each of the parties acknowledges to the others (and shall execute this Deed in reliance upon such acknowledgement) that it has not been induced to enter into this Deed by, nor relied upon, any representation or warranty other than the representations and/or warranties contained in this Deed and/or the Scheme;

(c)    each party irrevocably and unconditionally waives any right which it may have to claim damages in respect of, or to rescind, this Deed by reason of any misrepresentation whatsoever or by reason of any warranty not set out in this Deed or in any such document;

(d)    the only remedy available for breach of any of the Warranties or for breach of any of the warranties or representations set out in the documents in the agreed form shall be for damages for breach of contract under the terms of the relevant document.

24.3    Nothing in this clause 24.3 shall exclude any liability which any party would otherwise have to any other party, or any right which any of them may have to rescind this Deed in respect of statements made fraudulently by any other party prior to the execution of this Deed, or any rights which any of them may have in respect of fraudulent concealment by any other party.

24.4    Each of the parties acknowledges and agrees for the purposes of the Misrepresentation Act 1967 and the Unfair Contract Terms Act 1977 that the provisions of clauses 24.1 to 24.3 inclusive are reasonable.

**Amendment**

24.5    No amendment, change or addition to this Deed is effective or binding on a party unless in writing and executed by all of the parties except that amendments to this Deed may be made by the written agreement of a Major Shareholder Majority without the involvement or agreement of the

28

**1305**

other parties to this Deed provided that such amendment is made in accordance with paragraph 1 of Part 4 of Schedule 6.

**24.6**  The parties hereto agree that, if for any reason the "Rules for Provision of Information by Foreign Legal Entities, Foreign Organisations Which Are Not Legal Entitles, and Entities Under Their Control Regarding Their Beneficiaries, Beneficial Owners and Controlling Persons to the Executive Authority Responsible for Control over Foreign Investments in the Russian Federation" adopted by the Decree of the Government of the Russian Federation No. 1456 dated 1 December 2018 (as amended from time to time) requiring a notification or filing to be made to the Federal Antimonopoly Service of the Russian Federation no longer apply to the Group, the parties shall amend clause 7.12 of this deed to remove all mechanisms implemented to ensure compliance with the foregoing regime.

**Termination**

**24.7**  On an Exit  the provisions of this Deed cease to have effect except that each party's accrued rights and obligations are not affected.

**24.8**  When a Shareholder ceases (or the person holding those A Ordinary Shares or other securities in the capital of a Group member for a Shareholder ceases) to hold A Ordinary Shares or other securities in the capital of a Group member, such Shareholder ceases to be a party to this Deed (and the definition of "**Shareholder**" no longer includes that person) except that its accrued rights and obligations are not affected.

**25**  **MISCELLANEOUS**

**Further assurance**

**25.1**  Each party must, and must use all reasonable efforts to procure that any other person will:

(a)  do all such further acts and things;

(b)  execute and perform such further deeds and documents; and

(c)  give such further assurances,

in each case as may reasonably be required to give effect to this Deed.

**Vote to achieve effect of Agreement**

**25.2**  Each party other than the Company, Midco and Bidco (and each of the Company, Midco and Bidco in relation to votes it controls at board or general meetings of other Group members only) undertakes to each other party at all times to exercise the votes that it controls at general meetings of the Company and/or board meetings of a Group member to give effect to this Deed and to procure that the Company, Midco and Bidco comply with this Deed and the Articles.  In particular, but without limitation, each party (other than the Company, Midco and Bidco) agrees to procure that no person is registered as the legal holder of A Ordinary Shares except according to this Deed and the Articles.

**Conflict with articles**

**25.3**  Where the provisions of the Articles or the articles of association or incorporation of another Group member conflict with a provision of this Deed, each party (other than the Company) agrees (and the Company agrees, in relation only to the articles of association or incorporation of other Group members) that the provisions of this Deed prevail, to the extent that, if a Major Shareholder Majority so requires, each party shall procure the amendment of the Articles or the articles of

29

**1306**

association or incorporation of the relevant Group member to the extent required to enable the Group to be administered as provided in this Deed.

**Unlawful fetter**

25.4    No Group member is bound by a provision of this Deed to the extent it constitutes an unlawful fetter on any of its statutory powers, but that provision remains valid and binding as regards each other party to which it is expressed to apply.

**Successors and assigns bound**

25.5    This Deed is binding on each party's successors in title or assigns or (in the case of a party who is an individual) his personal representatives, but such a person is not entitled to the benefit of its provisions unless that person has entered into a Deed of Adherence.

**No partnership or agency**

25.6    This Deed is not to be construed as creating a partnership or an agency (except to the extent expressly described) relationship between any of the parties.

**Survival beyond Completion**

25.7    Each obligation and undertaking given by each party under this Deed and each right of each Shareholders in respect of the warranties continues in full force and effect notwithstanding Completion.

**Counterparts**

25.8    This Deed may be executed in any number of counterparts, each of which when executed and delivered is an original, but all of which when taken together constitute a single instrument.

**Indulgence**

25.9    No relaxation, forbearance, indulgence or delay (together "**Indulgence**") of a party in exercising a right under this Deed is to be construed as a waiver of that right and does not affect the ability of that party subsequently to exercise that right or to pursue a remedy in respect of it, nor does any Indulgence constitute a waiver of any other right.

**Waiver for permitted Share issues**

25.10    Each party waives any rights conferred or to be conferred on it under the Articles in connection with the allotment and issue of any A Ordinary Shares and/or Warrants pursuant to this Deed and the Warrant Instrument and undertakes to take such steps as are from time to time within his power to enable such allotments and issues to be made.

**Compromise**

25.11    Except where a clause makes a contrary express provision:

(a)    a liability to a Shareholder may be released or compromised, wholly or partially, and any time or Indulgence may be given, by that Shareholder to any person (a "**Recipient**") in writing in the Shareholder's absolute discretion without prejudicing or otherwise affecting its rights and remedies against any other person, whether that other person is under the same or similar liability, including a liability held with the Recipient; and

(b)    each party is responsible only for its own acts and defaults, and has no liability for the act or default of any other party.

**Nominee holdings**

25.12    A party whose A Ordinary Shares are held by a wholly-owned subsidiary nominee, trustee or custodian who is not party to this Deed undertakes to each other party to procure that wholly-owned subsidiary nominee, trustee or custodian observes the provisions of this Deed which would be binding on it if it were named in this Deed as a Shareholder.

**Capacity**

25.13    The provisions of this Deed shall not apply where a Shareholder is acting in its capacity as a lender to the Group, provided that when acting as a lender such Shareholder shall only be entitled to use the information provided to them in such capacity, and not any information acquired by virtue of being a Shareholder.

**Finance Documents**

25.14    The terms and conditions of this Deed are subject to the terms and conditions of the Finance Documents. In particular, but without limitation to the foregoing:

(a)    the payment of fees under this Deed;

(b)    the payment of dividends on all classes of shares in the capital of the Company; and

(c)    the redemption or purchase (if applicable) of any class of shares in the capital of the Company,

may only be made if and to the extent permitted by the Finance Documents and, in each case if the payment of all or any part of such fee, dividend or payment cannot be paid by virtue of the Finance Documents, then no such payment may be made but the unpaid portion remains a debt due from the relevant Group member to the relevant shareholder or party.

**Group refinancing**

25.15    If the Major Shareholder Majority proposes a (re)financing of the Group's third party debt financing arrangements, each party undertakes to exercise all rights (as Shareholder) and carry out all actions in his or its capacity as Shareholder in order to facilitate the (re)financing on the terms proposed by the Major Shareholder Majority, and as approved by the Board, provided that in relation to any (re)financing, no Shareholder shall be materially and adversely affected disproportionately to any other Shareholder.

25.16    Nothing in this Deed shall oblige any Shareholder to continue, or provide additional, debt finance or guarantee, to the Company or the Group.

**26    THIRD PARTY RIGHTS**

**Exclusion of Contracts (Rights of Third Parties) Act 1999, subject to exceptions**

26.1    Except as provided in clause 26.2, a person who is not a party to this Deed has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce this Deed. This clause 26.1 does not affect a right or remedy of a person which exists or is available otherwise than pursuant to that act.

**Exceptions to exclusion of Contracts (Rights of Third Parties) Act 1999**

26.2    The following persons (each a "**Third Party**") may enforce the following terms of this Deed subject to and in accordance with the terms of this Deed and the Contracts (Rights of Third Parties) Act 1999:

(a)     the Chairperson and each Director is entitled to enforce clauses 5, 6.5 and 10.2 to the extent that such clauses relate to that person in accordance with the Contracts (Rights of Third Parties) Act 1999; and

(b)     each Affiliate of a Shareholder of the Shareholders is entitled to enforce clause 5 to the extent that that clause relates to that Affiliate in accordance with the Contracts (Rights of Third Parties) Act 1999.

**Termination and variation without Third Party permission**

26.3    This Deed may be rescinded or terminated and a term may be amended or waived without the permission of a Third Party even if that takes away a right which the Third Party would otherwise have.

**Assignment of rights under Contracts (Rights of Third Parties) Act 1999**

26.4    No Third Party may, without the prior written permission of the Major Shareholder Majority, assign, charge or otherwise dispose of any of its rights under this Deed or grant or create any third party interest in its rights under this Deed (including holding an interest on trust for another).

**27      GOVERNING LAW AND JURISDICTION**

27.1    This Deed (together with all documents to be entered into pursuant to it which are not expressed to be governed by another law) and all matters (including without limitation, any contractual or non-contractual obligation) arising from or in connection with it are governed by, and to be construed and take effect in accordance with, English law.

27.2    The courts of England have exclusive jurisdiction to settle any claim, dispute or matter of difference which may arise out of or in connection with this Deed (including without limitation claims for set-off or counterclaim) or the legal relationships established by this Deed.

IN WITNESS WHEREOF this Deed has been executed as a Deed and delivered on the date hereof.

## SCHEDULE 1

### THE SHAREHOLDERS[1]

| Name, address, email address | Number of A Ordinary Shares |
|---|---|
| [●] | [●] |
| [●] | [●] |
| [●] | [●] |
| [●] | [●] |

---

[1] **Note**: to be completed

33

34

### SCHEDULE 2
### THE COMPANY, MIDCO AND BIDCO

#### PART 1
#### THE COMPANY

| | | | |
|---|---|---|---|
| 1 | Name | : | Kelly Topco Limited |
| 2 | Date of Incorporation | : | 28 September 2020 |
| 3 | Country of Incorporation | : | Jersey |
| 4 | Type of company | : | Private company |
| 5 | Registered number | : | 132385 |
| 6 | Registered office | : | 47 Esplanade, St Helier, Jersey JE1 0BD, Channel Islands |
| 7 | Directors | : | |

| Name | Address |
|---|---|
| [●] | |
| [●] | |

| | | | |
|---|---|---|---|
| 8 | Secretary | : | [●] |
| 9 | Subsidiary undertakings (direct and indirect) at the date of this Deed | : | [●] |

10   Authorised share capital at the date of this Deed is US$150,000 divided into 15,000,000 A Ordinary Shares of US$0.01 each

11   Issued share capital at the date of, but immediately prior to execution of this Deed:

| Name and address of registered holder | Number and class of A Ordinary Shares held |
|---|---|
| [●] | [●] |

35

**1312**

## SCHEDULE  2

### PART 2
### MIDCO

| | | | |
|---|---|---|---|
| 1 | Name | : | Kelly Holdco 1 Limited |
| 2 | Date of Incorporation | : | 2 October 2020 |
| 3 | Country of Incorporation | : | England |
| 4 | Type of company | : | Private company |
| 5 | Registered number | : | 12922288 |
| 6 | Registered office | : | 1 Park Row, Leeds, England, England, LS1 5AB |
| 7 | Directors | : | |

| Name | Address |
|---|---|
| [●] | [●] |
| [●] | [●] |

| | | | |
|---|---|---|---|
| 8 | Subsidiary undertakings (direct and indirect) at the date of this Deed | : | [●] |

9    Issued share capital at the date of this Deed:

| Name and address of registered holder | Number  and class of shares held |
|---|---|
| [●] | [●] |

**1313**

## SCHEDULE  2

### PART 3
### BIDCO

| | | | |
|---|---|---|---|
| 1 | Name | : | Kelly Holdco 2 Limited |
| 2 | Date of Incorporation | : | 2 October 2020 |
| 3 | Country of Incorporation | : | England |
| 4 | Type of company | : | Private company |
| 5 | Registered number | : | 12922637 |
| 6 | Registered office | : | 1 Park Row, Leeds, England, England, LS1 5AB |
| 7 | Directors | : | |

| Name | Address |
|---|---|
| [●] | [●] |
| [●] | [●] |

| | | | |
|---|---|---|---|
| 8 | Subsidiary undertakings (direct and indirect) at the date of this Deed | : | [●] |

9    Issued share capital at the date of this Deed:

| Name and address of registered holder | Number  and class of shares held |
|---|---|
| [●] | [●] |

**1314**

## SCHEDULE 3
## COMPLETION MATTERS

**1**     Meetings of the Board and of the board of directors of the Company, Midco and Bidco (as appropriate) shall be held at which:

   **(a)**     the subscription for A Ordinary Shares and the Release referred to in clause 2 is approved and the A Ordinary Shares allotted and issued to each subscriber of such A Ordinary Shares or its nominee and the relevant names entered in the register of members of the Company; and

   **(b)**     the Audit Committee and Remuneration Committee is each duly constituted as envisaged by clauses 6.10 and 6.11.

**2**     Immediately after completion of the Board meeting referred to in paragraph 1 above, the Company shall deliver to the Major Shareholders a copy of the minutes of that Board meeting.

**3**     A Major Shareholder Majority shall approve the Slate proposed by a Substantial Shareholder.

**4**     Any Shareholder who is identified by the Transfer Agent or the Holding Period Trustee (acting in its capacity as information agent) as holding, when aggregated with the A Ordinary Shares held by its Affiliates, such Shares that it and its Affiliates would be: (i) a Major Shareholder; (ii) a 5% Shareholder; (iii) a Substantial Shareholder; (iv) a Controlling Shareholder; (v) a Super Majority Holder; (vi) a holder of either 50%, 60%, 70% or 80% of A Ordinary Shares in the Company; or (vii) a 1% Holder, will be notified by the Transfer Agent (who shall also notify the Company) of the details of the number of Shares held by it and its Affiliates.

**5**     Shareholders shall (i) notify the Transfer Agent of their Affiliates who are also Shareholders; and (ii) nominate one of their number as Major Shareholder Nominee and notify the Transfer Agent and the Company accordingly.

## SCHEDULE 4
## AUDIT COMMITTEE AND REMUNERATION COMMITTEE TERMS OF REFERENCE

### PART 1
### AUDIT COMMITTEE TERMS OF REFERENCE

To monitor the integrity of the financial statements of the Group, reviewing significant financial reporting judgements contained in them.

1    To review the Group's internal financial controls and the Group's internal control and risk management systems.

2    To establish and monitor and review the effectiveness of the Group's internal audit function.

3    To make recommendations to the Board in relation to the appointment of the Group's external auditor and to approve the remuneration and terms of engagement of that external auditor (in each case subject to clause 9.3).

4    To review and monitor the Group's external auditor's independence and objectivity and the effectiveness of the audit process, taking into consideration relevant professional and regulatory requirements.

5    To develop and implement policy on the engagement of the Group's external auditor to supply non-audit services, taking into account relevant ethical guidance regarding the provision of non-audit services by that external audit firm.

6    To report to the Board on the above, identifying any matters in respect of which it considers that action or improvement is needed, and making recommendations as to the steps to be taken.

7    To require the attendance before it of any officer or employee of a Group member and to obtain (at the cost of the Group) legal or other professional advice in respect of any matters within its terms of reference.

## PART 2
## REMUNERATION COMMITTEE TERMS OF REFERENCE

**1**    To, subject to clause 9.3, determine and action on behalf of the Company all matters concerning:

    **(a)**    the salary and other remuneration and benefits (including bonus, share incentive and pension arrangements) and terms and conditions of appointment of directors (subject to Major Shareholder Majority approval) or of employment of senior employees or any replacement or employee of equivalent position (including, without limitation, salary reviews and the setting of bonus levels and performance targets), save for the structure of any bonus, share incentive or performance target for employees and other senior employees which will be determined by the Board;

    **(b)**    the appointment or dismissal (and terms of appointment or dismissal) of a senior employee (or a person who would on his appointment become a senior employee);

    **(c)**    the terms of appointment or dismissal of directors (subject to Major Shareholder Majority approval); and

    **(d)**    any employee share based remuneration schemes.

**2**    To, subject to clause 9.3, take the following actions on behalf of the Company or relevant Group member:

    **(a)**    to amend any of the terms of each employment agreement from time to time;

    **(b)**    to exercise any right or discretion of the Company under each employment agreement; and

    **(c)**    to amend any term of an employee share based remuneration scheme.

**3**    To require the attendance before it of any officer or employee of any Group member and to obtain (at the cost of the Group) legal or other professional advice in respect of any matters within its terms of reference.

### SCHEDULE 5
### PROVISION OF INFORMATION

### PART 1
### ALL SHAREHOLDERS

All of the items specified in paragraphs 1 to 10 below are to be provided in the form delivered to the noteholders under the notes indenture included in the definition of Finance Documents (the "**Indenture**")

**Reports**

1       The Company shall deliver to the Shareholders, within 120 days after the end of the Reporting Group's fiscal year beginning with the first fiscal year ending after the date of the issuance of A Ordinary Shares, annual reports containing, to the extent applicable, and in a level of detail that is consistent with past practice, the following information:

      **(a)**      audited consolidated balance sheets of the Reporting Group as of the end of the two most recent fiscal years and audited consolidated income statements and statements of cash flow of the Reporting Group for the two most recent fiscal years, including complete footnotes to such financial statements and the report of the independent auditors on the financial statements;

      **(b)**      unaudited pro forma income statement information and balance sheet information of the Reporting Group (which, for the avoidance of doubt, shall not include the provision of a full income statement or balance sheet to the extent not reasonably available), together with explanatory footnotes, for any material acquisitions, dispositions or recapitalisations that have occurred since the beginning of the most recently completed fiscal year as to which such annual report relates, in each case unless pro forma information has been provided in a previous report pursuant to paragraph 2 below;

      **(c)**      an operating and financial review of the audited financial statements, including a discussion of the results of operations, financial condition, and liquidity and capital resources of the Reporting Group, and a discussion of material commitments and contingencies and critical accounting policies in a level of detail that is consistent with past practice;

      **(d)**      description of the business, management and shareholders of the Reporting Group, all material affiliate transactions and a description of all material contractual arrangements, including material debt instruments; and

      **(e)**      a description of material risk factors,

*provided that* the information described in clauses (d) and (e) may be provided in the footnotes to the audited financial statements;

2       Within 60 days following the end of the first three fiscal quarters in each fiscal year of the Reporting Group beginning with the quarter ending 31 March 2021 all quarterly reports of the Reporting Group containing the following information:

      **(a)**      an unaudited condensed consolidated balance sheet as of the end of such quarter and unaudited condensed statements of income and cash flow for the most recent quarter year-to-date periods ending on the unaudited condensed balance sheet date, and the comparable prior year period, together with condensed footnote disclosure;

**(b)**    unaudited pro forma income statement information and balance sheet information of the Reporting Group (which, for the avoidance of doubt, shall not include the provision of a full income statement or balance sheet to the extent not reasonably available), together with explanatory footnotes, for any material acquisitions, dispositions or recapitalizations that have occurred since the beginning of the relevant quarter unless pro forma information has been provided in a previous report pursuant to this Schedule;

**(c)**    an operating and financial review of the unaudited financial statements, including a discussion of the results of operations, financial condition, EBITDA and material changes in liquidity and capital resources of the Reporting Group, and a discussion of material changes not in the ordinary course of business in commitments and contingencies since the most recent report in a level of detail that is consistent with past practice; and

**(d)**    any material changes to the risk factors disclosed in the most recent annual report;

*provided that* the information described in clause (d) may be provided in the footnotes    to    the unaudited financial statements.

**3**    Promptly after the occurrence of any material acquisition, disposition or restructuring or any senior executive officer changes at Alpha or change in auditors of Alpha or any other material event that Alpha or any of any of its subsidiaries  announces publicly, a report containing a description of such event.

**4**    All financial statements and *pro forma* financial information shall be prepared in accordance with the international accounting standards promulgated by the International Accounting Standards Board and its successors, as adopted by the European Union or the United Kingdom, as in effect from time to time, unless otherwise stated ("**IFRS**"),  *provided* that at any date after the date of issuance of the A Ordinary Shares, Alpha may make an irrevocable election to establish that "IFRS" shall mean, except as otherwise specified herein, IFRS as in effect on a date that is on or prior to the date of such election as in effect on the date of such report or financial statement (or otherwise on the basis of IFRS as then in effect) and on a consistent basis for the periods presented; *provided, however,* that the reports set forth in this Schedule may, in the event of a change in applicable IFRS, present earlier periods on a basis that applied to such periods. No report needs to include separate financial statements for any subsidiaries of Alpha.

**5**    At any time that any of  Alpha's subsidiaries are designated as "Unrestricted Subsidiaries" in accordance with the terms of the Finance Documents and any such Unrestricted Subsidiary or a group of Unrestricted Subsidiaries, taken as a whole, constitutes a Significant Subsidiary (as defined in the Finance Documents) of Alpha, then the quarterly and annual financial information required by this Schedule will include a reasonably detailed presentation, either on the face of the financial statements or in the footnotes thereto, of the financial condition and results of operations of Alpha and its Restricted Subsidiaries (as defined in the Finance Documents) separate from the financial condition and results of operations of the Unrestricted Subsidiaries of Alpha.

**Conference Call**

**6**    The Company will, either, (i) within ten Business Days after the delivery of the reports discussed at paragraphs 1 and 2 of this Part 1 of this Schedule 5, conduct a conference call to discuss such report and answer questions about such report, which conference call will be open to all Shareholders, or (ii)  provide Shareholders with access to and the opportunity to participate in  any public conference call, investor presentation, webcast or other event, the primary  purpose of which is to discuss results of operations or any material event referenced in paragraph 3 of this Part 1 of this Schedule 6 with investors in the capital stock of Alpha.

**7**    Details of such conference calls will either (a) be delivered with each report or (b) posted on an electronic website that is used by Alpha to communicate to its investors or the equity holders generally for which the Shareholders have been, prior to the posting of such notice, informed of

the website address and relevant password specifications, which notice shall constitute reasonable notice of such public calls for the purpose of this paragraph.

8       In addition, so long as the A Ordinary Shares remain outstanding and during which Alpha is not subject to Section 13 or 15(d) of the U.S. Exchange Act nor exempt therefrom pursuant to Rule 12g3-2(b), Alpha shall furnish to the Shareholders and, upon their request, prospective purchasers of the Shares, the information required to be delivered pursuant to Rule 144A(d)(4).

**Compliance Certificate**

9       The Company shall deliver to the Shareholders, within 120 days after the end of each fiscal year, a copy of the Executive Director's certificate delivered under the Indenture stating that a review of the activities of Alpha and its subsidiaries during the preceding fiscal year has been made under the supervision of the signing Executive Director with a view to determining whether Alpha and its subsidiaries have kept, observed, performed and fulfilled their respective obligations under the Finance Documents and the Security Documents, and further stating, as to each such Director signing such certificate, that to the best of his or her knowledge Alpha and its Subsidiaries have kept, observed, performed and fulfilled each and every covenant contained in the Finance Documents and the Security Documents and each is not in default in the performance or observance of any of the terms, provisions and conditions of such agreement (or, if a Default or Event of Default has occurred and is continuing, describing all such Defaults or Events of Default of which he or she may have knowledge and what action Alpha is taking or proposes to take with respect thereto) and that to the best of his or her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of, premium on, if any, interest or additional amounts, if any, due pursuant to the Finance Documents is prohibited or if such event has occurred, a description of the event and what action Alpha is taking or proposes to take with respect thereto.

10      So long as any of the Finance Documents are outstanding, the Company will deliver to the Shareholders, forthwith upon any Officer becoming aware of any Default or Event of Default, an Officer's Certificate specifying such Default or Event of Default and what action Alpha is taking or proposes to take with respect thereto.

**Company reporting**

11      In respect of the period to 31 December 2021 and thereafter, the Company shall deliver to the Shareholders, within 120 days following the end of the financial year to which they relate, the consolidated accounts of the Company.

**1320**

## PART 2
## 1% HOLDERS & MAJOR SHAREHOLDERS

A reference in this Part 2 to a 1% Holder or a Major Shareholder is a reference to those 1% Holders and Major Shareholders that have elected to receive information pursuant to clause 8.2

**Approach from prospective purchasers**

1       The Company agrees to notify the 1% Holders and the Major Shareholders promptly of any approach received from any person to acquire any shares in a Group member or any business or substantial part of the business or assets of the Group, which would, if completed, constitute a Sale.

**Monthly Reporting**

2       Within 30 days following the end of each month, commencing with the first calendar month ending after the date of Completion, the Company shall prepare and submit to the 1% Holders and Major Shareholders the monthly reporting pack for the Reporting Group which shall cover the following items:

  (a)     Executive Summary: a report from the CEO commenting on the performance in the month and containing a business commentary against the current Business Plan;

  (b)     Group Performance Summary: a summary of the Reporting Group's revenue and EBITDA for the month and year to date compared to the Annual Business Plan, together with monthly and year to date commentary;

  (c)     Summary Financials by Business Unit: a summary of revenue and EBITDA by business unit, including waterfalls and variance analysis by month and year to date including commentary by division;

  (d)     Primary Financial Statements: a consolidated income statement, balance sheet and cash flow statement, including a statement of the actual financial ratios of the Company with any required under the Finance Documents or any third party facility which replaces the Finance Documents;

  (e)     Business Unit Performance Variances: a summary of revenue and EBITDA by business unit by country/area together with exceptional items and eliminations including monthly and year to date commentary;

  (f)     Liquidity Outlook: the latest liquidity projection from the Reporting Group's 13 week cashflow forecast;

  (g)     Capex and Working Capital: a working capital summary, daily sales outstandings by area and region and capex against budgets and capital commitments; and

  (h)     the monthly operations performance report including certain KPIs in accordance with the Reporting Group's past practice.

**Annual Business Plan**

3       The Company provide to the 1% Holders and Major Shareholders within 60 days after the start of each Financial Year a copy of the Annual Business Plan as approved by the Board.

**Other Information**

4       The 1% Holders and Major Shareholders shall be provided with:

(a)     such other information relating to the Group as the 1% Holders and Major Shareholders may reasonably request from time to time, reasonableness for this purpose to be determined by the Board; and

(b)     any financial information and reporting provided to, and in the same format as, that provided to any lender to the Group.

SCHEDULE 6
CONDUCT OF THE GROUP

PART 1
POSITIVE OBLIGATIONS

**Corporate Matters**

1       Other than as previously approved by a Major Shareholder Majority, no resolution is made to place a Group member in voluntary liquidation or any analogous procedure.

2       The Company shall, enforce its rights under the MIP Investment Agreement so far as it is legally able.

**Financial and Accounting Matters**

3       The Company shall, and shall procure that each other Group member does, keep proper accounting records and, so far as they are legally able, in them make true and complete entries of all dealings and transactions in relation to its business.

**Business Matters**

4       The business of the Company and each other Group member shall be properly managed and comply, in all material respects, with all applicable laws and each Group member shall maintain all licences, consents and authorisations of any nature whatsoever (public or private) which senior management of the Group are aware are necessary to carry on the businesses of the Group from time to time.

5       Each Group member shall procure, according to prudent management practice, that the properties which are leasehold and leased or occupied by it from time to time are maintained during their respective terms in a state of repair and condition consistent with the provisions of the leases relating to them.

**Insurance and D&O Insurance**

6       Insurance cover for Group member, Directors and officers of Group members shall be maintained at all times with a reputable insurance Company against all such risks and liabilities in such manner and amounts, and on such terms and conditions, as accord with good commercial practice having regard to the businesses and assets of the Group, and in any event as reasonably required from time to time by a majority of the Board (including a majority of Non-Executive Directors) (such insurance to include, without limiting the generality of the foregoing, cover against any liability of any Director of a Group Company in the lawful performance of his respective duties and shall note the interests (if any) of the Shareholders on the relevant policy or policies).

7       Except as required pursuant to the terms of any third party debt financing, no Group member may at any time assign, charge or otherwise dispose of any interest in any insurance policy maintained pursuant to the preceding subparagraph, or do or omit to do anything by which any such policy may be rendered void or unenforceable.

**Other Matters**

8       The Company shall comply with its obligations under this Deed and shall procure that each other Group member acts in the manner contemplated by this Deed and observes and performs the provisions of this Deed which are to be observed and performed by that other Group member.

9       The Company shall and shall procure that each Group member implements a policy in a form acceptable to the Major Shareholders (acting reasonably) requiring the compliance by each Group

46

**1323**

member and each of their respective officers, directors, employees, agents and advisers with applicable anti-bribery, anti-corruption, and anti-money laundering laws in each country and/or jurisdiction in which the Group operates on or after the date of this Deed including but not limited to the Bribery Act 2010, the  Criminal Finances Act 2017, the Proceeds of Crime Act 2002 and any applicable requirements of any sanctions regime imposed by the USA, whether such sanctions regime is implemented under the Trading with the Enemy Act, the International Emergency Economic Powers Act or any presidential or executive order or otherwise.

10      The Company shall procure that the [compliance officer] of the Group delivers an annual certification that the Group has maintained reasonable compliance policies in accordance with paragraph 9 above.

11      Each Group member shall provide to any Shareholder such information as any such Shareholder may reasonably request at any time or from time to time in order to permit such Shareholder to: (i) prepare its U.S. federal, state, and local income Tax returns or Tax forms; (ii) determine whether any Group member is or has been a "controlled foreign corporation" as defined in section 957 of the Internal Revenue Code of 1986 (as amended) and the consequences to the Shareholder of such status; and (iii) determine whether any Group member is or has been a "passive foreign investment company" as defined in section 1297(a) of the Internal Revenue Code of 1986 (as amended) and the consequences to the Shareholder of such status.

## PART 2
## BOARD RESERVED MATTERS

Each of the following matters shall require the prior approval of a majority of the Non-Executive Directors on the Board:

1.  Recommend, declare or pay a dividend excluding dividends made to other Group members.

2.  Make repurchases of equity or loan capital provided such repurchases are made on a fully pre-emptive basis.

3.  Approval of the Annual Business Plan.

4.  Capitalise any reserves, or reduce any amount standing to the credit of the share premium account or capital redemption or other reserve.

5.  Appoint or remove (other than as an alternate as permitted by the articles of association) a person as a director of a Group member other than the Company and other than appointments made in accordance with clause 6.9.

6.  Delegate any powers of the Directors to a committee other than the Remuneration Committee or the Audit Committee or take any action which materially contravenes any recommendation or decision of the Remuneration Committee or the Audit Committee.

7.  Commence any material litigation, or settle material litigation for an amount that has a cash impact of less than $100 million in one transaction or series of related transactions.

8.  Establish, vary or terminate the management incentive plan.

9.  (i) Hire or fire CEO, CFO and other executives that directly report to CEO, which includes all Business Unit and Functional Heads and anyone else whose base salary is in excess of $250,000 per annum; and (ii) any amendment to the compensation packages for such persons other than the payment of the Management Transaction Bonuses.

10. Material acquisitions/disposals of assets, securities or businesses for amounts up to between $10 million and up to but not including $50 million in aggregate in one transaction or series of related transactions.

11. Enter into a contract or transaction or make a payment or incur a commitment in excess of $5 million or otherwise of a material nature other, in each case, than in the ordinary course of business and on arm's length terms.

12. Make a material change to any of the Group's insurance policies including any directors' liability insurance.

13. Make any political or charitable donations.

14. Any acquisition or creation of a joint venture arrangement or of an entity in which the liability of the partners or interest-holders in respect of such entity is not limited to such partner's or interest-holder's capital contribution, of a value up to but not including $25 million.

15. Adopt a new accounting policy or practice or principles or make a material change to the accounting policies and practices or accounting reference date of any Group member.

16. Any decision to make any loan to an employee of any Group member in an amount or having a value exceeding $10,000 (but excluding any loan approved by the Board under the management incentive plan).

**1325**

17.  Any change to the terms of any debt or finance documents (including any waivers) or any decision requiring prior authorisation by the lenders under such document, or which would constitute an Event of Default under the Finance Documents without such prior authorisation.

18.  Any early repayment under the terms of any debt or finance documents.

19.  Any appointment or removal of a trustee or manager of a pension scheme for the benefit of current or former officers or employees of a Group member located in the UK.

20.  Make any change to the auditors of the Group.

21.  Incurrence of any debt which is permitted or not otherwise prohibited by the terms of any financing documents to which any member of the Group is a party from time to time for an amount that is $5 million or more but less than $100 million.

22.  Capital expenditure that is not contemplated in the Annual Business Plan and is $10 million or more but less than $25 million.

23.  Any agreement to do any of the above.

**1326**

## PART 3
## SHAREHOLDER   RESERVED   MATTERS

Each of the following matters shall require prior Major Shareholder Majority approval:

1. Sale of the Company or the business or any Listing.

2. Any merger, de-merger, partial contribution or similar transactions except for the purpose of internal reorganisation.

3. Any allotment or issue of shares or other securities, and any grant to any person of any option or right to call for the issue of any shares or other securities, excluding to any Group member or pursuant to the Warrant Instrument.

4. Incurrence of any debt which is permitted or not otherwise prohibited by the terms of any financing documents to which any member of the Group is a party from time to time for an amount that is $100 million or more.

5. Any bankruptcy, liquidation, dissolution or any analogous procedure of any Group member.

6. Any commencement of any new activity of the Group outside its existing course of business (other than where such new activity would constitute a material change in the nature or scope of the business conducted by the Company or any other member of the Group).

7. Any of the following matters:

   a. the filing of any U.S. Tax election, form, return, or other document in relation to the U.S. Tax status of entities in the Group or the treatment of any transactions undertaken by the Group, other than any filing in the ordinary course of business;

   b. any change in any member of the Group's place of Tax residence, place of incorporation or corporate form;

   c. any other matter which the Company is aware (having made all reasonable enquiries), or could reasonably expected to be aware, has a material adverse Tax consequence on any Major Shareholder.

8. Capital expenditure that is not contemplated in the Annual Business Plan and is in excess of $25 million.

9. Material acquisitions/disposals of assets, securities or businesses for amounts equal to or exceeding $50 million in aggregate in one transaction or series of related transactions.

10. Any acquisition or creation of a joint venture arrangement or of an entity in which the liability of the partners or interest-holders in respect of such entity is not limited to such partner's or interest-holder's capital contribution, of a value equal to or exceeding $25 million.

11. Any cessation of the activities of the Group, or reduction in such activities that would result in a reduction in turnover of $20 million or more (other than where such cessation or reduction would constitute a material change in the nature or scope of the business conducted by the Company or any other member of the Group).

12. Modifying, varying or abrogating any rights attaching to shares in the Company or any other member of the Group (except to the extent that would have a disproportionate adverse effect on one or more Shareholders from that on other Shareholders).

50

13. Settle material litigation which has a cash impact in excess of $100 million in aggregate in one transaction or series of related transactions.

14. Any agreement to do any of the above.

**1328**

## PART 4
## SHAREHOLDER SUPER RESERVED MATTERS

The following matters require prior approval of holders of 80% of the A Ordinary Shares (whether or not they carry voting rights) ("**Shareholder Super Reserved Matters**"):

1.  Amending or modifying of the constitutional documents of the Company or this Deed in a manner that would have a materially disproportionate adverse effect on one or more Shareholders from that on other Shareholders.

2.  Entering into any related party transaction.

3.  Any material change in the nature or scope of the business conducted by the Company or any other member of the Group (excluding the sale of any assets of the Group).

4.  Modifying, varying or abrogating any rights attaching to shares in the Company or any other member of the Group to the extent that would have a materially disproportionate adverse effect on one or more Shareholders from that on other Shareholders.

5.  Save in connection with: (a) management issuances; (b) Emergency Funding Issues (provided a catch up opportunity is available); (c) issuances between members of the Group; (d) acquisition issuances; and (e) issuances on a fully pre-emptive basis:

    i.   issuing any shares (including convertible instruments) in; or

    ii.  changing or varying the share capital of the Company or any Group Company (including a reduction of capital or a purchase or redemption of shares or a consolidation, subdivision, conversion or cancellation of any shares),

    in each case on a non pro-rata basis.

## SCHEDULE 7
## DEED OF ADHERENCE

**THIS DEED** is made on                              20[●] by the person whose contact details appear in the schedule (the "**New Shareholder**");

**WHEREAS**:

(A)    By an Agreement dated [●] 2020 (the "**Investment Agreement**") concerning [Kelly Topco] Limited, made between, amongst others, the Shareholders and the Company (as those expressions are defined in the Investment Agreement)

**Option A** [to be used where A Ordinary Shares are to be transferred]

and to which ● (the "**Transferor**") is a party [by virtue of a Deed of Adherence dated ● ], the Transferor has agreed to sell and transfer to the New Shareholder [*Insert number and class of A Ordinary Shares*] conditional upon the New Shareholder entering into this Deed of Adherence and provision of KYC in a form satisfactory to the Jersey registrar.

**Option B** [to be used when A Ordinary Shares are to be subscribed]

the Company will issue to the New Shareholder [*Insert number and class of A Ordinary Shares*] conditional upon the New Shareholder entering into this Deed of Adherence and provision of KYC in a form satisfactory to the Jersey registrar.

(B)    The New Shareholder wishes to acquire those A Ordinary Shares, subject to such condition and to enter into this Deed of Adherence pursuant to the Investment Agreement.

**THIS DEED WITNESSES:**

1       The New Shareholder undertakes to and covenants with all the parties to the Investment Agreement from time to time (including any person who enters into a Deed of Adherence pursuant to the Investment Agreement, whether before or after this Deed is entered into) to comply with the provisions of and to perform all the obligations in the Investment Agreement in so far as they remain to be observed and performed, as if the New Shareholder had been an original party to the Investment Agreement in place of the Transferor as a Shareholder.

2       [The Transferor assigns to the New Shareholder its share of its rights under the Investment Agreement in proportion to the number of A Ordinary Shares transferred as against the number of A Ordinary Shares retained by the Transferor (if any).] [*Only relevant for Option A and Transferor will need to be a party for that purpose if not dealt with elsewhere*]

3       Except as expressly varied by this Deed, the Investment Agreement will continue in full force and effect, and the Investment Agreement be interpreted accordingly.

4       [Details of appointment of agent for service, where relevant]

5       The interpretation provisions and the provisions of clause 19.1 (*Fees and Costs*), 22 (*Notices*), 24 (*Entire agreement, amendment and termination*), 25.1 (*Further assurance*), 25.6 (*No partnership or agency*), 25.8 (*Counterparts*), and 27 (*Governing law and jurisdiction*) of the Investment Agreement apply to this Deed as if those provisions had been set out expressly in this Deed, which will take effect from the date set out above.

**1330**

**THE SCHEDULE**

**DETAILS OF NEW SHAREHOLDER**


Name    :
Registered number (if a company)          :
Country of Incorporation (if a company)   :



Address:



**EXECUTED** by the parties as a deed



[*insert signature blocks*]

### SCHEDULE 8
### DEFINITIONS AND INTERPRETATION

## 1        DEFINITIONS

In this Deed the expressions set out below have the meanings set out after them:

"**1% Holder**" is defined in clause 8.2;

"**Acceptance Notice**" is defined in clause 9.6;

"**A Ordinary Shares**" the A ordinary shares of US$0.01 each, in each case the rights of which are set out in the Articles and "**A Ordinary Share**" means each of them;

"**Acquirer**" any person or group of persons acting in concert, other than a Shareholder or its Affiliates interested in acquiring A Ordinary Shares from a Selling Shareholder;

"**Affiliate**" with respect to a person (the "**First Person**"):

(a)        another person that, directly or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, the First Person;

(b)        a pooled investment vehicle organised by the First Person (or an Affiliate thereof) the investments of which are directed by the First Person;

(c)        a partner or an officer or employee of the First Person (or an Affiliate thereof);

(d)        an investment fund organised by the First Person for the benefit of the First Person's (or its Affiliates') partners, officers or employees or their dependants; or

(e)        a successor trustee or nominee for, or a successor by re-organisation of, a trust the direct or indirect principal beneficiary/ies of which is any of the First Person, its Affiliates or any of their respective partners, officers or employees or their dependants;

"**Aggregate Subscription Price**" is defined in clause 9.8(b)(ii);

"**Alpha**" KCA Deutag Alpha Limited, a company incorporated in England with registered number 06433748 and having its registered office at 1 Park Row, Leeds, England, LS1 5AB;

"**Annual Business Plan**" the annual business and strategic plan of the Reporting Group;

"**Articles**" the memorandum and articles of incorporation or similar constitutional document of the Company (as amended from time to time), which at Completion will be those regulations in the agreed form;

"**Audit Committee**" is defined in clause 6.10;

"**Bidco**" the company listed as such in Part 3 of Schedule 2;

"**Board**" the board of Directors for the time being of the Company from time to time including any duly appointed committee thereof;

"**Board Reserved Matters**" those matters set out in Part 2 of Schedule 6;

"**Business Day**" a day, except a Saturday or Sunday or a public holiday in the United Kingdom and Jersey, on which clearing banks in the City of London and Saint Helier are generally open for business;

"**Business Plan**" the Initial Business Plan or an Annual Business Plan;

"**Catch-Up Option**" is defined in clause 9.14;

"**Catch-Up Option Price**" is defined in clause 9.15;

"**Catch-Up Payment**" is defined in clause 9.13(d);

"**Catch-Up Group Shares or Debt Instruments**" is defined in clause 9.14(b);

"**CEO**" the person employed as the chief executive officer (or equivalent) of the Company, the first such person being Joseph Elkhoury;

"**CFO**" person employed as the chief financial officer (or equivalent) of the Company, the first such person being Neil Gilchrist;

"**Chairperson**" the Chairperson of the Company and the Board from time to time appointed pursuant to clause 6.5 the first such person being [●];

"**Co-Investment Scheme**" and Fund which co-invests alongside a Fund;

"**Company**" Kelly Topco Limited a company incorporated in Jersey further details of which are set out in Schedule 2;

"**Competitor**" means each of: Helmerich & Payne, Inc., Precision Drilling Corporation, Nabors Industries Ltd., Patterson-UTI Energy, Inc., ADES International Holding PLC, Ensign Energy Services Inc., Daldrup & Söhne Aktiengesellschaft, Honghua Group Limited, Hunting PLC, Dril-Quip, Inc., Forum Energy Technologies, Inc., Scholler-Bleckmann Oilfield Equipment, Aktiengesellschaft, The Weir Group PLC, Archer Limited, Aker Solutions ASA, Cactus, Inc., Enerflex Ltd., National Oilwell Verco, Transocean Ltd., Valaris plc, Odfjell Drilling Ltd., The Drilling Company of 1972 A/S, Weatherford International plc, Saipem SpA, Archer Limited, Halliburton Company, Baker Hughes Company, Petrofac Limited, National Oilwell Varco, Inc., Aker Solutions ASA, Schlumberger Limited, SNC-Lavalin Group Inc., AECOM, Stantec Inc., Arcadis NV, Worley Limited, KBR, Inc., Anton Oilfield Services, Yantai Jereh Oilfield Services Group, COSL, CNOOC, Sinopec OFS, COOEC, Oilserv, Abraj Energy, ADNOC Drilling, Arabian Drilling Co, Rawabi Holdings, Joy Global Inc, United Heavy Machinery, McDermott, Subsea7, Seadrill Ltd, Noble Corp and John Wood Group PLC; together with any person or entity which undertakes any of the following services form time to time: (a) the provision of drilling, engineering and technology services to the onshore and offshore drilling markets in any part of the world; (b) the design, engineering and manufacturing of drilling rigs and related components for the onshore and offshore drilling markets in any part of the world; or (c) the owning and operation of offshore and onshore drilling rigs;

"**Completion**" the completion of this Deed;

"**Confidentiality Agreement**" is defined in clause 8.2;

"**connected person**" has the meaning given to that expression in section 1122 of the Corporation Tax Act 2010 and a "**person connected**" with a party shall have a corresponding meaning;

"**Control**", including with its correlative meanings, "**Controlled by**" and "**under common Control with**", means, when used in respect of a person, the power and authority to direct or cause the direction of management and policies of such person, whether directly or indirectly, through the holding of voting securities, equity, membership or partnership interests, by contract or otherwise;

"**Debt Instruments**" means any debt instruments from time to time but excluding the Excluded Debt;

"**Deed of Adherence**" a deed substantially in the form set out in Schedule 7 with such amendments as the Board may approve in writing;

"**Default**" has the meaning given in the Finance Documents;

"**Directors**" the directors of the Company from time to time, including the Non-Executive Directors (if appointed) and, "**Director**" means any of them;

"**Drag-Along Notice**" notice from the Purchaser to each Dragged Shareholder of any Proposed Drag-Along Sale to be given as soon as practicable after reaching agreement in respect of the Proposed Drag-Along Sale;

"**Dragged Shareholders**" Shareholders or holders of Shares other than the Majority Selling Shareholders;

"**Emergency Funding Issue**" is defined in clause 9.13(a);

"**Emergency A Ordinary Shares and Debt Instruments**" is defined in clause 9.13(a);

"**Event of Default**" is defined in the Finance Documents;

"**Excess Forfeited Instruments**" is defined in clause 12.3;

**Excess New Group Shares or New Debt Instruments**" is defined in clause 9.6(a);

"**Excluded Debt**" means:

(a)     the $500,000,000 in aggregate principal amount of 9.875% Senior Secured Notes due 2025 of the Issuer issued under an indenture dated [●] 2020 (as amended from time to time), among the Issuer, Lucid Trustee Services Limited as trustee and security agent, and the other parties thereto (the "**Reinstated Bonds**");

(b)     the FAB Run-Off LC Facility (as defined in the explanatory statement issued by KCA Deutag UK Finance plc in October 2020 (the "**Explan**"));

(c)     the New Cash Management Facilities (as defined in the Explan);

(d)     the New LC Facility (as defined in the Explan); and

(e)     any further facilities (senior and subordinated facilities, together with any related hedging arrangements) of the Group as borrower for the funding of any future acquisitions, repayment of and/or refinancing of third party debt, capital expenditure and/or working capital (excluding for the avoidance of doubt any debt in the nature of shareholder debt issued to any Shareholder);

"**Executive Director**" any director who is an employee of the Group and who is not a Non-Executive Director;

"**Exit**" (i) a Listing of the Company (or another entity in which the Original Participating Creditors (as defined in the Lock-up Agreement) or their transferees are shareholders at the time, following a pre-sale reorganisation); (ii) a Sale; (iii) if there is an indirect sale of assets of the Company (as described in subparagraph (ii)) including by way of merger, then the distribution of the proceeds of sale to the Company shareholders; or (iv) voluntary liquidation of the Company;

"**Finance Documents**" the Primary Debt Documents as defined in the intercreditor agreement entered into on or around the date of this Deed between, among others, KCA Deutag Alpha Limited (as Company) and the Holding Period Trustee as Security Agent;

"**Forfeited Instruments**" is defined in clause 12.3;

"**Forfeiting Shareholder**" is defined in clause 12.3;

"**FPO**" the Financial Services and Markets Act (Financial Promotion) Order 2001;

"**FSMA**" the Financial Services and Markets Act 2000;

"**Fund**": any collective investment scheme (as defined in the FSMA) or any high net worth company, high net worth unincorporated association and high value trust (each as defined in the FPO), partnership, limited partnership, pension fund or insurance company, in any such case the principal business of which is to make investments and whose business is managed by an Investment Manager and any subsidiary or parent undertaking of any of the foregoing;

"**Group**" the Company and each of its subsidiary undertakings from time to time including each Reporting Group Company (in each case until it ceases to be a subsidiary undertaking), and "**Group member**" means any of them;

"**Group Shares**" the shares in the capital of any Group member in issue from time to time, the rights to and "**Group Share**" means each of them;

"**Indulgence**" is defined in clause 25.9;

"**Initial Business Plan**" the business plan in the agreed form;

"**Investment Manager**" a person whose principal business is to make, manage or advise upon investments;

"**IPO Shareholders' Agreement**" is defined in clause 11.3;

"**Holding Company**" means each of the Company, Midco and Bidco;

"**Issue Completion Date**" is defined in clause 9.8(b)(iii);

"**Issue Notice**" is defined in clause 9.5(b);

"**KYC**" is defined in clause 18.1;

"**Law**" the Companies (Jersey) Law 1991 (as amended from time to time);

"**Listing**" means the first public offering of any class of equity securities by the Company or one of the Holding Companies (or a new holding company interposed for the purposes of being a successor of the Company or such Holding Company) in the legal form (after conversion if necessary) that results in a listing of such class of securities on a public securities market, whether effected by way of an offer for sale, a new issue of shares, an introduction, a placing or otherwise;

"**Lock-up Agreement**" the lock-up agreement between, inter alia, KCA Deutag Alpha II Limited, KCA Deutag UK Finance PLC and the Original Participating Creditors, dated 31 July 2020;

"**Management Transaction Bonuses**" means the transaction bonuses payable to certain members of the Group's management team in connection with the implementation of the Reporting Group's restructuring on or around the date of this Deed;

"**Mandatory Offer Price**" is defined in clause 12.3;

"**Mandatory Transfer Offer Notice**" is defined in clause 12.3;

"**Mandatory Transfer Offer Period**" is defined in clause 12.3;

"**Mandatory Transfer Relevant Amount**" is defined in clause 12.3;

"**Marketable Securities**" is defined in clause 13.3(b);

"**Major Shareholders**" each Shareholder who, together with their Affiliates, holds 5% or more of the issued A Ordinary Shares in the Company;

"**Major Shareholder Majority**" the holders of a majority of the A Ordinary Shares which are held by the Major Shareholders;

"**Majority Selling Shareholders**" holders of more than 50% of the Company's issued and allotted A Ordinary Shares who wish to sell 50% or more of the A Ordinary Shares in the Company in one transaction or a series of connected transactions;

"**Midco**" the company listed as such in Part 2 of Schedule 2;

 "**Minority Holder**" is defined in clause 15.1;

"**MIP Investment Agreement**" the agreement to be entered into on or around the date hereof between the Company and certain members of management of the Group regarding their investment in the Company:

"**New Issue Subscription Price**" shall be calculated in accordance with clause 9.10;

"**New Member**" a person becoming a new member of the Company due to the exercise of a pre-existing option to acquire A Ordinary Shares in the Company following the issue of a Drag-Along Notice or a Squeeze-Out Offer;

 "**Non-Executive Directors**" the Directors appointed pursuant to clause 6.3 and "**Non-Executive Director**" means any one of them;

"**Non Forfeiting Shareholder**" is defined in clause 12.3;

 "**Non-Selling Shareholders**" each holder of Shares who is not a Selling Shareholder;

"**Notified Price**" the same price per Share offered by the Acquirer to the Selling Shareholder(s);

"**Observer**" is defined in clause 6.8;

"**Ordinary Resolution**" has the meaning given in the Articles;

"**Permitted Transfer**" a transfer of shares to any person specified in clause 12.1;

 "**Percentage Interest**": in respect of any Shareholder, the proportion which the number of A Ordinary Shares comprising such Shareholders' holding of shares bears to the total number of A Ordinary Shares (excluding those of the Forfeiting Shareholder) expressed as a percentage;

 "**Pre-emption Period**" is defined in clause 9.5(b)(iii);

"**Proposed Drag-Along Sale**" the proposed sale to the Purchaser of 50% or more of the A Ordinary Shares held by all Shareholders;

"**Proposed Tag-along Transfer**" the proposed transfer of any Shares by one or more Selling Shareholders in one or a series of connected transactions, of:

a)   50% of the Shares in issue to any party;

b)   20% or more of the Shares in issue to any Competitor;

c) such number of Shares to any party, which, when taken together with the Shares held by such party's Affiliates ("**Third Party Group**"), result in the Third Party Group holding in excess of 50% of the Shares in issue, together with each subsequent occasion where such Third Party Group acquires such Shares such that they hold Shares equal to or in excess of, in aggregate, 60%, 70%, 80% or 90% of the Shares in issue;

"**Purchaser**" a bona fide arms-length third party purchaser (being a person or group of persons acting in concert, other than a Shareholder or its Affiliates) of the Majority Selling Shareholders' A Ordinary Shares;

"**Recipient**" is defined in clause 25.11(a);

"**Recognised Investment Exchange**" an internationally recognised and reputable stock exchange;

"**Remaining Shareholders**" is defined in clause 9.8(a)(ii);

"**Remuneration Committee**" is defined in clause 6.10;

"**Reporting Group Company**" any member of the Reporting Group;

"**Reporting Group**" Alpha and its subsidiaries;

"**Resolution**" the resolution of the members of the Company in the agreed form;

"**Ring-Fenced Body**" a ring-fenced body pursuant to Financial Services (Banking Reform) Act 2013 or any of its Affiliates;

"**Sale**" the sale and transfer of all the shares in the Company or all or substantially all of the assets of the Company (directly or indirectly by way of one or a number of related transactions);

"**Scheme**" the scheme of arrangement in respect of [●] which received court sanction on or around the date hereof;

"**Security Documents**" [*tbc*];

"**Security Interest**" includes any mortgage, charge, pledge, lien, encumbrance, hypothecation or assignment or any other agreement or arrangement having the effect of conferring security;

"**Selling Shareholder**" any Shareholder(s) proposing to transfer any A Ordinary Shares (or any interest in any A Ordinary Shares);

"**Shareholder(s)**" the persons listed in Schedule 1 and any person who is named a Shareholder in a Deed of Adherence, in each case subject to clause 25.9, in each case holding A Ordinary Shares;

"**Share or Debt Instrument Proportion**" is defined in clause 9.5(a);

"**Shareholder Super Reserved Matters**" is defined in Part 4 of Schedule 5;

"**Shares**" the shares in the capital of the Company in issue from time to time, the rights to and "**Share**" means each of them;

"**Signing Date**" the date this Deed is signed by the parties to it;

"**Squeeze-Out Offer**" is defined in clause 15.1;

"**Substantial Shareholder**" any:

(a)    single Shareholder, together with its Affiliates which holds; or

(b)    such Major Shareholders, who acting together and together with their respective Affiliates who hold,

10% or more of the A Ordinary Shares in issue;

"**Super Majority Holder**" is defined in clause 15.1;

"**Tagging Shareholder**" a Non-Selling Shareholder who accepts an offer made in accordance with clause 14.1;

"**Tax**" means all taxes, levies, duties, imposts and any charges, deductions or withholdings in the nature of tax, including social security contributions, taxes on gross or net income, profits or gains and taxes on receipts, sales, use, occupation, development, franchise, employment, value added and personal property and penalties or interest thereon, regardless of whether any such taxes, levies, duties, imposts, charges, deductions, withholdings, penalties and interest are chargeable directly or primarily against or attributable directly or primarily against any person and of whether any amount in respect of any of them is recoverable from any other person;

"**Tax Authority**" means any authority responsible for the collection or management of any Tax;

"**Third Party**" is defined in clause 26.2;

"**Transaction Documents**" the Scheme, the implementation documents for the Scheme, this Deed, [*any others*];

"**Transfer Agent**" GLAS Specialist Services Limited or any other appointed transfer agent of the Company from time to time;

"**Warrants**" the warrants issued pursuant to the Warrant Instrument; and

"**Warrant Instrument**" warrant instrument between the Company and the Warrantholders (as defined therein) dated on or around the date hereof

## 2    INTERPRETATION

2.1    In this Deed:

(a)    a clause, paragraph or Schedule is, unless stated otherwise, a reference to a clause or paragraph of, or Schedule to, this Deed;

(b)    a reference to a paragraph in a Schedule is, unless otherwise stated, a reference to a paragraph in that Schedule or, where that Schedule is split into parts, a reference to a paragraph in that part of that Schedule.

(c)    legislation includes a reference to that legislation as amended, re-enacted, or extended before the date of this Deed;

(d)    a "**person**" includes an individual, company, corporation, firm, partnership, joint venture, association, state, state agency, institution or trust (whether or not it has a separate legal personality);

(e)    a document in the "**agreed form**" is a reference to a document in a form approved and, for the purpose of identification, initialled by or on behalf of each party;

(f)    one gender is a reference to all or any genders;

61

**1338**

**(g)**     the singular includes the plural and vice versa;

**(h)**     a particular time of day is, unless specified otherwise, a reference to that time in London;

**(i)**     an action that is to take place on a particular day means, unless a time is specified, that that action can take place at any time on or before 11.59 pm London time on that day;

**(j)**     "**including**" that the words following it are illustrative and not exhaustive;

**(k)**     a "**month**" a calendar month.; and

**(l)**     a reference to any obligation on a Shareholder to procure, that obligation to procure shall be limited to procuring in so far as is possible by exercising all of their rights as a Shareholder.

**2.2**     A reference in this Deed to the transfer of any Share shall mean the transfer of either or both of the legal and beneficial ownership in such Share and/or the grant of an option to acquire either or both of the legal and beneficial ownership in such Share and the following shall be deemed (but without limitation) to be a transfer of a Share:

**(a)**     any direction (by way of renunciation or otherwise) by a Shareholder entitled to an issue of the legal or beneficial interest in any Share that such Share be issued (beneficially or otherwise) to some person other than himself;

**(b)**     any sale or other disposition of any legal or equitable interest in a Share (including any voting right attached thereto) and whether or not by the registered holder thereof and whether or not for consideration or otherwise and whether or not effected by an instrument in writing; and

**(c)**     any grant of a legal or equitable mortgage or charge over any legal or beneficial interest in any Share (other than arising pursuant to the lien in the Articles).

**EXECUTED** as a **DEED**
By **[KELLY TOPCO] LIMITED**
acting by:

       Director

       Director/Secretary


**EXECUTED** as a **DEED**
By **[KELLY MIDCO] LIMITED**
acting by:

       Director

       Director/Secretary


**EXECUTED** as a **DEED**
By **[KELLY BIDCO] LIMITED**
acting by:

       Director

       Director/Secretary

**EXECUTED** as a **DEED**
By ●
in the presence of:


…..…………………………….
Witness


…..…………………………….
Witness Name


…..…………………………….
Witness Address

**EXECUTED** as a **DEED**
By [**TRUST**] **LIMITED**
**As trustee of the [Kelly Topco] Limited Employee Benefit Trust**
acting by:


Authorised Signatory


Authorised Signatory

**1342**

[INSERT  SHAREHOLDER  SIGNING  BLOCKS]

**1343**

# PART 7

## JERSEY NEWCO SALE AND PURCHASE AGREEMENT

# DEED OF TRANSFER OF THE SHARE CAPITAL OF KELLY TOPCO LIMITED

**DATED [●] 2020**

**KCA DEUTAG ALPHA II LIMITED**

**and**

**KELLY TOPCO LIMITED**

**and**

**[●]¹**

---

¹ Relevant Scheme Creditor details to be agreed and inserted in accordance with the terms of the Restructuring Implementation Deed.

# ALLEN & OVERY

ALLEN & OVERY LLP

LONDON

**1345**

**CONTENTS**

**Clause**                                                                                                    **Page**

1.    Transfer..................................................................................................................1
2.    Completion.............................................................................................................1
3.    Treasury Services Agreement.................................................................................2
4.    Costs......................................................................................................................2
5.    Further Assurance..................................................................................................2
6.    Counterparts..........................................................................................................2
7.    Governing Law ......................................................................................................2
8.    Jurisdiction............................................................................................................2

Signatories..................................................................................................................3

**THIS DEED** is made on [●] 2020

**BETWEEN**:

(1)　　**KCA DEUTAG ALPHA II LIMITED** (registered number 06511474) whose registered office is at 1 Park Row, Leeds, England, LS1 5AB (the **Transferor**);

(2)　　**KELLY TOPCO LIMITED** (registered number 132385) whose registered office is at 47 Esplanade, St Helier, Jersey, JE1 0BD (the **Company**); and

(3)　　[●]² (registered number [●]) whose registered office is at [●] (the **Transferee[s]**).

**BACKGROUND:**

(A)　　The Company is a private par value company limited by shares having an issued share capital of US$100 divided into [●]³ A ordinary shares which have been issued fully paid or credited as fully paid and is legally and beneficially owned by the Transferor (the **Shares**).

(B)　　The Transferor wishes to transfer and the Transferees wish to acquire the Shares on the terms set out in this deed.

**IT IS AGREED** as follows:

**1.　　TRANSFER**

1.1　　The Transferor shall transfer with full title guarantee and each of the Transferees shall acquire the Shares with all rights attaching to the Shares as at the date of this deed.

1.2　　The Transferor shall transfer the Shares to the Transferees for nil consideration.

**2.　　COMPLETION**

2.1　　Conditional upon the delivery by each of the Transferees of the KYC information acceptable to the Jersey Registrar, completion of the transfer of the Shares (**Completion**) shall take place immediately after the signature of this deed.⁴

2.2　　By Completion the Transferor shall procure:

(a)　　the delivery to the Transferees of a duly executed transfer instrument in respect of the Shares in favour of the Transferees; and

(b)　　that a board meeting of the Company is held at which:

(i)　　it is resolved that the transfer of the Shares to the Transferees is approved and the Transferees' names be entered in the Company's register of members as the Company's shareholders subject to the receipt of the KYC from each of the Transferees; and

(ii)　　it is resolved that any of the directors (or alternate directors) of the Company are authorised to perform such acts and enter into such documents as deemed necessary

---

² Relevant Scheme Creditor details to be agreed and inserted in accordance with the terms of the Restructuring Implementation Deed.
³ Division of shares as between the initial set of transferee creditors to be determined.
⁴ Shares in Jersey Newco to be registered in the names of the relevant Scheme Creditors before the Scheme steps take place.

1

to effect the transfer of the Shares in accordance with the terms and conditions of this deed.

**3.    TREASURY SERVICES AGREEMENT**

3.1    The Company undertakes that, as soon as practicable following registration at the United Kingdom Companies House of its indirect subsidiary, KCA Deutag Alpha Limited's (**Alpha**) reduction of capital in accordance with the relevant step of the Deloitte tax structure paper, the Company shall procure that Alpha releases, by way of a deed of release, any and all amounts owed by the Transferor to Alpha under the domestic multicurrency treasury services agreement entered into between the Transferor and Alpha dated 31 December 2019 (the **TSA**); following which Alpha and the Transferor shall terminate the TSA.

3.2    The Transferor and the Company agree that, on and from the date of this deed, no further loans, cash transfers, advances, invoice recharges, assignments of balances and the like shall be made or received by the Transferor or Alpha under the TSA, and the Company shall procure that Alpha does not make any demand against the Transferor for any amounts owed thereunder.

**4.    COSTS**

Each party shall pay the costs and expenses incurred by it in connection with the entering into and completion of this deed.

**5.    FURTHER ASSURANCE**

Each party shall, at its own cost and expense, procure the convening of all meetings, the giving of all waivers and consents and the passing of all resolutions and shall otherwise exercise all powers and rights available to it in order to give effect to this deed.

**6.    COUNTERPARTS**

This deed may be executed in any number of counterparts, all of which, taken together, shall constitute one and the same deed, and any party may enter into this deed by executing a counterpart.

**7.    GOVERNING LAW**

This deed and any non-contractual obligations arising out of or in connection with it shall be governed by English law.

**8.    JURISDICTION**

8.1    The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this deed (including a dispute relating to the existence, validity or termination of this deed or any non-contractual obligation arising out of or in connection with this deed) (a **Dispute**).

8.2    The parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no party will argue to the contrary.

**IN WITNESS** of which this deed has been executed and delivered on the date which appears first on page 1.

2

**1348**

**SIGNATORIES**

| | | |
|---|---|---|
| EXECUTED as a deed by **KCA DEUTAG ALPHA II LIMITED** | ) | |
| acting by | ) | …….....................................................
_____ | | Director |
| and | ) | …….....................................................
_____ | | Director/Secretary |

3

**1349**

EXECUTED as a deed by **KELLY**          )
**TOPCO LIMITED**

acting by                                )          ………………………………………………
——————————————————                                  Director


and                                      )          ………………………………………………
——————————————————                                  Director/Secretary

4

**1350**

EXECUTED as a deed by [●][5]    )

acting by    )

———————————————    ………......................................................

Director

and    )

———————————————    ………......................................................

Director/Secretary

---

[5] Relevant Scheme Creditor details to be agreed and inserted in accordance with the terms of the Restructuring Implementation Deed.

## PART 8

## DEED OF RELEASE

# DEED OF RELEASE

**DATED [●] 2020**

**By**

**The Company**

**The Scheme Creditors**

**The Non-Scheme Creditors**

**and**

**The Other Obligors**

**in favour of The Released Parties**

**ALLEN & OVERY**

**Allen & Overy LLP**

0101521-0000029 UKO3: 2000964903.8

# CONTENTS

**Clause**                                                                                              **Page**

1.      Interpretation ...................................................................................................................1
2.      Releases in relation to the restructuring ..........................................................................6
3.      Waiver ...............................................................................................................................7
4.      Exclusion of Liability .......................................................................................................7
5.      Further Assurance.............................................................................................................8
6.      Severability.......................................................................................................................8
7.      Third Party rights.............................................................................................................8
8.      Variation ...........................................................................................................................8
9.      Counterparts .....................................................................................................................8
10.     Governing Law .................................................................................................................8
11.     Jurisdiction .......................................................................................................................9

**Appendix**

1.      Other Obligors ...............................................................................................................10
2.      Released Parties..............................................................................................................12
        Part 1      the Released Parties ..........................................................................................12
        Part 2      Advisers ............................................................................................................12

Signatories .......................................................................................................................................13

**THIS DEED** is dated [●] 2020

**BETWEEN**:

(1)  **KCA DEUTAG UK FINANCE PLC** (the **Company**);

(2)  **THE SCHEME CREDITORS** (as defined in the Scheme Document (as defined below)), acting by the Company pursuant to the authority conferred on the Company by the Scheme Creditors in the Scheme; and

(3)  **LLOYDS BANK PLC** in its capacity as lender under the Existing LC Facility (as defined below) (the **Existing LC Facility Lender**);

(4)  **FIRST ABU DHABI BANK PJSC** in its capacity as lender under the Existing Undertaking Facility (as defined below) (the **Existing Undertaking Facility Lender**); and

(5)  **THE ENTITIES** listed in Schedule 1 (the **Other Obligors**);

in favour of:

(6)  **THE RELEASED PARTIES** (as defined below).

**BACKGROUND**

(A)  On 31 July 2020, the Company, the Other Obligors and certain of the Scheme Creditors, among others, entered into the Lock-up Agreement (as defined below) in connection with the Restructuring, to be implemented through various steps, including the Scheme.

(B)  The Company has entered into the Scheme with the Scheme Creditors and has entered into the Restructuring Implementation Deed (as defined below) with, amongst others, the Scheme Creditors and the Non-Scheme Creditors.

(C)  Under the authority conferred by the Scheme, the Company is authorised, under clause 3 (Authorisation to execute and undertaking to be bound by the Implementation Documents) of the Scheme Document, to execute and deliver this Deed on behalf of each of the Scheme Creditors in connection with the transactions contemplated by the Scheme.

(D)  Pursuant to clause 9.2 (Releases on the Completion Date) of the Lock-up Agreement certain of the parties to this Deed agreed to provide certain mutual releases in connection with the Restructuring as part of the Scheme. Each such party enters into this Deed to give effect to such releases.

(E)  It is intended that this document takes effect as a deed notwithstanding the fact that a party may only execute this document by hand.

**IT IS AGREED** as follows:

1.  **INTERPRETATION**

1.1  **Definitions**

In this Deed:

**A&O** means Allen & Overy LLP and all other undertakings which are authorised to practise using the name "Allen & Overy".

**Ad-Hoc Committee** has the meaning given to that term in the Lock-up Agreement.

**Ad-Hoc Committee Released Parties** means, in respect of a member of the Ad-Hoc Committee:

(a)     that member of the Ad-Hoc Committee;

(b)     any Nominee of a member of the Ad-Hoc Committee; and

(c)     each of its (and, if applicable, its Nominee's) directors (both current and former), managers, officers, employees and professional advisers (including, without limitation, its Advisers).

**Advisers** means the persons listed in Part 2 of Appendix 2.

**Claim** means any claim, and any and all proceedings, damages, counterclaims, complaints, demands, causes of action, liabilities, rights of set-off, indemnities and rights or interests of any kind or nature whatsoever and howsoever arising, whether present or future, prospective or contingent, whether in England and Wales or any other jurisdiction or under any law or in equity, in contract (including breaches or non-performance of contract), statute or in fact (including negligence, breach of trust and misrepresentation) or any other manner whatsoever, breach of statutory duty, for contribution or for interest and/or costs and/or disbursements, whether or not for a fixed or unliquidated amount, whether filed or unfiled, whether asserted or unasserted, whether direct or indirect, whether foreseen or unforeseen, whether known or unknown, whether suspected or unsuspected, or not presently known to the relevant parties or to the law.

**Court** has the meaning given to that term in the Scheme Document.

**Credit Agreement** has the meaning given to that term in the Scheme Document.

**Creditor** means a Scheme Creditor and a Non-Scheme Creditor.

**Creditor Released Parties** means, in respect of a Creditor (other than a member of the Ad-Hoc Committee or an RCF Lender):

(a)     that Creditor;

(b)     any Nominee of that Creditor; and

(c)     each of its (and, if applicable, its Nominee's) directors (both current and former), managers, officers, employees and professional advisers.

**Effective Time** means the time at which this Deed is dated and released in accordance with the terms of the Restructuring Implementation Deed.

**English Newco 1** means Kelly Holdco 1 Limited.

**English Newco 2** means Kelly Holdco 2 Limited.

**Existing Finance Documents** means the Finance Documents (under and as defined in the Existing Intercreditor Agreement).

**Existing Financings** means each of the Existing Notes (as defined in the Restructuring Implementation Deed) and the facilities made available under the Credit Agreement (including, for the avoidance of doubt, any "Ancillary Facility" under and as defined in the Credit Agreement).

**Existing Instrument** has the meaning given to it in the Restructuring Implementation Deed.

**Existing Intercreditor Agreement** means the intercreditor agreement dated 15 March 2008 (as amended and restated from time to time) between, among others, the Company and KCA Deutag Alpha Limited as parent.

**Existing LC Facility** means the standby letter of credit and lender guarantee facility made available to KCA Deutag Alpha Limited and certain other members of the Group by Lloyds Bank plc pursuant to an agreement originally dated 16 May 2014, as amended and/or amended and restated from time to time, being an Ancillary Facility under (and as defined in) the Credit Agreement.

**Existing Security Documents** means the Transaction Security Documents under (and as defined in) the Existing Intercreditor Agreement.

**Existing Undertaking Facility** means the custom bonds, standby letters of credit and bank guarantee facility made available to KCA Deutag Alpha Limited and certain other members of the Group by First Abu Dhabi Bank PJSC pursuant to an agreement dated 26 March 2018, being an Ancillary Facility under (and as defined in) the Credit Agreement.

**Group** has the meaning given to that term in the Scheme Document.

**Group Company** means any member of the Group from time to time.

**Holdco** means each of:

(a)    KCA Deutag Alpha II Limited;

(b)    KCAD Holdings I Limited;

(c)    KCAD Holdings II Limited;

(d)    KCA Deutag Finance I Limited;

(e)    KCA Deutag Finance II Limited;

(f)    Land Rig Ventures I Limited;

(g)    Land Rig Ventures II Limited; and

(h)    KCA Deutag Drillings Rigs I Limited.

**Holdco Released Parties** means, in respect of a Holdco:

(a)    that Holdco; and

(b)    each of its directors (both current and former), managers, officers, employees and professional advisers.

**Investors' Shareholders Agreement** means the investors' shareholders agreement originally dated 11 July 2012 (as amended and restated from time to time including on 30 April 2018) entered into between KCAD Holdings I Limited, PHM Holdco 14 S.a. r.l. and the A Shareholders (as defined therein).

**Jersey Newco** means Kelly Topco Limited.

**Lock-up Agreement** means the lock-up agreement (including each of the schedules thereto) dated 31 July 2020 between, among others, the Company and the Participating Creditors (as defined therein).

**Newco** means each of:

(a)     Jersey Newco;

(b)     English Newco 1; and

(c)     English Newco 2.

**Newco Released Parties** means, in respect of a Newco:

(a)     that Newco; and

(b)     each of its directors (both current and former), managers, officers, employees and professional advisers.

**Nominee** has the meaning given to that term in the Scheme Document.

**Non-Scheme Creditors** means each of:

(a)     the Existing LC Facility Lender; and

(b)     the Existing Undertaking Facility Lender.

**Obligor** means each of the Company and each Other Obligor.

**Obligor Released Parties** means, in respect of an Obligor:

(a)     that Obligor; and

(b)     each of its directors (both current and former), managers, officers, employees and professional advisers (including, without limitation, its Advisers).

**RCF Lenders** has the meaning given to that term in the Lock-up Agreement.

**RCF Lender Released Parties** means, in respect of an RCF Lender:

(a)     that RCF Lender; and

(b)     each of its directors (both current and former), managers, officers, employees and professional advisers (including, without limitation, its Advisers).

**Released Claims** has the meaning given to that term in Clause 2.1(a) (Releases in relation to the Restructuring).

**Released Parties** means the persons listed at Part 1 of Appendix 2.

**Relevant Director** means:

(a)     each Shareholder Director; and

(b)     any director (current or previous) of any Holdco or the Company that is not a Shareholder Director.

**Restructuring** has the meaning given to that term in the Scheme Document.

**Restructuring Documents** has the meaning given to that term in the Restructuring Implementation Deed.

**Restructuring Effective Date** has the meaning given to that term in the Restructuring Implementation Deed.

**Restructuring Implementation Deed** means the restructuring implementation deed dated on or about the date of this Deed between, amongst others, the Company and the Creditors.

**Restructuring Steps Plan** has the meaning given to that term in the Lock-up Agreement.

**Scheme** means the scheme of arrangement in relation to the Company under part 26 of the Companies Act as set out in the Scheme Document.

**Scheme Consideration** has the meaning given to that term in the Restructuring Implementation Deed.

**Scheme Document** means the document setting out the terms of the Company's proposed scheme of arrangement to implement the Restructuring in its present form as at the date of this Deed, or subject to any modification, addition or condition that the Court may think fit to approve or impose, as appropriate, in accordance with the terms of such scheme.

**Shareholder Director** means any director (current or previous) of any Group Company or Holdco, appointed by a Shareholder pursuant to the terms of the Investors' Shareholders Agreement.

**Shareholders** means the entities, funds or accounts party (current or previous) to the Investors' Shareholders Agreement from time to time and, in each case, any Affiliate (as that term is defined in the Investor's Shareholders Agreement) of such party.

**Shareholder Released Parties** means, in respect of a Shareholder:

(a)    that Shareholder; and

(b)    each of its directors (both current and former), managers, officers, employees and professional advisers (including, without limitation, its Advisers).

**Undertaking Parties** means each person listed in schedule 2 (Scheme Undertaking Parties) to the Scheme Document.

**Undertaking Released Parties** means, in respect of an Undertaking Party:

(a)     that Undertaking Party; and

(b)    each of its directors (both current and former), managers, officers, employees and professional advisers (including, without limitation, its Advisers).

## 1.2    Construction

In this Deed, unless the context otherwise requires or otherwise expressly provides:

(a)    a reference in this Deed to this Deed or any other document is a reference to this Deed or that document as amended, novated, supplemented, extended, replaced or restated;

(b)    references to Appendices and Clauses are references to Appendices and Clauses respectively of this Deed;

(c)     references to a person includes any individual, company, corporation, unincorporated association or body (including a partnership, trust, joint venture or consortium), government, state, agency, organisation or other entity whether or not having separate legal personality references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(d)     references to a statute or statutory provision include references to the same as subsequently modified, amended or re-enacted from time to time;

(e)     the singular includes the plural and vice versa and words importing one gender shall include all genders;

(f)     headings to Clauses are for ease of reference only and shall not affect the interpretation of this Deed; and

(g)     unless a contrary indication appears, a reference to a party or a person will be construed as including its and any subsequent successors in title, permitted transferees and permitted assigns, in each case in accordance with their respective interests.

## 2.     RELEASES IN RELATION TO THE RESTRUCTURING

2.1     With effect from the Effective Time, subject to Clause 2.2 below, each Creditor and each Obligor (on behalf of itself and each of its successors and assigns):

(a)     irrevocably, unconditionally, fully, finally and absolutely waives and releases and forever discharges, to the fullest extent permitted by law, each and every Claim that it ever had, may have or hereafter can, shall or may have against the Released Parties, in each case, in relation to or arising directly or indirectly out of or in connection with:

   (i)     the Existing Financings, including under the Existing Finance Documents and the Existing Security Documents;

   (ii)     the negotiation or preparation of the Restructuring, the Scheme or the Restructuring Documents or the implementation and/or consummation of the Restructuring;

   (iii)     the execution of the Restructuring Documents or any other documents required to implement the Restructuring or the taking of any steps or actions necessary or desirable to implement the Restructuring (including, without limitation, the steps set out in the Restructuring Steps Plan); and

   (iv)     with respect to the Shareholders or any Relevant Director (past or present), any matter arising out of or in connection with any steps, actions or omissions on or prior to the Restructuring Effective Date by or on behalf of such person holding such positions with respect to any Group Company or Holdco (as the case may be),

   (collectively, the **Released Claims**); and

(b)     irrevocably and unconditionally undertakes and (in the case of a Scheme Creditor only) shall procure that each of its Nominees (if applicable) undertakes, that it will not assert, threaten, bring, commence, facilitate, participate, provide any information (to the extent that non-provisions of information is permissible under applicable law or regulation) take or continue, cooperate in any manner or support any person commencing, taking or continuing, or instruct any person to commence, take or continue any proceedings or other judicial, quasi-judicial,

administrative or regulatory process in any jurisdiction whatsoever against any Released Party, in each case in relation to or arising out or in connection with:

(i)      the Existing Financings, including under the Existing Finance Documents and Existing Security Documents;

(ii)     the negotiation or preparation of the Restructuring, the Scheme or the Restructuring Documents or the implementation and/or consummation of the Restructuring;

(iii)    the execution of the Restructuring Documents or any other documents required to implement the Restructuring or the taking of any steps or actions necessary or desirable to implement the Restructuring (including, without limitation, the steps set out in the Restructuring Steps Plan); and

(iv)     with respect to the Shareholders or any Relevant Director (past or present), any matter arising out of or in connection with any steps, actions or omissions on or prior to the Restructuring Effective Date by or on behalf of such person holding such positions with respect to any Group Company or Holdco (as the case may be).

2.2     Nothing in this Deed shall:

(a)      affect, impair or prejudice any right of any Creditor arising under the Scheme Document or any Restructuring Document (including as a consequence of non-compliance with the terms of the Scheme Document or any Restructuring Document);

(b)      affect, amend, vary or waive the rights of any beneficiary under any Existing Instrument;

(c)      apply to any claim or liability in respect of fraud, gross negligence or wilful misconduct by any Released Party; or

(d)      extend to any liability of any Adviser arising under or relating to a duty of care to such Adviser's client or arising under a duty of care to another person which has been expressly accepted in writing by that Adviser.

## 3.     WAIVER

3.1     Each Creditor and each Obligor acknowledges, and (in the case of a Scheme Creditor only) shall procure that each of its Nominees (if applicable) acknowledges, that it may later discover facts in addition to or different from those which it presently knows or believes to be true with respect to the subject matter of this Deed, but that it is its intention to fully and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and any Released Party in respect of the Released Claims, and that in furtherance of this intention, the waivers, releases and discharges given in this Deed shall be and shall remain in effect as full and complete general waivers, releases and discharges notwithstanding the discovery or existence of any such additional or different facts.

3.2     The Scheme Creditors hereby acknowledge and agree that the right of the Scheme Creditors to receive Scheme Consideration in accordance with the Restructuring Implementation Deed is accepted in full and final settlement of all and any Claims waived and released under this Deed.

## 4.     EXCLUSION OF LIABILITY

To the extent permitted by law, no Creditor or Obligor shall be entitled to challenge the validity of any act done or omitted to be done in good faith by any Released Party in connection with its actions or

omissions pursuant to the provisions of the Scheme or the Restructuring Documents or the exercise by any Released Party in good faith of any power conferred on it for the purposes of the Scheme or the Restructuring Documents if exercised in accordance with the provisions of the Scheme or the relevant Restructuring Document (as applicable).

**5.    FURTHER ASSURANCE**

Each Creditor and each Obligor shall, and (in the case of a Scheme Creditor only) shall instruct that each of its Nominees (if applicable), as soon as reasonably practicable, execute and deliver such instruments and other documents at such times and places, and shall, as soon as reasonably practicable, take any action reasonably requested or required, in each case, to give full effect to this Deed, including, without limitation to perfect or evidence any release, waiver or discharge referred to in this Deed.

**6.    SEVERABILITY**

(a)    If any provision of this Deed is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable.  If such modification is not possible, the relevant provision shall be deemed deleted and the Parties shall use reasonable efforts to replace it with a valid and enforceable substitution provision the effect of which is as close to its intended effect as possible, with any reasonable costs or expenses incurred by a Party arising therefrom to be borne by the Company (provided that the Company has agreed in writing to meet such costs and expenses).  Any modification to or deletion of a provision under this Clause 6 shall not affect the validity and enforceability of the rest of this Deed.

(b)    To the extent that the Company does not agree to pay the costs and expenses set out in paragraph (a) above, no Party shall be required to use reasonable efforts to replace any relevant provisions by a valid and enforceable substitution provision in accordance with in paragraph (a) above if such efforts would necessitate the incurrence of material out-of-pocket expenses by that Party.

**7.    THIRD PARTY RIGHTS**

7.1    Each Released Party (including, for the avoidance of doubt, the Advisers) may rely on this Deed and enforce any of its terms, as if it were a party to this Deed.

7.2    Unless otherwise specified herein, a person who is not party to this Deed has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Deed.

**8.    VARIATION**

No variation of this Deed shall be effective unless such variation is in accordance with clause 15 (Amendments and Further Assurance) of the Restructuring Implementation Deed.

**9.    COUNTERPARTS**

This Deed may be executed in any number of counterparts.  This has the same effect as if the signatures on the counterparts were on a single copy of the Deed.

**10.    GOVERNING LAW**

This Deed and any dispute or Claim (including any non-contractual disputes or Claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with the law of England and Wales.

## 11.    JURISDICTION

The courts of England and Wales shall have exclusive jurisdiction to settle any dispute or claim (including any non-contractual disputes or claims) arising out of or in connection with this Deed or its subject matter or formation.

This Deed has been entered into and delivered as a deed on the date stated at the beginning of this Deed.

## APPENDIX 1

## OTHER OBLIGORS

| Obligor name | Jurisdiction of incorporation |
|---|---|
| KCA Deutag US Finance LLC | Delaware |
| Abbot Group Limited | England |
| Abbot Holdings Limited | England |
| Abbot Investments (North Africa) Limited | England |
| KCA Deutag (Land Rig) Limited | England |
| KCA Deutag Alpha Limited | England |
| KCA Deutag Alpha II Limited | England |
| KCA Deutag Caspian Limited | England |
| KCA Deutag Drilling Group Limited | England |
| KCA European Holdings Limited | England |
| Abbot Verwaltungsgesellschaft mbH | Germany |
| Bentec GmbH Drilling & Oilfield Systems | Germany |
| KCA Deutag Drilling GmbH | Germany |
| KCA Deutag GmbH | Germany |
| KCA Deutag Tiefbohrgesellschaft mbH | Germany |
| KCA Deutag Europe BV | Netherlands |
| KCA Deutag Nederland BV | Netherlands |
| Abbot Holdings Norge AS | Norway |
| KCA Deutag Drilling Norge AS | Norway |
| KCA Deutag Drilling Offshore Services AS | Norway |
| KCA Deutag Holdings Norge AS | Norway |
| KCA Deutag MODU Operations AS | Norway |
| KCA Deutag Offshore AS | Norway |
| KCA Deutag Energy Global LLC | Oman |

| | |
|---|---|
| KCA Deutag Energy International LLC | Oman |
| KCA Deutag Energy LLC | Oman |
| KCA Deutag Energy National LLC | Oman |
| KCA Deutag Drilling LLC | Russia |
| KCA Deutag Russia LLC | Russia |
| KCA Deutag Gulf Drilling Limited Company | Saudi Arabia |
| KCA Deutag Drilling Limited | Scotland |
| KCA Deutag Technical Support Limited | Scotland |
| KCA Deutag Rig Design Services Limited | Scotland |
| SET Drilling Company Limited | Scotland |
| KCA Deutag Pte Ltd | Singapore |

**APPENDIX 2**

**RELEASED PARTIES**

**PART 1**

**THE RELEASED PARTIES**

1.      The Obligor Released Parties

2.      The Holdco Released Parties

3.      The Shareholder Released Parties

4.      The Undertaking Released Parties

5.      The Ad-Hoc Committee Released Parties

6.      The RCF Lender Released Parties

7.      The Creditor Released Parties

**PART 2**

**ADVISERS**

1.      A&O (as the legal advisers to the Group)

2.      Houlihan Lokey EMEA, LLP (as financial advisers to the Group)

3.      Deloitte LLP (as tax and financial advisers to the Group)

4.      Weil, Gotshal & Manges (London) LLP and Weil, Gotshal & Manges LLP (as the legal advisers to the Ad-Hoc Committee)

5.      Moelis & Company UK LLP (as the financial advisers to the Ad-Hoc Committee)

6.      Linklaters LLP (as the legal advisers to the RCF Lenders)

7.      FTI Consulting LLP (as the financial advisers to the RCF Lenders)

8.      Kirkland & Ellis International LLP (as the legal advisers to the Shareholders)

9.      White & Case LLP (as legal advisers to the Notes Trustee (as defined in the Restructuring Implementation Deed))

10.     Latham & Watkins LLP (as legal advisers to the Term Loan Administrative Agent (as defined in the Restructuring Implementation Deed))

11.     Hogan Lovells LLP (as legal advisers to the Revolving Credit Administrative Agent and the Existing Security Agent (each as defined in the Restructuring Implementation Deed))

12.     McDermott Will & Emery UK LLP (as legal adviser to the New Trustee and New Security Agent (each term as defined in the Restructuring Implementation Deed))

**SIGNATORIES**

**COMPANY**

**EXECUTED** as a **DEED** by
**KCA DEUTAG UK FINANCE PLC**
acting by

By: _____          By: _____
      Name:                                           Name:
      Title:                                            Title:

**SCHEME CREDITORS**

**EXECUTED** as a **DEED** by
**THE SCHEME CREDITORS**
acting by
**KCA DEUTAG UK FINANCE PLC**
pursuant to the authority conferred upon
the Company by the Scheme Creditors
under the Scheme


By:  _____        By:  _____
　　　　Name:                                           Name:
　　　　Title:                                            Title:

**1368**

**EXISTING LC FACILITY LENDER**

**EXECUTED** as a **DEED** by
**LLOYDS BANK PLC**
acting by

By: _____          By: _____
    Name:                                                          Name:
    Title:                                                            Title:

**1369**

**EXISTING UNDERTAKING FACILITY LENDER**

**EXECUTED** as a **DEED** by
**FIRST ABU DHABI BANK PJSC**
acting by

By: _____    By: _____

    Name:                                Name:

    Title:                                  Title:

**OTHER OBLIGORS**

**EXECUTED** as a **DEED** by
**KCA DEUTAG US FINANCE LLC**
acting by


By: _____          By: _____

    Name:                                    Name:

    Title:                                   Title:


**1371**

**EXECUTED** as a **DEED** by
**ABBOT GROUP LIMITED** acting by


By: _____          By: _____

      Name:                                               Name:

      Title:                                              Title:

**EXECUTED** as a **DEED** by
**ABBOT HOLDINGS LIMITED** acting
by

By: _____     By: _____
    Name:                                        Name:

    Title:                                        Title:

**1373**

**EXECUTED** as a **DEED** by
**ABBOT INVESTMENTS (NORTH
AFRICA) LIMITED** acting by


By: _____       By: _____

    Name:                                        Name:

    Title:                                       Title:

**1374**

**EXECUTED** as a **DEED** by
**KCA DEUTAG (LAND RIG) LIMITED**
acting by


By: _____     By: _____

    Name:                                  Name:

    Title:                                   Title:

**1375**

**EXECUTED** as a **DEED** by
**KCA DEUTAG ALPHA LIMITED**
acting by


By: _____          By: _____
    Name:                                    Name:

    Title:                                   Title:

**EXECUTED as a DEED by**
**KCA DEUTAG ALPHA II LIMITED**
**acting by**

By: _____      By: _____

    Name:          Name:

    Title:          Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG CASPIAN LIMITED**
acting by

By: _____          By: _____

    Name:                                       Name:

    Title:                                      Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG DRILLING GROUP**
**LIMITED** acting by


By: _____     By: _____

     Name:                      Name:

     Title:                       Title:

**1380**

**EXECUTED** as a **DEED** by
**KCA EUROPEAN HOLDINGS**
**LIMITED** acting by


By: _____          By: _____
       Name:                                     Name:

       Title:                                        Title:

**EXECUTED** as a **DEED** by
**ABBOT**
**VERWALTUNGSGESELLSCHAFT**
**MBH** acting by


By: _____    By: _____

    Name:        Name:

    Title:        Title:

**EXECUTED** as a **DEED** by
**BENTEC GMBH DRILLING &**
**OILFIELD SYSTEMS** acting by


By: _____          By: _____

    Name:                                   Name:

    Title:                                   Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG DRILLING GMBH**
acting by


By: _____     By: _____

Name:                                     Name:

Title:                                     Title:


**1384**

**EXECUTED** as a **DEED** by
**KCA DEUTAG GMBH** acting by


By: _____          By: _____

    Name:                                                            Name:

    Title:                                                              Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG**
**TIEFBOHRGESELLSCHAFT MBH**
acting by


By: _____        By: _____
  Name:                                    Name:

  Title:                                    Title:

**1386**

**EXECUTED** as a **DEED** by
**KCA DEUTAG EUROPE BV** acting by

By: _____         By: _____

    Name:                                                     Name:

    Title:                                                       Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG NEDERLAND BV**
acting by

By: _____          By: _____

    Name:                                          Name:

    Title:                                          Title:

**1388**

**EXECUTED** as a **DEED** by
**ABBOT HOLDINGS NORGE AS** acting
by

By: _____        By: _____

    Name:                                      Name:

    Title:                                        Title:

**1389**

**EXECUTED** as a **DEED** by
**KCA DEUTAG DRILLING NORGE
AS** acting by

By: _____        By: _____

  Name:                               Name:

  Title:                              Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG DRILLING**
**OFFSHORE SERVICES AS** acting by

By: _____    By: _____

    Name:        Name:

    Title:        Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG HOLDINGS NORGE**
**AS** acting by


By:  _____          By:  _____
      Name:                                           Name:

      Title:                                            Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG MODU OPERATIONS**
**AS** acting by


By: _____          By: _____

    Name:                                       Name:

    Title:                                      Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG OFFSHORE AS** acting
by

By: _____       By: _____
    Name:                                       Name:

    Title:                                      Title:

**1394**

**EXECUTED** as a **DEED** by
**KCA DEUTAG ENERGY GLOBAL
LLC** acting by


By:  _____        By:  _____

    Name:                                    Name:

    Title:                                    Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG ENERGY**
**INTERNATIONAL LLC** acting by


By: _____    By: _____

    Name:        Name:

    Title:        Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG ENERGY LLC** acting
by

By: _____     By: _____

    Name:                                         Name:

    Title:                                          Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG ENERGY NATIONAL
LLC** acting by


By: _____    By: _____

    Name:                                    Name:

    Title:                                    Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG DRILLING LLC** acting
by


By: _____          By: _____

    Name:                                              Name:

    Title:                                                Title:


**1399**

**EXECUTED** as a **DEED** by
**KCA DEUTAG RUSSIA LLC** acting by


By: _____          By: _____
        Name:                                    Name:

        Title:                                   Title:

**1400**

**EXECUTED** as a **DEED** by
**KCA DEUTAG GULF DRILLING**
**LIMITED COMPANY** acting by

By: _____       By: _____

    Name:                                           Name:

    Title:                                          Title:

**1401**

**EXECUTED** as a **DEED** by
**KCA DEUTAG DRILLING LIMITED**
acting by

By: _____     By: _____

    Name:                                       Name:

    Title:                                         Title:

**1402**

**EXECUTED** as a **DEED** by
**KCA DEUTAG TECHNICAL**
**SUPPORT LIMITED** acting by


By: _____     By: _____

    Name:                                                  Name:

    Title:                                                  Title:

**EXECUTED** as a **DEED** by
**KCA DEUTAG RIG DESIGN**
**SERVICES LIMITED** acting by

By: _____          By: _____

    Name:                                                        Name:

    Title:                                                          Title:

**EXECUTED** as a **DEED** by
**SET DRILLING COMPANY LIMITED**
acting by

By: _____     By: _____

    Name:                                     Name:

    Title:                                      Title:

**1405**

**EXECUTED** as a **DEED** by
**KCA DEUTAG PTE LTD** acting by


By: _____    By: _____
    Name:        Name:

    Title:        Title:

**PART 9**

**HOLDING PERIOD TRUST AGREEMENT**

# HOLDING PERIOD TRUST DEED

_____ 2020

**Between**

**KCA DEUTAG UK FINANCE PLC**
**as the Company**

**KELLY TOPCO LIMITED**
**as Jersey Newco**

**LUCID ISSUER SERVICES LIMITED**
**as Information Agent**

**and**

**LUCID ISSUER SERVICES LIMITED**
**as Holding Period Trustee**

## ALLEN & OVERY

**Allen & Overy LLP**

0101521-0000029 UKO3: 2001030867.6

**1408**

# CONTENTS

**Clause**                                                                                                    **Page**

1.    Definitions and Interpretation.................................................................................................1
2.    Holding Period Trust ..............................................................................................................3
3.    Reliance and Duties of Holding Period Trustee .....................................................................5
4.    Undertakings ..........................................................................................................................7
5.    Confidentiality .......................................................................................................................9
6.    Action Contrary to any Law ...................................................................................................9
7.    No responsibility to spend own Funds ....................................................................................9
8.    Responsibility for Documentation..........................................................................................9
9.    No Duty to Monitor ................................................................................................................9
10.   Liability ..................................................................................................................................9
11.   Resignation of the Holding Period Trustee ..........................................................................10
12.   Confidentiality .....................................................................................................................11
13.   Information from the Information Agent................................................................................12
14.   Custodians and Nominees .....................................................................................................12
15.   Miscellaneous Provisions .....................................................................................................12
16.   Notices..................................................................................................................................13
17.   Miscellaneous.......................................................................................................................15

Signatories ......................................................................................................................................16

**THIS DEED** is made on [●] 2020

**BETWEEN**:

(1)     **KCA DEUTAG UK FINANCE PLC**, a public limited company incorporated and registered in England and Wales as a public limited company with registered address at 1 Park Row, Leeds, LS1 5AB, United Kingdom and whose registered number is 09015065 (the **Company**);

(2)     **KELLY TOPCO LIMITED**, a private limited company incorporated in Jersey with registered number 132385 and registered office at 47 Esplanade, St Helier, Jersey, JE1 0BD (**Jersey Newco**);

(3)     **LUCID ISSUER SERVICES LIMITED**, a private limited company incorporated in England and Wales with registered address Tankerton Works, 12 Argyle Walk, London, England, WC1H 8HA, and whose registered number is 5098454 in its capacity as Information Agent (the **Information Agent**); and

(4)     **LUCID ISSUER SERVICES LIMITED**, a private limited company incorporated in England and Wales with registered address at Tankerton Works, 12 Argyle Walk, London, England, WC1H 8HA, and whose registered number is 5098454, in its capacity as Holding Period Trustee (the **Holding Period Trustee**).

**WHEREAS**:

(A)     The High Court of Justice of England and Wales has on [●] 2020 sanctioned in proceedings under claim number [●] a scheme of arrangement under Part 26 of the Companies Act 2006 (the **Scheme**) between the Company and the Scheme Creditors.

(B)     Pursuant to the terms of the Scheme Document and the Restructuring Implementation Deed, each Scheme Creditor is entitled to receive its Scheme Consideration, consisting of its proportion of the New Notes (equal to its New Notes Entitlement) and the Jersey Newco Shares (equal to its Jersey Newco Shares Entitlement).

(C)     If, on the Restructuring Effective Date, any Scheme Consideration is withheld from being allotted to a Scheme Creditor or its Nominee (as applicable) pursuant to clauses 5 (Restructuring Steps) and 7 (Allocation and Distribution of Scheme Consideration) of the Restructuring Implementation Deed (the **Unadmitted Entitlements**), the Unadmitted Entitlements shall in each case be issued on the Restructuring Effective Date to the Holding Period Trustee who will hold such Unadmitted Entitlements on trust for the relevant Unadmitted Scheme Creditor for the Holding Period, subject to the terms of the Restructuring Documents.

(D)     The Holding Period Trustee is entering into this Deed in order to create the trust arrangement contemplated in clause 8 (Holding Period Trustee) of the Restructuring Implementation Deed in respect of the Scheme Creditor Entitlements so withheld. The Holding Period Trustee has the benefit of separate indemnity and remuneration protection in relation to its role as Holding Period Trustee.

(E)     Each Party intends that this document takes effect as a deed (even though a Party may execute it under hand).

**1.     DEFINITIONS AND INTERPRETATION**

**1.1     Definitions**

Capitalised terms used in this Deed that are not otherwise defined shall have the meanings given to them in the Restructuring Implementation Deed or the Scheme Document (as applicable).

In this Deed:

**Account Holder Letter** means the account holder letter to be signed by each Existing Noteholder (and, where applicable, its Nominee(s)) substantially in the form set out at Appendix 8 to the Explanatory Statement;

**Beneficiaries** means the "Unadmitted Scheme Creditors" under and as defined in the Restructuring Implementation Deed;

**Holding Period** means the period of 12 months following the Restructuring Effective Date.

**Jersey Newco KYC** means the "know your customer" requirements by the Jersey Registrar in relation to the Jersey Newco Consideration Shares, as set out in the Schedule to the Account Holder Letter or Schedule 1 to the Lender Claim Form (as applicable) (and, if a Scheme Creditor will, or is likely to, beneficially hold more than 10% of the Jersey Newco Shares, such extra information as the Jersey Registrar requests upon email inquiry (email: projectkelly@crestbridge.com) to the Jersey Registrar by that Scheme Creditor);

**Jersey Registrar** means Crestbridge as registrar for Jersey Newco;

**Lender Claim Form** means the lender claim form signed by each Lender Scheme Creditor (and, where applicable, its Nominee(s)) in substantially the form set out at Appendix 9 to the Explanatory Statement;

**Lender Scheme Creditor** means each Term Loan Lender, each Revolving Loan Lender and the Existing Overdraft Provider;

**Party** means a party to this Deed;

**Restructured Group** means Jersey Newco and each of its direct and indirect Subsidiaries (whether directly or indirectly owned, and whether wholly or partly owned);

**Restructuring Implementation Deed** means the restructuring implementation deed entered into by, among others, the Company and the Scheme Creditors, dated on or around the date of this Deed;

**Scheme Document** means the document setting out the terms of the Scheme dated [●] 2020;

**Trust Entitlements Consideration** has the meaning given to it in Clause 2.5(c) (Release from the Trust);

**Trust Entitlements Consideration Holding Period** has the meaning given to it in Clause 2.5(d) (Release from the Trust); and

**Validly completed** shall have the meaning given to it in the relevant Account Holder Letter and/or Lender Claim Form.

## 1.2    Construction

In this Deed, except where the context otherwise requires:

(a)    a reference to any person includes its successors and assigns;

(b)    references to any deed (including this Deed), negotiable instrument, certificate, notice or other document of any kind (including, without limitation, any Restructuring Document), and references to any document (or a provision thereof) shall be construed as a reference to that

document or provision as from time to time amended, supplemented, varied or replaced (in whole or in part); and

(c)     references to any statute or other legislative provision shall include any statutory or legislative modification or re-enactment thereof, or any substitution thereof.

**1.3     Third Party Rights**

(a)     Unless expressly provided to the contrary in this Deed, a person who is not a party to this Deed has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Deed.

(b)     Notwithstanding anything to the contrary in this Deed, any Selling Agent and any Beneficiary may rely on any clause of this Deed which expressly confers rights on it.

**1.4     Perpetuity Period**

If the rule against perpetuities applies to any trust created by this Deed, the perpetuity period shall be 125 years (as specified by section 5(1) of the Perpetuities and Accumulations Act 2009).

**2.     HOLDING PERIOD TRUST**

**2.1     Information Agent and Holding Period Trustee**

(a)     The Information Agent shall provide the Holding Period Trustee with details of all Trust Entitlements and the Beneficiaries (to the extent known) who it understands are entitled to such Trust Entitlements (based on the aggregate amount of Scheme Claims for that Beneficiary at the Record Time) which are to be transferred to the Holding Period Trustee on the Restructuring Effective Date as a result of:

(i)     no Account Holder Letter or Lender Claim Form (as applicable) being validly completed before the Voting Instruction Deadline (or such later date as the Information Agent shall agree) by any such Beneficiary; and/or

(ii)     no Jersey Newco KYC being submitted by such Beneficiary (or its Nominee (if applicable)) to the Jersey Registrar before the Voting Instruction Deadline and/or the Jersey Registrar not being satisfied with the Jersey Newco KYC provided in relation to the Jersey Newco Consideration Shares by the date falling five Business Days before the Restructuring Effective Date.

(b)     The Company and/or Jersey Newco shall provide the Information Agent and the Holding Period Trustee with any information which the Information Agent or the Holding Period Trustee may reasonably specify as being necessary or desirable to enable the Information Agent or the Holding Period Trustee to perform their respective obligations hereunder.

(c)     The Information Agent may transfer its rights and obligations under this Deed to a person succeeding it as information agent provided that any successor information agent accedes to this Deed and agrees to be bound by its terms.

**2.2     Holding Period Trustee as trustee**

The Holding Period Trustee declares that:

(a)     as soon as it receives (and has legal or beneficial ownership of) the Trust Entitlements, it will hold them on bare trust for the relevant Beneficiaries for the Holding Period (or until the sale

**1412**

of such Trust Entitlements pursuant to Clause 2.5 (Release from the Trust) if such sale takes place after the end of the Holding Period) on the terms contained in this Deed; and

(b)    at the end of the Holding Period, it will hold any Trust Entitlements and/or Trust Entitlements Consideration on bare trust for the relevant Beneficiaries for the Trust Entitlements Consideration Holding Period on the terms contained in this Deed.

## 2.3    Trust Entitlements

The Holding Period Trustee is authorised to perform the duties, obligations and responsibilities and to exercise the rights, powers, authorities and discretions specifically given to the Holding Period Trustee under this Deed, or under, or in connection with, the Restructuring Documents together with any other incidental rights, powers, authorities and discretions.

## 2.4    Related Rights

(a)    The Holding Period Trustee hereby agrees to hold all Related Rights received during the Holding Period in a separate account until the payment or transfer of the Trust Entitlements (together with any Related Rights which have accrued during the Holding Period) to the relevant Beneficiary (or, if applicable, its Nominee) in accordance with the provisions of this Deed.

(b)    The Holding Period Trustee shall not be under any obligation to invest any Related Rights and shall have the express power to retain any Related Rights in any form or condition for the duration of the Holding Period in the separate account referred to in paragraph (a) above.

## 2.5    Release from the Trust

(a)    The Holding Period Trustee acknowledges that a Beneficiary may, at any time after the Restructuring Effective Date but prior to the expiry of the Holding Period, request in writing that the Holding Period Trustee transfer the relevant Trust Entitlements to that Beneficiary or its Nominee (as applicable) (the **Transfer Request**).

(b)    The Holding Period Trustee will only be obliged to comply with the Transfer Request if:

(i)    the Beneficiary delivers a validly completed Account Holder Letter or Lender Claim Form (as applicable) to the Information Agent (who, in turn, shall send such document to the Holding Period Trustee) (and therefore the Beneficiary (or its Nominee) represents that is an Eligible Person and is not a Disqualified Person);

(ii)    the Beneficiary was a Scheme Creditor (or a Nominee thereof) as at the Record Time;

(iii)    the Beneficiary (and/or its Nominee (if applicable)) delivers any additional information, representations or undertakings as the Information Agent and/or Holding Period Trustee may reasonably request;

(iv)    the Jersey Registrar has confirmed that the Jersey Newco KYC is complete in relation to the Jersey Newco Consideration Shares in relation to the Beneficiary or its Nominee (as applicable); and

(v)    the Beneficiary delivers a copy of the executed deed of adherence in the form attached to the Jersey Newco Investment Agreement which will provide evidence to the Information Agent and the Holding Period Trustee that the Beneficiary or its Nominee (as applicable) has adhered to the Jersey Newco Investment Agreement.

Following the satisfaction of all such conditions the Holding Period Trustee shall promptly transfer the relevant Trust Entitlements to the relevant Beneficiary or its Nominee, as applicable.

(c)    At the end of the Holding Period, the Holding Period Trustee shall, as soon as reasonably practicable thereafter, use reasonable endeavours, including by the appointment of a Selling Agent or otherwise, to sell or otherwise dispose of the remaining Trust Entitlements (in each case, subject to the terms of Jersey Newco Investment Agreement and Jersey Newco Articles of Association and provided that the purchaser of such Trust Entitlements provides Jersey Newco and the Holding Period Trustee with such relevant information and evidence as Jersey Newco and the Holding Period Trustee may reasonably require, including in the case of Jersey Newco in connection with their customary know your customer and/or anti-money laundering processes) for such consideration as it is able to obtain (after any taxes, withholding, deductions, fees, costs or any other expenses in connection therewith) (such consideration being the **Trust Entitlements Consideration**).

(d)    The Holding Period Trustee shall, for a period of 6 months after the end of the Holding Period (the **Trust Entitlements Consideration Holding Period**), hold any Trust Entitlements Consideration on trust for each relevant Beneficiary pro rata to the Trust Entitlements Consideration (rounded down to the nearest US dollar or other relevant currency) raised from the sale or disposal of the relevant Beneficiary's Trust Entitlements.

(e)    A Beneficiary whose Trust Entitlements have been sold or otherwise disposed of by the Holding Period Trustee pursuant to clause 8 (Holding Period Trustee) of the Restructuring Implementation Deed or this Deed may request the Holding Period Trustee in writing to transfer the relevant Trust Entitlements Consideration (rounded down to the nearest US dollar or other relevant currency) to it or its Nominee (after deducting any taxes, withholding or deductions and any reasonable fees, costs, or expenses in connection with such Trust Entitlements or Trust Entitlements Consideration being so transferred).

(f)    The Holding Period Trustee will only be obliged to transfer any Trust Entitlements Consideration to the Beneficiary or it Nominee if the Beneficiary delivers an executed Account Holder Letter and/or Lender Claim Form (as applicable) to the Information Agent (who in turn delivers such letter to the Holding Period Trustee), completed as appropriate, together with any relevant information, confirmation, representations or undertakings that the Holding Period Trustee may reasonably request.

(g)    At the end of the Trust Entitlements Consideration Holding Period, the Holding Period Trustee shall pay or deliver any remaining Trust Entitlements or Trust Entitlements Consideration to Alpha or any person nominated by Alpha, subject always to Jersey Newco having satisfied its customary know your customer and/or anti-money laundering processes.

(h)    On payment of the Trust Entitlements or Trust Entitlements Consideration in accordance with paragraph (g) above, the Holding Period Trustee shall have no liability to any Beneficiary in the event such Beneficiary later submits a request in writing to the Holding Period Trustee to transfer the relevant Trust Entitlements or Trust Entitlements Consideration to the Beneficiary or its Nominee.

## 3.    RELIANCE AND DUTIES OF HOLDING PERIOD TRUSTEE

### 3.1    Instructions

(a)    The Holding Period Trustee shall be entitled to request instructions, or clarification of any instruction, from the Company and/or Jersey Newco as to whether, and in what manner, it should exercise or refrain from exercising any right, power, authority or discretion and the Holding Period Trustee may refrain from acting unless and until it receives those instructions or that clarification, and the Company and/or Jersey Newco shall provide such instructions or clarification as soon as reasonably practicable.

(b) In exercising any discretion to exercise a right, power or authority under the Restructuring Documents where it has not received any instructions as to the exercise of that discretion, the Holding Period Trustee shall do so having regard to the interests of the Beneficiaries.

(c) The Holding Period Trustee may refrain from acting in accordance with any instructions of the Information Agent until it has received any indemnification and/or security that it may in its discretion (acting reasonably) require for any cost, loss or liability (together with any applicable VAT) which it may incur in complying with those instructions.

(d) Without prejudice to the provisions of this Clause 3.1 (Instructions) in the absence of instructions, the Holding Period Trustee may act (or refrain from acting) as it considers in its discretion to be appropriate and having regard to the interests of the relevant Beneficiaries.

**3.2    Duties of the Holding Period Trustee**

(a) The Holding Period Trustee is not obliged to review or check the adequacy, accuracy or completeness of any document it forwards to another Party.

(b) The Holding Period Trustee shall have only those duties, obligations and responsibilities expressly specified in the Restructuring Documents to which it is a party and no others shall be implied.

**3.3    No fiduciary duties to the Restructured Group**

Nothing in this Deed constitutes the Holding Period Trustee as an agent, trustee or fiduciary of any member of the Restructured Group.

**3.4    No duty to account**

The Holding Period Trustee shall not be bound to account to any Beneficiary or Nominee for any sum or the profit element of any sum received by it for its own account.

**3.5    Business with the Restructured Group**

The Holding Period Trustee may generally engage in any kind of other business with any member of the Restructured Group but not to the extent that to do so would place the Holding Period Trustee or the Information Agent in a position where it has a conflict of interest with its rights, duties and obligations under this Deed or the Restructuring Documents.

**3.6    Discretions**

The Holding Period Trustee shall have absolute discretion as to the exercise of its functions provided to it pursuant to any Restructuring Document and shall not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience that may result from their exercise or non-exercise, except where any such loss is caused by gross negligence, wilful misconduct or fraud on its part.

**3.7    Rights and Information**

The Holding Period Trustee may:

(a) rely on any representation, communication, notice or document believed by it to be genuine, correct and appropriately authorised;

(b)     rely on a certificate from any person:

(i)     as to any matter of fact or circumstance which might reasonably be expected to be within the knowledge of that person; or

(ii)    to the effect that such person approves of any particular dealing, transaction, step, action or thing,

as sufficient evidence that that is the case and, in the case of paragraph (i) above, may assume the truth and accuracy of that certificate.

## 3.8    Advice

The Holding Period Trustee may act on the opinion or advice of, or information obtained from any lawyer, accountant, tax advisers, surveyors or other professional advisers or experts and shall not be responsible to anyone for any loss occasioned by so acting whether such advice is obtained or addressed to a member of the Restructured Group or the Holding Period Trustee. Any such opinion, advice or information may be sent or obtained by letter or email and the Holding Period Trustee shall not be liable to anyone for acting in good faith on any opinion, advice, or information purporting to be conveyed by such means, even if it contains some error or is not authentic.

## 3.9    Agent

The Information Agent, the Holding Period Trustee and any Selling Agent may act in relation to the Restructuring Documents and the Trust Entitlements through its officers, employees and agents and shall not:

(a)     be liable for any error of judgment made by any such person; or

(b)     be bound to supervise, or be in any way responsible for any loss incurred by reason of misconduct, omission or default on the part of any such person,

unless such error or such loss was directly caused by the Information Agent's, the Holding Period Trustee's or any Selling Agent's gross negligence, wilful misconduct or fraud.

## 4.    UNDERTAKINGS

## 4.1    General

(a)     The Holding Period Trustee hereby undertakes in favour of the Company, Jersey Newco, the Information Agent and the Beneficiaries that it shall deal with the Trust Entitlements and the Related Rights as contemplated by this Deed and as instructed by the Information Agent pursuant to the terms of this Deed and the trusts constituted hereby.

(b)     The Holding Period Trustee hereby undertakes in favour of the other parties to this Deed and the Beneficiaries that it will act honestly and in good faith and will exercise the diligence expected of a reasonably prudent trustee in the fulfilment and/or exercise of its duties and obligations under this Deed.

(c)     The Holding Period Trustee hereby undertakes to request that any Selling Agent shall undertake in favour of other parties to this Deed and the Beneficiaries that it will act honestly and in good faith and will exercise the diligence expected of a reasonably prudent expert in comparable circumstances in the fulfilment and/or exercise of its duties and obligations under this Deed.

(d)    The Information Agent hereby undertakes in favour of the other parties to this Deed and the Beneficiaries that it will act honestly and in good faith and will exercise the diligence of a reasonably prudent expert in comparable circumstances in the fulfilment and/or exercise of its duties and obligations under this Deed.

**4.2    Restrictions**

The Holding Period Trustee shall not, and shall not purport to (and the Holding Period Trustee hereby undertakes that it shall not nor purport to):

(a)    create or permit to subsist any Security whatsoever (unless arising by operation of law) upon the Trust Entitlements or any of the assets comprised in the Trust Entitlements;

(b)    save as expressly set out in this Deed or as required (and to the extent necessary) to perform its obligations as trustee of the trusts constituted by this Deed, sell, transfer or otherwise dispose of, or deal with, the Trust Entitlements, any interest, estate, right, title or benefit therein or thereto or any Trust Entitlement Consideration;

(c)    save as expressly set out in this Deed or in respect of the trusts created by this Deed, permit any person other than itself to have any interest, estate, right, title or benefit in any of the assets comprised in the Trust Entitlements; or

(d)    exercise any voting, conversion or other rights attaching to the Trust Entitlements whilst they are held by the Holding Period Trustee, including, for the avoidance of doubt, any rights under the Jersey Newco Investment Agreement.

**4.3    Information Agent**

The Information Agent (in its capacity as such) hereby undertakes in favour of each Beneficiary, the Holding Period Trustee, Jersey Newco and the Company:

(a)    to ensure that the information provided to Jersey Newco, the Company and the Holding Period Trustee is true and correct in all respects, and without limitation that any portion of the Trust Entitlements identified in respect of a Beneficiary, in accordance with Clause 2.1 of this Deed, will be in accordance with that Beneficiary's allocation of and entitlement to the relevant portion of the Trust Entitlements pursuant to the terms of the Restructuring Documents;

(b)    to liaise with the Beneficiaries during the Holding Period to ensure, where possible, that a validly completed (in the sole determination of the Information Agent) Account Holder Letter and/or Lender Claim Form (as applicable) is delivered during the Holding Period;

(c)    to liaise with the relevant Beneficiary to complete any missing information and correct any errors in each Account Holder Letter and/or Lender Claim Form (as applicable) delivered to and received by the Information Agent during the Holding Period (in accordance with the terms of this Deed);

(d)    to maintain records and copies of all Account Holder Letters and/or Lender Claim Forms (as applicable) received (whether in hard copy or electronic form) and to make such records (or copies thereof) available to Jersey Newco, the Company and the Holding Period Trustee at all reasonable times upon request; and

(e)    to provide the Holding Period Trustee with such details of the Beneficiaries (and/or Nominees (as applicable) as are necessary for the Holding Period Trustee to perform its obligations in this Deed.

5.    **CONFIDENTIALITY**

Unless this Deed expressly specifies otherwise, the Holding Period Trustee may disclose to any other Party any information it reasonably believes it has received as trustee under this Deed.

6.    **ACTION CONTRARY TO ANY LAW**

Notwithstanding any other provision of any Restructuring Document to the contrary, the Holding Period Trustee is not obliged to do or omit to do anything if it would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty or duty of confidentiality.

7.    **NO RESPONSIBILITY TO SPEND OWN FUNDS**

Notwithstanding any provision of any Restructuring Document to the contrary, the Holding Period Trustee is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion.

8.    **RESPONSIBILITY FOR DOCUMENTATION**

The Holding Period Trustee is not responsible or liable for:

(a)    the adequacy, accuracy or completeness of any information (whether oral or written) supplied by the Holding Period Trustee or any other person in connection with any Restructuring Document or the transactions contemplated in the Restructuring Documents or any other arrangement or document entered into, made or executed in anticipation of, under or in connection with any Restructuring Document save to the extent any liabilities in connection therewith are directly caused by its negligence, wilful misconduct or fraud; or

(b)    the legality, validity, effectiveness, adequacy or enforceability of any Restructuring Document or any other deed, arrangement or document entered into, made or executed in anticipation of, under or in connection with any Restructuring Document or the Trust Entitlements.

9.    **NO DUTY TO MONITOR**

The Holding Period Trustee shall not be bound to enquire:

(a)    as to the performance, default or any breach by any Party of its obligations under any Restructuring Documents; or

(b)    whether any other event specified in any Restructuring Document has occurred.

10.    **LIABILITY**

10.1    **Exclusion of Liability**

Without limiting paragraph (b) below (and without prejudice to any other provision of any Restructuring Document excluding or limiting the liability of the Holding Period Trustee or any Selling Agent), none of the Holding Period Trustee nor any Selling Agent will be liable for:

(a)    any damages, costs or losses to any person, any diminution in value, or any liability whatsoever arising as a result of taking or not taking any action under or in connection with any Restructuring Document unless directly caused by its gross negligence, wilful misconduct or fraud;

(b)    exercising or not exercising any right, power, authority or discretion given to it by, or in connection with any Restructuring Document or any other Deed, arrangement or document entered into, made or executed in anticipation of, under or in connection with, any Restructuring Document;

(c)    any shortfall which arises on any sale of the Trust Entitlements; or

(d)    without prejudice to the generality of paragraphs (a) to (c) above, any damages, costs, losses, any diminution in value or any liability whatsoever arising as a result of:

(i)    any act, event or circumstance not reasonably within its control; or

(ii)    the general risks of investment in. or the holding of assets in, any jurisdiction,

including (in each case and without limitation) such damages, costs, losses, diminution in value or liability arising as a result of: nationalisation, expropriation or other governmental actions; any regulation, currency restriction, devaluation or fluctuation; market conditions affecting the execution or settlement of transactions or the value of assets; breakdown, failure or malfunction of any third party transport, telecommunications, computer services or systems; natural disasters or acts of God; war, terrorism, insurrection or revolution; or strikes or industrial action.

## 10.2    Proceedings

Except in the case of gross negligence, wilful misconduct or fraud, no Party (other than the Holding Period Trustee) may take any proceedings against any officer, employee or agent of the Holding Period Trustee in respect of any claim it might have against the Holding Period Trustee, or in respect of any act or omission of any kind by that officer, employee or agent in relation to any Restructuring Document.

## 10.3    KYC

Nothing in this Deed shall oblige the Holding Period Trustee to carry out any "know your customer" or other checks in relation to any person and each other Party confirms to the Holding Period Trustee that each such Party is solely responsible for any such checks it is required to carry out and that it may not rely on any statement in relation to such checks made by the Holding Period Trustee.

## 10.4    Limitation

Without prejudice to any provision of any Restructuring Document, the liability of the Holding Period Trustee arising under or in connection with any Restructuring Document shall be limited to the amount of actual loss which has been finally judicially determined to have been suffered but without reference to any special conditions or circumstances known to the Holding Period Trustee at any time which increase the amount of that loss.  In no event shall the Holding Period Trustee be liable for any loss of profits, goodwill, reputation, business opportunity or anticipated saving, or for special, punitive, indirect or consequential damages, whether or not the Holding Period Trustee has been advised of the possibility of such loss or damages.

## 11.    RESIGNATION OF THE HOLDING PERIOD TRUSTEE

## 11.1    Resignation

The Holding Period Trustee may resign and appoint one of its affiliates as successor by giving notice to the Company, subject to such a successor agreeing to be bound by the terms of the Restructuring Documents applicable to it.

### 11.2    On Notice

Alternatively, the Holding Period Trustee may resign at any time by giving 30 Business Days' prior written notice to the Company, in which case the Company may appoint a successor Holding Period Trustee.

### 11.3    Successor

If the Company has not appointed a successor Holding Period Trustee in accordance with Clause 11.2 (On Notice) within 30 Business Days after notice of resignation was given, the retiring Holding Period Trustee may appoint a successor Holding Period Trustee.

### 11.4    Retiring Holding Period Trustee

The retiring Holding Period Trustee shall make available to the successor Holding Period Trustee such documents and records and provide such assistance as the successor Holding Period Trustee may reasonably request for the purposes of performing its functions as Holding Period Trustee under the Restructuring Documents. The retiring Holding Period Trustee shall be reimbursed from the Trust Entitlements or from any indemnity which it has the benefit of from a member of the Restructured Group for the amount of all reasonable costs and expenses (including legal fees) properly incurred by it in making available such documents and records and providing such assistance.

### 11.5    Removal on Notice

(a)    The Holding Period Trustee's resignation notice shall only take effect upon:

    (i)    the appointment of a successor who agrees to be bound by the terms of the Restructuring Implementation Deed; and

    (ii)    the transfer of all the Trust Entitlements to that successor.

(b)    The Company shall be entitled to remove the Holding Period Trustee at any time by giving to the Holding Period Trustee 30 Business Days' prior notice in writing.

## 12.    CONFIDENTIALITY

### 12.1    Separate Entity

In acting as trustee for the Beneficiaries, the Holding Period Trustee shall be regarded as acting through its trustee division which shall be treated as a separate entity from any other of its divisions or departments.

### 12.2    Confidential Information

If information is received by another division or department of the Holding Period Trustee, it may be treated as confidential to that division or department and the Holding Period Trustee shall not be deemed to have notice of it.

### 12.3    No Duty to Disclose

Notwithstanding any other provision of any Restructuring Document to the contrary, the Holding Period Trustee is not obliged to disclose to any other person (i) any confidential information or (ii) any other information if the disclosure would, or might in its reasonable opinion, constitute a breach of any law or regulation or a breach of a fiduciary duty.

**13.    INFORMATION FROM THE INFORMATION AGENT**

The Information Agent shall supply the Holding Period Trustee with any information that the Holding Period Trustee may reasonably specify as being necessary or desirable to enable the Holding Period Trustee to perform its functions as Holding Period Trustee.

**14.    CUSTODIANS AND NOMINEES**

The Holding Period Trustee may appoint and pay any person to act as a custodian or nominee on any terms in relation to any asset of the trust as the Holding Period Trustee may determine, including for the purpose of depositing with a custodian this Deed, any Trust Entitlements or any document relating to the trust created under this Deed and the Holding Period Trustee shall not be responsible for any loss, liability, expense, demand, cost, claim or proceedings incurred by reason of the misconduct, omission or default on the part of any person appointed by it under this Deed or be bound to supervise the proceedings or acts of any person.

**15.    MISCELLANEOUS PROVISIONS**

**15.1    Delegation by the Holding Period Trustee**

(a)    The Holding Period Trustee may, at any time, delegate by power of attorney or otherwise to any person for any period, all or any right, power, authority or discretion vested in it in its capacity as such.

(b)    That delegation may be made upon any terms and conditions (including the power to sub-delegate) and subject to any restrictions that the Holding Period Trustee (as the case may be) may, in its discretion, think fit in the interests of the Beneficiaries.

(c)    The Holding Period Trustee shall not be bound to supervise, or be in any way responsible for any damages, costs or losses incurred by reason of any misconduct, omission or default on the part of, any such delegate or sub-delegate.

**15.2    Additional Holding Period Trustees**

(a)    The Holding Period Trustee may at any time appoint (and subsequently remove) any person to act as a separate trustee or as a co-trustee jointly with it, subject to such a trustee agreeing to be bound by the terms of the Restructuring Implementation Deed:

(i)    if it considers that appointment to be in the interests of the Beneficiaries;

(ii)    for the purposes of conforming to any legal requirement, restriction or condition which the Holding Period Trustee deems to be relevant; or

(iii)    for obtaining or enforcing any judgment in any jurisdiction,

and the Holding Period Trustee shall give prior notice to the Company and Jersey Newco of that appointment.

(b)    Any person so appointed shall have the rights, powers, authorities and discretions (not exceeding those given to the Holding Period Trustee under or in connection with the Restructuring Documents) and the duties, obligations and responsibilities that are given or imposed by the instrument of appointment.

(c)    The remuneration that the Holding Period Trustee may pay to that person, and any costs and expenses (together with any applicable VAT) incurred by that person in performing its functions pursuant to that appointment shall, for the purposes of this Deed, be treated as costs and expenses incurred by the Holding Period Trustee.

### 15.3 Acceptance of title

The Holding Period Trustee shall be entitled to accept without enquiry, and shall not be obliged to investigate, any right and title that any Beneficiary may have to any of the Trust Entitlements and shall not be liable for, or bound to require any person to remedy, any defect in its right or title.

### 15.4 Powers supplemental to Trustee Acts

The rights, powers, authorities and discretions given to the Holding Period Trustee under or in connection with the Restructuring Documents shall be supplemental to the Trustee Act 1925 and the Trustee Act 2000 (the **Trustee Acts**) and in addition to any which may be vested in the Holding Period Trustee by law or regulation or otherwise.

### 15.5 Disapplication of Trustee Acts

Section 1 of the Trustee Act 2000 shall not apply to the duties of the Holding Period Trustee in relation to the trusts constituted by this Deed. Where there are any inconsistencies between the Trustee Acts and the provisions of this Deed, the provisions of this Deed shall, to the extent permitted by law and regulation, prevail and, in the case of any inconsistency with the Trustee Act 2000, the provisions of this Deed shall constitute a restriction or exclusion for the purposes of that Act.

### 15.6 Indemnity from Trust Entitlements

The Holding Period Trustee may, in priority to any payment to the Beneficiaries and to the extent that the Holding Period Trustee has not been indemnified by any member of the Restructured Group, indemnify itself out of the Trust Entitlements in respect of, and pay and retain, all sums necessary to give effect to any indemnity and shall have a lien on the Trust Entitlements for all moneys payable to it.

### 15.7 Winding up of Trust

If the Holding Period Trustee determines that all Trust Entitlements have, or the Trust Entitlements Consideration has, been distributed to the relevant Beneficiaries (or their Nominees) then the trusts set out in this Deed shall be wound up.

## 16. NOTICES

### 16.1 Communications in writing

Each communication to be made under or in connection with this Deed shall be made in writing and, unless otherwise stated, shall be duly given if it is delivered by hand, email, prepaid recorded delivery or international courier to the address or email address set out below.

### 16.2 Addresses

The addresses and emails (and the department or officer, if any, for whose attention the communication is to be made) of each party for any communication or document to be made or delivered under or in connection with this Deed is:

(a)     in the case of the Company:

Address: 1 Park Row, Leeds, LS1 5AB, United Kingdom

Email: Neil.Gilchrist@kcadeutag.com and Tony.Byrne@kcadeutag.com

Attention: the CFO and General Counsel

(b)    in the case of Jersey Newco:

Address: [●]

Email: [●]

Attention: [●]

(c)    in the case of the Information Agent:

Address: Tankerton Works, 12 Argyle Walk, London, WC1H 8HA for the attention of Jacek Kusion

Email: kcadeutag@lucid-is.com

(d)    in the case of the Holding Period Trustee:

Address: Tankerton Works, 12 Argyle Walk, London, WC1H 8HA for the attention of Jacek Kusion

Email: kcadeutag@lucid-is.com

or any substitute address, email or department or officer as each party may notify to the other by not less than five Business Days' notice.

**16.3    Delivery**

(a)    Any communication or document made or delivered by one person to another under or in connection with this Deed will only be effective:

(i)    at the time of delivery if delivered personally;

(ii)    at the time of transmission if sent by email;

(iii)    two Business Days after the time and date of posting if sent by pre-paid recorded delivery; or

(iv)    three Business Days after the time and date of posting if sent by international courier.

(b)    The accidental omission to send any notice, written communication or other document in accordance with Clauses 16.1 (Communications in writing) or 16.2 (Addresses) or the non-receipt of any such notice by any party, shall not affect the provisions of this Deed.

(c)    In proving service, it shall be sufficient proof, in the case of a notice sent by post, that the envelope was properly stamped, addressed and placed in the post.

(d)    Any communication or document to be made or delivered to the Holding Period Trustee will be effective only when actually received by the Holding Period Trustee and then only if it is expressly marked for the attention of the department or officer identified with the Holding Period Trustee's signature below (or any substitute department or officer as the Holding Period Trustee shall specify for this purpose).

## 17.    MISCELLANEOUS

### 17.1    Counterparts

This Deed may be executed in any number of counterparts, each of which when executed and delivered shall constitute a duplicate original, but all the counterparts shall together constitute the one agreement.

### 17.2    Governing law

This Deed and any non-contractual obligations arising out of, or in connection with it, shall be governed by and construed in accordance with the laws of England and Wales.

### 17.3    Jurisdiction

The courts of England and Wales have exclusive jurisdiction to settle any dispute arising out of, or connected with, this Deed (including a dispute regarding the existence, validity or termination of this Deed or the consequences of its nullity).

**IN WITNESS** of which the Parties have executed and delivered this Deed on the date stated at its beginning.

## SIGNATORIES

**SIGNED** as a **DEED** by
**KCA DEUTAG UK FINANCE PLC**

acting by                                                  ....................................................

in the presence of:

Signature of witness

....................................................

Name:

Occupation:

Address:

**SIGNED** as a **DEED** by
**KELLY TOPCO LIMITED**

acting by                                            ...................................................

in the presence of:

Signature of witness

...................................................

Name:

Occupation:

Address:

**SIGNED** as a **DEED** by
**LUCID ISSUER SERVICES LIMITED**
in its capacity as Information Agent

acting by                                           ....................................................

in the presence of:

Signature of witness

....................................................

Name:

Occupation:

Address:

**SIGNED** as a **DEED** by
**LUCID ISSUER SERVICES LIMITED**
in its capacity as Holding
Period Trustee

acting by                                      ...................................................

in the presence of:


Signature of witness

...................................................

Name:

Occupation:

Address:

**1428**

**APPENDIX 5**

**JERSEY NEWCO ARTICLES OF ASSOCIATION**

**THE COMPANIES (JERSEY) LAW 1991**

**PRIVATE PAR VALUE COMPANY LIMITED BY SHARES**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**OF**

**KELLY TOPCO LIMITED**

**(as adopted by special resolution dated [●] 2020)**

**THE COMPANIES (JERSEY) LAW 1991**

**PRIVATE PAR VALUE COMPANY LIMITED BY SHARES**

**MEMORANDUM OF ASSOCIATION**

**OF**

**KELLY TOPCO LIMITED**

1    The name of the Company is **KELLY TOPCO LIMITED**.

2    The Company is a private par value company.

3    The liability of each Shareholder is limited to the amount unpaid on such Shareholder's shares.

4    The authorised share capital of the Company is USD 150,000 divided into A Ordinary Shares of a par value of USD 0.01 each.

5    Capitalised terms that are not defined in this Memorandum of Association bear the respective meanings given to them in the Articles of Association of the Company.

**Index**

1    Interpretation ...................................................................................................1

2    Commencement of Business ..............................................................................1

3    Issue of Shares .................................................................................................1

4    Pre-Emption Rights ...........................................................................................2

5    Emergency Funding Requirement .......................................................................5

6    Register of Members .........................................................................................6

7    Closing Register of Members or Fixing Record Date ............................................7

8    Certificates for Shares ......................................................................................7

9    Transfer of Shares ............................................................................................8

Permitted Transfers .................................................................................................8

Indirect transfers .....................................................................................................8

10    Drag-Along ....................................................................................................9

11    Tag-Along ....................................................................................................11

12    Squeeze-Out ................................................................................................13

13    Redemption, Repurchase and Surrender of Shares .........................................14

14    Treasury Shares ...........................................................................................14

15    Rights and Restrictions Attaching to A Ordinary Shares ...................................14

16    Commission on Issue or Sale of Shares ..........................................................17

17    Non Recognition of Trusts .............................................................................17

18    Lien on Shares .............................................................................................17

19    Call on Shares .............................................................................................18

20    Forfeiture of Shares ......................................................................................18

21    Transmission of Shares .................................................................................19

22    Amendments of Memorandum and Articles of Association and Alteration of Capital ..............20

2

**1432**

23   Offices and Places of Business and Residence ................................................20

24   General Meetings ................................................21

25   Notice of General Meetings ................................................21

26   Proceedings at General Meetings ................................................22

27   Votes of Members ................................................24

28   Proxies ................................................24

29   Corporate Shareholders ................................................25

30   Shares that May Not be Voted ................................................25

31   Directors ................................................25

32   Powers of Directors ................................................25

33   Appointment of Directors ................................................26

34   Non-Executive Directors ................................................26

35   CEO and CFO ................................................27

36   Chairperson ................................................27

37   Observer ................................................27

38   Appointment to subsidiary undertaking boards and committees ................................................27

39   Vacation of Office of Director ................................................27

40   Proceedings of Directors ................................................28

41   Presumption of Assent ................................................29

42   Directors' Interests ................................................30

43   Minutes ................................................30

44   Delegation of Directors' Powers ................................................30

45   Alternate Directors ................................................31

46   No Minimum Shareholding ................................................32

47   Remuneration of Directors ................................................32

3

**1433**

48     Dividends, Distributions and Reserve ............................................................... 32

49     Capitalisation .................................................................................................. 33

50     Books of Account ............................................................................................. 34

51     Audit ............................................................................................................... 34

52     Notices ............................................................................................................ 34

53     Winding Up ...................................................................................................... 35

54     Indemnity and Insurance ................................................................................. 36

55     Accounting Period ........................................................................................... 36

56     Finance Documents ......................................................................................... 36

4

**1434**

THE COMPANIES (JERSEY) LAW 1991


PRIVATE PAR VALUE COMPANY LIMITED BY SHARES


ARTICLES OF ASSOCIATION

OF

KELLY TOPCO LIMITED

# 1    Interpretation

1.1    In the Articles the Standard Table prescribed by Law does not apply and is expressly excluded in its entirety and, unless there is something in the subject or context inconsistent therewith:

| | |
|---|---|
| "**Acceptance Notice**" | is defined in Article 4.2. |
| "**A Ordinary Shares**" | the A ordinary shares of US$0.01 each in the capital of the Company. |
| "**Acquirer**" | means any person or group of persons acting in concert, other than a Shareholder or its Affiliates interested in acquiring Shares from a Selling Shareholder. |
| "**Affiliate**" | with respect to a person (the "**First Person**"): |

      (a)    another person that, directly or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, the First Person;

      (b)    a pooled investment vehicle organised by the First Person (or an Affiliate thereof) the investments of which are directed by the First Person;

      (c)    a partner or an officer or employee of the First Person (or an Affiliate thereof);

      (d)    an investment fund organised by the First Person for the benefit of the First Person's (or its Affiliates') partners, officers or employees or their dependants; or

      (e)    a successor trustee or nominee for, or a successor by re-organisation of, a trust the direct or indirect principal beneficiary/ies of which is any of the First Person, its Affiliates or any of their respective partners, officers or employees or their dependants.

| | |
|---|---|
| "**Aggregate Subscription Price**" | is defined in Article 4.4(b)(ii). |
| "**Articles**" | means these articles of association of the Company. |
| "**Auditor**" | means the person for the time being performing the duties of auditor of the Company. |
| "**Audit Committee**" | means the audit committee of the Board of the Company from time to time. |
| "**Bidco**" | Kelly Holdco 2 Limited, a private limited company incorporated in England & Wales with registered number 12922637 and having its registered office at 1 Park Row, Leeds, England, LS1 5AB. |
| "**Board**" | means the board of Directors for the time being of the Company from time to time including any duly appointed committee thereof. |
| "**Business Day**" | a day, except a Saturday or Sunday or a public holiday in the United Kingdom and Jersey, on which clearing banks in the City of London and Saint Helier are generally open for business. |
| "**Catch-Up Option**" | is defined in Article 5.3. |
| "**Catch-Up Option Price**" | is defined in Article 5.4; |
| "**Catch-Up Payment**" | is defined in Article 5.2(d). |
| "**Catch-Up Shares or Debt Instruments**" | is defined in Article 5.3(b). |
| "**Chairperson**" | means the Chairperson of the Company and the Board from time to time appointed pursuant to Article 35 the first such person being [●]; |
| "**Company**" | means the above named company. |
| "**Company Shares**" | means the shares in the capital of the Company in issue from time to time and "**Company Share**" means of them. |
| "**Competitor**" | means each of: Helmerich & Payne, Inc., Precision Drilling Corporation, Nabors Industries Ltd., Patterson-UTI Energy, Inc., ADES International Holding PLC, Ensign Energy Services Inc., Daldrup & Söhne Aktiengesellschaft, Honghua Group Limited, Hunting PLC, Dril-Quip, Inc., Forum Energy Technologies, Inc., Schoeller-Bleckmann Oilfield Equipment, Aktiengesellschaft, The Weir Group PLC, Archer Limited, Aker Solutions ASA, Cactus, Inc., Enerflex Ltd., National Oilwell Verco, Transocean Ltd., Valaris plc, Odfjell Drilling Ltd., The Drilling Company of |

2

**1436**

1972 A/S, Weatherford International plc, Saipem SpA, Archer Limited, Halliburton Company, Baker Hughes Company, Petrofac Limited, National Oilwell Varco, Inc., Aker Solutions ASA, Schlumberger Limited, SNC-Lavalin Group Inc., AECOM, Stantec Inc., Arcadis NV, Worley Limited, KBR, Inc., Anton Oilfield Services, Yantai Jereh Oilfield Services Group, COSL, CNOOC, Sinopec OFS, COOEC, Oilserv, Abraj Energy, ADNOC Drilling, Arabian Drilling Co, Rawabi Holdings, Joy Global Inc, United Heavy Machinery, McDermott, Subsea7, Seadrill Ltd, Noble Corp and John Wood Group PLC; together with any person or entity which undertakes any of the following services form time to time: (a) the provision of drilling, engineering and technology services to the onshore and offshore drilling markets in any part of the world; (b) the design, engineering and manufacturing of drilling rigs and related components for the onshore and offshore drilling markets in any part of the world; and (c) the owning and operation of offshore and onshore drilling rigs.

| | |
|---|---|
| "**Completion**" | means completion of the Investment Agreement. |
| "**Control**" | including with its correlative meanings, "Controlled by" and "under common Control with", means, when used in respect of a person, the power and authority to direct or cause the direction of management and policies of such person, whether directly or indirectly, through the holding of voting securities, equity, membership or partnership interests, by contract or otherwise. |
| "**Debt Instruments**" | means any debt instruments from time to time but excluding the Excluded Debt.. |
| "**Directors**" | means the directors of the Company from time to time, including the Non-Executive Directors (if appointed) and, "**Director**" means any of them. |
| "**Dividend**" | means any dividend (whether interim or final) resolved to be paid on Shares pursuant to the Articles. |
| "**Drag-Along Notice**" | means notice from the Purchaser to each Dragged Shareholder of any Proposed Drag-Along Sale to be given as soon as practicable after reaching agreement in respect of the Proposed Drag-Along Sale. |
| "**Dragged Shareholders**" | means Shareholders or holders of Shares other than the Majority Selling Shareholders; |
| "**Emergency Funding Issue**" | is defined in Article 5.2(a). |
| "**Emergency Shares and Debt Instruments**" | is defined in Article 5.2(a). |
| "**Event of Default**" | has the same meaning as in the Finance Documents. |

3

**1437**

"**Excess      Forfeited Instruments**"

is defined in Article 9.4.

"**Excess New Shares or New Debt Instruments**"

is defined in Article 4.2(a).

"**Excluded Debt**"

means:

a) the $500,000,000 in aggregate principal amount of 9.875% Senior Secured Notes due 2025 of the Issuer issued under an indenture (as amended from time to time), among KCA Deutag UK Finance PLC, Lucid Trustee Services Limited as trustee and security agent, and the other parties thereto (the "**Reinstated Bonds**");

b) the super senior facility to be provided the super senior facility agreement between, among others, Alpha and First Abu Dhabi Bank PJSC to be entered into on or around the date of these Articles;

c) the new facilities that will be entered into by HSBC upon the completion of the restructuring of the Group, pursuant to the super senior facilities agreement between, among others, KCA Deutag Alpha Limited and HSBC UK Bank plc to be entered into on or around the date of these Articles;

d) the new, extended super senior facility to be provided under the super senior facility agreement between, among others, KCA Deutag Alpha Limited and Lloyds Bank plc to be entered into on or around the date of these Articles; and

e) any further facilities (senior and subordinated facilities, together with any related hedging arrangements) of the Group as borrower for the funding of any future acquisitions, repayment of and/or refinancing of third party debt, capital expenditure and/or working capital (excluding for the avoidance of doubt any debt in the nature of shareholder debt issued to any Shareholder).

"**Executive Director**"

means any director who is an employee of the Group and who is not a Non-Executive Director.

"**Exit**"

(i) a Listing of the Company (or another entity in which the Original Participating Creditors (as defined in the Lock-up Agreement) or their transferees are shareholders at the time, following a pre-sale reorganisation); (ii) a Sale; (iii) if there is an indirect sale of assets of the Company (as

4

**1438**

described in subparagraph (ii)) including by way of merger, then the distribution of the proceeds of sale to the Company shareholders; or (iv) voluntary liquidation of the Company;.

| | |
|---|---|
| "**Finance Documents**" | means any Primary Debt Documents as defined in any intercreditor agreement entered into on or around the date of the Articles between, among others, KCA Deutag Alpha Limited (as Company) and the Holding Period Trustee as Security Agent. |
| "**Forfeited Instruments**" | is defined in Article 9.4. |
| "**Forfeiting Shareholder**" | is defined in Article 9.4. |
| "**Group**" | means the Company and each subsidiary undertaking from time to time and "**Group Member**" means any of them. |
| "**Holding Company**" | means each of the Company, Midco and Bidco; |
| "**Holding Period Trustee**" | Lucid Issuer Services Limited, a company incorporated in England (registered number 05098454) whose registered office is at Tankerton Works, 12 Argyle Walk, London, England, WC1H 8HA. |
| "**Investment Agreement**" | any Investment Agreement entered into between, amongst others, the Company and the Shareholders who are holders of the A Ordinary Shares from time to time. |
| "**Issue Completion Date**" | is defined in Article 4.4(b)(iii). |
| "**Issue Notice**" | is defined in Article 4.1(b). |
| "**KYC**" | is defined in Article 9.2. |
| "**Law**" | means the Companies (Jersey) Law 1991 (as amended from time to time). |
| "**Listing**" | means the first public offering of any class of equity securities by the Company or one of the Holding Companies (or a new holding company interposed for the purposes of being a successor of the Company or such Holding Company) in the legal form (after conversion if necessary) that results in a listing of such class of securities on a public securities market, whether effected by way of an offer for sale, a new issue of shares, an introduction, a placing or otherwise. |
| "**Lock-up Agreement**" | lock-up agreement between, inter alia, KCA Deutag Alpha II Limited, KCA Deutag UK Finance PLC and the Original Participating Creditors (as amended from time to time). |
| "**Mandatory Offer Price**" | is defined in Article 9.4. |
| "**Mandatory Transfer Offer Notice**" | is defined in Article 9.4. |
| "**Mandatory Transfer Offer Period**" | is defined in Article 9.4. |

5

**1439**

| | |
|---|---|
| "**Mandatory Transfer Relevant Amount**" | is defined in Article 9.4. |
| "**Marketable Securities**" | is defined in Article 10.3(b); |
| "**Majority Selling Shareholders**" | holders of more than 50% of the Company's issued and allotted A Ordinary Shares who wish to sell 50% or more of the A Ordinary Shares in the Company in one transaction or a series of connected transactions. |
| "**Major Shareholders**" | means each Shareholder who, together with their Affiliates, holds 5% or more of the issued A Ordinary Shares in the Company. |
| "**Major Shareholder Majority**" | means the holders of a majority of the A Ordinary Shares which are held by the Major Shareholders; |
| "**Major Shareholder Nominee**" | means the nominee which may be appointed to act, vote, attend meetings and make decisions on the behalf of a Major Shareholder comprising more than one Shareholder. |
| "**Midco**" | Kelly Holdco 1 Limited, a private limited company incorporated in England & Wales with registered number 12922288 and having its registered office at 1 Park Row, Leeds, England, LS1 5AB. |
| "**Minority Holder**" | is defined in Article 12.1. |
| "**Memorandum**" | means the memorandum of association of the Company. |
| "**New Issue Subscription Price**" | shall be calculated in accordance with Article 4.6. |
| "**New Shares**" | is defined in Article 4.1. |
| "**New Debt Instruments**" | is defined in Article 4.1. |
| "**New Member**" | a person becoming a new member of the Company due to the exercise of a pre-existing option to acquire Shares in the Company following the issue of a Drag-Along Notice or a Squeeze-Out Offer. |
| "**Non-Executive Directors**" | the Directors appointed pursuant to Article 34 and "**Non-Executive Director**" means any one of them. |
| "**Non-Selling Shareholders**" | each holder of A Ordinary Shares who is not a Selling Shareholder. |
| "**Notified Price**" | the same price per A Ordinary Share offered by the Acquirer to the Selling Shareholder(s). |
| "**Observer**" | is defined in Article 37. |
| "**Ordinary Relevant Majority**" | is defined in the definition of Ordinary Resolution. |

6

**1440**

| | |
|---|---|
| **"Ordinary Resolution"** | means a resolution of a duly constituted general meeting of the Company (or any class of share for the purposes of Article 15.12)passed by a simple majority of the votes cast, by or on behalf of the Shareholders entitled to vote (the "**Ordinary Relevant Majority**"). The expression also includes a written resolution signed by or on behalf of such Ordinary Relevant Majority. The Ordinary Relevant Majority shall be computed on the basis of the votes cast by Shareholders who, at the date when the resolution is deemed to be passed, would be entitled to vote on the resolution if it were proposed at a general meeting of the Company or when a poll is demanded regard shall be had to the number of votes to which each Shareholder is entitled by the Company. |
| **"Permitted Transfer"** | a transfer of shares to any person specified in Article 9.1. |
| **"Percentage Interest"** | in respect of any Shareholder, the proportion which the number of Shares comprising such Shareholders' holding of shares bears to the total number of Shares (excluding those of the Forfeiting Shareholder) expressed as a percentage. |
| **"Pre-emption Period"** | is defined in Article 4.1(b)(iii). |
| **"Proposed Drag-Along Sale"** | the proposed sale to the Purchaser of 50% or more of the A Ordinary Shares held by all Shareholders. |
| **"Proposed Tag-along Transfer"** | the proposed transfer of any Shares by one or more Selling Shareholders in one or a series of connected transactions, of: |

      a)  50% of the Shares in issue to any party;

      b)  20% or more of the Shares in issue to any Competitor;

      c)  such number of Shares to any party, which, when taken together with the Shares held by such party's Affiliates ("**Third Party Group**"), result in the Third Party Group holding in excess of 50% of the Shares in issue, together with each subsequent occasion where such Third Party Group acquires such Shares such that they hold Shares equal to or in excess of, in aggregate, 60%, 70%, 80% or 90% of the Shares in issue.

| | |
|---|---|
| **"Purchaser"** | a bona fide arms-length third party purchaser (being a person or group of persons acting in concert, other than a Shareholder or its Affiliates) of the Majority Selling Shareholders' A Ordinary Shares. |

7

**1441**

| | |
|---|---|
| "**Register of Members**" | means the register of members maintained in accordance with the Law and includes (except where otherwise stated) any branch or duplicate register of members. |
| "**Registered Office**" | means the registered office for the time being of the Company. |
| "**Remaining Excess New Shares or New Debt Instruments**" | is defined in Article 4.4(a)(ii). |
| "**Remaining Shareholders**" | is defined in Article 4.4(a)(ii). |
| "**Remuneration Committee**" | is defined in the Investment Agreement. |
| "**Ring-Fenced Body**" | means a ring-fenced body pursuant to Financial Services (Banking Reform) Act 2013 or any of its Affiliates; |
| "**Sale**" | the sale and transfer of all the shares in the Company or all or substantially all of the assets of the Company (directly or indirectly by way of one or a number of related transactions. |
| "**Selling Shareholder**" | any Shareholder(s) proposing to transfer any Shares (or any interest in any Shares). |
| "**Shareholder(s)**" | the holders for the time being of Shares. |
| "**Share or Debt Instrument Proportion**" | is defined in Article 4.1(a). |
| "**Shares**" | means the A Ordinary Shares each in the capital of the Company in issue from time to time. |
| "**Special Relevant Majority**" | is defined in the definition of Special Resolution. |
| "**Special Resolution**" | shall have the same meaning given in the Law, provided that, pursuant to Article 90(1A)(b) of the Law, a majority of not less than two-thirds of the votes cast by or on behalf of the Shareholders entitled to vote (the "**Special Relevant Majority**") shall be required for the passing of such special resolution. The expression also includes a written resolution signed by or on behalf of the Special Relevant Majority for the passing of special resolutions. The Special Relevant Majority shall be computed on the basis of the votes cast by Shareholders who, at the date when the resolution is deemed to be passed, would be entitled to vote on such resolution if it were proposed at a general meeting of the Company or when a poll is demanded regard shall be had to the number of votes to which each Shareholder is entitled by the Company. |
| "**Squeeze-Out Offer**" | is defined in Article 12.1. |
| "**Substantial Shareholder**" | means any: |

8

**1442**

|   |   |
|---|---|
| **(a)** | single Shareholder who is a holder of A Ordinary Shares, together with its Affiliates which holds; or |
| **(b)** | such Major Shareholders, who acting together and together with their respective Affiliates who hold, |

10% or more of the A Ordinary Shares in issue.

| | |
|---|---|
| "**Super Majority Holder**" | is defined in Article 12.1. |
| "**Tag Acceptance Period**" | is defined in Article 11.5. |
| "**Tagging Shareholder**" | a Non-Selling Shareholder who accepts an offer made in accordance with Article 11.1. |
| "**Treasury Share**" | means a Share held in the name of the Company as a treasury share in accordance with the Law. |
| "**12 Month High**" | is defined in Article 11.4. |
| "**Transfer Agent**" | GLAS Specialist Services Limited or any other appointed transfer agent of the Company from time to time. |
| "**Warrants**" | means the warrants issued pursuant to the Warrant Instrument. |
| "**Warrant Instrument**" | means any warrant instrument between the Company and the warrantholders dated on or around the date hereof. |

9

**1443**

1.2    In the Articles:

(a)    words importing the singular number include the plural number and vice versa;

(b)    words importing the masculine gender include the feminine gender;

(c)    words importing persons include corporations as well as any other legal or natural person;

(d)    "written" and "in writing" include all modes of representing or reproducing words in visible form;

(e)    "shall" shall be construed as imperative and "may" shall be construed as permissive;

(f)    references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced;

(g)    any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(h)    the term "and/or" is used to mean both "and" as well as "or." The use of "and/or" in certain contexts in no respects qualifies or modifies the use of the terms "and" or "or" in others. The term "or" shall not be interpreted to be exclusive and the term "and" shall not be interpreted to require the conjunctive (in each case, unless the context otherwise requires);

(i)    headings are inserted for reference only and shall be ignored in construing the Articles;

(j)    the term "clear days" in relation to the period of a notice means that period excluding the day when the notice is received or deemed to be received and the day for which it is given or on which it is to take effect; and

(k)    the term "holder" in relation to a Share means a person whose name is entered in the Register of Members as the holder of such Share.

## 2    Commencement of Business

2.1    The business of the Company may be commenced as soon after incorporation of the Company as the Directors shall see fit.

2.2    The Directors may, to the extent permitted by Law, pay, out of the capital or any other monies of the Company, all expenses incurred in or about the formation and establishment of the Company, including the expenses of registration.

## 3    Issue of Shares

3.1    Subject to the provisions, if any, in the Memorandum, the Articles, the Investment Agreement (and to any direction that may be given by the Company in a general meeting) and without prejudice to any rights attached to any existing Shares, the Directors may subject to the required consents from the Shareholders in accordance with Articles 4 and 22, allot, issue, grant options over or otherwise dispose of Shares (including fractions of a Share) with or without preferred, deferred or other rights or restrictions, whether in regard to Dividend or other distribution, voting, return of capital or otherwise and to such persons, at such times and on such other terms as they think proper, and may also (subject to the Law, the Investment Agreement and the Articles) vary such rights in accordance with Article 15.15. The Directors may also issue Warrants

**1444**

pursuant to the Warrant Instrument, and subject to the exercise of such Warrants by the Warrantholders, the Directors shall issue and allot A Ordinary Shares to such Warrantholders in accordance with the terms of the Warrant Instrument.

3.2    The Company shall not issue Shares to bearer.

3.3    The Company may by Special Resolution alter its Memorandum so as to increase its authorised share capital and make all such other alterations and amendments to its share capital as may be permitted by the Law and the Investment Agreeement.

3.4    The share capital of the Company is as specified in the Memorandum and the Shares shall have the rights and are subject to the conditions set out in these Articles.

3.5    The par or nominal value paid up on any Share shall be transferred to a nominal capital account maintained in accordance with the Law.

3.6    The premium (if any) paid up on any Share shall be transferred to a share premium account maintained in accordance with the Law.

## 4    Pre-Emption Rights

4.1    Subject to the required consent being obtained from the Major Shareholder Majority, if a Group Member proposes to or a Major Shareholder Majority requires a Group Member to issue any new Company Shares or Debt Instruments (the "**New Shares or New Debt Instruments**") no such New Shares or New Debt Instruments shall be so issued unless such issuance is made in accordance with Articles 4.1 to 4.6 (inclusive), save where Article 4.7 applies, and the Shareholders and the Company shall procure that:

(a)    the New Shares or New Debt Instruments shall be offered for subscription in cash at the same time and on the same terms to each Shareholder, each Shareholder being offered such percentage of each class of New Shares or New Debt Instruments as is equal to its pro rata proportion of Shares and/or debt securities (as applicable in relation to the Company Shares or Debt Instruments being offered) immediately prior to such offer (or as nearly as may be) ("**Share or Debt Instrument Proportion**") on the basis that each Shareholder may take up all or none of the New Shares or New Debt Instruments offered to it;

(b)    subject to the New Issue Subscription Price having been determined in accordance with Article 4.6 below, each offer shall be made by notice from the relevant Group Member (the "**Issue Notice**") specifying:

(i)    the number of New Shares or New Debt Instruments to which the relevant Shareholder is entitled (pursuant to Article 4.1(a));

(ii)    the New Issue Subscription price per New Share or Debt Instrument (established in accordance with Article 4.6 below); and

(iii)    the time (being not less than 15 Business Days from the date of the Issue Notice) within which the offer (if not irrevocably accepted in writing) will be deemed to have been declined (the "**Pre-emption Period**").

4.2    By no later than the expiry of the Pre-emption Period, each Shareholder may by notice in writing to the Company (the "**Acceptance Notice**") exercise the right to subscribe for all of the New Shares or New Debt Instruments on the terms set out in the Issue Notice. Once given, an

2

**1445**

Acceptance Notice shall be irrevocable and binding. Each Shareholder who irrevocably accepts the offer in accordance with this Article 4.2 shall, in addition to such acceptance, confirm either:

(a)     that it would irrevocably accept, on the same terms, New Shares or New Debt Instruments (specifying a maximum number) that are not accepted by other Shareholders ("**Excess New Shares or New Debt Instruments**"); or

(b)     that it would not accept any Excess New Shares or New Debt Instruments,

(and, if a Shareholder who accepts the offer fails to give a confirmation in the terms of (a) or (b), it shall be deemed to have made a confirmation in the terms of (b));

4.3     Any Shareholder who does not accept the offer in accordance with Article 4.2 within the Pre-emption Period shall be deemed to have irrevocably declined the offer in full.

4.4     Promptly following, and no later than the date that is five Business Days after, the expiry of the Pre-emption Period, the Company shall:

(a)     determine the allocation of New Shares or New Debt Instruments as follows:

(i)     Excess New Shares or New Debt Instruments (if any) shall be allocated to each Shareholder who has indicated that it shall accept Excess New Shares or New Debt Instruments, pro rata to the Share or Debt Instrument Proportions of all those Shareholders who have indicated that they would accept Excess New Shares or New Debt Instruments (discounting those Shareholders which did not apply for Excess New Shares or New Debt Instruments and provided that no Shareholder shall be allocated more than the maximum number of Excess New Shares or New Debt Instruments that it has indicated it is willing to accept);

(ii)    if, after the first allocation of Excess New Shares or New Debt Instruments, there remain Excess New Shares or New Debt Instruments which have not been allocated (the "**Remaining Excess New Shares or New Debt Instruments**") and one or more Shareholders have indicated in their response to the Issue Notice that they shall accept more Excess New Shares or New Debt Instruments than they have been allocated (the "**Remaining Shareholders**"), the Remaining Excess New Shares or New Debt Instruments shall be allocated to the Remaining Shareholders pro rata to the Share or Debt Instrument Proportions (or as nearly as may be) of the Remaining Shareholders (discounting each Shareholder that is not a Remaining Shareholder and Remaining Excess New Shares or New Debt Instruments shall continue to be allocated on this basis until either: (i) all Remaining Excess New Shares or New Debt Instruments are allocated; or (ii) all requests for Remaining Excess New Shares or New Debt Instruments have been satisfied (provided, in each case, that no Shareholder shall be allocated more than the maximum number of Remaining Excess New Shares or New Debt Instruments that it has indicated it is willing to accept);

(iii)   if, after the allocation of the Remaining Excess New Shares or New Debt Instruments there remains Remaining Excess New Shares or New Debt Instruments which have not been allocated, those unallocated Remaining Excess New Shares or New Debt Instruments may be allocated by the Board to third parties; and

(iv)    where any allocation of New Shares or New Debt Instruments pursuant to this Article 4.4 would result in a fractional allotment of New Shares or New Debt

3

**1446**

Instruments, the board of the relevant Group Member may, in its absolute discretion, round up or down such fractional allotments so that the offers or allotments of New Shares or New Debt Instruments by the relevant Group Member are of whole numbers of New Shares or New Debt Instruments;

(b)   shall give notice in writing to each Shareholder of:

    (i)   its allocation of New Shares or New Debt Instruments in accordance with this Article 4.4;

    (ii)   the aggregate amount payable by each such Shareholder calculated by reference to the New Issue Subscription Price per New Share or Debt Instrument (the "**Aggregate Subscription Price**"); and

    (iii)   the date on which the Aggregate Subscription Price is to be provided to the Company, provided that date is not less than 15 Business Days after the expiry of the Pre-emption Period (the "**Issue Completion Date**").

4.5   On the Issue Completion Date, upon receipt of the Aggregate Subscription Price for the New Shares or New Debt Instruments (and Excess New Shares or New Debt Instruments, as applicable), allot and issue (credited as fully paid) the New Shares or New Debt Instruments (and Excess New Shares or New Debt Instruments, as applicable), enter the relevant allottees in the relevant register and complete and despatch to the relevant allottee(s) certificates (if any) for the New Shares or New Debt Instruments (and Excess New Shares or New Debt Instruments, in each case as applicable).

4.6   The "**New Issue Subscription Price**" in respect of any allocation of Company Shares or Debt Instruments pursuant to this Articles shall be:

(a)   in the case of an Emergency Funding Issue, such price per New Share or Debt Instrument as the Board shall agree with Major Shareholder Majority consent based on advice received by an appropriately qualified independent financial adviser; or

(b)   in the case of an issue of Company Shares or Debt Instruments in accordance with Article 4.1, such other price per New Share or Debt Instrument as shall be approved by the Board based on advice received by an appropriately qualified independent financial adviser.

4.7   The pre-emption rights provided in the provisions of Articles 4.1 through 4.6 (inclusive) shall not apply:

(a)   to issuances to members of management and/or directors of the Group up to 5% of the fully diluted share capital of the Company or further issuances to members of management as may be approved in writing by a Major Shareholder Majority from time to time;

(b)   any issuance of A Ordinary Shares or Warrants pursuant to the terms of the Warrant Instrument;

(c)   any issuance of Company Shares or Debt Instruments to another Group Member;

(d)   any issuance of Company Shares or Debt Instruments which is carried out as part of a Listing or secondary offering or any restructuring of any Group Member prior to and as part of a Listing or recapitalisation of such Group Member in each case where each

4

**1447**

Shareholder holds the same proportionate economic entitlement of such other Shareholder before and after such restructuring;

(e)     to the re-designation of any class of Company Shares or Debt Instruments into any other class of Share or Debt Instrument;

(f)     to any issuance of Company Shares or Debt Instruments to a third party as consideration, in whole or in part, for a bona fide acquisition of shares or assets by any Group Member in accordance with the terms of the Investment Agreement or

(g)     pursuant to an Emergency Funding Requirement, subject to the applicable catch-up rights in the Investment Agreement.

## 5    Emergency Funding Requirement

5.1    The Company, acting in good faith and subject to first having considered all reasonable alternatives, may resolve to issue New Shares or New Debt Instruments:

(a)     in order to remedy cash or liquidity requirements, including to cure an actual or potential event of default under any of the Finance Documents or (a "**Finance Event of Default**"), where such Finance Event of Default is continuing and has not been unconditionally waived by the relevant agent and, in the reasonable opinion of the Company further financing is required in connection with curing such Finance Event of Default; or

(b)     if in the reasonable opinion of the Company further financing is required to avoid within 60 days either:

(i)     the occurrence of a Finance Event of Default; or

(ii)     circumstances that would reasonably be expected to amount to, or give rise to the occurrence of, a Finance Event of Default,

(c)     each event an "**Emergency Funding Requirement**".

5.2    If the Company determines, acting in good faith that an event is an Emergency Funding Requirement pursuant to the above:

(a)     the Company may authorise the issue of only such number of Company Shares or Debt Instruments (the "**Emergency Shares or Debt Instruments**") as would, in its reasonable opinion cure or avoid the relevant Finance Event of Default (the "**Emergency Funding Issue**");

(b)     the Company may only issue Emergency Shares or Debt Instruments to third parties if the then existing Shareholders subscribe for an insufficient amount of Emergency Shares or Debt Instruments (with the Company having first offered the opportunity to all Shareholders);

(c)     the nature of the Emergency Shares or Debt Instruments issued shall be determined by the Company on an arm's length basis such that they are priced in the most cost effective and appropriate way given the nature of the Finance Event of Default, and for the purposes of minimising the impact on prevailing governance arrangements;

(d)     the pricing of an Emergency Funding Issue shall be agreed by the Company pursuant to Article 4.6(a) based on advice received by an appropriately qualified independent

5

**1448**

financial adviser, except for any issue under a Catch-Up Option which shall carry additional payment for carrying cost (the "**Catch-Up Payment**").

5.3    If any Shareholders do not have the opportunity to participate in an Emergency Funding Issue then, within 30 days from such Emergency Funding Issue, such Shareholder(s) may elect (but shall not be obliged) to:

(a)    purchase such number of Emergency Shares or Debt Instruments from Shareholders who subscribed for Emergency Shares or Debt Instruments pursuant to the Emergency Funding Issue, which would result in, following such acquisition, such Shareholder holding such percentage of the Emergency Shares or Debt Instruments as equates to its Equity Proportion immediately prior to the Emergency Funding Issue Shareholders; or

(b)    have the Company approve the additional issuance of New Shares or New Debt Instruments in the same class of the Emergency Shares or Debt Instruments ("**Catch-Up Shares or Debt Instruments**") (without regard to any pre-emption rights on issue, including (without limitation) as set out in the Investment Agreement or the Articles) which would result in, following such subscription, such Shareholder holding such percentage of the total number of the Emergency Shares or Debt Instruments and Catch-Up Shares or Debt Instruments (taken together) as equates to its Share or Debt Instrument Proportion immediately prior to the Emergency Funding Issue,

together, the "**Catch-Up Option**".

5.4    If a Shareholder elects to exercise a Catch-Up Option pursuant to Article 5.3 the Shareholders and (if applicable) the Company shall complete the purchase of Emergency Shares or Debt Instruments or additional issuance of the Catch-Up Shares or Debt Instruments which are subject to the Catch-Up Option, in consideration for the payment of the Catch-Up Option Price by such electing Shareholder, as soon as reasonably practicable following such election and, in any event, by no later than 90 days from the relevant Emergency Funding Issue, in default of which, the Catch-Up Option shall lapse. For the purposes of this Article 5.4, the price payable in respect of the Catch-Up Option shall be the aggregate of:

(a)    the price paid in respect of the Emergency Funding Issue by those Shareholders who participated in the Emergency Funding Issue (as determined in accordance with Article 4.6(a)); and

(b)    the Catch-Up Payment, where there has been a carrying cost incurred.

(the "**Catch-Up Option Price**").

5.5    The Catch-Up Payment shall be determined by the Company but shall be subject to unanimous approval of those Shareholders who subscribed for Emergency Shares or Debt Instruments in the relevant Emergency Funding Issue, in each case acting reasonably. If the Shareholders are unable to agree the Catch-Up Payment within 14 days, the Catch-Up Payment shall be calculated at a daily simple rate of 10% per annum on the issue price of Emergency Shares or Debt Instruments issued for the relevant Emergency Funding Issue.

## 6    Register of Members

The Company shall maintain or cause to be maintained the Register of Members in accordance with the Law.

6

## 7     Closing Register of Members or Fixing Record Date

7.1     For the purpose of determining the Shareholders entitled to notice of, or to vote at any meeting of the Shareholders or any adjournment thereof in accordance with Articles 15.5-15.8 (inclusive), or Shareholders entitled to receive payment of any Dividend or other distribution, or in order to make a determination of the Shareholders for any other purpose, the Directors may provide that the Register of Members shall be closed for transfers for a stated period which shall not in any case exceed 40 days.

7.2     In lieu of, or apart from, closing the Register of Members, the Directors may fix in advance or arrears a date as the record date for any such determination of the memebrs entitled to notice of, or to vote at any meeting of the members or any adjournment thereof, or for the purpose of determining the Shareholders entitled to receive payment of any Dividend or other distribution, or in order to make a determination of members for any other purpose.

7.3     If the Register of Members is not so closed and no record date is fixed for the determination of Shareholders entitled to notice of, or to vote at, a meeting of the Shareholders or Shareholders entitled to receive payment of a Dividend or other distribution, the date on which notice of the meeting is sent or the date on which the resolution of the Directors resolving to pay such Dividend or other distribution is passed, as the case may be, shall be the record date for such determination of members. When a determination of Shareholders entitled to vote at any meeting of members has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## 8     Certificates for Shares

8.1     Share certificates representing Shares, if any, shall be in such form as the Directors may determine. Share certificates shall be signed by any two Directors or by any one Director and the secretary of the Company.

8.2     The Directors may authorise certificates to be issued with the authorised signature(s) affixed by mechanical or electronic process. All certificates for Shares shall be consecutively numbered or otherwise identified and shall specify the Shares to which they relate. All certificates surrendered to the Company for transfer shall be cancelled and subject to the Articles no new certificate shall be issued until the former certificate representing a like number of relevant Shares shall have been surrendered and cancelled.

8.3     The Company shall not be bound to issue more than one certificate for Shares held jointly by more than one person and delivery of a certificate to one joint holder shall be a sufficient delivery to all of them.

8.4     If a share certificate is defaced, worn out, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity and on the payment of such expenses reasonably incurred by the Company in investigating evidence, as the Directors may prescribe, and (in the case of defacement or wearing out) upon delivery of the old certificate.

8.5     Every share certificate sent in accordance with the Articles will be sent at the risk of the Shareholder or other person entitled to the certificate. The Company will not be responsible for any share certificate lost or delayed in the course of delivery.

7

## 9       Transfer of Shares

**Permitted Transfers**

9.1     Subject to Article 9.2, the A Ordinary Shares shall be freely transferable, save that no transfer of any A Ordinary Shares, or any interest in any A Ordinary Shares, may be made except (i) where an equivalent proportion of Debt Instruments are also transferred; and (ii) pursuant to clause 18 of the Investment Agreement and the Articles, including but not limited to Article 11. For this purpose, an interest in any A Ordinary Shares is deemed to be transferred if a Shareholder enters into an agreement (other than the Investment Agreement) with any person in respect of the exercise of votes attached to such A Ordinary Shares. Notwithstanding the foregoing, Shareholders may transfer their A Ordinary Shares and Debt Instruments to any of their Affiliates, and in such case the provisions of Article 11 shall not apply to such a transfer.

9.2     The Company will, subject to receipt of any Know Your Client information ("**KYC**") (if required), immediately register each Shareholder as the fully paid holder of the Shares.

**Indirect transfers**

9.3     Subject to Article 9.1, there shall be no transfer of any direct, indirect or beneficial interest in any Shares by any Person unless such transfer would be permitted under Article 9.1, if it was a transfer by the Shareholder.

9.4     If: (i) the Company; or (ii) a Shareholder, becomes aware of any breach of Article 9.3, then (A) in the case of (i) the Company shall promptly; and (B) in the case of (ii) promptly following notification to the Company of such breach by the relevant Shareholder, the Company shall serve a notice on the Shareholder in respect of which an indirect interest has been transferred (the "**Forfeiting Shareholder**") who shall have five Business Days after receipt of the notice served by the Company in accordance with this Article 9.4 to cure the breach (the "**Cure Period**"). If the Forfeiting Shareholder fails to cure the breach within the Cure Period, it may be required to transfer all or a portion of their Shares and/or Debt Instruments (collectively "**Forfeited Instruments**") in accordance with Articles 9.4 to 9.6 inclusive. The Company or relevant Shareholder shall promptly deliver a written notice (a "**Mandatory Transfer Offer Notice**") to each Shareholder who is a holder of A Ordinary Shares ("**Non-Forfeiting Shareholder**") that such Shareholder who is a holder of A Ordinary Shares is entitled to acquire a proportion of the Forfeited Instruments equal to such Non-Forfeiting Shareholder's Percentage Interest at that time as a proportion of the aggregate Percentage Interests of all Non-Forfeiting Shareholders (the "**Mandatory Transfer Relevant Amount**"), at a price per Share or Debt Instrument equal to 50% of fair market value of the Forfeited Instruments at the date of the Mandatory Transfer Offer Notice (as determined by the Board acting reasonably) (the "**Mandatory Offer Price**"). The Mandatory Transfer Offer Notice shall invite each Non-Forfeiting Shareholder to apply to purchase: (i) all or any portion of their Mandatory Transfer Relevant Amount; and (ii) (if they become available as a result of any Non-Forfeiting Shareholders not wishing to purchase all of their Mandatory Transfer Relevant Amount) any Forfeited Instruments in excess of their Mandatory Transfer Relevant Amount, in each case, within twenty (20) Business Days of the following date of the Mandatory Transfer Offer Notice (the "**Mandatory Transfer Offer Period**"). The Company shall allocate the relevant proportion of Forfeited Instruments to each Non-Forfeiting Shareholder which submits an application to the Company within the Mandatory Transfer Offer Period stating the proportion of the Mandatory Transfer Relevant Amount which the Non-Forfeiting Shareholder wishes to acquire and providing payment in full for such amount of Forfeited Instruments. If any Non-Forfeiting Shareholder fails to submit an application to the Company within the Mandatory Transfer Offer Period, it shall be deemed to have declined the invitation to purchase any Forfeited Instruments. If and to the extent that any Non-Forfeiting Shareholder has submitted an application for less than their Mandatory Transfer Relevant Amount or has or is deemed to

8

**1451**

have declined the invitation to purchase any Forfeited Instruments (together, such unallocated Forfeited Shares, being referred to as the "**Excess Forfeited Instruments**"):

(a)     such Excess Forfeited Instruments shall be allocated to each Non-Forfeiting Shareholder wishing to purchase Forfeited Instruments in excess of their Mandatory Transfer Relevant Amount, in proportion to such Non-Forfeiting Shareholder's Percentage Interest for the time being as a proportion of the aggregate Percentage Interests of those Non-Forfeiting Shareholders who have submitted an application to purchase any part of such Excess Forfeited Instruments (provided that any allocation made under this Article shall be made so as not to result in any Non-Forfeiting Shareholder being allocated more Forfeited Instruments than it wishes to purchase); and

(b)     any remaining Excess Forfeited Instruments shall continue to be allocated on this basis until either all the Forfeited Instruments have been allocated or all requests for extra Forfeited Instruments have been satisfied.

9.5     Following the expiry of the Mandatory Transfer Offer Period (or, as the case may be, following election and payment (if applicable) by any Non-Forfeiting Shareholder for any Excess Forfeited Instruments pursuant to Article 9.4), the Forfeiting Shareholder shall sell the amount of Forfeited Instruments which the Non-Forfeiting Shareholders applied for in accordance with Article 9.4 at the Mandatory Offer Price to the relevant Non-Forfeiting Shareholders. Each member of the Board is individually authorised to execute, complete and deliver as agent for and on behalf of the Forfeiting Shareholder such documents as are required to transfer such Forfeited Instruments to the relevant Non-Forfeiting Shareholder (provided that any Director(s) appointed by the Forfeiting Shareholder (s) shall be excluded from such authority), and following such transfer shall update the Register of Members accordingly.

9.6     Immediately on the occurrence of any breach of Article 9.3, any and all specific rights of the Forfeiting Shareholder attaching to their holding of Shares pursuant to the Articles (including, without limitation, rights to vote, appoint directors and/or observers and any and all rights of consent in relation to any matter) shall cease to apply in respect of such Forfeiting Shareholder.

## 10     Drag-Along

## Drag-Along Mechanism

10.1    If the Majority Selling Shareholders agree terms for a Proposed Drag-Along Sale with a Purchaser then, on receipt of a Drag-Along Notice from the Purchaser, all the Dragged Shareholders are bound to transfer the same proportion of their Shares to the Purchaser on the same terms as agreed by the Majority Selling Shareholders (save as provided in Article 10.5).

## Representations, Warranties and Costs

10.2    Dragged Shareholders must make or give the same representations, warranties, covenants and indemnities (if any) as to title and capacity of the Shares, together with a locked box indemnity or covenant (subject to customary permitted leakage exceptions, including transactions with any Shareholder (and or its Affiliates) in the ordinary and usual course of trading and on arms-length terms) in each case as given by the Majority Selling Shareholders. Each Dragged Shareholder is responsible for its proportionate share of the costs of the Proposed Drag-Along Sale to the extent not paid or reimbursed by the Purchaser based on the proportion his or its number of Shares held bears to the proportion of the total number of Shares in issue and such costs will be deducted from the proceeds

## Drag-Along Notice

9

10.3    The Drag-Along Notice must set out the number of Shares proposed to be transferred, the name and address of the proposed Purchaser, the proposed amount, if any, and form of consideration and any other terms and conditions of payment offered for the Shares. Consideration for the Shares must be in either:

(a)    cash; or

(b)    marketable securities listed on a Recognised Investment Exchange (which shall not have been suspended from trading due to fraud or deficiencies in quality of corporate governance or financial reporting of their issuer at any time within the 12 month period prior to the proposed Drag-Along Sale ("**Marketable Securities**"); or

(c)    a combination of cash and Marketable Securities;

**PROVIDED THAT** where a Dragged Shareholder is a Ring-Fenced Body, that Dragged Shareholder (on behalf of itself only and not in respect of any Shares which it holds as market-maker or broker) shall have the option to elect, within fifteen Business Days of the date of the Drag-Along Notice, to receive its consideration in cash only, even in circumstances where all or part of the proposed consideration for the Shares is to be in Marketable Securities. In such circumstances, the Company shall appoint a broker (whose appointment has been agreed with the Ring-Fenced Body making the election, acting reasonably) to sell that proportion of the proposed consideration due to the Ring-Fenced Body that constitutes Marketable Securities either by way of a sale of the entire block or in one or more transfers within 30 days of the issue of the Marketable Securities. The proceeds of such sale (with the reasonable broker fees relating to the sale of the proportion of the Marketable Securities attributable to the shares issued to the Ring-Fenced Body as part of the Scheme being borne by the Company) shall be paid to such Ring-Fenced Body within two Business Days of receipt of the cash by the Company in full and final satisfaction of the Marketable Securities consideration otherwise due to that Ring-Fenced Body.

10.4    The Drag-Along Notice must specify a date, time and place for the Dragged Shareholders to execute transfers in respect of their Shares, being a date which is not less than eight Business Days after the date of the Drag-Along Notice (and not earlier than the transfers by the Majority Selling Shareholders). The Drag-Along Notice may be expressed to be conditional upon completion of the sale by the Majority Selling Shareholders. A Drag-Along Notice shall be valid for: (i) 90 days; or (ii) if completion is subject to conditions, 60 days from the earlier of: (a) satisfaction of such conditions; and (b) the long stop date in the relevant Share and Purchase Agreement.

**Execution of Transfers**

10.5    If a Dragged Shareholder does not, within five Business Days of the date of the Drag-Along Notice (or on the date specified in the Drag-Along Notice if later than five Business Days after the date of the Drag-Along Notice) execute transfers in respect of its Shares, then the Board is entitled to authorise and instruct such person as it thinks fit to execute, complete and deliver the necessary transfer(s) as agent on the Dragged Shareholder's behalf on the same terms as those accepted by the Majority Selling Shareholders and, against receipt by the Company (on trust for the Shareholder) of the consideration payable for the Shares, deliver the transfer(s) to the Purchaser (or its nominee) and register the Purchaser (or its nominee) as the holder of those Shares. After the Purchaser or its nominee has been registered as the holder the validity of such proceedings may not be questioned by any person. The Company will deliver the consideration payable for each Dragged Shareholder's Shares held on trust in accordance with this Article for a member to that member as soon as practicable following the delivery to the

10

**1453**

Company by that member of his original share certificate (if any)in respect of such Shares or an indemnity for a lost share certificate in a form reasonably acceptable to the Chairperson.

10.6    Subject to Article 10.7 , unless the Board otherwise agrees in writing, any Shares held by a Dragged Shareholder on the date of a Drag-Along Notice (and any Shares acquired by a Dragged Shareholder from time to time thereafter, whether by virtue of the exercise of any right or option granted or arising by virtue of the holding of Shares by the Dragged Shareholder, or otherwise) shall immediately on failure by the holder of such Shares to comply with this Article 10.6:

(a)    (automatically cease to confer the right to receive notice of or to attend or vote (either in person or by proxy and whether on a poll or on a show of hands) at any general meeting of the Company or (subject to the Law) at any meeting of the holders of any class of Shares in the capital of the Company with effect from the date of the Drag-Along Notice (or the date of acquisition of such Shares, if later); and

(b)    not be counted in determining the total number of votes which may be cast at any such meeting, or required for the purposes of a written resolution of any member or any class of members, or for the purposes of any other consent required under these Articles.

10.7    The rights referred to in Article 10.6 shall be restored immediately upon the transfer of the Shares in accordance with the Drag-Along Notice.

10.8    Following the issue of a Drag-Along Notice, if any person becomes a New Member, a Drag-Along Notice is deemed to have been served upon the New Member on the same terms as the previous Drag-Along Notice.  The New Member will be bound to sell and transfer all such Shares acquired by him or it to the Purchaser or as the Purchaser may direct and the provisions of this Article 10 shall apply (with necessary modifications) to the New Member save that completion of the sale of such Shares shall take place immediately following the registration of the New Member as a Shareholder.

## 11    Tag-Along

## Tag-Along Mechanism

11.1    No Proposed Tag-along Transfer may be made by any Selling Shareholder(s) unless the Acquirer has first made a written offer in accordance with this Article 11 to the Non-Selling Shareholders to purchase the Non-Selling Shareholders' Shares at the Notified Price (whether the consideration is cash or newly issued shares in the Acquirer's share capital) and on no less preferential terms and conditions (including time of payment, form of consideration, representations, warranties, covenants and indemnities (if any) and limitations of liability) (provided they are given on a several basis) as to be paid and given to and by the Selling Shareholder(s).

## Costs

11.2    A Tagging Shareholder is responsible for his or its proportionate share of the costs of the Proposed Tag-along Transfer to the extent not paid or reimbursed by the Acquirer or the Company based on the proportion his or its number of Shares held bears to the proportion of the total number of Shares, being sold pursuant to the Proposed Tag-along Transfer.

## Terms of Tag-Along Offer

11.3    The Selling Shareholder(s) must give written notice to each Non-Selling Shareholder of each Proposed Tag-along Transfer at least five Business Days prior to signing a definitive agreement

11

relating to the Proposed Tag-along Transfer providing details of the Acquirer and its proposed price and, to the extent it is able, the other terms and conditions.

11.4    Where the Proposed Tag-Along Transfer occurs in a series of connected transactions, the price which is payable to the Tagging Shareholders shall be the highest price paid by the Acquirer in the 12 month period prior to the date of the notice of the Proposed Tag-Along Transfer delivered pursuant to Article 11.3, and for these purposes the value attributed to the Shares pursuant to the Scheme shall be disregarded (such price being the "**12 Month High**").

11.5    The written offer required to be given by the Acquirer under Article 11.1 must be given at least than five Business Days before the signing of the definitive agreement relating to the Proposed Tag-along Transfer and must be open for acceptance for at least twenty Business Days after the date of the written offer ("**Tag Acceptance Period**"). The Selling Shareholder(s) must deliver or cause to be delivered to the Non-Selling Shareholders copies of all material transaction documents relating to the Proposed Tag-along Transfer promptly as the same become available.

## Acceptance of Tag-Along Offer

11.6    If a Non-Selling Shareholder wishes to accept the Acquirer's offer under Article 11.1 it must do so by means of a written notice to the Selling Shareholder(s) indicating its acceptance of the offer in respect of all of the number of its Shares specified in the written offer. If the Tag-Along Notice is accepted the Proposed Tag-along Transfer shall be conditional upon the Selling Shareholders' sale and shall be completed at the same time as that sale.

## Effect of No Acceptances of Tag-Along Offer

11.7    If some or all of the Non-Selling Shareholders do not accept such offer within the period that is open for acceptance pursuant to Article 11.5, signing of the Proposed Tag-along Transfer is permitted to be made:

(a)    within 10 Business Days after signing the definitive agreement, provided that the offer shall remain open to any Tagging Shareholder to accept within the Tag Acceptance Period and the purchaser shall be bound to purchase any such shares;

(b)    so long as it takes place on terms and conditions no more favourable in any respect to the Selling Shareholder(s) than those stated in the original written offer under Article 11.1; and

(c)    on the basis that all of the Shares proposed to be sold under the Proposed Tag-along Transfer are transferred.

## Exclusions

11.8    The provisions of Article 11.1 will not apply to any transfers of Shares:

(a)    in respect of which a Drag-Along Notice has been served;

(b)    a transfer to Affiliates in accordance with Article 9.1; or

(c)    to a new holding company of the Company which is established for the purposes of planning for a reorganization or an Exit and in which the share capital structure (principally the shareholdings but including all economic rights) of the Company is replicated in all material respects.

12

**1455**

## 12      Squeeze-Out

12.1     Without prejudice to the provisions of the Law, if a person, together with its Affiliates, acquires 90% or more of the Shares in issue at any time (a "**Super Majority Holder**"), then such Super Majority Holder shall be entitled to make a written offer to the remaining Shareholders (the "**Minority Holders**") to acquire the Shares held by the Minority Holders at a price which is no lower than the 12 Month High (a "**Squeeze-Out Offer**"). If the Super Majority Holder makes such a Squeeze-Out Offer, the Minority Holders are bound to transfer 100% of their Shares to the Super Majority Holder on the terms of the Squeeze-Out Offer.

12.2     Minority Holders are required to make or give the representations and warranties as to title and capacity of the Shares and a leakage indemnity or covenant.  The Super Majority Holder is responsible for the costs of the Squeeze-Out Offer.

12.3     The Squeeze-Out Offer must set out the number of Shares to be transferred by each Minority Holder, the name and address of the Super Majority Holder, the proposed amount, if any, and form of consideration and any other terms and conditions of payment offered for the Shares. Consideration for the Shares must be in cash.

12.4     The Squeeze-Out Offer must specify a date, time and place for the Minority Holders to execute transfers in respect of their Shares, being a date which is not less than eight Business Days after the date of the Squeeze-Out Offer.  The Squeeze-Out Offer shall be valid for  (i) 90 days; or (ii) if completion is subject to conditions, 60 days from the earlier of: (a) satisfaction of such conditions; and (b) the long stop date in the relevant  Sale and Purchase Agreement .

12.5     If a Minority Holder does not, within five  Business Days of the date of the Squeeze-Out Offer (or on the date specified in the Squeeze-Out Offer if later than five Business Days after the date of the Squeeze-Out Offer) execute transfers in respect of its Shares, then the Board is entitled to authorise and instruct such person  as it thinks fit to execute, complete and deliver the necessary transfer(s) as agent on the Minority Holder's behalf on the same terms as those set out in the Squeeze-Out Offer and, against receipt by the Company (on trust for the member) of the consideration payable for the Shares, deliver the transfer(s) to the Super Majority Holder (or its nominee) and register the Super Majority Holder (or its nominee) as the holder of those Shares.  After the Super Majority Holder or its nominee has been registered as the holder the validity of such proceedings may not be questioned by any person.  The Company will deliver the consideration payable for each Minority Holder's Shares held on trust in accordance with this Article for a member to that member as soon as practicable following the delivery to the Company by that member of his original share certificate (if any) in respect of such Shares or an indemnity for a lost share certificate in a form reasonably acceptable to the Chairperson.

12.6     Subject to Article 12.7, unless the Chairperson otherwise agrees in writing, any Shares held by a Minority Holder on the date of a Squeeze-Out Offer (and any Shares acquired by a Minority Holder from time to time thereafter, whether by virtue of the exercise of any right or option granted or arising by virtue of the holding of Shares by the Minority Holder, or otherwise) shall immediately on failure by the holder of such Shares to comply with this Article 12:

(a)      (automatically cease to confer the right to receive notice of or to attend or vote (either in person or by proxy and whether on a poll or on a show of hands) at any general meeting of the Company or (subject to the Law) at any meeting of the holders of any class of Shares in the capital of the Company with effect from the date of the Squeeze-Out Offer (or the date of acquisition of such Shares, if later); and

(b)      not be counted in determining the total number of votes which may be cast at any such meeting, or required for the purposes of a written resolution of any member or any class of members, or for the purposes of any other consent required under these Articles.

13

12.7    The rights referred to in Article 12.6 shall be restored immediately upon the transfer of the Shares in accordance with the Squeeze-Out Offer.

12.8    Following the issue of a Squeeze-Out Offer, if any person becomes a New Member, a Squeeze-Out Offer is deemed to have been served upon the New Member on the same terms as the previous Squeeze-Out Offer. The New Member will be bound to sell and transfer all such Shares acquired by him or it to the Super Majority Holder or as the Super Majority Holder may direct and the provisions of this Article 12 shall apply (with necessary modifications) to the New Member save that completion of the sale of such Shares shall take place immediately following the registration of the New Member as a Shareholder.

## 13    Redemption, Repurchase and Surrender of Shares

13.1    Subject to the Law and the Investment Agreement, the Company may issue Shares that are to be redeemed or are liable to be redeemed at the option of the Shareholder or the Company. The redemption of such Shares shall be effected in such manner and upon such other terms as the Company may subject to the Investment Agreement, by Special Resolution, determine before the issue of the Shares.

13.2    Subject to the provisions of the Law and the Investment Agreement, the Company may purchase its own Shares (including any redeemable Shares) in such manner and on such other terms as the Directors may agree with the relevant Shareholder, provided that such purchase of shares shall be on a pari passu basis.

13.3    Subject to the Investment Agreement, the Company may make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Law, including out of capital provided that such redemption or purchase of shares is on a pari passu basis.

13.4    The Directors may accept the surrender for no consideration of any fully paid Share.

## 14    Treasury Shares

14.1    Subject to the terms of an Ordinary Resolution to hold Shares as Treasury Shares as required by the Law, the Directors may, prior to the purchase, redemption or surrender of any Share, determine that such Share shall be held as a Treasury Share.

14.2    The Directors may determine to cancel a Treasury Share or transfer a Treasury Share on such terms as they think proper (including, without limitation, for nil consideration).

## 15    Rights and Restrictions Attaching to A Ordinary Shares

15.1    The rights and restrictions attaching to the A Ordinary Shares are as set out in this Article 15.

### Income

15.2    The monies which are available for distribution by the Company shall be distributed in accordance with the Law by way of distribution among the holders of the A Ordinary Shares pro rata to the number of A Ordinary Shares held by them.

### Capital

15.3    Upon a winding-up of the Company, or any other return of capital, the assets of the Company remaining after payment of its debts and liabilities and of the costs, charges and expenses of such winding-up or return of capital shall be divided between the holders of the A Ordinary Shares pro rata to the number of A Ordinary Shares held by them.

14

**Sale or Listing**

15.4    On a Sale or Listing, including any Proposed Drag-Along Sale or Proposed Tag-Along Transfer the proceeds of Sale or Listing of the issued share capital must be applied in the same manner as for capital set out in Article 15.3.

**Determination of voting thresholds**

15.5    If the Major Shareholder(s) hold in aggregate 30% or more of the A Ordinary Shares in issue, then:

(a)    each Major Shareholder Nominee and Major Shareholder, if no election has been made,:

(i)    is entitled to receive notice of, and to attend and vote at, general meetings of the Company; and

(ii)    who is an individual (present in person or by proxy) or a corporate entity (present by a duly authorised representative or by proxy) or, if not present as aforesaid, whose beneficiary is present in person, by authorised representative or proxy, has:

(A)    on a show of hands, one vote; or

(B)    on a poll, one vote for each A Ordinary Share of which that person (taken together with their Affiliates if a Major Shareholder Nominee) is the holder;

(b)    holders of A Ordinary Shares who hold less than 5% of the A Ordinary Shares in issue shall not be entitled to receive notice of, attend or vote at general meetings of the Company.

15.6    If there are no Major Shareholders, then the 5% threshold for qualification as a Major Shareholder shall be reduced to such percentage as would deliver no fewer than three Major Shareholders.

15.7    If the Major Shareholder(s) in aggregate hold less than 30% of the A Ordinary Shares in issue, then each holder of A Ordinary Shares:

(a)    is entitled to receive notice of, and to attend and vote at, general meetings of the Company; and

(b)    who is an individual (present in person or by proxy) or a corporate entity (present by a duly authorised representative or by proxy) or, if not present as aforesaid, whose beneficiary is present in person, by authorised representative or proxy, has:

(i)    on a show of hands, one vote; or

(ii)    on a poll, one vote for each A Ordinary Share of which that person (taken together with their Affiliates if a Major Shareholder Nominee) is the holder,

and each matter expressed herein or in the Investment Agreement as requiring Major Shareholder Majority approval shall be determined by the passing of a resolution by a majority, or where required by the Law, 66⅔, of the A Ordinary Shares in issue.

15

15.8    Notwithstanding the provisions of Articles 15.5 to 15.7 all holders of A Ordinary Shares shall be entitled to vote on a resolution of the Company in respect of certain undertakings, in accordance with the Investment Agreement.

## Prevention of Unintentional Control

15.9    Each person who actively acquires (through transfer or subscription) further A Ordinary Shares after Completion shall be responsible for: (i) determining whether any anti-trust or foreign direct investment filings need to be made in respect of such acquisition(s); and (ii) obtaining all required consents, approvals and acknowledgements before proceeding with any such acquisition(s).

15.10    Neither the Company nor its Transfer Agent shall be required to register any transfer of Shares or proceed with any issue of Shares (as applicable) in Article 15.7 above unless and until all such required consents, approvals and acknowledgements (as applicable) have been obtained.

15.11    If:

(a)    a Major Shareholder at any time makes an election pursuant to Article 15.12;

(b)    any Major Shareholder(s) sells such number of A Ordinary Shares after Completion; or

(c)    any person would be transferred or issued A Ordinary Shares on Completion,

and which would, in the case of any of (a), (b) and (c) lead to one or more Major Shareholders gaining control of 25% or more of the A Ordinary Shares eligible to vote (each such Major Shareholder being a "**Controlling Shareholder**"), then immediately prior to any such election, sell down, issue or acquisition the 5% threshold (subject to any adjustment that may have previously been made pursuant to this Article 15.11) for voting rights on A Ordinary Shares shall automatically be deemed to have been reduced to such a level that: (i) the potentially Controlling Shareholder does not become a Controlling Shareholder; (ii) any Shareholder holding less than 5% of the voting rights on A Ordinary Shares does not, by way of operation of this Article 15.11, hold 5% or more of the voting rights on A Ordinary Shares; and (iii) any Shareholder holding 5% or more but less than 25% of the voting rights on A Ordinary Shares does not, by way of operation of this Article 15.11, vary its percentage of voting rights on Ordinary Shares unless it has previously consented to the same, until the earlier of:

(d)    provided the relevant merger clearance or foreign direct investment approval or acknowledgement has been obtained, that potentially Controlling Shareholder notifying the Company that it wishes to be a Controlling Shareholder; or

(e)    other Shareholders increasing their shareholding such that the potentially Controlling Shareholder ceases to be a potentially Controlling Shareholder,

whereupon, in the case of each of (a) and (b), the 5% threshold for voting rights shall be automatically reinstated (subject to any adjustment that may have previously been made pursuant to this Article 15.11 which shall be retained).

## Voluntary capping of voting rights

15.12    Major Shareholders may, at any time by notice to the Company, elect to have the votes attributable to its A Ordinary Shares capped at a percentage set out in such notice, and the votes of the other Major Shareholders will be increased accordingly.

## Notification of shareholdings

16

**1459**

15.13   If as a result of any change in the shareholding of any Shareholder which, when taken with the A Ordinary Shares held by its Affiliates, would alter its status such that it (together with its Affiliates) would become, or cease to be, any of the following: (i) a Major Shareholder; (ii) a 5% Shareholder; (iii) a Substantial Shareholder; (iv) a Controlling Shareholder; (v) a Super Majority Holder; (vi) a holder of either 50%, 60%, 70% or 80% of A Ordinary Shares in the Company; or (vii) a 1% Holder, the Company shall procure that the Transfer Agent, notify the Major Shareholders and the Company within three Business Days to ensure appropriate steps are taken regarding voting rights.

15.14   The Company shall procure that the Transfer Agent notifies each Shareholder whose voting rights have been adjusted of their adjusted voting right percentage in accordance with Articles 15.11 to 15.12 as soon as reasonably practicable, and in any event within four Business Days of such adjustment.

## Class Rights

15.15   If there is more than one class of Shares in issue at any time, any amendment to the rights of any class may be passed by Ordinary Resolution.

## 16   Commission on Issue or Sale of Shares

The Company may, in so far as the Law permits, pay a commission to any person in consideration of his subscribing or agreeing to subscribe (whether absolutely or conditionally) or procuring or agreeing to procure subscriptions (whether absolutely or conditionally) for any Shares. Such commissions may be satisfied by the payment of cash and/or the issue of fully or partly paid-up Shares. The Company may also on any issue of Shares pay such brokerage as may be lawful.

## 17   Non Recognition of Trusts

The Company shall not be bound by or compelled to recognise in any way (even when notified) any equitable, contingent, future or partial interest in any Share, or (except only as is otherwise provided by the Articles or the Law) any other rights in respect of any Share other than an absolute right to the entirety thereof in the holder.

## 18   Lien on Shares

18.1   The Company shall have a first and paramount lien on all unpaid or part paid Shares registered in the name of a Shareholder (whether solely or jointly with others) for all debts, liabilities or engagements to or with the Company (whether presently payable or not) by such Shareholder or his estate, either alone or jointly with any other person, whether a Shareholder or not, but the Directors may at any time declare any Share to be wholly or in part exempt from the provisions of this Article.  The registration of a transfer of any such Share shall operate as a waiver of the Company's lien thereon.  The Company's lien on a Share shall also extend to any amount payable in respect of that Share.

18.2   The Company may sell, in such manner as the Directors think fit, any Shares on which the Company has a lien, if a sum in respect of which the lien exists is presently payable, and is not paid within 14 clear days after notice has been received or deemed to have been received by the holder of the Shares, or to the person entitled to it in consequence of the death or bankruptcy of the holder, demanding payment and stating that if the notice is not complied with the Shares may be sold.

18.3   To give effect to any such sale the Directors may authorise any person to execute an instrument of transfer of the Shares sold to, or in accordance with the directions of, the purchaser.  The purchaser or his nominee shall be registered as the holder of the Shares comprised in any such

17

transfer, and he shall not be bound to see to the application of the purchase money, nor shall his title to the Shares be affected by any irregularity or invalidity in the sale or the exercise of the Company's power of sale under the Articles.

18.4    The net proceeds of such sale after payment of costs, shall be applied in payment of such part of the amount in respect of which the lien exists as is presently payable and any balance shall (subject to a like lien for sums not presently payable as existed upon the Shares before the sale) be paid to the person entitled to the Shares at the date of the sale.

18.5    Any lien on any Shares (whether part or fully paid) which the Company has shall not apply in respect of any Shares that have been charged by way of security to a secured party.

## 19    Call on Shares

19.1    Subject to the terms of the allotment and issue of any Shares, the Directors may make calls upon the Shareholders in respect of any monies unpaid on their Shares (whether in respect of par value or premium), and each Shareholder shall (subject to receiving at least 14 clear days' notice specifying the time or times of payment) pay to the Company at the time or times so specified the amount called on the Shares.  A call may be revoked or postponed, in whole or in part,  as the Directors may determine.  A call may be required to be paid by instalments. A person upon whom a call is made shall remain liable for calls made upon him notwithstanding the subsequent transfer of the Shares in respect of which the call was made.

19.2    A call shall be deemed to have been made at the time when the resolution of the Directors authorising such call was passed.

19.3    The joint holders of a Share shall be jointly and severally liable to pay all calls in respect thereof.

19.4    If a call remains unpaid after it has become due and payable, the person from whom it is due shall pay interest on the amount unpaid from the day it became due and payable until it is paid at such rate as the Directors may determine (and in addition all expenses that have been incurred by the Company by reason of such non-payment), but the Directors may waive payment of the interest or expenses wholly or in part.

19.5    An amount payable in respect of a Share on issue or allotment or at any fixed date, whether on account of the par value of the Share or premium or otherwise, shall be deemed to be a call and if it is not paid all the provisions of the Articles shall apply as if that amount had become due and payable by virtue of a call.

19.6    The Directors may issue Shares with different terms as to the amount and times of payment of calls, or the interest to be paid.

19.7    The Directors may, if they think fit, receive an amount from any Shareholder willing to advance all or any part of the monies uncalled and unpaid upon any Shares held by him, and may (until the amount would otherwise become payable) pay interest at such rate as may be agreed upon between the Directors and the Shareholder paying such amount in advance.

19.8    No such amount paid in advance of calls shall entitle the Shareholder paying such amount to any portion of a Dividend or other distribution payable in respect of any period prior to the date upon which such amount would, but for such payment, become payable.

## 20    Forfeiture of Shares

20.1    If a call or instalment of a call remains unpaid after it has become due and payable the Directors may give to the person from whom it is due not less than 14 clear days' notice requiring payment

18

**1461**

of the amount unpaid together with any interest which may have accrued, and any expenses incurred by the Company by reason of such non-payment. The notice shall specify where payment is to be made and shall state that if the notice is not complied with the Shares in respect of which the call was made will be liable to be forfeited.

20.2    If the notice is not complied with, any Share in respect of which it was given may, before the payment required by the notice has been made, be forfeited by a resolution of the Directors. Such forfeiture shall include all Dividends, other distributions or other monies payable in respect of the forfeited Share and not paid before the forfeiture.

20.3    A forfeited Share may be sold, re-allotted or otherwise disposed of on such terms and in such manner as the Directors think fit and at any time before a sale, re-allotment or disposition the forfeiture may be cancelled on such terms as the Directors think fit. Where for the purposes of its disposal a forfeited Share is to be transferred to any person the Directors may authorise some person to execute an instrument of transfer of the Share in favour of that person.

20.4    A person any of whose Shares have been forfeited shall cease to be a Shareholder in respect of them and shall surrender to the Company for cancellation the certificate for the Shares (if any) forfeited and shall remain liable to pay to the Company all monies which at the date of forfeiture were payable by him to the Company in respect of those Shares together with interest at such rate as the Directors may determine, but his liability shall cease if and when the Company shall have received payment in full of all monies due and payable by him in respect of those Shares.

20.5    A certificate in writing under the hand of one Non-Executive Director of the Company that a Share has been forfeited on a specified date shall be conclusive evidence of the facts stated in it as against all persons claiming to be entitled to the Share. The certificate (if any) shall (subject to the execution of an instrument of transfer) constitute a good title to the Share and the person to whom the Share is sold or otherwise disposed of shall not be bound to see to the application of the purchase money, if any, nor shall his title to the Share be affected by any irregularity or invalidity in the proceedings in reference to the forfeiture, sale or disposal of the Share.

20.6    The provisions of the Articles as to forfeiture shall apply in the case of non payment of any sum which, by the terms of issue of a Share, becomes payable at a fixed time, whether on account of the par value of the Share or by way of premium as if it had been payable by virtue of a call duly made and notified.

## 21    Transmission of Shares

21.1    If a Shareholder dies the survivor or survivors (where he was a joint holder) or his executor, administrator or legal personal representatives (where he was a sole holder), shall be the only persons recognised by the Company as having any title to his Shares. The estate of a deceased Shareholder is not thereby released from any liability in respect of any Share, for which he was a joint or sole holder.

21.2    Any person becoming entitled to a Share in consequence of the death or bankruptcy or liquidation or dissolution of a Shareholder (or in any other way than by transfer) may, upon such evidence being produced as may be required by the Directors, elect, by a notice in writing sent by him to the Company, either to become the holder of such Share or to have some person nominated by him registered as the holder of such Share. If he elects to have another person registered as the holder of such Share he shall sign an instrument of transfer of that Share to that person. The Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the relevant Shareholder before his death or bankruptcy or liquidation or dissolution, as the case may be.

19

**1462**

21.3    A person becoming entitled to a Share by reason of the death or bankruptcy or liquidation or dissolution of a Shareholder (or in any other case than by transfer) shall be entitled to the same Dividends, other distributions and other advantages to which he would be entitled if he were the holder of such Share. However, he shall not, before becoming a Shareholder in respect of a Share, be entitled in respect of it to exercise any right conferred by membership in relation to general meetings of the Company and the Directors may at any time give notice requiring any such person to elect either to be registered himself or to have some person nominated by him registered as the holder of the Share (but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the relevant Shareholder before his death or bankruptcy or liquidation or dissolution or any other case than by transfer, as the case may be). If the notice is not complied with within 90 days of being received or deemed to be received (as determined pursuant to the Articles) the Directors may thereafter withhold payment of all Dividends, other distributions, bonuses or other monies payable in respect of the Share until the requirements of the notice have been complied with.

## 22    Amendments of Memorandum and Articles of Association and Alteration of Capital

22.1    Subject to the Investment Agreement, the Company may by Special Resolution:

   (a)    increase its share capital by such sum as the Special Resolution shall prescribe and with such rights, priorities and privileges as may be set out in the Special Resolution;

   (b)    consolidate and divide all or any of its share capital into Shares of larger amount than its existing Shares;

   (c)    convert all or any of its paid-up Shares into stock, and reconvert that stock into paid-up Shares of any denomination;

   (d)    by subdivision of its existing Shares or any of them divide the whole or any part of its share capital into Shares of smaller amount than is fixed by the Memorandum;

   (e)    convert its status to that of a no par value company;

   (f)    cancel any Shares that at the date of the passing of the Special Resolution have not been taken or agreed to be taken by any person and diminish the amount of its share capital by the amount of the Shares so cancelled;

   (g)    change its name;

   (h)    alter or add to the Articles;

   (i)    alter or add to the Memorandum; and

   (j)    reduce its share capital or any capital redemption reserve fund.

22.2    All new Shares created in accordance with the provisions of the preceding Article shall be subject to the same provisions of the Articles with reference to the payment of calls, liens, transfer, transmission, forfeiture and otherwise as the Shares in the original share capital.

## 23    Offices and Places of Business and Residence

Subject to the provisions of the Law, the Company may by resolution of the Directors change the location of its Registered Office. The Company may, in addition to its Registered Office, maintain such other offices or places of business as the Directors determine provided that the

20

**1463**

management and control of the Company remains within the United Kingdom. Notwithstanding anything else in these Articles, the Company will be solely resident for tax purposes in the United Kingdom and shall be governed in a manner to ensure that its residence for tax purposes remains solely in the United Kingdom.

## 24    General Meetings

24.1    Subject to the agreement of all Shareholders to waive the requirement to hold annual general meetings, the Company shall not be required to hold annual general meetings, unless the Company determines otherwise by way of Special Resolution.

24.2    All general meetings shall be called extraordinary general meetings.

24.3    The Directors may call general meetings, and they shall on a Shareholders' requisition forthwith proceed to convene an extraordinary general meeting of the Company within 5 Business Days of the date of the deposit of the requisition, such extraordinary general meeting to be held within a further 10 Business Days.

24.4    A Shareholders' requisition is a requisition of at least 10% or more of the Shares held by Major Shareholder(s) who are entitled to receive notice of, and attend and vote at general meetings of the Company, in accordance with Articles 15.5 to 15.8 (inclusive).

24.5    The Shareholders' requisition must state the objects of the meeting and must be signed by the requisitionists and deposited at the Registered Office, and may consist of several documents in like form each signed by one or more requisitionists.

24.6    If there are no Directors as at the date of the deposit of the Shareholders' requisition or if the Directors do not within 5 Business Days from the date of the deposit of the Shareholders' requisition duly proceed to convene a general meeting to be held within a further 10 Business Days, the requisitionists, or any of them representing more than one-half of the total voting rights of all of the requisitionists, may themselves convene a general meeting, but any meeting so convened shall be held no later than the day which falls three months after the expiration of the said 10 Business Day period.

24.7    A general meeting convened as aforesaid by requisitionists shall be convened in the same manner as nearly as possible as that in which general meetings are to be convened by Directors.

## 25    Notice of General Meetings

25.1    Subject to the Investment Agreement, at least 14 clear days' notice shall be given of any general meeting, including any general meeting at which a Special Resolution is proposed. Every notice shall specify the place, the day and the hour of the meeting and the general nature of the business to be conducted at the general meeting and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this Article has been given and whether or not the provisions of the Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

(a)    in the case of an annual general meeting, by all of the Shareholders entitled to attend and vote thereat; and

(b)    in the case of an extraordinary general meeting, by a majority in number of the Shareholders having a right to attend and vote at the meeting, together holding not less than 90% in par value of the Shares giving that right.

21

25.2    The accidental omission to give notice of a general meeting to, or the non receipt of notice of a general meeting by, any person entitled to receive such notice shall not invalidate the proceedings of that general meeting.

## 26    Proceedings at General Meetings

26.1    Subject to the Investment Agreement, no business shall be transacted at any general meeting unless a quorum is present. The holders of 50% of the shares held by Major Shareholders Majority present in person or by proxy or if a corporation or other non-natural person by its duly authorised representative or proxy shall be a quorum unless the Company has only one Shareholder entitled to vote at such general meeting in which case the quorum shall be that one shareholder present in person or by proxy or (in the case of a corporation or other non-natural person) by its duly authorised representative or proxy.

26.2    A person may participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other. Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

26.3    Subject to the Investment Agreement, Shareholders may pass a written resolution without holding a meeting of the Members provided that:

(a)    all Shareholders entitled to vote on such resolution receive:

(i)    a copy of the resolution;

(ii)    a statement informing them:

(A)    how to signify agreement to the resolution; and

(B)    the date by which the resolution must be passed if it is not to lapse (as set out in Article 26.3(c));

(b)    the majority of Shareholders as specified for an Ordinary Resolution or a Special Resolution to be passed (as applicable):

(i)    sign a document; or

(ii)    sign several documents (counterparts) in the like form each signed by one or more of those Shareholders which may be circulated by email; and

and, in which case, such written resolution shall be effective as if it had been passed at a meeting of all Shareholders entitled to vote duly convened and held. To avoid any doubt whatsoever, valid and effective resolutions in writing made in accordance with this Article need not be unanimous.

(c)    if a proposed written resolution has not been passed by the requisite majority in this Article within 20 Business Days of it being proposed, the resolution will fail and all counterparts signed or approved by one or more Shareholders shall cease to be valid,

26.4    If a quorum is not present within half an hour from the time appointed for the meeting to commence or if during such a meeting a quorum ceases to be present, the meeting, if convened upon a Shareholders' requisition, shall be dissolved and in any other case it shall stand adjourned to the same day in the next week at the same time and/or place or to such other day, time and/or place as the Directors may determine, and if at the adjourned meeting a quorum is

22

**1465**

not present within half an hour from the time appointed for the meeting to commence, the Shareholders present shall be a quorum.

26.5    The Chairperson of the Board shall also act as a Chair of the general meeting.

26.6    If the Chairperson is not present, and if no director is present and willing to act within fifteen minutes after the time appointed for the meeting to commence, the Shareholders present shall choose one of their number to be Chairperson of the meeting.

26.7    The Chairperson may, with the consent of a meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

26.8    When a general meeting is adjourned for 30 days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Otherwise it shall not be necessary to give any such notice of an adjourned meeting.

26.9    Subject to Articles 15.5 - 15.7 (inclusive), a resolution put to the vote of the meeting shall be decided on a show of hands unless before, or on the declaration of the result of, the show of hands, the Chairperson demands a poll, or (ii) any other Shareholder or Shareholders collectively present in person or by proxy (or in the case of a corporation or other non-natural person, by its duly authorised representative or proxy) and holding at least 10% in par value of the Shares giving a right to attend and vote at the meeting; or (ii) not less than five Shareholders present and having a right to vote at the meeting demand a poll.

26.10    Unless a poll is duly demanded and the demand is not withdrawn a declaration by the Chairperson that a resolution has been carried or carried unanimously, or by a particular majority, or lost or not carried by a particular majority, an entry to that effect in the minutes of the proceedings of the meeting shall be conclusive evidence of that fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

26.11    The demand for a poll may be withdrawn.

26.12    Except on a poll demanded on the election of a Chairperson or on a question of adjournment, a poll shall be taken as the Chairperson directs, and the result of the poll shall be deemed to be the resolution of the general meeting at which the poll was demanded.

26.13    A poll demanded on the election of a Chairperson or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such date, time and place as the Chairperson of the general meeting directs, and any business other than that upon which a poll has been demanded or is contingent thereon may proceed pending the taking of the poll.

26.14    In the case of an equality of votes, whether on a show of hands or on a poll, the Chairperson shall be entitled to a second or casting vote.

26.15    A person may participate in a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other at the same time. Participation by a person in a meeting in this manner is treated as presence in person at that meeting. Unless otherwise determined by the Directors the meeting shall be deemed to be held at the place specified in the notice of the meeting.

23

## 27    Votes of Members

27.1    In the case of joint holders the vote of the senior holder who tenders a vote, whether in person or by proxy (or, in the case of a corporation or other non-natural person, by its duly authorised representative or proxy), shall be accepted to the exclusion of the votes of the other joint holders, and seniority shall be determined by the order in which the names of the holders stand in the Register of Members.

27.2    A Shareholder of unsound mind, or in respect of whom an order has been made by any court, having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by his committee, receiver, *curator bonis*, or other person on such Shareholder's behalf appointed by that court, and any such committee, receiver, *curator bonis* or other person may vote by proxy.

27.3    No person shall be entitled to vote at any general meeting unless he is registered as a Shareholder on the record date for such meeting nor unless all calls or other monies then payable by him in respect of Shares have been paid.

27.4    No objection shall be raised as to the qualification of any voter except at the general meeting or adjourned general meeting at which the vote objected to is given or tendered and every vote not disallowed at the meeting shall be valid.  Any objection made in due time in accordance with this Article shall be referred to the chairperson whose decision shall be final and conclusive.

27.5    On a poll or on a show of hands votes may be cast either personally or by proxy (or in the case of a corporation or other non-natural person by its duly authorised representative or proxy). A Shareholder may appoint more than one proxy or the same proxy under one or more instruments to attend and vote at a meeting. Where a Shareholder appoints more than one proxy the instrument of proxy shall state which proxy is entitled to vote on a show of hands and shall specify the number of Shares in respect of which each proxy is entitled to exercise the related votes.

27.6    On a poll, a Shareholder holding more than one Share need not cast the votes in respect of his Shares in the same way on any resolution and therefore may vote a Share or some or all such Shares either for or against a resolution and/or abstain from voting a Share or some or all of the Shares and, subject to the terms of the instrument appointing him, a proxy appointed under one or more instruments may vote a Share or some or all of the Shares in respect of which he is appointed either for or against a resolution and/or abstain from voting a Share or some or all of the Shares in respect of which he is appointed.

## 28    Proxies

28.1    The instrument appointing a proxy shall be in writing and shall be executed under the hand of the appointor or of his attorney duly authorised in writing, or, if the appointor is a corporation or other non natural person, under the hand of its duly authorised representative.   A proxy need not be a Shareholder.

28.2    The Directors may, in the notice convening any meeting or adjourned meeting, or in an instrument of proxy sent out by the Company, specify the manner by which the instrument appointing a proxy shall be deposited and the place and the time (being not later than the time appointed for the commencement of the meeting or adjourned meeting to which the proxy relates) at which the instrument appointing a proxy shall be deposited.  In the absence of any such direction from the Directors in the notice convening any meeting or adjourned meeting or in an instrument of proxy sent out by the Company, the instrument appointing a proxy shall be deposited physically at the Registered Office not less than 48 hours before the time appointed for the meeting or adjourned meeting to commence at which the person named in the instrument proposes to vote.  Provided always that no account shall be taken of any day or part thereof

which is not a "working day" for the purposes of Article 96(4B) of the Law in determining such 48 hour period.

28.3   The Chairperson may in any event at his discretion declare that an instrument of proxy shall be deemed to have been duly deposited.  An instrument of proxy that is not deposited in the manner permitted, or which has not been declared to have been duly deposited by the chairperson, shall be invalid.

28.4   The instrument appointing a proxy may be in any usual or common form (or such other form as the Directors may approve) and may be expressed to be for a particular meeting or any adjournment thereof or generally until revoked.  An instrument appointing a proxy shall be deemed to include the power to demand or join or concur in demanding a poll.

28.5   Votes given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the transfer of the Share in respect of which the proxy is given unless notice in writing of such death, insanity, revocation or transfer was received by the Company at the Registered Office before the commencement of the general meeting, or adjourned meeting at which it is sought to use the proxy.

## 29   Corporate Shareholders

Any corporation or other non-natural person which is a Shareholder may in accordance with its constitutional documents, or in the absence of such provision by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of Shareholders, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as the corporation could exercise if it were an individual Shareholder.  The Directors or chairperson of the meeting may require a representative of a non-natural person to produce certified copy evidence of their authority to act.

## 30   Shares that May Not be Voted

Shares in the Company that are beneficially owned by the Company as Treasury Shares or otherwise shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding Shares at any given time.

## 31   Directors

31.1   There shall be a board of Directors consisting of not less than five persons (exclusive of alternate Directors) provided however that the Company may by Ordinary Resolution increase or reduce the limits in the number of Directors.  The Directors of the Company shall be determined in writing by, or appointed by a resolution of, the Majority Shareholders and shall consist of a majority of which are the Non-Executive Directors.

31.2   At all time, there shall not be a majority of directors on the Board, including the Non-Executive Directors, tax resident in a particular jurisdiction other than the United Kingdom. To the extent that a Director, which is tax resident in the UK, appoints an alternate director, such alternate director shall be tax resident in the United Kingdom.

## 32   Powers of Directors

32.1   Subject to the provisions of the Law, the Memorandum, the Investment Agreement and the Articles and to any directions given by Special Resolution, the business of the Company shall be managed by the Directors who may exercise all the powers of the Company.  No alteration of the Memorandum or Articles and no such direction shall invalidate any prior act of the

25

Directors which would have been valid if that alteration had not been made or that direction had not been given. A duly convened meeting of Directors at which a quorum is present may exercise all powers exercisable by the Directors.

32.2    All cheques, promissory notes, drafts, bills of exchange and other negotiable or transferable instruments and all receipts for monies paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed as the case may be in such manner as the Directors shall determine by resolution.

32.3    The Directors on behalf of the Company may pay a gratuity or pension or allowance on retirement to any Director who has held any other salaried office or place of profit with the Company or to his widow or dependants and may make contributions to any fund and pay premiums for the purchase or provision of any such gratuity, pension or allowance.

32.4    The Directors may, subject to the terms and conditions of the Finance Documents and the approval from the Major Shareholder Majority, exercise all the powers of the Company to borrow money and to mortgage, create a security interest over or charge its undertaking, property and assets (present and future) and uncalled capital or any part thereof and to issue debentures, debenture stock, mortgages, bonds and other such securities whether outright or as security for any debt, liability or obligation of the Company or of any third party.

## 33    Appointment of Directors

33.1    The Company may by Ordinary Resolution appoint any person to be a Director or may by Ordinary Resolution remove any Director.

33.2    The Directors may, subject prior approval of a majority of the Non-Executive Directors on the Board, procure the appointment of any person to be a director of a Group Member other than the Company, either to fill a vacancy or as an additional director.

## 34    Non-Executive Directors

34.1    In addition to all other rights the Substantial Shareholders may have as Shareholders, each Substantial Shareholder is entitled by written notice to the Company, to request that new directors are appointed to the Board, by proposing a list of independent directors for appointment to the board (a "**Slate**"). Upon receipt of a Slate from a Substantial Shareholder, the Company will promptly send the Slate to all Major Shareholders, who may either, if they are a Substantial Shareholder or are acting together such that as a group they constitute a Substantial Shareholder, (i) propose an alternative Slate within 10 Business Days of receipt, or (ii) waive the 10 Business Day period. Within two Business Days of expiry of the initial 10 Business Day period or receipt of waivers from the Major Shareholders, as the case may be, the Company (or failing which the Major Shareholder) shall circulate any Slate(s) to the Major Shareholders for approval by Major Shareholder Majority. Once approved the appointment or approval shall be automatic, subject to receipt by the Company of KYC. A maximum of one Slate may be approved at any one time, and the nominating Substantial Shareholder(s) shall be entitled to vote on the proposed Slate(s), including the Slate which that Substantial Shareholder has itself proposed. If a Slate is not approved or is rejected in favour of a differing Slate, the Substantial Shareholder who proposed such Slate may not nominate a further Slate for a period of 12 months. If a Slate is accepted, the independent directors named therein shall be appointed and any existing independent director who is not named on the Slate shall be removed from office. For the avoidance of doubt, a Substantial Shareholder who has a Slate approved shall not be prohibited from proposing future Slate(s) unless and until any such Slate(s) are rejected. Each director appointed in accordance with this Article 34.1 will be a "**Non-Executive Director**".

34.2    Notwithstanding the provisions of Article 34.1, if the Slate proposed is accompanies by, or takes the form of, a resolution already passed by a Major Shareholder Majority, such appointments (and any resignations) shall become effective automatically upon delivery of the resolution to the Company.

## 35    CEO and CFO

35.1    The Group's CEO and CFO from time to time shall both be appointed as directors of the Company.

## 36    Chairperson

36.1    In addition to all other rights the Major Shareholders may have as Shareholders, any Major Shareholder is entitled by written notice to the Company from time to time to propose the appointment of any Non-Executive Director as the Chairperson. The Company shall, within four Business Days of receipt of such notice, circulate a resolution to the Major Shareholders to approve or reject the appointment of such Chairperson by Major Shareholder Majority.

36.2    The Company must pay or procure the payment by another Group Member to the Non-executive Directors and Chairperson each year market-standard fees for each such Director as are proposed by the Remuneration Committee and approved by the Major Shareholder Majority, together with any reasonable, documented expenses properly incurred by the Non-Executive Directors and Chairperson in proper fulfilment of their duties and in accordance with the Company's expenses policy.

36.3    Any Director may be removed from office at any time by a decision of the Major Shareholder Majority, provided that this Article 36.3 shall be without prejudice to the terms and conditions of their employment with any Group Member.

## 37    Observer

Any Substantial Shareholder may from time to time appoint an observer (the "**Observer**") to attend meetings of the Board (and its committees). The Observer must be given (at the same time as the relevant directors) notice of all meetings of the directors and all agendas, minutes and other papers relating to those meetings. The Observer may speak at meetings and require business to be added to the agenda but may not in any circumstances vote on any matter. The Company must reimburse all reasonable, documented expenses properly incurred by the Observer in in proper fulfilment of their duties and in accordance with the Company's expenses policy.

## 38    Appointment to subsidiary undertaking boards and committees

If a resolution is passed by a Major Shareholder Majority, each Shareholder shall direct that the Board and the Company, to the extent permitted by applicable law procure that some or all of the Non-Executive Directors are appointed to the board of directors (or equivalent body) of any Group Member other than the Company and to any committee (or equivalent body) of a Group Member (including the Audit Committee and the Remuneration Committee).

## 39    Vacation of Office of Director

The office of a Director shall be vacated if:

(a)    the Director gives notice in writing to the Company that he resigns the office of Director; or

27

**1470**

(b)     the Director is removed from office at any time by a decision of the Major Shareholder Majority, in accordance with Article 34.3; or

(c)     the Director absents himself (for the avoidance of doubt, without being represented by proxy or an alternate Director appointed by him) from three consecutive meetings of the board of Directors without special leave of absence from the Directors, and the Directors pass a resolution that he has by reason of such absence vacated office; or

(d)     the Director dies, becomes bankrupt or makes any arrangement or composition with his creditors generally; or

(e)     the Director ceases to be a director pursuant to the Law or is disqualified or prohibited from acting as a Director whether pursuant to the Law or otherwise; or

(f)     the Director is found to be or becomes of unsound mind.

## 40     Proceedings of Directors

40.1    The quorum for the transaction of the business of the Directors including any adjourned meetings of the Directors shall be a majority of the board of Directors. If a meeting of the Directors is not quorate, it shall be adjourned to the same time on the date which is no less than two but no greater than ten Business Days following the date of the original meeting. A person who holds office as an alternate Director shall, if his appointor is not present, be counted in the quorum. A Director who also acts as an alternate Director shall, if his appointor is not present, count twice towards the quorum.

40.2    Subject to the provisions of the Articles, the Directors may regulate their proceedings as they think fit. Each Director shall have one vote. In the case of an equality of votes, the Chairperson shall have a second or casting vote. A Director who is also an alternate Director shall be entitled in the absence of his appointor to a separate vote on behalf of his appointor in addition to his own vote.

40.3    A person may participate in a meeting of the Directors or any committee of Directors by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other at the same time provided that majority of the Directors are present in the United Kingdom. Participation by a person in a meeting in this manner is treated as presence in person at that meeting. Unless otherwise determined by the Directors the meeting shall be deemed to be held at the place where the chairperson is located at the start of the meeting.

40.4    A resolution in writing (in one or more counterparts) signed by all the Directors, or all the members of a committee of the Directors or, in the case of a resolution in writing relating to the removal of any Director or the vacation of office by any Director, all of the Directors other than the Director who is the subject of such resolution (an alternate Director being entitled to sign such a resolution on behalf of his appointor and if such alternate Director is also a Director, being entitled to sign such resolution both on behalf of his appointor and in his capacity as a Director) shall be as valid and effectual as if it had been passed at a meeting of the Directors, or committee of Directors as the case may be, duly convened and held provided that all such resolutions in writing are signed by Directors majority of which are present in the United Kingdom.

40.5    Board meetings shall be held at least six times during the period of 12 months starting on the date of the Investment Agreement, with no longer than three months between each Board meeting, and following such period Board meetings shall take place at least once per quarter. All Board meetings shall be held in the United Kingdom and majority of the board of Directors

**1471**

shall attend either in person or dial in from the United Kingdom. The Board shall send each Director, including each Executive Director and Non-Executive Director:

(a)     so far as is reasonably practicable to do so and save to the extent waived by at least half of the appointed Non-Executive Directors, not less than 10 Business Days' advance notice of each meeting of the Board or of a committee of the Board (including the Audit Committee and the Remuneration Committee) and not less than three Business Days before such meeting an agenda of the business to be transacted at such meeting (together with all papers to be circulated or presented to the same and no other business shall be transacted at such meeting without the consent of a majority of the Non-Executive Directors then present; and

(b)     as soon as practicable after each such meeting, a copy of the minutes,

provided however, no Executive Director who ceases to be an employee of any Group Member or who is suspended from employment shall be notified or entitled to participate in Board meetings or any meeting of any committee of the Board or receive a copy of Board papers or minutes of Board meetings or of meetings of any committee of the Board.

40.6    The continuing Directors (or a sole continuing Director, as the case may be) may act notwithstanding any vacancy in their body, but if and so long as their number is reduced below the number fixed by or pursuant to the Articles as the necessary quorum of Directors the continuing Directors or Director may act for the purpose of increasing the number of Directors to be equal to such fixed number, or of summoning a general meeting of the Company, but for no other purpose.

40.7    Subject to Article 34 and 36, the Directors may elect a chairperson of their board and determine the period for which he is to hold office; but if no such chairperson is elected, or if at any meeting the chairperson is not present within five minutes after the time appointed for the meeting to commence, the Directors present may choose one of their number to be chairperson of the meeting.

40.8    All acts done by any meeting of the Directors or of a committee of the Directors (including any person acting as an alternate Director) shall, notwithstanding that it is afterwards discovered that there was some defect in the appointment of any Director or alternate Director, and/or that they or any of them were disqualified, and/or had vacated their office and/or were not entitled to vote, be as valid as if every such person had been duly appointed and/or not disqualified to be a Director or alternate Director and/or had not vacated their office and/or had been entitled to vote, as the case may be.

40.9    A Director but not an alternate Director may be represented at any meetings of the board of Directors by a proxy appointed in writing by him. The proxy shall count towards the quorum and the vote of the proxy shall for all purposes be deemed to be that of the appointing Director.

## 41   Presumption of Assent

A Director or alternate Director who is present at a meeting of the board of Directors at which action on any Company matter is taken shall be presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent from such action with the person acting as the chairperson or secretary of the meeting before the adjournment thereof or shall forward such dissent by registered post to such person immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Director or alternate Director who voted in favour of such action.

29

## 42        Directors' Interests

42.1    A Director or alternate Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with his office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

42.2    A Director or alternate Director may act by himself or by, through or on behalf of his firm in a professional capacity for the Company and he or his firm shall be entitled to remuneration for professional services as if he were not a Director or alternate Director.

42.3    A Director or alternate Director may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as a shareholder, a contracting party or otherwise, and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by him as a director or officer of, or from his interest in, such other company.

42.4    No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by or arising in connection with any such contract or transaction by reason of such Director or alternate Director holding office or of the fiduciary relationship thereby established. A Director or alternate Director who has, directly or indirectly, an interest, including but not limited to, an interest specified in this Article 42.4 or Articles 42.1 to 42.3, in a transaction entered into or proposed to be entered into by the Company or by a subsidiary of the Company which to a material extent conflicts or may conflict with the interest of the Company and of which the Director or alternate Director is aware, shall disclose to the Company the nature and extent of his interest. A Director (or his alternate Director in his absence) shall be at liberty to vote and count to the quorum in respect of any contract or transaction in which he is interested, provided that the Director has disclosed any nature and extent of his conflict with the interest of the Company, and that prior to its consideration and any vote thereon, the board of Directors have approved at a duly convened meeting of Directors at which a quorum is present (or through a resolution in writing) that such conflicted Director may vote and count to the quorum in respect of any contract or transaction in which he is interested.

42.5    A general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting and counting to the quorum on a resolution in respect of a contract or transaction in which he has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

## 43        Minutes

The Directors shall cause minutes to be made in books kept for the purpose of recording all appointments of officers made by the Directors, all proceedings at meetings of the Company or the holders of any class of Shares and of the Directors, and of committees of the Directors, including the names of the Directors or alternate Directors present at each meeting.

## 44        Delegation of Directors' Powers

44.1    The Directors may delegate any of their powers, authorities and discretions, including the power to sub-delegate, to any committee consisting of one or more Directors provided that majority of

30

**1473**

such persons are tax resident in the United Kingdom. They may also delegate to any managing director or any Director holding any other executive office such of their powers, authorities and discretions as they consider desirable to be exercised by him provided that an alternate Director may not act as managing director and the appointment of a managing director shall be revoked forthwith if he ceases to be a Director. Any such delegation may be made subject to any conditions the Directors may impose and either collaterally with or to the exclusion of their own powers and any such delegation may be revoked or altered by the Directors. Subject to any such conditions, the proceedings of a committee of Directors shall be governed by the Articles regulating the proceedings of Directors, so far as they are capable of applying.

44.2    Subject to the Investment Agreement, the Directors may establish any committees (including Remuneration Committee and Audit Committee), local boards or agencies or appoint any person to be a manager or agent for managing the affairs of the Company and may appoint any person to be a member of such committees, local boards or agencies. Any such appointment may be made subject to any conditions the Directors and the Shareholders may impose, and either collaterally with or to the exclusion of their own powers and any such appointment may be revoked or altered by the Directors. Subject to any such conditions, the proceedings of any such committee, local board or agency shall be governed by the Articles regulating the proceedings of Directors, so far as they are capable of applying and the terms of the Investment Agreement.

44.3    The Directors may by power of attorney or otherwise appoint any person to be the agent of the Company on such conditions as the Directors may determine provided that they are tax resident in the United Kingdom and provided that the delegation is not to the exclusion of their own powers and may be revoked by the Directors at any time.

44.4    The Directors may by power of attorney or otherwise appoint any company, firm, person or body of persons, whether nominated directly or indirectly by the Directors, to be the attorney or authorised signatory of the Company for such purpose and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under the Articles) and for such period and subject to such conditions as they may think fit, and any such powers of attorney or other appointment may contain such provisions for the protection and convenience of persons dealing with any such attorneys or authorised signatories as the Directors may think fit and may also authorise any such attorney or authorised signatory to delegate all or any of the powers, authorities and discretions vested in him, provided that any such person is tax resident in the United Kingdom.

44.5    The Directors may appoint such officers of the Company (including, for the avoidance of doubt and without limitation, any secretary) as they consider necessary on such terms, at such remuneration and to perform such duties, and such provisions as to disqualification and removal as the Directors may think fit provided that such persons are tax resident in the United Kingdom. Unless otherwise specified in the terms of his appointment an officer of the Company may be removed by resolution of the Directors or Shareholders. An officer of the Company may vacate his office at any time if he gives notice in writing to the Company that he resigns his office.

## 45    Alternate Directors

45.1    Any Director (but not an alternate Director) may by writing appoint any other Director, or any other person willing to act, to be an alternate Director and by writing may remove from office an alternate Director so appointed by him.

45.2    An alternate Director shall be entitled to receive notice of all meetings of Directors and of all meetings of committees of Directors of which his appointor is a member, to attend and vote at every such meeting at which the Director appointing him is not personally present, to sign any

31

**1474**

written resolution of the Directors, and generally to perform all the functions of his appointor as a Director in his absence.

45.3    An alternate Director shall cease to be an alternate Director if his appointor ceases to be a Director.

45.4    Any appointment or removal of an alternate Director shall be by notice to the Company signed by the Director making or revoking the appointment or in any other manner approved by the Directors.

45.5    Subject to the provisions of the Articles, an alternate Director shall be deemed for all purposes to be a Director and shall alone be responsible for his own acts and defaults and shall not be deemed to be the agent of the Director appointing him.

## 46    No Minimum Shareholding

The Company in general meeting may fix a minimum shareholding required to be held by a Director, but unless and until such a shareholding qualification is fixed a Director is not required to hold Shares.

## 47    Remuneration of Directors

47.1    The remuneration to be paid to the Directors, if any, shall be such remuneration as the Remuneration Committee shall determine. The Company must pay or procure the payment by another Group member to the Non-executive Directors and Chairperson each year market-standard fees for each such Director as are proposed by the Remuneration Committee and approved by the Major Shareholder Majority, together with any reasonable, documented expenses properly incurred by the Non-Executive Directors and Chairperson in proper fulfilment of their duties and in accordance with the Company's expenses policy.

47.2    The the Remuneration Committee may by a resolution approve additional remuneration to any Director for any services which in the opinion of the Directors go beyond his ordinary routine work as a Director. Any fees paid to a Director who is also counsel, attorney or solicitor to the Company, or otherwise serves it in a professional capacity shall be in addition to his remuneration as a Director.

## 48    Dividends, Distributions and Reserve

48.1    Subject to the Law, the Finance Documents and this Article and except as otherwise provided by the rights attached to any Shares, the Directors may, with approval of a majority of the Non-Executive Directors on the Board, resolve to pay Dividends and other distributions on Shares in issue and authorise payment of the Dividends or other distributions out of the funds of the Company lawfully available therefor. A Dividend shall be deemed to be an interim Dividend unless the terms of the resolution pursuant to which the Directors resolve to pay such Dividend specifically state that such Dividend shall be a final Dividend.

48.2    Except as otherwise provided by the rights attached to any Shares, all Dividends and other distributions shall be paid according to the par value of the Shares that a Shareholder holds. If any Share is issued on terms providing that it shall rank for Dividends as from a particular date, that Share shall rank for Dividends accordingly.

48.3    The Directors may deduct from any Dividend or other distribution payable to any Shareholder all sums of money (if any) then payable by him to the Company on account of calls or otherwise.

32

48.4    The Directors may resolve that any Dividend or other distribution be paid wholly or partly by the distribution of specific assets and in particular (but without limitation) by the distribution of shares, debentures, or securities of any other company or in any one or more of such ways and where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient and in particular may issue fractional Shares and may fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any Shareholders upon the basis of the value so fixed in order to adjust the rights of all Shareholders and may vest any such specific assets in trustees in such manner as may seem expedient to the Directors.

48.5    Except as otherwise provided by the rights attached to any Shares, Dividends and other distributions may be paid in any currency. The Directors may determine the basis of conversion for any currency conversions that may be required and how any costs involved are to be met.

48.6    The Directors may, before resolving to pay any Dividend or other distribution, set aside such sums as they think proper as a reserve or reserves which shall, at the discretion of the Directors, be applicable for any purpose of the Company and pending such application may, at the discretion of the Directors, be employed in the business of the Company.

48.7    Any Dividend, other distribution, interest or other monies payable in cash in respect of Shares may be paid by wire transfer to the holder or by cheque or warrant sent through the post directed to the registered address of the holder or, in the case of joint holders, to the registered address of the holder who is first named on the Register of Members or to such person and to such address as such holder or joint holders may in writing direct. Every such cheque or warrant shall be made payable to the order of the person to whom it is sent. Any one of two or more joint holders may give effectual receipts for any Dividends, other distributions, bonuses, or other monies payable in respect of the Share held by them as joint holders.

48.8    No Dividend or other distribution shall bear interest against the Company.

48.9    Any Dividend or other distribution which cannot be paid to a Shareholder and/or which remains unclaimed after six months from the date on which such Dividend or other distribution becomes payable may, in the discretion of the Directors, be paid into a separate account in the Company's name, provided that the Company shall not be constituted as a trustee in respect of that account and the Dividend or other distribution shall remain as a debt due to the Shareholder. Any Dividend or other distribution which remains unclaimed after a period of six years from the date on which such Dividend or other distribution becomes payable shall be forfeited and shall revert to the Company.

**49    Capitalisation**

Subject to the Investment Agreement, the Directors may at any time capitalise any sum standing to the credit of any of the Company's reserve accounts or funds (including, to the extent permitted by the Law, the share premium account and capital redemption reserve fund) or any sum standing to the credit of the profit and loss account or otherwise available for distribution; appropriate such sum to Shareholders in the proportions in which such sum would have been divisible amongst such Shareholders had the same been a distribution of profits by way of Dividend or other distribution; and apply such sum on their behalf in paying up in full unissued Shares for allotment and distribution credited as fully paid-up to and amongst them in the proportion aforesaid. In such event the Directors shall do all acts and things required to give effect to such capitalisation, with full power given to the Directors to make such provisions as they think fit in the case of Shares becoming distributable in fractions (including provisions whereby the benefit of fractional entitlements accrue to the Company rather than to the Shareholders concerned). The Directors may authorise any person to enter on behalf of all of the Shareholders interested into an agreement with the Company providing for such

33

capitalisation and matters incidental or relating thereto and any agreement made under such authority shall be effective and binding on all such Shareholders and the Company.

## 50    Books of Account

50.1    The Directors shall cause proper books of account (including, where applicable, material underlying documentation including contracts and invoices) to be kept with respect to all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place, all sales and purchases of goods by the Company and the assets and liabilities of the Company.  Such books of account shall be sufficient to show and explain the Company's transactions and shall (i) disclose with reasonable accuracy, at any time, the financial position of the Company at that time; and (ii) enable the Directors to ensure that any accounts prepared by the Company under the Law comply with the requirements of the Law. Such books of account must be retained for a minimum period of ten years from the date on which they are prepared.

50.2    The Directors shall determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Law or authorised by the Directors or by the Company in general meeting.

50.3    The Directors shall cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by the Law.

50.4    The Directors shall deliver to the Registrar of Companies a copy of the accounts of the Company signed on behalf of the Directors by one of them together with a copy of the report thereon by the Auditors prepared in accordance with the Law.

## 51    Audit

51.1    The Audit Committee shall appoint an Auditor of the Company in accordance with the Investment Agreement.

51.2    Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of the Company such information and explanation as may be necessary for the performance of the duties of the Auditor.

51.3    Auditors shall make a report on the accounts of the Company during their tenure in accordance with the Law and otherwise upon request of the Directors or any general meeting of the Shareholders.

## 52    Notices

52.1    Notices shall be in writing and may be given by email or any other electronic method provided that a notice calling a meeting of the Directors need not be in writing. Notice may be given by the Company to any Shareholder either personally or by sending it by courier, or by emailing the notice to the Shareholder's electronic address last notified to the Company by the Shareholder, post or hand to his address as shown in the Register of Shareholders.  Any notice, if posted from one country to another, is to be sent by airmail. A notice calling a meeting of the Directors need not be in writing.

34

52.2    Where a notice is sent by courier, service of the notice shall be deemed to be effected by delivery of the notice to a courier company, and shall be deemed to have been received on the third day (not including Saturdays or Sundays or public holidays) following the day on which the notice was delivered to the courier. Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, pre paying and posting a letter containing the notice, and shall be deemed to have been received on the fifth day (not including Saturdays or Sundays or public holidays in Jersey and the United Kingdom) following the day on which the notice was posted. Electronic communication of a notice (properly addressed and dispatched to the Shareholder's electronic address last notified in writing) is given or deemed to have been given at the time the electronic notice leaves the information system of the Company or the information system any other person sending the notice on the Company's behalf (as the case may be).

52.3    A notice may be given by the Company to the person or persons which the Company has been advised are entitled to a Share or Shares in consequence of the death or bankruptcy of a Shareholder in the same manner as other notices which are required to be given under the Articles and shall be addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address supplied for that purpose by the persons claiming to be so entitled, or at the option of the Company by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

52.4    Notice of every general meeting shall be given in any manner authorised by the Articles to every holder of Shares carrying an entitlement to receive such notice on the record date for such meeting except that in the case of joint holders the notice shall be sufficient if given to the joint holder first named in the Register of Shareholders and every person upon whom the ownership of a Share devolves by reason of his being a legal personal representative or a trustee in bankruptcy of a Shareholder where the Shareholder but for his death or bankruptcy would be entitled to receive notice of the meeting, and no other person shall be entitled to receive notices of general meetings.

## 53    Winding Up

53.1    If the Company shall be wound up the liquidator (if any) or Directors shall apply the assets of the Company in satisfaction of creditors' claims in such manner and order as they think fit. Subject to the rights attaching to any Shares, in a winding up:

(a)    if the assets available for distribution amongst the Shareholders shall be insufficient to repay the whole of the Company's issued share capital, such assets shall be distributed so that, as nearly as may be, the losses shall be borne by the Shareholders in proportion to the par value of the Shares held by them; or

(b)    if the assets available for distribution amongst the Shareholders shall be more than sufficient to repay the whole of the Company's issued share capital at the commencement of the winding up, the surplus shall be distributed amongst the Shareholders in proportion to the par value of the Shares held by them at the commencement of the winding up subject to a deduction from those Shares in respect of which there are monies due, of all monies payable to the Company for unpaid calls or otherwise.

53.2    If the Company shall be wound up the liquidator (if any) or Directors may, subject to the rights attaching to any Shares and with the approval of a Special Resolution of the Company and any other approval required by the Statute, divide amongst the Shareholders in kind the whole or any part of the assets of the Company (whether such assets shall consist of property of the same kind or not) and may for that purpose value any assets and determine how the division

35

shall be carried out as between the Shareholders or different classes of Shareholders. The liquidator (if any) or Directors may, with the like approval, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Shareholders as the liquidator (if any) or Directors, with the like approval, shall think fit, but so that no Shareholder shall be compelled to accept any asset upon which there is a liability.

## 54    Indemnity and Insurance

54.1    To the fullest extent permitted by the Law, every Director and officer of the Company (which for the avoidance of doubt, shall not include auditors of the Company), together with every former Director and former officer of the Company (each an "**Indemnified Person**") shall be indemnified out of the assets of the Company against any liability, action, proceeding, claim, demand, costs, damages or expenses, including legal expenses, whatsoever which they or any of them may incur as a result of any act or failure to act in carrying out their functions other than such liability (if any) that they may incur by reason of their own actual fraud or wilful default. Subject to the Law, no Indemnified Person shall be liable to the Company for any loss or damage incurred by the Company as a result (whether direct or indirect) of the carrying out of their functions unless that liability arises through the actual fraud or wilful default of such Indemnified Person. No person shall be found to have committed actual fraud or wilful default under this Article unless or until a court of competent jurisdiction shall have made a finding to that effect.

54.2    The Company shall advance to each Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defence of any action, suit, proceeding or investigation involving such Indemnified Person for which indemnity will or could be sought. In connection with any advance of any expenses hereunder, the Indemnified Person shall execute an undertaking to repay the advanced amount to the Company if it shall be determined by final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification pursuant to this Article. If it shall be determined by a final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to the Company (without interest) by the Indemnified Person.

54.3    The Directors, on behalf of the Company, may purchase and maintain insurance for the benefit of any Director or other officer of the Company against any liability which, by virtue of any rule of law, would otherwise attach to such person in respect of any negligence, default, breach of duty or breach of trust of which such person may be guilty in relation to the Company.

## 55    Accounting Period

Unless the Directors otherwise prescribe, the accounting period of the Company shall end on 31 December in each year and, following the year of incorporation, shall begin on 1 January in each year.

## 56    Finance Documents

The provisions of these Articles are subject to the terms and conditions of the Finance Documents to the extent then in force. In particular, but without limitation to the foregoing:

a)    the payment of fees under the Articles and the Investment Agreement;

b)    the payment of dividends on all classes of shares in the capital of the Company; and

c)    the redemption or purchase (if applicable) of any class of shares in the capital of the Company,

36

**1479**

may only be made if and to the extent permitted by the Finance Documents to the extent then in force, and, in each case if the payment of all or any part of such fee, dividend or payment cannot be paid by virtue of the Finance Documents, then no such payment may be made but the unpaid portion remains a debt due from the relevant Group Member to the relevant shareholder or party.

**APPENDIX 6**

**WARRANT INSTRUMENT**

**2020**

**WARRANT  INSTRUMENT**

**constituting  and  regulating  warrants  to subscribe for  A  Ordinary  Shares  in the  share capital  of**

**KELLY  TOPCO  LIMITED**

i

## TABLE OF CONTENTS

**Page No.**

1     INTERPRETATION ................................................................................................. 1

2     CONSTITUTION ................................................................................................... 5

3     EXERCISE OF WARRANTS .................................................................................. 5

4     ISSUE OF SHARES UPON EXERCISE ................................................................ 6

5     RESTRICTIONS AND OBLIGATIONS OF THE COMPANY ............................ 7

6     TRANSFER OF WARRANTS ................................................................................. 9

7     RESOLUTIONS OF WARRANT HOLDERS ........................................................ 9

8     JOINT HOLDERS ................................................................................................... 9

9     WARRANTIES ....................................................................................................... 9

10    MODIFICATION OF RIGHTS .............................................................................. 9

11    DISPUTES ............................................................................................................. 10

12    THIRD PARTY RIGHTS ....................................................................................... 10

13    NOTICES ............................................................................................................... 10

14    SEVERANCE ......................................................................................................... 11

15    COUNTERPARTS ................................................................................................. 11

16    GOVERNING LAW ............................................................................................... 11

17    JURISDICTION ..................................................................................................... 11

SCHEDULE 1   14

THE WARRANT HOLDERS ............................................................................................ 14

SCHEDULE 2
              ADJUSTMENTS TO WARRANT SHARES AND EXERCISE PRICE .................... 15

SCHEDULE 3
              THE REGISTER ......................................................................................... 16

SCHEDULE 4 PART 1: TRANSFERS .............................................................................. 17

PART 2: FORM OF TRANSFER ....................................................................................... 18

SCHEDULE 5 PROVISIONS AS TO RESOLUTIONS OF WARRANT HOLDERS ................................. 19

**THIS INSTRUMENT** is made by way of deed on                          2020 by:

(1) **Kelly Topco Limited**, a company limited by shares incorporated in Jersey (registered number 132385) whose registered office is at 47 Esplanade, St Helier, Jersey JE1 0BD, Channel Islands ("**Company**");  and

(2) **The Persons** whose names, addresses and authorised e-mail addresses are set out in Schedule 1 (the "**Warrantholders**" or individually a "**Warrantholder**").

RECITALS

(A) By a resolution of the Board passed on                          2020, the Company has agreed to create and issue warrants to subscribe for 1,111,111 A Ordinary Shares in the share capital of the Company, such number to be subject to adjustment in accordance with the terms of this Instrument.

(B) Pursuant to the Lock-Up Agreement and in connection with the Proposed Restructuring (as defined in the Lock-Up Agreement), the Company has agreed to issue the Warrants to the Warrantholders in consideration for their compliance with the terms of the Lock-Up Agreement and their obligations thereunder.

**IT IS AGREED** as follows:

1       **INTERPRETATION**

1.1     In this Instrument the following terms shall have the meanings set out opposite them:

| | |
|---|---|
| "**Adjustment Event**" | has the meaning given to it in Clause 5.5; |
| "**Affiliate**" | with respect to a person (the "**First Person**"): |

(a)     another person that, directly or indirectly through one or more intermediaries, Controls, or is Controlled by, or is under common Control with, the First Person;

(b)     a pooled investment vehicle organised by the First Person (or an Affiliate thereof) the investments of which are directed by the First Person;

(c)     a partner or an officer or employee of the First Person (or an Affiliate thereof);

(d)     an investment fund organised by the First Person for the benefit of the First Person's (or its Affiliates') partners, officers or employees or their dependants; or

(e)     a successor trustee or nominee for, or a successor by re-organisation of, a trust the direct or indirect principal beneficiary/ies of which is any of the First Person, its Affiliates or any of their respective partners, officers or employees

1

**1484**

or their dependants;

| | |
|---|---|
| "Allottee" | has the meaning given to it in Clause 4.1 |
| "A Ordinary Shares" | the A ordinary shares of $0.01 each issued in the capital of the Company from time to time, the rights of which are further set out in the Articles; |
| "Articles" | the memorandum and articles of association of the Company in force at the relevant time; |
| "Board" or "Directors" | the board of directors from time to time of the Company; |
| "Business Day" | a day, except a Saturday or Sunday or a public holiday in the United Kingdom and Jersey, on which clearing banks in the City of London and Saint Helier are generally open for business; |
| "COBO Order" | Control of Borrowing (Jersey) Order 1958; |
| "Consent" | the consent in writing of Warrantholders entitled to the right to subscribe for at least 50 per cent. of the Warrant Shares that are still to be issued at the relevant time; |
| "Exercise Price" | has the meaning given to it in clause 3.2; |
| "Exit" | (i) a Listing of the Company (or another entity in which the Original Participating Creditors or their transferees are shareholders at the time, following a pre-sale reorganisation); (ii) a sale of all of the shares in the Company or all or substantially all of the assets of the Company (directly or indirectly by way of one or a number of related transactions); (iii) if there is an indirect sale of assets of the Company (as described in subparagraph (ii)) including by way of merger, then the distribution of the proceeds of sale to the Company shareholders; or (iv) voluntary liquidation of the Company. |
| "Expert" | a partner with at least five years' relevant experience of an appropriate independent professional firm (which may be a firm of lawyers or a firm of international chartered accountants, depending upon the matter in respect of which a determination is needed) nominated by the Directors and agreed by the Warrantholders or, in default of agreement within five (5) Business Days, as nominated (on application by any party) by the president of the relevant professional association of which such lawyers or accountants are members (and, in default of agreement as to the appropriate type of professional association, as nominated by the President of the Law Society of |

2

**1485**

England and Wales on application by any party);

| | |
|---|---|
| "**Instrument**" | this deed and the schedules to this deed and any deed expressed to be supplemental to this deed as amended from time to time; |
| "**Listing**" | means the first public offering of any class of equity securities by the Company or one of Kelly Holdco 1 Limited or Kelly Holdco 2 Limited (or a new holding company interposed for the purposes of being a successor of the Company or Kelly Holdco 1 Limited or Kelly Holdco 2 Limited) in the legal form (after conversion if necessary) that results in a listing of such class of securities on a public securities market, whether effected by way of an offer for sale, a new issue of shares, an introduction, a placing or otherwise; |
| "**Lock-Up Agreement**" | the lock-up agreement between, inter alia, KCA Deutag Alpha II Limited, KCA Deutag UK Finance PLC and the Original Participating Creditors, dated 31 July 2020; |
| "**Major Shareholder**" | each Shareholder who, together with their Affiliates, holds five per cent. or more of the A Ordinary Shares in the Company; |
| "**Major Shareholder Majority**" | the holders of a majority of the A Ordinary Shares which are held by the Major Shareholders; |
| "**Market Value**" | means with respect to a share, the closing sales price per share of the Company's shares on any stock exchange on which the share is then listed or admitted to trading (or, if prior to a Listing, the price per share at which the shares will be offered in the Listing), or, if not then listed or admitted (or proposed to be listed or admitted) to trading on any such exchange, will mean the market value at the relevant time of shares, loan capital or other securities of the Company as if they were being subscribed for or acquired by a willing third party buyer on the basis of a bona fide arm's length transaction (which, for the avoidance of doubt, in connection with an Exit which is not a Listing will be the per Ordinary Share price payable in that transaction); |
| "**New Entity**" | has the meaning given to it in Clause 5.9; |
| "**Original Participating Creditors**" | those persons listed in Schedule 2 to the Lock-Up Agreement; |
| "**Permitted Transferee**" | any Warrantholder or any Affiliate of a Warrantholder; |
| "**Proceedings**" | has the meaning given to it in Clause 17.1; |

3

**1486**

| "**Register**" | has the meaning given to it in Schedule 3; |
|---|---|
| "**Shareholders**" | the holders of shares issued in the capital of the Company from time to time; |
| "**Warrantholder**" | in relation to a Warrant, the person whose name appears in the Register as the holder of the Warrant; |
| "**Warrants**" | the warrants of the Company constituted by this Instrument and all rights conferred by them; |
| "**Warrantholders' Resolution**" | a written resolution of the Warrantholders holding Warrants entitling them to subscribe for not less than 50 per cent. of the Warrant Shares; |
| "**Warrant Shares**" | up to 1,111,111 A Ordinary Shares in the share capital of the Company issued pursuant to the Warrants (subject to adjustment in accordance with Schedule 2). |

**1.2**  In this Instrument:

**(a)**  a company is a "subsidiary" of another company, its "holding company", if that other company: (i) holds a majority of the voting rights in it; or (ii) is a member of it and has the right to appoint or remove a majority of its board of directors; or (iii) is a member of it and controls alone, pursuant to an agreement with other members, a majority of the voting rights in it; or if it is a subsidiary of a company that is itself a subsidiary of that other company. A company is a "wholly-owned subsidiary" of another company if it has no members except that other and that other's wholly-owned subsidiaries or persons acting on behalf of that other or its wholly-owned subsidiaries and references to "**subsidiary**" and "**holding company**" shall be construed accordingly;

**(b)**  references to a "**person**" include an individual, body corporate (wherever incorporated), unincorporated association, trust or partnership (whether or not having separate legal personality), government, state or agency of a state, or two or more of the foregoing;

**(c)**  references to a "**party**" or "**parties**" mean a party to or the parties to this Instrument;

**(d)**  references to "**$**" or "**USD**" are to US Dollars, the lawful currency of the United States of America;

**(e)**  the singular includes the plural and vice versa and any gender includes any other gender;

**(f)**  references to a "**Clause**" or "**Schedule**" to this Instrument are to a clause of or schedule to this Instrument, and references to this Instrument include the schedules;

**(g)**  the headings in this Instrument do not affect its construction or interpretation;

**(h)**  references to a statute or a statutory provision include references to such statute or statutory provision as amended or re-enacted whether before or after the date of this Instrument and include all subordinate legislation made under the relevant statute whether before or after the date of this Instrument save where that amendment, re-enactment or subordinate legislation is made after the date of this Instrument and would extend or increase the liability of any party under this Instrument;

4

**1487**

**(i)**     references to any times of the day are to that time in London, England and references to a day are to a period of 24 hours running from midnight to midnight.

**(j)**     a reference to a document is a reference to that document as amended or modified from time to time in writing by the mutual consent of the Company and the Warrantholders; and

**(k)**     references to "**writing**" or "**written**" will be deemed to include any modes of reproducing words in a legible or non-transitory form including by way of electronic communications.

## 2        CONSTITUTION

**Constitution of Warrants**

**2.1**     This Instrument constitutes the Warrants and the Company has the power and authority to issue the Warrants.

**2.2**     The number of Warrants to be issued under this Instrument is 1,111,111 Warrants.

**2.3**     The Company shall issue such number of Warrants to the Warrantholders as are set out opposite their respective names in Schedule 1 of this Instrument in each case, on the date of this Instrument immediately after its execution.

**2.4**     Each Warrantholder may elect for the Warrants set out opposite their respective names in Schedule 1 to be issued to an Affiliate or any other Warrantholder.

**2.5**     The Warrants will rank *pari passu* amongst themselves in all respects and without discrimination or preference.

**Form of Warrants**

**2.6**     No certificates will be issued for the Warrants.

**Instrument to be binding**

**2.7**     The Warrants are issued subject to the Articles and otherwise on the terms of this Instrument which are binding upon the Company and the Warrantholders and all persons claiming through or under either the Company or the Warrantholders.

**Duration**

**2.8**     This Instrument will cease to have effect when all the Warrants have been exercised or have lapsed in accordance with the terms of this Instrument.

## 3        EXERCISE OF WARRANTS

**Timing**

**3.1**     The Warrants shall be exercised automatically immediately prior to and conditional upon an Exit, provided that the Exercise Price is less than the Market Value of one Ordinary Share immediately following such exercise (an "**Exercise**").

**Price**

**3.2**     The price payable on exercise of the Warrants (the "**Exercise Price**") shall be as follows:

5

**1488**

| Year in which completion of the relevant Exit must occur | Exercise Price per Warrant Share |
|---|---|
| 2021 | $171.61 |
| 2022 | $181.24 |
| 2023 | $190.88 |

**Lapse**

**3.3**    Any Warrants which have not been exercised immediately prior to an Exit will lapse on the earlier of:

   **(a)**    an Exit; and

   **(b)**    31 December 2023.

**3.4**    Immediately following the Exercise of the Warrants, the Company will issue the Warrant Shares to each Warrantholder pro rata to the proportion of the Warrants held by each Warrantholder, and each Warrantholder hereby:

   **(a)**    if the Exit is not a Listing, directs that the purchaser of its A Ordinary Shares, or the Company in the event that the Exit falls under limbs (iii) or (iv) of the definition, deduct the amount of that Warrantholder's aggregate Exercise Price from its proceeds and pay such an amount to the Company for and on behalf of that Warrantholder in full and final satisfaction of the Warrantholder's obligation to pay the Exercise Price; or

   **(b)**    if the Exit is a Listing, undertakes to either pay the Exercise Price to the Company in cash, or sell down such proportion of its A Ordinary Shares to satisfy the payment of the Exercise Price to the Company.

**4**    **ISSUE OF SHARES UPON EXERCISE**

**Allotment and Issue**

**4.1**    A Ordinary Shares issued pursuant to the exercise of Warrants will be allotted immediately prior to, or otherwise so as to enable the Warrantholder to fully participate in, the Exit.

**4.2**    On the date prescribed in Clause 4.1 the Company will:

   **(a)**    allot and issue to the Warrantholders (the "**Allottee(s)**") the A Ordinary Shares to which the Warrantholder is entitled;

   **(b)**    enter the Allottee(s) name in the register of members of the Company as the holder of the A Ordinary Shares issued to the Allottee(s),

subject to the provisions of the Articles and to compliance with any applicable law, regulatory requirement, judgment, order or decree.

**Power of Attorney**

**4.3**    Each Warrantholder hereby appoints any director of the Company from time to time (each an "**Attorney**" and together the "**Attorneys**") jointly and severally to be its attorney, failing which, its agent, and with its full authority and on its behalf and in its name or otherwise to:

6

**1489**

(a)     take any actions to restructure one or more group members prior to an Exit, including, without limitation, converting the A Ordinary Shares into a different class of shares or exchanging the A Ordinary Shares for shares in another entity, including by amending the terms of the Warrants, passing resolutions of the Warrantholders, exchanging the Warrants for Warrants in a new company interposed for the purposes of the Exit and signing and delivering all such deeds and documents as may be required to effect the same;

(b)     signing transfer instruments, powers of attorney, notices, letters and certificates in order to transfer and sell any Warrant Shares (in each case in such manner and on such terms as any Attorney in his absolute and unfettered discretion considers desirable but provided that the Warrantholders shall not be required to make or give any representations, warranties, covenants or indemnities or be responsible for any costs, in addition to those that he would be required to make or give or for which he would be responsible if he were a Dragged Shareholder (as defined in the Articles);

(c)     if the Exit is a Listing, enter into any lock-up agreement; and

(d)     receive any notices of, and attend and vote at, all meetings and sign all resolutions and consents of the Shareholders (or any class of them) of the Company in respect of the Warrants.

**Rights attaching to Warrant Shares**

4.4     The A Ordinary Shares allotted pursuant to the exercise of the Warrants will:

(a)     be allotted and issued fully paid;

(b)     not carry any right to vote;

(c)     be subject to and benefit from all of the rights and obligations relating to the A Ordinary Shares under the Articles;

(d)     rank *pari passu* in all respects with the fully paid A Ordinary Shares then in issue; and

(e)     be entitled to receive any dividend or other distribution which has previously been announced or declared in respect of any A Ordinary Shares provided that the date by which the holder of A Ordinary Shares must be registered to participate in such dividend or other distribution is on or after the date of the valid Exercise.

**Rounding**

4.5     If the number of A Ordinary Shares falling to be allotted to a Warrantholder (or at its direction) on an exercise of Warrants would otherwise require a fraction of an A Ordinary Share to be allotted, the number of A Ordinary Shares to be so allotted will be rounded down to the nearest whole number of A Ordinary Shares.

**Cancellation of warrants**

4.6     Warrants which have been exercised in full will be deemed to be cancelled upon exercise.

**5       RESTRICTIONS AND OBLIGATIONS OF THE COMPANY**

**Undertakings**

5.1     For so long as any Warrants remain unexercised, the Company will comply with the undertakings in this Clause 5.

**Share Capital**

5.2    The Company will be able to issue such number of A Ordinary Shares as would enable the Warrant Shares to be issued to the Warrantholders in full and will ensure that the Directors have all necessary authorisations to allow them to allot the Warrant Shares at any time to the Warrantholders free of any pre-emption rights or other third party rights.

**Notifications**

5.3    The Company will use its reasonable endeavours to notify Warrantholders of any Exit at least three (3) Business Days prior to completion of the relevant Exit.

**Adjustment Event**

5.4    If there is an Adjustment Event at any time when any of the Warrants are outstanding the provisions of Schedule 2 will apply.

5.5    For the purposes of this Instrument an "**Adjustment Event**" means:

    **(a)**    any allotment or issue of Shares by way of capitalisation of profits or reserves; or

    **(b)**    any cancellation, purchase or redemption of Shares, or any reduction or repayment of Shares, by the Company;

    **(c)**    any split, sub-division, consolidation or redesignation of Shares; or

    **(d)**    any sale of part of the Company or its group which does not constitute an Exit.

**Tag Along Rights**

5.6    Provided that the Exercise Price is less than the Market Value, the Company will procure that any person who makes an offer of the type described in article [●] (*Tag Along Rights*) of the Articles at the same time makes an offer to each of the Warrantholders to purchase all of their Warrants on terms substantially similar (but no less favourable) to those offered to the holders of A Ordinary Shares.

5.7    The consideration for each such Warrant will be equal to the consideration per Ordinary Share offered to the holders of the A Ordinary Shares who accept the Proposed Tag-Along Transfer (as defined in the Articles) multiplied by the number of Warrants held, less an amount equal to the Exercise Price payable upon such exercise.

5.8    The Company will not register any transfer of shares arising pursuant to such an offer unless each Warrantholder has been given the same opportunities as the holders of A Ordinary Shares to accept such offer.

**New Holding Company**

5.9    If the Company incorporates a new holding company in any jurisdiction or otherwise alters or restructures its corporate structure, the Company will procure that warrants of an equivalent proportion of the total issued share capital of the new holding company of the Company will be granted and issued to the Warrantholders by such company (the "**New Entity**").

**No Impairment**

5.10    The Company will not, by amending its Articles or through any consolidation or reorganization seek to avoid, the observance or performance of any of the terms of this Instrument.

**Register**

**5.11**    The Company will maintain the Register in accordance with the provisions of Schedule 3.

**COBO Order**

**5.12**    It is agreed between the parties that for the avoidance of doubt save where a consent has been obtained pursuant to the COBO Order and notwithstanding any other provision of this Instrument, the maximum number of holders of Warrants at any given time will be ten (10).

**6    TRANSFER OF WARRANTS**

The Warrants may be transferred in whole or in part in accordance with the provisions of Schedule 4.

**7    RESOLUTIONS OF WARRANTHOLDERS**

The provisions of Schedule 5 apply in relation to resolutions of Warrantholders.

**8    JOINT HOLDERS**

**8.1**    All notices, documents or other information will be delivered to the holder whose name is first in the Register in respect of such joint holding and delivery of notices, documents or other information to one joint holder is sufficient delivery to all joint holders. The Company will not be bound to register more than four persons as joint holders of any Warrant.

**8.2**    Anything to be agreed or specified in relation to any notice, document or other information to be served on or sent or supplied to the joint holders may be agreed or specified by any one of the joint holders and the agreement or specification of the senior joint holder shall be accepted to the exclusion of the other joint holders and, for this purpose, seniority shall be determined by the order in which the names stand in the Register in respect of the joint holding.

**9    WARRANTIES**

The Company warrants to the Warrantholders that:

**(a)**    the Board has approved the execution of this Instrument, the issue of the Warrants and the allotment and issue of the Warrant Shares in accordance with the terms of this Instrument and, pursuant to that approval, the Board may allot and issue the Warrant Shares free from pre-emptive rights upon exercise of the Warrants; and

**(b)**    other than pursuant to this Instrument and the issuance of up to 5% (as at the date of this Instrument) of the fully diluted share capital of Company to members of management of the Company's group, as at the date of this Instrument there is no agreement, arrangement or obligation requiring the creation, allotment or issue or grant to a person of the right (conditional or not) to require the allotment or issue of any shares in the Company (including without limitation any option or right of conversion).

**10    MODIFICATION OF RIGHTS**

**10.1**    The Company may (by deed poll expressed to be supplemental to this Instrument) from time to time amend this Instrument on terms previously sanctioned by a Warrantholders' Resolution and Major Shareholder Majority.

**10.2**    The Company will endorse on this Instrument a memorandum of execution of any deed poll supplemental to this Instrument.

## 11   DISPUTES

**11.1**   In the event of any dispute arising between the Warrantholders and the Company in relation to the Warrants which is not resolved within ten (10) Business Days of written notice of such dispute being given by the Warrantholders (any such notice to be sanctioned by a Consent) or the Company to the other, then the dispute will be referred by either the Company or the Warrantholders for determination to an Expert on the following basis:

**(a)**   the Expert's costs will be borne as the Expert will determine;

**(b)**   the Expert will be deemed to act as an expert and not an arbitrator;

**(c)**   the determination of the Expert will, in the absence of manifest error, be final and binding on all concerned; and

**(d)**   the Expert will be given by the Company and the Warrantholders all such information and other assistance as he may reasonably require in order to make his determination.

## 12   THIRD PARTY RIGHTS

Other than each of the Warrantholders, a person who is not a party to this Instrument has no right under the Contract (Rights of Third Parties) Act 1999 or otherwise to enforce any term of this Instrument.

## 13   NOTICES

**Mode of Service**

**13.1**   Any notice or other communication given under or in connection with the matters contemplated by this Instrument will be in writing and in the English language and will be served by delivering it to the person due to receive it at the address set out below:

**(a)**   in the case of the Company, to (i) the registered office of the Company set out in the recitals to this Instrument for the attention of the directors with a copy (which shall not constitute notice) to Neil Devaney and Simon Lyell at Weil, Gotshal & Manges (London) LLP of 110 Fetter Lane, EC4A 1AY, or (ii) via email to: Tony.Byrne@kcadeutag.com with a copy (which shall not constitute notice) to: Neil.Devaney@weil.com and Simon.Lyell@weil.com;

**(b)**   in the case of the Warrantholders, to (i) the address set out in Schedule 1 to this Instrument, with a copy (which shall not constitute notice) to Sean Lacey of Kirkland & Ellis (International) LLP at 30 St Mary Axe, London EC3A 8AF or (ii) via email to the email address set out in Schedule 1 to this Instrument, with a copy (which shall not constitute notice) to: Sean.Lacey@kirkland.com; and

**(c)**   in the case of any other Warrantholder, to the address of the Warrantholder shown in the Register or, if no address is shown in the Register, to the address of its last known place of business or residence,

and will be deemed to have been delivered in accordance with Clause 13.2.

**Deemed Service**

**13.2**   Any notice or other communication so addressed will be deemed to have been received:

**(a)**   if personally delivered, at the time of delivery;

10

**1493**

**(b)**    if sent by pre-paid first class post, recorded delivery or registered post, two (2) Business Days after the date of posting to the relevant address;

**(c)**    if sent by registered air mail, five (5) Business Days after the date of posting to the relevant address;

**(d)**    if served, sent or supplied by email, at the time it was sent and it shall be sufficient to show that such notice, document or other information was properly addressed,

provided that if, under Clauses 13.2(a) and (d) any notice, document or other information would be deemed to have been served or delivered after 5.00 pm on a Business Day and before 9.00 am on the next Business Day, such notice, document or other information shall be deemed to have been served or delivered at 9.00 am on the second of such Business Days.

**Service of process**

**13.3**    Without prejudice to any other method of service permitted by law, each party irrevocably and unconditionally agrees to accept service of any proceedings commenced in accordance with Clause 17 if delivered in accordance with this Clause 13.

**Successors**

**13.4**    Any person who becomes entitled to any Warrant (whether by operation of law, transfer or otherwise) will be bound by every notice given in respect of that Warrant before its name and address is entered on the Register.

**14      SEVERANCE**

If any provision or part-provision of this Instrument is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision under this Clause 14 shall not affect the validity and enforceability of the rest of this Instrument.

**15      COUNTERPARTS**

This Instrument may be executed in any number of counterparts and this has the same effect as if the signature on the counterparts were on a single copy of the Instrument.

**16      GOVERNING LAW**

**16.1**    This Instrument and all matters (including, without limitation, any contractual or non-contractual obligation) arising from or connected with it are governed by, and will be construed in accordance with, English law.

**17      JURISDICTION**

**17.1**    The Company irrevocably agrees that the courts of England have exclusive jurisdiction to decide and to settle any dispute or claim arising out of, or in connection with, this Instrument ("**Proceedings**").

**17.2**    The Company agrees that the courts of England are the most appropriate and convenient courts to settle Proceedings and accordingly no Warrantholder will argue to the contrary.

**THIS INSTRUMENT IS EXECUTED AND DELIVERED AS A DEED ON THE DATE SHOWN ON THE FRONT OF THIS INSTRUMENT**

EXECUTED   AND DELIVERED   AS A DEED   BY
**KELLY  TOPCO  LIMITED**
ACTING BY:

) ……..………………………………
) Director
)
)

Witness signature            ………….................

Witness name                ………….................

Witness profession          ………….................

Witness address:            ………….................


EXECUTED   AND DELIVERED   AS A DEED   BY
[*WARRANTHOLDERS*]
ACTING BY:

) ……..………………………………
) Director
)
)

Witness signature            ………….................

Witness name                ………….................

Witness profession          ………….................

Witness address:            ………….................

12

**1495**

**1496**

## SCHEDULE 1

### THE WARRANTHOLDERS

| Name, address, email address | Number of Warrants |
|---|---|
| [●] | [●] |
| [●] | [●] |
| [●] | [●] |
| [●] | [●] |
| TOTAL | 1,111,111 |

14

**1497**

## SCHEDULE 2

## ADJUSTMENTS TO WARRANT SHARES AND EXERCISE PRICE

1    If there is an Adjustment Event of the type described in Clause 5.5 other than Clause 5.5(d) whilst any of the Warrants are outstanding, the number of A Ordinary Shares to be, or capable of being, subscribed on any subsequent exercise of the Warrants and the Exercise Price will be adjusted in such manner as the Company's auditors shall certify to be necessary in order that, after such adjustment:

(a)    the total number of A Ordinary Shares to be, or capable of being, subscribed on an Exercise will carry the same entitlement (expressed as a percentage of the total entitlement conferred by all the A Ordinary Shares) to participate in the profits and assets of the Company, as would the total number of A Ordinary Shares which could have been subscribed pursuant to the Exercise had there been no such adjustment and no such event giving rise to such adjustment;

(b)    the aggregate Exercise Price payable in order to subscribe for all the A Ordinary Shares will be as nearly as possible the same as it was prior to such adjustment; and

(c)    no fraction of a Warrant Share will be issued and therefore, in calculating the aggregate entitlement to additional Warrant Shares under paragraph 1, any entitlement to a fraction of a Warrant Share shall be rounded down to the nearest whole Warrant Share.

2    The Company will notify each Warrantholder in writing, following the occurrence of any such Adjustment Event, as soon as reasonably practicable and in any event no later than 15 Business Days after such an Adjustment Event has occurred and confirm any required updates to the Register to reflect the same.

3    If there is an Adjustment Event of the type described in Clause 5.5(d) whilst any of the Warrants are outstanding, the relevant recovery thresholds set out below shall be reduced by an amount equal to any amount of Return received by the Shareholders and the Exercise Price shall be reduced accordingly (using the same calculation as was used for calculating the original Exercise Price from the recovery thresholds set out in the table below):

| Year in which completion of the relevant Exit must occur | Recovery threshold for Warrants |
|---|---|
| 2021 | $2,216,000,000 |
| 2022 | $2,312,400,000 |
| 2023 | $2,408,800,000 |

For the purposes of this Schedule, "**Return**" means the aggregate return received by the Shareholders in respect of the A Ordinary Shares, loan notes or securities issued by any other subsidiary or holding company of Topco ("**Securities**") and all returns on Securities, dividends on Securities, redemptions of Securities by the Original Participating Creditors, repayment of loans (but not the interest thereon), proceeds of sale or realised value on a refinancing, prior to an Exit or otherwise, which results in a distribution of proceeds or other securities after deduction of all reasonable fees, costs and expenses (but for the avoidance of doubt prior to the effect of any tax) properly incurred by the Shareholder and their Affiliates, PROVIDED THAT there shall be no double-counting of Return if proceeds are received in respect of the sale or transfer of shares more than once.

## SCHEDULE 3
### THE REGISTER

**1**   An accurate register of entitlement to the Warrants (the "**Register**") will be kept by the Company's registrar, Crestbridge Limited of 47 Esplanade, St Helier, Jersey JE1 0BD, in which the Company will enter:

    **(a)**   the names and addresses of the persons for the time being entitled to be registered as the holders of the Warrants;

    **(b)**   the number of Warrants held by every registered holder and the date of issue of the Warrants; and

    **(c)**   the date on which the name of every registered holder is entered in the Register in respect of the Warrants in his name.

**2**   Any change of name or address on the part of a Warrantholder will forthwith be immediately notified to the Company by the Warrantholder which will cause the Register to be altered accordingly.

**3**   Any Warrantholder and any person authorised by any Warrantholder may at all reasonable times during office hours inspect the Register or request that the Company provides it with copies of or extracts from the Register or any part of it.

**4**   The Company shall recognise the registered Warrantholder as the absolute owner of the Warrants registered in his name and shall not be bound to take notice or see to the execution of any equitable interest or trust, whether express, implied or constructive, to which any Warrants may be subject. The Company may accept the receipt of the registered holder for the time being of any Warrants as a good discharge to the Company notwithstanding any notice it may have whether express or otherwise of the right, title, interest, claim of any person to or in the Warrants. No notice of any trust, express, implied or constructive shall (except as provided by statute or as required by order of a court of competent jurisdiction) be entered in the Register in respect of any Warrants.

**5**   Every Warrantholder will be recognised by the Company as entitled to its Warrants free from any equity, set-off or cross-claim on the part of the Company against the original or any intermediate holder of Warrants.

## SCHEDULE 4

### PART 1: TRANSFERS

**1**    **Transfers**

**(a)**    Subject to the terms and conditions of this Instrument and compliance with all applicable securities and regulatory laws, rules and consents (including, but not limited to, any limitation on the number of Warrant holders pursuant to the COBO Order) the Warrants may be transferred, in whole or in part, in accordance with this Schedule 4.

**(b)**    The Warrants may be transferred to:

    **(i)**    any Permitted Transferee, provided that the Warrants must be transferred back to the original transferor or another Permitted Transferee thereof at such time such transferee ceases to be a Permitted Transferee; or

    **(ii)**    to any other person, provided that prior consent of a Major Shareholder Majority has been obtained.

**(c)**    Every transfer of a Warrant will be made by an instrument of transfer in the form set out in part 2 of this Schedule 4 or in any other form which may be approved by the Directors.

**(d)**    The instrument of transfer of a Warrant will be executed by or on behalf of the transferor and on behalf of the transferee. The transferor will be deemed to remain the holder of the Warrant until the name of the transferee is entered in the Register in respect of the Warrant being transferred.

**(e)**    The Directors may decline to recognise any instrument of transfer of a Warrant: (i) if such transfer would cause any limitation on the number of Warrant holders pursuant to the COBO Order to be breached; and (ii) unless the instrument is deposited at the registered office of the Company and in the event that such transfer is not in accordance with the terms of this Instrument.

**(f)**    No fee will be charged for any registration of a transfer of a Warrant or for the registration of any other documents which in the opinion of the Directors require registration.

**(g)**    The registration of a transfer will be conclusive evidence of the approval by the Directors of such a transfer.

**1500**

## PART 2: FORM OF TRANSFER

To:
The Directors
Kelly Topco Limited
47 Esplanade
St Helier
Jersey JE1 0BD
Channel Islands

Dear Sirs

**Instrument entered into by way of deed relating to the warrants to subscribe for certain A Ordinary Shares in the capital of Kelly Topco Limited dated                    2020 (the "Instrument")**

We hereby give notice that we have today in accordance with paragraph 1 of Schedule 4 of the Instrument transferred Warrants to subscribe for [ ] A Ordinary Shares issued pursuant to the Instrument to [*name of transferee*] (the "**Transferee**").

The Transferee hereby appoints any director of the Company from time to time (each an "**Attorney**" and together the "**Attorneys**") jointly and severally to be its attorney, failing which, its agent, and with its full authority and on its behalf and in its name or otherwise to:

**(A)**    take any actions to restructure one or more group members prior to an Exit, including, without limitation, converting the A Ordinary Shares into a different class of shares or exchanging the A Ordinary Shares for shares in another entity, including by amending the terms of the Warrants, passing resolutions of the Warrantholders, exchanging the Warrants for Warrants in a new company interposed for the purposes of the Exit and signing and delivering all such deeds and documents as may be required to effect the same;

**(B)**    signing transfer instruments, powers of attorney, notices, letters and certificates in order to transfer and sell any Warrant Shares (in each case in such manner and on such terms as any Attorney in his absolute and unfettered discretion considers desirable but provided that the Warrantholders shall not be required to make or give any representations, warranties, covenants or indemnities or be responsible for any costs, in addition to those that he would be required to make or give or for which he would be responsible if he were a Dragged Shareholder (as defined in the Articles);

**(C)**    if the Exit is a Listing, enter into any lock-up agreement; and

**(D)**    receive any notices of, and attend and vote at, all meetings and sign all resolutions and consents of the Shareholders (or any class of them) of the Company in respect of the Warrants.

Yours faithfully


for and on behalf of

[NAME OF WARRANTHOLDER]


**EXECUTED and DELIVERED as a DEED**

[NAME OF TRANSFEREE]

## SCHEDULE 5

## PROVISIONS AS TO RESOLUTIONS OF WARRANTHOLDERS

**1**    **POWERS OF RESOLUTIONS OF WARRANTHOLDERS**

**(a)**    A Warrantholders' Resolution will in addition to all other powers (but without prejudice to any powers conferred on any other person by this Instrument) have the following powers:

**(i)**    power to sanction any compromise or arrangement proposed to be made between the Company and the Warrantholders or any of them;

**(ii)**    power to sanction any proposal by the Company for the modification, abrogation, variation or compromise of, or arrangement in respect of, the rights of the Warrantholders against the Company whether such rights will arise under this Instrument or otherwise;

**(iii)**    power to sanction any proposal by the Company for the exchange or substitution for the Warrants of, or the conversion of the Warrants into, shares, stock, bonds, debentures, debenture stock or other obligations or securities of the Company, or any other body corporate formed or to be formed;

**(iv)**    power to assent to any modification of the provisions contained in this Instrument which will be proposed by the Company;

**(v)**    power to authorise any person to concur in and execute all such documents and do all such acts and things as may be necessary to carry out and give effect to any Warrantholders' Resolution;

**(vi)**    power to discharge or exonerate any person from any liability in respect of any act or omission for which such person may have become responsible under this Instrument;

**(vii)**    power to give any authority, direction or sanction which under the provisions of this Instrument is required to be given by Warrantholders' Resolution; and

**(viii)**    power to appoint any person (whether a Warrantholder or not) as an agent or to a committee or committees to represent the interests of the Warrantholders and to confer upon such agent or committee any powers or discretions which the Warrantholders could themselves exercise by Warrantholders' Resolution.

**2**    **WARRANTHOLDERS' RESOLUTIONS BINDING ON WARRANTHOLDERS**

A Warrantholders' Resolution will be binding upon all the Warrantholders, whether or not they voted in favour of the resolution, and each of the Warrantholders will be bound to give effect to the Warrantholders' Resolution. The passing of any Warrantholders' Resolution will be conclusive evidence that the circumstances of such resolution justified the passing of it.

# APPENDIX 7

## INSTRUCTIONS AND GUIDANCE FOR SCHEME CREDITORS

### INSTRUCTIONS AND GUIDANCE FOR SCHEME CREDITORS

This Appendix 7 sets out instructions and guidance for voting at the Scheme Meeting and certain additional matters, including the distribution of Scheme Consideration.

Capitalised terms used in these instructions but not defined in it have the same meaning as given to them in the explanatory statement relating to the Scheme (the **Explanatory Statement**), subject to any amendments or modifications made by the Court.

**All Scheme Creditors are requested to read:**

(1)     the details about the Scheme Meeting in paragraph 1 of this Appendix;

(2)     the guidance on voting procedures at the Scheme Meeting in paragraphs 3 and 4 of this Appendix;

(3)     the information about the role of the Information Agent in paragraph 5 of this Appendix;

(4)     the guidance on attending the Scheme Meeting in paragraph 6 of this Appendix;

(5)     the guidance on transfers and assignments after the Record Time in paragraph 7 of this Appendix; and

(6)     the guidance on the distribution of Scheme Consideration in paragraph 8 of this Appendix.

**Scheme Creditors who are Existing Noteholders are requested to also read paragraph 2 of this Appendix. If you are unsure whether you are an Existing Noteholder, please read paragraph 2 below.**

As explained in section 6 of this Appendix, the Scheme Meeting will be a virtual meeting and therefore references in these instructions to attending the meeting and/or attending in person should be read as the context requires.

-------------------------------------------------------------------------------------------------------------------

1.     **SCHEME MEETING**

(a)     Before the Scheme can become effective and binding on the Company and the Scheme Creditors, a resolution to approve it must be passed by the requisite majorities of the Scheme Creditors required by section 899 of the Companies Act. The requisite majorities are a majority in number representing at least 75% in value of the Scheme Creditors who, being so entitled, are present in person, by a duly authorised representative if a corporation, or by proxy, and vote at the Scheme Meeting. The Scheme Meeting has been ordered by the Court to be summoned to take place by way of video conference on 30 October 2020 at 10:30 am (London time).

(b)     Formal notice of the Scheme Meeting is set out in Appendix 10 (Notice of Scheme Meeting) to this Explanatory Statement and such notice has been sent on behalf of the Company to the Scheme Creditors.

(c)     If the requisite majorities of the Scheme Creditors do not approve the Scheme at the Scheme Meeting, then the Group will not be able to implement the Restructuring.

(d)     The Scheme Creditors for the purposes of voting on the Scheme at the Scheme Meeting are the Existing Noteholders and the Lender Scheme Creditors. To avoid double counting in respect of the Scheme Claims, the Existing Trustee has confirmed that it will not exercise any voting rights to which

it may be entitled as a Scheme Creditor. It is customary that the Existing Depositary and Existing Custodian do not vote on the Scheme. The voting procedure for Existing Notes held through DTC (i.e. those Existing Noteholders with a DTC Book-Entry Interest) will be based on the Existing Custodian, in its capacity as nominee of DTC, in accordance with its usual procedures, appointing the DTC Participants as its sub-proxies under the Omnibus Proxy in respect of the principal amount of the Existing Notes shown on its records as being held by them as at the Principal Record Time, being 5:00 p.m. (New York time) on 26 October 2020.

## 2.    OVERVIEW OF THE POSITION FOR SCHEME CREDITORS WHO ARE EXISTING NOTEHOLDERS

(a)    The Existing Custodian holds the Global Notes in DTC in relation to each of the Existing Notes.

(b)    Existing Noteholders either hold their Existing Notes via:

(i)    DTC, either directly (a DTC Participant) or through an intermediary who is a DTC Participant; or

(ii)    Euroclear or Clearstream (via certain DTC Participants who are holding Existing Notes for Euroclear or Clearstream, respectively), either directly (a Euroclear/Clearstream Account Holder) or through an intermediary who is a Euroclear/Clearstream Account Holder.

(c)    The following persons have interests in the Existing Notes:

(i)    *DTC Participants*: You are a DTC Participant if you are recorded directly in the records of DTC as holding an interest in any Existing Notes in an account with DTC.

(ii)    *Intermediaries*: You are an Intermediary if you hold an interest in Existing Notes on behalf of another person or other persons, and you do not hold that interest as an Account Holder.

(iii)    *Euroclear/Clearstream Account Holders*: You are a Euroclear/Clearstream Account Holder if you are recorded directly in the records of Euroclear or Clearstream as holding an interest in the Existing Notes in an account with that Clearing System.

(iv)    *Account Holders:* You are an Account Holder if you are either a DTC Participant or Euroclear/Clearstream Account Holder (i.e. the term Account Holders is used where a certain action or step is relevant to both a DTC Participant and a Euroclear/Clearstream Account Holder).

(v)    *Existing Noteholder*: You are an Existing Noteholder if you have a beneficial interest in the Existing Notes held through and shown on, and transferred only through, records maintained in book entry form by a Clearing System at the Principal Record Time. For the avoidance of doubt, a person who is an Account Holder or Intermediary may also be an Existing Noteholder where they hold a beneficial interest in the Existing Notes.

(vi)    Certain other persons, including the Existing Trustee, the Existing Depositary, the Existing Custodian and any other depositary for them.

(d)    Existing Noteholders, as the beneficial owners of and/or the persons with the ultimate economic interest in the Existing Notes, are Scheme Creditors.

(e)    The number of Existing Noteholders voting and the votes cast by them will be taken into account for both value and numerosity purposes in relation to the Scheme.

(f)     **Existing Noteholders are advised to check with the bank, securities broker, relevant DTC Participant, relevant Euroclear/Clearstream Account Holder or other intermediary through which they hold their existing notes whether such intermediary applies different deadlines for any of the events specified in relation to the Scheme.**

(g)     The following diagram illustrates the relationship between certain persons with interests in the Existing Notes (with the column on the left applying to those Existing Noteholders with Existing Notes held via DTC (those with a DTC Book-Entry Interest) and that on the right applying to those Existing Noteholders with Existing Notes held via Euroclear or Clearstream (those with a Euroclear/Clearstream Book-Entry Interest)).

**Clearing System**
(DTC, with Cede & Co as nominee)
DTC is the holder of the global notes in relation to each of the Existing Notes.

**DTC Participants**

DTC has a number of DTC Participants who have accounts with DTC. Two of these DTC Participants hold Existing Notes on behalf of Euroclear and Clearstream.

 **OR**

**Intermediary**
(For example a bank or brokerage house which does not have an account with DTC)

There may be one or more Intermediaries between a DTC Participant and an Existing Noteholder.

**Euroclear/Clearstream Account Holders**
Euroclear and Clearstream have a number of Euroclear/Clearstream Account Holders who have accounts with Euroclear or Clearstream

**Intermediary**
(For example a bank or brokerage house which does not have an account with Euroclear or Clearstream)

There may be one or more Intermediaries between a Euroclear/Clearstream Account Holder and an Existing Noteholder

**Existing Noteholder**
(The beneficial owner of and/or the owner of the ultimate economic interest in any of the Existing Notes)

Each Existing Noteholder will be entitled to give instructions for the appointment of a proxy to attend and vote at the Scheme Meeting (either the Chairperson or another person selected by the Existing Noteholder) or to attend and vote at the Scheme Meeting in person.

**Existing Noteholder**
(The beneficial owner of and/or the owner of the ultimate economic interest in any of the Existing Notes)

Each Existing Noteholder will be entitled to give instructions for the appointment of a proxy to attend and vote at the Scheme Meeting (either the Chairperson or another person selected by the Existing Noteholder) or to attend and vote at the Scheme Meeting in person.

## 3.    VOTING

### 3.1    Scheme Meeting

(a)    Voting will take place at the Scheme Meeting by Scheme Creditors appearing in person, by a duly authorised representative or by proxy.

### 3.2    Voting Procedure

(a)    The voting procedures that a Scheme Creditor must follow are set out this section 3 (*Voting*). The procedure that must be followed will differ depending on the type of Scheme Creditor (for example, whether the Scheme Creditor is an Existing Noteholder or a Lender Scheme Creditor) and, in respect of Existing Noteholders, whether the Existing Notes are held (i) via Euroclear or Clearstream or (ii) via DTC.

(b)    There are three potentially applicable voting procedures. These are the voting procedures that apply to:

    (i)    Existing Noteholders with Existing Notes held via Euroclear or Clearstream (i.e. those with a Euroclear/Clearstream Book-Entry Interest);

    (ii)    Existing Noteholders with Existing Notes held via DTC (i.e. those with a DTC Book-Entry Interest); and

    (iii)    Lender Scheme Creditors.

### 3.3    Existing Noteholders with Existing Notes held via Euroclear or Clearstream

(a)    Each Scheme Creditor that is an Existing Noteholder with Existing Notes held via Euroclear or Clearstream should immediately contact its Euroclear/Clearstream Account Holder (through any Intermediaries, if appropriate) to ensure that a valid Account Holder Letter in respect of its Scheme Claim is delivered to and received by the Information Agent.

(b)    Each Existing Noteholder who wishes to vote at the Scheme Meeting must ensure that it or, if it is not a Euroclear/Clearstream Account Holder, its Euroclear/Clearstream Account Holder completes and submits to the Information Agent a valid Account Holder Letter in order to vote at the Scheme Meeting. **For the purposes of voting, Account Holder Letters must be delivered to and received by the Information Agent before the Voting Instruction Deadline, being 5:00 pm (London time) on 28 October 2020.**

(c)    A **valid** Account Holder Letter for the purposes of voting in respect of Existing Notes held via Euroclear or Clearstream means an Account Holder Letter which is signed by a Euroclear/Clearstream Account Holder (on its own behalf or on behalf of an Existing Noteholder) and in respect of which the following Parts of the Account Holder Letter have been completed:

    (i)    Part 1 (Administrative Information);

    (ii)    Part 2 (Existing Noteholder Scheme Claims (Euroclear/Clearstream)); and

    (iii)    Part 3 (Voting Instructions (Euroclear/Clearstream)).

In order to receive Scheme Consideration, the other relevant Parts of the Account Holder Letter must be signed and completed (as applicable).

(d)    **Existing Notes must be blocked by no later than the Custody Instruction Deadline, being 5:00 pm (New York time) on 26 October 2020 in accordance with the normal operating procedures imposed by Euroclear or Clearstream**. Any Existing Notes so held and blocked in Euroclear or Clearstream for this purpose shall be released to the Euroclear/Clearstream Account Holder or Euroclear or Clearstream:

    (i)    if the Scheme is not approved at the Scheme Meeting, at the conclusion of the Scheme Meeting;

    (ii)    if the Scheme is approved at the Scheme Meeting but not sanctioned at the Sanction Hearing, at the conclusion of the Sanction Hearing;

    (iii)    if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing, but the Restructuring Effective Date does not occur on or before the Long Stop Date, on the Long Stop Date; or

    (iv)    if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing and the Restructuring Effective Date occurs on or before the Long Stop Date, on the Restructuring Effective Date (with such Existing Notes being cancelled in accordance with the Restructuring Implementation Deed).

(e)    The Information Agent will request that Euroclear or Clearstream (as applicable) confirms to its satisfaction that the relevant Existing Notes have been blocked with effect from or before the date of receipt by the Information Agent of an Account Holder Letter. In the event that Euroclear or Clearstream fails to do so, the Information Agent may reject that Account Holder Letter. In order to give the requested confirmation for the purpose of voting, Euroclear or Clearstream will need to have received the Custody Instructions no later than the Custody Instruction Deadline.

(f)    **Failure to deliver a valid Account Holder Letter by or on behalf of an Existing Noteholder by the Voting Instruction Deadline will mean that the voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the Scheme Meeting and the relevant Existing Noteholder will not be entitled to vote at the Scheme Meeting. Failure to deliver a valid Account Holder Letter by or on behalf of an Existing Noteholder by the Voting Instruction Deadline will also mean that the relevant Existing Noteholder and/or their Nominee (as applicable) will not receive the Scheme Consideration on Restructuring Effective Date and will instead have to wait for the Scheme Consideration to be allocated to them in accordance with the terms of the Holding Period Trust Agreement.**

(g)    If a person is in any doubt as to whether or not it is an Existing Noteholder, such person should contact the Information Agent.

### 3.4    Existing Noteholders with Existing Notes held via DTC

(a)    As a prerequisite to receiving the New Notes, all Existing Noteholders holding positions through DTC and outside Euroclear/Clearstream are strongly recommended to transfer their positions into an existing securities account with either Euroclear or Clearstream as soon as possible. This will greatly assist with settlement in respect of the New Notes.

(b)    If such transfer is not undertaken, each Scheme Creditor that is an Existing Noteholder with Existing Notes held via DTC (i.e. those Existing Noteholders with a DTC Book-Entry Interest) should immediately contact its DTC Participant (if applicable, or through any Intermediaries, if appropriate) to ensure that a valid Account Holder Letter in respect of its Scheme Claim is delivered to and received by the Information Agent.

(c)     Each Existing Noteholder who wishes to vote at the Scheme Meeting must ensure that it or, if it is not a DTC Participant, its DTC Participant completes and submits to the Information Agent a valid Account Holder Letter in order to vote at the Scheme Meeting. **For the purpose of voting, Account Holder Letters must be delivered to and received by the Information Agent before the Voting Instruction Deadline, being 5:00 pm (London time) on 28 October 2020.**

(d)     A **valid** Account Holder Letter for the purposes of voting in respect of Existing Notes held through DTC means an Account Holder Letter which is signed by a DTC Participant (on its own behalf or on behalf of an Existing Noteholder), guaranteed by an Eligible Institution and in respect of which the following Parts of the Account Holder Letter have been completed:

(i)     Part 1 (Administrative Information); and

(ii)    Part 4 (Existing Noteholder Scheme Claims and Voting Instructions (DTC)) which includes the Sub-Proxy.

In order to receive Scheme Consideration, the other relevant Parts of the Account Holder Letter must be signed and completed (as applicable) – see paragraph 8 below.

(e)     The voting procedures under this section assume that, in accordance with its usual procedures, the Existing Custodian appoints each of the DTC Participants through whom Existing Notes are held as its sub-proxies, in each case, under the Omnibus Proxy in respect of the principal amount of the Existing Notes shown on its records as being held by them (which is referred to as the Recorded Principal Amount) as at the Principal Record Time.

(f)     Only those DTC Participants shown in DTC's records on the Principal Record Time as holding a Recorded Principal Amount will be entitled to vote in respect of the Scheme or to appoint sub-proxies to enable their votes and those of Existing Noteholders who hold their Existing Notes through DTC Participants to be cast in respect of the Scheme in relation to their Recorded Principal Amount.

(g)     If a voting instruction contained in a Part 4 of the Account Holder Letter (the **Sub-Proxy**) relates to less than all Existing Notes held through a DTC Participant with DTC, that DTC Participant must indicate in the Sub-Proxy the aggregate amount (in integral multiples of $1,000) of such Existing Notes to which such instruction relates. Otherwise, such Sub-Proxy will be deemed to relate to all such Existing Notes held through DTC.

(h)     By either delivering a Sub-Proxy, or instructing the DTC Participant through whom an Existing Noteholder holds Existing Notes to deliver a Sub-Proxy, that Existing Noteholder agrees that it will not sell or transfer any of the Existing Notes that are the subject of that Sub-Proxy until:

(i)     if the Scheme is not approved at the Scheme Meeting, the conclusion of the Scheme Meeting;

(ii)    if the Scheme is approved at the Scheme Meeting but not sanctioned at the Sanction Hearing, the conclusion of the Sanction Hearing;

(iii)   if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing, but the Restructuring Effective Date does not occur before the Long Stop Date, the Long Stop Date; or

(iv)    if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing and the Restructuring Effective Date occurs before the Long Stop Date, the Restructuring Effective Date (with such Existing Notes being cancelled in accordance with the Restructuring Implementation Deed).

(i)     **Failure to deliver a valid Account Holder Letter (including a Sub-Proxy) by or on behalf of an Existing Noteholder by the Voting Instruction Deadline will mean that the voting instructions contained in the Account Holder Letter will be disregarded for the purposes of voting at the Scheme Meeting and the relevant Existing Noteholder will not be entitled to vote at the Scheme Meeting.**

(j)     If a person is in any doubt as to whether or not it is an Existing Noteholder, such person should contact the Information Agent.

**3.5     Term Loan Lenders, Revolving Lenders and the Existing Overdraft Provider** (the **Lender Scheme Creditors**)

(a)     **For the avoidance of doubt, Lender Claim Forms should only be completed by lenders of record on the books of the relevant administrative agent. Creditors with a beneficial interest only cannot submit a Lender Claim Form themselves and are therefore recommended to contact their lender of record.**

(b)     Each Lender Scheme Creditor must ensure that it completes and submits to the Information Agent a valid Lender Claim Form in order to vote at the Scheme Meeting. **For the purpose of voting, Lender Claim Forms must be delivered to and received by the Information Agent before the Voting Instruction Deadline, being 5:00 pm (London time) on 28 October 2020.**

(c)     A **valid** Lender Claim Form for the purposes of voting for each Lender Scheme Creditor means a Lender Claim Form which is signed by a Lender Scheme Creditor and in respect of which the following Parts of the Account Holder Letter have been completed:

(i)     Part 1 (Administrative Information); and

(ii)     Part 2 (Proxy Form) (if applicable).

In order to receive Scheme Consideration, the other relevant Parts of the Lender Claim Form must be signed and completed (as applicable) – see paragraph 8 below.

**3.6     All Scheme Creditors**

(a)     Notwithstanding any other provision of this Explanatory Statement, the Chairperson will be entitled, at the sole discretion of the Chairperson, to permit a Scheme Creditor in respect of which a completed Account Holder Letter and/or Lender Claim Form has not been delivered prior to the Voting Instruction Deadline to vote at the Scheme Meeting if the Chairperson considers that the relevant Scheme Creditor has produced sufficient proof that it is a Scheme Creditor.

(b)     **Each Scheme Creditor is recommended to appoint a proxy (either the Chairperson or someone else of its choice who would be willing to attend the Scheme Meeting) in any event, even if that Scheme Creditor intends to attend and vote in person or by a duly authorised representative, if a corporation, in case such Scheme Creditor is unable to do so for some reason. If a Scheme Creditor appoints a proxy and then decides to attend and vote at the Scheme Meeting in person or by a duly authorised representative, if a corporation, that Scheme Creditor will be entitled to do so.**

(c)     Save as set out in paragraph 3.6(d) below, any Account Holder Letter and/or Lender Claim Form delivered to the Information Agent will be irrevocable.

(d)     An Account Holder Letter and/or Lender Claim Form which has been delivered to and received by the Information Agent prior to the Voting Instruction Deadline may be amended by a Scheme Creditor by delivering an updated Account Holder Letter and/or Lender Claim Form to the Information Agent at

any time prior to the Voting Instruction Deadline. If an updated Account Holder Letter and/or Lender Claim Form is received after the Voting Instruction Deadline, the Information Agent will decide (in its sole discretion) whether or not to accept such updated Account Holder Letter and/or Lender Claim Form.

## 4.    ASSESSMENT OF SCHEME CLAIMS FOR VOTING PURPOSES

(a)    The amount of the Scheme Claims of each Scheme Creditor which submits a valid Account Holder Letter and/or Lender Claim Form (as applicable) in respect of their Scheme Claims will be calculated as at the Record Time based on information confidentially provided to the Company by the Information Agent and/or an Existing Administrative Agent. This information will be used by the Chairperson to determine whether the Scheme is approved at the Scheme Meeting. Accordingly, Scheme Creditors do not need to take any action in respect of confirming the amount of their Scheme Claims other than providing the details requested in the Account Holder Letter (no confirmations are required in the Lender Claim Form). However, Scheme Creditors may be requested by the Company to assist with confirming the amount of their Scheme Claims.

(b)    The nominal amount of Scheme Claims for voting purposes for each Scheme Creditor will be all amounts owed by the Obligors to that Scheme Creditor (in its capacity as such) at the Record Time (including, for the avoidance of doubt, any accrued and unpaid interest (including any default interest) or commitment fees in accordance with the terms of the Credit Agreement and/or Existing Indentures (as applicable)) based on information provided to the Company, or the Information Agent on its behalf, by (i) the Existing Noteholders in their Account Holder Letter, or (ii), in relation to the Lender Scheme Creditors, the relevant Existing Administrative Agent, or will otherwise be based on the Company's own books and records, information available to its financial and legal advisers and/or information provided to it.

(c)    Only those Scheme Creditors who (i) are Scheme Creditors at the Record Time and (ii) provide a validly completed and executed Account Holder Letter and/or Lender Claim Form (as applicable) to the Information Agent before the Voting Instruction Deadline are entitled to attend and vote at the Scheme Meeting in accordance with the procedures set out in more detail below.

(d)    The assessment of Scheme Claims for voting purposes shall be carried out by the Chairperson. The Chairperson may, for voting purposes only, reject a Scheme Claim in whole or in part if he/she considers that it does not constitute a fair and reasonable assessment of the relevant sums owed to the relevant Scheme Creditor by the relevant Obligor or if the relevant Scheme Creditor has not complied with the voting procedures described in this Explanatory Statement.

(e)    To the extent any amount owed under the Existing Overdraft Facilities are denominated in a currency other than U.S. dollars, that amount shall be converted into U.S. dollars using the HSBC Mid-Market Rate (or if the HSBC Mid-Market Rate is not accessible by the Company at the Existing Overdraft Record Time, the Bank of England Exchange Rate).

(f)    The Chairperson will report to the Court, at the Sanction Hearing (which it is anticipated will take place on 5 November 2020), his/her decision to reject Scheme Claims (if any), with details of those Scheme Claims and the reasons for rejection.

(g)    The admission and valuation of any Scheme Claim for voting purposes does not (in itself) constitute an admission of the existence or value of the Scheme Claim and will not bind the Company or the Scheme Creditor concerned.

## 5.    INFORMATION AGENT

(a)    The Information Agent has been appointed to facilitate communications with Scheme Creditors. The Information Agent's remuneration and expenses, and all costs incurred by it on behalf of the Company,

will be met by the Company. The Information Agent is the agent of the Company and owes no duty to any Scheme Creditor, express or implied.

(b)     The Information Agent will use all reasonable endeavours to assist Scheme Creditors to complete their Account Holder Letters and/or Lender Claim Forms validly, should it receive any Account Holder Letters and/or Lender Claim Forms which are not validly completed. However, failure to deliver a valid Account Holder Letter and/or Lender Claim Form to the Information Agent in the manner and within the deadlines referred to therein will mean that the voting instructions contained in such Account Holder Letter and/or Lender Claim Form will be disregarded for the purposes of voting at the Scheme Meeting and the relevant Scheme Creditor will not be entitled to vote at the Scheme Meeting.

(c)     None of the Company, the Information Agent, the Holding Period Trustee, the Jersey Registrar or any other person will be responsible for any loss or liability incurred by a Scheme Creditor as a result of any determination by the Information Agent that an Account Holder Letter and/or Lender Claim Form contains an error or is incomplete, even if this is subsequently shown not to have been the case.

## 6.    ATTENDING THE SCHEME MEETING

(a)     The Scheme Meeting will take place at 10:30 am (London time) on 30 October 2020 by way of video conference.

(b)     If a Scheme Creditor wishes to attend the Scheme Meeting, and has indicated the same in its Account Holder Letter and/or Lender Claim Form (as applicable), it should produce evidence of corporate authority (in the case of a corporation) (for example, a valid power of attorney and/or board minutes) and evidence of personal identity (a passport or other equivalent identification) to the Information Agent via email (kcadeutag@lucid-is.com) **no later than one hour before the scheduled time of the Scheme Meeting**. The Scheme Creditor will then receive an email with the video conference details and password from the Information Agent.

(c)     Any proxy attending the Scheme Meeting on behalf of a Scheme Creditor should, prior to the Scheme Meeting, provide the Information Agent with supporting evidence of his/her appointment if the Account Holder and/or Scheme Creditor (as applicable) is a corporate person (i.e. evidence of such proxy's authority). Where that evidence is sufficient to ascertain the person in question is the appointed proxy, that Scheme Creditor's proxy will be admitted to the Scheme Meeting (through receipt of an email with the video conference details and password). Similarly, where a natural person is appointed as proxy, that natural person will be required to provide evidence of his/her personal identity (a passport or other equivalent identification).

## 7.    TRANSFERS AND ASSIGNMENTS AFTER THE RECORD TIME

Under the terms of the Scheme, the Company shall not be under any obligation to recognise any purported assignment or transfer of any Scheme Claims by a Scheme Creditor following the Record Time for the purposes of the Scheme or the Implementation Documents (including but not limited to determining the applicable allocation of Scheme Consideration). Notwithstanding the foregoing, where the Company has received from the relevant parties written notice of such purported assignment or transfer, the Company may in its absolute discretion, and subject to such evidence as it may reasonably require, agree to recognise such purported assignment or transfer, subject to the assignee or transferee agreeing to be bound by the terms of this Scheme and to be treated as having been a Scheme Creditor for the purposes of the Scheme.

## 8.    DISTRIBUTION OF SCHEME CONSIDERATION AND JERSEY NEWCO KYC

(a)     Scheme Creditors are advised to read in full the Restructuring Implementation Deed, the Holding Period Trust Agreement (which is attached at part 9 (Holding Period Trust Agreement) of schedule 2 (Key Restructuring Documents) to the Restructuring Implementation Deed and appended to the

**1513**

Explanatory Statement at Part 9 (Holding Period Trust Agreement) of Appendix 4 (Key Restructuring Documents)) and the summary of the Holding Period Trust Agreement in section 5 (Holding Period Trust Agreement) of Part 6 (Summary of the Key Restructuring Documents) of the Explanatory Statement.

(b)     In order to receive its Scheme Creditor Entitlements in accordance with the terms of the Restructuring Implementation Deed, each Scheme Creditor must:

(i)     ensure that it submits a valid Account Holder Letter and/or Lender Claim Form to the Information Agent by the Voting Instruction Deadline (including making the confirmations in the Securities Confirmation Deed in Part 6 of the Account Holder Letter and Part 4 of the Lender Claim Form); and

(ii)    submit the correct Jersey Newco KYC to the Jersey Registrar by the Voting Instruction Deadline (and the Information Agent must have received confirmation from the Jersey Registrar that all Jersey Newco KYC has to its been completed to its satisfaction in respect of such Scheme Creditor (or its Nominee, if applicable) no later than five Business Days before the Restructuring Effective Date) in relation to the Jersey Newco Consideration Shares.

(c)     The Schedule to the Account Holder Letter and/or Lender Claim Form sets out the initial Jersey Newco KYC required by the Jersey Registrar from each Scheme Creditor or its Nominee (if applicable).

(d)     If a Scheme Creditor would like to receive Jersey Newco Consideration Shares on the Restructuring Effective Date, it must ensure that the Jersey Newco KYC is provided in a form satisfactory to the Jersey Registrar in respect of the legal person which will receive the Jersey Newco Consideration Shares (either the Scheme Creditor or its Nominee (if applicable)) by the Voting Instruction Deadline and, in the case of any supplementary information requested by the Jersey Registrar, by no later than the date falling no later than five Business Days before the Restructuring Effective Date.

(e)     Once compiled, the relevant information in the Schedule should be sent to the Jersey Registrar at the following email address: projectkelly@crestbridge.com.

(f)     For any queries related to the Jersey Newco KYC that must be provided, Scheme Creditors should contact the Jersey Registrar at projectkelly@crestbridge.com or by telephone on +44 1534 835950. The Information Agent cannot assist with any queries related to the Jersey Newco KYC.

(g)     A **valid** Account Holder Letter for the purposes of receiving Scheme Consideration means an Account Holder Letter which is signed by an Account Holder (on its own behalf or on behalf of an Existing Noteholder) and in respect of which the following Parts of the Account Holder Letter have been completed:

(i)     Part 1 (Administrative Information);

(ii)    Part 2 (Existing Noteholder Scheme Claims (Euroclear/Clearstream)) (if applicable);

(iii)   Part 4 (Existing Noteholder Scheme Claims and Voting Instructions (DTC)) (if applicable);

(iv)    Part 5 (Scheme Creditor Entitlements); and

(v)     Part 6 (Securities Confirmation Deed).

In order to vote at the Scheme Meeting, the other relevant Parts of the Account Holder must be signed and completed (as applicable) – see paragraph 3 above.

(h)    A **valid** Lender Claim Form for the purposes of receiving Scheme Consideration means a Lender Claim Form which is signed by the Lender Scheme Creditor and in respect of which the following Parts of the Lender Claim Form have been completed:

(i)    Part 1 (Administrative Information);

(ii)    Part 3 (Scheme Creditor Entitlements); and

(iii)    Part 4 (Securities Confirmation Deed).

In order to vote at the Scheme Meeting, the other relevant Parts of the Lender Claim Form must be signed and completed (as applicable) – see paragraph 3 above.

(i)    A Scheme Creditor must be an Eligible Person to receive Scheme Consideration. If the Scheme Creditor is not an Eligible Person, in the Account Holder Letter and/or Lender Claim Form, a Scheme Creditor may appoint a Nominee (who must be an Eligible Person) to receive the New Notes and/or Jersey Newco Consideration Shares to which it is entitled.

(j)    Failure to deliver a valid Account Holder Letter and/or Lender Claim Form before the Voting Instruction Deadline, and/or failure to submit the correct Jersey Newco KYC to the Jersey Registrar will mean that the Scheme Creditor will be an Unadmitted Scheme Creditor and will not receive all or part (as applicable) of its Scheme Creditor Entitlements in accordance with the terms of the Restructuring Implementation Deed on the Restructuring Effective Date.

(k)    Following receipt by the Information Agent from an Unadmitted Scheme Creditor of a valid Account Holder Letter and/or Lender Claim Form which is completed and delivered to and received by the Information Agent after the Voting Instruction Deadline but before the end of the Holding Period, and following confirmation to the Information Agent from the Jersey Registrar before the end of the Holding Period that all Jersey Newco KYC has been completed by an Unadmitted Scheme Creditor (or its Nominee, if applicable) in relation to the Jersey Newco Consideration Shares, the relevant Unadmitted Scheme Creditor (or, to the extent applicable, its Nominee) will receive all or part (as applicable) of its Scheme Creditor Entitlements in accordance with the terms of the Restructuring Implementation Deed and Holding Period Trust Agreement (including any interest, any dividends, or other payments received by the Holding Period Trustee in respect of such Scheme Consideration, in each case net of fees, taxes and expenses) as soon as reasonably practicable and in accordance with the terms of the Restructuring Implementation Deed and Holding Period Trust Agreement.

(l)    For more information about the terms of the Holding Period Agreement and the treatment of unclaimed Scheme Consideration please see section 5 (Holding Period Trust Agreement) of Part 6 (Summary of the Key Restructuring Documents) of the Explanatory Statement.

**1515**

# APPENDIX 8

## ACCOUNT HOLDER LETTER

*For use by Existing Noteholders only*

## ACCOUNT HOLDER LETTER

## (INCLUDING FORM OF SUB-PROXY IN RESPECT OF EXISTING NOTES HELD VIA DTC)

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES

INSOLVENCY AND COMPANIES LIST (ChD)

### IN THE MATTER OF KCA DEUTAG UK FINANCE PLC
**- and -**
### IN THE MATTER OF THE COMPANIES ACT 2006

### SCHEME OF ARRANGEMENT
(*under Part 26 of the Companies Act 2006*)

between

### KCA DEUTAG UK FINANCE PLC

and

### THE SCHEME CREDITORS

7.25% senior secured notes due 2021
(Regulation S Notes ISIN: USG5222MAA39, Regulation S Notes Common Code: 104277586, Rule 144A Notes ISIN: US48244LAA61, Rule 144A Notes Common Code: 104277578, Regulation S Notes CUSIP: G5222MAA3, Rule 144A Notes CUSIP)

9.875% senior secured notes due 2022
(Regulation S Notes ISIN: USG5222MAB12, Regulation S Notes Common Code: 153994803, Rule 144A Notes ISIN: US48244LAC28, Rule 144A Notes Common Code: 153994994, Regulation S Notes CUSIP: G5222MAB1, Rule 144A Notes CUSIP: 48244LAC2)

and

9.625% senior secured notes due 2023
(Regulation S Notes ISIN: USG5222MAC94, Regulation S Notes Common Code: 180491589, Rule 144A Notes ISIN: US48244LAE83, Rule 144A Notes Common Code: 180491562, Regulation S Notes CUSIP: G5222MAC9, Rule 144A Notes CUSIP: 48244LAE8)

| **Custody Instruction Deadline:** 5:00 pm (New York time) on 26 October 2020  **Principal Record Time**: 5:00 pm (New York time) on 26 October 2020 | ACCOUNT HOLDER LETTER FOR EXISTING NOTEHOLDERS, ONLY | **Scheme Meeting:** 10:30 am (London Time) on 30 October 2020, via video conference |
|---|---|---|

**1517**

| **Voting Instruction Deadline:** 5:00 pm (London time) on 28 October 2020 | | |

You are advised to act well in advance of the above deadlines in order to make sure all the necessary procedures are completed before the relevant deadline.

## PURPOSE OF THIS ACCOUNT HOLDER LETTER

Capitalised terms used in this Account Holder Letter but not defined in it have the same meaning as given to them in the explanatory statement relating to the Scheme (the **Explanatory Statement**), subject to any amendments or modifications made or approved by the Court.

Persons who are Euroclear/Clearstream Account Holders, and persons who are DTC Participants (whom together with Euroclear/Clearstream Account Holders, are referred to as Account Holders) must use this Account Holder Letter to: (i) register details of either their interests in the Existing Notes or the interests of another Scheme Creditor on whose behalf they are acting, (ii) vote in respect of the Scheme and (iii) provide the necessary information and confirmations in order to receive the Scheme Consideration. A summary of what is required from each Account Holder is set out at pages 9 to 12 of this letter.

For the avoidance of doubt, as the term Account Holder includes both DTC Participants and Euroclear/Clearstream Account Holders, any action or step required by an Account Holder is required by both DTC Participants and Euroclear/Clearstream Account Holders. Where an action or step is limited to just a DTC Participant or just a Euroclear/Clearstream Account Holder, the relevant term DTC Participant or Euroclear/Clearstream Account Holder (as applicable) will be used.

**If the documents and information required by this Account Holder Letter are not submitted to the Information Agent by the Voting Instruction Deadline, being 5:00 pm (London time) on 28 October 2020, the relevant Existing Noteholder will not be eligible to receive the Scheme Consideration (comprising the New Notes and the Jersey Newco Consideration Shares) on the Restructuring Effective Date.**

**Scheme Creditors are strongly encouraged to appoint a proxy (either the Chairperson or another person of their choice who is willing to attend the Scheme Meeting) by completing and submitting the relevant sections of this Account Holder Letter and, for those attending the Scheme Meeting in person or appointing a proxy other than the Chairperson, their relevant identification documents prior to the Voting Instruction Deadline, even if they intend to attend and vote in person, in case they are unable to do so for any reason.**

**As explained in Appendix 7 (Instructions and Guidance for Scheme Creditors) to the Explanatory Statement, the Scheme Meeting will be a virtual meeting and therefore references in this document to attending the meeting and/or attending in person should be read as the context requires.**

A separate Account Holder Letter must be completed for each separate beneficial holding of/interest in the Existing Notes.

This Account Holder Letter is only to be completed by Existing Noteholders, Account Holders (if different) and, if applicable, any Nominees.  If an Existing Noteholder is appointing one or more Nominees to receive any of its Scheme Creditor Entitlements, the relevant Existing Noteholder and each Nominee must complete Section 3 of Part 5 of this Account Holder Letter, to be delivered to the Information Agent along with this Account Holder Letter.

**THIS ACCOUNT HOLDER LETTER IS NOT TO BE DISTRIBUTED TO OR ACCESSED BY (I) ANY PERSON LOCATED OR RESIDENT IN THE UNITED STATES OTHER THAN QUALIFIED INSTITUTIONAL BUYERS OR INSTITUTIONAL ACCREDITED INVESTORS, (II) (FOR CERTAIN SECURITIES) ANY U.S. PERSON OUTSIDE THE UNITED STATES OR (III) ANY RETAIL INVESTORS IN THE EUROPEAN ECONOMIC AREA OR THE UNITED KINGDOM.**

**THIS DOCUMENT DOES NOT CONSTITUTE OR FORM PART OF ANY OFFER OR INVITATION TO SELL OR ISSUE, OR ANY SOLICITATION OF ANY OFFER TO PURCHASE OR SUBSCRIBE FOR, ANY SECURITIES.**

**Confirmation of your representations**: By receiving this Account Holder Letter, you have confirmed that:

(a)    you are either: (x) an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act; (y) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act; or (z) receiving the relevant securities in an offshore transaction in accordance with Regulation S under the Securities Act (and, in case of the Regulation S New Notes, not a "U.S. person" under the meaning of Regulation S under the Securities Act);

(b)    you are not a retail investor in the European Economic Area or the United Kingdom (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of MiFID II; (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II or (z) not a qualified investor as defined in the Prospectus Regulation); and

(c)    you are not a Disqualified Person.

**IF YOU ARE UNABLE TO CONFIRM THE REPRESENTATIONS SET FORTH ABOVE, YOU ARE NOT AN ELIGIBLE PERSON AND, UNLESS YOU APPOINT A NOMINEE WHO IS AN ELIGIBLE PERSON (PURSUANT TO PART 5 OF THIS ACCOUNT HOLDER LETTER), YOU ARE NOT ELIGIBLE TO RECEIVE OR REVIEW THIS ACCOUNT HOLDER LETTER AND SHOULD REFRAIN FROM ACCESSING, RELYING ON OR ACTING ON IT IN ANY WAY.**

**INSTRUCTIONS FOR THE COMPLETION AND SUBMISSION OF THIS ACCOUNT HOLDER
LETTER**

This Account Holder Letter is divided into six parts as summarised below.

Before any part of this Account Holder Letter is completed, Existing Noteholders should read the Scheme, the
Restructuring Implementation Deed and the Explanatory Statement and, in particular, Appendix 7 to the
Explanatory Statement (Instructions and Guidance for Scheme Creditors).  The Scheme, the Restructuring
Implementation Deed and the Explanatory Statement and all relevant associated documentation can be found
via the Scheme Website at http://www.lucid-is.com/kcadeutag.

**In order for an Existing Noteholder to vote at the Scheme Meeting and receive their Scheme Creditor
Entitlements (through a Nominee(s), if applicable) on the Restructuring Effective Date, the validly
completed Account Holder Letter(s) together with any accompanying documents or evidence must be
submitted by an Account Holder to the Information Agent by the Voting Instruction Deadline online
via http://www.lucid-is.com/kcadeutag or by email in PDF form to kcadeutag@lucid-is.com. In addition,
to receive the Jersey Newco Consideration Shares on the Restructuring Effective Date, the Existing
Noteholder (or its Nominee, if applicable) must have submitted all Jersey Newco KYC to the Jersey
Registrar by the Voting Instruction Deadline (and the Jersey Registrar must have confirmed to the
Information Agent that all Jersey Newco KYC in respect of the relevant Scheme Creditor (or its
Nominee, as applicable) has been completed to its satisfaction no later than five Business Days prior to
the Restructuring Effective Date).**

In relation to an Account Holder Letter, **validly completed** means an Account Holder Letter which, to the
satisfaction of the Information Agent (acting reasonably):

(a)    has had each relevant part and section thereof completed in full;

(b)    gives all required authorisations, confirmations and undertakings in the form requested therein; and

(c)    is executed in Part 2 thereof by the Account Holder, Part 4 by the DTC Participant and an Eligible
Institution (if applicable) and, in the case of Part 6, by the Existing Noteholder and (if applicable) its
Nominee(s).

**1521**

## IMPORTANT DEADLINES

--------------------------------------------------------------------------------------------------------------------

### A. FOR ACCOUNT HOLDERS HOLDING EXISTING NOTES VIA EUROCLEAR AND/OR CLEARSTREAM

**Custody Instruction Deadline – 5:00 pm (New York time) on 26 October 2020**

**Existing Noteholders will receive notice of the elections required by this Account Holder Letter from their respective Euroclear/Clearstream Account Holders.**

**Once the Existing Noteholder has confirmed its consent to this notification, the Euroclear/Clearstream Account Holder must submit an electronic instruction to the Information Agent (via Euroclear and/or Clearstream) by no later than the Custody Instructions Deadline. The Euroclear/Clearstream Account Holder will receive a Custody Instruction Reference Number upon delivery of their instruction, and must include this in the Account Holder Letter submission where indicated.**

**ONCE THE ELECTRONIC INSTRUCTION IS SUBMITTED, THE RELEVANT EXISTING NOTES WILL BE BLOCKED IN THE CLEARING SYSTEMS.  THE BLOCK WILL REMAIN IN PLACE UNTIL THE RESTRUCTURING EFFECTIVE DATE, OR SUCH EARLIER TIME SPECIFIED IN PART 2 OF THE SUMMARY OF CONTENTS OF THIS ACCOUNT HOLDER LETTER BELOW.**

--------------------------------------------------------------------------------------------------------------------

### B. FOR ALL ACCOUNT HOLDERS

**Parts 1 to 6 of this Account Holder Letter must be completed (if applicable) and submitted to the Information Agent by no later than the Voting Instruction Deadline, that is 5:00 pm (London time) on 28 October 2020, in order to vote on the Scheme and receive the Scheme Consideration on the Restructuring Effective Date.  In addition, to receive the Jersey Newco Consideration Shares by the Restructuring Effective Date, (i) the Existing Noteholder (or its Nominee, if applicable) must have submitted all Jersey Newco KYC to the Jersey Registrar by the Voting Instruction Deadline and (ii) the Jersey Registrar must have confirmed to the Information Agent that all Jersey Newco KYC in respect of the relevant Scheme Creditor (or its Nominee, as applicable) has been completed to its satisfaction no later than five Business Days prior to the Restructuring Effective Date. A summary of how to submit your Jersey Newco KYC to the Jersey Registrar is set out below.**

It is highly recommended that the completed Account Holder Letter is printed or saved as a PDF document after submission.  You will receive acknowledgement of the online transmission of your submission together with the final PDF.  Original paper copies of the Account Holder Letter are not required and should not be sent to the Information Agent.

**All elections made in this Account Holder Letter shall, subject to verification by the Company and/or the Information Agent, be final and binding (save that you can submit an updated Account Holder Letter provided you do so before the Voting Instruction Deadline) on and from the date of submission of the Account Holder Letter to the Information Agent.**

If the Scheme Effective Time occurs, the Scheme will become effective and binding on all Scheme Creditors, regardless of whether you voted in favour or against the Scheme or abstained from voting.  The New Notes Entitlement and the Jersey Newco Shares Entitlement (which together comprise **the Scheme Creditor Entitlements**) will be delivered on or around the Restructuring Effective Date to you and/or your Nominee (as applicable) or, if you have not validly completed an Account Holder Letter(s), to the Holding Period Trustee.

Notwithstanding any other provision of this Account Holder Letter, any representation, undertaking or confirmation required to be given by an Existing Noteholder or its Account Holder or Nominee in this Account Holder Letter may be waived in writing by the Company and the Information Agent.

This Account Holder Letter and any non-contractual obligations arising out of or in relation to this Account Holder Letter shall be governed by, and interpreted in accordance with, English law.

**SUMMARY OF CONTENTS OF THIS ACCOUNT HOLDER LETTER**

**THIS ACCOUNT HOLDER LETTER HAS SIX PARTS.**

1.    **PART 1: ADMINISTRATIVE INFORMATION**

*This part must be completed by **all** Account Holders.*

If the Account Holder is different to the Existing Noteholder, the Account Holder shall also specify the name of the Existing Noteholder on whose behalf this Account Holder Letter is being submitted. If there are multiple Existing Noteholders, **a separate Account Holder Letter** must be completed by an Account Holder in respect of each Existing Noteholder.

If the Account Holder and the Existing Noteholder are the same person or legal entity, any references in this Account Holder Letter to an "Account Holder" and "Existing Noteholder" shall be treated as interchangeable.

2.    **PART 2: EXISTING NOTEHOLDER SCHEME CLAIMS (EUROCLEAR/CLEARSTREAM)**

*This part must be completed and signed by Euroclear/Clearstream Account Holders (i.e. in respect of Existing Notes held via Euroclear or Clearstream), **only**.*

Where a Euroclear/Clearstream Account Holder is acting on behalf of an Existing Noteholder who is its client then the Euroclear/Clearstream Account Holder must complete and sign this part on behalf of that Existing Noteholder.  Please sign where indicated.

A Custody Instruction Reference Number in respect of any Existing Notes that are identified in Part 2 of this Account Holder Letter must first be provided by the Euroclear/Clearstream Account Holder by submitting its Custody Instructions to the relevant Clearing System (i.e. by way of electronic instruction) by the Custody Instruction Deadline of 5:00 pm (New York time) on 26 October 2020. Such Custody Instruction Reference Number must be specified in the space provided in Part 2 of this Account Holder Letter. Once the Euroclear/Clearstream Account Holder has submitted an electronic instruction, a block on the trading of the relevant Existing Notes will apply as from that time until:

(a)    if the Scheme is not approved at the Scheme Meeting, the conclusion of the Scheme Meeting;

(b)    if the Scheme is approved at the Scheme Meeting but not sanctioned at the Sanction Hearing, the conclusion of the Sanction Hearing;

(c)    if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing, but the Restructuring Effective Date does not occur before the Long Stop Date, the Long Stop Date; or

(d)    if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing and the Restructuring Effective Date occurs before the Long Stop Date, the Restructuring Effective Date (with such Existing Notes being cancelled in accordance with the Restructuring Implementation Deed).

Failure to include a valid Custody Instruction Reference Number will invalidate an Account Holder Letter, the voting instructions contained in that Account Holder Letter will be disregarded for the purposes of voting at the Scheme Meeting and the relevant Existing Noteholder will not be entitled to vote at the Scheme Meeting.

3. **PART 3: VOTING INSTRUCTIONS (EUROCLEAR/CLEARSTREAM)**

*This part must be completed and signed by Euroclear/Clearstream Account Holders (i.e. in respect of Existing Notes held via Euroclear or Clearstream), **only**.*

This part must be completed by the Euroclear/Clearstream Account Holder if it (or if different, the Existing Noteholder who is its client) wishes to vote on the Scheme. In order for the Euroclear/Clearstream Account Holder (or the Existing Noteholder, as applicable) to vote on the Scheme, this Account Holder Letter must be validly completed and submitted to the Information Agent by the Voting Instruction Deadline.

Where a Euroclear/Clearstream Account Holder (or if different, an Existing Noteholder, as applicable) or its proxy intends to attend the Scheme Meeting in person, a valid original passport or other original government issued photographic identification will be required as proof of personal identity and the passport or identification details contained therein must match those provided in Part 3 of this Account Holder Letter.

In addition, where a proxy is appointed to attend the Scheme Meeting in person and the Euroclear/Clearstream Account Holder (or the Existing Noteholder, as applicable) is a corporate person, evidence of the individual proxy's authority to attend the Scheme Meeting on behalf of the Euroclear/Clearstream Account Holder/the Existing Noteholder (for example, a valid power of attorney and/or board resolutions) will be required (unless the Chairperson has been selected as the proxy). If appropriate personal identification or evidence of authority is not produced, that person shall only be permitted to attend and vote at the Scheme Meeting at the discretion of the Chairperson.

Unless a Euroclear/Clearstream Account Holder (or if different, an Existing Noteholder) has selected the Chairperson as its proxy, any proxy attending the Scheme Meeting on behalf of a Euroclear/Clearstream Account Holder (or if different, an Existing Noteholder) should, prior to the Scheme Meeting, provide the Information Agent with supporting evidence of his/her appointment if the Account Holder (or if different, an Existing Noteholder) is a corporate person (i.e. evidence of such proxy's authority).

4. **PART 4: EXISTING NOTEHOLDER SCHEME CLAIMS AND VOTING INSTRUCTIONS (INCLUDING SUB-PROXY) (DTC)**

*This part must be completed and signed by DTC Participants in respect of Existing Notes held via DTC **only**.*

**As a prerequisite to receiving the New Notes, all Account Holders and/or Existing Noteholders holding positions through DTC and not through Euroclear/Clearstream are strongly recommended to transfer their positions into an existing securities account with either Euroclear or Clearstream as soon as possible. On completion of such transfer, Account Holders and Existing Noteholders should refer to Part 3 above.**

If no such transfer is completed, this part 4 should be completed by a DTC Participant if it (or if different, the Existing Noteholder who is its client) wishes to vote on the Scheme. In order for the DTC Participant (or the Existing Noteholder, as applicable) to vote on the Scheme, this Account Holder Letter must be validly completed and submitted to the Information Agent by the Voting Instruction Deadline. Please note that the DTC Participant's signature must be guaranteed by an Eligible Institution.

Where a DTC Participant (or if different, an Existing Noteholder, as applicable) or its proxy intends to attend the Scheme Meeting in person, a valid original passport or other original government issued photographic identification will be required as proof of personal identity and the passport or

identification details contained therein must match those provided in Part 4 of this Account Holder Letter.

In addition, where a proxy is appointed to attend the Scheme Meeting in person and the DTC Participant (or the Existing Noteholder, as applicable) is a corporate person, evidence of the individual proxy's authority to attend the Scheme Meeting on behalf of the DTC Participant/the Existing Noteholder (for example, a valid power of attorney and/or board resolutions) will be required (unless the Chairperson has been selected as the proxy). If appropriate personal identification or evidence of authority is not produced, that person shall only be permitted to attend and vote at the Scheme Meeting at the discretion of the Chairperson.

Unless a DTC Participant (or if different, an Existing Noteholder) has selected the Chairperson as its proxy, any proxy attending the Scheme Meeting on behalf of a DTC Participant (or if different, an Existing Noteholder) should, prior to the Scheme Meeting, provide the Information Agent with supporting evidence of his/her appointment if the DTC Participant (or if different, an Existing Noteholder) is a corporate person (i.e. evidence of such proxy's authority).

## 5.    PART 5: SCHEME CREDITOR ENTITLEMENTS

### 5.1    U.S. Securities Elections

*This section must be completed by **all** Account Holders (i.e. by both DTC Participants and Euroclear/Clearstream Account Holders).*

This section must be completed by all Account Holders (or if different, an Existing Noteholder, as applicable) in order for the relevant Scheme Creditor to receive its Scheme Creditor Entitlements.

### 5.2    New Account Holder Details for Remaining DTC Noteholders

*This section must be completed by Account Holders in respect of Existing Notes held in DTC (i.e. for those Account Holders with a DTC Book-Entry Interest outside Euroclear/Clearstream) **only**.*

This section must be completed by Account Holders that hold Existing Notes via DTC in order for the relevant Scheme Creditor to receive its New Notes Entitlements through Euroclear or Clearstream as applicable.

### 5.3    Appointment of Nominee(s)

*This section must be completed by **any** Account Holders that wish to appoint one or more Nominees.*

This section must be completed by Account Holders (or, if different, an Existing Noteholder, as applicable) if it intends to appoint one or more Nominees (each of which must be an Eligible Person) to receive any of its Scheme Creditor Entitlements. Scheme Creditor Entitlements will not be allocated to any Existing Noteholder and/or Nominee which is not an Eligible Person.

### 5.4    Jersey Newco Consideration Shares KYC Requirements

*Jersey Newco KYC should be submitted by Existing Noteholders or their Nominee (if appointed), and this section must be confirmed as completed, by **all** Account Holders on behalf of Existing Noteholders.*

The Schedule to this Account Holder Letter sets out the initial Jersey Newco KYC required in respect of each Existing Noteholder and/or its Nominee (if appointed).

If an Existing Noteholder (or its Nominee (if applicable)) would like to receive the Jersey Newco Consideration Shares on the Restructuring Effective Date, Jersey Newco KYC in respect of the legal

person which will receive the Jersey Newco Consideration Shares (either the Exiting Noteholder and/or its Nominee (if appointed)) must be submitted by the Existing Noteholder to the Jersey Registrar by the Voting Instruction Deadline and the Jersey Registrar must have confirmed to the Information Agent that all Jersey Newco KYC in respect of the relevant Existing Noteholder (or its Nominee (if applicable)) has been completed to its satisfaction no later than five Business Days prior to the Restructuring Effective Date.

Please note that the relevant Jersey Newco KYC to be provided to the Jersey Registrar will depend on whether the legal person receiving the Jersey Newco Consideration Shares is a company or a limited partnership and accordingly, the relevant forms for each type of person are included in the Schedule.

Once completed, the relevant information in the Schedule should be sent to the Jersey Registrar at the following email address: projectkelly@crestbridge.com.

For any queries related to the Jersey Newco KYC that must be provided, the Existing Noteholders should contact the Jersey Registrar at projectkelly@crestbridge.com or by telephone on +44 1534 835950.

6.    **PART 6: SECURITIES CONFIRMATION DEED**

*This part must be completed by **all** Existing Noteholders and, if applicable, each of its Nominees.*

This part **must be completed and signed** in all cases by an Existing Noteholder and its Nominee(s) (if appointed).  The Securities Confirmation Deed must be printed in full, **executed as a deed (which means it must be executed in the presence of a witness, being any person of the age over 18 years**) where indicated and the scanned PDF of all of the pages of the executed Securities Confirmation Deed (not only the signature page) uploaded by the Account Holder (together with the Account Holder Letter) online via http://www.lucid-is.com/kcadeutag or by email in PDF form to kcadeutag@lucid-is.com.

If an Existing Noteholder (and/or a Nominee) would like to receive its Scheme Creditor Entitlements on the Restructuring Effective Date, it must ensure that the Securities Confirmation Deed is validly completed, executed and received by the Information Agent by the Voting Instruction Deadline.

**FOR ASSISTANCE, CONTACT THE INFORMATION AGENT:**

**Lucid Issuer Services Limited**
**Tankerton Works**
**12 Argyle Walk**
**London WC1H 8HA**
**United Kingdom**

Attention: Oliver Slyfield / Jacek Kusion

Phone: +44 20 7704 0880

Email: **kcadeutag@lucid-is.com**

# PART 1

## ADMINISTRATIVE INFORMATION

### *TO BE COMPLETED BY ALL ACCOUNT HOLDERS*

1. **ACCOUNT HOLDER ADMINISTRATIVE DETAILS**

Full name of Account Holder:

.............................................................................................................................................

Is the Account Holder a member of Euroclear, Clearstream or DTC:

[*Please state "Euroclear", "Clearstream" or "DTC" as applicable, below*]

.............................................................................................................................................

Account Number of Account Holder at Clearing System:

.............................................................................................................................................

Telephone number (with country code):

.............................................................................................................................................

Email address:

.............................................................................................................................................

Jurisdiction of incorporation/country of residence (if Account Holder is also the Existing Noteholder):

…………………………………………………………………………………………………

Principal contact person:

.............................................................................................................................................

2. **EXISTING NOTEHOLDER ADMINISTRATIVE DETAILS (IF DIFFERENT TO THE ABOVE)**

Name of Existing Noteholder:

…………………………………………………………………………………………………

Jurisdiction of incorporation/country of residence:

…………………………………………………………………………………………………

Telephone number (with country code):

…………………………………………………………………………………………………

Email address:

…………………………………………………………………………………………………

**1529**

Principal contact person:

………………………………………………………………………………………………

## PART 2

### EXISTING NOTEHOLDER SCHEME CLAIMS (EUROCLEAR/CLEARSTREAM)

*TO BE COMPLETED BY EUROCLEAR/CLEARSTREAM ACCOUNT HOLDERS (I.E. IN RESPECT OF EXISTING NOTES HELD VIA EUROCLEAR OR CLEARSTREAM), ONLY.*

The Euroclear/Clearstream Account Holder on behalf of itself or on behalf of the relevant Existing Noteholder named in Part 1 of this Account Holder Letter holds the Existing Notes to which this Account Holder Letter relates (as identified below), and such Existing Notes have been "blocked" through delivery of Custody Instructions to Euroclear or Clearstream, the Custody Instruction Reference Number(s) in relation to which is/are identified below.

| ISIN | Amount blocked at Clearing System | Clearing System | Clearing System Account Number | Custody Instruction Reference Number[1] |
|------|------|------|------|------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Euroclear/Clearstream Account Holder's authorised employee/representative name:

................................................................

Signed by authorised employee/representative for and on behalf of Euroclear/Clearstream Account Holder:

................................................................

Date _____

---

[1]    Corresponding to your blocking instruction at either Euroclear or Clearstream.

## PART 3

### VOTING INSTRUCTIONS (EUROCLEAR/CLEARSTREAM)

***TO BE COMPLETED BY EUROCLEAR/CLEARSTREAM ACCOUNT HOLDERS (I.E. IN RESPECT OF EXISTING NOTES HELD VIA EUROCLEAR OR CLEARSTREAM), ONLY.***

The Existing Noteholder wishes to appoint (and the Euroclear/Clearstream Account Holder is hereby authorised to appoint on its behalf):

**Tick only ONE of the boxes below.**

☐　　　the Chairperson; or

☐　　　the following individual (tick box if appropriate and fill in the details immediately below)

　　　Name:

　　　Address:

　　　Passport number or identification number on equivalent identification:

　　　*or failing him/her:*

　　　Name:　　　　　　　　　　　　　　　　　　　**(Alternate 1)**

　　　Address:

　　　Passport number or identification number on equivalent identification:

　　　*or failing Alternate 1:*

　　　the Chairperson

　　　as its proxy and wishes its proxy to vote:

**Tick only ONE of the boxes below.**

☐　　　FOR the Scheme

☐　　　AGAINST the Scheme

**Alternatively, if the Existing Noteholder wishes to attend and vote in person or by a duly authorised representative, if a corporate, please tick below.**

☐

**Acceptance of this Part 3 by the Information Agent is subject to receipt by the Information Agent by no later than the Voting Instruction Deadline of valid Custody Instruction Reference Numbers in respect of those Existing Notes which are the subject of this Account Holder Letter. Custody Instructions must be delivered to Euroclear or Clearstream, as the case may be, in respect of the Existing Notes identified in Part 2 (Existing Noteholder Scheme Claims) of this Account Holder Letter as being held in Euroclear or Clearstream, prior to the Custody Instruction Deadline.**

**PART 4**

**EXISTING NOTEHOLDER SCHEME CLAIMS AND VOTING INSTRUCTIONS (INCLUDING SUB-PROXY) (DTC)**

*TO BE COMPLETED BY DTC PARTICIPANTS IN RESPECT OF EXISTING NOTES HELD THROUGH DTC AND OUTSIDE EUROCLEAR/CLEARSTREAM, ONLY*

**FORM OF SUB-PROXY**

**For use by DTC Participants in DTC in respect of**

7.25% senior secured notes due 2021

(Regulation S Notes ISIN: USG5222MAA39, Regulation S Notes Common Code: 104277586, Rule 144A Notes ISIN: US48244LAA61, Rule 144A Notes Common Code: 104277578, Regulation S Notes CUSIP: G5222MAA3, Rule 144A Notes CUSIP: 48244LAA6)

9.875% senior secured notes due 2022

(Regulation S Notes ISIN: USG5222MAB12, Regulation S Notes Common Code: 153994803, Rule 144A Notes ISIN: US48244LAC28, Rule 144A Notes Common Code: 153994994, Regulation S Notes CUSIP: G5222MAB1, Rule 144A Notes CUSIP: 48244LAC2)

and

9.625% senior secured notes due 2023

(Regulation S Notes ISIN: USG5222MAC94, Regulation S Notes Common Code: 180491589, Rule 144A Notes ISIN: US48244LAE83, Rule 144A Notes Common Code: 180491562, Regulation S Notes CUSIP: G5222MAC9, Rule 144A Notes CUSIP: 48244LAE8)

issued by

**KCA Deutag UK Finance plc**

and in relation to

The scheme of arrangement proposed by KCA Deutag UK Finance plc under
Part 26 of the Companies Act 2006

**for use in connection with the Scheme Meeting convened by order of the Court to be held at 10:30 am (London time) on 30 October 2020**

**Voting Instruction Deadline: 5:00 pm (London time) on 28 October 2020**

Persons who are DTC Participants must use this form of Sub-Proxy to register details of their interests in the Existing Notes and to make certain elections in relation to the voting in respect of the Scheme.

A separate form of Sub-Proxy must be completed in respect of each separate beneficial holding of/interest in the Existing Notes.

*This form of Sub-Proxy should be completed and signed by a DTC Participant and delivered to and received by the Information Agent as part of this Account Holder Letter by email (kcadeutag@lucid-is.com) by no later than 5:00 pm (London time) on 28 October 2020, being the Voting Instruction Deadline, to appoint a nominee as a sub-proxy and to attend and vote at the Scheme Meeting.*

We hereby certify that:

1.    Existing Notes in the aggregate principal amount specified below are held by the DTC Participant specified below as at **5:00 pm (New York time) on 26 October 2020, being the Principal Record Time** for the purposes of the Scheme Meeting:

Principal Amount of Existing Notes:  ....................................................................U.S.$

CUSIP:                            ..................................................................

2.    We appoint: (Tick only ONE of the boxes below):

☐    the Chairperson; or

☐    the following individual (tick box if appropriate and fill in the details immediately below)

Name:

Address:

Passport number or identification number on equivalent identification:

*or failing him:*

Name:                                            (**Alternate 1**)

Address:

Passport number or identification number on equivalent identification:

*or failing Alternate 1:*

the Chairperson

to act as our sub-proxy in respect of the Existing Notes described below and to attend the Meeting on our behalf and we wish our sub-proxy to vote:

**Tick only ONE of the boxes below.**

☐    FOR the Scheme

☐    AGAINST the Scheme

**Alternatively, if the DTC Participant wishes to attend and vote in person or by a duly authorised representative, if a corporate, please tick below.**

☐

3.    No other person has been appointed as a sub-proxy in respect of the above Existing Notes and no other voting instruction has been given in relation to such Existing Notes in relation to the Scheme.

3.1    The Existing Notes, in an amount set out in paragraph 1 above, will not be sold or transferred from the Principal Record Time until:

(i)    if the Scheme is not approved at the Scheme Meeting, the conclusion of the Scheme Meeting;

(ii)    if the Scheme is approved at the Scheme Meeting but not sanctioned at the Sanction Hearing, the conclusion of the Sanction Hearing;

(iii)    if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing, but the Restructuring Effective Date does not occur before the Long Stop Date, the Long Stop Date; or

(iv)    if the Scheme is approved at the Scheme Meeting and sanctioned at the Sanction Hearing and the Restructuring Effective Date occurs before the Long Stop Date, the Restructuring Effective Date (with such Existing Notes being cancelled in accordance with the Restructuring Implementation Deed).

............................................................

Signed by a duly authorised officer on behalf of the DTC Participant

Name of DTC Participant: ...........................................................

Date:            ..................................................................

**1535**

## MEDALLION SIGNATURE GUARANTEE[2]

Authorised Signature of Guarantor:

Name:

      (please print)

Name of Firm:

Address:

Telephone Number with Area Code:

Date:

Place Seal Here

    _____

### FOR ASSISTANCE CONTACT THE INFORMATION AGENT:

**Lucid Issuer Services Limited**
Tankerton Works
12 Argyle Walk
London WC1H 8HA

Attention: Oliver Slyfield / Jacek Kusion

Telephone: +44 (0)20 7704 0880
Email: kcadeutag@lucid-is.com

---

[2]     Note: Signatures on this Sub-Proxy must be guaranteed by an Eligible Institution. A recognised participant in the Securities Transfer Agents Medallion Program, the New York Stock Exchange Medallion Signature Program or the Stock Exchanges Medallion Program is each an **Eligible Institution**.

**1536**

## PART 5

## SCHEME CREDITOR ENTITLEMENTS

1.    **U.S. SECURITIES ELECTIONS**

*TO BE COMPLETED BY ALL ACCOUNT HOLDERS ON BEHALF OF EXISTING NOTEHOLDERS.*

By ticking one box from each set of the boxes below, the Existing Noteholder or its Account Holder on its behalf expressly acknowledges and confirms that the Existing Noteholder intends to receive and is eligible to receive (and/or intends its Nominee to receive and confirms that its Nominee is eligible to receive) New Notes and Jersey Newco Consideration Shares in the form as follows:

Select one of the following:

☐ **Restricted New Notes**

☐ **Regulation S New Notes**

AND select one of the following:

☐ **Restricted Jersey Newco Consideration Shares**

☐ **Regulation S Jersey Newco Consideration Shares.**

By ticking one box from each set of the boxes above, the Existing Noteholder or its Account Holder on its behalf, expressly confirms, represents and warrants to Jersey Newco and the Company that:

(a)    in the case of ticking the **Restricted New Notes and/or Restricted Jersey Newco Consideration Shares** box, the Existing Noteholder (or its Nominee):

(i)    is either (x) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act, or (y) an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act;

(ii)    is aware the sale of the Restricted New Notes and the Restricted Jersey Newco Consideration Shares is being made in reliance on one or more exemptions from registration under the Securities Act; and

(iii)    is acquiring the Restricted New Notes and the Restricted Jersey Newco Consideration Shares for its own account or for one or more managed accounts, each of which is a "qualified institutional buyer" or an institutional "accredited investor" and as to each of which it exercises sole investment discretion; and

(b)    in the case of ticking the **Regulation S New Notes and/or Regulation S Jersey Newco Consideration Shares** box, the Existing Noteholder (or its Nominee):

(i)    is receiving the Regulation S New Notes and/or Regulation S Jersey Newco Consideration Shares in an offshore transaction in accordance with Regulation S under the Securities Act (and, in case of the Regulation S New Notes, is not a "U.S. person" as defined in Rule 902(k) of Regulation S under the Securities Act); and

(ii)     is aware that the sale of the Regulation S New Notes and the Regulation S Jersey Newco Consideration Shares is being made in reliance on one or more exemptions from registration under the Securities Act.

## 2.    SETTLEMENT INFORMATION REQUIRED TO BE PROVIDED BY ALL DTC PARTICIPANTS

*TO BE COMPLETED BY EXISTING NOTEHOLDERS IN RESPECT OF EXISTING NOTES HELD IN DTC AND OUTSIDE EUROCLEAR/CLEARSTREAM, ONLY.*

**Existing Noteholders holding positions directly via a DTC Participant must indicate a Euroclear/Clearstream Account Holder for receipt of their New Notes.  Failure to do so will mean that the Existing Noteholder will not receive New Notes on the Restructuring Effective Date, in which case, the New Notes will instead be transferred to the Holding Period Trustee to be held by the Holding Period Trustee in accordance with the terms of the Holding Period Trust Agreement.**

Name of Euroclear/Clearstream Account Holder

_____

Clearing System in which Euroclear/Clearstream Account Holder holds account

☐Euroclear
☐Clearstream
* Please tick relevant box

Account Number of Euroclear/Clearstream Account Holder

_____

Contact name at Euroclear/Clearstream Account Holder

_____

Contact email of Euroclear/Clearstream Account Holder

_____

Contact telephone number (with country code) of Euroclear/Clearstream Account Holder

_____

## 3.    APPOINTMENT OF NOMINEE(S)

*TO BE COMPLETED BY ALL ACCOUNT HOLDERS THAT WISH TO APPOINT ONE OR MORE NOMINEES*

If you would like to appoint a Nominee to receive the New Notes and/or the Jersey Newco Consideration Shares, please complete the following details in respect of the Nominee(s).

**Note: a maximum of two Nominees can be appointed – one in respect of the New Notes and one in respect of the Jersey Newco Consideration Shares.**

### 3.1    New Notes

Name of Nominee

_____

Address of Nominee

_____

***If you are a DTC Participant and have already completed Section 2 above, the New Notes will be credited into the account specified in Section 2 above and you therefore do not need to complete the remainder of this Section 3.1.***

Name of Nominee's Euroclear/Clearstream Account Holder

_____

Account Number of Nominee's Euroclear/Clearstream Account Holder

_____

Contact name at Nominee's Euroclear/Clearstream Account Holder

_____

Contact email of Nominee's Euroclear/Clearstream Account Holder

_____

Contact telephone number (with country code) of Nominee's Euroclear/Clearstream Account Holder

_____

### 3.2    Jersey Newco Consideration Shares

Name of Nominee

_____

Registered address of Nominee

_____

Contact email of Nominee

_____

Contact telephone number (with country code) of Nominee

_____

4.    **JERSEY NEWCO CONSIDERATION SHARES KYC REQUIREMENTS**

*JERSEY NEWCO KYC TO BE SUBMITTED, AND THIS PART TO BE COMPLETED, BY ALL EXISTING NOTEHOLDERS*

To be eligible to receive the Jersey Newco Consideration Shares pursuant to the Restructuring Implementation Deed, the Existing Noteholder (or, if the Existing Noteholder has appointed a Nominee, its Nominee) must complete the relevant "know your customer" requirements set out in the Schedule (being the Jersey Newco KYC) to this Account Holder Letter.

If an Existing Noteholder (or its Nominee (if applicable)) would like to receive the Jersey Newco Consideration Shares on the Restructuring Effective Date, Jersey Newco KYC in respect of the legal person which will receive the Jersey Newco Consideration Shares (either the Exiting Noteholder or its Nominee (if appointed)) must be submitted by the Existing Noteholder to the Jersey Registrar by the Voting Instruction Deadline and the Jersey Registrar must have confirmed to the Information Agent that all Jersey Newco KYC has been completed to its satisfaction no later than five Business Days prior to the Restructuring Effective Date. Please note, the Jersey Registrar may have follow up queries or request additional information from the Existing Noteholder after the Voting Instruction Deadline and all follow-up queries or additional requests must be resolved to the satisfaction of the Jersey Registrar by no later than five Business Days prior to the Restructuring Effective Date.

Select one of the following:

☐ Jersey Newco KYC **has** been submitted to the Jersey Registrar

☐ Jersey Newco KYC **has not** been submitted to the Jersey Registrar

## PART 6

## SECURITIES CONFIRMATION DEED

*TO BE COMPLETED BY ALL EXISTING NOTEHOLDERS <u>AND</u>, IF APPLICABLE, EACH OF ITS NOMINEES.*

**To receive the New Notes and Jersey Newco Consideration Shares, a validly completed Account Holder Letter, including a validly completed Securities Confirmation Deed, must be submitted to and received by the Information Agent.  For the avoidance of doubt, an Existing Noteholder does not have to complete a Securities Confirmation Deed in order to vote on the Scheme.  However, if no Securities Confirmation Deed is validly completed and submitted, the Existing Noteholder and/or its Nominee will not receive any Scheme Creditor Entitlements on the Restructuring Effective Date.**

THIS DEED IS MADE BY WAY OF DEED POLL BY (I) THE EXISTING NOTEHOLDER WHOSE DETAILS ARE SET OUT IN PART 1 OF THE ACCOUNT HOLDER LETTER AND (II) ANY NOMINEE(S) WHOSE DETAILS ARE SET OUT IN PART 5 OF THE ACCOUNT HOLDER LETTER (IF APPLICABLE), IN EACH CASE ON THE DATE STATED THEREIN FOR THE BENEFIT OF THE COMPANY AND JERSEY NEWCO, AND WITH THE INTENTION AND EFFECT THAT IT MAY BE DIRECTLY RELIED UPON AND ENFORCED SEPARATELY BY, (I) EACH BENEFICIARY OF ANY RELEASE GRANTED UNDER THIS DEED; AND (II) ANY PERMITTED ASSIGNEE OR ANY OTHER PERSON RELYING ON THIS DEED, EVEN THOUGH THEY ARE NOT PARTY TO THIS DEED.

1.    **DEFINITIONS AND INTERPRETATION**

(a)    Unless expressed otherwise, terms defined in the Explanatory Statement shall have the same meaning in this Deed.

(b)    In this Deed, unless the context otherwise requires:

(i)    words in the singular include the plural and in the plural include the singular;

(ii)    the words "including" and "include" shall not be construed as or take effect as limiting the generality of the foregoing;

(iii)    the headings shall not be construed as part of this Deed nor affect its interpretation;

(iv)    references to any clause, without further designation, shall be construed as a reference to the clause of this Deed so numbered;

(v)    reference to any act, statute or statutory provision shall include a reference to that provision as amended, re-enacted or replaced from time to time whether before or after the date of this Deed and any former statutory provision replaced (with or without modification) by the provision referred to;

(vi)    reference to a person includes a reference to any body corporate, unincorporated association or partnership and to that person's legal personal representatives or successors; and

(vii)    the principles of construction set out in the Scheme apply to this Deed except that references to the Scheme shall instead be construed as references to this Deed.

## 2.    CONFIRMATIONS, WARRANTIES AND UNDERTAKINGS

(a)    The Existing Noteholder and, if the Existing Noteholder has appointed a Nominee for either the New Notes or the Jersey Newco Consideration Shares, each Nominee, gives the following confirmations, acknowledgements, warranties and undertakings:

(i)    if the Existing Noteholder has elected to receive (or to have its Nominee receive) the New Notes and/or Jersey Newco Consideration Shares pursuant to Section 4(a)(2) of the Securities Act (as defined in Annex 1) by ticking the "Restricted New Notes " and/or "Restricted Jersey Newco Consideration Shares" box in Part 5 (Scheme Creditor Entitlements) of the Account Holder Letter, as applicable, those set out in Section 2 (Restricted New Notes) and Section 4 (Restricted Newco Shares) in Part 1 of Annex 1;

(ii)    if the Existing Noteholder has elected to receive (or to have its Nominee receive) the New Notes and/or Jersey Newco Consideration Shares pursuant to Regulation S (as defined in Annex 1) by ticking the "Regulation S New Notes " and/or "Regulation S Jersey Newco Consideration Shares" box in Part 5 (Scheme Creditor Entitlements) of the Account Holder Letter, as applicable, those set out in Section 3 (Regulation S New Notes) and Section 5 (Regulation S Jersey Newco Consideration Shares) in Part 1 of Annex 1; and

(iii)    those set out in Section 6 (Other jurisdictions) in Part 1 of Annex 1.

(b)    Without prejudice to the provisions in Annex 1, the Existing Noteholder and/or, if the Existing Noteholder has appointed a Nominee, each Nominee, at the Restructuring Effective Date irrevocably warrants, undertakes and represents to the Company and Jersey Newco that:

(i)    it will not seek or attempt nor aid or facilitate any other person to dispute, set aside, challenge, compromise or question in any jurisdiction the validity and efficacy of the cancellation and/or write-down of its Scheme Claims; and

(ii)    it will not seek or attempt nor aid or facilitate any other person to dispute, challenge, set aside or question the validity, authority or efficacy of the Scheme in any jurisdiction or before any court, regulatory authority, tribunal or otherwise.

(c)    The Existing Noteholder and, if the Existing Noteholder has appointed one or more Nominee(s), each Nominee, hereby:

(i)    undertakes to be bound by and perform each of the obligations applicable to it as set out in the Scheme and each of the Restructuring Documents to which it is a party as if such obligation were set out in full in this Account Holder Letter; and

(ii)    expressly accepts and acknowledges that certain releases and waivers will be granted on its behalf pursuant to the terms of the Deed of Release.

## 3.    GRANT OF AUTHORITY TO THE COMPANY TO EXECUTE CERTAIN DOCUMENTS ON ITS BEHALF

On and from the Scheme Effective Time in relation to the Scheme, the Existing Noteholder and, if the Existing Noteholder has appointed one or more Nominees, each Nominee, in consideration of the rights provided to Scheme Creditors under the Scheme and the Restructuring Implementation Deed, hereby irrevocably authorises and directs the Company as its agent and attorney (acting by its directors or other duly appointed representatives) in accordance with the authorisation and undertaking given pursuant to Clause 3 of the Scheme to enter into, execute, notarise and deliver the documents and take each of the actions stipulated in Clause 5 of the Restructuring Implementation Deed and each Nominee

agrees and acknowledges that the authorisation and undertaking given pursuant to Clause 3 of the Scheme shall be deemed to be given by it notwithstanding that it may not be a Scheme Creditor.

4. **INSTRUCTIONS TO EXISTING ADMINISTRATIVE PARTIES TO UNDERTAKE TO SUPPORT THE RESTRUCTURING**

The Existing Noteholder and, if the Existing Noteholder has appointed one or more Nominee(s), each Nominee, hereby authorises and instructs each Existing Administrative Party, the Existing Custodian and the Existing Depositary to undertake such steps as it considers necessary or desirable for it to take for the purposes of facilitating the implementation of the Scheme, including (without limitation) entering into and executing in its respective capacity the Implementation Document to which it is a party (including, for the avoidance of doubt, in respect of the Existing Security Agent, each Security and Guarantees Release Document) and any other document that it reasonably considers necessary or advisable to implement the Scheme.

5. **AGREEMENT NOT TO INSTRUCT THE TRUSTEE**

The Existing Noteholder and, if the Existing Noteholder has appointed one or more Nominee(s), each Nominee hereby agrees not to instruct the Existing Trustee to vote on its behalf in respect of the Scheme.

6. **MODIFICATIONS TO THE SCHEME**

The Existing Noteholder and, if the Existing Noteholder has appointed one or more Nominee(s), each Nominee hereby agrees that the Company may, subject to Clause 9.2 of the Scheme, at any Court hearing to sanction the Scheme, consent on behalf of itself as Scheme Creditor to any modification of, or addition to, the Scheme and/or any of the Implementation Documents on any terms or conditions that the Court may think fit to approve or impose which is necessary for the implementation of the Restructuring, and which could not reasonably be expected directly or indirectly to have an adverse effect on the interests of any Scheme Creditor under the Scheme. However, if such modifications could reasonably be expected directly or indirectly to have an adverse effect on the interests of a Scheme Creditor, then the Company may not give such consent without the prior written consent of that Scheme Creditor.

7. **GOVERNING LAW**

This Deed and any dispute or claim (including any non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by and construed in accordance with, the law of England and Wales.

8. **JURISDICTION**

The English courts shall have exclusive jurisdiction to settle any dispute or claim (including any non-contractual disputes or claims) arising out of or in connection with this Deed or its subject matter.

# ANNEX 1

## SECURITIES CONFIRMATIONS

1.    **Definition**

**Relevant Person** means, in this Annex 1, (1) the relevant Scheme Creditors or (2) its Nominee(s) (if appointed), as the case may be, giving the representations.

2.    **Restricted New Notes**

The Relevant Person represents and warrants to the Company, Alpha and Jersey Newco, on behalf of itself and each other person or account for which it is acting that:

(a)    It understands that the Restricted New Notes are being offered in reliance upon an exemption from, or in a transaction not subject to, registration under the Securities Act and similar provisions under state securities laws for an offer and sale by the Company not involving a public offering in the United States (the **Restricted New Notes**).

(b)    Its receipt of the Restricted New Notes is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it.

(c)    It understands that the Restricted New Notes have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States.

(d)    As a purchaser of the Restricted New Notes in a private placement not registered under the Securities Act, it is receiving Restricted New Notes for its own account, or for an account as to which it exercises sole investment discretion, for investment purposes and (subject, to the extent necessary, to the disposition of its or such discretionary accounts' property being at all times within its or their control) not with a view to any distribution or resale, directly or indirectly, in the United States or otherwise in violation of the securities laws of the United States.

(e)    It understands that the Restricted New Notes issued in reliance on Section 4(a)(2) of the Securities Act are "restricted securities" (as defined by Rule 144 under the Securities Act), and that for one year after the latest of the original issue date of the Restricted New Notes and the last date on which the issuer or any affiliate of the issuer was the owner of the Restricted New Notes, the Restricted New Notes are restricted securities, may not be offered, sold, pledged or otherwise transferred except (i) to the issuer, the guarantors or any subsidiary thereof, (ii) pursuant to a registration statement that has been declared effective under the Securities Act, (iii) for so long as the Restricted New Notes are eligible for resale pursuant to Rule 144A, to a person that it, and any person acting on its behalf, reasonably believes is a QIB purchasing for its own account or for the account of one or more QIBs to whom notice is given that the transfer is being made in reliance on Rule 144A, (iv) in an offshore transaction in accordance with Rule 903 or Rule 904 of Regulation S to a person that is not a U.S. person and that is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU (as amended, **MiFID II**); or (y) a customer within the meaning of Directive 2016/97/EU (as amended, the **Insurance Distribution Directive**), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a Qualified Investor), or (v) pursuant to an exemption

from, or in a transaction not subject to, registration under the Securities Act (if available) in each case in accordance with any applicable securities laws of the United States and any state or other jurisdiction of the United States

(f)     It understands that no representation has been made as to the availability of any exemption under the Securities Act or any applicable securities laws of any state or other jurisdiction of the United States for the reoffer, resale, pledge or transfer of the Restricted New Notes and that, pursuant to these laws, such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

(g)     It understands that, if an exemption from registration or qualification under the Securities Act or United States federal and state securities laws is available, it may be conditional on various requirements including, but not limited to, the time and manner of sale, the holding period for the Restricted New Notes, and requirements relating to the Company which are outside of its control, and which the Company would not be under any obligation (and may not be able) to satisfy.

(h)     It understands that the transfer agent for the Restricted New Notes will not be required to accept for registration of transfer any Restricted New Notes acquired by the undersigned or any account of the undersigned, except upon presentation of evidence satisfactory to the Company, as the issuer, and the transfer agent that the foregoing restrictions on transfer have been complied with.  It will give to each person to whom it transfers the Restricted New Notes notice of any restrictions on the transfer of such Restricted New Notes.

(i)     It understands that the Restricted New Notes will bear a legend in or substantially in the following form:

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE WHICH ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY), ONLY (A) TO THE ISSUER, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (C) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT ("REGULATION S")) THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S, (D) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER

**1545**

THE U.S. SECURITIES ACT OR (E) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS WITHIN THE MEANING OF REGULATION S. THE HOLDER AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY SIMILAR TO THE EFFECT OF THIS LEGEND."

(j)     It will notify any person to whom it subsequently reoffers, resells, pledges, transfers or otherwise disposes of the Restricted New Notes of the foregoing restrictions on transfer and any certificates evidencing such securities shall contain a legend referring to such restrictions on transferability.

(k)     It acknowledges and agrees that the Restricted New Notes may be issued in a certificated registered form and that each notes certificate will bear appropriate legends.

(l)     It is a "qualified institutional buyer" as defined in Rule 144A or an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act and its receipt of the Restricted New Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act.

(m)     It: (i) has conducted its own investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of the Company, Alpha and Jersey Newco and their respective subsidiaries and the Restricted New Notes and, following such investigation and appraisal and the other due diligence that it deemed necessary and subsequently conducted in connection with the offering of the Restricted New Notes, it has made its own investment decision to acquire the Restricted New Notes; (ii) acknowledges that it has had the opportunity to ask and has asked queries regarding an acquisition of the Restricted New Notes, the Company, Alpha and Jersey Newco and their respective subsidiaries and affairs and the terms of the Restricted New Notes, and has received satisfactory answers from representatives of Alpha, the Company and Jersey Newco; (iii) has reviewed all information that it believes is necessary or appropriate in connection with its election to receive the Restricted New Notes; (iv) has made its own assessment and has satisfied itself concerning the relevant tax, legal, currency and other economic considerations relevant to its investment in the Restricted New Notes (and has sought such accounting, legal, tax and other advice as it has considered necessary to make an informed decision); (v) possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its prospective investment in the Restricted New Notes; (vi) understands that, in the future, the Restricted New Notes may significantly increase or decrease in value; and (vii) would be able to afford a complete loss of the value of the Restricted New Notes and would be able to bear the economic risk of holding such securities for an indefinite period.

(n)     It acknowledges that neither the Company, as the issuer, nor any of its subsidiaries, affiliates or any other person, has made any representation, warranty or undertaking (express or implied) to it with respect to the Company, the guarantors, the Restricted New Notes or the accuracy, completeness or adequacy of any financial or other information concerning the Company, the guarantors, or the Restricted New Notes, other than (in the case of the Company, the guarantors and their subsidiaries only) any representation, warranty or undertaking of the Company, the guarantors and their subsidiaries contained in this Deed. Further, none of the Company, the guarantors and their subsidiaries or their affiliates, directors, officers, employees, agents, representatives or advisers makes any representation as to the future performance of the Company, the guarantors or any of their subsidiaries or affiliates or their respective securities, including the Restricted New Notes.

(o)    It understands that there may be certain consequences under U.S. and other tax laws resulting from an investment in the Restricted New Notes and it has made such investigation and has consulted its own independent advisers or otherwise has satisfied itself concerning, without limitation, the effects of the U.S. federal, state and local income tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, as amended, the U.S. Investment Company Act of 1940, as amended, and the Securities Act.

(p)    It (and each other qualified institutional buyer, if any, for whose account it is receiving the Restricted New Notes), in the normal course of business, invests in or purchases securities similar to the Restricted New Notes, is aware that there are substantial risks incident to the receipt of the Restricted New Notes and has the ability to bear the economic risk of its investment in the Restricted New Notes, has adequate means of providing for its current and contingent needs, has no need for liquidity with respect to its investment in the Restricted New Notes, and is able to sustain a complete loss of its investment in the Restricted New Notes.

(q)    It satisfies any and all standards for investors making an investment in the Restricted New Notes imposed by the jurisdiction of its residence or otherwise.

(r)    It is empowered, authorised and qualified to receive the Restricted New Notes.

(s)    It understands that the foregoing representations, warranties and agreements are required in connection with U.S. securities laws and that the Company and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.  It agrees that, if any of the acknowledgements, representations and warranties made in connection with its receipt of the Restricted New Notes are no longer accurate, it will promptly, and in any event prior to the issuance of the Restricted New Notes to it, notify the Company in writing.

(t)    If it is receiving the Restricted New Notes for the account of another person, it represents that it has full power and authorisation to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

(u)    It acknowledges that the Company may request from it and/or any account for which it is acting (if any) such additional information as the Company may deem necessary to evaluate its eligibility or the eligibility of any account for which it is acting to acquire the Restricted New Notes, and may request from time to time such information as the Company may reasonably deem necessary to determine its eligibility or eligibility of any account for which it is acting to hold the Restricted New Notes or to enable the issuer to comply with applicable regulatory requirements or tax law, and it and each account for which it is acting (if any) shall use reasonable efforts to provide such information as may reasonably be requested; provided that in no event shall any purchaser be obliged to disclose the name (or any other identifying information) of its limited partners, members or shareholders.

3.    **Regulation S New Notes**

The Relevant Person represents and warrants to Alpha, the Company and Jersey Newco, on behalf of itself and each other person or account for which it is acting that:

(a)    It is, or at the time New Notes issued to such Relevant Persons under the Scheme (such New Notes, the **Regulation S New Notes**) are delivered will be, the beneficial owner of such Regulation S New Notes and (i) it is not a U.S. person and is receiving the Regulation S New Notes in an offshore transaction in accordance with Regulation S under the Securities Act and (ii) it is not an affiliate of the Company or a person acting on behalf of such an affiliate.

(b)    It represents and warrants that its receipt of the Regulation S New Notes is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if

different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it.

(c)     It understands that such Regulation S New Notes have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States.

(d)     As a purchaser of the Regulation S New Notes not registered under the Securities Act, it is receiving Regulation S New Notes for its own account, or for an account as to which it exercises sole investment discretion, for investment purposes and (subject, to the extent necessary, to the disposition of its or such discretionary accounts' property being at all times within its or their control) not with a view to any distribution or resale, directly or indirectly, in the United States or otherwise in violation of the securities laws of the United States.

(e)     It understands that for 40 days after the latest of the original issue date of the Regulation S New Notes and the date on which the Regulation S New Notes (or any predecessors thereto) were first offered to persons other than distributors, the Regulation S New Notes may not be offered, sold, pledged or otherwise transferred except (i) to the issuer, the guarantors or any subsidiary thereof, (ii) pursuant to a registration statement that has been declared effective under the Securities Act, (iii) for so long as the Regulation S New Notes are eligible for resale pursuant to Rule 144A, to a person that it, and any person acting on its behalf, reasonably believes is a QIB purchasing for its own account or for the account of one or more QIBs to whom notice is given that the transfer is being made in reliance on Rule 144A, (iv) in an offshore transaction in accordance with Rule 903 or Rule 904 of Regulation S to a person that is a non-U.S. person and that is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a Qualified Investor), or (v) pursuant to an exemption from, or in a transaction not subject to, registration under the Securities Act (if available) in each case in accordance with any applicable securities laws of the United States and any state or other jurisdiction of the United States.

(f)     It understands that no representation has been made as to the availability of any exemption under the Securities Act or any applicable securities laws of any state or other jurisdiction of the United States for the reoffer, resale, pledge or transfer of the Regulation S New Notes and that, pursuant to these laws, such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

(g)     It understands that, if an exemption from registration or qualification under the Securities Act or U.S. federal and state securities laws is available, it may be conditional on various requirements including, but not limited to, the time and manner of sale, the holding period for the Regulation S New Notes, and requirements relating to the Company which are outside of its control, and which the Company would not be under any obligation (and may not be able) to satisfy.

(h)     It understands that the transfer agent for the Regulation S New Notes will not be required to accept for registration of transfer any Regulation S New Notes acquired by the undersigned or any account of the undersigned, except upon presentation of evidence satisfactory to the Company, as the issuer, and the transfer agent that the foregoing restrictions on transfer have been complied with.  It will give to each person to whom it transfers the Regulation S New Notes notice of any restrictions on the transfer of such Regulation S New Notes.

(i)     It and any account for which it is acting (if any) became aware of the offering of the Regulation S New Notes, and the Regulation S New Notes were offered to it and each account for which it is acting (if any), solely by means of direct contact between it and the Company as the issuer, and not by any other means.  It and any account for which it is acting (if any) did not become aware of the offering of the Regulation S New Notes, and the Regulation S New Notes were not offered to it or any account for which it is acting (if any), through any directed selling efforts within the meaning of Regulation S.

(j)     It understands that the Regulation S New Notes will bear a legend in or substantially in the following form:

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE WHICH IS 40 DAYS AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE DATE ON WHICH THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY) WAS FIRST OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN RULE 902 OF REGULATION S) IN RELIANCE ON REGULATION S, ONLY (A) TO THE ISSUER, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A (C) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT ("REGULATION S")) THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S, (D) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE U.S. SECURITIES ACT OR (E) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS WITHIN THE MEANING OF REGULATION S. THE HOLDER AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY SIMILAR TO THE EFFECT OF THIS LEGEND."

(k)     It will notify any person to whom it subsequently reoffers, resells, pledges, transfers or otherwise disposes of the Regulation S New Notes of the foregoing restrictions on transfer and any certificates evidencing such securities shall contain a legend referring to such restrictions on transferability.

(l)     It acknowledges and agrees that the Regulation S New Notes may be issued in a certificated registered form and that each notes certificate will bear appropriate legends.

(m)    It is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1)

of MiFID II; (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a Qualified Investor).

(n)    It: (i) has conducted its own investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of the Company, Alpha and Jersey Newco and their respective subsidiaries and the Regulation S New Notes and, following such investigation and appraisal and the other due diligence that it deemed necessary and subsequently conducted in connection with the offering of the Regulation S New Notes, it has made its own investment decision to acquire the Regulation S New Notes; (ii) acknowledges that it has had the opportunity to ask and has asked queries regarding an acquisition of the Regulation S New Notes, Alpha, the Company and Jersey Newco and their respective subsidiaries and affairs and the terms of the Regulation S New Notes, and has received satisfactory answers from representatives of Alpha, the Company and Jersey Newco; (iii) has reviewed all information that it believes is necessary or appropriate in connection with its election to receive the Regulation S New Notes; (iv) has made its own assessment and has satisfied itself concerning the relevant tax, legal, currency and other economic considerations relevant to its investment in the Regulation S New Notes (and has sought such accounting, legal, tax and other advice as it has considered necessary to make an informed decision); (v) possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its prospective investment in the Regulation S New Notes; (vi) understands that, in the future, the Regulation S New Notes may significantly increase or decrease in value; and (vii) would be able to afford a complete loss of the value of the Regulation S New Notes and would be able to bear the economic risk of holding such securities for an indefinite period.

(o)    It acknowledges that neither the Company, as the issuer, nor any of its subsidiaries, affiliates or any other person has made any representation, warranty or undertaking (express or implied) to it with respect to the Company, the guarantors, the Regulation S New Notes or the accuracy, completeness or adequacy of any financial or other information concerning the Company, the guarantors, or the Regulation S New Notes, other than (in the case of the Company, the guarantors and their subsidiaries only) any representation, warranty or undertaking of the Company, the guarantors and their subsidiaries contained in this Deed.  Further, none of the Company, the guarantors and their subsidiaries or their affiliates, directors, officers, employees, agents, representatives or advisers makes any representation as to the future performance of the Company, the guarantors or any of their subsidiaries or affiliates or their respective securities, including the Regulation S New Notes.

(p)    It understands that there may be certain consequences under U.S. and other tax laws resulting from an investment in the Regulation S New Notes and it has made such investigation and has consulted its own independent advisers or otherwise has satisfied itself concerning, without limitation, the effects of the U.S. federal, state and local income tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, as amended, the U.S. Investment Company Act of 1940, as amended, and the Securities Act.

(q)    It (and each other qualified institutional buyer, if any, for whose account it is receiving the Regulation S New Notes), in the normal course of business, invests in or purchases securities similar to the Regulation S New Notes, is aware that there are substantial risks incident to the receipt of the Regulation S New Notes and has the ability to bear the economic risk of its investment in the Regulation S New Notes, has adequate means of providing for its current and contingent needs, has no need for liquidity with respect to its investment in the Regulation S New Notes, and is able to sustain a complete loss of its investment in the Regulation S New Notes.

(r)     It satisfies any and all standards for investors making an investment in the Regulation S New Notes imposed by the jurisdiction of its residence or otherwise.

(s)     It is empowered, authorised and qualified to receive the Regulation S New Notes.

(t)     It understands that the foregoing representations, warranties and agreements are required in connection with U.S. securities laws and that the Company and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements. It agrees that, if any of the acknowledgements, representations and warranties made in connection with its receipt of the Regulation S New Notes are no longer accurate, it will promptly, and in any event prior to the issuance of the Regulation S New Notes to it, notify the Company in writing.

(u)     If it is receiving the Regulation S New Notes for the account of another person, it represents that it has full power and authorisation to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

(v)     It acknowledges that the Company may request from it and/or any account for which it is acting (if any) such additional information as the Company may deem necessary to evaluate its eligibility or the eligibility of any account for which it is acting to acquire the Regulation S New Notes, and may request from time to time such information as the Company may reasonably deem necessary to determine its eligibility or eligibility of any account for which it is acting to hold the Regulation S New Notes or to enable the issuer to comply with applicable regulatory requirements or tax law, and it and each account for which it is acting (if any) shall use reasonable efforts to provide such information as may reasonably be requested; provided that in no event shall any purchaser be obliged to disclose the name (or any other identifying information) of its limited partners, members or shareholders.

**4.      Restricted Jersey Newco Consideration Shares**

The Relevant Person represents and warrants to Alpha, the Company and Jersey Newco, on behalf of itself and each other person or account for which it is acting that:

(a)     It understands that the Jersey Newco Consideration Shares are being offered in reliance upon an exemption from, or in a transaction not subject to, registration under the Securities Act and similar provisions under state securities laws for an offer and sale by Jersey Newco not involving a public offering in the U.S. (the **Restricted Jersey Newco Consideration Shares**).

(b)     Its receipt of the Restricted Jersey Newco Consideration Shares is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it.

(c)     It understands that the Restricted Jersey Newco Consideration Shares have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the U.S.

(d)     As a subscriber of the Restricted Jersey Newco Consideration Shares in a private placement not registered under the Securities Act, it is receiving Restricted Jersey Newco Consideration Shares for its own account, or for an account as to which it exercises sole investment discretion, for investment purposes and (subject, to the extent necessary, to the disposition of its or such discretionary accounts' property being at all times within its or their control) not with a view to any distribution or resale, directly or indirectly, in the U.S. or otherwise in violation of the securities laws of the U.S.

(e)     It understands that the Restricted Jersey Newco Consideration Shares issued in reliance on Section 4(a)(2) of the Securities Act are "restricted securities" (as defined by Rule 144 under the Securities Act), and that for one year after the latest of the original issue date of the Restricted Jersey Newco Consideration Shares and the last date on which the issuer or any affiliate of the issuer was the owner of the Restricted Jersey Newco Consideration Shares, the Restricted Jersey Newco Consideration Shares are restricted securities, may not be offered, sold, pledged or otherwise transferred except (i) to the issuer or any subsidiary thereof, (ii) pursuant to a registration statement that has been declared effective under the Securities Act, (iii) for so long as the Restricted Jersey Newco Consideration Shares are eligible for resale pursuant to Rule 144A, to a person that it, and any person acting on its behalf, reasonably believes is a QIB purchasing for its own account or for the account of one or more QIBs to whom notice is given that the transfer is being made in reliance on Rule 144A, (iv) in an offshore transaction in accordance with Rule 903 or Rule 904 of Regulation S that is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a Qualified Investor), or (v) pursuant to an exemption from, or in a transaction not subject to, registration under the Securities Act (if available) in each case in accordance with any applicable securities laws of the U.S. and any state or other jurisdiction of the U.S.

(f)     It understands that no representation has been made as to the availability of any exemption under the Securities Act or any applicable securities laws of any state or other jurisdiction of the U.S. for the reoffer, resale, pledge or transfer of the Restricted Jersey Newco Consideration Shares and that, pursuant to these laws, such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

(g)     It understands that, if an exemption from registration or qualification under the Securities Act or U.S. federal and state securities laws is available, it may be conditional on various requirements including, but not limited to, the time and manner of sale, the holding period for the Restricted Jersey Newco Consideration Shares, and requirements relating to Jersey Newco which are outside of its control, and which Jersey Newco would not be under any obligation (and may not be able) to satisfy.

(h)     It understands that Jersey Newco will not be required to accept for registration of transfer any Restricted Jersey Newco Consideration Shares acquired by the undersigned or any account of the undersigned, except upon presentation of evidence satisfactory to Jersey Newco that the foregoing restrictions on transfer have been complied with.  It will give to each person to whom it transfers the Restricted Jersey Newco Consideration Shares notice of any restrictions on the transfer of such Restricted Jersey Newco Consideration Shares.

(i)     It understands that, to the extent the Restricted Jersey Newco Consideration Shares are delivered in certificated form, the certificate (or the shareholder register) will bear a legend in or substantially in the following form:

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR

UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE WHICH IS ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY) ONLY (A) TO THE ISSUER, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (C) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT ("REGULATION S"), (D) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE U.S. SECURITIES ACT OR (E) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS WITHIN THE MEANING OF REGULATION S. THE HOLDER AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY SIMILAR TO THE EFFECT OF THIS LEGEND."

(j)     It will notify any person to whom it subsequently reoffers, resells, pledges, transfers or otherwise disposes of the Restricted Jersey Newco Consideration Shares of the foregoing restrictions on transfer and any certificates evidencing such securities shall contain a legend referring to such restrictions on transferability.

(k)     It acknowledges and agrees that the Restricted Jersey Newco Consideration Shares may be issued in a certificated registered form and that each share certificate will bear appropriate legends.

(l)     It is a "qualified institutional buyer" as defined in Rule 144A or an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act and its receipt of the Restricted Jersey Newco Consideration Shares is not part of a plan or scheme to evade the registration requirements of the Securities Act.

(m)     It: (i) has conducted its own investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of the Company, Alpha and Jersey Newco and their respective subsidiaries and the Restricted Jersey Newco Consideration Shares and, following such investigation and appraisal and the other due diligence that it deemed necessary and subsequently conducted in connection with the offering of the Restricted Jersey Newco Consideration Shares, it has made its own investment decision to acquire the Restricted Jersey Newco Consideration Shares; (ii) acknowledges that it has had the opportunity to ask and has asked queries regarding an acquisition of the Restricted Jersey Newco Consideration Shares, the Company, Alpha and Jersey Newco and their respective subsidiaries and affairs and the terms of the Restricted Jersey Newco Consideration Shares, and has received satisfactory answers from representatives of Alpha, the Company and Jersey Newco; (iii) has reviewed all information that it believes is necessary or appropriate in connection with its election to receive the Restricted Jersey Newco Consideration Shares; (iv) has made its own assessment and has satisfied itself concerning the relevant tax, legal,

currency and other economic considerations relevant to its investment in the Restricted Jersey Newco Consideration Shares (and has sought such accounting, legal, tax and other advice as it has considered necessary to make an informed decision); (v) possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its prospective investment in the Restricted Jersey Newco Consideration Shares; (vi) understands that, in the future, the Restricted Jersey Newco Consideration Shares may significantly increase or decrease in value; and (vii) would be able to afford a complete loss of the value of the Restricted Jersey Newco Consideration Shares and would be able to bear the economic risk of holding such securities for an indefinite period.

(n) It acknowledges that neither Jersey Newco nor any of its subsidiaries, affiliates or any other person, has made any representation, warranty or undertaking (express or implied) to it with respect to Jersey Newco, the Restricted Jersey Newco Consideration Shares or the accuracy, completeness or adequacy of any financial or other information concerning Jersey Newco or the Restricted Jersey Newco Consideration Shares, other than (in the case of Jersey Newco and its subsidiaries only) any representation, warranty or undertaking of Jersey Newco and its subsidiaries contained in this Deed. Further, none of Jersey Newco and its subsidiaries or its affiliates, directors, officers, employees, agents, representatives or advisers makes any representation as to the future performance of Jersey Newco or any of its subsidiaries or affiliates or their respective securities, including the Restricted Jersey Newco Consideration Shares.

(o) It understands that there may be certain consequences under U.S. and other tax laws resulting from an investment in the Restricted Jersey Newco Consideration Shares and it has made such investigation and has consulted its own independent advisers or otherwise has satisfied itself concerning, without limitation, the effects of the U.S. federal, state and local income tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, as amended, the U.S. Investment Company Act of 1940, as amended, and the Securities Act.

(p) It (and each other qualified institutional buyer, if any, for whose account it is receiving the Restricted Jersey Newco Consideration Shares), in the normal course of business, invests in or purchases securities similar to the Restricted Jersey Newco Consideration Shares, is aware that there are substantial risks incident to the receipt of the Restricted Jersey Newco Consideration Shares and has the ability to bear the economic risk of its investment in the Restricted Jersey Newco Consideration Shares, has adequate means of providing for its current and contingent needs, has no need for liquidity with respect to its investment in the Restricted Jersey Newco Consideration Shares, and is able to sustain a complete loss of its investment in the Restricted Jersey Newco Consideration Shares.

(q) It satisfies any and all standards for investors making an investment in the Restricted Jersey Newco Consideration Shares imposed by the jurisdiction of its residence or otherwise.

(r) It is empowered, authorised and qualified to receive the Restricted Jersey Newco Consideration Shares.

(s) It understands that the foregoing representations, warranties and agreements are required in connection with U.S. securities laws and that Jersey Newco and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.  It agrees that, if any of the acknowledgements, representations and warranties made in connection with its receipt of the Restricted Jersey Newco Consideration Shares are no longer accurate, it will promptly, and in any event prior to the issuance of the Restricted Jersey Newco Consideration Shares to it, notify Jersey Newco and the Company in writing.

(t)    If it is receiving the Restricted Jersey Newco Consideration Shares for the account of another person, it represents that it has full power and authorisation to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

(u)    It acknowledges that Jersey Newco may request from it and/or any account for which it is acting (if any) such additional information as Jersey Newco may deem necessary to evaluate its eligibility or the eligibility of any account for which it is acting to acquire the Restricted Jersey Newco Consideration Shares, and may request from time to time such information as Jersey Newco may reasonably deem necessary to determine its eligibility or eligibility of any account for which it is acting to hold the Restricted Jersey Newco Consideration Shares or to enable Jersey Newco to comply with applicable regulatory requirements or tax law, and it and each account for which it is acting (if any) shall use reasonable efforts to provide such information as may reasonably be requested; provided that in no event shall any purchaser be obliged to disclose the name (or any other identifying information) of its limited partners, members or shareholders.

5.    **Regulation S Jersey Newco Consideration Shares**

The Relevant Person represents and warrants to Alpha, the Company and Jersey Newco, on behalf of itself and each other person or account for which it is acting that:

(a)    It is, or at the time Regulation S Jersey Newco Consideration Shares issued to such Relevant Persons (such Regulation S Jersey Newco Consideration Shares, the **Regulation S Jersey Newco Consideration Shares**) are delivered will be, the beneficial owner of such Regulation S Jersey Newco Consideration Shares and (i) it is receiving the Regulation S Jersey Newco Consideration Shares in an offshore transaction in accordance with Regulation S under the Securities Act and (ii) it is not an affiliate of Jersey Newco or a person acting on behalf of such an affiliate.

(b)    It represents and warrants that its receipt of the Regulation S Jersey Newco Consideration Shares is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it.

(c)    It understands that such Regulation S Jersey Newco Consideration Shares have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States.

(d)    As a subscriber of the Regulation S Jersey Newco Consideration Shares not registered under the Securities Act, it is receiving Regulation S Jersey Newco Consideration Shares for its own account, or for an account as to which it exercises sole investment discretion, for investment purposes and (subject, to the extent necessary, to the disposition of its or such discretionary accounts' property being at all times within its or their control) not with a view to any distribution or resale, directly or indirectly, in the United States or otherwise in violation of the securities laws of the United States.

(e)    It understands that no representation has been made as to the availability of any exemption under the Securities Act or any applicable securities laws of any state or other jurisdiction of the United States for the reoffer, resale, pledge or transfer of the Regulation S Jersey Newco Consideration Shares and that, pursuant to these laws, such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

(f)    It understands that, if an exemption from registration or qualification under the Securities Act or U.S. federal and state securities laws is available, it may be conditional on various

**1555**

requirements including, but not limited to, the time and manner of sale, the holding period for the Regulation S Jersey Newco Consideration Shares, and requirements relating to Jersey Newco which are outside of its control, and which Jersey Newco would not be under any obligation (and may not be able) to satisfy.

(g)     It understands that Jersey Newco will not be required to accept for registration of transfer any Regulation S Jersey Newco Consideration Shares acquired by the undersigned or any account of the undersigned, except upon presentation of evidence satisfactory to Jersey Newco that the foregoing restrictions on transfer have been complied with.  It will give to each person to whom it transfers the Regulation S Jersey Newco Consideration Shares notice of any restrictions on the transfer of such Regulation S Jersey Newco Consideration Shares.

(h)     It and any account for which it is acting (if any) became aware of the offering of the Regulation S Jersey Newco Consideration Shares, and the Regulation S Jersey Newco Consideration Shares were offered to it and each account for which it is acting (if any), solely by means of direct contact between it and Jersey Newco, and not by any other means.  It and any account for which it is acting (if any) did not become aware of the offering of the Regulation S Jersey Newco Consideration Shares, and the Regulation S Jersey Newco Consideration Shares were not offered to it or any account for which it is acting (if any), through any directed selling efforts within the meaning of Regulation S.

(i)     It understands that, to the extent the Regulation S Jersey Newco Consideration Shares are delivered in certificated form, the certificate will bear a legend in or substantially in the following form:

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS."

(j)     It will notify any person to whom it subsequently reoffers, resells, pledges, transfers or otherwise disposes of the Regulation S Jersey Newco Consideration Shares of the foregoing restrictions on transfer and any certificates evidencing such securities shall contain a legend referring to such restrictions on transferability.

(k)     It acknowledges and agrees that the Regulation S Jersey Newco Consideration Shares may be issued in a certificated registered form and that each share certificate will bear appropriate legends.

(l)     It is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a Qualified Investor).

(m)     It: (i) has conducted its own investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of the Company, Alpha and Jersey Newco and their respective subsidiaries and the Regulation S Jersey Newco Consideration Shares and, following such investigation and appraisal and the other due diligence that it deemed necessary and subsequently conducted in connection with the offering of the

Regulation S Jersey Newco Consideration Shares, it has made its own investment decision to acquire the Regulation S Jersey Newco Consideration Shares; (ii) acknowledges that it has had the opportunity to ask and has asked queries regarding an acquisition of the Regulation S Jersey Newco Consideration Shares, the Company, Alpha and Jersey Newco and their respective subsidiaries and affairs and the terms of the Regulation S Jersey Newco Consideration Shares, and has received satisfactory answers from representatives of Alpha, the Company and Jersey Newco; (iii) has reviewed all information if any, that it believes is necessary or appropriate in connection with its election to receive the Regulation S Jersey Newco Consideration Shares; (iv) has made its own assessment and has satisfied itself concerning the relevant tax, legal, currency and other economic considerations relevant to its investment in the Regulation S Jersey Newco Consideration Shares (and has sought such accounting, legal, tax and other advice as it has considered necessary to make an informed decision); (v) possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its prospective investment in the Regulation S Jersey Newco Consideration Shares; (vi) understands that in the future, the Regulation S Jersey Newco Consideration Shares may significantly increase or decrease in value; and (vii) would be able to afford a complete loss of the value of the Regulation S Jersey Newco Consideration Shares and would be able to bear the economic risk of holding such securities for an indefinite period.

(n)    It acknowledges that neither Jersey Newco, nor any of its subsidiaries, affiliates or any other person, has made any representation, warranty or undertaking (express or implied) to it with respect to Jersey Newco, the Regulation S Jersey Newco Consideration Shares or the accuracy, completeness or adequacy of any financial or other information concerning Jersey Newco or the Regulation S New Notes, other than (in the case of Jersey Newco and its subsidiaries only) any representation, warranty or undertaking of Jersey Newco and its subsidiaries contained in this Deed.  Further, none of Jersey Newco and its subsidiaries or its affiliates, directors, officers, employees, agents, representatives or advisers makes any representation as to the future performance of Jersey Newco or any of its subsidiaries or affiliates or their respective securities, including the Regulation S Jersey Newco Consideration Shares.

(o)    It understands that there may be certain consequences under U.S. and other tax laws resulting from an investment in the Regulation S Jersey Newco Consideration Shares and it has made such investigation and has consulted its own independent advisers or otherwise has satisfied itself concerning, without limitation, the effects of the U.S. federal, state and local income tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, as amended, the U.S. Investment Company Act of 1940, as amended, and the Securities Act.

(p)    It (and each other qualified institutional buyer, if any, for whose account it is receiving the Regulation S Jersey Newco Consideration Shares), in the normal course of business, invests in or purchases securities similar to the Regulation S Jersey Newco Consideration Shares, is aware that there are substantial risks incident to the receipt of the Regulation S Jersey Newco Consideration Shares and has the ability to bear the economic risk of its investment in the Regulation S Jersey Newco Consideration Shares, has adequate means of providing for its current and contingent needs, has no need for liquidity with respect to its investment in the Regulation S Jersey Newco Consideration Shares, and is able to sustain a complete loss of its investment in the Regulation S Jersey Newco Consideration Shares.

(q)    It satisfies any and all standards for investors making an investment in the Regulation S Jersey Newco Consideration Shares imposed by the jurisdiction of its residence or otherwise.

(r)    It is empowered, authorised and qualified to receive the Regulation S Jersey Newco Consideration Shares.

(s)     It understands that the foregoing representations, warranties and agreements are required in connection with U.S. securities laws and that Jersey Newco and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.  It agrees that, if any of the acknowledgements, representations and warranties made in connection with its receipt of the Regulation S Jersey Newco Consideration Shares are no longer accurate, it will promptly, and in any event prior to the issuance of the Regulation S Jersey Newco Consideration Shares to it, notify Jersey Newco and the Company in writing.

(t)     If it is receiving the Regulation S Jersey Newco Consideration Shares for the account of another person, it represents that it has full power and authorisation to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

(u)     It acknowledges that Jersey Newco may request from it and/or any account for which it is acting (if any) such additional information as Jersey Newco may deem necessary to evaluate its eligibility or the eligibility of any account for which it is acting to acquire the Regulation S Jersey Newco Consideration Shares, and may request from time to time such information as Jersey Newco may reasonably deem necessary to determine its eligibility or eligibility of any account for which it is acting to hold the Regulation S Jersey Newco Consideration Shares or to enable the issuer to comply with applicable regulatory requirements or tax law, and it and each account for which it is acting (if any) shall use reasonable efforts to provide such information as may reasonably be requested; provided that in no event shall any purchaser be obliged to disclose the name (or any other identifying information) of its limited partners, members or shareholders.

## 6.    Other jurisdictions

The Relevant Person (and any person acting on its behalf):

(a)     represents and warrants that if it is outside the United States, it has read the Restructuring Implementation Deed in its entirety;

(b)     represents and warrants that if it is in the United Kingdom, it has complied with its obligations in connection with money laundering and terrorist financing under the Proceeds of Crime Act 2002, the Terrorism Act 2000, the Criminal Justice Act 1993, the Money Laundering Regulations 2007 and, if it is making payment on behalf of a third party, that satisfactory evidence has been obtained and recorded by it to verify the identity of the third party as required by the regulations; and

(c)     represents and warrants that it and any person acting on its behalf falls within Section 86(7) of the Financial Services and Markets Act 2000, as amended, being a "qualified investor" within the meaning of Article (2)(e) of the Prospectus Regulation (a **Qualified Investor**), and is otherwise a person whose ordinary activities involve it in acquiring, holding, managing and disposing of investments (as principal or agent) for the purposes of its business and who has professional experience in matters relating to investments and who falls within Article 19(I) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the **Order**) or are persons who fall within Articles 49(2)(a) to (d) (**High net worth companies, unincorporated associations, etc.**) of the Order or to whom it may otherwise lawfully be communicated (all such persons together being referred to as Relevant Persons).

## PART 2

## OTHER SECURITIES LAW CONSIDERATIONS

1.    **European Economic Area and the United Kingdom**

The Restricted Jersey Newco Consideration Shares, the Restricted New Notes, the Regulation S Jersey Newco Consideration Shares and the Regulation S New Notes are not being offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area or in the United Kingdom. For these purposes, a "retail investor" means a person who is one (or more) of: (i) a "retail client" as defined in point (11) of Article 4(1) of MiFID II; or (ii) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a Qualified Investor.  Consequently no key information document required by Regulation (EU) No 1286/2014 (as amended, the **PRIIPs Regulation**) for offering or selling the Restricted New Notes and the Regulation S New Notes or otherwise making them available to retail investors in the European Economic Area or in the United Kingdom will be prepared and therefore offering or selling the Restricted New Notes and the Regulation S New Notes or otherwise making them available to any retail investor in the European Economic Area or in the United Kingdom may be unlawful under the PRIIPs Regulation.

2.    **United Kingdom only**

This Deed is only being distributed to and is only directed at Qualified Investors who are also: (i) persons who are outside the United Kingdom; (ii) persons within the definition of "Investment Professional" (as defined in Article 19(5) of the Order); (iii) persons falling within Articles 49(2)(a) to (d) of the Order; or (iv) persons to whom it may otherwise lawfully be communicated (all such persons together being referred to as **relevant persons**).  The Scheme Consideration is only available to Scheme Creditors (in accordance with the terms of the Restructuring Implementation Deed) and any invitation, offer or agreement to subscribe for, purchase or otherwise acquire such Scheme Consideration will only be engaged in with relevant persons.  Any invitation, offer or agreement to subscribe for, purchase or otherwise acquire such Restricted New Notes and Regulation S New Notes will only be engaged in with relevant persons. Any invitation, offer or agreement to subscribe for, purchase or otherwise acquire Restricted Jersey Newco Consideration Shares and Regulation S Jersey Newco Consideration Shares will only be engaged in with relevant persons.  Any person who is not a relevant person should not act or rely on the Explanatory Statement or any of its contents.

2.1    **General**

The implications of the Scheme for Scheme Creditors who are resident in, have a registered address in or are citizens of and/or are taxable in jurisdictions other than the United Kingdom may be affected by the laws of the relevant jurisdiction. Such overseas Scheme Creditors should inform themselves about and observe any applicable legal requirements. Any person outside the United Kingdom who is resident in, or who has a registered address in, or is a citizen of and/or is taxable in, an overseas jurisdiction and who is to receive or subscribe for any Scheme Consideration should consult his or her professional advisers and satisfy himself or herself as to the full observance of the laws of the relevant jurisdiction in connection with the Scheme, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

In the absence of bad faith, none of Alpha, the Company, Jersey Newco, the New Trustee, the New Security Agent, the Information Agent or any person appointed to distribute the Scheme Consideration shall have any Liability for any loss or damage arising as a result of the timing or terms of such a sale or as a result of any remittance made pursuant to such distribution.

**2.2    Non-Eligible Persons**

Without limiting the information set out in the "Important Securities Law Notice" section of the Explanatory Statement, the New Notes and the Jersey Newco Consideration Shares will not be issued to a Scheme Creditor (and/or if appointed, its Nominee) pursuant to the Restructuring Implementation Deed on the Restructuring Effective Date where such a Scheme Creditor (and/or its Nominee) is not an Eligible Person.

**2.3    Scheme Creditor Entitlements under the Scheme**

Each Scheme Creditor and/or its Nominee(s) shall be entitled to receive its Scheme Creditor Entitlements on the Restructuring Effective Date in accordance with the provisions of the Restructuring Implementation Deed, save that such Scheme Creditor Entitlements may be withheld from being distributed to a Scheme Creditor (and/or its Nominee(s)) on the Restructuring Effective Date if the Information Agent does not receive a validly completed Account Holder Letter from that Scheme Creditor by the Voting Instruction Deadline, being 5:00 pm (London time) on 28 October 2020 and all of the information, representations, confirmations and any other documentation required to be provided therein.

**NONE OF THE SECURITIES REFERRED TO IN THIS DEED SHALL BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.**

**IN WITNESS** whereof this Deed has been executed as a deed and delivered on

_____ 2020 by the parties hereto.

**Existing Noteholder who is an individual**

**EXECUTED** and **DELIVERED** as a **DEED** by

*Existing Noteholder*, _____    _____

(print name)                                    (sign)

in the presence of:

*Witness[3] signature*: _____

*Witness name*: _____

*Witness address*: _____


**Existing Noteholder who is a corporate entity**

**EXECUTED** and **DELIVERED** as a **DEED**

for and on behalf of

*Existing Noteholder*, _____

(print name)

acting by:


_____    _____

(sign)                                    (sign)

Name:                                    Name:

Title:                                    Title:

in the presence of:

*Witness[4] signature*: _____

*Witness name*: _____

*Witness address*: _____

---

[3] A witness may be any person over the age of 18 years
[4] A witness may be any person over the age of 18 years

**1561**

**Nominee for the New Notes who is an individual**

**EXECUTED** and **DELIVERED** as a **DEED** by

Nominated Recipient,  _____  _____

                                 (print name)                         (sign)

in the presence of:

*Witness[5] signature*:  _____

*Witness name*:  _____

*Witness address*:  _____


**Nominee for New Notes who is a corporate entity**

**EXECUTED** and **DELIVERED** as a **DEED**

for and on behalf of

Nominee,  _____

                         (print name)

acting by:

_____    _____

                   (sign)                          (sign)

 Name:                                 Name:

 Title:                                 Title:


in the presence of:

*Witness[6] signature*:  _____

*Witness name*:  _____

*Witness address*:  _____

---

**Nominee for Jersey Newco Consideration Shares who is an individual**

**EXECUTED** and **DELIVERED** as a **DEED** by

Nominated Recipient,  _____    _____

                                (print name)                    (sign)

in the presence of:

*Witness*[7] *signature*:  _____

*Witness name*:  _____

*Witness address*:  _____


**Nominee for Jersey Newco Consideration Shares who is a corporate entity**

**EXECUTED** and **DELIVERED** as a **DEED**

for and on behalf of

Nominee,  _____

                         (print name)

acting by:

_____    _____

                  (sign)                      (sign)

 Name:                        Name:

 Title:                        Title:

in the presence of:

*Witness*[8] *signature*:  _____

*Witness name*:  _____

*Witness address*:  _____

---

[7] A witness may be any person over the age of 18 years
[8] A witness may be any person over the age of 18 years

**Before returning this Account Holder Letter or any part of this Account Holder Letter, please make certain that you have provided all the information requested.**

**The Account Holder may complete and submit this Account Holder Letter on behalf of the Existing Noteholder (if applicable) if the Account Holder has authority to do so.**

**Online or PDF copies of this Account Holder Letter will be accepted and originals are not required.**

**SCHEDULE**

**JERSEY NEWCO KYC**

## 1. Company information

Each investor in Kelly Topco Limited (the "**JerseyCo**") is required to complete an application form. This form is designed to collect the information required under applicable anti-money laundering ("**AML**") legislation. As well as collecting information on the subscribing entity itself, JerseyCo will also need information on the direct owners, directors or other controllers and potentially the ultimate beneficial owners of the subscribing entity (the "**Investor**").

JerseyCo is required to comply with Jersey AML regulations. This requires JerseyCo to identify its Investors and certain parties/individuals associated with the Investor.

## 1.1 Company details

**Name of company:**

**Trading names (if applicable):**

**Former names (if applicable):**

**Registered office address:**

**Principal place of business/operations or mailing address (if different):**

**Email address:**

**Country of incorporation:**

**Date of incorporation:**

**Official identification numbers:**

**Name of regulator (if applicable):**

**Name of stock exchange (if applicable):**

## 1.2 Source of wealth and Investor background

Please provide details of the activities that have generated the company's total net w orth including the period over w hich the w ealth w as generated and the geographical sphere of such activities, including the net w orth of the UBOs.

## 2. Directors

The JerseyCo is required to identify the directors of the Investor. Please complete the following for **ALL** of the Directors of the Investor:

| Name (include any former names) | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## 3. Ownership

Please provide a structure chart showing the relationship from the Investor through to the UBOs (if any).

The JerseyCo is required to identify the ultimate beneficial owner(s) ("**UBO(s)**") of the Investor.

**Are any of the direct owners or UBO(s) of the Investor regulated or listed?**

Yes ☐  Please complete section 3.1 or 3.2 and contact Crestbridge[(1)] at projectkelly@crestbridge.com for guidance on the requirements for that direct owner or UBO.

No ☐  Continue Section 3.3 of the form.

### 3.1 Listed companies

Name of listed company:

Stock Exchange:

Ticker no:

### 3.2 Regulated companies

Name of regulated company:

Name of regulator:

Regulated entity no:

Regulated activities:

### 3.3 UBOs and controllers

A person is considered a UBO if they hold 25 per cent. or more of the shares in the Investor. The UBO must be an individual person. If the Investor company is widely held and there are no individual persons identified as UBOs, Jerseyco must identify any "controllers" of the Investor.

"**Controllers**" are those individual persons, other than directors, who can control the company (i.e. through shareholders' agreements, the power to appoint senior management, or through holding convertible stock or any outstanding debt that is convertible into voting rights or through personal connections, by participating in financing, because of close and intimate family relationships, historical or contractual associations or as a result of default on certain payments).

**1569**

The UBOs or Controllers of the Investor have been identified and their details included ☐
in the table below.

I/we confirm that there are no UBOs or other controllers of the Investor other than the ☐
directors detailed in section 2.

Please complete the following for **ALL** UBOs or Controllers of the Investor:

| Name (include any former names) | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**1570**

## Declaration and signature

I declare that the information provided on this form is, to the best of my knowledge and belief, accurate and complete.

I further certify that:

- I am officially authorised to sign for the company to which this form relates.

- Where legally required to do so, I hereby consent to Jerseyco sharing this information with Crestbridge and the relevant authorities.

- The company, its beneficial owners, directors, controllers and third parties for whom the company is acting have no direct/indirect connection to Iran and/or North Korea.


_____                    _____

Print name                                          Signature


_____

Date


_____

Capacity


## Notes

If you have any questions on the application form or documents to be provided, please do not hesitate to contact Crestbridge:

**Email:**          **projectkelly@crestbridge.com**

**Telephone:**      +44 1534 835950

**1571**

| Limited Partnership information |
|---|

Each investor in Kelly Topco Limited (the "**JerseyCo**") is required to complete an application form. This form is designed to collect the information required under applicable anti-money laundering ("**AML**") legislation. As well as collecting information on the subscribing entity itself, JerseyCo will also need information on the direct owners, directors or other controllers and potentially the ultimate beneficial owners of the subscribing entity (the "**Investor**").

JerseyCo is required to comply with Jersey AML regulations. This requires JerseyCo to identify its Investors and certain parties/individuals associated with the Investor.

| 1.1 Limited Partnership details |
|---|

**Name of Limited Partnership:**

**Trading names (if applicable):**

**Former names (if applicable):**

**Registered office address:**

**Principal place of business/operations or mailing address (if different):**

**Email address:**

**Country of establishment:**

**Date of establishment:**

**Official identification numbers:**

**Name of regulator (if applicable):**

**Name of stock exchange (if applicable):**

**1572**

## 1.2 General Partner details

**Name of Limited Partnership's General Partner:**

**Trading names (if applicable):**

**Former names (if applicable):**

**Registered office address:**

**Principal place of business/operations or mailing address (if different):**

**Country of establishment:**

**Date of establishment:**

**Official identification numbers:**

**Name of regulator (if applicable):**

**Name of stock exchange (if applicable):**

## 1.3 Investment Manager details

**Name of investment manager:**

**Name of regulator**

**Regulated entity no:**

**Regulated activities:**

**1573**

## 1.4 Source of wealth and Investor background

Please provide details of the activities that have generated the Limited Partnership's total net worth including the period over which the wealth was generated and the geographical sphere of such activities, including the net worth of the UBOs.

## 2. Directors

The JerseyCo is required to identify the directors of the General Partner ("**GP**") (if it is a company). Please complete the following for **ALL** of the Directors of the GP or if all of the below required information is included on the GP's register of directors, please provide a copy of the current register:

| Name (include any former names) | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## 3. Ownership

JerseyCo is required to identify the ultimate beneficial owner(s) ("**UBO(s)**") of the Investor.

A person is considered a UBO if they hold 25 per cent. or more of the shares in the Investor. The UBO must be an **individual person.** If the Investor is widely held and there are no individual persons identified as UBOs, Jerseyco must identify any "controllers" of the Investor.

"Controllers" are those **individual persons**, other than directors, who can control the company (i.e. through shareholders' agreements, the power to appoint senior management, or through holding convertible stock or any outstanding debt that is convertible into voting rights or through personal connections, by participating in financing, because of close and intimate family relationships, historical or contractual associations or as a result of default on certain payments).

| | |
|---|---|
| The UBOs or Controllers of the Investor have been identified and their details included in the table below | ☐ |
| I/we confirm that there are no UBOs or other controllers of the Investor other than the directors detailed in section 2 | ☐ |

If any of the UBO(s) or Controller(s) you identify is a company, please complete the AML Form for Companies in Section 1. However, if such corporate entity is also **regulated** or **listed** - please contact Crestbridge at **projectkelly@crestbridge.com** for guidance on the requirements.

If any of the UBO(s) or Controller(s) is an **individual person** please complete the following for **ALL** such parties:

| Name (include any former names) | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Declaration and signature

I declare that the information provided on this form is, to the best of my knowledge and belief, accurate and complete.

I further certify that:

- I am officially authorised to sign for the Limited Partnership to which this form relates.

- Where legally required to do so, I hereby consent to Jerseyco sharing this information with Crestbridge and the relevant authorities.

- The Limited Partnership, its beneficial owners, controllers and third parties for whom the Limited Partnership is acting have no direct/indirect connection to Iran and/or North Korea.


Print name                                              Signature


Date


Capacity


## Notes

If you have any questions on the application form or documents to be provided, please do not hesitate to contact Crestbridge:

**Email:**        **projectkelly@crestbridge.com**

**Telephone:**        +44 1534 835950

**APPENDIX 9**

**LENDER CLAIM FORM**

*For use by Scheme Creditors in their capacities as Term Loan Lender, Revolving Loan Lender and/or the Existing Overdraft Provider in respect of their Scheme Claims (the Lender Scheme Creditors) only*

## LENDER CLAIM FORM

IN THE HIGH COURT OF JUSTICE

BUSINESS AND PROPERTY COURTS OF
ENGLAND AND WALES

INSOLVENCY AND COMPANIES LIST (ChD)

### IN THE MATTER OF KCA DEUTAG UK FINANCE PLC

**- and -**

### IN THE MATTER OF THE COMPANIES ACT 2006
### SCHEME OF ARRANGEMENT

(*under Part 26 of the Companies Act 2006*)

between

### KCA DEUTAG UK FINANCE PLC

and

### THE SCHEME CREDITORS

| **Principal Record Time**: 5:00 pm (New York time) on 26 October 2020 <br><br> **Existing Overdraft Record Time**: 8:00 am (London time) on 27 October 2020 <br><br> **Voting Instruction Deadline**: 5:00 pm (London time) on 28 October 2020 | LENDER CLAIM FORM FOR LENDER SCHEME CREDITORS ONLY | **Scheme Meeting**: 10:30 am (London time) on 30 October 2020, via video conference |
| --- | --- | --- |

You are advised to act well in advance of the above deadline in order to make sure all the necessary procedures are completed before the deadline.

**1579**

**Purpose of this Lender Claim Form**

This Lender Claim Form is only to be completed by Lender Scheme Creditors (and, if applicable, their Nominees). Capitalised terms used in this Lender Claim Form but not defined in it have the same meaning as given to them in the explanatory statement relating to the Scheme (the **Explanatory Statement**), subject to any amendments or modifications made or approved by the Court.

Each Lender Scheme Creditor must use this letter to vote in respect of the Scheme and to provide details in order to receive the Scheme Consideration. A summary of what is required from each Lender Scheme Creditor is set out at pages 8 and 9 of this letter.

**If the documents and information required by this Lender Claim Form are not submitted to the Information Agent by the Voting Instruction Deadline, being 5:00pm (London time) on 28 October 2020, the relevant Lender Scheme Creditor will not be eligible to receive the Scheme Consideration (comprising the New Notes and the Jersey Newco Consideration Shares) on the Restructuring Effective Date.**

**Lender Scheme Creditors are strongly encouraged to appoint a proxy (either the Chairperson or another person of their choice who is willing to attend the Scheme Meeting) by completing and submitting Part 2 of this Lender Claim Form and, for those attending the Scheme Meeting in person or appointing a proxy other than the Chairperson, their relevant identification documents prior to the Voting Instruction Deadline, even if they intend to attend and vote in person, in case they are unable to do so for any reason.**

**As explained in Appendix 7 (Instructions and Guidance for Scheme Creditors) of the Explanatory Statement, the Scheme Meeting will be a virtual meeting and therefore references in this document to attending the meeting and/or attending in person should be read as the context requires.** In any case, only one individual person may attend the Scheme Meeting on behalf of a Lender Scheme Creditor. If a Lender Scheme Creditor does not complete and submit Part 2 of this Lender Claim Form before the Voting Instruction Deadline, its admission to, and, thus, entitlement to vote at, the Scheme Meeting (following the submission of its relevant identification documents) will be at the discretion of the Chairperson.

**THIS LENDER CLAIM FORM IS NOT TO BE DISTRIBUTED TO OR ACCESSED BY (I) ANY PERSON LOCATED OR RESIDENT IN THE UNITED STATES OTHER THAN QUALIFIED INSTITUTIONAL BUYERS OR INSTITUTIONAL ACCREDITED INVESTORS, (II) (FOR CERTAIN SECURITIES) ANY U.S. PERSON OUTSIDE THE UNITED STATES OR (III) ANY RETAIL INVESTORS IN THE EUROPEAN ECONOMIC AREA OR THE UNITED KINGDOM.**

**THIS DOCUMENT DOES NOT CONSTITUTE OR FORM PART OF ANY OFFER OR INVITATION TO SELL OR ISSUE, OR ANY SOLICITATION OF ANY OFFER TO PURCHASE OR SUBSCRIBE FOR, ANY SECURITIES.**

**Confirmation on your representations**: By receiving this Lender Claim Form, you have confirmed that:

(1)     you are either: (x) an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under the Securities Act; (y) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act; or (z) receiving the relevant securities in an offshore transaction in accordance with Regulation S under the Securities Act (and, in case of the Regulation S New Notes, not a "U.S. person" under the meaning of Regulation S under the Securities Act);

(2)     you are not a retail investor in the European Economic Area or the United Kingdom (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of MiFID II; (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a qualified investor as defined in the Prospectus Regulation); and

(3)     you are not a Disqualified Person.

**IF YOU ARE UNABLE TO CONFIRM THE REPRESENTATIONS SET FORTH ABOVE, YOU ARE NOT AN ELIGIBLE PERSON AND, UNLESS YOU APPOINT A NOMINEE WHO IS AN ELIGIBLE PERSON (PURSUANT TO PART 3 OF THIS LENDER CLAIM FORM), YOU ARE NOT ELIGIBLE TO RECEIVE OR REVIEW THIS LENDER CLAIM FORM AND SHOULD REFRAIN FROM ACCESSING, RELYING ON OR ACTING ON IT IN ANY WAY.**

**IMPORTANT NOTICE TO THE LENDER SCHEME CREDITORS**

The nominal amount of Scheme Claims of each Lender Scheme Creditor (other than the Existing Overdraft Provider) for voting purposes and to calculate the Scheme Consideration will be all amounts owed by the Group to that Lender Scheme Creditor (in its capacity as such) as at the Principal Record Time (including, for the avoidance of doubt, any accrued and unpaid interest (including any default interest) and commitment fees in accordance with the Credit Agreement) based on information provided to the Company, or the Information Agent on its behalf, by the relevant Existing Administrative Agent or otherwise based on the Company's own books and records and/or information provided to it, or the Information Agent on its behalf, by or on behalf of a Lender Scheme Creditor.

The nominal amount of Scheme Claims of the Existing Overdraft Provider for voting purposes and to calculate the Scheme Consideration will be all amounts owed by the Group to the Existing Overdraft Provider (in its capacity as such), as at the Existing Overdraft Record Time (including, for the avoidance of doubt, any accrued and unpaid interest (including any default interest) and commitment fees in accordance with the Credit Agreement and the terms of the Existing Overdraft Facilities) based on the Company's own books and records and/or information provided to it, or the Information Agent on its behalf, by or on behalf of the Existing Overdraft Provider. To the extent any amount owed under the Existing Overdraft Facilities are denominated in a currency other than U.S. dollars, that amount shall be converted into U.S. dollars using the HSBC Mid-Market Rate (or if the HSBC Mid-Market Rate is not accessible by the Company at the Existing Overdraft Record Time, the Bank of England Exchange Rate).

This information will be used by the Chairperson to determine whether the Scheme is approved at the Scheme Meeting.

As such, Lender Scheme Creditors do not need to provide the Company with any information relating to the amount they are owed in connection with their Scheme Claims in this Lender Claim Form in order for the Chairperson to determine the value of their Scheme Claims. However, the Lender Scheme Creditors may be requested by the Company or the Information Agent to assist with confirming the amount of their Scheme Claims.

## INSTRUCTIONS FOR THE COMPLETION AND SUBMISSION OF THIS LENDER CLAIM FORM

This Lender Claim Form is divided into four parts as summarised below.

Before any part of this Lender Claim Form is completed, Lender Scheme Creditors should read the Scheme, the Restructuring Implementation Deed and the Explanatory Statement and, in particular, Appendix 7 to the Explanatory Statement (Instructions and Guidance for Scheme Creditors). The Scheme, the Restructuring Implementation Deed and the Explanatory Statement and all relevant associated documentation can be found via the Scheme Website at http://www.lucid-is.com/kcadeutag.

**In order for a Lender Scheme Creditor to vote at the Scheme Meeting and receive their Scheme Creditor Entitlements (through a Nominee(s), if applicable) on the Restructuring Effective Date, the validly completed Lender Claim Form(s) together with any accompanying documents or evidence must be submitted by that Lender Scheme Creditor to the Information Agent by the Voting Instruction Deadline online via http://www.lucid-is.com/kcadeutag or by email in PDF form to kcadeutag@lucid-is.com. In addition, to receive the Jersey Newco Consideration Shares on the Restructuring Effective Date, the Lender Scheme Creditor (or its Nominee, if applicable) must have submitted all Jersey Newco KYC to the Jersey Registrar by the Voting Instruction Deadline (and the Jersey Registrar must have confirmed to the Information Agent that all Jersey Newco KYC in respect of the relevant Scheme Creditor (or its Nominee, as applicable)  has been completed to its satisfaction no later than five Business Days prior to the Restructuring Effective Date).**

In relation to a Lender Claim Form, **validly completed** means a Lender Claim Form which, to the satisfaction of the Information Agent (acting reasonably):

(a)    has had each relevant part and section thereof completed in full;

(b)    gives all required authorisations, confirmations and undertakings in the form requested therein; and

(c)    is executed in Part 2 by any Lender Scheme Creditor who wishes to appoint a proxy, and in Part 6 by the Lender Scheme Creditor and (if applicable) its Nominee(s).

**1583**

**IMPORTANT DEADLINE**

**This Lender Claim Form must be completed and submitted to the Information Agent by no later than the Voting Instruction Deadline, that is 5:00pm (London time) on 28 October 2020, in order to vote on the Scheme and receive the Scheme Consideration on the Restructuring Effective Date. In addition, to receive the Jersey Newco Consideration Shares by the Restructuring Effective Date, (i) the Lender Scheme Creditor (or its Nominee, if applicable) must have submitted all Jersey Newco KYC to the Jersey Registrar by the Voting Instruction Deadline and (ii) the Jersey Registrar must have confirmed to the Information Agent that all Jersey Newco KYC in respect of the relevant Scheme Creditor (or its Nominee, as applicable) has been completed to its satisfaction no later than five Business Days prior to the Restructuring Effective Date. A summary of how to submit your Jersey Newco KYC to the Jersey Registrar is set out below.**

It is highly recommended that the completed Lender Claim Form is printed or saved as a PDF document after submission. You will receive acknowledgement of the online transmission of your submission together with the final PDF. Original paper copies of the Lender Claim Form are not required and should not be sent to the Information Agent.

**All elections made in this Lender Claim Form shall, subject to verification by the Company and/or the Information Agent, be final and binding (save that you can submit an updated Lender Claim Form provided you do so before the Voting Instruction Deadline) on and from the date of submission of the Lender Claim Form to the Information Agent.**

If the Scheme Effective Time occurs, the Scheme will become effective and binding on all Scheme Creditors, regardless of whether you voted in favour or against the Scheme or abstained from voting. The New Notes Entitlement and the Jersey Newco Shares Entitlement (which together comprise the **Scheme Creditor Entitlements**) will be delivered on or around the Restructuring Effective Date to you and/or your Nominee (if applicable) or, if you have not validly completed a Lender Claim Form(s), to the Holding Period Trustee.

Notwithstanding any other provision of this Lender Claim Form, any representation, undertaking or confirmation required to be given by a Lender Scheme Creditor or Nominee in this Lender Claim Form may be waived in writing by the Company and the Information Agent.

This Lender Claim Form and any non-contractual obligations arising out of or in relation to this Lender Claim Form shall be governed by, and interpreted in accordance with, English law.

## SUMMARY OF CONTENTS OF THIS LENDER CLAIM FORM

**THIS LENDER CLAIM FORM HAS FOUR PARTS.**

1. **PART 1: ADMINISTRATIVE INFORMATION**

   *This part must be completed by **all** Lender Scheme Creditors.*

   In this part, each Term Loan Lender, each Revolving Loan Lender and the Existing Overdraft Provider (as applicable) must fill in their administrative details.

2. **PART 2: PROXY FORM**

   *This part must be completed and signed by **any** Lender Scheme Creditor that wishes to vote at the Scheme Meeting.*

   Where a Lender Scheme Creditor or its proxy intends to attend the Scheme Meeting in person, a valid original passport or other original government issued photographic identification will be required as proof of personal identity and the passport or identification details contained therein must match those provided in Part 2 of this Lender Claim Form.

   In addition, where a proxy is appointed to attend the Scheme Meeting in person and the Lender Scheme Creditor is a corporate person, evidence of the individual proxy's authority to attend the Scheme Meeting on behalf of the Lender Scheme Creditor (for example, a valid power of attorney and/or board resolutions) will be required (unless the Chairperson has been selected as the proxy). If appropriate personal identification or evidence of authority is not produced, that person shall only be permitted to attend and vote at the Scheme Meeting at the discretion of the Chairperson.

   Unless a Lender Scheme Creditor has selected the Chairperson as its proxy, any proxy attending the Scheme Meeting on behalf of a Lender Scheme Creditor should, prior to the Scheme Meeting, provide the Information Agent with supporting evidence of his/her appointment if the Lender Scheme Creditor is a corporate person (i.e. evidence of such proxy's authority).

3. **PART 3: SCHEME CREDITOR ENTITLEMENTS**

   3.1 **U.S. Securities Elections**

   *This section must be completed by **all** Lender Scheme Creditors.*

   This section must be completed by all Lender Scheme Creditors in order to receive their Scheme Creditor Entitlements.

   3.2 **Euroclear/Clearstream Account Holder Details**

   *This section must be completed by **all** Lender Scheme Creditors.*

   This section must be completed by all Lender Scheme Creditors in order to receive their New Notes Entitlements.

   3.3 **Appointment of Nominee(s)**

   *This section must be completed by **any** Lender Scheme Creditor that wishes to appoint one or more Nominees to receive their Scheme Consideration.*

This section must be completed by Lender Scheme Creditors who intend to appoint one or more Nominees (each of which must be an Eligible Person) to receive any of their Scheme Creditor Entitlements. Scheme Creditor Entitlements will not be allocated to any Lender Scheme Creditor or Nominee which is not an Eligible Person.

### 3.4    Jersey Newco Consideration Shares KYC Requirements

*Jersey Newco KYC should be submitted, and this section must be completed, by **all** Lender Scheme Creditors.*

The Schedule to this Lender Claim Form sets out the initial Jersey Newco KYC required in respect of each Lender Scheme Creditor and/or its Nominee (if appointed).

If a Lender Scheme Creditor (or its Nominee (if applicable)) would like to receive the Jersey Newco Consideration Shares on the Restructuring Effective Date, Jersey Newco KYC in respect of the legal person which will receive the Jersey Newco Consideration Shares (either the Lender Scheme Creditor and/or its Nominee (if appointed)) must be submitted to the Jersey Registrar by the Voting Instruction Deadline and the Jersey Registrar must have confirmed to the Information Agent that all Jersey Newco KYC in respect of the relevant Lender Scheme Creditor (or its Nominee (if applicable)) has been completed to its satisfaction no later than five Business Days prior to the Restructuring Effective Date.

Please note that the relevant Jersey Newco KYC to be provided to the Jersey Registrar will depend on whether the legal person receiving the Jersey Newco Consideration Shares is a company or a limited partnership and, accordingly, the relevant forms for each type of person are included in the Schedule.

Once completed, the relevant information in the Schedule should be sent to the Jersey Registrar at the following email address: **projectkelly@crestbridge.com**.

For any queries related to the Jersey Newco KYC that must be provided, the Lender Scheme Creditors should contact the Jersey Registrar at projectkelly@crestbridge.com or by telephone on +44 1534 835950.

### 4.    PART 4: SECURITIES CONFIRMATION DEED

*This part must be completed and signed by **all** Lender Scheme Creditors and, if applicable, each of its Nominees.*

This part **must be completed and signed** in all cases by a Lender Scheme Creditor and its Nominee(s) (if appointed). The Securities Confirmation Deed must be printed in full, **executed as a deed (which means it must be executed in the presence of a witness, being any person of the age of 18 years)** where indicated and the scanned PDF of all of the pages of the executed Securities Confirmation Deed (not only the signature page) uploaded by the Lender Scheme Creditor (together with the Lender Claim Form) online via http://www.lucid-is.com/kcadeutag or by email in PDF form to kcadeutag@lucid-is.com.

If a Lender Scheme Creditor (and/or a Nominee) would like to receive its Scheme Creditor Entitlements on the Restructuring Effective Date, it must ensure that the Securities Confirmation Deed is validly completed, executed and received by the Information Agent by the Voting Instruction Deadline.

**FOR ASSISTANCE, CONTACT THE INFORMATION AGENT:**

**Lucid Issuer Services Limited**
**Tankerton Works**
**12 Argyle Walk**
**London WC1H 8HA**
**United Kingdom**

Attention: Oliver Slyfield / Jacek Kusion

Phone: +44 20 7704 0880

Email: **kcadeutag@lucid-is.com**

# PART 1

## ADMINISTRATIVE INFORMATION

Full name of Lender Scheme Creditor:

……………………………………………………………………………………………

Representative (investment manager/investment adviser/general partner)[1]

……………………………………………………………………………………………

Telephone number (with country code):

……………………………………………………………………………………………

Email address:

……………………………………………………………………………………………

Jurisdiction of incorporation/country of residence

……………………………………………………………………………………………

Principal contact person:

……………………………………………………………………………………………

---

[1] To be populated only if the Lender Scheme Creditor is an investment fund, managed account, discretionary account or similar over which a manager, adviser or general partner has discretionary authority.

**1588**

## PART 2

## PROXY FORM

Each Lender Scheme Creditor wishes to appoint:

**Tick only ONE of the boxes below.**

☐    the Chairperson; or

☐    the following individual (tick box if appropriate and fill in the details immediately below)

Name:

Address:

Passport number or identification number on equivalent identification:

*or failing him/her:*

Name:  (**Alternate 1**)

Address:

Passport number or identification number on equivalent identification:

*or failing Alternate 1:*

the Chairperson

as its proxy and wishes its proxy to vote:

**Tick only ONE of the boxes below.**

☐    FOR the Scheme

☐    AGAINST the Scheme

**Alternatively, if the Lender Scheme Creditor wishes to attend and vote in person or by a duly authorised representative, if a corporate, please tick below.**

☐

**1589**

**EXECUTION OF THE PROXY**

| |
|---|
| **TO BE COMPLETED BY ALL LENDER SCHEME CREDITORS APPOINTING A PROXY** <br><br> Name of Lender Scheme Creditor: …………………………………………………….. <br><br><br> Signature(s): ……………………………..……………………………….. <br><br> Date: ……………………………….. |

**1590**

## PART 3

## SCHEME CREDITOR ENTITLEMENTS

### SECTION 1: U.S. SECURITIES ELECTIONS

By ticking one box from each set of the boxes below, the Lender Scheme Creditor expressly acknowledges and confirms that the Lender Scheme Creditor intends to receive and is eligible to receive (and/or intends its Nominee to receive and confirms that its Nominee is eligible to receive) New Notes and Jersey Newco Consideration Shares in the form as follows:

Select one of the following:

☐ **Restricted New Notes**

☐ **Regulation S New Notes**

AND select one of the following:

☐ **Restricted Jersey Newco Consideration Shares**

☐ **Regulation S Jersey Newco Consideration Shares**

By ticking one box from each set of the boxes above, the Lender Scheme Creditor expressly confirms, represents and warrants to Jersey Newco and the Company that:

(a)     in the case of ticking the **Restricted New Notes** and/or **Restricted Jersey Newco Consideration Shares** box, the Lender Scheme Creditor (or its Nominee):

    (i)      is either (x) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act, or (y) an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act;

    (ii)     is aware the sale of the Restricted New Notes and the Restricted Jersey Newco Consideration Shares is being made in reliance on one or more exemptions from registration under the Securities Act; and

    (iii)    is acquiring the Restricted New Notes and the Restricted Jersey Newco Consideration Shares for its own account or for one or more managed accounts, each of which is a "qualified institutional buyer" or an institutional "accredited investor" and as to each of which it exercises sole investment discretion; and

(b)     in the case of ticking the **Regulation S New Notes** and/or **Regulation S Jersey Newco Consideration Shares** box, the Lender Scheme Creditor (or its Nominee):

    (i)      is receiving the Regulation S New Notes and/or Regulation S Jersey Newco Consideration Shares in an offshore transaction in accordance with Regulation S under the Securities Act (and, in case of the Regulation S New Notes, is not a "U.S. person" as defined in Rule 902(k) of Regulation S under the Securities Act); and

    (ii)     is aware that the sale of the Regulation S New Notes and the Regulation S Jersey Newco Consideration Shares is being made in reliance on one or more exemptions from registration under the Securities Act.

### SECTION 2: EUROCLEAR/CLEARSTREAM ACCOUNT HOLDER DETAILS

**Lender Scheme Creditors must indicate a Euroclear/Clearstream Account Holder for receipt of their New Notes.**

Name of Euroclear/Clearstream Account Holder

_____

Clearing System in which Euroclear/Clearstream Account Holder holds account

☐ Euroclear
☐ Clearstream
* Please tick relevant box

Account Number of Euroclear/Clearstream Account Holder

_____

Contact name at Euroclear/Clearstream Account Holder

_____

Contact email of Euroclear/Clearstream Account Holder

_____

Contact telephone number (with country code) of Euroclear/Clearstream Account Holder

_____

## SECTION 3: APPOINTMENT OF NOMINEE(S)

If you would like to appoint a Nominee to receive the New Notes and/or the Jersey Newco Consideration Shares, please complete the following details in respect of the Nominee(s).

**Note: a maximum of two Nominees can be appointed – one in respect of the New Notes and one in respect of the Jersey Newco Consideration Shares. The New Notes entitlement will be delivered to the Euroclear/Clearstream Account Holder specified in Section 2 (Euroclear/Clearstream Account Holder Details) above.**

**1. New Notes**

Name of Nominee

_____

Address of Nominee

_____

**2. Jersey Newco Consideration Shares**

Name of Nominee

_____

Address of Nominee

_____

Contact email of Nominee

_____

Contact telephone number (with country code) of Nominee

_____

## SECTION 4: JERSEY NEWCO CONSIDERATION SHARES KYC REQUIREMENTS

To be eligible to receive the Jersey Newco Consideration Shares pursuant to the Restructuring Implementation Deed, the Lender Scheme Creditor (or, if the Lender Scheme Creditor has appointed a Nominee, its Nominee) must complete the relevant "know your customer" requirements set out in the Schedule (being the Jersey Newco KYC) to this Lender Claim Form.

If a Lender Scheme Creditor (or its Nominee (if applicable)) would like to receive the Jersey Newco Consideration Shares on the Restructuring Effective Date, Jersey Newco KYC in respect of the legal person which will receive the Jersey Newco Consideration Shares (either the Lender Scheme Creditor or its Nominee (if appointed)) must be submitted to the Jersey Registrar by the Lender Scheme Creditor by the Voting Instruction Deadline and the Jersey Registrar must have confirmed to the Information Agent that all Jersey Newco KYC has been completed to its satisfaction by no later than five Business Days prior to the Restructuring Effective Date. Please note, the Jersey Registrar may have follow-up queries or request additional information from the Lender Scheme Creditor after the Voting Instruction Deadline and all follow-up queries or additional requests must be resolved to the satisfaction of the Jersey Registrar by no later than five Business Days prior to the Restructuring Effective Date.

Select one of the following:

☐ Jersey Newco KYC **has** been submitted to the Jersey Registrar

☐ Jersey Newco KYC **has not** been submitted to the Jersey Registrar

PART 4

SECURITIES CONFIRMATION DEED

**To receive the New Notes and Jersey Newco Consideration Shares, a validly completed Lender Claim Form, including a validly completed Securities Confirmation Deed, must be submitted to and received by the Information Agent. For the avoidance of doubt, a Lender Scheme Creditor does not have to complete a Securities Confirmation Deed in order to vote on the Scheme. However, if no Securities Confirmation Deed is validly completed and submitted, the Lender Scheme Creditor and/or its Nominee will not receive any Scheme Creditor Entitlements on the Restructuring Effective Date.**

THIS DEED IS MADE BY WAY OF DEED POLL BY (I) THE LENDER SCHEME CREDITOR WHOSE DETAILS ARE SET OUT IN PART 1 OF THE LENDER CLAIM FORM AND (II) ANY NOMINEE(S) WHOSE DETAILS ARE SET OUT IN PART 3 OF THE LENDER CLAIM FORM (IF APPLICABLE), IN EACH CASE ON THE DATE STATED THEREIN FOR THE BENEFIT OF THE COMPANY AND JERSEY NEWCO, AND WITH THE INTENTION AND EFFECT THAT IT MAY BE DIRECTLY RELIED UPON AND ENFORCED SEPARATELY BY: (I) EACH BENEFICIARY OF ANY RELEASE GRANTED UNDER THIS DEED; AND (II) ANY PERMITTED ASSIGNEE OR ANY OTHER PERSON RELYING ON THIS DEED, EVEN THOUGH THEY ARE NOT PARTY TO THIS DEED.

1.    **DEFINITIONS AND INTERPRETATION**

(a)    Unless expressed otherwise, terms defined in the Explanatory Statement shall have the same meaning in this Deed.

(b)    In this Deed, unless the context otherwise requires:

(i)    words in the singular include the plural and in the plural include the singular;

(ii)    the words "including" and "include" shall not be construed as or take effect as limiting the generality of the foregoing;

(iii)    the headings shall not be construed as part of this Deed nor affect its interpretation;

(iv)    references to any clause, without further designation, shall be construed as a reference to the clause of this Deed so numbered;

(v)    reference to any act, statute or statutory provision shall include a reference to that provision as amended, re-enacted or replaced from time to time whether before or after the date of this Deed and any former statutory provision replaced (with or without modification) by the provision referred to;

(vi)    reference to a person includes a reference to any body corporate, unincorporated association or partnership and to that person's legal personal representatives or successors; and

(vii)    the principles of construction set out in the Scheme apply to this Deed except that references to the Scheme shall instead be construed as references to this Deed.

2.    **CONFIRMATIONS, WARRANTIES AND UNDERTAKINGS**

(a)    The Lender Scheme Creditor and, if the Lender Scheme Creditor has appointed a Nominee for either the New Notes or the Jersey Newco Consideration Shares, each Nominee, gives the following confirmations, acknowledgements, warranties and undertakings:

**1596**

(i)     if the Lender Scheme Creditor has elected to receive (or to have its Nominee receive) the New Notes and/or Jersey Newco Consideration Shares pursuant to Section 4(a)(2) of the Securities Act (as defined in Annex 1) by ticking the "Restricted New Notes" and/or "Restricted Jersey Newco Consideration Shares" box in Part 3 (Scheme Creditor Entitlements) of the Lender Claim Form, those set out in Section 2 (Restricted New Notes) and Section 4 (Restricted Jersey Newco Consideration Shares) in Part 1 of Annex 1;

(ii)    if the Lender Scheme Creditor has elected to receive (or to have its Nominee receive) the New Notes and/or Jersey Newco Consideration Shares issued in reliance on Regulation S (as defined in Annex 1) by ticking the "Regulation S New Notes" and/or "Regulation S Newco Shares" box in Part 3 (Scheme Creditor Entitlements) of the Lender Claim Form, as applicable, those set out in Section 3 (Regulation S New Notes) and Section 5 (Regulation S Jersey Newco Consideration Shares) in Part 1 of Annex 1; and

(iii)   those set out in Section 6 (Other jurisdictions) in Part 1 of Annex 1.

(b)   Without prejudice to the provisions in Annex 1, the Lender Scheme Creditor and/or, if the Lender Scheme Creditor has appointed a Nominee, each Nominee, at the Restructuring Effective Date, irrevocably warrants, undertakes and represents to the Company and Jersey Newco that:

(i)     it will not seek or attempt nor aid or facilitate any other person to dispute, set aside, challenge, compromise or question in any jurisdiction the validity and efficacy of the cancellation and/or write-down of its Scheme Claims; and

(ii)    it will not seek or attempt nor aid or facilitate any other person to dispute, challenge, set aside or question the validity, authority or efficacy of the Scheme in any jurisdiction or before any court, regulatory authority, tribunal or otherwise.

(c)   The Lender Scheme Creditor and, if the Lender Scheme Creditor has appointed one or more Nominee(s), each Nominee, hereby:

(i)     undertakes to be bound by and perform each of the obligations applicable to it as set out in the Scheme and each of the Restructuring Documents to which it is a party as if such obligation were set out in full in this Lender Claim Form; and

(ii)    expressly accepts and acknowledges that certain releases and waivers will be granted on its behalf pursuant to the terms of the Deed of Release.

## 3.    GRANT OF AUTHORITY TO THE COMPANY TO EXECUTE CERTAIN DOCUMENTS ON ITS BEHALF

On and from the Scheme Effective Time in relation to the Scheme, the Lender Scheme Creditor and, if the Lender Scheme Creditor has appointed one or more Nominees, each Nominee, in consideration of the rights provided to Lender Scheme Creditors under the Scheme and the Restructuring Implementation Deed, hereby irrevocably authorises and directs the Company as its agent and attorney (acting by its directors or other duly appointed representatives) in accordance with the authorisation and undertaking given pursuant to Clause 3 of the Scheme to enter into, execute, notarise and deliver the documents and take each of the actions stipulated in Clause 5 of the Restructuring Implementation Deed and each Nominee agrees and acknowledges that the authorisation and undertaking given pursuant to Clause 3 of the Scheme shall be deemed to be given by it notwithstanding that it may not be a Scheme Creditor.

**4.    INSTRUCTIONS TO EXISTING ADMINISTRATIVE PARTIES TO UNDERTAKE TO SUPPORT THE RESTRUCTURING**

The Lender Scheme Creditor and, if the Lender Scheme Creditor has appointed one or more Nominee(s), each Nominee, hereby authorises and instructs each Existing Administrative Party, the Existing Custodian and the Existing Depositary to undertake such steps as it considers necessary or desirable for it to take for the purposes of facilitating the implementation of the Scheme, including (without limitation) entering into and executing in its respective capacity the Implementation Documents to which it is a party (including, for the avoidance of doubt, in respect of the Existing Security Agent, each Security and Guarantees Release Document) and any other document that it reasonably considers necessary or advisable to implement the Scheme.

**5.    MODIFICATIONS TO THE SCHEME**

The Lender Scheme Creditor and, if the Lender Scheme Creditor has appointed one or more Nominee(s), each Nominee hereby agrees that the Company may, subject to Clause 9.2 of the Scheme , at any Court hearing to sanction the Scheme, consent on behalf of itself as Scheme Creditor to any modification of, or addition to, the Scheme and/or any of the Implementation Documents on any terms or conditions that the Court may think fit to approve or impose which is necessary for the implementation of the Restructuring, and which could not reasonably be expected directly or indirectly to have an adverse effect on the interests of any Scheme Creditor under the Scheme. However, if such modifications could reasonably be expected directly or indirectly to have an adverse effect on the interests of a Scheme Creditor, then the Company may not give such consent without the prior written consent of that Scheme Creditor.

**6.    GOVERNING LAW**

This Deed and any dispute or claim (including any non-contractual disputes or claims) arising out of or in connection with it or its subject matter or formation shall be governed by, and construed in accordance with, the law of England and Wales.

**7.    JURISDICTION**

The English courts shall have exclusive jurisdiction to settle any dispute or claim (including any non-contractual disputes or claims) arising out of or in connection with this Deed or its subject matter.

## ANNEX 1

## SECURITIES CONFIRMATIONS

## PART 1

1.    **Definition**

**Relevant Person** means, in this Annex I, (1) the relevant Scheme Creditors or (2) its Nominee(s) (if appointed), as the case may be, giving the representations.

2.    **Restricted New Notes**

The Relevant Person represents and warrants to the Company, Alpha and Jersey Newco, on behalf of itself and each other person or account for which it is acting that:

(a)    It understands that the Restricted New Notes are being offered in reliance upon an exemption from, or in a transaction not subject to, registration under the Securities Act and similar provisions under state securities laws for an offer and sale by the Company not involving a public offering in the United States (the **Restricted New Notes**).

(b)    Its receipt of the Restricted New Notes is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it.

(c)    It understands that the Restricted New Notes have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States.

(d)    As a purchaser of the Restricted New Notes in a private placement not registered under the Securities Act, it is receiving Restricted New Notes for its own account, or for an account as to which it exercises sole investment discretion, for investment purposes and (subject, to the extent necessary, to the disposition of its or such discretionary accounts' property being at all times within its or their control) not with a view to any distribution or resale, directly or indirectly, in the United States or otherwise in violation of the securities laws of the United States.

(e)    It understands that the Restricted New Notes issued in reliance on Section 4(a)(2) of the Securities Act are "restricted securities" (as defined by Rule 144 under the Securities Act), and that for one year after the latest of the original issue date of the Restricted New Notes and the last date on which the issuer or any affiliate of the issuer was the owner of the Restricted New Notes, the Restricted New Notes are restricted securities, may not be offered, sold, pledged or otherwise transferred except (i) to the issuer, the guarantors or any subsidiary thereof, (ii) pursuant to a registration statement that has been declared effective under the Securities Act, (iii) for so long as the Restricted New Notes are eligible for resale pursuant to Rule 144A, to a person that it, and any person acting on its behalf, reasonably believes is a QIB purchasing for its own account or for the account of one or more QIBs to whom notice is given that the transfer is being made in reliance on Rule 144A, (iv) in an offshore transaction in accordance with Rule 903 or Rule 904 of Regulation S to a person that is not a U.S. person and that is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU (as amended, **MiFID II**); or (y) a customer within the meaning of Directive 2016/97/EU (as amended, the **Insurance Distribution Directive**), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a Qualified Investor), or (v) pursuant to an exemption

from, or in a transaction not subject to, registration under the Securities Act (if available) in each case in accordance with any applicable securities laws of the United States and any state or other jurisdiction of the United States.

(f)    It understands that no representation has been made as to the availability of any exemption under the Securities Act or any applicable securities laws of any state or other jurisdiction of the United States for the reoffer, resale, pledge or transfer of the Restricted New Notes and that, pursuant to these laws, such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

(g)    It understands that, if an exemption from registration or qualification under the Securities Act or United States federal and state securities laws is available, it may be conditional on various requirements including, but not limited to, the time and manner of sale, the holding period for the Restricted New Notes, and requirements relating to the Company which are outside of its control, and which the Company would not be under any obligation (and may not be able) to satisfy.

(h)    It understands that the transfer agent for the Restricted New Notes will not be required to accept for registration of transfer any Restricted New Notes acquired by the undersigned or any account of the undersigned, except upon presentation of evidence satisfactory to the Company, as the issuer, and the transfer agent that the foregoing restrictions on transfer have been complied with.  It will give to each person to whom it transfers the Restricted New Notes notice of any restrictions on the transfer of such Restricted New Notes.

(i)    It understands that the Restricted New Notes will bear a legend in or substantially in the following form:

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE WHICH ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY), ONLY (A) TO THE ISSUER, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (C) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT ("REGULATION S")) THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S, (D) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER

**1600**

THE U.S. SECURITIES ACT OR (E) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS WITHIN THE MEANING OF REGULATION S. THE HOLDER AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY SIMILAR TO THE EFFECT OF THIS LEGEND."

(j)     It will notify any person to whom it subsequently reoffers, resells, pledges, transfers or otherwise disposes of the Restricted New Notes of the foregoing restrictions on transfer and any certificates evidencing such securities shall contain a legend referring to such restrictions on transferability.

(k)     It acknowledges and agrees that the Restricted New Notes may be issued in a certificated registered form and that each notes certificate will bear appropriate legends.

(l)     It is a "qualified institutional buyer" as defined in Rule 144A or an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7)  of Regulation D under the Securities Act and its receipt of the Restricted New Notes is not part of a plan or scheme to evade the registration requirements of the Securities Act.

(m)     It: (i) has conducted its own investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of the Company, Alpha and Jersey Newco and their respective subsidiaries and the Restricted New Notes and, following such investigation and appraisal and the other due diligence that it deemed necessary and subsequently conducted in connection with the offering of the Restricted New Notes, it has made its own investment decision to acquire the Restricted New Notes; (ii) acknowledges that it has had the opportunity to ask and has asked queries regarding an acquisition of the Restricted New Notes, the Company, Alpha and Jersey Newco and their respective subsidiaries and affairs and the terms of the Restricted New Notes, and has received satisfactory answers from representatives of Alpha, the Company and Jersey Newco; (iii) has reviewed all information that it believes is necessary or appropriate in connection with its election to receive the Restricted New Notes; (iv) has made its own assessment and has satisfied itself concerning the relevant tax, legal, currency and other economic considerations relevant to its investment in the Restricted New Notes (and has sought such accounting, legal, tax and other advice as it has considered necessary to make an informed decision); (v) possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its prospective investment in the Restricted New Notes; (vi) understands that, in the future, the Restricted New Notes may significantly increase or decrease in value; and (vii) would be able to afford a complete loss of the value of the Restricted New Notes and would be able to bear the economic risk of holding such securities for an indefinite period.

(n)     It acknowledges that neither the Company, as the issuer, nor any of its subsidiaries, affiliates or any other person, has made any representation, warranty or undertaking (express or implied) to it with respect to the Company, the guarantors, the Restricted New Notes or the accuracy, completeness or adequacy of any financial or other information concerning the Company, the guarantors, or the Restricted New Notes, other than (in the case of the Company, the guarantors and their subsidiaries only) any representation, warranty or undertaking of the Company, the guarantors and their subsidiaries contained in this Deed.  Further, none of the Company, the guarantors and their subsidiaries or their affiliates, directors, officers, employees, agents, representatives or advisers makes any representation as to the future performance of the Company, the guarantors or any of their subsidiaries or affiliates or their respective securities, including the Restricted New Notes.

**1601**

(o)    It understands that there may be certain consequences under U.S. and other tax laws resulting from an investment in the Restricted New Notes and it has made such investigation and has consulted its own independent advisers or otherwise has satisfied itself concerning, without limitation, the effects of the U.S. federal, state and local income tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, as amended, the U.S. Investment Company Act of 1940, as amended, and the Securities Act.

(p)    It (and each other qualified institutional buyer, if any, for whose account it is receiving the Restricted New Notes), in the normal course of business, invests in or purchases securities similar to the Restricted New Notes, is aware that there are substantial risks incident to the receipt of the Restricted New Notes and has the ability to bear the economic risk of its investment in the Restricted New Notes, has adequate means of providing for its current and contingent needs, has no need for liquidity with respect to its investment in the Restricted New Notes, and is able to sustain a complete loss of its investment in the Restricted New Notes.

(q)    It satisfies any and all standards for investors making an investment in the Restricted New Notes imposed by the jurisdiction of its residence or otherwise.

(r)    It is empowered, authorised and qualified to receive the Restricted New Notes.

(s)    It understands that the foregoing representations, warranties and agreements are required in connection with U.S. securities laws and that the Company and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.  It agrees that, if any of the acknowledgements, representations and warranties made in connection with its receipt of the Restricted New Notes are no longer accurate, it will promptly, and in any event prior to the issuance of the Restricted New Notes to it, notify the Company in writing.

(t)    If it is receiving the Restricted New Notes for the account of another person, it represents that it has full power and authorisation to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

(u)    It acknowledges that the Company may request from it and/or any account for which it is acting (if any) such additional information as the Company may deem necessary to evaluate its eligibility or the eligibility of any account for which it is acting to acquire the Restricted New Notes, and may request from time to time such information as the Company may reasonably deem necessary to determine its eligibility or eligibility of any account for which it is acting to hold the Restricted New Notes or to enable the issuer to comply with applicable regulatory requirements or tax law, and it and each account for which it is acting (if any) shall use reasonable efforts to provide such information as may reasonably be requested; provided that in no event shall any purchaser be obliged to disclose the name (or any other identifying information) of its limited partners, members or shareholders.

3.    **Regulation S New Notes**

The Relevant Person represents and warrants to Alpha, the Company and Jersey Newco, on behalf of itself and each other person or account for which it is acting that:

(a)    It is, or at the time New Notes issued to such Relevant Persons under the Scheme (such New Notes, the **Regulation S New Notes**) are delivered will be, the beneficial owner of such Regulation S New Notes and (i) it is not a U.S. person and is receiving the Regulation S New Notes in an offshore transaction in accordance with Regulation S under the Securities Act and (ii) it is not an affiliate of the Company or a person acting on behalf of such an affiliate.

(b)    It represents and warrants that its receipt of the Regulation S New Notes is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if

**1602**

different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it.

(c)     It understands that such Regulation S New Notes have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States.

(d)     As a purchaser of the Regulation S New Notes not registered under the Securities Act, it is receiving Regulation S New Notes for its own account, or for an account as to which it exercises sole investment discretion, for investment purposes and (subject, to the extent necessary, to the disposition of its or such discretionary accounts' property being at all times within its or their control) not with a view to any distribution or resale, directly or indirectly, in the United States or otherwise in violation of the securities laws of the United States.

(e)     It understands that for 40 days after the latest of the original issue date of the Regulation S New Notes and the date on which the Regulation S New Notes (or any predecessors thereto) were first offered to persons other than distributors, the Regulation S New Notes may not be offered, sold, pledged or otherwise transferred except (i) to the issuer, the guarantors or any subsidiary thereof, (ii) pursuant to a registration statement that has been declared effective under the Securities Act, (iii) for so long as the Regulation S New Notes are eligible for resale pursuant to Rule 144A, to a person that it, and any person acting on its behalf, reasonably believes is a QIB purchasing for its own account or for the account of one or more QIBs to whom notice is given that the transfer is being made in reliance on Rule 144A, (iv) in an offshore transaction in accordance with Rule 903 or Rule 904 of Regulation S to a person that is a non-U.S. person and that is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a Qualified Investor), or (v) pursuant to an exemption from, or in a transaction not subject to, registration under the Securities Act (if available) in each case in accordance with any applicable securities laws of the United States and any state or other jurisdiction of the United States.

(f)     It understands that no representation has been made as to the availability of any exemption under the Securities Act or any applicable securities laws of any state or other jurisdiction of the United States for the reoffer, resale, pledge or transfer of the Regulation S New Notes and that, pursuant to these laws, such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

(g)     It understands that, if an exemption from registration or qualification under the Securities Act or U.S. federal and state securities laws is available, it may be conditional on various requirements including, but not limited to, the time and manner of sale, the holding period for the Regulation S New Notes, and requirements relating to the Company which are outside of its control, and which the Company would not be under any obligation (and may not be able) to satisfy.

(h)     It understands that the transfer agent for the Regulation S New Notes will not be required to accept for registration of transfer any Regulation S New Notes acquired by the undersigned or any account of the undersigned, except upon presentation of evidence satisfactory to the Company, as the issuer, and the transfer agent that the foregoing restrictions on transfer have been complied with.  It will give to each person to whom it transfers the Regulation S New Notes notice of any restrictions on the transfer of such Regulation S New Notes.

(i)    It and any account for which it is acting (if any) became aware of the offering of the Regulation S New Notes, and the Regulation S New Notes were offered to it and each account for which it is acting (if any), solely by means of direct contact between it and the Company as the issuer, and not by any other means. It and any account for which it is acting (if any) did not become aware of the offering of the Regulation S New Notes, and the Regulation S New Notes were not offered to it or any account for which it is acting (if any), through any directed selling efforts within the meaning of Regulation S.

(j)    It understands that the Regulation S New Notes will bear a legend in or substantially in the following form:

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE WHICH IS 40 DAYS AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE DATE ON WHICH THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY) WAS FIRST OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN RULE 902 OF REGULATION S) IN RELIANCE ON REGULATION S, ONLY (A) TO THE ISSUER, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A (C) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT ("REGULATION S")) THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S, (D) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE U.S. SECURITIES ACT OR (E) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS WITHIN THE MEANING OF REGULATION S. THE HOLDER AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY SIMILAR TO THE EFFECT OF THIS LEGEND."

(k)    It will notify any person to whom it subsequently reoffers, resells, pledges, transfers or otherwise disposes of the Regulation S New Notes of the foregoing restrictions on transfer and any certificates evidencing such securities shall contain a legend referring to such restrictions on transferability.

(l)    It acknowledges and agrees that the Regulation S New Notes may be issued in a certificated registered form and that each notes certificate will bear appropriate legends.

(m)    It is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1)

**1604**

of MiFID II; (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a Qualified Investor).

(n)     It: (i) has conducted its own investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of the Company, Alpha and Jersey Newco and their respective subsidiaries and the Regulation S New Notes and, following such investigation and appraisal and the other due diligence that it deemed necessary and subsequently conducted in connection with the offering of the Regulation S New Notes, it has made its own investment decision to acquire the Regulation S New Notes; (ii) acknowledges that it has had the opportunity to ask and has asked queries regarding an acquisition of the Regulation S New Notes, Alpha, the Company and Jersey Newco and their respective subsidiaries and affairs and the terms of the Regulation S New Notes, and has received satisfactory answers from representatives of Alpha, the Company and Jersey Newco; (iii) has reviewed all information that it believes is necessary or appropriate in connection with its election to receive the Regulation S New Notes; (iv) has made its own assessment and has satisfied itself concerning the relevant tax, legal, currency and other economic considerations relevant to its investment in the Regulation S New Notes (and has sought such accounting, legal, tax and other advice as it has considered necessary to make an informed decision); (v) possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its prospective investment in the Regulation S New Notes; (vi) understands that, in the future, the Regulation S New Notes may significantly increase or decrease in value; and (vii) would be able to afford a complete loss of the value of the Regulation S New Notes and would be able to bear the economic risk of holding such securities for an indefinite period.

(o)     It acknowledges that neither the Company, as the issuer, nor any of its subsidiaries, affiliates or any other person has made any representation, warranty or undertaking (express or implied) to it with respect to the Company, the guarantors, the Regulation S New Notes or the accuracy, completeness or adequacy of any financial or other information concerning the Company, the guarantors, or the Regulation S New Notes, other than (in the case of the Company, the guarantors and their subsidiaries only) any representation, warranty or undertaking of the Company, the guarantors and their subsidiaries contained in this Deed.  Further, none of the Company, the guarantors and their subsidiaries or their affiliates, directors, officers, employees, agents, representatives or advisers makes any representation as to the future performance of the Company, the guarantors or any of their subsidiaries or affiliates or their respective securities, including the Regulation S New Notes.

(p)     It understands that there may be certain consequences under U.S. and other tax laws resulting from an investment in the Regulation S New Notes and it has made such investigation and has consulted its own independent advisers or otherwise has satisfied itself concerning, without limitation, the effects of the U.S. federal, state and local income tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, as amended, the U.S. Investment Company Act of 1940, as amended, and the Securities Act.

(q)     It (and each other qualified institutional buyer, if any, for whose account it is receiving the Regulation S New Notes), in the normal course of business, invests in or purchases securities similar to the Regulation S New Notes, is aware that there are substantial risks incident to the receipt of the Regulation S New Notes and has the ability to bear the economic risk of its investment in the Regulation S New Notes, has adequate means of providing for its current and contingent needs, has no need for liquidity with respect to its investment in the Regulation S New Notes, and is able to sustain a complete loss of its investment in the Regulation S New Notes.

(r)     It satisfies any and all standards for investors making an investment in the Regulation S New Notes imposed by the jurisdiction of its residence or otherwise.

(s)     It is empowered, authorised and qualified to receive the Regulation S New Notes.

(t)     It understands that the foregoing representations, warranties and agreements are required in connection with U.S. securities laws and that the Company and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements. It agrees that, if any of the acknowledgements, representations and warranties made in connection with its receipt of the Regulation S New Notes are no longer accurate, it will promptly, and in any event prior to the issuance of the Regulation S New Notes to it, notify the Company in writing.

(u)     If it is receiving the Regulation S New Notes for the account of another person, it represents that it has full power and authorisation to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

(v)     It acknowledges that the Company may request from it and/or any account for which it is acting (if any) such additional information as the Company may deem necessary to evaluate its eligibility or the eligibility of any account for which it is acting to acquire the Regulation S New Notes, and may request from time to time such information as the Company may reasonably deem necessary to determine its eligibility or eligibility of any account for which it is acting to hold the Regulation S New Notes or to enable the issuer to comply with applicable regulatory requirements or tax law, and it and each account for which it is acting (if any) shall use reasonable efforts to provide such information as may reasonably be requested; provided that in no event shall any purchaser be obliged to disclose the name (or any other identifying information) of its limited partners, members or shareholders.

**4.     Restricted Jersey Newco Consideration Shares**

The Relevant Person represents and warrants to Alpha, the Company and Jersey Newco, on behalf of itself and each other person or account for which it is acting that:

(a)     It understands that the Jersey Newco Consideration Shares are being offered in reliance upon an exemption from, or in a transaction not subject to, registration under the Securities Act and similar provisions under state securities laws for an offer and sale by Jersey Newco not involving a public offering in the U.S. (the **Restricted Jersey Newco Consideration Shares**).

(b)     Its receipt of the Restricted Jersey Newco Consideration Shares is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it.

(c)     It understands that the Restricted Jersey Newco Consideration Shares have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the U.S.

(d)     As a subscriber of the Restricted Jersey Newco Consideration Shares in a private placement not registered under the Securities Act, it is receiving Restricted Jersey Newco Consideration Shares for its own account, or for an account as to which it exercises sole investment discretion, for investment purposes and (subject, to the extent necessary, to the disposition of its or such discretionary accounts' property being at all times within its or their control) not with a view to any distribution or resale, directly or indirectly, in the U.S. or otherwise in violation of the securities laws of the U.S.

(e)    It understands that the Restricted Jersey Newco Consideration Shares issued in reliance on Section 4(a)(2) of the Securities Act are "restricted securities" (as defined by Rule 144 under the Securities Act), and that for one year date after the latest of the original issue date of the Restricted Jersey Newco Consideration Shares and the last date on which the issuer or any affiliate of the issuer was the owner of the Restricted Jersey Newco Consideration Shares, the Restricted Jersey Newco Consideration Shares are restricted securities, may not be offered, sold, pledged or otherwise transferred except (i) to the issuer or any subsidiary thereof, (ii) pursuant to a registration statement that has been declared effective under the Securities Act, (iii) for so long as the Restricted Jersey Newco Consideration Shares are eligible for resale pursuant to Rule 144A, to a person that it, and any person acting on its behalf, reasonably believes is a QIB purchasing for its own account or for the account of one or more QIBs to whom notice is given that the transfer is being made in reliance on Rule 144A, (iv) in an offshore transaction in accordance with Rule 903 or Rule 904 of Regulation S that is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a Qualified Investor), or (v) pursuant to an exemption from, or in a transaction not subject to, registration under the Securities Act (if available) in each case in accordance with any applicable securities laws of the U.S. and any state or other jurisdiction of the U.S.

(f)    It understands that no representation has been made as to the availability of any exemption under the Securities Act or any applicable securities laws of any state or other jurisdiction of the U.S. for the reoffer, resale, pledge or transfer of the Restricted Jersey Newco Consideration Shares and that, pursuant to these laws, such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

(g)    It understands that, if an exemption from registration or qualification under the Securities Act or U.S. federal and state securities laws is available, it may be conditional on various requirements including, but not limited to, the time and manner of sale, the holding period for the Restricted Jersey Newco Consideration Shares, and requirements relating to Jersey Newco which are outside of its control, and which Jersey Newco would not be under any obligation (and may not be able) to satisfy.

(h)    It understands that Jersey Newco will not be required to accept for registration of transfer any Restricted Jersey Newco Consideration Shares acquired by the undersigned or any account of the undersigned, except upon presentation of evidence satisfactory to Jersey Newco that the foregoing restrictions on transfer have been complied with.  It will give to each person to whom it transfers the Restricted Jersey Newco Consideration Shares notice of any restrictions on the transfer of such Restricted Jersey Newco Consideration Shares.

(i)    It understands that, to the extent the Restricted Jersey Newco Consideration Shares are delivered in certificated form, the certificate (or the shareholder register) will bear a legend in or substantially in the following form:

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR

UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS.

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, AGREES ON ITS OWN BEHALF AND ON BEHALF OF ANY INVESTOR ACCOUNT FOR WHICH IT HAS PURCHASED SECURITIES, TO OFFER, SELL OR OTHERWISE TRANSFER SUCH SECURITY, PRIOR TO THE DATE WHICH IS ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE AND THE LAST DATE ON WHICH THE ISSUER OR ANY AFFILIATE OF THE ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF THIS SECURITY) ONLY (A) TO THE ISSUER, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE U.S. SECURITIES ACT ("RULE 144A"), TO A PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHOM NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (C) PURSUANT TO OFFERS AND SALES THAT OCCUR OUTSIDE THE UNITED STATES IN COMPLIANCE WITH REGULATION S UNDER THE U.S. SECURITIES ACT ("REGULATION S"), (D) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE U.S. SECURITIES ACT OR (E) PURSUANT TO ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS WITHIN THE MEANING OF REGULATION S. THE HOLDER AGREES THAT IT WILL GIVE TO EACH PERSON TO WHOM THIS SECURITY IS TRANSFERRED A NOTICE SUBSTANTIALLY SIMILAR TO THE EFFECT OF THIS LEGEND."

(j)    It will notify any person to whom it subsequently reoffers, resells, pledges, transfers or otherwise disposes of the Restricted Jersey Newco Consideration Shares of the foregoing restrictions on transfer and any certificates evidencing such securities shall contain a legend referring to such restrictions on transferability.

(k)    It acknowledges and agrees that the Restricted Jersey Newco Consideration Shares may be issued in a certificated registered form and that each share certificate will bear appropriate legends.

(l)    It is a "qualified institutional buyer" as defined in Rule 144A or an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) of Regulation D under the Securities Act and its receipt of the Restricted Jersey Newco Consideration Shares is not part of a plan or scheme to evade the registration requirements of the Securities Act.

(m)    It: (i) has conducted its own investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of the Company, Alpha and Jersey Newco and their respective subsidiaries and the Restricted Jersey Newco Consideration Shares and, following such investigation and appraisal and the other due diligence that it deemed necessary and subsequently conducted in connection with the offering of the Restricted Jersey Newco Consideration Shares, it has made its own investment decision to acquire the Restricted Jersey Newco Consideration Shares; (ii) acknowledges that it has had the opportunity to ask and has asked queries regarding an acquisition of the Restricted Jersey Newco Consideration Shares, the Company, Alpha and Jersey Newco and their respective subsidiaries and affairs and the terms of the Restricted Jersey Newco Consideration Shares, and has received satisfactory answers from representatives of Alpha, the Company and Jersey Newco; (iii) has reviewed all information that it believes is necessary or appropriate in connection with its election to receive the Restricted Jersey Newco Consideration Shares; (iv) has made its own assessment and has satisfied itself concerning the relevant tax, legal,

currency and other economic considerations relevant to its investment in the Restricted Jersey Newco Consideration Shares (and has sought such accounting, legal, tax and other advice as it has considered necessary to make an informed decision); (v) possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its prospective investment in the Restricted Jersey Newco Consideration Shares; (vi) understands that, in the future, the Restricted Jersey Newco Consideration Shares may significantly increase or decrease in value; and (vii) would be able to afford a complete loss of the value of the Restricted Jersey Newco Consideration Shares and would be able to bear the economic risk of holding such securities for an indefinite period.

(n)    It acknowledges that neither Jersey Newco nor any of its subsidiaries, affiliates or any other person, has made any representation, warranty or undertaking (express or implied) to it with respect to Jersey Newco, the Restricted Jersey Newco Consideration Shares or the accuracy, completeness or adequacy of any financial or other information concerning Jersey Newco or the Restricted Jersey Newco Consideration Shares, other than (in the case of Jersey Newco and its subsidiaries only) any representation, warranty or undertaking of Jersey Newco and its subsidiaries contained in this Deed. Further, none of Jersey Newco and its subsidiaries or its affiliates, directors, officers, employees, agents, representatives or advisers makes any representation as to the future performance of Jersey Newco or any of its subsidiaries or affiliates or their respective securities, including the Restricted Jersey Newco Consideration Shares.

(o)    It understands that there may be certain consequences under U.S. and other tax laws resulting from an investment in the Restricted Jersey Newco Consideration Shares and it has made such investigation and has consulted its own independent advisers or otherwise has satisfied itself concerning, without limitation, the effects of the U.S. federal, state and local income tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, as amended, the U.S. Investment Company Act of 1940, as amended, and the Securities Act.

(p)    It (and each other qualified institutional buyer, if any, for whose account it is receiving the Restricted Jersey Newco Consideration Shares), in the normal course of business, invests in or purchases securities similar to the Restricted Jersey Newco Consideration Shares, is aware that there are substantial risks incident to the receipt of the Restricted Jersey Newco Consideration Shares and has the ability to bear the economic risk of its investment in the Restricted Jersey Newco Consideration Shares, has adequate means of providing for its current and contingent needs, has no need for liquidity with respect to its investment in the Restricted Jersey Newco Consideration Shares, and is able to sustain a complete loss of its investment in the Restricted Jersey Newco Consideration Shares.

(q)    It satisfies any and all standards for investors making an investment in the Restricted Jersey Newco Consideration Shares imposed by the jurisdiction of its residence or otherwise.

(r)    It is empowered, authorised and qualified to receive the Restricted Jersey Newco Consideration Shares.

(s)    It understands that the foregoing representations, warranties and agreements are required in connection with U.S. securities laws and that Jersey Newco and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements.  It agrees that, if any of the acknowledgements, representations and warranties made in connection with its receipt of the Restricted Jersey Newco Consideration Shares are no longer accurate, it will promptly, and in any event prior to the issuance of the Restricted Jersey Newco Consideration Shares to it, notify Jersey Newco and the Company in writing.

(t)    If it is receiving the Restricted Jersey Newco Consideration Shares for the account of another person, it represents that it has full power and authorisation to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

(u)    It acknowledges that Jersey Newco may request from it and/or any account for which it is acting (if any) such additional information as Jersey Newco may deem necessary to evaluate its eligibility or the eligibility of any account for which it is acting to acquire the Restricted Jersey Newco Consideration Shares, and may request from time to time such information as Jersey Newco may reasonably deem necessary to determine its eligibility or eligibility of any account for which it is acting to hold the Restricted Jersey Newco Consideration Shares or to enable Jersey Newco to comply with applicable regulatory requirements or tax law, and it and each account for which it is acting (if any) shall use reasonable efforts to provide such information as may reasonably be requested; provided that in no event shall any purchaser be obliged to disclose the name (or any other identifying information) of its limited partners, members or shareholders.

## 5.    Regulation S Jersey Newco Consideration Shares

The Relevant Person represents and warrants to Alpha, the Company and Jersey Newco, on behalf of itself and each other person or account for which it is acting that:

(a)    It is, or at the time Regulation S Jersey Newco Consideration Shares issued to such Relevant Persons (such Regulation S Jersey Newco Consideration Shares, the **Regulation S Jersey Newco Consideration Shares**) are delivered will be, the beneficial owner of such Regulation S Jersey Newco Consideration Shares and (i) it is receiving the Regulation S Jersey Newco Consideration Shares in an offshore transaction in accordance with Regulation S under the Securities Act and (ii) it is not an affiliate of Jersey Newco or a person acting on behalf of such an affiliate.

(b)    It represents and warrants that its receipt of the Regulation S Jersey Newco Consideration Shares is lawful under the laws of the jurisdiction of its incorporation and the jurisdiction in which it operates (if different), and that such acquisition will not contravene any law, regulation or regulatory policy applicable to it.

(c)    It understands that such Regulation S Jersey Newco Consideration Shares have not been and will not be registered under the Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States.

(d)    As a subscriber of the Regulation S Jersey Newco Consideration Shares not registered under the Securities Act, it is receiving Regulation S Jersey Newco Consideration Shares for its own account, or for an account as to which it exercises sole investment discretion, for investment purposes and (subject, to the extent necessary, to the disposition of its or such discretionary accounts' property being at all times within its or their control) not with a view to any distribution or resale, directly or indirectly, in the United States or otherwise in violation of the securities laws of the United States.

(e)    It understands that no representation has been made as to the availability of any exemption under the Securities Act or any applicable securities laws of any state or other jurisdiction of the United States for the reoffer, resale, pledge or transfer of the Regulation S Jersey Newco Consideration Shares and that, pursuant to these laws, such securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available.

(f)    It understands that, if an exemption from registration or qualification under the Securities Act or U.S. federal and state securities laws is available, it may be conditional on various

**1610**

requirements including, but not limited to, the time and manner of sale, the holding period for the Regulation S Jersey Newco Consideration Shares, and requirements relating to Jersey Newco which are outside of its control, and which Jersey Newco would not be under any obligation (and may not be able) to satisfy.

(g)     It understands that Jersey Newco will not be required to accept for registration of transfer any Regulation S Jersey Newco Consideration Shares acquired by the undersigned or any account of the undersigned, except upon presentation of evidence satisfactory to Jersey Newco that the foregoing restrictions on transfer have been complied with.  It will give to each person to whom it transfers the Regulation S Jersey Newco Consideration Shares notice of any restrictions on the transfer of such Regulation S Jersey Newco Consideration Shares.

(h)     It and any account for which it is acting (if any) became aware of the offering of the Regulation S Jersey Newco Consideration Shares, and the Regulation S Jersey Newco Consideration Shares were offered to it and each account for which it is acting (if any), solely by means of direct contact between it and Jersey Newco, and not by any other means.  It and any account for which it is acting (if any) did not become aware of the offering of the Regulation S Jersey Newco Consideration Shares, and the Regulation S Jersey Newco Consideration Shares were not offered to it or any account for which it is acting (if any), through any directed selling efforts within the meaning of Regulation S.

(i)     It understands that, to the extent the Regulation S Jersey Newco Consideration Shares are delivered in certificated form, the certificate will bear a legend in or substantially in the following form:

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "U.S. SECURITIES ACT"), OR THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN THE ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION REQUIREMENTS."

(j)     It will notify any person to whom it subsequently reoffers, resells, pledges, transfers or otherwise disposes of the Regulation S Jersey Newco Consideration Shares of the foregoing restrictions on transfer and any certificates evidencing such securities shall contain a legend referring to such restrictions on transferability.

(k)     It acknowledges and agrees that the Regulation S Jersey Newco Consideration Shares may be issued in a certificated registered form and that each share certificate will bear appropriate legends.

(l)     It is not a retail investor in the European Economic Area or in the United Kingdom (defined as a person who is one (or more) of: (x) a retail client as defined in point (11) of Article 4(1) of MiFID II; (y) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (z) not a Qualified Investor).

(m)    It: (i) has conducted its own investigation and appraisal of the business, results, financial condition, prospects, creditworthiness, status and affairs of the Company, Alpha and Jersey Newco and their respective subsidiaries and the Regulation S Jersey Newco Consideration Shares and, following such investigation and appraisal and the other due diligence that it deemed necessary and subsequently conducted in connection with the offering of the

**1611**

Regulation S Jersey Newco Consideration Shares, it has made its own investment decision to acquire the Regulation S Jersey Newco Consideration Shares; (ii) acknowledges that it has had the opportunity to ask and has asked queries regarding an acquisition of the Regulation S Jersey Newco Consideration Shares, the Company, Alpha and Jersey Newco and their respective subsidiaries and affairs and the terms of the Regulation S Jersey Newco Consideration Shares, and has received satisfactory answers from representatives of Alpha, the Company and Jersey Newco; (iii) has reviewed all information if any, that it believes is necessary or appropriate in connection with its election to receive the Regulation S Jersey Newco Consideration Shares; (iv) has made its own assessment and has satisfied itself concerning the relevant tax, legal, currency and other economic considerations relevant to its investment in the Regulation S Jersey Newco Consideration Shares (and has sought such accounting, legal, tax and other advice as it has considered necessary to make an informed decision); (v) possesses such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its prospective investment in the Regulation S Jersey Newco Consideration Shares; (vi) understands that in the future, the Regulation S Jersey Newco Consideration Shares may significantly increase or decrease in value; and (vii) would be able to afford a complete loss of the value of the Regulation S Jersey Newco Consideration Shares and would be able to bear the economic risk of holding such securities for an indefinite period.

(n)     It acknowledges that neither Jersey Newco, nor any of its subsidiaries, affiliates or any other person, has made any representation, warranty or undertaking (express or implied) to it with respect to Jersey Newco, the Regulation S Jersey Newco Consideration Shares or the accuracy, completeness or adequacy of any financial or other information concerning Jersey Newco or the Regulation S New Notes, other than (in the case of Jersey Newco and its subsidiaries only) any representation, warranty or undertaking of Jersey Newco and its subsidiaries contained in this Deed.  Further, none of Jersey Newco and its subsidiaries or its affiliates, directors, officers, employees, agents, representatives or advisers makes any representation as to the future performance of Jersey Newco or any of its subsidiaries or affiliates or their respective securities, including the Regulation S Jersey Newco Consideration Shares.

(o)     It understands that there may be certain consequences under U.S. and other tax laws resulting from an investment in the Regulation S Jersey Newco Consideration Shares and it has made such investigation and has consulted its own independent advisers or otherwise has satisfied itself concerning, without limitation, the effects of the U.S. federal, state and local income tax laws and foreign tax laws generally and the U.S. Employee Retirement Income Security Act of 1974, as amended, the U.S. Investment Company Act of 1940, as amended, and the Securities Act.

(p)     It (and each other qualified institutional buyer, if any, for whose account it is receiving the Regulation S Jersey Newco Consideration Shares), in the normal course of business, invests in or purchases securities similar to the Regulation S Jersey Newco Consideration Shares, is aware that there are substantial risks incident to the receipt of the Regulation S Jersey Newco Consideration Shares and has the ability to bear the economic risk of its investment in the Regulation S Jersey Newco Consideration Shares, has adequate means of providing for its current and contingent needs, has no need for liquidity with respect to its investment in the Regulation S Jersey Newco Consideration Shares, and is able to sustain a complete loss of its investment in the Regulation S Jersey Newco Consideration Shares.

(q)     It satisfies any and all standards for investors making an investment in the Regulation S Jersey Newco Consideration Shares imposed by the jurisdiction of its residence or otherwise.

(r)     It is empowered, authorised and qualified to receive the Regulation S Jersey Newco Consideration Shares.

(s)    It understands that the foregoing representations, warranties and agreements are required in connection with U.S. securities laws and that Jersey Newco and others will rely upon the truth and accuracy of the foregoing acknowledgements, representations and agreements. It agrees that, if any of the acknowledgements, representations and warranties made in connection with its receipt of the Regulation S Jersey Newco Consideration Shares are no longer accurate, it will promptly, and in any event prior to the issuance of the Regulation S Jersey Newco Consideration Shares to it, notify Jersey Newco and the Company in writing.

(t)    If it is receiving the Regulation S Jersey Newco Consideration Shares for the account of another person, it represents that it has full power and authorisation to make the foregoing acknowledgements, representations and agreements on behalf of each such account.

(u)    It acknowledges that Jersey Newco may request from it and/or any account for which it is acting (if any) such additional information as Jersey Newco may deem necessary to evaluate its eligibility or the eligibility of any account for which it is acting to acquire the Regulation S Jersey Newco Consideration Shares, and may request from time to time such information as Jersey Newco may reasonably deem necessary to determine its eligibility or eligibility of any account for which it is acting to hold the Regulation S Jersey Newco Consideration Shares or to enable the issuer to comply with applicable regulatory requirements or tax law, and it and each account for which it is acting (if any) shall use reasonable efforts to provide such information as may reasonably be requested; provided that in no event shall any purchaser be obliged to disclose the name (or any other identifying information) of its limited partners, members or shareholders.

6.    **Other** jurisdictions

The Relevant Person (and any person acting on its behalf):

(a)    represents and warrants that if it is outside the United States, it has read the Restructuring Implementation Deed in its entirety;

(b)    represents and warrants that if it is in the United Kingdom, it has complied with its obligations in connection with money laundering and terrorist financing under the Proceeds of Crime Act 2002, the Terrorism Act 2000, the Criminal Justice Act 1993, the Money Laundering Regulations 2007 and, if it is making payment on behalf of a third party, that satisfactory evidence has been obtained and recorded by it to verify the identity of the third party as required by the regulations; and

(c)    represents and warrants that it and any person acting on its behalf falls within Section 86(7) of the Financial Services and Markets Act 2000, as amended, being a "qualified investor" within the meaning of Article (2)(e) of the Prospectus Regulation (a **Qualified Investor**), and is otherwise a person whose ordinary activities involve it in acquiring, holding, managing and disposing of investments (as principal or agent) for the purposes of its business and who has professional experience in matters relating to investments and who falls within Article 19(I) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the **Order**) or are persons who fall within Articles 49(2)(a) to (d) (**High net worth companies, unincorporated associations, etc.**) of the Order or to whom it may otherwise lawfully be communicated (all such persons together being referred to as Relevant Persons).

<div align="center">

**PART 2**

**OTHER SECURITIES LAW CONSIDERATIONS**

</div>

1. **European Economic Area and the United Kingdom**

The Restricted Jersey Newco Consideration Shares, the Restricted New Notes, the Regulation S Jersey Newco Consideration Shares and the Regulation S New Notes are not being offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area or in the United Kingdom. For these purposes, a "**retail investor**" means a person who is one (or more) of: (i) a "retail client" as defined in point (11) of Article 4(1) of MiFID II; or (ii) a customer within the meaning of the Insurance Distribution Directive, where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a Qualified Investor. Consequently, no key information document required by Regulation (EU) No 1286/2014 (as amended, the **PRIIPs Regulation**) for offering or selling the Restricted New Notes and the Regulation S New Notes or otherwise making them available to retail investors in the European Economic Area or in the United Kingdom will be prepared and therefore offering or selling the Restricted New Notes and the Regulation S New Notes or otherwise making them available to any retail investor in the European Economic Area or in the United Kingdom may be unlawful under the PRIIPs Regulation.

2. **United Kingdom only**

This Deed is only being distributed to and is only directed at Qualified Investors who are also: (i) persons who are outside the United Kingdom; (ii) persons within the definition of "Investment Professional" (as defined in Article 19(5) of the Order); (iii) persons falling within Articles 49(2)(a) to (d) of the Order; or (iv) persons to whom it may otherwise lawfully be communicated (all such persons together being referred to as **relevant persons**). The Scheme Consideration is only available to Scheme Creditors (in accordance with the terms of the Restructuring Implementation Deed) and any invitation, offer or agreement to subscribe for, purchase or otherwise acquire such Scheme Consideration will only be engaged in with relevant persons. Any invitation, offer or agreement to subscribe for, purchase or otherwise acquire such Restricted New Notes and Regulation S New Notes will only be engaged in with relevant persons. Any invitation, offer or agreement to subscribe for, purchase or otherwise acquire Restricted Jersey Newco Consideration Shares and Regulation S Jersey Newco Consideration Shares will only be engaged in with relevant persons. Any person who is not a relevant person should not act or rely on the Explanatory Statement or any of its contents.

3. **General**

The implications of the Scheme for Scheme Creditors who are resident in, have a registered address in or are citizens of and/or are taxable in jurisdictions other than the United Kingdom may be affected by the laws of the relevant jurisdiction. Such overseas Scheme Creditors should inform themselves about and observe any applicable legal requirements. Any person outside the United Kingdom who is resident in, or who has a registered address in, or is a citizen of and/or is taxable in, an overseas jurisdiction and who is to receive or subscribe for any Scheme Consideration should consult his or her professional advisers and satisfy himself or herself as to the full observance of the laws of the relevant jurisdiction in connection with the Scheme, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

In the absence of bad faith, none of Alpha, the Company, Jersey Newco, the New Trustee, the New Security Agent, the Information Agent or any person appointed to distribute the Scheme Consideration shall have any Liability for any loss or damage arising as a result of the timing or terms of such a sale or as a result of any remittance made pursuant to such distribution.

4.      **Non-Eligible Persons**

Without limiting the information set out in the "Important Securities Law Notice" section of the Explanatory Statement, the New Notes and the Jersey Newco Consideration Shares will not be issued to a Scheme Creditor (and/or if appointed, its Nominee) pursuant to the Restructuring Implementation Deed on the Restructuring Effective Date where such a Scheme Creditor (and/or its Nominee) is not an Eligible Person.

5.      **Scheme Creditor Entitlements under the Scheme**

Each Lender Scheme Creditor and/or its Nominee(s) shall be entitled to receive its Scheme Creditor Entitlements on the Restructuring Effective Date in accordance with the provisions of the Restructuring Implementation Deed, save that such Scheme Creditor Entitlements may be withheld from being distributed to a Lender Scheme Creditor (and/or its Nominee(s)) on the Restructuring Effective Date if the Information Agent does not receive a validly completed Lender Claim Form from that Lender Scheme Creditor by the Voting Instruction Deadline, being 5:00 pm (London time) on 28 October 2020 and all of the information, representations, confirmations and any other documentation required to be provided therein.

**NONE OF THE SECURITIES REFERRED TO IN THIS DEED SHALL BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.**

**IN WITNESS WHEREOF** this Deed has been executed as a deed and delivered on

_____2020 by the parties hereto.

**Lender Scheme Creditor who is an individual**

**EXECUTED** and **DELIVERED** as a **DEED** by

*Scheme Creditor*, _____ _____

                        (print name)                   (sign)

in the presence of:

*Witness[2]' signature*: _____

*Witness' name*: _____

*Witness' address*: _____


**Lender Scheme Creditor who is a corporate entity**

**EXECUTED** and **DELIVERED** as a **DEED**

for and on behalf of

*Scheme Creditor*, _____

                        (print name)

acting by:

_____ _____

            (sign)                   (sign)

            Name:                  Name:

            Title:                   Title:

in the presence of:

*Witness[3]' signature*: _____

*Witness' name*: _____

*Witness' address*: _____

---

[2] A witness may be any person over the age of 18 years
[3] A witness may be any person over the age of 18 years

**Nominee for the New Notes who is an individual**

**EXECUTED** and **DELIVERED** as a **DEED** by

*Nominated Recipient*, _____  _____

                         (print name)                     (sign)

in the presence of:

*Witness[4]' signature*: _____

*Witness' name*: _____

*Witness' address*: _____

**Nominee for New Notes who is a corporate entity**

**EXECUTED** and **DELIVERED** as a **DEED**

for and on behalf of

*Nominee*, _____

                 (print name)

acting by:

_____  _____

                (sign)                   (sign)

                Name:                Name:

                Title:                Title:

in the presence of:

*Witness[5]' signature*: _____

*Witness' name*: _____

*Witness' address*: _____

---

[4] A witness may be any person over the age of 18 years
[5] A witness may be any person over the age of 18 years

**1618**

**Nominee for Jersey Newco Consideration Shares who is an individual**

**EXECUTED** and **DELIVERED** as a **DEED** by

*Nominee*, _____  _____

               (print name)                      (sign)

in the presence of:

*Witness[6]' signature*: _____

*Witness' name*: _____

*Witness' address*: _____


**Nominee for Jersey Newco Consideration Shares who is a corporate entity**

**EXECUTED** and **DELIVERED** as a **DEED**

for and on behalf of

*Nominee*, _____

               (print name)

acting by:

_____  _____

               (sign)                    (sign)

               Name:                    Name:

               Title:                     Title:

in the presence of:

*Witness[7]' signature*: _____

*Witness' name*: _____

*Witness' address*: _____

---

[6] A witness may be any person over the age of 18 years
[7] A witness may be any person over the age of 18 years

**1619**

**Before returning this Lender Claim Form or either part of this Lender Claim Form, please make certain that you have provided all the information requested.**

**Online or PDF copies of this Lender Claim Form will be accepted and originals are not required.**

## SCHEDULE 1

## JERSEY NEWCO KYC

## 1. Company information

Each investor in Kelly Topco Limited (the "**JerseyCo**") is required to complete an application form. This form is designed to collect the information required under applicable anti-money laundering ("**AML**") legislation. As well as collecting information on the subscribing entity itself, JerseyCo will also need information on the direct owners, directors or other controllers and potentially the ultimate beneficial owners of the subscribing entity (the "**Investor**").

JerseyCo is required to comply with Jersey AML regulations. This requires JerseyCo to identify its Investors and certain parties/individuals associated with the Investor.

## 1.1 Company details

**Name of company:**

**Trading names (if applicable):**

**Former names (if applicable):**

**Registered office address:**

**Principal place of business/operations or mailing address (if different):**

**Email address:**

**Country of incorporation:**

**Date of incorporation:**

**Official identification numbers:**

**Name of regulator (if applicable):**

**Name of stock exchange (if applicable):**

**1622**

## 1.2 Source of wealth and Investor background

Please provide details of the activities that have generated the company's total net worth including the period over which the wealth was generated and the geographical sphere of such activities, including the net worth of the UBOs.

## 2. Directors

The JerseyCo is required to identify the directors of the Investor. Please complete the following for **ALL** of the Directors of the Investor:

| Name (include any former names) | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**1624**

## 3. Ownership

Please provide a structure chart showing the relationship from the Investor through to the UBOs (if any).

The JerseyCo is required to identify the ultimate beneficial owner(s) ("**UBO(s)**") of the Investor.

**Are any of the direct owners or UBO(s) of the Investor regulated or listed?**

Yes    ☐    Please complete section 3.1 or 3.2 and contact Crestbridge[(1)] at projectkelly@crestbridge.com for guidance on the requirements for that direct owner or UBO.

No    ☐    Continue Section 3.3 of the form.

### 3.1 Listed companies

Name of listed company:

Stock Exchange:

Ticker no:

### 3.2 Regulated companies

Name of regulated company:

Name of regulator:

Regulated entity no:

Regulated activities:

### 3.3 UBOs and controllers

A person is considered a UBO if they hold 25 per cent. or more of the shares in the Investor. The UBO must be an individual person. If the Investor company is widely held and there are no individual persons identified as UBOs, Jerseyco must identify any "controllers" of the Investor.

"**Controllers**" are those individual persons, other than directors, who can control the company (i.e. through shareholders' agreements, the power to appoint senior management, or through holding convertible stock or any outstanding debt that is convertible into voting rights or through personal connections, by participating in financing, because of close and intimate family relationships, historical or contractual associations or as a result of default on certain payments).

**1625**

The UBOs or Controllers of the Investor have been identified and their details included ☐
in the table below.

I/we confirm that there are no UBOs or other controllers of the Investor other than the ☐
directors detailed in section 2.

Please complete the following for **ALL** UBOs or Controllers of the Investor:

| Name (include any former names) | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## Declaration and signature

I declare that the information provided on this form is, to the best of my knowledge and belief, accurate and complete.

I further certify that:

- I am officially authorised to sign for the company to which this form relates.

- Where legally required to do so, I hereby consent to Jerseyco sharing this information with Crestbridge and the relevant authorities.

- The company, its beneficial owners, directors, controllers and third parties for whom the company is acting have no direct/indirect connection to Iran and/or North Korea.


_____           _____
Print name                                     Signature


_____
Date


_____
Capacity


**Notes**

If you have any questions on the application form or documents to be provided, please do not hesitate to contact Crestbridge:

**Email:**        **projectkelly@crestbridge.com**

**Telephone:**   +44 1534 835950

**1627**

| Limited Partnership information |
|---|

Each investor in Kelly Topco Limited (the "**JerseyCo**") is required to complete an application form. This form is designed to collect the information required under applicable anti-money laundering ("**AML**") legislation. As well as collecting information on the subscribing entity itself, JerseyCo will also need information on the direct owners, directors or other controllers and potentially the ultimate beneficial owners of the subscribing entity (the "**Investor**").

JerseyCo is required to comply with Jersey AML regulations. This requires JerseyCo to identify its Investors and certain parties/individuals associated with the Investor.

| 1.1 Limited Partnership details |
|---|

**Name of Limited Partnership:**

**Trading names (if applicable):**

**Former names (if applicable):**

**Registered office address:**

**Principal place of business/operations or mailing address (if different):**

**Email address:**

**Country of establishment:**

**Date of establishment:**

**Official identification numbers:**

**Name of regulator (if applicable):**

**Name of stock exchange (if applicable):**

**1628**

## 1.2 General Partner details

**Name of Limited Partnership's General Partner:**

**Trading names (if applicable):**

**Former names (if applicable):**

**Registered office address:**

**Principal place of business/operations or mailing address (if different):**

**Country of establishment:**

**Date of establishment:**

**Official identification numbers:**

**Name of regulator (if applicable):**

**Name of stock exchange (if applicable):**

## 1.3 Investment Manager details

**Name of investment manager:**

**Name of regulator**

**Regulated entity no:**

**Regulated activities:**

**1629**

## 1.4 Source of wealth and Investor background

Please provide details of the activities that have generated the Limited Partnership's total net worth including the period over which the wealth was generated and the geographical sphere of such activities, including the net worth of the UBOs.

## 2. Directors

The JerseyCo is required to identify the directors of the General Partner ("**GP**") (if it is a company). Please complete the following for **ALL** of the Directors of the GP or if all of the below required information is included on the GP's register of directors, please provide a copy of the current register:

| Name (include any former names) | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**1631**

## 3. Ownership

JerseyCo is required to identify the ultimate beneficial owner(s) ("**UBO(s)**") of the Investor.

A person is considered a UBO if they hold 25 per cent. or more of the shares in the Investor. The UBO must be an **individual person.** If the Investor is widely held and there are no individual persons identified as UBOs, Jerseyco must identify any "controllers" of the Investor.

"Controllers" are those **individual persons**, other than directors, who can control the company (i.e. through shareholders' agreements, the power to appoint senior management, or through holding convertible stock or any outstanding debt that is convertible into voting rights or through personal connections, by participating in financing, because of close and intimate family relationships, historical or contractual associations or as a result of default on certain payments).

| | |
|---|---|
| The UBOs or Controllers of the Investor have been identified and their details included in the table below | ☐ |
| I/we confirm that there are no UBOs or other controllers of the Investor other than the directors detailed in section 2 | ☐ |

If any of the UBO(s) or Controller(s) you identify is a company, please complete the AML Form for Companies in Section 1. However, if such corporate entity is also **regulated** or **listed** - please contact Crestbridge at **projectkelly@crestbridge.com** for guidance on the requirements.

If any of the UBO(s) or Controller(s) is an **individual person** please complete the following for **ALL** such parties:

| Name (include any former names) | Address | Date of birth | Place of birth (city and country) | Nationality/ies |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Declaration and signature

I declare that the information provided on this form is, to the best of my knowledge and belief, accurate and complete.

I further certify that:

- I am officially authorised to sign for the Limited Partnership to which this form relates.

- Where legally required to do so, I hereby consent to Jerseyco sharing this information with Crestbridge and the relevant authorities.

- The Limited Partnership, its beneficial owners, controllers and third parties for whom the Limited Partnership is acting have no direct/indirect connection to Iran and/or North Korea.


_____                  _____
Print name                                                Signature


_____
Date


_____
Capacity


## Notes

If you have any questions on the application form or documents to be provided, please do not hesitate to contact Crestbridge:

**Email:**           **projectkelly@crestbridge.com**

**Telephone:**       +44 1534 835950


12

**1633**

## APPENDIX 10

## NOTICE OF SCHEME MEETING

## NOTICE OF SCHEME MEETING

**IN THE HIGH COURT OF JUSTICE**                          **Claim No: CR-2020-003944**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**INSOLVENCY AND COMPANIES LIST (ChD)**

### IN THE MATTER OF KCA DEUTAG UK FINANCE PLC

(the **Company**)

and

### IN THE MATTER OF THE COMPANIES ACT 2006

**NOTICE IS HEREBY GIVEN** that, by an Order dated 15 October 2020 made in the above matter, the High Court of Justice of England and Wales (the **Court**) has directed that a meeting (the **Scheme Meeting**) of the Company and the Scheme Creditors (as such term is defined in the scheme of arrangement hereinafter referred to) shall be convened for the purposes of considering and, if thought fit, approving (with or without modification, addition or condition approved or imposed by the Court and agreed by the Company) a scheme of arrangement proposed in respect of the Company pursuant to Part 26 of the Companies Act 2006 (the **Scheme**) as set out in Appendix 2 (*Scheme Document*) to the statement required to be furnished to Scheme Creditors pursuant to section 897 of the Companies Act 2006 (the **Explanatory Statement**).

Unless otherwise defined, capitalised terms used in this notice shall have the meaning given to those terms in the Explanatory Statement.

**NOTICE IS HEREBY GIVEN** that the Scheme Meeting will be held via webinar on 30 October 2020 commencing at 10:30am (London time). Scheme Creditors who wish to attend the Scheme Meeting may contact the Information Agent at kcadeutag@lucid-is.com, prior to the date of the Scheme Meeting, to obtain the instructions for joining the Scheme Meeting.

1.      All Scheme Creditors as at the Record Time are requested to attend the Scheme Meeting at the time indicated above either via webinar or by proxy.

2.      Scheme Creditors may attend the webinar and vote at the Scheme Meeting or they may appoint the Chairperson or anyone else as their proxy to attend and vote in their place. Each Scheme Creditor or its proxy will be required to register his/her attendance at the Scheme Meeting prior to its commencement. Registration will commence from 9:30am (London time) on 30 October 2020.

3.      Copies of the Scheme Document, the Account Holder Letter, the Lender Claim Form and the Explanatory Statement have been made available to you online via the Scheme Website at www.lucid-is.com/kcadeutag.

4.      In order to vote on the Scheme, it is a requirement that an Account Holder Letter and/or Lender Claim Form (as applicable) be completed, signed and submitted in accordance with the procedures described in the Explanatory Statement, online via www.lucid-is.com/kcadeutag or via email in pdf form to kcadeutag@lucid-is.com by the Voting Instruction Deadline, being 5pm (London time) on 28 October 2020.

5.      The Scheme will be binding on all Scheme Creditors if:

(a)      a majority in number (above 50%) representing at least 75% of claims (agreed by the Chairperson in accordance with the value of Scheme Claims or otherwise allowed by the

Court) of the Scheme Creditors present and voting either in person or by proxy at the Scheme Meeting agrees to the Scheme;

(b)     the Court sanctions the Scheme; and

(c)     an office copy of the sanction order sanctioning the Scheme is filed with the Registrar of Companies.

6.     By the said Order, the Court has appointed Robert Ellis or, failing him, Ian Field of Allen & Overy LLP to act as chairperson of the meeting referred to above and has directed the chairperson to report the result of the meeting to the Court.

7.     The Scheme will be subject to the subsequent approval of the Court.

8.     For further information in this regard, please contact the Information Agent using the following details:

**Lucid Issuer Services Limited**
Tankerton Works
12 Argyle Walk
London WC1H 8HA
Email:          kcadeutag@lucid-is.com
Phone:         +44 (0) 207 704 0880
Attention:      Oliver Slyfield

Allen & Overy LLP
One Bishop's Square
London
E1 6AD
Solicitors for KCA Deutag UK Finance plc
Dated 15 October 2020

## APPENDIX 11

## SIMPLIFIED GROUP STRUCTURE CHART

# KCA DEUTAG – PRE-SCHEME EFFECTIVE TIME GROUP LEGAL ENTITY STRUCTURE



**1638**

**APPENDIX 12**

**SIMPLIFIED POST-RESTRUCTURED GROUP STRUCTURE CHART**



KCA DEUTAG – POST-RESTRUCTURING EFFECTIVE DATE
GROUP LEGAL ENTITY STRUCTURE

**1640**

**APPENDIX 13**

**MANAGEMENT EQUITY PLAN – SUMMARY**

**SUMMARY OF KEY INDICATIVE TERMS OF PROPOSED MANAGEMENT EQUITY PLAN**

| 1 | DEFINITIONS | |
|---|---|---|
| 1.1 | "**Company**" | Kelly Topco Limited, a private company (tax resident in the UK) incorporated in Jersey. |
| 1.2 | "**Management**" or **Managers**" | Certain managers of the Company and its subsidiaries who will receive Sweet Equity from time-to-time. |

| 2 | EQUITY STRUCTURE | |
|---|---|---|
| 2.1 | Share Capital | A ordinary shares to be held by non-Manager shareholders. |
| | | B ordinary shares and C ordinary shares to be held by Management as sweet equity (the "**Sweet Equity**"). Each B ordinary share and C ordinary share will be stapled. |
| | | The equity allocation above the Second Hurdle will be up to 5%. |
| | | The Major Shareholder Majority (as defined in the Equity Term Sheet) may approve the issue of further Sweet Equity to Management from time to time (if it determines that incentivisation of a wider management pool or incoming senior managers is required). |
| 2.2 | Voting rights | Sweet Equity to have no voting rights. Class rights of B shares and C shares may be amended by ordinary resolution of the Company (which shall not override management protections in paragraph 9.1). |
| 2.3 | Economic rights | On an Exit, proceeds (with non-cash proceeds being valued at that time and deferred proceeds being valued at the time of their actual receipt) up to the First Hurdle Amount shall be shared between the holders of the A ordinary shares pro rata. |
| | | Amounts in excess of the First Hurdle Amount shall be shared pro rata between the holders of the A ordinary shares and B ordinary shares, up to the holders of the A ordinary shares receiving the Second Hurdle Amount. |
| | | Amounts in excess of the Second Hurdle Amount shall be shared pro rata between the holders of the A ordinary shares, the B ordinary shares and the C ordinary shares. |
| | | Method of delivery of equivalent economics being discussed on a jurisdiction-by-jurisdiction basis. |

| Date of Exit | First Hurdle Amount per A ordinary share increasing on a straight line basis | Second Hurdle Amount per A ordinary share increasing on a straight line basis |
|---|---|---|
| Before 31 December 2020 | $55.00 | $80.77 |

| | | |
|---|---|---|
| On or after 31 December 2020 but before 31 December 2021 | $57.20 | $84.00 |
| On or after second anniversary but before third anniversary of acquiring relevant shares | $61.78 | $90.72 |
| On or after third anniversary but before fourth anniversary of acquiring relevant shares | $66.72 | $97.98 |
| On or after fourth anniversary of acquiring relevant shares | $72.06 | $105.82 |

2.4    "Exit"

(i) the first public offering of any class of equity securities by the Company or one of Kelly Holdco 1 Limited or Kelly Holdco 2 Limited (or a new holding company interposed for the purposes of being a successor of the Company or Kelly Holdco 1 Limited or Kelly Holdco 2 Limited) in the legal form (after conversion if necessary) that results in a listing of such class of securities on a public securities market, whether effected by way of an offer for sale, a new issue of shares, an introduction, a placing or otherwise;

(ii) a sale of all of the shares in Company or all or substantially all of the assets of the Company (directly or indirectly by way of one or a number of related transactions);

(iii) if there is an indirect sale of assets of Company (as described in subparagraph (ii)) including by way of merger, then the distribution of the proceeds of sale to the Company shareholders; or

(iv) voluntary liquidation of the Company.

2.5    Adjustment Events

The will be an appropriate adjustment (determined by the remuneration committee) to the First and Second Hurdle Amounts upon:

- any allotment or issue of ordinary shares by way of capitalisation of profits or reserves; or

- any cancellation, purchase or redemption of ordinary shares, or any reduction or repayment of ordinary shares, by the Company; or

- any split, sub-division, consolidation or redesignation of ordinary shares.

2

Further upon:

- any sale of part of the Company or its group the proceeds of which are distributed to shareholders, which does not constitute an Exit; or

- any issuance of ordinary shares to a third party (at less than their market value) as consideration, in whole or in part, for an acquisition of shares or assets,

there will be an appropriate reduction on the First and Second Hurdle Amounts to reflect the return to holders of A ordinary shares.

There will be no adjustment in respect of emergency share issues.

| | | |
|---|---|---|
| 2.6 | Management pooling | All Management will hold their securities through an offshore nominee who will vote and deal with securities in accordance with the instructions and/or recommendations of the remuneration committee (subject always to the rights of Management under the MIP and the Management protections).  The nominee will follow the relevant Manager's instructions with respect to the exercise of tag rights, pre-emptive rights and the making of permitted transfers, and will pass to the relevant Manager notices required to be given to the holder of the shares under the shareholders' agreement (including notices relating to pre-emptive rights, tag notices, drag notices and leaver notices). The costs of the establishment and running of the pooling vehicle will be for the Company.  The nominee (most likely Ocorian) will issue certificates of beneficial ownership. |
| 2.7 | Reserved shares | A proportion of the Sweet Equity will be reserved for issuance to employees and/or directors (including non-executive directors) of the group at the discretion of the remuneration committee in good faith consultation with CEO.

Shares issued to or for the benefit of employees and/or directors (including non-executive directors) will dilute all shareholders and warrant holders pro rata. |
| **3** | **LEAVER PROVISIONS** | |
| 3.1 | General | Leaver provisions will be customary for a management equity plan of this nature. |
| **4** | **TRANSFERS** | |
| 4.1 | Management permitted transfers | Management may not transfer their securities without consent of the Major Shareholder Majority, other than:

- pursuant to drag-along, tag-along or leaver provisions;

- up to 50% of the Manager's securities to current spouse or civil partner or the trustees of a family trust, but the Manager must retain control over the rights attaching to the securities (including any voting and transfer rights) and the securities must be transferred back to the Manager or transferred to another |

3

**1644**

permitted transferee of that Manager if the relevant relationship ceases; or

- to special purposes personal holding companies.

## 5    DRAG-ALONG RIGHTS

If shareholders wish to transfer more than 50% of the A ordinary shares in issue to any bona fide third party in one transaction or a series of connected transactions they can compel the other shareholders (the "**Dragged Shareholder(s)**") to sell an equal proportion of their shares on the same terms (subject to any economic terms being in accordance with the waterfall) and conditions, provided that: (i) the consideration for such shares must be in: (a) cash; or (b) marketable securities (which shall not have been suspended from trading due to fraud or deficiencies in quality of corporate governance or financial reporting of their issuer at any time within the 12 months prior to the proposed transfer) listed on an internationally recognised and reputable stock exchange (or a combination of (a) and (b)); (ii) the Dragged Shareholder(s) shall only be required to give title and capacity warranties in respect of the Shares held by them.

## 6    TAG ALONG RIGHTS

If a shareholder or shareholders propose to transfer, in one transaction or a series of connected transactions:

- more than 50% of the A ordinary shares in issue to any party;

- more than 20% of the A ordinary shares in issue to any competitor of the group; or

- such number of the A ordinary shares that results in any party (together with any affiliated shareholders) holding more than 50% of the A ordinary shares in issue, and each subsequent occasion on which that party crosses a 10% threshold (i.e. 60/70/80/90%),

each Manager shall have the right to sell, and the proposed transferee shall be required to offer to purchase:

(i) a proportionate amount of their Sweet Equity (and any A ordinary shares); or

(ii) in circumstances where, following the proposed transfer(s), the proposed transferee will hold more than 75% of the A ordinary shares in issue, all of their Sweet Equity (and any A ordinary shares),

in each case on the same terms (subject to any economic terms being in accordance with the waterfall) and conditions. Transferee may not complete triggering purchase unless tag along rights are honoured (at the same time as the main transfer).

Where the transfer occurs in a series of connected transactions, the price payable to the tagging shareholders (subject to any economic terms being in accordance with the waterfall) shall be the highest

4

price paid by the transferee in the previous 12 months (for which purposes the value of the shares acquired as part of the restructuring shall be ignored).

If a shareholder (affiliated holdings being aggregated for this purpose) obtains 90% or more of the A ordinary shares they shall be entitled to require the other shareholders to sell all their shares at a price (subject to any economic terms being in accordance with the waterfall) no lower than the highest price the acquiring party paid for shares in the preceding 12 months (for which purposes the value of the shares acquired as part of the restructuring shall be ignored).

| 7 | **EXIT PLANNING** |
|---|---|

Management to give customary cooperation in connection with Exit planning (including restructurings, rolling into new holding structures prior to Exit, etc.) and Exit, which will be controlled by the Major Shareholder Majority.

On a listing, Management to agree to a customary lock-up and other underwriting terms as reasonably determined by Company and underwriters. On any sale, Management agree to give customary business warranties subject to customary qualifications and limitations (including financial, de minimis and basket caps and time) and, on the same basis as the other sellers, a locked box covenant (if the pricing mechanism is structured as such). The non-Manager shareholders will not give any warranties beyond title to securities and capacity to sell.

| 8 | **COMPANY BOARD** |
|---|---|

Appointment rights    CEO and CFO from time to time will be appointed to sit on the Board and the audit committee and will be invited to attend meetings of the remuneration committee, save where the matter being discussed relates to either of their positions, salaries, remuneration or other benefits.

| 9 | **OTHER** |
|---|---|

**9.1**  Management protections    Manager Majority consent (being the consent of holders of >50% of the Sweet Equity) will be required to amend the economic rights of the Sweet Equity, voting, leaver, restrictive covenants, pre-emption or share transfer (including drag-along and tag-along) provisions in a manner which adversely and disproportionately affects Management or their shares when compared to its effect on the other shareholders.

**9.2**  Restrictive covenants    Management to enter into restrictive covenants in the investment agreement prohibiting them from:

- competing with the group's business for a period of 18 months following their ceasing to be an employee; and

- soliciting customers, suppliers or staff of the group for a period of 2 years following their ceasing to be an employee,

5

**1646**

such periods will be reduced by garden leave or any time spent working out notice.

| | | |
|---|---|---|
| **9.3** | Timeline | MIP subscriptions to occur on or around the scheme implementation date. |
| **9.4** | Governing law | Shareholders' agreement will be governed by English law and articles of association by Jersey law. |

This summary highlights certain key terms of the proposed management equity plan it is not intended to, nor is it to be construed as, giving rise to any legally binding obligations on any party.

6